1   LUCIA E. COYOCA (SBN 128314)
        lec@msk.com
2   VALENTINE A. SHALAMITSKI (SBN 236061)
        vas@msk.com
3   DANIEL M. HAYES (SBN 240250)
        dmh@msk.com
4   MITCHELL SILBERBERG & KNUPP LLP
    11377 West Olympic Boulevard
5   Los Angeles, CA 90064-1683
    Telephone:  (310) 312-2000
6   Facsimile:  (310) 312-3100

7   Attorneys for Plaintiffs
    Universal Cable Productions LLC and
8   Northern Entertainment Productions LLC

9               UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                    WESTERN DIVISION

12   UNIVERSAL CABLE                    CASE NO. 2:16-cv-4435-PA-MRW
     PRODUCTIONS LLC, *et al.*,
13                                      **JOINT STIPULATION RE:**
                 Plaintiffs,            **PLAINTIFFS' MOTION TO**
14                                      **COMPEL DISCOVERY**
            v.
15                                      Time:      9:30 a.m.
     ATLANTIC SPECIALTY                 Date:      April 26, 2017
16   INSURANCE COMPANY,                 Judge:     Hon. Michael R. Wilner
17               Defendant.
                                        File Date:        June 20, 2016
18                                      Discovery Cutoff:  May 12, 2017
                                        Pre-Trial Conf.:   June 16, 2017
19                                      Trial Date :       July 25, 2017

20

21

22          Pursuant to Local Rule 37-2, Plaintiffs Universal Cable Productions LLC

23   ("UCP") and Northern Entertainment Productions LLC ("Plaintiffs") and

24   Defendant Atlantic Specialty Insurance Company ("Atlantic"), hereby submit this

25   Joint Stipulation Re: Plaintiffs' Motion to Compel Discovery.

26

27

28

Mitchell
Silberberg &
Knupp LLP

# TABLE OF CONTENTS

**Page**

I.   DISCOVERY OF THE COVERAGE OPINION ATLANTIC PROCURED IN CONNECTION WITH THE *DIG* CLAIM, AND RELATED CORRESPONDENCE ............................................................ 6

    A.   The Discovery Requests And Responses ............................................. 6

    B.   Plaintiffs' Contentions And Points And Authorities ............................ 7

        1.   Brief Background ....................................................................... 8

        2.   Analysis ................................................................................... 14

        3.   Conclusion .............................................................................. 20

    C.   Atlantic's Contentions And Points And Authorities ......................... 20

        1.   Background .............................................................................. 20

        2.   Analysis ................................................................................... 22

II.   THE SUFFICIENCY OF ATLANTIC'S RESPONSES TO INTERROGATORY NOS. 3-14 ................. 32

    A.   The Discovery Requests And Responses ........................................... 32

    B.   Plaintiffs' Contentions And Points And Authorities .......................... 36

    C.   Atlantic's Contentions and Points and Authorities ........................... 38

III.   THE SUFFICIENCY OF ATLANTIC'S SEARCH FOR DOCUMENTS CONCERNING OTHER INSTANCES IN WHICH IT HAS CONSIDERED THE APPLICABILITY OF A WAR EXCLUSION TO AN INSURANCE CLAIM ............................................................................................. 40

    A.   The Discovery Requests and Responses ........................................... 40

    B.   Plaintiffs' Contentions and Points and Authorities .......................... 43

    C.   Atlantic's Contentions and Points and Authorities ........................... 46

IV.   ATLANTIC'S REFUSAL TO PRODUCE FINANCIAL DOCUMENTS RESPONSIVE TO RFP No. 25 ............................................................................................................................. 50

    A.   The Discovery Requests and Responses ........................................... 50

    B.   Plaintiffs' Contentions and Points and Authorities .......................... 50

    C.   Atlantic's Contentions and Points and Authorities ........................... 52

Mitchell
Silberberg &
Knupp LLP

---

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

## PLAINTIFFS' INTRODUCTORY STATEMENT

### *Brief Case Overview*

This is an insurance coverage action brought by Plaintiff-insureds against their production insurer, Atlantic.  In the summer of 2014, UCP was filming a new television series entitled *Dig* in Israel when Hamas (a group designated by the United States government as a terrorist organization since 1997) began launching terrorist attacks against Israel.  For the safety of cast and crew, UCP postponed the *Dig* production and ultimately moved it out of Israel.  The production was completed in Croatia and New Mexico, and Plaintiffs incurred approximately $7 million in extra expenses associated with moving the production.

On July 15, 2014 UCP submitted a claim to Atlantic (the "*Dig* Claim") under the Extra Expense coverage part of its Motion Picture/Television Producers Portfolio Policy (the "Policy").  Atlantic assigned Daniel Gutterman and Pamela Johnson to investigate Plaintiffs' claim.  A mere two days later, on July 17, 2014, Atlantic decided to deny the *Dig* Claim on the ground that the Policy's war exclusion precluded coverage.  Plaintiffs immediately challenged Atlantic's analysis, prompting Atlantic to solicit a coverage opinion from an attorney, Leon Gladstone.  After receiving Gladstone's coverage opinion, Atlantic issued its coverage denial letter, in which it stated that the decision to deny coverage was "based on … consultation with counsel."

Plaintiffs now assert two claims against Atlantic:  (1) breach of insurance contract; and (2) breach of the implied covenant of good faith and fair dealing.  With respect to the first claim, the only question is whether a coverage exclusion applies.  None do.  Significantly, losses from acts of terrorism are not excluded under the Policy.  And, Atlantic's position that the Policy's war exclusion applies is contrary to the Policy's terms, applicable law, and the foreign policy of the United States of America.  Under all applicable case law interpreting the type of war exclusion language in the Policy, in order for the exclusions to apply, Atlantic

1    must establish that the events in Israel constituted a war, or war-like activity,

2    between two sovereign or quasi-sovereign nations.  Atlantic cannot meet this

3    burden.  The U.S. government does not recognize Hamas as a sovereign

4    government or Gaza as a sovereign territorial nation, and has officially designated

5    Hamas as a terrorist organization. Therefore, Atlantic cannot establish that the

6    events in Israel fall within the ambit of the war exclusion language in the Policy.

7         As for Plaintiffs' second claim for bad faith, Plaintiffs contend, among other

8    things, that Atlantic's decision to deny the *Dig* Claim was made after a perfunctory

9    and inadequate investigation and ultimately was based on Atlantic's own financial

10   interests, not on the terms of the Policy.  Shortly after being tendered the *Dig*

11   Claim, several other unrelated losses that fell within the Policy's scope of coverage

12   were also tendered to Atlantic.  This meant that, if it covered the *Dig* Claim,

13   Atlantic would be obligated to make substantial claim payments during that 2014

14   Policy year because the self-insured retention of $3.1 million would be met.  In

15   order to avoid making those payments, Atlantic denied the *Dig* Claim.

### ***The Disputed Issues***

16

17        This discovery motion addresses the following four disputed issues:

18   **1.  Discovery of the coverage opinion Atlantic procured and related**

19        **correspondence:**  At every stage of this case, Atlantic has intentionally

20        put Gladstone's coverage opinion at issue, relying on it as evidence that

21        Atlantic investigated and denied the *Dig* Claim in good faith.  Therefore,

22        Atlantic has waived the right to withhold Gladstone's coverage opinion

23        and related correspondence on attorney-client privilege grounds.

24   **2.  The sufficiency of Atlantic's responses to Interrogatory No. 3-14:**

25        Plaintiffs contend that Atlantic's incorporation by reference of documents

26        (many of which have not been produced or even identified) and

27        deposition testimony is improper.

28

Mitchell
Silberberg &
Knupp LLP

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

3. **The sufficiency of Atlantic's search for documents concerning other instances in which it has considered the applicability of a war exclusion to an insurance claim:** Plaintiffs contend that Atlantic's refusal to search for such documents beyond July 2013 – one year prior to the date the *Dig* Claim was tendered – is improper given the aim of this discovery. Consequently, Atlantic's qualified responses to interrogatories and requests for production are incomplete.

4. **Atlantic's refusal to produce financial documents:** Plaintiffs contend that Atlantic's withholding of documents regarding the profitability of Plaintiffs as insureds, on relevance and confidentiality grounds, is improper and frivolous.

Plaintiffs respectfully request that the Court impose monetary sanctions against Atlantic in connection with this motion. Fed. R. Civ. P. 37(a)(5)(A).

The meet-and-confer requirements of Fed. R. Civ. P. 37(a)(1) and L.R. 37-1 have been satisfied. This discovery motion follows Plaintiffs' extensive good faith efforts to resolve the four disputes at issue, beginning in late November 2016 and spanning more than three months, including detailed written correspondence and several hours of telephone conferences. *See* Declaration of Daniel M. Hayes ("Hayes Decl.") ¶¶ 19-30, Exs. 18-27. Plaintiffs also asked Atlantic to participate in the Court's informal resolution procedure, but Atlantic refused to do so until its purported issues with Plaintiffs' discovery responses were ready to be discussed at the same time. This indefinite delay was unworkable given the discovery schedule, so Plaintiffs were forced to proceed with this motion in the first instance. Hayes Decl. ¶¶ 19-30, Exs. 18-27.

## ATLANTIC'S INTRODUCTORY STATEMENT

The plaintiffs' position in this case rests on the unwarranted hope that the Court will ignore the California law (California Civil Code § 1644) that words

used in insurance policies are interpreted according to their ordinary and popular sense. Because under the ordinary and popular sense of the word "war," the 50-day conflict between Israel and Palestine *was* a war. During the 50-day period, Palestinians fired thousands of rockets into Israel, and the Israeli Defense Force retaliated with airstrikes, gunboats, and a ground invasion involving infantry, tanks, armored personnel carriers and other weapons of war. The fighting killed approximately 2,200 Palestinians and 71 Israelis, displaced approximately *500,000* Gazans, and destroyed tens of thousands of homes. Media the world over referred to the destruction and bloodshed as the 50-Day War or the Gaza War. In fact, *news outlets bearing the NBC name called the conflict a war.* And politicians both in the United States and around the world, including the then Secretary of State John Kerry, referred to the conflict as a war. But for insurance purposes, the plaintiffs argue, this is all irrelevant. All that matters to them is that the United States has designated Hamas, the governing entity of the Gaza Strip in Palestine, a terrorist organization. This, they argue, means that neither Hamas, nor apparently, Palestine in general, is capable of engaging in a war, or war-like activity, or using weapons of war, all of which are exclusions under the relevant policy. The plaintiffs' approach is not only hopelessly outdated, it directly contradicts the actual historic facts, as well as the case law and statutory law that govern this case.

Moreover, even if there were a hyper-technical definition of the word "war" that applied, Atlantic's policy contains three other exclusions that apply. First, it precludes coverage for loss resulting from "War*like* action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents." Second, it bars coverage for "Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." Finally, it

precludes coverage for loss resulting from "Any weapon of war including atomic fission or radioactive force, whether in time of peace or war." To contend that the 50-Day War does not fit within any of these categories is to deny the plain English meaning of the words in Atlantic's Policy.

The plaintiffs cast Atlantic's handling of this claim as hasty and poorly reasoned. But the *true* facts paint an entirely different picture. The plaintiffs notified Atlantic of the claim on July 15, 2014. The plaintiffs demanded from the outset that Atlantic make a coverage decision immediately. Atlantic bent over backwards to accommodate this request and conducted thorough research and review to analyze what was happening in Israel and Palestine. It was clear to Atlantic from the beginning that the war exclusions presented a serious hurdle. And Atlantic's research only confirmed that the events in Israel and Palestine could hardly be characterized as anything *but* a war.  Certainly, it was war*like* action by a military force, and weapons of war (rockets, gunboats, war planes) were plainly involved, and if nothing else, Israel was certainly defending against an insurrection, rebellion, revolution, or attempt to usurp power. Atlantic therefore became confident in its analysis of the facts and unambiguous policy wording early. But it reached this decision carefully, after appropriate analysis, and internal discussions, including those of Pamela Johnson, the Assistant Vice President of Entertainment Claims for Atlantic, and Theresa Gooley, the vice president who oversaw all entertainment-related claims at Atlantic.

The plaintiffs' characterization of Atlantic's claim handling is both factually and legally faulty. The plaintiffs now take equally insupportable positions in an attempt to obtain a truly privileged legal opinion that Atlantic obtained in order to continue its claims process in deference to a request by an insured, to force Atlantic to provide an absurdly detailed response to interrogatories, to conduct a further expensive and unnecessary search for documents when the answer is known, and to divulge irrelevant financial documents when the information

1  plaintiffs want has been provided in discovery. None of these requests have merit,

2  and Atlantic respectfully requests that the Court deny each one.

