LUCIA E. COYOCA (SBN 128314)
  lec@msk.com
VALENTINE A. SHALAMITSKI (SBN 236061)
  vas@msk.com
DANIEL M. HAYES (SBN 240250)
  dmh@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone:  (310) 312-2000
Facsimile:  (310) 312-3100

Attorneys for Plaintiffs
Universal Cable Productions LLC and
Northern Entertainment Productions LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, *et al.*,<br><br>              Plaintiffs,<br><br>       v.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY,<br><br>              Defendant. | CASE NO. 2:16-cv-4435-PA-MRW<br><br>**DECLARATION OF DANIEL M. HAYES IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DISCOVERY**<br><br>Time:         9:30 a.m.<br>Date:         April 26, 2017<br>Judge:        Hon. Michael R. Wilner<br><br>File Date:         June 20, 2016<br>Discovery Cutoff:  May 12, 2017<br>Pre-Trial Conf.:   June 16, 2017<br>Trial Date :       July 25, 2017 |

Mitchell
Silberberg &
Knupp LLP

8736752.3

---

**DECLARATION OF DANIEL M. HAYES ISO JOINT STIPULATION RE MOTION TO COMPEL DISCOVERY**

## DECLARATION OF DANIEL M. HAYES

I, Daniel M. Hayes, declare:

1.      I am an attorney duly licensed to practice law in the State of California and before this Court.  I am, through my professional corporation, a partner in the law firm of Mitchell Silberberg & Knupp LLP, attorneys of record for Plaintiffs Universal Cable Productions LLC ("UCP") and Northern Entertainment Productions LLC ("Plaintiffs") in the above-captioned matter.  I make this declaration in support of Plaintiffs' Motion To Compel Discovery.   I have personal knowledge of the following facts and, if called and sworn as a witness, could and would competently testify thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of Defendant Atlantic Specialty Insurance Company's ("Atlantic") Amended Responses to Plaintiffs' First Set of Requests for Production of Documents.

3.      Attached hereto as Exhibit 2 is a true and correct copy of Atlantic's First Supplemental Privilege Log.

4.      Attached hereto as Exhibit 3 is a true and correct copy of Atlantic's Second Amended Responses to Plaintiffs' First Set of Interrogatories.

5.      Attached hereto as Exhibit 4 is a true and correct copy of Plaintiff's Second Set of Requests for Admissions to Atlantic.

6.      Attached hereto as Exhibit 5 is a true and correct copy of Atlantic's Responses to Plaintiffs' Second Set of Interrogatories.

7.      Attached hereto as Exhibit 6 is a true and correct copy of Atlantic's Objections and Responses to UCP's First Set of Requests for Admissions.

8.      Attached hereto as Exhibit 7 is a true and correct copy of document labeled ATL001814, produced by Atlantic.

9.      Attached hereto as Exhibit 8 is a true and correct copy of documents labeled ATL001818-1820, produced by Atlantic.

10.      Attached hereto as Exhibit 9 is a true and correct copy of documents labeled ATL001826-1827, produced by Atlantic.

Mitchell
Silberberg &
Knupp LLP

8736752.3

1

11.     Attached hereto as Exhibit 10 is a true and correct copy of documents labeled ATL001829-1831, produced by Atlantic.

12.     Attached hereto as Exhibit 11 is a true and correct copy of documents labeled ATL001832-1834, produced by Atlantic.

13.     Attached hereto as Exhibit 12 is a true and correct copy of documents labeled ATL001835-1836, produced by Atlantic.

14.     Attached hereto as Exhibit 13 is a true and correct copy of documents labeled ATL000094-0101, produced by Atlantic.

15.     Attached hereto as Exhibit 14 is a true and correct copy of the Expert Report of Anthony Clark.

16.     Attached hereto as Exhibit 15 is a true and correct copy of the transcript of the February 8, 2017 Videotaped Deposition of Theresa A. Gooley Wolf.

17.     Attached hereto as Exhibit 16 is a true and correct copy of the transcript of the February 3, 2017 Deposition of Daniel Gutterman.

18.     Attached hereto as Exhibit 17 is a true and correct copy of the transcript of the February 1, 2017 Deposition of Peter Williams.

19.     Attached hereto as Exhibit 18 is a true and correct copy of a November 29, 2016 letter from Valentine Shalamitski of my firm to Atlantic's Counsel.

20.     I am informed that on December 2, 2016, my colleagues, Lucia Coyoca and Valentine Shalamitski, had a meet-and-confer telephone call with Atlantic's counsel, John Riddle and Carla Crapster, regarding Atlantic's initial responses to Plaintiffs' First Sets of Requests for Production of Documents and Interrogatories.

21.     Attached hereto as Exhibit 19 is a true and correct copy of an email chain between counsel for Plaintiffs (myself, Mr. Shalamistki, and Lucia Coyoca) and counsel for Atlantic (Carla Crapster, Toni Reed, and Michael Keeley), the most recent email of which is dated February 2, 2017.

22.     Attached hereto as Exhibit 20 is a true and correct copy of a February 2, 2017 email from Ms. Crapster to me, Ms. Coyoca and Mr. Valentine, with attachment.

23.     Attached hereto as Exhibit 21 is a true and correct copy of a February 6, 2017 email from Ms. Crapster to me, Ms. Coyoca and Mr. Shalamitski.

24.     Attached hereto as Exhibit 22 is a true and correct copy of a February 20, 2017 email from Ms. Crapster to Ms. Coyoca, me and Mr. Shalamitski, with attachment.

25.     Attached hereto as Exhibit 23 is a true and correct copy of an email chain between me and Ms. Reed, the most recent email of which is dated February 22, 2017.

26.     On February 23, 2017, my colleague Valentine Shalamitski and I had a meet-and-confer telephone call with Atlantic's counsel, Toni Reed and Carla Crapster, regarding Atlantic's Amended Responses to Plaintiffs' First Set of Requests for Production of Documents and Atlantic's Second Amended Responses to Plaintiffs' First Set of Interrogatories.  My email dated March 2, 2017, attached hereto as Exhibit 24, contains an accurate summary of what was discussed during that call regarding the foregoing discovery responses.  The lasted over two hours.

27.     Attached hereto as Exhibit 24 is a true and correct copy of an email chain between Ms. Reed, me, Ms. Crapster and Mr. Keeley, the most recent email of which is dated March 2, 2017.

28.     Attached hereto as Exhibit 25 is a true and correct copy of an email chain between me, Ms. Reed, Mr. Keeley and Ms. Crapster, the most recent email of which is dated March 10, 2017.

29.     Attached hereto as Exhibit 26 is a true and correct copy of an email chain between me, Ms. Crapster, Ms. Coyoca and Mr. Shalamitski, the most recent email of which is dated March 15, 2017.

30.     Attached hereto as Exhibit 27 is a true and correct copy of an email chain between me and Ms. Crapster, the most recent email of which is dated March 20, 2017.

31.     Attached hereto as Exhibit 28 is a true and correct copy of the September 15, 2016 Scheduling Order.

32.     Attached hereto as Exhibit 29 is a true and correct copy of the January 19, 2017 Order On Joint Stipulation And Application To Modify Case Schedule.

Mitchell
Silberberg &
Knupp LLP

8736752.3

HAYES DECLARATION ISO JOINT STIPULATION RE MOTION TO COMPEL DISCOVERY

1    33.    Our office has bracketed the relevant portions of the foregoing exhibits for the

2 Court's convenience.

3    I declare under penalty of perjury under the laws of the United States of America that the

4 foregoing is true and correct.

5    Executed March 27, 2017, at Los Angeles, California.

6

7                                    /S/DANIEL M. HAYES

8                                        Daniel M. Hayes

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

8736752.3

**HAYES DECLARATION ISO JOINT STIPULATION RE MOTION TO COMPEL DISCOVERY**

# EXHIBIT 1

1   MARC J. SHRAKE (SBN 219331)
       mjs@amclaw.com
2   ANDERSON, MCPHARLIN & CONNERS LLP
     707 Wilshire Boulevard, Suite 4000
3   Los Angeles, California 90017-3623
     Telephone: (213) 236-1691
4   Facsimile: (213) 622-7594

5   MICHAEL KEELEY *(Pro Hac Vice)*
       michael.keeley@strasburger.com
6   JOHN R. RIDDLE *(Pro Hac Vice)*
       john.riddle@strasburger.com
7   CARLA C. CRAPSTER *(Pro Hac Vice)*
       carla.crapster@strasburger.com
8   STRASBURGER & PRICE, LLP
     901 Main Street, Suite 6000
9   Dallas, Texas 75202
     Telephone: (214) 651-4300
10  Facsimile: (214) 651-4330

11  Attorneys for Defendant
     Atlantic Specialty Insurance Company

12

13          **UNITED STATES DISTRICT COURT**

14   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

15

16  UNIVERSAL CABLE                   Case No. 2:16-cv-04435-PA-MRW
     PRODUCTIONS LLC, a Delaware
17  limited liability company, and      **DEFENDANT ATLANTIC**
     NORTHERN ENTERTAINMENT           **SPECIALTY INSURANCE**
18  PRODUCTIONS LLC, a Delaware       **COMPANY'S AMENDED**
     limited liability company,          **RESPONSES TO FIRST SET OF**
19                                      **REQUESTS FOR PRODUCTION**
                                       **PROPOUNDED BY PLAINTIFFS**
                    Plaintiffs,         **UNIVERSAL CABLE**
20                                      **PRODUCTIONS LLC AND**
            vs.                         **NORTHERN ENTERTAINMENT**
21                                      **PRODUCTIONS LLC**
     ATLANTIC SPECIALTY
22  INSURANCE COMPANY, a New
     York insurance company,
23
                    Defendant.
24

25   / / /

26   / / /

27   / / /

28   / / /

1515571.1 05608-054

**ANDERSON, MCPHARLIN & CONNERS LLP**
*LAWYERS*
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

RECEIVED

DEC 2 2 2016

MITCHELL SILBERBERG & KNUPP LLP

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES TO PLAINTIFFS' FIRST SET
OF REQUESTS FOR PRODUCTION OF DOCUMENTS

EXHIBIT 01

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  PROPOUNDING PARTY:      Plaintiffs UNIVERSAL CABLE PRODUCTIONS
2                          LLC and NORTHERN ENTERTAINMENT
3                          PRODUCTIONS LLC
4  RESPONDING PARTY:       Defendant ATLANTIC SPECIALTY INSURANCE
5                          COMPANY
6  SET NO.:                One

7       Pursuant to Federal Rule of Civil Procedure 34, Defendant ATLANTIC
8  SPECIALTY INSURANCE COMPANY ("Atlantic") submits these amended
9  responses and objections (the "Response") to the First Set of Requests for Production
10 propounded by Plaintiffs UNIVERSAL CABLE PRODUCTIONS LLC and
11 NORTHERN ENTERTAINMENT PRODUCTIONS LLC ("Propounding Parties").

## **PRELIMINARY STATEMENT**

13      Nothing in this Response should be construed as an admission by Atlantic with
14 respect to the admissibility or relevance of any fact or document, or of the truth or
15 accuracy of any characterization or statement of any kind contained in Propounding
16 Parties' Requests for Production.  Atlantic has not completed its investigation of the
17 facts relating to this case, its discovery or its preparation for trial.  All responses and
18 objections contained herein are based only upon such information and such documents
19 that are presently available to and specifically known by Atlantic.  It is anticipated that
20 further discovery, independent investigation, legal research and analysis may supply
21 additional facts and add meaning to known facts, as well as new factual conclusions
22 and legal contentions, all of which may lead to additions to, changes in and variations
23 from the responses set forth herein.  The following objections and responses are made
24 without prejudice to Atlantic's right to produce at trial, or otherwise, evidence
25 regarding any subsequently discovered documents.  Atlantic accordingly reserves the
26 right to modify and amend any and all responses herein as research is completed and
27 contentions are made. Relevant responsive  documents that are privileged and being
28 withheld are listed on the Privilege Log previously provided to Plaintiffs' counsel or

1  will be included on a Supplemental Privilege Log. However, pursuant to agreement

2  between the parties, by and through their respective counsel of record, Atlantic is not

3  including on its privilege logs any documents created by Strasburger & Price LLP

4  personnel or by Anderson McPharlin & Conners LLP personnel on or after June 20,

5  2016 (the date the plaintiffs filed suit) or any correspondence including Strasburger &

6  Price LLP personnel or Anderson McPharlin & Conners LLP personnel that was

7  created on or after June 20, 2016. As the parties have agreed, by and through their

8  respective counsel of record, Atlantic does not waive any privilege or other protection

9  that might apply to those documents by not including them on its privilege logs.

10  **RESPONSES TO REQUESTS FOR PRODUCTION**

11  **REQUEST FOR PRODUCTION NO. 1:**

12       All of YOUR files, including file jackets and labels, and all other

13  DOCUMENTS that RELATE to:

14            a)       The POLICY;

15            b)       The *DIG* INSURED PRODUCTION;

16            c)       The *DIG* CLAIM (including, but not limited to, its receipt,

17                     investigation, evaluation, consideration, and denial); and

18            d)       The WAR EXCLUSION.

19  **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**  Atlantic objects to this

20  Request to the extent it seeks documents that are protected from disclosure by the

21  attorney-client privilege or work-product doctrine, or which were prepared in

22  anticipation of litigation or for trial. Privileged documents are outside the scope of

23  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. As required

24  by Rule 34(b)(2)(C), Atlantic states that documents responsive to this Request that are

25  protected from disclosure by the attorney-client privilege or work-product doctrine, or

26  that were prepared in anticipation of litigation or for trial, are being withheld from

27  production.  Privileged documents relating to this claim that are being withheld are

28  listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

3

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

7                                                           EXHIBIT 01

1  on a Supplemental Privilege Log (except for those documents covered by the parties'

2  agreement described on pages 2-3 of this Response that certain categories of documents

3  need not be included on Atlantic's privilege logs). Atlantic's documents that are

4  responsive to this Request and concern this claim, and which are not privileged, have

5  been, or will be, produced.

6  Atlantic further objects to this Request to the extent that it seeks information that is

7  outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil

8  Procedure. In particular, the definition of "WAR EXCLUSION" in the Request

9  includes not only the particular war exclusion in the POLICY but also any similar

10  exclusion in other policies. Documents relating to other policies or claims is not

11  relevant to either party's claims or defenses and is not proportional to the needs of this

12  case, considering the importance of the issues at stake in the action, the amount in

13  controversy, the parties' relative access to relevant information, the parties' resources,

14  the importance of the discovery in resolving the issues, and the burden and expense of

15  the proposed discovery, which greatly outweighs its likely benefit, if any. To find all

16  documents responsive to this Request would be extremely burdensome, and Atlantic

17  would have to manually locate and review each policy it has issued that may contain

18  this particular exclusion and any related claim files.

19  Nonetheless, to avoid a discovery dispute, Atlantic further responds as follows: Thus

20  far, Atlantic has not located any other claim in which it denied the claim in whole or in

21  part on the basis of the WAR EXCLUSION. As counsel for Atlantic has stated in

22  discussions with counsel for Plaintiffs, Atlantic has reviewed more than 36,000

23  documents identified in a search of its document management and e-mail system. One

24  of the search terms used in the search that returned these documents was "war." That

25  search looked for documents and e-mails dating back to July 2013. Atlantic can now

26  confirm that it has identified no documents suggesting that any claims were denied on

27  the basis of the WAR EXCLUSION. Atlantic, and its Informational Technology

28  department in particular, have represented that a broader search that would encompass

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

4

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

EXHIBIT 01

all e-mails and documents without any date restrictions would be nearly impossible. In lieu of searching for the WAR EXCLUSION in each and every one of the many millions of documents and e-mails that Atlantic and OneBeacon have generated over the course of their existences, Atlantic has made inquiries with its employees who oversee, and former employees who previously oversaw, the claims handling for the entertainment division of Atlantic and with employees of OneBeacon who oversee claims for all of OneBeacon's divisions. Those persons do not recall any claims that Atlantic denied on the grounds that the WAR EXCLUSION applied. Those persons also do not recall any claims in which Atlantic considered the potential applicability of the WAR EXCLUSION or any part thereof but ultimately paid the claim despite the potential applicability of the WAR EXCLUSION. Atlantic has, however, found one e-mail that an employee of Atlantic, Daniel Gutterman, sent to himself, that concerns another claim, and which quotes the various policy language, including its WAR EXCLUSION. There are no other documents suggesting that the WAR EXCLUSION was considered any further in connection with that claim. This one e-mail is being produced as Bates No. ATL000785 – ATL000788.

**REQUEST FOR PRODUCTION NO. 2:**

All DOCUMENTS that RELATE to the underwriting of the POLICY.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:** Atlantic objects to this Request to the extent it seeks documents that are protected from disclosure by the attorney-client privilege or work-product doctrine, or which were prepared in anticipation of litigation or for trial. Privileged documents are outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are protected from disclosure by the attorney-client privilege or work-product doctrine, or that were prepared in anticipation of litigation or for trial, are being withheld from production. Privileged documents that are being withheld are listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included on a Supplemental

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

5

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

9                                         EXHIBIT 01

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  Privilege Log (except for those documents covered by the parties' agreement described
2  on pages 2-3 of this Response that certain categories of documents need not be included
3  on Atlantic's privilege logs). Atlantic's documents that are responsive to this Request,
4  and which are not privileged, have been, or will be, produced.

5  **REQUEST FOR PRODUCTION NO. 3:**

6       All DOCUMENTS that RELATE to the negotiation and/or drafting of the
7  POLICY.

8  **RESPONSE TO REQUEST FOR PRODUCTION NO. 3:** Atlantic objects to this
9  Request to the extent it seeks documents that are protected from disclosure by the
10  attorney-client privilege or work-product doctrine, or which were prepared in
11  anticipation of litigation or for trial. Privileged documents are outside the scope of
12  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

13  As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are
14  protected from disclosure by the attorney-client privilege or work-product doctrine, or
15  that were prepared in anticipation of litigation or for trial, are being withheld from
16  production. Privileged documents relating to this claim that are being withheld are
17  listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included
18  on a Supplemental Privilege Log (except for those documents covered by the parties'
19  agreement described on pages 2-3 of this Response that certain categories of documents
20  need not be included on Atlantic's privilege logs).  Atlantic's documents that are
21  responsive to this Request, and which are not privileged, have been, or will be,
22  produced.

23  **REQUEST FOR PRODUCTION NO. 4:**

24       All DOCUMENTS that RELATE to the issuance of the POLICY.

25  **RESPONSE TO REQUEST FOR PRODUCTION NO. 4:** Atlantic objects to this
26  Request to the extent it seeks documents that are protected from disclosure by the
27  attorney-client privilege or work-product doctrine, or which were prepared in
28  anticipation of litigation or for trial. Privileged documents are outside the scope of

1515571.1 05608-054

6

1  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

2  As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are

3  protected from disclosure by the attorney-client privilege or work-product doctrine, or

4  that were prepared in anticipation of litigation or for trial, are being withheld from

5  production. Privileged documents relating to this claim that are being withheld are

6  listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

7  on a Supplemental Privilege Log (except for those documents covered by the parties'

8  agreement described on pages 2-3 of this Response that certain categories of documents

9  need not be included on Atlantic's privilege logs).   Atlantic's documents that are

10  responsive to this Request, and which are not privileged, have been, or will be,

11  produced.

12  **REQUEST FOR PRODUCTION NO. 5:**

13      All DOCUMENTS that RELATE to the coverage of the *DIG* INSURED

14  PRODUCTION, including but not limited to the Request, negotiation, approval, or

15  acceptance of coverage under the POLICY or Policy No. MP00163-03.

16  **RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**   Atlantic objects to this

17  Request to the extent it seeks documents that are protected from disclosure by the

18  attorney-client privilege or work-product doctrine, or which were prepared in

19  anticipation of litigation or for trial. Privileged documents are outside the scope of

20  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

21  As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are

22  protected from disclosure by the attorney-client privilege or work-product doctrine, or

23  that were prepared in anticipation of litigation or for trial, are being withheld from

24  production. Privileged documents relating to this claim that are being withheld are

25  listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

26  on a Supplemental Privilege Log (except for those documents covered by the parties'

27  agreement described on pages 2-3 of this Response that certain categories of documents

28  need not be included on Atlantic's privilege logs).   Atlantic's documents that are

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

7

1  responsive to this Request, and which are not privileged, have been, or will be,

2  produced.

3  **REQUEST FOR PRODUCTION NO. 6:**

4       All DOCUMENTS that constitute, memorialize, evidence, or reflect YOUR

5  internal COMMUNICATIONS that RELATE to:

6            a)     The POLICY;

7            b)     The *DIG* INSURED PRODUCTION;

8            c)     The *DIG* CLAIM (including, but not limited to, its receipt,

9                   investigation, evaluation, consideration, and denial); and

10           d)     The WAR EXCLUSION.

11 **RESPONSE TO REQUEST FOR PRODUCTION NO. 6:** Atlantic objects to this

12 Request to the extent it seeks documents that are protected from disclosure by the

13 attorney-client privilege or work-product doctrine, or which were prepared in

14 anticipation of litigation or for trial. Privileged documents are outside the scope of

15 discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. As required

16 by Rule 34(b)(2)(C), Atlantic states that documents responsive to this Request that are

17 protected from disclosure by the attorney-client privilege or work-product doctrine, or

18 that were prepared in anticipation of litigation or for trial, are being withheld from

19 production.  Privileged documents relating to this claim that are being withheld are

20 listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

21 on a Supplemental Privilege Log (except for those documents covered by the parties'

22 agreement described on pages 2-3 of this Response that certain categories of documents

23 need not be included on Atlantic's privilege logs). Atlantic's documents that are

24 responsive to this Request and concern this claim, and which are not privileged, have

25 been, or will be, produced.

26 Atlantic further objects to this Request to the extent that it seeks information that is

27 outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil

28 Procedure. In particular, the definition of "WAR EXCLUSION" in the Request

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

8

1   includes not only the particular war exclusion in the POLICY but also any similar

2   exclusion in other policies. Documents relating to other policies or claims is not

3   relevant to either party's claims or defenses and is not proportional to the needs of this

4   case, considering the importance of the issues at stake in the action, the amount in

5   controversy, the parties' relative access to relevant information, the parties' resources,

6   the importance of the discovery in resolving the issues, and the burden and expense of

7   the proposed discovery, which greatly outweighs its likely benefit, if any. To find all

8   documents responsive to this Request would be extremely burdensome, and Atlantic

9   would have to manually locate and review each policy it has issued that may contain

10   this particular exclusion and any related claim files.

11   Nonetheless, to avoid a discovery dispute, Atlantic further responds as follows: Thus

12   far, Atlantic has not located any other claim in which it denied the claim in whole or in

13   part on the basis of the WAR EXCLUSION. As counsel for Atlantic has stated in

14   discussions with counsel for Plaintiffs, Atlantic has reviewed more than 36,000

15   documents identified in a search of its document management and e-mail system. One

16   of the search terms used in the search that returned these documents was "war." That

17   search looked for documents and e-mails dating back to July 2013. Atlantic can now

18   confirm that it has identified no documents suggesting that any claims were denied on

19   the basis of the WAR EXCLUSION. Atlantic, and its Informational Technology

20   department in particular, have represented that a broader search that would encompass

21   all e-mails and documents without any date restrictions would be nearly impossible. In

22   lieu of searching for the WAR EXCLUSION in each and every one of the many

23   millions of documents and e-mails that Atlantic and OneBeacon have generated over

24   the course of their existences, Atlantic has made inquiries with its employees who

25   oversee, and former employees who previously oversaw, the claims handling for the

26   entertainment division of Atlantic and with employees of OneBeacon who oversee

27   claims for all of OneBeacon's divisions. Those persons do not recall any claims that

28   Atlantic denied on the grounds that the WAR EXCLUSION applied. Those persons

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

9

1  also do not recall any claims in which Atlantic considered the potential applicability of

2  the WAR EXCLUSION or any part thereof but ultimately paid the claim despite the

3  potential applicability of the WAR EXCLUSION. Atlantic has, however, found one e-

4  mail that an employee of Atlantic, Daniel Gutterman, sent to himself, that concerns

5  another claim, and which quotes the various policy language, including its WAR

6  EXCLUSION. There are no other documents suggesting that the WAR EXCLUSION

7  was considered any further in connection with that claim. This one e-mail is being

8  produced as Bates No. ATL000785 – ATL000788.

9  **REQUEST FOR PRODUCTION NO. 7:**

10      All DOCUMENTS that constitute, memorialize, evidence, or reflect

11  COMMUNICATIONS between YOU, on the one part, and ONEBEACON, on the

12  other part, that RELATE to:

13          a)      The POLICY;

14          b)      The *DIG* INSURED PRODUCTION;

15          c)      The *DIG* CLAIM (including, but not limited to, its receipt,

16                  investigation, evaluation, consideration, and denial); and

17          d)      The WAR EXCLUSION.

18  **RESPONSE TO REQUEST FOR PRODUCTION NO. 7:** Atlantic objects to this

19  Request to the extent it seeks documents that are protected from disclosure by the

20  attorney-client privilege or work-product doctrine, or which were prepared in

21  anticipation of litigation or for trial. Privileged documents are outside the scope of

22  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. As required

23  by Rule 34(b)(2)(C), Atlantic states that documents responsive to this Request that are

24  protected from disclosure by the attorney-client privilege or work-product doctrine, or

25  that were prepared in anticipation of litigation or for trial, are being withheld from

26  production.  Privileged documents relating to this claim that are being withheld are

27  listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

28  on a Supplemental Privilege Log (except for those documents covered by the parties'

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

10

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

14                                                          EXHIBIT 01

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  agreement described on pages 2-3 of this Response that certain categories of documents

2  need not be included on Atlantic's privilege logs). Atlantic's documents that are

3  responsive to this Request and concern this claim, and which are not privileged, have

4  been, or will be, produced.

5  Atlantic further objects to this Request to the extent that it seeks information that is

6  outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil

7  Procedure. In particular, the definition of "WAR EXCLUSION" in the Request

8  includes not only the particular war exclusion in the POLICY but also any similar

9  exclusion in other policies. Documents relating to other policies or claims is not

10  relevant to either party's claims or defenses and is not proportional to the needs of this

11  case, considering the importance of the issues at stake in the action, the amount in

12  controversy, the parties' relative access to relevant information, the parties' resources,

13  the importance of the discovery in resolving the issues, and the burden and expense of

14  the proposed discovery, which greatly outweighs its likely benefit, if any. To find all

15  documents responsive to this Request would be extremely burdensome, and Atlantic

16  would have to manually locate and review each policy it has issued that may contain

17  this particular exclusion and any related claim files.

18  Nonetheless, to avoid a discovery dispute, Atlantic further responds as follows: Thus

19  far, Atlantic has not located any other claim in which it denied the claim in whole or in

20  part on the basis of the WAR EXCLUSION. As counsel for Atlantic has stated in

21  discussions with counsel for Plaintiffs, Atlantic has reviewed more than 36,000

22  documents identified in a search of its document management and e-mail system. One

23  of the search terms used in the search that returned these documents was "war." That

24  search looked for documents and e-mails dating back to July 2013. Atlantic can now

25  confirm that it has identified no documents suggesting that any claims were denied on

26  the basis of the WAR EXCLUSION. Atlantic, and its Informational Technology

27  department in particular, have represented that a broader search that would encompass

28  all e-mails and documents without any date restrictions would be nearly impossible. In

1515571.1 05608-054

11

1 lieu of searching for the WAR EXCLUSION in each and every one of the many
2 millions of documents and e-mails that Atlantic and OneBeacon have generated over
3 the course of their existences, Atlantic has made inquiries with its employees who
4 oversee, and former employees who previously oversaw, the claims handling for the
5 entertainment division of Atlantic and with employees of OneBeacon who oversee
6 claims for all of OneBeacon's divisions. Those persons do not recall any claims that
7 Atlantic denied on the grounds that the WAR EXCLUSION applied. Those persons
8 also do not recall any claims in which Atlantic considered the potential applicability of
9 the WAR EXCLUSION or any part thereof but ultimately paid the claim despite the
10 potential applicability of the WAR EXCLUSION. Atlantic has, however, found one e-
11 mail that an employee of Atlantic, Daniel Gutterman, sent to himself, that concerns
12 another claim, and which quotes the various policy language, including its WAR
13 EXCLUSION. There are no other documents suggesting that the WAR EXCLUSION
14 was considered any further in connection with that claim. This one e-mail is being
15 produced as Bates No. ATL000785 – ATL000788.

16 **REQUEST FOR PRODUCTION NO. 8:**

17        All DOCUMENTS that constitute, memorialize, evidence, or reflect
18 COMMUNICATIONS between YOU and/or ONEBEACON, on the one part, and
19 any of PLAINTIFFS, NBCUNIVERSAL, or AON, on the other part, that RELATE
20 to:

21              a)      The POLICY;
22              b)      The *DIG* INSURED PRODUCTION;
23              c)      The *DIG* CLAIM (including, but not limited to, its receipt,
24                      investigation, evaluation, consideration, and denial); and
25              d)      The WAR EXCLUSION.

26 **RESPONSE TO REQUEST FOR PRODUCTION NO. 8:** Atlantic objects to this
27 Request to the extent it seeks documents that are protected from disclosure by the
28 attorney-client privilege or work-product doctrine, or which were prepared in

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

12

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

16                                              EXHIBIT 01

1  anticipation of litigation or for trial. Privileged documents are outside the scope of
2  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.
3  As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are
4  protected from disclosure by the attorney-client privilege or work-product doctrine, or
5  that were prepared in anticipation of litigation or for trial, are being withheld from
6  production. Privileged documents relating to this claim that are being withheld are
7  listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included
8  on a Supplemental Privilege Log (except for those documents covered by the parties'
9  agreement described on pages 2-3 of this Response that certain categories of documents
10  need not be included on Atlantic's privilege logs). Atlantic's documents that are
11  responsive to this Request, and which are not privileged, have been, or will be,
12  produced.

13  **REQUEST FOR PRODUCTION NO. 9:**
14      All DOCUMENTS that constitute, memorialize, evidence, or reflect
15  COMMUNICATIONS between YOU, on the one part, and any PERSON (other
16  than PLAINTIFFS, NBCUNIVERSAL, and AON), on the other part, that RELATE
17  to:

18          a)      The POLICY;
19          b)      The *DIG* INSURED PRODUCTION;
20          c)      The *DIG* CLAIM (including, but not limited to, its receipt,
21                  investigation, evaluation, consideration, and denial); and
22          d)      The WAR EXCLUSION.

23  **RESPONSE TO REQUEST FOR PRODUCTION NO. 9:** Atlantic objects to this
24  Request to the extent it seeks documents that are protected from disclosure by the
25  attorney-client privilege or work-product doctrine, or which were prepared in
26  anticipation of litigation or for trial. Privileged documents are outside the scope of
27  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. As required
28  by Rule 34(b)(2)(C), Atlantic states that documents responsive to this Request that are

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

13

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

17                                                              EXHIBIT 01

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  protected from disclosure by the attorney-client privilege or work-product doctrine, or
2  that were prepared in anticipation of litigation or for trial, are being withheld from
3  production.  Privileged documents relating to this claim that are being withheld are
4  listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included
5  on a Supplemental Privilege Log (except for those documents covered by the parties'
6  agreement described on pages 2-3 of this Response that certain categories of documents
7  need not be included on Atlantic's privilege logs). Atlantic's documents that are
8  responsive to this Request and concern this claim, and which are not privileged, have
9  been, or will be, produced.

10  Atlantic further objects to this Request to the extent that it seeks information that is
11  outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil
12  Procedure. In particular, the definition of "WAR EXCLUSION" in the Request
13  includes not only the particular war exclusion in the POLICY but also any similar
14  exclusion in other policies. Documents relating to other policies or claims is not
15  relevant to either party's claims or defenses and is not proportional to the needs of this
16  case, considering the importance of the issues at stake in the action, the amount in
17  controversy, the parties' relative access to relevant information, the parties' resources,
18  the importance of the discovery in resolving the issues, and the burden and expense of
19  the proposed discovery, which greatly outweighs its likely benefit, if any. To find all
20  documents responsive to this Request would be extremely burdensome, and Atlantic
21  would have to manually locate and review each policy it has issued that may contain
22  this particular exclusion and any related claim files.

23  Nonetheless, to avoid a discovery dispute, Atlantic further responds as follows: Thus
24  far, Atlantic has not located any other claim in which it denied the claim in whole or in
25  part on the basis of the WAR EXCLUSION. As counsel for Atlantic has stated in
26  discussions with counsel for Plaintiffs, Atlantic has reviewed more than 36,000
27  documents identified in a search of its document management and e-mail system. One
28  of the search terms used in the search that returned these documents was "war." That

1515571.1 05608-054

1  search looked for documents and e-mails dating back to July 2013. Atlantic can now
2  confirm that it has identified no documents suggesting that any claims were denied on
3  the basis of the WAR EXCLUSION. Atlantic, and its Informational Technology
4  department in particular, have represented that a broader search that would encompass
5  all e-mails and documents without any date restrictions would be nearly impossible. In
6  lieu of searching for the WAR EXCLUSION in each and every one of the many
7  millions of documents and e-mails that Atlantic and OneBeacon have generated over
8  the course of their existences, Atlantic has made inquiries with its employees who
9  oversee, and former employees who previously oversaw, the claims handling for the
10  entertainment division of Atlantic and with employees of OneBeacon who oversee
11  claims for all of OneBeacon's divisions. Those persons do not recall any claims that
12  Atlantic denied on the grounds that the WAR EXCLUSION applied. Those persons
13  also do not recall any claims in which Atlantic considered the potential applicability of
14  the WAR EXCLUSION or any part thereof but ultimately paid the claim despite the
15  potential applicability of the WAR EXCLUSION. Atlantic has, however, found one e-
16  mail that an employee of Atlantic, Daniel Gutterman, sent to himself, that concerns
17  another claim, and which quotes the various policy language, including its WAR
18  EXCLUSION. There are no other documents suggesting that the WAR EXCLUSION
19  was considered any further in connection with that claim. This one e-mail is being
20  produced as Bates No. ATL000785 – ATL000788.

21  **REQUEST FOR PRODUCTION NO. 10:**

22       To the extent not included in the preceding requests, all DOCUMENTS that
23  RELATE to YOUR investigation, evaluation, consideration, and denial of the *DIG*
24  CLAIM, and YOUR claims handling with respect to the *DIG* CLAIM.

25  **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:** Atlantic objects to this
26  Request to the extent it seeks documents that are protected from disclosure by the
27  attorney-client privilege or work-product doctrine, or which were prepared in
28  anticipation of litigation or for trial. Privileged documents are outside the scope of

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

15

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

2  As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are

3  protected from disclosure by the attorney-client privilege or work-product doctrine, or

4  that were prepared in anticipation of litigation or for trial, are being withheld from

5  production. Privileged documents relating to this claim that are being withheld are

6  listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

7  on a Supplemental Privilege Log (except for those documents covered by the parties'

8  agreement described on pages 2-3 of this Response that certain categories of documents

9  need not be included on Atlantic's privilege logs). Atlantic's documents that are

10  responsive to this Request, and which are not privileged, have been, or will be,

11  produced.

12  **REQUEST FOR PRODUCTION NO. 11:**

13  All DOCUMENTS that YOU reviewed in connection with the WAR

14  EXCLUSION prior to YOUR denial of the *DIG* CLAIM.

15  (For clarity, these DOCUMENTS should be specifically labeled, segregated,

16  and/or identified as responsive to this Request.)

17  **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:** Atlantic objects to this

18  Request to the extent it seeks documents that are protected from disclosure by the

19  attorney-client privilege or work-product doctrine, or which were prepared in

20  anticipation of litigation or for trial. Privileged documents are outside the scope of

21  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. As required

22  by Rule 34(b)(2)(C), Atlantic states that documents responsive to this Request that are

23  protected from disclosure by the attorney-client privilege or work-product doctrine, or

24  that were prepared in anticipation of litigation or for trial, are being withheld from

25  production.  Privileged documents relating to this claim that are being withheld are

26  listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

27  on a Supplemental Privilege Log. Atlantic's documents that are responsive to this

28  Request and concern this claim, and which are not privileged, have been, or will be,

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

1515571.1 05608-054

1   produced.

2   Atlantic further objects to this Request to the extent that it seeks information that is

3   outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil

4   Procedure. In particular, the definition of "WAR EXCLUSION" in the Request

5   includes not only the particular war exclusion in the POLICY but also any similar

6   exclusion in other policies. Documents relating to other policies or claims is not

7   relevant to either party's claims or defenses and is not proportional to the needs of this

8   case, considering the importance of the issues at stake in the action, the amount in

9   controversy, the parties' relative access to relevant information, the parties' resources,

10  the importance of the discovery in resolving the issues, and the burden and expense of

11  the proposed discovery, which greatly outweighs its likely benefit, if any. To find all

12  documents responsive to this Request would be extremely burdensome, and Atlantic

13  would have to manually locate and review each policy it has issued that may contain

14  this particular exclusion and any related claim files.

15  Nonetheless, to avoid a discovery dispute, Atlantic further responds as follows: Thus

16  far, Atlantic has not located any other claim in which it denied the claim in whole or in

17  part on the basis of the WAR EXCLUSION. As counsel for Atlantic has stated in

18  discussions with counsel for Plaintiffs, Atlantic has reviewed more than 36,000

19  documents identified in a search of its document management and e-mail system. One

20  of the search terms used in the search that returned these documents was "war." That

21  search looked for documents and e-mails dating back to July 2013. Atlantic can now

22  confirm that it has identified no documents suggesting that any claims were denied on

23  the basis of the WAR EXCLUSION. Atlantic, and its Informational Technology

24  department in particular, have represented that a broader search that would encompass

25  all e-mails and documents without any date restrictions would be nearly impossible. In

26  lieu of searching for the WAR EXCLUSION in each and every one of the many

27  millions of documents and e-mails that Atlantic and OneBeacon have generated over

28  the course of their existences, Atlantic has made inquiries with its employees who

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

17

1  oversee, and former employees who previously oversaw, the claims handling for the

2  entertainment division of Atlantic and with employees of OneBeacon who oversee

3  claims for all of OneBeacon's divisions. Those persons do not recall any claims that

4  Atlantic denied on the grounds that the WAR EXCLUSION applied. Those persons

5  also do not recall any claims in which Atlantic considered the potential applicability of

6  the WAR EXCLUSION or any part thereof but ultimately paid the claim despite the

7  potential applicability of the WAR EXCLUSION. Atlantic has, however, found one e-

8  mail that an employee of Atlantic, Daniel Gutterman, sent to himself, that concerns

9  another claim, and which quotes the various policy language, including its WAR

10 EXCLUSION. There are no other documents suggesting that the WAR EXCLUSION

11 was considered any further in connection with that claim. This one e-mail is being

12 produced as Bates No. ATL000785 – ATL000788.

13 **REQUEST FOR PRODUCTION NO. 12:**

14        All DOCUMENTS RELATING to the WAR EXCLUSION that YOU relied

15 on in denying the *DIG* CLAIM.

16        (For clarity, these DOCUMENTS should be specifically labeled, segregated,

17 and/or identified as responsive to this Request.)

18 **RESPONSE TO REQUEST FOR PRODUCTION NO. 12:** Atlantic objects to this

19 Request to the extent it seeks documents that are protected from disclosure by the

20 attorney-client privilege or work-product doctrine, or which were prepared in

21 anticipation of litigation or for trial. Privileged documents are outside the scope of

22 discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

23 As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are

24 protected from disclosure by the attorney-client privilege or work-product doctrine, or

25 that were prepared in anticipation of litigation or for trial, are being withheld from

26 production. Privileged documents relating to this claim that are being withheld are

27 listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

28 on a Supplemental Privilege Log (except for those documents covered by the parties'

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

18

1  agreement described on pages 2-3 of this Response that certain categories of documents

2  need not be included on Atlantic's privilege logs). Atlantic's documents that are

3  responsive to this Request, and which are not privileged, have been, or will be,

4  produced.

5  **REQUEST FOR PRODUCTION NO. 13:**

6      Any DOCUMENTS that YOU reviewed in connection with the WAR

7  EXCLUSION after YOU denied the *DIG* CLAIM.

8      (For clarity, these DOCUMENTS should be specifically labeled, segregated,

9  and/or identified as responsive to this Request.)

10  **RESPONSE TO REQUEST FOR PRODUCTION NO. 13:** Atlantic objects to this

11  Request to the extent it seeks documents that are protected from disclosure by the

12  attorney-client privilege or work-product doctrine, or which were prepared in

13  anticipation of litigation or for trial. Privileged documents are outside the scope of

14  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. As required

15  by Rule 34(b)(2)(C), Atlantic states that documents responsive to this Request that are

16  protected from disclosure by the attorney-client privilege or work-product doctrine, or

17  that were prepared in anticipation of litigation or for trial, are being withheld from

18  production.  Privileged documents relating to this claim that are being withheld are

19  listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

20  on a Supplemental Privilege Log (except for those documents covered by the parties'

21  agreement described on pages 2-3 of this Response that certain categories of documents

22  need not be included on Atlantic's privilege logs). Atlantic's documents that are

23  responsive to this Request and concern this claim, and which are not privileged, have

24  been, or will be, produced.

25  Atlantic further objects to this Request to the extent that it seeks information that is

26  outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil

27  Procedure. In particular, the definition of "WAR EXCLUSION" in the Request

28  includes not only the particular war exclusion in the POLICY but also any similar

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1   exclusion in other policies. Documents relating to other policies or claims is not

2   relevant to either party's claims or defenses and is not proportional to the needs of this

3   case, considering the importance of the issues at stake in the action, the amount in

4   controversy, the parties' relative access to relevant information, the parties' resources,

5   the importance of the discovery in resolving the issues, and the burden and expense of

6   the proposed discovery, which greatly outweighs its likely benefit, if any. To find all

7   documents responsive to this Request would be extremely burdensome, and Atlantic

8   would have to manually locate and review each policy it has issued that may contain

9   this particular exclusion and any related claim files.

10  Nonetheless, to avoid a discovery dispute, Atlantic further responds as follows: Thus

11  far, Atlantic has not located any other claim in which it denied the claim in whole or in

12  part on the basis of the WAR EXCLUSION. As counsel for Atlantic has stated in

13  discussions with counsel for Plaintiffs, Atlantic has reviewed more than 36,000

14  documents identified in a search of its document management and e-mail system. One

15  of the search terms used in the search that returned these documents was "war." That

16  search looked for documents and e-mails dating back to July 2013. Atlantic can now

17  confirm that it has identified no documents suggesting that any claims were denied on

18  the basis of the WAR EXCLUSION. Atlantic, and its Informational Technology

19  department in particular, have represented that a broader search that would encompass

20  all e-mails and documents without any date restrictions would be nearly impossible. In

21  lieu of searching for the WAR EXCLUSION in each and every one of the many

22  millions of documents and e-mails that Atlantic and OneBeacon have generated over

23  the course of their existences, Atlantic has made inquiries with its employees who

24  oversee, and former employees who previously oversaw, the claims handling for the

25  entertainment division of Atlantic and with employees of OneBeacon who oversee

26  claims for all of OneBeacon's divisions. Those persons do not recall any claims that

27  Atlantic denied on the grounds that the WAR EXCLUSION applied. Those persons

28  also do not recall any claims in which Atlantic considered the potential applicability of

1515571.1 05608-054

20

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

24                                                        EXHIBIT 01

1   the WAR EXCLUSION or any part thereof but ultimately paid the claim despite the

2   potential applicability of the WAR EXCLUSION. Atlantic has, however, found one e-

3   mail that an employee of Atlantic, Daniel Gutterman, sent to himself, that concerns

4   another claim, and which quotes the various policy language, including its WAR

5   EXCLUSION. There are no other documents suggesting that the WAR EXCLUSION

6   was considered any further in connection with that claim. This one e-mail is being

7   produced as Bates No. ATL000785 – ATL000788.

8   **REQUEST FOR PRODUCTION NO. 14:**

9        All of YOUR files, including file jackets and labels, and all other

10   DOCUMENTS that RELATE to PLAINTIFFS' claim that YOU breached YOUR

11   coverage obligations in connection with the POLICY and/or the *DIG* CLAIM.

12   **RESPONSE TO REQUEST FOR PRODUCTION NO. 14:** Atlantic objects to this

13   Request to the extent it seeks documents that are protected from disclosure by the

14   attorney-client privilege or work-product doctrine, or which were prepared in

15   anticipation of litigation or for trial. Privileged documents are outside the scope of

16   discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

17   As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are

18   protected from disclosure by the attorney-client privilege or work-product doctrine, or

19   that were prepared in anticipation of litigation or for trial, are being withheld from

20   production. Privileged documents relating to this claim that are being withheld are

21   listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

22   on a Supplemental Privilege Log (except for those documents covered by the parties'

23   agreement described on pages 2-3 of this Response that certain categories of documents

24   need not be included on Atlantic's privilege logs). Atlantic's documents that are

25   responsive to this Request, and which are not privileged, have been, or will be,

26   produced.

27   **REQUEST FOR PRODUCTION NO. 15:**

28        All DOCUMENTS that constitute, memorialize, evidence, or reflect YOUR

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

21

1 internal COMMUNICATIONS that RELATE to PLAINTIFFS' claim that YOU
2 breached YOUR coverage obligations in connection with the POLICY and/or the
3 *DIG* CLAIM.
4 **RESPONSE TO REQUEST FOR PRODUCTION NO. 15:** Atlantic objects to this
5 Request to the extent it seeks documents that are protected from disclosure by the
6 attorney-client privilege or work-product doctrine, or which were prepared in
7 anticipation of litigation or for trial. Privileged documents are outside the scope of
8 discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.
9 As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are
10 protected from disclosure by the attorney-client privilege or work-product doctrine, or
11 that were prepared in anticipation of litigation or for trial, are being withheld from
12 production. Privileged documents relating to this claim that are being withheld are
13 listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included
14 on a Supplemental Privilege Log (except for those documents covered by the parties'
15 agreement described on pages 2-3 of this Response that certain categories of documents
16 need not be included on Atlantic's privilege logs). Atlantic's documents that are
17 responsive to this Request, and which are not privileged, have been, or will be,
18 produced.
19 **REQUEST FOR PRODUCTION NO. 16:**
20          All DOCUMENTS that constitute, memorialize, evidence, or reflect
21 COMMUNICATIONS between YOU, on the one part, and ONEBEACON, on the
22 other part, that RELATE to PLAINTIFFS' claim that YOU breached YOUR
23 coverage obligations in connection with the POLICY and/or the *DIG* CLAIM.
24 **RESPONSE TO REQUEST FOR PRODUCTION NO. 16:** Atlantic objects to this
25 Request to the extent it seeks documents that are protected from disclosure by the
26 attorney-client privilege or work-product doctrine, or which were prepared in
27 anticipation of litigation or for trial. Privileged documents are outside the scope of
28 discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

EXHIBIT 01

As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are protected from disclosure by the attorney-client privilege or work-product doctrine, or that were prepared in anticipation of litigation or for trial, are being withheld from production. Privileged documents relating to this claim that are being withheld are listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included on a Supplemental Privilege Log (except for those documents covered by the parties' agreement described on pages 2-3 of this Response that certain categories of documents need not be included on Atlantic's privilege logs). Atlantic's documents that are responsive to this Request, and which are not privileged, have been, or will be, produced.

**REQUEST FOR PRODUCTION NO. 17:**

All DOCUMENTS that constitute, memorialize, evidence, or reflect COMMUNICATIONS between YOU and/or ONEBEACON, on the one part, and any of PLAINTIFFS, NBCUNIVERSAL, or AON, on the other part, that RELATE to PLAINTIFFS' claim that YOU breached YOUR coverage obligations in connection with the POLICY and/or the *DIG* CLAIM.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:** Atlantic objects to this Request to the extent it seeks documents that are protected from disclosure by the attorney-client privilege or work-product doctrine, or which were prepared in anticipation of litigation or for trial. Privileged documents are outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are protected from disclosure by the attorney-client privilege or work-product doctrine, or that were prepared in anticipation of litigation or for trial, are being withheld from production. Privileged documents relating to this claim that are being withheld are listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included on a Supplemental Privilege Log (except for those documents covered by the parties' agreement described on pages 2-3 of this Response that certain categories of documents

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

23

1 | need not be included on Atlantic's privilege logs). Atlantic's documents that are
2 | responsive to this Request, and which are not privileged, have been, or will be,
3 | produced.

4 | **REQUEST FOR PRODUCTION NO. 18:**

5 |        All DOCUMENTS that constitute, memorialize, evidence, or reflect
6 | COMMUNICATIONS between YOU, on the one part, and any PERSON (other than
7 | PLAINTIFFS, NBCUNIVERSAL, and AON), on the other part, that RELATE to
8 | PLAINTIFFS' claim that YOU breached YOUR coverage obligations in connection
9 | with the POLICY and/or the *DIG* CLAIM.

10 | **RESPONSE TO REQUEST FOR PRODUCTION NO. 18:** Atlantic objects to this
11 | Request to the extent it seeks documents that are protected from disclosure by the
12 | attorney-client privilege or work-product doctrine, or which were prepared in
13 | anticipation of litigation or for trial. Privileged documents are outside the scope of
14 | discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

15 | As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are
16 | protected from disclosure by the attorney-client privilege or work-product doctrine, or
17 | that were prepared in anticipation of litigation or for trial, are being withheld from
18 | production. Privileged documents relating to this claim that are being withheld are
19 | listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included
20 | on a Supplemental Privilege Log (except for those documents covered by the parties'
21 | agreement described on pages 2-3 of this Response that certain categories of documents
22 | need not be included on Atlantic's privilege logs). Atlantic's documents that are
23 | responsive to this Request, and which are not privileged, have been, or will be,
24 | produced.

25 | **REQUEST FOR PRODUCTION NO. 19:**

26 |        All DOCUMENTS that RELATE to the amount of any reserve that YOU
27 | considered or established in connection with the POLICY and/or the *DIG* CLAIM.

28 |

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

EXHIBIT 01

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1  **RESPONSE TO REQUEST FOR PRODUCTION NO. 19:** Atlantic objects to this
2  Request on the grounds that it seeks documents that are outside the scope of discovery
3  permitted under Rule 26 of the Federal Rules of Civil Procedure, because they are not
4  relevant to either party's claims or defenses. The amount of reserve set has no relation
5  to either the contract-interpretation issue that this case presents or the issue of whether
6  Atlantic investigated or handled the claim at issue properly.

7  Atlantic also objects to this Request to the extent it seeks documents that are protected
8  from disclosure by the attorney-client privilege or work-product doctrine, or which
9  were prepared in anticipation of litigation or for trial. Privileged documents are outside
10 the scope of discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.
11 As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are
12 protected from disclosure by the attorney-client privilege or work-product doctrine, or
13 that were prepared in anticipation of litigation or for trial, are being withheld from
14 production. Privileged documents responsive to this Request that are being withheld are
15 listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included
16 on a Supplemental Privilege Log (except for those documents covered by the parties'
17 agreement described on pages 2-3 of this Response that certain categories of documents
18 need not be included on Atlantic's privilege logs). Atlantic's documents that are
19 responsive to this Request, and which are not privileged, will not be produced because
20 they are not relevant to either party's claims or defenses and are outside the scope of
21 discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

22 **REQUEST FOR PRODUCTION NO. 20:**

23          All agreements, registrations, filings, correspondence, memoranda, and all
24 other DOCUMENTS that RELATE to ONEBEACON or any other PERSON acting
25 as YOUR agent, representative, administrator, or broker in connection with the
26 POLICY or the *DIG* CLAIM.

27 **RESPONSE TO REQUEST FOR PRODUCTION NO. 20:** Atlantic objects to this
28 Request on the grounds that it seeks documents that are outside the scope of discovery

1515571.1 05608-054

25

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  permitted under Rule 26 of the Federal Rules of Civil Procedure. The documents

2  sought are not relevant to either party's claims or defenses and are not proportional to

3  the needs of this case, considering the importance of the issues at stake in the action, the

4  amount in controversy, the parties' relative access to relevant information, the parties'

5  resources, the importance of the discovery in resolving the issues, and the burden and

6  expense of the proposed discovery, which greatly outweighs its likely benefit, if any.

7  Nonetheless, to avoid a discovery dispute, Atlantic further responds as follows: The

8  persons who were involved in the underwriting of the Policy or the handling of the *DIG*

9  *CLAIM* were Atlantic employees, regardless of whether their communications to

10  Plaintiffs or its representatives, including Plaintiffs' broker, contained the name

11  OneBeacon on those communications.  It is not Atlantic's intent to disavow such

12  communications, which were sent on behalf of Atlantic.

13  **REQUEST FOR PRODUCTION NO. 21:**

14      All claims handling manuals, guidelines, policy statements, instructions, and

15  other DOCUMENTS from January 1, 2010 through the present that RELATE to

16  YOUR procedures in assessing, handling, or addressing insured's claims pursuant to

17  commercial insurance products.

18  **RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**  Atlantic objects to this

19  Request to the extent it seeks documents that are protected from disclosure by the

20  attorney-client privilege or work-product doctrine, or which were prepared in

21  anticipation of litigation or for trial. Privileged documents are outside the scope of

22  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

23  As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are

24  protected from disclosure by the attorney-client privilege or work-product doctrine, or

25  that were prepared in anticipation of litigation or for trial, are being withheld from

26  production. Privileged documents relating to this claim that are being withheld are

27  listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

28  on a Supplemental Privilege Log (except for those documents covered by the parties'

1515571.1 05608-054

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  agreement described on pages 2-3 of this Response that certain categories of documents
2  need not be included on Atlantic's privilege logs). Atlantic's documents that are
3  responsive to this Request, and which are not privileged, have been, or will be,
4  produced, including a document entitled "CORE PRINCIPLES" and a document
5  entitled "GENERAL CLAIMS PRACTICES."

6  **REQUEST FOR PRODUCTION NO. 22:**

7        DOCUMENTS sufficient to identify any claims of loss from January 1, 2001
8  to the present under any policy YOU or ONEBEACON issued and/or underwrote in
9  which YOU or ONEBEACON considered, assessed, or addressed the WAR
10 EXCLUSION.

11 **RESPONSE TO REQUEST FOR PRODUCTION NO. 22:** Atlantic objects to this
12 Request to the extent it seeks documents that are protected from disclosure by the
13 attorney-client privilege or work-product doctrine, or which were prepared in
14 anticipation of litigation or for trial. Privileged documents are outside the scope of
15 discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. As required
16 by Rule 34(b)(2)(C), Atlantic states that documents responsive to this Request that are
17 protected from disclosure by the attorney-client privilege or work-product doctrine, or
18 that were prepared in anticipation of litigation or for trial, are being withheld from
19 production.  Privileged documents relating to this claim that are being withheld are
20 listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included
21 on a Supplemental Privilege Log (except for those documents covered by the parties'
22 agreement described on pages 2-3 of this Response that certain categories of documents
23 need not be included on Atlantic's privilege logs). Atlantic's documents that are
24 responsive to this Request and concern this claim, and which are not privileged, have
25 been, or will be, produced.

26 Atlantic further objects to this Request to the extent that it seeks information that is
27 outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil
28 Procedure. In particular, the definition of "WAR EXCLUSION" in the Request

1515571.1 05608-054

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  includes not only the particular war exclusion in the POLICY but also any similar
2  exclusion in other policies. Documents relating to other policies or claims is not
3  relevant to either party's claims or defenses and is not proportional to the needs of this
4  case, considering the importance of the issues at stake in the action, the amount in
5  controversy, the parties' relative access to relevant information, the parties' resources,
6  the importance of the discovery in resolving the issues, and the burden and expense of
7  the proposed discovery, which greatly outweighs its likely benefit, if any. To find all
8  documents responsive to this Request would be extremely burdensome, and Atlantic
9  would have to manually locate and review each policy it has issued that may contain
10 this particular exclusion and any related claim files.

11 Nonetheless, to avoid a discovery dispute, Atlantic further responds as follows: Thus
12 far, Atlantic has not located any other claim in which it denied the claim in whole or in
13 part on the basis of the WAR EXCLUSION. As counsel for Atlantic has stated in
14 discussions with counsel for Plaintiffs, Atlantic has reviewed more than 36,000
15 documents identified in a search of its document management and e-mail system. One
16 of the search terms used in the search that returned these documents was "war." That
17 search looked for documents and e-mails dating back to July 2013. Atlantic can now
18 confirm that it has identified no documents suggesting that any claims were denied on
19 the basis of the WAR EXCLUSION. Atlantic, and its Informational Technology
20 department in particular, have represented that a broader search that would encompass
21 all e-mails and documents without any date restrictions would be nearly impossible. In
22 lieu of searching for the WAR EXCLUSION in each and every one of the many
23 millions of documents and e-mails that Atlantic and OneBeacon have generated over
24 the course of their existences, Atlantic has made inquiries with its employees who
25 oversee, and former employees who previously oversaw, the claims handling for the
26 entertainment division of Atlantic and with employees of OneBeacon who oversee
27 claims for all of OneBeacon's divisions. Those persons do not recall any claims that
28 Atlantic denied on the grounds that the WAR EXCLUSION applied. Those persons

28

1515571.1 05608-054

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
32                                                          EXHIBIT 01

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1 also do not recall any claims in which Atlantic considered the potential applicability of
2 the WAR EXCLUSION or any part thereof but ultimately paid the claim despite the
3 potential applicability of the WAR EXCLUSION. Atlantic has, however, found one e-
4 mail that an employee of Atlantic, Daniel Gutterman, sent to himself, that concerns
5 another claim, and which quotes the various policy language, including its WAR
6 EXCLUSION. There are no other documents suggesting that the WAR EXCLUSION
7 was considered any further in connection with that claim. This one e-mail is being
8 produced as Bates No. ATL000785 – ATL000788.

9 **REQUEST FOR PRODUCTION NO. 23:**

10       A copy of each form policy YOU or ONEBEACON issued and/or underwrote
11 from January 1, 2001 to the present with the WAR EXCLUSION, and any changes
12 to the WAR EXCLUSION language.

13 **RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

14 Atlantic objects to this Request to the extent that it seeks information that is outside the
15 scope of discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.
16 Documents relating to other policies is not relevant to either party's claims or defenses
17 and is not proportional to the needs of this case, considering the importance of the
18 issues at stake in the action, the amount in controversy, the parties' relative access to
19 relevant information, the parties' resources, the importance of the discovery in
20 resolving the issues, and the burden and expense of the proposed discovery, which
21 greatly outweighs its likely benefit, if any. To find all documents responsive to this
22 Request would be extremely burdensome, and Atlantic would have to manually locate
23 and review each policy it has issued that may contain this particular exclusion.
24 Moreover, the policies that Atlantic has provided to any other insureds are wholly
25 irrelevant to the meaning of the language in the policy that governs the relationship
26 between the parties to this lawsuit. Atlantic further objects on the grounds that the
27 Request is not reasonably limited in time. Atlantic is declining to produce responsive
28 documents on the basis of these objections.

1515571.1 05608-054

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

EXHIBIT 01

1   Nonetheless, to avoid a discovery dispute, Atlantic further responds as follows: Atlantic
2   is not currently aware of any indication that it changed the WAR EXCLUSION over
3   time. It is continuing to discuss with its underwriters whether any such change has ever
4   been implemented. As counsel for the parties have agreed, Atlantic will provide
5   information on any changes to the WAR EXCLUSION that have ever been
6   implemented in lieu of providing numerous policies that merely have the same WAR
7   EXCLUSION that appears in the POLICY.

8   **REQUEST FOR PRODUCTION NO. 24:**

9       All claims handling manuals, guidelines, policy statements, instructions, and
10  other DOCUMENTS (and any changes thereto) from January 1, 2001 through the
11  present that RELATE to YOUR procedures in assessing, handling, or addressing the
12  WAR EXCLUSION.

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 24:** Atlantic objects to this
14  Request to the extent it seeks documents that are protected from disclosure by the
15  attorney-client privilege or work-product doctrine, or which were prepared in
16  anticipation of litigation or for trial. Privileged documents are outside the scope of
17  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. Atlantic
18  further objects on the grounds that the Request is not reasonably limited in time.
19  However, Atlantic responds that it has not located any documents responsive to this
20  Request.  But see the documents produced in response to Request No. 21.

21  **REQUEST FOR PRODUCTION NO. 25:**

22      Any financial statements, profit and loss statements, balance sheets, financial
23  projections, or similar DOCUMENTS RELATING to YOUR profit/loss under the
24  POLICY and under each of the earlier policies YOU issued to NBCUNIVERSAL
25  (Policy Nos. MP00163-03; MP00163-02; MP00163-01; and Policy No.
26  MP00163-00).

27  **RESPONSE TO REQUEST FOR PRODUCTION NO. 25:** Atlantic objects to this
28  Request to the extent that it seeks documents that are outside the scope of discovery

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

30

permitted under Rule 26 of the Federal Rules of Civil Procedure. The Request seeks documents that are not relevant to either party's claims or defenses. Atlantic also objects to this Request because it seeks documents that contain trade secrets or similar confidential and/or proprietary information protected from disclosure. Atlantic is withholding documents on the basis of these objections.

**REQUEST FOR PRODUCTION NO. 26:**

All DOCUMENTS that RELATE to YOUR decision not to renew the POLICY.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:** Atlantic objects to this Request to the extent it seeks documents that are protected from disclosure by the attorney-client privilege or work-product doctrine, or which were prepared in anticipation of litigation or for trial. Privileged documents are outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are protected from disclosure by the attorney-client privilege or work-product doctrine, or that were prepared in anticipation of litigation or for trial, are being withheld from production. Privileged documents relating to this claim that are being withheld are listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included on a Supplemental Privilege Log (except for those documents covered by the parties' agreement described on pages 2-3 of this Response that certain categories of documents need not be included on Atlantic's privilege logs).

Atlantic further objects to this Request because it seeks documents that are not relevant to either party's claims or defenses and are thus outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil Procedure for this additional reason.

However, the non-privileged documents responsive to this Request will be produced.

**REQUEST FOR PRODUCTION NO. 27:**

All DOCUMENTS that constitute, memorialize, evidence, or reflect YOUR

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

31

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  internal COMMUNICATIONS that RELATE to YOUR decision not to renew the
2  POLICY.

3  **RESPONSE TO REQUEST FOR PRODUCTION NO. 27:** Atlantic objects to this
4  Request to the extent it seeks documents that are protected from disclosure by the
5  attorney-client privilege or work-product doctrine, or which were prepared in
6  anticipation of litigation or for trial. Privileged documents are outside the scope of
7  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

8  As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are
9  protected from disclosure by the attorney-client privilege or work-product doctrine, or
10 that were prepared in anticipation of litigation or for trial, are being withheld from
11 production. Privileged documents relating to this claim that are being withheld are
12 listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included
13 on a Supplemental Privilege Log (except for those documents covered by the parties'
14 agreement described on pages 2-3 of this Response that certain categories of documents
15 need not be included on Atlantic's privilege logs).

16 Atlantic further objects to this Request because it seeks documents that are not relevant
17 to either party's claims or defenses and are thus outside the scope of discovery
18 permitted under Rule 26 of the Federal Rules of Civil Procedure for this additional
19 reason.

20 However, the non-privileged documents responsive to this Request will be
21 produced.

22 **REQUEST FOR PRODUCTION NO. 28:**

23      All DOCUMENTS that constitute, memorialize, evidence, or reflect
24 COMMUNICATIONS between YOU, on the one part, and ONEBEACON, on the
25 other part, that RELATE to YOUR decision not to renew the POLICY.

26 **RESPONSE TO REQUEST FOR PRODUCTION NO. 28:** Atlantic objects to this
27 Request to the extent it seeks documents that are protected from disclosure by the
28 attorney-client privilege or work-product doctrine, or which were prepared in

1515571.1 05608-054

32

1  anticipation of litigation or for trial. Privileged documents are outside the scope of

2  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

3  As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are

4  protected from disclosure by the attorney-client privilege or work-product doctrine, or

5  that were prepared in anticipation of litigation or for trial, are being withheld from

6  production. Privileged documents relating to this claim that are being withheld are

7  listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

8  on a Supplemental Privilege Log (except for those documents covered by the parties'

9  agreement described on pages 2-3 of this Response that certain categories of documents

10  need not be included on Atlantic's privilege logs).

11  Atlantic further objects to this Request because it seeks documents that are not relevant

12  to either party's claims or defenses and are thus outside the scope of discovery

13  permitted under Rule 26 of the Federal Rules of Civil Procedure for this additional

14  reason.

15  However, the non-privileged documents responsive to this Request will be

16  produced.

17  **REQUEST FOR PRODUCTION NO. 29:**

18      All DOCUMENTS that constitute, memorialize, evidence, or reflect

19  COMMUNICATIONS between YOU and/or ONEBEACON, on the one part, and

20  any of PLAINTIFFS, NBCUNIVERSAL, or AON, on the other part, that RELATE

21  to YOUR decision not to renew the POLICY.

22  **RESPONSE TO REQUEST FOR PRODUCTION NO. 29:** Atlantic objects to this

23  Request because it seeks documents that are not relevant to either party's claims or

24  defenses and are thus outside the scope of discovery permitted under Rule 26 of the

25  Federal Rules of Civil Procedure for this additional reason.

26  However, the non-privileged documents responsive to this Request will be produced.

27  **REQUEST FOR PRODUCTION NO. 30:**

28      All DOCUMENTS that constitute, memorialize, evidence, or reflect

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

33

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

37                                              EXHIBIT 01

1    COMMUNICATIONS between YOU, on the one part, and any PERSON (other

2    than PLAINTIFFS, NBCUNIVERSAL, and AON), on the other part, that RELATE

3    to YOUR decision not to renew the POLICY.

4    **RESPONSE TO REQUEST FOR PRODUCTION NO. 30:** Atlantic objects to this

5    Request to the extent it seeks documents that are protected from disclosure by the

6    attorney-client privilege or work-product doctrine, or which were prepared in

7    anticipation of litigation or for trial. Privileged documents are outside the scope of

8    discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

9    As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are

10   protected from disclosure by the attorney-client privilege or work-product doctrine, or

11   that were prepared in anticipation of litigation or for trial, are being withheld from

12   production. Privileged documents relating to this claim that are being withheld are

13   listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

14   on a Supplemental Privilege Log (except for those documents covered by the parties'

15   agreement described on pages 2-3 of this Response that certain categories of documents

16   need not be included on Atlantic's privilege logs).   Atlantic's documents that are

17   responsive to this Request, and which are not privileged, have been, or will be,

18   produced.

19   **REQUEST FOR PRODUCTION NO. 31:**

20       All DOCUMENTS supporting, contradicting, or otherwise RELATING to the

21   allegation in YOUR ANSWER (¶ 29) that YOU "den[y] that [the *DIG* CLAIM] was

22   properly tendered and submitted."

23   **RESPONSE TO REQUEST FOR PRODUCTION NO. 31:** Atlantic objects to this

24   Request to the extent it seeks documents that are protected from disclosure by the

25   attorney-client privilege or work-product doctrine, or which were prepared in

26   anticipation of litigation or for trial. Privileged documents are outside the scope of

27   discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

28   As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

34

1  protected from disclosure by the attorney-client privilege or work-product doctrine, or

2  that were prepared in anticipation of litigation or for trial, are being withheld from

3  production. Privileged documents relating to this claim that are being withheld are

4  listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

5  on a Supplemental Privilege Log (except for those documents covered by the parties'

6  agreement described on pages 2-3 of this Response that certain categories of documents

7  need not be included on Atlantic's privilege logs).  Atlantic's documents that are

8  responsive to this Request, and which are not privileged, have been, or will be,

9  produced.

10  **REQUEST FOR PRODUCTION NO. 32:**

11  All DOCUMENTS supporting, contradicting, or otherwise RELATING to

12  each of the affirmative defenses YOU alleged in YOUR ANSWER to the

13  COMPLAINT.

14  **RESPONSE TO REQUEST FOR PRODUCTION NO. 32:** Atlantic objects to this

15  Request to the extent it seeks documents that are protected from disclosure by the

16  attorney-client privilege or work-product doctrine, or which were prepared in

17  anticipation of litigation or for trial. Privileged documents are outside the scope of

18  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.

19  As required by Rule 34(b)(2)(C), Atlantic states that responsive documents that are

20  protected from disclosure by the attorney-client privilege or work-product doctrine, or

21  that were prepared in anticipation of litigation or for trial, are being withheld from

22  production. Privileged documents relating to this claim that are being withheld are

23  listed on the Privilege Log previously provided to Plaintiffs' counsel or will be included

24  on a Supplemental Privilege Log (except for those documents covered by the parties'

25  agreement described on pages 2-3 of this Response that certain categories of documents

26  need not be included on Atlantic's privilege logs).  Atlantic's documents that are

27  responsive to this Request, and which are not privileged, have been, or will be,

28  produced.

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

35

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

39                                                                    EXHIBIT 01

<u>**REQUEST FOR PRODUCTION NO. 33:**</u>

All DOCUMENTS identified in YOUR initial disclosures pursuant to Fed. R. Civ. P. Rule 26(a)(1) served on September 16, 2016.

<u>**RESPONSE TO REQUEST FOR PRODUCTION NO. 33:**</u> These documents have been or will be produced.

DATED: December 16, 2016    MARC J. SHRAKE
                                ANDERSON, McPHARLIN & CONNERS LLP

                                       -and-

                                MICHAEL KEELEY *(Pro Hac Vice)*
                                JOHN R. RIDDLE *(Pro Hac Vice)*
                                CARLA C. CRAPSTER *(Pro Hac Vice)*
                                STRASBURGER & PRICE, LLP

                                By:    */s/ Michael Keeley*
                                        Michael Keeley
                                Attorneys for Defendant ATLANTIC
                                SPECIALTY INSURANCE COMPANY

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515571.1 05608-054

ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

40

EXHIBIT 01

## PROOF OF SERVICE

I am employed in the County of Dallas, State of Texas. I am over the age of eighteen years and not a party to the within action; my business address is 901 Main Street, Suite 6000, Dallas, Texas 75202.

On December 16, 2016, I served the following document(s) described as **DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES TO FIRST SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS LLC AND NORTHERN ENTERTAINMENT PRODUCTIONS LLC** on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

Lucia E. Coyoca, Esq.                                  Attorneys for Plaintiffs
Valentine A. Shalamitski, Esq.
Mitchell Silberg & Knupp LLP
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

**BY MAIL:** I am "readily familiar" with Strasburger & Price, LLP's practice for collecting and processing correspondence for mailing with the United States Postal Service. Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business. Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Dallas, Texas, on that same day following ordinary business practices.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made. Executed on December 16, 2016, at Dallas, Texas.

Marianna Green

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

# EXHIBIT 2

| DATE | DESCRIPTION | TO/ADDRESSEE | FROM/AUTHOR | CC | PRIVILEGE ASSERTED |
|---|---|---|---|---|---|
| N/A | Letter regarding August 13, 2014 response received from Lucia Coyoca | N/A | Leon Gladstone | | Work Product, Anticipation of Litigation, Attorney Client |
| N/A | Charts regarding various claims (including many others besides the Dig claim) | N/A | N/A | | Work Product, Anticipation of Litigation, Attorney Client |
| N/A | Report Summarizing Dig Claim (including status and strategy) | N/A | N/A | | Work Product; Anticipation of Litigation |
| 07/17/2014 | Email regarding question on Dig claim | Peter Williams | Mike Frimet, Attorney with Stalker Vogrin Bracken Frimet | | Attorney Client |
| 07/18/2014 | Email regarding requested information | Leon Gladstone | Pamela Johnson | Gene Weisberg | Attorney Client |
| 07/18/2014 | Email regarding Dig claim | Leon Gladstone; Gene Weisberg | Pamela Johnson | Daniel Gutterman | Attorney Client |
| 07/18/2014 | Email string regarding Dig claim | Daniel Gutterman; Pamela Johnson; Leon Gladstone; Gene Weisberg | | | Attorney Client |
| 07/21/2014 | Email string regarding opinion letter; attachment - opinion letter | Pamela Johnson; Daniel Gutterman; Leon Gladstone | | | Attorney Client |
| 07/21/2014 | Email regarding opinion letter; attachment - opinion letter | Pamela Johnson | Leon Gladstone | | Attorney Client |
| 07/21/2014 | Email regarding opinion letter | Pamela Johnson; Theresa Gooley | | | Attorney Client |
| 07/21/14 | Email regarding opinion letter | Pamela Johnson; Theresa Gooley; Leon Gladstone | | | Attorney Client |
| 07/21/14 | Email regarding opinion letter | Pamela Johnson; Theresa Gooley; Leon Gladstone | | | Attorney Client |
| 07/21/2014; 07/22/2014 | Email regarding opinion letter; attachment - opinion letter | Pamela Johnson; Daniel Gutterman; Leon Gladstone | | | Attorney Client |

42

EXHIBIT 02

| 07/21/2014; 07/23/2014 | Email string regarding opinion letter | Pamela Johnson; Peter Williams; Leon Gladstone | | | Attorney Client |
|---|---|---|---|---|---|
| 07/21/14; 07/23/14 | Email string regarding opinion letter and communications with NBC | Pamela Johnson; Leon Gladstone | | | Attorney Client |
| 07/24/2014 | Email regarding Dig | Pamela Jonson | Leon Gladstone | | Attorney Client |
| 07/24/2014 | Email regarding opinion letter; attachment | Pamela Johnson | Leon Gladstone | | Attorney Client |
| 07/21/2014 | Attachment: opinion letter | Pamela Johnson | Leon Gladstone; Gene Weisberg | | Attorney Client |
| 07/29/14 | Email regarding counsel used for coverage opinion | Pamela Johnson | Peter Williams | | Attorney Client, Work Product, Anticipation of Litigation |
| 07/29/14 | Email string regarding counsel used for coverage opinion | Pamela Johnson; Peter Williams | | | Attorney Client, Work Product, Anticipation of Litigation |
| 07/29/14 | Email string regarding counsel used for coverage opinion | Peter Williams; Pamela Johnson | | | Attorney Client, Work Product, Anticipation of Litigation |
| 08/02/2014 | Email regarding claims review; attachment - chart of claims summaries (including many others besides the Dig claim) | Daniel Gutterman | Daniel Gutterman | | Work Product, Anticipation of Litigation |
| 08/05/2014 | Email regarding opinion letter | Pamela Johnson | Leon Gladstone | | Attorney Client, Work Product, Anticipation of Litigation |
| 08/05/2014 | Email regarding opinion letter | Leon Gladstone | Pamela Johnson | | Attorney Client, Work Product, Anticipation of Litigation |
| 08/05/2014 | Email regarding opinion letter | Pamela Johnson | Leon Gladstone | | Attorney Client, Work Product, Anticipation of Litigation |
| 08/08/2014 | Email regarding claims review; attachment - chart of claims summaries (including many others besides the Dig claim) | Daniel Gutterman | Daniel Gutterman | | Work Product, Anticipation of Litigation |
| 08/14/2014 | Email regarding NBC response | Daniel Gutterman | Pamela Johnson | | Work Product, Anticipation of Litigation |

43

EXHIBIT 02

| 08/14/2014 | Email regarding NBC response | Daniel Gutterman; Leon Gladstone; Gene Weisberg | Pamela Johnson | | Attorney Client; Work Product; Anticipation of Litigation |
|---|---|---|---|---|---|
| 08/14/2014 | Email regarding NBC response | Daniel Gutterman; Pamela Johnson; Leon Gladstone; Gene Weisberg | | | Attorney Client; Work Product; Anticipation of Litigation |
| 08/14/2014 | Email regarding NBC response | Daniel Gutterman | Pamela Johnson | | Attorney Client; Work Product; Anticipation of Litigation |
| 08/14/2014 | Email regarding NBC response | Pamela Johnson | Leon Gladstone | Daniel Gutterman; Gene Weisberg | Attorney Client; Work Product; Anticipation of Litigation |
| 08/16/2014 | Email regarding claims review; attachment - chart of claims summaries (including many others besides the Dig claim) | Daniel Gutterman | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 08/14/2014; 08/18/2014 | Email string regarding NBC response | Pamela Johnson; Leon Gladstone; Daniel Gutterman; Gene Weisberg | | | Attorney Client; Work Product; Anticipation of Litigation |
| 08/14/2014; 08/18/2014 | Email string regarding NBC response | Daniel Gutterman; Pamela Johnson; Leon Gladstone; Gene Weisberg | | | Attorney Client; Work Product; Anticipation of Litigation |
| 08/14/2014; 08/18/2014 | Email string regarding NBC response | Leon Gladstone; Pamela Johnson; Daniel Gutterman; Gene Weisberg | | | Attorney Client; Work Product; Anticipation of Litigation |
| 08/14/2014; 08/18/2014 | Email string regarding NBC response | Daniel Gutterman; Leon Gladstone; Pamela Johnson; Gene Weisberg | | | Attorney Client; Work Product; Anticipation of Litigation |
| 08/14/2014; 08/18/2014 | Email string regarding NBC response | Leon Gladstone; Pamela Johnson; Daniel Gutterman; Gene Weisberg | | | Attorney Client; Work Product; Anticipation of Litigation |
| 08/23/14 | Email regarding claims review; attachment - chart of claims summaries (including many others besides the Dig claim) | Daniel Gutterman | Daniel Gutterman | | Work Product; Anticipation of Litigation |

44

EXHIBIT 02

| 08/27/2014 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Kristin Boller, Executive Administrative Assistant Claims for OneBeacon | Aaron Stone, Vice President Claims - OneBeacon | Theresa Gooley; Joseph Schmitt | Work Product; Anticipation of Litigation |
| --- | --- | --- | --- | --- | --- |
| 08/29/2014 | Email regarding claims review; attachment - chart of claims summaries (including many others besides the Dig claim) | Daniel Gutterman | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 09/02/2014 | Email regarding list of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Kristin Boller | Dana Lenahan,  Assistant Vice President for OneBeacon Technology Claims | Theresa Gooley; Joseph Schmitt | Work Product; Anticipation of Litigation |
| 09/03/2014 | Email regarding NBC Response | Pamela Johnson | Michelle Schmidt, Senior Claim Assistant for OneBeacon | | Work Product; Anticipation of Litigation |
| 09/04/2014 | Email regarding list of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Pamela Johnson | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 09/04/2014 | Email regarding list of claims (including many others besides Dig); attachments - Charts regarding claims (including many others besides Dig) | | Theresa Gooley | Joseph Schmitt | Work Product; Anticipation of Litigation |
| 09/08/2014 | Email regarding claims review; attachment - chart of claims summaries (including many others besides the Dig claim) | Daniel Gutterman | Daniel Gutterman | | Work Product; Anticipation of Litigation |

| 09/13/2014 | Email regarding claims review; attachment - chart of claims summaries (including many others besides the Dig claim) | Daniel Gutterman | Daniel Gutterman | | Work Product; Anticipation of Litigation |
|---|---|---|---|---|---|
| 09/13/2014 | Email regarding response to NBC | Leon Gladstone; Gene Weisberg | Pamela Johnson | | Attorney Client, Work Product; Anticipation of Litigation |
| 09/12/2014; 09/14/2014 | Email string regarding response to NBC | Leon Gladstone; Pamela Johnson; Gene Weisberg | | | Attorney Client, Work Product; Anticipation of Litigation |
| 09/12/2014; 09/14/2014 | Email string regarding response to NBC | Pamela Johnson; Leon Gladstone; Gene Weisberg | | | Attorney Client, Work Product; Anticipation of Litigation |
| 09/12/2014; 09/15/2014 | Email string regarding response to NBC | Gene Weisberg; Pamela Johnson; Leon Gladstone | | | Attorney Client, Work Product; Anticipation of Litigation |
| 09/15/2014 | Email regarding NBC letter | Leon Gladstone; Gene Weisberg | Pamela Johnson | | Attorney Client, Work Product; Anticipation of Litigation |
| 09/15/2014 | Email regarding NBC letter | Pamela Johnson | Gene Weisberg | Leon Gladstone | Attorney Client, Work Product; Anticipation of Litigation |
| 09/15/2014 | Email string regarding NBC letter | Leon Gladstone; Pamela Johnson; Gene Weisberg | | | Attorney Client, Work Product; Anticipation of Litigation |
| 09/18/2014 | Email regarding draft response to NBC; attachment - Draft letter | Pamela Johnson | Leon Gladstone | | Attorney Client, Work Product; Anticipation of Litigation |
| 09/19/2014 | Email regarding research regarding Dig claim | Pamela Johnson; Peter Williams | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 09/19/2014 | Email string regarding research regarding Dig claim | Peter Williams; Wanda Phillips, Underwriting Manager - NY Office - OneBeacon; Daniel Gutterman; Pamela Johnson | | | Work Product; Anticipation of Litigation |
| 09/19/2014 | Email string regarding research regarding Dig claim | Wanda Phillips; Peter Williams; Daniel Gutterman; Pamela Johnson | | | Work Product; Anticipation of Litigation |

46

EXHIBIT 02

| | | | | |
|---|---|---|---|---|
| 09/20/2014 | Email regarding claims review; attachment - chart of claims summaries (including many others besides the Dig claim) | Daniel Gutterman | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 09/19/2014; 09/22/2014 | Email regarding list of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Theresa Gooley | Judi Lamble, Vice President of Claims for OneBeacon Insurance | | Work Product; Anticipation of Litigation |
| 10/07/14 | Email regarding various claims (including Dig) | Pamela Johnson | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 10/10/2014 | Email regarding claims review; attachment - chart of claims summaries (including many others besides the Dig claim) | Daniel Gutterman | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 10/18/2014 | Email regarding claims review; attachment - chart of claims summaries (including many others besides the Dig claim) | Daniel Gutterman | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 10/07/2014; 10/27/2014 | Email string regarding status of claims (including many others besides the Dig claim) | Pamela Johnson; Daniel Gutterman | | | Work Product; Anticipation of Litigation |
| 10/27/2014 | Email string regarding status of claims (including many others besides the Dig claim) | Daniel Gutterman; Pamela Johnson | | | Work Product; Anticipation of Litigation |
| 10/07/2014; 10/27/2014 | Email string regarding status of claims (including many others besides the Dig claim) | Daniel Gutterman; Pamela Johnson | | | Work Product; Anticipation of Litigation |
| 10/07/2014; 10/27/2014 | Email string regarding status of claims (including many others besides the Dig claim) | Pamela Johnson; Daniel Gutterman | | | Work Product; Anticipation of Litigation |

47

EXHIBIT 02

| | | | | |
|---|---|---|---|---|
| 10/07/2014; 10/27/2014 | Email string regarding status of claims (including many others besides the Dig claim) | Daniel Gutterman; Pamela Johnson | | Work Product; Anticipation of Litigation |
| 10/27/2014 | Email regarding status update on Dig and other claims | Sean Duffy, Senior Vice President and Chief Claims Officer of OneBeacon Insurance | Theresa Gooley | Work Product; Anticipation of Litigation |
| 11/04/2014 | Email regarding meeting with NBC | Pamela Johnson | Theresa Gooley | Work Product; Anticipation of Litigation |
| 11/04/2014 | Email string regarding meeting with NBC | Pamela Johnson; Theresa Gooley | | Work Product; Anticipation of Litigation |
| 11/05/2014 | Email regarding proposed status call | Kristin Boller | Theresa Gooley | Work Product; Anticipation of Litigation |
| 11/05/2014 | Email string regarding proposed status call | Kristin Boller; Theresa Gooley | | Work Product; Anticipation of Litigation |
| 11/05/2014 | Email string regarding status call - Dig | Theresa Gooley; Kristin Boller | | Work Product; Anticipation of Litigation |
| 11/05/2014 | Calendar Event regarding status call - Dig | Theresa Gooley | Kristin Boller on behalf of Sean Duffy | Work Product; Anticipation of Litigation |
| 11/05/2014 | Email string regarding status call - Dig | Kristin Boller; Theresa Gooley | | Work Product; Anticipation of Litigation |
| 11/05/2014 | Calendar event regarding status call - Dig | Sean Duffy | Theresa Gooley | Work Product; Anticipation of Litigation |
| 11/05/2014 | Email string regarding status call - Dig | Theresa Gooley; Kristin Boller | | Work Product; Anticipation of Litigation |
| 11/07/14 | Email regarding claims review process, as discussed with Aon representatives | Pamela Johnson | Daniel Gutterman | Work Product; Anticipation of Litigation |
| 11/06/2014; 11/07/2014 | Email string regarding status of open claims (including many others besides Dig); attachment summarizing status of such claims | Naomi Dearing, Senior Administrative Assistant at OneBeacon Insurance; Theresa Gooley | | Work Product; Anticipation of Litigation |
| 11/07/2014 | Email regarding status meeting - Dig | Pamela Johnson | Theresa Gooley | Work Product; Anticipation of Litigation |
| 11/07/2014 | Email string regarding status meeting - Dig | Pamela Johnson; Theresa Gooley | | Work Product; Anticipation of Litigation |

48

EXHIBIT 02

| 11/07/2014 | Calendar Event regarding Dig meeting | Daniel Gutterman; Peter Williams; Theresa Gooley | Pamela Johnson | | Work Product; Anticipation of Litigation |
|---|---|---|---|---|---|
| 11/07/2014 | Calendar Event regarding Dig meeting | | | | Work Product; Anticipation of Litigation |
| 11/14/2014 | Email regarding contact with counsel | Theresa Gooley | Pamela Johnson | | Work Product; Anticipation of Litigation |
| 11/14/2014 | Email string regarding contact with counsel | Theresa Gooley; Pamela Johnson | | | Work Product; Anticipation of Litigation |
| 11/14/2014 | Email string regarding contact with counsel | Pamela Johnson; Theresa Gooley | | | Work Product; Anticipation of Litigation |
| 11/16/2014 | Email regarding representation | Pamela Johnson | Wayne Borgeest, Attorney with Kaufman Borgeest & Ryan LLP | | Attorney Client; Work Product; Anticipation of Litigation |
| 11/16/2014 | Email string regarding representation | Pamela Johnson; Wayne Borgeest | | | Attorney Client; Work Product; Anticipation of Litigation |
| 11/16/2014; 11/17/2014 | Email string regarding representation | Wayne Borgeest; Pamela Johnson; Lisa Gonzalez, assistant to Wayne Borgeest | | | Attorney Client; Work Product; Anticipation of Litigation |
| 11/16/2014 | Calendar Event regarding call with Wayne Borgeest - Dig Claim | Pamela Johnson; Theresa Gooley; Daniel Gutterman | | | Attorney Client; Work Product; Anticipation of Litigation |
| 11/17/2014 | Email string regarding representation and call | Pamela Johnson; Wayne Borgeest; Lisa Gonzalez | | | Attorney Client; Work Product; Anticipation of Litigation |
| 11/17/2014 | Email regarding contact | Pamela Johnson | Lisa Gonzalez | | Attorney Client; Work Product; Anticipation of Litigation |
| 11/17/2014 | Calendar Event regarding call with Wayne Borgeest | Pamela Johnson | Daniel Gutterman | | Attorney Client; Work Product; Anticipation of Litigation |
| 11/17/2014 | Calendar Event regarding call with Wayne Borgeest | Pamela Johnson | Theresa Gooley | | Attorney Client; Work Product; Anticipation of Litigation |
| 11/14/2014; 11/18/2014 | Email string regarding contact with counsel | Theresa Gooley; Pamela Johnson | | | Work Product; Anticipation of Litigation |
| 11/14/2014; 11/18/2014 | Email string regarding contact with counsel | Pamela Johnson; Theresa Gooley | | | Work Product; Anticipation of Litigation |

49

EXHIBIT 02

| 11/18/2014 | Email string regarding representation and contact | Pamela Johnson; Wayne Borgeest; Lisa Gonzalez | | | Attorney Client; Work Product; Anticipation of Litigation |
|---|---|---|---|---|---|
| 11/18/2014 | Email regarding contact | Pamela Johnson | Lisa Gonzalez | | Attorney Client; Work Product; Anticipation of Litigation |
| 11/18/2014 | Email string regarding conference call | Wayne Borgeest; Pamela Johnson; Lisa Gonzalez | | | Attorney Client; Work Product; Anticipation of Litigation |
| 11/18/2014 | Email string regarding conference call | Pamela Johnson; Wayne Borgeest; Lisa Gonzalez | | | Attorney Client; Work Product; Anticipation of Litigation |
| 11/18/2014 | Email regarding response to NBC in settlement negotiations | Pamela Johnson; Theresa Gooley | | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 11192014 | Email regarding offer of settlement | Pamela Johnson; Daniel Gutterman | Theresa Gooley | Peter Williams | Work Product; Anticipation of Litigation; Settlement Discussions |
| 11/19/2014 | Email regarding update on discussions of Dig with NBC | Daniel Gutterman | Theresa Gooley | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 11/19/2014 | Email string regarding update on discussions of Dig with NBC | Daniel Gutterman; Theresa Gooley | | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 11/19/2014 | Email regarding offer - Dig | Pamela Johnson; Daniel Gutterman | Theresa Gooley | Peter Williams | Work Product; Anticipation of Litigation; Settlement Discussions |
| 11/19/2014 | Email string regarding offer | Pamela Johnson; Theresa Gooley | | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 11/20/2014 | Email regarding claims review (including many others besides the Dig claim) ; attachment - Chart of claims summaries (including many others besides the Dig claim) | Peter Williams | Daniel Gutterman | | Work Product; Anticipation of Litigation |

| 11/20/2014 | Email regarding claims review (including many others besides the Dig claim) ; attachment -Chart of claims summaries (including many others besides the Dig claim) | Judi Lamble | Theresa Gooley | | Work Product; Anticipation of Litigation |
|---|---|---|---|---|---|
| 11/16/2014; 11/17/2014; 11/18/2014; 11/24/2014 | Email string regarding call and representation | Pamela Johnson; Wayne Borgeest; Lisa Gonzales | | | Attorney Client; Work Product; Anticipation of Litigation |
| 11/16/2014; 11/17/2014; 11/18/2014; 11/24/2014 | Email string regarding call and representation | Wayne Borgeest; Pamela Johnson; Lisa Gonzalez | | | Attorney Client; Work Product; Anticipation of Litigation |
| 12/03/2014 | Email regarding reserve for Dig claim | Pamela Johnson | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 12/03/2014 | Email string regarding reserve for Dig claim | Pamela Johnson; Theresa Gooley | | | Work Product; Anticipation of Litigation |
| 12/03/2014 | Email string regarding reserve for Dig claim | Pamela Johnson; Peter Williams; Theresa Gooley | | | Work Product; Anticipation of Litigation |
| 12/03/2014 | Email string regarding reserve for Dig claim | Pamela Johnson; Theresa Gooley | | | Work Product; Anticipation of Litigation |
| 12/03/2014 | Email string regarding reserve for Dig claim | Peter Williams | Pamela Johnson | | Work Product; Anticipation of Litigation |
| 12/03/2014 | Email string regarding reserve for Dig claim | Peter Williams; Pamela Johnson | | | Work Product; Anticipation of Litigation |
| 12/03/2014 | Email string regarding reserve for Dig claim | Pamela Johnson; Peter Williams | | | Work Product; Anticipation of Litigation |
| 12/03/2014 | Email string regarding reserve for Dig claim | Pamela Johnson; Theresa Gooley | | | Work Product; Anticipation of Litigation |
| 12/03/2014 | Email string regarding reserve for Dig claim | Theresa Gooley; Pamela Johnson | | | Work Product; Anticipation of Litigation |
| 12/03/2014; 12/04/2014 | Email string regarding reserve for Dig claim | Pamela Johnson; Peter Williams | | | Work Product; Anticipation of Litigation |
| 12/03/2014; 12/04/2014 | Email string regarding reserve for Dig claim | Peter Williams; Pamela Johnson | | | Work Product; Anticipation of Litigation |

51                                                                      EXHIBIT 02

| 12/09/2014 | Email regarding offer of settlement | Daniel Gutterman | Peter Williams | Wanda Phillips, Underwriter for OneBeacon Services, LLC | Work Product; Anticipation of Litigation; Settlement Discussions |
|---|---|---|---|---|---|
| 12/09/2014 | Email regarding status update on claims (including many others besides the Dig claim); attachment - Chart regarding claims (including many others besides Dig) | Pamela Johnson; Peter Williams | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 12/09/2014 | Email string regarding offer to NBC regarding Dig claim | Pamela Johnson; Peter Williams; Daniel Gutterman; Theresa Gooley; Wanda Phillips | | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 12/09/2014 | Email string regarding offer to NBC regarding Dig claim | Wanda Phillips; Peter Williams; Daniel Gutterman; Theresa Gooley; Pamela Johnson | | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 12/09/2014 | Email string regarding offer to NBC regarding Dig claim | Peter Williams | Theresa Gooley | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 12/09/2014 | Email regarding claims (including many others besides the Dig claim); attachment - list of claims (including many others besides the Dig claim) | Pamela Johnson; Peter Williams; Wanda Phillips | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 12/17/2014 | Email regarding claims (including many others besides the Dig claim); attachment - Chart regarding claims (including many others besides Dig) (including many others besides the Dig claim) | Judi Lamble | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 01/07/2015 | Email regarding call from Lucia Coyoca | Peter Williams; Daniel Gutterman; Pamela Johnson | Theresa Gooley | | Work Product; Anticipation of Litigation |

EXHIBIT 02

| Date | Description | To/From | CC | Privilege |
|---|---|---|---|---|
| 01/12/2015 | Email string regarding communications with Lucia Coyoca | Theresa Gooley; Peter Williams; Dennis Crosby; Sean Duffy | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 01/12/2015 | Email regarding communications with Lucia Coyoca | Pamela Johnson | Theresa Gooley | Work Product; Anticipation of Litigation; Settlement Discussions |
| 01/12/2015 | Email string regarding communications with Lucia Coyoca | Pamela Johnson; Theresa Gooley | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 01/12/2015 | Email string regarding communications with Lucia Coyoca | Theresa Gooley; Pamela Johnson | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 01/12/2015 | Email string regarding communications with Lucia Coyoca | Pamela Johnson; Theresa Gooley | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 01/12/2015 | Email string regarding communications with Lucia Coyoca | Theresa Gooley; Pamela Johnson | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 01/16/2015; 01/19/2015; 01/20/2015 | Email string regarding invoices; attachments - invoices | Leon Gladstone; Daniel Gutterman; Brian Gross, Accounting Manager - Gladstone, Michel, Weisberg, Willner & Sloane, ALC | | Attorney Client |
| 01/16/2015; 01/19/2015; 01/20/2015; 01/21/2015 | Email string regarding invoices | Daniel Gutterman; Brian Gross; Leon Gladstone | | Attorney Client |
| 01/16/2015; 01/19/2015; 01/20/2015; 01/21/2015 | Email string regarding invoices | Daniel Gutterman; Lucy Lopez, Senior Claims Representative for OneBeacon; Brian Gross; Leon Gladstone | | Attorney Client |
| 01/28/2015 | Chart regarding loss run for NBC (includes information on many other claims besides the Dig claim) | | Wanda Phillips | Work Product; Anticipation of Litigation |

53

EXHIBIT 02

| 02/03/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Judi Lamble; Theresa Gooley; Joseph Gallagher, Senior Vice President at International Marine Underwriters (a division of OneBeacon Insurance Group) | Kristin Boller | Sean Duffy; Joseph Schmitt | Work Product; Anticipation of Litigation |
|---|---|---|---|---|---|
| 02/03/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Naomi Dearing | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 02/03/2015; 02/09/2015 | Email string regarding chart of claims (including many others besides Dig); attachment -Chart regarding claims (including many others besides Dig) | Theresa Gooley; Lawrence Wagner, Senior Vice President for OneBeacon Accident Claims; Aaron Stone; Dana Lenahan; Pamela Johnson; Kristin Boller; Judi Lamble; Theresa Gooley; Joseph Gallagher; Sean Duffy; Joseph Schmitt | | | Work Product; Anticipation of Litigation |
| 02/03/2015; 02/09/2015; 02/12/2015 | Email string regarding chart of claims (including many others besides Dig); attachment -Chart regarding claims (including many others besides Dig) | Lawrence Wagner; Theresa Gooley; Aaron Stone; Dana Lenahan; Pamela Johnson; Kristin Boller; Judi Lamble; Theresa Gooley; Joe Gallagher; Sean | | | Work Product; Anticipation of Litigation |
| 02/03/2015; 02/12/2015 | Email string regarding chart of claims (including many others besides Dig); attachment -Chart regarding claims (including many others besides Dig) | Theresa Gooley; Dana Lenahan; Kristin Boller; Judi Lamble; Joe Gallagher; Sean Duffy; Joseph Schmitt | | | Work Product; Anticipation of Litigation |

| 02/12/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Theresa Gooley | Dana Lenahan | | Work Product; Anticipation of Litigation |
|---|---|---|---|---|---|
| 02/12/2015; 02/13/2015 | Email string regarding chart of claims (including many others besides Dig); attachment -Chart regarding claims (including many others besides Dig) | Theresa Gooley; Kristin Boller; Dana Lenahan | | | Work Product; Anticipation of Litigation |
| 02/13/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Kristin Boller | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 02/13/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Kristin Boller | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 02/16/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Theresa Gooley | Aaron Stone | | Work Product; Anticipation of Litigation |
| 02/16/2015 | Email string regarding chart of claims (including many others besides Dig); attachment -Chart regarding claims (including many others besides Dig) | Theresa Gooley; Kristin Boller; Aaron Stone | | | Work Product; Anticipation of Litigation |

| 03/09/2015 | Email regarding NBC contact | Peter Williams | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 03/09/2015 | Report Summarizing Dig Claim (including status and strategy) | | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 03/12/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Theresa Gooley; Dana Lenahan | Kristin Boller | | Work Product; Anticipation of Litigation |
| 03/12/2015 | Email string regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Dana Lenahan; Sean Duffy; Theresa Gooley; Kristin Boller | | | Work Product; Anticipation of Litigation |
| 03/11/2015; 03/12/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Sean Duffy; Theresa Gooley; Judi Lamble; Joe Gallagher; Joseph Schmitt; Howard Tripolsky, former Senior Vice President of Claims at OneBeacon; Kristin Boller; Jillian Culver, Claims Support Supervisor for OneBeacon | | | Work Product; Anticipation of Litigation |
| 03/17/2015 | Email regarding NBC update; attachment - Chart regarding claims (including many others besides Dig) | Theresa Gooley | Sean Duffy | | Work Product; Anticipation of Litigation |
| 03/17/2015 | Email string regarding update on numerous claims involving NBC | Theresa Gooley; Sean Duffy | | | Work Product; Anticipation of Litigation |
| 03/17/2015 | Email string regarding update on numerous claims involving NBC | Sean Duffy; Theresa Gooley | | | Work Product; Anticipation of Litigation |

56

EXHIBIT 02

| 03/17/2015 | Email string regarding update on numerous claims involving NBC | Theresa Gooley; Sean Duffy | | | Work Product; Anticipation of Litigation |
|---|---|---|---|---|---|
| 03/17/2015 | Email string regarding NBC update; attachment -Chart regarding claims (including many others besides Dig) | Theresa Gooley; Kristin Boller; Sean Duffy | | | Work Product; Anticipation of Litigation |
| 03/17/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Judi Lamble | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 03/17/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Theresa Gooley | Judi Lamble | | Work Product; Anticipation of Litigation |
| 03/17/2015 | Email string regarding chart of claims (including many others besides Dig); attachment -Chart regarding claims (including many others besides Dig) | Theresa Gooley; Judi Lamble | | | Work Product; Anticipation of Litigation |
| 03/24/2015 | Email requesting reports summarizing NBC claims | Pamela Johnson | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 03/24/2015 | Report Summarizing Dig Claim (including status and strategy) | | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 03/25/2015 | Email string regarding report on status of Dig claim and discussing reserve | Theresa Gooley; Pamela Johnson; | | | Work Product; Anticipation of Litigation |
| 04/06/2015 | Email regarding phone call from Henry Darr, Executive VP from Aon | Theresa Gooley | Pamela Johnson | Daniel Gutterman | Work Product; Anticipation of Litigation; Settlement Discussions |

57

EXHIBIT 02

| 04/06/2015 | Email string regarding phone call from Henry Darr, Executive VP from Aon | Pamela Johnson; Theresa Gooley; Daniel Gutterman | | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 04/06/2015 | Email string regarding phone call from Henry Darr, Executive VP from Aon | Pamela Johnson; Theresa Gooley; Daniel Gutterman | | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 04/06/2015 | Email regarding phone call from Henry Darr, Executive VP from Aon | Pamela Johnson; Theresa Gooley; Daniel Gutterman | | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 04/06/2015 | Email regarding phone call from Henry Darr, Executive VP from Aon | Pamela Johnson; Theresa Gooley; Daniel Gutterman | | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 04/07/2015 | Email regarding NBC offer | Theresa Gooley | Pamela Johnson | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 04/07/2015 | Email string regarding NBC offer | Theresa Gooley; Pamela Johnson | | | Work Product; Anticipation of Litigation; Settlement Discussions |
| 04/21/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Judi Lamble; Theresa Gooley; Joel Gallagher; Howard Tripolsky; Sean Duffy; Joseph Schmitt | Kristin Boller | | Work Product; Anticipation of Litigation |
| 04/21/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Howard Tripolsky; Douglas Bloomquist, former Vice President of Medical Excess Claims at OneBeacon; Kerry Evensen, former Vice President of Claims at OneBeacon; Joel Gallagher; Theresa Gooley; Judi Lamble; Kristin Boller; Sean Duffy; Joseph Schmitt | | | Work Product; Anticipation of Litigation |

| 04/28/2015 | Email string regarding NBC claims; attachment -Chart regarding claims (including many others besides Dig) | Daniel Gutterman; Wanda Phillips | | | Work Product; Anticipation of Litigation |
|---|---|---|---|---|---|
| 04/21/2015; 04/29/2015 | Email string regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Theresa Gooley; Lawrence Wagner; Pamela Johnson; Daniel Ryan; Aaron Stone; Kristen Boller; Judi Lamble; Joe Gallagher; Howard Tripolsky; Sean Duffy; Joseph Schmitt | | | Work Product; Anticipation of Litigation |
| 04/21/2015; 04/29/2015; 04/30/2015 | Email string regarding chart of claims (including many others besides Dig); attachment -Chart regarding claims (including many others besides Dig) | Lawrence Wagner; Theresa Gooley; Pamela Johnson; Daniel Ryan; Aaron Stone; Kristen Boller; Judi Lamble; Joe Gallagher; Howard Tripolsky; Sean Duffy | | | Work Product; Anticipation of Litigation |
| 05/05/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Theresa Gooley | Pamela Johnson | | Work Product; Anticipation of Litigation |
| 05/07/2015 | Email regarding report summarizing Dig claim, including status and strategy; attachment -Report on Dig claim including status and strategy | Theresa Gooley; Steven Baltzell, Claims Supervisor - OneBeacon | Daniel Gutterman | | Work Product; Anticipation of Litigation |

59

EXHIBIT 02

18

| 04/21/2015; 05/18/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Joseph Schmitt; Joe Gallagher; Judi Lamble; Theresa Gooley; Thomas Ruane, Vice President of Claims at OneBeacon; Virginia Troy, Vice President of Managed Care Claims for OneBeacon; Kerry Evensen; Christopher Paar, VP & Chief Claims Counsel, Claims Legal Group - OneBeacon; Howard Tripolsky; Rebecca Matthews, Paralegal for OneBeacon; Kristin Boller; Judi Lamble; Sean Duffy; Joseph Schmitt | | | Work Product; Anticipation of Litigation; Attorney Client |
|---|---|---|---|---|---|
| 05/20/2015 | Email regarding status of multiple open NBC claims | Theresa Gooley | Daniel Gutterman | Steven Baltzell | Work Product; Anticipation of Litigation |
| 05/20/2015; 05/21/2015 | Email string regarding multiple open NBC claims | Theresa Gooley; Daniel Gutterman; Steven Baltzell | | | Work Product; Anticipation of Litigation |
| 05/28/2015 | Email string regarding scheduling of proposed meeting | Theresa Gooley; Daniel Gutterman; Steven Baltzell | | | Work Product; Anticipation of Litigation |
| 06/01/2015 | Email regarding chart summarizing claims (including many others besides the Dig claim) | Theresa Gooley | Lauren Kennedy, Senior Claims Assistant at OneBeacon | | Work Product; Anticipation of Litigation |
| 06/02/2015 | Email regarding report summarizing Dig claim, including status and strategy; attachment -Report on Dig claim including status and strategy | Daniel Gutterman | Theresa Gooley | | Work Product; Anticipation of Litigation |

60

EXHIBIT 02

| 06/03/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Joseph Schmitt; Theresa Gooley; Joe Gallagher; Kerry Evensen; Thomas Ruane; Virginia Troy; Douglas Bloomquist; Rebecca Matthews; Judi Lamble | | | Work Product; Anticipation of Litigation |
| 06/03/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Theresa Gooley; Lawrence Wagner; Dana Lenahan; Aaron Stone; Daniel Ryan, Assistant Vice President - Financial Services Claims at OneBeacon; Joseph Schmitt; Joe Gallagher; Kerry Evensen; Thomas Ruane; Virginia Troy; Douglas Bloomquist; Rebecca Matthews; Judi Lamble | | | Work Product; Anticipation of Litigation |
| 06/03/2015; 06/05/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Aaron Stone; Theresa Gooley; Lawrence Wagner; Dana Lenahan; Daniel Ryan; Joseph Schmitt; Joe Gallagher; Kerry Evensen; Thomas Ruane; Virginia Troy; Douglas Bloomquist; Rebecca Matthews; Judi Lamble | | | Work Product; Anticipation of Litigation |
| 06/03/2015; 06/10/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Aaron Stone; Theresa Gooley; Lawrence Wagner; Dana Lenahan; Daniel Ryan; Joseph Schmitt; Joe Gallagher; Kerry Evensen; Thomas Ruane; Virginia Troy; Douglas Bloomquist; Rebecca Matthews; Judi Lamble | | | Work Product; Anticipation of Litigation |

| 06/11/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Rebecca Matthews | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 06/02/2015; 06/12/2015 | Email string regarding report summarizing Dig claim, including status and strategy; attachment - Report on Dig claim including status and strategy | Daniel Gutterman; Theresa Gooley | | | Work Product; Anticipation of Litigation |
| 06/03/2015; 06/16/2015 | Email string regarding chart of claims (including many others besides Dig); attachment -Chart regarding claims (including many others besides Dig) | Aaron Stone; Theresa Gooley; Lawrence Wagner; Dana Lenahan; Daniel Ryan; Joseph Schmitt; Joe Gallagher; Kerry Evensen; Thomas Ruane; Virginia Troy; Douglas Bloomquist; Rebecca Matthews; Judi Lamble | | | Work Product; Anticipation of Litigation |
| 06/23/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Theresa Gooley; Judi Lamble | Rebecca Kristal, Actuarial Consultant - Corporate Actuarial - OneBeacon | | Work Product; Anticipation of Litigation |
| 06/02/2015; 06/12/2015; 06/24/2015 | Email string regarding report summarizing Dig claim, including status and strategy; attachment -Report on Dig claim including status and strategy | Theresa Gooley; Daniel Gutterman; Steven Baltzell | | | Work Product; Anticipation of Litigation |
| 06/25/2015 | Email regarding status of Dig claim | Peter Williams | Leon Gladstone | | Attorney Client; Work Product; Anticipation of Litigation |

62

EXHIBIT 02

| 07/06/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Theresa Gooley | Rebecca Matthews | | Work Product; Anticipation of Litigation |
| 07/06/2015; 07/21/2015 | Email string regarding chart of claims (including many others besides Dig); attachment -Chart regarding claims (including many others besides Dig) | Rebecca Matthews; Theresa Gooley | | | Work Product; Anticipation of Litigation |
| 07/06/2015; 07/21/2015 | Email string regarding chart of claims (including many others besides Dig); attachment -Chart regarding claims (including many others besides Dig) | Aaron Stone; Theresa Gooley; Rebecca Matthews; Dana Lenahan; Lawrence Wagner; Rebecca Matthews | | | Work Product; Anticipation of Litigation |
| 07/21/2015 | Email string regarding billing matters | Daniel Gutterman; Lucy Lopez; Julia Smith of Gladstone, Weisberg; Leon Gladstone | | | Attorney Client |
| 07/21/2015 | Email string regarding billing matters | Lucy Lopez; Daniel Gutterman; Julia Smith; Leon Gladstone | | | Attorney Client |
| 07/06/2015; 07/21/2015; 07/27/2015 | Email string regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Rebecca Matthews; Theresa Gooley; | | | Work Product; Anticipation of Litigation |
| 07/06/2015; 07/21/2015; 07/31/2015 | Email string regarding chart of claims (including many others besides Dig); attachment -Chart regarding claims (including many others besides Dig) | Lawrence Wagner; Theresa Gooley; Dana Lenahan; Aaron Stone; Rebecca Matthews | | | Work Product; Anticipation of Litigation |

63

EXHIBIT 02

8547774                    22

| 08/12/2015 | E-mail regarding various claims (including many others besides the Dig claim); attachment -Chart regarding claims (including many others besides Dig) | Rebecca Matthews | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 08/28/2015 | Email regarding chart of claims (including many others besides Dig); attachment -Chart regarding claims (including many others besides Dig) | Peter Williams | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 09/24/2015 | Chart regarding loss run for NBC (includes information on many other claims besides the Dig claim) | | Lucy Lopez | | Work Product; Anticipation of Litigation |
| 12/01/15 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Cynthia Arends, Vice President of P&C Liability Claims for OneBeacon | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 12/14/2015 | Email summarizing various claims, including Dig; attachment - Redacted Chart regarding claims (including many others besides Dig) | Daniel Gutterman | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 12/23/2015 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Steven Baltzell | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 12/23/2015 | Email regarding status of various claims, including Dig | Steven Baltzell | Daniel Gutterman | | Work Product; Anticipation of Litigation |

8547774                                                          23

| Date | Description | From | To | CC | Privilege |
|---|---|---|---|---|---|
| 01/21/2016 | Email regarding chart of claims (including many others besides Dig); attachment - Chart regarding claims (including many others besides Dig) | Steven Baltzell | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 05/19/2016 | Email regarding research on Dig claim | Pamela Johnson | Pamela Johnson | | Work Product; Anticipation of Litigation |
| 05/19/2016 | Email regarding Dig claim | Daniel Gutterman | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 05/19/2016 | Email regarding Dig claim | Pamela Johnson | Leon Gladstone | | Work Product; Anticipation of Litigation; Attorney Client |
| 05/19/2016; 07/21/2014 | Email regarding opinion letter | Theresa Gooley; Leon Gladstone; Pamela Johnson | | | Attorney Client; Work Product; Anticipation of Litigation |
| 05/19/2016 | Email regarding opinion letter | Daniel Gutterman; Pamela Johnson; Leon Gladstone | | | Attorney Client; Work Product; Anticipation of Litigation |
| 05/19/2016; 08/05/2014 | Email regarding Dig claim | Leon Gladstone; Pamela Johnson | | | Attorney Client; Work Product; Anticipation of Litigation |
| 06/24/2016 | Email regarding Dig suit | Steven Baltzell | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 06/24/2016 | Email string regarding Dig suit | Daniel Gutterman; Steven Baltzell | | | Work Product; Anticipation of Litigation |
| 06/24/2016 | Email string regarding Dig suit | Daniel Gutterman; Steven Baltzell | | | Work Product; Anticipation of Litigation |
| 06/24/2016 | Email string regarding Dig suit | Aaron Stone; Joseph Fitzgerald; Jeffrey Richardson, Senior Vice President - Specialty for OneBeacon | Steven Baltzell | Daniel Gutterman | Work Product; Anticipation of Litigation |
| 06/24/2016 | Email string regarding Dig suit | Daniel Gutterman | Leon Gladstone | | Attorney Client; Work Product; Anticipation of Litigation |
| 06/24/2016 | Email regarding Dig suit | Daniel Gutterman; Leon Gladstone | | | Attorney Client; Work Product; Anticipation of Litigation |
| 06/24/2016 | Email string regarding Dig suit | Daniel Gutterman; Steven Baltzell; Leon Gladstone | | | Attorney Client; Work Product; Anticipation of Litigation |

65

EXHIBIT 02

| 06/24/2016 | Email regarding Dig suit | Steven Baltzell | Daniel Gutterman | | Work Product; Anticipation of Litigation |
|---|---|---|---|---|---|
| 06/24/2016 | Email string regarding Dig suit | Steven Baltzell; Aaron Stone; Daniel Gutterman | | | Work Product; Anticipation of Litigation |
| 06/24/2016 | Email string regarding Dig suit | Joseph Fitzgerald; Steven Baltzell; Aaron Stone; Jeffrey Richardson; Daniel Gutterman | | | Work Product; Anticipation of Litigation |
| 06/27/2016 | Email string regarding Dig suit; attachment -Litigation Hold form | Shannon Lauby-Wolf, Paralegal for OneBeacon; Daniel Gutterman; Aaron Stone; Christopher Paar; Joseph Schmitt; Steven Baltzell; Joseph Fitzgerald; Jeffrey Richardson | | | Work Product; Anticipation of Litigation; Attorney Client |
| 06/30/2016 | Email regarding Dig suit; attachments - Litigation hold form, Report on Dig claim including status and strategy | Steven Baltzell | Daniel Gutterman | | Work Product; Anticipation of Litigation |
| 07/03/2016; 12/09/2014 | Email string regarding NBC claims; attachment -Chart regarding claims (including many others besides Dig) | Daniel Gutterman; Pamela Johnson; Peter Williams | | | Work Product; Anticipation of Litigation |
| 07/06/2016 | Email regarding claims; attachments - charts regarding claims (including many others besides the Dig claim) | Kristin Boller | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 07/06/2016 | Email regarding NBC claims | Pamela Johnson | Theresa Gooley | | Work Product; Anticipation of Litigation |
| 07/06/2016; 03/17/2015 | Email string regarding NBC claims; attachment - Chart regarding claims (including many others besides the Dig claim) | Theresa Gooley; Sean Duffy | | | Work Product; Anticipation of Litigation |

66

EXHIBIT 02

| | | | | |
|---|---|---|---|---|
| 07/06/2015; 03/17/2015 | Email string regarding NBC claims; attachment -Chart regarding claims (including many others besides Dig) | Theresa Gooley; Sean Duffy | | Work Product; Anticipation of Litigation |
| 07/06/2016; 06/22/2015 | Email string regarding meeting on various claims; attachment -Chart regarding claims (including many others besides Dig) | Theresa Gooley; Lauren Kennedy; Judi Lamble | | Work Product; Anticipation of Litigation |
| 07/06/2016; 06/30/2016 | Email string regarding litigation hold form; attachment - Litigation Hold form | Daniel Gutterman; Steven Baltzell; | | Work Product; Anticipation of Litigation |
| 07/06/2016; 06/27/2016; 06/24/2016 | Email string regarding Dig suit; attachment - Litigation hold form | Daniel Gutterman; Shannon Lauby-Wolf; Aaron Stone; Christopher Paar; Joseph Schmitt; Joseph Fitzgerald; Jeffrey Richardson | | Work Product; Anticipation of Litigation; Attorney Client |
| 07/06/2016; 06/27/2016; 06/24/2016 | Email string regarding Dig suit | Daniel Gutterman; Shannon Lauby-Wolf; Aaron Stone; Christopher Paar; Joseph Schmitt; Joseph Fitzgerald; Jeffrey Richardson | | Work Product; Anticipation of Litigation; Attorney Client |
| 07/06/2016; 06/27/2016; 06/24/2016 | Email string regarding Dig suit | Daniel Gutterman; Shannon Lauby-Wolf; Aaron Stone; Christopher Paar; Joseph Schmitt; Joseph Fitzgerald; Jeffrey Richardson | | Work Product; Anticipation of Litigation; Attorney Client |
| 07/13/2016 | Email regarding Dig suit | Kaisa Adams, Counsel, Claims Legal Group - One Beacon | Daniel Gutterman | Anticipation of Litigation; Work Product; Attorney Client |
| 07/13/2016 | Email regarding Dig suit; attachment- prior email regarding Dig claim | Kaisa Adams | Daniel Gutterman | Anticipation of Litigation; Work Product; Attorney Client |

67

EXHIBIT 02

| 07/13/2016 | Email regarding Dig suit; attachments - prior emails regarding Dig claim | Kaisa Adams | Daniel Gutterman | | Work Product; Anticipation of Litigation; Attorney Client |
|---|---|---|---|---|---|
| 07/13/2016 | Email regarding Dig claim; attachment - prior email regarding Dig claim | Kaisa Adams | Daniel Gutterman | | Anticipation of Litigation; Work Product; Attorney Client |
| 07/18/2016 | Email regarding Dig complaint | Daniel Gutterman | Shannon Lauby-Wolf | Kaisa Adams | Work Product; Anticipation of Litigation; Attorney Client |
| 07/19/2016 | Email regarding Dig suit | Aaron Stone | Christopher Paar | Daniel Gutterman | Work Product; Anticipation of Litigation; Attorney Client |
| 07/19/2016 | Email regarding Dig suit | Daniel Gutterman; Steven Baltzell; Christopher Paar | | | Work Product; Anticipation of Litigation; Attorney Client |
| 07/19/2016 | Email regarding Dig suit | Daniel Gutterman; Steven Baltzell; Christopher Paar | | | Work Product; Anticipation of Litigation; Attorney Client |
| 07/19/2016 | Email string regarding Dig suit | Christopher Paar; Aaron Stone; Daniel Gutterman | | | Work Product; Anticipation of Litigation; Attorney Client |
| 07/19/2016; 07/18/2016 | Email string regarding Dig suit | Daniel Gutterman; Aaron Stone; Steven Baltzell; Shannon Lauby-Wolf; Kaisa Adams | | | Work Product; Anticipation of Litigation; Attorney Client |
| 07/19/2016 | Email string regarding Dig suit | Aaron Stone; Daniel Gutterman; Steven Baltzell; Shannon Lauby-Wolf; Kaisa Adams | | | Work Product; Anticipation of Litigation; Attorney Client |
| 07/21/2016 | Email regarding Dig suit; attachments - prior emails regarding Dig claim | Daniel Gutterman | Kaisa Adams | | Work Product; Anticipation of Litigation; Attorney Client |
| 07/22/2016 | Email string regarding Dig claim | Daniel Gutterman; Steven Baltzell; Christopher Paar; Aaron Stone; Kaisa Adams | | | Work Product; Anticipation of Litigation; Attorney Client |
| 07/25/2016; 07/21/2016 | Email string regarding contact with counsel | Daniel Gutterman; Kaisa Adams | | | Work Product; Anticipation of Litigation; Attorney Client |
| 09/15/2016; 07/19/2016 | Email string regarding Dig suit | Daniel Gutterman; Lucy Lopez; Aaron Stone; Steven Baltzell | | | Work Product; Anticipation of Litigation |
| 10/19/2016 | Email regarding Dig suit | Steven Baltzell | Daniel Gutterman | | Work Product; Anticipation of Litigation |

EXHIBIT 02

| 10/20/2016; 10/19/2016 | Email string regarding Dig suit | Steven Baltzell; Daniel Gutterman | | | Work Product; Anticipation of Litigation |
| 10/24/2016 | Email regarding Dig suit; attachment - Chart summarizing search terms | Aaron Stone | Daniel Gutterman | | Work Product; Anticipation of Litigation |

Atlantic reserves the right to supplement or amend this privilege log to list additional documents. The omission of a document from this privilege log is not intended as a waiver of any applicable privilege or exemption.

As the parties have agreed, Atlantic is not including on this privilege log any documents created by Strasburger & Price LLP personnel or by Anderson McPharlin & Conners LLP personnel on or after June 20, 2016 (the date the plaintiffs filed suit) or any correspondence including Strasburger & Price LLP personnel or Anderson McPharlin & Conners LLP personnel that was created on or after June 20, 2016. As the parties have agreed, Atlantic does not waive any privilege or other protection that might apply to those documents by not including them on the privilege log.

69                                        EXHIBIT 02

# EXHIBIT 3

1  MARC J. SHRAKE (SBN 219331)
       mjs@amclaw.com
2  ANDERSON, MCPHARLIN & CONNERS LLP
   707 Wilshire Boulevard, Suite 4000
3  Los Angeles, California 90017-3623
   Telephone: (213) 236-1691
4  Facsimile:  (213) 622-7594

5  MICHAEL KEELEY *(Pro Hac Vice)*
       michael.keeley@strasburger.com
6  JOHN R. RIDDLE *(Pro Hac Vice)*
       john.riddle@strasburger.com
7  TONI SCOTT REED *(Pro Hac Vice)*
       toni.reed@strasburger.com
8  CARLA C. CRAPSTER *(Pro Hac Vice)*
       carla.crapster@strasburger.com
9  STRASBURGER & PRICE, LLP
   901 Main Street, Suite 6000
10 Dallas, Texas 75202
   Telephone: (214) 651-4300
11 Facsimile:  (214) 651-4330

12 Attorneys for Defendant
   Atlantic Specialty Insurance Company

13

14             UNITED STATES DISTRICT COURT

15    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

16

17 UNIVERSAL CABLE                Case No. 2:16-cv-04435-PA-MRW
   PRODUCTIONS LLC, a Delaware
18 limited liability company, and    **DEFENDANT ATLANTIC**
   NORTHERN ENTERTAINMENT            **SPECIALTY INSURANCE**
19 PRODUCTIONS LLC, a Delaware       **COMPANY'S SECOND AMENDED**
   limited liability company,        **RESPONSES TO FIRST SET OF**
20                                    **INTERROGATORIES**
          Plaintiffs,                **PROPOUNDED BY PLAINTIFFS**
21                                    **UNIVERSAL CABLE**
          vs.                        **PRODUCTIONS LLC AND**
22                                   **NORTHERN ENTERTAINMENT**
   ATLANTIC SPECIALTY               **PRODUCTIONS LLC**
23 INSURANCE COMPANY, a New
   York insurance company,
24
          Defendant.
25

26 / / /

27 / / /

28

ANDERSON, MCPHARLIN & CONNERS LLP
*LAWYERS*
*707 WILSHIRE BOULEVARD, SUITE 4000*
*LOS ANGELES, CALIFORNIA 90017-3623*

1   / / /

2   PROPOUNDING PARTY:        Plaintiffs UNIVERSAL CABLE PRODUCTIONS

3                             LLC and NORTHERN ENTERTAINMENT

4                             PRODUCTIONS LLC

5   RESPONDING PARTY:         Defendant ATLANTIC SPECIALTY INSURANCE

6                             COMPANY

7   SET NO.:                  One

8          Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant

9   ATLANTIC SPECIALTY INSURANCE COMPANY ("Atlantic") hereby submits

10  these amended objections and responses to the First Set of Interrogatories

11  propounded by Plaintiffs UNIVERSAL CABLE PRODUCTIONS LLC and

12  NORTHERN ENTERTAINMENT PRODUCTIONS LLC ("Propounding Parties").

13                       **PRELIMINARY STATEMENT**

14         Nothing in this response should be construed as an admission by Atlantic with

15  respect to the admissibility or relevance of any fact, or of the truth or accuracy of any

16  characterization or statement of any kind, contained in Propounding Parties'

17  Interrogatories.  Atlantic has not completed its investigation of the facts relating to this

18  case, its discovery or its preparation for trial.  All responses and objections contained

19  herein are based only upon information that is presently available to and specifically

20  known by Atlantic.  It is anticipated that further discovery, independent investigation,

21  legal research and analysis may supply additional facts and add meaning to known

22  facts, as well as new factual conclusions and legal contentions, all of which may lead to

23  additions to, changes in and variations from the responses set forth herein.  The

24  following objections and responses are made without prejudice to Atlantic's right to

25  produce at trial, or otherwise, evidence regarding any subsequently discovered

26  information.  Atlantic accordingly reserves the right to modify and amend any and all

27  responses herein as research is completed and contentions are made.

28

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

IDENTIFY each individual employed by, acting as a REPRESENTATIVE of, or in any way associated with ATLANTIC, that was responsible for the decision to deny the *DIG* CLAIM.

**RESPONSE TO INTERROGATORY NO. 1:** The following persons were responsible for Atlantic's decision to deny the *DIG* CLAIM, all of whom were employed by Atlantic when the decision was reached:

a. Pamela Johnson, former Assistant Vice President of Entertainment Claims for Atlantic. Ms. Johnson is a Second Vice President at The Travelers Companies, Inc. Ms. Johnson's current business address is 385 Washington Street, St. Paul Minnesota, 55102. Her current phone number is 651-310-5861. Her current e-mail address is pajohnso@travelers.com.

b. Theresa Gooley, former Vice President of Claims for Atlantic. Ms. Gooley is currently employed with The Travelers Companies, Inc. Ms. Gooley's current business address is 385 Washington Street, St. Paul Minnesota, 55102. Her current phone number is 651-310-2100. Her current e-mail address is tgooleyw@travelers.com.

c. Peter Williams, former President of the Entertainment Division for Atlantic. Mr. Williams is a Global Products Leader with Allianz Global and Corporate Specialty. His current business address is 2350 West Empire Avenue Suite 200, Burbank California 91504. His current phone number is 310-910-4026. His current e-mail address is peter.williams@ffic.com.

d. Sean Duffy, Senior Vice President & Chief Claims Officer of OneBeacon Insurance Group. Mr. Duffy's business address is 605 Highway 169, Suite 800 Plymouth MN 5544. His current phone number is (952) 852-2469. His e-mail address is sduffy@onebeacon.com.

**The persons listed above may only be contacted through counsel of record**

1 | **for Atlantic.**

2

3 | **INTERROGATORY NO. 2:**

4 |     IDENTIFY each individual employed by, acting as a REPRESENTATIVE of, or

5 | in any way associated with ATLANTIC, that had any involvement in evaluating and

6 | considering the *DIG* CLAIM.

7 | **RESPONSE TO INTERROGATORY NO. 2:**   The following persons had

8 | involvement in the evaluation and consideration of the *DIG* CLAIM, all of whom were

9 | employed by Atlantic at such time:

10 |   a. Pamela Johnson, former Assistant Vice President of Entertainment Claims for

11 |      Atlantic. Ms. Johnson is a Second Vice President at The Travelers Companies,

12 |      Inc. Ms. Johnson's current business address is 385 Washington Street, St. Paul

13 |      Minnesota, 55102. Her current phone number is 651-310-5861. Her current e-

14 |      mail address is pajohnso@travelers.com.

15 |   b. Theresa Gooley, former Vice President of Claims for Atlantic. Ms. Gooley is

16 |      currently employed with The Travelers Companies, Inc. Ms. Gooley's current

17 |      business address is 385 Washington Street, St. Paul Minnesota, 55102. Her

18 |      current phone number is 651-310-2100. Her current e-mail address is

19 |      tgooleyw@travelers.com.

20 |   c. Peter Williams, former President of the Entertainment Division for Atlantic. Mr.

21 |      Williams is a Global Products Leader with Allianz Global and Corporate

22 |      Specialty. His current business address is 2350 West Empire Avenue Suite 200,

23 |      Burbank California 91504. His current phone number is 310-910-4026. His

24 |      current e-mail address is peter.williams@ffic.com.

25 |   d. Daniel Gutterman, Senior Entertainment Claims Investigator for Atlantic, which

26 |      is his current position. Mr. Gutterman's phone number is (781) 332-8550. Mr.

27 |      Gutterman's address is 1100 Glendon Avenue, Suite 900, Los Angeles, CA

28 |      90024. Mr. Gutterman's e-mail address is dgutterman@onebeacon.com.

**ANDERSON, MCPHARLIN & CONNERS LLP**
*LAWYERS*
*707 WILSHIRE BOULEVARD, SUITE 4000*
*LOS ANGELES, CALIFORNIA 90017-3623*

4

ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

EXHIBIT 03

e. Sean Duffy, Senior Vice President & Chief Claims Officer of OneBeacon Insurance Group. Mr. Duffy's business address is 605 Highway 169, Suite 800 Plymouth MN 5544. His current phone number is (952) 852-2469. His e-mail address is sduffy@onebeacon.com.

In addition, while not conceding that he had "involvement in evaluating and considering the *DIG* CLAIM," Leon Gladstone, a partner with Gladstone Weinberg ALC, provided a coverage opinion to Atlantic on or about July 21, 2014. Mr. Gladstone's phone number is 800-215-7237. His address is 300 Corporate Pointe, Suite 400, Culver City, CA 90230. His e-mail address is lgladstone@gladstonemichel.com. All correspondence between Atlantic and Mr. Gladstone or his law firm are protected from the attorney-client privilege.

**The persons listed above may only be contacted through counsel of record for Atlantic.**

**INTERROGATORY NO. 3:**

State all facts which ATLANTIC considered in denying the *DIG* CLAIM.

**RESPONSE TO INTERROGATORY NO. 3:** Atlantic considered, in denying the *DIG* CLAIM, all of the facts and information that it received from the Plaintiffs, as well as the facts revealed by its own investigation of the *DIG* CLAIM and independent research. With regard to its investigation, Atlantic refers to and incorporates the documents it has produced in this case, and further incorporates and refers to the documents identified in the documents it has produced in this case, as the response to this interrogatory may be determined by examining those documents, and the burden of ascertaining such response is substantially the same for the Plaintiffs as it would be for Atlantic. Atlantic also refers to, relies upon, and incorporates herein the testimony of Peter Williams, Danny Gutterman, and Theresa Gooley, each of whom testified to what they relied upon in considering the *DIG* CLAIM. Additionally, in further answer to this interrogatory, Atlantic considered the following facts:

a. The facts set forth in the December 2, 2010 Congressional Research Service

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1   Report entitled "Hamas: Background and Issues for Congress," which was

2   authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern

3   Affairs. Representatives of Atlantic, including at least Pamela Johnson, reviewed

4   that report. Ms. Johnson, who is no longer employed by Atlantic, was prepared

5   to testify more specifically as to what she had relied upon in this report before

6   her deposition was unilaterally cancelled by the Plaintiffs. Among other things,

7   Atlantic believes Ms. Johnson, on behalf of Atlantic, relied upon the entirety of

8   the report, including but not limited to, the fact that Hamas was identified in that

9   Report as a religious and political organization and the Report's statement that,

10  since June 2007, Hamas has had control over the Gaza Strip, that Hamas governs

11  the Gaza strip,  and that Hamas has a "military wing." Atlantic also relied on the

12  timeline included in this Report, which sets forth a long history of the key dates

13  in Hamas's history and its many conflicts with Israel, several of which are

14  referred to as wars.

15  b.  The statement by Israeli President Benjamin Netanyahu, as reported in the news,

16      that Israel would use "full force" against militants in Gaza.

17  c.  The statement by Israeli President Benjamin Netanyahu, as reported in the news,

18      that "Hamas chose to continue fighting and will pay the price for that decision …

19      When there is no cease-fire, our answer is fire."

20  d.  A report by the Washington Post stating that: Israel had struck at least 25 targets

21      inside Gaza, including the home of a senior Hamas leader Mahmoud Al Zahar;

22      Hamas militants had fired at least 13 rockets into southern Israel; Israel's "Iron

23      Dome," an air-defense system that exists to deflect weapons fired from Palestine,

24      was deflecting fire from Gaza; Israel had announced plans for a ground attack on

25      Gaza; Israel dropped leaflets into Gaza warning the population to evacuate;

26      Israel had invaded Gaza with tanks and gunboats.

27  e.  Several sources, in particular, Black's Law Dictionary, The Dictionary of

28      International and Comparative Law, and the Handbook of Humanitarian Law in

6

ANDERSON, McPHARLIN & CONNERS LLP

*LAWYERS*

707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

Armed Conflicts, define "war" as including any hostile conflict by means of armed forces between nations, states, or rulers, or even between two "parties." Atlantic quoted these definitions on page 6 of its July 28, 2014 denial letter to Andrea Garber.

f.  Hamas was the governing authority over the Gaza Strip in July 2014 and had a military wing known as the Qassam Brigades, as well as a police force, a security force, and intelligence personnel.

g.  In several news articles published in July 2014 by MSNBC and in television reports that appeared on the news channel MSNBC (which is an affiliate of NBC Universal), the Israeli-Palestinian "conflict" in 2014 was referred to as a "war."

h.  Reported events and details of actions that occurred during June and July 2014, as reported in various news sources, including but not limited to CBS news videos and MSNBC videos, articles, and features, including direct clashes of armed forces from opposing sides of the war, gunfights, firing of long-range rockets, rocket attacks into Tel Aviv, Jerusalem, and/or Southern Israel, planning for a ground incursion, a ground campaign, war planes, gunboats, mutual exchange of air strikes, rejection of a proposed cease fire, and injuries and deaths in Israel, Palestine, Gaza City, and/or the Gaza Strip, and comments from Israel regarding its intentions.

i.  Hamas militants stated on al-Aqsa TV that Hamas was firing rockets in response to "Israeli aggression against Palestinians in the West Bank, Jerusalem and Gaza." According to news reports, the statement was issued in the name of the Qassam Brigades and laid out four conditions for a ceasefire: ending all action in Jerusalem and the West Bank, ending the fire on and siege of Gaza, releasing all the prisoners who were re-arrested in the Israeli operation launched on June 12, 2014, after the disappearance of three Israeli settlers and the ceasing of "meddling" in the Palestinian Unity government.

j.  Moussa Abu Marzouk, a top Hamas official, stated, as reported in a news article:

7

"There should be a new equation so that we will not have a war on Gaza every two years."

k.  The word "militants" is used to describe Hamas forces in various news articles (identified in response to Interrogatory No. 4 below) and the Congressional Reports identified in subparts (a) and (b) of this response to Interrogatory No. 3.

l.  Hamas spokesman Sami Abu Zuhri stated, as reported in a news article: "There will be no truce without an end to the war that the Occupation (Israel) began, a lifting of the blockade and a halt to all violations and killings in Gaza and the West Bank."

m.  Facts learned through research of Hamas and Palestine, and Hamas's ongoing conflicts and prior wars with Israel, including operations, official positions held, and capabilities, which research included review of primary sources discussing Hamas and Palestine, as listed in "Hamas," appearing in Wikipedia (http://en.wikipedia.org/wiki/Hamas) as it existed on July 16, 2014, as well as a review of multiple news reports referring to the war between Israel and Palestine, including print reports as well as news reports by MSNBC and CBS.

Additionally, other employees of Atlantic, including at least Pamela Johnson, conducted other internet research into Hamas and its relationship with Israel, and events occurring during the summer of 2014, the details of which are not currently known to Atlantic.

**INTERROGATORY NO. 4:**

IDENTIFY all DOCUMENTS that ATLANTIC reviewed in evaluating and considering the *DIG* CLAIM.

**RESPONSE TO INTERROGATORY NO. 4:** Atlantic objects to this interrogatory to the extent that it seeks information that is protected from disclosure by the attorney-client privilege or work-product doctrine or was prepared in anticipation of litigation or for trial. Such information is outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. Such information will not be included in

8

EXHIBIT 03

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1    Atlantic's answer to this interrogatory.

2          With this understanding, Atlantic refers to and incorporates into its response, the

3    claims-related documents it has produced in this case, and further incorporates and

4    refers to the documents identified in the documents it has produced in this case, as the

5    response to this interrogatory may be determined by examining those documents, and

6    the burden of ascertaining such response is substantially the same for the Plaintiffs as it

7    is for Atlantic. Atlantic also refers to, relies upon, and incorporates herein the testimony

8    of Peter Williams, Danny Gutterman, and Theresa Gooley, each of whom testified to

9    what they relied upon in considering the *DIG* CLAIM. Additionally, in further answer

10   to this interrogatory and in regard to its review and consideration, Atlantic refers to and

11   incorporates the documents it has produced in this case, and further incorporates and

12   refers to the documents identified in the documents it has produced in this case.

13   Further, Atlantic states that it reviewed the following documents in evaluating and

14   considering the *DIG* CLAIM:

15   a.  E-mail sent by Stephen Smith, head of NBC security for Europe, dated July 10,

16       2014, regarding NBCU Security's decision to move the filming of *Dig* out of

17       Israel.

18   b.  A news article published by the Washington Post, dated July 10, 2014, by Griff

19       Witte and William Booth, entitled "As cease-fire with Hamas fails to take shape,

20       Netanyahu says, 'Our answer is fire.'" This article is available at:

21       https://www.washingtonpost.com/world/israel-accepts-truce-plan-hamas-

22       balks/2014/07/15/04373008-0bf5-11e4-8c9a-

23       923ecc0c7d23_story.html?utm_term=.e99302eb1314.

24   c.  A news article published by MSNBC dated July 18, 2014, by Benjamin Landy

25       and Maria Lokke, entitled "Scenes of war and heartbreak as Israeli ground forces

26       invade Gaza." This article is available at: http://www.msnbc.com/msnbc/scenes-

27       war-and-heartbreak-israel-hamas-conflict-intensifies.

28   d.  A news article published by MSNBC dated July 18, 2014, by David Taintor,

ANDERSON, MCPHARLIN & CONNERS LLP
*LAWYERS*
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1   entitled "Obama points to rebels in downed Malaysian jet." This article is
2   available at: http://www.msnbc.com/msnbc/obama-american-dead-malaysia-
3   airlines-crash.

4   e.  A news article published by MSNBC dated July 16, 2014, by Donna Stefano,
5       entitled "In Israel and Palestine, children imagine a world without war." This
6       article is available at: http://www.msnbc.com/msnbc/israel-and-palestine-
7       children-imagine-world-without-war.

8   f.  A news article published by the Times of Israel by Adiv Sterman, dated July 16,
9       2014, entitled "Ground incursion in Gaza said 'very likely.'" This article is
10      available at: http://www.timesofisrael.com/idf-ground-incursion-in-gaza-very-
11      likely/.

12  g.  A collection of "LiveBlogs" published by the Times of Israel on July 7, 2014, by
13      Itamar Sharon, Marissa Newman, and Ilan Ben Zion, entitled "Israel launches
14      'Protective Edge' counteroffensive on Gaza, Jewish suspects reenact teen's
15      murder." This collection is available at: http://www.timesofisrael.com/as-israel-
16      grapples-with-homegrown-killers-violence-continues/#!.

17  h.  A news article published by Middle East Eye dated July 8, 2014, entitled
18      "Hamas claims responsibility for rockets fired at Jerusalem, Tel Aviv and
19      Haifa." This article is available at: http://www.middleeasteye.net/news/israels-
20      army-prepared-ground-assault-gaza-official-275282816.

21  i.  A news article published by the Global News, dated July 9, 2014, entitled
22      "UPDATE: Israel hits key Hamas targets in Gaza offensive." This article is
23      available at: http://globalnews.ca/news/1438089/israel-strikes-hamas-targets-in-
24      gaza-to-stop-rocket-fire/.

25  j.  A news article published by the Global News, dated July 15, 2014, entitled
26      "Israel: Hamas to pay price for its 'no' to truce." This article is available at:
27      http://globalnews.ca/news/1451058/israel-hamas-to-pay-price-for-its-no-to-
28      truce/.

10

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

k.  The news article entitled "LIVE UPDATES: Operation Protective Edge, Day 7," published by Haaretz on July 15, 2014. The article is available at: http://www.haaretz.com/israel-news/1.604898#!.

l.  The December 2, 2010 Congressional Research Service Report entitled "Hamas: Background and Issues for Congress," and authored by Jim Zanotti.

m.  Black's Law Dictionary, as discussed in the response to Interrogatory No. 3,

n.  The Dictionary of International and Comparative Law, as discussed in the response to Interrogatory No. 3.

o.  The Handbook of Humanitarian Law in Armed Conflicts, as discussed in response to Interrogatory No. 3.

p.  The travel warning issued by the United States on February 3, 2014, regarding travel to Israel.

q.  The United Kingdom's website regarding travel to Israel, available at: https://www.gov.uk/foreign-travel-advice/israel, as it existed on July 15, 2014.

r.  The news clips (videos) available at the following websites:

   i.  http://www.msnbc.com/the-last-word/watch/mh17-mystery-and-war-in-gaza-308247107963;

   ii.  http://www.msnbc.com/melissa-harris-perry/watch/what-it-means-to-live-in-a-war-zone-309370947801;

   iii.  http://www.msnbc.com/all-in-with-chris-hayes/watch/day-breaks-in-gaza-following-invasion-307348035939;

   iv.  http://www.msnbc.com/all-in-with-chris-hayes/watch/ground-war-in-gaza-307290179722;

   v.  www.cbsnews.com/videos/new-clashes-between-israel-palestinians-is-ground-war-next/.

s.  Primary sources discussing Hamas and Palestine, as listed in "Hamas," appearing in Wikipedia (http://en.wikipedia.org/wiki/Hamas), as it existed on July 16, 2014.

11

1      t.   Articles and sources located through internet research, the titles or names of

2           which were not specifically recorded in written form.

3   In addition, as counsel for Atlantic has explained to counsel for the Plaintiffs, Atlantic

4   obtained a coverage opinion prepared by Leon Gladstone and Gene Weisberg of

5   Gladstone Weisberg ALC, dated July 21, 2014, prior to the issuance of Atlantic's

6   formal notice of denial of the *DIG* CLAIM. Such coverage opinion was obtained after a

7   telephone discussion with the insured and its broker regarding the potential application

8   of the war exclusion language.   By referencing that document in response to this

9   Interrogatory, Atlantic does not waive its contention that the opinion is a privileged

10  attorney-client communication that is exempt from discovery. Atlantic is not

11  identifying such document in support of a reliance on the advice of counsel defense - a

12  defense Atlantic has not asserted and is not asserting herein.

13  **INTERROGATORY NO. 5:**

14          Identify all steps taken by ATLANTIC to investigate the *DIG* CLAIM.

15  **RESPONSE TO INTERROGATORY NO. 5:**  Atlantic's investigation of the *DIG*

16  CLAIM consisted of researching the hostilities between Israel and Palestine that were

17  occurring during July 2014 and the time leading up to that period, and the history of the

18  hostilities between Israel and Palestine that spans back many decades. Atlantic also

19  evaluated all of the facts and information provided by Plaintiffs.  With regard to its

20  investigation undertaken, Atlantic refers to and incorporates the documents it has

21  produced in this case, and further incorporates and refers to the documents identified in

22  the documents it has produced in this case, as the response to this interrogatory may be

23  determined by examining those documents, and the burden of ascertaining such

24  response is substantially the same for the Plaintiffs as it would be for Atlantic. Atlantic

25  also refers to, relies upon, and incorporates herein the testimony of Peter Williams,

26  Danny Gutterman, and Theresa Gooley, each of whom testified to what they relied

27  upon in considering the *DIG* CLAIM. Additionally, in further answer to this

28  interrogatory, Atlantic also incorporates herein by reference its responses to

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

12

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  interrogatories Nos. 3 and 4 above.  Further, Atlantic considered the following facts and

2  documents in investigating the *DIG* CLAIM:

    a.  The facts set forth in the December 2, 2010 Congressional Research Service Report entitled "Hamas: Background and Issues for Congress," which was authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not recite each and every fact within that Congressional Report. But in particular, Atlantic noted that Hamas was identified in that Report as a religious and political organization and the Report's statement that, since June 2007, Hamas has had control over the Gaza Strip and that Hamas has a "military wing." Atlantic also considered the timeline included in this Report, which sets forth a long history of the key dates in Hamas's history and its many conflicts with Israel, several of which are referred to as wars.

    b.  The statement by Israeli President Benjamin Netanyahu, as reported in the news, that Israel would use "full force" against militants in Gaza.

    c.  The statement by Israeli President Benjamin Netanyahu, as reported in the news, that "Hamas chose to continue fighting and will pay the price for that decision … When there is no cease-fire, our answer is fire."

    d.  A report by the Washington Post stating that: Israel had struck at least 25 targets inside Gaza, including the home of a senior Hamas leader Mahmoud Al Zahar; Hamas militants had fired at least 13 rockets into southern Israel; Israel's "Iron Dome," an air-defense system that exists to deflect weapons fired from Palestine, was deflecting fire from Gaza; Israel had announced plans for a ground attack on Gaza; Israel dropped leaflets into Gaza warning the population to evacuate; Israel had invaded Gaza with tanks and gunboats.

    e.  Several sources, in particular, Black's Law Dictionary, The Dictionary of International and Comparative Law, and the Handbook of Humanitarian

13

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

Law in Armed Conflicts, define "war" as including any hostile conflict by means of armed forces between nations, states, or rulers, or even between two "parties." Atlantic quoted these definitions on page 6 of its July 28, 2014 denial letter to Andrea Garber.

f.   Hamas was the governing authority over the Gaza Strip in July 2014 and had a military wing known as the Qassam Brigades, as well as a police force, a security force, and intelligence personnel.

g.   In several news articles published in July 2014 by MSNBC and in television reports that appeared on the news channel MSNBC (which is an affiliate of NBC Universal), the Israeli-Palestinian "conflict" in 2014 was referred to as a "war."

h.   Reported events and details of actions that occurred during June and July 2014, as reported in various news sources, including but not limited to CBS news videos and MSNBC videos, articles, and features, including direct clashes of armed forces from opposing sides of the war, gunfights, firing of long-range rockets, rocket attacks into Tel Aviv, Jerusalem, and/or Southern Israel, planning for a ground incursion, a ground campaign, war planes, gunboats, mutual exchange of air strikes, rejection of a proposed cease fire, and injuries and deaths in Israel, Palestine, Gaza City, and/or the Gaza Strip, and comments from Israel regarding its intentions.

i.   Hamas militants stated on al-Aqsa TV that Hamas was firing rockets in response to "Israeli aggression against Palestinians in the West Bank, Jerusalem and Gaza." According to news reports, the statement was issued in the name of the Qassam Brigades and laid out four conditions for a ceasefire: ending all action in Jerusalem and the West Bank, ending the fire on and siege of Gaza, releasing all the prisoners who were re-arrested in the Israeli operation launched on June 12, 2014, after the disappearance

14

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1   of three Israeli settlers and the ceasing of "meddling" in the Palestinian

2   Unity government.

3       j.   Moussa Abu Marzouk, a top Hamas official, stated, as reported in a news

4   article:  "There should be a new equation so that we will not have a war

5   on Gaza every two years."

6       k.   The word "militants" is used to describe Hamas forces in various news

7   articles (identified in response to Interrogatory No. 4 below) and the

8   Congressional Reports identified in subparts (a) and (b) of this response to

9   Interrogatory No. 3.

10      l.   Hamas spokesman Sami Abu Zuhri stated, as reported in a news article:

11  "There will be no truce without an end to the war that the Occupation

12  (Israel) began, a lifting of the blockade and a halt to all violations and

13  killings in Gaza and the West Bank."

14  Atlantic also reviewed the following documents in investigating the *DIG* CLAIM:

15      a.   E-mail sent by Stephen Smith, head of NBC security for Europe, dated

16  July 10, 2014, regarding NBCU Security's decision to move the filming of

17  *Dig* out of Israel.

18      b.   A news article published by the Washington Post, dated July 10, 2014, by

19  Griff Witte and William Booth, entitled "As cease-fire with Hamas fails to

20  take shape, Netanyahu says, 'Our answer is fire.'" This article is available

21  at:   https://www.washingtonpost.com/world/israel-accepts-truce-plan-

22  hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-

23  923ecc0c7d23_story.html?utm_term=.e99302eb1314.

24      c.   A news article published by MSNBC dated July 18, 2014, by Benjamin

25  Landy and Maria Lokke, entitled "Scenes of war and heartbreak as Israeli

26  ground forces invade Gaza." This article is available at:

27  http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-

28  conflict-intensifies.

15

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

d.  A news article published by MSNBC dated July 18, 2014, by David Taintor, entitled "Obama points to rebels in downed Malaysian jet." This article is available at: http://www.msnbc.com/msnbc/obama-american-dead-malaysia-airlines-crash.

e.  A news article published by MSNBC dated July 16, 2014, by Donna Stefano, entitled "In Israel and Palestine, children imagine a world without war." This article is available at: http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-world-without-war.

f.  A news article published by the Times of Israel by Adiv Sterman, dated July 16, 2014, entitled "Ground incursion in Gaza said 'very likely.'" This article is available at: http://www.timesofisrael.com/idf-ground-incursion-in-gaza-very-likely/.

g.  A collection of "LiveBlogs" published by the Times of Israel on July 7, 2014, by Itamar Sharon, Marissa Newman, and Ilan Ben Zion, entitled "Israel launches 'Protective Edge' counteroffensive on Gaza, Jewish suspects reenact teen's murder." This collection is available at: http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-violence-continues/#!.

h.  A news article published by Middle East Eye dated July 8, 2014, entitled "Hamas claims responsibility for rockets fired at Jerusalem, Tel Aviv and Haifa." This article is available at: http://www.middleeasteye.net/news/israels-army-prepared-ground-assault-gaza-official-275282816.

i.  A news article published by the Global News, dated July 9, 2014, entitled "UPDATE: Israel hits key Hamas targets in Gaza offensive." This article is available at: http://globalnews.ca/news/1438089/israel-strikes-hamas-targets-in-gaza-to-stop-rocket-fire/.

16

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

j.  A news article published by the Global News, dated July 15, 2014, entitled "Israel: Hamas to pay price for its 'no' to truce." This article is available at: http://globalnews.ca/news/1451058/israel-hamas-to-pay-price-for-its-no-to-truce/.

k.  The news article entitled "LIVE UPDATES: Operation Protective Edge, Day 7," published by Haaretz on July 15, 2014. The article is available at: http://www.haaretz.com/israel-news/1.604898#!.

l.  The December 2, 2010 Congressional Research Service Report entitled "Hamas: Background and Issues for Congress," and authored by Jim Zanotti.

m.  Black's Law Dictionary, as discussed above.

n.  The Dictionary of International and Comparative Law, as discussed above.

o.  The Handbook of Humanitarian Law in Armed Conflicts, as discussed above.

p.  The travel warning issued by the United States on February 3, 2014, regarding travel to Israel.

q.  The United Kingdom's website regarding travel to Israel, available at: https://www.gov.uk/foreign-travel-advice/israel, as it existed on July 15, 2014.

r.  Primary sources discussing Hamas, as listed in "Hamas," appearing in Wikipedia (http://en.wikipedia.org/wiki/Hamas), as it existed on July 16, 2014.

s.  Articles and sources located through internet research, the titles or names of which were not specifically recorded in written form.

t.  The news clips (videos) available at the following websites:

    i.  http://www.msnbc.com/the-last-word/watch/mh17-mystery-and-war-in-gaza-308247107963;

17

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ii. http://www.msnbc.com/melissa-harris-perry/watch/what-it-means-to-live-in-a-war-zone-309370947801;

iii. http://www.msnbc.com/all-in-with-chris-hayes/watch/day-breaks-in-gaza-following-invasion-307348035939;

iv. http://www.msnbc.com/all-in-with-chris-hayes/watch/ground-war-in-gaza-307290179722;

v. www.cbsnews.com/videos/new-clashes-between-israel-palestinians-is-ground-war-next/.

Atlantic also considered all of the information and updates provided by representatives of NBC Universal, including Stephen Smith, Andrea Garber, and Susan Weiss regarding the status of the filming in Israel and the conditions noted by security personnel and/or representatives for the Plaintiffs, as well as the events occurring in Israel.

**INTERROGATORY NO. 6:**

State all facts which support ATLANTIC'S position that Exclusion 1 of the General Conditions section of the POLICY, which excludes coverage for loss caused directly or indirectly by "war, including undeclared or civil war" applies to the *DIG* CLAIM.

**RESPONSE TO INTERROGATORY NO. 6:** Atlantic contends that the exclusion quoted above in Interrogatory No. 6 applies based on the facts recited in response to interrogatories Nos. 3-5 and the facts contained in the documents cited therein, and incorporates those responses herein by reference. Atlantic further states that it contends that the exclusion quoted above in Interrogatory No. 6 applies based on the following facts and the information contained in and statements made in the following documents:

a. The facts set forth in the December 2, 2010 Congressional Research Service Report entitled "Hamas: Background and Issues for Congress," which was authored by Jim Zanotti, who is identified as an Analyst in

18

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Middle Eastern Affairs. Atlantic will not recite each and every fact within that Congressional Report. But in particular, Atlantic noted that Hamas was identified in that Report as a religious and political organization and the Report's statement that, since June 2007, Hamas has had control over the Gaza Strip and that Hamas has a "military wing." Atlantic also considered the timeline included in this Report, which sets forth a long history of the key dates in Hamas's history and its many conflicts with Israel, several of which are referred to as wars.

b. The facts set forth in the January 31, 2014 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," which was authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not recite each and every fact within that Congressional Report. But in particular, Atlantic considered the following facts: the report seemed to distinguish between "armed conflicts" and "terrorism"; 130 of the 193 U.N. member states have formally recognized the state of Palestine; on November 29, 2012, the U.N. General Assembly adopted Resolution 67/19 by a vote of 138 to 9 (with 41 abstentions), which recognized Palestine as a "non-member state," (whereas it was previously an "entity"); in the fall of 2011, the Palestinians obtained membership in the U.N. Educational, Scientific and Cultural Organization (UNESCO); the claim by the Palestinians that Israel is directing even more force and violence against them than Palestine is directing at Israel; Hamas has entered into a position of responsibility and political power since 2007; that the Palestinian Authority, which rules the Gaza Strip and parts of the West Bank, is, though not a state, organized like one—complete with democratic mechanisms, security forces, and executive, legislative, and judicial organs of governance; the Palestinian Authority's legislative branch is the Palestinian Legislative Council

19

ANDERSON, MCPHARLIN & CONNERS LLP
*LAWYERS*
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  (PLC); Hamas won the January 2006 PLC elections; ultimately, Hamas

2  forcibly took control over Gaza in June 2007.

3  c.  The statement by Israeli President Benjamin Netanyahu, as reported in the

4  news, that Israel would use "full force" against militants in Gaza.

5  d.  The statement by Israeli President Benjamin Netanyahu, as reported in the

6  news, that "Hamas chose to continue fighting and will pay the price for

7  that decision … When there is no cease-fire, our answer is fire."

8  e.  A report by the Washington Post stating that: Israel had struck at least 25

9  targets inside Gaza, including the home of a senior Hamas leader

10  Mahmoud Al Zahar; Hamas militants had fired at least 13 rockets into

11  southern Israel; Israel's "Iron Dome," an air-defense system that exists to

12  deflect weapons fired from Palestine, was deflecting fire from Gaza; Israel

13  had announced plans for a ground attack on Gaza; Israel dropped leaflets

14  into Gaza warning the population to evacuate; Israel had invaded Gaza

15  with tanks and gunboats.

16  f.  Several sources, in particular, Black's Law Dictionary, The Dictionary of

17  International and Comparative Law, and the Handbook of Humanitarian

18  Law in Armed Conflicts, define "war" as including any hostile conflict by

19  means of armed forces between nations, states, or rulers, or even between

20  two "parties." Atlantic quoted these definitions on page 6 of its July 28,

21  2014 denial letter to Andrea Garber.

22  g.   Hamas was the governing authority over the Gaza Strip in July 2014 and

23  had a military wing known as the Qassam Brigades, as well as a police

24  force, a security force, and intelligence personnel.

25  h.  In several news articles published in July 2014 by MSNBC and in

26  television reports that appeared on the news channel MSNBC (which is an

27  affiliate of NBC Universal), the Israeli-Palestinian "conflict" in 2014 was

28  referred to as a "war."

20

ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

EXHIBIT 03

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1    i.    Reported events and details of actions that occurred during June and July
2          2014, as reported in various news sources, including but not limited to
3          CBS news videos and MSNBC videos, articles, and features, including
4          direct clashes of armed forces from opposing sides of the war, gunfights,
5          firing of long-range rockets, rocket attacks into Tel Aviv, Jerusalem,
6          and/or Southern Israel, planning for a ground incursion, a ground
7          campaign, war planes, gunboats, mutual exchange of air strikes, rejection
8          of a proposed cease fire, and injuries and deaths in Israel, Palestine, Gaza
9          City, and/or the Gaza Strip, and comments from Israel regarding its
10         intentions.

11   j.    Hamas militants stated on al-Aqsa TV that Hamas was firing rockets in
12         response to "Israeli aggression against Palestinians in the West Bank,
13         Jerusalem and Gaza." According to news reports, the statement was issued
14         in the name of the Qassam Brigades and laid out four conditions for a
15         ceasefire: ending all action in Jerusalem and the West Bank, ending the
16         fire on and siege of Gaza, releasing all the prisoners who were re-arrested
17         in the Israeli operation launched on June 12, 2014, after the disappearance
18         of three Israeli settlers and the ceasing of "meddling" in the Palestinian
19         Unity government.

20   k.    Moussa Abu Marzouk, a top Hamas official, stated, as reported in a news
21         article: "There should be a new equation so that we will not have a war
22         on Gaza every two years."

23   l.    The word "militants" is used to describe Hamas forces in various news
24         articles (identified in response to Interrogatory No. 4 below) and the
25         Congressional Reports identified in subparts (a) and (b) of this response to
26         Interrogatory No. 3.

27   m.    Hamas spokesman Sami Abu Zuhri stated, as reported in a news article:
28         "There will be no truce without an end to the war that the Occupation

21

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  (Israel) began, a lifting of the blockade and a halt to all violations and

2  killings in Gaza and the West Bank."

3  n.  E-mail sent by Stephen Smith, head of NBC security for Europe, dated

4  July 10, 2014, regarding NBCU Security's decision to move the filming of

5  *Dig* out of Israel.

6  o.  A news article published by the Washington Post, dated July 10, 2014, by

7  Griff Witte and William Booth, entitled "As cease-fire with Hamas fails to

8  take shape, Netanyahu says, 'Our answer is fire.'" This article is available

9  at:   https://www.washingtonpost.com/world/israel-accepts-truce-plan-

10  hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-

11  923ecc0c7d23_story.html?utm_term=.e99302eb1314.

12  p.  A news article published by MSNBC dated July 18, 2014, by Benjamin

13  Landy and Maria Lokke, entitled "Scenes of war and heartbreak as Israeli

14  ground   forces   invade   Gaza."   This   article   is   available   at:

15  http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-

16  conflict-intensifies.

17  q.  A news article published by MSNBC dated July 18, 2014, by David

18  Taintor, entitled "Obama points to rebels in downed Malaysian jet." This

19  article is available at: http://www.msnbc.com/msnbc/obama-american-

20  dead-malaysia-airlines-crash.

21  r.  A news article published by MSNBC dated July 16, 2014, by Donna

22  Stefano, entitled "In Israel and Palestine, children imagine a world

23  without   war."   This   article   is   available   at:

24  http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-

25  world-without-war.

26  s.  A news article published by the Times of Israel by Adiv Sterman, dated

27  July 16, 2014, entitled "Ground incursion in Gaza said 'very likely.'" This

28  article is available at: http://www.timesofisrael.com/idf-ground-incursion-

22

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1    in-gaza-very-likely/.

2    t.   A collection of "LiveBlogs" published by the Times of Israel on July 7,

3         2014, by Itamar Sharon, Marissa Newman, and Ilan Ben Zion, entitled

4         "Israel launches 'Protective Edge' counteroffensive on Gaza, Jewish

5         suspects reenact teen's murder." This collection is available at:

6         http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-

7         violence-continues/#!.

8    u.   A news article published by Middle East Eye dated July 8, 2014, entitled

9         "Hamas claims responsibility for rockets fired at Jerusalem, Tel Aviv and

10        Haifa."       This       article       is       available       at:

11        http://www.middleeasteye.net/news/israels-army-prepared-ground-

12        assault-gaza-official-275282816.

13   v.   A news article published by the Global News, dated July 9, 2014, entitled

14        "UPDATE: Israel hits key Hamas targets in Gaza offensive." This article

15        is available at: http://globalnews.ca/news/1438089/israel-strikes-hamas-

16        targets-in-gaza-to-stop-rocket-fire/.

17   w.   A news article published by the Global News, dated July 15, 2014,

18        entitled "Israel: Hamas to pay price for its 'no' to truce." This article is

19        available  at:  http://globalnews.ca/news/1451058/israel-hamas-to-pay-

20        price-for-its-no-to-truce/.

21   x.   The news article entitled "LIVE UPDATES: Operation Protective Edge,

22        Day 7," published by Haaretz on July 15, 2014. The article is available at:

23        http://www.haaretz.com/israel-news/1.604898#!.

24   y.   The December 2, 2010 Congressional Research Service Report entitled

25        "Hamas: Background and Issues for Congress," and authored by Jim

26        Zanotti.

27   z.   The January 31, 2014 Congressional Research Service Report entitled

28        "The Palestinians: Background and U.S. Relations," and authored by Jim

                                        23

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1      Zanotti.

2  aa. Black's Law Dictionary, as discussed above.

3  bb. The Dictionary of International and Comparative Law, as discussed

4      above.

5  cc. The Handbook of Humanitarian Law in Armed Conflicts, as discussed

6      above.

7  dd. The travel warning issued by the United States on February 3, 2014,

8      regarding travel to Israel.

9  ee. The United Kingdom's website regarding travel to Israel, available at:

10      https://www.gov.uk/foreign-travel-advice/israel, as it existed on July 15,

11      2014.

12  ff. The news clips (videos) available at the following websites:

13      i. http://www.msnbc.com/the-last-word/watch/mh17-mystery-and-

14      war-in-gaza-308247107963;

15      ii. http://www.msnbc.com/melissa-harris-perry/watch/what-it-means-

16      to-live-in-a-war-zone-309370947801;

17      iii. http://www.msnbc.com/all-in-with-chris-hayes/watch/day-breaks-

18      in-gaza-following-invasion-307348035939;

19      iv. http://www.msnbc.com/all-in-with-chris-hayes/watch/ground-war-

20      in-gaza-307290179722;

21      v. www.cbsnews.com/videos/new-clashes-between-israel-

22      palestinians-is-ground-war-next/.

23  gg. The facts set forth in the February 10, 2015 Congressional Research

24      Service Report entitled "The Palestinians: Background and U.S.

25      Relations," which was authored by Jim Zanotti, who is identified as an

26      Analyst in Middle Eastern Affairs. Atlantic will not recite each and every

27      fact within that Congressional Report. But in particular, Atlantic relies on

28      the following facts: the report referred to the "summer 2014 conflict"

24

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  between Israel and Hamas (along with other Palestinian militants based in

2  Gaza) as a "major conflict" and noted that it lasted approximately 50 days;

3  2,100 Palestinians were killed, and 71 Israelis (including five civilians)

4  were killed in the 50-day conflict; Hamas depleted 80% of its rocket and

5  mortar arsenal during the summer 2014 Israel-Gaza conflict; an Israeli

6  official was quoted as stating that Israel's military efforts during the

7  summer 2014 conflict "will give us quiet for a long time." (page 25 of the

8  Report).

9  hh. Reports that: as many as 485,000 Palestinians had been displaced and

10  were staying in emergency shelters or with host families, more than 130

11  schools and 24 health facilities were damaged in the Gaza Strip as a result

12  of attacks by Israeli forces; Israeli forces also completely destroyed 73

13  mosques in Gaza and damaged another 203.

14  ii. Reports that: rocket attacks from Gaza caused damage to Israeli civilian

15  infrastructure, resulting in 3,000 claims of damage being submitted to

16  Israel's Tax Authority; the estimated economic cost to Israel was $2.5

17  billion.

18  jj. Reports that the Palestinian casualties totaled 2,220, 1,492 of whom were

19  civilians (551 children and 299 women), 605 militants, and 123 of

20  unknown status. Approximately 11,000 Palestinians were wounded.

21  kk. Reports that 66 Israeli Defense Force soldiers were killed, as were 5

22  Israeli civilians.

23  ll. To the extent not already mentioned above, facts learned through research

24  of Hamas and Palestine, and Hamas's ongoing conflicts and prior wars

25  with Israel, including operations, official positions held, and capabilities,

26  which research included review of primary sources discussing Hamas and

27  Palestine, as listed in "Hamas," appearing in Wikipedia

28  (http://en.wikipedia.org/wiki/Hamas) as it existed on July 16, 2014.

25

1  With regard to facts supporting its position, Atlantic also refers to and incorporates the
2  documents it has produced in this case, and further incorporates and refers to the
3  documents identified in the documents it has produced in this case.

4  **INTERROGATORY NO. 7:**

5      State all facts which support ATLANTIC'S position that Exclusion 2 of the
6  General Conditions section of the POLICY, which excludes coverage for loss caused
7  directly or indirectly by "warlike action by a military force, including action in
8  hindering or defending against an actual or expected attack, by any government,
9  sovereign or other authority using military personnel or other agents," applies to the
10  *DIG* CLAIM.

11  **RESPONSE TO INTERROGATORY NO. 7:** Atlantic contends that the exclusion
12  quoted above in Interrogatory No. 7 applies based on based on the facts recited in
13  response to interrogatories Nos. 3-5 and the facts contained in the documents cited
14  therein, and incorporates those responses herein by reference. Atlantic further responds
15  that it contends that the exclusion quoted above in Interrogatory No. 7 applies based on
16  the following facts and the information contained in and statements made in the
17  following documents:

18          a.  The facts set forth in the December 2, 2010 Congressional Research
19              Service Report entitled "Hamas: Background and Issues for Congress,"
20              which was authored by Jim Zanotti, who is identified as an Analyst in
21              Middle Eastern Affairs. Atlantic will not recite each and every fact within
22              that Congressional Report. But in particular, Atlantic noted that Hamas
23              was identified in that Report as a religious and political organization and
24              the Report's statement that, since June 2007, Hamas has had control over
25              the Gaza Strip and that Hamas has a "military wing." Atlantic also
26              considered the timeline included in this Report, which sets forth a long
27              history of the key dates in Hamas's history and its many conflicts with
28              Israel, several of which are referred to as wars.

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

26

b. The facts set forth in the January 31, 2014 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," which was authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not recite each and every fact within that Congressional Report. But in particular, Atlantic considered the following facts: the report seemed to distinguish between "armed conflicts" and "terrorism"; 130 of the 193 U.N. member states have formally recognized the state of Palestine; on November 29, 2012, the U.N. General Assembly adopted Resolution 67/19 by a vote of 138 to 9 (with 41 abstentions), which recognized Palestine as a "non-member state," (whereas it was previously an "entity"); in the fall of 2011, the Palestinians obtained membership in the U.N. Educational, Scientific and Cultural Organization (UNESCO); the claim by the Palestinians that Israel is directing even more force and violence against them than Palestine is directing at Israel; Hamas has entered into a position of responsibility and political power since 2007; that the Palestinian Authority, which rules the Gaza Strip and parts of the West Bank, is, though not a state, organized like one—complete with democratic mechanisms, security forces, and executive, legislative, and judicial organs of governance; the Palestinian Authority's legislative branch is the Palestinian Legislative Council (PLC); Hamas won the January 2006 PLC elections; ultimately, Hamas forcibly took control over Gaza in June 2007.

c. The statement by Israeli President Benjamin Netanyahu, as reported in the news, that Israel would use "full force" against militants in Gaza.

d. The statement by Israeli President Benjamin Netanyahu, as reported in the news, that "Hamas chose to continue fighting and will pay the price for that decision … When there is no cease-fire, our answer is fire."

e. A report by the Washington Post stating that: Israel had struck at least 25

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

27

1    targets inside Gaza, including the home of a senior Hamas leader

2    Mahmoud Al Zahar; Hamas militants had fired at least 13 rockets into

3    southern Israel; Israel's "Iron Dome," an air-defense system that exists to

4    deflect weapons fired from Palestine, was deflecting fire from Gaza; Israel

5    had announced plans for a ground attack on Gaza; Israel dropped leaflets

6    into Gaza warning the population to evacuate; Israel had invaded Gaza

7    with tanks and gunboats.

8    f.  Several sources, in particular, Black's Law Dictionary, The Dictionary of

9        International and Comparative Law, and the Handbook of Humanitarian

10       Law in Armed Conflicts, define "war" as including any hostile conflict by

11       means of armed forces between nations, states, or rulers, or even between

12       two "parties." Atlantic quoted these definitions on page 6 of its July 28,

13       2014 denial letter to Andrea Garber.

14   g.  Hamas was the governing authority over the Gaza Strip in July 2014 and

15       had a military wing known as the Qassam Brigades, as well as a police

16       force, a security force, and intelligence personnel.

17   h.  In several news articles published in July 2014 by MSNBC and in

18       television reports that appeared on the news channel MSNBC (which is an

19       affiliate of NBC Universal), the Israeli-Palestinian "conflict" in 2014 was

20       referred to as a "war."

21   i.  Reported events and details of actions that occurred during June and July

22       2014, as reported in various news sources, including but not limited to

23       CBS news videos and MSNBC videos, articles, and features, including

24       direct clashes of armed forces from opposing sides of the war, gunfights,

25       firing of long-range rockets, rocket attacks into Tel Aviv, Jerusalem,

26       and/or Southern Israel, planning for a ground incursion, a ground

27       campaign, war planes, gunboats, mutual exchange of air strikes, rejection

28       of a proposed cease fire, and injuries and deaths in Israel, Palestine, Gaza

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

28

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

City, and/or the Gaza Strip, and comments from Israel regarding its intentions.

j.  Hamas militants stated on al-Aqsa TV that Hamas was firing rockets in response to "Israeli aggression against Palestinians in the West Bank, Jerusalem and Gaza." According to news reports, the statement was issued in the name of the Qassam Brigades and laid out four conditions for a ceasefire: ending all action in Jerusalem and the West Bank, ending the fire on and siege of Gaza, releasing all the prisoners who were re-arrested in the Israeli operation launched on June 12, 2014, after the disappearance of three Israeli settlers and the ceasing of "meddling" in the Palestinian Unity government.

k.  Moussa Abu Marzouk, a top Hamas official, stated, as reported in a news article:  "There should be a new equation so that we will not have a war on Gaza every two years."

l.  The word "militants" is used to describe Hamas forces in various news articles (identified in response to Interrogatory No. 4 below) and the Congressional Reports identified in subparts (a) and (b) of this response to Interrogatory No. 3.

m.  Hamas spokesman Sami Abu Zuhri stated, as reported in a news article: "There will be no truce without an end to the war that the Occupation (Israel) began, a lifting of the blockade and a halt to all violations and killings in Gaza and the West Bank."

n.  E-mail sent by Stephen Smith, head of NBC security for Europe, dated July 10, 2014, regarding NBCU Security's decision to move the filming of *Dig* out of Israel.

o.  A news article published by the Washington Post, dated July 10, 2014, by Griff Witte and William Booth, entitled "As cease-fire with Hamas fails to take shape, Netanyahu says, 'Our answer is fire.'" This article is available

29

ANDERSON, MCPHARLIN & CONNERS LLP
*LAWYERS*
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

at: https://www.washingtonpost.com/world/israel-accepts-truce-plan-hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-923ecc0c7d23_story.html?utm_term=.e99302eb1314.

p. A news article published by MSNBC dated July 18, 2014, by Benjamin Landy and Maria Lokke, entitled "Scenes of war and heartbreak as Israeli ground forces invade Gaza." This article is available at: http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies.

q. A news article published by MSNBC dated July 18, 2014, by David Taintor, entitled "Obama points to rebels in downed Malaysian jet." This article is available at: http://www.msnbc.com/msnbc/obama-american-dead-malaysia-airlines-crash.

r. A news article published by MSNBC dated July 16, 2014, by Donna Stefano, entitled "In Israel and Palestine, children imagine a world without war." This article is available at: http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-world-without-war.

s. A news article published by the Times of Israel by Adiv Sterman, dated July 16, 2014, entitled "Ground incursion in Gaza said 'very likely.'" This article is available at: http://www.timesofisrael.com/idf-ground-incursion-in-gaza-very-likely/.

t. A collection of "LiveBlogs" published by the Times of Israel on July 7, 2014, by Itamar Sharon, Marissa Newman, and Ilan Ben Zion, entitled "Israel launches 'Protective Edge' counteroffensive on Gaza, Jewish suspects reenact teen's murder." This collection is available at: http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-violence-continues/#!.

u. A news article published by Middle East Eye dated July 8, 2014, entitled

30

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

"Hamas claims responsibility for rockets fired at Jerusalem, Tel Aviv and Haifa." This article is available at: http://www.middleeasteye.net/news/israels-army-prepared-ground-assault-gaza-official-275282816.

v. A news article published by the Global News, dated July 9, 2014, entitled "UPDATE: Israel hits key Hamas targets in Gaza offensive." This article is available at: http://globalnews.ca/news/1438089/israel-strikes-hamas-targets-in-gaza-to-stop-rocket-fire/.

w. A news article published by the Global News, dated July 15, 2014, entitled "Israel: Hamas to pay price for its 'no' to truce." This article is available at: http://globalnews.ca/news/1451058/israel-hamas-to-pay-price-for-its-no-to-truce/.

x. The news article entitled "LIVE UPDATES: Operation Protective Edge, Day 7," published by Haaretz on July 15, 2014. The article is available at: http://www.haaretz.com/israel-news/1.604898#!.

y. The December 2, 2010 Congressional Research Service Report entitled "Hamas: Background and Issues for Congress," and authored by Jim Zanotti.

z. The January 31, 2014 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," and authored by Jim Zanotti.

aa. Black's Law Dictionary, as discussed above.

bb. The Dictionary of International and Comparative Law, as discussed above.

cc. The Handbook of Humanitarian Law in Armed Conflicts, as discussed above.

dd. The travel warning issued by the United States on February 3, 2014, regarding travel to Israel.

31

ANDERSON, MCPHARLIN & CONNERS LLP

*LAWYERS*

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

ee. The United Kingdom's website regarding travel to Israel, available at: https://www.gov.uk/foreign-travel-advice/israel, as it existed on July 15, 2014.

ff. The news clips (videos) available at the following websites:

    i.  http://www.msnbc.com/the-last-word/watch/mh17-mystery-and-war-in-gaza-308247107963;

    ii.  http://www.msnbc.com/melissa-harris-perry/watch/what-it-means-to-live-in-a-war-zone-309370947801;

    iii.  http://www.msnbc.com/all-in-with-chris-hayes/watch/day-breaks-in-gaza-following-invasion-307348035939;

    iv.  http://www.msnbc.com/all-in-with-chris-hayes/watch/ground-war-in-gaza-307290179722;

    v.  www.cbsnews.com/videos/new-clashes-between-israel-palestinians-is-ground-war-next/.

gg. The facts set forth in the February 10, 2015 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," which was authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not recite each and every fact within that Congressional Report. But in particular, Atlantic relies on the following facts: the report referred to the "summer 2014 conflict" between Israel and Hamas (along with other Palestinian militants based in Gaza) as a "major conflict" and noted that it lasted approximately 50 days; 2,100 Palestinians were killed, and 71 Israelis (including five civilians) were killed in the 50-day conflict; Hamas depleted 80% of its rocket and mortar arsenal during the summer 2014 Israel-Gaza conflict; an Israeli official was quoted as stating that Israel's military efforts during the summer 2014 conflict "will give us quiet for a long time." (page 25 of the Report).

ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

EXHIBIT 03

hh. Reports that: as many as 485,000 Palestinians had been displaced and were staying in emergency shelters or with host families, more than 130 schools and 24 health facilities were damaged in the Gaza Strip as a result of attacks by Israeli forces; Israeli forces also completely destroyed 73 mosques in Gaza and damaged another 203.

ii. Reports that: rocket attacks from Gaza caused damage to Israeli civilian infrastructure, resulting in 3,000 claims of damage being submitted to Israel's Tax Authority; the estimated economic cost to Israel was $2.5 billion.

jj. Reports that the Palestinian casualties totaled 2,220, 1,492 of whom were civilians (551 children and 299 women), 605 militants, and 123 of unknown status. Approximately 11,000 Palestinians were wounded.

kk. Reports that 66 Israeli Defense Force soldiers were killed, as were 5 Israeli civilians.

ll. To the extent not already mentioned above, facts learned through research of Hamas and Palestine, and Hamas's ongoing conflicts and prior wars with Israel, including operations, official positions held, and capabilities, which research included review of primary sources discussing Hamas and Palestine, as listed in "Hamas," appearing in Wikipedia (http://en.wikipedia.org/wiki/Hamas) as it existed on July 16, 2014.

With regard to facts supporting its position, Atlantic refers to and incorporates the documents it has produced in this case, and further incorporates and refers to the documents identified in the documents it has produced in this case.

**INTERROGATORY NO. 8:**

State all facts which support ATLANTIC'S position that Exclusion 3 of the General Conditions section of the POLICY, which excludes coverage for loss caused directly or indirectly by "insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these,"

33

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1 applies to the *DIG* CLAIM.

2 **RESPONSE TO INTERROGATORY NO. 8:** Atlantic contends that the exclusion

3 quoted above in Interrogatory No. 8 applies based on based on the facts recited in

4 response to interrogatories Nos. 3-5 and the facts contained in the documents cited

5 therein, and incorporates those responses herein by reference. Atlantic further responds

6 that it contends that the exclusion quoted above in Interrogatory No. 8 applies based on

7 the following facts and the information contained in and statements made in the

8 following documents:

9     a. The facts set forth in the December 2, 2010 Congressional Research

10         Service Report entitled "Hamas: Background and Issues for Congress,"

11         which was authored by Jim Zanotti, who is identified as an Analyst in

12         Middle Eastern Affairs. Atlantic will not recite each and every fact within

13         that Congressional Report. But in particular, Atlantic noted that Hamas

14         was identified in that Report as a religious and political organization and

15         the Report's statement that, since June 2007, Hamas has had control over

16         the Gaza Strip and that Hamas has a "military wing." Atlantic also

17         considered the timeline included in this Report, which sets forth a long

18         history of the key dates in Hamas's history and its many conflicts with

19         Israel, several of which are referred to as wars.

20     b. The facts set forth in the January 31, 2014 Congressional Research

21         Service Report entitled "The Palestinians: Background and U.S.

22         Relations," which was authored by Jim Zanotti, who is identified as an

23         Analyst in Middle Eastern Affairs. Atlantic will not recite each and every

24         fact within that Congressional Report. But in particular, Atlantic

25         considered the following facts: the report seemed to distinguish between

26         "armed conflicts" and "terrorism"; 130 of the 193 U.N. member states

27         have formally recognized the state of Palestine; on November 29, 2012,

28         the U.N. General Assembly adopted Resolution 67/19 by a vote of 138 to

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

34

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017–3623

9 (with 41 abstentions), which recognized Palestine as a "non-member state," (whereas it was previously an "entity"); in the fall of 2011, the Palestinians obtained membership in the U.N. Educational, Scientific and Cultural Organization (UNESCO); the claim by the Palestinians that Israel is directing even more force and violence against them than Palestine is directing at Israel; Hamas has entered into a position of responsibility and political power since 2007; that the Palestinian Authority, which rules the Gaza Strip and parts of the West Bank, is, though not a state, organized like one—complete with democratic mechanisms, security forces, and executive, legislative, and judicial organs of governance; the Palestinian Authority's legislative branch is the Palestinian Legislative Council (PLC); Hamas won the January 2006 PLC elections; ultimately, Hamas forcibly took control over Gaza in June 2007.

c.  The statement by Israeli President Benjamin Netanyahu, as reported in the news, that Israel would use "full force" against militants in Gaza.

d.  The statement by Israeli President Benjamin Netanyahu, as reported in the news, that "Hamas chose to continue fighting and will pay the price for that decision … When there is no cease-fire, our answer is fire."

e.  A report by the Washington Post stating that: Israel had struck at least 25 targets inside Gaza, including the home of a senior Hamas leader Mahmoud Al Zahar; Hamas militants had fired at least 13 rockets into southern Israel; Israel's "Iron Dome," an air-defense system that exists to deflect weapons fired from Palestine, was deflecting fire from Gaza; Israel had announced plans for a ground attack on Gaza; Israel dropped leaflets into Gaza warning the population to evacuate; Israel had invaded Gaza with tanks and gunboats.

f.  Several sources, in particular, Black's Law Dictionary, The Dictionary of International and Comparative Law, and the Handbook of Humanitarian

ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

EXHIBIT 03

ANDERSON, McPHARLIN & CONNERS LLP

*LAWYERS*

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Law in Armed Conflicts, define "war" as including any hostile conflict by means of armed forces between nations, states, or rulers, or even between two "parties." Atlantic quoted these definitions on page 6 of its July 28, 2014 denial letter to Andrea Garber.

g.   Hamas was the governing authority over the Gaza Strip in July 2014 and had a military wing known as the Qassam Brigades, as well as a police force, a security force, and intelligence personnel.

h.   In several news articles published in July 2014 by MSNBC and in television reports that appeared on the news channel MSNBC (which is an affiliate of NBC Universal), the Israeli-Palestinian "conflict" in 2014 was referred to as a "war."

i.   Reported events and details of actions that occurred during June and July 2014, as reported in various news sources, including but not limited to CBS news videos and MSNBC videos, articles, and features, including direct clashes of armed forces from opposing sides of the war, gunfights, firing of long-range rockets, rocket attacks into Tel Aviv, Jerusalem, and/or Southern Israel, planning for a ground incursion, a ground campaign, war planes, gunboats, mutual exchange of air strikes, rejection of a proposed cease fire, and injuries and deaths in Israel, Palestine, Gaza City, and/or the Gaza Strip, and comments from Israel regarding its intentions.

j.   Hamas militants stated on al-Aqsa TV that Hamas was firing rockets in response to "Israeli aggression against Palestinians in the West Bank, Jerusalem and Gaza." According to news reports, the statement was issued in the name of the Qassam Brigades and laid out four conditions for a ceasefire: ending all action in Jerusalem and the West Bank, ending the fire on and siege of Gaza, releasing all the prisoners who were re-arrested in the Israeli operation launched on June 12, 2014, after the disappearance

36

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017–3623

of three Israeli settlers and the ceasing of "meddling" in the Palestinian Unity government.

k. Moussa Abu Marzouk, a top Hamas official, stated, as reported in a news article: "There should be a new equation so that we will not have a war on Gaza every two years."

l. The word "militants" is used to describe Hamas forces in various news articles (identified in response to Interrogatory No. 4 below) and the Congressional Reports identified in subparts (a) and (b) of this response to Interrogatory No. 3.

m. Hamas spokesman Sami Abu Zuhri stated, as reported in a news article: "There will be no truce without an end to the war that the Occupation (Israel) began, a lifting of the blockade and a halt to all violations and killings in Gaza and the West Bank."

n. E-mail sent by Stephen Smith, head of NBC security for Europe, dated July 10, 2014, regarding NBCU Security's decision to move the filming of *Dig* out of Israel.

o. A news article published by the Washington Post, dated July 10, 2014, by Griff Witte and William Booth, entitled "As cease-fire with Hamas fails to take shape, Netanyahu says, 'Our answer is fire.'" This article is available at: https://www.washingtonpost.com/world/israel-accepts-truce-plan-hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-923ecc0c7d23_story.html?utm_term=.e99302eb1314.

p. A news article published by MSNBC dated July 18, 2014, by Benjamin Landy and Maria Lokke, entitled "Scenes of war and heartbreak as Israeli ground forces invade Gaza." This article is available at: http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies.

q. A news article published by MSNBC dated July 18, 2014, by David

37

Taintor, entitled "Obama points to rebels in downed Malaysian jet." This article is available at: http://www.msnbc.com/msnbc/obama-american-dead-malaysia-airlines-crash.

r. A news article published by MSNBC dated July 16, 2014, by Donna Stefano, entitled "In Israel and Palestine, children imagine a world without war." This article is available at: http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-world-without-war.

s. A news article published by the Times of Israel by Adiv Sterman, dated July 16, 2014, entitled "Ground incursion in Gaza said 'very likely.'" This article is available at: http://www.timesofisrael.com/idf-ground-incursion-in-gaza-very-likely/.

t. A collection of "LiveBlogs" published by the Times of Israel on July 7, 2014, by Itamar Sharon, Marissa Newman, and Ilan Ben Zion, entitled "Israel launches 'Protective Edge' counteroffensive on Gaza, Jewish suspects reenact teen's murder." This collection is available at: http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-violence-continues/#!.

u. A news article published by Middle East Eye dated July 8, 2014, entitled "Hamas claims responsibility for rockets fired at Jerusalem, Tel Aviv and Haifa." This article is available at: http://www.middleeasteye.net/news/israels-army-prepared-ground-assault-gaza-official-275282816.

v. A news article published by the Global News, dated July 9, 2014, entitled "UPDATE: Israel hits key Hamas targets in Gaza offensive." This article is available at: http://globalnews.ca/news/1438089/israel-strikes-hamas-targets-in-gaza-to-stop-rocket-fire/.

w. A news article published by the Global News, dated July 15, 2014,

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1 entitled "Israel: Hamas to pay price for its 'no' to truce." This article is
2 available at: http://globalnews.ca/news/1451058/israel-hamas-to-pay-
3 price-for-its-no-to-truce/.

4 x. The news article entitled "LIVE UPDATES: Operation Protective Edge,
5 Day 7," published by Haaretz on July 15, 2014. The article is available at:
6 http://www.haaretz.com/israel-news/1.604898#!.

7 y. The December 2, 2010 Congressional Research Service Report entitled
8 "Hamas: Background and Issues for Congress," and authored by Jim
9 Zanotti.

10 z. The January 31, 2014 Congressional Research Service Report entitled
11 "The Palestinians: Background and U.S. Relations," and authored by Jim
12 Zanotti.

13 aa. Black's Law Dictionary, as discussed above.

14 bb. The Dictionary of International and Comparative Law, as discussed
15 above.

16 cc. The Handbook of Humanitarian Law in Armed Conflicts, as discussed
17 above.

18 dd. The travel warning issued by the United States on February 3, 2014,
19 regarding travel to Israel.

20 ee. The United Kingdom's website regarding travel to Israel, available at:
21 https://www.gov.uk/foreign-travel-advice/israel, as it existed on July 15,
22 2014.

23 ff. The news clips (videos) available at the following websites:

24 a. http://www.msnbc.com/the-last-word/watch/mh17-mystery-and-
25 war-in-gaza-308247107963;

26 b. http://www.msnbc.com/melissa-harris-perry/watch/what-it-means-
27 to-live-in-a-war-zone-309370947801;

28 c. http://www.msnbc.com/all-in-with-chris-hayes/watch/day-breaks-

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

in-gaza-following-invasion-307348035939;

    d.  http://www.msnbc.com/all-in-with-chris-hayes/watch/ground-war-in-gaza-307290179722;

    e.  www.cbsnews.com/videos/new-clashes-between-israel-palestinians-is-ground-war-next/.

gg. The facts set forth in the February 10, 2015 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," which was authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not recite each and every fact within that Congressional Report. But in particular, Atlantic relies on the following facts: the report referred to the "summer 2014 conflict" between Israel and Hamas (along with other Palestinian militants based in Gaza) as a "major conflict" and noted that it lasted approximately 50 days; 2,100 Palestinians were killed, and 71 Israelis (including five civilians) were killed in the 50-day conflict; Hamas depleted 80% of its rocket and mortar arsenal during the summer 2014 Israel-Gaza conflict; an Israeli official was quoted as stating that Israel's military efforts during the summer 2014 conflict "will give us quiet for a long time." (page 25 of the Report).

hh. Reports that: as many as 485,000 Palestinians had been displaced and were staying in emergency shelters or with host families, more than 130 schools and 24 health facilities were damaged in the Gaza Strip as a result of attacks by Israeli forces; Israeli forces also completely destroyed 73 mosques in Gaza and damaged another 203.

ii. Reports that: rocket attacks from Gaza caused damage to Israeli civilian infrastructure, resulting in 3,000 claims of damage being submitted to Israel's Tax Authority; the estimated economic cost to Israel was $2.5 billion.

ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

EXHIBIT 03

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

jj. Reports that the Palestinian casualties totaled 2,220, 1,492 of whom were civilians (551 children and 299 women), 605 militants, and 123 of unknown status. Approximately 11,000 Palestinians were wounded.

kk. Reports that 66 Israeli Defense Force soldiers were killed, as were 5 Israeli civilians.

ll. To the extent not already mentioned above, facts learned through research of Hamas and Palestine, and Hamas's ongoing conflicts and prior wars with Israel, including operations, official positions held, and capabilities, which research included review of primary sources discussing Hamas and Palestine, as listed in "Hamas," appearing in Wikipedia (http://en.wikipedia.org/wiki/Hamas) as it existed on July 16, 2014.

With regard to facts supporting its position, Atlantic refers to and incorporates the documents it has produced in this case, and further incorporates and refers to the documents identified in the documents it has produced in this case.

**INTERROGATORY NO. 9:**

State all facts which support ATLANTIC'S position that Exclusion 4 of the General Conditions section of the POLICY, which excludes coverage for loss caused directly or indirectly by "any weapon of war including atomic fission or radioactive force, whether in time of peace or war," applies to the *DIG* CLAIM.

**RESPONSE TO INTERROGATORY NO. 9:** Atlantic contends that the exclusion quoted above in Interrogatory No. 9 applies based on based on the facts recited in response to interrogatories Nos. 3-5 and the facts contained in the documents cited therein, and incorporates those responses herein by reference. Atlantic further responds that it contends that the exclusion quoted above in Interrogatory No. 9 applies based on the following facts and the information contained in and statements made in the following documents:

a. The facts set forth in the December 2, 2010 Congressional Research

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

Service Report entitled "Hamas: Background and Issues for Congress," which was authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not recite each and every fact within that Congressional Report. But in particular, Atlantic noted that Hamas was identified in that Report as a religious and political organization and the Report's statement that, since June 2007, Hamas has had control over the Gaza Strip and that Hamas has a "military wing." Atlantic also considered the timeline included in this Report, which sets forth a long history of the key dates in Hamas's history and its many conflicts with Israel, several of which are referred to as wars.

b.  The facts set forth in the January 31, 2014 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," which was authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not recite each and every fact within that Congressional Report. But in particular, Atlantic considered the following facts: the report seemed to distinguish between "armed conflicts" and "terrorism"; 130 of the 193 U.N. member states have formally recognized the state of Palestine; on November 29, 2012, the U.N. General Assembly adopted Resolution 67/19 by a vote of 138 to 9 (with 41 abstentions), which recognized Palestine as a "non-member state," (whereas it was previously an "entity"); in the fall of 2011, the Palestinians obtained membership in the U.N. Educational, Scientific and Cultural Organization (UNESCO); the claim by the Palestinians that Israel is directing even more force and violence against them than Palestine is directing at Israel; Hamas has entered into a position of responsibility and political power since 2007; that the Palestinian Authority, which rules the Gaza Strip and parts of the West Bank, is, though not a state, organized like one—complete with democratic mechanisms, security forces, and

42

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

executive, legislative, and judicial organs of governance; the Palestinian Authority's legislative branch is the Palestinian Legislative Council (PLC); Hamas won the January 2006 PLC elections; ultimately, Hamas forcibly took control over Gaza in June 2007.

c. The statement by Israeli President Benjamin Netanyahu, as reported in the news, that Israel would use "full force" against militants in Gaza.

d. The statement by Israeli President Benjamin Netanyahu, as reported in the news, that "Hamas chose to continue fighting and will pay the price for that decision … When there is no cease-fire, our answer is fire."

e. A report by the Washington Post stating that: Israel had struck at least 25 targets inside Gaza, including the home of a senior Hamas leader Mahmoud Al Zahar; Hamas militants had fired at least 13 rockets into southern Israel; Israel's "Iron Dome," an air-defense system that exists to deflect weapons fired from Palestine, was deflecting fire from Gaza; Israel had announced plans for a ground attack on Gaza; Israel dropped leaflets into Gaza warning the population to evacuate; Israel had invaded Gaza with tanks and gunboats.

f. Several sources, in particular, Black's Law Dictionary, The Dictionary of International and Comparative Law, and the Handbook of Humanitarian Law in Armed Conflicts, define "war" as including any hostile conflict by means of armed forces between nations, states, or rulers, or even between two "parties." Atlantic quoted these definitions on page 6 of its July 28, 2014 denial letter to Andrea Garber.

g. Hamas was the governing authority over the Gaza Strip in July 2014 and had a military wing known as the Qassam Brigades, as well as a police force, a security force, and intelligence personnel.

h. In several news articles published in July 2014 by MSNBC and in television reports that appeared on the news channel MSNBC (which is an

43

affiliate of NBC Universal), the Israeli-Palestinian "conflict" in 2014 was referred to as a "war."

i. Reported events and details of actions that occurred during June and July 2014, as reported in various news sources, including but not limited to CBS news videos and MSNBC videos, articles, and features, including direct clashes of armed forces from opposing sides of the war, gunfights, firing of long-range rockets, rocket attacks into Tel Aviv, Jerusalem, and/or Southern Israel, planning for a ground incursion, a ground campaign, war planes, gunboats, mutual exchange of air strikes, rejection of a proposed cease fire, and injuries and deaths in Israel, Palestine, Gaza City, and/or the Gaza Strip, and comments from Israel regarding its intentions.

j. Hamas militants stated on al-Aqsa TV that Hamas was firing rockets in response to "Israeli aggression against Palestinians in the West Bank, Jerusalem and Gaza." According to news reports, the statement was issued in the name of the Qassam Brigades and laid out four conditions for a ceasefire: ending all action in Jerusalem and the West Bank, ending the fire on and siege of Gaza, releasing all the prisoners who were re-arrested in the Israeli operation launched on June 12, 2014, after the disappearance of three Israeli settlers and the ceasing of "meddling" in the Palestinian Unity government.

k. Moussa Abu Marzouk, a top Hamas official, stated, as reported in a news article: "There should be a new equation so that we will not have a war on Gaza every two years."

l. The word "militants" is used to describe Hamas forces in various news articles (identified in response to Interrogatory No. 4 below) and the Congressional Reports identified in subparts (a) and (b) of this response to Interrogatory No. 3.

44

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

m. Hamas spokesman Sami Abu Zuhri stated, as reported in a news article: "There will be no truce without an end to the war that the Occupation (Israel) began, a lifting of the blockade and a halt to all violations and killings in Gaza and the West Bank."

n. E-mail sent by Stephen Smith, head of NBC security for Europe, dated July 10, 2014, regarding NBCU Security's decision to move the filming of *Dig* out of Israel.

o. A news article published by the Washington Post, dated July 10, 2014, by Griff Witte and William Booth, entitled "As cease-fire with Hamas fails to take shape, Netanyahu says, 'Our answer is fire.'" This article is available at: https://www.washingtonpost.com/world/israel-accepts-truce-plan-hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-923ecc0c7d23_story.html?utm_term=.e99302eb1314.

p. A news article published by MSNBC dated July 18, 2014, by Benjamin Landy and Maria Lokke, entitled "Scenes of war and heartbreak as Israeli ground forces invade Gaza." This article is available at: http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies.

q. A news article published by MSNBC dated July 18, 2014, by David Taintor, entitled "Obama points to rebels in downed Malaysian jet." This article is available at: http://www.msnbc.com/msnbc/obama-american-dead-malaysia-airlines-crash.

r. A news article published by MSNBC dated July 16, 2014, by Donna Stefano, entitled "In Israel and Palestine, children imagine a world without war." This article is available at: http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-world-without-war.

s. A news article published by the Times of Israel by Adiv Sterman, dated

45

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

July 16, 2014, entitled "Ground incursion in Gaza said 'very likely.'" This article is available at: http://www.timesofisrael.com/idf-ground-incursion-in-gaza-very-likely/.

t.   A collection of "LiveBlogs" published by the Times of Israel on July 7, 2014, by Itamar Sharon, Marissa Newman, and Ilan Ben Zion, entitled "Israel launches 'Protective Edge' counteroffensive on Gaza, Jewish suspects reenact teen's murder." This collection is available at: http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-violence-continues/#!.

u.   A news article published by Middle East Eye dated July 8, 2014, entitled "Hamas claims responsibility for rockets fired at Jerusalem, Tel Aviv and Haifa."   This   article   is   available   at: http://www.middleeasteye.net/news/israels-army-prepared-ground-assault-gaza-official-275282816.

v.   A news article published by the Global News, dated July 9, 2014, entitled "UPDATE: Israel hits key Hamas targets in Gaza offensive." This article is available at: http://globalnews.ca/news/1438089/israel-strikes-hamas-targets-in-gaza-to-stop-rocket-fire/.

w.   A news article published by the Global News, dated July 15, 2014, entitled "Israel: Hamas to pay price for its 'no' to truce." This article is available at:   http://globalnews.ca/news/1451058/israel-hamas-to-pay-price-for-its-no-to-truce/.

x.   The news article entitled "LIVE UPDATES: Operation Protective Edge, Day 7," published by Haaretz on July 15, 2014. The article is available at: http://www.haaretz.com/israel-news/1.604898#!.

y.   The December 2, 2010 Congressional Research Service Report entitled "Hamas: Background and Issues for Congress," and authored by Jim Zanotti.

z. The January 31, 2014 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," and authored by Jim Zanotti.

aa. Black's Law Dictionary, as discussed above.

bb. The Dictionary of International and Comparative Law, as discussed above.

cc. The Handbook of Humanitarian Law in Armed Conflicts, as discussed above.

dd. The travel warning issued by the United States on February 3, 2014, regarding travel to Israel.

ee. The United Kingdom's website regarding travel to Israel, available at: https://www.gov.uk/foreign-travel-advice/israel, as it existed on July 15, 2014.

ff. The news clips (videos) available at the following websites:

    a. http://www.msnbc.com/the-last-word/watch/mh17-mystery-and-war-in-gaza-308247107963;

    b. http://www.msnbc.com/melissa-harris-perry/watch/what-it-means-to-live-in-a-war-zone-309370947801;

    c. http://www.msnbc.com/all-in-with-chris-hayes/watch/day-breaks-in-gaza-following-invasion-307348035939;

    d. http://www.msnbc.com/all-in-with-chris-hayes/watch/ground-war-in-gaza-307290179722;

    e. www.cbsnews.com/videos/new-clashes-between-israel-palestinians-is-ground-war-next/.

gg. The facts set forth in the February 10, 2015 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," which was authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not recite each and every

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

47

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1    fact within that Congressional Report. But in particular, Atlantic relies on
2    the following facts: the report referred to the "summer 2014 conflict"
3    between Israel and Hamas (along with other Palestinian militants based in
4    Gaza) as a "major conflict" and noted that it lasted approximately 50 days;
5    2,100 Palestinians were killed, and 71 Israelis (including five civilians)
6    were killed in the 50-day conflict; Hamas depleted 80% of its rocket and
7    mortar arsenal during the summer 2014 Israel-Gaza conflict; an Israeli
8    official was quoted as stating that Israel's military efforts during the
9    summer 2014 conflict "will give us quiet for a long time." (page 25 of the
10   Report).

11   hh. Reports that: as many as 485,000 Palestinians had been displaced and
12   were staying in emergency shelters or with host families, more than 130
13   schools and 24 health facilities were damaged in the Gaza Strip as a result
14   of attacks by Israeli forces; Israeli forces also completely destroyed 73
15   mosques in Gaza and damaged another 203.

16   ii.  Reports that: rocket attacks from Gaza caused damage to Israeli civilian
17   infrastructure, resulting in 3,000 claims of damage being submitted to
18   Israel's Tax Authority; the estimated economic cost to Israel was $2.5
19   billion.

20   jj.  Reports that the Palestinian casualties totaled 2,220, 1,492 of whom were
21   civilians (551 children and 299 women), 605 militants, and 123 of
22   unknown status. Approximately 11,000 Palestinians were wounded.

23   kk. Reports that 66 Israeli Defense Force soldiers were killed, as were 5
24   Israeli civilians.

25   ll.  To the extent not already mentioned above, facts learned through research
26   of Hamas and Palestine, and Hamas's ongoing conflicts and prior wars
27   with Israel, including operations, official positions held, and capabilities,
28   which research included review of primary sources discussing Hamas and

48

1   Palestine, as listed in "Hamas," appearing in Wikipedia
2   (http://en.wikipedia.org/wiki/Hamas) as it existed on July 16, 2014.
3   With regard to facts supporting its position, Atlantic refers to and incorporates the
4   documents it has produced in this case, and further incorporates and refers to the
5   documents identified in the documents it has produced in this case.
6
7   **INTERROGATORY NO. 10:**
8   State all facts which support ATLANTIC'S position that Exclusion 8 of Section
9   III — Extra Expense of the POLICY, which excludes coverage for loss caused by,
10  resulting from, or arising out of "any concern or fear of an occurrence which may affect
11  the commencement of [sic] the continuation of the Insured Production, except the
12  action of a civil authority that prevents access to, exit from (ingress or egress) or closes
13  down the location and or facilities due to condition that threaten the safety of case, crew
14  or property," applies to the *DIG* CLAIM.
15  **RESPONSE TO INTERROGATORY NO. 10:** Atlantic contends that the exclusion
16  quoted above in Interrogatory No. 10 applies based on based on the facts recited in
17  response to interrogatories Nos. 3-5 and the facts contained in the documents cited
18  therein, and incorporates those responses herein by reference. Atlantic further responds
19  that it contends that the exclusion quoted above in Interrogatory No. 10 applies based
20  on the following facts and the information contained in and statements made in the
21  following documents:
22          a.  The facts set forth in the December 2, 2010 Congressional Research
23              Service Report entitled "Hamas: Background and Issues for Congress,"
24              which was authored by Jim Zanotti, who is identified as an Analyst in
25              Middle Eastern Affairs. Atlantic will not recite each and every fact within
26              that Congressional Report. But in particular, Atlantic noted that Hamas
27              was identified in that Report as a religious and political organization and
28              the Report's statement that, since June 2007, Hamas has had control over

ANDERSON, McPHARLIN & CONNERS LLP
*LAWYERS*
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

the Gaza Strip and that Hamas has a "military wing." Atlantic also considered the timeline included in this Report, which sets forth a long history of the key dates in Hamas's history and its many conflicts with Israel, several of which are referred to as wars.

b.  The facts set forth in the January 31, 2014 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," which was authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not recite each and every fact within that Congressional Report. But in particular, Atlantic considered the following facts: the report seemed to distinguish between "armed conflicts" and "terrorism"; 130 of the 193 U.N. member states have formally recognized the state of Palestine; on November 29, 2012, the U.N. General Assembly adopted Resolution 67/19 by a vote of 138 to 9 (with 41 abstentions), which recognized Palestine as a "non-member state," (whereas it was previously an "entity"); in the fall of 2011, the Palestinians obtained membership in the U.N. Educational, Scientific and Cultural Organization (UNESCO); the claim by the Palestinians that Israel is directing even more force and violence against them than Palestine is directing at Israel; Hamas has entered into a position of responsibility and political power since 2007; that the Palestinian Authority, which rules the Gaza Strip and parts of the West Bank, is, though not a state, organized like one—complete with democratic mechanisms, security forces, and executive, legislative, and judicial organs of governance; the Palestinian Authority's legislative branch is the Palestinian Legislative Council (PLC); Hamas won the January 2006 PLC elections; ultimately, Hamas forcibly took control over Gaza in June 2007.

c.  The statement by Israeli President Benjamin Netanyahu, as reported in the news, that Israel would use "full force" against militants in Gaza.

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

50

ANDERSON, McPHARLIN & CONNERS LLP

*LAWYERS*

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

d.  The statement by Israeli President Benjamin Netanyahu, as reported in the news, that "Hamas chose to continue fighting and will pay the price for that decision … When there is no cease-fire, our answer is fire."

e.  A report by the Washington Post stating that: Israel had struck at least 25 targets inside Gaza, including the home of a senior Hamas leader Mahmoud Al Zahar; Hamas militants had fired at least 13 rockets into southern Israel; Israel's "Iron Dome," an air-defense system that exists to deflect weapons fired from Palestine, was deflecting fire from Gaza; Israel had announced plans for a ground attack on Gaza; Israel dropped leaflets into Gaza warning the population to evacuate; Israel had invaded Gaza with tanks and gunboats.

f.  Several sources, in particular, Black's Law Dictionary, The Dictionary of International and Comparative Law, and the Handbook of Humanitarian Law in Armed Conflicts, define "war" as including any hostile conflict by means of armed forces between nations, states, or rulers, or even between two "parties." Atlantic quoted these definitions on page 6 of its July 28, 2014 denial letter to Andrea Garber.

g.  Hamas was the governing authority over the Gaza Strip in July 2014 and had a military wing known as the Qassam Brigades, as well as a police force, a security force, and intelligence personnel.

h.  In several news articles published in July 2014 by MSNBC and in television reports that appeared on the news channel MSNBC (which is an affiliate of NBC Universal), the Israeli-Palestinian "conflict" in 2014 was referred to as a "war."

i.  Reported events and details of actions that occurred during June and July 2014, as reported in various news sources, including but not limited to CBS news videos and MSNBC videos, articles, and features, including direct clashes of armed forces from opposing sides of the war, gunfights,

51

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1  firing of long-range rockets, rocket attacks into Tel Aviv, Jerusalem,

2  and/or Southern Israel, planning for a ground incursion, a ground

3  campaign, war planes, gunboats, mutual exchange of air strikes, rejection

4  of a proposed cease fire, and injuries and deaths in Israel, Palestine, Gaza

5  City, and/or the Gaza Strip, and comments from Israel regarding its

6  intentions.

7  j.  Hamas militants stated on al-Aqsa TV that Hamas was firing rockets in

8  response to "Israeli aggression against Palestinians in the West Bank,

9  Jerusalem and Gaza." According to news reports, the statement was issued

10  in the name of the Qassam Brigades and laid out four conditions for a

11  ceasefire: ending all action in Jerusalem and the West Bank, ending the

12  fire on and siege of Gaza, releasing all the prisoners who were re-arrested

13  in the Israeli operation launched on June 12, 2014, after the disappearance

14  of three Israeli settlers and the ceasing of "meddling" in the Palestinian

15  Unity government.

16  k.  Moussa Abu Marzouk, a top Hamas official, stated, as reported in a news

17  article: "There should be a new equation so that we will not have a war

18  on Gaza every two years."

19  l.  The word "militants" is used to describe Hamas forces in various news

20  articles (identified in response to Interrogatory No. 4 below) and the

21  Congressional Reports identified in subparts (a) and (b) of this response to

22  Interrogatory No. 3.

23  m.  Hamas spokesman Sami Abu Zuhri stated, as reported in a news article:

24  "There will be no truce without an end to the war that the Occupation

25  (Israel) began, a lifting of the blockade and a halt to all violations and

26  killings in Gaza and the West Bank."

27  n.  E-mail sent by Stephen Smith, head of NBC security for Europe, dated

28  July 10, 2014, regarding NBCU Security's decision to move the filming of

52

*Dig* out of Israel.

o.  A news article published by the Washington Post, dated July 10, 2014, by Griff Witte and William Booth, entitled "As cease-fire with Hamas fails to take shape, Netanyahu says, 'Our answer is fire.'" This article is available at: https://www.washingtonpost.com/world/israel-accepts-truce-plan-hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-923ecc0c7d23_story.html?utm_term=.e99302eb1314.

p.  A news article published by MSNBC dated July 18, 2014, by Benjamin Landy and Maria Lokke, entitled "Scenes of war and heartbreak as Israeli ground forces invade Gaza." This article is available at: http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies.

q.  A news article published by MSNBC dated July 18, 2014, by David Taintor, entitled "Obama points to rebels in downed Malaysian jet." This article is available at: http://www.msnbc.com/msnbc/obama-american-dead-malaysia-airlines-crash.

r.  A news article published by MSNBC dated July 16, 2014, by Donna Stefano, entitled "In Israel and Palestine, children imagine a world without war." This article is available at: http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-world-without-war.

s.  A news article published by the Times of Israel by Adiv Sterman, dated July 16, 2014, entitled "Ground incursion in Gaza said 'very likely.'" This article is available at: http://www.timesofisrael.com/idf-ground-incursion-in-gaza-very-likely/.

t.  A collection of "LiveBlogs" published by the Times of Israel on July 7, 2014, by Itamar Sharon, Marissa Newman, and Ilan Ben Zion, entitled "Israel launches 'Protective Edge' counteroffensive on Gaza, Jewish

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

suspects reenact teen's murder." This collection is available at: http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-violence-continues/#!.

u. A news article published by Middle East Eye dated July 8, 2014, entitled "Hamas claims responsibility for rockets fired at Jerusalem, Tel Aviv and Haifa." This article is available at: http://www.middleeasteye.net/news/israels-army-prepared-ground-assault-gaza-official-275282816.

v. A news article published by the Global News, dated July 9, 2014, entitled "UPDATE: Israel hits key Hamas targets in Gaza offensive." This article is available at: http://globalnews.ca/news/1438089/israel-strikes-hamas-targets-in-gaza-to-stop-rocket-fire/.

w. A news article published by the Global News, dated July 15, 2014, entitled "Israel: Hamas to pay price for its 'no' to truce." This article is available at: http://globalnews.ca/news/1451058/israel-hamas-to-pay-price-for-its-no-to-truce/.

x. The news article entitled "LIVE UPDATES: Operation Protective Edge, Day 7," published by Haaretz on July 15, 2014. The article is available at: http://www.haaretz.com/israel-news/1.604898#!.

y. The December 2, 2010 Congressional Research Service Report entitled "Hamas: Background and Issues for Congress," and authored by Jim Zanotti.

z. The January 31, 2014 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," and authored by Jim Zanotti.

aa. Black's Law Dictionary, as discussed above.

bb. The Dictionary of International and Comparative Law, as discussed above.

EXHIBIT 03

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

cc. The Handbook of Humanitarian Law in Armed Conflicts, as discussed above.

dd. The travel warning issued by the United States on February 3, 2014, regarding travel to Israel.

ee. The United Kingdom's website regarding travel to Israel, available at: https://www.gov.uk/foreign-travel-advice/israel, as it existed on July 15, 2014.

ff. The news clips (videos) available at the following websites:

   a. http://www.msnbc.com/the-last-word/watch/mh17-mystery-and-war-in-gaza-308247107963;

   b. http://www.msnbc.com/melissa-harris-perry/watch/what-it-means-to-live-in-a-war-zone-309370947801;

   c. http://www.msnbc.com/all-in-with-chris-hayes/watch/day-breaks-in-gaza-following-invasion-307348035939;

   d. http://www.msnbc.com/all-in-with-chris-hayes/watch/ground-war-in-gaza-307290179722;

   e. www.cbsnews.com/videos/new-clashes-between-israel-palestinians-is-ground-war-next/.

gg. The facts set forth in the February 10, 2015 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," which was authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not recite each and every fact within that Congressional Report. But in particular, Atlantic relies on the following facts: the report referred to the "summer 2014 conflict" between Israel and Hamas (along with other Palestinian militants based in Gaza) as a "major conflict" and noted that it lasted approximately 50 days; 2,100 Palestinians were killed, and 71 Israelis (including five civilians) were killed in the 50-day conflict; Hamas depleted 80% of its rocket and

55

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

mortar arsenal during the summer 2014 Israel-Gaza conflict; an Israeli official was quoted as stating that Israel's military efforts during the summer 2014 conflict "will give us quiet for a long time." (page 25 of the Report).

hh. Reports that: as many as 485,000 Palestinians had been displaced and were staying in emergency shelters or with host families, more than 130 schools and 24 health facilities were damaged in the Gaza Strip as a result of attacks by Israeli forces; Israeli forces also completely destroyed 73 mosques in Gaza and damaged another 203.

ii. Reports that: rocket attacks from Gaza caused damage to Israeli civilian infrastructure, resulting in 3,000 claims of damage being submitted to Israel's Tax Authority; the estimated economic cost to Israel was $2.5 billion.

jj. Reports that the Palestinian casualties totaled 2,220, 1,492 of whom were civilians (551 children and 299 women), 605 militants, and 123 of unknown status. Approximately 11,000 Palestinians were wounded.

kk. Reports that 66 Israeli Defense Force soldiers were killed, as were 5 Israeli civilians.

ll. To the extent not already mentioned above, facts learned through research of Hamas and Palestine, and Hamas's ongoing conflicts and prior wars with Israel, including operations, official positions held, and capabilities, which research included review of primary sources discussing Hamas and Palestine, as listed in "Hamas," appearing in Wikipedia (http://en.wikipedia.org/wiki/Hamas) as it existed on July 16, 2014.

With regard to facts supporting its position, Atlantic refers to and incorporates the documents it has produced in this case, and further incorporates and refers to the documents identified in the documents it has produced in this case.

ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

EXHIBIT 03

1

2  **INTERROGATORY NO. 11:**

3      State all facts which support ATLANTIC'S position that Exclusion 9 of Section

4  III — Extra Expense of the POLICY, which excludes coverage for loss caused by,

5  resulting from, or arising out of, "an imminent peril or physical damage to property,

6  facilities, or locations necessary to the insured production," applies to the *DIG* CLAIM.

7  **RESPONSE TO INTERROGATORY NO. 11:** Atlantic contends that the exclusion

8  quoted above in Interrogatory No. 11 applies based on based on the facts recited in

9  response to interrogatories Nos. 3-5 and the facts contained in the documents cited

10 therein, and incorporates those responses herein by reference. Atlantic further responds

11 that it contends that the exclusion quoted above in Interrogatory No. 11 applies based

12 on the following facts and the information contained in and statements made in the

13 following documents:

14     The facts set forth in the December 2, 2010 Congressional Research Service

15 Report entitled "Hamas: Background and Issues for Congress," which was authored by

16 Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not

17 recite each and every fact within that Congressional Report. But in particular, Atlantic

18 noted that Hamas was identified in that Report as a religious and political organization

19 and the Report's statement that, since June 2007, Hamas has had control over the Gaza

20 Strip and that Hamas has a "military wing." Atlantic also considered the timeline

21 included in this Report, which sets forth a long history of the key dates in Hamas's

22 history and its many conflicts with Israel, several of which are referred to as wars.

23     a.  The facts set forth in the January 31, 2014 Congressional Research

24         Service Report entitled "The Palestinians: Background and U.S.

25         Relations," which was authored by Jim Zanotti, who is identified as an

26         Analyst in Middle Eastern Affairs. Atlantic will not recite each and every

27         fact within that Congressional Report. But in particular, Atlantic

28         considered the following facts: the report seemed to distinguish between

57

EXHIBIT 03

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

"armed conflicts" and "terrorism"; 130 of the 193 U.N. member states have formally recognized the state of Palestine; on November 29, 2012, the U.N. General Assembly adopted Resolution 67/19 by a vote of 138 to 9 (with 41 abstentions), which recognized Palestine as a "non-member state," (whereas it was previously an "entity"); in the fall of 2011, the Palestinians obtained membership in the U.N. Educational, Scientific and Cultural Organization (UNESCO); the claim by the Palestinians that Israel is directing even more force and violence against them than Palestine is directing at Israel; Hamas has entered into a position of responsibility and political power since 2007; that the Palestinian Authority, which rules the Gaza Strip and parts of the West Bank, is, though not a state, organized like one—complete with democratic mechanisms, security forces, and executive, legislative, and judicial organs of governance; the Palestinian Authority's legislative branch is the Palestinian Legislative Council (PLC); Hamas won the January 2006 PLC elections; ultimately, Hamas forcibly took control over Gaza in June 2007.

b.  The statement by Israeli President Benjamin Netanyahu, as reported in the news, that Israel would use "full force" against militants in Gaza.

c.  The statement by Israeli President Benjamin Netanyahu, as reported in the news, that "Hamas chose to continue fighting and will pay the price for that decision … When there is no cease-fire, our answer is fire."

d.  A report by the Washington Post stating that: Israel had struck at least 25 targets inside Gaza, including the home of a senior Hamas leader Mahmoud Al Zahar; Hamas militants had fired at least 13 rockets into southern Israel; Israel's "Iron Dome," an air-defense system that exists to deflect weapons fired from Palestine, was deflecting fire from Gaza; Israel had announced plans for a ground attack on Gaza; Israel dropped leaflets into Gaza warning the population to evacuate; Israel had invaded Gaza

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1  with tanks and gunboats.

2  e.  Several sources, in particular, Black's Law Dictionary, The Dictionary of

3  International and Comparative Law, and the Handbook of Humanitarian

4  Law in Armed Conflicts, define "war" as including any hostile conflict by

5  means of armed forces between nations, states, or rulers, or even between

6  two "parties." Atlantic quoted these definitions on page 6 of its July 28,

7  2014 denial letter to Andrea Garber.

8  f.  Hamas was the governing authority over the Gaza Strip in July 2014 and

9  had a military wing known as the Qassam Brigades, as well as a police

10  force, a security force, and intelligence personnel.

11  g.  In several news articles published in July 2014 by MSNBC and in

12  television reports that appeared on the news channel MSNBC (which is an

13  affiliate of NBC Universal), the Israeli-Palestinian "conflict" in 2014 was

14  referred to as a "war."

15  h.  Reported events and details of actions that occurred during June and July

16  2014, as reported in various news sources, including but not limited to

17  CBS news videos and MSNBC videos, articles, and features, including

18  direct clashes of armed forces from opposing sides of the war, gunfights,

19  firing of long-range rockets, rocket attacks into Tel Aviv, Jerusalem,

20  and/or Southern Israel, planning for a ground incursion, a ground

21  campaign, war planes, gunboats, mutual exchange of air strikes, rejection

22  of a proposed cease fire, and injuries and deaths in Israel, Palestine, Gaza

23  City, and/or the Gaza Strip, and comments from Israel regarding its

24  intentions.

25  i.  Hamas militants stated on al-Aqsa TV that Hamas was firing rockets in

26  response to "Israeli aggression against Palestinians in the West Bank,

27  Jerusalem and Gaza." According to news reports, the statement was issued

28  in the name of the Qassam Brigades and laid out four conditions for a

59

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

ceasefire: ending all action in Jerusalem and the West Bank, ending the fire on and siege of Gaza, releasing all the prisoners who were re-arrested in the Israeli operation launched on June 12, 2014, after the disappearance of three Israeli settlers and the ceasing of "meddling" in the Palestinian Unity government.

j. Moussa Abu Marzouk, a top Hamas official, stated, as reported in a news article: "There should be a new equation so that we will not have a war on Gaza every two years."

k. The word "militants" is used to describe Hamas forces in various news articles (identified in response to Interrogatory No. 4 below) and the Congressional Reports identified in subparts (a) and (b) of this response to Interrogatory No. 3.

l. Hamas spokesman Sami Abu Zuhri stated, as reported in a news article: "There will be no truce without an end to the war that the Occupation (Israel) began, a lifting of the blockade and a halt to all violations and killings in Gaza and the West Bank."

m. E-mail sent by Stephen Smith, head of NBC security for Europe, dated July 10, 2014, regarding NBCU Security's decision to move the filming of *Dig* out of Israel.

n. A news article published by the Washington Post, dated July 10, 2014, by Griff Witte and William Booth, entitled "As cease-fire with Hamas fails to take shape, Netanyahu says, 'Our answer is fire.'" This article is available at: https://www.washingtonpost.com/world/israel-accepts-truce-plan-hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-923ecc0c7d23_story.html?utm_term=.e99302eb1314.

o. A news article published by MSNBC dated July 18, 2014, by Benjamin Landy and Maria Lokke, entitled "Scenes of war and heartbreak as Israeli ground forces invade Gaza." This article is available at:

60

1      http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-

2      conflict-intensifies.

3    p.  A news article published by MSNBC dated July 18, 2014, by David

4      Taintor, entitled "Obama points to rebels in downed Malaysian jet." This

5      article is available at: http://www.msnbc.com/msnbc/obama-american-

6      dead-malaysia-airlines-crash.

7    q.  A news article published by MSNBC dated July 16, 2014, by Donna

8      Stefano, entitled "In Israel and Palestine, children imagine a world

9      without war." This article is available at:

10     http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-

11     world-without-war.

12   r.  A news article published by the Times of Israel by Adiv Sterman, dated

13     July 16, 2014, entitled "Ground incursion in Gaza said 'very likely.'" This

14     article is available at: http://www.timesofisrael.com/idf-ground-incursion-

15     in-gaza-very-likely/.

16   s.  A collection of "LiveBlogs" published by the Times of Israel on July 7,

17     2014, by Itamar Sharon, Marissa Newman, and Ilan Ben Zion, entitled

18     "Israel launches 'Protective Edge' counteroffensive on Gaza, Jewish

19     suspects reenact teen's murder." This collection is available at:

20     http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-

21     violence-continues/#!.

22   t.  A news article published by Middle East Eye dated July 8, 2014, entitled

23     "Hamas claims responsibility for rockets fired at Jerusalem, Tel Aviv and

24     Haifa." This article is available at:

25     http://www.middleeasteye.net/news/israels-army-prepared-ground-

26     assault-gaza-official-275282816.

27   u.  A news article published by the Global News, dated July 9, 2014, entitled

28     "UPDATE: Israel hits key Hamas targets in Gaza offensive." This article

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

61

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1  is available at: http://globalnews.ca/news/1438089/israel-strikes-hamas-

2  targets-in-gaza-to-stop-rocket-fire/.

3  v.  A news article published by the Global News, dated July 15, 2014,

4  entitled "Israel: Hamas to pay price for its 'no' to truce." This article is

5  available at: http://globalnews.ca/news/1451058/israel-hamas-to-pay-

6  price-for-its-no-to-truce/.

7  w.  The news article entitled "LIVE UPDATES: Operation Protective Edge,

8  Day 7," published by Haaretz on July 15, 2014. The article is available at:

9  http://www.haaretz.com/israel-news/1.604898#!.

10  x.  The December 2, 2010 Congressional Research Service Report entitled

11  "Hamas: Background and Issues for Congress," and authored by Jim

12  Zanotti.

13  y.  The January 31, 2014 Congressional Research Service Report entitled

14  "The Palestinians: Background and U.S. Relations," and authored by Jim

15  Zanotti.

16  z.  Black's Law Dictionary, as discussed above.

17  aa. The Dictionary of International and Comparative Law, as discussed

18  above.

19  bb. The Handbook of Humanitarian Law in Armed Conflicts, as discussed

20  above.

21  cc. The travel warning issued by the United States on February 3, 2014,

22  regarding travel to Israel.

23  dd. The United Kingdom's website regarding travel to Israel, available at:

24  https://www.gov.uk/foreign-travel-advice/israel, as it existed on July 15,

25  2014.

26  ee. The news clips (videos) available at the following websites:

27  a.  http://www.msnbc.com/the-last-word/watch/mh17-mystery-and-

28  war-in-gaza-308247107963;

62

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

b. http://www.msnbc.com/melissa-harris-perry/watch/what-it-means-to-live-in-a-war-zone-309370947801;

c. http://www.msnbc.com/all-in-with-chris-hayes/watch/day-breaks-in-gaza-following-invasion-307348035939;

d. http://www.msnbc.com/all-in-with-chris-hayes/watch/ground-war-in-gaza-307290179722;

e. www.cbsnews.com/videos/new-clashes-between-israel-palestinians-is-ground-war-next/.

ff. The facts set forth in the February 10, 2015 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," which was authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not recite each and every fact within that Congressional Report. But in particular, Atlantic relies on the following facts: the report referred to the "summer 2014 conflict" between Israel and Hamas (along with other Palestinian militants based in Gaza) as a "major conflict" and noted that it lasted approximately 50 days; 2,100 Palestinians were killed, and 71 Israelis (including five civilians) were killed in the 50-day conflict; Hamas depleted 80% of its rocket and mortar arsenal during the summer 2014 Israel-Gaza conflict; an Israeli official was quoted as stating that Israel's military efforts during the summer 2014 conflict "will give us quiet for a long time." (page 25 of the Report).

gg. Reports that: as many as 485,000 Palestinians had been displaced and were staying in emergency shelters or with host families, more than 130 schools and 24 health facilities were damaged in the Gaza Strip as a result of attacks by Israeli forces; Israeli forces also completely destroyed 73 mosques in Gaza and damaged another 203.

hh. Reports that: rocket attacks from Gaza caused damage to Israeli civilian

63

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1   infrastructure, resulting in 3,000 claims of damage being submitted to

2   Israel's Tax Authority; the estimated economic cost to Israel was $2.5

3   billion.

4   ii.  Reports that the Palestinian casualties totaled 2,220, 1,492 of whom were

5   civilians (551 children and 299 women), 605 militants, and 123 of

6   unknown status. Approximately 11,000 Palestinians were wounded.

7   jj.  Reports that 66 Israeli Defense Force soldiers were killed, as were 5

8   Israeli civilians.

9   kk. To the extent not already mentioned above, facts learned through research

10   of Hamas and Palestine, and Hamas's ongoing conflicts and prior wars

11   with Israel, including operations, official positions held, and capabilities,

12   which research included review of primary sources discussing Hamas and

13   Palestine, as listed in "Hamas," appearing in Wikipedia

14   (http://en.wikipedia.org/wiki/Hamas) as it existed on July 16, 2014.

15   With regard to facts supporting its position, Atlantic refers to and incorporates the

16   documents it has produced in this case, and further incorporates and refers to the

17   documents identified in the documents it has produced in this case.

18

19   **INTERROGATORY NO. 12:**

20   State all facts which support ATLANTIC'S position that Exclusion 10 of Section

21   III — Extra Expense of the POLICY, which excludes coverage for loss caused by,

22   resulting from, or arising out of "any concern or belief that the commencement or

23   continuation of Insured Production is inappropriate," applies to the *DIG* CLAIM.

24   **RESPONSE TO INTERROGATORY NO. 12:** Atlantic contends that the exclusion

25   quoted above in Interrogatory No. 12 applies based on based on the facts recited in

26   response to interrogatories Nos. 3-5 and the facts contained in the documents cited

27   therein, and incorporates those responses herein by reference. Atlantic further responds

28   that it contends that the exclusion quoted above in Interrogatory No. 12 applies based

64

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  on the following facts and the information contained in and statements made in the

2  following documents:

3      The facts set forth in the December 2, 2010 Congressional Research Service

4  Report entitled "Hamas: Background and Issues for Congress," which was authored by

5  Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not

6  recite each and every fact within that Congressional Report. But in particular, Atlantic

7  noted that Hamas was identified in that Report as a religious and political organization

8  and the Report's statement that, since June 2007, Hamas has had control over the Gaza

9  Strip and that Hamas has a "military wing." Atlantic also considered the timeline

10  included in this Report, which sets forth a long history of the key dates in Hamas's

11  history and its many conflicts with Israel, several of which are referred to as wars.

12      a.  The facts set forth in the January 31, 2014 Congressional Research

13         Service Report entitled "The Palestinians: Background and U.S.

14         Relations," which was authored by Jim Zanotti, who is identified as an

15         Analyst in Middle Eastern Affairs. Atlantic will not recite each and every

16         fact within that Congressional Report. But in particular, Atlantic

17         considered the following facts: the report seemed to distinguish between

18         "armed conflicts" and "terrorism"; 130 of the 193 U.N. member states

19         have formally recognized the state of Palestine; on November 29, 2012,

20         the U.N. General Assembly adopted Resolution 67/19 by a vote of 138 to

21         9 (with 41 abstentions), which recognized Palestine as a "non-member

22         state," (whereas it was previously an "entity"); in the fall of 2011, the

23         Palestinians obtained membership in the U.N. Educational, Scientific and

24         Cultural Organization (UNESCO); the claim by the Palestinians that Israel

25         is directing even more force and violence against them than Palestine is

26         directing at Israel; Hamas has entered into a position of responsibility and

27         political power since 2007; that the Palestinian Authority, which rules the

28         Gaza Strip and parts of the West Bank, is, though not a state, organized

65

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1   like one—complete with democratic mechanisms, security forces, and
2   executive, legislative, and judicial organs of governance; the Palestinian
3   Authority's legislative branch is the Palestinian Legislative Council
4   (PLC); Hamas won the January 2006 PLC elections; ultimately, Hamas
5   forcibly took control over Gaza in June 2007.

6   b.  The statement by Israeli President Benjamin Netanyahu, as reported in the
7   news, that Israel would use "full force" against militants in Gaza.

8   c.  The statement by Israeli President Benjamin Netanyahu, as reported in the
9   news, that "Hamas chose to continue fighting and will pay the price for
10  that decision … When there is no cease-fire, our answer is fire."

11  d.  A report by the Washington Post stating that: Israel had struck at least 25
12  targets inside Gaza, including the home of a senior Hamas leader
13  Mahmoud Al Zahar; Hamas militants had fired at least 13 rockets into
14  southern Israel; Israel's "Iron Dome," an air-defense system that exists to
15  deflect weapons fired from Palestine, was deflecting fire from Gaza; Israel
16  had announced plans for a ground attack on Gaza; Israel dropped leaflets
17  into Gaza warning the population to evacuate; Israel had invaded Gaza
18  with tanks and gunboats.

19  e.  Several sources, in particular, Black's Law Dictionary, The Dictionary of
20  International and Comparative Law, and the Handbook of Humanitarian
21  Law in Armed Conflicts, define "war" as including any hostile conflict by
22  means of armed forces between nations, states, or rulers, or even between
23  two "parties." Atlantic quoted these definitions on page 6 of its July 28,
24  2014 denial letter to Andrea Garber.

25  f.   Hamas was the governing authority over the Gaza Strip in July 2014 and
26  had a military wing known as the Qassam Brigades, as well as a police
27  force, a security force, and intelligence personnel.

28  g.  In several news articles published in July 2014 by MSNBC and in

66

ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

EXHIBIT 03

1   television reports that appeared on the news channel MSNBC (which is an

2   affiliate of NBC Universal), the Israeli-Palestinian "conflict" in 2014 was

3   referred to as a "war."

4   h.  Reported events and details of actions that occurred during June and July

5   2014, as reported in various news sources, including but not limited to

6   CBS news videos and MSNBC videos, articles, and features, including

7   direct clashes of armed forces from opposing sides of the war, gunfights,

8   firing of long-range rockets, rocket attacks into Tel Aviv, Jerusalem,

9   and/or Southern Israel, planning for a ground incursion, a ground

10  campaign, war planes, gunboats, mutual exchange of air strikes, rejection

11  of a proposed cease fire, and injuries and deaths in Israel, Palestine, Gaza

12  City, and/or the Gaza Strip, and comments from Israel regarding its

13  intentions.

14  i.  Hamas militants stated on al-Aqsa TV that Hamas was firing rockets in

15  response to "Israeli aggression against Palestinians in the West Bank,

16  Jerusalem and Gaza." According to news reports, the statement was issued

17  in the name of the Qassam Brigades and laid out four conditions for a

18  ceasefire: ending all action in Jerusalem and the West Bank, ending the

19  fire on and siege of Gaza, releasing all the prisoners who were re-arrested

20  in the Israeli operation launched on June 12, 2014, after the disappearance

21  of three Israeli settlers and the ceasing of "meddling" in the Palestinian

22  Unity government.

23  j.  Moussa Abu Marzouk, a top Hamas official, stated, as reported in a news

24  article:  "There should be a new equation so that we will not have a war

25  on Gaza every two years."

26  k.  The word "militants" is used to describe Hamas forces in various news

27  articles (identified in response to Interrogatory No. 4 below) and the

28  Congressional Reports identified in subparts (a) and (b) of this response to

67

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

Interrogatory No. 3.

l.   Hamas spokesman Sami Abu Zuhri stated, as reported in a news article: "There will be no truce without an end to the war that the Occupation (Israel) began, a lifting of the blockade and a halt to all violations and killings in Gaza and the West Bank."

m.  E-mail sent by Stephen Smith, head of NBC security for Europe, dated July 10, 2014, regarding NBCU Security's decision to move the filming of *Dig* out of Israel.

n.   A news article published by the Washington Post, dated July 10, 2014, by Griff Witte and William Booth, entitled "As cease-fire with Hamas fails to take shape, Netanyahu says, 'Our answer is fire.'" This article is available at: https://www.washingtonpost.com/world/israel-accepts-truce-plan-hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-923ecc0c7d23_story.html?utm_term=.e99302eb1314.

o.   A news article published by MSNBC dated July 18, 2014, by Benjamin Landy and Maria Lokke, entitled "Scenes of war and heartbreak as Israeli ground forces invade Gaza." This article is available at: http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies.

p.   A news article published by MSNBC dated July 18, 2014, by David Taintor, entitled "Obama points to rebels in downed Malaysian jet." This article is available at: http://www.msnbc.com/msnbc/obama-american-dead-malaysia-airlines-crash.

q.   A news article published by MSNBC dated July 16, 2014, by Donna Stefano, entitled "In Israel and Palestine, children imagine a world without war." This article is available at: http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-world-without-war.

ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

EXHIBIT 03

ANDERSON, MCPHARLIN & CONNERS LLP
*LAWYERS*
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

r.  A news article published by the Times of Israel by Adiv Sterman, dated July 16, 2014, entitled "Ground incursion in Gaza said 'very likely.'" This article is available at: http://www.timesofisrael.com/idf-ground-incursion-in-gaza-very-likely/.

s.  A collection of "LiveBlogs" published by the Times of Israel on July 7, 2014, by Itamar Sharon, Marissa Newman, and Ilan Ben Zion, entitled "Israel launches 'Protective Edge' counteroffensive on Gaza, Jewish suspects reenact teen's murder." This collection is available at: http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-violence-continues/#!.

t.  A news article published by Middle East Eye dated July 8, 2014, entitled "Hamas claims responsibility for rockets fired at Jerusalem, Tel Aviv and Haifa." This article is available at: http://www.middleeasteye.net/news/israels-army-prepared-ground-assault-gaza-official-275282816.

u.  A news article published by the Global News, dated July 9, 2014, entitled "UPDATE: Israel hits key Hamas targets in Gaza offensive." This article is available at: http://globalnews.ca/news/1438089/israel-strikes-hamas-targets-in-gaza-to-stop-rocket-fire/.

v.  A news article published by the Global News, dated July 15, 2014, entitled "Israel: Hamas to pay price for its 'no' to truce." This article is available at: http://globalnews.ca/news/1451058/israel-hamas-to-pay-price-for-its-no-to-truce/.

w.  The news article entitled "LIVE UPDATES: Operation Protective Edge, Day 7," published by Haaretz on July 15, 2014. The article is available at: http://www.haaretz.com/israel-news/1.604898#!.

x.  The December 2, 2010 Congressional Research Service Report entitled "Hamas: Background and Issues for Congress," and authored by Jim

69

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1    Zanotti.

2    y.  The January 31, 2014 Congressional Research Service Report entitled

3        "The Palestinians: Background and U.S. Relations," and authored by Jim

4        Zanotti.

5    z.  Black's Law Dictionary, as discussed above.

6    aa. The Dictionary of International and Comparative Law, as discussed

7        above.

8    bb. The Handbook of Humanitarian Law in Armed Conflicts, as discussed

9        above.

10   cc. The travel warning issued by the United States on February 3, 2014,

11       regarding travel to Israel.

12   dd. The United Kingdom's website regarding travel to Israel, available at:

13       https://www.gov.uk/foreign-travel-advice/israel, as it existed on July 15,

14       2014.

15   ee. The news clips (videos) available at the following websites:

16       a.  http://www.msnbc.com/the-last-word/watch/mh17-mystery-and-

17           war-in-gaza-308247107963;

18       b.  http://www.msnbc.com/melissa-harris-perry/watch/what-it-means-

19           to-live-in-a-war-zone-309370947801;

20       c.  http://www.msnbc.com/all-in-with-chris-hayes/watch/day-breaks-

21           in-gaza-following-invasion-307348035939;

22       d.  http://www.msnbc.com/all-in-with-chris-hayes/watch/ground-war-

23           in-gaza-307290179722;

24       e.  www.cbsnews.com/videos/new-clashes-between-israel-

25           palestinians-is-ground-war-next/.

26   ff. The facts set forth in the February 10, 2015 Congressional Research

27       Service Report entitled "The Palestinians: Background and U.S.

28       Relations," which was authored by Jim Zanotti, who is identified as an

70

ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

EXHIBIT 03

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1    Analyst in Middle Eastern Affairs. Atlantic will not recite each and every

2    fact within that Congressional Report. But in particular, Atlantic relies on

3    the following facts: the report referred to the "summer 2014 conflict"

4    between Israel and Hamas (along with other Palestinian militants based in

5    Gaza) as a "major conflict" and noted that it lasted approximately 50 days;

6    2,100 Palestinians were killed, and 71 Israelis (including five civilians)

7    were killed in the 50-day conflict; Hamas depleted 80% of its rocket and

8    mortar arsenal during the summer 2014 Israel-Gaza conflict; an Israeli

9    official was quoted as stating that Israel's military efforts during the

10   summer 2014 conflict "will give us quiet for a long time." (page 25 of the

11   Report).

12   gg. Reports that: as many as 485,000 Palestinians had been displaced and

13   were staying in emergency shelters or with host families, more than 130

14   schools and 24 health facilities were damaged in the Gaza Strip as a result

15   of attacks by Israeli forces; Israeli forces also completely destroyed 73

16   mosques in Gaza and damaged another 203.

17   hh. Reports that: rocket attacks from Gaza caused damage to Israeli civilian

18   infrastructure, resulting in 3,000 claims of damage being submitted to

19   Israel's Tax Authority; the estimated economic cost to Israel was $2.5

20   billion.

21   ii.  Reports that the Palestinian casualties totaled 2,220, 1,492 of whom were

22   civilians (551 children and 299 women), 605 militants, and 123 of

23   unknown status. Approximately 11,000 Palestinians were wounded.

24   jj.  Reports that 66 Israeli Defense Force soldiers were killed, as were 5

25   Israeli civilians.

26   kk. To the extent not already mentioned above, facts learned through research

27   of Hamas and Palestine, and Hamas's ongoing conflicts and prior wars

28   with Israel, including operations, official positions held, and capabilities,

71

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  which research included review of primary sources discussing Hamas and

2  Palestine, as listed in "Hamas," appearing in Wikipedia

3  (http://en.wikipedia.org/wiki/Hamas) as it existed on July 16, 2014.

4  With regard to facts supporting its position, Atlantic refers to and incorporates the

5  documents it has produced in this case, and further incorporates and refers to the

6  documents identified in the documents it has produced in this case.

7

8  **INTERROGATORY NO. 13:**

9  State all facts which support ATLANTIC'S, position that Exclusion 17 of Section

10  III — Extra Expense of the POLICY, which excludes coverage for loss caused by,

11  resulting from, or arising out of "loss of use (including loss of use of animals), loss of

12  market, interruption of business, or any other consequential loss" applies to the *DIG*

13  CLAIM.

14  **RESPONSE TO INTERROGATORY NO. 13:** Atlantic contends that the exclusion

15  quoted above in Interrogatory No. 13 applies based on based on the facts recited in

16  response to interrogatories Nos. 3-5 and the facts contained in the documents cited

17  therein, and incorporates those responses herein by reference. Atlantic further responds

18  that it contends that the exclusion quoted above in Interrogatory No. 13 applies based

19  on the following facts and the information contained in and statements made in the

20  following documents:

21  a. The facts set forth in the December 2, 2010 Congressional Research

22  Service Report entitled "Hamas: Background and Issues for Congress,"

23  which was authored by Jim Zanotti, who is identified as an Analyst in

24  Middle Eastern Affairs. Atlantic will not recite each and every fact within

25  that Congressional Report. But in particular, Atlantic noted that Hamas

26  was identified in that Report as a religious and political organization and

27  the Report's statement that, since June 2007, Hamas has had control over

28  the Gaza Strip and that Hamas has a "military wing." Atlantic also

considered the timeline included in this Report, which sets forth a long history of the key dates in Hamas's history and its many conflicts with Israel, several of which are referred to as wars.

b. The facts set forth in the January 31, 2014 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," which was authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not recite each and every fact within that Congressional Report. But in particular, Atlantic considered the following facts: the report seemed to distinguish between "armed conflicts" and "terrorism"; 130 of the 193 U.N. member states have formally recognized the state of Palestine; on November 29, 2012, the U.N. General Assembly adopted Resolution 67/19 by a vote of 138 to 9 (with 41 abstentions), which recognized Palestine as a "non-member state," (whereas it was previously an "entity"); in the fall of 2011, the Palestinians obtained membership in the U.N. Educational, Scientific and Cultural Organization (UNESCO); the claim by the Palestinians that Israel is directing even more force and violence against them than Palestine is directing at Israel; Hamas has entered into a position of responsibility and political power since 2007; that the Palestinian Authority, which rules the Gaza Strip and parts of the West Bank, is, though not a state, organized like one—complete with democratic mechanisms, security forces, and executive, legislative, and judicial organs of governance; the Palestinian Authority's legislative branch is the Palestinian Legislative Council (PLC); Hamas won the January 2006 PLC elections; ultimately, Hamas forcibly took control over Gaza in June 2007.

c. The statement by Israeli President Benjamin Netanyahu, as reported in the news, that Israel would use "full force" against militants in Gaza.

d. The statement by Israeli President Benjamin Netanyahu, as reported in the

ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

EXHIBIT 03

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1   news, that "Hamas chose to continue fighting and will pay the price for

2   that decision … When there is no cease-fire, our answer is fire."

3   e. A report by the Washington Post stating that: Israel had struck at least 25

4   targets inside Gaza, including the home of a senior Hamas leader

5   Mahmoud Al Zahar; Hamas militants had fired at least 13 rockets into

6   southern Israel; Israel's "Iron Dome," an air-defense system that exists to

7   deflect weapons fired from Palestine, was deflecting fire from Gaza; Israel

8   had announced plans for a ground attack on Gaza; Israel dropped leaflets

9   into Gaza warning the population to evacuate; Israel had invaded Gaza

10   with tanks and gunboats.

11   f. Several sources, in particular, Black's Law Dictionary, The Dictionary of

12   International and Comparative Law, and the Handbook of Humanitarian

13   Law in Armed Conflicts, define "war" as including any hostile conflict by

14   means of armed forces between nations, states, or rulers, or even between

15   two "parties." Atlantic quoted these definitions on page 6 of its July 28,

16   2014 denial letter to Andrea Garber.

17   g.   Hamas was the governing authority over the Gaza Strip in July 2014 and

18   had a military wing known as the Qassam Brigades, as well as a police

19   force, a security force, and intelligence personnel.

20   h. In several news articles published in July 2014 by MSNBC and in

21   television reports that appeared on the news channel MSNBC (which is an

22   affiliate of NBC Universal), the Israeli-Palestinian "conflict" in 2014 was

23   referred to as a "war."

24   i. Reported events and details of actions that occurred during June and July

25   2014, as reported in various news sources, including but not limited to

26   CBS news videos and MSNBC videos, articles, and features, including

27   direct clashes of armed forces from opposing sides of the war, gunfights,

28   firing of long-range rockets, rocket attacks into Tel Aviv, Jerusalem,

74

and/or Southern Israel, planning for a ground incursion, a ground campaign, war planes, gunboats, mutual exchange of air strikes, rejection of a proposed cease fire, and injuries and deaths in Israel, Palestine, Gaza City, and/or the Gaza Strip, and comments from Israel regarding its intentions.

j.  Hamas militants stated on al-Aqsa TV that Hamas was firing rockets in response to "Israeli aggression against Palestinians in the West Bank, Jerusalem and Gaza." According to news reports, the statement was issued in the name of the Qassam Brigades and laid out four conditions for a ceasefire: ending all action in Jerusalem and the West Bank, ending the fire on and siege of Gaza, releasing all the prisoners who were re-arrested in the Israeli operation launched on June 12, 2014, after the disappearance of three Israeli settlers and the ceasing of "meddling" in the Palestinian Unity government.

k.  Moussa Abu Marzouk, a top Hamas official, stated, as reported in a news article:  "There should be a new equation so that we will not have a war on Gaza every two years."

l.  The word "militants" is used to describe Hamas forces in various news articles (identified in response to Interrogatory No. 4 below) and the Congressional Reports identified in subparts (a) and (b) of this response to Interrogatory No. 3.

m.  Hamas spokesman Sami Abu Zuhri stated, as reported in a news article: "There will be no truce without an end to the war that the Occupation (Israel) began, a lifting of the blockade and a halt to all violations and killings in Gaza and the West Bank."

n.  E-mail sent by Stephen Smith, head of NBC security for Europe, dated July 10, 2014, regarding NBCU Security's decision to move the filming of *Dig* out of Israel.

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
EXHIBIT 03

ANDERSON, MCPHARLIN & CONNERS LLP

*LAWYERS*

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1    o.  A news article published by the Washington Post, dated July 10, 2014, by
2        Griff Witte and William Booth, entitled "As cease-fire with Hamas fails to
3        take shape, Netanyahu says, 'Our answer is fire.'" This article is available
4        at:   https://www.washingtonpost.com/world/israel-accepts-truce-plan-
5        hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-
6        923ecc0c7d23_story.html?utm_term=.e99302eb1314.

7    p.  A news article published by MSNBC dated July 18, 2014, by Benjamin
8        Landy and Maria Lokke, entitled "Scenes of war and heartbreak as Israeli
9        ground   forces   invade   Gaza."   This   article   is   available   at:
10       http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-
11       conflict-intensifies.

12   q.  A news article published by MSNBC dated July 18, 2014, by David
13       Taintor, entitled "Obama points to rebels in downed Malaysian jet." This
14       article is available at: http://www.msnbc.com/msnbc/obama-american-
15       dead-malaysia-airlines-crash.

16   r.  A news article published by MSNBC dated July 16, 2014, by Donna
17       Stefano, entitled "In Israel and Palestine, children imagine a world
18       without   war."   This   article   is   available   at:
19       http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-
20       world-without-war.

21   s.  A news article published by the Times of Israel by Adiv Sterman, dated
22       July 16, 2014, entitled "Ground incursion in Gaza said 'very likely.'" This
23       article is available at: http://www.timesofisrael.com/idf-ground-incursion-
24       in-gaza-very-likely/.

25   t.  A collection of "LiveBlogs" published by the Times of Israel on July 7,
26       2014, by Itamar Sharon, Marissa Newman, and Ilan Ben Zion, entitled
27       "Israel launches 'Protective Edge' counteroffensive on Gaza, Jewish
28       suspects reenact teen's murder." This collection is available at:

76

ANDERSON, McPHARLIN & CONNERS LLP
*LAWYERS*
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017–3623

http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-violence-continues/#!.

u. A news article published by Middle East Eye dated July 8, 2014, entitled "Hamas claims responsibility for rockets fired at Jerusalem, Tel Aviv and Haifa." This article is available at: http://www.middleeasteye.net/news/israels-army-prepared-ground-assault-gaza-official-275282816.

v. A news article published by the Global News, dated July 9, 2014, entitled "UPDATE: Israel hits key Hamas targets in Gaza offensive." This article is available at: http://globalnews.ca/news/1438089/israel-strikes-hamas-targets-in-gaza-to-stop-rocket-fire/.

w. A news article published by the Global News, dated July 15, 2014, entitled "Israel: Hamas to pay price for its 'no' to truce." This article is available at: http://globalnews.ca/news/1451058/israel-hamas-to-pay-price-for-its-no-to-truce/.

x. The news article entitled "LIVE UPDATES: Operation Protective Edge, Day 7," published by Haaretz on July 15, 2014. The article is available at: http://www.haaretz.com/israel-news/1.604898#!.

y. The December 2, 2010 Congressional Research Service Report entitled "Hamas: Background and Issues for Congress," and authored by Jim Zanotti.

z. The January 31, 2014 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," and authored by Jim Zanotti.

aa. Black's Law Dictionary, as discussed above.

bb. The Dictionary of International and Comparative Law, as discussed above.

cc. The Handbook of Humanitarian Law in Armed Conflicts, as discussed

77

above.

dd. The travel warning issued by the United States on February 3, 2014, regarding travel to Israel.

ee. The United Kingdom's website regarding travel to Israel, available at: https://www.gov.uk/foreign-travel-advice/israel, as it existed on July 15, 2014.

ff. The news clips (videos) available at the following websites:

    a. http://www.msnbc.com/the-last-word/watch/mh17-mystery-and-war-in-gaza-308247107963;

    b. http://www.msnbc.com/melissa-harris-perry/watch/what-it-means-to-live-in-a-war-zone-309370947801;

    c. http://www.msnbc.com/all-in-with-chris-hayes/watch/day-breaks-in-gaza-following-invasion-307348035939;

    d. http://www.msnbc.com/all-in-with-chris-hayes/watch/ground-war-in-gaza-307290179722;

    e. www.cbsnews.com/videos/new-clashes-between-israel-palestinians-is-ground-war-next/.

gg. The facts set forth in the February 10, 2015 Congressional Research Service Report entitled "The Palestinians: Background and U.S. Relations," which was authored by Jim Zanotti, who is identified as an Analyst in Middle Eastern Affairs. Atlantic will not recite each and every fact within that Congressional Report. But in particular, Atlantic relies on the following facts: the report referred to the "summer 2014 conflict" between Israel and Hamas (along with other Palestinian militants based in Gaza) as a "major conflict" and noted that it lasted approximately 50 days; 2,100 Palestinians were killed, and 71 Israelis (including five civilians) were killed in the 50-day conflict; Hamas depleted 80% of its rocket and mortar arsenal during the summer 2014 Israel-Gaza conflict; an Israeli

78

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1   official was quoted as stating that Israel's military efforts during the

2   summer 2014 conflict "will give us quiet for a long time." (page 25 of the

3   Report).

4   hh. Reports that: as many as 485,000 Palestinians had been displaced and

5   were staying in emergency shelters or with host families, more than 130

6   schools and 24 health facilities were damaged in the Gaza Strip as a result

7   of attacks by Israeli forces; Israeli forces also completely destroyed 73

8   mosques in Gaza and damaged another 203.

9   ii. Reports that: rocket attacks from Gaza caused damage to Israeli civilian

10   infrastructure, resulting in 3,000 claims of damage being submitted to

11   Israel's Tax Authority; the estimated economic cost to Israel was $2.5

12   billion.

13   jj. Reports that the Palestinian casualties totaled 2,220, 1,492 of whom were

14   civilians (551 children and 299 women), 605 militants, and 123 of

15   unknown status. Approximately 11,000 Palestinians were wounded.

16   kk. Reports that 66 Israeli Defense Force soldiers were killed, as were 5

17   Israeli civilians.

18   ll. To the extent not already mentioned above, facts learned through research

19   of Hamas and Palestine, and Hamas's ongoing conflicts and prior wars

20   with Israel, including operations, official positions held, and capabilities,

21   which research included review of primary sources discussing Hamas and

22   Palestine, as listed in "Hamas," appearing in Wikipedia

23   (http://en.wikipedia.org/wiki/Hamas) as it existed on July 16, 2014.

24   With regard to facts supporting its position, Atlantic refers to and incorporates the

25   documents it has produced in this case, and further incorporates and refers to the

26   documents identified in the documents it has produced in this case.

27

28   **INTERROGATORY NO. 14:**

79

1    State all facts on which ATLANTIC relied in making the determination, as stated

2    at page 5 in the letter dated July 28, 2014 from Pamela A. Johnson to Andrea Garber,

3    that the "terrorism coverage should not apply" and that "[ATLANTIC] do[es] not

4    believe the terrorism coverage would apply" under the POLICY endorsement titled

5    "Coverage for Certified Acts of Terrorism; Cap on Losses."

6    **RESPONSE TO INTERROGATORY NO. 14:** As Atlantic stated in its denial letter

7    dated July 28, 2014, the Policy contains an endorsement referenced in the Interrogatory.

8    That endorsement makes clear that coverage that might not have otherwise have been

9    available due to an exclusion for acts of terror *would* be available for acts of terror that

10   were "certified acts of terrorism," meaning an act that was certified as an act of terror

11   by the Secretary of Treasury, with the concurrence of the Secretary of State and the

12   Attorney General of the United States. In the July 28, 2014 denial letter, Atlantic was

13   making clear that any additional coverage this endorsement might have provided would

14   not be available here because such coverage applies only if the United States Secretary

15   of the Treasury, with the concurrence of the United States Secretary of State and the

16   Attorney General, certifies the act that caused the insured's loss as an act of terrorism in

17   accordance with the Terrorism Risk Insurance Act of 2002 ("TRIA"). Atlantic relied on

18   the fact that none of the events that took place in Israel and Palestine in and around July

19   2014, when *Dig* was being filmed in Israel, were certified as acts of terrorism under

20   TRIA. Moreover, the endorsement states that coverage for acts of terror are not

21   available unless the violent act was "part of an effort to coerce the civilian population

22   of the United States or to influence the policy or affect the conduct of the United States

23   Government by coercion." Atlantic never learned of any information suggesting that the

24   events in Israel and Palestine in approximately July 2014 were part of an effort to

25   coerce the civilian population of the United States or to influence the policy of the

26   United States Government by coercion. Instead, Atlantic's investigation of the events

27   that occurred in Israel and Palestine in July 2014 showed that those events were the

28   continuation of long-standing tensions and political disagreements between Israelis and

ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

EXHIBIT 03

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

Palestinians. Atlantic refers the Plaintiff s to its response to Interrogatory No. 5, in which it set forth more specific facts regarding those tensions and political disagreements that Atlantic considered in investigating the *DIG* CLAIM.

**INTERROGATORY NO. 15:**

Without identifying the insured or the specific facts of the claims, describe each time that ATLANTIC has previously denied a claim based in whole or in part on the WAR EXCLUSION, or any part thereof.

**RESPONSE TO INTERROGATORY NO. 15:** Atlantic objects to this Interrogatory on the grounds that it seeks information that is not relevant to either party's claims or defenses and that is not proportional to the needs of this case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and the burden and expense of the proposed discovery, which greatly outweighs its likely benefit, if any. Information relating to other claims that Atlantic has denied can have no bearing on the issues in this case and is outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. Information relating to other claims that Atlantic has denied can have no bearing on the issues in this case.

Nonetheless, to avoid a discovery dispute, Atlantic responds as follows: Atlantic has not located any other claim in which it denied the claim in whole or in part on the basis of the WAR EXCLUSION. As counsel for Atlantic has stated in discussions with counsel for the Plaintiffs, counsel for Atlantic reviewed over 36,000 documents that Atlantic by searching its document management and e-mail system. One of the search terms used in the search that returned these documents was "war." That search looked for documents and e-mails dating back to July 2013. Atlantic has completed its review of these 36,000 documents and can confirm that there were no documents included in this set that indicated or suggested in any way that Atlantic had ever denied a claim in whole or in part on the basis of the WAR EXCLUSION. Atlantic, and its Informational

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

Technology department in particular, have represented that a broader search that would encompass all e-mails and documents without any date restrictions would be nearly impossible. In lieu of searching for the WAR EXCLUSION in each and every one of the many millions of documents and e-mails that Atlantic and OneBeacon have generated over the course of their existences, Atlantic has made inquiries with its employees who oversee, and former employees who previously oversaw, the claims handling for the entertainment division of Atlantic and with employees of OneBeacon who oversee claims for all of OneBeacon's divisions. Those persons do not recall any claims that Atlantic denied on the grounds that the WAR EXCLUSION applied.

**INTERROGATORY NO. 16:**

Without identifying the insured or the specific facts of the claims, describe each claim as to which ATLANTIC considered the potential applicability of the WAR EXCLUSION, or any part thereof, but ultimately paid out on the claim, in whole or in part, despite the potential applicability of the WAR EXCLUSION, or any part thereof.

**RESPONSE TO INTERROGATORY NO. 16:** Atlantic objects to this Interrogatory on the grounds that it seeks information that is not relevant to either party's claims or defenses and that is not proportional to the needs of this case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and the burden and expense of the proposed discovery, which greatly outweighs its likely benefit, if any. Information relating to other claims that Atlantic has denied can have no bearing on the issues in this case and is outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. Information relating to other claims that Atlantic has denied can have no bearing on the issues in this case.

Nonetheless, to avoid a discovery dispute, Atlantic responds as follows: Atlantic has identified one e-mail, which it produced on December 16, 2016 as ATL000785-788, in which Danny Gutterman e-mailed himself the language of the war exclusion

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1  (along with other excerpts of language from the relevant policy) in December 2013. Mr.

2  Gutterman never sent an e-mail containing the language of the war exclusion to anyone

3  else at Atlantic. The claim file in connection with that claim makes no mention

4  whatsoever of the war exclusion. The claim involved an insured that was planning to

5  film a commercial in Thailand in late 2013. At the time, there was protesting (some of

6  which turned into violent internal rioting) within Thailand due to political unrest, and

7  the insured chose not to shoot the commercial there in Thailand as a result. Atlantic

8  covered the costs associated with cancelling the filming of the commercial. Atlantic did

9  not give any serious consideration to the application of the war exclusion to the claim,

10  as evidenced by the fact that Mr. Gutterman's e-mail to himself is the only indication

11  that the exclusion received *any* consideration, and Mr. Gutterman does not recall giving

12  serious thought to the exclusion in connection with that claim.

13  Atlantic has not located any other claim in which it considered the potential

14  applicability of the WAR EXCLUSION or any part thereof but ultimately paid out on

15  the claim despite the potential applicability of the WAR EXCLUSION. As counsel for

16  Atlantic has stated in discussions with counsel for the Plaintiffs, counsel for Atlantic

17  has reviewed over 36,000 documents that Atlantic found by searching its document

18  management and e-mail system. One of the search terms used in the search that

19  returned these documents was "war." That search looked for documents and e-mails

20  dating back to July 2013. Atlantic has completed its review of these 36,000 documents

21  and hereby confirms that these documents have not revealed any other claims in which

22  Atlantic has considered the applicability of the WAR EXCLUSION. Atlantic, and its

23  Informational Technology department in particular, have represented that a broader

24  search that would encompass all e-mails and documents without any date restrictions

25  would be nearly impossible. In lieu of searching for the WAR EXCLUSION in each

26  and every one of the many millions of documents and e-mails that Atlantic and

27  OneBeacon have generated over the course of their existences, Atlantic has made

28  inquiries with its employees who oversee, and former employees who previously

1  oversaw, the claims handling for the entertainment division of Atlantic and with
2  employees of OneBeacon who oversee claims for all of OneBeacon's divisions. Other
3  than the claim discussed above, those persons do not recall any claims in which
4  Atlantic considered the potential applicability of the WAR EXCLUSION or any part
5  thereof but ultimately paid out on the claim despite the potential applicability of the
6  WAR EXCLUSION.

7  **INTERROGATORY NO. 17:**

8      State all facts which ATLANTIC considered in deciding not to renew the
9  POLICY.

10  **RESPONSE TO INTERROGATORY NO. 17:** Atlantic objects to providing this
11  information on the ground that it seeks information that is outside the scope of
12  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. The
13  information sought is not relevant to any party's claims or defenses.

14      In the interest of avoiding an unnecessary discovery dispute, however, Atlantic
15  will answer this Interrogatory. In 2015, Atlantic reevaluated its risk profile and made a
16  decision to significantly curtail issuance of policies involving major movie and
17  television productions. As a result, when the Policy came up for renewal, Atlantic was
18  unwilling to renew the Policy because it no longer fit Atlantic's risk profile.   This
19  decision had nothing to do with the *DIG* CLAIM.

20
21
22
23
24
25
26
27
28

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

84

1 | DATED: February 20, 2017

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MARC J. SHRAKE
ANDERSON, McPHARLIN & CONNERS LLP

-and-

MICHAEL KEELEY *(Pro Hac Vice)*
JOHN R. RIDDLE *(Pro Hac Vice)*
TONI SCOTT REED *(Pro Hac Vice)*
CARLA C. CRAPSTER *(Pro Hac Vice)*
STRASBURGER & PRICE, LLP

By:    */s/ Michael Keeley*
          Michael Keeley
Attorneys for Defendant ATLANTIC
SPECIALTY INSURANCE COMPANY

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

85

## VERIFICATION

I, Aaron Stone , declare and state as follows:

I have read the **DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES TO FIRST SET OF INTERROGATORIES PROPOUNDED BY PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS LLC AND NORTHERN ENTERTAINMENT PRODUCTIONS LLC** ("Responses") and I am familiar with its contents thereof.  I am Vice President of Claims of Atlantic Specialty Insurance Company ("Atlantic Specialty"), and am authorized to make this verification on behalf of Atlantic Specialty.

These Responses are limited by the records and information in existence, presently collected and thus far discovered in the course of preparation of these Responses.  Based thereon, I am informed and believe that the matters stated in these Responses as to Atlantic Specialty are true and on that ground certify under penalty of perjury under the laws of the United States of America that the same are true and correct.

Executed this 20th day of February, 2017, at Plymouth, Minnesota.



Aaron Stone

CANNON MARIE LAUBY-WOLF
NOTARY PUBLIC
STATE OF MINNESOTA
MY COMMISSION EXPIRES
JANUARY 31, 2020

Notary Public

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1515693.1 05608-054

86

ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

8396218.12/SP/15247/0131/022017

EXHIBIT 03

**PROOF OF SERVICE**

I am employed in the County of Dallas, State of Texas.  I am over the age of eighteen years and not a party to the within action; my business address is 901 Main Street, Suite 6000, Dallas, Texas 75202.

On February 20, 2017, I served the following document(s) described as **DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S SECOND AMENDED RESPONSES TO FIRST SET OF INTERROGATORIES PROPOUNDED BY PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS LLC AND NORTHERN ENTERTAINMENT PRODUCTIONS LLC** on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

Lucia E. Coyoca, Esq.                                    Attorneys for Plaintiffs
Valentine A. Shalamitski, Esq.
Daniel M. Hayes, Esq.
Mitchell Silberberg & Knupp LLP
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

**BY MAIL:** I am "readily familiar" with Strasburger & Price, LLP's practice for collecting and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business.  Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Dallas, Texas, on that same day following ordinary business practices.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made. Executed on February 20, 2017, at Dallas, Texas.

*Marianna Green*
Marianna Green

*(Left margin, vertical text)*
ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

# EXHIBIT 4

1  LUCIA E. COYOCA (SBN 128314)
   lec@msk.com
2  VALENTINE A. SHALAMITSKI (SBN 236061)
   vas@msk.com
3  DANIEL M. HAYES (SBN 240250)
   dmh@msk.com
4  MITCHELL SILBERBERG & KNUPP LLP
   11377 West Olympic Boulevard
5  Los Angeles, CA  90064-1683
   Telephone: (310) 312-2000
6  Facsimile: (310) 312-3100

7  Attorneys for Plaintiffs
   Universal Cable Productions LLC and
8  Northern Entertainment Productions LLC

9                     UNITED STATES DISTRICT COURT

10                   CENTRAL DISTRICT OF CALIFORNIA

11                          WESTERN DIVISION

12  UNIVERSAL CABLE                    CASE NO. 2:16-cv-4435-PA-MRW
13  PRODUCTIONS LLC, a Delaware
    limited liability company, and     **PLAINTIFF UNIVERSAL CABLE**
14  NORTHERN ENTERTAINMENT            **PRODUCTIONS LLC'S SECOND**
    PRODUCTIONS LLC, a Delaware        **SET OF REQUESTS FOR**
15  limited liability company,         **ADMISSIONS TO DEFENDANT**
                                       **ATLANTIC SPECIALTY**
16             Plaintiffs,             **INSURANCE COMPANY**

17        v.

18  ATLANTIC SPECIALTY                 FILED:    June 20, 2016
    INSURANCE COMPANY, a New           TRIAL:    July 25, 2017
19  York insurance company,

20             Defendant.

21

22

23  PROPOUNDING PARTY:      Plaintiff Universal Cable Productions LLC

24  RESPONDING PARTY:       Defendant Atlantic Specialty Insurance Company

25  SET NUMBER:             Two (Nos. 34 – 35)

26

27

28

Mitchell
Silberberg &
Knupp LLP

8676086.1

1    Pursuant to Federal Rules of Civil Procedure 26 and 36 and Central District

2  of California Local Rules 36-1 – 36-3, Plaintiff Universal Cable Productions LLC

3  hereby demands that Defendant Atlantic Specialty Insurance Company answer the

4  following Requests for Admission in writing and under oath within the time

5  specified in the Federal Rules of Civil Procedure.

6                                           **DEFINITIONS**

7    As used in this document, the following terms shall have the following

8  meanings:

9    1.    "ATLANTIC," "YOU," and "YOUR" mean Defendant Atlantic

10  Specialty Insurance Company, its predecessors and successors in interest, its

11  present and former directors, officers, agents, representatives, employees,

12  attorneys, accountants, and all other PERSON(S) acting or purporting to act on its

13  behalf, and specifically includes (but is not limited to) ONEBEACON.

14    2.    "ONEBEACON" means OneBeacon Insurance Group LLC and

15  OneBeacon Insurance Group, Ltd., their divisions or businesses known by any

16  other trade names (*e.g.*, OneBeacon Entertainment), and their respective

17  predecessors and successors in interest, their present and former directors, officers,

18  agents, representatives, employees, attorneys, accountants, and all other

19  PERSON(S) acting or purporting to act on their behalf.

20    3.    "COMPLAINT" means the First Amended Complaint PLAINTIFFS

21  filed in the above-entitled action (ECF No. 10).

22    4.    "ANSWER" means the Answer to the COMPLAINT YOU filed in

23  the above-entitled action (ECF No. 14).

24    5.    "PLAINTIFFS" means Plaintiffs Universal Cable Productions LLC

25  and Northern Entertainment Productions LLC.

26    6.    "NBCUNIVERSAL" means NBCUniversal Media, LLC.

27

28

Mitchell
Silberberg &
Knupp LLP

8676086.1

1

PLAINTIFF UNIVERSAL CABLE PRODUCTIONS LLC'S SECOND SET OF REQUESTS FOR ADMISSIONS
TO DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY

1    7.    "AON" means Aon/Albert G. Ruben Insurance Services, Inc.,

2    NBCUNIVERSAL'S insurance broker.

3    8.    "POLICY" means Motion Picture/Television Producers Portfolio

4    Policy No. MP00163-04, attached as Exhibit A to the COMPLAINT.

5    9.    "*DIG* INSURED PRODUCTION" means the television show at issue

6    in the COMPLAINT (*see, e.g., id.*, ¶ 1) that was approved and/or accepted as an

7    Insured Production under the POLICY and Policy No. MP00163-03 (*see, e.g.,*

8    ANSWER, ¶ 21).

9    10.    "*DIG* CLAIM" means the extra expense claim at issue in the

10    COMPLAINT (*see, e.g., id.*, ¶ 29).

11    11.    "WAR EXCLUSION" means any of the exclusions set forth in the

12    General Conditions, Section III(1)-(4) of the POLICY, or any similar exclusion

13    language in other versions of insurance policies issued and/or underwritten by

14    YOU or ONEBEACON.

15    12.    "COMMUNICATIONS" means all written, oral, telephonic,

16    electronic, e-mail, or other inquiries, discussions, conversations, negotiations,

17    agreements, understandings, meetings, letters, notes, memoranda, telegrams, or

18    interviews, and all documents evidencing and/or reflecting such communications.

19    13.    "DOCUMENT(S)" means all "writings and recordings" as defined in

20    Rule 1001 of the Federal Rules of Evidence, and includes but is not limited to the

21    original, or a duplicate (as those terms are defined in Rule 1001) of any and all

22    tangible things and documents, whether handwritten, typed, printed, or otherwise

23    visually reproduced, including but not limited to letters, cables, wires, memoranda,

24    inter-office and intra-office communications, reports, notes, e-mail messages,

25    minutes, video recordings, audio recordings, other recordings, drawings,

26    blueprints, sketches, charts, photographs, maps, printouts, books, records, any data

27    not available in hard copy but contained in a computer drive or on a computer

28

Mitchell
Silberberg &
Knupp LLP

8676086.1

PLAINTIFF UNIVERSAL CABLE PRODUCTIONS LLC'S SECOND SET OF REQUESTS FOR ADMISSIONS
TO DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY

1  diskette, and any non-identical copies and drafts of the foregoing, in YOUR

2  possession, custody, or control.

3       14.   "PERSON(S)" means any natural person, firm, association,

4  organization, partnership, business, trust, corporation, company, public or

5  governmental agency or enterprise, or any other entity of any kind.

6       15.   "RELATE" or "RELATING" mean relating to, regarding, discussing,

7  describing, identifying, mentioning, referring, evidencing, supporting, negating,

8  constituting, or containing information about.

9       16.   "PUBLICIS CLAIM" means the insurance claim involving rioting in

10  Thailand identified by Daniel Gutterman during his February 3, 2017 deposition

11  (*see, e.g.,* deposition transcript pages 120-136), and evidenced by Exhibit 14 to Mr.

12  Gutterman's deposition and the documents labeled ATL004005-ATL004097

13  produced by ATLANTIC on February 23, 2017.

14       17.   "MIDDLE EAST CLAIM" means the insurance claim involving a

15  commercial that was going to be filmed in the Middle East but was cancelled or

16  otherwise affected due to violence in the region, identified by Theresa Gooley

17  during her February 8, 2017 deposition (*see, e.g.,* deposition transcript pages 32-

18  38).

19

20                   **REQUESTS FOR ADMISSION**

21  **REQUEST FOR ADMISSION NO. 34:**

22       Admit that, prior to the DIG CLAIM, ATLANTIC had never considered the

23  application of a WAR EXCLUSION to an insurance claim other than the

24  PUBLICIS CLAIM.

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

8676086.1

PLAINTIFF UNIVERSAL CABLE PRODUCTIONS LLC'S SECOND SET OF REQUESTS FOR ADMISSIONS
TO DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY

1  **REQUEST FOR ADMISSION NO. 35:**

2      Admit that, with the exception of the DIG CLAIM and the PUBLICIS

3  CLAIM, ATLANTIC has never considered the application of a WAR

4  EXCLUSION to an insurance claim.

5

6  DATED:  March 6, 2017          LUCIA E. COYOCA

7                         VALENTINE A. SHALAMITSKI

                       DANIEL M. HAYES

8                         MITCHELL SILBERBERG & KNUPP LLP

9

10                   By:

                       _____

11                         Daniel M. Hayes

                       Attorneys for Plaintiffs Universal Cable

12                         Productions LLC and Northern

                       Entertainment Productions LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

PLAINTIFF UNIVERSAL CABLE PRODUCTIONS LLC'S SECOND SET OF REQUESTS FOR ADMISSIONS
TO DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY

                    EXHIBIT 04

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California, I am over the age of eighteen years and am not a party to this action; my business address is Mitchell Silberberg & Knupp LLP, 11377 West Olympic Boulevard, Los Angeles, CA 90064-1683, and my business email address is mxb@msk.com.

On March 6, 2017, I served a copy of the foregoing document(s) described as **PLAINTIFF UNIVERSAL CABLE PRODUCTIONS LLC'S SECOND SET OF REQUESTS FOR ADMISSIONS TO DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY** on the interested parties in this action at their last known address as set forth below by taking the action described below:

Marc J. Shrake, Esq.　　　　　　　　*Attorneys for Defendant Atlantic*
ANDERSON, MCPHARLIN &　　　　　*Specialty Insurance Company*
CONNERS LLP
707 Wilshire Boulevard, Suite 4000
Los Angeles, CA 90017-3623
Tel: (213) 236-1691
Fax: (213) 622-7594
Email: mjs@amclaw.com

☑ **BY PERSONAL DELIVERY**: I placed the above-mentioned document(s) in sealed envelope(s), and caused personal delivery by [Name of Person] of the document(s) listed above to the person(s) at the address(es) set forth above.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on March 6, 2017, at Los Angeles, California.

_____
Monica Bowdre

## **PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California, I am over the age of eighteen years and am not a party to this action; my business address is Mitchell Silberberg & Knupp LLP, 11377 West Olympic Boulevard, Los Angeles, CA 90064-1683, and my business email address is mxb@msk.com.

On March 6, 2017, I served a copy of the foregoing document(s) described as **PLAINTIFF UNIVERSAL CABLE PRODUCTIONS LLC'S SECOND SET OF REQUESTS FOR ADMISSIONS TO DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY** on the interested parties in this action at their last known address as set forth below by taking the action described below:

Michael Keeley, Esq.                          *Attorneys for Defendant Atlantic*
John R. Riddle, Esq.                          *Specialty Insurance Company*
Carla C. Crapster, Esq.
STRASBURGER & PRICE, LLP
901 Main Street, Suite 6000
Dallas, TX  75202
Tel:  (214) 651-4300
Fax:  (214) 651-4330
Email: michael.keeley@strasburger.com;
john.riddle@strasburger.com;
carla.crapster@strasburger.com

☑   **BY ELECTRONIC MAIL**:  I served the above-mentioned document electronically before 5:00 p.m. on the parties listed at the email addresses above and, to the best of my knowledge, the transmission was complete and without error in that I did not receive an electronic notification to the contrary.

☑   **BY MAIL**:  I placed the above-mentioned document(s) in sealed envelope(s) addressed as set forth above, and deposited each envelope in the mail at Los Angeles, California.  Each envelope was mailed with postage thereon fully prepaid.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on March 6, 2017, at Los Angeles, California.

_____
                                           Monica Bowdre

Mitchell
Silberberg &
Knupp LLP

2

**PROOF OF SERVICE**

8676086.1

EXHIBIT 04

# EXHIBIT 5

MARC J. SHRAKE (SBN 219331)
  mjs@amclaw.com
ANDERSON, MCPHARLIN & CONNERS LLP
707 Wilshire Boulevard, Suite 4000
Los Angeles, California 90017-3623
Telephone: (213) 236-1691
Facsimile:  (213) 622-7594

MICHAEL KEELEY (*Pro Hac Vice*)
  michael.keeley@strasburger.com
JOHN R. RIDDLE (*Pro Hac Vice*)
  john.riddle@strasburger.com
TONI SCOTT REED (*Pro Hac Vice*)
  toni.reed@strasburger.com
CARLA C. CRAPSTER (*Pro Hac Vice*)
  carla.crapster@strasburger.com
STRASBURGER & PRICE, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile:  (214) 651-4330

Attorneys for Defendant
Atlantic Specialty Insurance Company

<div align="center">

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

</div>

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, a Delaware limited liability company, and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, a Delaware limited liability company,<br><br>        Plaintiffs,<br><br>        vs.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY, a New York insurance company,<br><br>        Defendant. | Case No. 2:16-cv-04435-PA-MRW<br><br>**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S RESPONSES TO SECOND SET OF INTERROGATORIES PROPOUNDED BY PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS LLC AND NORTHERN ENTERTAINMENT PRODUCTIONS LLC** |

/ / /

/ / /

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  / / /

2  PROPOUNDING PARTY:        Plaintiffs UNIVERSAL CABLE PRODUCTIONS

3                            LLC and NORTHERN ENTERTAINMENT

4                            PRODUCTIONS LLC

5  RESPONDING PARTY:         Defendant ATLANTIC SPECIALTY INSURANCE

6                            COMPANY

7  SET NO.:                  Two

8        Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant

9  ATLANTIC SPECIALTY INSURANCE COMPANY ("Atlantic") hereby submits

10 these amended objections and responses to the First Set of Interrogatories

11 propounded by Plaintiffs UNIVERSAL CABLE PRODUCTIONS LLC and

12 NORTHERN ENTERTAINMENT PRODUCTIONS LLC ("Propounding Parties").

13                    **PRELIMINARY STATEMENT**

14

15       Nothing in this response should be construed as an admission by Atlantic with

16 respect to the admissibility or relevance of any fact, or of the truth or accuracy of

17 any characterization or statement of any kind, contained in Propounding Parties'

18 Interrogatories.  Atlantic has not completed its investigation of the facts relating to

19 this case, its discovery or its preparation for trial.  All responses and objections

20 contained herein are based only upon information that is presently available to and

21 specifically known by Atlantic.  It is anticipated that further discovery, independent

22 investigation, legal research and analysis may supply additional facts and add

23 meaning to known facts, as well as new factual conclusions and legal contentions,

24 all of which may lead to additions to, changes in and variations from the responses

25 set forth herein.  The following objections and responses are made without prejudice

26 to Atlantic's right to produce at trial, or otherwise, evidence regarding any

27 subsequently discovered information.   Atlantic accordingly reserves the right to

28

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1   modify and amend any and all responses herein as research is completed and

2   contentions are made.

3

## RESPONSES TO INTERROGATORIES

4

5   **INTERROGATORY NO.18:** IDENTIFY each PERSON involved in the decision

6   to approve the *DIG* INSURED PRODUCTION as an insured production under the

7   POLICY.

8

9   **RESPONSE TO INTERROGATORY NO. 18** The following persons were

10   involved in the decision to approve the *DIG* INSURED PRODUCTION as an

11   insured production under the POLICY:

12

13       a. Ms. Wanda Phillips, formerly the Underwriting Manager for OneBeacon

14          Entertainment. Ms. Phillips is currently an underwriter with Allianz Global

15          Corporate & Specialty. Her current business address is believed to be 1 Chase

16          Manhattan Plaza #37, New York, NY 10005. Her current phone number and

17          e-mail address are not known.

18       b. Ms. Bernadette Milinovic, an administrative assistant in the underwriting

19          department of OneBeacon Entertainment. Ms. Milinovic's current business

20          address is 77 Water Street New York, NY 10005. Her current e-mail address

21          is bmilinovic@onebeacon.com. Her current phone number is 212-440-6581.

22

23   **INTERROGATORY NO.19:** IDENTIFY all COMMUNICATIONS between

24   ATLANTIC or ONEBEACON, on the one hand, and any other PERSON

25   (including, without limitation, any of PLAINTIFFS, NBCUNIVERSAL, or AON),

26   on the other hand, that RELATE to the POLICY, the *DIG* INSURED

27   PRODUCTION, the *DIG* CLAIM, or the WAR EXCLUSION.

28

ANDERSON, MCPHARLIN & CONNERS LLP

*LAWYERS*

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1  **RESPONSE TO INTERROGATORY NO. 19**  Atlantic objects to this
2  interrogatory to the extent that it seeks information that is protected from disclosure
3  by the attorney-client privilege and/or work-product doctrine and/or was prepared in
4  anticipation of litigation or for trial. Such information is outside the scope of
5  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.  Atlantic
6  further objects to this interrogatory on the grounds that it is overly broad and would
7  be unduly burdensome for Atlantic to answer, as it would be a very long and
8  detailed list to set forth every communication (whether verbal, written, and/or
9  electronic) on all the subject matter stated in the interrogatory. As the Plaintiffs are
10 aware as a result of Atlantic's large production of documents in this case, there are
11 many communications between Atlantic and third parties (including AON and
12 various affiliates of NBC Universal Media, LLC) regarding the POLICY, *DIG*, and
13 the *DIG* CLAIM. Atlantic further responds that it has produced all
14 COMMUNICATIONS responsive to this request that are not privileged or otherwise
15 protected (with one caveat discussed below), and Atlantic therefore refers to and
16 incorporates by referenced, as if fully set forth herein, the documents it has
17 produced in this case, as the response to this interrogatory may be determined by
18 examining those documents, and the burden of ascertaining such response is
19 substantially the same for the Plaintiffs as it would be for Atlantic.

20

21 With respect to the portion of the Interrogatory that seeks any
22 COMMUNICATIONS between Atlantic and any other PERSON regarding the
23 WAR EXCLUSION, which is defined broadly enough to encompass any exclusion
24 relating to war in any policy Atlantic has ever issued, Atlantic objects on the
25 grounds that the Interrogatory seeks information that is outside the scope of
26 discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.
27 Documents relating to other policies or claims are not relevant to either party's
28

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1   claims or defenses, and the request is not proportional to the needs of this case,

2   considering the importance of the issues at stake in the action, the amount in

3   controversy, the parties' relative access to relevant information, the parties'

4   resources, the importance of the discovery in resolving the issues, and the burden

5   and expense of the proposed discovery, which greatly outweighs its likely benefit, if

6   any. To find all COMMUNICATIONS regarding any reference to war responsive to

7   this Interrogatory would be extremely burdensome. Atlantic would have to conduct

8   an electronic search of every single document and e-mail created since January 1,

9   2001 (more than sixteen years ago), for the word "war." This is many, many

10  millions of documents that would need to be searched. Atlantic, and its parent

11  OneBeacon, have 15 separate divisions, each of which issues policies covering

12  multiple types of insurance. Each one of these divisions generates many millions of

13  documents and e-mails every year. According to Atlantic's Information Technology

14  Department, because there are so many millions of documents created in Atlantic's

15  and OneBeacon's documents in the past sixteen years, this search would take many

16  months to run, not including the time it would take a human to review the

17  documents returned as responsive.

18

19  Nonetheless, to avoid a discovery dispute, Atlantic further responds as follows:

20  Thus far, excluding the documents relating to the *DIG* CLAIM, Atlantic has not

21  located any correspondence between Atlantic and any third party relating to any

22  WAR EXCLUSION. As counsel for Atlantic has stated in various discussions with

23  counsel for Plaintiffs, Atlantic has reviewed more than 36,000 documents identified

24  in a search of its document management and e-mail system. One of the search terms

25  used in the search that returned these documents was "war." That search looked for

26  documents and e-mails dating back to July 2013. Atlantic, and its Informational

27  Technology department in particular, have represented that a broader search that

28

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

would encompass all e-mails and documents without any date restrictions would be nearly impossible. In lieu of searching for the WAR EXCLUSION in each and every one of the many millions of documents and e-mails that Atlantic and OneBeacon have generated over the course of their existences, Atlantic has made inquiries with its employees who oversee, and former employees who previously oversaw, the claims handling for the entertainment division of Atlantic and with employees of OneBeacon who oversee claims for all of OneBeacon's divisions. Those persons also do not recall any claims in which Atlantic considered the potential applicability of the WAR EXCLUSION or any part thereof. Theresa Gooley has also testified in her deposition regarding her discussions with departments other than entertainment, which testimony is incorporated by reference. Atlantic has, however, found one e-mail that an employee of Atlantic, Daniel Gutterman, sent to himself, that concerns another claim, and which quotes the various policy language, including its WAR EXCLUSION. There are no other documents suggesting that the WAR EXCLUSION was considered any further in connection with that claim. This one e-mail has been produced as Bates No. ATL000785 – ATL000788.  Additionally, the claim file and other materials for such claim have been produced.

Verbal communications occurred on many dates, and many of those are referenced in the written documents produced herein.  Atlantic again incorporates by reference such documents produced in discovery.  Atlantic also incorporates by reference the testimony of witnesses in the case, in which verbal communications have been identified.

**INTERROGATORY NO. 20:** Does ATLANTIC contend it relied on the advice of its lawyer(s) in denying the *DIG* CLAIM?

ATLANTIC SPECIALTY INSURANCE COMPANY'S RESPONSES
TO PLAINTIFFS' SECOND SET OF INTERROGATORIES
EXHIBIT 05

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

**RESPONSE TO INTERROGATORY NO. 20:** Atlantic objects to this interrogatory on the grounds same is vague and ambiguous.  As counsel for Atlantic has explained, as a factual matter, to counsel for the Plaintiffs, Atlantic obtained a coverage opinion prepared by Leon Gladstone and Gene Weisberg of Gladstone Weisberg ALC, dated July 21, 2014, prior to the issuance of Atlantic's letter denying the *DIG* CLAIM. This coverage opinion was obtained after a telephone discussion with the insured and its broker on July 17, 2014, regarding the potential application of the war exclusion language, and the position taken in response by the insured.  Atlantic reviewed the coverage opinion after obtaining it.  Atlantic has not, however, asserted the advice-of-counsel defense in this case, and it does not intend to. Atlantic refers to and incorporates by reference its pleadings on file in regard to its legal theories and defenses.

**INTERROGATORY NO. 21:** If the answer to the previous Interrogatory is anything other than an unqualified "no," state all facts and IDENTIFY all DOCUMENTS that support ATLANTIC'S response to Interrogatory No. 20, and IDENTIFY all PERSONS that have knowledge of such facts or DOCUMENTS.

**RESPONSE TO INTERROGATORY NO. 21:** Atlantic objects to this Interrogatory because it is vague and ambiguous, and to the extent that it seeks information or information about documents protected from disclosure by the attorney-client privilege and/or work-produce doctrine and/or was prepared in anticipation of litigation or for trial.  Such information is outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil Procedure.  Subject to and without waiving these objections, the facts that support Atlantic's answer are set forth in response to Interrogatory No. 20 and the Defendant's pleadings on file.

1    Atlantic is not aware of any DOCUMENTS that "support" its statements made in

2    response to Interrogatory No. 20, other than pleadings filed by Atlantic, which set

3    forth its legal defenses relief upon in this case.  Such a document is a public filing,

4    which is incorporated by reference, to which access can be made by persons interest

5    in such a record. Finally, this subject has been discussed in writing in

6    correspondence between the counsel in the case.

7

8    **INTERROGATORY NO. 22:** IDENTIFY each instance (including, without

9    limitation, in the context of litigation) since January 1, 2001, in which ATLANTIC

10   or ONEBEACON has characterized Hamas as a terrorist organization or taken the

11   position that certain acts by Hamas constitute acts of terrorism. (For purposes of this

12   Interrogatory, "IDENTIFY" means describe the characterization or the position

13   taken, and the circumstances under which the characterization was made or the

14   position taken. If applicable, "IDENTIFY" also means state the name of the parties

15   and case number of the litigation in which the characterization was made or the

16   position taken, and describe the pleading or other filing in which the

17   characterization was made or the position taken.)

18

19   **RESPONSE TO INTERROGATORY NO. 22:** Atlantic objects to this

20   Interrogatory on the grounds that it seeks information that is outside the scope of

21   discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. The

22   Request seeks information that is not relevant to either party's claims or defenses,

23   and the request is not proportional to the needs of this case, considering the

24   importance of the issues at stake in the action, the amount in controversy, the

25   parties' relative access to relevant information, the parties' resources, the

26   importance of the discovery in resolving the issues, and the burden and expense of

27   the proposed discovery, which greatly outweighs its likely benefit, if any. To

28

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

definitively confirm whether any instances referenced in the Interrogatory have ever occurred, Atlantic would have to conduct an electronic search of every single document and e-mail created since January 1, 2001 (more than sixteen years ago), for the word "Hamas." This is many, many millions of documents that would need to be searched. Atlantic, and its parent OneBeacon, have 15 separate divisions, each of which issues policies covering multiple types of insurance. Each one of these divisions generates many millions of documents and e-mails every year. According to Atlantic's Information Technology Department, because there are so many millions of documents created in Atlantic's and OneBeacon's documents in the past sixteen years, this search would take many months to run, not including the time it would take a human to review the documents returned as responsive.

Subject to and without waiving these objections, in lieu of conducting the nearly impossible search that the Plaintiffs have requested, Atlantic has conducted inquiries of the Vice President of Claims of OneBeacon Entertainment, the Chief Claims Officer for all of OneBeacon Insurance Group, the Senior Vice President of Claims for Atlantic, and the Chief Claims Counsel of OneBeacon Insurance Group's Claims Legal Group to determine whether they could recall any instances in which ATLANTIC or ONEBEACON characterized Hamas as a terrorist organization or took the position that certain acts by Hamas constitute acts of terrorism.  None of those persons could recall any such instances. [NOTE: STILL NEED TO CONFIRM THIS FACT.] Moreover, as counsel for Atlantic has stated in discussions with counsel for Plaintiffs, Atlantic has reviewed more than 36,000 documents identified in a search of its document management and e-mail system. One of the search terms used in the search that returned these documents was "Hamas." That search looked for documents and e-mails dating back to July 2013. Atlantic can confirm based on its review of those 36,000 documents that it found

1  none in which Atlantic or OneBeacon had characterized Hamas as a terrorist

2  organization or taken the position that acts by Hamas constitute acts of terrorism.

3  Based on this review and its inquiries, Atlantic represents that it is not aware of any

4  instance in which ATLANTIC or ONEBEACON has characterized Hamas as a

5  terrorist organization or taken the position that certain acts by Hamas constitute acts

6  of terrorism.

7

8  With respect to discussions of Hamas in the context of this claim, Atlantic refers to

9  the letters to the insured that mention Hamas.

10

11  **INTERROGATORY NO. 23:** IDENTIFY all insurance claims since January 1,

12  2001, made pursuant to any ATLANTIC or ONEBEACON insurance policy, that

13  RELATE to (1) Hamas, or (2) any conflict between Israel, on the one hand, and

14  Hamas and/or Palestinians, on the other hand. (For purposes of this Interrogatory,

15  "IDENTIFY" means state the date of the claim, describe the type of policy and loss

16  at issue, state the policy number, and describe the outcome of the claim (*i.e.,*

17  accepted and paid or denied).)

18

19  **RESPONSE TO INTERROGATORY NO. 23:** Atlantic objects to this

20  Interrogatory on the grounds that it seeks documents that are outside the scope of

21  discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. The

22  Interrogatory seeks information that is not relevant to either party's claims or

23  defenses, and the request is not proportional to the needs of this case, considering

24  the importance of the issues at stake in the action, the amount in controversy, the

25  parties' relative access to relevant information, the parties' resources, the

26  importance of the discovery in resolving the issues, and the burden and expense of

27  the proposed discovery, which greatly outweighs its likely benefit, if any. To

28

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

10

definitively confirm that there neither Atlantic nor OneBeacon has ever handled another claim involving Israel and Palestine, Atlantic would have to conduct an electronic search of every single document and e-mail created since January 1, 2001 (more than sixteen years ago), for the words "Palestine" and "Israel." This is many, many millions of documents that would need to be searched. Atlantic, and its parent OneBeacon, have 15 separate divisions, each of which issues policies covering multiple types of insurance. Each one of these divisions generates many millions of documents and e-mails every year. According to Atlantic's Information Technology Department, because there are so many millions of documents created in Atlantic's and OneBeacon's documents in the past sixteen years, this search would take many months to run, not including the time it would take a human to review the documents returned as responsive.

Subject to and without waiving these objections, other than the claim at issue in this lawsuit, of which the Plaintiffs are already aware, in lieu of conducting the nearly impossible search that the Plaintiffs have requested, Atlantic has made inquiries with its employees who oversee, and former employees who previously oversaw, the claims handling for the entertainment division of Atlantic and with employees of OneBeacon who oversee claims for all of OneBeacon's divisions. None of those persons recall any claims, other than the DIG CLAIM involving a conflict between Palestine and Israel.

Moreover, as counsel for Atlantic has stated in discussions with counsel for Plaintiffs, Atlantic has reviewed more than 36,000 documents identified in a search of its document management and e-mail system. Some of the search terms used in the search that returned these documents were "Hamas," and "Israel." That search looked for documents and e-mails dating back to July 2013. Atlantic can confirm

ATLANTIC SPECIALTY INSURANCE COMPANY'S RESPONSES
TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

EXHIBIT 05

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

based on its review of those 36,000 documents that it found none suggesting that Atlantic or OneBeacon have ever handled any other claims involving Hamas or a conflict between Israel and Palestine.

Based on its review of the 36,000 documents and its inquiries, Atlantic represents that it is not aware of any insurance claims since January 1, 2001, made pursuant to any ATLANTIC or ONEBEACON insurance policy, that RELATE to (1) Hamas, or (2) any conflict between Israel, on the one hand, and Hamas and/or Palestinians, on the other hand.

**INTERROGATORY NO. 24:** IDENTIFY each PERSON that has knowledge of any fact or DOCUMENT that supports any denial or affirmative defense set forth in ATLANTIC'S ANSWER (including, without limitation, any fact or DOCUMENT that supports ATLANTIC'S contention that the *DIG* CLAIM is not covered by the POLICY or that ATLANTIC complied with the implied covenant of good faith and fair dealing in its handling of the *DIG* CLAIM).

**RESPONSE TO INTERROGATORY NO. 24:** Atlantic objects to this interrogatory to the extent that it seeks information that is protected from disclosure by work-product doctrine and/or was prepared in anticipation of litigation or for trial. Such information is outside the scope of discovery permitted under Rule 26 of the Federal Rules of Civil Procedure. Atlantic further objects to this Interrogatory on the grounds that it is overly broad an unduly burdensome, and appears to be an attempt to avoid the limit of 25 interrogatories imposed by Federal Rule of Civil Procedure 33(a)(1), given that it asks for persons with knowledge of multiple facts, and multiple DOCUMENTS, and multiple affirmative defenses. Moreover, it would be truly impossible for Atlantic to respond fully to this Interrogatory. Atlantic has

identified, in response to earlier interrogatories, many dozens of news articles and videos and scholarly articles and publications that Atlantic contends support its position in this case. Atlantic has no way of knowing who might have any knowledge whatsoever of all such documents. This case involves facts and articles that are available to the public at large, and Atlantic has no way of identifying all persons who have familiarity with those facts and articles, nor would any such information be relevant to this lawsuit. Subject to and without waiving these objections, Atlantic directs the Plaintiffs to its responses to Interrogatories No. 1 and 2 for a list of Atlantic employees who were involved in the consideration and analysis of the claim at issue in this lawsuit and who were responsible for the decision to deny the claim, and further directs the plaintiffs to the following Atlantic employee who has knowledge of Atlantic's position in this case:

a. Mr. Aaron Stone, the current Vice President of Claims for OneBeacon Entertainment. Mr. Stone's current business address is 605 Highway 169 North, Suite 800, Plymouth, MN 55441. Mr. Stone's current phone number is 952-852-0829. Mr. Stone's current e-mail address is astone@onebeacon.com.

**The persons identified above may only be contacted through counsel of record for Atlantic.**

**INTERROGATORY NO. 25:** Unless your response to each request for admission served with these interrogatories is an unqualified admission, for each response that is not an unqualified admission: state the number of the request; state all facts and IDENTIFY all DOCUMENTS that support ATLANTIC'S response; and IDENTIFY all persons that have knowledge of such facts or DOCUMENTS.

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

**RESPONSE TO INTERROGATORY NO. 25:** Atlantic objects to this Interrogatory on the grounds that it is far too broad and unduly burdensome, and appears to be an attempt to avoid the limit of 25 interrogatories imposed by Federal Rule of Civil Procedure 33(a)(1). Atlantic refuses to answer this Interrogatory on those grounds.


DATED: March 13, 2017

MARC J. SHRAKE
ANDERSON, McPHARLIN & CONNERS LLP

-and-

MICHAEL KEELEY *(Pro Hac Vice)*
JOHN R. RIDDLE *(Pro Hac Vice)*
TONI SCOTT REED *(Pro Hac Vice)*
CARLA C. CRAPSTER *(Pro Hac Vice)*
STRASBURGER & PRICE, LLP

By:     */s/ Michael Keeley*
        Michael Keeley
Attorneys for Defendant ATLANTIC
SPECIALTY INSURANCE COMPANY

ANDERSON, McPHARLIN & CONNERS LLP
*LAWYERS*
*707 WILSHIRE BOULEVARD, SUITE 4000*
*LOS ANGELES, CALIFORNIA 90017-3623*

14

**ANDERSON, McPHARLIN & CONNERS LLP**
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

## VERIFICATION

1

2   I, Aaron Stone , declare and state as follows:

3   I have read the **DEFENDANT ATLANTIC SPECIALTY INSURANCE**

4   **COMPANY'S RESPONSES TO SECOND SET OF INTERROGATORIES**

5   **PROPOUNDED BY PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS**

6   **LLC AND NORTHERN ENTERTAINMENT PRODUCTIONS LLC**

7   ("Responses") and I am familiar with its contents thereof.  I am Vice President of

8   Claims of Atlantic Specialty Insurance Company ("Atlantic Specialty"), and am

9   authorized to make this verification on behalf of Atlantic Specialty.

10   These Responses are limited by the records and information in existence,

11   presently collected and thus far discovered in the course of preparation of these

12   Responses.  Based thereon, I am informed and believe that the matters stated in

13   these Responses as to Atlantic Specialty are true and on that ground certify under

14   penalty of perjury under the laws of the United States of America that the same are

15   true and correct.

16   Executed this 13th day of March, 2017, at Plymouth, Minnesota.

17

18

19   _____

Aaron Stone

20

21

22   _____

Notary Public

23

24

25

26   

27

28

15

**PROOF OF SERVICE**

I am employed in the County of Dallas, State of Texas.  I am over the age of eighteen years and not a party to the within action; my business address is 901 Main Street, Suite 6000, Dallas, Texas 75202.

On March 13, 2017, I served the following document(s) described as **DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S RESPONSES TO SECOND SET OF INTERROGATORIES PROPOUNDED BY PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS LLC AND NORTHERN ENTERTAINMENT PRODUCTIONS LLC** on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

Lucia E. Coyoca, Esq.                               Attorneys for Plaintiffs
Valentine A. Shalamitski, Esq.
Daniel M. Hayes, Esq.
Mitchell Silberberg & Knupp LLP
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

**BY MAIL:**  I am "readily familiar" with Strasburger & Price, LLP's practice for collecting and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business.  Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Dallas, Texas, on that same day following ordinary business practices.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.  Executed on March 13, 2017, at Dallas, Texas.

Marianna Green

ATLANTIC SPECIALTY INSURANCE COMPANY'S RESPONSES
TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

# EXHIBIT 6

MARC J. SHRAKE (SBN 219331)
  mjs@amclaw.com
ANDERSON, MCPHARLIN & CONNERS LLP
707 Wilshire Boulevard, Suite 4000
Los Angeles, California 90017-3623
Telephone: (213) 236-1691
Facsimile:  (213) 622-7594

MICHAEL KEELEY *(Pro Hac Vice)*
  michael.keeley@strasburger.com
JOHN R. RIDDLE *(Pro Hac Vice)*
  john.riddle@strasburger.com
TONI SCOTT REED *(Pro Hac Vice)*
  toni.reed@strasburger.com
CARLA C. CRAPSTER *(Pro Hac Vice)*
  carla.crapster@strasburger.com
STRASBURGER & PRICE, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile:  (214) 651-4330

Attorneys for Defendant
Atlantic Specialty Insurance Company

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, a Delaware limited liability company, and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, a Delaware limited liability company,<br><br>          Plaintiffs,<br><br>          vs.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY, a New York insurance company,<br><br>          Defendant. | Case No. 2:16-cv-04435-PA-MRW<br><br>**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S OBJECTIONS AND RESPONSES TO PLAINTIFF UNIVERSAL CABLE PRODUCTIONS LLC'S FIRST SET OF REQUESTS FOR ADMISSIONS** |

/ / /

/ / /

*Sidebar (vertical text):* ANDERSON, MCPHARLIN & CONNERS LLP / LAWYERS / 707 WILSHIRE BOULEVARD, SUITE 4000 / LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, McPHARLIN & CONNERS LLP

*LAWYERS*

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

/ / /

PROPOUNDING PARTY:     Plaintiffs UNIVERSAL CABLE PRODUCTIONS LLC and NORTHERN ENTERTAINMENT PRODUCTIONS LLC

RESPONDING PARTY:     Defendant ATLANTIC SPECIALTY INSURANCE COMPANY

SET NO.:     One

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Defendant ATLANTIC SPECIALTY INSURANCE COMPANY ("Atlantic") hereby submits these OBJECTIONS AND RESPONSES TO THE FIRST SET OF REQUESTS FOR ADMISSIONS PROPOUNDED BY PLAINTIFF UNIVERSAL CABLE PRODUCTIONS LLC ("Propounding Party").

## **PRELIMINARY STATEMENT**

Nothing in this response should be construed as an admission by Atlantic with respect to the admissibility or relevance of any fact, or of the truth or accuracy of any characterization or statement of any kind, contained in Propounding Parties' Interrogatories.  Atlantic has not completed its investigation of the facts relating to this case, its discovery or its preparation for trial.  All responses and objections contained herein are based only upon information that is presently available to and specifically known by Atlantic.  It is anticipated that further discovery, independent investigation, legal research and analysis may supply additional facts and add meaning to known facts, as well as new factual conclusions and legal contentions, all of which may lead to additions to, changes in and variations from the responses set forth herein.  The following objections and responses are made without prejudice to Atlantic's right to produce at trial, or otherwise, evidence regarding any subsequently discovered information.  Atlantic accordingly reserves the right to modify and amend any and all responses herein as research is completed and contentions are made.

2

ATLANTIC SPECIALTY INSURANCE COMPANY'S OBJECTIONS AND RESPONSES TO PLAINTIFF UNIVERSAL CABLE PRODUCTION LLC'S FIRST SET OF REQUESTS FOR ADMISSIONS

181     EXHIBIT 06

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

## RESPONSES TO REQUESTS FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 1:**

Admit that, unless an exclusion applies, the loss that forms the basis of the *DIG* CLAIM falls within the insurance coverage grant under that part of the POLICY entitled "Section III – Extra Expense."

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:** Atlantic objects to Request No. 1 on the grounds that it is vague and ambiguous in its reference to loss, and because it is misleading in that exclusions do apply.  Subject to and without waiving these objections, Atlantic can neither admit nor deny that the loss falls within the coverage grant because discovery is ongoing and, despite being due on December 30, 2016, Plaintiffs still have not produced all documents requested by Atlantic.  Further, as a result of Plaintiffs' failure to timely produce documents, Atlantic was required to postpone depositions of fact witnesses that would have allowed Atlantic to evaluate the issue raised by this Request.  Therefore, the information Atlantic knows or can reasonably obtain is insufficient to enable it to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 2:**

Admit that the extra expenses which were incurred to move the *DIG* INSURED PRODUCTION out of Israel were due to IMMINENT PERIL.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:** Atlantic objects to Request No. 2 on the grounds that it is vague and ambiguous in its reference to the "extra expenses which were incurred," and because it is misleading in that exclusions do apply.  Subject to and without waiving these objections, Atlantic can neither admit nor deny that any "extra expenses" were due to IMMINENT PERIL because discovery is ongoing and, despite being due on December 30, 2016, Plaintiffs still have not produced all documents requested by Atlantic.  Further, as a result of Plaintiffs' failure to timely produce documents, Atlantic was required to postpone depositions of fact witnesses that would have allowed Atlantic to evaluate the issue raised by this Request.

ATLANTIC SPECIALTY INSURANCE COMPANY'S OBJECTIONS AND RESPONSES TO
PLAINTIFF UNIVERSAL CABLE PRODUCTION LLC'S FIRST SET OF REQUESTS FOR ADMISSIONS

1  Therefore, the information Atlantic knows or can reasonably obtain is insufficient to

2  enable it to admit or deny this Request.

3

4  **REQUEST FOR ADMISSION NO. 3:**

5       Admit that the expenses incurred to move the *DIG* INSURED PRODUCTION

6  out of Israel were necessary in order to complete the production.

7  **RESPONSE TO REQUEST FOR ADMISSION NO. 3:** Denied.

8

9  **REQUEST FOR ADMISSION NO. 4:**

10       Admit that Exclusion 1 of the "General Conditions" section of the POLICY,

11  regarding loss caused by "War, including undeclared or civil war" (cited by

12  ATLANTIC in support of its Second Affirmative Defense), does not exclude from

13  coverage any portion of the loss that forms the basis of the *DIG* CLAIM.

14  **RESPONSE TO REQUEST FOR ADMISSION NO. 4:** Denied.

15

16  **REQUEST FOR ADMISSION NO. 5:**

17       Admit that Exclusion 2 of the "General Conditions" section of the POLICY,

18  regarding loss caused by "Warlike action by a military force, including action in

19  hindering or defending against an actual or expected attack, by any government,

20  sovereign or other authority using military personnel or other agents" (cited by

21  ATLANTIC in support of its Third Affirmative Defense), does not exclude from

22  coverage any portion of the loss that forms the basis of the *DIG* CLAIM.

23  **RESPONSE TO REQUEST FOR ADMISSION NO. 5:** Denied.

24

25  **REQUEST FOR ADMISSION NO. 6:**

26       Admit that Exclusion 3 of the "General Conditions" section of the POLICY,

27  regarding loss caused by "Insurrection, rebellion, revolution, usurped power, or action

28  taken by governmental authority in hindering or defending against any of these" (cited

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

4

1  by ATLANTIC in support of its Fourth Affirmative Defense), does not exclude from

2  coverage any portion of the loss that forms the basis of the *DIG* CLAIM.

3  **RESPONSE TO REQUEST FOR ADMISSION NO. 6:** Denied.

4

5  **REQUEST FOR ADMISSION NO. 7:**

6  Admit that Exclusion 4 of the "General Conditions" section of the POLICY,

7  regarding loss caused by "Any weapon of war including atomic fission or radioactive

8  force, whether in time of peace or war" (cited by ATLANTIC in support of its Fifth

9  Affirmative Defense), does not exclude from coverage any portion of the loss that

10  forms the basis of the *DIG* CLAIM.

11  **RESPONSE TO REQUEST FOR ADMISSION NO. 7:** Denied.

12

13  **REQUEST FOR ADMISSION NO. 8:**

14  Admit that "General Condition I(2)" of the POLICY (cited by ATLANTIC in

15  support of its Sixth Affirmative Defense) does not bar any portion of the *DIG* CLAIM.

16  **RESPONSE TO REQUEST FOR ADMISSION NO. 8:** Denied.

17

18  **REQUEST FOR ADMISSION NO. 9:**

19  Admit that "General Condition G" of the POLICY (cited by ATLANTIC in

20  support of its Seventh Affirmative Defense) does not reduce ATLANTIC'S liability

21  under the *DIG* CLAIM.

22  **RESPONSE TO REQUEST FOR ADMISSION NO. 9:** Denied.

23

24  **REQUEST FOR ADMISSION NO. 10:**

25  Admit that "Section V. Warranties, Section III — Extra Expense" of the

26  POLICY (cited by ATLANTIC in support of its Eighth Affirmative Defense) does not

27  bar any portion of the *DIG* CLAIM.

28

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  **RESPONSE TO REQUEST FOR ADMISSION NO. 10:** Denied.

2

3  **REQUEST FOR ADMISSION NO. 11:**

4       Admit that the "Fortuity Doctrine" (cited by ATLANTIC in support of its Ninth

5  Affirmative Defense) does not bar any portion of the *DIG* CLAIM.

6  **RESPONSE TO REQUEST FOR ADMISSION NO. 11:** Denied.

7

8  **REQUEST FOR ADMISSION NO. 12:**

9       Admit that the loss that forms the basis of the *DIG* CLAIM is insurable and not

10  barred by public policy (cited by ATLANTIC in support of its Tenth Affirmative

11  Defense).

12  **RESPONSE TO REQUEST FOR ADMISSION NO. 12:** Denied.

13

14  **REQUEST FOR ADMISSION NO. 13:**

15       Admit that Exclusion 8 of "Section III – Extra Expense" of the POLICY,

16  regarding loss caused by "Any concern or fear of an occurrence which may affect the

17  commencement of the continuation of the Insured Production, except the action of a

18  civil authority that prevents access to, exit from (ingress or egress) or closes down the

19  location and or facilities due to conditions that threaten the safety of case [sic], crew or

20  property" (cited by ATLANTIC in support of its Eleventh Affirmative Defense), does

21  not exclude from coverage any portion of the loss that forms the basis of the *DIG*

22  CLAIM.

23  **RESPONSE TO REQUEST FOR ADMISSION NO. 13:** Denied.

24

25  **REQUEST FOR ADMISSION NO. 14:**

26       Admit that Exclusion 9 of "Section III – Extra Expense" of the POLICY,

27  regarding loss caused by "An imminent peril or physical damage to property, facilities,

28  or locations necessary to the insured production" (cited by ATLANTIC in support of its

ANDERSON, MCPHARLIN & CONNERS LLP

*LAWYERS*

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

6

ATLANTIC SPECIALTY INSURANCE COMPANY'S OBJECTIONS AND RESPONSES TO
PLAINTIFF UNIVERSAL CABLE PRODUCTION LLC'S FIRST SET OF REQUESTS FOR ADMISSIONS

185                                    EXHIBIT 06

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  Twelfth Affirmative Defense), does not exclude from coverage any portion of the loss

2  that forms the basis of the *DIG* CLAIM.

3  **RESPONSE TO REQUEST FOR ADMISSION NO. 14:** Denied.

4

5  **REQUEST FOR ADMISSION NO. 15:**

6      Admit that Exclusion 10 of "Section III – Extra Expense" of the POLICY,

7  regarding loss caused by "Any concern or belief that the commencement or

8  continuation of Insured Production is inappropriate" (cited by ATLANTIC in support

9  of its Thirteenth Affirmative Defense), does not exclude from coverage any portion of

10  the loss that forms the basis of the *DIG* CLAIM.

11  **RESPONSE TO REQUEST FOR ADMISSION NO. 15:** Denied.

12

13  **REQUEST FOR ADMISSION NO. 16:**

14      Admit that Exclusion 17 of "Section III – Extra Expense" of the POLICY,

15  regarding loss caused by "Loss of use (including loss of use of animals), loss of market,

16  interruption of business, or any other consequential loss" (cited by ATLANTIC in

17  support of its Fourteenth Affirmative Defense), does not exclude from coverage any

18  portion of the loss that forms the basis of the *DIG* CLAIM.

19  **RESPONSE TO REQUEST FOR ADMISSION NO. 16:** Denied.

20

21  **REQUEST FOR ADMISSION NO. 17:**

22      Admit that the POLICY does not expressly exclude loss caused by terrorism

23  from coverage.

24  **RESPONSE TO REQUEST FOR ADMISSION NO. 17:** Atlantic objects to this

25  request as vague and ambiguous. Subject to and without waiving these objections, and

26  specifically subject thereto, Atlantic admits that there is not an exclusion in the

27  POLICY that specifically excludes coverage for acts of terrorism, but Atlantic denies

28  this Request for Admission as worded because the POLICY includes exclusions broad

7

ATLANTIC SPECIALTY INSURANCE COMPANY'S OBJECTIONS AND RESPONSES TO
PLAINTIFF UNIVERSAL CABLE PRODUCTION LLC'S FIRST SET OF REQUESTS FOR ADMISSIONS

186                                                    EXHIBIT 06

ANDERSON, McPHARLIN & CONNERS LLP

*Lawyers*

707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1   enough to exclude loss caused by acts of terror and exclusions that exclude coverage for

2   Plaintiffs' alleged losses.

3

4   **REQUEST FOR ADMISSION NO. 18:**

5        Admit that loss caused by terrorism falls within the insurance coverage grant of

6   the POLICY.

7   **RESPONSE TO REQUEST FOR ADMISSION NO. 18:** Atlantic objects to this

8   request as vague and ambiguous. Subject to and without waiving these objections, and

9   specifically subject thereto, Atlantic admits that there is not an exclusion in the

10  POLICY that specifically excludes coverage for acts of terrorism, but Atlantic denies

11  this Request for Admission as worded because the POLICY includes exclusions broad

12  enough to exclude loss caused by acts of terror and exclusions that exclude coverage for

13  Plaintiffs' alleged losses.

14

15  **REQUEST FOR ADMISSION NO. 19:**

16       Admit that, prior to January 1, 2014, ATLANTIC has included terms or

17  endorsements that expressly exclude loss caused by terrorism from coverage in

18  insurance policies other than the POLICY.

19  **RESPONSE TO REQUEST FOR ADMISSION NO. 19:** Atlantic objects to this

20  Request to the extent that it seeks information outside the scope of discovery permitted

21  under Rule 26 of the Federal Rules of Civil Procedure. The Request seeks information

22  that is not relevant to either party's claims or defenses. The policies that Atlantic has

23  provided to any other insureds are wholly irrelevant to the meaning of the language in

24  the policy that governs the relationship between the parties to this lawsuit.

25

26  **REQUEST FOR ADMISSION NO. 20:**

27       Admit that the COVERAGE FOR CERTIFIED ACTS OF TERRORISM

28  ENDORSEMENT does not limit the insurance coverage provided by the POLICY.

ATLANTIC SPECIALTY INSURANCE COMPANY'S OBJECTIONS AND RESPONSES TO
PLAINTIFF UNIVERSAL CABLE PRODUCTION LLC'S FIRST SET OF REQUESTS FOR ADMISSIONS

EXHIBIT 06

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1    **RESPONSE TO REQUEST FOR ADMISSION NO. 20:** Atlantic objects to Request

2    for Admission No. 20 on the grounds that it is vague and ambiguous in its wording and

3    references, and on the grounds that it fails to provide a sufficient basis or predicate to

4    which response can be made.  Atlantic further objects to Request for Admission No. 20

5    on the grounds same calls for speculation.  Subject to the foregoing objections and

6    without waiving the objections, Atlantic can neither admit nor deny Request No. 20, as

7    it calls for an abstract opinion or conclusion, and not an admission of fact based upon a

8    predicate set forth with particularity.

9

10   **REQUEST FOR ADMISSION NO. 21:**

11        Admit that ATLANTIC'S characterization of the COVERAGE FOR

12   CERTIFIED ACTS OF TERRORISM ENDORSEMENT as "terrorism coverage," in

13   the July 28, 2014 letter from Pamela A. Johnson attached hereto as Exhibit B, was

14   false.

15   **RESPONSE TO REQUEST FOR ADMISSION NO. 21:** Denied.

16

17   **REQUEST FOR ADMISSION NO. 22:**

18        Admit that ATLANTIC'S characterization of the COVERAGE FOR

19   CERTIFIED ACTS OF TERRORISM ENDORSEMENT as "terrorism coverage," in

20   the July 28, 2014 letter from Pamela A. Johnson attached hereto as Exhibit B, was a

21   misrepresentation of the terms of the POLICY.

22   **RESPONSE TO REQUEST FOR ADMISSION NO. 22:** Denied.

23

24   **REQUEST FOR ADMISSION NO. 23:**

25        Admit that as of the July 28, 2014 letter from Pamela A. Johnson attached hereto

26   as Exhibit B, ATLANTIC'S decision to deny the *DIG* CLAIM was based solely on its

27   application of the following two exclusions in the POLICY:

28

1       "This policy does not insure against loss or damage caused

2       directly or indirectly by:

3       1.    War, including undeclared or civil war; or

4       2.    Warlike action by a military force, including action in

5       hindering or defending against an actual or expected attack,

6       by any government, sovereign or other authority using

7       military personnel or other agents[.]"

8   **RESPONSE TO REQUEST FOR ADMISSION NO. 23:** Denied.

9

10   **REQUEST FOR ADMISSION NO. 24:**

11       Admit that as of the September 19, 2014 letter from Pamela A. Johnson attached

12 hereto as Exhibit C, ATLANTIC'S refusal to reconsider its denial of the *DIG* CLAIM

13 was based solely on its application of the following two exclusions in the POLICY:

14       "This policy does not insure against loss or damage caused

15       directly or indirectly by:

16       1.    War, including undeclared or civil war; or

17       2.    Warlike action by a military force, including action in

18       hindering or defending against an actual or expected attack,

19       by any government, sovereign or other authority using

20       military personnel or other agents[.]"

21   **RESPONSE TO REQUEST FOR ADMISSION NO. 24:** Atlantic objects to this

22 Request as it is misleading and mischaracterizes the facts and evidence. Subject to and

23 without waiving this objection, denied.

24

25   **REQUEST FOR ADMISSION NO. 25:**

26       Admit that, for the time period January 1, 2001 to the present, ATLANTIC has

27 never issued an insurance policy that contained a WAR EXCLUSION with terms that

28

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

10

1 are different in any way from the terms of the WAR EXCLUSION contained in the

2 POLICY.

3 **RESPONSE TO REQUEST FOR ADMISSION NO. 25:** Denied.

4

5 **REQUEST FOR ADMISSION NO. 26:**

6      Admit that, prior to the *DIG* CLAIM, ATLANTIC had never considered the

7 application of a WAR EXCLUSION to an insurance claim.

8 **RESPONSE TO REQUEST FOR ADMISSION NO. 26:** Atlantic objects to this

9 Request to the extent that it seeks information that is outside the scope of discovery

10 permitted under Rule 26 of the Federal Rules of Civil Procedure. In particular, the

11 definition of "WAR EXCLUSION" in the Request includes not only the particular war

12 exclusion in the POLICY but also any similar exclusion in other policies. Information

13 relating to other policies or claims is not relevant to either party's claims or defenses

14 and is not proportional to the needs of this case, considering the importance of the

15 issues at stake in the action, the amount in controversy, the parties' relative access to

16 relevant information, the parties' resources, the importance of the discovery in

17 resolving the issues, and the burden and expense of the proposed discovery, which

18 greatly outweighs its likely benefit, if any. To conduct the search necessary to be able

19 to definitively admit or deny this Request would be extremely burdensome, and

20 Atlantic would have to manually locate and review each policy it has issued that may

21 contain this particular exclusion and any related claim files. Atlantic also objects to this

22 Request in that the word "consider" is vague and ambiguous.

23

24 Nonetheless, to avoid a discovery dispute, Atlantic further responds as follows: As

25 counsel for Atlantic has stated in discussions with counsel for Plaintiffs, Atlantic has

26 reviewed more than 36,000 documents identified in a search of its document

27 management and e-mail system. One of the search terms used in the search that

28 returned these documents was "war." That search looked for documents and e-mails

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

11

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  dating back to July 2013. Atlantic, and its Informational Technology department in

2  particular, have represented that a broader search that would encompass all e-mails and

3  documents without any date restrictions would be nearly impossible. In lieu of

4  searching for the WAR EXCLUSION in each and every one of the many millions of

5  documents and e-mails that Atlantic and OneBeacon have generated over the course of

6  their existences, Atlantic has made inquiries with its employees who oversee, and

7  former employees who previously oversaw, the claims handling for the entertainment

8  division of Atlantic and with employees of OneBeacon who oversee claims for all of

9  OneBeacon's divisions. Those persons do not recall any claims in which Atlantic

10  considered the potential applicability of the WAR EXCLUSION or any part thereof.

11  Atlantic has, however, found one e-mail that an employee of Atlantic, Daniel

12  Gutterman, sent to himself, that concerns another claim, and which quotes the various

13  policy language, including its WAR EXCLUSION. There are no other documents

14  suggesting that the WAR EXCLUSION was considered any further in connection with

15  that claim. This one e-mail has been produced as Bates No. ATL000785 – ATL000788.

16

17  **REQUEST FOR ADMISSION NO. 27:**

18      Admit that, with the exception of the *DIG* CLAIM, ATLANTIC has never

19  denied an insurance claim on the ground that the loss was excluded from coverage by a

20  WAR EXCLUSION.

21  **RESPONSE TO REQUEST FOR ADMISSION NO. 27:** Atlantic objects to this

22  Request to the extent that it seeks information that is outside the scope of discovery

23  permitted under Rule 26 of the Federal Rules of Civil Procedure. In particular, the

24  definition of "WAR EXCLUSION" in the Request includes not only the particular war

25  exclusion in the POLICY but also any similar exclusion in other policies. Information

26  relating to other policies or claims is not relevant to either party's claims or defenses

27  and is not proportional to the needs of this case, considering the importance of the

28  issues at stake in the action, the amount in controversy, the parties' relative access to

12

1  relevant information, the parties' resources, the importance of the discovery in

2  resolving the issues, and the burden and expense of the proposed discovery, which

3  greatly outweighs its likely benefit, if any. To conduct the search necessary to be able

4  to definitively admit or deny this Request would be extremely burdensome, and

5  Atlantic would have to manually locate and review each policy it has issued that may

6  contain this particular exclusion and any related claim files.

7  Nonetheless, to avoid a discovery dispute, Atlantic further responds as follows: As

8  counsel for Atlantic has stated in discussions with counsel for Plaintiffs, Atlantic has

9  reviewed more than 36,000 documents identified in a search of its document

10  management and e-mail system. One of the search terms used in the search that

11  returned these documents was "war." That search looked for documents and e-mails

12  dating back to July 2013. Atlantic can confirm that it has identified no documents

13  suggesting that any claims were denied on the basis of the WAR EXCLUSION.

14  Atlantic, and its Informational Technology department in particular, have represented

15  that a broader search that would encompass all e-mails and documents without any date

16  restrictions would be nearly impossible. In lieu of searching for the WAR

17  EXCLUSION in each and every one of the many millions of documents and e-mails

18  that Atlantic and OneBeacon have generated over the course of their existences,

19  Atlantic has made inquiries with its employees who oversee, and former employees

20  who previously oversaw, the claims handling for the entertainment division of Atlantic

21  and with employees of OneBeacon who oversee claims for all of OneBeacon's

22  divisions. Those persons do not recall any claims in which Atlantic denied a claim on

23  the basis of the WAR EXCLUSION.

24

25  **REQUEST FOR ADMISSION NO. 28:**

26      Admit that, with the exception of the *DIG* CLAIM, ATLANTIC has never

27  considered the application of a WAR EXCLUSION to an insurance claim.

28  **RESPONSE TO REQUEST FOR ADMISSION NO. 28:** Atlantic objects to this

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1   Request to the extent that it seeks information that is outside the scope of discovery

2   permitted under Rule 26 of the Federal Rules of Civil Procedure. In particular, the

3   definition of "WAR EXCLUSION" in the Request includes not only the particular war

4   exclusion in the POLICY but also any similar exclusion in other policies. Information

5   relating to other policies or claims is not relevant to either party's claims or defenses

6   and is not proportional to the needs of this case, considering the importance of the

7   issues at stake in the action, the amount in controversy, the parties' relative access to

8   relevant information, the parties' resources, the importance of the discovery in

9   resolving the issues, and the burden and expense of the proposed discovery, which

10  greatly outweighs its likely benefit, if any. To conduct the search necessary to be able

11  to definitively admit or deny this Request would be extremely burdensome, and

12  Atlantic would have to manually locate and review each policy it has issued that may

13  contain this particular exclusion and any related claim files.

14

15  Nonetheless, to avoid a discovery dispute, Atlantic further responds as follows: As

16  counsel for Atlantic has stated in discussions with counsel for Plaintiffs, Atlantic has

17  reviewed more than 36,000 documents identified in a search of its document

18  management and e-mail system. One of the search terms used in the search that

19  returned these documents was "war." That search looked for documents and e-mails

20  dating back to July 2013. Atlantic, and its Informational Technology department in

21  particular, have represented that a broader search that would encompass all e-mails and

22  documents without any date restrictions would be nearly impossible. In lieu of

23  searching for the WAR EXCLUSION in each and every one of the many millions of

24  documents and e-mails that Atlantic and OneBeacon have generated over the course of

25  their existences, Atlantic has made inquiries with its employees who oversee, and

26  former employees who previously oversaw, the claims handling for the entertainment

27  division of Atlantic and with employees of OneBeacon who oversee claims for all of

28  OneBeacon's divisions. Those persons do not recall any claims in which Atlantic

14

considered the potential applicability of the WAR EXCLUSION or any part thereof. Atlantic has, however, found one e-mail that an employee of Atlantic, Daniel Gutterman, sent to himself, that concerns another claim, and which quotes the various policy language, including its WAR EXCLUSION. There are no other documents suggesting that the WAR EXCLUSION was considered any further in connection with that claim. This one e-mail has been produced as Bates No. ATL000785 – ATL000788.

**REQUEST FOR ADMISSION NO. 29:**

Admit that ATLANTIC has never adopted or implemented standards governing the investigation and processing of claims that implicate a WAR EXCLUSION.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:** Atlantic objects to Request No. 29 on the grounds that it is vague and ambiguous.  Subject to and without waiving these objections, denied as worded. As Plaintiffs are aware from Atlantic's production of documents, Atlantic had guidelines that governed the handling of claims. These guidelines would have guided the assessment of any insurance claim, including one that implicates a WAR EXCLUSION.

**REQUEST FOR ADMISSION NO. 30:**

Admit that, for the time period January 1, 2001 to the present, ATLANTIC has never had any written guidelines or instructions that apply to the assessment of an insurance claim that implicates a WAR EXCLUSION.

**RESPONSE TO REQUEST FOR ADMISSION NO. 30:** Atlantic objects to Request No. 30 on the grounds that it is vague and ambiguous.  Subject to and without waiving these objections, denied as worded. As Plaintiffs are aware from Atlantic's production of documents, Atlantic had guidelines that governed the handling of claims. These guidelines would have guided the assessment of any insurance claim, including one that implicates a WAR EXCLUSION.

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ATLANTIC SPECIALTY INSURANCE COMPANY'S OBJECTIONS AND RESPONSES TO
PLAINTIFF UNIVERSAL CABLE PRODUCTION LLC'S FIRST SET OF REQUESTS FOR ADMISSIONS

ANDERSON, MCPHARLIN & CONNERS LLP
*LAWYERS*
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  **REQUEST FOR ADMISSION NO. 31:**

2      Admit that, for the time period January 1, 2001 to the present, ATLANTIC has

3  never had any written guidelines or instructions that apply to the investigation of an

4  insurance claim that implicates a WAR EXCLUSION.

5  **RESPONSE TO REQUEST FOR ADMISSION NO. 31:** Atlantic objects to Request

6  No. 31 on the grounds that it is vague and ambiguous.  Subject to and without waiving

7  these objections, denied as worded. As Plaintiffs are aware from Atlantic's production

8  of documents, Atlantic had guidelines that governed the handling of claims. These

9  guidelines would have guided the assessment of any insurance claim, including one that

10  implicates a WAR EXCLUSION.

11  **REQUEST FOR ADMISSION NO. 32:**

12      Admit that all of the individuals that were in any way involved in the

13  underwriting of the POLICY were, at the time of their involvement, employees of

14  Atlantic Specialty Insurance Company.

15  **RESPONSE TO REQUEST FOR ADMISSION NO. 32:** Admitted, except for

16  representatives of Plaintiffs who were involved in applying for and obtaining the

17  POLICY.

18

19  **REQUEST FOR ADMISSION NO. 33:**

20      Admit that all of the individuals that were in any way involved in the handling of

21  the *DIG* CLAIM were, at the time of their involvement, employees of Atlantic

22  Specialty Insurance Company.

23  **RESPONSE TO REQUEST FOR ADMISSION NO. 33:** Admitted, except for

24  representatives of Plaintiffs who were involved in submission of, discussion of, and

25  handling of the *DIG* CLAIM.

26

27

28

ATLANTIC SPECIALTY INSURANCE COMPANY'S OBJECTIONS AND RESPONSES TO
PLAINTIFF UNIVERSAL CABLE PRODUCTION LLC'S FIRST SET OF REQUESTS FOR ADMISSIONS

EXHIBIT 06

DATED: March 13, 2017

                              MARC J. SHRAKE
                              ANDERSON, McPHARLIN & CONNERS LLP

                                         -and-

                              MICHAEL KEELEY *(Pro Hac Vice)*
                              JOHN R. RIDDLE *(Pro Hac Vice)*
                              TONI SCOTT REED *(Pro Hac Vice)*
                              CARLA C. CRAPSTER *(Pro Hac Vice)*
                              STRASBURGER & PRICE, LLP

                              By:    */s/ Michael Keeley*
                                        Michael Keeley
                              Attorneys for Defendant ATLANTIC
                              SPECIALTY INSURANCE COMPANY

ATLANTIC SPECIALTY INSURANCE COMPANY'S OBJECTIONS AND RESPONSES TO
PLAINTIFF UNIVERSAL CABLE PRODUCTION LLC'S FIRST SET OF REQUESTS FOR ADMISSIONS

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1

## PROOF OF SERVICE

2

I am employed in the County of Dallas, State of Texas.  I am over the age of
eighteen years and not a party to the within action; my business address is 901 Main
Street, Suite 6000, Dallas, Texas 75202.

3

4

5

On March 13, 2017, I served the following document(s) described as
**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S
OBJECTIONS AND RESPONSES TO PLAINTIFF UNIVERSAL CABLE
PRODUCTION LLC'S FIRST SET OF REQUESTS FOR ADMISSIONS** on
the interested parties in this action by placing true copies thereof enclosed in sealed
envelopes addressed as follows:

6

7

8

9

Lucia E. Coyoca, Esq.                          Attorneys for Plaintiffs
Valentine A. Shalamitski, Esq.
Daniel M. Hayes, Esq.
Mitchell Silberberg & Knupp LLP
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

10

11

12

13

14

15

**BY MAIL:**  I am "readily familiar" with Strasburger & Price, LLP's practice for
collecting and processing correspondence for mailing with the United States Postal
Service.  Under that practice, it would be deposited with the United States Postal
Service that same day in the ordinary course of business.  Such envelope(s) were
placed for collection and mailing with postage thereon fully prepaid at Dallas,
Texas, on that same day following ordinary business practices.

16

17

18

19

I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct and that I am employed in the office
of a member of the bar of this Court at whose direction the service was made.
Executed on March 13, 2017, at Dallas, Texas.

20

21

22

23

_Marianna Green_
Marianna Green

24

25

26

27

28

18

ATLANTIC SPECIALTY INSURANCE COMPANY'S OBJECTIONS AND RESPONSES TO
PLAINTIFF UNIVERSAL CABLE PRODUCTION LLC'S FIRST SET OF REQUESTS FOR ADMISSIONS

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

# EXHIBIT 7

Sent:              Tue 7/22/2014 2:03 AM (GMT-00:00)
Subject:           Accepted: Call to discuss War Exclusion
Location:          I will call you

Start:             Tue 7/22/2014 2:30 PM (GMT-00:00)
End:               Tue 7/22/2014 3:00 PM (GMT-00:00)

Organizer:         Gooley, Theresa A.

Required Attendees: LIT_Johnson, Pamela
Optional Attendees:

EXHIBIT 07   ATL001814

# EXHIBIT 8

From:    Johnson, Pamela A.
Sent:    Tue 7/22/2014 1:27 PM (GMT-00:00)
To:      Susan Weiss; Garber, Andrea (NBCUniversal); Gutterman, Daniel S.
Cc:
Bcc:
Subject: RE: 0AB097918 NBCU "Dig"

Susan and Andrea,

We can use my conference call number.  Dial-in 877-937-1357, participant 5741516.

Best,

**Pamela A. Johnson, Esq.** Assistant Vice President  | OneBeacon Entertainment

tel: 952.852.2455  | PamelaJohnson@onebeacon.com

onebeaconentertainment.com

**From:** Susan Weiss [mailto:susan.weiss@aon.com]
**Sent:** Monday, July 21, 2014 10:37 PM
**To:** Garber, Andrea (NBCUniversal); Gutterman, Daniel S.
**Cc:** Johnson, Pamela A.
**Subject:** RE: 0AB097918 NBCU "Dig"

I'm available as well.

———

**From:** Garber, Andrea (NBCUniversal)
**Sent:** Monday, July 21, 2014 8:54:06 PM
**To:** Gutterman, Daniel S.; Susan Weiss
**Cc:** Johnson, Pamela A.
**Subject:** RE: 0AB097918 NBCU "Dig"

EXHIBIT 08
ATL001818

Hi, Danny –

I am available.  Just let me know the details.

Best Regards,

Andrea

**From:** Gutterman, Daniel S. [mailto:DGutterman@OneBeacon.com]
**Sent:** Monday, July 21, 2014 5:06 PM
**To:** Garber, Andrea (NBCUniversal); susan.weiss@aon.com
**Cc:** Johnson, Pamela A.; Gutterman, Daniel S.
**Subject:** 0AB097918 NBCU "Dig"

Hi Andrea and Susan –

I hope you're both doing well!

Are you both available tomorrow at 4pm PT for a conference call?

Best Regards,

**Danny Gutterman**

**OneBeacon Entertainment**

Sr. Entertainment Claims Investigator

(781) 332-8550

ATL001819

Confidentiality notice:

The information contained in this email message including attachments is confidential and is intended only for the use of the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, you are hereby notified that any use, unauthorized dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please delete immediately or if any problems occur with transmission, please notify me immediately by telephone.

Thank you.

EXHIBIT 08
ATL001820

# EXHIBIT 9

From:       Gooley, Theresa A.
Sent:       Tue 7/22/2014 6:18 PM (GMT-00:00)
To:         Duffy, Sean W.
Cc:
Bcc:
Subject:    OBE - NBC 0AB097918
Attachments: 57751 20140721 Opn Ltr to Pamela Johnson.pdf

Sean,


I just wanted to flag this new claim again.  Pamela is having a discussion with NBC this evening about the claim.
Briefly,


Production shut down of "DIG" due to unrest in Tel Aviv and Jerusalem.  Dig is an episodic drama about an FBI agent who is called in to investigate a murder and finds an artifact that throws him down a historical worm hole.  The season is shot in Tel Aviv, Jerusalem and Toronto.  Toronto has already been shot.  The total budget is fir $20M to $25M.


We believe the policy exclusion for war operates to significantly limit and/or preclude any available coverage.  The applicable exclusion provides:


The policy does not insure against loss or damage caused directly or indirectly by:


1.  War, including undeclared or civil war; or
2.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
3.  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss;
4.  Any weapon of war including atomic fission or radioactive force, whether in time of peace or war;


****


Any uninsured event occurring before, concurrently with or after the happening of any insured event, which directly or indirectly causes or in any way contributes to cause or increase a loss under this policy; but only with respect to that portion of any such loss caused by or contributed to by the uninsured event, unless the uninsured event would not have been a factor has such insured event never occurred.

EXHIBIT 09   ATL001826

We anticipate NBC will not be happy with the analysis and may give you a call.   (I am attaching the coverage analysis).

Thanks,

Theresa

**Theresa A. Gooley, Esq.** VP Claims  |  **OneBeacon Insurance Group**

601 Carlson Parkway  |  Suite 600  |  Minnetonka, MN 55305

tel: 952.852.2467  |  fax: 888.553.9530  |  tgooley@onebeacon.com

EXHIBIT 09   **ATL001827**

# EXHIBIT 10

From:        Crosby, Dennis A.
Sent:        Wed 7/23/2014 3:37 PM (GMT-00:00)
To:          Williams, Peter D.
Cc:
Bcc:
Subject:     FW: OBE - NBC 0AB097918
Attachments: 57751 20140721 Opn Ltr to Pamela Johnson.pdf

FYI

D


**Dennis Crosby**  Executive Vice President| **OneBeacon Insurance Group**

1720 Windward Concourse | Suite 325 | Alpharetta, Georgia 30005
tel: 781-332-7665 | cell: 770-329-9036 | fax: 888-330-8693 |dcrosby@onebeacon.com


**From:** Duffy, Sean W.
**Sent:** Wednesday, July 23, 2014 11:03 AM
**To:** Crosby, Dennis A.
**Subject:** FW: OBE - NBC 0AB097918


FYI – this seems correct to me. Will update you if warranted.


**Sean Duffy**  SVP & Chief Claims Officer | **OneBeacon Insurance Group**
tel: 952.852.2469 | fax: 888.252.0578 | sduffy@onebeacon.com


**From:** Gooley, Theresa A.
**Sent:** Tuesday, July 22, 2014 1:18 PM
**To:** Duffy, Sean W.
**Subject:** OBE - NBC 0AB097918


Sean,

EXHIBIT 10   ATL001829

I just wanted to flag this new claim again.  Pamela is having a discussion with NBC this evening about the claim.  Briefly,

Production shut down of "DIG" due to unrest in Tel Aviv and Jerusalem.  Dig is an episodic drama about an FBI agent who is called in to investigate a murder and finds an artifact that throws him down a historical worm hole.  The season is shot in Tel Aviv, Jerusalem and Toronto.  Toronto has already been shot.  The total budget is fir $20M to $25M.

We believe the policy exclusion for war operates to significantly limit and/or preclude any available coverage.  The applicable exclusion provides:

The policy does not insure against loss or damage caused directly or indirectly by:

1.  War, including undeclared or civil war; or
2.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
3.  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss;
4.  Any weapon of war including atomic fission or radioactive force, whether in time of peace or war;

****

Any uninsured event occurring before, concurrently with or after the happening of any insured event, which directly or indirectly causes or in any way contributes to cause or increase a loss under this policy; but only with respect to that portion of any such loss caused by or contributed to by the uninsured event, unless the uninsured event would not have been a factor has such insured event never occurred.

We anticipate NBC will not be happy with the analysis and may give you a call.   (I am attaching the coverage analysis).

Thanks,

EXHIBIT 10   ATL001830

Theresa


**Theresa A. Gooley, Esq.** VP Claims | **OneBeacon Insurance Group**

601 Carlson Parkway | Suite 600 | Minnetonka, MN 55305

tel: 952.852.2467 | fax: 888.553.9530 | tgooley@onebeacon.com

EXHIBIT 10   **ATL001831**

# EXHIBIT 11

From:     Williams, Peter D.
Sent:     Wed 7/23/2014 5:35 PM (GMT-00:00)
To:       Crosby, Dennis A.
Cc:
Bcc:
Subject: RE: OBE - NBC 0AB097918


I am aware and think the decision is justified. Either way the claim would fall within NBC's SIR but it is important we adhere to policy terms and conditions.


**Thanks and Regards,**

**Peter D Williams ACILA FCII**  President | **OneBeacon Entertainment**

Tel.: 1-781-332-8450  |  fax: 866-934-4992  |  Cell: 310-910-4026

onebeaconentertainment.com

A Member of OneBeacon Insurance Group


**From:** Crosby, Dennis A.
**Sent:** Wednesday, July 23, 2014 8:37 AM
**To:** Williams, Peter D.
**Subject:** FW: OBE - NBC 0AB097918


FYI

D


Dennis Crosby  Executive Vice President| **OneBeacon Insurance Group**

EXHIBIT 11  **ATL001832**

1720 Windward Concourse | Suite 325 | Alpharetta, Georgia 30005
tel: 781-332-7665 | cell: 770-329-9036 | fax: 888-330-8693 |dcrosby@onebeacon.com

**From:** Duffy, Sean W.
**Sent:** Wednesday, July 23, 2014 11:03 AM
**To:** Crosby, Dennis A.
**Subject:** FW: OBE - NBC 0AB097918


FYI – this seems correct to me.  Will update you if warranted.


Sean Duffy  SVP & Chief Claims Officer | **OneBeacon Insurance Group**
tel: 952.852.2469  |  fax: 888.252.0578  |  sduffy@onebeacon.com


**From:** Gooley, Theresa A.
**Sent:** Tuesday, July 22, 2014 1:18 PM
**To:** Duffy, Sean W.
**Subject:** OBE - NBC 0AB097918


Sean,


I just wanted to flag this new claim again.  Pamela is having a discussion with NBC this evening about the claim.
Briefly,


Production shut down of "DIG" due to unrest in Tel Aviv and Jerusalem.  Dig is an episodic drama about an
FBI agent who is called in to investigate a murder and finds an artifact that throws him down a historical
worm hole.  The season is shot in Tel Aviv, Jerusalem and Toronto.  Toronto has already been shot.  The
total budget is fir $20M to $25M.


We believe the policy exclusion for war operates to significantly limit and/or preclude any available coverage.  The
applicable exclusion provides:


The policy does not insure against loss or damage caused directly or indirectly by:

EXHIBIT 11   ATL001833

1. War, including undeclared or civil war; or
2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss;
4. Any weapon of war including atomic fission or radioactive force, whether in time of peace or war;

****

Any uninsured event occurring before, concurrently with or after the happening of any insured event, which directly or indirectly causes or in any way contributes to cause or increase a loss under this policy; but only with respect to that portion of any such loss caused by or contributed to by the uninsured event, unless the uninsured event would not have been a factor has such insured event never occurred.

We anticipate NBC will not be happy with the analysis and may give you a call.   (I am attaching the coverage analysis).

Thanks,

Theresa

**Theresa A. Gooley, Esq.** VP Claims  |  **OneBeacon Insurance Group**

601 Carlson Parkway  |  Suite 600  |  Minnetonka, MN 55305

tel: 952.852.2467  |  fax: 888.553.9530  |  tgooley@onebeacon.com

EXHIBIT 11   ATL001834

# EXHIBIT 12

From:     Duffy, Sean W.
Sent:     Wed 7/23/2014 6:01 PM (GMT-00:00)
To:       Gooley, Theresa A.
Cc:
Bcc:
Subject: RE: OBE - NBC 0AB097918

I agree with the analysis.

Sean Duffy  SVP & Chief Claims Officer | **OneBeacon Insurance Group**
tel: 952.852.2469  |  fax: 888.252.0578  |  sduffy@onebeacon.com

**From:** Gooley, Theresa A.
**Sent:** Tuesday, July 22, 2014 1:18 PM
**To:** Duffy, Sean W.
**Subject:** OBE - NBC 0AB097918

Sean,

I just wanted to flag this new claim again.  Pamela is having a discussion with NBC this evening about the claim. Briefly,

Production shut down of "DIG" due to unrest in Tel Aviv and Jerusalem.  Dig is an episodic drama about an FBI agent who is called in to investigate a murder and finds an artifact that throws him down a historical worm hole.  The season is shot in Tel Aviv, Jerusalem and Toronto.  Toronto has already been shot.  The total budget is fir $20M to $25M.

We believe the policy exclusion for war operates to significantly limit and/or preclude any available coverage.  The applicable exclusion provides:

The policy does not insure against loss or damage caused directly or indirectly by:

1.  War, including undeclared or civil war; or
2.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

EXHIBIT 12   ATL001835

3.  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss;

4.  Any weapon of war including atomic fission or radioactive force, whether in time of peace or war;

****

Any uninsured event occurring before, concurrently with or after the happening of any insured event, which directly or indirectly causes or in any way contributes to cause or increase a loss under this policy; but only with respect to that portion of any such loss caused by or contributed to by the uninsured event, unless the uninsured event would not have been a factor has such insured event never occurred.

We anticipate NBC will not be happy with the analysis and may give you a call.   (I am attaching the coverage analysis).

Thanks,

Theresa

**Theresa A. Gooley, Esq.** VP Claims  |  **OneBeacon Insurance Group**

601 Carlson Parkway  |  Suite 600  |  Minnetonka, MN 55305

tel: 952.852.2467  |  fax: 888.553.9530  |  tgooley@onebeacon.com

EXHIBIT 12   ATL001836

# EXHIBIT 13



A Member of OneBeacon Insurance Group

Pamela A. Johnson
Assistant Vice President
One Beacon Entertainment
601 Carlson Parkway, Suite 600
Minnetonka, MN  55305

July 28, 2014

**VIA EMAIL: Andrea.Garber@nbcuni.com**

Andrea Garber
NBC Universal Media
30 Rockefeller Plaza, 2nd Floor
New York, NY  10112

RE:    **Claim Number:**        **OBI 66746**
        **Insured:**                **NBC Universal Media, LLC**
        **Policy Number:**       **MP00163-04**
        **Date of Loss:**         **July 10, 2014**
        **Type of Loss:**         **Extra Expense**
        **Underwriting Co.:**     **Atlantic Specialty Insurance Company**

Dear Andrea:

This letter is to memorialize the information I provided to you in our telephone conversations last week.  As I explained, we have evaluated NBCU's decision to move its production of the television series *DIG* from Israel to the United States or another country due to the imminent peril created by the escalated conflict between Israel and Hamas.  We have concluded that the extra expense associated with the move is not covered under policy number MP00163-04 because of the exclusion for war and warlike actions.  Our decision is based on information gathered about the situation in Israel, case law, treatises and consultation with counsel. A more detailed explanation of our decision is provided below:

**BACKGROUND FACTS**

On Thursday, July 10th, 2014, NBCU contacted Peter Williams, the President of OneBeacon Entertainment (OBE) and orally submitted a claim for extra expenses associated with a production delay caused by the heightened violence in that country.  At the time, the production was shooting in Tel Aviv and Jerusalem.  On Tuesday, July 7th, Hamas began firing rockets into those cities, which had not been the target of rocket attacks since 2012.  Claiming that its personnel were in "imminent peril," the producers advised that they would push production by one week.  This decision was based on reports from personnel in Tel Aviv and an email to the production dated July 10, 2014, from Stephen Smith, the head of NBCU security for Europe, stating:

EXHIBIT 13

ATL000094

Andrea Garber
July 28, 2014
Page 2

This is to advise you that the security environment in Israel currently prohibits NBCU Security from being able to guarantee the safety and security of our employees, production partners and associated crew and talent.

NBCU Security have monitored and evaluated the events in Israel, Gaza and the West Bank, since inception and analyzed information from multiple sources.  All current intelligence and activity in country points to events still being in escalation phase without a predictable or realistic timeframe for a reduction in hostilities.  We have looked at the magnitude and range, of current rocket attacks (which appear to target locations to be used in forthcoming filming), the escalation of civil disorder and potential for a further increase in hostilities including a ground campaign and acts of terrorism within Israel, all of which mean there is no short term and realistic likelihood for positive changes to the security landscape.

As the situation is unlikely to change, this raises significant concern over the level of risk facing our crew and talent, and the liability over duty of care to which NBCUniversal would be exposed.  There are no current security controls that would allow NBCU Security to guarantee the safety and security of our personnel planning to arrive or currently based in Israel without the prospect of serious injury or loss of life. Personnel based in country in relation to this production should make arrangements to leave.

On Monday, July 14th, NBCU finalized its decision to push the production for one week and you communicated its decision to OBE in a telephone call with me, Danny Gutterman and NBC's broker, Susan Weiss.  In that conversation, you also mentioned that if the hostilities did not deescalate, there was a chance that NBCU would decide to move the production to another country or back to the United States.  We asked to be kept informed and we scheduled another call for Friday, July 18th.

In the meantime, the hostilities between Israel and Hamas worsened.  On Tuesday, July 15th, Hamas refused to agree to a cease-fire suggested by Egypt.  In response, Israeli President Netanyahu gave the military authorization to use "full force" against militants in Gaza stating, "Hamas chose to continue fighting and will pay the price for that decision. . . . When there is no cease-fire, our answer is fire."

According to the Washington Post, citing Israeli news reports, "by early Wednesday morning, Israel had struck at least 25 targets inside Gaza, including the home of a senior Hamas leader, Mahmoud Al Zahar.  Hamas militants fired at least 13 rockets into southern Israel, seven of which were intercepted by Israel's Iron Dome air defense system."  Israel then called up an additional 18,000 reservists and announced plans for a ground attack on Gaza.  Israel dropped leaflets into Gaza warning the population to evacuate.  On Thursday, Israel began a ground invasion into Gaza, including the use of tanks and gunboats.

EXHIBIT 13          ATL000095

On Thursday afternoon, we had another telephone conversation which included Danny Gutterman and Susan Weiss.  In this conversation, you informed us that NBCU had decided to move the production due to the ongoing hostilities which were creating dangerous conditions in Tel Aviv and Jerusalem.  I informed you that we were seriously considering whether the exclusion for war and warlike actions would preclude coverage for the claim.  Peter Williams had informed Susan Weiss the night before that we were evaluating whether the exclusion would apply to the situation in Israel.  You and Susan Weiss both protested, asserting that the situation in Israel did not constitute a war because Hamas was a terrorist organization, not a governmental authority and that there had been no formal declaration of war.  I informed you that we were still considering the matter and we would get back to you on Monday, July 21st with our final decision.  At that time, I informed you that our final decision was to exclude the claim based on the exclusion, but as a courtesy, we would cover the expenses related to the initial push in production.

## PERTINENT POLICY PROVISIONS

OneBeacon, through Atlantic Specialty Insurance Company, issued policy no. MP00163-04 to NBCUniversal Media, LLC, effective from January 1, 2014, to June 30, 2015.  That policy contains extra expense coverage, which includes the following pertinent provisions:

> **I.     INSURING AGREEMENT**
>
> We agree to pay to you such loss (as defined in Paragraph VII) not including loss of earnings or profit, as you sustain by reason of such extra expense you necessarily incur as a result of the interruption, postponement, cancellation, relocation, curtailment or abandonment of an Insured Production due to the following:
>
> 1.   The loss must be a direct result of an unexpected, sudden or accidental occurrence entirely beyond your control to include:
>
> * * *
>
> g)   Imminent peril, defined as certain, immediate and impending danger of such probability and severity to person or property that it would be unreasonable or unconscionable to ignore.
>
> h)   Any expenses incurred to avoid a loss imminent peril are covered to the extent that they serve to avoid a loss otherwise covered.
>
> 2.   Except as provided above, this extension does not negate the applicability of the basic terms and conditions of:

EXHIBIT 13   ATL000096

a)      The Extra Expense Coverage in the event that an imminent peril results in damage to or destruction of property or facilities payable under this policy . . .

The policy's General Conditions contain the following exclusion applicable to all sections of the policy:

This policy does not insure against loss or damage caused directly or indirectly by:

1.    War, including undeclared or civil war; or

2.    Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3.    Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

4.    Any weapon of war including atomic fission or radioactive force, whether in time of peace or war;

* * *

8.    Any uninsured event occurring before, concurrently with or after the happening of an insured event, which directly or indirectly causes or in any way contributes to cause or increase a loss under this policy; but only with respect to that portion of any such loss caused by or contributed to by the uninsured event, unless the uninsured event would not have been a factor had such insured event never occurred.

The policy contains coverage for Certified Acts of Terrorism.  The term "certified act of terrorism" is defined as follows:

An act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The criteria contained in that Act for a "certified act of terrorism" include the following:

1.    The act resulted in aggregate losses in excess of $5 million; and

ATL000097

2.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. . . .

## ANALYSIS

### *Imminent Peril*

Based on Mr. Smith's email to the production and what we know about the present conflict, we believe that the extra expenses that will be incurred to move the production out of Israel will be due to imminent peril.  Rockets launched toward areas where filming is taking place would no doubt reasonably constitute a "certain, immediate and impending danger of such probability and severity to person or property that it would be unreasonable or unconscionable to ignore."  With hostilities increasing, there remains a certain, immediate and impending danger.  The question now is not whether the loss falls within the insuring clause but whether the war exclusion or the terrorism coverage applies.

### *Terrorism Coverage*

The terrorism coverage should not apply because, under its terms, the act must be part of an effort to coerce or influence the United States population or government.  The acts being carried out in Israel are part of a long-term dispute between Hamas and Israel. The focus is not the United States or its policy.  Moreover, the U.S. Secretary of the Treasury has not certified the events as acts of terrorism.  Thus, we do not believe the terrorism coverage would apply.

### *War Exclusion*

The key question is whether the hostilities causing the imminent peril will be considered to be a war, or warlike action by a military force.  Case law and other treatises indicate that this would be the likely finding.  Therefore, the war exclusion should apply.

#### *War*

Subparagraph 1 of the war exclusion states that no coverage is provided for loss or damage caused directly or indirectly by "war, including undeclared . . . war."  Statutes defining "war" in various contexts, and cases that have interpreted war exclusions in insurance policies, provide assistance in determining whether the loss presented here was caused by war.

In *Wilkinson v. Equitable Life Assurance Soc.*, 2 Misc. 2d 249 (N.Y. Mun. Ct. 1956), considered whether the Korean conflict in the 1950s was a war even though it was not a declared war:

We must take the view that words are to be taken in their plain, ordinary, popular sense and that they are to be considered as they would be understood by the average man. "Contracts of insurance are to be construed according to the sense and meaning of the

terms which the parties have used, and if they are clear and unambiguous the terms are to be taken and understood in their plain, ordinary and proper sense." [Citation.]

The likelihood of death by external, violent and accidental means is immeasurably increased by military service in time of war. . . . Our courts have held it to be entirely proper for an insurer to limit its liability in situations involving war risks. [Citation.]

While it is true that there was no formal declaration of war by Congress, there can be no doubt that the United States was engaged in a war in Korea as an actual fact.

*Id.*, at 251.  The court cited a 1951 Attorney General opinion finding that "[t]he magnitude and actuality of the conflict in Korea, its pervading effect upon the national security and interest, together with the demands created thereby upon the nation as a whole are too apparent to need recounting. . . . They require the conclusion that the Korean hostilities constitute a war for the purpose of determining eligibility under Military Law, Section 210, for the assistance intended thereby for war veterans disabled by blindness."  *Id.* at 251-252.

Appleman on Insurance discusses exclusions for war, including the meaning of war and similar terms.  "War is 'a course of hostility' between 'states or state-like entities.'  To constitute a de facto state, a group must have 'significant attributes of sovereignty' and the application of this exclusion is fact-specific."

Black's Law Dictionary defines a "war" as a "[h]ostile conflict by means of armed forces, carried on between nations, states, or rulers, or sometimes between parties within the same nation or state."  8th ed. at 1614.  A leading dictionary of international law defines an "act of war" as a "use of force or other action by one state against another [which t]he state acted against recognizes . . . as an act of war, either by use of retaliatory force or a declaration of war." James R. Fox, Dictionary of International and Comparative Law, 3d ed. (2003).  Another dictionary defines an "act of war" as "a measure of force which one party, using military instruments of power, implements against another party in an international armed conflict."  The Handbook of Humanitarian Law in Armed Conflicts, 49 (Dieter Fleck, ed., 1995).

Hamas has become the government of the Gaza Strip. Hamas has a military wing, the Qassam Brigades, as well as a force of police, security and intelligence personnel[1]  Our understanding is that it is Hamas's military wing that has carried out the attacks on Israel that led to NBCU's claim.  "Hamas directs the Gaza government and security forces through a self-appointed cabinet of Hamas ministers       . . ."[2]

Thus, although Gaza or Palestine is not a recognized nation, at least by most of the world, it does have some indicia of sovereignty.  It governs territory and it is this territory from which the attacks on Israel have come.  Hamas has a stated goal of destroying Israel and is using

---

[1] Zanotti, *Hamas: Background and Issues for Congress* (Congressional Research Service 2010).

[2] *Id.*, at p. 19.

EXHIBIT 13  ATL000099

weapons in its quest.  Although the rockets are being fired into civilian areas, which may violate established norms of warfare and armed conflict under international law, this is not a situation where a single civilian, or group of civilians, is the target.   This conflict involves sophisticated military weapons fired from one territory into another country, Israel.  We believe that the only reasonable interpretation of what is occurring, and that has led to NBCU's action, is war or warlike action.

We note that NBCU affiliate company, MSNBC, has referred to the conflict as a war for the past several days. This should be considered in taking into account the insured's reasonable expectations.

### Warlike Action By A Military Force

Even if what occurred, and is occurring, would not be found to be a war, it is nevertheless a "warlike action."  However, if this is the case, to be excluded under Subparagraph 2 of the exclusion, the warlike action must be by a "military force."  There is no question that one side of the conflict, the Israeli side, is a military force of a sovereign nation.  But if it is necessary that the military force must be the one firing rockets at the areas where the filming was occurring, we must determine whether Hamas is a military force.  As to this question, we believe that Hamas is a military force of a government, the government of Gaza. Even though many, including Israel and the United States, consider Hamas to be a terrorist group, it is the government of a territory that is involved in the conflict.  Hamas operates a military command in the Gaza Strip, a territory it has controlled since 2007.[3]  It operates its military force through self-appointed ministers.  *Id.*, at p. 19.  In light of the governmental structure within Gaza, the Hamas military in Gaza fits the definition of a military force.  The current structure represents a considerable evolution from the Hamas that carried out the isolated terrorist attacks in the 1990's and the first few years of the 21st century.

Thus, the only reasonable interpretation of the situation that led to NBCU's decision to postpone the *Dig* production and its ultimate decision to move the production from Israel is that the imminent peril that led to these decisions was caused by war, or warlike action by a military force.  As a result, we believe the war exclusion applies to this claim

### CONCLUSION

NBCU is a valued and respected client of OBE and we regret that we cannot be of more assistance in this situation.  Although we cannot cover the extra expense associated with the production's move to another country to complete production, based on our long relationship with NBC, we are willing to cover the expenses associated with the initial postponement as a courtesy.  Please submit the initial budget, the costs associated with the removal of personnel from Israel and an itemization of any payment made to personnel that NBCU was contractually obligated to pay from the date the decision was made to postpone production until July 17th, the date we informed you that the war exclusion would likely apply to this claim.

Pursuant to California Code of Regulations, you have the right to request a review of this matter by the California Department of Insurance. You may contact the Department at telephone number 1-800- 927-

---

[3] Zanotti, *Hamas: Background and Issues for Congress* (Congressional Research Service 2010).

Andrea Garber
July 28, 2014
Page 8


4357, or you may write to the Department of Insurance, Claims Services Bureau, 300 S. Spring Street, Los Angeles, California  90013.

If you have any further questions, please don't hesitate to contact me.


Sincerely,


ATLANTIC SPECIALTY INSURANCE COMPANY



By:_____/s/_____

        Pamela A. Johnson
        Assistant Vice President
        OneBeacon Entertainment


cc:     Susan Weiss (via email)
        Senior Vice President
        Aon/Albert G. Ruben Insurance Services, Inc.
        15303 Ventura Blvd., Suite 1200
        Sherman Oaks, CA  91403-5817

EXHIBIT 13

ATL000101

# EXHIBIT 14

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
CASE NO: 2:16-cv-04435-PA-MRW

UNIVERSAL CABLE PRODUCTIONS LLC, and
NORTHERN ENTERTAINMENT PRODUCTIONS LLC,
Plaintiffs,
v.

ATLANTIC SPECIALTY INSURANCE COMPANY,
Defendant

## EXPERT REPORT OF ANTHONY CLARK, AIC

I am the Principal of Clark Insurance Arbitration & Consulting, LLC located in Plainfield, Illinois. Strasburger & Price, LLP, on behalf of Atlantic Specialty Insurance Company, has engaged me as an expert witness for the purpose of forming an opinion in the above referenced case regarding the denial of the claim and whether the denial of the claim by the insurance company would be considered reasonable given the circumstances from which the claim arose.

I have over 40 years of experience as a property insurance adjuster, supervisor, claims officer, and property insurance consultant. I retired from the position of Vice President of Property Claims for a major international insurance carrier in 2014 and am now engaged as a consultant. During the first fifteen years of my career I was a field adjuster progressing from a trainee, initially involved in homeowners and small commercial losses, to the level of Executive General Adjuster handling significant commercial losses exclusively. I was then promoted to the position of Assistant Vice President of property claims with responsibility for the direct supervision of a staff of General Adjusters located throughout the United States as well as conducting extensive training regarding the handling of commercial losses. In addition, I had responsibility for the set up and field supervision of the catastrophe response team during major natural disaster events that included

1

EXHIBIT 14

tornadoes, hurricanes, hailstorms, and earthquakes. As a result of this experience, I am very familiar with the handling, supervision, and management of first party property claims in many jurisdictions. During my career I have directly handled and supervised claims in California. My experience includes the internal audit and review of claim files for an independent adjusting firm. Thus I was required to be familiar with the statutory requirements of multiple jurisdictions. Throughout my career, both as an adjuster and in supervision, I have been involved in claims where there were allegations of bad faith handling of claims and was required to respond to those allegations. I have prepared industry presentations and taught classes related to the appropriate handling of first party property claims for the past 30 years of my career.

My background and experience is fully described in the C.V. attached to this report. I have not testified as an expert at trial in the past four years. I have testified in deposition on three matters within the past four years as noted on the C.V. I have not authored any publications within the past 10 years.

My fee for consultation, review, and reporting is $350 per hour and for deposition or testimony time is $400 per hour. Expenses are reimbursed on an actual incurred basis and travel time is $150 per hour.

2

EXHIBIT 14

**Documents Reviewed**

1. Plaintiffs' First Amended Complaint for (1) Breach of Insurance Contract; and (2) Breach of Implied Covenant of Good Faith and Fair Dealing, Filed 07/07/16.

2. Defendant's Original Answer to Plaintiffs' First Amended Complaint, Filed 08/05/16.

3. Plaintiffs' Response to Defendant's First Set of Interrogatories, Filed June 20, 2016.

4. Defendant's Second Amended Responses to Plaintiffs' First Set of Interrogatories, served on February 22, 2017.

5. Atlantic Specialty Insurance Company Policy Number MP 00163-04.

6. Letter of July 28, 2014 from Pamela A. Johnson of OneBeacon Entertainment to Andrea Garber of NBC Universal Media, LLC.

7. Letter of August 13, 2014 from Lucia E. Coyoca, A Professional Corporation of Mitchell Silberberg & Knupp LLP to Pamela A. Johnson as a response to her letter of July 28, 2014.

8. Letter of September 13, 2014 from Pamela A Johnson to Lucia E. Coyoca as a response to the letter of August 13, 2014.

9. Atlantic Specialty Insurance Company documents encompassing the following Bates reference numbers: ATL000001 through ATL000161, ATL000294 through ATL000319, ATL000322 through ATL000328, and ATL000393 through ATL000399.

10. Atlantic Specialty Insurance Company production of claim correspondence and documents for the DIG claim.

11. Deposition Testimony of Daniel Gutterman, with exhibits.

12. Deposition Testimony of Theresa Gooley, with exhibits.

13. Deposition Testimony of Peter Williams, with exhibits.

3

EXHIBIT 14

**Summary of Opinions**

Based on my experience in the handling, review, and denial of claims, it is my opinion that Atlantic Specialty Insurance Company (Atlantic) properly conducted a thorough and timely investigation into the circumstances surrounding the Extra Expense claim as presented by the plaintiffs and made a reasonable determination under the terms and conditions of the applicable policy of insurance that the war exclusion applied and therefore could make no payment to the insured. Atlantic acted as a reasonable carrier would by staying in communication with its insured during the investigation stage of the claim, and by providing updates on its analysis on coverage. Atlantic then proceeded to provide the insured with a clear and detailed explanation of the denial in an expedited manner as requested by the insured. Atlantic also responded in a complete and timely manner to a request by the insured for reconsideration. Atlantic continued to communicate with its insured in efforts to discuss the coverage issues and reach some negotiated resolution, including through an in-person meeting and a settlement offer.

It is my opinion that this determination—that coverage was precluded by applicable exclusions in the policy—was made solely from the specific circumstances as they were made known to, investigated by, and considered by Atlantic Specialty Insurance Company, and those circumstances were considered in light of the policy contract wording. Nothing in the claim file or in any other actions of Atlantic Specialty indicates that any other extraneous motives affected the ultimate claim decision.

**Discussion**

The actions and activity leading up to the various circumstances that came into focus in early July of 2014 between Israel and Hamas in the Gaza Strip has been

4

documented through many sources and news reports.  Following is a small sample of the reporting, which according to the claim file materials were reviewed and considered by Atlantic:

https://www.washingtonpost.com/news/worldviews/wp/2014/09/03/heres-what-really-happened-in-the-gaza-war-according-to-the-israelis/?utm_term=.e7ccbabd8102

http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies

http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

https://www.nytimes.com/2014/08/30/world/middleeast/50-days-of-war-leave-israelis-and-palestinians-only-more-entrenched.html

http://time.com/3076594/israel-gaza-cease-fire-hamas-netanyahu/

According to the claim materials maintained by Atlantic, the insured notified Atlantic Specialty Insurance Company by telephone call on July 11, 2014 that due to the outbreak of hostilities they believed that the Imminent Peril portion of the Extra Expense coverage in the policy could be applicable and that they would delay the resumption of filming one of their productions, namely *DIG*, in Israel for one week. Within a very short time period, due to the ongoing conflict, the production was ultimately moved to Croatia and New Mexico.

It is my understanding that the insured sought Extra Expense coverage, in connection with its position that the Imminent Peril condition would apply.  Due to

EXHIBIT 14

the facts that were presented to Atlantic, Atlantic quickly began to review the facts in the context of the several war exclusions in the policy, which are set out here:

III. EXCLUSIONS APPLICABLE TO ALL SECTIONS OF THIS POLICY

This policy does not insure against loss or damage caused directly or indirectly by:

1. War, including undeclared or civil war, or

2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents, or

3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

4. Any weapon of war including atomic fission or radioactive force, whether in time of peace or war;

In considering all the factors that are entering into an analysis at the time of a coverage determination, it is my understanding from the custom and practice of the industry that unless a term is specifically defined in a policy, it is to be viewed as it is commonly used or ordinarily understood.

In looking at the entire political situation in the Middle East and the historical perspective of the Israeli and Palestinian relationship, the claim materials indicate that Atlantic noted some points and some research that appeared to be important to understanding the reasonable application of the terms and conditions of the contract at issue here, and the application of the common use and understanding of the terms in the contract.

1. Hamas directed its military force to engage in rocket attacks on Israel in June and July 2014.
2. Israel engaged in not only air strikes directed to the Gaza Strip but also a ground invasion into the Gaza Strip.

6

3.  This ongoing action between the parties continued for a period of time until late August when the Israelis withdrew from Gaza.

4.  During the conflict, 2,143 Palestinians and 69 Israelis were killed, Israel struck 5,283 targets in Gaza, Hamas fired 4,564 rockets into Israel, and more than 50,000 buildings in Gaza were damaged or destroyed.

5.  Hamas is the de facto governing entity in the Gaza Strip and is known to have a military force at its disposal.

6.  The action between the Hamas and Israeli forces was clearly warlike and a majority of the reputable news and media outlets clearly labeled this activity as a "war" including affiliates of the insured, MSNBC and NBC News.

Atlantic, in the analysis of the applicable exclusions noted above, appears to have concluded that the common understanding and ordinary meaning given to the activities that caused the move of the production and any Extra Expense to be incurred by the insured was clearly a "war." In addition, Atlantic appears to have concluded that war occurred between a "government, sovereign," namely Israel, and an "other authority," namely Hamas, the controlling entity in the Gaza Strip. Both entities used military forces as well as "weapons of war," namely: rockets, war planes, and tanks. In regard to its process of research and its analysis of the facts, I found that Atlantic followed a reasonable approach to its analysis and ultimate conclusion.

Communications from the insured make clear that the insured preferred that Atlantic consider this to be a terrorist action merely because the United States has designated Hamas as a terrorist organization. Atlantic's writings communicated the concept that such a designation does not change the fact that the events leading up to and precipitating the moving of the filming were not terrorist attacks but rather

7

EXHIBIT 14

an outbreak and continuation of ongoing hostilities that amounted to a war or warlike actions. Based upon all of its research, which appears to have been comprehensive, especially for the time involved, Atlantic concluded that all the activity involved in these events lead one to the conclusion: that this was a war.

On Friday, July 11, 2014, after hostilities had escalated earlier in the week and security reports seemed to indicate that the production could not be protected, Atlantic was provided with a verbal notice by telephone call to the President of the Entertainment division that a claim would be filed. On Tuesday, July 15, 2014, Atlantic received a written submission of a claim through the ordinary claims-reporting channels. It included a security notice from July 10, 2014, reporting conditions as of that date. At the time of the written notice and on several occasions until a final and detailed, written coverage determination was communicated to the insured, it was made clear through the insured's broker, Aon, that the insured wanted a determination of coverage as soon as possible. Time was of the essence and that was impressed upon Atlantic. In response to this request, Atlantic began its own investigation of the circumstances surrounding the hostilities as well as reviewing all the materials as supplied by the insured on an expedited basis as requested.

Using numerous reliable and authoritative sources, Atlantic thoroughly investigated the circumstances as reported and considered pertinent data in order to produce a substantiated coverage position quickly as the insured had requested. Furthermore, over the period immediately following the notice of loss, Atlantic continued to monitor the ongoing hostilities between Hamas and Israel, including the reporting of a ground invasion of Gaza by Israeli armed forces. It was during this period of time that Atlantic analyzed the information and stayed in contact with its insured (and its broker), communicating its belief, based upon its analysis, that the war exclusions appeared to apply to these facts. In addition to conducting its own

8

independent analysis and reaching a coverage decision, which was made relying on the various news articles and up-to-date reports as the hostilities were unfolding, as well as information provided to it by the insured, Atlantic separately sought legal advice by requesting a coverage opinion to add to the overall process. Ultimately, Atlantic communicated its final conclusion in writing that the war exclusions in the policy would be applicable.

Atlantic continued to stay in communication with its insured and the insured's broker, including through telephone calls of July 15, July 17, and July 22. The file materials indicate that Atlantic provided updates on its ongoing process and its analysis that the war exclusions could apply here in the calls of July 17 and July 22. The file materials also indicate that Pamela Johnson involved her supervisor in the claim review process, and that the ultimate decision of Atlantic was approved by additional supervisory personnel within Atlantic.

After Atlantic arrived at its final conclusion, it provided NBCUniversal Media LLC (NBCU) with a letter on July 28, 2014 that fully explained their reasoning in denying the claim. The letter clearly laid out all the facts as Atlantic came to understand them, and in detail, enumerated the results of their investigation and the reasoning for the application of the exclusion and thus the denial of the claim. The denial was made in an expeditious and timely manner, as the insured had requested, as well as providing a reasonable and complete explanation for the conclusion. The denial documented the prior verbal discussions of the matter as well.

In a response letter dated August 13, 2014, Mitchell Silberberg & Knupp LLP as a representative for NBCU responded to the July 28, 2014 denial letter by presenting their view and requested a reconsideration of the denial. Upon receipt of the letter, Atlantic proceeded to give careful consideration to the points raised. After this consideration, Atlantic still felt that they had reached the proper conclusion in

9

EXHIBIT 14

denying the claim. On September 19, 2014 Atlantic responded to the request for reconsideration with a letter that set forth the position that it remained their conclusion that the insurance policy did not insure the claim. Furthermore, Atlantic proceeded in this letter to once again address all the points as they were raised in the response letter and provide a complete and timely response.

All the activity undertaken by Atlantic in response to the claim as presented and the requests for coverage determination leads me to the opinion that Atlantic acted in compliance with all reasonable insurance industry claim standards and fully and timely communicated the results of their investigation and their conclusion to the insured.   Upon receipt of a request for reconsideration, Atlantic gave serious consideration to the request and responded to it promptly and completely, restating all their reasoning for the continued denial of the claim.

Even after there was disagreement regarding application of the war exclusions, Atlantic continued to make efforts to resolve the claim.  Atlantic met in person with its insured (and the insured's outside counsel) in November 2014, continuing its efforts to discuss the claim and the exclusions.  As a show of good faith, even though it was not obligated to do so, Atlantic made a settlement offer in an effort to resolve the disputed claim.

Atlantic reviewed this claim in the context of a long-standing relationship with this insured, where Atlantic had reviewed and paid many other claims.  This was not a single or isolated incident whereby a single claim was submitted on this policy and not paid.  Atlantic demonstrated in the ongoing relationship that it certainly would pay covered claims under the policy.  It seems clear from what I have reviewed that, while Atlantic was willing to make very significant payments to the insureds in the past, exceeding $4 million in a prior single policy period, it was not willing to pay

10

this claim only because it, in good faith, had concluded the claim was excluded under the policy.

Atlantic in the handling of this claim took all steps that a reasonable insurer and claim handler would take to determine the pertinent facts and circumstances surrounding this claim. They relied on reputable and trustworthy sources for background information and real-time reporting regarding the hostilities that ultimately caused the insured to make the decision to move the production out of Israel. By expediting their thorough investigation as requested by the insured, Atlantic acted in a manner that reflected best practices as recognized in the insurance industry and made their coverage determination based on the circumstances surrounding this individual claim and the applicable terms and conditions of the policy contract at issue. Atlantic communicated fully and clearly, and continued to do so over the course of the claim's existence.

No facts demonstrate a lack of good faith or failure on the part of Atlantic to act in a reasonable fashion.

Anthony Clark, AIC

March 17, 2017

# EXHIBIT '1'

# *Curriculum Vitae*

Anthony "Tony" Clark
Clark Insurance Arbitration & Consulting, LLC
2100 Pebble Beach Drive
Plainfield, IL 60586-8384
815-260-3140
tclark112@sbcglobal.net

Tony has experience as a field adjuster, claim management officer, and insurance instructor.   Additional experience has been gained through active participation in claim industry trade associations.   Tony is also a certified arbitrator with ARIAS-US.

Tony retired as Head of the Property Claims Division for Allianz Global Corporate & Specialty North America where he managed claims arising from Property, Energy, and Engineering (Builder's Risk) lines of business for large multinational corporate insureds.

Besides being a certified arbitrator with ARIAS-US, he is available to act as a consultant to the claims industry either as an auditor, coverage and claim handling expert or consultant, appraisal umpire, or arbitrator in various other matters where he has a particular interest and feels that he can contribute. The practice is not limited to representation of either the client or company side of the business.

History:

February 2014 to Present – Self-employed as Principal, Clark Insurance Arbitration and Consulting, LLC.

Tony has been retained in sixteen litigation matters as an expert providing opinions regarding industry custom and practice in the application of coverage provisions and the appropriateness of the claim handling activity.  He has also been retained as a party arbitrator in three reinsurance disputes.  One matter, a boiler and machinery reinsurance coverage dispute, has been concluded with an award.  Another boiler and machinery matter is still open.  A third reinsurance dispute recently settled just prior to the scheduled arbitration hearings.  Finally, he was retained as a party arbitrator in a direct insurance arbitration regarding application of code issues, building valuations, and business interruption value and coverage, but that matter settled prior to any action by the arbitration panel.  Tony will be providing lessons plans and seminars for an independent adjusting company as well.

Expert report and deposition for defendants. United States District Court for the Western District of Missouri at Kansas City, Case No. 4:13-cv-00945-ODS, Performing Arts Community Improvement District, Plaintiff v. Ace American Insurance Company, Defendant.

Expert deposition for defendant. Superior Court of the State of California, County of Los Angeles, Case No. BC45397. Northrop Grumman Corp., Plaintiff vs. Aon Risk Insurance Services West, Inc., Defendant. (Matter settled before deposition was transcribed.)

Expert report and deposition for defendant. United States District Court for the Northern District of Illinois, Eastern Division, Case No. 13-CV-03482, PQ Corporation, Plaintiff, vs. Lexington Insurance Company, Defendant.

October 2003 to January 2014 - Vice President Property Claims - Allianz Global Corporate & Specialty (AGCS)

> Head of Property Claims Department for Americas
>> Included US, Canada, Mexico, Brazil
>> Responsible for Property/Energy/Engineering (Builders Risk and Power Generation) Lines of Business
>> Member of Executive Management Team
>> Manage claims staff
>> Manage litigation
>> Negotiate and conclude claims with clients, brokers, and representative counsel
>> Interact with Underwriting Department on coverage and lessons learned
>> Provide Local/Global Management reports
>> Participate in Global projects and Global Claims Council
>> Participate in Market Management Client/Broker Meetings
>> Presenter at Global Managers meetings – Business Income 2010 and Thailand Flood Lessons Learned Supply Chain Coverage 2012

May, 1999 to Sept. 2003 - Manager Professional Development – VeriClaim (formerly McLarens Toplis)

> Conduct Educational Seminars for all level of adjusters, internal and client
>> Basic Adjusting Skills, e.g., estimating, investigating, reporting
>> Advanced Commercial Adjusting
>> Business Income, incl., Gross Earnings, Loss of Profits, Extra Expense, Expediting Expense, Rental Income and Value, Stated Value Forms
>> Specialized Coverage, e.g., Boiler and Machinery, Inland Marine

Conduct Internal Audits and Client External Audits
Function as Executive General Adjuster on assigned losses

July 1976 – April 1999 - Progression from Adjuster Trainee to Assistant Vice President
Property, Continental Insurance Company – CNA purchased Continental 1996

Supervision of 18 member General Adjusting Staff

Home Office Supervision Responsibility for claims over $5M for marine and international divisions.

Home Office responsibility for subrogation/salvage recovery 1993 - 1994

Catastrophe Coordinator – Responsibility for initial survey, set-up, and supervision of major losses.   (Andrew, Northridge Earthquake, various Hurricanes / Catastrophes 1990 through 1999)

Setup Project for evaluation of third party business income losses resulting from Exxon Valdez oil spill on behalf of Trans-Alaska Pipeline Fund - 1991. Evaluated claims for lost income presented by Native American Tribes and several major fishing/canning operations.

Primary Developer and Instructor for Advanced Property Training Program 1984 - 1999

Eight week course of study over two year period covering over 20 topics relating to Commercial Adjusting – Trained over 60 participants

Industry Involvement:

AIC designation granted June 1981

RPA (Registered Professional Adjuster) designation granted December 1998, Retired 2014

Member RPA Board of Directors 2007 to 2013

Member RPA Education Committee 2000 to 2005

Member – LEA (Loss Executives Association) – 1996 to 2013 (Retired 2014)

Panelist LEA Education Conference

Response to Dirty Bomb Attack - 2005

Appraisal in Major Losses - 2007

Member PLRB Claims Conference Planning Committee 2000 to 2007

PLRB Claims Conference Vice-Chairman - 2006, Chairman - 2007

Member PLRB Regional Advisory Board 2004 to 2005

Member PLRB Property and Liability Advisory Board 2006 to 2013

Workshop Panelist PLRB Claims Conference

Catastrophe Review 1986 through 1998 inclusive

Most Asked Coverage Questions 1999 & 2000

Property Communication 2003

Appraising Large Commercial Losses 2008-2009

Equipment Losses, A Different Adjustment Challenge 2011

Dram Shop Mock Trial – Role as the Judge 2014

Mediation – Removing the Mystique 2015 and 2016

Anthony "Tony" Clark                          Curriculum Vitae                                          3

EXHIBIT 14

Business Income Presentation
    NJ Chapter of CPCU Society – 1994
    Chicago Chapter of IMUA - 2005
Ethics Presentation
    RPA meeting - 2000 and 2004
    ISO Catastrophe Conference – 2001
    Combined Claims Conference in California – 2002
    Combined regional meeting NAIIA & RPA – 2007
Earthquake Preparation Seminar Memphis I-Day – 1995
Panelist – IFAA (International Federation of Adjusting Associations),
    Educational Conference – Catastrophe Claims - 2015
Panelist on Inland Marine Insurance topic at CPCU annual meeting 2004
Faculty Member at ARIAS-US Spring Conference – Supply Chain Coverage
Issues – 2013
Vericlaim Inc., Instructor, Generation Next development seminars, 2016
through 2017
Member – Boiler and Machinery Association of Chicago 1996 - 2003
Member – Western Loss Association - 2010 - 2013
Member Arbitration Panel (5 member) for two arbitrations representing
Boiler and Machinery aspect – Boiler and Machinery vs. Property – 1993
Party Arbitration (3 member) representing property carrier – Boiler and
Machinery vs. Property – 2002

Education:
St. Mary's Seminary, Perryville, MO
    Bachelor of Science - 1971
    Major - Philosophy
    Minors – Mathematics and Education
Catholic University, Washington, DC
    Graduate Studies in Philosophy
DeAndreis Seminary, Lemont, IL
    Graduate Studies in Theology

# EXHIBIT 15

Page 1

1                UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
2                    WESTERN DIVISION
    ---------------------------------------------------
3

    UNIVERSAL CABLE PRODUCTIONS LLC,
4   a Delaware limited liability company,
    and NORTHERN ENTERTAINMENT PRODUCTIONS, LLC,
5   a Delaware limited liability company,
6                  Plaintiffs,           Case No.
                                     2:16-cv-4435-PA-MRW
7   -vs-
8   ATLANTIC SPECIALTY INSURANCE COMPANY,
    a New York insurance company,
9
                   Defendant.
10
    ---------------------------------------------------
11
12  ** CONTAINS CONFIDENTIAL PORTIONS BOUND SEPARATELY **
              *  PAGE 36 & PAGES 66-67  *
13
                  VIDEOTAPED DEPOSITION
14
                         OF
15
                THERESA A. GOOLEY WOLF
16
                       VOLUME 1
17
             Wednesday, February 8, 2017
18
19
20
21
22
23
24
    Job No. 118730
25  Reported By:  Amy L. Larson, RPR

1    APPEARANCES:

2        MITCHELL SILBERBERG & KNUPP

         11377 West Olympic Boulevard

3        Los Angeles, CA 90064

4        By:  Lucia Coyoca, Esq.

         For:  Plaintiffs

5

6

         STRASBURGER & PRICE

7        901 Main Street

         Dallas, TX  75202

8

         By:  Toni Scott Reed, Esq.

9            Michael Keeley, Esq.

         For:  Defendant/Deponent

10

11       ALSO PRESENT:  Ben Abraham, Videographer

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 15

1    INDEX:

2    EXAMINATION BY:                                       PAGE

3    Ms. Coyoca......................................6

4    CONFIDENTIAL - BOUND SEPARATELY AS DESIGNATED BY:

5    Ms. Scott Reed.......................36, 66, 67

6    EXHIBITS MARKED FOR IDENTIFICATION:

7    Exhibit 31.....................................93
     July 2014 E-mail Chain

8    Subject:  Act of war exclusion -
     Are you available for a short call?

9    Bates ATL001571 - ATL001572

10   Exhibit 32....................................163
     July 2014 E-mail Chain

11   Subject:  Privileged & Confidential
     Bates ATL001800 - ATL001801

12

     Exhibit 33....................................167

13   7/28/14 E-mail
     Subject:  NBC Coverage determination -

14   They want it this morning
     Bates ATL001847 - ATL001855

15

     Exhibit 34....................................182

16   7/28/14 E-mail
     Subject:  NBC - DIG -

17   Coverage determination.docx
     Bates ATL001858 - ATL001866

18

     Exhibit 35....................................260

19   October 2014 E-mail Chain
     Subject:  Theresa Gooley's Contact

20   Bates AONNBCU0000079 - AONNBCU0000080

21   Exhibit 36....................................262
     October 2014 E-mail Chain

22   Subject:  Dig Claim
     Bates AONNBCU0003533 - AONNBCU0003534

23

     Exhibit 37....................................276

24   3/9/15 E-mail
     Subject:  NBC

25   Bates ATL002459

Page 4

1   INDEX:  (Cont'd.)

2   EXHIBITS MARKED FOR IDENTIFICATION:     PAGE

3   Exhibit 38....................................278

    November 2014 E-mail Chain

4   Subject:  NBCU TV Claims Process

    Bates ATL002435 - ATL002435,

5   ATL002429 - ATL002431

6   Exhibit 39....................................291

    June 2015 E-mail Chain

7   Subject:  NBCU - Meeting

    Bates ATL002495 - ATL002496

8

    PREVIOUSLY MARKED EXHIBITS:

9

    Exhibit 1.....................................128

10  Motion Picture/Television Producers

    Portfolio Declarations

11  Bates ATL003073 - ATL003127

12  Exhibit 15.....................................44

    General Claims Practices

13  Bates ATL000735 - ATL000744

14  Exhibit 16.....................................85

    Core Principles

15  Bates ATL000731 - ATL000732

16  Exhibit 18....................................188

    7/28/14 Letter to NBC Universal Media

17  Bates ATL000094 - ATL000101

18  Exhibit 19....................................221

    8/13/14 Letter from Mitchell,

19  Silberberg & Knupp, LLP

    Bates ATL000087 - ATL000093

20

    Exhibit 20....................................250

21  9/19/14 Letter to Mitchell,

    Silberberg & Knupp, LLP

22  Bates ATL000705 - ATL000708

23

24

25

Page 5

1    THE VIDEOTAPED DEPOSITION OF THERESA A. GOOLEY

2    WOLF, taken on this 8th day of February, 2017, at

3    the Law Offices of Meagher & Greer, PLLP, 33 South

4    Sixth Street, Suite 4400, Minneapolis, MN 55402,

5    commencing at approximately 10:08 a.m.

6

7              P R O C E E D I N G S

8

9              THE VIDEOGRAPHER:  This is the

10   start of tape labeled number 1 of the

11   videotaped deposition of Theresa Gooley in

12   the matter Universal Cable Productions, LLC

13   v. Atlantic Specialty Insurance Company in

14   the United States District Court, Central

15   District of California, Western Division.

16             This deposition is being held at

17   Meagher & Geer on February 8th, 2017, at

18   approximately 10:08 a.m.  My name is Ben

19   Abraham, I'm the legal video specialist from

20   TSG, Incorporated, headquartered at 747 Third

21   Avenue, New York, New York.  The court

22   reporter is Amy Larson in association with

23   TSG Reporting.

24             Will counsel please introduce

25   yourselves.

Page 6

1                    MS. COYOCA:  Good morning.  My

2         name is Lucia Coyoca, C-O-Y-O-C-A, of

3         Mitchell, Silberberg & Knupp.  I represent

4         the plaintiffs in this matter.

5                    MS. SCOTT REED:  My name is

6         Toni Scott Reed of the law firm

7         Strasburger & Price.  I represent the

8         defendants Atlantic Specialty Insurance

9         Company, as well as this witness presented

10        here today.

11                   THE VIDEOGRAPHER:  And will the

12        court reporter please swear in the witness.

13

14                   THERESA A. GOOLEY,

15             a witness in the above-entitled action,

16             after having been first duly sworn, was

17             deposed and says as follows:

18

19                        EXAMINATION

20     BY MS. COYOCA:

21     Q.  Good morning, Ms. Gooley.  Could you please

22         state your full name and address for the

23         record.

24     A.  Sure.  It's Theresa Anne, A-N-N-E, Gooley,

25         G-O-O-L-E-Y, Wolf, W-O-L-F.  And you want my

1    home address?

2    Q.  Actually, business address is fine.

3    A.  I don't -- I can't --

4    Q.  Okay.  Who do you work for?

5    A.  I work for Travelers, and it's in St. Paul,

6        Minnesota.

7    Q.  Okay.  And why don't you give us your home

8        address.

9    A.  4901 Winsdale Street North, and that's

10       Golden Valley, Minnesota 55422.

11   Q.  Thank you.

12              So, Ms. Gooley, have you ever had

13       your deposition taken before?

14   A.  Yes.

15   Q.  How many times approximately?

16   A.  About five.

17   Q.  And when was the last time you had your

18       deposition taken?

19   A.  December of 2016.

20   Q.  Okay.  Since that was relatively recently,

21       I'm not going to belabor the preliminaries

22       too much, I just want to go over a few ground

23       rules.

24              As you know, you need to give verbal

25       responses to all the questions I'm asking

EXHIBIT 15

1    today, no shakes of the head or nods of the

2    head.  The court reporter can't take any of

3    that down.

4             If you don't understand a question,

5    I would ask that you please ask me about it

6    and I will seek to try to clarify it for you.

7    If you want to take a break at any time,

8    that's completely fine.  You mentioned off

9    the record that there may be a need to take

10   more breaks, and that's fine, I would just

11   ask that you not do so while a question is

12   pending.

13            Are you taking any medications or

14   are you under any physical or mental duress

15   that would prohibit your ability to give your

16   best testimony here today?

17   A.  No.

18   Q.  Thank you.

19            Can you think of any reason why your

20   deposition should not go forward today?

21   A.  No.

22   Q.  Okay.  At the end of these proceedings the

23   court reporter is going to be transcribing

24   all of my questions and all of your answers

25   verbatim.  You'll have an opportunity to

1       review the transcript, correct it if you have

2       any corrections or make any changes that you

3       care to make; however, I do caution you that

4       any changes that you do make may be the

5       subject of comment at trial.  Do you

6       understand that?

7   A.  I do.

8   Q.  Thank you.

9           Could you please describe your

10      educational background starting from college

11      moving forward?

12  A.  I graduated from the University of Minnesota,

13      Minneapolis, from the Carlson School of

14      Management with a finance degree, and then I

15      worked for a year, and then I went to law

16      school at Drake Law School in Iowa and

17      graduated in 1994.  And then I -- let's see,

18      I'm trying -- yup, that's -- that is it.

19  Q.  When did you receive your undergraduate

20      degree?

21  A.  Nineteen ninety.

22  Q.  And you indicated you worked for a year in

23      between undergrad and law school; is that

24      correct?

25  A.  That's correct.

Page 10

1    Q.  Where did you work?

2    A.  I worked at Medtronic.

3    Q.  Doing what?

4    A.  More accounting-related things.

5    Q.  Do you have any degrees beyond your JD from

6        Drake Law School?

7    A.  No.

8    Q.  No LLMs or anything like that?

9    A.  No.

10   Q.  Do you have any kind of certificates or

11       specializations in any particular legal area?

12   A.  No.

13   Q.  Have you attended any continuing legal

14       education that specifically focused on

15       insurance?

16   A.  Yes.

17   Q.  Can you please describe for me the nature of

18       such continuing legal education just

19       generally?

20   A.  I've attended Tort Trial Insurance, they have

21       different events and I've attended those,

22       they focus primarily on first-party fidelity

23       coverage.  I've, you know, just attended CLEs

24       here and there that may have addressed, like,

25       directors and officers insurance,

1          employment-related insurance, coverage

2          insurance in general.

3     Q.   Okay.  With respect to continuing legal

4          education, have you taken any seminars or any

5          kind of courses with respect to best

6          practices in terms of claims handling?

7     A.   We -- at OneBeacon they did -- they had -- we

8          had training for different states, so I know

9          that I did some in California and -- but like

10         best practices just consistent with what the

11         requirements are in the different states.

12    Q.   Okay.  With respect to your OneBeacon

13         training for different states, and

14         specifically focusing on California, when did

15         that training take place?

16    A.   I'm -- I think it took place on more than one

17         occasion.  I'm trying to remember when the

18         last time would have been.  Maybe sometime in

19         2015.  I apologize, I simply can't remember

20         the dates.

21    Q.   How many -- that's fine.  If you can't

22         remember, that's fine; however, I am entitled

23         to your best recollection, so I may need to

24         probe that from time to time.

25              You indicated that it may have

EXHIBIT 15

Page 12

1        occurred in 2015; is that correct?

2    A.   Yes.

3    Q.   How long did the training take place, the one

4        that occurred in 2015?

5    A.   It would have been about an hour.

6    Q.   You also indicated that you attended

7        California focused best practices claims

8        handling, legal education seminars more than

9        once; is that correct?

10   A.   I --

11                   MS. SCOTT REED:  Objection; form,

12       misstates the witness's testimony.

13                   THE WITNESS:  We've -- at

14       OneBeacon we had training.  I don't know that

15       we entitled it the best practices, but it was

16       consistent with what the requirements are in

17       California --

18                   MS. COYOCA:  Okay.

19                   THE WITNESS:  -- in terms of,

20       like, claim handling --

21                   MS. COYOCA:  Okay.

22                   THE WITNESS:  So, yes.

23   BY MS. COYOCA:

24   Q.   So you indicated you attended California

25       focused training more than on one occasion;

EXHIBIT 15

1      is that correct?

2   A.   Yes, that's correct.

3   Q.   Approximately how many times?

4   A.   I'd say at least two.

5   Q.   Was it more than two?

6   A.   I can't remember.

7   Q.   And on both occasions did the seminar take

8        approximately an hour?

9   A.   Yes.

10  Q.   Who presented it?

11  A.   On the -- I think the -- the last occasion it

12       was an attorney in -- in California, and I

13       don't recall who presented it before that.

14  Q.   And the attorney in California, was that an

15       attorney associated with OneBeacon?

16  A.   No.

17  Q.   Who was the attorney?

18  A.   I can see him, I just can't think of what his

19       name is.  I can't recall what his name is.

20  Q.   Okay.  Was he from an outside law firm then?

21  A.   Yes.

22  Q.   And was it an attorney that OneBeacon uses to

23       handle legal matters for OneBeacon; do you

24       recall?

25                  MS. SCOTT REED:  Objection to

EXHIBIT 15

Page 14

1          form, foundation.

2                    THE WITNESS:  It's an attorney

3          that OneBeacon had used, yeah, for coverage

4          matters.

5    BY MS. COYOCA:

6    Q.  Was the attorney Gene Weisberg?

7    A.  No.

8    Q.  Was the attorney Leon Gladstone?

9    A.  No.

10   Q.  Did the training take place in California?

11   A.  No, in Minnesota, a teleconference.

12   Q.  And can you please describe your employment

13         background just generally from graduation

14         from law school forward?

15   A.  So after I graduated from law school, I

16         clerked for the District Court here in

17         Minneapolis for former Judge Sean Rice, and

18         then former Judge Kathleen Blatz, and I also

19         did a rotation with -- she's a current judge,

20         Lancaster, Joan Lancaster, Joan Ericksen

21         Lancaster, it might be Joan Ericksen now.

22                    Then I worked at the Department of

23         Commerce, the Minnesota Department of

24         Commerce for, I want to say, maybe nine

25         months, maybe a year, and then came over to

EXHIBIT 15

Page 15

1    Meagher & Geer, and worked at Meagher & Geer

2    until I went over to what was St. Paul

3    Companies, and that would have been in about

4    2001.

5              And at some point, I think it was

6    2004, 2005, St. Paul and Travelers merged,

7    and so I worked for what is now Travelers

8    through two thousand -- November 2010, and

9    then went to OneBeacon in two thousand --

10   November 2010, and left OneBeacon in December

11   2015.  I worked -- and I started at Travelers

12   again in -- excuse me, June of 2016 and am

13   currently at Travelers.

14   Q.  Okay.  And the work that you did for the

15   Minnesota Department of Commerce for

16   approximately nine months to one year, what

17   did you do while you were there?

18   A.  I worked in the division that -- that worked

19   with the underground storage tanks and

20   environmental cleanup of -- of, you know,

21   underground storage-related tanks.

22   Q.  And you worked as a lawyer?

23   A.  Yes.

24   Q.  Your work for St. Paul Travelers the first

25   time that you worked for them, what did you

1        do for St. Paul Travelers?

2   A.   I was a claim handler.

3   Q.   Did you have any particular area of industry

4        focus?

5   A.   When I initially started, I handled directors

6        and officers, errors and omissions,

7        employment and fidelity-related matters, and

8        that was for about the first five years.  And

9        then thereafter I was the managing director

10       for financial institutions, so focused on

11       claims that our financial institution

12       insureds had, so it could be anything from a

13       community bank to a U.S. Bank to a former

14       Lehman Brothers.

15  Q.   And what was your last position when you left

16       Travelers?

17  A.   Managing director.

18  Q.   Okay.  I believe you indicated you joined

19       OneBeacon entertainment in November of 2010;

20       is that correct?

21              MS. SCOTT REED:  Objection to

22       form, misstates the witness's testimony.

23              THE WITNESS:  Yeah, I went -- yes,

24       I went to OneBeacon in November 2010.

25              MS. COYOCA:  Okay.

Page 17

1    BY MS. COYOCA:

2    Q.   And what was your position when you were

3         first hired at OneBeacon?

4    A.   Again in claims.  I was the vice-president of

5         claims, so initially I oversaw the -- the

6         financial institution group and what --

7         what -- what is called the government risk

8         group and then the energy group.

9    Q.   And how long did you handle that position

10        overseeing the financial institution group,

11        the government group and the energy group?

12   A.   The government group I -- I've -- my whole

13        tenure at -- at OneBeacon I -- I oversaw.

14        Energy I oversaw -- OneBeacon ultimately

15        moved out of the -- out of energy, and so I

16        oversaw that up through the time that they

17        moved out of the energy in -- I'm trying to

18        think.  I can't remember the exact date.  I

19        want to say it probably was sometime in 2013,

20        but I don't remember the exact date.

21   Q.   What about the financial institutions group?

22   A.   So the financial institutions group, I

23        oversaw that group probably for about four

24        years, and then it transitioned over to

25        somebody else within OneBeacon.

1    Q.   And when you say you oversaw the financial

2         institution group or the energy group,

3         et cetera, what do you mean by the words

4         "oversaw"?

5    A.   Each of -- each of those divisions within

6         OneBeacon had a claim manager and so I

7         oversaw that claim manager.

8    Q.   What position, if -- if there were any

9         different positions other than a

10        vice-president of claims, did you hold while

11        you were employed by OneBeacon?

12   A.   I think my position at all times was

13        vice-president of claims.  I think -- strike

14        that.  My -- it is -- my position at all

15        times was vice-president of claims.  The

16        groups that I oversaw changed during the

17        course of my tenure at OneBeacon.

18   Q.   Other than the three groups that you've

19        already mentioned, what other groups did you

20        oversee?

21   A.   I oversaw the technology group, and the

22        accident and health group, and the

23        entertainment group.  I just want to make

24        sure I'm not missing one.  And the

25        environmental group or excess and surplus.

Page 19

1    Q.   Did you oversee more than one claims manager

2         when you were overseeing the technology

3         group?

4    A.   Yes.

5    Q.   How many?

6    A.   About five or six.

7    Q.   And were all of the claims managers for the

8         technology group, were they all lawyers?

9    A.   There was only one claim manager for the

10        technology group, and she is a lawyer, yes.

11   Q.   And who were the remaining four to five

12        people?

13   A.   You want their names or their --

14   Q.   I do not want that names, I'd just like a

15        description of their positions or work that

16        they did.

17   A.   So for accident and health, he oversaw the

18        accident and health group, and he's not a

19        lawyer.  His oversight included both those

20        groups that handled the OneBeacon claims

21        within OneBeacon and also then TPAs that were

22        used.

23   Q.   Okay.  You know what, let's stop and step

24        back a moment.

25   A.   Okay.

Page 20

1    Q.   So with respect to the technology group, I

2         believe you indicated that you oversaw five

3         to six individuals in that group; is that

4         correct?

5    A.   No, five to six claim managers of the

6         different groups, technology, government,

7         risk, entertainment.

8    Q.   Got it.  So for -- so for each individual

9         group, so for technology group was there just

10        one claim manager?

11   A.   For the technology group, as they grew it

12        changed, but there was one claim manager and

13        then at some point there were a few direct

14        reports to that claim manager.  There are

15        also a number of claim handlers who weren't

16        direct reports to the claim manager who

17        handled the technology-related claims.

18   Q.   Okay.  Focusing on the entertainment group --

19   A.   Perfect.

20   Q.   -- what was the -- who did you oversee at the

21        entertainment group?

22   A.   Pamela Johnson.

23   Q.   Okay.  What was Pamela Johnson?

24   A.   She was the -- the claim manager, I'm not

25        sure if that was the exact title, but the

Page 21

1          claim manager of the entertainment group.

2     Q.   Was there more than one claims manager for

3          the entertainment group while you were

4          overseeing it?

5     A.   She was the head claim person.  At some point

6          just before I left, we had another individual

7          come in and was a claim manager, but not

8          parallel -- it wouldn't have been a parallel

9          position to Pamela Johnson.

10    Q.   When you say not a parallel position, what do

11         you mean?

12    A.   Pamela -- Pamela oversaw the -- the whole

13         entertainment group and then reported up to

14         me.  Her oversight included all the

15         individual claim handlers that handled the

16         entertainment claims and then loosely the

17         other groups that handled other -- that

18         handled other entertainment claims.

19              After Pamela's departure we had --

20         we hired a claim manager but he did not -- he

21         didn't have the experience Pamela did, so he

22         wasn't brought in at the level Pamela was.

23    Q.   And Pamela Johnson, when she was the claims

24         manager, you indicated that there were

25         various claims handlers that reported to her;

Page 22

1        is that correct?

2    A.  That's correct.

3    Q.  How many?

4    A.  I think about five or six.

5    Q.  And how long did you oversee the

6        entertainment group, from what period of time

7        until the end?

8    A.  I oversaw it through December of 2015.  When

9        I started -- let's see, Pamela came in 2012.

10       I think I started probably in 2013.

11   Q.  Who did Pamela report to prior to reporting

12       to you as the --

13   A.  Judy Lamble.

14   Q.  You just need for me to wait to finish my --

15   A.  I'm sorry.

16   Q.  -- my question.  Okay.

17           So Judy Lamble is who Pamela Johnson

18       reported to with respect to entertainment

19       claims prior to reporting to you; is that

20       right?

21   A.  That's correct.

22   Q.  And who were the five or six claims handlers,

23       if you can recall, that Pamela oversaw in the

24       entertainment group?

25   A.  Danny Gutterman, Lucy, and I apologize I

Page 23

1        can't remember Lucy's last name right now,

2        Elyse Reinke, Ryan, and I believe her name is

3        Christine, she sits out in Boston, and then

4        at one point also Jill, and I can't remember

5        Jill's last name either, sorry.

6   Q.   Are any of these individuals that you just

7        identified, are any of them lawyers?

8   A.   No, no.

9   Q.   And when you left the company, I believe you

10       indicated December of 2015, who, if anyone,

11       was still at OneBeacon of the list of claims

12       handlers?

13  A.   From the entertainment group?

14  Q.   From the entertainment group.

15  A.   Ryan, Lucy, Danny, and I believe, again, it's

16       Christine and Elise.

17  Q.   But not Jill; is that correct?

18  A.   Not Jill, no.

19  Q.   As the VP and over -- of claims and

20       overseeing, let's just focus on the

21       entertainment group, what did your

22       responsibilities entail?

23  A.   I worked directly with Pamela.  To the extent

24       I had questions about any claims or she had

25       questions, that would be something we talked

Page 24

1     about.  We would talk generally about what

2     was going on within entertainment, you know,

3     what we were seeing based on claim -- claim

4     volume, types of claims.  My oversight would

5     include staffing, you know, appropriate

6     staffing, monitoring volume, assisting with

7     broker relationships, things like that.

8   Q.  When an entertainment claim would come in,

9     would you receive notice of it?

10  A.  No.

11  Q.  When did you receive notice, if ever, that an

12    entertainment claim had been asserted?

13          MS. SCOTT REED:  Objection;

14    foundation, speculation.

15          THE WITNESS:  At OneBeacon, with

16    the entertainment, the claims, it depended on

17    when they came in in terms of the time

18    period, but generally the claims were

19    supposed to be reported up through our

20    central reporting and that's when the claims

21    were set up.

22          Pamela Johnson would assign the

23    claims.  There may be occasions where Lucy

24    would or Lucy would get a claim and then

25    she'd direct it to be set up.  I would find

Page 25

1    out about particular claims if Pamela was

2    gone or if Pamela let me know about the

3    particular claim.

4  BY MS. COYOCA:

5  Q.  But as a matter of routine course, you did

6    not necessarily receive notice of each

7    entertainment claim that was filed with

8    OneBeacon; is that correct?

9  A.  That's correct.

10 Q.  You indicated that Pamela Johnson would

11    assign the claim.  What did you mean by that?

12 A.  My recollection is if -- when the claim came

13    in, she'd look at the claim and she'd

14    determine which of the claim handlers should

15    handle the particular claim.

16 Q.  What was your understanding as to how she

17    determined who would receive the assignment?

18 A.  I think there's -- there would be a number of

19    factors that would go into her analysis.  I

20    think if there's an existing relationship, if

21    a particular claim handler handles a

22    particular account, we obviously want to keep

23    that claim with the particular account.

24       It could be based on complexity, it

25    could be based on region.  It also -- could

1          also be based on what the actual claim load

2          is of the individual claim handlers and their

3          capacity.

4     Q.   With respect to the complexity factor that

5          you referenced, what about the complex or

6          non-complex nature of the claim would impact

7          the assignment to a particular claims

8          handler?

9     A.   If a claim would be particularly complex, it

10         could go to a less -- it would -- it could go

11         to somebody who is less experienced, but then

12         Pamela would know she would have to -- she

13         would be working side by side with that

14         individual.  If it -- you know, if it fit

15         within -- you know, if it was appropriate for

16         somebody who has already handled that

17         particular type of claim, she might direct it

18         to that particular individual.

19    Q.   Did each of the claims handlers in the

20         entertainment group, while you were there,

21         did each of them have a college degree?

22    A.   Yes, yes.  They all had a college degree.  I

23         don't know that Lucy did.

24    Q.   So they all had a college degree with the

25         exception of potentially Lucy, Lucy may not

1        have; is that correct?

2    A.  That's correct.  And Lucy to -- Lucy handled

3        some claims, but very small claims, and it

4        was really towards the -- towards the end of

5        Pamela's tenure that Lucy started to handle

6        claims.

7    Q.  What was Lucy's role prior to handling

8        claims?

9    A.  She -- I don't know what Lucy's title was,

10       but she had worked with Peter Williams for a

11       number of years.  She essentially ran the

12       whole office and had -- you know, could help

13       anybody with any particular question they may

14       have about systems, about claim setup, about

15       history, about payments, things like that.

16   Q.  So Lucy was officed in Los Angeles?

17   A.  Yes.

18   Q.  And what about Danny Gutterman, was he also

19       officed in Los Angeles?

20   A.  Yes.

21   Q.  Focusing on Danny Gutterman, what was your

22       understanding of Mr. Gutterman's educational

23       background?

24   A.  Danny has a degree from the University of

25       Wisconsin-Madison, he's very bright and

Page 28

1      so -- yeah, that's -- I can't recall what his

2      degree is in, but...

3   Q.  And how long has he worked for OneBeacon, to

4      your knowledge?

5                  THE WITNESS:  Ouch.  Excuse me.

6                  MS. SCOTT REED:  Let's go off the

7      record just a minute.

8                  THE VIDEOGRAPHER:  It's 10 --

9                  THE WITNESS:  Can I take a break

10     for a second and get the --

11                 MS. COYOCA:  Sure.

12                 THE WITNESS:  -- item that fell on

13     my knee?

14                 THE VIDEOGRAPHER:  It's

15     10:37 a.m.  We're going off the record.

16                 (Whereupon, a brief recess

17                 was taken.)

18                 THE VIDEOGRAPHER:  It's

19     10:38 a.m., and we're back on the record.

20                 MS. SCOTT REED:  We removed the

21     piece of the table that fell on the witness.

22     Thank you.  We can resume.

23   BY MS. COYOCA:

24   Q.  Are you okay, Ms. -- Ms. Gooley?

25   A.  Yes, thank you.

1   Q.   Do you need to take any further break to look

2        at your knee or anything like that?

3   A.   No, I'm okay, thank you.

4   Q.   Okay.  Great.

5             So to your knowledge, how long has

6        Danny Gutterman worked for OneBeacon?

7   A.   I think he started sometime in 2013.  I think

8        that's right.  I think it would have been --

9        it was in the spring or early summer, I

10       believe, that he started.

11  Q.   And prior to working for OneBeacon, what did

12       Mr. Gutterman do, if you know?

13  A.   I don't know what his title was, but I have a

14       general -- it's a production assistant or

15       he -- he worked on different productions, and

16       my understanding is he did a handful of

17       miscellaneous jobs associated with the

18       productions.

19  Q.   And did Mr. Gutterman, to your knowledge,

20       have any insurance experience prior to going

21       to work for OneBeacon?

22  A.   I don't believe he did.

23  Q.   To your knowledge, did Mr. Gutterman receive

24       any insurance-related training when he came

25       onboard to work for OneBeacon in 2013?

Page 30

1   A.   He worked directly with Pamela and she

2        provided him with training on the policies,

3        on the coverages, so essentially she was his

4        mentor.

5   Q.   Aside from that mentoring relationship

6        between Mr. Gutterman and Ms. Johnson, did

7        Mr. Gutterman, to your knowledge, attend any

8        formal training sessions with respect to

9        insurance?

10  A.   He would have attended the California

11       training.  Other than that, I -- I don't know

12       whether or not he attended any other formal

13       training sessions.

14  Q.   And when you say, "The California training,"

15       are you referring to the training that was

16       directed to how to handle claims in

17       California?

18  A.   Yeah, the training -- yes, I'm referring to

19       the training regarding the California

20       statutes and the requirements.

21  Q.   Do you know, did Mr. Gutterman attend any

22       training that was directed to how to read an

23       insurance policy?

24  A.   He -- he would have worked with Pamela, so I

25       don't know if he had any formal classes

Page 31

1        independent of Pamela, no.

2   Q.   Right.  That's what I'm asking.  Other than

3        the mentoring relationship that he had with

4        Ms. Johnson as a result of working with her

5        directly, did he attend any formal training

6        classes or seminars that was -- that were

7        directed towards learning how to read an

8        insurance policy?

9   A.   Not that I'm aware of.

10  Q.   This case concerns a claim regarding the

11       television show Dig.  You're aware of that,

12       are you not?

13  A.   Yes.

14  Q.   Okay.  Prior to -- just setting to the side

15       the Dig claim, did you have any experience

16       reviewing any coverage determinations that

17       were made as to any other extra expense

18       claims?

19  A.   I know that I've -- I worked with Pamela on

20       other claims.  I can't recall specific claims

21       at this time, though.

22  Q.   You can't recall any other claims relating to

23       entertainment claims or any other extra

24       expense claims?

25  A.   Any other extra expense claims.

Page 32

1   Q.  And prior to the Dig claim, do you recall

2       working with Pamela on any claims that

3       involved any sort of international violence?

4   A.  Yes.

5   Q.  What other claims?

6   A.  There was another claim that involved a

7       commercial that was being -- they were going

8       to shoot it in -- I believe it was the

9       Middle East, and we had -- they canceled the

10      shooting or they either started it and

11      cancelled it or cancelled it altogether.

12  Q.  Who was the commercial for?

13  A.  I don't remember.

14  Q.  When was that claim made, if you recall?

15  A.  I -- I don't recall when that was made.

16  Q.  Was it shortly before the -- the time that

17      you left the company in December of 2015?

18  A.  No, it was well before that.

19  Q.  Okay.  And I believe you indicated you began

20      overseeing entertainment-related claims in

21      2013; is that right?

22  A.  That's to the best of my recollection.

23  Q.  Okay.  So was the -- do you believe that you

24      oversaw that claim involving a commercial and

25      violence in the Middle East when you were

Page 33

1     with the company beginning in 2010?

2  A.  No.

3  Q.  Twenty eleven?

4  A.  It wouldn't have been before I worked with

5     Pamela.

6  Q.  Right.  I'm just trying to probe your

7     recollection as to when you think this

8     commercial claim might have been made.

9          Is it correct to say that your best

10     estimation of when that claim occurred would

11     have been sometime in 2013 or 2014?

12  A.  That would be correct.

13  Q.  Do you believe that it was prior to the time

14     that you became aware of the Dig claim?

15  A.  Yes.

16  Q.  So is it correct to say that the commercial

17     that was planning on being filmed in the

18     Middle East, as a result of violence in the

19     Middle East, was not filmed there and a claim

20     was asserted as a result of that?

21          MS. SCOTT REED:  Objection to

22     form, vague.

23          THE WITNESS:  I -- honestly, I

24     just remember very few details.  I just

25     remember there was a commercial, a claim

1          involving a commercial that ultimately

2          either, A, wasn't completed or wasn't filmed.

3          Pamela would have the details.

4                    MS. COYOCA:  Great.  Thank you.

5     BY MS. COYOCA:

6     Q.  Did OneBeacon pay on that insurance claim?

7     A.  I don't remember.

8     Q.  Was there an assessment done of whether any

9          potential exclusions applied to that claim?

10    A.  Again, Pamela would be able to tell you that.

11    Q.  Did you review the coverage opinion or the

12         coverage determination before that went out

13         to the insured?

14    A.  I don't recall.

15    Q.  Do you recall whether or not that claim

16         involving the commercial in the Middle East,

17         did it involve the potential applicability of

18         the war exclusion?

19    A.  I, again, don't recall.

20    Q.  I understand you may not recall specifically,

21         I'm just trying to probe your recollection.

22                    It's -- you may not have specific

23         recollections of it, but I do need to probe

24         it to try to understand what you do or do not

25         recall.  Do you understand?

Page 35

1    A.  I do.

2    Q.  Okay.  Do you recall if the claim involving

3        the commercial in the Middle East, if that

4        particular policy involved -- excuse me, had

5        any kind of terrorism coverage?

6    A.  I don't recall.

7    Q.  Do you recall whether or not the policy that

8        involved the Middle East situation in the

9        commercial, whether or not it had a terrorism

10       exclusion?

11   A.  I -- I don't recall.

12                   (The following page 36 is bound

13                    separately under seal pursuant to

14                    protective order.)

15   ///

16

17

18

19

20

21

22

23

24

25

Page 37

1           (Continuation of non-confidential

2           testimony.)

3    BY MS. COYOCA:

4    Q.  Do you recall if the insured was the

5        production company that was actually shooting

6        the commercial or some other entity?

7    A.  I don't recall.

8    Q.  Can you remember or recall any other

9        information about the claim that involved

10       violence in the Middle East and a commercial

11       that was being filmed there?

12               MS. SCOTT REED:  Objection; vague,

13       misstates prior testimony.

14               THE WITNESS:  I -- again, I

15       can't -- all I can recall is having a

16       conversation with Pamela.

17   BY MS. COYOCA:

18   Q.  What was the conversation about?

19   A.  She was just telling me about the claim.

20   Q.  And what did she tell you about the claim?

21   A.  Again, all I remember is just, again, that it

22       was -- I believe it was a commercial and I

23       don't -- they either started shooting or they

24       didn't shoot it at all.

25   Q.  Did Pamela tell you what she intended to do

Page 38

1        with respect to her investigation of the

2        claim?

3    A.   I would guess that she did.  Again, I -- I

4        simply can't remember.

5    Q.   Okay.  Other than the Dig claim, can you

6        recall any other instance while you were

7        working for OneBeacon where you or anyone

8        working for you considered the potential

9        applicability of the war exclusion?

10   A.   Not that I'm aware of.

11   Q.   Prior to working for OneBeacon, did you have

12       any circumstances pursuant to which you were

13       reviewing the potential applicability of the

14       war exclusion to a claim?

15   A.   No.

16   Q.   While you were at St. Paul Travelers, did you

17       have responsibility for seeing any

18       entertainment-related claims?

19   A.   No, I did not.

20   Q.   Do you currently have any responsibility for

21       overseeing entertainment-related claims?

22   A.   No, I do not.

23   Q.   In terms of overseeing Ms. Johnson's

24       management of entertainment-related claims,

25       what specifically were your duties?

Page 39

1   A.   Again, I worked with Pamela on any

2        particularly large claims, any particular

3        claims that had significant coverage issues,

4        and then worked with her on staffing issues,

5        you know, reviewed claims, claim loads,

6        things of that nature.

7   Q.   When you say you worked with her on large

8        claims, what specifically did that entail?

9   A.   Well, if she had -- if we had any particular

10       large claims, she would flag -- flag them up

11       to me and we would generally have a

12       conversation about the particular claims, and

13       depending on the nature of the claim, may

14       have several conversations.

15  Q.   Did you review the work that Ms. Johnson had

16       done in investigating claims?

17  A.   Generally, no.

18  Q.   Would you -- when discussing particular

19       claims with Ms. Johnson, would you question

20       her with respect to the steps that she had

21       taken to investigate a claim?

22  A.   I -- I may question her to make sure that I

23       understood what we had done and what her

24       conclusions were and, you know, what she

25       based those conclusions on.

Page 40

1   Q.   Were there any occasions that you can recall
2        where you would direct Ms. Johnson to go back
3        and do additional work in investigating a
4        claim?
5   A.   No.
6   Q.   While you were overseeing Ms. Johnson's work,
7        did you provide any type of guidance with
8        respect to the steps that should be
9        undertaken when investigating a claim?
10  A.   Generally, no.  Pamela is an expert in the
11       area.  To the extent we have a discussion and
12       we think of something that we would want to
13       probe further, we'd go forward with that, but
14       I trusted Pamela's judgment.
15  Q.   You indicated that Ms. Johnson was an expert
16       in the area; is that correct?
17  A.   Yes.
18  Q.   What did you base that conclusion on?
19  A.   She has significant experience handling
20       entertainment claims.  She also was a trial
21       lawyer, has significant trial experience.
22       She's very bright, very articulate, and she
23       knows a lot of the players in the industry.
24  Q.   And when you say, "She knows a lot of players
25       in the industry," what industry are you

EXHIBIT 15

Page 41

1          referring to?

2    A.   Entertainment.

3    Q.   Had she ever worked for any studio?

4    A.   I don't -- I don't believe she has, no.

5    Q.   Does she have an entertainment-related

6         undergraduate degree?

7    A.   I don't know what her undergraduate degree

8         is.

9    Q.   Did she work for any television production

10        company ever?

11   A.   Not that I'm aware of.

12   Q.   Did she work for any of the agencies, CAA,

13        Endeavor, any of them?

14   A.   Not that I'm aware of.

15   Q.   Did she work for any production-related

16        entity?

17   A.   I -- not that I'm aware of.

18   Q.   Now, when you indicate that she knows a lot

19        of players in the industry, what players are

20        you referring to?

21   A.   She's familiar with the brokers, she's --

22        she's familiar with a lot of the different

23        insureds, and I believe she's familiar with

24        the different attorneys that work in -- in

25        the entertainment industry as well.

EXHIBIT 15

1   Q.   And how long, to your knowledge, had

2        Ms. Johnson worked overseeing

3        entertainment-related claims?

4   A.   She oversaw the entertainment-related claims

5        at OneBeacon, so when she started, which I

6        think was in 2012.  Before that she worked --

7        she -- I don't recall with a her position was

8        with Travelers in terms of whether she

9        directly oversaw people and also handled

10       claims, but my understanding is she handled

11       entertainment claims at that time as well.

12  Q.   So your understanding is that she handled

13       entertainment-related claims in some capacity

14       while she worked for Travelers; is that

15       correct?

16  A.   That's my understanding.

17  Q.   And prior to working for Travelers, what was

18       her entertainment-related experience, to your

19       knowledge?

20  A.   I don't know.  I -- I don't know.

21  Q.   Other than her work for Travelers handling

22       entertainment-related claims prior to coming

23       to work for OneBeacon, are you aware of any

24       other specific work experiences that

25       contributed to her expertise in the

EXHIBIT 15

Page 43

1       entertainment industry?

2   A.  I'm not aware of any particular, no.

3   Q.  Are you aware of any entertainment, not

4       insurance, entertainment industry

5       affiliations that contributed to your

6       understanding as to why she had an expertise

7       in the entertainment industry?

8               MS. SCOTT REED:  I'm going to

9       object, vague and misstates her prior

10      testimony.

11              THE WITNESS:  What -- what do you

12      mean by, "Affiliations," please?

13  BY MS. COYOCA:

14  Q.  So, for example, do you know if she was a

15      member of the Screen Actors Guild, the

16      Writers Guild, the DTA, any other industry

17      associated group that would give her -- the

18      Copyright Society, any other industry,

19      entertainment industry, group or association

20      that would have given her some expertise in

21      the entertainment industry?

22  A.  I'm not aware.

23  Q.  And, again, just to close it out, are you

24      aware if she has any kind of educational or

25      academic training or study in the

Page 44

1      entertainment industry?

2    A.   I'm not aware, no.

3    Q.   Okay.  I'd like to show you a document,

4         Ms. Gooley, that has previously been

5         identified as an exhibit to Danny Gutterman's

6         deposition.  So I'm going to go ahead and

7         give you that.  (Hands document.)

8              And for the record, this document is

9         titled, "General Claims Practices," and it's

10        labeled Bates control numbers ATL000735

11        through 743.  Could you please take a moment

12        to familiarize yourself with this document?

13   A.   Yes.

14   Q.   Please let me know when you're ready for

15        questions.

16   A.   Okay.  (Reviews document.)  I'm done

17        reviewing the document.

18   Q.   Thank you.  Are you familiar with this

19        document?

20   A.   Yes.

21   Q.   What is it?

22   A.   It's called the General Claims Practices.

23   Q.   Were you familiar with it before you just

24        read through it?

25   A.   Yes, I've seen it before.

Page 45

1    Q.   When did you see it?

2    A.   When I was at OneBeacon.

3    Q.   Was it the General Claims Practice --

4         practices that were in effect at the time

5         that you were working for OneBeacon?

6    A.   Yes, it was.

7    Q.   Was there any entertainment-related claims

8         practices document?

9    A.   Not that we use, no.

10   Q.   Regardless of whether you used it, were you

11        aware whether or not there was an

12        entertainment-related claims practices

13        document?

14   A.   No.

15   Q.   Did you ever become aware that Mr. Williams

16        had an entertainment-related claims practices

17        document?

18   A.   No, I did not.

19   Q.   Did you ever speak with Ms. Johnson about the

20        need to develop a claims practices manual or

21        guidelines for the handling of

22        entertainment-related claims?

23   A.   No.

24   Q.   Did you ever direct anyone at OneBeacon to

25        develop a claims practices manual or

Page 46

1    guidelines for the handling of

2    entertainment-related claims?

3  A.  No, I did not.

4  Q.  With respect to the fifth bullet point on

5    page 735 where it indicates, "Review and

6    assess coverage provided to the insured by

7    applicable policies," do you see that bullet

8    point?

9              MS. SCOTT REED:  Counsel, are we

10   talking about bold bullet points, circle

11   bullet points?

12             MS. COYOCA:  The blacked-in bullet

13   points, and it would be the language as I

14   just indicated that reads, begin quotes,

15   "Review and assess coverage provided to the

16   insured by applicable policies issued by us

17   in accordance with applicable state law."

18  BY MS. COYOCA:

19  Q.  Do you see that provision?

20  A.  I do.

21  Q.  And it's on page ATL000735.  Do you see that?

22  A.  Yes.

23  Q.  Okay.  What was your understanding of the

24    meaning of that provision?

25  A.  My understanding is that when you -- when we

Page 47

1      receive a claim, we look at the facts and

2      then we -- we analyze coverage based on the

3      facts given the existing policies in place

4      with the insured.

5   Q.  What comes first, the review of the facts or

6      looking at the provisions of the policy?

7   A.  You look at them in both.  I don't know that

8      one necessarily comes before the other.

9   Q.  Now, when you say you need to look at the

10     facts, what do you mean by that?

11  A.  For instance, if you had a complaint on a

12     liability policy you'd want to look at what

13     the allegations are in the complaint against

14     the insured and then you want to look at that

15     in the context of what the applicable policy

16     is.

17  Q.  Okay.  Let's focus, though, on first-party

18     claims.  If there was a first-party claim,

19     how would you look at the facts?

20  A.  It would depend on the nature of the claim,

21     but you would begin with what the insured

22     provided you.  From there you may ask the

23     insured additional questions and you may also

24     engage in an outside investigation yourself.

25  Q.  Can you think of any other things that could

Page 48

1        be done in order to look at the facts?

2    A.   Again, it depends on what the type of claim

3         is.  But if we assume it's a first-party

4         claim, we want to look at what the insured

5         provided us, we want to see what questions

6         that raises in our mind.  We may ask for

7         additional documentation, we may ask for

8         additional communication, we may ask to talk

9         to individuals within the insured company or

10        we may talk to individuals that work for

11        them, we may also do outside investigation

12        which could include looking at, you know,

13        media clips, looking at -- looking at any

14        other thing that may be relevant.

15   Q.   Are there circumstances pursuant to which --

16        and, again, focusing on a first-party

17        claim -- OneBeacon would retain the services

18        of an independent claims adjuster?

19   A.   There are occasions when OneBeacon would

20        retain an independent claim adjuster.  It

21        would depend on the nature of the claim and

22        it would also depend -- I mean, there --

23        there are a number of facts that would go

24        into whether or not they think it was prudent

25        to retain an independent adjuster.

Page 49

1        Generally, we don't do that, though.

2   Q.   Focusing again on just entertainment-related

3        claims, are there -- were there circumstances

4        pursuant to which OneBeacon would retain the

5        services of an independent adjuster in order

6        to investigate an entertainment-related

7        claim?

8   A.   There are circumstances where they might

9        retain an independent adjuster, yes.

10  Q.   And under what circumstances would OneBeacon

11       decide to use the services of an independent

12       adjuster in order to investigate, again,

13       focusing on an independent first-party claim?

14  A.   There might be an occasion where we have, say

15       for instance, Sandy or something where

16       there's so -- there's such a volume of claims

17       that we want to make sure that we get to the

18       particular claim, so we may enlist an

19       independent adjuster.

20            We may enlist them to help us with

21       particular pieces of the investigation,

22       because we want to make sure that we, you

23       know, do a thorough investigation, but it is

24       also timely.

25            So -- so those would be

Page 50

1    circumstances where we may -- we may have

2    retained an independent adjuster.

3  Q.  What if the factual circumstances of the

4    claim involved an area that was not of common

5    understanding or knowledge?

6         MS. SCOTT REED:  Objection; vague,

7    ambiguous.

8  BY MS. COYOCA:

9  Q.  You can answer the question.

10 A.  I'm trying to think of a particular type of

11    claim where we wouldn't have the common

12    understanding or knowledge.  Again, we might

13    retain independent -- an independent adjuster

14    to help us with a slice of it, but, again, we

15    feel at least the way OneBeacon is structured

16    that we have -- we have the skill level and

17    the experience to handle claims.

18 Q.  You indicated in one of your prior answers

19    that you want to make sure that you do a

20    thorough investigation.  What do you mean by

21    thorough investigation?

22 A.  A thorough investigation is we want to make

23    sure that we look at what we see as the

24    totality of the evidence and the information

25    and then reach a conclusion.  So, again, it

Page 51

1      depends on the nature of the facts of the

2      claim what -- what that may or may not

3      entail.

4   Q.  When -- when you are overseeing a claims

5      manager, is it -- or focusing on your time at

6      OneBeacon, was it your practice to look at a

7      claim from the standpoint of all potential

8      coverages that might apply to the claim?

9   A.  Absolutely.

10  Q.  When you look at the possibility of other

11     coverages that could potentially apply to a

12     claim, did you consider the claim from the

13     standpoint of the insured's perspective as

14     opposed to just OneBeacon's?

15             MS. SCOTT REED:  Objection; vague,

16     ambiguous.

17             THE WITNESS:  At OneBeacon, when

18     we look at a claim we look for coverage, we

19     look across all lines, all policies that we

20     write, we always look.  The insured's

21     interests are paramount over OneBeacon's.

22  BY MS. COYOCA:

23  Q.  The insured's interests are paramount over

24     OneBeacon's; is that correct?  That's what

25     you're saying?

Page 52

1   A.   That's correct.  That's correct, yes.

2   Q.   When you indicated the need to do a thorough

3        investigation, was it -- was it important not

4        to rush an investigation?

5                    MS. SCOTT REED:  Objection; vague.

6                    THE WITNESS:  I think that you're

7        always balancing facts, right?  I mean,

8        thorough could take ten years if you want to

9        do that.  I mean, you always have to balance

10       it with the timing, both whether the insured

11       needs an answer quickly or -- so we balance

12       both of those.  We want to do a thorough

13       investigation, but we also have time

14       pressures to get it done in a timely fashion.

15   BY MS. COYOCA:

16   Q.   If there's a time pressure to get it done in

17        a certain time frame, but there is a question

18        about whether a claim is covered or not

19        covered, wouldn't a potential option be to

20        issue a reservation of rights on the claim,

21        again, speaking to a first-party claim?

22                    MS. SCOTT REED:  Objection; vague.

23                    THE WITNESS:  I mean, I think

24        there's several options.  If you're

25        continuing with your investigation and you

1    need additional information, then you let the

2    insured know what -- what additional

3    information you need before you can reach a

4    coverage decision.  If you feel like you've

5    got enough information then -- and you're in

6    a position to issue a coverage -- a coverage

7    determination, then you'd want to let the

8    insured know right away.

9  BY MS. COYOCA:

10  Q.  So in your view, if there was a close

11     question, it would not be appropriate to

12     accept a claim, but do it subject to a

13     reservation of rights and then continue to

14     look at the coverage issue?

15              MS. SCOTT REED:  Objection to

16     form, misstates this witness's testimony.

17              THE WITNESS:  What -- I -- I think

18     that -- what do you mean by accept a claim?

19  BY MS. COYOCA:

20  Q.  Accept that a claim is covered, but do -- do

21     so subject to a reservation of rights?

22  A.  When you -- yeah, I'm just trying to -- with

23     a first-party claim there may be -- I'm

24     trying to think of an occasion where we'd

25     accept coverage and then reserve our rights.

Page 54

1    There may be pieces of a particular claim

2    that are covered and uncovered and we'd point

3    that out, and maybe the entire claim is

4    uncovered and then we're not going to say

5    part of it's covered and then issue a

6    reservation, so...

7  Q.  Right.  I'm actually asking about a different

8    circumstance.

9         What I'm asking about is:  If there

10   is a close coverage question as to whether

11   the claim is covered or not covered, not

12   whether a particular exclusion applies or

13   does not apply, do you ever think it's

14   appropriate to accept the claim, but do so

15   subject to a reservation of rights so that

16   more time can be given to analyzing the

17   coverage?

18         MS. SCOTT REED:  Objection; vague

19   and improper foundation.

20         THE WITNESS:  I don't think that

21   we would -- if there's a close call, if we

22   need more information to determine whether or

23   not it's covered or uncovered, would we

24   accept coverage and then reserve.

25  BY MS. COYOCA:

Page 55

1    Q.   Is there any period of time that you would

2         consider to be too short a time in order to

3         do a proper coverage analysis?

4    A.   Again, I think it really depends on the facts

5         of the case, so I -- I don't think you can

6         say, you know, five days is too short as

7         opposed to two years.  It really depends on

8         what the nature of the claim is.

9    Q.   Are there circumstances where you could see

10        that it would be appropriate to make a

11        coverage determination an hour after a claim

12        was tendered?

13                  MS. SCOTT REED:  Objection; vague,

14        improper foundation.

15                  THE WITNESS:  I'm sure there

16        probably are some circumstances, but I -- at

17        this time I can't think of anything where

18        after an hour I'd be comfortable issuing a

19        coverage position, particularly in light of

20        the fact that I'd have to look at the facts

21        and the policy.  It takes more than an hour,

22        generally, to get through a policy.

23   BY MS. COYOCA:

24   Q.   What about a day?

25                  MS. SCOTT REED:  Same objections.

Page 56

1           THE WITNESS:  Yeah, again, it

2      depends on the nature of the facts.

3   BY MS. COYOCA:

4   Q.  Have you ever made a coverage determination

5      the next day after a claim was tendered?

6   A.  No.

7   Q.  What about two days, have you ever made a

8      coverage determination two days after a claim

9      was tendered?

10  A.  Do you mean have I issued a coverage letter

11      to the insured after two days?

12  Q.  In any claims that you've been involved in,

13      and, again, I'm focusing on first-party

14      claims --

15  A.  Okay.

16  Q.  -- have you ever made a coverage

17      determination, whether it's you issuing the

18      letter or making a decision about the claim

19      and somebody else is issuing a coverage

20      determination letter?

21  A.  Not that I recall.

22  Q.  In your experience, what do you consider to

23      be, if there is, an average period of time

24      pursuant to which a claim, a first-party

25      claim, can be investigated and a coverage

EXHIBIT 15

Page 57

1    determination made?

2              MS. SCOTT REED:  Objection; vague,

3    lack of foundation.

4              THE WITNESS:  I -- I don't -- you

5    know, again, I don't think there's an average

6    time, it really depends on the nature of the

7    claim.

8  BY MS. COYOCA:

9  Q.  If you could please look at page 736, that's

10     the second page of this Exhibit Number 15.

11     And I'm looking at the second bullet point

12     that refers to, "Determine the need for

13     outside vendors to assist in the

14     investigation."  Do you see that entry?

15 A.  I do.

16 Q.  Under what circumstances do you believe it's

17     appropriate to retain outside vendors to

18     assist in the investigation of a claim?

19              MS. SCOTT REED:  Objection; vague,

20     ambiguous.

21              THE WITNESS:  Again, it really

22     kind of depends on what the nature of the

23     claim is.  But I suppose if we had a claim

24     related to fire damage, there may be a need

25     for a fire expert.  It would be occasions

Page 58

1       where we would retain somebody to assist us

2       with an investigation.

3               Whether we -- whether it's because

4       of the timing and the need, or if it's a

5       particular slice, again, within the

6       investigation that we feel like they would be

7       helpful, an accountant might be helpful in

8       terms of looking at the books or the

9       financials or certain transactions, something

10      like that.

11  BY MS. COYOCA:

12  Q.  In the case where there's a claim for fire

13      damage, you indicated there may be a need for

14      a fire expert.  Why would that be?

15  A.  I don't handle fire-related claims, but I --

16      I would imagine one of the questions that's

17      always asked is what was the origin of the

18      fire.  Probably to the extent that's not

19      readily apparent, a fire expert may -- may

20      assist.

21  Q.  Why would it be important to know the origin

22      of the fire?

23              MS. SCOTT REED:  Objection; vague,

24      calls for speculation.  This witness has

25      already testified she doesn't handle these

1    claims.

2              THE WITNESS:  I suppose, I mean,

3    on the front end, you know, whether it was --

4    you know, whether it was because of the

5    electrical for subrogation interests, I mean,

6    if there was work done, if there was a

7    problem with the electrical that was recently

8    put in, that might be a claim subsequently

9    that can be made.

10             If it's, you know, sheer negligence

11   or if it's -- you know, if somebody actually

12   set the fire, you know, if it was criminal --

13   criminally related, those would be instances

14   where I imagine it might be helpful to know

15   what the origin of the fire was.

16   BY MS. COYOCA:

17   Q.  So in your view, separate and apart from fire

18       investigation, a fire claim or any other type

19       of first-party claim, is it important to know

20       the origin of the source of the loss that's

21       being suffered?

22             MS. SCOTT REED:  Objection; vague,

23   ambiguous, calls for speculation.

24             THE WITNESS:  Yeah, I apologize,

25   I'm not -- origin or the source of -- if you

Page 60

1          could rephrase your question, I'd appreciate

2          it.

3                    MS. COYOCA:  Okay.

4     BY MS. COYOCA:

5     Q.   Do you understand the commonplace meaning of

6          the word "origin"?

7     A.   Yes, I do understand the meaning of origin.

8     Q.   Okay.  What do you understand the word to

9          mean?

10    A.   Where it started or began.

11    Q.   Great.  I will adopt that -- that

12         interpretation.

13                   Do you think it's important to

14         understand the origin of the loss when a

15         first-party claim is asserted?

16                   MS. SCOTT REED:  Objection; vague,

17         ambiguous.

18                   THE WITNESS:  Again, depending on

19         the facts, yeah, it may be very important to

20         understand where -- where the claim -- when

21         it began.

22                   THE VIDEOGRAPHER:  Counsel, we

23         have about five minutes left on the tape.

24    BY MS. COYOCA:

25    Q.   Is there any claim that you can think of, any

Page 61

1    circumstance where it would not be important

2    to know the origin of the loss?

3                 MS. SCOTT REED:  Objection; vague,

4    ambiguous, calls for speculation.

5                 THE WITNESS:  I -- I imagine in

6    the liability context.  I don't know that it

7    necessarily would be imperative to know the

8    origin of the basis of the claims.  But in

9    most circumstances, I think you probably

10   would want to know that.

11                MS. COYOCA:  Right.

12   BY MS. COYOCA:

13   Q.  And, again, I'm -- I'm just focusing on

14       first-party claims.  So with respect to a

15       first-party claim, can you envision any type

16       of claim where it would not be important to

17       know the origin of the loss?

18                MS. SCOTT REED:  Vague, ambiguous,

19   calls for speculation.

20                THE WITNESS:  Not at this time,

21   no.

22   BY MS. COYOCA:

23   Q.  When a claim is being investigated and

24       coverage is being assessed, do you think it's

25       important to go back to the underwriter?

Page 62

1    A.   No.

2    Q.   Why not?

3    A.   Because when you look at coverage, the

4         language of the policy is clear and

5         unambiguous.  You apply the law -- you apply

6         the -- the policy as it is written and you

7         investigate and look at the facts.

8    Q.   What if the claim -- excuse me.

9              What if the language of the policy

10        is not clear or unambiguous, do you think if

11        that circumstance it's important to go back

12        to the underwriter?

13             MS. SCOTT REED:  Objection; vague.

14             THE WITNESS:  I think that, again,

15        you look at the language of the policy.  To

16        the extent -- and I'm not suggesting to the

17        extent there's an argument that there is an

18        ambiguity, then you look at what the common

19        sense meaning of the policy is.  I don't know

20        that I would go back to the underwriter.

21   BY MS. COYOCA:

22   Q.   So in your view, in terms of your experience

23        and expertise in handling insurance claims,

24        you don't think that it's an important thing

25        to go back to the underwriter to try to gain

EXHIBIT 15

1       the underwriter's understanding of the use of

2       words or terms in the policy?

3                   MS. SCOTT REED:  Objection; vague

4       and misstates this witness's prior testimony.

5                   THE WITNESS:  It's the policy that

6       dictates the coverage, the language of the

7       policy.

8                   MS. COYOCA:  Right.

9    BY MS. COYOCA:

10   Q.  But in order to understand -- try to get a

11      better understanding of the meaning of the

12      policy, do you think it's ever important to

13      go back to the underwriter to gain their

14      perspective with respect to the policy?

15                  MS. SCOTT REED:  Objection; vague,

16      ambiguous, calls for speculation.

17                  THE WITNESS:  Again, I think that

18      we can look at the language of the policy and

19      determine the meaning of it on our own.

20   BY MS. COYOCA:

21   Q.  And before we take a break, you left

22      OneBeacon in December 2015; is that correct?

23   A.  That's correct.

24   Q.  And why did you leave OneBeacon?

25   A.  I was laid off.

Page 64

1    Q.   Why were you laid off?

2    A.   They did a claim restructuring.

3    Q.   By "claim restructuring," you mean a

4         restructuring of the claims department?

5    A.   Correct.

6    Q.   And what was the restructuring?

7    A.   Can you be more specific?

8                   MS. SCOTT REED:  Objection; vague

9         and calls for speculation.

10                  MS. COYOCA:  Yes.

11   BY MS. COYOCA:

12   Q.   What was restructured?

13   A.   The claim group.

14   Q.   Were there particular aspects or areas of the

15        business that OneBeacon decided that it no

16        longer needed claims representatives for that

17        area?

18                  MS. SCOTT REED:  Objection; form,

19        calls for speculation.

20                  THE WITNESS:  I don't know.  I

21        mean, they -- at that time in December they

22        let four claim VPs and above, they let four

23        of them go, and it crossed all lines, so I

24        think it was simply a cost measure.

25

Page 65

1                    (The following pages 66 through 67

2                    are bound separately under seal

3                    pursuant to protective order.)

4      ///

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 15

Page 68

1              (Continuation of non-confidential

2              testimony.)

3              MS. COYOCA:  We can go ahead and

4     take a break.

5              THE VIDEOGRAPHER:  It's

6     11:29 a.m.  We're going off the record.

7              (Whereupon, a brief recess

8              was taken.)

9              THE VIDEOGRAPHER:  It's 11:41 a.m.

10    We're back on the record and this begins DVD

11    number 2.

12    BY MS. COYOCA:

13    Q.  Ms. Gooley, was it necessary for you to be

14        informed as to every claim that Ms. Johnson

15        was going to deny before the denial was

16        conveyed to the client?

17              MS. SCOTT REED:  Objection; vague,

18        ambiguous.

19              THE WITNESS:  No, she -- she had

20        the authority to deny a claim.

21    BY MS. COYOCA:

22    Q.  Were there particular parameters pursuant to

23        which Ms. Johnson was required to report to

24        you before she denied a claim?

25    A.  We never had any express parameters.  We had

Page 69

1    worked together long enough, you just know

2    when you need to flag something up and talk

3    about it and when you -- you know, you can go

4    forward, so...

5  Q.   When Ms. Johnson came to you to discuss a

6    claim and the fact that her recommendation

7    was going to be to deny the claim, did you

8    have any process that you would go through

9    with her in order to review the

10    determination?

11            MS. SCOTT REED:   Objection; lack

12    of foundation.

13            THE WITNESS:   If Pamela and I were

14    talking about a denial, I would always want

15    to see the policy first and then I'd -- you

16    know, and then we'd have a discussion about

17    the facts of the claim and everything that

18    she knew and, you know, she'd outline why she

19    felt there was or was not coverage, and then

20    I'd ask any questions that I may have and,

21    you know, it really depended on the nature of

22    the claim, how many -- how many questions I

23    may or may not have had.

24  BY MS. COYOCA:

25  Q.   Were there ever circumstances pursuant to

Page 70

1      which you would send Ms. Johnson back in

2      order to obtain additional facts or further

3      investigate the claim?

4   A.  I can't recall any, no.

5   Q.  You indicated that she'd outline the -- why

6      she felt there was or was not coverage.  Did

7      you require that Ms. Johnson provide the

8      reasons why she felt there was or was not

9      coverage in writing?

10              MS. SCOTT REED:  Objection; vague.

11              THE WITNESS:  No, not necessarily.

12      Again, you know, we'd have a conversation and

13      I'd want -- you know, we'd talk about the

14      facts, I'd want to look at the policy, we'd

15      talk through the coverage issues, whether

16      there was or was not coverage, and it may be

17      at the end of the day when the letter -- when

18      we're ready to issue a letter I may want to

19      look at it.  But, generally, that was not

20      common practice.

21  BY MS. COYOCA:

22  Q.  Turning back to Exhibit 15, again focusing on

23      page 736, there's a reference to, "Determine

24      the need for outside vendors," we were just

25      speaking about it before the break, and

Page 71

1      there's a reference to attorneys.  Do you see

2      that?

3  A.  I do.

4  Q.  Under what circumstances would attorneys be

5      needed to assist in the investigation?

6            MS. SCOTT REED:  Objection; lack

7      of foundation.

8            THE WITNESS:  In -- with respect

9      to the entertainment claims, I'm not sure

10     that we would necessarily ever need an

11     attorney.  Again, I think this document is

12     intended to cross all lines of the types of

13     coverages that OneBeacon writes, so...

14            MS. COYOCA:  Okay.

15  BY MS. COYOCA:

16  Q.  So would there have been a benefit to have

17     had entertainment-related claims handling

18     practices that would specifically focus on

19     those needs that would be specific to the

20     entertainment industry?

21            MS. SCOTT REED:  Objection; vague,

22     ambiguous, calls for speculation.

23            THE WITNESS:  I don't -- no, I

24     don't think so.  I think we had an

25     experienced group and then we had a mentoring

1    system in place and a training system in

2    place, and that's how we ensured that we

3    handled the claims appropriately.

4  BY MS. COYOCA:

5  Q.  With respect to the use of attorneys in the

6    investigation of a claim, were there any

7    circumstances pursuant to which, as to an

8    entertainment claim, a first-party

9    entertainment claim, the -- an outside

10    attorney would be necessary?

11             MS. SCOTT REED:  Objection; vague,

12    ambiguous, calls for speculation.

13             THE WITNESS:  As we speak, I'm

14    having a hard time thinking when we -- when

15    we would necessarily need an attorney on a

16    particular claim.

17  BY MS. COYOCA:

18  Q.  Again, focusing just on entertainment

19    first-party claims, were there circumstances

20    pursuant to which outside counsel's coverage

21    opinion would be sought?

22  A.  There may be occasions where we would ask for

23    a coverage opinion, yes.

24  Q.  What were the circumstances that would inform

25    the decision to retain outside counsel to

Page 73

1       obtain an outside counsel coverage opinion?

2   A.  Again, it depends on the nature -- it would

3       depend on the nature of the claim and the

4       facts, it would depend on the particular

5       coverage or policy question at issue.  It may

6       depend on -- on simply on the -- the timing

7       or the availability when we need to turn

8       things around really quite quickly.  So

9       there's really a host of facts that we'd

10      consider on whether or not we need -- whether

11      or not we would retain counsel.

12  Q.  If the coverage question was a close call, is

13      that a circumstances pursuant to which it

14      would be advantageous to obtain outside

15      coverage counsel's opinion?

16              MS. SCOTT REED:  Objection; vague,

17      ambiguous.

18              THE WITNESS:  It might be an

19      occasion when we'd hire -- we'd retain

20      outside counsel.

21  BY MS. COYOCA:

22  Q.  Any other circumstances that you can think

23      of?

24  A.  No, I can't think of any right now, no.

25  Q.  Are there any specific guidelines in place at

EXHIBIT 15

Page 74

1        OneBeacon that you were aware of when you

2        worked there that governed the use of outside

3        counsel to help inform and make a decision

4        about a coverage question?

5   A.   The only process we had internally, at least

6        with the group that I worked with, is that if

7        you wanted to retain outside counsel,

8        coverage counsel, you needed to run it

9        through me first.

10  Q.   Why did they need -- why did they need to run

11       it through you first?

12  A.   Because we wanted to make sure we were being

13       prudent when we decided whether or not to use

14       counsel and I wanted to understand why we

15       felt it would be necessary to retain counsel.

16  Q.   So you were the gatekeeper in terms of making

17       the decision about whether to expend the

18       resources to utilize outside counsel?

19            MS. SCOTT REED:  Objection to

20       form.

21            THE WITNESS:  I was the individual

22       that looked at whether or not it was prudent

23       to -- based on their recommendation, to

24       retain counsel.

25  BY MS. COYOCA:

Page 75

1   Q.   And when you say, "Prudent," do you mean

2        financially prudent or some other measure of

3        prudence?

4   A.   Prudence would be a whole series of different

5        facts.  The finances isn't -- is not going to

6        stop us if we need it for one particular

7        reason or another.  It's necessarily

8        something we would think about, but it really

9        depends on the issue that's involved in the

10       particular claim.

11  Q.   So very fact specific?

12  A.   Absolutely.

13  Q.   Did you ever consider whether or not the

14       outside counsel's opinion could potentially

15       come into play if the denial was challenged

16       in making a decision as to whether outside

17       counsel's opinion should be sought?

18            MS. SCOTT REED:  Objection; vague,

19       ambiguous.

20            THE WITNESS:  At OneBeacon, if we

21       retain coverage counsel for an opinion, we

22       consider it.  We make the decision.  We do

23       not rely on counsel.  We look at all the

24       facts and, ultimately, we make the decision

25       whether or not we believe there's coverage.

1            MS. COYOCA:  Got it.

2    BY MS. COYOCA:

3    Q.  But if coverage counsel, outside coverage

4        counsel opinions -- opinion is sought,

5        OneBeacon would consider that opinion in

6        making the coverage determination; is that

7        correct?

8    A.  It would --

9            MS. SCOTT REED:  Objection to

10       form, vague, ambiguous, calls for

11       speculation.

12            THE WITNESS:  It would be one of

13       many things that we consider when we make our

14       decision.

15   BY MS. COYOCA:

16   Q.  Can you think of any circumstances where an

17       outside coverage -- coverage opinion would be

18       sought, but OneBeacon simply wouldn't

19       consider it in making a determination about

20       the claim?

21   A.  I -- I'm -- if we had -- if we retained

22       outside counsel and asked for their opinion,

23       we wouldn't ignore it.  Again, it would be

24       something that would be part of our overall

25       determination.

1    Q.   Okay.  And moving down to the next bullet

2         point immediately under the, "Determine the

3         need for outside vendors," bullet point, and

4         that's the bullet point that references,

5         "Collect documents pertinent to the type of

6         claim and investigate sources of

7         information"; do you see that bullet point?

8    A.   I do.

9    Q.   In investigating a claim, what type of

10        documents would you consider to be the

11        necessary documents needed to investigate the

12        claim?

13                  MS. SCOTT REED:  Objection; vague

14        and ambiguous.

15                  THE WITNESS:  And, again, you

16        know, it depends entirely on the facts of the

17        claim.  You know, if you had a first-party

18        claim, if you had, you know, an employee

19        dishonesty or something of that nature,

20        you're going to want to look at the

21        underlying documents, maybe there's

22        allegations they charged on the credit card

23        that they -- you know, they weren't

24        authorized to do, you want to see the

25        underlying documentation.

1            So, again, it would depend on the

2      nature of the claim what documents you need

3      and what are relevant to -- to -- to what's

4      being asserted by the insured.

5   BY MS. COYOCA:

6   Q.  If the claim involved the actions of a

7      governmental authority, the U.S. government

8      or a municipality or a county or a state,

9      would it be necessary to go and look at what

10      the U.S. government or the municipality or

11      the state government, et cetera, had

12      indicated about the circumstances?

13            MS. SCOTT REED:  Objection; vague

14      and ambiguous, calls for speculation.

15            THE WITNESS:  If the -- if the

16      government is -- you know, if there's a

17      particular entity, if it's our insured and

18      they -- they allege that the -- you know,

19      bring a claim based on certain facts, we're

20      necessarily going to want to talk to them

21      about the particular facts.

22            MS. COYOCA:  Okay.

23   BY MS. COYOCA:

24   Q.  But I'm specifically focusing on if those

25      facts involve the actions of any kind of

1     governmental authority, would it be necessary

2     to look at what that governmental authority

3     had said in making a decision about the

4     claim?

5               MS. SCOTT REED:  Objection; vague,

6     ambiguous, improper foundation, calls for

7     speculation.

8               THE WITNESS:  Again, I mean, it

9     depends on the nature of the claim.

10    BY MS. COYOCA:

11    Q.   If there was a first-party claim that was

12         asserted that involved the loss of cargo of a

13         client and the client made the claim saying,

14         "Look, I had to dump that cargo," maybe food

15         stuff, something that was -- had some kind of

16         shelf life on it, "because the government

17         said I had to do this," would it be important

18         to look at what the government had actually

19         said about disposal of the -- the cargo?

20              MS. SCOTT REED:  Objection;

21         improper foundation, calls for speculation.

22              THE WITNESS:  If -- again, I

23         wouldn't handle a cargo claim.  But in the

24         event the insured indicated they had cargo

25         and they had to dump it pursuant to a

Page 80

1      particular order, then I'd want to see what

2      the order said.

3    BY MS. COYOCA:

4    Q.  Could you please turn to the next page, which

5        would be page 4 of this document labeled

6        Bates control ATL000738.

7    A.  (Complies.)

8    Q.  Under the second bullet point, under item

9        number 4, "Coverage Determinations," the

10       bullet point reads, "When appropriate, the

11       adjuster may consider referring the claim for

12       review by coverage counsel or consult

13       appropriate legal resources, including

14       internal claims legal resources"; do you see

15       that?

16   A.  I do.

17   Q.  First of all, what is claims legal resources?

18   A.  Claims legal is -- is a group within the

19       claim organization at OneBeacon.

20   Q.  And who is in the claims legal group?  You

21       don't have to identify the names of people,

22       but what they do.

23   A.  Lawyers are in the group.  I -- you know,

24       they'd -- I'm trying to think what they do.

25       Assist with coverage litigation, they may do

1          research for you on particular issues, things

2          like that.

3     Q.   How many lawyers are in the claims legal

4          group?

5                    MS. SCOTT REED:   Objection; vague

6          and ambiguous.   Do you want to specify time

7          frame, Counsel?

8     BY MS. COYOCA:

9     Q.   During the time frame that you were at

10         OneBeacon.

11    A.   It was three or four.

12    Q.   I'm sorry?

13    A.   Three or four, excuse me.

14    Q.   So in addition to the -- a claims manager who

15         would be a lawyer; is that correct?

16    A.   Not necessarily.

17    Q.   Oh, okay.   So in the context of the

18         entertainment claims, the claims manager was

19         Pamela Johnson, and she was a lawyer,

20         correct?

21    A.   Correct.

22    Q.   All right.   And so in addition to the lawyer

23         that may be managing the claim, there -- the

24         claims manager could also look to the claims

25         legal resources group?

EXHIBIT 15

Page 82

1    A.   Correct.

2    Q.   Now, there's a reference here that it may be

3         appropriate to consider appropriate legal

4         sources.  Do you see that?

5    A.   I do.

6    Q.   Okay.  What are the appropriate legal

7         sources?

8                   MS. SCOTT REED:  Objection; vague,

9         ambiguous, calls for speculation.

10                  THE WITNESS:  It says, "Or you may

11        consult appropriate legal resources."  You

12        know, I -- I imagine it's, you know, Westlaw,

13        it could be Lexis to the extent anybody uses

14        that anymore, Google Scholar, it could be

15        resources or treatises or any type of thing

16        that's available at OneBeacon.

17   BY MS. COYOCA:

18   Q.   In terms of the consultation of legal

19        resources, was there a practice, at least

20        with respect to the claims managers that you

21        oversaw, that when such legal resources were

22        sought, there had to be a record kept as to

23        the resources that were being reviewed?

24                  MS. SCOTT REED:  Objection; form,

25        vague, ambiguous and calls for speculation.

Page 83

1          THE WITNESS:  I mean, when -- I

2      mean, if you're handling a particular claim,

3      you may look at Westlaw, you may look at a

4      number of additional resources.  To the

5      extent you look at anything that bears on

6      your determination, you -- you would most

7      likely want to probably put that in the file.

8      But there was no specific express requirement

9      that you write down every resource you

10     touched.

11 BY MS. COYOCA:

12 Q.  And when you say, "The file," are you

13     referring to the claims file?

14 A.  Correct.

15 Q.  And when a coverage determination is made

16     after consulting legal resources, is there --

17     was there any type of practice with respect

18     to the claims managers that you reviewed or

19     that you oversaw, that required them to

20     provide some kind of written analysis as to

21     what that legal research provided?

22 A.  No, not necessarily.

23 Q.  So prior to your being consulted about a

24     claim, you did not have any specific

25     requirement that they give you any kind of

Page 84

1      written analysis of the coverage question; is

2      that correct?

3   A.  That's correct.

4   Q.  Are there any circumstances, when you were

5      being consulted about a claim or any of the

6      claims managers that you oversaw, where you

7      would ask to see the legal authority or the

8      legal resources on which the claims manager

9      was relying?

10  A.  Yes.

11  Q.  When were the circumstances that you would

12      ask to see the legal authorities?

13  A.  Again, it depends on the -- on the -- on the

14      claim, but if there -- if we're citing a

15      particular case or relying on a particular

16      case, A, that I'm not familiar with, or if

17      it's a claim manager that I haven't worked

18      with for a long time, you know, I want to

19      look at it and confirm as well that it

20      supports the proposition that we're citing it

21      for.

22  Q.  I would like to direct your attention to a

23      new exhibit that previously has been marked,

24      and this is entitled, "Core Principals," and

25      it's labeled Bates control ATL000731 dash

Page 85

1      732, and it was previously marked as

2      Exhibit 16.  (Hands document.)

3              And, again, just let me know when

4      you're ready for questions.

5  A.   Okay.  (Reviews document.)  I've finished

6      reviewing it.

7  Q.   Thank you.

8              Are you familiar with the

9      Core Principals document?

10  A.  Yes, I am.

11  Q.  What is it?

12  A.  It's -- it's one of the documents that

13      OneBeacon has that assist the claim adjuster.

14  Q.  Other than the document that we were just

15      looking at, the claims practices document,

16      Exhibit 15, General Claims Practices, and the

17      Core Principals document, are you aware of

18      any other claims related documents that

19      contain OneBeacon's policies, procedures or

20      recommendations for claims handling?

21  A.  Not specific to entertainment, no.

22  Q.  Other than specific to entertainment, just

23      generally as to claims, are you aware of any

24      other claims practices, policies, procedures

25      set forth in any manual?

Page 86

1    A.   I think some of the other groups may have

2         them, but I'm not sure.

3    Q.   Any of the groups that you oversaw, did they

4         have additional documentation with respect to

5         claims handling practices?

6    A.   I don't think so, no.

7    Q.   You indicated that some of the other groups

8         may.  Are you familiar with what groups had

9         claims handling practices, procedures or

10        manuals?

11   A.   I don't know whether they did, and that's why

12        I can't say.

13   Q.   What did you base your statement on that you

14        believe some other groups may have had such

15        documents?

16   A.   OneBeacon had another arm that was called

17        OneBeacon Professional Insurance.  I don't

18        know whether or not they had other policies

19        or procedures.

20   Q.   In terms of the work that you did for

21        OneBeacon, were you ever directed or asked to

22        develop claims handling practices or

23        procedures, manuals or guidelines for any of

24        the groups that you oversaw?

25   A.   No.

EXHIBIT 15

Page 87

1   Q.   In item number 1 on Exhibit 16, "Focus on the
2        claims file," the first sentence is, "Claims
3        personnel should thoroughly investigate each
4        claim."  Do you see that?
5   A.   I do.
6   Q.   What did you understand that to mean?
7   A.   To thoroughly investigate the claim, to --
8        to -- to complete a thorough investigation
9        before reaching a decision.
10  Q.   What -- what did you consider, though, to be
11       a thorough investigation?  We talked about
12       what an investigation could be.  What did you
13       consider to be a thorough investigation?
14                  MS. SCOTT REED:  Objection; asked
15       and answered.
16                  THE WITNESS:  It would depend on
17       the nature of the claim, what the facts were
18       and what was necessary to complete a thorough
19       investigation.  It's necessarily fact
20       specific, I think.
21  BY MS. COYOCA:
22  Q.   If there was an area of expertise that was
23       necessary to understand a claim that was
24       presented and no one in OneBeacon had that
25       expertise, would you, if it was a claims

Page 88

1       manager you were overseeing, direct that

2       individual to go seek input from someone who

3       had that expertise?

4                    MS. SCOTT REED:  Objection;

5       improper foundation.

6                    THE WITNESS:  As I sit today, I

7       can't think of a particular claim where we

8       wouldn't have had the area -- wouldn't have

9       had the expertise.  So, again, I guess to the

10      extent it would involve something where we'd

11      need to look at records, we might use an

12      accountant, we might do something like that,

13      but I'm -- those would be different resources

14      that we may use.

15  BY MS. COYOCA:

16  Q.  And, again, I'm focusing on -- on your

17      practices.

18  A.  Yes.

19  Q.  Can you recall of any circumstance where you

20      directed any of the claims managers that you

21      were overseeing to go consult with someone

22      outside of OneBeacon to obtain a better

23      understanding of the facts or circumstances

24      of a claim?

25  A.  No.

1    Q.   Ms. Gooley, do you agree that an insurer must

2         treat the policyholder's interest with equal

3         regard as its own interest when investigating

4         a claim?

5    A.   Yes.

6    Q.   In considering whether or not -- well, no,

7         strike that.

8              Do you agree with the proposition

9         that an insured cannot misrepresent facts or

10        policy provisions in investigating a claim?

11                  MS. SCOTT REED:   Objection; vague,

12        ambiguous.

13                  THE WITNESS:   It should never

14        intentionally misrepresent facts or policy.

15   BY MS. COYOCA:

16   Q.   Do you agree with the proposition that an

17        insurer should not misrepresent policy

18        provisions to the insured when communicating

19        with the insured?

20   A.   Yes, they shouldn't intentionally

21        misrepresent.   It could be a mistake.

22   Q.   When you were reviewing coverage

23        determinations that Ms. Johnson provided to

24        you for your review, did you look to see

25        whether or not any provisions were being

1    misrepresented to the insured?

2    A.   When I reviewed the -- or when I reviewed a

3         coverage position, I would look at the policy

4         and, you know, run through it.  So, yeah, we

5         wouldn't want anything to intentionally go

6         out and misrepresent something, no.

7    Q.   But when you were doing your work and you

8         were reviewing coverage determinations, if

9         you had a question about a statement that was

10        made in terms of a policy provision, would

11        you go back and look at the policy to ensure

12        that the policy said what the coverage

13        determination letter said it said?

14             MS. SCOTT REED:  Objection;

15        improper foundation.

16             THE WITNESS:  You mean would I go

17        back and check that we quoted the language

18        appropriately or --

19   BY MS. COYOCA:

20   Q.   Not just quoting the language, but that

21        the -- the policy said what the claims

22        manager was saying it said.

23   A.   I --

24             MS. SCOTT REED:  Same objection.

25             THE WITNESS:  Yeah, I think if I

1        had the policy in front of me and I'm reading

2        a letter, I should be able to tell if the

3        policy is saying what we're -- if I'm

4        agreeing or disagreeing --

5                        MS. COYOCA:  Right.

6                        THE WITNESS:  -- with what -- but

7        I wouldn't -- like with Pamela, I've worked

8        with her enough that I trust her judgment.

9    BY MS. COYOCA:

10   Q.  My question is actually directed to, though,

11       as I indicated before, would you actually --

12       as you review the coverage determination

13       letter, would you -- if you had a question

14       about a policy provision and the way it was

15       characterized, would you go back to the

16       policy and actually double-check to make sure

17       that it said what the claims manager is

18       representing that it says?

19                        MS. SCOTT REED:  Objection;

20       improper foundation, asked and answered.

21                        THE WITNESS:  I might.

22   BY MS. COYOCA:

23   Q.  Other than looking at the policy language, if

24       you had a question about a representation

25       that was being made in a coverage

Page 92

1    determination letter, would you look --

2    independently look at any legal authorities

3    or resources?

4              MS. SCOTT REED:  Objection; vague,

5    ambiguous.

6              THE WITNESS:  If it's -- I'd

7    probably call up the claim manager and talk

8    through the questions that I had.

9    BY MS. COYOCA:

10   Q.  Again, other than calling the claims manager

11       and going back and speaking with him or her,

12       would you independently look at any legal

13       authority to determine whether or not the

14       coverage determination position was correct?

15   A.  I -- I may or may not.  Generally, no.

16       Again, if it's a new manager that I haven't

17       worked with, I might go back and look at the

18       case law.  Or if I have simply questions that

19       I can't -- that I just need to look at it,

20       then I'd go back and look at it.

21   Q.  Was there any process or procedure in place

22       at OneBeacon that when a coverage

23       determination letter went out citing legal

24       authority, that that coverage determination

25       letter would be cite checked or reviewed for

1       purposes of determining whether the cases

2       stood for the proposition for which it was

3       cited?

4    A.  No.  When we -- when a coverage letter went

5       out that cited case law, we trust in the

6       claim manager that wrote the letter that the

7       cites are accurate and -- and the analysis is

8       accurate.

9    Q.  Okay.

10              MS. COYOCA:  I actually want to

11      move on to a new exhibit number, and I

12      believe we're on Exhibit 31.  So Exhibit 31

13      will be an e-mail chain, and it's labeled

14      Bates control ATL001571 through 1572.

15              (Whereupon, Exhibit 31 was

16              marked for identification.)

17              THE WITNESS:  (Reviews document.)

18      I've finished looking at it.

19              MS. COYOCA:  Okay.

20   BY MS. COYOCA:

21   Q.  Actually, before you -- I ask you about this

22      document, when is the first time you heard

23      about the Dig claim?

24   A.  I think that -- I'm trying to remember if

25      it -- I think it was the day after Aon

Page 94

1       provided OneBeacon with formal notice of the

2       claim.

3   Q.  And how did you hear about it?

4   A.  From Pamela.

5   Q.  Did she call you, send you an e-mail, ask for

6       a meeting?

7   A.  I think -- I think this might have been how

8       she let me know about it.

9   Q.  Okay.  And by, "This," you mean Exhibit 31,

10      the e-mail exchange?

11  A.  Yes.

12  Q.  Okay.  So do you recall any conversations or

13      communications with Ms. Johnson prior to

14      receipt of the e-mail exchange that's

15      contained in Exhibit 31?

16  A.  I don't recall any conversations before this

17      e-mail, no.

18  Q.  How was Ms. Johnson assigned to handle the

19      claim?  Just as a matter of course because it

20      was an entertainment-related claim?

21              MS. SCOTT REED:  Objection; form,

22      lack of foundation, assumes facts not in

23      evidence.

24              THE WITNESS:  Again, Pamela

25      generally assigns the entertainment claims.

EXHIBIT 15

1      And my understanding on this one is I think

2      it was initially assigned to Danny Gutterman

3      and Pamela worked with him, and so that would

4      be how Pamela was involved in the claim.

5                    MS. COYOCA:  Right.

6   BY MS. COYOCA:

7   Q.  But what I'm asking is separate and apart

8      from that, was it a -- if an

9      entertainment-related claim came in, was it

10     automatically assigned to Pamela Johnson for

11     handling?

12  A.  No, it was -- Pamela Johnson assigned who

13     handled the claim.

14  Q.  Got it.  Who gave it to Pamela Johnson?

15  A.  The claim intake group either out in Canton,

16     Massachusetts, or Lucy, if it came through

17     Lucy.

18  Q.  You indicated that Ms. Johnson was a claims

19     manager for OneBeacon; is that correct?

20  A.  That's what I call her.  I don't know what

21     her formal title was.

22  Q.  Got it.  So would there be any circumstance

23     pursuant to which Pamela Johnson would not

24     receive an entertainment claim?

25                    MS. SCOTT REED:  Objection to

Page 96

1          form, calls for speculation.

2                    THE WITNESS:  I'm just trying to

3          remember.  It -- I mean, if there was a

4          Workers' Compensation claim, it might not run

5          up through Pamela, it might run up through

6          the other group to be assigned, because the

7          Workers' Comp claims weren't handled in her

8          group.  So there are circumstances where it

9          wouldn't run up through her necessarily.

10                   MS. COYOCA:  Okay.

11   BY MS. COYOCA:

12   Q.  Other than the Workers' Comp, though, pretty

13       much all entertainment-related claims would

14       go through Pamela Johnson?

15   A.  At that point I think pretty much all of them

16       would run up through Pamela if she's in,

17       otherwise it would run up to me or -- yeah,

18       we'd assign it that way.

19   Q.  Okay.  And how would a claims investigator be

20       assigned?

21                   MS. SCOTT REED:  Objection; form,

22          lack of foundation, assumes facts not in

23          evidence.

24                   THE WITNESS:  Pamela would assign

25          a claim adjuster, a claim handler to handle a

1        particular claim.

2    BY MS. COYOCA:

3    Q.   Have you ever used -- heard the use of the

4         term claims investigator used in the context

5         of OneBeacon?

6    A.   No, no.

7    Q.   Was Danny Gutterman a claims investigator?

8    A.   Again, I don't know his formal title.  It

9         definitely wasn't that.  I think he was a

10        claims handler, that's what -- that's how I

11        would refer to Danny.

12   Q.   So if Mr. Gutterman indicated, for example,

13        on his e-mail designations at the bottom of

14        his e-mails that he was a claims

15        investigator, that would just be a colloquial

16        use of the term investigator?

17                 MS. SCOTT REED:  Objection to

18        form, calls for speculation.

19   BY MS. COYOCA:

20   Q.   To the best of your understanding.

21   A.   To the best of my understanding, maybe

22        that's -- that's part of what his job may

23        entail, so that may be why he made that

24        representation.  I don't know.

25   Q.   But -- but from your understanding, the

Page 98

1          person would be referred to as a claims

2          adjuster or a claims handler; is that

3          correct?

4     A.   Again, I don't know what his formal title is,

5          that's just generally how I refer to them.

6          That didn't sound appropriate.  That's

7          generally how I refer to the individuals that

8          handle claims at OneBeacon.

9     Q.   Do you ever have any input in terms of

10         assignment of a claims handler or a claims

11         adjuster?  And, again, I'm focusing on

12         first-party entertainment claims.

13    A.   I may have input if Pamela asked me.  It may

14         be also, let's say during the life of the

15         claim if there's something that comes up

16         where we together, either together or I

17         individually think that maybe the claim is

18         better -- better to be handled by somebody --

19         a different person within the group.

20    Q.   Why would you make a determination that a

21         claim might be better handled by someone

22         different in the group than the original

23         assignment?

24    A.   There could be a whole host of reasons.  They

25         may have a relationship with the insured

1          already, they may have a particular expertise

2          in the area, it might be close to them and so

3          that might warrant it, and it -- I mean,

4          there's just a whole number -- number of

5          reasons why it may warrant being reassigned.

6     Q.   Would you ever seek to have a claims adjuster

7          reassigned because the claims adjuster did

8          not have a particular area of expertise?

9     A.   I might.

10    Q.   Did you ever seek to have a claims adjuster

11         or a claims handler reassigned if the

12         adjuster or handler that was originally

13         assigned was too busy?

14    A.   I might do that as well.

15    Q.   Did you distinguish between one claims

16         adjuster or handler to another to anyone else

17         in the group in terms of the quality of work

18         that they were able to perform?

19    A.   No.

20    Q.   Did you consider all claims adjusters or

21         handlers that were involved in claims

22         relating to the entertainment industry to be

23         of equal value -- or, excuse me, equal

24         quality?

25                    MS. SCOTT REED:   Objection; vague,

1       ambiguous.

2                   THE WITNESS:  They all had their

3       strengths.  Some had more experience than

4       others and so some necessarily needed more

5       mentoring.

6   BY MS. COYOCA:

7   Q.  At the time that -- that Danny Gutterman was

8       assigned to the Dig claim in 2014, how long

9       had Mr. Gutterman been at the company?

10  A.  I think he'd been there about a year, but,

11      again, I can't remember the exact dates.

12  Q.  Did you consider a one-year period of

13      experience to be an experienced claims

14      adjuster?

15  A.  It depends.  I mean, it really depends.  You

16      know, they may have a significant amount of

17      experience in a particular area, they may

18      have come with more experience, but, again,

19      it depends.  In this particular case, though,

20      Pamela worked with Danny the entire time,

21      so...

22  Q.  Okay.  But -- but separate and apart from

23      Ms. Johnson, I'm just asking with respect to

24      Mr. Gutterman, did you consider his one year

25      of experience as a claims adjuster to be

1      having significant experience?

2                  MS. SCOTT REED:  Objection; vague,

3      ambiguous.

4                  THE WITNESS:  I think it's a good

5      base.  I mean, he can always learn more, like

6      everybody.

7   BY MS. COYOCA:

8   Q.  But one-year period of time adjusting claims,

9       you would consider to be a good base to

10      develop claims handling expertise?

11  A.  Correct.  He might -- yeah.

12  Q.  Would you consider one year to be sufficient

13      to hold one's self out to be an experienced

14      claims adjuster?

15  A.  Could be.

16  Q.  Do you think that there is a qualitative

17      difference in terms of expertise if one has

18      been a claims handler for 20 years versus one

19      who has been doing it for one year?

20  A.  I think someone who has been doing it for

21      20 years is clearly seeing a lot of

22      variations of claims and, yeah, I mean, they

23      have more experience.

24  Q.  Who was responsible for assigning

25      Mr. Gutterman to the claim?  Was it just

1      Ms. Johnson?

2                  MS. SCOTT REED:  Objection to

3      form, foundation and calls for speculation.

4                  THE WITNESS:  It would have been

5      Mrs. -- it would have been Pamela, yes.

6   BY MS. COYOCA:

7   Q.  And did you have any input on that

8      assignment?

9   A.  No.

10  Q.  What was Mr. Gutterman's role in the

11      adjusting of the Dig claim?

12                  MS. SCOTT REED:  Objection; form,

13      foundation, calls for speculation.

14                  THE WITNESS:  I think Danny had a

15      more limited role in that.  I think Pamela is

16      the one that truly handled the claim.

17  BY MS. COYOCA:

18  Q.  I understand that you viewed it to have been

19      more limited, but -- but what did he do?

20                  MS. SCOTT REED:  Objection to

21      form, foundation, calls for speculation.

22                  THE WITNESS:  I mean, he would

23      have worked with Pamela.  I can't -- you

24      know, I can't tell you specifically.

25  BY MS. COYOCA:

Page 103

1    Q.  At any point in time that you were involved

2        with the claim, did you gain an understanding

3        of what it exactly is that Mr. Gutterman was

4        doing?

5    A.  I know that he was looking at different

6        outside, you know, articles, things like

7        that.  But my primary correspondence --

8        communication -- my communication was with

9        Pamela.

10   Q.  Did you have any conversations with

11       Ms. Johnson about the work that Mr. Gutterman

12       was doing?

13   A.  I -- I don't recall.

14   Q.  Did you have any conversations with her

15       specifically about the outside sources, the

16       articles that Mr. Gutterman was consulting

17       with?

18   A.  No.

19   Q.  Did you provide any direction to Ms. Johnson

20       in terms of the use of Mr. Gutterman as a

21       resource to locate sources of information?

22   A.  No, I did not.

23   Q.  Directing your attention to the first e-mail

24       in the chain of Exhibit 31, which is the

25       July 16 e-mail from Pamela Johnson to

Page 104

1          Theresa Gooley, "Active War Exclusion, Are

2          you available for a short call," it indicates

3          that it was sent at 1:44 p.m.  Do you see the

4          e-mail?

5     A.   I do.

6     Q.   Do you recall receiving the e-mail?

7     A.   I do now.  I mean, I wouldn't have remembered

8          an e-mail that long ago, but...

9     Q.   Do you have any reason to believe that you

10         didn't receive it at or about the time it

11         indicates it was sent?

12    A.   No.

13    Q.   In the e-mail Ms. Johnson makes reference to

14         the fact that, "An imminent peril claim has

15         been made by NBC stemming from a production

16         that was shut down due to the rocket fire

17         into Tel Aviv and Jerusalem."  Do you see

18         that?

19    A.   I do.

20    Q.   First of all, at that point in time did you

21         know what an imminent peril claim was?

22    A.   I had heard of it, yes.

23    Q.   What was your understanding of what an

24         imminent peril claim was?

25    A.   Just that there was some immediate danger.

1   Q.  And what was your understanding as to what

2       the coverage would be?

3   A.  I'd have to see the policy.

4   Q.  There's a reference in the e-mail in the

5       second to the last line to the, "Israeli

6       Hamas conflict."  Do you see that?

7   A.  I do.

8   Q.  At or about this time frame in July 2014,

9       what was your understanding of what Hamas was

10      or is?

11  A.  It's an organization or a -- in the

12      Middle East in the Gaza Strip.

13  Q.  And, again, just focusing back on July 16,

14      did you know anything further about Hamas

15      other than it was an organization in the

16      Middle East in Gaza Strip?

17  A.  I mean, you know, just general things that

18      you hear in the news, et cetera.

19  Q.  Right.  That's what I'm trying to get at.

20      What was your general understanding based on

21      news sources of what Hamas is?

22  A.  Well, just what I said, it's in the

23      Middle East, I mean...

24  Q.  Okay.  Did you -- did you know what kind of

25      activities Hamas engaged in?

Page 106

1            MS. SCOTT REED:  Object to form,
2       foundation.
3            THE WITNESS:  They -- I mean,
4       yeah, generally, they engage in quite a few
5       different activities.
6    BY MS. COYOCA:
7    Q.  What activities were you aware of as of July
8        2014 that Hamas engaged in?
9    A.  Just, you know, the bombing and the conflict
10       back and forth within Israel.
11   Q.  And what was your understanding as to what
12       the conflict was with Israel?
13   A.  At that time?
14   Q.  Uh-huh.
15   A.  Well, I think there's a whole number -- a
16       whole number of issues as to what the
17       conflict is, I guess.  But, you know, at that
18       time I just -- I understood that, you know,
19       they were -- they were launching missiles
20       back and forth at each other.
21   Q.  Okay.  So it was your understanding that the
22       conflict involved Hamas and Israel launching
23       missiles back and forth at each other; is
24       that correct?
25   A.  That's part of it.  I mean, this is just an

Page 107

1       initial e-mail, so I wanted to have a

2       conversation with Pamela.

3   Q.  I completely understand, but --

4   A.  Yeah.

5   Q.  -- I'm just asking for your -- your baseline

6       level of knowledge prior to getting into the

7       claim, I want -- I'd like to know what --

8       gain your understanding of Hamas is and what

9       the conflict was about, so that's the reason

10      for the questions.

11              The -- the -- I'd like to focus on

12      the missiles going back and forth.  Was it

13      your understanding that Israel was launching

14      missiles at Hamas in Gaza?

15  A.  That's my understanding, yes.

16  Q.  What was your understanding as to the reasons

17      why there was the conflict?

18  A.  You mean generally why there's a conflict

19      between the two or the express reasons at

20      this time?

21  Q.  Generally.

22  A.  Generally?  I -- I mean, there's a whole host

23      of reasons.  I mean, it goes back to, you

24      know, thousands of years ago.  But first and

25      foremost, it's over the -- over the land,

1          over...

2     Q.   And what land would that be?

3     A.   Well, it's Israel.

4     Q.   And this is not meant to be a history test, I

5          really just would like to understand your

6          base level of knowledge prior to getting into

7          the investigation of the land.  What -- what

8          was the -- of the claim.

9                    When you say there was a conflict

10         over the land and a conflict over the land of

11         Israel, what was that conflict?

12    A.   Well, again, you know, there's -- there's --

13         they're fighting back and forth, there's

14         Gaza, there's the west bank, I mean, there --

15         and that's my understanding of what was going

16         on.

17    Q.   And you consider Gaza to be separate, you

18         knew that it was separate from the West

19         Bank --

20                    MS. SCOTT REED:  Objection --

21    BY MS. COYOCA:

22    Q.   -- at the time in July 2014 when this claim

23         first surfaced; is that right?

24                    MS. SCOTT REED:  Objection to

25         form, foundation, misstates the witness's

1    testimony.

2              THE WITNESS:  Yes.  I mean, the

3    West Bank is up in this part of Israel,

4    (indicating), and the Gaza Strip is down --

5    down in the lower part, (indicating), so...

6              MS. COYOCA:  Okay.  And let the

7    record reflect that the witness was using her

8    hands to distinguish that there were two

9    different areas where the two land groups

10   were located.

11   BY MS. COYOCA:

12   Q.  Is that right?

13   A.  That's correct.

14   Q.  Okay.  Now, as to the -- as to your

15   understanding of the reason why this

16   particular July 2014 conflict came into

17   existence, what was your understanding as to

18   that?

19   A.  At this time?

20   Q.  Uh-huh.

21   A.  At this time I -- I had just -- Pamela had

22   just let me know, so I -- I needed to talk to

23   her.  I didn't have any particular

24   understanding at that time.

25   Q.  Got it.  You responded the next day on

1    July 17; is that correct?

2  A.  Yes.

3  Q.  Between your written response, the e-mail

4      response on July 17, and the time Ms. Johnson

5      sent the e-mail on July 16, did you have any

6      communications with her about the Dig claim?

7  A.  My guess is that we did.

8  Q.  Your guess.  Do you specifically recall

9      having communications with her about it?

10  A.  I know that we talked about it.

11  Q.  So it's your belief that prior to the time

12      that you sent the July 17 e-mail, you had a

13      conversation with Ms. Johnson about the Dig

14      claim; is that correct?

15  A.  I -- I would -- yes, that would be my belief

16      based on -- based on the type of claim that

17      she's talking about, yes.

18  Q.  Okay.  And do you recall specifically having

19      the conversation?

20  A.  I -- I can't recall specifically, no.

21  Q.  But it's your best estimate that, because of

22      the nature of the claim, you think it's

23      likely that you did have such a conversation?

24  A.  Yes.

25  Q.  Do you recall meeting with her or did you

1    have a conversation by telephone, if you

2    recall?

3  A.  Again, I don't recall.  Most likely, it was a

4    telephone call.

5  Q.  And what did Ms. Johnson tell you about the

6    claim during that call?

7  A.  Again, we would have discussed kind of

8    the -- the facts surrounding the initial --

9    when the initial notice came in.  We would

10    have talked about what she understood today.

11    We would have talked about anything that --

12    any additional information that she had

13    gathered since the initial notice, things

14    like that, that would have been typical.

15  Q.  Okay.  What do you recall specifically as to

16    the facts surrounding the claim when the

17    initial notice came in that she told you?

18  A.  I mean, the initial notice, I think the --

19    was whether or not NBC was deciding whether

20    or not they were going to continue filming in

21    Israel.

22  Q.  Anything else?

23  A.  Well, they were -- the decision -- or they

24    were -- they were considering whether or not

25    to continue filming based on what was going

Page 112

1        on between Hamas and Israel.

2   Q.   Did she tell you specifically any facts about

3        what was going on in -- in Israel at the

4        time?

5   A.   I'm sure that she did.

6   Q.   Do you recall any of the specifics as to what

7        she told you?

8   A.   I mean, I'm sure that she -- that she would

9        have mentioned just the rocket fire, she

10       would have mentioned just the -- you know,

11       the ground troops, the bombings, you know,

12       the -- what was going on that made, you know,

13       the area unsafe, what Israel was doing, what

14       Hamas was doing.

15  Q.   So during this initial phone conference or

16       conversation, you believe that Ms. --

17       Ms. Johnson talked about ground troops?

18  A.   I said that we probably would have talked

19       about what was going on.  So, again, I don't

20       have the express recollection of exactly what

21       she told me two years ago, but...

22  Q.   Okay.  Did this conversation, to the best of

23       your recollection, did it take place on

24       the -- on the 16th when you first received

25       the e-mail at about 1:44 p.m.?

Page 113

1   A.   My guess is it either would have taken place

2        that evening or early the next morning.

3   Q.   And, again, focusing specifically on

4        ground -- the question of ground troops, do

5        you have a specific recollection that

6        Ms. Johnson spoke to you about ground troops

7        at the time that you had that first telephone

8        call?

9   A.   Not on the first -- I mean, I'm just -- no,

10       specifically, I can't remember exactly what.

11  Q.   What did she tell you -- I understand it may

12       not have been on the first conversation, but

13       what did she tell you about ground troops?

14  A.   Again, I mean, when we would have had our

15       conversations over the course of the claim,

16       she would have told me everything that she

17       had gained, all the information she gathered

18       based on her investigation.

19  Q.   Right.  I'm focusing, though, specifically on

20       ground troops.  What did Ms. Johnson tell

21       you, if anything, about ground troops?

22  A.   I would -- that -- that Israel is putting

23       together ground troops and calling, you know,

24       together their military arm.

25  Q.   And when's the first time that you can

1    recollect that Ms. Johnson spoke with you

2    about ground troops?

3  A.  Again, it would have been sometime during the

4    course of our conversations.

5  Q.  But you don't know whether or not it was at

6    this very initial stage when you first

7    received notice about the claim on July 16 or

8    at some later point --

9  A.  I don't.

10  Q.  -- is that right?

11  A.  That's correct.

12  Q.  Okay.  You also said that you discussed --

13    well, I don't want to mischaracterize it.

14    You used the words rocket fire, and I was

15    asking you about that initial phone

16    conference.  Do you recall specifically

17    during the initial phone conference having a

18    discussion about rocket fire?

19  A.  I know we had a discussion about it, I don't

20    know whether it was the initial call or not.

21  Q.  Okay.  And do you recall did Ms. -- did

22    Ms. Johnson tell you that rockets were being

23    launched by Hamas into Israel?

24  A.  I knew that.  I don't -- you know, I don't

25    know whether she told me or not, but I would

1        guess she did, because, again, it would have

2        been part of her overall investigation.

3   Q.   Okay.  And you believe that's something you

4        knew just from news sources generally?

5   A.   I'm sure, yes.

6   Q.   Okay.  Now, with respect to the concept of

7        Israel firing rockets into Gaza, where did

8        you learn that information?

9   A.   I either learned it from Pamela, probably

10       both Pamela and just news, watching news.

11  Q.   Okay.  What do you recall about Pamela

12       telling you with respect to rockets being

13       fired from Israel into Gaza?

14  A.   I think she probably just -- again, it would

15       have been -- it would have been during the

16       course of the investigation.  It would have

17       been her telling me what's going on and the

18       rockets firing, simply that they are firing,

19       I mean, that Israel is firing and that Hamas

20       is firing rockets as well, and this is just

21       one of many things that's going on between

22       Hamas and Israel.

23  Q.   What else did Ms. Johnson tell you about the

24       things that were going on between Hamas and

25       Israel?

EXHIBIT 15

1  A.  Well, I think she looked at all the resources

2      that she could that were available and just

3      we wanted to get an understanding of what was

4      going on in Israel in terms of, A, the -- you

5      know, the fighting between Hamas and Israel,

6      so what did that entail, did -- you know,

7      did -- it entailed launching rockets back and

8      forth, it entailed ground troops, it entailed

9      airplanes fire, things like that.  Again,

10     everything that she did in her investigation.

11 Q.  Right.  But I'm focusing specifically on what

12     Ms. Johnson told you about as opposed to what

13     you believe Ms. Johnson did in terms of her

14     investigation.

15          So can you recall specifically what

16     she told you about the Hamas/Israeli conflict

17     during that first phone conversation or at

18     any point when you were handling the claim?

19 A.  Again, I -- I can't recall the specific

20     conversations, I just know she would have

21     told me everything that was going on in --

22     between Hamas and Israel.

23 Q.  And -- and do you recall, as you sit here

24     today, any of the specific things that she

25     told you that were going on?

Page 117

1    A.   Again, like I said, she would have mentioned

2         all the different things that were going on

3         in terms of military weapons, you know,

4         tanks, ground troops, airplanes, missiles,

5         things of that nature.

6    Q.   Anything else aside from military weapons,

7         tanks, ground troops, airplanes, missiles,

8         things of that nature, anything else?

9    A.   We would have talked about the policy, of

10        course.  We would have talked about anything

11        that she had further gleaned -- further

12        understood from NBC.  We would have again

13        talked about what -- again, the conclusion,

14        what -- what she had found, what research she

15        had done, what she had looked at.

16   Q.   I'm focusing specifically about the things

17        that she told you that were going on between

18        Hamas and Israel, not anything to do with the

19        policy or anything like that, but just the

20        things that were going on between Hamas and

21        Israel.

22   A.   Right.  And, I apologize, but I think I

23        answered that already.

24   Q.   Okay.  And I -- I'm just trying to probe your

25        recollection to get the best understanding

EXHIBIT 15

Page 118

1      that there wasn't anything that -- that you

2      have not yet testified to.  So it's just the

3      list that you provided?

4   A.  That's what I -- that's what I can think of

5      right now.

6   Q.  Okay.  Now, you indicated that you believe

7      that she told you about all the resources

8      that she had looked at; is that correct?

9   A.  That's correct.

10  Q.  What resources did she tell you she had

11      looked at?

12  A.  My understanding is that she looked at news

13      clippings, news articles, resources available

14      online and -- and -- yeah, those were things

15      that she looked at.

16  Q.  News clippings, articles and online articles;

17      is that right?

18  A.  Online broadcasts as well, broadcasts, and

19      then I think she tried also to get

20      multitude -- kind of multiple different

21      sources as well.

22  Q.  What are the other multiple different

23      resources?

24  A.  Well, I think we wanted to look at what, you

25      know, CBS, NBC, CNN, to the extent, you know,

1       the BBC, things like that.

2   Q.  So just so I understand, Ms. Johnson told you

3       that she was looking at, she, Ms. Johnson,

4       was looking at these various news sources,

5       CBS, NBC, CNN, to see what they were saying

6       about the conflict?

7   A.  She said she was doing -- yeah, doing

8       significant research, yes.

9   Q.  Did she tell you that she was doing the

10      research or that Danny Gutterman was doing

11      the research?

12  A.  I don't think she distinguished for me, no.

13  Q.  Did Ms. Johnson provide you with copies of

14      any of the news clippings or articles that

15      she had indicated she was looking at

16      reviewing?

17  A.  I don't recall.

18  Q.  While you were at OneBeacon, did you maintain

19      a separate file as to each claim that

20      Ms. Johnson would consult with you about?

21  A.  No, not necessarily.

22  Q.  Did you keep any of the e-mails that she

23      would send to you about particular claims,

24      did you save them someplace on the system?

25  A.  No, I wouldn't necessarily save the e-mails.

Page 120

1          I mean, only if we thought that -- that we

2          might be involved in litigation or something

3          like that, but, no.

4     Q.   Are there particular documents or

5          communications that you would have sent to

6          the claims file as part of your

7          communications with Ms. Johnson?

8     A.   No.

9     Q.   Did Ms. Johnson send to you links to any of

10         the online broadcasts that she was looking

11         at?

12    A.   She may have.

13    Q.   Do you recall seeing any of them?

14    A.   I recall seeing some online broadcasts, but I

15         don't recall whether or not she sent me the

16         links.

17    Q.   And what news source were the online

18         broadcasts from?

19    A.   I -- I don't remember.

20    Q.   Did Ms. Johnson ever tell you that she was

21         looking at how the U.S. government was

22         characterizing the conflict?

23              MS. SCOTT REED:  Objection;

24         assumes facts not in evidence, lack of

25         foundation.

Page 121

1          THE WITNESS:  I don't recall

2      having a conversation about that, no.

3   BY MS. COYOCA:

4   Q.  Did you ever ask Ms. Johnson, Let's look at

5      how the U.S. government is treating the

6      conflict?

7   A.  No, I don't think I did.

8   Q.  Did Ms. Johnson ever tell you that she had

9      looked at any U.S. government websites, such

10     as the Secretary of State or White House

11     press briefings or anything of that nature in

12     terms of how the U.S. government looked at

13     Hamas?

14  A.  I don't -- I don't -- I don't remember that.

15     I don't recall, no.

16  Q.  Did you ever direct Ms. Johnson to go and

17     investigate how the U.S. government viewed

18     Hamas?

19  A.  No.

20  Q.  In the e-mail that Ms. Johnson sent to you on

21     Wednesday, July 16, she indicates, begin

22     quotes, "I want to make sure that OBE takes a

23     position that is consistent with the rest of

24     OneBeacon in interpreting the exclusion for

25     warlike actions by a military force," close

Page 122

1       quotes.  Do you see that?

2   A.   Yes.

3   Q.   What did you understand her to be saying to

4        you there?

5   A.   She just wants to make sure that one -- if

6        OneBeacon has ever taken a position with

7        respect to warlike action, that we know about

8        it and we're consistent with that position.

9   Q.   And did you ever make a determination as to

10       how OneBeacon had previously treated warlike

11       actions by a military force?

12              MS. SCOTT REED:  Objection to

13       form, foundation, assumes facts not in

14       evidence.

15              THE WITNESS:  What -- what we --

16       or what I would have done on this end is just

17       to check with the groups that I work with and

18       then the managers of the other groups to see

19       if they've ever had -- if they've ever had

20       occasion to deal with a war exclusion or

21       taking a position on it with respect to a

22       claim.

23   BY MS. COYOCA:

24   Q.   And did you do that?

25   A.   I did.

Page 123

1    Q.   Who did you talk to?

2    A.   My guess is I talked to the -- the different

3         managers, so I probably talked to Judy Lamble

4         and maybe Jeffrey Comisso, and then

5         probably -- and then probably the claim

6         managers also that I -- that I managed.

7    Q.   Do you know how to spell Commisso?

8    A.   I think it's C-O-M-I-S-S-O.  It might be two

9         M's, but...

10   Q.   Okay.  And what about Judy Lamble?

11   A.   It's L-A-M-B-L-E.

12   Q.   Now, you indicated that your guess is that

13        you talked to the different managers.  Do you

14        actually specifically recall talking to

15        different managers about their experience in

16        handling war exclusion -- the war exclusion

17        in the context of other claims?

18   A.   I don't have a specific recollection, but I

19        know that I would have followed up on -- on

20        this issue.

21   Q.   So you believe that you did?

22   A.   Absolutely.

23   Q.   Did you do any review of any files or

24        documents in order to determine whether or

25        not OneBeacon had previously addressed a

Page 124

1    claim that potentially implicated the war

2    exclusion?

3  A.   No.

4  Q.   Other than speaking with the other claim

5    managers, is there any other specific action

6    that you took?

7  A.   No, that would have been the extent of it.

8              THE VIDEOGRAPHER:  Counsel, we

9    have about five minutes left on the tape.

10             MS. SCOTT REED:  And can we get to

11   a stopping point for lunch as well?

12             MS. COYOCA:  Yeah, sure.  No

13   problem.  You guys want to go ahead and take

14   lunch?

15             THE WITNESS:  Yeah.

16             MS. COYOCA:  Why don't we go off

17   the record now and you can do it.

18             THE VIDEOGRAPHER:  It's

19   12:55 p.m.  We're going off the record.

20             (Whereupon, a brief recess

21             was taken.)

22             THE VIDEOGRAPHER:  It's 2:04 p.m.,

23   We're back on the record.  This begins DVD

24   number 3.

25  BY MS. COYOCA:

Page 125

1    Q.  Ms. Gooley, before we took a break for lunch

2         we were talking about the conversation, the

3         very first conversation that you had with

4         Ms. Johnson concerning the claim.  And I

5         believe you indicated that that conversation

6         occurred after you received the e-mail chain

7         that's set forth in Exhibit 31; is that

8         right?

9                    MS. SCOTT REED:  Objection to

10        form, misstates prior testimony.

11   BY MS. COYOCA:

12   Q.  Is that correct?

13   A.  My recollection is that I spoke with her

14        after the e-mail, yes.

15   Q.  Okay.  During that conversation, did you

16        discuss the potential applicability of the

17        war exclusion to the Dig claim?

18   A.  Can I refer to the e-mail --

19   Q.  Absolutely.

20   A.  -- quickly, please?  I'm sure that we did

21        given the nature of the e-mail.

22   Q.  Because of the fact that Ms. Johnson

23        referenced the potential applicability of the

24        war exclusion; is that correct?

25   A.  Because -- because she said, "I want to make

Page 126

1     sure OBE takes the position consistent with

2     the rest of OneBeacon in interpreting the

3     exclusion of warlike actions by a military

4     force," so, yes.

5   Q.  Okay.  So do you recall actually discussing

6       it with Ms. Johnson during that first

7       conversation?

8   A.  I don't have a specific recollection.

9   Q.  Do you generally recall that you discussed

10      the war exclusions with Ms. Johnson in the

11      context of the Dig claim?

12  A.  Yes.

13  Q.  Generally, what do you recall?

14  A.  I think we would have discussed what she --

15      you know, what research she had done, what --

16      you know, what she -- what she had received

17      from NBC, we would have looked at the policy,

18      and given those facts we would have, you

19      know, discussed whether or not we thought

20      there was coverage based on the -- the war,

21      warlike exclusions in the policy.

22  Q.  Do you believe any of those discussions in

23      the context of what research had been done,

24      what she had received from NBC, her look at

25      the policy, had any of that occurred at the

Page 127

1    time you initially spoke to her on the 16th

2    or 17th?

3  A.  We probably would have had initial

4    conversations.  I don't know how far along

5    she would have -- I mean, she -- how much

6    information she would have put together by

7    that point.

8  Q.  What, if anything, do you recall in terms of

9    the specifics as to what Ms. Johnson had for

10   you with respect to the claim the first time

11   you talked?

12 A.  Again, I -- I can't recall the express

13   conversation.  All I can remember is over the

14   course of the -- you know, over the course of

15   the life of the claim what we would have --

16   what we talked about.

17 Q.  Were you at all surprised by Ms. Johnson's

18   invocation of the potential applicability of

19   the war exclusion coming so shortly after the

20   claim having been tendered?

21 A.  I don't know that I would say I was

22   necessarily surprised.  I think that -- I

23   think that you always look at the coverages,

24   and given the nature of -- you know, given

25   the nature of what was going on at that time,

Page 128

1       that necessarily would have been an issue

2       that we would have considered.

3   Q.  After you received -- or did you eventually

4       look at the policy in the context of this

5       claim?

6   A.  Yes.

7   Q.  Okay.  And the policy has previously been

8       marked as Exhibit 1 at the Peter Williams

9       deposition.  Can you take a look at the

10      policy?

11  A.  You want me to look at the entire policy?

12  Q.  No, I just want to -- want you to assure

13      yourself that this is indeed the policy that

14      you reviewed in the context of the Dig claim.

15  A.  (Reviews document.)  Yes, this would have

16      been the policy.

17  Q.  Okay.  It's for the policy period from

18      January 1, 2014, through June 30, 2015?

19  A.  Correct.

20  Q.  Okay.  I want to direct your attention to

21      page ATL003083.  When you -- when you

22      indicate that you discussed the war exclusion

23      or the war exclusions with Ms. Johnson, are

24      you referring to the exclusions that are set

25      forth in section 3, exclusions applicable to

Page 129

1    all sections of this policy?

2    A.   That -- that would be my recollection, but I

3         would like to just look through the policy

4         quickly.  (Reviews document.)

5              Yes, that's -- I think that's

6         correct.

7    Q.   All right.  I want to -- I want to talk about

8         section 3-1 on page 3083, "War, Including

9         Undeclared or Civil War."  Do you see that

10        exclusion?

11   A.   Yes.  Yes, I do.

12   Q.   Did you have conversations with Ms. Johnson

13        about the potential applicability of

14        exclusion 3 -- section 3.1?

15   A.   Yes.

16   Q.   What were your discussions?

17   A.   Again, to the best of my recollection, our

18        discussions would have been based on what

19        information she had, what was going on

20        between Hamas and Israel and all the -- you

21        know, all the facts surrounding the -- what

22        was -- in July and early June -- or mid June,

23        and whether or not we believed that amounted

24        to war, including undeclared or civil war.

25        So we would have talked about exclusion 1 and

1          along with the exclusion 2, 3 and 4 as well.

2          Not 4, not the atomic fission, so...

3     Q.   So as to exclusion 4, you did not discuss it

4          and you did not -- is that correct?

5     A.   I think we -- I mean, we would have looked at

6          it, "Any weapon of war including atomic

7          fission" -- or excuse me, we did.  I was

8          looking at the, "Atomic fission or

9          radioactive force," so I apologize, I

10         misspoke.

11    Q.   I want to -- I want to go through this a

12         little more slowly.

13              With respect to exclusion 1, "War,

14         Including Undeclared or Civil War," you

15         reviewed that exclusion with Ms. Johnson; is

16         that correct?

17    A.   That's correct.

18    Q.   And did you -- you conclude personally that

19         exclusion 1 applied to the Dig claim?

20    A.   Yes, I believe it does.

21    Q.   And did you make the decision that the claim

22         should be denied on the basis of exclusion 1?

23    A.   We made the decision that the claim should be

24         denied based on the exclusions, that was one

25         of them.

Page 131

1   Q.   Okay.  When you say, "We," who is we?

2   A.   Pamela and I.

3   Q.   Anyone else?

4   A.   Ultimately, Sean signed off on it as well.

5   Q.   And by Sean do you mean Sean Duffy?

6   A.   Yes.  Excuse me.  Yes.

7   Q.   And did you involve Mr. Duffy in the review

8        of the claim?

9   A.   No.

10  Q.   Were you the one who brought it to his

11       attention?

12  A.   Yes.

13  Q.   When you say that he was also involved in the

14       decision, what was his involvement?

15  A.   I -- I simply flagged it for him and he had

16       an opportunity to agree or disagree.

17  Q.   Now, in terms of deciding whether or not

18       exclusion 1 -- I'm just going to call them 1,

19       2, 3, 4 as they're set forth on page 3083.

20       In terms of exclusion 1 and making the

21       decision that it applied, did you look at

22       whether or not Hamas was a sovereign entity?

23  A.   Pamela looked at -- at Hamas and what -- how

24       Hamas was considered, in what -- in terms of,

25       you know, it being part of the government,

1          governing the Gaza Strip, the activities it

2          was involved in, including, you know,

3          providing social services, having its own

4          military, political office, things of that

5          nature.

6    Q.    But my question to you is, specifically, did

7          you come to a conclusion that Hamas was a

8          sovereign entity?

9    A.    Hamas governs Gaza.

10   Q.    Okay.  But I'm asking you for the -- the

11         label, if you -- if you put one on it, did

12         you conclude that Hamas was a sovereign

13         entity?

14   A.    We didn't put a sovereign label on it.

15   Q.    Did you conclude that it was a

16         quasi-sovereign entity?

17   A.    We concluded that it was an entity that

18         governed Gaza.

19   Q.    Was it your understanding that Hamas needed

20         to govern Gaza in order for the war exclusion

21         to apply?

22   A.    No.

23              MS. SCOTT REED:  Objection to

24         form, misstates the witness's testimony.

25   BY MS. COYOCA:

Page 133

1    Q.   Why was that not necessary, in your view?

2    A.   Well, because I think when you think about

3         war, war is between -- I mean, the war is

4         between entities, it doesn't have to be

5         between Greece and France, it can be -- like

6         in this case, we had Gaza -- we had the

7         Gaza Strip and we had the action going on

8         between Hamas and Israel.

9    Q.   But in your view, is it sufficient to invoke

10        the war exclusion if there is a course of

11        hostilities between a sovereign government

12        and some other entity that has some

13        authority?

14   A.   It depends on the facts.

15   Q.   Okay.  What is it about Hamas that, in your

16        view, made it sufficient to conclude that it

17        had sufficient control or governmental

18        authority that it was appropriate to invoke

19        the war exclusion?

20             MS. SCOTT REED:  Objection to

21        form, lack of foundation and misstates the

22        witness's prior testimony.

23             THE WITNESS:  Again, I mentioned

24        Hamas having its own, you know, holding

25        political office, having different branches

365                                          EXHIBIT 15

Page 134

1          that are consistent with the government, but

2          then you couple that with what was going on,

3          that invokes the war exclusion, the missiles

4          being exchanged between Israel and Hamas, the

5          ground fighting, you know, the war planes,

6          all those things, that is war.

7     BY MS. COYOCA:

8     Q.   Do you believe that in order for a course of

9          hostilities to be characterized as war, that

10         it is necessary for both entities to be a

11         sovereign government?

12                    MS. SCOTT REED:  Objection to

13         form, legal conclusion.

14                    THE WITNESS:  I don't believe it

15         is necessary.

16    BY MS. COYOCA:

17    Q.   Do you believe that it is necessary in order

18         for the war exclusion, prong 1, to be

19         invoked, that it is necessary for the

20         activities, the hostile activities between

21         the two forces, that they occur between a

22         sovereign and a quasi-sovereign government?

23                    MS. SCOTT REED:  Objection to the

24         extent it calls for a legal conclusion.

25                    THE WITNESS:  Again, it could be a

1          quasi -- a sovereign or a quasi-sovereign.

2          But it's -- again, we're talking about war,

3          what the actions are between the two parties.

4                    MS. COYOCA:  Right.  I'm asking

5          you, though, a different question.

6     BY MS. COYOCA:

7     Q.   What I'm asking you is, in your view, in

8          order to find that this exclusion, the term

9          war has been met, is it necessary that those

10         hostilities that you referenced, do they have

11         to occur between a sovereign government and

12         another sovereign government or a sovereign

13         government and a quasi-sovereign government?

14    A.   No.

15                   MS. SCOTT REED:  Objection to

16         form --

17                   THE WITNESS:  No.

18                   MS. SCOTT REED:  -- legal

19         conclusion.

20    BY MS. COYOCA:

21    Q.   Now, you indicated that part of your

22         conclusion that it was appropriate to invoke

23         the war exclusions was the type and nature of

24         the hostilities that were occurring, the

25         missiles, the war planes, the ground troops;

1       is that correct?

2    A.   That's correct --

3             MS. SCOTT REED:  Objection;

4       misstates --

5             THE WITNESS:  -- that is a

6       consideration.

7             MS. SCOTT REED:  Misstates the

8       full character of her prior testimony.

9    BY MS. COYOCA:

10   Q.   Where did you learn the information or how

11      did you learn the information that war planes

12      were involved?

13   A.   From Pamela.

14   Q.   How did you learn that missiles were

15      involved?

16   A.   That would probably be from Pamela and also

17      just from the news.

18   Q.   Any other source aside from Pamela?

19   A.   Pamela or the news.

20   Q.   In -- in approving the decision to deny the

21      war exclusion or not raising an objection to

22      it being invoked, were you relying on your

23      personal viewing of news reports?

24   A.   I relied on Pamela's research and also my

25      understanding and my own personal viewing of

Page 137

1    different news.

2  Q.  And what news reports did you review?

3  A.  I mean, every -- A, I watch the general local

4      news.  I specifically remember watching the

5      NBC clip on what was going on in -- in Israel

6      and how it referred to it as war.  And then,

7      you know, discussions with Pamela, of course.

8  Q.  Did you ask Ms. Johnson where she had

9      obtained the information from as to the

10     activities that you're characterizing as war?

11 A.  I -- I may or -- I don't know whether I asked

12     her, simply because I knew she got them on

13     the Internet or watched them, you know, over

14     the local television show.

15 Q.  But did you ever form an understanding as to

16     specifically what resources she had consulted

17     in order to investigate whether or not a war

18     was taking place?

19 A.  Yes, I'm sure in the course of our

20     discussions she detailed what she looked at

21     and how she reached her conclusions.

22 Q.  Did she memorialize any of that in writing to

23     you?

24 A.  No, we would have had an oral discussion.

25     Ultimately, you know, what we put in writing

1    was the coverage letter that was sent to NBC.

2  Q.  And with respect to her explaining to you

3      what resources she had consulted, aside from

4      news -- local news reports and Internet

5      searches, did she describe anything else?

6                MS. SCOTT REED:  Objection to

7      form, misstates the witness's testimony.

8                THE WITNESS:  She looked at more

9      than just local news reports.  She looked at

10     news reports both locally, nationally and

11     internationally.  I know she looked at -- you

12     know, she looked at -- just did different

13     research on -- on how -- what was going on on

14     the Internet.  She also -- I'm trying to --

15     pulled news clips, actual footage too and

16     looked at that as well.

17  BY MS. COYOCA:

18  Q.  So in terms of the news reports locally,

19     nationally and internationally, what news

20     reports did she -- what -- what sources of

21     news reports did she consult?

22  A.  To the best of my recollection, she'd be able

23     to tell you more appropriately, but I know,

24     like I mentioned, that the NBC clips.  I know

25     that she looked at international.  I would

1    guess BBC, that would be -- and then, you

2    know, the -- the -- the national CNN, things

3    of that -- news reports relating to that.

4  Q.  And did she report to you that in all

5    instances, all of these news reports had

6    indicated that a war was occurring?

7  A.  I think, yeah, she concluded, based on

8    everything, that she had seen in terms of the

9    reports that there was a war.

10  Q.  I'm asking you a different question.  My

11    question is -- I understand that there would

12    have been a discussion about the activities

13    that were occurring in Israel and Gaza.

14          But what I'm asking is:  Did she

15    report back to you that all these news

16    sources were referring to the activities in

17    Israel as being a war?

18  A.  To the best of my recollection, she did not

19    report anything to me that indicated it

20    wasn't a war.

21  Q.  Okay.  My question is --

22  A.  I think I answered it, because it's --

23    there's --

24  Q.  Right, no, I don't think you did, okay?

25  A.  But I do -- I did.

Page 140

1          MS. SCOTT REED:  Objection to the

2      side bar, Counsel.  Pose a question if you're

3      going to pose a question.

4  BY MS. COYOCA:

5  Q.  Here's the question --

6          MS. SCOTT REED:  Don't argue with

7      my witness.

8  BY MS. COYOCA:

9  Q.  -- did Ms. Johnson tell you that the news

10     sources that she was consulting were

11     reporting the circumstances in Israel as

12     being a war?

13 A.  She said all of the -- the news that reported

14     indicated it was a war.

15 Q.  And that all of the news sources that were

16     reporting on the circumstances actually used

17     the word -- word war, that's what Ms. Johnson

18     told you?

19         MS. SCOTT REED:  Objection; form,

20     compound.

21         THE WITNESS:  The testimony -- or

22     what you're asking me is two-and-a-half years

23     ago.  I don't know if she said specifically

24     no, none of them, they said war in every one.

25     What I'm saying is based on everything that

Page 141

1        she saw, including our conversations, it

2        indicated that there was a war going on.

3    BY MS. COYOCA:

4    Q.  What specific news organizations did

5        Ms. Johnson tell you had characterized the

6        events in Israel as being a war, using the

7        word war?

8              MS. SCOTT REED:  Objection to

9        form, lack of foundation, assumes facts not

10       in evidence.

11             THE WITNESS:  NBC was one of them.

12   BY MS. COYOCA:

13   Q.  Any others?

14   A.  I mean, the other sources that she looked at,

15       again, national, international, I can't

16       recall the specifics.  NBC I do recall.

17   Q.  But what I'm asking is:  The use of the word

18       war during the news reports, what news

19       reports by what specific news sources did

20       Ms. Johnson indicate had characterized the

21       actions in Israel as a war?

22             MS. SCOTT REED:  Objection; asked

23       and answered.  That exact question which was

24       posed and she give you a full answer.

25             THE WITNESS:  All the reports that

Page 142

1        she looked at indicated it was a war.

2   BY MS. COYOCA:

3   Q.   In Ms. Johnson's investigation of the facts

4        and circumstances concerning the claim, did

5        she investigate whether or not Hamas was a

6        terrorist organization?

7                  MS. SCOTT REED:  Objection to

8        form, lack of foundation, speculation.

9                  THE WITNESS:  She -- she did look

10       at Hamas, yes.

11  BY MS. COYOCA:

12  Q.   But did she look to see whether or not Hamas

13       had been designated as a terrorist

14       organization by the U.S. government?

15  A.   I don't --

16                 MS. SCOTT REED:  Objection; calls

17       for speculation.

18                 THE WITNESS:  I don't believe she

19       looked at whether the U.S. government

20       designated Hamas as a terrorist organization.

21  BY MS. COYOCA:

22  Q.   Did you ask Ms. Johnson to consider whether

23       or not Hamas was a terrorist organization in

24       the context of reviewing the claim?

25  A.   No.

EXHIBIT 15

Page 143

1   Q.   To your knowledge, is there any terrorism

2        exclusion in this policy?

3   A.   I don't believe there is a terrorism

4        exclusion.

5   Q.   Did you ever ask Ms. Johnson to research and

6        look at the issue of whether the activities

7        could be characterized as being terrorist

8        activities as opposed to a war?

9   A.   No.

10  Q.   Did you direct anyone at OneBeacon that was

11       involved in the management of the claim or

12       the handling of the claim, to investigate

13       whether or not these acts in Israel

14       constituted terrorist acts as opposed to a

15       war?

16  A.   No.

17  Q.   Did you ask Ms. Johnson to look at the status

18       of Hamas as designated by Israel?

19  A.   No, I did not.

20  Q.   Did you ask Ms. Johnson to look at the

21       United Nations designation of Hamas, its

22       status?

23  A.   I didn't ask her to look at it, but she may

24       have looked at it.

25  Q.   Do you recall relying on her investigation as

EXHIBIT 15

Page 144

1          to UN's determination as to Hamas's status as

2          being part of the decision?

3                      MS. SCOTT REED:  Objection to

4          form, lack of foundation, assumes facts not

5          evidence.

6                      THE WITNESS:  Yeah, I don't recall

7          a conversation about what the United Nations'

8          designation of Hamas was.

9     BY MS. COYOCA:

10    Q.   I understand you don't recall it

11         specifically, but did Ms. Johnson tell you

12         that she had looked at the UN designation?

13    A.   I said she hadn't told me that.

14    Q.   Did you ever ask her to do so?

15    A.   No.

16    Q.   Did OneBeacon consult with outside coverage

17         counsel in order to gain a coverage opinion

18         as to the Dig claim?

19    A.   One -- yeah, OneBeacon did ask coverage

20         counsel to look at the -- look at the issue.

21    Q.   Who made the decision to seek an outside

22         coverage counsel opinion?

23    A.   Ultimately, I would have approved it, but

24         Pamela and I would have talked about it.

25    Q.   Who selected the counsel to be retained for

Page 145

1     that purpose?

2  A.  I would have gone with Pamela's

3     recommendation.

4  Q.  When was the decision made to consult with

5     outside coverage counsel?

6  A.  I -- it would have -- I don't remember the

7     exact date.  It was sometime I think -- it

8     would have been sometime the following week

9     that -- that the notice came in.

10 Q.  Was the decision made to consult with outside

11    counsel, was that made after the

12    determination was made to deny the claim

13    based on the war exclusions?

14 A.  We -- by that time we had already determined

15    that based on everything we knew those -- the

16    exclusions would apply and exclude coverage,

17    yes.

18 Q.  Did OneBeacon consider the opinion that had

19    been obtained from outside counsel in

20    deciding to deny the claim?

21           MS. SCOTT REED:  Objection to

22    form, lack of foundation.

23           THE WITNESS:  Again, before we

24    retained outside counsel, we believed that it

25    was excluded based on the war exclusions.

EXHIBIT 15

Page 146

1        After we received the opinion, of course we

2        looked at it and considered that as well.

3    BY MS. COYOCA:

4    Q.  Did you raise the prospect of getting an

5        outside coverage opinion or did someone else

6        at OneBeacon?

7                MS. SCOTT REED:  Objection to

8        form, lack of foundation, assumes facts not

9        in evidence.

10               THE WITNESS:  Pamela and I talked

11       about it.  I was not the one that had the

12       idea initially.

13   BY MS. COYOCA:

14   Q.  Do you know who had the idea initially?

15   A.  No, I don't.  I would assume it's Pamela.

16   Q.  Do you know if Peter Williams made the

17       suggestion to Pamela Johnson to seek an

18       outside coverage opinion?

19   A.  He may have.

20   Q.  Were you on any phone calls where coverage

21       counsel, outside coverage counsel was also on

22       the call concerning the Dig claim?

23   A.  I -- I don't -- I don't remember.

24   Q.  Do you know how long it took from the time of

25       retention of outside counsel to the time an

1       opinion was rendered, how many days had

2       elapsed?

3   A.  About three, I think.

4   Q.  Were you on any e-mail communications where

5       outside coverage counsel was also on the

6       e-mail chain?

7   A.  I might have been.  I don't remember.

8   Q.  Going to the second prong of the war

9       exclusions, number 2, the one that begins,

10      "Warlike action by a military force," do

11      you -- do you see that exclusion?

12  A.  Yes.

13  Q.  Did you have specific discussions with

14      Ms. Johnson about prong 2?

15  A.  I -- I'm sure that we did, yes.

16  Q.  What did you discuss?

17  A.  We would have discussed what the -- you know,

18      what the investigation, what we had found out

19      through our factual investigation and

20      whether, you know, the fact that what was

21      going on between Hamas and Israel and --

22      including the -- again, the -- you know, the

23      hostility, the ground crews, the missiles,

24      airplanes, things of that nature, whether

25      that constituted a warlike action by a

Page 148

1        military force.

2    Q.  In -- in reviewing, in your mind, the factual

3        investigation that occurred, do you

4        differentiate between the events that were --

5        that were part of the investigation for the

6        first prong of the exclusion versus events

7        that occurred to investigate the second prong

8        of the war claim -- excuse me, the war

9        exclusion?

10   A.  I think we looking at all the -- excuse me --

11       all the events and took all of the

12       information in totality and then look at the

13       application of the exclusions.

14   Q.  Okay.  When you indicated previously that

15       Ms. Johnson looked at news reports, was she

16       looking at those news reports in order to

17       inform her decision about the potential

18       applicability of prong 2, as well as prong 1?

19                MS. SCOTT REED:  Objection to

20       form, calls for speculation.

21                THE WITNESS:  When Pamela was

22       looking at the news reports throughout the

23       time period in doing her research, she wanted

24       to get a better understanding of what the

25       claim was.  And based on that information,

EXHIBIT 15

Page 149

1       then we looked at the policy and the

2       exclusions, which would include these

3       exclusions.

4  BY MS. COYOCA:

5  Q.  By, "These exclusions," which ones are you

6       referring to?

7  A.  I'm referring to exclusion 1 and 2, and

8       potentially exclusion 4.

9  Q.  When the decision was made to deny the claim,

10      what exclusions specifically were invoked?

11 A.  I'd have to see the -- the denial.

12 Q.  Did you discuss with Ms. Johnson -- I

13      understand you can't recall specifics of time

14      frame of discussions, but did you discuss

15      with Ms. Johnson at any time that OneBeacon

16      was considering the Dig claim, whether there

17      was a difference between prongs 1 and

18      prongs 2 of the war exclusions?

19 A.  I'm sure that we did discuss it, because they

20      are different.

21 Q.  In your mind, what are the differences?

22 A.  Well --

23 Q.  Well, I'm sorry, before I ask you that,

24      you've indicated you're sure that you

25      discussed it.  Do you specifically recall

1        discussing the differences?

2    A.  We went through the exclusions, which I'm

3        sure that we did, we would have discussed the

4        differences between the exclusions.

5    Q.  But do you have a specific recollection, as

6        you sit here today, of having such a

7        discussion about the differences?

8    A.  I don't, but I know that we would have had

9        that discussion.

10   Q.  What were the differences that were

11       discussed?

12   A.  Well, I don't -- I mean, I can tell you what

13       I think we would have discussed.

14   Q.  If you can't recall the specifics then, if

15       you think you discussed it, then, yes, please

16       tell me what you think you discussed as to

17       those differences.

18   A.  When you look at the second prong, it's,

19       "Warlike action by military force, including

20       action in hindering or defending against

21       actual or suspected attacks by a government,

22       sovereign or other authority using military

23       personnel or other agents."

24            Warlike action by a military force.

25       What was going on in Israel between Hamas and

EXHIBIT 15

1          Israel was warlike action.  Hamas is a

2          military force, Israel has a military force.

3          At a minimum, it's an other -- Hamas is an,

4          "Other authority using military personnel or

5          agents."

6    Q.   Did you discuss -- when you say you think you

7          discussed it, do you think that you discussed

8          the fact that exclusion 2 was broader than

9          exclusion 1, narrower, the exact same in

10         scope?

11   A.   It's -- it's a different -- it's not the --

12         it's not the exact same exclusion, it's

13         warlike action by a military force.  That

14         would suggest to me that it has even broader

15         implication.

16   Q.   You indicated you did not discuss

17         exclusion 3; is that correct?

18                  MS. SCOTT REED:  Objection to

19         form, misstates prior testimony.

20                  THE WITNESS:  I imagine that we

21         discussed it.  I think we -- and I'm -- just

22         let me read through it, whether or not they

23         believed it was applicable.  (Reviews

24         document.)

25                  I'm sure we talked about it and we

EXHIBIT 15

1          came -- and it wouldn't have appeared to be

2          applicable to the NBC claim.

3     BY MS. COYOCA:

4     Q.   Do you recall if prong 3 was invoked as being

5          one of the grounds for denial of the claim?

6     A.   Again, I'd have to look at the -- at the

7          actual letter that we sent out.

8     Q.   And what about prong 4, do you recall having

9          discussions about prong 4?

10    A.   I don't recall this -- any express

11         discussions.  Again, it would be based on,

12         you know, our pattern and practice, and we

13         would have run through all four.

14    Q.   Did OneBeacon end up concluding that prong 4

15         applied?

16    A.   I think, yeah, prong -- excuse me, prong 4

17         would apply, any weapon of war, whether in

18         time of peace or war.  I mean, I think we --

19         I think missiles, ground troops, war planes,

20         those are weapons of war.

21    Q.   Was prong 4 invoked in the denial of coverage

22         letter --

23    A.   Again, I'd have to look at the denial letter.

24    Q.   Were you involved in any -- any telephone

25         conferences or any conversations with

Page 153

1        Peter Williams as to the Dig claim?

2   A.   I imagine I was.

3   Q.   Do you recall any specifics?

4   A.   No.

5   Q.   Why do you imagine that you would have had

6        conversations with Peter Williams about the

7        claim?

8   A.   Because it's a big claim and NBC is a big

9        account and he would want to know the status

10       of it, because I know that NBC would contact

11       Peter directly, along with Pamela, and so we

12       would want to keep him abreast of -- of

13       everything.

14  Q.   Did Peter Williams ever indicate that he

15       believed the claim was covered?

16  A.   Not to my recollection.

17  Q.   Did Peter Williams ever indicate to you or

18       anyone at OneBeacon, which you were involved

19       in the communications, that he thought the

20       war exclusions applied?

21  A.   I -- I can't expressly -- I mean, I imagine

22       that he had discussions with people, I --

23       about the war exclusion, specifically Pamela,

24       but I can't -- I can't today tell you whether

25       I had an express discussion with Peter or not

EXHIBIT 15

1        on that issue.  Before the denial of the

2        claim, I should say.

3    Q.  Before you approved the denial of the claim,

4        what did you do to assure yourself that all

5        facts -- all factual investigation that

6        needed to be done had been done?

7                    MS. SCOTT REED:  Objection form,

8        lack of foundation, assumes facts not in

9        evidence.

10                    THE WITNESS:  When Pamela and I

11       decided to go forward with the denial, I --

12       we -- you know, I looked at everything that

13       had been done, I talked to -- or I talked to

14       Pamela, we talked about what had been done,

15       we talked about what the conclusions were,

16       and I think, yes, a thorough investigation

17       was completed by Pamela.

18   BY MS. COYOCA:

19   Q.  Did you ask to see any of the research or

20       analysis that she had been -- that she had

21       done in coming to her conclusions?

22   A.  I know that I -- I -- I saw the NBC clip, so

23       I imagine that she provided that to me.  I

24       know that I saw some of the other

25       information, but today I can't tell you what

Page 155

1       I saw expressly.

2    Q.  When you indicate you saw other information,

3        did you see other news reports?

4    A.  It would have been news reports or articles

5        or things of that nature.

6    Q.  Did Ms. Johnson send you links to any of her

7        Internet searches?

8    A.  She may have.

9    Q.  Do you recall, though, looking at any links

10       to information?

11   A.  I don't recall if I looked at any links.

12   Q.  Now, as to Ms. Johnson's legal analysis of

13       the claim, what did you do to assure yourself

14       that the legal analysis that she had

15       performed was correct?

16   A.  First, I've worked with Pamela for a while

17       and I trust her judgment and rely on her.

18       Second, we had the discussions, and I also

19       reviewed -- I looked at the policy myself and

20       would have reviewed the letter and asked her

21       any questions that I may had with respect to

22       any conclusions that I had a problem with.

23   Q.  You indicated that you've worked with her --

24       you had worked with her for a while.  As of

25       July 2014, how long had you worked with

1      Ms. Johnson?

2  A.  I had probably about a year, but I knew her

3      before that, so...

4  Q.  I'm sorry, you had worked with her at

5      OneBeacon for about one year?

6  A.  Yes.

7  Q.  And when -- when -- when you had known

8      Ms. Johnson previously, was that in the

9      context of working for Travelers?

10  A.  I knew her, yup, in the context of working

11      with Travelers and then also when she

12      reported to Judy Lamble.

13  Q.  Did you work with Ms. Johnson at Travelers?

14  A.  Never in the same business unit, no.

15  Q.  Now, you indicated that you trusted

16      Ms. Johnson's judgment.  Aside from your --

17      your -- working with her at OneBeacon for a

18      year and knowing her when she worked for

19      Ms. Lamble, and also when she worked at

20      Travelers, is there anything else -- is there

21      any other reason why you relied on her -- or,

22      excuse me, you trusted her judgment?

23  A.  When she worked for Judy Lamble, Judy and I

24      are close and so I necessarily knew about her

25      work quality and experience through Judy.

1  Q.  So Judy shared with you information about

2      Ms. Johnson's work performance?

3  A.  Just that she -- she thought she did a good

4      job and she was an experienced and qualified

5      claim handler.

6  Q.  Anything else?

7  A.  Not that I can recall right now.

8  Q.  You indicated that you also looked at the

9      policy yourself when you were determining

10     whether the legal analysis was correct.  Do

11     you recall that?

12 A.  I recall looking at the policy, yes.

13 Q.  Okay.  What parts did you look at?

14 A.  To the best of my recollection, I would have

15     run through the whole policy.  I would have

16     liked -- I would have looked at the -- I

17     would want to -- excuse me.  I would have

18     looked at the endorsements, things of that

19     nature, and then I would have looked at the

20     particular provisions that we believe were

21     applicable in terms of what was triggered and

22     what were the potentially applicable

23     conditions or exclusions.

24 Q.  As you sit here today, can you identify any

25     specific portions of the policy that you

1    believe you reviewed when you were checking

2    the legal analysis, looking into the legal

3    analysis?

4  A.  Again, I would have looked at, you know, at

5    the policy, the dec page, the endorsements.

6    I would have looked at the applicable

7    coverages, the extra expense and the

8    applicable conditions, limitations and

9    exclusions.  But I can't recall expressly did

10   I look at, you know, page 1 of 5 on gas

11   coverage, so...

12 Q.  Did you review the policy in order to

13   determine whether or not there was any

14   terrorism coverage under the policy?

15 A.  I reviewed the policy to try to understand

16   what coverage was provided.

17 Q.  I'm asking specifically did you review it for

18   purposes of trying to determine if there was

19   terrorism coverage under the policy?

20 A.  No.

21 Q.  How early in the process, if at all, did you

22   involve Mr. Duffy in the -- in the claim

23   review?

24          MS. SCOTT REED:  Objection; form,

25   lack of foundation, assumes facts not in

1    evidence.

2                    THE WITNESS:  Sean didn't do the

3         claim review.  I just flagged him about the

4         claim so he knew about it and its existence,

5         and then I flagged him when we were at a

6         position where we were going to decline

7         coverage.

8    BY MS. COYOCA:

9    Q.   When you say you flagged him, what do you

10        mean by that?

11   A.   I just let him know.

12   Q.   Why were you letting him know?

13   A.   Because NBC is a big client, because there is

14        a possibility that NBC would call Sean or an

15        agent of NBC, and because, generally, as a

16        practice, if there's a bigger claim I like to

17        let Sean know.

18   Q.   Did you ask Ms. Johnson to reach out to

19        Mr. Duffy about the claim?

20   A.   No.

21   Q.   Did you have any conference calls with

22        Mr. Duffy and Ms. Johnson about the claim?

23   A.   Not that I remember, no.

24   Q.   How often in your practice, as of July 2014,

25        would you flag Mr. Duffy about a claim very

Page 160

1          early on in the process?

2     A.   It -- it would really depend on the nature of

3          the claim.

4     Q.   Are you able to provide any kind of estimate

5          as to how often you would flag Mr. Duffy

6          about a claim early in the claim process?

7     A.   No.

8     Q.   Other than the Dig claim, can you recall any

9          other instances where you flagged Mr. Duffy

10         when the claim was initially made?

11    A.   I'm sure that there were, but I can't recall

12         anything specifically, no.

13    Q.   During this period of July 2014,

14         approximately how many claims were you

15         involved in reviewing?

16    A.   I -- I really have no idea.

17    Q.   Expanding to the entire time that you were

18         responsible for overseeing management of

19         entertainment related claims, on average, how

20         many claims would you be involved in looking

21         at on a monthly basis?

22    A.   It really depends kind of on what's going on.

23         It could be one to two, it could be three or

24         four.  It just -- it really -- really

25         depends.

Page 161

1   Q.   Do you recall any months during the -- the
2        period of time that you were overseeing the
3        entertainment claims management where you had
4        more than ten claims in one month?
5   A.   There could be.  I mean, it really depends.
6        A, it depends on what's going on in the life
7        of the claim.  If there's claims that are
8        going to trial, I'm going to be involved
9        necessarily to understand what's going
10       forward.  If there's a large mediation
11       they -- I would know about that.  Things of
12       that nature.
13  Q.   Okay.  But I'm actually excluding instances
14       where there was litigation or some type of
15       mediation process.  I'm talking about when a
16       claim is tendered in the entertainment area,
17       were there months that you recall where you
18       handled more than ten claims, ten separate
19       claims?
20  A.   I --
21            MS. SCOTT REED:  Objection to
22       form.
23            THE WITNESS:  I never handled the
24       claims.  There may be months where we would
25       talk about particular claims, never more than

EXHIBIT 15

1        ten.

2    BY MS. COYOCA:

3    Q.   When did Ms. Johnson tell you that she had

4         made a decision to deny the Dig claim based

5         on the war exclusion?

6                  MS. SCOTT REED:   Objection to

7         form, lack of foundation, assumes facts not

8         in evidence.

9                  THE WITNESS:   Pamela didn't tell

10        me she decided to deny the claim, we talked

11        about what her investigation was, what her

12        conclusions were, and then we made a decision

13        whether or not to deny the claim.

14   BY MS. COYOCA:

15   Q.   So the decision was made jointly?

16   A.   She recommended it and I approved it.

17   Q.   When did Ms. Johnson first recommend to you

18        that the claim should be denied?

19   A.   It would have been sometime in late July,

20        around the 22nd, I think, sometime in that

21        range.

22   Q.   Did Ms. Gooley tell you -- excuse me, I'm

23        sorry.

24                  Did Ms. Johnson tell you that she

25        was making the recommendation to deny the

Page 163

1    claim on the basis of the war exclusion

2    before she had told the client?

3  A.  She would have talked to me before she talked

4      to our insured.

5  Q.  Do you recall having that conversation?

6  A.  Whether she talked to the insured first or me

7      or --

8  Q.  No, having the conversation before she went

9      to the insured to tell them that the claim

10     was going to be denied on the war exclusion,

11     do you recall having such a conversation with

12     her?

13 A.  I don't specifically recall today, but given

14     our relationship and how things go, she would

15     have talked to me before she talked to the

16     client.

17            MS. COYOCA:  I believe we are on

18     Exhibit 32.  And this is an e-mail exchange

19     dated July 18, 2014, labeled Bates control

20     ATL001800 through 1801.

21            (Whereupon, Exhibit 32 was

22            marked for identification.)

23 BY MS. COYOCA:

24 Q.  Do you recall sending this e-mail to

25     Mr. Duffy?

1   A.   I don't recall specifically sending it, but I

2        did send it, so...

3   Q.   You don't have any reason to believe you did

4        not send it; is that right?

5   A.   That's correct.

6   Q.   Why were you flagging this claim for

7        Mr. Duffy in the context of this particular

8        e-mail?

9   A.   Because I think, again, I just wanted to let

10       Sean know about a rather significant claim in

11       the event, A, that he was called by NBC or by

12       Aon, but also that he was aware of it as the

13       chief claims officer.

14  Q.   Did you ever discuss the claim, after you

15       sent this e-mail, with just Mr. Duffy?

16  A.   I may have.  I don't recall.

17  Q.   Would it have been your practice to go and

18       discuss a claim that was for a larger client

19       before the claim decision was actually made?

20  A.   It depends on the type of claim.  In this --

21       in this case, again, I don't -- I don't

22       remember whether or not I actually went and

23       had an oral discussion with Sean or not.

24  Q.   Did Mr. Duffy ever indicate to you that he

25       agreed with the claim decision?

1    A.   I believe at some point he -- he did.

2    Q.   When?

3    A.   I can't remember the exact date.  It would

4         have been after we made a recommendation to

5         deny the claim.

6    Q.   As of July 18, had a decision been made to

7         recommend to deny the claim?

8    A.   I'm -- I -- I don't -- I don't know if by

9         that point we had made the decision or not.

10        I simply can't remember.

11   Q.   At the time that Ms. Johnson indicated to you

12        that she believed the claim should be denied,

13        recommended it, did you ask Ms. Johnson to

14        perform any other research or any other

15        analysis before you accepted her

16        recommendation?

17   A.   When Pamela and I had discussions about

18        whether or not to deny, whether or not the

19        claim was covered or not, I didn't ask her to

20        go out and do additional research, no.

21   Q.   Other than Mr. Duffy's response thanking you

22        for the e-mail that appears below on

23        Exhibit 32, did you have any further response

24        from Mr. Duffy to this particular e-mail?

25   A.   I -- I can't remember.  I don't know.

Page 166

1   Q.   Now, you indicated that you reviewed the

2        coverage opinion letter before it went out;

3        is that right?

4   A.   I reviewed the letter drafted by Pamela?

5   Q.   Yes.

6   A.   Yes, I reviewed that before it went out.

7   Q.   Did you have any changes that you wanted made

8        to the letter?

9   A.   I think I had one minor change that was

10       non-substantive.

11  Q.   What was the minor change that you recall?

12  A.   It was something in the first paragraph, but

13       I'd have to see my revisions and I don't

14       remember expressly what it was, but...

15  Q.   Did it have to do with the substance of the

16       war exclusions?

17  A.   No.

18  Q.   Do you recall what it had to do with?

19  A.   It was a non-substantive change in the first

20       paragraph.  It's wording, wordsmithing.

21  Q.   But do you recall specifically what the

22       wordsmithing was about?

23  A.   No.

24  Q.   Did Ms. Johnson make the change that you had

25       suggested?

Page 167

1    A.   I don't think she did, no.

2    Q.   Do you know why she didn't?

3    A.   I think she probably just overlooked it.

4    Q.   Did you have a conversation with her after

5         the letter went out that the change you had

6         requested be made had not been made?

7    A.   No.

8    Q.   Okay.

9                   MS. COYOCA:  I'd like to mark as

10        exhibit, I believe we're at 33, an e-mail and

11        attachment labeled Bates control ATL001847

12        through 1865.

13                  (Whereupon, Exhibit 33 was

14                  marked for identification.)

15                  MS. COYOCA:  Counsel, I appear to

16        be missing one of my exhibits, so I suggest

17        we take a quick break and I will locate it

18        and we can start again.

19                  THE VIDEOGRAPHER:  It's 3:05 p.m.

20        We're going off the record.

21                  (Whereupon, a brief recess

22                  was taken.)

23                  THE VIDEOGRAPHER:  It's 3:20 p.m.

24        We're back on the record and this begins DVD

25        number 4.

EXHIBIT 15

1    BY MS. COYOCA:

2    Q.   Turning your attention to Exhibit 33,

3         Ms. Johnson, do you recall --

4                   MS. SCOTT REED:  Gooley.

5                   THE WITNESS:  Gooley.

6    BY MS. COYOCA:

7    Q.   I'm sorry, Ms. Gooley.  I apologize.

8                   Ms. Gooley, do you recall receiving

9         this e-mail from Ms. Johnson on or about

10        July 28, 2014?

11   A.   I don't specifically recall, but it was sent

12        to me, so I'm sure I did receive it.

13   Q.   You don't have any reason to believe that you

14        didn't receive it?

15   A.   No.

16   Q.   Okay.  Now, as of July 28, was the insured,

17        NBC Universal, had they already been told

18        that the claim was going to be denied on the

19        basis of the war exclusion?

20   A.   Yes, that's my understanding.

21   Q.   And how did you -- how did you learn that the

22        exclusion that Ms. Johnson was going to tell

23        NBC Universal that the exclusion had been

24        denied on the basis of the -- let's start all

25        over again.

Page 169

1           How did you learn that Ms. Johnson

2      had told NBC Universal that the Dig claim was

3      going to be denied on the basis of the war

4      exclusion?

5   A.  I -- Pamela would have told me that she was

6      going to reach out to NBC and Aon and let

7      them know that our position was that the

8      exclusion precluded coverage.

9   Q.  Were you involved in that conversation or

10     that notice to NBC Universal and Aon that the

11     claim was going to be denied based on the war

12     exclusion?

13  A.  I don't think that I was, no.

14  Q.  Were you told before the call took place to

15     advise NBC Universal and Aon that the claim

16     was being denied?

17  A.  I'm sure that I was.

18  Q.  And is it -- do you know how the

19     communication was delivered?  In other words,

20     by e-mail, telephone call, in-person meeting,

21     do you know?

22  A.  I -- my understanding was via telephone.

23  Q.  And do you know when that telephone

24     conversation took place?

25  A.  I think it was the evening of the 17th.

1   Q.   So by the evening of the 17th, the decision

2        already had been made that the claim should

3        be denied?

4   A.   Based on the -- yeah, that we believed it was

5        not covered.

6   Q.   And I believe you indicated previously that

7        you first received notice about the claim the

8        day after Aon had tendered the claim; is that

9        right?

10  A.   I think Aon tendered it to OneBeacon on

11       Tuesday, so the 15th, I believe, of July, and

12       Pamela sent me an e-mail on the 16th.  So,

13       yeah, the day after.

14  Q.   Okay.  So between July 15 and July 17, the

15       investigation was done, the legal analysis

16       was completed, a decision was made to deny

17       the claim on the basis of the war exclusion;

18       is that correct?

19            MS. SCOTT REED:  Objection to

20       form, lack of foundation, assumes facts not

21       in evidence.

22            THE WITNESS:  By the 17th we

23       believed we had enough information based on

24       our investigation to make the decision to

25       deny the claim.

Page 171

1    BY MS. COYOCA:

2    Q.  Do you know how long Ms. Johnson worked on

3        the claim before making that recommendation

4        to you that the claim should be denied based

5        on the war exclusion?

6    A.  I don't -- I don't, no.

7    Q.  Did you ever ask Ms. Johnson if she had

8        consulted with any experts on the

9        Middle Eastern region with regard to the

10       facts and circumstances about this claim?

11   A.  I never asked her that, no.

12   Q.  Do you know if she did consult with any

13       Middle East experts before making the

14       decision to recommend to deny the claim?

15   A.  She did not consult with any -- anyone from

16       the Middle East.

17   Q.  So between July 17 and the time that a denial

18       letter went out, what was your involvement,

19       if anything, in terms of the claim?

20   A.  So on the 17th Pamela had the conversation

21       with Aon and NBC.  On the 18th, I believe

22       that is when we sent it out to coverage

23       counsel to get their opinion.  We received

24       their opinion the following Monday, so that

25       would be 21st.  Of course we looked at the

Page 172

1    opinion and thought about the opinion, but

2    based on everything, we included -- in our

3    analysis concluded the claim was not covered.

4    And then subsequently on the -- I think

5    Pamela communicated again with Aon and NBC,

6    and then we actually provided a hard copy of

7    the denial on the 28th, which is a Monday.

8    Q.   Okay.  But beginning with the time frame on

9         the 17th when Aon and NBC Universal was told

10        that the claim was going to be denied on that

11        basis, at that point in time, no opinion had

12        been received from outside coverage counsel;

13        is that correct?

14   A.   That's correct.

15   Q.   Had a decision been made by the 17th to seek

16        an outside coverage opinion?

17   A.   No.  I think it was the following -- either

18        that later -- the following day that we

19        decided to send it out to coverage counsel.

20   Q.   So you remember the dates between the 17th

21        and the 28th very well.  Did you review any

22        documents prior to your deposition today in

23        order to refresh your recollection as to the

24        dates?

25   A.   Yes.

Page 173

1   Q.  What documents did you review?

2               MS. SCOTT REED:  I'm going to

3       object based upon attorney/client privilege

4       and work product to the extent you reviewed

5       anything with counsel.  If you reviewed

6       anything separately, you can say.

7               THE WITNESS:  I didn't review

8       anything independent of counsel.

9   BY MS. COYOCA:

10  Q.  And did you meet with counsel prior to your

11      deposition today?

12  A.  Yes.

13  Q.  For how long?

14  A.  A couple hours.

15  Q.  And when did that meeting take place?

16  A.  Yesterday.

17  Q.  Did you have any meetings with them prior to

18      your meeting yesterday?

19  A.  Yes.

20  Q.  When?

21  A.  In January.

22  Q.  How long did that meeting take place?

23  A.  Maybe three hours.

24  Q.  And with respect to the outreach to outside

25      coverage counsel, were you involved in giving

EXHIBIT 15

Page 174

1           directions to coverage counsel as to the

2           issue to be addressed?

3      A.   Pamela would have done that.

4      Q.   But were you involved at all in that process?

5      A.   I would have been involved in the decision to

6           go to outside counsel.

7      Q.   Right.  What I'm asking is in terms of asking

8           outside counsel to do the work, did you

9           provide any direction to him?

10     A.   No.

11     Q.   Did -- after the 17th, after the phone call

12          had taken place with Aon and NBC Universal,

13          did Ms. Johnson come back and report to you

14          as to how the call went?

15     A.   She -- my -- I don't have an express

16          recollection, but she would have followed up

17          with me either that night or the next

18          morning.

19     Q.   Okay.  What did she tell you?

20     A.   Again, to the best of my recollection, she

21          would have just told me how NBC reacted.

22     Q.   What did she -- what -- if you believe that

23          she did have that conversation with you, what

24          do you think she told you?

25     A.   I would think that she told me that NBC

EXHIBIT 15

1        disagreed with our coverage position.

2   Q.  Anything else?

3   A.  Nope.  I think that was -- that's what I

4        recall.

5   Q.  Did you have any further interactions or

6        communications with Ms. Johnson after the

7        17th about NBC Universal's reaction to the

8        decision?

9   A.  I'm sure that we probably had conversations

10       throughout.  NBC is a big client of ours, or

11       of OneBeacon, and an important relationship,

12       we wanted to do our best to maintain that

13       relationship.

14  Q.  Once the outside coverage opinion was

15       received on the 21st, did you ask Ms. Johnson

16       to go back and do any other work relating to

17       the investigation of the claim?

18  A.  No, I did not.

19  Q.  Did you have any discussions with her about

20       whether the determination was correct or

21       incorrect in light of the coverage opinion

22       that they received?

23  A.  We -- I -- I reviewed the coverage -- the

24       coverage opinion from coverage counsel along

25       with Pamela and then we had a discussion

Page 176

```
1        based on everything, everything that Pamela

2        had done, all our independent research along

3        with we -- what coverage counsel said, and,

4        again, nothing changed our position with

5        respect to the fact that we believed the

6        matter was not covered.

7    Q.  Did you involve anyone else at OneBeacon in

8        that analysis after the coverage opinion was

9        received?

10   A.  I think Pamela and I did the analysis.  I

11       don't know whether or not we shared the

12       opinion with other people, but, ultimately,

13       we were the ones that did the analysis and

14       reached the conclusion.

15   Q.  Did you discuss the coverage opinion that had

16       been received from outside counsel with

17       Mr. Duffy?

18   A.  I don't know that I discussed it with him.  I

19       may have shared it with him.

20   Q.  Do you recall sharing it with him?

21   A.  I think that I did, but...

22   Q.  Did Mr. Duffy reply at all?

23   A.  Again, I -- I don't recall.  I would imagine

24       he said thank you.

25   Q.  Anything else?
```

Page 177

1    A.   I would think that would probably have been

2         it.

3    Q.   Did you ever discuss the substance of the

4         opinion with Mr. Duffy?

5    A.   I don't think so, no.

6    Q.   Did you flag the claim for Mr. Duffy because

7         you considered the coverage call to be a

8         close one?

9                   MS. SCOTT REED:  Objection to

10        form.

11                  THE WITNESS:  No, that's not why I

12        flagged it for Sean.

13   BY MS. COYOCA:

14   Q.   Did you believe that the coverage call to be

15        made on this claim, did you think it was a

16        close one?

17   A.   No, I didn't.

18   Q.   You thought it was a hundred percent clear

19        that the war exclusion applied?

20   A.   I don't think anything is a hundred percent,

21        but given the facts, yes, I think the war

22        exclusions apply and preclude coverage.

23   Q.   How confident were you in the correctness of

24        the decision based on a percentage, was it

25        95 percent, 85 percent?

Page 178

1    MS. SCOTT REED:  Objection to

2    form, vague, ambiguous, calls for

3    speculation.

4    THE WITNESS:  On -- from

5    OneBeacon's perspective and my perspective as

6    well, we don't deny a claim unless we believe

7    it's not covered.  So when I say a hundred

8    percent, there's always a chance someone can

9    disagree, but it's 99 percent that we don't

10   deny a claim unless we believe it's not

11   covered.  We don't enter that decision

12   lightly.

13   BY MS. COYOCA:

14   Q.  Were you concerned at all in terms of the

15       short time frame that -- in which the

16       analysis, the investigation, the review of

17       information and the legal analysis that was

18       performed, the short time frame in which it

19       was done?

20   MS. SCOTT REED:  Objection to

21   form, vague, ambiguous.

22   THE WITNESS:  My -- we can -- we

23   moved as quickly as we could on this

24   particular claim.  I know that NBC wanted an

25   answer right away.  Aon had pushed OneBeacon

EXHIBIT 15

1         very hard to get an answer as soon as

2         possible and so that's why there's this --

3         why everything was turned around.  We did it

4         to accommodate the insured, but we did do a

5         thorough investigation.

6     BY MS. COYOCA:

7     Q.  If you had not been pushed, or if OneBeacon

8         had not been pushed by the insured and Aon to

9         get a decision out as quickly as possible,

10        would you have taken more time in the

11        investigation?

12              MS. SCOTT REED:  Objection; calls

13        for speculation.

14              THE WITNESS:  I think we -- I

15        think we had enough information, we did a

16        thorough investigation.  We would not have

17        issued a coverage position if we didn't feel

18        confident that we had done a thorough

19        investigation, so I think we would have put

20        out an opinion in a -- in a condensed time

21        frame given the nature of the claim.

22    BY MS. COYOCA:

23    Q.  But would you have put out an opinion within

24        two days after the claim had first been

25        asserted?

1              MS. SCOTT REED:  Objection to

2      form, vague, ambiguous as to the reference

3      you're making.

4              THE WITNESS:  I think --

5              MS. COYOCA:  No, that's

6      actually -- I want to respond to that.

7              THE WITNESS:  Okay.

8  BY MS. COYOCA:

9  Q.  Would you have put out a determination as to

10     no coverage if there had been no pressure

11     from Aon or the insured in two days?

12             MS. SCOTT REED:  Objection to

13     form, misstates prior testimony.

14             THE WITNESS:  If we thought we had

15     all the information we needed to make a

16     coverage position -- to take a coverage

17     position, we would have provided it.

18  BY MS. COYOCA:

19  Q.  Can you recall any other instances in any

20     entertainment claims that you reviewed while

21     you were at OneBeacon where a coverage

22     determination was made in two days?

23             MS. SCOTT REED:  Objection to

24     form.

25             THE WITNESS:  I'm not aware of any

Page 181

1      claim.

2    BY MS. COYOCA:

3    Q.   Would you consider two days to be a

4         relatively expedited time frame?

5    A.   I would think that's, yes, fairly expedited.

6    Q.   Okay.  Turning to Exhibit 33 and the

7         attachment to Exhibit 33, is this the draft

8         of Ms. Johnson's letter with respect to the

9         Dig claim that you reviewed before it was

10        sent out?

11   A.   May I have a moment to look at it, please?

12   Q.   Sure.  Absolutely.

13   A.   (Reviews document.)  This is the letter

14        Pamela sent to me.

15   Q.   The draft letter?

16   A.   Yes.

17   Q.   You indicated previously that you had a

18        suggested change as to language in the first

19        paragraph; is that correct?

20   A.   That's correct.

21   Q.   What change were you referring to?

22              MS. SCOTT REED:  Objection; asked

23        and answered.

24              THE WITNESS:  I think it was the

25        second to the last sentence of the first

Page 182

1      paragraph.

2    BY MS. COYOCA:

3    Q.  And is what change specifically were you

4        recommending be made to the letter?

5    A.  I -- I'd have to see the exact change, but I

6        carved out, "In consultation with counsel."

7    Q.  You carved it out, you took it out of the

8        letter entirely?

9    A.  No, I put it in a separate sentence, but I

10       may have modified it.  I'd have to see what I

11       did.

12   Q.  Okay.

13               MS. COYOCA:  Let's mark as the

14       next exhibit, I believe we're on 34, an

15       e-mail exchange with -- with attachments

16       labeled Bates control ATL001858 through 1866.

17               (Whereupon, Exhibit 34 was

18               marked for identification.)

19   BY MS. COYOCA:

20   Q.  Does Exhibit 34 refresh your recollection as

21       to the change that you had proposed?

22   A.  Yes.

23   Q.  What is it?

24   A.  The initial draft says, "Our decision is

25       based on information gathered about the

Page 183

1        situation in Israel," comma, "case law,"

2        comma, "treatises," comma -- or, "case law,

3        treatises and consultation with counsel."

4                My revision is, "Our decision is

5        based on information gathered about the

6        situation in Israel," comma, "case law,"

7        comma, "and treatises," period.  "We also

8        consulted with counsel," period.

9    Q.  Why did you propose that -- that sentence

10       with respect to consulting with counsel that

11       that be inserted as a separate sentence?

12   A.  Because we -- I didn't want it to appear our

13       decision was made independent, "we" being

14       OneBeacon, made the decision to deny the

15       claim.  We did consult with counsel, we did

16       consider it, but we made the ultimate

17       decision.

18   Q.  Do you know if that change was made in the

19       final letter?

20   A.  It wasn't.

21   Q.  Okay.  And do you know why that particular

22       change was not made?

23               MS. SCOTT REED:  Objection; asked

24       and answered.

25               THE WITNESS:  I don't know why.  I

1       imagine Pamela just overlooked it.

2   BY MS. COYOCA:

3   Q.   Were you concerned at all about the original

4        draft as it went out in the final indicating

5        that the decision was based on, among other

6        things, consultation with counsel, were you

7        concerned at all about the timing of the

8        decision in terms of coverage counsel's

9        opinion not having been procured by the time

10       the decision had already been made?

11              MS. SCOTT REED:  Objection; lack

12       of foundation, it misstates the facts in

13       evidence.

14              THE WITNESS:  Would you be good

15       enough to restate your question?

16              MS. COYOCA:  Yeah, sure.

17  BY MS. COYOCA:

18  Q.   So the decision that the claim was going to

19       be denied was conveyed to counsel by

20       July 17th; is that correct?

21  A.   It was conveyed to NBC and Aon on July 17th.

22  Q.   Excuse me.  I'm sorry.  Yes, it was conveyed

23       to Aon and NBC, to the insured, by July 17th,

24       correct?

25  A.   Correct.

1    Q.  And the consultation with counsel, that was

2        not initiated until July 18th; isn't that

3        correct?

4    A.  That's correct.

5    Q.  And the opinion from counsel was not procured

6        until July 21; is that right?

7    A.  Correct.

8    Q.  So was one of the reasons for your suggestion

9        as to the changed language in the letter the

10       fact that outside counsel's opinion had not

11       yet been procured by the time the decision

12       had been made to deny the claim?

13   A.  No.

14   Q.  Do you believe that making the statement that

15       the decision had been based on, amongst other

16       factors, consultation with counsel, do you

17       think that was a correct statement?

18   A.  I think we considered what counsel said, but

19       our decision, again, was independent, that's

20       why I broke it out.

21   Q.  Okay.  But -- but from a timing standpoint,

22       is it correct to say that the decision was

23       based on consultation with counsel if the

24       decision was made prior to receiving any

25       input from counsel?

Page 186

1   A.   OneBeacon made the decision to deny the claim

2        based on all the facts on the 17th.  We

3        retained counsel on the 18th, had counsel

4        engage in a coverage analysis and then we

5        reviewed that.  But, yes, we made the

6        decision prior to retaining coverage counsel.

7   Q.   So is it accurate to say in the letter that

8        the decision was based on consultation with

9        counsel?

10  A.   Well, ultimately, at the end of the day, when

11       we looked at counsel's opinion, had it

12       been -- had we found we were diametrically

13       opposed, we may have changed our opinion.

14  Q.   But you did not believe that the opinion was

15       diametrically opposed to OneBeacon's

16       decision; is that correct?

17  A.   I believe the opinion consistent with

18       everything else supported our position.

19  Q.   Were there any changes, to your knowledge,

20       that were made to the letter between the

21       original draft and as it was sent out?

22  A.   I don't think so.

23  Q.   Ms. Johnson was seeking input from

24       Peter Williams and also Christopher Paar with

25       respect to the letter; isn't that correct?

EXHIBIT 15

1          MS. SCOTT REED:  Objection to

2      form, assumes facts not in evidence.

3              THE WITNESS:  I don't -- I don't

4      know if -- I don't -- I don't recall if she

5      sent it to Peter before or sent it to Chris

6      as well.

7  BY MS. COYOCA:

8  Q.  Could you turn back to Exhibit 33?

9  A.  Okay.  (Reviews document.)  Oh, yes, I'm

10     sorry, she did, she sent it to Peter and

11     copied Chris.

12 Q.  Okay.  Was, to your knowledge, Ms. Johnson

13     seeking input from Mr. Williams by sending

14     this e-mail to him and saying, "Theresa and

15     Peter," and then the e-mail as follows?

16 A.  I -- I mean, I don't -- I don't know whether

17     she was seeking input other than maybe just

18     giving Peter the head's up here's the draft

19     and -- and, you know, it'll be going out

20     today.

21 Q.  In the last line of the e-mail it says,

22     "Please let me know if you have any questions

23     or comments."  Do you see that?

24 A.  I do.

25 Q.  Did you believe that she was actually seeking

Page 188

1     questions and comments from Mr. Williams or

2     just that she was simply giving him notice

3     that it was going out?

4              MS. SCOTT REED:  Objection;

5     speculation.

6              THE WITNESS:  Again, I'm -- you

7     know, I'm sure she wanted to give him an

8     opportunity to see it before it went out.

9     Whether he had any questions or comments,

10    questions or comments about the content or

11    concerns, explanations, I don't know.

12             MS. COYOCA:  Okay.

13  BY MS. COYOCA:

14  Q.  I'd like to show you the final version of the

15      letter.  It's already been marked as

16      Exhibit 18.  Let me know when you're ready

17      for questions.

18  A.  Okay.  (Reviews document.)  I'm ready.

19  Q.  Okay.  Turning to page 5 of the letter

20      labeled Bates control 98, there is a heading

21      entitled -- under, "Analysis," entitled,

22      "Terrorism coverage."  Do you see that?

23  A.  I do.

24  Q.  Do you agree with the statements that

25      Ms. Johnson is making in this paragraph?

EXHIBIT 15

Page 189

1    A.   I'm -- I don't think those -- those

2         statements are correct in terms of the

3         terrorism coverage.

4    Q.   And why not?

5    A.   Because I think -- I have to look at the

6         earlier OneBeacon reference, the terrorism

7         endorsement.

8    Q.   And are you specifically referring to the,

9         "Coverage for certified acts of terrorism,

10        caps on losses"?

11   A.   I'd have to see it.  Yes.

12   Q.   That would be page ATL 3120.

13   A.   Yes.

14   Q.   Okay.  So you said that you don't believe

15        that the statements are correct in terms of

16        the terrorism coverage.  What do you think is

17        incorrect about the statements?

18   A.   Well, the -- when you look at the endorse --

19        or the endorsement, I'm looking at, it says,

20        "Any exclusion of terrorism in this coverage

21        part or policy or attached to such covered

22        part or policy by endorsement is hereby

23        amended."  The policy doesn't have a

24        terrorism exclusion, so there's nothing to

25        amend --

1    Q.   Okay.

2    A.   -- so it's really not applicable.

3    Q.   So it's not applicable at all?

4    A.   This endorsement isn't, no.

5    Q.   Okay.  The -- the statement that the

6         terrorism coverage should not apply here,

7         because under its terms the act must be part

8         of an effort to coerce or influence the

9         United States population or government, is

10        that a correct statement?  In order for there

11        to be coverage for an act of terrorism, must

12        the act have been part of an effort to coerce

13        or influence the United States population or

14        government?

15   A.   I don't -- I don't know -- I don't have the

16        terrorism coverage, so I can't really comment

17        on that.

18   Q.   Do you know, is there specific coverage under

19        the policy, a coverage part that is coverage

20        for acts of terrorism?

21   A.   I'd have to look through the policy.

22   Q.   Okay.

23   A.   (Reviews document.)  I'm not seeing anything.

24   Q.   Okay.  So assuming there is no specific

25        provision providing for terrorism coverage

Page 191

1          under the policy, if there was an act of

2          terrorism that resulted in a loss that

3          constituted an imminent peril, assuming no

4          other exclusion applied, would that loss be

5          covered?

6                    MS. SCOTT REED:  Objection;

7          improper foundation, calls for speculation.

8                    THE WITNESS:  You're asking me

9          that if there was one incident of terrorism,

10         would that be excluded under the policy under

11         the imminent peril coverage?

12    BY MS. COYOCA:

13    Q.  Would it be -- well, first of all, would it

14        be covered under imminent peril?

15                   MS. SCOTT REED:  Objection;

16        improper foundation, calls for speculation.

17                   THE WITNESS:  One discrete act

18        independent of anything else?

19                   MS. COYOCA:  Uh-huh.

20                   THE WITNESS:  It may not be, it

21        may be.

22    BY MS. COYOCA:

23    Q.  Is there any provision in the policy that

24        would exclude an act of terrorism from

25        coverage?

EXHIBIT 15

Page 192

1           MS. SCOTT REED:  Objection;

2       improper foundation, calls for speculation.

3              THE WITNESS:  I'd have to go

4       through the entire policy.

5              MS. COYOCA:  Okay.

6    BY MS. COYOCA:

7    Q.  I believe you previously testified, though,

8        that there's no terrorism exclusion in the

9        policy?

10   A.  I didn't see one, no.

11   Q.  Okay.  Assuming no other exclusion is

12       applicable, that there is just an act of

13       terrorism which causes a loss under the

14       imminent peril extra expense coverage part,

15       would that claim be covered?

16             MS. SCOTT REED:  Objection;

17       improper foundation and calls for

18       speculation.

19             THE WITNESS:  So independent of

20       any exclusions or conditions or provisions,

21       would a single act of terrorism be

22       potentially covered under the imminent peril?

23             MS. COYOCA:  Yes.

24             THE WITNESS:  Yes --

25             MS. SCOTT REED:  Same --

Page 193

1           THE WITNESS:  -- potentially.

2           MS. SCOTT REED:  Same objections.

3   BY MS. COYOCA:

4   Q.  Is there any requirement under the policy

5       that that claim be a certified act of

6       terrorism as is defined under the

7       endorsement, Coverage for Certified Acts of

8       Terrorism, Cap on Losses?

9   A.  I don't think so.

10  Q.  Is there any requirement under the terms of

11      the policy that the act of terrorism be

12      certified by the U.S. Secretary or the -- by

13      the U.S. Secretary of the Treasury in order

14      for it to be a covered claim?

15  A.  There's -- there's nothing under the -- under

16      the body of the policy that says an act of

17      terrorism has to be certified by the

18      U.S. government.

19  Q.  Is the statement that Ms. Johnson made in the

20      letter that begins, begin quotes, "Moreover,

21      the U.S. Secretary of the Treasury has not

22      certified the events as acts of terrorism,"

23      period, "Thus, we do not believe that

24      terrorism coverage would apply," period close

25      quote; is that a correct statement?

Page 194

1           MS. SCOTT REED:  Objection to

2      form, vague and ambiguous.

3           THE WITNESS:  The -- the first

4      statement, "Moreover, the U.S. Secretary of

5      the Treasury has not certified the events as

6      acts of terrorism," is a correct statement.

7      The second statement, "Thus, we do not

8      believe the terrorism coverage would apply,"

9      we -- we don't -- we believe that -- we do

10     not believe -- well, there is -- is that

11     correct that we don't believe the terrorism

12     coverage would apply?  We believe that the

13     events of this claim are excluded by the war

14     or warlike exclusion.

15 BY MS. COYOCA:

16 Q.  But I'm asking you to please confine your

17     analysis just to the provision that I'm

18     talking about, which is the terrorism

19     coverage paragraph, and specifically, the

20     conclusion that the terrorism coverage does

21     not apply because of provisions of the

22     endorsement coverage for certified acts of

23     terrorism, cap on losses.  Do you believe

24     that that's a correct statement to be making

25     to the insured?

Page 195

1              MS. SCOTT REED:  Objection to

2        form, vague and ambiguous.

3                   THE WITNESS:  I think that there

4        is no terrorism -- I think that to the extent

5        that there's no terrorism coverage for the

6        facts of this claim, so with that --

7        consistent with that, that's -- that's true.

8   BY MS. COYOCA:

9   Q.   Well, but I'm asking specifically about the

10       invocation of the requirements that the act

11       has to be part of an effort to coerce or

12       influence the U.S. government and that the

13       U.S. Secretary of Treasury has to certify the

14       act as terrorism, are either of those

15       requirements, in order for there to be

16       coverage under this policy for an act of

17       terrorism, that's separate and apart from

18       what's being addressed in the endorsement?

19                   MS. SCOTT REED:  Objection; vague

20       ambiguous, improper foundation.

21                   THE WITNESS:  I don't think so.

22   BY MS. COYOCA:

23   Q.   When you were reviewing the letter, did you

24       tell Ms. Johnson that you thought that her

25       discussion of terrorism coverage was not

Page 196

1        correct?

2    A.  No.

3    Q.  Why not?

4    A.  Because my focus, when I reviewed the letter,

5        was on the war or warlike exclusions.

6    Q.  Did you read the entire letter before it went

7        out?

8    A.  I did.

9    Q.  Did you read the portion on terrorism

10       coverage?

11   A.  I'm sure I did.

12   Q.  Did you think to yourself at the time that

13       you reviewed it, That's not correct?

14   A.  No.

15   Q.  If you had focused on it, would you have

16       asked her to rewrite this paragraph?

17                MS. SCOTT REED:  Objection to

18       form, calls for speculation.

19                THE WITNESS:  If I thought it was

20       incorrect, I would have asked her to redraft

21       it, yes.

22   BY MS. COYOCA:

23   Q.  Looking to the prior page of the letter,

24       page 4, and it's labeled ATL 97, there is a

25       sentence that reads, near the end of the

Page 197

1      page, "The policy contains coverage for

2      certified acts of terrorism."  Do you see

3      that?

4  A.  I see that.

5  Q.  Do you believe that the only coverage under

6      the policy is for certified acts of terrorism

7      as that term is defined in the endorsement?

8  A.  I'd have to run through the policy again.

9      (Reviews document.)

10            MS. SCOTT REED:  I'm going to

11      object to the form as vague and ambiguous.

12            THE WITNESS:  So on this, though,

13      I mean what -- what's being cited is -- is

14      the endorsement and we talked about the fact

15      that it -- or the endorsement is not

16      applicable, so -- so I apologize, can you ask

17      me your question again?

18            MS. COYOCA:  Right.

19  BY MS. COYOCA:

20  Q.  What I'm asking is:  Do you believe that the

21      only coverage under the policy as to

22      terrorism is for certified acts of terrorism

23      as it's defined in that endorsement?

24            MS. SCOTT REED:  Objection; vague,

25      ambiguous.

EXHIBIT 15

1          THE WITNESS:  Again, this is an

2     endorsement that modifies -- that provides

3     certain coverage in the event of an

4     exclusion, there's not -- that exclusion

5     doesn't exist, so I'm not sure that the

6     endorsement -- the endorsement is not

7     applicable.

8   BY MS. COYOCA:

9   Q.  So it shouldn't have been referenced in the

10     letter at all?

11  A.  Correct.

12  Q.  Turning to page 6 of the letter, there's a

13     paragraph that begins, "Appleman on

14     insurance"; do you see that paragraph?

15  A.  I do.

16  Q.  Can you please read that paragraph out loud?

17  A.  Yes.  "Appleman on insurance discusses

18     exclusions for war, including the meaning of

19     war and similar terms.  War is," paren, "a

20     course of hostility," paren, "between,"

21     paren, "states or state-like entities,"

22     period, close paren.  "To constitute a

23     de facto state, a group must have," paren,

24     "significant attributes of sovereignty,"

25     close paren, "and the application of this

1     exclusion is fact specific," double paren.

2  Q.  Do you believe that the statement that, "War

3     is a course of hostilities between states or

4     state-like entities," do you think that's

5     correct?

6            MS. SCOTT REED:  Objection to the

7     extent it calls for legal conclusion.

8            THE WITNESS:  I -- I believe that,

9     yeah, war could include hostilities between

10    state or state-like entities --

11           MS. COYOCA:  Actually --

12           THE WITNESS:  -- it's not

13    exclusive.

14  BY MS. COYOCA:

15  Q.  Actually, that's not the question I'm asking.

16     The question I'm asking is:  Do you agree

17     with the sentence, "War is a course of

18     hostilities between states or state-like

19     entities"?

20            MS. SCOTT REED:  Objection to the

21    extent it calls for a legal conclusion.

22           THE WITNESS:  No, I don't.

23  BY MS. COYOCA:

24  Q.  Do you think that statement is incorrect?

25  A.  I think that's -- I think the statement is

EXHIBIT 15

Page 200

1     too limited.

2  Q.  Did you point that out to Ms. Johnson when

3      you were reviewing the letter?

4  A.  I don't recall that I did.

5  Q.  Could you please read the sentence that

6      begins, "Black's Law Dictionary"?

7  A.  "Black's Law Dictionary defines a," paren,

8      "war," close paren, "as," paren, "hostile

9      conflict by means of armed forces," comma,

10     "carried on between nations," comma, "states

11     or rulers," comma, "or sometimes between

12     parties within the same nation or state,"

13     period, close paren.

14 Q.  Do you believe that statement is correct?

15              MS. SCOTT REED:  Objection to the

16     extent it calls for a legal conclusion.

17              THE WITNESS:  Yeah, I mean, that's

18     correct that's -- that's how Black's Law

19     Dictionary defines war.

20 BY MS. COYOCA:

21 Q.  Do you believe that's the correct definition

22     of war?

23              MS. SCOTT REED:  Objection to the

24     extent it calls for a legal conclusion.

25              THE WITNESS:  I believe that's one

EXHIBIT 15

1          of the definitions of war, yes.

2     BY MS. COYOCA:

3     Q.   Do you believe there are others?

4     A.   Yes.

5     Q.   Are they recited or cited in this letter?

6     A.   There's a -- she said, "A leading dictionary

7          of international law defines an act of war as

8          the use of force or other action by one state

9          against another which they acted against

10         recognizes as an act of war either by the use

11         of retaliatory force or declaration of war.

12         Another dictionary defines an act of war as a

13         measure of force which one party, using

14         military instruments as power, implements

15         against another party in an international

16         armed conflict."

17              So there's -- she cites -- recites

18         Appleman, Black's Law Dictionary, a

19         dictionary of international and comparative

20         law, and The Handbook of Humanitarian Law and

21         Armed Conflicts.

22    Q.   Okay.  Do you believe that the definitions

23         which she's cited in their totality, all of

24         them that are contained in the letter, do you

25         believe that they're the correct definitions

1    of the term war?

2              MS. SCOTT REED:  Objection to the

3    extent it calls for a legal conclusion.

4              THE WITNESS:  I believe all these

5    encompass what war could be.

6    BY MS. COYOCA:

7    Q.  Are there other definitions of war that you

8        think should have been cited here that are

9        not cited here?

10   A.  Not that I can recall right now.

11   Q.  Did you ask Ms. Johnson to delete any

12       references to war being hostility between

13       states or state-like entities?

14   A.  No, I did not.

15   Q.  At the time you were reviewing those words,

16       did you think that they were correct?

17   A.  I think -- I thought that's one -- that is

18       one possible definition of war, yes.

19   Q.  What definition of war, what source are you

20       aware of that defined -- that does not

21       require that the hostility being engaged in

22       by state or state-like actors?

23              MS. SCOTT REED:  Objection to

24       form, assumes facts not in evidence, lacks

25       foundation.

1           THE WITNESS:  Here we have an act

2      of war -- another dictionary defines an act

3      of war as, "A measure of force with one party

4      using military instruments of power

5      implements against one party in an

6      international armed conflict."

7  BY MS. COYOCA:

8  Q.  Do you believe that that statement under

9      The Handbook of Humanitarian Law and Armed

10     Conflicts excludes the requirement that it

11     must be engaged in between state or

12     state-like actors?

13 A.  It doesn't reference the requirement that

14     it -- so it necessarily doesn't require that.

15 Q.  Have you reviewed The Humanitarian Law and

16     Armed Conflicts?

17 A.  I haven't read the whole thing, no, I have

18     not.

19 Q.  Is it your position, though, that

20     The Handbook of Humanitarian Law in Armed

21     Conflicts excludes any requirement that the

22     armed conflict take place between state or

23     state-like actors?

24 A.  I haven't read it, the entire book, so I

25     don't know whether it takes that position.

Page 204

1    Q.   On what factual basis did Ms. Johnson rely on

2         to make the statement that Hamas has become

3         the government of the Gaza Strip, if you

4         know?

5    A.   I -- I think that she indicates Hamas has

6         become the government of the Gaza Strip and

7         then subsequent in that paragraph references

8         the fact that it is the military wing, the

9         brigade, as well as a police force, security

10        and intelligence.

11   Q.   Anything else?

12   A.   She says it also has -- well, she said a

13        military wing -- that, "Hamas directs the

14        Gaza government and security forces through a

15        self-appointed cabinet of ministers."

16   Q.   Anything -- anything else?

17   A.   She --

18             MS. SCOTT REED:  Objection to the

19        form of the question, it's vague and

20        ambiguous at this point.

21             THE WITNESS:  So she indicates

22        that Hamas -- that, "Although Gaza and

23        Palestine is not a recognized nation, at

24        least by most of the world, it does have some

25        indicia of sovereignty and it governs a

Page 205

1     territory and is a territory for which the

2     attacks on Israel have come, Hamas has a

3     stated goal of destroying Israel and weapons

4     in its quest."

5   BY MS. COYOCA:

6   Q.  Do you believe that the --

7             MS. SCOTT REED:  Are you finished

8     giving your answer?

9             THE WITNESS:  I'm just looking at

10    the rest of the paragraph.  I think the rest

11    of the paragraph supports her position as

12    well.

13            MS. COYOCA:  Okay.  So let's just

14    take some of that apart.

15  BY MS. COYOCA:

16  Q.  With respect to the statement that, "Hamas

17    has a stated goal of destroying Israel and is

18    using weapons in its quest," do you believe

19    that statement actually supports the concept

20    that Hamas has become the government of the

21    Gaza Strip?

22            MS. SCOTT REED:  Objection; form,

23    improper foundation.

24            THE WITNESS:  I mean, it -- it

25    neither supports nor negates that it's a

1       recognized nation, it just indicates one of

2       Hamas's goals.

3                    MS. COYOCA:  Right.

4    BY MS. COYOCA:

5    Q.  The question that I was asking you initially

6        was what's the basis on which OneBeacon is

7        relying to make the statement that Hamas has

8        become the government of the Gaza Strip, and

9        you read the two paragraphs.  So is it every

10       statement in those two paragraphs that you

11       believe supports the finding by OneBeacon

12       that Hamas has become the government of the

13       Gaza Strip?

14                   MS. SCOTT REED:  Objection to

15       form, improper foundation.

16                   THE WITNESS:  Again, the -- the

17       paragraph that -- including the paragraph

18       that starts out with, "Hamas has become the

19       government of the Gaza Strip," and again

20       references the military, the police, the

21       security, the intelligence.  It references

22       the military again.  It references that it

23       directs the government.  And it indicates --

24       the subsequent paragraph indicates it has an

25       indicia of sovereignty, it governs a

1      territory, and those -- yeah, those are

2      statements that support the position.

3  BY MS. COYOCA:

4  Q.  If you know, what is the resource or the

5      source for the information that's set forth

6      in those two paragraphs?

7  A.  I -- one of the sources is footnoted.  It

8      would be, "Hamas Background and Issues for

9      Congress, Congressional Research Service."

10     The remaining sources, I can't remember what

11     was the -- what where the remaining sources

12     for the -- for the statements made by

13     OneBeacon.

14 Q.  You previously have testified about Internet

15     searches being done.  Do you know if

16     Ms. Johnson relied on Internet researches

17     separate and apart from the Zanotti article

18     in order to make the statement that Hamas has

19     become the government of the

20     Gaza Strip?

21 A.  I imagine she relied on Internet research,

22     articles, resources, including the -- the

23     article by Zanotti.

24 Q.  Do you know any of the specifics of any of

25     the research that she performed, specifically

Page 208

1          which articles supported her conclusion and

2          finding that Hamas was the government of the

3          Gaza Strip?

4     A.   I can't point to the express articles right

5          now.

6     Q.   At the point in time when you were

7          considering the coverage position letter,

8          were you aware of the specific resources that

9          she was utilizing in order to make the

10         statement that Hamas is the government to the

11         Gaza Strip?

12    A.   Yes.

13    Q.   Was there -- did you ask to see any of those

14         resources?

15    A.   I may have asked to see some of them.  I may

16         have, you know, seen things again on the

17         news.  I simply can't recall.

18    Q.   Do you have any recollection of looking

19         specifically at any particular document or

20         source with respect to this issue of Hamas

21         has become the government of the state of

22         Gaza -- excuse me, Hamas has become the

23         government of the Gaza Strip?

24    A.   I don't have a specific recollection which

25         sources I looked at.

EXHIBIT 15

1    Q.   But your best recollection is that you did

2         look at resources; is that right?

3    A.   That is my recollection.

4    Q.   The statement that, "Although Gaza or

5         Palestine is not a recognized nation at least

6         by most of the world, it does have some

7         indicia of sovereignty"; do you see that

8         statement?

9    A.   I do.

10   Q.   What are the indicia of sovereignty that are

11        required in order to meet the semi-state-like

12        entity standard?

13            MS. SCOTT REED:  Objection; legal

14        conclusion.

15            THE WITNESS:  Again, the things --

16        the items referenced in the letter, the

17        indicia -- indicia, excuse me, of

18        sovereignty, it governs the territory, it has

19        a military, it has a police force, it has a

20        security force, it also has social services,

21        it provides health care services, it holds

22        elected office, those are the indicia.

23   BY MS. COYOCA:

24   Q.   Ms. Gooley, my question that I'm asking you

25        is:  What are the indicia of sovereignty that

1      is necessary in order to meet the semi-state

2      entity standard, not what was relied on here

3      by OneBeacon, but rather, independently what

4      are those indicia?

5                    MS. SCOTT REED:  Objection; calls

6      for a legal conclusion.

7                    THE WITNESS:  Yeah, I can't -- I

8      can tell you what OneBeacon relied on, I

9      can't tell you otherwise.

10    BY MS. COYOCA:

11    Q.  At the point in time that you reviewed the

12         coverage denial letter, did you know what

13         indicia were necessary in order to meet the

14         standard of semi-sovereignty?

15                    MS. SCOTT REED:  Objection; legal

16         conclusion and assumes facts not in evidence,

17         lack of foundation.

18                    THE WITNESS:  Based on what we

19         cited, we believe that that is what -- that

20         indicated it was indicia of sovereignty.

21                    MS. COYOCA:  Okay.

22    BY MS. COYOCA:

23    Q.  But my question is:  At the time that you

24         reviewed the letter, did you actually know

25         what the indicia were?

1          MS. SCOTT REED:  Objection; legal

2     conclusion, assumes facts not in evidence,

3     lack of foundation, misleading the witness.

4          THE WITNESS:  Again, I'm pointing

5     back to what OneBeacon is pointing to, the

6     issue of sovereignty that we saw back with

7     respect to Hamas, military, social services,

8     police, government, health care, and it

9     all -- it has indicia of sovereignty.

10   BY MS. COYOCA:

11   Q.   Were the -- the indicia of sovereignty that

12        are referenced in the letter, were each of

13        those required in order to meet the standard

14        of semi-state-like status?

15          MS. SCOTT REED:  Objection; legal

16     conclusion, assumes facts not in evidence,

17     lack of foundation, misleading the witness.

18          THE WITNESS:  Again, we believe

19     that what we pointed out to provides indicia

20     of sovereignty.

21   BY MS. COYOCA:

22   Q.   I understand that point.  What I'm trying to

23        get at is:  In July 2014 as you were

24        reviewing the letter, did you know what would

25        be sufficient, what standards were

Page 212

1      sufficient?  Other than what is recited in

2      the letter, did you actually know based on

3      legal authority or what Ms. Johnson told you

4      or looking at a case, okay, this is what is

5      needed in order to meet that standard?

6                  MS. SCOTT REED:  I'm going to

7      object to the form of the question as vague

8      and ambiguous and also restate my standing

9      objections, lack of foundation, assumes facts

10     not in evidence, misleading the witness.

11                  Are you trying to indicate to this

12     witness that there are some black letter law,

13     statute or otherwise to which your question

14     refers?

15     BY MS. COYOCA:

16     Q.  Can you please answer the question.

17     A.  Again, based on our research, based on

18     everything that we found, we believe that

19     what Hamas has is enough to satisfy what is

20     an indicia of sovereignty.  We wouldn't have

21     put it in the letter if we didn't think so.

22     Q.  What sources did you look at in order to

23     determine whether or not the factors that

24     were recited were sufficient to meet the

25     standard for semi-state-like sovereignty?

Page 213

1           MS. SCOTT REED:  Objection;

2      assumes facts not in evidence, lack of

3      foundation.

4           THE WITNESS:  Again, Pamela and I

5      had discussions about her research, about

6      what she looked at, and then ultimately we

7      reached conclusions.

8  BY MS. COYOCA:

9  Q.  Did you read any case authority?

10  A.  Not that I recall.

11  Q.  Did you read the Zanotti article?

12  A.  No.

13  Q.  Okay.

14           MS. SCOTT REED:  Counsel, I need a

15      break if you're kind of transitioning here.

16           MS. COYOCA:  Sure.

17           MS. SCOTT REED:  Thank you.

18           THE VIDEOGRAPHER:  It's 4:26 p.m.

19      We're going off the record.

20           (Whereupon, a brief recess

21           was taken.)

22           THE VIDEOGRAPHER:  It's 4:44 p.m.

23      We're back on the record.  This begins DVD

24      number 5.

25  BY MS. COYOCA:

Page 214

1    Q.   Keeping your attention to Exhibit 18, the

2         July 28, 2014, letter, on the fifth page of

3         the letter labeled Bates control ATL0000098,

4         under, "Analysis," there's a section

5         entitled, "Imminent Peril."  I'd like to ask

6         you a question about that.  Are you there?

7    A.   Yes.

8    Q.   Great.  Do you agree with Ms. Johnson's

9         statements made in that paragraph that the

10        situation in Israel constituted imminent

11        peril?

12   A.   I'm just going to read through it, but

13        presumably I do, because I approved the

14        letter.  (Reviews document.)  Yes.

15   Q.   The two grounds that I see that are invoked

16        in the July 28 letter is subparagraph 1 of

17        the war exclusions and subparagraph 2.  I do

18        not see the third or fourth subparagraphs

19        invoked.  Do you -- do you agree?

20             MS. SCOTT REED:  Objection; form,

21        assumes facts not in evidence.

22             THE WITNESS:  We -- yeah, we -- we

23        reference the -- the first prong of the war

24        exclusion and then we reference paragraph 1

25        and paragraph 2, warlike action by a military

1       force.

2    BY MS. COYOCA:

3    Q.   Was the third prong of the exclusion,

4         "Insurrection, revolution, rebellion,"

5         et cetera, was that referenced in the letter?

6              MS. SCOTT REED:  Objection to

7         form, vague and ambiguous.

8              THE WITNESS:  The third prong

9         isn't referenced.

10   BY MS. COYOCA:

11   Q.   And what about the fourth prong with respect

12        to weapons of war?

13   A.   Well, yeah, the -- the fourth prong is

14        referred to in the -- in the general

15        conditions when we cite the policy.  The

16        third prong is referred to as well under,

17        "Pertinent Policy Provisions."

18   Q.   But in the Analysis section, when Ms. Johnson

19        is indicating why the claim is not covered,

20        does Ms. Johnson indicate that the claim is

21        not covered because of the third prong of the

22        war exclusions?

23             MS. SCOTT REED:  Objection to

24        form, vague and ambiguous, misstates the

25        record.

1          THE WITNESS:  She cites the third

2      prong, but there's no -- there's no analysis

3      under the Analysis provision -- or section of

4      the policy analyzing the application of the

5      third prong.

6  BY MS. COYOCA:

7  Q.  Under the Analysis section of the policy,

8      does Ms. Johnson cite the third prong?

9  A.  No, she doesn't cite the third prong.

10  Q.  With respect to the fourth prong --

11  A.  Yeah -- okay.

12          MS. SCOTT REED:  Are you finished

13      with your answer?

14          THE WITNESS:  Yes.  Sorry.

15  BY MS. COYOCA:

16  Q.  With respect to the fourth prong, begin

17      quotes, "Any weapon of war, including atomic

18      fission or radioactive force, whether in time

19      of peace or war," close quotes, under the

20      Analysis section of Ms. Johnson's July 28

21      letter does she invoke the fourth prong as a

22      grounds on which OneBeacon is denying the Dig

23      claim?

24          MS. SCOTT REED:  Objection; vague

25      ambiguous, misstates the record.

EXHIBIT 15

1          THE WITNESS:  It's cited -- I

2     mean, she cites it in the policy piece.  But

3     in terms of the analysis, she -- analysis she

4     focuses just on the first paragraph and the

5     second paragraph of the war, what I refer to

6     as the war exclusions.

7 BY MS. COYOCA:

8 Q.  Did you speak to Ms. Johnson as to why she

9     did not address the third prong of the war

10    exclusions in the Analysis section of the

11    denial letter?

12 A.  I don't recall that conversation, no.

13 Q.  Did you ever tell Ms. Johnson that the third

14    prong should also be invoked as a grounds for

15    exclusion of the Dig claim?

16 A.  The third prong?

17 Q.  Yes.

18 A.  Or the third paragraph?

19 Q.  The third paragraph of the war exclusions,

20    subparagraph 3.

21 A.  No.

22 Q.  Was OneBeacon denying the claim on the basis

23    of the third paragraph, subparagraph 3 of the

24    war exclusions?

25 A.  The paragraph that begins, "Insurrection,

1       rebellion, revolution"?

2   Q.  Yes.

3   A.  No.

4   Q.  Did you ever tell Ms. Johnson that she should

5       address the fourth prong of the war exclusion

6       with respect to any weapon of war in the

7       Analysis section of the coverage denial

8       letter?

9   A.  We discussed the fourth prong, but I don't

10      recall telling her to expressly include

11      the -- it in the analysis of the coverage

12      position.

13  Q.  In the coverage denial letter, is OneBeacon

14      relying on the fourth prong, the fourth --

15      the subparagraph 4 of the war exclusions in

16      denying the Dig claim?

17  A.  Yes, OneBeacon would be.  The fourth prong

18      says, "Any weapon of war," so any weapon of

19      war necessarily would be included in any

20      warlike action by a military force, war

21      including undeclared war, any weapon of war I

22      think would -- would fall within that, and in

23      here it would -- warlike action, again,

24      you're using a weapon of war, so it would be

25      included within 1 and 2.

Page 219

1  Q.  Why wasn't it specifically addressed in the

2      Analysis section of the policy?

3  A.  I think part of it is because it's --

4      implicitly would be included, but we

5      highlighted two of the provisions.

6  Q.  Is it your practice in reviewing coverage

7      denial letters to not recite all of the

8      provisions on which the insurer is denying

9      coverage?

10              MS. SCOTT REED:  Objection to

11     form, assumes facts not in evidence, lack of

12     foundation.

13              THE WITNESS:  It is not our

14     practice to not -- to not cite all

15     exclusions, at the same time, we reference

16     the exclusions.  When we cite we highlight

17     exclusions.  We may not hit every possible

18     variation of an exclusion.  But in this case,

19     like I mentioned, paragraph 4, "Any weapon of

20     war," if it's a war or warlike action, it

21     would include a weapon of war.

22 BY MS. COYOCA:

23 Q.  Did you ever have any discussions with

24     Ms. Johnson about the fact that the third and

25     fourth prongs of the war exclusions were not

Page 220

1    addressed in the coverage denial letter?

2              MS. SCOTT REED:  I'm sorry,

3    Counsel, I -- I just missed your question, do

4    you mind it if I --

5  BY MS. COYOCA:

6  Q.  Do -- did you ever have any discussions with

7      Ms. Johnson about the fact that the third and

8      the fourth prongs of the war exclusions were

9      not addressed in the coverage denial letter?

10             MS. SCOTT REED:  Objection to

11   form, vague and ambiguous and misstates the

12   facts in evidence and this witness's prior

13   testimony.

14             THE WITNESS:  So, again, the --

15   the third paragraph I don't think is

16   applicable, and so necessarily we wouldn't

17   have included it in the letter.

18             The fourth paragraph is applicable,

19   but based on the analysis of the application

20   of war, including undeclared or civil war and

21   warlike actions by a military force, that

22   would include the use of any weapon of war.

23  BY MS. COYOCA:

24  Q.  Did you ever ask Ms. Johnson about the fact

25      that the fourth prong of the war exclusion

Page 221

1      was not explicitly addressed in the Analysis

2      section of the July 28th coverage denial

3      letter?

4                  MS. SCOTT REED:  Objection to

5      form, lack of foundation, assumes facts not

6      in evidence.

7                  THE WITNESS:  I -- I didn't ask --

8      I never asked her about whether or not the

9      fourth was addressed, because we cited it,

10     and again it was -- would be part of the

11     analysis, it would be necessarily included by

12     paragraph 1 and 2.

13                 MS. COYOCA:  Okay.

14  BY MS. COYOCA:

15  Q.  I want to show you a document that's already

16      previously been marked as Exhibit 19 to the

17      Gutterman deposition.  Please let me know

18      when you're ready for questions.

19  A.  Okay.  Thank you.  I'll read through it.

20  Q.  Thanks.

21  A.  (Reviews document.)

22  Q.  Are you ready for questions?

23  A.  Yes.

24  Q.  Have you seen this letter before?

25  A.  Yes.

Page 222

1    Q.   When did you see it?

2    A.   I would have seen it after Pamela received

3         it.

4    Q.   Did you ever discuss it with Pamela?

5    A.   I'm sure that we did discuss it, yes.

6    Q.   Do you recall any of your discussions about

7         the letter?

8    A.   I don't specifically recall the discussions.

9    Q.   Do you have any general recollections of your

10        discussions?

11   A.   My general recollection would be we would

12        have -- we would have gone through the

13        arguments and that Pamela would have pulled

14        the cases and read the case law and looked at

15        the arguments raised in the letter.

16   Q.   With respect to the second paragraph of the

17        letter, talking about OneBeacon's willingness

18        to cover expenses associated with the initial

19        one-week postponement; do you see that?

20   A.   I do.

21   Q.   Were you aware that OneBeacon had agreed to

22        cover the first one week push cost -- or

23        postponement costs?

24             MS. SCOTT REED:  Objection to

25        form, assumes facts not in evidence,

1      misstates the record.

2                  THE WITNESS:  I -- I knew that

3      OneBeacon had agreed to offer 3 to 350 for

4      the first -- first week.

5  BY MS. COYOCA:

6  Q.  How did you become aware of that?

7  A.  Pamela would have told me.

8  Q.  What did she tell you about that?

9  A.  I just recall when it initially came in, it

10      came in as a postponement claim and that --

11      that initially, you know, to the extent that

12      NBC only postponed it for a week estimate and

13      then began -- or resumed filming, estimated

14      losses associated with that were between 3

15      and 350.

16  Q.  And what did she tell you with regard to

17      OneBeacon's willingness to cover 300 to

18      350,000 of those costs?

19                  MS. SCOTT REED:  Objection to

20      form, assumes facts not in evidence,

21      misstates the record.

22                  THE WITNESS:  Again, I -- I think

23      that it was initially based on the

24      understanding that it was a postponement

25      claim, that it would only be a one-week

Page  224

1      postponement of shooting, and then thereafter

2      when it became clear, I think OneBeacon

3      simply wanted to make a concession to NBC and

4      continue to offer the 3 to 350 for the claim.

5   BY MS. COYOCA:

6   Q.  Specifically, did Ms. Johnson tell you how

7      OneBeacon's willingness to pay 3 to 350 for

8      the initial one-week postponement, how that

9      was ever conveyed to the client?

10              MS. SCOTT REED:  Objection to

11     form, assumes facts not in evidence,

12     misstates the record.

13              THE WITNESS:  I -- I don't

14     remember or recall how that was conveyed to

15     NBC.

16   BY MS. COYOCA:

17   Q.  Did you ever -- were you ever told that

18     Mr. Williams had made the statement that

19     OneBeacon would cover 300 to 350 of the

20     initial postponement costs?

21              MS. SCOTT REED:  Objection to

22     form, assumes facts not in evidence,

23     misstates the record.

24              THE WITNESS:  I -- I wasn't aware

25     if Peter made any statement like that.

Page 225

1   BY MS. COYOCA:

2   Q.   Was it your understanding that Ms. Johnson

3        had indicated to NBC Universal and Aon that

4        OneBeacon would cover 300 to 350,000 of the

5        initial one-week postponement costs?

6                    MS. SCOTT REED:   Objection to

7        form, assumes facts not in evidence,

8        misstates the record.

9                    THE WITNESS:   I understand that

10       Pamela offered to -- to cover 300 to 350 for

11       the initial week postponement.

12  BY MS. COYOCA:

13  Q.   When was that offer conveyed?

14  A.   I don't remember.

15  Q.   Why was --

16                   MS. SCOTT REED:   Are you -- are

17       you referring to something to answer the

18       question?

19                   THE WITNESS:   Yes.   Sorry.   I -- I

20       said I don't remember.   I just -- I don't --

21       I'm just referring to the letter that -- that

22       Pamela sent out dated July 28th and the

23       conclusion.   She states, "Although we cannot

24       cover the extra expense associated with the

25       production move to another country to

1       complete the production, based on our long

2       relationship with NBC, we're willing to cover

3       the expenses associated with the initial

4       postponement as a courtesy," and then she

5       references a budget and the costs associated

6       with the initial postponement.

7    BY MS. COYOCA:

8    Q.  Is it your understanding that this was the

9        first time that there was ever any indication

10       by OneBeacon that it would cover the initial

11       one-week postponement costs?

12   A.  I think that it -- there was an indication

13       before that, but I don't have a -- a specific

14       recollection as to when.

15   Q.  And do you know who provided that indication

16       to Aon or NBC Universal?

17   A.  I don't.

18   Q.  On what basis did OneBeacon decide that it

19       was willing to pay the one-week initial

20       postponement costs?

21            MS. SCOTT REED:  Objection to

22       form, misstates the record, assumes facts not

23       in evidence, vague and ambiguous, the

24       reference to pay.

25            THE WITNESS:  Again, I'm just

1        going to -- I -- I don't know the earlier

2        conversations, but as detailed in the

3        July 28th letter, Pamela indicates that based

4        on our long relationship, we're willing to

5        cover the expenses associated -- associated,

6        excuse me, with the initial postponement as a

7        courtesy.  So at least as of July 28th, that

8        was the basis, as a courtesy given the

9        existing relationship with NBC.

10   BY MS. COYOCA:

11   Q.  Are you aware of any other grounds as to why

12       OneBeacon was willing to pay the initial --

13       or to cover, to cover the expenses associated

14       with the initial postponement?

15              MS. SCOTT REED:  Objection to

16       form, assumes facts not in evidence,

17       misstates the record.

18              THE WITNESS:  Again, I think

19       when -- when the claim initially claim to

20       Peter it -- he thought it would be simply a

21       postponement for a week and then reconvene or

22       resume the filming.  And based on that, it's

23       my understanding we thought potentially 3 to

24       350 would be the expenses incurred by NBC to

25       postpone the production.

1    BY MS. COYOCA:

2    Q.   Was it OneBeacon's position that the initial

3         postponement costs of 300 to 350, whatever

4         the original estimate was, that those were a

5         covered expense under extra -- under the

6         extra expense coverage of the policy?

7    A.   I think initially when the claim first came

8         in, it appeared that it might be based on the

9         postponement.  But then, clearly, by

10        July 28th when the letter was issued,

11        OneBeacon took the position that those

12        weren't covered, but again, as a courtesy

13        would -- would provide NBC with reimbursement

14        for those expenses it incurred during that

15        first week.

16   Q.   What do you base your understanding that

17        initially when the claim first came in it

18        appeared that it might be based on the

19        postponement?  What do you -- what do you

20        base your understanding of that statement?

21   A.   My understanding is that when it initially

22        came in, that's how -- that's how it was

23        described by NBC.

24   Q.   I'm actually directing your attention to the

25        statement that -- that it appeared the claim

Page 229

1      might be covered based on the postponement.

2                    MS. SCOTT REED:  Objection to

3      form, asked and answered.

4                    Do you -- do you want to go back and

5      read her answer --

6                    MS. COYOCA:  Yeah.

7                    MS. SCOTT REED:  -- so she knows

8      what you're saying?

9  BY MS. COYOCA:

10 Q.  You indicated previously that I asked you was

11     it OneBeacon's position that the initial

12     postponement costs of 300 to 350, whatever

13     the original estimate was that those were a

14     covered expense under extra -- under the

15     extra expense coverage of the policy.  And

16     you indicated, "I think initially when the

17     first came" -- "when the claim first came in,

18     it appeared that it might be based on the

19     postponement, but then clearly by July 28th

20     when the letter was issued, OneBeacon took

21     the position that those weren't covered, but

22     again as a courtesy would -- would provide

23     NBC with reimbursement for those expenses it

24     incurred during that first week."

25                    And my question to you is:  As that

Page 230

1      first portion of your response when you say,

2      "I think initially when the claim first claim

3      in, it appeared that it might be based on the

4      postponement," what did you base that

5      statement on?

6   A. I -- I'm looking back at the letter, but I

7      also -- my recollection was that, again, it

8      was a moving -- kind of a moving target, and

9      NBC postponed it and wanted to see how -- how

10      the -- how it went forward between Israel and

11      Hamas before making -- you know, and then

12      ultimately decided that for the safety of NBC

13      they needed to pull out of -- pull out of

14      Israel.

15   Q. If the -- if only postponement had occurred

16      and no relocation was necessary, would that

17      be a covered claim?

18          MS. SCOTT REED:  Objection to

19      form, improper foundation and calls for

20      speculation.

21          Are you asking the witness to

22      rewrite the historical events that occurred?

23          THE WITNESS:  Are you asking me if

24      they just postponed it for a week and

25      continued filming after a week would that

462                                    EXHIBIT 15

1    potentially be covered?

2    BY MS. COYOCA:

3    Q.  Yes, I'm asking you would it be covered?

4              MS. SCOTT REED:  Same objections.

5              THE WITNESS:  If they postponed it

6    for a week and continued to film -- no, the

7    war exclusion would apply.

8    BY MS. COYOCA:

9    Q.  Why --

10             THE WITNESS:  Exclusions, excuse

11   me, plural.

12   BY MS. COYOCA:

13   Q.  Why would the -- why then did you believe

14   that the postponement costs initially

15   appeared that it would be covered?

16             MS. SCOTT REED:  Objection to

17   form, misstates prior testimony.

18             THE WITNESS:  Initially, when it

19   came in and as the facts were developing, it

20   was early on.  And at that point the facts

21   escalated to what was war.  And so the facts

22   developed over that period of time beginning

23   in June running through into August.  But

24   initially when it came in, it wasn't clear if

25   the -- there would be a cease fire, if there

1          would be just that initial hostility, so that

2          was based on our initial impression.

3     BY MS. COYOCA:

4     Q.   The -- the initial impression that at some

5          point prior to whatever escalation you're

6          referring to, that it -- it wasn't clear

7          whether it was a war, when do you date that

8          period of time to?

9                    MS. SCOTT REED:  Objection;

10         misstates the witness's testimony.  That's

11         absolutely misleading.  The witness did not

12         use those words.

13                   THE WITNESS:  What I'm saying is

14         that based on all the facts, at that point we

15         didn't -- things were continuing to develop

16         in Israel.  It was escalating and when --

17         then when we looked at the totality of the

18         facts over the period of time, we reached the

19         conclusion that the war-related exclusions

20         would apply.

21    BY MS. COYOCA:

22    Q.   When you said, "What I'm saying is that based

23         on all the facts, at that point we didn't --

24         things were continuing to develop in Israel,"

25         what point in time were you referring to when

Page 233

1      you say, "At that point," in that response?

2   A.  When they initially were speaking with Peter.

3       It would have been in, like, around

4       July 11th.  NBC itself characterized it as a

5       postponement claim as well.

6   Q.  At that point in time when the initial

7       discussions were had with Peter -- by the

8       way, at the time the discussions were had

9       around July 11, did -- were you aware that

10      those conversations were going on?

11  A.  No.

12  Q.  When did you become aware of them?

13  A.  I -- when Pamela reached out to me.

14  Q.  Okay.  So during that initial period, did

15      OneBeacon believe that the events that were

16      happening in Israel at that point in time,

17      that they constituted a war?

18              MS. SCOTT REED:  Objection to

19      form, lack of foundation, assumes facts not

20      in evidence, calls for speculation by this

21      witness.

22              THE WITNESS:  Again, at -- at that

23      point we were, you know, still monitoring

24      what was going on and what was going on

25      between Israel and Hamas and so -- and

1    whether there would be a cease fire, which

2    was shortly thereafter, I think it was

3    short -- there appeared there might be.  We

4    wanted to see how the -- how it -- how it

5    played out as it were in terms of what was

6    going on between Israel and Hamas.

7  BY MS. COYOCA:

8  Q.  I understand that you're indicating that

9    OneBeacon wanted to see how it played out,

10    but the question that I'm asking you, and it

11    may be that no determination was made, but

12    I'm asking you:  Initially when the claim was

13    first discussed around July 11 with

14    Mr. Williams, did OneBeacon consider the

15    hostilities that were going on at that point,

16    did they consider those hostilities to be a

17    war?

18            MS. SCOTT REED:  Objection; calls

19    for speculation.  This witness already

20    testified she wasn't involved on July 11th.

21            THE WITNESS:  Yeah, I -- again, I

22    wasn't part of those conversations, but

23    OneBeacon hadn't engaged in all its research

24    at that point either.

25            MS. COYOCA:  Okay.

Page 235

1    BY MS. COYOCA:

2    Q.   But regardless of whether you were involved,

3         I understand you do not think you were or you

4         were not, did you ever subsequently learn

5         that at that point in time around July 11,

6         that OneBeacon considered the situation in

7         Israel to be a war?

8                   MS. SCOTT REED:   Objection;

9         improper foundation, assumes facts not in

10        evidence, calls for speculation.

11                  THE WITNESS:   I never -- there --

12        I don't recall anything -- or learning

13        anything indicating that we thought it was --

14        it was a war on July 11th.

15   BY MS. COYOCA:

16   Q.   Did you ever hear anything that indicated to

17        you that OneBeacon did not consider the

18        situation as it existed in Israel around

19        July 11, that it was not a war?

20   A.   I think at -- at July 11th, when we initially

21        found out about the claim we needed to find

22        out more information about everything that

23        was going on and also what went on in the

24        subsequent events to make that determination.

25   Q.   Is the fact that the hostilities escalated

Page 236

1      after July 11, does that factor in at all in

2      terms of OneBeacon's conclusion that there

3      was a war that existed?

4                  MS. SCOTT REED:  Objection; calls

5      for speculation, assumes facts not in

6      evidence.

7                  THE WITNESS:  When we looked at

8      all the facts, we concluded there was war,

9      including the events subsequent to July 11th.

10  BY MS. COYOCA:

11  Q.  But I'm asking specifically about the

12      escalation of hostilities.  Was the

13      escalation of hostilities one of the factors

14      that led OneBeacon to conclude that it was a

15      war?

16                  MS. SCOTT REED:  Objection; lack

17      of foundation, assumes facts not in evidence,

18      calls for speculation of this witness.

19                  THE WITNESS:  Again, it was all

20      the facts included within that is -- yeah,

21      you could say the escalation, the sending of

22      the ground troops, the -- you know, the war

23      planes, the missiles launched back and forth,

24      the number of missiles launched back and

25      forth.  Again, it's the totality of the

EXHIBIT 15

Page 237

1      circumstances.

2  BY MS. COYOCA:

3  Q.  If there had been no escalation, would

4      OneBeacon have concluded that the hostilities

5      that existed as of July 11, that it

6      constituted a war?

7              MS. SCOTT REED:  Objection; lack

8      of foundation, assumes facts not in evidence,

9      calls for speculation of this witness and

10     legal conclusion.

11             THE WITNESS:  If on July 11th

12     nothing further was exchanged, no missiles,

13     no ground forces, no kidnappings, nothing

14     like that --

15  BY MS. COYOCA:

16  Q.  No, no, no.  I'm talking about the state

17     of --

18             MS. SCOTT REED:  I'm going -- I'm

19     going to object.  You've interrupted the

20     witness's answer.  She's answering your

21     question.

22             MS. COYOCA:  I thought she --

23             MS. SCOTT REED:  Do you want to

24     withdraw it?

25             MS. COYOCA:  I thought she was

1       asking for a clarification.

2   BY MS. COYOCA:

3   Q.  Do you understand the question?

4   A.  If you'd repeat the question, please.

5   Q.  Sure.  I'm actually just going to ask a new

6       one.

7               If the circumstances in Israel, as

8       they existed in Israel as of July 11,

9       whatever had transpired before had in fact

10      transpired, but nothing developed subsequent

11      after July 11, would OneBeacon still have

12      concluded that those factual circumstances as

13      they existed as of July 11, did those

14      constitute a war?

15              MS. SCOTT REED:  Objection; lack

16      of foundation, improper foundation, assumes

17      facts not in evidence, calls for speculation

18      and legal conclusion.

19              THE WITNESS:  I think on July 11th

20      when initially Peter had the conversation

21      with Andrea and Susan, I assume, perhaps at

22      that point we just received notice, so we

23      would have had to look at all the facts,

24      including the facts rising -- the facts

25      leading up to the events and the facts

Page 239

1    subsequent to the events.  So I don't know

2    whether we would have concluded it was a war

3    or not or it was not a war.

4    BY MS. COYOCA:

5    Q.  Turning back to Exhibit 19, my August 13,

6        2014, letter to Ms. Johnson.

7    A.  Yes.

8    Q.  On the third page of the letter there is a

9        reference to -- in the -- in the second to

10       last paragraph on the page, there's a

11       reference to, "The U.S. Department of State

12       County reports on terrorism"; do you see

13       that?

14   A.  Sorry, third page, which paragraph, please?

15   Q.  Page 3.

16   A.  Yup.

17   Q.  Bates label 89.

18   A.  Yup.

19   Q.  Fourth paragraph down.

20   A.  Okay.  I see that.

21   Q.  Did you ever review this county reports on

22       terrorism that had been issued by the

23       U.S. Department of State?

24   A.  I didn't personally review it, no.

25   Q.  Did Ms. Johnson?

Page 240

1   A.  I don't --

2              MS. SCOTT REED:  Objection;

3        speculation.

4              THE WITNESS:  I don't know whether

5        she did or not.

6   BY MS. COYOCA:

7   Q.  Did you ask Ms. Johnson to review it?

8   A.  I asked Pamela to review the arguments in the

9        letter, including case law, and then draft a

10       response.

11  Q.  But did you ask her to review specifically

12       this authority that was cited in the letter,

13       which is not a case --

14             MS. SCOTT REED:  Objection to

15       form, vague and ambiguous.

16             THE WITNESS:  I didn't -- I don't

17       recall asking her to look at -- from a

18       statement from the U.S. Department of -- or

19       U.S. State Department, excuse me.

20  BY MS. COYOCA:

21  Q.  Turning to page 4, in the paragraph that

22       begins, "Indeed, there is longstanding and

23       ample authority," in that paragraph there's a

24       reference to a U.S. Department of State

25       County reports -- oh, I'm sorry let me take

1      that back and try over.

2              There is a reference to a

3      publication entitled, "U.S. Department of the

4      Treasury Press Center from the Office of

5      Public Affairs," from August of 2003.  Do you

6      see that reference?

7   A.  I do.

8   Q.  Did you review the Treasury Department

9      statement or article from the Office of

10     Public Affairs that came out in August of

11     2003?

12  A.  I did not.

13  Q.  Did you ask Ms. Johnson to?

14  A.  I didn't specifically ask her to, no.

15  Q.  Do you know if she did?

16  A.  I don't know whether she did or not.

17  Q.  On the next page, on page 5, there's a

18     reference to -- right before the paragraph

19     heading number 4, to a European council --

20     excuse me, "European Union Foreign Affairs

21     Council, Foreign Ministers Meeting Report";

22     do you see that?

23  A.  I do.

24  Q.  Did you review that European Foreign Affairs

25     Council Report?

Page 242

1    A.  I did not.

2    Q.  Did you ask Ms. Johnson to?

3    A.  I did not specifically ask her, no.

4    Q.  Do you know if she did?

5    A.  I don't know.

6    Q.  Did you review -- you personally review any

7        of the case authority that was cited in the

8        letter?

9    A.  I did not.

10   Q.  Did you ask Ms. Johnson to?

11   A.  I did.

12   Q.  And did she share with you her views after

13       reading those cases?

14   A.  I'm sure that she did, yes.

15   Q.  How are you sure?  Why are you sure?

16             MS. SCOTT REED:  Objection;

17       compound.

18             THE WITNESS:  Because I asked her

19       to look at it, and she would have looked at

20       it and then we would have a -- we would have

21       had a discussion.

22   BY MS. COYOCA:

23   Q.  Do you recall specifically having a

24       discussion about the Pan American case?

25   A.  I don't.

EXHIBIT 15

1   Q.   Do you believe that you did?

2   A.   I would think we did.

3   Q.   Do you recall anything at all specifically

4        about the Pan American case?

5   A.   Other than what you cite in your letter, no,

6        not -- not right now.

7   Q.   Did you ever ask Ms. Johnson how or why it is

8        that the Pan American case did not apply to

9        this situation?

10  A.   I don't know whether I asked her that express

11       question, but when she reviewed the case law,

12       we necessarily would have a discussion

13       whether we believed it applied, whether we

14       believed it was by a new precedent, whether

15       we believed it would change our opinion as to

16       the applicability of the war exclusion.

17  Q.   And what about the Holiday Inn case,

18       Holiday Inn vs. Aetna Insurance, did you

19       review that case?

20  A.   I did not.

21  Q.   And did you ask Ms. Johnson to?

22  A.   Yes.

23  Q.   Did you discuss her analysis of the case?

24  A.   I don't have any recollection of it.  But,

25       again, I would imagine that we had that

Page 244

1       discussion.

2   Q.  Did you ask Ms. Johnson for her specific

3       analysis as to why Holiday Inn's was

4       inapplicable to the situation?

5   A.  I wouldn't have asked her why it was or

6       wasn't inapplicable.  I would have asked her

7       to tell me what -- she read the case and

8       whether she believes that is -- what the

9       proposition of the case is, whether it -- if

10      it's contrary to our position, you know,

11      whether we need to -- to look at it again,

12      so...

13  Q.  Did you discuss the request for

14      reconsideration of the denial with anyone

15      other than Ms. Johnson?

16  A.  I think it was probably Pamela and I.

17  Q.  Did you discuss the request for

18      reconsideration with Sean Duffy?

19  A.  I don't recall discussing it with him, no.

20  Q.  Did you discuss the request for

21      reconsideration of the denial with outside

22      coverage counsel?

23  A.  I don't recall having a discussion with

24      outside coverage counsel, no.

25  Q.  Do you know if there was a discussion with

EXHIBIT 15

Page 245

1    outside coverage counsel concerning the

2    request for reconsideration?

3  A. I don't know whether Pamela did or did not.

4  Q. Did you ever tell Ms. Johnson that she should

5    run the re -- request for reconsideration of

6    the denial letter by outside coverage

7    counsel?

8  A. I don't -- I don't remember asking her that,

9    no.

10 Q. Did you ever discuss the August 13, 2014,

11   request for reconsideration of the denial

12   with Peter Williams?

13 A. We may have had a discussion, Peter, Pamela

14   and I, but again, I don't recall anything --

15   any specific discussion.

16 Q. When you say you may have had a discussion,

17   what do you base that on?

18 A. I -- I just don't know.  I -- I can't tell

19   you whether we did or did not.

20 Q. Separate and apart from the discussion, did

21   you ever have any conversations with

22   Mr. Williams about any of the grounds that

23   were cited in the reconsideration letter as

24   to the analysis and as it was applied to this

25   claim?

EXHIBIT 15

1                  MS. SCOTT REED:  Objection; vague

2          and ambiguous as to reconsideration letter.

3                  THE WITNESS:  Are you asking me

4          whether I had discussions with Peter just

5          about the policy language and the application

6          of it to the facts?

7      BY MS. COYOCA:

8      Q.  No, I'm -- I'm specifically asking with

9          respect to the grounds that are set forth in

10         the August 13, 2014, letter requesting that

11         OneBeacon reconsider its denial of the claim.

12         Did you ever discuss those grounds that were

13         cited in the letter with Mr. Williams?

14     A.  I don't recall.

15     Q.  Were you involved in drafting a response to

16         the August 13, 2014, letter?

17     A.  Pamela would have drafted it and I would

18         have -- would have looked at it, but I didn't

19         draft it.

20     Q.  Do you specifically recall reviewing a draft

21         of the reply?

22     A.  I don't specifically recall it, but I would

23         assume that I did.

24     Q.  How would you have received a copy of the

25         draft?  Would it have been by e-mail?

EXHIBIT 15

Page 247

1    A.   I would guess, yes.

2    Q.   Do you recall if you proposed any revisions

3         to the reply letter?

4    A.   I don't -- I don't remember, no.

5    Q.   With respect to the discussion that is set

6         forth on page 5 of the August 13, 2014,

7         letter, under section 4, "The certified acts

8         of terrorism coverage cap endorsement does

9         not preclude coverage the claim"; do you see

10        that section?

11   A.   I do.

12   Q.   Did you discuss this section of the letter

13        specifically with Ms. Johnson?

14   A.   I don't -- I don't recall the discussion, but

15        I imagine we did, because we addressed it in

16        the -- in the responsive letter.

17   Q.   Did you -- did Ms. Johnson tell you that she

18        thought that the analysis of the August 13

19        letter was incorrect and that, in fact, the

20        endorsement did apply?

21   A.   I -- I don't recall that -- given that we

22        subsequently withdrew it, I don't think she

23        would have said that the endorsement applied.

24   Q.   Did you ever ask her why she had originally

25        invoked the endorsement when it didn't apply?

Page 248

1              MS. SCOTT REED:  Objection to

2      form, vague and ambiguous.

3              THE WITNESS:  I may have.  I don't

4      recall.

5   BY MS. COYOCA:

6   Q.  Was there any disagreement between the two of

7      you as to whether the certified acts of

8      terrorism cap on losses endorsement did or

9      did not apply?

10  A.  I don't think there was.

11  Q.  Did you ever gain an understanding as to why

12      it is that Ms. Johnson invoked the certified

13      acts of terrorism cap on losses endorsement

14      in the initial denial letter?

15              MS. SCOTT REED:  Objection; vague

16      and ambiguous.

17              THE WITNESS:  No, I don't

18      remember.

19              MS. COYOCA:  Can we go off the

20      record for a moment.

21              THE VIDEOGRAPHER:  It's 5:35 p.m.

22      We're going off the record.

23              (Whereupon, a brief recess

24              was taken.)

25              THE VIDEOGRAPHER:  It's 5:36 p.m.

Page 249

1        We're back on the record.

2   BY MS. COYOCA:

3   Q.  Did you ever have a conversation with

4       Ms. Johnson as to whether an entity that had

5       been designated by the U.S. government as a

6       terrorist organization could also be

7       considered a semi-sovereign state?

8               MS. SCOTT REED:  Objection;

9       assumes facts not in evidence, lack of

10      foundation.

11              THE WITNESS:  I don't -- yeah, I

12      don't remember ever having a discussion on

13      that particular issue.

14  BY MS. COYOCA:

15  Q.  Did you ever ask Ms. Johnson for legal

16      authority for the proposition that a

17      terrorist organization could also be

18      considered a semi-sovereign state?

19              MS. SCOTT REED:  Objection to

20      form, lack of foundation, assumes facts not

21      in evidence.

22              THE WITNESS:  Pamela did the

23      research, and based on her research and

24      analysis, again, we came to the conclusion

25      that -- that Hamas could be considered a

Page 250

1        quasi.  And so did I expressly ask her that,

2        no.  But based on our research, we reached

3        that conclusion.

4    BY MS. COYOCA:

5    Q.  I'm specifically focusing, though, on whether

6        you ever asked her for legal authority on

7        that specific proposition?

8    A.  No, I didn't.

9    Q.  Did you ever look for any legal authority for

10       the proposition that an entity that was a

11       terrorist organization could also be

12       considered a semi-sovereign?

13              MS. SCOTT REED:  Objection;

14       assumes facts not in evidence, lack of

15       foundation.

16              THE WITNESS:  No, I did not.

17              MS. COYOCA:  Okay.

18    BY MS. COYOCA:

19    Q.  I want to go to a document that was

20        previously marked as Exhibit 20, and it's a

21        September 9, 2014, letter from Pamela Johnson

22        to Lucia Coyoca, and it's labeled Bates

23        control ATL000705 through 708.

24              And just let me know when you're

25        ready for questions, Ms. Johnson.  Excuse me,

Page 251

1       Ms. Gooley.

2   A.  Okay.

3   Q.  Thank you.

4   A.  You're welcome.  (Reviews document.)

5   Q.  Ready for questions?

6   A.  Yes.

7   Q.  Have you seen this letter before?

8   A.  Yes.

9   Q.  When did you first see it?

10  A.  I -- my guess is I -- I would have seen it

11      before it went out, so I can't tell you

12      exactly what day that was, but it would have

13      been before -- it would have been either on

14      September 9th, depending on when it went out,

15      or before that.

16  Q.  Now that you've reread the letter, do you

17      recall if you had any changes or revisions

18      for the letter?

19  A.  I don't recall any changes.

20  Q.  Did you discuss the letter with Ms. Johnson

21      before it was sent?

22  A.  I think I would have discussed it before it

23      was drafted, and then, yeah, we would have

24      had a discussion before it went out.

25  Q.  So after it was drafted you believe you had a

1        discussion with her as well?

2   A.   I would -- yes, yes, because I would have

3        looked at it and let her know if I had

4        revisions or not.

5   Q.   Okay.  Turning to page 3 of the letter, the

6        top of the letter, are you there?

7   A.   Is it, "To hold that under"?

8   Q.   No.  I'm actually looking at, "You seem to

9        assert that a government," so it's page 3 --

10                  MS. SCOTT REED:   Page 3.

11  BY MS. COYOCA:

12  Q.   -- of the letter, Bates control 708.  I'm on

13       the September 19, 2014, letter.

14                  MS. SCOTT REED:   Second page 3.

15                  THE WITNESS:   Yeah, I think

16       they're all page 3, sorry.

17                  MS. COYOCA:   Oh, you are right.

18       She probably just didn't change the header.

19                  THE WITNESS:   Yeah.  No, no.

20  BY MS. COYOCA:

21  Q.   So this is a letter that Ms. Johnson sent to

22       Ms. -- to myself, correct?

23  A.   Correct.

24  Q.   All right.  And you pointed out that the

25       header of each of the pages appears to

Page 253

1       indicate that they're all page 3, correct?

2   A.  Correct.

3   Q.  All right.  So -- so looking at the Bates

4       control label numbers, 708, the last page of

5       the letter, the paragraph that begins, "You

6       seem to assert"; do you see that?

7   A.  I do.

8   Q.  Could you please read that sentence out loud?

9   A.  "You seem to assert that a government that is

10      deemed to be a terrorist organization cannot

11      have sufficient sovereignty to fall within

12      the war exclusion."

13  Q.  Okay.  Focusing specifically on legal

14      authority, did you look at any legal

15      authority to support that proposition?

16              MS. SCOTT REED:  Objection to

17      form, vague and ambiguous.

18          Legal support for your proposition,

19      Ms. Coyoca?

20              MS. COYOCA:  No, the proposition

21      that is stated in the sentence.

22              MS. SCOTT REED:  Which is a

23      restatement of your proposition.  I just want

24      to clarify for the record what you're asking

25      the witness to do.

Page 254

1           MS. COYOCA:  I believe that

2      Ms. Gooley knows, but let me ask it directly

3      then.

4  BY MS. COYOCA:

5  Q.  Did you look at any legal authority for the

6      proposition that a government that is deemed

7      to be a terrorist organization can also have

8      sufficient sovereignty to fall within the war

9      exclusion?

10          MS. SCOTT REED:  Objection to

11     form, assumes facts not in evidence and legal

12     conclusion.

13          THE WITNESS:  I don't recall

14     looking at anything specific, but what it's

15     stating is that a terrorist organization can

16     still be -- can be a sovereignty, and then it

17     refers to North Korea and Saddam Hussein,

18     which are --

19          MS. COYOCA:  Right.

20          THE WITNESS:  Yeah.

21  BY MS. COYOCA:

22  Q.  I see the words that are written there, but

23      what I'm specifically asking is:  Did you

24      read any cases that stood for that

25      proposition that you just indicated?

Page 255

1    A.   I myself did not read any cases.

2    Q.   Did you ask Ms. Johnson to research and

3         provide some legal authority for the

4         proposition?

5    A.   For the proposition in the first sentence?

6    Q.   Yes, that a terrorist organization could also

7         have sufficient sovereignty to fall within

8         the war exclusion?

9              MS. SCOTT REED:  I'm going to

10        object to the form of the question.  It's

11        vague and ambiguous and it misstates the

12        first -- the first sentence.  The first

13        sentence restates and summarizes what she

14        supposes to be your position, Ms. Coyoca.  It

15        does not state the position of OneBeacon, so

16        the record is going to be garbled on this

17        with asking it that way.

18   BY MS. COYOCA:

19   Q.   You can answer the question.

20   A.   Whether I asked her for authority --

21   Q.   Yes.

22   A.   -- as whether or not a terrorist organization

23        can be a sovereignty or fall within the war

24        exclusion?

25   Q.   Yes.

1    A.   No.

2    Q.   Further on in that paragraph, beginning with

3         the sentence, "Further, as explained above";

4         do you see that?

5    A.   I do.

6    Q.   Could you read that portion of the paragraph

7         through to the conclusion of the paragraph?

8    A.   Sure.  "Further, as explained above, the

9         Israeli government participated in the

10        conflicts and invaded Gaza.  There is no

11        question that the Israeli government is

12        identified by the majority of the world

13        governments as a legitimate sovereign, not a

14        terrorist organization."

15   Q.   Is it OneBeacon's position, based on your

16        understanding, that in order for the war

17        exclusion to -- to apply, it was sufficient

18        for there to be only one sovereign government

19        involved in the hostilities?

20   A.   Are you talking about the prong 1 of the war

21        exclusion, war or --

22   Q.   Prong 1.

23   A.   War -- I mean, prong 1, I don't -- I don't

24        think one necessarily has to be -- whether

25        it's sufficient to just have one as a

1      sovereignty?

2   Q.  Uh-huh.

3   A.  It could be, yes.

4   Q.  Is it OneBeacon's position that it is

5       sufficient to meet the definition of war, as

6       used in the first prong of the exclusion, if

7       only one of the entities is a quasi

8       sovereign?

9              MS. SCOTT REED:  Objection to

10      form, lack of foundation and proper

11      foundation, and misstates the record.  There

12      is no definition of war.

13             THE WITNESS:  I think OneBeacon's

14      position is outlined in this letter and also

15      in the earlier letter as to why the

16      war-related exclusions apply.

17             MS. COYOCA:  Right.

18  BY MS. COYOCA:

19  Q.  I'm just trying to gain an understanding of

20      why there was a reference made to just the

21      Israeli government being involved in the

22      hostilities.  Do you know why she used that

23      language as opposed to discussing that there

24      were two parties involved in the hostilities

25      in those particular sentences?

1          MS. SCOTT REED:  Objection to

2     form, vague and ambiguous, misstates the

3     contents of the communication.

4          THE WITNESS:  I mean, as I stand

5     today, I can't tell you why she referenced --

6     I mean, we can all agree that Israel is a

7     sovereign nation.

8  BY MS. COYOCA:

9  Q.  After the September 19, 2014, letter, did you

10    have any further involvement in the Dig

11    claim?

12 A.  Yes.

13 Q.  What was your involvement?

14 A.  I had communication back and forth with

15    Susan Weiss.  I would have also had

16    discussions with Pamela, most likely, and

17    Peter, and at some point I also had

18    discussions with Andrea as well.

19 Q.  Anyone else?

20 A.  I had discussions with you as well, and we

21    met with NBC and you were at the meeting as

22    well, to discuss the Dig claim, and that

23    would have been Peter, Danny Gutterman and

24    myself along with you and Andrea and a number

25    of, I assume from NBC, I'm trying to

1      remember, I thought there was some

2      individuals from -- actually from Dig that

3      were explaining what had happened and the

4      costs associated with moving the production,

5      et cetera.

6   Q.  Okay.  Let's focus -- before we get to the

7      meeting, let's focus on any phone calls that

8      you might have had.  You indicated that you

9      believe you had calls with Ms. Weiss; is that

10      correct?

11  A.  Yes, I think so.

12  Q.  And what was the purpose of those calls?

13  A.  I -- I know that we had calls after the

14      issuance of OneBeacon's follow-up, the

15      September letter from Pamela, about one --

16      about OneBeacon's position.  And then we also

17      had discussions just generally about NBC as

18      an insured and how to handle the account in

19      terms of the claims going forward.

20  Q.  In terms of the conversations with Ms. Weiss

21      about OneBeacon's position, specifically, if

22      you recall, what was discussed?

23  A.  I think it -- less the merits other than

24      whether OneBeacon would be willing to try to

25      negotiate a resolution with NBC on the -- on

1       the claim.

2   Q.  Did you reach out to Ms. Weiss to have that

3       conversation or did Ms. Weiss reach out to

4       you?

5   A.  I don't -- I don't remember who reached out

6       to who.

7                   MS. COYOCA:  I want to mark as the

8       next exhibit -- and I apologize, I don't

9       remember what number we're on.

10                  THE COURT REPORTER:  Thirty-five.

11                  MS. COYOCA:  Exhibit 35 is an

12      e-mail exchange that's labeled Bates control

13      AONNBCU0000079.

14                  (Whereupon, Exhibit 35 was

15                  marked for identification.)

16                  THE WITNESS:  (Reviews document.)

17  BY MS. COYOCA:

18  Q.  Let me know when you're ready for questions.

19  A.  I'm ready.

20  Q.  Okay.  So there are three e-mails that appear

21      on this Exhibit 35.  You are not, I don't

22      believe, indicated as a to, from or a cc.

23      However, in the middle e-mail from

24      Susan Weiss sent Friday, October 10, to

25      Andrea Garber, Kurt Ford, the subject line

1          reads, "Forward Theresa Gooley's contact"; do

2          you see that?

3                    MS. SCOTT REED:  Objection to

4          form, misstates the contents of this

5          document.

6                    THE WITNESS:  (Reviews document.)

7          The e-mail dated October 10th just indicates,

8          "FYI," that they received a call from me, and

9          that -- or, excuse me, that Susan received a

10         call from me and she -- and then I had

11         asked -- and I asked her to call me back.

12                   MS. COYOCA:  Right, that's the

13         e-mail that I'm speaking about.

14                   THE WITNESS:  Yeah, right.

15                   MS. COYOCA:  Okay.

16    BY MS. COYOCA:

17    Q.  So with respect to that e-mail, is it

18         correct, do you believe that you made a phone

19         call to Ms. Weiss on October 10?

20    A.  Yeah, if -- I mean, I don't recall it, but if

21         it's in there, yeah, I imagine that I did.

22    Q.  And do you know why you were calling

23         Ms. Weiss?

24    A.  I don't -- I don't specifically know.  But

25         when I'm looking at Kurt Ford, I'm thinking

Page 262

1      that it probably had something to do with the

2      Slap claim.

3  Q.  So you think that this October 10th call

4      concerned the Slap claim, not Dig?

5  A.  Again, I -- I don't remember, but I thought

6      Kurt Ford was the director of Slap, of the

7      mini series Slap.

8  Q.  Okay.

9           MS. COYOCA:  I want to mark as

10     Exhibit 36 an e-mail chain that is labeled

11     AONNBCU0003533 through 3534.

12          (Whereupon, Exhibit 36 was

13           marked for identification.)

14 BY MS. COYOCA:

15 Q.  Let me know when you're ready for questions.

16 A.  Okay.  (Reviews document.)  I'm done reading

17     it.

18 Q.  Okay.  So I want to direct your attention to

19     the first e-mail in the chain, which would be

20     the last in the document, the one that was

21     sent from Susan Weiss, Monday, October 13,

22     2014, at 12:53 p.m., to Andrea Garber and

23     Kurt Ford cc'ing Deborah Kizner, subject,

24     "Dig claim."  Do you see that?

25 A.  Yes.

Page 263

1    Q.   Okay.  In that e-mail Ms. Weiss makes

2         reference to a phone -- a game of phone tag

3         that she had been playing with you and that

4         she had finally connected with you that

5         particular morning.  Do you see that?

6    A.   I do.

7    Q.   Is that -- is that accurate, do you believe

8         you had a conversation with Ms. Weiss on

9         October 13?

10   A.   I don't recall it, but I'm sure -- I imagine

11        if it -- she indicates it in the e-mail, it

12        happened, yes.

13   Q.   Okay.  And then beginning with the sentence,

14        "She apologized profusely for this claim

15        going sideways," could you please read that

16        -- the rest of that paragraph out loud?

17   A.   Beginning with, "She apologized," or just

18        after that?

19   Q.   Beginning with, "She apologized."

20   A.   "She apologized profusely for this claim

21        going sideways and very much wanted to get

22        things back on track.  I told that the

23        meeting with Peter was a step in the right

24        direction.  I told her that I felt litigation

25        was a last resort for NBC and most probably

1       OBI, and she agreed.  I said I felt it would

2       be good thing to get around a table and start

3       a dialog, and again she agreed.  She thought

4       Peter would be out of the office" --

5   Q.  Oh, that's okay.

6   A.  All right.

7   Q.  Okay.  So did you have a conversation with

8       Ms. Weiss on or about October 13 where you

9       indicated to Ms. Weiss that you wanted to get

10      the claim -- the claim back on track or the

11      relationship back on track?

12                  MS. SCOTT REED:  Objection to

13      form.

14                  THE WITNESS:  I'm -- I don't -- I

15      mean, I -- I obviously had a conversation.  I

16      mean, this is Susan's characterization of the

17      conversation.  I do remember there were some

18      concerns that NBC raised, and so I imagine

19      that was what our discussion was about.

20  BY MS. COYOCA:

21  Q.  What concerns do you recall NBC raising?

22  A.  I think that NBC had some concerns with

23      Pamela.

24  Q.  And what concerns were those?

25  A.  I -- I think, if I recall, you know, there is

Page 265

1          a lot of strong personalities, and -- and

2          Pamela has a strong personality, and so I

3          think they may have taken offense at some

4          things.

5     Q.   Do you recall any specifics?

6     A.   Nothing specific, no.

7     Q.   Who conveyed to you that there were concerns

8          about Ms. Johnson?

9     A.   You know, I don't recall.  I would -- I would

10         assume it was Susan and -- that's what I

11         would assume.

12    Q.   Did you apologize during the call of the

13         claim going sideways?

14    A.   I'm sure I apologized if they were offended

15         by the behavior of OneBeacon.

16    Q.   Got it.  Did you indicate that you wanted to

17         get things back on track during the call?

18    A.   I'm sure that I -- yeah, I'm sure that what I

19         said is, you know, let's see if we can, you

20         know, get this thing, exactly that words,

21         back on track and see if we can build the

22         relationship again.

23    Q.   Okay.  At that point in time, the

24         conversations that were going on around

25         October 13, did you think that one of the

Page 266

1        ways to get the -- the relationship back on

2        track would be to pay some amount on the Dig

3        claim?

4                   MS. SCOTT REED:  Objection to

5        form, assumes facts not in evidence.

6                   THE WITNESS:  When I think back to

7        that period of time in, you know, the

8        relationship and the issues, I don't think my

9        thought was to pay something on the Dig

10       claim, but to do what I could on my end to

11       make sure that -- that we worked with NBC on

12       existing claims, the -- the -- you know,

13       sitting around the table is to actually maybe

14       personally sit down with NBC and discuss Dig

15       as well and -- but I don't think at any time

16       my thought to get it on track was to pay the

17       Dig claim.

18                   THE VIDEOGRAPHER:  We have about

19       five minutes left on the tape.

20                   MS. COYOCA:  Okay.  Let me just

21       finish this out.

22       BY MS. COYOCA:

23       Q.  At any point in time did you have any

24       discussions with anyone internal to OneBeacon

25       about paying some amount on the Dig claim in

Page 267

1        order to resolve the claim?

2   A.   I -- I don't recall who -- I imagine I

3        probably had a discussion with Pamela about,

4        you know, what we might offer to settle the

5        claim.

6   Q.   You imagine that you would have had such a

7        conversation.  Do you -- do you recall having

8        such a conversation?

9   A.   I don't specifically recall, but we would

10       have talked about it.

11  Q.   And, in fact, an offer was made of a specific

12       dollar amount to resolve the Dig claim; isn't

13       that correct?

14  A.   That's correct.

15  Q.   So who made the decision within OneBeacon to

16       make the offer?

17  A.   I made the ultimate decision to make an

18       offer.

19  Q.   Who did you consult with about making the

20       offer?

21            MS. SCOTT REED:  Objection to

22       form, assumes facts the not in evidence.

23            THE WITNESS:  Before I made the

24       offer?

25            MS. COYOCA:  Yes.

Page 268

1           THE WITNESS:  I would have talked

2      to Pamela.

3  BY MS. COYOCA:

4  Q.  Anyone else?

5  A.  It probably may have been just Pamela.

6  Q.  Did you talk to Peter Williams?

7  A.  I probably talked to Peter, yes.

8  Q.  Did Ms. Johnson agree with your decision to

9      make an offer to pay some amount on the Dig

10     claim?

11  A.  I think she did, yeah.

12  Q.  Why did you decide to make an offer to pay

13     some amount on the Dig claim?

14  A.  Why?

15  Q.  Uh-huh.

16  A.  I think because, while we believe OneBeacon's

17     coverage position is correct, there's

18     always -- settlement is always -- is always

19     something that we look for and that would be

20     also -- that would be an opportunity to try

21     to settle a claim as opposed to going into

22     litigation.

23          MS. COYOCA:  Okay.  Why don't we

24     take a break here so we can change the tape.

25          THE VIDEOGRAPHER:  It's 6:06 p.m.

1      We're going off the record and this ends DVD

2      number 5.

3                  (Whereupon, a brief recess

4                  was taken.)

5                  THE VIDEOGRAPHER:  It's 6:25 p.m.

6      We're back on the record and this begins DVD

7      number 6.

8   BY MS. COYOCA:

9   Q.  Ms. Gooley, how much did OneBeacon offer to

10      pay to settle and resolve the Dig claim?

11  A.  I think we ultimately -- I conveyed an offer

12      of 850,000.

13  Q.  850,000?

14  A.  Yes.

15  Q.  Who did you convey that offer to?

16  A.  I think that I had a phone conversation with

17      Susan and Andrea.

18  Q.  When did you convey the offer?

19  A.  I think it was sometime in late November, mid

20      November 2014.

21  Q.  Was it after the in-person meeting in

22      Los Angeles that took place regarding the Dig

23      claim?

24  A.  Yes.

25  Q.  What were the terms of the offer?

1                MS. SCOTT REED:  Objection; form,

2        assumes facts not in evidence.

3                THE WITNESS:  I -- I don't know

4        that we discussed the terms, but OneBeacon's

5        position or my position is that if NBC

6        accepted the offer of 850, that would be a

7        full release of any claims that NBC believes

8        it has with respect to the Dig claim.

9   BY MS. COYOCA:

10  Q.  Was the 850 an offer to pay that amount in

11       cash or to simply reduce the self-insured

12       retention on the policy?

13  A.  I think it would have been applied to the

14       self-insured retention.

15  Q.  At the time the offer was made, had the

16       self-insured retention been met?

17  A.  I -- I -- I don't believe it had been.

18  Q.  What was the self-insured retention under the

19       2014 to June 30, 2015, policy, if you recall?

20  A.  I -- I would be guessing.  I thought it was

21       around 10 million, but I don't specifically

22       recall.

23  Q.  I asked about the self-insured retention.  Do

24       you believe the self-insured retention on the

25       policy --

Page 271

1    A.   Oh, I don't -- yeah, I don't know what the

2         self-insured retention is, no.

3    Q.   Okay.  Do you know if it was in excess of

4         $1 million?

5    A.   I don't know.

6    Q.   Okay.  What was either Andrea Garber or

7         Ms. Weiss's response to that offer?

8                   MS. SCOTT REED:  Objection;

9         assumes facts not in evidence.

10                  THE WITNESS:  They were

11        disappointed.

12   BY MS. COYOCA:

13   Q.   What did they say, generally?

14   A.   I think they just said that they're

15        disappointed that that was OneBeacon's offer.

16   Q.   At the time that the Dig claim was made in

17        July of 2014, were you aware of the

18        profitability of the policy at that point as

19        to whether it was profitable to NBC -- excuse

20        me, OneBeacon?

21                  MS. SCOTT REED:  Objection; vague,

22        ambiguous, lack of foundation and time.

23                  THE WITNESS:  What do you mean by

24        whether it was profitable to OneBeacon or

25        not?

Page 272

1    BY MS. COYOCA:

2    Q.   So I'm saying at the time that the Dig claim

3         was made in July of 2014, did you know if the

4         amount of losses that were going to be

5         incurred on the policy exceeded the amount of

6         the premiums after application of the

7         self-insured retention?

8                   MS. SCOTT REED:  Objection to

9         form, vague, ambiguous, lack of foundation

10        and time.

11                  THE WITNESS:  I didn't -- I didn't

12        know.

13   BY MS. COYOCA:

14   Q.   At the time that the Dig claim had been made,

15        did you review any run loss reports?

16   A.   I don't -- I don't -- I don't -- I don't

17        recall reviewing any run loss reports, no.

18   Q.   Did you review any reports with respect to

19        the claims that had been asserted by

20        NBC Universal on any of the production

21        portfolio policies that OneBeacon had issued

22        to NBC Universal?

23   A.   We -- OneBeacon had spreadsheets on the

24        claims, and I think NBC would provide us,

25        through Aon, with updates on the claims or --

Page 273

1       or the spreadsheet itself, but those are --

2       that would be what I would have had -- had

3       been -- had been reviewing kind of

4       consistently.

5    Q.  So those spreadsheets on the claims, at the

6       time that the Dig claim was made in July of

7       2014, had you previously reviewed the

8       spreadsheets on claims that had been asserted

9       by NBC Universal?

10                  MS. SCOTT REED:  Objection to

11      form, vague, ambiguous, lack of foundation

12      and time.

13                  THE WITNESS:  Before the Dig

14      claim -- before the Dig claim, I remember

15      reviewing the spreadsheets with NBC's -- with

16      a list of NBC's claims.  I don't know whether

17      that spreadsheet was from NBC or was a

18      OneBeacon spreadsheet put together based on

19      NBC information.

20   BY MS. COYOCA:

21   Q.  Did you routinely review the spreadsheets on

22      claims as part of your handling of the

23      management of the entertainment claims?

24   A.  No, I didn't.

25   Q.  Why were you looking at the NBC Universal

1        spreadsheet of claims?

2   A.   I was looking at it because we were trying to

3        streamline the process.  We were having a

4        hard time getting information from NBC with

5        respect to particular claims.  I think we

6        were trying to figure out what was the least

7        cumbersome, most efficient way to ensure that

8        OneBeacon gets the information that it needs

9        and that NBC -- you know, were not constantly

10       reaching out to NBC through Aon for

11       information.

12  Q.   Prior to July of 2014, did you have any

13       discussions with anyone within OneBeacon

14       about whether the NBC Universal account was

15       profitable for OneBeacon?

16  A.   I don't recall having any discussions, no.

17  Q.   Did you ever have any conversations with

18       Peter Williams about the profitability or

19       unprofitability of the NBC Universal account?

20  A.   I don't recall having any discussions about

21       that, no.

22  Q.   During your discussions with Pamela Johnson

23       about the Dig claim, did you ever discuss the

24       profitability of the NBC Universal account?

25  A.   We wouldn't have discussed the profitability

1    of NBC, because our analysis is based on the

2    claim regardless of whether or not the

3    account is profitable for underwriting.

4 Q. Did you ever have any conversations when

5    discussing the Dig claim with Peter Williams

6    about the profitability of the account?

7 A. I don't recall having any discussions about

8    that.

9 Q. Have you ever discussed the Dig claim with

10    Wanda Phillips?

11 A. I don't think I had a discussion with

12    Wanda about it, no.

13 Q. As part of Ms. Johnson's investigation and

14    handling of the Dig claim, did you ask her

15    whether or not she had taken steps to ensure

16    that Dig was an insured production under the

17    policy?

18 A. I don't recall asking her that specifically.

19    I would have assumed that she would have done

20    all -- all those steps.

21 Q. Did you keep a separate file with respect to

22    the Dig claim while you were employed by

23    OneBeacon?

24 A. I -- I don't -- I may have had a file with

25    the policy in it.  I don't recall.

EXHIBIT 15

Page 276

1  Q.  Did you take any documents with you

2      concerning NBC Universal when you left

3      OneBeacon?

4  A.  No, I did not.

5  Q.  Were you involved in any of the discussions

6      concerning nonrenewal of the NBC Universal

7      policy?

8  A.  No.

9  Q.  Did you have any internal discussions at

10     OneBeacon about the decision not to renew the

11     Dig -- the NBC Universal policy?

12 A.  Did I have any internal discussions?

13 Q.  Uh-huh.

14 A.  No.

15             MS. COYOCA:  I want to mark as

16     Exhibit 37 an e-mail with Bates control

17     ATL002459.

18             (Whereupon, Exhibit 37 was

19             marked for identification.)

20             THE WITNESS:  I've read the

21     e-mail.

22 BY MS. COYOCA:

23 Q.  Do you recognize this document?

24 A.  I -- I mean, I don't remember it, but it -- I

25     obviously sent it to Peter.

EXHIBIT 15

Page 277

1    Q.   Do you have any reason to believe that you

2         did not send the e-mail on or about the date

3         that's reflected, March 9?

4    A.   No.

5    Q.   Okay.  Why were you sending Mr. Williams the

6         e-mail?

7    A.   I -- I -- I honestly can't remember why.  I

8         was -- obviously, it must have had something

9         to do with NBC, but I don't remember why I

10        was sending the e-mail.

11   Q.   Do you recall if it had anything to do with

12        the Dig claim?

13   A.   I don't.

14   Q.   Do you recall if it had anything to do with

15        efforts to streamline the claims process?

16   A.   It may have.  I -- I simply don't recall.  I

17        apologize.

18   Q.   I'm entitled to probe your recollection, so I

19        just want to ask a few follow-up questions.

20             Do you know if the e-mail was being

21        sent in order to discuss NBC Universal and

22        renewal of the policy?

23   A.   I know it -- that was not why -- I would not

24        have reached out to Susan to discuss renewal

25        of the NBC policy.

Page 278

1    Q.   Okay.

2                     MS. COYOCA:   I want to mark as

3         Exhibit 38 an e-mail exchange that's got

4         Bates control label ATL002435 through 2431.

5                     (Whereupon, Exhibit 38 was

6                     marked for identification.)

7                     MS. SCOTT REED:   Counsel, do you

8         mean for these to be out of Bates label

9         order?

10                    MS. COYOCA:   No.

11                    MS. SCOTT REED:   And do you know

12        if this is a single document or whether these

13        are a couple of documents that have been

14        combined?

15                    MS. COYOCA:   This is how they were

16        tabbed in the electronic production.   They

17        were -- they were loaded as a single TIFF.

18                    MS. SCOTT REED:   Let me point out

19        for the record that --

20                    MS. COYOCA:   I see that.

21                    MS. SCOTT REED:   -- the copy has

22        2435 through 38, and then the next pages are

23        2429 through 31.   If you want to tender them

24        this way, that's fine, but I'll just point

25        out for the record what is attached.

EXHIBIT 15

1          MS. COYOCA:  I understand.  And

2     I'm going to represent on the record that the

3     format in which the documents were produced,

4     it was presented as a single TIFF file.

5  BY MS. COYOCA:

6  Q.  Let me know when you're ready for questions.

7  A.  Okay.  (Reviews document.)  I've completed

8     reading it.

9  Q.  Okay.  Thank you.

10          So can you please turn to the e-mail

11     that begins on page 2436 from Susan Weiss to

12     Theresa Gooley, Daniel Gutterman with a cc to

13     Deborah Kizner on -- it's dated November 5 at

14     5:08 p.m.

15  A.  Okay.

16  Q.  Do you have it?

17  A.  Yes.

18  Q.  Okay.  In this e-mail Ms. Weiss makes

19     reference to a discussion that was had the

20     prior -- the day before, "Yesterday"; do you

21     see that?

22  A.  Yes.

23  Q.  Do you recall discussing the NBC Universal TV

24     claims process on November 4th?

25  A.  I don't have a specific recollection, but if

EXHIBIT 15

1          it's referenced in there, then I believe we

2          had that discussion.

3     Q.   Do you recall when the meeting actually took

4          place concerning the Dig claim?

5     A.   It was the 3rd.

6     Q.   Okay.  So did you meet in person with

7          Ms. Weiss on NBC Universal separate and apart

8          from the -- the Dig larger meeting?

9     A.   We went with her to the Dig meeting and

10         talked to her then and talked to her after.

11         I can't remember if we had a subsequent

12         meeting the following day.

13    Q.   So what was the purpose in discussing the

14         claims process, from your perspective?

15    A.   I think the purpose, again, is -- I think

16         with an insured and insurer it's like a

17         bordereau, you're always trying to balance

18         how much information you need with the

19         imposition it places on the client.  And in

20         this case, I think NBC was -- was getting a

21         little bit upset because of a number of

22         questions that OneBeacon was asking, so I was

23         trying to get -- get together with Susan and

24         see if we could talk about the claims process

25         again and put something in place that was

1       agreeable to everybody.

2   Q.  Okay.  In the -- the second page of this

3       e-mail, the one that's labeled 2437, there's

4       a paragraph that reads, "One last thing"; do

5       you see that?

6   A.  I do.

7   Q.  Can you read that paragraph out loud?

8   A.  Yes.  "One last thing, on October 10th,

9       Pamela advised in an e-mail, also forwarded

10      to you, that she would begin issuing payments

11      the following week on the 2012 claims that

12      had been audited and accepted.  We have not

13      received any of those payments yet.  See my

14      earlier e-mail sent to you today."

15  Q.  Do you recall discussing with Ms. Weiss in

16      November of 2014 that there were payments

17      that were still outstanding on 2012 claims

18      that had not yet been paid?

19  A.  I don't recall the specific discussion, but I

20      know there were -- there were outstanding

21      payments for the 2012 claims.

22  Q.  Do you know why those payments had not yet

23      been made?

24  A.  I know that it took a long time to get the

25      information on these particular -- on the

Page 282

1    particular claims.  I believe they were both

2    Sandy and -- and the Smash claims.  And so

3    when we had buttoned it all up, which I think

4    was the fall of 2014, then we were going to

5    start issuing payment, so --

6  Q.  Okay.  So I just want to make sure I

7    understand.

8        When you refer to Sandy, are you

9    referring to claims that were made as a

10   result of Hurricane Sandy that occurred in

11   2012?

12 A.  Yes.

13 Q.  And there were production claims that were

14   made as a result of Hurricane Sandy; is that

15   correct?

16 A.  That's my recollection, yes.

17 Q.  And, ultimately, in order for there to be a

18   payout on those claims, that means that

19   NBC Universal would have had to have exceeded

20   its retention amount for the 2012 policy

21   year; is that correct?

22 A.  That's my understanding, yes.

23 Q.  You also referred to the Smash claim.  What

24   was the Smash claim?

25 A.  I think they were -- I think they were

EXHIBIT 15

Page 283

1      plural.  I don't -- I -- I vaguely think it

2      may have -- may have had to do with just

3      delays in production, and I think it involved

4      one -- one of the actresses and some sickness

5      as well.

6   Q.  Okay.  And did one of the Smash claims have

7      to do with a delay in production associated

8      with a death in the family of the one of the

9      actors as well?

10  A.  I -- I don't remember the specifics.

11  Q.  In order for there to be -- and, I'm sorry,

12      the Smash claims, were those also

13      attributable to the 2012 policy year?

14  A.  If I recall that's -- yes, they fell in the

15      2012.

16  Q.  Okay.  And, again, in order to -- for the

17      claims to be paid out on -- by OneBeacon,

18      NBC Universal would have had to have exceeded

19      it's self-insured retention for that policy

20      year; is that correct?

21  A.  That's correct.

22  Q.  Did OneBeacon pay out on any claims prior to

23      the claims that were asserted for the 2012

24      policy year?

25  A.  I don't know.

Page 284

1    Q.   Did you look at the totality of claims that

2         had been asserted by NBC Universal going back

3         to the inception of the first policy as of

4         January 1, 2010, forward, in the work that

5         you were doing with respect to the Dig claim?

6    A.   I wouldn't have looked at the other claims,

7         no.

8    Q.   Did you look at whether or not OneBeacon had

9         exceeded its self-insured retention?  Excuse

10        me.

11                 Would -- would you -- did you look

12        at whether or not NBC Universal had exceeded

13        its self-insured retention in any of the

14        policy years prior to the 2013 -- I'm sorry,

15        the 2014, 2015 policy?

16   A.   Are you asking me just generally if I looked

17        at --

18   Q.   No.  In the -- in the context of the work

19        that you did on Dig, did you ever look at

20        whether or not NBC Universal had met or was

21        close to or exceeded its self-insured

22        retention for that policy year?

23   A.   No.

24   Q.   In Ms. Weiss's e-mail to you and to

25        Danny Gutterman, she indicates that there is

1        a quarterly log that was attached to the

2        e-mail.  Do you see that?

3   A.   Let's see.

4   Q.   I'm looking at the sentence that reads, "Due

5        to the transition of Andrea moving to the

6        risk management side."  Do you see that?

7   A.   Oh, yes, yes.  Oh, yes, yes, she indicates

8        that she attached it for our review.

9   Q.   Did you review the NBC Universal claims log

10       that was attached to the e-mail?

11  A.   My guess is that I did.  I don't have any

12       specific recollection today.

13  Q.   If you look at the document number, which is

14       out of order from the e-mail, that reads

15       ATL002429, at the title -- the title reads,

16       "2014-6/30/2015 NBCU TV claims-OneBeacon last

17       updated 11/3/14"; do you see that?

18  A.   I do.

19  Q.   Do you recognize this document?

20  A.   Yeah, it looks like a spreadsheet that had

21       the NBC claims.

22  Q.   Is it your understanding that this is the

23       document that was attached to the e-mail that

24       Ms. Weiss referenced?

25  A.   I don't know whether this is the document.

EXHIBIT 15

1    It -- it looks similar to the -- to the

2    documents that -- that -- or it looks

3    similar, excuse me, to the spreadsheet that

4    outlines the existing claims, so most likely.

5    Q.  In the cover e-mail that Ms. Weiss sent, in

6        the second paragraph she indicates, begin

7        quotes, "NBCU TV has always wanted to have

8        their claims loosely monitored by OBE.  And

9        early in the relationship it was agreed with

10       Peter and Michael Arevalo that they would

11       only be interested in looking closely at

12       claims that exceeded 250,000," close quotes.

13       Do you see that?

14   A.  I do.

15   Q.  Who is the Peter that's referenced in the

16       e-mail?  Is that Peter Williams?

17   A.  Yes.

18   Q.  Okay.  And who is Michael Arevalo?

19   A.  It's Michael Arevalo, but Michael Arevalo

20       worked in the entertainment group initially.

21       I'm trying to think, his role has kind of

22       changed.  I think he was a claim handler at

23       one point and then moved over to the

24       underwriting side.

25   Q.  Did you agree with Ms. Weiss's statement that

1      was made in that first sentence that there

2      had been this agreement with Peter and

3      Michael?

4                    MS. SCOTT REED:  Objection to

5      form, speculation.

6                    THE WITNESS:  I mean, I -- I -- I

7      had no personal knowledge whether there --

8      there was or wasn't an agreement, but I would

9      take her at her word.

10   BY MS. COYOCA:

11   Q.  Did you ask Peter Williams about that

12       statement?

13   A.  I don't recall asking him expressly about

14       that statement, no.

15   Q.  Were you seeking somehow to change that

16       process when you were discussing the claims

17       review process with Ms. Weiss?

18   A.  I think that -- yeah, I think we were --

19       loosely monitored, I think that we felt like

20       we weren't getting enough information and

21       enough information in a timely fashion, and

22       so I think we wanted -- again, we wanted to

23       balance the interest of NBC, but also those

24       of OneBeacon to get timely -- timely and

25       meaningful information so we can analyze the

EXHIBIT 15

Page 288

1          claims as well.

2    Q.   The e-mail that follows is an e-mail that

3          appears to be from you to Susan and Danny --

4          Daniel Gutterman cc'ing Deborah Kizner sent

5          on Friday 11/7/2014 at 12:03 a.m.; do you see

6          that?

7    A.   I do.

8    Q.   Did you write this e-mail?

9    A.   I assume so, yes.

10   Q.   In the e-mail, in the -- in the middle

11         paragraph, you indicate -- well, I'm sorry,

12         why don't you just read the -- the paragraph

13         beginning with, "As you indicated."

14   A.   "As you indicated, OneBeacon would like to

15         continue to receive specific notice of those

16         claims which are greater than 250,000 or

17         claims that have other indicia that warrant

18         specific notice.  If NBC would be good enough

19         to continue to provide notice of these claims

20         directly to Danny Gutterman, and now at

21         Lucy Lopez, that would be great."

22   Q.   Okay.  With respect to the reference to

23         claims that are greater than 250,000, was it

24         your intent to continue to focus on -- have

25         OneBeacon focus on those claims that exceeded

1        that amount --

2                    MS. SCOTT REED:  Object --

3     BY MS. COYOCA:

4     Q.  -- as opposed to lower value claims?

5                    MS. SCOTT REED:  Objection to

6        form, vague, ambiguous.

7                    THE WITNESS:  I think my intent

8        is, A, I wanted -- we wanted information on

9        claims that were greater than 250,000, or, B,

10       claims that have other indicia that warrant

11       specific notice, so that being it may be

12       greater than 2, it may be less, but given the

13       particular facts, they should let OneBeacon

14       know about it.

15    BY MS. COYOCA:

16    Q.  What other indicia were you referencing that

17       would warrant specific notice?

18    A.  It really depends.  I mean, I think you get

19       that sixth sense for something that may or

20       may not end up being a very significant

21       claim, and -- and so that's what we're

22       looking at.  Again, you know it when you see

23       it.

24    Q.  Are you done?

25    A.  I am.

1    Q.   Okay.  When you referenced -- when you used

2         the words, "Other indicia," to Ms. Weiss, did

3         you have -- had you had a conversation with

4         her previously about what you were referring

5         to?

6    A.   I don't -- I don't recall if I had a

7         conversation.  Again, I wanted the -- I

8         wanted the category to be broad in terms of

9         particular claims that, A, warrant, I use

10        other indicia, or would cause me to pause for

11        some reason or another.  We want to know

12        about those and we want to know about them

13        right away.

14   Q.   At some point during the policy period that

15        involves the Dig claim, the January 1, 2014,

16        through June 30, 2015, policy, did it become

17        apparent to you that the amount of claims was

18        going to exceed the self-insured retention on

19        the policy?

20   A.   I -- I don't remember.  I don't.

21   Q.   Do you remember flagging that as an issue and

22        wanting to discuss it with Ms. Weiss?

23   A.   I -- no, I don't remember.

24             MS. COYOCA:  I may be done.  Why

25        don't we go off the record for one moment and

Page 291

1       I'll look at my documents and then we can go

2       back on and close it out.

3                    THE VIDEOGRAPHER:  It's 6:58 p.m.

4       We're going off the record.

5                    (Whereupon, a brief recess

6                    was taken.)

7                    THE VIDEOGRAPHER:  It's 7:06 p.m.,

8       we're back on the record.

9                    MS. COYOCA:  I want to mark as

10      Exhibit 39 an e-mail exchange that is dated

11      June 1st and June 2nd, 2015, and it's got

12      Bates label ATL002495 through 2496.

13                   (Whereupon, Exhibit 39 was

14                   marked for identification.)

15                   THE WITNESS:  (Reviews document.)

16      I've read it.

17   BY MS. COYOCA:

18   Q.  Ready for questions?

19   A.  Yes, I am.

20   Q.  Okay.  The first e-mail in this exchange

21      appears to be the one from Wanda Phillips

22      that was sent to Peter Williams on June 1st

23      at 9:37 a.m.; do you see that?

24   A.  Yes.  Yes, yes, uh-huh.

25   Q.  Okay.  At the very end of that e-mail

1       Ms. Phillips indicates, "Will Theresa be

2       available from claims on Tuesday, or Danny?

3       Who else should be in invited if anyone"; do

4       you see that?

5   A.  Yes, I do.

6   Q.  Mr. Williams responds and says, "Yes, Theresa

7       and Danny and Steve from claims."  Do you see

8       that?

9   A.  I do see that.

10  Q.  And then Wanda Phillips' response to Peter,

11      and she also references Steve and Theresa.

12      Do you see that?

13  A.  I do.  I do.

14  Q.  Okay.  Are these references to Theresa

15      references to you, do you know?

16  A.  Yes, they are.

17  Q.  Okay.  Does this refresh your recollection

18      that you were involved in conversations or

19      meetings in which renewal was discussed?

20  A.  This does.

21  Q.  Okay.  What do you recall about this pre,

22      pre-meeting which took place before the

23      meeting with NBCU and Aon?

24  A.  I -- I -- I don't -- I actually really don't

25      recall anything about the pre, pre-meeting.

1    Q.   Why were you invited, do you know?

2    A.   I think I was out there already out in L.A.,

3         but I -- I -- because underwriting invited us

4         to come, so...

5    Q.   Do you know why underwriting invited you and

6         others from claims to come?

7    A.   I -- I don't -- I mean, I assume that Wanda

8         invited us in the event there were questions

9         about claims.

10   Q.   Did you attend the pre-meeting as well as the

11        meeting with NBCU and Aon?

12   A.   I don't remember a pre-meeting.  If we had

13        one I would have been there.  I vaguely

14        remember a meeting with Aon.

15   Q.   Okay.  According to my reading of this e-mail

16        exchange, I believe there actually were three

17        meetings that were being discussed.  There

18        was a meeting internally of OneBeacon folks,

19        and then there was going to be a meeting with

20        Susan Weiss of OneBeacon folks, and Susan

21        Weiss before the meeting with NBCU and Aon

22        and OneBeacon.  Is that your recollection as

23        well?

24   A.   I'm not -- I guess -- I'll read through this

25        again.  I -- I was thinking it was one -- two

Page 294

1        meetings, a pre-meeting and then a meeting

2        with Aon and NBC, but not --

3    Q.  Okay.  Well, let's just walk through it.

4    A.  That's fine.

5    Q.  So -- so beginning with the paragraph that

6        says, "Basically, she is asking for a

7        heads-up on renewal terms"; do you see that?

8    A.  I do.

9    Q.  Okay.  I'm sorry, before that, the paragraph

10       before that says, "Susan has requested a

11       pre-meeting before meeting with NBC."  Do you

12       see that?

13   A.  I do, I do.  Okay.

14   Q.  All right.  And then in Mr. Williams' e-mail

15       he indicates, "Should we have a pre-meeting

16       to discuss their pre-meeting."

17   A.  Yes, okay.

18   Q.  And Ms. Phillips responds, "Yes, Peter, an

19       OBE pre-meeting is wise to have before

20       meeting with NBCU and Aon."  Do you see that?

21   A.  I do, yes.

22   Q.  Okay.  So does this refresh your recollection

23       that there were actually three different

24       meetings?

25   A.  It sounds like it, yes.

1    Q.  All right.  So what do you recall, if

2        anything, specifically about the first

3        meeting, which would have been the meeting

4        internal to just OneBeacon people before

5        meeting with Aon?

6    A.  I don't recall anything really with respect

7        to that.

8    Q.  Do you recall presenting any information with

9        respect to claims during that internal

10       OneBeacon meeting?

11   A.  I don't recall, no.

12   Q.  Do you know for a fact, do you recall

13       specifically that the meeting took place?

14       And I'm referring now to the internal to

15       OneBeacon meeting.

16   A.  I -- I don't remember.  Peter is indicating

17       he'd like one.  I assume one took place, but

18       I simply can't remember --

19   Q.  Okay.

20   A.  -- whether or not it did.

21   Q.  Do you recall the meeting that took place

22       with OneBeacon people and Aon, but not

23       NBC Universal?

24   A.  I -- I -- I vaguely remember sitting down

25       with Susan.

1    Q.   What do you recall about that meeting?

2    A.   Again, I don't -- I don't recall much.  Maybe

3         Peter went through the terms of the renewal

4         or the quote.  But, again, that's me

5         guessing.  I just don't remember.

6    Q.   Do you know if NBC Universal -- excuse me, if

7         OneBeacon renewed NBC Universal's policy

8         after expiration on June 30, 2015?

9    A.   Yes.

10   Q.   It was renewed?

11   A.   No, it wasn't renewed.

12   Q.   It was not renewed.

13             So when you indicate that Mr.

14        Williams would be going through terms for

15        renewal, was it your understanding as of

16        June 2nd, 2015, that OneBeacon was discussing

17        renewing the policy?

18   A.   I -- my understanding is that they were

19        discussing renewal under certain terms.

20   Q.   Is it your understanding that it was

21        NBC Universal that made the decision that it

22        no longer wanted to be insured by OneBeacon,

23        or was it OneBeacon's decision that it no

24        longer wanted to insure NBC Universal?

25   A.   I think ultimately NBC -- or, excuse me,

1        OneBeacon decided that it no longer wanted to

2        continue that relationship.

3    Q.  In terms of that conversation that took place

4        with Susan Weiss, do you recall discussing

5        claims during that meeting?

6    A.  I -- I don't, no.

7    Q.  Okay.  And do you recall attending the third

8        meeting with NBC Universal, Aon and OneBeacon

9        individuals?

10   A.  I don't specifically recall, but I must have.

11   Q.  Do you recall discussing anything about

12       claims during the course of that meeting?

13   A.  I don't -- I don't recall discussing the

14       claims at that time, no.

15   Q.  What was your role in the meeting?

16   A.  I think my role would be if they ask

17       questions about the claims, but other than

18       that, nothing.

19   Q.  Before you went to the meeting, did you have

20       an understanding as to why you were going to

21       be there?

22   A.  Again, I presume the reason I was asked is

23       the -- in the event there were questions

24       about claims.

25   Q.  Did anybody tell you what the reason was as

Page 298

1        to why you were there, why you needed to

2        participate?

3    A.   Not that I recall.

4    Q.   During the meeting with NBC Universal

5        representatives, were there renewal terms

6        discussed, do you recall?

7    A.   I think Peter probably gave them general

8        renewal terms.

9    Q.   Do you recall that happening?

10   A.   I don't specifically recall it, but I imagine

11       that occurred.

12   Q.   Previously you indicated that it was

13       your -- your understanding that it was

14       OneBeacon that decided that it no longer

15       wanted to continue the relationship with

16       NBC Universal.  Do you recall that?

17   A.   I do.

18   Q.   Okay.  Why did OneBeacon make that decision,

19       if you know?

20           MS. SCOTT REED:  Objection;

21       speculation.

22           THE WITNESS:  Yeah, I -- I don't

23       know.  That would have been a decision on the

24       underwriting side.

25   BY MS. COYOCA:

Page 299

1   Q.   Did anybody ever tell you why OneBeacon

2        decided that it did not want to continue its

3        relationship with NBC Universal?

4   A.   I'm trying to remember if any -- not -- not

5        that I recall.

6   Q.   Was one of the reasons that you were involved

7        in the meeting with NBC Universal

8        individuals, was to explain that the volume

9        of claims was causing a problem with

10       OneBeacon?

11               MS. SCOTT REED:   Objection to

12       form, assumes facts not in evidence.

13               THE WITNESS:   I don't -- no.   The

14       reason we would have been there was to be

15       able to answer any questions with respect to

16       particular claims.

17  BY MS. COYOCA:

18  Q.   And you can't think of any other reason as to

19       why you would about there?

20  A.   Not at this moment, no.

21               MS. COYOCA:   I have nothing

22       further.

23               MS. SCOTT REED:   Are you passing

24       the witness at this time?

25               MS. COYOCA:   I am.

1      MS. SCOTT REED:  All right.  We've

2  advised ahead of time, Counsel, that we have

3  questions for this witness.  This witness

4  can't continue tonight.  She's advised this

5  is as long as she can go, so we'll discuss

6  the scheduling for the continuation for our

7  questions.

8      MS. COYOCA:  It was my

9  understanding that we were going to go the

10  next day, tomorrow.

11      MS. SCOTT REED:  I don't know

12  about that understanding.  We said that the

13  witness would be available for some extra

14  time.  She's advised she can't do it tonight.

15  And you have advised that you're not going to

16  go forward with Pamela Johnson's deposition.

17      MS. COYOCA:  That's correct, not

18  at this time.

19      MS. SCOTT REED:  So our suggestion

20  is that those be reset together.

21      MS. COYOCA:  Okay.  So, I'm sorry,

22  you are not going to question Ms. Gooley as

23  of tomorrow; is that correct?

24      MS. SCOTT REED:  I'm going to

25  question Ms. Gooley when she's available to

1      continue the questioning and when we agree

2      with you on counsel that that's the

3      appropriate time.

4                  MS. COYOCA:  Okay.  I guess that

5      terminates the day.

6                  THE VIDEOGRAPHER:  It's 7 --

7                  MS. COYOCA:  I'm sorry, before we

8      go off the record, do you have any sense when

9      you can make Ms. Gooley available for the

10     redemption of her deposition?

11                 MS. SCOTT REED:  Well, we'll

12     consult with her.  And if you want to make

13     two trips to Minneapolis, that's one thing.

14     And if you want to make one trip and we see

15     if she and Ms. Johnson can be available,

16     that's another consideration.

17                 MR. KEELEY:  Is your preference to

18     stay tomorrow and do it as opposed to doing

19     it when we come back for Pamela?

20                 MS. COYOCA:  It was -- it was my

21     understanding, and I -- I don't have flights

22     out, so -- but it's fine.  We can go tomorrow

23     or we can go -- I just wanted to know if we

24     had a sense of when we'd be going.

25                 MR. KEELEY:  Let us go off the

Page 302

1      record and talk.  I know -- I think we

2      probably said she could come tomorrow --

3                     THE WITNESS:  I don't think it's

4      off the record.

5                     MR. KEELEY:  -- there's some

6      logistical issues, so it may be more

7      convenient for her to do it later if we're

8      going to come back, so let -- let us just

9      check with her real quick.

10                    MS. COYOCA:  Great.  Thank you.

11                    THE VIDEOGRAPHER:  It's 7:21 p.m.

12     We're going off the record.

13                    (Whereupon, going off the

14                    video record at 7:21 p.m.)

15                    MR. KEELEY:  We're back on the

16     record.  All right.  So we've conferred and

17     understand you're in agreement that we'll

18     complete Ms. Gooley's deposition when we come

19     back for Pamela Johnson's deposition.

20                    MS. COYOCA:  That's agreeable.

21     And it's my understanding from the court

22     reporter that it's not necessary to put a

23     stipulation on the record with respect to the

24     witness reviewing the transcript, but I would

25     indicate that we would request that

1       Ms. Gooley review the transcript and provide

2       a signature within the 30 days specified by

3       the federal statute, or if possible, if we

4       request and you're able to accommodate, in a

5       shorter period of time.

6                       MR. KEELEY:  And we had talked

7       about that before, and I think we're fine

8       agreeing that the witnesses will review and

9       sign within 14 days, if you want to do that

10      for moving forward.

11                      MS. COYOCA:  That's great.  We

12      appreciate that.

13                      MR. KEELY:  Okay.

14                      MS. COYOCA:  Okay.  Thank you.

15      Off the record.

16                          (Whereupon, the foregoing

17                          deposition adjourned at 7:23 p.m.)

18

19

20

21

22

23

24

25

Page 304

1                                  ERRATA SHEET
2       Case Name:   Universal Cable Productions, LLC,
                      et al. vs. Atlantic Specialty
3                     Insurance Co.
        Deposition Date:   2-8-17
4       Deponent:   Theresa A. Gooley Wolf
5       Pg.   Line   Now Reads        Should Read   Reason

6       ____  ____   _____        _____    _____

7       ____  ____   _____        _____    _____

8       ____  ____   _____        _____    _____

9       ____  ____   _____        _____    _____

10      ____  ____   _____        _____    _____

11      ____  ____   _____        _____    _____

12      ____  ____   _____        _____    _____

13      ____  ____   _____        _____    _____

14      ____  ____   _____        _____    _____

15      ____  ____   _____        _____    _____

16      ____  ____   _____        _____    _____

17      ____  ____   _____        _____    _____

18      ____  ____   _____        _____    _____

19
20      EHRICH L. KOCH
        Notary Public-Minnesota
        My Commission Expires Jan 31, 2020
21                                       _____
22                                          Signature of Deponent

        SUBSCRIBED AND SWORN BEFORE ME THIS  6  DAY OF
23      March      2017.
24
        _____
        (Notary Public)    MY COMMISSION EXPIRES: 1/31/20
25

EXHIBIT 15

Page 305

1    STATE OF MINNESOTA    )
                           ) ss
2    COUNTY OF ANOKA       )

3

             Be it known that I took the foregoing
4    deposition of Theresa A. Gooley Wolf, Volume 1, on
     February 8, 2017, in Minneapolis, Minnesota;

5

             That I was then and there a notary public
6    in and for the County of Anoka, State of Minnesota,
     and that by virtue thereof, I was duly authorized
7    to administer an oath;

8            That the witness was by me first duly
     sworn to testify to the truth, the whole truth and
9    nothing but the truth relative to said cause;

10           That the foregoing transcript is a true
     and correct transcript of my stenographic notes in
11   said matter;

12           That the witness reserved the right to
     read and sign the transcript;

13

             That I am not related to any of the
14   parties hereto, nor interested in the outcome of
     the action;

15

             WITNESS MY HAND AND SEAL this 21st day of
16   February, 2017.

17

18           _____
             Amy L. Larson, RPR
19           My Commission Expires 01/31/2018

20

21

22

23

24

25

# EXHIBIT 16

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNIVERSAL CABLE            )   CASE NO. 2:16-cv-4435-PA-MRW
PRODUCTIONS LLC, et al.,)
                          )
        Plaintiffs,       )
                          )
     vs.                  )
                          )
ATLANTIC SPECIALTY        )
INSURANCE COMPANY,        )
                          )
        Defendant.        )
                          )


DEPOSITION OF DANIEL SPENCER GUTTERMAN

Friday, February 3, 2017


Reported by:  Ingrid Suárez Egnatuk
              CSR No. 3098

1

Video Deposition

Videotaped deposition of DANIEL SPENCER

GUTTERMAN, taken on behalf of Plaintiffs

Universal Cable Productions LLC and Northern

Entertainment Productions LLC, 707 Wilshire

Boulevard, Suite 4000, Los Angeles,

California 90017, commencing at 9:27 a.m.,

Friday, February 3, 2017, before Ingrid

Suarez Egnatuk, CSR No. 3098.


APPEARANCES:

FOR PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS
LLC AND NORTHERN ENTERTAINMENT PRODUCTIONS
LLC:

    MITCHELL SILBERBERG & KNUPP LLP
    BY:  DANIEL M. HAYES, ESQ.
    11377 West Olympic Boulevard
    Los Angeles, California 90064-1683
    (310) 312-2000
    dmh@msk.com

FOR DEFENDANT:

    STRASBURGER & PRICE. LLP
    BY:  MICHAEL KEELEY, ESQ.
    901 Main Street
    Suite 6000
    Dallas, Texas 75202-3794
    (214) 651-4718
    michael.keeley@strasburger.com

    ANDERSON, McPHARLIN & CONNERS, LLP
    (Not present at deposition)
    707 Wilshire Boulevard
    Suite 4000
    Los Angeles, California 90017-3623
    (213) 688-0080

2

**APPEARANCES:**

    **(Continued)**

    **THE VIDEOGRAPHER:**

        **VERBATIM VIDEO**
        **BY:  ESROM JAYASINGHE**
        **9725 Gladbeck Avenue**
        **Northridge, California 91324**
        **(800) 520-8273**

3

# I N D E X

Witness:   DANIEL SPENCER GUTTERMAN

Examination                                          Page

By Mr. Hayes                                           8


AFTERNOON SESSION                                     163

     (Pages 116 through 138 are deemed
     confidential; under separate cover.)



Exhibit              Description                      Page

13    Daniel Gutterman LinkedIn                        67

14    E-mail, 12-3-13 to Daniel S. Gutterman    114
      from Daniel S. Gutterman
      ATL000785 through ATL000793

15    General Claims Practices                    189
      ATL000735 through ATL000744

16    Core Principles                             189
      ATL000731 through ATL000732

17    E-mail chain ending July 28, 2014,          198
      to Pamela Johnson and Susan Weiss
      from Andrea Garber
      AONNBCU0003277

18    Letter, July 28, 2014, to Andrea            198
      Garber from Pamela Johnson
      ATL000094 through ATL000101

19    Letter, August 13, 2014, to Pamela          200
      Johnson from Lucia E. Coyoca
      ATL000087 through ATL000093

20    Letter, September 19, 2014, to              201
      Lucia E. Coyoca from Pamela Johnson
      ATL000705 through ATL000708

4

I N D E X

(Continued)

| Exhibit | Description | Page |
|---------|-------------|------|
| 21 | File Note History<br>ATL000001 through ATL000161 | 220 |
| 22 | E-mail chain ending 7-16-14 to<br>Daniel S. Gutterman from Daniel S.<br>Gutterman<br>ATL001391 through ATL001396 | 227 |
| 23 | E-mail chain ending July 17, 2014,<br>to Susan Weiss, Andrea Garber,<br>and Daniel Gutterman from Pamela<br>Johnson<br>AONNBCU0003252 through AONNBCU0003255 | 231 |
| 24 | Conference call invitation<br>ATL001723 | 232 |
| 25 | E-mail chain ending July 22, 2014,<br>to Susan Weiss, Andrea Garber, and<br>Daniel Gutterman from Pamela Johnson<br>AONNBCU0003242, AONNBCU0003253 | 236 |
| 26 | Kerry Comments on Ukraine, Gaza<br>to CBS News | 276 |
| 27 | U.S. Department of State<br>Diplomacy in Action<br>U.S. Condemns Kidnapping of Three<br>Israeli Teenagers | 283 |
| 28 | E-mail, 7-3-16, to Pamela Johnson<br>from Danny Gutterman<br>ATL003211 | 289 |
| 29 | E-mail chain ending 7-16-14 to<br>Daniel Gutterman from Wanda Phillips<br>ATL001547 through ATL001550 | 295 |
| 30 | E-mail chain ending 7-16-14 to<br>Daniel Gutterman from Pamela Johnson<br>ATL001977 through ATL001081 | 304 |

5



1                    I N D E X

2                  (Continued)

3   Referenced Exhibits                          Page

4   1     Motion Picture/Television Producers        37
          Portfolio Declarations, 55 pages
5         ATL003073 through ATL003127

6   12    E-mail chain ending 7-16-2014 to        225
          Peter Williams and Daniel Gutterman
7         from Pamela Johnson, 5 pages
          ATL001101 through ATL001105
8

9

10  UNANSWERED QUESTIONS:

11      (None)

12

13  INFORMATION REQUESTED:

14      (None)

15

16

17

18

19

20

21

22

23

24

25

                                                           6

Video Deposition

```
 1                    LOS ANGELES, CALIFORNIA

 2                    Friday, February 3, 2017

 3                         9:27 a.m.

 4

 5           THE VIDEOGRAPHER:  We are on the record.

 6           This is the deposition of Daniel

 7   Gutterman, taken on behalf of the plaintiffs in

 8   the matter of Universal Cable Productions LLC vs.

 9   Atlantic Specialty Insurance Company pending in

10   the United States District Court, Central District

11   of California, Western Division, Case No.

12   2:16-cv-4435-PA-MRW.

13           It is February 3, 2017, and today we are

14   at 707 Wilshire Boulevard, Suite 4000 in

15   Los Angeles, California.

16           My name is Esrom Jayasinghe, a Certified

17   Legal Video Specialist and a notary with Verbatim

18   Video, located at 9725 Gladbeck Avenue in

19   Northridge, California.

20           This is the start of Media 1.  The time

21   now is 9:28.

22           And, Counsel, if you would kindly state

23   your appearance.

24           MR. HAYES:  Dan Hayes of Mitchell

25   Silberberg & Knupp on behalf of plaintiffs.
```

7

EXHIBIT 16

```
 1              MR. KEELEY:  Michael Keeley of
 2  Strasburger & Price on behalf of Atlantic Specialty
 3  Insurance Company, defendant.
 4              THE VIDEOGRAPHER:  Please proceed.
 5              THE REPORTER:  Raise your right hand,
 6  please.
 7              Do you solemnly swear or affirm the
 8  testimony you are about to give in this deposition
 9  will be the truth, the whole truth, and nothing but
10  the truth?
11              THE WITNESS:  Yes.
12              THE REPORTER:  Thank you.
13
14              DANIEL SPENCER GUTTERMAN,
15              having been first duly sworn, was
16              examined and testified as follows:
17
18                   EXAMINATION
19  BY MR. HAYES:
20      Q.   Good morning, Mr. Gutterman.
21      A.   Good morning.
22      Q.   Please spell your full name for the
23  record.
24      A.   Daniel Spencer Gutterman, D-A-N-I-E-L
25  S-P-E-N-C-E-R G-U-T-T-E-R-M-A-N.
```

8

Video Deposition

```
 1        Q.   Have you ever had your deposition taken

 2   before?

 3        A.   No.

 4        Q.   Okay.  Before we get into the substantive

 5   questioning, I'm going to go over a few ground

 6   rules.

 7        A.   Okay.

 8        Q.   Most of them are necessary because

 9   everything that we say in this room is being

10   recorded.  The court reporter to your left is

11   writing down everything we say.  The videographer is

12   recording by video and audio everything we say and

13   do.

14             So for that reason I want to make sure

15   that you always answer my questions in an audible

16   fashion.  No -- no nodding of the head or shaking of

17   the head or hand gestures.  In order to make sure we

18   have a clear record, please, to the extent you

19   understand the question, answer audibly.

20             Do you understand?

21        A.   Yes.

22        Q.   Okay.  The other important point -- and

23   maybe hopefully we can avoid this today -- it's very

24   difficult for the court reporter to take down two

25   people talking at once.  It's actually impossible.
```

9

1    So I'm going to do my best to wait until you finish

2    answering my question before asking you a new

3    question, and I'd ask that you wait until I finish

4    asking my question before beginning to answer.

5              Do you understand?

6        A.   I do.

7        Q.   I don't want you to answer any question

8    today that you don't understand.  If there is

9    anything about my question that you don't

10   understand, please ask me to clarify it.

11             Okay?

12       A.   Understood.

13       Q.   If you don't, I'll go to assume you

14   understood it.

15             Okay?

16       A.   Okay.

17       Q.   And have you ever testified at a trial

18   before?

19       A.   Not that I can recall.  No.

20       Q.   Have you ever testified at, like, an

21   administrative hearing or anything like that?

22       A.   Not that I can recall.

23       Q.   Okay.  So this is -- this is an informal

24   setting, but the oath that you took is the same oath

25   that you would take if you were to testify at trial.

                                                      10

Video Deposition

```
 1              Do you understand that?
 2      A.    Understood.
 3      Q.    Can your think of any reason why you can't
 4  give complete, truthful testimony today?
 5      A.    No.
 6      Q.    Are you on any medication that might
 7  affect your memory?
 8      A.    No.
 9      Q.    Okay.  Mr. Gutterman, do you have a
10  college degree?
11      A.    I do.
12      Q.    And what is that degree?
13      A.    I'm a history major with a criminal
14  justice certificate.
15      Q.    And is that your most advanced degree?
16      A.    Yes.
17      Q.    Is that a bachelor's of the arts?
18      A.    Yes.
19      Q.    And from what university?
20      A.    University of Wisconsin, Madison.
21      Q.    When did you graduate?
22      A.    1997.
23      Q.    And that's when you received your B.A.?
24      A.    Correct.
25      Q.    And you said you had -- you're a history
```

11

EXHIBIT 16

1    major and a criminal justice certificate.

2              What does that mean?

3        A.   It was essentially, like, a minor.  But

4    there wasn't -- it was -- instead of a minor, that

5    was what they gave.

6        Q.   Okay.  Your history major, did you have a

7    specialty?  Did you focus on any portion of history?

8        A.   Primarily U.S. history from 1945 until, at

9    that time, 1997.

10       Q.   Did you take any classes that pertained to

11   international history?

12       A.   Yes.

13       Q.   Which classes?

14       A.   It's been a long time.  I can't recall,

15   actually.

16       Q.   Do you still have your transcripts?

17       A.   I'm sure I could get them.  I don't know

18   where they are currently.

19       Q.   Do you have any documents that you can

20   think of that would reflect what classes you took at

21   Wisconsin?

22       A.   With me right now or in general, like, at

23   my apartment?

24       Q.   In general.

25       A.   I -- I don't recall if I have any or not.

                                                      12

```
 1          Q.   Okay.  Can you recall any other countries
 2   that you took classes on?
 3          A.   Not off the top of my head, I cannot, no.
 4          Q.   Did you take any classes related to the
 5   Middle East?
 6          A.   Not that I can recall.
 7          Q.   Any classes related to the conflict
 8   between Israel and Hamas?
 9          A.   No.
10               Actually, let me revise.  When you asked
11   if I took any classes, I visited Israel, and we
12   went -- we -- yes.  I visited Israel for a class.
13   It was through Emory University.  It wasn't through
14   the University of Wisconsin.
15          Q.   This was while you were in college?
16          A.   Correct.
17          Q.   And was this study abroad or something
18   else?
19          A.   It was sort of like that.  Basically, it
20   was just like a three-week trip, and we just studied
21   the history of Israel.
22          Q.   Are you Jewish?
23          A.   I am.
24          Q.   Have you visited Israel on other
25   occasions?
```

13

```
 1        A.   I have not.
 2        Q.   So one time to Israel, and it was in
 3   connection with this program offered by Emory
 4   University?
 5        A.   Correct.  I got credit for it, three --
 6   from Wisconsin.  I got, I think, three credits.
 7        Q.   At Wisconsin what is three credits?  Is
 8   that like a semester?
 9        A.   Essentially.  Well, for one particular
10   class, yes.
11        Q.   You took classes in Israel?
12        A.   It was one class, and we went on a tour.
13        Q.   One class every day for three weeks?
14        A.   It wasn't really set up that way.
15   Basically, we all flew in, all these people from
16   different universities, primarily Emory.  And my dad
17   was a law professor there.  So we went to -- and
18   that's why I went through Emory.  We went to -- we
19   traveled around, basically, different parts of
20   Israel.
21        Q.   Did your dad go with you?
22        A.   He did not.
23        Q.   What's your dad's name?
24        A.   Melvin Gutterman.  He passed away in 2009.
25        Q.   I'm sorry for your loss.
```

14

```
 1        A.   Thank you.

 2        Q.   You said he was a lawyer?

 3        A.   He was a law professor.

 4        Q.   Was he a practicing lawyer at one time?

 5        A.   At one time.

 6        Q.   And what subject -- what specific subject

 7   matter did he teach?

 8        A.   Primarily criminal history -- criminal

 9   law.  Sorry.

10        Q.   And when he was in practice, did he

11   practice criminal law?

12        A.   Yes.

13        Q.   Which side?

14        A.   Both.

15        Q.   He was a prosecutor and a defense

16   attorney?

17        A.   Uh-huh.

18        Q.   For what state was he a prosecutor?

19        A.   I -- I can't recall.  I -- he worked in

20   multiple different places in Illinois, New York.

21        Q.   Okay.  Do you remember what year you

22   visited Israel through this Emory program?

23        A.   I want to say it was 1996.  But I'm not

24   sure.

25        Q.   And you said it was -- you said there was
```

15

1    a class associated with this trip; right?

2         A.   And the whole class traveled together.  So

3    we'd go on hikes together, and we'd go to different

4    locations.  We -- they would show us places where

5    the original -- like, all the ancient history

6    occurred.

7         Q.   How many people were in this class?

8         A.   I don't recall.  Probably 15 or 20.

9         Q.   Do you remember any of their names?

10        A.   No.  Oh.  One person.  Her name was Sara

11   Day.

12        Q.   Sara Day?

13        A.   Uh-huh.

14        Q.   "Yes"?

15        A.   Yes.  I'm sorry.

16        Q.   No problem.

17             Do you have any written materials or notes

18   or any documents of any kind related to this

19   three-week trip to Israel or the class you took

20   there?

21        A.   I might.  I'm not -- I don't recall.  I

22   think so.

23        Q.   Where would they be if you had them?

24        A.   In a box somewhere.

25        Q.   Somewhere at your apartment?

                                                          16

```
 1        A.    Probably.

 2        Q.    Did this class have a name?

 3        A.    I don't recall what it was called.

 4        Q.    Was there one professor who taught the

 5   class?

 6        A.    Yes.

 7        Q.    What was his name?

 8        A.    I can't remember.

 9        Q.    Was he from the United States or from

10   Israel --

11        A.    I don't recall.

12        Q.    -- or somewhere else?

13        A.    I don't recall.

14        Q.    That was my fault.  I'm sorry.

15              Was he from the United States?

16        A.    I -- I don't recall.

17        Q.    And do you recall whether or not he was

18   from Israel?

19        A.    I don't recall that either.

20        Q.    Was there anyone from Israel involved in

21   the teaching of this class?

22        A.    There was a -- like a -- like a T.A. sort

23   of person that was part of our tour guide.

24        Q.    And what was his or her name?

25        A.    I don't recall their name.
```

17

```
 1        Q.    And you said "part of our tour guide."
 2              Was there a tour guide that was separate
 3   from the professor?
 4        A.    No.
 5        Q.    So in terms of persons who were leading
 6   this class/trip, you have the professor and the T.A.
 7        A.    The T.A., tour guide.  I mean, however you
 8   want to consider him.  I don't remember what his
 9   title was.
10        Q.    But those two persons only?
11        A.    As far as I recall, yes.
12        Q.    Okay.  And what was the subject matter of
13   this clout?
14        A.    Israeli ancient history.
15        Q.    Did it involve the conflict in Israel?
16        A.    Which one?
17        Q.    Any conflict in Israel.
18        A.    I don't recall.  But there have been so
19   many.  I'm pretty sure at some point we discussed --
20   honestly, I don't recall.
21        Q.    You're "pretty sure at some point we
22   discussed" what?
23        A.    I started the sentence 'cause I was
24   thinking.  We were -- we discussed the creation of
25   Christianity and how that affected that area.  We
```

18

Video Deposition

1    went to the Wailing Wall.  So we discussed some of

2    those matters.  I mean, I -- that's really what I

3    remember.

4         Q.   Did you -- did you discuss the conflict

5    between Jews and Muslims?

6         A.   I don't remember.

7         Q.   Did you discuss Hamas?

8         A.   I don't remember.

9         Q.   Where did you live when you were in

10   Israel?

11        A.   We traveled around the country.  We didn't

12   have one specific place.

13        Q.   Where did you sleep?

14        A.   In kibbutzes, in hotels.

15        Q.   What's a kibbutz?

16        A.   A -- I wouldn't even know how to define

17   it.  It's -- it's a group of people that are living

18   together off of the land.  Sort of like a commune, I

19   guess.

20        Q.   In which cities did you stay in kibbutzes?

21        A.   I don't remember.

22        Q.   Did you stay in Jerusalem at all ever?

23        A.   I don't remember if we stayed there.  We

24   visited it.

25        Q.   Did you stay in Tel Aviv?

                                                        19

EXHIBIT 16

Video Deposition

```
 1        A.   We did.

 2        Q.   And where in Tel Aviv did you stay?

 3        A.   I don't recall.

 4        Q.   Did you travel with security?

 5        A.   Not that I remember.  No.

 6        Q.   Did you take any security precautions,

 7   safety precautions?

 8        A.   Not that I remember.

 9        Q.   None?

10        A.   I don't recall.

11        Q.   This was 1996?

12        A.   Yes.

13        Q.   When you were in Israel, did you ever feel

14   afraid?

15        A.   No.

16        Q.   Can you recall whether there was any

17   violence in Israel when you were there for that

18   three-week period?

19        A.   I don't remember.

20        Q.   In this three-week class, did you discuss

21   terrorism?

22        A.   I don't recall.  And I just want to say,

23   three weeks is -- I don't remember if that's the

24   exact length of time.

25        Q.   Okay.
```

                                                        20

EXHIBIT 16

Video Deposition

```
 1          A.   I don't want to say that that was
 2   definitely that was the length of time that we
 3   were there for.
 4               But to answer your question, I don't
 5   recall in terms of if we discussed terrorism.
 6          Q.   So it was about three weeks?
 7          A.   I think so.  Somewhere between three and
 8   six.  I honestly don't remember.
 9          Q.   At any time during your visit to Israel,
10   this three to six-week period, was there a war in or
11   around Israel?
12          A.   Not that I remember, no.
13          Q.   Do you recall any warnings regarding
14   terrorism either from the Israeli government or the
15   U.S. Government at any time during your three- to
16   six-week trip?
17          A.   I don't recall that.
18          Q.   You don't recall whether or not that
19   happened or you --
20          A.   I don't remember that happening.
21          Q.   Okay.  Okay.  So this started with my
22   question did you take any classes at Wisconsin that
23   had anything to do with the conflict in the Middle
24   East or the conflict between Jews and Muslims in and
25   around Israel.
```

21

EXHIBIT 16

Video Deposition

```
 1              Agree?
 2       A.    That's what started this?
 3       Q.    Yes.  That's why you told me about this
 4    three-week trip.
 5       A.    That sounds right.
 6       Q.    Okay.  Let's ask it a different way.
 7              So during your time at Wisconsin, you had
 8    this three- to six-week trip to Israel in which you
 9    took a class which you've described, and you took a
10    tour around Israel, and you described your
11    recollection of that trip; correct?
12       A.    Yes.
13       Q.    Did you take any other class at any time
14    during your tenure at the University of Wisconsin
15    that had anything to do with Israel or Hamas or the
16    Middle East, any other class?
17       A.    There -- not that I remember that there'd
18    be a specific class about it.  But it would
19    certainly come up as, obviously, it was a part of,
20    as well, American history from 1945 to the present,
21    in terms of that was when the creation of Israel as
22    we know it was, was in '46, I think.
23       Q.    So you recall the subject of Israel and
24    the conflicts in and around Israel coming up in the
25    context of general U.S. history classes?  Is that
```

                                                              22

```
 1    what you're saying?
 2         A.   I don't specifically remember any specific
 3    classes.  But I could also be just confusing it with
 4    learning things that I've learned since I've been
 5    out of college.  I'm very interested in history.
 6         Q.   Are you interested in the conflict between
 7    Israel and Hamas?
 8         A.    Not as much as I'm interested in American
 9    history and current events, of American current
10    events.
11         Q.   Do you have any understanding of what the
12    United States' stance is regarding the conflict in
13    Israel?
14              MR. KEELEY:  Objection.  Vague.
15              THE WITNESS:  I'm sorry.  Can you repeat
16    the question?
17    BY MR. HAYES:
18         Q.   You understand that over the years there
19    have been well-publicized hostilities between Jews
20    and Muslims in and around Israel.
21         A.   Yes.
22         Q.   Okay.  Do you have any understanding as to
23    what the United States' stance is on that conflict?
24         A.   Currently or previously?
25         Q.   Currently.
```

23

Video Deposition

```
 1        A.   I do not know what it currently is because
 2   I don't know how this president stands.
 3        Q.   How about previously?
 4        A.   A little bit more, but not that much.
 5        Q.   Okay.  Tell me what your understanding is.
 6             MR. KEELEY:  Objection.  Vague.
 7             THE WITNESS:  Can you please ask it a
 8   different way.
 9   BY MR. HAYES:
10        Q.   First you said you don't know what the
11   United States' stance is currently; right?
12        A.   Correct.
13        Q.   And I said do you know what the United
14   States' stance was previously, and you said "a
15   little bit."
16        A.   Yes.
17        Q.   What did you mean?
18             MR. KEELEY:  Objection.  Vague.
19             THE WITNESS:  From the little bits that I
20   would read, President Obama had an interesting
21   stance with Netanyahu, and that interesting stance
22   is I don't know if they had a very good
23   relationship.
24   BY MR. HAYES:
25        Q.   When you say "interesting stance," what do
```

24

EXHIBIT 16

1    you mean?

2        A.   That it didn't seem like they have a very

3    good relation- -- they did not have a very good

4    relationship.

5        Q.   Well, not the relationship.  What was

6    interesting about the stance that President Obama

7    took?

8        A.   Oh.  Sorry.  That's exactly what I meant,

9    was that they didn't seem to have a very good

10   relationship.

11       Q.   Do you have an understanding as to why

12   not?

13       A.   I do not.

14       Q.   How about before President Obama?  Do you

15   have any understanding as to what the United States'

16   stance was on the conflict?

17            MR. KEELEY:  Objection.  Vague.

18            THE WITNESS:  What period of time?

19   BY MR. HAYES:

20       Q.   Any period of time prior to Obama.

21            MR. KEELEY:  Objection.  Vague.

22            THE WITNESS:  We were pro Israel when --

23   after the Holocaust.  They've been one of America's

24   major allies in the Middle East.  There've been good

25   relationships and bad relationships that I can think

25

1    of between -- between our presidents and their

2    presidents.

3    BY MR. HAYES:

4         Q.   Any good relationships you can think of in

5    specific, in particular?

6         A.   I'm pretty sure Harry Truman was one.

7    But, again, I don't want to -- that's not a definite

8    answer.

9         Q.   What is that based on?

10        A.   That he was -- from what I recall, he was

11   in agreement that there should be an Israeli state

12   after the Holocaust.

13        Q.   Okay.  Anyone else that you can think of

14   that had a good relationship with Israel,

15   presidents?

16        A.   Not that I know with any certainty.

17        Q.   How about bad relationships?  Can you

18   think of any presidents that you would characterize

19   as having a bad relationship with Israel?

20        A.   Besides what appeared to be his --

21   President Obama's and Netanyahu's.  But, again, that

22   was from the occasional article that I would see.

23        Q.   No one besides Obama that you can think

24   of?

25        A.   Not off the top of my head, no.

26

1     Q.   Okay.  What articles are you referring to?

2     A.   Just randomly throughout time --

3  throughout the eight years.  I don't remember.

4     Q.   Do you remember the subject matter of any

5  of these articles, anything specific about any of

6  them?

7     A.   No.

8     Q.   When I say the conflict between Jews and

9  Muslims in and around Israel, what do you understand

10  that to mean?

11        MR. KEELEY:  Well, I'll object.  Calls for

12  speculation.

13        THE WITNESS:  It's been going on for

14  millennial -- millennium.  It's been going on

15  through biblical periods that is it Isaac and -- I

16  don't remember.  But basically it's been going on

17  for centuries and centuries and centuries.  And then

18  once Israel was created after World War II and the

19  Holocaust, the surrounding countries were unhappy,

20  as well as Palestine was unhappy that a Jewish state

21  was created in that -- in that area, in the Middle

22  East.  And so there have been conflicts since then

23  between them.

24  BY MR. HAYES:

25     Q.   Who's at fault in these conflicts?

27

Video Deposition

```
 1          A.   Are you asking my opinion or are you --

 2          Q.   Yes.

 3          A.   I don't -- I don't know.

 4          Q.   You don't have an opinion?

 5          A.   I think it's a very biased opinion because

 6    I'm Jewish.

 7          Q.   And what is it?

 8          A.   Actually, I take that back.

 9               I -- yeah.  I think it's -- I think that

10    the Middle East is very unhappy with the Jews being

11    there, and they've done what they -- the surrounding

12    countries have, in different conflicts, have

13    attacked without provocation.

14          Q.   Does Israel have a right to exist?

15          A.   I believe --

16               MR. KEELEY:  I'm going to object on the

17    basis of relevance from this point.

18               THE WITNESS:  Yes.

19    BY MR. HAYES:

20          Q.   Why?

21               MR. KEELEY:  Same objection.

22               THE WITNESS:  Why do they have a right to

23    exist?

24    BY MR. HAYES:

25          Q.   Yes.
```

28

EXHIBIT 16

1       A.   I don't really -- I don't really

2   understand the question.

3       Q.   Do Jews have a right to maintain the state

4   of Israel in the Middle East?

5            MR. KEELEY:  Same objection.

6            Mr. Hayes, may I have a running objection

7   on this line of questioning?

8            MR. HAYES:  Yes.

9            MR. KEELEY:  Thank you.

10            MR. HAYES:  Based on relevance; right?

11            MR. KEELEY:  Correct.

12            THE WITNESS:  I'm sorry.  Can you repeat

13   the question, please.

14   BY MR. HAYES:

15       Q.   Do Jews have a right to maintain the state

16   of Israel in the Middle East?

17       A.   Yes.

18       Q.   Why?

19       A.   I don't have really an opinion on that.

20       Q.   You said there's been various conflicts

21   over the years in the region.  You're aware that

22   some of those conflicts involve Hamas; correct?

23       A.   Yes.

24       Q.   What is your opinion of the violence in

25   which Hamas is involved?

29

```
 1              MR. KEELEY:  Same objection.
 2              THE WITNESS:  I don't agree with that
 3    violence.
 4    BY MR. HAYES:
 5         Q.   Why not?
 6         A.   I don't -- I don't agree with violence.
 7         Q.   Well, is there anything specific about the
 8    Hamas violence that you don't agree with?
 9         A.   From what I know of it -- actually, from
10    what I know of it, it's typically terrorist actions,
11    and -- and it's also -- a lot of the time creates
12    wars that are terrible.  I mean, they -- they're
13    bombing Israel, they're throwing missiles,
14    they're -- they are -- yeah.  They -- they -- they
15    set up armies.  They -- yeah.  I would say I
16    disagree with how they have related to Israel.
17         Q.   Is Israel at war with Hamas?
18         A.   Currently?
19         Q.   Yes.
20              MR. KEELEY:  Object.  Calls for a legal
21    conclusion.
22              THE WITNESS:  I'm not an attorney.  I
23    don't know that answer.
24    BY MR. HAYES:
25         Q.   Your opinion.  You used the word "war" in
```

30

Video Deposition

```
 1    your previous response.  So I'm just asking for your

 2    understanding, and that applies to the entire

 3    deposition.

 4         A.   Okay.

 5         Q.   Is Israel at war with Hamas?

 6         A.   At this exact moment, I don't know.

 7         Q.   Has it ever been?

 8         A.   Yes.

 9         Q.   When?

10         A.   When this claim occurred.

11         Q.   Any other time?

12         A.   I'm not -- I don't know.

13         Q.   Does Israel have a right to be at war with

14    ham?

15         A.   They have a right to defend themselves.

16         Q.   Israel has a right to use violence to

17    defend itself against Hamas?

18              MR. KEELEY:  Objection.  Argumentative.

19    Relevance.

20              THE WITNESS:  Yes, they do.

21    BY MR. HAYES:

22         Q.   So Israel was at war with Hamas at the

23    time period of this claim.

24              Is that your opinion?

25         A.   Yes.
```

31

1     Q.   Has Israel ever been at war with Hamas

2  before or after that time period?

3     A.   I don't know.

4     Q.   When did you formulate this opinion that

5  Israel was at war with Hamas at the time period of

6  the claim at issue in this case?

7     A.   During the claim.

8     Q.   And what was that opinion based on?

9     A.    Information provided by the insured,

10  information provided by the broker, reviewing

11  articles online, as well as -- yeah.

12     Q.   Anything else?

13     A.   No.  Not that I can think of.

14     Q.   So your opinion that Israel was at war

15  with Hamas during the time of the claim is based on,

16  No. 1, information provided by the insured; No.2

17  information by the broker; and No. 3, articles that

18  you researched online; is that correct?

19     A.   Correct.

20     Q.   Is it based on anything else?

21     A.   Not that I can think of.

22     Q.   Okay.  Did you communicate that opinion to

23  anyone when you formed it?

24     A.   I don't remember.

25     Q.   Were you tasked with researching whether

32

Video Deposition

```
 1    the conflict between Israel and Hamas at the time of
 2    the claim was a war?
 3         A.   I was tasked with obtaining information
 4    about what was going on over there.
 5         Q.   By who?
 6         A.   My supervisors.
 7         Q.   Who were they?
 8         A.   Pamela Johnson and Peter Williams.
 9         Q.   Anyone else?
10         A.   No.  Not that I can recall.
11         Q.   Was there a chain of command among the
12    three of you?
13         A.   Yes.  Pam was my -- was my direct
14    supervisor.
15         Q.   And did Peter supervise Pam?
16         A.   No.
17         Q.   Did Peter supervise you?
18         A.   Yes.  He more was a mentor.
19         Q.   Why would you characterize him as a
20    mentor?
21         A.   He has decades of experience in claims,
22    and I learned from him.
23         Q.   Was Pamela Johnson a mentor?
24         A.   Yes.
25         Q.   Why?
```

33

EXHIBIT 16

1      A.   I appreciated her opinion, and she's very

2  educated and understands insurance very well.

3      Q.   So you said you formed an opinion that the

4  conflict between Israel and Hamas at the time of the

5  complaint -- I'm sorry.  Let me start that over.

6           You said you formulated an opinion that

7  the conflict between Israel and Hamas at the time of

8  the claim was a war; right?

9      A.   As we were progressing through the claim.

10 Yes.

11     Q.   Okay.  And did you communicate that

12 opinion to Pam or to Peter?

13     A.   I don't recall any specific conversations.

14     Q.   Did you communicate that opinion to Pamela

15 or to Peter?

16     A.   I don't -- I don't recall any specific

17 conversations.

18     Q.   Do you know whether or not you ever

19 communicated that opinion to Pamela or to Peter,

20 irrespective of whether you can recall the specific

21 conversation?

22     A.   I don't recall.

23     Q.   So you don't recall whether you ever told

24 Peter or Pamela that your opinion was the conflict

25 between Israel and Hamas was a war?

34

1        A.    That's correct.  I don't recall.

2        Q.    Can you think of any documents that might

3    refresh your recollection on that point?

4        A.    No.

5        Q.    Okay.  Where did you go to high school?

6        A.    Druid Hills High School, in Atlanta,

7    Georgia.

8        Q.    And I'm assuming you got a high school

9    diploma?

10        A.    Yes.

11        Q.    What years did you attend?

12        A.    1993 to 1997.  I'm -- yes.  Oh.  Wait.

13    I'm sorry.  That's incorrect.

14              1988 to 1993.  I just told you the date I

15    went to college.

16        Q.    When did you begin -- strike that.

17              You're a current employee of who?

18        A.    One Beacon Entertainment.

19        Q.    Are you certain that's the entity that is

20    your employer?

21        A.    Yes.

22        Q.    Okay.  And how long have you been employed

23    by One Beacon Entertainment?

24        A.    Since 2013.

25        Q.    Do you remember the month?

35

1          A.   I believe it was July.

2          Q.   Okay.  Working backwards from July, 2013,

3     when you became an employee of One Beacon

4     Entertainment, what was your job immediately

5     preceding your employment at OneBeacon?

6          A.   I was working on a TV show called MODERN

7     DADS for a network called -- which network was it?

8     I don't remember the network.  Oh.  A & E.  I'm

9     sorry.  And I worked on that show for a few months.

10         Q.   Do you remember the start and end dates?

11         A.   I do not.  Oh.  Well, the end date would

12    have been very soon -- very close to when I started

13    this position.

14         Q.   And what were your responsibilities at --

15    in connection with this MODERN DADS production?

16         A.   I was the production manager.

17         Q.   And what duties and responsibilities did

18    you have as the production manager?

19         A.   Hiring some of the personnel, helping come

20    up with finding crew meals, helping with finding

21    locations to shoot at, dealing with some of the

22    accounting, minor bits of the accounting.

23         Q.   You understand that there is an insurance

24    policy at issue in this case?

25         A.   Yes.

                                                      36

```
 1        Q.   And do you understand the nature of the
 2   coverage that's being disputed?
 3        A.   I'm sorry.  Ask the question again,
 4   please.
 5        Q.   Do you understand the nature of the
 6   coverage dispute?
 7        A.   Yes.  I believe so.
 8        Q.   What is your understanding?
 9        A.   The question is whether or not the four
10   exclusions for war, warlike -- and I can't think of
11   the other two off the top of my head -- apply to
12   this claim.
13             MR. HAYES:  I believe the policy was
14   Exhibit 1 Wednesday?  Can we show the witness
15   Exhibit 1?
16        Q.   Do you recognize the document marked
17   Exhibit 1?
18        A.   Yes.
19        Q.   What is it?
20        A.   It is the NBCUniversal Media Motion
21   Picture/Television Producers Portfolio Declarations
22   policy.
23        Q.   Is this the policy that you understand at
24   issue in this case?
25        A.   Without reviewing all of it, it appears to
```

37

1    be.

2         Q.   Okay.  I want you to turn to the page

3    marked ATL 3083.

4         A.   Yes.

5         Q.   You referred to four exclusions; correct?

6         A.   Yes.

7         Q.   Are the four exclusions that you referred

8    to on this page?

9         A.   Yes.

10        Q.   Where are they?

11        A.   The bottom right-hand side.

12        Q.   And those exclusions are:

13             "War, including undeclared or civil war."

14             Correct?

15        A.   Yes.

16        Q.   "Warlike action by a military force,

17             including action in hindering or defending

18             against an actual or expected attack by any

19             government, sovereign or other authority using

20             military personnel or other agents."

21             Correct?

22        A.   Yes.

23        Q.   "Insurrection, rebellion, revolution,

24             usurped power, or action taken by governmental

25             authority in hindering or defending against any

                                                          38

Video Deposition

```
 1        of these.  Such loss or damages is excluded
 2        regardless of any other cause or event that
 3        contributes concurrently or in any sequence to
 4        the loss."
 5            Correct?
 6        A.   Yes.
 7        Q.   "Any weapon of war including atomic
 8        fission or radioactive force, whether in time
 9        of peace or war."
10            Correct?
11        A.   Yes.
12        Q.   Those are the four that you referred to?
13        A.   Yes.
14        Q.   Okay.  Going back to the MODERN DADS
15   job --
16        A.   Uh-huh.  Yes.
17        Q.   -- do you know whether or not there was
18   any insurance associated with that production?
19        A.   I don't know if there was or not.
20        Q.   Okay.  Going back to your employment
21   history, we talked about MODERN DADS.
22            Where were you employed before MODERN
23   DADS?
24        A.   I believe I worked for a TV show called
25   EXTREME MAKEOVER:  HOME EDITION.
```

39

1        Q.   Do you remember the dates of when you

2   started and ended that job?

3        A.   It's hard for me to go backwards.  No, I

4   can't recall the exact date -- the dates.  I don't

5   recall.  I want to say this is maybe 2011 or 2012.

6   But I can't -- I'm not certain.

7        Q.   What was your role in connection with that

8   production?

9        A.   I was called an assistant location

10  manager.

11       Q.   What were your responsibilities?

12       A.   I'd be dealing with -- the show itself was

13  about helping families in need.  And so we would go

14  to the different cities or little towns where these

15  houses and these families were located.  And we

16  would discuss with the government there, whether it

17  was the police or the fire department, shutting down

18  different city streets so that we would be able to

19  have access to them so that the construction could

20  be done and all the volunteers could get in and out.

21  So dealing with that.

22            Also finding different restaurants that

23  potentially wanted to donate.  Stuff along those

24  lines.

25       Q.   Do you know whether or not that production

                                                        40

1    had any insurance associated with it?

2         A.   I believe it did.

3         Q.   And what insurance do you believe it had?

4         A.   I do not know.

5         Q.   What is your belief based on?

6         A.   We had an incident where an individual's

7    vehicle got damaged, and I'm -- the location manager

8    said that he was going to bring it up to the -- I

9    believe he said he was going to bring it up to -- to

10   the line producer, who was going to probably bring

11   it up to insurance.  But that's as much as I know

12   about it.

13        Q.   You weren't involved in that claim, if

14   there was one; is that correct?

15        A.   Yes.  I was not.

16        Q.   Okay.  Before EXTREME MAKEOVER:  HOME

17   EDITION, were you employed at any time?

18        A.   At any time?  Yes.

19        Q.   Okay.  What was your employment

20   immediately before EXTREME MAKEOVER:  HOME EDITION?

21        A.   It was one of two different shows.  It was

22   either a show called DUDE, WHAT WOULD HAPPEN or

23   GLORY HOUNDS.

24        Q.   Okay.  You worked on both DUDE, WHAT WOULD

25   HAPPEN and GLORY HOUNDS.  You just can't remember

                                                        41

```
 1    which came first; is that accurate?
 2          A.   Each of these shows would -- would only
 3    last for a matter of months.
 4          Q.   Okay.  What was your role on DUDE, WHAT
 5    HAPPENED or WHAT WOULD HAPPEN, I guess?
 6          A.   Production manager again.
 7          Q.   What were your responsibilities?
 8          A.   Very similar to the -- the other time.
 9          Q.   Did DUDE, WHAT WOULD HAPPEN have any
10    insurance associated with the production?
11          A.   I don't know if they did or did not.
12          Q.   But if they did, you were not involved in
13    any aspect of it; is that --
14          A.   I was not.
15          Q.   That's an accurate statement?
16          A.   I'm sorry.  I didn't let you finish the
17    question.  Could you please repeat it.
18          Q.   Yes.
19               If there was insurance associated with
20    DUDE, WHAT WOULD HAPPEN, you weren't involved in any
21    aspect of it, including any claims that may have
22    been made pursuant to the policy?
23          A.   Oh.  There was an actor that got sick
24    once, and they let us all go home for a day.
25          Q.   But you weren't involved in submitting the
```

42

1   claim --

2        A.   No.

3        Q.   -- anything have do with the claim;

4   correct?

5        A.   No.  I had nothing to do with that.

6        Q.   Okay.  GLORY HOUNDS.

7        A.   Yes.

8        Q.   What was your position --

9             I'm assuming that's a production as well?

10       A.   Correct.

11       Q.   And what was your position on that

12  production?

13       A.   Production manager as well.

14       Q.   What were your responsibilities?

15       A.   We -- helping obtain travel, helping

16  obtain equipment.

17       Q.   What was the show about?

18       A.   Military war dogs.

19       Q.   Military war dogs and their relationship

20  with their handlers; is that accurate?

21       A.   Correct.

22       Q.   Anything else?

23       A.   No.  That was primarily it.

24       Q.   Did you gain any understanding as to what

25  the word "war" means through your work on this

                                                    43

1   production?

2       A.   Did I gain any additional understanding?

3   Not -- not really.

4       Q.   When you say "additional understanding,"

5   did you at that time have an understanding of what

6   "war" meant?

7       A.   Just my own opinion.

8       Q.   And what was your opinion at the time of

9   GLORY HOUNDS on what "war" meant?

10      A.   Bombings, missile attacks, the Vietnam War

11  or World War II.  I'm not -- these are -- it's

12  mainly examples.

13      Q.   Anything else regarding your understanding

14  of what "war" meant while you were working on this

15  production GLORY HOUNDS?

16      A.   It would have just been a cumulative

17  under- -- thought process of what I believed war was

18  at that time period.  I don't know if I made a

19  new -- any new thought processes of what this -- of

20  what war is at that time.

21      Q.   Yeah.  I'm not asking if you made any new

22  thought processes, just what was your opinion of

23  what constituted a war at the time you were working

24  on the show about military dogs and their handlers.

25      A.   I don't remember what I believed war at

                                                    44

EXHIBIT 16

1    that time period.

2         Q.   What do you believe war is now?

3         A.   Two parties fighting over land or

4    governance or going up -- armies, tanks, missiles.

5         Q.   Anything else?

6         A.   No.

7         Q.   Just to be clear, I'm asking:  If you were

8    tasked with giving your best definition of what war

9    is, what would you say?

10        A.   It's really -- it's hard to define it.  I

11   just know it when I see it.  It's -- again, when

12   reviewing for -- when reviewing the articles and

13   information I found online during this time period,

14   it -- everything I saw was a war.

15        Q.   Is your understanding today of what war is

16   based on the work that you did in connection with

17   the DIG claim?

18        A.   I'm sorry.  Could your repeat the

19   question.

20        Q.   Is your understanding today of what "war"

21   means based on the work that you did in connection

22   with the DIG claim that's at issue in this lawsuit?

23             MR. KEELEY:  Object.  Vague.

24   BY MR. HAYES:

25        Q.   Do you understand what I mean by "DIG

                                                           45

1    claim"?

2         A.    I understand what you mean by that.

3         Q.    Okay.

4         A.    I'm not sure I understand the rest of the

5    question, though.

6         Q.    You just gave a response to my question

7    what does "war" mean.

8         A.    Yes.

9         Q.    Of course, you understand, as I said

10   before, when I ask you questions like that, I mean

11   what does it mean to you.

12        A.    Okay.

13        Q.    "Yes"?

14        A.    Yes.

15        Q.    Would that change your response?

16        A.    To -- to what question?

17        Q.    When you answered the question what does

18   "war" mean, you were answering what "war" means to

19   you; right?

20        A.    Yes.

21        Q.    Okay.  Your understanding of what "war"

22   means as you sit here today, what is that

23   understanding based on?  You said, "When I was

24   researching in connection with the claim, all I saw

25   was war."

                                                    46

```
 1              I'm paraphrasing, but is that generally
 2    what you said?
 3         A.   That sounds correct.  Yes.
 4         Q.   Okay.  So we've got the research that you
 5    did in connection with the DIG claim that's at issue
 6    in this case as one of the bases for your current
 7    understanding of what "war" means; right?
 8         A.   One of.  Yes.
 9         Q.   Okay.  What are the others?
10         A.   Being a history major, learning about
11    World War II, learning about Desert Storm.  Just
12    curiosity throughout watching History Channel shows.
13         Q.   Anything else?
14         A.   Not -- not off the top of my head.
15         Q.   Okay.  You said four things, being a
16    history major, learning about World War II, learning
17    about Desert Storm, and curiosity watching History
18    Channel shows; right?
19         A.   Yes.
20         Q.   Okay.  Being a history major, what about
21    being a history major informed your understanding of
22    what "war" means?
23         A.   I would -- I took classes that involved
24    World War II.
25         Q.   Based on those classes that you took about
```

47

EXHIBIT 16

1    World War II, what's your understanding of what

2    "war" means?  What did those classes teach you about

3    the definition of "war"?

4         A.   I don't think the definition of "war" was

5    ever brought up.  It just -- there's wars, and we

6    went through the historical aspects of them, whether

7    it was particular battles or whatever that happened

8    to be.

9         Q.   What about that class contributed to your

10   understanding of what "war" means?

11        A.   I got a better feel for what the soldiers'

12   lives were like.

13        Q.   Anything else?

14        A.   Not off the top of my head.

15        Q.   And you also said you learned about Desert

16   Storm.

17             Was that a specific class?

18        A.   No.

19        Q.   You learned about Desert Storm --

20        A.   Through watching news.

21        Q.   Were you in college at the time of Desert

22   Storm?

23        A.   I don't believe so.

24        Q.   So I want to make sure I get the universe

25   of these first two bases, being a history major,

48

```
 1    learning about World War II.
 2            Is there anything else about being a
 3    history major that contributed to your understanding
 4    of what the word "war" means other than the classes
 5    you took regarding World War II?
 6        A.   Other than the classes?
 7        Q.   That you took about World War II.  Yes.
 8        A.   I've watched movies.  I've -- I've read
 9    articles.
10        Q.   So I'm just -- I'm just focusing now on
11    the first -- the first of the four things you said,
12    and that is, being a history major.
13            Okay?
14        A.   Okay.
15        Q.   Anything else about being a history major
16    that informs your understanding of what "war" means
17    other than the classes pertaining to World War II?
18        A.   No.
19        Q.   All right.  Now let's move on to learning
20    about Desert Storm.
21            You said you learned about Desert Storm
22    through what?
23        A.   Watching newscasts, reading articles.
24        Q.   And what did you learn about World -- I'm
25    sorry.  Strike that.
```

49

EXHIBIT 16

```
 1              What did you learn about Desert Storm in
 2   watching newscasts and reading articles?
 3        A.    What was happening over there.
 4        Q.    And what was happening?
 5        A.    Iraq had invaded Kuwait, and
 6   President Bush at the time -- oh.  So I was not in
 7   college then.  President Bush went to war with Iraq.
 8        Q.    The United States went to war with Iraq.
 9        A.    Correct.  Sorry.
10        Q.    Anything else?
11        A.    We won that war.
12        Q.    How do you know we won the war?
13        A.    From newscasts telling me that -- that we
14   did.
15        Q.    But was there an event that marked our
16   victory.
17        A.    I don't recall it.
18        Q.    And you also said curiosity watching
19   history channel shows.
20              Other than what you've already described,
21   what falls under that category in terms of things
22   that inform your understanding of what "war" means?
23        A.    So not including TV shows and movies?
24        Q.    You can include TV shows and movies as
25   well.
```

50

EXHIBIT 16

1     A.   Yes.

2     Q.   Is that -- you also -- TV shows, movies,

3 History Channel shows, those all inform your

4 understanding of war?

5     A.   Yes.

6     Q.   Okay.  Any TV shows in particular?

7     A.   I watch something called WORLD WAR II IN

8 COLOR.

9     Q.   Any others you can think of?

10     A.   Just -- nothing -- I mean, nothing

11 specific comes to my head.

12     Q.   How about movies?

13     A.   Yes.  BAND OF BROTHERS.

14     Q.   That's about World War II?

15     A.   Correct.

16     Q.   Any others?

17     A.   I think JARHEAD was about Desert Storm.  I

18 think CASUALTIES OF WAR was about Vietnam, but I

19 don't really remember that much about it.  Yes.

20 That's what comes to my mind.

21     Q.   Have we discussed everything that informs

22 your understanding of what "war" means?

23     A.   I think so.  I mean, I might have looked

24 up other things that I can't think of right now.

25     Q.   Prior to the DIG claim --

51

EXHIBIT 16

Video Deposition

1          Do you understand what I mean by "DIG

2   claim"?

3        A.   Yes.

4        Q.   What's your understanding?

5        A.   That there was a DIG claim.  I'm not sure

6   I understand the question.

7        Q.   Your understanding is that when I say "DIG

8   claim," I'm referring to the claim that's at issue

9   in this case.

10       A.   Correct.

11       Q.   Prior to your involvement in the DIG

12  claim, what was your understanding of what "war"

13  meant?

14          MR. KEELEY:  Objection.  Asked and

15  answered.

16          THE WITNESS:  I don't know if I ever had a

17  definition of what "war" was.  I think it's just --

18  I know it when I see it.

19  BY MR. HAYES:

20       Q.   And how has that understanding changed

21  since the DIG claim, if at all?

22       A.   I don't believe that it has.

23       Q.   Okay.  We ended with GLORY HOUNDS; right?

24       A.   Either GLORY HOUNDS or -- yes.

25       Q.   With respect to GLORY HOUNDS, do you know

                                                      52

```
 1    whether or not there was any insurance associated
 2    with that production?
 3         A.   I don't know.
 4         Q.   Now, before GLORY HOUNDS/ --
 5         A.   DUDE, WHAT WOULD HAPPEN.
 6         Q.   -- DUDE, WHAT WOULD HAPPEN, what was your
 7    employment?
 8         A.   I believe I worked on a TV show called
 9    SCHOOL PRIDE.
10         Q.   And what was your role on that show?
11         A.   I was an assistant location manager.
12         Q.   And what did that entail?
13         A.   It was similar to EXTREME MAKEOVER:  HOME
14    EDITION.  But instead of making over homes for
15    people in need, we were making over schools that
16    were in need.  And so we -- my role was to go to
17    these towns and figure out and lay out maps so that
18    we could close down different roads so that we could
19    have volunteers as well as ourselves help in
20    repairing these schools that were in bad condition.
21         Q.   Was there any insurance associated with
22    that production?
23         A.   I don't know.
24         Q.   What was your employment before SCHOOL
25    PRIDE?
```

53

```
 1        A.   I worked for a company called Red Varden

 2   Studios.

 3        Q.   What was your position?

 4        A.   Director of development.

 5        Q.   What did that entail?

 6        A.   I was -- I helped in coming up with ideas

 7   for TV shows.

 8        Q.   Do you know whether or not Red Varden

 9   Studios had insurance?

10        A.   I don't know.

11        Q.   How about before Red Varden Studios?

12        A.   I worked for Fox Sports Net for six years.

13        Q.   What did you do for Fox?

14        A.   For Fox Sports Net?  I just -- just want

15   to make sure that they're -- they're two different

16   entities.

17             I think you're in the way.  Sorry.

18             I had two different positions.  I started

19   as a coordinator of development, and then I was

20   promoted to manager of development.

21        Q.   And what did those positions entail?  What

22   were your duties?

23        A.   Initially I was assisting the

24   vice president of development.  I would help come up

25   ideas for television shows for the network.  I would
```

54

1  receive pitches from different production companies

2  that wanted to try and get shows on our network.

3      Q.   Do you know whether or not Fox Sports Net

4  had any type of insurance?

5      A.   I don't know.

6      Q.   While you were working there?

7      A.   I don't know.

8      Q.   How about before Fox Sports Net?

9      A.   The Gersh Agency, G-E-R-S-C-H [sic].

10     Q.   And what did you do there?

11     A.   I was an assistant to a -- an agent.

12     Q.   What is The Gersh Agency?

13     A.   They represent both talent and literary

14  talent for TV shows and movies.

15     Q.   And I apologize.  You answered.  But what

16  was your position?

17     A.   I was an assistant to an agent.

18     Q.   Do you know whether or not The Gersh

19  Agency had insurance?

20     A.   I don't know.

21     Q.   Prior to The Gersh Agency, what did you

22  do?

23     A.   I worked at Progressive Insurance.

24     Q.   Okay.  Do you remember the years that you

25  worked at progressive?

55

```
1        A.    I want to say right around 2000 to 2002.
2        Q.    What was your position at Progressive
3   Insurance?
4        A.    Auto claims adjuster.
5        Q.    Does progressive have any other insurance
6   division other than auto?  Do you know?
7        A.    I don't know.
8        Q.    Okay.  At the time did they?  Do you know?
9        A.    I don't know.  Actually, I take that back.
10   Seeing the commercials, it looks like I've seen them
11   say they have home and stuff.  But at that time
12   period I don't know.
13        Q.    Okay.  And for your entire tenure at
14   Progressive, you were auto claims adjuster?
15        A.    Yes.
16        Q.    Is that the first job you had out of
17   college or not?
18        A.    No.
19        Q.    What was the first job you had out of
20   college?
21        A.    It was the one before -- I'm sorry.  I had
22   two before that.
23        Q.    What were they?
24        A.    The first one right out of college was --
25   I worked at Pretrial Services Agency in Washington,
```

56

1    D.C.

2         Q.   Pretrial?

3         A.   Uh-huh.  Yes.

4         Q.   What did they do?

5         A.   We would interview people that had

6    recently been arrested and they were currently in

7    lockup.  And the goal of the agency was to come up

8    with the most fair means for people that couldn't

9    afford bail.  So we would -- we would interview them

10   to determine whether or not they were a flight risk.

11   If they had any type of drug issues, they would come

12   in once a week.  So basically interviewing and then

13   discussing with the commissioner what their bail

14   should be.

15        Q.   That job had nothing to do with insurance.

16             Is that a fair statement?

17        A.   My role had nothing to do with insurance.

18   I don't know if the company -- I'm not sure I

19   understand the question.

20        Q.   Did your role have anything to do with

21   insurance?

22        A.   No.

23        Q.   I think you mentioned another job besides

24   Pretrial Services prior to your employment at

25   progressive.

57

```
 1        A.    Correct.  I worked for a company called
 2   Russell Iungerich & Associates.  And it was two
 3   attorneys, and they represented doctors who were
 4   being brought up on medical malpractice charges.
 5        Q.    What was your role?
 6        A.    I would deliver court documents to
 7   different courts and stuff like that.
 8        Q.    Did you have a job title?
 9        A.    I believe it was "investigator."
10        Q.    And your role was to deliver --
11        A.    Documents to different courts, reviewing
12   the different Complaints that came in, giving my
13   opinions on those.
14        Q.    When you say reviewing the different
15   Complaints that came in and giving your opinion,
16   expand on that.  What do you mean?
17        A.    I don't really recall very much.  I mean,
18   a Complaint -- they would receive a Complaint that a
19   doctor had received against them.  They would show
20   it to me, and I would look at it, and they would
21   sort of ask me what was -- what did I think.  But
22   having no law experience, they didn't really -- I
23   think they were just being nice.
24        Q.    Besides reading the Complaint, did you do
25   any research or investigation in association with
```

58

1    this review of the Complaint?

2         A.   If -- if there was a potential witness, if

3    I recall correctly, I think I would go with one of

4    the attorneys and -- and be taking notes.

5         Q.   The attorney would interview the witness;

6    you would take notes?

7         A.   As far as I can recall.  I'm sorry.  It's

8    been a long time.  I don't really remember.

9         Q.   Anything else you can remember about your

10   role at Russell Iungerich?

11        A.   No.

12        Q.   And did your job at Russell Iungerich have

13   anything to do with insurance?

14        A.   No.

15        Q.   All right.  So now we're at Progressive;

16   right?

17        A.   Yes.

18        Q.   Is that the only job we haven't talked

19   about yet since college?

20        A.   There were smaller, like, week jobs I

21   would have, I mean, produ- -- working in TV

22   production, there's a lot of ups and downs, and you

23   just take little roles here and there.  These would

24   be the only ones that were probably more than a

25   month or two.  So there -- but there may be

59

1     something in between that would all be TV

2     production-related roles.

3          Q.   Of that universe, those smaller ones that

4     might have come up in between, did any of them have

5     anything to do with insurance?

6          A.   My roles never involved insurance in

7     those.  No.

8          Q.   Okay.  Now let's talk about your role at

9     Progressive.

10          A.   Okay.

11          Q.   Auto claims adjuster?

12          A.   Correct.  I don't remember if that was my

13    exact title or not.  But that's what I did.

14          Q.   Whatever your title was, you had the same

15    job the entire time?

16          A.   Correct.

17          Q.   And what was that job?

18          A.   I would be assigned a claim that involved

19    a vehicle or multiple vehicles that had been

20    involved in an accident of some sort.  I would

21    interview all the parties.  I would interview all of

22    the witnesses.  And then determine, based upon

23    liability, either make payments or -- or -- or have

24    our insured go through another insurance company.

25          Q.   So part of your job was determining

60

1   whether a payment should be made by Progressive to

2   your insured -- right? -- based on the facts of the

3   case?

4        A.   I was a portion of that decision-making

5   process.  Yes.

6        Q.   What portion?

7        A.   We had supervisors, and they were always

8   reviewing our claims.

9        Q.   But what was your role?

10       A.   Helping them determine liability and

11  interviewing the different participants to the

12  accident in helping form that decision.

13       Q.   When you say "helping to determine

14  liability," why is that relevant?

15       A.   So that the at-fault party would have to

16  pay.

17       Q.   So if our insured was not at fault -- by

18  "our insured, I mean the Progressive insured -- was

19  not at fault, what would you do?

20       A.   I don't remember exactly.  But -- I don't

21  remember exactly.  I mean, every claim was

22  different.

23       Q.   Would you review the policy?

24       A.   I believe so.  I don't recall.

25       Q.   Okay.  Would you form an opinion regarding

                                                    61

```
 1   whether or not the Progressive insured was at fault?
 2        A.   Yes.
 3        Q.   And what would you do with that opinion?
 4   Would you communicate it to anyone?
 5        A.   It depended on the particular claim.  But
 6   typically it would probably involve my supervisors,
 7   and then it would involve the insured and anyone
 8   else that was involved in it.  If there was another
 9   party, that other party.  And then also potentially
10   the other insurance company.
11        Q.   When you say it depends on the particular
12   claim, what you mean is you would always communicate
13   your opinion to someone.  It depends on the
14   particular claim as to who you would communicate it
15   to; right?
16        A.   Correct.
17        Q.   Okay.  So in every case would you
18   communicate your opinion to your supervisor?
19        A.   I don't remember.
20        Q.   In every case would you communicate your
21   opinion to the insured?
22        A.   I believe so.
23        Q.   Okay.  And in those cases where you
24   communicate your opinion to the insured, did you
25   first clear that opinion with your supervisor?
```

62

```
 1         A.    I don't remember.
 2         Q.    Were there instances in which you did not
 3    clear the opinion with your supervisor prior to
 4    communicating it to the insured?
 5         A.    I don't remember.
 6         Q.    Okay.  Your role as claims adjuster at
 7    Progressive Insurance, how did it differ from your
 8    role at OneBeacon, if at all?
 9         A.    The types of claims I get are different.
10         Q.    Any other differences?
11         A.    The policies were obviously very
12    different.
13         Q.    The insurance policies?
14         A.    The insurance policies themselves.  How
15    they were affected by each claim was different.
16              What was the exact question again?  I'm
17    sorry.
18         Q.    How was your job at Progressive Insurance
19    different from your job at OneBeacon, if at all?
20    And I want you to focus not so much on the fact that
21    the Progressive Insurance policies covered auto, and
22    you had different policies or have different
23    policies at OneBeacon.  I want you to focus for
24    purposes of this question on the process.
25              How did your role in the process of
```

63

```
 1    determining whether or not a claim was covered
 2    differ, if at all, as between your role at
 3    Progressive and your role at OneBeacon?
 4         A.   The processes aren't actually that
 5    different.  It's a claim comes in and -- I think
 6    that reviewing the policy and coverage comes up more
 7    often than it did at Progressive.  But I still have
 8    supervisors that I report to.  And so those
 9    decisions are typically made with their input
10    involved.
11         Q.   Okay.  A claim comes in.  You investigate
12    the claim.  You form an opinion on coverage.  You
13    communicate that opinion to your supervisors.
14              Is that correct as to your job at
15    OneBeacon and as to your job as Progressive?
16         A.   I don't recall how it worked exactly at
17    Progressive.  That's how I recall it.  But, no, not
18    every single claim do I discuss with my supervisors
19    at OneBeacon.
20         Q.   Which claims do you not discuss with your
21    supervisors?
22         A.   Noncomplex claims that don't involve any
23    question of liability or coverage.
24         Q.   With respect to the DIG claim at issue in
25    this case, did you discuss your opinion as to
```

64

1    coverage with your supervisors?

2         A.   I don't remember a specific conversation.

3         Q.   Well, did you or not?  Was this a complex

4    claim?

5         A.   Yes.

6              MR. KEELEY:  Objection.  Compound.

7              MR. HAYES:  That's a fair point.

8         Q.   Was this a complex claim?  And by "this" I

9    mean the DIG claim.

10        A.   Yes.

11        Q.   Did you discuss your coverage opinion with

12   respect to the DIG claim with your supervisor?

13             MR. KEELEY:  Objection.  Asked and

14   answered.

15             THE WITNESS:  I don't recall a specific

16   conversation.

17   BY MR. HAYES:

18        Q.   Did you communicate your coverage opinion

19   to the insured in connection with the DIG claim?

20        A.   I don't believe that I did.

21        Q.   Did you communicate your coverage opinion

22   to anyone in connection with the DIG claim?

23        A.   Ever?

24        Q.   Yes.

25        A.   Yes.

65

```
 1        Q.   Who did you communicate it to?
 2             MR. KEELEY:  Let me just caution you at
 3   this point, Mr. Gutterman.  Don't convey any
 4   conversations you've had with me on the basis of the
 5   attorney-client privilege.  I think he means
 6   employees of OneBeacon.
 7             MR. HAYES:  That's fair.
 8             THE WITNESS:  I don't remember any
 9   specific conversations where I brought up what my
10   opinion was about coverage.
11   BY MR. HAYES:
12        Q.   Do you remember whether or not you did?
13        A.   I -- I don't remember if I did or not.
14        Q.   And what was your opinion as to coverage?
15        A.   At that time period or currently?
16        Q.   At the time period that the DIG claim was
17   made and reviewed by you and OneBeacon.
18        A.   As we learned more and more information, I
19   believed that the war exclusion applied.
20        Q.   And did you communicate that belief to
21   anyone at any time?
22             MR. KEELEY:  Object.  Asked and answered.
23             THE WITNESS:  At that time I don't recall.
24             MR. HAYES:  Okay.  This is going to be
25   Exhibit --
```

66

```
 1              THE REPORTER:  13.

 2              MR. KEELEY:  Convenient time for a break

 3   here?

 4              MR. HAYES:  Yeah.  I think give me

 5   five minutes.  This is just, I think, going to be

 6   authentication.  This is a copy of his LinkedIn

 7   page.

 8              MR. KEELEY:  Okay.

 9              (Exhibit 13 was marked

10              for identification.)

11   BY MR. HAYES:

12      Q.   Do you recognize the document marked

13   Exhibit 13?

14      A.   Yes.

15      Q.   Okay.  Take a moment, review the document,

16   and let me know when you're done.  And just a

17   preview, when you're done reviewing it, I'm going to

18   ask you whether or not it looks accurate and

19   complete.  So review it with that in mind, please.

20      A.   Yes.

21      Q.   You're done reviewing it?

22      A.   Yes.

23      Q.   Is it accurate and complete?

24      A.   Yes.

25      Q.   Is there anything that you'd like to
```

67

Video Deposition

```
 1   clarify about it or change?
 2        A.   Not that I see.
 3             MR. HAYES:  Okay.  We can break now if
 4   you'd like.
 5             THE VIDEOGRAPHER:  Off record, 10:51.
 6             This is the end of Media 1.
 7        (Recess from 10:51 a.m. to 11:07 a.m.)
 8             THE VIDEOGRAPHER:  Back on record.
 9             We're commencing Media 2 of the deposition
10   of Daniel Gutterman.  On record at 11:07.
11   BY MR. HAYES:
12        Q.   Mr. Gutterman, do you currently hold any
13   licenses?
14        A.   I do.
15        Q.   What licenses do you currently hold?
16        A.   Insurancewise or in general?
17        Q.   In general, all licenses.
18        A.   Driver's license.
19        Q.   Any others?
20        A.   Florida out-of-state adjuster's license.
21        Q.   Any others?
22        A.   Not that I can think of, no.
23        Q.   Putting aside your driver's license, how
24   long have you had the Florida out-of-state
25   adjuster's license?
```

68

```
 1        A.   It just renewed recently.  So two years.

 2        Q.   When did you first become licensed?

 3        A.   Two years ago.

 4        Q.   So 2015?

 5        A.   No.  It's -- it's -- I don't remember

 6   exactly when I got it.  They have a thing where

 7   it's, like -- it's the -- I don't remember exactly

 8   the wording or how it works.  But it's, like, the

 9   year of your birthday of -- I don't remember -- so I

10   think I've had it for about two and a half years.

11        Q.   Have you ever had any other licenses in

12   the past other than the two that you've identified,

13   driver's license and Florida out-of-state adjuster's

14   license?

15        A.   Not that I can recall.

16        Q.   Why do you have a Florida out-of-state

17   adjuster's license?

18        A.   So I can be licensed around the vast

19   majority of the country.  Florida has a reciprocity

20   program with many states.

21        Q.   I see.

22             So if you have a license in Florida, the

23   majority of other states in the country will

24   recognize that license so that you can practice in

25   those other states?
```

69

Video Deposition

1        A.    Correct.

2        Q.    Is that accurate?

3        A.    Yes.

4        Q.    Is California one of those dates?

5        A.    I believe -- actually, I don't know if

6   California even requires a license or not.  I'm not

7   sure.

8        Q.    Did you have a Florida out-of-state

9   adjuster's license when you began employment at

10   OneBeacon?

11        A.    I did not.

12        Q.    Did you have a Florida out-of-state

13   adjuster's license when you were reviewing the DIG

14   claim?

15        A.    I don't recall.

16        Q.    Is this license evidenced by, like, a

17   piece of paper?

18        A.    Yes.

19        Q.    Do you have it?

20        A.    Not with me currently.  But I have a copy

21   of it in my office -- in my cubicle.

22        Q.    Are there documents that would reveal when

23   you first became a licensee under this Florida

24   out-of-state adjuster's license?

25        A.    I'm not completely sure.  But I think that

                                                              70

EXHIBIT 16

1    that might show the date.

2        Q.   Did somebody tell you to become licensed?

3        A.   Yes.

4        Q.   Who?

5        A.   Pamela Johnson, as well as another woman.

6    I can't think of what her name was.  But she's

7    involved in aspects like that.

8        Q.   And do you know why Pamela Johnson told

9    you to become licensed?

10       A.   So that I could adjust -- so I could

11   adjust claims around the country.

12       Q.   When you say "adjust claims," what do you

13   mean?  I you just want to make sure you and I have

14   the same understanding of what that means.

15       A.   Okay.  Investigate the claim, determine

16   coverage, if applicable, issuing payment.

17       Q.   Anything else?

18       A.   Those are the big broad strokes of it.

19   Yes.

20       Q.   Okay.  Do you recall what you had to do to

21   become licensed?

22       A.   I had to study multiple different types of

23   insurance.

24       Q.   What types?

25       A.   Homeowners, auto, property.  Those are the

                                                            71

1    three that stand out.

2         Q.   How about insurance policies related to

3    the entertainment industry?

4         A.   Not specifically.

5         Q.   And did you study from written materials?

6         A.   Yes.

7         Q.   Do you have those written materials?

8         A.   I believe so.  Yes.

9         Q.   Where would they be?

10        A.   In my cubicle, again, as well as they were

11   online.

12        Q.   In your cubicle at OneBeacon?

13        A.   Correct.  And it was also done online as

14   well.

15        Q.   You said you studied.

16             Did you study to take a test?

17        A.   Yes.

18        Q.   Did you pass the test the first time?

19        A.   No.

20        Q.   And when did you take the test the first

21   time?

22        A.   I don't remember what year it was.

23        Q.   Was it before or after the DIG claim?

24        A.   I believe it was after.

25        Q.   Do you have your test results?

72

Video Deposition

1     A.   I don't think that they actually gave us

2  anything as an actual test result.  It was just -- I

3  think it just went to Florida or whoever the -- I

4  think it's, like, the Florida Insurance Agency.  And

5  they accepted that, and then I received the

6  documentation.  If I can recall, I think that's the

7  way it work.  I don't remember receiving, like, a

8  printout that said whatever score I got.

9     Q.   Did the documentation say anything beyond

10  "pass" or "fail," if you can recall.

11     A.   All I remember about that moment was that

12  I was really excited after I passed it after the

13  second -- that was the second try, if I recall

14  correctly.  And so all I remember was just being so

15  thrilled that I did.  I don't remember if I got

16  paperwork showing that or not.

17     Q.   So let's back up to the first time you

18  took the test.  You said you didn't pass the first

19  time.

20          How did you find out you didn't pass?  Did

21  you get something in the mail?

22     A.   No.  Just the lady at the front desk said,

23  "I'm sorry.  You didn't pass."

24     Q.   On the spot?

25     A.   Yes.

73

EXHIBIT 16

Video Deposition

1      Q.   Okay.  So you go in -- describe the

2   testing procedure to me.

3      A.   It's not the only test that's occurring at

4   that time.  It's just a testing facility.  You go to

5   this testing facility.  It happens to be in

6   Torrance.  I don't know what anyone else's tests

7   were that they were taking.  But -- I don't know if

8   it was all insurance.  I don't know anything.

9           But basically they just give me one

10   computer, and you just look at the computer screen.

11   And it asks -- I don't even remember -- 150

12   questions.  And they're all multiple choice.  And

13   then the result, because it's on the computer, I

14   think are instantaneously provided to that testing

15   facility.  And then the testing facility can tell me

16   within minutes whether or not I passed or failed.

17      Q.   Okay.  So your recollection is you went in

18   the first time, did not pass.

19      A.   Correct.

20      Q.   When did you take the test the second time

21   in relation to that first attempt?

22      A.   I want to say it was a month or two later.

23      Q.   What did you do in that month or two

24   later -- strike that.

25           What did you do during that interim

74

1    period?

2         A.   Continued to study online.  I'd also made

3    some flash cards.  So I continued to study the flash

4    cards.

5         Q.   Do you still have the flash cards?

6         A.   Yes.  That would be when you asked earlier

7    if I still had those documents -- those materials,

8    that would be included in those materials.

9         Q.   Okay.  In your cubicle at your office?

10        A.   Correct.

11        Q.   Okay.

12        A.   I believe so.  Yes.

13        Q.   And then your best recollection is that

14   the second time you went in to the same facility,

15   same format, you passed?

16        A.   Correct.

17        Q.   And you found out you passed the same way

18   you found out you failed the first time?

19        A.   That's correct.

20        Q.   And that was orally by the person at the

21   front?

22        A.   As -- as far as I can recollect, yes.  I

23   was basically very, very excited.

24        Q.   And do you recall whether you got some

25   document that evidenced your passing?

75

1          A.   I don't recall if I did or not.  I'm

2     sorry.

3          Q.   That's going to look strange on the

4     record; right?

5          A.   What?

6          Q.   "Document that evidenced your passing."

7          A.   Yeah.

8          Q.   So I'm going to withdraw that question.

9          A.   Okay.

10         Q.   Do you recall whether or not you received

11    any piece of paper from the testing facility after

12    you passed the test?

13         A.   I don't recall that.

14         Q.   Okay.  But do you have a certificate or

15    some evidence of some sort that shows you're

16    licensed in the state of Florida?

17         A.   Correct.

18         Q.   Okay.  I want you to think back to first

19    all of the materials that you studied in preparation

20    for both of these tests.

21         A.   Okay.

22         Q.   Okay?

23              Did any of the materials involve a war

24    exclusion?

25         A.   I don't believe so.  No.

76

1    Q.   Did any of the materials involve a

2  terrorism exclusion?

3    A.   I don't believe so.  No.

4    Q.   Now I want you to think back to the tests,

5  both tests that you took.

6         Okay?

7    A.   Okay.

8    Q.   Was a war exclusion at issue in connection

9  with any of the questions that you answered on any

10  of those tests, either of those tests?

11    A.   Not that I can recall.

12    Q.   How about a terrorism exclusion?  Was that

13  the subject of either of those tests?

14    A.   Not that I can recall.

15    Q.   This Florida license, does it have --

16  withdraw that.

17         Does being licensed in Florida come with

18  continuing education requirements?

19    A.   Yes.

20    Q.   And what are those requirements?

21    A.   24 hours of continuing education over the

22  course of two years.

23    Q.   So every two years you have to prove that

24  you've done 24 hours of continuing education?

25    A.   Correct.

77

```
 1          Q.   And have you been licensed long enough to
 2     have to submit your continuing education?
 3          A.   Yes.
 4          Q.   "Yes"?
 5               One time?
 6          A.   Correct.
 7          Q.   How many hours did you complete for that
 8     first period?
 9          A.   Either 24 or 25.
10          Q.   And what does that continuing education
11     consist of?
12          A.   Taking online courses that involve
13     different subjects.
14          Q.   What subjects?
15          A.   It could be all across the insurance
16     board.
17          Q.   Have you ever taken an online class in
18     connection with this continuing education
19     requirement relating to a war exclusion?
20          A.   I don't -- I don't remember doing so.  No.
21          Q.   Have you ever taken an online class
22     relating to this continuing education requirement
23     related to a terrorism exclusion?
24          A.   I don't remember.
25          Q.   Have you ever taken an online class
```

78

1    related to this continuing education requirement

2    about extra expense coverage like the type at issue

3    in this case?

4         A.   Could you define the second part of that

5    question, extra expense as the type in this case.

6         Q.   Let's look at Exhibit 1.  And you're

7    probably familiar with how this policy is laid out.

8    But the extra expense part starts on ATL 3103.

9         A.   Okay.

10        Q.   I want you to think of the universe of

11   continuing education that you have taken in

12   connection with this Florida license.

13             Do you have that in mind?

14        A.   Okay.

15        Q.   Did you ever study coverage similar to the

16   extra expense coverage which is at issue in this

17   case and which is described in the policy starting

18   at 3103?

19        A.   Sort of in a roundabout way.  I mean, what

20   I remember the most about what I had to study was

21   homeowner policies and property policies.  So --

22   and -- and auto.  'Cause this was just an all

23   adjusters' line.  So is it possible to say that

24   interruption or loss of utilities could have been a

25   question, did someone's power go down and -- or did

                                                         79

```
 1   power go out potentially, but I don't remember the
 2   specific questions.
 3        Q.   How about any continuing education on
 4   issues that pertained to entertainment-related
 5   insurance policies?
 6        A.   I don't remember.
 7        Q.   Okay.  Same questions for your study
 8   leading up to your test.
 9             Did any of that study include study of
10   policies related to the entertainment industry?
11        A.   No.  And I'm just realizing your first
12   question was about my license.  The answer's the
13   same both times around.  The continuing education as
14   well as the -- no.  I don't remember.
15        Q.   Okay.  So let's just make sure we have
16   this clear.
17        A.   Yeah.
18        Q.   We've got the studying you did for your
19   license to take the test.  That's No. 1.  We've got
20   the test itself which you took twice, and we've got
21   the continuing education that you've done since
22   passing the test.
23             With respect to that universe, did you
24   ever study the war exclusion?
25        A.   Not that I recall.  No.
```

80

EXHIBIT 16

1      Q.   Did you ever study a terrorism exclusion?

2      A.   That I recall.  No.

3      Q.   Did you ever study entertainment

4    industry-related insurance coverage?

5      A.   Not that I can recall.  No.

6      Q.   Did you ever study insurance coverage

7    similar to the extra expense coverage at issue in

8    this case which starts at 3103 of the policy?

9      A.   I don't remember if I took a course about

10   extra expense or not.

11     Q.   Okay.  Has your Florida license ever been

12   suspended?

13     A.   No.

14     Q.   Has it ever been revoked?

15     A.   No.

16     Q.   So from the time you obtained it after

17   that second test until today, it's been in it place

18   consistently?

19     A.   Yes.

20     Q.   Is there a process in Florida for

21   consumers to file complaints against licensees, if

22   you know?

23     A.   I don't know definitively.  But for some

24   reason, something in my head is saying that I

25   remember seeing something like that.

81

1          Q.   Have you ever had a complaint filed

2     against you in connection with your job as an

3     insurance adjuster ever?

4          A.   Filed, no.

5          Q.   Has a consumer ever raised a complaint

6     about you as an insurance adjuster?

7          A.   I don't remember if I did or not -- if

8     they did or not at Progressive.  But it wouldn't

9     have been unheard of in the auto -- in -- in auto

10    accidents people are -- want to get their car back

11    quickly.  But in terms of OneBeacon -- define

12    "consumer."

13         Q.   Well, any person.

14         A.   Yes.

15         Q.   Okay.  Who?

16         A.   A broker was unhappy with me.

17         Q.   Anyone else, any other instances?

18         A.   Where it was reported to a supervisor?

19    That's the only one that pops up in my head.

20         Q.   How about where it wasn't?

21         A.   Reported to a supervisor?

22         Q.   Right.

23         A.   People have told me that they're unhappy

24    with my job.  Yes.

25         Q.   By "people," do you mean people outside of

82

```
 1    the company, OneBeacon?

 2         A.   Yes.

 3         Q.   Okay.  Insureds?

 4         A.   Yes.

 5         Q.   On how many occasions?

 6         A.   I don't know off the top of my head.

 7         Q.   More or less than 10?

 8         A.   I would think less than 10.

 9         Q.   More or less than five?

10         A.   I'm not sure.  People get anxious and want

11    payment very quickly.  And so if my investigation is

12    taking longer than what they appreciate, they get

13    upset.

14         Q.   Can you remember ever -- strike that.

15              Can you remember a specific instance?

16         A.   Yeah.

17         Q.   How many?

18         A.   Yeah.  Somewhere between one and five.

19         Q.   And what were the circumstances of any

20    that you can remember?

21         A.   People would be unhappy with final

22    liability determinations or people upset with

23    coverage determinations or people upset with the

24    amount of a settlement.

25         Q.   So you can recall instances at OneBeacon
```

                                                              83

1    in which an insured has expressed dissatisfaction

2    with your coverage determination?

3         A.   Yes.

4         Q.   Okay.  And do you remember the

5    circumstances surrounding any of those instances?

6    By the way, let me withdraw that question.

7              Was one of those instances the DIG claim

8    at issue in this case?

9         A.   Oh.  No.

10        Q.   Okay.  Now tell me about the issue -- tell

11   me about the instances that you're thinking of.

12        A.   I actually don't remember the exact

13   specifics.

14        Q.   And those expressions of dissatisfaction

15   were to you?

16        A.   Yes.

17        Q.   Were they to anybody else?

18        A.   I think to their broker.

19        Q.   Okay.  Now, you mentioned that there was

20   an instance in which a broker was unhappy with your

21   work.

22        A.   Uh-huh.

23        Q.   Do you remember that?

24        A.   Yes.

25        Q.   Who?  What was the broker's name?

84

1          A.    Brian Kingman.

2          Q.    Brian Kingman?

3          A.    Yes.

4          Q.    Do you remember when this happened?

5          A.    No more than a year ago.  Somewhere within

6     the last year.

7          Q.    After the DIG claim?

8          A.    Yes.

9          Q.    Do you remember why he was unhappy?

10         A.    I'm not meaning to laugh.  I'm just -- I'm

11    recalling the conversation.

12               There was a claim, a property claim, where

13    there had been some question about coverage.  He --

14    he -- his insured knew the property owner, and the

15    property owner had complained to his insured that

16    this claim continued.

17               And just to show off that he had any type

18    of pull, Brian Kingman was basically saying to his

19    insured, "I will get you all the information about

20    this claim," even though his insured had nothing to

21    do with the claim, he had nothing to do with the

22    claim.

23               And so he was very frustrated when I kept

24    saying, "I can't give you any information about this

25    claim 'cause you have nothing to do with it."  So he

                                                           85

1    was very, very upset with me.

2        Q.   So that didn't involve a coverage

3    determination that you had made?

4        A.   His being upset with me?  Is that what

5    you're asking?

6        Q.   Yeah.  His dissatisfaction with you on

7    that occasion didn't involve his dissatisfaction

8    with a coverage determination that you had made?

9        A.   No.  He was upset because I wouldn't give

10   him information.

11       Q.   Have you ever been a party -- strike that.

12           Have you ever been a witness in an

13   administrative proceeding relating to insurance?

14       A.   I'm sorry.  Can you ask that question a

15   different way?

16       Q.   I think I asked you at the beginning of

17   the day if you had ever been -- and this was during

18   the admonitions -- if you had ever been a witness at

19   trial.  And you said "no"; right?

20       A.   Not that I can remember.  No.

21       Q.   Do you have an understanding of what

22   happens when a person files a complaint with a

23   government agency about a licensee like yourself?

24   Do you understand what happens next?

25       A.   Not really, no.

86

```
 1        Q.   Okay.  So you've never been involved in
 2   any proceedings before a government agency related
 3   to, in some way, your job as an insurance adjuster?
 4        A.   No, I have not.
 5        Q.   Okay.  Have you ever been convicted of a
 6   crime?
 7        A.   No.
 8        Q.   Have you ever been charged with a crime?
 9        A.   What do you mean?  Are you talking, like,
10   a ticket, or are you talking about --
11        Q.   Just take traffic tickets -- well,
12   actually, let me withdraw that.
13             You've received a traffic ticket before in
14   your life; correct?
15        A.   Correct.
16        Q.   How many?
17             MR. KEELEY:  Objection -- excuse me.
18   Objection.  Relevance.
19             THE WITNESS:  I have no idea.
20   BY MR. HAYES:
21        Q.   Okay.  Have you ever been charged with a
22   crime that does not relate to your driving?
23             MR. KEELEY:  Objection.  Relevance.
24             THE WITNESS:  I received a ticket for
25   disorderly conduct when I was in college.  I don't
```

87

```
 1    remember if that was exactly what the name of it
 2    was, it was a disorderly conduct or not.  I believe
 3    it was expunged.
 4    BY MR. HAYES:
 5         Q.   Just very broad strokes, what was the
 6    circumstances behind that charge?
 7              MR. KEELEY:  Objection.  Relevance.
 8    BY MR. HAYES:
 9         Q.   I just want to make sure it is what I
10    think it is.
11              MR. KEELEY:  Same objection.
12              THE WITNESS:  I got rowdy in a -- in a
13    football game at the University of Wisconsin.
14    BY MR. HAYES:
15         Q.   Okay.
16              MR. KEELEY:  You and 50,000 other
17    students.
18    BY MR. HAYES:
19         Q.   Do you remember who you were playing?
20         A.   No.  But the week following it, just so
21    you understand how busy and chaotic it was, they
22    played -- Wisconsin played Michigan the next week,
23    and I think something like 70 to 100 people got
24    trampled, the gates broke, and everyone came down,
25    and it was a major national story.  So a lot of
```

88

1    people got hurt.  So the week before that, it was

2    very, very rowdy in there as well.

3         Q.   All right.  So let's talk about the

4    insurance claims that arose out of that incident.

5    No.

6              All right.  So let's -- we've talked about

7    your education, you r prior employment.  Let's start

8    talking now about your employment at OneBeacon.

9              Okay?

10        A.   Okay.

11        Q.   What is your title today?

12        A.   Senior entertainment investigator.

13        Q.   What was your title when you began?

14        A.   The same.

15        Q.   Has it ever been different?

16        A.   No.

17        Q.   Do you have an understanding of what your

18   job duties are as senior entertainment claims

19   investigator?

20        A.   Yes.

21        Q.   Have those responsibilities changed at any

22   time from the beginning of your employment until

23   today?

24        A.   Yes.

25        Q.   When?

89

1       A.   Over the course of my employment.

2       Q.   What do you mean by that?

3       A.   A lot of it had to do with the

4    complexities of the claims as well as the type of

5    claims I was receiving.  Initially it was -- it was

6    less complex claims like a camera gets broken.

7    Eventually it became claims like this or an actor

8    got sick or what- -- whatever it happens to be.  And

9    then I've -- I've recently started taking on more --

10   other types of claims as well.

11      Q.   So when you say that your role has

12   changed, what you mean is it's --

13      A.   It's expanded.  Sorry.

14      Q.   -- it's expanded, your responsibility has

15   expanded, the complexity of the matters has

16   increased as you have gained experience.

17           Is that a fair statement?

18      A.   That's a fair statement.

19      Q.   But in terms of your process and what you

20   actually do today to day, has that changed since you

21   began at OneBeacon?

22      A.   Well, every day is different.  But the

23   general processes are very similar.  Yes.

24      Q.   Okay.  You've been a claims adjuster since

25   you began through the present?

90

```
 1        A.    Correct.
 2        Q.    By "claims adjuster," you remember we
 3   talked earlier about what you understood that to
 4   mean?
 5        A.    Yes.
 6        Q.    You still hold that understanding?
 7        A.    Yes.
 8              Well, you asked my -- what I believed a
 9   claims adjuster was.  We didn't come to an
10   agreement.  You didn't tell me what you thought a
11   claims adjuster was.  Those are what I believe a
12   claims adjuster are.
13        Q.    And when I said before that I wanted to
14   make sure we're on the same page, I wanted to make
15   sure I understood what you meant when you said
16   "claims adjuster," and I do.
17        A.    Okay.  Thank you.
18        Q.    When you adjust a claim -- and when I say
19   "adjust a claim," I mean -- sorry.
20              When you adjust a claim -- and when I say
21   "adjust a claim," I mean perform your duties as a
22   claims adjuster, and what you said was, investigate
23   the claim, determine coverage, if applicable, issue
24   payment; right?  Is that consistent?
25        A.    Yes.
```

91

1        Q.   So when I say "when you adjust a claim,"

2    that's what I'm referring to.

3        A.   Okay.

4        Q.   Okay.  When you adjust a claim, do you

5    determine what the cause of the loss was?

6        A.   Yes.

7        Q.   When you adjust a claim, do you determine

8    whether or not a loss is covered or excluded?

9        A.   I'm sorry.  You paused in the middle of

10   that.  Would you please ask it again.

11       Q.   When you adjust a claim, do you decide

12   whether or not it is covered?  Strike that.

13            When you adjust a claim, do you decide

14   whether the loss is covered?

15       A.   When there's definitive coverage.  Yes.

16   When there's coverage in question, my supervisors

17   get involved.

18       Q.   But do you render an opinion as to whether

19   or not the loss is covered in all cases?

20       A.   Well, going back to your question earlier

21   today when you asked whether or not I rendered an

22   opinion, I don't recall if I did in this one.  But

23   typically, yes, I would render an opinion.

24       Q.   Can you remember any other instance in

25   which you were involved as a claims adjuster on a

                                                        92

```
 1    claim in which you did not render an opinion?
 2              MR. KEELEY:  Objection.  Misstates
 3    testimony.
 4              THE WITNESS:  Would you repeat it, please.
 5    BY MR. HAYES:
 6        Q.   Well, I suppose -- what you're saying is,
 7    with respect to the DIG claim, you don't remember
 8    whether or not you communicated your coverage
 9    opinion to anyone?  Is that what you're saying?
10        A.   Yes.  That's correct.
11        Q.   Okay.  So you may have?
12        A.   I may have.  Correct.
13        Q.   Okay.  Can you remember an instance at any
14    time during your tenure at OneBeacon in which you
15    were assigned as a claims adjuster on a claim in
16    which you did not come to an opinion as to whether
17    or not the loss at issue was covered?
18        A.   I've been -- I've had claims that have
19    been reassigned to me where the coverage
20    determinations have been made prior to my decision.
21    So I wouldn't -- I wouldn't even -- I wouldn't make
22    a coverage determination in those.
23        Q.   So put those to the side.
24              Any others?
25        A.   So let's say it gets -- an initially
```

93

EXHIBIT 16

1    assigned claim.

2            Nothing comes in my head right now, no.

3    That doesn't mean that there weren't.  But I don't

4    remember any.

5        Q.  When you adjust a claim, do you determine

6    the dollar value of the loss?

7        A.  I'm sorry.  Ask it one more time.

8        Q.  When you adjust a claim, do you determine

9    what the value of the loss is, the dollar value?

10       A.  Eventually.

11       Q.  When in the process?

12       A.  It depends on what claim -- what type of

13   claim it is or the claim itself.  Every claim is

14   different.

15       Q.  What do you mean by that?

16       A.  A lot of the time it depends on the

17   insured or the claimant.  It -- it could be

18   instantaneous.  We get the claim in, and they've

19   already provided us what the spreadsheet's going to

20   be of exactly how much it's going to be, or there's

21   times they have no idea, and it's deep in the claims

22   process.

23       Q.  When they provide you -- and by "they" I

24   mean the insured -- provides you with an account of

25   what the loss is according to the insured, what do

                                                    94

1    you do with that?  Do you analyze it?

2         A.   Yes.

3         Q.   And do you come to a determination as to

4    whether the claimed loss as set forth in that

5    presentation is accurate?

6         A.   I would.  Or if we had an outside adjuster

7    that was working on it, I would be in consultation

8    with them or any consultants.

9         Q.   In which cases do you have outside

10   adjusters working with you?

11        A.   Typically with claims that involve casts

12   or extra expense claims that are larger, as well as

13   third-party property damage claims, I use -- I use

14   an adjuster, an outside independent adjuster, or a

15   few, because I -- they could be out of state, and

16   I'm not flying -- I'm -- it's easier to get an

17   adjuster, and it's more cost-effective.

18        Q.   What do you consider to be a claim that is

19   larger?

20        A.   Typically anything over $200,000.

21        Q.   Anything over $200,000, typically

22   OneBeacon, in your experience, will use an

23   independent outside adjuster?

24        A.   No.  It's my determination in -- with the

25   consultation with my supervisors, if I feel like it

95

```
 1    would be beneficial to have another person take a
 2    look at this, then I would have that person help me
 3    out.
 4         Q.   So anything over $200,000, that's your --
 5         A.   That's my --
 6         Q.   -- rule of thumb?
 7         A.   That's -- yeah.  There's no -- I haven't
 8    been given a specific amount.
 9         Q.   Okay.  And are there particular outside
10    independent adjusters that you use?
11         A.   One in particular for -- for -- well, it
12    depends on the type of claim.
13         Q.   One in particular for what?
14         A.   Okay.  So let's say it was for an extra
15    expense type of a claim.
16         Q.   Okay.
17         A.   We use someone named Graham Henderson
18    often.
19         Q.   Is he independent?  Does he work for a
20    company?
21         A.   Yes.  He's an independent.
22         Q.   It's Graham Henderson; he doesn't work for
23    an entity?
24         A.   Correct.
25         Q.   And where is he located?
```

96

1         A.    In Northridge.

2         Q.    And how do you know Graham Henderson?  Is

3    that your contact, or did that relationship exist

4    before you got to OneBeacon?

5         A.    It existed before I got to OneBeacon.

6         Q.    Do you know who the contact person is at

7    OneBeacon for --

8         A.    Peter Williams.

9         Q.    How do you know that?

10        A.    Because they both told me.  They worked on

11   a claim a long, long time ago.

12        Q.    What claim?

13        A.    I have no idea.

14        Q.    What was the first time you brought Graham

15   Henderson in on a case, on a claim?

16        A.    When I -- my own time I brought him in or

17   when was he brought in the first time?

18        Q.    Well, right now I'm obviously only talking

19   about --

20        A.    My window of time.

21        Q.    -- your window of time at OneBeacon.

22        A.    Okay.

23        Q.    Okay.  During that window of time, did

24   Graham Henderson consult on any of your claims?

25        A.    Yes.

                                                        97

1       Q.   How many?

2       A.   Oh, I have no idea.  Many.

3       Q.   More than 100?

4       A.   I would -- I don't know.  Maybe.

5       Q.   Could it have been more than 200?

6       A.   I don't think so.

7       Q.   Could it -- so maybe more than 100, maybe

8  not?

9       A.   I would say somewhere between 100 and 150.

10      Q.   Okay.

11      A.   I'm sorry.  Between -- I had it in my head

12  somewhere between 50 and 150.  Somewhere in that

13  neighborhood.

14      Q.   Okay.

15      A.   He was working on claims before I started

16  that got brought -- that were given to me.

17           Does that make sense?

18      Q.   That makes sense.

19           What portion of the 50 to 150 does that

20  account for?

21      A.   I think, like, 15.

22      Q.   Okay.

23      A.   10 to 15.

24      Q.   So you inherited about 10 to 15 that

25  Graham had been working on?

98

```
 1        A.    Correct.

 2        Q.    And that was obviously towards the

 3   beginning of your tenure?

 4        A.    That's -- yes.

 5        Q.    When was the last time Graham Henderson

 6   consulted on a claim that you were also involved in?

 7        A.    He's currently working on a few of them.

 8        Q.    And tell me generally what they're about.

 9             MR. KEELEY:  Let me at this point caution

10   you -- I'm going to object based on work product

11   doctrine -- to revealing any information about

12   persons or consultants involved in this DIG claim.

13   So to the extent that you can answer that with

14   respect to claims other than the current claim, you

15   may do so.  But do not provide any information

16   concerning consultants involved in this particular

17   claim.

18             So if you're thinking of claims other than

19   this claim that Mr. Henderson is involved in, you

20   may reveal that.

21             THE WITNESS:  Can I get a break for a

22   second?

23   BY MR. HAYES:

24        Q.    Well, I'll just -- let's carve that out.

25   Let's -- I'm not saying that I agree with that.  But
```

99

1    let's carve it out for purposes of this question.

2              You don't need to talk to me about Graham

3    Henderson's role in connection with the DIG claim,

4    to the extent there is a role.  So put that all to

5    one side.

6              Okay?

7         A.   Okay.

8         Q.   Is there a claim -- let's ask this first.

9              Is there a claim that you're working on

10   right now that Graham Henderson is also working on?

11        A.   Yes.

12        Q.   Okay.  And is it an extra expense claim?

13        A.   Yes.

14        Q.   And how much is at issue?

15             MR. KEELEY:  And, again, Mr. Gutterman,

16   just so I'm clear, I'm objecting to your responding

17   to this question to the extent it involves the DIG

18   claim.  So I think the question has been clarified.

19   I think you're being asked about other than the DIG

20   claim.

21   BY MR. HAYES:

22        Q.   Correct.  That's correct.

23        A.   I'm trying to think of how many claims I'm

24   working on him with currently excluding this one, if

25   he's involved in it or not.  In which case I think

                                                    100

```
 1   I'm working on three, and I think that they are --
 2   range from -- actually, I think it's more than that.
 3   But I think -- I think they range anywhere from,
 4   like, $50,000 up to a claimed amount of -- excess of
 5   $1 million.
 6        Q.   Okay.  I want you to think about all of
 7   the claims you've ever worked with Graham Henderson
 8   on.
 9             Okay?
10        A.   Uh-huh.  Yes.
11        Q.   Now, from that universe, take the DIG
12   claim and put it outside that universe.
13             Okay?
14        A.   Yes.
15        Q.   So disregard the DIG claim.
16             In terms of the dollar value at issue,
17   what's the largest claim you've ever worked on with
18   Graham Henderson?
19             MR. KEELEY:  Objection.  Relevance.
20             THE WITNESS:  Over $1 million.  I don't
21   remember a specific amount.
22   BY MR. HAYES:
23        Q.   Was it over 2 million?
24             MR. KEELEY:  Same objection.
25             THE WITNESS:  I don't believe so.
```

101

1    BY MR. HAYES:

2         Q.   Okay.  And I think you suggested earlier

3    that in some instances it's your decision to call

4    Graham and have him consult on a particular claim;

5    right?

6         A.   Yes.

7         Q.   In other instances it might be somebody

8    else on the team's decision to bring in Graham; is

9    that fair?  By "team," I mean the people at

10   OneBeacon who are looking at a specific claim.

11        A.   Are you talking about before or currently?

12        Q.   I'm just talking about the time period

13   from -- beginning when you started at OneBeacon

14   until today.  You've identified a universe of about

15   50 to 150 claims in which Graham Henderson was

16   involved in his capacity as an independent adjuster.

17             Do I have that right?

18        A.   Yes.

19        Q.   Okay.  In that universe, with respect to

20   some of the claims, it was your decision to bring

21   him in; you brought him in; right?

22        A.   Yes.

23        Q.   And with respect to some of the other

24   ones, what I gathered from your testimony was

25   somebody else at OneBeacon made the decision to

                                                    102

1   bring Graham in.

2           Is that accurate?

3       A.   Yes.

4       Q.   Okay.  Can you estimate how many of the 50

5   to 150 universe -- strike that.

6           Of the 50 to 150, what percentage of those

7   claims in which Graham Henderson was involved, what

8   percentage of those claims was it your decision to

9   bring him in?

10      A.   The reason I asked before, whether before

11  or now, is because supervisors have changed.  Since

12  the supervisors have changed, it's almost always me

13  making those determinations.  Before the supervisors

14  changed, it would be in consultation with each --

15  with my supervisors.

16      Q.   So you'd say, "Hey, maybe this case

17  requires an independent set of eyes.  Let's use

18  Graham."  You'd present that to your supervisor, and

19  he or she would either agree or not.

20          Is that accurate?

21      A.   That's correct.  Or my supervisors would

22  say, "I see you received this claim.  Let's get

23  Graham on it."

24      Q.   Okay.  You said that the supervisors have

25  changed.

103

Video Deposition

```
 1              When you started, who was your supervisor?
 2        A.    My direct supervisor was Pamela Johnson.
 3        Q.    Okay.  And is she your direct supervisor
 4   today?
 5        A.    She is not.
 6        Q.    Because?
 7        A.    She's no longer with the company.
 8        Q.    While she was at the company, was she
 9   always your direct supervisor?
10        A.    Yes.
11        Q.    When she left, who became your direct
12   supervisor?
13        A.    A gentleman named Steve Baltzell.  There
14   was a slight period where he was below Pamela.  So
15   he was sort of my direct supervisor.  But because of
16   the relationship had with Pamela -- you understand.
17        Q.    Have you ever had a direct supervisor
18   other than Steve or Pamela?
19        A.    No.  Not at this job.  No.
20        Q.    All right.  When Pamela was your direct
21   supervisor -- withdraw that.
22              You said that you needed clarification on
23   when because the process differed between your
24   supervisors, who we now know are Steve and Pamela;
25   right?
```

104

EXHIBIT 16

1     A.   Correct.

2     Q.   How did the process for determining

3   whether or not to bring in Graham differ as between

4   Pamela and Steve?

5     A.   My supervisor, Steve, understands when I

6   believe it's time that Graham needs to be involved

7   in the claim, versus -- I think before I was so new

8   that it made a lot more sense that they would make

9   the -- they would help with that determination.

10    Q.   I understand.

11         But during that time period when Pamela

12  was your supervisor, there still were instances

13  where you suggested, "Hey, this claim requires

14  somebody like Graham."

15         Is that a fair statement?

16    A.   Yes.

17    Q.   Okay.  Can you remember any specific

18  claims in which you did that during the time period

19  when Pamela was your supervisor?

20    A.   Any specific claims, no.

21    Q.   Okay.  What was your rule of thumb while

22  Pam was your supervisor in determining whether or

23  not to suggest bringing in Graham, if you had one?

24    A.   I'm sorry.  Ask the question one more

25  time.

                                                          105

1      Q.    I want you to think of the time period
2   when Pamela was your supervisor.
3      A.    Uh-huh.
4      Q.    Just that time period.
5            Do you understand?
6      A.    Yes.
7      Q.    There were instances in which you went to
8   Pamela and said, "Let's bring in Graham"; right?
9      A.    As far as I can recall.  Yes.
10      Q.    Okay.  What were your reasons for doing
11   that in general?  You said initially the amount of
12   the claim.
13      A.    Yes.
14      Q.    Right.  Anything over 200,000; right?
15      A.    And at that point, it was probably less
16   than that.
17      Q.    Okay.  So we've got that, the monetary
18   value of the claim.
19      A.    Correct.
20      Q.    Anything else?
21      A.    Usually it depended on what the type of
22   coverage was, if it was an extra expense, if it was
23   a faulty stock, if it was whatever it happened to
24   be, he would help in -- in the consultation of what
25   the value was.

106

1        Q.   In the consultation of what the value was.

2             What do you mean?

3        A.   Yes.  He doesn't -- he didn't ever deal

4   with coverage.  His -- his pure role was his -- he

5   came from the world of movie production.  He was

6   a -- he dealt with all the financing with them.  And

7   so he understood how to read all the different

8   spreadsheets that are being delivered to us.  So we

9   utilized his expertise in that function.  That's why

10  the monetary amount was such a big deal, was because

11  we wanted to make sure that what was being provided

12  to us was justified.

13       Q.   So is it fair to say that it wasn't only

14  the amount of the claim, but also the complexity

15  associated with determining the amount of the loss

16  that factored into the decision whether or not to

17  involve Graham?

18       A.   Yeah.  I think that's fair to say, the

19  complexity of -- yes.

20       Q.   Okay.  And was Graham Henderson consulted

21  in connection with the DIG claim at the time the DIG

22  claim was initially made and reviewed by you,

23  Pamela, and Peter?

24       A.   I don't believe so.  No.

25       Q.   Why not?

                                                   107

1      A.   I don't know if we ever received actual
2  documentation showing what the value of the claim
3  was for him to even analyze.
4      Q.   Is Graham Henderson the only outside
5  independent insurance adjuster that you know of that
6  OneBeacon consults?
7      A.   In what capacity?
8      Q.   Any capacity.
9      A.   No.
10     Q.   How many others are you aware of?
11     A.   Actually, I'm sorry.  Will you ask the
12  question one more time.
13     Q.   Is Graham Henderson the only outside
14  independent adjuster that OneBeacon consults?
15          MR. KEELEY:  You mean OneBeacon across the
16  board or Entertainment?
17  BY MR. HAYES:
18     Q.   Let's start with Entertainment.  Just that
19  you know of, just your knowledge.
20     A.   Well, we use outside adjusters for auto
21  claims.  We use -- I use outside adjusters, like I
22  said earlier, for third-party property damage
23  claims.  I mean -- so, yeah.  I mean, we certainly
24  use other outside adjusters.
25     Q.   And you've used outside adjusters as you

108

```
1    just described from the beginning of your tenure at
2    OneBeacon until today?
3         A.   I mean, I don't think it was the very
4    first day.  But eventually, yes, I started using
5    them.
6         Q.   When do you either suggest or directly
7    engage the use of an independent outside adjuster in
8    connection with your adjusting of a claim?
9         A.   It depends on the type of claim.
10        Q.   Okay.  When do you engage in independent
11   outside adjuster?  Just give me all the
12   circumstances.
13        A.   Okay.  If it's a third-party property
14   damage claim where a location has been affected and
15   it's outside of Los Angeles.  Actually, sometimes in
16   Los Angeles as well; when there is a -- a claim
17   that's potentially necessary to have an outside
18   adjuster because it's out of state, and it'd be --
19   it's necessary to -- to go to that particular person
20   or location to discuss with the person.  It can't be
21   done over e-mail or phone.  Or situations where it's
22   extra expense, and that's situations where we'd use
23   Graham.  Situations like that.  And it's not always
24   Graham.  Sometimes we use other adjusters.  But
25   primarily Graham for extra expense ones where we're
```

109

1    dealing with value.

2         Q.   Any other circumstances?

3         A.   I mean -- sorry.  And also auto claims.  I

4    don't deal with auto claims very often.  But I'll

5    have an occasional time where it's not your typical

6    just auto.  It will be a trailer, like an actor's

7    trailer gets damaged.  And I deal with claims like

8    that.

9         Q.   Do you as a matter of practice engage

10   outside independent adjusters in a consulting

11   capacity when the claim involves complex issues?

12             MR. KEELEY:  Objection.  Vague.

13             MR. HAYES:  Withdraw that.

14        Q.   Do you as a matter of practice engage

15   outside independent adjusters in a consulting

16   capacity when the claim involves an issue that

17   you've never dealt with?

18        A.   Yes.

19        Q.   Why?

20        A.   Well, especially early on, most of the

21   things that I was dealing with were I hadn't any

22   experience with.  So if an outside adjuster was

23   necessary, then we would utilize them.  Whether that

24   would be just purely to take an interview or -- or

25   to -- not even an interview, just to have a

                                                    110

1    conversation with that particular person or insured

2    or the complainant.  But we -- we certainly use

3    outside people.

4        Q.   Did OneBeacon use an outside independent

5    adjuster in connection with the DIG claim?

6        A.   I'm sorry.  Ask that question one more

7    time.

8        Q.   Did OneBeacon use an independent outside

9    adjuster in connection with the DIG claim?

10            THE WITNESS:  (To Mr. Keeley)  Doesn't

11   this go back to the original objection you made?

12   BY MR. HAYES:

13       Q.   I'm not talking about right now.  Before

14   the litigation was filed.

15       A.   Oh.  Okay.

16       Q.   Hold on.

17            Do you have the time period between when

18   you got notice of the DIG claim as a starting point

19   and the September letter from OneBeacon in which

20   OneBeacon reaffirmed its decision to deny coverage?

21   Do you have that time period in mind?

22       A.   Yes.

23       Q.   Okay.  At any time during that time

24   period, did OneBeacon use an independent outside

25   adjuster in connection with the DIG claim?

111

1    A.   Would you define what is an independent

2    outside adjuster.

3    Q.   No.  We've been talking about independent

4    outside adjusters for 20 minutes.  I want you to use

5    the same definition you've been using.

6    A.   Then using that definition, no.

7    Q.   Okay.  Is there another definition of

8    "independent outside adjuster" that you would use

9    which would change your answer?

10    A.   No.

11    Q.   Okay.  Why not?

12    A.   Why not what?

13    Q.   Why didn't OneBeacon use an independent

14    outside adjuster in connection with the DIG claim?

15    A.   The facts of the loss that were presented

16    to us didn't necessarily warrant that.

17    Q.   Had you ever dealt with the application of

18    a war exclusion to a claim before?

19    A.   No.

20    Q.   Have you ever dealt with the application

21    of a war exclusion to a claim other than in the

22    context of the DIG claim?

23    A.   I'm sorry.  Ask it one more time.

24    Q.   Have you ever, excluding the DIG claim,

25    have you ever considered the application of a war

112

1    exclusion to a claim?

2         A.   I believe so.  Yes.

3         Q.   When?

4         A.   There was a claim in -- that involved a

5    rioting in Thailand.

6         Q.   When was that?

7         A.   I'm not sure.  In 2014, I think.  I'm

8    not -- I think.

9         Q.   Before or after the DIG claim?

10         A.   I don't remember.  I think it was before.

11   But I don't recall.

12         Q.   And do you recall the circumstances of

13   your consideration of a war exclusion in that

14   context?

15         A.   So the No. 1 thing I was taught from the

16   very, very beginning was that I'm always supposed to

17   review the policies as thoroughly as possible and

18   look for coverage and also -- always look for

19   coverage, but also to determine where the facts of

20   loss apply.

21              In this particular -- in that particular

22   instance, I think that I could -- could this have

23   been considered a war.  I quickly determined that it

24   wasn't, because our job is to look for coverage.

25         Q.   Describe this again.  Thailand.

                                                      113

```
 1          A.    There was rioting in the streets.
 2          Q.    In Thailand, and something -- what was the
 3    loss?
 4          A.    From what I recall, the production told us
 5    that they were having trouble moving to different
 6    locations around the country.
 7          Q.    Was this an extra expense claim?
 8          A.    I don't remember if it was extra expense
 9    or if it was another category.
10          MR. HAYES:  This is Exhibit 14.
11          (Exhibit 14 was marked
12          for identification.)
13    BY MR. HAYES:
14          Q.    Do you recognize the document marked
15    Exhibit 14?
16          A.    Yes, I do.
17          Q.    What is it?
18          A.    It's an e-mail from myself to myself.
19          Q.    Does this e-mail relate in any way to this
20    claim that you've testified about arising out of
21    Thailand?
22          A.    I believe this is the one.
23          Q.    Okay.  And you quote here the war
24    exclusion that you considered in connection with
25    that Thailand claim; right?
```

114

```
 1          A.    Amongst other -- other coverages.  Yes.

 2          Q.    Okay.  And you testified that your

 3    recollection is with respect to this particular

 4    claim, you determined that the war exclusion did not

 5    apply to exclude the loss; right?

 6          A.    I believe so.  Yes.

 7          Q.    And do you recall who the insured was on

 8    this claim?

 9          MR. KEELEY:  I'm going to object.  That's

10    confidential.

11          First of all, do you remember?  Sorry.

12          Do you recall, "yes" or "no"?

13          THE WITNESS:  Yes, I do.

14          MR. KEELEY:  Okay.  We're going to go

15    ahead and --

16          MR. HAYES:  We can designate it

17    confidential.

18          MR. KEELEY:  Yes.  Designate this portion

19    of the transcript as confidential, starting now.

20

21          (Pages 116 through 138 are deemed

22          "Confidential"; under separate cover.)

23

24

25
```

115

1    BY MR. HAYES:

2         Q.   You remember what I just said; right?

3              Other than that claim we just discussed,

4    any other instance in which you were involved in

5    considering a war exclusion in connection with a

6    claim?

7         A.   Not that I can recall.  No.

8         Q.   Has there ever been an instance in which

9    you considered a terrorism exclusion in connection

10   with a claim?

11        A.   I think so.  But I can't -- there was

12   something with the Boston Marathon.

13        Q.   Is that the only one you can recall?

14        A.   Yes.

15        Q.   Was that a case in which the terrorism

16   exclusion that you're thinking of was determined to

17   exclude the loss from coverage?

18        A.   Not that I recall.  No.  I think we paid

19   on that one.

20        Q.   On that one do you recall whether or not

21   there was a terrorism exclusion in the policy at

22   issue?

23        A.   I have no recollection.

24        Q.   But this was one that you were involved in

25   as a claims adjuster?

139

1      A.   Yes.  But honestly, I don't remember if --

2   if we even considered terrorism for that.  I just

3   remember, for some reason when you said it that way,

4   that particular incident popped in my head.

5      Q.   Do you recall what type of policy was at

6   issue?

7      A.   Actually, we did not pay, and that claim

8   closed because I think they actually -- the

9   circumstances were a video truck, like a camera

10  truck, was at the Boston Marathon.  It was close

11  enough that it was a part of the bombing.  And it

12  got confiscated by the FBI.  They wanted us to do

13  everything we possibly could to try and get that

14  back.

15      I actually -- now that I think about it, I

16  think we told them that there may not be coverage,

17  but we never had to get to that point because

18  eventually the FBI provided the truck back to them.

19  I think those are the circumstances of it.  But I

20  can't -- I mean, don't hold me to it.

21      Q.   Other than that claim, were you ever

22  involved at OneBeacon with the consideration of

23  whether a terrorism exclusion applied to a claim?

24      A.   Not that I can recall.

25      Q.   Okay.  With respect -- back to the war

                                                      140

1    exclusion.

2              Are you aware of any instance in which

3    OneBeacon considered the application of a war

4    exclusion to a claim that you were not involved in?

5              So other than this claim that we talked

6    about before related to Exhibit 14, are you aware of

7    any other instance in which OneBeacon has considered

8    the application of a war exclusion to a claim,

9    whether or not you were involved in the process?

10        A.   Well -- and obviously the case that we're

11   dealing with currently.

12        Q.   Other than that one.

13        A.   No.  I do not recall one.

14        Q.   Same question with respect to a terrorism

15   exclusion.

16             Other than the Boston Marathon claim that

17   you just testified about, are you aware of any other

18   claim in which OneBeacon has considered the

19   application of a terrorism exclusion to a claim?

20        A.   No.  Nothing comes to mind.

21        Q.   Okay.  Back to the DIG claim.

22             You testified that OneBeacon did not

23   consult an outside independent insurance adjuster on

24   the DIG claim; correct?

25        A.   Correct.

                                                      141

1      Q.   Why not?

2      A.   The facts of the loss didn't warrant it.

3      Q.   The facts of the loss didn't warrant it?

4      A.   Yes.

5      Q.   Okay.  What about the question whether or

6   not the war exclusion applied?

7      A.   We eventually had a coverage review done

8   by an outside attorney.

9      Q.   Okay.  Putting that to the side.

10          Okay?

11      A.   Yes.

12      Q.   At any point during the process, did you

13   suggest that OneBeacon seek the opinion of an

14   outside insurance adjuster who had applied the war

15   exclusion?

16      A.   No.

17      Q.   Why not?

18      A.   The facts of the loss didn't warrant it.

19      Q.   Okay.  When you say "facts of the loss,"

20   what do you mean?

21      A.   We were initially provided by the broker

22   and the insured an e-mail from the head of security

23   from NBC in Israel.  Based upon that e-mail, as well

24   as the conversation with the broker and the insured,

25   it -- as well as also doing research thereafter,

142

1    there was no need for -- an independent adjuster

2    wouldn't have been -- I use independent adjusters to

3    create estimates and to talk with insureds about

4    their property.  I don't ever use them in a

5    situation like this.

6          Q.   Okay.  You said the facts of the loss

7    didn't warrant it; right?

8          A.   Correct.

9          Q.   Okay.  When you say "facts of the loss,"

10   are you including with that whether or not the loss

11   was caused by a war?

12             MR. KEELEY:  Object.  Vague.

13   BY MR. HAYES:

14         Q.   I'm just asking what you mean.  Because

15   one of the facts of the loss, at least what I'm

16   understanding from you is, what caused the loss;

17   right?  Is that right?

18         A.   Yes and no.  I mean, there's also to

19   the -- I don't use independent adjusters --

20         Q.   Well, that's not my question.

21         A.   -- for coverage.

22             MR. KEELEY:  Let him finish.

23   BY MR. HAYES:

24         Q.   That's -- that's not my question.  I just

25   want to make sure we're on the same page.

                                                    143

1           When you say "facts of the loss," does

2    that include whether or not the loss in this case

3    was caused by a war?

4           A.   I don't understand the question because it

5    doesn't relate to the first question that you asked.

6    I use independent adjusters -- I don't use

7    independent adjusters for -- I've never used an

8    independent adjuster for determining if war was

9    involved.

10          Q.   Well, you said before that the facts of

11   the loss didn't warrant it.  I thought that's what

12   you said; right?

13          A.   That sounds right.  Yes.

14          Q.   Okay.  And all I'm asking is:  Since

15   OneBeacon had never considered, to your knowledge, a

16   war exclusion to -- application of a war exclusion

17   to a claim other than this Thailand case, I want to

18   know if you consider whether or not there was a war

19   that caused this loss, whether or not that's a fact.

20          MR. KEELEY:  Objection.  Vague and

21   ambiguous.

22          THE WITNESS:  This was a war.  I'm not

23   really sure I understand the question.

24   BY MR. HAYES:

25          Q.   Okay.  You didn't need -- let's just cut

                                                        144

1    to the chase.

2              You felt you didn't need to consult

3    anybody on the question of whether or not the loss

4    was caused by a war.

5              MR. KEELEY:  Objection.  Misstates prior

6    testimony.  Is misleading.

7    BY MR. HAYES:

8         Q.   Did you feel at the time you were involved

9    in the review of the DIG claim, did you feel at any

10   time that you needed to consult anybody on the

11   question whether or not the loss was caused by a

12   war?

13        A.   My supervisors.

14        Q.   At one point you felt you needed to

15   consult your supervisors on the question whether or

16   not the loss was caused by a war?

17        A.   I didn't need to consult with them.  They

18   came up with that completely independent of me.

19              I'm sorry.  I think I'm lost in the

20   questioning.  I'm not sure I understand it.

21        Q.   You were involved in the DIG claim; right?

22        A.   Yes.

23        Q.   You did research; right?

24        A.   Yes.

25        Q.   What research did you do?

                                                    145

```
 1        A.   I had conversations with the broker, the
 2   insured, reviewed the e-mail that was sent to us,
 3   looked online at multiple different websites.
 4        Q.   Okay.  At any point during that process,
 5   did you feel the need to consult with somebody else
 6   on the question whether or not the loss was caused
 7   by a war?
 8        A.   I don't remember specific conversations.
 9   But I'm sure I had conversations with Pamela and/or
10   Peter where they described -- I mean, we were all
11   discussing what had we found from our research.
12        Q.   And what had you found from your research?
13        A.   Primarily that this was a war.  Everything
14   that we were seeing showed that there was missiles
15   that were being shot from Palestine into Israel;
16   that a ground offensive was a possibility and
17   eventually, I believe it occurred; that -- that
18   tanks were mobilizing.  I mean, the ground -- the
19   armies were mobilizing at borders.
20        Q.   Why did it matter that there was a ground
21   offensive?
22             MR. KEELEY:  You didn't let him finish his
23   answer.
24             Are you finished with your answer?
25             THE WITNESS:  Yeah.  I guess so.
```

146

1    BY MR. HAYES:

2        Q.   Why did it matter that there was a ground

3    offensive possible?

4        A.   Well, you asked me what -- what research I

5    had done.  That was what we'd found.

6        Q.   Right.  You said that this was a war, and

7    then you started to list the reasons why; right?

8        A.   Why it's a war?

9        Q.   Right.

10       A.   Oh, I was just telling you this is some of

11   the research we'd found.

12       Q.   Right.  Well, what relevance does the fact

13   that there was a ground offensive possible have to

14   this determination of whether or not it's a war?

15       A.   All those constitute a war, to me.

16       Q.   All of what constitute a war to you?

17       A.   All those examples that I lined up after I

18   said this is a war.

19       Q.   Ground offensive; right?

20       A.   (No audible response.)

21       Q.   "Yes"?

22       A.   Correct.  Yes.  Sorry.

23       Q.   Tanks?

24       A.   Yes.

25       Q.   Missiles?

147

```
 1        A.    Strikes.  Yes.

 2        Q.    What else did you say?  I'm sorry?

 3        A.    Armies mobilizing at borders.

 4        Q.    Anything else?

 5        A.    No.  Not off the top of my head.

 6        Q.    All of those are indicia of war; is that

 7   accurate?

 8        A.    I believe so.  Yeah.

 9        Q.    Were you considering any other indicia of

10   war at the time?

11        A.    Can you actually define "indicia."

12        Q.    Were you considering any other facts that

13   might indicate what was going on was a war?

14        A.    Yes.  I'm -- I believe I even saw a

15   website on MSNBC specifically called it a war.

16        Q.    Anything else?

17        A.    Not off the top of my head.

18        Q.    Okay.  So based on all of that research,

19   in your opinion, at the time the DIG claim was made

20   and reviewed by OneBeacon, your opinion was the loss

21   was caused by a war?

22        A.    No.  Not instantaneously.

23        Q.    I didn't say "instantaneously."

24              After you conducted the research before

25   OneBeacon denied the claim, at some point between
```

148

EXHIBIT 16

1    the time you got notice of the claim and OneBeacon's

2    denial, your research led you to believe that the

3    loss was caused by a war.

4         A.   Yes.

5         Q.   Okay.  And you just identified all the

6    reasons why you came to that conclusion; right?

7         A.   Yes.

8         Q.   And can you think of any other reasons?

9         A.   No.

10         Q.   Okay.  And when you came to that

11    conclusion, did you communicate it to somebody?

12         A.   I don't recall.

13         Q.   Did you tell Pamela?  You don't remember

14    if you told Pamela?

15         A.   I don't recall.

16         Q.   Do you remember if you told Peter?

17         A.   I don't recall.

18         Q.   Okay.  Do you remember if you discussed

19    your opinion of whether or not the loss was caused

20    by a war with Pamela or Peter?

21         A.   I don't recall a specific conversation.

22    No.

23         Q.   Okay.  Did you ever consider whether or

24    not Hamas was a sovereign?

25         A.   Did I personally?

                                                        149

1    Q.   Yes.   In your research into whether or not

2    the loss was caused by a war.

3    A.   I don't know if I did or not.

4    Q.   Did you ever consider whether or not Hamas

5    had indicia of sovereignty in that research?

6    A.   Please define "indicia."

7    Q.   Did you ever consider whether Hamas was in

8    any way like a sovereign nation in that research?

9    A.   I did not.

10   Q.   Why not?

11   A.   My involvement in this claim was it was

12   assigned to me.   But eventually this claim was

13   almost dealt with primarily by Pam- -- by Pamela.

14   And so that type of research would have been handled

15   at that point by her.

16   Q.   Did you ever seek to determine in your

17   research whether or not Hamas was a terrorist

18   organization?

19   A.   I don't recall.

20   Q.   Did you ever seek to determine in your

21   research whether the loss at issue was caused by

22   terrorism?

23   A.   I don't recall.

24   Q.   Did anybody at OneBeacon ever seek to

25   determine whether the loss at issue in connection

150

```
 1    with the DIG claim was caused by terrorism?
 2              MR. KEELEY:  Objection.  Speculation.
 3    BY MR. HAYES:
 4         Q.   If you know.
 5         A.   We eventually had a conversation with the
 6    broker and the insured a few days later where they
 7    said they disagreed with -- in our conversation we
 8    had told them, meaning Pamela had told them, that
 9    the war exclusion could potentially apply.  They
10    brought up that they disagreed with it because
11    Hamas -- their -- in their opinion, Hamas was not a
12    sovereign state.  And so at that point I'm sure
13    research was done by Pamela.
14         Q.   After that conversation did you -- did you
15    do any research into whether or not Hamas was a
16    sovereign state?
17         A.   I don't recall.
18         Q.   Did you do any research into whether or
19    not Hamas had things about it that were similar to a
20    sovereign state?
21         A.   I don't recall.
22         Q.   Did you do any research into whether or
23    not Hamas was a terrorist organization after this
24    call that you just described?
25         A.   Any time after this call or during this
```

151

Video Deposition

1   time period up until litigation that we're still in?

2      Q.   That time period.

3      A.   Okay.  I don't recall.

4      Q.   Is Hamas a terrorist organization?

5           MR. KEELEY:  Objection.  Calls for a legal

6   conclusion.

7           THE WITNESS:  Are you asking my opinion?

8   BY MR. HAYES:

9      Q.   Yes.

10     A.   They perform terrorist acts.  But they

11  certainly also have aspects of them that are very

12  sovereign, as sovereign states.  I know that they

13  govern up to 1.7 million people.  They have a

14  welfare section.  They have their own military.  So

15  I would certainly say that they -- I actually think

16  that they won votes in the Parliament, I think, in

17  like, the mid-2000s.  So I definitely feel that

18  they're a sovereign state, if not a government.

19     Q.   Where did you learn that?

20     A.   Wikipedia.

21     Q.   When?

22     A.   I don't remember when I learned it.

23     Q.   Was it in between the time you received

24  notice of the DIG claim and that claim was denied?

25     A.   I don't recall.

                                                    152

1    Q.   Could it have been?

2    A.   I don't recall.

3    Q.   So you might are done research into

4    whether or not Hamas was a sovereign at the time?

5    A.   Potentially, yes.

6    Q.   Okay.  And if you did, would you have

7    taken notes?

8    A.   Potentially, yes.

9    Q.   Okay.  So is it -- I want to make sure I

10   get your best recollection.

11        I thought you said that research into

12   questions over whether or not Hamas was a sovereign

13   or whether or not war required a sovereign party or

14   sovereign parties, that was done by Pamela, not you?

15   A.   At that time period, I don't recall doing

16   it.

17   Q.   Okay.  So at that time period, between the

18   time you received notice of the DIG claim and the

19   time it was denied, do you recall doing any research

20   into whether or not war required a dispute and

21   conflict between sovereign nations?

22   A.   I don't recall.

23   Q.   Do you recall doing any research into

24   whether or not the acts that caused the loss in this

25   case were terrorist acts?

153

```
 1        A.   I don't recall.
 2        Q.   Do you recall doing any research into
 3   whether or not Hamas was a terrorist organization?
 4        A.   I don't recall.
 5        Q.   Do you recall whether or not anybody at
 6   OneBeacon did any such research?
 7        A.   Again, I'm sure as soon as we had that
 8   conversation and they brought it up, that would have
 9   been a time when we went back and started looking at
10   what they were talking about, if not before then.
11        Q.   Would have been.
12             But do you have any personal knowledge of
13   anybody at OneBeacon doing any research into whether
14   or not war requires a conflict between two
15   sovereigns?
16        A.   I don't.  No.
17        Q.   Do you have any personal knowledge of
18   anybody at OneBeacon doing any research under the
19   question whether the acts that caused the loss at
20   issue in this case were acts of terrorism?
21        A.   I don't know.
22        Q.   Do you have any personal knowledge
23   regarding whether or not anybody at OneBeacon did
24   any research into the question whether or not Hamas
25   is a terrorist organization?
```

154

```
 1        A.   I don't know.
 2        Q.   At the time of the DIG claim, what was
 3   your opinion as to whether or not Hamas was a
 4   terrorist organization?
 5        A.   I don't know if I had one.
 6             THE VIDEOGRAPHER:  10 minutes, please.
 7             MR. HAYES:  Okay.  We can -- we've got
 8   about five more minutes, and then we can break, just
 9   to wrap --
10             MR. KEELEY:  For the day?
11             MR. HAYES:  No.  It never fails.  I always
12   get that question when I say something like that.
13   But I keep saying it.
14        Q.   What was your role, again, in connection
15   with the adjusting of the DIG claim?
16        A.   It initially came to me.  Pamela and I had
17   a conversation with the broker and the insured,
18   doing research online, sending that research back
19   and forth between Pamela and I, as well as Peter, I
20   believe; having another conversation thereafter.
21   But ultimate decisions of coverage were done by
22   Pamela.
23        Q.   Were you responsible for determining
24   coverage?
25        A.   In certain claims, yes.
```

155

1            Are you asking about this particular
2    claim?
3        Q.   I'm asking about the DIG claim.
4            Were you responsible for determining
5    coverage?
6        A.   No.
7        Q.   Not at all?
8        A.   No.
9        Q.   I want you to think of the entire tenure
10   at OneBeacon, your entire tenure at OneBeacon.  Put
11   the one -- put the DIG claim to one side.
12           Has there ever been another claim that
13   you've worked on where you were not responsible for
14   determining coverage?
15       A.   Yes.
16       Q.   How many?
17       A.   Whenever coverage was denied, it always
18   was run by my supervisors.  If there was ones where
19   coverage was in question, then that would be run by
20   my supervisors as well.  I have no idea how many
21   that entails.
22       Q.   Okay.  But in all circumstances you came
23   to a conclusion as to what you would do with respect
24   to the coverage question.
25       A.   Yes.

156

1       Q.    Including the DIG claim.

2       A.    Yes.

3       Q.    Okay.  And your recommendation in

4    connection with the DIG claim at the time it was

5    made and prior to its ultimate denial was that it

6    should be denied because it's excluded by the war

7    exclusion?

8             MR. KEELEY:  Objection.  Misstates prior

9    testimony.

10            THE WITNESS:  I had been working there for

11   around a year at that point.  I completely defaulted

12   to my supervisor and Peter, who had significantly

13   more experience than I did.  I don't think I ever --

14   I certainly didn't give a recommendation.  It was

15   just my own thought process, this seems like a war.

16      Q.    You expressed that opinion?

17      A.    I don't recall if I did or did not.

18      Q.    Okay.  Has there ever been another case in

19   which you did not express your opinion on coverage,

20   ever another claim?

21      A.    That I was involved in?

22      Q.    Yeah.

23            MR. KEELEY:  Object to the question as

24   being misleading, misstating testimony.

25            Go ahead.

                                                        157

```
 1              THE WITNESS:  Not that comes to mind, no.
 2   BY MR. HAYES:
 3        Q.   Okay.  I want you to look back at
 4   Exhibit 13.
 5              You say in your summary job description
 6   that, quote:
 7              "I and the adjuster are responsible for
 8         determining coverage, investigating the cause
 9         of loss and ultimately either paying or denying
10         the claim."
11              Do you see that?
12        A.   Yes.
13        Q.   Is that a correct statement?
14        A.   It depends on the claim.  But, yes.
15        Q.   Well, is it correct with respect to the
16   DIG claim?
17        A.   No.
18        Q.   Is it correct -- is it incorrect with
19   respect to any other claim?
20              MR. KEELEY:  Objection.  Misleading.
21              THE WITNESS:  I'm sorry.  What was the
22   question again?
23   BY MR. HAYES:
24        Q.   I understand your testimony to be that
25   this statement, "I am the adjuster responsible for
```

158

1    determining coverage, investigating the cause of

2    loss and ultimately either paying or denying the

3    claim," is not correct with respect to the DIG

4    claim.

5         A.   That's correct.

6         Q.   Is that statement not correct with respect

7    to any other claim?

8              MR. KEELEY:  Objection.  Misleading.

9              THE WITNESS:  The word "ultimately" for

10   denying claims, because, in the end, my supervisors

11   were the ones that agree or disagree with my

12   assessment.

13   BY MR. HAYES:

14        Q.   Okay.  So the word "ultimately" should be

15   taken out.

16             That's not correct with respect to any

17   claim?

18        A.   Not with any claim.  It -- just certain

19   claims.  When it involves denying the claim, the

20   ultimate decision of agreement or disagreement with

21   my determination is made by my supervisors.

22        Q.   In all cases in which a claim is denied?

23        A.   Yes.

24        Q.   Okay.  And the statement, "I am the

25   adjuster responsible for determining coverage," is

159

```
 1    that incorrect in the context of any claim other
 2    than the DIG claim?
 3              MR. KEELEY:  Objection.  Misleading.
 4    BY MR. HAYES:
 5         Q.   Is it correct in the context of the DIG
 6    claim?
 7         A.   It is not correct in the . . . . . .
 8              MR. KEELEY:  Objection.  Misleading.
 9    BY MR. HAYES:
10         Q.   Is the statement, "I am the adjuster
11    responsible for determining coverage," correct in
12    connection with the DIG claim?
13         A.   It is not correct.
14         Q.   Is the statement, "I am the adjuster
15    responsible for determining coverage," not correct
16    in connection with any claim other than the DIG
17    claim?
18              MR. KEELEY:  Objection.  Misleading.
19              THE WITNESS:  Is there any way to say it
20    without so many negatives?
21    BY MR. HAYES:
22         Q.   Is that a correct statement with respect
23    to every claim other than the DIG claim?
24         A.   No.
25         Q.   Okay.  Which other claims is it incorrect
```

160

1    with respect to?

2         A.   Actually, I help in the determination of

3    coverage.  So, yes, I help in the determination of

4    coverage.

5         Q.   You help in the determination of coverage

6    in every claim?

7         A.   That I'm involved in where it wasn't --

8    what was the word you used earlier? -- inherited and

9    not including this claim, off the top of my head,

10   yes, I help in the determination of coverage.

11        Q.   Well, did you help in the determination of

12   coverage in connection with the DIG claim?

13        A.   I don't remember if I had conversation --

14   well, yes, because we were sending each other back

15   and forth the articles which helped in the process

16   of determining if there was coverage or not.

17        Q.   Did you do anything else to help in the

18   determination of coverage?

19        A.   I reviewed the policy.

20        Q.   Did you render your opinion based on your

21   review of the policy?

22        A.   I don't recall if I did or not.

23        Q.   Did you do anything else other than review

24   the policy and circulate website links?

25             MR. KEELEY:  Objection.  Asked and

161

```
 1   answered.

 2            THE VIDEOGRAPHER:  Three minutes, please.

 3            THE WITNESS:  I do not recall if I did or

 4   did not.

 5            MR. HAYES:  Okay.  I think we can break.

 6            THE VIDEOGRAPHER:  This is the end of

 7   Media 2.

 8            Off record, 1303.

 9

10            (At 1:03 p.m. a luncheon recess was

11            taken, the proceedings to be resumed at

12            1:45 p.m.)

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /
```

162

EXHIBIT 16

```
 1                    AFTERNOON SESSION

 2

 3            (At 1:59 p.m. the proceedings

 4            were resumed at the same place.)

 5

 6                  EXAMINATION (Resumed)

 7

 8            THE VIDEOGRAPHER:  Back on record.

 9    Commencing Media 3 of the deposition of Daniel

10    Gutterman.  On record at 1359.

11

12                      EXAMINATION

13    BY MR. HAYES:

14        Q.   Mr. Gutterman, this morning we talked

15    about your position as senior entertainment claims

16    investigator at OneBeacon.

17        A.   Yes.

18        Q.   And you testified that that's the only

19    position you've ever held at OneBeacon.

20        A.   Yes.

21        Q.   And you've testified with respect to your

22    duties and responsibilities as senior entertainment

23    claims investigator, they've evolved over your

24    tenure such that you've gained more responsibility

25    as you've gained experience.
```

163

```
 1              Is that generally correct?
 2       A.    Yes.
 3       Q.    But in other respects, in terms of your
 4  process, the process that you apply to a claim when
 5  it comes in, that has remained the same?
 6       A.    Relatively, yes.
 7       Q.    In what ways has it changed since you
 8  began?
 9       A.    Just the more complex the claim -- yes.
10  It's basically exactly the same.
11       Q.    But as you were beginning to say, the more
12  complex the claim, the more you rely on your
13  supervisors; is that accurate?
14       A.    Actually, it's probably the reverse, I
15  would say, in terms of -- of coverage determination
16  and stuff like that, it's still ultimately done by
17  my supervisors with my -- but I would say initially
18  it was just me saying this what I think it is, and
19  Pamela and Peter, they're either agreeing or
20  disagreeing and then ultimately making their
21  decisions.
22              I mean, it's still the same.  Obviously
23  it's just different people.  But, yeah, it's
24  relatively the same.
25       Q.    And I wasn't -- strike that.
```

164

Video Deposition

```
 1           You saying what you think it is and Pamela
 2  and Peter either agreeing or disagreeing, when you
 3  say "me saying what I think it is," are you
 4  referring to whether or not there's coverage?
 5      A.   Typically, yes.
 6      Q.   Okay.  And was that the approach you took
 7  in connection with the DIG claim?
 8      A.   I --
 9           MR. KEELEY:  Objection.  Asked and
10  answered.  Vague.
11           THE WITNESS:  I don't recall ever having a
12  conversation where I brought up to them what my
13  ultimate thought was about coverage.
14  BY MR. HAYES:
15      A.   Okay.  Did you ever take notes on what
16  your ultimate thoughts were on coverage in
17  connection with the DIG claim?
18      A.   Not that I can remember.
19      Q.   Okay.  And in as much detail as possible,
20  I want you to --
21      A.   Actually, let me take that back.
22           Are you asking handwritten ones?  I'm
23  sorry I interrupted you.  I apologize.
24      Q.   That's totally fine.  And I'm glad you
25  did.  If there's -- remember what I said at the
```

165

Video Deposition

```
 1   beginning.  If there is anything you feel is

 2   unclear --

 3        A.    Yes.

 4        Q.    -- let me know, and you did.  Thank you.

 5              No.  I'm saying any notes, typewritten

 6   notes, handwritten notes, if --

 7        A.    Potentially --

 8        Q.    -- you have a voice recorder,

 9   voice-recorded notes, any notes in the world that

10   you took regarding your opinion as to coverage in

11   connection with the DIG claim?

12        A.    Oh.  In regards to coverage?  I know I

13   definitely had notes that were typed up.  But they

14   were, I believe, ultimate -- I think you guys

15   probably have them.

16        Q.    Anything other than notes that you typed

17   up?

18        A.    Not that I can recall, no.

19        Q.    Okay.

20        A.    And I apologize again for interrupting

21   you.

22        Q.    It's no problem.

23              I want to talk about your process in more

24   detail.

25              When you -- and this is -- my questions
```

166

Video Deposition

```
1    pertain to your entire tenure at OneBeacon.  If you
2    need to qualify your answer based on the timing, let
3    me know.
4              When you receive a claim, walk me through
5    your process in adjusting that claim.  What do you
6    do?
7         A.   It depends on the type of claim.
8         Q.   Okay.  Why does it depend on the type of
9    claim?
10        A.   The people that would be discuss- -- I
11   would be discussing it with could change, in terms
12   of how many and positions involved; what type of
13   research would be done online, if any; what is
14   necessary in terms of documentation.  So whether --
15   if it's something that's a stolen item, it would be
16   meaning going for a police report.  Obviously, there
17   would be no police report in a situation where an
18   actor got sick.
19        Q.   Okay.  As a matter of general practice,
20   you receive a claim, and it's assigned to you.
21             Who assigns you claims?
22        A.   It's done through -- through Canton where
23   we were talking about before.
24        Q.   Okay.
25        A.   But I handle primarily a group of types of
```

167

EXHIBIT 16

1    claims that really nobody else does besides my

2    supervisors.  So I deal with extra expense claims.

3    I deal with faulty stock claims, miscellaneous

4    claims, primarily first-party claims and then the --

5    and then as well as third-party property damage in

6    the entertainment section.

7         Q.   So is it your testimony that you deal with

8    first-party extra expense claims in the

9    entertainment space; is that correct?

10        A.   Yes.

11        Q.   Does anybody else at OneBeacon deal in --

12   strike that.

13             Does anybody else at OneBeacon adjust

14   those kinds of claims?

15        A.   Occasionally.  Yes.

16        Q.   Who?

17        A.   Well, my supervisors potentially.

18        Q.   Pamela and --

19        A.   No.  Not anymore.  At that time period,

20   yes.

21        Q.   Remember I'm talking about the entire

22   tenure that you were at OneBeacon.

23        A.   So I apologize.  So, yes.

24        Q.   So let's back up.

25             We're talking about first-party claims in

                                                       168

1    the entertainment space, specifically extra expense

2    claims.

3              Okay?

4         A.   Okay.

5         Q.   Like the one at issue in the DIG claim;

6    right?

7         A.   Okay.

8         Q.   You testified that you're one of the

9    people at OneBeacon who adjusts those claims; right?

10        A.   Yes.

11        Q.   And that's true for your entire tenure?

12        A.   Yes.

13        Q.   Okay.  Who else?

14        A.   Pamela Johnson.

15        Q.   Anyone else?

16        A.   No.  Not that I can think of.  Up until

17   she was at OneBeacon.  Once she was no longer with

18   the company, it was primarily me and Steve Baltzell,

19   or is primarily me and Steve Baltzell.

20        Q.   So if I were to define the universe of

21   people at OneBeacon who adjust first-party extra

22   expense claims in the entertainment space for the

23   time period starting when you began at OneBeacon

24   until today, that universe is you, Pamela Johnson,

25   and Steve Baltzell?

169

1      A.   Correct.  I've actually -- I've remembered

2  also Theresa Gooley was involved in claims that --

3  in -- that were extra expense claims as well.  And

4  Peter certainly was always there to help us.

5      Q.   What does that mean, "always there to help

6  us"?

7      A.   He had 30 years of claims experience.  So

8  we certainly used him as a sounding board.

9      Q.   So we've got you, Pamela Johnson, Steve

10  Baltzell, Theresa Gooley, Peter Williams.

11          Anybody else?

12      A.   Currently Aaron Stone.

13      Q.   Aaron Stone?

14      A.   Yep.

15      Q.   Okay.  Anyone else?

16          By the way is that Aaron with an "A" or an

17  "E"?

18      A.   Two As.

19      Q.   Okay.

20      A.   There's people that are involved in it

21  in -- in regards to if a claim goes beyond people's

22  authorities monetarily, where they'd have to sign

23  off for something, along those lines, but I can't

24  think of what their names are off the top.  They're

25  much higher than I am.  They're multiple levels

170

1    above me.

2         Q.   Okay.  So the claim comes in.  It's

3    assigned to you from -- did you say from Canton?

4         A.   Yes.

5         Q.   Is there a person in Canton that assigns

6    you the claim, or it just comes, like, automatic

7    from an anonymous e-mail address?

8         A.   It actually just -- we have this system

9    called CWS, and I check it every so often throughout

10   the course of the day.  And all of a sudden I'll

11   have a new claim up there.

12        Q.   Okay.  So you get a claim.

13        A.   Yes.

14        Q.   What's the first thing you do?

15        A.   Open up all the different attachments that

16   are related to it, whether that's -- again,

17   depending on the particular type of claim, police

18   reports.  The first notice of loss usually is

19   involved, which is from a broker, which is inclu- --

20   which is usually filled out by the insured.

21             I look at any pictures that I've been

22   provided, I look at any spreadsheets, and then

23   typically either make a phone call or an e-mail to

24   whoever the first point of contact is.

25        Q.   First point of contact for the insured?

                                                          171

```
 1        A.   If that's the person that was the person
 2   that brought us the claim.  Yes.
 3        Q.   Or a broker?
 4        A.   Yes.
 5        Q.   Anybody else you would contact first
 6   besides the insured or a broker?
 7        A.   If -- if there was a vendor that was the
 8   one that was complaining about not being paid and
 9   they had gotten -- they had been -- they had
10   received a certificate of insurance from one of our
11   insureds, that would be who I would speak with.
12        Q.   Would you read the policy?
13        A.   Eventually.  But typically I would start
14   with getting the facts of loss.
15        Q.   Okay.  What would you do if you had a
16   question about the scope of coverage?
17        A.   Usually I discuss it with my supervisors
18   and then discuss it with the underwriters to see
19   what their intent was.  And then depending on where
20   we go from there, discussing it with the brokers and
21   ultimately discussing it with the insureds,
22   assuming, of course, we already have facts of loss
23   and we know that there's certainly a question that
24   coverage is not -- that an exclusion could
25   potentially apply.
```

172

1    Q.   You said discuss with the insured.

2         What would you discuss with the insured

3    regard- -- regarding the coverage, the scope of

4    coverage?

5    A.   Oh.  Typically I would discuss it with the

6    broker first.  And then if they were okay with me

7    bringing up that I thought there was a potential

8    exclusion, I would bring that up to the insured.

9    Q.   But aside from bringing it up to the

10   insured, would you ask the insured what their

11   understanding of the coverage part is or was?

12   A.   I don't know if I would put it that way.

13   I would bring it up to the broker and say, "This is

14   our concerns."  If they agreed with it, then I would

15   bring it up -- if they wanted me to, to bring it up

16   to the insured and discuss it with the insured and

17   say, "These -- this coverage is concerning to us.

18   Either speak some more to your broker or try and

19   clarify."

20   Q.   Okay.  So part of the discussion with the

21   insured is, "How do you interpret -- interpret

22   coverage?"

23        Is that accurate?

24        MR. KEELEY:  Objection.  Misstates

25   testimony.

173

```
 1              THE WITNESS:  No.
 2    BY MR. HAYES:
 3         Q.   Part of the discussion with the insured
 4    is, "Why do you think there's coverage?"
 5              Is that accurate?
 6         A.   No.
 7         Q.   Okay.
 8         A.   Not necessarily.  I mean, again, sometimes
 9    the insureds understand that there is an issue, and
10    then there's other times when the insureds just
11    don't -- don't get it.  And then you say, "Okay.
12    Well, explain to me."
13              So, yes, occasionally there will be times
14    when I've brought up, "Okay.  Explain to me more do
15    why you believe that there's coverage for this."
16         Q.   Okay.  And if it's a situation where you
17    say, "Why do you believe there is coverage for
18    this," what do you do with the information they give
19    you?
20         A.   Review the policy again to see how we
21    determine -- basically, redo everything I did the
22    first time around.  Again, speak with my
23    supervisors, speak with the underwriters, and then
24    speak again with the broker.
25              We really want to find coverage.  I mean,
```

                                                            174

```
 1    that's -- I was taught that from Peter and from
 2    Pamela over and over and over again.  So if we can
 3    find it, we'll do so.  We want people to -- we want
 4    to find coverage.
 5         Q.   Is that one of the things that you are
 6    taught in the continuing education that you
 7    participate in for your Florida license?
 8         A.   Not in those words.  I mean, this is --
 9    this is word for word what I was told by Peter and
10    Pamela.  I mean, that's where it came from.
11         Q.   "Word for word," you're referring to your
12    statement that "we really want to find coverage"?
13         A.   That's what -- yeah.  We don't want to
14    deny claims unless we have to.
15         Q.   So if finding coverage is your objective
16    in every case, how do you go about achieving that
17    objective?
18         A.   Look through every aspect of the policy,
19    make sure that there's no other -- other policies
20    that are out there, see if any other coverage could
21    potentially apply, see if there's any endorsements
22    that are out there that we didn't necessarily know
23    about; and, again, speaking with the underwriters.
24    Maybe there's things that we missed.
25              And when I said "word for word," I meant
```

175

Video Deposition

```
 1  that colloquially.  I don't know if they -- again,
 2  it's been three years.  But it was -- always the
 3  basis was, you -- your goal is to try and find
 4  coverage.
 5       Q.   That was from the moment you stepped in at
 6  OneBeacon; right?
 7       A.   I mean, not the moment I stepped in.  But,
 8  like, within days of being there.  I don't remember
 9  the exact time period.
10       Q.   And was that message given to you in any
11  kind of formal training, or was that just word
12  around the office, or both?
13       A.   I don't remember if there was a formal
14  training for it.  That was just given to me by,
15  again, Peter and Pamela.
16       Q.   In their capacity as your mentor?
17       A.   Yes.
18       Q.   Did you have any kind of, like,
19  on-boarding when you joined OneBeacon?  Let me know
20  if you know what I mean or you think you know what I
21  mean.
22            MR. KEELEY:  Objection.  Vague.
23            MR. HAYES:  I'll withdraw that.
24       Q.   Do you have any understanding of what
25  "on-boarding" means in the context of a new hire at
```

176

1    a company?

2        A.    No.

3        Q.    Did you have any kind of initial training

4    at OneBeacon?

5        A.    When I very first started, they flew me up

6    to Denver, and I was -- I was informally trained by

7    their property -- their lead property adjuster up

8    there, just reviewing their types of policies,

9    stuff -- I don't remember specifically.  I don't

10   remember any true formal training.  No.

11       Q.    Anything else that you can think of that

12   you do to try to find coverage when a claim comes

13   in?

14       A.    Well, sometimes it's just so obvious.  But

15   other times it's not.  I mean, again, it's really --

16   it's -- it's trying to interpret what the policy

17   reads.  And if -- if that's beneficial to the

18   insured, great.  But there's times when it's not.

19       Q.    So when you say there's some times when

20   it's obvious, you mean there's some times when it's

21   obvious that there's coverage?

22       A.    Yes.

23       Q.    Those are the easy cases?

24       A.    Yes.

25       Q.    And I'm assuming you would say sometimes

177

1   it's obvious that there's not coverage, and those

2   are, unfortunately, easy cases, too; is that

3   correct?

4        A.   I don't think I've ever had a coverage

5   denial that was obvious.

6        Q.   Okay.  Is that because it's your goal and

7   OneBeacon's goal to find coverage in every case?

8        A.   Yes.  I believe so.

9        Q.   Okay.  So in the cases where it's not

10  obvious that there's coverage, which is all of the

11  other cases, what do you do when you can interpret

12  the policy one way and include it under the coverage

13  provision or another way and exclude it?

14            MR. KEELEY:  Objection.  Vague.

15  BY MR. HAYES:

16       Q.   And there's two possible interpretations

17  of an insurance policy.  And one interpretation

18  means the loss is covered, and the other means it's

19  not covered.

20            What do you do?

21            MR. KEELEY:  Objection.  Vague.

22  BY MR. HAYES:

23       Q.   When both of those interpretations are

24  reasonable.

25            MR. KEELEY:  Same objection.  Ambiguous.

178

1           THE WITNESS:  Your question reminded me

2     that we also have claims legal involved.  So I want

3     to incorporate them to the people that you were

4     asking me about who's involved in our claims,

5     entertainment claims.

6           So that's when conversations are had

7     internally amongst supervisors.  And then higher and

8     higher up, and then claims legal takes a look at it.

9     And then in this case we also had outside counsel

10    review it.

11    BY MR. HAYES:

12         Q.   Who is claims legal?

13         A.   A department that -- our legal claims

14    department.

15         Q.   That's not Pamela Johnson, though, is it?

16         A.   No, it is not.

17         Q.   Pamela Johnson is a lawyer --

18         A.   Correct.

19         Q.   -- as I understand it?

20         A.   I believe so.  Yes.

21         Q.   When Pamela Johnson was your supervisor,

22    where did she live?

23         A.   Minnesota.

24         Q.   Okay.  Do you know whether or not she was

25    licensed to practice in Minnesota?

                                                          179

```
 1          A.    I have no idea.

 2          Q.    Okay.  When you work with Pamela Johnson

 3    on a claim, what's your understanding of the working

 4    relationship?  Are you seeking her legal advice?

 5          A.    I'm seeking her supervisory advice.

 6          Q.    Are you seeking her legal advice?

 7          A.    I never thought of it that way.  No.

 8          Q.    Okay.  So in your effort to find coverage,

 9    do you ever do any research?

10          A.    In what regards?

11          Q.    Any -- any regard.  Any research that you

12    think might help the case for the insured.

13          A.    Beyond reviewing the policy?

14          Q.    Yes.  Like Internet research, for example.

15          A.    Nothing is popping in my head.  I don't

16    know.

17          Q.    But if the goal is to find coverage and

18    you thought you could find something on the Internet

19    that might support the claim for coverage, would you

20    do it consistent with that objective?

21          A.    Would I?

22          Q.    Yes.

23                MR. KEELEY:  Objection.  Vague.

24    BY MR. HAYES:

25          Q.    What you said was, "We really want to find
```

180

1    coverage"; right?

2         A.   If -- if it helped, yes, I would look

3    online.

4         Q.   If you thought it would help to look

5    online for evidence supporting the insured's

6    position, you would do it?

7         A.   Yes.

8         Q.   Okay.  How about consultation with an

9    expert, outside expert?  If you thought consultation

10   with an outside expert would help locate evidence or

11   argument that would support an insured's claim for

12   coverage, would you do it?

13             MR. KEELEY:  Objection.  Calls for

14   speculation.  Vague.

15   BY MR. HAYES:

16        Q.   Would you consult an expert to help

17   support the insured's position?

18             MR. KEELEY:  Same objections.

19             THE WITNESS:  Just depends on the claim.

20   I mean --

21   BY MR. HAYES:

22        Q.   Sir -- go ahead.  Sorry.

23             MR. KEELEY:  Go ahead and finish your

24   answer.

25             THE WITNESS:  Really, that's it.  It

                                                    181

Video Deposition

```
 1    really just depends on the claim.  That's not really

 2    anything that's come up before.

 3              But would I do it?  Sure.

 4    BY MR. HAYES:

 5        Q.   So remember, we've got two categories

 6    here.  At least this is my understanding.  You've

 7    got the instances in which coverage is clear.  Those

 8    are easy.  Then you've got the instances where

 9    there's an issue.  Those are never easy because

10    you're always trying to find coverage.

11        A.   Correct.

12        Q.   Okay.  So I'm talking about that second

13    group, the ones that aren't easy, where the coverage

14    isn't clear.

15              If you thought consultation with an expert

16    would help tip the scales in favor of coverage,

17    would you seek that consultation?

18              MR. KEELEY:  Objection.  Vague.  Calls for

19    speculation.

20    BY MR. HAYES:

21        Q.   I'm just asking what you would do.

22              MR. KEELEY:  Same objection.

23              THE WITNESS:  It was done in this claim.

24    BY MR. HAYES:

25        Q.   No.  No.  No.  I'm just asking what you
```

182

1    would do generally.

2         A.   I would discuss it with my supervisors.

3    And if they believed that that was the best course

4    of action, then that's where we would go.

5         Q.   And you said it was done in this claim.

6              What do you mean?

7         A.   We went to outside counsel to have them

8    review the coverage.

9         Q.   The DIG claim?

10        A.   Yes.

11        Q.   But you didn't go to an independent

12   adjuster who had considered the war exclusion in the

13   context of a claim; right?

14        A.   That's correct.

15        Q.   And other than that one Thailand claim,

16   you're not aware of any claim at OneBeacon handled

17   by anybody that involved the war exclusion; right?

18        A.   I do not know of any of those.

19        Q.   Okay.  What would you do today if you

20   received a claim that implicated the war exclusion?

21   Would you seek an independent opinion from an

22   adjuster who had dealt with the war exclusion in the

23   past?

24             MR. KEELEY:  Objection.  Lack of

25   foundation.  Calls for speculation.  Vague.

183

```
 1               THE WITNESS:  It depends on the claim.
 2   BY MR. HAYES:
 3        Q.   It's a claim that implicates the war
 4   exclusion.
 5               MR. KEELEY:  Same objections.
 6   BY MR. HAYES:
 7        Q.   And it's not clear that it's covered.
 8               MR. KEELEY:  Same objections.
 9               THE WITNESS:  I can only use this one
10   claim as an example.  And the research that we did
11   and the parties that we involved in it I believe
12   were correctly done.
13   BY MR. HAYES:
14        Q.   Okay.  So if the DIG claim happened today,
15   you would not seek the advice of an independent
16   adjuster who had dealt with a war exclusion in the
17   context of another claim?
18               MR. KEELEY:  Objection.  Calls for
19   speculation.  Vague.
20               THE WITNESS:  No.
21   BY MR. HAYES:
22        Q.   Why not?
23        A.   I think it goes all the way back to your
24   question hours ago, which was I don't think -- the
25   determination was correct.  And so it doesn't --
```

184

1    it's not -- that wasn't necessary.

2         Q.   What --

3              MR. KEELEY:   Excuse me just a second.
This shut off.

5              It's back.   Sorry.

6    BY MR. HAYES:

7         Q.   Which category would you put the DIG claim

8    in?  The "coverage is obvious category" or "it's

9    questionable" category?

10        A.   It was -- it was -- it was complex.

11        Q.   Which category is that?

12        A.   It was difficult.

13        Q.   So it's in the category of "coverage isn't

14   clear, so it's not an easy case"; right?

15        A.   I don't think that's what I said

16   initially.  Any time we're going potentially to deny

17   a claim, it's always complicated.

18        Q.   Okay.  So that's the category the DIG

19   claim is in?

20        A.   Yes.

21        Q.   The "always complicated" category; right?

22        A.   Yes.

23        Q.   Sitting here today, if you thought the

24   opinion of an outside independent insurance adjuster

25   who had dealt with a war exclusion in the past might

                                                    185

1    tip the scales in favor of coverage on the DIG

2    claim, would you seek such opinion?

3            MR. KEELEY:  Objection.  Calls for

4    speculation.  Lack of foundation.  Vague.

5            THE WITNESS:  It's such a random

6    hypothetical.  I don't know.  I don't . . . . . .

7    I -- again, I think what it comes down to is that

8    what we did for this claim was correctly done.

9    BY MR. HAYES:

10       Q.   But if you received that -- if that DIG

11   claim fell in your lap today, the same, exact claim,

12   you would not think to seek the opinion of an

13   adjuster who had dealt with a war exclusion in the

14   past?

15           MR. KEELEY:  Objection.  Asked and

16   answered.

17   BY MR. HAYES:

18       Q.   That's just "yes" or "no."  I'm not asking

19   whether or not what you think what you did was

20   correct -- and maybe by implication you're answering

21   my question -- but I'd like it to be clear for the

22   record.

23           If you got the DIG claim today, would you

24   seek the consultation of an independent insurance

25   adjuster who had experience with applying the war

186

```
 1    exclusion to determine whether you could tip the
 2    scales in favor of coverage?
 3             MR. KEELEY:  Objection.  Calls for
 4    speculation.  Misleading.  Asked and answered.
 5             THE WITNESS:  I don't know what we would
 6    do in that instance.  Again, I think it's important
 7    to reiterate for -- I know we're playing
 8    hypothetical of what's going to happen with a
 9    brand-new claim that you're talking about --
10    actually, I don't -- I think we would probably
11    replicate exactly what we did the last time around.
12    BY MR. HAYES:
13        Q.   What would you do, though?  And I don't
14    want you to speculate what Pamela would do or what
15    Peter would do at this point.  What would you do if
16    it was up to you?
17             MR. KEELEY:  He just answered that.
18             THE WITNESS:  I think we would replicate
19    it exactly as we did.
20    BY MR. HAYES:
21        Q.   You would not recommend seeking that
22    opinion?
23             MR. KEELEY:  Object.  Calls for
24    speculation.
25             THE WITNESS:  I just don't know what this
```

187

Video Deposition

```
 1   adjuster would do versus what our coverage counsel
 2   did and what we did internally.
 3   BY MR. HAYES:
 4        Q.   But isn't the best way to find out what
 5   that adjuster with experience would do to contact
 6   the adjuster and ask them?
 7             MR. KEELEY:  Objection.  Argumentative.
 8   Calls for speculation.  Lack of foundation.
 9   Misleading.
10             THE WITNESS:  I -- I don't know what I
11   would do in that instance.
12   BY MR. HAYES:
13        Q.   Okay.  But to your recollection, that idea
14   never came up in any of the meetings, in any of the
15   e-mail correspondence?  And by that idea I mean,
16   "Let's go see if we can find an insurance adjuster
17   in-house or outside that has dealt with the war
18   exclusion."  That wasn't discussed, to your
19   recollection?
20        A.   No.  It was not.
21        Q.   And do you have any understanding as to
22   why it wasn't?
23        A.   No.
24             MR. KEELEY:  You know what?  I need to
25   take a short break, unless you're --
```

188

```
 1              MR. HAYES:  I just -- can I --

 2              MR. KEELEY:  If you're right on -- I don't

 3   want to stop your thought.

 4              MR. HAYES:  Actually, that's -- that

 5   happens to be a fine, perfect time to break.

 6              MR. KEELEY:  Okay.  Thanks --

 7              THE VIDEOGRAPHER:  Off record, 1432.

 8          (Recess from 2:32 p.m. to 2:41 p.m.)

 9              THE VIDEOGRAPHER:  On record at 1449 --

10   41.

11              MR. HAYES:  15 is next?

12              THE REPORTER:  Yes.

13              MR. HAYES:  And this is 16.

14              (Exhibits 15 and 16 were

15              marked for identification.)

16   BY MR. HAYES:

17       Q.   Do you recognize the document that's been

18   marked Exhibit 15?

19       A.   Yes.

20       Q.   What is it?

21       A.   General Claims Practices.

22       Q.   When did you first see this document?

23       A.   I don't remember.

24       Q.   Do you know when it was written?

25       A.   I do not.
```

189

```
 1        Q.   Is it currently -- strike that.
 2             Are these rules that apply to the
 3   adjusting of claims at OneBeacon?
 4        A.   I believe so.  Yes.
 5        Q.   Are these rules in effect at OneBeacon
 6   today?
 7        A.   I don't know.
 8        Q.   Were these rules in effect at OneBeacon
 9   when you started?
10        A.   I don't know.
11        Q.   Were these rules in effect at OneBeacon at
12   the time of the DIG claim?
13        A.   I don't know.
14        Q.   Have you ever reviewed these rules?
15        A.   Yes.
16        Q.   When?
17             MR. KEELEY:  Mr. Gutterman, I would just
18   caution you, don't testify about any documents that
19   you've reviewed with me in preparation for your
20   deposition.  But other than that, you're free to
21   answer.
22             THE WITNESS:  I don't know.
23   BY MR. HAYES:
24        Q.   Did you review any documents in connection
25   with your preparation for this depo?
```

190

1    A.    Yes.

2    Q.    Did any of the documents that you reviewed

3  refresh your recollection about events that they

4  concerned?

5    A.    My recollections are my recollections.

6    Q.    Did any of the documents that you reviewed

7  in preparation for this deposition refresh your

8  recollection about the events that they concerned?

9    A.    I'm sorry.  Ask that again, please.

10    Q.    You reviewed documents to prepare for the

11  deposition; correct?

12    A.    Yes.

13    Q.    Did any of the documents you reviewed

14  refresh your recollection about the events the

15  documents concerned?

16    A.    Including these?

17    Q.    I don't know whether you reviewed those in

18  preparation for the deposition.  I'm just asking the

19  prefatory question.

20    A.    Well, you're pointing at everything.  I

21  don't know what you're pointing at.

22    Q.    The documents that you reviewed to prepare

23  for this deposition, do you have those documents in

24  mind, without disclosing what they are to me?

25    A.    Yes.

191

1      Q.   Okay.  Did any of those documents refresh

2  your recollection about the events talked about in

3  the documents?

4      A.   No.  For the most part, I remembered

5  everything.

6      Q.   Well, you said "for the most part."

7           Did any of the documents refresh your

8  recollection about the events discussed in the

9  documents?

10     A.   No.

11     Q.   Okay.  So you don't remember -- putting

12  aside your preparation for this deposition, you

13  don't remember when you first reviewed the General

14  Claims Practices marked Exhibit 15; is that correct?

15     A.   Correct.

16     Q.   Okay.  Do you remember whether you

17  reviewed it prior to the DIG claim?

18     A.   I do not.

19     Q.   Do these rules set forth in Exhibit 15

20  apply to you?

21     A.   Yes.

22     Q.   Have they applied to you since you began

23  working at OneBeacon?

24     A.   I don't know.

25     Q.   Did they apply to the DIG claim?

192

```
 1        A.   I don't know when I reviewed them to find
 2   out whether or not they applied to the DIG claim.
 3        Q.   Do you have any reason to believe that
 4   they did not apply to the DIG claim?
 5             MR. KEELEY:  Object.  Calls for
 6   speculation.
 7             THE WITNESS:  I don't have any reason --
 8   what was the question again?  I'm sorry.
 9   BY MR. HAYES:
10        Q.   Do you have any reason to believe that the
11   General Claims Practices set forth in Exhibit 15 did
12   not apply to the DIG claim?
13             MR. KEELEY:  Same objection.
14             THE WITNESS:  No.
15   BY MR. HAYES:
16        Q.   Okay.  Look at Exhibit 16.
17             Do you recognize that document?
18        A.   Yes.
19        Q.   What is it?
20        A.   Core Principles.
21        Q.   When was the first time you saw this
22   document?
23        A.   I don't know.
24        Q.   Before the DIG claim or after?
25        A.   I don't recall.
```

193

```
 1        Q.   Have you ever read it?

 2        A.   Yes.

 3        Q.   When?

 4        A.   Right now.

 5        Q.   You never read it before today?

 6        A.   Yes.

 7        Q.   When?

 8        A.   I don't recall.

 9        Q.   Before or after the DIG claim?

10        A.   I don't recall.

11        Q.   Okay.  Have you discussed either the

12   General Claims Practices set forth in Exhibit 15 or

13   the Core Principles set forth in Exhibit 16 with

14   Peter Williams?

15        A.   I don't recall.

16        Q.   Same question, Pamela Johnson.

17        A.   I don't recall.

18        Q.   Do these Core Principles apply to you

19   today, referring to Exhibit 16?

20        A.   Yes.

21        Q.   Did they apply to you when you started at

22   OneBeacon?

23        A.   Yes.

24        Q.   Did they apply to you at the time of the

25   DIG claim?
```

194

```
 1        A.   Yes.
 2        Q.   Have you at all times, during your tenure
 3   at OneBeacon, sought to follow the Core Principles
 4   set forth in Exhibit 16?
 5        A.   Yes.
 6        Q.   Have you at all times, during your tenure
 7   at OneBeacon, sought to follow the General Claims
 8   Practices set forth in Exhibit 15?
 9        A.   Yes.
10        Q.   Can you think of any circumstances under
11   which you would not follow any of the General Claims
12   Practices set forth in Exhibit 15?
13        A.   No.
14        Q.   Can you think of any circumstances under
15   which you would not follow any of the Core
16   Principles set forth in Exhibit 16?
17        A.   No.
18        Q.   Okay.  I'm going to ask you some
19   questions, and I want your best recollection as to
20   timing.  And if you want -- and your counsel is okay
21   with it -- I have give you a calendar to reference.
22   I'm going to be talking about dates in 2014.  It's
23   up to you guys.
24             MR. KEELEY:  Why don't you ask the
25   questions first.
```

195

Video Deposition

```
 1              MR. HAYES:  Okay.
 2       Q.   When did you first receive notice of the
 3  DIG claim, you personally?
 4       A.   I believe on that Tuesday.
 5       Q.   What was the date?
 6       A.   Did you say you had a calendar?
 7       Q.   I have a blank calendar.  Your counsel can
 8  look at it first if he wants just to make sure
 9  there's no --
10              MR. KEELEY:  If you're representing it's a
11  calendar from July, 2014, I'll take your word for
12  it.
13  BY MR. HAYES:
14       Q.   Does that calendar help you or assist you
15  in answering my previous question?
16       A.   It helps some, yes.
17              I believe it was that Tuesday, the 15th.
18       Q.   So best recollection, the day that you
19  first received notice of the DIG claim was July 15,
20  2014?
21       A.   Yes.  It was either that or the day
22  before.  I don't remember exactly.
23       Q.   Do you remember how you received notice
24  the first time?
25       A.   There was a chain of e-mails that got to
```

196

EXHIBIT 16

1   me.

2        Q.   So the e-mail was the first time you

3   received notice?

4        A.   As I recollect, yes.

5        Q.   Okay.   At some point after you received

6   notice, you had some involvement in the process of

7   adjusting the DIG claim, which we'll talk about a

8   little bit more.

9             What I want to know is when your

10  involvement ended.   Do you have that date in mind?

11  When did your involvement in the adjusting of the

12  DIG claim end?

13       A.   I don't think "adjusting" is the right

14  word here.   My true involvement in it would have

15  come the following week.   I was still on e-mails,

16  but I wasn't really involved in anything.

17       Q.   When did your involvement in the DIG claim

18  end?

19       A.   Well, I'm here.

20       Q.   Okay.   Fair enough.

21            I want you to separate this litigation

22  from the initial adjusting of the DIG claim, the

23  initial evaluation of the DIG claim by OneBeacon.

24            Would it help for you to see the denial

25  letters?   Would that help place in time when your

                                                          197

1    involvement stopped?

2         A.   Potentially.  Yes.

3         Q.   Okay.

4              What are we on?  17?

5              THE REPORTER:  Yes.

6              MR. HAYES:  This is going to be

7    Exhibit 17.

8              (Exhibit 17 was marked

9              for identification.)

10             MR. HAYES:  This is going to be

11   Exhibit 18.

12             (Exhibit 18 was marked

13             for identification.)

14             THE WITNESS:  Thank you.

15   BY MR. HAYES:

16        Q.   Do you recognize the document marked

17   Exhibit 17?

18        A.   Yes.

19        Q.   What is it?

20        A.   E-mails from Pamela to the broker and the

21   insured and cc'ing myself and then an e-mail from

22   the insured to Pamela, the broker, and cc'ing myself

23   regarding coverage determination.

24        Q.   Okay.  Now, I want you to look at the

25   e-mail dated July 28 at 10:56 a.m. from Pamela

198

1    Johnson to Susan Weiss and others.

2            Do you see that link?

3        A.   Yes.

4        Q.   And do you see there is reference to a

5    corrected version that's attached?

6        A.   Yes.

7        Q.   And that corrected version is the

8    corrected version of a coverage determination letter

9    from OneBeacon.

10           Is that your understanding?

11       A.   Looking at this, yes.

12       Q.   And I want you to look at Exhibit 18.

13           Do you recognize that document?

14       A.   Yes.

15       Q.   What is it?

16       A.   It's Pamela Johnson's denial letter to

17   Andrea Garber.

18       Q.   Does this appear to you to be the

19   attachment to the e-mail on Exhibit 17 dated

20   July 28, 2014, at 10:56 a.m. from Pamela Johnson?

21       A.   It does.

22       Q.   Okay.  Now, in relation to this denial

23   letter, did your involvement in the adjustment of

24   the DIG claim end before or after this denial

25   letter?

                                                      199

Video Deposition

```
 1        A.   My involvement in the claim had not ended
 2   at that point because I think that we also received
 3   a response back at some point later down the line,
 4   which I then inputted to our computer system.  So I
 5   was still involved in the claim but I wasn't dealing
 6   with it directly.
 7        Q.   Did you do any research at any point after
 8   the denial letter marked Exhibit 18?
 9        A.   I don't recall if I did.
10        Q.   You don't recall whether or not you did?
11        A.   Correct.
12             MR. HAYES:  This is going to be
13   Exhibit 19.
14             (Exhibit 19 was marked
15             for identification.)
16   BY MR. HAYES:
17        Q.   Do you recognize the letter marked
18   Exhibit 19?
19        A.   Yes.
20        Q.   What is it?
21        A.   It appears to be the response from the
22   insured to Pamela Johnson.  I'm sorry.  From Lucia
23   Coyoca of Mitchell Silberberg & Knupp to Pamela
24   Johnson.
25        Q.   Did you continue to be involved in the
```

200

```
 1    adjustment of the DIG claim after the letter marked
 2    Exhibit 19?
 3         A.   I believe I was the one that put it into
 4    the system, if it's in the system.  But, again, my
 5    involvement was very limited in the claim at that
 6    point.
 7         Q.   What does it mean, "put it into the
 8    system"?
 9         A.   If it was e-mailed to us, then we -- to
10    make -- once an e-mail comes in, it can be
11    electronically stored into our system.
12         Q.   Into the file?
13         A.   Correct.
14         Q.   The file that was created for the DIG
15    claim?
16         A.   Correct.  I don't know if that was what
17    happened here.  But if it -- if it did, I would
18    probably have been the one that inputted it in.
19              MR. HAYES:  This is Exhibit 20.
20              (Exhibit 20 was marked
21              for identification.)
22    BY MR. HAYES:
23         Q.   Do you recognize the letter marked
24    Exhibit 20?
25         A.   Yes.
```

                                                        201

1     Q.   What is it?

2     A.   It appears to be Pamela Johnson's response

3     to Ms. Coyoca.

4     Q.   Did you have any involvement in the

5     adjustment of the DIG claim after September 19,

6     2014, the date of this letter?

7     A.   I believe my name was still attached to

8     the file -- the system.  But in terms of what was

9     occurring in the day-to-day of it or however long it

10    was, I did not have any involvement in that.

11    Q.   Okay.  So the DIG claim comes in on

12    July 15, 2014, as far as you know; right?

13    A.   As far as I'm aware, yes.

14    Q.   And you received that claim from the

15    Canton system, I think you said?

16    A.   I don't remember exactly how I got it.  I

17    think it came in -- there had been a process for a

18    long time where a -- the broker could send claims

19    directly to the claims department.  So I think

20    that's what happened in this instance.

21    Q.   Okay.  But it was sent to you?

22    A.   Eventually, yes.

23    Q.   And when you received the claim, what did

24    you understand your role to be in terms of adjusting

25    the claim?

                                                    202

1        A.    Speaking with the insured, speaking with

2    the broker, reviewing the e-mail that had been sent

3    to them from the head of security at NBC,

4    investigating the claim, investigating and searching

5    online for what was going on over there, and help in

6    the determination of coverage.  And if there --

7    yeah.

8        Q.    And how was it that you were going to help

9    in the determination of coverage?  What was your

10    understanding at the time you received the claim?

11        A.    Reviewing the facts of the loss, dealing

12    with the research that we had done, and then

13    applying it to the policy.

14        Q.    You said "reviewing the facts of the

15    loss."

16              What were the facts of the loss in

17    connection with the DIG claim?

18        A.    The e-mail that had been sent to us by the

19    head of NB- -- head of NBC security in Israel and

20    then the information that was eventually provided to

21    us by the broker and the insured.

22        Q.    Anything else?

23        A.    No.

24        Q.    What was the information provided by the

25    broker and the insured?

                                                        203

1      A.   I don't remember the specific

2  conversation.

3      Q.   Did you receive that information orally or

4  in writing?

5      A.   I believe it was orally.  Well, the

6  initial e-mail with the head of security came in

7  writing from them to us.

8      Q.   Right.

9      A.   But there was a -- a conversation

10  thereafter that we had, which was an oral

11  conversation.

12      Q.   And do you remember what information was

13  provided by the broker and the insured in that

14  conversation?

15      A.   Not really, no.

16      Q.   Anything about it?

17      A.   No.

18      Q.   Okay.  So you reviewed the facts of the

19  loss, and you've told me what you consider to be the

20  universe of the facts of the loss; right?

21      A.   Are we still talking about the day we

22  received it?

23      Q.   I want to know what your understanding was

24  at the beginning when you received the claim of what

25  your role would be in adjusting the claim.

204

1          Okay?

2     A.    Uh-huh.

3     Q.    My understanding from your testimony was

4  that when you received the claim, you understood

5  your role to be, one, review the facts of the loss;

6  two, review the research that you did; and, three,

7  applying that research to the policy.

8          That's what you understood at the time

9  that you -- your role would be in adjusting the

10  claim?

11     A.    Well, as well as speaking with the insured

12  and the broker.  Yes.  Sorry.  I didn't realize that

13  that wasn't one of the ones.

14     Q.    When you received the claim, what did you

15  understand would be the research that would need to

16  be conducted?

17     A.    Googling websites, news sites, to

18  determine -- to just get a better understanding of

19  what was going on over there.

20     Q.    When you say "understanding of what was

21  going on over there," what do you mean exactly?

22     A.    I don't recall my exact headspace.  But I

23  don't believe I really had a very good understanding

24  at that time period of what was occurring in Israel

25  at that time.

205

1       Q.   You mean what physically was occurring on

2    the ground?

3       A.   Yes.

4       Q.   And what were you -- what kinds of things

5    were you looking for in your searches, in your

6    Google searches?

7       A.   Just to gain knowledge of what was

8    occurring on the ground there.

9       Q.   Okay.  And why did it matter what was

10   occurring on the ground?

11      A.   'Cause we received a claim that involved

12   what was going on on the ground there.

13      Q.   But did you have any sense of what you

14   would use that information for once you found it?

15   And by "information," I mean the information as to

16   what was going on on the ground in Israel.

17      A.   To help my bosses and myself understand

18   more of what -- just knowledge, just plain

19   knowledge.  We didn't -- I didn't have an under- --

20   what was your question?  I did not know what I would

21   use that information for beyond just learning what

22   was going on.

23      Q.   Why did you need to know what was going on

24   to evaluate the claim?

25      A.   Research is always beneficial.

206

```
 1        Q.   But why in this case did you need to know

 2   what was actually going on on the ground to evaluate

 3   the claim for extra expense coverage?

 4        A.   Why did I need to?  It was just -- it was

 5   almost just an automatic response.  It's just I'd

 6   like to know as much as I possibly can.

 7        Q.   So you weren't looking for anything in

 8   particular?  You were just looking for anything out

 9   there relating to the situation in Israel as it was

10   unfolding?

11        A.   I guess that's a fair statement.  Yes.

12        Q.   Were you -- were you using search terms?

13   How did you search for the information?

14        A.   I have no idea what I did then.

15        Q.   You have no idea what you did on the

16   Internet to search for information?

17        A.   At that time, no, I don't recall.

18        Q.   Did you use Google?

19        A.   I don't recall.  I'm -- my main word

20   search sites are Yahoo!, Google, and Bing, and

21   barely ever Bing.  So Google is my main one.

22        Q.   And did you search using keywords?

23        A.   I don't recall.

24        Q.   So you say that your initial understanding

25   of what your role would be was review the facts of
```

207

1    the loss.  We've talked about that; review research.

2    We've talked about that.

3              And then you said apply it to the policy;

4    right?

5         A.   I believe so.  Yes.

6         Q.   What did you mean when you said "apply it

7    to the policy"?

8              And by "it," you meant the facts of the

9    loss and the research; right?

10        A.   Correct.

11        Q.   Okay.  So what did you mean when you said

12   "apply it to the policy"?

13        A.   Determining what, if any, coverages the

14   facts of the loss could apply to.

15        Q.   Again, through this lens of "we really

16   want to find coverage"; right?

17        A.   I'm sorry.  What's the question?

18        Q.   You applied the facts and the research to

19   the policy with the guiding principle that, "we,"

20   meaning OneBeacon, "really want to find coverage."

21        A.   Yes.

22        Q.   Okay.  Because this was not one of those

23   easy cases where coverage was obvious; right?

24        A.   Yes.

25        Q.   Okay.  And then you also said you added

                                                      208

1    speaking with the insured and the broker.

2             Was that just another part of your

3    fact-gathering --

4        A.   Yes.

5        Q.   -- function?

6        A.   Yes.  Yes.

7        Q.   And then you applied whatever facts you

8    learned from the insured and/or the broker to the

9    policy; is that accurate?

10       A.   Yes.

11       Q.   And you applied it using that same guiding

12   principle, "we really want to find coverage"; right?

13       A.   Yes.

14       Q.   Okay.  All right.  Now, did your

15   understanding of what your role was in the context

16   of adjusting the DIG claim ever change at any time?

17       A.   Yes.

18       Q.   When did it change?

19       A.   It is -- it basically became Pamela

20   Johnson's claim.

21       Q.   When did it become Pamela Johnson's claim?

22       A.   Well, my name was still -- I believe the

23   person that said in the system or whatever you --

24   our CWS system, if that's what it was at the time

25   period.  But there wasn't, like, a -- I can't give

209

1   you a specific date because it sort of just happened

2   gradually.

3        Q.   Do you remember when it -- let me back up.

4             What do you mean when you say it became

5   her claim?

6        A.   She was the person that was making

7   ultimate decisions about coverage.  She was the one

8   that was asking for -- I believe she was the one

9   that asked for outside coverage counsel, and she was

10  the one that wrote the -- the denial letter.

11       Q.   So the DIG claim became Pamela's claim

12  sometime before the initial denial letter; is that

13  fair?

14       A.   It was always my claim.  She was the lead

15  on it.

16       Q.   When you said it became Pamela's claim,

17  did you mean Pamela became the lead on the claim?

18       A.   Yes.

19       Q.   Okay.  When did Pamela become the lead on

20  the claim?  Was it at some point prior to the

21  initial denial letter?

22       A.   Yes.

23       Q.   And that initial denial letter was marked

24  Exhibit 18; right?

25       A.   Yes.

210

Video Deposition

1    Q.   It's dated July 28, 2014; correct?

2    A.   Yes.

3    Q.   So at some point prior to July 28, 2014,

4  Pamela Johnson became the lead on the DIG claim;

5  correct?

6    A.   Yes.  I -- just the words of the -- the

7  key is -- in the system itself, my name probably

8  said I was the adjuster.  But in terms of who was

9  actually leading the claim, almost from the start

10  Pamela was leading this claim.

11   Q.   Well, that's what I'm getting at.  I'm

12  not -- I don't want to know at this point what it

13  says in the system.

14   A.   Yeah.

15   Q.   I want to know what your understanding of

16  it was --

17   A.   Yes.

18   Q.   -- your role --

19   A.   Yes.

20   Q.   -- and Pamela's role.

21   A.   Yes.

22   Q.   At some point in this process Pamela

23  became the lead on the claim; right?

24   A.   Yes.

25   Q.   And that date, whenever it was, was prior

211

1    to July 28, 2014; correct?

2         A.   Yes.  As far as I can recall.  Yes.

3         Q.   But it was sometime after July 15, 2014;

4    correct?

5         A.   I don't recall the exact conversation we

6    were having.  But I'm sure Pamela was the one that

7    was leading the conversation with the broker and the

8    insured.

9         Q.   Okay.  So do you remember the event that

10   marks the day or that marks the point in time --

11        A.   There wasn't -- sorry.

12             MR. KEELEY:  Let him finish.

13             THE WITNESS:  I apologize.

14   BY MR. HAYES:

15        Q.   Do you remember the event that marks the

16   point at which Pamela Johnson became the lead on the

17   case?

18        A.   There wasn't an event.  Again, I think she

19   was leading the conversation with the insured and

20   the broker.  I wasn't -- I don't know what I was

21   saying, and I don't even recall the conversation.

22   But I'm sure she was the one that was leading it.

23        Q.   Okay.  But remember how this started.  We

24   talked about what you understood your role to be at

25   the beginning.

212

1      A.   Yeah.

2      Q.   And you described that; right?

3      A.   Yes.

4      Q.   Then I wanted to know if that role ever

5   changed.

6           Okay?

7      A.   Yes.

8      Q.   Did it ever change?

9      A.   Yes.

10     Q.   When did it change?

11     A.   I -- I don't know.

12     Q.   It changed when Pamela became the lead?

13     A.   I guess so.

14     Q.   How did it change?

15     A.   I was primarily involved -- I was

16  involved, and then I was not involved.

17     Q.   When you say "I was involved," do you mean

18  you were involved doing all the things that you went

19  through -- one second -- reviewing the facts of the

20  loss, reviewing research, speaking with the insured

21  and the broker, applying all of that to the policy?

22  Is that what you mean by "involved"?

23     A.   Yes.  But also when you asked me that

24  question, you were asking, "What did you do to start

25  off with?"  That's what I did to start off with.

213

```
 1        Q.   That's right.  And I asked after that
 2    whether that changed.
 3        A.   Yes.
 4        Q.   And it did change, apparently.
 5             Did it, or not?
 6        A.   No.  I mean, that's what I did to start
 7    off the claim.  That wasn't -- claims progress
 8    throughout time.  That's the initial thing that
 9    occurred.
10        Q.   That was your involvement at the
11    beginning.
12        A.   Correct.
13        Q.   Reviewing the facts of the loss, reviewing
14    the research, speaking with the insured and the
15    broker, and collecting facts from those
16    conversations and applying all of those facts and
17    research to the policy.
18        A.   Correct.
19        Q.   That's what you started doing.  That was
20    your role at the beginning; right?
21        A.   As far as I can remember, yes.
22        Q.   Okay.  But at some point your role changed
23    from that to something else; right?
24        A.   Yes.
25        Q.   When did that happen?
```

214

1          A.    We now have that information, and so now

2    it became applying it truly to the policy to

3    determine coverage.

4          Q.    Who did that?

5          A.    Pamela.

6          Q.    Anyone else?

7          A.    With consultation from Peter.

8          Q.    Anyone else?

9          A.    I don't know.

10         Q.    Were you involved in those discussions?

11         A.    I don't recall.

12         Q.    You said you also applied facts, research

13   to the policy; correct?

14         A.    Uh-huh.

15         Q.    You did that -- "yes"?

16         A.    Yes.

17         Q.    You did it before Pamela did it; is that

18   correct?

19         A.    I don't recall.

20         Q.    Did you form any conclusions through your

21   application of the facts and the research to the

22   policy or opinions?

23         A.    I don't recall.  It's been three years.

24   But that would be the typical claims process.

25         Q.    Okay.  And if you had formed an opinion or

215

```
 1   a conclusion, you would have communicated that
 2   opinion or conclusion to Pamela; right?
 3              MR. KEELEY:  Objection.  Asked and
 4   answered.
 5              THE WITNESS:  I don't recall in this
 6   claim.  But that would be a typical process.
 7   BY MR. HAYES:
 8        Q.   And what is your opinion now, knowing the
 9   facts of the loss, the research, having spoken with
10   the insured and the broker, what is your opinion as
11   to coverage now --
12              MR. KEELEY:  Objection.
13              Excuse me.
14   BY MR. HAYES:
15        Q.   -- with respect to the DIG claim?
16              MR. KEELEY:  Objection.  Asked and
17   answered.
18              THE WITNESS:  This was a war.  This was a
19   warlike situation.  This was -- all four of the
20   categories, I believe, could be attributable to
21   this.  And so the denial of coverage was correct.
22   BY MR. HAYES:
23        Q.   Was it terrorism?  Was terrorism the cause
24   of the loss?
25              MR. KEELEY:  Objection.  Vague.
```

                                                                216

```
 1                  THE WITNESS:  No.
 2    BY MR. HAYES:
 3        Q.   Could it have been the cause of the loss?
 4                  MR. KEELEY:  Objection.  Calls for
 5    speculation.  Vague.  Asked and answered.
 6                  THE WITNESS:  No.
 7    BY MR. HAYES:
 8        Q.   Why not?
 9        A.   Everything that I saw, the missiles
10    shooting from Palestine to Israel, the missiles
11    shooting from Israel to Palestine, MSNBC writing,
12    "This is a war," everything -- I mean, tanks,
13    soldiers, this -- that -- that was a war.  It
14    wasn't -- it wasn't a terrorist act.
15        Q.   There's no facts or evidence that would
16    suggest the loss was caused by terrorism?
17                  MR. KEELEY:  Objection.  Calls for
18    speculation.  Asked and answered.
19                  THE WITNESS:  When I think of terrorism, I
20    think of 9/11.  I think of the Boston Marathon.  I
21    think of Oklahoma City.  This was not terrorism.
22    BY MR. HAYES:
23        Q.   That opinion that you've just articulated,
24    you don't recall whether you ever communicated that
25    to Pamela or Peter at any point prior to the
```

217

1    July 28, 2014 denial letter; is that your testimony?

2         A.   That's correct.

3         Q.   Now, the role that you described,

4    collecting facts, talking to the insured, talking to

5    the broker, applying it to the policy, did somebody

6    instruct you to take on that role, or did you just

7    take it on yourself at the beginning?

8         A.   For this claim?

9         Q.   Yes.

10        A.   That would just be my normal claims

11   process.

12        Q.   What was Pamela's role in the adjustment

13   of the DIG claim?

14        A.   She was doing very similar things as I was

15   and also doing her research and investigation.  And,

16   as you can see, she was also the one that wrote the

17   opinions and cover letters -- coverage letters.

18        Q.   She was responsible for making the

19   ultimate coverage decision?

20        A.   I don't know.

21        Q.   What was Peter's role?

22        A.   He was the president of OneBeacon

23   Entertainment.

24        Q.   What was his role in connection with the

25   DIG claim?

218

1      A.   Providing his opinion.

2      Q.   Did he make the ultimate decision

3  regarding whether or not there was coverage?

4      A.   No.  I don't think that would have been

5  his role.

6      Q.   Who did?

7      A.   It was Pamela.  But I don't know if she

8  consulted with anyone above her as well.

9          MR. KEELEY:  Daniel, I want to take a

10  break as soon as it's convenient before you go on to

11  your next areas.

12          MR. HAYES:  Okay.  Are we -- it's tough to

13  get all this in with so many breaks.  But can you

14  give me 10 minutes?

15          MR. KEELEY:  Yeah.  10 minutes.

16          MR. HAYES:  I mean 10 minutes until the

17  break.

18          MR. KEELEY:  Oh.  Give you 10 minutes

19  until the break?

20          MR. HAYES:  Yeah.

21          MR. KEELEY:  If you're about to get into a

22  new area --

23          MR. HAYES:  It's not --

24          MR. KEELEY:  -- let's go ahead and break

25  right now.

219

Video Deposition

```
1              MR. HAYES:  It's not new.  It's not.  I
2    mean, how long have we been on the record since the
3    last break?
4              MR. KEELEY:  This is a new area.  I'd like
5    to take a break.  The witness needs a break.
6              MR. HAYES:  How long have we been on the
7    record?
8              THE REPORTER:  2:42 we came back on the
9    record.
10             MR. HAYES:  Well, since I handed -- let me
11   just authenticate this document, and then you can
12   have your break.
13             THE REPORTER:  Exhibit 21?
14             MR. HAYES:  Yes.
15             (Exhibit 21 was marked
16             for identification.)
17   BY MR. HAYES:
18        Q.  Do you recognize the document that's been
19   marked Exhibit 21?
20        A.  Without reading line for line, yes.
21        Q.  What is it?
22        A.  It appears to be our electronic file.
23        Q.  This is the electronic file that OneBeacon
24   opens for every new claim?
25        A.  Yes.
```

220

1         Q.   And this is the one that pertains to the

2   DIG claim?

3         A.   It appears that way.  Yes.

4         Q.   Was there a paper file that corresponded

5   with the DIG claim?

6         A.   Not that I can recall.

7              MR. HAYES:  Okay.  Let's break.

8              THE VIDEOGRAPHER:  Off record, 1533.

9              This is the end of Media 3.

10          (Recess from 3:33 p.m. to 3:47 p.m.)

11             THE VIDEOGRAPHER:  Back on record.

12             Commencing Media 4 of the deposition of

13   Daniel Gutterman.  On record at 1547.

14   BY MR. HAYES:

15        Q.   Mr. Gutterman, we went over what your

16   understanding of your role in adjusting the DIG

17   claim would be.  I anticipate this is going to be

18   duplicative.  But I just want to make sure we know

19   what you actually did in adjusting the DIG claim.

20             Okay?

21        A.   Okay.

22        Q.   It may be completely co-extensive with

23   what you've already testified to, but I just want to

24   make sure we have that clear understanding on the

25   record.

                                                    221

```
 1            Okay?
 2            My understanding is that, in connection
 3   with adjusting the DIG claim, you actually reviewed
 4   the facts of the loss, which included information
 5   from the broker and the insured and the letter from
 6   NBC security; is that correct?
 7       A.   The e-mail.  Yes.
 8       Q.   The e-mail from security; is that correct?
 9       A.   Yes.
10       Q.   You researched using Google and the
11   Internet.
12       A.   I don't remember if it was Google.  But,
13   yes, it was using the Internet.
14       Q.   Okay.  You talked to the insured and the
15   broker.  You collected facts from them; yes?
16       A.   I believe so.  I don't remember that
17   conversation.  But that's what we would have -- I'm
18   sure that's what we would have done on the 15th.
19   Yes.
20       Q.   Okay.  And you took the facts of the loss
21   that we just discussed, whatever facts you may have
22   learned in conversations from the -- with the
23   insured and the broker and whatever research you did
24   on the Internet, you took all that, and you applied
25   it to the policy to determine whether there was
```

222

```
 1   coverage.
 2        A.   I don't recall if I did that specifically
 3   in regards to DIG.  But, again, that would be our
 4   normal claims process.
 5        Q.   You don't know whether or not you took the
 6   facts of the loss, the research that you did, what
 7   you learned from the insured, and applied it to the
 8   policy to determine whether there was coverage?
 9        A.   I don't specifically remember if I did
10   that.  But that's exactly what I would do in every
11   single claim.
12        Q.   Do you have any reason to believe you did
13   not do that in connection with the DIG claim?
14        A.   No.
15        Q.   Did you do anything else other than what
16   I've just summarized in connection with the
17   evaluation of the DIG claim?
18        A.   I believe we had another conversation with
19   them again.  But that's probably -- you're saying
20   the same thing.  But I don't want to put words in
21   your mouth.  I believe we had another conversation
22   with the broker and the insured a few days later or
23   a couple of days later.  But that was, again,
24   fact-finding.
25        Q.   So we've got two conversations with the
```

223

EXHIBIT 16

1    insured and the broker.

2         A.   Correct.

3         Q.   Anything else that you remember actually

4    doing besides what I've just summarized in

5    connection with the evaluation of the DIG claim?

6         A.   Well, I would continue to put information

7    into the system, our CWS system, which is this.

8         Q.   Would you characterize that as a -- like a

9    clerical task, just inputting information?

10        A.   For this claim, I would say "yes."

11        Q.   Anything else that you did in connection

12   with the DIG claim?

13        A.   Nothing comes up to my mind now.

14        Q.   And you did all of this with the goal of

15   finding coverage; right?  Your fact-finding, your

16   research, your application of the same to the

17   policy, all of that was done with a goal of finding

18   coverage; right?

19             MR. KEELEY:  Object.  Misstates prior

20   testimony.

21             THE WITNESS:  Yes.

22             MR. HAYES:  Okay.  This is Exhibit 1

23   previously introduced.

24             MR. KEELEY:  This has stopped scrolling,

25   stopped moving.

                                                      224

```
 1              THE REPORTER:  Can we go off the record
 2   for a minute?
 3              MR. HAYES:  That's fine.  We can go off
 4   the record.  I'd prefer to not use this against my
 5   time.
 6              THE VIDEOGRAPHER:  Off record, 1552.
 7         (Recess from 3:52 p.m. to 3:56 p.m.)
 8              THE VIDEOGRAPHER:  On record, 1556.
 9   BY MR. HAYES:
10        Q.   Do you recognize the document marked
11   Exhibit 12.
12        A.   Yes.
13        Q.   What is it?
14        A.   An e-mail chain.
15        Q.   I want you to look at the page marked
16   ATL 1102.
17        A.   Okay.
18        Q.   Do you see the e-mail from Lucy Lopez to
19   OBE Claims with a cc to you and Pamela Johnson?
20        A.   Yes.
21        Q.   It's dated July 15, 2014, at 10:25 a.m.?
22        A.   Yes.
23        Q.   Is that the e-mail pursuant to which you
24   first became aware of the DIG claim?
25        A.   It appears so.  Yes.
```

225

1        Q.    Who is Lucy Lopez?

2        A.    At that time period she was a claims

3    administrator, senior claims assistant.

4        Q.    What is that?

5        A.    She dealt with a lot of the administrative

6    aspects of the claims department for OneBeacon

7    Entertainment.

8        Q.    Was she your superior?

9        A.    No.

10       Q.    I want you to look at the page marked

11   ATL 1105 and ATL 1104.

12       A.    Okay.

13       Q.    This is an e-mail from Randi Richmond at

14   NBCUniversal to Andrea Garber with a copy to Mark

15   Binke and Kurt Ford dated July 14, 2014, at

16   12:44 p.m.

17             Do you see that?

18       A.    Yes.

19       Q.    And this e-mail was forwarded to you,

20   among other portions of the chain, on July 15, 2014,

21   at 10:25 a.m.?

22       A.    It appears that way.  Yes.

23       Q.    And the e-mail from Randi Richmond to

24   Andrea Garber and others itself forwards an e-mail

25   from Stephen Smith, head of security for Europe,

                                                        226

1    International Security & Crisis Management for

2    NBCUniversal International; is that correct?

3         A.   Yes.

4         Q.   Is that the e-mail from NBC Security that

5    you referred to in your prior testimony which was

6    part of the facts of the loss that you reviewed?

7         A.   Yes.

8         Q.   And did you review that e-mail from NBC

9    Security upon your receipt of the e-mail at page

10   ATL 1102?

11        A.   I don't recall if I did or didn't.  But

12   I'm sure I would have.

13             MR. HAYES:  This is going to be

14   Exhibit 22.

15             (Exhibit 22 was marked

16             for identification.)

17   BY MR. HAYES:

18        Q.   Do you recognize the document marked

19   Exhibit 22?

20        A.   Yes.

21        Q.   What is it?

22        A.   An e-mail chain.

23        Q.   I want you to look at the e-mail on page

24   ATL 1392 --

25        A.   Okay.

227

1      Q.   -- from Pamela Johnson to Peter Williams

2    and a cc to you dated July 15, 2014, at 5:58 p.m.

3           Do you see that e-mail?

4      A.   Yes.

5      Q.   The e-mail says, "Let's do the call at

6    2:00" eastern "and use my conference call

7    number . . . "

8           Do you see that?

9      A.   Yes.

10     Q.   Do you understand from reviewing this

11   document what call that e-mail is referring to?

12     A.   No.

13     Q.   Did you have a call -- strike that.

14          I want you to look down at the e-mail at

15   the bottom of the page, July 15, 2014, at 8:48 p.m.

16   from Pamela Johnson.

17          "I suggest we have a call about this

18          tomorrow.  Danny and I had a conversation with

19          Susan and Andrea today about what the

20          production's plans were, but we didn't make any

21          representations about whether there was

22          coverage but we also did not alert them that

23          this might not be a covered claim."

24          Do you see that?

25     A.   Yes.

228

1    Q.   Does that refresh your recollection that

2    the first conversation you had with NBCUniversal

3    about the DIG claim was on July 15, 2014?

4         A.   Yes.

5         Q.   And who was present on that call?

6         A.   Pamela Johnson, myself, Susan Weiss, and

7    Andrea Garber, based upon this e-mail.

8         Q.   And do you recall what was discussed?

9         A.   I do not, beyond what the e-mail says.

10        Q.   Is the e-mail an accurate representation

11   of what was discussed?

12        A.   I don't recall what was discussed.  So I

13   will go by what the Pamela -- Pamela's e-mail says.

14        Q.   Do you have any reason to believe that

15   what Pamela says in her July 15, 2014 e-mail at

16   8:58 p.m. regarding that call is in any way

17   incorrect?

18        A.   No.

19        Q.   Did NBCUniversal mention terrorism in that

20   call?

21        A.   I don't recall.

22        Q.   That was the first of two calls you can

23   recall in which you were a party and NBCUniversal

24   was also a party; is that right?

25        A.   I believe I was involved in two calls.

229

1   Yes.

2         Q.   Okay.  And that was the first one?

3         A.   I believe so.  Yes.

4         Q.   Now, if you look back at that first

5   reference, "Let's do the call at 2:00" eastern "and

6   use my conference call number," and you also look

7   down at the part where Pamela says, "I suggest we

8   have a call about this tomorrow," does that refresh

9   your recollection that you, Pamela Johnson, and

10  Peter Williams had a call about the DIG claim on

11  July 16, 2014?

12        A.   It does not.

13        Q.   Did you ever have a call with Peter

14  Williams and Pamela Johnson about the DIG claim?

15        A.   I don't recall.

16        Q.   You don't recall whether or not you ever

17  had a call about the DIG claim with Pamela Johnson,

18  Peter Williams, and yourself?

19        A.   That's correct.  I do not recall.

20        Q.   Okay.  Are there any documents that might

21  refresh your recollection on that point that you can

22  think of?

23        A.   No.

24        Q.   If you had a call, would you have taken

25  notes?

                                                          230

```
 1        A.   Potentially.

 2        Q.   Would those notes have been in

 3   handwriting?

 4        A.   Potentially.

 5        Q.   And if you had taken notes, where would

 6   they be today?

 7        A.   I don't know.

 8        Q.   If you had created a paper file in

 9   connection with the DIG claim, would they be in that

10   file?

11        A.   Potentially, yes.

12        Q.   And if you had created a paper file in

13   connection with the DIG claim, that file would be at

14   your office here in L.A.; right?

15        A.   Potentially, yes.

16             MR. HAYES:  This is going to be

17   Exhibit 23.

18             (Exhibit 23 was marked

19             for identification.)

20   BY MR. HAYES:

21        Q.   Do you recognize the document marked

22   Exhibit 23?

23        A.   Yes.

24        Q.   What is it?

25        A.   An e-mail chain.
```

231

```
 1              MR. HAYES:  This is going to be
 2   Exhibit 24.
 3              (Exhibit 24 was marked
 4              for identification.)
 5   BY MR. HAYES:
 6        Q.   Do you recognize the document marked
 7   Exhibit 24?
 8        A.   Yes.
 9        Q.   What is it?
10        A.   It appears to be a -- an invitation for a
11   conference call.
12        Q.   I want you to look at Exhibits 23 and 24
13   together, review those documents, and tell me
14   whether these documents together refresh your
15   recollection that on July 17, 2014, you had the
16   second of two calls with NBCUniversal regarding the
17   DIG claim.
18        A.   Yes.
19        Q.   Do you recall anything that was discussed
20   on that July 17 call?
21        A.   Not more than what was described by Susan
22   Weiss.
23        Q.   I'm not sure what you mean.
24        A.   Upon reading this, now I'm -- we -- we
25   must have discussed the situation in Israel.
```

232

```
 1        Q.   What did you discuss?
 2        A.   I don't recall.
 3        Q.   You don't recall anything about the
 4   conversation?
 5        A.   I believe that they were telling us that
 6   more things were occurring in Israel and that they
 7   were potentially going to be moving at that point.
 8        Q.   Did the -- strike that.
 9             Do you recall anything else about that
10   conversation, what you said, what Pamela said, what
11   anybody at NBCUniversal said, anything at all?
12        A.   No.
13        Q.   Would it have been your practice to have
14   taken notes during this call?
15        A.   Potentially, yes.
16        Q.   And if you had taken notes, would they
17   have been handwritten notes?
18        A.   Potentially, yes.  Actually, I don't know.
19   Would it have been my practice?  It could have been
20   either that, or it could have been typed.
21        Q.   But if you had taken handwritten notes,
22   you would have put those in the paper file for this
23   claim, to the extent you had a paper file; right?
24        A.   If I had one, yes.
25        Q.   And if you had a paper file, it would be
```

233

EXHIBIT 16

1    in your office?

2         A.   Potentially, yes.

3         Q.   Today?

4         A.   I'm sorry?

5         Q.   Today.

6         A.   Yes.

7         Q.   And if you had taken handwritten notes and

8    did not put the handwritten notes in the paper file,

9    you may have transcribed your handwritten notes into

10   electronic form and put those in the file.

11             Is that a possibility as well?

12        A.   Yes.

13        Q.   Do you remember whether or not you did

14   that on this occasion?

15        A.   Well, going back to Exhibit 21, it doesn't

16   appear that the second one that you brought up

17   occurred.  No.

18        Q.   So if you had taken notes during this

19   July 17 call and thereafter transcribed your notes

20   into electronic form, if that had happened, you

21   would have put those transcribed notes into the DIG

22   claim file?

23        A.   That's very typical.  That's my claims

24   process.  Yes.

25        Q.   Which file?  The electronic file or the

234

1    paper file?

2         A.   Both.  But I don't -- there is not a paper

3    file that I can find anywhere.

4         Q.   Okay.  So you've looked?

5         A.   I've looked.  Yes.

6         Q.   But it would have also been in the

7    electronic file -- right? -- the transcribed notes,

8    had you taken them?

9         A.   Potentially, yes.

10        Q.   When you say "potentially," what are

11   you -- if you -- I'm asking you to assume that you

12   took notes and that you transcribed them.  If those

13   two things happened --

14        A.   Yes.  They would have gone into -- yes.

15        Q.   The electronic file?

16        A.   (No audible response.)

17        Q.   "Yes"?

18        A.   Yes.

19        Q.   Marked Exhibit 21?

20        A.   Correct.

21        Q.   And they're not; right?

22        A.   It does not appear that they are now.

23             MR. HAYES:  This is going to be

24   Exhibit 25.

25   / / /

235

```
 1              (Exhibit 25 was marked

 2              for identification.)

 3   BY MR. HAYES:

 4      Q.   Do you recognize the e-mail chain marked

 5   Exhibit 25.

 6      A.   Yes.

 7      Q.   I want you to look at the bottom of the

 8   page marked AONNBCU3242.  And it's an e-mail from

 9   you to Andrea Garber and others, including Pamela

10   Johnson, dated July 21, 2014, at 5:06 p.m.

11              Do you see that e-mail?

12      A.   Yes.

13      Q.   I'd like you to read the text of that

14   e-mail into the record.

15      A.   "Hi Andrea and Susan -

16              "I hope you're both doing well.

17              "Are you both available tomorrow at 4pm"

18      Pacific time "for a conference call?

19              "Best Regards.

20              "Danny Gutterman."

21      Q.   Does that refresh your recollection that

22   you had another call with NBCUniversal on July 22,

23   2014?

24      A.   I don't remember that call.

25      Q.   You don't remember having a call with
```

                                                        236

1    NBCUniversal on July 22, 2014?

2          A.    That's correct.

3          Q.    Do you -- do you remember having a call

4    with NBCUniversal in which OneBeacon's denial of the

5    DIG claim was communicated orally?

6          A.    I don't remember it specifically.  But --

7    the specifics of the conversation, but I believe it

8    happened on the 17th.  Actually -- yes.

9          Q.    So let's break that up.

10               You remember a call that you were on with

11   NBCUniversal in which OneBeacon communicated to

12   NBCUniversal that the DIG claim would be denied.

13         A.    Oh.  No.  That there was a concern, I

14   believe, that there -- that.  Yeah.  There was a

15   concern that the war exclusion would be applied, not

16   that there was a definitive answer at that point.

17         Q.    You don't recall a telephone conversation

18   in which OneBeacon told representatives of

19   NBCUniversal that the DIG claim would be denied?

20         A.    No.

21         Q.    You weren't on one of -- that call if it

22   happened?

23         A.    I'm not saying that.  I could have been.

24   I don't recall it.

25         Q.    Okay.  Let's go back to Exhibit 12.

                                                      237

1          So I want you to have in your mind the

2    telephone conversation that you had with

3    NBCUniversal on July 15, 2014.

4          Do you have that call in mind?

5      A.   Okay.

6      Q.   That's the same day you received notice of

7    the claim; right?

8      A.   Yes.

9      Q.   Now I want you to look at the e-mail at

10   the top of the page marked 1102.  It's dated

11   July 15, 2014, at 4:14 p.m., and it's from you to

12   Peter Williams.

13         Do you see that?

14     A.   On the second page?

15     Q.   Yeah.  It's marked 1102.

16     A.   Yes.

17     Q.   Do you see that e-mail?

18     A.   I do.

19     Q.   Please read that e-mail into the record.

20     A.   "Hi Peter -

21         "Per the below, you spoke with Andrea

22     Garber / Susan Weiss about this.

23         "Any chance you happened to suggest that

24     they push for more than just the week, since

25     the crew needs to be advised at least one week

                                                    238

```
 1          in advance for a push and since a ground war
 2          still might occur (per the support from CBS
 3          News from 2 days ago.)"
 4               And then there is a link.  Would you like
 5   me to read the link?
 6        Q.   No.
 7        A.   "Best regards.
 8               "Danny Gutterman."
 9        Q.   Can you recall whether you sent this
10   e-mail before or after your phone conversation with
11   NBCUniversal on July 15?
12        A.   I can't recall.
13        Q.   Why did you send this e-mail to Peter
14   Williams?
15        A.   To ask him whether or not he suggested
16   that they push for more than just the week since the
17   crew needs to be advised at least one week in
18   advance for a push and since the ground war still
19   might occur.
20        Q.   Why did you want to know that?
21        A.   To determine whether or not the -- why
22   would I need to know that?  When there's extra
23   expense claims, we always try and find out whether
24   or not crew is being held on or not.
25        Q.   What does that mean, "held on"?
```

239

1    A.   They're still being paid without actually

2    doing any work.  If an actress gets sick and there's

3    not enough time to tell the crew, then you have to

4    pay the crew for the next day.

5    Q.   So I'm not clear what that means in the

6    context of this e-mail.

7         Why did you want to know if he happened to

8    suggest that they push for more than just the week?

9    A.   Based upon the e-mail that -- well, let me

10   put this -- I don't recall writing this 'cause it

11   was over two years ago, two and a half years ago.

12   But -- and so I don't know my exact head space at

13   that particular time period.

14        But if I was to venture to say, it's based

15   upon reading the e-mail from Stephen Smith, the head

16   of security Europe at NBC and -- as well as looking

17   at this video which shows -- which says that the

18   clash between Israel and the Palestines [sic] is

19   ground war -- is ground war next.

20   Q.   So at the time you wrote this e-mail,

21   July 15, 2014, at 4:14 p.m., was there a war in

22   Israel?

23        MR. KEELEY:  Objection.  Calls for a legal

24   conclusion.

25   / / /

240

1    BY MR. HAYES:

2         Q.   In your opinion.

3         A.   I don't recall if I thought that there was

4    at that point or not.  I think that was the only

5    video I had seen, and I don't remember what that

6    video looks like.

7         Q.   Why was it relevant that a ground war

8    still might occur?  Why did you write that?

9         A.   'Cause it had to do with the escalation

10   possibility.

11        Q.   What does that mean, "because it had to do

12   with the escalation possibility"?

13        A.   It didn't appear that what was occurring

14   over there was going to deescalate, only escalate.

15   And that's also what was told to us by the head of

16   security.

17        Q.   My question is:  Why did you want to know

18   if Peter had told them to push for more than a week

19   because a ground war still might occur?  What's the

20   connection?

21        A.   If the -- it's a way of saving the

22   production money.  If they can let the crew know

23   early enough on, they may be able to let the crew go

24   so they don't have to pay for the crew for that time

25   period.

241

1      Q.   I want you to go back to the e-mail marked

2   ATL 1105.

3      A.   Okay.

4      Q.   If you look at the very last line of

5   Stephen Smith's e-mail, he says, "Personnel based in

6   country in relation to this production should make

7   arrangements to leave."

8           Do you see that?

9      A.   Yes.

10     Q.   So he was already recommending that

11  personnel based in country should make arrangements

12  to leave.

13     A.   Okay.

14     Q.   So why -- why is it relevant that a ground

15  war still might occur?  We've already got an e-mail

16  from security saying that the situation requires

17  personnel to leave.

18          MR. KEELEY:  Objection.  Asked and

19  answered.  Argumentative.

20          THE WITNESS:  This doesn't definitively

21  state whether those arrangements were made or not.

22  This is just a -- it's a suggestion.  I mean, I was

23  asking Peter to find out, based upon this

24  conversation he had with Susan Weiss and Andrea

25  Garber, was that brought up.

242

EXHIBIT 16

BY MR. HAYES:

    Q.   But why did you want to know if it was brought up?

        MR. KEELEY:  Object.  Asked and answered.

BY MR. HAYES:

    Q.   Did you think the personnel should leave because of the situation?

    A.   I don't -- I don't recall at that particular moment what I was thinking.

    Q.   On July 15, 2014, at 4:14 p.m., when you apparently gathered from the Internet that a ground war might occur, did you think the personnel should leave at that point?

    A.   They had to do what was prudent safetywise.

    Q.   But wasn't NBCUniversal security on the ground in Israel in the best position to decide what was prudent?

        MR. KEELEY:  Objection.  Calls for speculation.  Assumes facts not in evidence.

        THE WITNESS:  They were -- the in- -- the information we were receiving was from them, as well as what we were getting from online.

BY MR. HAYES:

    Q.   Was the existence or non-existence of a

243

Video Deposition

1    ground war part of the facts that you considered

2    when applying the policy language?

3         A.   Me personally?

4         Q.   Yes.

5         A.   At this particular time?

6         Q.   Yes.

7         A.   I don't -- I don't really think that I was

8    thinking about the policy at that point.  I don't

9    know.

10        Q.   Did the existence or non-existence of a

11   ground war factor into your analysis of the policy

12   at any time?

13             MR. KEELEY:  Objection.  Asked and

14   answered.

15             THE WITNESS:  Yes.

16   BY MR. HAYES:

17        Q.   When?

18        A.   I don't remember the exact date.

19        Q.   And how did it factor into your analysis

20   of whether or not the loss was covered in connection

21   with the DIG claim?

22        A.   Ground war is one portion -- one aspect of

23   war.

24        Q.   The fact that a ground war was occurring,

25   if it was, would have been a fact that would have

                                                      244

Video Deposition

1    suggested the loss was not covered.

2           Is that accurate pursuant to what your

3    understanding was and opinion was at the time?

4        A.   It would be one of others.  Yes.

5        Q.   Okay.  So if NBCUniversal moved the

6    production of DIG after a ground war begun -- had

7    begun, would that have been a fact that would weigh

8    in favor of granting coverage or in favor of denying

9    coverage?

10          Do you understand the question?

11          THE WITNESS:  (To the reporter)  I think

12   there is a word missing in your teletype.

13          MR. KEELEY:  Don't look at this.

14   BY MR. HAYES:

15       Q.   If -- if NBC waited -- first of all, for

16   purposes of my question, I want you to assume that a

17   ground war occurred at some point in time.

18          If NBC had waited until a ground war

19   started to move the production of DIG out of Israel,

20   would that fact have supported an interpretation

21   that coverage was available or that it was excluded;

22   that the loss was covered or excluded?

23          MR. KEELEY:  Objection.  Vague.

24   Misleading.

25   / / /

                                                    245

BY MR. HAYES:

    Q.    If NBCUniversal had moved the production
of DIG after a ground war started, would the extra
expenses incurred in connection with that move been
a loss that was covered or not?

    A.    It still would not have been covered.

    Q.    Would the fact that a ground war was
already occurring have affected the analysis?

    A.    It was one portion of it.

    Q.    Do you know whether or not NBC moved the
production -- strike that.

          Do you know when NBC University -- I'm
sorry.

          Do you know NBCUniversal moved the DIG
production out of Israel?

    A.    No.

    Q.    At the time you wrote this e-mail,
July 15, 2014, at 4:14 p.m., did you know that the
policy included the war exclusion?

    A.    I don't recall.

    Q.    Do you recall why you searched the
Internet to find the CBS News article copied in this
e-mail?

    A.    To provide my supervisor more information
probably.

                                                    246

1        Q.   Who was your supervisor?  Peter?

2        A.   I'm sorry.  To provide Peter, yes, my --

3   more information.

4        Q.   Did you have a conversation with Peter

5   about your e-mail?

6        A.   I don't remember.

7        Q.   When you say "push for more than just a

8   week," what does that mean?  Does that mean push the

9   production and stay on-site?  What did you mean by

10  "push"?

11       A.   I think that I just meant that they

12  weren't going to be working for another week.

13       Q.   Where would they be physically?

14       A.   I don't know.

15       Q.   What did you have in mind when you wrote

16  the e-mail?

17       A.   We always want to try and help the

18  insureds mitigate their losses as best as they

19  possibly can.  And this looks like it was just me

20  asking Peter that he suggest it to them because that

21  would be a way of the production saving costs.

22       Q.   How would delaying the production more

23  than a week assist in saving costs?

24       A.   Again, the crew would not be paid for that

25  week.  If we told them in advance -- they need a

247

1   one-week advance.  If we told them in advance, we

2   wouldn't have to pay the crew for that extra week.

3       Q.   Well, what did a ground war have to do

4   with that?

5       A.   It had to do with escalation that was

6   occurring.  That's -- I'm just using the words from

7   the CBS News, "is a ground war next; since a ground

8   war still might occur."

9       Q.   But how did the fact that a ground war

10  still might occur, according to this news article,

11  have anything to do with saving money on paying the

12  crew?

13          MR. KEELEY:  Objection.  Asked and

14  answered.

15          THE WITNESS:  Once again, the crew would

16  not have to be paid if they were given advance

17  warning that they were not going to be working.  If

18  the situation escalated, then they were going to

19  have to push anyway.  So there's a cost saving

20  possibility there.

21  BY MR. HAYES:

22      Q.   What did you mean when you said "ground

23  war"?

24      A.   Again, it's over two and a half years ago

25  so I don't know exactly what I meant when I wrote

248

1    this e-mail.  But Stephen Smith brought up "ground

2    campaign," and CBS News brought up "ground war."  So

3    I was just utilizing, I guess, words that had been

4    presented to me.

5         Q.   But at some point during your analysis,

6    you determined that whether or not there was a

7    ground war was a relevant fact in determining

8    whether or not there was coverage?

9         A.   I don't know.

10        Q.   You don't know whether or not you thought

11   the occurrence of a ground war was a relevant fact

12   in determining whether there was coverage?

13        A.   I did not make the ultimate decision.  But

14   if you're asking my opinion, that would have come

15   into play.

16        Q.   The occurrence of a ground war would have

17   come into play in the coverage determination?

18        A.   Yes.

19        Q.   How?

20        A.   The word "war" is right there.

21        Q.   So how would it have come into play?

22             MR. KEELEY:  Objection.  Asked and

23   answered.

24             THE WITNESS:  The word "war" is right

25   there.

249

BY MR. HAYES:

    Q.   What do you mean when you say "the word
'war' is right there"?

    A.   "Since a ground war," is what I wrote when
CBS News wrote "war," these are . . . . . .

    Q.   How would the presence of a ground war
have affected the analysis of whether or not the DIG
claim was covered?

        MR. KEELEY:  Objection.  Asked and
answered.

        THE WITNESS:  A ground war is one aspect
of war.

BY MR. HAYES:

    Q.   So that fact would have weighed in favor
of denial of coverage; right?

    A.   I don't know if it did at that specific
time.  But when we did additional research, and I
saw the missiles being shot from Israel to Palestine
and from Palestine to Israel and the war planes and
the ground troops lining up and Israel calling up
50,000 guards -- 50,000 of their reservists,
that's -- ground war is only one piece of what was
many, many aspects that looked like war.

    Q.   But it's a piece that suggests -- that
suggests that the loss is not covered, to you;

       250

```
 1   right?
 2        A.   Yes.
 3        Q.   Okay.  I want you to look at the document
 4   marked Exhibit 22.
 5             This is an e-mail from you to yourself
 6   dated July 16, 2014.
 7             Do you see that?
 8        A.   Yes.
 9        Q.   Can you read what it says.
10        A.   "Look up war exclusion.  Look up war
11   definition."
12        Q.   And do you remember whether or not you had
13   spoken orally to Pamela Johnson or Peter Williams
14   before you wrote this note to yourself?
15        A.   I do not.
16        Q.   Why did you write this note to yourself?
17        A.   'Cause I believed it was relevant to the
18   claim.
19        Q.   Did somebody instruct you to look up "war
20   exclusion"?
21        A.   Not that I can recall.
22        Q.   Did somebody instruct you to look up "war
23   definition"?
24        A.   No.  Not that I can recall.
25        Q.   But you're saying that you did these
```

251

1    things because you thought it was relevant to the

2    claim?

3           MR. KEELEY:  Objection.  Misstates the

4    testimony.

5    BY MR. HAYES:

6        Q.   Did you do these two things?  Did you look

7    up "war exclusion"?

8        A.   Yes.

9        Q.   Did you look up "war definition"?

10       A.   I don't recall.

11       Q.   Why did you look up "war exclusion"?

12       A.   'Cause it was relevant to the claim.

13       Q.   Why was it relevant to the claim?

14       A.   'Cause from the previous article that we

15   were just discussing, the word "ground war" came up,

16   and so it made me look at the war exclusion.

17       Q.   So when you read the article that said

18   "ground war," you immediately thought the war

19   exclusion might apply?

20          MR. KEELEY:  Objection.  Misstates

21   testimony.

22   BY MR. HAYES:

23       Q.   That is right?

24       A.   No.

25       Q.   How -- how soon after you read the article

252

1    that said "ground war" did you start thinking the

2    war exclusion might apply.

3         A.   I don't recall.

4         Q.   But it was sometime after you read the

5    article referenced on Exhibit 12, page 1102,

6    sometime after you read that article that you

7    thought the war exclusion might apply?

8              MR. KEELEY:  Objection.  Mischaracterizes

9    the evidence.

10   BY MR. HAYES:

11        Q.   Is that right?

12             MR. KEELEY:  Same objection.

13             THE WITNESS:  I don't recall.

14   BY MR. HAYES:

15        Q.   The sequence is you read the CBS News

16   article referenced on page 1102 of Exhibit 12.

17        A.   I'm sorry?

18        Q.   The sequence is you read the news article

19   cited on the page marked 1102 of Exhibit 12.

20        A.   Yes.

21        Q.   Then at some point after your reading that

22   article, you determine that the war exclusion might

23   be an issue for the DIG claim.

24             MR. KEELEY:  Objection.  Mischaracterizes

25   the evidence.  It's misleading.

253

```
 1            THE WITNESS:  It appears to be that way.
 2   Yes.
 3   BY MR. HAYES:
 4        Q.   Okay.  Let me just make sure we're clear.
 5            At some point you determined that the war
 6   exclusion might be relevant to the DIG claim; right?
 7        A.   Yes.
 8        Q.   And that is evidenced by Exhibit 22 --
 9   right? -- your note to yourself, "Look up war
10   exclusion"; correct?
11        A.   Correct.
12        Q.   So that happened either before you read
13   the CBS News article on page 1102 of Exhibit 1 or
14   after; right?
15            MR. KEELEY:  Daniel, it's a video.  It's
16   not an article.  That's my objection.
17   BY MR. HAYES:
18        Q.   It happened before or after you watched
19   the video on page 1102 of Exhibit 12; right?
20        A.   It appears it's after.  But I don't
21   believe that I was up at 1:07 a.m. sending myself
22   text messages.  So I don't know.
23        Q.   Okay.  So it could have been before you
24   watched the video?
25        A.   I -- I don't recall.
```

254

1      Q.   It could have been before?

2      A.   Sure.

3      Q.   Okay.  How did you look up "war

4   exclusion," if you did?

5      A.   In the policy.

6      Q.   So you went to the policy, and you read

7   the war exclusion.

8      A.   I don't recall if I did.  But at some

9   point I would have done that, yes.

10      Q.   Did "look up war exclusion" mean anything

11   other than reading the war exclusion in the policy?

12      A.   Not that I can recall.  No.

13      Q.   Did that mean research how the war

14   exclusion is applied?

15      A.   No.  I think it just meant read what the

16   war exclusion in the policy means.

17      Q.   Okay.  If you go back to Exhibit 12, first

18   page, 1101, the last e-mail in that chain is the

19   part of the policy that contains the war exclusion;

20   right?

21      A.   Yes.

22      Q.   And that was e-mailed to you on July 16,

23   2014; right?

24      A.   It appears that way.  Yes.

25      Q.   Do you know if that e-mail reached your

255

1    "in" box before or after you wrote the note, "Look

2    up war exclusion"?

3         A.   From looking at these time stamps, it

4    appears that it came afterwards.

5         Q.   Okay.  So after you received this e-mail

6    from Pamela Johnson with the part of the policy that

7    includes the war exclusion, did you go back to the

8    actual policy and read the war exclusion?

9         A.   I don't recall.

10        Q.   Did you read the entire policy at any

11   point during your involvement in the evaluation of

12   the DIG claim?

13        A.   I don't recall.

14        Q.   Did you read any part of the policy other

15   than the war exclusion?

16        A.   Yes.

17        Q.   What part?

18        A.   Well, if you look two days before the one

19   that you're talking about with the "look up the war

20   exclusion," I actually pointed out the general

21   conditions as well as extra expense and what it

22   covers and excludes.  So I was bringing up coverage

23   of what is covered, not just exclusions.

24        Q.   So does that refresh your recollection on

25   what portions of the policy you reviewed?

256

1        A.    Yes.

2        Q.    And what portions of the policy did you

3    review?

4        A.    Extra expense, war exclusion, the general

5    conditions.

6        Q.    Okay.  And did you review all those

7    portions of the policy before or after you sent the

8    e-mail dated July 15, 2014, at 7:59 p.m., page 1391

9    of Exhibit 22?

10        A.    I'm sure I would have reviewed them before

11    I sent them off.

12        Q.    Okay.  Did you review those parts of the

13    policy -- strike that.

14             When you say, "Please review the general

15    conditions as Pamela pointed out," was the war

16    exclusion one of those general conditions?

17        A.    I'm going to look at the policy, if that's

18    okay.

19        Q.    Sure.

20        A.    Yes, it is.

21        Q.    Is that the first thing you did in

22    connection with the DIG claim, review the policy?

23        A.    No.  We had those conversations

24    beforehand.

25        Q.    What conversations?

257

1          A.    We had the conversation with -- with the

2    broker and the insured on the 15th.

3          Q.    Before you reviewed the policy?

4          A.    Oh.   Hmm.   I don't recall if we reviewed

5    the policy before or after -- if I reviewed the

6    policy before or after that conversation.

7          Q.    Would your practice be to review the

8    policy before talking to an insured on a claim?

9          A.    Sometimes.

10         Q.    What determines whether you review the

11   policy before talking to an insured about their

12   claim?

13         A.    There's no real hard-and-fast rule.   If

14   I -- a lot of times I won't have the policy before I

15   actually have a conversation with the insured.   So

16   the vast majority of the time I will at least send

17   an e-mail, if not having a phone conversation with

18   an insured or a claimant or a vendor, whoever the --

19   as you said earlier, whoever the contact was,

20   usually I will not have the policy beforehand.

21         Q.    Okay.   Let's look back at Exhibit 12.

22         A.    Okay.

23         Q.    I want you to look at the page marked

24   1102, the e-mail from Lucy Lopez to you on July 15,

25   2014, at 10:25 a.m.   It says:

258

```
 1                "New claim.

 2                "Danny

 3                "This should be coming your way, see

 4        policy attached."

 5                Do you see that?

 6        A.   Yes.

 7        Q.   So according to that e-mail, Lucy Lopez

 8   attached the policy to the e-mail notifying you of

 9   the claim; agreed?

10        A.   Correct.

11        Q.   Do you agree with that?

12        A.   I agree.

13        Q.   And do you have any reason to believe the

14   policy was not attached to that e-mail?

15        A.   I do not.

16        Q.   And that's 10:25 a.m.  You forwarded that

17   e-mail to Peter Williams, based on the time stamps,

18   almost six hours later.

19                Do you see that?

20        A.   Okay.

21        Q.   Did you review the policy during that

22   six-hour period?

23        A.   I don't recall.

24        Q.   Could you have?

25                MR. KEELEY:  Objection.  Calls for
```

259

1    speculation.

2              THE WITNESS:  I could have.

3    BY MR. HAYES:

4         Q.   Would that have been your practice, to

5    review the policy upon receiving the claim?

6              MR. KEELEY:  Objection.  Asked and

7    answered.

8              THE WITNESS:  Again, it -- there was no

9    hard-and-fast rule of whether I did or didn't.

10   BY MR. HAYES:

11        Q.   Would that have been your general

12   practice?

13        A.   Just depends.  I mean, if I had the claim

14   and I had the policy, I might have.  If -- if I

15   didn't -- if I had the claim and I didn't have the

16   policy, then I may not have.

17        Q.   But here you did have the policy and the

18   claim; right?  It was attached to her e-mail giving

19   you notice of the claim.

20        A.   Correct.

21        Q.   So given those circumstances, would it

22   have been your practice to review the policy upon

23   receiving the claim and before talking to Peter

24   Williams?

25        A.   Potentially, yes.

                                                    260

1          Q.   Do you have any reason to believe you

2     didn't?

3          A.   I just don't recall.

4          Q.   Do you have any reason to believe you

5     didn't?

6          A.   No.  But I don't have any reason to

7     believe I did either.

8          Q.   Except your general practice?

9               MR. KEELEY:  Objection.  Asked and

10    answered.

11              THE WITNESS:  Yes.

12    BY MR. HAYES:

13         Q.   Okay.  Okay.  Go back to Exhibit 22,

14    please.  I want you to look at the page marked 1392.

15    And this is your e-mail -- I'm sorry.  This is the

16    e-mail from Pamela Johnson to you and Peter Williams

17    on the page marked 1392.  And Pamela says:

18              "I suggest we have a call about this

19         tomorrow.  Danny and I had a conversation with

20         Susan and Andrea today about what the

21         production's plans were, but we didn't make any

22         representations about whether there was

23         coverage but we also did not alert them that

24         this might not be a covered claim.  If this is

25         going to be an issue, we need to alert them

                                                        261

```
1          right away.  Peter, when are you available
2      tomorrow?"
3              When Pamela says "if this is going to be
4   an issue," what is she referring to?
5              MR. KEELEY:  Objection.  Calls for
6   speculation.
7   BY MR. HAYES:
8      Q.   Do you have an understanding of what she
9   was referring to?
10     A.   I don't recall what I was thinking at that
11  time when I read that e-mail.
12     Q.   When she says, "We did not alert them that
13  this might not be a covered claim," do you have any
14  idea what she was referring to when she said that?
15     A.   I don't recall that -- anything specific
16  about that.  But obviously now that we're looking at
17  this claim, it obviously was probably about the war
18  exclusion.
19     Q.   Okay.  Let's go back to Exhibit 22.
20              We talked about your note, "Look up war
21  exclusion," and we -- strike that.  And you said
22  that that meant read the war exclusion in the
23  policy; is that right?
24     A.   I believe so.  Yes.
25     Q.   And nothing more?
```

262

```
 1        A.   Not that I can recall.  No.

 2        Q.   Now let's look at "Look up war

 3   definition."

 4             Do you see that note?

 5        A.   Yes.

 6        Q.   What does that mean?

 7        A.   I'm guessing I was saying to remind myself

 8   to look up the war definition.

 9        Q.   Did you look up the war definition?

10        A.   I don't recall if I did or did not.

11        Q.   What does that mean, "look up war

12   definition"?  In the dictionary?  On the Internet?

13   What does that mean?

14        A.   I don't remember what I wrote to myself.

15        Q.   Why did you want to look up the war

16   definition?

17        A.   To see how it pertained to this claim.

18        Q.   To see how the war definition affected the

19   analysis of whether or not the loss was covered?

20        A.   I -- yes.

21        Q.   And did you look up the definition of

22   "war"?

23             MR. KEELEY:  Objection.  Asked and

24   answered.

25             THE WITNESS:  I don't recall.
```

                                                    263

BY MR. HAYES:

    Q.   If we wanted to try to determine whether
you actually looked up the definition of "war," are
there documents we could refer to to try to figure
out that?

    A.   I believe there was a time period when
Pamela and I were sending each other links.  I don't
remember if that was before or after this.  In terms
of whether I looked something up specifically, I
wouldn't -- I don't know.

    Q.   Did you ever look up the definition of
"terrorism"?

    A.   I don't -- I don't recall doing so.  No.

    Q.   Did you ever do any Google searches aimed
at determining what terrorism was or what terrorism
meant?

    A.   Not that I remember.

    Q.   Why not?

    A.   Nothing we were seeing looked like
terrorism, and I never had a terrorism claim before.
So I don't think it came into my head.

    Q.   When you say "nothing we were seeing
looked like terrorism," what do you mean, "nothing
we were seeing"?

    A.   I believe it was a video, the one that I

264

1    sent to Peter.  And so . . . . . .

2        Q.   Rockets fired by Hamas into Israel doesn't

3    look like terrorism?  Is that what you're saying?

4        A.   I'm sorry.  Ask the question again,

5    please.

6        Q.   Rockets fired by Hamas into Israel doesn't

7    look like terrorism to you?  Is that what you're

8    saying?

9        A.   Yes.

10       Q.   What is terrorism, in your mind?

11       A.   As I said before, I think it's -- it's

12   hard to define it.  It's much easier to say I know

13   it when I see it, and that would be Oklahoma City,

14   Boston Marathon, what happened in Orlando.

15   That's -- that's terrorism.

16       Q.   Well, is Israel a victim of terrorism?

17            MR. KEELEY:  Objection.  Vague.

18            THE WITNESS:  Yes.  They have been the

19   victim of terrorism.

20   BY MR. HAYES:

21       Q.   From who?

22       A.   People that strap on suicide bombing vests

23   and go into cafes and buses.

24       Q.   Is Hamas involved in that conduct?

25            MR. KEELEY:  Object.  Calls for

                                                        265

1   speculation.

2          THE WITNESS:  I don't know.

3   BY MR. HAYES:

4      Q.   What about Israeli teenagers being

5   kidnapped by Hamas?  Would that be terrorism, in

6   your mind?

7          MR. KEELEY:  Object.  Vague.  Lacks

8   foundation.

9          THE WITNESS:  I guess so.

10  BY MR. HAYES:

11     Q.   You say you know it when you see it,

12  terrorism, that is; right?

13     A.   Yes.

14     Q.   Okay.  Do you think the U.S. Government is

15  in a position to know terrorism when it sees it?

16     A.   Yes.

17     Q.   Who is in a better position to know

18  terrorism when they see it, you or the U.S.

19  Government?

20     A.   The U.S. Government.

21     Q.   Who is in a better position, you or John

22  Kerry?

23     A.   John Kerry.

24     Q.   Did you ever search the Internet or search

25  any resource to determine what the United States

266

```
 1    Government's position was on the conduct in Israel

 2    perpetrated by Hamas, whether or not that was

 3    terrorism?  Did you ever look and see what the U.S.

 4    Government thought?

 5         A.   Yes.

 6         Q.   When?

 7         A.   I don't recall.

 8         Q.   Was it before or after OneBeacon denied

 9    the claim on July 28, 2014?

10         A.   After.

11         Q.   Not before?

12         A.   Correct.

13         Q.   Okay.  When you looked to see what the

14    U.S. Government thought about the conduct, what did

15    you find?

16         A.   About what?

17         Q.   Whether or not the U.S. Government thought

18    the acts perpetrated by Hamas on Israel constituted

19    terrorism?

20              MR. KEELEY:  Objection.  Vague.

21              THE WITNESS:  You mean that specific time

22    period?  I don't -- no, I did not look that up.  I'm

23    sorry.

24    BY MR. HAYES:

25         Q.   You said you didn't try to determine what
```

267

EXHIBIT 16

1    the U.S. Government thought about Hamas's conduct

2    prior to the July 28, 2014 denial letter; is that

3    correct?

4         A.    Correct.

5         Q.    But you also said that at some point after

6    the denial letter, you did seek to determine what

7    the U.S. Government thought; right?

8         A.    I don't recall.  I'm sorry.

9         Q.    You don't recall whether or not you did

10   that?

11        A.    Look that up, no, I don't recall if I did

12   or not.

13        Q.    Okay.  Why didn't you seek to determine

14   what the United States Government thought of Hamas's

15   conduct prior to the July 28, 2014 denial?

16        A.    I really wasn't involved in the claim that

17   much at that point.

18        Q.    The claim came to you.

19        A.    Yes.  But as we discussed earlier, at some

20   point Pamela became the lead person that was running

21   this claim.  She was the one at that particular time

22   period that if she was looking things up.

23        Q.    But at some point you were the one

24   searching the Internet for information pertinent to

25   the coverage decision; right?

268

```
 1        A.    When we were trading e-mails back and

 2   forth, I don't think that that was what we were

 3   looking for.  We were just trying to get

 4   information.

 5        Q.    Well, that's my precise question.

 6              Why weren't you looking for what the U.S.

 7   Government's position was on Hamas's conduct prior

 8   to deciding whether or not the acts that resulted in

 9   the loss were terrorism or war?

10              MR. KEELEY:  Objection.  Misleading.

11   Misstates prior testimony.

12              THE WITNESS:  I didn't.  I don't know what

13   the answer is.

14   BY MR. HAYES:

15        Q.    Well, I know you didn't.  The question is

16   why you didn't.

17              Why didn't you?

18              MR. KEELEY:  Same objections.

19              THE WITNESS:  I didn't.

20   BY MR. HAYES:

21        Q.    There is no exclusion in the policy for

22   terrorism; right?

23              While you're looking, I'm going to

24   rephrase my question.

25              There is no exclusion in the policy
```

269

1    applicable to loss caused by terrorism; right?

2         A.   I'm sorry.  Ask the question again,

3    please.

4         Q.   There is no exclusion in the policy for

5    loss caused by terrorism; correct?

6         A.   It has to be a certified act of terrorism.

7         Q.   What -- what does that mean?

8         A.   "Certified act of terrorism means an

9         act that is certified by the Secretary of the

10        Treasury in concurrence with the Secretary of

11        State and Attorney General to be an act of

12        terrorism pursuant to the Federal Terrorism

13        Risk Insurance Act of 2002.

14             "The criteria contained in that Act for a

15        certified act of terrorism include the

16        following:  The act resulted in aggregate

17        losses in excess of $5 million and the act is a

18        violent act or an act that is dangerous to

19        human life, property, or infrastructure, and

20        it's submitted by an individual or individuals

21        acting on behalf of any foreign person or

22        foreign interest as part of an effort to coerce

23        the civilian population of the United States or

24        to influence the policy or affect the conduct

25        of the United States Government by coercion."

270

```
 1        Q.   All right.  I want you to look back at

 2   Exhibit 18, please.  Look at page ATL 98.

 3             Are you there?

 4        A.   Yes.

 5        Q.   Do you see the heading "Terrorism

 6   Coverage"?

 7        A.   Yes.

 8        Q.   I want you to read that paragraph into the

 9   record, please.

10        A.   "The terrorism coverage should not

11        apply because, under its terms, the act must be

12        an act to coerce or influence the United States

13        population of government.  The acts being

14        carried out in Israel are part of a long-term

15        dispute between Hamas and Israel.  The focus is

16        not the United States or its policy.  Moreover,

17        the U.S. Secretary of the Treasury has not

18        certified the events as acts of terrorism.

19        Thus, we do not believe the terrorism coverage

20        would apply."

21        Q.   Is that what you just said, in a nutshell?

22        A.   I'm sorry?

23        Q.   That portion of the letter that you just

24   read, is that, in a nutshell, what you just

25   testified to?
```

271

1         A.   What part?

2         Q.   I asked you if the policy included an

3    exclusion of loss caused by terrorism.

4              Do you remember that question?

5         A.   Yes.

6         Q.   In response you went to the TRIA

7    endorsement that is page ATL 3120 of Exhibit 1;

8    correct?

9         A.   Yes.

10        Q.   And you read portions of it; right?

11        A.   Yes.

12        Q.   And the position you just took in this

13   deposition on the effect of that endorsement to the

14   coverage determination is the same position that

15   OneBeacon took on July 28, 2014, in that letter on

16   page ATL 98 that you just read into the record; is

17   that right?

18             MR. KEELEY:  Objection.  Misstates

19   testimony.  It's misleading.

20             THE WITNESS:  Actually, I read that, the

21   one at ATL 3120, because I said it has to be a

22   certified act of terrorism.  You asked me what's a

23   certified act of terrorism.  So I read what that

24   means.

25   / / /

272

1    BY MR. HAYES:

2        Q.   So did you have any hand in preparing the

3    letter marked Exhibit 18?

4        A.   I did not.

5        Q.   Did you contribute any information or

6    opinion in the course of the preparation of that

7    letter?

8        A.   No, I did not.  Not that I can recall.

9    No.

10       Q.   Was it your opinion prior to July 28,

11   2014, that for terrorism, loss caused by terrorism

12   to be covered by the policy, that terrorism had to

13   be a certified act of terrorism?

14       A.   I'm sorry.  Could you ask it one more

15   time.

16       Q.   Was it your opinion prior to July 28,

17   2014, that for loss caused by terrorism to be

18   covered, the terrorism had to be a certified act of

19   terrorism?

20       A.   I don't recall if I did or did not think

21   that.

22       Q.   I want you to read the first line under

23   heading A on page 3120 of Exhibit 1.  It starts,

24   "Any exclusion."  It's the TRIA endorsement that we

25   were looking at in the policy itself, page 3120 of

                                                    273

1   Exhibit 1.

2        A.   Oh.  Okay.

3             Which would you like me to read?

4        Q.   Just the first sentence, "Any exclusion of

5   terrorism."

6        A.   "Any exclusion of terrorism in this

7        Coverage Part or Policy, or attached to such

8        Coverage Part or Policy by endorsement, is

9        hereby amended to the effect that such

10       exclusion does not apply to a 'certified act of

11       terrorism.'"

12       Q.   So is there an exclusion of terrorism in

13  the policy?

14       A.   It does not appear that there is.  No.

15       Q.   So this TRIA endorsement that amends any

16  exclusion of terrorism in the policy doesn't matter

17  because there isn't an exclusion of terrorism in the

18  policy.

19            Would you agree?

20       A.   I'd agree with that.

21       Q.   Okay.  So whether or not the loss was

22  caused by terrorism was an important question in

23  determining coverage; right?

24            MR. KEELEY:  Objection.  Misleading.

25  / / /

                                              274

```
 1    BY MR. HAYES:

 2         Q.   Or was it not?

 3         A.   It was to Pamela because she brought it

 4    up.

 5         Q.   Okay.  And what did you do, if anything,

 6    to determine whether or not there was any evidence

 7    to support the position that the loss at issue was

 8    caused by terrorism?

 9              MR. KEELEY:  Objection.  Asked and

10    answered.

11              THE WITNESS:  I don't recall if I did

12    anything.

13    BY MR. HAYES:

14         Q.   Okay.  But you definitely didn't go and

15    check to see what the U.S. Government's position on

16    the acts of Hamas was at the time; right?

17         A.   I don't recall.

18         Q.   You don't recall whether or not you did

19    that?

20         A.   Correct.

21         Q.   Okay.  I want you to look back --

22              THE VIDEOGRAPHER:  Is this a good time for

23    a media --

24              MR. HAYES:  No.

25              THE VIDEOGRAPHER:  At your convenience.
```

                                                      275

```
 1   BY MR. HAYES:
 2        Q.   I want you to look back at Exhibit 19.
 3   Okay.  And just let me know when you're there.
 4        A.   I'm here.
 5        Q.   Okay.  When was the first time you saw
 6   this letter?
 7        A.   I don't recall.
 8        Q.   Do you think you saw it -- strike that.
 9             Did you see it at or around the time it
10   was received by OneBeacon?
11        A.   I don't remember.
12        Q.   I want you to look at the --
13             What number are we on?
14             THE REPORTER:  26 is next.
15             MR. HAYES:  This is going to be
16   Exhibit 26.
17             (Exhibit 26 was marked
18             for identification.)
19   BY MR. HAYES:
20        Q.   Take a look at the document marked 26, and
21   let me know if it you've ever seen it before.
22        A.   I have never seen this before.
23        Q.   Okay.  I want you to look at the page
24   marked 3 of 4.
25        A.   Yes.
```

276

1    Q.   And there's some -- there's some
2    statements attributed to Secretary Kerry, and I want
3    you to read the part that starts, "But Hamas" into
4    the record.
5         Do you see that?
6    A.   Yes.
7         "But Hamas is trying to" assist -- "insist
8         that as a reward for their terrorist behavior,
9         things be decided ahead of time, and we support
10        Israel and international community's right not
11        to be extorted by terrorism."
12   Q.   Had you seen that statement by Secretary
13   Kerry prior to July 28, 2014, how, if at all, would
14   that have affected your opinion as to whether or not
15   the DIG claim was covered?
16   A.   I don't recall ever seeing that.  So I
17   can't say how it would have affected it or not.
18   Q.   How would it have affected your opinion on
19   whether or not the loss claimed was caused by
20   terrorism?
21   A.   Are you asking in the sense of how it
22   applies to the policy or just in general for
23   terrorism?
24   Q.   Just in general.  How would that have
25   affected your opinion as to whether the loss claimed

277

1    was caused by terrorism?

2            MR. KEELEY:  Objection.  Calls for a legal

3    conclusion.

4    BY MR. HAYES:

5        Q.   Just your opinion.

6        A.   Well, it would have to be applied against

7    3120.  And nowhere does it say anything of what he's

8    saying about it to coerce the civilian population of

9    the United States.

10       Q.   We've already established that that's

11   irrelevant because there is no exclusion for

12   terrorism in the policy.

13           MR. KEELEY:  Objection.  Argumentative.

14   BY MR. HAYES:

15       Q.   But we don't even --

16       A.   But there has to be aspects of what --

17   these two aspects have to be involved for it to be

18   considered a certified act of terrorism.

19       Q.   We don't even have to address that.

20           My question is:  How would what you just

21   read affect your opinion as to whether the loss

22   claimed in connection with the DIG claim was caused

23   by terrorism?

24       A.   Well, I can't separate these two things

25   from each other.

278

1     Q.   Okay.

2     A.   These two things -- these two portions of

3  it have to be involved for terrorism to be a part of

4  it.  And there was nothing that he's saying here

5  that's saying that it was to coerce the civilian

6  population of the United States.  So it doesn't

7  apply.

8     Q.   Okay.  Put that endorsement to the side.

9  Pretend it's not in the policy.

10        Does your answer change?

11    A.   Well, then terrorism would be excluded.  I

12  mean, there is a reason why this is here.

13    Q.   I thought you testified that there was no

14  terrorism exclusion in the policy.

15    A.   That's correct.

16    Q.   Okay.  So let's ask this again.  Let's go

17  back to Exhibit 26.

18    A.   Yes.

19    Q.   I want you to -- so we have it clean on

20  the record, I want you to read that portion again,

21  I'll read it.

22        "But Hamas is trying to insist that as a

23        reward for their terrorist behavior, things be

24        decided ahead of time, and we support Israel

25        and international community's right not to be

                                                    279

1    extorted by terrorism."

2         Does that statement by Secretary Kerry

3    change your opinion as to whether or not the acts

4    perpetrated by Hamas on to Israel constituted

5    terrorism?

6         A.   No.

7         Q.   And what is your opinion?

8         A.   This was war.

9         Q.   So despite the fact that Secretary Kerry

10   characterizes the acts as terrorism, you maintain it

11   was war, not terrorism?

12        MR. KEELEY:  Objection.  Assumes facts not

13   in evidence.

14   BY MR. HAYES:

15        Q.   Is that right?

16        A.   Yes.

17        Q.   Okay.  But as you said before, Secretary

18   Kerry is in a better position to assess whether or

19   not the acts are, indeed, terrorism or war; right?

20        MR. KEELEY:  Objection.  Misleading.

21   BY MR. HAYES:

22        Q.   Is that correct?

23        A.   Yes.

24        Q.   Okay.  You testified that Pamela Johnson

25   thought the distinction whether the acts were

280

```
 1    terrorism or war was an important one; right?
 2            MR. KEELEY:  Objection.  Misstates
 3    testimony.
 4            THE WITNESS:  Based upon that she brought
 5    it up in her denial letter, yes.
 6    BY MR. HAYES:
 7        Q.  Okay.  So going back to what you said
 8    earlier, from day one you were told, "We try to find
 9    coverage wherever possible"; right?
10        A.  Yes.
11        Q.  So if there was a chance that the loss at
12    issue was caused by terrorism, that's something that
13    you, in keeping with that objective, should see if
14    there's support for; right?
15            MR. KEELEY:  Objection.  Argumentative.
16            THE WITNESS:  Yes.  We would look for
17    everything.
18    BY MR. HAYES:
19        Q.  Including terrorism in this case; right?
20    Including evidence that the acts that caused the
21    loss constituted terrorism; right?
22        A.  I'm sorry.  Could you ask the question
23    again.
24        Q.  If there was a chance that the loss at
25    issue in connection with the DIG claim was caused by
```

281

1    terrorism, in keeping with your objective,

2    OneBeacon's objective to try to find coverage

3    wherever possible, you would look for evidence that

4    the loss was caused by terrorism; right?

5         A.   Yes.

6         Q.   Okay.  And you also said that, on

7    occasion, under certain circumstances, you consult

8    with outside independent insurance adjusters on

9    occasion; right?

10        A.   Yes.

11        Q.   Okay.  If you had the opportunity to

12   consult with the United States Government on the

13   issue whether the acts that caused the loss at issue

14   in this case constituted terrorism, would you take

15   that opportunity?

16             MR. KEELEY:  Objection.  Misleading.

17   Assumes facts not in evidence.

18             THE WITNESS:  Yes.

19   BY MR. HAYES:

20        Q.   Should you have in this case?

21             MR. KEELEY:  Same objections.

22             THE WITNESS:  I wasn't involved at this

23   point.

24   BY MR. HAYES:

25        Q.   You were involved from the very beginning.

282

 1              Should you have, at the very beginning,

 2  when terrorism was raised by Pamela, sought the

 3  counsel of, through your research, the United States

 4  Government on the question whether or not the acts

 5  at issue in this case constituted terrorism?

 6              MR. KEELEY:  Objection.  Misstates prior

 7  testimony.  It's misleading.  Assumes facts not in

 8  evidence.

 9              THE WITNESS:  We did, I believe,

10  everything correctly for this claim.

11              MR. HAYES:  Okay.  This is going to be

12  Exhibit 27.

13              MR. KEELEY:  I'm going to need to take one

14  more break here as soon as it's convenient, Daniel.

15              MR. HAYES:  Yes.

16              (Exhibit 27 was marked

17              for identification.)

18  BY MR. HAYES:

19      Q.   Do you recognize the document marked

20  Exhibit 27?

21      A.   Yes.  No.  Do I recognize it, no.  I've

22  never seen this before.

23      Q.   Okay.  I'm going to read what it says.

24              "The United States strongly condemns the

25          kidnapping of three Israeli teenagers and calls

                                                        283

Video Deposition

```
 1        for their immediate release.  Our thoughts and
 2        prayers are with their families.  We hope for
 3        their quick and safe return home.  We continue
 4        to offer our full support for Israel in its
 5        search for the missing teens, and we have
 6        encouraged full cooperation between the Israeli
 7        and Palestinian security services.  We
 8        understand that cooperation is ongoing.
 9            "We are still seeking details on the
10        parties responsible for this despicable
11        terrorist act, although many indications point
12        to Hamas' involvement.  As we gather this
13        information, we reiterate our position that
14        Hamas is a terrorist organization known for its
15        attacks on innocent civilians and which has
16        used kidnapping in the past."
17            Do you see that?
18    A.    Yes.
19    Q.    Does that statement from John Kerry change
20 your opinion as to whether the conduct that caused
21 the loss in this case was terrorism?
22            MR. KEELEY:  Objection.  Assumes facts not
23 in evidence.  It's misleading.
24            THE WITNESS:  Actually, going back to 26,
25 3 of 4, when he's calling it terrorism acts, he very
```

284

```
1    well could be talking about kidnapping three Israeli
2    teenagers, which I do believe is an act of
3    terrorism.
4    BY MR. HAYES:
5         Q.   Okay.
6         A.   It may not in any way involve what was at
7    that point, I believe, missile rockets and tanks and
8    stuff along those lines.
9         Q.   What about missile rockets fired on
10   innocent civilians?  Is that terrorism?
11             MR. KEELEY:  Objection.  Misleading.
12   Assumes facts not in evidence.
13             THE WITNESS:  That's not what that says
14   here, though.
15   BY MR. HAYES:
16        Q.   I'm not asking you what this says.  I'm
17   asking -- you said missiles or rockets.
18             Rockets fired at innocent civilians, is
19   that terrorism?
20             MR. KEELEY:  Objection.  Assumes facts not
21   in evidence.  Misleading.
22             THE WITNESS:  No.  That's an act of war.
23   BY MR. HAYES:
24        Q.   Okay.  But, again, in keeping with your
25   objective to find coverage wherever possible, should
```

285

1    you have researched what John Kerry thought about

2    Hamas and its activities prior to denying the claim?

3        A.   Again, I felt like we did everything

4    necessary for this claim.

5        Q.   But this is a very specific question.

6             In keeping with your objective to find

7    coverage wherever possible, should you have

8    researched what Secretary Kerry thought about Hamas

9    and its activities prior to denying the claim?

10       A.   Again, I think everything we did was

11   correct.

12       Q.   Should you have sought to determine what

13   Secretary Kerry thought about Hamas and its

14   activities prior to denying the claim?

15       A.   No.

16       Q.   Why not?

17       A.   The -- from the videos that we'd seen,

18   everything looked like a war.

19       Q.   Secretary Kerry thinks Hamas is a

20   terrorist organization.

21            Does that change your opinion on whether

22   or not their acts constitute acts of terrorism?

23            MR. KEELEY:  Objection.  Misleading.

24   Assumes facts not in evidence.  Misstates the

25   record.

286

1             THE WITNESS:  I'm sorry.  Could you ask it

2      again, please.

3      BY MR. HAYES:

4           Q.   Mr. Kerry, Secretary Kerry, thinks Hamas

5      is a terrorist organization known for its attacks on

6      civilians, innocent civilians.

7             Does that affect in any way your opinion

8      as to whether or not the acts committed by Hamas in

9      connection with the DIG claim constitute acts of

10     terrorism?

11            MR. KEELEY:  Objection.  Asked and

12     answered.

13            THE WITNESS:  No.

14     BY MR. HAYES:

15          Q.   It doesn't affect your opinion at all?

16          A.   No.

17            MR. HAYES:  Okay.  We can take a break.

18            THE VIDEOGRAPHER:  Off record 1730.

19            This is the end of Media 4.

20          (Recess from 5:30 p.m. to 5:43 p.m.)

21            THE VIDEOGRAPHER:  We're back on record.

22            We're commencing Media --

23            Did you want to wait, you said?

24            MR. HAYES:  No.  Go ahead.

25            THE VIDEOGRAPHER:  -- Media 5 of the

                                                          287

1    deposition of Daniel Gutterman.  On record at 1743.

2    BY MR. HAYES:

3         Q.   Mr. Gutterman, I want to return to your

4    testimony a little bit earlier regarding what you do

5    at OneBeacon, what OneBeacon does in pursuit of this

6    objective to want to find coverage.

7              Okay?

8              I recall you testified that if an insured

9    mentions a fact that bears on the coverage

10   determination in a way that would suggest there is

11   coverage, here's some things you said OneBeacon

12   would do.

13             Redo everything you did the first time in

14   determining whether or not there was coverage, talk

15   to the insured about why they think there's

16   coverage, talk to underwriting about what

17   OneBeacon's understanding was at the time the policy

18   was agreed to, and do additional research on the

19   Internet to see whether there was support for the

20   insured's position.

21             Is that all correct?

22        A.   Would you read the first one again,

23   please.

24        Q.   Redo everything you did to make the

25   determination, the preliminary determination that

288

1    there was no coverage.

2         A.   I don't know if we -- I don't think we

3    would redo everything that we did.  But we would

4    certainly review every -- all the information that

5    we've received both before and after any new

6    information came to light.

7         Q.   Okay.  So you'd talk to the insured about

8    why they think the information weighs in favor of

9    coverage?

10        A.   Typically, yes.

11        Q.   You'd talk to underwriting about what

12   their understanding was at the time the policy was

13   put into effect?

14        A.   Yes.

15        Q.   You'd do research to see if there was any

16   support for the insured's position?

17        A.   Yes.

18             MR. HAYES:  Okay.  This is going to be

19   Exhibit 28.

20             (Exhibit 28 was marked

21             for identification.)

22   BY MR. HAYES:

23        Q.   Do you recognize the document marked 28?

24        A.   Yes.

25        Q.   What is it?

289

```
 1         A.   Actually, I -- I -- I don't know.  It
 2   doesn't say it was from me.  It appears that it was
 3   from me.
 4         Q.   Well, it says, "Best regards, Danny
 5   Gutterman"; right?
 6         A.   Correct.  But in the "From" line, it
 7   doesn't have my name.
 8         Q.   Okay.  The e-mail starts:
 9              "Hi Pamela -
10              "I'm going to put the following into the
11         CWS notes, if you're okay with it."
12              What does that mean, "CWS notes"?
13         A.   That is our electronic file system.
14         Q.   That's Exhibit 21; right?
15         A.   Yes.
16         Q.   And then you say in this e-mail to Pamela:
17              "Pamela Johnson and I had a conference
18         call with Andrea Garber of NBC and Susan Weiss
19         of AON.
20              "Andrea Garber stated said the production
21         decided to move the production as the situation
22         in Israel has not improved and does not appear
23         that it will.
24              "Pamela Johnson told them that we have
25         reviewed the policy and it appears that the war
```

290

1      exclusion will potentially apply here."

2           Do you see that?

3      A.   Yes.

4      Q.   Does that refresh your recollection that

5 you had a conversation with Andrea Garber and Susan

6 Weiss in which Pamela Johnson told them that the war

7 exclusion will potentially apply here?

8      A.   That -- yes.  That reminds me of that.

9      Q.   Okay.  The notes go on:

10          "She told them that the production push

11     appears to be covered as it occurred before

12     Hamas's rejection of the cease fire and Israel

13     then stating that they will be going forward

14     with all force."

15          Do you see that?

16     A.   Yes.

17     Q.   Do you remember that part of the

18 conversation?

19     A.   No.

20     Q.   Then you say:

21          "Andrea and Susan stated that they did not

22     believe that Hamas can be considered a

23     government and are considered by the U.S. to be

24     a terrorist organization."

25          Do you see that?

291

```
 1          A.   Yes.

 2          Q.   Do you recall Andrea and Susan saying that

 3   in the phone call?

 4          A.   No.

 5          Q.   Okay.  Do you have any reason to believe

 6   that Exhibit 28 is not a true and correct copy of

 7   notes that you wrote to yourself or to Pamela

 8   memorializing a phone call that you had with Andrea

 9   and Susan at NBCU?

10          A.   I don't know when these were written

11   because Pamela was to longer working July 3, 2016.

12   So I don't know when these were written.

13          Q.   Do you have any reason to believe that

14   these notes do not accurately reflect the content of

15   a conversation that you and Pamela had with Andrea

16   and Susan?

17          A.   No.  I have no reason.

18          Q.   Okay.  Are these notes in the DIG claim

19   file marked Exhibit 21?

20          A.   It does not appear that they are.

21          Q.   Why not?

22          A.   Again, I'm not sure when this was -- were

23   taken.  It doesn't say it was from me.  I don't know

24   if this was a draft.  I don't -- I don't know why

25   this was not put in.
```

292

1        Q.   Did Pamela tell you to keep them out of
2    the file?
3        A.   No.  Not that I recall.
4        Q.   Do you have any idea why these notes
5    aren't in the file?
6        A.   No.  But, again, I don't know when they
7    came from.  This says July 3, 2016, and she was no
8    longer with the company.
9        Q.   Okay.  But you testified that reading
10   these notes refreshed your recollection that you
11   were a party to a phone call with Pamela Johnson,
12   Andrea Garber, and Susan Weiss; right?
13       A.   Yes.
14       Q.   Okay.  Do you see here at the bottom it
15   says:
16            "Andrea and Susan stated that they do not
17        believe Hamas can be considered a government
18        and are considered by the U.S. to be a
19        terrorist organization"?
20            In keeping with OneBeacon's policy to do
21   what they can to find coverage, did you research
22   whether or not there was support for that contention
23   that Hamas was a terrorist organization and not a
24   government?
25       A.   I personally did not.

                                                        293

1    Q.   Did anybody?

2    A.   I don't know.

3    Q.   Why not?

4    A.   I don't know why I did not.

5    Q.   Should you have?

6    A.   I didn't really have any involvement in

7  the claim at that point.

8    Q.   Should somebody have researched that

9  issue?

10   A.   That's not really for me to answer on

11  behalf of someone else.

12   Q.   Should you have researched that issue?

13   A.   I -- again, I don't remember -- I don't

14  know when this was written.  I don't know what --

15  no.

16   Q.   Sorry?

17   A.   Would you ask the question again, please.

18   Q.   Should somebody have researched whether,

19  quote, "Hamas can be considered a government," or,

20  quote, "considered by the U.S. to be a terrorist

21  organization"?  Should somebody have researched

22  those issues after NBCU, OneBeacon's insured,

23  brought them up?  Should somebody have researched

24  them to determine whether or not there was support

25  for those contentions?

294

```
 1          A.   I don't know if anyone did or not.  I did

 2     not.

 3          Q.   Should somebody have researched that?

 4          A.   Yes.  But it doesn't change the fact that

 5     it was a war.

 6          Q.   Despite what John Kerry says; right?

 7               MR. KEELEY:  Objection.  Argumentative.

 8     Misleading.  Assumes facts not in evidence.

 9               MR. HAYES:  This is going to be

10     Exhibit 29.

11               (Exhibit 29 was marked

12               for identification.)

13     BY MR. HAYES:

14          Q.   Do you recognize the e-mail chain marked

15     Exhibit 29?

16          A.   Yes.

17          Q.   What is it?

18          A.   It appears to be an e-mail chain.

19          Q.   Is this an e-mail chain that you

20     participated in?

21          A.   Yes.

22          Q.   I want you to look at the initiating

23     e-mail on page ATL 1549.

24          A.   Okay.

25          Q.   It says:
```

295

1          "Hi Wanda -

2          "Please confirm that NBCU's 'DIG' was

3      declared.  Also, please advise if the Israel

4      portion was approved.  I see the Toronto part

5      was in ImageNow."

6          Do you see that?

7      A.   Yes.

8      Q.   What did you mean by that, those three

9  sentences?

10     A.   Whether -- sorry.  "Please confirm that

11 NBCU's DIG was declared," asking her whether or not

12 the production had been declared by the

13 production -- to the broker and the broker declared

14 it to us.

15     Q.   Okay.  Why did you want to know that?

16     A.   If it had not been declared, there is

17 potential that we wouldn't have covered any claim

18 that came from it just because it wouldn't have been

19 a declared production.

20     Q.   Okay.  Then the next sentence is, "Also,

21 please advise if the Israel portion was approved."

22          Why did you ask that question?

23     A.   Because the claim was about Israel.

24     Q.   Why did you want to know whether or not it

25 was approved, the Israel portion?

                                                    296

1      A.   Just to confirm that it was.

2      Q.   Okay.  Wanda responds:

3           "The production was . . . declared, and we

4      approved the filming in Israel with terms."

5           Do you see that?

6      A.   Yes.

7      Q.   And you ask:

8           "Thank you for the response!

9           "What were the terms?"

10          Do you see that?

11     A.   Yes.

12     Q.   And then she responds:

13          "We approved filming in East Jerusalem and

14     Tel Aviv.  NBC Security team is to remain

15     involved and continue working with production.

16     We required that production work with the local

17     production company Keshet and coordination with

18     the local police."

19          Do you see that?

20     A.   Yes.

21     Q.   What does that mean to you?

22     A.   Those were the terms that Wanda, as the

23     underwriter, agreed to with the broker.

24     Q.   How does that bear on the coverage

25     determination, if at all?

                                                          297

1        A.    It didn't.

2        Q.    Why not?  Why did you ask what the terms

3   were?

4        A.    Because they potentially could have

5   beared [sic] on -- on the claim.

6        Q.    But these terms did not, in your opinion?

7        A.    No.

8        Q.    Why did OneBeacon require that the

9   production work with local production company Keshet

10   in coordination with the local police?

11        A.    I don't know.  I don't deal with the

12   underwriting side.

13        Q.    Why did OneBeacon require that the NBC

14   Security team remain involved?

15        A.    I don't know.  I don't work with the

16   underwriting side.

17        Q.    Did you ask Wanda in connection --

18        A.    No.

19        Q.    You did not?

20        A.    Not that I recall, no.

21        Q.    Did you have any conversations with Wanda

22   outside of the four corners of Exhibit 29?

23        A.    Not that I can recall.

24        Q.    Did you have any -- did you call her on

25   the phone?

298

1     A.   Not that I can recall.

2     Q.   Did you follow up with any other questions

3  in response to her last e-mail on Exhibit 29?

4     A.   Not that I can recall.

5     Q.   What if OneBeacon required the NBC

6  Security team to remain involved because OneBeacon

7  was worried about loss as a result of terrorism in

8  Israel?

9          MR. KEELEY:  Objection.  Vague.

10  Assume- -- objection.  Vague.  Assumes facts not in

11  evidence.

12  BY MR. HAYES:

13     Q.   Would that have been relevant to your

14  decision whether or not there was coverage?

15          MR. KEELEY:  Same objections.

16          THE WITNESS:  Will you ask the question

17  again, please.

18  BY MR. HAYES:

19     Q.   The e-mail from Wanda says that OneBeacon

20  required NBCU to coordinate with local police.  It

21  also says that OneBeacon required NBC to remain

22  involved -- the NBC Security team to remain involved

23  and continue working with production.

24          Do you see that?

25     A.   Yes.


                                                    299

```
 1        Q.   Do you have any idea why OneBeacon
 2   required the NBC Security team to remain involved in
 3   the --
 4        A.   No.
 5        Q.   -- DIG production?
 6        A.   I did not.
 7        Q.   And you didn't seek to find out why?
 8        A.   No.
 9        Q.   But if the reason why was OneBeacon was
10   worried about the hostilities in the region
11   affecting the production, that would have been
12   relevant; right?
13             MR. KEELEY:  Objection.  Misleading.
14   BY MR. HAYES:
15        Q.   That would have been relevant to your
16   coverage determination; right?
17             MR. KEELEY:  Same objection.
18             THE WITNESS:  I'm not sure.
19   BY MR. HAYES:
20        Q.   If you were trying to achieve the
21   OneBeacon objective of finding coverage, wouldn't
22   you want to know why OneBeacon required NBC Security
23   to remain involved and whether or not OneBeacon had
24   terrorism on its mind when it made that requirement?
25             MR. KEELEY:  Objection.  Assumes facts not
```

300

```
 1    in evidence.  Misleading.
 2             THE WITNESS:  I don't know.  That
 3    doesn't -- that's a hypothetical that I'd never
 4    thought about until you just asked it.
 5    BY MR. HAYES:
 6        Q.   If Wanda Phillips said to you, "The reason
 7    we wanted NBC Security to remain involved was we
 8    were worried about Hamas committing terrorist acts
 9    that would affect the production," would that have
10    affected the coverage determination?
11             MR. KEELEY:  Objection.  Calls for
12    speculation.  Assumes facts not in evidence.  Is
13    misleading.
14             THE WITNESS:  I don't know.
15    BY MR. HAYES:
16        Q.   Okay.  I want you to go back to
17    Exhibit 15.
18             Did OneBeacon follow all of the general
19    claims practices set forth in Exhibit 15 in their
20    handling of the DIG claim?
21             Are you literally reading the entire --
22        A.   I just want to make sure.  Yes.  You asked
23    me a question.  I don't want -- I'll skip the last
24    five pages.
25        Q.   Well, I just want to know, in your reading
```

301

1    of it, did you come upon anything that OneBeacon did

2    not do in connection with the --

3         A.   From what I've currently read, no.

4         Q.   Okay.  Look at page 2, where it says:

5              "Determine the need for outside vendors to

6         assist in the investigation, such as surveyors,

7         attorneys, engineers, accountants, fire

8         experts, salvor, etc., and assign

9         responsibility to such vendors, when

10        appropriate."

11             Who determined the need for outside

12   vendors?

13        A.   That would have been Pamela.

14        Q.   Okay.  Did she determine whether or not an

15   independent adjuster who had dealt with a war

16   exclusion or a terrorism exclusion should be

17   consulted?

18        A.   I don't know.

19        Q.   Okay.  Did that question ever come up, to

20   your knowledge?

21        A.   Not that I can recall.

22        Q.   Okay.  Look at page 7.  It says:

23             "All claims-related communications,

24        written and oral, should be documented in the

25        claims file.  This includes, but is not limited

                                                        302

```
 1         to, electronic communications, such as e-mail,
 2         as well as paper communications and notes of
 3         oral communications."
 4              Was that procedure followed?
 5         A.   Again, I don't know what that one that is
 6    that you showed me earlier.  But besides that, yes.
 7         Q.   Besides that?
 8         A.   Well, I don't know when that came from.
 9              There's also another part I thought I saw
10    earlier.
11              "Draft documents, whether in paper or
12         electronic form, are not to be part of the
13         claim file since they are not finished or
14         complete documents.  Incomplete or unfinished
15         documents should not be retained.  All
16         completed or finished documents are final
17         documents and must be retained."
18              Okay.
19         Q.   So you think that Exhibit 28 was a draft?
20         A.   I don't know what that was.
21         Q.   Okay.  Is that why you were asking Pamela
22    to approve it, because it was just a draft?
23         A.   I don't -- I don't know.
24         Q.   Do you know whether or not she responded
25    to your e-mail, if that was your e-mail?
```

                                                        303

1       A.   I don't know.

2       Q.   Okay.

3            THE VIDEOGRAPHER:   About two minutes,

4   Counsel.

5            MR. HAYES:   This is going to be

6   Exhibit 30.

7            (Exhibit 30 was marked

8            for identification.)

9   BY MR. HAYES:

10      Q.   Do you recognize the document marked

11   Exhibit 30?

12      A.   Yes.

13      Q.   Why did you say here:

14           "Please review the policy language for

15      Extra Expense.  The wording for Civil Unrest

16      and the exclusions for it are not like other

17      policies . . . "?

18           Do you know why you said that?

19      A.   No.

20      Q.   It says at the top:

21           "It looks like we need to have a lot of

22      further discussion about this.  Please call me

23      first thing in the morning."

24           Do you recall having that conversation?

25      A.   I do not.

                                                    304

1    Q.   Do you recall why she said, "We need to

2    have a lot of further discussion"?

3    A.   I did not.

4    Q.   What did you do to search for documents in

5    this case, if anything?

6    A.   I'm sorry.  Can you ask the question

7    again.

8    Q.   Did you do anything to search for

9    documents in connection with this case?

10   A.   What type of documents?

11   Q.   Any documents, electronic or paper.

12   A.   Well, once again, once we got the claim

13   and it came in, I went on Google.

14   Q.   In connection with this litigation, did

15   you search for documents in the discovery process?

16   A.   Oh.  I looked to see if I had a hard file.

17   I looked everywhere, and I didn't see anything.

18   Q.   Okay.  And did you look for electronic

19   documents?

20   A.   No.

21        MR. HAYES:  Okay.  Are we out of time?

22        THE VIDEOGRAPHER:  Yes.

23        MR. HAYES:  Okay.

24        THE WITNESS:  Not that I recall, I don't.

25        THE REPORTER:  There was a stipulation.

305

1                MR. HAYES:  I don't know what it was.

2    What was the stip?

3                THE REPORTER:  I can import it into this

4    transcript.

5                MR. HAYES:  I'd like to know what it was.

6                THE VIDEOGRAPHER:  Do you want to go off

7    the record?

8                MR. HAYES:  Sure.

9                THE VIDEOGRAPHER:  Off record, 18:10.

10        (A discussion was held off the record.)

11           MR. HAYES:  We propose the same

12   stipulation reached at the end of Mr. Williams'

13   deposition on Wednesday.

14                THE WITNESS:  I would like to back on --

15                MR. KEELEY:  That's agreeable.

16                THE REPORTER:  Thank you.

17                Off the record?

18                MR. KEELEY:  Off the record.

19                MR. HAYES:  Okay.

20

21           (For the convenience of the parties, the

22        following excerpt from the deposition of PETER

23        DONALD WILLIAMS, taken on February 1, 2017, is

24        reprinted herein as follows:

25                "MS. COYOCA:  . . . at the time of

                                                           306

1      transmission of the transcript to counsel for

2      Mr. Williams, the court reporter will be

3      relieved of all of her responsibilities; the

4      witness shall have either 14 or 30 days to

5      review the transcript, sign it under penalty of

6      perjury, and provide the original signature to

7      counsel for plaintiffs in the matter; and that

8      the failure to provide the signed transcript

9      does not impact the ability of plaintiffs to be

10     able to use the transcript for any purpose at

11     the time of trial.

12          "MR. KEELEY:  Yeah.  And this is

13     conditioned on having the same stipulation in

14     the remaining depositions concerning timing and

15     the other terms.

16          "MS. COYOCA:  Agreed.")

17

18          (At 6:22 p.m. the deposition of DANIEL

19          SPENCER GUTTERMAN was adjourned.)

20

21

22

23

24

25

307

Video Deposition

```
 1

 2

 3

 4

 5

 6

 7

 8           I declare under penalty of perjury that

 9      the foregoing testimony is true and correct.

10

11           Executed at                              ,

12      this        day of                            ,

13      20      .

14

15

16

17                DANIEL SPENCER GUTTERMAN

18

19

20

21

22

23

24

25

                                                     308
```

STATE OF CALIFORNIA      )
                         )
COUNTY OF LOS ANGELES    )


          I, Ingrid Suárez Egnatuk, CSR No. 3098, a

Certified Shorthand Reporter in and for the State of

California, do hereby certify:

          That the foregoing deposition of DANIEL

SPENCER GUTTERMAN was taken before me at the time

and place therein set forth, at which time the

witness was put under oath by me;

          That the testimony of the witness and all

objections made at the time of the examination were

recorded stenographically by me and were thereafter

transcribed under my direction;

          That the foregoing is a true record of the

testimony and of all objections made at the time of

the examination.


          In witness whereof, I have subscribed my

name this 6th day of February, 2017.




                    Certified Shorthand Reporter
                              No. 3098




                                                          309

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 841 of 970   Page ID #:16222

Universal Cable Productions, LLC v.
Atlantic Specialty Insurance Company

Video Deposition

Daniel Spencer Gutterman
February 3, 2017

**$**

**$1 (2)**
101:5,20
**$200,000 (3)**
95:20,21;96:4
**$5 (1)**
270:17
**$50,000 (1)**
101:4

**[**

**[sic] (3)**
55:9;240:18;298:5

**A**

**Aaron (3)**
170:12,13,16
**ability (1)**
307:9
**able (3)**
40:18;241:23;
307:10
**above (2)**
171:1;219:8
**abroad (1)**
13:17
**accepted (1)**
73:5
**access (1)**
40:19
**accident (2)**
60:20;61:12
**accidents (1)**
82:10
**according (3)**
94:25;248:10;
259:7
**account (2)**
94:24;98:20
**accountants (1)**
302:7
**accounting (2)**
36:22,22
**accurate (16)**
42:1,15;43:20;
67:18,23;70:2;95:5;
103:2,20;148:7;
164:13;173:23;
174:5;209:9;229:10;
245:2
**accurately (1)**
292:14
**achieve (1)**
300:20
**achieving (1)**
175:16
**across (2)**
78:15;108:15
**act (23)**

217:14;270:6,8,9,
11,13,14,15,16,17,
18,18;271:11,12;
272:22,23;273:13,
18;274:10;278:18;
284:11;285:2,22
**acting (1)**
270:21
**action (4)**
38:16,17,24;183:4
**actions (1)**
30:10
**activities (3)**
286:2,9,14
**actor (3)**
42:23;90:7;167:18
**actor's (1)**
110:6
**actress (1)**
240:2
**acts (23)**
152:10;153:24,25;
154:19,20;267:18;
269:8;271:13,18;
275:16;280:3,10,19,
25;281:20;282:13;
283:4;284:25;
286:22,22;287:8,9;
301:8
**actual (4)**
38:18;73:2;108:1;
256:8
**actually (41)**
9:25;12:15;13:10;
28:8;30:9;56:9;64:4;
70:5;73:1;84:12;
87:12;90:20;101:2;
108:11;109:15;
140:7,8,15;148:11;
152:15;161:2;
164:14;165:21;
170:1;171:8;187:10;
189:4;207:2;211:9;
221:19;222:3;224:3;
233:18;237:8;240:1;
256:20;258:15;
264:3;272:20;
284:24;290:1
**added (1)**
208:25
**additional (4)**
44:2,4;250:17;
288:18
**address (2)**
171:7;278:19
**adjourned (1)**
307:19
**adjust (16)**
71:10,11,12;91:18,
19,20,21;92:1,4,7,11,
13;94:5,8;168:13;
169:21
**adjuster (57)**

56:4,14;60:11;
63:6;82:3,6;87:3;
90:24;91:2,9,11,12,
16,22;92:25;93:15;
95:6,14,14,17,23;
102:16;108:5,14;
109:7,11,18;110:22;
111:5,9,25;112:2,8,
14;139:25;141:23;
142:14;143:1;144:8;
158:7,25;159:25;
160:10,14;177:7;
183:12,22;184:16;
185:24;186:13,25;
188:1,5,6,16;211:8;
302:15
**adjusters (15)**
95:10;96:10;
108:20,21,24,25;
109:24;110:10,15;
112:4;143:2,19;
144:6,7;282:8
**adjusters' (1)**
79:23
**adjuster's (7)**
68:20,25;69:13,
17;70:9,13,24
**adjusting (15)**
109:8;155:15;
167:5;190:3;197:7,
11,13,22;202:24;
204:25;205:9;
209:16;221:16,19;
222:3
**adjustment (4)**
199:23;201:1;
202:5;218:12
**adjusts (1)**
169:9
**administrative (3)**
10:21;86:13;226:5
**administrator (1)**
226:3
**admonitions (1)**
86:18
**advance (6)**
239:1,18;247:25;
248:1,1,16
**advanced (1)**
11:15
**advice (4)**
180:4,5,6;184:15
**advise (2)**
296:3,21
**advised (2)**
238:25;239:17
**affect (6)**
11:7;270:24;
278:21;287:7,15;
301:9
**affected (11)**
18:25;63:15;
109:14;246:8;250:7;

263:18;277:14,17,
18,25;301:10
**affecting (1)**
300:11
**affirm (1)**
8:7
**afford (1)**
57:9
**afraid (1)**
20:14
**AFTERNOON (1)**
163:1
**afterwards (1)**
256:4
**again (56)**
26:7,21;37:3;42:6;
45:11;63:16;72:10;
92:10;100:15;
113:25;154:7;
155:14;158:22;
166:20;171:16;
174:8,20,22,24;
175:2,23;176:1,15;
177:15;186:7;187:6;
191:9;193:8;201:4;
208:15;212:18;
223:3,19,23;247:24;
248:15,24;260:8;
265:4;270:2;279:16,
20;281:23;285:24;
286:3,10;287:2;
288:22;292:22;
293:6;294:13,17;
299:17;303:5;305:7,
12
**against (8)**
31:17;38:18,25;
58:19;81:21;82:2;
225:4;278:6
**Agency (9)**
55:9,12,19,21;
56:25;57:7;73:4;
86:23;87:2
**agent (2)**
55:11,17
**agents (1)**
38:20
**aggregate (1)**
270:16
**ago (8)**
69:3;85:5;97:11;
184:24;239:3;
240:11,11;248:24
**Agree (11)**
22:1;30:2,6,8;
99:25;103:19;
159:11;259:11,12;
274:19,20
**agreeable (1)**
306:15
**agreed (5)**
173:14;259:9;
288:18;297:23;

307:16
**agreeing (2)**
164:19;165:2
**agreement (3)**
26:11;91:10;
159:20
**ahead (8)**
115:15;157:25;
181:22,23;219:24;
277:9;279:24;
287:24
**aimed (1)**
264:14
**alert (4)**
228:22;261:23,25;
262:12
**allies (1)**
25:24
**almost (5)**
103:12;150:13;
207:5;211:9;259:18
**along (3)**
40:23;170:23;
285:8
**although (1)**
284:11
**always (20)**
9:15;61:7;62:12;
103:12;104:9;
109:23;113:16,18;
155:11;156:17;
170:4,5;176:2;
182:10;185:17,21;
206:25;210:14;
239:23;247:17
**ambiguous (2)**
144:21;178:25
**amended (1)**
274:9
**amends (1)**
274:15
**American (3)**
22:20;23:8,9
**America's (1)**
25:23
**among (2)**
33:11;226:20
**Amongst (2)**
115:1;179:7
**amount (8)**
83:24;96:8;101:4,
21;106:11;107:10,
14,15
**analysis (6)**
244:11,19;246:8;
249:5;250:7;263:19
**analyze (2)**
95:1;108:3
**ancient (2)**
16:5;18:14
**and/or (2)**
146:9;209:8
**Andrea (19)**

Min-U-Script®

Bayside Reporting Company
(888) 229 - 9897

(1) $1 - Andrea

824

EXHIBIT 16

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 842 of 970   Page ID
#:16123

Universal Cable Productions, LLC v.
Atlantic Specialty Insurance Company

Video Deposition

Daniel Spencer Gutterman
February 3, 2017

199:17;226:14,24;
228:19;229:7;236:9,
15;238:21;242:24;
261:20;290:18,20;
291:5,21;292:2,8,15;
293:12,16
**ANGELES (4)**
7:1,15;109:15,16
**anonymous (1)**
171:7
**answered (26)**
46:17;52:15;
55:15;65:14;66:22;
77:9;162:1;165:10;
186:16;187:4,17;
216:4,17;217:5,18;
242:19;243:4;
244:14;248:14;
249:23;250:10;
260:7;261:10;
263:24;275:10;
287:12
**answer's (1)**
80:12
**anticipate (1)**
221:17
**anxious (1)**
83:10
**anymore (1)**
168:19
**AON (1)**
290:19
**AONNBCU3242 (1)**
236:8
**apartment (2)**
12:23;16:25
**apologize (5)**
55:15;165:23;
166:20;168:23;
212:13
**apparently (1)**
214:4;243:11
**appear (7)**
199:18;234:16;
235:22;241:13;
274:14;290:22;
292:20
**appearance (1)**
7:23
**appeared (1)**
26:20
**appears (16)**
37:25;200:21;
202:2;220:22;221:3;
225:25;226:22;
232:10;254:1,20;
255:24;256:4;290:2,
25;291:11;295:18
**applicable (3)**
71:16;91:23;270:1
**application (9)**
112:17,20,25;
141:3,8,19;144:16;

215:21;224:16
**applied (15)**
66:19;140:23;
142:6,14;192:22;
193:2;208:18;209:7,
11;215:12;222:24;
223:7;237:15;
255:14;278:6
**applies (2)**
31:2;277:22
**apply (28)**
37:11;113:20;
115:5;151:9;164:4;
172:25;175:21;
190:2;192:20,25;
193:4,12;194:18,21,
24;208:3,6,12,14;
252:19;253:2,7;
271:11,20;274:10;
279:7;291:1,7
**applying (8)**
186:25;203:13;
205:7;213:21;
214:16;215:2;218:5;
244:2
**appreciate (1)**
83:12
**appreciated (1)**
34:1
**approach (1)**
165:6
**appropriate (1)**
302:10
**approve (1)**
303:22
**approved (5)**
296:4,21,25;297:4,
13
**area (4)**
18:25;27:21;
219:22;220:4
**areas (1)**
219:11
**argument (1)**
181:11
**Argumentative (6)**
31:18;188:7;
242:19;278:13;
281:15;295:7
**arising (1)**
114:20
**armies (4)**
30:15;45:4;
146:19;148:3
**arose (1)**
89:4
**around (18)**
14:19;19:11;
21:11,25;22:10,24;
23:20;27:9;56:1;
69:18;71:11;80:13;
114:6;157:11;
174:22;176:12;

187:11;276:9
**arrangements (3)**
242:7,11,21
**arrested (1)**
57:6
**article (13)**
26:22;246:22;
248:10;252:14,17,
25;253:5,6,16,18,22;
254:13,16
**articles (9)**
27:1,5;32:11,17;
45:12;49:9,23;50:2;
161:15
**articulated (1)**
217:23
**arts (1)**
11:17
**aside (3)**
68:23;173:9;
192:12
**aspect (5)**
42:13,21;175:18;
244:22;250:11
**aspects (7)**
48:6;71:7;152:11;
226:6;250:23;
278:16,17
**assess (1)**
280:18
**assessment (1)**
159:12
**assign (1)**
302:8
**assigned (6)**
60:18;93:15;94:1;
150:12;167:20;
171:3
**assigns (2)**
167:21;171:5
**assist (4)**
196:14;247:23;
277:7;302:6
**assistant (5)**
40:9;53:11;55:11,
17;226:3
**assisting (1)**
54:23
**associated (8)**
16:1;39:18;41:1;
42:10,19;53:1,21;
107:15
**Associates (1)**
58:2
**association (1)**
58:25
**assume (3)**
10:13;235:11;
245:16
**Assume- (1)**
299:10
**Assumes (12)**
243:20;280:12;

282:17;283:7;
284:22;285:12,20;
286:24;295:8;
299:10;300:25;
301:12
**assuming (4)**
35:8;43:9;172:22;
177:25
**at-fault (1)**
61:15
**ATL (13)**
38:3;79:8;225:16;
226:11,11;227:10,
24;242:2;271:2;
272:7,16,21;295:23
**ATL003073 (1)**
6:5
**ATL003127 (1)**
6:5
**Atlanta (1)**
35:6
**Atlantic (2)**
7:9;8:2
**atomic (1)**
39:7
**attached (7)**
199:5;202:7;
259:4,8,14;260:18;
274:7
**attachment (1)**
199:19
**attachments (1)**
171:15
**attack (1)**
38:18
**attacked (1)**
28:13
**attacks (3)**
44:10;284:15;
287:5
**attempt (1)**
74:21
**attend (1)**
35:11
**attorney (5)**
15:16;30:22;59:5;
142:8;270:11
**attorney-client (1)**
66:5
**attorneys (3)**
58:3;59:4;302:7
**attributable (1)**
216:20
**attributed (1)**
277:2
**audible (3)**
9:15;147:20;
235:16
**audibly (1)**
9:19
**audio (1)**
9:12
**authenticate (1)**

220:11
**authentication (1)**
67:6
**authorities (1)**
170:22
**authority (2)**
38:19,25
**Auto (13)**
56:4,6,14;60:11;
63:21;71:25;79:22;
82:9,9;108:20;110:3,
4,6
**automatic (2)**
171:6;207:5
**available (3)**
236:17;245:21;
262:1
**Avenue (1)**
7:18
**Aviv (3)**
19:25;20:2;297:14
**avoid (1)**
9:23
**aware (8)**
29:21;108:10;
141:2,6,17;183:16;
202:13;225:24
**away (2)**
14:24;262:1

**B**

**BA (1)**
11:23
**bachelor's (1)**
11:17
**back (47)**
28:8;39:14,20;
56:9;68:8;73:17;
76:18;77:4;82:10;
92:20;111:11;
140:14,18,25;
141:21;154:9;
155:18;158:3;
161:14;163:8;
165:21;168:24;
184:23;185:5;200:3;
210:3;220:8;221:11;
230:4;234:15;
237:25;242:1;
255:17;256:7;
258:21;261:13;
262:19;269:1;271:1;
275:21;276:2;
279:17;281:7;
284:24;287:21;
301:16;306:14
**backwards (2)**
36:2;40:3
**bad (4)**
25:25;26:17,19;
53:20
**bail (2)**

Min-U-Script®

Bayside Reporting Company
(888) 229 - 9897

(2) ANGELES - bail

825

EXHIBIT 16

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 843 of 970   Page ID
#:1024

Universal Cable Productions, LLC v.
Atlantic Specialty Insurance Company

Video Deposition

Daniel Spencer Gutterman
February 3, 2017

57:9,13
**Baltzell (5)**
104:13;169:18,19,
25;170:10
**BAND (1)**
51:13
**barely (1)**
207:21
**based (25)**
26:9;29:10;32:8,
15,20;41:5;45:16,21;
46:23;47:25;60:22;
61:2;99:10;142:23;
148:18;161:20;
167:2;229:7;240:9,
14;242:5,11,23;
259:17;281:4
**bases (2)**
47:6;48:25
**Basically (11)**
13:19;14:15,19;
27:16;57:12;74:9;
75:23;85:18;164:10;
174:21;209:19
**basis (3)**
28:17;66:4;176:3
**battles (1)**
48:7
**Beacon (3)**
35:18,23;36:3
**bear (1)**
297:24
**beared (1)**
298:5
**bears (1)**
288:9
**became (16)**
36:3;70:23;90:7;
104:11;209:19;
210:4,11,16,17;
211:4,23;212:16;
213:12;215:2;
225:24;268:20
**become (6)**
69:2;71:2,9,21;
209:21;210:19
**beforehand (2)**
257:24;258:20
**began (7)**
70:9;89:13;90:21,
25;164:8;169:23;
192:22
**begin (1)**
35:16
**beginning (16)**
10:4;86:16;89:22;
99:3;102:13;109:1;
113:16;164:11;
166:1;204:24;
212:25;214:11,20;
218:7;282:25;283:1
**begun (2)**
245:6,7

**behalf (5)**
7:7,25;8:2;270:21;
294:11
**behavior (2)**
277:8;279:23
**behind (1)**
88:6
**belief (2)**
41:5;66:20
**below (2)**
104:14;238:21
**beneficial (3)**
96:1;177:17;
206:25
**Besides (9)**
26:20,23;57:23;
58:24;168:1;172:6;
224:4;303:6,7
**best (13)**
10:1;45:8;75:13;
153:10;183:3;188:4;
195:19;196:18;
236:19;239:7;
243:17;247:18;
290:4
**better (5)**
48:11;205:18;
266:17,21;280:18
**beyond (5)**
73:9;170:21;
180:13;206:21;
229:9
**biased (1)**
28:5
**biblical (1)**
27:15
**big (2)**
71:18;107:10
**Bing (2)**
207:20,21
**Binke (1)**
226:15
**birthday (1)**
69:9
**bit (4)**
24:4,15;197:8;
288:4
**bits (2)**
24:19;36:22
**blank (1)**
196:7
**board (3)**
78:16;108:16;
170:8
**bombing (3)**
30:13;140:11;
265:22
**Bombings (1)**
44:10
**borders (2)**
146:19;148:3
**bosses (1)**
206:17

**Boston (5)**
139:12;140:10;
141:16;217:20;
265:14
**Both (13)**
15:14;41:24;
55:13;76:20;77:5;
80:13;97:10;176:12;
178:23;235:2;
236:16,17;289:5
**bottom (4)**
38:11;228:15;
236:7;293:14
**Boulevard (1)**
7:14
**box (2)**
16:24;256:1
**brand-new (1)**
187:9
**break (19)**
67:2;68:3;99:21;
155:8;162:5;188:25;
189:5;219:10,17,19,
24;220:3,5,5,12;
221:7;237:9;283:14;
287:17
**breaks (1)**
219:13
**Brian (3)**
85:1,2,18
**bring (13)**
41:8,9,10;102:8,
20;103:1,9;105:3;
106:8;173:8,13,15,
15
**bringing (5)**
105:23;173:7,9;
256:22
**broad (2)**
71:18;88:5
**broke (1)**
88:24
**broken (1)**
90:6
**broker (42)**
32:10,17;82:16;
84:18,20;142:21,24;
146:1;151:6;155:17;
171:19;172:3,6;
173:6,13,18;174:24;
198:20,22;202:18;
203:2,21,25;204:13;
205:12;209:1,8;
212:7,20;213:21;
214:15;216:10;
218:5;222:5,15,23;
223:22;224:1;258:2;
296:13,13;297:23
**brokers (1)**
172:20
**broker's (1)**
84:25
**BROTHERS (1)**

51:13
**brought (21)**
48:5;58:4;66:9;
97:14,16,17;98:16;
102:21;151:10;
154:8;165:12;172:2;
174:14;234:16;
242:25;243:3;249:1,
2;275:3;281:4;
294:23
**buses (1)**
265:23
**Bush (2)**
50:6,7
**busy (1)**
88:21

**C**

**Cable (1)**
7:8
**cafes (1)**
265:23
**calendar (5)**
195:21;196:6,7,11,
14
**CALIFORNIA (6)**
7:1,11,15,19;70:4,
6
**call (38)**
102:3;151:24,25;
171:23;228:5,6,11,
13,17;229:5,16,20;
230:5,6,8,10,13,17,
24;232:11,20;
233:14;234:19;
236:18,22,24,25;
237:3,10,21;238:4;
261:18;290:18;
292:3,8;293:11;
298:24;304:22
**called (12)**
17:3;36:6,7;39:24;
40:9;41:22;51:7;
53:8;54:1;58:1;
148:15;171:9
**calling (2)**
250:20;284:25
**Calls (25)**
27:11;30:20;
152:5;181:13;
182:18;183:25;
184:18;186:3;187:3,
23;188:8;193:5;
217:4,17;229:22,25;
232:16;240:23;
243:19;259:25;
262:5;265:25;278:2;
283:25;301:11
**came (24)**
42:1;58:12,15;
88:24;107:5;145:18;
149:6,10;155:16;

156:22;175:10;
188:14;202:17;
204:6;220:8;252:15;
256:4;264:21;
268:18;289:6;293:7;
296:18;303:8;
305:13
**camera (2)**
90:6;140:9
**campaign (1)**
249:2
**can (105)**
9:23;10:19,22;
11:3;12:19;13:1,6;
20:16;23:15;24:7;
25:25;26:4,13,17,23;
29:12;32:13,21;
33:10;34:20;35:2;
37:14;50:24;51:9;
59:7,9;68:3,22;
69:15,18,24;73:6,10;
74:15;75:22;77:11,
14;81:5;83:14,15,20,
25;86:14,20;92:24;
93:13;99:13,21;
103:4;105:17;106:9;
115:16;139:7,13;
140:24;148:11;
149:8;155:7,8;
162:5;165:18;
166:18;169:16;
175:2;177:11;
178:11;184:9;
188:16;189:1;
195:10,14;196:7;
201:10;207:6;212:2;
214:21;218:16;
219:13;220:11;
221:6;225:1,3;
229:22;230:21;
235:3;239:9;241:22;
247:19;251:9,21,24;
255:12;263:1;273:8;
287:17;291:22;
293:17,21;294:19;
298:23;299:1,4;
302:21;305:6;306:3
**Canton (4)**
167:22;171:3,5;
202:15
**capacity (6)**
102:16;108:7,8;
110:11,16;176:16
**car (1)**
82:10
**cards (3)**
75:3,4,5
**carried (1)**
271:14
**carve (2)**
99:24;100:1
**Case (39)**
7:11;32:6;36:24;

EXHIBIT 16

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 844 of 970   Page ID #:16225

Universal Cable Productions, LLC v.
Atlantic Specialty Insurance Company

Video Deposition

Daniel Spencer Gutterman
February 3, 2017

37:24;47:6;52:9;
61:3;62:17,20;
64:25;79:3,5,17;
81:8;84:8;97:15;
100:25;103:16;
139:15;141:10;
144:2,17;153:25;
154:20;157:18;
175:16;178:7;179:9;
180:12;185:14;
207:1;212:17;
281:19;282:14,20;
283:5;284:21;305:5,
9

**cases (9)**
62:23;92:19;95:9;
159:22;177:23;
178:2,9,11;208:23

**casts (1)**
95:11

**CASUALTIES (1)**
51:18

**categories (2)**
182:5;216:20

**category (9)**
50:21;114:9;
185:7,8,9,11,13,18,
21

**cause (15)**
18:23;39:2;79:22;
85:25;92:5;158:8;
159:1;206:11;
216:23;217:3;
240:10;241:9;
251:17;252:12,14

**caused (33)**
143:11,16;144:3,
19;145:4,11,16;
146:6;148:21;149:3,
19;150:2,21;151:1;
153:24;154:19;
217:16;270:1,5;
272:3;273:11,17;
274:22;275:8;
277:19;278:1,22;
281:12,20,25;282:4,
13;284:20

**caution (3)**
66:2;99:9;190:18

**CBS (7)**
239:2;246:22;
248:7;249:2;250:5;
253:15;254:13

**cc (2)**
225:19;228:2

**cc'ing (2)**
198:21,22

**cease (1)**
291:12

**Central (1)**
7:10

**centuries (3)**
27:17,17,17

**certain (5)**
35:19;40:6;
155:25;159:18;
282:7

**certainly (10)**
22:19;108:23;
111:2;152:11,15;
157:14;170:4,8;
172:23;289:4

**certainty (1)**
26:16

**certificate (4)**
11:14;12:1;76:14;
172:10

**Certified (12)**
7:16;270:6,8,9,15;
271:18;272:22,23;
273:13,18;274:10;
278:18

**chain (12)**
6:6;33:11;196:25;
225:14;226:20;
227:22;231:25;
236:4;255:18;
295:14,18,19

**chance (3)**
238:23;281:11,24

**change (15)**
46:15;68:1;112:9;
167:11;209:16,18;
213:8,10,14;214:4;
279:10;280:3;
284:19;286:21;
295:4

**changed (13)**
52:20;89:21;
90:12,20;103:11,12,
14,25;164:7;213:5,
12;214:2,22

**Channel (4)**
47:12,18;50:19;
51:3

**chaotic (1)**
88:21

**characterize (3)**
26:18;33:19;224:8

**characterizes (1)**
280:10

**charge (1)**
88:6

**charged (2)**
87:8,21

**charges (1)**
58:4

**chase (1)**
145:1

**check (2)**
171:9;275:15

**choice (1)**
74:12

**Christianity (1)**
18:25

**circulate (1)**

161:24

**circumstances (13)**
83:19;84:5;88:6;
109:12;110:2;
113:12;140:9,19;
156:22;195:10,14;
260:21;282:7

**cited (1)**
253:19

**cities (2)**
19:20;40:14

**city (3)**
40:18;217:21;
265:13

**civil (2)**
38:13;304:15

**civilian (3)**
270:23;278:8;
279:5

**civilians (5)**
284:15;285:10,18;
287:6,6

**claim (364)**
31:10,23;32:6,7,
15;33:2;34:8,9;
37:12;41:13;43:1,3;
45:17,22;46:1,24;
47:5;51:25;52:2,5,8,
8,12,21;60:18;61:21;
62:5,12,14;63:15;
64:1,5,11,12,18,24;
65:4,8,9,12,19,22;
66:16;70:14;71:15;
72:23;84:7;85:7,12,
12,16,20,21,22,25;
91:18,19,20,21,23;
92:1,4,7,11,13;93:1,
7,15;94:1,5,8,12,13,
13,13,18;95:18;
96:12,15;97:11,12,
15;99:6,12,14,17,19;
100:3,8,9,12,18,20;
101:12,15,17;102:4,
10;103:22;105:7,13;
106:12,18;107:14,
21,22;108:2;109:8,9,
14,16;110:11,16;
111:5,9,18,25;
112:14,18,21,22,24;
113:1,4,9;114:7,20,
25;115:4,8;139:3,6,
10;140:7,21,23;
141:4,5,8,16,18,19,
21,24;144:17;145:9,
21;148:19,25;149:1;
150:11,12;151:1;
152:24,24;153:18;
155:2,15;156:2,3,11,
12;157:1,4,20;
158:10,14,16,19;
159:3,4,7,17,18,19,
22;160:1,2,6,12,16,
17,23,23;161:6,9,12;

164:4,9,12;165:7,17;
166:11;167:4,5,7,9,
20;169:5;170:21;
171:2,6,11,12,17;
172:2;177:12;180:3,
19;181:11,19;182:1,
23;183:5,9,13,15,16,
20;184:1,3,10,14,17;
185:7,17,19;186:2,8,
11,11,23;187:9;
190:12;192:17,25;
193:2,4,12,24;194:9,
25;196:3,19;197:7,
12,17,22,23;199:24;
200:1,5;201:1,5,15;
202:5,11,14,23,25;
203:4,10,17;204:24,
25;205:4,10,14;
206:11,24;207:3;
209:16,20,21;210:5,
11,11,14,16,17,20;
211:4,9,10,23;214:7;
216:6,15;218:8,13,
25;220:24;221:2,5,
17,19;222:3;223:11,
13,17;224:5,10,12;
225:24;228:23;
229:3;230:10,14,17;
231:9,13;232:17;
233:23;234:22;
237:5,12,19;238:7;
244:21;250:8;
251:18;252:2,12,13;
253:23;254:6;
256:12;257:22;
258:8,12;259:1,9;
260:5,13,15,18,19,
23;261:24;262:13,
17;263:17;264:20;
267:9;268:16,18,21;
277:15;278:22;
281:25;283:10;
286:2,4,9,14;287:9;
292:18;294:7;
296:17,23;298:5;
301:20;303:13;
305:12

**claimant (2)**
94:17;258:18

**claimed (5)**
95:4;101:4;
277:19,25;278:22

**claims (100)**
33:21;42:21;56:4,
14;60:11;61:8;63:6,
9;64:20,22;71:11,12;
89:4,18;90:4,5,6,7,
10,24;91:2,9,11,12,
16,22;92:25;93:15,
18;94:21;95:11,12,
13;97:24;98:15;
99:14,18;100:23;
101:7;102:15,20;

103:7,8;105:18,20;
108:21,23;110:3,4,7;
139:25;155:25;
159:10,19;160:25;
163:15,23;167:21;
168:1,2,3,4,4,8,14,
25;169:2,9,22;170:2,
3,7;175:14;179:2,4,
5,8,12,13;189:21;
190:3;192:14;
193:11;194:12;
195:7,11;202:18,19;
214:7;215:24;
218:10;223:4;
225:19;226:2,3,6;
234:23;239:23;
301:19;302:25

**claims-related (1)**
302:23

**clarification (1)**
104:22

**clarified (1)**
100:18

**clarify (3)**
10:10;68:1;173:19

**clash (1)**
240:18

**class (21)**
13:12;14:10,12,
13;16:1,2,7,19;17:2,
5,21;20:20;22:9,13,
16,18;48:9,17;78:17,
21,25

**class/trip (1)**
18:6

**classes (17)**
12:10,13,20;13:2,
4,7,11;14:11;21:22;
22:25;23:3;47:23,
25;48:2;49:4,6,17

**clean (1)**
279:19

**clear (14)**
9:18;45:7;62:25;
63:3;80:16;100:16;
182:7,14;184:7;
185:14;186:21;
221:24;240:5;254:4

**clerical (1)**
224:9

**close (3)**
36:12;53:18;
140:10

**closed (1)**
140:8

**clout (1)**
18:13

**coerce (4)**
270:22;271:12;
278:8;279:5

**coercion (1)**
270:25

**co-extensive (1)**

Min-U-Script®

Bayside Reporting Company
(888) 229 - 9897

(4) cases - co-extensive

827

EXHIBIT 16

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 845 of 970   Page ID
#:16226

Universal Cable Productions, LLC v.                    Video Deposition                    Daniel Spencer Gutterman
Atlantic Specialty Insurance Company                                                       February 3, 2017

221:22

**collected (1)**
222:15

**collecting (2)**
214:15;218:4

**college (11)**
11:10;13:15;23:5;
35:15;48:21;50:7;
56:17,20,24;59:19;
87:25

**colloquially (1)**
176:1

**COLOR (1)**
51:8

**coming (3)**
22:24;54:6;259:3

**command (1)**
33:11

**commencing (4)**
68:9;163:9;
221:12;287:22

**commercials (1)**
56:10

**commissioner (1)**
57:13

**committed (1)**
287:8

**committing (1)**
301:8

**commune (1)**
19:18

**communicate (15)**
32:22;34:11,14;
62:4,12,14,18,20,24;
64:13;65:18,21;66:1,
20;149:11

**communicated (6)**
34:19;93:8;216:1;
217:24;237:5,11

**communicating (1)**
63:4

**communications (4)**
302:23;303:1,2,3

**community's (2)**
277:10;279:25

**companies (1)**
55:1

**Company (16)**
7:9;8:3;54:1;
57:18;58:1;60:24;
62:10;83:1;96:20;
104:7,8;169:18;
177:1;293:8;297:17;
298:9

**complainant (1)**
111:2

**complained (1)**
85:15

**complaining (1)**
172:8

**complaint (8)**
34:5;58:18,18,24;
59:1;82:1,5;86:22

**Complaints (3)**
58:12,15;81:21

**complete (5)**
11:4;67:19,23;
78:7;303:14

**completed (1)**
303:16

**completely (4)**
70:25;145:18;
157:11;221:22

**complex (7)**
65:3,8;90:6;
110:11;164:9,12;
185:10

**complexities (1)**
90:4

**complexity (3)**
90:15;107:14,19

**complicated (2)**
185:17,21

**Compound (1)**
65:6

**computer (4)**
74:10,10,13;200:4

**concern (2)**
237:13,15

**concerned (3)**
191:4,8,15

**concerning (3)**
99:16;173:17;
307:14

**concerns (1)**
173:14

**conclusion (9)**
30:21;149:6,11;
152:6;156:23;216:1,
2;240:24;278:3

**conclusions (1)**
215:20

**concurrence (1)**
270:10

**concurrently (1)**
39:3

**condemns (1)**
283:24

**condition (1)**
53:20

**conditioned (1)**
307:13

**conditions (4)**
256:21;257:5,15,
16

**conduct (10)**
87:25;88:2;
265:24;267:1,14;
268:1,15;269:7;
270:24;284:20

**conducted (2)**
148:24;205:16

**conference (5)**
228:6;230:6;
232:11;236:18;
290:17

**confidential (4)**
115:10,17,19,22

**confirm (3)**
296:2,10;297:1

**confiscated (1)**
140:12

**conflict (17)**
13:7;18:15,17;
19:4;21:23,24;23:6,
12,23;25:16;27:8;
33:1;34:4,7,24;
153:21;154:14

**conflicts (6)**
22:24;27:22,25;
28:12;29:20,22

**confusing (1)**
23:3

**connection (53)**
14:3;36:15;40:7;
45:16,21;46:24;
47:5;65:19,22;77:8;
78:18;79:12;82:2;
100:3;107:21;109:8;
111:5,9,25;112:14;
114:24;139:5,9;
150:25;155:14;
157:4;160:12,16;
161:12;165:7,17;
166:11;190:24;
203:17;218:24;
222:2;223:13,16;
224:5,11;231:9,13;
241:20;244:20;
246:4;257:22;
278:22;281:25;
287:9;298:17;302:2;
305:9,14

**consider (7)**
18:8;95:18;
144:18;149:23;
150:4,7;204:19

**consideration (2)**
113:13;140:22

**considered (18)**
112:25;113:23;
114:24;139:9;140:2;
141:3,7,18;144:15;
183:12;244:1;
278:18;291:22,23;
293:17,18;294:19,20

**considering (3)**
139:5;148:9,12

**consist (1)**
78:11

**consistent (2)**
91:24;180:20

**consistently (1)**
81:18

**constitute (4)**
147:15,16;286:22;
287:9

**constituted (6)**
44:23;267:18;

280:4;281:21;
282:14;283:5

**construction (1)**
40:19

**consult (11)**
97:24;102:4;
141:23;145:2,10,15,
17;146:5;181:16;
282:7,12

**consultants (3)**
95:8;99:12,16

**consultation (11)**
95:7,25;103:14;
106:24;107:1;181:8,
9;182:15,17;186:24;
215:7

**consulted (4)**
99:6;107:20;
219:8;302:17

**consulting (2)**
110:10,15

**consults (2)**
108:6,14

**consumer (2)**
82:5,12

**consumers (1)**
81:21

**contact (7)**
97:3,6;171:24,25;
172:5;188:5;258:19

**contained (1)**
270:14

**contains (1)**
255:19

**content (1)**
292:14

**contention (1)**
293:22

**contentions (1)**
294:25

**context (10)**
22:25;112:22;
113:14;160:1,5;
176:25;183:13;
184:17;209:15;
240:6

**continue (5)**
200:25;224:6;
284:3;297:15;
299:23

**Continued (4)**
6:2;75:2,3;85:16

**continuing (13)**
77:18,21,24;78:2,
10,18,22;79:1,11;
80:3,13,21;175:6

**contribute (1)**
273:5

**contributed (2)**
48:9;49:3

**contributes (1)**
39:3

**convenience (2)**

275:25;306:21

**Convenient (3)**
67:2;219:10;
283:14

**conversation (45)**
34:21;65:2,16;
85:11;111:1;142:24;
149:21;151:5,7,14;
154:8;155:17,20;
161:13;165:12;
204:2,9,11,14;212:5,
7,19,21;222:17;
223:18,21;228:18;
229:2;233:4,10;
237:7,17;238:2;
239:10;242:24;
247:4;258:1,6,15,17;
261:19;291:5,18;
292:15;304:24

**conversations (14)**
34:13,17;66:4,9;
146:1,8,9;179:6;
214:16;222:22;
223:25;257:23,25;
298:21

**convey (1)**
66:3

**convicted (1)**
87:5

**cooperation (2)**
284:6,8

**coordinate (1)**
299:20

**coordination (2)**
297:17;298:10

**coordinator (1)**
54:19

**copied (1)**
246:22

**copy (4)**
67:6;70:20;
226:14;292:6

**Core (5)**
193:20;194:13,18;
195:3,15

**corners (1)**
298:22

**corrected (3)**
199:5,7,8

**correctly (5)**
59:3;73:14;
184:12;186:8;
283:10

**corresponded (1)**
221:4

**correspondence (1)**
188:15

**cost (1)**
248:19

**cost-effective (1)**
95:17

**costs (2)**
247:21,23

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 846 of 970   Page ID #:1627

Universal Cable Productions, LLC v.
Atlantic Specialty Insurance Company

Video Deposition

Daniel Spencer Gutterman
February 3, 2017

**Counsel (11)**
7:22;179:9;183:7;
188:1;195:20;196:7;
210:9;283:3;304:4;
307:1,7
**countries (3)**
13:1;27:19;28:12
**country (7)**
19:11;69:19,23;
71:11;114:6;242:6,
11
**couple (1)**
223:23
**course (8)**
46:9;77:22;81:9;
90:1;171:10;172:22;
183:3;273:6
**courses (1)**
78:12
**Court (5)**
7:10;9:10,24;58:6;
307:2
**courts (2)**
58:7,11
**cover (2)**
115:22;218:17
**coverage (159)**
37:2,6;64:6,12,23;
65:1,11,18,21;66:10,
14;71:16;79:2,15,16;
81:4,6,7;83:23;84:2;
85:13;86:2,8;91:23;
92:15,16;93:8,19,22;
106:22;107:4;
111:20;113:18,19,
24;139:17;140:16;
142:7;143:21;
155:21,24;156:5,14,
17,19,24;157:19;
158:8;159:1,25;
160:11,15;161:3,4,5,
10,12,16,18;164:15;
165:4,13,16;166:10,
12;172:16,24;173:3,
4,11,17,22;174:4,15,
17,25;175:4,12,15,
20;176:4;177:12,21;
178:1,4,7,10,12;
180:8,17,19;181:1,
12;182:7,10,13,16;
183:8;185:8,13;
186:1;187:2;188:1;
198:23;199:8;203:6,
9;207:3;208:16,20,
23;209:12;210:7,9;
215:3;216:11,21;
218:17,19;219:3;
223:1,8;224:15,18;
228:22;245:8,9,21;
249:8,12,17;250:15;
256:22;261:23;
268:25;271:6,10,19;
272:14;274:7,8,23;

281:9;282:2;285:25;
286:7;288:6,9,11,14,
16;289:1,9;293:21;
297:24;299:14;
300:16,21;301:10
**coverages (2)**
115:1;208:13
**covered (27)**
63:21;64:1;92:8,
12,14,19;93:17;
178:18,19;184:7;
228:23;244:20;
245:1,22;246:5,6;
250:8,25;256:23;
261:24;262:13;
263:19;273:12,18;
277:15;291:11;
296:17
**covers (1)**
256:22
**Coyoca (4)**
200:23;202:3;
306:25;307:16
**create (1)**
143:3
**created (5)**
27:18,21;201:14;
231:8,12
**creates (1)**
30:11
**creation (2)**
18:24;22:21
**credit (1)**
14:5
**credits (2)**
14:6,7
**crew (13)**
36:20;238:25;
239:17,24;240:3,4;
241:22,23,24;
247:24;248:2,12,15
**crime (3)**
87:6,8,22
**criminal (5)**
11:13;12:1;15:8,8,
11
**Crisis (1)**
227:1
**criteria (1)**
270:14
**cubicle (4)**
70:21;72:10,12;
75:9
**cumulative (1)**
44:16
**curiosity (3)**
47:12,17;50:18
**current (5)**
23:9,9;35:17;47:6;
99:14
**currently (18)**
12:18;23:24,25;
24:1,11;30:18;57:6;

66:15;68:12,15;
70:20;99:7;100:24;
102:11;141:11;
170:12;190:1;302:3
**cut (1)**
144:25
**CWS (5)**
171:9;209:24;
224:7;290:11,12

**D**

**dad (2)**
14:16,21
**DADS (5)**
36:7,15;39:14,21,
23
**dad's (1)**
14:23
**damage (4)**
95:13;108:22;
109:14;168:5
**damaged (2)**
41:7;110:7
**damages (1)**
39:1
**Dan (1)**
7:24
**dangerous (1)**
270:18
**Daniel (12)**
7:6;8:14,24;68:10;
163:9;219:9;221:13;
254:15;283:14;
288:1;307:18;
308:17
**D-A-N-I-E-L (1)**
8:24
**Danny (6)**
228:18;236:20;
239:8;259:2;261:19;
290:4
**date (10)**
35:14;36:11;40:4;
71:1;196:5;197:10;
202:6;210:1;211:25;
244:18
**dated (10)**
198:25;199:19;
211:1;225:21;
226:15;228:2;
236:10;238:10;
251:6;257:8
**dates (5)**
36:10;40:1,4;70:4;
195:22
**day (18)**
14:13;16:11,12;
42:24;86:17;90:20,
22;109:4;155:10;
171:10;196:18,21;
204:21;212:10;
238:6;240:4;281:8;

308:12
**days (7)**
151:6;176:8;
223:22,23;239:3;
256:18;307:4
**day-to-day (1)**
202:9
**DC (1)**
57:1
**deal (9)**
107:3,10;110:4,7;
168:2,3,7,11;298:11
**dealing (8)**
36:21;40:12,21;
110:1,21;141:11;
200:5;203:11
**dealt (12)**
107:6;110:17;
112:17,20;150:13;
183:22;184:16;
185:25;186:13;
188:17;226:5;
302:15
**decades (1)**
33:21
**decide (3)**
92:11,13;243:17
**decided (3)**
277:9;279:24;
290:21
**deciding (1)**
269:8
**decision (15)**
61:12;93:20;
102:3,8,20,25;103:8;
107:16;111:20;
159:20;218:19;
219:2;249:13;
268:25;299:14
**decision-making (1)**
61:4
**decisions (4)**
64:9;155:21;
164:21;210:7
**Declarations (1)**
37:21
**declare (1)**
308:8
**declared (7)**
296:3,11,12,13,16,
19;297:3
**deemed (1)**
115:21
**deep (1)**
94:21
**deescalate (1)**
241:14
**defaulted (1)**
157:11
**defend (2)**
31:15,17
**defendant (1)**
8:3

308:12
**defending (1)**
38:17,25
**defense (1)**
15:15
**define (9)**
19:16;45:10;79:4;
82:11;112:1;148:11;
150:6;169:20;
265:12
**definite (1)**
26:7
**definitely (3)**
152:17;166:13;
275:14
**definition (19)**
45:8;48:3,4;52:17;
112:5,6,7;251:11,23;
252:9;263:3,8,9,12,
16,18,21;264:3,11
**definitive (2)**
92:15;237:16
**definitively (3)**
21:2;81:23;242:20
**degree (3)**
11:10,12,15
**delaying (1)**
247:22
**deliver (2)**
58:6,10
**delivered (1)**
107:8
**denial (20)**
149:2;157:5;
178:5;197:24;
199:16,22,24;200:8;
210:10,12,21,23;
216:21;218:1;237:4;
250:15;268:2,6,15;
281:5
**denied (9)**
148:25;152:24;
153:19;156:17;
157:6;159:22;
237:12,19;267:8
**Denver (1)**
177:6
**deny (3)**
111:20;175:14;
185:16
**denying (8)**
158:9;159:2,10,
19;245:8;286:2,9,14
**department (5)**
40:17;179:13,14;
202:19;226:6
**depend (1)**
167:8
**depended (2)**
62:5;106:21
**depending (2)**
171:17;172:19
**depends (12)**
62:11,13;94:12,

Min-U-Script®

Bayside Reporting Company
(888) 229 - 9897

(6) Counsel - depends

829

EXHIBIT 16

16;96:12;109:9;
158:14;167:7;
181:19;182:1;184:1;
260:13
**depo (1)**
190:25
**deposition (18)**
7:6;8:8;9:1;31:3;
68:9;163:9;190:20;
191:7,11,18,23;
192:12;221:12;
272:13;288:1;
306:13,22;307:18
**depositions (1)**
307:14
**describe (2)**
74:1;113:25
**described (10)**
22:9,10;50:20;
79:17;109:1;146:10;
151:24;213:2;218:3;
232:21
**description (1)**
158:5
**Desert (9)**
47:11,17;48:15,19,
21;49:20,21;50:1;
51:17
**designate (2)**
115:16,18
**desk (1)**
73:22
**despicable (1)**
284:10
**despite (2)**
280:9;295:6
**detail (2)**
165:19;166:24
**details (1)**
284:9
**determination (29)**
84:2;86:3,8;93:22;
95:3,24;105:9;
147:14;159:21;
161:2,3,5,10,11,18;
164:15;184:25;
198:23;199:8;203:6,
9;249:17;272:14;
288:10,25,25;
297:25;300:16;
301:10
**determinations (4)**
83:22,23;93:20;
103:13
**determine (32)**
57:10;60:22;
61:10,13;71:15;
91:23;92:5,7;94:5,8;
113:19;150:16,20,
25;174:21;187:1;
205:18;215:3;
222:25;223:8;
239:21;253:22;

264:2;266:25;
267:25;268:6,13;
275:6;286:12;
294:24;302:5,14
**determined (6)**
113:23;115:4;
139:16;249:6;254:5;
302:11
**determines (1)**
258:10
**determining (21)**
60:25;64:1;105:2,
22;107:15;144:8;
155:23;156:4,14;
158:8;159:1,25;
160:11,15;161:16;
208:13;249:7,12;
264:15;274:23;
288:14
**development (4)**
54:4,19,20,24
**dictionary (1)**
263:12
**differ (3)**
63:7;64:2;105:3
**differed (1)**
104:23
**differences (1)**
63:10
**different (39)**
14:16,19;15:20;
16:3;22:6;24:8;
28:12;40:14,18,22;
41:21;53:18;54:15,
18;55:1;58:7,11,12,
14;61:11,22;63:9,12,
15,19,22,22;64:5;
71:22;78:13;86:15;
89:15;90:22;94:14;
107:7;114:5;146:3;
164:23;171:15
**difficult (2)**
9:24;185:12
**DIG (138)**
45:17,22,25;47:5;
51:25;52:1,5,7,11,
21;64:24;65:9,12,19,
22;66:16;70:13;
72:23;84:7;85:7;
93:7;99:12;100:3,17,
19;101:11,15;
107:21,21;111:5,9,
18,25;112:14,22,24;
113:9;141:21,24;
145:9,21;148:19;
151:1;152:24;
153:18;155:2,15;
156:3,11;157:1,4;
158:16;159:3;160:2,
5,12,16,23;161:12;
165:7,17;166:11;
169:5;183:9;184:14;
185:7,18;186:1,10,

23;190:12;192:17,
25;193:2,4,12,24;
194:9,25;196:3,19;
197:7,12,17,22,23;
199:24;201:1,14;
202:5,11;203:17;
209:16;210:11;
211:4;216:15;
218:13,25;221:2,5,
16,19;222:3;223:3,
13,17;224:5,12;
225:24;229:3;
230:10,14,17;231:9,
13;232:17;234:21;
237:5,12,19;244:21;
245:6,19;246:3,14;
250:7;253:23;254:6;
256:12;257:22;
277:15;278:22;
292:18;296:11;
300:5;301:20
**DIG' (1)**
296:2
**diploma (1)**
35:9
**direct (8)**
33:13;104:2,3,9,
11,15,17,20
**directly (3)**
109:6;200:6;
202:19
**Director (1)**
54:4
**disagree (2)**
30:16;159:11
**disagreed (2)**
151:7,10
**disagreeing (2)**
164:20;165:2
**disagreement (1)**
159:20
**disclosing (1)**
191:24
**discovery (1)**
305:15
**discuss (17)**
19:4,7;20:20;
40:16;64:18,20,25;
65:11;109:20;
172:17,18;173:1,2,5,
16;183:2;233:1
**discuss- (1)**
167:10
**discussed (18)**
18:19,22,24;19:1;
21:5;51:21;139:3;
149:18;188:18;
192:8;194:11;
222:21;229:8,11,12;
232:19,25;268:19
**discussing (6)**
57:13;146:11;

167:11;172:20,21;
252:15
**discussion (5)**
173:20;174:3;
304:22;305:2;
306:10
**discussions (1)**
215:10
**disorderly (2)**
87:25;88:2
**dispute (3)**
37:6;153:20;
271:15
**disputed (1)**
37:2
**disregard (1)**
101:15
**dissatisfaction (4)**
84:1,14;86:6,7
**distinction (1)**
280:25
**District (2)**
7:10,10
**Division (2)**
7:11;56:6
**doctor (1)**
58:19
**doctors (1)**
58:3
**doctrine (1)**
99:11
**document (24)**
37:16;67:12,15;
75:25;76:6;114:14;
189:17,22;193:17,
22;198:16;199:13;
220:11,18;225:10;
227:18;228:11;
231:21;232:6;251:3;
276:20;283:19;
289:23;304:10
**documentation (4)**
73:6,9;108:2;
167:14
**documented (1)**
302:24
**documents (35)**
12:19;16:18;35:2;
58:6,11;70:22;75:7;
190:18,24;191:2,6,
10,13,15,22,23;
192:1,3,7,9;230:20;
232:13,14;264:4;
303:11,14,15,16,17;
305:4,9,10,11,15,19
**dogs (3)**
43:18,19;44:24
**dollar (3)**
94:6,9;101:16
**DONALD (1)**
306:23
**donate (1)**
40:23

**done (26)**
28:11;40:20;
67:16,17,21;72:13;
77:24;80:21;109:21;
142:7;147:5;151:13;
153:3,14;155:21;
164:16;167:13,22;
182:23;183:5;
184:12;186:8;
203:12;222:18;
224:17;255:9
**down (10)**
9:11,24;40:17;
53:18;79:25;88:24;
186:7;200:3;228:14;
230:7
**downs (1)**
59:22
**draft (4)**
292:24;303:11,19,
22
**Driver's (3)**
68:18,23;69:13
**driving (1)**
87:22
**drug (1)**
57:11
**Druid (1)**
35:6
**DUDE (7)**
41:22,24;42:4,9,
20;53:5,6
**duly (1)**
8:15
**duplicative (1)**
221:18
**during (24)**
21:9,15;22:7,14;
32:7,15;45:13;
74:25;86:17;93:14;
97:23;105:11,18;
111:23;142:12;
146:4;151:25;195:2,
6;233:14;234:18;
249:5;256:11;
259:21
**duties (5)**
36:17;54:22;
89:18;91:21;163:22

---

**E**

**earlier (12)**
75:6;91:3;92:20;
102:2;108:22;161:8;
258:19;268:19;
281:8;288:4;303:6,
10
**early (2)**
110:20;241:23
**easier (2)**
95:16;265:12
**East (9)**

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 848 of 970   Page ID #:16229

Universal Cable Productions, LLC v.
Atlantic Specialty Insurance Company

Video Deposition

Daniel Spencer Gutterman
February 3, 2017

13:5;21:24;22:16;
25:24;27:22;28:10;
29:4,16;297:13
**eastern (2)**
228:6;230:5
**easy (7)**
177:23;178:2;
182:8,9,13;185:14;
208:23
**EDITION (4)**
39:25;41:17,20;
53:14
**educated (1)**
34:2
**education (14)**
77:18,21,24;78:2,
10,18,22;79:1,11;
80:3,13,21;89:7;
175:6
**effect (6)**
190:5,8,11;
272:13;274:9;
289:13
**effort (2)**
180:8;270:22
**eight (1)**
27:3
**either (22)**
17:19;21:14;
41:22;52:24;60:23;
77:10,13;78:9;
103:19;109:6;158:9;
159:2;164:19;165:2;
171:23;173:18;
194:11;196:21;
233:20;254:12;
261:7;307:4
**electronic (12)**
220:22,23;234:10,
20,25;235:7,15;
290:13;303:1,12;
305:11,18
**electronically (1)**
201:11
**else (46)**
13:18;17:12;
26:13;32:12,20;
33:9;43:22;44:13;
45:5;47:13;48:13;
49:2,15;50:10;59:9;
62:8;71:17;82:17;
84:17;102:8,25;
106:20;146:5;148:2,
4,16;161:17,23;
168:1,11,13;169:13,
15;170:11,15;172:5;
177:11;203:22;
214:23;215:6,8;
223:15;224:3,11;
233:9;294:11
**else's (1)**
74:6
**E-mail (89)**

6:6;109:21;
114:18,19;142:22,
23;146:2;171:7,23;
188:15;197:2;
198:21,25;199:19;
201:10;203:2,18;
204:6;222:7,8;
225:14,18,23;
226:13,19,23,24;
227:4,8,9,22,23;
228:3,5,11,14;229:7,
9,10,13,15;231:25;
236:4,8,11,14;238:9,
17,19;239:10,13;
240:6,9,15,20;242:1,
5,15;246:17,23;
247:5,16;249:1;
251:5;255:18,25;
256:5;257:8;258:17,
24;259:7,8,14,17;
260:18;261:15,16;
262:11;290:8,16;
295:14,18,19,23;
299:13,19;303:1,25,
25
**e-mailed (2)**
201:9;255:22
**e-mails (4)**
196:25;197:15;
198:20;269:1
**Emory (5)**
13:13;14:3,16,18;
15:22
**employed (3)**
35:22;39:22;41:17
**employee (2)**
35:17;36:3
**employees (1)**
66:6
**employer (1)**
35:20
**employment (11)**
36:5;39:20;41:19;
53:7,24;57:24;70:9;
89:7,8,22;90:1
**encouraged (1)**
284:6
**end (11)**
36:10,11;68:6;
159:10;162:6;
197:12,18;199:24;
221:9;287:19;
306:12
**ended (4)**
40:2;52:23;
197:10;200:1
**ending (1)**
6:6
**endorsement (6)**
272:7,13;273:24;
274:8,15;279:8
**endorsements (1)**
175:21

**engage (4)**
109:7,10;110:9,14
**engineers (1)**
302:7
**enough (5)**
78:1;140:11;
197:20;240:3;
241:23
**entail (3)**
53:12;54:5,21
**entails (1)**
156:21
**Entertainment (19)**
35:18,23;36:4;
72:3;80:10;81:3;
89:12,18;100:18,18;
163:15,22;168:6,9;
169:1,22;179:5;
218:23;226:7
**entertainment-related (1)**
80:4
**entire (10)**
31:2;56:13;60:15;
156:9,10;167:1;
168:21;169:11;
256:10;301:21
**entities (1)**
54:16
**entity (2)**
35:19;96:23
**equipment (1)**
43:16
**escalate (1)**
241:14
**escalated (1)**
248:18
**escalation (3)**
241:9,12;248:5
**especially (1)**
110:20
**Esrom (1)**
7:16
**essentially (2)**
12:3;14:9
**established (1)**
278:10
**estimate (1)**
103:4
**estimates (1)**
143:3
**etc (1)**
302:8
**Europe (2)**
226:25;240:16
**evaluate (2)**
206:24;207:2
**evaluation (4)**
197:23;223:17;
224:5;256:11
**even (12)**
19:16;70:6;74:11;
85:20;93:21;108:3;
110:25;140:2;

148:14;212:21;
278:15,19
**event (5)**
39:2;50:15;212:9,
15,18
**events (8)**
23:9,10;191:3,8,
14;192:2,8;271:18
**Eventually (11)**
90:7;94:10;109:4;
140:18;142:7;
146:17;150:12;
151:5;172:13;
202:22;203:20
**everyone (1)**
88:24
**everywhere (1)**
305:17
**evidence (21)**
76:15;181:5,10;
217:15;243:20;
253:9,25;275:6;
280:13;281:20;
282:3,17;283:8;
284:23;285:12,21;
286:24;295:8;
299:11;301:1,12
**evidenced (4)**
70:16;75:25;76:6;
254:8
**evolved (1)**
163:23
**exact (12)**
20:24;31:6;40:4;
60:13;63:16;84:12;
176:9;186:11;
205:22;212:5;
240:12;244:18
**exactly (16)**
25:8;61:20,21;
64:16;69:6,7;88:1;
94:20;164:10;
187:11,19;196:22;
202:16;205:21;
223:10;248:25
**EXAMINATION (3)**
8:18;163:6,12
**examined (1)**
8:16
**example (2)**
180:14;184:10
**examples (2)**
44:12;147:17
**Except (1)**
261:8
**excerpt (1)**
306:22
**excess (2)**
101:4;270:17
**excited (2)**
73:12;75:23
**exclude (3)**
115:5;139:17;

178:13
**excluded (6)**
39:1;92:8;157:6;
245:21,22;279:11
**excludes (1)**
256:22
**excluding (2)**
100:24;112:24
**exclusion (90)**
66:19;76:24;77:2,
8,12;78:19,23;80:24;
81:1;112:18,21;
113:1,13;114:24;
115:4;139:5,9,16,21;
140:23;141:1,4,8,15,
19;142:6,15;144:16,
16;151:9;157:7;
172:24;173:8;
183:12,17,20,22;
184:4,16;185:25;
186:13;187:1;
188:18;237:15;
246:19;251:10,20;
252:7,11,16,19;
253:2,7,22;254:6,10;
255:4,7,10,11,14,16,
19;256:2,7,8,15,20;
257:4,16;262:18,21,
22;269:21,25;270:4;
272:3;273:24;274:4,
6,10,12,16,17;
278:11;279:14;
291:1,7;302:16,16
**exclusions (12)**
37:10;38:5,7,12;
256:23;304:16
**excuse (3)**
87:17;185:3;
216:13
**Executed (1)**
308:11
**Exhibit (100)**
37:14,15,17;
66:25;67:9,13;79:6;
114:10,11,15;141:6;
158:4;189:18;
192:14,19;193:11,
16;194:12,13,19;
195:4,8,12,16;198:7,
8,11,12,17;199:12,
19;200:8,13,14,18;
201:2,19,20,24;
210:24;220:13,15,
19;224:22;225:11;
227:14,15,19;
231:17,18,22;232:2,
3,7;234:15;235:19,
24;236:1,5;237:25;
251:4;253:5,16,19;
254:8,13,19;255:17;
257:9;258:21;
261:13;262:19;
271:2;272:7;273:3,

Min-U-Script®

**Bayside Reporting Company**
**(888) 229 - 9897**

**(8) eastern - Exhibit**

831

EXHIBIT 16

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 849 of 970   Page ID
#:1650

Universal Cable Productions, LLC v.
Atlantic Specialty Insurance Company

Video Deposition

Daniel Spencer Gutterman
February 3, 2017

23;274:1;276:2,16,
17;279:17;283:12,
16,20;289:19,20;
290:14;292:6,19;
295:10,11,15;
298:22;299:3;
301:17,19;303:19;
304:6,7,11
**Exhibits (3)**
6:3;189:14;232:12
**exist (3)**
28:14,23;97:3
**existed (1)**
97:5
**existence (2)**
243:25;244:10
**expand (1)**
58:16
**expanded (3)**
90:13,14,15
**expected (1)**
38:18
**expense (24)**
79:2,5,8,16;81:7,
10;95:12;96:15;
100:12;106:22;
109:22,25;114:7,8;
168:2,8;169:1,22;
170:3;207:3;239:23;
256:21;257:4;
304:15
**expenses (1)**
246:4
**experience (10)**
33:21;58:22;
90:16;95:22;110:22;
157:13;163:25;
170:7;186:25;188:5
**expert (5)**
181:9,9,10,16;
182:15
**expertise (1)**
107:9
**experts (1)**
302:8
**explain (2)**
174:12,14
**express (1)**
157:19
**expressed (2)**
84:1;157:16
**expressions (1)**
84:14
**expunged (1)**
88:3
**extent (5)**
9:18;99:13;100:4,
17;233:23
**extorted (2)**
277:11;280:1
**extra (26)**
79:2,5,8,16;81:7,
10;95:12;96:14;

100:12;106:22;
109:22,25;114:7,8;
168:2,8;169:1,21;
170:3;207:3;239:22;
246:3;248:2;256:21;
257:4;304:15
**EXTREME (4)**
39:25;41:16,20;
53:13
**eyes (1)**
103:17

**F**

**facility (6)**
74:4,5,15,15;
75:14;76:11
**fact (15)**
63:20;144:19;
147:12;244:24,25;
245:7,20;246:7;
248:9;249:7,11;
250:14;280:9;288:9;
295:4
**fact-finding (2)**
223:24;224:15
**fact-gathering (1)**
209:3
**factor (2)**
244:11,19
**factored (1)**
107:16
**facts (54)**
61:2;112:15;
113:19;142:2,3,18,
19;143:6,9,15;144:1,
10;148:12;172:14,
22;203:11,14,16;
204:18,20;205:5;
207:25;208:8,14,18;
209:7;213:19;
214:13,15,16;
215:12,21;216:9;
217:15;218:4;222:4,
15,20,21;223:6;
227:6;243:20;244:1;
280:12;282:17;
283:7;284:22;
285:12,20;286:24;
295:8;299:10;
300:25;301:12
**fail (1)**
73:10
**failed (2)**
74:16;75:18
**fails (1)**
155:11
**failure (1)**
307:8
**fair (13)**
57:8,16;65:7;66:7;
90:17,18;102:9;
105:15;107:13,18;

197:20;207:11;
210:13
**falls (1)**
50:21
**familiar (1)**
79:7
**families (3)**
40:13,15;284:2
**far (8)**
18:11;59:7;75:22;
106:9;202:12,13;
212:2;214:21
**fashion (1)**
9:16
**fault (5)**
17:14;27:25;
61:17,19;62:1
**faulty (2)**
106:23;168:3
**favor (7)**
182:16;186:1;
187:2;245:8,8;
250:14;289:8
**FBI (1)**
140:12,18
**February (3)**
7:2,13;306:23
**Federal (1)**
270:12
**feel (8)**
20:13;48:11;
95:25;145:8,9;
146:5;152:17;166:1
**fell (1)**
186:11
**felt (3)**
145:2,14;286:3
**few (6)**
9:5;36:9;95:15;
99:7;151:6;223:22
**fighting (1)**
45:3
**figure (2)**
53:17;264:4
**file (30)**
81:21;201:12,14;
202:8;220:22,23;
221:4;231:8,10,12,
13;233:22,23,25;
234:8,10,22,25,25;
235:1,3,7,15;290:13;
292:19;293:2,5;
302:25;303:13;
305:16
**filed (3)**
82:1,4;111:14
**files (1)**
86:22
**filled (1)**
171:20
**filming (2)**
297:4,13
**final (2)**

83:21;303:16
**financing (1)**
107:6
**find (31)**
73:20;174:25;
175:3,4,12;176:3;
177:12;178:7;180:8,
17,18,25;182:10;
188:4,16;193:1;
208:16,20;209:12;
235:3;239:23;
242:23;246:22;
267:15;281:8;282:2;
285:25;286:6;288:6;
293:21;300:7
**finding (7)**
36:20,20;40:22;
175:15;224:15,17;
300:21
**fine (3)**
165:24;189:5;
225:3
**finish (7)**
10:1,3;42:16;
143:22;146:22;
181:23;212:12
**finished (3)**
146:24;303:13,16
**fire (3)**
40:17;291:12;
302:7
**fired (4)**
265:2,6;285:9,18
**first (59)**
8:15;24:10;42:1;
48:25;49:11,11;
56:16,19,24;62:25;
69:2;70:23;72:18,
20;73:17,18;74:18,
21;75:18;76:18;
78:8;80:11;97:14,
17;100:8;109:4;
115:11;144:5;
171:14,18,24,25;
172:5;173:6;174:22;
177:5;189:22;
192:13;193:21;
195:25;196:2,8,19,
24;197:2;225:24;
229:2,22;230:2,4;
245:15;255:17;
257:21;273:22;
274:4;276:5;288:13,
22;304:23
**first-party (4)**
168:4,8,25;169:21
**fission (1)**
39:8
**five (5)**
67:5;83:9,18;
155:8;301:24
**flash (3)**
75:3,3,5

**flew (2)**
14:15;177:5
**flight (1)**
57:10
**Florida (18)**
68:20,24;69:13,16,
19,22;70:8,12,23;
73:3,4;76:16;77:15,
17;79:12;81:11,20;
175:7
**flying (1)**
95:16
**focus (4)**
12:7;63:20,23;
271:15
**focusing (1)**
49:10
**follow (6)**
195:3,7,11,15;
299:2;301:18
**followed (1)**
303:4
**following (5)**
88:20;197:15;
270:16;290:10;
306:22
**follows (2)**
8:16;306:24
**football (1)**
88:13
**force (3)**
38:16;39:8;291:14
**Ford (1)**
226:15
**foregoing (1)**
308:9
**foreign (2)**
270:21,22
**form (7)**
61:12,25;64:12;
215:20;234:10,20;
303:12
**formal (3)**
176:11,13;177:10
**format (1)**
75:15
**formed (3)**
32:23;34:3;215:25
**formulate (1)**
32:4
**formulated (1)**
34:6
**forth (13)**
95:4;155:19;
161:15;192:19;
193:11;194:12,13;
195:4,8,12,16;269:2;
301:19
**forward (1)**
291:13
**forwarded (2)**
226:19;259:16
**forwards (1)**

Min-U-Script®

Bayside Reporting Company
(888) 229 - 9897

(9) Exhibits - forwards

832

EXHIBIT 16

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 850 of 970   Page ID
#:18591

Universal Cable Productions, LLC v.                          Video Deposition                          Daniel Spencer Gutterman
Atlantic Specialty Insurance Company                                                                              February 3, 2017

226:24
**found (8)**
    45:13;75:17,18;
    146:11,12;147:5,11;
    206:14
**foundation (4)**
    183:25;186:4;
    188:8;266:8
**four (8)**
    37:9;38:5,7;39:12;
    47:15;49:11;216:19;
    298:22
**Fox (5)**
    54:12,13,14;55:3,8
**free (1)**
    190:20
**Friday (1)**
    7:2
**front (2)**
    73:22;75:21
**frustrated (1)**
    85:23
**full (3)**
    8:22;284:4,6
**function (2)**
    107:9;209:5
**further (2)**
    304:22;305:2

## G

**gain (3)**
    43:24;44:2;206:7
**gained (3)**
    90:16;163:24,25
**game (1)**
    88:13
**Garber (7)**
    199:17;226:14,24;
    229:7;236:9;238:22;
    242:25;290:18,20;
    291:5;293:12
**gates (1)**
    88:24
**gather (1)**
    284:12
**gathered (2)**
    102:24;243:11
**gave (3)**
    12:5;46:6;73:1
**general (24)**
    12:22,24;22:25;
    68:16,17;90:23;
    106:11;167:19;
    189:21;192:13;
    193:11;194:12;
    195:7,11;256:20;
    257:4,14,16;260:11;
    261:8;270:11;
    277:22,24;301:18
**generally (4)**
    47:1;99:8;164:1;
    183:1

**gentleman (1)**
    104:13
**Georgia (1)**
    35:7
**G-E-R-S-C-H (1)**
    55:9
**Gersh (4)**
    55:9,12,18,21
**gestures (1)**
    9:17
**gets (4)**
    90:6;93:25;110:7;
    240:2
**given (6)**
    96:8;98:16;
    176:10,14;248:16;
    260:21
**giving (4)**
    45:8;58:12,15;
    260:18
**glad (1)**
    165:24
**Gladbeck (1)**
    7:18
**GLORY (9)**
    41:23,25;43:6;
    44:9,15;52:23,24,25;
    53:4
**goal (7)**
    57:7;176:3;178:6,
    7;180:17;224:14,17
**goes (2)**
    170:21;184:23
**Good (11)**
    8:20,21;24:22;
    25:3,3,9,24;26:4,14;
    205:23;275:22
**Google (8)**
    206:6;207:18,20,
    21;222:10,12;
    264:14;305:13
**Googling (1)**
    205:17
**Gooley (2)**
    170:2,10
**govern (1)**
    152:13
**governance (1)**
    45:4
**government (24)**
    21:14,15;38:19;
    40:16;86:23;87:2;
    152:18;266:14,19,
    20;267:4,14,17;
    268:1,7,14;270:25;
    271:13;282:12;
    283:4;291:23;
    293:17,24;294:19
**governmental (1)**
    38:24
**Government's (3)**
    267:1;269:7;
    275:15

**gradually (1)**
    210:2
**graduate (1)**
    11:21
**Graham (30)**
    96:17,22;97:2,14,
    24;98:25;99:5;
    100:2,10;101:7,18;
    102:4,8,15;103:1,7,
    18,23;105:3,6,14,23;
    106:8;107:17,20;
    108:4,13;109:23,24,
    25
**granting (1)**
    245:8
**great (1)**
    177:18
**ground (49)**
    9:5;146:16,18,20;
    147:2,13,19;206:2,8,
    10,12,16;207:2;
    239:1,18;240:19,19;
    241:7,19;242:14;
    243:11,17;244:1,11,
    22,24;245:6,17,18;
    246:3,7;248:3,7,7,9,
    22;249:1,2,7,11,16;
    250:4,6,11,20,22;
    252:15,18;253:1
**group (3)**
    19:17;167:25;
    182:13
**guards (1)**
    250:21
**guess (7)**
    19:19;42:5;
    146:25;207:11;
    213:13;249:3;266:9
**guessing (1)**
    263:7
**guide (4)**
    17:23;18:1,2,7
**guiding (2)**
    208:19;209:11
**Gutterman (22)**
    7:7;8:14,20,24;
    11:9;14:24;66:3;
    68:10,12;100:15;
    163:10,14;190:17;
    221:13,15;236:20;
    239:8;288:1,3;
    290:5;307:19;
    308:17
**G-U-T-T-E-R-M-A-N (1)**
    8:25
**guys (2)**
    166:14;195:23

## H

**half (3)**
    69:10;240:11;
    248:24

**ham (1)**
    31:14
**Hamas (57)**
    13:8;19:7;22:15;
    23:7;29:22,25;30:8,
    17;31:5,17,22;32:1,
    5,15;33:1;34:4,7,25;
    149:24;150:4,7,17;
    151:11,11,15,19,23;
    152:4;153:4,12;
    154:3,24;155:3;
    265:2,6,24;266:5;
    267:2,18;271:15;
    275:16;277:3,7;
    279:22;280:4;
    284:14;286:2,8,13,
    19;287:4,8;291:22;
    293:17,23;294:19;
    301:8
**Hamas' (1)**
    284:12
**Hamas's (4)**
    268:1,14;269:7;
    291:12
**hand (3)**
    8:5;9:17;273:2
**handed (1)**
    220:10
**handle (1)**
    167:25
**handled (2)**
    150:14;183:16
**handlers (2)**
    43:20;44:24
**handling (1)**
    301:20
**handwriting (1)**
    231:3
**handwritten (7)**
    165:22;166:6;
    233:17,21;234:7,8,9
**HAPPEN (9)**
    41:22,25;42:5,9,
    20;53:5,6;187:8;
    214:25
**happened (18)**
    21:19;42:5;48:7;
    85:4;106:23;184:14;
    201:17;202:20;
    210:1;234:20;
    235:13;237:8,22;
    238:23;240:7;
    254:12,18;265:14
**happening (3)**
    21:20;50:3,4
**happens (5)**
    74:5;86:22,24;
    90:8;189:5
**hard (4)**
    40:3;45:10;
    265:12;305:16
**hard-and-fast (2)**
    258:13;260:9

**Harry (1)**
    26:6
**HAYES (205)**
    7:24,24;8:19;
    23:17;24:9,24;
    25:19;26:3;27:24;
    28:19,24;29:6,8,10,
    14;30:4,24;31:21;
    37:13;45:24;52:19;
    65:7,17;66:7,11,24;
    67:4,11;68:5,11;
    87:20;88:4,8,14,18;
    93:5;99:23;100:21;
    101:22;102:1;
    108:17;110:13;
    111:12;114:10,13;
    115:16;139:1;
    143:13,23;144:24;
    145:7;147:1;151:3;
    152:8;155:7,11;
    158:2,23;159:13;
    160:4,9,21;162:5;
    163:13;165:14;
    174:2;176:23;
    178:15,22;179:11;
    180:24;181:15,21;
    182:4,20,24;184:2,6,
    13,21;185:6;186:9,
    17;187:12,20;188:3,
    12;189:1,4,11,13,16;
    190:23;193:9,15;
    196:1,13;198:6,10,
    15;200:12,16;
    201:19,22;212:14;
    216:7,14,22;217:2,7,
    22;219:12,16,20,23;
    220:1,6,10,14,17;
    221:7,14;224:22;
    225:3,9;227:13,17;
    231:16,20;232:1,5;
    235:23;236:3;241:1;
    243:1,5,24;244:16;
    245:14;246:1;
    248:21;250:1,13;
    252:5,22;253:10,14;
    254:3,17;260:3,10;
    261:12;262:7;264:1;
    265:20;266:3,10;
    267:24;269:14,20;
    273:1;275:1,13,24;
    276:1,15,19;278:4,
    14;280:14,21;281:6,
    18;282:19,24;
    283:11,15,18;285:4,
    15,23;287:3,14,17,
    24;288:2;289:18,22;
    295:9,13;299:12,18;
    300:14,19;301:5,15;
    304:5,9;305:21,23;
    306:1,5,8,11,19
**head (28)**
    9:16,17;13:3;
    26:25;37:11;47:14;

48:14;51:11;81:24;
82:19;83:6;94:2;
98:11;140:4;142:22;
148:5,17;161:9;
180:15;203:3,19,19;
204:6;226:25;
240:12,15;241:15;
264:21
**heading (2)**
271:5;273:23
**headspace (1)**
205:22
**hearing (1)**
10:21
**held (4)**
163:19;239:24,25;
306:10
**help (25)**
53:19;54:24;96:2;
105:9;106:24;161:2,
3,5,10,11,17;170:4,
5;180:12;181:4,10,
16;182:16;196:14;
197:24,25;203:5,8;
206:17;247:17
**helped (3)**
54:6;161:15;181:2
**helping (8)**
36:19,20;40:13;
43:15,15;61:10,12,
13
**helps (1)**
196:16
**Henderson (15)**
96:17,22;97:2,15,
24;99:5,19;100:10;
101:7,18;102:15;
103:7;107:20;108:4,
13
**Henderson's (1)**
100:3
**hereby (1)**
274:9
**herein (1)**
306:24
**here's (1)**
288:11
**Hey (2)**
103:16;105:13
**Hi (4)**
236:15;238:20;
290:9;296:1
**high (3)**
35:5,6,8
**higher (3)**
170:25;179:7,8
**hikes (1)**
16:3
**Hills (1)**
35:6
**hindering (2)**
38:17,25
**hire (1)**

176:25
**Hiring (1)**
36:19
**historical (1)**
48:6
**history (27)**
11:13,25;12:6,7,8,
11;13:21;15:8;16:5;
18:14;22:20,25;23:5,
9;39:21;47:10,12,16,
17,20,21;48:25;49:3,
12,15;50:19;51:3
**Hmm (1)**
258:4
**hold (5)**
68:12,15;91:6;
111:16;140:20
**Holocaust (3)**
25:23;26:12;27:19
**HOME (7)**
39:25;41:16,20;
42:24;53:13;56:11;
284:3
**homeowner (1)**
79:21
**Homeowners (1)**
71:25
**homes (1)**
53:14
**honestly (3)**
18:20;21:8;140:1
**hope (2)**
236:16;284:2
**hopefully (1)**
9:23
**hostilities (2)**
23:19;300:10
**hotels (1)**
19:14
**HOUNDS (8)**
41:23,25;43:6;
44:9,15;52:23,24,25
**HOUNDS/ (1)**
53:4
**hours (5)**
77:21,24;78:7;
184:24;259:18
**houses (1)**
40:15
**human (1)**
270:19
**hurt (1)**
89:1
**hypothetical (3)**
186:6;187:8;301:3

## I

**idea (13)**
87:19;94:21;
97:13;98:2;156:20;
180:1;188:13,15;
207:14,15;262:14;

293:4;300:1
**ideas (2)**
54:6,25
**identification (17)**
67:10;114:12;
189:15;198:9,13;
200:15;201:21;
220:16;227:16;
231:19;232:4;236:2;
276:18;283:17;
289:21;295:12;
304:8
**identified (3)**
69:12;102:14;
149:5
**II (12)**
27:18;44:11;
47:11,16,24;48:1;
49:1,5,7,17;51:7,14
**Illinois (1)**
15:20
**ImageNow (1)**
296:5
**immediate (1)**
284:1
**immediately (3)**
36:4;41:20;252:18
**impact (1)**
307:9
**implicated (1)**
183:20
**implicates (1)**
184:3
**implication (1)**
186:20
**import (1)**
306:3
**important (4)**
9:22;187:6;
274:22;281:1
**impossible (1)**
9:25
**improved (1)**
290:22
**in- (1)**
243:21
**incident (3)**
41:6;89:4;140:4
**inclu- (1)**
171:19
**include (5)**
50:24;80:9;144:2;
178:12;270:15
**included (4)**
75:8;222:4;
246:19;272:2
**includes (2)**
256:7;302:25
**including (12)**
38:13,17;39:7;
42:21;50:23;143:10;
157:1;161:9;191:16;
236:9;281:19,20

**Incomplete (1)**
303:14
**incorporate (1)**
179:3
**incorrect (5)**
35:13;158:18;
160:1,25;229:17
**increased (1)**
90:16
**incurred (1)**
246:4
**indeed (1)**
280:19
**independent (35)**
95:14,23;96:10,19,
21;102:16;103:17;
108:5,14;109:7,10;
110:10,15;111:4,8,
24;112:1,3,8,13;
141:23;143:1,2,19;
144:6,7,8;145:18;
183:11,21;184:15;
185:24;186:24;
282:8;302:15
**indicate (1)**
148:13
**indications (1)**
284:11
**indicia (5)**
148:6,9,11;150:5,6
**individual (1)**
270:20
**individuals (1)**
270:20
**individual's (1)**
41:6
**industry (2)**
72:3;80:10
**industry-related (1)**
81:4
**influence (2)**
270:24;271:12
**inform (2)**
50:22;51:3
**informal (1)**
10:23
**informally (1)**
177:6
**INFORMATION (38)**
6:13;32:9,10,16,
17;33:3;45:13;
66:18;85:19,24;
86:10;99:11,15;
174:18;203:20,24;
204:3,12;206:14,15,
15,21;207:13,16;
215:1;222:4;224:6,
9;243:22;246:24;
247:3;268:24;269:4;
273:5;284:13;289:4,
6,8
**informed (1)**
47:21

**informs (2)**
49:16;51:21
**infrastructure (1)**
270:19
**inherited (2)**
98:24;161:8
**in-house (1)**
188:17
**initial (9)**
177:3;197:22,23;
204:6;207:24;
210:12,21,23;214:8
**Initially (9)**
54:23;90:5;93:25;
106:11;107:22;
142:21;155:16;
164:17;185:16
**initiating (1)**
295:22
**innocent (4)**
284:15;285:10,18;
287:6
**input (1)**
64:9
**inputted (2)**
200:4;201:18
**inputting (1)**
224:9
**insist (1)**
277:7;279:22
**instance (12)**
83:15;84:20;
92:24;93:13;113:22;
139:4,8;141:2,7;
187:6;188:11;
202:20
**instances (12)**
63:2;82:17;83:25;
84:5,7,11;102:3,7;
105:12;106:7;182:7,
8
**instantaneous (1)**
94:18
**instantaneously (3)**
74:14;148:22,23
**instead (2)**
12:4;53:14
**instruct (3)**
218:6;251:19,22
**Insurance (54)**
7:9;8:3;34:2;
36:23;39:18;41:1,3,
11;42:10,19;53:1,21;
54:9;55:4,19,23;
56:3,5;57:15,17,21;
59:13;60:5,6,24;
62:10;63:7,13,14,18,
21;71:23;72:2;73:4;
74:8;78:15;80:5;
81:4,6;82:3,6;86:13;
87:3;89:4;108:5;
141:23;142:14;
172:10;178:17;

185:24;186:24;
188:16;270:13;
282:8
**Insurancewise (1)**
68:16
**insured (73)**
32:9,16;60:24;
61:2,17,18,18;62:1,
7,21,24;63:4;65:19;
84:1;85:14,15,19,20;
94:17,24,25;111:1;
115:7;142:22,24;
146:2;151:6;155:17;
171:20,25;172:6;
173:1,2,8,10,10,16,
16,21;174:3;177:18;
180:12;198:21,22;
200:22;203:1,21,25;
204:13;205:11;
209:1,8;212:8,19;
213:20;214:14;
216:10;218:4;222:5,
14,23;223:7,22;
224:1;258:2,8,11,15,
18;288:8,15;289:7;
294:22
**Insureds (7)**
83:3;143:3;
172:11,21;174:9,10;
247:18
**insured's (5)**
181:5,11,17;
288:20;289:16
**Insurrection (1)**
38:23
**intent (1)**
172:19
**interest (1)**
270:22
**interested (3)**
23:5,6,8
**interesting (4)**
24:20,21,25;25:6
**interim (1)**
74:25
**internally (2)**
179:7;188:2
**international (5)**
12:11;227:1,2;
277:10;279:25
**Internet (12)**
180:14,18;207:16;
222:11,13,24;
243:11;246:22;
263:12;266:24;
268:24;288:19
**interpret (4)**
173:21,21;177:16;
178:11
**interpretation (2)**
178:17;245:20
**interpretations (2)**
178:16,23

**interrupted (1)**
165:23
**interrupting (1)**
166:20
**interruption (1)**
79:24
**interview (7)**
57:5,9;59:5;60:21,
21;110:24,25
**interviewing (2)**
57:12;61:11
**into (41)**
9:4;107:16;
146:15;150:1;
151:15,18,22;153:3,
11,20,23;154:2,13,
24;201:3,7,11,12;
219:21;224:7;234:9,
20,21;235:14;
236:14;238:19;
244:11,19;249:15,
17,21;264:21;265:2,
6,23;271:8;272:16;
277:3;289:13;
290:10;306:3
**introduced (1)**
224:23
**invaded (1)**
50:5
**investigate (3)**
64:11;71:15;91:22
**investigating (4)**
158:8;159:1;
203:4,4
**investigation (4)**
58:25;83:11;
218:15;302:6
**investigator (5)**
58:9;89:12,19;
163:16,23
**invitation (1)**
232:10
**involve (13)**
18:15;29:22;62:6,
7;64:22;76:23;77:1;
78:12;86:2,7;95:11;
107:17;285:6
**involved (69)**
17:20;29:25;
41:13;42:12,20,25;
47:23;60:6,18,20;
62:8;64:10;71:7;
87:1;92:17,25;99:6,
12,16,19;100:25;
102:16;103:7;105:6;
113:4;139:4,24;
140:22;141:4,9;
144:9;145:8,21;
157:21;161:7;
167:12;170:2,20;
171:19;179:2,4;
183:17;184:11;
197:16;200:5,25;

206:11;213:15,16,
16,17,18,22;215:10;
229:25;265:24;
268:16;278:17;
279:3;282:22,25;
297:15;298:14;
299:6,22,22;300:2,
23;301:7
**involvement (17)**
52:11;150:11;
197:6,10,11,14,17;
198:1;199:23;200:1;
201:5;202:4,10;
214:10;256:11;
284:12;294:6
**involves (4)**
100:17;110:11,16;
159:19
**Iraq (3)**
50:5,7,8
**irrelevant (1)**
278:11
**irrespective (1)**
34:20
**Isaac (1)**
27:15
**Israel (89)**
13:8,11,12,21,24;
14:2,11,20;15:22;
16:19;17:10,18,20;
18:15,17;19:10;
20:13,17;21:9,11,25;
22:8,10,15,21,23,24;
23:7,13,20;25:22;
26:14,19;27:9,18;
28:14;29:4,16;30:13,
16,17;31:5,13,16,22;
32:1,5,14;33:1;34:4,
7,25;142:23;146:15;
203:19;205:24;
206:16;207:9;
217:10,11;232:25;
233:6;240:18,22;
243:17;245:19;
246:15;250:18,19,
20;265:2,6,16;267:1,
18;271:14,15;
277:10;279:24;
280:4;284:4;290:22;
291:12;296:3,21,23,
25;297:4;299:8
**Israeli (7)**
18:14;21:14;
26:11;266:4;283:25;
284:6;285:1
**issue (37)**
32:6;36:24;37:24;
45:22;47:5;52:8;
64:24;77:8;79:2,16;
81:7;84:8,10;91:23;
93:17;100:14;
101:16;110:16;
139:22;140:6;

150:21,25;154:20;
169:5;174:9;182:9;
253:23;261:25;
262:4;275:7;281:12,
25;282:13,13;283:5;
294:9,12
**issues (4)**
57:11;80:4;
110:11;294:22
**issuing (1)**
71:16
**item (1)**
167:15
**Iungerich (3)**
58:2;59:10,12

## J

**JARHEAD (1)**
51:17
**Jayasinghe (2)**
7:16
**Jerusalem (2)**
19:22;297:13
**Jewish (3)**
13:22;27:20;28:6
**Jews (7)**
19:5;21:24;23:19;
27:8;28:10;29:3,15
**job (24)**
36:4;39:15;40:2;
56:16,19;57:15,23;
58:8;59:12,18;60:15,
17,25;63:18,19;
64:14,15;82:2,24;
87:3;89:18;104:19;
113:24;158:5
**jobs (1)**
59:20
**John (5)**
266:21,23;284:19;
286:1;295:6
**Johnson (36)**
6:7;33:8,23;71:5,
8;104:2;169:14,24;
170:9;179:15,17,21;
180:2;194:16;199:1,
20;200:22,24;211:4;
212:16;225:19;
228:1,16;229:6;
230:9,14,17;236:10;
251:13;256:6;
261:16;280:24;
290:17,24;291:6;
293:11
**Johnson's (4)**
199:16;202:2;
209:20,21
**joined (1)**
176:19
**July (45)**
36:1,2;196:11,19;
198:25;199:20;

202:12;211:1,3;
212:1,3;218:1;
225:21;226:15,20;
228:2,15;229:3,15;
230:11;232:15,20;
234:19;236:10,22;
237:1;238:3,11;
239:11;240:21;
243:10;246:18;
251:6;255:22;257:8;
258:24;267:9;268:2,
15;272:15;273:10,
16;277:13;292:11;
293:7
**justice (2)**
11:14;12:1
**justified (1)**
107:12

## K

**KEELEY (157)**
8:1,1;23:14;24:6,
18;25:17,21;27:11;
28:16,21;29:5,9,11;
30:1,20;31:18;
45:23;52:14;65:6,
13;66:2,22;67:2,8;
87:17,23;88:7,11,16;
93:2;99:9;100:15;
101:19,24;108:15;
110:12;111:10;
115:9,14,18;143:12,
22;144:20;145:5;
146:22;151:2;152:5;
155:10;157:8,23;
158:20;159:8;160:3,
8,18;161:25;165:9;
173:24;176:22;
178:14,21,25;
180:23;181:13,18,
23;182:18,22;
183:24;184:5,8,18;
185:3;186:3,15;
187:3,17,23;188:7,
24;189:2,6;190:17;
193:5,13;195:24;
196:10;212:12;
216:3,12,16,25;
217:4,17;219:9,15,
18,21,24;220:4;
224:19,24;240:23;
242:18;243:4,19;
244:13;245:13,23;
248:13;249:22;
250:9;252:3,20;
253:8,12,24;254:15;
259:25;260:6;261:9;
262:5;263:23;
265:17,25;266:7;
267:20;269:10,18;
272:18;274:24;
275:9;278:2,13;

EXHIBIT 16

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 853 of 970   Page ID
#:16954

Universal Cable Productions, LLC v.          Video Deposition          Daniel Spencer Gutterman
Atlantic Specialty Insurance Company                                              February 3, 2017

280:12,20;281:2,15;
282:16,21;283:6,13;
284:22;285:11,20;
286:23;287:11;
295:7;299:9,15;
300:13,17,25;
301:11;306:15,18;
307:12
**keep (2)**
    155:13;293:1
**keeping (5)**
    281:13;282:1;
    285:24;286:6;
    293:20
**kept (1)**
    85:23
**Kerry (15)**
    266:22,23;277:2,
    13;280:2,9,18;
    284:19;286:1,8,13,
    19;287:4,4;295:6
**Keshet (2)**
    297:17;298:9
**key (1)**
    211:7
**keywords (1)**
    207:22
**kibbutz (1)**
    19:15
**kibbutzes (2)**
    19:14,20
**kidnapped (1)**
    266:5
**kidnapping (3)**
    283:25;284:16;
    285:1
**kind (4)**
    16:18;176:11,18;
    177:3
**kindly (1)**
    7:22
**kinds (2)**
    168:14;206:4
**Kingman (3)**
    85:1,2,18
**knew (1)**
    85:14
**knowing (1)**
    216:8
**knowledge (9)**
    108:19;144:15;
    154:12,17,22;206:7,
    18,19;302:20
**known (2)**
    284:14;287:5
**Knupp (2)**
    7:25;200:23
**Kurt (1)**
    226:15
**Kuwait (1)**
    50:5

**L**

**LA (1)**
    231:14
**Lack (3)**
    183:24;186:4;
    188:8
**Lacks (1)**
    266:7
**lady (1)**
    73:22
**laid (1)**
    79:7
**land (2)**
    19:18;45:3
**language (2)**
    244:2;304:14
**lap (1)**
    186:11
**larger (2)**
    95:12,19
**largest (1)**
    101:17
**last (9)**
    42:3;85:6;99:5;
    187:11;220:3;242:4;
    255:18;299:3;
    301:23
**later (7)**
    74:22,24;151:6;
    200:3;223:22,23;
    259:18
**laugh (1)**
    85:10
**law (3)**
    14:17;15:3,9,11;
    58:22
**lawsuit (1)**
    45:22
**lawyer (3)**
    15:2,4;179:17
**lay (1)**
    53:17
**lead (9)**
    177:7;210:14,17,
    19;211:4,23;212:16;
    213:12;268:20
**leading (7)**
    18:5;80:8;211:9,
    10;212:7,19,22
**learn (3)**
    49:24;50:1;152:19
**learned (10)**
    23:4;33:22;48:15,
    19;49:21;66:18;
    152:22;209:8;
    222:22;223:7
**learning (5)**
    23:4;47:10,11,16,
    16;49:1,19;206:21
**least (5)**
    143:15;182:6;

238:25;239:17;
258:16
**leave (5)**
    242:7,12,17;243:6,
    13
**led (1)**
    149:2
**left (2)**
    9:10;104:11
**Legal (11)**
    7:17;30:20;152:5;
    179:2,8,12,13;180:4,
    6;240:23;278:2
**length (2)**
    20:24;21:2
**lens (1)**
    208:15
**less (5)**
    83:7,8,9;90:6;
    106:15
**letter (24)**
    111:19;199:8,16,
    23,25;200:8,17;
    201:1,23;202:6;
    210:10,12,21,23;
    218:1;222:5;268:2,
    6;271:23;272:15;
    273:3,7;276:6;281:5
**letters (3)**
    197:25;218:17,17
**levels (1)**
    170:25
**liability (5)**
    60:23;61:10,14;
    64:23;83:22
**license (20)**
    68:18,20,23,25;
    69:13,14,17,22,24;
    70:6,9,13,16,24;
    77:15;79:12;80:12,
    19;81:11;175:7
**licensed (9)**
    69:2,18;71:2,9,21;
    76:16;77:17;78:1;
    179:25
**licensee (2)**
    70:23;86:23
**licensees (1)**
    81:21
**licenses (4)**
    68:13,15,17;69:11
**life (2)**
    87:14;270:19
**light (1)**
    289:6
**limited (2)**
    201:5;302:25
**line (9)**
    29:7;41:10;79:23;
    200:3;220:20,20;
    242:4;273:22;290:6
**lined (1)**
    147:17

**lines (3)**
    40:24;170:23;
    285:8
**lining (1)**
    250:20
**link (3)**
    199:2;239:4,5
**LinkedIn (1)**
    67:6
**links (2)**
    161:24;264:7
**list (1)**
    147:7
**literally (1)**
    301:21
**literary (1)**
    55:13
**litigation (4)**
    111:14;152:1;
    197:21;305:14
**little (7)**
    24:4,15,19;40:14;
    59:23;197:8;288:4
**live (2)**
    19:9;179:22
**lives (1)**
    48:12
**living (1)**
    19:17
**LLC (1)**
    7:8
**local (5)**
    297:16,18;298:9,
    10;299:20
**locate (1)**
    181:10
**located (3)**
    7:18;40:15;96:25
**location (5)**
    40:9;41:7;53:11;
    109:14,20
**locations (3)**
    16:4;36:21;114:6
**lockup (1)**
    57:7
**long (11)**
    12:14;35:22;59:8;
    68:24;78:1;97:11,
    11;202:9,18;220:2,6
**longer (5)**
    83:12;104:7;
    169:17;292:11;
    293:8
**long-term (1)**
    271:14
**look (76)**
    58:20;74:10;76:3;
    79:6;96:2;113:18,18,
    24;158:3;171:21,22;
    175:18;179:8;181:2,
    4;193:16;196:8;
    198:24;199:12;
    225:15;226:10;

227:23;228:14;
230:4,6;232:12;
236:7;238:9;242:4;
245:13;251:3,10,10,
19,22;252:6,9,11,16;
254:9;255:3,10;
256:1,18,19;257:17;
258:21,23;261:14;
262:20;263:2,2,8,9,
11,15,21;264:11;
265:3,7;267:3,22;
268:11;271:1,2;
275:21;276:2,12,20,
23;281:16;282:3;
295:22;302:4,22;
305:18
**looked (13)**
    51:23;146:3;
    235:4,5;250:23;
    264:3,9,19,23;
    267:13;286:18;
    305:16,17
**looking (14)**
    102:10;154:9;
    199:11;206:5;207:7,
    8;240:16;256:3;
    262:16;268:22;
    269:3,6,23;273:25
**looks (5)**
    56:10;67:18;
    241:6;247:19;
    304:21
**Lopez (4)**
    225:18;226:1;
    258:24;259:7
**LOS (5)**
    7:1,15;109:15,16
**loss (93)**
    14:25;39:1,4;
    79:24;92:5,8,14,19;
    93:17;94:6,9,25;
    95:4;107:15;112:15;
    113:20;114:3;115:5;
    139:17;142:2,3,18,
    19;143:6,9,10,15,16;
    144:1,2,11,19;145:3,
    11,16;146:6;148:20;
    149:3,19;150:2,21,
    25;153:24;154:19;
    158:9;159:2;171:18;
    172:14,22;178:18;
    203:11,15,16;
    204:19,20;205:5;
    208:1,9,14;213:20;
    214:13;216:9,24;
    217:3,16;222:4,20;
    223:6;227:6;244:20;
    245:1,22;246:5;
    250:25;263:19;
    269:9;270:1,5;
    272:3;273:11,17;
    274:21;275:7;
    277:19,25;278:21;

281:11,21,24;282:4,
13;284:21;299:7
**losses (2)**
247:18;270:17
**lost (1)**
145:19
**lot (10)**
30:11;59:22;
88:25;90:3;94:16;
105:8;226:5;258:14;
304:21;305:2
**Lucia (1)**
200:22
**Lucy (4)**
225:18;226:1;
258:24;259:7
**luncheon (1)**
162:10

## M

**Madison (1)**
11:20
**mail (1)**
73:21
**main (2)**
207:19,21
**mainly (1)**
44:12
**maintain (3)**
29:3,15;280:10
**major (13)**
11:13;12:1,6;
25:24;47:10,16,20,
21;48:25;49:3,12,15;
88:25
**majority (3)**
69:19,23;258:16
**MAKEOVER (4)**
39:25;41:16,20;
53:13
**makes (1)**
98:18
**making (6)**
53:14,15;103:13;
164:20;210:6;
218:18
**malpractice (1)**
58:4
**Management (1)**
227:1
**manager (8)**
36:16,18;40:10;
41:7;42:6;43:13;
53:11;54:20
**many (20)**
16:7;18:19;69:20;
78:7;83:5,17;87:16;
98:1,2;100:23;
103:4;108:10;
156:16,20;160:20;
167:12;219:13;
250:23,23;284:11

**maps (1)**
53:17
**Marathon (5)**
139:12;140:10;
141:16;217:20;
265:14
**Mark (1)**
226:14
**marked (56)**
37:16;38:3;50:15;
67:9,12;114:11,14;
189:15,18;192:14;
198:8,12,16;200:8,
14,17;201:1,20,23;
210:23;220:15,19;
225:10,15;226:10;
227:15,18;231:18,
21;232:3,6;235:19;
236:1,4,8;238:10,15;
242:1;251:4;253:19;
258:23;261:14,17;
273:3;276:17,20,24;
283:16,19;289:20,
23;292:19;295:11,
14;304:7,10
**marks (3)**
212:10,10,15
**materials (8)**
16:17;72:5,7;75:7,
8;76:19,23;77:1
**matter (13)**
7:8;15:7;18:12;
27:4;42:3;110:9,14;
146:20;147:2;
167:19;206:9;
274:16;307:7
**matters (2)**
19:2;90:15
**may (14)**
29:6;42:21;59:25;
93:11,12;99:15,20;
140:16;221:22;
222:21;234:9;
241:23;260:16;
285:6
**maybe (8)**
9:23;40:5;98:4,7,
7;103:16;175:24;
186:20
**meals (1)**
36:20
**mean (98)**
12:2;18:7;19:2;
24:17;25:1;27:10;
30:12;45:25;46:2,7,
10,11,18;51:10,23;
52:1;58:16,17;
59:21;61:18,21;
62:12;65:9;71:13;
79:19;82:25;87:9;
90:2,12;91:4,19,21;
94:3,15,24;102:9;
107:2;108:15,23,23;

109:3;110:3;140:20;
142:20;143:14,18;
146:10,18;164:22;
170:5;174:8,25;
175:8,10;176:7,20,
21;177:15,20;
181:20;183:6;
188:15;201:7;
205:21;206:1,15;
208:6,11;210:4,17;
213:17,22;214:6;
217:12;219:16;
220:2;232:23;
239:25;241:11;
242:22;247:8,8,9;
248:22;250:2;
255:10,13;260:13;
263:6,11,13;264:23;
267:21;270:7;
279:12;290:12;
296:8;297:21
**meaning (4)**
85:10;151:8;
167:16;208:20
**means (22)**
43:25;45:21;
46:18,22;47:7,22;
48:2,10;49:4,16;
50:22;51:22;57:8;
66:5;71:14;176:25;
178:18,18;240:5;
255:16;270:8;
272:24
**meant (13)**
25:8;44:6,9,14;
52:13;91:15;175:25;
208:8;247:11;
248:25;255:15;
262:22;264:16
**Media (12)**
7:20;37:20;68:6,9;
162:7;163:9;221:9,
12;275:23;287:19,
22,25
**medical (1)**
58:4
**medication (1)**
11:6
**meetings (1)**
188:14
**Melvin (1)**
14:24
**memorializing (1)**
292:8
**memory (1)**
11:7
**mention (1)**
229:19
**mentioned (2)**
57:23;84:19
**mentions (1)**
288:9
**mentor (4)**

33:18,20,23;
176:16
**message (1)**
176:10
**messages (1)**
254:22
**Michael (1)**
8:1
**Michigan (1)**
88:22
**mid-2000s (1)**
152:17
**Middle (9)**
13:5;21:23;22:16;
25:24;27:21;28:10;
29:4,16;92:9
**might (30)**
11:6;16:21;35:2;
51:23;60:4;71:1;
102:7;148:13;153:3;
180:12,19;185:25;
228:23;230:20;
239:2,19;241:8,19;
242:15;243:12;
248:8,10;252:19;
253:2,7,22;254:6;
260:14;261:24;
262:13
**military (6)**
38:16,20;43:18,
19;44:24;152:14
**millennial (1)**
27:14
**millennium (1)**
27:14
**million (5)**
101:5,20,23;
152:13;270:17
**mind (15)**
51:20;67:19;
79:13;111:21;
141:20;158:1;
191:24;197:10;
224:13;238:1,4;
247:15;265:10;
266:6;300:24
**Minnesota (2)**
179:23,25
**minor (3)**
12:3,4;36:22
**minute (1)**
225:2
**minutes (11)**
67:5;74:16;112:4;
155:6,8;162:2;
219:14,15,16,18;
304:3
**miscellaneous (1)**
168:3
**Mischaracterizes (2)**
253:8,24
**misleading (25)**
145:6;157:24;

158:20;159:8;160:3,
8,18;187:4;188:9;
245:24;253:25;
269:10;272:19;
274:24;280:20;
282:16;283:7;
284:23;285:11,21;
286:23;295:8;
300:13;301:1,13
**missed (1)**
175:24
**missile (3)**
44:10;285:7,9
**missiles (8)**
30:13;45:4;
146:14;147:25;
217:9,10;250:18;
285:17
**missing (2)**
245:12;284:5
**Misstates (12)**
93:2;145:5;157:8;
173:24;224:19;
252:3,20;269:11;
272:18;281:2;283:6;
286:24
**misstating (1)**
157:24
**Mitchell (2)**
7:24;200:23
**mitigate (1)**
247:18
**mobilizing (3)**
146:18,19;148:3
**MODERN (5)**
36:6,15;39:14,21,
22
**moment (6)**
31:6;67:15;73:11;
176:5,7;243:9
**monetarily (1)**
170:22
**monetary (2)**
106:17;107:10
**money (2)**
241:22;248:11
**month (4)**
35:25;59:25;
74:22,23
**months (2)**
36:9;42:3
**more (45)**
24:4;33:18;59:24;
64:6;66:18,18;83:7,
9;85:5;90:9;94:7;
95:17;98:3,5,7;
101:2;105:8,24;
108:12;111:6;
112:23;155:8;
157:13;163:24;
164:9,11,12;166:23;
173:18;174:14;
197:8;206:18;

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 855 of 970   Page ID #:1656

Universal Cable Productions, LLC v.
Atlantic Specialty Insurance Company

Video Deposition

Daniel Spencer Gutterman
February 3, 2017

232:21;233:6;
238:24;239:16;
240:8;241:18;
246:24;247:3,7,22;
262:25;273:14;
283:14
**Moreover (1)**
271:16
**morning (4)**
8:20,21;163:14;
304:23
**Most (7)**
9:8;11:15;57:8;
79:20;110:20;192:4,
6
**Motion (2)**
6:4;37:20
**mouth (1)**
223:21
**move (4)**
49:19;245:19;
246:4;290:21
**moved (4)**
245:5;246:2,10,14
**movie (1)**
107:5
**movies (6)**
49:8;50:23,24;
51:2,12;55:14
**moving (3)**
114:5;224:25;
233:7
**MSNBC (2)**
148:15;217:11
**much (13)**
23:8;24:4;41:11;
51:19;58:17;63:20;
94:20;100:14;
165:19;170:25;
207:6;265:12;
268:17
**multiple (6)**
15:20;60:19;
71:22;74:12;146:3;
170:25
**Muslims (4)**
19:5;21:24;23:20;
27:9
**must (3)**
232:25;271:11;
303:17
**myself (9)**
114:18,18;198:21,
22;206:17;229:6;
254:21;263:7,14

**N**

**name (15)**
7:16;8:22;14:23;
16:10;17:2,7,24,25;
71:6;84:25;88:1;
202:7;209:22;211:7;

290:7
**named (2)**
96:17;104:13
**names (2)**
16:9;170:24
**nation (1)**
150:8
**national (1)**
88:25
**nations (1)**
153:21
**nature (2)**
37:1,5
**NB- (1)**
203:19
**NBC (20)**
142:23;203:3,19;
222:6;227:4,8;
240:16;245:15,18;
246:10,12;290:18;
297:14;298:13;
299:5,21,22;300:2,
22;301:7
**NBCU (3)**
292:9;294:22;
299:20
**NBCUniversal (20)**
37:20;226:14;
227:2;229:2,19,23;
232:16;233:11;
236:22;237:1,4,11,
12,19;238:3;239:11;
243:16;245:5;246:2,
14
**NBCU's (2)**
296:2,11
**necessarily (3)**
112:16;174:8;
175:22
**necessary (7)**
9:8;109:17,19;
110:23;167:14;
185:1;286:4
**need (23)**
40:13;53:15,16;
100:2;143:1;144:25;
145:2,17;146:5;
167:2;188:24;
205:15;206:23;
207:1,4;239:22;
247:25;261:25;
283:13;302:5,11;
304:21;305:1
**needed (3)**
104:22;145:10,14
**needs (4)**
105:6;220:5;
238:25;239:17
**negatives (1)**
160:20
**neighborhood (1)**
98:13
**Net (4)**

54:12,14;55:3,8
**Netanyahu (1)**
24:21
**Netanyahu's (1)**
26:21
**network (5)**
36:7,7,8;54:25;
55:2
**new (14)**
10:2;15:20;44:19,
19,21;105:7;171:11;
176:25;219:22;
220:1,4,24;259:1;
289:5
**news (11)**
48:20;205:17;
239:3;246:22;248:7,
10;249:2;250:5;
253:15,18;254:13
**newscasts (3)**
49:23;50:2,13
**next (9)**
86:24;88:22;
189:11;219:11;
240:4,19;248:7;
276:14;296:20
**nice (1)**
58:23
**No2 (1)**
32:16
**nobody (1)**
168:1
**nodding (1)**
9:16
**Noncomplex (1)**
64:22
**None (3)**
6:11,14;20:9
**non-existence (2)**
243:25;244:10
**normal (2)**
218:10;223:4
**Northridge (2)**
7:19;97:1
**notary (1)**
7:17
**note (6)**
251:14,16;254:9;
256:1;262:20;263:4
**notes (36)**
16:17;59:4,6;
153:7;165:15;166:5,
6,6,9,9,13,16;
230:25;231:2,5;
233:14,16,17,21;
234:7,8,9,18,19,21;
235:7,12;290:11,12;
291:9;292:7,14,18;
293:4,10;303:2
**notice (12)**
111:18;149:1;
152:24;153:18;
171:18;196:2,19,23;

197:3,6;238:6;
260:19
**notifying (1)**
259:8
**nowhere (1)**
278:7
**number (3)**
228:7;230:6;
276:13
**nutshell (2)**
271:21,24

**O**

**oath (2)**
10:24,24
**Obama (5)**
24:20;25:6,14,20;
26:23
**Obama's (1)**
26:21
**OBE (1)**
225:19
**object (15)**
27:11;28:16;
30:20;45:23;66:22;
99:10;115:9;143:12;
157:23;187:23;
193:5;224:19;243:4;
265:25;266:7
**objecting (1)**
100:16
**Objection (102)**
23:14;24:6,18;
25:17,21;28:21;29:5,
6;30:1;31:18;52:14;
65:6,13;87:17,18,23;
88:7,11;93:2;101:19,
24;110:12;111:11;
144:20;145:5;151:2;
152:5;157:8;158:20;
159:8;160:3,8,18;
161:25;165:9;
173:24;176:22;
178:14,21,25;
180:23;181:13;
182:18,22;183:24;
184:18;186:3,15;
187:3;188:7;193:13;
216:3,12,16,25;
217:4,17;240:23;
242:18;243:19;
244:13;245:23;
248:13;249:22;
250:9;252:3,20;
253:8,12,24;254:16;
259:25;260:6;261:9;
262:5;263:23;
265:17;267:20;
269:10;272:18;
274:24;275:9;278:2,
13;280:12,20;281:2,
15;282:16;283:6;

284:22;285:11,20;
286:23;287:11;
295:7;299:9,10;
300:13,17,25;301:11
**objections (6)**
181:18;184:5,8;
269:18;282:21;
299:15
**objective (10)**
175:15,17;180:20;
281:13;282:1,2;
285:25;286:6;288:6;
300:21
**obtain (2)**
43:15,16
**obtained (1)**
81:16
**obtaining (1)**
33:3
**obvious (8)**
177:14,20,21;
178:1,5,10;185:8;
208:23
**obviously (9)**
22:19;63:11;
97:18;99:2;141:10;
164:22;167:16;
262:16,17
**occasion (4)**
86:7;234:14;
282:7,9
**occasional (2)**
26:22;110:5
**Occasionally (2)**
168:15;174:13
**occasions (2)**
13:25;83:5
**occur (8)**
239:2,19;241:8,
19;242:15;243:12;
248:8,10
**occurred (7)**
16:6;31:10;
146:17;214:9;
234:17;245:17;
291:11
**occurrence (2)**
249:11,16
**occurring (11)**
74:3;202:9;
205:24;206:1,8,10;
233:6;241:13;
244:24;246:8;248:6
**off (31)**
13:3;19:18;26:25;
37:11;47:14;48:14;
68:5;83:6;85:17;
148:5,17;161:9;
162:8;170:23,24;
185:4;189:7;213:25,
25;214:7;221:8;
225:1,3,6;257:11;
287:18;306:6,9,10,

Min-U-Script®

Bayside Reporting Company
(888) 229 - 9897

(15) Moreover - off

838

EXHIBIT 16

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 856 of 970   Page ID
#:1857

Universal Cable Productions, LLC v.                    Video Deposition                    Daniel Spencer Gutterman
Atlantic Specialty Insurance Company                                                            February 3, 2017

17,18
**offensive (5)**
146:16,21;147:3,
13,19
**offer (1)**
284:4
**offered (1)**
14:3
**office (5)**
70:21;75:9;
176:12;231:14;
234:1
**often (4)**
64:7;96:18;110:4;
171:9
**Oklahoma (2)**
217:21;265:13
**on-boarding (2)**
176:19,25
**once (10)**
9:25;27:18;42:24;
57:12;169:17;
201:10;206:14;
248:15;305:12,12
**one (99)**
14:2,9,12,13;15:4,
5;16:10;17:4;18:16;
19:12;25:23;26:6,
23;35:18,23;36:3;
41:14,21;47:6,8;
56:21,24;59:3;70:4;
74:9;78:5;82:19;
83:18;84:7;92:22;
94:7;96:11,13;100:5,
24;105:23,24;
108:12;111:6;
112:23;114:22;
139:13,19,20,24;
141:12,13;143:15;
145:14;155:5;
156:11,11;169:5,8;
172:8,10;175:5;
178:12,17;183:15;
184:9;201:3,18;
205:5,13;207:21;
208:22;210:7,8,10;
212:6,22;213:19;
218:16;221:1;230:2;
233:24;234:16;
237:21;238:25;
239:17;244:22,22;
245:4;246:9;250:11,
22;256:18;257:16;
264:25;268:21,23;
272:21;273:14;
281:1,8;283:13;
288:22;303:5
**OneBeacon (100)**
36:5;63:8,19,23;
64:3,15,19;66:6,17;
70:10;72:12;82:11;
83:1,25;89:8;90:21;
93:14;95:22;97:4,5,

7;21;102:10,13,25;
108:6,14,15;109:2;
111:4,8,19,20,24;
112:13;140:22;
141:3,7,18,22;
142:13;144:15;
148:20,25;150:24;
154:6,13,18,23;
156:10,10;163:16,
19;167:1;168:11,13,
22;169:9,17,21,23;
176:6,19;177:4;
183:16;190:3,5,8,11;
192:23;194:22;
195:3,7;197:23;
199:9;208:20;
218:22;220:23;
226:6;237:11,18;
267:8;272:15;
276:10;288:5,5,11;
298:8,13;299:5,6,19,
21;300:1,9,21,22,23;
301:18;302:1
**OneBeacon's (7)**
149:1;178:7;
237:4;282:2;288:17;
293:20;294:22
**ones (9)**
59:24;60:3;
102:24;109:25;
156:18;159:11;
165:22;182:13;
205:13
**one-week (1)**
248:1
**ongoing (1)**
284:8
**online (17)**
32:11,18;45:13;
72:11,13;75:2;78:12,
17,21,25;146:3;
155:18;167:13;
181:3,5;203:5;
243:23
**only (16)**
18:10;42:2;59:18,
24;74:3;82:19;
97:18;107:13;108:4,
13;139:13;163:18;
184:9;241:4,14;
250:22
**on-site (1)**
247:9
**Open (1)**
171:15
**opens (1)**
220:24
**opinion (84)**
28:1,4,5;29:19,24;
30:25;31:24;32:4,8,
14,22;34:1,3,6,12,14,
19,24;44:7,8,22;
58:15;61:25;62:3,13,

18,21,24,25;63:3;
64:12,13,23;65:11,
18,21;66:10,14;
92:18,22,23;93:1,9,
16;142:13;148:19,
20;149:19;151:11;
152:7;155:3;157:16,
19;161:20;166:10;
183:21;185:24;
186:2,12;187:22;
215:25;216:2,8,10;
217:23;219:1;241:2;
245:3;249:14;273:6,
10,16;277:14,18,25;
278:5,21;280:3,7;
284:20;286:21;
287:7,15;298:6
**opinions (3)**
58:13;215:22;
218:17
**opportunity (2)**
282:11,15
**oral (3)**
204:10;302:24;
303:3
**orally (5)**
75:20;204:3,5;
237:5;251:13
**order (1)**
9:17
**organization (13)**
150:18;151:23;
152:4;154:3,25;
155:4;284:14;
286:20;287:5;
291:24;293:19,23;
294:21
**original (3)**
16:5;111:11;307:6
**Orlando (1)**
265:14
**others (11)**
47:9;51:9,16;
68:19,21;93:24;
108:10;199:1;
226:24;236:9;245:4
**ourselves (1)**
53:19
**out (38)**
23:5;40:20;53:17,
17;56:16,19,24;72:1;
73:20;75:17,18;
79:7;80:1;89:4;
95:15;96:3;99:24;
100:1;109:18;
114:20;159:15;
171:20;175:20,22;
188:4;193:2;207:8;
239:23;242:23;
245:19;246:15;
256:20;257:15;
264:5;271:14;293:1;
300:7;305:21

**out-of-state (7)**
68:20,24;69:13,
16;70:8,12,24
**outside (42)**
82:25;95:6,9,14,
23;96:9;101:12;
108:4,13,20,21,24,
25;109:7,11,15,17;
110:10,15,22;111:3,
4,8,24;112:2,4,8,14;
141:23;142:8,14;
179:9;181:9,10;
183:7;185:24;
188:17;210:9;282:8;
298:22;302:5,11
**over (30)**
9:5;23:18;29:21;
33:4;34:5;45:3;50:3;
53:14,15;77:21;
90:1;95:20,21;96:4;
101:20,23;106:14;
109:21;153:12;
163:23;175:2,2,2;
203:5;205:19,21;
221:15;240:11;
241:14;248:24
**own (4)**
44:7;97:16;
152:14;157:15
**owner (2)**
85:14,15

---

## P

**Pacific (1)**
236:18
**Page (33)**
6:3;38:2,8;67:7;
91:14;143:25;
225:15;226:10;
227:9,23;228:15;
236:8;238:10,14;
253:5,16,19;254:13,
19;255:18;257:8;
258:23;261:14,17;
271:2;272:7,16;
273:23,25;276:23;
295:23;302:4,22
**paid (5)**
139:18;172:8;
240:1;247:24;
248:16
**Palestine (6)**
27:20;146:15;
217:10,11;250:18,19
**Palestines (1)**
240:18
**Palestinian (1)**
284:7
**Pam (4)**
33:13,15;34:12;

105:22
**Pam- (1)**
150:13
**Pamela (104)**
6:7;33:8,23;34:14,
19,24;71:5,8;104:2,
14,16,18,20,24;
105:4,11,19;106:2,8;
107:23;146:9;
149:13,14,20;
150:13;151:8,13;
153:14;155:16,19,
22;164:19;165:1;
168:18;169:14,24;
170:9;175:2,10;
176:15;179:15,17,
21;180:2;187:14;
194:16;198:20,22,
25;199:16,20;
200:22,23;202:2;
209:19,21;210:17,
19;211:4,10,22;
212:6,16;213:12;
215:5,17;216:2;
217:25;219:7;
225:19;228:1,16;
229:6,13,15;230:7,9,
14,17;233:10;236:9;
251:13;256:6;
257:15;261:16,17;
262:3;264:7;268:20;
275:3;280:24;283:2;
290:9,16,17,24;
291:6;292:7,11,15;
293:1,11;302:13;
303:21
**Pamela's (5)**
210:11,16;211:20;
218:12;229:13
**paper (14)**
70:17;76:11;
221:4;231:8,12;
233:22,23,25;234:8;
235:1,2;303:2,11;
305:11
**paperwork (1)**
73:16
**paragraph (1)**
271:8
**paraphrasing (1)**
47:1
**Parliament (1)**
152:16
**part (31)**
17:23;18:1;22:19;
60:25;79:4,8;
140:11;173:11,20;
174:3;192:4,6;
209:2;227:6;230:7;
244:1;255:19;256:6,
14,17;270:22;
271:14;272:1;274:7,
8;277:3;279:3;

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 857 of 970   Page ID
#:1658

Universal Cable Productions, LLC v.                    Video Deposition                    Daniel Spencer Gutterman
Atlantic Specialty Insurance Company                                                       February 3, 2017

291:17;296:4;303:9,
12
**participants (1)**
    61:11
**participate (1)**
    175:7
**participated (1)**
    295:20
**particular (25)**
    14:9;26:5;48:7;
    51:6;62:5,11,14;
    96:9,11,13;99:16;
    102:4;109:19;111:1;
    113:21,21;115:3;
    140:4;156:1;171:17;
    207:8;240:13;243:9;
    244:5;268:21
**parties (6)**
    45:3;60:21;
    153:14;184:11;
    284:10;306:21
**parts (2)**
    14:19;257:12
**party (8)**
    61:15;62:9,9;
    86:11;153:13;
    229:23,24;293:11
**pass (6)**
    72:18;73:10,18,20,
    23;74:18
**passed (6)**
    14:24;73:12;
    74:16;75:15,17;
    76:12
**passing (3)**
    75:25;76:6;80:22
**past (5)**
    69:12;183:23;
    185:25;186:14;
    284:16
**paused (1)**
    92:9
**pay (5)**
    61:16;140:7;
    240:4;241:24;248:2
**paying (3)**
    158:9;159:2;
    248:11
**payment (4)**
    61:1;71:16;83:11;
    91:24
**payments (1)**
    60:23
**peace (1)**
    39:9
**penalty (2)**
    307:5;308:8
**pending (1)**
    7:9
**people (28)**
    9:25;14:15;16:7;
    19:17;53:15;57:5,8;
    82:10,23,25,25;

83:10,21,22,23;
88:23;89:1;102:9;
111:3;152:13;
164:23;167:10;
169:9,21;170:20;
175:3;179:3;265:22
**people's (1)**
    170:21
**Per (2)**
    238:21;239:2
**percentage (2)**
    103:6,8
**perfect (1)**
    189:5
**perform (2)**
    91:21;152:10
**period (40)**
    20:18;21:10;
    25:18,20;31:23;32:2,
    5;44:18;45:1,13;
    56:12;66:15,16;
    75:1;78:8;102:12;
    104:14;105:11,18;
    106:1,4;111:17,21,
    24;152:1,2;153:15,
    17;168:19;169:23;
    176:9;205:24;
    209:25;226:2;
    240:13;241:25;
    259:22;264:6;
    267:22;268:22
**periods (1)**
    27:15
**perjury (2)**
    307:6;308:8
**perpetrated (3)**
    267:2,18;280:4
**person (18)**
    16:10;17:23;
    75:20;82:13;86:22;
    96:1,2;97:6;109:19,
    20;111:1;171:5;
    172:1,1;209:23;
    210:6;268:20;
    270:21
**personal (3)**
    154:12,17,22
**personally (4)**
    149:25;196:3;
    244:3;293:25
**personnel (7)**
    36:19;38:20;
    242:5,11,17;243:6,
    12
**persons (3)**
    18:5,10;99:12
**pertain (1)**
    167:1
**pertained (3)**
    12:10;80:4;263:17
**pertaining (1)**
    49:17
**pertains (1)**

221:1
**pertinent (1)**
    268:24
**Peter (45)**
    33:8,15,17;34:12,
    15,19,24;97:8;
    107:23;146:10;
    149:16,20;155:19;
    157:12;164:19;
    165:2;170:4,10;
    175:1,9;176:15;
    187:15;194:14;
    215:7;217:25;228:1;
    230:10,13,18;
    238:12,20;239:13;
    241:18;242:23;
    247:1,2,4,20;251:13;
    259:17;260:23;
    261:16;262:1;265:1;
    306:22
**Peter's (1)**
    218:21
**Phillips (1)**
    301:6
**phone (8)**
    109:21;171:23;
    239:10;258:17;
    292:3,8;293:11;
    298:25
**physically (2)**
    206:1;247:13
**Picture/Television (2)**
    6:4;37:21
**pictures (1)**
    171:21
**piece (4)**
    70:17;76:11;
    250:22,24
**pitches (1)**
    55:1
**place (4)**
    19:12;81:17;
    163:4;197:25
**places (2)**
    15:20;16:4
**plain (1)**
    206:18
**plaintiffs (4)**
    7:7,25;307:7,9
**planes (1)**
    250:19
**plans (2)**
    228:20;261:21
**play (3)**
    249:15,17,21
**played (2)**
    88:22,22
**playing (2)**
    88:19;187:7
**Please (33)**
    8:4,6,22;9:18;
    10:10;24:7;29:13;
    37:4;42:17;67:19;

92:10;93:4;150:6;
155:6;162:2;191:9;
238:19;257:14;
261:14;265:5;270:3;
271:2,9;287:2;
288:23;294:17;
296:2,3,10,21;
299:17;304:14,22
**pm (22)**
    162:10,12;163:3;
    189:8,8;221:10,10;
    225:7,7;226:16;
    228:2,15;229:16;
    236:10;238:11;
    240:21;243:10;
    246:18;257:8;
    287:20,20;307:18
**point (54)**
    9:22;18:19,21;
    28:17;35:3;65:7;
    66:3;99:9;106:15;
    111:18;140:17;
    142:12;145:14;
    146:4;148:25;
    150:15;151:12;
    157:11;171:24,25;
    187:15;197:5;200:2,
    3,7;201:6;210:20;
    211:3,12,22;212:10,
    16;214:22;217:25;
    230:21;233:7;
    237:16;241:4;
    243:13;244:8;
    245:17;249:5;
    253:21;254:5;255:9;
    256:11;268:5,17,20,
    23;282:23;284:11;
    285:7;294:7
**pointed (2)**
    256:20;257:15
**pointing (2)**
    191:20,21
**police (7)**
    40:17;167:16,17;
    171:17;297:18;
    298:10;299:20
**policies (15)**
    63:11,13,14,21,22,
    23;72:2;79:21,21;
    80:5,10;113:17;
    175:19;177:8;
    304:17
**policy (96)**
    36:24;37:13,22,
    23;42:22;61:23;
    64:6;79:7,17;81:8;
    139:21;140:5;
    161:19,21,24;
    172:12;174:20;
    175:18;177:16;
    178:12,17;180:13;
    203:13;205:7;208:3,
    7,12,19;209:9;

213:21;214:17;
215:2,13,22;218:5;
222:25;223:8;
224:17;244:2,8,11,
16,19;255:5,6,11,
16,19;256:6,8,10,14,
25;257:2,7,13,17,22;
258:3,5,6,8,11,14,20;
259:4,8,14,21;260:5,
14,16,17,22;262:23;
269:21,25;270:4,24;
271:16;272:2;
273:12,25;274:7,8,
13,16,18;277:22;
278:12;279:9,14;
288:17;289:12;
290:25;293:20;
304:14
**popped (1)**
    140:4
**popping (1)**
    180:15
**pops (1)**
    82:19
**population (4)**
    270:23;271:13;
    278:8;279:6
**Portfolio (1)**
    37:21
**portion (12)**
    12:7;61:4,6;98:19;
    115:18;244:22;
    246:9;271:23;
    279:20;296:4,21,25
**portions (6)**
    226:20;256:25;
    257:2,7;272:10;
    279:2
**position (24)**
    36:13;43:8,11;
    54:3;55:16;56:2;
    163:15,19;181:6,17;
    243:17;266:15,17,
    21;267:1;269:7;
    272:12,14;275:7,15;
    280:18;284:13;
    288:20;289:16
**positions (3)**
    54:18,21;167:12
**possibility (5)**
    146:16;234:11;
    241:10,12;248:20
**possible (10)**
    79:23;113:17;
    147:3,13;165:19;
    178:16;281:9;282:3;
    285:25;286:7
**possibly (3)**
    140:13;207:6;
    247:19
**potential (3)**
    59:2;173:7;296:17
**potentially (27)**

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 858 of 970   Page ID
#:11059

Universal Cable Productions, LLC v.                    Video Deposition                    Daniel Spencer Gutterman
Atlantic Specialty Insurance Company                                                        February 3, 2017

40:23;62:9;80:1;
109:17;151:9;153:5,
8;166:7;168:17;
172:25;175:21;
185:16;198:2;231:1,
4,11,15;233:7,15,18;
234:2;235:9,10;
260:25;291:1,7;
298:4
**power (3)**
38:24;79:25;80:1
**practice (14)**
15:10,11;69:24;
110:9,14;167:19;
179:25;233:13,19;
258:7;260:4,12,22;
261:8
**Practices (7)**
189:21;192:14;
193:11;194:12;
195:8,12;301:19
**practicing (1)**
15:4
**prayers (1)**
284:2
**precautions (2)**
20:6,7
**preceding (1)**
36:5
**precise (1)**
269:5
**prefatory (1)**
191:19
**prefer (1)**
225:4
**preliminary (1)**
288:25
**preparation (7)**
76:19;190:19,25;
191:7,18;192:12;
273:6
**prepare (2)**
191:10,22
**preparing (1)**
273:2
**presence (1)**
250:6
**present (4)**
22:20;90:25;
103:18;229:5
**presentation (1)**
95:5
**presented (2)**
112:15;249:4
**president (9)**
24:2,20;25:6,14;
26:21;50:6,7;54:24;
218:22
**presidents (4)**
26:1,2,15,18
**Pretend (1)**
279:9
**Pretrial (3)**

56:25;57:2,24
**pretty (3)**
18:19,21;26:6
**preview (1)**
67:17
**previous (3)**
31:1;196:15;
252:14
**previously (4)**
23:24;24:3,14;
224:23
**Price (1)**
8:2
**PRIDE (2)**
53:9,25
**Primarily (12)**
12:8;14:16;15:8;
43:23;109:25;
146:13;150:13;
167:25;168:4;
169:18,19;213:15
**principle (2)**
208:19;209:12
**Principles (5)**
193:20;194:13,18;
195:3,16
**printout (1)**
73:8
**prior (29)**
25:20;51:25;
52:11;55:21;57:24;
63:3;89:7;93:20;
145:5;157:5,8;
192:17;210:20;
211:3,25;217:25;
224:19;227:5;268:2,
15;269:7,11;273:10,
16;277:13;283:6;
286:2,9,14
**privilege (1)**
66:5
**pro (1)**
25:22
**Probably (15)**
16:8;17:1;41:10;
59:24;62:6;79:7;
106:15;164:14;
166:15;187:10;
201:18;211:7;
223:19;246:25;
262:17
**problem (2)**
16:16;166:22
**procedure (2)**
74:2;303:4
**proceed (1)**
8:4
**proceeding (1)**
86:13
**proceedings (3)**
87:2;162:11;163:3
**process (28)**
44:17;61:5;63:24,

25;81:20;90:19;
94:11,22;104:23;
105:2;141:9;142:12;
146:4;157:15;
161:15;164:4,4;
166:23;167:5;197:6;
202:17;211:22;
215:24;216:6;
218:11;223:4;
234:24;305:15
**processes (4)**
44:19,22;64:4;
90:23
**produ- (1)**
59:21
**producer (1)**
41:10
**Producers (2)**
6:4;37:21
**product (1)**
99:10
**production (45)**
36:15,16,18;
39:18;40:8,25;42:6,
10;43:9,12,13;44:1,
15;53:2,22;55:1;
59:22;107:5;114:4;
241:22;242:6;245:6,
19;246:2,11,15;
247:9,21,22;290:20,
21;291:10;296:12,
13,19;297:3,15,16,
17;298:9,9;299:23;
300:5,11;301:9
**production-related (1)**
60:2
**Productions (1)**
7:8
**production's (2)**
228:20;261:21
**professor (5)**
14:17;15:3;17:4;
18:3,6
**program (3)**
14:3;15:22;69:20
**progress (1)**
214:7
**progressing (1)**
34:9
**Progressive (19)**
55:23,25;56:2,5,
14;57:25;59:15;
60:9;61:1,18;62:1;
63:7,18,21;64:3,7,
15,17;82:8
**promoted (1)**
54:20
**property (13)**
71:25;79:21;
85:12,14,15;95:13;
108:22;109:13;
143:4;168:5;177:7,
7;270:19

**propose (1)**
306:11
**prosecutor (2)**
15:15,18
**prove (1)**
77:23
**provide (6)**
94:23;99:15;
246:24;247:2;307:6,
8
**provided (12)**
32:9,10,16;74:14;
94:19;107:11;
140:18;142:21;
171:22;203:20,24;
204:13
**provides (1)**
94:24
**Providing (1)**
219:1
**provision (1)**
178:13
**provocation (1)**
28:13
**prudent (2)**
243:14,18
**pull (1)**
85:18
**pure (1)**
107:4
**purely (1)**
110:24
**purpose (1)**
307:10
**purposes (3)**
63:24;100:1;
245:16
**pursuant (3)**
42:22;225:23;
245:2;270:12
**pursuit (1)**
288:5
**push (11)**
238:24;239:1,16,
18;240:8;241:18;
247:7,8,10;248:19;
291:10
**put (20)**
93:23;100:4;
101:12;156:10,11;
173:12;185:7;201:3,
7;223:20;224:6;
233:22;234:8,10,21;
240:10;279:8;
289:13;290:10;
292:25
**Putting (3)**
68:23;142:9;
192:11

**Q**

**qualify (1)**

167:2
**questionable (1)**
185:9
**quick (1)**
284:3
**quickly (3)**
82:11;83:11;
113:23
**quote (4)**
114:23;158:6;
294:19,20

**R**

**radioactive (1)**
39:8
**Raise (1)**
8:5
**raised (2)**
82:5;283:2
**Randi (1)**
226:13,23
**random (1)**
186:5
**randomly (1)**
27:2
**range (2)**
101:2,3
**reached (2)**
255:25;306:12
**read (39)**
24:20;49:8;107:7;
172:12;194:1,5;
236:13;238:19;
239:5;251:9;252:17,
25;253:4,6,15,18;
254:12;255:6,15;
256:8,10,14;262:11,
22;271:8,24;272:10,
16,20,23;273:22;
274:3;277:3;278:21;
279:20,21;283:23;
288:22;302:3
**reading (11)**
49:23;50:2;58:24;
220:20;232:24;
240:15;253:21;
255:11;293:9;
301:21,25
**reads (1)**
177:17
**reaffirmed (1)**
111:20
**real (1)**
258:13
**realize (1)**
205:12
**realizing (1)**
80:11
**really (32)**
14:14;19:2;29:1,1,
19;44:3;45:10;
51:19;58:17,22;

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 859 of 970   Page ID #:16440

Universal Cable Productions, LLC v.                    Video Deposition                    Daniel Spencer Gutterman
Atlantic Specialty Insurance Company                                                              February 3, 2017

59:8;73:12;86:25;
144:23;168:1;
174:25;175:12;
177:15;180:25;
181:25;182:1,1;
197:16;204:15;
205:23;208:15,20;
209:12;244:7;
268:16;294:6,10
**reason (20)**
9:14;11:3;81:24;
103:10;140:3;193:3,
7,10;223:12;229:14;
259:13;261:1,4,6;
279:12;292:5,13,17;
300:9;301:6
**reasonable (1)**
178:24
**reasons (4)**
106:10;147:7;
149:6,8
**reassigned (1)**
93:19
**rebellion (1)**
38:23
**recall (184)**
10:19,22;12:14,
25;13:1,6;15:19;
16:8,21;17:3,11,13,
16,17,19,25;18:11,
18,20;20:3,10,16,22;
21:5,13,17,18;22:23;
26:10;33:10;34:13,
16,20,22,23;35:1;
40:4,5;50:17;58:17;
59:3,7;61:24;64:16,
17;65:15;66:23;
69:15;70:15;71:20;
73:6,10,13;75:24;
76:1,10,13;77:11,14;
80:25;81:2,5;83:25;
92:22;106:9;113:11,
12;114:4;115:7,12;
139:7,13,18,20;
140:5,24;141:13;
149:12,15,17,21;
150:19,23;151:17,
21;152:3,25;153:2,
15,19,22,23;154:1,2,
4,5;157:17;161:22;
162:3;165:11;
166:18;193:25;
194:8,10,15,17;
200:9,10;205:22;
207:17,19,23;212:2,
5,21;215:11,19,23;
216:5;217:24;221:6;
223:2;227:11;229:8,
12,21,23;230:15,16,
19;232:19;233:2,3,9;
237:17,24;239:9,12;
240:10;241:3;243:8;
246:20,21;251:21,

24;252:10;253:3,13;
254:25;255:8,12;
256:9,13;258:4;
259:23;261:3;
262:10,15;263:1,10,
25;264:13;267:7;
268:8,9,11;273:8,20;
275:11,17,18;276:7;
277:16;288:8;292:2;
293:3;298:20,23;
299:1,4;302:21;
304:24;305:1,24
**recalling (1)**
85:11
**receipt (1)**
227:9
**receive (6)**
55:1;58:18;167:4,
20;196:2;204:3
**received (30)**
11:23;58:19;73:5;
76:10;87:13,24;
103:22;108:1;
152:23;153:18;
172:10;183:20;
186:10;196:19,23;
197:3,5;200:2;
202:14,23;203:10;
204:22,24;205:4,14;
206:11;238:6;256:5;
276:10;289:5
**receiving (5)**
73:7;90:5;243:22;
260:5,23
**recently (3)**
57:6;69:1;90:9
**Recess (6)**
68:7;162:10;
189:8;221:10;225:7;
287:20
**reciprocity (1)**
69:19
**recognize (21)**
37:16;67:12;
69:24;114:14;
189:17;193:17;
198:16;199:13;
200:17;201:23;
220:18;225:10;
227:18;231:21;
232:6;236:4;283:19,
21;289:23;295:14;
304:10
**recollect (2)**
75:22;197:4
**recollection (24)**
22:11;35:3;74:17;
75:13;115:3;139:23;
153:10;188:13,19;
191:3,8,14;192:2,8;
195:19;196:18;
229:1;230:9,21;
232:15;236:21;

256:24;291:4;
293:10
**recollections (2)**
191:5,5
**recommend (1)**
187:21
**recommendation (2)**
157:3,14
**recommending (1)**
242:10
**record (39)**
7:5;8:23;9:18;
68:5,8,10;76:4;
162:8;163:8,10;
186:22;189:7,9;
220:2,7,9;221:8,11,
13,25;225:1,4,6,8;
236:14;238:19;
271:9;272:16;277:4;
279:20;286:25;
287:18,21;288:1;
306:7,9,10,17,18
**recorded (1)**
9:10
**recorder (1)**
166:8
**recording (1)**
9:12
**Red (3)**
54:1,8,11
**redo (4)**
174:21;288:13,24;
289:3
**refer (1)**
264:4
**reference (3)**
195:21;199:4;
230:5
**Referenced (3)**
6:3;253:5,16
**referred (4)**
38:5,7;39:12;
227:5
**referring (10)**
27:1;52:8;92:2;
165:4;175:11;
194:19;228:11;
262:4,9,14
**reflect (2)**
12:20;292:14
**refresh (13)**
35:3;191:3,7,14;
192:1,7;229:1;230:8,
21;232:14;236:21;
256:24;291:4
**refreshed (1)**
293:10
**regard (1)**
180:11
**regard- (1)**
173:3
**regarding (13)**
21:13;23:12;

256:24;291:4;
293:10

44:13;49:5;61:25;
154:23;166:10;
173:3;198:23;219:3;
229:16;232:16;
288:4
**regardless (1)**
39:2
**regards (7)**
166:12;170:21;
180:10;223:3;
236:19;239:7;290:4
**region (2)**
29:21;300:10
**reiterate (2)**
187:7;284:13
**rejection (1)**
291:12
**relate (3)**
87:22;114:19;
144:5
**related (11)**
13:4,7;16:18;
30:16;72:2;78:23;
79:1;80:10;87:2;
141:6;171:16
**relating (4)**
78:19,22;86:13;
207:9
**relation (3)**
74:21;199:22;
242:6
**relation- (1)**
25:3
**relationship (10)**
24:23;25:4,5,10;
26:14,19;43:19;
97:3;104:16;180:4
**relationships (4)**
25:25,25;26:4,17
**Relatively (2)**
164:6,24
**release (1)**
284:1
**relevance (8)**
28:17;29:10;
31:19;87:18,23;
88:7;101:19;147:12
**relevant (13)**
61:14;241:7;
242:14;249:7,11;
251:17;252:1,12,13;
254:6;299:13;
300:12,15
**relieved (1)**
307:3
**rely (1)**
164:12
**remain (8)**
297:14;298:14;
299:6,21,22;300:2,
23;301:7
**remained (1)**
164:5

**remaining (1)**
307:14
**remember (133)**
15:21;16:9;17:8;
18:8;19:3,6,8,21,23;
20:5,8,19,23;21:8,
12,20;22:17;23:2;
27:3,4,16;32:24;
35:25;36:8,10;40:1;
41:25;44:25;51:19;
55:24;59:8,9;60:12;
61:20,21;62:19;63:1,
5;65:2;66:8,12,13;
69:5,7,9;72:22;73:7,
11,14,15;74:11;
78:20,24;79:20;80:1,
6,14;81:9,25;82:7;
83:14,15,20;84:4,12,
23;85:4,9;86:20;
88:1,19;91:2;92:24;
93:7,13;94:4;
101:21;105:17;
113:10;114:8;
115:11;139:2;140:1,
3;146:8;149:13,16,
18;152:22;161:13;
165:18,25;168:21;
176:8,13;177:9,10;
182:5;189:23;
192:11,13,16;
196:22,23;202:16;
204:1,12;210:3;
212:9,15,23;214:21;
222:12,16;223:9;
224:3;234:13;
236:24,25;237:3,6,
10;241:5;244:18;
247:6;251:12;
263:14;264:8,17;
272:4;276:11;
291:17;294:13
**remembered (2)**
170:1;192:4
**remind (1)**
263:7
**reminded (1)**
179:1
**reminds (1)**
291:8
**render (4)**
92:18,23;93:1;
161:20
**rendered (1)**
92:21
**renewed (1)**
69:1
**repairing (1)**
53:20
**repeat (5)**
23:15;29:12;
42:17;45:18;93:4
**rephrase (1)**
269:24

**replicate (2)**
  187:11,18
**report (3)**
  64:8;167:16,17
**reported (2)**
  82:18,21
**REPORTER (16)**
  8:5,12;9:10,24;
  67:1;189:12;198:5;
  220:8,13;225:1;
  245:11;276:14;
  305:25;306:3,16;
  307:2
**reports (1)**
  171:18
**represent (1)**
  55:13
**representation (1)**
  229:10
**representations (2)**
  228:21;261:22
**representatives (1)**
  237:18
**represented (1)**
  58:3
**representing (1)**
  196:10
**reprinted (1)**
  306:24
**REQUESTED (1)**
  6:13
**require (2)**
  298:8,13
**required (8)**
  153:13,20;297:16;
  299:5,20,21;300:2,
  22
**requirement (4)**
  78:19,22;79:1;
  300:24
**requirements (2)**
  77:18,20
**requires (5)**
  70:6;103:17;
  105:13;154:14;
  242:16
**research (63)**
  47:4;58:25;
  142:25;145:23,25;
  146:11,12;147:4,11;
  148:18,24;149:2;
  150:1,5,8,14,17,21;
  151:13,15,18,22;
  153:3,11,19,23;
  154:2,6,13,18,24;
  155:18,18;167:13;
  180:9,11,14;184:10;
  200:7;203:12;205:6,
  7,15;206:25;208:1,9,
  18;213:20;214:14,
  17;215:12,21;216:9;
  218:15;222:23;
  223:6;224:16;

**250:17;255:13;**
  283:3;288:18;
  289:15;293:21
**researched (10)**
  32:18;222:10;
  286:1,8;294:8,12,18,
  21,23;295:3
**researching (2)**
  32:25;46:24
**reservists (1)**
  250:21
**resource (1)**
  266:25
**respect (21)**
  52:25;64:24;
  65:12;80:23;93:7;
  99:14;102:19,23;
  115:3;140:25;
  141:14;156:23;
  158:15,19;159:3,6,
  16;160:22;161:1;
  163:21;216:15
**respects (1)**
  164:3
**responded (1)**
  303:24
**responding (1)**
  100:16
**responds (2)**
  297:2,12
**response (11)**
  31:1;46:6,15;
  147:20;200:3,21;
  202:2;207:5;235:16;
  272:6;299:3
**response! (1)**
  297:8
**responsibilities (8)**
  36:14,17;40:11;
  42:7;43:14;89:21;
  163:22;307:3
**responsibility (3)**
  90:14;163:24;
  302:9
**responsible (10)**
  155:23;156:4,13;
  158:7,25;159:25;
  160:11,15;218:18;
  284:10
**rest (1)**
  46:4
**restaurants (1)**
  40:22
**result (3)**
  73:2;74:13;299:7
**resulted (2)**
  269:8;270:16
**results (1)**
  72:25
**resumed (3)**
  162:11;163:4,6
**retained (2)**
  303:15,17

**return (2)**
  284:3;288:3
**reveal (2)**
  70:22;99:20
**revealing (1)**
  99:11
**reverse (1)**
  164:14
**review (32)**
  59:1;61:23;67:15,
  19;113:17;142:7;
  145:9;161:21,23;
  174:20;179:10;
  183:8;190:24;205:5,
  6;207:25;208:1;
  227:8;232:13;257:3,
  6,12,14,22;258:7,10;
  259:21;260:5,22;
  289:4;304:14;307:5
**reviewed (25)**
  66:17;107:22;
  146:2;148:20;
  161:19;190:14,19;
  191:2,6,10,13,17,22;
  192:13,17;193:1;
  204:18;222:3;227:6;
  256:25;257:10;
  258:3,4,5;290:25
**reviewing (21)**
  32:10;37:25;
  45:12,12;58:11,14;
  61:8;64:6;67:17,21;
  70:13;177:8;180:13;
  203:2,11,14;213:19,
  20;214:13,13;228:10
**revise (1)**
  13:10
**revoked (1)**
  81:14
**revolution (1)**
  38:23
**reward (2)**
  277:8;279:23
**Richmond (2)**
  226:13,23
**right (139)**
  8:5;12:22;16:1;
  22:5;24:11;28:14,
  22;29:3,10,15;31:13,
  15,16;34:8;46:19;
  47:7,18;49:19;
  51:24;52:23;56:1,
  24;59:15,16;61:2;
  62:15;76:4;82:22;
  86:19;89:3,6;91:24;
  94:2;97:18;100:10;
  102:5,17,21;104:20,
  25;106:8,14,14;
  111:13;114:25;
  115:5;139:2;143:7,
  17,17;144:12,13;
  145:21,23;147:6,7,9,
  12,19;149:6;169:6,9;

**176:6;181:1;183:13,**
  17;185:14,21;189:2;
  194:4;197:13;
  202:12;204:8,20;
  208:4,9,16,23;
  209:12,14;210:24;
  211:23;213:2;214:1,
  20,23;216:2;219:25;
  224:15,18;229:24;
  231:14;233:23;
  235:7,21;238:7;
  249:20,24;250:3,15;
  251:1;252:23;
  253:11;254:6,9,14,
  19;255:20,23;
  260:18;262:1,23;
  266:12;268:7,25;
  269:22;270:1;271:1;
  272:10,17;274:23;
  275:16;277:10;
  279:25;280:15,19;
  281:1,9,14,19,21;
  282:4,9;290:5,14;
  293:12;295:6;
  300:12,16
**right-hand (1)**
  38:11
**rioting (2)**
  113:5;114:1
**risk (2)**
  57:10;270:13
**roads (1)**
  53:18
**Rockets (6)**
  265:2,6;285:7,9,
  17,18
**role (40)**
  40:7;42:4;53:10,
  16;57:17,20;58:5,10;
  59:10;60:8;61:9;
  63:6,8,25;64:2,3;
  90:11;100:3,4;
  107:4;155:14;
  202:24;204:25;
  205:5,9;207:25;
  209:15;211:18,20;
  212:24;213:4;
  214:20,22;218:3,6,
  12,21,24;219:5;
  221:16
**roles (3)**
  59:23;60:2,6
**room (1)**
  9:9
**roundabout (1)**
  79:19
**rowdy (2)**
  88:12;89:2
**rule (2)**
  96:6;105:21;
  258:13;260:9
**rules (7)**
  9:6;190:2,5,8,11,

**14;192:19**
**run (2)**
  156:18,19
**running (2)**
  29:6;268:20
**Russell (3)**
  58:2;59:10,12

**S**

**safe (1)**
  284:3
**safety (1)**
  20:7
**safetywise (1)**
  243:15
**salvor (1)**
  302:8
**same (43)**
  10:24;28:21;29:5;
  30:1;60:14;71:14;
  75:14,15,17;80:7,13;
  88:11;89:14;91:14;
  101:24;112:5;
  141:14;143:25;
  163:4;164:5,10,22,
  24;178:25;181:18;
  182:22;184:5,8;
  186:11;193:13;
  194:16;209:11;
  223:20;224:16;
  238:6;253:12;
  269:18;272:14;
  282:21;299:15;
  300:17;306:11;
  307:13
**Sara (2)**
  16:10,12
**saving (5)**
  241:21;247:21,23;
  248:11,19
**saw (9)**
  45:14;46:24;
  148:14;193:21;
  217:9;250:18;276:5,
  8;303:9
**saying (24)**
  23:1;81:24;85:18,
  24;93:6,9;99:25;
  155:13;164:18;
  165:1,3;166:5;
  212:21;223:19;
  237:23;242:16;
  251:25;263:7;265:3,
  8;278:8;279:4,5;
  292:2
**scales (3)**
  182:16;186:1;
  187:2
**school (5)**
  35:5,6,8;53:9,24
**schools (2)**
  53:15,20

Min-U-Script®

Bayside Reporting Company
(888) 229 - 9897

(20) replicate - schools

843

EXHIBIT 16

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 861 of 970   Page ID
#:16442

Universal Cable Productions, LLC v.                    Video Deposition                    Daniel Spencer Gutterman
Atlantic Specialty Insurance Company                                                       February 3, 2017

**scope (2)**
172:16;173:3
**score (1)**
73:8
**screen (1)**
74:10
**scrolling (1)**
224:24
**search (11)**
207:12,13,16,20,
22;266:24,24;284:5;
305:4,8,15
**searched (1)**
246:21
**searches (3)**
206:5,6;264:14
**searching (2)**
203:4;268:24
**second (13)**
73:13,13;74:20;
75:14;79:4;81:17;
99:22;182:12;185:3;
213:19;232:16;
234:16;238:14
**Secretary (12)**
270:9,10;271:17;
277:2,12;280:2,9,17;
286:8,13,19;287:4
**section (2)**
152:14;168:6
**security (24)**
20:4,6;142:22;
203:3,19;204:6;
222:6,8;226:25;
227:1,4,9;240:16;
241:16;242:16;
243:16;284:7;
297:14;298:14;
299:6,22;300:2,22;
301:7
**Seeing (7)**
56:10;81:25;
146:14;264:19,22,
24;277:16
**seek (13)**
142:13;150:16,20,
24;182:17;183:21;
184:15;186:2,12,24;
268:6,13;300:7
**seeking (5)**
180:4,5,6;187:21;
284:9
**seem (2)**
25:2,9
**seems (1)**
157:15
**sees (1)**
266:15
**semester (1)**
14:8
**send (3)**
202:18;239:13;
258:16

**sending (4)**
155:18;161:14;
254:21;264:7
**Senior (5)**
89:12,18;163:15,
22;226:3
**sense (5)**
98:17,18;105:8;
206:13;277:21
**sent (8)**
146:2;202:21;
203:2,18;239:9;
257:7,11;265:1
**sentence (3)**
18:23;274:4;
296:20
**sentences (1)**
296:9
**separate (4)**
18:2;115:22;
197:21;278:24
**September (2)**
111:19;202:5
**sequence (3)**
39:3;253:15,18
**Services (3)**
56:25;57:24;284:7
**SESSION (1)**
163:1
**set (13)**
14:14;30:15;95:4;
103:17;192:19;
193:11;194:12,13;
195:4,8,12,16;
301:19
**setting (1)**
10:24
**settlement (1)**
83:24
**shaking (1)**
9:16
**shall (1)**
307:4
**shoot (1)**
36:21
**shooting (2)**
217:10,11
**short (1)**
188:25
**shot (2)**
146:15;250:18
**show (14)**
16:4;36:6,9;37:14;
39:24;40:12;41:22;
43:17;44:24;53:8,
10;58:19;71:1;85:17
**showed (2)**
146:14;303:6
**showing (2)**
73:16;108:2
**shows (5)**
41:21;42:2;47:12,
18;50:19,23,24;51:2,

3,6;54:7,25;55:2,14;
76:15;240:17
**shut (1)**
185:4
**shutting (1)**
40:17
**sick (4)**
42:23;90:8;
167:18;240:2
**side (9)**
15:13;38:11;
93:23;100:5;142:9;
156:11;279:8;
298:12,16
**sign (2)**
170:22;307:5
**signature (1)**
307:6
**signed (1)**
307:8
**significantly (1)**
157:12
**Silberberg (2)**
7:25;200:23
**similar (7)**
42:8;53:13;79:15;
81:7;90:23;151:19;
218:14
**single (2)**
64:18;223:11
**sit (1)**
46:22
**sites (2)**
205:17;207:20
**Sitting (1)**
185:23
**situation (10)**
143:5;167:17;
174:16;207:9;
216:19;232:25;
242:16;243:7;
248:18;290:21
**situations (3)**
109:21,22,23
**six (3)**
21:8;54:12;259:18
**six-hour (1)**
259:22
**six-week (3)**
21:10,16;22:8
**skip (1)**
301:23
**sleep (1)**
19:13
**slight (1)**
104:14
**smaller (2)**
59:20;60:3
**Smith (3)**
226:25;240:15;
249:1
**Smith's (1)**
242:5

**soldiers (1)**
217:13
**soldiers' (1)**
48:11
**solemnly (1)**
8:7
**somebody (14)**
71:2;102:7,25;
105:14;146:5;
149:11;218:5;
251:19,22;294:8,18,
21,23;295:3
**someone (3)**
62:13;96:17;
294:11
**someone's (1)**
79:25
**sometime (3)**
210:12;212:3;
253:4,6
**sometimes (6)**
109:15,24;174:8;
177:14,25;258:9
**somewhere (9)**
16:24,25;17:12;
21:7;83:18;85:5;
98:9,12,12
**soon (5)**
36:12;154:7;
219:10;252:25;
283:14
**sorry (62)**
14:25;15:9;16:15;
17:14;23:15;25:8;
29:12;34:5;35:13;
36:9;37:3;42:16;
45:18;49:25;50:9;
54:17;56:21;59:7;
63:17;73:23;76:2;
86:14;90:13;91:19;
92:9;94:7;98:11;
105:24;108:11;
110:3;111:6;112:23;
115:11;145:19;
147:22;148:2;
158:21;165:23;
181:22;185:5;191:9;
193:8;200:22;
205:12;208:17;
212:11;234:4;
246:13;247:2;
253:17;261:15;
265:4;267:23;268:8;
270:2;271:22;
273:14;281:22;
287:1;294:16;
296:10;305:6
**sort (9)**
13:19;17:22;
19:18;58:21;60:20;
76:15;79:19;104:15;
210:1
**sought (4)**

195:3,7;283:2;
286:12
**sounding (1)**
170:8
**sounds (3)**
22:5;47:3;144:13
**sovereign (14)**
38:19;149:24;
150:8;151:12,16,20;
152:12,12,18;153:4,
12,13,14,21
**sovereigns (1)**
154:15
**sovereignty (1)**
150:5
**space (4)**
168:9;169:1,22;
240:12
**speak (5)**
172:11;173:18;
174:22,23,24
**speaking (7)**
175:23;203:1,1;
205:11;209:1;
213:20;214:14
**Specialist (1)**
7:17
**Specialty (5)**
7:9;8:2;12:7
**specific (30)**
15:6;19:12;22:18;
23:2;26:5;27:5;30:7;
34:13,16,20;48:17;
51:11;65:2,15;66:9;
80:2;83:15;96:8;
101:21;102:10;
105:17,20;146:8;
149:21;204:1;210:1;
250:16;262:15;
267:21;286:5
**specifically (9)**
23:2;72:4;148:15;
169:1;177:9;223:2,
9;237:6;264:9
**specifics (2)**
84:13;237:7
**speculate (1)**
187:14
**speculation (18)**
27:12;151:2;
181:14;182:19;
183:25;184:19;
186:4;187:4,24;
188:8;193:6;217:5,
18;243:20;260:1;
262:6;266:1;301:12
**spell (1)**
8:22
**SPENCER (4)**
8:14,24;307:19;
308:17
**S-P-E-N-C-E-R (1)**
8:25

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 862 of 970   Page ID
#:16443

Universal Cable Productions, LLC v.                    Video Deposition                    Daniel Spencer Gutterman
Atlantic Specialty Insurance Company                                                        February 3, 2017

**spoke (1)**
238:21
**spoken (2)**
216:9;251:13
**Sports (4)**
54:12,14;55:3,8
**spot (1)**
73:24
**spreadsheets (2)**
107:8;171:22
**spreadsheet's (1)**
94:19
**stamps (2)**
256:3;259:17
**stance (9)**
23:12,23;24:11,14,
21,21,25;25:6,16
**stand (1)**
72:1
**stands (1)**
24:2
**start (11)**
7:20;34:5;36:10;
89:7;108:18;172:13;
211:9;213:24,25;
214:6;253:1
**started (20)**
18:23;21:21;22:2;
36:12;40:2;54:18;
90:9;98:15;102:13;
104:1;109:4;147:7;
154:9;177:5;190:9;
194:21;212:23;
214:19;245:19;
246:3
**starting (4)**
79:17;111:18;
115:19;169:23
**starts (5)**
79:8;81:8;273:23;
277:3;290:8
**state (15)**
7:22;15:18;26:11;
27:20;29:3,15;
76:16;95:15;109:18;
151:12,16,20;
152:18;242:21;
270:11
**stated (3)**
290:20;291:21;
293:16
**statement (17)**
42:15;57:16;
90:17,18;105:15;
158:13,25;159:6,24;
160:10,14,22;
175:12;207:11;
277:12;280:2;
284:19
**statements (1)**
277:2
**States (19)**
7:10;17:9,15;50:8;

**States' (5)**
69:20,23,25;152:12;
266:25;268:14;
270:23,25;271:12,
16;278:9;279:6;
282:12;283:3,24
23:12,23;24:11,
14;25:15
**stating (1)**
291:13
**stay (5)**
19:20,22,25;20:2;
247:9
**stayed (1)**
19:23
**Stephen (4)**
226:25;240:15;
242:5;249:1
**stepped (2)**
176:5,7
**Steve (9)**
104:13,18,24;
105:4,5;169:18,19,
25;170:9
**still (24)**
12:16;64:7;75:5,7;
91:6;105:12;152:1;
164:16,22;197:15;
200:5;202:7;204:21;
209:22;239:2,18;
240:1;241:8,19;
242:15;246:6;248:8,
10;284:9
**stip (1)**
306:2
**stipulation (3)**
305:25;306:12;
307:13
**stock (2)**
106:23;168:3
**stolen (1)**
167:15
**Stone (2)**
170:12,13
**stop (1)**
189:3
**stopped (3)**
198:1;224:24,25
**stored (1)**
201:11
**Storm (9)**
47:11,17;48:16,19,
22;49:20,21;50:1;
51:17
**story (1)**
88:25
**strange (1)**
76:3
**strap (1)**
265:22
**Strasburger (1)**
8:2
**streets (2)**

40:18;114:1
**strike (16)**
35:16;49:25;
74:24;83:14;86:11;
92:12;103:5;164:25;
168:12;190:1;
228:13;233:8;
246:11;257:13;
262:21;276:8
**Strikes (1)**
148:1
**strokes (2)**
71:18;88:5
**strongly (1)**
283:24
**students (1)**
88:17
**studied (3)**
13:20;72:15;76:19
**Studios (3)**
54:2,9,11
**study (15)**
13:17;71:22;72:5,
16;75:2,3;79:15,20;
80:7,9,9,24;81:1,3,6
**studying (1)**
80:18
**Stuff (6)**
40:23;56:11;58:7;
164:16;177:9;285:8
**subject (6)**
15:6,6;18:12;
22:23;27:4;77:13
**subjects (2)**
78:13,14
**submit (1)**
78:2
**submitted (1)**
270:20
**submitting (1)**
42:25
**substantive (1)**
9:4
**sudden (1)**
171:10
**suggest (11)**
105:23;109:6;
142:13;217:16;
228:17;230:7;
238:23;240:8;
247:20;261:18;
288:10
**suggested (4)**
102:2;105:13;
239:15;245:1
**suggestion (1)**
242:22
**suggests (2)**
250:24,25
**suicide (1)**
265:22
**Suite (1)**
7:14

**summarized (2)**
223:16;224:4
**summary (1)**
158:5
**superior (1)**
226:8
**supervise (2)**
33:15,17
**supervisor (25)**
33:14;62:18,25;
63:3;65:12;82:18,
21;103:18;104:1,2,3,
9,12,15,17,21;105:5,
12,19,22;106:2;
157:12;179:21;
246:24;247:1
**supervisors (31)**
33:6;61:7;62:6;
64:8,13,18,21;65:1;
92:16;95:25;103:11,
12,13,15,21,24;
104:24;145:13,15;
156:18,20;159:10,
21;164:13,17;168:2,
17;172:17;174:23;
179:7;183:2
**supervisory (1)**
180:5
**support (13)**
180:19;181:11,17;
239:2;275:7;277:9;
279:24;281:14;
284:4;288:19;
289:16;293:22;
294:24
**supported (1)**
245:20
**supporting (1)**
181:5
**suppose (1)**
93:6
**supposed (1)**
113:16
**sure (47)**
9:14,17;12:17;
15:24;18:19,21;
26:6;46:4;48:24;
52:5;54:15;57:18;
70:7,25;71:13;
80:15;83:10;88:9;
91:14,15;107:11;
113:7;143:25;
144:23;145:20;
146:9;151:12;153:9;
154:7;175:19;182:3;
196:8;212:6,22;
221:18,24;222:18;
227:12;232:23;
254:4;255:2;257:10,
19;292:22;300:18;
301:22;306:8
**surrounding (3)**
27:19;28:11;84:5

**surveyors (1)**
302:6
**Susan (16)**
199:1;228:19;
229:6;232:21;
236:15;238:22;
242:24;261:20;
290:18;291:5,21;
292:2,9,16;293:12,
16
**suspended (1)**
81:12
**swear (1)**
8:7
**sworn (1)**
8:15
**system (15)**
171:8;200:4;
201:4,4,8,11;202:8,
15;209:23,24;211:7,
13;224:7,7;290:13

---

**T**

**TA (3)**
17:22;18:6,7
**talent (2)**
55:13,14
**talk (10)**
60:8;89:3;100:2;
143:3;166:23;197:7;
288:14,16;289:7,11
**talked (12)**
39:21;59:18;89:6;
91:3;141:5;163:14;
192:2;208:1,2;
212:24;222:14;
262:20
**talking (24)**
9:25;87:9,10;89:8;
97:18;102:11,12;
111:13;112:3;
154:10;167:23;
168:21,25;182:12;
187:9;195:22;
204:21;218:4,4;
256:19;258:8,11;
260:23;285:1
**tanks (5)**
45:4;146:18;
147:23;217:12;
285:7
**task (1)**
224:9
**tasked (3)**
32:25;33:3;45:8
**taught (4)**
17:4;113:15;
175:1,6
**teach (2)**
15:7;48:2
**teaching (1)**
17:21

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 863 of 970   Page ID #:18444

Universal Cable Productions, LLC v.
Atlantic Specialty Insurance Company

Video Deposition

Daniel Spencer Gutterman
February 3, 2017

**team (6)**
102:9;297:14;
298:14;299:6,22;
300:2
**team's (1)**
102:8
**teenagers (3)**
266:4;283:25;
285:2
**teens (1)**
284:5
**Tel (3)**
19:25;20:2;297:14
**telephone (2)**
237:17;238:2
**teletype (1)**
245:12
**television (1)**
54:25
**telling (3)**
50:13;147:10;
233:5
**tenure (13)**
22:14;56:13;
93:14;99:3;109:1;
156:9,10;163:24;
167:1;168:22;
169:11;195:2,6
**terms (23)**
18:5;21:5;22:21;
50:21;82:11;90:19;
101:16;164:3,15;
167:11,14;202:8,24;
207:12;211:8;264:8;
271:11;297:4,9,22;
298:2,6;307:15
**terrible (1)**
30:12
**terrorism (105)**
20:21;21:5,14;
77:2,12;78:23;81:1;
139:9,15,21;140:2,
23;141:14,19;
150:22;151:1;
154:20;216:23,23;
217:16,19,21;
229:19;264:12,15,
15,20,20,23;265:3,7,
10,15,16,19;266:5,
12,15,18;267:3,19;
269:9,22;270:1,5,6,
8,12,12,15;271:5,10,
18,19;272:3,22,23;
273:11,11,12,13,17,
18,19;274:5,6,12,16,
17,22;275:8;277:11,
20,23;278:1,12,18,
23;279:3,11,14;
280:1,5,10,11,19;
281:1,12,19,21;
282:1,4,14;283:2,5;
284:21,25;285:3,10,
19;286:22;287:10;

**299:7;300:24;**
302:16
**terrorism' (1)**
274:11
**terrorist (21)**
30:10;150:17;
151:23;152:4,10;
153:25;154:3,25;
155:4;217:14;277:8;
279:23;284:11,14;
286:20;287:5;
291:24;293:19,23;
294:20;301:8
**test (14)**
72:16,18,20,25;
73:2,18;74:3,20;
76:12;80:8,19,20,22;
81:17
**testified (16)**
8:16;10:17,20;
114:20;115:2;
141:17,22;163:18,
21;169:8;221:23;
271:25;279:13;
280:24;288:8;293:9
**testify (2)**
10:25;190:18
**testimony (22)**
8:8;11:4;93:3;
102:24;145:6;157:9,
24;158:24;168:7;
173:25;205:3;218:1;
224:20;227:5;252:4,
21;269:11;272:19;
281:3;283:7;288:4;
308:9
**testing (6)**
74:2,4,5,14,15;
76:11
**tests (7)**
74:6;76:20;77:4,5,
10,10,13
**Thailand (7)**
113:5,25;114:2,21,
25;144:17;183:15
**Thanks (1)**
189:6
**thereafter (4)**
142:25;155:20;
204:10;234:19
**there'd (1)**
22:17
**Theresa (2)**
170:2,10
**There've (1)**
25:24
**thinking (8)**
18:24;84:11;
99:18;139:16;243:9;
244:8;253:1;262:10
**third-party (4)**
95:13;108:22;
109:13;168:5

**thoroughly (1)**
113:17
**though (5)**
46:5;85:20;
179:15;187:13;
285:14
**thought (34)**
44:17,19,22;
91:10;144:11;
153:11;157:15;
165:13;173:7;180:7,
18;181:4,9;182:15;
185:23;189:3;241:3;
249:10;252:1,18;
253:7;267:4,14,17;
268:1,7,14;279:13;
280:25;286:1,8,13;
301:4;303:9
**thoughts (2)**
165:16;284:1
**three (18)**
14:5,6,7,13;20:23;
21:6,7,10;33:12;
72:1;101:1;162:2;
176:2;205:6;215:23;
283:25;285:1;296:8
**three- (2)**
21:15;22:8
**three-week (5)**
13:20;16:19;
20:18,20;22:4
**thrilled (1)**
73:15
**throughout (5)**
27:2,3;47:12;
171:9;214:8
**throwing (1)**
30:13
**thumb (2)**
96:6;105:21
**Thus (1)**
271:19
**ticket (3)**
87:10,13,24
**tickets (1)**
87:11
**times (11)**
80:13;94:21;
174:10,13;177:15,
18,19,20;195:2,6;
258:14
**timing (3)**
167:2;195:20;
307:14
**tip (3)**
182:16;186:1;
187:1
**title (6)**
18:9;58:8;60:13,
14;89:11,13
**today (29)**
7:13;9:23;10:8;
11:4;45:15,20;

46:22;81:17;89:11,
23;90:20;92:21;
102:14;104:4;109:2;
169:24;183:19;
184:14;185:23;
186:11,23;190:6;
194:5,19;228:19;
231:6;234:3,5;
261:20
**together (5)**
16:2,3;19:18;
232:13,14
**told (23)**
22:3;34:23;35:14;
71:8;82:23;97:10;
114:4;140:16;
149:14,16;151:8,8;
175:9;204:19;
237:18;241:15,18;
247:25;248:1;281:8;
290:24;291:6,10
**tomorrow (5)**
228:18;230:8;
236:17;261:19;
262:2
**took (25)**
10:24;12:20;13:2,
11;14:11;16:19;
22:9,9;25:7;47:23,
25;49:5,7;73:18;
77:5;80:20;81:9;
165:6;166:10;
222:20,24;223:5;
235:12;272:12,15
**top (12)**
13:3;26:25;37:11;
47:14;48:14;83:6;
148:5,17;161:9;
170:24;238:10;
304:20
**Toronto (1)**
296:4
**Torrance (1)**
74:6
**totally (1)**
165:24
**tough (1)**
219:12
**tour (6)**
14:12;17:23;18:1,
2,7;22:10
**towards (1)**
99:2
**towns (2)**
40:14;53:17
**trading (1)**
269:1
**traffic (2)**
87:11,13
**trailer (2)**
110:6,7
**trained (1)**
177:6

**training (3)**
176:11,14;177:3,
10
**trampled (1)**
88:24
**transcribed (5)**
234:9,19,21;235:7,
12
**transcript (6)**
115:19;306:4;
307:1,5,8,10
**transcripts (1)**
12:16
**transmission (1)**
307:1
**travel (2)**
20:4;43:15
**traveled (3)**
14:19;16:2;19:11
**Treasury (2)**
270:10;271:17
**TRIA (3)**
272:6;273:24;
274:15
**trial (4)**
10:17,25;86:19;
307:11
**trip (7)**
13:20;16:1,19;
21:16;22:4,8,11
**troops (1)**
250:20
**trouble (1)**
114:5
**truck (3)**
140:9,10,18
**true (5)**
169:11;177:10;
197:14;292:6;308:9
**truly (1)**
215:2
**Truman (1)**
26:6
**truth (3)**
8:9,9,10
**truthful (1)**
11:4
**try (13)**
55:2;73:13;
140:13;173:18;
176:3;177:12;
239:23;247:17;
264:2,4;267:25;
281:8;282:2
**trying (7)**
100:23;177:16;
182:10;269:3;277:7;
279:22;300:20
**Tuesday (2)**
196:4,17
**turn (1)**
38:2
**TV (11)**

Min-U-Script®

Bayside Reporting Company
(888) 229 - 9897

(23) team - TV

846

EXHIBIT 16

36:6;39:24;50:23,
24;51:2,6;53:8;54:7;
55:14;59:21;60:1
**twice (1)**
    80:20
**two (39)**
    9:24;18:10;37:11;
41:21;45:3;48:25;
54:15,18;56:22;
58:2;59:25;69:1,3,
10,12;74:22,23;
77:22,23;154:14;
170:18;178:16;
182:5;205:6;223:25;
229:22,25;232:16;
235:13;240:11,11;
248:24;252:6;
256:18;278:17,24;
279:2,2;304:3
**type (18)**
    55:4;57:11;79:2,5;
85:17;90:4;94:12;
96:12,15;106:21;
109:9;140:5;150:14;
167:7,8,12;171:17;
305:10
**typed (3)**
    166:13,16;233:20
**types (6)**
    63:9;71:22,24;
90:10;167:25;177:8
**typewritten (1)**
    166:5
**typical (4)**
    110:5;215:24;
216:6;234:23
**typically (12)**
    30:10;62:6;64:9;
92:23;95:11,20,21;
165:5;171:23;
172:13;173:5;
289:10

**U**

**ultimate (10)**
    155:21;157:5;
159:20;165:13,16;
166:14;210:7;
218:19;219:2;
249:13
**ultimately (7)**
    158:9;159:2,9,14;
164:16,20;172:21
**UNANSWERED (1)**
    6:10
**unclear (1)**
    166:2
**undeclared (1)**
    38:13
**under (12)**
    50:21;70:23;
115:22;154:18;

178:12;195:10,14;
271:11;273:22;
282:7;307:5;308:8
**under- (2)**
    44:17;206:19
**understands (2)**
    34:2;105:5
**Understood (9)**
    10:12,14;11:2;
91:3,15;107:7;205:4,
8;212:24
**underwriter (1)**
    297:23
**underwriters (3)**
    172:18;174:23;
175:23
**underwriting (4)**
    288:16;289:11;
298:12,16
**unfinished (1)**
    303:14
**unfolding (1)**
    207:10
**unfortunately (1)**
    178:2
**unhappy (8)**
    27:19,20;28:10;
82:16,23;83:21;
84:20;85:9
**unheard (1)**
    82:9
**United (20)**
    7:10;17:9,15;
23:12,23;24:11,13;
25:15;50:8;266:25;
268:14;270:23,25;
271:12,16;278:9;
279:6;282:12;283:3,
24
**Universal (1)**
    7:8
**universe (12)**
    48:24;60:3;79:10;
80:23;101:11,12;
102:14,19;103:5;
169:20,24;204:20
**universities (1)**
    14:16
**university (8)**
    11:19,20;13:13,
14;14:4;22:14;
88:13;246:12
**unless (2)**
    175:14;188:25
**Unrest (1)**
    304:15
**up (92)**
    14:14;22:19,24;
30:15;36:20;41:8,9,
11;45:4;48:5;51:24;
54:6,24;57:7;58:4;
60:4;64:6;66:9;
73:17;80:8;82:19;

101:4;145:18;
147:17;151:10;
152:1,13;154:8;
165:12;166:13,17;
168:24;169:16;
171:11,15;173:7,8,9,
13,15,15;174:14;
177:5,7;179:8;
182:2;187:16;
188:14;195:23;
210:3;224:13;
234:16;237:9;
242:25;243:3;249:1,
2;250:20,20;251:10,
10,19,22;252:7,9,11,
15;254:9,21;255:3,
10;256:2,19,22;
262:20;263:2,8,9,11,
15,21;264:3,9,11;
267:22;268:11,22;
275:4;281:5;294:23;
299:2;302:19
**upon (12)**
    60:22;142:23;
227:9;229:7;232:24;
240:9,15;242:23;
260:5,22;281:4;
302:1
**ups (1)**
    59:22
**upset (6)**
    83:13,22,23;86:1,
4,9
**use (34)**
    31:16;95:13,13,
22;96:10,17;103:17;
108:20,21,21,24;
109:7,22,24;111:2,4,
8,24;112:4,8,13;
143:2,4,19;144:6,6;
184:9;206:14,21;
207:18;225:4;228:6;
230:6;307:10
**used (6)**
    30:25;108:25;
144:7;161:8;170:8;
284:16
**using (10)**
    38:19;109:4;
112:5,6;207:12,22;
209:11;222:10,13;
248:6
**Usually (5)**
    106:21;171:18,20;
172:17;258:20
**usurped (1)**
    38:24
**utilities (1)**
    79:24
**utilize (1)**
    110:23
**utilized (1)**
    107:9

**utilizing (1)**
    249:3

**V**

**Vague (27)**
    23:14;24:6,18;
25:17,21;45:23;
110:12;143:12;
144:20;165:10;
176:22;178:14,21;
180:23;181:14;
182:18;183:25;
184:19;186:4;
216:25;217:5;
245:23;265:17;
266:7;267:20;299:9,
10
**value (9)**
    94:6,9,9;101:16;
106:18,25;107:1;
108:2;110:1
**Varden (3)**
    54:1,8,11
**various (1)**
    29:20
**vast (2)**
    69:18;258:16
**vehicle (2)**
    41:7;60:19
**vehicles (1)**
    60:19
**vendor (2)**
    172:7;258:18
**vendors (3)**
    302:5,9,12
**venture (1)**
    240:14
**Verbatim (1)**
    7:17
**version (3)**
    199:5,7,8
**versus (2)**
    105:7;188:1
**vests (1)**
    265:22
**vice (1)**
    54:24
**victim (2)**
    265:16,19
**victory (1)**
    50:16
**Video (11)**
    7:17,18;9:12;
140:9;240:17;241:5,
6;254:15,19,24;
264:25
**VIDEOGRAPHER (24)**
    7:5;8:4;9:11;68:5,
8;155:6;162:2,6;
163:8;189:7,9;221:8,
11;225:6,8;275:22,
25;287:18,21,25;

304:3;305:22;306:6,
9
**videos (1)**
    286:17
**Vietnam (2)**
    44:10;51:18
**violence (6)**
    20:17;29:24;30:3,
6,8;31:16
**violent (1)**
    270:18
**visit (1)**
    21:9
**visited (5)**
    13:11,12,24;
112:5;22;19:24
**voice (1)**
    166:8
**voice-recorded (1)**
    166:9
**volunteers (2)**
    40:20;53:19
**votes (1)**
    152:16
**vs (1)**
    7:8

**W**

**Wailing (1)**
    19:1
**wait (4)**
    10:1,3;35:12;
287:23
**waited (2)**
    245:15,18
**walk (1)**
    167:4
**Wall (1)**
    19:1
**Wanda (7)**
    296:1;297:2,22;
298:17,21;299:19;
301:6
**wants (1)**
    196:8
**war (224)**
    21:10;27:18;
30:17,25;31:5,13,22;
32:1,5,14;33:2;34:8,
25;37:10;38:13,13;
39:7,9;43:18,19,25;
44:6,9,10,11,14,17,
20,23,25;45:2,8,14,
15,20;46:7,18,18,21,
25;47:7,11,16,22,24;
48:1,2,3,4,10;49:1,4,
5,7,16,17;50:7,8,11,
12,22;51:4,7,14,18,
22;52:12,17;66:19;
76:23;77:8;78:19;
80:24;112:18,21,25;
113:13,23;114:23;

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 865 of 970   Page ID
#:18446

Universal Cable Productions, LLC v.
Atlantic Specialty Insurance Company

Video Deposition

Daniel Spencer Gutterman
February 3, 2017

115:4;139:5;140:25;
141:3,8;142:6,14;
143:11;144:3,8,16,
16,18,22;145:4,12,
16;146:7,13;147:6,8,
14,15,16,18;148:6,
10,13,15,21;149:3,
20;150:2;151:9;
153:13,20;154:14;
157:6,15;183:12,17,
20,22;184:3,16;
185:25;186:13,25;
188:17;216:18;
217:12,13;237:15;
239:1,18;240:19,19,
21;241:7,19;242:15;
243:12;244:1,11,22,
23,24;245:6,17,18;
246:3,7,19;248:3,7,
8,9,23;249:2,7,11,16,
20,24;250:4,5,6,11,
12,19,22,23;251:10,
10,19,22;252:7,9,11,
15,16,18,18;253:1,2,
7,22;254:5,9;255:3,
7,10,11,13,16,19;
256:2,7,8,15,19;
257:4,15;262:17,20,
22;263:2,8,9,11,15,
18,22;264:3;269:9;
280:8,11,19;281:1;
285:22;286:18;
290:25;291:6;295:5;
302:15

**war' (1)**
250:3
**warlike (3)**
37:10;38:16;
216:19
**warning (1)**
248:17
**warnings (1)**
21:13
**warrant (6)**
112:16;142:2,3,
18;143:7;144:11
**wars (2)**
30:12;48:5
**Washington (1)**
56:25
**watch (1)**
51:7
**watched (3)**
49:8;254:18,24
**watching (6)**
47:12,17;48:20;
49:23;50:2,18
**way (32)**
14:14;22:6;24:8;
54:17;73:7;75:17;
79:19;84:6;86:15;
87:3;114:19;140:3;
150:8;160:19;

170:16;173:12;
178:12,13;180:7;
184:23;188:4;221:3;
226:22;229:16;
241:21;247:21;
254:1;255:24;259:3;
285:6;287:7;288:10
**ways (2)**
164:7
**weapon (1)**
39:7
**website (2)**
148:15;161:24
**websites (2)**
146:3;205:17
**Wednesday (2)**
37:14;306:13
**week (17)**
57:12;59:20;
88:20,22;89:1;
197:15;238:24,25;
239:16,17;240:8;
241:18;247:8,12,23,
25;248:2
**weeks (3)**
14:13;20:23;21:6
**weigh (1)**
245:7
**weighed (1)**
250:14
**weighs (1)**
289:8
**Weiss (8)**
199:1;229:6;
232:22;238:22;
242:24;290:18;
291:6;293:12
**welfare (1)**
152:14
**well-publicized (1)**
23:19
**weren't (8)**
41:13;42:20,25;
94:3;207:7;237:21;
247:12;269:6
**Western (1)**
7:11
**what- (1)**
90:8
**What's (11)**
14:23;19:15;48:1;
52:4;101:17;171:14;
180:3;187:8;208:17;
241:19;272:22
**Whenever (1)**
156:17;211:25
**wherever (4)**
281:9;282:3;
285:25;286:7
**whole (2)**
8:9;16:2
**Who's (2)**
27:25;179:4

**Wikipedia (1)**
152:20
**Williams (16)**
33:8;97:8;170:10;
194:14;228:1;
230:10,14,18;
238:12;239:14;
251:13;259:17;
260:24;261:16;
306:23;307:2
**Williams' (1)**
306:12
**Wilshire (1)**
7:14
**window (3)**
97:20,21,23
**Wisconsin (10)**
11:20;12:1;
13:14;14:6,7;21:22;
22:7,14;88:13,22
**withdraw (7)**
76:8;77:16;84:6;
87:12;104:21;
110:13;176:23
**within (3)**
74:16;85:5;176:8
**without (6)**
28:13;37:25;
160:20;191:24;
220:20;240:1
**WITNESS (104)**
8:11;23:15;24:7,
19;25:18,22;27:13;
28:18,22;29:12;30:2,
22;31:20;37:14;
52:16;59:2,5;65:15;
66:8,23;86:12,18;
87:19,24;88:12;
93:4;99:21;101:20,
25;111:10;115:13;
144:22;146:25;
152:7;157:10;158:1,
21;159:9;160:19;
162:3;165:11;174:1;
179:1;181:19,25;
182:23;184:1,9,20;
186:5;187:5,18,25;
188:10;190:22;
193:7,14;198:14;
212:13;216:5,18;
217:1,6,19;220:5;
224:21;242:20;
243:21;244:15;
245:11;248:15;
249:24;250:11;
253:13;254:1;260:2,
8;261:11;263:25;
265:18;266:2,9;
267:21;269:12,19;
272:20;275:11;
281:4,16;282:18,22;
283:9;284:24;
285:13,22;287:1,13;

299:16;300:18;
301:2,14;305:24;
306:14;307:4
**witnesses (1)**
60:22
**woman (1)**
71:5
**won (3)**
50:11,12;152:16
**word (21)**
30:25;43:25;49:4;
159:9,14;161:8;
175:9,9,11,11,25,25;
176:11;196:11;
197:14;207:19;
245:12;249:20,24;
250:2;252:15
**wording (2)**
69:8;304:15
**words (5)**
175:8;211:6;
223:20;248:6;249:3
**work (16)**
43:25;45:16,21;
73:7;84:21;96:19,
22;99:10;180:2;
240:2;297:16;298:9,
15
**worked (16)**
15:19;36:9;39:24;
41:24;53:8;54:1,12;
55:23,25;56:25;
58:1;64:16;97:10;
101:7,17;156:13
**Working (23)**
36:2,6;44:14,23;
55:6;59:21;95:7,10;
98:15,25;99:7;100:9,
10,24;101:1;157:10;
180:3;192:23;
247:12;248:17;
292:11;297:15;
299:23
**works (1)**
69:8
**World (15)**
27:18;44:11;
47:11,16,24;48:1;
49:1,5,7,17,24;51:7,
14;107:5;166:9
**worried (3)**
299:7;300:10;
301:8
**wrap (1)**
155:9
**write (2)**
241:8;251:16
**writing (5)**
9:11;204:4,7;
217:11;240:10
**written (8)**
16:17;72:5,7;
189:24;292:10,12;

294:14;302:24
**wrote (12)**
210:10;218:16;
240:20;246:17;
247:15;248:25;
250:4,5;251:14;
256:1;263:14;292:7

---

**Y**

**Yahoo! (1)**
207:20
**year (6)**
15:21;69:9;72:22;
85:5,6;157:11
**years (17)**
23:18;27:3;29:21;
35:11;54:12;55:24;
69:1,3,10;77:22,23;
170:7;176:2;215:23;
240:11,11;248:24
**Yep (1)**
170:14
**York (1)**
15:20

---

**1**

**1 (16)**
6:4;7:20;32:16;
37:14,15,17;68:6;
79:6;80:19;113:15;
224:22;254:13;
272:7;273:23;274:1;
306:23
**1.7 (1)**
152:13
**1:03 (1)**
162:10
**1:07 (1)**
254:21
**1:45 (1)**
162:12
**1:59 (1)**
163:3
**10 (9)**
83:7,8;98:23,24;
155:6;219:14,15,16,
18
**10:25 (4)**
225:21;226:21;
258:25;259:16
**10:51 (2)**
68:5,7
**10:56 (2)**
198:25;199:20
**100 (4)**
88:23;98:3,7,9
**11:07 (2)**
68:7,10
**1101 (1)**
255:18
**1102 (10)**

Min-U-Script®

Bayside Reporting Company
(888) 229 - 9897

(25) war' - 1102

848

EXHIBIT 16

Case 2:16-cv-04435-PA-MRW   Document 44-1   Filed 04/05/17   Page 866 of 970   Page ID
#:16447

Universal Cable Productions, LLC v.
Atlantic Specialty Insurance Company

Video Deposition

Daniel Spencer Gutterman
February 3, 2017

225:16;227:10;
238:10,15;253:5,16,
19;254:13,19;258:24
**1104 (1)**
226:11
**1105 (2)**
226:11;242:2
**116 (1)**
115:21
**12 (9)**
6:6;225:11;
237:25;253:5,16,19;
254:19;255:17;
258:21
**12:44 (1)**
226:16
**13 (4)**
67:1,9,13;158:4
**1303 (1)**
162:8
**1359 (1)**
163:10
**138 (1)**
115:21
**1391 (1)**
257:8
**1392 (3)**
227:24;261:14,17
**14 (6)**
114:10,11,15;
141:6;226:15;307:4
**1432 (1)**
189:7
**1449 (1)**
189:9
**15 (32)**
16:8;98:21,23,24;
189:11,14,18;
192:14,19;193:11;
194:12;195:8,12;
196:19;202:12;
212:3;225:21;
226:20;228:2,15;
229:3,15;238:3,11;
239:11;240:21;
243:10;246:18;
257:8;258:24;
301:17,19
**150 (7)**
74:11;98:9,12,19;
102:15;103:5,6
**1533 (1)**
221:8
**1547 (1)**
221:13
**1549 (1)**
295:23
**1552 (1)**
225:6
**1556 (1)**
225:8
**15th (3)**
196:17;222:18;

258:2
**16 (10)**
189:13,14;193:16;
194:13,19;195:4,16;
230:11;251:6;
255:22
**17 (8)**
198:4,7,8,17;
199:19;232:15,20;
234:19
**1730 (1)**
287:18
**1743 (1)**
288:1
**17th (1)**
237:8
**18 (7)**
198:11,12;199:12;
200:8;210:24;271:2;
273:3
**18:10 (1)**
306:9
**19 (6)**
200:13,14,18;
201:2;202:5;276:2
**1945 (2)**
12:8;22:20
**1988 (1)**
35:14
**1993 (2)**
35:12,14
**1996 (2)**
15:23;20:11
**1997 (3)**
11:22;12:9;35:12

**2**

**2 (5)**
68:9;101:23;
162:7;239:3;302:4
**2:00 (2)**
228:6;230:5
**2:16-cv-4435-PA-MRW (1)**
7:12
**2:32 (1)**
189:8
**2:41 (1)**
189:8
**2:42 (1)**
220:8
**20 (6)**
16:8;112:4;
201:19,20,24;308:13
**200 (1)**
98:5
**200,000 (1)**
106:14
**2000 (1)**
56:1
**2002 (2)**
56:1;270:13
**2009 (1)**

14:24
**2011 (1)**
40:5
**2012 (1)**
40:5
**2013 (1)**
35:24;36:2
**2014 (40)**
113:7;195:22;
196:11,20;199:20;
202:6,12;211:1,3;
212:1,3;218:1;
225:21;226:15,20;
228:2,15;229:3,15;
230:11;232:15;
236:10,23;237:1;
238:3,11;240:21;
243:10;246:18;
251:6;255:23;257:8;
258:25;267:9;268:2,
15;272:15;273:11,
17;277:13
**2015 (1)**
69:4
**2016 (2)**
292:11;293:7
**2017 (3)**
7:2,13;306:23
**21 (8)**
220:13,15,19;
234:15;235:19;
236:10;290:14;
292:19
**22 (10)**
227:14,15,19;
236:22;237:1;251:4;
254:8;257:9;261:13;
262:19
**225 (1)**
6:6
**23 (4)**
231:17,18,22;
232:12
**24 (7)**
77:21,24;78:9;
232:2,3,7,12
**25 (4)**
78:9;235:24;
236:1,5
**26 (6)**
276:14,16,17,20;
279:17;284:24
**27 (3)**
283:12,16,20
**28 (18)**
198:25;199:20;
211:1,3;212:1;
218:1;267:9;268:2,
15;272:15;273:10,
16;277:13;289:19,
20,23;292:6;303:19
**29 (5)**
295:10,11,15;

298:22;299:3

**3**

**3 (9)**
7:2,13;32:17;
163:9;221:9;276:24;
284:25;292:11;
293:7
**3:33 (1)**
221:10
**3:47 (1)**
221:10
**3:52 (1)**
225:7
**3:56 (1)**
225:7
**30 (5)**
170:7;304:6,7,11;
307:4
**3083 (1)**
38:3
**3103 (3)**
79:8,18;81:8
**3120 (5)**
272:7,21;273:23,
25;278:7
**37 (1)**
6:4

**4**

**4 (4)**
221:12;276:24;
284:25;287:19
**4:14 (4)**
238:11;240:21;
243:10;246:18
**4000 (1)**
7:14
**41 (1)**
189:10
**46 (1)**
22:22
**4pm (1)**
236:17

**5**

**5 (2)**
6:7;287:25
**5:06 (1)**
236:10
**5:30 (1)**
287:20
**5:43 (1)**
287:20
**5:58 (1)**
228:2
**50 (5)**
98:12,19;102:15;
103:4,6
**50,000 (3)**

88:16;250:21,21

**6**

**6:22 (1)**
307:18

**7**

**7 (1)**
302:22
**7:59 (1)**
257:8
**70 (1)**
88:23
**707 (1)**
7:14
**7-16-2014 (1)**
6:6

**8**

**8:48 (1)**
228:15
**8:58 (1)**
229:16

**9**

**9/11 (1)**
217:20
**9:27 (1)**
7:3
**9:28 (1)**
7:21
**9725 (1)**
7:18
**98 (2)**
271:2;272:16

Min-U-Script®

Bayside Reporting Company
(888) 229 - 9897

(26) 1104 - 98

849

EXHIBIT 16

1    I declare under penalty of perjury that I have

2    read the foregoing transcript of my deposition

3    testimony, taken on Wednesday, February 3, 2017, at

4    _____, _____, and that, with the

5    following exceptions which I have hand-marked on the

6    transcript, the same is a true record of the testimony

7    given by me at that deposition:

8

9    Page/Line          Should read               Reason for change:

10   305/20             Yes.                      I misspoke when I said "no"

11   _____         _____      _____

12   _____         _____      _____

13   _____         _____      _____

14   _____         _____      _____

15   _____         _____      _____

16   _____         _____      _____

17   _____         _____      _____

18   _____         _____      _____

19   _____         _____      _____

20   _____         _____      _____

21   _____         _____      _____

22

23

24   3/7/17                          _____

25   Date                            Daniel Spencer Gutterman

850                                    EXHIBIT 16

1      Q.   Do you recall why she said, "We need to
2  have a lot of further discussion"?

3      A.   I did not.

4      Q.   What did you do to search for documents in
5  this case, if anything?

6      A.   I'm sorry.  Can you ask the question
7  again.

8      Q.   Did you do anything to search for
9  documents in connection with this case?

10     A.   What type of documents?

11     Q.   Any documents, electronic or paper.

12     A.   Well, once again, once we got the claim
13  and it came in, I went on Google.

14     Q.   In connection with this litigation, did
15  you search for documents in the discovery process?

16     A.   Oh.  I looked to see if I had a hard file.
17  I looked everywhere, and I didn't see anything.

18     Q.   Okay.  And did you look for electronic
19  documents?

20     A.   No "Yes" I MISSPOKE WHEN I SAID No.

21          MR. HAYES:  Okay.  Are we out of time?

22          THE VIDEOGRAPHER:  Yes.

23          MR. HAYES:  Okay.

24          THE WITNESS:  Not that I recall, I don't.

25          THE REPORTER:  There was a stipulation.

1

2

3

4

5

6

7

8          I declare under penalty of perjury that

9     the foregoing testimony is true and correct.

10

11         Executed at _____10:04 AM PT_____,

12    this __7ᵗʰ__ day of __MARCH_____,

13    20 _17_.

14

15

16         _____

17              DANIEL SPENCER GUTTERMAN

18

19

20

21

22

23

24

25

308

EXHIBIT 16

# EXHIBIT 17

Bayside Reporting Company

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, ET AL., | ) ) ) | |
| PLAINTIFFS, | ) ) | CASE NO.: 2:16-cv-4435-PA-MRW |
| VS. | ) ) | |
| ATLANTIC SPECIALTY INSURANCE COMPANY, | ) ) ) | |
| DEFENDANT. | ) | |

**CONFIDENTIAL**

**EXHIBITS BOUND SEPARATELY**

VOLUME I

DEPOSITION OF PETER DONALD WILLIAMS

WEDNESDAY, FEBRUARY 1, 2017

REPORTED BY:   INGRID SUÁREZ EGNATUK
                      CSR NO. 3098

EXHIBIT 17

CONFIDENTIAL

1            UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4

5   UNIVERSAL CABLE        )  CASE NO. 2:16-cv-4435-PA-MRW
    PRODUCTIONS LLC, et al.,)
6                          )
         Plaintiffs,       )
7                          )
         vs.               )
8                          )
    ATLANTIC SPECIALTY      )        **CONFIDENTIAL**
9   INSURANCE COMPANY,      )
                           )
10       Defendant.        )
    _____)
11

12

13

14          VOLUME I (Pages 1 - 260)

15      DEPOSITION OF PETER DONALD WILLIAMS

16        Wednesday, February 1, 2017

17

18

19

20

21

22

23  Reported by:  Ingrid Suárez Egnatuk
                  CSR No. 3098
24

25

Videotaped Deposition of PETER DONALD

WILLIAMS, VOLUME I, taken on behalf of

Plaintiffs Universal Cable Productions LLC

and Northern Entertainment Productions LLC,

at 707 Wilshire Boulevard, Suite 4000,

Los Angeles, California 90017, commencing at

9:58 a.m., Wednesday, February 1, 2017,

before Ingrid Suarez Egnatuk, CSR No. 3098.


APPEARANCES:

    FOR PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS
    LLC AND NORTHERN ENTERTAINMENT PRODUCTIONS
    LLC:

        MITCHELL SILBERBERG & KNUPP LLP
        BY:  LUCIA E. COYOCA, ESQ.
        11377 West Olympic Boulevard
        Los Angeles, California 90064-1683
        (310) 312-2000
        lec@msk.com

    FOR DEFENDANT:

        STRASBURGER & PRICE. LLP
        BY:  MICHAEL KEELEY, ESQ.
        901 Main Street
        Suite 6000
        Dallas, Texas 75202-3794
        (214) 651-4718
        michael.keeley@strasburger.com

        ANDERSON, McPHARLIN & CONNERS, LLP
        (Not present at deposition)
        707 Wilshire Boulevard
        Suite 4000
        Los Angeles, California 90017-3623
        (213) 688-0080

2

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW  Document 44CONFIDENTIAL5/17  Page 874 of 970  Page ID
#:1655

05:13  1    opinion.

2         Q.   In what situations do you believe it is

3    appropriate to obtain a legal opinion?

4         A.   If it's unclear if there is coverage, if

05:14  5    it is clear there is no coverage, but to reinforce

6    that opinion.

7              THE VIDEOGRAPHER:  Are we at a good point?

8              MS. COYOCA:  Sure.

9              THE VIDEOGRAPHER:  Thank you.

05:14 10              This is the end of Media 3.  Off record,

11    1713.

12         (Recess from 5:13 p.m. to 5:22 p.m.)

13              THE VIDEOGRAPHER:  Back on record.

14              Commencing Media 4 of the deposition of

05:23 15    Peter Williams.  On record, 1722.

16    BY MS. COYOCA:

17         Q.   You were talking about a legal --

18    obtaining a legal opinion before we went for a

19    break.

05:23 20              With respect to this DIG production claim,

21    was a legal opinion obtained from outside counsel?

22         A.   Yes.

23         Q.   Who made the decision to obtain an opinion

24    from outside legal counsel?

05:23 25         A.   Pamela Johnson, I believe.

                                                        218

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 44   CONFIDENTIAL 5/17   Page 875 of 970   Page ID
#:1656

05:23  1          Q.   Did you have any discussions with

       2    Ms. Johnson about the fact that outside legal

       3    counsel was going to be sought?

       4          A.   Yes.

05:23  5          Q.   What were your conversations in that

       6    regard?

       7          A.   I thought it was a good idea.  NBC is a

       8    big client, an important client.  It was -- they

       9    deserved the recommendation.  Also I felt, you know,

05:24 10    it could be good for NBC to know that we did go to

      11    outside counsel to verify the -- the decision, or

      12    not, as the case may be.  At that point we hadn't

      13    got the legal opinion.

      14          Q.   Was it Ms. Johnson that first raised the

05:24 15    concept of going to outside counsel to get a legal

      16    opinion?

      17          A.   I don't know.  I can't recall.

      18          Q.   Did you suggest obtaining outside

      19    counsel's legal opinion on the issue of coverage for

05:24 20    the DIG production claim?

      21          A.   I can't specifically recall.  I may have

      22    done.

      23          Q.   You may have made that suggestion to her?

      24          A.   Yes.  In the form of should we, maybe we

05:25 25    should.

                                                              219

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 44 CONFIDENTIAL 15/17   Page 876 of 970   Page ID
#:1657

05:25  1        Q.   I'm sorry.  Could you --

       2        (Cell phone interruption in proceedings.)

       3             THE WITNESS:  I said in the form of -- I

       4   mean, should we get an outside opinion, would it be

05:25  5   a good idea to get an outside opinion, I think it

       6   would be a good idea to get an outside opinion.

       7   BY MS. COYOCA:

       8        Q.   So is it your recollection that you were

       9   the one who initiated the concept of going to

05:25 10   outside counsel for an opinion?

      11        A.   Yeah.  I -- yes.  I believe my

      12   recollection is that I -- I thought it would be a

      13   good idea.

      14        Q.   Were you involved in the decision as to

05:26 15   who to send the claim to in order to procure outside

      16   coverage opinion?

      17        A.   No.

      18        Q.   Did you know who Ms. Johnson -- was it

      19   Ms. Johnson that made the decision as to where to

05:26 20   send it?

      21        A.   I believe so.

      22        Q.   And did Ms. Johnson involve you in any

      23   way, in terms of seeking that opinion?

      24        A.   No.

05:26 25             MS. COYOCA:  Okay.  I want to mark as

                                                              220

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 44 CONFIDENTIAL 5/17   Page 877 of 970   Page ID
#:1658

05:26   1    Exhibit 11 a document labeled Bates control

2    ATL001132 through 1192.

3                    (Exhibit 11 was marked

4                    for identification.)

05:27   5                    THE WITNESS:  Do you want me to read all

6    60 pages?

7    BY MS. COYOCA:

8         Q.   I do not.  But what I would like you to do

9    is to refresh your recollection with respect to the

05:27  10    e-mail exchanges.  And I believe the e-mail

11    exchanges end on 1137, and the remainder of the

12    document is the policy.

13                    And let me know when you're ready for

14    questions.

05:28  15         A.   Okay.

16         Q.   Okay.  I want to ask you about an e-mail

17    that was sent by Daniel Gutterman on July 15 at

18    4:14 p.m.  And it appears at the bottom of

19    page 1133.

05:29  20                    Do you see the e-mail that begins "Hi

21    Peter"?

22         A.   Yes.

23         Q.   Could you please read that e-mail out

24    loud.

05:29  25         A.   "Hi Peter.

221

1        I declare under penalty of perjury that I have

2    read the foregoing transcript of my deposition

3    testimony, taken on Wednesday, February 1, 2017, at

4    707 Wilshire, Blvd _____, and that, with the

5    following exceptions which I have hand-marked on the

6    transcript, the same is a true record of the testimony

7    given by me at that deposition:

8

9    Page/Line     Should read         Reason for change:

10    21 Line 6.    $5 million      MISSPOKE

11    24 Line 22   Name is INCORRECT  MISTAKEN.

12    _____   _____  _____

13    _____   _____  _____

14    _____   _____  _____

15    _____   _____  _____

16    _____   _____  _____

17    _____   _____  _____

18    _____   _____  _____

19    _____   _____  _____

20    _____   _____  _____

21    _____   _____  _____

22

23

24    3/3/17

25    Date                       Peter Donald Williams

I declare under penalty of perjury that the foregoing testimony is true and correct.

Executed at _____Los Angeles_____,

this __3rd__ day of _____March_____,

20 __17__..

PETER DONALD WILLIAMS

# EXHIBIT 18



MITCHELL SILBERBERG & KNUPP LLP
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Valentine A. Shalamitski
(310) 312-3736 Phone
(310) 231-8489 Fax
vas@msk.com

November 29, 2016

**VIA E-MAIL**

Michael Keeley, Esq.
John R. Riddle, Esq.
Carla C. Crapster, Esq.
Strasburger & Price, LLP
901 Main Street, Suite 6000
Dallas, TX  75202

Marc J. Shrake, Esq
Anderson, McPharlin & Conners LLP
707 Wilshire Boulevard, Suite 4000
Los Angeles, CA  90017-3623

Re:     *Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Company*
        *CD Cal. Case No. CV16-4435 PA (MRWx)*

Dear Counsel:

This letter shall serve as our good faith attempt to informally resolve issues presented by the November 11, 2016 objections and responses of defendant Atlantic Specialty Insurance Company ("Atlantic") to the First Set of Interrogatories and First Set of Requests for Production of Documents and Things propounded by plaintiffs Universal Cable Productions LLC and Northern Entertainment Productions LLC (collectively, "Plaintiffs") on October 5, 2016.

As discussed below, Atlantic asserted multiple unfounded objections and limited its responses in ways which are not supported by the Federal Rules of Civil Procedure ("FRCP").  Moreover, as to those responses where Atlantic has indicated it will produce documents, given the vagaries (and inconsistencies) of Atlantic's responses, we cannot tell whether Atlantic is agreeing to produce *all* responsive, non-privileged documents in its possession or control.  Atlantic's refusal to provide straightforward responses to discovery requests aimed at the core issues in this action is particularly troubling in light of the tight deadlines the Court set in this case—*e.g.*, the March 13, 2017 discovery cut-off and the May 23, 2017 trial.  Further, the day before Atlantic's responses were due on November 4, 2016, it requested, and Plaintiffs granted, a one-week extension of time for Atlantic to respond.  Contrary to Plaintiffs' expectation that Atlantic would use this additional time to provide complete and straightforward responses and to prepare responsive documents for production, Atlantic instead used the time to further delay the progress of the case by preparing meritless objections and deficient responses.

11377 West Olympic Boulevard, Los Angeles, California 90064-1683
Phone:  (310) 312-2000 Fax:  (310) 312-3100 Website: WWW.MSK.COM

EXHIBIT 18



Michael Keeley, Esq.
November 29, 2016
Page 2

That said, we are looking forward to speaking with you on Friday, December 2, at 11 a.m. Pacific, to attempt to eliminate the necessity for motion practice or at least narrow the scope of the disputes if possible.

## 1.      INTERROGATORIES

**General objections**:  We would prefer not to spend time arguing over Atlantic's boilerplate "Preliminary Statement" and "General Objections" which are insufficient to withhold discovery. *See, e.g., M2 Software, Inc. v. M2 Communs., L.L.C.*, 217 F.R.D. 499, 501 (C.D. Cal. 2003) ("General Objections are not sufficient to raise any substantial, meaningful or enforceable objections to any particular discovery request.").  Please confirm Atlantic is not withholding any information based solely on its "Preliminary Statement" and "General Objections."

**Interrogatory No. 1**:  This interrogatory seeks plainly relevant information:  "IDENTIFY each individual employed by, acting as a REPRESENTATIVE of, or in any way associated with ATLANTIC, that was responsible for the decision to deny the *DIG* CLAIM."  Atlantic did not object to the interrogatory, but it did unilaterally rephrase the interrogatory, and improperly limited its response to persons "***employed*** by Atlantic [who] were ***involved*** in Atlantic's decision" (emphasis added).  This is unacceptable and does not provide fully responsive information.  If there are individuals who were acting as Atlantic's REPRESENTATIVE that were "responsible for the decision to deny the *DIG* CLAIM," Atlantic must identify those individuals regardless of whether they are or were "employed by Atlantic." Further, Atlantic must provide the information required by the defined term "IDENTIFY," which information is lacking from Atlantic's response.

**Interrogatory No. 2**:  This interrogatory seeks clearly relevant information:  "IDENTIFY each individual employed by, acting as a REPRESENTATIVE of, or in any way associated with ATLANTIC, that had any involvement in evaluating and considering the *DIG* CLAIM." Atlantic did not object to the interrogatory.  However, once again Atlantic improperly rephrased the interrogatory and limited its response to persons "***employed*** by Atlantic [who] had involvement in the evaluation and consideration of the *DIG* CLAIM ***prior to the denial*** of the *DIG* CLAIM" (emphasis added).  Again, this is unacceptable and not responsive to what the interrogatory seeks.  Please identify all individuals who were acting as a REPRESENTATIVE of Atlantic that were involved in evaluating and considering the *DIG* CLAIM, not limited to those individuals who are or were "employed by Atlantic," and not limited by an unspecified time period "prior to the denial."  (See further discussion as to this time period issue re Interrogatory No. 4.)  Finally, please provide the information required by the defined term "IDENTIFY," which information is lacking from Atlantic's response.

**Interrogatory No. 3**:  This interrogatory seeks information central to this action:  "State all facts which ATLANTIC considered in denying the *DIG* CLAIM."  Atlantic did not object to this interrogatory but did provide a woefully deficient response:

> "Atlantic considered all of the facts that it received from the Plaintiffs, as well as the facts revealed by its own investigation of the *DIG* CLAIM and independent research.  See also Atlantic's denial letter dated July 28,



Michael Keeley, Esq.
November 29, 2016
Page 3

> 2014, in which Atlantic sets forth facts that it considered in denying the *DIG* CLAIM."

Atlantic's response is evasive and incomplete and provides no specific facts whatsoever.  To state the obvious, in responding to interrogatories, Atlantic must respond "fully" and "must furnish the information available to the party."  FRCP 33(b)(1)(B) & (3).  What are the facts that were revealed to Atlantic in its investigation of the claim?  What are the facts that were revealed to Atlantic based on its independent research?  What are the facts that it received from Plaintiffs that it considered in denying the claim?  The information which this interrogatory seeks is known only to Atlantic, and Atlantic has no legitimate justification to withhold it.  To the extent Atlantic seeks to rely at trial on any facts not specifically identified in these interrogatory responses or otherwise properly disclosed in discovery, Plaintiffs will seek to exclude such evidence at trial.

**Interrogatory No. 4**: This interrogatory requests that Atlantic:  "IDENTIFY all DOCUMENTS that ATLANTIC reviewed in evaluating and considering the *DIG* CLAIM."  In response, Atlantic (a) improperly limited the scope of its response to an unidentified time period prior to the denial of the *DIG* Claim based on its relevance and privilege objections, and (b) otherwise provided an evasive, incomplete, and deficient response which must be supplemented.

First, assuming Atlantic objects to providing information after "Atlantic's denial letter dated July 28, 2014," this objection is baseless.  Plaintiffs are entitled to, *inter alia*, discovery "relevant to any party's claim or defense" (FRCP 26(b)(1)).  Plaintiffs' First Amended Complaint ("Complaint") specifically alleged violations by Atlantic which took place after July 28, 2014. *See* Complaint, ¶ 34 ("Following Atlantic's July 28, 2014 denial of the *DIG* Claim, NBCUniversal requested on numerous occasions that Atlantic reconsider its position.  Atlantic, however, repeatedly refused to change its position."), ¶ 52(G).  Obviously, for example, if Atlantic failed to review any documents after Plaintiffs' reconsideration requests, that would be relevant to Plaintiffs' claim that Atlantic breached the implied covenant of good faith and fair dealing.  Thus, Atlantic's unilateral limitation to an unidentified time period *prior* to the denial of the *DIG* Claim makes no sense.

Second, Atlantic's privilege objection, standing alone, is deficient and insufficient to withhold discovery.  To begin with, Atlantic must, but thus far has failed to, provide a privilege log for all responsive documents which Atlantic asserts are privileged and/or protected from discovery.  Also, it is axiomatic that a document which is not privileged in the first instance (*e.g.*, a news report) does not become privileged merely because it is attached to otherwise privileged attorney-client correspondence.  Atlantic accordingly cannot withhold such non-privileged documents.  Please confirm that it has not done so.

Moreover, to the extent Atlantic intends to assert or rely on advice or investigation of counsel as defense in this case, Plaintiffs are entitled to the information or documents regarding said advice or investigation.  *See Wellpoint Health Networks v. Superior Court*, 59 Cal. App. 4th 110, 128 (1997) ("injection into the lawsuit of an issue concerning the adequacy of the investigation where the investigation was undertaken by an attorney or law firm must result in waiver of the attorney-client privilege and work product doctrine"); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-63 (9th Cir. 1992) (relying on advice of counsel in defense waives privilege); *Holmgren v.*



Michael Keeley, Esq.
November 29, 2016
Page 4

*State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992) (in a bad faith action, the "strategy, mental impressions and opinion of [the insurer's] agents concerning the handling of the claim are directly at issue") (alterations in original).

Here, Atlantic's discovery responses—albeit woefully deficient for the reasons discussed herein—indicate the possibility of a defense based on its lawyers' investigation of the claim and their advice. *See, e.g.*, Atlantic's Response to Interrogatory Nos. 3 & 4 (Atlantic considered and/or reviewed documents and facts "it received from the Plaintiffs" and "revealed by its own investigation of the *DIG* CLAIM and independent research"), No. 5 ("Atlantic also conducted independent research relevant to the *DIG* CLAIM"). Indeed, Atlantic's denial of coverage letter dated July 28, 2014 specifically asserted that its "decision is based on … consultation with counsel." However, Atlantic's deficient discovery responses prejudicially prevent Plaintiffs from ascertaining the scope and nature of Atlantic's defense.

Third, Atlantic's response is evasive and incomplete for the reasons stated above in connection with Interrogatory No. 3. To reiterate, if Atlantic reviewed any documents which are not listed in "Atlantic's denial letter dated July 28, 2014," Atlantic must identify those documents.

Fourth, Atlantic's response states: "In addition, the non-privileged documents that Atlantic reviewed in considering and denying the *DIG* CLAIM are being produced in response to Plaintiffs' request for production of documents." To the extent Atlantic intends to use the FRCP 33(d) procedure by identifying documents in lieu of responding to the interrogatory, this response is inadequate because Atlantic has not yet produced all responsive documents or a privilege log. Had Atlantic produced all responsive documents and the privilege log, the response would still not be adequate. Rather, to comply with FRCP 33(d), Atlantic must specifically identify the documents, which it failed to do. *See* FRCP 33(d)(1).

For the foregoing reasons, Atlantic must supplement its response.

**Interrogatory No. 5**: This interrogatory request that Atlantic: "Identify all steps taken by ATLANTIC to investigate the *DIG* CLAIM." For the reasons discussed above in connection with Interrogatory No. 4, Atlantic's response is also deficient as to Interrogatory No. 5 and must be supplemented.

**Interrogatory Nos. 6-14**: These are straightforward contention interrogatories, seeking the information on which Atlantic intends to rely to support the affirmative defenses Atlantic asserted in its Answer to the Complaint (Nos. 6-13), and the information on which Atlantic relied in denying coverage (No. 14). These interrogatories seek factual information fundamentally relevant to the issues in dispute in the case. In response, Atlantic interposed no specific objections, and instead provided woefully deficient responses. Specifically, Atlantic responded to all nine interrogatories with circular statements which are evasive and provide no facts. For example, Interrogatory No. 6 asked:

> "State all facts which support ATLANTIC'S position that Exclusion of the
> General Conditions section of the POLICY, which excludes coverage for



loss caused directly or indirectly by "war, including undeclared or civil war" applies to the *DIG* CLAIM."

Atlantic's response, in full, stated:

> "The events that took place in Israel and Palestine in and around July 2014, when *DIG* was being filmed in Israel constitute war, including undeclared or civil war, and the Plaintiffs' claimed loss was caused directly or indirectly by such war."

This response provides no specific factual information whatsoever. Atlantic's responses are not made in good faith. Plaintiffs are entitled to know the basis for Atlantic's contention that the events which took place in Israel and Palestine in and around July 2014 constituted a war, and that the loss purportedly was caused by a war. Atlantic must accordingly supplement its responses to each Interrogatory Nos. 6-14 "separately and fully." FRCP 33(b)(1)(B). *See also Cable & Comput. Tech. v. Lockheed Saunders*, 175 F.R.D. 646, 650-52 (C.D. Cal. 1997) (granting motion to compel "factual" contention interrogatories "to state all facts" upon which various pleading allegations are based).

**Interrogatory Nos. 15 & 16**: These interrogatories seek limited information regarding Atlantic's consideration of prior claims involving the war exclusion. Plaintiffs carefully tailored these interrogatories by specifying that Atlantic need ***not*** "identify[] the insured or the specific facts of the claims." Nevertheless, Atlantic asserted boilerplate relevance objections. Atlantic's refusal to provide any responsive information is unsupportable. The requested information is relevant to at least three issues which overlap and permeate the entire case.

<u>First</u>, to the extent Atlantic's prior denials and/or payout on claims in connection with the war exclusion (*i.e.*, the information sought by Interrogatory Nos. 15 & 16) occurred under circumstances involving a terrorist group (*see* Complaint, ¶ 1), that information is relevant to Atlantic's interpretation of the policy and the war exclusion. *See Owens-Brockway Glass Container v. Seaboard Sur. Co.*, 1992 U.S. Dist. LEXIS 10337, at *8-9 (E.D. Cal. May 27, 1992) ("similar insurance claims asserted by other insureds against defendants may be relevant to the interpretation of the insurance policy language of this case").

<u>Second</u>, regardless of whether the prior claims implicating the war exclusion involved a terrorist group, the requested information is relevant to the sufficiency and adequacy of Atlantic's evaluation and consideration of the *DIG* Claim, and Plaintiffs' claim that Atlantic breached the implied covenant of good faith and fair dealing. *See* Complaint, ¶ 52 (listing Atlantic's "unreasonable, arbitrary, and/or bad faith conduct"). For example, if Atlantic has not "previously denied a claim based in whole or in part on the WAR EXCLUSION" (Interrogatory No. 15), but decided to deny the *DIG* Claim in a manner and time-frame not commensurate with the consideration of an otherwise novel claim or exclusion, that would be relevant to Plaintiffs' bad faith claim, as alleged in paragraph 52 of the Complaint and otherwise. Conversely, the information would also be relevant if Atlantic had many such prior claims, in which event its familiarity with the war exclusion would be relevant to Atlantic's bad faith conduct in, *inter alia*, misrepresenting plainly inapplicable policy terms—*i.e.*, the endorsement titled "Coverage for



Michael Keeley, Esq.
November 29, 2016
Page 6

Certified Acts of Terrorism; Cap on Losses"—in connection with the war exclusion, as also alleged in paragraph 52 of the Complaint. *See also* Complaint, ¶¶ 35-38.

Third, the requested information is relevant to Atlantic's initial determination that the *DIG* Claim was covered under the policy, which determination Atlantic later retracted based on the war exclusion. *See* Complaint, ¶ 3, 30-31, 39-41. As yet another example, information about any "claim as to which ATLANTIC considered the potential applicability of the WAR EXCLUSION. . .but ultimately paid out on the claim. . ." (Interrogatory No. 16) is relevant to Plaintiffs' bad faith claim. Here, Atlantic initially determined that the *DIG* claim was covered, but later reneged on that determination. To the extent Atlantic previously considered the potential applicability of the war exclusion, and paid out on any claims, such evidence would bear not just on the interpretation of the exclusion, but also the egregiousness of Atlantic's conduct in this particular situation.

**Interrogatory No. 17**: This interrogatory asks: "State all facts which ATLANTIC considered in deciding not to renew the POLICY." In response, Atlantic objected on the ground of relevance, and refused to provide any information. Atlantic's position is without merit. Atlantic's non-renewal of the policy is relevant to the issues alleged in the Complaint. Plaintiffs specifically alleged Atlantic made the decision not to renew the Policy once it became clear Atlantic would have to pay out on the Policy in an amount that would exceed premiums, which meant that it was no longer in Atlantic's financial interest to pay *any* amount on the *DIG* claim. *See*, *e.g.*, Complaint, ¶¶ 5, 39-41. Facts which bear on the reasons why Atlantic decided not to renew the Policy are directly relevant to that claim.

## 2.    REQUESTS FOR PRODUCTION OF DOCUMENTS ("REQUESTS")

**A.    Production of documents and privilege log**: Lucia Coyoca emailed you on November 15, 2016, because Atlantic had failed to produce any documents or a privilege log on November 11, 2016, when Atlantic responded to Plaintiffs' requests. She also pointed out that Atlantic had not indicated when such production or a privilege log would be forthcoming, and noted that no further extension of time had been sought. Carla Crapster responded on November 17, 2016 indicating as follows:

> "Regarding the production of documents, we are preparing to send you responsive documents tomorrow. We will prepare a privilege log and send it to you as soon as possible. We are still waiting to receive a number of documents from our client. We will produce those as soon as we receive them (which we have been told will be in the next couple of days) and have had a chance to review them. We do not yet know how voluminous the document production we receive from our client will be, so it is difficult to predict how long it will take to review all the documents. We will provide you with a time estimate as soon as we have the documents."

On Friday, November 18, we received a partial production from you. Tellingly, in the cover letter accompanying the production you indicated that "Today, we received a voluminous set of documents from our client…. Our IT department is still inputting those documents into a



Michael Keeley, Esq.
November 29, 2016
Page 7

database, so we have not had a chance to begin reviewing them yet, and do not yet have a time frame for how long that process will take."  Again, you did not tell us when your production would be complete nor did you commit to a date certain by which Atlantic's privilege log would be produced.  Moreover, you did not provide any explanation as to why the documents and privilege log were not produced at the time the responses were served.

Despite Ms. Coyoca's follow up emails to you on November 22 and 28, Atlantic's sole response to date is that it is "hopeful" that "an estimated completion date" is not "more than two weeks" away.  However, again, you did not address when a privilege log would be produced or provide any explanation as to why all responsive documents were not timely produced on November 11.  Given the tight time deadlines in this case, Atlantic's conduct is simply unacceptable.  Plaintiffs are entitled to know when Atlantic's full production will be complete and when its privilege log will be produced.  Given the continued vagaries of Atlantic's response, we anticipate filing a motion to compel the full production and a privilege log, unless dates are immediately provided so that Plaintiffs can assess the full extent of the prejudice that has been caused by Atlantic's delayed production.

      **B.**      **General objections**:  As with the interrogatories, please confirm that Atlantic is not withholding any documents based solely on its "Preliminary Statement" and "General Objections."

      **C.**      **Objections based on assertion of privilege**:  Atlantic objected on the basis of the attorney-client privilege and/or work product doctrine in response to all Requests, except for Nos. 19, 20, 22, 23, 25-30.  As detailed above in connection with Interrogatory No. 4, these objections, standing alone, are deficient and insufficient to preclude all discovery.  Further, Atlantic must, but thus far has failed to, provide a privilege log for all responsive documents which Atlantic asserts are privileged and/or protected from discovery (*i.e.*, in response to Requests Nos. 1-18, 21, 24, 31, 32).

      **D.**      **"Burdensome" objections**:  Atlantic objected to Request Nos. 20, 22, and 23 on the ground of burden.  Plaintiffs carefully tailored their Requests, and do not believe Atlantic's burden objections are valid.  Furthermore, Atlantic failed to provide any support for its objections, other than generic statements:  "It would be a heavy burden" (No. 20), "would be burdensome and require an extensive search" (No. 22), "extremely burdensome," "manually locate and review" (No. 23).  Plaintiffs are amenable to discussing any claimed burden to minimize it, as practicable and possible, but Atlantic must first provide adequate information as to any claimed burden.  *See A. Farber & Ptnrs., Inc. v. Garber*, 234 F.R.D. 186, 188 (C.D. Cal. 2006) ("general or boilerplate objections such as 'overly burdensome and harassing' are improper – especially when a party fails to submit any evidentiary declarations supporting such objections").  If Atlantic cannot adequately support its burden objections, it must produce the responsive documents.

      **E.**      **Objections based on the definition of "WAR EXCLUSION:"**  In response to Request Nos. 1, 6, 7, 9, 11, and 13, Atlantic objected to the definition of "War Exclusion" on the grounds that (a) the definition includes "similar exclusion in other policies" and therefore seeks



Michael Keeley, Esq.
November 29, 2016
Page 8

irrelevant information, and (b) it is not clear to Atlantic what Plaintiffs mean by "documents that 'RELATE' to the WAR EXCLUSION." Neither ground has merit.

Plaintiffs sensibly defined "WAR EXCLUSION" to mean "any of the exclusions set forth in the General Conditions, Section III(1)-(4) of the POLICY, or any similar exclusion language in other versions of insurance policies issued and/or underwritten by YOU or ONEBEACON." Documents with "similar exclusion language" are relevant to, *inter alia*, Atlantic's interpretation of the policy at issue and Atlantic's denial of the *DIG* Claim. *See, e.g., Owens-Brockway Glass Container*, 1992 U.S. Dist. LEXIS 10337, at *6 ("the drafting history of an insurance policy as evidence of the intent of the drafter" is discoverable). Further, as one example only, Atlantic may have previously paid out on claims under the policies which used "similar exclusion language." If it did so, the information as to that claim would be relevant to the issue of the propriety of Atlantic's denial of the *DIG* Claim, as noted above in connection with Interrogatory Nos. 15 & 16. *And see id*., at *8-9 ("similar insurance claims asserted by other insureds against defendants" are discoverable).

Atlantic's claim that it does not understand what Plaintiffs mean by "documents that 'RELATE' to the WAR EXCLUSION" is specious and belied by Atlantic's own responses. For example, while Atlantic objected to the use of the term "RELATE" in connection with subpart d) of Request No. 1, Atlantic objected to no other subpart using the same term. There is nothing "unclear" about the defined term "RELATE." Rather, Atlantic's objection that it "does not understand" the term is selective and improper. As another example, Atlantic had no problems understanding and responding to Request Nos. 8 and 12, which use the same terms and phrasing to which Atlantic selectively objected in response to Request Nos. 1, 6, 7, 9, 11, and 13.

### F.    Additional improper objections and refusal to produce

**Request Nos. 10 & 13**: Atlantic objected to these Requests on the ground that "information subsequent to the denial of the *DIG* CLAIM" is irrelevant. As detailed above in connection with Interrogatory No. 4, Atlantic is wrong. To provide another obvious example, documents created on or after the date of denial may refer to or describe Atlantic's conduct prior to the denial, and those documents are relevant and responsive to Request No. 10. And, whether Atlantic reviewed documents after its denial of the *DIG* Claim (*i.e.*, documents sought in Request No. 13) in response to repeated requests for reconsideration or otherwise, is relevant to the bad faith claim.

Further, in response to Request No. 10, Atlantic improperly rephrased it as "seeking documents relating to Atlantic's evaluation and consideration of the *DIG* CLAIM leading up to the denial of the *DIG* CLAIM." That is not what the Request asks. Atlantic's repeated unilateral rephrasing of discovery requests is improper. Atlantic must supplement its response and produce all responsive documents.

**Request No. 14**: This Request seeks: "All of YOUR files, including file jackets and labels, and all other DOCUMENTS that RELATE to PLAINTIFFS' claim that YOU breached YOUR coverage obligations in connection with the POLICY and/or the *DIG* CLAIM." In response, Atlantic interposed an 18 line run-on objection, including objections as to relevance and



Michael Keeley, Esq.
November 29, 2016
Page 9

privilege, but then stated: "However, see the documents that Atlantic is producing in response to other Requests."

Based on this response, it is impossible to tell what Atlantic is objecting to, what Atlantic is withholding, and what has or will be produced in response to "other Requests" which may also be responsive to Request No. 14. Accordingly, please produce *all* responsive documents and the privilege log, identify what documents are responsive to Request No. 14 in the already produced or to be produced documents, and if Atlantic is withholding additional responsive documents in response to Request No. 14, identify the grounds for its withholding of the documents. Without the privilege log and more specification as to what Atlantic is producing or withholding, Plaintiffs cannot assess whether Atlantic has fully complied with this request.

**Request Nos. 15, 16, 18**: These Requests seek Atlantic's internal communications (No. 15), communications with OneBeacon (No. 16), and any person other than Plaintiffs, NBCUniversal, and AON (No. 18) "that RELATE to PLAINTIFFS' claim that YOU breached YOUR coverage obligations in connection with the POLICY and/or the *DIG* CLAIM." In response, Atlantic objected, asserting *inter alia*, privilege, but did not state that it will produce all responsive non-privileged documents (as, for example, Atlantic stated in response to Request No. 17 seeking the same type of communications with Plaintiffs, NBCUniversal, or AON). Is Atlantic withholding all responsive documents on the basis of privilege, or are there certain responsive non-privileged documents that Atlantic will produce? All responsive non-privileged documents should be produced, and Atlantic's responses supplemented. And, once again, to the extent Atlantic is withholding documents based on privilege or some other ground, Plaintiffs need the privilege log to assess the privilege claim.

**Request No. 19**: This Request seeks: "All DOCUMENTS that RELATE to the amount of any reserve that YOU considered or established in connection with the POLICY and/or the *DIG* CLAIM." In response, Atlantic refused to produce any documents, claiming that none are relevant. Atlantic is wrong. The amount of reserve is relevant to at least two issues in this action.

First, it is relevant to Atlantic's initial determination—later retracted—that the *DIG* claim is covered under the policy as Plaintiffs alleged in the Complaint, ¶¶ 3, 30-31, 39-41. The amount of reserve, or its absence, before or after Atlantic's initial determination is accordingly relevant to Atlantic's subsequent reversal of its position and denial of coverage.

Second, the amount of reserve is relevant to Atlantic's bad faith denial of coverage, and its ulterior motives for the denial, as Plaintiffs also specifically alleged in the Complaint, ¶¶ 5, 39-41. *See, e.g., Lipton v. Superior Court*, 48 Cal. App. 4th 1599, 1614 (1996) (in a bad faith action against an insurer, reserve information can have "relevance to the question of whether … the insurer had conducted a proper investigation or given reasonable consideration to all of the factors involved in a specific case" and "on any number of issues which commonly are presented in bad faith actions"). Because the requested documents are relevant to the issues squarely alleged in the Complaint, and Atlantic did not object except on relevance grounds, Atlantic must produce all responsive documents.



Michael Keeley, Esq.
November 29, 2016
Page 10

**Request No. 20**:  This Request seeks:  "All agreements, registrations, filings, correspondence, memoranda, and all other DOCUMENTS that RELATE to ONEBEACON or any other PERSON acting as YOUR agent, representative, administrator, or broker in connection with the POLICY or the *DIG* CLAIM."

This Request was necessitated by Atlantic's ambiguous allegations and denials in connection with OneBeacon's role as Atlantic's agent.  *Compare* Complaint, ¶ 8 ("On information and belief, at all relevant times mentioned herein as pertinent to the wrongful acts alleged herein, OBE and OB were the agents of Atlantic and were acting within the course and scope of such agency."), *with* Answer, ¶ 8 ("Answering paragraph 8 of the Complaint, Atlantic denies the allegations contained therein."); *and compare* Complaint, ¶ 25 *with* Answer, ¶ 25, *and* Complaint, ¶ 29 *with* Answer, ¶ 29.

Thus, contrary to Atlantic's unsupported objection, Request No. 20 seeks relevant documents which must be produced in order to clear up that ambiguity.  However, Plaintiffs are amenable to discussing alternatives to document production, such as a stipulation that OneBeacon was Atlantic's agent, representative, administrator, or broker in connection with the policy and the *DIG* Claim.

**Request No. 21**:  This Request seeks:  "All claims handling manuals, guidelines, policy statements, instructions, and other DOCUMENTS from January 1, 2010 through the present that RELATE to YOUR procedures in assessing, handling, or addressing insured's claims pursuant to commercial insurance products."  In response, Atlantic refused to produce any documents, based on the grounds of (a) unreasonable time frame, (b) relevance because this "particular dispute involves only one particular type of 'insurance product':  a Motion Picture/Television Producers Portfolio," and (c) the Request not being "clear" as to what is meant by "documents that 'RELATE' to Atlantic's procedures in assessing, handling, or addressing insured's claims." These grounds are insufficient to justify withholding discovery.

First, the "Policy [at issue] was a renewal of policies which NBCUniversal obtained from Atlantic in prior years (and for which NBCUniversal paid millions of dollars in premiums)," starting in 2010 (Complaint, ¶ 17), *DIG* was added as an insured production first to Policy No. MP00163-03 (effective from January 1, 2013, to January 1, 2014) and thereafter to the policy at issue effective from January 1, 2014, and the *DIG* Claim arose in 2014 (*see id.* ¶¶ 15, 22).  Thus, the time frame of 2010, spanning the parties' several years of relationship and the *DIG* Claim, is reasonable.

Second, Atlantic's relevance objection because this "particular dispute involves only one particular type of 'insurance product':  a Motion Picture/Television Producers Portfolio" policy is evasive.  Are there claims handling manuals, guidelines, policy statements, and instructions *specific* to a Motion Picture/Television Producers Portfolio policy?  If yes, Atlantic must produce them.  Conversely, if there are *no* claims handling manuals, guidelines, policy statements, and instructions *specific* to a Motion Picture/Television Producers Portfolio policy, Plaintiffs seek production of whatever manuals, guidelines, policy statements, and instructions apply to claims asserted pursuant to such policies.  There is no doubt these policies and manuals are relevant to Plaintiffs' bad faith claim, either because they may specify a process which makes it difficult for



Michael Keeley, Esq.
November 29, 2016
Page 11

the insured to secure coverage or alternatively, they may demonstrate that Atlantic did not comply with its own claims handling practices.

Third, Atlantic's objection that it is "not clear" what is meant by "documents that 'RELATE' to Atlantic's procedures in assessing, handling, or addressing insured's claims" is specious. However, to clarify, "other DOCUMENTS" that "RELATE to YOUR procedures in assessing, handling, or addressing insured's claims pursuant to commercial insurance products" means documents similar or equivalent to, though perhaps not named or referred to that exact way, the "handling manuals, guidelines, policy statements, and instructions."

**Request No. 22**: This Request seeks: "DOCUMENTS sufficient to identify any claims of loss from January 1, 2001 to the present under any policy YOU or ONEBEACON issued and/or underwrote in which YOU or ONEBEACON considered, assessed, or addressed the WAR EXCLUSION." In response, Atlantic refused to produce any documents, arguing relevance. Atlantic's objection is not well-taken. As detailed above in connection with Interrogatory Nos. 15 & 16, the requested information is relevant.

**Request No. 23**: This Request seeks: "A copy of each form policy YOU or ONEBEACON issued and/or underwrote from January 1, 2001 to the present with the WAR EXCLUSION, and any changes to the WAR EXCLUSION language." In response, Atlantic refused to produce any documents, arguing overbroad time period and relevance. These objections also fail.

The time period is sensible, is tied to the 9/11/2001 Trade Center terrorist attack, after which Atlantic may have made pertinent changes to the war exclusion language in its "form policies," which are likely kept in some sort of a depository, thus further diminishing the "overbreadth" objection. Further, the requested documents are relevant. As just one example, if at any point in time Atlantic's war exclusion was phrased in a manner which listed or referred to terrorist acts as those excluded by the war exclusion, then Atlantic's subsequent changes to the language, resulting in the policy at issue in this case, would show Atlantic's intent to provide coverage for claims involving terrorist acts, such as the *DIG* Claim. *See also Owens-Brockway Glass Container*, 1992 U.S. Dist. LEXIS 10337, at *6 ("the drafting history of an insurance policy" is discoverable). In fact, shortly after Atlantic received the *DIG* Claim, Atlantic's own claims investigator, Daniel Gutterman, wrote as follows regarding the policy at issue: "Hi Pamela [Johnson]-Please review the policy language for Extra Expense. The wording for Civil Unrest and the exclusions for it are not like other policies where Civil Unrest has its own coverage section." ATL000295. Therefore, Request Nos. 23 seeks relevant documents.

**Request No. 25**: This Request seeks: "Any financial statements, profit and loss statements, balance sheets, financial projections, or similar DOCUMENTS RELATING to YOUR profit/loss under the POLICY and under each of the earlier policies YOU issued to NBCUNIVERSAL (Policy Nos. MP0163-03; MP0163-02; MP0163-01; and Policy No. MP0163-00)." In response, Atlantic objected asserting the documents were "trade secrets or [contained] similar confidential and/or proprietary information" and relevance grounds. These objections are without merit. The Court entered a protective order in this case, dispensing with the first objections. And, the requested information is clearly relevant to Atlantic's bad faith denial of



Michael Keeley, Esq.
November 29, 2016
Page 12

coverage and its ulterior motives for the denial as specifically alleged in the Complaint, ¶¶ 5, 17, 39-41.

**Request Nos. 26, 27, 28, 29, 30**: These Requests seek documents in connection with Atlantic's "decision not to renew the POLICY." In response to each of these Requests, Atlantic objected, including, among others, a meritless relevance objection. As discussed above in connection with Interrogatory No. 17 and Request No. 25, Atlantic's decision not to renew is relevant to the issues in dispute in this case, and as specifically alleged in the Complaint, *e.g.*, ¶¶ 5, 17, 39-41.

Plaintiffs reserve all rights with respect to relief they may seek in connection with Atlantic's deficient discovery responses.

Very truly yours,

Valentine A. Shalamitski for
MITCHELL SILBERBERG & KNUPP LLP

# EXHIBIT 19

| | |
|---|---|
| **From:** | Hayes, Daniel |
| **To:** | "Crapster, Carla"; "Reed, Toni"; "Keeley, Michael" |
| **Cc:** | Coyoca, Lucia; Shalamitski, Valentine |
| **Subject:** | RE: UCP v. Atlantic - Atlantic"s Responses to First Set of Written Discovery |
| **Date:** | Thursday, February 02, 2017 12:58:39 PM |

Carla, have you had a chance to review my email, and will you be available for a call on Monday before 11:00 a.m. or after 3:00 p.m. Pacific time?



**Daniel M. Hayes** | **Partner, through his professional corporation**

T: 310.312.3216 | dmh@msk.com

**Mitchell Silberberg & Knupp LLP** | **www.msk.com**

11377 W. Olympic Blvd., Los Angeles, CA 90064

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

**From:** Crapster, Carla [mailto:Carla.Crapster@strasburger.com]
**Sent:** Tuesday, January 31, 2017 11:10 AM
**To:** Hayes, Daniel; Reed, Toni; Keeley, Michael
**Cc:** Coyoca, Lucia; Shalamitski, Valentine
**Subject:** RE: UCP v. Atlantic - Atlantic's Responses to First Set of Written Discovery

Daniel,

We only saw your communication regarding discovery responses this morning for the first time. We are not available today to discuss, and we have not had an opportunity to study the lengthy issues you detail or discuss with our client. We will undertake those steps, and we will propose a time later this week for our discussion with you.

**Carla Crapster** • Strasburger & Price, LLP
901 Main Street, Suite 6000, Dallas, TX 75202
214.651.2034 • Fax 214.659.4060 • Strasburger.com

**From:** Hayes, Daniel [mailto:dmh@msk.com]
**Sent:** Monday, January 30, 2017 10:16 AM
**To:** Crapster, Carla; Reed, Toni; Keeley, Michael
**Cc:** Coyoca, Lucia; Shalamitski, Valentine
**Subject:** UCP v. Atlantic - Atlantic's Responses to First Set of Written Discovery

Carla,

I am going to be joining Lucia and Val in representing Plaintiffs in this case. I look forward to working with you. I write to discuss certain remaining outstanding issues with Atlantic's responses to our first set of written discovery. After you have a chance to review this email,

EXHIBIT 19

let's pick a time to have a telephone call to hopefully resolve these remaining issues, in the interest of avoiding motion practice.  I am generally available tomorrow (Tuesday) after around 12:00 p.m. Pacific – please let me know if that works for you.

*First Set of Interrogatories*

**Nos. 1 and 2:**  Please confirm that the individuals identified in response to these Interrogatories constitute *all* of the individuals that were "responsible for the decision to deny the *DIG* CLAIM" and that "had any involvement in evaluating and considering the *DIG* CLAIM."

**Nos. 3, 5-14:**  In response to each of these Interrogatories (which seek, *inter alia*, all facts that Atlantic considered in denying the *Dig* Claim and that support its various contentions), Atlantic recites a substantially similar set of facts and sources that it consulted during the course of its investigation.  But certain portions of Atlantic's response still lack the requisite specificity.  For example, Atlantic references the "facts set forth in the December 2, 2010 Congressional Research Service Report entitled 'Hamas:  Background and Issues for Congress,'" but goes on to state that it "will not recite each and every fact" within the report.  The report Atlantic references is 63 pages long, and we obviously are not required to guess which facts within that voluminous report Atlantic will argue support its contentions at trial.  (Atlantic identifies certain parts of the report "in particular."  If those are the only facts that are responsive to these respective Interrogatories, please confirm that in Atlantic's responses.)  Atlantic also makes reference to, for example, "several sources" and "several news articles" without particularity.  Please remove the general references and identify all of the specific facts that are responsive to each of these questions.

**No. 4:**  This interrogatory asks Atlantic to identify all documents it reviewed in evaluating and considering the *Dig* Claim.  Atlantic prefaces its response by stating it will not provide information protected by the attorney-client privilege or work product doctrine.  At the end of its response, Atlantic identifies the coverage opinion letter prepared by Leon Gladstone as the only arguably privileged responsive document (and refuses to produce it).  But Atlantic's privilege log identifies many other documents related to Mr. Gladstone's analysis (*e.g.*, three emails on 7/18/2014).  Please confirm whether Atlantic reviewed any other documents that it claims are privileged in evaluating and considering the *Dig* Claim.  If there are other such documents that Atlantic is withholding, please identify them with specificity.

**Nos. 15 and 16:**  These interrogatories ask Atlantic for information pertaining to each instance in which it has denied a claim based on the War Exclusion (No. 15) or paid a claim where the War Exclusion arguably applied (No. 16).  In a nutshell, Atlantic states that it searched but could not find any evidence that it has ever considered the application of the War Exclusion before, but is still "working to further confirm this."  If Atlantic has never denied a claim based on the War Exclusion, or paid a claim where the War Exclusion arguably applied, we need

concrete answers to that effect, without the qualifiers.

*Requests for Production*

**Status of Production:**  I understand that Atlantic has produced all of the documents that it has thus far agreed to produce, and that Atlantic has completed its privilege log.  Please confirm in writing as to both.

**Privilege Claims:**  In response to most of the Requests, Atlantic includes the preface that it will not produce privileged documents.  We are reviewing Atlantic's privilege log and will likely need more information to assess the validity of certain entries.  There is, however, one issue that needs to be resolved immediately.  Atlantic is withholding documents that it relied upon in denying the *Dig* Claim (*see, e.g.,* the Leon Gladstone "coverage opinion" letter referenced in response to Interrogatory No. 4), based on the assertion that the attorney-client privilege and attorney work product doctrine render these documents "exempt from discovery."  This is not correct.  Atlantic has put its communications with counsel at issue in this case.  *See, e.g.,* July 28, 2014 letter from Pamela A. Johnson ("Our decision is based on information gathered about the situation in Israel, case law, treatises *and consultation with counsel*.") (emphasis added).  Therefore, the Leon Gladstone coverage opinion letter, all communications with outside counsel regarding the *Dig* Claim, and all internal communications about outside counsel's opinion as to the *Dig* Claim *must* be produced.  *See, e.g., Garcia v. Progressive Choice Ins. Co.*, 2012 U.S. Dist. LEXIS 105932, at *9 (S.D. Cal. July 30, 2012) ("Attorney-client privilege may also be impliedly waived if a party to litigation places into issue a matter that is traditionally privileged.  Such an implied waiver can be found when a party states that it relied upon the advice of counsel, therefore putting attorney-client communication directly at issue.") (citations omitted); *Handgards, Inc. v. Johnson & Johnson*, 413 F. Supp. 926, 929 (N.D. Cal. 1976) ("The deliberate injection of the advice of counsel into a case waives the attorney-client privilege as to communications and documents relating to the advice.").  I understand there have been prior discussions about this issue and that Atlantic disagrees with our position.  If you think it would be productive to discuss this issue any further before we file our motion to compel production, please let me know.  If not, we believe our prior communications on the issue satisfy our meet-and-confer obligations and intend to proceed with a motion.

**Nos. 1, 6, 7, 9, 11, 13, and 22:**  Nos. 1, 6, 7, and 9 seek Atlantic's files and communications (internal and external) that relate to the Policy, the *Dig* production, the *Dig* Claim, and the "War Exclusion."  Nos. 11 and 13 seek documents reviewed in connection with the War Exclusion (both prior to and after denial).  No. 22 explicitly targets documents sufficient to identify other claims in which Atlantic "considered, assessed, or addressed the War Exclusion."

Atlantic states the "documents that are responsive to this Request *and concern this claim*, and

which are not privileged, have been, or will be, produced." Does the italicized qualifier affect Atlantic's production as to the first three categories – documents that relate to the Policy, the *Dig* production, or the *Dig* Claim? Please confirm.

Our impression is that it is aimed at the fourth category – the "War Exclusion." As to that category, the response includes a narrative concerning Atlantic's unsuccessful efforts to locate responsive documents: "Thus far, Atlantic has not located any other claim in which it denied the claim in whole or in part on the basis of the WAR EXCLUSION."

We would like to discuss Atlantic's search in more detail, and the feasibility of additional searching to confirm the War Exclusion has never been considered before. If it has not, then here again, we need a clear, concrete written statement to that effect, and confirmation that no responsive documents exist.

**Nos. 2, 3-5, 8, 10, 12, 14-18, 21, and 26-32:** After stating it will not produce privileged documents (all of which, we assume, have been logged), Atlantic provides one of the following two statements of compliance: "Atlantic's documents that are responsive to this Request, and which are not privileged, have been, or will be, produced;" or "the non-privileged documents responsive to this Request will be produced." Does this mean that *all* responsive documents have been produced? (Other than those you consider privileged, and with respect to those, see above.) We assume it does, but we need confirmation with respect to all of the Requests, including these.

**No. 19:** This request seeks documents that show the amount of reserve Atlantic set aside for this claim. Atlantic objected and refused to produce documents. We cited authority for our position in our last meet-and-confer letter. Let's discuss whether we are at impasse in our call.

**No. 20:** This Request seeks "all agreements, registrations, filings, correspondence, memoranda, and all other DOCUMENTS that RELATE to ONEBEACON or any other PERSON acting as YOUR agent, representative, administrator, or broker in connection with the POLICY or the DIG CLAIM." Atlantic objected and refused to produced documents, but added: "The persons who were involved in the underwriting of the Policy or the handling of the *DIG* CLAIM were Atlantic employees, regardless of whether their communications to Plaintiffs or its representatives, including Plaintiffs' broker, contained the name OneBeacon on those communications. It is not Atlantic's intent to disavow such communications, which were sent on behalf of Atlantic."

The stipulation we suggested in our meet-and-confer correspondence was that "OneBeacon was Atlantic's agent, representative, administrator, or broker in connection with the Policy and the DIG Claim." Let's discuss in our call whether Atlantic is willing to enter into a formal written stipulation to that effect.

EXHIBIT 19

**No. 23:**  This request seeks all Atlantic policy forms with a War Exclusion since 2001.  We reached an informal agreement on this one, but it is not accurately spelled out in the response.  To be clear:  We need an exemplar of every unique policy form that has a War Exclusion that differs in any way from the one at issue, or a formal written stipulation that it has never been different.  Let's discuss in our call.

**No. 24:**  This Request seeks all "claims handling manuals, guidelines, policy statements, instructions, and other DOCUMENTS (and any changes thereto) from January 1, 2001 through the present that RELATE to YOUR procedures in assessing, handling, or addressing the WAR EXCLUSION."  Atlantic responded that it had not located any responsive documents.  (However, Atlantic did refer to "core principles" and "general claims practices" documents produced in response to No. 21.)

We need more detail regarding Atlantic's search.  For example, did Atlantic restrict its search for documents based on its "outside the scope" and "not reasonably limited in time" objections?  And if Atlantic truly has no responsive documents, as in other places, we need a clear, concrete written statement to that effect.

**No. 25:**  This Request seeks any "financial statements, profit and loss statements, balance sheets, financial projections, or similar DOCUMENTS RELATING to YOUR profit/loss under the POLICY and under each of the earlier policies YOU issued to NBCUNIVERSAL … ."  Atlantic objects that the requested information is not relevant and that it seeks trade secrets and proprietary information, and then confirms that it is withholding documents on the basis of those objections.  As we noted in our previous meet-and-confer letter, we have a protective order, so the trade secret/proprietary information objections are not valid.  And the information is relevant to our bad faith theory – *i.e.,* Atlantic placed its own financial interests over the interests of its insured in refusing to honor the Policy.  Let's discuss whether we are at impasse on this one, too.

I look forward to speaking with you Carla.  Please let me know if tomorrow (Tuesday) after 12:00 p.m. Pacific time works (and if so, what time you would prefer).  We would like to resolve these issues without further delay.

Dan

**Daniel M. Hayes | Partner, through his professional corporation**
T: 310.312.3216 | dmh@msk.com
**Mitchell Silberberg & Knupp LLP | www.msk.com**
11377 W. Olympic Blvd., Los Angeles, CA 90064

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE

EXHIBIT 19

DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

*This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Strasburger & Price, LLP immediately -- by replying to this message or by sending an email to postmaster@strasburger.com -- and destroy all copies of this message and any attachments. Thank you.*

EXHIBIT 19

# EXHIBIT 20

| From: | Crapster, Carla |
|---|---|
| To: | Hayes, Daniel; Coyoca, Lucia; Shalamitski, Valentine |
| Cc: | Keeley, Michael; Reed, Toni |
| Subject: | UCP v Atlantic - Reserves |
| Date: | Thursday, February 02, 2017 4:34:05 PM |
| Attachments: | ATL004004.pdf |
| | ATT00001.htm |

Lucia, Val, and Daniel,

We are still working through the issues you identified in Daniel's earlier e-mail. We will follow up.

There is, however, one issue on which we think we can reach agreement. We are producing, attached to this e-mail, a document that represents the history of the reserve Atlantic set on this claim. This states the reserve posted, and which remained in effect until after litigation was filed.  We have redacted information after the date the lawsuit was filed.  As you can see from the document, the only notations after the reserve was posted, as noted, relate to matters after suit was filed.  You have already received, in documents initially produced, other items that refer to the same reserve that was maintained.

We are not producing, and do not believe that we are required to produce, any information on reserves after anticipation of litigation. That information is protected work product. We are not producing documents reflecting communications on the subject of reserves after anticipation of litigation or that reflect confidential settlement discussions. We are not waiving the work-product protection or the confidential nature of the settlement discussions by producing the attached document.

**Carla Crapster** • Strasburger & Price, LLP
901 Main Street, Suite 6000, Dallas, TX 75202
214.651.2034 • Fax 214.659.4060 • Strasburger.com

---

*This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Strasburger & Price, LLP immediately -- by replying to this message or by sending an email to postmaster@strasburger.com -- and destroy all copies of this message and any attachments. Thank you.*

880                                                    EXHIBIT 20

```
01/30/17                    A C T S                      10:22:08
ACTS              COVERAGE  TRANSACTION  SUMMARY          N42IQ25P

CLAIM NO 0AB 097918  01   COV STATUS SUIT       ACC DATE 07/11/14   SPV
JJ21
INSURED NBC UNIVERSAL TELEVISION STUDI   M/A: A  POLICY MP0016304     ADJ JJ2N
CLAIMANT NBC UNIVERSAL TELEVISION STUDI    COV 490  INLAND MARINE      HC I3
STORAGE DATE                                         CONV-CLAIM:
         TRANSACTION     PEND TRANSACTION TRANSACTION   CHECK/DEP    BOOKED    PAY
SEL       TYPE          CODE   DATE        AMOUNT        NUMBER       DATE     TYPE
.  INITIAL RESERVE            08/12/14         2.00                 08/12/14
.                            09/27/16
.                            10/12/16
.                            10/19/16
.                            11/22/16
.                            11/30/16
.                            12/14/16
.                            12/14/16
.                            01/26/17
.                            01/26/17
.                            12/28/16
.                            12/28/16
OFFICE CASE PURGED FROM
OPTION: .   B OR PF19 = SUF SEL  R OR PF16 = RESTART  PF20 = RECV  PF7 = SCRL
```

ATL004004

EXHIBIT 20

# EXHIBIT 21

| From: | Crapster, Carla |
|---|---|
| To: | Hayes, Daniel; Coyoca, Lucia; Shalamitski, Valentine |
| Cc: | Keeley, Michael; Reed, Toni |
| Subject: | UCP v. Atlantic - Waiver of Privilege Issue |
| Date: | Monday, February 06, 2017 11:31:20 AM |

Daniel, Lucia, and Val,

We have reviewed the e-mail that Daniel sent on January 30, 2017. We are preparing a letter that responds to each individual item. But we wanted to let you know our position on one additional issue now. You contend that Atlantic waived the attorney-client privilege as to the coverage opinion it obtained in July 2014 regarding the *Dig* claim, and that we must produce the coverage opinion itself and all other communications in connection with Atlantic's obtaining that coverage opinion. We disagree.

The two cases you cited for support on this point do not actually support your position. First, you cite *Garcia v. Progressive Choice Ins. Co.*, 2012 U.S. Dist. LEXIS 105932 (S.D. Cal. 2012). The holding of this case is narrow. In that case, an insured was seeking to recover the lost value of a Jeep that had been stolen and was later found destroyed. Progressive denied the claim, and in the ensuing coverage litigation, it at first relied on an "advice of counsel" defense. As a result, Progressive *willingly* disclosed many communications it had with its attorney that were clearly privileged. As the coverage lawsuit wore on, Progressive decided to withdraw its "advice of counsel" defense. And later, it was discovered that there were many more privileged e-mails than Progressive initially thought (they were kept on an old server apparently). Progressive did not want to produce the newly discovered e-mails, and argued that it didn't have to at that point because it had withdrawn the "advice of counsel" defense. The court disagreed, but *only because* it held that the new e-mails were "contemporaneous with the disclosed items, involve the same claim, and are between the same individuals." In other words, the court held that Progressive had already voluntarily waived the attorney-client privilege for communications it had with this lawyer on the particular topic at issue, and could not now fairly withhold a significant part of those already-disclosed communications. Here, we have obviously not voluntarily produced the coverage opinion or any communications in connection therewith. The *Garcia* case is therefore inapposite.

You also relied on *Handards, Inc. v. Johnson & Johnson*, 413 F. Supp. 926 (N.D. Cal. 1976). In that case, the plaintiffs alleged that the defendants had accumulated patents relating to plastic gloves, knowing that these patents were invalid, and had then brought infringement actions based on those invalid patents. The defendant, Johnson & Johnson, made clear that they intended to call as witnesses three lawyers who were primarily responsible for prosecuting these infringement suits. The court ruled that if these lawyers were going to testify as witnesses about the prosecution of the patent suits, then the defendant's communications with those lawyers were no longer privileged. The court held: "By putting their lawyers on the witness stand in order to demonstrate that the prior lawsuits were pursued on the basis of competent legal advice and were, therefore, brought in good faith,

defendants will waive the attorney-client privilege ....” This case is clearly distinguishable. The testimony of the attorneys about their prosecution of the patent suits was directly at issue in that case. Here, however, the substance of the coverage opinion that Atlantic obtained in July 2014 is *not* in issue, and Atlantic has not placed it in issue.  Atlantic has made clear that it is not relying on the “advice of counsel” defense, and none of its other defenses relate to the content of the coverage opinion.

In short, neither of these cases persuades us that Atlantic waived the attorney-client privilege as to the coverage opinion it obtained in July 2014 by making mention of the fact that it consulted counsel in its denial letter.

Instead, our research suggests that to waive the attorney-client privilege, Atlantic had to intentionally and knowingly waive the privilege or put it directly into issue in the case. In fact, as the *Garcia* case that you have relied upon states: “[A]ny waiver of the attorney-client privilege is to be narrowly construed.” 2012 U.S. Dist. LEXIS 105932, at *16. The Ninth Circuit case of *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003), offered a helpful primer on waiver of the attorney-client privilege. That case stated that there are two types of waiver: express and implied. Express waiver “occurs when a party discloses privileged information to a third party who is not bound by the privilege, or otherwise shows disregard for the privilege by making the information public.” *Id.* at 719. Here, we obviously did not disclose the contents of the coverage opinion or anything about it to any third party. Clearly no express waiver occurred here, and we do not believe you contend otherwise. Implied waiver occurs when one party puts a lawyer’s advice directly into issue in the case. As the Ninth Circuit put it, “The doctrine of waiver by implication reflects the position that the attorney-client privilege was intended as a shield, not a sword.” Or, put another way, “In practical terms, this means that parties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials. The party asserting the claim is said to have implicitly waived the privilege.” Here, however, Atlantic is not using the attorney-client privilege as a “sword.” It has not asserted any claims or defenses that depend on the content of the coverage opinion that it obtained in July 2014. It is relying on the attorney-client privilege solely as a shield to protect the information included in the coverage opinion. One mention of the  fact that there was consultation with counsel in the denial letter does not change that, and we have not seen any case law suggesting that it does.

At this point, if you still believe Atlantic has waived the attorney-client privilege as to the coverage opinion it obtained in July 2014 and the surrounding communications, we believe the meet-and-confer obligations have been satisfied, and we look forward to resolving this dispute with the magistrate’s assistance.

**Carla Crapster** • Strasburger & Price, LLP

901 Main Street, Suite 6000, Dallas, TX 75202
214.651.2034 • Fax 214.659.4060 • Strasburger.com

---

*This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Strasburger & Price, LLP immediately -- by replying to this message or by sending an email to postmaster@strasburger.com -- and destroy all copies of this message and any attachments. Thank you.*

---

EXHIBIT 21

# EXHIBIT 22

| From: | Crapster, Carla |
|---|---|
| To: | Coyoca, Lucia; Hayes, Daniel; Shalamitski, Valentine |
| Cc: | Reed, Toni; Keeley, Michael |
| Subject: | UCP v. Atlantic - Updated Interrogatory Responses and Letter Regarding Discovery Issues |
| Date: | Monday, February 20, 2017 12:29:07 PM |
| Attachments: | SP-#8396218 - Atlantic"s Responses to Plaintiffs" Interrogatories Set One.pdf |
| | February 20 Letter to Daniel Hayes.pdf |

All,

Please see the attached amended interrogatory responses and  letter, which addresses the outstanding discovery disputes raised in Mr. Hayes' e-mail of January 30.

Sincerely,

**Carla Crapster** • Strasburger & Price, LLP
901 Main Street, Suite 6000, Dallas, TX 75202
214.651.2034 • Fax 214.659.4060 • Strasburger.com

*This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Strasburger & Price, LLP immediately -- by replying to this message or by sending an email to postmaster@strasburger.com -- and destroy all copies of this message and any attachments. Thank you.*

EXHIBIT 22



February 20, 2017

Carla C. Crapster
(214) 651-2034
Direct Fax (214) 659-4060
Carla.Crapster@strasburger.com

Mr. Daniel M. Hayes
Mitchell Silberberg Knupp LLP
11377 W. Olympic Boulevard
Los Angeles, CA 90064

Re:     *Universal Cable Productions LLC and Northern Entertainment Productions LLC v. Atlantic Specialty Insurance Company*; Case No. 2:16-cv-04435-PA-MRW, pending in the United States District Court for the Central District of California, Western Division

Dear Daniel:

This letter responds to your e-mail of January 30, 2017 raising various issues relating to discovery in the Universal Cable v. Atlantic Specialty case. We have reviewed these issues, engaged in separate correspondence on a number of them, and served the Second Amended Responses to the First Set of Interrogatories, to address various items.   In addition, as you know, we have already separately responded and discussed two other issues you raised: (1) whether the attorney-client privilege protects the coverage opinion that Atlantic obtained in July 2014 and the related communications, and (2) whether the reserves Atlantic set on this claim are discoverable.  Please refer to our complete discussions on those items.  We address the remaining issues below.

**Issues Relating to Interrogatories**

**Your Position:** Nos. 1 and 2: Please confirm that the individuals identified in response to these Interrogatories constitute all of the individuals that were "responsible for the decision to deny the *DIG* CLAIM" and that "had any involvement in evaluating and considering the *DIG* CLAIM."

**Atlantic's Response:** Atlantic refers to the Second Amended Responses to the First Set of Interrogatories that have been served and hereby confirms that the individuals identified therein in response to Interrogatories 1 and 2 propounded by the plaintiffs are the only individuals that were "responsible for the decision to deny the *DIG* CLAIM" or that "had any involvement in evaluating and considering the

**Strasburger & Price, LLP**

901 Main Street, Suite 6000 | Dallas, Texas 75202.3794 | 214.651.4300 tel | 214.651.4330 fax | www.strasburger.com
Austin | Collin County | Dallas | Houston | San Antonio | New York, N.Y. | Washington, D.C. | Mexico City - Strasburger & Price, SC

886                                                                                              EXHIBIT 22



Mr. Daniel M. Hayes
February 20, 2017
Page 2

"*DIG* CLAIM."

**Your Position:** Nos. 3, 5-14:  In response to each of these Interrogatories (which seek, inter alia, all facts that Atlantic considered in denying the *Dig* Claim and that support its various contentions), Atlantic recites a substantially similar set of facts and sources that it consulted during the course of its investigation.  But certain portions of Atlantic's response still lack the requisite specificity.  For example, Atlantic references the "facts set forth in the December 2, 2010 Congressional Research Service Report entitled 'Hamas:  Background and Issues for Congress,'" but goes on to state that it "will not recite each and every fact" within the report. The report Atlantic references is 63 pages long, and we obviously are not required to guess which facts within that voluminous report Atlantic will argue support its contentions at trial.  (Atlantic identifies certain parts of the report "in particular." If those are the only facts that are responsive to these respective Interrogatories, please confirm that in Atlantic's responses.)  Atlantic also makes reference to, for example, "several sources" and "several news articles" without particularity.  Please remove the general references and identify all of the specific facts that are responsive to each of these questions.

**Atlantic's Response:** Atlantic refers to the Second Amended Responses to the First Set of Interrogatories that have been served.  Atlantic stands by its statement that it need not pick certain facts out from the Congressional Reports referenced in response to these interrogatories. The reports referenced broadly discuss the background and history of Hamas and Palestine, and Atlantic's position is based on this background and history. Atlantic does not believe the Federal Rules of Civil Procedure require it to essentially summarize these Congressional reports, when they are already fairly condensed discussions of a complicated situation and history. Moreover, Plaintiffs have already deposed Peter Williams, Danny Gutterman, and Theresa Gooley, who have testified to what they have reviewed and considered. Further, Plaintiffs had the opportunity to depose Pamela Johnson, the person in charge of the *Dig* claim, concerning her evaluation. Atlantic refers Plaintiffs to the earlier deposition testimony, and to any testimony that Ms. Johnson might provide. In any event, Atlantic has already identified what it believes are the most critical facts from these reports. But it cannot state that these facts highlighted in its interrogatory responses are the *only* facts it relied on from these reports. As stated in the interrogatories, Atlantic has reviewed the entirety of these reports and relies on them in their entirety. You also noted that our interrogatory responses refer to



Mr. Daniel M. Hayes
February 20, 2017
Page 3

"several sources" and "several news articles" without particularity. Atlantic hereby confirms that the "several sources" it refers to (Black's Law Dictionary, The Dictionary of International and Comparative Law, and the Handbook of Humanitarian Law in Armed Conflicts) are the specific sources it can identify now, based upon written information in the file, that were reviewed for the definition of "war," as well as published opinions Pamela Johnson reviewed. Ms. Johnson is no longer an employee of Atlantic, and therefore Atlantic does not know all sources she reviewed. But as stated in response to Interrogatory No. 3, Atlantic's employees, including at least Pamela Johnson, conducted other internet research regarding war and Hamas, the further details of which are not currently known to Atlantic.  Those further details cannot be described with particularity as they were not the subject of a written note or other recording.   The reference to "several news articles" is a reference to the news articles and video clips by MSNBC that are listed in response to Interrogatories 6-14, as well as items reported by CBS and other reporting agencies, as set out in the responses.   The specific items, where known, are identified.   Others may have been reviewed, but they were not the subject of a written note or other recording. Atlantic does, however, reserve its right to amend its responses to these interrogatories to the extent it identifies, as the discovery process continues, additional news articles or clips that support its position or that it may use as trial.

**Your Position:** No. 4:  This interrogatory asks Atlantic to identify all documents it reviewed in evaluating and considering the *Dig* Claim.   Atlantic prefaces its response by stating it will not provide information protected by the attorney-client privilege or work product doctrine.  At the end of its response, Atlantic identifies the coverage opinion letter prepared by Leon Gladstone as the only arguably privileged responsive document (and refuses to produce it).   But Atlantic's privilege log identifies many other documents related to Mr. Gladstone's analysis (e.g., three emails on 7/18/2014).   Please confirm whether Atlantic reviewed any other documents that it claims are privileged in evaluating and considering the *Dig* Claim.   If there are other such documents that Atlantic is withholding, please identify them with specificity.

**Atlantic's Response:** Atlantic refers to the Second Amended Responses to the First Set of Interrogatories that have been served.   Atlantic has identified the documents it is able to specifically name.   Atlantic cannot confirm that the documents it identifies in response to Interrogatory No. 4 are the *only* documents it

EXHIBIT 22



Mr. Daniel M. Hayes
February 20, 2017
Page 4

ever reviewed in evaluating and considering the *Dig* Claim. As Atlantic stated in response to Interrogatory No. 3, other employees of Atlantic, including at least Pamela Johnson, conducted other internet research into war and Hamas and its relationship with Israel, the details of which are not currently known to Atlantic, as they were not the subject of a written note or other recording. Atlantic has identified all the documents in response to Interrogatory No. 4 that it is able to confirm were reviewed or that someone specifically recalls reviewing. Regarding your statement that there are other documents "related to Mr. Gladstone's analysis" identified on the privilege log, Atlantic confirms that it intentionally did not include other communications with Leon Gladstone in response to this interrogatory.

**Your Position:** Nos. 15 and 16:  These interrogatories ask Atlantic for information pertaining to each instance in which it has denied a claim based on the War Exclusion (No. 15) or paid a claim where the War Exclusion arguably applied (No. 16).  In a nutshell, Atlantic states that it searched but could not find any evidence that it has ever considered the application of the War Exclusion before, but is still "working to further confirm this."  If Atlantic has never denied a claim based on the War Exclusion, or paid a claim where the War Exclusion arguably applied, we need concrete answers to that effect, without the qualifiers.

**Atlantic's Response:** Atlantic refers to the Second Amended Responses to the First Set of Interrogatories that have been served.  Atlantic has updated the response to further address both requests.

### Issues Relating to Requests for Production

**Your Position:** Status of Production:  I understand that Atlantic has produced all of the documents that it has thus far agreed to produce, and that Atlantic has completed its privilege log.  Please confirm in writing as to both.

**Atlantic's Response:** Atlantic hereby confirms that it has produced all responsive documents that Atlantic has not otherwise specifically objected to or identified on a privilege log, other than as specifically discussed in this letter.

**Your Position:** Nos. 1, 6, 7, 9, 11, 13, and 22:  Nos. 1, 6, 7, and 9 seek Atlantic's files and communications (internal and external) that relate to the Policy, the *Dig* production, the *Dig* Claim, and the "War Exclusion."   Nos. 11 and 13 seek documents reviewed in connection with the War Exclusion (both prior to and after

                                             EXHIBIT 22



Mr. Daniel M. Hayes
February 20, 2017
Page 5

denial).   No. 22 explicitly targets documents sufficient to identify other claims in which Atlantic "considered, assessed, or addressed the War Exclusion."

Atlantic states the "documents that are responsive to this Request *and concern this claim*, and which are not privileged, have been, or will be, produced."   Does the italicized qualifier affect Atlantic's production as to the first three categories – documents that relate to the Policy, the Dig production, or the *Dig* Claim?   Please confirm.

Our impression is that it is aimed at the fourth category – the "War Exclusion."   As to that category, the response includes a narrative concerning Atlantic's unsuccessful efforts to locate responsive documents:   "Thus far, Atlantic has not located any other claim in which it denied the claim in whole or in part on the basis of the WAR EXCLUSION."

We would like to discuss Atlantic's search in more detail, and the feasibility of additional searching to confirm the War Exclusion has never been considered before.   If it has not, then here again, we need a clear, concrete written statement to that effect, and confirmation that no responsive documents exist.

**Atlantic's Response:** Atlantic refers to the Second Amended Responses to the First Set of Interrogatories that have been served.   Those provide updated information regarding the search conducted and results of the search.   We believe that the search has been as comprehensive as reasonably possible.   We are happy to discuss the feasibility of conducting further computer searches to locate any other claims in which the war exclusion was considered, but we do not believe that there is further information that can reasonably be located.

As we have previously stated, our client tells us that it has no way to conduct a search for every claim in which the war exclusion was considered without running a search for the word "war" in every document and e-mail created for the duration of the existence of Atlantic's entertainment division, and we are told that this search would be completely infeasible and would take many, many months. Thus, it is not reasonable nor required by the Rules. The search described in the Second Amended Responses was conducted and completed.   Additionally, in lieu of attempting any other incredibly expensive and time-intensive process, we asked Atlantic employees who currently oversee, and former employees who previously oversaw, the claims handling for the entertainment division of Atlantic and employees of OneBeacon



Mr. Daniel M. Hayes
February 20, 2017
Page 6

who oversee claims handling for all of OneBeacon's divisions, whether they recalled any claims in which the War Exclusion was applied or was considered, assessed, or addressed. No one recalled any claims that applied a war exclusion. And you have received testimony from Theresa Gooley on the issue of her inquiries internally on the War Exclusion. Other than as memorialized in Danny Gutterman's note to himself about which he testified, no other employees recall any claim in which a war exclusion was considered, assessed, or addressed. Based on this reasonable inquiry, Atlantic represents that it has produced all responsive and non-protected/privileged documents that concern the Policy, the *Dig* production, and the *Dig* claim. And Atlantic does not believe it has any documents, other than ATL000785 – ATL000788, as discussed in responses to Requests for Production and the Second Amended Responses to the First Set of Interrogatories, that mention the "War Exclusion" but do *not* concern the *Dig* production, the *Dig* claim, or the Policy.

**Your Position:** Nos. 2, 3-5, 8, 10, 12, 14-18, 21, and 26-32: After stating it will not produce privileged documents (all of which, we assume, have been logged), Atlantic provides one of the following two statements of compliance: "Atlantic's documents that are responsive to this Request, and which are not privileged, have been, or will be, produced;" or "the non-privileged documents responsive to this Request will be produced." Does this mean that all responsive documents have been produced? (Other than those you consider privileged, and with respect to those, see above.) We assume it does, but we need confirmation with respect to all of the Requests, including these.

**Atlantic's Response:** Atlantic hereby confirms that it has produced all responsive documents that Atlantic has not otherwise specifically objected to or identified on a privilege log, other than as specifically discussed in this letter.

**Your Position:** No. 20: This Request seeks "all agreements, registrations, filings, correspondence, memoranda, and all other DOCUMENTS that RELATE to ONEBEACON or any other PERSON acting as YOUR agent, representative, administrator, or broker in connection with the POLICY or the *DIG* CLAIM." Atlantic objected and refused to produced documents, but added: "The persons who were involved in the underwriting of the Policy or the handling of the *DIG* CLAIM were Atlantic employees, regardless of whether their communications to Plaintiffs or its representatives, including Plaintiffs' broker, contained the name OneBeacon

EXHIBIT 22



Mr. Daniel M. Hayes
February 20, 2017
Page 7

on those communications.    It is not Atlantic's intent to disavow such communications, which were sent on behalf of Atlantic."

The stipulation we suggested in our meet-and-confer correspondence was that "OneBeacon was Atlantic's agent, representative, administrator, or broker in connection with the Policy and the *DIG* Claim."  Let's discuss in our call whether Atlantic is willing to enter into a formal written stipulation to that effect.

**Atlantic's Response:** In connection with Interrogatory No. 20, we understood from our previous conversation with Lucia Coyoca that our amended response addressed the plaintiffs' concern. We do not believe the precise language you have proposed is technically accurate, and believe that our language should address this issue adequately. We are, however, willing to discuss this issue further.

**Your Position:** No. 23:  This request seeks all Atlantic policy forms with a War Exclusion since 2001.  We reached an informal agreement on this one, but it is not accurately spelled out in the response.  To be clear:  We need an exemplar of every unique policy form that has a War Exclusion that differs in any way from the one at issue, or a formal written stipulation that it has never been different.  Let's discuss in our call.

**Atlantic's Response:** Regarding Request for Production 23, we are willing to discuss an agreement on the issue of providing policies that contain "war exclusions" slightly different from the ones in the Policy.

**Your Position:** No. 24:   This Request seeks all "claims handling manuals, guidelines, policy statements, instructions, and other DOCUMENTS (and any changes thereto) from January 1, 2001 through the present that RELATE to YOUR procedures in assessing, handling, or addressing the WAR EXCLUSION."  Atlantic responded that it had not located any responsive documents.  (However, Atlantic did refer to "core principles" and "general claims practices" documents produced in response to No. 21.)

We need more detail regarding Atlantic's search.  For example, did Atlantic restrict its search for documents based on its "outside the scope" and "not reasonably limited in time" objections?  And if Atlantic truly has no responsive documents, as in other places, we need a clear, concrete written statement to that effect.



Mr. Daniel M. Hayes
February 20, 2017
Page 8

**Atlantic's Response:** As already discussed in prior correspondence, based on the knowledge of the current and former employees of Atlantic who oversee the handling of claims in both the entertainment division and other divisions, it has no manuals that specifically address the "War Exclusion."

**Your Position:** No. 25: This Request seeks any "financial statements, profit and loss statements, balance sheets, financial projections, or similar DOCUMENTS RELATING to YOUR profit/loss under the POLICY and under each of the earlier policies YOU issued to NBCUNIVERSAL … ." Atlantic objects that the requested information is not relevant and that it seeks trade secrets and proprietary information, and then confirms that it is withholding documents on the basis of those objections. As we noted in our previous meet-and-confer letter, we have a protective order, so the trade secret/proprietary information objections are not valid. And the information is relevant to our bad faith theory – i.e., Atlantic placed its own financial interests over the interests of its insured in refusing to honor the Policy. Let's discuss whether we are at impasse on this one, too.

**Atlantic's Response:** Atlantic is willing to provide a document that summarizes all the claims it has paid to NBC Universal Media, LLC over the course of the five policies it issued to that entity. Atlantic will redact the reserve information on the open claims that are listed on this summary, including the reserve for this claim because it is the reserve that has been set since the plaintiffs brought this lawsuit, which reflects Atlantic's confidential analysis of the lawsuit and its settlement value.

We hope our separate correspondence, the Second Amended Responses that were served, and these further comments will resolve the issues you have identified. Please let us know if there is further discussion needed on these issues.

Sincerely,

Carla C. Crapster
CCC:mg

8675047.4/SP/15247/0131/022017

EXHIBIT 22

# EXHIBIT 23

| From: | Hayes, Daniel |
|---|---|
| To: | "Reed, Toni" |
| Cc: | Coyoca, Lucia; Shalamitski, Valentine; "Keeley, Michael"; "Crapster, Carla" |
| Subject: | RE: Conference on Discovery Responses |
| Date: | Wednesday, February 22, 2017 11:04:57 AM |

Let's do 2:00 p.m. Pacific tomorrow, Thursday.  Please call me at the number below.



**Daniel M. Hayes | Partner, through his professional corporation**

T: 310.312.3216 | dmh@msk.com

**Mitchell Silberberg & Knupp LLP | www.msk.com**

11377 W. Olympic Blvd., Los Angeles, CA 90064

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

**From:** Reed, Toni [mailto:Toni.Reed@strasburger.com]
**Sent:** Wednesday, February 22, 2017 8:53 AM
**To:** Hayes, Daniel
**Cc:** Coyoca, Lucia; Shalamitski, Valentine; Keeley, Michael; Crapster, Carla
**Subject:** Re: Conference on Discovery Responses

Dan,

Working on the road today, and I cannot get free from a client meeting for a call this afternoon.  I propose either 9 am Pacific time tomorrow, or 2 pm Pacific time tomorrow (Thursday February 23).  We can discuss all open issues.  We will be producing the File for the claim discussed in the Gutterman testimony, but I will need to confirm that I can get that out tomorrow.

Best regards,
Toni Scott Reed

On Feb 21, 2017, at 7:58 PM, Hayes, Daniel <dmh@msk.com> wrote:

> Toni,
>
> We have reviewed Atlantic's second amended responses to UCP's first set of interrogatories, and Ms. Crapster's response to my January 30 email.  Notwithstanding Atlantic's second amended responses, Atlantic's discovery responses and document production remain deficient.   It has been over three weeks since my email initiating this dialogue, and Plaintiffs cannot wait any longer to have our call.  Please let me know ASAP whether you are available tomorrow, Wednesday, at 2:00 p.m. Pacific.
>
> Absent from Ms. Crapster's letter was any mention of the "Publicis" claim file that Mr.

                    EXHIBIT 23

Gutterman identified at his deposition.  On February 9, Mr. Keeley stated that your office had obtained a copy of the file that morning, and that Atlantic intended to produce it.  We have not received it.  Please send it to us so that we can discuss it in our call tomorrow.

In response to your questions (all of which we are happy to discuss tomorrow):

- As you know, we made another rolling production last Friday.  We anticipate making another rolling production of documents at the end of this week.  With that production, we will have completed the production of all non-damages related documents which we agreed to produce that are responsive to Plaintiffs' First Set of Requests for Production of Documents.  We are continuing to explore the availability of additional damages information or documents, and the next rolling production will likely include additional damages documents, but Plaintiffs' production of damages related documents is more fully addressed below.

- As you know, Plaintiffs have already produced an enormous amount of financial data supporting its damages claim which should address the majority of Atlantic's concerns regarding being able to assess the claim and its calculation.  Moreover, when our offices last discussed the issue on January 25, 2017, you indicated you wanted Plaintiffs to provide certain documents which are different than what you describe in your email below.  Specifically, during the call you indicated you wanted Plaintiffs to provide:  (a) documentation showing the tax credits provided by the Croatia and New Mexico taxing authorities and the accounting reports or documents submitted to the taxing authorities to substantiate the credits; (b) documents showing a further breakdown of the extra expenses (as currently reflected in the Extra Expense production bible in Excel format produced on October 26, 2016) by categories or synopsis, whether in Excel form or some type of a narrative; (c) a list of abbreviations used in the Extra Expense production bible (please note that this document was produced on February 14 as UCP004048-4075); and (d) documents provided to Plaintiffs' damages expert and relied upon by the expert to support Plaintiffs' damages calculation.  Please confirm that these are the documents that you are seeking.

- As to Mr. Smith's deposition, we previously advised you that, to the extent you are seeking to take Mr. Smith's deposition as a percipient witness, Mr. Smith resides in London, and we do not believe there is any authority to support your demand that he be made available in the United States so that you may depose him as a percipient witness.  If you have any such authority, please provide it.  However, as we also previously told you, Plaintiffs may be designating Mr. Smith as a Rule 30(b)(6) witness to testify as to those Rule 30(b)(6) topics which relate to security issues.  If that is

EXHIBIT 23

the case, then we will make Mr. Smith available in the United States.  That determination, however, has not yet been made.  If you want to take Mr. Smith's deposition as a percipient witness now, before Plaintiffs decide whether he will be designated to testify as to security topics, then his deposition will need to go forward in London.  If that is the case, please let us know ASAP, as we will need lead time to coordinate schedules and make travel arrangements.  (We also previously inquired whether you would like to explore taking the deposition by videoconference, but you have not responded.)

• As we previously advised you, we followed up with Foley & Lardner to determine if the additional documents had been produced.  We do not know if they have or not, and will follow up again.  We remind you again that we do not represent Aon, and do not control their document production.

• While we believe the information provided on the original Aon privilege log is sufficient under the Rules, to avoid further disputes, an amended Aon privilege log is attached.

• As to Plaintiffs' privilege log, we believe it is sufficient under the Rules, because all of the individuals listed therein are employed by NBCUniversal/UCP-related entities.  Thus, as to each individual identified on the privilege log, Atlantic knows that he/she is an employee of a Plaintiff or a parent, subsidiary, affiliated, or related entity to a Plaintiff. That should be sufficient information for you to be able to assess the privilege claim and evaluate whether the identified document is privileged.  If you have case authority for the proposition that you are entitled to additional detail identifying the specific entity each individual is employed by, please share it with us, and we will consider it.

Please confirm ASAP that you are available at 2:00 p.m. Pacific tomorrow, Wednesday, for our call.

Dan


**Daniel M. Hayes | Partner, through his professional corporation**
T: 310.312.3216 | dmh@msk.com
**Mitchell Silberberg & Knupp LLP | www.msk.com**
11377 W. Olympic Blvd., Los Angeles, CA 90064

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR

EXHIBIT 23

TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

---

**From:** Reed, Toni [mailto:Toni.Reed@strasburger.com]
**Sent:** Friday, February 17, 2017 2:01 PM
**To:** Hayes, Daniel; Coyoca, Lucia; Shalamitski, Valentine
**Cc:** Keeley, Michael; Crapster, Carla
**Subject:** RE: Conference on Discovery Responses

Daniel,

Greetings on a Friday afternoon.  I hope you are well.

As I advised below, we have worked with our client on a full set of Amended Responses and a letter discussion that our client has been reviewing and finalizing.  I indicated that, as soon as the amended responses are back from our client, we will be able to provide those and the accompanying letter, and we will be happy to propose a time to speak again.  Finally, I advised that we are moving the process as expeditiously as possible.  I did not indicate that I knew when these would be approved for service, but again, we are moving along as quickly as we can.  I have just received an update after 3:30 p.m. central time that I will not have the final and signed Amended Responses back in hand today.  I do anticipate that we will be serving them early next week (note that Monday is a federal holiday and company holiday for many), but I will know more on Monday.  Once again, I will state we are making every effort to expedite the process, and of course want to move forward on these items, and all outstanding discovery matters.

On some of our other pending issues, and in follow-up to my message to Valentine this week, can the Plaintiffs now confirm that they have produced the responsive documents that they have previously agreed to produce in regard to the Defendant's First Request for Production to Plaintiffs?  The prior message about the rolling production was that a final installment would be delivered by February 14, but I want to understand the most updated information you have on that.

If, based upon your current information, there will be any additional documents forthcoming, please let me know the date by which they will be received.  If there are others forthcoming, are they now limited to damage-related documents?

Regarding items from our January 25 telephone conference of counsel (where Lucia and Valentine participated):

1.  Have you discussed with your clients a search for categories of damage

EXHIBIT 23

documents as backup for the general item produced?  We had discussed (a) the government-related documents or audit records that exist, as a result of the fact that there were tax incentives in both Croatia and New Mexico, (b) the documents that reflect the breakdown of the full damages by categories or synopsis, both through Excel-type records and any reports or memos or analysis of categories and amounts incurred, and (c) the records that establish your clients' basis for arguing that the expenses were reasonable and necessary, including the documents reviewed by and relied upon by your damage expert.  Has your client agreed to produce those?

2.  Do you have a position from your client regarding making Mr. Smith available in the U.S. for his deposition, strictly for the pragmatic considerations discussed?

3.  Have you confirmed that the Aon documents noted as "redacted" on the initial privilege log have been actually redacted and will be provided?  We have understood from Aon previously that you as counsel were involved with designations of privilege, and therefore we direct the request for the redacted documents (relating to your designations of privilege) to you.

Finally, we are still waiting on an updated privilege log on the Aon documents, with specifics on individuals (regarding identification of title, employer, and designation as lawyer where applicable) mentioned in various correspondence.  Will that be available this week?

We also anticipate that you will be updating your clients' privilege log in light of the various recent rolling productions.  Additionally, we have sent requests that you complete the information on the existing privilege log, particularly with respect to identifying individuals by employer.  There is no confirmation that each is an employee of one of the Plaintiffs, and it is appropriate and necessary to identify their employers otherwise.  Will that be available this week?

I will appreciate your updates on all these items, and I'll look forward to working with you to progress through the discovery process for the case.

Best regards,
Toni Scott Reed

**Toni Scott Reed** • Strasburger & Price, LLP
901 Main Street, Suite 6000, Dallas, TX 75202
214.651.4345 • Fax 214.659.4091 • Strasburger.com

EXHIBIT 23

**From:** Hayes, Daniel [mailto:dmh@msk.com]
**Sent:** Friday, February 17, 2017 12:04 PM
**To:** Hayes, Daniel; Reed, Toni; Coyoca, Lucia; Shalamitski, Valentine
**Cc:** Keeley, Michael; Crapster, Carla
**Subject:** RE: Conference on Discovery Responses

Toni,

We have not received Atlantic's written response to my January 30 email or Atlantic's amended discovery responses. You also did not respond to my request for a date certain this week by which we would receive the promised written response and amended discovery responses. I have not heard from you at all since Tuesday.

Based on your communications on Tuesday, my understanding was that the above documents were done, with your client, and awaiting Atlantic's approval. Will we receive them by COB today?

Dan


-----Original Message-----
**From:** Hayes, Daniel
**Sent:** Tuesday, February 14, 2017 04:06 PM Pacific Standard Time
**To:** 'Reed, Toni'; Coyoca, Lucia; Shalamitski, Valentine
**Cc:** Keeley, Michael; Crapster, Carla
**Subject:** RE: Conference on Discovery Responses


Toni,

We are amenable to waiting to have our call until you send us your written response to my January 30 email and Atlantic's amended discovery responses, assuming we get them reasonably soon. Please let us know what day this week we can expect to receive those.

In response to your email to Val, yes, we will be making another rolling production today. As for potential future productions, we are continuing to explore what additional damages information/documents we may be able to provide. I suggest we add this to the list of items we discuss when we talk.

Dan

**<image001.gif>**
**Daniel M. Hayes | Partner, through his professional corporation**
T: 310.312.3216 | dmh@msk.com

EXHIBIT 23

**Mitchell Silberberg & Knupp LLP** | **www.msk.com**

11377 W. Olympic Blvd., Los Angeles, CA 90064

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

**From:** Reed, Toni [mailto:Toni.Reed@strasburger.com]
**Sent:** Tuesday, February 14, 2017 12:14 PM
**To:** Hayes, Daniel; Coyoca, Lucia; Shalamitski, Valentine
**Cc:** Keeley, Michael; Crapster, Carla
**Subject:** Conference on Discovery Responses

Daniel,

I'm following up on my phone message to you from earlier today.  We had planned to speak at 2:00 p.m. your time today to address your letter of January 30, on the subject of discovery responses from Atlantic.  On behalf of Atlantic, we have been in the process of addressing the individual issues you raised, and also in the process of updating information that has been identified and gathered, to respond to your letter.  As the process has moved forward, we have determined that we will be serving amended responses to discovery.  We also have a letter that addresses the still-open items that we have not already written to you to discuss before this week.  As soon as the amended responses are back from our client, we will be able to provide those and the accompanying letter.  We are happy to talk today, but we are not yet in a position to communicate our client's responses.  We are also happy to propose a time as soon as we have the responses and letter out to you.  We are moving the process as expeditiously as possible.

Best regards,
Toni Scott Reed

**Toni Scott Reed** • Strasburger & Price, LLP
901 Main Street, Suite 6000, Dallas, TX 75202
214.651.4345 • Fax 214.659-4091 • Strasburger.com

*This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Strasburger & Price, LLP immediately -- by replying to this message or by sending an email to postmaster@strasburger.com -- and destroy all copies of this message and any attachments. Thank you.*

&lt;AON Amended Privilege Log (8626197).pdf&gt;

# EXHIBIT 24

| From: | Reed, Toni |
|---|---|
| To: | Hayes, Daniel; Crapster, Carla; Keeley, Michael |
| Cc: | Coyoca, Lucia; Shalamitski, Valentine |
| Subject: | RE: UCP, et al. v. Atlantic |
| Date: | Thursday, March 02, 2017 5:36:29 PM |
| Attachments: | image001.gif |

Dan,

The summary you set out below regarding the discussions of February 23 and 24 is incomplete in many respects.  If you are truly asking us to provide a written statement of all the additional and/or different content that we covered, and all points you have not stated below, we can refer to our notes and do so.  We will provide that when we are able to do so, so that you can have our specific responses.

This is our notice that we do not read this set of summaries to be fully accurate or complete.

Best regards,

Toni Scott Reed

**Toni Scott Reed** • Strasburger & Price, LLP
901 Main Street, Suite 6000, Dallas, TX 75202
214.651.4324 • Fax 214.659-4091 • Strasburger.com

---

**From:** Hayes, Daniel [mailto:dmh@msk.com]
**Sent:** Thursday, March 02, 2017 6:55 PM
**To:** Reed, Toni; Crapster, Carla; Keeley, Michael
**Cc:** Coyoca, Lucia; Shalamitski, Valentine
**Subject:** UCP, et al. v. Atlantic

Toni and Carla,

This email confirms that portion of our February 23, 2017 telephone conference regarding the issues raised in my January 30, 2017 email to you.

**The "Publicis" File**

You sent this to us by email right before the call.  We had some initial questions:

1. Is there a hard copy file pertaining to the "Publicis" claim?  I referenced Mr. Gutterman's testimony on the subject – he said that a hard copy file might exist, and if it did it he believes it would be in his office.  Gutterman Depo. 128:5-11.  You said that you did not know, and that you would check.  Please let us know ASAP.

2. We asked why so much information was redacted.  You said generally that you redacted personal information and information regarding the "creative process" of your insured.  After we complete our review of the file, we will let you know what further questions we have regarding your redactions.

EXHIBIT 24

3.   I noted that the insurance policy was not in the file you sent, and asked you to send us the policy at issue in the Publicis claim.  (I have since reviewed the Dig Claim file that Atlantic produced in discovery, and note that the policy applicable to the Dig Claim does appear in that file.)  You said you would check to see whether you could locate the policy at issue in the Publicis claim.  Please check before we talk at 2:00 p.m. Pacific on Monday and be prepared to address this issue in that call.

We will review the file further and follow up with you if we have additional questions.

**The "Middle East Claim" File**

The "Middle East Claim" is the claim that Ms. Gooley identified at her deposition on February 8.

1.   You stated that you did not think this file was responsive to any of the requests in UCP's first set of requests for production of documents.  I noted that our position is that it is responsive to several requests (see my February 9 email to Mr. Keeley), but that we have now specifically requested the file in our second set of requests.  You said that you would respond to our second set of requests for production when such responses come due.

2.   When we discussed this file in connection with RFP No. 23, which seeks policies that contain a War Exclusion, you said that you would check to see if you had the policy that corresponds to the Middle East Claim and whether it contains a War Exclusion, and that you would let us know.  Please do ASAP.

**The "Entertainment Claims Manual"**

This is the manual that Peter Williams testified he helped draft.  You claimed that you did not know what Mr. Williams was referring to.  We find it inconceivable that no one at Atlantic has any idea where this manual might be, or what happened to it.

**Interrogatories**

**Nos. 3, 5-14:**  In my January 30 email, I asked that you amend Atlantic's responses to these interrogatories by removing the oblique references to general sources and by providing all of the specific facts that are responsive to each interrogatory.  During our call, I noted that instead of fixing this "lack of specificity" problem in its second amended responses, Atlantic compounded it, and appeared to be attempting to leave the door open to introduce facts at trial that it has not identified in response to these interrogatories.  In particular, I pointed to the following new statement in Atlantic's second amended responses:  "Atlantic refers to and incorporates the documents it has produced in this case, and further incorporates and refers to the documents identified in the documents it has produced in this case, as the response to this interrogatory may be determined by examining those documents, and the burden of ascertaining such response is substantially the same for the Plaintiffs as it would be for Atlantic."  During our call, you said this statement meant that Atlantic was relying on all of the documents it produced, the documents referenced in the documents it produced (which were not themselves produced), and – in some instances – the documents referenced by footnote in the documents that were referenced (but not

produced) in the documents that Atlantic produced.  I asked whether Atlantic had the documents and videos referenced in the documents that Atlantic had produced.  (*E.g.*, Daniel Gutterman's emails to himself.)  You said "no."  I inquired whether you would get them and produce them to us.  You declined.

I said that this was unacceptable, of course, because the point of a contention interrogatory is to define and limit the universe of facts that the responding party is relying upon to support its position.  You responded that the facts that were specifically listed in the interrogatory responses were the only ones Atlantic could identify now.  You said the sources for these facts are the written records – all of which you claim have been produced to Plaintiffs – and witness interviews.  You said the only new facts you could anticipate would come from the depositions of former Atlantic employees – like Pamela Johnson – who Atlantic no longer controlled, and whose testimony Atlantic could not predict or anticipate.  Thus, you said the statement "the discovery process continues" in Ms. Crapster's February 20, 2017 letter does not mean that Atlantic is continuing to search its records and interview its personnel to gather more information responsive to UCP's interrogatories.  It means that more information might be discovered during the depositions of witnesses like Pamela Johnson, who are no longer employed by Atlantic – "what is in their heads," as you put it.

I noted that it was incorrect for Atlantic to claim that the burden of identifying the facts that it was relying upon, among the thousands of pages Atlantic has produced, was the same for Plaintiffs as for Atlantic.  Only Atlantic is in a position to identify the facts upon which it is relying.  You did not respond to this point.

I confirmed that in the event Atlantic attempted to introduce any fact at trial that was responsive to any of Plaintiffs' interrogatories but that was not specifically identified in Atlantic's responses, Plaintiffs would take the position that any and all such facts should be excluded from evidence.  You said you would dispute that position.

**No. 4:**  Atlantic's response to this interrogatory is plagued by the same issues as Nos. 3 and 5-14.  Here, I asked if Atlantic had reconsidered its refusal to produce the coverage opinion obtained from Leon Gladstone, given that Atlantic witnesses have been relying on it in response to deposition questions. You said no, Atlantic's position has not changed.  You noted that Atlantic had not asserted an "advice of counsel" defense in its answer.  I asked whether any Atlantic witnesses were going to reference the coverage opinion that Atlantic procured in any of their testimony at trial.  You said that you could not predict what the witnesses were going to say.  I asked whether you were going to elicit such testimony from the witnesses.  You said that you were not going to discuss your trial strategy.  I asked whether you were going to mention the coverage opinion in Atlantic's opening statement.  You repeated that you were not going to discuss your trial strategy.

**Nos. 15 and 16:**  You said that it would be "incredibly unwieldy" to search for documents that evidenced Atlantic's consideration of a War Exclusion before July 2013, and that Atlantic is not willing to do so.  You also said that Atlantic's electronic claims files are not searchable.  I stated our position that limiting Atlantic's search to post-July 2013 material was not appropriate, but explored whether Atlantic would admit, with the exception of the Dig Claim, that it has never denied a claim based on a War Exclusion, and that with the exception of the Dig Claim and the Publicis Claim, it has

never considered the application of a War Exclusion.  You said that you might consider admitting the same, but would not commit, stating that you would need to see the RFAs.  See RFA No. 26-29, propounded by UCP on February 10.  We maintain that Atlantic's decision to limit its review of documents to those dating back to July 2013, only, is insufficient and inappropriate under the Rules.

**Requests for Production of Documents**

**Status of Production:**  You reconfirmed that Atlantic has produced all of the documents it said it would produce in response to UCP's First Set of Requests for Production, and that you have logged all of the documents Atlantic withheld on the basis of the attorney-client privilege and attorney work product doctrine.

**Nos. 1, 6, 7, 9, 11, 13, and 22:**  You stated that, with the exception of documents withheld on the basis of the attorney-client privilege and attorney work product doctrine, you have produced all documents that are responsive to these requests that relate to the Policy, the Dig Production, or the Dig Claim.  As for documents that are responsive to these requests that relate to the War Exclusion but not the Policy, the Dig Production, or the Dig Claim, you restated your position that Atlantic's search for documents dating back to July 2013 was sufficient.  As you know, we disagree with your position.  You confirmed that, with the exception of the documents it has produced that relate to the Dig Claim, the Publicis claim file (which you produced on Thursday, February 23), and Mr. Gutterman's email to himself regarding the Publicis claim (Deposition Exhibit 14, ATL000785-793), Atlantic has not located any documents related to the War Exclusion.

**Nos. 2, 3-5, 8, 10, 12, 14-18, 21, and 26-32:**  You confirmed that all non-privileged responsive documents have been produced, and that the documents that you have withheld on attorney-client privilege or attorney work product grounds have been logged.

**No. 20:**  You stated that if we can agree on language, you will agree to enter into a formal stipulation to obviate the need to produce documents in response to this request.  We propose the following language:  "For purposes of this case, the officers, employees, and other agents of OneBeacon and any of its affiliated entities were at all times and are, likewise, the officers, employees, and agents of Atlantic, for the entire duration of their employment or other affiliation with OneBeacon or its affiliated entity."

Please let us know if this language is acceptable.  If it is, we will prepare a formal stipulation.

**No. 23:**  Here, we asked for an exemplar of every Atlantic policy form that has a War Exclusion that differs in any way from the War Exclusion at issue in this case.  You stated that searching for such documents would be a "manual process" that would take six people working almost around the clock two-and-one-half months.  I asked whether you had asked anyone in the underwriting department whether they were aware of any policy forms that contained a War Exclusion that was different from the one at issue.  You said you had not done so, but would explore that question with Atlantic.

**No. 25:**  I explained our position that we are entitled to all of the documents responsive to this request to support our bad faith claim – not merely the "document that summarizes all the claims

[Atlantic] has paid to NBC Universal Media, LLC over the course of the five policies it issued to that entity" offered in Ms. Crapster's February 20 letter.  You responded that you were only authorized to produce what was offered in the February 20 letter.

Please let me know if you feel that any portion of what I have summarized above is not accurate.

Dan



**Daniel M. Hayes** | **Partner, through his professional corporation**
T: 310.312.3216 | dmh@msk.com
**Mitchell Silberberg & Knupp LLP** | **www.msk.com**
11377 W. Olympic Blvd., Los Angeles, CA 90064

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

*This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Strasburger & Price, LLP immediately -- by replying to this message or by sending an email to postmaster@strasburger.com -- and destroy all copies of this message and any attachments. Thank you.*

EXHIBIT 24

# EXHIBIT 25

| | |
|---|---|
| **From:** | Hayes, Daniel |
| **To:** | "Reed, Toni"; "Keeley, Michael"; "Crapster, Carla" |
| **Cc:** | Coyoca, Lucia; Shalamitski, Valentine |
| **Subject:** | RE: UCP, et al. v. Atlantic |
| **Date:** | Friday, March 10, 2017 2:01:01 PM |
| **Attachments:** | UCP et al. v. Atlantic.msg |
| | UCP v. Atlantic - Waiver of Privilege Issue.msg |

Toni,

Of course you may have more time to consider my request.  I asked for a response by COB yesterday because (a) I did not think you would have any objection to trying Magistrate Judge Wilner's informal procedure before motion practice, and (b) the issues with Atlantic's discovery responses that I listed need to be resolved without further delay.  For example, as we told you before, we would like to resolve the dispute over production of the coverage opinion and related documents before taking Pamela Johnson's deposition.  Can you please confirm your willingness to participate in Magistrate Judge Wilner's informal procedure by COB today?

Suffice it to say that I was surprised at your suggestion that involving the Magistrate Judge is "premature."  Each of these issues has been the subject of extensive written and oral meet-and-confer efforts spanning more than three months, including our detailed November 29, 2016 meet-and-confer letter, your subsequent telephonic meet-and-confer with Valentine Shalamitski, my January 30, 2017 follow-up email, and our February 23, 2017 telephonic meet-and-confer.  We are at impasse on each one.  Specifically:

1. *Discovery of the coverage opinion Atlantic procured in connection with the Dig Claim, and related correspondence and other documents.*

   We addressed this issue in our November 2016 and January 2017 correspondence, and in both of the telephonic conferences.  Please see my email confirming our February 23 call, attached again to this email for your reference.  As I told you during our call, there is no requirement that counsel identify each and every case that supports its position during the meet-and-confer process, and we have already identified several cases in our correspondence.  If we locate other cases that support our position we will cite them.  We expect you will do the same in support of your position.  But we have exhausted the meet-and-confer process, and there is no reason to delay bringing this matter to the Magistrate Judge.  Indeed, Ms. Crapster already confirmed this in her February 6 email that you reference (attached):  "At this point, if you still believe Atlantic has waived the attorney-client privilege as to the coverage opinion it obtained in July 2014 and the surrounding communications, **we believe the meet-and-confer obligations have been satisfied, and we look forward to resolving this dispute with the magistrate's assistance**."  (Ms. Crapster also says in her email that you do not believe Plaintiffs contend an express waiver occurred.  That is not correct.  In putting the coverage opinion at issue, Atlantic has also selectively disclosed its content.  For example, after Ms. Crapster's email, Ms. Gooley testified as to the content of the coverage opinion (*see, e.g.,* page 186 of the transcript).  Plaintiffs contend this was an express subject matter waiver of any attorney-client privilege applicable to the coverage opinion.  We understand you disagree.  As Ms. Crapster indicated in her email, the next step is to discuss these issues with the Magistrate Judge –

EXHIBIT 25

not perpetual meet-and-confer letters and calls.)

2. *The sufficiency of Atlantic's responses to Plaintiffs' Interrogatory Nos. 3-14.*

You claim that you are not aware of Plaintiffs' position.  This is disingenuous given the amount of time we spent discussing it on February 23.  Please review my email confirming that call.  Atlantic's boundless incorporation by reference of documents and testimony in its second amended responses has compounded the "lack of specificity" problem that I discussed in my January 30 email.  We are clearly at impasse, and this is precisely the kind of issue that an informal call with the Magistrate Judge would help resolve.

3. *The sufficiency of Atlantic's search for documents concerning instances in which it has: (1) denied an insurance claim based on a "war" exclusion; or (2) considered the applicability of a "war" exclusion to an insurance claim, but ultimately paid the claim.*

Again, you claim that you "are not aware of what challenges to sufficiency Plaintiffs may still be making."  We discussed the challenges at length during the February 23 call.  Please review the confirming email, including the summary of our discussion regarding Interrogatory Nos. 15 and 16 (*e.g.*, "We [Plaintiffs] maintain that Atlantic's decision to limit its review of documents to those dating back to July 2013, only, is insufficient and inappropriate under the Rules.").

4. *The sufficiency of Atlantic's agreement to produce financial documents responsive to RFP No. 25.*

You claim not to know where we stand on this one, either.  Our position as to why these documents are discoverable was clearly stated in our November 2016 correspondence.  It was stated again in our January 2017 correspondence.   It was discussed at length on the February 23 call, during which you brought our discussion of this issue to a close by stating you were not authorized to produce anything more than the summary document offered in Ms. Crapster's February 20 letter.  We have explained over and over why that document is not sufficient.  There is simply nothing more that can be done without the Magistrate Judge.

Please confer with your client and confirm to me that Atlantic is willing to participate in the informal pre-discovery motion telephonic conference that Magistrate Judge Wilner offers.  Please do your best to get me that confirmation before COB today, but we need an answer by COB on Monday at the latest.  If you so confirm, I will then send you a proposed neutral background and summary of each issue.  Then at an agreed time on Monday, we can simultaneously exchange our respective positions (which we propose should be limited to two or three short paragraphs).  We do not understand Magistrate Judge Wilner to want citations to case law, so we do not intend to include any in our portion.  After the simultaneous exchange, I will consolidate our respective positions into one email we can send to Magistrate Judge Wilner.

Please let me know.

Dan

                    EXHIBIT 25



**Daniel M. Hayes | Partner, through his professional corporation**

T: 310.312.3216 | dmh@msk.com

**Mitchell Silberberg & Knupp LLP | www.msk.com**

11377 W. Olympic Blvd., Los Angeles, CA 90064

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

**From:** Reed, Toni [mailto:Toni.Reed@strasburger.com]
**Sent:** Thursday, March 09, 2017 3:28 PM
**To:** Hayes, Daniel; Keeley, Michael; Crapster, Carla
**Cc:** Coyoca, Lucia; Shalamitski, Valentine
**Subject:** RE: UCP, et al. v. Atlantic

Dan,

Will you kindly provide the professional courtesy of allowing more than a few hours to respond on substantive issues?  It is very difficult (sometimes impossible) to respond to a same-day demand when a day is already fully booked with client obligations away from the office, and when there is not sufficient time to confer with our client.  I'll appreciate your cooperation on that issue, particularly in this context, when there does not seem to be a reason for placing this type of arbitrary deadline.

In regard to the discovery points below, I'll note that each seems premature, as Atlantic is not aware of the most current position of Plaintiffs, and as Atlantic needs to be advised, ahead of any submission, on the relevant details, as set forth below.  In addition, Atlantic will point out that it has continued to confer with you on such points, and has provided more information, amended discovery responses, and additional documents, in order to attempt resolution.

1.  Coverage opinion- We have written to you (see email of February 6) with a full discussion of the facts of this case and the legal authorities you cited in support of your assertion that there has been waiver of privilege.  We spoke at length on this point during a conference of February 23, and I very specifically asked whether Plaintiffs are relying upon other legal authorities not provided, or other arguments not specified.  You did not answer those questions during the call.  I've received nothing since.  Therefore, Atlantic is not aware of Plaintiffs' current position or whether it relies on other arguments or authorities, not yet disclosed to Atlantic.  Atlantic is entitled to know this information in order to determine how it will respond to such positions, whether there is need for action before the Court, and what will be raised.  Please advise whether Plaintiffs are relying upon other case law or arguments, as we assume that those would be the substantive basis for any motion to compel by Plaintiffs.

EXHIBIT 25

2.   Interrogatory Nos. 3-14 – We spoke at length on February 23 on these various responses. We discussed the basis for providing a response to each (some of which reach up to about 8 pages of material), with very specific details included.  Plaintiffs have not specified what about these lengthy responses is either non-responsive or incomplete.  Therefore, Atlantic is not aware of Plaintiffs' current position or what the specifics would be regarding a need for action before the Court.  Atlantic is not aware of what Plaintiffs assert is missing from the responses, and therefore what would be sought to be compelled, as the substantive basis for a motion.  What relief would be sought?  Will you please specify this for items 3 through 14, and advise how you believe this amount of detail addressed in such interrogatories could be reasonably handled in a telephone conference setting?

3.   Search for "war" documents – We spoke at length on February 23 on the search conducted and additional inquiries made (which has also been described in detail in multiple written discovery responses provided to Plaintiffs).  Plaintiffs' counsel have questioned witnesses during depositions on the subject of addressing other war claims, if any.  A full response has been provided, regarding the results of the search and inquiry, including the documents associated with the sole claim that was identified where the war exclusion language was at least reviewed.  You have also received copies of the portions of other insurance policies where the war exclusion language appears.  We are not aware of what challenges to sufficiency Plaintiffs may still be making, and therefore cannot determine whether there is need for action before the Court.  Please specify the relief which Plaintiffs would be seeking in any motion to compel.

4.   Request for Production 25 – An offer of production of documents was made and referred to during the conference of February 23.  The documents referenced do respond to the subject raised.  The cumulative loss run will be produced in the case.  Plaintiffs also have their own records of all claims submitted and losses paid under the various policies.  If Plaintiffs are seeking additional documents from Atlantic, what are the particular ones sought, and what is the relief that will be requested in any motion to compel?  On what grounds do Plaintiffs argue that further documents are discoverable, in the context of this contract claim?

At this point, we cannot say that participating in the telephone conference procedure would be necessary, appropriate, or helpful.  Atlantic is entitled to know, with specificity, the particulars that would be put before the court and the precise relief sought (as mentioned above), before we can confer about the process.  We will be happy to review the responses to the above matters from Plaintiffs, so that we can have a written statement of the specifics of any remaining issues that Plaintiffs believe would require a motion, and to communicate with you our response on such matters, and our thoughts about whether the telephonic conference step appears to be appropriate here, in light of the particulars at issue.

We will separately send to you the items outstanding from Plaintiffs, addressed previously on February 25 and this week, that may also require action through a motion to compel procedure.

Best regards,
Toni Scott Reed

**Toni Scott Reed** • Strasburger & Price, LLP
901 Main Street, Suite 6000, Dallas, TX 75202
214.651.4345 • Fax 214.659-4091 • Strasburger.com

---

**From:** Hayes, Daniel [mailto:dmh@msk.com]
**Sent:** Thursday, March 09, 2017 12:22 PM
**To:** Reed, Toni; Keeley, Michael; Crapster, Carla
**Cc:** Coyoca, Lucia; Shalamitski, Valentine
**Subject:** UCP, et al. v. Atlantic

Toni,

As you know, we have been unable to resolve the following issues (among others) with Atlantic's responses to Plaintiffs' first set of written discovery:

1. Discovery of the coverage opinion Atlantic procured in connection with the Dig Claim, and related correspondence and other documents.

2. The sufficiency of Atlantic's responses to Plaintiffs' Interrogatory Nos. 3-14

3. The sufficiency of Atlantic's search for documents concerning instances in which it has: (1) denied an insurance claim based on a "war" exclusion; or (2) considered the applicability of a "war" exclusion to an insurance claim, but ultimately paid the claim.

4. The sufficiency of Atlantic's agreement to produce financial documents responsive to RFP No. 25.

We intend to request a telephonic conference with Magistrate Judge Wilner before filing a discovery motion, pursuant to his Civil Procedures (available at https://www.cacd.uscourts.gov/honorable-michael-r-wilner).  By close of business today, please confirm you are prepared to participate in Magistrate Judge Wilner's procedure.  Assuming you so confirm, I will send you our portion of the initiating email, so that you can fill-in Atlantic's portions.

Dan

**msk**

**Daniel M. Hayes | Partner, through his professional corporation**
T: 310.312.3216 | dmh@msk.com
**Mitchell Silberberg & Knupp LLP | www.msk.com**
11377 W. Olympic Blvd., Los Angeles, CA 90064

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE

DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

*This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Strasburger & Price, LLP immediately -- by replying to this message or by sending an email to postmaster@strasburger.com -- and destroy all copies of this message and any attachments. Thank you.*

EXHIBIT 25

# EXHIBIT 26

| From: | Hayes, Daniel |
| --- | --- |
| To: | "Crapster, Carla"; Coyoca, Lucia; Shalamitski, Valentine |
| Cc: | "Keeley, Michael"; "Reed, Toni" |
| Subject: | RE: UCP v. Atlantic - Response to Last Night"s Letter |
| Date: | Wednesday, March 15, 2017 6:03:14 PM |

Carla,

First, we are at an impasse on the four issues identified in my March 9 email to you, which have been discussed over and over for more than three months.   Your stated belief that "further meet-and-confers are necessary" with respect to these four issues is wholly without basis.  In addition to our extensive written correspondence, we have already discussed these issues for hours, and we see no need to discuss them any further unless Atlantic has changed its position with respect to any of the four issues.  Nevertheless, we are willing to have one final meet and confer on these four issues tomorrow (Thursday) at 12:00 p.m. Pacific.   If we cannot conclusively resolve the four issues during our call tomorrow, and if you will not agree to participate in a telephone conference with the Magistrate Judge *now* on our four issues, we intend to proceed with a discovery motion on these issues on Monday.

Second, I addressed all of the issues set forth in your March 10 letter in my March 14 letter.  As set forth in my letter, you need to provide us with more information (including, for example, legal authority for your various positions), and we need time to consider the same with our clients, before we can have a meaningful telephonic meet-and-confer.  We will not be in a position to do so on Monday.  That is precisely why your attempt to tie our clients' respective issues together was inappropriate.   After I receive your substantive written response to my March 14 letter, we can discuss whether a telephone conference would be fruitful, and if so, when to conduct it.

Please recall, it took over three weeks for you to respond to my January 30 email, which was the second written meet-and-confer correspondence to you covering Plaintiffs' four issues.  As I said in my correspondence yesterday, unlike Atlantic, we are willing to participate in an informal telephone conference with Magistrate Judge Wilner regarding Atlantic's purported issues with Plaintiffs' document production and privilege log, if and when we complete the meet-and-confer process on those issues, and to the extent any issues remain after such process has finished.  But we will not be forced to meet-and-confer regarding Atlantic's issues (some of which are brand new as of March 10) on a rushed and unreasonable schedule simply because you would like to present them to the Magistrate Judge at the same time we present our issues.

We are also waiting for your response to my March 14 correspondence regarding our deposition notices.  We need to start scheduling the depositions we noticed, for dates between March 22 and April 5.  Please respond to my March 14 letter on that issue, and let us know your witnesses' availability.

Thank you.

Dan

EXHIBIT 26



**Daniel M. Hayes** | **Partner, through his professional corporation**

T: 310.312.3216 | dmh@msk.com

**Mitchell Silberberg & Knupp LLP** | **www.msk.com**

11377 W. Olympic Blvd., Los Angeles, CA 90064

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

**From:** Crapster, Carla [mailto:Carla.Crapster@strasburger.com]
**Sent:** Wednesday, March 15, 2017 11:57 AM
**To:** Hayes, Daniel; Coyoca, Lucia; Shalamitski, Valentine
**Cc:** Keeley, Michael; Reed, Toni
**Subject:** UCP v. Atlantic - Response to Last Night's Letter

Dan,

We have reviewed your letter sent last night. We do not  agree with the position that none of our issues are ready to be presented to the magistrate. And as to your statements about the urgency of your client's issues, our issues are every bit as urgent– more so given that we are still waiting on a privilege log from you, which you now say will not come until next Monday. And as you know, we believe further meet-and-confers are necessary on your issues, as well.

In short, we do not agree to go to the magistrate judge with only your four issues this week.

Mike and Toni are both traveling today, and we have not had a chance to put together a substantive response that fully responds to all the issues you raised in your letter we received at 8:38 p.m. last night. We will get that to you as soon as possible. In the meantime, we propose one last telephonic meet-and-confer on Monday of next week, in which we in which we make every effort to reach final decision on all issues (yours and ours) so that they are all ready to go before the magistrate. Please let us know if you will agree, and if so, what time works best for you.

Carla

**Carla Crapster** • Strasburger & Price, LLP
901 Main Street, Suite 6000, Dallas, TX 75202
214.651.2034 • Fax 214.659.4060 • Strasburger.com

*This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Strasburger & Price, LLP immediately -- by replying to this message or by sending an email to postmaster@strasburger.com -- and destroy all copies of this message and any attachments. Thank you.*

# EXHIBIT 27

| From: | Hayes, Daniel |
|---|---|
| To: | "Crapster, Carla" |
| Cc: | Coyoca, Lucia; Shalamitski, Valentine; Keeley, Michael; Reed, Toni |
| Subject: | RE: UCP v. Atlantic - Plaintiffs" Outstanding Discovery Issues |
| Date: | Monday, March 20, 2017 8:21:39 AM |
| Attachments: | image001.gif |

Carla,

Our position has not changed.  As I said in my correspondence last week, we have exhaustively conferred over Plaintiffs' four issues over several months and are at an impasse.  Your suggestion that you do not understand Plaintiffs' position on any of these issues is simply not credible.

But in any event, I asked you to call me on Friday if you wanted to discuss any of Plaintiffs' issues or had any questions.  You did not call me.  Again, if you would like to discuss any of Plaintiffs' issues further or have any questions, please call me.  But we are not going to delay our discovery motion waiting for another call – The meet-and-confer requirement has been satisfied in connection with Plaintiffs' four issues (as you said yourself with respect to Issue No. 1).

Dan



**Daniel M. Hayes** | **Partner, through his professional corporation**
T: 310.312.3216 | dmh@msk.com
**Mitchell Silberberg & Knupp LLP** | **www.msk.com**
11377 W. Olympic Blvd., Los Angeles, CA 90064

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

**From:** Crapster, Carla [mailto:Carla.Crapster@strasburger.com]
**Sent:** Friday, March 17, 2017 4:08 PM
**To:** Hayes, Daniel
**Cc:** Coyoca, Lucia; Shalamitski, Valentine; Keeley, Michael; Reed, Toni
**Subject:** RE: UCP v. Atlantic - Plaintiffs' Outstanding Discovery Issues

Dan,

We *do* still want to present both our issues to the magistrate together. See the last two sentences of my e-mail below. And we see no reason why they cannot both be ready next week. We are sending a letter to you today providing you with our legal authority for the positions on which you have asked for our legal authority. But please note that you raised many of these requests in your letter that we received Tuesday night. We have taken a *very* reasonable amount of time to prepare a response letter (less than three days).

In response to each of the items you listed below:

EXHIBIT 27

1.   Discovery of the Coverage Opinion

We have explained to you our position that the case law you *have* presented does not support the proposition for which you are citing it. You have cited cases that stand for the general proposition that when the advice of counsel is put "at issue" in a case – for example, in a malpractice lawsuit in which the issue is whether an attorney provided sound legal advice – the attorney-client privilege is waived. What you have *not* provided is a case suggesting that a lawyer's advice is put "at issue" when there is a mere mention of the fact that advice of counsel was obtained. This seems to be your client's position, and we have seen no case law that supports this at all. We explained why the cases you cited earlier were clearly distinguishable. That is the reason for our continued follow-up on this issue: you have provided us with no case law that actually supports your position. Here is our remaining question that we need resolved before we are prepared to appear before the magistrate: Do you have any case law supporting your position that a coverage opinion is put "at issue" when its existence is merely mentioned? Additionally, what are the precise waiver facts upon which you are relying for your position to compel?

2.   Atlantic's Responses to Interrogatory 3-14

It appears we do have genuine disagreement on this point.  You have not identified how the responses provided fail to answer the interrogatory posed – they do so in as much detail as can be provided.

3.   The Sufficiency of Atlantic's Search

You note that you cannot be ready to move forward with our issues next week because you will need time to present "any proposed solutions" with your client. But you contend that all your issues are ready to appear before the magistrate despite proposing in your e-mail sent at 10:21 p.m. last night a new solution on this key issue: suggesting that Atlantic expand its search to January 1, 2010. We obviously have not had time to discuss this proposed solution with our client. Based on the time it took to run the last search and review the documents we received in response to that search, we see no way that this search and the follow-up review does not take 30-45 days. Such a search will obviously be extremely expensive and completely unnecessary, given that we have inquired of the people who have worked in Atlantic Entertainment's claim department since 2010, and OneBeacon's chief claims officer who has held that role since April 2010, whether they recall any claims involving the war exclusion – a memorable issue – and they have all said no.  You have told us that Atlantic should bear the cost of any search for invoices because such a search is unreasonable in your view. We are taking the same position on any further computer search and the resulting review by attorneys of the documents received from that search. We do not believe you have any reasonable basis to force us to go through this expensive process yet again. Moreover, you are incorrect in stating that our search had a "one-year look-back." Our search began in July 2013 and went through the date of the search, which was late last year. It covered more than three years, and the plaintiffs are obviously every bit as interested in claims involving the war exclusion after July 2014 as they are in claims arising before that date.

Regarding your suggestion that we unqualifiedly admit to RFAs 34 and 35 before the thirty-day time frame we have to consider this issue, we can only respond that if you needed our response to these RFAs as a matter of urgency, they should have been included in the first set of RFAs.  As you are surely aware, however, RFAs 34 and 35 are nearly identical to RFA 28. Please see our response to that RFA.

In short, we need time to confer with our client on your new proposed solution. But we expect the response to be that it will take significant time and resources. Please let us know your position on whether you would like us to conduct the search and review of the search results at the plaintiffs' expense.

4.   Financial Documents

The documents are not "readily available." It will certainly take time to gather these documents. We understand the plaintiffs' relevancy argument to be that Atlantic was incentivized to deny the Dig claim because the account was already unprofitable. We obviously do not agree with this argument. But to the extent you intend to make that argument, you already have all the information needed to prove that the account was unprofitable. We have provided you with the loss runs, and in any event NBC is already aware of how much it received in payments from Atlantic and how much it paid in premiums. Atlantic's own internal calculations on this point and its decision on how much to charge in premiums are confidential and proprietary information that have no relevance and can add nothing to the argument NBC intends to make. You have not explained to us why you need the additional information beyond what you already have, and we need an explanation on that issue before we are prepared to go before the magistrate.

Sincerely,
Carla

**Carla Crapster** • Strasburger & Price, LLP
901 Main Street, Suite 6000, Dallas, TX 75202
214.651.2034 • Fax 214.659.4060 • Strasburger.com

**From:** Hayes, Daniel [mailto:dmh@msk.com]
**Sent:** Thursday, March 16, 2017 10:21 PM
**To:** Crapster, Carla
**Cc:** Coyoca, Lucia; Shalamitski, Valentine; Keeley, Michael; Reed, Toni
**Subject:** RE: UCP v. Atlantic - Plaintiffs' Outstanding Discovery Issues

Carla,

First, we will not agree to artificially tie Plaintiffs' discovery issues to Atlantic's discovery issues, for all of the reasons I have already stated.  Atlantic's issues are not ready for presentation to the Magistrate Judge, and they will not be ready next week based on our last letter exchange.  Again, as I have explained multiple times now, when we receive your response to my March 14 letter, we will need time to discuss it with our clients and consider, among other things, any legal authority you cite, any solutions you may propose, and/or whether further telephonic meet-and-confers would be

fruitful.  We do not see the need for further discussion on this point, and it appears you are no longer demanding that all issues be presented together – please confirm.

Second, Plaintiffs' four issues have been discussed to the point of exhaustion over the past three months and are ready for presentation to the Magistrate Judge now.  The meet-and-confer requirement has been satisfied, and despite our efforts, you have not corrected the deficiencies in Atlantic's discovery responses and document production.  They need to be addressed by the Magistrate Judge.  Here is our response to your latest questions (I will not repeat our respective positions in full – each side is well aware of the other's position):

1.  *Discovery of the coverage opinion Atlantic procured in connection with the Dig Claim, and related correspondence and other documents.*

You state:  "We need you to confirm that you do not have any other case law that you have not provided to us yet that you contend supports your position."  As I told you during our call, and again in my email on March 10: There is no requirement that counsel identify each and every case that supports its position during the meet-and-confer process.  If you believe there is such a requirement, send us the legal authority for the same.  We have cited at least five cases in our written correspondence on this issue, and we will almost certainly cite additional case law in our portion of the motion.  We assume you do not intend to limit your opposition to the single case you have cited in your email response to me on this issue.  (If this assumption is incorrect, please let me know.)

I note that, despite our multiple requests, you have not cited a single case to support Atlantic's position on any of the issues Toni identified in her March 10 letter.  So your implication that Plaintiffs must recite *all* of the cases they intend to rely on rings hollow.

2.  *The sufficiency of Atlantic's responses to Plaintiffs' Interrogatory Nos. 3-14*

Our issue is that Atlantic's responses incorporate, by general reference, all of the documents produced in the case, "documents identified in the documents" produced in the case (but not themselves produced), and all of its witnesses' deposition testimony.  In our call, Toni said Atlantic also intended to incorporate documents referenced in footnotes in some of the "documents identified in the documents it has produced in this case."  This is clearly inappropriate, and I am surprised that you disagree.  No further discussion is necessary.

3.  *The sufficiency of Atlantic's search for documents concerning instances in which it has: (1) denied an insurance claim based on a "war" exclusion; or (2) considered the applicability of a "war" exclusion to an insurance claim, but ultimately paid the claim.*

As we have discussed, it is Plaintiffs' position that Atlantic's arbitrary one-year look-back in its search for documents and information related to the War Exclusion is not sufficient.  We propose one of two solutions:

a.  Atlantic expands its search to documents and information dating back to January 1, 2010, as opposed to July 2013; or

EXHIBIT 27

b. Atlantic provides unqualified admissions to Request for Admission Nos. 34 ("Admit that, prior to the DIG CLAIM, ATLANTIC had never considered the application of a WAR EXCLUSION to an insurance claim other than the PUBLICIS CLAIM") and 35 ("Admit that, with the exception of the DIG CLAIM and the PUBLICIS CLAIM, ATLANTIC has never considered the application of a WAR EXCLUSION to an insurance claim.").

If you are willing to agree to one of the above two proposed solutions, please let me know immediately.  If you choose (b), please note that we will need the unqualified admissions next week.  We are not willing to wait until the current deadline for Atlantic to respond to Plaintiffs' second set of requests for admissions, if you would like to solve Disputed Issue No. 3 by accepting proposed solution (b).

4. *The sufficiency of Atlantic's agreement to produce financial documents responsive to RFP No. 25.*

We are at an impasse, as stated numerous times.  Plaintiffs have requested, and are entitled to, "[a]ny financial statements, profit and loss statements, balance sheets, financial projections, or similar DOCUMENTS RELATING to [ATLANTIC'S] profit/loss under the POLICY and under each of the earlier policies [ATLANTIC] issued to NBCUNIVERSAL … ."  We have already explained why the documents are relevant, and they must be readily available.  Indeed, you have not asserted any burden objection in response to No. 25, and have confirmed that you are withholding documents.  I have reviewed the document you sent today.  It is not sufficient, and Atlantic's document production in response to RFP No. 25 remains incomplete.

I am available tomorrow from 9:00 a.m. – 9:30 a.m. Pacific to discuss any of Disputed Issue Nos. 1-4 to the extent your position has changed or feel you need any further explanation regarding ours.  Please let me know.

Dan



**Daniel M. Hayes** | **Partner, through his professional corporation**
T: 310.312.3216 | dmh@msk.com
**Mitchell Silberberg & Knupp LLP** | **www.msk.com**
11377 W. Olympic Blvd., Los Angeles, CA 90064

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

**From:** Crapster, Carla [mailto:Carla.Crapster@strasburger.com]
**Sent:** Thursday, March 16, 2017 11:19 AM
**To:** Hayes, Daniel
**Cc:** Coyoca, Lucia; Shalamitski, Valentine; Keeley, Michael; Reed, Toni
**Subject:** UCP v. Atlantic - Plaintiffs' Outstanding Discovery Issues

EXHIBIT 27

Dan,

As you'll recall, Toni is out of town until tomorrow, and so a call for us at noon Pacific time today does not work. But we are hoping that the below e-mail can resolve our outstanding questions regarding the four issues you wish to take to the magistrate.

Here is what we need from you to feel that we are ready to proceed to the magistrate on your four issues:

Regarding the discovery of the Gladstone coverage opinion, we need you to confirm that you do not have any other case law that you have not provided to us yet that you contend supports your position. If you confirm this, we will be ready to proceed to the magistrate.

Regarding the sufficiency of Atlantic's responses to Plaintiffs' Interrogatory Nos. 3-14, we assume that as you stated in your e-mail of March 10, 2017, that your only issue with those interrogatory responses is that they have incorporated by reference documents and testimony. Assuming this is the case, we are ready to proceed to the magistrate on this issue.

Regarding the sufficiency of Atlantic's search for documents confirming that Atlantic has ever denied a claim on the basis of a war exclusion or considered the applicability of a war exclusion, please confirm that it is your client's position that Atlantic must run an electronic search for documents and e-mails generated by all of Atlantic and OneBeacon's branches of coverage dating back to January 1, 2001. Please further confirm that it is your position that the search we have run dating back to July 2013 and the inquiries we have conducted outside of this search is inadequate. Assuming this is the case, we are ready to proceed to the magistrate on this issue.

Finally, regarding Atlantic's agreement to produce financial documents, we are producing with this e-mail the document that we offered to produce earlier, that summarizes the cost of all claims that Atlantic paid over the course of its relationship with NBC Universal. We have redacted from this document only the amount of the reserve for open claims, including the *Dig* claim, as this document reflects the reserve that was set after the lawsuit had already been filed and Atlantic was preparing for mediation. This is a confidential number regarding Atlantic's settlement valuation of this case, and is also protected by the work-product doctrine. The only other numbers we have redacted are the totals that would allow the Plaintiffs to work backwards and do the math to calculate the amount of the reserve set for open claims, including the *Dig* claim. Please confirm that it is your client's position that this document does not provide the information that the Plaintiffs are seeking and that you intend to move to compel us to produce all financial statements, profit and loss statements, balance sheets, financial projections, or similar documents relating to Atlantic's profit/loss under the policy at issue in this case and the earlier policies Atlantic issued to NBC. Assuming you confirm this, we believe this issue is ready to proceed to the magistrate.

We do agree generally to use the informal procedure that Judge Wilner outlines on his website. Once you have confirmed the above issues, please send us the e-mail with the Plaintiffs' position briefly outlined in a few lines, as Judge Wilner requests, and send it to us for inclusion of Atlantic's

positions. We cannot promise to have our inclusion of Atlantic's positions to you by the end of this week, but we expect that your issues can be raised before the magistrate sometime next week (as can ours).

Regarding our issues, we are working on a substantive response to your March 14th letter and will have that to you as soon as possible. As we've said before, we obviously need our issues raised before the magistrate as urgently as you need yours raised, and we expect that our letter will resolve many of the issues and questions you have raised regarding our discovery objections. We therefore would like to present both our issues and your issues to the magistrate together next week. We expect the magistrate will appreciate this type of efficiency from the parties.

Thank you,
Carla

**Carla Crapster** • Strasburger & Price, LLP
901 Main Street, Suite 6000, Dallas, TX 75202
214.651.2034 • Fax 214.659.4060 • Strasburger.com

---

*This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Strasburger & Price, LLP immediately -- by replying to this message or by sending an email to postmaster@strasburger.com -- and destroy all copies of this message and any attachments. Thank you.*

---

EXHIBIT 27

# EXHIBIT 28

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10

11   UNIVERSAL CABLE                      Case No. CV16-4435 PA (MRWx)
     PRODUCTIONS, LLC, et al.,
12                                        SCHEDULING ORDER [FED. R. CIV. P.
            Plaintiffs,                   16(b)]
13
            v.                            1.    Establishing a Discovery Cut-off
14                                              Date of 3/13/2017
     ATLANTIC SPECIALTY
15   INSURANCE COMPANY,                   2.    Setting Motion Cut-off date of
                                                3/20/2017
16          Defendant.
                                          3.    Setting Final Pretrial Conference for
17                                              4/21/2017, at 1:30 p.m.

18                                        4.    Setting Jury Trial Date of 5/23/2017,
19                                              at 9:00 a.m.

20

21

22       1.   Discovery Cut-Off.  This is the last date to complete discovery, including expert

23   discovery, and the resolution of any discovery motions before the magistrate judge.  If

24   expert witnesses are to be called at trial, the parties shall designate experts to be called at

25   trial and provide reports required by Fed. R. Civ. P. 26(a)(2)(B), not later than eight weeks

26   prior to the discovery cutoff date.  Rebuttal expert witnesses shall be designated and reports

27   provided as required by Fed. R. Civ. P. 26(a)(2)(B), not later than five weeks prior to the

28   discovery cutoff date.  Failure to timely comply with this deadline may result in the expert

1   being excluded at trial as a witness.  The Court requires compliance with Local Rule 37-1

2   and 37-2 in the preparation and filing of discovery motions.  Discovery motions may not be

3   heard on an ex parte basis.

4       2.   Joinder of Parties and Amendment of Pleadings.  The deadline for joining parties

5   and amending pleadings is listed in the "Schedule of Trial and Pretrial Dates" issued by the

6   Court.  Any motions to join other parties or for leave to amend the pleadings shall be filed

7   and served at least twenty-eight (28) days prior to the hearing deadline as required by Local

8   Rule 6-1 so that they can be heard and decided prior to the deadline.  This deadline does not

9   apply if the deadline for joining parties or amending pleadings has already been calendared

10  or occurred by virtue of an order issued by this Court or another court.

11      In addition to the requirements of Local Rule 15-1, all motions to amend the

12  pleadings shall (1) state the effect of the amendment; (2) be serially numbered to

13  differentiate the amendment from previous amendments and (3) state the page, line

14  number(s), and wording of any proposed change or addition of material.

15      For the Court's ease of reference, the moving party shall submit to chambers a

16  redlined version of the amended pleading.

17      3.   Motion Filing Cut-Off.  The Court hears motions on Mondays at 1:30 p.m.  The

18  motion filing cut-off date is the last day motions may be heard (not filed).  The Court will

19  not decide late motions.  Issues left undetermined by the passage of the motion cut-off date

20  should be listed as issues for trial in the Final Pretrial Conference Order.  As an exception to

21  the above, motions in limine dealing with evidentiary matters may be heard at or before trial;

22  however, summary judgment motions disguised as motions in limine will not be heard.

23  Parties need not wait until the discovery cut-off to bring motions for summary judgment or

24  partial summary judgment.  However, in the usual case, the Court expects that more than the

25  minimum notice will be provided to counsel opposing motions for summary judgment.  In

26  the usual case, the parties should confer and agree on the date for setting such motions.

27      Ex parte applications are entertained solely for extraordinary relief.  See Mission

28  Power Eng. Co. v. Continental Casualty Co., 883 F.Supp. 488 (C.D. Cal. 1995).  Strict

EXHIBIT 28

1    adherence to proper ex parte procedures is required for any ex parte application filed with

2    the Court.

3        4.    Stipulations to Extend Time.  Stipulations to extend the time to file any required

4    document or to continue any pretrial or trial date must set forth:

5            (a)  the existing due date or hearing date;

6            (b)  the current pretrial conference date and trial date;

7            (c)  the specific reasons supporting good cause for granting the extension or

8    continuance.  For example, a statement that a continuance "will promote settlement" or that

9    the parties decided to suspend discovery while engaging is settlement discussions is

10   insufficient.

11           (d)  whether there have been any prior requests for extensions or continuances, and

12   whether these were granted or denied by the Court.

13       5.    Summary Judgment Motions.  The Separate Statement of Undisputed Facts is to be

14   prepared in a two column format.  The left hand column should set forth the allegedly

15   undisputed fact.  The right hand column should set forth the evidence that supports the

16   factual statement. The fact statements should be set forth in sequentially numbered

17   paragraphs.  Each paragraph should contain a narrowly focused statement of fact.  Each

18   numbered paragraph should address a single subject in as concise a manner as possible.

19           The opposing party's statement of genuine issues must be in two columns and

20   track the movant's separate statement exactly as prepared.  The document must be in two

21   columns; the left hand column must restate the allegedly undisputed fact, and the right hand

22   column must indicate either undisputed, or disputed.  The opposing party may dispute all or

23   only a portion of the statement, but if disputing only a portion, must clearly indicate what

24   part is being disputed.  Where the opposing party is disputing the fact in whole or part, the

25   opposing party must, in the right hand column, label and restate the moving party's evidence

26   in support of the fact, followed by the opposing party's evidence controverting the fact.

27   Where the opposing party is disputing the fact on the basis of an evidentiary objection, the

28

-3-

EXHIBIT 28

party must cite to the evidence alleged to be objectionable and state the ground of the objection and nothing more. **No argument should be set forth in this document**.

The opposing party may submit additional material facts that bear on or relate to the issues raised by the movant, which shall follow the format described above for the moving party's separate statement. These additional facts shall follow the movant's facts, shall continue in sequentially numbered paragraphs (i.e., if movant's last statement of fact was set forth in paragraph 30, then the first new fact will be set forth in paragraph 31), and shall set forth in the right hand column the evidence that supports that statement.

The moving party, in its reply, shall respond to the additional facts in the same manner and format that the opposition party is required to adhere to in responding to the statement of undisputed facts, as described above.

(a) <u>Supporting Evidence</u>. No party should submit any evidence other than the specific items of evidence or testimony necessary to support or controvert a proposed statement of undisputed fact. Thus, for example, the entire transcript of a deposition, entire sets of interrogatory responses, and documents that do not specifically support or controvert material in the separate statements, should not be submitted in support or opposition to a motion for summary judgment. Any such material will not be considered.

Evidence submitted in support or opposition to a motion should be submitted either by way of stipulation or as exhibits to declarations sufficient to authenticate the proffered evidence, and should not be attached to the Memorandum of Points and Authorities. The Court will accept counsel's authentication of deposition transcript, of written discovery responses, and of the <u>receipt</u> of documents in discovery <u>if the fact that the document was in the opponent's possession is of independent significance</u>. Documentary evidence as to which there is no stipulation regarding foundation must be accompanied by the testimony, either by declaration or properly authenticated deposition transcript, of a witness who can establish its authenticity.

If evidence in support of or in opposition to a motion exceeds twenty pages, the evidence must be in a separate bound volume and include a Table of Contents.

EXHIBIT 28

(b) <u>Objections to Evidence</u>.  If a party disputes a fact based in whole or in part on an evidentiary objection, the ground of the objection, as indicated above, should be stated in the separate statement but not argued in that document.  Evidentiary objections are to be addressed in a separate memorandum to be filed with the opposition or reply brief of the party.  This memorandum should be organized **to track the paragraph numbers of the separate statement in sequence**.  It should identify the specific item of evidence to which objection is made, the ground of the objection, and a very brief argument with citation to authority as to why the objection is well taken.  The following is an example of the format contemplated by the Court:

> Separate Statement Paragraph 1: Objection to the supporting deposition transcript of Jane Smith at 60:1-10 on the grounds that the statement constitutes inadmissible hearsay and no exception is applicable. To the extent it is offered to prove her state of mind, it is irrelevant since her state of mind is not in issue.

> Fed. R. Evid. 801, 802.

Do not submit blanket or boilerplate objections to the opponent's statements of undisputed fact: these will be disregarded and overruled.

(c) <u>The Memorandum of Points and Authorities</u>.  The movant's memorandum of points and authorities should be in the usual form required under Local Rule 7 and should contain a narrative statement of facts as to those aspects of the case that are before the Court. All facts should be supported with citations to the paragraph number in the Separate Statement that supports the factual assertion and not to the underlying evidence.

Unless the case involves some unusual twist on Rule 56, the motion need only contain a brief statement of the Rule 56 standard; the Court is familiar with the Rule and with its interpretation under <u>Celotex</u> and its progeny. If at all possible, the argument should be organized to focus on the pertinent elements of the cause(s) of action or defense(s) in

EXHIBIT 28

1   issue, with the purpose of showing the existence or non-existence of a genuine issue of

2   material fact for trial on that element of the claim or defense.

3       Likewise, the opposition memorandum of points and authorities should be in the

4   usual form required by Local Rule 7, and where the opposition memorandum sets forth

5   facts, the memorandum should cite to paragraphs in the separate statement if they are not in

6   dispute, to the evidence that contravenes the fact where the fact is in dispute, or, if the fact is

7   contravened by an additional fact in the statement of genuine issues, the citation should be to

8   such fact by paragraph number.

9       (d)  Timing.  In virtually every case, the Court expects that the moving party will

10  provide more than the minimum twenty-eight (28) day notice for such motions.  The moving

11  party shall submit a copy of the Statement of Uncontroverted Facts and Conclusions of Law

12  to the Court's ECF e-mail address, in WordPerfect format (X6 or earlier versions) or

13  Microsoft Word (Word 2010 or earlier versions).

14  6.    Motions in Limine.  Before filing any motion in limine, counsel for the parties

15  shall confer pursuant to Local Rule 7-3 in a good faith effort to eliminate the necessity for

16  hearing the motion in limine or to eliminate as many of the disputes as possible.  It shall be

17  the responsibility of counsel for the moving party to arrange for this conference.  The

18  conference shall take place in person within seven days of service upon opposing counsel of

19  a letter requesting such conference.  Unless counsel agree otherwise, the conference shall

20  take place at the office of the moving party.  If both counsel are not located in the same

21  county in the Central District, the conference may take place by telephone.  The moving

22  party's letter shall identify the testimony, exhibits, or other specific matters alleged to be

23  inadmissible and/or prejudicial, shall state briefly with respect to each such matter the

24  moving party's position (and provide any legal authority which the moving party believes is

25  dispositive), and specify the terms of the order to be sought.

26      (a)  If counsel are unable to resolve their differences, they shall prepare a Joint

27  Motion in Limine.  The Joint Motion in Limine shall consist of one document signed by all

28  counsel.  The Joint Motion in Limine shall contain a clear identification of the testimony,

EXHIBIT 28

1   exhibits, or other specific matters alleged to be inadmissible and/or prejudicial and a

2   statement of the specific prejudice that will be suffered by the moving party if the motion is

3   not granted.  The identification of the matters in dispute shall be followed by each party's

4   contentions and each party's memorandum of points and authorities.  The title page of the

5   Joint Motion in Limine must state the hearing date for the motions in limine and the trial

6   date.

7         (b)  Unless otherwise ordered by the Court, motions in limine will be heard on the

8   date indicated in the Schedule of Trial and Pretrial Dates issued by the Court.  Unless the

9   Court in its discretion otherwise allows, no motions in limine shall be filed or heard on an ex

10  parte basis absent a showing of irreparable injury or prejudice not attributable to the lack of

11  diligence of the moving party. The moving party shall serve its portion of the Joint Motion

12  in Limine on the responding party fourteen (14) days prior to the date for filing of motions

13  in limine indicated in the Schedule of Trial and Pretrial Dates.  The responding party shall

14  then serve the opposition portion of the Joint Motion in Limine on the moving party both on

15  paper and in an electronic format seven (7) days prior to the date for the filing of motions in

16  limine.  The moving party shall incorporate the responding party's portion into the Joint

17  Motion in Limine, add its arguments in reply, and file and serve the Joint Motion in Limine.

18  Neither party's portions of a Joint Motion in Limine shall exceed eight (8) pages.

19        (c)  Joint Motions in Limine made for the purpose of precluding the mention or

20  display of inadmissible and/or prejudicial matter in the presence of the jury shall be

21  accompanied by a declaration from the moving party that includes the following:  (1) a clear

22  identification of the specific matter alleged to be inadmissible and/or prejudicial; (2) a

23  representation to the Court that the subject of the motion in limine has been discussed with

24  opposing counsel, and that opposing counsel has either indicated that such matter will be

25  mentioned or displayed in the presence of the jury before it is admitted in evidence or that

26  counsel has refused to stipulate that such matter will not be mentioned or displayed in the

27  presence of the jury unless and until it is admitted in evidence; and (3) a statement of the

28

EXHIBIT 28

specific prejudice that will be suffered by the moving party if the motion in limine is not granted.

(d)  Unless ordered by the Court, no supplemental or separate memorandum of points and authorities shall be filed by either party in connection with any motion in limine.

(e)  The Court will not consider any motion in limine in the absence of a joint motion or a declaration from counsel for the moving party establishing that opposing counsel: (1) failed to confer in a timely manner; (2) failed to provide the opposing party's portion of the joint motion in a timely manner; or (3) refused to sign and return the joint motion after the opposing party's portion was added.

(f)  The failure of any counsel to comply with or cooperate in the foregoing procedures will result in the imposition of sanctions, including a resolution of the issue against the party refusing to cooperate.

7.  <u>Pretrial Conference and Trial Setting</u>.  Compliance with the requirements of Local Rule 16 is mandatory.  Counsel shall submit carefully prepared Memoranda of Contentions of Fact and Law (which may also serve as the trial briefs) and Proposed Pre-Trial Conference Order ("PTCO") in accordance with the provisions of Local Rules 16-2.8 through 16-6. The Proposed Pre-Trial Conference Order shall conform to the example set forth in Appendix A to the Local Rules, modified as necessary to comply with this order.

The Memoranda of Contentions of Fact and Law, Exhibit Lists, and Witness Lists shall be served and filed no later than fourteen (14) days before the Pre-Trial Conference. The Proposed Pre-Trial Conference Order shall be filed fourteen (14) days before the Pre-Trial Conference.

The Proposed Pre-Trial Conference Order must contain a Table of Contents.  Place in all capital letters and in bold the separately numbered headings for each category in the PTCO.  Under paragraph 1, list each claim, counterclaim, or defense that has been dismissed or abandoned.  In multiple party cases where not all claims or counterclaims will be prosecuted against all remaining parties on the other side, please specify to which party each claim or counterclaim directed.  The factual issues in dispute should track the elements of a

1   claim or defense upon which the jury would be required to make findings.  Counsel should

2   state issues in ultimate fact form, not as evidentiary fact issues (i.e., "was the defendant

3   negligent," "was defendant's negligence the proximate cause of plaintiff's injury;" not "was

4   the plaintiff standing on the corner of 5th and Spring at 10:00 a.m. on May 3").  Issues of

5   law should state legal issues upon which the Court will be required to rule after the Pre-Trial

6   Conference, including during the trial, and should not list ultimate fact issues to be

7   submitted to the trier of fact.

8           In drafting the PTCO, the Court expects that counsel will attempt to agree on and

9   set forth as many non-contested facts as possible.  The Court will normally read the

10  uncontested facts to the jury at the start of the trial.  Carefully drafted and comprehensively

11  stated stipulation of facts will reduce the length of trial and increase jury understanding of

12  the case.

13          If expert witnesses are to be called at trial, each party must list and identify its

14  respective expert witnesses, both retained and non-retained.  <u>Failure of a party to list and</u>

15  <u>identify an expert witness in the Proposed Pre-Trial Conference Order shall preclude a party</u>

16  <u>from calling that expert witness at trial</u>.

17          This case has been placed on calendar for a Final Pretrial Conference ("PTC")

18  pursuant to F. R. Civ. P. 16 and Local Rule 16-1, unless the PTC was expressly waived at

19  the Scheduling Conference by the Court.  Unless excused for good cause, each party

20  appearing in this action shall be represented at the PTC and all pretrial meetings of counsel,

21  by lead trial counsel.  The failure to attend the PTC or to submit the required pretrial

22  documents may result in the dismissal of the action, striking the answer and entering a

23  default, and/or the imposition of sanctions.

24          A continuance of the Final Pretrial Conference at counsel's request or stipulation is

25  highly unlikely.  Counsel should plan to do the necessary pretrial work on a schedule which

26  will insure its completion with time to spare before the Final Pretrial Conference.

27  Specifically, failure to complete discovery work, including expert discovery, is not a ground

28  for a continuance.

EXHIBIT 28

1    Compliance with the requirements of Local Rules 16-1 to 16-13 is required by the

2    Court. Carefully prepared Memoranda of Contentions of Fact (which may also serve as the

3    trial brief) and a proposed Final Pretrial Conference Order shall be submitted in accordance

4    with the provisions of Local Rule 16-6 and the form of the proposed Final Pretrial

5    Conference Order shall be in conformity with the format set forth in Appendix A to the

6    Local Rules.

7    At the PTC, counsel should be prepared to discuss means of streamlining the trial,

8    including, but not limited to: bifurcation, presentation of non-critical testimony by

9    deposition excerpts, stipulations as to the content of testimony, presentation of testimony on

10   direct examination by declaration subject to cross-examination, and qualification of experts

11   by admitted resumes. In rare cases where the PTC is waived by the Court, counsel must

12   follow Local Rule 16-10.

13   8. <u>Summary of Witness Testimony and Time Estimates</u>. Counsel shall prepare a list

14   of their witnesses, including a brief summary (two to three paragraphs) of each witness'

15   expected testimony and an estimate of the length of time needed for direct examination; and

16   whether the witness will testify by deposition or in person. Counsel shall exchange these

17   lists with opposing counsel. **Counsel shall jointly file a single list of witness testimony**

18   **summaries, including estimates for direct examination of their own witnesses and**

19   **estimates for cross-examination of opposing witnesses.** These statements shall be filed at

20   the time counsel file the Proposed Pre-Trial Conference Order, i.e., fourteen (14) days

21   before the Pre-Trial Conference. A copy of the Joint Trial Witness Form is attached to this

22   Order.

23   If a party desires to offer deposition testimony into evidence at trial, he shall

24   designate only those relevant portions of same which he wishes to read at trial and advise

25   opposing counsel of same. Opposing counsel shall then designate those relevant portions of

26   such deposition which he wishes to offer in evidence. All objections to any such testimony

27   shall be made in writing and filed at the same time counsel file the Proposed Pre-Trial

28   Conference Order so the Court may consider whether ruling on such objections will either

1    facilitate the conduct of the trial or result in the disposition of certain evidentiary matters

2    that may assist continuing settlement negotiations.

3    9.    <u>Jury Instructions and Verdict Forms</u>.  Fourteen (14) days prior to counsel's Rule

4    16 pre-trial meeting, counsel shall exchange proposed jury instructions (general and special)

5    and special verdict forms (if applicable).  Seven (7) days prior to the Rule 16-2 meeting,

6    counsel shall exchange any objections to the instructions and special verdict forms.  Prior to,

7    or at the time of the Rule 16 meeting, counsel shall meet and confer with the goal of

8    reaching agreement on one set of joint jury instructions and one special verdict form.

9    The parties should make every attempt to agree upon the jury instructions before

10   submitting them to the Court.  The Court expects counsel to agree on the substantial

11   majority of jury instructions, particularly when pattern instructions provide a statement of

12   applicable law.  When the Manual of Model Civil Jury Instructions for the Ninth Circuit

13   provides a version of an applicable requested instruction, the parties should submit the most

14   recent version of the Model instruction.  Where language appears in brackets in the model

15   instruction, counsel shall select the appropriate text and eliminate the inapplicable bracketed

16   text.  Where California law applies, counsel should use the current edition of the Judicial

17   Council of California Civil Jury Instructions ("CACI").  If neither of the above sources is

18   applicable, counsel are directed to use the instructions from O'Malley, Grenig & Lee

19   (formerly Devitt, <u>et al.</u>), Federal Jury Practice and Instructions (latest edition).  Each

20   requested jury instruction shall cover only one subject or principle of law and shall be

21   numbered and set forth in full on a separate page, citing the authority or source of the

22   requested instruction (except for the "clean" jury copy discussed below).

23   When the parties disagree on an instruction, the party opposing the instruction

24   must attach a short statement (one to two paragraphs) supporting the objection, and the party

25   submitting the instruction must attach a short statement supporting the instruction.  Each

26   statement should be on a separate page and should follow directly after the disputed

27   instruction.

28

EXHIBIT 28

The parties ultimately must submit one document or, if the parties disagree over any proposed jury instructions, two documents.  If the parties submit two documents, those documents shall consist of: (1) a set of Joint Proposed Jury Instructions and (2) a set of Disputed Jury Instructions, along with reasons supporting and opposing each disputed instruction in the format set forth in the previous paragraph.

The parties must file proposed jury instructions fourteen (14) days before the Pre-Trial Conference.  If the court is closed that day, counsel shall file the proposed instructions the preceding Friday.  No later than 5:00 p.m. on the date such instructions are due, the parties must submit conformed courtesy copies to the Court's courtesy box located outside the entrance to chambers on the Spring Street level of the U.S. Courthouse.  Counsel shall also submit a copy of the proposed jury instructions to the Court's ECF e-mail address in WordPerfect format (X6 or earlier versions) or Microsoft Word (Word 2010 or earlier versions) in accordance with this paragraph and the previous paragraph.

The Court will send a copy of the instructions into the jury room for the jury's use during deliberations.  Accordingly, in addition to the file copies described above, the e-mail containing the jury instructions shall contain a "clean set" of Joint Proposed and/or Disputed Jury Instructions, containing only the text of each instruction set forth in full on each page, with the caption "Court's Instruction No. __" (eliminating titles, supporting authority, indication of party proposing, etc.).

An index page shall accompany all jury instructions submitted to the Court.  The index page shall indicate the following:

(a)  The number of the instruction;

(b)  A brief title of the instruction;

(c)  The source of the instruction and any relevant case citations; and

(d)  The page number of the instruction.

EXAMPLE:

| Number | Title | Source | Page |
|--------|-------|--------|------|
| 1 | Trademark-Defined | 9th Cir. 15.3.2 | 7 |

EXHIBIT 28

1          (15 U.S.C. § 1127)

2                 Along with the jury instructions, counsel shall submit any necessary special verdict

3     form fourteen (14) days before the Pre-Trial Conference and e-mail any such proposed

4     special verdict form in WordPerfect format (X6 or earlier versions) or Microsoft Word

5     (Word 2010 or earlier versions) to the Court's ECF e-mail address.

6          10.  <u>Voir Dire Questions</u>.  Counsel may, but need not, submit brief proposed <u>voir dire</u>

7     questions for the jury at the Pre-Trial Conference.  The Court will conduct its own <u>voir dire</u>

8     after consulting any proposed <u>voir dire</u> submitted by counsel.

9          11.  <u>Joint Statement of the Case</u>.  Counsel shall submit a joint statement of the case at

10    the Pretrial Conference.  The joint statement of the case will be read to the prospective panel

11    of jurors prior to the commencement of <u>voir dire</u>.  The statement should not exceed one

12    page.  The statement shall be filed with the Court at the Pre-Trial Conference.

13         12.  <u>Exhibits</u>.  The parties shall file their witness lists and exhibits lists in accordance

14    with Local Rule 16.  Counsel are to assemble their exhibits by placing them in three-ring

15    binders labeled on the spine portion of the binder showing both the volume number and the

16    exhibit numbers.  Each exhibit shall be separated by a tabbed divider on the right side.

17    Counsel shall provide original exhibits for the Courtroom Deputy Clerk and a duplicate set

18    for the judge.  The original exhibits shall be tagged with the appropriate exhibit tags in the

19    upper or lower right corner of the first page of each exhibit.  Each binder shall contain a

20    Table of Contents.  Counsel must comply with Local Rule 26-4 when numbering the

21    exhibits.  The Clerk's Office, Room G-8, 312 North Spring Street, Los Angeles, California

22    can supply counsel with appropriate exhibit tags.

23         13.  <u>Pre-Trial Exhibit Stipulation</u>.  The parties shall prepare a Pre-Trial Exhibit

24    Stipulation which shall contain each party's numbered list of trial exhibits, with objections,

25    if any, to each exhibit including the basis of the objection and the offering party's response.

26    All exhibits to which there is no objection shall be deemed admitted.  All parties shall

27    stipulate to the authenticity of exhibits whenever possible, and the Pre-Trial Exhibit

28

1   Stipulation shall identify any exhibits whose authenticity has not been stipulated to and the

2   specific reasons for the party's failure to stipulate.

3        The Stipulation shall be substantially in the following form:

4   <div align="center">Pre-Trial Exhibit Stipulation</div>

5   Plaintiff's Exhibits

6   Number     Description     Objection     Response to Objection

7

8   Defendant's Exhibits

9   Number     Description     Objection     Response to Objection

10

11        The Pre-Trial Exhibit Stipulation shall be filed at the same time as counsel files the

12   Proposed Pre-Trial Conference Order.  Failure to comply with this paragraph shall constitute

13   a waiver of all objections.

14        The Court requires the following to be submitted to the Courtroom Deputy Clerk

15   on the first day of trial:

16        (1)     The original exhibits with the Court's exhibit tags. Plaintiff shall use

17             yellow tags; defendant shall use blue tags. Each tag shall be stapled to

18             the front of the exhibit on the upper right corner and include the case

19             number, case name, and exhibit number.

20        (2)     One bench book with a copy of each exhibit for the Court's use, tabbed

21             as described above; a copy of the witness lists).

22        (3)     Three (3) copies of exhibit lists.  The exhibit list should also be

23             submitted to the Court's ECF e-mail address in both a PDF version and

24             a WordPerfect(X6 or earlier versions) or Microsoft Word (Word 2010

25             or earlier versions) version.

26        (4)     Three (3) copies of witness lists in the order in which the witnesses will

27             be called to testify.

28

EXHIBIT 28

1    All counsel are to meet no later than fourteen (14) days before trial to discuss and
2    agree to the extent possible on issues including foundation and admissibility.

3        14.   <u>Findings of Fact and Conclusions of Law</u>.  For a non-jury trial, counsel for each
4    party shall file and serve proposed findings of fact and conclusions of law fourteen days
5    before trial.  The parties should also e-mail these proposed findings of fact and conclusions
6    of law in WordPerfect format (X6 or earlier versions) or Microsoft Word (Word 2010 or
7    earlier versions) to the Court's ECF e-mail address.  Counsel for each party shall then:

8            (1)    Underline or highlight in red the portions which it disputes;

9            (2)    Underline or highlight in blue the portions which it admits; and

10           (3)    Underline or highlight in yellow the portions which it does not dispute,
11                  but deems irrelevant.

12       Counsel may agree with a part of a finding or conclusion, disagree with a part of it
13   and/or consider a part of it irrelevant.

14       The parties should then file and serve their respective objections to the other
15   party's proposed findings of fact and conclusions of law.  Courtesy copies of the marked
16   copies shall be delivered to the courtesy box next to the entrance to chambers on the Spring
17   Street level of the U.S. Courthouse, 312 North Spring Street, by 12:00 noon of the business
18   day following filing.

19       15.   <u>Settlement</u>.  Local Rule 16-15.2 provides that the Settlement Conference shall be
20   conducted not later than 45 days before the Pretrial Conference.  The Court believes that in
21   most cases completion of all discovery and dispositive motions will help the parties assess
22   their positions before they embark on the costly pre-trial process.  However, in many cases,
23   the parties find it more difficult to settle after they have incurred the cost of all discovery
24   and motion practice.  Accordingly, the Court strongly encourages counsel and the parties to
25   pursue settlement earlier.

26       Notwithstanding the provisions of Local Rule 16-15.5, unless the parties have
27   received prior approval by the Court, lead trial counsel and each party shall appear at the
28   settlement proceeding in person or, in the case of a corporation or other non-governmental

-15-

EXHIBIT 28

Case 2:16-cv-04435-PA-MRW Document 24-1 Filed 04/05/17 Page 965 of 970 Page ID
Case 2:16-cv-04435-PA-MRW Document 24-1 Filed 09/15/16 Page 16 of 18 Page ID #:280
#:1746

1    entity, by a corporate representative with final authority to settle the case and who is

2    knowledgeable about the facts of the case. Representatives of insurers with decision-making

3    authority are also required to attend the settlement proceedings in person unless their

4    presence is expressly excused by the Court. The Court's requirement that lead trial counsel,

5    parties, corporate representatives, and insurer representatives must appear at the settlement

6    proceedings in person unless they have been expressly excused by the Court applies to

7    individuals located both within and outside the Central District of California.

8         The Court has a keen interest in helping the parties achieve settlement. If the

9    parties believe that it would be more likely that a settlement would be reached if they

10   conduct settlement conference at an earlier time than that specified by the Court, they should

11   conduct it at that time. In any event, the parties must together file a single Joint Status

12   Report re Settlement at the time they file the Proposed Pretrial Order.

13        The Court will not conduct settlement conferences in non-jury cases which the

14   Court will try. In jury cases, the Court will conduct a settlement conference at the parties'

15   request if three conditions exist:

16        1.   The parties are satisfied that the fact issues in the case will be tried to a jury;

17        2.   All significant pre-trial rulings which Court must make have been made; and

18        3.   The parties desire the Court to conduct the conference, understanding that if

19   settlement fails, the Court will preside over the trial of the case.

20      16. <u>Sanctions</u>. The failure to attend the pretrial conference or to submit in conformity

21   with this order, the jury instructions, pre-trial exhibit stipulation, joint statement of the case,

22   voir dire questions, summary of witness testimony and times estimates, proposed Pretrial

23

24

25

26

27

28

-16-

EXHIBIT 28

1    Conference Order or the memorandum of contentions of fact and law may result in the

2    dismissal of the action, striking the answer and entering default and/or the imposition of

3    sanctions.

4              IT IS SO ORDERED.

5     Dated:  September 15, 2016

6                                                    _____

7                                                         Percy Anderson
                                                     UNITED STATES DISTRICT JUDGE

8

9    Revised:  10/29/2013

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 28

## JOINT TRIAL WITNESS ESTIMATE FORM

CASE: _____        TRIAL DATE: _____

| | WITNESS NAME | PARTY CALLING WITNESS AND ESTIMATE | X-EXAMINER'S ESTIMATE | DESCRIPTION OF TESTIMONY | COMMENTS |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 1 | | | | | |
| | TOTAL ESTIMATES THIS PAGE: | | | | |

Instructions:
(1) List witnesses (last name first); (2) For description, be extremely brief, e.g., "eyewitness to accident."  Or "expert on standard of care."
(3) Use estimates within fractions of an hour, rounded off to closest quarter of an hour.  E.g., if you estimate 20 minutes, make it .25.  An estimate of one and one-half hours would be 1.5.  An estimate of three-quarters of an hour would be .75; (4) Note special factors in "Comments" column.  E.g., "Needs interpreter."  (5) Entries may be in handwriting if very neat and legible.

EXHIBIT 28

# EXHIBIT 29

1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT
9                  CENTRAL DISTRICT OF CALIFORNIA
10

11   UNIVERSAL CABLE                    CASE NO. 2:16-cv-4435-PA-MRW
     PRODUCTIONS LLC, *et al.*,
12                                      Honorable Percy Anderson
            Plaintiffs,
13                                      **ORDER ON JOINT STIPULATION
            v.                          AND APPLICATION TO MODIFY
14                                      CASE SCHEDULE**
     ATLANTIC SPECIALTY
15   INSURANCE COMPANY,
                                        Complaint Filed:      June 20, 2016
16          Defendant.
17
18
19
20
21
22
23
24
25
26
27
28

---

**ORDER ON JOINT STIPULATION AND APPLICATION TO MODIFY CASE SCHEDULE**

8538721.1

939                                                        EXHIBIT 29

Case 2:16-cv-04435-PA-MRW  Document 44-1  Filed 04/05/17  Page 970 of 970  Page ID
Case 2:16-cv-04435-PA-MRW  Document 34-1  Filed 01/19/17  Page 2 of 2  Page ID #:802
#:1751

1                              **[PROPOSED]** ORDER

2              Based on the Joint Stipulation and Application to Modify Case Schedule and

3      good cause appearing, the Court hereby modifies the Scheduling Order as follows

4      (associated dates triggered by the dates below are adjusted accordingly):

| | |
|---|---|
| Discovery Cut-off | May 12, 2017 |
| Motion Cut-off | May 22, 2017 |
| Final Pretrial Conference | June 16, 2017, at 1:30 p.m. |
| Jury Trial | July 25, 2017, at 9 a.m. |

9              IT IS SO ORDERED.

10

11     Dated:  January 19, 2017

12

13                                        _____
                                          The Honorable Percy Anderson
14                                        UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2