1  MARC J. SHRAKE (SBN 219331)
    mjs@amclaw.com
2  ANDERSON, MCPHARLIN & CONNERS LLP
   707 Wilshire Boulevard, Suite 4000
3  Los Angeles, California 90017-3623
   Telephone: (213) 236-1691
4  Facsimile: (213) 622-7594

5  MICHAEL KEELEY (Pro Hac Vice)
    michael.keeley@strasburger.com
6  TONI SCOTT REED (Pro Hac Vice)
    toni.reed@strasburger.com
7  CARLA C. CRAPSTER (Pro Hac Vice)
    carla.crapster@strasburger.com
8  STRASBURGER & PRICE, LLP
   901 Main Street, Suite 6000
9  Dallas, Texas 75202
   Telephone: (214) 651-4300
10 Facsimile: (214) 651-4330

11 Attorneys for Defendant
   Atlantic Specialty Insurance Company
12

13          **UNITED STATES DISTRICT COURT**

14   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

15

16 UNIVERSAL CABLE
   PRODUCTIONS LLC, a Delaware
17 limited liability company, and
   NORTHERN ENTERTAINMENT
18 PRODUCTIONS LLC, a Delaware
   limited liability company,
19
20          Plaintiffs,

            vs.
21
   ATLANTIC SPECIALTY
22 INSURANCE COMPANY, a New York
   insurance company,
23
24          Defendant.

25

26

27

28

Case No. 2:16-cv-04435-PA-MRW

**DEFENDANT ATLANTIC
SPECIALTY INSURANCE
COMPANY'S NOTICE OF
MOTION AND MOTION FOR
SUMMARY JUDGMENT, OR
ALTERNATIVELY PARTIAL
SUMMARY JUDGMENT;
MEMORANDUM OF POINTS
AND AUTHORITIES**

*[Filed Concurrently with Memorandum of Points
and Authorities; Statement of Uncontroverted
Facts and Conclusions of Law; Volume of
Summary Judgment Evidence – Part I
(including Declarations of Frank G.
Lowenstein, Peter D. Williams, and Carla C.
Crapster); Volume of Summary Judgment
Evidence – Part II; Request for Judicial Notice;
Proposed Judgment; Application for Leave to
File Under Seal (Including Declaration of Carla
C. Crapster); Stipulation of Authenticity]*

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

Date:  May 22, 2017
Time:  1:30 p.m.
Place:  Courtroom 9A
Judge:  Honorable Percy Anderson
Discovery Cutoff:  June 2, 2017
Pretrial Conference:  June 16, 2017
Trial:  July 25, 2017

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**NOTICE IS HEREBY GIVEN** that on May 22, 2017 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 9A of the First Street Courthouse, located at 350 W. 1st Street, 9th Floor, Los Angeles, California 90012, Defendant Atlantic Specialty Insurance Company ("Atlantic") will and hereby does respectfully move the Court for summary judgment against Plaintiffs on all causes of action set forth in Plaintiffs' First Amended Complaint, or alternatively for partial summary judgment. Atlantic is entitled to summary judgment as follows:

1       Atlantic is entitled to summary judgment in its favor on plaintiffs' claim one – Breach of Insurance Contract, as there was no breach of the contract by Atlantic. Atlantic issued an insurance policy to the plaintiffs, which are indirect subsidiaries of the named insured on the policy: NBCUniversal Media, LLC ("NBCU"). The plaintiffs seek coverage for losses allegedly incurred in moving the filming of a television show out of Israel. But the plaintiffs moved the production because of deadly fighting between Israelis and Palestinians. The policy contains exclusions for war; warlike action; insurrection, rebellion, or revolution; and weapons of war. Atlantic's position is that all these exclusions apply. The conflict lasted 50 days, killed thousands, injured thousands more, and devastated both sides. Under the common, ordinary meaning of the word, which governs in California, the conflict was a war, as evidenced by—among other things—the *many* news articles calling the conflict a war, *including* those by news organizations bearing the NBC name: MSNBC and NBC News. In any event, the conflict at least involved warlike actions and weapons of war, or was an insurrection,

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ii

1  rebellion, or revolution.   Accordingly, Atlantic did not breach the contract when it

2  denied the claim, and seeks summary judgment on that claim.

3      2.      Additionally, and/or in the alternative, Atlantic is entitled to summary

4  judgment in its favor on plaintiffs' claim two – Breach of Implied Covenant of Good

5  Faith and Fair Dealing. First, because Atlantic did not commit a breach of the contract

6  of insurance, it cannot have violated the covenant of good faith and faith dealing, and

7  is entitled to judgment in its favor. Additionally, or in the alternative, under California

8  law, as long as Atlantic's position regarding the claim was at least reasonable, the claim

9  of bad faith cannot stand. For these additional reasons, Atlantic is entitled to summary

10  judgment on claim two.

11      This Notice and Motion are based upon the Memorandum of Points and

12  Authorities, the Statement of Uncontroverted Facts, all summary judgment evidence

13  filed in support of the Statement of Uncontroverted Facts in the accompanying

14  Volumes of Evidence (Part I and Part II) (including the Declarations of Frank G.

15  Lowenstein, Peter D. Williams, and Carla C. Crapster), the Request for Judicial Notice,

16  and the papers, records, and pleadings on file, and any other oral and documentary

17  evidence and argument presented in support of this Motion.

18      This Motion is made following the conference of counsel in accordance with

19  L.R. 7-3, which took place on April 17, 2017.

20

21

22

23

24

25

26

27

28

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

iii

DATED: April 24, 2017

MARC J. SHRAKE
ANDERSON, McPHARLIN & CONNERS LLP

-and-

MICHAEL KEELEY *(Pro Hac Vice)*
JOHN R. RIDDLE *(Pro Hac Vice)*
TONI SCOTT REED *(Pro Hac Vice)*
CARLA C. CRAPSTER *(Pro Hac Vice)*
STRASBURGER & PRICE, LLP

By:     */s/ Michael Keeley*
            Michael Keeley

Attorneys for Defendant ATLANTIC SPECIALTY
INSURANCE COMPANY

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

iv

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................ v

TABLE OF AUTHORITIES ..................................................................................... vi

I.      INTRODUCTION .......................................................................................... 1

II.     Undisputed Facts ........................................................................................... 2

      A.      A Brief History of Israel and Palestine ................................................ 2

      B.      The 50-Day War ................................................................................... 3

      C.      The Devastation of the War .................................................................. 6

      D.      *Dig* and the Decision to Leave Israel ................................................... 7

      E.      The Policy .............................................................................................. 7

III.    ARGUMENT ................................................................................................. 9

      A.      The Ordinary and Popular Meaning Governs .................................... 9

      B.      The Plain Meaning of "War" Applies to the 50-Day War ................. 9

            1.      The Ordinary and Popular Meaning .................................... 9

            2.      The Case Law Supports Atlantic's Position .................... 11

      C.      The 50-Day War Involved War*like* Actions .................................... 16

      D.      The Plaintiffs' Loss Resulted from Weapons of War ....................... 20

      E.      Insurrection, Rebellion, or Revolution ............................................. 22

      F.      Bad Faith: Atlantic Had a Reasonable Basis to Apply the War Exclusion ........................................................................................... 23

IV.     CONCLUSION ........................................................................................... 25

PROOF OF SERVICE ........................................................................................... 1

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

v

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Estates of Ungar v. Palestinian Auth.*,
304 F. Supp. 2d 232 (D.R.I. 2004) ........................................................... 3, 15

