# EXHIBIT 14

1   LUCIA E. COYOCA (SBN 128314)
      lec@msk.com
2   VALENTINE A. SHALAMITSKI (SBN 236061)
      vas@msk.com
3   MITCHELL SILBERBERG & KNUPP LLP
    11377 West Olympic Boulevard
4   Los Angeles, CA 90064-1683
    Telephone:  (310) 312-2000
5   Facsimile:  (310) 312-3100

6   Attorneys for Plaintiffs
    Universal Cable Productions LLC and
7   Northern Entertainment Productions LLC

8                 UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10                     WESTERN DIVISION

11

12  UNIVERSAL CABLE                     CASE NO. 2:16-cv-04435-PA-MRW
    PRODUCTIONS LLC, a Delaware
13  limited liability company, and      **FIRST AMENDED COMPLAINT
    NORTHERN ENTERTAINMENT              FOR:**
14  PRODUCTIONS LLC, a Delaware         **(1)  BREACH OF INSURANCE
    limited liability company,          CONTRACT; AND
15                                       (2)  BREACH OF IMPLIED
            Plaintiffs,                  COVENANT OF GOOD FAITH
16                                       AND FAIR DEALING**
            v.
17                                       **DEMAND FOR JURY TRIAL**
    ATLANTIC SPECIALTY
18  INSURANCE COMPANY, a New
    York insurance company,
19
            Defendant.
20

21

22       Plaintiffs in this action are Universal Cable Productions LLC, formerly

23  known as Universal Network Television LLC ("UCP"), and Northern

24  Entertainment Productions LLC ("Northern Entertainment").  (UCP and Northern

25  Entertainment are collectively referred to herein as "Plaintiffs.")  Plaintiffs, by and

26  through their counsel, aver as follows:

27

28

Mitchell
Silberberg &
Knupp LLP

7914943.1

                              1                              Page 499
                    **FIRST AMENDED COMPLAINT**

# **NATURE OF CLAIM**

1.     This is an insurance coverage action by Plaintiffs against their production insurer, Atlantic Specialty Insurance Company ("Atlantic" or "Defendant"). In the summer of 2014, UCP was filming a new television show "*Dig*" in Israel when Hamas (a group designated by the United States as a terrorist organization since 1997) began launching rockets into Israel from the Gaza Strip, as reported by the United States Department of State ("State Department").[1] For the safety of cast and crew, UCP decided initially to postpone, and subsequently move the *Dig* production out of Israel. UCP, through NBCUniversal Media, LLC ("NBCUniversal"), submitted a claim to Atlantic to cover the extra expenses it and Northern Entertainment incurred in connection with postponing and eventually moving the production. Atlantic had a clear and unequivocal obligation under the terms of the Motion Picture/Television Producers Portfolio Policy No. MP00163-04 (the "Policy") to pay these extra expenses. Despite this obligation, Atlantic chose instead to abandon its insured at this perilous time. As NBCUniversal scrambled to protect the physical safety and well-being of its cast and crew, Atlantic wrongfully denied the claim, improperly contending that an exclusion for war or warlike action (the "war exclusion") precluded coverage.

2.     Atlantic's denial of the claim is a breach of the Policy. The Policy covers loss sustained as a result of extra expense incurred due to interruption, postponement, or relocation (among things) of an Insured Production caused by "imminent peril." Atlantic concedes the situation in Israel constituted imminent peril. Thus, the only question is whether there is an applicable exclusion.

---

[1] U.S. Department of State, Foreign Terrorist Organizations (available at http://www.state.gov/j/ct/rls/other/des/123085.htm); U.S. Department of State, Daily Press Briefing, Washington, DC, July 9, 2014 (available at http://www.state.gov/r/pa/prs/dpb/2014/07228980.htm). Unless otherwise indicated, all quoted and cited sources were last accessed on June 14, 2016.

Mitchell
Silberberg &
Knupp LLP

7914943.1

1    Significantly, acts of terrorism are not excluded under the Extra Expense or any

2    other coverage under the Policy. And, Atlantic's position that the war exclusion

3    applies is contrary to the Policy's terms, applicable law, and foreign policy of the

4    United States of America. In order for the exclusion to apply, under applicable

5    law, Atlantic must establish that the events in Israel constituted a war or war-like

6    activity between two sovereign or quasi-sovereign nations. Under the political

7    question doctrine, only the United States government can recognize a sovereign

8    nation or government or, conversely, designate an entity a terrorist organization.

9    The United States government does not recognize the Gaza Strip as a sovereign

10    territorial nation, and does not recognize Hamas as a sovereign government.

11    Rather, the United States government has officially designated Hamas as a terrorist

12    organization.[2] Nevertheless, Atlantic has ignored the United States government

13    position and applicable law. It claims Hamas is a sovereign or quasi-sovereign

14    government over the Gaza Strip territory (even though Atlantic admits the Gaza

15    Strip is not a recognized sovereign nation), in a self-serving attempt to invoke the

16    war exclusion and avoid its coverage obligations.

17        3.      Tellingly, Atlantic initially *admitted* that an insured event under the

18    applicable Extra Expense coverage of the Policy had occurred and that the extra

19    expenses incurred in connection with the initial postponement of the *Dig*

20    production would be covered under the Policy. However, when confronted with a

21    large pay out on the claim for relocation costs, even though Atlantic already had

22    conceded that an insured event had occurred and agreed to cover postponement

23    costs, it retracted its prior determination and denied the claim on the basis of the

24    war exclusion.

25        4.      NBCUniversal is the named insured under the Policy, and the indirect

26    parent of UCP and Northern Entertainment, which are also named insureds

27

28    [2]   *Id.*

Mitchell
Silberberg &
Knupp LLP

7914943.1

3

FIRST AMENDED COMPLAINT

Page 501

1   pursuant to the Policy terms. NBCUniversal bargained for and paid substantial

2   premiums for the Policy so that it and its affiliated and subsidiary companies

3   would be covered when, like here, events beyond their control (including acts of

4   terrorism) affect one of their Insured Productions.

5        5.    Ultimately, Atlantic did not conduct an objective and fair evaluation

6   of the *Dig* claim based on the facts and circumstances giving rise to the claim, but

7   rather denied the claim because of the poor financial performance of the Policy and

8   the financial impact on Atlantic. Thus, in denying the *Dig* claim, Atlantic chose to

9   favor its own financial interests over those of its insureds, a bad faith breach of its

10   obligations under the Policy.

11

12                **THE PARTIES**

13  **A.**    **Plaintiffs**

14        6.    Plaintiffs UCP and Northern Entertainment are Delaware limited

15   liability companies, operating, *inter alia*, out of Universal City, California, and are

16   indirect subsidiaries of NBCUniversal, one of the world's leading media and

17   entertainment companies. NBCUniversal is the first named insured in Item 1 of

18   the Declarations of the Policy. Each of UCP and Northern Entertainment is a

19   "Named Insured" under the definition of the term as set forth in Section I.A of the

20   Policy. In pertinent part Section I.A provides: "Named Insured shall mean the

21   first named insured as per the Declarations and any majority owned or managed

22   subsidiaries thereof, their respective parent and affiliated companies and or any

23   financially controlled or managed organization(s) and or any production company

24   or other entity formed or contracted by the named insured or an [*sic*] other

25   organization, entity or person(s) which the named insured has agreed to insure

26   contractually."

27

28

Mitchell
Silberberg &
Knupp LLP

7914943.1

4

Page 502

FIRST AMENDED COMPLAINT

**B.    Defendant**

7.    On information and belief, Atlantic is an insurance company organized under the laws of New York, with its principal place of business in Minnesota.  On information and belief, Atlantic is an underwriting insurance company affiliated with, controlled by, and/or owned in whole or in part by OneBeacon Insurance Group, Ltd. ("OB"), a publicly traded company (NYSE: OB) domiciled in Bermuda.  On information and belief, Atlantic is engaged in the business of underwriting specialized commercial insurance products which are issued to those engaged in the entertainment industry (among others), such as the motion picture/television production portfolio policy in question here, throughout the United States, including California and this District.  Although Atlantic is the underwriter on the Policy, the Policy was administered by One Beacon Entertainment, LLC ("OBE"), which Plaintiffs are informed and believe is wholly owned by OB, either directly or indirectly.

8.    On information and belief, at all relevant times mentioned herein as pertinent to the wrongful acts alleged herein, OBE and OB were the agents of Atlantic and were acting within the course and scope of such agency.

## JURISDICTION AND VENUE

**Allegations regarding citizenship of UCP and Northern Entertainment**

9.    This is a diversity lawsuit brought under 28 U.S.C. § 1332(a) and (c). Complete diversity exists because Plaintiffs UCP and Northern Entertainment, limited liability companies organized under the laws of the state of Delaware, are both citizens of Delaware and Pennsylvania by virtue of the citizenship of the

Mitchell
Silberberg &
Knupp LLP

7914943.1

5

Page 503

FIRST AMENDED COMPLAINT

1    entities in their chains of membership.  The citizenship for diversity purposes of
2    each entity in Plaintiffs' membership chains is specifically set forth below.[3]

3    **Plaintiff UCP**

4            10.    The two members of UCP are NBCU Television Holding LLC and
5    New-U Studios LLC.  For diversity purposes, each of NBCU Television Holding
6    LLC and New-U Studios LLC is a citizen of Delaware and Pennsylvania, based on
7    the citizenship of the entities in their membership chains, as set forth below:

8            a.    The sole member of NBCU Television Holding LLC is Universal
9                   TV NewCo LLC.  The three members of Universal TV NewCo
10                  LLC are:

11                  1.    Universal City Studios Productions LLLP, whose two
12                         partners are:

13                  a.    VUE NewCo LLC ("VUE"), whose two members are:

14                         i.    USI Entertainment LLC,

15                               1.    Whose sole member is Universal Studios
16                                      Company LLC,

17                                      a.    Whose sole member is NBCU Acquisition
18                                             Sub LLC,

19                                             i.    Whose sole member is
20                                                    NBCUniversal.  The membership of
21                                                    NBCUniversal is set forth below in
22                                                    paragraph 11.  It establishes that for
23                                                    diversity purposes, based on the
24                                                    citizenship of the entities in its

25

26

27   _____

[3] All limited liability companies (LLC) and a limited liability limited partnership (LLLP) listed
in paragraphs 9 through 12 are organized under the laws of the state of Delaware, except
28   Universal Television LLC, which is organized under the laws of the state of New York.

Mitchell
Silberberg &
Knupp LLP

7914943.1

1   membership chain, NBCUniversal is a

2   citizen of Delaware and Pennsylvania.

3      ii.      Universal Studios Company LLC,

4         1.    Whose sole member is NBCU Acquisition Sub

5          LLC,

6            a.    Whose sole member is NBCUniversal.

7   The membership of NBCUniversal is set

8   forth below in paragraph 11.  It establishes

9   that for diversity purposes, NBCUniversal

10  is a citizen of Delaware and Pennsylvania,

11  based on the citizenship of the entities in

12  its membership chain.

13       b.    VUE Holding LLC, whose sole member is VUE.  The

14  membership of VUE is set forth above in paragraph

15  10.a.1.a. (membership chain up to NBCUniversal) and

16  below in paragraph 11 (as to membership chain of

17  NBCUniversal).  Paragraphs 10.a.1.a. and 11 establish

18  that for diversity purposes, VUE is a citizen of Delaware

19  and Pennsylvania, based on the citizenship of the entities

20  in its membership chain.

21     2.    USANi Holding Company LLC, whose sole member is

22  VUE.  The membership of VUE is set forth above in

23  paragraph 10.a.1.a. (membership chain up to NBCUniversal)

24  and below in paragraph 11 (membership chain of

25  NBCUniversal).  Paragraphs 10.a.1.a. and 11 establish that

26  for diversity purposes, VUE is a citizen of Delaware and

27  Pennsylvania, based on the citizenship of the entities in its

28  membership chain.

Mitchell
Silberberg &
Knupp LLP

7914943.1

Page 505

FIRST AMENDED COMPLAINT

3.     New-U Studios LLC, whose sole member is VUE.  The membership of VUE is set forth above in paragraph 10.a.1.a. (membership chain up to NBCUniversal) and below in paragraph 11 (membership chain of NBCUniversal).  Paragraphs 10.a.1.a. and 11 establish that for diversity purposes, VUE is a citizen of Delaware and Pennsylvania, based on the citizenship of the entities in its membership chain.

b.     The sole member of New-U Studios LLC is VUE.  The membership of VUE is set forth above in paragraph 10.a.1.a. (membership chain up to NBCUniversal) and below in paragraph 11 (membership chain of NBCUniversal).  Paragraphs 10.a.1.a. and 11 establish that for diversity purposes, VUE is a citizen of Delaware and Pennsylvania, based on the citizenship of the entities in its membership chain.

11.     The sole member of NBCUniversal is NBCUniversal, LLC.  The four members of NBCUniversal, LLC are:

a.     Comcast Navy Acquisition, LLC, whose sole member is Comcast Corporation, a corporation incorporated in Pennsylvania with its principal place of business in Pennsylvania and therefore, for diversity purposes, a citizen of Pennsylvania.

b.     Comcast Navy Contribution, LLC, whose six members are:

1.     E! Holdings, Inc., a corporation incorporated in Delaware with its principal place of business in Pennsylvania and therefore, for diversity purposes, a citizen of Delaware and Pennsylvania.

2.     Comcast Contribution Holdings, LLC, whose sole member is Comcast Corporation, a corporation incorporated in Pennsylvania with its principal place of business in

Mitchell
Silberberg &
Knupp LLP

7914943.1

8

Page 506

Case 2:16-cv-04435-PA-MRW Document 58-6 Filed 04/24/17 Page 10 of 83 Page ID
Case 2:16-cv-04435-PA-MRW Document 19-3 Filed 07/07/16 Page 9 of 82 Page ID #:110
#:3368

Pennsylvania and therefore, for diversity purposes, a citizen of Pennsylvania.

3.  Versus Holdings, LLC, whose two members are:

    i.  Comcast Holdings Corporation, a corporation incorporated in Pennsylvania with its principal place of business in Pennsylvania and therefore, for diversity purposes, a citizen of Pennsylvania; and

    ii. E! Holdings, Inc., a corporation incorporated in Delaware with its principal place of business in Pennsylvania and therefore, for diversity purposes, a citizen of Delaware and Pennsylvania.

4.  Comcast CHC, LLC, whose sole member is Comcast Holdings Corporation, a corporation incorporated in Pennsylvania with its principal place of business in Pennsylvania and therefore, for diversity purposes, a citizen of Pennsylvania.

5.  Comcast SportsNet New England Holdings, LLC, whose two members are:

    i.  Comcast SportsNet NE Holdings, Inc., a corporation incorporated in Delaware with its principal place of business in Pennsylvania and therefore, for diversity purposes, a citizen of Delaware and Pennsylvania; and

    ii. CSNNE Partner, LLC, whose sole member is Comcast Holdings Corporation, a corporation incorporated in Pennsylvania with its principal place of business in Pennsylvania and therefore, for diversity purposes, a citizen of Pennsylvania.

Mitchell
Silberberg &
Knupp LLP

7914943.1

9

Page 507

FIRST AMENDED COMPLAINT

6.        Comcast SportsNet Philadelphia Holdings, LLC, whose two members are:

        i.        Comcast Spectacor Holding Company, Inc., a corporation incorporated in Delaware with its principal place of business in Pennsylvania and therefore, for diversity purposes, a citizen of Delaware and Pennsylvania; and

        ii.       Comcast Holdings Corporation, a corporation incorporated in Pennsylvania with its principal place of business in Pennsylvania and therefore, for diversity purposes, a citizen of Pennsylvania.

c.      NBCUniversal Enterprise, Inc., a corporation incorporated in Delaware with its principal place of business in Delaware and therefore, for diversity purposes, a citizen of Delaware.

d.      SNL Entertainment Holdings, Inc., a corporation incorporated in Delaware with its principal place of business in Delaware and therefore, for diversity purposes, a citizen of Delaware.

**Plaintiff Northern Entertainment**

12.    The sole member of Northern Entertainment is Universal Television LLC. For diversity purposes, Universal Television LLC is a citizen of Delaware and Pennsylvania because:

a.      The sole member of Universal Television LLC is NBCUniversal. The membership of NBCUniversal is set forth above in paragraph 11. It establishes that for diversity purposes, based on the citizenship of the entities in its membership chain, NBCUniversal is a citizen of Delaware and Pennsylvania.

13.     On the other hand, Defendant Atlantic is a citizen of New York and Minnesota.  Thus, complete diversity exists.  Furthermore, the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## **THE INSURANCE POLICY AND THE INSURED *DIG* PRODUCTION**

14.     UCP's television series entitled *Dig* is set predominantly in Jerusalem. *Dig* is about an American FBI agent based in Jerusalem whose investigation of an American's death in Jerusalem leads to the discovery of a two thousand year-old conspiracy.  The ten-episode season of *Dig* premiered in the United States in March 2015 on the USA cable network.

15.     The series, created by award-winning Israeli director and screenwriter Gideon Raff (who created *Homeland* and *Tyrant*) and American television producer and screenwriter Tim Kring (who created *Heroes*), had been in development for a substantial period of time prior to its premiere.  As early as about 2013, UCP announced that *Dig* would be set and filmed in and around Jerusalem and Tel Aviv, and would begin production in 2014.

16.     Atlantic issued the Policy to NBCUniversal for the policy period effective from January 11, 2014, to June 30, 2015.  The Policy covers losses that NBCUniversal and other Named Insureds, such as UCP and Northern Entertainment, might incur associated with their television productions (among other productions), with specific coverage provisions for risks relating to cast, negative film, extra expense due to, *inter alia*, imminent peril, property, and third party property damage losses.  NBCUniversal paid a substantial premium for the Policy, which also contains a self-insured retention.

17.     The Policy was a renewal of policies which NBCUniversal obtained from Atlantic in prior years (and for which NBCUniversal paid millions of dollars in premiums):  i.e., Policy No. MP00163-03 (effective from January 11, 2013, to January 11, 2014); Policy No. MP00163-02 (effective from January 11, 2012, to

Mitchell
Silberberg &
Knupp LLP

7914943.1

January 11, 2013); Policy No. MP00163-01 (effective from January 11, 2011, to January 11, 2012); and Policy No. MP00163-00 (effective from January 11, 2010, to January 11, 2011).

18.    The provision of the Policy relevant here, the "Extra Expense" coverage, covers losses associated with, among other things, unanticipated expenses incurred in connection with the postponement and relocation of production.

19.    The relevant provision of the Policy provides as follows:

"**I. INSURING AGREEMENT**

We [Atlantic] agree to pay to you such loss (as defined in Paragraph VII) not including loss of earnings or profit, as you sustain by reason of such extra expense you necessarily incur as a result of the interruption, postponement, cancellation, relocation, curtailment or abandonment of an Insured Production due to the following:

1.    The loss must be a direct result of an unexpected, sudden or accidental occurrence entirely beyond your control to include: …

   g) Imminent peril, defined as certain, immediate and impending danger of such probability and severity to person or property that it would be unreasonable or unconscionable to ignore.

   h) Any expenses incurred to avoid a loss resulting from imminent peril are covered to the extent that they serve to avoid a loss otherwise covered."

Mitchell
Silberberg &
Knupp LLP

7914943.1

12

FIRST AMENDED COMPLAINT

Page 510

Policy, Section III – Extra Expense, § I (a true and correct copy of the Policy is attached hereto as Exhibit A).

20.     Thus, the Policy covers *all* loss incurred as Extra Expense if an Insured Production is interrupted, cancelled, postponed or relocated due to imminent peril.  While there is no express coverage provision for terrorism, and indeed the word "terrorism" is not defined in the Policy, the Policy *does* cover all Extra Expense losses that may occur as a result of "imminent peril."  In its July 28, 2014 coverage position letter, Atlantic agreed the losses UCP sustained as a result of the acts occurring in Israel during the summer of 2014 did result from "imminent peril" as that term is defined in Section III, the Extra Expense coverage of the Policy.

