1  LUCIA E. COYOCA (SBN 128314)
   lec@msk.com
2  VALENTINE A. SHALAMITSKI (SBN 236061)
   vas@msk.com
3  DANIEL M. HAYES (SBN 240250)
   dmh@msk.com
4  MITCHELL SILBERBERG & KNUPP LLP
   11377 West Olympic Boulevard
5  Los Angeles, CA 90064-1683
   Telephone:  (310) 312-2000
6  Facsimile:  (310) 312-3100

7  Attorneys for Plaintiffs
   Universal Cable Productions LLC and
8  Northern Entertainment Productions LLC

9  UNITED STATES DISTRICT COURT

10  CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| 11  UNIVERSAL CABLE<br>PRODUCTIONS LLC and<br>12  NORTHERN ENTERTAINMENT<br>PRODUCTIONS LLC,<br><br>13          Plaintiffs,<br>14<br>     v.<br>15<br>ATLANTIC SPECIALTY<br>16  INSURANCE COMPANY,<br>17         Defendant. | CASE NO. 2:16-cv-4435-PA-MRW<br><br>The Honorable Percy Anderson<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS LLC AND NORTHERN ENTERTAINMENT PRODUCTIONS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Notice of Motion and Motion; Notice of Lodging Statement of Uncontroverted Facts and Conclusions of Law; Statement of Uncontroverted Facts and Conclusions of Law; Table of Contents of Evidence; Declarations of Andrea Garber, Kurt Ford, Randi Richmond, Matthew Levitt, Dennis Ross, Harold Koh, Ty Sagalow, and Lucia Coyoca; and Request for Judicial Notice filed / lodged and [Proposed] Order lodged concurrently herewith]<br><br>Date:      May 22, 2017<br>Time:     1:30 pm<br>Ctrm.:    9A, First Street<br>            Courthouse |

18
19
20
21
22
23
24
25
26
27
28

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

**Page(s)**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

I.    PRELIMINARY STATEMENT ............................................................. 1

II.   STATEMENT OF MATERIAL FACTS ................................................. 3

    A.    The Policy ........................................................................... 3

    B.    Addition Of *Dig* To The Policy As An Insured Production ............... 4

    C.    Events Leading To The *Dig* Claim ......................................... 5

    D.    Atlantic's Denial Of The *Dig* Claim ...................................... 7

III.  STANDARDS OF LAW ......................................................................... 7

    A.    Summary Judgment Standard ................................................. 7

    B.    Principles For Construing Insurance Policies .......................... 8

IV.   ARGUMENT ....................................................................................... 9

    A.    Universal Suffered A Loss Falling Within The Scope Of The Extra Expense Coverage ...................................................... 9

    B.    Exclusions 1 And 2 Do Not Apply To The Claim .................... 9

        1.    Exclusions 1 And 2 Both Require A Conflict Between Sovereigns Or Quasi-Sovereigns ............................... 9

        2.    Exclusions 1 And 2 Do Not Apply Because There Was No Conflict Between Sovereigns Or Quasi-Sovereigns ......... 16

    C.    Exclusion 3 Does Not Apply To The Claim ............................ 21

    D.    Exclusion 4 Does Not Apply To The Claim ............................ 22

V.    CONCLUSION ................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## CASES

*Anderson v. State Farm Mut. Auto. Ins.*,
270 Cal. App. 2d 346 (1969) ................................................................ 23

*Conestoga Servs. Corp. v. Exec. Risk Indem.*,
312 F.3d 976 (9th Cir. 2002) .................................................................. 7

*E.M.M.I. Inc. v. Zurich Am. Ins. Co.*,
32 Cal. 4th 465 (2004) ........................................................................... 8

*Ennar Latex v. Atlantic Mut. Ins. Co.*,
1995 U.S. Dist. LEXIS 7386 (S.D.N.Y. May 30, 1995) .............................. 10, 17

*Fireman's Fund Ins. Co. v. Atl. Richfield Co.*,
94 Cal. App. 4th 842 (2001) ................................................................. 14

*Garvey v. State Farm Fire & Cas. Co.*,
48 Cal. 3d 395 (1989) ............................................................................ 9

*Hans v. Louisiana*,
134 U.S. 1 (1890) ................................................................................ 19

*Holiday Inns Inc. v. Aetna Ins. Co.*,
571 F. Supp. 1460 (S.D.N.Y. 1983) .............................................. *passim*

*HS Servs., Inc. v. Nationwide Mut. Ins. Co.*,
109 F.3d 642 (9th Cir. 1997) .................................................................. 8

*Knox v. PLO*,
306 F. Supp. 2d 424 (S.D.N.Y. 2004) .................................................... 19

*MacKinnon v. Truck Ins. Exch.*,
31 Cal. 4th 635 (2003) .................................................................. *passim*

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
210 F.3d 1099 (9th Cir. 2000) ................................................................ 8

*Oetjen v. Cent. Leather Co.*,
246 U.S. 297 (1918) ............................................................................ 17

ii

*Pan Am. World Airways v. Aetna Cas. & Surety Co.*,
　505 F.2d 989 (2nd Cir. 1974) ......................................................*passim*

*Safeco Ins. Co. v. Robert S.*,
　26 Cal. 4th 758 (2001) ......................................................8, 14, 15, 24

*Schleimer v. Strahl*,
　219 Cal. App. 2d 613 (1963) ........................................................ 10

*Shell Oil Co. v. Nat'l Union Fire Ins. Co.*,
　44 Cal. App. 4th 1633 (1996) ....................................................... 23

*State Farm Mut. Auto. Ins. Co. v. Jacober*,
　10 Cal. 3d 193 (1973) ..............................................................8, 25

*State Farm Mut. Auto. Ins. Co. v. Mrozek*,
　29 Cal. App. 3d 113 (1972) .......................................................... 23

*Ungar v. PLO*,
　402 F.3d 274 (1st Cir. 2005) ................................................18, 19, 20

*United States v. Abdi*,
　498 F. Supp. 2d 1048 (S.D. Ohio 2007) ........................................... 16

*United States v. Damra*,
　621 F.3d 474 (6th Cir. 2010) ........................................................ 19

*United States v. PLO*,
　695 F. Supp. 1456 (S.D.N.Y. 1988) ................................................. 19

*Weiss v. Arab Bank, PLC*,
　2007 U.S. Dist. LEXIS 94029 (E.D.N.Y. Dec. 21, 2007)........................ 10

### STATUTES

California Civil Code
　§ 1644 ................................................................................. 10

### OTHER AUTHORITIES

5-43 New Appleman on Insurance Law Library Ed.,
　§ 43.02 (2016).......................................................................... 14

Federal Rules of Civil Procedure
　Rule 56(a) ............................................................................... 8

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**



*Restatement (Third) of Foreign Relations Law of the United States*
   § 201 (1987)...........................................................................................19

Mitchell
Silberberg &
Knupp LLP

iv

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.    PRELIMINARY STATEMENT**

In July 2014, Israel publicly identified the terrorist group Hamas as being responsible for the kidnapping and murder of three Israeli teens.  In retaliation, Hamas began indiscriminately bombing Israeli civilian population areas near locations where Plaintiffs Universal Cable Productions LLC ("UCP") and Northern Entertainment Productions LLC ("NEP") (collectively, "Universal") were filming a new television show titled "*Dig*."  Thereafter, Israel's military took measures to protect Israeli civilians from these terrorist attacks.  Mindful of the safety of cast and crew, Universal first delayed and ultimately moved the *Dig* production out of Israel, incurring substantial expenses and costs associated with moving a full scale production on short notice.

