1  LUCIA E. COYOCA (SBN 128314)
   lec@msk.com
2  VALENTINE A. SHALAMITSKI (SBN 236061)
   vas@msk.com
3  DANIEL M. HAYES (SBN 240250)
   dmh@msk.com
4  MITCHELL SILBERBERG & KNUPP LLP
   11377 West Olympic Boulevard
5  Los Angeles, CA 90064-1683
   Telephone:  (310) 312-2000
6  Facsimile:   (310) 312-3100

7  Attorneys for Attorneys for Plaintiffs
   Universal Cable Productions LLC and
8  Northern Entertainment Productions LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, and NORTHERN ENTERTAINMENT PRODUCTIONS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY,<br><br>Defendant. | CASE NO. 2:16-cv-4435-PA-MRW<br><br>Honorable Percy Anderson<br><br>**DECLARATION OF AMBASSADOR DENNIS ROSS IN SUPPORT OF PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS LLC, AND NORTHERN ENTERTAINMENT PRODUCTIONS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Notice of Motion and Motion; Memorandum of Points and Authorities; Notice of Lodging Statement of Uncontroverted Facts and Conclusions of Law; Statement of Uncontroverted Facts and Conclusions of Law; Table of Contents of Evidence; Declarations of Andrea Garber, Kurt Ford, Randi Richmond, Matthew Levitt, Harold Koh, Ty Sagalow, and Lucia Coyoca; and Request for Judicial Notice filed / lodged and [Proposed] Order lodged concurrently herewith]<br><br>Time:  1:30 p.m.<br>Date:  May 22, 2017<br>Ctrm.:  9A, 1st St Courthouse |

Mitchell
Silberberg &
Knupp LLP

8798423.2

**DECLARATION OF AMBASSADOR DENNIS ROSS**

**DECLARATION OF AMBASSADOR DENNIS ROSS**

I, Ambassador Dennis Ross, declare as follows:

1. I have been retained as an expert witness on behalf of Plaintiffs Universal Cable Productions LLC and Northern Entertainment Productions LLC (collectively, "Plaintiffs") in this action. I make this Declaration in support of Plaintiffs' Motion for Partial Summary Judgment. I have personal knowledge of the facts set forth herein, and if called as witness, I could and would competently testify thereto.

2. Attached hereto as **Exhibit B** is a true and correct copy of my expert report pursuant to F.R.C.P. 26(a)(2)(B) in this matter, which report is incorporated herein as though set forth in full. I hold the opinions set forth therein in full, and if called as a witness could and would competently testify thereto.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20 day of April, 2017, at Washington, DC.

*[signature]*
Ambassador Dennis Ross

# EXHIBIT B

# REPORT OF AMBASSADOR DENNIS ROSS

### *Background and Experience*

1. I am the William Davidson Distinguished Fellow at the Washington Institute for Near East Policy. A copy of my curriculum vitae is attached. I have served in senior government positions for more than twenty five years, first as an excepted civil servant, based on particular skills and expertise, and later as a political appointee. I served in four separate presidential administrations and was appointed to senior foreign policy making positions in the Ronald Reagan, George H.W. Bush, Bill Clinton, and Barack Obama administrations. My diplomatic experience involved strategic and European arms control negotiations, Soviet and subsequently Russian relations, and wide-ranging Middle East issues. I held the senior position on Middle East and Arab-Israeli issues on the National Security Council staff in the last two years of the Reagan administration from 1986 to 1988. I was responsible in the Bush 41 administration—as head of the Policy Planning Staff and one of Secretary of State James Baker's closest aides—for dealing with the unification of Germany in NATO, helping to put together the Gulf War coalition in 1990, and for negotiating the terms of the Madrid Peace Conference in October-November 1991. Significant to this case, the Madrid Peace Conference broke the taboo on direct talks between Israel and its Arab neighbors, which helped pave the way for subsequent talks between Israel and the Palestinian Liberation Organization ("PLO").

