LUCIA E. COYOCA (SBN 128314)
 lec@msk.com
VALENTINE A. SHALAMITSKI (SBN 236061)
 vas@msk.com
DANIEL M. HAYES (SBN 240250)
 dmh@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone:   (310) 312-2000
Facsimile:   (310) 312-3100

Attorneys for Attorneys for Plaintiffs
Universal Cable Productions LLC and
Northern Entertainment Productions LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ATLANTIC SPECIALTY INSURANCE COMPANY, <br><br> Defendant. | CASE NO. 2:16-cv-4435-PA-MRW <br><br> Honorable Percy Anderson <br><br> **DECLARATION OF PROFESSOR HAROLD HONGJU KOH IN SUPPORT OF PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS LLC AND NORTHERN ENTERTAINMENT PRODUCTIONS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> [Notice of Motion and Motion; Memorandum of Points and Authorities; Notice of Lodging Statement of Uncontroverted Facts and Conclusions of Law; Statement of Uncontroverted Facts and Conclusions of Law; Table of Contents of Evidence; Declarations of Andrea Garber, Kurt Ford, Randi Richmond, Matthew Levitt, Dennis Ross, Ty Sagalow, and Lucia Coyoca; and Request for Judicial Notice filed / lodged and [Proposed] Order lodged concurrently herewith] <br><br> Time:     1:30 p.m. <br> Date:     May 22, 2017 <br> Ctrm.:    9A, First Street Courthouse |

Mitchell
Silberberg &
Knupp LLP

8798411.2

**DECLARATION OF PROFESSOR HAROLD HONGJU KOH**

## DECLARATION OF PROFESSOR HAROLD HONGJU KOH

I, Professor Harold Hongju Koh, declare as follows:

1.      I have been retained as an expert witness on behalf of Plaintiffs Universal Cable Productions LLC and Northern Entertainment Productions LLC (collectively, "Plaintiffs") in this action.  I make this Declaration in support of Plaintiffs' Motion for Partial Summary Judgment.  I have personal knowledge of the facts set forth herein, and if called as witness, I could and would competently testify thereto.

2.      Attached hereto as **Exhibit C** is a true and correct copy of my expert report pursuant to F.R.C.P. 26(a)(2)(B) in this matter, which report is incorporated herein as though set forth in full.  I hold the opinions set forth therein in full, and if called as a witness could and would competently testify thereto.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of April, 2017, at Irvine, California.

Professor Harold Hongju Koh

Mitchell
Silberberg &
Knupp LLP

DECLARATION OF PROFESSOR HAROLD HONGJU KOH

# EXHIBIT C

## REPORT OF PROFESSOR HAROLD HONGJU KOH

1.     I am Sterling Professor of International Law and former Dean (2004-09) of Yale Law School in New Haven, Connecticut, where I have taught since July 1, 1985. From 2009-2013, I served as Legal Adviser of the United States Department of State in the Obama Administration. From 1998-2001, I served as Assistant Secretary of State for Democracy, Human Rights, and Labor in the Clinton Administration. I am an expert in the fields of public and private international law, foreign relations law, and international human rights law. My credentials are described in paragraph 2 below. A copy of my curriculum vitae is attached.

2.     ***Professional Qualifications:*** During the past 37 years, I have developed expertise as a governmental official, professor, scholar, and lawyer in the areas of public and private international law and the law of U.S. foreign policy. In addition to my service as Legal Adviser of the State Department from 2009–2013, and as Assistant Secretary of State for Democracy, Human Rights and Labor from 1998-2001, I served from 1982-85 as an Attorney-Adviser at the Office of Legal Counsel at the United States Department of Justice. In both my private and governmental capacities, I have testified before Congress on numerous occasions, on a broad range of issues ranging from U.S. national security policy, to human rights policy, to foreign policy issues, to the lawfulness of proposed foreign policy actions, to refugee law and policy.

     a.  ***Teaching****:* I teach courses in international law, transnational law, foreign affairs law, international human rights law, and Procedure at the Yale Law School in New Haven, Connecticut. At Yale, I have been Associate Professor of Law from 1985-90, Professor of Law from 1990-93, Gerard C. and Bernice Latrobe Smith Professor of International Law from 1993-2009, Martin R. Flug '55 Professor of International Law from 2009-13, and since 2013, Sterling Professor of International Law, the highest

professorial rank recognized by Yale University. In the course of those duties, I regularly teach courses, give lectures and supervise research papers on public and private international law. I have also delivered named lectures, taught courses and seminars, and conducted workshops on international law and related subjects at dozens of universities around the country and the world. In particular, I have served as a visiting faculty member and lecturer at both Oxford University (where I am an Honorary Fellow of Magdalen College, Oxford and have been Clarendon Law Lecturer, Smithies Lecturer, Waynflete Lecturer and a Visiting Fellow at All Souls College, Oxford) and Cambridge University (where I will be Goodhart Visiting Professor of Legal Science from 2018-20). I have also been a visiting professor of Law at Columbia University, Georgetown University, the Hague Academy of International Law, the University of Hawaii, New York University, the University of Toronto Faculty of Law, and the Oxford/George Washington University Joint Programme in International Human Rights Law. I have also served regularly as a faculty member on international and foreign affairs law at the Federal Judicial Center, the NYU-Columbia Law Judges Colloquium, and at the Aspen Institute Judicial Seminar.

b. ***Editorial Boards***: I have served on the Board of Editors of the *American Journal of International Law* and Foundation Press Casebook Series, *Human Rights Quarterly*, and the Editorial Advisory Board of *Human Rights Watch World Report* (Yale University Press).

c. ***Publications***: I am the author of more than 200 articles and book chapters on international law, human rights, and constitutional law. I am also the author, editor, or co-editor of nine books on international law, foreign affairs law, and international human

rights, including *Transnational Litigation in United States Courts (*Foundation 2008); *Foundations of International Law and Politics* (2006 with O. Hathaway); *Transnational Business Problems* (4th ed. 2014 with W. Dodge and H. Buxbaum); *Deliberative Democracy and Human Rights* (1999 with R. Slye), *Transnational Legal Problems* (2d ed. 1994 with H. Steiner & D. Vagts), *International Business Transactions in United States Courts* (Martinus Nijhoff 1998), and *The National Security Constitution: Sharing Power After the Iran-Contra Affair* (Yale 1990) (awarded the Richard E. Neustadt Prize for the best book on the American Presidency in that year by the American Political Science Association).

d. ***Professional Activities***:  Since 1990, I have served as counsel, co-counsel or legal adviser for parties or amici in dozens of cases involving human rights and international law, before federal district and circuit courts, and the United States Supreme Court.  In particular, I have served as counsel of record to Haitian and Cuban refugees before the U.S. Supreme Court, see *Sale v. Haitian Centers Council*, 509 U.S. 155 (1993); *Cuban American Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412 (11th Cir. 1995), *cert. denied,* 515 U.S. 1142 (1995); and as counsel for former American diplomats or national security officials with respect to a number of *amicus curiae* briefs filed before the Supreme Court: including *Sanchez-Llamas v. Oregon,* 126 S. Ct. 2669 (2006); *Medellin v. Dretke*, 544 U.S. 660, 687 (2005) (cert. dismissed as improvidently granted); *Roper v. Simmons* 543 U.S. 551 (2005), *Atkins v. Virginia,* 122 S. Ct. 2242 (No. 00-8452 decided June 20, 2002), and *McCarver v. North Carolina* (No. 00-8727, *cert. dismissed* Sept. 25, 2001*).*  I have also regularly appeared before international courts and tribunals as an international lawyer on behalf of the United States and other governments.  See,

3

e.g., Counsel for United States of America in *Advisory Opinion on the Accordance with International Law of the Unilateral Declaration of Independence In Respect of Kosovo*, 2010 ICJ Rep. 403 (July 22, 2010); Counsel for Uruguay in *Phillip Morris Brands Sarl v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Award (July 8, 2016); Counsel for the United States of America in *Grand River Enterprises Six Nations, Ltd. v. United States of America*, UNCITRAL, Final Award (Jan. 12, 2011); Counsel for Ukraine in *Case Concerning Application of the International Convention for the Suppression of the Financing of Terrorism and of the International Convention on the Elimination of All Forms of Racial Discrimination (Ukraine v. Russian Federation) -* Request for the Indication of Provisional Measures *(*argued March 6-9, 2017).

e. ***Professional Recognition***:  I have received seventeen honorary degrees, two law school medals, and dozens of awards and recognitions from various bar and nongovernmental organizations, including the 2003 Wolfgang Friedmann Award from Columbia Law School and the 2004 Louis B. Sohn Award from the American Bar Association Section on International Law for lifetime achievements in international Law. I am Honorary Counselor of the American Society of International Law, Counselor of the American Law Institute's *Restatement (Fourth) of the Foreign Relations Law of the United States*, a Fellow of the American Academy of Arts and Sciences and the American Philosophical Society, and a Member of the Council of the American Law Institute.

3. ***Materials Reviewed***:  In preparing my Report I reviewed the various authorities that are referenced herein.  In addition, I reviewed the following case-specific documents:

a.  The expert report of Dr. Matthew Levitt ("Levitt Report").

4

    b.  The expert report of Ambassador Dennis Ross ("Ross Report").

    c.  First Amended Complaint dated July 7, 2016.

    d.  July 28, 2014 letter from Pamela A. Johnson to Andrea Garber.

    e.  August 13, 2014 letter from Lucia E. Coyoca to Pamela A. Johnson.

    f.  September 19, 2014 letter from Pamela A. Johnson to Lucia E. Coyoca.

4.    ***Questions Presented***:  I have been asked to opine on the following questions:

    a.    Under international law, did the hostilities occurring between Hamas and Israel during the summer of 2014 constitute "war"?

    b.    Under international law, did Hamas' actions, launching mortars and rockets into Israel during the summer of 2014, constitute "acts of war"?

