LUCIA E. COYOCA (SBN 128314)
  lec@msk.com
VALENTINE A. SHALAMITSKI (SBN 236061)
  vas@msk.com
DANIEL M. HAYES (SBN 240250)
  dmh@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone:  (310) 312-2000
Facsimile:  (310) 312-3100

Attorneys for Plaintiffs
Universal Cable Productions LLC and
Northern Entertainment Productions LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA -- WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, *et al.*,<br><br>                    Plaintiffs,<br><br>             v.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY,<br><br>                    Defendant. | CASE NO. 2:16-cv-4435-PA-MRW<br><br>The Honorable Percy Anderson<br><br>**DECLARATION OF LUCIA E. COYOCA IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Notice of Motion and Motion; Memorandum; Notice of Lodging Statement of Uncontroverted Facts and Conclusions of Law; Statement of Uncontroverted Facts and Conclusions of Law; Table of Contents of Evidence; Declarations of Andrea Garber, Kurt Ford, Randi Richmond, Matthew Levitt, Dennis Ross, Harold Koh, Ty and Sagalow; Request for Judicial Notice filed/lodged; and [Proposed] Order lodged concurrently herewith]<br><br>Date:          May 22, 2017<br>Time:          1:30 pm<br>Ctrm.:         9A, 1st St. Courthouse |

**COYOCA DECLARATION ISO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## DECLARATION OF LUCIA E. COYOCA

I, Lucia E. Coyoca, declare:

1.      I am an attorney duly licensed to practice law in the State of California and before this Court.  I am, through my professional corporation, a partner in the law firm of Mitchell Silberberg & Knupp LLP, attorneys of record for Plaintiffs Universal Cable Productions LLC ("UCP") and Northern Entertainment Productions LLC (collectively, "Plaintiffs") in the above-captioned matter.  I make this declaration in support of Plaintiffs' Motion For Partial Summary Judgment.  Unless otherwise indicated, I have personal knowledge of the following facts and, if called and sworn as a witness, could and would competently testify thereto.

2.      Attached hereto as **Exhibit 18** is a true and correct copy of Plaintiffs' First Amended Complaint in this action, filed July 7, 2016.

3.      Attached hereto as **Exhibit 19** is a true and correct copy of Defendant Atlantic Specialty Insurance Company's ("Atlantic") Answer to Plaintiffs' First Amended Complaint in this action, filed August 15, 2016.

4.      Attached hereto as **Exhibit 20** is a true and correct copy of a page from the OneBeacon website, available at http://www.onebeacon.com/OneBeacon/pages/corppolicies/underwriting_companies.page, accessed and downloaded at my direction on April 19, 2017.  This document was produced by UCP as UCP035239.

5.      Attached hereto as **Exhibit 21** is a true and correct copy of the U.S. Department of State's Foreign Terrorist Organizations list, available at http://www.state.gov/j/ct/rls/other/des/123085.htm and accessed and downloaded

1  at my direction on May 18, 2016.  This document was produced by UCP in this

2  action as UCP000162 – 000165.

3

4      6.      Attached hereto as **Exhibit 22** is a true and correct copy of the U.S.

   Department of Treasury's press release titled "U.S. Designates Five Charities

5  Funding Hamas and Six Senior Hamas Leaders as Terrorist Entities," available at

6  https://www.treasury.gov/press-center/press-releases/Pages/js672.aspx and

7  accessed and downloaded at my direction on December 22, 2016.  This document

8  was produced by UCP in this action as UCP000178 – 000182.

9

10     7.      Attached hereto as **Exhibit 23** is a true and correct copy of a U.S.

11 Department of State Fact Sheet, available at

12 http://www.state.gov/s/inr/rls/4250.htm and accessed and downloaded at my

13 direction on December 22, 2016.   This document was produced by UCP in this

14 action as UCP000183 – 000200.

15

16     8.      Attached hereto as **Exhibit 24** is a true and correct copy of a

   document produced by Atlantic in this action as ATL001547 – 1550 and attached

17 as Exhibit 29 to the deposition of Daniel Gutterman ("Gutterman Dep"), an email

18 chain between Wanda Phillips and Daniel Gutterman, with the most recent email

19 dated July 16, 2014.

20

21     9.      Attached hereto as **Exhibit 25** is a true and correct copy of the U.S.

22 Department of State Travel Warning regarding travel to Israel, The West Bank and

23 Gaza, as updated February 3, 2014, available from the Internet Archive at

24 https://web.archive.org/web/20140718040911/http://travel.state.gov/content/passp

25 orts/english/alertswarnings/israel-travel-warning.html and accessed and

26 downloaded at my direction on April 22, 2017.   This document was produced by

27 UCP in this action as UCP035240 – 035243.

28

**COYOCA DECLARATION ISO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

10.     Attached hereto as **Exhibit 26** is a true and correct copy of a U.S. Department of State Daily Press Briefing dated June 18, 2014, available at http://www.state.gov/r/pa/prs/dpb/2014/06/227816.htm and accessed and downloaded at my direction on May 18, 2016.   This document was produced by UCP in this action as UCP000201 – 000215.

11.     Attached hereto as **Exhibit 27** is a true and correct copy of a U.S. Department of State Daily Press Briefing dated June 30, 2014, available at http://www.state.gov/r/pa/prs/dpb/2014/06/228570.htm and accessed and downloaded at my direction on May 18, 2016.  This document was produced by UCP in this action as UCP000216 – 000229.

12.     Attached hereto as **Exhibit 28** is a true and correct copy of a U.S. Department of State Daily Press Briefing dated July 9, 2014, available at http://www.state.gov/r/pa/prs/dpb/2014/07/228980.htm and accessed and downloaded at my direction on May 18, 2016.  This document was produced by UCP in this action as UCP000166 – 000177.

13.     Attached hereto as **Exhibit 29** is a true and correct copy of a U.S. Department of State Daily Press Briefing dated July 8, 2014, available at http://www.state.gov/r/pa/prs/dpb/2014/07/228878.htm and accessed and downloaded at my direction on May 18, 2016.  This document was produced by UCP in this action as UCP000230 – 000245.

14.     Attached hereto as **Exhibit 30** is a true and correct copy of a transcript of the Daily Briefing by the Department of State Press Secretary dated July 8, 2014, available at https://www.whitehouse.gov/the-press-office/2014/07/08/daily-briefing-presssecretary-07082014 and accessed and downloaded at my direction on May 18, 2016.  This document was produced by UCP in this action as UCP000246 – 000273.

**COYOCA DECLARATION ISO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

15.     Attached hereto as **Exhibit 31** is a true and correct copy of a document produced by Aon in this action as AONNBCU0000128 – 0000130 and attached as Exhibit 10 to the Williams Dep., an email chain between Michael Arevalo, Susan Weiss, Peter Williams, and Deborah Kizner, with the most recent email dated July 15, 2014.

16.     Attached hereto as **Exhibit 32** is a true and correct copy of a U.S. Department of State Daily Press Briefing dated July 16, 2014, available at http://www.state.gov/r/pa/prs/dpb/2014/07/229360.htm and accessed and downloaded at my direction on May 18, 2016.  This document was produced by UCP in this action as UCP000279 – 000291.

17.     Attached hereto as **Exhibit 33** is a true and correct copy of a document produced by Atlantic in this action as ATL001077 – 001081 and attached as Exhibit 30 to the deposition of Daniel Gutterman ("Gutterman Dep"), an email chain between Pamela Johnson and Daniel Gutterman, with the most recent email dated July 16, 2014.

18.     Attached hereto as **Exhibit 34** is a true and correct copy of a document produced by Atlantic in this action as ATL001132 – 001137 and attached as Exhibit 11 to the deposition of Peter Williams ("Williams Dep"), an email chain between Peter Williams, Pamela Johnson and Daniel Gutterman (without attachment), with the most recent email dated July 16, 2014.

19.     Attached hereto as **Exhibit 35** is a true and correct copy of a September 19, 2014 letter from Pamela Johnson to me, produced by Atlantic in this action as ATL00705 – 00708 and attached as Exhibit 20 to the Gutterman Dep.

20.     Attached hereto as **Exhibit 36** is a true and correct copy of a sample insurance policy from OneBeacon for TULIP (event) coverage, available on the

4

OneBeacon website at https://www.onebeaconentertainment.com/sites/OneBeaconEntertainment/pdfs/tulip/Standard_TULIP_Policy.pdf, accessed and downloaded at my direction on April 14, 2017.  This document was produced by UCP in this action as UCP035244 – 035315.

21.    Attached hereto as **Exhibit 37** is a true and correct copy of the primary Merriam-Webster Dictionary definition of the term "war," available at https://www.merriam-webster.com/dictionary/war, and accessed and downloaded at my direction on April 23, 2017.  This document was produced by UCP in this action as UCP035316.

22.    Attached hereto as **Exhibit 38** is a true and correct copy of the Encyclopedia Britannica Online definition of the term "atomic bomb," available at https://www.britannica.com/technology/atomic-bomb, and accessed and downloaded at my direction on April 23, 2017.  This document was produced by UCP in this action as UCP035317 – 035326.

23.    Attached hereto as **Exhibit 39** is a true and correct copy of the U.S. Nuclear Regulatory Commission Glossary definition of the term "radioactivity," available at https://www.nrc.gov/reading-rm/basic-ref/glossary/radioactivity.html, and accessed and downloaded at my direction on April 23, 2017.  This document was produced by UCP in this action as UCP035327.

24.    Attached hereto as **Exhibit 40** is a true and correct copy of the U.S. Nuclear Regulatory Commission Glossary definition of the term "atomic energy," available at https://www.nrc.gov/reading-rm/basic-ref/glossary/atomic-energy.html, and accessed and downloaded at my direction on April 23, 2017.  This document was produced by UCP in this action as UCP035328.

**COYOCA DECLARATION ISO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

25.    Attached hereto as **Exhibit 41** is a true and correct copy of the article *How much did the September 11 terrorist attack cost America?*, available at http://www.iags.org/costof911.html, and accessed and downloaded at my direction on April 23, 2017.  This document was produced by UCP in this action as UCP035329 – 035330.

26.    Attached hereto as **Exhibit 42** is a true and correct copy of the article *Timeline: Terror Attacks Linked to Islamists Since 9/11*, available at http://graphics.wsj.com/terror-timeline-since-911/, and accessed and downloaded at my direction on April 23, 2017.  This document was produced by UCP in this action as UCP035331 – 035337.

27.    Attached hereto as **Exhibit 43** are true and correct copy of excerpts from the February 1, 2017 Deposition Transcript of Peter Williams.

28.    Attached hereto as **Exhibit 44** are true and correct copy of excerpts from the February 3, 2017 Deposition Transcript of Daniel Gutterman.

29.    Attached hereto as **Exhibit 45** are true and correct copy of excerpts from the February 8, 2017 Deposition Transcript of Theresa Gooley.

30.    Attached hereto as **Exhibit 46** are true and correct copy of excerpts from the April 18, 2017 Deposition Transcript of Andrea Garber.

31.    Attached hereto as **Exhibit 47** are true and correct copy of excerpts from the April 14, 2017 Deposition Transcript of Susan Weiss.

32.    Attached hereto as **Exhibit 48** is a true and correct copy of the Remarks of the President on Foreign Policy released by the Press Secretary of the White House dated July 16, 2014, available at , https://www.whitehouse.gov/the-press-office/2014/07/16/remarks-president-foreign-policy, and accessed and

6

downloaded at my direction on May 18, 2016.  This document was produced by UCP in this action as UCP00274 – 000278.

33.    Attached hereto as **Exhibit 49** is a true and correct copy of the U.S. Department of State travel warning entitled "Israel, The West Bank and Gaza Travel Warning" dated July 21, 2014, available at https://web.archive.org/web/20140724171638/http://travel.state.gov/content/passports/english/alertswarnings/israel-travelwarning.html, and accessed and downloaded at my direction on May 18, 2016.  This document was produced by UCP in this action as UCP00292 – 000295.

34.    Attached as **Exhibit 50** is a true and correct copy of the Hamas Founding Charter (1988), available at http://avalon.law.yale.edu/20th_century/hamas.asp, and accessed and downloaded at my direction on April 24, 2017.  This document was produced by UCP in this action as UCP035338 – 035346.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed April 24, 2017, at Los Angeles, California.

/S/Lucia E. Coyoca
Lucia E. Coyoca

7

# EXHIBIT 18

1  LUCIA E. COYOCA (SBN 128314)
      lec@msk.com
2  VALENTINE A. SHALAMITSKI (SBN 236061)
      vas@msk.com
3  MITCHELL SILBERBERG & KNUPP LLP
   11377 West Olympic Boulevard
4  Los Angeles, CA 90064-1683
   Telephone:  (310) 312-2000
5  Facsimile:  (310) 312-3100

6  Attorneys for Plaintiffs
   Universal Cable Productions LLC and
7  Northern Entertainment Productions LLC

8                  UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                        WESTERN DIVISION

11

12  UNIVERSAL CABLE                    CASE NO. 2:16-cv-04435-PA-MRW
    PRODUCTIONS LLC, a Delaware
13  limited liability company, and     **FIRST AMENDED COMPLAINT
    NORTHERN ENTERTAINMENT          FOR:**
14  PRODUCTIONS LLC, a Delaware     **(1)  BREACH OF INSURANCE
    limited liability company,          CONTRACT; AND
15                                   (2)  BREACH OF IMPLIED
                   Plaintiffs,          COVENANT OF GOOD FAITH
16                                      AND FAIR DEALING**
             v.
17                                   **DEMAND FOR JURY TRIAL**
    ATLANTIC SPECIALTY
18  INSURANCE COMPANY, a New
    York insurance company,
19
                   Defendant.
20

21

22        Plaintiffs in this action are Universal Cable Productions LLC, formerly

23  known as Universal Network Television LLC ("UCP"), and Northern

24  Entertainment Productions LLC ("Northern Entertainment").  (UCP and Northern

25  Entertainment are collectively referred to herein as "Plaintiffs.")  Plaintiffs, by and

26  through their counsel, aver as follows:

27

28

Mitchell
Silberberg &
Knupp LLP
7914943.1
                              1
                   **FIRST AMENDED COMPLAINT**

## <u>NATURE OF CLAIM</u>

1.      This is an insurance coverage action by Plaintiffs against their production insurer, Atlantic Specialty Insurance Company ("Atlantic" or "Defendant").  In the summer of 2014, UCP was filming a new television show "*Dig*" in Israel when Hamas (a group designated by the United States as a terrorist organization since 1997) began launching rockets into Israel from the Gaza Strip, as reported by the United States Department of State ("State Department").[1]  For the safety of cast and crew, UCP decided initially to postpone, and subsequently move the *Dig* production out of Israel.  UCP, through NBCUniversal Media, LLC ("NBCUniversal"), submitted a claim to Atlantic to cover the extra expenses it and Northern Entertainment incurred in connection with postponing and eventually moving the production.  Atlantic had a clear and unequivocal obligation under the terms of the Motion Picture/Television Producers Portfolio Policy No. MP00163-04 (the "Policy") to pay these extra expenses.  Despite this obligation, Atlantic chose instead to abandon its insured at this perilous time.  As NBCUniversal scrambled to protect the physical safety and well-being of its cast and crew, Atlantic wrongfully denied the claim, improperly contending that an exclusion for war or warlike action (the "war exclusion") precluded coverage.

2.      Atlantic's denial of the claim is a breach of the Policy.  The Policy covers loss sustained as a result of extra expense incurred due to interruption, postponement, or relocation (among things) of an Insured Production caused by "imminent peril."  Atlantic concedes the situation in Israel constituted imminent peril.  Thus, the only question is whether there is an applicable exclusion.

---

[1]  U.S. Department of State, Foreign Terrorist Organizations (available at http://www.state.gov/j/ct/rls/other/des/123085.htm); U.S. Department of State, Daily Press Briefing, Washington, DC, July 9, 2014 (available at http://www.state.gov/r/pa/prs/dpb/2014/07/228980.htm).  Unless otherwise indicated, all quoted and cited sources were last accessed on June 14, 2016.

Mitchell
Silberberg &
Knupp LLP

7914943.1

1    Significantly, acts of terrorism are not excluded under the Extra Expense or any
2    other coverage under the Policy.  And, Atlantic's position that the war exclusion
3    applies is contrary to the Policy's terms, applicable law, and foreign policy of the
4    United States of America.  In order for the exclusion to apply, under applicable
5    law, Atlantic must establish that the events in Israel constituted a war or war-like
6    activity between two sovereign or quasi-sovereign nations.  Under the political
7    question doctrine, only the United States government can recognize a sovereign
8    nation or government or, conversely, designate an entity a terrorist organization.
9    The United States government does not recognize the Gaza Strip as a sovereign
10   territorial nation, and does not recognize Hamas as a sovereign government.
11   Rather, the United States government has officially designated Hamas as a terrorist
12   organization.[2]  Nevertheless, Atlantic has ignored the United States government
13   position and applicable law.  It claims Hamas is a sovereign or quasi-sovereign
14   government over the Gaza Strip territory (even though Atlantic admits the Gaza
15   Strip is not a recognized sovereign nation), in a self-serving attempt to invoke the
16   war exclusion and avoid its coverage obligations.
17        3.     Tellingly, Atlantic initially *admitted* that an insured event under the
18   applicable Extra Expense coverage of the Policy had occurred and that the extra
19   expenses incurred in connection with the initial postponement of the *Dig*
20   production would be covered under the Policy.  However, when confronted with a
21   large pay out on the claim for relocation costs, even though Atlantic already had
22   conceded that an insured event had occurred and agreed to cover postponement
23   costs, it retracted its prior determination and denied the claim on the basis of the
24   war exclusion.
25        4.     NBCUniversal is the named insured under the Policy, and the indirect
26   parent of UCP and Northern Entertainment, which are also named insureds
27
28   [2] *Id.*

Mitchell
Silberberg &
Knupp LLP

7914943.1

3

FIRST AMENDED COMPLAINT

1   pursuant to the Policy terms.  NBCUniversal bargained for and paid substantial

2   premiums for the Policy so that it and its affiliated and subsidiary companies

3   would be covered when, like here, events beyond their control (including acts of

4   terrorism) affect one of their Insured Productions.

5        5.      Ultimately, Atlantic did not conduct an objective and fair evaluation

6   of the *Dig* claim based on the facts and circumstances giving rise to the claim, but

7   rather denied the claim because of the poor financial performance of the Policy and

8   the financial impact on Atlantic.  Thus, in denying the *Dig* claim, Atlantic chose to

9   favor its own financial interests over those of its insureds, a bad faith breach of its

10  obligations under the Policy.

11

12                          **THE PARTIES**

13  **A.    Plaintiffs**

14       6.      Plaintiffs UCP and Northern Entertainment are Delaware limited

15  liability companies, operating, *inter alia*, out of Universal City, California, and are

16  indirect subsidiaries of NBCUniversal, one of the world's leading media and

17  entertainment companies.  NBCUniversal is the first named insured in Item 1 of

18  the Declarations of the Policy.  Each of UCP and Northern Entertainment is a

19  "Named Insured" under the definition of the term as set forth in Section I.A of the

20  Policy.  In pertinent part Section I.A provides:  "Named Insured shall mean the

21  first named insured as per the Declarations and any majority owned or managed

22  subsidiaries thereof, their respective parent and affiliated companies and or any

23  financially controlled or managed organization(s) and or any production company

24  or other entity formed or contracted by the named insured or an [*sic*] other

25  organization, entity or person(s) which the named insured has agreed to insure

26  contractually."

27

28

Mitchell
Silberberg &
Knupp LLP

7914943.1

4

FIRST AMENDED COMPLAINT

**B.**    <u>Defendant</u>

7.    On information and belief, Atlantic is an insurance company organized under the laws of New York, with its principal place of business in Minnesota. On information and belief, Atlantic is an underwriting insurance company affiliated with, controlled by, and/or owned in whole or in part by OneBeacon Insurance Group, Ltd. ("OB"), a publicly traded company (NYSE: OB) domiciled in Bermuda. On information and belief, Atlantic is engaged in the business of underwriting specialized commercial insurance products which are issued to those engaged in the entertainment industry (among others), such as the motion picture/television production portfolio policy in question here, throughout the United States, including California and this District. Although Atlantic is the underwriter on the Policy, the Policy was administered by One Beacon Entertainment, LLC ("OBE"), which Plaintiffs are informed and believe is wholly owned by OB, either directly or indirectly.

8.    On information and belief, at all relevant times mentioned herein as pertinent to the wrongful acts alleged herein, OBE and OB were the agents of Atlantic and were acting within the course and scope of such agency.

**<u>JURISDICTION AND VENUE</u>**

**<u>Allegations regarding citizenship of UCP and Northern Entertainment</u>**

9.    This is a diversity lawsuit brought under 28 U.S.C. § 1332(a) and (c). Complete diversity exists because Plaintiffs UCP and Northern Entertainment, limited liability companies organized under the laws of the state of Delaware, are both citizens of Delaware and Pennsylvania by virtue of the citizenship of the

Mitchell
Silberberg &
Knupp LLP

7914943.1

1 entities in their chains of membership. The citizenship for diversity purposes of
2 each entity in Plaintiffs' membership chains is specifically set forth below.[3]

3 **Plaintiff UCP**

4      10.   The two members of UCP are NBCU Television Holding LLC and
5 New-U Studios LLC. For diversity purposes, each of NBCU Television Holding
6 LLC and New-U Studios LLC is a citizen of Delaware and Pennsylvania, based on
7 the citizenship of the entities in their membership chains, as set forth below:

8      a.   The sole member of NBCU Television Holding LLC is Universal
9      TV NewCo LLC. The three members of Universal TV NewCo
10      LLC are:

11      1.   Universal City Studios Productions LLLP, whose two
12      partners are:

13      a.   VUE NewCo LLC ("VUE"), whose two members are:

14      i.   USI Entertainment LLC,

15      1.   Whose sole member is Universal Studios
16      Company LLC,

17      a.   Whose sole member is NBCU Acquisition
18      Sub LLC,

19      i.   Whose sole member is
20      NBCUniversal. The membership of
21      NBCUniversal is set forth below in
22      paragraph 11. It establishes that for
23      diversity purposes, based on the
24      citizenship of the entities in its

25
26

---

27 [3] All limited liability companies (LLC) and a limited liability limited partnership (LLLP) listed
28 in paragraphs 9 through 12 are organized under the laws of the state of Delaware, except
Universal Television LLC, which is organized under the laws of the state of New York.

Mitchell
Silberberg &
Knupp LLP

7914943.1

6

FIRST AMENDED COMPLAINT

membership chain, NBCUniversal is a
citizen of Delaware and Pennsylvania.

    ii.    Universal Studios Company LLC,

        1.    Whose sole member is NBCU Acquisition Sub
LLC,

            a.    Whose sole member is NBCUniversal.
The membership of NBCUniversal is set
forth below in paragraph 11. It establishes
that for diversity purposes, NBCUniversal
is a citizen of Delaware and Pennsylvania,
based on the citizenship of the entities in
its membership chain.

        b.    VUE Holding LLC, whose sole member is VUE. The
membership of VUE is set forth above in paragraph
10.a.1.a. (membership chain up to NBCUniversal) and
below in paragraph 11 (as to membership chain of
NBCUniversal). Paragraphs 10.a.1.a. and 11 establish
that for diversity purposes, VUE is a citizen of Delaware
and Pennsylvania, based on the citizenship of the entities
in its membership chain.

    2.    USANi Holding Company LLC, whose sole member is
VUE. The membership of VUE is set forth above in
paragraph 10.a.1.a. (membership chain up to NBCUniversal)
and below in paragraph 11 (membership chain of
NBCUniversal). Paragraphs 10.a.1.a. and 11 establish that
for diversity purposes, VUE is a citizen of Delaware and
Pennsylvania, based on the citizenship of the entities in its
membership chain.

FIRST AMENDED COMPLAINT

Mitchell
Silberberg &
Knupp LLP

7914943.1

3.    New-U Studios LLC, whose sole member is VUE.  The membership of VUE is set forth above in paragraph 10.a.1.a. (membership chain up to NBCUniversal) and below in paragraph 11 (membership chain of NBCUniversal). Paragraphs 10.a.1.a. and 11 establish that for diversity purposes, VUE is a citizen of Delaware and Pennsylvania, based on the citizenship of the entities in its membership chain.

b.    The sole member of New-U Studios LLC is VUE.  The membership of VUE is set forth above in paragraph 10.a.1.a. (membership chain up to NBCUniversal) and below in paragraph 11 (membership chain of NBCUniversal).  Paragraphs 10.a.1.a. and 11 establish that for diversity purposes, VUE is a citizen of Delaware and Pennsylvania, based on the citizenship of the entities in its membership chain.

11.    The sole member of NBCUniversal is NBCUniversal, LLC.  The four members of NBCUniversal, LLC are:

a.    Comcast Navy Acquisition, LLC, whose sole member is Comcast Corporation, a corporation incorporated in Pennsylvania with its principal place of business in Pennsylvania and therefore, for diversity purposes, a citizen of Pennsylvania.

b.    Comcast Navy Contribution, LLC, whose six members are:

1.    E! Holdings, Inc., a corporation incorporated in Delaware with its principal place of business in Pennsylvania and therefore, for diversity purposes, a citizen of Delaware and Pennsylvania.

2.    Comcast Contribution Holdings, LLC, whose sole member is Comcast Corporation, a corporation incorporated in Pennsylvania with its principal place of business in

Mitchell
Silberberg &
Knupp LLP

7914943.1

8

FIRST AMENDED COMPLAINT

1    Pennsylvania and therefore, for diversity purposes, a citizen

2    of Pennsylvania.

3    3.    Versus Holdings, LLC, whose two members are:

4          i.    Comcast Holdings Corporation, a corporation

5                incorporated in Pennsylvania with its principal place

6                of business in Pennsylvania and therefore, for

7                diversity purposes, a citizen of Pennsylvania; and

8          ii.   E! Holdings, Inc., a corporation incorporated in

9                Delaware with its principal place of business in

10               Pennsylvania and therefore, for diversity purposes, a

11               citizen of Delaware and Pennsylvania.

12   4.    Comcast CHC, LLC, whose sole member is Comcast

13         Holdings Corporation, a corporation incorporated in

14         Pennsylvania with its principal place of business in

15         Pennsylvania and therefore, for diversity purposes, a citizen

16         of Pennsylvania.

17   5.    Comcast SportsNet New England Holdings, LLC, whose

18         two members are:

19         i.    Comcast SportsNet NE Holdings, Inc., a corporation

20               incorporated in Delaware with its principal place of

21               business in Pennsylvania and therefore, for diversity

22               purposes, a citizen of Delaware and Pennsylvania;

23               and

24         ii.   CSNNE Partner, LLC, whose sole member is

25               Comcast Holdings Corporation, a corporation

26               incorporated in Pennsylvania with its principal place

27               of business in Pennsylvania and therefore, for

28               diversity purposes, a citizen of Pennsylvania.

Mitchell
Silberberg &
Knupp LLP

7914943.1

9

FIRST AMENDED COMPLAINT

6.      Comcast SportsNet Philadelphia Holdings, LLC, whose two members are:

     i.      Comcast Spectacor Holding Company, Inc., a corporation incorporated in Delaware with its principal place of business in Pennsylvania and therefore, for diversity purposes, a citizen of Delaware and Pennsylvania; and

     ii.      Comcast Holdings Corporation, a corporation incorporated in Pennsylvania with its principal place of business in Pennsylvania and therefore, for diversity purposes, a citizen of Pennsylvania.

c.      NBCUniversal Enterprise, Inc., a corporation incorporated in Delaware with its principal place of business in Delaware and therefore, for diversity purposes, a citizen of Delaware.

d.      SNL Entertainment Holdings, Inc., a corporation incorporated in Delaware with its principal place of business in Delaware and therefore, for diversity purposes, a citizen of Delaware.

**Plaintiff Northern Entertainment**

12.      The sole member of Northern Entertainment is Universal Television LLC. For diversity purposes, Universal Television LLC is a citizen of Delaware and Pennsylvania because:

a.      The sole member of Universal Television LLC is NBCUniversal. The membership of NBCUniversal is set forth above in paragraph 11. It establishes that for diversity purposes, based on the citizenship of the entities in its membership chain, NBCUniversal is a citizen of Delaware and Pennsylvania.

Mitchell Silberberg & Knupp LLP

7914943.1

10

FIRST AMENDED COMPLAINT

13.     On the other hand, Defendant Atlantic is a citizen of New York and Minnesota.  Thus, complete diversity exists.  Furthermore, the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## THE INSURANCE POLICY AND THE INSURED *DIG* PRODUCTION

14.     UCP's television series entitled *Dig* is set predominantly in Jerusalem. *Dig* is about an American FBI agent based in Jerusalem whose investigation of an American's death in Jerusalem leads to the discovery of a two thousand year-old conspiracy.  The ten-episode season of *Dig* premiered in the United States in March 2015 on the USA cable network.

15.     The series, created by award-winning Israeli director and screenwriter Gideon Raff (who created *Homeland* and *Tyrant*) and American television producer and screenwriter Tim Kring (who created *Heroes*), had been in development for a substantial period of time prior to its premiere.  As early as about 2013, UCP announced that *Dig* would be set and filmed in and around Jerusalem and Tel Aviv, and would begin production in 2014.

16.     Atlantic issued the Policy to NBCUniversal for the policy period effective from January 11, 2014, to June 30, 2015.  The Policy covers losses that NBCUniversal and other Named Insureds, such as UCP and Northern Entertainment, might incur associated with their television productions (among other productions), with specific coverage provisions for risks relating to cast, negative film, extra expense due to, *inter alia*, imminent peril, property, and third party property damage losses.  NBCUniversal paid a substantial premium for the Policy, which also contains a self-insured retention.

17.     The Policy was a renewal of policies which NBCUniversal obtained from Atlantic in prior years (and for which NBCUniversal paid millions of dollars in premiums):  i.e., Policy No. MP00163-03 (effective from January 11, 2013, to January 11, 2014); Policy No. MP00163-02 (effective from January 11, 2012, to

Mitchell
Silberberg &
Knupp LLP

7914943.1

11

January 11, 2013); Policy No. MP00163-01 (effective from January 11, 2011, to January 11, 2012); and Policy No. MP00163-00 (effective from January 11, 2010, to January 11, 2011).

18.    The provision of the Policy relevant here, the "Extra Expense" coverage, covers losses associated with, among other things, unanticipated expenses incurred in connection with the postponement and relocation of production.

19.    The relevant provision of the Policy provides as follows:

**"I.  INSURING AGREEMENT**

We [Atlantic] agree to pay to you such loss (as defined in Paragraph VII) not including loss of earnings or profit, as you sustain by reason of such extra expense you necessarily incur as a result of the interruption, postponement, cancellation, relocation, curtailment or abandonment of an Insured Production due to the following:

1.    The loss must be a direct result of an unexpected, sudden or accidental occurrence entirely beyond your control to include: …

g)  Imminent peril, defined as certain, immediate and impending danger of such probability and severity to person or property that it would be unreasonable or unconscionable to ignore.

h)  Any expenses incurred to avoid a loss resulting from imminent peril are covered to the extent that they serve to avoid a loss otherwise covered."

Mitchell Silberberg & Knupp LLP

7914943.1

12

FIRST AMENDED COMPLAINT

EXHIBIT 18, PAGE 19

1   Policy, Section III – Extra Expense, § I (a true and correct copy of the Policy is

2   attached hereto as Exhibit A).

3       20.   Thus, the Policy covers *all* loss incurred as Extra Expense if an

4   Insured Production is interrupted, cancelled, postponed or relocated due to

5   imminent peril.  While there is no express coverage provision for terrorism, and

6   indeed the word "terrorism" is not defined in the Policy, the Policy *does* cover all

7   Extra Expense losses that may occur as a result of "imminent peril."  In its July 28,

8   2014 coverage position letter, Atlantic agreed the losses UCP sustained as a result

9   of the acts occurring in Israel during the summer of 2014 did result from

10  "imminent peril" as that term is defined in Section III, the Extra Expense coverage

11  of the Policy.

12      21.   The *Dig* production was added as an Insured Production under the

13  Policy in or about January 2014.  Production of the *Dig* 90-minute pilot episode

14  commenced on or about June 1, 2014 and was completed on June 26, 2014.  The

15  show then went on hiatus while pre-production and preparation for filming of the

16  next nine episodes occurred, with production of the next nine episodes scheduled

17  to begin on July 20, 2014.

18

19              **EVENTS LEADING UP TO THE CLAIM**

20      22.   The events occurring in Israel during the summer of 2014 have been

21  the subject of numerous State Department reports and travel advisory warnings.

22  As described by the United States government, Hamas (a.k.a. Harakat

23  al-Muqawama al-Islamiya, or the Islamic Resistance Movement) had in the past

24  conducted numerous anti-Israeli attacks, "including shootings, suicide bombings,

25  and standoff mortar-and-rocket attacks against civilian and military targets."[4]  The

26  _____

27  [4]  U.S. Department of Treasury, U.S. Designates Five Charities Funding Hamas
    and Six Senior Hamas Leaders as Terrorist Entities (available at
28  https://www.treasury.gov/press-center/press-releases/Pages/js672.aspx).

Mitchell
Silberberg &
Knupp LLP

7914943.1

13

FIRST AMENDED COMPLAINT

EXHIBIT 18, PAGE 20

1  United States government, currently and at all relevant times, has designated

2  Hamas as a foreign terrorist organization and has never recognized Hamas as a

3  sovereign government.[5]  Moreover, the United States government does not

4  recognize the Gaza Strip as a sovereign territorial nation.[6]

5        23.    According to a State Department Daily Press Briefing, on or about

6  June 12, 2014, three Israeli "teenagers were kidnapped" with "many signs that

7  point to Hamas involvement."[7]  On or about June 30, 2014, "the bodies of the three

8  kidnapped teenagers" were found, and there were reports "indicat[ing] that Hamas

9  was involved."[8]  Shortly thereafter, according to a White House Daily Press

10  Briefing, Israel began taking affirmative action to protect its security interests[9] and,

11  according to a July 9, 2014 State Department Daily Press Briefing, Hamas began

12  launching rockets from Gaza into Israel.[10]

13        24.    As a result of these events, when questioned about the situation in

14  Israel during a State Department Daily Press Briefing, the State Department

15  spokesperson indicated the government's concerns about "the safety and security

16  of civilians"[11] in and around Israel and Jerusalem, where certain *Dig* filming was

17

18  [5]  U.S. Department of State, Foreign Terrorist Organizations (available at http://www.state.gov/j/ct/rls/other/des/123085.htm).

19  [6]  U.S. Department of State, Independent States in the World (available at http://www.state.gov/s/inr/rls/4250.htm).

20
21  [7]  U.S. Department of State, Daily Press Briefing, Washington, DC, June 18, 2014 (available at http://www.state.gov/r/pa/prs/dpb/2014/06/227816.htm).

22  [8]  U.S. Department of State, Daily Press Briefing, Washington, DC, June 30, 2014 (available at http://www.state.gov/r/pa/prs/dpb/2014/06/228570.htm).

23
24  [9]  White House Daily Press Briefing, July 8, 2014 (available at https://www.whitehouse.gov/the-press-office/2014/07/08/daily-briefing-press-secretary-07082014).

25  [10]  *Id.* and *e.g.*, U.S. Department of State, Daily Press Briefing, Washington, DC, July 9, 2014 (available at http://www.state.gov/r/pa/prs/dpb/2014/07/228980.htm).

26  [11]  *E.g.*, U.S. Department of State, Daily Press Briefing, Washington, DC, July 8, 2014 (available at http://www.state.gov/r/pa/prs/dpb/2014/07/228878.htm).  *See also* The White House, Daily Briefing by the Press Secretary, July 8, 2014 (same) (available at https://www.whitehouse.gov/the-press-office/2014/07/08/daily-briefing-press-secretary-07082014).

27

28

1  scheduled to take place.  Thus, on or about July 11, 2014, UCP decided to

2  postpone production of the *Dig* episodes which had been scheduled to resume on

3  July 20, 2014.  The crew was alerted on that same date that production was being

4  "pushed," and that their services would not be required the following week.

5      25.    Also on or about July 11, 2014, NBCUniversal advised OBE that due

6  to the circumstances and concomitant safety concerns for cast and crew members,

7  production of the show was being postponed.  On that same date, NBCUniversal

8  also advised Atlantic through its agent, OBE, that should conditions in Israel

9  continue to deteriorate and/or not improve, UCP might be compelled to move the

10 *Dig* production to another location.

11     26.    While UCP would have been justified if it had moved the production

12 earlier or immediately due to safety concerns, UCP initially decided to postpone

13 the production to see if the situation would improve.  At the time NBCUniversal

14 informed OBE of the initial postponement, OBE, as Atlantic's agent, told

15 NBCUniversal that the expenses associated with the postponement would be

16 covered under the Extra Expense coverage of the Policy.

17     27.    On or about July 16, 2014, during a State Department Daily Press

18 Briefing, the State Department spokesperson said "right now the potential we're

19 looking at is … an even greater escalation of violence" in and around Israel.[12]

20 Faced with the prospect of escalated violence, UCP decided to move the *Dig*

21 production out of Jerusalem and Israel, and NBCUniversal promptly advised OBE

22 of the intent to relocate the production.[13]  The production of *Dig* was ultimately

23 completed in Croatia and the State of New Mexico.

24 _____

25 [12]  U.S. Department of State, Daily Press Briefing, Washington, DC, June 16, 2014
   (available at http://www.state.gov/r/pa/prs/dpb/2014/07/229360.htm).  *See also*
   The White House, Remarks by the President on Foreign Policy, July 16, 2014

26 ("Hamas continued to fire rockets at civilians, thereby prolonging the conflict.")
   (available at https://www.whitehouse.gov/the-press-office/2014/07/16/remarks-

27 president-foreign-policy).

28 [13]  In fact, on July 21, 2014, the State Department issued an official Travel Warning
   advising that "U.S. citizens consider the deferral of non-essential travel to Israel

                                                    (…continued)

Mitchell
Silberberg &
Knupp LLP

7914943.1

15

28.     The postponement and subsequent relocation of the *Dig* production came at great additional expense to Plaintiffs, in an amount to be proved at trial, but which exceeds $6.9 million.  This expense falls squarely within the definition of the Extra Expense coverage under the Policy.

## ATLANTIC WRONGFULLY DENIES THE EXTRA EXPENSE CLAIM

29.     At all pertinent times, Plaintiffs through NBCUniversal properly tendered and submitted the claim at issue to Atlantic through OBE, Atlantic's agent and administrator of the Policy.  In addition to the discussion on July 11, 2014 referenced above in paragraph 22, on or about July 15, 2014, Aon/Albert G. Ruben Insurance Services, Inc. (NBCUniversal's broker) tendered the claim to OBE as Atlantic's agent providing notice as to the losses that Plaintiffs had incurred or would incur in connection with the delay, postponement, and eventual relocation of the *Dig* production out of Israel (the "*Dig* Claim").  On or about July 16, 2014, OBE acknowledged receipt of the *Dig* Claim on Atlantic's behalf.

**A.     Defendant Atlantic Relies On Inapplicable Exclusions**

30.     On or about July 28, 2014, Pamela Johnson of OBE responded to the *Dig* Claim on Atlantic's behalf.  As indicated above in paragraph 17, Johnson admitted that the *Dig* Claim constituted an "imminent peril" and therefore triggered the Extra Expense coverage under Section III of the Policy.

31.     However, despite OBE's earlier admission that an insured event had occurred and the expenses associated with the postponement would be covered under the Extra Expense coverage of the Policy, Johnson now indicated the *Dig*

---

(…continued)
and to the West Bank" and "against any travel to the Gaza Strip."  U.S. Department of State, Israel, The West Bank and Gaza Travel Warning, July 21, 2014 (available at https://web.archive.org/web/20140724171638/ http://travel.state.gov/content/passports/english/alertswarnings/israel-travel-warning.html).

Mitchell
Silberberg &
Knupp LLP

7914943.1

16

FIRST AMENDED COMPLAINT

1    claim was *not* covered because of the war exclusion (although as a "courtesy" to

2    NBCUniversal Atlantic would pay the initial postponement costs through July 17).

3        32.    The war exclusion is set forth in the Motion Picture Television

4    Portfolio General Conditions, § III.  That exclusion is clearly inapplicable here.

5    Based on controlling law, the war exclusion applies solely in the event the acts at

6    issue are between sovereign or quasi-sovereign nations.  Here, the United States

7    government does not recognize Hamas as a sovereign government or the Gaza

8    Strip as a separate sovereign territorial nation.  And, under applicable law, Hamas

9    is not a quasi-sovereign nation, but rather an entity that the United States

10   government has officially designated as a terrorist organization.

11       33.    Here, Atlantic concedes the losses sustained were a result of imminent

12   peril.  If the acts involved meet the definition of a grant of coverage under the

13   Insuring Agreement of the Policy, then it is covered, unless an exclusion applies.

14   Significantly, there is no terrorism exclusion in the Policy, and indeed, the word

15   "terrorism" is not a defined term.  Therefore, the only exclusion on which Atlantic

16   can (and did) use to try to justify its denial of coverage is the war exclusion.

17       34.    Atlantic's unmeritorious position that it does not have to pay the *Dig*

18   Claim is a breach of the Policy terms.  Atlantic is required to pay *all* losses

19   associated with the *Dig* Claim under the Extra Expense coverage of the Policy, and

20   there is no applicable exclusion.  Despite NBCUniversal's numerous requests,

21   however, Atlantic has failed and refused to pay the *Dig* Claim.  Following

22   Atlantic's July 28, 2014 denial of the *Dig* Claim, NBCUniversal requested on

23   numerous occasions that Atlantic reconsider its position.  Atlantic, however,

24   repeatedly refused to change its position.  Atlantic's breach of contract forced

25   Plaintiffs to pay all of the expenses and costs associated with the delay,

26   postponement, and relocation of the production from Israel to Croatia and New

27   Mexico in order to complete production of the series.

28

## B.   **Defendant Atlantic Misrepresents the Terms of the Policy**

35.   In addition to denying the claim based on an inapplicable exclusion, Atlantic also misrepresented the terms of the Policy by contending there was no coverage for acts of terrorism, relying on a wholly inapplicable endorsement.  In Johnson's July 28, 2014 letter to NBCUniversal articulating the reasons why Atlantic believed the claim was not covered, Johnson argued "the terrorism coverage should not apply," because the focus of the acts "is not the United States or its policy" and "the U.S. Secretary of the Treasury has not certified the [Hamas/Israel] events as acts of terrorism."

36.   Atlantic's position as articulated by Johnson is based on an endorsement to the Policy titled "Coverage for Certified Acts of Terrorism; Cap on Losses" (the "Endorsement").  In pertinent part, the Endorsement provides that "any *exclusion* of terrorism in this Coverage Part or Policy … is hereby amended to the effect that such exclusion does not apply to a 'certified act of terrorism.'" *See* Coverage for Certified Acts of Terrorism; Cap on Losses, § A.  (Emphasis added.)  Since the Endorsement *only* applies if there is an exclusion for terrorism in the Policy, it is inapplicable here because this Policy does not have a terrorism exclusion.

37.   On its face it is apparent that the Endorsement does not apply here. The Endorsement defines a "certified act of terrorism" as:

"… an act that is certified by the Secretary of Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002.  The criteria contained in that act for a "certified act of terrorism" include the following:

1.   The act resulted in aggregate losses in excess of $5 million; and

2.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or

Mitchell
Silberberg &
Knupp LLP

7914943.1

18

FIRST AMENDED COMPLAINT

individuals acting on behalf of any foreign person or foreign interest,
as part of an effort to coerce the civilian population of the United
States or to influence the policy or affect the conduct of the United
States Government by coercion."

*See* Policy, Endorsement titled "Coverage for Certified Acts of Terrorism; Cap on
Losses." The purpose of the Endorsement is to cap the losses Atlantic would have
to pay that resulted from certified acts of terrorism, consistent with the Terrorism
Risk Insurance Act of 2002, which was enacted in the aftermath of 9/11. In short,
the Endorsement amends *any policy exclusions for terrorism*, to allow coverage for
"certified acts of terrorism." It does not provide that only certified acts of
terrorism are covered. Moreover, since there is no terrorism exclusion in the
Policy, it is patently clear the Endorsement is inapplicable to the *Dig* Claim.

38. By invoking the Endorsement to deny coverage for the *Dig* Claim,
Atlantic misrepresented the terms of the Policy in at least three material ways:

> (a) The Policy does *not* contain *any* exclusion for losses caused by
> terrorist acts and, therefore, the Endorsement cannot operate to
> exclude coverage, regardless of whether the Hamas/Israel
> events are "certified acts of terrorism" as defined in the Policy
> or undefined acts of terrorism;

> (b) The Endorsement expressly modifies only specific types of
> coverage listed in the Endorsement (e.g., Boiler and Machinery
> Coverage Part, Commercial Crime Coverage Form) and,
> therefore, by its express terms, the Endorsement does not
> modify or apply to the Extra Expense coverage at issue here;
> and,

> (c) The Endorsement does *not* provide that only "certified acts of
> terrorism" are covered under the Policy; instead, it merely caps
> Atlantic's liability for "certified acts of terrorism" in

EXHIBIT 18, PAGE 26

accordance with the provisions of the Terrorism Risk Insurance Act of 2002.

**C.**     **Defendant Atlantic Places Its Interests Over Those of Its Insureds**

39.     Plaintiffs are informed and believe, and on that basis allege, that Atlantic's wrongful conduct as alleged herein was motivated by Atlantic's own financial interests and concerns, rather than Atlantic's coverage obligations based on the terms of the Policy.

40.     Among other things, shortly after the *Dig* Claim was tendered, NBCUniversal and/or its affiliate and subsidiary companies also insured under the Policy suffered other, unrelated losses that fell within the Policy's scope of coverage.  The *Dig* Claim paired with these new claims meant that Atlantic would be obligated to make substantial claim payments during that Policy year because the self-insured retention had now been met.

41.     Once it became apparent Atlantic would have to pay out on the Policy in an amount that would exceed the premiums earned from insuring NBCUniversal over the past several years, NBCUniversal is informed and believes Atlantic made the decision not to renew NBCUniversal's Policy, and thus it was no longer in Atlantic's interest to pay any amount on the *Dig* Claim.  Even though Atlantic had initially agreed an insured event had occurred and that it would pay for the initial *Dig* postponement costs, it changed its position and asserted the war or war related exclusion applied to preclude coverage for the entire claim (although as a "courtesy" it remained willing to pay six days' worth of postponement costs).  In so doing, Atlantic chose to favor its own financial interests over those of its insureds in bad faith breach of its obligations under the Policy.

Mitchell
Silberberg &
Knupp LLP

7914943.1

20

FIRST AMENDED COMPLAINT

EXHIBIT 18, PAGE 27

# FIRST CLAIM

## (Breach of Insurance Contract)

42.    Plaintiffs incorporate by reference each of the allegations set forth in Paragraphs 1 through 41 above, as though set forth fully herein.

43.    Atlantic issued the Policy at issue effective as of January 1, 2014, to June 30, 2015, the material terms of which are set forth above and a copy of which is attached hereto as Exhibit A.  In exchange for the Policy, all required premiums were paid.

44.    Atlantic was obligated to pay the losses that Plaintiffs incurred as a result of the *Dig* Claim under the Extra Expense coverage.

45.    Plaintiffs performed all terms, conditions, and covenants required to be performed on their part under the Policy, except as such performance was excused, rendered impossible, impracticable, and/or futile, by the acts and omissions of Atlantic.

46.    At all relevant times and to the present, Atlantic has breached and continues to breach the Policy by failing and refusing to accept and pay the *Dig* Claim.  Among other things, Atlantic wrongfully misinterpreted and misapplied the war exclusion.  Ignoring applicable law, Atlantic erroneously contends Hamas is a sovereign or quasi-sovereign entity, which engaged in hostilities with Israel, a sovereign nation, to justify its wrongful application of the "war" or "warlike action" exclusions to the *Dig* Claim.

47.    As a direct and proximate result of the foregoing breaches, Plaintiffs have suffered damages in an amount to be proved at trial, but which amount is at least $6.9 million, for the costs and expenses Plaintiffs incurred in postponing and relocating the *Dig* production out of Jerusalem and Israel, plus pre-judgment interest thereon.

Mitchell Silberberg & Knupp LLP

7914943.1

EXHIBIT 18, PAGE 28

## SECOND CLAIM

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

48.     Plaintiffs incorporate by reference each of the allegations set forth in Paragraphs 1 through 47 above, as though set forth fully herein.

49.     The Policy contains an implied covenant of good faith and fair dealing requiring Atlantic, the insurer, to act reasonably and in good faith and refrain from any conduct that would deprive Plaintiffs, insureds under the Policy, of the benefits of the Policy, including Plaintiffs' right to receive full and prompt payment of the Extra Expense losses covered by the Policy.

50.     Plaintiffs performed all terms, conditions, and covenants to be performed on their part under the Policy, except as such performance was excused and/or rendered impossible, impracticable, and/or futile by the acts and omissions of Atlantic.

51.     Atlantic failed to deal fairly and in good faith with Plaintiffs by, among other things, misinterpreting the Policy's terms to justify its application of an inapplicable war exclusion, failing to evaluate the *Dig* Claim objectively, misrepresenting Policy terms, and unreasonably, arbitrarily, and willfully withholding and denying Plaintiffs the benefits provided under the Policy.

52.     Specifically, without limitation, Atlantic has engaged in the following unreasonable, arbitrary, and/or bad faith conduct:

        A.     <u>Denying benefits due</u>:  Despite OBE's admission that an insured event had occurred and the initial expenses associated with the postponement of the *Dig* production would be covered, Atlantic reneged, and failed and refused to pay the losses associated with the relocation of the *Dig* production, thereby depriving Plaintiffs of the benefit under the Policy such that if losses occurred, production could continue uninterrupted;

Mitchell
Silberberg &
Knupp LLP

7914943.1

B.    <u>Applying an inapplicable exclusion to deny the claim</u>:  Atlantic

denied that the *Dig* Claim was covered under the Extra Expense

coverage of the Policy by wrongfully claiming that the war

exclusion applied;

C.    <u>Misrepresenting the Policy terms</u>:  Atlantic misrepresented the

terms of the Policy to its insureds, specifically including but not

limited to the statements made regarding the Endorsement

entitled "Coverage for Certified Acts of Terrorism; Cap on

Losses" in an effort to avoid its obligation to pay losses on the

*Dig* Claim, which also constitutes a violation of Cal. Ins. Code

§ 790.03(a) and (h)(1) as unfair and deceptive acts or practices

in the business of insurance;

D.    <u>Failing to evaluate the claim objectively</u>:  Atlantic favored its

own financial interests above those of its insureds by basing its

decision to deny the *Dig* Claim on, among other things, the

overall financial performance of Atlantic's insurance

relationship with its insureds and the resulting financial impact

on Atlantic, rather than objectively evaluating the *Dig* Claim

based solely on the facts and circumstances giving rise to the

Claim;

E.    <u>Interpreting the Policy and law unreasonably and arbitrarily</u>:

Atlantic wrongfully attempted to justify its application of the

war exclusion by unreasonably and arbitrarily interpreting

applicable law and ignoring the political question doctrine, the

designation of Hamas as a terrorist organization by the United

States government, the government's refusal to recognize

Hamas as a sovereign government or the Gaza Strip as a

Mitchell
Silberberg &
Knupp LLP

7914943.1

23

FIRST AMENDED COMPLAINT

1  sovereign state, and applicable law as to what constitutes a

2  quasi-sovereign entity;

3  F.   <u>Failing to investigate the claim objectively and thoroughly</u>:

4  Atlantic failed to conduct a thorough, fair, adequate, and

5  objective investigation and analysis of the *Dig* Claim, which

6  also constitutes a violation of Cal. Ins. Code § 790.03(h)(3) and

7  10 Cal. Code Regs. § 2695.7(d) as unfair and deceptive acts or

8  practices in the business of insurance; and

9  G.   <u>Failing to objectively reconsider its denial of the claim</u>:

10  Atlantic failed to objectively reconsider its denial of the *Dig*

11  Claim despite multiple requests that it do so based on the

12  political question doctrine, the pronouncements of the United

13  States government as to Hamas' status as a terrorist

14  organization, the government's refusal to recognize the Gaza

15  Strip as a separate sovereign state or Hamas as a sovereign

16  government, and applicable law as to what constitutes a quasi-

17  sovereign entity.

18  53.   As a direct and proximate result of the foregoing breaches and

19  wrongful conduct, Plaintiffs have suffered damages in an amount to be proved at

20  trial, but which amount is at least $6.9 million, for the costs and expenses Plaintiffs

21  incurred in postponing and relocating the *Dig* production out of Jerusalem and

22  Israel, plus pre-judgment interest thereon.

23  54.   As a further direct and proximate result of the foregoing breaches and

24  wrongful conduct, Plaintiffs are entitled to recover from Atlantic the attorneys'

25  fees and other costs incurred by them to establish their right to receive

26  reimbursement for the *Dig* Claim as alleged herein.

27  55.   Plaintiffs are informed and believe, and on that basis allege, that

28  Atlantic's wrongful conduct as alleged herein was done willfully and with the

Mitchell
Silberberg &
Knupp LLP

7914943.1

24

FIRST AMENDED COMPLAINT

1 deliberate intent to injure, vex, and annoy Plaintiffs, and/or in conscious disregard

2 of Plaintiffs' rights so as to constitute fraud, oppression, and/or malice, thereby

3 entitling Plaintiffs to recover exemplary and punitive damages from Atlantic in an

4 amount to be determined by the trier of fact.

5                                  **PRAYER**

6          WHEREFORE, Plaintiffs pray for judgment against Atlantic as follows:

7          1.      On the First and Second Claims, for compensatory damages according

8 to proof, but in no event less than $6,900,000;

9          2.      On the Second Claim, for exemplary, consequential, and punitive

10 damages according to proof;

11         3.      For attorneys' fees and costs of suit incurred herein to compel

12 payment of the Policy's benefits in accordance with law;

13         4.      For prejudgment interest in accordance with law;

14         5.      For costs of suit incurred herein; and

15         6.      For such other and further relief as the Court may deem just and

16 proper.

17

18 DATED: July 7, 2016                LUCIA E. COYOCA
                                     VALENTINE A. SHALAMITSKI
19                                   MITCHELL SILBERBERG & KNUPP LLP

20

21                                   By: s/ Lucia E. Coyoca
22                                        Lucia E. Coyoca
                                          Attorneys for Plaintiffs
23                                        Universal Cable Productions LLC and
                                          Northern Entertainment
24                                        Productions LLC

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

7914943.1

FIRST AMENDED COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury of all issues so triable.

DATED:  July 7, 2016

LUCIA E. COYOCA
VALENTINE A. SHALAMITSKI
MITCHELL SILBERBERG & KNUPP LLP


By: _s/ Lucia E. Coyoca_
Lucia E. Coyoca
Attorneys for Plaintiffs
Universal Cable Productions LLC and
Northern Entertainment
Productions LLC

Mitchell
Silberberg &
Knupp LLP

7914943.1

26

FIRST AMENDED COMPLAINT

# EXHIBIT A

Policy Number: **MP00163-04**
Renewal of Number: **MP00163-03**



| | |
|---|---|
| **MOTION PICTURE/TELEVISION PRODUCERS PORTFOLIO DECLARATIONS** | **One Beacon** SM<br>I N S U R A N C E<br>Atlantic Specialty Insurance Company<br>150 Royall Street<br>Canton, MA 02021-1030 |

---

**Item 1.** Named Insured and Mailing Address

**NBCUniversal Media, LLC.**

30 Rockefeller Plaza, 2nd Floor
New York, NY 10112

Agent Name and Address

Aon/Albert G Ruben Insurance Services, Inc

1533 Ventura Blvd., Suite 1200
Sherman Oaks, CA  91403
NYFTZ: 2-14160

---

**Item 2.** Policy Period       From: **01-01-2014**       To: **06-30-2015**
At 12:01AM Standard Time at the Mailing Address Shown Above

---

**Item 3.** Insured Production(s): 2012 Television Production(s)

---

**Item 4.** Estimated Period of Principal Photography:
       Start Date:                Completion Date:                              Print Date:

---

**Item 5.** Coverage

| | | Limit of Liability Each Loss | Deductible Each Loss | Trailing Deductible Each Loss |
|---|---|---|---|---|
| Section I | **Cast** | $   50,000,000 | $  50,000 | $ 50,000 |
| Section II | **Negative Film** - Faulty Stock | $   50,000,000<br>$   50,000,000 | $ Nil<br>$  50,000 | $ Nil<br>$ 25,000 |
| Section III | **Extra Expense** | $   10,000,000 | $  50,000 | $ 25,000 |
| Section IV | **Property** | $   10,000,000 | $   5,000 | $ 5,000 |
| Section V | **Third Party Property Damage** | $   10,000,000 | $  10,000 | $ 5,000 |

---

**Item 6.** The policy is subject to a Self Insured Retention: $3,100,000 Aggregate
       (Includes Paid Losses and Adjustment Expenses)

| | |
|---|---|
| Scripted TV Productions | $ 1,650,000 |
| Comcast In House Production | $ 161,007 |
| Flat Charge, Strip Shows, Specials and Webisodes requiring property coverage only | $ 40,000 |
| Policy Premium (see Rating Schedule) | $ 1,851,007 |
| Taxes, Surcharges & Fees | $ |
| **Total Premium** | **$ 1,851,007** Deposit Premium |

---

**Item 7.** Form(s) and Endorsement(s) made a part of the certificate at time of issue:

---

EBI MP DEC 100 (08-06)

Page 1 of 1

Ex. A  Pg. 27

Item 8. Insurance is provided against those perils and for those coverages under those sections for which a specific amount or limit of liability is shown in schedules incorporated herein, subject to all terms of the policy and all forms and endorsements made a part hereof.

Countersigned:
Date: _____     By: _____
                                         Authorized Representative

THIS POLICY TOGETHER WITH THE POLICY CONDITIONS, COVERAGE PARTS AND FORMS
AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY

**EBI MP DEC 100 (05-02)**                                    **Page 2 of 2**

Ex. A  Pg. 28



# EXECUTION OF OFFICERS' SIGNATURES

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Secretary

President

G 10779 09 01

Page 1 of 1

**ARCHIVE**

Ex. A  Pg. 29

**THIS ENDORSEMENT CLARIFIES THE POLICY. PLEASE READ IT CAREFULLY**

ADJ. NO.

| NAMED INSURED<br>NBCUniversal Media LLC, | DATE<br>01/01/2014 | POLICY NUMBER<br>MP00163-04 |
|---|---|---|

| IF THIS ENDORSEMENT IS LISTED IN THE POLICY DECLARATIONS, IT IS IN EFFECT FROM THE TIME COVERAGE UNDER THIS POLICY COMMENCES. OTHERWISE, THE EFFECTIVE DATE OF THIS ENDORSEMENT IS AS SHOWN ABOVE AT THE SAME TIME OR HOUR OF THE DAY AS THE POLICY BECAME EFFECTIVE. | COUNTERSIGNED BY: |
|---|---|
| | _____<br>AUTHORIZED REPRESENTATIVE |

THIS ENDORSEMENT IS USED AS AN OVERFLOW FOR FIELDS ON THE DECLARATIONS PAGE NOT LARGE ENOUGH FOR THE NECESSARY INFORMATION AND TO LIST OPTIONAL COVERAGES.

MPTV Producers Portfolio Declarations – MP DEC 100 (08-06)
Signature Page – G 10779 09 01
Schedule of Forms – ILU 003 (0589)
Common Policy Conditions – IL 00 17 11 98
Motion Picture Television Portfolio General Conditions  NS 100 01 10

DICE Production General Conditions  DI 200 (06 10)

Rating Schedule and Self Insure Retention  SIR 100 0110

Cast Coverage – Section I  NS 101 0110

Broad Form Disgrace Coverage  NS 109 0105

Negative Film & Faulty Stock – Section II  NS 102 0110

Extra Expense – Section III  NS 103 0110

Animal Extra Expense  NS 106 0110

Property – Section IV  NS 104 0110

Property Animal Coverage NS 110 0110

Third Party Property Damage – Section V  MP 204 (01-05)

Strip Show Coverage Extension  NS 108 0105

Hurricane, Tornado & Country Exclusion  NS 107 0105

Cap on Losses from Certified Acts of Terrorism  IL 09 50 11 02

Exclusion of Certain Computer Related Losses –IL 09 35 07 02

New York Changes – Cancellation and Non Renewal – IL 02 68 01 11

New York Changes - Fraud – IL 01 83 08

**ILU 003 (0589)**

Ex. A  Pg. 30

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   **a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

   **a.** Make inspections and surveys at any time;

   **b.** Give you reports on the conditions we find; and

   **c.** Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   **a.** Are safe or healthful; or

   **b.** Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Ex. A  Pg. 31

# MOTION PICTURE TELEVISION PORTFOLIO
## GENERAL CONDITIONS

Throughout this policy the words **you** and **your** refer to the Named Insured shown in the Declarations. The words **we, us** and **our** refer to the Company providing this insurance.

## I. GENERAL CONDITIONS

### A. NAMED INSURED
Named insured shall mean the first named insured as per the Declarations and any majority owned or managed subsidiaries thereof, their respective parent and affiliated companies and or any financially controlled or managed organization(s) and or any production company or other entity formed or contracted by the named insured or an other organization, entity or person(s) which the named insured has agreed to insure contractually.

Named insured includes your "employees", but only within the scope of their employment by you or while performing duties related to the conduct of your business.

### B. TERRITORY
This Policy applies anywhere in the world.

### C. MISREPRENTATION AND FRAUD
This Policy is void if you knowingly concealed or misrepresented any material fact or circumstance concerning this insurance, or in the case of any fraud or false swearing by you, whether before or after a loss.  If you make any false or fraudulent claim as to the amount or otherwise, this Policy is void as to that specific claim, and we have the right to terminate this Policy at that time, and any subsequent claims by you are forfeited.  The term "you:" as used in this paragraph applies to your Risk Management Department.

### D. ASSIGNMENT
This Policy may not be assigned without our written consent.

### E. ACTION AGAINST US
No action against us may be brought unless you have complied with all of the material provisions of this Policy and the action is started within two (2) years after the date on which the loss occurred.

Nothing in this Policy gives any person or organization any right to join us as a co-defendant in any action against you to determine your liability.

### F. ACCESS TO RECORDS AND EXAMINATION UNDER OATH
We or our representatives may examine and audit your books and records as they relate to this policy at any time during the policy period or while a claim is pending.

If requested, you must permit us to question you and, so far as within your power, all other interested persons under oath, at such times as may be reasonably required, about any matter relating to this insurance or a claim.

No such examination under oath or examination of books or documents, nor any other act by us or any of our employees or representatives in connection with the investigation of any loss or claim hereunder, shall be deemed a waiver of any defense which we might otherwise have with respect to any loss or claim, but all such examinations and acts shall be deemed to have been made or done without prejudice to our liability.

### G. OTHER INSURANCE
If at the time of loss or damage, any other valid insurance is available which would apply to the loss or damage in the absence of this policy, the insurance provided by this policy will be primary to any other policy held by you, but excess with respect to any policy or coverage held or provided by any other party, unless otherwise agreed by you.

This policy does not apply to any production that has been declared by you under similar insurance provided by any other insurer.

### H. SUBROGATION
If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment.  That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. This insurance will not be prejudiced if you have waived your right of recovery from any party or parties in a lease for premises or rental agreement

NS 100 0110

Ex. A  Pg. 32

for property. We will honor any written contractual waiver of subrogation obligation agreed to by you prior to a loss.

## I. DUTIES IN THE EVENT OF LOSS OR DAMAGE

In the case of loss or damage to which this insurance may apply, you must see that the following duties are performed:

(1) Police Notification – Notify the police if you believe that a law may have been broken.

(2) Minimize Loss or Damage – Take all reasonable steps to protect the property from further damage and minimize the loss. Keep a record of your expenses in doing so for consideration in the settlement of the claim. This will not increase the limit of insurance.

(3) Notice of Loss or Damage

(a) Report to us or our authorized representative as soon as practicable any loss or damage which may become a claim under this policy and provide to us a description of how, when and where the loss or damage occurred.

(4) Proof of Loss – File with us, or our authorized representative, a detailed proof of loss signed and sworn to by you setting forth to the best of your knowledge and belief the facts of the loss and the amount thereof. You must do this within one hundred eighty (180) days as requested by us or required by law after discovery of the loss or damage.

(5) Cooperation

(a) Except at your own cost, make no voluntary payments, assume no obligations, and incur no expenses without our consent, except in settlement of a covered claim where the amount of the claim is not disputed or under the policy deductible.

(b) Permit us to inspect the property and records supporting the loss or damage. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(c) Immediately send us copies of any demands, summonses or legal papers received in connection with the claim or suit.

(d) Cooperate with us in the investigation or settlement of the claim.

## J. LOSS PAYMENT

(1) Loss or damage covered by this policy will be payable to you or your loss payee. We agree that any holder of a Certificate of Insurance in which such holder is evidenced as a Loss Payee issued by us or on our behalf will be considered a Loss Payee subject to your legal liability.

(2) We will not pay you more than your financial interest in the covered property.

(3) If two or more of this policy's coverage apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

(4) We will pay you for covered loss or damage within thirty (30) days after we received and accept a satisfactory sworn proof of loss as we have required, or as required by law; if you have complied with all the terms of this policy and:

(a) We have reached agreement with you on the amount of loss; or

(b) A final judgment has been entered; or

(c) An appraisal award has been made.

(5) We may adjust losses directly with the owners of lost or damaged property, it other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the covered property.

(6) We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

We will not be liable for any part of a loss that has been paid or made good by others.

## K. LIMITS, DEDUCTIBLE and TERMS OF COVERAGE

(1) When a deductible applies, the terms of this insurance, including those with respect to your duties in the event of loss or damage, apply irrespective of the application of the deductible amount.

(2) We may pay any part or all of a deductible amount to effect settlement of any claim and, upon notification of the action taken; you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

(3) The Limits of Liability as stated herein apply per occurrence.

(4) The Term of Coverage will apply as stated herein to each Insured Production declared hereunder.

## L. PREMIUM

(1) The first Named Insured shown in the Declarations:

(a) Is responsible for the payment of all premiums; and

(b) Will be the payee for any return premiums we pay.

(2) We will compute all premiums for this policy in accordance with the rating schedule(s) attached to and made a part of this policy.

(3) The premium shown in this policy is a deposit premium only unless specifically stated otherwise. At the end of the policy period we will compute the earned premium by applying the rates set forth in the rating schedule(s) to the final "Insurable Production Cost". However, the earned premium will not

be less than the minimum policy premium stated on the rating schedule(s), regardless of the term of coverage.

If the earned premium is greater then the deposit premium, we will send a bill to the first Named Insured that shows the amount due and when it is payable. If the earned premium is less than the deposit premium, we will return the excess to the first Named Insured.

The first Named Insured must keep records of the "Insurable Production Costs" and other information we need for premium computation, and send us copies at such times as we may request.

## M. CANCELLATION

(1) The first Named Insured shown in the Declarations may cancel this policy by returning it to us or our authorized representative, stating in writing the future date it is to be cancelled. The policy period will end on that date.

(2) We may cancel this policy by written notice to the first Named Insured at least:

    (a) Ten (10) days before the effective date of cancellation if we cancel for nonpayment of premium; or

    (b) One hundred and twenty (120) days before the effective date of cancellation if we cancel for any other reason.

(3) We will mail or deliver our notice to the first Named Insured's last mailing address known ot us.

(4) Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

(5) If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. In the event of policy cancellation, the policy premium will be adjusted to reflect audited, actual insurable production costs from policy inception date to cancellation date. Pro-rata refund will apply to all flat charges. The cancellation will be effective even if we have not made or offered a refund.

(6) If notice is mailed, proof of mailing will be sufficient proof of notice.

## N. ABANDONMENT

There can be no abandonment of any property to us without our written consent.

## O. STOP LOSS DATE

If as a result of delay in completing the original shooting schedule of an insured production you incur a loss in order to honor the termination date contained in a performance contract between you and any other person and/or their respective loan out company, such loss (hereinafter referred to as a stop date loss) would not be covered by the provisions of this policy, but this policy will, nonetheless, participate in a stop date loss to the extent that the need to incur such loss is directly related to a loss insured under the terms of this policy.  The extent of our participation in a

stop date loss will be governed by the proper consideration of the following factors:

    (1) If the need to incur the stop date loss is solely and directly the result of an insured loss, the stop date loss will be recoverable in full.

    (2) If the need to incur the stop date loss arises in part by reason of an insured loss and also arises in part by reason of an uninsured occurrence so that it can reasonably be said that each contributed to the incidence of the stop date loss, then the extent that each so contributed will be determined and an apportionment of the stop date loss will be made.

    (3) If the need to incur the stop date loss is in no way connected with an insured loss, no part of the stop date loss will be recoverable.

    (4) Coverage afforded by this paragraph is subject to the proviso that the performance contract term was sufficiently longer than your original scheduled time for completion of the insured production so as to allow a reasonable margin of safety to cover possible delays in completing the insured production. It is agreed that ten (10) consecutive days is a reasonable margin of safety for features and three (3) consecutive days is a reasonable margin of safety for all other productions.

## P. APPRAISAL

If you and we fail to agree on the amount of loss, either one can demand that the amount of loss be set by appraisal.   Each party will select a competent, independent appraiser and notify the other of the appraiser's identity within twenty (20) days of receipt of the written demand.   The two appraisers will then select a competent, impartial umpire.   If the two appraisers are unable to agree upon an umpire within fifteen (15) days, you or we can ask a judge of a court of record in the state of your residence to select an umpire.   The appraisers will then submit a written report of an agreement to us and the amount agreed upon will be the amount of the loss. If the appraisers fail to agree within a reasonable period of time, they will submit their difference to the umpire.   Written agreement signed by any two of these three will set the amount of the loss.   The party selecting that appraiser will pay each appraiser.   Other expenses of the appraisers and the compensation of the umpire will be paid equally by you and us.

## Q. POLICY CHANGES

No changes may be made to this policy except by mutual agreement in writing.

## R. CONFORMITY TO STATE LAW

When any policy provision is in conflict with the applicable law of the state in which this policy is issued, the law of the state will apply, unless the provision of this policy is broader.

## S. DUE DILIGENCE

You shall use due diligence and do and concur in doing all things reasonably practicable to avoid or diminish any loss or any circumstance likely to give rise to a loss or claim insured under this policy. This

NS 100 0110

policy extends to indemnify you for any additional expenses necessarily incurred by you to avoid or diminish such loss or claim, subject to any deductible provisions of this policy. This indemnification will not increase the limit of insurance, and we will not pay more for any loss than the amount that would have been payable had you not incurred the additional expenses.

**T. INADVERTENT ERRORS**

You will not be prejudiced by any unintentional or inadvertent omission, error or incorrect description of the property, persons, animals or exposures insured hereunder.

**U. INSPECTIONS OF SURVEYS**

   (1)  We have the right to:

       (a)  Make inspections and surveys at any time;

       (b)  Give you reports on the conditions we find; and

       (c)  Recommend changes.

   (2)  We are not obligated to make any inspections, surveys, reports, or recommendations, and any such actions we do undertake related only to insurability and the premiums to be charged. We do not make safety recommendations. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

       (a)  Are safe or healthful; or

       (b)  Comply with laws, regulations, codes or standards.

   (3)  Paragraphs (1) and (2) of this Condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**V. RECOVERIES**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

To the extent recovery is made from such other insurance, the deductible and/or the SIR under this policy will be reduced by such recovery. In no event will the deductible/SIR under this policy be greater than that shown in this policy. If recovery from such other insurance is greater than the deductible/SIR in this policy, then the deductible/SIR under this policy will apply.

To the extent there is a recovery from other insurance when the loss exceeds the Deductible or SIR, we will share the recovery and costs proportionally.

**W. INSURANCE NOT TO BENEFIT OTHERS**

No person or organization, other than you, having custody of the property and to be paid for services shall benefit from this insurance. This restriction does not apply to a person or organization, other than a common carrier, which is working or providing services on your behalf.

**X. PROPERTY OF OTHERS**

In the event of loss or damage to property of others (insured hereunder) held by you for which a claim is made. We have the right to adjust such loss or damage with the owner or owners of such property. Receipt of payment by such owner or owners satisfaction of any claim by you for which such payment has been made. If legal proceedings are taken to enforce a claim against you as respects any such loss or damage, we shall, at our expense, conduct and control the defense of such legal proceeding on your behalf of and in your name. No action of ours in such regard will increase our liability under this policy.

**Y. EXCHANGE RATE**

The rate of exchange applied to a loss shall be the rate as paid by you to purchase the foreign funds to pay a claim.

We reserve the right, for claims that we settle directly with third parties to this policy, to adjust the claims at the prevailing exchange rate or the exchange rate used to actually purchase the foreign funds to pay a covered claim.

**II. SPECIAL CONDITIONS**

**A. DEFINITIONS**

   1.  "Continuity" means costs incurred to match or maintain the Environment of the "Insured Production" during "Principle Photography". The Environment includes weather, climate, natural lighting or seasonal changes in which you are filming the "Insured Production".

   2.  "Earthquake" means:

       (a)  Any earth movement, such as an earthquake, landslide, mine subsidence, or earth sinking, rising or shifting; and

       (b)  Volcanic eruption, meaning the eruption, explosion or effusion of a volcano;

Provided that all earth movements or volcanic eruptions that occur within any seventy-two (72) hour period will constitute a single earth movement or volcanic eruption.

   3.  "Flood" means, flood waters, surface water, waves, tide or tidal water, overflow or rupture of a dam, levy, dike or other surface containment structure, storm surge, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not.

   4.  "Insurable Production Cost" includes: all costs, including overhead and interest on loans chargeable directly to an "Insured Production" or series of productions. Insurable Production Cost also includes any amount of other overhead only when declared at the time you declare an "Insured Production" or series of productions. The fol-

**Page 4 of 7**              **NS 100 0110**  ☐

lowing costs shall not be included in "Insurable Production Cost":

    (a) Royalties Term Deals for Executive Producer(s), Package Fee & Publicity, residuals, premiums paid for this insurance, and personal property taxes;

    (b) Story, scenario, music rights, and sound rights, except with respect to television series, specials and pilots; and

    (c) "Continuity", except when a period of suspension due to covered loss or damage exceeds ninety (90) days.

    (d) Any other costs specifically stated not to be "Insurable Production Costs" in an endorsement to this policy.

Nevertheless, you have the option to include these excluded costs at the time you declare an "Insured Production" or series of productions. In that case, such costs will be included in the "Insurable Production Cost", and

The amount of any loss or damage paid under this policy.

5. "Insured Production" means a production or series of productions that has been declared to us.

6. "Mobile Equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    (a) Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    (b) Vehicles that travel on crawler treads;

    (c) Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted equipment, or maintained primarily for purposes other than the transportation of persons or cargo. However, "Mobile Equipment" does not include any land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

7. "Principal Photography" means the continuous period of time from the start date to the completion date you actually require to photograph or tape an "Insured Production", including any necessary wrap time or reshoots.

8. "Employee" includes a leased, temporary or volunteer worker leased to you under a written agreement perform duties related to the conduct of your business.

9. "Suit" means a civil proceeding in which damages to which this insurance applies are alleged.

**B. ABANDONMENT OF INSURED PRODUCTION**

Should a covered loss result in an abandonment during the term of coverage under this section of the policy, we have the right to require that you surrender all owned or licensed rights, title(s), and interest(s) in all documents, underlying works, copyrights and all related material of the insured production, except as relates to any sequel, prequel, and their attendant merchandise. We will reimburse you for the cost you incurred for the rights.

**C. REPORTING REQUIREMENTS**

You must declare to us on a declaration and information form acceptable to us, the particulars of each and every production or series of productions undertaken by you during the term of this policy. If Cast Insurance is to be provided you will report to us each Covered Person to be insured prior to the completion of "principal photography".

**D. HIATUS COVERAGE**

1. With respect to episodic television, coverage is continuous from the pilot through season one, and between seasons for each television series declared to this policy, hereinafter referred to as Hiatus Coverage, subject to all other terms and conditions of this policy.

2. Hiatus Coverage as defined in this policy shall mean the period of time from the end of coverage for the pilot or an episodic television series until the commencement of pre-production, for the series following the pilot or subsequent season.

Cast coverage will be provided during the hiatus period and will mirror the coverage that was provided during the previous season for all declared productions. Cast coverage will remain as such during the term of declaration of the new season, until a new cast examination has been received, for a period of 30 days from declaring an artist for the new season. If a covered person who requires a medical examination becomes physically disabled or ill resulting in a claim, and such illness either occurs prior to their new medical examination, and results from a condition that would not have routinely been discovered during such examination or by a review of the case history of that person, then this section shall cover such claim, subject to terms and conditions in the policy language.

3. The limits of liability, deductibles and terms that were in effect for the preceding pilot or season will apply during the hiatus period.

4. Hiatus Coverage applies solely to Cast Coverage, Property and Third Party Property Damage.

5. Hiatus Coverage will cease:

    a) On the effective date of cancellation when this policy is cancelled or non-renewed by you or us;

    b) On commencement of pre-production for the series following the pilot or subsequent season of a television series;

    c) 180-days after the start of Hiatus; or

    d) At such time as the pilot or television series is not picked up or renewed by the network, whichever occurs first.

**E. DELIVERY DATE EXPEDITING COSTS**

NS 100 0110

With respect to all productions insured hereunder, subject to all other terms and conditions, the definition of loss with respect to Cast Coverage, Negative Film, Faulty Stock and Extra Expense is extended to include the necessary production extra expenses you necessarily incur to meet an air date or delivery date of an insured production subject to a sub limit of liability of $1,000,000.

## F. PRINTS AND ADVERTISING COSTS

With respect to all productions insured hereunder, subject to all other terms and conditions, the definition of loss with respect to Cast Coverage, Negative Film, Faulty Stock and Extra Expense is extended to include the costs incurred for prints and advertising as have been rendered entirely valueless, solely in the event of an abandonment of an insured production, subject to a sub limit of liability of $1,000,000.

## G. PUBLIC RELATIONS COSTS

With respect to all productions insured hereunder, subject to all other terms and conditions, the definition of loss with respect to "Disgrace" and or "Violent Death" under Cast Insurance is extended to include the costs to hire a third party public relations firm, law firm or crisis management firm for the specific purpose to minimize potential harm to you arising from a situation or occurrence involving the Disgrace or Violent Death of an insured cast member, subject to a sub-limit of liability of $250,000.

## H. DEDUCTIBLES, ANNUAL AGGREGATE DEDUCTIBLE and TRAILING DEDUCTIBLES

Coverage afforded under this policy is provided subject to the following terms and conditions:

A. Deductibles
1. You will incur the deductibles as stated in the policy on all covered loss before a loss accrues to the Annual Aggregate Deductible or we pay a loss:
2. The total of the adjusted claim amounts and adjusting expenses that exceed the deductible(s) will accrue to the Annual Aggregate Deductible.
B. Annual Aggregate Deductible
The annual aggregate self insured retention is $3,100,000
For "Insured Production(s) declared to us during the policy term an Annual Aggregate Deductible for the policy term of $3,100,000 applies subject to the following:

1. All adjusted claim amounts approved by us that you incur over the deductible amounts stated herein will accrue to the Annual Aggregate Deductible;
2. At such time as the Annual Aggregate Deductible(s) has been exhausted, the deductible shown on the Declarations Page or within the policy will change to the Trailing Deductible(s) stated herein for each adjusted claim and for all subsequently adjusted claims for that "Insured Production" or annual period of declared productions.
C. Trailing Deductible(s)

After the Annual Aggregate Deductible has been exhausted, you will incur a Trailing Deductible(s) in the amounts stated below as Deductibles for each adjusted claim and we will pay all covered claims in excess of the Trailing Deductible including any and all related adjusting expense(s):

## TRAILING DEDUCTIBLES

| COVERAGE | TRAILING DEDUCTIBLE |
|---|---|
| Cast | $50,000 |
| Negative | NIL |
| Faulty | $25,000 |
| Extra Expense | $25,000 |
| Property | $5,000 |
| Third Party Property Damage | $5,000 |
| ALL OTHER EXTENSIONS | $50,000 |

## I. CLAIMS ADMINISTRATION

All claims must be reported to:

Entertainment Brokers International /OneBeacon Insurance Company Claims Department
1100 Glendon Ave. Suite 900
Los Angeles, CA 90024
Phone: 781-332-8480
marevalo@onebeacon.com

## III. EXCLUSIONS APPLICABLE TO ALL SECTIONS OF THIS POLICY

This policy does not insure against loss or damage caused directly or indirectly by:

1. War, including undeclared or civil war; or
2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
4. Any weapon of war including atomic fission or radioactive force, whether in time of peace or war;

Page 6 of 7

NS 100 0110    ☐

Ex. A  Pg. 37

5. Nuclear reaction or radiation, or radioactive contamination from any other cause. But if nuclear reaction or   radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage caused by that fire if the fire would be covered under this policy.

6. Risks of contraband or illegal transportation of trade.

7. Violation of any Law or Statute, or any actual dishonest, fraudulent, criminal or malicious act committed by you, your employees, including any judicial injunction or action for injunctive relief.

8. Any uninsured event occurring before, concurrently with or after the happening of an insured event, which directly or indirectly causes or in any way contributes to cause or increase a loss under this policy; but only       with respect to that portion of any such loss caused by or contributed to by the uninsured event, unless the uninsured event would not have been a factor had such insured event never occurred.

NS 100 0110

Page 7 of 7   ☐

Ex. A  Pg. 38

# DICE PRODUCERS PORTFOLIO POLICY CONDITIONS

Throughout this policy, "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning.

The following conditions, exclusions and definitions apply in addition to the applicable Additional Conditions, Additional Exclusions and Additional Definitions in the DICE Producers Portfolio Coverage Forms.

## I. LOSS CONDITIONS

### a. Abandonment

(1) Abandonment of Property

There can be no abandonment of any property to us without our written consent.

(2) Abandonment of an "Insured Production"

Should a covered loss or damage result in abandonment of an "Insured Production" during the policy period, under any Coverage of this policy, we have the right to require that you surrender all owned or licensed rights, titles and interests in all documents, underlying works, copyrights and all related material of the "Insured Production". If we exercise our right, we are not obligated to pay any loss or damage covered under this policy until you comply with these requirements.

### b. Access To Records And Examination Under Oath

We or our representatives may examine and audit your books and records as they relate to this policy at any time during the policy period or while a claim is pending.

If requested, you must permit us to question you and, so far as within your power, all other interested persons under oath, at such times as may be reasonably required, about any matter relating to this insurance or a claim.

No such examination under oath or examination of books or documents, nor any other act by us or any of our employees or representatives in connection with the investigation of any loss or claim hereunder, shall be deemed a waiver of any defense which we might otherwise have with respect to any loss or claim, but all such examinations and acts shall be deemed to have been made or done without prejudice to our liability.

### c. Appraisal

If you and we fail to agree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent, independent appraiser and notify the other party of the appraiser's identity within twenty (20) days after receipt of the written demand. The two appraisers will then select a competent, impartial umpire. If they are unable to agree upon an umpire within fifteen (15) days, you or we can ask a judge of a court of record in the state of your residence to select an umpire. The appraisers will state separately the value of the property and amount of loss. If they fail to agree within a reasonable time, they will submit their differences to the umpire. Written agreement signed by any two of these three shall be binding. Each party will pay its chosen appraiser and equally bear the other expenses of the appraisal and umpire.

If there is an appraisal, we will still retain our right to deny the claim.

### d. Deductible

(1) When a deductible applies, the terms of this insurance, including those with respect to your duties in the event of loss or damage, apply irrespective of the application of the deductible amount.

(2) We may pay any part or all of a deductible amount to effect settlement of any claim and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**e. Due Diligence Clause**

You shall use due diligence and do and concur in doing all things reasonably practicable to avoid or diminish any loss or any circumstance likely to give rise to a loss or claim insured under this policy. This policy extends to indemnify you for any additional expenses necessarily incurred by you to avoid or diminish such loss or claim, subject to any deductible provisions of this policy. This indemnification will not increase the limit of insurance, and we will not pay more for any loss than the amount that would have been payable had you not incurred the additional expenses.

**f. Duties In The Event of Loss Or Damage**

In case of a loss or damage to which this insurance may apply, you must see that the following duties are performed:

(1) Police Notification - Notify the police if a law may have been broken.

(2) Minimize Loss or Damage – Take all reasonable steps to protect the property and Covered Persons from further damage and minimize the loss. Keep a record of your expenses in doing so for consideration in the settlement of the claim. This will not increase the limit of insurance.

(3) Notice of Loss or Damage

(a) Report as soon as practicable to us or our authorized representative any loss or damage which may become a claim under this policy. Include a description of the property or loss involved.

(b) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Proof of Loss - File with us, or our authorized representative, a detailed proof of loss signed and sworn to by you setting forth to the best of your knowledge and belief the facts of the loss and the amount thereof. You must do this within one hundred eighty (180) days after discovery of the loss or damage.

(5) Cooperation

(a) Except at your own cost, make no voluntary payments, assume no obligations, and incur no expenses without our consent.

(b) Permit us to inspect the property and records proving the loss or damage.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(c) Immediately send us copies of any demands, summonses or legal papers received in connection with the claim or suit.

(d) Cooperate with us in the investigation or settlement of the claim.

**g. Loss Payment**

(1) Loss or damage covered by this policy will be payable to you or your loss payee.

We agree that any holder of a Certificate of Insurance issued by us or on our behalf will be considered a Loss Payee, subject to your legal liability.

(2) We will not pay you more than your financial interest in the covered property.

(3) If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

(4) We will pay you for covered loss or damage within thirty (30) days after we receive and accept a satisfactory sworn proof of loss, if you have complied with all the terms of this policy and:

(a) We have reached agreement with you on the amount of loss;

(b) A final judgment has been entered; or

(c) An appraisal award has been made.

(5) We may adjust losses directly with the owners of lost or damaged property, if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property.  We will not pay the owners more than their financial interest in the covered property.

(6) We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

We will not be liable for any part of a loss that has been paid or made good by others.

**h. Other Insurance**

If at the time of loss or damage any other insurance is available, which would apply to the loss or damage in the absence of this policy, the insurance provided by this policy shall apply as excess insurance over the other insurance.

**i. Recoveries**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

EXHIBIT 18, PAGE 48

**j.   Subrogation**

If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them.

**k.   Exchange Rate**

The rate of exchange applied to a loss shall be the rate as paid by you to purchase the foreign funds. We reserve the right for claims that we settle directly with third parties to this policy, to adjust the claims at the prevailing exchange rate or the exchange rate used to actually purchase the foreign funds.

## II.   GENERAL CONDITIONS

**a.   Assignment**

This policy may not be assigned or transferred without our written consent.

**b.   Cancellation**

(1)  The first Named Insured shown in the Declarations may cancel this policy by returning it to us or our authorized representative, stating in writing the future date it is to be cancelled. The policy period will end on that date.

(2)  We may cancel this policy by written notice to the first Named Insured at least:

(a)  Ten (10) days before the effective date of cancellation if we cancel for nonpayment of premium; or

(b)  Thirty (30) days before the effective date of cancellation if we cancel for any other reason.

(3)  We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

(4)  Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

(5)  If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

(6)  If notice is mailed, proof of mailing will be sufficient proof of notice.

**c.   Concealment, Misrepresentation or Fraud**

This policy is void in any case of fraud, intentional concealment or misrepresentation of

any material fact or circumstances concerning this insurance, by you or any other insured, at any time. If you make any false or fraudulent claim as to amount or otherwise, this policy is void as to that specific claim and we have the right to terminate this policy at that time, and any subsequent claims by you are forfeited.

**d.   Conformity to State Law**

When any policy provision is in conflict with the applicable law of the State in which this policy is issued, the law of the State shall apply unless this policy is broader.

**e.   Inspections and Surveys**

(1)  We have the right to:

(a)  Make inspections and surveys at any time;

(b)  Give you reports on the conditions we find; and

(c)  Recommend changes.

(2)  We are not obligated to make any inspections, surveys, reports or recommendations, and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety recommendations. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

(a)  Are safe or healthful; or

(b)  Comply with laws, regulations, codes or standards.

(3)  Paragraphs (1) and (2) of this Condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**f.   Insurance Not to Benefit Others**

No person or organization, other than you, having custody of the property and to be paid for services shall benefit from this insurance. This restriction does not apply to a person or organization, other than a common carrier, who is working on your behalf under the terms of a contract.

**g.   Legal Action Against Us**

No one may bring a legal action against us under this policy unless there has been full compliance with all the terms of this policy and the action is brought within one (1) year after the occurrence causing the loss or damage.

No person or organization has a right under this policy to join us as a party or otherwise bring us into any action to determine the liability of you or any other insured.

DI 200 (06-10)                                                              Page 3 of 6        ◻

Ex. A  Pg. 41

**h. Policy Changes**

This policy contains all of the agreements between you and us concerning the insurance afforded. No changes may be made in this policy except by us in writing.

**i. Territory**

This policy applies anywhere in the world.

**j. Inadvertent Error Clause**

You shall not be prejudiced by an unintentional or inadvertent omission, error or incorrect description of the property insured hereunder, provided notice be given to us and corrections made as soon as practicable after discovery of any such error or omission.

**k. Liberalization Clause**

If we adopt any provision which would broaden the coverage under this policy without additional premium within 90 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

**III. SPECIAL CONDITIONS**

**a. Policy Period**

We cover loss or damage commencing during the policy period stated on the Coverage Forms attached to and made a part of this policy.

**b. Premium**

(1) The first Named Insured shown in the Declarations:

    (a) Is responsible for the payment of all premiums; and

    (b) Will be the payee for any return premiums we pay.

(2) We will compute all premiums for this policy in accordance with the rating schedule(s) attached to and made a part of this policy.

(3) The premium shown in this policy is a deposit premium only unless specifically stated otherwise. At the end of the policy period we will compute the earned premium by applying the rates set forth in the rating schedule(s) to the final "Gross Production Costs". However, the earned premium will not be less than the minimum policy premium stated on the rating schedule(s), regardless of the term of coverage.

If the earned premium is greater then the deposit premium, we will send a bill to the first Named Insured that shows the amount due and when it is payable. If the earned premium is less than the deposit premium, we will return the excess to the first Named Insured.

The first Named Insured must keep records of the "Gross Production Costs" and other information we need for premium computation, and send us copies at such times as we may request.

**c. Premises Protection**

As a condition of this insurance, you are required to maintain the protective safeguards that you represented were in effect at the time of the attachment of this insurance.  Failure to maintain such protective safeguards will release us from all obligations under this policy to the extent that a loss is suffered or increased by that failure.

**d. Stop Date Loss**

A "Stop Date Loss" is a loss you necessarily incur because of a delay in completing the original shooting schedule of an "Insured Production" that will otherwise prevent you from honoring the termination date to which you have agreed in a written performance contract or agreement for persons or property.

This policy does not insure against loss or damage caused by or resulting from a "Stop Date Loss" unless the need to incur the "Stop Date Loss" directly prevents or reduces loss or damage to which this insurance applies. In that case only, coverage will apply to a "Stop Date Loss", subject to the following conditions:

(1) If you necessarily incur the "Stop Date Loss" solely and directly as a result of loss or damage to which this insurance applies, the "Stop Date Loss" will be recoverable, subject to the applicable limit of insurance, any applicable deductible provisions, and all other terms and conditions of this policy.

(2) If you necessarily incur the "Stop Date Loss" partly as a result of loss or damage to which this insurance applies and partly as a result of uninsured loss or damage, then an apportionment of the "Stop Date Loss" will be made.

(3) If you necessarily incur the "Stop Date Loss" not as a result of loss or damage to which this insurance applies, then no part of the "Stop Date Loss" will be recoverable.

Your performance contract must allow you to extend the original termination date by at least 25% of the contracted period, subject to a minimum period of one (1) shooting day.

**IV. DEFINITIONS APPLICABLE TO ALL COVERAGES OF THIS POLICY**

**a.** "Earthquake" means:

DI 200 (06-10)                                              Page 4 of 6   ☐

(1) Any earth movement, such as an earthquake, landslide, mine subsidence, or earth sinking, rising or shifting; and

(2) Volcanic eruption, meaning the eruption, explosion or effusion of a volcano;

provided that all earth movements or volcanic eruptions that occur within any seventy-two (72) hour period will constitute a single earth movement or volcanic eruption.

**b.** "Flood" means flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not.

**c.** "Gross Production Costs" means all costs incurred by you during the policy period except:

(1) Administrative costs not directly related to an "Insured Production";

(2) Any cost you did not initially incur or report as a cost directly related to the "Insured Production"; and

(3) Any other costs specifically stated not to be "Gross Production Costs" in an endorsement to this policy. "Insured Production" means a production or event that has been declared and accepted by us and endorsed to this policy.

**d.** "Mobile Equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

(1) Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

(2) Vehicles that travel on crawler treads;

(3) Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted equipment, or maintained primarily for purposes other than the transportation of persons or cargo.

However, "Mobile Equipment" does not include any land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

**e.** "Principal Photography" means the continuous period of time from the start date to the completion date you actually require to photograph or tape an "Insured Production", including any necessary wraptime.

## V. EXCLUSIONS APPLICABLE TO ALL COVERAGES OF THIS POLICY

**a.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

(1) Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a Covered Cause of Loss in order to protect Covered Property.

(2) Risks of contraband or illegal transportation or trade.

(3) (a) War, including undeclared or civil war;

(b) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(c) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

(4) (a) Any weapon employing atomic fission, atomic fusion or radioactive force; or

(b) Nuclear reaction or radiation, or radioactive contamination from any other cause. But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage caused by that fire if the fire would be covered under this policy.

Exclusions a.(1) through a.(4) apply whether or not the loss event results in widespread damage or affects a substantial area.

**b.** We will not pay for loss or damage caused by or resulting from any of the following:

(1) Dishonest or criminal acts committed by:

(a) You, any of your partners, members, officers, managers, employees, leased employees, directors, trustees or authorized representatives;

(b) Anyone else with an interest in the property, or their employees or authorized representatives; or

(c) Anyone else to whom the property is entrusted for any purpose.

This exclusion applies whether or not such persons are acting alone or in collusion with other persons or such acts occur during the hours of employment.

(2) Any uninsured event occurring before, concurrently with or after the happening of an insured event, which directly or indirectly causes or in any way contributes to cause or increase loss or damage under this policy, but only with respect to that portion of any

DI 200 (06-10)

Page 5 of 6  □

Ex. A  Pg. 43

such loss or damage caused by or
contributed to by the uninsured event.

(3) Discharge, dispersal, seepage, migration,
release or escape of "Pollutants" or
environmental impairment of any kind.

But if any of these results in a Covered
Cause of Loss, we will pay for the loss or
damage caused by that Covered Cause of
Loss.

"Pollutants" means any solid, liquid, gaseous
or thermal irritant or contaminant, including
smoke, vapor, soot, fumes, acids, alkalis,

chemicals and waste. Waste includes
materials to be recycled, reconditioned or
reclaimed.

(4) A "Stop Date Loss", as described in Special
Condition d., except as otherwise provided
in Special Condition d.

(5) Neglect of an insured to use all reasonable
means to save and preserve property from
further damage at and after the time of loss.

Ex. A  Pg. 44

POLICY NUMBER:                                                    **MPTV PRODUCERS PORTFOLIO**

# RATING SCHEDULE
# SELF INSURED RETENTION

This endorsement modifies insurance provided under the following:

**MPTV PRODUCERS PORTFOLIO**

**I.      EXPOSURES**

The base rates contemplate exposures worldwide you will use reasonable efforts to give us prior notice of any activities, conditions or hazards, which may materially increase your exposure to loss, and we have the right to apply terms, conditions or change the premium to reflect such increased exposure. The estimated insurable production cost of $1,500,000,000 applies to television productions. The estimated annual gross production costs of $87,031,000 applies to DICE Productions for Comcast.

**II.     RATES**

Rates shown below are per $100 of Insurable Production Cost ("IPC") as defined in CONDITIONS APPLICABLE TO ALL SECTIONS, SECTION II. SPECIAL CONDITIONS, A. DEFINITION OF INSURABLE PRODUCTION COST:

**A.**    Motion Pictures, Movies of the Week, Feature Films for Theatrical Release  (collectively "Features") – NOT COVERED

**B.**    All Television Productions, Pilots, Episodic Series, Mini-Series & Movies of the Week specifically made for Broadcast Television  (collectively "Television"): $.11 per $100 Net Insurable Production Costs.

**C.**    Documentaries, Industrial, Commercials and Educational productions (collectively "DICE") $0.185 per $100 of Gross Production Cost

**D.**    Animation Productions, mobisodes and any other similar productions distributed via the web or mobile devices NOT COVERED.

**E.**    Strip Shows, television specials and webisodes with property coverage only are subject to a flat premium of $40,000.  Coverage applies only to the property section(s) of the policy; including Third Property Damage

**F.**    Webisodes requiring coverage for more than property cover will be rated as television series, subject to a rate of $.11 per $100 of Insurable Production Costs.

**III.    PREMIUM PAYMENT AND AUDIT**

**A.**    Premium Payment

1.    The deposit premium for all insured productions will be determined using the rates stated herein or otherwise negotiated.

2.    The premium for all insured productions will be billed on the inception date of the policy and based upon a schedule of productions that you will present to us. Such premium is a deposit and estimated premium will be subject to a final audit, and adjusted on audit. The deposit premium will be payable in four quarterly installments.

3.    In the event of a mid-term cancellation, the policy earned premium will be determined based the audited insurable production cost for all declared productions at the time of the cancellation.

SIR 100 0110                                                              Page 1 of 3        □

Ex. A  Pg. 45

**B.**   Premium Audits

    1.   The final adjusted premium will be subject to a "voluntary audit" of Insurable Productions Costs in accordance with the rates and terms shown herein and as defined in the policy. A "Voluntary Audit" means that you will submit to us within ninety (90) days of the expiration of the policy an itemized accounting in the form of a production cost report (as commonly used in the Entertainment Industry) of the total Insurable Productions Cost of all productions.

    In the event of a policy cancellation, the policy premium will be adjusted to reflect the audited, actual insurable production costs from the inception to the cancellation date. Pro-rata refund will apply to all flat charges.

    2.   Premiums for audit adjustments will be billed upon completion of the audit.

## IV.   DEDUCTIBLES AND ANNUAL AGGREGATE SELF-INSURED RETENTION

Coverage afforded under this policy is provided subject to the following terms and conditions:

**A.**   Maintenance Deductible

    1.   You shall incur all covered loss up to and including the amounts stated below as Maintenance Deductibles see below:

    2.   The total of the adjusted claim amounts exceeding the deductible and related adjusting expense will accrue to the annual aggregate self-insured retention ("SIR").

    3.   Adjusted claim amounts that do not exceed the Deductibles will not accrue to the SIR.

**B.**   Annual Aggregate Self-Insured Retention
    The annual aggregate self insured retention is $3,100,000

**C.**   The "self insured" retention is not applicable to productions defined as DICE productions.

**D.**   Deductibles applicable to DICE Productions;

| | |
|---|---|
| Cast | $10,000 |
| Negative | $NIL |
| Faulty | $5,000 |
| Property | $2,500 |
| Extra Expenses | $5,000 |
| Third Party PD | $2,500 |

**D.**   Trailing Deductible(s)

    After the Self Insured Retention has been exhausted, you will incur a Trailing Deductible in the same amounts stated below as Deductibles for each adjusted claim and we will pay all covered claims in excess of the trailing deductible including any and all related adjusting expense(s)>

Ex. A  Pg. 46

## V.   MAINTENANCE AND TRAILING DEDUCTIBLES

| COVERAGE | MAINTENANCE | TRAILING |
|---|---|---|
| Cast | $50,000 | 50,000 |
| Negative | $0 | $0 |
| Faulty | $50,000 | $25,000 |
| Extra Expense | $50,000 | $25,000 |
| Property | $  5,000 | $5,000 |
| Third Party Property Damage | $10,000 | $5,000 |

# SECTION I - CAST COVERAGE

Throughout this policy the words **you** and **your** refer to the Named Insured shown in the Declarations. The words **we**, **us** and **our** refer to the Company providing this insurance.

## I. COVERAGE

### A. Coverage
We will pay the actual and necessary loss you sustain by reason of a Covered Person being prevented from commencing, continuing or completing an assigned duty or role in an "Insured Production". The loss must be caused by or result from a Covered Cause of Loss during the Term of Coverage.

### B. Covered Causes of Loss
1. Accidental injury, sickness or death, to a Covered Person;
2. Kidnap of a Covered Person;
3. Death, Severe Injury, Catastrophic Injury, life threatening illness of an "Immediate Family Member" during the term a Covered Person is insured hereunder.
4. "Violent Death" or "disgrace" of a Covered Person declared and accepted by us, that necessarily forces the abandonment of the "Insured Production", except those causes of loss listed in the Exclusions.

### C. Term of Coverage
Term of Coverage, as used in this Coverage, means the period beginning with the effective date shown in the Declarations, reporting form or the start date of principal photography whichever occurs first, and continuing until the earliest of the following dates:

1. The date of delivery required under the completion guarantee agreement with the distributor(s);
2. The date your completion guarantor is released from further obligations to you;
3. Eighteen (18) months after completion of "Principal Photography";
4. The date on which a protection print or duplicate tape has been completed and physically removed from the premises where the original negative or tape is located; and in the case of "Violent Death or Disgrace", upon airing of the Insured Productions Coverage.

5. The date on which cancellation or termination of coverage under this policy for the "Insured Production" becomes effective.
6. The expiration date of this policy or declaration will be extended, if necessary, from the earliest of these dates. We may charge additional premium for this extension.
7. Subject to the Medical Examination Condition below, Term of Coverage also includes the Pre-Production period of Cast Coverage.
8. The Pre-Production period for Covered Persons who are "Guest Artists" in episodic television begins sixty 60 days before the start of "Principal Photography" or videotaping of the "Insured Production".
9. The Pre-Production period for other Covered Persons begins one hundred and eighty (180) days before the start of "Principal Photography".
10. You may, provided we are given prior notice, Declare a starting date of "Principal Photography" at any time within the term of this policy;

## II. EXCLUSIONS
We will not pay for loss caused by or resulting from any of the following:

1. Sickness on a Covered Person unless accepted by us and or as may be provided under IV b Medical Examination.
2. Any Covered Person taking part in flying other than as a passenger;
3. The inability of any female to continue her performance because of pregnancy or conditions pertaining to pregnancy.  This exclusion will not apply if you can prove that the female was not aware of the pregnancy when they accepted the position with you or when they completed the medical certificate

NS 101 0110

or when the medical examination was performed

4. Any Covered Person over seventy eight (78) years of age unless the person is specifically named in an endorsement attached to this policy

5. Any reservation, exception or restriction we have imposed on a Covered Person, as described in the Medical Examination Condition below, regardless of when the event causing loss occurs.

6. Behavior, action or inaction of a covered person that is consistent with the known public or private persona or behavior of the covered person which gives rise to "disgrace" of the "covered person".

## III. LIMITS OF LIABILITY

The most we will pay for loss in any one occurrence is the Limit of Insurance shown in the Declarations for Cast Coverage.

Family Death is subject to a sublimit of $2,000,000 per Occurrence.

## IV. DEDUCTIBLE OR SELF INSURED RETENTION

We will not pay for loss in any one occurrence until the amount of the adjusted loss before applying the applicable limits of insurance exceeds the deductible or self insured retention amount shown in the Declarations for Cast Coverage. We will then pay the amount of the adjusted loss in excess of the deductible or self insured retention, up to the applicable limit of insurance.

A Maintenance Deductible applies excess of the Self Insured Retention as described on a schedule or endorsement of Maintenance Deductibles.

A separate Deductible of $250,000 shall apply to Cast Coverage loss arising from any artists participating in stunts or other hazardous activity where such stunts or other hazardous activity was not declared to the underwriter, and accepted and approved for coverage by the underwriter prior to the activity taking place.

## V. DEFINITION OF LOSS

a. The amount of your loss will be determined based on:

(1) All necessary "Insurable Production Cost" you incur to complete the "Insured Production" that exceeds the amount of "Insurable Production Cost" you would have incurred if the covered cause of loss had not occurred; and

(2) All other necessary expenses that reduce the amount of loss otherwise payable.

However, your loss will not include loss of earnings of profit.

If you abandon an "Insured Production" that has been made substantially valueless solely because one or more covered causes of loss reasonably, practically and necessarily prevents you from completing the "Insured Production", irrespective of any completion or delivery date requirements for the "Insured Production", we will pay as loss the total "Insurable Production Cost" you have incurred for the "Insured Production".

"Insurable Production" including the "Insurable Production Costs" of any unaired production or series of productions in the event of loss under Coverage I, Section B.4 "Violent Death" or Disgrace".

## VI. ADDITIONAL CONDITIONS

For the purposes of this Coverage, the following Conditions apply in addition to the Policy Conditions.

a. Additional Duties In The Event of Loss Or Damage

The following is added to Policy Condition VIII - Duties In The Event of Loss:

(1) You must report immediately to us or our authorized representative any fact or circumstance which may prevent a Covered Person from commencing, continuing or completing an assigned duty or role in an "Insured Production" and which may result in a claim under this policy.

(2) You must immediately secure and file with us or our authorized representative the certification of a duly licensed physician. The certification must include a complete description of the injury, sickness or death and the prognosis.

(3) You must make every effort to preserve our rights, including enforcing any contractual conditions or terms applicable to the Covered Person, to:

(a) Have any Covered Person examined by a medical doctor of our choice; and

(b) Have continuing access to the medical records of any Covered Person.

It is your responsibility to comply with these conditions and your inability to provide the

Ex. A  Pg. 49

above may result in your not proving your claim hereunder.

b. Medical Examination, Accident Coverage, Immediate Family, Essential Element, Violent Death & Disgrace

(1) Any production except Feature Films each Covered Person, other than a "Guest Artist" in episodic television, must be examined by a duly licensed physician, designated or approved by us or submit a medical affidavit not more than one hundred eighty (180) days prior to the start of principal photography of the start date the Covered Person's assigned duties or role in the "Insured Production" are scheduled to commence.

For Feature Films the following Covered Person(s) must be examined by a duly qualified physician designated or approved by us, (veterinarian with respect to animals), who will submit to us a Medical Certificate or Affidavit signed by the examinee and physician (not applicable to animals prior to the date the Covered Person's assigned duties or role in the "Insured Production" are scheduled to commence. The physician must complete and submit to us a Medical Certificate or Affidavit, on forms approved by us and signed by the Covered Person.

a. The Director(s);
b. Seven (7) covered persons with the greatest exposure to the production as determined by the Risk Management Department. If Risk Management has made a determination of the top seven (7) artists and it is discovered that the determination was incorrect, we will not deny a claim or penalize you for such incorrect determination.

The physician must complete and submit to us a medical questionnaire and certificate, on forms approved by us and signed by the Covered Person.

If the doctors we provide are not available to you for the completion of a medical examination, we grant you permission to use any licensed medical doctor available, except for the Covered Person's personal physician;

(2) Cast Exams are required for cast coverage to apply to any artists declared to a DICE production, when the estimated gross production costs exceeds $5,000,000 or when the total number of filming days exceeds thirty (30) days.

Productions with total Gross Production Costs exceeding 10,000,000 or $1,500,000 per episode, requiring Cast Coverage must be declared to the policy in order for coverage to apply. All other DICE productions, regardless of total production costs or the episodic costs per episode that do not require Cast Coverage, do not need to be declared in order for coverage, other than cast coverage to be afforded under the policy to apply.

(3) Sickness Coverage for the Covered Person will become effective on the date the medical examination, Medical Certificate or Affidavit authorization is completed, subject to our receipt and approval of the medical exam, Medical Certificate & Affidavit.

Based on the medical information submitted to us, we have the right to make any reservation, exception or restriction regarding the insurability of the Covered Person within two (2) business days of receipt of the medical exam. We will not pay for loss caused by or resulting from any such reservation, exception or restriction.

If a Covered Person becomes sick or disabled before the medical exam or Medical Affidavit has been completed we will cover the sickness or disability subject to you showing that the sickness or disability would not have been discovered or disclosed during the medical exam or outlined in the Medical Affidavit and that the Covered Person had no prior knowledge.

Our failure to respond to a Medical Certificate & Affidavit and or Affidavit & Authorization within two (2) business days of our receipt will result in full coverage without restriction.

(4) Accident and Kidnap Coverage is effective on the date you have contracted

NS 101 0110

Ex. A Pg. 50

with the Covered Person to perform in the "Insured Production".

(5) "Disgrace" & "Violent Death" is effective when the Covered Person is approved by us.

(6) "Immediate Family" is effective on the date you have contracted with the Covered Person to perform in the "Insured Production".

(7) "Essential Element" is effective when the Covered Person is declared and approved by us.

(8) Animals must be declared and accepted by us before coverage will commence.

We will also review our own case history and public records to determine the coverage on any Covered Person.

## VI. DEFINITIONS

1. "Covered Person" means a person declared and accepted by us, except as outlined herein.

2. "Guest Artist" means the Host under a DICE Production & a Covered Person appearing in or contracted to appear in episodic television for less than three (3) consecutive episodes or less than fifty percent (50%) of a series of productions.

3. "Immediate Family Member" means the mother, father, sister, brother, spouse, life partner, child, stepparents, stepchildren, stepbrother, stepsister, mother-in-law, father-in-law, sister-in-law, brother-in-law, daughter-in-law, son-in-law or "significant others" who reside together, grandparent or grandchild of the Covered Person.

4. "Violent Death" means the Covered Person died at the hands of another person and that the Covered Person was involved in a crime. The showing of the "Insured Production" would degrade the insured and would anger the public

5. "Disgrace" means any criminal act or alleged criminal act, or any offense against public taste or decency, committed by a covered person, beyond their usual or expected behavior, that degrades or brings that Covered Person into disrepute or provokes insult or shock to the community that reflects un-

favorably upon the named insured or insured production that renders the "Insured Production" commercially unviable on unaired shows.

6. "Essential Element" is defined AS a declared artist(s) for the purpose of completion and delivery of the "Insured Production" as an "Essential Element" and accepted by us.

## VII. ESSENTIAL ELEMENT

In the event of:

(i) The death of a declared "Essential Element" during the period of pre-production or principal photography; or

(ii) The injury or illness of an "Essential Element" during the period of principal photography, whose injury or illness necessarily prevents the declared artist from performing services and completing the insured production. The injury or illness must incapacitate the "Essential Element" for a period of more than 30 days;

it shall be considered reasonable, practical, and necessary for you to abandon the Insured Production during principal photography and make claim under this Section for such costs.

Pursuant to Paragraph c. (ii) above, we shall have the option to delay your abandonment of the insured production for up to 30 days after the occurrence of the injury or onset of the injury or illness if in our good faith business judgment the artist is likely to recover from such injury or illness to resume his/her assigned role or position within 30 days.

In the event our decision to exercise our option to delay your abandonment of the insured production for up to 30 days after the occurrence of an injury or onset of an illness of the declared "Essential Element" causes you to incur a loss in excess of the amount stated in Section I. Cast, III Limits of Liability then such limit of liability shall automatically be increased to include the costs necessarily incurred in excess of the Limit of Liability caused solely and directly by the warranties below.

## VIII. DUTIES IN THE EVENT OF LOSS

Prior to payment of the "Essential Element" loss covered, you will comply with the following:

Ex. A  Pg. 51

EXHIBIT 18, PAGE 59

1. Upon our written request, within five (5) business days following the "Essential Element" loss you and one of our representatives shall meet to determine the viability of the options to complete the insured production, including the possibility of replacing the "Essential Element". You will do all things possible to complete the Insured Production, where possible with the remaining cast and crew, including maintaining or replacing financing to complete the insured production. "Essential Element" replacement will be a person of similar standing within the motion picture industry who is acceptable to independent financiers or distributors.

2. You will work with us in good faith and do all things possible to replace the "Essential Element" and upon our request, provide us your authority to negotiate on your behalf with any other party to assist in the replacement of an "Essential Element" or financing.

3. You will at our option enable us to maintain or replace any financing to complete the insured production.

Any breach of the above warranties will relieve us of any claim that would be payable hereunder.

POLICY NUMBER:                                         **MPTV PRODUCERS PORTOLIO**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# BROAD FORM DISGRACE COVERAGE

This endorsement modifies insurance provided under the following:

**MPTV PRODUCERS PORTFOLIO**

"Violent Death" or "Disgrace" of a Covered Person declared and accepted by us, that forces the abandonment or delay of the "Insured Production"; except those causes of loss listed in the Exclusions.

The above Disgrace Coverage is provided contingent on the following provision:

A separate request must be received by Underwriting, accepted by us, and declared to the policy.

All other terms and conditions remain unchanged.

NS 109 0105                                                         Page 1 of 1      □

Ex. A  Pg. 53

# SECTION II – NEGATIVE FILM AND FAULTY STOCK

Throughout this policy the words **you** and **your** refer to the Named Insured shown in the Declarations. The words **we**, **us** and **our** refer to the Company providing this insurance.

## I. INSURING AGREEMENT

We agree to pay you such loss (defined in Paragraph IV) as you directly and solely sustain as a result of loss of, damage to or destruction of video-tape stock, raw film stock, recorded videotape, exposed motion picture film (developed or undeveloped), inter-positives, positives, work prints, cutting copies, fine grain prints, sound tracks, tapes, transparencies, cells, art work (used to create animation or other images), source materials, software, data, media and related material used to generate computer or other images, and or any similar material or property, caused by an insured peril (defined in Paragraph II) when such property is your property or the property of others for which you are legally liable and, while such property is used or to be used in connection with an insured production.

## II. PERILS INSURED

This coverage insures:

(1) All risks of direct physical loss or damage;

(2) Faulty materials, faulty equipment, faulty computer equipment, faulty editing, faulty developing or fault processing; including accidental erasure, magnetic, or x-ray injury, disturbance or erasure of film, electronic recordings or video tape and loss of media, data, or software;

(3) Operator error including faulty manipulation or faulty operation, of camera, lighting, sound, electrical, editing, computer or any other equipment; technician's error(s) of judgment; and errors in machine or computer programming or instructions to any machine or computer.

## III. LIMITS OF INSURANCE

The most we will pay for loss in any one occurrence is the Limit of Insurance shown in the Declarations for Negative Film coverage.

Operator Error is subject to a $2,000,000 Sub-limit

## IV. DEDUCTIBLE

We will not pay for loss or damage in any one occurrence until the amount of the adjusted loss or damage before applying the applicable limits of insurance exceeds the deductible amount shown in the Declarations for Negative Film Coverage. We will then pay the amount of the adjusted loss or damage in excess of the deductible, up to the applicable limit of insurance.

## V. TERM OF COVERAGE

Term of Coverage, as used in this Coverage, means the period beginning one hundred eighty (180) days before the date shown in the Declarations as the start of "Principal Photography" or the start date of principal photography which ever occurs first , and continuing until the earliest of the following dates:

(a) The date of delivery required under the completion guarantee agreement with the distributor(s);

(b) The date your completion guarantor is released from further obligations to you;

(c) Eighteen (18) months after completion of "Principal Photography";

(d) The date on which a protection print or duplicate tape has been completed and physically removed from the premises where the original negative or tape is located;

(e) The date your interest in the property ceases; or

(f) The date on which cancellation or termination of coverage under this policy for the "Insured Production" becomes effective.

The expiration date of this policy will be extended, if necessary, until the earliest of these dates. We may charge additional premium for this extension.

NS 102 0110

## VI. PROPERTY EXCLUDED
This coverage does not insure cut-outs, unused foot-age or library stock.

## VII. DEFINITION OF LOSS
A. The amount of your loss will be determined based on the following:

(1) With respect to videotape stock, raw film stock and blank media, the actual cost to replace these items with property of like kind and quality.

(2) With respect to other Covered Property, all necessary "Insurable Production Cost" you incur to reshoot, re-create, or restore the "Insured Production" that exceeds the amount of "Insurable Production Cost" you would have incurred if no physical loss or damage had occurred.

(3) All other necessary expenses that reduce the amount of loss otherwise payable.

B. Your loss will not include:

(1) Loss of earnings or profit; or

(2) "Insurable Production Cost" incurred due to delay in completing an "Insured Production".

C. But we will pay for "Insurable Production Cost" incurred:

(1) As the direct result of unavoidable delay that occurs during the period necessary to restore the affected portions of the "Insured Production"; and

(2) As the result of a covered "Stop Date Loss".

If you abandon an "Insured Production" that has been made substantially valueless solely because one or more covered causes of loss reasonably, practically and necessarily prevents you from completing "Insured Production", irrespective of any completion or delivery date requirements for the "Insured Production", we will pay as loss the total "Insurable Production Cost" you have incurred for the "Insured Production".

## VIII. EXCLUSIONS
This coverage does not insure against loss caused by or resulting from:

(1) Exposure to light, deterioration, atmospheric dampness or changes in temperature;

(2) The use of incorrect raw film stock or videotape or media/software;

(3) Delay, loss of use, loss of market, interruption of business, or any other consequential loss due to loss of or damage to videotape stock, raw film stock or blank media;

(4) Unexplained or mysterious disappearance or shortage found upon taking of inventory of video tape stock, raw film or blank media.

## IX. CONDITIONS
You will ensure that artwork, drawings, software and related material (hereinafter referred to as "source material") used to generate computer images and animation cells are retained until a protection print has been completed or expiration of this coverage, whichever comes first.

You will safeguard and maintain all source material(s) that have been photographed, or used as intended in the production process. Damage to such source material will not be considered a loss hereunder, except to the extent that other covered property is damaged and you have complied with the above.

## X. DEFINITIONS
1) COMPUTER PROGRAMS means data, and source code used to direct the computer equipment, including diagrams or other records which can be used to reproduce programs.

2) DATA includes and is not limited to facts, concepts, source code, programming records or instructions which are converted to a form usable in your electronic data processing operations, computer programs or electronically controlled equipment.

3) MEDIA includes electronic data processing recording or storage media on which Data are recorded or stored such as software, films, tapes, discs or cells.

4) SOFTWARE means any combination of DATA, MEDIA or COMPUTER PROGRAMS

5) Computer EQUIPMENT means your programmable electronic equipment that is used to store, retrieve or process software. It includes but is not limited to any component parts and associated peripheral equipment or hardware that provides communication including input and output functions, printing and data transmission. Computer equipment does not include software.

## XI. LIBRARY STOCK EXTENSION
The following is added to Paragraph I.a Covered Property:

Covered Property, as used in this Coverage, includes the following:

(1) Your original cut negative film of completed or released productions, duplicate negatives, completed video tapes or other media which is considered library stock to you.

Ex. A  Pg. 55

Paragraph I.b. Property Not Covered is amended to remove subparagraph (3) Library stock.

Part III. Limits of Insurance is replaced by the following:

    a.  The most we will pay for loss in any one occurrence is the Limit of Insurance shown in the Declarations for the applicable Coverage(s).

    b.  Subject to the above limit of insurance applicable to any one occurrence, the most we will pay for loss or damage to library stock in any one occurrence is $1,000,000.

    c.  Subject to the above limits of insurance applicable to any one occurrence and library stock, $1,000,000 is the most we pay for loss or damage to any one production.

The following is added to Part IV. Deductible:

With respect to library stock, the deductible amount is the same as the deductible amount shown in the Declarations or otherwise applicable.

The following is added to Part V. Method of Valuation:

The amount of your library stock loss will be determined based on the actual cost to repurchase from an outside source, reprint or copy in whole or in part the affected portions of the library stock, whether or not the reprint or copy is made from an original or a copy of the lost or damaged library stock.

Ex. A  Pg. 56

EXHIBIT 18, PAGE 64

MOTION PICTURE PORTFOLIO

# SECTION III – EXTRA EXPENSE

Throughout this policy the words **you** and **your** refer to the Named Insured shown in the Declarations. The words **we**, **us** and **our** refer to the Company providing this insurance.

## I. INSURING AGREEMENT

We agree to pay to you such loss (as defined in Paragraph VII) not including loss of earnings or profit, as you sustain by reason of such extra expense you necessarily incur as a result of the interruption, postponement, cancellation, relocation, curtailment or abandonment of an Insured Production due to the following:

1. The loss must be a direct result of an unexpected, sudden or accidental occurrence entirely beyond your control to include:
   a) Confiscation and/or detainment of equipment, material or personal property by order of any government or civil authority;
   b) Shipping or transit delays or cancellation of necessary and required equipment, material or personal property used or to be used in the Insured Production caused by adverse weather conditions;
   c) Interruption or loss of utilities (electrical, steam, gas or any other power source) required to continue or complete an insured production;
   d) Strikes by any party, union, guild or labor group for which you are not a signatory or directly involved in negotiations or is not a major entertainment union or guild;
   e) Verifiable breakdown, short circuit, electrical injury, disturbance or malfunction to Covered Personal Property or vehicles.  Subject to props; created, constructed, designed or maintained by you must be tested and verified to be in working order under the conditions you will be using them.
   f) Interruption, postponement or cancellation of an insured  production as a direct result of the action of a civil

authority that revokes your permission to use or prohibits access to property or facilities used or to be used in connection with an Insured Production.
   g) Imminent peril, defined as certain, immediate and impending danger of such probability and severity to persons or property that it would be unreasonable or unconscionable to ignore.
   h) Any expenses incurred to avoid a loss resulting from imminent peril are covered to the extent that they serve to avoid a loss otherwise covered.

2. Except as provided above, this extension does not negate the applicability of the basic terms and conditions of:
   a) The Extra Expense Coverage in the event that an imminent peril results in damage to or destruction of property or facilities payable under this policy; or
   b) The Cast Coverage in the event that an imminent peril results in death, injury or sickness of a covered person, in which case a separate claim will result from the consequential loss as described above.

3. All unexpected, sudden or accidental crisis accident seriously injuring or killing a cast or crew member on the production site that necessarily forces you to stop the filming of the Insured Production, the following elements must have occurred:
   a) The crisis resulted in a life-threatening physical injury or accidental death to a cast or crew member of the insured production;
   b) The crisis occurs at the filming location of the Insured Production (meaning a location where cast or crew is assembled to shoot any scheduled work);

NS 103 0110

Ex. A  Pg. 57

c) The crisis was witnessed by cast or crew members of the Insured Production or is a forced closure by a civil authority;

d) The crisis necessarily results in the immediate suspension of the production of the Insured Production.

## II. LIMITS OF INSURANCE

The most we will pay for loss in any one occurrence is the Limit of Insurance shown in the Declarations for Extra Expense coverage, except the following:

1. Strike is subject to a $1,000,000 any one occurrence;

2. Confiscation is subject to a $1,000,000 any one occurrence;

3. Shipping & Transit Coverage is subject to a $1,000,000 any one occurrence;

4. Vehicle mechanical break down is subject to a $1,000,000 sublimit any one occurrence;

## III. DEDUCTIBLE

We will not pay for loss in any one occurrence until the amount of the adjusted loss before applying the applicable limits of insurance exceeds the deductible amount shown in the Declarations for Extra Expense Coverage. We will then pay the amount of the adjusted loss in excess of the deductible, up to the applicable limit of insurance.

## IV. TERM OF COVERAGE

Term of Coverage, as used in this Coverage, means the period beginning one hundred eighty (180) days before the date shown in the Declarations as the start of "Principal Photography" or the start date of principal photography which ever occurs first , and continuing until the earliest of the following dates:

(1) The date of delivery required under the completion guarantee agreement with the distributor(s);

(2) The date your completion guarantor is released from further obligations to you;

(3) Eighteen (18) months after completion of "Principal Photography";

(4) The date on which a protection print or duplicate tape has been completed and physically removed from the premises where the original negative or tape is located;

(5) The date your interest in the property ceases; or

(6) The date on which cancellation or termination of coverage under this policy for the "Insured Production" becomes effective.

The expiration date of this policy will be extended, if necessary, until the earliest of these dates. We may charge additional premium for this extension.

## V. WARRANTIES

You warrant that:

**A.** All necessary arrangements and contractual agreements for the Insured Production, including, but not limited to, permits, visa(s) and licenses, have been obtained and/or executed by you, prior to any "loss" covered hereunder.

**B.** You have disclosed to us any arrangements, contractual conditions, physical conditions or other facts that could affect the Insured Production.

**C.** Prior to the inception of coverage hereunder, you warrant having no knowledge of any matter, fact or circumstance, actual or threatened, that increases or could increase the possibility of a "loss" under this Policy.

Failure to fulfill any warranty above will release us from all obligations under this Policy, to the extent that a "loss" is suffered or increased by that failure.

## VI. PROPERTY NOT COVERED

Covered Property does not include Negative film, video tape, tapes, animation cells, transparencies, positives, sound tracks, art work, software, programs or any other form of media.

## VII. EXCLUSIONS

This coverage does not cover "loss" caused by, resulting from, or arising out of:

1. The failure of any person(s) in connection with the Insured Production to commence, continue or complete their respective duties or performances for any reason; or

2. Any financial cause of "loss", including but not limited to:

a) Any deficient or inadequate response, support or withdrawal of support, including insufficient attendance or interest prior to attendance;

b) Withdrawal of funds, inadequate or insufficient finances, however caused;

NS 103 0110 ☐

Ex. A  Pg. 58

c) Any financial failure of any venture, company, entity or person;

d) Any failure to maintain adequate receipts, sales or profits, including any failure to provide bond(s) or financial security;

e) Any variation in the rate of exchange, including devaluation, rate of interest or stability of any currency;

f) Any financial default, insolvency, debt or failure to pay necessary expense to any person, firm or corporation;

3. Any actual adverse weather at the location of any insured production except:

a) The action of a civil authority that prevents access to, exit from (ingress or egress) or closes down the location and or facilities due to conditions that threaten the safety of cast, crew or property, an imminent peril; or

b) Physical damage to property, facilities, or locations necessary to the insured production.

4. Your failure or inability to complete or obtain any contractual agreements, permits or licenses of any kind;

5. Your failure or inability to properly comply with, or the violation of any requirement or any procedure necessary for the issuance and continuance of any permit or authorization; or your failure to properly process or complete any applications or required documents.

6. The refusal or revocation of any permit or authorization due to a violation of any existing civil or criminal law or codes.

7. Any governmental body or civil authority preventing the commencement or completion of an Insured Production due to a breach of the terms of the permit or any civil or criminal violation by you.

8. Any concern or fear of an occurrence which may affect the commencement of the continuation of the Insured Production, except the action of a civil authority that prevents access to, exit from (ingress or egress) or closes down the location and or facilities due to conditions that threaten the safety of case, crew or property;

9. An imminent peril or physical damage to property, facilities, or locations necessary to the insured production.

10. Any concern or belief that the commencement or continuation of Insured Production is inappropriate.

11. Breach of contract by any party whether their contractual relationship be with you or otherwise where such loss is consequent upon or contributed to by any cause within your control or any other such party which includes the failure of any individual or entity contracted, hired or employed to willingly perform the duties for which that person or entity has been hired with respect to the Insured Production.

12. Wear and tear; any quality in the property that causes it to damage or destroy itself; hidden or latent defect; gradual deterioration; depreciation; mechanical breakdown or electrical breakdown; insects; vermin, or rodents; corrosion, rust, dampness, cold or heat. This exclusion does not apply to Verifiable breakdown, short circuit, electrical injury, disturbance or malfunction to Covered Personal Property or vehicles. Subject to props; created, constructed, designed or maintained by you must be tested and verified to be in working order under the conditions you will be using them.

13. Processing or work upon the property. But if processing or work upon the property results in fire or explosion, this exclusion does not apply to direct loss or damage caused by that fire or explosion, if the fire or explosion would be covered under this Coverage.

14. Unexplained or mysterious disappearance or shortage found upon taking of inventory.

15. Rain, ice, sleet, snow or hail, whether driven by wind or not, to property stored in the open. This exclusion does not apply to property that was built or designed to be stored in the open.

16. Intentional acts committed by you or at your direction. This exclusion does not apply to damage, destruction or threat thereof to software or computer media by an external person or an internal employee breaching your authority and safeguards to protect such software or computer media.

17. Loss of use (including loss of use of animals), loss of market, interruption of business, or any other consequential loss.

18. Any other loss that may be covered by some other section of this policy.

NS 103 0110

Ex. A  Pg. 59

19. Any weather condition that is a photographic
    weather condition;
20. The quality or content of the "Insured Produc-
    tion".
21. Strike by any organization for which you are
    a signatory or negotiate with or is a major en-
    tertainment union or guild;
22. Strike by an union or guild that was occurring
    prior to the commencement of "principle pho-
    tography" of an "Insured Production"
23. Watercraft exclusion amended to cover ves-
    sels valued under $750,001 No exclusion or
    restriction will be applied for watercraft used
    as part of a set and moored to a pier, dock,
    wharf of similar fixed structure.

## IX. DEFINITION OF LOSS

The amount of your loss will be determined based
on:

1. All necessary "Insurable Production Cost"
   you incur to complete the "Insured Produc-
   tion" that exceeds the amount of "Insurable
   Production Cost" you would have incurred if
   the covered cause of loss had not occurred;

2. All other necessary expenses that reduce
   the amount of loss otherwise payable.

3. Your loss will not include loss of earnings of
   profit.

4. If you abandon an "Insured Production" that
   has been made substantially valueless sole-
   ly because one or more covered causes of
   loss reasonably, practically and necessarily
   prevents you from completing the "Insured
   Production", irrespective of any completion
   or delivery date requirements for the "In-
   sured Production", we will pay as loss the to-
   tal "Insurable Production Cost" you have in-
   curred for the "Insured Production".

NS 103 0110    ☐

Ex. A  Pg. 60

POLICY NUMBER:                                             **PRODUCERS PORTFOLIO**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ANIMAL COVERAGE (EXTRA EXPENSE)

This endorsement modifies insurance provided under the following:

**MPTV PRODUCERS PORTFOLIO, SECTION III. EXTRA EXPENSE**

1. The following **Coverage Extensions** are added to Part I. Coverage:

    a. **Animal Extra Expense Coverage**

    **This Coverage Extension applies only when Extra Expense Coverage is part of the policy.**

    We will pay the actual and necessary loss you sustain as Extra Expense during the "Period of Restoration" due to the interruption, postponement or cancellation of an "Insured Production". The interruption, postponement or cancellation must be the direct result of a Covered Cause of Loss to a Covered Animal during the "Term of Coverage".

    Extra Expense, as used in this Coverage Extension, means the following expenses you incur that you would not have incurred had there been no interruption, postponement or cancellation of the "Insured Production":

    (1) Necessary additional "Costs" incurred to avoid or minimize the interruption, postponement or cancellation of the "Insured Production"; and

    (2) Necessary expenses incurred to the extent they reduce the amount of loss that otherwise would be payable under this Coverage.

    Extra Expense does not include:

    (1) Loss of earnings or profit;

    (2) Expense to repair or replace property, other than Covered Animals;

    (3) Expense payable under any other Coverage of this policy.

    b. **Covered Animals**

    For the purposes of these Coverage Extensions, **Covered Animal** means the animal(s) scheduled below that are used or intended to be used in an "Insured Production":

        Animals

    c. **Covered Causes of Loss**

    For the purposes of these Coverage Extensions, Covered Causes of Loss means accidental injury, Sickness or death to a Covered Animal after you accept a Certificate of Health signed by a duly licensed veterinarian. Until your acceptance, or in the absence of your acceptance, Covered Causes of Loss means only accidental injury or death resulting from accidental injury.

    Sickness means sickness, disease or illness resulting from any cause other than accidental injury.

    Certificate of Health Requirement is that certificate is on file with insured.

2. **Additional Exclusions**

    We will not pay for loss caused by or resulting from any of the following:

    a. Use of the animal in any activity other than in connection with the filming or taping of an "Insured Production";

    b. Use of the animal in any stunt or hazardous activity;

    c. Any cosmetic alteration of the animal;

    d. Willful misconduct or misuse of the animal;

    e. Confiscation or nationalization of the animal for any reason whatsoever;

**NS 106 0110**                                                          **Page 1 of 2**    ☐

Ex. A  Pg. 61

    f.   Quarantine, unless as a result of a Cause of Loss not otherwise excluded;

    g.   Intentional slaughter of the animal, either voluntarily or by act of or at the direction of any local authority; or This will not apply when an animal is sick and the Veterinarian recommendation is to slaughter the Covered Animal instead of attempting to provide sickness coverage.

    h.   Sickness of the animal as declared in the Certificate of health on file, regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

3. **Limits of Insurance**

The most we will pay for all loss to which these Coverage Extensions apply in any one occurrence is $1,000,000

The limit applicable to these Coverage Extensions is in addition to the policy Limits of Insurance.

4. **Deductible**

The Deductible provisions described in the applicable Coverage form apply to this Coverage Extension.

5. **Method of Valuation**

    a.  **Animal Cast Coverage**

    The Method of Valuation described in the applicable Cast Coverage form applies to this Coverage Extension if accepted by us.

    b.  **Animal Extra Expense Coverage**

    For the purposes of this Coverage Extension, paragraphs V.a. and V.b. are replaced by the following:

        a.   The amount of your loss will be determined based on:

           (1)  All "Costs" that exceeds the amount of "Costs" you would have incurred if there had been no interruption, postponement or cancellation of the "Insured Production"; and

           (2)  All other necessary expenses that reduce the amount of loss otherwise payable.

        b.   We will reduce the amount of your loss to the extent you can resume the "Insured Production" and discontinue Extra Expense or do not resume the "Insured Production" as quickly as possible.

           We will pay based on the length of time it would have taken to resume the "Insured Production" as soon as possible.

6. **Additional Conditions**

    a.  **Additional Duties In The Event of Loss**

        (1)  You must report immediately to us or our authorized representative any fact or circumstance which may prevent a Covered Animal from commencing, continuing or completing an assigned duty or role in an "Insured Production" and which may result in a claim under these Coverage Extensions.

        (2)  You must immediately secure and file with us or our authorized representative the certification of a duly licensed veterinarian. The certification must include a complete description of the injury, sickness or death and the prognosis.

        (3)  You must make every effort to preserve our rights, including enforcing any contractual conditions or terms applicable to the Covered Animal, to:

           (a)  Have any Covered Animal examined by a veterinarian of our choice; and

           (b)  Have continuing access to the medical records of any Covered Animal.

        (4)  You must exercise due diligence and dispatch to secure a substitute animal, when and where available, following a Covered Cause of Loss to a Covered Animal.

Ex. A Pg. 62

# SECTION IV - PROPERTY

Throughout this policy the words **you** and **your** refer to the Named Insured shown in the Declarations. The words **we, us** and **our** refer to the Company providing this insurance.

## I. INSURING AGREEMENT

We agree to pay to you or on your behalf the value of any property, not including loss of use, owned by you or which is the property of others and for which you are legally liable and which is lost, damaged or destroyed, caused by the Perils Insured against, while such property is used or to be used by you in connection with an Insured Production including:

1. Scenery, costumes, theatrical props and related equipment;

2. Cameras, camera equipment, sound and lighting equipment, portable electrical equipment, mechanical effects equipment, grip equipment and mobile equipment;

3. Office equipment, furniture, fixtures and tenants improvements and betterments;

4. Vehicles rented, hired or picture vehicles you own.

## II. PROPERTY NOT COVERED

Covered Property does not include:

1. Personal Property that is covered under any other Coverage of this policy;

2. Animals;

3. Growing plants except as part of a set;

4. Accounts; bills; numismatic properties; food stamps; notes; securities; stamps; deeds; evidences of debt; letters of credit; credit cards; passports; transportation, admission or other tickets, unless specifically added to this policy;

5. Buildings or their improvements and betterments, except as part of a set or the Insured Production Office.

6. Aircraft unless used as part of a set as a non-functional craft during filming or taping;

7. Watercraft valued over $750,000, and watercraft involved in racing, chase scenes, stunts or pyrotechnics, unless specifically

declared and accepted by us and added to this policy. If watercraft involved in racing, chase scenes, stunts or pyrotechnics, is not declared or accepted by us, a deductible of $100,000 shall apply.

8. "Land Vehicles" or "Mobile Equipment" while involved in racing, chase scenes, or stunts, unless specifically added and endorsed to this policy or when insured's production team can provide evidence that Risk Safety controls and procedures are in place, using qualified safety personnel, including stunt coordinators, local fire fighters, local police personnel and Risk Management signed off on activity.

9. "Land Vehicles" you own valued in excess of $125,000 unless specifically added by an endorsement to this policy or that are picture vehicles owned by you while used or intended to be used on-camera in an "Insured Production";

10. Negative film, video tape, tapes, cels, transparencies, positives, sound tracks, art work, software, programs or any other form of media;

11. The following property is excluded if the value of the item(s) exceeds $500,000:

    a) Furs, fur garments and garments trimmed with fur except as added to this policy.

    b) Jewelry, costume jewelry, watched, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals except as provided in the policy.

    c) Works of art, antiques or rate articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac except as provided in the policy.

## III. TERM OF COVERAGE

NS 104 0110

Term of Coverage, as used in this Coverage, means the period beginning one hundred eighty (180) days before the date shown in the Declarations as the start of "Principal Photography" or the start date of principal photography which ever occurs first , and continuing until the earliest of the following dates:

    (1) The date of delivery required under the completion guarantee agreement with the distributor(s);

    (2) The date your completion guarantor is released from further obligations to you;

    (3) Eighteen (18) months after completion of "Principal Photography";

    (4) The date on which a protection print or duplicate tape has been completed and physically removed from the premises where the original negative or tape is located;

    (5) The date your interest in the property ceases; or

    (6) The date on which cancellation or termination of coverage under this policy for the "Insured Production" becomes effective.

The expiration date of this policy will be extended, if necessary, until the earliest of these dates. We may charge additional premium for this extension.

## IV. LIMITS OF INSURANCE

    **A.** The most we will pay for loss or damage in any one occurrence is the Limit of Insurance shown in the Declarations for Property.

    **B.** Subject to a. above, $500,000 is the most we will pay for loss or damage to the following types of property:

        (1) Furs, fur garments and garments trimmed with fur;

        (2) Jewelry, costume jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals; and

        (3) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac.

This limit applies to any one occurrence, regardless of the types or number of articles that are lost or damaged in that occurrence.

## V. DEDUCTIBLE

We will not pay for loss or damage in any one occurrence until the amount of the adjusted loss or damage before applying the applicable limits of insurance exceeds the deductible amount shown in the Declarations. We will then pay the amount of the adjusted loss or damage in excess of the deductible, up to the applicable limit of insurance.

## VI. PERILS INSURED

This Coverage Section insures against all risks of direct physical loss or damage to the property covered from any external cause, except as hereinafter excluded.

## VII. EXCLUSIONS

This Coverage does not insure against loss or damage caused by or resulting from:

1. Wear and tear; any quality in the property that causes it to damage or destroy itself; hidden or latent defect; gradual deterioration; depreciation; mechanical breakdown or electrical breakdown; insects; vermin, or rodents; corrosion, rust, dampness, cold or heat. This exclusion does not apply to Verifiable breakdown, short circuit, electrical injury, disturbance or malfunction to Covered Personal Property or vehicles. Subject to props; created, constructed, designed or maintained by you must be tested and verified to be in working order under the conditions you will be using them.

2. Any work process, experimentation, repairing, restoration, conversion, or partial conversion, retouching, painting, cleaning or any other form of process performed or undertaken by you or on your behalf or at your direction, unless accidental fire or explosion ensues and then only for the loss or damage caused by such ensuing fire or explosion.;

3. Unexplained or mysterious disappearance, or shortage found upon taking of inventory;

4. Rain, sleet, snow or hail, whether driven by wind or not, to property stored in the open. This exclusion does not apply to property that was built or designed to be stored in the open;

5. damage to or destruction of property caused intentionally by you or at your direction;

6. loss, destruction or damage caused by or resulting from delay, loss of market, interruption of business or other consequential loss extending beyond direct physical loss or damage;

## VIII. VALUATION

Ex. A Pg. 64

The basis of determining the value of the property insured hereunder, except with respect to vehicles, will be as follows:

1. Your property will be valued at the full cost of repair or replacement, without deduction for depreciation or betterment, if repaired or re-placed with due diligence and dispatch and in no event unless repair or replacement is completed within one year from the date of loss. If not repaired or replaced, the property will be valued at its actual cash value at the time and the place of loss.

2. Property of others will be valued in accord-ance with a written contract and in the ab-sence of a written contract at common or fair market value or as you are obligated to pay by common law.

3. Vehicles will be valued at actual cash value as of the date and location of loss or in ac-cord with a written contract.

## IX. MONEY AND CURRENCY EXTENSION

**A.** Coverage is extended for loss or destruction of money and currency subject to a sub-limit of liability of $250,000 any one loss arising out of:

    1) Fire;

    2) Burglary (defined as a loss, which results from forcible entry to or exit from premises, safes or locked property);

**B.** Armed robbery (defined as the forcible tak-ing of money at gunpoint or by similar threat);

**C.** Coverage is provided at the following loca-tions while:

    1) In locked safes and vaults secured on your premises and/or locations used as temporary production offic-es and/or in hotel safes;

    2) IIn the custody of your approved agents in the course of and while performing their duties as agents;

    3) On your business premises during the normal hours of business.

**D.** You warrant that you and your agents will secure money and currency overnight in safes whenever available at locations other than your business premises. Failure to ad-here to this warranty will relieve us from all obligations under this coverage to the extent that a loss is suffered or increased by that failure.

**E.** No loss attaches hereunder for loss of mon-ey and currency arising out of mysterious or unexplained disappearance, or for shortage disclosed upon taking of inventory.

## X. DEFINITIONS

"Precision Driving" means two or more "Land Vehi-cles" or "Mobile Equipment" driving in unison, syn-chronization or choreographed interation.

Ex. A  Pg. 65

EXHIBIT 18, PAGE 73

POLICY NUMBER:                                            **PRODUCERS PORTFOLIO**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ANIMAL COVERAGE (PROPERTY)

This endorsement modifies insurance provided under the following:

**MPTV PRODUCERS PORTFOLIO, SECTION IV. COVERAGE PROPERTY**

1. The following **Coverage Extensions** are added to **I. INSURING AGREEMENT**:

   a. **Animal Health Coverage**

   We will pay the actual and necessary loss you sustain by reason of a Covered Cause of Loss to a Covered Animal during the "Term of Coverage".

   b. **Animal Repatriation, Rendering or Disposal Coverage**

   We will pay the actual and necessary loss you sustain by reason of the necessary repatriation, rendering or disposal of a Covered Animal by reason of a Covered Cause of Loss during the "Term of Coverage". Any repatriation must have our prior written authorization.

   c. **Animal Loss of Use Coverage**

   We will pay the actual and necessary loss you sustain by reason of a Covered Animal being prevented by a Covered Cause of Loss during the "Term of Coverage" from commencing, continuing or completing an assigned duty or role for a third party or parties.

   d. For the purposes of these Coverage Extensions:

   (1) **Covered Animals** means the animal(s) scheduled below that are used or intended to be used in an "Insured Production";

   (2) **Covered Causes of Loss** means accidental injury, Sickness or death to a Covered Animal with a Certificate of Health signed by a duly licensed veterinarian on file with insured.
   Sickness means sickness, disease or illness resulting from any cause other than accidental injury.

2. **Additional Exclusions**

   We will not pay for loss caused by or resulting from any of the following:

   a. Use of the animal in any activity other than in connection with the filming or taping of an "Insured Production";

   b. Use of the animal in any stunt or hazardous activity;

   c. Any cosmetic alteration of the animal;

   d. Failure to establish your legal liability for and the actual cash value of a Covered Animal;

   e. Willful misconduct or misuse of the animal;

   f. Confiscation or nationalization of the animal for any reason whatsoever;

   g. Quarantine, unless as a result of a Cause of Loss not otherwise excluded;

   h. Intentional slaughter of the animal, either voluntarily or by act of or at the direction of any local authority; This will not apply when an animal is sick and the Veterinarian recommendation is to slaughter the Covered Animal instead of attempting to provide sickness coverage.

   i. Any sickness as described in the Certificate of Health.

3. **Limits of Insurance**

   **Each Animal Per Production**

   The most we will pay for all loss to which these Coverage Extensions apply in any one animal is $250,000.

   The most we will pay for all loss to which these Coverage Extensions apply in any one occurrence is $1,000,000.

NS 110 0110                                                   Page 1 of 3   ☐

4. **Deductible**

Subject to the deductible amount shown in the Declarations or otherwise applicable with respect to each occurrence, we will not pay for loss caused by or resulting from a Covered Cause of Loss to a Covered Animal until the amount of the adjusted loss before applying the applicable limits of insurance exceeds the applicable deductible amount shown below. We will then pay the amount of the adjusted loss in excess of the deductible, up to the applicable limit of insurance.

Deductible any one occurrence of $5,000.

5. **Method of Valuation**

a. We will determine the amount of your loss as follows:

(1) **Animal Health Coverage**

(a) **Injury or Sickness of a Covered Animal**

The amount of your loss for injury or sickness to a Covered Animal will be the actual and necessary veterinary bills you incur.

(b) **Death of a Covered Animal**

The value of a Covered Animal in the event of death will be the actual cash value of the animal, as determined prior your using the animal(s). Covered animal(s) of others will be valued in accordance with a written contract and in the absence of a written contract at common or fair market value or as your are obligated to pay by common law.

(2) **Animal Repatriation, Rendering or Disposal Coverage**

The amount of your loss for repatriation, rendering or disposal of a Covered Animal will be the actual and necessary expenses you incur.

(3) **Animal Loss of Use Coverage**

The amount of your loss by reason of a Covered Animal being prevented from commencing, continuing or completing an assigned duty or role for a third party or parties will be the verifiable loss on income the third party can prove that the Covered Animal is contracted or has earned in income.

b. We will reduce the amount of your loss by any payments you receive from other insurance or any other source.

6. **Additional Conditions**

a. **Additional Duties In The Event of Loss**

(1) You must report immediately to us or our authorized representative any fact or circumstance which may prevent a Covered Animal from commencing, continuing or completing an assigned duty or role in an "Insured Production" and which may result in a claim under these Coverage Extensions.

(2) You must immediately secure and file with us or our authorized representative the certification of a duly licensed veterinarian. The certification must include a complete description of the injury, sickness or death and the prognosis.

(3) You must make every effort to preserve our rights, including enforcing any contractual conditions or terms applicable to the Covered Animal, to:

(a) Have any Covered Animal examined by a veterinarian of our choice; and

(b) Have continuing access to the medical records of any Covered Animal.

**WARRANTY**

It is warranted that your failure to comply with any of these conditions will prejudice us and will release us from any claim that involves such failure.

b. **Legal Liability and Valuation**

You agree to determine:

(1) The extent of your legal liability, and

(2) The actual cash value of each Covered Animal prior to your first use of the Covered Animal.

NS 110 0110                                                                                      Page 2 of 3      ☐

Ex. A  Pg. 67

In the event you do not have: 6b. (1) and (2) above you will pay to have the valuation established by an independent animal(s) professional in the event of a loss.

**b. Certificate of Health**

(1) You will have on file for each Covered Animal a signed Certificate of Health completed by a duly licensed veterinarian. The Certificate of Health must disclose:

(a) Any medical condition that has been treated; or

(b) Any medication that has been prescribed within one year prior to the date the Certificate of Health is completed.

(2) The Covered Animal will be covered for Sickness on the date you receive the Certificate of Health. Until that time, the Covered Animal is covered only for the Causes of Loss of accidental injury or death resulting from accidental injury.

Based on the medical information submitted to you, we and you have the right to make any reservation, exception or restriction regarding the insurability of the Covered Animal within a reasonable period of time.  We will not pay for loss caused by or resulting from any such reservation, exception or restriction.

NS 110 0110

Ex. A  Pg. 68

EXHIBIT 18, PAGE 76

MPTV PRODUCERS PORTFOLIO
MP 204 (01-05)

# SECTION V THIRD PARTY PROPERTY DAMAGE

**I.  COVERAGE**

We will pay those sums that the Insured becomes legally obligated to pay as damages because of direct physical loss of or damage, including loss of use, to Covered Property, caused by accident and arising out of any Covered Cause of Loss during the Term of Coverage. We will have the right and duty to defend the Insured against any "Suit" seeking those damages. However, we will have no duty to defend the Insured against any "Suit" seeking damages for direct physical loss or damage to which this insurance does not apply.  We may, at our discretion, investigate and settle any claim or "Suit" that may result. But:

(1)  The amount we will pay for damages is limited, as described in Part III. - Limits of Insurance; and

(2)  Our right and duty to defend ends when we have used up the Limit of Insurance in the payment of judgments and settlements.

a.  Covered Property, as used in this Coverage, means tangible property of others in an Insured's care, custody or control that is used or intended to be used in connection with an "Insured Production".

b.  Property Not Covered

Covered Property does not include:

(1)  Personal property rented to or leased by an Insured, except for loss of use of such property that is covered for direct physical damage under Section II, Coverage A. Props, Sets & Wardrobe or Section II, Coverage D. Miscellaneous Equipment of this policy;

(2)  Buildings and premises rented to or leased by an Insured for any use or purpose other than filming or taping in connection with an "Insured Production";

(3)  Any property that is involved in a hazardous activity or stunt, unless approved by us in writing;

(4)  Animals;

(5)  Negative film, video tape, tapes, cels, transparencies, positives, sound tracks, art work, software, programs or any other form of media; and

(6)  Motor vehicles, trailers, aircraft or watercraft, except for loss of use of such property that is covered for direct physical damage under Section II, Coverage A. Props, Sets & Wardrobe or Section II, Coverage D. Miscellaneous Equipment of this policy.

c.  Covered Causes of Loss

Covered Causes of Loss means risks of direct physical loss or damage to Covered Property except those causes of loss listed in the Exclusions.

d.  Additional Coverage

**Supplementary Payments**

We will pay, with respect to any claim we investigate or settle, or any "Suit" against an Insured we defend:

(1)  All expenses we incur.

(2)  The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance. We do not have to furnish these bonds.

(3)  All reasonable expenses, other than loss of earnings, incurred by the Insured at our request.

(4)  All costs taxed against the Insured in the "Suit".

(5)  Prejudgment interest awarded against the Insured on that part of the judgment we pay. If we make an offer to pay our Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

(6)  All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the Limit of Insurance.

Ex. A  Pg. 69

e. Coverage Extension

**Who Is An Insured**

Throughout this Coverage, the word "Insured" includes you and each of the following:

(1) If you are a partnership or joint venture, your members and partners, but only with respect to the conduct of your business.

(2) If you are a limited liability company, your members, but only with respect to the conduct of your business. Your managers are Insureds, but only with respect to their duties as your managers.

(3) If you are an organization other than a partnership, joint venture or limited liability company, your executive officers and directors, but only with respect to their duties as your officers or directors.

(4) If you are a trust, your trustees, but only with respect to their duties as trustees.

(5) Your "Employees", but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

(6) Your "Volunteer Workers" or any other person under your direct control, but only while performing duties related to the conduct of your business.

f. Term of Coverage

Term of Coverage, as used in this Coverage, means the period beginning sixty (60) days before the date shown in the Declarations as the start of "Principal Photography", and continuing until the earliest of the following dates:

(1) The date of delivery required under the completion guarantee agreement with the distributor(s);

(2) The date your completion guarantor is released from further obligations to you;

(3) Eighteen (18) months after completion of "Principal Photography";

(4) The date on which a protection print or duplicate tape of an "Insured Production" has been completed and physically removed from the premises where the original negative or tape is located;

(5) The date your interest in the property ceases; or

(6) The date on which cancellation or termination of coverage under this policy for the "Insured Production" becomes effective.

The expiration date of this policy will be extended, if necessary, until the earliest of these dates. We may charge additional premium for this extension.

**II. ADDITIONAL EXCLUSIONS**

For the purposes of this Coverage, the following exclusions apply in addition to the exclusions described in Part V. of the Policy Conditions - Exclusions Applicable To All Coverages of This Policy.

We will not pay for loss or damage caused by or resulting from any of the following:

a. Intentional acts committed by or at the direction of any Insured.

b. The failure of an Insured to provide reasonable care for Covered Property.

**III. LIMITS OF INSURANCE**

The most we will pay in damages as the result of any one accident is the Limit of Insurance shown in the Declarations for Third Party Property Damage coverage.

**IV. DEDUCTIBLE**

Our obligation to pay damages applies only to the amount of damages in excess of the deductible amount shown in the Declarations for Third Party Property Damage Coverage. The deductible amount applies to all damages as the result of any one accident, regardless of the number of persons or organizations who sustain damages because of that accident.

This deductible does not apply to a loss of use claim for property that is covered for direct physical loss or damage under any other Coverage of this policy.

**V. AMENDED CONDITIONS**

a. The following Policy Condition does not apply to this Coverage:

Condition III.d. – Stop Date Loss

b. Condition I.g. – Loss Payment is replaced by the following:

(1) If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

(2) We will not be liable for any part of a loss that has been paid or made good by others.

Ex. A  Pg. 70

EXHIBIT 18, PAGE 78

## VI. ADDITIONAL CONDITION

For the purposes of this Coverage, the following Condition applies in addition to the Policy Conditions.

**Legal Action Against Us**

The following is added to Policy Condition II.g. – Legal Action Against Us

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an Insured; but we will not be liable for damages that are not payable under the terms of this Coverage or that are in excess of the Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the Insured, and the claimant or the claimant's legal representative.

## VII. ADDITIONAL DEFINITIONS

For the purposes of this Coverage, the following definitions apply in addition to the definitions described in Part IV. of the Policy Conditions - Definitions Applicable To All Coverages of This Policy:

a. "Employee" includes a "Leased Worker" and a "Temporary Worker".

b. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased Worker" does not include a "Temporary Worker".

c. "Suit" means a civil proceeding in which damages to which this insurance applies are alleged.  "Suit" includes:

(1) An arbitration proceeding in which damages are claimed and to which the Insured must submit or does submit with our consent; or

(2) Any other alternative dispute resolution proceeding in which such damages are claimed and to which the Insured submits with our consent.

d. "Temporary Worker" means a person who is furnished to you to substitute for a permanent "Employee" on leave or to meet seasonal or short-term workload conditions.

e. "Volunteer Worker" means a person who is not your "Employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

POLICY NUMBER:                                            **MPTV PRODUCERS PORTOLIO**

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# STRIP SHOW COVERAGE EXTENSION

This endorsement modifies insurance provided under the following:

**MPTV PRODUCERS PORTFOLIO**

**STRIP SHOW COVERAGE**

The only Coverage Sections applicable to Strip Shows, TV Specials and Webisodes are: General Conditions; Section IV Property; Section V Third Party Property Damage; and any endorsements attached to these sections only.

All other terms and conditions remain unchanged.

**NS 108 0105**                                                     **Page 1 of 1**    ☐

Ex. A  Pg. 72

POLICY NUMBER:                                              **MPTV PRODUCERS PORTOLIO**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# HURRICANE, TORNADO & COUNTRY EXCLUSION

This endorsement modifies insurance provided under the following:

**MPTV PRODUCERS PORTFOLIO**

**A. WIND STORM EXCLUSION**
All Coverage Sections specifically exclude any claims caused or contributed to by a named windstorm in the following territories during the terms indicated unless endorsed hereon:

**Dates:** 1st of June through 30th November

Territories of Virginia, Washington, DC, Georgia, North Carolina, South Carolina, Florida, Alabama, Arkansas, Louisiana, Texas: within 100 miles of the coast.

**Dates:** 1st of January through 30th June

Territories of Hawaii, Indonesia, Australia, Asia, New Zealand, Philippines, Korea, and other Asia countries.


**B. COUNTRY EXCLUSION**
All Coverage Sections specifically exclude any claims in the following territories unless endorsed hereon:

That is under trade or economic embargoes imposed by the laws or regulations of the United States of America. That has a Travel Warning as listed on travel.state.gov or is a country that is on the USA travel warning watch lists, terrorist watch lists or a USA sanctioned country, except as endorsed hereon.



All other terms and conditions remain unchanged.

**NS 107 0105**

IL 09 35 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** We will not pay for loss ("loss") or damage caused directly or indirectly by the following. Such loss ("loss") or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss ("loss") or damage.

  **1.** The failure, malfunction or inadequacy of:

    **a.** Any of the following, whether belonging to any insured or to others:

      **(1)** Computer hardware, including microprocessors;

      **(2)** Computer application software;

      **(3)** Computer operating systems and related software;

      **(4)** Computer networks;

      **(5)** Microprocessors (computer chips) not part of any computer system; or

      **(6)** Any other computerized or electronic equipment or components; or

    **b.** Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **A.1.a.** of this endorsement;

    due to the inability to correctly recognize, process, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

**2.** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **A.1.** of this endorsement.

**B.** If an excluded Cause of Loss as described in Paragraph **A.** of this endorsement results:

  **1.** In a Covered Cause of Loss under the Crime and Fidelity Coverage Part, the Commercial Inland Marine Coverage Part or the Standard Property Policy; or

  **2.** Under the Commercial Property Coverage Part:

    **a.** In a "Specified Cause of Loss", or in elevator collision resulting from mechanical breakdown, under the Causes of Loss – Special Form; or

    **b.** In a Covered Cause of Loss under the Causes Of Loss – Basic Form or the Causes Of Loss – Broad Form;

  we will pay only for the loss ("loss") or damage caused by such "Specified Cause of Loss", elevator collision, or Covered Cause of Loss.

**C.** We will not pay for repair, replacement or modification of any items in Paragraphs **A.1.a.** and **A.1.b.** of this endorsement to correct any deficiencies or change any features.

© ISO Properties, Inc., 2001

Ex. A  Pg. 74

IL 02 68 01 11

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraphs **1.**, **2.**, **3.** and **5.** of the **Cancellation** Common Policy Condition are replaced by the following:

**1.** The first Named Insured shown in the Declarations may cancel this entire policy by mailing or delivering to us advance written notice of cancellation.

**2. Cancellation Of Policies In Effect**

**a. 60 Days Or Less**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**(1)** 30 days before the effective date of cancellation if we cancel for any reason not included in Paragraph **A.2.a.(2)** below.

**(2)** 15 days before the effective date of cancellation if we cancel for any of the following reasons:

**(a)** Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

**(b)** Conviction of a crime arising out of acts increasing the hazard insured against;

**(c)** Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim;

**(d)** After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and that occurred subsequent to inception of the current policy period;

**(e)** Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the policy, that results in the property becoming uninsurable in accordance with our objective, uniformly applied underwriting standards in effect at the time the policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, that causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

**(f)** Required pursuant to a determination by the Superintendent that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interest of our policyholders, our creditors or the public;

IL 02 68 01 11 © Insurance Services Office, Inc., 2010 Page 1 of 5 ☐

Ex. A Pg. 75

(g) A determination by the Superintendent that the continuation of the policy would violate, or would place us in violation of, any provision of the Insurance Code; or

(h) Where we have reason to believe, in good faith and with sufficient cause, that there is a probable risk of danger that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. If we cancel for this reason, you may make a written request to the Insurance Department, within 10 days of receipt of this notice, to review our cancellation decision. Also, we will simultaneously send a copy of this cancellation notice to the Insurance Department.

**b. For More Than 60 Days**

If this policy has been in effect for more than 60 days, or if this policy is a renewal or continuation of a policy we issued, we may cancel only for any of the reasons listed in Paragraph **A.2.a.(2)** above, provided:

(1) We mail the first Named Insured written notice at least 15 days before the effective date of cancellation; and

(2) If we cancel for nonpayment of premium, our notice of cancellation informs the first Named Insured of the amount due.

**3.** We will mail or deliver our notice, including the reason for cancellation, to the first Named Insured at the address shown in the policy and to the authorized agent or broker.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata.

However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, we will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. The cancellation will be effective even if we have not made or offered a refund.

**B.** The following is added to the **Cancellation** Common Policy Condition:

**7.** If one of the reasons for cancellation in Paragraph **A.2.a.(2)** or **D.2.b.(2)** exists, we may cancel this entire policy, even if the reason for cancellation pertains only to a new coverage or endorsement initially effective subsequent to the original issuance of this policy.

**C.** The following conditions are added:

**1. Nonrenewal**

If we decide not to renew this policy we will send notice as provided in Paragraph **C.3.** below.

**2. Conditional Renewal**

If we conditionally renew this policy subject to:

**a.** A change of limits;

**b.** A change in type of coverage;

**c.** A reduction of coverage;

**d.** An increased deductible;

**e.** An addition of exclusion; or

**f.** Increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

we will send notice as provided in Paragraph **C.3.** below.

**3. Notices Of Nonrenewal And Conditional Renewal**

**a.** If we decide not to renew this policy or to conditionally renew this policy as provided in Paragraphs **C.1.** and **C.2.** above, we will mail or deliver written notice to the first Named Insured shown in the Declarations at least 60 but not more than 120 days before:

(1) The expiration date; or

(2) The anniversary date if this is a continuous policy.

**b.** Notice will be mailed or delivered to the first Named Insured at the address shown in the policy and to the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

© Insurance Services Office, Inc., 2010

IL 02 68 01 11     ☐

Ex. A  Pg. 76

c. Notice will include the specific reason(s) for nonrenewal or conditional renewal, including the amount of any premium increase for conditional renewal and description of any other changes.

d. If we violate any of the provisions of Paragraph **C.3.a.**, **b.** or **c.** above by sending the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice:

(1) And if notice is provided prior to the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the first Named Insured, during this 60-day period, has replaced the coverage or elects to cancel;

(2) And if the notice is provided on or after the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy for another policy period, at the lower of the current rates or the prior period's rates, unless the first Named Insured, during this additional policy period, has replaced the coverage or elects to cancel.

e. If you elect to renew on the basis of a late conditional renewal notice, the terms, conditions and rates set forth in such notice shall apply:

(1) Upon expiration of the 60-day period, unless Subparagraph **(2)** below applies; or

(2) Notwithstanding the provisions in Paragraphs **d.(1)** and **d.(2)**, as of the renewal date of the policy if the conditional renewal notice was sent at least 30 days prior to the expiration or anniversary date of the policy.

f. We will not send you notice of nonrenewal or conditional renewal if you, your authorized agent or broker or another insurer of yours mails or delivers notice that the policy has been replaced or is no longer desired.

D. The following provisions apply when the Commercial Property Coverage Part, the Farm Coverage Part or the Capital Assets Program (Output Policy) Coverage Part is made a part of this policy:

1. Items **D.2.** and **D.3.** apply if this policy meets the following conditions:

a. The policy is issued or issued for delivery in New York State covering property located in this state; and

b. The policy insures:

(1) For loss of or damage to structures, other than hotels or motels, used predominantly for residential purposes and consisting of no more than four dwelling units; or

(2) For loss of or damage to personal property other than farm personal property or business property; or

(3) Against damages arising from liability for loss of, damage to or injury to persons or property, except liability arising from business or farming; and

c. The portion of the annual premium attributable to the property and contingencies described in **1.b.** exceeds the portion applicable to other property and contingencies.

2. Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

2. **Procedure And Reasons For Cancellation**

a. We may cancel this entire policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1) 15 days before the effective date of cancellation if we cancel for nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

b. But if this policy:

(1) Has been in effect for more than 60 days; or

**(2)** Is a renewal of a policy we issued;

we may cancel this policy only for one or more of the following reasons:

**(1)** Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

**(2)** Conviction of a crime arising out of acts increasing the risk of loss;

**(3)** Discovery of fraud or material misrepresentation in obtaining the policy or in making a claim;

**(4)** Discovery of willful or reckless acts or omissions increasing the risk of loss;

**(5)** Physical changes in the covered property that make that property uninsurable in accordance with our objective and uniformly applied underwriting standards in effect when we:

   **(a)** Issued the policy; or

   **(b)** Last voluntarily renewed the policy;

**(6)** The Superintendent of Insurance's determination that continuing the policy would violate Chapter 28 of the Insurance Law; or

**(7)** Required pursuant to a determination by the Superintendent of Insurance that the continuation of our present premium volume would be hazardous to the interests of our policyholders, our creditors or the public.

**3.** The following are added:

   **a. Conditional Continuation**

   Instead of cancelling this policy, we may continue it on the condition that:

   **(1)** The policy limits be changed; or

   **(2)** Any coverage not required by law be eliminated.

   If this policy is conditionally continued, we will mail or deliver to the first Named Insured written notice at least 20 days before the effective date of the change or elimination. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

**b. Nonrenewal**

   If, as allowed by the laws of New York State, we:

   **(1)** Do not renew this policy; or

   **(2)** Condition policy renewal upon:

      **(a)** Change of limits; or

      **(b)** Elimination of coverage;

   we will mail or deliver written notice of nonrenewal or conditional renewal:

      **(a)** At least 45 days; but

      **(b)** Not more than 60 days;

   before the expiration date of the policy. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

**E.** The following is added to the Farm Property – Other Farm Provisions Form – Additional Coverages, Conditions, Definitions, the Commercial Property Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

When the property is subject to the Anti-arson Application in accordance with New York Insurance Department Regulation No. 96, the following provisions are added:

If you fail to return the completed, signed and affirmed anti-arson application to us:

**1.** Or our broker or agent within 45 days of the effective date of a new policy, we will cancel the entire policy by giving 20 days' written notice to you and to the mortgageholder shown in the Declarations.

**2.** Before the expiration date of any policy, we will cancel the policy by giving written notice to you and to the mortgageholder shown in the Declarations at least 15 days before the effective date of cancellation.

The cancellation provisions set forth in **E.1.** and **E.2.** above supersede any contrary provisions in this policy including this endorsement.

If the notice in **E.1.** or **E.2.** above is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

© Insurance Services Office, Inc., 2010

IL 02 68 01 11          □

Ex. A  Pg. 78

EXHIBIT 18, PAGE 86

**F.** The following applies to the Commercial Property Coverage Part, the Farm Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

Paragraphs **f.** and **g.** of the **Mortgageholders** Condition are replaced by the following:

**f. Cancellation**

**(1)** If we cancel this policy, we will give written notice to the mortgageholder at least:

**(a)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(b)** 30 days before the effective date of cancellation if we cancel for any other reason.

**(2)** If you cancel this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, cancellation will become effective on the later of:

**(a)** The effective date of cancellation of the insured's coverage; or

**(b)** 10 days after we give notice to the mortgageholder.

**g. Nonrenewal**

**(1)** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**(2)** If you elect not to renew this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, nonrenewal will become effective on the later of:

**(a)** The expiration date of the policy; or

**(b)** 10 days after we give notice to the mortgageholder.

**G.** The following provisions apply when the following are made a part of this policy:

Commercial General Liability Coverage Part

Employment-Related Practices Liability Coverage Part

Farm Liability Coverage Form

Liquor Liability Coverage Part

Products/Completed Operations Liability Coverage Part

**1.** The aggregate limits of this policy as shown in the Declarations will be increased in proportion to any policy extension provided in accordance with Paragraph **C.3.d.** above.

**2.** The last sentence of Limits Of Insurance does not apply when the policy period is extended because we sent the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice.

Ex. A  Pg. 79

IL 01 83 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – FRAUD

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART – FARM PROPERTY – OTHER FARM PROVISIONS FORM – ADDITIONAL
COVERAGES, CONDITIONS, DEFINITIONS
FARM COVERAGE PART – MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE
FORM
FARM COVERAGE PART – LIVESTOCK COVERAGE FORM

The CONCEALMENT, MISREPRESENTATION OR FRAUD Condition is replaced by the following:

**FRAUD**

We do not provide coverage for any insured ("insured") who has made fraudulent statements or engaged in fraudulent conduct in connection with any loss ("loss") or damage for which coverage is sought under this policy.

However, with respect to insurance provided under the COMMERCIAL AUTOMOBILE COVERAGE PART, we will provide coverage to such "insured" for damages sustained by any person who has not made fraudulent statements or engaged in fraudulent conduct if such damages are otherwise covered under the policy.

IL 01 83 07 02                    © ISO Properties, Inc., 2001                    Page 1 of 1    □

Ex. A Pg. 80

IL 09 50 11 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COVERAGE FOR CERTIFIED ACTS OF TERRORISM; CAP ON LOSSES

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EMPLOYEE THEFT AND FORGERY POLICY
FARM COVERAGE PART
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY
KIDNAP/RANSOM AND EXTORTION COVERAGE FORM
KIDNAP/RANSOM AND EXTORTION POLICY
STANDARD PROPERTY POLICY

**A. Amendment**

Any exclusion of terrorism in this Coverage Part or Policy, or attached to such Coverage Part or Policy by endorsement, is hereby amended to the effect that such exclusion does not apply to a "certified act of terrorism".

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The criteria contained in that Act for a "certified act of terrorism" include the following:

1. The act resulted in aggregate losses in excess of $5 million; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Further, the aforementioned exclusion does not apply to an act which meets the criteria set forth in Paragraph **2.** of the definition of "certified act of terrorism", when such act resulted in aggregate losses of $5 million or less.

**B. Cap On Certified Terrorism Losses**

With respect to any one or more "certified acts of terrorism" under the federal Terrorism Risk Insurance Act of 2002, we will not pay any amounts for which we are not responsible under the terms of that Act (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

**C. Application Of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

IL 09 50 11 02      © ISO Properties, Inc., 2002      Page 1 of 1    ☐

Ex. A Pg. 81

# EXHIBIT 19

MARC J. SHRAKE (SBN 219331)
  mjs@amclaw.com
ANDERSON, MCPHARLIN & CONNERS LLP
707 Wilshire Boulevard, Suite 4000
Los Angeles, California 90017-3623
Telephone: (213) 236-1691
Facsimile: (213) 622-7594

MICHAEL KEELEY
  michael.keeley@strasburger.com
*Pro Hac Vice Application Pending*
JOHN R. RIDDLE
  john.riddle@strasburger.com
*Pro Hac Vice Application Pending*
CARLA C. CRAPSTER
  carla.crapster@strasburger.com
*Pro Hac Vice Application Pending*
STRASBURGER & PRICE, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330

Attorneys for Defendant
Atlantic Specialty Insurance Company

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

UNIVERSAL CABLE PRODUCTIONS, LLC and NORTHERN ENTERTAINMENT PRODUCTIONS LLC,

      Plaintiffs,

v.

ATLANTIC SPECIALTY INSURANCE COMPANY,

      Defendant.

Case No. 2:16-cv-04435-PA-MRW

**DEFENDANT'S ORIGINAL ANSWER TO PLAINTIFFS' FIRST AMENDED COMPLAINT**

Defendant, Atlantic Specialty Insurance Company ("Atlantic"), files its Original Answer to Plaintiff's First Amended Complaint (the "Complaint") and would respectfully show the Court as follows:

1489146.1

1

**DEFENDANT'S ORIGINAL ANSWER**

## **NATURE OF CLAIM**

1.      Answering the first sentence of paragraph 1 of the Complaint, Atlantic admits that Plaintiffs have filed their Complaint seeking coverage under the Motion Picture/Television Producers Portfolio Insurance Policy, Policy No. MP00163-04, that Atlantic issued to NBCUniversal Media, LLC ("NBCUniversal") and others (the "Policy"), but denies that Plaintiffs have accurately characterized Atlantic as a "production insurer." Answering the second sentence of paragraph 1 of the Complaint, Atlantic admits that UCP was filming the television show "*Dig*" in Israel in the summer of 2014, admits that Hamas has been designated by the United States Secretary of State as a Foreign Terrorist Organization, and admits that Hamas fired rockets into Israel, but denies that this was the beginning of Hamas' firing of rockets into Israel, and further denies that Plaintiffs have accurately characterized the U.S. State Department's Daily Briefing on July 9, 2014, or the manner in which the United States has characterized Hamas. Answering the third sentence of paragraph 1 of the Complaint, Atlantic admits that the decision was made to move the production of *Dig* out of Israel, but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained therein. Answering the fourth sentence of paragraph 1 of the Complaint, Atlantic admits that NBCUniversal submitted a claim to Atlantic for indemnification of expenses it claims were incurred in connection with postponing and moving the production of *Dig*. Further answering paragraph 1 of the Complaint, Atlantic denies the remaining allegations contained there.

2.      Answering paragraph 2 of the Complaint, Atlantic admits that Section III ━ Extra Expense of the Policy provides potential coverage, subject to all of the terms, conditions, and limitations of the Policy, for loss an insured sustains by reason of extra expenses necessarily incurred "as a result of the interruption,

**DEFENDANT'S ORIGINAL ANSWER**

EXHIBIT 19, PAGE 91

postponement, cancellation, relocation, curtailment or abandonment of an Insured Production," admits that the Policy does not contain an exclusion for "acts of terrorism," but denies that Plaintiffs have accurately characterized the terms of the Policy. Further answering paragraph 2 of the Complaint, Atlantic denies that Plaintiffs have accurately characterized Atlantic's position or statements concerning Plaintiffs' claim, and further denies that Plaintiffs have accurately characterized the positions of the United States regarding the Gaza Strip and Hamas. Further answering paragraph 2 of the Complaint Atlantic denies the remaining allegations contained therein.

3.    Answering paragraph 3 of the Complaint, Atlantic denies the allegations contained therein.

4.    Answering the first sentence of paragraph 4 of the Complaint, Atlantic admits that NBCUniversal is a named insured under the Policy, but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained therein. Answering the second sentence of paragraph 4 of the Complaint, Atlantic admits that NBCUniversal paid a premium for the Policy, but lacks knowledge or information sufficient to form a belief about the truth of the allegations concerning NBCUniversal's reasons for obtaining the Policy. Further answering paragraph 4 of the Complaint, Atlantic denies the remaining allegations contained therein.

5.    Answering paragraph 5 of the Complaint, Atlantic denies the allegations contained therein.

## **THE PARTIES**

**A.    Plaintiffs**

6.    Answering the first sentence of paragraph 6 of the Complaint, Atlantic admits that Plaintiffs are Delaware limited liability companies that conduct business in California and elsewhere, but lacks knowledge or information

1489146.1

3

DEFENDANT'S ORIGINAL ANSWER

sufficient to form a belief about the truth of the remaining allegations contained therein. Answering the second sentence of paragraph 6 of the Complaint, Atlantic admits that NBCUniversal is listed as a named insured in Item 1 of the Declarations Page of the Policy, but denies that any other entities are listed in Item 1 of the Declarations of the Policy as implied by Plaintiffs. Answering the third sentence of paragraph 6 of the Complaint, Atlantic lacks knowledge or information sufficient to form a belief about the truth of the allegations contained therein. Answering the fourth sentence of paragraph 6 of the Complaint, Atlantic admits that Plaintiffs have accurately quoted the first paragraph of Section I.A. of the Motion Picture Television Portfolio General Conditions section of the Policy with the addition of the term "[sic]."

**B.    Defendant**

7.    Answering the first sentence of paragraph 7 of the Complaint, Atlantic admits the allegations contained therein. Answering the second sentence of paragraph 7 of the Complaint, Atlantic admits that it is an insurance company that is an indirect wholly-owned subsidiary of OneBeacon Insurance Group, Ltd. ("OB"), that OB is a publicly-traded company domiciled in Bermuda, but otherwise denies that Plaintiffs have accurately characterized Atlantic or its relationship with OB. Answering the third sentence of Paragraph 7 of the Complaint, Atlantic admits that it has issued insurance policies to entities involved in the entertainment industry, admits that it has issued insurance policies throughout the United States, including California and the Central District of California, but denies that Plaintiffs have otherwise accurately characterized Atlantic's business. Answering the fourth sentence of paragraph 7 of the Complaint, Atlantic admits that it conducted underwriting before issuing the Policy, admits that OneBeacon Entertainment LLC ("OBE") is an indirect wholly-owned subsidiary of OB, but denies that the Policy was administered by OBE.

**DEFENDANT'S ORIGINAL ANSWER**

Further answering paragraph 7 of the Complaint, Atlantic denies the remaining allegations contained therein.

8.  Answering paragraph 8 of the Complaint, Atlantic denies the allegations contained therein.

## JURISDICTION AND VENUE

### Allegations regarding citizenship of UCP and Northern Entertainment

9.  Answering paragraph 9 of the Complaint, Atlantic admits that Plaintiffs have filed their Complaint as a diversity lawsuit, but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained therein.

### Plaintiff UCP

10.  Answering paragraph 10 of the Complaint, Atlantic lacks knowledge or information sufficient to form a belief about the truth of the allegations contained therein.

11.  Answering paragraph 11 of the Complaint, Atlantic lacks knowledge or information sufficient to form a belief about the truth of the allegations contained therein.

### Plaintiff Northern Entertainment

12.  Answering paragraph 12 of the Complaint, Atlantic lacks knowledge or information sufficient to form a belief about the truth of the allegations contained therein.

13.  Answering paragraph 13 of the Complaint, Atlantic admits it is a citizen of New York and Minnesota, admits that the amount in controversy in this lawsuit exceeds the sum of $75,000, exclusive of interest and costs, but lacks knowledge of information sufficient to form a belief about the truth of the remaining allegations contained therein.

1489146.1

5

**DEFENDANT'S ORIGINAL ANSWER**

## THE INSURANCE POLICY AND THE INSURED *DIG* PRODUCTION

14.　Answering paragraph 14 of the Complaint, Atlantic lacks knowledge or information sufficient to form a belief about the truth of the allegations contained therein.

15.　Answering paragraph 15 of the Complaint, Atlantic lacks knowledge or information sufficient to form a belief about the truth of the allegations contained therein.

16.　Answering paragraph 16 of the Complaint, Atlantic admits that it issued the Policy to NBCUniversal for the policy period from January 1, 2014 (not January 11, 2014), to June 30, 2015, admits that NBCUniversal paid a premium for the Policy, and admits that the Policy includes various coverages including Section I — Cast Coverage, Section II — Negative Film and Faulty Stock, and Section III — Extra Expense, as well as other coverages, terms, conditions, and limitations, but denies that Plaintiffs have accurately characterized the terms of the Policy. Further answering paragraph 16 of the Complaint, Atlantic denies the remaining allegations contained therein.

17.　Answering paragraph 17 of the Complaint, Atlantic admits the allegations contained therein, except that each of the policies were effective from January 1, not January 11.

18.　Answering paragraph 18 of the Complaint, Atlantic admits that Section III — Extra Expense, is relevant to Plaintiffs' claim, but denies that it is the only relevant section of the Policy, and denies that Plaintiffs have accurately characterized the terms of Section III — Extra Expense.

19.　Answering paragraph 19 of the Complaint, Atlantic admits that Plaintiffs have accurately quoted the Insuring Agreement of Section III — Extra Expense, with the addition of the term "[Atlantic]," but denies that this is the only relevant provision of the Policy, and further denies that Plaintiffs have accurately

**DEFENDANT'S ORIGINAL ANSWER**

characterized the terms of the Policy.

20.     Answering paragraph 20 of the Complaint, Atlantic admits that in the letter from Pamela A. Johnson to Andrea Garber dated July 28, 2014, Ms. Johnson stated: "Based on Mr. Smith's email to the production and what we know about the present conflict, we believe that the extra expenses that will be incurred to move the production out of Israel will be due to imminent peril," but denies that Plaintiffs have accurately characterized such letter or Atlantic's position in connection with this matter. Further answering paragraph 20 of the Complaint, Atlantic admits that there is no express coverage provision in the Policy for terrorism, and that the Policy does not define the term "terrorism," but denies that Plaintiffs have accurately characterized the terms of the Policy. Further answering paragraph 20 of the Complaint, Atlantic denies the remaining allegations contained therein.

21.     Answering paragraph 21 of the Complaint, Atlantic admits that *Dig* was approved for potential coverage under an earlier policy on or about December 12, 2013 (not in or about January 2014), and that the production of *Dig* also was accepted as a production for potential coverage under the Policy. Further answering paragraph 21 of the Complaint, Atlantic lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained therein.

## **EVENTS LEADING UP TO THE CLAIM**

22.     Answering the first, second, and third sentences of paragraph 22 of the Complaint, Atlantic admits the allegations contained therein. Answering the fourth sentence of paragraph 22 of the Complaint, Atlantic admits that Hamas is not listed on the Bureau of Intelligence and Research Fact Sheet cited at footnote 6 of the Complaint as an Independent State in the World, but denies that Plaintiffs have accurately alleged the way in which the United States Government

1489146.1

7

**DEFENDANT'S ORIGINAL ANSWER**

characterizes the Gaza Strip.

23.    Answering the first sentence of paragraph 23 of the Complaint, Atlantic admits that three Israeli teenagers, one of whom was an American citizen, were kidnapped on June 12, 2014, and that Hamas later admitted to kidnapping the teenagers, but denies that Plaintiffs have accurately characterized the U.S. Department of State Daily Press Briefing cited in footnote 7 of the Complaint. Answering the second sentence of Paragraph 23 of the Complaint, Atlantic admits that bodies of the kidnapped teenagers were found on or about June 30, 2014, and that there were reports indicating that Hamas was involved, but denies that Plaintiffs have accurately recited statements made by the spokesperson for the U.S. Department of State in her Daily Press Briefing on June 30, 2014, as implied by citing to such briefing in footnote 8 of the Complaint. Answering the third sentence of paragraph 23 of the Complaint, Atlantic denies that Plaintiffs have accurately characterized the referenced Daily Press Briefings.

24.    Answering the first sentence of paragraph 24 of the Complaint, Atlantic admits that in the referenced State Department's Daily Press Briefing, the State Department's representative voiced concern about the "safety and security of civilians," but denies that those concerns were limited to Israel and Jerusalem, where certain *Dig* filming was allegedly scheduled to take place. Further answering paragraph 24 of the Complaint, Atlantic lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained therein.

25.    Answering paragraph 25 of the Complaint, Atlantic admits that NBCUniversal advised it, but not OBE, that the show was being postponed and that it might be moved to another location.

26.    Answering the first sentence of paragraph 26 of the Complaint, Atlantic lacks knowledge or information sufficient to form a belief about the truth

**DEFENDANT'S ORIGINAL ANSWER**

of the allegations contained therein. Answering the second sentence of paragraph 26 of the Complaint, Atlantic denies the allegations contained therein.

27. Answering the first sentence of paragraph 27 of the Complaint, Atlantic admits that in the State Department Daily Press Briefing dated July 16, 2014, the State Department's spokesperson said that "right now the potential we are looking at is, of course, an even greater escalation of violence," but denies that such statement was limited to "in and around Israel," and further denies that Plaintiffs have accurately characterized the briefing. Answering the second sentence of paragraph 27 of the Complaint, Atlantic admits that UCP moved the *Dig* production out of Jerusalem and Israel, and that it advised Atlantic, but not OBE, of its intention to do so, but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained therein. Answering footnote 13, cited at paragraph 27 of the Complaint, Atlantic admits the allegations contained therein. Further answering paragraph 27 of the Complaint, Atlantic lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained therein.

28. Answering the first sentence of paragraph 28 of the Complaint, Atlantic admits that Plaintiffs incurred expenses as a result of relocating the production of *Dig*, but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained therein. Answering the second sentence of paragraph 28 of the Complaint, Atlantic denies the allegations contained therein.

**ATLANTIC WRONGFULLY DENIES THE EXTRA EXPENSE CLAIM**

29. Answering the first sentence of paragraph 29 of the Complaint, Atlantic admits that Plaintiffs, through NBCUniversal, submitted a claim for their expenses to Atlantic, but not through OBE, and denies that such claim was properly tendered and submitted and further denies that such claim is covered

1489146.1

9

**DEFENDANT'S ORIGINAL ANSWER**

under the terms of the Policy. Answering the second sentence of paragraph 29 of the Complaint, Atlantic admits that in an e-mail dated July 15, 2014, from Susan Weiss, Senior Vice President Aon/Albert G. Ruben Insurance Services, Inc., to Michael J. Arevalo, Ms. Weiss notified Atlantic, not OBE, through Mr. Arevalo that the production of *Dig* had been postponed by one week and provided him other information, including an e-mail from Andrea Garber of NBCUniversal, but denies the remaining allegations contained therein. Answering the third sentence of paragraph 29 of the Complaint, Atlantic admits that it acknowledged receipt of the *Dig* claim, but denies such acknowledgment was through NBE. Further answering paragraph 29 of the Complaint, Atlantic denies the remaining allegations contained therein.

## A.   Defendant Atlantic Relies On Inapplicable Exclusions

30.   Answering the first sentence of paragraph 30 of the Complaint, Atlantic admits that Pamela Johnson wrote to Andrea Garber of NBCUniversal by letter dated July 28, 2014, concerning the claim, and in that letter informed her that the claim was not covered under the Policy. Further answering paragraph 30 of the Complaint, Atlantic denies the remaining allegations contained therein.

31.   Answering paragraph 31 of the Complaint, Atlantic admits that in her letter to Andrea Garber dated July 28, 2014, Pamela Johnson informed NBCUniversal that the claim was not covered under the Policy, and admits that she indicated Atlantic was willing to cover the expenses associated with the initial postponement as a courtesy, but denies the remaining allegations contained therein.

32.   Answering the first sentence of paragraph 32 of the Complaint, Atlantic admits that the Motion Picture Television Portfolio General Conditions section of the Policy contains a number of exclusions providing that the Policy does not insure against loss or damage caused directly or indirectly by "[w]ar, . . .," "[w]arlike action . . .," "any weapon of war . . .," and other exclusions that are

1489146.1

10

**DEFENDANT'S ORIGINAL ANSWER**

applicable to Plaintiffs' claim. Answering the second and third sentences of paragraph 32 of the Complaint, Atlantic denies the allegations contained herein. Answering the fourth sentence of paragraph 32 of the Complaint, Atlantic admits that the U.S. Department of State has not listed Hamas as an Independent State in the World in its Bureau of Intelligence and Research Fact Sheet, and that it has recognized Hamas as a Foreign Terrorist Organization, but denies that Plaintiffs have accurately alleged the way in which the United States Government characterizes Hamas and the Gaza Strip. Answering the fifth sentence of paragraph 32 of the Complaint, Atlantic admits that the United States Government has characterized Hamas as a Foreign Terrorist Organization, but denies the remaining allegations contained therein.

33. Answering paragraph 33 of the Complaint, Atlantic admits that there is no "terrorism exclusion" in the Policy and that the term "terrorism" is not defined by the Policy, but denies the remaining allegations contained therein.

34. Answering paragraph 34 of the Complaint, Atlantic admits that it denied coverage for Plaintiffs' claim, admits that NBCUniversal requested Atlantic to reconsider its decision to deny coverage, and admits that it has consistently taken the position that there is no coverage for the claim and, therefore, has not paid the claim. Further answering paragraph 34 of the Complaint, Atlantic denies the remaining allegations contained therein.

**B.** **Defendant Atlantic Misrepresents the Terms of the Policy**

35. Answering the first sentence of paragraph 35 of the Complaint, Atlantic denies the allegations contained therein. Answering the second sentence of paragraph 35 of the Complaint, Atlantic admits that, in her letter to Andrea Garber dated July 28, 2014, Pamela Johnson stated that the "terrorism coverage should not apply," but denies that Plaintiffs have accurately quoted or characterized the terms of Ms. Johnson's letter. Further answering paragraph 35 of the Complaint, Atlantic

**DEFENDANT'S ORIGINAL ANSWER**

EXHIBIT 19, PAGE 100

denies the remaining allegations contained therein.

36.     Answering paragraph 36 of the Complaint, Atlantic admits that Ms. Johnson's comment that the "terrorism coverage should not apply" was based, in part, on the Endorsement to the Policy entitled Coverage for Certified Acts of Terrorism; Cap on Losses, but denies that Atlantic's denial of coverage was based only upon such Endorsement. Answering the second sentence of paragraph 36 of the Complaint, Atlantic admits that Plaintiffs have accurately quoted a part of such Endorsement with italics added. Answering the third sentence of paragraph 36 of the Complaint, Atlantic admits that such Endorsement is inapplicable to Plaintiffs' claim because there is no exclusion in the Policy for terrorism.

37.     Answering paragraph 37 of the Complaint, Atlantic admits that, as Ms. Johnson explained in her letter to Andrea Garber dated July 28, 2014, there is no terrorism coverage for Plaintiffs' losses, admits that Plaintiffs have quoted a part, but not all, of an Endorsement to the Policy, and admits that it is clear that such Endorsement is inapplicable to Plaintiffs' claim. Further answering paragraph 37 of the Complaint, Atlantic denies the remaining allegations contained therein.

38.     Answering paragraph 38 of the Complaint, Atlantic denies the allegations contained therein.

## C.     Defendant Atlantic Places Its Interest Over Those of Its Insureds

39.     Answering paragraph 39 of the Complaint, Atlantic denies the allegations contained therein.

40.     Answering the first sentence of paragraph 40 of the Complaint, Atlantic lacks knowledge or information sufficient to form a belief about the truth of the allegations contained therein. Answering the second sentence of paragraph 40 of the Complaint, Atlantic denies the allegations contained therein.

41.     Answering paragraph 41 of the Complaint, Atlantic denies the allegations contained therein.

1489146.1

12

**DEFENDANT'S ORIGINAL ANSWER**

## **FIRST CLAIM**

### **(Breach of Insurance Contract)**

42. Answering paragraph 42 of the Complaint, Atlantic incorporates herein by reference paragraphs 1 through 41 above as though specifically set forth herein.

43. Answering paragraph 43 of the Complaint, Atlantic admits that the policy period of the Policy is from January 1, 2014, to June 30, 2015, and that the required premium for the Policy was paid, but denies the remaining allegations contained therein.

44. Answering paragraph 44 of the Complaint, Atlantic denies the allegations contained therein.

45. Answering paragraph 45 of the Complaint, Atlantic denies the allegations contained therein.

46. Answering paragraph 46 of the Complaint, Atlantic denies the allegations contained therein.

47. Answering paragraph 47 of the Complaint, Atlantic denies the allegations contained therein.

## **SECOND CLAIM**

### **(Breach of Implied Covenant of Good Faith and Fair Dealing)**

48. Answering paragraph 48 of the Complaint, Atlantic incorporates herein by reference paragraphs 1 through 47 above as though specifically set forth herein.

49. Answering paragraph 49 of the Complaint, Atlantic denies the allegations contained therein.

50. Answering paragraph 50 of the Complaint, Atlantic denies the allegations contained therein.

1489146.1

13

**DEFENDANT'S ORIGINAL ANSWER**

51.     Answering paragraph 51 of the Complaint, Atlantic denies the allegations contained therein.

52.     Answering paragraph 52 of the Complaint, Atlantic denies the allegations contained therein.

53.     Answering paragraph 53 of the Complaint, Atlantic denies the allegations contained therein.

54.     Answering paragraph 54 of the Complaint, Atlantic denies the allegations contained therein.

55.     Answering paragraph 55 of the Complaint, Atlantic denies the allegations contained therein.

### **PRAYER**

56.     Answering the Wherefore clause of the Complaint, Atlantic admits that Plaintiffs have sought the relief requested therein, but denies that Plaintiffs are entitled to any such relief.

57.     Further answering the allegations of the Complaint, Atlantic denies all other allegations contained therein not specifically admitted above.

### **DEMAND FOR JURY TRIAL**

58.     Answering the unnumbered paragraph making a demand for trial by jury, Atlantic admits that Plaintiffs have requested a jury of all triable issues, but denies that Plaintiffs are entitled to a jury and denies that Plaintiffs are entitled to any relief requested in the Complaint.

### **AFFIRMATIVE DEFENSES**

### **First Affirmative Defense**
### **(Failure to State a Claim)**

59.     Plaintiffs' Second Claim for alleged breach of the implied covenant of good faith and fair dealing fails to state a claim upon which relief can be granted.

14

**DEFENDANT'S ORIGINAL ANSWER**

## **Second Affirmative Defense**
### **(Exclusion 1, General Conditions)**

60.    Exclusion 1 of the General Conditions section of the Policy provides that the Policy does not insure against loss or damage caused directly or indirectly by:

      1.    War, including undeclared or civil war;

61.    Plaintiffs' claims are barred by Exclusion 1 of the General Conditions section of the Policy.

## **Third Affirmative Defense**
### **(Exclusion 2, General Conditions)**

62.    Exclusion 2 of the General Conditions section of the Policy provides that the Policy does not insure against loss or damage caused directly or indirectly by:

      2.    Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents.

63.    Plaintiffs' claims are barred by Exclusion 2 of the General Conditions section of the Policy.

## **Fourth Affirmative Defense**
### **(Exclusion 3, General Conditions)**

64.    Exclusion 3 of the General Conditions section of the Policy provides that the Policy does not insure against loss or damage caused directly or indirectly by:

      3.    Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is

excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

65. Plaintiffs' claims are barred by Exclusion 3 of the General Conditions section of the Policy.

### **Fifth Affirmative Defense**

### **(Exclusion 4, General Conditions)**

66. Exclusion 4 of the General Conditions section of the Policy provides that the Policy does not insure against loss or damage caused directly or indirectly by:

4. Any weapon of war including atomic fission or radioactive force, whether in time of peace or war.

67. Plaintiffs' claims are barred by Exclusion 4 of the General Conditions section of the Policy.

### **Sixth Affirmative Defense**

### **(Failure to Mitigate)**

68. General Condition I(2) of the Policy provides that the insureds are required to:

Minimize Loss or Damage – Take all reasonable steps to protect the property from further damage and minimize the loss. Keep a record of your expenses in doing so for consideration in the settlement of the claim. This will not increase the limit of insurance.

69. To the extent Plaintiffs failed to take all reasonable steps to minimize their loss, or to keep a record of their expenses in doing so, their claims are barred from coverage by General Condition I(2) of the Policy, and by the common law.

## Seventh Affirmative Defense

### (Other Insurance)

70. General Condition G of the Policy provides:

> If at the time of loss or damage, any other valid insurance is available which would apply to the loss or damage in the absence of this policy, the insurance provided by this policy will be primary to any other policy held by you, but excess with respect to any policy or coverage held or provided by any other party, unless otherwise agreed by you.

> This policy does not apply to any production that has been declared by you under similar insurance provided by any other insurer.

71. To the extent other valid insurance is available which is applicable to Plaintiffs' loss, the Policy provides only excess insurance with respect to any such policy or coverage held or provided by any other party, unless otherwise agreed by Plaintiffs. Further, to the extent that production of *Dig* was declared under a similar insurance policy provided by another insurer, the Plaintiffs' loss is not covered by the Policy.

## Eighth Affirmative Defense

### (Warranty C)

72. Section V. Warranties, Section III — Extra Expense, provides, in pertinent part, as follows:

> You warrant that:

> . . . .

> C.    Prior to the inception of coverage hereunder, you warrant having no knowledge of any matter, fact or circumstance, actual or threatened, that

1489146.1

17

increases or could increase the possibility of a "loss" under this Policy.

Failure to fulfill any warranty above will release us from all obligations under this Policy, to the extent that a "loss" is suffered or increased by that failure.

73. To the extent that, prior to inception of the Policy, Plaintiffs had knowledge of any matter, fact or circumstance, actual or threatened, that increased or could have increased the possibility of a loss under the Policy, their claims are barred by their breach of Warranty C of the Policy.

## Ninth Affirmative Defense

### (Fortuity Doctrine)

74. To the extent that Plaintiffs' could have reasonably foreseen the losses they incurred, to the extent such losses were not fortuitous, to the extent such losses were known or expected, to the extent such losses were substantially certain to follow, and to the extent such losses were not, to a substantial extent, beyond the control of Plaintiffs, Plaintiffs' claims are barred by the fortuity doctrine.

## Tenth Affirmative Defense

### (Uninsurable Claim)

75. To the extent that Plaintiffs' could have reasonably foreseen the losses they incurred, to the extent such losses were not fortuitous, to the extent such losses were known or expected, to the extent such losses were substantially certain to follow, and to the extent such losses were not, to a substantial extent, beyond the control of Plaintiffs, Plaintiffs' claims are uninsurable and barred by public policy.

## Eleventh Affirmative Defense

### (Exclusion 8, Section III — Extra Expense)

76. Exclusion 8 of Section III — Extra Expense of the Policy, provides that the Policy does not cover loss caused by, resulting from, or arising out of:

1489146.1

18

**DEFENDANT'S ORIGINAL ANSWER**

Any concern or fear of an occurrence which may affect the commencement of [sic] the continuation of the Insured Production, except the action of a civil authority that prevents access to, exit from (ingress or egress) or closes down the location and or facilities due to condition that threaten the safety of case, crew or property.

77.　To the extent Plaintiffs' loss resulted from or arose out of a concern or fear of an occurrence as set forth above, its loss is excluded by Exclusion 8, Section III — Extra Expense, of the Policy.

## Twelfth Affirmative Defense

## (Exclusion 9, Section III — Extra Expense)

78.　Exclusion 9 of Section III — Extra Expense of the Policy, provides that the Policy does not cover loss caused by, resulting from, or arising out of:

An imminent peril or physical damage to property, facilities, or locations necessary to the insured production.

79.　To the extent Plaintiffs' loss is caused by, results directly from, or arises out of an imminent peril or physical damage to property, facilities or locations necessary to the insured production, its claims are barred by Exclusion 9, Section III — Extra Expense, of the Policy.

## Thirteenth Affirmative Defense

## (Exclusion 10, Section III — Extra Expense)

80.　Exclusion 10 of Section III — Extra Expense of the Policy, provides that the Policy does not cover loss caused by, resulting from, or arising out of:

Any concern or belief that the commencement or continuation of Insured Production is inappropriate.

81.　To the extent Plaintiffs' loss was caused by, resulted from, or arose out of a concern or belief that the commencement or continuation of the Insured

1489146.1

19

**DEFENDANT'S ORIGINAL ANSWER**

1  Production was inappropriate, its loss is excluded by Exclusion 10, Section III —
2  Extra Expense, of the Policy.

### **Fourteenth Affirmative Defense**

#### **(Exclusion 17, Section III — Extra Expense)**

5  82.  Exclusion 17 of Section III — Extra Expense of the Policy, provides
6  that the Policy does not cover loss caused by, resulting from, or arising out of:

7  Loss of use (including loss of use of animals), loss of market,
8  interruption of business, or any other consequential loss.

9  83.  To the extent Plaintiffs' loss was caused by, resulted from or arose out
10  of a consequential loss, its claims are excluded by Exclusion 17, Section III —
11  Extra Expense, of the Policy.

### **Fifteenth Affirmative Defense**

#### **(Violation of Constitution)**

14  84.  Plaintiffs' claim for exemplary and punitive damages violates the
15  Constitution of the United States of America and the applicable State Constitution
16  or Constitutions.


18  DATED: August 5, 2016          MARC J. SHRAKE
19                                 ANDERSON, MCPHARLIN & CONNERS LLP

20                                      -and-

21                                 MICHAEL KEELEY
                                   *Pro Hac Vice Application Pending*
22                                 JOHN R. RIDDLE
                                   *Pro Hac Vice Application Pending*
23                                 CARLA C. CRAPSTER
                                   *Pro Hac Vice Application Pending*
24                                 STRASBURGER & PRICE, LLP


25                                 By:  */s/ Marc J. Shrake*
26                                       Marc J. Shrake
                                         Attorneys for Defendant
27                                       Atlantic Specialty Insurance Company

28  1489146.1                          20
                       **DEFENDANT'S ORIGINAL ANSWER**
8135353.2/SP/15247/0131/080516

# EXHIBIT 20



Print | Close

### Underwriting Companies

The following is a list of the insurance companies in the OneBeacon Insurance Group, Ltd. As required by law, the last columns note whether the company has a certificate of authority in California and/or Massachusetts. If licensed in California, the certificate number is noted as required by section 702 of the California Insurance Code. OneBeacon conducts business in all 50 states. In Rhode Island, the company operates under the OBI Insurance brand.

| Underwriting Company | California Certificate of Authority | Massachusetts License Status |
|---|---|---|
| ATLANTIC SPECIALTY INSURANCE COMPANY | 4650-8 | Licensed |
| HOMELAND INSURANCE COMPANY OF DELAWARE | Unlicensed | Unlicensed |
| HOMELAND INSURANCE COMPANY OF NEW YORK | Unlicensed | Unlicensed |
| OBI AMERICA INSURANCE COMPANY | Unlicensed | Unlicensed |
| OBI NATIONAL INSURANCE COMPANY | 5871-9 | Licensed |

The mailing address and principal place of business for all OneBeacon companies is:

*OneBeacon Insurance Group*
*605 Highway 169 North*
*Suite 800*
*Plymouth, MN 55441*

©2017 OneBeacon Insurance Group, Ltd. All rights reserved.

UCP35239

EXHIBIT 20, PAGE 110

# EXHIBIT 21



## Foreign Terrorist Organizations

**BUREAU OF COUNTERTERRORISM**

Foreign Terrorist Organizations (FTOs) are foreign organizations that are designated by the Secretary of State in accordance with section 219 of the Immigration and Nationality Act (INA), as amended. FTO designations play a critical role in our fight against terrorism and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business.

| Designated Foreign Terrorist Organizations | |
|---|---|
| **Date Designated** | **Name** |
| 10/8/1997 | Abu Nidal Organization (ANO) |
| 10/8/1997 | Abu Sayyaf Group (ASG) |
| 10/8/1997 | Aum Shinrikyo (AUM) |
| 10/8/1997 | Basque Fatherland and Liberty (ETA) |
| 10/8/1997 | Gama'a al-Islamiyya (Islamic Group) (IG) |
| 10/8/1997 | HAMAS |
| 10/8/1997 | Harakat ul-Mujahidin (HUM) |
| 10/8/1997 | Hizballah |
| 10/8/1997 | Kahane Chai (Kach) |
| 10/8/1997 | Kurdistan Workers Party (PKK) (Kongra-Gel) |
| 10/8/1997 | Liberation Tigers of Tamil Eelam (LTTE) |
| 10/8/1997 | National Liberation Army (ELN) |
| 10/8/1997 | Palestine Liberation Front (PLF) |
| 10/8/1997 | Palestinian Islamic Jihad (PIJ) |
| 10/8/1997 | Popular Front for the Liberation of Palestine (PFLP) |
| 10/8/1997 | PFLP-General Command (PFLP-GC) |
| 10/8/1997 | Revolutionary Armed Forces of Colombia (FARC) |
| 10/8/1997 | Revolutionary People's Liberation Party/Front (DHKP/C) |
| 10/8/1997 | Shining Path (SL) |

**UCP000162**

| 10/8/1999 | al-Qa'ida (AQ) |
|---|---|
| 9/25/2000 | Islamic Movement of Uzbekistan (IMU) |
| 5/16/2001 | Real Irish Republican Army (RIRA) |
| 12/26/2001 | Jaish-e-Mohammed (JEM) |
| 12/26/2001 | Lashkar-e Tayyiba (LeT) |
| 3/27/2002 | Al-Aqsa Martyrs Brigade (AAMB) |
| 3/27/2002 | Asbat al-Ansar (AAA) |
| 3/27/2002 | al-Qaida in the Islamic Maghreb (AQIM) |
| 8/9/2002 | Communist Party of the Philippines/New People's Army (CPP/NPA) |
| 10/23/2002 | Jemaah Islamiya (JI) |
| 1/30/2003 | Lashkar i Jhangvi (LJ) |
| 3/22/2004 | Ansar al-Islam (AAI) |
| 7/13/2004 | Continuity Irish Republican Army (CIRA) |
| 12/17/2004 | Islamic State of Iraq and the Levant (formerly al-Qa'ida in Iraq) |
| 6/17/2005 | Islamic Jihad Union (IJU) |
| 3/5/2008 | Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B) |
| 3/18/2008 | al-Shabaab |
| 5/18/2009 | Revolutionary Struggle (RS) |
| 7/2/2009 | Kata'ib Hizballah (KH) |
| 1/19/2010 | al-Qa'ida in the Arabian Peninsula (AQAP) |
| 8/6/2010 | Harakat ul-Jihad-i-Islami (HUJI) |
| 9/1/2010 | Tehrik-e Taliban Pakistan (TTP) |
| 11/4/2010 | Jundallah |
| 5/23/2011 | Army of Islam (AOI) |
| 9/19/2011 | Indian Mujahedeen (IM) |
| 3/13/2012 | Jemaah Anshorut Tauhid (JAT) |
| 5/30/2012 | Abdallah Azzam Brigades (AAB) |
| 9/19/2012 | Haqqani Network (HQN) |

UCP000163

| 3/22/2013 | Ansar al-Dine (AAD) |
| 11/14/2013 | Boko Haram |
| 11/14/2013 | Ansaru |
| 12/19/2013 | al-Mulathamun Battalion |
| 1/13/2014 | Ansar al-Shari'a in Benghazi |
| 1/13/2014 | Ansar al-Shari'a in Darnah |
| 1/13/2014 | Ansar al-Shari'a in Tunisia |
| 4/10/2014 | ISIL Sinai Province (formally Ansar Bayt al-Maqdis) |
| 5/15/2014 | al-Nusrah Front |
| 8/20/2014 | Mujahidin Shura Council in the Environs of Jerusalem (MSC) |
| 9/30/2015 | Jaysh Rijal al-Tariq al Naqshabandi (JRTN) |
| 1/14/2016 | ISIL-Khorasan (ISIL-K) |

| Delisted Foreign Terrorist Organizations | | |
| --- | --- | --- |
| Date Removed | Name | Date Orginally Designated |
| 10/8/1999 | Democratic Front for the Liberation of Palestine -Hawatmeh Faction | 10/8/1997 |
| 10/8/1999 | Khmer Rouge | 10/8/1997 |
| 10/8/1999 | Manuel Rodriguez Patriotic Front Dissidents | 10/8/1997 |
| 10/8/2001 | Japanese Red Army | 10/8/1997 |
| 10/8/2001 | Tupac Amaru Revolution Movement | 10/8/1997 |
| 5/18/2009 | Revolutionary Nuclei | 10/8/1997 |
| 10/15/2010 | Armed Islamic Group (GIA) | 10/8/1997 |
| 9/28/2012 | Mujahedin-e Khalq Organization (MEK) | 10/8/1997 |
| 5/28/2013 | Moroccan Islamic Combatant Group (GICM) | 10/11/2005 |
| 7/15/2014 | United Self Defense Forces of Colombia | 9/10/2001 |
| 9/3/2015 | Revolutionary Organization 17 November (17N) | 10/8/1997 |
| 12/9/2015 | Libyan Islamic Fighting Group (LIFG) | 12/17/2004 |

**Identification**

The Bureau of Counterterrorism in the State Department (CT) continually monitors the activities of terrorist groups active around the world to identify potential

**UCP000164**

EXHIBIT 21, PAGE 113

targets for designation. When reviewing potential targets, CT looks not only at the actual terrorist attacks that a group has carried out, but also at whether the group has engaged in planning and preparations for possible future acts of terrorism or retains the capability and intent to carry out such acts.

**Designation**

Once a target is identified, CT prepares a detailed "administrative record," which is a compilation of information, typically including both classified and open sources information, demonstrating that the statutory criteria for designation have been satisfied. If the Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, decides to make the designation, Congress is notified of the Secretary's intent to designate the organization and given seven days to review the designation, as the INA requires. Upon the expiration of the seven-day waiting period and in the absence of Congressional action to block the designation, notice of the designation is published in the *Federal Register*, at which point the designation takes effect. By law an organization designated as an FTO may seek judicial review of the designation in the United States Court of Appeals for the District of Columbia Circuit no later than 30 days after the designation is published in the *Federal Register*.

Until recently the INA provided that FTOs must be redesignated every 2 years or the designation would lapse. Under the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), however, the redesignation requirement was replaced by certain review and revocation procedures. IRTPA provides that an FTO may file a petition for revocation 2 years after its designation date (or in the case of redesignated FTOs, its most recent redesignation date) or 2 years after the determination date on its most recent petition for revocation. In order to provide a basis for revocation, the petitioning FTO must provide evidence that the circumstances forming the basis for the designation are sufficiently different as to warrant revocation. If no such review has been conducted during a 5 year period with respect to a designation, then the Secretary of State is required to review the designation to determine whether revocation would be appropriate. In addition, the Secretary of State may at any time revoke a designation upon a finding that the circumstances forming the basis for the designation have changed in such a manner as to warrant revocation, or that the national security of the United States warrants a revocation. The same procedural requirements apply to revocations made by the Secretary of State as apply to designations. A designation may be revoked by an Act of Congress, or set aside by a Court order.

**Legal Criteria for Designation under Section 219 of the INA as amended**

1. It must be a *foreign organization*.
2. The organization must *engage in terrorist activity*, as defined in section 212 (a)(3)(B) of the INA (8 U.S.C. § 1182(a)(3)(B)),* or *terrorism*, as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C. § 2656f(d)(2)),** or *retain the capability and intent to engage in terrorist activity or terrorism*.
3. The organization's terrorist activity or terrorism must threaten the security of U.S. nationals *or* the national security (national defense, foreign relations, *or* the economic interests) of the United States.

**Legal Ramifications of Designation**

1. It is unlawful for a person in the United States or subject to the jurisdiction of the United States to knowingly provide "material support or resources" to a designated FTO. (The term "material support or resources" is defined in 18 U.S.C. § 2339A(b)(1) as " any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who maybe or include oneself), and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(2) provides that for these purposes "the term 'training' means instruction or teaching designed to impart a specific skill, as opposed to general knowledge." 18 U.S.C. § 2339A(b)(3) further provides that for these purposes the term 'expert advice or assistance' means advice or assistance derived from scientific, technical or other specialized knowledge.''
2. Representatives and members of a designated FTO, if they are aliens, are inadmissible to and, in certain circumstances, removable from the United States (see 8 U.S.C. §§ 1182 (a)(3)(B)(i)(IV)-(V), 1227 (a)(1)(A)).
3. Any U.S. financial institution that becomes aware that it has possession of or control over funds in which a designated FTO or its agent has an interest must retain possession of or control over the funds and report the funds to the Office of Foreign Assets Control of the U.S. Department of the Treasury.

**Other Effects of Designation**

1. Supports our efforts to curb terrorism financing and to encourage other nations to do the same.
2. Stigmatizes and isolates designated terrorist organizations internationally.
3. Deters donations or contributions to and economic transactions with named organizations.
4. Heightens public awareness and knowledge of terrorist organizations.
5. Signals to other governments our concern about named organizations.

**Revocations of Foreign Terrorist Organizations**

The Immigration and Nationality Act sets out three possible bases for revoking a Foreign Terrorist Organization designation:

1. The Secretary of State must revoke a designation if the Secretary finds that the circumstances that were the basis of the designation have changed in such a manner as to warrant a revocation;
2. The Secretary of State must revoke a designation if the Secretary finds that the national security of the United States warrants a revocation;
3. The Secretary of State may revoke a designation at any time.

Any revocation shall take effect on the date specified in the revocation or upon publication in the Federal Register if no effective date is specified. The revocation of a designation shall not affect any action or proceeding based on conduct committed prior to the effective date of such revocation.

**UCP000165**

# EXHIBIT 22

# U.S. DEPARTMENT OF THE TREASURY

## Press Center

### U.S. Designates Five Charities Funding Hamas and Six Senior Hamas Leaders as Terrorist Entities

8/22/2003

FROM THE OFFICE OF PUBLIC AFFAIRS

JS-672

Present Bush today announced that the U.S. Treasury is designating five Hamas related charities and six senior Hamas leaders as Specially Designated Global Terrorists (SDGTs), freezing any assets in the U.S. and prohibiting transactions with U.S. nationals. �By claiming responsibility for the despicable act of terror on August 19, Hamas has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people,� President Bush stated.

�Hamas� leaders and those who provide their funding again have the blood of innocents on their hands.� U.S. Treasury Secretary John Snow stated. �Empty words cannot wash them clean. As they resist the road map for peace, Hamas is devastating the dreams of the Palestinian people for freedom, prosperity, and an independent state.�

The United States will continue to work with our allies to encourage the recognition of Hamas as a terrorist organization and to shut down their sources of funding and support.

The following individuals are designated as SDGTs by today�s action:

1. **Sheik Ahmed Yassin**, the leader of Hamas in Gaza.
2. **Imad Khalil Al-Alami**, a member of the Hamas Political Bureau in Damascus, Syria.
3. **Usama Hamdan**, a senior Hamas leader in Lebanon.
4. **Khalid Mishaal**, head of the Hamas Political Bureau and Executive Committee in Damascus, Syria.
5. **Musa Abu Marzouk**, Deputy Chief of the Political Bureau in Syria.
6. **Abdel Aziz Rantisi,** a Hamas leader in Gaza reporting to Sheik Yassin.

The following charities that provide support to Hamas and form part of its funding network in Europe are designated as well:

1. **Commite de Bienfaisance et de Secours aux Palestiniens (CBSP),** of France.
2. **The Association de Secours Palestinien (ASP),** of Switzerland. (An organization related to CBSP)
3. **The Palestinian Relief and Development Fund, or Interpal,** headquartered in the United Kingdom.
4. **The Palestinian Association in Austria,** PVOE.
5. **The Sanabil Association for Relief and Development,** based in Lebanon .

Today�s action follows several actions taken against Hamas previously, including the designation of several entities that formed part of the Hamas network such as Holy Land Foundation for Relief and Development and the Al Aqsa Foundation, key sources of financial support for Hamas.

ATTACHED: Fact Sheet

**END**

Fact Sheet

### HAMAS

-

HAMAS is a terrorist organization that has intentionally killed hundreds of innocent civilians and continues to kill and maim with the aim of terrorizing a civilian population. HAMAS was formed in 1987 as an outgrowth of the Palestinian branch of the Muslim Brotherhood. HAMAS activists have conducted many attacks � including large-scale suicide bombings � against Israeli citizens and military targets. In the early 1990s, they also targeted U.S. citizens, suspected Palestinian collaborators and Fatah rivals.

During 2002, more than 370 persons � including 10 US citizens � were killed in Israel, the West Bank and the Gaza Strip by acts of terrorism. HAMAS was responsible for carrying out more than 50 of these attacks, including shootings, suicide bombings, and standoff mortar-and-rocket attacks against civilian and military targets. The group was responsible for the most deadly Palestinian terrorist attack of the year � the suicide bombings of a Passover gathering at a Netanya hotel that killed 29 Israelis, including one dual US-Israeli citizen. HAMAS's bombing of a cafeteria on the Hebrew University campus, which killed nine, including five US citizens, demonstrated its willingness to stage operations in areas frequented by students and tourists, including US citizens.

In addition, HAMAS's rejectionist policies and terrorist actions are aimed at derailing the peace process in the Middle East. On April 30, 2003, the U.S. government released the roadmap for peace between Israel and the Palestinians, which constitutes a crucial step in international efforts to actively support movement towards peace in the region. HAMAS, however, has since the mid-90s purposefully worked against all regional peace efforts by engaging in

**UCP000178**

EXHIBIT 22, PAGE 115

suicide attacks and other acts of the most violent type of terrorism. On June 8 and HAMAS took credit for attacks against Israelis. The organization also took credit for four suicide bombings in a 24-hour period during the weekend preceding May 20th.

On June 29th, HAMAS and two other designated terrorist groups announced a cease-fire. On August 19th, a suicide bomber detonated his bomb in the back of a double-length city bus near the border between east and west Jerusalem. According to a CNN report, HAMAS said that it was committed to the cease-fire, but also claimed responsibility, stating that �the man was a member of its military wing, the Izzedine al-Qassam Brigades, and the attack came in revenge for the killing of two of its members.� As noted by the Human Rights Watch, �the Hamas leadership has pursued attacks against civilians as a conscious policy. A group that pursues multiple, intentional attacks against civilians as a matter of policy is responsible for crimes against humanity.� *Erased in a Moment: Suicide Bombing Attacks Against Israeli Civilians* at 67 (October 2002).

Under Executive Order 13224, the United States government may block the assets of HAMAS (which it has done) and the assets of individuals and entities owned or controlled by; acting for or on behalf of; or providing support, financial or otherwise, to designated terrorists and terrorist organizations. HAMAS has been designated as a Foreign Terrorist Organization (66 Fed. Reg. 51088) and as a Specially Designated Global Terrorist (SDGT) under Executive Order 13224, "Blocking Property and Prohibiting Transactions with Persons who Commit, or Support Terrorism.�

The United States government has credible evidence that the following six HAMAS leaders that command and control terrorist activity.

**Sheik Ahmed YASSIN**

Yassin is the head of HAMAS in Gaza. He maintains a direct line of communication with other HAMAS leaders on coordination of HAMAS's military activities and openly admits that there is no distinguishing the political and military wings of Hamas. Yassin

also conveys messages about operational planning to other Palestinian terrorist organizations.

Surrounding Y

assin is an entourage of personal "bodyguards," including many implicated in providing information and supplies to fugitives, recruiting personnel to undertake military operations, planning terrorist cells, attacking settlements, and manufacturing weapons and explosives.

I

**mad Khalil AL-ALAMI**

Imad al-Alami is a member of HAMAS's Political Bureau, located in Damascus, Syria and a military operations leader. As part of HAMAS's external leadership, he is part of the most effective and powerful wing of HAMAS because it controls the West Bank and prison branches of HAMAS and has gained total financial control.

Al-Alami has had oversight responsibility for the military wing of HAMAS within the Palestinian territories. As a HAMAS military leader, al-Alami directs sending personnel and funding to the West Bank and Gaza.

U

**sama HAMDAN**

Hamdan, a senior HAMAS official based in Lebanon, maintains contact with representatives with other terrorist organizations with the purpose of strengthening the ties between these organizations in order to strengthen an international Islamic Jihad. He has worked with other HAMAS and Hizballah leaders on initiatives to develop and activate the military network inside the Palestinian territories in support of the current intifada, including the movement of weapons, explosives and personnel to the West Bank and Gaza for HAMAS fighters.

Funds transferred from charitable donations to HAMAS for distribution to the families of Palestinian �martyrs� have been transferred to the bank account of Hamdan and used to support HAMAS military operations in Israel.

**Khalid MISHAAL**

**UCP000179**

EXHIBIT 22, PAGE 116

Mishaal is the chief of HAMAS's Political Bureau in Damascus, Syria and heads HAMAS's Executive Committee and Special Office. Cells in the military wing based in the West Bank that are under Mishaal's control have been implicated in efforts by HAMAS to plan large attacks that would undermine the "road map" peace plan.

Mishaal has been responsible for supervising assassination operations, bombings and the killing of Israeli settlers. To execute HAMAS military activities, Mishaal maintains a direct link to Gaza-based HAMAS leader, Abdel Aziz Rantisi (*see* below). He also provides instructions to other parts of the HAMAS military wing.

Funds transferred from charitable donations to HAMAS for distribution to the families of Palestinian martyrs have been transferred to the bank account of Mishaal and used to support HAMAS military operations in Israel.

**Musa Abu MARZOUK**

Musa Abu Marzouk is the Deputy Chief of HAMAS's Political Bureau based in Damascus, Syria. His activities include directing and coordinating terrorist acts by HAMAS against soldiers and civilians in Israel and the West Bank and Gaza. Marzouk maintains relationships with other terrorist organizations.

The Holy Land Foundation for Relief and Development, designated as an SDGT under EO 13224 in December 2001 based on its support of HAMAS, received start-up funding and instructions from Marzouk. Marzouk is implicated in receiving financing for HAMAS terrorist attacks, funds that have been used to mobilize military activity inside Israel and the West Bank/Gaza.

**Abdel Aziz RANTISI**

Rantisi is part of the HAMAS leadership in Gaza, operating directly under HAMAS Leader Shaykh Yassin (*see* above) with whom he maintains a direct line of communication for the coordination of military operations. Mishaal (*see* above) has also issued orders for HAMAS terrorist activities through R

antisi.

In October of 2002, Rantisi was reported in Al-Hayat as personally claiming responsibility for the assassination of a Palestinian Authority Police Colonel. In December 2002, he was calling for Iraq to prepare thousands of martyrdom cells to fight the United States and its allies in the event of war.

**HAMAS Fundraising**
-

HAMAS raises tens of millions or dollars per year throughout the world using charitable fundraising as cover. While HAMAS may provide money for legitimate charitable work, this work is a primary recruiting tool for the organization's militant causes. HAMAS relies on donations from Palestinian expatriates around the world and private benefactors located in moderate Arab states, Western Europe and North America. HAMAS uses a web of charities to facilitate funding and to funnel money. Charitable donations to non-governmental organizations are commingled, moved between charities in ways that hide the money trail, and then often diverted or siphoned to support terrorism.

The funds pouring into HAMAS coffers directly undermine the Middle East peace process. These funds allow the group to continue to foment violence, strengthen its terrorist infrastructure, and undermine responsible leadership.

The political leadership of HAMAS directs its terrorist networks just as they oversee their other activities. HAMAS leader Yassin confirms this relationship, stating to al-Sharq al-Awsat on August 12, 2002: "When we make decisions on the political level and convey them to the military wing, it abides by it normally.� The intensity of this relationship is reflected in Yassin's words quoted by Reuters on May 12, 1998:

We can not separate the wing from the body. If we do so, the body will not be able to fly. HAMAS is one body.

A report issued by Human Rights Watch has also noted the unified nature of HAMAS:

**UCP000180**

EXHIBIT 22, PAGE 117

In the case of Hamas, there is abundant evidence that the military wing is subordinate to a political steering committee . . . . Yassin himself, as well as Salah Shehadah, the late founder and commander of the �Izz al-Din al-Qassam Brigades, have confirmed in public remarks that the military wing implements policies that are set by the political wing.�  *Erased in a Moment:  Suicide Bombing Attacks Against Israeli Civilians* at 63 (October 2002).

Fundraising may involve community solicitation in the United States, Canada, Europe and the Middle East or solicitations directly to wealthy donors.   While some donors may be aware of the intended use of their donations, too many innocent donors who intend for their money to be used to provide humanitarian services here or abroad, are unwittingly funding acts of violence when these funds are diverted to terrorist causes.

HAMAS fundraising directly undermines Prime Minister Mahmud Abbas's ability to clamp down on this terrorist organization.   One of the obstacles and threats to establishing a meaningful dialogue toward peace comes from terrorist groups such as HAMAS, which view peace discussions as inimical to their interests and are intent on undermining the multilateral work on the roadmap by fomenting violence.   In order to support momentum towards peace, to strengthen the ability of the new Palestinian leadership to take the actions it must take against HAMAS, the assets of groups like HAMAS must be frozen, as well as the assets of organizations raising funds for such terrorist groups.

E.O. 13224 provides a means to disrupt the financial-support network funding terrorist attacks committed by HAMAS.   Under this Order, the United States government may block the assets of HAMAS (which it has done) and the assets of individuals and entities owned or controlled by; acting for or on behalf of; or providing support, financial or otherwise, to designated terrorists and terrorist organizations.   HAMAS has been designated as a Foreign Terrorist Organization (66 Fed.  Reg.  51088) and as a Specially Designated Global Terrorist (SDGT) under Executive Order 13224, "Blocking Property and Prohibiting Transactions with Persons who Commit, or Support Terrorism.�

The United States government has credible evidence that the following five organizations are part of a web of charities raising funds on behalf of HAMAS and using humanitarians purposes as a cover for acts that support HAMAS.   Funds are generated by, and flow through, these organizations on behalf of HAMAS.

C

ommite de Bienfaisance et de Secours aux Palestiniens (CBSP) and Association de Secours Palestinien (ASP)

CBSP and ASP are primary fundraisers for HAMAS in France and Switzerland, respectively.   Founded in France in the late 80s/early 90s, CBSP acts in collaboration with more than a dozen humanitarian organizations based in different towns in the West Bank and Gaza and in Palestinian refugee camps in Jordan and Lebanon.   ASP, a subsidiary of CBSP, was founded in Switzerland in 1994.   The group has collected large amounts of money from mosques and Islamic centers, which it then transfers to sub-organizations of HAMAS.   Khalid Al-S

huli is the president of CBSP and ASP .

Palestinian Relief and Development Fund (I

nterpal)

Interpal, headquartered in the UK, has been a principal charity utilized to hide the flow of money to HAMAS.   Reporting indicates it is the conduit through which money flows to HAMAS from other charities, *e.g.*, the Al Aqsa Foundation (designated under EO 13224 on May 29th) and oversees the activities of other charities.   For example, the Sanabil Association for Relief and Development (designated as part of this tranche), represents Interpal in Lebanon.   Reporting indicates that Interpal is the fundraising coordinator of HAMAS.   This role is of the type that includes supervising activities of charities, developing new charities in targeted areas, instructing how funds should be transferred from one charity to another, and even determining public relations policy.

Palestinian Association in Austria (PVOE)

PVOE is controlled by the leader of HAMAS in Austria.   The money is targeted to support members of HAMAS and is funneled through other charities in Lebanon, the West Bank and Gaza or other areas of the Middle East in order to ensure the transfer of funds is undetected and reaches its intended recipients. PVOE is part of the HAMAS network of charitable organizations that includes the Al Aqsa Foundation.

**UCP000181**

EXHIBIT 22, PAGE 118

S

**anabil Association for Relief and Development**

The Sanabil Association for Relief and Development (Sanabil), based in Sidon, Lebanon, receives large quantities of funds raised by major HAMAS-affiliated charities in Europe and the Middle East and, in turn, provides funding to HAMAS.    For example, Sanabil has received funding from the Al Aqsa Foundation (designated as an SDGT under EO 13224 in May 2003); the Holy Land Foundation for Relief and Development (designated as an SDGT under EO 13224 in December 2001), and Interpal (designated as an SDGT under EO 13224 as part of this tranche).   HAMAS recruits permanent members from the religious and the poor by extending charity to them from organizations such as S

anabil.

At the request of a HAMAS political leader, Sanabil began opening offices in all of the Palestinian refugee camps in Lebanon in August of 2001 in order to increase the foundation's role inside the camps.    After starting by providing basic necessities the charity eventually began asking poor families within the camps to fill out application forms, particularly those who had worked with the Islamic Movement (Al-Haraka al-Islamiyya) and HAMAS.    As a result of these efforts, S

anabil has increased its scope of influence within the camps.

**UCP000182**

EXHIBIT 22, PAGE 119

# EXHIBIT 23

# U.S. Department of State
## Diplomacy in Action

# Independent States in the World

Fact Sheet
BUREAU OF INTELLIGENCE AND RESEARCH
Washington, DC
July 22, 2016

See also:

Dependencies and Areas of Special Sovereignty (http://www.state.gov/s/inr/rls/10543.htm)

Total count of independent states: 195

\* Diplomatic relations with the United States

+ Member of United Nations

! New change, since previous list

**STATE**

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Afghanistan *+ | Islamic Republic of Afghanistan | AF | AFG | Kabul |
| Albania *+ | Republic of Albania | AL | ALB | Tirana |
| Algeria *+ | People's Democratic Republic of Algeria | DZ | DZA | Algiers |
| Andorra *+ | Principality of Andorra | AD | AND | Andorra la Vella |

**UCP000183**

EXHIBIT 23, PAGE 120

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Angola *+ | Republic of Angola | AO | AGO | Luanda |
| Antigua and Barbuda *+ | Antigua and Barbuda | AG | ATG | Saint John's |
| Argentina *+ | Argentine Republic | AR | ARG | Buenos Aires |
| Armenia *+ | Republic of Armenia | AM | ARM | Yerevan |
| Australia *+ | Commonwealth of Australia | AU | AUS | Canberra |
| Austria *+ | Republic of Austria | AT | AUT | Vienna |
| Azerbaijan *+ | Republic of Azerbaijan | AZ | AZE | Baku |
| Bahamas, The *+ | Commonwealth of The Bahamas | BS | BHS | Nassau |
| Bahrain *+ | Kingdom of Bahrain | BH | BHR | Manama |
| Bangladesh *+ | People's Republic of Bangladesh | BD | BGD | Dhaka |
| Barbados *+ | Barbados | BB | BRB | Bridgetown |
| Belarus *+ | Republic of Belarus | BY | BLR | Minsk |
| Belgium *+ | Kingdom of Belgium | BE | BEL | Brussels |

**UCP000184**

EXHIBIT 23, PAGE 121

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Belize *+ | Belize | BZ | BLZ | Belmopan |
| Benin *+ | Republic of Benin | BJ | BEN | Porto-Novo |
| Bhutan + | Kingdom of Bhutan | BT | BTN | Thimphu |
| Bolivia *+ | Plurinational State of Bolivia | BO | BOL | La Paz (administrative)<br>Sucre (legislative/judiciary) |
| Bosnia and Herzegovina *+ | Bosnia and Herzegovina | BA | BIH | Sarajevo |
| Botswana *+ | Republic of Botswana | BW | BWA | Gaborone |
| Brazil *+ | Federative Republic of Brazil | BR | BRA | Brasília |
| Brunei *+ | Brunei Darussalam | BN | BRN | Bandar Seri Begawan |
| Bulgaria *+ | Republic of Bulgaria | BG | BGR | Sofia |
| Burkina Faso *+ | Burkina Faso | BF | BFA | Ouagadougou |
| Burma *+ | Union of Burma | MM | MMR | Rangoon<br>Nay Pyi Taw (administrative) |
| Burundi *+ | Republic of Burundi | BI | BDI | Bujumbura |
| Cabo Verde *+ | Republic of Cabo Verde | CV | CPV | Praia |

**UCP000185**

EXHIBIT 23, PAGE 122

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Cambodia *+ | Kingdom of Cambodia | KH | KHM | Phnom Penh |
| Cameroon *+ | Republic of Cameroon | CM | CMR | Yaoundé |
| Canada *+ | Canada | CA | CAN | Ottawa |
| Central African Republic *+ | Central African Republic | CF | CAF | Bangui |
| Chad *+ | Republic of Chad | TD | TCD | N'Djamena |
| Chile *+ | Republic of Chile | CL | CHL | Santiago |
| China *+ **(see note 3)** (http://www.state.gov/s/inr/rls/4250.htm#note3) | People's Republic of China | CN | CHN | Beijing |
| Colombia *+ | Republic of Colombia | CO | COL | Bogotá |
| Comoros *+ | Union of the Comoros | KM | COM | Moroni |
| Congo (Brazzaville) *+ **(see note 4)** (http://www.state.gov/s/inr/rls/4250.htm#note4) | Republic of the Congo | CG | COG | Brazzaville |
| Congo (Kinshasa) *+ **(see note 4)** (http://www.state.gov/s/inr/rls/4250.htm#note4) | Democratic Republic of the Congo | CD | COD | Kinshasa |
| Costa Rica *+ | Republic of Costa Rica | CR | CRI | San José |

**UCP000186**

EXHIBIT 23, PAGE 123

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Côte d'Ivoire *+ | Republic of Côte d'Ivoire | CI | CIV | Yamoussoukro |
| Croatia *+ | Republic of Croatia | HR | HRV | Zagreb |
| Cuba *+ | Republic of Cuba | CU | CUB | Havana |
| Cyprus *+ | Republic of Cyprus | CY | CYP | Nicosia |
| ! Czechia *+ | Czech Republic | CZ | CZE | Prague |
| Denmark *+ | Kingdom of Denmark | DK | DNK | Copenhagen |
| Djibouti *+ | Republic of Djibouti | DJ | DJI | Djibouti |
| Dominica *+ | Commonwealth of Dominica | DM | DMA | Roseau |
| Dominican Republic *+ | Dominican Republic | DO | DOM | Santo Domingo |
| Ecuador *+ | Republic of Ecuador | EC | ECU | Quito |
| Egypt *+ | Arab Republic of Egypt | EG | EGY | Cairo |
| El Salvador *+ | Republic of El Salvador | SV | SLV | San Salvador |
| Equatorial Guinea *+ | Republic of Equatorial Guinea | GQ | GNQ | Malabo |

UCP000187

EXHIBIT 23, PAGE 124

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Eritrea *+ | State of Eritrea | ER | ERI | Asmara |
| Estonia *+ | Republic of Estonia | EE | EST | Tallinn |
| Ethiopia *+ | Federal Democratic Republic of Ethiopia | ET | ETH | Addis Ababa |
| Fiji *+ | Republic of Fiji | FJ | FJI | Suva |
| Finland *+ | Republic of Finland | FI | FIN | Helsinki |
| France *+ | French Republic | FR | FRA | Paris |
| Gabon *+ | Gabonese Republic | GA | GAB | Libreville |
| Gambia, The *+ | Republic of The Gambia | GM | GMB | Banjul |
| Georgia *+ | Georgia | GE | GEO | Tbilisi |
| Germany *+ | Federal Republic of Germany | DE | DEU | Berlin |
| Ghana *+ | Republic of Ghana | GH | GHA | Accra |
| Greece *+ | Hellenic Republic | GR | GRC | Athens |
| Grenada *+ | Grenada | GD | GRD | Saint George's |
| Guatemala *+ | Republic of Guatemala | GT | GTM | Guatemala City |

**UCP000188**

EXHIBIT 23, PAGE 125

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Guinea *+ | Republic of Guinea | GN | GIN | Conakry |
| Guinea-Bissau *+ | Republic of Guinea-Bissau | GW | GNB | Bissau |
| Guyana *+ | Co-operative Republic of Guyana | GY | GUY | Georgetown |
| Haiti *+ | Republic of Haiti | HT | HTI | Port-au-Prince |
| Holy See * | Holy See | VA | VAT | Vatican City |
| Honduras *+ | Republic of Honduras | HN | HND | Tegucigalpa |
| Hungary *+ | Hungary | HU | HUN | Budapest |
| Iceland *+ | Republic of Iceland | IS | ISL | Reykjavík |
| India *+ | Republic of India | IN | IND | New Delhi |
| Indonesia *+ | Republic of Indonesia | ID | IDN | Jakarta |
| Iran + | Islamic Republic of Iran | IR | IRN | Tehran |
| Iraq *+ | Republic of Iraq | IQ | IRQ | Baghdad |
| Ireland *+ | Ireland | IE | IRL | Dublin |

**UCP000189**

EXHIBIT 23, PAGE 126

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Israel *+ | State of Israel | IL | ISR | Jerusalem **(see note 5)** (http://www.state.gov/s/inr/rls/4250.htm#note |
| Italy *+ | Italian Republic | IT | ITA | Rome |
| Jamaica *+ | Jamaica | JM | JAM | Kingston |
| Japan *+ | Japan | JP | JPN | Tokyo |
| Jordan *+ | Hashemite Kingdom of Jordan | JO | JOR | Amman |
| Kazakhstan *+ | Republic of Kazakhstan | KZ | KAZ | Astana |
| Kenya *+ | Republic of Kenya | KE | KEN | Nairobi |
| Kiribati *+ | Republic of Kiribati | KI | KIR | Tarawa |
| Korea, North + | Democratic People's Republic of Korea | KP | PRK | Pyongyang |
| Korea, South *+ | Republic of Korea | KR | KOR | Seoul |
| Kosovo * | Republic of Kosovo | XK | XKS | Pristina |
| Kuwait *+ | State of Kuwait | KW | KWT | Kuwait City |
| Kyrgyzstan *+ | Kyrgyz Republic | KG | KGZ | Bishkek |

**UCP000190**

EXHIBIT 23, PAGE 127

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Laos *+ | Lao People's Democratic Republic | LA | LAO | Vientiane |
| Latvia *+ | Republic of Latvia | LV | LVA | Riga |
| Lebanon *+ | Lebanese Republic | LB | LBN | Beirut |
| Lesotho *+ | Kingdom of Lesotho | LS | LSO | Maseru |
| Liberia *+ | Republic of Liberia | LR | LBR | Monrovia |
| Libya *+ | Libya | LY | LBY | Tripoli |
| Liechtenstein *+ | Principality of Liechtenstein | LI | LIE | Vaduz |
| Lithuania *+ | Republic of Lithuania | LY | LTU | Vilnius |
| Luxembourg *+ | Grand Duchy of Luxembourg | LU | LUX | Luxembourg |
| Macedonia *+ | Republic of Macedonia | MK | MKD | Skopje |
| Madagascar *+ | Republic of Madagascar | MG | MDG | Antananarivo |
| Malawi *+ | Republic of Malawi | MW | MWI | Lilongwe |
| Malaysia *+ | Malaysia | MY | MYS | Kuala Lumpur |
| Maldives *+ | Republic of Maldives | MV | MDV | Male |

**UCP000191**

EXHIBIT 23, PAGE 128

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Mali *+ | Republic of Mali | ML | MLI | Bamako |
| Malta *+ | Republic of Malta | MT | MLT | Valletta |
| Marshall Islands *+ | Republic of the Marshall Islands | MH | MHL | Majuro |
| Mauritania *+ | Islamic Republic of Mauritania | MR | MRT | Nouakchott |
| Mauritius *+ | Republic of Mauritius | MU | MUS | Port Louis |
| Mexico *+ | United Mexican States | MX | MEX | Mexico City |
| Micronesia, Federated States of *+ | Federated States of Micronesia | FM | FSM | Palikir |
| Moldova *+ | Republic of Moldova | MD | MDA | Chisinau |
| Monaco *+ | Principality of Monaco | MC | MCO | Monaco |
| Mongolia *+ | Mongolia | MN | MNG | Ulaanbaatar |
| Montenegro *+ | Montenegro | ME | MNE | Podgorica |
| Morocco *+ | Kingdom of Morocco | MA | MAR | Rabat |

**UCP000192**

EXHIBIT 23, PAGE 129

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Mozambique *+ | Republic of Mozambique | MZ | MOZ | Maputo |
| Namibia *+ | Republic of Namibia | NA | NAM | Windhoek |
| Nauru *+ | Republic of Nauru | NR | NRU | Yaren District (no capital city) |
| Nepal *+ | Federal Democratic Republic of Nepal | NP | NPL | Kathmandu |
| Netherlands *+ | Kingdom of the Netherlands | NL | NLD | Amsterdam The Hague (seat of gov't) |
| New Zealand *+ | New Zealand | NZ | NZL | Wellington |
| Nicaragua *+ | Republic of Nicaragua | NI | NIC | Managua |
| Niger *+ | Republic of Niger | NE | NER | Niamey |
| Nigeria *+ | Federal Republic of Nigeria | NG | NGA | Abuja |
| Norway *+ | Kingdom of Norway | NO | NOR | Oslo |
| Oman *+ | Sultanate of Oman | OM | OMN | Muscat |
| Pakistan *+ | Islamic Republic of Pakistan | PK | PAK | Islamabad |

**UCP000193**

EXHIBIT 23, PAGE 130

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Palau *+ | Republic of Palau | PW | PLW | ! Ngerulmud |
| Panama *+ | Republic of Panama | PA | PAN | Panama City |
| Papua New Guinea *+ | Independent State of Papua New Guinea | PG | PNG | Port Moresby |
| Paraguay *+ | Republic of Paraguay | PY | PRY | Asunción |
| Peru *+ | Republic of Peru | PE | PER | Lima |
| Philippines *+ | Republic of the Philippines | PH | PHL | Manila |
| Poland *+ | Republic of Poland | PL | POL | Warsaw |
| Portugal *+ | Portuguese Republic | PT | PRT | Lisbon |
| Qatar *+ | State of Qatar | QA | QAT | Doha |
| Romania *+ | Romania | RO | ROU | Bucharest |
| Russia *+ | Russian Federation | RU | RUS | Moscow |
| Rwanda *+ | Republic of Rwanda | RW | RWA | Kigali |
| Saint Kitts and Nevis *+ | Federation of Saint Kitts and Nevis | KN | KNA | Basseterre |

**UCP000194**

EXHIBIT 23, PAGE 131

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Saint Lucia *+ | Saint Lucia | LC | LCA | Castries |
| Saint Vincent and the Grenadines *+ | Saint Vincent and the Grenadines | VC | VCT | Kingstown |
| Samoa *+ | Independent State of Samoa | WS | WSM | Apia |
| San Marino *+ | Republic of San Marino | SM | SMR | San Marino |
| Sao Tome and Principe *+ | Democratic Republic of Sao Tome and Principe | ST | STP | São Tomé |
| Saudi Arabia *+ | Kingdom of Saudi Arabia | SA | SAU | Riyadh |
| Senegal *+ | Republic of Senegal | SN | SEN | Dakar |
| Serbia *+ | Republic of Serbia | RS | SRB | Belgrade |
| Seychelles *+ | Republic of Seychelles | SC | SYC | Victoria |
| Sierra Leone *+ | Republic of Sierra Leone | SL | SLE | Freetown |
| Singapore *+ | Republic of Singapore | SG | SGP | Singapore |
| Slovakia *+ | Slovak Republic | SK | SVK | Bratislava |

**UCP000195**

EXHIBIT 23, PAGE 132

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Slovenia *+ | Republic of Slovenia | SI | SVN | Ljubljana |
| Solomon Islands *+ | Solomon Islands | SB | SLB | Honiara |
| Somalia *+ | Federal Republic of Somalia | SO | SOM | Mogadishu |
| South Africa *+ | Republic of South Africa | ZA | ZAF | Pretoria (administrative) Cape Town (legislative) Bloemfontein (judiciary) |
| South Sudan *+ | Republic of South Sudan | SS | SSD | Juba |
| Spain *+ | Kingdom of Spain | ES | ESP | Madrid |
| Sri Lanka *+ | Democratic Socialist Republic of Sri Lanka | LK | LKA | Colombo Sri Jayewardenepura Kotte (legislative) |
| Sudan *+ | Republic of the Sudan | SD | SDN | Khartoum |
| Suriname *+ | Republic of Suriname | SR | SUR | Paramaribo |
| Swaziland *+ | Kingdom of Swaziland | SZ | SWZ | Mbabane (administrative) Lobamba (legislative) |
| Sweden *+ | Kingdom of Sweden | SE | SWE | Stockholm |
| Switzerland *+ | Swiss Confederation | CH | CHE | Bern |

**UCP000196**

EXHIBIT 23, PAGE 133

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Syria *+ | Syrian Arab Republic | SY | SYR | Damascus |
| Tajikistan *+ | Republic of Tajikistan | TJ | TJK | Dushanbe |
| Tanzania *+ | United Republic of Tanzania | TZ | TZA | Dar es Salaam Dodoma (legislative) |
| Thailand *+ | Kingdom of Thailand | TH | THA | Bangkok |
| Timor-Leste *+ | Democratic Republic of Timor-Leste | TL | TLS | Dili |
| Togo *+ | Togolese Republic | TG | TGO | Lomé |
| Tonga *+ | Kingdom of Tonga | TO | TON | Nuku'alofa |
| Trinidad and Tobago *+ | Republic of Trinidad and Tobago | TT | TTO | Port of Spain |
| Tunisia *+ | Republic of Tunisia | TN | TUN | Tunis |
| Turkey *+ | Republic of Turkey | TR | TUR | Ankara |
| Turkmenistan *+ | Turkmenistan | TM | TKM | Ashgabat |
| Tuvalu *+ | Tuvalu | TV | TUV | Funafuti |
| Uganda *+ | Republic of Uganda | UG | UGA | Kampala |

**UCP000197**

EXHIBIT 23, PAGE 134

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Ukraine *+ | Ukraine | UA | UKR | Kyiv |
| United Arab Emirates *+ | United Arab Emirates | AE | ARE | Abu Dhabi |
| United Kingdom *+ | United Kingdom of Great Britain and Northern Ireland | GB | GBR | London |
| United States + | United States of America | US | USA | Washington, DC |
| Uruguay *+ | Oriental Republic of Uruguay | UY | URY | Montevideo |
| Uzbekistan *+ | Republic of Uzbekistan | UZ | UZB | Tashkent |
| Vanuatu *+ | Republic of Vanuatu | VU | VUT | Port-Vila |
| Venezuela *+ | Bolivarian Republic of Venezuela | VE | VEN | Caracas |
| Vietnam *+ | Socialist Republic of Vietnam | VN | VNM | Hanoi |
| Yemen *+ | Republic of Yemen | YE | YEM | Sanaa |
| Zambia *+ | Republic of Zambia | ZM | ZMB | Lusaka |
| Zimbabwe *+ | Republic of Zimbabwe | ZW | ZWE | Harare |

**UCP000198**

EXHIBIT 23, PAGE 135

**OTHER**

| Short-form name | Long-form name | GENC 2A Code (see Note 2)! | GENC 3A Code (see Note 2)! | Capital |
|---|---|---|---|---|
| Taiwan **(see note 6 (http://www.state.gov/s/inr/rls/4250.htm#note6))** | (no long-form name) | TW | TWN | Taipei |

**Source:** Office of The Geographer and Global Issues, Bureau of Intelligence and Research, U.S. Department of State, Washington, D.C

---

**NOTES**

Note **1:** In this listing, the term "independent state" refers to a people politically organized into a sovereign state with a definite territory recognized as independent by the US.

Note **2:** Geopolitical Entities, Names, and Codes (GENC) Standard two-letter and three-letter codes. GENC is the replacement standard for FIPS 10-4 and is the U.S. Government profile of the ISO 3166 international country code standard. For more information on GENC please see https://nsgreg.nga.mil/genc/discovery.

Note **3:** With the establishment of diplomatic relations with China on January 1, 1979, the US Government recognized the People's Republic of China as the sole legal government of China and acknowledged the Chinese position that there is only one China and that Taiwan is part of China.

Note **4:** "Congo" is the official short-form name for both the Republic of the Congo and the Democratic Republic of the Congo. To distinguish one from the other, the U.S. Department of State adds the capital in parentheses. This practice is unofficial and provisional.

Note **5:** Israel proclaimed Jerusalem as its capital in 1950. The United States, like nearly all other countries, maintains its embassy in Tel Aviv.

Note **6:** Claimed by both the Government of the People's Republic of China and the authorities on Taiwan. Administered by the authorities on Taiwan. (see note 3)

---

---

**UCP000199**

EXHIBIT 23, PAGE 136

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department.

External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, download Adobe Acrobat Reader (http://get.adobe.com/reader/).

UCP000200

EXHIBIT 23, PAGE 137

# EXHIBIT 24

From:     Phillips, Wanda M.
Sent:     Wed 7/16/2014 6:03 PM (GMT-00:00)
To:       Gutterman, Daniel S.
Cc:       McFadden, Ryan
Bcc:
Subject: RE: NBCU's "Dig"

We approved filming in East Jerusalem & Tel Aviv.  NBC Security team is to remain involved and continue working with production.  We required that production work with the local production company Keshet and coordination with the local police.

Location filming on public streets and public areas can not involve any car crashes, chase scenes, pyro, fires or fighting in a public area.

**Wanda M Phillips**  Underwriting Manager – NY Office | **OneBeacon Entertainment**

Tel: 212.440-6576  | Fax: 212.307-0598

WPhillips@OneBeacon.com  onebeaconentertainment.com

77 Water Street 17ᵗʰ Floor New York, NY 10005

A Member of OneBeacon Insurance Group



Please visit our website at onebeaconentertainment.com for applications, news, and product information.

This e-mail, and any attachments to it, is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If you are not the intended recipient, any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately either by telephone at ( 212)  440-6581 or by e-mail.  Thank you.

**From:** Gutterman, Daniel S.
**Sent:** Wednesday, July 16, 2014 1:05 PM
**To:** Phillips, Wanda M.
**Subject:** RE: NBCU's "Dig"



**Exhibit 29**

Gutterman - 2-3-17

ATL001547

Hi Wanda –

Thank you for the response!

What were the terms?

Best Regards,

**Danny Gutterman**

**OneBeacon Entertainment**

Sr. Entertainment Claims Investigator

(781) 332-8550

**From:** Phillips, Wanda M.
**Sent:** Wednesday, July 16, 2014 9:49 AM
**To:** Gutterman, Daniel S.
**Subject:** RE: NBCU's "Dig"

Hi Danny,

The production Dig was declared, and we approved the filming in Israel with terms.

Let me know if you need anything additional.

**Wanda M Phillips**  Underwriting Manager – NY Office | **OneBeacon Entertainment**

Tel: 212.440-6576  | Fax: 212.307-0598

WPhillips@OneBeacon.com   onebeaconentertainment.com

77 Water Street 17ᵗʰ Floor New York, NY 10005

A Member of OneBeacon Insurance Group



Please visit our website at onebeaconentertainment.com for applications, news, and product information.

This e-mail, and any attachments to it, is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If you are not the intended recipient, any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately either by telephone at ( 212)  440-6581 or by e-mail.  Thank you.

**From:** Gutterman, Daniel S.
**Sent:** Wednesday, July 16, 2014 11:50 AM
**To:** Phillips, Wanda M.
**Cc:** Gutterman, Daniel S.
**Subject:** NBCU's "Dig"

Hi Wanda –

Please confirm that NBCU's "Dig" was declared.  Also, please advise if the Israel portion was approved.  I see that the Toronto part was in ImageNow.

Thank you!

Best Regards,

**Danny Gutterman**

**OneBeacon Entertainment**

Sr. Entertainment Claims Investigator

(781) 332-8550

ATL001550

# EXHIBIT 25

INTERNET ARCHIVE
WayBackMachine

87 captures
21 Jan 2014 - 8 Mar 2017

http://travel.state.gov/content/passports/english/alertswarnings/israel-travel-warnin    Go

MAR  JUL  AUG
◀  18  ▶
2013  2014  2015

• 🔎 Contact Us • 🇺🇸 Find U.S. Embassies & Consulates

SEARCH 🔍

# Israel, The West Bank and Gaza Travel Warning

LAST UPDATED: FEBRUARY 3, 2014

**The security environment remains complex in Israel, the West Bank, and Gaza, and U.S. citizens need to be aware of the continuing risks of travel to these areas, particularly to areas described in this Travel Warning where there are heightened tensions and security risks.**  The Department of State strongly warns U.S. citizens against travel to the Gaza Strip; U.S. government employees are not allowed to conduct official or personal travel there. Furthermore, we caution that, with the exception of Jericho and Bethlehem, U.S. government employees are prohibited from personal travel to the West Bank.  This replaces the Travel Warning issued June 19, 2013, to update information on the general security environment.

Over three million foreign citizens, including hundreds of thousands of U.S. citizens, safely visit Israel and the West Bank each year for study, tourism, and business.  The Government of Israel and the Palestinian Authority make considerable efforts to protect U.S. citizens and other visitors to major tourist destinations. Nonetheless, U.S. citizens should also take into consideration the rules governing travel by U.S. government employees:

- U.S. government personnel are not permitted to conduct official or personal travel to the Gaza strip;
- U.S. government personnel are restricted from conducting personal travel to most parts of the West Bank; travel for official business is done with special security arrangements coordinated by the U.S. Consulate General in Jerusalem;
- U.S. government personnel must notify Embassy Tel Aviv's Regional Security Officer before traveling in the areas of Israel surrounding Gaza and south of Beersheva, as well as to the Golan Heights;
- U.S. government personnel are not permitted to use public buses anywhere in Israel or the West Bank due to past attacks on public transportation;

**Major Metropolitan Areas in Israel**

Personal safety conditions in major metropolitan areas, including Tel Aviv and Haifa and their surrounding regions, are comparable to or better than those in other major global cities. Please see below for specific information regarding Jerusalem. Tourists, students, and businesspeople from around the world are welcome.  Visitors should observe appropriate personal security practices to reduce their vulnerability to crime, particularly late at night or in isolated or economically depressed areas, including in the countryside.  Visitors are advised to avoid large gatherings or demonstrations and keep current with local news, which is available through numerous English language sources.

U.S. citizen employees of the U.S. Embassy in Tel Aviv and Consulate General in Jerusalem and their families are prohibited from using public buses and their associated terminals and bus stops throughout the country.  In November, 2012, a bomb exploded on a public bus in downtown Tel Aviv, causing several injuries.  In December 2013, a bomb exploded on a public bus in Bat Yam after all of the passengers had been evacuated.  Additionally, in November 2012, long-range rockets launched from Gaza reached as far north as Tel Aviv and southern Jerusalem.  In light of the threat of rocket or missile attacks, visitors and U.S. citizens living in Israel should also familiarize themselves with the location of the nearest bomb shelter (often referred to as a secure or protected room).  Since the early 1990s, the Government of Israel has required that all new homes and buildings include a designated shelter.  Visitors should seek information on shelters from hotel staff or building managers.

The Government of Israel has had a long-standing policy of issuing gas masks to its citizens and, starting in 2010, it began issuing replacement masks.  It stopped this distribution process in early 2014, but does not rule out starting it again at any time, in response to regional events. Visitors and foreign residents in Israel are not issued masks and must individually procure them, if desired.  The U.S. Embassy and Consulate General do not provide gas masks for persons who are not U.S. government employees

UCP035240

on their documents.  For further ... the Government of Israel ... which also provides information on how to choose a secure space in a home or apartment, as well as the types of protective kits (gas masks) issued by the Government of Israel to its citizens.

**Gaza Vicinity**

Travelers to areas of Israel in the vicinity of the Gaza Strip should be aware of the risks presented by small arms fire, anti-tank weapons, rockets, and mortars launched from inside Gaza toward Israeli cities and towns.  These attacks can come with little warning.  Some rockets have reached areas in central Tel Aviv, the Bethlehem area south of Jerusalem, and Beersheva.  Gunfire, rocket, and mortar attacks in the regions immediately bordering Gaza are a regular occurrence.  Visitors to these areas should remain aware of their surroundings and of the location of bomb shelters and should take note of announcements and guidance provided by the Home Front Command.

Travelers should also be aware of the heightened state of alert maintained by Israeli authorities along Israel's border with Egypt since an August 2011 terrorist attack that killed eight and injured nearly 40 people along Route 12, north of Eilat.  There have been subsequent cross-border incidents from Egypt, including rocket attacks and ground incursions, such as an attack that took place in August 2013 and one on January 20, 2014.

Due to the threats in these areas, U.S. government personnel must notify the Embassy's Regional Security Office in advance if they plan to visit areas of Israel in the vicinity of the Gaza Strip or south of Beersheva.  Added security measures, such as the use of armored vehicles, are commonly used for U.S. government travel to these areas when on official business.  U.S. citizens considering travel overland into Egypt from Israel should review the Department of State's Country Specific Information for Egypt.

**Northern Israel**

Rocket attacks into Israel from Lebanon have occurred without warning along the Israeli-Lebanese border.  Tensions have increased along portions of the Disengagement Zone with Syria in the Golan Heights as a result of the internal conflict occurring in Syria.  Sporadic gunfire has occurred along the border region. There have been several incidents of mortar shells and light arms fire impacting on the Israeli-controlled side of the zone as a result of spillover from the fighting in Syria.  Travelers should be aware that cross-border gunfire could occur without warning.  Furthermore, there are active land mines in areas of the Golan Heights, so visitors should walk only on established roads or trails.  The Syrian conflict is sporadic and unpredictable.  U.S. government personnel must notify the Embassy's Regional Security Office in advance if they plan to visit the Golan Heights.

**Jerusalem**

U.S. citizens should be aware of the possibility of isolated street protests, particularly within the Old City and areas around Salah Ed-Din Street, Damascus Gate, Silwan, and the Sheikh Jarrah neighborhood.  Travelers should exercise caution at religious sites on Fridays and on holy days, including during Ramadan.  U.S. government employees are prohibited from entering the Old City on Fridays during the month of Ramadan due to congestion and security-related access restrictions.

U.S. government employees are prohibited from transiting Independence Park in central Jerusalem during the hours of darkness due to reports of criminal activity.

In October 2012, a tour bus in Jerusalem was the target of a stone-throwing attack that resulted in injury to a U.S. citizen tourist.  Such attacks, however, are not common in Jerusalem.

**The West Bank**

The Department of State urges U.S. citizens to exercise caution when traveling to the West Bank.  Demonstrations and violent incidents can occur without warning, and vehicles are regularly targeted by rocks, Molotov cocktails, and gunfire on West Bank roads.  U.S citizens have been killed in such attacks.  There have also been an increasing number of violent incidents involving Israeli settlers and Palestinian villagers in the corridor stretching from Ramallah to Nablus, including attacks by Israeli settlers on Palestinian villages in which U.S. citizens have suffered injury or property damage, and attacks by Palestinians on settlements.  U.S. citizens can be caught in the middle of potentially dangerous situations, and some U.S. citizens involved in political demonstrations in the West Bank have sustained serious injuries.  The Department of State recommends that U.S. citizens, for their own safety, avoid all demonstrations.  During periods of unrest, the Israeli Government may restrict access to the West Bank, and some areas may be placed under curfew.  All persons in areas under curfew should remain indoors to avoid arrest or injury.  Security conditions in the West Bank may hinder the ability of consular staff to offer timely assistance to U.S. citizens.

UCP035241

Personal travel in the West Bank is restricted for U.S. government personnel to the towns of Bethlehem and Jericho on Route 1, 443, and 90.  Personal travel is also permitted to Qumran off Route 90 by the Dead Sea, and to stop at roadside facilities along Routes 1 and 90.  All other personal travel by U.S. government personnel in the West Bank is prohibited.  U.S. government personnel routinely travel to the West Bank for official business, but do so with special security arrangements.

**The Gaza Strip**

The Department of State strongly urges U.S. citizens to avoid all travel to the Gaza Strip, which is under the control of Hamas, a foreign terrorist organization.  U.S. citizens in Gaza are advised to depart immediately.  The security environment within Gaza, including its border with Egypt and its seacoast, is dangerous and volatile.  Exchanges of fire between the Israel Defense Forces and militant groups in Gaza take place regularly, and civilians have been caught in the crossfire in the past.  Although the Rafah crossing between Gaza and Egypt normally allows for some passenger travel, prior coordination with local authorities -- which could take days or weeks to process -- is generally required, and crossing points may be closed for days or weeks.  Travelers who enter the Gaza Strip through the Rafah crossing must also exit through the Rafah crossing, and those entering the Gaza Strip may not be able to depart at a time of their choosing.  Many U.S. citizens have been unable to exit Gaza or faced lengthy delays in doing so.  Furthermore, the schedule and requirements for exiting through the Rafah crossing are unpredictable and can involve significant expense.  Because U.S. citizen employees of the U.S. government are not allowed to enter the Gaza Strip or have contact with Hamas, the ability of consular staff to offer timely assistance to U.S. citizens, including assistance departing Gaza, is extremely limited.

**Entry/Exit Difficulties**

Some U.S. citizens holding Israeli nationality, possessing a Palestinian identity card, or who are of Arab or Muslim origin have experienced significant difficulties in entering or exiting Israel or the West Bank.  U.S. citizens planning to travel to Israel, the West Bank, or Gaza should consult the detailed information concerning entry and exit difficulties in the Country Specific Information.

Contact the Consular Section of the U.S. Embassy for information and assistance in Israel, the Golan Heights, and ports of entry at Ben Gurion Airport, Haifa Port, the northern (Jordan River/Sheikh Hussein) and southern (Arava) border crossings connecting Israel and Jordan, and the border crossings between Israel and Egypt.  An embassy officer can be contacted at (972) (3) 519-7575 from Monday through Friday during working hours.  The after-hours emergency number is (972) (3) 519-7551.

Contact the Consular Section of the U.S. Consulate General in Jerusalem for information and assistance in Jerusalem, the West Bank, the Gaza Strip, and the Allenby/King Hussein Bridge crossing between the West Bank and Jordan, at (972) (2) 630-4000 from Monday through Friday during working hours.  The after-hours emergency number is (972) (2) 622-7250.

**For More Information**

Occasionally, the Embassy and the Consulate General send public messages by email to registered U.S. citizens and post them on State Department websites to highlight time-sensitive security concerns.  To receive such messages, travelers should register with the Embassy or the Consulate General via the Smart Traveler Enrollment Program and visit the Consular Affairs website.

Current information on travel and security in Israel, the West Bank, and the Gaza Strip may be obtained from the Department of State by calling 1-888-407-4747 within the United States and Canada, or, from overseas, 1-202-501-4444.  For additional and more in-depth information about specific aspects of travel to these areas, travelers should consult the Country Specific Information for Israel, the West Bank and Gaza and the Worldwide Caution.  Travelers transiting or visiting Jordan and Egypt during their trip to Israel should also consult their respective Travel Warnings, Travel Alerts and Country Specific Information, all of which are available on the Department of State's Consular Affairs website.

The U.S. Embassy also encourages U.S. citizens to review the Traveler's Checklist which includes valuable security information for those living and traveling abroad. Follow us on Twitter and the Bureau of Consular Affairs page on Facebook as well. Download our free Smart Traveler app, available through iTunes or Google Play to have travel information at your fingertips.

Embassies & Consulates

UCP035242



- About Us
- Newsroom
- Passport Statistics
- Legal Considerations

- Find a U.S. Embassy or Consulate
- Contact Us
- Careers
- Consular Notification and Access

**STAY CONNECTED**

- Diplomacy Blog
- Facebook
- Flickr

- @travelgov
- Youtube
- RSS

| travel.state.gov | U.S. Passports & International Travel | Students Abroad | U.S. Visa | Intercountry Adoption | International Parental Child Abduction |

Privacy • Copyright & Disclaimer • FOIA • No FEAR Act Data • Office of the Inspector General • USA.gov • GobiernoUSA.gov

This site is managed by the Bureau of Consular Affairs, U.S. Department of State.

UCP035243

# EXHIBIT 26



**Jen Psaki**
**Spokesperson**
**Daily Press Briefing**
**Washington, DC**
**June 18, 2014**

G+1 ➕ **Share**

**INDEX FOR TODAY'S BRIEFING**

**SAUDI ARABIA**
  • Secretary's Discussions with Ambassador Adel Al-Jubeir

**DEPARTMENT**
  • Secretary's Meeting with Senate Foreign Relations Committee Members

**IRAQ/IRAN/REGION**
  • U.S. Embassy Security
  • Overflow of Violence from Syria
  • Chairman Dempsey Testimony on ISIL
  • No U.S. Troops into Combat
  • U.S. Will Not Connect P5+1 Talks with Iraq
  • U.S. View of Maliki as Leader
  • National Unity Meeting in Baghdad
  • Refinery Update
  • Iran Nuclear Negotiations and Economic Conditions
  • P5+1 Negotiations / Iran's Terrorism Role
  • Turkish Hostages and U.S. Offers of Assistance

**SYRIA**
  • OPCW Probe on Chemical Weapons / Secretary's Discussions with Lavrov
  • OPCW Investigation of Chlorine Gas / Preliminary Report Summary Under Review

**UKRAINE**
  • U.S. Welcomes Ceasefire Announcement and Good Faith Efforts
  • Secretary Discussions with Russians and Ukrainians

**MIDDLE EAST PEACE**
  • Kidnapped Teens / Abbas Comments
  • Privacy Waiver Signed

**CUBA**
  • Condolences to Alan Gross and Family
  • Furlough Requested by U.S.

**LIBYA**
  • Arrest of Ahmed Abu Khatallah

**TRANSCRIPT:**

**1:18 p.m. EDT**

MS. PSAKI: Hi, everyone.

QUESTION: Hello.

MS. PSAKI: Hello. I have just --

QUESTION: Thank you for waiting.

**UCP000201**

Case 2:16-cv-04435-PA-MRW   Document 61-10   Filed 04/24/17   Page 157 of 198   Page ID
#:4690

MS. PSAKI: Sure, my please. A couple of items at the top upon your request. The Secretary met this morning with Ambassador Al-Jabeir. They reaffirmed the strong and enduring partnership between our countries. They discussed a range of shared concerns including recent developments in Iraq and our shared support for the Syrian opposition, and how we can best move forward in the process to end the war and the suffering of the Syrian people.

The Secretary also hosted a – met this morning with members of the Senate Foreign Relations Committee as part of our ongoing effort to consult with Congress. They discussed a broad range of foreign policy challenges, including Iraq, including Iran, Ukraine, Africa, and the pending State Department nominations. And of course, a number of members will, of course, be meeting with the President later this afternoon as well.

With that, Matt.

QUESTION: Can you be a little bit more specific about his meeting with the Saudi ambassador? Did they discuss questions like the – about the accusations of Saudi funding ISIL?

MS. PSAKI: I don't have any more readout than that. As you know, we've expressed concerns in the past, but I'm not aware of that being a new issue raised today.

QUESTION: Okay. Did you get an answer to the question that was posed yesterday about whose authority or under whose authority the additional security troops that went to Iraq are under, under chief of mission or under some other agreement with the Iraqis?

MS. PSAKI: I – as I said yesterday, certainly understand your interest. I'm still working through the final details of that and we'll venture to get you all an answer by the end of the day.

As I mentioned yesterday, the Department's – and I don't know if I did, so maybe this is new information. The RSO, of course, in the Embassy Baghdad is charged with the security and protection of mission personnel and facilities, and the DOD security teams have been integrated with the State security team. But we will get you a final answer on that by the end of the day, Matt.

QUESTION: All right. And then just back to the broader picture for a second. Are you familiar or have you seen the comments that Mr. Jarba made today in Jeddah?

MS. PSAKI: I have not seen those comments, but I'm sure you can inform me of them.

QUESTION: Well, I can tell you a little bit what I've seen. That he basically accused everyone in the room – this was at an Organization of the Islamic Conference. It used to be conference. It is still conference?

QUESTION: Organization of Islamic Cooperation.

QUESTION: Basically accused everyone in the room of being responsible for – everyone else in the room of being responsible for the situation not just in Syria but in Iraq. Would you have any reaction to that?

MS. PSAKI: Well, without knowing the details of who else was in the room, we --

QUESTION: Well, it's 57 countries that are all predominantly Islamic nations.

MS. PSAKI: Well, you are familiar with our view, which is that all of the countries in the region and their leaders need to focus on supporting Iraq and the Iraqi Government and the broad range of Iraqi officials at this difficult time, and it's not a time for a blame game. We are certainly concerned about the events in Syria and the overflow of violence that has – we feel is a predominant factor that's led us to where we are in Iraq.

QUESTION: At the same conference, Foreign Minister Zebari said that they have submitted an official request to the United States to actually commence strikes, airstrikes against ISIL. Are you aware of that?

MS. PSAKI: I believe that Chairman Dempsey also spoke about this during his testimony today, and I would point you to his comments.

QUESTION: But as far as you know, are we about to take a decision in that direction?

MS. PSAKI: There --

QUESTION: Is that something that the Secretary supports?

MS. PSAKI: Well, again, Said, I know you're aware – as you're aware, there are a range of options the President is considering, not all military options. At this stage, the only thing that the President has ruled out is sending U.S. troops back into combat in Iraq. But as we've noted many times, the solution is not – needed is not an Iraqi one – is an Iraqi one – I'm sorry – and any U.S. action, including any possible military action, would be in support of a comprehensive strategy to build the capacity of the Iraqis. So I have no new update to provide to you at this point in terms of the President's decision making.

Kim.

**UCP000202**

EXHIBIT 26, PAGE 147

QUESTION: Any more discussions planned with the Iranians about Iraq? Because they are – I know you said no yesterday, but I was wondering whether things have changed because they are today making noises about the fact that they're willing to discuss Iraq with you and help if they get to a nuclear deal. So it sounds like they have quite a bit of leverage at the moment. Who wants the nuclear deal more?

MS. PSAKI: I would dispute that. There are still no more discussions planned in Vienna, as I mentioned yesterday. Further discussions would likely take place at a lower level, but I don't have any update on that front. Our view is that any discussion with Iran regarding Iraq would be entirely separate from the P5+1 negotiations, and any effort to connect the two is a nonstarter for the United States.

QUESTION: But it sounds as though they're going to play even more hardball in the nuclear negotiations to get you to talk to them about Iraq.

MS. PSAKI: Well, there's no plans to have further conversations about Iraq at the P5+1 negotiations.

QUESTION: And that's what I want to follow-up. You say there's no more discussions in Vienna, but what about elsewhere?

MS. PSAKI: Well, as I mentioned yesterday, we are open to engagement or discussions on these issues. I don't have anything to predict for you, but it would happen at a lower level.

QUESTION: But – and not in Vienna, but could be in –

MS. PSAKI: Correct. That hasn't changed since yesterday.

QUESTION: And then I have a follow-up. Do you still have confidence in Maliki as the head of state in Iraq?

MS. PSAKI: Well, Lesley, as you know, he's the democratically elected leader of Iraq. Obviously, they're working through their elections process now. It's up to the people of Iraq to determine who their leadership is. We have expressed and continue to have concerns about the lack of inclusivity and the way of governing in a sectarian manner. There have been some steps taken over the last couple of days that have been encouraging, but clearly there's more that needs to be done, and we certainly don't expect that a couple of steps will solve months, if not years, of concern.

QUESTION: And then today they called for – they've asked the U.S. for airstrikes to occur, to – kind of formally. Was that done to the White House? Was Secretary Kerry involved in that? When was it done? How was it done?

MS. PSAKI: I don't have any more details to share. Again, Chairman Dempsey spoke to this today during his testimony, so I would point – certainly point you to that. Obviously, military requests typically go through the military channels.

QUESTION: Did you see the prime minister was on the major televised appeal with Sunni and Kurdish leaders for unity?

MS. PSAKI: I did. There were actually a range of steps, so let me go through a couple of them. Yesterday, there was a national unity meeting in Baghdad at the initiative of former Prime Minister Jafari. We were encouraged to see that Iraqi leaders from all across the political and ethno-sectarian spectrum were a part of that. They met and issued a statement, including a joint call to defend the state of Iraq and protect its sovereignty and dignity. We also welcome, as I have before, but worth noting again, the Iraqi federal supreme court's ratification of the April 30th election results, and we support Iraqi political and religious leaders' call for national unity to confront the ISIL terrorist threat. I would also note that Iraqi national security advisor has announced the formation of a public mobilization effort to regulate the thousands of volunteers who have stepped forward to assist Iraq's security forces. And Prime Minister Maliki also announced that he had dismissed four senior military commanders as they continue to address issues that led to a security breakdown. So these are a couple of steps. Obviously, there needs to be a continuity of this effort.

QUESTION: I just wonder if in this this building the thinking might be that these are steps that should've been taken perhaps months ago. As you said repeatedly, we're calling for unity for the last few months. Is it a question that this is too late now to stop the march of ISIL as they try and capture more parts of Iraq?

MS. PSAKI: Well, our view is that Iraq needs to be unified, including all of its political leaders across the spectrum on a step on that fight. Whether that is efforts to take it on with – through the security forces and in coordination and cooperation that's happening on that front, or the need to be more politically united over the long term. And as I mentioned a little bit earlier, even if there is assistance from the United States or other countries, this is up to the Iraqi leaders to take steps to make this sustainable over the long term.

QUESTION: But I guess the question is: Why would the Sunni Iraqis, who feel they've been so badly marginalized over the last few years, now trust a televised appeal and some of these steps that you've outlined to be reflective of what will happen going forward in the future? Why should they believe the message now coming from the Iraqi leadership?

MS. PSAKI: Well, certainly any leaders have to earn the trust of their people, but these are a range of steps that have been taken to show unity and the need to take on the threat of ISIL with a united front. And they have a common enemy, and that is these terrorists – this terrorist group that is killing and terrorizing people across the country. And that should be incentive.

QUESTION: And did you have anything to say about the reports of fighting around the oil refinery near Baghdad?

MS. PSAKI: Sure.

QUESTION: Any concerns about what would happen if that were to fall into ISIL's hands?

**UCP000203**

MS. PSAKI: Well, the refinery produces for domestic consumption, and production had already stopped for several days due to a combination of technical and security reasons. Iraqi authorities may need to import domestic fuel from neighboring countries. There's no impact on Iraq's crude oil exports, and we haven't seen any major disruptions in oil supplies in Iraq. But we're certainly constantly monitoring the global oil supply and demand situation.

QUESTION: Have you – and I understand there seems to be maybe at even the White House that any intervention, any American intervention should be conditioned or predicated on Maliki having a more inclusive government. Does the Secretary also subscribe to that?

MS. PSAKI: Well, I think you've heard the Secretary speak about the steps that we feel Prime Minister Maliki and other leaders in Iraq need to take. But this is not a quid pro quo. We're talking about what is – what will – what – regardless of the decision made by the President, Prime Minister Maliki and other leaders in Iraq must take additional steps to unite the country and govern in a non-sectarian manner in order to be successful over the long term.

QUESTION: So you would discourage Maliki from taking the election results and feel free to form a government of his own coalition here?

MS. PSAKI: Well again, I think the process of forming a government will work itself through the natural process in Iraq.

QUESTION: Jen --

MS. PSAKI: Oh, go ahead, Kim. And then we'll go to Lucas. Go ahead.

QUESTION: Can I just go back to the Iran thing? I understand you don't want to link the nuclear negotiations with Iran to any of the other issues.

MS. PSAKI: Mm-hmm.

QUESTION: But clearly they are. So how do you handle that in your nuclear negotiations with them? Aren't you worried that the talks are going to stall until the Iranians get what they want, which is cooperation with you in Iraq?

MS. PSAKI: Well, we shouldn't forget Iran has a significant incentive here, and cooperating and negotiating on the nuclear – their nuclear program, which is the impact that sanctions has had on their economy and the fact that President Rouhani ran on a platform of improving the economy. So I don't think anyone is engaging in this effort as a favor to us or to the other P5+1 countries. That doesn't change the fact that gaps remain. Significant gaps remain. It's difficult, but our team will make – take every effort to keep them focused on that nuclear program.

QUESTION: Can I just clarify one thing?

MS. PSAKI: Yeah.

QUESTION: On – you keep saying that there won't be another talks in Vienna, but – on Iraq.

MS. PSAKI: Mm-hmm.

QUESTION: But it is possible that there could be talks at a lower level in Vienna, isn't that right? I mean, not related to --

MS. PSAKI: Well, I'm referring to these ongoing negotiations.

QUESTION: Yeah, but are you ruling out Vienna completely as a venue for lower-level talks unrelated --

MS. PSAKI: I wasn't speaking to Vienna as in the city. I was speaking to these P5+1 negotiations that are happening now.

QUESTION: Yeah. So, I mean, there could be, at some point next week or whatever – unrelated to P5+1, Vienna could be – is not ruled out as a venue for U.S.-Iran talks on Iraq, right?

MS. PSAKI: It's not ruled in either, Matt.

QUESTION: I know, but I just want to make sure I – just want to --

MS. PSAKI: Just -- I was not implying city --

QUESTION: It sounded like you think Vienna (inaudible) --

MS. PSAKI: What I was – I perhaps shorthanded it. What I was meaning – what I meant was the talks that are ongoing right now on the nuclear program.

Samir.

QUESTION: Were the Iranian officials in Vienna authorized to discuss Iraq?

UCP000204

MS. PSAKI: Well, I think we've spoken to this, and I think they've spoken to this. So I think you can assume that they were to the degree the conversation was – briefly took place the other day.

QUESTION: Did you talk about Syria too in Vienna?

MS. PSAKI: No.

Go ahead, Nicolas.

QUESTION: I have a follow-up on Iran.

MS. PSAKI: Mm-hmm.

QUESTION: I think the question was asked yesterday, but I don't remember your response on that. Was Syria discussed between the Iranians and the American officials yesterday in Vienna?

MS. PSAKI: No. Samir just asked the same question.

QUESTION: Okay. Sorry.

MS. PSAKI: No, no.

QUESTION: He came back.

MS. PSAKI: It's Wednesday, it's okay.

QUESTION: And --

MS. PSAKI: Oh, go ahead.

QUESTION: Yeah. And since ISIL is your common enemy with Iraq, with Iran and Syria, would you consider any contact with the Syrian regime on the fight against ISIL?

MS. PSAKI: As you know, we've had a means of communicating in the past, but I'm not aware of that being a part of our calculation at this point.

QUESTION: Is ISIS your common enemy with Iran?

MS. PSAKI: Is it our common enemy? I think we both have concerns about the impact of their – the steps they've taken in Iraq and how they've terrorized the people in Iraq, yes.

QUESTION: Because earlier in the briefing you said that Secretary Kerry, when he met with the ambassador of Saudi Arabia, expressed concerns about the past. Have you ever been concerned about Iran's support of ISIL or AQI in the past?

MS. PSAKI: Well certainly, Lucas, we've been concerned about the role Iran has played in supporting terrorists in Syria and supporting the regime in Syria. But again, what I'm making a point about here is our shared concern about the impact of what's been happening over the last week on stability in Iraq.

QUESTION: But like, is it – the Treasury Department in 2012 said that the Iranian Ministry of Intelligence and Security had been funding and supporting AQI, which has now morphed into ISIS or ISIL. And I was curious how you intend to negotiate or have talks with a country who has supported two years ago a terrorist organization in Iraq; that it's not just Saudi Arabia, it's Iran as well.

MS. PSAKI: Well, we're not talking about negotiations. We're not talking about military cooperation. We're talking about a discussion, a brief discussion that took place earlier this week about concerns about the stability of Iraq, the need for the leaders to be more unified, and that was the thrust of the conversation.

QUESTION: By the way --

MS. PSAKI: Go ahead, Said.

QUESTION: -- is it ISIL or ISIS?

MS. PSAKI: Oh --

QUESTION: Is there like a standard operating procedure?

MS. PSAKI: Well, I know different organizations and different individuals use different terms, but yes.

QUESTION: Okay. I just wanted to follow up on Iran.

**UCP000205**

EXHIBIT 26, PAGE 150

MS. PSAKI: Mm-hmm.

QUESTION: President Rouhani today vowed to protect the Shia holy places, and he spoke from a place nearby the border. Do you have any comment on that?

MS. PSAKI: Well, we've seen, of course, those comments. As I mentioned in response to Lucas's question, ISIL is clearly a common threat to the entire region, including Iran. But Iraq will only successfully overcome this threat by governing in a nonsectarian manner. We've made concerns clear regarding Iranian fighters joining the fight in Syria. We've made – we would view this as much the same.

QUESTION: So you – what he said about volunteers and so on, you look negatively on that aspect?

MS. PSAKI: Volunteers in what capacity?

QUESTION: Well, he said that there are basically thousands of – I'm paraphrasing – of volunteers who are ready to go and protect these holy places. You would --

MS. PSAKI: I said that?

QUESTION: No, not you. He said that. He said there are Iranian volunteers who --

MS. PSAKI: Correct, we believe that --

QUESTION: -- are ready to go in and protect --

MS. PSAKI: -- our focus should be on encouraging nonsectarian governance.

QUESTION: And would you call on Maliki to reject such an offer by Iran?

MS. PSAKI: We've called on Maliki – Prime Minister Maliki and any Iraqi leader to not be pulled into efforts to divide the country along sectarian lines.

QUESTION: Do you have proof that Iran is no longer supporting ISIS?

MS. PSAKI: Do we have proof?

QUESTION: Yes.

MS. PSAKI: I --

QUESTION: Because your own Treasury Department in the past said that Iran was supporting al-Qaida in Iraq, which has morphed into ISIS.

MS. PSAKI: I don't think it was as simple as that, Lucas, but I don't think I have anything more to add to your question.

Go ahead.

QUESTION: I'm just wondering if you also had any information or evidence of Iranian forces on the ground in Iraq. This was a question that was raised last week.

MS. PSAKI: Mm-hmm.

QUESTION: You said you didn't have any information on that. Has there been --

MS. PSAKI: I don't have any new information on that, no.

QUESTION: So do you believe that there are Iranian forces on the ground in Iraq?

MS. PSAKI: Well, we've seen those reports, but I don't have any independent confirmation from here.

QUESTION: Do you have any embassy update?

MS. PSAKI: The process is ongoing of relocating staff, but other than that there hasn't been any additional steps taken.

Go ahead.

QUESTION: Was there any contact between the Secretary and Foreign Minister Davutoglu recently, Jen?

MS. PSAKI: As you know, there was just a couple of days ago, but not since then.

**UCP000206**

EXHIBIT 26, PAGE 151

QUESTION: There was a phone call, another phone call – it was the third phone call, actually, over the last week – between Prime Minister Erdogan and Vice President Biden.

MS. PSAKI: Mm-hmm.

QUESTION: Do you have anything that you can share with us?

MS. PSAKI: I believe the Vice President's office would have any readout of that.

QUESTION: Turkish officials told recently that the Turkish side requested from U.S. not to take any military action until ISIL releases the hostages. Do you have any comment on that?

MS. PSAKI: I don't. Again, we're – the President has a range of options, not all of them military, that he's considering. There's a range of factors that are being considered. But I don't have anything else to read out on that.

QUESTION: Are the Turkish hostages a concern for the Administration?

MS. PSAKI: I think we've been very clear about our concern about the hostages. We've offered our support and our assistance to Turkish authorities, and that door remains open.

QUESTION: Syria?

MS. PSAKI: Mm-hmm.

QUESTION: Jen, yesterday the OPCW, the Ambassador Mikulak – I'm not sure if I'm saying his name properly --

MS. PSAKI: Mm-hmm.

QUESTION: -- had issued that statement which was then posted on the website in regards to the OPCW probe that found there was very credible evidence of chemical weapons use in a systematic form in Syria, suggesting that perhaps that body should do a little bit more given that we're three weeks out from the deadline, June 30th.

MS. PSAKI: Mm-hmm.

QUESTION: Has anything happened in this building? I mean, what are we exactly asking them to do?

MS. PSAKI: Well, I think we're continuing to ask the regime to --

QUESTION: The OPCW, I meant. Sorry.

MS. PSAKI: The OPCW? Well, our focus is on continuing to encourage the Syrian regime to meet its obligation to remove the remaining 8 percent of chemical weapons materials. As you know, the OPCW – and officials who are involved in it – remains committed to delivering on their part, and they have confirmed that packaging has been completed at the site where the last 8 percent remains. So we just join the international community on urging the Assad regime to uphold its obligations to remove the remaining chemicals, fully destroy the 12 production facilities that remain intact, and respond substantively – substantially to questions from the OPCW about the completeness and accuracy of Syria's declaration.

QUESTION: But the ambassador said it doesn't look like that deadline is going to be met. We're three weeks out and none of the destruction has even begun on the 12 production facilities that we have concerns about and this remaining 8 percent that you mentioned there. So what's happening actively on the ground? I mean, is it more calls to Lavrov or has there been any conversations with the – outreach to the Syrian regime?

MS. PSAKI: Well, this is an issue, Margaret, that the Secretary raises with Foreign Minister Lavrov virtually every time they speak. The international community and many other countries are very focused on encouraging them to keep making progress. We've removed 92 percent of the most toxic chemicals, but obviously we want to see the remaining 8 percent removed, so we will use every diplomatic lever possible in order to encourage them to keep making progress on that effort.

QUESTION: Because broadly speaking, I mean, some argue that by allowing the Syrian Government to continue to, what it looks like, flout this deadline, not comply, hold on to the weapons which some would say is a tool to stay in power, that it feeds support of extremist groups, because you're going to go to the guys who have movement been on the ground, whether it's ISIS or others, and that failing to follow through with this diplomatic agreement in a more forceful way doesn't serve the U.S.'s own purposes in terms of undercutting the extremist forces who are gaining support.

MS. PSAKI: Well, I wouldn't limit our concerns about Syria to just the – removing the remainder of the 8 percent of chemical weapons. Obviously as long Assad remains in power, we have concerns about the role he plays as a magnet for terror. So it's much broader than that.

But I don't think we should lose sight of the fact that we've removed 92 percent. We have every mechanism and every tool available and ready to remove the remaining 8 percent. If they don't abide by that, then I'm sure the international community and the OPCW will take a close look at what to do from there.

QUESTION: So – but what is that mechanism that you just referenced?

**UCP000207**

EXHIBIT 26, PAGE 152

MS. PSAKI: In terms of what?

QUESTION: To make them follow through.

MS. PSAKI: Well, it's not just – obviously there is a UN Security Council resolution, as you know. There's – there are consequences that are included in there. But our focus now is on continuing to press them to make additional progress. We believe that there is every tool possible on the ground to get this job done.

QUESTION: When the OPCW called on Syria to redouble its efforts – I think they call on them to redouble their effort – what does that mean? I mean, does that mean that Syria is not complying and not doing anything, that it's lagging behind doing part of its job?

MS. PSAKI: Well, they've missed a number of target dates, to include the timeline it proposed for the removal of all declared weapons by April 27th. So we have expressed concern about the delay. We've expressed concern about the fact that they have blamed it on a variety of reasons that we don't feel are valid. There have been some security issues on the ground that the OPCW and others have made every effort to address, but our focus remains on providing any support necessary to finish the job and get this done.

Anne. Syria or --

QUESTION: Yeah, also on Syria. Is there any update on where the investigation into the possible use of chlorine gas stands? And what is your expectation for when that investigation will be complete, and you and the international bodies looking at it will have something to say?

MS. PSAKI: Well, the OPCW Technical Secretariat released a summary report – I believe it was just yesterday – on the fact-finding mission in Syria. We will be reviewing that. We feel it warrants serious consideration and we'll study it carefully. The findings included in this summary offer credence ascribed to the systematic use – systemic use of toxic chemicals such as chlorine, and this underscores, of course, the importance as we've been discussing to – and the urgency of removing the remaining chemical weapons in Syria.

This fact-finding mission is an important first step. Obviously, there'll be a final report released which we'll also review when that is released.

QUESTION: Will there be a separate U.S. finding or declaration about what – either in conjunction with the OPCW or on your own?

MS. PSAKI: I don't believe that is in the works. I'm happy to check and see if that's something we have access to information about. Obviously, the OPCW, with support of the United States and other countries, is the mechanism that has access on the ground and kind of the information needed to make an evaluation.

QUESTION: But you've been participating in some sort of --

MS. PSAKI: Certainly we have been, but they've obviously been on the ground. The United States doesn't have a separate investigative mission on the ground.

QUESTION: No, but why is this different than last summer when you did actually kind of run your – you didn't have U.S. investigators there, but did sort of run a separate U.S. analysis of the evidence available and make your own pronouncement…

MS. PSAKI: Well, there obviously was – it was a different circumstance, certainly, in terms of the level and the horrific acts that happened. I mean, any of these is horrible, but I think last August certainly stands out to all of us. I can check and see if there's any plan – not that I'm aware of at this moment – to do a separate U.S. report on these findings.

QUESTION: And lastly, would you consider the – if this bears out from credible evidence to actually OPCW saying that chlorine gas was used, that that also crosses President Obama's redline?

MS. PSAKI: Well, I'm not going to make any pronouncements about future redlines. We'll evaluate the report when it comes out and make a determination about what that means from the United States.

QUESTION: I'm just curious about the – their use of the word "credence," which is not confirmation. And what do you think needs to come next? Are you interested in getting 100 percent – the United States Government – are you interested in the OPCW getting 100 percent confirmation --

MS. PSAKI: Well, we're --

QUESTION: -- that chlorine was used?

MS. PSAKI: We're absolutely interested in as much certainty as possible, and this is a preliminary report. So again, we'll review a final report when that is concluded.

QUESTION: So your – you would support the OPCW fact-finding team going back and doing what it needs to do to get 100 percent?

MS. PSAKI: I'm not --

QUESTION: I'm just not sure I understand what it means that their preliminary mission finds credence to reports that chemical --

**UCP000208**

EXHIBIT 26, PAGE 153

MS. PSAKI: Well, they released --

QUESTION: -- I mean, that chlorine was --

MS. PSAKI: -- a summary report, Matt.

QUESTION: I know. I read it --

MS. PSAKI: Mm-hmm. I'm not certain --

QUESTION: -- when it came out yesterday.

MS. PSAKI: -- what is required to release a final report.

QUESTION: But it seems just kind of – it's kind of wishy-washy. It doesn't – not kind of, it is. I mean it doesn't say – doesn't give a definitive answer one way or
another whether chlorine was used or not, correct?

MS. PSAKI: Well, it states exactly as you read and I stated.

QUESTION: Right. I mean, it says "gives credence to." So what was the point of it? I mean, it was credible. There was credence to these reports when people
started showing up in hospitals with lung abrasions and problems, pulmonary --

MS. PSAKI: Well, they evaluate the information that's available on the ground, Matt. They're not going to obviously provide an evaluation or a conclusion that they
don't find. So I would --

QUESTION: So --

MS. PSAKI: -- point you to the OPCW for more specifics on --

QUESTION: But --

MS. PSAKI: -- what they have and the information they have available.

QUESTION: Right. But I'm less interested in what the OPCW thinks about it than what the U.S. Government thinks about – does the U.S. Government think that
this preliminary report is worthwhile – I mean, you said it warrants serious consideration, but I'm wondering: Why?

MS. PSAKI: Because we review any report that is issued by a body like the OPCW. We'll take a look at that and see if there's more conclusions we can draw from
it.

QUESTION: But does the U.S. Government believe that there is credence to the reports of chemical – of chlorine gas use?

MS. PSAKI: I think we've expressed before, Matt, concerns about the reports that we've seen. I don't have more information than what was available in the OPCW
report.

QUESTION: But you would endorse this report? The government – the U.S. Government backs the findings of this report?

MS. PSAKI: Well, we obviously are reviewing it, and if we have any more to add I'm sure we'll do that.

QUESTION: But, Jen, I think you've used the term "systemic use" of – that there's been use of chemical weapons systemically.

MS. PSAKI: Systematic use.

QUESTION: Systematically, okay. So is that like every – was there a pattern or a --

MS. PSAKI: Said, I'm sure that --

QUESTION: Every month?

MS. PSAKI: -- the OPCW can give you a more conclusive briefing on the findings of their preliminary report.

QUESTION: But I'm saying that the evidence was gathered apparently by people showing up at the hospitals and so on, and showing symptoms and so on – do
you have any other evidence?

MS. PSAKI: Again, I – the OPCW has had the lead as the appropriate international body here, and I'm sure if they're going to provide a briefing, you can participate
in that.

**UCP000209**

EXHIBIT 26, PAGE 154

QUESTION: Can I go to Ukraine?

QUESTION: Just --

MS. PSAKI: Go ahead, and then we'll go to Ukraine.

QUESTION: Just I wanted to clarify your previous answer --

MS. PSAKI: Okay.

QUESTION: -- about the Turkish hostages. When you said that the door is still open for the Turks – for helping the Turks to release these hostages, does it mean
that Turks haven't yet asked your help on this issue?

MS. PSAKI: I don't have an update on that. I'm happy to check and see if there's been any change to what we discussed last week.

Go ahead, Jo.

QUESTION: I'd like to go to Ukraine. And today, President Poroshenko announced plans to order a unilateral ceasefire in the east, which would allow the pro-
separatists – the pro-Russian separatists to lay down their arms. Is this something you would welcome? Is this a good step?

MS. PSAKI: Well, we certainly welcome President Poroshenko's announcement that Ukraine would implement a ceasefire as a first step of a peace plan, a plan he
discussed with President Putin during a phone call last night. President Poroshenko reiterated that amnesty would be offered to those who lay down arms
voluntarily and who are not guilty of capital crimes.

He also committed to providing a safe corridor for Russian fighters to return to Russia. He's been clear that he will continue discussions about decentralization and
constitutional reform to also address the legitimate concerns, but this was a unilateral step. So these steps were taken by the Ukrainian Government, which we
certainly commend them for these good-faith efforts, but naturally they need a partner in this effort.

QUESTION: Did they consult – did the – did President Poroshenko and his team consult with the United States before making this offer?

MS. PSAKI: Well --

QUESTION: Was it something that you put together with them?

MS. PSAKI: This was a plan put together by the Ukrainians. As you know, we and the European Union have been in consultations and discussions with them for
months about the best way to de-escalate the situation on the ground.

QUESTION: Have you seen any reciprocal good-faith efforts from either Russia or the separatists?

MS. PSAKI: Nothing to update you on today, Matt. I think that's one of the reasons why a partner is needed. And Russia, of course, must support the peace plan
instead of continuing to support the separatists on the ground.

QUESTION: So as far as you're concerned, they – there has not been any reciprocal good-faith action?

MS. PSAKI: Well, it just --

QUESTION: I know it's – but so far, you haven't seen anything, and so far what you have seen is a continuation of Russia being a bad actor? Is that --

MS. PSAKI: Well, there isn't any specific thing I'm pointing to at this moment. But I don't – I have not seen them speak out in support of this ceasefire either.

QUESTION: Okay. Would you also – would you be supportive of investigations into what has happened in the east specifically, I mean, what has been going on in
the fighting, in the clashes, the bombings, the killings of journalists, et cetera?

MS. PSAKI: Yeah. I believe I spoke to this yesterday and said we would --

QUESTION: Little bit.

MS. PSAKI: -- certainly support an effort to look into what happened.

QUESTION: Not just with the journalists. I'm talking about everything writ large, not just the actions of the Ukrainian authorities and the Ukrainian security forces but
also the separatists. I mean, is there any kind of a call for an investigation into what – would the U.S. be prepared to support an investigation by whatever body
might be appropriate into the actual what happened on the – in the --

MS. PSAKI: Into – I'm not sure which specific --

**UCP000210**

QUESTION: Well, there's been a lot of fighting. There's been a number of civilian casualties on both sides. And I'm just wondering if this is something the U.S. feels should be investigated.

MS. PSAKI: Again, I mean, every day we make every effort, as do the Ukrainians and others, to obtain the most information we can in these circumstances. I'm not aware of a plan for or desire to call for a broad, sweeping investigation.

QUESTION: All right. Do you – yesterday you talked about how you were concerned about the movements of Russian troops inside Russia near the border. Is that still a concern, or is that gone away?

MS. PSAKI: I don't believe anything has changed on that front.

QUESTION: All right. And on the transfer of heavy weaponry and vehicles like tanks, still – you still haven't seen anything new since that one incident with the three tanks?

MS. PSAKI: Correct, mm-hmm.

QUESTION: But it remains – but you still – as you said yesterday, you still believe there is a lot of cross-border traffic and --

MS. PSAKI: Yes.

QUESTION: Just to go back to the ceasefire, I wondered what the thinking was behind not giving an immediate order for the unilateral ceasefire, one? He said that he could – or the Ukrainian officials are saying it could take place in a few days. Why not do it immediately?

MS. PSAKI: Well, there are a range of steps I think they likely needed to prepare in order to implement it effectively from their end, so a couple of days is – obviously whatever they think is appropriate and possible is, of course – we support that – that process.

QUESTION: You don't have a timeline from here?

MS. PSAKI: No, I would point to them on what the specific implementation timeline is on their end.

Ukraine or any --

QUESTION: Sorry, just have there been – have there been any discussions between the Secretary and Foreign Minister Lavrov since --

MS. PSAKI: I don't believe --

QUESTION: -- or the Ukrainians?

MS. PSAKI: I don't believe there have been. I think he may speak with both sides in the coming days, but I don't – there hasn't been one since I came down here.

QUESTION: Both sides meaning the Ukrainians and the Russians?

MS. PSAKI: Correct, yes.

QUESTION: Can we go to the clampdown in the West Bank?

MS. PSAKI: Do we have any more on Ukraine just on – sure. On which --

QUESTION: Palestinian and Israeli --

MS. PSAKI: Sure.

QUESTION: -- issues. As the search for the three teenagers goes into its sixth day, the Israelis are arresting hundreds of Palestinians, rounding up some or re-arresting in some cases many of the ones that were released. They're having a clampdown, a lockdown. It's really causing a very difficult humanitarian condition. Are you talking with the Israelis to sort of lighten – but I asked you this yesterday. Are you asking them to lighten up their heavy hand in their search?

MS. PSAKI: Well, Said, we've been in touch with both the Israelis and the Palestinians throughout the course of the last several days since these teenagers were kidnapped. We know this is a difficult time obviously on the ground. We've urged continued security cooperation between the Israelis and the Palestinians in the search for the kidnapped teenagers. We were encouraged by President Abbas's strong statement to the Arab and Islamic foreign ministers today in Saudi Arabia. But – and certainly as the search continues and in our conversations, we urge both sides to exercise restraint and avoid the types of steps that could destabilize the situation. And that's a message that we are conveying in all of our conversations as well.

QUESTION: So it would be more prudent for the Israelis to sort of search selectively and work and coordinate with the Palestinians rather than subject the whole Palestinian population to collective punishment?

MS. PSAKI: Well, our understanding is that there is security cooperation that's ongoing --

**UCP000211**

QUESTION: Right.

MS. PSAKI: -- and we encourage that to continue.

QUESTION: Well, wait. So I'm going to re-raise the questions I asked yesterday, which kind of got – what – you do not believe at this moment that what the Israelis – that the Israeli operation to free – to find and free these teenagers – is amounts to collective punishment of Palestinians in the West Bank? Is that correct?

MS. PSAKI: Nothing has changed since what I said yesterday.

QUESTION: So no. But you have expressed concern to the Israelis that – I just want to make sure I understand. Have you expressed to the Israelis concern that an operation might become some form of collective punishment?

MS. PSAKI: I would not state it in those terms. We've – know this is a difficult and sensitive time and we've urged both sides to exercise restraint.

QUESTION: In the Secretary's statement from Sunday he talked about how there are many signs that point to Hamas involvement in this.

MS. PSAKI: Mm-hmm.

QUESTION: Is that – are you now confident that Hamas is responsible for this, as confident as the Israelis say they are?

MS. PSAKI: No conclusion has been made on our end since the statement on Sunday, so we remain in the same place we were in the Secretary's statement.

QUESTION: So you do not know or you do know that these teenagers are being held by Palestinian militants?

MS. PSAKI: We don't have any other independent information.

QUESTION: Okay. You said that you had offered assistance to Israel.

MS. PSAKI: Mm-hmm.

QUESTION: Has that happened? Do you know? And do you know – if it has or even if it hasn't – what specific kind of assistance you have offered?

MS. PSAKI: I don't have any more details. I'm happy to see if it's been accepted or if there are any specifics about what we may be able to offer on this front in the search for the three teenagers.

QUESTION: All right. And then I just want to draw a fine point of it. Is the U.S. – is the Administration concerned or not concerned about the Israeli operation and the impact that it's having on the Palestinians?

MS. PSAKI: I think we recognize this is an incredibly sensitive --

QUESTION: Right.

MS. PSAKI: -- and difficult circumstance on the ground, and we feel all sides should exercise restraint. So --

QUESTION: And thus far you believe that all sides have exercised restraint? Is that --

MS. PSAKI: We wouldn't say all sides should exercise restraint if we felt all sides were at this point.

QUESTION: Oh. Okay. So which side, or maybe both have not --

MS. PSAKI: I'm just not going to have much more to add on this particular topic, Matt.

QUESTION: I – well, but it sounds as though you – you're not convinced that – it sounds as though you think that either one side or both sides have been acting without restraint.

MS. PSAKI: I think it's just important, given the circumstances, that they do moving forward. And I'm going to leave it at that.

QUESTION: Can I ask you about --

MS. PSAKI: Said.

QUESTION: The spokesman for Hamas said today, to the suggestion that they kidnapped these young Israelis, it's stupid. Doesn't that amount to sort of denying that they have done it?

MS. PSAKI: They may have. There's obviously an investigation going on. There's lots of accusations. I don't have any other conclusion from here.

**UCP000212**

Go ahead, Jo.

QUESTION: Can I ask if you have a privacy waiver for the – one of the teenagers?

MS. PSAKI: We do, yes. So we can confirm that one of the kidnapped was an American citizen.

QUESTION: Which one?

MS. PSAKI: I believe his name has been reported. I don't have it in front of me right now.

QUESTION: And what is the – is it the Consulate General in Jerusalem or the Embassy in Tel Aviv that's involved in trying to provide consular services to the family
and --

MS. PSAKI: I don't have that level of detail. I'm happy to check and see which entity on the ground is in touch with the family. But we certainly are.

QUESTION: In your opinion, has Israel taken advantage of the situation to sort of break – tear down the infrastructure for this national unity government in its
infancy?

MS. PSAKI: I'm just not going to have much more to add on that front, Said.

Go ahead.

QUESTION: On this at all, I just want to make sure that – yesterday, again, you were asked this question as well.

MS. PSAKI: Mm-hmm.

QUESTION: But there's – numerous Israeli officials have said that the U.S. decision to work with and continue to fund the Palestinian government, the new unity
government, is – contributes – contributed to this incident with the three – is it – am I correct in thinking that you still would reject such an allegation?

MS. PSAKI: Yes, that is correct.

QUESTION: All right.

MS. PSAKI: Do we have a new topic? Are we done?

QUESTION: Oh, could I have one more on Cuba?

MS. PSAKI: Oh, go ahead, Lesley.

QUESTION: Sorry, I was --

MS. PSAKI: Sure, mm-hmm.

QUESTION: The mother of Alan Gross has passed away.

MS. PSAKI: Mm-hmm.

QUESTION: And his wife's come out and called again on the U.S. to secure – to do everything it can to secure his release, saying that she didn't think – she was
worried what he might do, that he might do something drastic. Are there any – given – what's the latest development? Any new efforts made to try for his release?

MS. PSAKI: Well, I will say first that we of course express our deepest and sincerest condolences to Mr. Gross and his family on their loss. We obviously feel it is a
tragedy that he was unable to be home in the United States at his mother's bedside for her passing. We've urged the Cuban Government to grant Mr. Gross a
humanitarian furlough so that he can travel to the United States and be with his family during this time of mourning, and we've made very clear that this is a strong
priority for us.

QUESTION: Was that made today, that request?

MS. PSAKI: I don't have a specific timing, but it's obviously recent, given her death today.

QUESTION: Well, yeah, but in fact, haven't you been asking – yeah, you've been asking for this for some time --

MS. PSAKI: We have, but in --

QUESTION: -- but not just --

**UCP000213**

MS. PSAKI: -- but specifically as it relates to returning home to --

QUESTION: For a funeral.

MS. PSAKI: -- be with his family during this time of mourning.

QUESTION: Right. But I'm trying to figure out if this is separate from – have you been asking for a temporary furlough in the past, or just for his complete release?

MS. PSAKI: Well, we've been asking for his release, as you know.

QUESTION: Right.

MS. PSAKI: But in these circumstances, we think that immediately --

QUESTION: So this --

MS. PSAKI: -- this is – would be a gesture that they should grant.

QUESTION: So this is a new request for him to be allowed to leave prison, come to the States, be with his family for the mourning period and funeral possibly, but then he would go back?

MS. PSAKI: That is what a furlough is. Yes.

QUESTION: I understand. So that – and you're okay with that?

MS. PSAKI: Well, we would like him to be released. That is what we've been pressing for for some time. But the death of his mother – the tragic death of his mother is a recent event and one we're --

QUESTION: Do you have to provide some guarantees that you would ensure that he would return?

MS. PSAKI: I'm just not going to get into any greater level of detail on that front.

QUESTION: Jen, I wondered if I could ask a question about Libya. Are you aware that some 40 Egyptian workers – oil workers – have been kidnapped in Libya? And some are tying it to the apprehension of Ahmed Abu Khatallah.

MS. PSAKI: I have not seen those reports, Said. I'm happy to look into them.

Oh, go ahead in the back.

QUESTION: Aru Pande from Voice of America. Just a quick follow-up on Libya. Some Libyan officials, including the justice minister, have come out condemning the operation, saying it's a violation of Libya's sovereignty. Your reaction to that?

MS. PSAKI: Well, this was a unilateral U.S. operation. Obviously we're in touch with our Libyan authorities. We'll keep those conversations private, but it should come as no surprise, given the tragedy that occurred on September 11, 2012, that we would take the opportunity to apprehend this individual and bring him to justice. And we have long stated that as a priority of the United States.

QUESTION: Any concern that if the United States had not helped dispose of Qadhafi in 2011 that none of this would have happened?

MS. PSAKI: I think, Lucas, we're focused here on moving forward. And obviously, detaining this individual, who I can also confirm is currently aboard a ship en route to the United States, which is a slight update from yesterday, was an important step forward.

QUESTION: Do you know which court he has to report to (inaudible).

MS. PSAKI: I don't have any – I think any of those details would come from the Department of Justice.

QUESTION: Including the --

QUESTION: Can I just – I just wondered, the fact that you went in and got this guy – arrested this guy – whether does – that shows a lack of belief in the strength of the Libyan forces to have done this? They were supposed to be – indeed they were – they have their own investigation into what happened in Benghazi. Have they ever shown you any results of it? Have they come up with any names? Have they made any kind of – has there been any proof that they're serious in trying to investigate what happened?

MS. PSAKI: Well, I think any of those conversations would take place through law enforcement channels. Obviously this was an effort that has been underway for quite some time, and we saw an opportunity over the course of the last couple days to detain this individual, so we did that. And I think, obviously, we've been speaking about it for some time. So --

**UCP000214**

EXHIBIT 26, PAGE 159

QUESTION: I guess also the requests that they have for you to return him so he could be tried in Libyan courts is not one that you're going to agree to.

MS. PSAKI: Well, I would refer you to the Department of Justice, but I think we've been very clear that the plan would be for him to be tried in courts in the United States.

Anne? Libya?

QUESTION: Well, does your referral to DOD for further details also cover when --

MS. PSAKI: DOJ.

QUESTION: Well, he's aboard a military ship, right?

MS. PSAKI: Mm-hmm.

QUESTION: When does that ship dock, even if you don't know where?

MS. PSAKI: I don't have any other details on that at this point in time.

QUESTION: Okay, but would that be – that would also be at DOJ, or would that be --

MS. PSAKI: It may be, but I'm not sure that there are details they're sharing at this time. So to save you a phone call.

QUESTION: And it – are there any State Department personnel as part of that package traveling with them?

MS. PSAKI: I'm happy to check on that for you. Not that I'm aware of, but I'll check and make sure that's the case.

QUESTION: Does he still have a right to consular access?

MS. PSAKI: Yeah. We discussed this yesterday, and obviously we will – we are committed in general to the principle of consular access, so we'll meet our obligations for that.

QUESTION: So that would be done on U.S. soil or on the ship?

MS. PSAKI: I don't have any more details on how it would take place.

Thanks, everyone.

QUESTION: Thank you.

(The briefing was concluded at 2:04 p.m.)

**DPB #108**

**UCP000215**

EXHIBIT 26, PAGE 160

# EXHIBIT 27

# U.S. DEPARTMENT OF STATE
## DIPLOMACY IN ACTION

**Jen Psaki**
**Spokesperson**
**Daily Press Briefing**
**Washington, DC**
**June 30, 2014**

G+1  Share

---

**INDEX FOR TODAY'S BRIEFING**

**DEPARTMENT**
- Secretary Kerry's Travel to Panama

**ISRAEL / PALESTINIAN TERRITORIES / REGION**
- Kidnapped Teenagers
- Violence
- Palestinian Technocratic Government

**IRAQ / SYRIA / REGION**
- Security Situation / ISIL
- Secretary Kerry's Meetings in the Region / Iraqi Government Formation
- Iraqi Military Requirements / Iraqi Security Forces
- Export and Import of Oil
- Contract Reviews

**D.P.R.K. / REGION**
- Reports of U.S. Citizens Facing Trial / Privacy Act Waivers / Travel Warning
- Reports of Launched Projectiles
- Six-Party Talks
- Support Improved Inter-Korean Relations

**UKRAINE / RUSSIA**
- Cease-fire / Russian-Backed Separatists / Sanctions
- UN Refugee Agency Claims

**NIGERIA**
- Kidnapped Girls
- Boko Haram
- Reported Attacks
- U.S. Assistance

**PANAMA / TAIWAN**
- Unofficial Relationship with Taiwan

**JAPAN**
- Japanese Right to Equip Themselves in Way They Deem Necessary

---

**TRANSCRIPT:**

1:38 p.m. EDT

**MS. PSAKI:** Hi, everyone. Happy Monday. So I just have one item at the top. Secretary Kerry – as the White House announced, Secretary Kerry will be visiting Panama July 1st, which is tomorrow, to attend the inauguration of Panama's president-elect, Juan Carlos Varela. We congratulate President Varela on his victory and Panama's history of peaceful democratic transfer of power. We have a growing trade relationship, excellent security cooperation, and share many of the same concerns on regional and multilateral issues. Panama is also an important partner of the United States, and we look forward to continuing our close relationship.

During the inauguration, Secretary Kerry will also meet with other Central American leaders to discuss the issue of unaccompanied children who have illegally crossed the border to the United States. A sustainable solution to this urgent situation requires a comprehensive approach to address issues of security, prosperity, and governance, all of which play a role in migration, especially the migration of unaccompanied minors. We hope to continue working with the Central American

**UCP000216**

and Mexican Governments to address the complex root causes of migration and identify ways the United States and countries in the region can more effectively contribute to the effort.

Secretary – I'm sorry, Vice President Biden was in Guatemala just a few weeks ago where he announced a U.S. assistance to increase the capacity of these countries, and I know the President will have an announcement later this afternoon. But the Secretary's meetings will be part of our effort to engage with these governments and discuss the root causes of these issues.

**QUESTION:** Sorry. The President will have an announcement on what?

**MS. PSAKI:** I think you saw on the news or in the newspapers earlier today the President would have more to say on assistance they're announcing.

**QUESTION:** Oh, on immigration.

**MS. PSAKI:** Yes.

**QUESTION:** Right. So before – this is --

**MS. PSAKI:** Did you get a haircut, Matt?

**QUESTION:** I did.

**MS. PSAKI:** Okay. (Laughter.) Noted. Noted for the transcript. Go ahead.

**QUESTION:** I notice you haven't said anything of it. Anyway – (laughter) – when you talk about Panama's peaceful – tradition of peaceful transfers of democratic power, I assume you're talking about recent tradition, yes?

**MS. PSAKI:** Yes, I was not making --

**QUESTION:** Not U.S.-assisted --

**MS. PSAKI:** -- a large, sweeping, historic claim there.

**QUESTION:** Okay.

**MS. PSAKI:** But go ahead.

**QUESTION:** Before we get back to that and other things, the breaking news just from the last 20 minutes or so about the Israelis finding the bodies of the three kidnapped teenagers, I'm wondering, one, are you aware of it? And if you are, what do you have to say about it? And two, have you been in contact with the Israelis, or the Palestinians for that matter?

**MS. PSAKI:** I have seen – we have seen the reports. I don't have anything to confirm from here. I would point you to the Government of Israel. Certainly as we've said many times throughout the course of the last several weeks, the kidnapping, and of course any harm that has been done to these teenagers is a tragedy. We've been in close touch with the Israelis and the Palestinians over the course of the last several weeks. I don't have any new calls to update you on as of this morning.

**QUESTION:** Okay. If there are any, can you expedite --

**MS. PSAKI:** Can we send them up? Yes, absolutely.

**QUESTION:** -- letting us know?

**MS. PSAKI:** Sure.

**QUESTION:** In – since this began, you and the Administration in general have been urging restraint, calling on both sides to show restraint. Does that remain your message even with this new development?

**MS. PSAKI:** It certainly does. We have, as you noted, been in touch with both sides and have been urging continued security cooperation, that the Israelis and the Palestinians continue to work with one another on that, and we certainly would continue to urge that despite – in spite of, obviously, the tragedy and the enormous pain on the ground as a result.

**QUESTION:** (Off-mike.)

**QUESTION:** Wait, I just have one more.

**MS. PSAKI:** Let's just go one at a time. Go ahead, Matt.

**QUESTION:** The Israelis have all along said that Hamas was behind this. You have said that signs indicate that Hamas was involved, but you have stopped short of saying that you're 100 percent certain of it. Presuming that the Israelis do provide you or you come up with your own 100 percent confirmation that it was involved, would that change – and I realize this is a hypothetical, but would Hamas's involvement in something like this be cause for the Administration to rethink its support for the Palestinian – the new Palestinian Government?

**MS. PSAKI:** Well, Matt, let me first say there's nothing new as it relates to our view in this specific case, and as we've noted in the past – but it's worth noting again – there are some similar circumstances that we have seen. I'm not going to make a prediction, of course. We do look at all kinds of information as it relates to our relationship with the Palestinians, our relationship with any entity that we work with. So I'm not going to make a prediction. I don't know what the outcome will be of the final findings.

**UCP000217**

EXHIBIT 27, PAGE 162

**QUESTION:** There were also, I think, fourteen – more than a dozen rockets that were fired into southern Israel from Gaza today. Is that something that would make you rethink your position as it relates to the Palestinian Government?

**MS. PSAKI:** Well, as you know, renouncing violence is one of the requirements, according to the Quartet, and one of the United States requirements. And as we said in the beginning when the first announcement of the technocratic government was made, we're going to continue to review and take a look at the circumstances on the ground on a daily basis if needed.

**QUESTION:** All right. But I mean, quite apart from whether they played any role in the killing of the three teenagers, there were these rocket attacks today. Is that – does that comport with a renunciation of violence?

**MS. PSAKI:** Well, obviously, we would condemn any type of violence along those lines against the Israelis. And we expect, and President Abbas has on many occasions also renounced this type of action. And there's a certain responsibility in conveying that to any entities that the Palestinians are tied with.

**QUESTION:** Yeah, but if I shoot you at the same time as saying I renounce violence, that doesn't really make much sense. So --

**MS. PSAKI:** Well, I think the point --

**QUESTION:** -- what you're saying, though, is that apart from the teenagers – because we don't – you don't know – you're not sure of the circumstances – just the rocket attacks themselves are not cause to have you rethink your relationship with the government.

**MS. PSAKI:** Well, Matt, as we have stated from the beginning, and the point I was trying to make, is that we would be constantly reviewing as it relates to action on the ground, whether you're abiding by the components that they have – the pledges that they made at the beginning. So I don't have anything new to predict for you or outline, but we look at all of the circumstances that happen on the ground as we evaluate our relationship.

**QUESTION:** I'll stop after this.

**MS. PSAKI:** Okay.

**QUESTION:** You think right now that they are abiding by the requirements?

**MS. PSAKI:** Well, I think the Palestinian Authority and President Abbas and the technocratic government that doesn't involve members of Hamas, yes, they are making every effort to. Obviously, when there are incidents of violence, when there are rocket attacks, those are certainly cause for concern and we take every incident into consideration.

**QUESTION:** Jen?

**QUESTION:** So --

**MS. PSAKI:** Oh, go ahead.

**QUESTION:** I'm sorry, I would've stopped after that, but I – you are sure, you're convinced that the Palestinian Government is making – what you just said, "making every effort" to abide by its commitments? That's the U.S. position?

**MS. PSAKI:** Matt, what I'm --

**QUESTION:** I --

**MS. PSAKI:** Matt, what I'm conveying is President Abbas has, as you know, renounced violence. He has condemned attacks. He has been a cooperative partner in an effort even with as it relates to the three teenagers over the last several weeks. Does that change the fact that we are concerned and could certainly condemn these rocket attacks and other incidents that occur? Certainly it doesn't change that, but again, this is not a black-and-white issue.

Go ahead.

**QUESTION:** Follow-up on that, Jen, if I may. The technocratic government that you spoke of, as far as you're concerned, they have not – they are doing everything possible to refrain from the use of violence, rhetoric or otherwise. Right?

**MS. PSAKI:** Mm-hmm.

**QUESTION:** So you are convinced that they are doing all they can to sort of keep the lid on as far as violence is concerned?

**MS. PSAKI:** President Abbas and --

**QUESTION:** And his technocratic government that is a national unity government.

**MS. PSAKI:** I think I've stated it a few times, Said, but go ahead.

**QUESTION:** Okay. Let me just go back to the breaking news. As far as – you have not heard anything yourself about the – to confirm the murder of the three teenagers?

**MS. PSAKI:** We've seen the reports. I don't have anything to confirm from here.

**QUESTION:** Okay. Now as far as you know, the Israelis have not informed you that these bodies were found and therefore we're going to do one, two, three, four; have they?

**MS. PSAKI:** I don't have anything else to update you on.

**QUESTION:** Do you have any comment on the total closure of Hebron and its environ?

**UCP000218**

**MS. PSAKI:** I don't have anything new to update you on.

New topic?

**QUESTION:** Prime Minister Netanyahu --

**MS. PSAKI:** Or go ahead, Roz.

**QUESTION:** Yeah. Prime Minister Netanyahu said on Sunday that the government had been able to identify two members of Hamas as being responsible. I know that you can't confirm the discovery of the bodies. Do you know whether they shared this information with their U.S. counterparts either in Tel Aviv or here in Washington over the weekend about these two suspects?

**MS. PSAKI:** We have regular consultations and discussions. I don't have anything further to outline for you in this regard.

**QUESTION:** Something else related to Israel also.

**MS. PSAKI:** Okay.

**QUESTION:** Prime Minister Netanyahu on Sunday called for an independent Kurdish state. Do you – what's your position, what's your reaction to his comment?

**MS. PSAKI:** Well, the view of the United States is that a united Iraq is a stronger Iraq, and especially at this challenging and grave security – at a time of a grave security situation on the ground, we think it's even more important that all parties – the Shia, the Sunni and the Kurds – remain united against the threat they face, and all countries should support that effort.

**QUESTION:** Does that mean your position is at odds with Israel's position on Iraq?

**MS. PSAKI:** I'll let you make your own conclusions, but that's the position of the United States.

Go ahead.

**QUESTION:** Sorry, but I just want to go back to the kidnapping.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** One of the three teenagers is a U.S. citizen, or dual citizen.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** To the best of your knowledge, have any demands been made like ransom demands or anything to the U.S. Government?

**MS. PSAKI:** I just don't have anything new to update you on on this particular incident.

Well, could we – or go ahead --

**QUESTION:** Just --

**MS. PSAKI:** -- and we'll go to Jo. Go ahead.

**QUESTION:** Just one more thing.

**MS. PSAKI:** Okay.

**QUESTION:** I mean, it's clearly that the U.S. position now is at odds with not only Israel, but also Turkey, which has recently said that it will welcome an independent Kurdistan in Iraq. On the other hand, many other people actually see America as being more on the side – like, in alliance with Iran over Iraq, as both countries have stepped up their military and political support for the al-Maliki government to combat the insurgency, the Sunni insurgency. Is that true?

**MS. PSAKI:** I'm not sure – can you – what is your specific question? Sorry, go ahead.

**QUESTION:** Like, the specific question is that are the United States and Iran unlikely allies in Iraq to combat the Islamic – Sunni Islamic militants?

**MS. PSAKI:** Well, I wouldn't put it in those terms. We've stated before from this podium and the Secretary has stated that certainly ISIL is a threat to the region, including Iran. There is a – it is a threat, ISIL is a threat to all of the people of Iraq, whether they're Sunni, whether they're Shia, whether they're Kurds. And that's why we've been so – been such strong advocates of moving the political process forward urgently to form a government, and of all parties to be united.

We're all certainly familiar with the aspirations of the Kurdish people, and that hasn't changed and has been the case for many years now. But the threat they're facing requires unity and that's why we've been emphasizing it so strongly.

**QUESTION:** What do you mean you are – you understand the aspiration of the Kurdish people?

**MS. PSAKI:** I think we all have seen the comments that have been made over the course of not just last week, but long before that.

Go ahead, Jo.

**QUESTION:** Can I just stay with ISIL --

**MS. PSAKI:** Sure.

**UCP000219**

EXHIBIT 27, PAGE 164

QUESTION: -- which have renamed themselves today the Islamic State, just IS, I believe. Does this mark a change in their offensive? Does it make the ground conditions more difficult for the Iraqi people and the Syrian people? What is your reaction to the news that they're trying to establish this caliphate over Iraq and Syria?

MS. PSAKI: Well, we've seen these types of words or comparable claims from ISIL before. This declaration has no meaning to the people in Iraq and Syria. It only further exposes the true nature of this organization and its desire to control people by fear and edicts. It emphasizes even more so that this is a critical moment for the international community, for countries in the region, for all of the Iraqi people to unite against the threat that they face.

QUESTION: Does it show that in some ways, the group believes – is assuming more confidence that they believe that they are on a winning track here?

MS. PSAKI: Well, I think it's, again, their strategy of using a repressive ideology and of conducting acts of ruthless terrorism against their people, against people across the region, has been consistent for some time now. So in our view, this claim, these words, this declaration is consistent with that and not a new – not providing new information.

QUESTION: And – sorry.

QUESTION: Go ahead.

QUESTION: Tomorrow the Iraqi parliament is due to meet.

MS. PSAKI: Mm-hmm.

QUESTION: Following the visit by Secretary Kerry to Iraq and Erbil, do you believe in this building that there will be an outcome which will start paving the way towards a new Iraqi Government?

MS. PSAKI: Well, as you noted, that was a big focus of the Secretary's meetings last week, not just in Iraq but in – with leaders in the region, and in fact even with his European counterparts. And tomorrow in – we are continuing to urge, I should say, Iraqis, Iraqi leaders to come to an agreement on the three critical posts that are key to forming Iraq's next government – the speaker, the president and prime minister – so that government formation can move forward as quickly as possible. We don't want to predict how quickly the outcome will occur. We will leave that to them, but they have – during meetings with Secretary Kerry have committed to moving forward quickly, have committed to abiding by the process. So we will see what happens in the course of the coming days.

QUESTION: Given this announcement, how urgently is the U.S. viewing this development, especially in light of the fact that it just put in what many would argue is a small number of military advisors to help the Iraqi military figure out what it can or can't do to stop these fighters from continuing their march onto Baghdad?

MS. PSAKI: And Roz, I'm sorry, which – are you – which announcement?

QUESTION: About the ISIL, IS, whatever they call themselves.

MS. PSAKI: Sure.

QUESTION: What are they – what are officials doing about it? How does this change what the U.S. is trying to do, for example, to help Baghdad defend itself against these fighters?

MS. PSAKI: Well, I think as I stated, but I'm happy to reiterate, these words – we've seen these types of words come from ISIL before. It's consistent with their claims in the past. It doesn't mean anything to the people of Iraq and the people of Syria. We remain both committed to a diplomatic process, and obviously, as you noted, military advisors have started arriving on the ground. We've continued to expedite our assistance and equipment as well, and we're taking every step in that regard.

So I wouldn't overemphasize the impact of the claim. We're continuing to take steps, including the discussions the Secretary had all of last week, on the political front to encourage the government to move forward with formation, but also to consider how we can best help address the threat on the ground.

QUESTION: Do you have any sense of what consultations are being held at the Secretary's level, at the under secretary level with their counterparts, not just in the Middle East but in Europe as well?

MS. PSAKI: Well, the Secretary – I think it was read out on Friday that he spoke with President Barzani. He also spoke with Foreign Minister Davutoglu over the weekend. I think it's safe for all of you to assume that he'll be in – closely engaged in diplomatic conversations with both counterparts in the Middle East as well as Europe over the course of the coming days.

QUESTION: Jen, did you have any comment or did you comment on the Iraqis receiving four or five Sukhoi fighters, Russian fighters --

MS. PSAKI: I think Marie may have spoken to this --

QUESTION: -- a couple days ago?

MS. PSAKI: -- on Friday, but I'm happy to speak to it as well.

QUESTION: Could you?

MS. PSAKI: Sure. We understand and have certainly seen reports about the purchase of equipment. I would remind you that Iraq has purchased military equipment from a range of countries in the past, including Russia, including the Czech Republic, South Korea, and others to fulfill their legitimate defense needs. We have a robust FMS program that will continue and we've expedited in recent days. And certainly, we are not surprised that Iraq would take steps to work with other countries in the region as they have for some time to gain the equipment that they need.

QUESTION: And you don't have any problem with them receiving these Russian fighters?

MS. PSAKI: Well, we don't --

**UCP000220**

**QUESTION:** I mean, because you're holding your deliveries for fear of falling in the wrong hands --

**MS. PSAKI:** We're not holding our --

**QUESTION:** -- and this could --

**MS. PSAKI:** I think that's incorrect information.

**QUESTION:** Sorry. Okay.

**MS. PSAKI:** But in terms of the first question, we don't oppose legal Iraqi efforts to meet their urgent military requirements. In fact, as you know, we're expediting our own assistance, and they have purchased military equipment from a variety of countries in the past, and so it's not a surprise that that has continued.

**QUESTION:** Can I ask you if you -- on the caliphate and Kurdistan questions.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** Do you oppose a caliphate idea in general? And if you do not -- because you actually recognized one and had an ambassador to the last one, the last Ottoman -- the Ottoman empire -- why you would, if you are opposed -- or sorry, if you're not opposed to a caliphate in -- is it just -- let me rephrase this completely.

**MS. PSAKI:** Okay. Go ahead.

**QUESTION:** Is it just this group forming a caliphate that you're opposed to, or an al-Qaida-like group, a repressive group? Or is it the whole idea in general that you don't like, of Muslims coming together under one person?

**MS. PSAKI:** I think the concern I'm expressing is about this specific group --

**QUESTION:** This specific -- okay.

**MS. PSAKI:** -- this extremist terrorist group, yes.

**QUESTION:** Okay. So then on the Kurdistan question, and about what Prime Minister Netanyahu said, there are a lot of people who think that this -- that an independent Kurdistan is basically inevitable, especially -- and it -- and its being -- its potential statehood is being accelerated by what's going on on the ground now. Why is the United States so wedded to the post-World War I borders?

**MS. PSAKI:** Well, Matt, obviously, it's up to the Iraqi people to determine what their future will be, not the United States.

**QUESTION:** So it's --

**MS. PSAKI:** I think our specific concern right now is that the largest threat they face is the threat of ISIL and that they should be united and focused on that and working together and continuing to work together. As you know, the Peshmerga and the Iraqi security forces have been working closely together over the last several weeks.

**QUESTION:** So in the end, in the long run, though, if all of Iraq was to agree to split, you would not be opposed if they were to do that?

**MS. PSAKI:** Well, I'm not going to speculate on what the future will hold. What we're looking at right now is the immediate threat that is posing a threat to the very security and stability of Iraq.

**QUESTION:** But you do agree that Kurdistan is basically conducting itself as a sovereign nation? I mean, it imports, exports goods, including the export of oil to Israel and so on.

**MS. PSAKI:** Well, you're familiar, Said --

**QUESTION:** I know, yeah.

**MS. PSAKI:** -- because we've talked about it quite a bit, what our position is on the export and import of oil as well, and we believe that should go through the central Iraqi Government.

**QUESTION:** I've got another Iraq-related question --

**MS. PSAKI:** Okay.

**QUESTION:** -- which has to do with the --

**QUESTION:** You're saying because ISIL is the bigger threat and they all need to confront this threat together. But the Kurdish forces have said it publicly that they're not going to fight ISIL unless they fight -- attack them. So they are going to just look and see the conflict and --

**MS. PSAKI:** Well --

**QUESTION:** -- they don't want to be dragged into a sectarian war. That's what they phrase -- how they phrase it.

**MS. PSAKI:** Well, but the Peshmerga, the Kurdish forces, have been working closely with the ISF over the past several weeks to confront this threat. And one of the points the Secretary made when he was there meeting with leaders was the fact that they do need to be united, they need to continue to band together against this threat. And it's not just a threat to Baghdad; it's a threat to all of Iraq and it's a threat to all of the region.

**QUESTION:** So you've seen the story -- you will have seen the story in The New York Times today about Blackwater --

**MS. PSAKI:** Mm-hmm.

**UCP000221**

EXHIBIT 27, PAGE 166

**QUESTION:** -- and the State Department calling off an investigation into its activities after your lead investigator was allegedly threatened. I'm wondering what you have to say about that.

**MS. PSAKI:** I don't have a great deal to say about it, and I'm happy to take any questions that you have. I certainly understand the interest. I will note that the story referenced this as an investigation. This was not an investigation. These were ongoing contract reviews that we do on a regular basis. That's what the individuals were on the ground doing.

Obviously, as you all know, this is an ongoing legal case, so there's very little we can say. But again, I know there are specific questions here, so I'm happy to take them if I can.

**QUESTION:** Okay. Well, an ongoing legal case has to do only with Nisour Square.

**MS. PSAKI:** You're correct.

**QUESTION:** This apparently happened before that --

**MS. PSAKI:** You're right.

**QUESTION:** -- so it would not be part of the ongoing legal case, correct?

**MS. PSAKI:** You're right. It is --

**QUESTION:** Unless, of course, you have – there is another case that we don't know about which involves the State Department against Blackwater.

**MS. PSAKI:** I'm not referencing a different legal case.

**QUESTION:** All right. So --

**MS. PSAKI:** I'm just referencing the context here, which I think is relevant.

**QUESTION:** All right. So was the internal review – or, sorry, the – what did you say – it was the something – contract review. Was the contract review halted because of a threat?

**MS. PSAKI:** As I understand, there were steps taken at the time given threats that were – people faced. But I don't have any additional information on it.

**QUESTION:** So you're saying – so that part of the story you're confirming? You're saying that the – that someone employed by Blackwater in Iraq threatened a State Department auditor – however you want to call it – who was conducting a contract review, and that resulted in the review being called off?

**MS. PSAKI:** No. I apologize.

**QUESTION:** Okay.

**MS. PSAKI:** Let me – I understand that there were reports of threats. Obviously, we take any of that seriously. I don't have any additional information beyond what I just shared.

**QUESTION:** Do you know what the result of the contract review was in question here? Was there a result or was it – or did it end? Did the review not come to an end?

**MS. PSAKI:** I don't have any additional information. Again, I understand the interest.

**QUESTION:** All right.

**MS. PSAKI:** This was seven years ago, so we're looking to track down more.

**QUESTION:** I understand this predates your time and even this Administration, but this building stays the same pretty much as it goes through --

**MS. PSAKI:** I understand. I'm not – I'm certainly validating your questions. I just don't have more information than what I've provided.

**QUESTION:** Do you know whether --

**QUESTION:** Are you aware that --

**QUESTION:** Do you know whether because of this incident that any steps were taken to essentially keep the contractors in their place? The story suggested that the contractors felt that they were above the authority of the U.S. Government and had undue sway over certain Embassy personnel. Are there policies in place that basically say to contractors, "You are here under the good graces of the U.S. Government and you need to know what your place is"?

**MS. PSAKI:** I'm not sure how to address your question, Roz. I'm not sure exactly what your question is. Maybe you can repeat it.

**QUESTION:** Well, essentially, if someone comes in, whether from the IG's office, Inspector General's office, or from some other auditing firm that's supposed to have the ability to talk to people, to look at records, to figure out if everything is being done according to rules and regulations – if that person's ability to do his or her job is proscribed because someone feels that he and his colleagues are above review, what's done to keep that from happening?

**MS. PSAKI:** Well, the reason – let me just say, broadly speaking, the reason why contract reviews or any reviews are done are to take a look at circumstances on the ground and make sure they are happening to – with all – taking all of the precautions and taking the appropriate process and pursuing the appropriate process. When there are findings that they are not, certainly those are reviewed and taken into account. I don't have anything more specific in this case, but that's why reviews, broadly speaking, are done – to look at the information and ensure that contractors or any individuals are operating at the top capacity.

Go ahead.

**UCP000222**

**QUESTION:** Yeah. Let me try one more.

**MS. PSAKI:** Okay.

**QUESTION:** Certainly in places that are warzones, and Iraq in 2007 was clearly still a warzone as far as the U.S. Government was concerned, it is understandable that in the middle of a crisis that people's relationships will stray beyond normally accepted bounds of behavior. Are there rules in place today for people who are serving for the State Department in high-risk zones and the contractors with whom they work? Are there rules clearly spelling out what the extent of their professional relationship can be?

**MS. PSAKI:** Sure, broadly speaking; let me take it and see what information we can provide.

**QUESTION:** Can you also take the question as to whether there – this contract review was undertaken either because of any concern that this company was operating somehow outside of the bounds that it should have been, or if that kind of concern arose during the review?

**MS. PSAKI:** Certainly, sure.

**QUESTION:** Thank you.

**MS. PSAKI:** New topic?

**QUESTION:** I have just a – very quickly. This happened, of course, in 2007, but there are allegations at the time that in fact higher-ups in the State Department took the side of Blackwater against the State Department auditor. Could you find out if that is the case?

**MS. PSAKI:** I just don't have any more information. I'm happy to take the --

**QUESTION:** Because right after that --

**MS. PSAKI:** Said, let me finish. I'm happy to take the questions that have been addressed. I don't think I have anything more, so let's move on to a new subject.

**QUESTION:** Because this just --

**MS. PSAKI:** Go ahead, Lesley. We're moving on. Go ahead, Lesley.

**QUESTION:** North Korea says they're going to try the two detained Americans. Have you had any notice on this, and any comment from you?

**MS. PSAKI:** Sure. Well, we are aware of reports that U.S. citizens Matthew Miller and Jeffrey Fowle will face trial in North Korea. There's no greater priority for us than the welfare and safety of U.S. citizens abroad. Out of humanitarian concern for Mr. Fowle and Mr. Miller and their families, we request North Korea release them so they may return home. We also request North Korea pardon Kenneth Bae and grant him special amnesty and immediate release so he may reunite with his family and seek medical care.

Beyond the reports, Lesley, I don't have any other official independent information, I guess I should say. I can also convey that the embassy of Sweden in North Korea visited Mr. Fowle on June 20th and Mr. Miller on May 9th and June 21st. And the embassy, of course, regularly requests consular access to all U.S. citizens in North Korean custody.

**QUESTION:** Do you --

**QUESTION:** Do you know, are they being held in the same place?

**MS. PSAKI:** I don't have any more information on that. I'm happy to check and see if there's more we can provide.

**QUESTION:** Presumably, because you are now able to give their names, they've signed these privacy waiver things?

**MS. PSAKI:** They have.

**QUESTION:** So can you tell us under what circumstances they were both arrested and what charges they might be facing?

**MS. PSAKI:** There isn't information – additional information we're going to share. They – yes, they did sign a Privacy Act waiver, but it doesn't obligate the Department to share all information about each case and each circumstances, especially when it comes to ensuring or taking every step we need to to help return them home.

**QUESTION:** Wait, wait, wait, wait.

**QUESTION:** So you cannot give us any indication of the charges they could be facing?

**MS. PSAKI:** I don't have any more information to provide.

**QUESTION:** Quite apart – this is a new one on me, and I've been – quite apart from this case, are you saying that if someone signs a Privacy Act waiver, if we ask a question, you don't have – you still don't have to answer it?

**MS. PSAKI:** Well, I think Privacy Act waiver gives us the ability to provide more information, and we do that as often as we possibly can. And there are some cases where it's not in the benefit of the case or the individuals to provide more information.

**QUESTION:** But you make that decision, not the person?

**MS. PSAKI:** Well, there are cases – there are processes that we undergo to ensure we can provide as much information as possible, and there are times when it's not appropriate to share. This is one of those times.

**UCP000223**

**QUESTION:** Well, let's not talk – forget about this case. Just in general, I don't get it. So if I sign a Privacy Act waiver saying I want you to tell the world about my case someplace, and one of my colleagues here asks you a question about it, you can say, "Well, he signed the waiver but we just don't feel like telling you what the information is, so we're not going to?"

**MS. PSAKI:** That's not exactly how it works, Matt. But --

**QUESTION:** Well, I don't understand. If I --

**MS. PSAKI:** -- we provide as much information as we can.

**QUESTION:** If I – as you can? But if I've authorized you to go out and speak and tell – and say what happened to me and what my condition is and everything, you can still decide to say no, we're not going to --

**MS. PSAKI:** Well, I think if --

**QUESTION:** You can say nothing?

**MS. PSAKI:** -- if you were detained, you would want us to take steps that are in the best interests of your safety and security, wouldn't you?

**QUESTION:** Well, yeah – if I've signed the waiver saying I want my story to be told, I would expect you to tell my story if I'm – if you were asked about it, not to say – tell people --

**MS. PSAKI:** I'm sure you've seen a Privacy Act waiver and what they look like.

**QUESTION:** I have.

**MS. PSAKI:** It's not exactly stating that. So we make decisions about what information is appropriate to provide in the best interests of citizens who are detained overseas. And we will --

**QUESTION:** (Inaudible.)

**QUESTION:** For that matter, you could say that you're not going to release any information ever, no matter what – no matter whether the thing – whether it's signed or not.

**MS. PSAKI:** I think we try – make every effort to release as much information as we can.

Go ahead.

**QUESTION:** So in this case, you can't confirm that they're facing trial? Even if you're not going to tell us what the charges are, you cannot confirm independently that they're facing trial?

**MS. PSAKI:** I can't. And that's not related to the Privacy Act waiver; that's related to the fact that these are reports. We don't have additional information to provide.

**QUESTION:** So the Swedish Embassy hasn't been able to convey that information to you, or they haven't been given that information?

**MS. PSAKI:** I just don't have any more information to provide.

**QUESTION:** And can you give us an idea of what the Embassy might have told you about their state of health when they saw them on June 20th and 21st?

**MS. PSAKI:** I don't. I'm happy to check with them and see if there's more to provide. Obviously, we're requesting their release for humanitarian purposes. I will see if there's more on their health that we are able to provide to all of you.

**QUESTION:** I imagine that you've been in touch with the families of both these men?

**MS. PSAKI:** We have been over the course of time. I don't have any new timing on that, but I can also check on that question as well.

**QUESTION:** Did the families make any request of this building to not release certain information about their loved ones, in particular why they chose to go to North Korea?

**MS. PSAKI:** I'm just not going to be able to provide any more information.

**QUESTION:** Can you just say in general, because we have these cases coming up every so often involving U.S. citizens – the U.S. doesn't have diplomatic relations with North Korea. I assume that if I just decided I wanted to go, it would be very difficult for me to go without facing some sort of repercussion. What can be done to dissuade people from trying to go?

**MS. PSAKI:** Well, we don't track the travel of United States citizens. But obviously, we put Travel Warnings out, Roz --

**QUESTION:** Yeah, but if I --

**MS. PSAKI:** -- to make sure people understand the circumstances they're walking into.

**QUESTION:** But certainly if I'm coming back through Dulles and I'm going through border control, I'm going to get the once-over – maybe the once-over when they see that I have a visa from D.P.R.K. in my passport. What can be done to dissuade people from going and almost certainly getting themselves into trouble every time an American steps foot on North Korean soil?

**MS. PSAKI:** Well, that's one of the reasons that we provide regular updates that are available on the State Department website, that we talk about frequently. All of you report about these cases as well. So I would encourage you to continue to do that.

**UCP000224**

QUESTION: I think one of the – the older man, if I'm not mistaken, apparently was arrested after people found a Bible in his hotel room. And we all know how the D.P.R.K. feels about Christianity. Is it an unnecessarily provocative act for those who think that they're trying to spread the gospel to try to go to North Korea, knowing that they're running the risk of being arrested, being treated however the North Koreans are able to cover up whatever they do to them, and then expecting the U.S. Government to come to their rescue even though, if you have a blue passport, you expect your government to come save you?

MS. PSAKI: Well, Roz, I think we are focused on the health and safety and well-being of United States citizens wherever they are in the world, and we take every step to ensure they either are returned home or they are safe. We have consular access. You know how we feel about freedom of religion and freedom of – and being able to express that. But certainly, the reason we provide information about a range of countries is to ensure people know what circumstances they're walking into. And I don't have the North Korea Travel Warning in front of me, but I can assure you that it suggests strongly not to travel at all to North Korea.

Go ahead, Ali.

QUESTION: Well, I had just two quick questions on that. Do you have any more on at what level the communication between the State Department officials and the families of the men who have been detained have been taking place?

MS. PSAKI: I do not. I can take that in the list of questions as well.

QUESTION: Sure. And then in the Travel Warning, there's plenty of caveats about the fact that these travel companies can't provide for safety of individual Americans. But I'm wondering, does this Department take a position on these companies actually doing these tours and seemingly, at times, willfully pulling – putting American citizens in danger? Do you take a position on the – just the merits in general of these tours being conducted?

MS. PSAKI: Well, I'm not going to get that specific. But clearly, any tour company or any individual can access the information that we make available about travel and the warnings of travel to North Korea as well as other countries. And so I think that states pretty clearly where we stand about any type of travel.

QUESTION: North Korea.

MS. PSAKI: North Korea? Go ahead.

QUESTION: Yes. North Korea, as you know, has launched the SCUD missile last September – no, no, last Saturday. Sorry. And then Marie – your colleague Marie told us that we are always concerned whenever they launch anything. So what about this time? Do you have some readout, or --

MS. PSAKI: Well, we are aware of reports that North Korea launched two projectiles from its east coast on June 29th, so just yesterday. We're continuing to closely monitor North Korean activities and the situation on the peninsula. We urge North Korea to refrain from taking provocative actions and instead fulfill its international obligations and commitments, but I don't have any further information on the type or specific details of the projectiles launched in this case.

QUESTION: As you know, President Park and Xi Jinping of China is going to meet this week. Does the United States ask something of both China or South Korea to send a message to North Korea?

MS. PSAKI: Well, as two of our vital partners in the Six-Party Talks that we engage with closely on the threat from North Korea, I'm certain – and I would refer you to them, but I would bet that this will be a part of their discussion and we'll continue to engage closely with both China and Japan as it – or, sorry, China and South Korea as it relates to their discussions. And certainly, as you know, we also encourage dialogue and restraint as it relates to relationships in the region as well.

QUESTION: One more thing. Japan will also continue to talk to North Korea about abduction issues after this. Are you consulting with Japan with regard to this timing and with the sanction?

MS. PSAKI: Well, we support Japanese efforts to resolve the abductions issues, and we encourage them to do so in a transparent manner, and we'd refer you to them for more information about their talks.

QUESTION: Can I just stay on North Korea?

MS. PSAKI: Sure.

QUESTION: North Korea this morning proposed that the two Koreas should halt hostile military activities later on this week. This appears to be ahead of the visit by Chinese President Xi Jinping. What is your reaction to this? Is this something that's welcome or is it just a cynical ploy by Pyongyang to try and have some kind of image of being peace-loving ahead of the visit?

MS. PSAKI: Well, broadly speaking, we certainly support improved inter-Korean relations. But with these specific exercises, these are defense-oriented and they're designed to enhance the ability to respond to any potential contingency that could arise. They're designed to increase readiness to defend South Korea and protect the region, and they occur around the same time every year and are a regular part of what happens in the region. So we've seen these calls before, and we certainly see the value in these exercises and the value in them continuing.

QUESTION: So you're not going to halt the exercises ahead of the visit by Xi Jinping to North Korea?

MS. PSAKI: I would refer you to the Department of Defense, but I'm not aware of any plans to do that.

QUESTION: One more (inaudible). Under Six-Party Talks, does the U.S. have any optimistic plan to resumption of Six-Party Talks future or near – within this year?

MS. PSAKI: Well, again, the – it remains in the ball – the ball remains in North Korea's court to take steps to abide by their international obligations in the 2005 Joint Statement. They haven't shown an indication of their plans to do that, so I don't have any prediction of a resumption.

QUESTION: Thank you.

QUESTION: Can we go to Ukraine?

MS. PSAKI: Sure.

**UCP000225**

EXHIBIT 27, PAGE 170

**QUESTION:** In an hour or so, or less than an hour – 40 minutes from now – the cease-fire is supposed to expire. I noticed that there was another four-way phone call today between President Putin, Chancellor Merkel, President Hollande, President Poroshenko. And I'm wondering – and out of that, it looks like everyone kind of agreed that it should be extended with the exception of maybe Poroshenko, because I'm not sure that it has been extended yet.

Do you support an extension of the cease-fire and do you think that the Russians have met the – or taken steps to meet the criteria that was laid out by the EU on Friday to do by today?

**MS. PSAKI:** Well, whether to extend the cease-fire is a decision that Ukraine and only Ukraine will make, and we'd certainly support the decision, whatever decision that they make. But it takes two to implement a cease-fire, and to answer your second question, there are still ongoing reports of fighters from Russia and Russia-backed separatists continuing to attack Ukrainian Government positions. There are still troops on the border. There are still armed militants in Ukraine with – who are posing a threat to the Ukrainian people. So there are steps that we've long been calling for that are a part of what President Poroshenko has been calling for that Russia has not done.

Now they have taken some steps that have been positive steps moving forward, but there's a great deal more that they need to do in order to de-escalate the situation.

**QUESTION:** Is it your understanding that the – well, first of all, how – this cease-fire doesn't seem to have been much of a cease-fire at all from the very beginning. But I'm wondering what you – because there have been a lot of reports of violations on both sides. But I'm wondering if you – if the U.S. Government's understanding or the U.S. Government's position is that the Ukrainian Government's violations of the cease-fire have come in response – only in response to them being attacked themselves in self-defense. Is that your understanding?

**MS. PSAKI:** That is my understanding of what's happening on the ground, and the Ukrainians were the ones who called for the cease-fire and exhibited admirable restraint in trying to implement the cease-fire, but there were steps that were taken from Russian-backed separatists that certainly didn't abide by it.

**QUESTION:** So the Administration's position is that the Ukrainian Government has and still is taking – is still showing admirable restraint in trying to keep the cease-fire alive and that violations are the fault of the Russian – of the separatists. Is that – that's correct?

**MS. PSAKI:** Yes, and certainly we'd be concerned about any violations, but I'm not – don't know if there were specific ones you're speaking to or reports or anything.

**QUESTION:** No, just in general. Just what – not anything specific. And then on the sanctions issue, you are not – the Administration is not yet prepared to pull the trigger on new sanctions? Is that –

**MS. PSAKI:** Well, we remain prepared to impose additional sanctions, including sectoral sanctions should circumstances warrant, in coordination with our allies and partners. But I don't have anything to announce for all of you today.

**QUESTION:** And my last one on Ukraine has to do with the refugee numbers. I asked Marie about this last week.

**MS. PSAKI:** I know you had a --

**QUESTION:** Yes, we had a bit of an exchange.

**MS. PSAKI:** An active debate.

**QUESTION:** Well, I wouldn't say debate.

**MS. PSAKI:** Sorry, discussion.

**QUESTION:** An active exchange. Is it still your position that the numbers offered by the UN last week of 110,000 are inaccurate or not credible, as she said?

**MS. PSAKI:** Well, I think they certainly – the context here is incredibly important because the UN Refugee Agency claims less than 10 percent of the 110,000 that they have given as a number. 9,600 people have applied for asylum. That is a significantly lower number. So by noting that 110,000 Ukrainians have arrived in Russia, which we don't have a validation of that either, it doesn't give context of in what capacity or how. And it certainly doesn't give validity to Russian claims that hundreds of thousands of people are pouring over the border seeking asylum in Russia.

**QUESTION:** Okay. Well, it seems to be a bit – I don't know – disingenuous to say that because only a small number of these people have actually applied for refugee – for asylum and refugee status in Russia that – it seems to be disingenuous to say that 110,000 people haven't fled. You --

**MS. PSAKI:** We're still looking into – I know Marie said this on Friday --

**QUESTION:** But your argument – your position is not based on – it's – tell me this: Is your position based on the fact that only – that less than 10 percent of 110,000 people have actually applied for – formally applied for refugee status?

**MS. PSAKI:** Well, that's part of the context here. We're still talking to the UN agency about how they arrived at these numbers, but I think that's an important component of the context.

**QUESTION:** Okay, but that doesn't – that doesn't mean that 100,000 people didn't flee. Just because they haven't formally applied doesn't mean that 100,000 haven't fled, right?

**MS. PSAKI:** Well, it doesn't mean that they have either, so I think we're --

**QUESTION:** Well, I – yeah, but – I know, but the UN is starting from the position or telling you or telling the world that 110,000 people have fled, and it just seems a bit odd if you're – if your argument is, well, only 10,000 of them actually applied for refugee status, that means that the whole figure if is wrong --

**MS. PSAKI:** Well, Matt, I think part of it is it's unclear if they're relying on Russian claims. And so we're just in discussions with them about how they arrived at these numbers, and I think there's some context that we felt was important to provide.

**UCP000226**

**QUESTION:** Okay, well, do you – and I had this – Marie and I had this exchange as well. I mean, is this the only case where you are not sure of the UN High Commissioner for Refugee's numbers? I mean, why do you take their word – the numbers in Syria or outside of Syria, the numbers who have fled Syria if you're not willing to take them on their own – not willing to accept them in this case?

**MS. PSAKI:** Well, I'm certain if we had a question about the validity of the numbers there, we would have raised it as well. But I – again, we're in conversations with them, and if there's more to say, we'll say it.

**QUESTION:** To the best of your knowledge, they have not responded with – what are you actually asking them? How did you get your numbers? And then --

**MS. PSAKI:** Where did you arrive at – how did you arrive at the numbers, exactly.

**QUESTION:** And are you going to tell them that they have to prove it once they tell you? I mean what do you – I just – I'm not sure what you're looking for. It seems to me that in almost every other situation, you guys accept the information that's given by the UNHCR, and this case is somehow different, and I don't understand – I'm not exactly sure why. That's – why is this case different than Syria where you also don't have people on the – eyes on the ground?

**MS. PSAKI:** We're just looking for more context and information on the numbers, and we'll be in touch with them about how they arrived at them.

**QUESTION:** Question about the cease-fire in Ukraine.

**MS. PSAKI:** About – I'm sorry, which piece?

**QUESTION:** Because it was unilateral, the cease-fire that was announced, I guess, unilaterally by Poroshenko, correct – by the president of Ukraine?

**MS. PSAKI:** Correct, mm-hmm.

**QUESTION:** So in this conversation today where they asked him to extend the cease-fire, it would be up to him to declare that since it is only one-sided?

**MS. PSAKI:** Up to President Poroshenko?

**QUESTION:** Right.

**MS. PSAKI:** Yes.

**QUESTION:** Are you sort of leaning on him or are you asking him to extend the cease-fire?

**MS. PSAKI:** We've – it's a decision for Ukraine and Ukraine --

**QUESTION:** I understand, but the --

**MS. PSAKI:** -- only to make. Obviously, we're in close consultations.

**QUESTION:** Are you encouraging him to extend the cease-fire?

**MS. PSAKI:** Again, it's for – it's a decision for Ukraine to make.

Let's just do a few more. Go ahead, in the back.

**QUESTION:** On Nigeria. Is the United States still working with Nigeria on the abducted schoolgirls? There's been really nothing in recent weeks. And are you guys still working with officials on this?

**MS. PSAKI:** We certainly are. The search for the kidnapped girls is ongoing. The Nigerians remain in the lead. We have a team that's been on the ground for several weeks now. We'll continue to evaluate additional resources, what additional resources we can provide. I wish I did have an update on it, but unfortunately there's not one at this point to provide.

**QUESTION:** There's been reporting over the weekend that some residents in northeastern Nigeria have basically formed their own militias because the Nigerian military can't or won't come into their areas to protect them from Boko Haram attacks. What has the U.S. been saying to Goodluck Jonathan and to his government about the need to mobilize their military and to be more proactive rather than having small groups of people who don't have firearms going up against people with semiautomatic rifles?

**MS. PSAKI:** Well, Roz, our discussions with Nigeria about addressing the threat of Boko Haram have been ongoing for months now. There's no doubt there are challenges – challenges the Nigerian Government faces and those who are taking on this threat on the ground. And we're certainly working with them to boost their capacity and advise them on how best to address it. But I'm not going to outline it further than that.

**QUESTION:** But doesn't it worry people in this building that the security situation inside what is arguably the largest economy in sub-Saharan Africa – that people don't feel they can trust their own security apparatus and that they have to take up weapons themselves to try to protect themselves from a vital security threat?

**MS. PSAKI:** Well, Roz, I'd remind you that we, the United States, has boosted our resources that we're providing to the Nigerian Government in order to help them take on the threat of Boko Haram because of our rising concern about that threat. So we too feel that there needs to be increased capacity, and our resources and our efforts have also backed that up.

Go ahead, Jo.

**QUESTION:** There are reports that there were a series of attacks yesterday in Borno State in four villages outside of the area where the girls were kidnapped. Explosives were thrown into churches and around 50 people were hurt – or killed. Do you have any reaction to that? Any information you can share?

**MS. PSAKI:** I don't have new information. I know there are similarities. It fits the – Boko Haram's recent pattern in terms of target attacks and methods of attack. They haven't seen – unless it's happened in the last hour, I don't think they have come out and claimed responsibility, but regardless of that, we condemn the

**UCP000227**

reported attacks on four villages near Chibok. Our sympathies go out to the victims and their families. We remain committed to helping the Government of Nigeria address the threat posed by the criminal terrorist group. Our Embassy continues to support Nigerian efforts to bring about the safe recovery of the abductees and to advise the Government of Nigeria on its response.

And as I noted in response to Roz's question, certainly, we all are concerned about the rising threat of Boko Haram, and we are – have been increasing our assistance as a result of that.

**QUESTION:** But to Roz's point, we've got some leaders from the Chibok area who said that the military didn't even bother to go and try and – attempt to try and go to the scene of this latest attack, which would – again, would suggest that they're in completely – in complete disarray despite any efforts that the Americans might be offering them on the ground.

I mean, are you finding that they're responsive to what you're trying to aid them with, or are they just not listening at all?

**MS. PSAKI:** Well, I haven't – I don't have any validation of all of those reports, and what I know is that because of our concern about the threat that's risen over the course of the last several months – obviously, the kidnapping, other attacks that have happened since then have prompted us to increase our assistance, to do more training, to do more to boost the capacity of the Nigerian military and of the Nigerian Government. So I don't have anything to speak to as it relates to reports of whether or not they went to the villages because I don't have any additional information on that.

**QUESTION:** Can you take the question on what additional assistance has been provided to the Nigerian military, in particular whether it's lethal aid, nonlethal aid, whether it's training, whether it's advising, whether it's working in teams? Can you provide a – some more detail on that?

**MS. PSAKI:** Well, I can --

**QUESTION:** Because my --

**MS. PSAKI:** I'm happy to outline it, Roz --

**QUESTION:** Yeah.

**MS. PSAKI:** -- as we've done many times before from here. But we maintain a significant level of military cooperation that includes increasing counterterrorism capabilities to counter IEDs and enhance civilian-military operations. We're providing additional equipment for Nigeria's intelligence fusion center. We're also providing military training and other assistance to help professionalize the Nigerian military and increase its maritime security and peacekeeping capabilities.

We also work with the Special Boat Service and other Leahy-cleared conventional and special operations unit. We're providing law enforcement assistance, including by training Nigerian law enforcement officials on CT investigations, basic forensics, border security, counter-IED and post-blast investigations, and crisis management. We also support programs and initiatives to combat violent extremist ideology, including job training and education. And we're working with civil society nongovernmental organizations in various levels of government to provide humanitarian and development assistance.

So as you can see, our assistance is – it's a broad breadth, and we feel that working with all of those areas is vital to continuing to counter the threat.

Let's just do a few more here.

**QUESTION:** Panama?

**MS. PSAKI:** Panama, go ahead.

**QUESTION:** Panama. Thank you.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** As you probably know, President Ma Ying-jeou of Taiwan will also visit Panama to attend the ceremony. Does Secretary Kerry has any plan to talk to him officially or unofficially?

**MS. PSAKI:** There's no plans at this point in time.

Do we have one more in the back?

**QUESTION:** (Off-mike), it's quite hard to meet him. What is your position?

**MS. PSAKI:** Well, you're familiar with our position on Taiwan as it relates to our unofficial relationship. I don't have any – there's no meeting planned.

**QUESTION:** Okay.

**MS. PSAKI:** Go ahead.

**QUESTION:** Yeah. Regarding Japanese collective self-defense, so Japanese cabinet seems to approve the use of collective self-defense tomorrow. So what does the U.S. Government expect from it and what's going to be the reaction?

**MS. PSAKI:** Well, we've spoken about this in the past, I believe, and our view that Japan has every right to conduct them – to provide the necessary – to equip themselves, I should say – every, it's a tongue twister – to equip themselves in the way they deem necessary. We encourage them to do that in a transparent manner, and we remain in touch with them about these important issues.

All right. Thanks, everyone.

**QUESTION:** Thank you.

**(The briefing was concluded at 2:33 p.m.)**

**UCP000228**

DPB # 115

**UCP000229**

EXHIBIT 27, PAGE 174

# EXHIBIT 28



# U.S. DEPARTMENT OF STATE
DIPLOMACY IN ACTION

**Jen Psaki**
**Spokesperson**
**Daily Press Briefing**
**Washington, DC**
**July 9, 2014**

G+1  Share

**INDEX FOR TODAY'S BRIEFING**

**DEPARTMENT**
- Secretary Kerry Travel Update / S&ED
- Treasury Department / Syrian Regime / Sanctions
- Pending Nominees / U.S. Senate

**ISRAEL/PALESTINIANS**
- Rocket Attacks / Diplomatic Engagement / Secretary Kerry's Efforts / Humanitarian Issues / Continuing Peace Process / Call for Restraint / Path Forward / Regional Concern
- Iran Involvement

**IRAQ**
- Government Formation / Inclusivity / Political Process / Deputy Assistant Secretary McGurk
- Efforts on the Ground / ISIL / Accurate Communication / Turkish Diplomats

**CHINA**
- International Woman of Courage Award Winner / Tsering Woeser

**AFGHANISTAN**
- Election / Reconciliation / Discussions with Afghan Leaders / Audit Process / Foreign Assistance

**BAHRAIN**
- Assistant Secretary Malinowski's Visit / Formal Complaint Registered

**DEPARTMENT**
- Pending Nominees / U.S. Senate / Secretary Kerry's Op-Ed / Working through Process

**VENEZUELA**
- Exchange of Chargés / Bilateral Relationship

**SYRIA**
- Syrian Opposition Coalition / Election / Assistance

**NORTH KOREA**
- North Korean Launches / U.S. Concern / International Obligations / Chinese Concerns / Japanese Concern

**TRANSCRIPT:**

**12:59 p.m. EDT**

**MS. PSAKI:** Hi, everyone.

**QUESTION:** Hi there.

**MS. PSAKI:** I just have a couple of items for all of you at the top. Secretary Kerry continues his visit to Beijing for the sixth round of the U.S.-China Strategic and Economic Dialogue, and the fifth U.S.-China High-Level Consultation on People to People Exchanges. On July 9th, which is of course today, he opened the S&ED and reiterated our commitment to cooperate in areas of common interest and to constructively manage our differences.

As the Secretary said, we welcome the emergence of a peaceful, stable, prosperous China that contributes to the stability and the development of the region and plays a responsible role in world affairs. Secretary Kerry co-chaired the S&ED strategic track session and a special joint session on climate change and clean energy, where the two sides reviewed and strengthened efforts to tackle climate change. He also attended an event to highlight the importance of combating wildlife trafficking and to outline areas of cooperation to stop this transnational crime.

**UCP000166**

I just have a couple of other quick items at the top. As the Treasury Department announced this morning, I wanted to highlight that the United States took action to increase pressure on the Syrian regime by sanctioning three entities contributing to its repression of the Syrian people and literally fueling its war machine. Treasury designated the Pangates International Corporation for providing material support for and goods and services to the regime, including a Syrian state oil company already sanctioned by us. Pangates International is based in the U.A.E.

Treasury also designated two Syria-based front companies – the Expert Partners and Megatrade – for acting for or on behalf of the regime agency responsible for developing and producing nonconventional weapons and ballistic missiles, which we've also sanctioned. Today's actions build on our robust multilateral sanctions coalition against the Assad regime. We've worked with more than 60 countries and international organizations to impose targeted sanctions against nearly 200 individuals and entities.

And just one more item, and then we'll get to your questions.

You all may have seen the Secretary's editorial piece this morning calling on the Senate to confirm our pending nominees. As he noted in this piece, the United States continues to operate without a complete diplomatic toolbox to exert our leadership, advance our security and economic interests, and address global crises because we are without ambassadors in nearly 40 countries while their nominations await Senate confirmation. Just to go through a couple of the numbers for all of you, 53 Department nominees are pending before the Senate, 35 of whom are noncontroversial career diplomats. Thirty-seven have been approved by the Senate Foreign Relations Committee and could be confirmed immediately with a simple vote. Not only do the vacancies in so many world capitals send a dangerous message to allies and adversaries alike about America's engagement, but the length and number of these vacancies compromises U.S. national and economic security.

And just to give you a few examples that were highlighted in the Secretary's opinion piece: In the Middle East, it's critical that we have leaders on the ground in a region where we have extensive economic and security interests. Countries like Qatar, Algeria, and Kuwait all are pending – all have nominees pending in the Senate. In Africa, nearly a full 25 percent of our total ambassadorial presence on the continent is pending before the Senate and has been for over eight months. Vital roles that ambassadors would play in coordination in the fight against Boko Haram and al-Qaida affiliates remain vacant. And to highlight something we've been talking about over the last week or so, we need ambassadors in the Western Hemisphere to help find ways to prevent the crush of unaccompanied minors along our southwestern border. Nominees for both Honduras and Guatemala await Senate action right now.

As noted in the piece, but just to highlight for all of you, the Secretary proposed a unique solution to combat the nominations backlog and prevent such a logjam in the future – that the Senate carve out State's career nominees and expedite their confirmation, just as it does for military promotions. And just to not to put too fine a point on it, obviously for America to continue to play a strong role in the world, we need equal treatment for diplomats, we need to have ambassadors and our representatives on the front lines in these countries around the world.

So with that, let's get to who's first. I knew it would be you, Said. Go ahead.

**QUESTION:** Jen, thank you. So can we start with the Palestinian Israeli --

**MS. PSAKI:** We certainly can.

**QUESTION:** -- fight over Gaza? Yesterday you took issue with my number. Today the Israelis acknowledged that they have waged, as of one o'clock this morning our time, they have waged 160 bombing runs over Gaza. Thirty-nine Palestinians have been killed, including a whole family, children and so on. Are you doing anything beyond just calling for restraint to actually bring about some sort of a de-escalation or a quiet?

**MS. PSAKI:** Well, let me first – I'll give you a brief update on the Secretary's diplomatic engagement, as well as the Administration, I should say. Secretary Kerry spoke with Prime Minister Netanyahu this morning and he plans to speak with President Abbas over the next 24 hours. There's a bit of a time change challenge, as you all know, given he's in China. White House coordinator Phil Gordon is in Jerusalem and the West Bank today and has been meeting with key decision makers on both sides. He met today with President Abbas. And the Secretary, as I noted yesterday, has been making calls over the past 24 hours to world leaders as we continue to evaluate the situation and look for ways to stop the rocket attacks.

As I mentioned yesterday, and I want to reiterate, certainly no country should be expected to stand by while rocket attacks from a terrorist organization are launching into their country and impacting innocent civilians. At the same time, in the Secretary's conversations, in the conversations of all of our senior Administration officials, they've been encouraging all sides to de-escalate the situation and certainly we don't want to see any civilian casualties. That is one of the prominent reasons why it's so important to move forward and de-escalate the situation on the ground.

**QUESTION:** Okay. He also made very clear time and time again Israel's right to self-defense. And I asked you about the Palestinians' right to self-defense. Let me ask you this: The population in Gaza, is it largely Hamas operatives or largely innocent civilians? And if there are larger Hamas operatives, then an argument can be made that they could be targets. But if they are largely civilians, then they should have, certainly, the right to self-defense --

**MS. PSAKI:** Well, Said, I would simply say there's a --

**QUESTION:** -- or to protection.

**MS. PSAKI:** -- strong difference between attacks --

**QUESTION:** Right, I understand.

**MS. PSAKI:** -- rocket attacks launched by a terrorist organization that is based in Gaza and the right of Israel to defend itself. At the same time, as you know, we work closely with the Palestinians. We work closely with the Israelis. And it's important at this point in time to see if all sides can take steps to de-escalate.

**QUESTION:** How could you follow or do you have any means of following what is going on on the ground in Gaza in terms of the humanitarian suffering, people that lack water, lack the -- of medical care, lack of food, things of that nature. Do you have anyone --

**MS. PSAKI:** How do we --

**QUESTION:** Do you have anyone on the ground in Gaza that can monitor the situation?

**UCP000167**

**MS. PSAKI:** Said, I think we are concerned about any humanitarian suffering around the world. As you know, that isn't about sides. That's about what's right morally. But I think – do you have any more questions on this issue?

**QUESTION:** But – yes, I do. Yeah.

**MS. PSAKI:** Okay. Go ahead.

**QUESTION:** You also mentioned that Mr. Gordon – Phil Gordon said yesterday in a speech at the peace conference, he said that the current Israeli Government is not committed to peace. Those were his words. Do you agree?

**MS. PSAKI:** Well, I think it's been clear that both sides haven't taken the – made the difficult choices needed to continue the peace process. And when there's an absence of peace or a peace process, there's a vacuum left that, at times, is filled by violence. So that's the circumstance we're looking at right now.

**QUESTION:** But he didn't say both sides. He said the current Israeli Government is not committed to peace, and he went on to say --

**MS. PSAKI:** I'm not going to parse his words --

**QUESTION:** -- and he went on to say --

**MS. PSAKI:** -- but we've – let me finish. We've consistently said that both sides didn't make the necessary choices needed to continue the process.

**QUESTION:** Do --

**MS. PSAKI:** I think we have one more for you and then we've got to move on.

**QUESTION:** Okay. One more, I promise, yeah. And he also said that Israel continues to deny the Palestinians sovereignty, security, and dignity. Do you agree with that assessment?

**MS. PSAKI:** I'm not going to parse his words. As you know, there are difficult issues with --

**QUESTION:** But he --

**MS. PSAKI:** -- let me finish, Said – with strong emotional feelings when it relates to these tough choices that need to be made around the peace process. Certainly, the Secretary, the President still believe, as is – as the President wrote in his op-ed, that that is the right path towards a stable and secure long-term Middle East. And that's why we're keeping the door open to a peace process in the future.

**QUESTION:** But you agree Mr. Gordon --

**MS. PSAKI:** I think we need to move on to other questions.

**QUESTION:** -- Mr. Gordon speaks on behalf of the Administration?

**MS. PSAKI:** Samir, go ahead.

**QUESTION:** Iraq – Iraq?

**QUESTION:** No, let's stay with Palestinian – yeah.

**MS. PSAKI:** Well, let's do this process.

**QUESTION:** No, this – the Palestinian.

**MS. PSAKI:** Okay, go ahead.

**QUESTION:** One more.

**MS. PSAKI:** Go ahead, Lucas.

**QUESTION:** Do you know who's supplying Hamas with these rockets?

**MS. PSAKI:** I don't have any information to share on that, Lucas.

**QUESTION:** Because a few weeks ago the United Nations said that Iran had been fingered in delivery of rockets to Gaza and Sudan, and I was wondering if you had a comment on that.

**MS. PSAKI:** That is true, and has – those reports have been around for some time, I believe, but I don't have anything specific or any confirmation from here.

**QUESTION:** Is this being brought up on the side during the ongoing nuclear talks in Vienna?

**MS. PSAKI:** Is the issue of --

**QUESTION:** Iran supplying Hamas with rockets?

**MS. PSAKI:** Not that I'm aware of. The focus is on the nuclear issue. There's plenty to discuss on that particular issue.

**QUESTION:** And how do you discuss just nuclear issues with Iran when all this is going on, them supplying rockets to Hamas or Syria, and also possible destabilizing efforts in Iraq?

**UCP000168**

EXHIBIT 28, PAGE 177

**MS. PSAKI:** Well, as we've long said, Lucas, obviously resolving the nuclear issue and preventing Iran from acquiring a nuclear weapon is not the only issue we have with Iran. But it's such an important issue and it's one that's vital to our national security interests and to the security of the region that we feel a focus on that at these discussions is absolutely appropriate.

**QUESTION:** But would cutting off the supply line help with the conflict currently going on in Gaza?

**MS. PSAKI:** Well, I think it's clear, Lucas, that our concern and our condemnation of the rocket attacks has been consistent. And of course we'd be concerned about the suppliers, but I don't have any more information to share on that.

Go ahead, Roz.

**QUESTION:** What specifically did the Secretary tell Prime Minister Netanyahu in his call?

**MS. PSAKI:** Well, they've been in close touch over the course of the last several days. They've been discussing the circumstances on the ground. Certainly, he commended him for his call for restraint this weekend when he was meeting with his cabinet, and they're discussing a path forward. I think certainly Prime Minister Netanyahu is concerned about the threat that the rockets from Hamas pose to his own people. He's spoken about that publicly. The Secretary is concerned as well, and so they've discussed that and they've had ongoing discussions.

**QUESTION:** Did the Secretary say to the prime minister that while it's perfectly appropriate to defend against rocket attacks from Gaza, that any effort to launch an offensive is inflammatory?

**MS. PSAKI:** I wouldn't put words in his mouth. What he's conveyed is what I just said. And as you know, we've – we're encouraging all sides to de-escalate the situation on the ground. But again, Israel has every right to defend themselves and take steps to defend themselves, as – and as we know, the aggression is currently coming from Hamas in Gaza.

**QUESTION:** Did the Secretary raise any concerns that the U.S. might have about Israel's plans to call up 40,000 reservists? You don't need 40,000 people to operate Iron Dome.

**MS. PSAKI:** Again, I don't have anything more to read out from the call, so I think I'll leave it at what I just said.

**QUESTION:** And then besides the time difference in trying to reach President Abbas, what would be the thrust of the Secretary's message to him?

**MS. PSAKI:** Well, I think it's a similar discussion in terms of discussing the path forward and how to de-escalate the situation on the ground. Obviously, as you know, President Abbas has condemned a range of the attacks as well as the recent tragic events with the three Israeli teenagers. And the Secretary will simply have a discussion about the path forward.

**QUESTION:** President Abbas also noted today that this wasn't just a matter of the Israeli Government engaged with Hamas, but that this was – and I'm paraphrasing here – an attack on the entire Palestinian people. Is that kind of language coming from Mr. Abbas appropriate?

**MS. PSAKI:** I didn't see his specific comments, so I don't have a comment on them.

Do we have more on this issue?

**QUESTION:** Yes, please. (Inaudible.)

**MS. PSAKI:** Go ahead. Go ahead in the back. Go ahead.

**QUESTION:** Regarding the Secretary Kerry contacts with the regional leaders, you said --

**MS. PSAKI:** Mm-hmm.

**QUESTION:** Yesterday, you didn't give any details. Do you have something to say today?

**MS. PSAKI:** I can give you a list of the meetings or the engagements, and certainly it's a discussion about the circumstances on the ground. He spoke with Qatari Foreign Minister al-Attiyah, he spoke with UN Secretary General Ban Ki-moon. I mentioned his call with Prime Minister Netanyahu. Those are the calls that he's had today and he's looking to speak with President Abbas in the next 24 hours.

**QUESTION:** So you think that regional power or regional countries have a role to play in the escalation of this, or you just asking the two sides?

**MS. PSAKI:** Well, they – certainly regional countries have a stake in the stability of the region. And so the Secretary's simply reaching out and having a discussion about the path forward with these regional leaders as well.

**QUESTION:** So either Prime Minister Netanyahu or Mahmoud Abbas, Palestinian Authority president, did they ask for other regional or did they ask their – your – what you call it – being in touch with leaders to be involved in this?

**MS. PSAKI:** I would point you to them to answer that question. I think the Secretary feels it's only natural to have these discussions with countries in the region and their leaders.

**QUESTION:** So there is another thing. Related to the – just to check with you, it's like – you said this morning he had a call with Netanyahu --

**MS. PSAKI:** Mm-hmm.

**QUESTION:** -- Prime Minister Netanyahu. This is the third call in the last four days? I mean, you said before, I think it was Friday and Sunday?

**MS. PSAKI:** That's correct. I believe at least three calls in the last several days. And during those calls, he certainly reiterated our concern about escalating tensions and our willingness to -- expressed our willingness to engage and helping to stop the rocket fire and restore the 2012 ceasefire as soon as possible. I mentioned the calls he's had with foreign leaders.

**UCP000169**

Let me reiterate, just in response to Said's earlier question, we are concerned about the safety and security of civilians on both sides and – whether that's the residents of southern Israel who are forced to live under rocket fire in their homes and the civilians in Gaza. And that's why we've called on both sides to do all they can to restore calm and to take steps to protect civilians, even as we're working to resolve the circumstances here.

QUESTION: Yes, please. My last question: Regarding the rocket attacks, in the last two days, the – in relation to Iron Dome statistics, almost that – just 20 percent of those rockets were intercepted. Did Israel ask U.S. for more help to – regarding the rocket attacks?

MS. PSAKI: I'm not aware of any additional requests. As you know, we are – we provide a significant amount of security assistance and provisions to the Israelis.

Go ahead, Samir. Can we go to Samir just since he hasn't had one? Go ahead, Samir.

QUESTION: Iraq?

MS. PSAKI: Oh, okay. Sorry. Go ahead, Said. Let's do one more on this. You don't – okay, okay. Go ahead, Samir.

QUESTION: Yes. Prime Minister Maliki in a TV address today, he accused the Kurdistan Regional Government of allowing Erbil to become a base for the ISIS and the al-Qaida and terrorists. And he also kind of confirmed that he will not allow them to take over disputed areas like Kirkuk. Do you have any reaction to this kind of a --

MS. PSAKI: Well, without seeing the full context of his comments, let me just reiterate that our view is that the focus in Iraq right now should be on taking steps to urgently move forward with government formation. There have been – there's a long history here of a lack of inclusivity, and at this pivotal point in time, it's important for all leaders, including Prime Minister Maliki, to act in a way that welcomes in and unites leaders in the country instead of dividing.

QUESTION: Are you concerned that Erbil might become a hotbed for extremists?

MS. PSAKI: Erbil?

QUESTION: Yes.

MS. PSAKI: I think we're concerned about any threat that ISIL poses to citizens and communities in Iraq.

QUESTION: Okay. And let me just follow up on the advisors on the ground. Their first assessment last week was that the Iraqis may be able to defend Baghdad but are unable to sort of retake territory already conquered by the Islamic State. Has there been any update to the situation? Are they doing anything other than assessment and perhaps talking to --

MS. PSAKI: Well, assessing is certainly a part of --

QUESTION: Right.

MS. PSAKI: -- what their mandate is. But I would refer you to DOD for any updates on their work on the ground.

QUESTION: Okay. But the fact that al-Baghdadi so boldly goes to a mosque that is a well-known mosque in Mosul and within – knowing exactly where he is, his location was well known and so on, is the United States or would the United States be willing to engage militarily to ensure that, like they did back in 2004 and '05 and '06 when they targeted Zawahiri, that they would actually target al-Baghdadi?

MS. PSAKI: You're familiar with the options that we always have and the President always has at his disposal, but as has consistently been the case, our focus is on the political process and encouraging that to move forward. And again, we have 300 advisors on the ground. They're in the process of assessing, but I would refer you to DOD for any more specifics on their work.

QUESTION: How realistic is – is it to assume that if Prime Minister Maliki started acting in a more inclusive way and if the Sunnis and Kurds bought into this inclusive policy of governance, that this would neutralize the threat from the Islamic State group. How realistic is this?

MS. PSAKI: Well, Roz, I think I'm not going to speculate on that. I think there's no question in anyone's mind that a unified Iraq and one that – where the leaders are moving forward toward a government formation would strengthen Iraq and strengthen the case and the fight against ISIL and the threat it poses.

Do we have more on --

QUESTION: But does that mean – I mean, it just seems as if the Administration has been creating this impression that if the political climate will change, then magically this threat from the Islamic State group will just --

MS. PSAKI: I don't think --

QUESTION: -- will just be eradicated. And it seems as if, given --

MS. PSAKI: That's not at all – let me stop you there. That's not at all the impression we're sending or we're intending to send, or I don't think anyone thinks we're sending. We're – our focus here is on the reality on the ground, which is that this is – there's a grave security situation on the ground. There's a threat that's being posed to all Iraqi people, as well as to leaders in the region, and right now the focus should not be on political disagreements. It should be on unifying against the threat that they all face. And so what we're talking about is how to strengthen the Iraqi leadership, Iraqi security forces, in order to take on the threat they face. And I think there's no question that in order to work towards a long-term sustainable Iraq, that that is an essential step toward that process.

QUESTION: But given the widespread criticism of Maliki's leadership in the past eight years, it's going to take time to build trust among Sunnis and among Kurds. And so it just seems as if it's going to take a while to get that political structure right-sized. In the meantime, Islamic State is going to be doing what it's doing.

MS. PSAKI: Well, Roz, they're meeting – let me disagree with you. They're meeting on Sunday, as you know, to move forward with the political process. We're encouraging them to do that rapidly. It's up to the Iraqi people to determine who their future leadership will be, but there's no question they have it in their capacity

**UCP000170**

to move forward. And once they've put a new parliament – speaker of the parliament, a new president, a new prime minister in place, that will begin the path, or – be an important step on the path towards unity and towards strengthening their fight on the ground.

More on Iraq? Samir, go ahead.

**QUESTION:** Is Assistant Secretary McGurk still in Iraq?

**MS. PSAKI:** He is. Deputy assistant secretary. Yes, he's still in Iraq.

**QUESTION:** He's deputy secretary.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** What is he doing?

**MS. PSAKI:** He's been working closely with a range of Iraqi leaders. He's been working closely with Ambassador Beecroft, and they're working to see how they can assist in moving this political process forward.

**QUESTION:** Can I just follow up on Iraq?

**MS. PSAKI:** Okay.

**QUESTION:** Now, the Iraqis claim that they have deployed the Sukhoi fighters that they have received from the Russians. If they can deploy these Sukhois that were apparently purchased, paid for, delivered, and deployed in the last month, why is it so difficult for them, at a time when they have been – or being trained for the past 10 years or so on to fly American fighter jets, why is it so difficult for them to receive those jets?

**MS. PSAKI:** Well, first let me say there've been a range of reports about what's happening on the ground and whether they're Russian-made aircraft, whether they're – what country they're coming from, and I don't have any confirmation of those specifics. We've seen all the reports. We're aware there are Iranian operatives inside Iraq, that Iran has provided some supplies for Iraq's armed forces.

But again, we take steps as the United States Government to ensure that any country – Iraq included, of course – is prepared to and equipped to accept and utilize the equipment that we're providing. And that's a natural part of the process, and one certainly, I think, that's supported broadly by the United States Congress.

**QUESTION:** So do you suspect that Iran may be conducting these aerial bombardments?

**MS. PSAKI:** I'm not going to speculate on that, Said. I don't have any confirmation of those I can offer from here.

Do we have any more on Iraq?

**QUESTION:** Yes, one more.

**MS. PSAKI:** Okay. Go ahead, Goyal.

**QUESTION:** Thank you, madam. Madam, my question is that – do you consider – I mean, U.S. – does U.S. consider Abu Baghdadi the next or similar to Usama bin Ladin, as he claims himself? And he has put a number of countries on alert, including U.S., India, and western countries, among others.

**MS. PSAKI:** Well, Goyal, I certainly spoke extensively to this the other day, but let me just reiterate. We've seen this type of videos and messages from ISIL and terrorist groups like ISIL in the past, and the goal here is to divide along sectarian lines the people of Iraq and to control people through terrorist means based in repressive ideology. And certainly, we have great concern about that and we have – that's why it's so important to express the fact that these are ruthless – this is a ruthless terrorist organization that's only serving to divide. I'm not going to make any comparisons other than to say that you certainly know where we stand on ISIL and the fact that it is a ruthless terrorist organization, and I think that speaks to how we feel about one of its leaders.

**QUESTION:** And finally, on Saudi, one more quickly. One, where are they getting all this financial help to get all these weapons and all these threats? I'm sure somebody big must be behind them. And second, finally, can you confirm if there is a $10 million or more reward on him or his organization?

**MS. PSAKI:** I don't have any details on their financial backing. I would point you to the Iraqis for that.

**QUESTION:** Thank you.

**MS. PSAKI:** Go ahead.

**QUESTION:** A follow-up?

**MS. PSAKI:** Oh, sorry, Lucas. On Iraq or --

**QUESTION:** ISIS.

**MS. PSAKI:** Uh-huh. Go ahead. Okay, we'll go to you next. Sorry about that. Go ahead, Lucas.

**QUESTION:** Okay, no problem.

**QUESTION:** Have you seen reports that ISIS has issued its own passports?

**MS. PSAKI:** I've not seen those reports.

**QUESTION:** Is there a plan from the State Department and U.S. Government to counter ISIS' social media presence?

**MS. PSAKI:** To counter ISIS' social media presence?

**UCP000171**

EXHIBIT 28, PAGE 180

**QUESTION:** Social media. Mm-hmm.

**MS. PSAKI:** Well, I think first one of the – we use every tool in our toolbox to communicate what's accurate, and that's something the Iraqi Government does and we work with them to do as well. And obviously, speaking from the podium and the Secretary speaking out about the circumstances on the ground, the President speaking out, sends a powerful message to people in Iraq and throughout the region.

**QUESTION:** Would it just be working with the Iraqi Government, because the Islamic State now covers a broad swath of territory?

**MS. PSAKI:** Well, no. Obviously, it's working with countries in the region, and it's vitally important to make sure that we continue to communicate and countries in the region continue to communicate that ISIL is a terrorist organization, that they are – their goal is to divide the Iraqi people, divide people in the region among sectarian lines. There's a long history of fighting against that and uniting against that, and that's one of the reasons we've been so engaged in encouraging countries in the region and their leadership to send that message as well.

**QUESTION:** And would the U.S. Government recognize an ISIL passport should someone come to the airport?

**MS. PSAKI:** I think that's highly unlikely, Lucas.

Go ahead.

**QUESTION:** It has been about a month now there are 49 Turkish consulate staff and diplomats still being held hostage by the ISIS. Do you have any update on any of those?

**MS. PSAKI:** I do not have an update. We remain in regular touch through our team on the ground with Turkish officials, and of course, we remain concerned about those who are being held, as we do about Americans who have been held, as we do about any international citizens who are being held by ISIL.

**QUESTION:** Have Turkish officials asked you any kind of help to --

**MS. PSAKI:** I don't have any update to offer for you on this case.

**QUESTION:** Last time you said that a door is – door remains open if there is any need by Ankara. The door is still open?

**MS. PSAKI:** Certainly. And we are engaged in continued discussions.

**QUESTION:** I just wanted to follow up on Lucas' question. Do you know whether there is any Rewards for Justice program for al-Baghdadi or anyone else in --

**MS. PSAKI:** I don't have that information in front of me. I'm sure we can check. I believe there are some for some of these officials, but we can get that around to all of you and it's available on our website as well, of course.

**QUESTION:** Right, okay. And if it hasn't been done, can you let us know whether it's being considered?

**MS. PSAKI:** We certainly don't get into what's being considered or isn't being considered. But if there's publicly available information on our website, we will pull that together and send that to all of you about anyone who has a Rewards for Justice – is linked to the program.

Go ahead, Scott.

**QUESTION:** On China?

**MS. PSAKI:** Mm-hmm.

**QUESTION:** The two writers who are under house arrest in Beijing, can you confirm that the International Women of Courage Award winner was invited previously to the U.S. Embassy?

**MS. PSAKI:** I have some information on this and some of it we're still gathering, Scott. But we are concerned – there were two Chinese recipients of the Secretary's International Women of Courage Awards who were invited to a private dinner focused on women's issues. We are concerned that Tsering Woeser was placed under house arrest and prevented from attending – I believe the other recipient as well – and we're looking into the matter to determine more details about what happened here and, of course, the reasons.

**QUESTION:** Has that been communicated with Chinese officials at the highest level, since some of the highest levels are in Beijing right now?

**MS. PSAKI:** I would have to check and see if this is an issue that came up in the dialogue in those discussions. And why don't I do that, and we'll let you know.

Go ahead.

**QUESTION:** Afghanistan?

**MS. PSAKI:** Mm-hmm.

**QUESTION:** Has Secretary made additional phone calls to the Afghan leaders?

**MS. PSAKI:** I don't – there have not been new, additional calls today, no.

**QUESTION:** So what is the assessment of the situation in Afghanistan right now? Do you believe that the two candidates are heading towards any kind of reconciliation?

**MS. PSAKI:** Well, in all of the discussions, whether it's the Secretary or Ambassador Cunningham or Ambassador Dobbins, in all of the conversations we're continuing to urge both candidates and their campaigns to refrain from statements and actions that could jeopardize the electoral process. As we've said, we expect allegations of fraud to be reported and investigated by the relevant commissions. And so we continue to talk to the parties involved and deliver our message that both sides need to remain engaged with the electoral institutions to avoid violence or threats of violence, and to avoid any move towards or call for extra-

**UCP000172**

EXHIBIT 28, PAGE 181

constitutional measures, and also to engage with each other. So these are messages that we're consistently sending through our senior leadership on the ground, and I expect that will continue in the coming days.

**QUESTION:** So what kind of action do you plan to take if they go ahead with the extra-constitutional measures which they have announced --

**MS. PSAKI:** Well, I don't --

**QUESTION:** -- like announcing a cabinet or --

**MS. PSAKI:** Mm-hmm. I don't want to speculate on that, other than to say it certainly is not our preference. Our preference is to continue providing the type of support and assistance that we have been to Afghanistan. Our preference is to continue to move forward, and we fully expect we can with the planned presence that the President announced just a few weeks ago.

I stated this yesterday, but we have -- we remain confident -- and I spoke with our team this morning about this -- that the audit process can be completed in time to allow the inauguration of the next president. And in the meantime, the fact is that there have been reports -- really, not new this morning but over the last couple of days -- of plans to declare victory or create a parallel government. And those are steps that we don't think would be productive or beneficial to the Afghan people or the future of Afghanistan. And we won't be able to provide the type of support that we would like to if things continue down that path. But that's certainly not our preference.

**QUESTION:** And finally, given the current situation right now that Afghanistan is in, is the Administration considering it to review the policies that it has in Afghanistan regarding post-2014 presence, number of troops that you're planning to draw?

**MS. PSAKI:** As I noted, we have every confidence that an audit process can be concluded in plenty of time for the presidential inauguration that's scheduled for August 2nd. And as you know, both candidates have committed to signing the BSA, so we'll look forward to hopefully moving this process forward.

**QUESTION:** And one more. If the U.S. is in talks with the regional countries like India, Pakistan, possibly Iran, too, on bringing the situation under control in Afghanistan.

**MS. PSAKI:** I don't have any contacts along those lines to read out for you. I'm happy to check and see if I think -- if we're in -- if we've been in touch on the ground with India and Pakistan about these issues. Not that I'm aware of at this point in time.

**QUESTION:** Thank you.

**QUESTION:** (Inaudible) aid message? At first blush, it looks like a threat: If you don't do this the right way, the U.S. is not going to provide aid. But I'm wondering whether there are -- what the legal restrictions are on providing foreign aid when there is a disputed election and there are questions about what is the legitimate government in country X.

**MS. PSAKI:** It's not a threat. I wasn't trying to make a legal point. I think the fact is that if they're not abiding by their constitution, it makes it difficult for us to continue to provide the kind of support that we have been and we would like to. But that certainly is not our preference and not what our focus is on at this point in time.

**QUESTION:** How does it make -- what is it that makes it difficult? Is it U.S. law that a government has to be properly constituted in order for the U.S. to provide foreign aid?

**MS. PSAKI:** It's our policy, Roz. But if there's a legal component, I'm happy to check on that as well for all of you.

**QUESTION:** Okay.

**QUESTION:** So this is not a threat. This is soft warning kind of thing?

**MS. PSAKI:** It's neither. It's a statement of fact.

**QUESTION:** All right. (Inaudible.)

**MS. PSAKI:** Afghanistan?

**QUESTION:** Yes.

**MS. PSAKI:** Go ahead.

**QUESTION:** Madam, just quickly. Just -- is Secretary planning to visit the region, including Afghanistan, any time soon?

**MS. PSAKI:** I don't have any travel to outline for or announce for all of you today.

**QUESTION:** Thank you, ma'am.


**MS. PSAKI:** Go ahead.

**QUESTION:** Ambassador Dobbins is still doing his special envoy message or is --

**MS. PSAKI:** He is. We expect he'll be here until about the end of the month, and Dan Feldman will be transitioning in over the course of that time.

**QUESTION:** Bahrain.

**MS. PSAKI:** Do we have any more on Afghanistan? Okay, Bahrain.

**UCP000173**

**QUESTION:** Bahrain. You were being criticized for mishandling this whole issue with the Assistant Secretary Malinowski.

**MS. PSAKI:** Who's criticizing?

**QUESTION:** It's in the newspapers and there are editorials.

**MS. PSAKI:** Do you have any specific names or just --

**QUESTION:** The *Washington Post* today had --

**MS. PSAKI:** -- unnamed sources?

**QUESTION:** No, the *Washington Post* today was – had an editorial that is not quite complimentary to the way you handled the issue.

**MS. PSAKI:** Well, Said, I think we were very clear that we found some of the requests issued by the Government of Bahrain to be inappropriate and contravening international diplomatic norms and conventions. We also have an important relationship with the Government of Bahrain. We've made our concerns known. We've voiced those both publicly and privately, and so I would point you to that.

**QUESTION:** Okay.

**MS. PSAKI:** And I can also confirm for all of you that we registered a formal complaint with the Embassy of the Kingdom of Bahrain in D.C. in the last 24 hours. We'll have probably more of an update on that later today.

**QUESTION:** If you were to counteraction, so to speak – if you take a counteraction, what would you do in this case? I mean, Bahrain is a small country that the United States protects in many ways. You have a major fleet out there to protect the country from any imagined aggression or possible aggression. So why do you think Bahrain has done this?

**MS. PSAKI:** Well, we're considering our response to the government's decision and I'm not going to speculate on that further.

Do we have more on Bahrain or a new topic?

Go ahead, Lucas.

**QUESTION:** Just going back to the Secretary's editorial piece, I was wondering, out of the 53 nominees that are awaiting confirmation, does one of them include a nominee to be the new special ambassador for international religious freedom?

**MS. PSAKI:** Well, I think you're familiar with the publicly announced nominations and who has made it through the committee and made it onto the Senate floor. And as you know, that position is a priority for the Administration and one that we intend to fill soon.

**QUESTION:** But Jen, you've said that a number of times. The President asked for it during the prayer breakfast in February. How long does it take just to make a nomination? I assume it's a few phone calls.

**MS. PSAKI:** Well, let me first assure you that we have a team of people who work on issues of international religious freedom. Certainly, having an ambassador in place is always our preference, as evidenced by the Secretary's op-ed. But we have a team working every day on these issues. We raise them at the highest level every day. But we're looking, as with any position, to find the right person for the job. And I think in the meantime, as the Secretary's op-ed said, the Senate can move forward with confirming dozens of nominees who are sitting and waiting.

**QUESTION:** But the Secretary said he wanted those positions filled, the ambassador post, because it's a critical time and it sends a bad message when you don't fill the positions. If this is a position that's maybe largely ceremonial, what message is that sending? Is it saying that the United States doesn't care about religion?

**MS. PSAKI:** I didn't state that at all. In fact, the United States cares deeply about human rights issues, including freedom of religion, and that's one of the reasons that we're working hard to find the right person and fill it with the right person for the job.

**QUESTION:** Yes, please. This editorial piece by the Secretary --

**MS. PSAKI:** Yes.

**QUESTION:** -- in Politico.

**MS. PSAKI:** Yes.

**QUESTION:** You mentioned that nearly 40 countries, they don't have ambassadors, and then you mentioned too that it's – although some of them were even approved by the Committee for Foreign Relation, yet the Senate didn't approve them – I mean, or at least confirm them. And we know that the Senate is majority Democratic. So how do you explain? Because the Secretary just highlight an issue, but he didn't explain why these people are approved or not approved and what is this process not going on?

**MS. PSAKI:** Well, we're dealing with a logjam Congress, logjam Senate and House right now, and a big part of that is that there is opposition to moving forward with anything, whether it is legislation or the approval of nominees, and one party can't do it on their own. So in this case, there are options that the Senate has at their disposal, and that includes a voice vote on dozens of noncontroversial nominees. These are officials who have served their country as Foreign Service officers for decades, many of them. There's nothing controversial about them. They have decades of experience and they would play vital roles on the ground. And that's why it's – we're pushing this so strongly. They can voice vote them through. And many of them receive approval of 93 to1 or 97 to1 anyway, while at the same time they're waiting. Of the 37 floor nominees, they've waited an average of 245 days. That's over eight months to be confirmed while there's no ambassador in many of these pivotal countries.

The other option that's mentioned in the op-ed is expediting confirmations for career employees, as it does – I mentioned that a little bit – for military – that happens with the military as well. So there are a range of options that the Senate can move forward with and we're urging them to do so.

**UCP000174**

EXHIBIT 28, PAGE 183

**QUESTION:** So the other question related – because this was – this issue was raised over the last – many times and – whether it was the case with having an ambassador in Moscow or whether in India or in Egypt for months. And the answer was coming from this podium, there are a lot of capable people and they are doing – we don't need the – I mean, it's not – we didn't – you didn't say you don't need, but it's like whether the ambassador is there or not, the job is done. What happened in the last few weeks or months that change your --

**MS. PSAKI:** The two are not contradictory, and I would go back to Lucas's question. We have capable mid to senior-level employees and staff, whether they're career staff or Foreign Service officers or political staff, serving at our posts and embassies around the world. But there is no question that it would be helpful and it's vitally important to have ambassadors and leaders at the helm in some of these important countries around the world where they're facing some of the biggest global challenges we face. And so we're looking to move things forward quickly.

**QUESTION:** Somehow related to this issue is the issue of perception, which is always either, like, appreciated or ignored here. Because it's how others are looking to United States, especially with – regarding the ambassadors. Do you think this perception is right, when people – they don't have ambassadors – U.S. ambassadors there, they feel that it is not – somehow their issues are not handled enough?

**MS. PSAKI:** Are – sorry, can you --

**QUESTION:** I mean, are you considering that it's an issue, the impression that if U.S. doesn't have an ambassador, as Ambassador Kerry – Secretary Kerry was raising the issue, the necessity of having the leadership role, so the presence of ambassadors are important or not?

**MS. PSAKI:** Absolutely, vitally important to have the individual at the helm of any post or embassy in these countries around the world. And when you have dozens that are vacant, that leaves a void of leadership at the top that we think needs to be avoided, because there's a real national security issue at stake here.

**QUESTION:** A follow-up on that question?

**MS. PSAKI:** Go ahead.

**QUESTION:** Is this the reason why the Administration has not announced a new – nomination for new ambassador to India?

**MS. PSAKI:** Well, as you know, the last ambassador just left her post and served there for the last – over a year. And obviously, it's a vitally important position, and with many you just have to work through the process and find the right person for the position. What I'm talking about here is slightly different, which is individuals who have been nominated who have waited an average of 245 days, over 8 months, to be confirmed. So there are people who have been sitting waiting to go to these countries to serve proudly in these countries who haven't been confirmed on the Senate floor.

**QUESTION:** So even if you nominate an ambassador to India now, it would take – it will be early next year that you have a new ambassador --

**MS. PSAKI:** Well, we certainly hope not.

**QUESTION:** You're concerned even by these --

**MS. PSAKI:** And that's a great example. I think everybody agrees that we should have an ambassador to India in place. And as soon as one is nominated, we're hopeful that the Senate will move forward as quickly as possible.

**QUESTION:** Just a quick follow-up.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** Is that, Madam, since India has now a new prime minister, a new government, it's taking time because it had to find the right person for India, the U.S's next ambassador?

**MS. PSAKI:** No, it – not at all. It's not taking a great deal of time at all. We're – we have to work through the process of finding the right person for these pivotal positions.

**QUESTION:** But sometime it's consultations between the two governments, right?

**MS. PSAKI:** Certainly, that's a part of any process.

**QUESTION:** Thank you.

**MS. PSAKI:** Go ahead.

**QUESTION:** Going back to the Senate, Senate Democrats have been putting the blame on Senate Republicans for holding up these nominations, but you have Senate Republicans saying look, Senator Reid, who's a Democrat, controls the schedule on these votes and he's been prioritizing judicial nominees over State Department nominees, perhaps because that's the Administration's priority. Do you feel that the White House is prioritizing State Department nominees and that Senate Democrats are as well?

**MS. PSAKI:** Well, a couple of important points here. One is there has been a logjam in the Senate on the Senate floor about nominations and legislation long before Senator – Majority Leader Reid moved forward with the nuclear option several months ago. That was put in place because there was a complete deadlock on getting anything done in the Senate at all. And I think the point you raised is an important one and that there – all you need for a voice vote is unanimous consent. And when you're talking about a vote that could be 97 to 1 or 90 to 1 or 80 to 1 or 80 to 5, whatever it may be, there's no reason they shouldn't have a voice vote for the majority of these nominees. That's an easy thing that the Senate can do on the Senate floor, and we encourage them to do that.

**QUESTION:** And then going back to what the Secretary said in this op-ed and what you actually just said earlier from the podium, he said that the length and number of these vacancies compromise national security, citing a few examples, as you did, of places where maybe greater capacity or presence would strengthen the partnership or help maintain the partnership in these countries.

**MS. PSAKI:** Mm-hmm.

**UCP000175**

**QUESTION:** But are there specific cases where the State Department feels U.S. national security has been compromised by a nomination being held up in the Senate?

**MS. PSAKI:** Well, I think in any case there are nominations – and I think I listed a bunch of the specific examples of individuals who have been waiting for months, if not longer. I don't want to parse it further than what the Secretary did in his op-ed.

Go ahead. Scott? Oh. Scott.

**QUESTION:** Venezuela.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** Do you have anything else that you can tell us about the circumstances surrounding the exchange of chiefs of mission?

**MS. PSAKI:** Certainly. One, there's nothing out of the norm about this at all. We – let me just get a quick update and see where we are on this. It's customary practice, diplomatic practice, to put in place a charge when we do not have ambassadors at the mission. This is not a new practice. There was an acting charge there previously, and Lee McClenny's arrival is part of a routine personnel rotation.

**QUESTION:** Well, it might not be unusual logistically, but relations between the United States and Venezuela are unusual.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** So I mean, what about the circumstances between the United States and Venezuela, as reflected by this move?

**MS. PSAKI:** Well, it doesn't change the fact that there are a range of reasons why we have a diplomatic presence in countries, even where we don't agree on every issue. And certainly, in this case, as I mentioned the other day, the Venezuelan Government has tried repeatedly over the last couple of months to shift focus from its mistakes and Venezuela's problems to the bilateral relationship. But again, it's still, in our view, productive to have a presence where we can. There are American citizens that we can provide services to, we can voice concerns where we have them, and those are some of the important tools that our diplomatic embassies and posts serve as well.

**QUESTION:** Can we go to Syria real quick?

**MS. PSAKI:** Sure.

**QUESTION:** Okay. The Syrian Opposition Coalition elected Hadi al Bahra. And other than the statement that you issued, has there been any conversations with him?

**MS. PSAKI:** The Secretary looks forward to congratulating him. He hasn't had a chance to do that yet. As you know, it's the middle of night in China.

**QUESTION:** Right. Okay. Who is the point person that is conducting affairs with the Syrian opposition at the present time? I mean, it was – in the past it was Ambassador Ford, then it was --

**MS. PSAKI:** Daniel Rubinstein?

**QUESTION:** Yeah.

**MS. PSAKI:** Continues to be.

**QUESTION:** He continues to be?

**MS. PSAKI:** Mm-hmm.

**QUESTION:** Are there any – what is the latest on their – whatever negotiations or talks? What is the likelihood of having a Geneva III or anything like that?

**MS. PSAKI:** Well, Said, I think you're familiar with the range of steps we've taken over the course of the last several weeks, even. The President announced additional assistance and additional funding to the moderate opposition. We remain in close touch with the opposition, obviously, working to elect new leadership at this time. And obviously, there are specific restrictions on how many consecutive terms that leaders can serve in the SOC is an important part of what took place in this case. They elected, in addition to the new president – and let me just note this – they also elected three new vice presidents and a new secretary general. And we understand the new president is planning a press conference later today, so I'd point you to that for any specific update.

But again, this is a group that has given – the coalition has given a voice to all Syrians who have been oppressed by the regime for decades. We remain committed to supporting them, and obviously, the President's announcement from a few weeks ago is evidence of that. And we remain – continue – committed to continuing to support them in their effort to work on behalf of the Syrian people. So there are a range of steps we take every day to work toward that.

**QUESTION:** The Syrian air force bombarded bases or convoys of ISIL right at the border, the Syria and Iraq border. And do you welcome that kind of activity?

**MS. PSAKI:** I don't have any confirmation of those specifics, Said.

Do we have any more on Syria? Go ahead.

**QUESTION:** Can you confirm reports that the UN Secretary-General is going to appoint today Ambassador de Mistura as a – to replace Brahimi as an envoy to Syria?

**MS. PSAKI:** I've seen those reports. I would point you to the UN to – for confirmation.

Do we have a few in the back? Go ahead. Oh, go ahead. In the front, in the middle. Go ahead.

**QUESTION:** North Korea?

**UCP000176**

**MS. PSAKI:** North Korea, sure.

**QUESTION:** So it launched two missiles last night again. So how does the U.S. analyze the purpose of it and intention on why they chose this timing?

**MS. PSAKI:** The United States is concerned by reports of yet another round of North Korean launches, the fourth in less than two weeks. As we have emphasized, such provocative actions unilaterally heighten tensions in the region, and they will not provide North Korea with the prosperity and security it claims to seek. We once again note with concern North Korea's apparent failure to provide prior notification to merchant ships, fishing vessels, and passenger and cargo aircraft in the vicinity, despite international provisions to do so. And we once again urge North Korea to refrain from taking provocative actions, and instead fulfill its international obligations and commitment.

**QUESTION:** A follow-up question?

**MS. PSAKI:** Sure.

**QUESTION:** Yeah. Pentagon has just confirmed that these missiles were Scud ballistic missiles and this launch is a violation of a number of UN Security Council resolutions. Do you have any plan to take action against the North at the Security Council? Thank you.

**MS. PSAKI:** I don't have any confirmation of those specific details or reports when I came down here. I can circle back with our team. Obviously, we take any violation seriously and have in the past certainly encouraged the UN Security Council to move forward with steps.

**QUESTION:** Do you believe Hollywood movies are to blame for the North Korean launch, Scud launches?

**MS. PSAKI:** I think they've been around long before this – recent Hollywood movies about these issues.

**QUESTION:** Jen, is it related to the S&ED held in Beijing?

**MS. PSAKI:** Are the launches related to?

**QUESTION:** Yeah, yeah.

**MS. PSAKI:** I can't speculate or make a prediction of what the cause of their launches are. As you know, this is the fourth in less than two weeks, and so it's merely provocative actions that they're taking from their end. Certainly, we're concerned, as are countries in the region concerned about these steps.

**QUESTION:** And a follow-up. But the fact that they did choose to fire this missile during this meeting, S&ED, does it affect in any way the U.S. and China interacting in Beijing?

**MS. PSAKI:** Well, the – certainly, North Korea and the threat from North Korea is a part of the agenda at the S&ED and has long been planned to be a part of the agenda. And I know that they discussed and will continue to discuss these issues over the next remaining day of the meetings there.

**QUESTION:** What is the U.S. view --

**MS. PSAKI:** Go ahead.

**QUESTION:** What is the U.S. view on Japanese Government still are going to keep contacting with North Korea on the abduction issue, and they are going to carefully watch the procedure of the discussion?

**MS. PSAKI:** Mm-hmm. Well, we have spoken to this a bit in the past, but I'm happy to reiterate what our statements have been on this.

We continue to support Japanese efforts to resolve the abductions issues in a transparent manner. We are closely coordinating with our allies and partners, including Japan, taking – in an effort to take appropriate measures to address the threat to global security posed by North Korea's nuclear and ballistic missile programs, but would refer you to the Government of Japan for any additional information about these discussions.

Go ahead, Scott.

**QUESTION:** But is it right for the Japanese to include the possibility of unilaterally lifting some of their sanctions as part of these negotiations, given what you have termed these provocative actions by North Korea?

**MS. PSAKI:** Well, as far as I'm last aware, I don't believe there's been any public announcements in that regard. There have been a range of reports and rumors, but I'm not going to speculate on proposals that haven't been announced.

Great. Thanks, everyone.

(The briefing was concluded at 1:53 p.m.)

**DPB #120**

**UCP000177**