# EXHIBIT 29



**Jen Psaki**
**Spokesperson**
**Daily Press Briefing**
**Washington, DC**
**July 8, 2014**

G+1 ➕ **Share**

**INDEX FOR TODAY'S BRIEFING**

**CHINA**
- Secretary's Visit to Beijing for the U.S.-China Strategic and Economic Dialogue and the U.S.-China High-Level Consultation on People-to-People Exchange

**ISRAEL/PALESTINIANS**
- Continued Attacks / Israel's Right to Defend Itself / Call for De-Escalation

**BAHRAIN**
- Assistant Secretary Malinowski's Visit

**AFGHANISTAN**
- Elections / Allegations of Fraud / Commitment to Resolution

**IRAN**
- P5+1 Talks

**CHINA**
- Reports of Discrimination against Ethnic and Religious Minorities during Ramadan

**ISRAEL/PALESTINIANS**
- Focus on Need for De-Escalation

**CHINA**
- U.S.-China Strategic and Economic Dialogue
- International Development Financial Institution Proposal
- North Korea / Ongoing Dialogue with Partners

**IRAQ**
- Congressional Briefings
- Government Formation Process
- Deputy Assistant Secretary McGurk's Engagement
- U.S. Support

**MEXICO/CENTRAL AMERICA**
- Asylum Claims / Process / UN Role

**IRAQ**
- Formation of New Government / Process Ongoing

**SYRIA**
- Chemical Weapons Removed
- Concern about Situation on the Ground

**UKRAINE/RUSSIA**
- Concerns about Russian Separatists
- Encourage All Sides to Minimize Civilian Casualties

**TRANSCRIPT:**

1:50 p.m. EDT

**MS. PSAKI:** Hi, everyone.

**UCP000230**

**QUESTION:** Hello.

**QUESTION:** I just have one item at the top. Secretary Kerry arrived in Beijing, China to take part in the sixth U.S.-China Strategic and Economic Dialogue and the fifth U.S.-China High-Level Consultation on People-to-People Exchange. He had a small working dinner with State Councilor Yang Jiechi. And tomorrow, the S&ED and the CPE will begin.

As you know, the S&ED is a central forum for the United States and China to take stock of progress, set new goals for the relationship, develop habits of cooperation in areas of mutual interest, and to manage areas of difference through candid, high-level discussions. The S&ED remains an important component of our efforts with China to build relations between our countries, and the CPE provides a high-level forum for government, civil society, and private sector representatives to discuss cooperation in various areas of common interest. Secretary Kerry will also co-chair this year's forum and call for closer and expanded people-to-people ties.

With that, Matt, let's get to what's on your mind.

**QUESTION:** Let's start with Israel.

**MS. PSAKI:** Okay.

**QUESTION:** As you are aware no doubt, the Israeli Air Force is conducting operations over in Gaza right now, and I'm wondering what you make of that. Also, the rockets have been – are being fired into southern Israel. Tel Aviv was – there were air raid sirens in Tel Aviv. What's your take on the situation? Do you believe that this is the kind of restraint that you've been calling for from both sides for the past week or so?

**MS. PSAKI:** Well, we strongly condemn the continuing rocket fire into Israel and the deliberate targeting of civilians by terrorist organizations in Gaza. No country can accept rocket fire aimed at civilians, and we certainly support Israel's right to defend itself against these attacks. We appreciate – we're concerned, of course, about the safety and security of civilians, as you mentioned. I know there's been a range of reported attacks that have gone directly on both sides, the residents of southern Israel who are forced to live under rocket fire in their homes, the civilians in Gaza who are subjected to the conflict because of Hamas's action.

The Secretary spoke with Prime Minister Netanyahu Friday and again on Sunday. He's been in regular contact. Let me just make sure he hasn't had a call today as well. Not today, but he's been in close contact and he's reiterated our concern, as our teams have on the ground, to both sides about the need to de-escalate the tensions on the ground. We've also – he's also been in touch with leaders in the region about our concern about what's happening on the ground.

So in terms of what's happening specifically today, our hope is certainly that by sending a strong message that Israel will be able to deter some of the attacks that have been happening that have been coming at them from Gaza. And again, I would just reiterate our view that they have the right to defend themselves.

**QUESTION:** Do you believe that this is – that the Israeli actions are "sending a strong message"? That's what you were referring to?

**MS. PSAKI:** Sending – well, I'm referring to --

**QUESTION:** The air strikes --

**MS. PSAKI:** -- the calls this morning. I'm not referring to specific air strikes. But I would reiterate just that they're defending themself. They have rocket attacks coming into their own country.

**QUESTION:** Right. I just – well, I don't have an ulterior motive here.

**MS. PSAKI:** No, go ahead. Keep going.

**QUESTION:** I'm just trying to figure out when you say that you think that Israel is sending a strong message – by sending a strong message Israel will be able to deter future rocket attacks from Gaza, is what the Israelis are doing now, do you consider that to be sending a strong message, or is it something else?

**MS. PSAKI:** I'm not referring to specific action. I'm referring to their statements that they are prepared – they're preparing themselves to respond to the attacks. Certainly, our preference, which is what the Secretary and others have been conveying to both sides, is to de-escalate the tensions, to bring an end to the violence. But we certainly believe they have the right to defend themselves as well.

**QUESTION:** They've – the government has authorized to call up 40,000 troops, which would appear to be paving the way for a potential ground operation. Is that something that you would oppose, something that you would think is fully within Israel's right to do? What's your – what are your thoughts about that?

**MS. PSAKI:** Well, we're not going to get ahead of where we are. I'm not going to get ahead of where we are now. I would remind you that just this past weekend, Prime Minister Netanyahu called for acting responsibly, called for all sides acting responsibly. We're continuing to convey the need to de-escalate to both sides. Again, it is not a surprise that they are taking steps to prepare themself, but certainly, our preference is to de-escalate the situation on the ground.

**QUESTION:** Do you believe that all sides are acting responsibly at the moment?

**MS. PSAKI:** Well, I think certainly, we've been calling for de-escalation because, obviously, the rocket attacks coming into Gaza, the recent violence on the ground --

**QUESTION:** So that's no?

**MS. PSAKI:** Correct.

**QUESTION:** On the Palestinian side, they are not – or on the Hamas side, they are not acting responsibly, correct?

**MS. PSAKI:** I'm not – we think all sides should act responsibly, all sides should take steps to de-escalate. But again, it's important to note where the rocket attacks are coming from. But obviously, there are a lot of circumstances on the ground now, as you know.

UCP000231

**QUESTION:** I understand that. I'm just trying to get at – I'm trying to find out what the Administration's position is on whether the sides are acting responsibly, whether they are showing the kind of restraint that you think is necessary to de-escalate the situation, or not. And it's very possible that one side is and the other side isn't, or that that's your opinion, but I'm just trying to find out if – what is the – what does the Administration believe? Is its – are its calls for restraint being heeded by one side, both sides, or either side?

**MS. PSAKI:** I'm not going to get into that level of specificity, Matt, other than to say that we're conveying through diplomatic channels the importance to both sides of acting responsibly and with restraint.

**QUESTION:** Okay. And then my last one is you said that the Secretary had been – in addition to calling Prime Minister Netanyahu on Friday and Sunday – was it Friday --

**MS. PSAKI:** Mm-hmm, correct, Friday and Sunday.

**QUESTION:** -- that he had also been in touch with leaders in the region to pass along the same message, I guess.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** Could you be more specific about who in the region?

**MS. PSAKI:** Well, what I'm specifically – let me see if there are more specific calls to read out for you. What I'm referring to is any leader in the region, any countries in the region that can send a strong message to Hamas as well.

**QUESTION:** But that would be – so, like the Egyptians, the Saudis, the – who, Turks? The --

**MS. PSAKI:** That's correct. Those are all applicable. I don't have any more specifics to read out for you, though, on that.

**QUESTION:** Well, what about the – what about Palestinian President Abbas sending a strong message to Hamas? I mean, you are recognizing his government, of which Hamas is a part. I mean, doesn't he bear some responsibility for reining in Hamas?

**MS. PSAKI:** We don't recognize governments. Hamas is not a part of the technocratic government. We certainly expect --

**QUESTION:** It's a unity government of which Hamas is --

**MS. PSAKI:** Let me finish. We certainly expect President Abbas to do everything in his power to prevent rocket attacks and to condemn violence, and he has made a range of those calls. But we're conveying the same message to him as well about the need to exercise restraint and de-escalate the situation on the ground.

**QUESTION:** But do you think that he bears some responsibility here? I mean, I just – it's like at one point, yes, it was a conflict between just the U.S. and Hamas, and Abbas had no real kind of skin in the game because it was between these two parties, even though it was affecting the Palestinian people directly. But now, he's part of a unity government and has some influence with Hamas now, wouldn't you say?

**MS. PSAKI:** Well, we have no evidence that Hamas plays any role in the interim technocratic government. And as far as we know, there have also been no steps taken for the implementation of the reconciliation. And obviously, as I mentioned yesterday, given the situation on the ground, it's difficult to see how the reconciliation process can move forward in the current atmosphere.

I think, yes, we want President Abbas to do everything in his power to prevent rocket attacks and to condemn violence. But I would remind you, as you know, Hamas control – continues to control Gaza. The Palestinian Authority security forces only operate in the West Bank and don't operate in Gaza. So there are certainly limitations to what is possible, though we want him to do everything in his power to prevent and condemn these type of attacks.

**QUESTION:** Remaining on the message theme, so you think that all Israel is doing is sending a strong deterrent message and that's all there is, and that remains within the accepted proportion or whatever, proportionally?

**MS. PSAKI:** I don't think that's what I stated, Said. There is obviously a range of circumstances on the ground right now, as you all know. There are the unfortunate recent deaths of the three teenagers. There are – there is the kidnapping and then the beating of the other teenager.

**QUESTION:** Right.

**MS. PSAKI:** There is violence and back-and-forth. I don't have to repeat for you. You know exactly what's happening on the ground.

**QUESTION:** I know. I understand and you don't have to repeat for me. But you feel that sort of the Israeli air raids, like maybe hundreds of them so far this day, are proportionate to the rockets?

**MS. PSAKI:** That's not – I wouldn't validate the accuracy of that number, but I would say, Said --

**QUESTION:** Okay. Well, the sorties – there are hundreds of sorties.

**MS. PSAKI:** I would say, Said, that I don't think any country would be expected to allow rockets to come in and threaten the lives and health and well-being of the citizens in their country, and Israel has the right to defend themselves.

**QUESTION:** Okay. Do you believe that the Palestinians in Gaza have the right to defend themselves?

**MS. PSAKI:** I think – I'm not sure what you're getting at, Said.

**QUESTION:** I am asking you: Do they have the right to defend themselves against Israeli aggression?

**MS. PSAKI:** What are you specifically referring to? Is there a specific event or a specific occurrence?

**QUESTION:** Do they have the right to respond to Israeli rocketing and bombing their homes, their houses, their areas, their schools?

**UCP000232**

**MS. PSAKI:** We're talking about attacks from a terrorist organization, Said. I don't think you're –

**QUESTION:** No, but there is also a population –

**MS. PSAKI:** -- we're having a conversation about what's happening here.

**QUESTION:** I mean, you agree that there is a civilian population in Gaza that is also subject to –

**MS. PSAKI:** Certainly, and the threat, as I mentioned earlier, to civilian populations is of great concern to us. And that's one of the reasons why we're so focused on encouraging all sides to de-escalate.

**QUESTION:** Are you calling on someone like Egypt to intervene, perhaps, that can bring about some sort of quiet?

**MS. PSAKI:** We've, again, been in touch with countries from the region. I'm not going to get into any greater level of specificity.

**QUESTION:** Have you gotten a response from the Egyptians that they are willing to intervene or perhaps broker --

**MS. PSAKI:** I'll let countries speak for themselves.

Do we have more on this issue? Okay. Should we move on to a new topic?

**QUESTION:** Bahrain?

**MS. PSAKI:** Bahrain.

**QUESTION:** I don't – can you update us on the l'affaire Malinowski?

**MS. PSAKI:** Sure. I believe we sent this out, but in case you didn't all see it, I just wanted to give a quick overview of the meetings that he had on the ground. He arrived on July 6th. On that evening, he briefly attended the Wefaq Ramadan gathering, which was open to the public. Throughout his visit he was also scheduled to attend the Ramadan gatherings of a broad spectrum of society, as is traditional. He also met with the minister of interior and police chief; with the National Institution for Human Rights. He had meetings scheduled over the coming days with the crown prince, first deputy prime minister and director general of his office, the foreign minister, the minister of justice and Islamic affairs, the minister of interior, ombudsman, the commission on prisoner and detainee rights, and the chief of the public prosecutor special investigative unit.

So as was noted in the statement we sent last night, this was a trip that was prior planned, that we'd worked with the government on. He held meetings internally at the Embassy today, and he's scheduled to leave today as well. To our knowledge, the Government of Bahrain has not changed its position.

**QUESTION:** How long had he planned to be there?

**MS. PSAKI:** He had planned to be there about through the end of the week – or through later this week.

**QUESTION:** Okay. And he will leave today, or has – it's getting late there. I don't know --

**MS. PSAKI:** He's scheduled to leave today.

**QUESTION:** Right.

**MS. PSAKI:** I'm not sure exactly with the time change if he's departed yet.

**QUESTION:** But will he have had all the meetings that he planned, or --

**MS. PSAKI:** No, he will not have.

**QUESTION:** The Bahrainis complained – and you had rejected this, but the Bahrainis complained that he was only meeting with one sect or one sector – wasn't meeting with everyone, and that's not conducive to their attempt at dialogue. The Gulf Cooperation Council, the head of that in Saudi Arabia has also – has expressed the same thing. Are you concerned that this incident is going to affect not just your relations with Bahrain, but also with the broader Gulf including Saudi, where you've already had a somewhat strained relationship?

**MS. PSAKI:** We're not. Obviously, we remain and will be in close touch with both the Government of Bahrain and any other country that expresses a concern, as would be normal protocol and process. As you mentioned, but it's worth noting, he was scheduled to meet with high-level government officials and had some of those meetings before all of these events happened just yesterday. But no, that's not a concern that we have at this moment.

**QUESTION:** Okay. Assistant Secretary Malinowski in a tweet, which was then retweeted by the State Department, said that this was not about him; this was rather about the Bahraini authorities trying to undermine dialogue and national reconciliation. Is that the position of the Administration, of the State Department, that the Bahraini Government is not interested in a dialogue and national reconciliation?

**MS. PSAKI:** Well, we spoke at great length and detail about this yesterday, Matt. Obviously, it's important for all sides, including the Government of Bahrain, to move forward on the reconciliation process. But I don't think I'm going to have anything to add to the tweet you referenced.

**QUESTION:** So did the retweet by the State Department constitute an endorsement of Assistant Secretary Malinowski's stance?

**MS. PSAKI:** I wouldn't take it that way.

**QUESTION:** Okay.

**QUESTION:** Have there been any conversations between the U.S. ambassador and the Bahraini Government about something which this building considers highly irregular?

**UCP000233**

EXHIBIT 29, PAGE 190

**MS. PSAKI:** We have been in close touch with the Government of Bahrain. I don't have any other specific meetings to detail for you.

**QUESTION:** How will you respond to this move, to this type --

**MS. PSAKI:** Well, we're considering our response to the government's decision. But again, obviously, this is new yesterday. So I don't have anything to outline in that regard.

**QUESTION:** When can we expect this response?

**MS. PSAKI:** I can't predict that for you, unfortunately.

**QUESTION:** When he leaves, is he coming back here, or does he have other stops in the region?

**MS. PSAKI:** That's a good question. I believe he's coming back to Washington, but we can double-check and make sure that's the case.

Said.

**QUESTION:** Will he respond to it?

**QUESTION:** (Inaudible) or is he out?

**MS. PSAKI:** He was scheduled to leave today. I'm not sure with the time change if he's departed yet.

**QUESTION:** So his last meeting, just so I'm checking -- his last meeting was this -- with this group that they said that it's not desirable to meet them?

**MS. PSAKI:** Well, he had meetings yesterday also with the minister of interior and police chief and the National Institution for Human Rights, as well as the Wefaq leaders. But he had meetings with the government as well as, obviously, members of the opposition.

**QUESTION:** And if you can clarify -- I'm not sure if it's clear or not. The reason that it was the meeting, or that they ask for somebody to attend the meeting and you refused to let them in?

**MS. PSAKI:** Well, he was scheduled -- there are a couple of reasons, and we outlined this a bit in our statement, but the Government of Bahrain did request to have an MFA representative in all of his private meetings with civil and political society leaders, including inside the U.S. Embassy. And that's not typical, it's not appropriate in our view, and it contravenes international diplomatic norms. But there have been a range of meetings that officials have had within the country where that wasn't requested, so that certainly isn't even consistent with what is standard there.

**QUESTION:** You said --

**QUESTION:** What --

**QUESTION:** -- "request." The statement last night, I believe, said that they demanded, they insisted. It was more than a request, right?

**MS. PSAKI:** Well --

**QUESTION:** Or -- did the interior or foreign ministries have someone present in these meetings, or were they rejected?

**MS. PSAKI:** Well, not that I'm aware of, Matt. Obviously, there are some meetings where it's appropriate and some where it's inappropriate. I don't have a list of who was at each of the meetings, but certainly having -- requiring it or insisting or demanding, whatever you want to use as an adjective, that they be in meetings is something we didn't feel --

**QUESTION:** Verb.

**MS. PSAKI:** Sorry, verb. Sorry.

**QUESTION:** Yes.

**MS. PSAKI:** It's hot up here. Go ahead.

**QUESTION:** There is another question related to the same issue. Usually these meetings, I think it's prescheduled and prearranged and preorganized with the authorities, wherever they are going. Is that -- was the case here, or that meeting was like at the last moment was scheduled and then took place?

**MS. PSAKI:** This is a visit that was highly coordinated with the government and it certainly --

**QUESTION:** With all the details, including the meeting of this group?

**MS. PSAKI:** Well, it's certainly pretty standard. The Secretary does, and a range of high level officials meet with a range of groups, civil society leaders, when they go to almost any country. So it was very -- highly coordinated with the government.

**QUESTION:** The reason that I'm asking is like just to be sure that the Bahraini Government was aware that the assistant secretary is going to meet this group, right?

**MS. PSAKI:** Well, I think there was a discussion about his agenda. I don't have the list of exactly the meetings they were aware of, and some of these come together on the ground, but certainly we've had government officials meet with these groups before, so there's a long precedent.

**QUESTION:** On Afghanistan?

**QUESTION:** I would refer to Matt's wisdom on this, but how unusual is it to have --

**QUESTION:** (Inaudible.)

**UCP000234**

**QUESTION:** How unusual is it to have a host government insist – and that's the language in the statement from last night – that one of its representatives be allowed to attend private meetings that a visiting U.S. official would be carrying out?

**MS. PSAKI:** Well, it's highly unusual, and in our view it's also inappropriate and contravenes international diplomatic norms.

**QUESTION:** So given that Assistant Secretary Malinowski was simply visiting, how does the U.S. respond in this sort of situation? I mean, you don't normally when there's a PNG situation – there's usually a diplomat or two in residence who was then told, pack your bags, you have 48 hours, or whatever. How do you respond in something like this to make it clear to the Emirate that this is not permissible?

**MS. PSAKI:** Well, we're considering our response to the government. Obviously, this just happened in the last 24 hours, so I don't have a prediction of the timing or the outcome of that at this point in time.

**QUESTION:** Is there a concern that the U.S. has to proceed carefully because of the presence of the Fifth Fleet in Bahrain?

**MS. PSAKI:** Well, certainly our strong relationship with Bahrain is something that we would like to maintain, but obviously we're considering a range of options with that in mind.

**QUESTION:** Jen, how do --

**QUESTION:** Really? Does the range of options include not maintaining a strong relationship with Bahrain?

**MS. PSAKI:** No. I don't think I said that it did, Matt.

**QUESTION:** Well --

**MS. PSAKI:** But obviously, there are, of course – our response, there's a range of options we can consider with that in mind.

**QUESTION:** Do any of those options have to do with moving the Fifth Fleet?

**MS. PSAKI:** No. That's not what I said, Matt. I know you --

**QUESTION:** I know. I'm just --

**MS. PSAKI:** You have an obsession with the Fifth Fleet, I know, Matt. (Laughter.)

**QUESTION:** I'm not --

**MS. PSAKI:** You need to visit.

**QUESTION:** I'm not saying that you said it. I'm asking if --

**MS. PSAKI:** I was actually trying to convey quite the opposite, that our strong relationship with Bahrain is, of course, something that we consider and something we want to maintain, and that's one of the reasons that we're having these conversations through diplomatic channels.

**QUESTION:** So in other words, maintaining your strong relationship with the Government of Bahrain is equal to or more important than them respecting human rights and working towards national reconciliation?

**MS. PSAKI:** It's all a factor, Matt. Obviously, we raised human rights issues as – at every opportunity, and certainly we've expressed our strong concern about the events of the last 24 hours.

**QUESTION:** Would it be fair to consider the presence of the Fifth Fleet as a bargaining tool --

**MS. PSAKI:** I'm not going to --

**QUESTION:** -- or as any sort of leverage?

**MS. PSAKI:** No. I'm not speculating on that. Obviously, we – considering our response, this just happened in the last 24 hours, but I wouldn't go down that direction, Roz.

**QUESTION:** So expressing your concerns about – the limit of your language and sort of expressing this – your displeasure with this act? Can't you say that we are outraged, we are --

**MS. PSAKI:** I think --

**QUESTION:** -- annoyed, we are --

**MS. PSAKI:** I don't know if you saw our statement last night, Said --

**QUESTION:** I saw your statement.

**MS. PSAKI:** -- but it was a pretty strong statement in terms of our view of the circumstances over the last 24 hours. That remains the case and we've conveyed that privately and we'll continue those discussions privately, and we'll continue to consider our response otherwise.

**QUESTION:** New topic?

**QUESTION:** Well, let's say it – hold on. It was a pretty strong statement when it comes to statements about Bahrain, that's for sure. But "deeply concerned" is a far bit different than "we condemn" or "we are mortified" or "we are horrified" or whatever. Is that correct?

**MS. PSAKI:** Well --

**UCP000235**

**QUESTION:** I mean, I take your point; it was a strong statement, but it was a strong statement as related to other statements about Bahrain.

**MS. PSAKI:** I would also point you to the fact that I just said that their requests were inappropriate and contravene international norms.

**QUESTION:** Fair enough, fair enough.

**MS. PSAKI:** So Margaret, do you want to go to Afghanistan?

**QUESTION:** Afghanistan, if we could.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** With other statements that came out yesterday, beyond expressing "gravest concern," which I think was the phrase in the statement last evening, can you tell us what the U.S. is doing to try to resolve the standoff on the ground?

**MS. PSAKI:** Well, first – and I know you've seen some of these readouts, but President Obama, Secretary Kerry, as well as S-Rep Dobbins, Ambassador Cunningham have been speaking with the candidates, the electoral bodies and Afghanistan's political leadership over the past couple of days to try to come to a resolution. And Secretary Kerry has been in touch with both candidates, President Karzai over the course of the weekend, and I expect that will continue. And we've been – as was noted in our statement last night or some we've issued over the last couple of days, we're calling on both campaigns and their supporters to work towards a resolution which will produce a president who can bring Afghanistan together and govern effectively and avoid steps that undermine Afghan national unity. And clearly our engagement shows our level of commitment to not just the future of Afghanistan, but to a resolution to this issue.

**QUESTION:** In the – one of the statements yesterday there was also the – I mean, threat is what it appeared to be, but the mention that at risk here is a tremendous amount of aid and potential other forms of U.S. support. What exactly was that referencing?

**MS. PSAKI:** Well, it's not our preference. It's not the preference of the United States; it's certainly not the preference of the Afghan people. That statement was in response to the fact that there have been reports on the ground of plans to declare victory, to create a parallel government. Both of those steps would be illegal, and it's not a threat, it's a fact that certainly we wouldn't be able to provide the kind of support that is our preference to provide if those type of steps were taken. So it was conveying that.

**QUESTION:** Because it would be a coup, essentially?

**MS. PSAKI:** Well, those are illegal steps, and obviously we're talking about a broad range of assistance that we provide.

**QUESTION:** Senator --

**QUESTION:** So if there were illegal steps taken to form a new government in Afghanistan, they would lose aid, but not in Egypt, huh?

**MS. PSAKI:** Matt, every circumstance is different --

**QUESTION:** Right.

**MS. PSAKI:** -- and you know where we stand on that particular issue.

**QUESTION:** Do you know – do you regard – does the Administration regard the steps that candidate Abdullah has taken already just by declaring himself the winner of the election, even though he didn't name a – hasn't tried to form a government – are those – isn't that a step that undermines the – what you called the – what you called Afghan national unity and what one might say – one might ask if Afghan national unity actually exists, given the situation – but is that the kind of step that you think is bad? Just the (inaudible).

**MS. PSAKI:** Well, certainly – I want to say acting on that step, yes. And one of the reasons the Secretary has been in close touch and we issued the statement last night is to convey that that is not acceptable.

**QUESTION:** That what – sorry --

**QUESTION:** Sure.

**QUESTION:** -- which is unacceptable? The proclaiming oneself the winner --

**MS. PSAKI:** Correct. There are proper entities and bodies in Afghanistan who will --

**QUESTION:** Okay.

**MS. PSAKI:** -- who can determine that. And this also – the rumors or reports that there were plans to create a --

**QUESTION:** Right.

**MS. PSAKI:** -- parallel government.

**QUESTION:** But what is – is that – that is a strike against Abdullah Abdullah in your – now, I'm not saying that there are three strikes; I'm not saying anything like that. But that is a checkmark on him; he's done something that you think crosses the line?

**MS. PSAKI:** No, I wouldn't say it that way at all, Matt. Obviously, we're concerned about having – about the fact that Afghanistan has made tremendous progress. We want to preserve that. Any of these steps, the implementation of them would not be good for the future of Afghanistan, the future of the Afghan people. We're not doing a day-by-day grading system here, but certainly we don't think that would be a productive step moving forward.

**QUESTION:** Is the – Ghani agreeing to the audit of, I think, it was 3 million votes or something. Is that something that's a step in the right direction?

**UCP000236**

**MS. PSAKI:** Well, we think there are two things that need to happen here that need to – that the candidate – that needs to happen on the ground, I should say, moving forward. The electoral commission and the complaints commission need to examine all of the allegations of fraud. There are serious allegations. They need to be looked into. There needs to be a review of all the ballots that may or may not be legitimate. There are – were the proposal of the couple of options, Margaret, that you reference, but there are also some UN proposals that we think the electoral bodies should be working with them on. And at the same time, the candidates and their supporters need to be in conversations with each other about the formation of a government of national unity and a government that includes all of the relevant parties and important groups, and we feel both of those steps are important moving forward.

**QUESTION:** Has anyone been in touch with Ashraf Ghani?

**QUESTION:** Senator Inhofe said --

**QUESTION:** I'm sorry.

**QUESTION:** Sorry. Has anyone been in touch with --

**MS. PSAKI:** Ladies first, Said.

**QUESTION:** Yes.

**MS. PSAKI:** You're normally so polite. Go ahead, Roz.

**QUESTION:** Jen just said that he had called him.

**QUESTION:** He called – okay. Sorry.

**MS. PSAKI:** Go ahead.

**QUESTION:** Senator Inhofe told reporters a short time ago that he's very concerned about these allegations of fraud and he started reading off some numbers about vote disparities between the first round and the second round – 10 times, 12 times the gap in the first election to the second election.

He's also very concerned that efforts to hew to the July 22nd final declaration may be stacking the victory in Ghani's favor, and he wants to see more time so that these allegations of fraud can be fully explored. Otherwise, Inhofe is arguing, whoever becomes the new president won't be considered credible. Does this building – does this Administration – share his concern about a rush to declaring someone the president?

**MS. PSAKI:** Well, we, one, feel there are serious allegations that – of fraud that need to be looked into, and we were disappointed. And I know that Matt asked this question yesterday, that the IEC went ahead with yesterday's announcement – serious – because these serious allegations were not sufficiently investigated and we would have preferred that the announcement be postponed until there was agreement on further audit measures that need to be taken to address the substantial allegations.

All of that being said, there are proposals on the table that would help to address that. Our view remains that the audit process can be completed in time to allow the inauguration of the next president to proceed as scheduled on August 2nd.

**QUESTION:** Is there concern – and maybe this came up yesterday – is there concern that a resolution on the BSA could be in jeopardy because of this dispute over who was the actual victor?

**MS. PSAKI:** Well, again, we view – we feel that an audit can be completed by – an audit process can be completed in time to allow the inauguration of the next president. As you know, both candidates have made clear that they would sign the BSA. We are proceeding with our planning accordingly.

**QUESTION:** Is it – you say that you were disappointed that IEC went ahead with this and that you would have preferred that they had waited.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** Was that conveyed to the IEC itself?

**MS. PSAKI:** I believe not through the Secretary, but I believe on the ground in some capacity, yes.

**QUESTION:** Okay. So in fact you – the U.S. has been involved in this process.

**MS. PSAKI:** Well, not exactly. I mean, I think obviously there's – we're not involved in the process of considering allegations or considering – or counting ballots. That's what I'm referring to. But certainly, when there's a partial result announced, which we've expressed a concern about --

**QUESTION:** Right.

**MS. PSAKI:** -- because it doesn't represent or doesn't necessarily represent the outcome, that can cause confusion. And that was one of our concerns.

**QUESTION:** Right. Okay. But I'm just trying to get it – so if you expressed your concern about that to the IEC, they clearly didn't listen to you. They clearly didn't buy – it's a bit like calling for restraint from people who never show restraint. So I'm just wondering: Are you – when you say that you're disappointed, are you – you're disappointed that they didn't heed your advice? You're disappointed that – disappointed at what?

**MS. PSAKI:** That they went forward with yesterday's announcement when there was serious allegations of fraud that remained on the table that hadn't been properly investigated.

**QUESTION:** Okay. But you still think, as you said before – I just want to make sure – that there is time enough to resolve all the fraud complaints, inaugurate a new president, get the BSA signed by the time you all and NATO have to figure out what you're going to do.