3         Certainly no monetary sanctions are appropriate under these

4  circumstances.  As the discussion of each of the issues below will make clear,

5  Atlantic's good faith position on each of these issues is legally supportable and

6  correct. But even if the Court disagrees, at the very least, Atlantic's positions are

7  "substantially justified." Under Rule 37(a)(5)(A)(ii), this makes the award of

8  monetary sanctions improper. Atlantic has continued to confer with plaintiffs on

9  these issues, but resolution was not possible.  One issue involves a serious legal

10  dispute, on which a factual and legal determination of an alleged waiver of

11  attorney/client privilege is required.  Three others involve responses to discovery

12  that Atlantic has provided, where the plaintiffs, despite receiving written discovery

13  responses and documents, continue to seek even more documents, beyond a

14  reasonable limit or scope, or seek to limit Atlantic's ability to provide a full

15  interrogatory answer.  Atlantic also notes that it *was* willing to handle these issues

16  through the Court's informal resolution procedure, and was surprised to see that

17  the plaintiffs had changed their mind on this point since Atlantic merely requested

18  that (primarily for the *Court's* convenience), both parties' disputed issues be

19  presented together. Atlantic will still be seeking to submit its discovery issues to

20  the Court using its informal procedure.   Declaration of Carla C. Crapster at ¶ 9.

21

22                        **ISSUES IN DISPUTE**

23  **I.    DISCOVERY OF THE COVERAGE OPINION ATLANTIC PROCURED IN**

24         **CONNECTION WITH THE *DIG* CLAIM, AND RELATED CORRESPONDENCE**

25         **A.    The Discovery Requests And Responses**

26         This issue concerns a coverage opinion letter and related emails

27  (collectively, the "Coverage Opinion") that Atlantic has refused to produce on

28  attorney-client privilege grounds.  Submitted herewith as Exhibit 2 are those pages

1   from Atlantic's Supplemental Privilege Log that identify the documents in dispute.

2   For the Court's convenience, Plaintiffs have bracketed the rows on the log

3   corresponding to the disputed documents.

4         Atlantic does not dispute that the Coverage Opinion is responsive to

5   numerous requests for production propounded by Plaintiffs, and refuses to produce

6   the Coverage Opinion based solely on its assertion of the attorney-client privilege.

7   See Ex. 1: Atlantic's Amended Responses to First Set of Requests for Production

8   (Nos. 1, 9-14, and 18).  Accordingly, a review of the text of the requests and

9   responses is not necessary to resolve this issue, and the parties have not provided

10  the same in the body of this joint stipulation.  L.R. 37-2.1.

11        **B.**     **Plaintiffs' Contentions And Points And Authorities**

12        Plaintiffs contend that Atlantic failed to conduct a thorough and objective

13  evaluation of the *Dig* Claim, and that Atlantic's decision to deny coverage was

14  motivated by its own financial interests.  Atlantic disputes this, asserting that it was

15  compelled to deny Plaintiffs' claim based on a good faith investigation, which

16  included obtaining the Coverage Opinion from outside counsel.  Atlantic and its

17  witnesses have repeatedly relied on the Coverage Opinion as evidence that Atlantic

18  investigated and denied the *Dig* Claim in good faith.  At the same time, however,

19  Atlantic has refused to produce the Coverage Opinion on attorney-client privilege

20  grounds, thereby depriving Plaintiffs of the ability to determine whether the

21  Coverage Opinion actually supports Atlantic's arguments and the testimony of

22  Atlantic's witnesses.

23        As set forth below, Atlantic has waived the right to withhold the Coverage

24  Opinion on privilege grounds by putting it squarely at issue in this case.  In short,

25  having chosen to use the avowedly privileged Coverage Opinion as a sword to

26  establish that it acted in good faith in denying the *Dig* Claim, Atlantic has forfeited

27  the right to shield the Coverage Opinion from discovery.

28

1.   **Brief Background**

    a.   **Atlantic Procures The Coverage Opinion, And Relies On It To Deny The *Dig* Claim**

Plaintiffs tendered the *Dig* Claim on Tuesday, July 15, 2014.  Two days later, Atlantic decided to deny the claim based on a hasty (and incorrect) application of the Policy's war exclusion.  On Thursday, July 17, claims adjuster Pamela Johnson conveyed Atlantic's decision in a telephone call with Andrea Garber and Susan Weiss, representatives of Plaintiffs and Plaintiffs' insurance agent, respectively.  Ex. 15: Deposition of Theresa A. Gooley Wolf ("Gooley Depo"), 169:14-170:5; 171:20-21; 184:18-25.  Garber and Weiss immediately challenged Johnson's reasoning, asserting that because Hamas was a terrorist organization – not a sovereign – the war exclusion did not apply.  Ex.16: Deposition of Daniel Gutterman ("Gutterman Depo"), 151:5-13; 289:18-293:19; Ex.13: ATL000094-101 (July 28, 2014 Denial Letter, p.3).

Atlantic was not confident enough in its cursory two-day investigation (conducted in large part by Daniel Gutterman, a novice claims adjuster with no relevant prior experience) to rely on it in the face of Plaintiffs' challenge.  And Atlantic had no institutional knowledge or experience to turn to – before *Dig*, Atlantic had never applied a war exclusion to an insurance claim.  Ex. 6: Atlantic Response to 1st Set of  Requests for Admission (No. 26); Ex. 27: March 17, 2017 email from C. Crapster to D. Hayes. Therefore, Atlantic decided to cover itself by procuring a coverage opinion from an attorney, Leon Gladstone, in part so that Atlantic could cite the coverage opinion to Plaintiffs in its formal coverage denial letter.  *See* Ex. 17: Deposition of Peter Williams ("Williams Depo"), 219:7-13.) On Friday, July 18, Johnson and Gladstone discussed the *Dig* Claim over email. Ex. 15: Gooley Depo, 185:1-185:7;  Ex. 2: Atlantic Priv. Log, p.1.  The following Monday, July 21, Gladstone delivered the Coverage Opinion to Johnson.  *Id.*

Mitchell
Silberberg &
Knupp LLP

28

8

On Tuesday, July 22, Johnson discussed Gladstone's Coverage Opinion with her supervisor, Theresa Gooley, the vice president who oversaw all entertainment-related claims at Atlantic. Ex. 7: ATL001814 (Johnson/Gooley meeting invite). Gooley testified that she believed "the opinion consistent with everything else supported our position" and "had we found we were diametrically opposed, we may have changed our opinion." Ex. 15: Gooley Depo, 186:10-18; *see also* Ex. 7: ATL001814 (Johnson/Gooley meeting invite); Ex. 15: Gooley Depo, 171:20-172:7; 175:23-176:6.

After her meeting with Johnson, Gooley sent Gladstone's coverage opinion to her supervisor, Sean Duffy, Chief Claims Officer at Atlantic, who responded: "I agree with the analysis." Ex. 12: ATL001835-36.[1] Duffy then sent the coverage opinion to his supervisor, Dennis Crosby, who in turn sent it to his supervisor, Peter Williams, President of Claims. Ex. 10: ATL001829-31; Ex. 11: ATL001832-34. Later that afternoon, on July 22, Johnson contacted Garber and Weiss and confirmed that Atlantic's "final decision" was to deny the *Dig* Claim based on the war exclusion. Ex. 8: ATL001818-20; Ex. 13: ATL000094-101 (July 28, 2014 Denial Letter, p.1).[2]

Following the July 22 call, Johnson turned to preparing Atlantic's coverage denial letter, while continuing to discuss Gladstone's coverage opinion with him by email over the course of that week. (Johnson and Gladstone exchanged emails every day from Tuesday, July 21 to Thursday, July 24. Ex. 2: Atlantic Priv. Log., pp.1-2.) On Monday, July 28, Johnson sent Atlantic's coverage denial letter to Garber. In the first paragraph, Johnson states: "Our decision is based on

---

[1] In her email to Duffy, Gooley states: "(I am attaching the coverage analysis)". The "coverage analysis" she referred to is Gladstone's coverage letter. *See* Ex. 9: ATL001826-27 (header reference to attachment "20140721 Opn Ltr to Pamela Johnson.pdf").

[2] In the July 28, 2014 coverage denial letter, Johnson incorrectly states this conversation took place on July 21, not July 22, but the email correspondence proves otherwise. Ex. 13: ATL000094-101 (July 28, 2014 Denial Letter, p.3)

1   information gathered about the situation in Israel, case law, treatises and

2   **consultation with counsel**."  Ex. 13: ATL000094-101 (July 28, 2014 Denial

3   Letter, p.1) (emphasis added).

4            **b.**     **Atlantic Withholds The Coverage Opinion In**

5                   **Discovery, But Relies On It In Its Defense**

6         Atlantic's overt reliance on the Coverage Opinion continues in this action.

7   In its defense against Plaintiffs' bad faith claim, Atlantic has repeatedly offered the

8   Coverage Opinion as evidence of Atlantic's purported good faith.  The record is

9   replete with examples:

10                  **(i)**     **Witness Testimony**

11         Atlantic's witnesses have repeatedly cited the Coverage Opinion as proof

12   that Atlantic's investigation and evaluation of the *Dig* Claim was fulsome and

13   undertaken in good faith.

14                  **(a)**     **Daniel Gutterman**

15         Gutterman, who was responsible for adjusting the *Dig* Claim with Johnson,

16   testified that Atlantic always goes out of its way to find coverage for a claim.  Ex.

17   16: Gutterman Depo, 174:25-175:4; 175:13-14.  Plaintiffs' counsel tested this

18   professed company-wide policy, asking:  "If you thought consultation with an

19   expert would help tip the scales in favor of coverage, would you seek that

20   consultation?"  Gutterman answered:  "It was done in this claim. … **We went to**

21   **outside counsel to have them review the coverage**."  *Id.*, 182:15-183:10

22   (emphasis added).  And later, when pressed on why Atlantic did not consult with

23   an independent insurance adjuster, Gutterman answered "[w]e eventually had a

24   coverage review done by an outside attorney" (*id.*, 141:22-142:8) and "I just don't

25   know what this adjuster would do versus **what our coverage counsel did** and what

26   we did internally."  *Id.*, 186:23-188:2 (emphasis added).

27

28

Mitchell
Silberberg &
Knupp LLP

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

**(b)   Theresa Gooley**

Like Gutterman, Gooley lauded Atlantic's general approach to insurance claims:  "[W]e don't deny a claim unless we believe it's not covered. …We don't enter that decision lightly."  Ex. 15: Gooley Depo, 178:4-12.  Attempting to carry that narrative through to the *Dig* Claim, Gooley testified that "at the end of the day, **when we looked at counsel's opinion**, had it been – had we found we were diametrically opposed, we may have changed our opinion."  *Id.*, 186:10-13 (emphasis added).  "I believe the **opinion consistent with** everything else **supported our position**."  *Id.*, 186:17-18 (emphasis added).  *See also id.*, 175:23-176:6 ("We – I – I reviewed the coverage – the coverage opinion from coverage counsel along with Pamela and then we had a discussion based on everything, everything that Pamela had done, all our independent research along with we – **what coverage counsel said**, and, again, nothing changed our position with respect to the fact that we believed the matter was not covered.") (emphasis added).

**(ii)   Expert Opinion**

Atlantic has designated Anthony Clark as an expert "for the purpose of forming an opinion … regarding the denial of the claim and whether the denial of the [*Dig* Claim] by [Atlantic] would be considered reasonable given the circumstances from which the claim arose."  Ex. 14: Clark Expert Report, p.1.  In his report, Clark opines that Atlantic "properly conducted a thorough and timely investigation into the circumstances surrounding the Extra Expense claim as presented by the plaintiffs and made a reasonable determination under the terms and conditions of the applicable policy of insurance that the war exclusion applied and therefore could make no payment to the insured."  *Id.* at p.4.  According to Clark, Atlantic "took all steps that a reasonable insurer and claim handler would take to determine the pertinent facts and circumstances surrounding this claim. …

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

Mitchell
Silberberg &
Knupp LLP

1  No facts demonstrate a lack of good faith or failure on the part of Atlantic to act in

2  a reasonable fashion." *Id.* at p.11.

3      Clark expressly relies on the coverage opinion as proof of Atlantic's good

4  faith:

5          In addition to conducting its own independent analysis

6          and reaching a coverage decision … **Atlantic separately**

7          **sought legal advice by requesting a coverage opinion**

8          **to add to the overall process**.

9  *Id.* at p.9 (emphasis added).