*Gagliormella v. Met. Life Ins. Co.*,
122 F. Supp. 246 (D. Mass. 1954) ........................................................ 11, 12

*Girdler Corp. v. Charles Eneu Johnson & Co.*,
95 F. Supp. 713 (E.D. Pa. 1951) ................................................................14

*Guebara v. Allstate Ins. Co.*,
237 F.3d 987 (9th Cir. 2001) .....................................................................24

*Hamdan v. Rumsfeld*,
548 U.S. 557 (2006) ............................................................................ 15, 16

*Hamdi & Ibrahim Mango Co. v. Reliance Ins. Co.*,
291 F.2d 437 (2d Cir. 1961) ................................................................ 18, 19

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004) ...................................................................................15

*In re Marzook*,
924 F. Supp. 565 (S.D.N.Y. 1996) ....................................................... 3, 15

*In re September 11 Litigation*,
751 F.3d 86 (2d Cir. 2014) ........................................................................15

*In re September 11 Litigation*,
931 F. Supp. 2d 496 (S.D.N.Y. 2013) .......................................................16

*Int'l Dairy Eng'g Co. v. Am. Home Assurance Co.*,
352 F. Supp. 827 (N.D. Cal. 1970), *aff'd* 474 F.2d 1242 (9th Cir. 1973) ...................11

*N.Y. Life Ins. Co. v. Durham*,
166 F.2d 874 (10th Cir. 1948) ...................................................................13

*Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*,
368 F. Supp. 1098 (S.D.N.Y. 1973), *aff'd*
505 F.2d 989 (2d Cir. 1974).......................................................... 14, 18, 19

vi

*United States v. El-Mezain,*
   664 F.3d 467 (5th Cir. 2011) ................................................................. 3, 14

*United States v. Flores,*
   729 F.3d 910 (9th Cir. 2013) ....................................................................21

*United States v. Jennings,*
   195 F.3d 795 (5th Cir. 1999) ....................................................................21

*Weissman v. Metro. Life Ins. Co.,*
   112 F. Supp. 420 (S.D. Cal. 1953) ..................................................... 12, 13

*Younis Bros. & Co., v. Cigna Worldwide Ins. Co.,*
   899 F. Supp. 1385 (E.D. Pa. 1995), aff'd 91 F.3d 13 (3d Cir. 1996) ....................22

**STATE CASES**

*Benavides v. State Farm Gen. Ins. Co.*
   39 Cal. Rptr. 3d 650 (Cal. Ct. App. 2006)..................................................... 23

*Burger v. Emps.' Ret. Sys.,*
   226 P.2d 38 (Cal. Ct. App. 1951) ..............................................................12

*Darnall v. Day,*
   37 N.W.2d 277 (Iowa 1949) ....................................................................14

*Fireman's Fund Ins. Co. v. Fibreboard Corp.,*
   182 Cal. App. 3d 462 (1986).......................................................................9

*Garcia v. Truck Ins. Exch.,*
   36 Cal. 3d 426 (Cal. 1984).........................................................................9

*Kaiser v. Hopkins,*
   58 P.2d 1278 (Cal. 1936) ..........................................................................12

*People v. James,*
   94 Cal. Rptr. 3d 576 (Cal. Ct. App. 2009)....................................................21

*State of Cal. v. Cont'l Ins. Co.,*
   281 P.3d 1000 (Cal. 2012).........................................................................9

*Stucker v. College Life Ins. Co.,*
   208 N.E.2d 731 (Ind. Ct. App. 1965)..........................................................13

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

vii

*Tilbury Constructors, Inc. v. State Comp. Ins. Fund*
   137 Cal. App. 4th 466 (Cal. Ct. App. 2006) ...................................................... 23

*Vandegrift v. Bd. of Supervisors,*
   23 Cal. App. 3d 228 (Cal. Ct. App. 1972) ........................................................12

*W. Reserve Life Ins. Co. v. Meadows,*
   261 S.W.2d 554 (Tex. 1953) ............................................................................14

*Wilkinson v. Equitable Life Assurance Soc.,*
   151 N.Y.S.2d 1018 (N.Y. Mun. Ct. 1956) .......................................................14

**FEDERAL STATUTES**

26 U.S.C.S. § 5845(f) ...........................................................................................21

**STATE STATUTES**

California Civil Code § 1644 ............................................................................ 9, 21

**OTHER AUTHORITIES**

Black's Law Dictionary 1007 (7th ed. 1999) ......................................................18

Random House Unabridged Dictionary 1609 (1993) ............................................23

S. Rep. No. 90-1501 (1968) .................................................................................21

Webster's Third New International Dictionary 1433 (1976) ............................18

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

viii

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Plaintiffs seek insurance coverage for "extra expenses" incurred to move the filming of a television show out of Israel. But the impetus for the move was prolonged and deadly fighting between Israelis and Palestinians, and the policy at issue excludes coverage for loss resulting directly or indirectly from war, warlike action, and even weapons of war, together with insurrection, rebellion, or revolution. By statute, California requires that words in an insurance contract be given their popular and ordinary meaning. Here, the popular and ordinary meaning of "war" (let alone war*like*) clearly encompasses the devastating and prolonged 2014 conflict. Plaintiffs prefer to focus narrowly on the actions of only one of the combatants—Hamas—to the exclusion of the other—Israel—and characterize the conflict as mere terrorism in the hope of avoiding the war exclusions. This position ignores the reality of warfare in the twenty-first century, and the views of their own representatives involved in the filming: those charged with assessing the security situation surrounding it and the actors in the production of their show, all of whom referred to the conflict as "war." Indeed, there can be no disagreement that the conflict was known around the globe as a war; world leaders, politicians from various countries, and news outlets from all over the world—including those bearing the name NBC (the plaintiffs' parent company)—referred to the conflict as the 50-Day War or Gaza War. As with all wars, the conflict was deadly; thousands were killed and wounded, and hundreds of thousands were displaced. Israel staged a ground invasion and deployed tanks, armored personnel carriers, warplanes, and gunboats. Hamas's military fired thousands of missiles and rockets into Israel. What *else* is such a conflict if not a war? Moreover, the precedent interpreting the words "war" and "warlike" directly supports Atlantic's position—courts have held that even intermittent fighting between Israelis and Palestinians specifically constitutes at least "warlike" actions. And on two occasions the United States Supreme Court has found

1

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  that a much shorter battle with al Qaeda constituted a war.  The plaintiffs hang their
2  hope on this Court applying a hyper-technical definition of the words in the Policy, but
3  California law flatly forbids it. These issues should be resolved as a matter of law as the
4  parties do not disagree on the salient facts—only their legal import. Moreover, at the
5  very least, reasonable minds cannot differ on whether Atlantic's position is reasonable.
6  Atlantic is certainly entitled to summary judgment on the plaintiffs' claims of bad faith.