21.     The *Dig* production was added as an Insured Production under the Policy in or about January 2014.  Production of the *Dig* 90-minute pilot episode commenced on or about June 1, 2014 and was completed on June 26, 2014.  The show then went on hiatus while pre-production and preparation for filming of the next nine episodes occurred, with production of the next nine episodes scheduled to begin on July 20, 2014.

## **EVENTS LEADING UP TO THE CLAIM**

22.     The events occurring in Israel during the summer of 2014 have been the subject of numerous State Department reports and travel advisory warnings. As described by the United States government, Hamas (a.k.a. Harakat al-Muqawama al-Islamiya, or the Islamic Resistance Movement) had in the past conducted numerous anti-Israeli attacks, "including shootings, suicide bombings, and standoff mortar-and-rocket attacks against civilian and military targets."[4]  The

---

[4]  U.S. Department of Treasury, U.S. Designates Five Charities Funding Hamas and Six Senior Hamas Leaders as Terrorist Entities (available at https://www.treasury.gov/press-center/press-releases/Pages/js672.aspx).

1   United States government, currently and at all relevant times, has designated

2   Hamas as a foreign terrorist organization and has never recognized Hamas as a

3   sovereign government.[5]  Moreover, the United States government does not

4   recognize the Gaza Strip as a sovereign territorial nation.[6]

5         23.    According to a State Department Daily Press Briefing, on or about

6   June 12, 2014, three Israeli "teenagers were kidnapped" with "many signs that

7   point to Hamas involvement."[7]  On or about June 30, 2014, "the bodies of the three

8   kidnapped teenagers" were found, and there were reports "indicat[ing] that Hamas

9   was involved."[8]  Shortly thereafter, according to a White House Daily Press

10  Briefing, Israel began taking affirmative action to protect its security interests[9] and,

11  according to a July 9, 2014 State Department Daily Press Briefing, Hamas began

12  launching rockets from Gaza into Israel.[10]

13        24.    As a result of these events, when questioned about the situation in

14  Israel during a State Department Daily Press Briefing, the State Department

15  spokesperson indicated the government's concerns about "the safety and security

16  of civilians"[11] in and around Israel and Jerusalem, where certain *Dig* filming was

17

18  [5] U.S. Department of State, Foreign Terrorist Organizations (available at
    http://www.state.gov/j/ct/rls/other/des/123085.htm).

19  [6] U.S. Department of State, Independent States in the World (available at
    http://www.state.gov/s/inr/rls/4250.htm).

20
    [7] U.S. Department of State, Daily Press Briefing, Washington, DC, June 18, 2014
21  (available at http://www.state.gov/r/pa/prs/dpb/2014/06/227816.htm).

22  [8] U.S. Department of State, Daily Press Briefing, Washington, DC, June 30, 2014
    (available at http://www.state.gov/r/pa/prs/dpb/2014/06/228570.htm).

23  [9] White House Daily Press Briefing, July 8, 2014 (available at
    https://www.whitehouse.gov/the-press-office/2014/07/08/daily-briefing-press-
24  secretary-07082014).

25  [10] *Id.* and *e.g.*, U.S. Department of State, Daily Press Briefing, Washington, DC,
    July 9, 2014 (available at http://www.state.gov/r/pa/prs/dpb/2014/07/228980.htm).

26  [11] *E.g.*, U.S. Department of State, Daily Press Briefing, Washington, DC, July 8,
    2014 (available at http://www.state.gov/r/pa/prs/dpb/2014/07/228878.htm).  *See
27  also* The White House, Daily Briefing by the Press Secretary, July 8, 2014 (same)
    (available at https://www.whitehouse.gov/the-press-office/2014/07/08/daily-
28  briefing-press-secretary-07082014).

Mitchell
Silberberg &
Knupp LLP

7914943.1

FIRST AMENDED COMPLAINT

1  scheduled to take place.  Thus, on or about July 11, 2014, UCP decided to

2  postpone production of the *Dig* episodes which had been scheduled to resume on

3  July 20, 2014.  The crew was alerted on that same date that production was being

4  "pushed," and that their services would not be required the following week.

5       25.    Also on or about July 11, 2014, NBCUniversal advised OBE that due

6  to the circumstances and concomitant safety concerns for cast and crew members,

7  production of the show was being postponed.  On that same date, NBCUniversal

8  also advised Atlantic through its agent, OBE, that should conditions in Israel

9  continue to deteriorate and/or not improve, UCP might be compelled to move the

10  *Dig* production to another location.

11       26.    While UCP would have been justified if it had moved the production

12  earlier or immediately due to safety concerns, UCP initially decided to postpone

13  the production to see if the situation would improve.  At the time NBCUniversal

14  informed OBE of the initial postponement, OBE, as Atlantic's agent, told

15  NBCUniversal that the expenses associated with the postponement would be

16  covered under the Extra Expense coverage of the Policy.

17       27.    On or about July 16, 2014, during a State Department Daily Press

18  Briefing, the State Department spokesperson said "right now the potential we're

19  looking at is … an even greater escalation of violence" in and around Israel.[12]

20  Faced with the prospect of escalated violence, UCP decided to move the *Dig*

21  production out of Jerusalem and Israel, and NBCUniversal promptly advised OBE

22  of the intent to relocate the production.[13]  The production of *Dig* was ultimately

23  completed in Croatia and the State of New Mexico.

---

[12]  U.S. Department of State, Daily Press Briefing, Washington, DC, June 16, 2014 (available at http://www.state.gov/r/pa/prs/dpb/2014/07/229360.htm).  *See also* The White House, Remarks by the President on Foreign Policy, July 16, 2014 ("Hamas continued to fire rockets at civilians, thereby prolonging the conflict.") (available at https://www.whitehouse.gov/the-press-office/2014/07/16/remarks-president-foreign-policy).

[13]  In fact, on July 21, 2014, the State Department issued an official Travel Warning advising that "U.S. citizens consider the deferral of non-essential travel to Israel

<span style="float:right">*(continued)*</span>

Case 2:16-cv-04435-PA-MRW  Document 58-6  Filed 04/24/17  Page 17 of 83  Page ID
Case 2:16-cv-04435-PA-MRW  Document 105  Filed 07/07/16  Page 18 of 82  Page ID #:17
#:3375

28.     The postponement and subsequent relocation of the *Dig* production came at great additional expense to Plaintiffs, in an amount to be proved at trial, but which exceeds $6.9 million.  This expense falls squarely within the definition of the Extra Expense coverage under the Policy.

## ATLANTIC WRONGFULLY DENIES THE EXTRA EXPENSE CLAIM

29.     At all pertinent times, Plaintiffs through NBCUniversal properly tendered and submitted the claim at issue to Atlantic through OBE, Atlantic's agent and administrator of the Policy.  In addition to the discussion on July 11, 2014 referenced above in paragraph 22, on or about July 15, 2014, Aon/Albert G. Ruben Insurance Services, Inc. (NBCUniversal's broker) tendered the claim to OBE as Atlantic's agent providing notice as to the losses that Plaintiffs had incurred or would incur in connection with the delay, postponement, and eventual relocation of the *Dig* production out of Israel (the "*Dig* Claim").  On or about July 16, 2014, OBE acknowledged receipt of the *Dig* Claim on Atlantic's behalf.

### A.     Defendant Atlantic Relies On Inapplicable Exclusions

30.     On or about July 28, 2014, Pamela Johnson of OBE responded to the *Dig* Claim on Atlantic's behalf.  As indicated above in paragraph 17, Johnson admitted that the *Dig* Claim constituted an "imminent peril" and therefore triggered the Extra Expense coverage under Section III of the Policy.

31.     However, despite OBE's earlier admission that an insured event had occurred and the expenses associated with the postponement would be covered under the Extra Expense coverage of the Policy, Johnson now indicated the *Dig*

---

(…continued)
and to the West Bank" and "against any travel to the Gaza Strip."  U.S. Department of State, Israel, The West Bank and Gaza Travel Warning, July 21, 2014 (available at https://web.archive.org/web/20140724171638/ http://travel.state.gov/content/passports/english/alertswarnings/israel-travel-warning.html).

Mitchell
Silberberg &
Knupp LLP

7914943.1

16

Page 514

1   claim was *not* covered because of the war exclusion (although as a "courtesy" to

2   NBCUniversal Atlantic would pay the initial postponement costs through July 17).

3       32.    The war exclusion is set forth in the Motion Picture Television

4   Portfolio General Conditions, § III.  That exclusion is clearly inapplicable here.

5   Based on controlling law, the war exclusion applies solely in the event the acts at

6   issue are between sovereign or quasi-sovereign nations.  Here, the United States

7   government does not recognize Hamas as a sovereign government or the Gaza

8   Strip as a separate sovereign territorial nation.  And, under applicable law, Hamas

9   is not a quasi-sovereign nation, but rather an entity that the United States

10  government has officially designated as a terrorist organization.

11      33.    Here, Atlantic concedes the losses sustained were a result of imminent

12  peril.  If the acts involved meet the definition of a grant of coverage under the

13  Insuring Agreement of the Policy, then it is covered, unless an exclusion applies.

14  Significantly, there is no terrorism exclusion in the Policy, and indeed, the word

15  "terrorism" is not a defined term.  Therefore, the only exclusion on which Atlantic

16  can (and did) use to try to justify its denial of coverage is the war exclusion.

17      34.    Atlantic's unmeritorious position that it does not have to pay the *Dig*

18  Claim is a breach of the Policy terms.  Atlantic is required to pay *all* losses

19  associated with the *Dig* Claim under the Extra Expense coverage of the Policy, and

20  there is no applicable exclusion.  Despite NBCUniversal's numerous requests,

21  however, Atlantic has failed and refused to pay the *Dig* Claim.  Following

22  Atlantic's July 28, 2014 denial of the *Dig* Claim, NBCUniversal requested on

23  numerous occasions that Atlantic reconsider its position.  Atlantic, however,

24  repeatedly refused to change its position.  Atlantic's breach of contract forced

25  Plaintiffs to pay all of the expenses and costs associated with the delay,

26  postponement, and relocation of the production from Israel to Croatia and New

27  Mexico in order to complete production of the series.

28

Mitchell
Silberberg &
Knupp LLP

7914943.1

17

Page 515

FIRST AMENDED COMPLAINT

## B.     <u>Defendant Atlantic Misrepresents the Terms of the Policy</u>

35.     In addition to denying the claim based on an inapplicable exclusion, Atlantic also misrepresented the terms of the Policy by contending there was no coverage for acts of terrorism, relying on a wholly inapplicable endorsement. In Johnson's July 28, 2014 letter to NBCUniversal articulating the reasons why Atlantic believed the claim was not covered, Johnson argued "the terrorism coverage should not apply," because the focus of the acts "is not the United States or its policy" and "the U.S. Secretary of the Treasury has not certified the [Hamas/Israel] events as acts of terrorism."

36.     Atlantic's position as articulated by Johnson is based on an endorsement to the Policy titled "Coverage for Certified Acts of Terrorism; Cap on Losses" (the "Endorsement"). In pertinent part, the Endorsement provides that "any *exclusion* of terrorism in this Coverage Part or Policy … is hereby amended to the effect that such exclusion does not apply to a 'certified act of terrorism.'" *See* Coverage for Certified Acts of Terrorism; Cap on Losses, § A. (Emphasis added.) Since the Endorsement *only* applies if there is an exclusion for terrorism in the Policy, it is inapplicable here because this Policy does not have a terrorism exclusion.

37.     On its face it is apparent that the Endorsement does not apply here. The Endorsement defines a "certified act of terrorism" as:

"… an act that is certified by the Secretary of Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The criteria contained in that act for a "certified act of terrorism" include the following:

1.     The act resulted in aggregate losses in excess of $5 million; and

2.     The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or

Mitchell
Silberberg &
Knupp LLP

7914943.1

18

Page 516

FIRST AMENDED COMPLAINT

individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion."

*See* Policy, Endorsement titled "Coverage for Certified Acts of Terrorism; Cap on Losses." The purpose of the Endorsement is to cap the losses Atlantic would have to pay that resulted from certified acts of terrorism, consistent with the Terrorism Risk Insurance Act of 2002, which was enacted in the aftermath of 9/11. In short, the Endorsement amends *any policy exclusions for terrorism*, to allow coverage for "certified acts of terrorism." It does not provide that only certified acts of terrorism are covered. Moreover, since there is no terrorism exclusion in the Policy, it is patently clear the Endorsement is inapplicable to the *Dig* Claim.

38. By invoking the Endorsement to deny coverage for the *Dig* Claim, Atlantic misrepresented the terms of the Policy in at least three material ways:

(a) The Policy does *not* contain *any* exclusion for losses caused by terrorist acts and, therefore, the Endorsement cannot operate to exclude coverage, regardless of whether the Hamas/Israel events are "certified acts of terrorism" as defined in the Policy or undefined acts of terrorism;

(b) The Endorsement expressly modifies only specific types of coverage listed in the Endorsement (e.g., Boiler and Machinery Coverage Part, Commercial Crime Coverage Form) and, therefore, by its express terms, the Endorsement does not modify or apply to the Extra Expense coverage at issue here; and,

(c) The Endorsement does *not* provide that only "certified acts of terrorism" are covered under the Policy; instead, it merely caps Atlantic's liability for "certified acts of terrorism" in

Mitchell
Silberberg &
Knupp LLP

7914943.1

19

FIRST AMENDED COMPLAINT

accordance with the provisions of the Terrorism Risk Insurance Act of 2002.

## C.  <u>Defendant Atlantic Places Its Interests Over Those of Its Insureds</u>

39.     Plaintiffs are informed and believe, and on that basis allege, that Atlantic's wrongful conduct as alleged herein was motivated by Atlantic's own financial interests and concerns, rather than Atlantic's coverage obligations based on the terms of the Policy.

40.     Among other things, shortly after the *Dig* Claim was tendered, NBCUniversal and/or its affiliate and subsidiary companies also insured under the Policy suffered other, unrelated losses that fell within the Policy's scope of coverage.  The *Dig* Claim paired with these new claims meant that Atlantic would be obligated to make substantial claim payments during that Policy year because the self-insured retention had now been met.

41.     Once it became apparent Atlantic would have to pay out on the Policy in an amount that would exceed the premiums earned from insuring NBCUniversal over the past several years, NBCUniversal is informed and believes Atlantic made the decision not to renew NBCUniversal's Policy, and thus it was no longer in Atlantic's interest to pay any amount on the *Dig* Claim.  Even though Atlantic had initially agreed an insured event had occurred and that it would pay for the initial *Dig* postponement costs, it changed its position and asserted the war or war related exclusion applied to preclude coverage for the entire claim (although as a "courtesy" it remained willing to pay six days' worth of postponement costs).  In so doing, Atlantic chose to favor its own financial interests over those of its insureds in bad faith breach of its obligations under the Policy.

Mitchell
Silberberg &
Knupp LLP

7914943.1

28

20

Page 518

FIRST AMENDED COMPLAINT

Case 2:16-cv-04435-PA-MRW Document 58-6 Filed 04/24/17 Page 22 of 83 Page ID
Case 2:16-cv-04435-PA-MRW Document 105 Filed 07/07/16 Page 21 of 82 Page ID #:122
#:3380

# FIRST CLAIM

## (Breach of Insurance Contract)

42.     Plaintiffs incorporate by reference each of the allegations set forth in Paragraphs 1 through 41 above, as though set forth fully herein.

43.     Atlantic issued the Policy at issue effective as of January 1, 2014, to June 30, 2015, the material terms of which are set forth above and a copy of which is attached hereto as Exhibit A.  In exchange for the Policy, all required premiums were paid.

44.     Atlantic was obligated to pay the losses that Plaintiffs incurred as a result of the *Dig* Claim under the Extra Expense coverage.

45.     Plaintiffs performed all terms, conditions, and covenants required to be performed on their part under the Policy, except as such performance was excused, rendered impossible, impracticable, and/or futile, by the acts and omissions of Atlantic.

46.     At all relevant times and to the present, Atlantic has breached and continues to breach the Policy by failing and refusing to accept and pay the *Dig* Claim.  Among other things, Atlantic wrongfully misinterpreted and misapplied the war exclusion.  Ignoring applicable law, Atlantic erroneously contends Hamas is a sovereign or quasi-sovereign entity, which engaged in hostilities with Israel, a sovereign nation, to justify its wrongful application of the "war" or "warlike action" exclusions to the *Dig* Claim.

47.     As a direct and proximate result of the foregoing breaches, Plaintiffs have suffered damages in an amount to be proved at trial, but which amount is at least $6.9 million, for the costs and expenses Plaintiffs incurred in postponing and relocating the *Dig* production out of Jerusalem and Israel, plus pre-judgment interest thereon.

Mitchell
Silberberg &
Knupp LLP

7914943.1

21

FIRST AMENDED COMPLAINT

## SECOND CLAIM

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

48.     Plaintiffs incorporate by reference each of the allegations set forth in Paragraphs 1 through 47 above, as though set forth fully herein.

49.     The Policy contains an implied covenant of good faith and fair dealing requiring Atlantic, the insurer, to act reasonably and in good faith and refrain from any conduct that would deprive Plaintiffs, insureds under the Policy, of the benefits of the Policy, including Plaintiffs' right to receive full and prompt payment of the Extra Expense losses covered by the Policy.

50.     Plaintiffs performed all terms, conditions, and covenants to be performed on their part under the Policy, except as such performance was excused and/or rendered impossible, impracticable, and/or futile by the acts and omissions of Atlantic.

51.     Atlantic failed to deal fairly and in good faith with Plaintiffs by, among other things, misinterpreting the Policy's terms to justify its application of an inapplicable war exclusion, failing to evaluate the *Dig* Claim objectively, misrepresenting Policy terms, and unreasonably, arbitrarily, and willfully withholding and denying Plaintiffs the benefits provided under the Policy.

52.     Specifically, without limitation, Atlantic has engaged in the following unreasonable, arbitrary, and/or bad faith conduct:

A.     Denying benefits due:  Despite OBE's admission that an insured event had occurred and the initial expenses associated with the postponement of the *Dig* production would be covered, Atlantic reneged, and failed and refused to pay the losses associated with the relocation of the *Dig* production, thereby depriving Plaintiffs of the benefit under the Policy such that if losses occurred, production could continue uninterrupted;

B.    <u>Applying an inapplicable exclusion to deny the claim</u>:  Atlantic denied that the *Dig* Claim was covered under the Extra Expense coverage of the Policy by wrongfully claiming that the war exclusion applied;

C.    <u>Misrepresenting the Policy terms</u>:  Atlantic misrepresented the terms of the Policy to its insureds, specifically including but not limited to the statements made regarding the Endorsement entitled "Coverage for Certified Acts of Terrorism; Cap on Losses" in an effort to avoid its obligation to pay losses on the *Dig* Claim, which also constitutes a violation of Cal. Ins. Code § 790.03(a) and (h)(1) as unfair and deceptive acts or practices in the business of insurance;

D.    <u>Failing to evaluate the claim objectively</u>:  Atlantic favored its own financial interests above those of its insureds by basing its decision to deny the *Dig* Claim on, among other things, the overall financial performance of Atlantic's insurance relationship with its insureds and the resulting financial impact on Atlantic, rather than objectively evaluating the *Dig* Claim based solely on the facts and circumstances giving rise to the Claim;

E.    <u>Interpreting the Policy and law unreasonably and arbitrarily</u>: Atlantic wrongfully attempted to justify its application of the war exclusion by unreasonably and arbitrarily interpreting applicable law and ignoring the political question doctrine, the designation of Hamas as a terrorist organization by the United States government, the government's refusal to recognize Hamas as a sovereign government or the Gaza Strip as a

sovereign state, and applicable law as to what constitutes a quasi-sovereign entity;

F. <u>Failing to investigate the claim objectively and thoroughly</u>: Atlantic failed to conduct a thorough, fair, adequate, and objective investigation and analysis of the *Dig* Claim, which also constitutes a violation of Cal. Ins. Code § 790.03(h)(3) and 10 Cal. Code Regs. § 2695.7(d) as unfair and deceptive acts or practices in the business of insurance; and

G. <u>Failing to objectively reconsider its denial of the claim</u>: Atlantic failed to objectively reconsider its denial of the *Dig* Claim despite multiple requests that it do so based on the political question doctrine, the pronouncements of the United States government as to Hamas' status as a terrorist organization, the government's refusal to recognize the Gaza Strip as a separate sovereign state or Hamas as a sovereign government, and applicable law as to what constitutes a quasi-sovereign entity.