At the time, Defendant Atlantic Specialty Insurance Company ("Atlantic") was Universal's production insurer.  The policy issued by Atlantic ("the Policy") covered losses resulting from "imminent peril," including imminent peril caused by acts of terrorism.  And when *Dig* was added as an insured production to the Policy, Atlantic had consented to filming the series in Israel without changing any terms of coverage because of the filming location, imposing a terrorism exclusion, or telling Universal that terrorist acts would not be covered.  Universal therefore reasonably expected Atlantic would cover the expenses associated with moving the *Dig* production, and was taken completely off-guard when Atlantic denied coverage for the claim.  At a time when insurer support was most critical – i.e., when the physical safety of cast and crew was at risk – Atlantic turned its back on Universal and disclaimed any responsibility for the claim.

Atlantic conceded the situation in Israel in July 2014 fell within the scope of the Extra Expense coverage of the Policy because the situation constituted "imminent peril."  But rather than honor the claim, Atlantic denied coverage on the grounds that losses resulting from Hamas' terrorist acts purportedly fell within the

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

scope of the Policy's "war exclusions."  Specifically, in its denial letter, Atlantic contended that Hamas' terrorist acts constituted (1) war, or (2) warlike action by a military force of a government, sovereign or other authority.  After the lawsuit was filed, Atlantic belatedly argued for the first time that Hamas' terrorist acts also constituted (3) insurrection, rebellion, revolution, or usurpation of power, or (4) use of a weapon of war including atomic fission or radioactive force.  This is a transparent attempt by Atlantic to rewrite the terms of coverage.

The issue before the Court on this Motion is whether any of these four war exclusions apply.  As a matter of law, they do not, for the following reasons:

<u>First</u>, exclusions 1 and 2 are inapplicable because they apply only when the conflict at issue is between two sovereign or quasi-sovereign states.  Here, Hamas is neither a sovereign nor quasi-sovereign because:

- The U.S. government has designated Hamas as a terrorist organization, and does not recognize it as a sovereign or a quasi-sovereign state.  Under the political question doctrine, that determination is binding on the judiciary and is not subject to second-guessing in civil litigation disputes; and,

- As a matter of law, Hamas lacks the necessary attributes to be deemed a sovereign or quasi-sovereign.

<u>Second</u>, exclusion 3 does not apply because Hamas is not attempting to seize control of Israel's government so that it can govern Israel, a necessary prerequisite of the exclusion for "insurrection, rebellion, revolution, [and] usurpation of power."  Instead, according to its own mission statement, Hamas seeks to destroy the state of Israel altogether.

<u>Third</u>, exclusion 4 does not apply because it excludes only losses caused by a weapon of war using atomic fission or radioactive force.  It is undisputed that no such weapon was used in the conflict between Hamas and Israel.  Moreover, regardless of whether atomic fission/radioactive force is a necessary prerequisite, Hamas used weapons of terror, *not* weapons of war.

1    Thus, Universal moves for partial summary judgment on the ground that, as

2    a matter of law, Atlantic breached the Policy by failing to cover the extra expenses

3    Universal incurred in postponing and relocating the *Dig* production.  In the

4    alternative, Universal seeks an order finding that none of the four enumerated war

5    exclusions apply.  At a minimum, Universal requests the Court enter an order

6    requiring the war exclusions to be interpreted based on the meanings set forth by

7    Universal herein.

8    **II.    STATEMENT OF MATERIAL FACTS**

9        **A.    The Policy**

10    Beginning in January 2010, following extensive negotiations, Atlantic[1]

11   issued a production policy to NBCUniversal Media, LLC ("NBCUniversal")

12   insuring against certain risks commonly incurred in connection with television

13   productions.  SUF ¶¶ 2-4.  The policy was renewed from year to year, until

14   issuance of the Policy at issue here, Motion Picture/Television Producers Portfolio

15   Policy No. MP00163-04, which had an eighteen month policy period from January

16   1, 2014 to June 30, 2015.  *Id*. ¶¶ 5, 6.  NBCUniversal is the first Named Insured

17   under the Policy.  *Id*. ¶ 7.  UCP and NEP are production companies and indirect

18   subsidiaries of NBCUniversal and they are also Named Insureds under the Policy.

19   *Id*. ¶¶ 8, 9.

20    The Policy covers losses the insureds might incur associated with their

21   television productions, with specific coverage for expenses incurred due to, *inter*

22   *alia*, "imminent peril," which is defined as "certain, immediate and impending

23   danger of such probability and severity to person or property that it would be

24   unreasonable or unconscionable to ignore."  *Id*. ¶¶ 10, 11 (Policy, Section III –

25   Extra Expense, § I).  The Extra Expense coverage includes, among other things,

26   those expenses incurred in connection with the postponement and/or relocation of

27   ─────────────────

28   [1] Atlantic is a OneBeacon Insurance Group company, which operates Atlantic and various OneBeacon entities.  Statement of Uncontroverted Facts ("SUF") ¶ 1.  All references to Atlantic include the OneBeacon entities and their employees / agents.

Mitchell
Silberberg &
Knupp LLP

3

1   productions resulting from imminent peril.  *Id.* ¶ 10.  The Policy does not exclude

2   losses caused by acts of terrorism.  *Id.* ¶ 13.  Each NBCUniversal/Universal

3   television production is added as an Insured Production to the Policy on an

4   individual basis.  *Id.* ¶ 44.

5       **B.    Addition Of *Dig* To The Policy As An Insured Production**

6       Aon/Albert G. Ruben Insurance Services, Inc. ("Aon") is NBCUniversal's

7   insurance broker.  SUF ¶ 15.  On December 11, 2013, Aon submitted an

8   application to Atlantic for *Dig* to be added to the Policy as an Insured Production.

9   *Id.* ¶ 16.  The application disclosed that production would take place, in large part,

10  in Israel.  *Id.* ¶ 17.

11      Intermittent violence in Israel has occurred since the establishment of the

12  State of Israel in 1948.  *Id.* ¶ 18.  In recent decades, a Palestinian group known as

13  Hamas has conducted numerous anti-Israeli attacks, "including shootings, suicide

14  bombings, and standoff mortar-and-rocket attacks against civilian and military

15  targets."  *Id.* ¶ 19.  Hamas has been designated as a terrorist organization by the

16  U.S. government since 1997, and the U.S. has never recognized Hamas as a

17  sovereign or quasi-sovereign.  *Id.* ¶¶ 20, 67.

18      In its submission to have *Dig* added to the Policy as an Insured Production,

19  Aon specifically addressed with Atlantic the higher risks associated with producing

20  a television show in Israel.  SUF ¶¶ 21-24.  Atlantic expressed concerns about

21  safety and security precautions, and Aon advised Atlantic that the *Dig* production

22  would have an NBCUniversal Security team on site and coordination with the

23  mayor of Jerusalem and the local police to "assist[] in assuring the safety of the

24  production company when they are working in Jerusalem."  *Id.*

25      While Universal agreed to implement additional security for the production,

26  as to the terms of the policy, Aon expressly told Atlantic:  "we would like to avoid

27  any deviation from our standard policy terms if possible."  *Id.* ¶¶ 24, 25.  On

28  December 12, 2013, and again on January 14, 2014, Atlantic accepted and

Mitchell
Silberberg &
Knupp LLP

4

1  confirmed coverage for *Dig* as an Insured Production under the Policy without

2  requiring that any Policy terms be changed.  *Id.* ¶¶ 26, 27.  Specifically, Atlantic

3  did *not* add any new or Israel-specific exclusions or endorsements to the Policy, or

4  otherwise change the Policy in any way.  *Id.* ¶ 27.  Atlantic also did not

5  communicate to Aon, NBCUniversal, or Universal, that it intended to exclude from

6  coverage attacks or violence by terrorist groups, such as Hamas, in Israel.  *Id.* ¶ 28.