2. After Bill Clinton's election in 1992, I was initially asked to stay on for a transitional period. Subsequently President Clinton asked that I serve as the chief negotiator on

1

Arab-Israeli issues commencing in June 1993. I held this position until January 2001. In that position, I was the first senior official in the administration to meet with PLO officials in September 1993, and I spent more time negotiating with Yasser Arafat and the Palestinian leadership than anyone else in the administration or State Department. I helped to negotiate or broker each of the agreements that were achieved in the Clinton Administration between the Israelis and Palestinians, and the Israelis and Jordanians. I also brokered an understanding between the Israelis and Syrians on the principles that would guide their negotiations on security arrangements.

3. During the first term of President Obama, I was appointed the Special Assistant to the President and Senior Director of the Central Region which was a new position that was created on the National Security Staff at the White House. This position put me in charge of the geographic region from Morocco to Bangladesh. While having broad responsibility for all the issues in this vast area, I had special responsibility for Iran and Arab-Israeli issues and again spent a great deal of time dealing with the Israelis and Palestinians. In that role, issues concerning Hamas would frequently arise, and I was involved in extensive discussions with both Israeli and Palestinian leaders regarding Hamas and how to contend with it.

4. I authored (or co-authored) the following books: *The Missing Peace – The Inside Story of the Fight for Middle East Peace* (2005); *Statecraft, And How To Restore America's Standing in the World* (2007); *Myths, Illusions, and Peace – Finding A New Direction for America in the Middle East* (co-authored with David Makovsky – 2009); and, *Doomed To Succeed: The U.S.-Israel Relationship From Truman to Obama* (2015).

5. As a result of my experience, I have extensive first-hand knowledge regarding Hamas, its terrorist activities, and its efforts to frustrate peace-making since its emergence on the

scene in the 1980's. In 1996, at a time when the U.S. was making real progress trying to broker a peaceful solution between Israelis and Palestinians and Israelis and Syrians, it was Hamas' use of suicide bombs in Israel in late February-early March that largely derailed our efforts and transformed the politics within Israel.

*Documents Reviewed and Questions Presented*

6. In preparing my Report I reviewed the various authorities that are referenced herein. In addition, I reviewed the following case specific documents: (a) the expert report of Dr. Matthew Levitt ("Levitt Report")[1]; (b) the expert report of Professor Harold Koh; and, (c) the First Amended Complaint dated July 7, 2016.

7. I am being compensated at a rate of $750 per hour for my work on this matter. All of the opinions stated herein are my own, and my compensation is not dependent on the outcome of the case.

8. I have been asked by Plaintiffs' counsel to opine on the following questions, analyzed from the perspective of U.S. foreign policy interests:

    a. What is the position of the U.S. government as to Hamas and the underlying reasons therefor?

    b. Does Hamas advocate for Gaza to be a separate territorial nation?

    c. If a determination were to be made as to Hamas' status in this action that is different than what has already been established by the U.S. government, what would be the impact on U.S. foreign policy?

---

[1] Unless otherwise specifically indicated, the facts discussed in my Report as to Hamas and the U.S. government's position as to Hamas are based on, *inter alia,* my own participation in the events discussed and the authorities set forth in the Levitt Report.

3

### *Hamas as a Terrorist Organization and its Refusal to Participate in the Peace Process*

9. From the standpoint of the U.S. government in terms of foreign relations, Hamas is a Palestinian non-state actor. The history of U.S. relations with Hamas is necessary to understand its current status. The term Hamas is actually an acronym -- *Harakat al-Muqaawama al-Islamiya* -- which stands for Islamic Resistance Movement.[2] It has long carried out terrorist acts against Israel and was designated by the Secretary of State as a Foreign Terrorist Organization on October 8, 1997.[3] Hamas is, in fact, part of the Muslim Brotherhood, a politically motivated international movement and organization whose aim is to have all Muslims governed exclusively by Sharia law and live under the banner of Allah.[4] Article two of the Hamas charter states: "The Islamic Resistance Movement is one of the wings of the Muslim Brothers of Palestine. The Muslim Brotherhood Movement is a universal organization which constitutes the largest Islamic movement in modern times."[5]