In my professional opinion as an international lawyer, the answer to both questions is no.[1]

5.    ***International Law***:  International law consists of treaties -- which have been drafted, signed, and ratified by nation-State Parties -- and rules of "customary international law," which result from a general and consistent practice of nation-states that is followed by those states out of a sense of legal obligation (*opinio juris*).  Customary international law may be discerned from the current practice of states, treaties, as well as statements of respected publicists and international organizations, among other sources.[2]  The United States Supreme Court has unanimously ruled that "international law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination."[3]  In §103 of the *Restatement*

---

[1]  The facts discussed in my Report as to the interactions between Hamas and Israel, and Hamas' status as a terrorist organization designated as such by the U.S. government and other nations, are based on, *inter alia,* my own knowledge, and the facts and authorities set forth in the Ross and Levitt Reports..
[2]  Article 38, Statute of the International Court of Justice.
[3]  The Paquete Habana, 175 U.S. 677, 700 (1900).

*(Third) of the Foreign Relations Law of the United States* (1986), the American Law Institute states that:

> "[i]n determining whether a rule has become international law, substantial weight is accorded to …
>
>> (a) judgments and opinions of international judicial and arbitral tribunals;
>>
>> (b) judgments and opinions of national judicial tribunals;
>>
>> (c) the writings of scholars…."

6.    ***"War" under International Law***:   Under modern international law, the terms "war" and "peace" are no longer commonly used as legal terms of art.   Classical international law scholars traditionally wrote about "war" and "peace."[4]   One sovereign state could initiate war against another sovereign state, and once a state of war was declared or initiated, the "belligerent" states at war had a legal duty to observe the rules of war and to respect the neutrality of non-belligerent sovereign states.   But "[i]n modern times, the practice of formally recognizing a state of 'war' has fallen into disuse."[5]   As a matter of U.S. law, the term "war" continues to be used in constitutional discourse, primarily because the U.S. Constitution, Article I, section 8, cl. 11, famously states that "Congress shall have the power...to declare war."   But in U.S. history there have only been five Declarations of War, and in recent times, Congress no longer "declares war," but rather, enacts statutory Authorizations for the Use of Military Force (AUMFs).   To my knowledge, no nation has issued a "Declaration of War" since the United Nations Charter was adopted in 1945.   Like laypeople, international lawyers still tend to refer to "war" and "peace" in colloquial speech, interviews, article and lecture titles, and the like.   But when speaking precisely and in legal terms, modern international lawyers rarely refer to "war,"

---

[4]  See, e.g., Hugo Grotius,  Of the Law of War and Peace (*De Jure Belli Ac Pacis*) (1625).
[5]  Lori Fisler Damrosch & Sean D. Murphy, International Law 1089 (6th ed. 2014).

which is generally a course of hostilities engaged in by governments of nation-states that exhibit significant attributes of national sovereignty.  See paragraph 8, *infra*.  Despite colloquial uses like the "war on terror" or "the war on drugs," the term "war" -- as currently understood by international lawyers -- is now considered a most unusual, broadly encompassing event confined to rare, large-scale interstate conflicts spanning significant geographical and temporal space. When discussing hostile attacks today, international lawyers instead now generally use the legal term "use of force," which is more clearly defined under modern international law.

7. ***"Use of force" under international law***:  In modern times, international law generally refers to particular acts that involve physical coercion as "international uses of force," a broad term that encompasses a range of coercive measures, such as armed attacks, forcible reprisals, self-defense, and the like.  Article 2(4) of the United Nations Charter (1945) calls on "All Members [to] refrain in their international relations from *the threat or use of force* against the territorial integrity or political independence of any state, or in any other manner inconsistent with the Purposes of the United Nations." (Emphasis added.)  As one international law scholar noted: "the permissible international use of force in time of peace … stretches across a wide spectrum of situations from 'showing the flag' and other kinds of diplomatic warnings to actual hostilities in the exercise of a state's sovereign and inherent right of self-defense."[6]

8. ***"Acts of war" under international law***:  Although the term "war" is generally no longer commonly used, looking to traditional concepts of war under international law, whether several or many uses of force will rise to the level of sovereign "war" or "act of war" depends on three factors:

(1) the *nature* of the act;

---

[6] Eugene V. Rostow, *"Once More Unto the Breach" The War Powers Resolution Revisited*, 21 Valparaiso U. L. Rev. 1, 6-7 (1986).

(2) the *geographic location* of the act; and,

(3) the *sovereign nature* of the actor, in particular, the degree to which that actor has been politically recognized as a legitimate participant in international politics and relations, i.e.,

>  (a) the act has been committed by an agent of a *recognized foreign state*;

>  (b) that has been recognized as a *legitimate foreign government* by the community of nations (including the United States of America); and,

>  (c) as part of an established *governmental chain of command* originating in a recognized foreign leader.

Thus, when the head of the Japanese armed forces authorized an armed attack on Pearl Harbor in December 1941, the presence of all three of the factors above -- the nature of the act, its location in another sovereign state, and the actor's political recognition as the Government of Japan (as defined by the three subfactors in (3) above) -- rendered the attack a sovereign act of war. But when one or more of those elements are missing, such acts are generally treated not as sovereign acts of war, but as terrorist acts. Absence of any one of these three elements -- nature of the act, location of the act, and sovereign nature of the actor -- is sufficient to place a particular violent act outside valid categorization as an "act of war."

9.    ___**Nature of the Act: Terrorist Acts**___:  Terrorist networks often use blatantly illegal violent acts not just to terrorize opposing civilian populations, but also to buttress their own aspirations to political legitimacy and statehood. Nation-states, and international law in general, are reluctant to dignify such terrorist acts by private networks with the sovereign label "war," or "acts of war" which international law reserves -- in the rare cases where it is used -- for undeniably sovereign acts by sovereign governments recognized as legitimate actors in the world

community.   Because of the difficulties of agreeing upon a single universal definition of

"terrorism," international law has instead agreed upon a detailed four-tiered international legal

framework to respond to particular terrorist acts, i.e. acts committed in service of terroristic ends,

for example: "(1) global conventions such as the Tokyo, Hague, and Montreal Conventions on

aircraft hijacking and sabotage, and the … conventions condemning hostage-taking and crimes

against internationally protected persons; (2) regional pacts, such as the European and

Organization of American States Conventions on the Suppression of Terrorism; (3) bilateral

treaties, particularly those facilitating extradition; and (4) national laws, such as United States

federal legislation criminalizing attacks against aviation and internationally protected persons,

hostage-taking, and theft of nuclear materials."[7]

       10.    ***Terrorist Acts Differ from Acts of War*:**   Generally speaking, "terrorist acts" are

actions designed to terrorize and intimidate a civilian population, whether committed in times of

peace or formally declared war.   While acts of war are generally responded to by counter-uses of

force or other kinds of official sanctions, terrorist acts can be and often are treated as gross

violations of domestic criminal law, as in the case of the Oklahoma City Bomber Timothy

McVeigh.   As another example, recent violent attacks within the United States in San

Bernardino, California or Orlando, Florida that were executed by individuals claiming to act on

behalf of an unrecognized "Islamic State" (ISIS or ISIL) were treated as domestic criminal law

violations.   Whether a nation-state chooses to respond to a series of terrorist acts with military

force or domestic law enforcement will depend on the factual setting and both strategic and

tactical considerations.   Thus, for example, after September 11, 2001, the United States

responded to the terrorist acts that brought down New York's World Trade Center not only with

---

[7]  Harold Hongju Koh, *Civil Remedies for Uncivil Wrongs: Combatting Terrorism through Transnational Public
Law Litigation*, 50 Texas Int'l L.J. 661, 663 (1987) (citations omitted).

military actions against Al Qaeda and the Taliban in Afghanistan, but also with law enforcement actions against particular Al Qaeda operatives who were apprehended in the United States.  In addition to the nature of the acts, these acts were also treated as terrorist acts because of (1) their geographic location--they were not committed in an active warzone, and (2) the lack of sovereign status of their perpetrators: they were not committed by agents of a recognized state or legitimate foreign government, acting at the direct command of a foreign political leader who is recognized by the United States government as exercising genuine political authority.

11. ***Geographic Location of the Acts*:**  Under the modern laws of warfare, also called International Humanitarian Law (IHL), all the world is not a battlefield.  Thus, for example, the United States is currently fighting with Al Qaeda, but not in all places and at all times.  In Afghanistan, the United States may engage with the Taliban and Al Qaeda in so-called "hot battlefields."  But other civilian zones where Al Qaeda may occasionally launch a terrorist attack -- for example, New York City on September 11, 2001 -- are not "hot battlefields" under international law.   Generally speaking, in active warzones or hot battlefields, rules of international humanitarian law apply and war crimes may be committed.  These include gross violations of *jus in bello*, or rules that govern humanitarian behavior in wartime, as specified by the four Geneva Conventions of 1949 and related international legal instruments.

12. ***Absence of Nationhood: Recognition of States and Governments Under International Law*:**   To be recognized as a nation-state ("State") capable of committing sovereign acts under international law, a State "should possess the following qualifications:

(a) a permanent population;

(b) a defined territory;

(c) government; and,

(d) capacity to enter into relations with other states."[8]

Even if a State exists as a matter of international law, it may not fully engage in diplomatic relations with other nation-States until its government has been recognized as the legitimate government of the relevant territory by the community of nations and its individual members.  Thus, for example, the Government of Taiwan is plainly in charge of the territory and population of the island of Taiwan (previously known as Formosa), but since the 1970s it has not been recognized by nearly all nations, including the United States, as the legitimate government of the Chinese mainland, which those nations now recognize as the government of the Peoples' Republic of China based in Beijing.