**MS. PSAKI:** Yes.

**UCP000237**

**QUESTION:** Okay.

**MS. PSAKI:** Afghanistan?

**QUESTION:** Yes.

**MS. PSAKI:** Okay, go ahead.

**QUESTION:** I mean, I'm trying to understand who is – both sides are ready to make this count or recount process? Because one of them is declaring that he's the victor, and the other one is saying that I'm going to make a parallel government. Who in those two sides or other sides is ready to continue the process until they come to the 2nd of August?

**MS. PSAKI:** Well, we'll let them speak for themselves.

**QUESTION:** Okay.

**MS. PSAKI:** But obviously, the – not the candidates, but the election commission and the complaints commission are the ones who would look in – the complaints commission specifically is the entity that would look into the allegations of fraud and examine those allegations.

**QUESTION:** So you believe – as United States believe that they want – you want them to recount the process, right? Recount the votes.

**MS. PSAKI:** Well, there are serious allegations, and we think that more can be done to examine the allegations.

**QUESTION:** Keeping in line with this country's own special experience with the 2000 election, what would be an acceptable audit – and I'm using your word – for reviewing these allegations?

**MS. PSAKI:** Well, there have been a number of proposals put out there. There have been some that the complaints commission and the electoral commission have referenced; Margaret referenced those a little bit earlier. But there are also some proposals put forward by the UN. We think they should all talk about the best way to move the process forward.

**QUESTION:** So just to be clarified: So U.S. and UN and others believe that this process has to be done, right? Is – am I correct or wrong?

**MS. PSAKI:** We think there are serious allegations of fraud. They need to review all of the ballots that may or may not be legitimate.

**QUESTION:** So --

**QUESTION:** Is two weeks really enough time? Two weeks from today?

**MS. PSAKI:** I would stand by what I just said. We feel there is enough time to conclude an audit process by that time.

Go ahead.

**QUESTION:** Change topic?

**MS. PSAKI:** Okay.

**QUESTION:** P5+1.

**MS. PSAKI:** Yeah.

**QUESTION:** France foreign minister said today the differences in approach between some of the world powers and Russia had appeared in the last few days during negotiations over Iran's nuclear program. Do you feel the same, or do you have the same feeling as France?

**MS. PSAKI:** Well, as you know, there – this is a long process that's been ongoing for more than six months now, and there have been concerns expressed in the past – actually, the last round we had by – by France, and the P5+1 remains united through the process. We certainly believe that that will be the case here.

That doesn't change the fact that significant gaps remain with Iran. Everyone is working very hard to see if we can get to an agreement here, and we have put on the table a reasonable, verifiable, and easily achievable proposal that can show the world that Iran is committed to what it means. And that means a peaceful program and preventing them from acquiring a nuclear weapon. So we're in the middle of it right now, so I don't have much more to speculate on.

**QUESTION:** Did you mean that the U.S., Europe, and Russia are still on the same page?

**MS. PSAKI:** And China, yes.

**QUESTION:** And China?

**MS. PSAKI:** The talks are continuing. Obviously, we never said this would be easy, and that certainly is the case now where gaps remain in the discussions.

**QUESTION:** Is the Secretary planning to attend the meetings in Geneva – in Vienna?

**MS. PSAKI:** Well, the Secretary is always happy to get on a plane, as you all know and many of you have experienced it. But there hasn't been a decision made at this point in time for him to travel to Vienna.

**QUESTION:** Because the French foreign minister has said that the United States wanted foreign minister to join the negotiations in Vienna. That means maybe he talked to the Secretary, and --

**MS. PSAKI:** Well, there are a lot of rumors on the ground, as there always are, around negotiations like these. But we evaluate day to day. I have nothing to announce for you, and there hasn't been a decision made at this point in time.

**UCP000238**

**QUESTION:** So I suspect – and I'm only – I know what your answer's going to be, but I would be remiss not to ask it.

**MS. PSAKI:** Okay.

**QUESTION:** And that is: Would you expect the Secretary to bring his case for and on Afghanistan to the candidates in person any time in the near future?

**MS. PSAKI:** I have nothing to announce in regard to upcoming travel beyond his trip in China that's ongoing.

**QUESTION:** Somalia. There was an attack today on the presidential election – on the president's – presidential palace. Do you have any information about this attack?

**MS. PSAKI:** I don't have any new information. I know it just happened, I believe, this morning or overnight.

**QUESTION:** Yeah.

**MS. PSAKI:** Obviously, we would condemn that attack, but let me circle back with our team post-briefing and see if we have more details. I'm not sure if there's been any claims or anything along those lines.

**QUESTION:** Okay.

**MS. PSAKI:** Okay.

Scott.

**QUESTION:** Does the United States have – on China. Does the United States have a view on Chinese authorities preventing some Uighur civil servants and students from observing the Ramadan fast?

**MS. PSAKI:** Well, we are deeply concerned by reports of discrimination against and restrictions on ethnic and religious minorities in China, including Uighurs, especially during the holy month of Ramadan. We urge Chinese authorities to take steps to reduce tensions, uphold China's international commitments to protect religious freedom and other universal human rights – and certainly, observation of religion is one of them – and reassess counterproductive policies in the region and other ethnic areas.

**QUESTION:** Is it your understanding that this is not the first time that this has happened in that area?

**MS. PSAKI:** I believe there is some history here. I don't have that in front of me. But certainly, we've been – expressed concern about discrimination against Uighurs in China, and I know that's been related to religious observations as well.

**QUESTION:** I meant to ask you if you have – if you can clarify what the Russian foreign ministry is saying, that one of its citizen was kidnapped by the Americans. Can you clarify that --

**MS. PSAKI:** I think you're referring to reports --

**QUESTION:** -- rumor?

**MS. PSAKI:** -- of allegations of --

**QUESTION:** Allegations, yes, yeah.

**MS. PSAKI:** It's a --

**QUESTION:** They're saying that he was kidnapped from the Maldives.

**MS. PSAKI:** It's – I just want to make sure I'm referring to the same person. Hopefully, there's only one incident you're talking about. You're talking about the Department of Justice case that's been raised?

**QUESTION:** No, they're – they said that one of their citizens, Roman Seleznyov, was kidnapped from the Maldives by American agents.

**MS. PSAKI:** Well, I know there have been – obviously, there's been a recent case that I would point you to the Department of Justice on. I'm not sure if this is exactly the same case or not, Said, in terms of allegations that have been issued. Certainly, no kidnapping took place.

**QUESTION:** Oh, you mean that there's more than one incident of a Russian citizen being taken --

**MS. PSAKI:** I'm not sure exactly --

**QUESTION:** -- by U.S. officials from the Maldives?

**MS. PSAKI:** -- what he's referring --

**QUESTION:** I was referring --

**MS. PSAKI:** I'm not sure what he's referring to specifically.

**QUESTION:** The issue (inaudible).

**QUESTION:** That's the issue.

**MS. PSAKI:** Okay.

**QUESTION:** The son of a member of parliament --

**UCP000239**

**QUESTION:** Yes.

**MS. PSAKI:** Yes, from the Maldives.

**QUESTION:** -- has been taken to Guam.

**QUESTION:** Right, yes.

**QUESTION:** Have you gotten an official or any kind of a protest from the Russians about this? They've been speaking about it publicly.

**MS. PSAKI:** I know they've spoken a great deal about it publicly. I don't have anything privately to lay out for all of you.

**QUESTION:** Okay. Well, do you know how it works in terms of consular access when you're – when someone is in Guam? I mean, you're still obligated to – it's not like Guantanamo, right? Even though the first three --

**MS. PSAKI:** It is a U.S. territory, yes.

**QUESTION:** -- first three letters are the same, but I think – (laughter) –

**MS. PSAKI:** That's good.

**QUESTION:** -- the airport code is probably different, so --

**MS. PSAKI:** It may be. We can look that up.

**QUESTION:** But is there some kind of – one of the things that the Russians say or the father of this guy says is that he suspects that his son was taken to Guam because people in Guam may not be – may not enjoy the full legal protections of – and I'm just wondering if you know if that – I don't expect you to know if that's a case. I know it's a DOJ thing. But in terms of consular access, I would expect the State Department, even if you don't know off the top of your head, or the State Department might know, is there some difference in terms of consular access versus someone who's being detained in Guam as opposed to someplace that's a state?

**MS. PSAKI:** Not that I'm aware of, Matt. And let me just reiterate – and I think part of the confusion is Said also referred to a woman, so I just wanted to make sure we're talking about --

**QUESTION:** I didn't say a woman.

**MS. PSAKI:** -- we're talking about the same individual, but --

**QUESTION:** I said his name was Roman.

**QUESTION:** I think we are, right? We're talking about the same --

**MS. PSAKI:** This is – yes, I believe so.

**QUESTION:** I did not --

**QUESTION:** This is a computer fraud --

**MS. PSAKI:** This is a – yes, there were accusations made. It's a Department of Justice case. Certainly, there was no kidnapping involved. I believe that certainly a U.S. territory would abide by the same consular access obligations.

**QUESTION:** Okay.

**MS. PSAKI:** We can check and confirm for you that is the case.

**QUESTION:** But I'm not sure – all right, maybe "kidnapping" is a bit too strong. But if someone is in the capital of the Maldives trying to get on a flight to – back to Russia, and somehow they're spirited away and they end up in Guam charged with a crime, how is that not abduction?

**QUESTION:** Napping.

**MS. PSAKI:** I'm just not going to have much more on this case to offer, Matt.

Do we have a new topic?

**QUESTION:** Yeah. With your indulgence and my colleagues, of course --

**MS. PSAKI:** Sure.

**QUESTION:** -- I just wanted to go back to the Gaza issue for a minute.

**MS. PSAKI:** Mm-hmm, okay.

**QUESTION:** Because the Israelis said this will take – it will take days, not hours. So this may go on for a long time. Is that okay with you? I mean, is Israel within its right to conduct this operation for as many days as it deems appropriate or necessary?

**MS. PSAKI:** Said, I'm happy to indulge you, as always, but I'm not going to speculate. Obviously, our focus is on communicating the need to de-escalate the situation on the ground, but I would reiterate that we believe Israel has every right to defend itself. And certainly, no country would – should be expected to stand by while rockets are impacting and threatening their citizens.

**UCP000240**

EXHIBIT 29, PAGE 197

**QUESTION:** In light of calling 40,000 reservists to duty, are you concerned that there may be a ground invasion in Gaza?

**MS. PSAKI:** I think I've already addressed and exhausted this topic.

Go ahead in the back.

**QUESTION:** My name is Jason Chong with Yonhap News Agency from South Korea.

**MS. PSAKI:** Hello.

**QUESTION:** Hi. My question is: You said yesterday that the denuclearization of the Korean Peninsula will be one of the key topics for the strategic --

**MS. PSAKI:** Mm-hmm.

**QUESTION:** -- talks with China. And what kind of specific outcome do you hope to see from the meeting with regard to this issue?

And my second question is: U.S. has been negative about Chinese plan to set up regional development bank AIIB.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** And do you think this will also come up during the strategic talks? Thank you.

**MS. PSAKI:** Well, there are a range of topics, certainly, that will be discussed that may or may not be at the top of the agenda. In terms of the AIIB, we believe that there is a need for additional public, private, and multilateral development bank to support infrastructure development. But we also believe any proposal for a new international development financial institution should clearly explain how it will complement and add value to existing institutions. As you know, there's already an existing institution that does some of the same work.

And additionally, we believe that any international institution involved in infrastructure investment and development should incorporate high standards of governance, environmental and social safeguards, procurement, and debt sustainability that have been established over decades of experience at multilateral development banks.

And as you know, there's already the ADB, which plays a critical role in regional infrastructure development, so the AIIB – excuse me – hasn't – doesn't exist yet, and obviously, those are the bar – that's the bar we believe it should pass.

In terms of North Korea, there's been an ongoing dialogue between the United States and China as well as all of our partners in the Six-Party process about how to best work together to put the necessary pressure on North Korea, but the ball remains in their court to take the necessary steps to abide by their international obligations. But certainly, we expect the threat from North Korea, our concerns about North Korea to be a part of the discussion ongoing on the ground now.

Lucas.

**QUESTION:** On Iraq?

**MS. PSAKI:** Yes.

**QUESTION:** Anne Patterson is leading a delegation on Capitol Hill today at 5 o'clock to brief the House. I was wondering if you had anything more on that.

**MS. PSAKI:** I believe it's a part of our standard efforts to make sure members of Congress are up to date on our thinking and policy and what's happening on the ground.

**QUESTION:** So this is just a routine update?

**MS. PSAKI:** That is my understanding, yes.

**QUESTION:** Was there any coordination with the Pentagon, given the Secretary of Defense's briefing this morning?

**MS. PSAKI:** Frequently, we have briefings the same day as the Pentagon and – or other officials throughout the Administration. So that certainly is not uncommon. And as you know, all of these senior officials are in regular meetings together about our policy, so I can assure you there's coordination.

**QUESTION:** Now, granted that this was closed door and classified, but Senator McCain told reporters afterwards that from his perspective, this Administration does not have a coherent policy on dealing with the Islamic State group. Is that a fair criticism?

**MS. PSAKI:** I think that's a common refrain from Senator McCain no matter what the issue is. But I would say, look, every member of Congress has every right to express their view of what our policies are and what they should be and where they see frustrations or where they support us. And that's the case for Senator McCain or any member of Congress.

In this case, I think our policy is fairly clear. The President has been clear, the Secretary has been clear, that we're going to take – go after threats where they face us. That includes ISIL and includes other terrorist organizations. But in Iraq, our focus is also on the political process, and that is the only way to have a long-term, sustainable, and successful Iraq. So hopefully, the continued briefings will help shed some light.

**QUESTION:** Two follow-ups on that. One, has this Administration seen any change in Nuri al-Maliki's political posture? Is he doing the work that this Administration believes needs to be done in order to make his government more inclusive?

**MS. PSAKI:** Well, our concerns haven't changed. But obviously, we continue to encourage all parties to move forward with the government formation process. I think you've seen overnight that they have announced that they'll be meeting on Sunday instead of August. So that was a positive step forward. Obviously, we'd like to see that happen and see the rapid – the – all parties move forward with the rapid creation of a government.

**UCP000241**

QUESTION: And then in terms of confronting the Islamic State group, Senator Graham said that he could not see any scenario in which the Iraqi security forces, Syrian opposition, even the Syrian Government, would be capable of confronting this organization without the assistance of the U.S. military. In particular, he said he couldn't see this happening without the use of air strikes. Is this Administration in any way contemplating some sort of very active engagement to confront this organization?

MS. PSAKI: I'm not going to outline from here what our options may or may not be. Obviously, we have a – always have a range of options at our disposal. Those are decisions for the President to make in consultation with the national security team. Our focus remains on continuing to encourage the rapid formation of the government.

QUESTION: Sorry. So you say it was a positive step forward for them to move up the resumption of –

MS. PSAKI: Well, we certainly –

QUESTION: – I mean, surely –

MS. PSAKI: – welcome the announcement. But I won't stop there. We – it will require –

QUESTION: Right.

MS. PSAKI: – a prompt agreement on a new parliamentary speaker, and following that candidates for president and prime minister in order to have a successful creation or formation of a government.

QUESTION: All right. In response to one of Roz's earlier questions, I mean, what are the odds of you ever agreeing with critics who say that the Administration's policy is incoherent on any issue?

MS. PSAKI: That's probably unlikely, but we certainly support freedom of speech here in the United States.

QUESTION: Okay.

QUESTION: Because there are people that – Iraqis who have accused Mr. McGurk of being one of Maliki's staunchest allies and that, in fact, his position may in any way hamstrung your position, so to speak, the Administration's position in Iraq in pushing forward some sort of reconciliation type of government. Do you agree with that assessment?

MS. PSAKI: I would not, and I'm not sure who the unnamed critics are. There are certainly a lot of unnamed critics out there. I would say that Deputy Assistant Secretary McGurk has been on the ground for weeks now. There's almost no one in the government who knows Iraq and the political parties and all the leaders better than he does, and he's been working day and night to move the political process forward. And I'd remind you he's been meeting with leaders from all – from all sects and it hasn't been just Prime Minister Maliki and his government. Far from it. He's had a diversity of meetings, and that, I expect, will continue.

QUESTION: Would you say that he's a strong advocate of Mr. Maliki?

MS. PSAKI: I would say he's a strong advocate of a stable Iraq, and he cares deeply about the future of the – for the Iraqi people.

QUESTION: When you are asking all these parties to be part of this process, of let's say, stable Iraq, what these people are expecting from U.S.? I mean, guarantor is like what – how do you – is – what is the U.S. role in the coming future? I mean, it's going to be like guaranteeing that these people are sitting together or secure the borders?

MS. PSAKI: Well, it's up to the Iraqi people to make the political choices that they need to move forward. At the same time, we have provided a great deal of assistance. We've only expedited that, and we've increased that in recent months. That is part of our effort to support Iraq, but we have a stake in a stable Iraq just like we have a stake in a stable region, and that's one of the reasons we're so committed to the future of what's happening on the ground.

QUESTION: But let's say when we are – U.S. is providing to the Iraqi army things, people looking to it as if it – you are supporting Maliki against the others, right?

MS. PSAKI: Well, we've provided also some support to the Peshmerga. We've advocated for a united security force that works with all parties that is united against the shared threat they all face with just ISIL, and that's the message we've been sending.

QUESTION: So there is no U.S. role in the coming future – I mean, the coming Iraq? Or there is a role for it?

MS. PSAKI: I'm not sure what you're getting at.

QUESTION: I mean like in 2011 or end of 2012, I mean, it's like it was decided to leave Iraq and come out of it. Now, it's getting another involvement, or I assume it's involvement. Am I wrong?

MS. PSAKI: A little bit. I think we're not considering putting combat troops back on the ground. That's not what is under consideration. We do have a stake in a stable and secure Iraq just like we have a stake in the stable and secure region, and that's one of the reasons we've increased our assistance. Iraq will remain a partner, and we're working to address the short-term threat so we can have a long-term successful Iraq.

QUESTION: Jen, yesterday – this is a new subject.

MS. PSAKI: Sure.

QUESTION: On the Central America and the migrants. Yesterday in exchange with Elise, you were talking about – the question about a potential UN role and whether or not these people could be considered refugees or not. There are people with UNHCR now who are saying that at least some of these people should be identified as refugees and be made eligible for resettlement. Is the Administration's – does the Administration believe that a UN role in this situation is appropriate or needed?

**UCP000242**

**MS. PSAKI:** Well, the UN plays a role. I know you know this, but they play a different role depending on the countries around the world. Obviously, we're – we have a far different circumstance than, say, Syria. And in this case, the UN – UNHCR has previously conducted monitoring trips to the U.S. border in conjunction with the Department of Homeland Security. That should come as no surprise. In terms of how you label what an individual may or may not be, that's determined through a process run by the Department of Homeland Security where they conduct interviews, and there's an entire process I would point you to them to get more details on.

Typically, the UNHCR conducts these interviews in countries where the host government is not capable or willing to conduct these interviews. And obviously, the United States – that's a process that we undergo ourselves.

**QUESTION:** So you do not – you believe that DHS – the Administration believes that it is capable of doing this itself and that the United Nations is not needed --

**MS. PSAKI:** Well --

**QUESTION:** -- to do the screening and the classifying of whether people are refugees or not? Is that --

**MS. PSAKI:** I would point you to DHS to see if there are needs that they have, but that's typically how the process works as a standard operating procedure in the United States.

**QUESTION:** Well, I guess I'm – so there is no Administration position? It's only a DHS position on whether they need help? I'm – I guess I'm --

**MS. PSAKI:** DHS oversees a process in the United States – obviously, in the United States.

**QUESTION:** I understand that.

**MS. PSAKI:** I would point you to them for more detail on how they work with the UNHCR.

**QUESTION:** But you don't – but – yeah, but you're the main – the State Department is the main --

**MS. PSAKI:** Sure.

**QUESTION:** -- interlocutor with all --

**MS. PSAKI:** You're right.

**QUESTION:** -- almost all these UN agencies.

**MS. PSAKI:** But specifically on individuals coming into the United States, as you know, DHS is the point for that specifically.

**QUESTION:** Right. But what I'm getting at is that – I'm trying to find out if the Administration broadly thinks that it's appropriate or necessary for the UN to involve itself in this. I'll take it and I'll go to DHS and ask them if that's – if they're the ones who decide whether that's the case or not. Are they?

**MS. PSAKI:** Well, DHS screens children to determine the validity of their asylum claims, consistent with our domestic law and international obligations. I'm not aware of a role needed --

**QUESTION:** Right.

**MS. PSAKI:** -- for UNHCR, but I just was pointing to you DHS because they are better versed on this specific issue.

Go ahead, Lucas.

**QUESTION:** Going back to Iraq. Is it realistic or was it ever realistic to expect the Iraqis to form a new government during the holy month of Ramadan?

**MS. PSAKI:** The process, as you know, Lucas, is ongoing on the ground, and they're going to be meeting on Sunday, so I think that answers your question.

**QUESTION:** But isn't it a little insensitive on the part of the U.S. Government based on the religious obligations of the Iraqi Government and Muslims everywhere?

**MS. PSAKI:** Well, it's up to the Iraqis to determine their process. They have determined the timing of their process, and we're simply urging them to move forward as quickly as possible.

**QUESTION:** But I mean, if someone asks the U.S. Government to do something over Christmas, wouldn't it be a little unrealistic?

**MS. PSAKI:** I think, Lucas – I think you're forgetting the fact that this is a Iraqi process that the Iraqis run, and we are certainly just here to support them and encourage them to move forward as quickly as possible?

**QUESTION:** You should ask the same thing about Afghanistan.

**MS. PSAKI:** Go ahead, Said.

**QUESTION:** A question on Syria.

**QUESTION:** Afghanistan.

**QUESTION:** On Syria real quickly.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** Are you satisfied that all chemical weapons are now out of Syria and in the process of being destroyed?

**MS. PSAKI:** Said, the declaration --

**QUESTION:** I mean, today there was --

**UCP000243**

EXHIBIT 29, PAGE 200

**MS. PSAKI:** -- is on declared weapons.

**QUESTION:** Right, right.

**MS. PSAKI:** The OPCW remains --

**QUESTION:** I mean the declared weapons.

**MS. PSAKI:** -- let me finish – they remain a member of the CWC, so obviously the OPCW will continue to take steps to verify that the declared weapons represent the stockpile in Syria.

**QUESTION:** So all the declared weapons have been accounted for?

**MS. PSAKI:** Correct. They've – 100 percent have been removed.

**QUESTION:** Now, on this issue of the SOC is holding elections, presidential elections in Turkey. Is there any U.S. representative there, or not?

**MS. PSAKI:** That's a good question. I will check and see. Obviously, we're not – these are internal SOC meetings, so no U.S. officials will attend. So there – we don't have any officials on the ground.

**QUESTION:** And the situation in Aleppo is deteriorating and the opposition is warning about the situation there. Do you have anything on this?

**MS. PSAKI:** I'm not in a position to give any ground updates. Obviously, you know we remain concerned about the situation on the ground. And that's one of the reasons we're so focused on doing everything we can to address it.

**QUESTION:** Does that concern extend to the fact that the opposition might lose Aleppo and then they might really have essentially lost the battle, lost the war?

**MS. PSAKI:** Well, I'm not going to speculate. Obviously, we're not there at this point. So – go ahead.

**QUESTION:** Can I go to Ukraine?

**MS. PSAKI:** Sure.

**QUESTION:** I'm just wondering what – it looks like people – the separatists in Donetsk are gearing up for a big – a last stand, and that the Ukrainian authorities are doing the same around these last little enclaves in the east, and I'm wondering what the – if the Administration believes that its – once again, its calls for restraint and for minimization of civilian casualties are being heeded by either or both or neither sides.

**MS. PSAKI:** Well, we have remaining concerns about the actions of the Russian separatists. I'd also note that President Poroshenko proposed to hold ceasefire talks with the separatists today in the Donetsk region. They have not responded yet. And certainly a peaceful outcome is what would be in the best interests of everyone, in our view. Ukraine, again, has the right to defend their country and their people and maintain calm and order to the degree they can. So we certainly support them in that effort. And there are – continue to be steps that Russia and the Russian separatists can take to de-escalate the situation.

**QUESTION:** In terms of either side or any of the three sides, two sides, however we want to call this --

**MS. PSAKI:** It could – it has three-side potential.

**QUESTION:** Right.

**MS. PSAKI:** Go back to a triangle.

**QUESTION:** Right. But let's talk the two sides at the moment, Ukraine and the separatists. Do you have concerns about reports of large – widespread civilian casualties --

**MS. PSAKI:** Well, certainly, and --

**QUESTION:** – on --

**MS. PSAKI:** We would have concerns, of course, about reports of widespread civilian casualties. And obviously de-escalating the situation and bringing an end to the violence is the step that could end civilian casualties. That's where the – one of the reasons we're so supportive of the ceasefire effort.

**QUESTION:** Okay. But to date, do you believe that either or both or neither side has shown any inclination to heed the call for restraint and for trying to minimize or prevent at all civilian casualties? You were presented here at the briefing yesterday with some graphic photos. I don't know if they could be authenticated or not, but I mean, have you expressed concern to authorities in Kyiv and also to the Russians for whatever influence they can have with the separatists about things like that?

**MS. PSAKI:** Well, one, I mean, we – in general, the Ukrainian security forces have sought to minimize casualties among the Ukrainian population during their security operation. There have been numerous reports on the contrary to Russian – the Russian-backed separatists using privately owned buildings as firing positions. We've also seen a great deal of exaggerated and outright false claims from Russian sources throughout the crisis in Ukraine. So certainly we would encourage all sides to minimize civilian casualties, and we've also seen the Ukrainian Government make effort to do just that themselves.

**QUESTION:** And you have not – but you have not yet seen the Russians use their influence with the separatists to do the same. Is that correct?

**MS. PSAKI:** That's correct.

**QUESTION:** And then one more thing on this. The Russian foreign ministry has said that the proposal you mentioned just now for Poroshenko was not – the venue is not good. And in fact, I believe some of the separatists or one of the separatist leaders said that venue is no good because it's under the control of Kyiv, which would seem to be a bit of a stumbling block. When you referred to that offer to meet, are you referring to that specific offer or do you not know? I mean, I'm trying to figure out this --

**UCP000244**

**MS. PSAKI:** I'm not sure which offer they're referring to.

**QUESTION:** You think it's appropriate – you think his offer should be acted – should be taken up by the separatists?

**MS. PSAKI:** Well, we're talking about discussions about the Government of Ukraine – what's happening in the country of Ukraine, I should say. So certainly, I think it's appropriate that it could be held in a government building run by the Government of Ukraine.

**QUESTION:** Okay.

**MS. PSAKI:** All right. Thanks, everyone. Oh, sorry in the back. One more.

**QUESTION:** Sorry, guys. I had asked this question before but haven't gotten a response.

**MS. PSAKI:** Okay.

**QUESTION:** It's about the European Court of Human Rights which had upheld a French ban on burkas. Did you get that question?

**MS. PSAKI:** I think we have something on that. I'm happy to send that you after the briefing.

**QUESTION:** Okay. Great, thanks.

**MS. PSAKI:** Thank you.

**(The briefing was concluded at 2:50 p.m.)**

**DPB # 119**

**UCP000245**

# EXHIBIT 30



*the WHITE HOUSE*    *PRESIDENT BARACK OBAMA*



## Briefing Room

Your Weekly Address

Speeches & Remarks

**Press Briefings**

Statements & Releases

White House Schedule

Presidential Actions

   Executive Orders

   Presidential Memoranda

   Proclamations

Legislation

   Pending Legislation

   Signed Legislation

   Vetoed Legislation

Nominations & Appointments

Disclosures

---

**The White House**

Office of the Press Secretary

---

For Immediate Release                                    July 08, 2014

# Daily Briefing by the Press Secretary, 07/08/2014

SHARE THIS:



TWITTER

FACEBOOK

**UCP000246**

Daily Briefing by the Press Secretary, 07/08/2014 | whitehouse.gov     Page 2 of 28
Case 2:16-cv-04435-PA-MRW   Document 61-11   Filed 04/24/17   Page 20 of 157   Page ID
#:4751

James S. Brady Press Briefing Room      

1:04 P.M. EDT

MR. EARNEST:  Good afternoon, everybody.  It's good to see you all.  I don't have any announcements at the top, Josh, so why don't you go ahead and get started with questions.

Q    Thanks, Josh.  This morning on a conference call, a White House official said that in working with Congress, the White House is basically asking for the same authority to send people from Central America back at the border that the administration has for people from Mexico.  Can you give that authority to Border Patrol agents as opposed to immigration judges and still guarantee that these children have due process?

MR. EARNEST:  What we are seeking, Josh, is we are seeking greater authority for the Secretary of Homeland Security to exercise greater discretion that will allow him to more efficiently and effectively remove and repatriate immigrants to this country that don't have a legal basis for remaining here.

As you know, there are -- the law requires some additional steps as it relates particularly to children and it also requires some additional steps for children who have traveled from what are described as non-contiguous countries. What this law did not contemplate is what we are seeing now along the southwest border. What we're seeing along the southwest border is a spike in illegal migration from a handful of Central American countries.  And what we would like is for the Secretary of Homeland Security to exercise some greater discretion after the due process rights of those individuals have been acknowledged and respected.

So there is a due process system.  What we are seeking, in addition to additional authority, are additional resources where immigration judges, ICE, prosecutors and asylum officials can be made available to expand the capacity of that system so that we can reduce the backlog that currently exists.

But, again, the bottom line here is this additional authority that we would like Congress to give the Secretary of Homeland Security would allow him to exercise his discretion to more efficiently remove those individuals that do not have a legal basis for remaining in this country.

**UCP000247**

EXHIBIT 30, PAGE 204

Q    But do those due process rights that you say are first respected, does that include appearing, for instance, before a judge, or appearing before someone other than just a Border Patrol agent during initial screening?