10     In addition, Clark emphasizes that the decision to deny the *Dig* Claim

11 received supervisory approval:  "Pamela Johnson involved her supervisor [Gooley]

12 in the claim review process, and [] the ultimate decision of Atlantic was approved

13 by additional supervisory personnel within Atlantic."  *Id.*  As noted above, Johnson

14 "involved" Gooley by discussing Gladstone's coverage opinion with her.  The

15 other supervisors in the chain of command that Clark alludes to – Duffy, Crosby,

16 and Williams – approved the denial based on the coverage opinion.  *See* Ex. 12:

17 ATL001835-36; Ex. 10: ATL001829-31; Ex. 11: ATL001832-34.

18              **(iii)   Interrogatory Responses**

19     Atlantic incorporates the testimony of its three witnesses, discussed above,

20 into its responses to interrogatories such as "[s]tate all facts that ATLANTIC

21 considered in denying the DIG CLAIM."  In response to Interrogatory No. 4 –

22 "IDENTIFY all DOCUMENTS that ATLANTIC reviewed in evaluating and

23 considering the DIG CLAIM" – Atlantic specifically identified Gladstone's

24 coverage opinion, but at the same time, invoked the attorney-client privilege and

25 stated that it was not asserting "the advice of counsel defense."  Ex. 3: Atlantic's

26 Second Amended Responses to First Set of Interrogatories, 12:3-12.

27     In an effort to get clarity on what Atlantic *is* asserting, Plaintiffs propounded

28 Interrogatory No. 20:  "Does ATLANTIC contend it relied on the advice of its

Mitchell
Silberberg &
Knupp LLP

12

lawyer(s) in denying the *DIG* CLAIM?"  Ex. 5: Atlantic's Responses to Second

Set of Interrogatories, 6:26-27.  Atlantic responded obliquely:

> Atlantic objects to this interrogatory on the grounds same
> is vague and ambiguous.  As counsel for Atlantic has
> explained, as a factual matter, to counsel for the
> Plaintiffs, Atlantic obtained a coverage opinion prepared
> by Leon Gladstone and Gene Weisberg of Gladstone
> Weisberg ALC, dated July 21, 2014, prior to the issuance
> of Atlantic's letter denying the DIG CLAIM.  This
> coverage opinion was obtained after a telephone
> discussion with the insured and its broker on July 17,
> 2014, regarding the potential application of the war
> exclusion language, and the position taken in response by
> the insured.  Atlantic reviewed the coverage opinion after
> obtaining it.  Atlantic has not, however, asserted the
> advice-of-counsel defense in this case, and it does not
> intend to.  Atlantic refers to and incorporates by
> reference its pleadings on file in regard to its legal
> theories and defenses.

*Id.*, 7:2-13.

On February 23, 2017, counsel for Plaintiffs and Atlantic, respectively had a

meet-and-confer call regarding, *inter alia*, the Coverage Opinion.  Plaintiffs'

counsel asked Atlantic's counsel whether she intended to elicit testimony about

Gladstone's coverage opinion from witnesses at trial.  Atlantic's counsel refused to

answer, saying only that she would not discuss her trial strategy.  Plaintiffs'

counsel then asked Atlantic's counsel whether she intended to mention Gladstone's

coverage opinion in Atlantic's opening statement.  Atlantic's counsel again refused

to answer, saying she would not discuss her trial strategy.  Hayes Decl. ¶ 26; Ex.
24: March 2, 2017 D. Hayes/T. Reed email.

### 2. **Analysis**

#### a. **Legal Standard**

Because this Court's jurisdiction is based on diversity, state law governs
Atlantic's assertion that the coverage opinion and related correspondence fall
within the attorney-client privilege.  Evid. Code § 501.  Under California law, it is
Atlantic's burden to establish the attorney-client privilege applies.  *See, e.g., Bible
v. Rio Props., Inc.*, 246 F.R.D. 614, 620 (C.D. Cal. 2007) ("The party asserting the
privilege bears the initial burden of demonstrating that the communication falls
within the privilege.") (applying California law).  If Atlantic satisfies this burden,
the question becomes:  Has Atlantic waived the attorney-client privilege?

"[W]aiver is established by a showing that 'the client has put the otherwise
privileged communication directly at issue and that disclosure is essential for a fair
adjudication of the action.'"  *Wellpoint Health Networks v. Superior Court*, 59 Cal.
App. 4th 110, 128 (1997) (*quoting S. Cal. Gas Co. v. Pub. Utils. Com*, 50 Cal. 3d
31, 40 (1990)).  *See also Allstate Ins. Co. v. Barnett*, 2010 U.S. Dist. LEXIS
94078, at *12-13 (N.D. Cal. Sep. 9, 2010) (citing *S. Cal. Gas Co.* in support of "at
issue" waiver finding).  "The deliberate injection of the advice of counsel into a
case waives the attorney-client privilege as to communications and documents
relating to the advice."  *Handgards, Inc. v. Johnson & Johnson*, 413 F. Supp. 926,
929 (N.D. Cal. 1976).[3]

This species of implied waiver is rooted in fairness:

> The principle is often expressed in terms of preventing a
> party from using the privilege as both a shield and a

---

[3] "California law is to the same effect as federal law" regarding at issue waiver.
*Wellpoint Health Networks*, 59 Cal. App. 4th at 128.  *See also S. Cal. Gas Co.*, 50
Cal. 3d at 41-42 ("Federal courts have applied a standard similar to our own for
determining whether a party has impliedly waived a privilege.").

Mitchell
Silberberg &
Knupp LLP

1  sword. … In practical terms, this means that parties in

2  litigation may not abuse the privilege by asserting claims

3  the opposing party cannot adequately dispute unless it

4  has access to the privileged materials.  The party

5  asserting the claim is said to have implicitly waived the

6  privilege.

7  *Bittaker v. Woodford*, 331 F.3d 715, 718-19 (9th Cir. 2003) (superseded by statute

8  on other grounds).  *See Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th

9  Cir. 1992).

10  "**Even where there is no disclosure, fairness requires a waiver when the**

11  **privilege holder raises a claim or defense that puts privileged communications**

12  **at issue**."  *Apple Inc. v. Samsung Elecs. Co.*, 306 F.R.D. 234, 241 (N.D. Cal. 2015)

13  (emphasis added).  *See Wi-LAN, Inc. v. LG Elecs., Inc.*, 684 F.3d 1364, 1370 (Fed.

14  Cir. 2012) ("Even if the party does not expressly disclose the advice received, but

15  only alludes to it, the privilege can be deemed waived by implication.").

16              b.      **Atlantic Has Waived Any Attorney-Client Privilege**

17                      **Applicable To The Coverage Opinion And Related**

18                      **Correspondence**

19  Atlantic has knowingly, willfully, and repeatedly put the Coverage Opinion

20  at issue, at every stage of this case, even *after* having been warned that doing so

21  would constitute a waiver of the attorney-client privilege.

22  Atlantic first put the Coverage Opinion directly at issue by citing it in the

23  very first paragraph of the coverage denial letter, in an attempt to justify Atlantic's

24  hasty decision to deny the *Dig* Claim.  Since then, Atlantic has continued to put the

25  Coverage Opinion at issue this lawsuit.  For example, Atlantic elected to allow its

26  witnesses to testify, *inter alia*, that the Coverage Opinion was "consistent with"

27  Atlantic's investigation and "supported" Atlantic's decision to deny the *Dig* Claim.

28  Atlantic then incorporated this testimony into its interrogatory responses.  Even

Mitchell
Silberberg &
Knupp LLP

15

after Plaintiffs told Atlantic that it had waived the attorney-client privilege by putting the Coverage Opinion at issue, Atlantic chose to double down, persisting to find new ways to inject the Coverage Opinion into this case.  Specifically, Atlantic submitted the expert report of Anthony Clark, in which Clark expressly relies on the fact that Atlantic "sought legal advice" as evidence of Atlantic's purported good faith.[4]

As a result of its tactical decisions, Atlantic has made the Coverage Opinion a central and indispensable part of this case.  For example, the only way to contradict Gooley's testimony that the Coverage Opinion was "consistent with" Atlantic's investigation and "supported" Atlantic's decision to deny the *Dig* Claim is to compare that testimony to the Coverage Opinion itself.  If the Coverage Opinion is in fact *inconsistent* with Atlantic's investigation and actually *undermines* Atlantic's decision to deny the *Dig* Claim, then it would impeach Gooley's self-serving testimony and establish that Atlantic acted in bad faith.

Likewise, the only way to refute Clark's expert opinion that Atlantic exhibited good faith by relying on "legal advice" from Gladstone and securing supervisory approval for its denial decision is to see whether the Coverage Opinion actually supports Atlantic's position.  If it does not, the Coverage Opinion would provide direct evidence of Atlantic's *bad* faith, Johnson's supervisors would not have been justified in relying on it,  and Clark's conclusions would fall apart.

*Apple Inc. v. Samsung Elecs. Co.* is instructive.  In response to a charge that it had disclosed Apple's and Nokia's confidential information in violation of a protective order, Samsung referenced privileged communications to argue that the disclosure was inadvertent and that it never actually used the confidential information.  *Apple Inc.*, 306 F.R.D. at 238, 241-42.  The Court held that Samsung had thereby waived the privilege:

---

[4] By incorporating the Coverage Opinion into its expert's report well *after* Plaintiffs had already asserted "at issue" waiver, Atlantic further demonstrated the knowing and intentional nature of its conduct.  *See Apple Inc.*, 306 F.R.D. at 243.

1       Samsung put the disputed documents at issue by raising

2       affirmative defenses about inadvertence and whether

3       Nokia's confidential information actually was used. …

4       Improperly invoking  privilege as a shield and a sword,

5       Samsung's use placed the privileged information at issue

6       while improperly limiting Apple and Nokia's ability to

7       assess or challenge these assertions.  This waived

8       privilege.

9   *Id.* at 241-43 (citations omitted).  *See United States v. Amlani*, 169 F.3d 1189,

10   1195-96 (9th Cir. 1999) (party waived privilege when he asserted the

11   government's disparagement of his "chosen counsel" caused him to hire new

12   ineffective counsel.  "Simply put, [a party] cannot assert that certain factors caused

13   him to discharge his attorney and then invoke the attorney-client privilege to

14   prevent the government from examining the situation further. … In fairness, to

15   defend against these charges, the government must have access to [] 

16   communications with counsel to determine **whether in fact the disparaging**

17   **comments caused the substitution of counsel**.") (citations omitted) (emphasis

18   added).

19      In sum, the only way for Plaintiffs to test Atlantic's position that it exhibited

20   good faith by soliciting the Coverage Opinion and acting in accordance therewith

21   is to review the Coverage Opinion itself.  If it turns out the Coverage Opinion is

22   *inconsistent* with Atlantic's denial decision, then it would impeach Gooley, refute

23   Clark's expert testimony, and serve as concrete evidence of Atlantic's bad faith.

24   Under these circumstances, disclosure of the coverage opinion and related

25   correspondence is essential for a fair adjudication of this action.  *S. Cal. Gas Co.*,

26   50 Cal. 3d at 40.  *See, e.g., Spin Master, Ltd. v. Zobmondo Entm't, LLC*, 2012 U.S.

27   Dist. LEXIS 188149, at *11 (C.D. Cal. Mar. 9, 2012) ("overall fairness dictates

28   that the privilege was waived because Plaintiffs need [the] privileged information

to rebut the claim of good faith"); *Apple Inc.*, 306 F.R.D. at 241 ("'… parties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials.'") (citations omitted); *Arista Records LLC v. Lime Grp. LLC*, 2011 U.S. Dist. LEXIS 42881, at *11-*12 (S.D.N.Y. Apr. 14, 2011) ("In sum, like many other courts have found, 'it would be unfair for a party asserting contentions [of good faith] to then rely on its privileges to deprive its adversary of access to material that might disprove or undermine the party's contentions.") (citations omitted, brackets in original); *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 470 (S.D.N.Y. 1996) (party "may waive the privilege if he makes factual assertions the truth of which can only be assessed by examination of the privileged communication."); *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 259 (Del. 1995) ("Where … an insurer makes factual assertions in defense of a claim which incorporate, expressly or implicitly, the advice and judgment of its counsel, it cannot deny an opposing party 'an opportunity to uncover the foundation for those assertions in order to contradict them.'") (citations omitted).

In addition, as a practical matter, it is now impossible to untangle the Coverage Opinion from the evidence that will have to be presented to the jury at trial.  For example, the coverage denial letter, an indispensable trial exhibit, makes express reference to Atlantic's "consultation with counsel" as a basis for its decision to deny the *Dig* Claim.  Redaction at trial is not feasible because the jury might infer that Atlantic's good faith is evidenced by whatever is being hidden.  Additionally, Gooley is a Minnesota resident who is beyond the subpoena power of this Court, so the parties will need to play for the jury her deposition testimony, which is laced with repeated references to the Coverage Opinion.

Atlantic's cagey rejoinder that it "has not … asserted the advice-of-counsel defense in this case, and it does not intend to" does not change the analysis.  As an initial matter, "advice of counsel" need not be pled as an affirmative defense and is

preserved by a general denial. *State Farm Mut. Auto. Ins. Co. v. Superior Court*, 228 Cal. App. 3d 721, 725-26 (1991). Therefore, the absence of a separately delineated defense in Atlantic's answer is immaterial, and the advice of counsel defense is technically in play for trial. Indeed, when confronted with precisely this issue, Atlantic's counsel refused to foreclose the possibility that Atlantic would introduce testimony and argument regarding the Coverage Opinion at trial. *See* Section I(B)(1)(b)(iii), *supra*.

In any event, whatever nomenclature it chooses to use in describing its defense, there can be no dispute that Atlantic has purposefully injected Gladstone's legal advice into this action and fairness requires that it now be revealed. That is all that is required to find waiver. *See Olvera v. Cty. of Sacramento*, 2012 U.S. Dist. LEXIS 10842, at *8 (E.D. Cal. Jan. 27, 2012) ("Defendants argue that they have not raised an affirmative defense based on advice of counsel. Courts in other cases, however, have found implied waiver of attorney-client privilege in instances in which the magic words 'advice of counsel' are not used but where the circumstances underlying an affirmative defense necessarily rely on otherwise privileged material."); *Spin Master, Ltd.*, 2012 U.S. Dist. LEXIS 188149, at *7 (following and quoting *Olvera*: "a party need not invoke the 'magic words "advice of counsel"' when it is otherwise relying on privileged information to trigger waiver").