7  ## II.    UNDISPUTED FACTS

8  **A.    A Brief History of Israel and Palestine**

9  Because this case centers on Israel and Palestine, it is helpful to begin with a
10  brief history. The Palestinian political identity emerged between 1923 and 1948. *See*
11  Atlantic's Statement of Uncontroverted Facts and Conclusions of Law ("SUF") No. 1.
12  In 1947, the United Nations ("U.N.") intended to create two states in what are now
13  Israel and Palestine: one Jewish and one Arab. SUF 2. For reasons that are still
14  disputed, it ultimately founded only the Jewish state, Israel. SUF 2. In 1947 and 1948,
15  there was an "Arab-Israeli War" in which Israel defeated Arab nations and declared its
16  independence. SUF 3. Almost 700,000 Palestinians were driven from their homes as a
17  result. SUF 4. The Palestinians who remained in the West Bank and Gaza were subject
18  to Egyptian, Jordanian, or Israeli rule. SUF 5. In June 1967, the Six-Day War occurred,
19  in which Israel "decisively defeated the Arab states." SUF 6. As a result, Israel gained
20  control over the entire area that constituted Palestine. SUF 7. But ultimately, Israel only
21  effectively annexed East Jerusalem and the Golan Heights, leaving the West Bank and
22  Gaza Strip under military occupation but not truly incorporated into Israel. SUF 8.

23  In the mid-1990s, the Palestinian Authority ("PA") was granted limited rule
24  (under supervening Israeli occupational authority) in the Gaza Strip and parts of the
25  West Bank. SUF 11. In 2005, Israel unilaterally withdrew its military forces and all of its
26  civilians from Gaza, leaving control to the PA. SUF 12. According to the U.S.
27  Congressional Research Service: "Although not a state, the PA is organized like one—

28

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

2

complete with democratic mechanisms; security forces; and executive, legislative, and judicial organs of governance." SUF 20. There are two primary competing Palestinian political parties or organizations. SUF 9. Fatah is the largest faction of the confederated multi-party Palestinian Liberation Organization, and is currently led by Yasser Arafat's successor, Mahmoud Abbas. SUF 9. Hamas is a Palestinian Islamic military and socio-political movement that formed in 1987. SUF 9. It has maintained its primary base of political support and military command in the Gaza Strip. SUF 9. In 2006, Hamas won a majority of the seats in the Palestinian Legislative Council. SUF 13. And, in 2007, Hamas gained control over the Gaza Strip, where it currently governs like any other government with "political, military and social welfare activities . . . ." SUF 14-15; *see also United States v. El-Mezain*, 664 F.3d 467, 485-486 (5th Cir. 2011) (Hamas has a military, political, and social service branch that runs hospitals and schools); *Estates of Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 250 (D.R.I. 2004) ("Hamas operates through a political branch and a military branch."); *In re Marzook*, 924 F. Supp. 565, 568 (S.D.N.Y. 1996). As plaintiffs' own security team recognized in a security update, Hamas governs the Gaza Strip. SUF 150-151.

**B.     The 50-Day War**

In June 2014, Hamas and Fatah agreed to establish a "consensus" or "unity" PA government, much to Israel's anger, as it refused to deal with Hamas, whose Charter commits it "to the destruction of Israel and the establishment of an Islamic State in all of historic Palestine. SUF 18-19. Tensions soon thereafter began to build between Israelis and Palestinians. SUF 35. On June 12, 2014, three Israeli teenagers were kidnapped. SUF 35. "In response, Israel launched an extensive search and arrest operation." SUF 37. These teenagers were later killed, allegedly by Hamas militants. SUF 24. Because plaintiffs were already in Israel filming *Dig*, the head of security for

**ATLANTIC SPECIALTY INSURANCE COMPANY'S NOTICE OF MOTION
AND MOTION FOR SUMMARY JUDGMENT**

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

NBCUniversal Media, LLC ("NBCU")[1] was closely monitoring events, and sent an
e-mail on June 15, 2014, summing up the building tension:

> In the past 48 hours, the extent of Israeli military operations in Hebron
> and its environs have significantly increased, highlighted by the
> deployment of over 2,500 IDF soldiers to the area. While at this time
> operations remain limited to searches and intelligence gathering, Israeli
> military build ups, deployment of Iron Dome missile batteries, and
> limited activation of military reserves, suggest that the IDF is prepared
> for broader altercations, including armed confrontations with militants,
> civil unrest in Palestinian urban centers, or a more significant military
> offensive. SUF 40-41.

On July 2, Israelis abducted and killed a Palestinian teenager, burning him alive,
in what appeared to be an act of revenge. SUF 42. Palestinians began launching rockets
into Israel, which deployed its Air Force to retaliate with airstrikes. SUF 49-52.

As demonstrated by plaintiffs' own security alerts, the fighting between Israel
and Hamas slowly escalated as each side retaliated with "tit-for-tat" responses. SUF 52.
As the fighting worsened with almost daily barrages of missiles, rockets and fighter jet
attacks, on July 8, 2014, Israel launched "Operation Protective Edge," an offensive
campaign against Hamas. SUF 56. Israel continued this Operation for 50 days (between
July 8 and August 26, 2014), hence the name given world-wide to the conflict, the "50-
Day War." SUF 80. During this time, "Hamas and other militant groups fired 4,465
rockets and mortar shells into Israel, while the [Israeli] government conducted 5,242
airstrikes within Gaza and a 20-day military ground operation in Gaza." SUF 81. Both
Hamas and Israel carried out seaborne attacks against each other, while Israel
pummeled Hamas from the air. SUF 58.

---

[1] This is the named insured on the Policy; the plaintiffs' are indirect subsidiaries of
NBCU. SUF 26.

4

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  To give the Court a snapshot of the deadly conflict, on July 9, 2014, Stephen

2  Smith ("Smith"), NBCU's head of security for the production of *Dig*, sent an e-mail to

3  the producers of *Dig* that contained a detailed timeline of the events of that day:



16  The next day, Chris Biggs of NBCU wrote the following to Smith:

20  SUF 59.

21  As the conflict wore on, it became increasingly clear to plaintiffs that Israel was

22  planning a ground invasion. SUF 62. On July 17, Israel's ground forces did in fact

23  invade Gaza. SUF 73-74. Early on July 18, 2014, Smith sent an e-mail stating:

28

ATLANTIC SPECIALTY INSURANCE COMPANY'S NOTICE OF MOTION
AND MOTION FOR SUMMARY JUDGMENT

21

Redacted pending application to seal.

9  In the ensuing days and weeks, Israel escalated its

10 airstrikes and attacked with tanks and soldiers on the ground. SUF 74, 76. By August

11 1st, NBCU's security team reported that "1,460 Palestinians, mostly civilians, have died

12 in the conflict … Sixty-three Israelis, mostly soldiers, have died." SUF 77.

13  Although there were several attempts to broker a ceasefire, all but the last were

14 unsuccessful. SUF 78. Finally, on August 26, 2014, both sides agreed to an indefinite

15 ceasefire, drawing the war to a close. SUF 79.

16 **C.  The Devastation of the War**

17  The 50 days of intense fighting left both Israelis and Palestinians ravaged.

18 Palestinian fatalities totaled at least 2,220, at least half of whom were civilians. SUF 83.

19 Approximately 11,000 Palestinians were wounded. SUF 84. The Israeli Defense Force

20 lost 67 soldiers and 6 Israeli citizens. SUF 85. According to the U.S. Department of

21 State Human Rights Report on Israel and Palestine for 2014, "by August 5, hostilities

22 during Operation Protective Edge internally displaced approximately 520,000 persons

23 in Gaza." SUF 86. Approximately 10,000 Israelis were displaced by the war. SUF 86.

24 The damage to infrastructure was also severe, with "Israeli armed forces destroy[ing]

25 electrical, water, and other public infrastructure," with damage estimates ranging from

26 15.6 billion to as high as 31.2 billion Israeli new shekels ($4- $8 billion). SUF 87-88.