53. As a direct and proximate result of the foregoing breaches and wrongful conduct, Plaintiffs have suffered damages in an amount to be proved at trial, but which amount is at least $6.9 million, for the costs and expenses Plaintiffs incurred in postponing and relocating the *Dig* production out of Jerusalem and Israel, plus pre-judgment interest thereon.

54. As a further direct and proximate result of the foregoing breaches and wrongful conduct, Plaintiffs are entitled to recover from Atlantic the attorneys' fees and other costs incurred by them to establish their right to receive reimbursement for the *Dig* Claim as alleged herein.

55. Plaintiffs are informed and believe, and on that basis allege, that Atlantic's wrongful conduct as alleged herein was done willfully and with the

deliberate intent to injure, vex, and annoy Plaintiffs, and/or in conscious disregard of Plaintiffs' rights so as to constitute fraud, oppression, and/or malice, thereby entitling Plaintiffs to recover exemplary and punitive damages from Atlantic in an amount to be determined by the trier of fact.

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Atlantic as follows:

1.      On the First and Second Claims, for compensatory damages according to proof, but in no event less than $6,900,000;

2.      On the Second Claim, for exemplary, consequential, and punitive damages according to proof;

3.      For attorneys' fees and costs of suit incurred herein to compel payment of the Policy's benefits in accordance with law;

4.      For prejudgment interest in accordance with law;

5.      For costs of suit incurred herein; and

6.      For such other and further relief as the Court may deem just and proper.


DATED:  July 7, 2016                LUCIA E. COYOCA
                                    VALENTINE A. SHALAMITSKI
                                    MITCHELL SILBERBERG & KNUPP LLP


                                    By: s/ Lucia E. Coyoca
                                        Lucia E. Coyoca
                                        Attorneys for Plaintiffs
                                        Universal Cable Productions LLC and
                                        Northern Entertainment
                                        Productions LLC

Mitchell
Silberberg &
Knupp LLP

7914943.1

25

Page 523

FIRST AMENDED COMPLAINT

# **DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury of all issues so triable.

DATED:  July 7, 2016

LUCIA E. COYOCA
VALENTINE A. SHALAMITSKI
MITCHELL SILBERBERG & KNUPP LLP


By:  s/ Lucia E. Coyoca
   Lucia E. Coyoca
   Attorneys for Plaintiffs
   Universal Cable Productions LLC and
   Northern Entertainment
   Productions LLC

Mitchell
Silberberg &
Knupp LLP

7914943.1

26

Page 524

FIRST AMENDED COMPLAINT

Case 2:16-cv-04435-PA-MRW Document 58-6 Filed 04/24/17 Page 28 of 83 Page ID
Case 2:16-cv-04435-PA-MRW Document 10-3 Filed 07/07/16 Page 29 of 82 Page ID #:128
#:3386

# EXHIBIT A

Case 2:16-cv-04435-PA-MRW Document 58-6 Filed 04/24/17 Page 29 of 83 Page ID
#:3387
Case 2:16-cv-04435-PA-MRW Document 10-3 Filed 07/07/16 Page 29 of 32 Page ID #:129

**Policy Number:** MP00163-04
Renewal of Number: MP00163-03



| **MOTION PICTURE/TELEVISION PRODUCERS PORTFOLIO DECLARATIONS** |
|---|

**OneBeacon** SM
**I N S U R A N C E**
Atlantic Specialty Insurance Company
150 Royall Street
Canton, MA 02021-1030

---

**Item 1. Named Insured and Mailing Address**     Agent Name and Address

**NBCUniversal Media, LLC.**     Aon/Albert G Ruben Insurance Services, Inc

30 Rockefeller Plaza, 2nd Floor
New York, NY 10112

1533 Ventura Blvd., Suite 1200
Sherman Oaks, CA 91403
NYFTZ: 2-14160

**Item 2. Policy Period**    From: **01-01-2014**    To: **06-30-2015**
At 12:01AM Standard Time at the Mailing Address Shown Above

**Item 3. Insured Production(s):** 2012 Television Production(s)

**Item 4. Estimated Period of Principal Photography:**
    Start Date:     Completion Date:     Print Date:

**Item 5. Coverage**

| Section | | Limit of Liability Each Loss | Deductible Each Loss | Trailing Deductible Each Loss |
|---|---|---|---|---|
| Section I | **Cast** | $ 50,000,000 | $ 50,000 | $ 50,000 |
| Section II | **Negative Film - Faulty Stock** | $ 50,000,000<br>$ 50,000,000 | $ Nil<br>$ 50,000 | $ Nil<br>$ 25,000 |
| Section III | **Extra Expense** | $ 10,000,000 | $ 50,000 | $ 25,000 |
| Section IV | **Property** | $ 10,000,000 | $ 5,000 | $ 5,000 |
| Section V | **Third Party Property Damage** | $ 10,000,000 | $ 10,000 | $ 5,000 |

**Item 6.** The policy is subject to a Self Insured Retention: $3,100,000 Aggregate
(Includes Paid Losses and Adjustment Expenses)

| | |
|---|---|
| Scripted TV Productions | $ 1,650,000 |
| Comcast In House Production | $ 161,007 |
| Flat Charge, Strip Shows, Specials and Webisodes requiring property coverage only | $ 40,000 |
| Policy Premium (see Rating Schedule) | $ 1,851,007 |
| Taxes, Surcharges & Fees | $ |
| **Total Premium** | **$ 1,851,007 Deposit Premium** |

**Item 7.** Form(s) and Endorsement(s) made a part of the certificate at time of issue:

---

EBI MP DEC 100 (08-06)          Page 1 of 1

Item 8. Insurance is provided against those perils and for those coverages under those sections for which a specific amount or limit of liability is shown in schedules incorporated herein, subject to all terms of the policy and all forms and endorsements made a part hereof.

Countersigned:
Date: _____     By: _____
                                                  Authorized Representative

THIS POLICY TOGETHER WITH THE POLICY CONDITIONS, COVERAGE PARTS AND FORMS
AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY

**EBI MP DEC 100 (05-02)**

**Page 2 of 2**

Page 527

Ex. A  Pg. 28

Case 2:16-cv-04435-PA-MRW Document 58-6 Filed 04/24/17 Page 31 of 83 Page ID
#:3389
Case 2:16-cv-04435-PA-MRW Document 105-8 Filed 07/07/16 Page 30 of 82 Page ID #:231



# EXECUTION OF OFFICERS' SIGNATURES

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

**Secretary**

**President**

G 10779 09 01

Page 1 of 1

**ARCHIVE**

Page 528

Ex. A Pg. 29

**THIS ENDORSEMENT CLARIFIES THE POLICY. PLEASE READ IT CAREFULLY**

ADJ. NO.

| NAMED INSURED<br>NBCUniversal Media LLC, | DATE<br>01/01/2014 | POLICY NUMBER<br>MP00163-04 |
|---|---|---|

| IF THIS ENDORSEMENT IS LISTED IN THE POLICY DECLARATIONS, IT IS IN EFFECT FROM THE TIME COVERAGE UNDER THIS POLICY COMMENCES. OTHERWISE, THE EFFECTIVE DATE OF THIS ENDORSEMENT IS AS SHOWN ABOVE AT THE SAME TIME OR HOUR OF THE DAY AS THE POLICY BECAME EFFECTIVE. | COUNTERSIGNED BY: |
|---|---|
| | _____<br>AUTHORIZED REPRESENTATIVE |

THIS ENDORSEMENT IS USED AS AN OVERFLOW FOR FIELDS ON THE DECLARATIONS PAGE NOT LARGE ENOUGH FOR THE NECESSARY INFORMATION AND TO LIST OPTIONAL COVERAGES.

MPTV Producers Portfolio Declarations – MP DEC 100 (08-06)

Signature Page – G 10779 09 01

Schedule of Forms – ILU 003 (0589)

Common Policy Conditions – IL 00 17 11 98

Motion Picture Television Portfolio General Conditions  NS 100 01 10

DICE Production General Conditions  DI 200 (06 10)

Rating Schedule and Self Insure Retention  SIR 100 0110

Cast Coverage – Section I  NS 101 0110

Broad Form Disgrace Coverage  NS 109 0105

Negative Film & Faulty Stock – Section II  NS 102 0110

Extra Expense – Section III  NS 103 0110

Animal Extra Expense  NS 106 0110

Property – Section IV  NS 104 0110

Property Animal Coverage NS 110 0110

Third Party Property Damage – Section V  MP 204 (01-05)

Strip Show Coverage Extension  NS 108 0105

Hurricane, Tornado & Country Exclusion  NS 107 0105

Cap on Losses from Certified Acts of Terrorism  IL 09 50 11 02

Exclusion of Certain Computer Related Losses –IL 09 35 07 02

New York Changes – Cancellation and Non Renewal – IL 02 68 01 11

New York Changes - Fraud – IL 01 83 08

**ILU 003 (0589)**

Page 529

Ex. A  Pg. 30

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   **a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

   **a.** Make inspections and surveys at any time;

   **b.** Give you reports on the conditions we find; and

   **c.** Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   **a.** Are safe or healthful; or

   **b.** Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 98          Copyright, Insurance Services Office, Inc., 1998          Page 1 of 1     □

Ex. A  Pg. 31

# MOTION PICTURE TELEVISION PORTFOLIO
## GENERAL CONDITIONS

Throughout this policy the words **you** and **your** refer to the Named Insured shown in the Declarations. The words **we**, **us** and **our** refer to the Company providing this insurance.

### I. GENERAL CONDITIONS

**A. NAMED INSURED**
Named insured shall mean the first named insured as per the Declarations and any majority owned or managed subsidiaries thereof, their respective parent and affiliated companies and or any financially controlled or managed organization(s) and or any production company or other entity formed or contracted by the named insured or an other organization, entity or person(s) which the named insured has agreed to insure contractually.
Named insured includes your "employees", but only within the scope of their employment by you or while performing duties related to the conduct of your business.

**B. TERRITORY**
This Policy applies anywhere in the world.

**C. MISREPRENTATION AND FRAUD**
This Policy is void if you knowingly concealed or misrepresented any material fact or circumstance concerning this insurance, or in the case of any fraud or false swearing by you, whether before or after a loss. If you make any false or fraudulent claim as to the amount or otherwise, this Policy is void as to that specific claim, and we have the right to terminate this Policy at that time, and any subsequent claims by you are forfeited. The term "you:" as used in this paragraph applies to your Risk Management Department.

**D. ASSIGNMENT**
This Policy may not be assigned without our written consent.

**E. ACTION AGAINST US**
No action against us may be brought unless you have complied with all of the material provisions of this Policy and the action is started within two (2) years after the date on which the loss occurred.
Nothing in this Policy gives any person or organization any right to join us as a co-defendant in any action against you to determine your liability.

**F. ACCESS TO RECORDS AND EXAMINATION UNDER OATH**
We or our representatives may examine and audit your books and records as they relate to this policy at any time during the policy period or while a claim is pending.
If requested, you must permit us to question you and, so far as within your power, all other interested persons under oath, at such times as may be reasonably required, about any matter relating to this insurance or a claim.
No such examination under oath or examination of books or documents, nor any other act by us or any of our employees or representatives in connection with the investigation of any loss or claim hereunder, shall be deemed a waiver of any defense which we might otherwise have with respect to any loss or claim, but all such examinations and acts shall be deemed to have been made or done without prejudice to our liability.

**G. OTHER INSURANCE**
If at the time of loss or damage, any other valid insurance is available which would apply to the loss or damage in the absence of this policy, the insurance provided by this policy will be primary to any other policy held by you, but excess with respect to any policy or coverage held or provided by any other party, unless otherwise agreed by you.
This policy does not apply to any production that has been declared by you under similar insurance provided by any other insurer.

**H. SUBROGATION**
If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. This insurance will not be prejudiced if you have waived your right of recovery from any party or parties in a lease for premises or rental agreement

**NS 100 0110**

Ex. A  Pg. 32

Case 2:16-cv-04435-PA-MRW   Document 105-6   Filed 07/07/16   Page 34 of 32   Page ID #:235

for property.  We will honor any written contractual waiver of subrogation obligation agreed to by you prior to a loss.

**I. DUTIES IN THE EVENT OF LOSS OR DAMAGE**

In the case of loss or damage to which this insurance may apply, you must see that the following duties are performed:

(1) Police Notification – Notify the police if you believe that a law may have been broken.

(2) Minimize Loss or Damage – Take all reasonable steps to protect the property from further damage and minimize the loss. Keep a record of your expenses in doing so for consideration in the settlement of the claim. This will not increase the limit of insurance.

(3) Notice of Loss or Damage

    (a) Report to us or our authorized representative as soon as practicable any loss or damage which may become a claim under this policy and provide to us a description of how, when and where the loss or damage occurred.

(4) Proof of Loss – File with us, or our authorized representative, a detailed proof of loss signed and sworn to by you setting forth to the best of your knowledge and belief the facts of the loss and the amount thereof. You must do this within one hundred eighty (180) days as requested by us or required by law after discovery of the loss or damage.

(5) Cooperation

    (a) Except at your own cost, make no voluntary payments, assume no obligations, and incur no expenses without our consent, except in settlement of a covered claim where the amount of the claim is not disputed or under the policy deductible.

    (b) Permit us to inspect the property and records supporting the loss or damage. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

    (c) Immediately send us copies of any demands, summonses or legal papers received in connection with the claim or suit.

    (d) Cooperate with us in the investigation or settlement of the claim.

**J. LOSS PAYMENT**

(1) Loss or damage covered by this policy will be payable to you or your loss payee. We agree that any holder of a Certificate of Insurance in which such holder is evidenced as a Loss Payee issued by us or on our behalf will be considered a Loss Payee subject to your legal liability.

(2) We will not pay you more than your financial interest in the covered property.

(3) If two or more of this policy's coverage apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

(4) We will pay you for covered loss or damage within thirty (30) days after we received and accept a satisfactory sworn proof of loss as we have required, or as required by law; if you have complied with all the terms of this policy and:

    (a) We have reached agreement with you on the amount of loss; or

    (b) A final judgment has been entered; or

    (c) An appraisal award has been made.

(5) We may adjust losses directly with the owners of lost or damaged property, it other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the covered property.

(6) We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

We will not be liable for any part of a loss that has been paid or made good by others.

**K. LIMITS, DEDUCTIBLE and TERMS OF COVERAGE**

(1) When a deductible applies, the terms of this insurance, including those with respect to your duties in the event of loss or damage, apply irrespective of the application of the deductible amount.

(2) We may pay any part or all of a deductible amount to effect settlement of any claim and, upon notification of the action taken; you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

(3) The Limits of Liability as stated herein apply per occurrence.

(4) The Term of Coverage will apply as stated herein to each Insured Production declared hereunder.

**L. PREMIUM**

(1) The first Named Insured shown in the Declarations:

    (a) Is responsible for the payment of all premiums; and

    (b) Will be the payee for any return premiums we pay.

(2) We will compute all premiums for this policy in accordance with the rating schedule(s) attached to and made a part of this policy.

(3) The premium shown in this policy is a deposit premium only unless specifically stated otherwise. At the end of the policy period we will compute the earned premium by applying the rates set forth in the rating schedule(s) to the final "Insurable Production Cost". However, the earned premium will not

**Page 2 of 7**

**NS 100 0110**     ☐

be less than the minimum policy premium stated on the rating schedule(s), regardless of the term of coverage.

If the earned premium is greater then the deposit premium, we will send a bill to the first Named Insured that shows the amount due and when it is payable. If the earned premium is less than the deposit premium, we will return the excess to the first Named Insured.

The first Named Insured must keep records of the "Insurable Production Costs" and other information we need for premium computation, and send us copies at such times as we may request.

### M. CANCELLATION

(1) The first Named Insured shown in the Declarations may cancel this policy by returning it to us or our authorized representative, stating in writing the future date it is to be cancelled. The policy period will end on that date.

(2) We may cancel this policy by written notice to the first Named Insured at least:

    (a) Ten (10) days before the effective date of cancellation if we cancel for nonpayment of premium; or

    (b) One hundred and twenty (120) before the effective date of cancellation if we cancel for any other reason.

(3) We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

(4) Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

(5) If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. In the event of policy cancellation, the policy premium will be adjusted to reflect audited, actual insurable production costs from policy inception date to cancellation date. Pro-rata refund will apply to all flat charges. The cancellation will be effective even if we have not made or offered a refund.

(6) If notice is mailed, proof of mailing will be sufficient proof of notice.

### N. ABANDONMENT

There can be no abandonment of any property to us without our written consent.

### O. STOP LOSS DATE

If as a result of delay in completing the original shooting schedule of an insured production you incur a loss in order to honor the termination date contained in a performance contract between you and any other person and/or their respective loan out company, such loss (hereinafter referred to as a stop date loss) would not be covered by the provisions of this policy, but this policy will, nonetheless, participate in a stop date loss to the extent that the need to incur such loss is directly related to a loss insured under the terms of this policy. The extent of our participation in a

stop date loss will be governed by the proper consideration of the following factors:

(1) If the need to incur the stop date loss is solely and directly the result of an insured loss, the stop date loss will be recoverable in full.

(2) If the need to incur the stop date loss arises in part by reason of an insured loss and also arises in part by reason of an uninsured occurrence so that it can reasonably be said that each contributed to the incidence of the stop date loss, then the extent that each so contributed will be determined and an apportionment of the stop date loss will be made.

(3) If the need to incur the stop date loss is in no way connected with an insured loss, no part of the stop date loss will be recoverable.

(4) Coverage afforded by this paragraph is subject to the proviso that the performance contract term was sufficiently longer than your original scheduled time for completion of the insured production so as to allow a reasonable margin of safety to cover possible delays in completing the insured production. It is agreed that ten (10) consecutive days is a reasonable margin of safety for features and three (3) consecutive days is a reasonable margin of safety for all other productions.

### P. APPRAISAL

If you and we fail to agree on the amount of loss, either one can demand that the amount of loss be set by appraisal. Each party will select a competent, independent appraiser and notify the other of the appraiser's identity within twenty (20) days of receipt of the written demand. The two appraisers will then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within fifteen (15) days, you or we can ask a judge of a court of record in the state of your residence to select an umpire. The appraisers will then submit a written report of an agreement to us and the amount agreed upon will be the amount of the loss. If the appraisers fail to agree within a reasonable period of time, they will submit their difference to the umpire. Written agreement signed by any two of these three will set the amount of the loss. The party selecting that appraiser will pay each appraiser. Other expenses of the appraisers and the compensation of the umpire will be paid equally by you and us.

### Q. POLICY CHANGES

No changes may be made to this policy except by mutual agreement in writing.

### R. CONFORMITY TO STATE LAW

When any policy provision is in conflict with the applicable law of the state in which this policy is issued, the law of the state will apply, unless the provision of this policy is broader.

### S. DUE DILIGENCE

You shall use due diligence and do and concur in doing all things reasonably practicable to avoid or diminish any loss or any circumstance likely to give rise to a loss or claim insured under this policy. This

**NS 100 0110**

policy extends to indemnify you for any additional expenses necessarily incurred by you to avoid or diminish such loss or claim, subject to any deductible provisions of this policy. This indemnification will not increase the limit of insurance, and we will not pay more for any loss than the amount that would have been payable had you not incurred the additional expenses.

**T. INADVERTENT ERRORS**

You will not be prejudiced by any unintentional or inadvertent omission, error or incorrect description of the property, persons, animals or exposures insured hereunder.