7       Although the Policy did not exclude, and therefore covered, losses caused by

8  acts of terrorism, the Policy did exclude from coverage losses caused by:

9       1.  War, including undeclared or civil war; or

10      2.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority

11      using military personnel or other agents; or,

12      3.  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or

13      defending against any of these.  Such loss or damage is excluded regardless of any other cause or event

14      contributed concurrently or in any sequence to the loss.

15      4.  Any weapon of war including atomic fission or radioactive force, whether in time of peace or war….

16  SUF ¶ 12 (Policy, General Conditions, § III).  (Exclusions 1-4 above are referred to

17  as "the War Exclusions" and each individual part is referred to by number.)  None

18  of the words used in the War Exclusions are specifically defined in the Policy.

19      **C.    Events Leading To The *Dig* Claim**

20      When the *Dig* pilot episode started filming in Israel on June 2, 2014,

21  conditions in Israel were considered safe for filming.  *Id.* ¶¶ 29, 30.  But conditions

22  in Israel began to destabilize when three Israeli teenagers were kidnapped on June

23  12, 2014, with "many signs that point[ed] to Hamas involvement."  *Id.* ¶¶ 31, 32.

24      On June 26, 2014, production of the *Dig* pilot episode was completed.  *Id.* ¶

25  33.  The show then went on hiatus for pre-production and preparation for filming

26  of the next five episodes, with production scheduled to resume on July 20, 2014.

27  *Id.* ¶ 34.  On or about June 30, 2014, the bodies of the three missing teenagers were

28  found, and it was again reported that there were signs "indicat[ing] that Hamas was

Mitchell Silberberg & Knupp LLP

5

involved." *Id.* ¶ 35.  After allegations were made that Hamas was responsible for the murders, Hamas began firing rockets into Israel, and in response, Israel began to take affirmative action to protect its civilian citizens and to stop Hamas' attacks. *Id.* ¶ 36.

Due to the deteriorating security conditions in Israel, on July 8, 2014, the State Department warned about concerns as to "the safety and security of civilians" in and around Israel and Jerusalem, where certain *Dig* filming was scheduled to take place. *Id.* ¶¶ 37, 38.  As tensions increased throughout early July, the NBCUniversal security team assessed the situation. *Id.* ¶ 39.  Ultimately, on July 10, 2014, they advised the UCP *Dig* production team that "the security environment in Israel currently prohibits NBCU Security from being able to guarantee the safety and security of our employees, production partners and associated crew and talent." *Id.* ¶ 40.

Thus, on July 11, 2014, UCP decided to postpone, for one week, production of the *Dig* episodes that had been scheduled to resume on July 20, 2014. *Id.* ¶ 41. That same day UCP informed Atlantic that, due to the circumstances and concomitant safety concerns for cast and crew members, production of the show was being postponed by one week. *Id.* ¶ 42.  UCP also told Atlantic that UCP might be compelled to move the *Dig* production to another location if conditions did not improve. *Id.* ¶ 43.

Unfortunately, rather than improving, the security situation in Israel further deteriorated.  On July 16, 2014, the State Department reported:  "right now the potential we're looking at is … an even greater escalation of violence" in and around Israel. *Id.* ¶ 44.  Faced with the prospect of escalating violence, UCP decided to move the *Dig* production out of Israel, and informed Atlantic of its decision on July 17, 2014. *Id.* ¶¶ 45, 46.  Universal incurred substantial expenses in connection with the initial delay in production and the subsequent relocation of the production to Croatia and New Mexico. *Id.* ¶¶ 47, 48.

Mitchell
Silberberg &
Knupp LLP

6

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1

### D.   Atlantic's Denial Of The *Dig* Claim

2        On July 15, 2014, Aon submitted to Atlantic a formal notice of the claim on

3   NBCUniversal's and UCP's behalf (the "Claim").  *Id.* ¶ 49.  Atlantic then assigned

4   an "investigator," Daniel Gutterman, and an in-house claims lawyer, Pamela

5   Johnson, to investigate and evaluate coverage for the Claim.  *Id.* ¶ 50.  Atlantic

6   denied the Claim, ultimately setting forth the grounds for its denial in a July 28,

7   2014 letter to NBCUniversal.  *Id.* ¶ 51.

8        In its denial letter, Atlantic conceded the Claim constituted "imminent peril"

9   and therefore triggered the Extra Expense coverage under Section III of the Policy:

10   "Rockets launched [by Hamas] toward areas where filming is taking place would

11   no doubt reasonably constitute a 'certain, immediate and impending danger of such

12   probability and severity to person or property that it would be unreasonable or

13   unconscionable to ignore.'… ***The question now is not whether the loss falls***

14   ***within the insuring clause but whether the war exclusion or the terrorism***

15   ***coverage applies.***"  *Id.* ¶¶ 52, 55 (emphasis added); *see also id*. ¶ 56.  However,

16   Atlantic "concluded that the extra expense associated with the move is not covered

17   under [the Policy] because of the exclusion for war and warlike actions."  *Id.* ¶ 53.

18   Atlantic did not cite Exclusion 3 (insurrection, etc.) or Exclusion 4 (weapon of

19   war) in its denial letter.  *Id.* ¶ 54.

20   ## III.   STANDARDS OF LAW

21   ### A.   Summary Judgment Standard

22        Interpretation of an insurance policy is a question of law, and thus

23   appropriate for determination at summary judgment.  *Conestoga Servs. Corp. v.*

24   *Exec. Risk Indem.,* 312 F.3d 976, 981 (9th Cir. 2002); *MacKinnon v. Truck Ins.*

25   *Exch.*, 31 Cal. 4th 635, 641 (2003) (same).

26        Summary judgment is appropriate when "there is no genuine issue as to any

27   material fact" and "the moving party is entitled to a judgment as a matter of law."

28   Fed. R. Civ. P. 56(a).  When the moving party does not bear the ultimate burden of

Mitchell
Silberberg &
Knupp LLP

7

1  persuasion at trial on an issue, the moving party "may carry its initial burden of

2  production by either . . . produc[ing] evidence negating an essential element of the

3  nonmoving party's case, or . . . show[ing] that the nonmoving party does not have

4  enough evidence of an essential element of its claim or defense to carry its ultimate

5  burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210

6  F.3d 1099, 1106 (9th Cir. 2000).

7      It is Universal's burden to establish that Atlantic breached the Policy by

8  refusing to pay for the losses incurred due to a covered claim. *See HS Servs., Inc.*

9  *v. Nationwide Mut. Ins. Co.*, 109 F.3d 642, 644-45 (9th Cir. 1997).  After Universal

10  meets this burden, the burden then shifts to Atlantic to establish the War

11  Exclusions apply. *Id.* ("The insurer bears the burden of bringing itself within a

12  policy's exclusionary clauses.").