10. At no point since Hamas was established in 1987 has the U.S. Government ever considered adding Hamas or Gaza to the list of state sponsors of terrorism because neither Hamas nor Gaza is a state or a sovereign entity. Moreover, since designating Hamas a Foreign Terrorist Organization in the 1990's, it has been the policy of every American administration not to engage in meetings or dialogue with officials of Hamas, let alone any formal diplomatic relations. Since 2007, when Hamas carried out a coup in Gaza and seized control from the Palestinian Authority, the U.S. established three conditions for recognition of Hamas as a legitimate political organization: (1) renunciation of violence; (2) recognition of Israel; and, (3)

---

[2] Levitt Report, p. 6.
[3] Levitt Report, p. 9.
[4] Levitt Report, p. 9, ftnte. 31.
[5] The Covenant of the Islamic Resistance Movement, August 18, 1988, Article 2 of the Hamas Charter (the Avalon Project at Yale Law School, at http://avalon.law.yale.edu/20th_century/hamas.asp)

4

readiness to abide by all previous agreements between Israel and the PLO. The third —all previous agreements with Israel—refers to: (a) the Declaration of Principles between Israel and the PLO and the exchange of documents of mutual recognition in September 1993; (b) the Gaza-Jericho Agreement of May 1994; (c) the Interim Agreement of September 1995; (d) the Hebron Protocol of January 1997; and, (e) the Wye River Memorandum of October 1998 (sometimes collectively referred to herein as the Oslo agreements).

11. Pursuant to these agreements, the PLO agreed to recognize the right of Israel to exist and renounced the use of violence to achieve its national aspirations through negotiations. These agreements were witnessed and in many cases brokered by the U.S. By contrast, Hamas rejects all of these agreements because it rejects Israel's right to exist and regards all of the land that was historically referred to as Palestine as being part of an Islamic trust. These agreements represent the foundation for peace-making between Israelis and Palestinians. Thus, Hamas' rejection of all of them and its use of terror, make it an illegitimate actor in the eyes of American administrations. For that reason, no administration—Republican or Democratic—has been willing even to meet with representatives of the Hamas movement in Gaza or elsewhere. For the foreseeable future, there is no prospect of that changing.

12. For the purposes of this case, the Oslo agreements are relevant for several reasons. First, they manifest Hamas' rejection of peace. Even if Hamas did not engage in terror, its rejectionist posture would make U.S. recognition of Hamas unlikely. Second, the U.S. played a central role in the Oslo negotiating process in which these agreements were concluded. The White House hosted three of the signing events. President Clinton presided at each of these ceremonies and he signed these agreements as a witness. (As the lead American negotiator during the Clinton Administration, I brokered and signed the Hebron Protocol as the

5

representative of the U.S.)  Third, these agreements established that the West Bank and Gaza are a "single territorial unit."  As such, there is no legal basis to treat them as separate entities.

13. According to the agreements with Israel that established the Palestinian Authority as an interim governing authority, the Palestinian Authority cannot conduct foreign policy; it is the PLO that engages in relations with states and international institutions.  The PLO remains the umbrella organization of all the parties of the Palestinian national movement.

### *Hamas' Position as to Establishment of a Separate State of Palestine*

14. Importantly, neither the Palestinian Authority nor Hamas regard the West Bank and Gaza as separate political entities.  In fact, the Palestinian Authority continues to pay the salaries of its employees in Gaza (nearly all of whom are members of the Fatah party) even though some actually now work for Hamas in Gaza.

15. Hamas, too, regards Gaza as an integral part of what it hopes will be the future state of Palestine, and not as a separate territory that should be treated as having separate sovereign or quasi-sovereign status.  Hamas leaders remain committed to Palestinian unity in word if not in deed.  There have been at least ten efforts to produce a national unity government in the aftermath of Hamas' successful 2007 coup against the Palestinian Authority in Gaza.  These efforts, many of which have been advanced by different Arab governments, have involved discussions to bridge the gaps between Hamas and Fatah which is the leading political party in the Palestinian Authority.  Historically, as the party founded by Yasser Arafat, the long-time leader of the PLO, Fatah was the most important of the Palestinian national organizations.  With the establishment of the Palestinian Authority as part of the Gaza-Jericho agreement, Arafat became the head of the Palestinian Authority, even as he retained his leadership of Fatah and the PLO.