13.     ***The conflict between Israel and Hamas in the summer of 2014***:  Applying the legal standards outlined above to the facts alleged in the First Amended Complaint filed in this case and also as described in the Levitt and Ross Reports, it is my professional opinion, as a matter of international law, that: (1) the events that took place between Hamas and Israel during the summer of 2014 did not constitute "war;" and, (2) Hamas' acts, e.g., launching rockets and mortars into Israel during the summer of 2014, did not constitute "acts of war."

14.     My opinion is based on my analysis of the nature of the acts which occurred, the geographic location of the acts, and Hamas' status as a non-sovereign actor.  Specifically:  (a) the nature of Hamas' acts were terrorist acts that fell outside the scope of the norms of warfare; (b) those terrorist acts did not occur in an active war zone or "hot battlefield;" and (c) Hamas is not recognized under international law as the legitimate government of a recognized nation-State. Each of these concepts is more fully addressed below.

---

[8]  Article 1, Montevideo Convention on the Rights and Duties of States, U.N.T.S. 3802, signed 1933, entered into force 1934.

(a)     ***Nature of the Acts***:  The acts committed by Hamas in July 2014 that led to the curtailment of Plaintiffs' filming -- namely, the firing of rockets from Gaza into the direction of civilian areas of Israel -- were not sovereign acts of war, but rather, terroristic acts directed primarily at civilians and civilian areas.  Hamas' violent terrorist tactics are extensively detailed in Dr. Levitt's Report.  Since Hamas' founding in 1987, it has committed countless acts of violence which include suicide bombings and other bombings, rocket and mortar attacks, shooting attacks, stabbing attacks, kidnappings and car ramming attacks.[9]  Hamas does not have a history of conducting hostile actions on hot battlefields, but instead hides its leaders and weapons in civilian structures such as mosques, hospitals and private homes.[10]  Hamas' actions are random and indiscriminate, designed to instill fear. They are "terrorist acts" in the literal meaning of that term: namely, "[i]ntended to terrorize not only the targeted individuals but the general Israeli population, Hamas attacks are indiscriminate in nature."[11]

The Hamas attacks during the summer of 2014 at issue in this lawsuit fit this general pattern and practice.  The attacks were preceded by the kidnapping and ultimately murder in June of 2014 of three Israeli teenagers (one of them, an Israel-American dual citizen).[12]  After allegations that Hamas was responsible for the kidnappings, Hamas began firing rockets and mortars from civilian locations in Gaza indiscriminately into Israel, which were largely directed at and sometimes struck Israeli civilians and civilian areas.[13]  In the aftermath of the attacks, Amnesty International reported that scores of the rocket and mortar attacks hit residential homes, infrastructure, public buildings and

---

[9]  Levitt Report, pps. 10, 12-17, 19 and 25.
[10]  Levitt Report, p. 7.
[11]  Levitt Report, p. 19.
[12]  Levitt Report, pp. 20-21.
[13]  Levitt Report, p. 21,23.

educational institutions.[14]  These types of acts -- kidnappings and indiscriminate mortar and rocket attacks launched from civilian areas in Gaza directed towards largely civilian areas and civilians -- are prohibited by many of the international conventions identified above in paragraph 9.[15]  In my opinion, as a matter of international law, these acts fall outside established norms of warfare and may constitute crimes against humanity, but would not be dignified by international law with the labels "war" or "acts of war."

   (b) ***Geographic Location of the terrorist acts:***  The acts at issue in this lawsuit, were terroristic acts directed at remote civilian zones.  They were not actions directed against combatants that were fully executed within active battlefields or war zones.  Rather, Hamas randomly and indiscriminately fired rockets from Gaza into Israel, including in the direction of Tel Aviv and Jerusalem, which are civilian areas of Israel.[16]  Indeed, because the projectiles fired by Hamas lacked guidance systems, they could not have been directed at specific military targets.[17]  A United Nations Commission of Inquiry report found:  "The absence of any possible military advantage resulting from rockets that cannot be directed at a military objective, coupled with statements by Palestinian armed groups, strongly suggest that the primary purpose of the rocket attacks

---

[14] Levitt Report, p. 22; https://www.amnesty.ch/fr/pays/moyen-orient-afrique-du-nord/israel-et-territoiresoccupes/ docs/2015/des-groupes-palestiniens-ont-commis-des-crimes-de-guerre/rapport-unlawful-anddeadly- rocket-and-mortar-attacks-by-palestinian-armed-groups-during-the-2014-gaza-israel-conflict-64- pages-en-anglais

[15] See, e.g, International Convention for the Suppression of the Financing of Terrorism, signed December 9, 1999; entered into force January 10, 2000, Article 2 (making it an offence under the Convention if a person "by any means" "provides" "assets of every kind" "in the knowledge that they are to be used, in full or in part, in order to carry out" a violation, *inter alia* of a number of enumerated conventions –e.g., barring such specific terrorist acts as terrorist bombings, unlawfully seizing or attacking civilian aircraft, attacking internationally protected persons (including diplomats), taking hostages, seizing nuclear material, engaging in unlawful acts of violence against airports, maritime navigation, or fixed platforms located on the continental shelf or "[a]ny other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context is to intimidate a population . . . ."

[16] Levitt Report, p. 22.

[17] Id.

13

was to spread terror among the civilian population. . .".[18]   Israel's response to those terroristic acts upon its civilian centers constituted a defense against terrorist acts, not initiation or continuation of "war" or "acts of war."

(c) ***Absence of Nationhood***:  The attacks by Hamas against Israel in the summer of 2014 were not committed by a recognized government of a recognized nation-State capable under international law of committing sovereign acts of war.  Under international law, Hamas is not a nation-State.  It does not meet the four requisite criteria under the Montevideo Convention set out in paragraph 12 above.  The United States does not recognize Hamas as a sovereign government or Gaza as a separate sovereign nation.[19]  Rather, the United States government has long officially designated Hamas as a foreign terrorist organization.[20]  Because of Hamas' terrorist activities, the United States government does not negotiate or enter into treaties with Hamas, and neither do many other democratic nations of the world, such as Canada and the member States of the European Union.[21]

15.   Significantly, Hamas itself does not claim that Gaza is a separate territorial nation.[22]  For decades, various Palestinian groups have advocated for the establishment of a separate state of Palestine, whose status remains a subject of substantial debate in international law.  Collectively, these groups have long aspired to global recognition as one recognized nation-State known as Palestine.  Hamas is just one part of that movement, and it does not seek separate

---

[18] Id. and see also,
https://unispal.un.org/DPA/DPR/UNISPAL.NSF/5ba47a5c6cef541b802563e000493b8c/d9b813ba823bf
05585257e6c004e12ef?OpenDocument
[19] U.S. Department of State, Independent States in the World, available at http://www.state.gov/s/inr/rls/4250.htm;
[20] U.S. Department of State, Foreign Terrorist Organizations, available at
http://www.state.gov/j/ct/rls/other/des/123085.htm.
[21] Levitt Report, pp. 16, 26-27
[22] Ross Report, p. 6, ¶14.

statehood for just Gaza.[23]   Indeed, Hamas regards both the West Bank *and* Gaza (as well as Israel, which it seeks to destroy) as integral parts of a future state of "Palestine."[24]

16.     Hamas is inextricably linked to the Palestine Authority (PA), which controls the West Bank. As noted by Ambassador Ross, the Oslo Accords established that the West Bank and Gaza were one territorial unit.[25]   Since 2007, when Hamas carried out a coup in Gaza and seized control from the PA, Hamas has controlled Gaza, while the PA has run unoccupied areas of the West Bank.   But there is no state of Palestine, and Gaza is not a separate sovereign territorial nation.   Hamas has never been recognized by the United States government as meeting the four legal prerequisites of statehood, nor has it ever been recognized as a legitimate government authorized to speak for any sovereign nation.   Hamas therefore lacks the legal personhood necessary to commit sovereign "war" or "acts of war."

17.     In conclusion, for all of the foregoing reasons, in my opinion as an expert on international law, the particular factual circumstances at issue here did not amount to "war" or "acts of war" as those terms have been defined under international law.

Respectfully submitted,

_____          __March 16, 2017__
HAROLD HONGJU KOH                                    Date

---

[23]   Ross Report, pp. 6-7, ¶¶15-16.
[24]   Ross Report, p. 5, ¶11.
[25]   Ross Report, p. 6, ¶12.

# Curriculum Vitae

# Harold Hongju Koh

**Yale Law School P.O. Box 208215  New Haven, CT 06520   203 432 4932 harold.koh@yale.edu**

**Employment:**

2013-             Sterling Professor of International Law, Yale Law School (Procedure, Public and Private International Law, Human Rights, Law and U.S. Foreign Policy, Law and National Security, Brexit and the Law, International Business Transactions, Constitution and Foreign Affairs, International Trade, International Organizations, Law of Climate Change, International Law and Political Science)

2014-             Nonresident Member, Blackstone Chambers, London

2009-13:       Legal Adviser, U.S. Department of State (on leave as Martin R. Flug '55 Professor of International Law at Yale Law School) (awarded Secretary of State's Distinguished Service Award 2013); Head of Delegation for U.S. Government: U.N. Human Rights Council, Assembly of States Parties International Criminal Court (Kampala 2010)

2004-2009:    Dean of Yale Law School & Gerard C. and Bernice Latrobe Smith Professor of International Law, Yale Law School

1998-2001:    Assistant Secretary of State for Democracy, Human Rights and Labor United States Department of State; Commissioner, Commission for Security and Cooperation in Europe; U.S. Delegate or Head of Delegation to United Nations General Assembly (Third Committee), the United Nations Human Rights Commission, the Organization of American States, the Council of Europe, the Organization for Security and Cooperation in Europe, the U.N. Committee Against Torture, Inaugural Community of Democracies Meeting (Warsaw 2000); U.N. Conference on New and Restored Democracies (Cotonou, Benin 2000)