MR. EARNEST:  Yes, it does.  It does.  There is due process in place that those individuals are entitled to.  Those are basic due process rights that will be respected.  There are also certain humanitarian requirements that are in place.  Those aren't just part of the law; those are also consistent with the values of this country.  We will meet both of those standards.  We're committed to doing that.

We're also just as committed to enforcing the law, and that means when it is found that an individual does not have the legal basis for remaining in this country, does not have the legal basis for being granted humanitarian relief, then those individuals will be removed and repatriated in collaboration with their home countries.

Q    Secretary General Rasmussen was here this morning, talked a little bit with us about his concerns about the Afghanistan election process dragging out.  Can you flesh out a little bit about what he spoke with the President about, both on Afghanistan and Ukraine?

MR. EARNEST:  Why don't I first start with a readout of the President's meeting and then we can go into additional detail if you like.

Earlier this morning, as you all know, the President met with NATO Secretary General Anders Fogh Rasmussen in what was Secretary General Rasmussen's final visit to the White House before he departs his post later this year.  The Secretary General's visit underscores the vital importance the United States places on NATO as the cornerstone of our alliance with Europe and the importance of Rasmussen's leadership at this critical time.

You will recall, Josh, that the President had the opportunity to talk about the strength and importance of this alliance during the President's recent visit to Europe just last month.

As you know, we have a NATO summit in September in Wales. That was an opportunity for them, the two leaders, to review a number of issues heading into that meeting.

**UCP000248**

They also discussed Ukraine, including implications of Russia's aggression for European security and the efforts the United States and other allies have been making over the past several months to reassure all allies of the Alliance's ironclad commitment to Article 5 collective defense.  They also spoke about the need to improve allied defense investment and to bolster the defense capacity of NATO's vast network of partners. And finally, they spoke about Afghanistan and planning for NATO's non-combat, post-2014 mission.

Now, in terms of Afghanistan, you may be aware that building upon Secretary Kerry's outreach to both of the presidential candidates in Afghanistan, the President spoke last night to Dr. Abdullah as part of our ongoing effort to engage the candidates and call for calm and dialogue.  The President made clear, as we've been saying publicly, that we expect a thorough review of all reasonable allegations of fraud, and that there is no justification for resorting to violent or extra-constitutional measures.  We've been clear that any such move would cost Afghanistan the financial and security assistance of the United States of America.

Serious allegations of fraud have been raised, but they have yet to be adequately investigated.  So we reiterate that the preliminary results that were announced yesterday are neither final, nor authoritative, and may not even predict the final outcome, which could still change based on the findings of Afghan's electoral bodies.  We continue to urge the candidates to maintain calm among their supporters.

There is a process in place for adjudicating the concerns that have been raised about fraud in that election, and we're encouraged -- or we're encouraging both candidates and their supporters to allow that process to work its way through so that all of these claims or concerns that have been raised about fraud can be examined and adjudicated so that both sides can respect the outcome of this process.

Q    Josh, the situation in Israel seems to be escalating rather quickly, with air raid sirens going off this morning in Tel Aviv and up to 40,000 reservists called for a possible ground invasion in Gaza.  What is the U.S. doing to calm the situation? And is there any effort to negotiate a ceasefire between Hamas and Israel?

**UCP000249**

MR. EARNEST:  Well, let me start by saying that we strongly condemn the continuing rocket fire into Israel and the deliberate targeting of civilians by terrorist organizations in Gaza.  No country can accept rocket fire aimed at civilians, and we support Israel's right to defend itself against these vicious attacks.

At the same time, we appreciate the call that Prime Minister Netanyahu himself has made publicly to act responsibly.  We're concerned about the safety and security of civilians on both sides.  This means both the residents of southern Israel who are forced to live under rocket fire in their homes and the civilians in Gaza who are subjected to the conflict because of Hamas's violence.

As you know, Secretary Kerry spoke with Prime Minister Netanyahu a couple times over the weekend and reiterated the United States' concern about escalating tensions and our willingness to engage robustly in helping to stop the rocket fire and restore the 2012 ceasefire as soon as possible.

So these kinds of consultations are ongoing.  It is not in the interest of either side for this violence to continue and even to escalate.  So we are hopeful that even as Israel exercises their right to self-defense that they'll leave open a channel for diplomacy to prevail and for a ceasefire or at least a de-escalation in the violence to commence.

Jeff.

Q    Josh, back on the supplemental request.  Is the White House willing to offer any budget cuts elsewhere to offset this additional money?

MR. EARNEST:  Well, Jeff, this falls in the category of emergency appropriations, and I think that even both Democrats and Republicans would acknowledge that what we're seeing is an emergent situation down there.  There are serious implications as it relates to a pretty dire humanitarian situation throughout Central America, and the consequences for that are being manifested along the southwest border.  So there is an urgent situation to respond to and we hope that Congress will act quickly on this emergency request for additional funding so that we can use these resources to address the problem.

Q    So the answer is no, right?

**UCP000250**

MR. EARNEST:  Well, the answer is that this is an emergency supplemental funding request and with an emergency request like this, traditionally, Congress has not sought to bog down that process in the search for offsets.

Q    Speaker Boehner also made a point of saying he had wanted to see the National Guard to be sent to the border and that was not included in the request.  Is there a reason for that?

MR. EARNEST:  Well, there are a couple of reasons for that. The first is there already has been made an historic investment in border security and we're seeing the benefits of that investment of resources along the border.  To put it bluntly, the concern right now is that what we're seeing is that a lot of these immigrants who are seeking to enter the country without authorization aren't seeking to evade detection by Border Patrol agents; rather, these individuals are seeking out these Border Patrol agents with the expectation they'll be detained and in the hope that they'll be allowed to remain in the country.

What we have made clear is that those individuals who enter this country without authorization will be put through the immigration court proceeding and there are due process rights that they will -- that they are entitled to.  But at the conclusion of those proceedings, if it is found that those individuals do not have a legal basis for remaining in the country, they'll be removed.  And what we have sought in addition to this supplemental appropriations request is authorization from Congress for the Secretary of Homeland Security to exercise greater discretion in ensuring the prompt removal of those individuals.

Michelle.

Q    Hi.  Yesterday we talked a little bit about this and you mentioned that there was no piece in the request for border security.  But it appears that there is some of that now, right? Has that changed since yesterday?  And if so, why?

MR. EARNEST:  I don't remember ruling out any additional resources that could be deployed to the border.  I think, in fact, the suggestion that I made was that we needed additional resources at the border to process these claims more rapidly.  And that is what a large chunk of this funding would be devoted toward -- that's hiring judges, ICE prosecutors and asylum officials who could address the backlog that has cropped up in recent months.

**UCP000251**

EXHIBIT 30, PAGE 208

By addressing that backlog, we can ensure that those individuals have prompt
access to the due process to which they're entitled.  It also means that as
those cases are resolved -- and as we expect in the majority of those cases
there will not be a basis for those individuals to remain in the country and be
granted humanitarian relief -- that we expect that the Homeland Security
Secretary will be able to exercise some additional discretion that would allow
him to repatriate those individuals efficiently.

Q    And so things like surveillance flights and more resources for interdiction,
that's not something that was added late?  That was always going to be part of
this?

MR. EARNEST:  That was always going to be part of the package.  I mean, I
would point out that those who are particularly concerned about these kinds of
resources being deployed to the border and the suggestion that these kinds of
resources are badly needed at the border should be strong advocates of
comprehensive immigration reform; that even the important steps that are
included in this emergency funding request are not as significant as the
investment in border security resources that's included in the common-sense
immigration reform proposal that was passed by both parties in the Senate.

Q    And this meeting that the President is going to have with the Governor,
can you talk a little bit about this?  I know there's been this kind of harsh back-
and-forth at times.  What does the President expect to gain from this meeting?

MR. EARNEST:  Well, we've been working on it for a couple of days to set up
a meeting between the President and local officials in the Dallas area to
discuss the situation on the border.

There are a number of non-governmental organizations, including nonprofits
and even some faith leaders in Dallas, who have been trying to mobilize some
resources to assist in the effort to meet the basic humanitarian needs of those
who have arrived in the southwest border and are attempting to enter the
country without authorization.  The President certainly welcomes the efforts of
those who are trying to contribute constructively to addressing this problem.
And we're seeing local officials and even some members of the faith
community in Dallas try to do exactly that.  The President is supportive of
those efforts.  And that's why we were seeking to set up a meeting with those
individuals.

**UCP000252**

EXHIBIT 30, PAGE 209

Case 2:16-cv-04435-PA-MRW   Document 61-11   Filed 04/24/17   Page 26 of 157   Page ID
#:4757

When Governor Perry sent a letter to the White House yesterday indicating the desire to meet with the President, we thought it made sense here to extend an invitation to Governor Perry to allow him to participate in that meeting with other Texans who are seeking to address this situation in a constructive manner.  So we're looking forward to Governor Perry participating in that manner.  Apparently, he has just in the last hour or so agreed to participate, and we certainly are pleased about that.

Mara.

Q    I just want to get clear -- you're asking that the HHS Secretary has greater discretion --

MR. EARNEST:  The DHS Secretary.

Q    I mean DHS -- but you're not asking Congress to change the law to make Central American children treated the same as Mexican children?  You're not asking for a change in the law to correct the discrepancy between the way these children are handled?

MR. EARNEST:  Well, I think what we are trying to do is to try to restore some greater consistency in that in terms of the way immigrants from Central America -- whether it's Mexico or other countries -- the way that that law is implemented.

Now, there's some natural barriers to that.  If somebody is detained along the Mexican border who's from Mexico, it's easy to just sort of turn them around and they're back in their home country. If someone -- if an immigrant from Honduras, for example, is detained at the U.S.-Mexico border, getting them back to Honduras requires additional resources and requires some additional steps.  So there are some logistical impediments to enforcing the law as efficiently when it comes to those who originated in Honduras compared to those who originated in Mexico.

Q    They're not just logistical impediments, they're legislative impediments. The 2008 law says these children have to be treated differently.

MR. EARNEST:  That's correct.

Q    And I just want to get clear -- you're not asking Congress to make changes to the 2008 law.

**UCP000253**

EXHIBIT 30, PAGE 210

Daily Briefing by the Press Secretary, 07/08/2014 | whitehouse.gov    Page 9 of 28
Case 2:16-cv-04435-PA-MRW   Document 61-11   Filed 04/24/17   Page 27 of 157   Page ID
#:4758

MR. EARNEST:  Right now what we are seeking is we're seeking the congressional authorization for the Secretary of Homeland Security to exercise greater discretion as he implements that law.

So I don't want to suggest to you that we're fine with the law the way that it is, because we're seeking some greater discretion so that we can enforce that law a little bit differently.  So I'm not trying to be obtuse in answering your question; I'm just trying to be as specific as I can that what we are seeking is an end result that allows for the more efficient application and enforcement of that law that essentially means those individuals that don't have a legal basis for remaining in this country are returned to their home country.  That make sense?  Okay.

Olivier.

Q    I've got a couple for you.  You talked about -- in the readout of the phone call last night, you talked about the risk of Afghanistan losing the financial and security assistance from the United States.  Is that money and materiel?  Or does that also extend to the presence of American forces on the ground?

MR. EARNEST:  Well, as you know, there is this issue of the pending bilateral security agreement.  This is an agreement that was struck between the United States and Afghanistan many months ago now.  What we have said is that we would seek for that agreement to be signed by the new president of Afghanistan.  The good news is that both candidates -- both of the remaining candidates in this runoff have indicated not just an openness but a desire to sign that agreement.  We certainly would welcome that.  We believe that this bilateral security agreement is in the best interests of American national security, but that it's also in the best interests of the people of Afghanistan.

So we're certainly pleased that both of them have indicated a desire to do that.  Of course, for them to sign this agreement, the election needs to be concluded.  And because of the concerns that have been raised about fraud, the conclusion of that election is being drawn out a little bit.

Fortunately, there is in place a series of procedures to adjudicate concerns about fraud, and we have sought through diplomatic channels to encourage both sides to allow that process to work.  And we're hopeful that both candidates and their supporters will continue to support that process as it moves forward.

**UCP000254**

EXHIBIT 30, PAGE 211

Daily Briefing by the Press Secretary, 07/08/2014 | whitehouse.gov          Page 10 of 28
Case 2:16-cv-04435-PA-MRW   Document 61-11   Filed 04/24/17   Page 28 of 157   Page ID
#:4759

Q    And there are administration officials briefing lawmakers on Capitol Hill today about Iraq and Afghanistan, and I'm wondering whether the timing reflects the conflict in either place shifting into a new phase, particularly as it relates to Iraq.

MR. EARNEST:  I'm not aware of the specific briefings that you're talking about, but because the consultation between the administration and our partners on Capitol Hill on these issues is frequent, I'm not surprised to hear that there are some meetings to discuss these issues.  As you point out, Olivier, these are pretty dynamic situations that we're dealing with, so it makes sense that the consultations between senior administration officials and our counterparts on Capitol Hill are pretty frequent.

So I don't know that there's any specific hook to today's meetings, but rather that they are an indication that these conversations happen pretty regularly.

Stephen.

Q    Thanks.  Your comments yesterday (inaudible) a German anger about this latest spying row.  Could you give any more details about how the U.S. plans to go about resolving this, as you said yesterday?

MR. EARNEST:  I'm not in a position to shed any more light either on those reports or on our efforts to try to resolve the situation other than to say what I said yesterday, which is that the United States highly values the strong partnership that we have with the Germans, particularly when it comes to security cooperation and intelligence-sharing activities.  That strong partnership benefits American national security and we believe that it benefits the national security of Germany as well.  That's why we are committed to resolving this situation appropriately.

There have been some communications in both law enforcement and diplomatic channels to begin to resolve this issue.  But in terms of the substance of the reports, as I was yesterday, I'm not in a position to comment on them.

Q    General terms, does the United States expect that foreign nations, including perhaps some allies, conduct the kind of operations -- intelligent operations that have been reported on the other side in the German media in the last few days?

**UCP000255**

Daily Briefing by the Press Secretary, 07/08/2014 | whitehouse.gov          Page 11 of 28
Case 2:16-cv-04435-PA-MRW   Document 61-11   Filed 04/24/17   Page 29 of 157   Page ID
#:4760

MR. EARNEST:  I'm sure there are some intelligence experts in our government who might be able to give you some greater insight into the intelligence activities of other countries, but I'm not in a position to do that from here.

Ed.

Q    Josh, can you clarify -- in terms of the Homeland Security Secretary getting more authority, you say you need Congress's help.  Does Congress have to pass a standalone bill to clarify this or -- what's the holdup?  What are you waiting for legally?

MR. EARNEST:  It's my understanding that for the Secretary of Homeland Security to exercise the kind of discretion that we would like him to be able to exercise in terms of more efficiently removing those individuals that don't have a claim to remain in this country, that that requires congressional authorization to give him that discretion.

Q    With a bill, a piece of legislation?

MR. EARNEST:  Yes.

Q    Okay.  And have you heard from Boehner, anyone?  Are they going to do this?

MR. EARNEST:  Well, we originally made this request last week in a letter to Congress.  Since then, there have been a number of conversations between senior administration officials here and senior officials on Capitol Hill.  So the discussions about trying to work this out have been underway for several days now.

Q    And in terms of the changes in the President's schedule, you kind of hooked it to Governor Perry writing this letter yesterday.

MR. EARNEST:  I didn't mean to do that.

Q    So what changed?  Because for days, you've been saying not only is he not going to the border but he's just fundraising and he's going to talk about the economy.

**UCP000256**

EXHIBIT 30, PAGE 213

Daily Briefing by the Press Secretary, 07/08/2014 | whitehouse.gov        Page 12 of 28
Case 2:16-cv-04435-PA-MRW   Document 61-11   Filed 04/24/17   Page 30 of 157   Page ID
#:4761

MR. EARNEST:  Well, I think what I was pretty declarative about is the fact that the President would not travel to the border, and he is not going to do that.  What the President will do, though, is he is going to spend some time -- in addition to those other activities that you mentioned -- visiting with some Texans who -- both local government officials as well as the leaders in the faith community down there who are seeking to mobilize resources in support of an effort to effectively deal with the situation at the southwest border.  The President welcomes their involvement, is certainly pleased to see their interest in playing a constructive role in meeting the humanitarian needs of these individuals.

Governor Perry indicated a desire to speak to the President about this, and the President extended an invitation for Governor Perry to join this meeting with other Texans who are working on this.

Q    But wasn't it also political pressure?  Because in addition to Governor Perry you had Democrat Henry Cuellar saying yesterday that he believes this could be the President's Katrina. How do you react to that, that there is sort of government just being paralyzed right now and not being able to fix this?

MR. EARNEST:  I think the steps that this government has announced not just today but over the last week or so are indicative of our proactive approach to dealing with this situation.  The President has already directed that resources be moved from the interior to the border region to address both this backlog that we're seeing but also this influx of illegal migration from Central America.

We're seeking greater resources from Congress that could be used to deal with this situation to whittle down the backlog, that we prioritize more recent border crossers.  We're also seeking, as we've been discussing now, the greater authority that the Secretary of Homeland Security could use to more efficiently remove those individuals that don't have a legal basis for remaining in the country.  I think that is indicative of the aggressive approach that this administration has taken to confronting this problem.

Q    Two other quick ones.  The U.N. High Commissioner for Refugees is pushing for the administration to consider the Central American adults and kids to be refugees, at least many of them.  That could potentially give them political asylum.  Is that even being considered here?  Is that on the table, that

**UCP000257**

EXHIBIT 30, PAGE 214

these adults and children would be considered refugees, not illegal
immigrants?

MR. EARNEST:  Well, Ed, these individuals from Central America are entitled
to due process and there is an immigration court system in this country to
consider their claims on a case-by-case basis.  What we're seeking are
additional resources so that we can have more judges and more prosecutors
and more asylum officials on hand to consider these cases carefully to ensure
that they are subject to this due process.

But what's also clear is our determination to make sure that once a ruling is
issued in these immigration proceedings, that if they are found to not warrant
special humanitarian relief that these individuals can be efficiently repatriated
in collaboration with their home countries back to those home countries.

Q    Valerie Jarrett, in her letter to Governor Perry, repeatedly referred to this
as a "humanitarian situation."  You yourself were calling this an emergency a
moment ago.  The President's budget request is an emergency.  You've called
it a "humanitarian crisis."  Why now is it being called a "humanitarian
situation"?  Is that an attempt to sort of dial this back and put a little pressure
on --

MR. EARNEST:  I think we've been pretty candid about the urgency with which
we are approaching this situation.  And I think that is reflective of the efforts
that we have undertaken to try to address it.

Q    Is that a --

MR. EARNEST:  Well, we've certainly called it a crisis, as you've pointed out.
It's also an emergent situation.  It also is something that requires the focus of
the federal government to making sure that we are ensuring the continued
security of our border, but also making sure that we are enforcing the law and
fulfilling the obligation that we have to meet the basic humanitarian needs of
those individuals who are showing up along the southwest border.  None of
those priorities is mutually exclusive.

So we intend to meet the due process rights and ensure that they are given a
due process opportunity to appear before a judge and to have that judge make
a ruling on their claim to remain in this country.  In the meantime, we'll meet
the basic humanitarian needs of these individuals.  That's consistent with the

UCP000258

Daily Briefing by the Press Secretary, 07/08/2014 | whitehouse.gov          Page 14 of 28
Case 2:16-cv-04435-PA-MRW   Document 61-11   Filed 04/24/17   Page 32 of 157   Page ID
#:4763

values of this country.  And at the same time, we're committed to enforcing the law.  And in fact, we are seeking greater authority that can be wielded by the Secretary of Homeland Security that, where necessary, he can repatriate individuals that don't have a legal basis for remaining in this country.

Bob.

Q    Hey, Josh.  I tried to read that 2008 law and make sense of it.  The law was, as we've heard a number of times, basically designed to prevent childhood trafficking and return the children to their rightful families, et cetera.  I looked for nuances about whether or not there could be room for children whose families have deliberately sent them to the United States.  Does the White House not see the nuance possibilities here?  And has the Counsel's Office weighed in on this?  You believe you need some new legislation, but could the President take some executive action, in a sense?

MR. EARNEST:  Well, I'm not steeped in the legalistic details of this law either.  I do understand that there is some flexibility in the law and we're certainly going to try to use that flexibility to implement this law in a way that reflects the situation that we currently face on the southwest border.  As you know, Bob, the President has already directed that resources within the Homeland Security Department that currently are focused on the interior be directed to the border to try to reduce the backlog and meet the increasingly difficult situation along the border.

So there are some steps that the President can take unilaterally, and he's done that already.  But in terms of enforcing the law and ensuring the efficient enforcement of the law, it does require some authorization from Congress so that the Secretary of Homeland Security can exercise some additional discretion.

April.

Q    Josh, I want to ask you two quick questions.  In light of the current political climate and your request for the supplemental, as well as for this greater discretion for the Homeland Secretary, what realistically are you expecting to happen with your request to Congress?

MR. EARNEST:  Well, April, you've seen comments from both Democrats and Republicans urging the administration to take steps to deal with this urgent

**UCP000259**

humanitarian situation -- in some cases, people have called it a crisis.  And so what I would expect is I would expect those individuals who are talking about this issue to back up that talk with action.  And what we'd like Congress to do is to act promptly, maybe even with some -- maybe even expeditiously, to consider this proposal and hopefully move on it in bipartisan fashion.  Again, members of both parties have acknowledged that this is an urgent situation, and we hope that members of both parties will act promptly to address it.

Q    So is there a plan B, C, in case something does not -- in case they don't act expeditiously on this matter?

MR. EARNEST:  Considering that it's just today that we've rolled out plan A and presented it to Congress, we hope that -- we're going to give Congress a fair chance, like I said, to back up their words with action and consider this proposal, and to move quickly in bipartisan fashion to ensure that this administration has the resources we need to deal with this urgent humanitarian situation.

Q    And Ed asked a question that piqued my curiosity. Strategically, it seems like you're not saying the word "refugee" -- yes, I gave him a little credit --

MR. EARNEST:  He deserves it.

Q    Strategically, you are not saying the word "refugee."  Is there a reason why you're not saying refugee, as it may mean that they are allowed to stay because they're fleeing with refugee status?

MR. EARNEST:  Well, as I mentioned to Bob, I'm not steeped in the legalistic details, but it is my understanding that describing someone as a refugee ascribes them a specific legal status.  And what I was -- what I've been describing is that the legal status of each of these individuals who is apprehended along the southwest border will be determined by an immigration judge.

And what we would like is we would like there to be more immigration judges on the case, so to speak, working to determine the legal status of each of these individuals who is apprehended. That is part of their due process rights, and we're committed to making sure that we respect those due process rights.

**UCP000260**

Daily Briefing by the Press Secretary, 07/08/2014 | whitehouse.gov        Page 16 of 28
Case 2:16-cv-04435-PA-MRW   Document 61-11   Filed 04/24/17   Page 34 of 157   Page ID
#:4765

Our anticipation, though, is that the majority of folks who go through that process will not be found by those judges to have -- to qualify for humanitarian relief.  And that's why we want the greater authority that can be exercised by the Secretary of Homeland Security to efficiently return them to their home country.

Q    According to a U.N. 1951 convention, it says a refugee is someone who has fled his or her country owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion.  Do some of these persons that are coming into the United States fall into this U.N. category?

MR. EARNEST:  I think the point of my answer, April, is to say that it's not for me to decide that.  It's for an immigration judge to make those kinds of rulings.  And what we want to ensure is we want to ensure that each individual who is apprehended along the border who is from one of those Central American countries has access to an immigration judge so that that determination can be reached by that judge, not by somebody who is standing here in the White House.

Jon.

Q    Josh, first a quick clarification on Afghanistan.  Did the President call both presidential candidates?  Was Ashraf Ghani called as well as Abdullah Abdullah?

MR. EARNEST:  No.  The President telephoned Dr. Abdullah.  But I know that there have been senior administration officials who have been in touch over the last several weeks with both candidates and with supporters of the candidates.

Q    Why would he call just one of the candidates?

MR. EARNEST:  Dr. Abdullah is the one who is expressing the most significant concern about reports of fraud.  And what we have done is all along in this process encouraged both candidates to remain engaged in the process of adjudicating the election.  And so the President telephoned Dr. Abdullah last night to more forcefully keep up that case that he should remain engaged in the process.

**UCP000261**

EXHIBIT 30, PAGE 218

Case 2:16-cv-04435-PA-MRW   Document 61-11   Filed 04/24/17   Page 35 of 157   Page ID
#:4766

Q    Okay.  And on the supplemental request, I want to be sure I'm reading this
properly.  It looks like there is significantly more money in this request for
providing and caring for these children that have crossed the border --
providing health care, shelter -- than there is for added border security or for
deportations.  Is that correct, that the bulk of this money, by far, is to provide
money to care for the children that have crossed the border illegally?

MR. EARNEST:  Well, I don't know if I would say bulk, by far, but I think that it
is --

Q    It is $1.8 billion, so that's about half.  So it's by far the biggest line item on
this.

MR. EARNEST:  Sure, but $1.1 billion would be dedicated to Homeland
Security resources to ensure that we're enforcing the law and securing the
border and efficiently repatriating those individuals that don't have a legal
basis for remaining in the country.

So I think the point is, is that there are significant resources that are required
to deal with the situation, both in terms of meeting the various needs that I was
describing to Ed -- the need to meet the basic humanitarian needs of those
who show up along the southwest border -- I think that is not just in line with
the law, it's also in line with some basic American values.

At the same time, this administration remains committed to enforcing the law.
And what we would like are some additional resources to make sure that we're
enforcing that law efficiently, both in terms of processing them through the
immigration system, but also in terms of repatriating them if it's found that they
don't have a legal basis for remaining in the country.

Q    Okay.  And then on the meeting with Governor Perry, Valerie Jarrett in her
letter to -- and by the way, just curious, why was this letter, this invitation
coming from Valerie Jarrett?

MR. EARNEST:  Well, as you know, Valerie spends a lot of time maintaining
our relationships here in the White House with governors across the country,
so she was the one who responded to Governor Perry's letter.

Q    Because the very first line, she says, "Thank you for your concern about
the urgent humanitarian situation in the Rio Grande Valley."  Obviously, the

**UCP000262**

EXHIBIT 30, PAGE 219

Daily Briefing by the Press Secretary, 07/08/2014 | whitehouse.gov          Page 18 of 28
Case 2:16-cv-04435-PA-MRW    Document 61-11    Filed 04/24/17    Page 36 of 157    Page ID
#:4767

concern that Governor Perry has been expressing has been some very harsh criticism of this President and even suggesting last week that there could even be a conspiracy, that somehow the President and this administration was in on the flow of children over the border, and it's either ineptitude or something else.  And he said that -- so I'm just wondering what exactly do you -- I mean, what's the President's message going to be to Governor Perry?  Governor Perry has blamed this problem directly on the President and even suggested that the President wanted to see this.

MR. EARNEST:  I think that despite all of the differences that exist when it comes to policy between Governor Perry and this administration, that there should be a level at which we can agree that it's important for this humanitarian situation to be addressed, both for the well-being of the United States but also for the well-being of these human beings who have been apprehended along the southwest border.

You can ask Governor Perry -- I certainly won't speak for him.  I know that it's a priority of the President's.  I assume it's a priority of Governor Perry's.  But I assume we'll find that out in the context of the meeting.

Q    Governor Perry said he doesn't think the President cares about border security.

MR. EARNEST:  Well, I don't think that any fair appraisal of the President's record when it comes to border security would allow that criticism to withstand any scrutiny at all.  The fact of the matter is this President has made an historic investment in border security and this President has worked with Republicans in Congress to try to increase our investment and increase the number of resources that are being dedicated to securing our border.  Unfortunately, it's Republicans -- many of them from Texas -- who are even blocking the House from considering that common-sense, bipartisan proposal that would make an additional historic investment in our border.

Roger.

Q    Thank you.  There is an all-members briefing on the Hill this afternoon, 5:00 p.m., on Iraq and Afghanistan.  Can you shed some light on that?

MR. EARNEST:  That may be the meeting that Olivier was asking about just a little bit earlier today.  I don't have any details specifically about that meeting.  I

**UCP000263**

think, however, it reflects the robust nature of coordination -- or the robust
coordination that exists between this administration and Congress when it
comes to confronting some of the national security challenges that we're facing
right now.  These kinds of meetings happen with some frequency because it's
such a dynamic situation over there and we want to make sure that our
congressional partners are briefed with the latest details.

Q   Are they telling them anything new or anything?

MR. EARNEST:  Presumably.  Again, it's a dynamic situation so the conditions
on the ground have been changing rather rapidly and they probably changed
since the last time they had to have a -- they had the opportunity to meet like
this.

Q   And back to the supplemental.  On the conference call, it states that all the
money is for Fiscal '14.  In order for that to happen, Congress has got to
appropriate the money by September 30.  What's the thinking that that would
happen?

MR. EARNEST:  Well, given the urgent nature of this humanitarian situation,
we hope that Congress will act pretty quickly to ensure the administration has
the resources necessary to deal with this situation.

Q   So it's more of a hope than anything else?

MR. EARNEST:  Well, again, if you take Democrats and Republicans on
Capitol Hill at face value, then you would expect that their actions would back
up their rhetoric.  Their rhetoric indicates that this is a pressing situation that
needs to be dealt with immediately, and we're hopeful that Republicans will
follow up those words with action and ensure that this administration has the
resources to deal with this situation immediately.  But, again, it will be up to
Congress to do that.

Mr. Knoller.

Q   Josh, did President Obama tell Abdullah that he is sending Secretary
Kerry to Afghanistan later in the week?

MR. EARNEST:  Mark, as you know, when senior administration officials travel
to Afghanistan, we don't often put out the details of that travel in advance.
Secretary Kerry has been in regular touch with the two leading candidates in

**UCP000264**

Daily Briefing by the Press Secretary, 07/08/2014 | whitehouse.gov        Page 20 of 28
Case 2:16-cv-04435-PA-MRW   Document 61-11   Filed 04/24/17   Page 38 of 157   Page ID
#:4769

the Afghan presidential election and we expect that he'll continue to be in close touch with him in the days ahead.