And "[o]nce the privilege is waived, all communications relating to the 'same subject matter' are discoverable." *In re Broadcom Corp. Secs. Litig.*, 2005 U.S. Dist. LEXIS 48549, at *7 (C.D. Cal. Apr. 7, 2005) (citations omitted); *SNK Corp. of Am. v. Atlus Dream Entm't Co.*, 188 F.R.D. 566, 571 (N.D. Cal. 1999) (citations omitted). Therefore, the coverage opinion itself and all email correspondence between Atlantic and Gladstone regarding it should be produced.

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

### 3.   Conclusion

For all the foregoing reasons, Plaintiffs respectfully request that the Court order Atlantic to produce the coverage opinion and all related correspondence, within five days of the issuance of said order.

### C.   Atlantic's Contentions And Points And Authorities

#### 1.   Background

This issue concerns plaintiffs' improper efforts to obtain (1) a coverage opinion letter from outside legal counsel to Atlantic; and (2) all communications between that outside counsel and Atlantic (collectively, the "Coverage Opinion and Communications"), which are absolutely protected by the attorney-client privilege. Atlantic has done nothing to waive such privilege, and has to the contrary continued to assert the privilege at every turn.

Plaintiffs seem to confuse two concepts: the existence of a fact—which has been stated and which has been referenced in this case (specifically the fact that an outside legal opinion was sought, in deference to a request by plaintiffs), and the intentional waiver of a known right—which has not occurred.  Reporting the fact that an outside legal opinion was obtained does not constitute a waiver of the attorney-client privilege in any regard.

Atlantic needs, first and foremost, to set the record straight on the facts. NBCU notified Atlantic of its claim on July 15, 2014. And immediately, NBCU began demanding that Atlantic provide an instantaneous coverage decision. *See* Ex. 30, Affidavit of Pamela Johnson ("Johnson Affidavit") at ¶ 5. To accommodate NBCU's insistence that Atlantic make a coverage decision immediately, Atlantic had a call with NBCU on July 17, to give them initial impressions. *Id.*  During that call, Atlantic did precisely what it should have done: it honestly represented that there was a potential problem with coverage in light of the war exclusions. *Id.* NBCU was frustrated with this response, and asked whether Atlantic had already obtained a legal opinion and suggested that Atlantic obtain a legal coverage

Mitchell
Silberberg &
Knupp LLP

20

opinion.  *Id.* at ¶¶5-6. Atlantic, in deference to the insured's insistence here, complied with this request, and again, in light of *NBCU's* insistence that Atlantic hurry, it had an attorney prepare a coverage opinion by July 21, 2014. *Id.* at ¶¶ 7-8. Unbelievably, the plaintiffs now attempt to hold *against* Atlantic its efforts to provide a coverage decision as quickly as NBCU demanded, and its steps to accommodate the additional requests made by NBCU. In light of the plaintiffs' current efforts to cast Atlantic's accommodation of *their* request as evidence of bad faith, NBCU's pleas for Atlantic to hurry now appear to be the efforts of a shrewd insured to set Atlantic up for a claim of bad faith.

The plaintiffs also make a bad misstatement of fact (with, of course, no supporting citation), when they state on page 5 of this Joint Stipulation that Atlantic was not confident in its decision and therefore decided to "cover itself" by obtaining the coverage opinion. As Ms. Johnson's attached Affidavit makes clear, this is not remotely what occurred. Instead, Atlantic *always* felt confident in its analysis, but obtained the coverage opinion because NBCU suggested it. Ex. 30: Johnson Affidavit at ¶¶ 8-9. The plaintiffs seem to bizarrely imply that Atlantic acted in bad faith by obtaining a coverage opinion at their suggestion.

The Court or jury can be the judge of what to infer from Atlantic's obtaining a coverage opinion at NBCU's suggestion, but the plaintiffs, no doubt realizing that the jury might infer that it demonstrates Atlantic was thorough and accommodating, are seeking to invade the attorney-client privilege, apparently because they believe something nefarious will be exposed.  But there is no support at all for the proposition that an insurer waives the privilege that inherently applies to the coverage opinion by merely noting its existence.  In fact, the California case law is *directly* contrary to this assertion.

2.    **Analysis**

a.    **The Coverage Opinion is Privileged**

First, as a threshold matter, the coverage opinion and all corresponding communications are attorney-client privileged communications. Pamela Johnson, the Atlantic employee who primarily corresponded with the attorneys who were preparing the coverage opinion, states the following in her attached affidavit, which definitively proves that the coverage opinion and corresponding communications are privileged:

> I was the employee at Atlantic who directly contacted attorneys Leon
> Gladstone and Gene Weisberg and asked them to prepare a coverage
> opinion on whether coverage applied to the *Dig* claim. All of the
> communications between Atlantic and Mr. Weisberg and Mr.
> Gladstone were confidential communications between Atlantic and its
> outside counsel made in confidence and were carried out by a means
> that did not disclose the information to a third person who was not
> present to further the interest of Atlantic in the consultation. In
> response to Atlantic's request, Mr. Gladstone and Mr. Weisberg
> provided confidential legal advice in regards to the issue that Atlantic
> had raised.  All of Atlantic's communications with Mr. Gladstone and
> Mr. Weisberg or their employees that concerned the *Dig* claim were
> made for the purpose of seeking and obtaining legal advice or
> otherwise concerned that legal advice.

Ex. 30: Johnson Affidavit at ¶ 11. Under California Evidence Code § 952, this is a confidential attorney-client communication.

Mitchell
Silberberg &
Knupp LLP

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

**b.     Insurers Will Be Discouraged from Obtaining Coverage Opinions if They Must Disclose Them at the First Mention of Their Existence**

The plaintiffs have not cited a *single* case suggesting that an insurance company must divulge a coverage opinion it obtains merely because it recites the fact that it obtained that coverage opinion. In fact, the case law actually supports Atlantic's position, as discussed below. But as a threshold matter of public policy, it is important to note that the law should encourage insurance companies to obtain legal coverage opinions. Those opinions allow insurers to be certain that their decisions are correct and invite thorough analysis. But insurers will be highly *dis*couraged from obtaining these opinions if the legal precedent is that they must automatically turn them, as well as all communications with their outside counsel providing the advice, over to their insureds as soon as their existence is revealed— a fact that insurers cannot keep secret as the existence of the opinion itself is not privileged. Moreover, in this case, the fact that Atlantic obtained a coverage opinion was known to NBCU from the outset because *they* requested that Atlantic obtain the opinion. They also demanded to know who provided the opinion.  Ex. 30: Johnson Affidavit at ¶ 10. According to the plaintiffs, every time Atlantic's witnesses mention this already-known fact in depositions, they somehow waive the privilege that applies to this opinion. This defies common sense and is not supported by any case law.

**c.     Atlantic's Witnesses Merely Recite the Existence of the Opinion and the Obvious Fact That Atlantic Then Considered and Relied on That Opinion**

The plaintiffs' claims that Atlantic has "injected" the content of the coverage opinion into this case are all based on nothing but mere mentions that Atlantic obtained the coverage opinion and—obviously—took the opinion into account in reaching its final decision.  The plaintiffs have elicited this testimony.

Mitchell Silberberg & Knupp LLP

23

Additionally, they demanded to know that the opinion existed and who rendered it before the lawsuit was filed.  Ex. 30: Johnson Affidavit: at ¶¶ 8-10. These matters are factual issues not protected by privilege.  The actual substance of the opinion, and all the communications with outside counsel, to the contrary, are privileged and remain privileged, even if the plaintiffs know that they exist. Atlantic has not relied on any advice-of-counsel defense.  It has never said that it made its decision solely as a result of advice of counsel. In short, it has taken no steps that result in waiver of the privilege.

The plaintiffs first cite Mr. Gutterman's deposition testimony as "evidence" of Atlantic waiving the privilege. But the only quotes that the plaintiffs are able to offer from this deposition as evidence of the so-called waiver are such earth-shattering revelations as:

- "We went to outside counsel to have them review the coverage." Ex. 16: Gutterman Depo, 183:7-8.
- [W]e eventually had a coverage review done by an outside attorney.' *Id.* at 142:7-8.

These references to the existence of the opinion are, on their face, no waiver of any privilege. Atlantic's expert witness, Anthony Clark, also mentioned Atlantic's obtaining the coverage opinion, stating that "Atlantic separately sought legal advice by requesting a coverage opinion to add to the overall process." Ex. 14: Clark Expert Report at p. 9.

Ms. Gooley also referenced the existence of the coverage opinion and stated facts that are obvious from its existence and Atlantic's decision to deny the claim after receiving the opinion: Atlantic considered the opinion and saw nothing in the opinion that changed Atlantic's mind.[5]

---

[5] The plaintiffs also fail to acknowledge that Pamela Johnson explained why she believed the war exclusions would apply before there was any legal opinion, which should make crystal clear that by discussing the analysis of the claim with the plaintiffs, Atlantic was certainly not waiving any privileged information.

Mitchell Silberberg & Knupp LLP

24

In short, none of these statements go beyond  reciting the fact that Atlantic obtained the opinion, carefully considered it, and then—as is obvious from the fact that Atlantic went on to deny coverage—did not see anything in the opinion that caused Atlantic to believe that the war exclusions did not apply. No matter what the opinion says, it will not contradict these basic facts, and these are the *only* facts that Atlantic has put into evidence. Atlantic has therefore not put the content of the coverage opinion or any communications with its outside counsel "at issue" in this case. As discussed below, under the law, this is no waiver of the privilege.[6]

### d.     The Importance of the Privilege

"The attorney-client privilege is based on grounds of public policy and is in furtherance of the proper and orderly functioning of our judicial system, which necessarily depends on the confidential relationship between the attorney and the client." *People v. Gionis*, 892 P.2d 1199, 1204-05  (Cal. 1995). "[B]y encouraging complete disclosures, the attorney-client privilege enables the attorney to provide suitable legal representation." *Id.* at 1205.  "The attorney-client privilege has been a well established part of Anglo-American jurisprudence for over 400 years [and] has been part of California statutory law in one form or another since 1851."  *S. Cal. Gas Co. v. Pub. Utils. Com*, 784 P.2d 1373, 1375 (Cal. 1990).

Because the attorney-client privilege is such a stronghold in the American legal system, "any waiver of the attorney-client privilege is to be narrowly construed." *Garcia v. Progressive Choice Ins. Co.*, 2012 U.S. Dist. LEXIS 105932, at *16 (S.D. Cal. 2012).  Moreover, "[p]rivileged communications do not become discoverable simply because they are related to issues raised in the litigation." *S.*

---

[6] The plaintiffs also strangely rely on testimony by Ms. Gooley, Mr. Gutterman, and Atlantic's expert that Atlantic had a practice of carefully considering claims and not denying coverage unless the policy truly does not provide that coverage. They also cite the fact that Atlantic involved its supervisors in the consideration of the claim. This truthful testimony, which does evidence that Atlantic took this claim seriously and did not act in bad faith, has no significance whatsoever as to whether Atlantic has deliberately put the content of the coverage opinion at issue in this case. Indeed, that testimony does not even concern the coverage opinion.

*Cal. Gas*, 784 P.2d at 1381 (Cal. 1990). Instead, the litigant must put the *substance* and *content* of the advice directly at issue in the case for the implied waiver doctrine to apply. *Rockwell Internat. Corp. v. Superior Court*, 32 Cal. Rptr. 2d 153, 161 (Cal. Ct. App. 1994).

### e.    The Case Law Demonstrates that the Substance of Atlantic's Coverage Opinion Is Not "In Issue"

The Ninth Circuit case of *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003), holds that a litigant waives the privilege by putting a lawyer's advice directly at issue in the case. As the Ninth Circuit put it, "The doctrine of waiver by implication reflects the position that the attorney-client privilege was intended as a shield, not a sword." *Id.* Here, Atlantic is not using the attorney-client privilege as a "sword." It has not asserted any claims or defenses that depend on the content of the coverage opinion that it obtained in July 2014. Atlantic is relying on the attorney-client privilege solely as a shield to protect the information included in the coverage opinion and the communications with outside counsel.