27 War, as it always does, left an indelible mark.

28

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

6

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

**D.    *Dig* and the Decision to Leave Israel**

While the dramatic clash between Israelis and Palestinians was underway, another story was unfolding. The plaintiffs were filming a television show called *Dig*. They finished filming the pilot episode on June 26, 2014, and were on a scheduled "hiatus" until July 19, 2014. SUF 67. On July 11, given the escalation of fighting, and following receipt of a July 10 security assessment noting that NBCU could not guarantee safety and security, the plaintiffs decided to postpone the production for one week. SUF 60. On July 16, as hostilities continued to escalate and there was no end in sight, the plaintiffs decided to move production of *Dig* out of Israel altogether. SUF 71. They completed filming in New Mexico and Croatia. SUF 72. Plaintiffs then submitted a claim to Atlantic for the "extra expenses" incurred as a result of their move. SUF 101.

**E.    The Policy**

The policy at issue is a Motion Picture/Television Producers Portfolio, No. MP00163-04, which was effective from January 1, 2014, through June 30, 2015 (the "Policy"). SUF 94. The "starting point" for the terms of the Policy was a manuscripted form prepared by Aon, which touts itself as the nation's leading insurance broker,[2] that represented NBCU in obtaining a new insurance policy. SUF 89, 91. After Aon and Atlantic heavily negotiated the terms, Atlantic issued its first policy to NBCU in January 1, 2010. SUF 92. That policy was renewed during each of the next three years, and finally the Policy was issued for the final period of January 1, 2014, to June 1, 2015. SUF 93, 94. In 2015, NBCU began shopping around for a new carrier, and Aon, on its behalf, submitted the actual Policy to other insurers, explaining: Redacted pending application to seal.

The relevant insuring agreement of the Policy states:

---

[2] SUF 90.

7

1   We agree to pay to you such loss (as defined in Paragraph VII) not

2   including loss of earnings or profit, as you sustain by reason of such

3   extra expense you necessarily incur as a result of the interruption,

4   postponement, cancellation, relocation, curtailment or abandonment of

5   an Insured Production due to the following:

6   1. The loss must be a direct result of an unexpected, sudden or

7   accidental occurrence entirely beyond your control to include:

8   ….

9   (g) Imminent peril, defined as certain, immediate and impending danger

10   of such probability and severity to persons or property that it would be

11   unreasonable or unconscionable to ignore. SUF 95.

12   While the Policy covers loss from impending danger under certain

13   circumstances, it includes war-related exclusions, similar to almost every insurance

14   policy, with one important difference, as acknowledged by plaintiffs' own risk

15   management department: the war exclusions are broad,[3] excluding coverage not just for

16   war, but also warlike actions and even weapons of war:

17   This policy does not insure against loss or damage caused directly or

18   indirectly by:

19   1. War, including undeclared or civil war; or

20   2. Warlike action by a military force, including action in hindering or

21   defending against an actual or expected attack, by any government,

22   sovereign or other authority using military personnel or other agents;

23   or

24   3. Insurrection, rebellion, revolution, usurped power, or action taken

25   by governmental authority in hindering or defending against any of

26   these. Such loss or damage is excluded regardless of any other cause

27   _____

28   [3] SUF 100.

8

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1    or event that contributes concurrently or in any sequence to the loss;

2    or

3    4. Any weapon of war including atomic fission or radioactive force,

4    whether in time of peace or war[.] SUF 96 (Emphasis added).

5  Atlantic seeks summary judgment on the grounds that one or more of these four

6  exclusions apply as a matter of law.

7                            III.   **ARGUMENT**

8  **A.     The Ordinary and Popular Meaning Governs**

9          Under California law, the words in the Policy must be given their ordinary and

10  popular sense. California Civil Code § 1644 states:

11    The words of a contract are to be understood in their ordinary and

12    popular sense, rather than according to their strict legal meaning; unless

13    used by the parties in a technical sense, or unless a special meaning is

14    given to them by usage, in which case the latter must be followed.

15  This statute governs the interpretation of insurance policies. *State of Cal. v. Cont'l Ins. Co.*,

16  281 P.3d 1000 (Cal. 2012). Thus, for purposes of determining whether an exclusion

17  applies, only the ordinary and popular meaning of the words matter.[4]

18  **B.     The Plain Meaning of "War" Applies to the 50-Day War**

19          *1.    The Ordinary and Popular Meaning*

20          Because the "ordinary" and "popular" sense of "war" governs in this case, it is

21  highly relevant that the world populace (including news outlets bearing the NBC name)

22  ─────────────────────

23  [4] The plain meaning should govern without any concerns of ambiguity; neither party
argues that the Policy is ambiguous. If, however, the Court finds one of the provisions
24  ambiguous, the Policy should be construed against the insureds, as they claim the
Policy as their own property. SUF 102-103. *See Fireman's Fund Ins. Co. v. Fibreboard Corp.*,
25  182 Cal. App. 3d 462, 468 (1986) (when the language in an insurance policy is the
insured's, the language is construed against them). At the very least, given how heavily
26  negotiated the Policy was, it should not be construed against Atlantic. *Id.*; *see also Garcia
27  v. Truck Ins. Exch.*, 36 Cal. 3d 426 (Cal. 1984) (if the policy is negotiated between two
sophisticated parties, the insured cannot invoke the doctrine of contra proferentem).

28

ANDERSON, MCPHARLIN & CONNERS LLP
*LAWYERS*
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

9

referred repeatedly to the 2014 conflict as a war. The following is a list, by no means complete, of news outlets that used the word "war" when discussing the conflict: **_NBC News_**, **_MSNBC_**, CBS News, CNN, The Wall Street Journal, The New York Times, The Washington Post, Time Magazine, U.S. News and World Report, the Los Angeles Times, The Atlantic, USA Today, The Chicago Tribune, The Chicago Sun Times, The Houston Chronicle, the Denver Post, The Dallas Morning News, Newsday, Haaretz News (an Israeli news outlet), BBC News, The Guardian, The Times of India, The Sydney Morning Herald, China Daily, The Daily Mail, and Salon. SUF 105-137.

But here, the Court need look no further than plaintiffs' own representatives, who also referred to the conflict as a "war." An employee of NBCU's security team, Chris Biggs, sent an analysis of the situation on July 2, 2014, and stated three times that there was a serious risk of "war" occurring soon. SUF 43. He wrote: "Killing of Israeli abductees increases pressure on Israeli government to retaliate militarily, raising *war* and unrest risks." SUF 44. He went on to state: "A broader *Gaza war* would become more likely if Hamas or other Gaza-based militants responded with several dozen rockets per day into southern Israel over a sustained period. A broader *war* would result in a much higher likelihood of Hamas using Fajr-5 rockets, capable of reaching Tel Aviv." SUF 44. NBCU's head of security, Smith, later adopted these words as his own, sending them in an e-mail to UCP's producers. SUF 45. The Max Security reports that NBCU received and relied upon[5] in deciding to leave Israel also note that in Israel, while the 2014 conflict was underway, there were "anti-war protests." SUF 138.

Even one of *Dig*'s cast members, through her lawyer, recognized the conflict amounted to "war." SUF 64. The lawyer wrote to several NBCU employees Redacted pending application to

Redacted pending application to seal.

---

[5] SUF 34, 153.