**U. INSPECTIONS OF SURVEYS**

(1) We have the right to:
   (a) Make inspections and surveys at any time;
   (b) Give you reports on the conditions we find; and
   (c) Recommend changes.
(2) We are not obligated to make any inspections, surveys, reports, or recommendations, and any such actions we do undertake related only to insurability and the premiums to be charged. We do not make safety recommendations. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:
   (a) Are safe or healthful; or
   (b) Comply with laws, regulations, codes or standards.
(3) Paragraphs (1) and (2) of this Condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**V. RECOVERIES**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

To the extent recovery is made from such other insurance, the deductible and/or the SIR under this policy will be reduced by such recovery. In no event will the deductible/SIR under this policy be greater than that shown in this policy. If recovery from such other insurance is greater than the deductible/SIR in this policy, then the deductible/SIR under this policy will apply.

To the extent there is a recovery from other insurance when the loss exceeds the Deductible or SIR, we will share the recovery and costs proportionally.

**W. INSURANCE NOT TO BENEFIT OTHERS**

No person or organization, other than you, having custody of the property and to be paid for services shall benefit from this insurance. This restriction does not apply to a person or organization, other than a common carrier, which is working or providing services on your behalf.

**X. PROPERTY OF OTHERS**

In the event of loss or damage to property of others (insured hereunder) held by you for which a claim is made. We have the right to adjust such loss or damage with the owner or owners of such property. Receipt of payment by such owner or owners satisfaction of any claim by you for which such payment has been made. If legal proceedings are taken to enforce a claim against you as respects any such loss or damage, we shall, at our expense, conduct and control the defense of such legal proceeding on your behalf of and in your name. No action of ours in such regard will increase our liability under this policy.

**Y. EXCHANGE RATE**

The rate of exchange applied to a loss shall be the rate as paid by you to purchase the foreign funds to pay a claim.

We reserve the right, for claims that we settle directly with third parties to this policy, to adjust the claims at the prevailing exchange rate or the exchange rate used to actually purchase the foreign funds to pay a covered claim.

## II. SPECIAL CONDITIONS

### A. DEFINITIONS

1. "Continuity" means costs incurred to match or maintain the Environment of the "Insured Production" during "Principle Photography". The Environment includes weather, climate, natural lighting or seasonal changes in which you are filming the "Insured Production".
2. "Earthquake" means:
   (a) Any earth movement, such as an earthquake, landslide, mine subsidence, or earth sinking, rising or shifting; and
   (b) Volcanic eruption, meaning the eruption, explosion or effusion of a volcano;

Provided that all earth movements or volcanic eruptions that occur within any seventy-two (72) hour period will constitute a single earth movement or volcanic eruption.

3. "Flood" means, flood waters, surface water, waves, tide or tidal water, overflow or rupture of a dam, levy, dike or other surface containment structure, storm surge, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not.
4. "Insurable Production Cost" includes: all costs, including overhead and interest on loans chargeable directly to an "Insured Production" or series of productions. Insurable Production Cost also includes any amount of other overhead only when declared at the time you declare an "Insured Production" or series of productions. The fol-

NS 100 0110 ☐

Case 2:16-cv-04435-PA-MRW Document 58-6 Filed 04/24/17 Page 38 of 83 Page ID
#:3396
Case 2:16-cv-04435-PA-MRW Document 105 Filed 07/07/16 Page 39 of 82 Page ID #:238

lowing costs shall not be included in "Insurable Production Cost":

    (a) Royalties Term Deals for Executive Producer(s), Package Fee & Publicity, residuals, premiums paid for this insurance, and personal property taxes;

    (b) Story, scenario, music rights, and sound rights, except with respect to television series, specials and pilots; and

    (c) "Continuity", except when a period of suspension due to covered loss or damage exceeds ninety (90) days.

    (d) Any other costs specifically stated not to be "Insurable Production Costs" in an endorsement to this policy.

Nevertheless, you have the option to include these excluded costs at the time you declare an "Insured Production" or series of productions. In that case, such costs will be included in the "Insurable Production Cost", and
The amount of any loss or damage paid under this policy.

5. "Insured Production" means a production or series of productions that has been declared to us.
6. "Mobile Equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    (a) Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    (b) Vehicles that travel on crawler treads;

    (c) Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted equipment, or maintained primarily for purposes other than the transportation of persons or cargo. However, "Mobile Equipment" does not include any land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

7. "Principal Photography" means the continuous period of time from the start date to the completion date you actually require to photograph or tape an "Insured Production", including any necessary wrap time or reshoots.

8. "Employee" includes a leased, temporary or volunteer worker leased to you under a written agreement perform duties related to the conduct of your business.

9. "Suit" means a civil proceeding in which damages to which this insurance applies are alleged.

**B. ABANDONMENT OF INSURED PRODUCTION**
Should a covered loss result in an abandonment during the term of coverage under this section of the policy, we have the right to require that you surrender all owned or licensed rights, title(s), and interest(s) in all documents, underlying works, copyrights and all related material of the insured production, except as relates to any sequel,

prequel, and their attendant merchandise. We will reimburse you for the cost you incurred for the rights.

**C. REPORTING REQUIREMENTS**
You must declare to us on a declaration and information form acceptable to us, the particulars of each and every production or series of productions undertaken by you during the term of this policy. If Cast Insurance is to be provided you will report to us each Covered Person to be insured prior to the completion of "principal photography".

**D. HIATUS COVERAGE**

1. With respect to episodic television, coverage is continuous from the pilot through season one, and between seasons for each television series declared to this policy, hereinafter referred to as Hiatus Coverage, subject to all other terms and conditions of this policy.

2. Hiatus Coverage as defined in this policy shall mean the period of time from the end of coverage for the pilot or an episodic television series until the commencement of pre-production, for the series following the pilot or subsequent season.
Cast coverage will be provided during the hiatus period and will mirror the coverage that was provided during the previous season for all declared productions. Cast coverage will remain as such during the term of declaration of the new season, until a new cast examination has been received, for a period of 30 days from declaring an artist for the new season. If a covered person who requires a medical examination becomes physically disabled or ill resulting in a claim, and such illness either occurs prior to their new medical examination, and results from a condition that would not have routinely been discovered during such examination or by a review of the case history of that person, then this section shall cover such claim, subject to terms and conditions in the policy language.

3. The limits of liability, deductibles and terms that were in effect for the preceding pilot or season will apply during the hiatus period.

4. Hiatus Coverage applies solely to Cast Coverage, Property and Third Party Property Damage.

5. Hiatus Coverage will cease:

    a) On the effective date of cancellation when this policy is cancelled or non-renewed by you or us;

    b) On commencement of pre-production for the series following the pilot or subsequent season of a television series;

    c) 180-days after the start of Hiatus; or

    d) At such time as the pilot or television series is not picked up or renewed by the network, whichever occurs first.

**E. DELIVERY DATE EXPEDITING COSTS**

NS 100 0110

With respect to all productions insured hereunder, subject to all other terms and conditions, the definition of loss with respect to Cast Coverage, Negative Film, Faulty Stock and Extra Expense is extended to include the necessary production extra expenses you necessarily incur to meet an air date or delivery date of an insured production subject to a sub limit of liability of $1,000,000.

**F. PRINTS AND ADVERTISING COSTS**
With respect to all productions insured hereunder, subject to all other terms and conditions, the definition of loss with respect to Cast Coverage, Negative Film, Faulty Stock and Extra Expense is extended to include the costs incurred for prints and advertising as have been rendered entirely valueless, solely in the event of an abandonment of an insured production, subject to a sub limit of liability of $1,000,000

**G. PUBLIC RELATIONS COSTS**
With respect to all productions insured hereunder, subject to all other terms and conditions, the definition of loss with respect to "Disgrace" and or "Violent Death" under Cast Insurance is extended to include the costs to hire a third party public relations firm, law firm or crisis management firm for the specific purpose to minimize potential harm to you arising from a situation or occurrence involving the Disgrace or Violent Death of an insured cast member, subject to a sub-limit of liability of $250,000.

**H. DEDUCTIBLES, ANNUAL AGGREGATE DEDUCTIBLE and TRAILING DEDUCTIBLES**
Coverage afforded under this policy is provided subject to the following terms and conditions:
A. Deductibles
1. You will incur the deductibles as stated in the policy on all covered loss before a loss accrues to the Annual Aggregate Deductible or we pay a loss:
2. The total of the adjusted claim amounts and adjusting expenses that exceed the deductible(s) will accrue to the Annual Aggregate Deductible.
B. Annual Aggregate Deductible
The annual aggregate self insured retention is $3,100,000
For "Insured Production(s)" declared to us during the policy term an Annual Aggregate Deductible for the policy term of $3,100,000 applies subject to the following:
1. All adjusted claim amounts approved by us that you incur over the deductible amounts stated herein will accrue to the Annual Aggregate Deductible;
2. At such time as the Annual Aggregate Deductible(s) has been exhausted, the deductible shown on the Declarations Page or within the policy will change to the Trailing Deductible(s) stated herein for each adjusted claim and for all subsequently adjusted claims for that "Insured Production" or annual period of declared productions.
C. Trailing Deductible(s)

After the Annual Aggregate Deductible has been exhausted, you will incur a Trailing Deductible(s) in the amounts stated below as Deductibles for each adjusted claim and we will pay all covered claims in excess of the Trailing Deductible including any and all related adjusting expense(s):

**TRAILING DEDUCTIBLES**

| COVERAGE | TRAILING DEDUCTIBLE |
|---|---|
| Cast | $50,000 |
| Negative | NIL |
| Faulty | $25,000 |
| Extra Expense | $25,000 |
| Property | $5,000 |
| Third Party Property Damage | $5,000 |
| ALL OTHER EXTENSIONS | $50,000 |

**I. CLAIMS ADMINISTRATION**

All claims must be reported to:

Entertainment Brokers International /OneBeacon Insurance Company Claims Department
1100 Glendon Ave. Suite 900
Los Angeles, CA 90024
Phone: 781-332-8480
marevalo@onebeacon.com

**III. EXCLUSIONS APPLICABLE TO ALL SECTIONS OF THIS POLICY**

This policy does not insure against loss or damage caused directly or indirectly by:
1. War, including undeclared or civil war; or
2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
4. Any weapon of war including atomic fission or radioactive force, whether in time of peace or war;

**Page 6 of 7**

NS 100 0110  ☐

5. Nuclear reaction or radiation, or radioactive contamination from any other cause. But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage caused by that fire if the fire would be covered under this policy.

6. Risks of contraband or illegal transportation of trade.

7. Violation of any Law or Statute, or any actual dishonest, fraudulent, criminal or malicious act committed by you, your employees, including any judicial injunction or action for injunctive relief.

8. Any uninsured event occurring before, concurrently with or after the happening of an insured event, which directly or indirectly causes or in any way contributes to cause or increase a loss under this policy; but only with respect to that portion of any such loss caused by or contributed to by the uninsured event, unless the uninsured event would not have been a factor had such insured event never occurred.

**NS 100 0110**

# DICE PRODUCERS PORTFOLIO POLICY CONDITIONS

Throughout this policy, "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning.

The following conditions, exclusions and definitions apply in addition to the applicable Additional Conditions, Additional Exclusions and Additional Definitions in the DICE Producers Portfolio Coverage Forms.

**I.   LOSS CONDITIONS**

**a.   Abandonment**

(1)   Abandonment of Property

There can be no abandonment of any property to us without our written consent.

(2)   Abandonment of an "Insured Production"

Should a covered loss or damage result in abandonment of an "Insured Production" during the policy period, under any Coverage of this policy, we have the right to require that you surrender all owned or licensed rights, titles and interests in all documents, underlying works, copyrights and all related material of the "Insured Production". If we exercise our right, we are not obligated to pay any loss or damage covered under this policy until you comply with these requirements.

**b.   Access To Records And Examination Under Oath**

We or our representatives may examine and audit your books and records as they relate to this policy at any time during the policy period or while a claim is pending.

If requested, you must permit us to question you and, so far as within your power, all other interested persons under oath, at such times as may be reasonably required, about any matter relating to this insurance or a claim.

No such examination under oath or examination of books or documents, nor any other act by us or any of our employees or representatives in connection with the investigation of any loss or claim hereunder, shall be deemed a waiver of any defense which we might otherwise have with respect to any loss or claim, but all such examinations and acts shall be deemed to have

been made or done without prejudice to our liability.

**c.   Appraisal**

If you and we fail to agree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent, independent appraiser and notify the other party of the appraiser's identity within twenty (20) days after receipt of the written demand. The two appraisers will then select a competent, impartial umpire. If they are unable to agree upon an umpire within fifteen (15) days, you or we can ask a judge of a court of record in the state of your residence to select an umpire. The appraisers will state separately the value of the property and amount of loss. If they fail to agree within a reasonable time, they will submit their differences to the umpire. Written agreement signed by any two of these three shall be binding. Each party will pay its chosen appraiser and equally bear the other expenses of the appraisal and umpire.

If there is an appraisal, we will still retain our right to deny the claim.

**d.   Deductible**

(1)   When a deductible applies, the terms of this insurance, including those with respect to your duties in the event of loss or damage, apply irrespective of the application of the deductible amount.

(2)   We may pay any part or all of a deductible amount to effect settlement of any claim and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**e. Due Diligence Clause**

You shall use due diligence and do and concur in doing all things reasonably practicable to avoid or diminish any loss or any circumstance likely to give rise to a loss or claim insured under this policy. This policy extends to indemnify you for any additional expenses necessarily incurred by you to avoid or diminish such loss or claim, subject to any deductible provisions of this policy. This indemnification will not increase the limit of insurance, and we will not pay more for any loss than the amount that would have been payable had you not incurred the additional expenses.

**f. Duties In The Event of Loss Or Damage**

In case of a loss or damage to which this insurance may apply, you must see that the following duties are performed:

(1) Police Notification - Notify the police if a law may have been broken.

(2) Minimize Loss or Damage – Take all reasonable steps to protect the property and Covered Persons from further damage and minimize the loss. Keep a record of your expenses in doing so for consideration in the settlement of the claim. This will not increase the limit of insurance.

(3) Notice of Loss or Damage

(a) Report as soon as practicable to us or our authorized representative any loss or damage which may become a claim under this policy. Include a description of the property or loss involved.

(b) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Proof of Loss - File with us, or our authorized representative, a detailed proof of loss signed and sworn to by you setting forth to the best of your knowledge and belief the facts of the loss and the amount thereof. You must do this within one hundred eighty (180) days after discovery of the loss or damage.

(5) Cooperation

(a) Except at your own cost, make no voluntary payments, assume no obligations, and incur no expenses without our consent.

(b) Permit us to inspect the property and records proving the loss or damage.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(c) Immediately send us copies of any demands, summonses or legal papers received in connection with the claim or suit.

(d) Cooperate with us in the investigation or settlement of the claim.

**g. Loss Payment**

(1) Loss or damage covered by this policy will be payable to you or your loss payee.

We agree that any holder of a Certificate of Insurance issued by us or on our behalf will be considered a Loss Payee, subject to your legal liability.

(2) We will not pay you more than your financial interest in the covered property.

(3) If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

(4) We will pay you for covered loss or damage within thirty (30) days after we receive and accept a satisfactory sworn proof of loss, if you have complied with all the terms of this policy and:

(a) We have reached agreement with you on the amount of loss;

(b) A final judgment has been entered; or

(c) An appraisal award has been made.

(5) We may adjust losses directly with the owners of lost or damaged property, if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the covered property.

(6) We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

We will not be liable for any part of a loss that has been paid or made good by others.

**h. Other Insurance**

If at the time of loss or damage any other insurance is available, which would apply to the loss or damage in the absence of this policy, the insurance provided by this policy shall apply as excess insurance over the other insurance.

**i. Recoveries**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**DI 200 (06-10)**

### j. Subrogation

If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them.

### k. Exchange Rate

The rate of exchange applied to a loss shall be the rate as paid by you to purchase the foreign funds. We reserve the right for claims that we settle directly with third parties to this policy, to adjust the claims at the prevailing exchange rate or the exchange rate used to actually purchase the foreign funds.

## II. GENERAL CONDITIONS

### a. Assignment

This policy may not be assigned or transferred without our written consent.

### b. Cancellation

(1) The first Named Insured shown in the Declarations may cancel this policy by returning it to us or our authorized representative, stating in writing the future date it is to be cancelled. The policy period will end on that date.

(2) We may cancel this policy by written notice to the first Named Insured at least:

(a) Ten (10) days before the effective date of cancellation if we cancel for nonpayment of premium; or

(b) Thirty (30) days before the effective date of cancellation if we cancel for any other reason.

(3) We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

(4) Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

(5) If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

(6) If notice is mailed, proof of mailing will be sufficient proof of notice.

### c. Concealment, Misrepresentation or Fraud

This policy is void in any case of fraud, intentional concealment or misrepresentation of any material fact or circumstances concerning this insurance, by you or any other insured, at any time. If you make any false or fraudulent claim as to amount or otherwise, this policy is void as to that specific claim and we have the right to terminate this policy at that time, and any subsequent claims by you are forfeited.

### d. Conformity to State Law

When any policy provision is in conflict with the applicable law of the State in which this policy is issued, the law of the State shall apply unless this policy is broader.

### e. Inspections and Surveys

(1) We have the right to:

(a) Make inspections and surveys at any time;

(b) Give you reports on the conditions we find; and

(c) Recommend changes.

(2) We are not obligated to make any inspections, surveys, reports or recommendations, and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety recommendations. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

(a) Are safe or healthful; or

(b) Comply with laws, regulations, codes or standards.

(3) Paragraphs (1) and (2) of this Condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

### f. Insurance Not to Benefit Others

No person or organization, other than you, having custody of the property and to be paid for services shall benefit from this insurance. This restriction does not apply to a person or organization, other than a common carrier, who is working on your behalf under the terms of a contract.

### g. Legal Action Against Us

No one may bring a legal action against us under this policy unless there has been full compliance with all the terms of this policy and the action is brought within one (1) year after the occurrence causing the loss or damage.

No person or organization has a right under this policy to join us as a party or otherwise bring us into any action to determine the liability of you or any other insured.

**DI 200 (06-10)**                                              **Page 3 of 6**          □

**h. Policy Changes**

This policy contains all of the agreements between you and us concerning the insurance afforded. No changes may be made in this policy except by us in writing.

**i. Territory**

This policy applies anywhere in the world.

**j. Inadvertent Error Clause**

You shall not be prejudiced by an unintentional or inadvertent omission, error or incorrect description of the property insured hereunder, provided notice be given to us and corrections made as soon as practicable after discovery of any such error or omission.

**k. Liberalization Clause**

If we adopt any provision which would broaden the coverage under this policy without additional premium within 90 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

## III. SPECIAL CONDITIONS

**a. Policy Period**

We cover loss or damage commencing during the policy period stated on the Coverage Forms attached to and made a part of this policy.

**b. Premium**

(1) The first Named Insured shown in the Declarations:

    (a) Is responsible for the payment of all premiums; and

    (b) Will be the payee for any return premiums we pay.

(2) We will compute all premiums for this policy in accordance with the rating schedule(s) attached to and made a part of this policy.

(3) The premium shown in this policy is a deposit premium only unless specifically stated otherwise. At the end of the policy period we will compute the earned premium by applying the rates set forth in the rating schedule(s) to the final "Gross Production Costs". However, the earned premium will not be less than the minimum policy premium stated on the rating schedule(s), regardless of the term of coverage.

If the earned premium is greater then the deposit premium, we will send a bill to the first Named Insured that shows the amount due and when it is payable. If the earned premium is less than the deposit premium, we will return the excess to the first Named Insured.

The first Named Insured must keep records of the "Gross Production Costs" and other information we need for premium computation, and send us copies at such times as we may request.

**c. Premises Protection**

As a condition of this insurance, you are required to maintain the protective safeguards that you represented were in effect at the time of the attachment of this insurance. Failure to maintain such protective safeguards will release us from all obligations under this policy to the extent that a loss is suffered or increased by that failure.