13      **B.    Principles For Construing Insurance Policies**

14      An exclusion in an insurance policy precludes coverage only if it is

15  "expressly and unambiguously excluded," using "conspicuous, plain, and clear"

16  language. *State Farm Mut. Auto. Ins. Co. v. Jacober*, 10 Cal. 3d 193, 200-02

17  (1973); *MacKinnon*, 31 Cal. 4th at 639.  Thus, "insurance coverage is 'interpreted

18  broadly so as to afford the greatest possible protection to the insured,. . . [whereas]

19  exclusionary clauses are interpreted narrowly against the insurer.'" *MacKinnon*,

20  31 Cal. 4th at 639 (citation omitted).  *See also HS Servs.*, 109 F.3d 642, 645 (9th

21  Cir. 1997) ( "Exclusionary clauses are strictly construed.").

22      Where there are two reasonable interpretations of an exclusion, the court

23  "***must resolve the ambiguity in favor of the insured***, consistent with the insured's

24  reasonable expectations." *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465,

25  473 (2004) (emphasis added); *Safeco Ins. Co. v. Robert S.*, 26 Cal. 4th 758, 763

26  (2001) (reversing grant of summary judgment to defendant insurance company

27  because the insured reasonably expected coverage for the claim purportedly

28  excluded).  In order to prevail, the insurer must prove that "its interpretation is the

8

*only* reasonable interpretation." *MacKinnon*, 31 Cal. 4th at 655.

## IV.   ARGUMENT

### A.   Universal Suffered A Loss Falling Within The Scope Of The Extra Expense Coverage

It is Universal's initial burden to show that the event causing Universal's loss falls within the scope of coverage of the policy. *See Garvey v. State Farm Fire & Cas. Co.*, 48 Cal. 3d 395, 406 (1989).  Here, that burden is easily satisfied.  The Policy, by its terms, covers those extra expenses associated with interruption, postponement, or relocation of an Insured Production as a result of "imminent peril."  SUF ¶ 10 (Policy, Section III – Extra Expense, § I.1.g).  Atlantic has admitted the facts and circumstances that caused the postponement and move of the *Dig* production constitute "imminent peril."  *Id*. ¶¶ 52, 54, 56.  Thus, there is no dispute that Hamas' repeated launching of rockets and mortars into Israel during July 2014 constituted imminent peril.  *Id.*

The burden then shifts to Atlantic to prove that the Claim is excluded from coverage by the War Exclusions.  *Garvey*, 48 Cal. 3d at 406.  Atlantic cannot meet its burden as to any War Exclusion, as set forth in Sections IV.B-D below.

### B.   Exclusions 1 And 2 Do Not Apply To The Claim

Atlantic's application of Exclusions 1 ("War") and 2 ("Warlike action by a military force") is unsupportable.  These Exclusions do not apply because (1) they require conflict between two sovereign or quasi-sovereign entities, and (2) Hamas is neither a sovereign nor quasi-sovereign.

#### 1.   Exclusions 1 And 2 Both Require A Conflict Between Sovereigns Or Quasi-Sovereigns

While the terms "war" and "warlike action by a military force" are not defined in the Policy, both (a) California's general rules of contract interpretation and (b) specific principles of insurance policy interpretation mandate that the Exclusions be read to require a conflict between sovereigns or quasi-sovereigns.

a.     **The established technical and special meaning of Exclusions 1 and 2 require a conflict between sovereigns or quasi-sovereigns**

Under California law, words in a contract that have a technical or special meaning must be interpreted in accordance with that technical and special meaning.  Cal. Civ. Code § 1644 (contract terms used in a technical sense or having a special meaning by usage should be interpreted as such); *see also Schleimer v. Strahl*, 219 Cal. App. 2d 613, 615 (1963) (interpreting undefined policy terms in a technical sense because to give a broader meaning to the words used would amount to rewriting the contract); *MacKinnon*, 31 Cal. 4th at 651 (courts consider existing case law in interpreting policy exclusions).  In the insurance context, the terms used in Exclusions 1 and 2 ("war" and "warlike action by a military force") have a well-established technical and special meaning.  Specifically, in the insurance context, courts have repeatedly held these terms each require the existence of a conflict between two sovereign or quasi-sovereign entities.  *See Pan Am. World Airways v. Aetna Cas. & Surety Co.*, 505 F.2d 989, 1012 (2nd Cir. 1974) ("*Pan Am*"); *Holiday Inns Inc. v. Aetna Ins. Co.*, 571 F. Supp. 1460, 1464-65 (S.D.N.Y. 1983); *Ennar Latex v. Atlantic Mut. Ins. Co.*, 1995 U.S. Dist. LEXIS 7386, at *12-16 (S.D.N.Y. May 30, 1995) (holding, on a motion for summary judgment, that war risk policy exclusions did not preclude coverage); *see also Weiss v. Arab Bank, PLC*, 2007 U.S. Dist. LEXIS 94029, at *14-20 (E.D.N.Y. Dec. 21, 2007) (Hamas is a terrorist group and cannot constitute a "military force of any origin").

In *Pan Am*, for example, the court determined that exclusions for "war" and "warlike operations by a military force" did *not* exclude coverage for the hijacking of a plane by a Palestinian terrorist organization the Popular Front for the Liberation of Palestine ("PFLP").  505 F.2d at 1015.  The insurers argued the loss was due to "war" or "warlike operations" because the PFLP was ostensibly waging a "guerrilla war" against either or both Israel and the United States.  *Id.* at 1013.

The court examined the history of the war exclusions, including case law on insurance meaning of "war" and international law, and determined that the defining feature of war was hostilities between two sovereign or quasi-sovereign governments. *Id.* at 1012-15.  Because the hijackers were "the agents of a radical political group, rather than a sovereign government," and also lacked the significant attributes of sovereignty necessary to qualify as a quasi-sovereign, the war exclusions did not apply. *Id.* at 1015.

Similarly, in *Holiday Inns* the court considered whether exclusions for, among other things, "war" and "warlike operations by a military force" precluded coverage for the destruction of an insured's hotel during widespread and months-long violence and fighting between various religious factions in Beirut, Lebanon. 571 F. Supp. at 1467-72.  The insured's hotel was destroyed after being subjected to weeks of shelling and artillery fire. *Id.* at 1471-72.  The insured made a claim under its insurance policy, which the insurer denied after invoking the policy's war exclusions. *Id.* at 1461.  Following *Pan Am*, the court found the war exclusions did *not* apply because the parties engaged in the conflict were not sovereign or quasi-sovereign entities. *Id.* at 1501.  While Syria, a sovereign country, did participate in the fighting, its adversaries were not sovereign states; rather, various militant factions fought to displace one another for supremacy in the region. *Id.* at 1501-03.  The court therefore found the insurer was obligated to pay for the loss because the hostilities were not "war" or "warlike operations." *Id.*

Thus, in the insurance context, courts interpret Exclusions 1 and 2 in a technical sense and ascribe to them a special meaning, requiring a conflict between sovereigns or quasi-sovereigns before either of the Exclusions can be applied.

### b. At a minimum, the parties' opposing interpretations are equally reasonable and therefore Universal's interpretation must control

Even if the Court disregards the technical or special meaning of Exclusions 1 and 2, and instead chooses to consider the plain language of the Policy and weigh

1  the respective contractual interpretations of Universal and Atlantic, Universal's
2  interpretation still must control because Atlantic's interpretation is "not the only
3  reasonable interpretation." *MacKinnon*, 31 Cal. 4th at 655; *Holiday Inns*, 571 F.
4  Supp. at 1464.