16.    The multiple attempts to negotiate national unity arrangements are themselves an indication of Hamas' reluctance to be responsible for dividing the Palestinians, or treating Gaza as if it could be a separate Palestinian entity.  Not long after the Hamas coup in 2007, Saudi Arabia invited both Hamas and Fatah to Mecca to end the fighting and promote reconciliation. Both parties agreed to form a national unity government and to stress the principle of political partnership based on the laws of the Palestine National Authority.[6]  The Mecca agreement as it was called was never implemented because of the unwillingness of either Hamas or Fatah to take a more subservient position to the other.

17.    In 2008, Yemen's government hosted a meeting between Fatah and Hamas officials and again they agreed to try to reconcile their differences.  The joint communique that was released is revealing: "We, the representatives of Fatah and Hamas, agree to the Yemeni initiative as a framework to resume dialogue between the two movements to return the Palestine situation to what it was before the Gaza incidents."[7]  The Sanaa Declaration as it would be called also affirmed "the unity of the Palestinian people, territory, and authority."  Referring to the coup euphemistically as "the Gaza incidents" was clearly designed to try to minimize their significance.  Similarly, the reference to the unity of territory was also a reminder that neither side would recognize a separation of the people or the land.

18.    There have been numerous attempts to end the division since that time including in 2009, 2010, 2011, 2012, 2013, 2014, and most recently in Beirut and Moscow in January 2017, but all have failed.  Fundamentally, Fatah does not want to give in to Hamas and give it equal status in the national movement, and Hamas feels empowered to accept nothing less.  Still,

---

[6] Palestinians refer to the Palestinian Authority as the Palestinian *National* Authority, which is an effort on its part to create the symbolism of statehood even though it has not actually acquired such status.
[7] The "Gaza incidents" are a reference to Hamas' violent overthrow through the use of force of the Palestinian Authority in Gaza in 2007.

the idiom of unity and the rejection of the division of people and territory has been a constant. In the 2012 Doha statement negotiated in Qatar, there was an attempt to circumvent party differences by having technocrats form a unity government to be restored in the West Bank and Gaza. However, in none of the reconciliation efforts was Gaza to be treated as anything but part of the future state of Palestine. The most recent announcement of reconciliation brokered by the Russians seeks to form a new Palestinian National Council through elections and then have that body establish a new unity government in both areas.

19. There is little reason to believe that this latest diplomatic gambit at reconciliation will yield results any different from those that have been tried and failed over the last decade. However, there is value in drawing attention to all these previous efforts if for no other reason than to show that Hamas, itself, has little interest in presenting Gaza as a separate territorial entity. Hamas' leaders may reject all of the Oslo agreements with Israel, but they see Gaza as an integral part of the future state of Palestine, not a sovereign or quasi-sovereign entity separate from it.

### *U.S. Government Position as to Hamas*

20. With the Oslo agreements forming the legal basis for the existence of the Palestinian Authority in both the West Bank and Gaza, U.S. policy will continue to see these territories as politically linked. U.S. policy will not recognize Gaza as a sovereign or quasi-sovereign territory. And it will not recognize Hamas as being a legitimate authority in Gaza. It will continue to treat Hamas as a terrorist organization.