1993-2009: Gerard C. & Bernice Latrobe Smith Professor of International Law, Yale Law School
1998-2004: Director, Orville H. Schell Jr., Center for International Human Rights, Yale Law School
1990-93: Professor, Yale Law School
1985-90: Associate Professor, Yale Law School
1983-85: Attorney-Adviser, Office of Legal Counsel, United States Department of Justice
1982-83: Associate, Covington & Burling, Washington, DC
1981-82: Law Clerk to Hon. Harry A. Blackmun, Associate Justice, United States Supreme Court
1980-81: Law Clerk to Hon. Malcolm Richard Wilkey, Circuit Judge, United States Court of Appeals, D.C. Circuit
1979 Summer: Summer Associate, Covington & Burling, Washington, D.C.
1978 Summer: Research Assistant to Professor Arthur R. Miller, Harvard Law School

**Visiting Positions:**
2018-20 (Goodhart Professor of Visiting Legal Science and Fellow of Trinity College, Cambridge); 2016 (Hawaii); 2014, 2017 (NYU, NYU Abu Dhabi); 2013-4 (Columbia Law, Clarendon Law Lecturer Oxford), 2012 (Oliver Smithies Lecturer Oxford Law Faculty), Honorary Fellow, Magdalen College (2002-); 2002, 1990 (Toronto),  1996 (Visiting Fellow, All Souls College, and Waynflete Lecturer, Magdalen College, Oxford), 1993 (Hague Academy of International Law), 1982-85 (George Washington Law School), 1978-79 (Harvard Law -- Contracts and Civil Procedure Teaching Assistant)

**Education:**
1996: M.A. Oxford, Philosophy Politics & Economics
1980: Harvard Law School, J.D. cum laude; Developments Editor, *Harvard Law Review*; Tutor, Mather House, Harvard College
1977: Magdalen College, Oxford University, Honours B.A. in Philosophy, Politics & Economics with First Class Honours; Marshall Scholar; Magdalen College Underhill Exhibitioner; President, Magdalen College Middle Common Room

1975: Harvard College, Harvard University A.B. in Government, *Summa Cum Laude*; Phi Beta Kappa;
Harvard National Scholar; Charles Bonaparte Scholar (Outstanding Junior Government Major); Harvard
Club of Southern Connecticut Distinguished Senior; National Merit Scholar; State of Connecticut Scholar

**Honorary Degrees (17)**
2014: Quinnipiac Law School; University of Denver Sturm College of Law
2012: American University School of Law
2010: Wayne State University; Northeastern University
2009: New School for Social Research
2008: Iona College, Jewish Theological Seminary
2005: University of Hartford, Widener School of Law
2002: Skidmore College
2001: Connecticut College
2000: University of Connecticut; Dickinson College
1999: Suffolk Law School; Albertus Magnus College
1998: CUNY-Queens Law School
1990: M.A., Yale University

**Medals**
2008: Western New England School of Law
2004: Presidential Medal, Central Connecticut State College
2000: Villanova Medal, Villanova Law School
2000: Arthur J. Goldberg Award, Jacob Fuchsberg Law Center, Touro Law School Other Honors and

**Awards**
2015: Inaugural Public Service Award, Council on Korean Americans, Washington, DC
2014: Frederick K. Cox Humanitarian Award for Advancing Global Justice, Case Western Reserve
University Law School
2013: Secretary of State's Distinguished Service Award; 2013 William Green Award for Professional
Excellence, University of Richmond, Law School
2010: Library of Congress George Wickersham Award for Outstanding Public Service
2009: Yale Law School Medal of Merit
2008: Judith Lee Stronach Human Rights Award, given for outstanding contribution to global justice by the
Center for Justice and Accountability, San Francisco 7th Annual Sengbe Pieh Award, First and
Summerfield United Methodist Church IRIS Human Rights Award
2007: Green Bag Award for "exemplary writing in a long article" Green Bag Almanac and Reader (2007)
2007, 8, 9 Lawdragon 500 Leading Lawyers in America
2007-08: Connecticut Bar Association Young Lawyers Section Diversity Award; Pacific Islander, Asian,
and Native American (PANA) Distinguished Service Award
2006: Philip Burton Award for Advocacy, Immigrant Legal Resource Center; Boston College 75th
Anniversary Celebration Law School's Distinguished Service Award Asian American Bar Association of
New York Award; The Asian American Law Students Association (Pace Law School) Award of
Distinction; Connecticut Super Lawyer, Connecticut Magazine (International Law)
2005: Louis B. Sohn Award, given by the International Law Section of the American Society of
International Law for Lifetime Achievement in International Law; Equal Access to Justice Award, New
Haven Legal Assistance; Allies for Justice Award ABA National Lesbian and Gay Law Association 100
Most Influential Asian Americans of the 1990s, A Magazine
2002: Wolfgang Friedmann Award, given by Columbia Journal of Transnational Law "to an individual
who has made outstanding contributions to the field of international law"; Connecticut Bar Association
Distinguished Public Service Award; John Quincy Adams Freedom Award, Amistad America 2001:
Korean American Coalition Public Service Award
2000: Institute for Corean-American Studies Liberty Award 1999;
1997: "Public Sector 45" (45 leading American Public Sector Lawyers Under the Age of 45), American
Lawyer Magazine 1997: Named one of nation's leading Asian-American Educators, Avenue Asia Magazine
Asian-American Lawyer of the Year, Asian-American Bar Association of New York; FACE (Facts About
Cuban Exiles) Excellence Award

1995: Trial Lawyer of the Year Award, Trial Lawyers for Public Justice (co-recipient)
1994: Cuban-American Bar Association; Political Asylum Immigration Representation Project; Asian-American Lawyers of Massachusetts; Haiti 2004; Korean-American Alliance
1993: Asian Law Caucus; Asian-American Legal Defense & Education Fund, Justice in Action Award
1992: Co-recipient, American Immigration Lawyers' Association Human Rights Award
1991: Richard E. Neustadt Award, Presidency Research Section, American Political Science Association

**Fellowships**
Fellow, Jonathan Edwards College, Yale University (2013-)
Honorary Member, Lincoln's Inn, London (2013-);
Fellow, American Philosophical Society (2007-);
Fellow, American Academy of Arts and Sciences (2000-);
Guggenheim Fellow (1996-97);
Twentieth Century Fund Fellow (1996-),
Visiting Fellow, All Souls College, Oxford (1996-97);
James Cooper Lifetime Fellow, Connecticut Bar Association (2006-)

**Publications: Books and Monographs**
Transnational Litigation in United States Courts (2008) (Foundation Press)

Transnational Business Problems (4th ed. 2008) (Foundation Press), with Detlev F. Vagts & William S. Dodge & Hannah Buxbaum

Foundations of International Law and Politics (with Oona A. Hathaway Oxford 2009)

The International Human Rights of Persons with Intellectual Disabilities: Different but Equal (Oxford University Press 2002) (with Stanley Herr and Lawrence Gostin, eds)

Deliberative Democracy and Human Rights (with Ronald C. Slye) (Yale University Press 1999) (translated into Spanish)

International Business Transactions in United States Courts, Recueil des Cours (Martinus Nijhoff 1998) (Monograph of Lectures in Private International Law at The Hague Academy of International Law)

Transnational Legal Problems (with Henry Steiner & Detlev Vagts) (Foundation Press 4th ed. 1994) and Documentary Supplement (1994)

The National Security Constitution: Sharing Power After the Iran-Contra Affair (Yale University Press 1990) (Winner, Richard E. Neustadt Award, awarded by the Presidency Research Section, American Political Science Association, to the best book published in 1990 that contributed most to research and scholarship on the American Presidency)

Justice Harry A. Blackmun Supreme Court Oral History Project, Federal Judicial Center/Supreme Court Historical Society (Editor 1996) (public release 2004)

**Articles and Book Chapters**
Triptych's End: A Better Approach to 21st Century International Lawmaking, 126 Yale L.J. Forum (2016-17), http://www.yalelawjournal.org/forum/triptychs-end

The Emerging Law of 21st Century War, 66 Emory L.J. 487 (2017).

 "Global Tobacco Control as a Health and Human Rights Imperative," 57 Harv. Int'l L.J. 433 (2016)

"The Enduring Legacies of the Haitian Refugee Litigation," 61 N.Y.L.S. L. Rev. 155 (2016/17)

The War Powers and Humanitarian Intervention, 53 Houston L. Rev. 971 (2016)

 "The Crime of Aggression: The United States Perspective"  (with Todd F. Buchwald), in Claus Kress & Stefan Barriga, eds., The Crime of Aggression: A Commentary (Cambridge University Press 2016)

 "'Effective' Policy in Syria: Ambassador Robert Ford's View," Just Security Blog, June 21, 2016, https://www.justsecurity.org/31590/effective-policy-syria-ambassador-robert-fords-view/

"Pain Versus Gain," Just Security Blog, June 20, 2016, https://www.justsecurity.org/31544/pain-gain/

"Another Legal View of the Dissent Channel Cable on Syria," Just Security Blog, June 20, 2016, https://www.justsecurity.org/31571/legal-view-dissent-channel-cable-syria/

 "Michael Ratner: The Leading Progressive Lawyer of a Generation," May 12, 2016, https://www.justsecurity.org/31010/michael-ratner/

 "The Legal Adviser's Duty to Explain," 41 Yale J. Int'l Law 189 (2016)

"The People," Interview with HanYang Law Review, 2015 Han Yang L. Rev. 97 (2015)

"The Legal Adviser's Duty to Explain," The Role of Legal Advisers in International Law (Andraz Zidar & Jean-Pierre Gauci eds. 2016)

Rapporteur's Report, Global Migration Crisis: Its Challenges to the United States, Europe and Global Order, Richard C. Holbrooke Forum at the Brookings Institution, http://www.americanacademy.de/home/program/past/global-migration-crisis-0.