Kelly.

Q    Nice to see you, Josh.

MR. EARNEST:  Nice to see you, too.

Q    Given your discussion of the President's schedule -- you're calling it an urgent situation, the scope of what you're asking for today -- why wouldn't the President see value in visiting the border, if not this trip, then sometime soon?

MR. EARNEST:  The President has been to the border on a couple of previous occasions, both as a candidate and as President of the United States.  I'd also point out that in the last several weeks, his Secretary of Homeland Security, Secretary of HHS, the FEMA Director, senior White House officials have all made separate visits to the border to assess the situation there and to assess the strength of the federal government's response to that situation.

The President is well aware of exactly what's happening on the border.  And what we are focused on right now are not political statements that would be made with an appearance, but rather with specific concrete action, steps that can be taken to mitigate this problem.

Q    So if he were to go it would be a photo op?  Is that what you're suggesting is the downside to him going personally?

MR. EARNEST:  No.  What I'm suggesting is that the focus of the President's attention is on making sure that we are taking all of the necessary steps to deal with this urgent humanitarian situation.  We hope that Congress will also take the steps that are necessary to deal with this urgent humanitarian situation to give the administration the resources that are necessary to deal with it.

Q    Even though members of Congress in both parties are asking the President to visit those who reside in the border area?  And clearly, Governor Perry I'm sure will extend an invitation for him to go again.  Is there a downside for the President being there personally?

MR. EARNEST:  A downside for being where personally?

**UCP000265**

EXHIBIT 30, PAGE 222

Q    Along the border to see these current situations?

MR. EARNEST:  No.  I think what is important is it's important for the President to be keenly aware of what exactly is happening on the southwest border and to have a thorough understanding of the impact that the government response to that situation is having.  The President has been clear that it's important for us to meet the basic humanitarian needs of these individuals to ensure that they are given access to the immigration courts in a way that complies with their rights to due process, but also ensuring that we're enforcing the law.

The President is regularly briefed on these efforts.  And those briefings often are the result of trips made by the Secretary of Homeland Security and the Secretary of HHS and the FEMA Director and other senior administration officials, including some from the White House, who have traveled frequently to the border in recent weeks.  I understand that a senior Department of Justice official is scheduled to travel there later this week to also assess the law enforcement situation.

Q    Does the President want to go himself?

MR. EARNEST:  Well, there are lots of administration eyes that are focused on this situation, and the reason for that is that there is an urgent humanitarian situation that needs to be dealt with.  And you've seen a very proactive response from the federal government.  And what we'd like Congress to do is to act with the same sense of urgency and make sure that this administration has all of the necessary resources to deal with the situation.

Major.

Q    Josh, on Afghanistan, as you know -- as you said, there's a process.  But there is no history of a process like that resolving a dispute like this.  This would be the first transition, democratically, of power in Afghanistan.  As candidly as you can, what is at stake?  And what was the "forceful message," to use your words, the President delivered to Dr. Abdullah?

MR. EARNEST:  The forceful message that the President delivered was to ask Dr. Abdullah to remain engaged in the process; that as you point out these processes are relatively new -- they're certainly relatively new to the Afghan people.

**UCP000266**

EXHIBIT 30, PAGE 223

Q    And untested?

MR. EARNEST:  Well, I think that they've been tested because there's been an election that's been carried out.  There was a general election; there's a runoff.  So there is an infrastructure that exists for conducting these kinds of elections, and even for considering reports of fraud.  So there is an infrastructure, there's a process that's laid out in the Afghan constitution for this.

But you're right that there is a question about whether or not these processes will hold up under the pressure of choosing the next president in Afghanistan.  The important principle that's at play here is that the Afghan people should have a say; in fact, they should be able to determine the leadership of their country.  And in order to do that, we need to have agreed upon processes in place to conduct those elections and also to dispense with concerns that have been raised about the conduct of these elections.

So there's a process in place.  The United States is fully supportive of the process and of the Afghan people as they go through this process, and that ensuring that we have a leader of Afghanistan with the stature necessary to lead the country, it's important for people to have confidence in the conduct of the election and in the outcome.  And so that's why we're seeking both candidates to remain engaged in that process.

Q    So if I understand you correctly, the President called Dr. Abdullah to say, if you pull out of this process, if you denounce it, if you reject it, the fate of U.S. financial support, security support, hangs in the balance?

MR. EARNEST:  Well, I think that there were even some reports overnight indicating that some of Dr. Abdullah's supporters were encouraging him to unilaterally declare himself the president; that there were a wide range of concerning reports coming out of Afghanistan.  What we're focused on is making sure that this process that's in place is followed.

And the reason for that is simply that if the process is followed and if the process is used to determine the outcome of the election, to address concerns that have been raised about fraud, then we can ensure that the outcome of that process will have some legitimacy associated with it, that we will be able to legitimately conclude that the Afghan people have selected their next leader.

**UCP000267**

EXHIBIT 30, PAGE 224

Daily Briefing by the Press Secretary, 07/08/2014 | whitehouse.gov        Page 23 of 28
Case 2:16-cv-04435-PA-MRW    Document 61-11    Filed 04/24/17    Page 41 of 157    Page ID
#:4772

The way to determine that definitively is for these prewritten rules that guide this process to be followed by both sides.  So that's what we're encouraging both sides to do.

Q    You mentioned earlier that there were diplomatic and law enforcement conversations between the United States and Germany about this allegation.  What is the nature of those conversations?

MR. EARNEST:  I can't really comment on the nature of those conversations except --

Q    Were they --

MR. EARNEST:  -- well, let me just say this.  Those conversations were designed to try to resolve this situation appropriately.

Q    What does that mean, resolve the situation appropriately?

MR. EARNEST:  I think it means exactly what it sounds like it means, which is that --

Q    It sounds like nothing to me.  (Laughter.)  What does it actually mean?

MR. EARNEST:  Well, no, I think it means that there have been reports in the German media -- reports on which I am not able to comment -- but there have been German officials who have raised concerns about those reports.

Q    At the highest levels.

MR. EARNEST:  It sounds like you've read the same reports that I have.  So it is our desire to resolve those concerns that have risen from those reports that I'm not in a position to talk about.  And that's the nature of those conversations.

Q    Forgive me for being dense, but how to do you resolve something without even saying to the Germans, we will investigate?

MR. EARNEST:  Well, I'm not in a position to talk publicly about the nature of the private conversations that are currently ongoing between U.S. officials and German officials.

Q    How successful are they going?

**UCP000268**

EXHIBIT 30, PAGE 225

Daily Briefing by the Press Secretary, 07/08/2014 | whitehouse.gov    Page 24 of 28
Case 2:16-cv-04435-PA-MRW    Document 61-11    Filed 04/24/17    Page 42 of 157    Page ID
#:4773

MR. EARNEST:  I'm not in a position to comment on those conversations.

Q    Very well.  Your use of the words "prompt," "efficient," and "effective" ring in the ears of some advocates on behalf of these unaccompanied children in a completely different context.  They feel there is something potentially inhumane, cruel and indifferent about efficiency, promptness and effectiveness in the deportation process.  How does this administration respond?

MR. EARNEST:  Well, I would respond by saying that it's important for everyone who considers the remarks that I've delivered today and the remarks that the President has delivered, more importantly, that they be viewed in the context in which we confront this situation.  The context is simply this:  We are focused on meeting the basic humanitarian needs of those individuals who are apprehended along the southwest border.  That's what the law requires, first of all.  In the view of the President, it's also what the values of this country require.  And that is why, as Jon pointed out, we have sought additional resources from Congress to make sure we have the bandwidth necessary to meet these basic humanitarian needs of these individuals.

Now, on top of that, it's also important for people to understand that those who are apprehended along the southwest border are entitled to a certain process, and they'll be put through the immigration system if they are detained at the border and found not to have the authorization to enter the country.

Over the course of that immigration proceeding, there will be an impartial judge who will evaluate on a case-by-case basis the legal standing that an individual may have to remain in the country.  If it is found by that judge that a particular individual does not have a legal basis for remaining in this country, what we would like to see happen efficiently and effectively and promptly is for that individual to be removed from this country and returned to their home country.

Now, we will also undertake that repatriation effort in close collaboration with that home country.  Some of the resources that we're seeking from Congress are also dedicated to working with Honduras and El Salvador and Guatemala to --

Q    To achieve what once they get home?

MR. EARNEST:  Well, to, first of all, make sure that there is, in some cases, a repatriation center so that we're not in a position of just returning a child who is

**UCP000269**

fleeing a crime-ridden neighborhood back into that crime-ridden neighborhood.  One thing that we could do and one thing that we have done is establish a repatriation center so that there is a place for this child to go and for this child to ensure that it's returning somewhere safe.

But, again, this is primarily the responsibility of these home countries to ensure the security of their citizens.  But if they need the support and even the contribution of some resources from the U.S. government to ensure their security, that's an investment worth making because it will contribute to stemming the flow of these individuals from this country.

Q    To get to the bottom line of the supplemental -- is your message to Congress, any member of Congress, Republican or Democrat, if you want these things to happen, you have to provide this funding; absent this funding, this new supplemental emergency funding, the hands of this administration are tied?  Or can you do some of the things you've outlined and wait for a continuing resolution sometime late September?

MR. EARNEST:  Well, there are some things that we can do immediately that we have already undertaken to try to address this surge in the illegal migration that we've seen.  So there have already been some resources that have already been funded by Congress that were already operating in the interior of this country that have been sent to the border to try to deal with this situation.

In order to have the necessary bandwidth to deal with this emergent humanitarian situation we need additional resources, and the only way that this administration can get access to additional resources is for Congress to appropriate them.  And so what we're seeking is Congress to take action, promptly, to ensure that this administration has the additional resources to meet all of the goals that we've been talking about here today.

Viquiera.

Q    Just to follow on that, so you want, in this language at the end of the transmittal letter here, additional authority to exercise discretion and you're going to work with Congress.  Why don't you put that in bill language?  You're very specific about what you want in terms of money.  Why don't you send them a bill with the extra authority that you want?

**UCP000270**

EXHIBIT 30, PAGE 227

Daily Briefing by the Press Secretary, 07/08/2014 | whitehouse.gov          Page 26 of 28
Case 2:16-cv-04435-PA-MRW   Document 61-11   Filed 04/24/17   Page 44 of 157   Page ID
#:4775

MR. EARNEST:  Well, first of all, we're talking about two different processes. One is the appropriations --

Q   That's a separate bill.

MR. EARNEST:  You understand the --

Q   Yes, I do understand.

MR. EARNEST:  You're a veteran of Capitol Hill so you understand this better than I, but just for the benefit of everybody else who is watching and the thousands of people who I'm sure are watching at home -- (laughter) --

Q   And listeners.

Q   How about radio listeners?

MR. EARNEST:  -- and are just absolutely enjoying this conversation.  So we're talking about two different processes.  And so what we have laid out is very specific -- a very specific funding request for additional resources. There's a separate process for the legislature giving the executive branch the authorization to use discretion like this.

Q   Let me rephrase it.  You need a bill -- you need the House to pass something and the Senate to pass something.  Are you going to get that done by the time -- I mean, how quickly do you need that?

MR. EARNEST:  We would like that to happen quickly.

Q   Then why don't you send them a bill?  You sent them a bill for the Highway Trust Fund.  You sent them a bill for supplementals.

MR. EARNEST:  More often than not, what we have done when we are seeking legislation from Congress is to basically tell them what generally the goal that we would like to achieve -- in this case, allowing the Secretary of Homeland Security to exercise greater discretion -- and then allow Congress to do their constitutionally appointed duty, which is to write legislation that would grant the executive branch this authority.

So we're certainly willing to work with them.  I wouldn't rule out that we may give them some suggested legislative language or work with them in a collaborative process to design legislation that would accomplish this goal.

**UCP000271**

But, ultimately, this is Congress's responsibility to ensure that the executive
branch has both the resources and the authority necessary to deal with this
challenge.  And based on the rhetoric that we've seen from members of
Congress, we hope that they'll act quickly.

Q    Okay.  We're not going to see you for a couple of days, and the Secretary
General was here so I want to ask you a question on a different subject --
Ukraine.  In Brussels, more than a month ago, the President says, "We'll have
a chance to see what Mr. Putin does over the next two, three, four weeks"  --
we've discussed this in the past --  "and if he remains on the current course,
then we've already indicated the kinds of actions we're prepared to take" --
meaning more broad, sectoral, hard-hitting sanctions.  That timeframe is
gone.  Mr. Putin has not changed course.  What is the President going to do?

MR. EARNEST:  Well, the one thing that he has done is he's had a number of
conversations with our allies in Western Europe. You saw from a readout that
we issued yesterday that the President telephoned President Hollande of
France to discuss this issue.  At the end of last week, the President had a
conversation with the Chancellor of Germany, Angela Merkel, to discuss
possible next steps.

As we have said all along, the economic costs that can be imposed on Russia
for their failure to respect the territorial sovereignty of Ukraine is most effective
when we can work in close collaboration with our partners; that when we can
implement a sanctions regime that has the buy-in of not just the United States,
but also of nations in Europe, that that sanctions regime is more effective.  It's
also in the best interest of American businesses, that they're not put at a
disadvantage as it relates to their competitors in Western Europe.

So the President has been working very closely with our allies to ensure that
we are working in close coordination to further isolate Russia, if necessary.  So
what we are doing is we are watching very closely whether or not President
Putin is heeding the urgings of the international community to stop the transfer
of heavy weaponry and materiel from the Russian side of the border to
separatists on the Ukrainian side of the border. We've been urging President
Putin to play a constructive role in encouraging those separatists to lay down
their arms.  And we will be continuing to evaluate his performance when it
comes to those metrics.

**UCP000272**

And we will always leave on the table the option of the United States acting alone, or preferably, in concert with our allies, to impose additional economic costs that would further isolate Russia and make it more likely that President Putin might adopt and abide by generally accepted international standards.

David Jackson, I'll give you the last one.

Q    But just to be clear, there won't be a private meeting between President Obama and Governor Perry? They'll just meet together at the roundtable?

MR. EARNEST: Well, the scheduling is still coming together, so if something like that occurs, we'll try to let you know.

Q    That's what we're looking forward to.

MR. EARNEST: It should be good.

Q    There will be coverage of the meeting with the activists, the President and the Governor -- correct?

MR. EARNEST: We're working through those logistics.

Q    You're aiming to do that?

MR. EARNEST: That's what we're aiming to do.

Q    Thank you, Josh.

MR. EARNEST: Thanks, everybody. Have a good day.

END
1:57 P.M. EDT



**HOME**     **BRIEFING ROOM**     **ISSUES**     **THE ADMINISTRATION**     **PARTICIPATE**     **1600 PENN**

En Español     Accessibility     Copyright Information     Privacy Policy     USA.gov

**UCP000273**

# EXHIBIT 31

| | |
|---|---|
| **From:** | Arevalo, Michael J. |
| **To:** | Susan Weiss |
| **Cc:** | Williams, Peter D.; Deborah Kizner |
| **Subject:** | RE: NBCU's "DIG" Season 1 - Imminent Peril claim notification |
| **Date:** | Tuesday, July 15, 2014 12:54:28 PM |

Hi Susan:

Sorry I missed your call. Yes, we confirm receipt of your email and have forwarded the email to the Claims Dept to start the process. Either Danny Gutterman (781-332-8550), Pamela Johnson (952-852-2455) or both will follow up on the matter.

Michael Arevalo | OneBeacon Entertainment
Tel.: 781-332-8480 | Fax: 866-640-3487 | **REDACTED**
marevalo@onebeacon.com
onebeaconentertainment.com
A Member of OneBeacon Insurance Group

-----Original Message-----
From: Susan Weiss     **REDACTED**
Sent: Tuesday, July 15, 2014 10:12 AM
To: Arevalo, Michael J.
Cc: Williams, Peter D.; Deborah Kizner
Subject: NBCU's "DIG" Season 1 - Imminent Peril claim notification

Michael,
Please see information on the below claim for NBCU TV. We spoke with Peter on Friday and gave him the intended game plan for production. Due to Imminent Peril, the production has postponed the start of episodes 2/3 by one week. They are hoping this postponement will give the situation enough time to calm down and make it safe for crew and cast to return. Below is an outline from the Production Executive on the show.

Feel free to give me a call to discuss further.

Susan M. Weiss | Senior Vice President Aon/Albert G. Ruben Insurance Services, Inc.
15303 Ventura Blvd., Suite 1200
Sherman Oaks, CA 91403-5817
CA License: 0806034
Tel: +1 818.742.0521 |     **REDACTED**     | Fax: +1 847.953.2479
     **REDACTED**     | http://www.aonagr.com

This email message, including any attachment(s), is intended only for the named recipient(s) and may contain confidential, proprietary or legally privileged information. Unauthorized individuals or entities are not permitted access to this information. Any dissemination, distribution, disclosure, or copying of this information is unauthorized and strictly prohibited. If you have received this message in error, please advise the sender by reply email, and delete this message and any attachments.

-----Original Message-----
From: Garber, Andrea (NBCUniversal)     **REDACTED**
Sent: Monday, July 14, 2014 2:15 PM
To: Susan Weiss
Cc: Deborah Kizner

**Exhibit 10**

**Williams – 2-1-17**

Subject: "DIG" Season 1 - Imminent Peril claim notification

Hi, Susan -

Following our discussion on Friday with Peter, below is the email I received from Randi Richmond, the Production Executive on the show, outlining the situation in Israel on our production "Dig" season 1. Due to the perilous conditions in both Tel Aviv and Jerusalem, production has postponed their start of the episode 2/3 block by one week. They were scheduled to start PP on 7/20 /14. The estimated cost of this push is : **REDACTED**

Please forward this on to OneBeacon on our behalf. In the past, the claim notifications have gone to Michael Arevalo and he distributes them internally as necessary.

Please give me a call if you there are any questions.

Thanks,
Andrea


Andrea Garber
Sr. Director, Risk Management
NBCUniversal
100 Universal City Plaza
Bldg. 1280, 8th Floor
Universal City, CA 91608
Phone: (818) 777-5179
**REDACTED**



-----Original Message-----
From: Richmond, Randi (NBCUniversal)
Sent: Monday, July 14, 2014 12:44 PM
To: Garber, Andrea (NBCUniversal)
Cc: Binke, Mark (NBCUniversal); Ford, Kurt B (NBCUniversal)
Subject: DIG


A) summary of where you are in the production schedule

 -Production completed the pilot on June26,2014 and was on a 'shooting' hiatus from June 29 thru July 19 and had ended the 2nd week  of a 3 week 'prep' prior to  shooting the next 5 episodes.
At the end of the 2nd week on July 11,2014 the crew was alerted to the following week being now a 'push' and their services not required.



B) what you have been advised of by security regarding the imminent peril to your operations

 - the following was an email send to Mark Binke 7/10/14 "This is to advise you that the security environment in Israel currently prohibits NBCU Security from being able to guarantee the safety and security of our employees, production partners and associated crew and talent.

NBCU Security have monitored and evaluated the events in Israel, Gaza and the West Bank, since inception and analysed information from multiple sources. All current intelligence and activity in country points to events still being in escalation phase without a predictable or realistic timeframe for a reduction in hostilities. We have looked at the magnitude and range, of current rocket attacks (which appear to target locations to be used in forthcoming

CONFIDENTIAL

AONNBCU0000129

filming), the escalation of civil disorder and potential for a further increase in hostilities including a ground campaign and acts of terrorism within Israel, all of which mean there is no short term and realistic likelihood for positive changes to the security landscape.

As the situation is unlikely to change, this raises significant concern over the level of risk facing our crew and talent, and the liability over duty of care to which NBCUniversal would be exposed. There are no current security controls that would allow NBCU Security to guarantee the safety and security of our personnel planning to arrive or currently based in Israel without the prospect of serious injury or loss of life. Personnel based in country in relation to this production should make arrangements to leave.

Thanks"

Stephen Smith
Head of Security, Europe
International Security & Crisis Management

+44 (0) 20 3618 5082 (office)
# REDACTED

NBCUniversal International
T1 Central St Giles
St Giles High Street
London WC2H 8NU
United Kingdom
www.nbcuni.com

C) what you are doing to address that (one week push at this time) and how that will impact production.

-Any crew that were hired from out of country were flown home.
Local crew reduced to minimum staffing.
Majority of crew require 1 week notice prior to time off work with no pay, therefore majority of crew will get paid for the first push week Impact to production is a delay in prep and shooting.

Confidentiality notice:

The information contained in this email message including attachments is confidential and is intended only for the use of the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, you are hereby notified that any use, unauthorized dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please delete immediately or if any problems occur with transmission, please notify me immediately by telephone.

Thank you.

CONFIDENTIAL

AONNBCU0000130

# EXHIBIT 32

**U.S. DEPARTMENT** of **STATE**

DIPLOMACY IN ACTION

**Jen Psaki**
**Spokesperson**
**Daily Press Briefing**
**Washington, DC**
**July 16, 2014**

G+1 ➕ Share

---

**INDEX FOR TODAY'S BRIEFING**

**AFGHANISTAN**
- Audit of Ballot Boxes / IEC / UN Supervision

**DEPARTMENT**
- U.S. Special Representative for the Arctic

**MIDDLE EAST PEACE**
- Secretary's Contacts
- Risks to Civilian Population
- Calls for Ceasefire / Egypt's Engagement
- U.S. Citizens in Gaza
- Two-State Solution / Reconciliation

**CHINA/DEPARTMENT**
- U.S. Welcomes China's Announcement on Movement of Oil Rig
- BRICS Summit / Plans for Development Bank
- South China Sea / Secretary Kerry Concerns

**NORTH KOREA**
- Letter to ICAO / Missile Launches / UN Security Council

**INDONESIA**

**IRAN/REGION**
- Next Steps / JPOA / Decision Hasn't Been Made on Possibility of Extension / Calls by Officials / Progress Made

**SYRIA**
- Assad / So-Called Presidential Election / Charade
- Mr. Hof

**RUSSIA/CUBA**
- Alleged Russian Intelligence Facilities

**RUSSIA/UKRAINE/REGION**
- European Council Meeting Today

**DEPARTMENT**
- Secretary Kerry's Engagement on Nominee Confirmations
- Update on Pending Nominees

**TURKEY**
- Ambassador Bass Will Serve As Strong Voice Supporting Democratic Principles in Turkey

---

**TRANSCRIPT:**

**12:58 p.m. EDT**

**MS. PSAKI:** I just have a couple of items at the top. We welcome today's announcement by the IEC that auditing of ballot boxes will begin in Kabul tomorrow, July 17th. As the Secretary announced while in Kabul last weekend, the audit process began immediately following his visit and has been ongoing since July 13th, with preparatory meetings, trainings, and working on the logistics of moving 8 million ballots in a difficult environment.

**UCP000279**

The purpose of the audit is to finalize the election and to honor the millions of Afghans who participated. The audit will be conducted by the IEC under close supervision of the United Nation in accordance with best – with international best practices, utilizing an IEC checklist supplemented by UN best practices recommendations. International and Afghan observers, along with representatives of the campaigns, will provide oversight and transparency. International observers have been trained and will be ready when the audit starts.

As Secretary Kerry promised this weekend, the United States is working very hard, hand in hand with both candidates and with Afghan officials to ensure that the July 12th agreement is translated into the actions that the people of Afghanistan expect, and ensuring the full legitimacy and credibility of this audit process.

So just to give you a few numbers: Already thousands of boxes are in Kabul ready to be counted. ISAF forces are guarding these boxes, and there are about a hundred international observers who have been trained, including 10 USAID contractors. So just a brief update on that.

Today, Secretary Kerry also announced the appointment of former Coast Guard Commandant Admiral Robert Papp, Jr. – Robert J. Papp, Jr. – to be the United States Special Representative for the Arctic. This new position was created to advance U.S. interests in the Arctic region as the United States prepares to take on the chairmanship of the Arctic Council in 2015. The Arctic has enormous and growing geostrategic, economic, climate, environment, and national security implications for the United States and the world, and we are, of course, delighted to welcome Admiral Papp, a distinguished and senior public servant with broad foreign policy experience.

With that, Matt, go ahead.

**QUESTION:** Right. Let's start with the Mideast.

**MS. PSAKI:** Okay.

**QUESTION:** First of all, can you just give us any update – the Secretary with the prime – foreign minister of Luxembourg said earlier that he was still working the phones. Are there any calls to report since we last got an update of this?

**MS. PSAKI:** Sure. Let me give you a clear update of that, and then we'll get to your next question. As has been the case for the last several weeks even, he's been in very close contact with a range of officials. Over the past 24 hours he's spoken with the Arab League Secretary General Elaraby, he's spoken with foreign minister – the Egyptian Foreign Minister Shoukry. He spoke with – let's see – the U.A.E. foreign minister, the Qatari foreign minister. He hasn't spoken with Prime Minister Netanyahu in the past – since we spoke yesterday, but I'm sure he will in the next 24 hours.

**QUESTION:** Okay. And these are all an attempt to get the cease-fire back – to push --

**MS. PSAKI:** That's correct. Mm-hmm.

**QUESTION:** -- to push the cease-fire. I don't know if you saw this, but overnight, Human Rights Watch put out a statement saying that Israel is in violation of international law attacking – with some of its attacks, at least, some of its airstrikes in Gaza, which they claim – Human Rights Watch – are actually targeting civilians. Since that report came out a little after midnight our time, there was this incident on the beach in Gaza where four children were killed. I'm wondering: Do you endorse or do you echo the call of Human Rights Watch here for Israel to stop these attacks?

**MS. PSAKI:** Well, I --

**QUESTION:** And do you think that they are, in fact, targeting civilian structures – if not civilians themselves, but civilian structures?

**MS. PSAKI:** Well, let me first say that we certainly believe – and this is the message the Secretary has conveyed to all parties – that it's in the interests of all sides to de-escalate the situation. That is a message he's conveyed to Prime Minister Netanyahu, to everybody involved in the events on the ground. And there are great risks in what is happening in the region to civilians, as you mentioned. That is of great concern to us, and certainly any death of a civilian, whether they're a child or otherwise, is certainly of great concern to the United States.

And right now the potential we're looking at is, of course, an even greater escalation of violence. I have not seen that specific report or reviewed it or discussed it with our team. Certainly, we would like to see an end to the tensions on the ground, and that's why Secretary Kerry is so engaged with the range of parties I just mentioned to all of you.

**QUESTION:** Right, but – well, but whether you've seen it or not, they say that these are unlawful airstrikes that are killing civilians and they're targeting apparent civilian structures and killing civilians in violation of the laws of war. Would you agree with – would you agree with that?

**MS. PSAKI:** I --

**QUESTION:** Whether or not you've seen it – I'm reading it to you right now – does the --

**MS. PSAKI:** I understand.

**QUESTION:** Does the Administration believe that Israel is in violation of the laws of war?

**MS. PSAKI:** I have not heard that concern expressed internally, Matt, specifically.

**QUESTION:** So you don't agree with the Human Rights Watch report?

**MS. PSAKI:** Well, again, I have not – there's not been a discussion I'm aware of a violation of international law by Israel.

**QUESTION:** Okay. Well, but even if there – whether there's been a discussion or not, the Administration's position is that Israel has the right to defend itself and it is – and its operation in Gaza is defending itself and therefore it's not in any violation --

**MS. PSAKI:** That remains our position and that has not changed.

**QUESTION:** All right. The --

**UCP000280**

**QUESTION:** (Off-mike.)

**QUESTION:** Hold on a sec. The Human Rights Watch statement said – also says that Palestinian armed groups should end indiscriminate rocket attacks launched toward the Israeli population, Israeli population centers. You would agree with that, yes?

**MS. PSAKI:** Certainly, we would agree --

**QUESTION:** Okay.

**MS. PSAKI:** And we view – and need to urgently bring an end to the escalation that we're seeing on the ground.

**QUESTION:** So you agree with Human Rights Watch when they say that the Palestinians should stop their shelling, but you don't agree with them when they say that Israel should; is that correct?

**MS. PSAKI:** Well, that's not exactly what I said at all, Matt. I think we --

**QUESTION:** Well, I'm trying --

**MS. PSAKI:** Let me finish.

**QUESTION:** Mm-hmm.

**MS. PSAKI:** Our view is that there are great risks in what is happening in the region to civilians. That is of concern to us. That's why we want to see a de-escalation from both sides.

**QUESTION:** Right. But I'm just – I just want to – I want to know why you are willing to accept or echo this Human Rights Watch call, which is something that you have been saying in the past, that the Palestinian – that Hamas and other armed groups in Gaza need to stop their indiscriminate shelling – their shelling of population centers in Israel, but you're not willing to call on Israel to stop its bombardment of what Human Rights Watch says apparent civilian structures and killing civilians in violation of the laws of war.

**MS. PSAKI:** Well, we're – been calling on and publicly and privately all sides to de-escalate. But the circumstance here is that we have a terrorist organization indiscriminately attacking and sending rockets into Israel. They have the right to defend themselves. Obviously, we'd like to see a return to the ceasefire. That's what our focus is on.

**QUESTION:** I don't think anyone is arguing that Israel does not have the right to defend itself.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** But if you don't think – but my question is whether or not you think Israel is targeting civilian structures and with the result of the deaths of civilians, including children.

**MS. PSAKI:** I don't think I have anything more to add on this particular question.

**QUESTION:** Shouldn't Israel be held to the same standards in this case?

**MS. PSAKI:** I think, Said, I've answered this question.

**QUESTION:** No, I have --

**MS. PSAKI:** Do we have other – Roz, go ahead.

**QUESTION:** No, I have --

**MS. PSAKI:** Said, I'm going to Roz.

**QUESTION:** I have – I asked another question.

**MS. PSAKI:** Go ahead, Roz.

**QUESTION:** All right. I'll try this a different way.

**QUESTION:** I have another one --

**MS. PSAKI:** We'll go to you next. We'll go to you next, Said. Go ahead, Roz.

**QUESTION:** Several journalists, including my colleague Stefanie Dekker, a correspondent from The Washington Post, a correspondent from The Guardian, all saw an attack on what can only be described as a civilian target, a fishing pier several yards from their hotel where many journalists are. And as they responded to the scene, they found that four children from one family, the Bakr family, had been killed. They said there wasn't any rocket strike that they could see or detect or hear that might ostensibly be coming from Hamas.