As discussed below, the plaintiffs cite only distinguishable cases. But the cases that are factually on point support Atlantic's position. One key case is *Aetna Casualty & Surety Co. v. Superior Court*, 200 Cal. Rptr. 471 (Cal. Ct. App. 1984). There, the insurer obtained a coverage opinion that supported its decision to deny coverage, but in a coverage dispute involving a claim of bad faith the insurer decided not to rely on the advice-of-counsel defense but instead to argue that it had not acted in bad faith because it believed the facts showed that its position was correct. Under these circumstances, the court held, the insurer did not waive the attorney-client privilege that protected the coverage opinion. The court noted that the insurer, Aetna, was "not saying that their conduct was reasonable *because their counsel opined so*, but rather that their conduct was reasonable because the *facts* indicated that no valid claim existed." *Id.* at 475 (emphasis in original). The court continued: "Aetna claims it acted as it did not because it was advised to do so, but

1 *because the advice was, in its view, correct*; and it is prepared to defend itself on

2 the basis of that asserted correctness rather than the mere fact of the advice. Such a

3 defense does not waive the attorney-client privilege." *Id.* This holding should close

4 the matter. Atlantic, just like *Aetna*, has not hidden that the opinion exists, but it

5 intends to defend itself from the plaintiffs' (baseless) claim of bad faith not on the

6 grounds that Atlantic obtained the coverage opinion but on the grounds that the

7 advice it received in that opinion "was, in its view, correct." As *Aetna* held in no

8 uncertain terms: "Such a defense does not waive the attorney-client privilege." *Id.*

9       California courts have held that a litigant places a privileged communication

10 "in issue," thus impliedly waiving the privilege, "*only* when the client tenders an

11 issue involving the substance or content of a protected communication. *Rockwell*,

12 32 Cal. Rptr. 2d at 161 (emphasis in original). In *Rockwell*, the court applied this

13 rule to hold: "For this reason, the doctrine has no application in a coverage action

14 between an insured and its carrier where the issues turn on the underlying facts and

15 the insured is not relying on the advice of counsel for any purpose." *Id.* This

16 holding directly supports Atlantic's position: Atlantic is not relying on the advice-

17 of-counsel defense for any purpose, and has not put the substance or content of its

18 coverage opinion "in issue."

19       In another directly relevant case, the California Supreme Court held that a

20 litigant had not waived the attorney-client privilege even after it referenced the fact

21 that it had obtained legal advice and even briefly summarized that advice to the

22 opposing party in a phone call. *S. Cal. Gas*, 784 P.2d at 1381.  The dispute in

23 *Southern California Gas* was over a long-term contract to buy gas. SoCalGas, the

24 appellant, had agreed to buy fuel from Getty Synthetic Fuels, Inc. (Getty). Years

25 after entering into this contract, SoCalGas wanted to terminate the relationship, but

26 it needed the blessing of the Public Utilities Commission. During an informal

27 phone conference  between SoCalGas and the Commission, SoCalGas stated that

28 its  attorneys had looked over the contract and found no way that SoCalGas could

Mitchell
Silberberg &
Knupp LLP

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

1   unilaterally terminate the contract without being subject to liability. The

2   Commission's staff members approved the negotiations, and SoCalGas negotiated

3   a buyout of the contract for $ 7.4 million. SoCalGas later applied for a

4   consolidated adjustment mechanism (CAM) proceeding to determine that its

5   buyout was reasonable. The Commission requested discovery of documents with

6   any legal analyses regarding the early termination of the Getty contract. SoCalGas

7   identified 15 confidential memos written by its attorneys, but refused to disclose

8   them on grounds of the attorney-client privilege. Critically, SoCalGas stated that it

9   would *not rely on advice of counsel* as a justification for its decision to buy out the

10   Getty contract. *Id.* at 1375. After the presiding administrative judge nonetheless

11   ordered SoCalGas to produce the documents for an in camera review, SoCalGas

12   appealed.

13       The Supreme Court of California reversed, holding that SoCalGas had not

14   impliedly waived the privilege. It reasoned:

15       SoCalGas has done nothing in the present proceedings to place in

16       issue its privileged communications. Nowhere in its CAM application

17       or in the proceedings before the commission does SoCalGas state that

18       it intends to rely on its attorneys' advice or state of mind to

19       demonstrate that it acted reasonably when it bought out the Getty

20       contract. It has expressly stated otherwise. Because its attorneys'

21       advice or state of mind is not in issue, it has not impliedly waived its

22       attorney-client privilege.

23   *Id.* at1379. The court found distinguishable all the other cases the Commission

24   cited, noting that they involved scenarios where the "client has placed in issue the

25   *decisions, conclusions, and mental state of the attorney who will be called as a*

26   *witness to prove such matters*." *Id.* at 1380 (emphasis in original) (quoting *Mitchell*

27   *v. Superior Court*, 691 P.2d 642 (Cal. 1984)). SoCalGas did not place those

28   decisions or mental processes at issue, and neither has Atlantic.

Mitchell
Silberberg &
Knupp LLP

28

Also legally incorrect is the plaintiffs' argument that Atlantic has *effectively* asserted the advice-of-counsel advice by referencing the coverage opinion it obtained. *Fed. Ins. Co. v. Superior Court*, No. G047825, 2013 Cal. App. LEXIS 1092, at *4-5 (Cal. Ct. App. May 2, 2013). There, court stated: "Merely relying on coverage counsel's advice … does not constitute assertion of the 'advice of counsel' defense." The court stated: "Petitioner did not assert the 'advice of counsel' defense in its answer, *and specifically denied any reliance on that defense in an interrogatory response*." *Id.* This was enough to persuade the court that the insurer was not relying on that defense, and this is precisely what Atlantic has done. Just like the insurer in *Federal Insurance Company*, Atlantic merely references the existence of the coverage opinion. This is *not* tantamount to the assertion of the advice-of-counsel defense.

There is good reason to hold that merely obtaining and reviewing a coverage opinion is not equivalent to asserting the advice-of-counsel defense—that defense truly *does* put the advice directly at issue. To successfully rely on this defense, the insurer must show that the attorney did advise the insurer to deny coverage, that the insurer gave the attorney all the relevant facts needed to analyze coverage, that the insurer was not legally knowledgeable enough to question the analysis, and that the insurer was willing to reconsider when it found out the advice was wrong. *T.G.S. Transp., Inc. v. Canal Ins. Co.*, No. CV-F-00-6797 REC SMS, 2004 U.S. Dist. LEXIS 31284, at *18 (E.D. Cal. June 7, 2004). These elements obviously depend on what the insurer communicated to the attorney and what the attorney communicated back. But as Atlantic has stated repeatedly—including in its sworn interrogatory responses—it is *not* asserting this defense. Ex. 5: Atlantic's Responses to Second Set of Interrogatories, at p. 7. To confirm: Atlantic has never and will never rely on the advice-of-counsel defense in this case.

In short, under the case law that is actually on point, it is clear that Atlantic has not waived the attorney-client privilege by merely obtaining a coverage

1  opinion and referencing its existence and reviewing it as a part of its claims

2  process. To hold otherwise would be to completely undermine the basis for the

3  attorney-client privilege, and to completely gut an insurer's ability to obtain legal

4  advice as a part of its claims process.

5         **f.**  **The Plaintiffs' Cases Are All Distinguishable**

6     The cases the plaintiffs cite as support for their contention that Atlantic

7  waived the privilege as to the coverage opinion all involve situations in which the

8  outcome depended on the *content* of the advice. The plaintiffs first cite *Handgards,*

9  *Inc. v. Johnson & Johnson*, 413 F. Supp. 926 (N.D. Cal. 1976). In that case, the

10  plaintiffs alleged that the defendants had accumulated patents relating to plastic

11  gloves, knowing that these patents were invalid, and had then brought infringement

12  actions based on those invalid patents. The defendant, Johnson & Johnson, made

13  clear that they intended to call as witnesses three lawyers who were primarily

14  responsible for prosecuting these infringement suits. The court ruled that if these

15  lawyers were going to testify as witnesses *about the prosecution of the patent suits*,

16  then the defendant's communications with those lawyers were no longer

17  privileged. The court held: "By putting their lawyers on the witness stand in order

18  to demonstrate that the prior lawsuits were pursued on the basis of competent legal

19  advice and were, therefore, brought in good faith, defendants will waive the

20  attorney-client privilege …." *Id.* at 929. This case is clearly distinguishable. The

21  testimony of the attorneys about their prosecution of the patent suits was directly at

22  issue in that case. Here, however, the substance of the coverage opinion that

23  Atlantic obtained in July 2014 is not in issue, and Atlantic has not placed it in

24  issue.  Atlantic has made clear that it is not relying on the "advice of counsel"

25  defense, and none of its other defenses relate to the content of the coverage

26  opinion. Atlantic's pleadings on file and discovery responses confirm these points.

27  Atlantic is not calling its outside counsel as a fact witness in this case.

28

Mitchell
Silberberg &
Knupp LLP

30

1    The plaintiffs also cite *Apple Inc. v. Samsung Electronics Co.*, 306 F.R.D.

2   234 (N.D. Cal. 2015). This case is completely inapposite. Samsung argued in that

3   case that the privileged communications demonstrated that no one at Samsung had

4   deliberately disclosed confidential information. *Id.* at 242. There was no way to

5   evaluate this claim without knowing what the privileged communications stated.

6   Here, on the other hand, as stated above, nothing that the coverage opinion says

7   can change the fact that Atlantic obtained the opinion and reviewed it. Atlantic has

8   *not* put the substance of the opinion at issue. Atlantic performed its own

9   independent analysis, as demonstrated by Pamela Johnson's discussion with the

10  insured before obtaining the opinion.

11    The plaintiffs also rely on *United States v. Amlani*, 169 F.3d 1189 (9th Cir.

12  1999). There, the appellant contended the government had deprived him of his

13  right to counsel by disparaging the attorney he had, which caused him to let that

14  attorney go. To support this claim, the appellant argued: "Before those disparaging

15  remarks, I had a high opinion of Mr. Katz, . . . and I intended to hire him for . . .

16  trial." *Id.* at 1195. The court held that "[t]o defend against this contention, the

17  government must have access to communications that describe events surrounding

18  Katz's initial withdrawal from representing Amlani." Here again, only the

19  substance of what was in the privileged communication could resolve the claim at

20  hand: whether Mr. Katz's withdrawal resulted from the government's disparaging

21  remarks.  This is distinguishable for the reasons discussed above.

22    *All* the plaintiffs' cases are distinguishable on these same grounds. The

23  plaintiffs cannot cite a single case that actually supports their position because no

24  such case exists. Instead, the case law Atlantic discusses above resolves the matter

25  decisively in Atlantic's favor.

26

27

28

Mitchell
Silberberg &
Knupp LLP

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

II.   **THE SUFFICIENCY OF ATLANTIC'S RESPONSES TO INTERROGATORY NOS. 3-14**

A.   **The Discovery Requests And Responses**

The full text of the discovery at issue is voluminous and not necessary for resolution of this issue, which concerns language that is repeated in the same or substantially similar form throughout Atlantic's responses to Nos. 3-14.  Therefore, for the Court's convenience, the parties include only the text of the Interrogatory No. 3 and Atlantic's response, which exemplifies the issue in dispute.  L.R. 37-2.1.

**Interrogatory No. 3**

State all facts which ATLANTIC considered in denying the *DIG* CLAIM.

**Response to Interrogatory No. 3**

Atlantic considered, in denying the *DIG* CLAIM, all of the facts and information that it received from the Plaintiffs, as well as the facts revealed by its own investigation of the *DIG* CLAIM and independent research.  With regard to its investigation, Atlantic refers to and incorporates the documents it has produced in this case, and further incorporates and refers to the documents identified in the documents it has produced in this case, as the response to this interrogatory may be determined by examining those documents, and the burden of ascertaining such response is substantially the same for the Plaintiffs as it would be for Atlantic.  Atlantic also refers to, relies upon, and incorporates herein the testimony of Peter Williams, Danny Gutterman, and Theresa Gooley, each of whom testified to what they relied upon in considering the *DIG* CLAIM.  Additionally, in further answer to this interrogatory, Atlantic considered the following facts:

    a.  The facts set forth in the December 2, 2010 Congressional Research Service Report entitled "Hamas: Background and Issues for Congress," which was authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Representatives of Atlantic, including at least Pamela Johnson, reviewed that report. Ms. Johnson,

who is no longer employed by Atlantic, was prepared to testify more specifically as to what she had relied upon in this report before her deposition was unilaterally cancelled by the Plaintiffs. Among other things, Atlantic believes Ms. Johnson, on behalf of Atlantic, relied upon the entirety of the report, including but not limited to, the fact that Hamas was identified in that Report as a religious and political organization and the Report's statement that, since June 2007, Hamas has had control over the Gaza Strip, that Hamas governs the Gaza strip, and that Hamas has a "military wing." Atlantic also relied on the timeline included in this Report, which sets forth a long history of the key dates in Hamas's history and its many conflicts with Israel, several of which are referred to as wars.

b. The statement by Israeli President Benjamin Netanyahu, as reported in the news, that Israel would use "full force" against militants in Gaza.

c. The statement by Israeli President Benjamin Netanyahu, as reported in the news, that "Hamas chose to continue fighting and will pay the price for that decision … When there is no cease-fire, our answer is fire."

d. A report by the Washington Post stating that: Israel had struck at least 25 targets inside Gaza, including the home of a senior Hamas leader Mahmoud Al Zahar; Hamas militants had fired at least 13 rockets into southern Israel; Israel's "Iron Dome," an air-defense system that exists to deflect weapons fired from Palestine, was deflecting fire from Gaza; Israel had announced plans for a ground attack on Gaza; Israel dropped leaflets into Gaza warning the population to evacuate; Israel had invaded Gaza with tanks and gunboats.

e. Several sources, in particular, Black's Law Dictionary, The Dictionary of International and Comparative Law, and the Handbook

of Humanitarian Law in Armed Conflicts, define "war" as including any hostile conflict by means of armed forces between nations, states, or rulers, or even between two "parties." Atlantic quoted these definitions on page 6 of its July 28, 2014 denial letter to Andrea Garber.

f. Hamas was the governing authority over the Gaza Strip in July 2014 and had a military wing known as the Qassam Brigades, as well as a police force, a security force, and intelligence personnel.

g. In several news articles published in July 2014 by MSNBC and in television reports that appeared on the news channel MSNBC (which is an affiliate of NBC Universal), the Israeli-Palestinian "conflict" in 2014 was referred to as a "war."

h. Reported events and details of actions that occurred during June and July 2014, as reported in various news sources, including but not limited to CBS news videos and MSNBC videos, articles, and features, including direct clashes of armed forces from opposing sides of the war, gunfights, firing of long-range rockets, rocket attacks into Tel Aviv, Jerusalem, and/or Southern Israel, planning for a ground incursion, a ground campaign, war planes, gunboats, mutual exchange of air strikes, rejection of a proposed cease fire, and injuries and deaths in Israel, Palestine, Gaza City, and/or the Gaza Strip, and comments from Israel regarding its intentions.

i. Hamas militants stated on al-Aqsa TV that Hamas was firing rockets in response to "Israeli aggression against Palestinians in the West Bank, Jerusalem and Gaza." According to news reports, the statement was issued in the name of the Qassam Brigades and laid out four conditions for a ceasefire: ending all action in Jerusalem and the West Bank, ending the fire on and siege of Gaza, releasing all the prisoners

1     who were re-arrested in the Israeli operation launched on June 12,

2     2014, after the disappearance of three Israeli settlers and the ceasing

3     of "meddling" in the Palestinian Unity government.