10

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

**Redacted pending application to seal.**

In addition, world leaders referred to the conflict as a war. Former Secretary of State John Kerry, who traveled to the area to negotiate a ceasefire, described the fighting as "war" in three public speeches and on a television program. SUF 141. Mr. Kerry's statements are particularly relevant given the plaintiffs' argument that the United States' position on the conflict is central to the case. These statements confirm the obvious—even though the United States lists Hamas as a terrorist organization, that does not mean Hamas cannot be involved in a war. Other prominent politicians agreed. SUF 142-146. Mr. Kerry's predecessor, Hillary Clinton, also referred to the conflict as a war. SUF 143. Critically, even *Israeli* officials, who refuse to negotiate with Hamas because they consider them terrorists, acknowledged Israel was at war, stating that Israel's airstrikes against Palestinians were a "declaration of war" and that "Hamas is determined to wage war." SUF 145-146. In short, the ordinary and popular meaning of "war" governs, and the ordinary and even not so ordinary populace around the world chose to use the word "war" to describe the 2014 conflict over and over.

## 2. The Case Law Supports Atlantic's Position

Well-reasoned case law also supports characterizing the conflict as a war, holding that there is good reason for applying the ordinary meaning of war rather than a technical meaning (as plaintiffs seek). This is because war exclusions reflect "the general recognition that war creates perils vastly greater than and quite different from" ordinary risks, and "such risks are expected to be covered by separate war risk insurance which has a premium schedule commensurate with the greater risks." *Int'l Dairy Eng'g Co. v. Am. Home Assurance Co.*, 352 F. Supp. 827, 828 (N.D. Cal. 1970), *aff'd* 474 F.2d 1242 (9th Cir. 1973). *Because* of this purpose, it is critical to interpret such exclusions to apply to the exceptional risks "attributable to organized hostilities," not just formal, declared war. *Gagliormella v. Met. Life Ins. Co.*, 122 F. Supp. 246, 249 (D.

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

Mass. 1954). In *Gagliormella*, the court held that the Korean conflict was a war because the insurer and insured were "concerned with bullets, not ballots" of the House and Senate needed to declare war. *Id. Gagliormella* also noted that any layman could see that the Korean conflict was a war, and that "what a layman can see, is not to be looked at with a squint unfriendly to insurance companies in their capacity as authors." *Id.*

The Supreme Court of California has held that "war" should be given an ordinary, rather than technical, meaning. *Kaiser v. Hopkins*, 58 P.2d 1278 (Cal. 1936). *Kaiser* involved a property tax exemption for men who served in the military during a "time of war." *Id.* at 1279. The plaintiff sought the exemption because he enlisted in the army before Congress had technically declared an end to World War I, but after an armistice that ended all actual fighting. The court refused to grant the exemption, reasoning that, "in the minds of the people," war was over when fighting ceased on the day of the armistice. *Id.* The court noted that the exemption existed "to reward those who served in time of actual war and not those who served in time of actual peace." *Id.* The court's decision gave effect to the "ordinary and common acceptation" of the word "war." *Id.; see also Vandegrift v. Bd. of Supervisors*, 23 Cal. App. 3d 228 (Cal. Ct. App. 1972) (Vietnam was a war "in fact" even though not declared); *Burger v. Emps.' Ret. Sys.*, 226 P.2d 38 (Cal. Ct. App. 1951) (the phrase "termination of war" had to be given its popular rather than technical sense, which meant true cessation of hostilities rather than formal declaration of peace).

California courts take the same view of the meaning of "war" in the insurance context. *Weissman v. Metro. Life Ins. Co.*, 112 F. Supp. 420, 425 (S.D. Cal. 1953) ( Korean conflict was a war even though never declared). There, the court held that "war" had to be given its ordinary and common meaning, and rejected the argument that the definition of "war" was a political question that only Congress could answer by declaring war. *Id.* at 423-25. The court also noted that "war" "is one of those words in the English language which, tho' everyone understands the meaning thereof, few can

12

definitely define." *Id.* at 421. The court noted that the parties probably did not put a definition in the policy because they "understood so well in their own minds the meaning." *Id.* The court's reasoning was both poignant and commonsensical:

> We doubt very much if there is any question in the minds of the majority of the people of this country that the conflict now raging in Korea can be anything but war. Certainly those who have been called upon to suffer injury and maiming, or to sacrifice their lives, would be unanimous in their opinion that this is war—war in all of its horrible aspects. And the families deprived of the love and companionship of their sons, brothers, husbands and fathers—who meet each day with hope and fear for their boys and men in Korea—and the widows and orphans of the men who died there—certainly they are aware of the stark reality that the Korea conflict is war. *Id.*

Here, we know that at least one member of the *Dig* cast felt exactly the same way, recognizing the dangers of filming in the middle of a war zone. SUF 64-66.

The Tenth Circuit has recognized that when an insurance policy excludes loss resulting from war, including "undeclared" war—as the Policy does—then the insurer and insured "chose not to use the word 'war' in its technical or formal sense, but rather in the practical and realistic sense in which it is commonly used and understood—in the sense it bears to the hazards to human life." *N.Y. Life Ins. Co. v. Durham*, 166 F.2d 874, 876 (10th Cir. 1948). In *Durham*, the court held that the United States was no longer "engaged in war" after "all of the enemies of the United States in World War Two had unconditionally surrendered," but before President Truman declared an end to the war. *Id.* at 875. Another case has held: "To say that the attack on Pearl Harbor, the action in Korea, the activities in Viet Nam are not wars, and that those killed were not killed by war, is saying, in effect, that war is not war." *Stucker v. College Life Ins. Co.*, 208 N.E.2d 731 (Ind. Ct. App. 1965).

**ANDERSON, McPHARLIN & CONNERS LLP**
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

Other courts hold that the term "war," in private contracts, refers to the presence of hostilities and not a *technical* state of war. *Girdler Corp. v. Charles Eneu Johnson & Co.*, 95 F. Supp. 713, 715 (E.D. Pa. 1951) ("Courts have uniformly held that the terms 'cessation of hostilities', 'termination of the war', 'duration of the war', 'engaged in war' and 'acts of war' refer to the end of actual hostilities."); *Darnall v. Day*, 37 N.W.2d 277, 280 (Iowa 1949) ("War, in the practical and realistic sense in which it is commonly used, refers to the period of hostilities and not to a technical state of war…."); *W. Reserve Life Ins. Co. v. Meadows*, 261 S.W.2d 554 (Tex. 1953) (the word "war" in a life insurance policy was not meant to be used in its technical or legal sense, but to refer to war in fact); *Wilkinson v. Equitable Life Assurance Soc.*, 151 N.Y.S.2d 1018 (N.Y. Mun. Ct. 1956) (Korean war was a war for purposes of a life insurance policy even though not declared because war should not be given a legalistic definition).