**d. Stop Date Loss**

A "Stop Date Loss" is a loss you necessarily incur because of a delay in completing the original shooting schedule of an "Insured Production" that will otherwise prevent you from honoring the termination date to which you have agreed in a written performance contract or agreement for persons or property.

This policy does not insure against loss or damage caused by or resulting from a "Stop Date Loss" unless the need to incur the "Stop Date Loss" directly prevents or reduces loss or damage to which this insurance applies. In that case only, coverage will apply to a "Stop Date Loss", subject to the following conditions:

(1) If you necessarily incur the "Stop Date Loss" solely and directly as a result of loss or damage to which this insurance applies, the "Stop Date Loss" will be recoverable, subject to the applicable limit of insurance, any applicable deductible provisions, and all other terms and conditions of this policy.

(2) If you necessarily incur the "Stop Date Loss" partly as a result of loss or damage to which this insurance applies and partly as a result of uninsured loss or damage, then an apportionment of the "Stop Date Loss" will be made.

(3) If you necessarily incur the "Stop Date Loss" not as a result of loss or damage to which this insurance applies, then no part of the "Stop Date Loss" will be recoverable.

Your performance contract must allow you to extend the original termination date by at least 25% of the contracted period, subject to a minimum period of one (1) shooting day.

## IV. DEFINITIONS APPLICABLE TO ALL COVERAGES OF THIS POLICY

**a.** "Earthquake" means:

Case 2:16-cv-04435-PA-MRW Document 58-6 Filed 04/24/17 Page 45 of 83 Page ID
Case 2:16-cv-04435-PA-MRW Document 105 Filed 07/07/16 Page 44 of 82 Page ID #:145
#:3403

(1) Any earth movement, such as an earthquake, landslide, mine subsidence, or earth sinking, rising or shifting; and

(2) Volcanic eruption, meaning the eruption, explosion or effusion of a volcano;

provided that all earth movements or volcanic eruptions that occur within any seventy-two (72) hour period will constitute a single earth movement or volcanic eruption.

**b.** "Flood" means flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not.

**c.** "Gross Production Costs" means all costs incurred by you during the policy period except:

(1) Administrative costs not directly related to an "Insured Production";

(2) Any cost you did not initially incur or report as a cost directly related to the "Insured Production"; and

(3) Any other costs specifically stated not to be "Gross Production Costs" in an endorsement to this policy. "Insured Production" means a production or event that has been declared and accepted by us and endorsed to this policy.

**d.** "Mobile Equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

(1) Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

(2) Vehicles that travel on crawler treads;

(3) Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted equipment, or maintained primarily for purposes other than the transportation of persons or cargo.

However, "Mobile Equipment" does not include any land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

**e.** "Principal Photography" means the continuous period of time from the start date to the completion date you actually require to photograph or tape an "Insured Production", including any necessary wraptime.

## V. EXCLUSIONS APPLICABLE TO ALL COVERAGES OF THIS POLICY

**a.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

(1) Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a Covered Cause of Loss in order to protect Covered Property.

(2) Risks of contraband or illegal transportation or trade.

(3) (a) War, including undeclared or civil war;

(b) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(c) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

(4) (a) Any weapon employing atomic fission, atomic fusion or radioactive force; or

(b) Nuclear reaction or radiation, or radioactive contamination from any other cause. But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage caused by that fire if the fire would be covered under this policy.

Exclusions a.(1) through a.(4) apply whether or not the loss event results in widespread damage or affects a substantial area.

**b.** We will not pay for loss or damage caused by or resulting from any of the following:

(1) Dishonest or criminal acts committed by:

(a) You, any of your partners, members, officers, managers, employees, leased employees, directors, trustees or authorized representatives;

(b) Anyone else with an interest in the property, or their employees or authorized representatives; or

(c) Anyone else to whom the property is entrusted for any purpose.

This exclusion applies whether or not such persons are acting alone or in collusion with other persons or such acts occur during the hours of employment.

(2) Any uninsured event occurring before, concurrently with or after the happening of an insured event, which directly or indirectly causes or in any way contributes to cause or increase loss or damage under this policy, but only with respect to that portion of any

such loss or damage caused by or contributed to by the uninsured event.

(3) Discharge, dispersal, seepage, migration, release or escape of "Pollutants" or environmental impairment of any kind.

But if any of these results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis,

chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

(4) A "Stop Date Loss", as described in Special Condition d., except as otherwise provided in Special Condition d.

(5) Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

DI 200 (06-10)

**Page 6 of 6**   ❏

Case 2:16-cv-04435-PA-MRW Document 58-6 Filed 04/24/17 Page 47 of 83 Page ID
Case 2:16-cv-04435-PA-MRW Document 105 Filed 07/07/16 Page 48 of 82 Page ID #:247
#:3405

POLICY NUMBER:                                              **MPTV PRODUCERS PORTFOLIO**

# RATING SCHEDULE
# SELF INSURED RETENTION

This endorsement modifies insurance provided under the following:

**MPTV PRODUCERS PORTFOLIO**

**I.**   **EXPOSURES**

The base rates contemplate exposures worldwide you will use reasonable efforts to give us prior notice of any activities, conditions or hazards, which may materially increase your exposure to loss, and we have the right to apply terms, conditions or change the premium to reflect such increased exposure.

The estimated insurable production cost of $1,500,000,000 applies to television productions. The estimated annual gross production costs of $87,031,000 applies to DICE Productions for Comcast.

**II.**   **RATES**

Rates shown below are per $100 of Insurable Production Cost ("IPC") as defined in CONDITIONS APPLICABLE TO ALL SECTIONS, SECTION II. SPECIAL CONDITIONS, A. DEFINITION OF INSURABLE PRODUCTION COST:

**A.**   Motion Pictures, Movies of the Week, Feature Films for Theatrical Release  (collectively "Features") – NOT COVERED

**B.**   All Television Productions, Pilots, Episodic Series, Mini-Series & Movies of the Week specifically made for Broadcast Television  (collectively "Television"): $.11 per $100 Net Insurable Production Costs.

**C.**   Documentaries, Industrial, Commercials and Educational productions (collectively "DICE") $0.185 per $100 of Gross Production Cost

**D.**   Animation Productions, mobisodes and any other similar productions distributed via the web or mobile devices NOT COVERED.

**E.**   Strip Shows, television specials and webisodes with property coverage only are subject to a flat premium of $40,000.  Coverage applies only to the property section(s) of the policy; including Third Property Damage

**F.**   Webisodes requiring coverage for more than property cover will be rated as television series, subject to a rate of $.11 per $100 of Insurable Production Costs.

**III.**   **PREMIUM PAYMENT AND AUDIT**

**A.**   Premium Payment

   **1.**   The deposit premium for all insured productions will be determined using the rates stated herein or otherwise negotiated.

   **2.**   The premium for all insured productions will be billed on the inception date of the policy and based upon a schedule of productions that you will present to us. Such premium is a deposit and estimated premium will be subject to a final audit, and adjusted on audit. The deposit premium will be payable in four quarterly installments.

   **3.**   In the event of a mid-term cancellation, the policy earned premium will be determined based the audited insurable production cost for all declared productions at the time of the cancellation.

**SIR 100 0110**                                              Page 1 of 3      ☐

    **B.**    Premium Audits

        1.    The final adjusted premium will be subject to a "voluntary audit" of Insurable Productions Costs in accordance with the rates and terms shown herein and as defined in the policy. A "Voluntary Audit" means that you will submit to us within ninety (90) days of the expiration of the policy an itemized accounting in the form of a production cost report (as commonly used in the Entertainment Industry) of the total Insurable Productions Cost of all productions.

              In the event of a policy cancellation, the policy premium will be adjusted to reflect the audited, actual insurable production costs from the inception to the cancellation date. Pro-rata refund will apply to all flat charges.

        2.    Premiums for audit adjustments will be billed upon completion of the audit.

**IV.**    **DEDUCTIBLES AND ANNUAL AGGREGATE SELF-INSURED RETENTION**

Coverage afforded under this policy is provided subject to the following terms and conditions:

**A.**    Maintenance Deductible

        1.    You shall incur all covered loss up to and including the amounts stated below as Maintenance Deductibles see below:

        2.    The total of the adjusted claim amounts exceeding the deductible and related adjusting expense will accrue to the annual aggregate self-insured retention ("SIR").

        3.    Adjusted claim amounts that do not exceed the Deductibles will not accrue to the SIR.

**B.**    Annual Aggregate Self-Insured Retention
       The annual aggregate self insured retention is $3,100,000

**C.**    The "self insured" retention is not applicable to productions defined as DICE productions.

**D.**    Deductibles applicable to DICE Productions;

| | |
|---|---|
| Cast | $10,000 |
| Negative | $NIL |
| Faulty | $5,000 |
| Property | $2,500 |
| Extra Expenses | $5,000 |
| Third Party PD | $2,500 |

**D.**    Trailing Deductible(s)

        After the Self Insured Retention has been exhausted, you will incur a Trailing Deductible in the same amounts stated below as Deductibles for each adjusted claim and we will pay all covered claims in excess of the trailing deductible including any and all related adjusting expense(s)>

### V. MAINTENANCE AND TRAILING DEDUCTIBLES

| COVERAGE | MAINTENANCE | TRAILING |
|---|---|---|
| Cast | $50,000 | 50,000 |
| Negative | $0 | $0 |
| Faulty | $50,000 | $25,000 |
| Extra Expense | $50,000 | $25,000 |
| Property | $ 5,000 | $5,000 |
| Third Party Property Damage | $10,000 | $5,000 |

# SECTION I - CAST COVERAGE

Throughout this policy the words **you** and **your** refer to the Named Insured shown in the Declarations. The words **we**, **us** and **our** refer to the Company providing this insurance.

### I. COVERAGE

**A. Coverage**
We will pay the actual and necessary loss you sustain by reason of a Covered Person being prevented from commencing, continuing or completing an assigned duty or role in an "Insured Production". The loss must be caused by or result from a Covered Cause of Loss during the Term of Coverage.

**B. Covered Causes of Loss**
1. Accidental injury, sickness or death, to a Covered Person;
2. Kidnap of a Covered Person;
3. Death, Severe Injury, Catastrophic Injury, life threatening illness of an "Immediate Family Member" during the term a Covered Person is insured hereunder.
4. "Violent Death" or "disgrace" of a Covered Person declared and accepted by us, that necessarily forces the abandonment of the "Insured Production", except those causes of loss listed in the Exclusions.

**C. Term of Coverage**
Term of Coverage, as used in this Coverage, means the period beginning with the effective date shown in the Declarations, reporting form or the start date of principal photography whichever occurs first, and continuing until the earliest of the following dates:
1. The date of delivery required under the completion guarantee agreement with the distributor(s);
2. The date your completion guarantor is released from further obligations to you;
3. Eighteen (18) months after completion of "Principal Photography";
4. The date on which a protection print or duplicate tape has been completed and physically removed from the premises where the original negative or tape is located; and in the case of "Violent Death or Disgrace", upon airing of the Insured Productions Coverage.

5. The date on which cancellation or termination of coverage under this policy for the "Insured Production" becomes effective.
6. The expiration date of this policy or declaration will be extended, if necessary, from the earliest of these dates. We may charge additional premium for this extension.
7. Subject to the Medical Examination Condition below, Term of Coverage also includes the Pre-Production period of Cast Coverage.
8. The Pre-Production period for Covered Persons who are "Guest Artists" in episodic television begins sixty 60 days before the start of "Principal Photography" or videotaping of the "Insured Production".
9. The Pre-Production period for other Covered Persons begins one hundred and eighty (180) days before the start of "Principal Photography".
10. You may, provided we are given prior notice, Declare a starting date of "Principal Photography" at any time within the term of this policy;

### II. EXCLUSIONS
We will not pay for loss caused by or resulting from any of the following:
1. Sickness on a Covered Person unless accepted by us and or as may be provided under IV b Medical Examination.
2. Any Covered Person taking part in flying other than as a passenger;
3. The inability of any female to continue her performance because of pregnancy or conditions pertaining to pregnancy. This exclusion will not apply if you can prove that the female was not aware of the pregnancy when they accepted the position with you or when they completed the medical certificate

**NS 101 0110**

Ex. A  Pg. 48

or when the medical examination was performed

4. Any Covered Person over seventy eight (78) years of age unless the person is specifically named in an endorsement attached to this policy

5. Any reservation, exception or restriction we have imposed on a Covered Person, as described in the Medical Examination Condition below, regardless of when the event causing loss occurs.

6. Behavior, action or inaction of a covered person that is consistent with the known public or private persona or behavior of the covered person which gives rise to "disgrace" of the "covered person".

### III. LIMITS OF LIABILITY

The most we will pay for loss in any one occurrence is the Limit of Insurance shown in the Declarations for Cast Coverage.

Family Death is subject to a sublimit of $2,000,000 per Occurrence.

### IV. DEDUCTIBLE OR SELF INSURED RETENTION

We will not pay for loss in any one occurrence until the amount of the adjusted loss before applying the applicable limits of insurance exceeds the deductible or self insured retention amount shown in the Declarations for Cast Coverage. We will then pay the amount of the adjusted loss in excess of the deductible or self insured retention, up to the applicable limit of insurance.

A Maintenance Deductible applies excess of the Self Insured Retention as described on a schedule or endorsement of Maintenance Deductibles.

A separate Deductible of $250,000 shall apply to Cast Coverage loss arising from any artists participating in stunts or other hazardous activity where such stunts or other hazardous activity was not declared to the underwriter, and accepted and approved for coverage by the underwriter prior to the activity taking place.

### V. DEFINITION OF LOSS

a. The amount of your loss will be determined based on:

(1) All necessary "Insurable Production Cost" you incur to complete the "Insured Production" that exceeds the amount of "Insurable Production Cost" you would have incurred if the covered cause of loss had not occurred; and

(2) All other necessary expenses that reduce the amount of loss otherwise payable.

However, your loss will not include loss of earnings of profit.

If you abandon an "Insured Production" that has been made substantially valueless solely because one or more covered causes of loss reasonably, practically and necessarily prevents you from completing the "Insured Production", irrespective of any completion or delivery date requirements for the "Insured Production", we will pay as loss the total "Insurable Production Cost" you have incurred for the "Insured Production".

"Insurable Production" including the "Insurable Production Costs" of any unaired production or series of productions in the event of loss under Coverage I, Section B.4 "Violent Death" or Disgrace".

### VI. ADDITIONAL CONDITIONS

For the purposes of this Coverage, the following Conditions apply in addition to the Policy Conditions.

a. Additional Duties In The Event of Loss Or Damage

The following is added to Policy Condition VIII - Duties In The Event of Loss:

(1) You must report immediately to us or our authorized representative any fact or circumstance which may prevent a Covered Person from commencing, continuing or completing an assigned duty or role in an "Insured Production" and which may result in a claim under this policy.

(2) You must immediately secure and file with us or our authorized representative the certification of a duly licensed physician. The certification must include a complete description of the injury, sickness or death and the prognosis.

(3) You must make every effort to preserve our rights, including enforcing any contractual conditions or terms applicable to the Covered Person, to:

(a) Have any Covered Person examined by a medical doctor of our choice; and

(b) Have continuing access to the medical records of any Covered Person.

It is your responsibility to comply with these conditions and your inability to provide the

---

**Page 2 of 5**

**NS 101 0110**  ☐

above may result in your not proving your claim hereunder.

b. Medical Examination, Accident Coverage, Immediate Family, Essential Element, Violent Death & Disgrace

(1) Any production except Feature Films each Covered Person, other than a "Guest Artist" in episodic television, must be examined by a duly licensed physician, designated or approved by us or submit a medical affidavit not more than one hundred eighty (180) days prior to the start of principal photography of the start date the Covered Person's assigned duties or role in the "Insured Production" are scheduled to commence.

For Feature Films the following Covered Person(s) must be examined by a duly qualified physician designated or approved by us, (veterinarian with respect to animals), who will submit to us a Medical Certificate or Affidavit signed by the examinee and physician (not applicable to animals prior to the date the Covered Person's assigned duties or role in the "Insured Production" are scheduled to commence. The physician must complete and submit to us a Medical Certificate or Affidavit, on forms approved by us and signed by the Covered Person.

a. The Director(s);
b. Seven (7) covered persons with the greatest exposure to the production as determined by the Risk Management Department. If Risk Management has made a determination of the top seven (7) artists and it is discovered that the determination was incorrect, we will not deny a claim or penalize you for such incorrect determination.

The physician must complete and submit to us a medical questionnaire and certificate, on forms approved by us and signed by the Covered Person.

If the doctors we provide are not available to you for the completion of a medical examination, we grant you permission to use any licensed medical doctor available, except for the Covered Person's personal physician;

(2) Cast Exams are required for cast coverage to apply to any artists declared to a DICE production, when the estimated gross production costs exceeds $5,000,000 or when the total number of filming days exceeds thirty (30) days.

Productions with total Gross Production Costs exceeding 10,000,000 or $1,500,000 per episode, requiring Cast Coverage must be declared to the policy in order for coverage to apply. All other DICE productions, regardless of total production costs or the episodic costs per episode that do not require Cast Coverage, do not need to be declared in order for coverage, other than cast coverage to be afforded under the policy to apply.

(3) Sickness Coverage for the Covered Person will become effective on the date the medical examination, Medical Certificate or Affidavit authorization is completed, subject to our receipt and approval of the medical exam, Medical Certificate & Affidavit.

Based on the medical information submitted to us, we have the right to make any reservation, exception or restriction regarding the insurability of the Covered Person within two (2) business days of receipt of the medical exam. We will not pay for loss caused by or resulting from any such reservation, exception or restriction.

If a Covered Person becomes sick or disabled before the medical exam or Medical Affidavit has been completed we will cover the sickness or disability subject to you showing that the sickness or disability would not have been discovered or disclosed during the medical exam or outlined in the Medical Affidavit and that the Covered Person had no prior knowledge.

Our failure to respond to a Medical Certificate & Affidavit and or Affidavit & Authorization within two (2) business days of our receipt will result in full coverage without restriction.

(4) Accident and Kidnap Coverage is effective on the date you have contracted

NS 101 0110

with the Covered Person to perform in the "Insured Production".

(5) "Disgrace" & "Violent Death" is effective when the Covered Person is approved by us.

(6) "Immediate Family" is effective on the date you have contracted with the Covered Person to perform in the "Insured Production".

(7) "Essential Element" is effective when the Covered Person is declared and approved by us.

(8) Animals must be declared and accepted by us before coverage will commence.

We will also review our own case history and public records to determine the coverage on any Covered Person.

## VI. DEFINITIONS

1. "Covered Person" means a person declared and accepted by us, except as outlined herein.

2. "Guest Artist" means the Host under a DICE Production & a Covered Person appearing in or contracted to appear in episodic television for less than three (3) consecutive episodes or less than fifty percent (50%) of a series of productions.

3. "Immediate Family Member" means the mother, father, sister, brother, spouse, life partner, child, stepparents, stepchildren, stepbrother, stepsister, mother-in-law, father-in-law, sister-in-law, brother-in-law, daughter-in-law, son-in-law or "significant others" who reside together, grandparent or grandchild of the Covered Person.

4. "Violent Death" means the Covered Person died at the hands of another person and that the Covered Person was involved in a crime. The showing of the "Insured Production" would degrade the insured and would anger the public

5. "Disgrace" means any criminal act or alleged criminal act, or any offense against public taste or decency, committed by a covered person, beyond their usual or expected behavior, that degrades or brings that Covered Person into disrepute or provokes insult or shock to the community that reflects un-

favorably upon the named insured or insured production that renders the "Insured Production" commercially unviable on unaired shows.

6. "Essential Element" is defined AS a declared artist(s) for the purpose of completion and delivery of the "Insured Production" as an "Essential Element" and accepted by us.