5        Here, Universal argues that, consistent with case law, international law, and
6  industry custom and practice, the terms "war" and "warlike action by a military
7  force" require a conflict between two sovereigns or quasi-sovereigns. Atlantic, on
8  the other hand, argues that the terms should be construed using some undefined
9  "common understanding" that does not take account of *who* is fighting.

10       As set forth below, Atlantic's interpretation is *unreasonable* and thus, by
11  definition, is not the only reasonable one. But even if Atlantic's interpretation is
12  deemed reasonable, Universal's interpretation is at a minimum also reasonable.
13  Therefore, it is Universal's reasonable expectation that must control.

14              **(i)    Atlantic's interpretation is not the *only***
15                     **reasonable one (or reasonable *at all*)**

16       Atlantic cannot establish its interpretation is the *only* reasonable one because
17  Atlantic's interpretation is not reasonable *at all*. Atlantic's interpretation is not
18  reasonable for at least three reasons:

19       First, Atlantic's "common understanding" argument has already been rejected
20  by courts that have considered it. *See Holiday Inns*, 571 F. Supp. at 1464 ("In
21  commercial litigation arising out of insurance policies, words and phrases are
22  construed 'for insurance purposes' – a context quite different from those of politics or
23  journalism.").[2]

24       Second, Atlantic cannot even articulate a consistent or coherent "common
25  understanding" definition of "war." Atlantic's witnesses have variously testified:

26  ───────────────
[2] Atlantic's current "common understanding" position is also inconsistent with the
27  position Atlantic took when it denied the *Dig* Claim. In its denial letter, Atlantic
    cited case authorities holding that "war" requires hostilities between sovereign or
28  quasi-sovereigns, and argued that there was a war here because Hamas is a quasi-
    sovereign. SUF ¶ 57.

1   (1) the word "war" has multiple meanings; (2) hostilities must be broad and

2   widespread to constitute war; and, (3) it is not possible to articulate what war is but

3   they "know it when they see it." *Id.* ¶¶ 58-60.  Atlantic's inconsistency

4   demonstrates the inherent unreasonableness of Atlantic's proffered interpretation.

5        Third, Atlantic's interpretation, which gives no regard to who is fighting,

6   leads to absurd results.  For example, one definition Atlantic has advanced is that

7   the determination of whether a conflict qualifies as a "war" should be made based

8   on the size and scope of the hostilities.  SUF ¶ 61.  That is *not* the applicable

9   standard.  If size or scope of loss were sufficient to qualify hostilities as war, then

10  the 9/11 attacks, which resulted in 2,996 deaths and caused at least $10 billion in

11  property and infrastructure damage, ostensibly would have constituted war.  *See,*

12  *e.g.,* WSJ, *Timeline: Terror Attacks Linked to Islamists Since 9/11*, available at

13  http://graphics.wsj.com/terror-timeline-since-911/; *How much did the September*

14  *11 terrorist attack cost America?*  Institute for the Analysis of Global Security,

15  available at http://www.iags.org/costof911.html.[3]  But the insurance industry did

16  *not* exclude 9/11 losses based on application of any war exclusions.  SUF ¶ 62.  In

17  short, without the limiting principle that the hostilities or conflict be between two

18  sovereigns or quasi-sovereigns, the Exclusion would extend far beyond its intended

19  scope and improperly lead to absurd results.  *Cf. MacKinnon*, 31 Cal. 4th at 650

20  (rejecting insurer's argument that dictionary meanings of "irritant" or "discharge"

21  should apply in pollution exclusion because such application would result in

22  absurdities and denial of coverage in situations that reasonably should be covered).

23       But even if Atlantic's interpretation of Exclusions 1 and 2 is reasonable,

24  which it is not, it is certainly not the *only* reasonable interpretation.  The

25  interpretation advanced by Universal is inherently reasonable because it is

26  consistent with:  (i) case law (*supra*, Section IV.B.1.a); (ii)  the primary Merriam-

27

28

---

[3] The Court can take judicial notice of these documents.  *See* Request for Judicial Notice ("RJN") filed concurrently herewith.

Webster Dictionary definition of the term "war," which requires "a state of usually open and declared armed hostile conflict *between states or nations.*"  Merriam-Webster.com, https://www.merriam-webster.com/dictionary/war (emphasis added); and (iii) the definition of a preeminent insurance law treatise:  "War is 'a course of hostility' between '*states or state-like entities*.'"  5-43 New Appleman on Insurance Law Library Ed. § 43.02 (2016) (emphasis added).

In short, because Universal has proffered a reasonable interpretation of Exclusions 1 and 2, and because of the strong policy favoring contractual construction in favor of the insured, it is Universal's interpretation and reasonable expectations that must control.

### (ii)  Universal reasonably expected losses caused by Hamas' terrorist acts would be covered

Universal's interpretations of Exclusions 1 and 2 are consistent with Universal's reasonable expectation as an insured that losses caused by Hamas' attacks, such as the ones that occurred in Israel in July 2014, would be covered given the absence of a terrorism exclusion in the Policy.  SUF ¶¶ 13, 26-28.  When there are other exclusion clauses potentially available to the insurer that are directly applicable to certain types of occurrences, but the insurer does not use them to clearly exclude such occurrences, "this gives rise to the inference that the parties intended not to so limit coverage."  *Fireman's Fund Ins. Co. v. Atl. Richfield Co.*, 94 Cal. App. 4th 842, 852 (2001).

*Safeco* is particularly instructive on this point.  In *Safeco*, the policy at issue had an exclusion for "any illegal act."  26 Cal. 4th at 763.  The insurer argued that the exclusion should be interpreted to bar coverage for any violation of criminal law.  *Id.*  The court rejected the argument:

> Had Safeco wanted to exclude criminal acts from coverage, it could have easily done so. Insurers commonly insert an exclusion for criminal acts in their liability policies. ... Because Safeco chose not to have a criminal act exclusion, instead opting for an illegal act exclusion, we cannot read into the policy what Safeco has omitted. To do so would violate the fundamental

14

Mitchell Silberberg & Knupp LLP

1    principle that in interpreting contracts, including
     insurance contracts, courts are not to insert what has been
2    omitted.

3    *Id.* at 763-64 (citations omitted).

4         The same analysis applies here.  Had Atlantic wanted to exclude Hamas'

5    terrorist acts from coverage, it could have easily requested the addition of a

6    terrorism exclusion to the Policy.  Atlantic knows how to write a terrorism

7    exclusion (*see* SUF ¶ 64), but when underwriting the addition of *Dig* to the Policy,

8    Atlantic considered the risk of filming in Israel and decided it would cover the

9    production *without* requiring a terrorism exclusion, or otherwise informing

10   Universal that violence and attacks on civilian population by Palestinian terrorist

11   groups would be excluded from coverage (*see id.* ¶¶ 13, 21-28).  Because Atlantic

12   "chose not to have a [terrorism] exclusion, … [the Court] cannot read [it] into the

13   policy."  *Safeco*, 26 Cal. 4th at 763-64.

14        Given that Atlantic did not add a terrorism exclusion, Universal reasonably

15   believed such violence *would* be covered by the Policy.  *See* SUF ¶¶ 13, 26-28.