21. At the time of the conflict in 2014, the U.S. was not prepared to change any of its policies toward Hamas. As such, there was no contact with Hamas even though the Obama administration hoped the fighting between Israel and Hamas would end. When the fighting

continued, the Obama administration did reach out through diplomatic channels to see if Turkey and Qatar—both of whom have ties to Hamas—would be able to help broker a ceasefire. But Israel and Egypt—the two countries that border Gaza and control access into and out of it—rejected any mediation efforts of Turkey and Qatar. The conflict ended only when Hamas came to the realization that Israel would not budge on the terms it offered for a cessation of hostilities, and that Egypt accepted those terms and would not ease its closure of Gaza. The state of affairs in effect at the end of the 2014 conflict reinforces the problems that Hamas confronts in Gaza in dealing with neighboring territories because it does not control the airspace over Gaza, immediate access to Gaza by sea, or Gaza's borders.[8] The three foregoing points highlight that Hamas is a non-state actor and severely constrained by its two state neighbors.

22. For now, Hamas is focused more on trying to tamp down pressures and challenges from within Gaza; it is contending with even more extreme Islamist groups. But that has not slowed its efforts to promote and incite violence against Israel; indeed, Israel has recently broken up Hamas plots to carry out bombings in the country and Hamas continues to call for the killing of Israelis.[9]

***Ramifications of a Finding in this Action as to U.S. Foreign Policy Interests***

23. As a matter of U.S. policy and interests in the Middle East, it is important that Hamas not be given greater standing as a political actor. It is a terrorist organization and has been designated as such by the U.S. government for over twenty years. Should the Court find against U.S. policy interests by treating Hamas as a sovereign or quasi-sovereign—something no American administration has been willing to do—it would damage U.S. interests and policies in

---

[8] Levitt Report, p. 26
[9] Levitt Report, pp. 25-26

the Middle East. Simply stated, it would confer a legitimacy on Hamas that the Islamic Resistance Movement has long sought. It would demoralize the Palestinian Authority, conveying an impression that it was only a matter of time before the U.S. began to deal with Hamas as an alternative. It would also be a propaganda bonanza for all the Islamist movements. They seek to create an impression of the inevitability of their victory; it is U.S. policy to debunk such notions, not provide them credence. Given Hamas' extremist positions, use of violence and terrorism, and rejectionist position with regard to Israel's right to exist, every U.S. presidential administration has sought to prevent any semblance of legitimacy for this terrorist group (or any other like-minded Islamist groups). The Court's judgment should not undercut U.S. policy.

24. Finally, in conclusion, the consistent foreign policy of the U.S. as to the Middle East, throughout either Republican or Democratic administrations, has been to work to weaken those fundamentalist Islamist forces which reject tolerance, secularism, coexistence, and peace. Any recognition of Hamas as a sovereign or quasi-sovereign entity would only serve to reinforce the notion that it is somehow a pseudo-state like actor, a position that the U.S. has firmly rejected. A finding by a U.S. Court that is contrary to established U.S. foreign policy would be a great disservice to the efforts of the past four presidential administrations to try to find a peaceful resolution to the historic Palestinian/Israeli conflict that has plagued that region for decades.

Dated: March 16, 2017

*[signature: Dennis Ross]*

Ambassador Dennis Ross

# CURRICULUM VITAE

Jump to:

- Bio

## Areas of Expertise

Iraq, Israel, Palestinians, Arab-Israeli Relations, Democracy and Reform, Peace Process, U.S. Policy

Back to Top

---

## Biography

Ambassador Dennis Ross is counselor and William Davidson Distinguished Fellow at The Washington Institute for Near East Policy. Prior to returning to the Institute in 2011, he served two years as special assistant to President Obama and National Security Council senior director for the Central Region, and a year as special advisor to Secretary of State Hillary Rodham Clinton.

For more than twelve years, Ambassador Ross played a leading role in shaping U.S. involvement in the Middle East peace process and dealing directly with the parties in negotiations. A highly skilled diplomat, Ambassador Ross was U.S. point man on the peace process in both the George H. W. Bush and Bill Clinton administrations. He was instrumental in assisting Israelis and Palestinians to reach the 1995 Interim Agreement; he also successfully brokered the 1997 Hebron Accord, facilitated the 1994 Israel-Jordan peace treaty, and intensively worked to bring Israel and Syria together.