Reflections on the Law and Politics of the *Kosovo* Case, Chapter 18 in The Law and Politics of the Kosovo Advisory Opinion (M. Wood & M. Milanovic eds. 2015);

Sunset and Supersede: Striking the Right Balance in the AUMF against ISIL http://justsecurity.org/20570/sunset-supersede-striking-balance-authorization-military-force-aumf-isil/, March 2, 2015

The Torture Report is Only the First Step http://foreignpolicy.com/2014/12/12/the-torture-report-is-only-the-first-step/ http://justsecurity.org/18372/torture-report-step/ ; December 12, 2014

America's "Unequivocal Yes" to the Torture Ban http://justsecurity.org/17551/americas-unequivocal-yes-torture-ban/ November 18, 2014

*International Criminal Justice 5.0*, 38 Yale J. Int'l Law 525 (2013)

*The Case for International Law* (with Michael Doyle), 92 Foreign Affairs 162 (2013)

*In Memoriam, Detlev F. Vagts* (1929-2013) (with William Dodge and Hannah Buxbaum), http://opiniojuris.org/2013/08/23/in-memoriam-detlev-f-vagts-1929-2013/

*Restoring Justice: The Legacy of Edward H. Levi,* Bulletin of the American Academy of Arts and Sciences, Winter 2014, at 26; available at https://www.amacad.org/multimedia/pdfs/publications/bulletin/winter2014/bulletin_Winter2014.pdf

YLS Sale Symposium, Sale's Legacies, http://opiniojuris.org/2014/03/17/yls-sale-symposium-sales-legacies/

ASIL Plenary on IL in Obama Administration for Proceeding, 2014 Proceedings of the American Society of International Law

5

Syria and the Law of Humanitarian Intervention, Parts I, II, III, http://justsecurity.org/2013/09/26/koh-syria/ ; justsecurity.org

Ending the Forever War: A Progress Report, October 28, 2013, http://justsecurity.org/2013/10/28/ending-war-progress-report

Strike on Syria for Chemical Weapons – Not Illegal, YaleGlobal http://yaleglobal.yale.edu/content/strike-syria-chemical-weapons-%25E2%2580%2593-not-illegal

POTUS' view on who counts as Al Qaeda http://justsecurity.org/2014/01/20/potus-view-counts/January 20, 2014

Nelson Mandela, 1918-2013; http://justsecurity.org/2013/12/06/nelson-mandela-1918-2013/December 6, 2013.

21st Century International Law Making, 101 Georgetown L.J. 725 (2013)

International Law in Cyberspace: Remarks of Harold Koh, 54 Harv. Int'l L.J. Online 1 (2012), available at http://www.harvardilj.org/2012/12/online_54_koh

The State Department Legal Adviser's Office: Eight Decades in Peace and War, 100 Georgetown L.J. 1747 (2012)

Commentary in Michael W. Doyle, Striking First: Preemption and Prevention in International Conflict 99 (2008)

Human Rights and National Security: Chapter in Mark Green, et al., eds, Change for America: Progressive Blueprint for the Next Administration (2008)

Keynote Address: A Community of Reason and Rights, 77 Fordham L. Rev. 583 (2008)

A Day in Court Denied The Washington Post, Monday, March 31, 2008 Page A19

No Torture. No Exceptions. The Washington Monthly, January/February/March 2008

Tom Eagleton: True Senator, 52 St. Louis U. L Journal 25 (2008)

Mirjan Damaska: A Bridge Between Two Cultures, in Maximo Langer, et al., Festschrift for Mirjan Damaska (2008)

Sale v. Haitian Centers Council: Guantanamo and Refoulement (with Michael J. Wishnie), in Ford, Hurwitz & Satterthwaite, Human Rights Advocacy Stories (2000)

Repairing America's Human Rights Reputation, 40 Cornell Int'l L.J. 635 (2007)

Is there a "New" New Haven School of International Law? 32 Yale J. Int'l L. 559 (2007)

"Repair America's Human Rights Reputation"—op-ed appeared in the Summer 2007 issue of the Yale Law Report as part of a collection of op-eds written by Yale Law School faculty members

Filártiga v. Pena-Irala: Judicial Internalization of the Customary International Law Norm Against Torture in International Law Stories (Noyes, Dickinson & Janis, eds.; Law Stories Series, Foundation Press 2007)

Preface to Eugene Fidell, Beth Hillman & Dwight Sullivan, Military Justice: Cases and Materials (2007)

Preface to William J. Aceves, The Anatomy of Torture: A Documentary History of Filártiga v. Peña-Irala (2007)
The Future of Lou Henkin's Human Rights, Movement, 38 Col. H.Rts Rev. 487 (2007)

The Bright Lights of Freedom, NPR: THIS I BELIEVE, Jay Allison & Dan Gediman, eds., (New York: Henry Holt & Company, 2006) 141-143; paperback edition (2007)

America and the World, 2020, in THE CONSTITUTION IN 2020 (Siegel & Balkin eds. 2009)

In Memoriam: Robert F. Drinan, S.J. (1920-2007) 95 Georgetown Law Journal 1709 (2007)

The Activist: Robert S. Drinan S.J., Stirring the Human Rights Revolution, BC Law Magazine 7 (Summer 2007) (tribute to Father Drinan)

A World Drowning in Guns, INTERNATIONAL LAW AND INTERNATIONAL RELATIONS: BRIDGING THEORY AND PRACTICE, Thomas J. Biersteker, Peter J. Spiro, Chandra Lekha Sriram, and Veronica Raffo, eds., (London: Routledge Press, 2006) 59

Louis B. Sohn: Present at the Creation, Harvard International Law Journal, 2006

Unveiling Justice Blackmun, 72 Brooklyn L. Rev. 9 (2006) Setting the World Right, 115 Yale L.J. 2350 (2006)

Why Transnational Law Matters, 24 Penn State Int'l L.Rev. 745 (2006)

The Healing Wisdom of Jay Katz, 6 Yale J. Health Policy, Law and Ethics 397 (Spring 2006)

Harry Andrew Blackmun, in Yale Biographical Dictionary of American Law (2007)

"The New Global Slave Trade," Displacement, Asylum, Migration 232 (Oxford Amnesty Lectures) (Kate Tunstall ed. 2006)

"A Law Unto Itself?," Yale L.J. (The Pocket Part), March 2006

Tribute to President Francis Daly Fergusson, upon her retirement from Vassar College, Vassar Quarterly, "Energy in the Executive"

"Can the President Be Torturer in Chief?," Ind. L. Rev. 81:1145 (winner 2007 Green Bag Award for "exemplary writing in a long article" Green Bag Almanac and Reader (2007)

"Mark Janis and the American Tradition of International Law," Conn. J. Int'l L.

"Captured by Guantanamo"

Choosing Heroes Carefully (Tribute to John Hart Ely), 57 Stan. L. Rev. 723 (2005)

"The Value of Process," in Why Obey International Law?, 10 Int'l Legal Theory 1 (2004)

"Standing Together," 15 Law & Sexuality, 15:1 "Internalization Through Socialization," Duke L.J. 54: 975 (2005)

"Commentary: A World Drowning in Guns," in International Law and International Relations 59-76 (Thomas Biersteker, Veronica Raffo, Peter Spiro and Chandra Sriram, eds Routledge 2006)

Preface to Jaya Ramji & Beth van Schaack, Bringing the Khmer Rouge to Justice: Prosecuting Mass Violence Before the Cambodian Courts

The Ninth Annual John W. Hager Lecture, The 2004 Term: The Supreme Court Meets International Law, Tulsa Journal of Comparative & International Law 12: 1 (2004)

"The Wolfgang Friedmann Lecture: A World Without Torture," Columbia Journal of Transnational Law (2005)

International Law as Part of Our Law, 98 Am. J. Int'l Law 43 (2004)

Separating Myth and Reality about Corporate Responsibility Litigation, 7 J. Intl Econ. L. 263 (2004)

Snatched in Sudan, Captive in Khartoum, Times Higher Education Supplement, Feb. 20, 2004

Advice to the Next High Commissioner, Columbia Human Rights L. Rev. 2003

Transnational Legal Process After September 11, 22 Berkeley J. Int'l L. (2004)

Rights to Remember, Economist, November 2003 at 24

American Diplomacy and the Death Penalty (with Thomas Pickering) 80 Foreign Service Journal 19 (October 2003)

"On America's Double Standard: The Good and Bad Faces of American Exceptionalism," American Prospect (October 2004)

"America's Jekyll and Hyde Exceptionalism," chapter in Michael Ignatieff, American Exceptionalism and Human Rights (Princeton University Press 2005)

On American Exceptionalism, 55 Stan. L. Rev. (2003) A World Drowning in Guns, 71 Fordham L. Rev. (2003)

Why the United States should ratify the Convention for the Elimination of Discrimination Against Women (CEDAW), 34 Case W. Res. L. Rev. 258 (2002)

Tribute to John Sexton, 60 Annual Survey of American Law (2003) (tribute to John Sexton)

A Tribute to Tom the Frank, 35 NYU Journal Int'l L. & Pol. (2003) (tribute to Thomas Franck)

The Law Under Stress After September 11, 31 Int'l Legal Info. 317 (2003)

International Human Rights of Persons with Mental Disabilities, 63 Md. L. Rev. 1 (2004)

Wrong on Rights, Yaleglobal Online (2004)

In Memoriam: Dean Eugene V. Rostow, Yale Law Report 16 (Summer 2003)

Paying "Decent Respect" to the World Opinion on the Death Penalty, 35 U.C. Davis L. Rev. 1085 (2002)

Paying Decent Respect to International Tribunal Rulings, 2002 Proceedings of the American Society of International Law

Against Military Tribunals, Dissent Magazine 58 (Fall 2002)

One Year Later, America Deserves Mixed Reviews, Yale Daily News (September 13, 2002)