How is an Israeli airstrike on what can only be described as a civilian target in full view of international journalists be acceptable to the U.S. Government?

**MS. PSAKI:** Well, Roz, let me first say that obviously the circumstances on the ground are of great concern to us, including the deaths of civilians, including the impact that the tensions on the ground have had on civilian communities. Obviously, there have been a number of lives lost in Gaza, including the lives of children, and that's absolutely tragic in our view.

**UCP000281**

I'm not in a position here to confirm or give you ground updates of what's happening on the ground. What we're focused on here is de-escalating the situation using every tool in our diplomatic toolbox to do that, and beyond that I'm not going to speculate on reports of what people may or may have not seen on the ground. We know the situation is tense. We're concerned about it. That's why we're focused on seeing if there's a diplomatic path forward.

**QUESTION:** Why is it --

**QUESTION:** Can I --

**QUESTION:** Let me follow up, Elise. Why wouldn't it be reasonable to expect that civilians who, for whatever reason, happen to be living in Gaza would not become more hardened in their view of the Israeli Government, of the Israeli people, when their own children can't ostensibly go play in the surf, and instead, the next time they see their children they're on funeral biers?

**MS. PSAKI:** Well, Roz, let me first say I'd remind you again that the deaths of any individuals, any civilians, the deaths of children, how this is impacting people in the region is why the Secretary's been working on this morning, noon, and night for the past several days. Obviously, the tensions have escalated. Obviously, that has caused a great deal of violence that is of concern. But I would remind you that yesterday there was a cease-fire proposed that was abided to by the Israelis for a couple of hours that Hamas did not abide to. And they're putting their own people at risk by continuing to escalate the situation on the ground.

**QUESTION:** If Israel does have the legal right to defend itself, and I don't think anyone in this room would dispute that, because I would expect the U.S. to protect this territory from attack --

**MS. PSAKI:** Sure.

**QUESTION:** -- how is this considered an acceptable form of retaliation? Why wouldn't people on the ground who weren't near any sort of Hamas airstrike into Israel, why wouldn't they believe that this is not an act of retaliation?

**MS. PSAKI:** I'm not sure what your exact question is.

**QUESTION:** Put it more simply: If rockets didn't emanate from where I happened to be living or playing or visiting or doing whatever, and suddenly my area is targeted by a foreign government's airstrike, why wouldn't it be reasonable for me to think this is an act of retaliation and punishment, vengeance, rather than a direct response to a military attack?

**MS. PSAKI:** I still don't understand what your question is.

**QUESTION:** I think she's saying that if – that because these are civilian areas, I think you're saying that --

**QUESTION:** Yeah. They weren't (inaudible).

**QUESTION:** -- this is indiscriminate, that wholesale – the whole Gaza population is suffering. And we – I understand what you're saying about that Hamas is the party responsible for what's coming from the territory, but that the whole Palestinian population in Gaza is suffering at those hands. And yes, it may be Hamas' fault, but that they're the ones that are bearing the brunt of it.

And let me just follow up on that: Given that, is there any discussion with Israel about how you can help them or whether they have better technology for better precision in these strikes? I mean, during the – for over many years, for instance, during the Israelis surrounding the Muqata when Arafat was alive, I mean, they used to boast that they knew exactly what room he was in. So they knew – they – it was very – when they want to, they can pinpoint with pretty exact precision. So is there any discussion of any technology or intelligence or anything that could help them better with their precision?

**MS. PSAKI:** I'm just not in a position to outline any of that, Elise. Obviously, their targeting or their response is something that the Israeli Government is overseeing, not the United States. Certainly, we've expressed our concern about civilian deaths and civilian casualties to all parties involved here. And I think beyond that, that's why our focus is on now moving as quickly as we can to see if we can return to a discussion about the cease-fire, whether that's the – that was proposed by the Egyptians just yesterday.

**QUESTION:** What is the gist of the Secretary's brief with the President in the next half hour or so? Is he going to be recommending that the President step up pressure on Israel and on interlocutors for Hamas to get back to a cease-fire? What exactly is he going there to do?

**MS. PSAKI:** Well, I'm not, obviously, going to outline the President's – the Secretary's private discussions with the President of the United States, but part of their discussion will certainly be on the situation on the ground that we've been discussing. It will also be about the P5+1 negotiations. I think you've seen a commitment by Secretary Kerry as well as by the President to reach out, to engage with any entity in the region who can play a role here on influencing Hamas and trying to take steps forward back to the cease-fire.

**QUESTION:** Has anyone spoken with President Abbas?

**MS. PSAKI:** Our team on the ground remains in close touch, and that will certainly continue. And the Secretary's – I've outlined some of the calls that he has done, but we receive many updates. He's in close touch with the team on the ground as well about what's happening on the ground.

**QUESTION:** Are you counseling Israel not to bomb hospitals?

**MS. PSAKI:** Said, I think --

**QUESTION:** Are you telling the Israelis not to bomb hospitals like Wafa Hospital and the Shifa Hospital? Again, (inaudible).

**MS. PSAKI:** Said, I think I've been clear --

**QUESTION:** Okay.

**MS. PSAKI:** -- that we've expressed our concern about civilian casualties. Obviously, we want to see an end to what's happening on the ground, and a de-escalation is in the interest of everyone.

**UCP000282**

**QUESTION:** I understand. But I remember last week asking you, and you said that the Israelis give warning to the Palestinians to evacuate. Now many of them evacuate to the beach out there, as was the Bakr family, and they have been hit. There isn't really many places to evacuate to, so what should the Palestinians do to escape this onslaught of Israeli bombardment? I'm talking about civilian – Palestinian civilians. What do you suggest to them?

**MS. PSAKI:** Well, Said, I think part of our focus here is on working with all of the parties who can have influence on the circumstances on the ground so civilians are not impacted. And obviously, that's one of the driving forces and motivations for us being as engaged as we are.

**QUESTION:** Okay, but seeing that this Gaza problem lingers on time and time and time again, and basically it is bad because it's – because of the siege, because of the lack of access, because of the humanitarian conditions – unemployment is 60, 70 percent and so on – why can't the ceasefire include a – either a promise or a commitment to open up these entry points, border points between Egypt and Gaza – between Israel and Gaza?

**MS. PSAKI:** Well, the Egyptians have the lead on the proposal. They will remain in the lead on that and in discussions about that. As you know, there are some discussions going on on the ground today. President Abbas is in Egypt today; so I'd point you to them for any specific updates about their proposal.

**QUESTION:** There are some who are throwing around the idea that maybe Israel should reoccupy the strip closest to Egypt, that small, narrow area and the border between Egypt and Gaza. Is that something that the Administration --

**MS. PSAKI:** I'm not going to speculate further --

**QUESTION:** Okay.

**MS. PSAKI:** -- on the proposals.

**QUESTION:** And my last question on the issue of Palestinian Americans in Gaza.

**MS. PSAKI:** Okay.

**QUESTION:** Did you find out what is the status of Palestinian Americans?

**MS. PSAKI:** Sure. I did. I did, after you asked that question yesterday.

So the U.S. Consulate General in Jerusalem continues to work to facilitate the safe passage of U.S. citizens from the Gaza Strip. That's an ongoing process. As you know, there was a message that we sent out July 10th, so just about a week ago, and we received quite a few responses from U.S. citizens and their immediate family members. I believe that on the ground they've put out a number of about 300 responses. The U.S. Consulate General Jerusalem has also – has now provided assistance to approximately 150 U.S. citizens and their family members to depart Gaza. And these individuals who checked in were – would check in at the point of departure and their – they've been transported to Jordan via a bus. This is an ongoing process, and we're continuing to engage with the local community to ensure that we can assist as many American citizens as possible.

**QUESTION:** And the same thing is true with the border with Egypt?

**MS. PSAKI:** In terms of their movements?

**QUESTION:** Yeah, their movement. Can they go through Egypt?

**MS. PSAKI:** I'm just not going to get into greater detail about how we're moving these individuals out.

**QUESTION:** What in your view is the goal of the cease-fire? Is it just to stop the rocket fire and have calm and quiet in a lasting way? Or is it something larger to kind of break Hamas' choke-hold on Gaza, disarm the territory, and see if you can use this opportunity to empower President Abbas or the Palestinian Authority to take – exert greater control over?

**MS. PSAKI:** Well, Elise, I think the first goal is the primary, immediate goal right now. Obviously, we know that this has been an ongoing issue that has long preceded the events of the last couple of weeks. If there's a possibility of a larger conversation, we'll leave that to the parties who are engaged in this to have.

**QUESTION:** But what would you – I mean, what would you – when you clearly the – while I understand you're saying that this is an Egyptian proposal, clearly the United States is involved in the discussions. And you've said and Secretary Kerry has said that you're willing to help facilitate. So what are you trying to facilitate? Are you trying to facilitate an end to this current round of violence, or something that changes the status quo?

**MS. PSAKI:** Well, the United States certainly would like to see an end to this current round of violence and a de-escalation of the tensions on the ground. And certainly we'd love to see a lasting peace in the region. Now our view is that will also require a two-state solution between the parties. Beyond that, I think we're just taking it day by day and playing the diplomatic role that we can play.

**QUESTION:** I understand about a two-state solution and all of that, but you seem to have been skirting around for years, and certainly what's going on right now is even – the issue is even more germane of Palestinian reconciliation and how one of the Palestinian parties is in a conflict with Israel while the other is not. So is de-escalation enough or can you really not have – are you bound to keep repeating this cycle of violence until something is done in Gaza?

**MS. PSAKI:** Well, there are a range of steps over the long term that obviously would need to be taken. A two-state solution is one of them. Obviously, given --

**QUESTION:** You could have a two-state solution, but you still – if Hamas --

**MS. PSAKI:** Let me finish.

**QUESTION:** -- still controls Gaza --

**MS. PSAKI:** Let me finish. Obviously, given – we've not – our position as the United States Government is not opposition to reconciliation. As you know, there are certain requirements that we would need to see in place in order for our relationship to continue. Given the circumstances right now, it's hard to see how that could

**UCP000283**

EXHIBIT 32, PAGE 238

move forward at this point in time. However, what our focus is on right now is bringing an immediate end to the violence. We're not ending our engagement or our work with the region if we see an end to violence. Obviously, discussions will continue about a range of issues.

QUESTION: The collapse of the Egyptian peace ceasefire initiative clearly shows that the relationship between the military-backed government in Egypt now is nothing like it was with Morsy's government, which brokered the cease-fire in 2012. So to what extent is the Secretary using these calls to regional players like Qatar to get them to reform – to get involved to reformulate a cease-fire proposal that might be more acceptable and more – that might gain Hamas' trust? And does Turkey have a role to play in this as well? Because they also have something of a bond with Hamas and Gaza.

MS. PSAKI: Mm-hmm. Well, the reason the Secretary's engaged in such a broad number of calls is the point you've raised, which is there is – there are many players in the region, many countries in the region who have a stake, who have different relationships with the relevant parties on the ground. And he is open to engaging with any country and any leader who can help play an influential role with Hamas. What we want to see is an end to the violence on the ground, a return to a restoration of the 2012 cease-fire.

In terms of the specific details and particulars, we'll continue to discuss those through private channels, but obviously the end goal is what our eyes are focused on.

QUESTION: Jen, just to – I have a quick follow up on a question that I asked yesterday.

MS. PSAKI: Yeah.

QUESTION: Seeing that Gaza is really twice the size of DC and has more than three times the population – so it's very densely populated – in this case, why shouldn't Israel be held to the same standard to avoid the – a high possibility of civilian casualties or intense civilian casualties in a state of – like Elise raised and Roz raised, having targeted targets?

MS. PSAKI: Well, Said, I think as I've mentioned in response to a similar question you've asked a couple of times before --

QUESTION: Right.

MS. PSAKI: -- Hamas is a terrorist organization. They've been firing indiscriminately into Israel. Israel – we want to see an end to the violence. We want to see a de-escalation of what's happening on the ground. They have the right to defend themselves. So I think the context of the circumstances on the ground is an important component of the answer here.

QUESTION: Yeah, but that same right to defend themselves is denied to Hamas because it is a terrorist organization regardless to what the population's position is, correct?

MS. PSAKI: Well, Hamas is putting their own people in Gaza at risk by continuing their actions.

QUESTION: So that means that it's okay?

MS. PSAKI: I did not say it was okay. I did not say it was okay.

QUESTION: More --

MS. PSAKI: That's why our focus is on de-escalating the situation on the ground.

QUESTION: More broadly, since this began, you have been counseling restraint on the side of the – on the Israelis and an end, obviously, to the rocket attacks. Today – and you have commended the Israelis, I believe, for showing restraint thus far. Can you still – are you still of the opinion that Israel has shown restraint in its operation?

MS. PSAKI: Well, yesterday, Matt, I was referring to the time where they – the Israeli cabinet abided by the cease-fire.

QUESTION: No, but even prior to that?

MS. PSAKI: That's true. I don't have any new – anything new to offer for you today.

QUESTION: Okay. So it's the opinion of the U.S. Government that the Israelis are still showing – well, I won't use a qualifier – that the Israelis are using – are showing restraint in their operation to exercise their right to self-defense?

MS. PSAKI: The comments I made about the cease-fire yesterday certainly stand, Matt, but obviously, we – the situation on the ground changes every day.

QUESTION: So if you don't agree that – I mean, if you say that Hamas – this is Hamas' fault, they're putting their own people at risk. That suggests that you think that whatever Israel does is okay and comes within their rights to self-defense. But correct me if I'm wrong, please.

MS. PSAKI: Not what I suggested, Matt. I'm speaking to circumstances that are happening on the ground, and I think the most important issue here is what we're working to do to bring an end to this violence, which is what our efforts and our focus is on.

QUESTION: When there has been collateral damage and civilian casualties in U.S. military operations – in Afghanistan, in Iraq, elsewhere – the United States has often apologized, paid compensation. Would you call – would you suggest or tell the Israelis that the same thing might be appropriate here?

MS. PSAKI: I'm not suggesting that, no.

QUESTION: Nope? So you would not?

MS. PSAKI: No.

QUESTION: So the people who have been killed, including these children – it's – frankly, it doesn't seem to – it doesn't faze you?

**UCP000284**

EXHIBIT 32, PAGE 239

**MS. PSAKI:** That's not at all what I said. I think I've stated multiple times that the deaths of civilians, the loss of lives for children and individuals in Gaza is horrific and is a tragedy. And that's why we're so focused on bringing an end to the violence, and I think that's far more important than a speculation about --

**QUESTION:** Right, but it's – but it's horrific and it's a tragedy, but you're saying that it's the fault of Hamas for not stopping the rocket fire.

**MS. PSAKI:** They certainly are at fault in part here, yes.

**QUESTION:** Can I get back to this Hamas proposal for – their own ceasefire proposal that they have put out, that in addition to a cessation of the hostilities – some of these other things, particularly like fishing rights, payment of salaries, opening of the – closing of Israeli aircrafts to Gaza airspace – I mean, do you think that some of these things should be considered as part of the cease-fire talks?

**MS. PSAKI:** I'm just not going to do a negotiation from here.

**QUESTION:** No, I understand, but – I mean, there are certain things that Israel has called for in order for there to be a cease-fire. Do you think it's reasonable that Hamas should have certain demands – certain conditions that they want met as well, or do you see this as a one-sided thing where Hamas has to stop the rocket fire in order for Israel to stop.

**MS. PSAKI:** Well obviously, Hamas would have to agree to a cease-fire. But in terms of what the specific details would be, I'm not going to do that from here.

**QUESTION:** But do you – but – I mean, I understand maybe you don't want to speak about the specific things. But do you see Hamas as having any legitimate demands, or – I don't even know if I want to use the word "demands." But as part of a negotiation, it's really two sides that are negotiating. Or do you just see this as Hamas has to agree to what Israel is calling for?

**MS. PSAKI:** Well, I don't think that's realistic, in the sense that, obviously, Hamas has to agree to a cease-fire. But beyond that, in terms of what it would entail or whether there will be requests or demands met, I'm just not going to speculate on that further.

**QUESTION:** Have you seen the Hamas cease-fire proposal?

**MS. PSAKI:** I just don't have any more details from here on this.

Do we have more on this issue? Should we move on? You want to go into --

**QUESTION:** No, I'm sorry. I --

**MS. PSAKI:** Go ahead.

**QUESTION:** This is not – this is just a logistical thing.

**MS. PSAKI:** Okay.

**QUESTION:** You said you would expect that the Secretary to speak with Prime Minister Netanyahu within the next 24 hours. Is that right?

**MS. PSAKI:** He's been in – he's been speaking with him frequently, so I was setting the expectation. I would suspect he speaks within the next 24 hours.

**QUESTION:** Okay. Is he still open – the Secretary – is the Secretary still open to going to the region if – I mean, that's still an option?

**MS. PSAKI:** Yes, he certainly is. I have nothing to announce at this particular moment.

**QUESTION:** All right.

**MS. PSAKI:** Go ahead in the back, and then we'll go to you. Go ahead.

**QUESTION:** A couple of questions first on China.

**MS. PSAKI:** Okay.

**QUESTION:** China just moved one of the oil rigs in South China Sea.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** Do you applaud this move?

**MS. PSAKI:** We welcome China's announcement that it is moving its oil rig from its location near the Paracels to an area closer to Hainan Island. The oil rig incident has highlighted the need for claimants to clarify their claims in accordance with international law to reach a shared understanding on appropriate behavior and activities in disputed areas. We support relevant parties adopting a voluntary freeze on provocative unilateral actions in support of further implementation of the 2002 code of conduct for the South China Sea between China and ASEAN.

**QUESTION:** Do you see the reason behind it – does it have anything to do with your recent call of all claimants to freeze their provocative actions, or the President's call with Chinese President Xi, like if they have reached any consensus?

**MS. PSAKI:** Well, the White House, of course, put out a readout of their call. As you know, issues related to maritime issues, issues related to the South China Sea often come up. The Secretary certainly discussed these issues and reiterated his concern while he was in China just last week. I'm not going to speculate on China's reasons for withdrawing its rig, but of course, we have expressed our same concerns publicly as we have privately.

**QUESTION:** And a quick one on the announcement of the BRICS bank yesterday. First of all, what's your thought on this?

**MS. PSAKI:** I think – I don't know that I have much more than I said yesterday. I'm happy to reiterate that. I know there have been some announcements over the course of the last 24 hours. As I noted yesterday, this summit is a venue for leading emerging economies to discuss economic issues they may have in common.

**UCP000285**

Obviously, they made an announcement about the plan for the creation of a BRIC development bank. There are no – not a lot of details about the specific focus that this planned development bank would play – or what it would have – the specific focus it would have, I should say. And many of the important details, including its governance and any relationships with the established international financial institutions aren't clear yet. So we'll wait to see what more details emerge.

QUESTION: But do you have any concern that the China and Russian lead BRICS bank may affect the U.S. interest?

MS. PSAKI: Well, again, without knowing the objectives or the focus or the means of governance, it's hard for us to speculate on that or worry about it at this particular moment.

QUESTION: If it is modeled after the World Bank, I mean, if they are trying to replicate the World Bank, would that be fine with you?

MS. PSAKI: Said, I don't think we've seen the details of how it's modeled, and obviously, it has to serve a particular role and needs to these countries that works with the other financial institutions that are out there internationally.

Go ahead.

QUESTION: One more on the South China Sea?

MS. PSAKI: Mm-hmm, sure.

QUESTION: So Chinese Government still emphasize that it has not any plan to stop the – carrying out the exploration activities in water. What's the view on – what's the U.S. view on that?

MS. PSAKI: Well, I think – our view, I think, on – is well known on this issue. We certainly maintain a national interest in maintenance of peace and stability and respect for international law, unimpeded lawful commerce and freedom of navigation and overflight in the South China Sea. The Secretary reiterated just last week his concerns about some of the recent actions when he was in China and those have not all been addressed.

Do we have any more on Asia or --

QUESTION: Just one.

MS. PSAKI: Okay. Go – Asia, Asia, go ahead.

QUESTION: Please. The U.S. has joined several other countries in writing to the International Civil Aviation Organization about North Korea's recent missile launches --

MS. PSAKI: Mm-hmm.

QUESTION: -- and the threat that those launches might pose to civil aviation. Can you tell us about that?

MS. PSAKI: Sure. On July 8th, so just last week, we cosigned – the United States cosigned a letter to the president of ICAO expressing concern with the serious threat to international aviation posed by North Korea's recent rocket and missile launches. We've talked about them a couple of times but there have been more than a half dozen, and certainly, that's raised concern.

North Korea's decision to conduct these launches without prior notification threatens the safety of international aviation and demonstrates North Korea's disregard for the rules and regulations of the organization, and hence our effort to express our concern from the United States.

QUESTION: North Korea?

MS. PSAKI: North Korea, sure.

QUESTION: I asked this question last week but didn't get a clear answer, and North Korea has, you said, fired a number of missiles, rockets and artillery rounds recently. And some of those launches violated UN Security Council resolution --

MS. PSAKI: Mm-hmm.

QUESTION: -- including the Scud launches last weekend, another set of ballistic missiles fired this week. North Korea is flouting these UN Security Council resolutions every week and – but it looks like all you do is just expressing concern over and over again. And I'm wondering if the U.S. has any plan to raise this issue at the Security Council, because there's no point of having these kind of resolutions unless violations are properly dealt with.

MS. PSAKI: Well, let me give you a little bit of context. There are times when we have to do a little more work confirming some of the details, so according to our information that North Korea launched two Scud-class short-range ballistic missiles from its southwest region on July 13th. Both missiles flew in a northeasterly direction and impacted the sea, and that was, of course, just a couple of days ago, but as I mentioned, sometimes it takes a little time to confirm specifics. And certainly, we are concerned about the most recent round of ballistic missile launches. These are yet another – this is yet another violation of multiple UN Security Council resolutions, and these provocative actions heighten tensions in the region and will not provide North Korea the prosperity and security it claims to seek. And obviously, the UN Security Council has the lead on deciding next steps here. In terms of our role, I can check on that and see if there's more specifics about our engagement with the UN Security Council.

QUESTION: You're not aware of the council considering any action at this point, though, to --

MS. PSAKI: I have not seen any updates from their end, but certainly, we view these as a clear violation.

QUESTION: Okay. And then on the ICAO thing, I don't know this and I don't know if you know it either --

MS. PSAKI: Okay.

**UCP000286**

EXHIBIT 32, PAGE 241

**QUESTION:** -- but does North Korea have a representative at this organization? It seems to me that writing to the head of ICAO instead of contacting the North Koreans directly would be – is a bit odd. I mean, I can see writing to both of them. Do you know if there was any contact with the North Koreans directly?

**MS. PSAKI:** I do not know if North Korea has a representative. We can certainly – I'll look into that, Matt.

**QUESTION:** But do you know if the same --

**MS. PSAKI:** But obviously, they have oversight over --

**QUESTION:** Right, fair enough.

**MS. PSAKI:** -- civil aviation issues, so --

**QUESTION:** But you don't happen to know if that same letter was cc'd to Pyongyang, do you?

**MS. PSAKI:** I do not have that level of detail. I'm sure we can check on that for you.

Do we have any more on Asia? Okay.

**QUESTION:** On Indonesia?

**MS. PSAKI:** Sure.

**QUESTION:** I know it's been addressed before, but the election. I wanted to see if the U.S. had anything further to say about the deadlock after the election. What's the level of concern with the lack of – or the rival claims to victory there?

**MS. PSAKI:** Well, I know that has been – I don't know that I have anything particularly new on this, Shaun, though we're happy to follow up afterwards and connect with the appropriate person from post on the ground, if that's helpful. Obviously, we – our understanding is that they're expected to announce the official results by July 22nd. And certainly, we remain committed to the close relationship we have based on common interests and values, but we typically would wait until the official announcement is announced before we have any additional comment.

Any – okay, Asia? Not – no more Asia. Go ahead, with the red shirt.

**QUESTION:** Hi. Kenneth Handelman recently spoke about the possibility or hinted about the possibility of loosening controls for the export of armed drones. Is there, first of all, a timeline for when this announcement will be made, what kind of factors play into this decision, and who the potential allies that we'd be seeking these drones for are?

**MS. PSAKI:** I don't have any details on that. We can check and see if there are any to share.

**QUESTION:** Iran?

**MS. PSAKI:** Iran? Sure.

**QUESTION:** If no comprehensive agreement is reached by July 20th, will the Administration recommend more sanctions?

**MS. PSAKI:** Well, let me just give you all a quick update. One, I'm not going to get ahead of the conclusion of this round of talks. Obviously, as you note – as you know, there are discussions that are ongoing on the ground with our team that's continuing to negotiate. The Secretary's meeting today with the President and Vice President to discuss the Iran talks, as I noted in response to Roz's question, and they will, of course, receive a briefing on the Secretary's conversations in Vienna and talk about the path forward.

And part of what they'll be talking about and what our teams will be talking about on the ground is whether taking more time for negotiations makes sense given the progress that has been made. And we'll also be engaging with Congress on that discussion. And obviously, there are a range of proposals that are out there, but we're just going to take this one day at a time and determine whether we have the progress that's needed to proceed and what steps would be taken accordingly.

**QUESTION:** And what progress has been made thus far?

**MS. PSAKI:** Well, again, I think as the Secretary noted yesterday, we're going to leave the negotiations behind the – at the negotiating table. You're familiar with the issues that are being discussed and the difficulty of those. But that's one of the factors – of course, the main factor – that will be part of our decision making.

**QUESTION:** The Iranians are saying, I mean pretty much – well, I think they're going even a little bit more forward-leaning than you in saying that, obviously, the goal is to get a deal by the end of the week, but they're already discussing that it's possible that there may be an extension. And so --

**MS. PSAKI:** Well, Elise, there's a discussion going on in Vienna and certainly an active discussion about the options, including that option. No decisions have been made at this point in time.

**QUESTION:** Jen, eight --

**QUESTION:** But Jen --

**QUESTION:** Hold on. Eight months ago, you said from that podium, "If the Iranians don't get to a yes at the end of six months, we can put in place more sanctions." Is that not the case anymore?

**MS. PSAKI:** Well, look, I think, Lucas, our focus here and our primary goal is preventing Iran from acquiring a nuclear weapon. We are going to let the negotiations proceed on the ground. There'll be ongoing discussions with a range of senior officials, with members of Congress, and I'm not going to get ahead of that process.

**QUESTION:** But is what you said no longer the case?

**UCP000287**

EXHIBIT 32, PAGE 242

**MS. PSAKI:** I would have to look at the context of the comments, Lucas. But I think our goal here has remained the same and we're looking at the negotiations through the prism of what our goal is.

**QUESTION:** And Jay Carney said the same thing. He said, "If Iran fails to reach an agreement with the P5+1 on the more comprehensive agreement over the course of six months," he said this back in December, "we are very confident that we can work with Congress to very quickly pass new, effective sanctions against Iran."

**MS. PSAKI:** Well, I think the discussion, Lucas, is about whether there's been enough progress made to continue these negotiations. It's been written into the JPOA, the possibility of an extension. Obviously, a decision hasn't been made, but we're working through what the best – what's in the best interests of the United States, our P5+1 partners, and our goal of preventing Iran from acquiring a nuclear weapon.

**QUESTION:** Given the fact that it's --

**QUESTION:** Was that the terms, though?

**QUESTION:** Given the fact that you're still negotiating – you haven't closed off the negotiations, even though, I mean --

**MS. PSAKI:** Sure, mm-hmm.

**QUESTION:** -- I know the deadline is Sunday. But it seems as if that would indicate that you think that there's enough good faith in the negotiations that would merit a continuation of them.

**MS. PSAKI:** Well, I wouldn't – I think we're making that determination right now. So that's part of the discussion the Secretary will have today with the President and the Vice President, and certainly part of what our team is discussing on the ground.

**QUESTION:** But I mean, whether – if you haven't already determined that, then I mean that would indicate that you're just running out the clock for the next couple of days.

**MS. PSAKI:** It's not an indication of that at all. I think our team is working to make a determination about whether it makes sense, given the progress that has been made, to proceed. And there are obviously a range of very senior officials who will be a – play a part in that decision making.

**QUESTION:** But even Mr. Carney was very clear that if Iran fails to reach a comprehensive agreement after six months there would be more sanctions. That's not the case anymore?

**MS. PSAKI:** Again, Lucas, I'd have to look at the context. I think we've always known it was written into the GPO – JPOA that if there was mutual agreement, there could be a six-month extension. Obviously, we want to take steps that would allow a negotiation to proceed, if that's the case. But we're going to take it one day at a time and see what's needed.

**QUESTION:** Does an extension help Iran more than the United States?

**MS. PSAKI:** I think – again, I'm not going to speculate on what decision may or may not be made, Lucas. But our goal here is to prevent Iran from acquiring a nuclear weapon. That helps not only the United States but countries in the region, and obviously Iran has its own reasons for being engaged in these discussions.

**QUESTION:** So if Iran has six more months, potentially, does that help them acquire a nuclear weapon, or does not help them acquire one?

**MS. PSAKI:** I think there have been several steps that were taken in the interim agreement, as you're familiar with. But I'm not going to speculate further on what that may or may not look like, given a decision hasn't yet been made.

**QUESTION:** Any conversations with members of Congress since the Secretary returned?

**MS. PSAKI:** Well, he just got back last night, as you know. There have been calls made by Deputy Secretary Burns, by Under Secretary Sherman, by Tony Blinken over at the White House. Those calls were made yesterday. They've continued. I don't have anything else to predict for you, but we're making decisions day by day on our engagement.

**QUESTION:** Can you say to whom those calls were made? Are we saying foreign relations, are we saying armed services? Who's at the receiving end?

**MS. PSAKI:** I don't have a list of those calls. I can see if there's anything more specific.

**QUESTION:** But the Secretary plans on making his own, I would assume.

**MS. PSAKI:** The Secretary plans to absolutely be engaged, of course, with members of Congress, as he stated yesterday.