4    j. Moussa Abu Marzouk, a top Hamas official, stated, as reported in a

5     news article:  "There should be a new equation so that we will not

6     have a war on Gaza every two years."

7    k. The word "militants" is used to describe Hamas forces in various

8     news articles (identified in response to Interrogatory No. 4 below) and

9     the Congressional Reports identified in subparts (a) and (b) of this

10     response to Interrogatory No. 3.

11    l. Hamas spokesman Sami Abu Zuhri stated, as reported in a news

12     article: "There will be no truce without an end to the war that the

13     Occupation (Israel) began, a lifting of the blockade and a halt to all

14     violations and killings in Gaza and the West Bank."

15    m. Facts learned through research of Hamas and Palestine, and Hamas's

16     ongoing conflicts and prior wars with Israel, including operations,

17     official positions held, and capabilities, which research included

18     review of primary sources discussing Hamas and Palestine, as listed in

19     "Hamas," appearing in Wikipedia

20     (http://en.wikipedia.org/wiki/Hamas) as it existed on July 16, 2014, as

21     well as a review of multiple news reports referring to the war between

22     Israel and Palestine, including print reports as well as news reports by

23     MSNBC and CBS.

24 Additionally, other employees of Atlantic, including at least Pamela Johnson,

25 conducted other internet research into Hamas and its relationship with Israel, and

26 events occurring during the summer of 2014, the details of which are not currently

27 known to Atlantic.

28

Mitchell
Silberberg &
Knupp LLP

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

B.     **Plaintiffs' Contentions And Points And Authorities**

Plaintiffs object to Atlantic's *en masse* incorporation by reference of thousands of documents – many of which have never been produced or even specifically identified – and voluminous deposition testimony in response to interrogatories designed to narrow the issues for trial.

The interrogatories at issue ask Atlantic to identify the specific facts and documents it considered in denying the *Dig* Claim, the steps it took to investigate the claim, and the facts that support its contention that various policy terms exclude the loss at issue from coverage.  Atlantic's responses state, in pertinent part:

> Atlantic **refers to and incorporates the documents it has produced in this case, and further incorporates and refers to the documents identified in the documents it has produced in this case**, as the response to this interrogatory may be determined by examining those documents, and the burden of ascertaining such response is substantially the same for the Plaintiffs as it would be for Atlantic.  Atlantic also **refers to, relies upon, and incorporates herein the testimony of Peter Williams, Danny Gutterman, and Theresa Gooley**, each of whom testified to what they relied upon in considering the *DIG* CLAIM.

Ex. 3: Atlantic's Second Amended Responses to First Set of Interrogatories, 5:19-27 (emphasis added).

During the parties' February 23, 2017 meet-and-confer call on this issue, Atlantic took its "incorporation by reference" strategy a step further, when Atlantic's counsel explained that Atlantic was also relying on an unknown number of **documents referenced in footnotes in the "documents identified in the**

Mitchell
Silberberg &
Knupp LLP

36

1  **documents it has produced in this case**."  Hayes Decl. ¶ 26; Ex. 24: March 2,

2  2017 D. Hayes/T. Reed email.

3     Atlantic's "incorporation by reference" strategy is improper and a

4  transparent attempt to sandbag Plaintiffs at trial.  "The purpose of interrogatories is

5  … **to narrow the issues to be tried**."  *Anderson v. Fresno Cty.*, 2007 U.S. Dist.

6  LEXIS 49879, at *7 (E.D. Cal. June 28, 2007) (emphasis added).  *See also Cable*

7  *& Comput. Tech. v. Lockheed Saunders*, 175 F.R.D. 646, 650 (C.D. Cal. 1997)

8  ("Generally, the purpose of discovery is to remove surprise from trial preparation

9  so the parties can obtain evidence necessary to evaluate and resolve their

10  dispute."); 7 *Moore's Federal Practice*, § 33.03 (Matthew Bender 3d Ed.) ("By

11  narrowing the issues, interrogatories reduce the possibility of surprise.").

12     Accordingly, Atlantic "was required to respond to each interrogatory

13  'separately and fully' **without incorporating other documents**."  *Asyst Techs.,*

14  *Inc. v. Empak, Inc.*, 2006 U.S. Dist. LEXIS 20129, at *17 (N.D. Cal. Mar. 31,

15  2006) (emphasis added).  *See also, e.g., Tumbling v. Merced Irrigation Dist.*, 2010

16  U.S. Dist. LEXIS 101404, at *57-58 n.9 (E.D. Cal. Sep. 27, 2010) ("Rule 33

17  requires that each interrogatory must be responded to 'separately and fully.'  An

18  answer to an interrogatory should be complete in itself and should not refer to the

19  pleadings, or to depositions or other documents, or to other interrogatories.

20  Incorporation by reference is an improper form of answer.") (citations omitted).[7]

21     By purporting to preserve the right to introduce virtually any unspecified

22  fact or document at trial, Atlantic attempts to turn the well-accepted purpose of

23  interrogatories on its head by erasing the evidentiary boundaries interrogatory

24

25

---

26  [7] And as Plaintiffs' counsel explained during the February 23 meet-and-confer call,
   Atlantic's assertion that the burden of ascertaining its response from documents

27  and testimony "is substantially the same for the Plaintiffs as it would be for
   Atlantic" is frivolous.  Of course, only *Atlantic* knows what steps it took to

28  investigate the *Dig* Claim, what documents it considered, and what facts support its
   contentions.  Ex. 24: March 2, 2017 D. Hayes/T. Reed email.

Mitchell
Silberberg &
Knupp LLP

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

1  responses are supposed to create, and attempting to position itself so that it may

2  ambush Plaintiffs at trial with as yet unspecified facts and documents.

3       Therefore, Plaintiffs respectfully request that the Court order Atlantic to

4  serve an amended response to the interrogatories at issue, omitting its

5  incorporation by reference, within five days of the issuance of said order.

6           **C.**     <u>**Atlantic's Contentions and Points and Authorities**</u>

7       The particular interrogatory cited by plaintiffs asks Atlantic to "*state all*

8  *facts* which Atlantic considered in denying the Dig claim." Ex. 3: Atlantic's

9  Second Amended Responses to First Set of Interrogatories , at p. 5. The various

10  other interrogatories for which plaintiffs seek relief state similarly broad questions.

11  *Id.* at Interrogatories No. 4-14 (all of which address separate subject matters).

12  Atlantic objected to Interrogatory No. 3 and the other interrogatories on the

13  grounds that each  interrogatory is overly broad and unduly burdensome. To

14  attempt to state all facts would be a time-consuming process and would improperly

15  require Atlantic to include incidental, secondary, and perhaps irrelevant and trivial

16  details. Such an exercise would also be quite difficult to fully execute from

17  memory, thus making reference to the supporting documentation appropriate.

18  Nevertheless, Atlantic *has* provided a lengthy and comprehensive answer to the

19  plaintiffs' interrogatories. Atlantic spent a great deal of time attempting to

20  overcome these obstacles of memory and  the sheer volume of relevant documents,

21  and it created a detailed list of facts, (a) through (m) in response to Interrogatory

22  No. 3 and (a) through (ll) in response to most others.  *Id.* at p. 49-56. That Atlantic

23  *also*, for completeness, referred the plaintiffs to and incorporated deposition

24  testimony and the claim-related documents that it had heavily relied upon was

25  certainly not improper.

26       Put another way, Atlantic responded substantively to each interrogatory by

27  listing all the *material* facts it considered in denying the Dig claim. Indeed, as

28  noted above, Atlantic included a lengthy list of the principal facts in its response to

the interrogatory. This is what the law requires. An interrogatory requiring a party to "state all facts" is deemed a contention interrogatory. "Contention interrogatories are often overly broad and unduly burdensome when they require a party to state 'every fact' or 'all facts' supporting identified allegations or defenses." *Mancini v. Ins. Corp.*, No. 07-cv-1750-L(NLS), 2009 U.S. Dist. LEXIS 51321, *9 (S.D. Cal. June 18, 2009); *see also Romero v. Macy's, Inc.*, No. 15-cv-815-GPC-MDD, 2016 U.S. Dist. LEXIS 123439, *7-8 (S.D. Cal. Sept. 12, 2016) ("Courts will generally find contention interrogatories overly broad and unduly burdensome on their face to the extent they ask for 'every fact [or 'all facts'] which support identified allegations or defenses"); *Haggarty v. Wells Fargo Bank, N.A.*, No. 10-cv-02416, 2012 U.S. Dist. LEXIS 133375, *5 (N.D. Cal. Sept. 18, 2012) (Court found contention interrogatory overly broad where interrogatory used the terms "all," "any" and "each.").

Accordingly, where a contention interrogatory requires a party to "state all facts," stating only the material or principal facts is a sufficient response. In an interrogatory request, "all facts" are construed "as those facts which are *material*." *Folz v. Union Pac. R.R. Co.*, No. 13-cv-00579-GPC-(PCL), 2014 U.S. Dist. LEXIS 15020, *7-8 (S.D. Cal. Jan. 29, 2014) (*emphasis added*); *see also In re Questcor Pharms, Inc.*, No. SACV-12-1623-DMG (JPRx), 2014 U.S. Dist. LEXIS 190264, *4 (C.D. Cal. Nov. 18, 2014) (Where an overly broad interrogatory requested "all facts," the court limited the response to only material facts); *Hernandez v. Best Buy Co.*, No. 13-cv-2587-JM(KSC), 2014 U.S. Dist. LEXIS 152117, *16-17 (S.D. Cal. Oct. 24, 2014) (*quoting Hiskett v. Wal-Mart Stores*, No. 97-2480-EEO, 180 F.R.D. 403, 404-05 (D. Kan. 1998)) ("Interrogatories may, however, properly ask for the principal or material facts which support an allegation or defense"); *Mancini*, 2009 U.S. Dist. LEXIS 51321 at *3 (court modified multiple interrogatories to seek "the material or principal facts" instead of "all facts.").

Because Atlantic already provided the plaintiffs with material facts it has identified that it considered in denying the *Dig* claim, and with all material facts responsive to the other interrogatories, an amended response to the interrogatories is unnecessary. It is therefore absurd for the plaintiffs to assert any surprise or to contend that the issues have not been narrowed through Atlantic's responses. Atlantic's inclusion of the material facts it considered in denying coverage, as well as its reference to documents that are the claim-related written evidence, removes surprise and narrows the issues for trial considerably. In fact, including only the material facts rather than "all facts" assists the plaintiffs to narrow what sources and materials Atlantic relied on, rather than analyzing every fact considered whether incidental or trivial.

The reference to the claim materials produced provides more, not less, information to plaintiffs.  The plaintiffs can see the titles of articles, features, research, and sources because they are reflected on the claim documents produced. It would not be appropriate to force Atlantic to remove any references to documents or testimony already provided, as those are further demonstrable sources of the information.

**III.    THE SUFFICIENCY OF ATLANTIC'S SEARCH FOR DOCUMENTS CONCERNING OTHER INSTANCES IN WHICH IT HAS CONSIDERED THE APPLICABILITY OF A WAR EXCLUSION TO AN INSURANCE CLAIM**

### A.    The Discovery Requests and Responses

Here again, the text of all of the discovery at issue is voluminous and not necessary for resolution of this issue, which is the same across Atlantic's responses to Interrogatory Nos. 15 and 16, and Request for Production Nos. 1, 6, 7, 9, 11, 13, and 22.  Therefore, for the Court's convenience, the parties include only the text of Request for Production No. 1 and Atlantic's response, which is exemplary.  L.R. 37-2.1.