Atlantic expects the plaintiffs to argue for a technical and outdated definition of "war,"—that there was no war because Hamas was not a sovereign. This argument fails for at least two reasons (besides that it is contrary to California law). First, plaintiffs must concede that even those cases applying a technical definition acknowledge that "[w]ar can exist between quasi-sovereign entities." *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 368 F. Supp. 1098 (S.D.N.Y. 1973), *aff'd* 505 F.2d 989 (2d Cir. 1974). *Pan Am* held, applying a technical definition unlike what California requires, that for a war exclusion to apply, that war need not involve a "nation"—only a "de facto government." *Id.* at 1129. According to *Pan Am*, a "de facto" government is "a force [controlling] a substantial territory with trappings of state." *Pan Am.*, 505 F.2d at 1009. Here, Hamas has governed the Gaza Strip since 2007. SUF 14-15. Hamas "employs civil service employees in various ministries, including health and education. SUF 21. It also runs an ad hoc judicial system and has "branches that conduct its political, military and social welfare activities." SUF 15, 22. Hamas is a force or authority governing substantial territory with all the trappings of a state. *El-Mezain*, 664 F.3d at 485-486 ;

*Estates of Ungar v. Palestinian Auth.*, 304 F. Supp. 2d at 250; *In re Marzook*, 924 F. Supp. at 568. Even the plaintiffs' own representatives referred to "the Hamas *Government*" and to the ▮Redacted pending application to seal.▮ SUF 150-151. And the U.S. Congressional Research Service has stated that the PA, of which Hamas was a part, is, "organized like [a state]—complete with democratic mechanisms; security forces; and executive, legislative, and judicial organs of governance." SUF 20. "The executive branch has both a president and a prime minister-led cabinet, the Palestinian Legislative Council ("PLC") is its legislature, and the judicial branch has separate high courts to decide substantive disputes and to settle constitutional controversies, as well as a High Judicial Council." SUF 20. Hamas was elected to take control of the PLC in 2006. SUF 13.

Second and perhaps more importantly, applying the ordinary definition of "war" comports with *today's* stark reality: the United States engages in war with terrorist organizations. The United States Supreme Court has recognized that this country has been at war with terrorist groups far less organized than Hamas. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 594 (2006); *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004); *see also In re September 11 Litigation*, 751 F.3d 86, 89 (2d Cir. 2014).

In *Hamdi* and *Hamdan*, coalition forces captured "enemy combatants" following the acts of September 11, 2001. They filed writs of habeas corpus challenging their detention. In *Hamdi*, the Court held that U.S. citizens could be detained as "enemy combatants" if they were given a meaningful opportunity to contest their detention. 542 U.S. at 533. In reaching its decision, the Supreme Court reasoned that the Authorization for Use of Military Force resolution passed by Congress following 9/11 triggered the President's "war powers." Justice O'Connor reasoned that the capture and detention of lawful or unlawful combatants was an "important incident of war." *Id.* at 518. Similarly, in *Hamdi*, the Court reasoned:

> [N]othing in our analysis turns on the admitted absence of either a formal
> declaration of war or a declaration of martial law. Our focus instead is on

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017–3623

15

**ATLANTIC SPECIALTY INSURANCE COMPANY'S NOTICE OF MOTION
AND MOTION FOR SUMMARY JUDGMENT**

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

1  the September 11, 2001, attacks that the Government characterizes as the

2  relevant act[s] of war, and on the measure that authorized the President's

3  deployment of military force—AUMF . . . . [W]e do not question the

4  Government's position that **the war** commenced with the events of

5  September 11, 2001 . . . ."

6  *Hamdan*, 548 U.S. at 600 n.31 9 (emphasis added); *see also In re September 11 Litigation*,

7  931 F. Supp. 2d 496, 512 (S.D.N.Y. 2013) ("as *Hamdi* and *Hamdan* held, Al-Qaeda's

8  attacks on New York and Washington were acts of war against the United States.").

9      Here, while the acts of 9/11 were horrific, so were the events of the 50-Day

10 War. While approximately 3,000 people died in 9/11 (*see* 931 F. Supp. 2d at 501),

11 approximately 2,200 died in the 50-Day War and an additional 11,000 Palestinians were

12 wounded and over half a million people were displaced. SUF 83-84, 86. The events of

13 9/11 occurred on a single day, while the conflict between Israel and Hamas lasted for a

14 full fifty days. SUF 80. And far more traditional weapons of war were used by Israel

15 and Hamas as opposed to Al-Qaeda on 9/11. SUF 50-51, 74, 76. Other comparisons

16 between these two horrible events need not be made to state the obvious: war is war.

17     In summary, California law mandates that the term "war" be construed

18 according to its ordinary meaning. Here, the two combatants, Israel and Hamas, each

19 acknowledge they were at war. SUF 145-146. The then-acting U.S. Secretary of State

20 and other politicians in the United States and around the world, including the

21 Australian Minister of Foreign Affairs, referred to the conflict as a war. SUF 141-146.

22 News outlets, including plaintiffs' affiliates NBC and MSNBC, referred to the conflict

23 as a war. The plaintiffs' security personnel charged with determining the safety of the

24 crew and cast members, and the cast, referred to the conflict as a war.

25 **C.    The 50-Day War Involved War*like* Actions**

26     In addition to excluding coverage for war, the Policy also has a broad exclusion

27 for loss resulting "directly or indirectly" from "Warlike action by a military force,

28                              16

including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents." SUF 96. Two points about this exclusion warrant emphasis. First, it applies in any situation where the loss is caused directly or indirectly by warlike action by **"a"** military force. In other words, it does not require that two separate military forces be warring. Instead, it is enough if there is warlike action by **"a"** military force, including action in hindering or defending against an actual or expected attack. Second, the military force need not be by a government or sovereign, but can also be by any "other authority."

Plaintiffs must concede that Israel employed its military force as it battled Hamas with its army, navy, and air force. SUF 51, 58, 74, 76, . And it was surely the combined effect of Israel's military actions and Hamas's response that made Israel such a dangerous place in July and August 2014. Israel's escalation of the violence caused Hamas to increase its attacks. Hamas made this clear in statements published on the Qassam Brigades' website: that its operations against Israel were "part of the response campaign against the occupation assault on the Gaza Strip, and the continued targeting of Palestinian civilians and their installations in the West Bank." SUF 147. It is also clear from the circumstances and NBCU's own recital of the facts. In early 2014, when the plaintiffs were considering whether to film in Israel, there was very little recent history of Hamas rocket fire into Israel, and ▮Redacted pending application to seal.▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. SUF 29. That all changed, however, when tensions began to escalate in June 2014, after a unity government was formed and the three Israeli teenagers were kidnapped. SUF 18, 35. NBCU's security team opined that after the kidnapping, which caused Israel to deploy soldiers into Palestinian territory, there was a risk for a "broader escalation of hostilities." SUF 38. The security team also advised that *Israeli measures* "may alter the status quo, increasing the potential for related retaliatory attacks or military operations." SUF 38. The security reports on which Smith relied also noted ▮Redacted pending application to seal.▮

17

1  [REDACTED] **Redacted pending application to seal.** SUF 52. As a result of

2  the escalation of hostilities, by July 1, 2014, **Redacted pending application to seal.**

3  [REDACTED] SUF

4  53. It also noted that "A Gaza war would become more likely if Hamas or other Gaza-

5  based militants responded with several dozen rockets per day into southern Israel over

6  a sustained period. *A broader war would result in a much higher likelihood of Hamas using Fajr-5*

7  *rockets, capable of reaching Tel Aviv.*" SUF 44. Smith, the head of security, also stated: [REDACTED]

8  [REDACTED]

9  [REDACTED]

10  [REDACTED] SUF 55.

11  NBCU's own statements recognize what is indisputable: Israel's attacks were causing

12  significantly increased rocket-fire from Hamas.

13  Further, Hamas's forces were also "military forces" by an "other authority."

14  "Military" means: "of or relating to soldiers, arms, or war." WEBSTER'S THIRD NEW

15  INTERNATIONAL DICTIONARY 1433 (1976); *see also* BLACK'S LAW DICTIONARY 1007

16  (7th ed. 1999) (defining "military" as "The armed forces."). Hamas's militants were a

17  force of soldiers, who carried arms, acted in and committed war, and they were surely

18  "armed forces." SUF 24, 49-5, 58. In fact, the plaintiffs' own representatives [REDACTED]

19  [REDACTED] SUF 153. The U.S.