## VII. ESSENTIAL ELEMENT

In the event of:

(i) The death of a declared "Essential Element" during the period of pre-production or principal photography; or

(ii) The injury or illness of an "Essential Element" during the period of principal photography, whose injury or illness necessarily prevents the declared artist from performing services and completing the insured production. The injury or illness must incapacitate the "Essential Element" for a period of more than 30 days;

it shall be considered reasonable, practical, and necessary for you to abandon the Insured Production during principal photography and make claim under this Section for such costs.

Pursuant to Paragraph c. (ii) above, we shall have the option to delay your abandonment of the insured production for up to 30 days after the occurrence of the injury or onset of the injury or illness if in our good faith business judgment the artist is likely to recover from such injury or illness to resume his/her assigned role or position within 30 days.

In the event our decision to exercise our option to delay your abandonment of the insured production for up to 30 days after the occurrence of an injury or onset of an illness of the declared "Essential Element" causes you to incur a loss in excess of the amount stated in Section I. Cast, III Limits of Liability then such limit of liability shall automatically be increased to include the costs necessarily incurred in excess of the Limit of Liability caused solely and directly by the warranties below.

## VIII. DUTIES IN THE EVENT OF LOSS

Prior to payment of the "Essential Element" loss covered, you will comply with the following:

1. Upon our written request, within five (5) business days following the "Essential Element" loss you and one of our representatives shall meet to determine the viability of the options to complete the insured production, including the possibility of replacing the "Essential Element". You will do all things possible to complete the Insured Production, where possible with the remaining cast and crew, including maintaining or replacing financing to complete the insured production. "Essential Element" replacement will be a person of similar standing within the motion picture industry who is acceptable to independent financiers or distributors.

2. You will work with us in good faith and do all things possible to replace the "Essential Element" and upon our request, provide us your authority to negotiate on your behalf with any other party to assist in the replacement of an "Essential Element" or financing.

3. You will at our option enable us to maintain or replace any financing to complete the insured production.

Any breach of the above warranties will relieve us of any claim that would be payable hereunder.

POLICY NUMBER:                                    **MPTV PRODUCERS PORTOLIO**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## BROAD FORM DISGRACE COVERAGE

This endorsement modifies insurance provided under the following:

**MPTV PRODUCERS PORTFOLIO**

"Violent Death" or "Disgrace" of a Covered Person declared and accepted by us, that forces the abandonment or delay of the "Insured Production"; except those causes of loss listed in the Exclusions.

The above Disgrace Coverage is provided contingent on the following provision:

A separate request must be received by Underwriting, accepted by us, and declared to the policy.

All other terms and conditions remain unchanged.

**NS 109 0105**                                    Page 1 of 1      ☐

# SECTION II – NEGATIVE FILM AND FAULTY STOCK

Throughout this policy the words **you** and **your** refer to the Named Insured shown in the Declarations. The words **we, us** and **our** refer to the Company providing this insurance.

## I. INSURING AGREEMENT

We agree to pay you such loss (defined in Paragraph IV) as you directly and solely sustain as a result of loss of, damage to or destruction of videotape stock, raw film stock, recorded videotape, exposed motion picture film (developed or undeveloped), inter-positives, positives, work prints, cutting copies, fine grain prints, sound tracks, tapes, transparencies, cells, art work (used to create animation or other images), source materials, software, data, media and related material used to generate computer or other images, and or any similar material or property, caused by an insured peril (defined in Paragraph II) when such property is your property or the property of others for which you are legally liable and, while such property is used or to be used in connection with an insured production.

## II. PERILS INSURED

This coverage insures:

(1) All risks of direct physical loss or damage;

(2) Faulty materials, faulty equipment, faulty computer equipment, faulty editing, faulty developing or fault processing; including accidental erasure, magnetic, or x-ray injury, disturbance or erasure of film, electronic recordings or video tape and loss of media, data, or software;

(3) Operator error including faulty manipulation or faulty operation, of camera, lighting, sound, electrical, editing, computer or any other equipment; technician's error(s) of judgment; and errors in machine or computer programming or instructions to any machine or computer.

## III. LIMITS OF INSURANCE

The most we will pay for loss in any one occurrence is the Limit of Insurance shown in the Declarations for Negative Film coverage.

Operator Error is subject to a $2,000,000 Sub-limit

## IV. DEDUCTIBLE

We will not pay for loss or damage in any one occurrence until the amount of the adjusted loss or damage before applying the applicable limits of insurance exceeds the deductible amount shown in the Declarations for Negative Film Coverage. We will then pay the amount of the adjusted loss or damage in excess of the deductible, up to the applicable limit of insurance.

## V. TERM OF COVERAGE

Term of Coverage, as used in this Coverage, means the period beginning one hundred eighty (180) days before the date shown in the Declarations as the start of "Principal Photography" or the start date of principal photography which ever occurs first , and continuing until the earliest of the following dates:

(a) The date of delivery required under the completion guarantee agreement with the distributor(s);

(b) The date your completion guarantor is released from further obligations to you;

(c) Eighteen (18) months after completion of "Principal Photography";

(d) The date on which a protection print or duplicate tape has been completed and physically removed from the premises where the original negative or tape is located;

(e The date your interest in the property ceases; or

(f) The date on which cancellation or termination of coverage under this policy for the "Insured Production" becomes effective.

The expiration date of this policy will be extended, if necessary, until the earliest of these dates. We may charge additional premium for this extension.

Page 553

Ex. A  Pg. 54

Case 2:16-cv-04435-PA-MRW  Document 58-6  Filed 04/24/17  Page 57 of 83  Page ID
#:3415
Case 2:16-cv-04435-PA-MRW  Document 10-5  Filed 07/07/16  Page 56 of 82  Page ID #:257

## VI. PROPERTY EXCLUDED

This coverage does not insure cut-outs, unused foot-age or library stock.

## VII. DEFINITION OF LOSS

A. The amount of your loss will be determined based on the following:

(1) With respect to videotape stock, raw film stock and blank media, the actual cost to replace these items with property of like kind and quality.

(2) With respect to other Covered Property, all necessary "Insurable Production Cost" you incur to reshoot, re-create, or restore the "Insured Production" that exceeds the amount of "Insurable Production Cost" you would have incurred if no physical loss or damage had occurred.

(3) All other necessary expenses that reduce the amount of loss otherwise payable.

B. Your loss will not include:

(1) Loss of earnings or profit; or

(2) "Insurable Production Cost" incurred due to delay in completing an "Insured Production".

C. But we will pay for "Insurable Production Cost" incurred:

(1) As the direct result of unavoidable delay that occurs during the period necessary to restore the affected portions of the "Insured Production"; and

(2) As the result of a covered "Stop Date Loss".

If you abandon an "Insured Production" that has been made substantially valueless solely because one or more covered causes of loss reasonably, practically and necessarily prevents you from completing "Insured Production", irrespective of any completion or delivery date requirements for the "Insured Production", we will pay as loss the total "Insurable Production Cost" you have incurred for the "Insured Production".

## VIII. EXCLUSIONS

This coverage does not insure against loss caused by or resulting from:

(1) Exposure to light, deterioration, atmospheric dampness or changes in temperature;

(2) The use of incorrect raw film stock or video-tape or media/software;

(3) Delay, loss of use, loss of market, interruption of business, or any other consequential

loss due to loss of or damage to videotape stock, raw film stock or blank media;

(4) Unexplained or mysterious disappearance or shortage found upon taking of inventory of video tape stock, raw film or blank media.

## IX. CONDITIONS

You will ensure that artwork, drawings, software and related material (hereinafter referred to as "source material") used to generate computer images and animation cells are retained until a protection print has been completed or expiration of this coverage, whichever comes first.

You will safeguard and maintain all source material(s) that have been photographed, or used as intended in the production process. Damage to such source material will not be considered a loss hereunder, except to the extent that other covered property is damaged and you have complied with the above.

## X. DEFINITIONS

1) COMPUTER PROGRAMS means data, and source code used to direct the computer equipment, including diagrams or other records which can be used to reproduce programs.

2) DATA includes and is not limited to facts, concepts, source code, programming records or instructions which are converted to a form usable in your electronic data processing operations, computer programs or electronically controlled equipment.

3) MEDIA includes electronic data processing recording or storage media on which Data are recorded or stored such as software, films, tapes, discs or cells.

4) SOFTWARE means any combination of DATA, MEDIA or COMPUTER PROGRAMS

5) Computer EQUIPMENT means your programmable electronic equipment that is used to store, retrieve or process software. It includes but is not limited to any component parts and associated peripheral equipment or hardware that provides communication including input and output functions, printing and data transmission. Computer equipment does not include software.

## XI. LIBRARY STOCK EXTENSION

The following is added to Paragraph I.a Covered-Property:

Covered Property, as used in this Coverage, includes the following:

(1) Your original cut negative film of completed or released productions, duplicate negatives, completed video tapes or other media which is considered library stock to you.

Paragraph I.b. Property Not Covered is amended to remove subparagraph (3) Library stock.

Part III. Limits of Insurance is replaced by the following:

    a. The most we will pay for loss in any one occurrence is the Limit of Insurance shown in the Declarations for the applicable Coverage(s).

    b. Subject to the above limit of insurance applicable to any one occurrence, the most we will pay for loss or damage to library stock in any one occurrence is $1,000,000.

    c. Subject to the above limits of insurance applicable to any one occurrence and library stock, $1,000,000 is the most we pay for loss or damage to any one production.

The following is added to Part IV. Deductible:

With respect to library stock, the deductible amount is the same as the deductible amount shown in the Declarations or otherwise applicable.

The following is added to Part V. Method of Valuation:

The amount of your library stock loss will be determined based on the actual cost to repurchase from an outside source, reprint or copy in whole or in part the affected portions of the library stock, whether or not the reprint or copy is made from an original or a copy of the lost or damaged library stock.

# SECTION III – EXTRA EXPENSE

Throughout this policy the words **you** and **your** refer to the Named Insured shown in the Declarations. The words **we**, **us** and **our** refer to the Company providing this insurance.

## I. INSURING AGREEMENT

We agree to pay to you such loss (as defined in Paragraph VII) not including loss of earnings or profit, as you sustain by reason of such extra expense you necessarily incur as a result of the interruption, postponement, cancellation, relocation, curtailment or abandonment of an Insured Production due to the following:

1. The loss must be a direct result of an unexpected, sudden or accidental occurrence entirely beyond your control to include:
   a) Confiscation and/or detainment of equipment, material or personal property by order of any government or civil authority;
   b) Shipping or transit delays or cancellation of necessary and required equipment, material or personal property used or to be used in the Insured Production caused by adverse weather conditions;
   c) Interruption or loss of utilities (electrical, steam, gas or any other power source) required to continue or complete an insured production;
   d) Strikes by any party, union, guild or labor group for which you are not a signatory or directly involved in negotiations or is not a major entertainment union or guild;
   e) Verifiable breakdown, short circuit, electrical injury, disturbance or malfunction to Covered Personal Property or vehicles. Subject to props; created, constructed, designed or maintained by you must be tested and verified to be in working order under the conditions you will be using them.
   f) Interruption, postponement or cancellation of an insured production as a direct result of the action of a civil

   authority that revokes your permission to use or prohibits access to property or facilities used or to be used in connection with an Insured Production.
   g) Imminent peril, defined as certain, immediate and impending danger of such probability and severity to persons or property that it would be unreasonable or unconscionable to ignore.
   h) Any expenses incurred to avoid a loss resulting from imminent peril are covered to the extent that they serve to avoid a loss otherwise covered.

2. Except as provided above, this extension does not negate the applicability of the basic terms and conditions of:
   a) The Extra Expense Coverage in the event that an imminent peril results in damage to or destruction of property or facilities payable under this policy; or
   b) The Cast Coverage in the event that an imminent peril results in death, injury or sickness of a covered person, in which case a separate claim will result from the consequential loss as described above.

3. All unexpected, sudden or accidental crisis accident seriously injuring or killing a cast or crew member on the production site that necessarily forces you to stop the filming of the Insured Production, the following elements must have occurred:
   a) The crisis resulted in a life-threatening physical injury or accidental death to a cast or crew member of the insured production;
   b) The crisis occurs at the filming location of the Insured Production (meaning a location where cast or crew is assembled to shoot any scheduled work);

**NS 103 0110**

Page 1 of 4   ☐

c) The crisis was witnessed by cast or crew members of the Insured Production or is a forced closure by a civil authority;

d) The crisis necessarily results in the immediate suspension of the production of the Insured Production.

## II. LIMITS OF INSURANCE

The most we will pay for loss in any one occurrence is the Limit of Insurance shown in the Declarations for Extra Expense coverage, except the following:

1. Strike is subject to a $1,000,000 any one occurrence;

2. Confiscation is subject to a $1,000,000 any one occurrence;

3. Shipping & Transit Coverage is subject to a $1,000,000 any one occurrence;

4. Vehicle mechanical break down is subject to a $1,000,000 sublimit any one occurrence;

## III. DEDUCTIBLE

We will not pay for loss in any one occurrence until the amount of the adjusted loss before applying the applicable limits of insurance exceeds the deductible amount shown in the Declarations for Extra Expense Coverage. We will then pay the amount of the adjusted loss in excess of the deductible, up to the applicable limit of insurance.

## IV. TERM OF COVERAGE

Term of Coverage, as used in this Coverage, means the period beginning one hundred eighty (180) days before the date shown in the Declarations as the start of "Principal Photography" or the start date of principal photography which ever occurs first , and continuing until the earliest of the following dates:

(1) The date of delivery required under the completion guarantee agreement with the distributor(s);

(2) The date your completion guarantor is released from further obligations to you;

(3) Eighteen (18) months after completion of "Principal Photography";

(4) The date on which a protection print or duplicate tape has been completed and physically removed from the premises where the original negative or tape is located;

(5) The date your interest in the property ceases; or

(6) The date on which cancellation or termination of coverage under this policy for the "Insured Production" becomes effective.

The expiration date of this policy will be extended, if necessary, until the earliest of these dates. We may charge additional premium for this extension.

## V. WARRANTIES

You warrant that:

**A.** All necessary arrangements and contractual agreements for the Insured Production, including, but not limited to, permits, visa(s) and licenses, have been obtained and/or executed by you, prior to any "loss" covered hereunder.

**B.** You have disclosed to us any arrangements, contractual conditions, physical conditions or other facts that could affect the Insured Production.

**C.** Prior to the inception of coverage hereunder, you warrant having no knowledge of any matter, fact or circumstance, actual or threatened, that increases or could increase the possibility of a "loss" under this Policy.

Failure to fulfill any warranty above will release us from all obligations under this Policy, to the extent that a "loss" is suffered or increased by that failure.

## VI. PROPERTY NOT COVERED

Covered Property does not include Negative film, video tape, tapes, animation cells, transparencies, positives, sound tracks, art work, software, programs or any other form of media.

## VII. EXCLUSIONS

This coverage does not cover "loss" caused by, resulting from, or arising out of:

1. The failure of any person(s) in connection with the Insured Production to commence, continue or complete their respective duties or performances for any reason; or

2. Any financial cause of "loss", including but not limited to:

a) Any deficient or inadequate response, support or withdrawal of support, including insufficient attendance or interest prior to attendance;

b) Withdrawal of funds, inadequate or insufficient finances, however caused;

**Page 2 of 4**

**NS 103 0110**    □

c) Any financial failure of any venture, company, entity or person;

d) Any failure to maintain adequate receipts, sales or profits, including any failure to provide bond(s) or financial security;

e) Any variation in the rate of exchange, including devaluation, rate of interest or stability of any currency;

f) Any financial default, insolvency, debt or failure to pay necessary expense to any person, firm or corporation;

3. Any actual adverse weather at the location of any insured production except:

a) The action of a civil authority that prevents access to, exit from (ingress or egress) or closes down the location and or facilities due to conditions that threaten the safety of cast, crew or property, an imminent peril; or

b) Physical damage to property, facilities, or locations necessary to the insured production.

4. Your failure or inability to complete or obtain any contractual agreements, permits or licenses of any kind;

5. Your failure or inability to properly comply with, or the violation of any requirement or any procedure necessary for the issuance and continuance of any permit or authorization; or your failure to properly process or complete any applications or required documents.

6. The refusal or revocation of any permit or authorization due to a violation of any existing civil or criminal law or codes.

7. Any governmental body or civil authority preventing the commencement or completion of an Insured Production due to a breach of the terms of the permit or any civil or criminal violation by you.

8. Any concern or fear of an occurrence which may affect the commencement of the continuation of the Insured Production, except the action of a civil authority that prevents access to, exit from (ingress or egress) or closes down the location and or facilities due to conditions that threaten the safety of case, crew or property;

9. An imminent peril or physical damage to property, facilities, or locations necessary to the insured production.

10. Any concern or belief that the commencement or continuation of Insured Production is inappropriate.

11. Breach of contract by any party whether their contractual relationship be with you or otherwise where such loss is consequent upon or contributed to by any cause within your control or any other such party which includes the failure of any individual or entity contracted, hired or employed to willingly perform the duties for which that person or entity has been hired with respect to the Insured Production.

12. Wear and tear; any quality in the property that causes it to damage or destroy itself; hidden or latent defect; gradual deterioration; depreciation; mechanical breakdown or electrical breakdown; insects; vermin, or rodents; corrosion, rust, dampness, cold or heat. This exclusion does not apply to Verifiable breakdown, short circuit, electrical injury, disturbance or malfunction to Covered Personal Property or vehicles. Subject to props; created, constructed, designed or maintained by you must be tested and verified to be in working order under the conditions you will be using them.

13. Processing or work upon the property. But if processing or work upon the property results in fire or explosion, this exclusion does not apply to direct loss or damage caused by that fire or explosion, if the fire or explosion would be covered under this Coverage.

14. Unexplained or mysterious disappearance or shortage found upon taking of inventory.

15. Rain, ice, sleet, snow or hail, whether driven by wind or not, to property stored in the open. This exclusion does not apply to property that was built or designed to be stored in the open.

16. Intentional acts committed by you or at your direction. This exclusion does not apply to damage, destruction or threat thereof to software or computer media by an external person or an internal employee breaching your authority and safeguards to protect such software or computer media.

17. Loss of use (including loss of use of animals), loss of market, interruption of business, or any other consequential loss.

18. Any other loss that may be covered by some other section of this policy.

NS 103 0110

19. Any weather condition that is a photographic weather condition;
20. The quality or content of the "Insured Production".
21. Strike by any organization for which you are a signatory or negotiate with or is a major entertainment union or guild;
22. Strike by an union or guild that was occurring prior to the commencement of "principle photography" of an "Insured Production"
23. Watercraft exclusion amended to cover vessels valued under $750,001 No exclusion or restriction will be applied for watercraft used as part of a set and moored to a pier, dock, wharf of similar fixed structure.

## IX. DEFINITION OF LOSS

The amount of your loss will be determined based on:

1. All necessary "Insurable Production Cost" you incur to complete the "Insured Production" that exceeds the amount of "Insurable Production Cost" you would have incurred if the covered cause of loss had not occurred;

2. All other necessary expenses that reduce the amount of loss otherwise payable.

3. Your loss will not include loss of earnings of profit.

4. If you abandon an "Insured Production" that has been made substantially valueless solely because one or more covered causes of loss reasonably, practically and necessarily prevents you from completing the "Insured Production", irrespective of any completion or delivery date requirements for the "Insured Production", we will pay as loss the total "Insurable Production Cost" you have incurred for the "Insured Production".

Page 559

Ex. A  Pg. 60

POLICY NUMBER:                                      **PRODUCERS PORTFOLIO**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ANIMAL COVERAGE (EXTRA EXPENSE)

This endorsement modifies insurance provided under the following:

**MPTV PRODUCERS PORTFOLIO, SECTION III. EXTRA EXPENSE**

1. The following **Coverage Extensions** are added to Part I. Coverage:

   a. **Animal Extra Expense Coverage**

   **This Coverage Extension applies only when Extra Expense Coverage is part of the policy.**

   We will pay the actual and necessary loss you sustain as Extra Expense during the "Period of Restoration" due to the interruption, postponement or cancellation of an "Insured Production". The interruption, postponement or cancellation must be the direct result of a Covered Cause of Loss to a Covered Animal during the "Term of Coverage".