16   Universal's expectation of coverage was particularly reasonable in light of the

17   aftermath of 9/11, when it became common in the insurance industry for policies to

18   have *both* a terrorism exclusion and a war exclusion, or at a minimum to address

19   with specificity whether "terrorism" is covered by the policy.  *Id.* ¶ 63.  In the

20   world of insurance, terrorism is not war, and war is not terrorism.  "[A]n

21   underwriter cannot merge the two concepts and say that 'an act of terrorism' can

22   be also 'act of war.'"  *Id.* ¶ 65.

23        In the post 9/11 world, insureds reasonably expect the two risks will be

24   treated separately, and underwritten and evaluated by an insurer separately.  *Id.* ¶

25   66.  To conflate the two, as Atlantic is doing here, means that an insured who pays

26   for terrorism insurance is not getting the benefit of its bargain if coverage is

27   precluded by the war exclusions.  Atlantic should not be permitted to frustrate its

28   insured's reasonable expectations by effectively revising the underwriting decision

Mitchell
Silberberg &
Knupp LLP

15

1  long after the fact in order to avoid paying out for coverage of the Claim.

2      In short, Universal's interpretations of Exclusions 1 and 2 are inherently

3  reasonable and are consistent with the parties' negotiating history and the

4  reasonable expectations of the insured.  Therefore, as a matter of law, Universal's

5  interpretations must control.  Under those interpretations, there can be no finding

6  that the *Dig* losses were caused by "war" or "warlike action" unless Atlantic can

7  establish that each participant in the conflict was a sovereign or quasi-sovereign.

8  As set forth below, Atlantic cannot establish that Hamas is either of these things.

9  ### 2. Exclusions 1 And 2 Do Not Apply Because There Was No Conflict Between Sovereigns Or Quasi-Sovereigns

10      As a matter of law Atlantic ***cannot*** establish Hamas is a sovereign or quasi-

11  sovereign for two reasons: (a) under the political question doctrine, the court must

12  defer to the U.S. government's designation of Hamas as a terrorist organization,

13  and not grant Hamas (or Gaza) status as a sovereign or quasi-sovereign; and, (b)

14  Hamas lacks the requisite attributes of sovereignty or quasi-sovereignty.

15  ### a. The political question doctrine mandates deference to the U.S. government's determination that Hamas is not a sovereign or quasi-sovereign

16

17      The U.S. government's designation of Hamas as a terrorist group, and the

18  fact that it has not recognized Hamas as a sovereign or quasi-sovereign or Gaza as

19  a sovereign territorial nation, implicate matters of foreign policy.  As the United

20  States Supreme Court has explained, the executive branch's determinations on

21  matters of foreign policy are binding on the courts:

22      Who is the sovereign, de jure or de facto [i.e., quasi-
        sovereign], of a territory is not a judicial, but is a political

23      question, the determination of which by the legislative
        and executive departments of any government

24      conclusively binds the judges, as well as all other
        officers, citizens and subjects of that government.  This

25      principle has always been upheld by this court, and has
        been affirmed under a great variety of circumstances.

26  *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) (emphasis added).[4]

27  ――――――――――――――
[4] This Court may properly take judicial notice of the U.S. government's

28  determinations as to Hamas' status.  *United States v. Abdi*, 498 F. Supp. 2d 1048, 1079 (S.D. Ohio 2007); *and see* RJN filed concurrently herewith.

Mitchell
Silberberg &
Knupp LLP

16

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    This principle applies in insurance contract disputes.  In *Ennar Latex*, for

2    example, the insured suffered a loss when its cargo was seized off the coast of

3    Liberia by ECOMOG (the armed forces of the Economic Community of West

4    African States).  1995 U.S. Dist. LEXIS 7386, at *1-2.  The policy excluded

5    coverage for loss due to seizures by a government.  *Id*. at *2-3.  The insurer argued

6    there was no coverage because ECOMOG purportedly acted on behalf of the

7    Liberian government and, therefore, the exclusion applied.  *Id*. The insured,

8    however, contended that there was coverage because ECOMOG was not the then-

9    government of Liberia.  *Id*. at *11-12.  The court ruled in favor of the insured

10   because a ruling for the insurance carrier would have required the court to make a

11   determination "whether the ECOMOG is the [*de facto*] Liberian government for

12   purposes of this exclusion."  *Id*. at *13.  As the court explained:  "***It is not for this***

13   ***Court to recognize a de facto [i.e., quasi] government; rather, that is the role of***

14   ***the executive branch.***"  *Id*. at *14 (emphasis added).

15   Here, the Court should not recognize Hamas as either a sovereign or quasi-

16   sovereign because the U.S. government has refused to do so.  SUF ¶ 67.  On the

17   contrary, the U.S. government has determined that Hamas is a terrorist

18   organization, and does not recognize Gaza as a sovereign territorial nation.  *Id*. ¶¶

19   20, 68, 69.  At no point since Hamas was established in 1987 has the U.S.

20   government ever considered adding Hamas to the list of state sponsors of terrorism

21   because Hamas is not a state or a sovereign entity.  *Id*. ¶ 71.  Rather, from the

22   standpoint of the U.S. government's foreign relations, Hamas is a Palestinian non-

23   state actor.  *Id*. ¶ 70.

24   The U.S. government's determinations that Hamas is a terrorist group, not a

25   sovereign or quasi-sovereign government, and that Gaza is not a sovereign

26   territorial nation, implicate matters of foreign policy.  "[S]ince designating Hamas

27   a Foreign Terrorist Organization in the 1990's, it has been the policy of every

28   American administration not to engage in meetings or dialogue with officials of

Mitchell
Silberberg &
Knupp LLP

17

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Hamas, let alone any formal diplomatic relations[,]" because of Hamas' use of violence and terrorism and rejectionist position with regard to Israel's right to exist. *Id*. ¶ 72. Were this Court to find that Hamas is a sovereign or quasi-sovereign, it would damage U.S. interests and policies in the Middle East by conferring on Hamas a legitimacy that would be contrary to the foreign policy position of the U.S. government.

In short, the Court should defer to the U.S. executive branch's foreign policy determinations that Hamas is a terrorist organization, and not a sovereign or quasi-sovereign, and find as a matter of law that Exclusions 1 and 2 do not apply.

### b.   As a matter of law, Hamas lacks sufficient attributes of sovereignty to be a sovereign or quasi-sovereign

Even if the Court does not defer to the U.S. government's position as to the status of Hamas and Gaza, it still should find, as a matter of law, that Hamas lacks the requisite sovereignty or quasi-sovereignty necessary for Atlantic to invoke Exclusions 1 and 2.

A sovereign is a recognized state. *Pan Am*, 505 F.2d at 1012. Atlantic admits that Hamas/Gaza is not a recognized state. SUF ¶ 68 (Hamas/Gaza "is not a recognized nation, at least by most of the world;" contrasting Hamas with Israel, a "legitimate sovereign"); *see also id*. ¶ 70 (Hamas is a "non-state actor"). Thus, the question is whether Hamas is a quasi-sovereign.