A scholar and diplomat with more than two decades of experience in Soviet and Middle East policy, Ambassador Ross worked closely with Secretaries of State James Baker, Warren Christopher, and Madeleine Albright. Prior to his service as special Middle East coordinator under President Clinton, Ambassador Ross served as director of the State Department's Policy Planning Staff in the first Bush administration. In that capacity, he played a prominent role in U.S. policy toward the former Soviet Union, the unification of Germany and its integration into NATO, arms control negotiations, and the 1991 Gulf War coalition.

During the Reagan administration, he served as director of Near East and South Asian affairs on the National Security Council staff and deputy director of the Pentagon's Office of Net Assessment. Ambassador Ross was awarded the Presidential Medal for Distinguished Federal Civilian Service by President Clinton, and Secretaries Baker and Albright presented him with the State Department's highest award.

A 1970 graduate of UCLA, Ambassador Ross wrote his doctoral dissertation on Soviet decisionmaking, and from 1984 to 1986 served as executive director of the Berkeley-Stanford program on Soviet International Behavior. He received UCLA's highest medal and has been named UCLA alumnus of the year. He has also received honorary doctorates from Brandeis, Amherst, Jewish Theological Seminary, and Syracuse University. Ambassador Ross was named a 2016-2017 senior fellow by Yale University's Jackson Institute for Global Affairs.

Ambassador Ross has published extensively on the former Soviet Union, arms control, and the greater Middle East, contributing numerous chapters to anthologies. In the 1970s and 1980s, his articles appeared in World Politics, Political Science Quarterly, Orbis, International Security, Survival, and Journal of Strategic Studies. Since leaving government at the end of 2011, he has authored many op-eds in the *New York Times*, *Washington Post*, and *Wall Street Journal*.

EXHIBIT B, PAGE 14

1/17/2017                                      Dennis Ross - The Washington Institute for Near East Policy

Ross is the author of several influential books on the peace process, most recently *Doomed to Succeed: The U.S.-Israel Relationship from Truman to Obama* (Farrar, Straus, and Giroux, October 2015). That book was awarded the 2015 National Jewish Book Award for history. Previously, he coauthored *Myths, Illusions, and Peace: Finding a New Direction for America in the Middle East* with Institute peace process expert David Makovsky. An earlier study, *The Missing Peace: The Inside Story of the Fight for Middle East Peace* (Farrar, Straus, and Giroux, 2004), offers comprehensive analytical and personal insight into the Middle East peace process. The *New York Times* praised his 2007 publication, *Statecraft, And How to Restore America's Standing in the World* (Farrar, Straus and Giroux, 2007), as "important and illuminating."

Back to Top

## Publications



Doomed to Succeed:

October 31, 2015

Monographs



Myths, Illusions, and Peace:

April 29, 2009

Monographs



Statecraft, And How to Restore America's Standing in the World

June 12, 2007

Monographs

EXHIBIT B, PAGE 15



The Missing Peace

January 15, 2005

Monographs

Back to Top

## Most Recent Analysis

Here's What Plan B in the Middle East Should Look Like

January 12, 2017

President Obama Has Been Against Israel Settlements Since Taking Office

December 23, 2016

Will Trump Strengthen Iran's Hand?

December 21, 2016

A New President and the Middle East with Norman Ornstein and Dennis Ross

December 9, 2016

How Trump Could Surprise the World on Israeli-Palestinian Peacemaking

November 30, 2016

A Syria Policy for Trump: How Washington Can Get to a Settlement

November 28, 2016

A New President and the Middle East

November 15, 2016

Middle East 2017: Challenges and Choices with Dennis Ross

October 7, 2016

America's Anxious Allies: Trip Report from Saudi Arabia, Turkey, and Israel

September 28, 2016

Dennis Ross Reflects on Peres, the Strategic Thinker

September 28, 2016

See all analysis by this author

## Selected Outside Publications

*Statecraft, And How to Restore America's Standing in the World* (Farrar, Straus and Giroux, June 2007)

*The Missing Peace: The Inside Story of the Fight for Middle East Peace* (Farrar, Straus and Giroux, August 2004)

Back to Top