A Better Way to Deal with Iraq, Hartford Courant, October 20, 2002

"Preserving Our Values: The Challenge At Home and Abroad," chapter 6 in The Age of Terror: America and the World After September 11 at 143 (Strobe Talbott & Nayan Chanda, eds. Basic Books 2002) \ "The Spirit of the Laws," 43 Harv. Int'l L.J. 23 (2002)

"The 2001 Richard Childress Memorial Lecture: A United States Human Rights Policy for the 21st Century," 46 St. Louis U. L. J. 293 (2002) (special issue with nine commentators)

"The Case Against Military Commissions," 96 Am. J. Int'l L. 337 (April 2002)

"Transnational Legal Process Illuminated,"in Transnational Legal Processes: Globalisation and Power Disparities 327 (Michael Likosky ed. Butterworths Press 2001)

"The Globalization of Freedom,"26 Yale J. Int'l L. 305 (2001)

"A Passion for Service," 45 N.Y.L.S. L. Rev. 17 (2001) (tribute to Harry Wellington)

"An Uncommon Lawyer," 42 Harv. Int'l L.J. 7 (2001) (tribute to Abram Chayes)

"We Have The Right Courts for Bin Laden," N.Y. Times, Nov. 23, 2001 at A39

Six Civil Rights Experts Weigh in on Sept. 11, Time.com, 12-1-01

"The U.S. Can't Allow Justice to Be Another War Casualty," The Los Angeles Times; Dec. 17, 2001 at B11

"The Best Defense: Article I," The Hartford Courant (September 16, 2001)

"America the Pariah," Project Syndicate (August 2001) (op ed piece published in 20 foreign newspapers)

"Estados Unidos y Europa, divididos por la pena de muerte," LA NACION (Argentina) July 23, 2001

"A Dismal Record on Executing the Retarded," New York Times (June 14, 2001)

"A Wake Up Call on Human Rights" Washington Post (May 8, 2001)

"A Breakthrough in North Korea," Washington Post (November 2, 2000)

"Complementarity Between International Organisations on Human Rights/The Rise of Transnational Networks as the "Third Globalization," 21 Human Rights Journal 307 (2000)

"The Third Globalization: Transnational Human Rights Networks,"

Introduction to the 1999 Human Rights Report, U.S. Dept. of State, Country Reports on Human Rights Practices for 1999 at xv (vol.1) (2000)

"The Right to Democracy," Introduction to the 1998 Human Rights Report, U.S. Dept. of State, Country Reports on Human Rights Practices for 1998 at xv (vol.1) (1999)

"1998 Harris Lecture: How Is International Human Rights Law Enforced?" 74 Indiana L. J. 1397 (1999)

"1998 Frankel Lecture: Bringing International Law Home," 35 Houston L. Rev. 623 (1998)

"Is International Law Really State Law?", 111 Harv. L. Rev. 1824 (1998)

"Why Do Nations Obey International Law?", 106 Yale L.J. 2599 (1997)

"Ten Lessons About Appellate Oral Argument,"71 Connecticut Bar Journal 218 (1997)

"Congressional Protection of International Human Rights,"170 Fed. R. D. 285 (1997)
"Book Review, Chayes & Chayes, The New Sovereignty," 91 American Journal of International Law 389 (1997)

"War and Responsibility in the Dole/Gingrich Congress," 50 Miami L. Rev. 1 (1996)

"Transnational Legal Process," 75 Neb. L. Rev. 181 (1996)

"The Constitution,"in Encyclopedia of U.S. Foreign Relations (Oxford University Press 1996)

"A World Transformed," 20 Yale Journal of International Law vii (1995)

"America's Offshore Refugee Camps," 29 Richmond L. Rev. 139 (Allen Chair 1994)

"Refugees, The Courts, and the New World Order," 1994 Utah L. Rev. 999

"The 'Haiti Paradigm' in United States Human Rights Policy," 103 Yale L.J. 2391 (1994)

"Democracy and Human Rights in U.S. Foreign Policy?: Lessons from the Haitian Crisis," 48 SMU L. Rev. 189 (1994)

"The Haitian Refugee Litigation: A Case Study in Transnational Public Law Litigation," 18 Md. J. Int'l L & Trade 1 (1994)

"Reflections on Refoulement and Haitian Centers Council," 35 Harv. Int'l L.J. 1 (1994)

"Who Are the Archetypal 'Good' Aliens?" 88 American Society of International Law Proc. 450 (1994)

"Justice Blackmun and the 'World Out There'," 104 Yale L.J. 23 (1994)

Broadening Access to International Law Resources Through New Technology," 89 American Society of International Law Proc. -- (1995)

"Aliens in Our 'Beloved Community,'" Smithsonian Working Paper (1995)

"One Step Forward, One Step Back," Miami Herald, May 4, 1995 A27

Alliance for Justice, "First Monday," October 3, 1994 (video panel)

"Terms for Assessment," Roundtable on Justice Blackmun, ABA Journal 52 (July 1994)

"Justice Done," New York Times, Apr. 8, 1994, at A27 "The Justice Who Grew," 1994 J. S.Ct. Hist. 5 (1994)

"DIANA: A Human Rights Data Base," 16 Human Rights Quarterly 753 (1994) (with N. Finke, T. Fitchett, and R. Slye)

"Bitter Fruit of the Asian Immigration Cases," 6 Constitution 68 (1994) (reproduced in Cong. Record, Jan. 6, 1995 at S569)

"Standing Up for Principle: A Personal Journey," 5 Korean and Korean-American Studies Bulletin 4 (1994)

"A Tribute to Justice Harry A. Blackmun," 108 Harv. L. Rev. 20 (1994)

Remarks at Proceedings Held on the Occasion of the Induction of Jose A. Cabranes As U.S. Circuit Judge, 2d Cir. (Sept. 26, 1994)

"The New New International Economic Order," 87 American Society of International Law Proc. 259 (1994)

"Aliens and the Duty of Nonrefoulement: Haitian Centers Council, Inc. v. McNary," 6 Harvard Human Rights Journal 1 (1993) (with the Lowenstein Human Rights Clinic)

"The Role of the Courts in War Powers Cases," in Constitutional Government and Military Intervention After the Cold War (M. Halperin & G. Stern eds.) (Westview Press 1993)

"The President Versus the Senate in Treaty Interpretation: What's all the Fuss About?" 15 Yale Journal of International Law 331 (1990)

"Reply to Book Reviews of The National Security Constitution: Sharing Power After the Iran Contra Affair, 15 Yale Journal of International Law 382 (1990)

"A History of the Fast Track Approval Mechanism," Chap. 1, A. Holmer & J. Bello, eds., The Legislative Fast Track: Its Illustrative Use for the U.S.-Canada Free Trade Agreement (Prentice Hall 1990)

"The Iran-Contra Affair," The Guide to American Law Yearbook 1990 (West 1990)

"The Human Face of the Haitian Interdiction Program," 33 Virginia Journal of International Law 483 (1993)

"Two Cheers for Feminist Procedure," 61 University of Cincinnati Law Review 1201 (1993)

"Protecting the Office of Legal Counsel from Itself," 15 Cardozo Law Review 1601 (1993)

"The War Powers Resolution," in Cold War Patriot and Statesman: Richard M. Nixon 321 (L. Friedman and W. Levantrosser, eds.) (Greenwood Press, 1993)

"Against Specialization in The Teaching of International Law," Contemporary International Law Issues: Sharing Pan-European and American Perspectives 198 (1992)

"The Fast Track and United States Trade Policy," 18 Brooklyn J. Int'l L. 143 (1992) "Dollar

Diplomacy/Dollar Defense: The Fabric of Economics and National Security Law," 26 International Lawyer 715 (1992) (with John Choon Yoo)

"Los regímenes de formulacion de politica comercial del Congreso y del Ejecutivo estadunidenses y su relacion con un posible acuerdo de libre comercio entre Canada, México y Estados Unidos," México/Estado Unidos 1990 at 193 (G. Vega ed. 1992)

Remarks at Presentation of the Portrait of the Honorable Malcolm R. Wilkey, 992 F.2d lxxi (1993) (U.S. Ct. App. D.C. Dec 17, 1992)

Selections, Encyclopedia of the American Presidency (1993)

Closed Door Policy for Refugees," Legal Times 36 (July 26, 1993)

"We the People --and Congress-- Have Yet to Be Heard" (with Bruce Ackerman), L.A. Times (May 5, 1993)

"Reflections on Kissinger," Constitution (Winter 1993)

"The War Powers Debate," Ending the Cold War at Home 41 (1992)

"The Constitution and the Bill of Rights," 85 American Society of International Law Proc. 199 (1991)

"Foreword," Asian Americans and the Supreme Court: A Documentary History ix (H.C. Kim ed.) (Greenwood Press 1992)

"Begging Bush's Pardon," 29 Hous. L. Rev. 889 (1992)

Conversation/By Steve Kemper," Northeast Magazine, July 26, 1992

"Good News, Bad News," Constitution 13 (Spring-Summer 1991)

"Bush Honors the Law When It Pleases Him," Newsday (January 20, 1991)

"A Justice for Passion," 1990 Annual Survey of American Law (1991)

"Transnational Public Law Litigation," 100 Yale L.J. 2347 (1991)

"The Constitutional Roles of Congress, the Executive and the Courts in the Conduct of U.S. Foreign Policy," (with K. Stith-Cabranes and S.Y. Koh) (Woodrow Wilson Center monograph) (Fall 1991)

"The Coase Theorem and the War Power: A Response," 1991 Duke L.J. 122(1991)

"Presidential War and Congressional Consent: The Law Professors' Memorandum in Dellums v. Bush," 27 Stanford J. Int'l L. 247 (1991)

"Summary Remarks, Conference on The Dynamics of U.S.-Korea Trade Relations: Economic, Political, Legal and Cultural," (East Rock Press, 1991)