**QUESTION:** Is there any plans for him to brief them or meet with them or anything on the Hill planned?

**MS. PSAKI:** Not at this moment, but we're making decisions day by day. And obviously, there are a range of senior officials who are – have been very closely involved in this who are certainly qualified and able to also brief members of Congress.

**QUESTION:** One more. Would the Administration grant an extension with no additional sanctions?

**MS. PSAKI:** I'm not going to speculate further on the circumstances that would go into granting or not granting an extension.

**QUESTION:** You've said several times that people are looking at the progress that has been made and whether it's worth it to continue if an agreement isn't reached by the 20th. What constitutes what you called "enough progress" to do that?

**MS. PSAKI:** Well, that goes into the discussions of those particular issues.

**UCP000288**

EXHIBIT 32, PAGE 243

**QUESTION:** Just very broadly, what would constitute – not specifics at all. What – very broadly, what would constitute enough progress to make an extension worthwhile?

**MS. PSAKI:** Well, I think, Matt, obviously on the core issues that you're familiar with, whether it's enrichment or other issues that are pivotal to these discussions, whether we've made enough progress on issues to see a path forward. And that's a decision being made on the ground and through discussions at a very high level.

**QUESTION:** But there has been – but you aver that there has been some progress; it's a question of whether it is enough to warrant an extension.

**MS. PSAKI:** That's correct, yes.

**QUESTION:** So would you – if you had to compare the progress made here with the progress that we heard so much about during the Israeli-Palestinian peace talks, how would you – where would you – that rate? About the same? More? Because as we all know, the progress that was allegedly made during the peace talks amounted to nothing in the end.

**MS. PSAKI:** Well, Matt, I would disagree with that as well. Just because we didn't talk about it publicly doesn't mean that it wasn't made. There was a great deal of progress made in the peace talks; there has been progress made in Iran negotiations. I don't – I can't tell you right now if we're going to be able to outline that publicly or not.

**QUESTION:** Well, given what's happening right now between Israel and the Palestinians, I hope there was more progress made in the Iran negotiations.

**MS. PSAKI:** Well, as you know, that the circumstances on the ground – the environment on the ground existed long before the Secretary made an effort to reignite the peace process.

**QUESTION:** Yeah.

**QUESTION:** Still on the conflict. If it's decided that there will be an extension, will it come out in the form of a statement, press conference?

**MS. PSAKI:** You always like to ask – how things will be rolled out.

**QUESTION:** I love it, yeah. I mean – if you know.

**MS. PSAKI:** I don't have any prediction of that for you at this point in time, Said.

I can just do a two – couple more, because I just have a meeting at two o'clock.

**QUESTION:** On North Korea. (Inaudible.)

**MS. PSAKI:** Mm-hmm.

**QUESTION:** In fact, there's talk right now about the – negotiating teams returning to capitals on Friday the 18th and announcing an extension. Was this decision made prior to the Secretary left --

**MS. PSAKI:** I understand that has come out in some Iranian press, but there hasn't been a decision made yet about an extension. So it's – would be hard to see how a rollout plan would be made.

**QUESTION:** Syria. Syria.

**MS. PSAKI:** Syria, okay.

**QUESTION:** Yes. Today President Assad gave a speech after the election, and he said that he pledged that uphold laws and freedoms in his third term. What's your reaction?

**MS. PSAKI:** Well, we've been clear that President Assad – that Assad has no more credibility now than he did before the so-called presidential election. And while Assad and his regime include in this charade – indulge in this charade, I guess I should say – Syrians are starving and besieged in Damascus, dodging barrel bombs in Aleppo, fleeing across Syria's borders for refuge, and enduring unspeakable abuses in regime prisons and detention facilities. And in the face of this, we will continue to help the Syrian people stand up against Bashar al-Assad and support those who fight for the right of all Syrians to choose their own future. So our concerns are no different today than they were yesterday, than they were right before this farcical election.

**QUESTION:** Just one more follow-up: Speaking of helping Syrian people, former U.S. State Department official Fred Hof wrote couple days ago that your Administration asked Congress for an opposition equip and train funds. And according to his analysis, this cannot happen – realized until the ideal circumstances, until the end of 2014. Is that a fair assessment?

**MS. PSAKI:** Well, Mr. Hof is a private citizen, and I'm not sure he has all of the details on all of the plans that have been proposed. Obviously, part of our effort is what you just outlined: the President's announcement to increase the kind of and expand the kind of support that we're providing to the moderate opposition. Daniel Rubenstein is on his way back from the region; he's been there for quite some time, meeting with a range of countries, meeting with the opposition as well. As you know, they just elected – the opposition just elected new leadership. So there are a range of steps that we're taking, and obviously, we want to see it move as quickly as it can. There's a process for that. I don't have any predictions on the timeline.

**QUESTION:** So this --

**MS. PSAKI:** But I have to move on so I can just do a few more.

**QUESTION:** -- this fund can reach them before 2014, is what you are saying?

**UCP000289**

**MS. PSAKI:** I don't have any predictions on the timeline. I'd just remind you that Mr. Hof is a private citizen and not currently employed by the United States Government.

Scott, go ahead.

**QUESTION:** Do you have any thoughts on Russian plans to reopen its electronic surveillance base in Cuba?

**MS. PSAKI:** Sure. Well, given, Scott, there hasn't been any formal announcement for – from the Russian or the Cuban Governments, I have very little to say. I'd of course – and would, naturally, have nothing to add on alleged Russian intelligence facilities. So if there's more public statements made, perhaps we'll have more to say.

**QUESTION:** Can you – can I ask you about --

**QUESTION:** Jen, staying on Russia, then Ukraine.

**MS. PSAKI:** Yes. And then we'll go to Michele, sorry.

**QUESTION:** As you know, the Europeans are meeting today right now --

**MS. PSAKI:** Yes.

**QUESTION:** -- soon, and – to discuss potential additional sanctions.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** In the view of the Administration, has Russian – has the Russian behavior gone now to the point where a new – you are encouraging the EU to enact a new round of sanctions?

**MS. PSAKI:** Well, we've been engaged in that discussion with them for some time. And obviously, all of our efforts are focused on being coordinated. We know that there's strength in numbers, especially when we're talking about impacting an economy. I – as you noted, the European Council is meeting today. We anticipate they'll discuss Ukraine at their dinner tonight, which should be taking place about now. It's possible we'll have more for you later today when we get closer to the end of the Council's discussions, including from here. But I would just say that we've been encouraging, of course, the Europeans to keep considering and keep on the path of preparing additional sanctions, just as we are doing on our end.

**QUESTION:** I – understood, but do you believe that the time has come to pull the trigger on new sanctions?

**MS. PSAKI:** Well again, that's of course up to the Europeans to determine, but we have certainly been discussing the need to keep sanctions prepared and ready to go. And certainly, the actions of the Russian-backed separatists – supported, in many cases, by the Russians – have not given us a great deal of pause in our preparations.

**QUESTION:** Just some quick ones.

**MS. PSAKI:** Okay, let – can we go to Michele?

**QUESTION:** Yeah – oh, Michele. Excuse me. Yeah.

**MS. PSAKI:** She hasn't had one. I just have to go in a minute here.

**MS. PSAKI:** Go ahead, Michele.

**QUESTION:** Thank you. I'm wondering if you can fill us in on what the Secretary has been doing to speed up the confirmation process for these ambassadors who have been lingering out there.

**MS. PSAKI:** Sure. Let me just give you a quick update on this, Michele. Well, you probably did see the Secretary's op-ed opinion piece last week. We also have been engaged with members of Congress through our office here on the need to move forward as rapidly as possible with confirming nominees. As you are all aware, we have the AU Summit coming up in early August where we'll be welcoming dozens of African leaders to the State Department, while at the same time we have nearly a full 25 percent of total ambassadorial posts or present – or posts in the continent are without an ambassador.

So what we're doing is the Secretary is asking our team every morning for an update, working through every channel we have to encourage fast movement on confirming nominees. In his opinion piece last week, he proposed considering career nominees in the same way that military nominees are proposed. We're continuing to work with our colleagues on the Hill on that. And right now the numbers stand at 55 Department nominees still pending before the Senate, 39 of whom are noncontroversial career diplomats, 33 have been approved by the Senate Foreign Relations Committee and could be confirmed with a simple voice vote on the Senate floor.

**QUESTION:** Hold on.

**QUESTION:** Wait, wait. Thirty-nine are noncontroversial career diplomats? Does that mean that there are some career diplomats who are controversial?

**MS. PSAKI:** I was using that as an adjective, Matt, for career diplomats who have served for decades. Those are --

**QUESTION:** Okay. But you're not saying that career diplomats can't be controversial.

**MS. PSAKI:** I'm saying that these are 39 career diplomats who should be confirmed as quickly as possible.

**QUESTION:** And – okay, but other than the 39, are you – does that mean that the others are controversial political appointees?

**MS. PSAKI:** They are not.

**UCP000290**

**QUESTION:** Okay.

**MS. PSAKI:** They are political appointees, so I was --

**QUESTION:** Right. But not necessarily controversial?

**MS. PSAKI:** Not controversial.

**QUESTION:** Just a follow-up --

**QUESTION:** The proposal --

**MS. PSAKI:** Go ahead, Michele.

**QUESTION:** The proposal that he's making is to vote for those 39 noncontroversial ones as a lump sum?

**MS. PSAKI:** Correct. Yes, exactly.

**QUESTION:** I have one question on that.

**MS. PSAKI:** Mm-hmm.

**QUESTION:** John Bass, Mr. John Bass at the Hill for his hearing yesterday as well. I think he's one of the 39. But Senator McCain several times ask him if he thinks Turkey's becoming more authoritarian, and he considered the fact that Turkey is becoming more authoritarian. As an ambassador who's going to Turkey very soon if he's confirmed, do you think he's going to be a problem for his post?

**MS. PSAKI:** Well, first, let me say that his comments were consistent with the concerns we have previously expressed, including in the annual Human Rights Report. We remain committed to supporting democracy, human rights, and fundamental freedoms in Turkey. And when they're not met, we certainly express our concerns, and that's true in many countries around the world. Ambassador Bass is – will serve as a strong voice on the ground in support of democratic principles in Turkey. I worked very closely with him, can't think of a better representative for the United States, and I'm – I can assure you that when he's confirmed, I think the people of Turkey will see that as well.

**QUESTION:** So you also agree with him that Turkey's becoming more authoritarian?

**MS. PSAKI:** I think we have expressed concerns in the past when we haven't seen actions that represent abiding by human rights – respect for human rights and media freedoms, and that's also noted in our Human Rights Report.

**QUESTION:** Did you get an answer to my Iran oil export question from yesterday?

**MS. PSAKI:** I did.

**QUESTION:** Do you have time to do it now or do you want to put it out as a taken question?

**MS. PSAKI:** Why don't we put it out as a taken question and we can discuss it further tomorrow if you'd like.

**QUESTION:** Okay. Thank you.

**QUESTION:** Can you (inaudible)?

**MS. PSAKI:** We'll be back tomorrow.

**(The briefing was concluded at 1:53 p.m.)**

**DPB # 123**

**UCP000291**

EXHIBIT 32, PAGE 246

# EXHIBIT 33

From:    Johnson, Pamela A.
Sent:    Wed 7/16/2014 12:45 AM (GMT-00:00)
To:      Gutterman, Daniel S.
Cc:
Bcc:
Subject: RE: NBCU's "DIG" Season 1 - Imminent Peril claim notification

Danny,

It looks like we need to have a lot of further discussion about this.  Please call me first thing in the morning.

Best,

Pamela A. Johnson, Esq. Assistant Vice President  | OneBeacon Entertainment
tel: 952.852.2455  | PamelaJohnson@onebeacon.com
onebeaconentertainment.com

-----Original Message-----
From: Gutterman, Daniel S.
Sent: Tuesday, July 15, 2014 7:07 PM
To: Johnson, Pamela A.
Cc: Gutterman, Daniel S.
Subject: FW: NBCU's "DIG" Season 1 - Imminent Peril claim notification

HI Pamela -

Please review the policy language for Extra Expense.  The wording for Civil Unrest and the exclusions for it are not like other policies where Civil Unrest has its own coverage section.

Thank you!

Best Regards,

Danny Gutterman
OneBeacon Entertainment
Sr. Entertainment Claims Investigator
(781) 332-8550

-----Original Message-----
From: Lopez, Lucy
Sent: Tuesday, July 15, 2014 10:25 AM
To: OBE-Claims
Cc: Gutterman, Daniel S.; Johnson, Pamela A.
Subject: FW: NBCU's "DIG" Season 1 - Imminent Peril claim notification

**Exhibit 30**

Gutterman - 2-3-17

ATL001077

EXHIBIT 33, PAGE 247

New claim.

Danny

This should be coming your way, see policy attached.

Thank you

Lucy Lopez
Senior Claims Assistant|OneBeacon Entertainment
tel: 781-332-8471| fax: 866-640-3487 | lxlopez@onebeacon.com onebeaconentertainment.com

A Member of OneBeacon Insurance Group

-----Original Message-----
From: Arevalo, Michael J.
Sent: Tuesday, July 15, 2014 10:20 AM
To: Lopez, Lucy
Subject: FW: NBCU's "DIG" Season 1 - Imminent Peril claim notification

New claim.

Michael Arevalo | OneBeacon Entertainment
Tel.: 781-332-8480 | Fax: 866-640-3487 |   **REDACTED**   marevalo@onebeacon.com
onebeaconentertainment.com A Member of OneBeacon Insurance Group

-----Original Message-----
From: Susan Weiss      **REDACTED**
Sent: Tuesday, July 15, 2014 10:12 AM
To: Arevalo, Michael J.
Cc: Williams, Peter D.; Deborah Kizner
Subject: NBCU's "DIG" Season 1 - Imminent Peril claim notification

Michael,
Please see information on the below claim for NBCU TV.  We spoke with Peter on Friday and gave him
the intended game plan for production.  Due to Imminent Peril, the production has postponed the start of
episodes 2/3 by one week.  They are hoping this postponement will give the situation enough time to
calm down and make it safe for crew and cast to return.  Below is an outline from the Production
Executive on the show.

Feel free to give me a call to discuss further.

Susan M. Weiss  | Senior Vice President Aon/Albert G. Ruben Insurance Services, Inc.
15303 Ventura Blvd., Suite 1200
Sherman Oaks, CA  91403-5817
CA License:  0806034
Tel: +1 818.742.0521 |      **REDACTED**      | Fax: +1 847.953.2479
        **REDACTED**        | http://www.aonagr.com

ATL001078

EXHIBIT 33, PAGE 248

This email message, including any attachment(s), is intended only for the named recipient(s) and may contain confidential, proprietary or legally privileged information. Unauthorized individuals or entities are not permitted access to this information. Any dissemination, distribution, disclosure, or copying of this information is unauthorized and strictly prohibited. If you have received this message in error, please advise the sender by reply email, and delete this message and any attachments.

-----Original Message-----
From: Garber, Andrea (NBCUniversal)          **REDACTED**
Sent: Monday, July 14, 2014 2:15 PM
To: Susan Weiss
Cc: Deborah Kizner
Subject: "DIG" Season 1 - Imminent Peril claim notification

Hi, Susan -

Following our discussion on Friday with Peter, below is the email I received from Randi Richmond, the Production Executive on the show, outlining the situation in Israel on our production "Dig" season 1.  Due to the perilous conditions in both Tel Aviv and Jerusalem, production has postponed their start of the episode 2/3 block by one week.  They were scheduled to start PP on 7/20 /14.  The estimated cost of this push is  **REDACTED**

Please forward this on to OneBeacon on our behalf.  In the past, the claim notifications have gone to Michael Arevalo and he distributes them internally as necessary.

Please give me a call if you there are any questions.

Thanks,
Andrea


Andrea Garber
Sr. Director, Risk Management
NBCUniversal
100 Universal City Plaza
Bldg. 1280, 8th Floor
Universal City, CA  91608
Phone: (818) 777-5179
**REDACTED**


-----Original Message-----
From: Richmond, Randi (NBCUniversal)
Sent: Monday, July 14, 2014 12:44 PM
To: Garber, Andrea (NBCUniversal)
Cc: Binke, Mark (NBCUniversal); Ford, Kurt B (NBCUniversal)
Subject: DIG

ATL001079

EXHIBIT 33, PAGE 249

A) summary of where you are in the production schedule

-Production completed the pilot on June26,2014 and was on a 'shooting' hiatus from June 29 thru July 19 and had ended the 2nd week  of a 3 week 'prep' prior to  shooting the next 5 episodes.

At the end of the 2nd week on July 11,2014 the crew was alerted to the following week being now a 'push' and their services not required.

B) what you have been advised of by security regarding the imminent peril to your operations

- the following was an email send to Mark Binke 7/10/14 "This is to advise you that the security environment in Israel currently prohibits NBCU Security from being able to guarantee the safety and security of our employees, production partners and associated crew and talent.

NBCU Security have monitored and evaluated the events in Israel, Gaza and the West Bank, since inception and analysed information from multiple sources. All current intelligence and activity in country points to events still being in escalation phase without a predictable or realistic timeframe for a reduction in hostilities. We have looked at the magnitude and range, of current rocket attacks (which appear to target locations to be used in forthcoming filming), the escalation of civil disorder and potential for a further increase in hostilities including a ground campaign and  acts of terrorism within Israel, all of which mean there is no short term and realistic likelihood for positive changes to the security landscape.

As the situation is unlikely to change, this raises significant concern over the level of risk facing our crew and talent, and the liability over duty of care to which NBCUniversal would be exposed. There are no current security controls that would allow NBCU Security to guarantee the safety and security of our personnel planning to arrive or currently based in Israel without the prospect of serious injury or loss of life. Personnel based in country in relation to this production should make arrangements to leave.

Thanks"

Stephen Smith
Head of Security, Europe
International Security & Crisis Management

+44 (0) 20 3618 5082 (office)
**REDACTED**

NBCUniversal International
T1 Central St Giles
St Giles High Street
London WC2H 8NU
United Kingdom
www.nbcuni.com

ATL001080

EXHIBIT 33, PAGE 250

C) what you are doing to address that (one week push at this time) and how that will impact production.


-Any crew that were hired from out of country were flown home.
Local crew reduced to minimum staffing.
Majority of crew require 1 week notice prior to time off work with no pay, therefore majority of crew will get paid for the first push week Impact to production is a delay in prep and shooting.

ATL001081

# EXHIBIT 34

From:        Gutterman, Daniel S.
Sent:        Wed 7/16/2014 12:58 AM (GMT-00:00)
To:          Johnson, Pamela A.; Williams, Peter D.
Cc:          Gutterman, Daniel S.
Bcc:
Subject:     RE: NBCU's "DIG" Season 1 - Imminent Peril claim notification
Attachments: NBC Universal T_MP00163-04_2014_Full.pdf

Hi Pamela and Peter -

I've attached the policy so we all have it.
Please review the General conditions (as Pamela pointed out) as well as Extra Expense and what it
covers and excludes.

Thank you!

Best Regards,

Danny Gutterman
OneBeacon Entertainment
Sr. Entertainment Claims Investigator
(781) 332-8550

-----Original Message-----
From: Johnson, Pamela A.
Sent: Tuesday, July 15, 2014 5:58 PM
To: Williams, Peter D.
Cc: Gutterman, Daniel S.
Subject: RE: NBCU's "DIG" Season 1 - Imminent Peril claim notification

Let's do the call at 2:00 ET and use my conference call number 877-937-1357, code 5741516.

Thanks.

Pamela A. Johnson, Esq. Assistant Vice President  | OneBeacon Entertainment
tel: 952.852.2455  | PamelaJohnson@onebeacon.com onebeaconentertainment.com

-----Original Message-----
From: Williams, Peter D.
Sent: Tuesday, July 15, 2014 7:53 PM
To: Johnson, Pamela A.
Cc: Gutterman, Daniel S.
Subject: Re: NBCU's "DIG" Season 1 - Imminent Peril claim notification

**Exhibit 11**

**Williams – 2-1-17**

ATL001132

Why is it not a covered claim they have immanent peril. Unless you are going to invoke the war exclusion.

I am available between 1 and 3 my time

Regards,
Peter Williams
Sent from my iPhone

> On Jul 15, 2014, at 8:48 PM, "Johnson, Pamela A." <PamelaJohnson@OneBeacon.com> wrote:
>
> I suggest we have a call about this tomorrow.  Danny and I had a conversation with Susan and Andrea today about what the production's plans were, but we didn't make any representations about whether there was coverage but we also did not alert them that this might not be a covered claim.  If this is going to be an issue, we need to alert them right away.  Peter, when are you available tomorrow?
>
> Best,
>
> Pamela A. Johnson, Esq. Assistant Vice President  | OneBeacon
> Entertainment
> tel: 952.852.2455 | PamelaJohnson@onebeacon.com
> onebeaconentertainment.com
>
>
> -----Original Message-----
> From: Williams, Peter D.
> Sent: Tuesday, July 15, 2014 7:46 PM
> To: Gutterman, Daniel S.
> Cc: Johnson, Pamela A.; Gutterman, Daniel S.
> Subject: Re: NBCU's "DIG" Season 1 - Imminent Peril claim notification
>
> No they spoke to me Friday night so I told them they needed to do what they felt was prudent. They mainly film in Tel Aviv but they do need to go to Jerusalem as well.
>
> Regards,
> Peter Williams
> Sent from my iPhone
>
>> On Jul 15, 2014, at 4:14 PM, "Gutterman, Daniel S." <DGutterman@OneBeacon.com> wrote:
>>
>> Hi Peter -
>>
>> Per the below, you spoke with Andrea Garber / Susan Weiss about this.
>> Any chance you happened to suggest that they push for more than just the week, since the crew needs to be advised at least one week in advance for a push and since a ground war still might occur (per this report from CBS News 2 days ago):
>> http://www.cbsnews.com/videos/new-clashes-between-israel-palestinians
>> -is-ground-war-next/
>>

ATL001133

EXHIBIT 34, PAGE 253

>> Best Regards,
>>
>> Danny Gutterman
>> OneBeacon Entertainment
>> Sr. Entertainment Claims Investigator
>> (781) 332-8550
>>
>> -----Original Message-----
>> From: Lopez, Lucy
>> Sent: Tuesday, July 15, 2014 10:25 AM
>> To: OBE-Claims
>> Cc: Gutterman, Daniel S.; Johnson, Pamela A.
>> Subject: FW: NBCU's "DIG" Season 1 - Imminent Peril claim
>> notification
>>
>> New claim.
>>
>> Danny
>>
>> This should be coming your way, see policy attached.
>>
>> Thank you
>>
>> Lucy Lopez
>> Senior Claims Assistant|OneBeacon Entertainment
>> tel: 781-332-8471| fax: 866-640-3487 | lxlopez@onebeacon.com
>> onebeaconentertainment.com
>>
>> A Member of OneBeacon Insurance Group
>>
>>
>>
>> -----Original Message-----
>> From: Arevalo, Michael J.
>> Sent: Tuesday, July 15, 2014 10:20 AM
>> To: Lopez, Lucy
>> Subject: FW: NBCU's "DIG" Season 1 - Imminent Peril claim
>> notification
>>
>> New claim.
>>
>> Michael Arevalo | OneBeacon Entertainment
>> Tel.: 781-332-8480 | Fax: 866-640-3487 |    REDACTED
>> marevalo@onebeacon.com onebeaconentertainment.com A Member of
>> OneBeacon Insurance Group
>>

ATL001134

>> -----Original Message-----
>> From: Susan Weiss       **REDACTED**
>> Sent: Tuesday, July 15, 2014 10:12 AM
>> To: Arevalo, Michael J.
>> Cc: Williams, Peter D.; Deborah Kizner
>> Subject: NBCU's "DIG" Season 1 - Imminent Peril claim notification
>>
>> Michael,
>> Please see information on the below claim for NBCU TV.  We spoke with Peter on Friday and gave him the intended game plan for production.  Due to Imminent Peril, the production has postponed the start of episodes 2/3 by one week.  They are hoping this postponement will give the situation enough time to calm down and make it safe for crew and cast to return.  Below is an outline from the Production Executive on the show.
>>
>> Feel free to give me a call to discuss further.
>>
>>
>>
>> Susan M. Weiss | Senior Vice President Aon/Albert G. Ruben Insurance Services, Inc.
>> 15303 Ventura Blvd., Suite 1200
>> Sherman Oaks, CA  91403-5817
>> CA License:  0806034
>> Tel: +1 818.742.0521 |       **REDACTED**       | Fax: +1 847.953.2479
>>        **REDACTED**        | http://www.aonagr.com
>>
>>
>> This email message, including any attachment(s), is intended only for the named recipient(s) and may contain confidential, proprietary or legally privileged information. Unauthorized individuals or entities are not permitted access to this information. Any dissemination, distribution, disclosure, or copying of this information is unauthorized and strictly prohibited. If you have received this message in error, please advise the sender by reply email, and delete this message and any attachments.
>>
>> -----Original Message-----
>> From: Garber, Andrea (NBCUniversal)       **REDACTED**
>> Sent: Monday, July 14, 2014 2:15 PM
>> To: Susan Weiss
>> Cc: Deborah Kizner
>> Subject: "DIG" Season 1 - Imminent Peril claim notification
>>
>> Hi, Susan -
>>
>> Following our discussion on Friday with Peter, below is the email I received from Randi Richmond, the Production Executive on the show, outlining the situation in Israel on our production "Dig" season 1.  Due to the perilous conditions in both Tel Aviv and Jerusalem, production has postponed their start of the episode 2/3 block by one week.  They were scheduled to start PP on 7/20 /14.  The estimated cost of this push is   **REDACTED**
>>
>> Please forward this on to OneBeacon on our behalf.  In the past, the claim notifications have gone to Michael Arevalo and he distributes them internally as necessary.

ATL001135

EXHIBIT 34, PAGE 255

>>
>> Please give me a call if you there are any questions.
>>
>> Thanks,
>> Andrea
>>
>>
>> Andrea Garber
>> Sr. Director, Risk Management
>> NBCUniversal
>> 100 Universal City Plaza
>> Bldg. 1280, 8th Floor
>> Universal City, CA  91608
>> Phone: (818) 777-5179
>>        REDACTED
>>
>>
>>
>> -----Original Message-----
>> From: Richmond, Randi (NBCUniversal)
>> Sent: Monday, July 14, 2014 12:44 PM
>> To: Garber, Andrea (NBCUniversal)
>> Cc: Binke, Mark (NBCUniversal); Ford, Kurt B (NBCUniversal)
>> Subject: DIG
>>
>>
>> A) summary of where you are in the production schedule
>>
>> -Production completed the pilot on June26,2014 and was on a 'shooting' hiatus from June 29 thru July
19 and had ended the 2nd week  of a 3 week 'prep' prior to  shooting the next 5 episodes.
>> At the end of the 2nd week on July 11,2014 the crew was alerted to the following week being now a
'push' and their services not required.
>>
>>
>>
>> B) what you have been advised of by security regarding the imminent
>> peril to your operations
>>
>>
>> - the following was an email send to Mark Binke 7/10/14 "This is to advise you that the security
environment in Israel currently prohibits NBCU Security from being able to guarantee the safety and
security of our employees, production partners and associated crew and talent.
>>
>> NBCU Security have monitored and evaluated the events in Israel, Gaza and the West Bank, since
inception and analysed information from multiple sources. All current intelligence and activity in country
points to events still being in escalation phase without a predictable or realistic timeframe for a reduction
in hostilities. We have looked at the magnitude and range, of current rocket attacks (which appear to
target locations to be used in forthcoming filming), the escalation of civil disorder and potential for a

ATL001136

EXHIBIT 34, PAGE 256

further increase in hostilities including a ground campaign and  acts of terrorism within Israel, all of which
mean there is no short term and realistic likelihood for positive changes to the security landscape.
>>
>> As the situation is unlikely to change, this raises significant concern over the level of risk facing our
crew and talent, and the liability over duty of care to which NBCUniversal would be exposed. There are
no current security controls that would allow NBCU Security to guarantee the safety and security of our
personnel planning to arrive or currently based in Israel without the prospect of serious injury or loss of
life. Personnel based in country in relation to this production should make arrangements to leave.
>>
>> Thanks"
>>
>> Stephen Smith
>> Head of Security, Europe
>> International Security & Crisis Management
>>
>> +44 (0) 20 3618 5082 (office)
>> **REDACTED**
>>
>>
>>
>> NBCUniversal International
>> T1 Central St Giles
>> St Giles High Street
>> London WC2H 8NU
>> United Kingdom
>> www.nbcuni.com
>>
>> C) what you are doing to address that (one week push at this time) and how that will impact
production.
>>
>>
>> -Any crew that were hired from out of country were flown home.
>> Local crew reduced to minimum staffing.
>> Majority of crew require 1 week notice prior to time off work with no pay, therefore majority of crew will
get paid for the first push week Impact to production is a delay in prep and shooting.

ATL001137

EXHIBIT 34, PAGE 257

# EXHIBIT 35



A Member of OneBeacon Insurance Group

Pamela A. Johnson
Assistant Vice President
One Beacon Entertainment
601 Carlson Parkway, Suite 600
Minnetonka, MN  55305

September 19, 2014

**VIA EMAIL: lec@msk.com**

Lucia E. Coyoca, Esq.
Mitchell Silberberg & Knupp LLP
11377 West Olympic Blvd.
Los Angeles, California 90064-1683

Re:     Claim Number:         OBI66746
          Insured:              NBCUniversal Media, LLC
          Policy Number:        MP00163-04
          Underwriting Co.:     Atlantic Specialty Ins. Co.

Dear Ms. Coyoca:

I'm writing in response to your August 13, 2014, letter, in which you asked Atlantic Specialty
Insurance Company to reconsider the coverage position set forth in our July 28, 2014, letter to
Andrea Garber of NBCUniversal Media ("NBCU").  We have carefully considered the points that
you raised in your letter.  Having done so, we must respectfully advise you that it remains our
conclusion that the insurance policy does not insure the claim.

Please refer to our July 28 letter in which we have summarized the facts of the claim, as we
understand them.