Mitchell
Silberberg &
Knupp LLP

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

1  **Request for Production No. 1**

2  All of YOUR files, including file jackets and labels, and all other

3  DOCUMENTS that RELATE to:

4      a.  The POLICY;

5      b.  The DIG INSURED PRODUCTION;

6      c.  The DIG CLAIM (including, but not limited to, its receipt,

7         investigation, evaluation, consideration, and denial); and

8      d.  The WAR EXCLUSION.

9  **Response to Request for Request for Production No. 1**

10  Atlantic objects to this Request to the extent it seeks documents that are

11  protected from disclosure by the attorney-client privilege or work-product doctrine,

12  or which were prepared in anticipation of litigation or for trial. Privileged

13  documents are outside the scope of discovery permitted under Rule 26 of the

14  Federal Rules of Civil Procedure. As required by Rule 34(b)(2)(C), Atlantic states

15  that documents responsive to this Request that are protected from disclosure by the

16  attorney-client privilege or work-product doctrine, or that were prepared in

17  anticipation of litigation or for trial, are being withheld from production.

18  Privileged documents relating to this claim that are being withheld are listed on the

19  Privilege Log previously provided to Plaintiffs' counsel or will be included on a

20  Supplemental Privilege Log (except for those documents covered by the parties'

21  agreement described on pages 2-3 of this Response that certain categories of

22  documents need not be included on Atlantic's privilege logs). Atlantic's documents

23  that are responsive to this Request and concern this claim, and which are not

24  privileged, have been, or will be, produced.

25  Atlantic further objects to this Request to the extent that it seeks information

26  that is outside the scope of discovery permitted under Rule 26 of the Federal Rules

27  of Civil Procedure.  In particular, the definition of "WAR EXCLUSION" in the

28  Request includes not only the particular war exclusion in the POLICY but also any

1  similar exclusion in other policies.  Documents relating to other policies or claims

2  is not relevant to either party's claims or defenses and is not proportional to the

3  needs of this case, considering the importance of the issues at stake in the action,

4  the amount in controversy, the parties' relative access to relevant information, the

5  parties' resources, the importance of the discovery in resolving the issues, and the

6  burden and expense of the proposed discovery, which greatly outweighs its likely

7  benefit, if any.  To find all documents responsive to this Request would be

8  extremely burdensome, and Atlantic would have to manually locate and review

9  each policy it has issued that may contain this particular exclusion and any related

10  claim files.

11      Nonetheless, to avoid a discovery dispute, Atlantic further responds as

12  follows: Thus far, Atlantic has not located any other claim in which it denied the

13  claim in whole or in part on the basis of the WAR EXCLUSION. As counsel for

14  Atlantic has stated in discussions with counsel for Plaintiffs, Atlantic has reviewed

15  more than 36,000 documents identified in a search of its document management

16  and e-mail system. One of the search terms used in the search that returned these

17  documents was "war." That search looked for documents and e-mails dating back

18  to July 2013. Atlantic can now confirm that it has identified no documents

19  suggesting that any claims were denied on the basis of the WAR EXCLUSION.

20  Atlantic, and its Informational Technology department in particular, have

21  represented that a broader search that would encompass all e-mails and documents

22  without any date restrictions would be nearly impossible. In lieu of searching for

23  the WAR EXCLUSION in each and every one of the many millions of documents

24  and e-mails that Atlantic and OneBeacon have generated over the course of their

25  existences, Atlantic has made inquiries with its employees who oversee, and

26  former employees who previously oversaw, the claims handling for the

27  entertainment division of Atlantic and with employees of OneBeacon who oversee

28  claims for all of OneBeacon's divisions. Those persons do not recall any claims

Mitchell
Silberberg &
Knupp LLP

42

1   that Atlantic denied on the grounds that the WAR EXCLUSION applied. Those

2   persons also do not recall any claims in which Atlantic considered the potential

3   applicability of the WAR EXCLUSION or any part thereof but ultimately paid the

4   claim despite the potential applicability of the WAR EXCLUSION. Atlantic has,

5   however, found one e-mail that an employee of Atlantic, Daniel Gutterman, sent to

6   himself, that concerns another claim, and which quotes the various policy

7   language, including its WAR EXCLUSION. There are no other documents

8   suggesting that the WAR EXCLUSION was considered any further in connection

9   with that claim. This one e-mail is being produced as Bates No. ATL000785 -

10  ATL000788.

11          **B.**      **Plaintiffs' Contentions and Points and Authorities**

12          Various interrogatories and requests for production require Atlantic to

13  investigate whether it has ever considered applying a war exclusion to deny an

14  insurance claim, other than in connection with the *Dig* Claim.  In its most recent

15  discovery responses, Atlantic states that, in an effort to respond, it interviewed its

16  employees and "looked for documents and e-mails dating back to July 2013."  Ex.

17  1: Atlantic's Amended Responses to First Set of Requests for Production, 4:22-

18  5:16.[8]  Atlantic's search for documents going back merely to July 2013 – one year

19  prior to the date the *Dig* Claim was tendered – is inadequate given the aim of this

20  discovery.

21          First, Atlantic's application of the war exclusion in the context of other

22  policies/claims will shed light on Atlantic's understanding of the exclusion and of

23  the way words such as "war" are used in the insurance industry.  Atlantic has

24  advanced an expansive definition that simply does not comport with the way "war"

25  is understood in the insurance industry or the way it is interpreted by courts.

26  Plaintiffs are entitled to documents that would disclose whether this understanding

27  _____

28  [8] *See also* Ex. 3: Atlantic's Second Amended Responses to First Set of
    Interrogatories, 81:22-84:6; Ex. 6: Atlantic's Responses to First Set of Requests for
    Admissions, 11:25-15:6.

Mitchell
Silberberg &
Knupp LLP

43

is consistent with the way Atlantic has applied the war exclusion to prior insurance claims.  *See Young v. Liberty Mut. Ins. Co.*, 1999 U.S. Dist. LEXIS 6987, at *15-16 (D. Conn. Feb. 16, 1999) (affirming Magistrate Judge order granting motion to compel production of documents related to claims of nonparty policyholders – "To facilitate a full understanding of the meaning of an insurance policy's terms, **many courts have allowed discovery of … other insureds' claims**.") (citations omitted) (emphasis added).

Second, Atlantic's prior experience applying war exclusions (or lack thereof) is relevant to adjudicating whether Atlantic's quick and cursory examination of the *Dig* Claim was sufficient to satisfy its duty to investigate and evaluate the claim thoroughly, objectively, and in good faith.  Atlantic's decision to deny the *Dig* Claim after an expedited two-day investigation is even more unreasonable if Atlantic had no prior experience applying the war exclusion.

Atlantic cannot dispute the relevance of this discovery and, other than a boilerplate objection in its written responses, has not attempted to do so.  Instead, Atlantic has argued that the inquiry it has conducted to date was reasonable, and that expanding its search to January 1, 2001 (the scope required by the discovery) would be too burdensome.

Atlantic's undue burden claim is suspect given the sophisticated e-discovery search tools available today and the fact that Atlantic has an electronic claims management system.[9]  Nevertheless, Atlantic's imposition of an arbitrary *one-year* look-back limit on its search – lopping off 12 years of requested information – bears no logical relationship to the purpose of this discovery or the purported burden to Atlantic.  It is also inconsistent with Atlantic's response to Request for Production No. 21, in which it agreed to produce, *inter alia*, all documents that

---

[9] As the party resisting discovery, Atlantic has the burden "to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections."  *Bible*, 246 F.R.D. at 618 (citing *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975)).

Mitchell
Silberberg &
Knupp LLP

relate to its "procedures in assessing, handling, or addressing insured's claims pursuant to commercial insurance policies" for the time period "January 1**, 2010** through the present."  Ex. 1: Atlantic's Amended Responses to First Set of Requests for Production, 26:13-27:5.

In an effort to compromise and avoid this discovery motion, on March 16, 2017, Plaintiffs proposed that Atlantic choose one of two solutions:  (1) expand the scope of its search to January 1, **2010**; or (2) admit that, with the exception of the *Dig* Claim and one other claim in which Atlantic noted the war exclusion and quickly dismissed it as inapplicable, Atlantic has never considered applying a war exclusion to deny an insurance claim.[10]  Ex. 27: March 17, 2017 email C. Crapster/D. Hayes.  Plaintiffs still do not have an answer to their proposal. Instead, Atlantic's counsel continues to emphasize the ill-defined burden associated with any additional searching, while asserting that such efforts would be superfluous:

> Such a search will obviously be extremely expensive and
> **completely unnecessary**, given that we have inquired of
> the people who have worked in Atlantic Entertainment's
> claim department since 2010, and OneBeacon's chief
> claims officer who has held that role since April 2010,
> whether they recall any claims involving the war
> exclusion – a memorable issue – and they have all said
> no.

Ex. 27: March 17, 2017 email C. Crapster/D. Hayes (emphasis added).

---

[10] Requests for admission on this issue have been propounded.  *See* Ex. 4: Plaintiffs' Second Set of Requests for Admission, Nos. 34 ("Admit that, prior to the DIG CLAIM, ATLANTIC had never considered the application of a WAR EXCLUSION to an insurance claim other than the PUBLICIS CLAIM") and 35 ("Admit that, with the exception of the DIG CLAIM and the PUBLICIS CLAIM, ATLANTIC has never considered the application of a WAR EXCLUSION to an insurance claim.")

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

1    Plaintiffs cannot have it both ways.  Either:  (1) Atlantic has performed a

2    reasonable Rules-compliant inquiry and can admit that it has never before

3    considered a war exclusion (with one potential but inconsequential exception); or

4    (2) Atlantic has not performed an adequate inquiry, in which case additional efforts

5    are required to respond to the interrogatories and requests for production at issue in

6    this motion (and related requests for admissions).  But Atlantic cannot

7    simultaneously refuse to perform a reasonable search *and* preserve its right to

8    introduce evidence of its prior consideration of a war exclusion at trial.

9    Plaintiffs respectfully request that the Court order Atlantic to either:

10   (1) expand its search to include documents and information dating back to

11   January 1, 2010, as opposed to July 2013, and to supplement or amend (as

12   necessary) its responses to the interrogatories and requests for production at issue

13   accordingly; or (2) provide unqualified admissions to Plaintiffs' Request for

14   Admission Nos. 34 and 35 (*see* n. 8, *supra*).  *Asea, Inc. v.  Southern Pacific*

15   *Transp. Co.*, 669 F.2d 1242, 1425 (9th Cir. 1981) ("[A] district court may, under

16   proper circumstances and in its discretion, order admitted matters which an

17   answering party has failed to admit or deny, **where the information known or**

18   **readily obtainable after reasonable inquiry was sufficient to enable the**

19   **answering party to admit or deny**.") (emphasis added)).

20   ## C.    Atlantic's Contentions and Points and Authorities

21   First and foremost, the plaintiffs neglect to mention that in an e-mail sent by

22   Atlantic's counsel on March 17, 2017, Atlantic offered to conduct the search that

23   the plaintiffs purport to request (dating back to January 2010), if the plaintiffs

24   would fund the search. Ex. 31: E-mail Dated March 17, 2017; Declaration of

25   Carla C. Crapster at ¶ 4. As Atlantic stated in the above-quoted response to

26   Request for Production No. 1, Atlantic ran an extensive and *expensive* search to

27   find the documents it has already produced in this case. Declaration of Carla C.

28   Crapster at ¶ 3. In late 2016, in order to answer the Request, it ran a search for key

Mitchell
Silberberg &
Knupp LLP

46

terms, including the word "war," that dated back to July 2013. *Id.* This search resulted in approximately 36,000 documents, and it took six attorneys several weeks to comb through these documents, log the privileged or protected ones, and identify those that should be produced. *Id.* Needless to say, this resulted in a large bill to Atlantic. Moreover, it took approximately thirty days for Atlantic's internal technology department to even run the search before the documents could be provided to Atlantic's counsel. *Id.* It is a lengthy and difficult process to search a database as large as Atlantic's.[11] It is misleading for the plaintiffs to categorize Atlantic's search as going back just one year, because Atlantic also searched from July 2013 through the date of the search (late last year). Though Atlantic's search went *back* only one year in time from the *Dig* claim, it also looked for all claims *since* then, and the plaintiffs were obviously every bit as interested in those claims as the ones preceding the *Dig* claim. *Id.* Atlantic's search thus encompassed approximately three-and-a-half years.

Because Atlantic and its counsel know—having just completed the process of searching for documents over a three-and-a-half-year period—how lengthy and expensive it will be to search for *another* three-and-a-half-year period from January 2010 through July 2013, when the plaintiffs' counsel complained that the search was not extensive enough, Atlantic instead identified all employees of Atlantic who could possibly have knowledge of any claims that Atlantic had handled in which the war exclusion came up. Ex. 3: Atlantic's Second Amended Responses to First Set of Interrogatories, at p. 82. As the plaintiffs will surely agree, war is thankfully rare enough in today's world, particularly in the context of insurance policies in the United States, that insurers rarely have cause to invoke war exclusions. When such an exclusion is relevant, it makes the claim far more

---

[11] The plaintiffs have no reason to be "suspect" of this fact, particularly not in light of their assertions, in response to Atlantic's request for documents supporting the plaintiffs' claim for damages, that it would be nearly impossible to gather all supporting documentation and that Atlantic should foot the bill for *that* search. Declaration of Carla C. Crapster at ¶ 6.