20  Congressional Research Service also refers to Hamas's "militia," which is "known as

21  the Izz al Din al Qassam Brigades." SUF 24, 152. And while Atlantic believes there can

22  be no doubt that Hamas is the government of Gaza, it at least is the "authority" in

23  Gaza. SUF 13, 15. Thus, this exclusion applies because plaintiffs' loss was caused by

24  the warlike action of the military forces of both Israel and Hamas.

25  Two cases have analyzed whether conflicts between Israelis and Palestinians

26  were "warlike," and both held that they were. *Hamdi & Ibrahim Mango Co. v. Reliance Ins.*

27  *Co.*, 291 F.2d 437 (2d Cir. 1961); *Pan Am.*, 368 F. Supp. 1098, *aff'd* 505 F.2d 989 (2nd

28

18

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

Cir. 1974). *Hamdi* involved the 1948 war between Israelis and Palestinians. As noted above, that war began after the U.N. created a Jewish state but not an Islamic one. SUF 2. In *Hamdi*, the insured shipped goods to the sea port of Haifa in Palestine in 1948. Some of the goods were "destroyed by mortar fire during the clash between the Israelis and the Arabs in Haifa." *Id.* at 439. The goods were insured, but the policy at issue contained an exclusion for "warlike operations." *Id.* at 441. The court held that the loss due to the destruction by mortar fire resulted from "warlike operations." *Id.* at 443.

*Pan Am* also held that fighting between Israelis and Palestinians is warlike. There, the Popular Front for the Liberation of Palestine ("PFLP") hijacked an airplane and forced the crew to fly to Beirut. It then evacuated all passengers before exploding the aircraft—killing no one but obviously making a statement. 505 F.2d at 993. Litigation ensued over whether the airline's insurance applied. The policy excluded loss resulting from war and "warlike operations." And although the court held that the destruction of an airplane was *not* a "warlike operation," it did so only because the PFLP was not "employed by or representing" a government *and* because the event took place "far removed from the locale or the subject of any warfare." 368 F. Supp. at 1130. Critically, the court went on to state: "Battles between fedayeen forces and Israelis, bombings of Israeli territory, and other forms of comparable violence, whether called 'guerilla' or 'commando' or whatever, *were probably 'warlike' in a pertinent sense.*" *Id.* (emphasis added). The term "fedayeen" referred to "Palestinian groups … organized, mostly by young men, all dedicated in their ways to Arab reconquest of Palestine." *Id.* at 1106. In short, the Second Circuit concluded that "warlike" refers to actual fighting between Palestinian forces and Israelis *in* Israel and Palestine—*precisely* what is at issue here.

Moreover, according to *Pan Am*, the phrase "military power" refers to "a de facto government, holding adversely and substantially controlling the territory it occupies." 368 F. Supp. at 1129. Hamas *was* a "de facto" government for all the reasons discussed above. *See* Section B at p. 14-15.

19

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

**D.    The Plaintiffs' Loss Resulted from Weapons of War**

Many insurance policies include a war-related exclusion for atomic or nuclear weapons of war. But Atlantic's policy is broader, excluding loss resulting from "Any weapon of war *including* [but not limited to] atomic fission or radioactive force, whether in time of peace or war." SUF 96. Thus, the Policy excludes coverage for loss resulting from any type of weapon of war.  Here, when the plaintiffs decided to leave Israel, Palestinian forces had fired hundreds of rockets into Israel, including "anti-aircraft missiles," "long-range missiles," "rockets," and "mortars." SUF 50. On July 2, 2013, Smith stated in an e-mail that: Redacted pending application to seal. SUF 54. Israel fought back with airstrikes carried out by fighter jets, missiles launched by gunboats, and a ground invasion using tanks, armored personnel carriers and infantry. SUF 74, 76, 82.

It is nothing short of obvious and indisputable that the plaintiffs left Israel because of the threat of rockets, missiles, and mortars. In fact, if the plaintiffs contend otherwise, it undermines coverage because they *must* have left due to activity that would put them in "imminent peril," under the Policy. In response to an interrogatory that asked the plaintiffs to explain why they contended their loss did not result from "weapons of war," they stated that the loss was not caused by weapons but "by the atmosphere of terror created by Hamas' random and indiscriminate firing of mortars and rockets and the potential threat of other attacks which could be used by Hamas, such as suicide bombers." SUF 104. It is nonsense to recast the *real* threat of incoming missiles as an "atmosphere of terror" created by those dangerous weapons. But even taking the plaintiffs at their word, they left because of the "atmosphere" created by the mortars and rockets, which is a loss resulting at least indirectly from those weapons.

Because it is so clear that the plaintiffs left because of the threat of rocket, mortar, and missile fire, if those weapons satisfy the definition of a "weapon of war," then Exclusion 4 applies. These weapons fit both the legal and every-day definition of

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

weapons of war. *See* Cal. Civ. Code § 1644 (requiring words in contracts to given their ordinary and popular sense). One California court called a ".50-caliber BMG rifle"—a weapon *far* less dangerous than a mortar, missile, or rocket—a "weapon of war," reasoning that it had "the capacity to destroy or seriously damage 'vital public and private buildings, civilian, police and military vehicles,'" among other things, and that it was not the type of weapon "typically possessed by law-abiding citizens for lawful purposes such as sport hunting or self-defense." *People v. James*, 94 Cal. Rptr. 3d 576, 585-86 (Cal. Ct. App. 2009). This definition applies to mortars, rockets, and missiles, as the U.S. Congress has confirmed.

Further, the National Firearms Act lists missiles and rockets as "destructive devices." 26 U.S.C.S. § 5845(f). A Senate Report discussing the Act noted that Congress had reached a "specific declaration and finding that … destructive devices (such as bazookas, mortars, antitank guns, bombs, missiles, etc.,) … are primarily weapons of war and have no appropriate sporting use or use for personal protection." S. Rep. No. 90-1501, at 28 (1968) (emphasis added); see also United States v. Jennings, 195 F.3d 795, 799 n.4 (5th Cir. 1999) (quoting this part of the Senate Report in deciding that possession of a pipe bomb was a crime of violence). Importantly, Congress's use of the phrase "weapons of war" is in the context of restricting the ownership of these weapons outside the context of war, making clear that Congress considers these destructive devices "weapons of war" no matter where they are or how they are used. The devices are "weapons of war" by their very nature.

The Ninth Circuit has also noted, in analyzing the National Firearms Act, that "[t]he term missile appears in [the National Firearms Act] alongside other *modern military weapons* such as bombs, grenades, *rockets*, and mines." *United States v. Flores*, 729 F.3d 910, 915 (9th Cir. 2013). This case makes clear that within the Ninth Circuit, missiles and rockets are considered military weapons. There can be no doubt, in short, that the

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

21

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017–3623

1  plaintiffs' loss resulted from weapons of war. The Palestinian forces were firing

2  weapons of war into Israel, and that is precisely why the plaintiffs left.