   Extra Expense, as used in this Coverage Extension, means the following expenses you incur that you would not have incurred had there been no interruption, postponement or cancellation of the "Insured Production":

   (1) Necessary additional "Costs" incurred to avoid or minimize the interruption, postponement or cancellation of the "Insured Production"; and

   (2) Necessary expenses incurred to the extent they reduce the amount of loss that otherwise would be payable under this Coverage.

   Extra Expense does not include:

   (1) Loss of earnings or profit;

   (2) Expense to repair or replace property, other than Covered Animals;

   (3) Expense payable under any other Coverage of this policy.

   b. **Covered Animals**

   For the purposes of these Coverage Extensions, **Covered Animal** means the animal(s) scheduled below that are used or intended to be used in an "Insured Production":

         Animals

   c. **Covered Causes of Loss**

   For the purposes of these Coverage Extensions, Covered Causes of Loss means accidental injury, Sickness or death to a Covered Animal after you accept a Certificate of Health signed by a duly licensed veterinarian. Until your acceptance, or in the absence of your acceptance, Covered Causes of Loss means only accidental injury or death resulting from accidental injury.

   Sickness means sickness, disease or illness resulting from any cause other than accidental injury.

   Certificate of Health Requirement is that certificate is on file with insured.

2. **Additional Exclusions**

   We will not pay for loss caused by or resulting from any of the following:

   a. Use of the animal in any activity other than in connection with the filming or taping of an "Insured Production";

   b. Use of the animal in any stunt or hazardous activity;

   c. Any cosmetic alteration of the animal;

   d. Willful misconduct or misuse of the animal;

   e. Confiscation or nationalization of the animal for any reason whatsoever;

**NS 106 0110**                                      **Page 1 of 2**      ☐

Page 560

Ex. A  Pg. 61

    f.    Quarantine, unless as a result of a Cause of Loss not otherwise excluded;

    g.    Intentional slaughter of the animal, either voluntarily or by act of or at the direction of any local authority; or This will not apply when an animal is sick and the Veterinarian recommendation is to slaughter the Covered Animal instead of attempting to provide sickness coverage.

    h.    Sickness of the animal as declared in the Certificate of health on file, regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**3. Limits of Insurance**

The most we will pay for all loss to which these Coverage Extensions apply in any one occurrence is $1,000,000

The limit applicable to these Coverage Extensions is in addition to the policy Limits of Insurance.

**4. Deductible**

The Deductible provisions described in the applicable Coverage form apply to this Coverage Extension.

**5. Method of Valuation**

    **a. Animal Cast Coverage**

The Method of Valuation described in the applicable Cast Coverage form applies to this Coverage Extension if accepted by us.

    **b. Animal Extra Expense Coverage**

For the purposes of this Coverage Extension, paragraphs V.a. and V.b. are replaced by the following:

      a.    The amount of your loss will be determined based on:

        (1)  All "Costs" that exceeds the amount of "Costs" you would have incurred if there had been no interruption, postponement or cancellation of the "Insured Production"; and

        (2)  All other necessary expenses that reduce the amount of loss otherwise payable.

      b.    We will reduce the amount of your loss to the extent you can resume the "Insured Production" and discontinue Extra Expense or do not resume the "Insured Production" as quickly as possible.

We will pay based on the length of time it would have taken to resume the "Insured Production" as soon as possible.

**6. Additional Conditions**

    **a. Additional Duties In The Event of Loss**

    (1)  You must report immediately to us or our authorized representative any fact or circumstance which may prevent a Covered Animal from commencing, continuing or completing an assigned duty or role in an "Insured Production" and which may result in a claim under these Coverage Extensions.

    (2)  You must immediately secure and file with us or our authorized representative the certification of a duly licensed veterinarian. The certification must include a complete description of the injury, sickness or death and the prognosis.

    (3)  You must make every effort to preserve our rights, including enforcing any contractual conditions or terms applicable to the Covered Animal, to:

      (a)  Have any Covered Animal examined by a veterinarian of our choice; and

      (b)  Have continuing access to the medical records of any Covered Animal.

    (4)  You must exercise due diligence and dispatch to secure a substitute animal, when and where available, following a Covered Cause of Loss to a Covered Animal.

**MOTION PICTURE PORTFOLIO**

# SECTION IV - PROPERTY

Throughout this policy the words **you** and **your** refer to the Named Insured shown in the Declarations. The words **we**, **us** and **our** refer to the Company providing this insurance.

## I. INSURING AGREEMENT

We agree to pay to you or on your behalf the value of any property, not including loss of use, owned by you or which is the property of others and for which you are legally liable and which is lost, damaged or destroyed, caused by the Perils Insured against, while such property is used or to be used by you in connection with an Insured Production including:

1. Scenery, costumes, theatrical props and related equipment;

2. Cameras, camera equipment, sound and lighting equipment, portable electrical equipment, mechanical effects equipment, grip equipment and mobile equipment;

3. Office equipment, furniture, fixtures and tenants improvements and betterments;

4. Vehicles rented, hired or picture vehicles you own.

## II. PROPERTY NOT COVERED

Covered Property does not include:

1. Personal Property that is covered under any other Coverage of this policy;

2. Animals;

3. Growing plants except as part of a set;

4. Accounts; bills; numismatic properties; food stamps; notes; securities; stamps; deeds; evidences of debt; letters of credit; credit cards; passports; transportation, admission or other tickets, unless specifically added to this policy;

5. Buildings or their improvements and betterments, except as part of a set or the Insured Production Office.

6. Aircraft unless used as part of a set as a non-functional craft during filming or taping;

7. Watercraft valued over $750,000, and watercraft involved in racing, chase scenes, stunts or pyrotechnics, unless specifically

declared and accepted by us and added to this policy. If watercraft involved in racing, chase scenes, stunts or pyrotechnics, is not declared or accepted by us, a deductible of $100,000 shall apply.

8. "Land Vehicles" or "Mobile Equipment" while involved in racing, chase scenes, or stunts, unless specifically added and endorsed to this policy or when insured's production team can provide evidence that Risk Safety controls and procedures are in place, using qualified safety personnel, including stunt coordinators, local fire fighters, local police personnel and Risk Management signed off on activity.

9. "Land Vehicles" you own valued in excess of $125,000 unless specifically added by an endorsement to this policy or that are picture vehicles owned by you while used or intended to be used on-camera in an "Insured Production";

10. Negative film, video tape, tapes, cels, transparencies, positives, sound tracks, art work, software, programs or any other form of media;

11. The following property is excluded if the value of the item(s) exceeds $500,000:

    a) Furs, fur garments and garments trimmed with fur except as added to this policy.

    b) Jewelry, costume jewelry, watched, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals except as provided in the policy.

    c) Works of art, antiques or rate articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac except as provided in the policy.

## III. TERM OF COVERAGE

**NS 104 0110**

Page 1 of 3    ☐

Page 562

Ex. A  Pg. 63

Term of Coverage, as used in this Coverage, means the period beginning one hundred eighty (180) days before the date shown in the Declarations as the start of "Principal Photography" or the start date of principal photography which ever occurs first , and continuing until the earliest of the following dates:

  (1) The date of delivery required under the completion guarantee agreement with the distributor(s);

  (2) The date your completion guarantor is released from further obligations to you;

  (3) Eighteen (18) months after completion of "Principal Photography";

  (4) The date on which a protection print or duplicate tape has been completed and physically removed from the premises where the original negative or tape is located;

  (5) The date your interest in the property ceases; or

  (6) The date on which cancellation or termination of coverage under this policy for the "Insured Production" becomes effective.

The expiration date of this policy will be extended, if necessary, until the earliest of these dates. We may charge additional premium for this extension.

### IV. LIMITS OF INSURANCE

  **A.** The most we will pay for loss or damage in any one occurrence is the Limit of Insurance shown in the Declarations for Property.

  **B.** Subject to a. above, $500,000 is the most we will pay for loss or damage to the following types of property:

  (1) Furs, fur garments and garments trimmed with fur;

  (2) Jewelry, costume jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals; and

  (3) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac.

This limit applies to any one occurrence, regardless of the types or number of articles that are lost or damaged in that occurrence.

### V. DEDUCTIBLE

We will not pay for loss or damage in any one occurrence until the amount of the adjusted loss or damage before applying the applicable limits of insurance exceeds the deductible amount shown in the Declarations. We will then pay the amount of the adjusted loss or damage in excess of the deductible, up to the applicable limit of insurance.

### VI. PERILS INSURED

This Coverage Section insures against all risks of direct physical loss or damage to the property covered from any external cause, except as hereinafter excluded.

### VII. EXCLUSIONS

This Coverage does not insure against loss or damage caused by or resulting from:

  1. Wear and tear; any quality in the property that causes it to damage or destroy itself; hidden or latent defect; gradual deterioration; depreciation; mechanical breakdown or electrical breakdown; insects; vermin, or rodents; corrosion, rust, dampness, cold or heat. This exclusion does not apply to Verifiable breakdown, short circuit, electrical injury, disturbance or malfunction to Covered Personal Property or vehicles. Subject to props; created, constructed, designed or maintained by you must be tested and verified to be in working order under the conditions you will be using them.

  2. Any work process, experimentation, repairing, restoration, conversion, or partial conversion, retouching, painting, cleaning or any other form of process performed or undertaken by you or on your behalf or at your direction, unless accidental fire or explosion ensues and then only for the loss or damage caused by such ensuing fire or explosion.;

  3. Unexplained or mysterious disappearance, or shortage found upon taking of inventory;

  4. Rain, sleet, snow or hail, whether driven by wind or not, to property stored in the open. This exclusion does not apply to property that was built or designed to be stored in the open;

  5. damage to or destruction of property caused intentionally by you or at your direction;

  6. loss, destruction or damage caused by or resulting from delay, loss of market, interruption of business or other consequential loss extending beyond direct physical loss or damage;

### VIII. VALUATION

**Page 2 of 3**

**NS 104 0110**     ☐

The basis of determining the value of the property insured hereunder, except with respect to vehicles, will be as follows:

1. Your property will be valued at the full cost of repair or replacement, without deduction for depreciation or betterment, if repaired or re-placed with due diligence and dispatch and in no event unless repair or replacement is completed within one year from the date of loss. If not repaired or replaced, the property will be valued at its actual cash value at the time and the place of loss.

2. Property of others will be valued in accord-ance with a written contract and in the ab-sence of a written contract at common or fair market value or as you are obligated to pay by common law.

3. Vehicles will be valued at actual cash value as of the date and location of loss or in ac-cord with a written contract.

### IX. MONEY AND CURRENCY EXTENSION

**A.** Coverage is extended for loss or destruction of money and currency subject to a sub-limit of liability of $250,000 any one loss arising out of:

  1) Fire;

  2) Burglary (defined as a loss, which results from forcible entry to or exit from premises, safes or locked property);

**B.** Armed robbery (defined as the forcible tak-ing of money at gunpoint or by similar threat);

**C.** Coverage is provided at the following loca-tions while:

  1) In locked safes and vaults secured on your premises and/or locations used as temporary production offic-es and/or in hotel safes;

  2) IIn the custody of your approved agents in the course of and while performing their duties as agents;

  3) On your business premises during the normal hours of business.

**D.** You warrant that you and your agents will secure money and currency overnight in safes whenever available at locations other than your business premises. Failure to ad-here to this warranty will relieve us from all obligations under this coverage to the extent that a loss is suffered or increased by that failure.

**E.** No loss attaches hereunder for loss of mon-ey and currency arising out of mysterious or unexplained disappearance, or for shortage disclosed upon taking of inventory.

### X. DEFINITIONS

 "Precision Driving" means two or more "Land Vehi-cles" or "Mobile Equipment" driving in unison, syn-chronization or choreographed interation.

**NS 104 0110**

POLICY NUMBER: **PRODUCERS PORTFOLIO**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ANIMAL COVERAGE (PROPERTY)

This endorsement modifies insurance provided under the following:

**MPTV PRODUCERS PORTFOLIO, SECTION IV. COVERAGE PROPERTY**

1. The following **Coverage Extensions** are added to **I. INSURING AGREEMENT**:
   a. **Animal Health Coverage**

      We will pay the actual and necessary loss you sustain by reason of a Covered Cause of Loss to a Covered Animal during the "Term of Coverage".
   b. **Animal Repatriation, Rendering or Disposal Coverage**

      We will pay the actual and necessary loss you sustain by reason of the necessary repatriation, rendering or disposal of a Covered Animal by reason of a Covered Cause of Loss during the "Term of Coverage". Any repatriation must have our prior written authorization.
   c. **Animal Loss of Use Coverage**

      We will pay the actual and necessary loss you sustain by reason of a Covered Animal being prevented by a Covered Cause of Loss during the "Term of Coverage" from commencing, continuing or completing an assigned duty or role for a third party or parties.
   d. For the purposes of these Coverage Extensions:
      (1) **Covered Animals** means the animal(s) scheduled below that are used or intended to be used in an "Insured Production";
      (2) **Covered Causes of Loss** means accidental injury, Sickness or death to a Covered Animal with a Certificate of Health signed by a duly licensed veterinarian on file with insured.
          Sickness means sickness, disease or illness resulting from any cause other than accidental injury.

2. **Additional Exclusions**

   We will not pay for loss caused by or resulting from any of the following:
   a. Use of the animal in any activity other than in connection with the filming or taping of an "Insured Production";
   b. Use of the animal in any stunt or hazardous activity;
   c. Any cosmetic alteration of the animal;
   d. Failure to establish your legal liability for and the actual cash value of a Covered Animal;
   e. Willful misconduct or misuse of the animal;
   f. Confiscation or nationalization of the animal for any reason whatsoever;
   g. Quarantine, unless as a result of a Cause of Loss not otherwise excluded;
   h. Intentional slaughter of the animal, either voluntarily or by act of or at the direction of any local authority; This will not apply when an animal is sick and the Veterinarian recommendation is to slaughter the Covered Animal instead of attempting to provide sickness coverage.
   i. Any sickness as described in the Certificate of Health.

3. **Limits of Insurance**

   **Each Animal Per Production**

   The most we will pay for all loss to which these Coverage Extensions apply in any one animal is $250,000.

   The most we will pay for all loss to which these Coverage Extensions apply in any one occurrence is $1,000,000.

**NS 110 0110** **Page 1 of 3** ☐

4. **Deductible**

Subject to the deductible amount shown in the Declarations or otherwise applicable with respect to each occurrence, we will not pay for loss caused by or resulting from a Covered Cause of Loss to a Covered Animal until the amount of the adjusted loss before applying the applicable limits of insurance exceeds the applicable deductible amount shown below. We will then pay the amount of the adjusted loss in excess of the deductible, up to the applicable limit of insurance.

Deductible any one occurrence of $5,000.

5. **Method of Valuation**

a. We will determine the amount of your loss as follows:

(1) **Animal Health Coverage**

(a) **Injury or Sickness of a Covered Animal**

The amount of your loss for injury or sickness to a Covered Animal will be the actual and necessary veterinary bills you incur.

(b) **Death of a Covered Animal**

The value of a Covered Animal in the event of death will be the actual cash value of the animal, as determined prior your using the animal(s). Covered animal(s) of others will be valued in accordance with a written contract and in the absence of a written contract at common or fair market value or as your are obligated to pay by common law.

(2) **Animal Repatriation, Rendering or Disposal Coverage**

The amount of your loss for repatriation, rendering or disposal of a Covered Animal will be the actual and necessary expenses you incur.

(3) **Animal Loss of Use Coverage**

The amount of your loss by reason of a Covered Animal being prevented from commencing, continuing or completing an assigned duty or role for a third party or parties will be the verifiable loss on income the third party can prove that the Covered Animal is contracted or has earned in income.

b. We will reduce the amount of your loss by any payments you receive from other insurance or any other source.

6. **Additional Conditions**

a. **Additional Duties In The Event of Loss**

(1) You must report immediately to us or our authorized representative any fact or circumstance which may prevent a Covered Animal from commencing, continuing or completing an assigned duty or role in an "Insured Production" and which may result in a claim under these Coverage Extensions.

(2) You must immediately secure and file with us or our authorized representative the certification of a duly licensed veterinarian. The certification must include a complete description of the injury, sickness or death and the prognosis.

(3) You must make every effort to preserve our rights, including enforcing any contractual conditions or terms applicable to the Covered Animal, to:

(a) Have any Covered Animal examined by a veterinarian of our choice; and

(b) Have continuing access to the medical records of any Covered Animal.

**WARRANTY**

It is warranted that your failure to comply with any of these conditions will prejudice us and will release us from any claim that involves such failure.

b. **Legal Liability and Valuation**

You agree to determine:

(1) The extent of your legal liability, and

(2) The actual cash value of each Covered Animal prior to your first use of the Covered Animal.

**NS 110 0110**  

Page 2 of 3  ▢

Page 566

Ex. A  Pg. 67

In the event you do not have: 6b. (1) and (2) above you will pay to have the valuation established by an independent animal(s) professional in the event of a loss.

b. **Certificate of Health**

(1) You will have on file for each Covered Animal a signed Certificate of Health completed by a duly licensed veterinarian. The Certificate of Health must disclose:

(a) Any medical condition that has been treated; or

(b) Any medication that has been prescribed within one year prior to the date the Certificate of Health is completed.

(2) The Covered Animal will be covered for Sickness on the date you receive the Certificate of Health. Until that time, the Covered Animal is covered only for the Causes of Loss of accidental injury or death resulting from accidental injury.

Based on the medical information submitted to you, we and you have the right to make any reservation, exception or restriction regarding the insurability of the Covered Animal within a reasonable period of time. We will not pay for loss caused by or resulting from any such reservation, exception or restriction.

Case 2:16-cv-04435-PA-MRW Document 58-6 Filed 04/24/17 Page 71 of 83 Page ID
Case 2:16-cv-04435-PA-MRW Document 10-5 Filed 07/07/16 Page 70 of 82 Page ID #:171
#:3429

# SECTION V THIRD PARTY PROPERTY DAMAGE

**I. COVERAGE**

We will pay those sums that the Insured becomes legally obligated to pay as damages because of direct physical loss of or damage, including loss of use, to Covered Property, caused by accident and arising out of any Covered Cause of Loss during the Term of Coverage. We will have the right and duty to defend the Insured against any "Suit" seeking those damages. However, we will have no duty to defend the Insured against any "Suit" seeking damages for direct physical loss or damage to which this insurance does not apply. We may, at our discretion, investigate and settle any claim or "Suit" that may result. But:

(1) The amount we will pay for damages is limited, as described in Part III. - Limits of Insurance; and

(2) Our right and duty to defend ends when we have used up the Limit of Insurance in the payment of judgments and settlements.

a. Covered Property, as used in this Coverage, means tangible property of others in an Insured's care, custody or control that is used or intended to be used in connection with an "Insured Production".

b. Property Not Covered

Covered Property does not include:

(1) Personal property rented to or leased by an Insured, except for loss of use of such property that is covered for direct physical damage under Section II, Coverage A. Props, Sets & Wardrobe or Section II, Coverage D. Miscellaneous Equipment of this policy;

(2) Buildings and premises rented to or leased by an Insured for any use or purpose other than filming or taping in connection with an "Insured Production";

(3) Any property that is involved in a hazardous activity or stunt, unless approved by us in writing;

(4) Animals;

(5) Negative film, video tape, tapes, cels, transparencies, positives, sound tracks, art work, software, programs or any other form of media; and

(6) Motor vehicles, trailers, aircraft or watercraft, except for loss of use of such property that is covered for direct physical damage under Section II, Coverage A. Props, Sets & Wardrobe or Section II, Coverage D. Miscellaneous Equipment of this policy.

c. Covered Causes of Loss

Covered Causes of Loss means risks of direct physical loss or damage to Covered Property except those causes of loss listed in the Exclusions.

d. Additional Coverage

**Supplementary Payments**

We will pay, with respect to any claim we investigate or settle, or any "Suit" against an Insured we defend:

(1) All expenses we incur.