To qualify as a quasi-sovereign, a group must have *significant* attributes of sovereignty. *Holiday Inns*, 571 F. Supp. at 1499-1500. The main attributes of sovereignty are: (1) formal recognition by other sovereigns; (2) the right to control borders; (3) sovereign or diplomatic immunity; and, (4) control as the government of meaningful territory. *Id*.; *see also, e.g., Ungar v. PLO*, 402 F.3d 274, 283, 291-92 (1st Cir. 2005). As detailed below, Hamas does not possess any of the main attributes of sovereignty:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**Recognition by other Sovereigns.**  A significant attribute of sovereignty that Hamas lacks is formal recognition by other sovereigns.  *See Restatement (Third) of Foreign Relations Law of the United States* § 201 (1987).  The United States refuses to recognize Hamas as anything other than a terrorist group, and does not engage in any meetings or dialogue with Hamas, "let alone any formal diplomatic relations."  SUF ¶¶ 20, 72, 73 ("U.S. policy will not recognize Gaza as a sovereign or quasi-sovereign territory. And it will not recognize Hamas as being a legitimate authority in Gaza.").  The same is true of the European Union, Canada, Australia, Israel, and other countries.  *Id.* ¶ 77.

**The Right to Control Borders.**  The right to control borders, airspace, and immigration are also significant attributes of sovereignty, which Hamas does not possess.  *See Ungar*, 402 F.3d at 291-92; *United States v. Damra*, 621 F.3d 474, 486 (6th Cir. 2010) (describing the "power to regulate immigration" as "an attribute of sovereignty essential to the preservation of any nation ….").  It is undisputed that Hamas does not have the right to control the borders, ports, or airspace of Gaza.  SUF ¶ 75.  *See also Ungar*, 402 F.3d at 291-92 (the Oslo Accord Interim Agreement, art. XII, 36 I.L.M. at 562, retained to Israel the undiminished ability to defend and control the territorial borders, as opposed to the Palestinian Authority).  And Hamas also does not have the power to regulate who comes in or out of Gaza.  *See id.*

**Sovereign / Diplomatic Immunity.**  Another important attribute of sovereignty that Hamas lacks is sovereign/diplomatic immunity.  *See Hans v. Louisiana*, 134 U.S. 1, 13 (1890).  Other Palestinian groups, including the PLO and the Palestinian Authority are not entitled to sovereign or diplomatic immunity "because there does not exist a state of Palestine which meets the legal criteria for statehood applicable to the Court's adjudication of the issue."  *Knox v. PLO*, 306 F. Supp. 2d 424, 430-31 (S.D.N.Y. 2004) (denying motion to dismiss based on alleged sovereign immunity of the PLO and PA); *United States v. PLO*, 695 F.

Supp. 1456, 1459 (S.D.N.Y. 1988) (no diplomatic immunity).  Similarly, Hamas and Gaza are not entitled to sovereign or diplomatic immunity because they are not recognized as a government or state, respectively, by the U.S. government.  SUF ¶¶ 67-70, 73.

**Control of meaningful territory.**  Another element of sovereignty that Hamas lacks is control of territory against the will of the territory's *de jure* government.  *Holiday Inns*, 571 F. Supp. at 1500.  In *Pan Am*, for example, the court held that the PFLP, a terrorist organization that controlled land and a facility in Jordan, was not a quasi-sovereign because the PFLP controlled the land at the sufferance of the Jordanian government.  505 F.2d at 1012.  Similarly, here, Hamas did not wrest control of Gaza from Israel; instead, in 2005 Israel voluntarily withdrew from Gaza (SUF ¶ 74), and Hamas now controls Gaza at the sufferance of Israel.

Additionally, courts have previously rejected the argument that the overarching Palestinian Authority, which is comprised of multiple factions, has sufficient "control" to establish the Palestinian Authority's sovereignty.  *See Ungar*, 402 F. 3d at 291-92 (While the Palestinian Authority is "vested [with] some autonomy... the authority so transferred [pursuant to the Oslo accord] was limited and, during and after that transition, Israel explicitly reserved control over all matters not transferred.  Several of these reserved powers are incompatible with the notion that the [Palestinian Authority] had independent governmental control over the defined territory.") (citations omitted).  If the overarching Palestinian Authority does not have sufficient control over the West Bank and Gaza to satisfy this factor of sovereignty, then Hamas, which has only some control over only Gaza, by definition cannot satisfy it either.

In sum, as a matter of law, Hamas lacks sufficient attributes of sovereignty for Atlantic to invoke Exclusions 1 and 2.  Thus, neither applies here.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## C.    Exclusion 3 Does Not Apply To The Claim

Courts have also interpreted Exclusion 3 ("insurrection, rebellion, revolution, etc.") in a technical sense and ascribed to it a special meaning in the insurance context.  In order to establish the existence of an "insurrection, rebellion, revolution, [or] usurped power" under Exclusion 3, Atlantic must prove:  (1) Hamas had the intent to "overthrow the established government [of Israel] and assume at least *de facto* governmental control;" or, (2) Hamas is part of a larger "group or movement" that has a cohesive purpose to overthrow the established government of Israel.  *Holiday Inns*, 571 F. Supp. at 1487-88; *Pan Am,* 505 F.2d at 1017-19.  Atlantic cannot do either.

First, Atlantic cannot show that Hamas' specific purpose and intent was to effectuate regime change in Israel or to seize control over Israel's government. Hamas does not seek to take over the Israeli government.  Instead, Hamas rejects the very right of Israel to exist.  SUF ¶ 81.  Hamas' stated intent, as expressed in its founding charter published in 1988, is to destroy Israel, establish a separate Islamic fundamentalist Palestinian state, and raise "the banner of Allah over every inch of Palestine." *Id*. ¶ 80.  *See Holiday Inns*, 571 F. Supp. at 1477-78 (citing various factions' stated aims as proof of intent); *Pan Am*, 505 F.2d at 1018 (similar).  In that vein, the purpose of Hamas' rocket attacks in July 2014 was *not* to unseat the Prime Minister of Israel or take over the Israeli Knesset, but rather to (i) retaliate for the Israeli allegations that Hamas was responsible for the kidnapping/murder of the three Israeli teens earlier in the summer, and (ii) terrorize, injure, and/or kill Israel's civilian population.  *See* SUF ¶ 82.

Second, Atlantic also cannot establish that Hamas is part of a larger group that seeks to overthrow the Israeli government.  Hamas is part of:  (i) the larger Muslim Brotherhood movement, whose goal is to have all Muslims governed exclusively by Sharia law and live under the banner of Allah; and, (ii) the overarching Palestinian Authority, who recognized the State of Israel and thus does

Mitchell Silberberg & Knupp LLP

21

not seek to overthrow the government of Israel. *See id*. ¶ 78. In short, Hamas is one of several different Palestinian factions that fundamentally disagree about how to achieve their objective to establish a state of Palestine. *Id*. ¶ 79. This is virtually identical to the situation in *Holiday Inns*, where multiple groups were involved in the conflict that caused the damage to the hotel. 571 F. Supp. 1489-90. Because the various groups "would often be sharply at odds with one another … on the larger question of the part Lebanon should play in the modern world," the court found that there was no cohesive purpose among the groups to overthrow the government of Lebanon, and therefore that the "insurrection" exclusion did not apply. *Id*.

Additionally, as with Exclusions 1 and 2, as a matter of law, Universal's interpretation of Exclusion 3 must control because Atlantic cannot meet its burden of showing that its interpretation is the ***only*** reasonable one. *MacKinnon*, 31 Cal. 4th at 655; *Holiday Inns*, 571 F. Supp. at 1464. Atlantic cannot possibly satisfy this standard when its own senior claims supervisor, who was charged with overseeing the Claim, has testified that Exclusion 3 did *not* apply. SUF ¶ 83 ("the third [exclusion] I don't think is applicable").