"A Level Playing Field for Global Problems: Section 337 of the Tariff Act -- A Case Study," Proceedings of the Eighth Annual Judicial Conference of the U.S.Court of Appeals for the Federal Circuit, 133 F.R.D. 257 (1990)

"The Liberal Constitutional Internationalism of Justice Douglas," He Shall Not Pass This Way Again: The Legacy of Justice William O. Douglas 297 (S. Wasby ed., U. of Pittsburgh Press 1990)

"The Responsibility of the Importer State," Chapter 8, in G. Handl & R. Lutz, eds., Transferring Hazardous Technologies and Substances: The International Legal Challenge 171 (Graham & Trotman/Martinus Nijhoff 1989)

"Don't Close the Books on Iran-Contra Mess," New Haven Register (May 13, 1990)

"Graduation Address to Yale Law School," (May 1989), excerpted in S. Lee & M. Fox, Learning Legal Skills 207 (1991) and Yale Law Report 14 (Fall 1989)

"What Congress Must Do To Reassert National Security Power," First Principles 5 (September 1988)

"Why the President (Almost) Always Wins in Foreign Affairs: Lessons of the Iran-Contra Affair," 97 Yale Law Journal 1255 (1988) (republished as Chapter 6 in The Constitution and the Conduct of American Foreign Policy (David Gray Adler & Larry N. George eds. 1996)

"The Palestine Liberation Organization Mission Controversy," 82 American Society of International Law Proc. 534 (1988)

"Four Dichotomies in American Trade Policy," in Symposium, American Trade Policy: Actors, Issues, and Options, Special Issue No. 1, Yale L. & Pol'y Rev. 4 (1988)

"Introduction," Focus: Foreign Affairs Under the Constitution, 13 Yale J. Int'l L. 1 (1988)

"Rebalancing the Medical Triad: Justice Blackmun's Contributions to Law and Medicine," 13 Am. J. L. & Med. 201 (1988)

"The Treaty Power," 43 U. Miami L. Rev. 106 (1988)

"A Legal Perspective," Chapter 5, in Perspectives On A U.S.-Canadian Free Trade Agreement (R. Stern, P. Trezise & J. Whalley, eds.) (Brookings Institution 1987) (based on 12 Yale J. Int'l L. 193 (1987) "The Legal Markets of International Trade: A Perspective on the Proposed United States-Canada Free Trade Agreement," 12 Yale Journal of International Law 193 (1987)

"Civil Remedies for Uncivil Wrongs: Combatting Terrorism Through Transnational Public Law Litigation," 22 Texas Int'l.L.J. 169 (1987)

"Why the President (Almost) Always Wins in Foreign Affairs," 81 American Society of International Law Proc. 248 (1987)

Looking Beyond Achievement: After `the Model Minority,' Then What?"," 3 Korean And KoreanAmerican Studies Bulletin 15 (Fall/Winter 1987)

"Thoughts on Being a Korean-American Legal Academic," 1 Korean-American Journal 5 (May 1986)

"Asians in American Law", Yale Law Report 28 (Fall 1986)

Book Review, H. Steiner & D. Vagts, Transnational Legal Problems and D.Vagts, Transnational Business Problems, 20 Int'l.Law 1417 (1986)

"Judge Wilkey's Contributions to International Law and the Foreign Relations Law of the United States," 1985 B.Y.U. Law Rev. 647 (1985)

"Malcolm R. Wilkey: Jurist and Scholar," 19 Int'l Law. 1289 (1985)

"Congressional Controls on Presidential Trade Policymaking after INS v. Chadha," 18 N.Y.U.J.Int'l.L.& Pol. 1191 (1986)

"Equality with a Human Face: Justice Blackmun and the Equal Protection of Aliens," 8 Hamline Law Rev. 51 (1985)

Note, "The Constitutionality of Municipal Advocacy in Statewide Referendum Campaigns," 93 Harv.L.Rev. 535 (1980)

Case Comment, "Discovery from Media Defendants in Public Figure Defamation Actions: Herbert v. Lando," 93 Harv.L.Rev. 149 (1979)

**Selected Congressional Testimony**
Testimony before the Senate Judiciary Committee Subcommittee on the Constitution regarding Restoring the Rule of Law (September 16, 2008) Testimony before the House Foreign Relations Committee regarding "The 2006 Country Reports on Human Rights Practices and the Promotion of Human Rights in U.S. Foreign Policy" (March 29, 2007) Testimony before the Senate Committee on the Judiciary regarding "Hamdan v. Rumsfeld: Establishing a Constitutional Process" (July 11, 2006) Testimony before the Senate Committee on the Judiciary regarding "Wartime Executive Power and the National Security Agency's Surveillance Authority" (February 28, 2006) Testimony before the Senate Judiciary Committee regarding

"The Nomination of the Honorable Alberto R. Gonzales as Attorney General of the United States" (January 7, 2005) Testimony before the House Committee on International Relations regarding "A survey and analysis of supporting human rights and democracy: The U.S. record 2002–2003" (July 9, 2003) "United States Ratification of the Convention on the Elimination of All Forms of Discrimination Against Women," Hearing Before the U.S. Senate Foreign Relations Committee (June 13, 2002) "Human Rights in Turkey," Hearing before the Commission on Security and Cooperation in Europe, Washington, DC (March 9, 2000). "Country Reports on Human Rights Conditions," Testimony before the Subcommittee on International Operations and Human Rights, U.S. House of Representatives Washington, DC, (March 8, 2000). "The Global Problem of Trafficking in Persons: Breaking the Vicious Cycle," Hearing Before the House Committee on International Relations (Sept. 14, 1999) "Human Rights at the End of the 20th Century," Hearing before the Commission on Security and Cooperation in Europe; Washington, DC, (March 17, 1999). "Country Reports on Human Rights Conditions," Testimony "Country Reports on Human Rights Conditions," Testimony before the Subcommittee on International Operations and Human Rights, U.S. House of Representatives (March 3, 1999) "Human Rights in China," Testimony International Operations and Human Rights, U.S. House of Representatives, Washington DC (January 20, 1999) "U.S. Policy Toward Haiti": Hearing Before the Subcommittee on Western Hemisphere and Peace Corps Affairs of the Senate Committee on Foreign Relations, 103d Cong. 2d Sess. (Mar. 8, 1994) "The Nonrefoulement Reaffirmation Act of 1992," House Foreign Affairs Committee (June 11, 1992) "U.S. Human Rights Policy Toward Haiti," Hearing before Legislation and National Security Subocmmittee; House Government Operations Committee, 102nd Cong., 2nd Sess. 97 (April 9, 1992) "The Constitutional Roles of Congress and the President in Waging and Delcaring War," Senate Judiciary Committee (January 8, 1991) "Executive-Congressional Relations in a Multipolar World," Hearings Before the Senate Foreign Relations Committee, 101st Cong., 2d Sess. 92 (Nov. 26, 1990) Testimony on H.R. 3665, the Official Accountability Act, before the House Judiciary Committee, Subcommittee on Criminal Justice, (June 15, 1988)

**Selected Legal Activities:**

Amicus Brief of National Security Officials, IRAP v. Trump (DMd. 2017); Amicus Brief of National Security Officials, Darweesh v. Trump (EDNY 2017); Expert Witness Declaration of National Security Officials, Washington v. Trump (9th Cir. 2017); Foreign and Comparative Law Scholars, Hollingsworth v. Perry (U.S. S. Court 2014); Counsel for *amicus curiae* U.S. diplomats in *Sanchez-Llamas v. Oregon,* 126 S. Ct. 2669 (2006); *Medellin v. Dretke*, 544 U.S. 660, 687 (2005) (cert. dismissed as improvidently granted); *Roper v. Simmons* 543 U.S. 551 (2005), *Atkins v. Virginia,* 122 S. Ct. 2242 (No. 00-8452 decided June 20, 2002), Co-author, Law Professors= Letter to Senate Judiciary Committee Regarding Military Commission, December 5, 2001, available athttp://www.yale.edu/lawweb/liman/letterleahy.pdf Counsel for U.S. Diplomats Morton Abramowitz, et al, Amicus Curiae in McCarver v. North Carolina, No. 00-8727 (U.S. cert. Dismissed Sept. 25, 2001) (arguing that execution of those with mental retardation violates Eighth Amendment's cruel and unusual punishments clause); Consultant, United Nations High Commissioner on Refugees Global Consultations on reformation of the UN Refugee Convention, Cambridge University (Summer 2001); Co-founder (with Michael Ratner), Allard K. Lowenstein International Human Rights Clinic at Yale Law School (1991-) Counsel for respondents, Royal Dutch Petroleum Co. v. Ken Wiwa, et al., (U.S. S.Ct., No. 00-1168, cert. denied March 26, 2001) Of counsel and oralist for plaintiffs, Cuban-American Bar Ass'n v. Christopher, 43 F.3d 1413 (11th Cir. 1995) (For work done on this case, received 1994 Human Rights Award from Cuban-American Bar Ass'n) Lead counsel for plaintiffs, Sale v. Haitian Centers Council, Inc., 113 S.Ct. 2549 (1993), 823 F.Supp. 1028 (E.D.N.Y. 1993), and 969 F.2d 1326 (2nd Cir. 1992) (For work done on this case, recognized by Haiti 2004, Korean-American Alliance, Political Asylum Immigration Representation Project and as co-recipient, 1993 Justice in Action Award, Asian-American Legal Defense and Education Fund; Co-recipient, 1992 Human Rights Award, American Immigration Lawyers' Association; Asian Law Caucus) Co-counsel for petitioners, In re civilian population of Chiapas, Mexico and certain Members of the Ejercito Zapatista de Liberacion Nacional (Inter-American Commission on Human Rights) (filed January 27, 1994); In re Haitian population of Bahamas Co-counsel for plaintiffs, Doe v. Karadzic, 70 F. 3d 232 (1995); 176 F.R.D. 458 (S.D.N.Y. 1997) (represented from filing of complaint until 1998, when withdrew from representation to join U.S. government; after a two-week jury trial in September 2000, a jury awarded plaintiffs approximately $ 4.5 billion in compensatory and punitive damages)Greenpeace, Inc. (U.S.A.) v. France, 946 F. Supp. 773 (C.D. Cal. 1996);Paul v. Avril, 812 F. Supp. 207 (S.D. Fla. 1993) ($41 million judgment awarded); Todd v. Panjaitan, No 92-12255WD (D. Mass. decided October 25, 1994) ($14 million judgment awarded); Xuncax v. Gramajo, No.