During the conflict which extended until August 26, 2014, 2,143 Palestinians and 69 Israelis,
were killed, Israel struck 5,283 targets in Gaza, Hamas fired 4,564 rockets into Israel and more
than 50,000 buildings in Gaza were damaged or destroyed.[1]

We are familiar with the case law and other references that you cited in your letter. Based on
that and other information, we cannot agree with your position that the policy's war exclusion

---

[1] This information was gathered from the Canadian Broadcasting Company, The
Guardian, The Economist, The BBC World News, The Times of Israel, as well as other sources.



**Exhibit 20**

Gutterman - 2-3-17

ATL000705

EXHIBIT 35, PAGE 258

Lucia Coyoca, Esq.
September 19, 2014
Page 3

does not apply.  We also do not agree that there is any "lack of precision" in that language.  The war exclusion states:

> This policy does not insure against loss or damage caused directly or indirectly by:
>
> 1.  War, including undeclared or civil war; or
>
> 2.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
>
> 3.  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
> 4.  Any weapon of war including atomic fission or radioactive force, whether in time of peace or war;
>
> * * *
>
> 8.  Any uninsured event occurring before, concurrently with or after the happening of an insured event, which directly or indirectly causes or in any way contributes to cause or increase a loss under this policy; but only with respect to that portion of any such loss caused by or contributed to by the uninsured event, unless the uninsured event would not have been a factor had such insured event never occurred.

Subparagraph 1 of the war exclusion states that no coverage is provided for loss or damage caused directly or indirectly by "war, including undeclared . . . war."  Statutes defining "war" in various contexts, and cases that have interpreted war exclusions in insurance policies, demonstrate that the loss presented here was caused by war.  This language makes it explicit that the war need not be a declared war.  By referring to "warlike action" in addition to "war," the clear intent is for the exclusion to be broad enough to encompass war, conflicts that look like war and specifically actions to defend against an actual or expected attack.  Here, Israel, which is indisputably a sovereign government, invaded Gaza to protect its people from a continuing attack from the military arm of Hamas.  Regardless of whether Hamas is defined as a terrorist organization, Israel's actions and the resulting escalation fall squarely within the exclusion.  The initiating barrage of rocket fire and the subsequent Israeli invasion constitute "warlike acts" as defined by the policy.  This is consistent with how cases have interpreted war exclusions, as discussed in our July 28 letter.

In *Wilkinson v. Equitable Life Assurance Soc.*, 2 Misc. 2d 249 (N.Y. Mun. Ct. 1956), discussed in our letter, the court considered whether the Korean conflict in the 1950s was a war, even though it was not a declared war, and discussed Pennsylvania cases determining whether accidental death benefits were owed when an insured was killed in Korea:

ATL000706

> To hold that under the provisions of this policy the Korean war is not war in the face of 128,000 American casualties is so unrealistic and legalistic as to be utterly unjustifiable, and we cannot shut our eyes to what everyone knows, that there has been, and was when the insured was killed, actually and in reality a war in Korea in which the United States has been seriously engaged. It is clear that nothing in the question of insurance involved herein suggests that the word "war" is used in its technical or legal sense. It is clear that the plain, ordinary and generally accepted meaning of the word "war" is war in fact. It is clear that there was war in fact in Korea when the insured was killed and that he was killed in "time of war".

*Id.*, at 252, citing *Beley v. Pennsylvania Mut. Life Ins. Co.*, 373 Pa. 231 (1953).

Similarly, as the casualty and damage numbers discussed above show, the Israel/Gaza conflict clearly was a war. With thousands of casualties, thousands of rockets fired, and more than 50,000 buildings damaged or destroyed in about two months of combat, the only realistic conclusion is that this was a war. No doubt this is why NBCU affiliate company, MSNBC, has referred to the conflict as a war, demonstrating its understanding that the conflict was a war.

In *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.*, 505 F.2d 989 (2d Cir. N.Y. 1974), which you cite in your letter, the district court found that damage from an airplane hijacking was not caused by war, and the Court of Appeals affirmed. Among the key reasons for this decision was that the Popular Front for the Liberation of Palestine ("PFLP"), who was responsible for the hijacking, was not a "state or state-like entity." It controlled no territory and was neither a de facto nor actual government. It had no significant attributes of sovereignty. The PFLP was not accorded the rights of a government. Thus, the court held that the hijacking was a criminal act, rather than a warlike one with military overtones, carried out by a radical political group, not a sovereign government.

Unlike the PFLP in *Pan Am*, since 2007 Hamas has been the government of the Gaza Strip. As previously noted, Hamas has a military wing, the Qassam Brigades, as well as a force of police, security, and intelligence personnel.[2] Our understanding is that it is Hamas's military wing that carried out the attacks on Israel that led to NBCU's claim. "Hamas directs the Gaza government and security forces through a self-appointed cabinet of Hamas ministers . . ."[3]

Unlike the PFLP in *Pan Am*, although Gaza or Palestine is not a recognized nation, at least by most of the world, it does have some indicia of sovereignty. Military weapons were fired from Hamas-governed territory into another country, Israel. Even though many, including Israel and the United States, consider Hamas to be a terrorist group, it is the government of a territory that is involved in the conflict. The Hamas military in Gaza fits the definition of a military force.

---

[2] Zanotti, *Hamas: Background and Issues for Congress* (Congressional Research Service 2010), which you cited in your letter.

[3] *Id.*, at p. 19.

ATL000707

Lucia Coyoca, Esq.
September 19, 2014
Page 3

You seem to assert that a government that is deemed to be a terrorist organization cannot have
sufficient sovereignty to fall within the war exclusion.  That is not correct. For example, the
governments of North Korea and Saddam Hussein era Iraq were called terrorists, but no one
would argue that they are not sovereign states or that the war exclusion would not apply to
conflicts involving them.  Further, as explained above, the Israeli government participated in the
conflict and invaded Gaza.  There is no question that the Israeli government is identified by the
majority of world governments as a legitimate sovereign, not a terrorist organization.

The only reasonable interpretation of the situation that led to the production's extraction from
Israel is that it was caused by war, or warlike action by a military force.  As a result, the war
exclusion applies.

We note that you cited California law regarding interpreting the policy.  Because the policy was
issued in New York, it is likely that New York law will apply.  Nevertheless, both states construe
contracts to give effect to the parties' mutual intentions at the time of contracting.  The
interpretation discussed in this and our earlier letter does that.

Regarding the Coverage For Certified Acts Of Terrorism endorsement, you are correct that it
does not apply.  Therefore, this endorsement does not provide a basis for granting any
coverage for the claim.

For these reasons, and as explained in our July 28 letter, no coverage can be provided for the
claim.  As you suggested, we are willing to meet with NBCU to further discuss this matter, if
NBCU thinks it would be helpful.

This letter is not intended to be exhaustive. Atlantic Specialty continues to reserve the right to
rely on all appropriate facts, law, and policy provisions in connection with this matter.  No rights
are waived.

Sincerely,


ATLANTIC SPECIALTY INSURANCE COMPANY



By:_____/s/_____

        Pamela A. Johnson
        Assistant Vice President
        OneBeacon Entertainment


cc:     Susan Weiss (via email)
        Senior Vice President
        Aon/Albert G. Ruben Insurance Services, Inc.
        15303 Ventura Blvd., Suite 1200
        Sherman Oaks, CA  91403-5817

ATL000708

# EXHIBIT 36

This policy is signed by officers of the Company shown on the Declarations page of this policy.

For:  Employers Fire Insurance Company

_____                    _____
President                                                              Secretary

SNP1 0608                                                                                    Page 1 of 1

UCP035244

EXHIBIT 36, PAGE 262

Policy Number:
Renewal of Number: New

# COMMON POLICY DECLARATIONS


One Beacon INSURANCE sm

**Employers Fire Insurance Company**
One Beacon Lane
Canton, MA 02021

| Item 1. Named Insured and Mailing Address | Agent Name and Address Sub Producer |
|---|---|
| Sample Online TULIP, Tenant User Of | Entertainment Brokers International - 0402487 |
| 123 Main Street | 10940 Wilshire Blvd., 17th Floor |
| | Los Angeles, CA 90024 |
| Los Angeles, CA 90024 | Agent No. 23401 |

Item 2. Policy Period    From:    07-11-2008    To:    07-11-2009

At 12:01AM Standard Time at the Mailing Address Shown Above

Item 3. Business Description        Online TULIP

**IN RETURN FOR THE PAYMENT OF THE PREMIUM AND SUBJECT TO ALL THE TERMS OF THIS POLICY WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

Item 4. This policy consists of the following coverage parts for which a premium is indicated.  This premium may be subject to adjustment.

| | **PREMIUM** |
|---|---|
| BOILER AND MACHINERY COVERAGE PART | $ Not Covered |
| CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART | $ Not Covered |
| COMMERCIAL AUTOMOBILE COVERAGE PART | $ Not Covered |
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $ 0 |
| COMMERCIAL INLAND MARINE COVERAGE PART | $ Not Covered |
| COMMERCIAL PROPERTY COVERAGE PART | $ Not Covered |
| CRIME AND FIDELITY COVERAGE PART | $ Not Covered |
| EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART | $ Not Covered |
| FARM COVERAGE PART | $ Not Covered |
| LIQUOR LIABILITY COVERAGE PART | $ As Declared |
| POLLUTION LIABILITY COVERAGE PART | $ Not Covered |
| PROFESSIONAL LIABILITY COVERAGE PART | $ Not Covered |
| | $ |
| **TOTAL:** | $0 |

Premium shown is payable:    $ 0 _____ at inception.  $ 0 _____

Item 5. FORMS APPLICABLE TO ALL COVERAGE PARTS (SHOW NUMBERS):

Common Policy Declarations - EDEC 525 12 05
Commercial General Liability Coverage Part Declarations – EDEC 526 12 05
Signature Page - SNP1 (0608)

**EDEC 525 12 05**                                                                **Page 1**

Specimen

UCP035245

Disclosure Pursuant To Terrorism Risk Insurance Act Of 2002 - IL 09 85 00 08
Policy Changes (TULIP Rates) - IL 12 01 11 85
Commercial General Liability Coverage Form - CG 00 01 12 04
Calculation of Premium - IL 00 03 04 98
Covered Events and Hazard Class - ECG 00 528 12 05
Aircraft, Auto or Watercraft Exclusion Amendment - ECG 04 586 12 05
Absolute Asbestos Exclusion - ECG 21 510 12 99
Absolute Lead Exclusion - ECG 21 512 12 99
Exclusion - All Hazards in Connection with Designated Events or Premises - ECG 21 622 12 05
Exclusion - Designated Activities - ECG 21 623 12 05
Exclusion - Personal and Advertising Injury Liability - Entertainment Industry - ECG 21 626 12 05
Exclusion - Fireworks With Exception For Concussion Effects, Flashpots And Smokepots - ECG 21 627 12 05
Exclusion - Throwing, Kicking or Projecting of Objects or Persons - ECG 21 629 12 05
Exclusion - Non-Performing Animals - ECG 21 635 12 05
Exclusion - Comparative Advertising (Designated Operations) - ECG 21 640 12 05
Exclusion - Damage To Premises Rented To You for Seven Or Fewer Consecutive Days - ECG 21 645 12 05
Amendment Of Employee Definition (Temporary Employee) - ECG 22 516 12 05
Limitation of Coverage to Designated Products – ECG 22 521 12 05

Limitation of Coverage to Designated Events for Tenant Users Liability Insurance - ECG 24 560 12 05
Additional Insured - Concessionaires Trading Under Your Name - CG 20 03 11 85
Additional Insured - Manager or Lessors of Premises - CG 20 11 01 96
Additional Insured - State or Political Subdivisions - Permit - CG 20 12 07 98
Exclusion - Athletic or Sports Participants - CG 21 01 11 85
Exclusion - Coverage C Medical Payments - CG 21 35 10 01
Abuse or Molestation Exclusion - CG 21 46 07 98
Employment Related Practices Exclusion - CG 21 47 07 98
Total Pollution Exclusion Endorsement - CG 21 49 09 99
Liquor Liability Declarations - EDEC 527 12 05
Liquor Liability Coverage Form - CG 00 33 12 04
Common Policy Conditions – IL 00 17 11 98
Exclusion - Violation of Statutes that Govern E-Mails, Fax, Phone Calls or Other Methods of Sending Material or Information - CG 00 67 03 05
Limited Fungi Or Bacteria Coverage - CG 24 25 12 04
Limited Terrorism Exclusion(Other than Certified Acts of Terrorism); Cap on Losses from Certified Acts of Terrorism - CG 21 71 12 02
Exclusion of Punitive Damages Related To A Certified Act of Terrorism - CG 21 76 01 08
California Changes - Cancellation and Nonrenewal - IL 02 70 11 04
California Changes – CG 32 34 01 05
Nuclear Energy Liability Exclusion Endorsement (Broad Form) – IL 00 21 07 02

Countersigned:

Date:   09-09-2008                           By:  _____
                                                 Authorized Representative

**THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S)
AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.**

## LAST PAGE OF DECLARATIONS

EDEC 525 12 05                                                    Page 2

UCP035246



**EDEC 525 12 05**                                                                                    **Page 3**

UCP035247

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS



**Employers Fire Insurance Company**
One Beacon Lane
Canton, MA 02021

Item 1. Named Insured and Mailing Address

Sample Online TULIP, Tenant User Of
123 Main Street

Los Angeles, CA 90024

Agent Name and Address Sub Producer

Entertainment Brokers International
10940 Wilshire Blvd., 17th Floor
Los Angeles, CA 90024
Agent No. 23401                    NYFTZ:

Item 2. Policy Period        From: 07-11-2008          To:07-11-2009

**IN RETURN FOR THE PAYMENT OF THE PREMIUM AND SUBJECT TO ALL THE TERMS OF THIS POLICY WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY**

Item 3. Limits of Insurance

| | | |
|---|---|---|
| General Aggregate Limit | NONE | |
| Products/Completed Operations Aggregate Limit | $1,000,000 | |
| Personal and Advertising Injury Limit | $1,000,000 | Any one person or organization |
| Each Occurrence Limit | $1,000,000 | |
| Damage To Premises Rented To You Limit | $50,000 | Any one premises |
| Medical Expense Limit | Excluded | Any one person |

Item 4. Description of Business and Location of Premises
Form of Business
[] Individual       [] Corporation       [] Joint Venture       [] Partnership       [] LLC       [X] Other

Business Description: Online TULIP

Locations of All Premises You Own, Rent or Occupy:
1.   123 Main Street,  Los Angeles, CA 90024

Item 5. Premium Summary
    Estimated Annual Premium:        $0
    Premium Due at Inception:        $0

**EDEC 526 12 05**                                                    **Page 1**

Specimen

UCP035248

| Loc. No. | Classification | Code No. | Premium Basis | Rate | | Premium | |
|---|---|---|---|---|---|---|---|
| | | | | Prem/Ops | All Other | Prem/Ops | All Other |
| | Exhibitions - Outside | 43424e | Per TULIP Rate | Endorsement | | $0 MP | |
| | Exhibitions - In Buildings | 63217e | Per TULIP Rate | Endorsement | | Included | |

| Sub Total | | | | | | $0 | |
|---|---|---|---|---|---|---|---|
| **Additional Coverages:** | | | | **Rate** | | **Premium** | |
| | | | | | | | |

| Policy Premium: | $0 |
|---|---|
| State Tax or other (if applicable): | $0 |
| Total Premium: | $0 |
| | |

| Audit Period (if applicable) | [ ]  Annually | [ ]  Semi-Annually | [ ]  Quarterly | [ ]  Monthly |
|---|---|---|---|---|

Subject to General Liability Coverage Part Minimum Premium of $0

**Premium Basis:**

(a)  Area
(e)  Each
(g)  Gross Production Cost
(p)  Payroll
(s)  Sales
(m)  Admissions
(r)  Participants
(u)  Unit

Item 6. ENDORSEMENTS ATTACHED TO THIS POLICY:

Countersigned:
Date: 09-09-2008

By: _John Allen_
Authorized Representative

**THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.**

**LAST PAGE OF DECLARATIONS**

UCP035249

EXHIBIT 36, PAGE 267

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

## SCHEDULE

**Terrorism Premium (Certified Acts) $** 0
**This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(s):**

**Additional information, if any, concerning the terrorism premium:**

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© ISO Properties, Inc., 2007

UCP035250

EXHIBIT 36, PAGE 268

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change Number

| POLICY NUMBER | POLICY CHANGES EFFECTIVE 07-11-2008 | COMPANY Employers Fire Insurance Company |
|---|---|---|
| NAMED INSURED Sample Online TULIP, Tenant User Of | | AUTHORIZED REPRESENTATIVE |

COVERAGE PARTS AFFECTED
Commercial General Liability Coverage Form

CHANGES

**Table 1 - Total Event Rates (1-4 Days)**

| Total Attendance (Spectators/Participants) | Class 1 | Class 2 | Class 3 | Additional Premium for Liquor Liability |
|---|---|---|---|---|
| a. 1-100 | $75.00 | $100.00 | $150.00 | $75.00 |
| b. 101-500 | $100.00 | $135.00 | $200.00 | $185.00 |
| c. 501-1500 | $150.00 | $185.00 | $310.00 | $260.00 |
| d. 1501-3000 | $200.00 | $315.00 | $425.00 | $375.00 |
| e. 3001-5000 | $300.00 | $425.00 | $625.00 | $490.00 |
| f. 5001 + (Rate Per Person) | Refer to Special Event Guide | Refer to Special Event Guide | Refer to Special Event Guide | Refer to Liquor Guide |

Any Class 4 Events use the Special Events Guide.

**Table 2 - Total Events Rates (5 or More Days)**

| Total Attendance (Spectators/Participants) | Class 1 | Class 2 | Class 3 | Additional Premium for Liquor Liability |
|---|---|---|---|---|
| a. 1-100 | $95.00 | $170.00 | $300.00 | $110.00 |
| b. 101-500 | $140.00 | $215.00 | $360.00 | $275.00 |
| c. 501-1500 | $235.00 | $355.00 | $455.00 | $435.00 |
| d. 1501-3000 | $335.00 | $460.00 | $575.00 | $600.00 |
| e. 3001-5000 | $450.00 | $625.00 | $785.00 | $750.00 |
| f. 5001 + (Rate Per Person) | Refer to Special Event Guide | Refer to Special Event Guide | Refer to Special Event Guide | Refer to Liquor Guide |

IL 12 01 11 85     Copyright, Insurance Services Office, Inc.,   1983
Copyright, ISO Commercial Risk Services, Inc.,   1983          Page 1 of 2

UCP035251

Any Class 4 Events use the Special Events Guide:

| Table 3 - Vendors Liability Rate Schedule | | |
|---|---|---|
| Exhibitors | No Sales | $45 per day/per exhibitor up to a maximum of $300 per day |
| Concessionaires | Non Food Sales | $65 per day/per concessionaire up to a maximum of $425 per day |
| Concessionaires | Food Sales | $75 per day/per concessionaire up to a maximum of $475 per day |
| Attractions | Performers | $150 per day/per concessionaire up to a maximum of $950 per day |



_____
Authorized Representative Signature

UCP035252

EXHIBIT 36, PAGE 270

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

Specimen

UCP035253

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© ISO Properties, Inc., 2003

CG 00 01 12 04   □

UCP035254

EXHIBIT 36, PAGE 272

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

**(b)** the operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

EXHIBIT 36, PAGE 274

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

Specimen

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of websites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

© ISO Properties, Inc., 2003

CG 00 01 12 04

UCP035258

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

## COVERAGE C MEDICAL PAYMENTS

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(1)** The accident takes place in the "coverage territory" and during the policy period;

**(2)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(3)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A.**

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

EXHIBIT 36, PAGE 277

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All costs taxed against the insured in the "suit".

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

**a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**b.** The conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

© ISO Properties, Inc., 2003

CG 00 01 12 04

UCP035260

EXHIBIT 36, PAGE 278

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

  **a.** Medical expenses under Coverage **C**;

  **b.** Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

  **c.** Damages under Coverage **B**.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

  **a.** Damages under Coverage **A**; and

  **b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

  Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

  **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

    **(1)** How, when and where the "occurrence" or offense took place;

    **(2)** The names and addresses of any injured persons and witnesses; and

    **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

  **b.** If a claim is made or "suit" is brought against any insured, you must:

    **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

    **(2)** Notify us as soon as practicable.

    You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

  **c.** You and any other involved insured must:

    **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

    **(2)** Authorize us to obtain records and other information;

    **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

    **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

  **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

  No person or organization has a right under this Coverage Part:

  **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

© ISO Properties, Inc., 2003

CG 00 01 12 04   ☐

UCP035262

EXHIBIT 36, PAGE 280

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b. Excess Insurance**

This insurance is excess over:

**(1)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(a)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(b)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(c)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(d)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(2)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in **a.** above;

**(2)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

**a.** The repair, replacement, adjustment or removal of "your product" or "your work"; or

Specimen

**b.** Your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

EXHIBIT 36, PAGE 283

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

EXHIBIT 36, PAGE 284

**b.** "Loss of use" of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

    **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

    **a.** Means:

      **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

        **(a)** You;

        **(b)** Others trading under your name; or

        **(c)** A person or organization whose business or assets you have acquired; and

      **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    **b.** Includes

      **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      **(2)** The providing of or failure to provide warnings or instructions.

    **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

    **a.** Means:

      **(1)** Work or operations performed by you or on your behalf; and

      **(2)** Materials, parts or equipment furnished in connection with such work or operations.

    **b.** Includes

      **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

      **(2)** The providing of or failure to provide warnings or instructions.

Specimen

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

    BOILER AND MACHINERY COVERAGE PART
    BUSINESSOWNERS POLICY
    COMMERCIAL AUTOMOBILE COVERAGE PART
    COMMERCIAL CRIME COVERAGE PART
    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    COMMERCIAL INLAND MARINE COVERAGE PART
    COMMERCIAL PROPERTY COVERAGE PART
    EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
    FARM COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    PROFESSIONAL LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART
    SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY – NEW YORK

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

UCP035268

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

UCP035269

EXHIBIT 36, PAGE 287

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

   **2. Exclusions**

   This insurance does not apply to:

   **DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

   "Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

   **a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

   **b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

   **c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

   **2. Exclusions**

   This insurance does not apply to:

   **DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

   "Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

   **a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

   **b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

   **c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

COMMERCIAL GENERAL LIABILITY
CG 21 71 12 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITED TERRORISM EXCLUSION (OTHER THAN CERTIFIED ACTS OF TERRORISM); CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:
This insurance does not apply to:
**TERRORISM**
"Any injury or damage" arising, directly or indirectly, out of an "other act of terrorism". However, this exclusion applies only when one or more of the following are attributed to such act:

**1.** The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

    **a.** Physical injury that involves a substantial risk of death; or

    **b.** Protracted and obvious physical disfigurement; or

    **c.** Protracted loss of or impairment of the function of a bodily member or organ; or

**3.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

    **a.** The act resulted in aggregate losses in excess of $5 million; and

Specimen

CG 21 71 12 02             © ISO Properties, Inc., 2002            **Page 1 of 2**
UCP035271

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not certified as a terrorist act pursuant to the federal Terrorism Risk Insurance Act of 2002. However, "other act of terrorism" does not include an act which meets the criteria set forth in Paragraph **b.** of the definition of "certified act of terrorism" when such act resulted in aggregate losses of $5 million or less. Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

**C.** In the event of an "other act of terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.

**D.** With respect to any one or more "certified acts of terrorism" we will not pay any amounts for which we are not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause which results in a cap on out liability for payments for terrorism losses:



CG 21 71 12 02                    © ISO Properties, Inc.,  2002                    **Page 2 of 2**    ☐

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF PUNITIVE DAMAGES
# RELATED TO A CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**B.** The following definition is added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Specimen

UCP035273

EXHIBIT 36, PAGE 291

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# COVERED EVENTS AND HAZARD CLASS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART

**SCHEDULE**

| EVENT DESCRIPTION | | HAZARD CLASS |
|---|---|---|
| Anniversary Parties | Electronics Conventions | 1 |
| Antique Shows | Face Painters | |
| Art Festivals And Shows | Fashion Shows | |
| Auctions | Flower And Garden Shows | |
| Auto Shows-Auto Static Only | Fund Raising Dinner | |
| Award Presentations | Funeral Service | |
| Baby Shower | Graduations | |
| Ballet Or Other Classical Dance Shows | Harvest Festivals – No Farm Implements Or | |
| Balloon Artists | Equipment | |
| Banquets | Holiday Events & Parties / Gift Exchanges | |
| Baptism | Home Shows | |
| Bar Mitzvahs/Bat Mitzvahs | Jazz And Jam Concerts – Indoors | |
| Bazaars | Jewelry Maker | |
| Beauty Pageants | Job Fairs Indoors | |
| Belly Dancer | Ladies Club Events | |
| Birthday Parties | Lectures | |
| Boat Shows (Dry Dock Only) | Luncheons | |
| Body Building Contests | Meetings - Indoors | |
| Book Signing | Mime | |
| Bridal Showers | Mobile Home Shows | |
| Business Meetings And Shows | Pageants | |
| Business Parties | Poet | |
| Camera Shows | Poetry Reading | |
| Card Shows | Professional And Amateur Association | |
| Caricature Sketching | Meetings | |
| Carolers | Puppeteer | |
| Cartoonist | Quinceanera | |
| Casino Nights | Recitals | |
| Chamber Of Commerce Events | Reunions Indoors | |
| Charity Benefits, Dances, Auctions, Or Sales | Rv Shows | |
| Choirs - Indoor | Scouting Jamborees – No Overnight Camping | |
| Church Services Or Meetings | Seances | |
| Civic Club Meetings | Seminars | |
| Classic Dance Shows | Social Receptions – Indoors | |
| Computer Shows | Speaking Engagements | |
| Concerts - Celtic Music | Store Openings | |
| Concerts - Chamber Music | Story Teller | |
| Concerts - Classical Music - Indoors | Symphony Concerts | |
| Concerts - Holiday Music | Teleconferences | |
| Concerts - Instrumental | Telethons | |
| Consumer Shows | Trade Shows – Indoors | |
| Conventions – Indoors | Vacation Shows | |

Specimen

| | | |
|---|---|---|
| **ECG 00 528 12 05** | Includes copyrighted material of ISO Properties, Inc. with its permission. | **Page 1 of 3** |

UCP035274

| | | |
|---|---|---|
| Craft Shows<br>Dance Competitions<br>Dance Recital<br>Debutant Balls<br>Debuts<br>Drill Team Exhibitions<br>Educational Exhibitions | Ventriloquist<br>Voter Registration<br>Weddings And Wedding Receptions<br>Yodeler | |
| Bingo Games<br>Card Games - Blackjack<br>Card Games - Poker<br>Carnivals – School Events with No Mechanical Rides<br>Chess Tournament<br>Choirs - Outdoor<br>Christmas Tree Lighting<br>Clowns - No Motorized Vehicles<br>Comedians<br>Concerts – 50's, 60's, 70's or 80's Music<br>Concerts - Blues Music<br>Concerts - Classical Music – Outdoors<br>Concerts – Country Music<br>Concerts - Folk Music<br>Concerts - Funk Music<br>Concerts - Motown<br>Concerts Soul Music<br>Dog, Cat, Bird & Other Domestic Animal Shows/Events<br>Easter Egg Hunt<br>Festival and Cultural Events – Indoors<br>Fishing Events<br>Golf Events - Non Professional<br>Impersonator - Celebrity or Holiday Character | Impressionist<br>Jazz And Jam Concerts – Outdoors<br>Job Fairs Outdoors<br>Jugglers (No Pyro)<br>Magician<br>Mariachi Band<br>Math Tournament<br>Meetings – Outdoors<br>Menorah Lightning<br>Picnics - No Pools Or Lakes<br>Reunions Outdoors<br>School Band Competitions Or Events<br>Soap Box Derbies<br>Social Receptions - Outdoors<br>Trade Shows – Outdoors<br>Union Meetings<br>Video Game Contests | 2 |
| Aerobics and Jazzercise Classes or Events<br>Amateur Rodeo and Roping Events<br>Baseball - Amateur<br>Basketball - Amateur<br>Bicycling - No Racing / Offroad<br>Block Parties/Street Closures/Street Fairs-Under 5,000 Spectators<br>Bowling Tournaments<br>Boxing, Wrestling, Hockey and Football Games - Amateur<br>Casino and Lounge Shows<br>Cheerleading Events/Competitions (no Pyramids)<br><br>Comedy Shows<br>Company or Corporate Retreats<br>Concerts - Pop Cover Bands<br>Cornfield Mazes<br>Country & Western Events – No Rodeos or Rides<br><br>Country Festivals and Fairs – No Rides<br>Festival and Cultural Events – Outdoors<br>Film Screenings<br>Film Showings<br>Golf Tounament - Daytime<br>Grad Night<br>Gymnastic Competitions - Spectators Only<br>Halloween - Costume Contests<br>Ice Skating Shows | Livestock Shows<br>Magic Show<br>Marathons (Walking & Running)<br>Mobile Homes/Rv Shows - Professionally Managed<br>Movie Release Party<br>New Years Party (Private/By Invite Only)<br>Old Timer Events<br>Parades – Under 5,000 Spectators<br>Play Readings<br>Plays<br>Pool And/Or Billiards Tournaments<br>Proms<br>Rugby<br>Soccer<br>Softball - Amateur<br>Sporting Events – Indoors – Non-Professional<br>Talent Show (No Rap, Hip Hop, Heavy Metal Shows)<br>Tap Dancing<br>Tennis Tournament<br>Theatrical Stage Performances<br>Volleyball - Amateur<br>Wagon / Hayrides<br>Walking / Hiking Tour<br>Wine Tasting | 3 |

| Junior Athletic Games |  |
|---|---|
| Karate Meets |  |
| Lacrosse |  |
| Laser Tag (Indoors) |  |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance applies to "injury", "bodily injury," "property damage," or "personal and advertising injury" arising out of "Designated Events" shown in the Schedule of this endorsement.