1   memorable than most. Atlantic therefore felt comfortable that its inquiry of

2   employees, who were the persons who would have full knowledge, was a more

3   than reasonable way to obtain the information the plaintiffs sought.

4        The plaintiffs are apparently still not satisfied. But they have not responded

5   to Atlantic's offer to conduct the search if the plaintiffs will fund it. Declaration of

6   Carla C. Crapster at ¶¶4-5. Atlantic remains willing to do so.

7        The plaintiffs' suggestion that Atlantic should admit to never having

8   considered the "war exclusion" is not tenable. To respond to a request for

9   admission is to "conclusively establish" a fact. Fed. R. Civ. Proc. 36. Atlantic

10  cannot state with *absolute certainty* that it has *never* considered the war exclusion.

11  To begin with, the request for such an admission goes much farther back in time

12  than the proposed request for production (which asks that Atlantic search back to

13  2010). Admitting to this type of request for admission is not, therefore, as the

14  plaintiffs suggest, a fair substitute for conducting the search that dating back to

15  2010.

16       Moreover, even if the request for admission were asking Atlantic to admit

17  only that it had considered no claims involving the war exclusion dating back to

18  2010, Atlantic still could not make a judicial admission of a fact that it has not

19  taken *every possible step* to confirm. Atlantic has performed a *reasonable* search to

20  satisfy the requests for production that ask for other claims involving the war

21  exclusion, which is all that the law requires. "A litigant does not have to examine

22  every document in its voluminous files to comply with discovery obligations.

23  Rather, a litigant has to conduct a diligent search which involves developing a

24  reasonably comprehensive search strategy." *Lauris v. Novartis AG*, 2016 U.S. Dist.

25  LEXIS 170203, *12 (E.D. Cal. Dec. 7, 2016). *Lauris* went on to note that "such a

26  strategy might, for example, *include identifying key employees* and reviewing any

27  of their files that are likely to be relevant to the claims in the litigation." *Id.* The

28  court also stated that "[d]efined search strategies are even more appropriate in

Mitchell
Silberberg &
Knupp LLP

48

cases involving electronic data, where the number of documents may be exponentially greater." *Id.* These are precisely the steps that Atlantic has taken. And these clearly satisfy the duty to conduct a reasonable search in response to a request for production. *See also Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 615 (C.D. Cal. 2013) ("While parties must impose a reasonable construction on discovery requests and conduct a reasonable search when responding to the requests, the Federal Rules do not demand perfection."); *Jacobs v. Sullivan*, 2012 U.S. Dist. LEXIS 121619, *71 (E.D. Cal. Aug. 27, 2012) ("Defendants cannot be compelled to make more than a reasonable and diligent search to locate documents."). But Atlantic has not conducted a search that can *completely* rule out the possibility that Atlantic handled a claim in which the war exclusion came up in any way. Atlantic therefore cannot admit to Requests for Admission Nos. 34 and 35, which ask Atlantic to admit that it has never considered the application of a "WAR EXCLUSION" to any insurance claim.[12]

Finally, and perhaps most pertinently, whether the war exclusion (of a different wording) has been applied to different facts is not relevant in any way to the legal question of whether the plaintiffs' policy excluded the claim it filed in July 2014. Plaintiff s seem to be on a fruitless search for items not relevant to any factual or legal issues in this case. Two claim files that have been produced to date related to different policy exclusion wording, and completely different facts and geographic locations. Declaration of Carla C. Crapster at ¶ 7. These add nothing to the substance of this legal dispute, and further searches for any reference to any war exclusion will be similarly irrelevant to the substance of this case.

---

[12] *See* Ex. 4: Plaintiffs' Second Set of Requests for Admission, Nos. 34 ("Admit that, prior to the DIG CLAIM, ATLANTIC had never considered the application of a WAR EXCLUSION to an insurance claim other than the PUBLICIS CLAIM") and 35 ("Admit that, with the exception of the DIG CLAIM and the PUBLICIS CLAIM, ATLANTIC has never considered the application of a WAR EXCLUSION to an insurance claim.")

Mitchell
Silberberg &
Knupp LLP

49

1    **IV.    ATLANTIC'S REFUSAL TO PRODUCE FINANCIAL DOCUMENTS RESPONSIVE TO**

2    **RFP NO. 25**

3        **A.    The Discovery Requests and Responses**

4    **Request for Production No. 25**

5        Any financial statements, profit and loss statements, balance sheets,

6    financial projections, or similar DOCUMENTS RELATING to YOUR profit/loss

7    under the POLICY and under each of the earlier policies YOU issued to

8    NBCUNIVERSAL (Policy Nos. MP00163-03; MP00163 02; MP00163-01; and

9    Policy No. MP00163-00).

10    **Response to Request for Production No. 25**

11        Atlantic objects to this Request to the extent that it seeks documents that are

12    outside the scope of discovery permitted under Rule 26 of the Federal Rules of

13    Civil Procedure.  The Request seeks documents that are not relevant to either

14    party's claims or defenses.  Atlantic also objects to this Request because it seeks

15    documents that contain trade secrets or similar confidential and/or proprietary

16    information protected from disclosure.  Atlantic is withholding documents on the

17    basis of these objections.

18        **B.    Plaintiffs' Contentions and Points and Authorities**

19        Plaintiffs contend that in denying the *Dig* Claim, Atlantic chose to favor its

20    own financial interests over those of its insured.  Documents exposing such

21    motivation would be textbook evidence of bad faith.  *See, e.g., Jordan v. Allstate*

22    *Ins.* Co., 148 Cal. App. 4th 1062, 1072 (2007) ("To fulfill its implied obligation, an

23    insurer must give at least as much consideration to the interests of the insured as it

24    gives to its own interests."); *Bernstein v. Travelers Ins. Co.*, 447 F. Supp. 2d 1100,

25    1114 (N.D. Cal. 2006) (ordering discovery of reserves – "an insurer's bad faith is

26    ordinarily a question of fact to be determined by the jury by considering the

27    evidence of motive, intent and state of mind.").

28

Mitchell
Silberberg &
Knupp LLP

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

1   Therefore, Plaintiffs requested (i) "financial statements, profit and loss

2   statements, balance sheets, financial projections," and (ii) similar documents

3   relating to the profitability of NBCUniversal as an insured, that would show

4   whether and how Atlantic factored that profitability (or lack thereof) into the

5   decision to deny the *Dig* Claim.  Such documents will more directly prove

6   Atlantic's true motive for denying the *Dig* Claim (and for deciding not to renew its

7   insurance policy with NBCUniversal):  The realization that, if it paid the *Dig*

8   Claim, Atlantic would have paid out more in claims than it received in the

9   substantial premiums the insureds paid over the life of the policies.

10   Atlantic has confirmed that it has documents responsive to this request, but

11   has refused to produce those documents on two frivolous grounds:[13]

12   First, Atlantic asserted a boilerplate objection that the request "seeks

13   documents that are not relevant to either party's claims or defenses."  Ex. 1:

14   Atlantic's Amended Responses to First Set of Requests for Production, 30:21-31:2.

15   That objection is frivolous.  As discussed above, the documents are directly

16   relevant to Atlantic's motive in denying the *Dig* Claim.  *See, e.g., Jordan*, 148 Cal.

17   App. 4th at 1072; *Bernstein*, 447 F. Supp. 2d at 1114.

18   Second, Atlantic asserted an objection that the request "seeks documents that

19   contain trade secrets or similar confidential and/or proprietary information

20   protected from disclosure."  Ex. 1: Atlantic's Amended Responses to First Set of

21   Requests for Production, 31:2-31:5.  That objection is also frivolous.  Plaintiffs are

22   not competitors of Atlantic and, in any event, there is a Protective Order in place

23   restricting use and disclosure.  *See Koninklijke Philips Elecs. N.V. v. KXD Tech.,*

24   *Inc.*, 2007 U.S. Dist. LEXIS 17540, at *15 (D. Nev. Mar. 8, 2007) ("[A]s Plaintiff

25   _____

[13] To date, Atlantic has only produced a single document "that summarizes the cost of all claims that Atlantic paid over the course of its relationship with NBC Universal."  Ex. 27: March 16, 2017 email C. Crapster/D. Hayes.  That is obviously only one small piece of what Plaintiffs requested and what Plaintiffs are entitled to.  Plaintiffs requested and are entitled to documents that show Atlantic's *analysis* and *evaluation* of the profitability of NBCUniversal as an insured (including "financial projections").

Mitchell
Silberberg &
Knupp LLP

28

51

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

1  notes in its motion, a stipulated protective order regarding the production of

2  confidential and proprietary information has been entered in this case.  Therefore,

3  Defendants' objection to producing documents based on the proprietary or

4  confidential nature of the requested information are overruled… .").

5       Accordingly, Plaintiffs respectfully request that the Court order Atlantic to

6  withdraw its objections and produce all of the documents requested pursuant to

7  Request No. 25, within five days of the issuance of said order.

8       **C.**     **<u>Atlantic's Contentions and Points and Authorities</u>**

9       Plaintiffs have served an overly broad request, that does not seek documents

10  relevant to the actual factual and legal disputes.  Atlantic's relevance objection is

11  not "boilerplate." Documents relating to the profitability of the relationship

12  between Atlantic and NBCU have *no* relevance to the contract interpretation

13  dispute at issue in this case or to the claim of bad faith in regard to the contract

14  interpretation. But more to the point, now that the plaintiffs have spelled out

15  exactly why they want the documents requested, it is clearer than ever that the

16  request is actually objectionable on additional grounds: it is *frivolous* because the

17  plaintiffs already possess all the information they need to make the argument

18  recited above.

19       Plaintiffs claim that they want to show that Atlantic paid out more in claims

20  than it received in premiums, and that the relationship with plaintiffs was not

21  "profitable." Atlantic offered to produce a document to the plaintiffs summarizing

22  all amounts Atlantic has ever paid to NBCU. And Atlantic did produce that

23  document on March 16, 2017. Declaration of Carla C. Crapster at ¶ 8.[14] The

24  plaintiffs therefore already have from Atlantic a summary of all the amounts that

25  Atlantic has paid in claims to NBCU over the course of the parties' entire

26  relationship (multiple policy years). The document that Atlantic produced set forth

27

28  [14] Atlantic is not attaching this document because it has been designated confidential. The Bates Numbers for this document are ATL004138-4172.

**JOINT STIPULATION RE: PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

every claim that Atlantic has paid over the course of its relationship with NBCU and the amount paid on each such claim. It also totaled the amounts paid for each policy period. The plaintiffs should have already had this information, but Atlantic provided it to them anyway to avoid a discovery dispute.

The plaintiffs obviously are already aware of the amounts they paid in premiums to Atlantic. Because the plaintiffs have both the amounts that Atlantic paid over the course of its relationship with NBCU and the amounts NBCU paid in premiums over that same time period, it can do a simple calculation to determine exactly what it claims to need: the "profitability" of Atlantic's relationship with NBCU. There is no need to force Atlantic to divulge voluminous confidential and proprietary information, which is quite awkwardly described in this request, or any of its internal calculations on this topic, when the specifics about the paid claims have been provided. *Id.* Plaintiffs seek to make a factual argument about the implication of the amount of claims paid.  Plaintiffs have been provided with information that was within their own control, as they know what claims were paid.

In short, the plaintiffs have represented that the purpose for which they seek Atlantic's confidential calculations is to do a computation they are already more than capable of doing. Whatever other financial information the plaintiffs seek in their broad Request for Production *will* be truly irrelevant, by their own admission in this Joint Stipulation that they need this information for a narrow purpose that they can already accomplish with what they have (though Atlantic continues to maintain that the profitability calculations had *nothing* to do with its analysis of the *Dig* claim and therefore are truly irrelevant). Atlantic requests that the Court deny the plaintiffs' motion to compel on this point.

1    DATED:  April 4, 2017          LUCIA E. COYOCA
VALENTINE A. SHALAMITSKI
2                                 DANIEL M. HAYES
MITCHELL SILBERBERG & KNUPP LLP

3

4

5                              By:    */s/ Daniel M. Hayes*
Daniel M. Hayes
6                                 Attorneys for Plaintiffs
Universal Cable Productions LLC and
7                                 Northern Entertainment
Productions LLC

8

9

10   DATED:  April 4, 2017          MARC J. SHRAKE, ESQ.
ANDERSON, MCPHARLIN & CONNERS
11                                 LLP

12

13                                 MICHAEL KEELEY, ESQ.
JOHN R. RIDDLE, ESQ.
14                                 CARLA C. CRAPSTER, ESQ.
STRASBURGER & PRICE, LLP

15

16                              By:    */s/ Michael Keeley*
Michael Keeley, Esq.
17                                 Attorneys for Defendant
Atlantic Specialty Insurance Company

18

19

20               **Attestation Regarding Signatures**

21        I, Daniel M. Hayes, attest that all signatories listed, and on whose behalf the

22  filing is submitted, concur in the filing's content and have authorized the filing.

23

24                              By:  */s/ Daniel M. Hayes*
Daniel M. Hayes
25

26

27

28