3  **E.      Insurrection, Rebellion, or Revolution**

4        Atlantic's position is that Palestine is a quasi-sovereign and that Hamas was the

5  governing entity there or at the very least the de facto government. But if the Court

6  disagrees, then it is left viewing Hamas as a political group in a territory that technically

7  belongs to Israel (SUF 7-8), but that struggles against Israeli rule. The Policy excludes

8  coverage for: "Insurrection, rebellion, revolution, usurped power, or action taken by

9  governmental authority in hindering or defending against any of these." SUF 96. If the

10 Court does not view Hamas as a de facto government, then insurrection is exactly what

11 occurred in 2014. It must be either one or the other. Either Hamas was a de facto

12 government fighting against Israel (which is war or at least warlike action), or it is a

13 band of rogues seeking to eradicate Israeli rule. Either way, coverage cannot apply.

14       In *Pan Am*, the Second Circuit held that "insurrection" referred to "[1] a violent

15 uprising by a group or movement [2] acting for the specific purpose of overthrowing

16 the constituted government and seizing its powers." 505 F.2d at 1017. The U.S.

17 Congressional Research Service has noted that Hamas authored a charter in 1988

18 setting forth its purpose and objectives. SUF 10. According to the report, the charter

19 "commits Hamas to the destruction of Israel *and the establishment of an Islamic state in all of*

20 *historic Palestine*, comprised of present-day Israel, the West Bank, and Gaza." (emphasis

21 added). SUF 10. Ousting Israelis to make room for "an Islamic state" is the precise

22 definition of an insurrection. *See Younis Bros. & Co., v. Cigna Worldwide Ins. Co.*, 899 F.

23 Supp. 1385 (E.D. Pa. 1995), *aff'd* 91 F.3d 13 (3d Cir. 1996) (applying the same

24 definition of insurrection as *Pan Am* and holding that Liberian political and social

25 turbulence of 1989 and 1990 was an insurrection). Moreover, the Qassam Brigades,

26 Hamas's military wing, made clear the purpose of its fighting during the war. According

27 to a statement posted on the Qassam Brigades' website dated August 20, 2014:

28
                                            22

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017–3623

1    The occupiers, and the entire world, should comprehend the truth

2    about what our people are demanding. All we seek is for the occupation

3    to leave us alone and stop controlling our food, the milk of our children

4    and our fuel. However, the occupiers insist on keeping us on a leash,

5    suffocating us or allowing us to breathe when they will and only as

6    much as they will. The occupiers will not be allowed to continue to do

7    so after this day, God-willing. SUF 148.

8 The Qassam Brigades also state that one of their goals is to: "Liberate Palestinians and

9 the land usurped by the Zionist occupation forces and settlers." SUF 149. From the

10 viewpoint of Hamas, and in particular its military arm, the Qassam Brigades was

11 fighting against what they perceived to be the Israeli control over Palestinians. Their

12 stated effort to end this control fits the exact definition of "insurrection."

13    The plain and ordinary meanings of "rebellion" and revolution" also apply. A

14 rebellion is an "open, organized, and armed resistance to one's government or ruler,"

15 or a "resistance to or defiance of any authority, control, or tradition." RANDOM HOUSE

16 UNABRIDGED DICTIONARY 1609 (1993). A revolution is "an overthrow or repudiation

17 and the thorough replacement of an established government or political system by the

18 people governed." *Id.* at 1649. Again, if Hamas was not a de facto government in its

19 own right—which the U.S. Congressional Research Service says it is[6]—then in the 50-

20 Day War, it was surely attempting to become one by carrying out its mission of

21 destroying Israel and establishing an Islamic State.

22 **F.**    **Bad Faith: Atlantic Had a Reasonable Basis to Apply the War Exclusion**

23    The plaintiffs cannot recover under their bad faith claim if coverage does not

24 apply. *Tilbury Constructors, Inc. v. State Comp. Ins. Fund* 137 Cal. App. 4th 466 (Cal. Ct.

25 App. 2006); *Benavides v. State Farm Gen. Ins. Co.* 39 Cal. Rptr. 3d 650 (Cal. Ct. App.

26

27 _____

28 [6] SUF 20, 23.

**ATLANTIC SPECIALTY INSURANCE COMPANY'S NOTICE OF MOTION**
**AND MOTION FOR SUMMARY JUDGMENT**

39

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017–3623

2006). For all the reasons discussed above, Atlantic is entitled to summary judgment not just on the claims for breach of contract but also on the claims of bad faith.

Even if the Court disagrees with Atlantic's coverage analysis, however, Atlantic is still entitled to summary judgment on the claims of bad faith, because reasonable minds cannot differ as to whether there is a genuine coverage dispute at issue here. "To establish a breach of the implied covenant of good faith and fair dealing under California law, a plaintiff must show: (1) benefits due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause." *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001). "The key to a bad faith claim is whether or not the insurer's denial of coverage was reasonable." *Id.* "Under California law, a bad faith claim can be dismissed on summary judgment if the defendant can show that there was a genuine dispute as to coverage." *Id.*

Here, for all the reasons discussed above, Atlantic's position is correct or, at the *very* least, reasonable. And as if all the above reasons were not enough, there is one final blow to the plaintiffs' position that completely undermines their claim of bad faith: when NBCU began internal discussions over whether they would have coverage if they moved out of Israel, *one of their own employees thought the war exclusion might apply*.

As soon as it became clear that NBCU was considering moving the filming of *Dig* out of Israel, there was a flurry of e-mails over whether there would be insurance coverage for the move. SUF 97. NBCU employees consulted Malika Adams, an employee of Comcast, which now owns NBCU, for her opinion on whether coverage would apply. Ms. Adams wrote that NBCU would Redacted pending application to seal. " SUF 98. In another follow up e-mail on the same issue, Ms. Adams wrote again to Randi Richmond, an employee of one of the plaintiffs in this case: Redacted pending application to seal. SUF 99.

24

1  If the people that the plaintiffs trusted to provide them advice on coverage were

2  advising that the war exclusion might apply, it is not credible for the plaintiffs to allege

3  that Atlantic is *unreasonable* for reaching the exact same conclusion.

4  ## IV.   CONCLUSION

5  The plaintiffs' position is disingenuous. Before the decision to leave Israel,

6  plaintiffs' own representatives referred to the conflict as a war, and people around the

7  globe have done the same.  When informing the public about the 50-Day War, NBC

8  News and MSNBC used the word "war" in articles and on television. But now, in

9  furtherance of their insurance claim, plaintiffs argue that only the most technical

10  definition will do. There is no credible support for this position and it ignores the

11  realities of war in the twenty-first century. On-point insurance case law holds that the

12  "war," "war*like*," and weapons of war exclusions apply here, as does the insurrection

13  and rebellion exclusion. And plaintiffs' claim of bad faith is frivolous given that NBCU

14  itself thought the war exclusion was relevant. Atlantic's position is more than

15  reasonable, it is correct. Atlantic respectfully requests summary judgment on all claims.

16

17  DATED: April 24, 2017          MARC J. SHRAKE
                                    ANDERSON, McPHARLIN & CONNERS LLP

18

19                                   -and-

20                                  MICHAEL KEELEY *(Pro Hac Vice)*
21                                  TONI SCOTT REED *(Pro Hac Vice)*
                                    CARLA C. CRAPSTER *(Pro Hac Vice)*
22                                  STRASBURGER & PRICE, LLP

23                                  By:    */s/  Michael Keeley*
24                                         Michael Keeley
25                                  Attorneys for Defendant ATLANTIC SPECIALTY
                                    INSURANCE COMPANY

26

27

28                                          25

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623