(2) The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance. We do not have to furnish these bonds.

(3) All reasonable expenses, other than loss of earnings, incurred by the Insured at our request.

(4) All costs taxed against the Insured in the "Suit".

(5) Prejudgment interest awarded against the Insured on that part of the judgment we pay. If we make an offer to pay our Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

(6) All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the Limit of Insurance.

Page 568

Ex. A  Pg. 69

e. Coverage Extension

**Who Is An Insured**

Throughout this Coverage, the word "Insured" includes you and each of the following:

(1) If you are a partnership or joint venture, your members and partners, but only with respect to the conduct of your business.

(2) If you are a limited liability company, your members, but only with respect to the conduct of your business. Your managers are Insureds, but only with respect to their duties as your managers.

(3) If you are an organization other than a partnership, joint venture or limited liability company, your executive officers and directors, but only with respect to their duties as your officers or directors.

(4) If you are a trust, your trustees, but only with respect to their duties as trustees.

(5) Your "Employees", but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

(6) Your "Volunteer Workers" or any other person under your direct control, but only while performing duties related to the conduct of your business.

f. Term of Coverage

Term of Coverage, as used in this Coverage, means the period beginning sixty (60) days before the date shown in the Declarations as the start of "Principal Photography", and continuing until the earliest of the following dates:

(1) The date of delivery required under the completion guarantee agreement with the distributor(s);

(2) The date your completion guarantor is released from further obligations to you;

(3) Eighteen (18) months after completion of "Principal Photography";

(4) The date on which a protection print or duplicate tape of an "Insured Production" has been completed and physically removed from the premises where the original negative or tape is located;

(5) The date your interest in the property ceases; or

(6) The date on which cancellation or termination of coverage under this policy for the "Insured Production" becomes effective.

The expiration date of this policy will be extended, if necessary, until the earliest of these dates. We may charge additional premium for this extension.

**II. ADDITIONAL EXCLUSIONS**

For the purposes of this Coverage, the following exclusions apply in addition to the exclusions described in Part V. of the Policy Conditions - Exclusions Applicable To All Coverages of This Policy.

We will not pay for loss or damage caused by or resulting from any of the following:

a. Intentional acts committed by or at the direction of any Insured.

b. The failure of an Insured to provide reasonable care for Covered Property.

**III. LIMITS OF INSURANCE**

The most we will pay in damages as the result of any one accident is the Limit of Insurance shown in the Declarations for Third Party Property Damage coverage.

**IV. DEDUCTIBLE**

Our obligation to pay damages applies only to the amount of damages in excess of the deductible amount shown in the Declarations for Third Party Property Damage Coverage. The deductible amount applies to all damages as the result of any one accident, regardless of the number of persons or organizations who sustain damages because of that accident.

This deductible does not apply to a loss of use claim for property that is covered for direct physical loss or damage under any other Coverage of this policy.

**V. AMENDED CONDITIONS**

a. The following Policy Condition does not apply to this Coverage:

Condition III.d. – Stop Date Loss

b. Condition I.g. – Loss Payment is replaced by the following:

(1) If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

(2) We will not be liable for any part of a loss that has been paid or made good by others.

**MP 204 (01-05)**                                                    Page 2 of 3   □

## VI. ADDITIONAL CONDITION

For the purposes of this Coverage, the following Condition applies in addition to the Policy Conditions.

### Legal Action Against Us

The following is added to Policy Condition II.g. – Legal Action Against Us

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an Insured; but we will not be liable for damages that are not payable under the terms of this Coverage or that are in excess of the Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the Insured, and the claimant or the claimant's legal representative.

## VII. ADDITIONAL DEFINITIONS

For the purposes of this Coverage, the following definitions apply in addition to the definitions described in Part IV. of the Policy Conditions - Definitions Applicable To All Coverages of This Policy:

a.  "Employee" includes a "Leased Worker" and a "Temporary Worker".

b.  "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased Worker" does not include a "Temporary Worker".

c.  "Suit" means a civil proceeding in which damages to which this insurance applies are alleged. "Suit" includes:

    (1) An arbitration proceeding in which damages are claimed and to which the Insured must submit or does submit with our consent; or

    (2) Any other alternative dispute resolution proceeding in which such damages are claimed and to which the Insured submits with our consent.

d.  "Temporary Worker" means a person who is furnished to you to substitute for a permanent "Employee" on leave or to meet seasonal or short-term workload conditions.

e.  "Volunteer Worker" means a person who is not your "Employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

POLICY NUMBER:                                         **MPTV PRODUCERS PORTOLIO**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# STRIP SHOW COVERAGE EXTENSION

This endorsement modifies insurance provided under the following:

**MPTV PRODUCERS PORTFOLIO**

**STRIP SHOW COVERAGE**

The only Coverage Sections applicable to Strip Shows, TV Specials and Webisodes are: General Conditions; Section IV Property; Section V Third Party Property Damage; and any endorsements attached to these sections only.

All other terms and conditions remain unchanged.

**NS 108 0105**                                                         Page 1 of 1    ☐

Ex. A  Pg. 72

POLICY NUMBER:                                    **MPTV PRODUCERS PORTOLIO**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# HURRICANE, TORNADO & COUNTRY EXCLUSION

This endorsement modifies insurance provided under the following:

**MPTV PRODUCERS PORTFOLIO**

**A. WIND STORM EXCLUSION**
All Coverage Sections specifically exclude any claims caused or contributed to by a named windstorm in the following territories during the terms indicated unless endorsed hereon:

**Dates:** 1st of June through 30th November

Territories of Virginia, Washington, DC, Georgia, North Carolina, South Carolina, Florida, Alabama, Arkansas, Louisiana, Texas: within 100 miles of the coast.

**Dates:** 1st of January through 30th June

Territories of Hawaii, Indonesia, Australia, Asia, New Zealand, Philippines, Korea, and other Asia countries.


**B. COUNTRY EXCLUSION**
All Coverage Sections specifically exclude any claims in the following territories unless endorsed hereon:

> That is under trade or economic embargoes imposed by the laws or regulations of the United States of America. That has a Travel Warning as listed on travel.state.gov or is a country that is on the USA travel warning watch lists, terrorist watch lists or a USA sanctioned country, except as endorsed hereon.



All other terms and conditions remain unchanged.

**NS 107 0105**                                   Page 1 of 1   ☐

Page 572

Ex. A  Pg. 73

Case 2:16-cv-04435-PA-MRW Document 58-6 Filed 04/24/17 Page 76 of 83 Page ID
Case 2:16-cv-04435-PA-MRW Document 105 Filed 07/07/16 Page 79 of 82 Page ID #:1976
#:3434

IL 09 35 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** We will not pay for loss ("loss") or damage caused directly or indirectly by the following. Such loss ("loss") or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss ("loss") or damage.

**1.** The failure, malfunction or inadequacy of:

**a.** Any of the following, whether belonging to any insured or to others:

**(1)** Computer hardware, including microprocessors;

**(2)** Computer application software;

**(3)** Computer operating systems and related software;

**(4)** Computer networks;

**(5)** Microprocessors (computer chips) not part of any computer system; or

**(6)** Any other computerized or electronic equipment or components; or

**b.** Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **A.1.a.** of this endorsement;

due to the inability to correctly recognize, process, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

**2.** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **A.1.** of this endorsement.

**B.** If an excluded Cause of Loss as described in Paragraph **A.** of this endorsement results:

**1.** In a Covered Cause of Loss under the Crime and Fidelity Coverage Part, the Commercial Inland Marine Coverage Part or the Standard Property Policy; or

**2.** Under the Commercial Property Coverage Part:

**a.** In a "Specified Cause of Loss", or in elevator collision resulting from mechanical breakdown, under the Causes of Loss – Special Form; or

**b.** In a Covered Cause of Loss under the Causes Of Loss – Basic Form or the Causes Of Loss – Broad Form;

we will pay only for the loss ("loss") or damage caused by such "Specified Cause of Loss", elevator collision, or Covered Cause of Loss.

**C.** We will not pay for repair, replacement or modification of any items in Paragraphs **A.1.a.** and **A.1.b.** of this endorsement to correct any deficiencies or change any features.

Ex. A  Pg. 74

IL 02 68 01 11

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraphs **1., 2., 3.** and **5.** of the **Cancellation** Common Policy Condition are replaced by the following:

**1.** The first Named Insured shown in the Declarations may cancel this entire policy by mailing or delivering to us advance written notice of cancellation.

**2. Cancellation Of Policies In Effect**

**a. 60 Days Or Less**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**(1)** 30 days before the effective date of cancellation if we cancel for any reason not included in Paragraph **A.2.a.(2)** below.

**(2)** 15 days before the effective date of cancellation if we cancel for any of the following reasons:

**(a)** Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

**(b)** Conviction of a crime arising out of acts increasing the hazard insured against;

**(c)** Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim;

**(d)** After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and that occurred subsequent to inception of the current policy period;

**(e)** Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the policy, that results in the property becoming uninsurable in accordance with our objective, uniformly applied underwriting standards in effect at the time the policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, that causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

**(f)** Required pursuant to a determination by the Superintendent that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interest of our policyholders, our creditors or the public;

IL 02 68 01 11 © Insurance Services Office, Inc., 2010 Page 1 of 5 ▢

Page 574

Ex. A Pg. 75

(g) A determination by the Superintendent that the continuation of the policy would violate, or would place us in violation of, any provision of the Insurance Code; or

(h) Where we have reason to believe, in good faith and with sufficient cause, that there is a probable risk of danger that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. If we cancel for this reason, you may make a written request to the Insurance Department, within 10 days of receipt of this notice, to review our cancellation decision. Also, we will simultaneously send a copy of this cancellation notice to the Insurance Department.

**b. For More Than 60 Days**

If this policy has been in effect for more than 60 days, or if this policy is a renewal or continuation of a policy we issued, we may cancel only for any of the reasons listed in Paragraph **A.2.a.(2)** above, provided:

(1) We mail the first Named Insured written notice at least 15 days before the effective date of cancellation; and

(2) If we cancel for nonpayment of premium, our notice of cancellation informs the first Named Insured of the amount due.

**3.** We will mail or deliver our notice, including the reason for cancellation, to the first Named Insured at the address shown in the policy and to the authorized agent or broker.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata.

However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, we will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. The cancellation will be effective even if we have not made or offered a refund.

**B.** The following is added to the **Cancellation Common Policy Condition:**

**7.** If one of the reasons for cancellation in Paragraph **A.2.a.(2)** or **D.2.b.(2)** exists, we may cancel this entire policy, even if the reason for cancellation pertains only to a new coverage or endorsement initially effective subsequent to the original issuance of this policy.

**C.** The following conditions are added:

**1. Nonrenewal**

If we decide not to renew this policy we will send notice as provided in Paragraph **C.3.** below.

**2. Conditional Renewal**

If we conditionally renew this policy subject to:

**a.** A change of limits;

**b.** A change in type of coverage;

**c.** A reduction of coverage;

**d.** An increased deductible;

**e.** An addition of exclusion; or

**f.** Increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

we will send notice as provided in Paragraph **C.3.** below.

**3. Notices Of Nonrenewal And Conditional Renewal**

**a.** If we decide not to renew this policy or to conditionally renew this policy as provided in Paragraphs **C.1.** and **C.2.** above, we will mail or deliver written notice to the first Named Insured shown in the Declarations at least 60 but not more than 120 days before:

(1) The expiration date; or

(2) The anniversary date if this is a continuous policy.

**b.** Notice will be mailed or delivered to the first Named Insured at the address shown in the policy and to the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

---

**Page 2 of 5**      © Insurance Services Office, Inc., 2010      **IL 02 68 01 11**     □

c. Notice will include the specific reason(s) for nonrenewal or conditional renewal, including the amount of any premium increase for conditional renewal and description of any other changes.

d. If we violate any of the provisions of Paragraph **C.3.a., b.** or **c.** above by sending the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice:

(1) And if notice is provided prior to the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the first Named Insured, during this 60-day period, has replaced the coverage or elects to cancel.

(2) And if the notice is provided on or after the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy for another policy period, at the lower of the current rates or the prior period's rates, unless the first Named Insured, during this additional policy period, has replaced the coverage or elects to cancel.

e. If you elect to renew on the basis of a late conditional renewal notice, the terms, conditions and rates set forth in such notice shall apply:

(1) Upon expiration of the 60-day period, unless Subparagraph **(2)** below applies; or

(2) Notwithstanding the provisions in Paragraphs **d.(1)** and **d.(2),** as of the renewal date of the policy if the conditional renewal notice was sent at least 30 days prior to the expiration or anniversary date of the policy.

f. We will not send you notice of nonrenewal or conditional renewal if you, your authorized agent or broker or another insurer of yours mails or delivers notice that the policy has been replaced or is no longer desired.

D. The following provisions apply when the Commercial Property Coverage Part, the Farm Coverage Part or the Capital Assets Program (Output Policy) Coverage Part is made a part of this policy:

1. Items **D.2.** and **D.3.** apply if this policy meets the following conditions:

a. The policy is issued or issued for delivery in New York State covering property located in this state; and

b. The policy insures:

(1) For loss of or damage to structures, other than hotels or motels, used predominantly for residential purposes and consisting of no more than four dwelling units; or

(2) For loss of or damage to personal property other than farm personal property or business property; or

(3) Against damages arising from liability for loss of, damage to or injury to persons or property, except liability arising from business or farming; and

c. The portion of the annual premium attributable to the property and contingencies described in **1.b.** exceeds the portion applicable to other property and contingencies.

2. Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

2. **Procedure And Reasons For Cancellation**

a. We may cancel this entire policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1) 15 days before the effective date of cancellation if we cancel for nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

b. But if this policy:

(1) Has been in effect for more than 60 days; or

**(2)** Is a renewal of a policy we issued;

we may cancel this policy only for one or more of the following reasons:

**(1)** Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

**(2)** Conviction of a crime arising out of acts increasing the risk of loss;

**(3)** Discovery of fraud or material misrepresentation in obtaining the policy or in making a claim;

**(4)** Discovery of willful or reckless acts or omissions increasing the risk of loss;

**(5)** Physical changes in the covered property that make that property uninsurable in accordance with our objective and uniformly applied underwriting standards in effect when we:

  **(a)** Issued the policy; or

  **(b)** Last voluntarily renewed the policy;

**(6)** The Superintendent of Insurance's determination that continuing the policy would violate Chapter 28 of the Insurance Law; or

**(7)** Required pursuant to a determination by the Superintendent of Insurance that the continuation of our present premium volume would be hazardous to the interests of our policyholders, our creditors or the public.

**3.** The following are added:

**a. Conditional Continuation**

Instead of cancelling this policy, we may continue it on the condition that:

**(1)** The policy limits be changed; or

**(2)** Any coverage not required by law be eliminated.

If this policy is conditionally continued, we will mail or deliver to the first Named Insured written notice at least 20 days before the effective date of the change or elimination. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

**b. Nonrenewal**

If, as allowed by the laws of New York State, we:

**(1)** Do not renew this policy; or

**(2)** Condition policy renewal upon:

  **(a)** Change of limits; or

  **(b)** Elimination of coverage;

we will mail or deliver written notice of nonrenewal or conditional renewal:

  **(a)** At least 45 days; but

  **(b)** Not more than 60 days;

before the expiration date of the policy. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

**E.** The following is added to the Farm Property – Other Farm Provisions Form – Additional Coverages, Conditions, Definitions, the Commercial Property Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

When the property is subject to the Anti-arson Application in accordance with New York Insurance Department Regulation No. 96, the following provisions are added:

If you fail to return the completed, signed and affirmed anti-arson application to us:

**1.** Or our broker or agent within 45 days of the effective date of a new policy, we will cancel the entire policy by giving 20 days' written notice to you and to the mortgageholder shown in the Declarations.

**2.** Before the expiration date of any policy, we will cancel the policy by giving written notice to you and to the mortgageholder shown in the Declarations at least 15 days before the effective date of cancellation.

The cancellation provisions set forth in **E.1.** and **E.2.** above supersede any contrary provisions in this policy including this endorsement.

If the notice in **E.1.** or **E.2.** above is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

**F.** The following applies to the Commercial Property Coverage Part, the Farm Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

Paragraphs **f.** and **g.** of the **Mortgageholders** Condition are replaced by the following:

**f. Cancellation**

**(1)** If we cancel this policy, we will give written notice to the mortgageholder at least:

**(a)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(b)** 30 days before the effective date of cancellation if we cancel for any other reason.

**(2)** If you cancel this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, cancellation will become effective on the later of:

**(a)** The effective date of cancellation of the insured's coverage; or

**(b)** 10 days after we give notice to the mortgageholder.

**g. Nonrenewal**

**(1)** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**(2)** If you elect not to renew this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, nonrenewal will become effective on the later of:

**(a)** The expiration date of the policy; or

**(b)** 10 days after we give notice to the mortgageholder.

**G.** The following provisions apply when the following are made a part of this policy:

Commercial General Liability Coverage Part

Employment-Related Practices Liability Coverage Part

Farm Liability Coverage Form

Liquor Liability Coverage Part

Products/Completed Operations Liability Coverage Part

**1.** The aggregate limits of this policy as shown in the Declarations will be increased in proportion to any policy extension provided in accordance with Paragraph **C.3.d.** above.

**2.** The last sentence of Limits Of Insurance does not apply when the policy period is extended because we sent the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice.

Case 2:16-cv-04435-PA-MRW Document 58-6 Filed 04/24/17 Page 82 of 83 Page ID
#:3440
Case 2:16-cv-04435-PA-MRW Document 10-5 Filed 07/07/16 Page 81 of 82 Page ID #:282

IL 01 83 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – FRAUD

This endorsement modifies insurance provided under the following:

    BOILER AND MACHINERY COVERAGE PART
    CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
    COMMERCIAL AUTOMOBILE COVERAGE PART
    COMMERCIAL INLAND MARINE COVERAGE PART
    COMMERCIAL PROPERTY COVERAGE PART
    FARM COVERAGE PART – FARM PROPERTY – OTHER FARM PROVISIONS FORM – ADDITIONAL
    COVERAGES, CONDITIONS, DEFINITIONS
    FARM COVERAGE PART – MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE
    FORM
    FARM COVERAGE PART – LIVESTOCK COVERAGE FORM

The CONCEALMENT, MISREPRESENTATION OR FRAUD Condition is replaced by the following:

**FRAUD**

We do not provide coverage for any insured ("insured") who has made fraudulent statements or engaged in fraudulent conduct in connection with any loss ("loss") or damage for which coverage is sought under this policy.

However, with respect to insurance provided under the COMMERCIAL AUTOMOBILE COVERAGE PART, we will provide coverage to such "insured" for damages sustained by any person who has not made fraudulent statements or engaged in fraudulent conduct if such damages are otherwise covered under the policy.

IL 09 50 11 02

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# COVERAGE FOR CERTIFIED ACTS OF TERRORISM; CAP ON LOSSES

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EMPLOYEE THEFT AND FORGERY POLICY
FARM COVERAGE PART
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY
KIDNAP/RANSOM AND EXTORTION COVERAGE FORM
KIDNAP/RANSOM AND EXTORTION POLICY
STANDARD PROPERTY POLICY

**A. Amendment**

Any exclusion of terrorism in this Coverage Part or Policy, or attached to such Coverage Part or Policy by endorsement, is hereby amended to the effect that such exclusion does not apply to a "certified act of terrorism".

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The criteria contained in that Act for a "certified act of terrorism" include the following:

**1.** The act resulted in aggregate losses in excess of $5 million; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Further, the aforementioned exclusion does not apply to an act which meets the criteria set forth in Paragraph **2.** of the definition of "certified act of terrorism", when such act resulted in aggregate losses of $5 million or less.

**B. Cap On Certified Terrorism Losses**

With respect to any one or more "certified acts of terrorism" under the federal Terrorism Risk Insurance Act of 2002, we will not pay any amounts for which we are not responsible under the terms of that Act (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

**C. Application Of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.