Thus, Exclusion 3 does not preclude coverage of Universal's Claim.

### D.   Exclusion 4 Does Not Apply To The Claim

Exclusion 4 applies only if the loss at issue is caused by a "weapon of war including atomic fission or radioactive force. . . ." SUF ¶ 12. On its face, the Exclusion only applies if the weapon of war at issue uses or employs atomic fission or radioactive force. No such weapon was used by Hamas or Israel.

To circumvent this inconvenient truth, Atlantic argues for an alternative interpretation that is neither reasonable nor plausible. Specifically, Atlantic contends that Exclusion 4 should be interpreted to encompass all "weapons," including the rockets used by Hamas. Atlantic's interpretation is contrary to: (i) rules of policy interpretation; (ii) rules of grammar; (iii) basic logic; and (iv) the

Mitchell
Silberberg &
Knupp LLP

22

1    testimony of Atlantic's own witness.

2         Atlantic's interpretation of Exclusion 4 violates basic rules of policy

3    interpretation because it is inconsistent with other sections of the Policy.

4    *MacKinnon*, 31 Cal. 4th at 648 ("language in a [policy] must be interpreted as a

5    whole"); *State Farm Mut. Auto. Ins. Co. v. Mrozek*, 29 Cal. App. 3d 113, 117

6    (1972) (a "contract should reasonably receive such interpretation as will make it

7    reasonable and avoid absurdities").  Immediately following Exclusion 4 in the

8    Policy is another exclusion (number 5) that relates to Exclusion 4 and makes it

9    clear that *both* exclusions are tied to loss causes by atomic, radioactive, or nuclear

10   force, whatever the source is:  "Nuclear reaction or radiation, or radioactive

11   contamination ***from any other cause***."  SUF ¶ 84 (Policy, General Conditions,

12   § III.5 (emphasis added)).  Thus, Exclusion 4 precludes coverage for loss from any

13   "weapon of war" employing or using atomic fission or radioactive force, and

14   Exclusion 5 precludes coverage for loss "from any other cause" of nuclear or

15   radioactive nature.  This is the only reasonable interpretation of the Exclusion.

16        Atlantic's interpretation of Exclusion 4 also makes no grammatical sense.

17   The lack of a comma in the provision as written—a singular "weapon of war

18   including atomic fission or radioactive force"—means that, rather than an

19   exclusion providing "atomic fission or radioactive force" as *examples* of possible

20   weapon(s) of war, this exclusion must be read as a whole, without inserting a

21   nonexistent comma, so that "including" applies as a *requirement* in order to bring

22   the weapon of war within the exclusion.  *See Anderson v. State Farm Mut. Auto.

23   Ins.*, 270 Cal. App. 2d 346, 349 (1969) (declining to read a comma into a policy

24   term that could have changed its meaning in favor of the insurer); *accord Shell Oil

25   Co. v. Nat'l Union Fire Ins. Co.*, 44 Cal. App. 4th 1633, 1641-42 (1996).

26        In other words, Atlantic's interpretation only works by re-writing the

27   Exclusion to say "any weapon of war including [, but not limited to, weapons

28   employing or using] atomic fission or radioactive force."  That is not permitted.

Mitchell
Silberberg &
Knupp LLP

23

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

1    *See Safeco*, 26 Cal. 4th at 763-64 ("[T]he fundamental principle … in interpreting

2    contracts, including insurance contracts, [is] not to insert what has been omitted").

3          Atlantic's interpretation also makes no logical sense because neither "atomic

4    fission" nor "radioactive force" is, by itself, a "weapon."  Instead, "atomic fission"

5    and "radioactive force" are processes by which a nuclear reaction powering a

6    "weapon" can be created.  *See* Encyclopædia Britannica Online,

7    https://www.britannica.com/technology/atomic-bomb ("Atomic bomb" is a

8    weapon powered by the "fission of the nuclei of such heavy elements as plutonium

9    or uranium"); U.S. Nuclear Regulatory Commission ("USNRC"), Glossary,

10    Glossary, Radioactivity, available at https://www.nrc.gov/reading-rm/basic-

11    ref/glossary/radioactivity.html.[5]  Indeed, these processes can be used for peaceful

12    purposes, such as generating electricity in atomic or nuclear plants.  *See* USNRC,

13    Glossary, Atomic Energy, available at https://www.nrc.gov/reading-rm/basic-

14    ref/glossary/atomic-energy.html.  Thus, the Exclusion for a "weapon of war"

15    including atomic fission or radioactive force" can mean only one thing:  a

16    "weapon" that uses or includes in that "weapon" either atomic fission or

17    radioactive force (*e.g.*, an atomic bomb).

18          Atlantic's interpretation of Exclusion 4 also notably contradicts the

19    interpretation offered by Atlantic's own witness, Peter Williams, the former

20    President of One Beacon Entertainment who helped negotiate the Policy.  Williams

21    testified that Exclusion 4 did *not* apply to the Claim because no weapons

22    employing atomic fission or radioactive force were used.  SUF ¶ 85.

23          Finally, even assuming that Exclusion 4 covers any "weapon of war," not

24    just weapons using atomic fission or radioactive force, the Exclusion still does not

25    apply here because Hamas did not use weapons of *war*.  Instead, Hamas used

26    weapons *of terror*.  Atlantic has conceded Hamas' actions fall outside of

27

28    [5] The Court can take judicial notice of the Encyclopedia Brittanica and USNRC definitions.  *See* RJN filed concurrently herewith.

24

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1  "established norms of warfare:"  "the rockets are being fired into civilian areas,

2  which may violate established norms of warfare and armed conflict under

3  international law." *Id.* ¶ 87.  And indeed, they do:  Hamas' indiscriminate firings

4  of rockets that lack directional controls to ensure they are hitting military (and not

5  civilian) targets constitute acts of terrorism, and therefore those rockets cannot be

6  considered "weapon[s] of war."  *See id.* ¶ 88.

7      In sum, Atlantic's interpretation is unreasonable, impermissibly broad, and

8  in contravention of the coverage purchased, because it would lead to the absurd

9  result that losses caused by *any* type of shooting, bombing, or other violence on a

10 set would be excluded, so long as "a" weapon had been used.  *See MacKinnon*, 31

11 Cal. 4th at 650 (rejecting insurer's argument that broad interpretation of an

12 exclusion should apply, as it would result in absurdities and denial of coverage in

13 situations that reasonably should be covered).

14     In contrast, Universal's interpretation is reasonable and comports with a

15 grammatical reading of the language, and therefore Universal's interpretation must

16 be applied as a matter of law.  *See Jacober*, 10 Cal. 3d at 202-03 (court must find

17 coverage if there is any "reasonable interpretation under which recovery would be

18 permitted").  Thus, Exclusion 4 does not preclude coverage here.

19 **V.    CONCLUSION**

20     Based on all of the foregoing, none of the War Exclusions apply here to

21 preclude coverage of the Claim, and Universal's Motion should be granted.

22     Respectfully submitted,

23 DATED:  April 24, 2017         MITCHELL SILBERBERG & KNUPP LLP

24

25                    By:  /s/ Lucia E. Coyoca
                          Lucia E. Coyoca
26                        Attorneys for Plaintiffs Universal Cable
                          Productions LLC and Northern Entertainment
27                        Productions LLC

28

Mitchell
Silberberg &
Knupp LLP

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**