91-11564WD (D.Mass., filed June 6, 1991); Ortiz v. Gramajo(D.Mass. 1992)($47.5 million judgment awarded); Doe v. Karadzic, 866 F. Supp. 734 (1994); No. 94-9035 (2d Cir. 1995); Belance v. FRAPH, No. 94-2619 (E.D.N.Y.) (Nickerson, J.) (For work done on Avril andGramajo cases, named as co-recipient, 1995 Trial Lawyer of the Year Award, by the Trial Lawyers for Public Justice). Amicus Curiae, U.S. Supreme Court, Argentine Republic v. Amerada Hess (1990); United States v. Alvarez-Machain, (1992); Nelson v. Saudi Arabia, No. 91-522 (1993); Jaffe v. Snow, No. 93-241 (1993); Trajano v. Marcos, 978 F.2d 493, 499¬500 (9th Cir. 1992), cert. denied, 113 S. Ct. 2960 (1993); No. 93-9133 Negewo v. Abebe-Jira, 11th Cir. 1995; Abebe-Jiri v. Negewo, No. 90-2010, Slip Op. at 7 (N.D. Ga. Aug. 20, 1993). Co-author (with ten other constitutional law scholars) of Memorandum Amicus Curiae of Law Professors in Ronald v. Dellums v. George Bush(D.D.C. 1990), reprinted in 27 Stanford Journal International Law 257 (1991); (with nine other constitutional law scholars) of Correspondence With Assistant Attorney General Walter Dellinger re Legality of United States Military Action in Haiti, reprinted in 89 American Journal International Law 127 (1995) Co-author (with David Cole and Jules Lobel), "Interpreting the Alien Tort Statute: Amicus Curiae Memorandum of International Law Scholars and Practitioners in Trajano v. Marcos," 12 Hastings Int'l & Comp. L. Rev. 1 (1988) (published Amicus Curiae Brief on behalf of nineteen international law scholars and practitioners in international human rights case). Co-author, Brief Amicus Curiae Urging Denial of Certiorari, Tel-Oren v. Libyan Arab Republic, reprinted in 24 I.L.M. 427 (1985) (as Justice Department Attorney) Litigation before Iran-U.S. Claims Tribunal, Case No. 55, Amoco Iran v. Islamic Republic of Iran (as Private Practitioner) Co-counsel for Iranian Hostages in Persinger v. Iran (D.C. Cir. 1982) and Cooke v. United States (Cl. Ct. 1982) (as Private Practitioner)

**Selected International Litigation and Arbitration:**
Counsel for Ukraine in *Case Concerning Application of the International Convention for the Suppression of the Financing of Terrorism and of the International Convention on the Elimination of All Forms of Racial Discrimination (Ukraine v. Russian Federation)* - Request for the Indication of Provisional Measures (argued March 6-9, 2017);  Counsel for Chile, *Obligation to Negotiate Acess to the Pacitic Ocean (Bolivia v. Chile),* Preliminary Objections (9/27/2016); Counsel for Uruguay in *Phillip Morris Brands Sarl v. Oriental Republic of Uruguay,* ICSID Case No. ARB/10/7, Award (July 8, 2016); Counsel for United States of America in *Advisory Opinion on the Accordance with International Law of the Unilateral Declaration of Independence In Respect of Kosovo,* 2010 ICJ Rep. 403 (July 22, 2010); Counsel for the United States of America in *Grand River Enterprises Six Nations, Ltd. v. United States of America,* UNCITRAL, Final Award (Jan. 12, 2011); and Counsel for the United States of America in *Ecuador v. U.S.* (PCA 2012), Counsel for the United States of America in *Apotex* (ICSID 2010), Counsel for United States in *Case A(15)(2)(a)* (Iran U.S. Claims Tribunal 2012); Arbitrator, Binational Dispute Settlement Panel Convened Under Chapter 19 of the U.S.-Canada Free Trade Agreement, No. U.S.A.-93-1904-05, *In re Certain Flat-Rolled Carbon Steel Products from Canada* (Nov. 4, 1994); Counsel for the applicant in *Amoco Iran (Case 55)* (Iran-U.S. Claims Tribunal 1987); Counsel for U.S., *Nicaragua v. United States*, Provisional Measures, 1986 I.C.J. 14 (as U.S. Justice Department Attorney).

**Selected Named Lectures:**
Vacketta-DLA Piper Lecture, University of Illinois College of Law (2017); Dickey Lecture, Dartmouth College (2017); Raoul Wallenberg Lecture, McGill University (2016); Thrower Lecture, Emory Law School (2016), 2016 Max Soerenson Lecture, Aarhus, Denmark; Justice Stephen Breyer Lecture on International Law, Brookings Institution, 2016; Frankel Lecture, University of Houston Law Center (2015); Clarendon Law Lectures (Oxford 2014); Oliver Smithies Lectures, Balliol College, Oxford (2013); Inaugural Thomas Bingham Lecture, Bingham Centre, London 2013; Inaugural International Law Lecture, U.K. Foreign and Commonwealth Office, 2013; Sir George F. Turner Lecture, 2013, Faculty of Law, University of Melbourne;  Benjamin Gupta Lecture, Oxford Human Rights Programme, 2013; 2013 George P. Smith Lecture, University of Indiana Maurer School of Law, 2013 Tamisiea Distinguished Lecture, University of Iowa College of Law; Ryan Lecture, Georgetown Law School 2011; Cecil Wright Lecture, University of Toronto School of Law (2002); Korematsu Lecture, New York University School of Law (2002); George Wythe Lecture, William and Mary College of Law (2002); Robert Levine Lecture, Fordham Law School 2002); Frank Strong Lecture, Ohio State University School of Law (2002); Barbara Harrell-Bond Lecture, Oxford University (2001); Edward Barrett Lecture, University of California at Davis School of Law (2001); Bruce Klatsky Lecture, Case Western Reserve University School of Law (2001); Richard Childress Lecture, St. Louis University School of Law (2001); Frankel Lecture, University of

Houston Law Center (1998); Harris Lecture, University of Indiana Law School (1998); Scuola Santa Anna (Pisa, Italy) (1997); Bartlett Lecture, Yale Divinity School (1997); Waynflete Lectures, Magdalen College, Oxford University (1996); Enrichment Lecturer, George Washington University National Law Center (1995); Scholar-in-Residence, Hofstra University (1995); Ralph Kharas Lecture, Syracuse University (1995); Mason Ladd Lecture, Florida State University (1995); 1995 Martin Luther King Lecture, Smithsonian Institution (1995); Roscoe Pound Lecture, University of Nebraska College of Law (1994); Emmanuel Emroch Lecture, University of Richmond Law School (1994); George Allen Distinguished Visiting Professor, University of Richmond Law School (1994); Roy R. Ray Lecture, Southern Methodist University School of Law (1994); William H. Leary Lecture, University of Utah Law School (1993); Convocation Lecturer, Duke Law School (1993); McGill Law School (1993); Gerber Lecture, University of Maryland (Baltimore) (1993).

**Selected Commencement Addresses:**
Yale Law School (1987, 1989, 2000, 2009), Skidmore College (2002); University of Connecticut School of Law (2000); Dickinson College (2000); Villanova Law School (2000); Touro College of Law (2000); Albertus Magnus College (1999); NYU Law School (1999); University of Maryland (Baltimore) School of Law (1995).

**Boards:** International Advisory Panel, National University of Singapore Law Faculty (2017); Secretary of State's Advisory Committee on Public International Law (1994-98, 2013-); Advisory Committee, Salzburg Global Seminar; Executive Committee, American Arbitration Association (2013-present); American Law Institute, Council (2013-); Brookings Institution Board of Directors (2004-); Connecticut Bar Foundation Board of Directors (2004- 05); Harvard University Overseer (2001-8); Visiting Committee, Harvard Law School (1996-2002); Visiting Committee, Harvard Kennedy School of Government (2007-); Visiting Committee, University of Toronto Faculty of Law (2004); Board of Directors, American Arbitration Association (2007-); Board of Directors, Human Rights in China (2002-5); Member of Council, American Law Institute (2006-); Counselor, American Society of International Law, Washington, DC (honorary post; 2008-); Thomas J. Dodd Research Center National Advisory Board (2001-); Board, National Democratic Institute (2001-); Board of Human Rights First (formerly Lawyers Committee for Human Rights) (2001-); Board of Human Rights in China (2001-); Board of International Campaign for Tibet (2001-); Human Rights Watch (1994-98); Hopkins School (1997-); Interights (1996-98); St. Thomas's Day School (1993-96); Connecticut Civil Liberties Union (1993-7); Initiative for Public Interest Law at Yale (Chair, 1988-90); East Rock Institute (Secretary); YLS Early Learning Center (Treasurer 1987-88).

**Bars:**
New York (1981); District of Columbia (1981); Connecticut (1985); U.S. Supreme Court (1985); U.S. Ct. App., Eleventh Circuit (1995); D.C. Circuit (1981); U.S. Dist. Ct., D.C. (1981); D. Conn. (1985); U.S. Claims Ct. (1983).

EXHIBIT C, PAGE 33