**ECG 00 528 12 05**        Includes copyrighted material of ISO Properties, Inc. with its permission.        **Page 3 of 3**   □

UCP035276

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AIRCRAFT, AUTO OR WATERCRAFT EXCLUSION AMENDMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph (**2**) under **Exclusion g. Aircraft, Auto or Watercraft** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is deleted and replaced by:

(2) A watercraft you do not own that is:

(a) less than 51 feet in overall length while used, operated or maintained by an insured or by any person in the course of their employment by an insured; and

(b) not being used to carry persons or property for a charge.

UCP035277

EXHIBIT 36, PAGE 295

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

## ABSOLUTE ASBESTOS EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" involving or arising out of, directly or indirectly, asbestos, in any manner or form.

This exclusion includes, but is not limited to, claims or "suits" concerning exposure or alleged exposure to asbestos, as well as claims or "suits" concerning the incorporation, presence, or removal of asbestos in any building, structure, or product.

UCP035278

EXHIBIT 36, PAGE 296

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

## ABSOLUTE LEAD EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the existence or control of the hazardous properties of lead, irrespective of the form or source of such lead.

This exclusion applies, but is not limited to the following:

1. To liability assumed under any contract or agreement;

2. To any obligation to pay or indemnify any person, organization or governmental agency for any portion of the injury, damage, or expense; and

3. To any supervision, instructions, recommendations, requests, warranties or representations (expressed or implied), warnings, or advice given or which should have been given regarding the existence or control of the lead.

When used in this exclusion:

I. "Control" includes, but is not limited to testing, monitoring, abatement, clean-up, removal, containment, treatment, or disposal.

II. "Form" means anything containing lead, including, but not limited to air, water, earth, dust, paint, plumbing solder, and pipes and fixtures.

Specimen

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - ALL HAZARDS IN CONNECTION WITH DESIGNATED EVENTS OR PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

Aircraft Events
Animal Acts and Shows
Bicycle Rallies, Races and Events
Block Parties/Street Closures/Street Fairs-over 5,000 in attendance
Boat Shows
Bounce Houses
Bungee Jumping
Carnivals With Amusement Devises
Circuses
Concerts - Not Otherwise Classified
Concerts with Rap, Hip Hop, Heavy Metal, Ski Punk or similar types of music
Cycle Events
Evangelistic Meetings with Faith Healing or Similar Activities
Events with Armed Private Security
Events with Known Attendance Prior to the Event Greater than 5,000 People
Events with prior losses
Exotic Animal Shows and Events
Film Production
Fireworks
Fraternity Events
Go Kart Races
Gun and Knife Shows
Halloween - Haunted Houses
Hand gliding/Sky Diving
Hay Rides
Heads of State Events
Hot Air Balloon Rides/Events
Hypnotist
Inflatables
Instructional Classes - Drives Education, Flying or Health
Laser Tag
Luge
Marathons / Walkathons
Mechanical Amusement Devices Including Mechanical Bulls
Mosh Pits
Motorized Sporting Events
New Years Party (Open to public/not by invite only)
Nightclub Shows
Overnight Camping and Retreats
Paint Ball
Parachuting
Parasailing
Political Rallies
Professional Sports

**Specimen**

ECG 21 622 12 05     Includes copyrighted material of ISO Properties, Inc. with its permission.     Page 1 of 2    □

UCP035280

Promoters
Pyrotechnics
Raves
Reality TV Shows
Record Signing's in stores
Renaissance Fairs/Festivals
Rodeo and Roping Events - Professional
Roller Coasters/Sky Coasters
Rummage Sales - Other than for Charities
Saddle Animals
Sidewalk Sales
Skate Boarding
Ski Events
Sky Diving
Slam Dancing
Sorority Events
Swap Meets/Flea Markets
Swimming and Pool Facilities
Temporary Grandstands
Tobogganing
Tractor Pulls
Trampolines
Triathlons
Wall Climbing
War Games/Re-enactments
Water Events
Water Slides
Any event with a known attendance prior to the event greater than 5,000 people. Any event not otherwise scheduled in TULIP Hazard Class I Events, or TULIP Hazard Class II Events, or TULIP Hazard Class III Events.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage", or "personal and advertising injury" arising out of the events or premises shown in the Schedule of this endorsement unless the events or premises are separately and specifically endorsed to this coverage part.

UCP035281

EXHIBIT 36, PAGE 299

COMMERCIAL GENERAL LIABILITY
ECG 21 623 12 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – DESIGNATED ACTIVITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**



| **Description Of Designated Activities:** |
|---|
| Hang Gliding |
| Parasailing |
| Parachuting |
| Tobogganing |
| Luge |
| Skateboarding |
| Trampolines |
| Bungee Jumping |
| Hot Air Balloon Rides |
| Mosh Pits |
| Slam Dancing |
| Skycoaster |
| Mechanical Bulls |
| Saddle Animals |

| **Specified Location (If Applicable):** |
|---|
| |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

The following exclusion is added to Paragraph **2.**, **Exclusions** of **Section I – Coverage  A – Bodily Injury And Property Damage Liability** and to Paragraph **2.**, **Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability**:

This insurance does not apply to "bodily injury", "property damage", or "personal and advertising injury" arising out of the activities described in the Schedule of this endorsement, regardless of whether such activities are conducted by you or on your behalf or whether the activities are conducted for you or for others.

Unless a "location" is specified in the Schedule, this exclusion applies regardless of where such activities are conducted by you or on your behalf.  If a specific "location" is designated in the Schedule of this endorsement, this exclusion applies only to the described activities conducted at that "location".

For the purpose of this endorsement, "location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

UCP035282

EXHIBIT 36, PAGE 300

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – PERSONAL AND ADVERTISING INJURY LIABILITY - ENTERTAINMENT INDUSTRY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2.**, **Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability**:

This policy does not apply to:

"Personal and advertising Injury" arising out of the development, creation, pre-production, production, post-production, distribution, exploitation, writing, broadcasting, airing, performing or exhibition of films, television/cable programs, radio programs, stage plays, video/audio cassettes, music, sheet music, computer programs, books or other similar materials, and properties; or to any advertising or broadcasting activities.



Includes copyrighted material of ISO Properties, Inc.,
with its permission.

UCP035283

EXHIBIT 36, PAGE 301

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - FIREWORKS
# WITH EXCEPTION FOR CONCUSSION EFFECTS, FLASHPOTS AND SMOKEPOTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.**, **Exclusions** of  **Section I – Coverage  A – Bodily Injury And Property Damage Liability** and to Paragraph **2.**, **Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability**:

This insurance does not apply to "bodily injury," "property damage," or "personal and advertising injury" arising out of fireworks, pyrotechnic devices, or any explosive materials.

This exclusion does not apply to any "concussion effect", "flashpot" or "smokepot" that is induced electrically in a cylinder with no projectile, wadding or wrapping and is used to create visual effects and/or an explosive noise.

**B.** For the purpose of this endorsement, the following definitions apply:

**1.** "Concussion effect" means an effect intended to produce a loud noise and a violent jarring shock for dramatic effect.

**2.** "Flashpot" means a device containing flashpowder and intended to produce a flash of light and capable of directing the flash in an upward direction.

**3.** "Smokepot" is a pyrotechnic device used to create smoke.

Includes copyrighted material of ISO Properties, Inc., with its permission.

UCP035284

Specimen

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – THROWING, KICKING OR PROJECTING OF OBJECTS OR PERSONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2.**, **Exclusions** of  **Section I – Coverage  A – Bodily Injury And Property Damage Liability** and to Paragraph **2.**, **Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability**:

This insurance does not apply to "bodily injury", "property damage", or "personal and advertising injury" arising out of throwing, kicking or projecting any object by an insured or any member of an insured band during a performance, including but not limited to any performer throwing objects, himself, herself, or another person.



Includes copyrighted material of ISO Properties, Inc., with its permission.

UCP035285

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - NON-PERFORMING ANIMALS

This endorsement modifies insurance provided under the following:

   COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2.**, **Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability**:

This insurance does not apply to "bodily injury" or "property damage" arising out of animals that are not performing or are not intended to perform at an event sponsored by an insured.



Includes copyrighted material of ISO Properties, Inc. with its permission.       □

UCP035286

EXHIBIT 36, PAGE 304

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - COMPARATIVE ADVERTISING
# (DESIGNATED OPERATIONS)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Designated Covered Operations: |
| --- |
| 1. Exhibitor(s)<br>2. Non Food Concessionaire(s) |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

With respect to designated operations shown in the Schedule, the definition of "personal and advertising injury" in the **Definitions** Section is replaced by the following:

1. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   **a.** False arrest, detention or imprisonment;

   **b.** Malicious prosecution;

   **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   **d.** Oral or written publication, in any manner, of material that violates a person's right of privacy.

Includes copyrighted material of ISO Properties, Inc.,
with its permission.

UCP035287

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – DAMAGE TO PREMISES RENTED TO YOU FOR SEVEN OR FEWER CONSECUTIVE DAYS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **j.** of Paragraph **2.**, **Exclusions** of **Section I – Coverage A -  Bodily Injury and Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**j.   Damage To Property**

"Property damage" to:

(1)   Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2)   Premises you sell, give away or abandon If the "property damage" arises out of any part of those premises;

(3)   Property loaned to you;

(4)   Personal property in the care, custody or control of the insured;

(5)   That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6)   That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraph (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

UCP035288

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT OF EMPLOYEE DEFINITION
# (TEMPORARY EMPLOYEE)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The definition of "Employee" in the **Definitions** Section is deleted and replaced by the following:

"Employee" includes a "leased worker" or a "temporary worker".



Includes copyrighted material of ISO Properties, Inc.,
with its permission.

UCP035289

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE TO DESIGNATED PRODUCTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Designated  Covered Products: |
|---|
| Clothing apparel, records, tapes, CDs, posters, badges, photos, stickers, food and beverages. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The Products-Completed Operations hazard portion of this Policy will apply only to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of any of "your products" shown in the Schedule.

Specimen

UCP035290

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE TO DESIGNATED EVENTS FOR TENANT USER'S LIABILITY INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART

Schedule

| Designated Covered Event | Tenant User's Name | Coverage Term |
|---|---|---|
| Per Schedule On File With The Company | | |

(If no entry appears above, information required to complete this endorsement will be shown in the
Declarations as applicable to this endorsement)

1. This policy applies only to "injury", "bodily injury," "property damage," or "personal and advertising injury"
   arising out of event(s) designated in the Schedule above, in the reporting form or added by endorsement.
2. As respects the Tenant Users Liability Insurance, the Named Insured(s) is the "Tenant User(s)", "Non-
   Food Concessionaire(s)", "Food Concessionaires", "Exhibitors," or "Attractions" shown in the Schedule
   above, in the reporting form or added by endorsement.
3. As respects this endorsement, the Limits of Insurance shown in the Declaration will apply separately to
   each designated event shown in the Schedule above, in the reporting form or added by endorsement.
4. Premiums due must be reported on the next periodic Reporting Form.
5. As respects this endorsement, the '**Other Insurance**' condition in **Section IV – Commercial General
   Liability Conditions** is deleted and replaced with the following:

   This insurance is excess over any other insurance, whether primary, excess, contingent or on any other
   basis.

   We will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer
   has a duty to defend the insured against that "suit".  If no other insurer defends, we will undertake to do
   so, but we will be entitled to the insured's rights against those other insurers.

   Under this excess insurance, we will pay only our share of the amount of the loss, if any, that exceeds the
   sum of:

   **(1)** The total amount that all such other insurance would pay for the loss in the absence of this
   insurance; and

   **(2)** The total of all deductible and self-insured amounts under all such other insurance.

**ADDITIONAL DEFINITIONS**:

"Attraction(s)" is an entity that provides entertainment at the Designated Event.

"Exhibitor(s)" is an entity that exhibits or demonstrates, but does not sell products at a Designated Event.

"Food Concessionaire(s)," is an entity that sells food products at a Designated Event.

"Non-Food Concessionaire(s)," is an entity that sells other than food products at a Designated Event.

"Tenant User(s)" is the Lessee of the Facility or Venue where the Designated Event is held.

UCP035291

EXHIBIT 36, PAGE 309

**Policy Number:**
Renewal of Number: New

## LIQUOR LIABILITY DECLARATIONS



**Employers Fire Insurance Company**
One Beacon Lane
Canton, MA 02021

Item 1. Named Insured and Mailing Address          Agent Name and Address Sub Producer

**AS PER COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS - EDEC 526 12 05**

Item 2. Policy Period   **AS PER COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS - EDEC 526 12 05**

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

Item 3. Limits of Insurance

Each Common Cause Limit                $1,000,000

Aggregate Limit                        $1,000,000 Each "Declared Event"

Item 4. Description of Business and Location of Premises

Form of Business
[] Individual        [] Corporation        [] Joint Venture        [] Partnership        [] LLC        [X] Other

Business Description: TULIP

Locations of All Premises You Own, Rent or Occupy
**AS PER COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS - EDEC 526 12 05**

Item 5. Classification and Premium

| Classification | Code No. | Premium Base | Rate | Advance Premium |
|---|---|---|---|---|
| Liquor Liability | 58168e | Each "Declared Event" | See Rate Endorsement | See EDEC 526 12 05 |

| | |
|---|---|
| **Policy Premium:** | **$Included** |
| **State Tax or other (if applicable):** | **$** |
| **Total Premium:** | **$Included** |

| **Audit Period (if applicable)** | [] Annually | [] Semi-Annually | [] Quarterly | [] Monthly |
|---|---|---|---|---|

**EDEC 527 12 05**                                                    **Page 1**

UCP035292

Item 6. ENDORSEMENTS ATTACHED TO THIS POLICY:
AS PER COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS - EDEC 526 12 05

Countersigned:
Date: _____     By: _____
                                                                            Authorized Representative

**THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S)
AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.**



**EDEC 527 12 05**                                                                                    **Page 2**

UCP035293

# LIQUOR LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – LIQUOR LIABILITY COVERAGE

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "injury" to which this insurance applies if liability for such "injury" is imposed on the insured by reason of the selling, serving or furnishing of any alcoholic beverage. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "injury" to which this insurance does not apply. We may, at our discretion, investigate any "injury" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

**b.** This insurance applies to "injury" only if:

**(1)** The "injury" occurs during the policy period in the "coverage territory"; and

**(2)** Prior to the policy period**,** no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "injury" or claim, knew that the "injury" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "injury" occurred, then any continuation, change or resumption of such "injury" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Injury" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "injury" or claim, includes any continuation, change or resumption of that "injury" after the end of the policy period.

**d.** "Injury" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "injury" or claim:

**(1)** Reports all, or any part, of the "injury" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "injury"; or

**(3)** Becomes aware by any other means that "injury" has occurred or has begun to occur.

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Injury" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

© ISO Properties, Inc., 2003

UCP035294

c. **Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

  **(a)** Employment by the insured; or

  **(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the "injury".

d. **Liquor License Not In Effect**

"Injury" arising out of any alcoholic beverage sold, served or furnished while any required license is not in effect.

e. **Your Product**

"Injury" arising out of "your product". This exclusion does not apply to "injury" for which the insured or the insured's indemnitees may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

f. **Other Insurance**

Any "injury" with respect to which other insurance is afforded, or would be afforded but for the exhaustion of the limits of insurance.

This exclusion does not apply if the other insurance responds to liability for "injury" imposed on the insured by reason of the selling, serving or furnishing of any alcoholic beverage.

g. **War**

"Injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**SUPPLEMENTARY PAYMENTS**

We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**1.** All expenses we incur.

**2.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**3.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**4.** All costs taxed against the insured in the "suit".

**5.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**6.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

**7.** Expenses incurred by the insured for first aid administered to others at the time of an event to which this insurance applies.

These payments will not reduce the limits of insurance.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

  **a.** An individual, you and your spouse are insureds.

  **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

  **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

  **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

© ISO Properties, Inc., 2003

CG 00 33 12 04 □

UCP035295

EXHIBIT 36, PAGE 313

**2.** Each of the following is also an insured:

**a.** Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

**(1)** "Injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **(1)(a)** above; or

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above.

**(2)** "Property damage" to property:

**(a)** Owned or occupied by, or

**(b)** Rented or loaned

to that "employee", any of your other "employees", by any of your partners or members (if you are a partnership or joint venture), or by any of your members (if you are a limited liability company).

**b.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**c.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier; and

**b.** Coverage does not apply to "injury" that occurred before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The Aggregate Limit is the most we will pay for all "injury" as the result of the selling, serving or furnishing of alcoholic beverages.

**3.** Subject to the Aggregate Limit, the Each Common Cause Limit is the most we will pay for all "injury" sustained by one or more persons or organizations as the result of the selling, serving or furnishing of any alcoholic beverage to any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – LIQUOR LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Injury, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "injury" which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "injury" took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any "injury".

UCP035296

EXHIBIT 36, PAGE 314

**b.** If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of "injury" to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary. Our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **b.** below.

**b. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

© ISO Properties, Inc., 2003

CG 00 33 12 04   ☐

UCP035297

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**2.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the "injury" occurs in the course of travel or transportation between any places included in **a.** above; or

**c.** All other parts of the world if the "injury" arises out of:

**(1)** Goods or products made or sold by you in the territory described in **a.** above; or

**(2)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

**3.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**4.** "Executive Officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**5.** "Injury" means all damages, including damages because of "bodily injury" and "property damage", and including damages for care, loss of services or loss of support.

**6.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**7.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it.

**8.** "Suit" means a civil proceeding in which damages because of "injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**9.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**10.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

EXHIBIT 36, PAGE 316

**b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product", and

    **(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.



© ISO Properties, Inc., 2003

**CG 00 33 12 04**   ☐

UCP035299

EXHIBIT 36, PAGE 317

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – CONCESSIONAIRES TRADING UNDER YOUR NAME

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

**Concessionaire:**

All Concessionaires Trading Under Your Name



(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured the concessionaire(s) shown in the Schedule but only with respect to their liability as a concessionaire trading under your name.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

1. **Designation of Premises (Part Leased to You):** All Premises Leased to You
2. **Name of Person or Organization (Additional Insured):** All Managers or Lessors of Premises
3. **Additional Premium:** Included

(If no entry appears above, the information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section **II**) is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

1. Any "occurrence" which takes place after you cease to be a tenant in that premises.
2. Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the Schedule.

EXHIBIT 36, PAGE 319

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED –
# STATE OR POLITICAL SUBDIVISIONS – PERMITS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| State Or Political Subdivision:  All States or Political Subdivisions issuing such permits to the insured |
| --- |
|  |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**Section II – Who Is An Insured** is amended to include as an insured any state or political subdivision shown in the Schedule, subject to the following provisions:

**1.** This insurance applies only with respect to operations performed by you or on your behalf for which the state or political subdivision has issued a permit.

**2.** This insurance does not apply to:

**a.** "Bodily injury," "property damage" or "personal and advertising injury" arising out of operations performed for the state or municipality; or

**b.** "Bodily injury" or "property damage" included within the "products-completed operations hazard".

Specimen

UCP035302

COMMERCIAL GENERAL LIABILITY
CG 21 01 11 85

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – ATHLETIC OR SPORTS PARTICIPANTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

**SCHEDULE**

**Description of Operations:**

Any Athletic Events

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any operations shown in the Schedule, this insurance does not apply to "bodily injury" to any person while practicing for or participating in any sports or athletic contest or exhibition that you sponsor.

Specimen

**CG 21 01 11 85**          Copyright, Insurance Services Office, Inc.,  1984          **Page 1 of 1**
UCP035303

COMMERCIAL GENERAL LIABILITY
CG 21 35 10 01

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – COVERAGE C – MEDICAL PAYMENTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Description And Location Of Premises Or Classification: |
|---|
| All Location, Premises and Classification |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any premises or classification shown in the Schedule:

1. Section **I** – Coverage **C** – Medical Payments does not apply and none of the references to it in the Coverage Part apply: and

2. The following is added to Section **I** – Supplementary Payments:

   **h.** Expenses incurred by the insured for first aid administered to others at the time of an accident for "bodily injury" to which this insurance applies.

Specimen

© ISO Properties, Inc.,  2000
UCP035304

EXHIBIT 36, PAGE 322

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ABUSE OR MOLESTATION EXCLUSION

This endorsement modifies insurance provided under the following:

   COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

1. The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or

2. The negligent:
   a. Employment;
   b. Investigation;
   c. Supervision;
   d. Reporting to the proper authorities, or failure to so report; or
   e. Retention;
   of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph **1.** above.

Specimen

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**
This insurance does not apply to:
"Bodily injury" to:
   **(1)** A person arising out of any:
      **(a)** Refusal to employ that person;
      **(b)** Termination of that person's employment; or
      **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or
   **(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.
   This exclusion applies:
   **(1)** Whether the insured may be liable as an employer or in any other capacity; and
   **(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**
This insurance does not apply to:
"Personal and advertising injury" to:
   **(1)** A person arising out of any:
      **(a)** Refusal to employ that person;
      **(b)** Termination of that person's employment; or
      **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or
   **(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.
   This exclusion applies:
   **(1)** Whether the insured may be liable as an employer or in any other capacity; and
   **(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

Specimen

Copyright, Insurance Services Office, Inc.,  1997

UCP035306

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITED FUNGI OR BACTERIA COVERAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Fungi And Bacteria Liability Aggregate Limit   $  15,000 Sublimit |
| --- |

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**a.** "Personal and advertising injury" arising out of a "fungi or bacteria incident".

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**B.** Coverage provided by this insurance for "bodily injury" or "property damage", arising out of a "fungi or bacteria incident", is subject to the Fungi and Bacteria Liability Aggregate Limit as described in Paragraph **C.** of this endorsement. This provision **B.** does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**C.** The following are added to **Section III – Limits Of Insurance:**

**1.** Subject to Paragraphs **2.** and **3.** of Section **III** – Limits of Insurance, as applicable, the Fungi and Bacteria Liability Aggregate Limit shown in the Schedule of this endorsement is the most we will pay under Coverage **A** for all "bodily injury" or "property damage" and Coverage **C.** for Medical Payments arising out of one or more "fungi or bacteria incidents". This provision **C.1.** does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**2.** Paragraphs **5.**, the Each Occurrence Limit, Paragraph **6.**, the Damage To Premises Rented To You Limit, and Paragraph **7.**, the Medical Expense Limit, of Section **III** – Limits Of Insurance continue to apply to "bodily injury" or "property damage" arising out of a "fungi or bacteria incident" but only if, and to the extent that, limits are available under the Fungi and Bacteria Liability Aggregate Limit.

**D.** The following definitions are added to the **Definitions** Section:

**1.** "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

**2.** "Fungi or bacteria incident" means an incident which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

UCP035308

EXHIBIT 36, PAGE 326

Specimen

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALIFORNIA CHANGES

This endorsement modifies insurance provided under the following:

     COMMERCIAL GENERAL LIABILITY COVERAGE PART
     ELECTRONIC DATA LIABILITY COVERAGE PART
     LIQUOR LIABILITY COVERAGE PART
     OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
     POLLUTION LIABILITY COVERAGE PART
     PRODUCT WITHDRAWAL COVERAGE PART
     PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
     UNDERGROUND STORAGE TANK POLICY

The term "spouse" is replaced by the following:

Spouse or registered domestic partner under Califor-
nia law.

         © ISO Properties, Inc., 2004          **Page 1 of 1**

UCP035309

IL 02 70 11 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CALIFORNIA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART

**A.** Paragraphs **2.** and **3.** of the **Cancellation** Common Policy Condition are replaced by the following:

    **2. All Policies In Effect For 60 Days Or Less**

      If this policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured at the mailing address shown in the policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

      **a.** 10 days before the effective date of cancellation if we cancel for:

        **(1)** Nonpayment of premium; or

        **(2)** Discovery of fraud by:

          **(a)** Any insured or his or her representative in obtaining this insurance; or

          **(b)** You or your representative in pursuing a claim under this policy.

      **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

    **3. All Policies In Effect For More Than 60 Days**

      **a.** If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:

      **(1)** Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

      **(2)** Discovery of fraud or material misrepresentation by:

        **(a)** Any insured or his or her representative in obtaining this insurance; or

        **(b)** You or your representative in pursuing a claim under this policy.

      **(3)** A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

UCP035310

EXHIBIT 36, PAGE 328

**(4)** Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

**(5)** Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

**(6)** A determination by the Commissioner of Insurance that the:

    **(a)** Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

    **(b)** Continuation of the policy coverage would:

        **(i)** Place us in violation of California law or the laws of the state where we are domiciled; or

        **(ii)** Threaten our solvency.

**(7)** A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

**b.** We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or discovery of fraud; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph **3.a.**

**B.** The following provision is added to the **Cancellation** Common Policy Condition:

**7. Residential Property**

This provision applies to coverage on real property which is used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household personal property in a residential unit, if such coverage is written under one of the following:

Commercial Property Coverage Part

Farm Coverage Part – Farm Property – Farm Dwellings, Appurtenant Structures And Household Personal Property Coverage Form

**a.** If such coverage has been in effect for 60 days or less, and is not a renewal of coverage we previously issued, we may cancel this coverage for any reason, except as provided in **b.** and **c.** below.

**b.** We may not cancel this policy solely because the first Named Insured has:

**(1)** Accepted an offer of earthquake coverage; or

**(2)** Cancelled or did not renew a policy issued by the California Earthquake Authority (CEA) that included an earthquake policy premium surcharge.

However, we shall cancel this policy if the first Named Insured has accepted a new or renewal policy issued by the CEA that includes an earthquake policy premium surcharge but fails to pay the earthquake policy premium surcharge authorized by the CEA.

**c.** We may not cancel such coverage solely because corrosive soil conditions exist on the premises. This Restriction **(c.)** applies only if coverage is subject to one of the following, which exclude loss or damage caused by or resulting from corrosive soil conditions:

**(1)** Capital Assets Program Coverage Form (Output Policy);

**(2)** Commercial Property Coverage Part – Causes Of Loss – Special Form; or

**(3)** Farm Coverage Part **–** Causes Of Loss Form – Farm Property, Paragraph **D.** Covered Causes Of Loss – Special.

EXHIBIT 36, PAGE 329

**C.** The following is added and supersedes any provisions to the contrary:

### NONRENEWAL

**1.** Subject to the provisions of Paragraphs **C.2.** and **C.3.** below, if we elect not to renew this policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

**2. Residential Property**

This provision applies to coverage on real property used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household property contained in a residential unit, if such coverage is written under one of the following:

Capital Assets Program (Output Policy) Coverage Part

Commercial Property Coverage Part

Farm Coverage Part – Farm Property – Farm Dwellings, Appurtenant Structures And Household Personal Property Coverage Form

**a.** We may elect not to renew such coverage for any reason, except as provided in **b., c.** and **d.** below:

**b.** We will not refuse to renew such coverage solely because the first Named Insured has accepted an offer of earthquake coverage.

However, the following applies only to insurers who are associate participating insurers as established by Cal. Ins. Code Section 10089.16. We may elect not to renew such coverage after the first Named Insured has accepted an offer of earthquake coverage, if one or more of the following reasons applies:

**(1)** The nonrenewal is based on sound underwriting principles that relate to the coverages provided by this policy and that are consistent with the approved rating plan and related documents filed with the Department of Insurance as required by existing law;

**(2)** The Commissioner of Insurance finds that the exposure to potential losses will threaten our solvency or place us in a hazardous condition. A hazardous condition includes, but is not limited to, a condition in which we make claims payments for losses resulting from an earthquake that occurred within the preceding two years and that required a reduction in policyholder surplus of at least 25% for payment of those claims; or

**(3)** We have:

**(a)** Lost or experienced a substantial reduction in the availability or scope of reinsurance coverage; or

**(b)** Experienced a substantial increase in the premium charged for reinsurance coverage of our residential property insurance policies; and

the Commissioner has approved a plan for the nonrenewals that is fair and equitable, and that is responsive to the changes in our reinsurance position.

**c.** We will not refuse to renew such coverage solely because the first Named Insured has cancelled or did not renew a policy, issued by the California Earthquake Authority that included an earthquake policy premium surcharge.

**d.** We will not refuse to renew such coverage solely because corrosive soil conditions exist on the premises. This Restriction **(d.)** applies only if coverage is subject to one of the following, which exclude loss or damage caused by or resulting from corrosive soil conditions:

**(1)** Capital Assets Program Coverage Form (Output Policy);

**(2)** Commercial Property Coverage Part – Causes Of Loss – Special Form; or

**(3)** Farm Coverage Part – Causes Of Loss Form – Farm Property, Paragraph **D.** Covered Causes Of Loss – Special.

**3.** We are not required to send notice of nonrenewal in the following situations:

**a.** If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between us and a member of our insurance group.

---

**b.** If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph **C.1.**

**c.** If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

**d.** If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

**e.** If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

**f.** If we have made a written offer to the first Named Insured, in accordance with the timeframes shown in Paragraph **C.1.**, to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.



© ISO Properties, Inc., 2004

**IL 02 70 11 04** ☐

UCP035313

EXHIBIT 36, PAGE 331

IL 00 21 07 02

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property threat.

© ISO Properties, Inc.,  2001

UCP035314

EXHIBIT 36, PAGE 332

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2001

IL 00 21 07 02    ◌

UCP035315

EXHIBIT 36, PAGE 333

# EXHIBIT 37





### $_1$war

*noun, often attributive*  |  \ˈwȯr\

Popularity: Top 20% of words

---

**Examples:** WAR in a sentence  ⌄

---

### Definition of WAR

**1**  **a** (1) **:**  a state of usually open and declared armed hostile conflict between states or nations (2) **:**  a period of such armed conflict (3) **:**  STATE OF WAR
   **b :**  the art or science of warfare
   **c** (1) *obsolete* **:**  weapons and equipment for war (2) *archaic* **:**  soldiers armed and equipped for war

**2**  **a :**  a state of hostility, conflict, or antagonism
   **b :**  a struggle or competition between opposing forces or for a particular end  • a class *war*  • a *war* against disease
   **c :**  VARIANCE, ODDS 3

  SINCE 1828   MENU                                                        ◯

---

See *war* defined for English-language learners

See *war* defined for kids

---

### Examples of WAR in a sentence

They fought a *war* over the disputed territory.

UCP035316

EXHIBIT 37, PAGE 334