# EXHIBIT 38

# Atomic bomb

FISSION DEVICE

WRITTEN BY: The Editors of Encyclopædia Britannica

**Alternative Titles:** atom bomb, fission bomb

**Atomic bomb,** also called **atom bomb**, weapon with great explosive power that results from the sudden release of energy upon the splitting, or fission, of the nuclei of such heavy elements as plutonium or uranium.



The first atomic bomb test, near Alamogordo, N.M., July 16, 1945.
*Jack Aeby/Los Alamos National Laboratory*

## The Properties And Effects Of Atomic Bombs

When a neutron strikes the nucleus of an atom of the isotopes uranium-235 or plutonium-239, it causes that nucleus to split into two fragments, each of which is a nucleus with about half the protons and neutrons of the original nucleus. In the process of splitting, a great amount of thermal energy, as well as gamma rays and two or more neutrons, is released. Under certain conditions, the escaping neutrons strike and thus fission more of the surrounding uranium nuclei, which then emit more neutrons that split still more nuclei. This series of rapidly multiplying fissions culminates in a chain reaction in which nearly all the fissionable material is consumed, in the process generating the explosion of what is known as an atomic bomb.



The neutron strikes the nucleus and is absorbed.

The absorbed neutron causes the nucleus to undergo deformation.

In about $10^{-14}$ second, one of the deformations is so drastic that the nucleus cannot recover.

The nucleus fissions, releasing an average of two to three neutrons.

In about $10^{-12}$ second, the fission fragments lose their kinetic energy and come to rest, emitting a number of gamma rays. Now the fragments are called fission products.

The fission products lose their excess energy by radioactive decay, emitting particles over a lengthy time period (seconds to years).

| • Neutrons | • Protons | • Beta particles | ⚡ Gamma rays |

© 2013 Encyclopædia Britannica, Inc.

Sequence of events in the fission of a uranium nucleus by a neutron.
*Encyclopædia Britannica, Inc.*

Many isotopes of uranium can undergo fission, but uranium-235, which is found naturally at a ratio of about one part per every 139 parts of the isotope uranium-238, undergoes fission more readily and emits more neutrons per fission than other such isotopes. Plutonium-239 has these same qualities. These are the primary fissionable materials used in



assembly without striking another nucleus and causing it to fission. If more uranium-235 is added to the assemblage, the chances that one of the released neutrons will cause another fission are increased, since the escaping neutrons must traverse more uranium nuclei and the chances are greater that one of them will bump into another nucleus and split it. At the point at which one of the neutrons produced by a fission will on average create another fission, critical mass has been achieved, and a chain reaction and thus an atomic explosion will result.



Sequence of events in the fission of a uranium nucleus by a neutron.
*Encyclopædia Britannica, Inc.*

In practice, an assembly of fissionable material must be brought from a subcritical to a critical state extremely suddenly. One way this can be done is to bring two subcritical masses together, at which point their combined mass becomes a critical one. This can be practically achieved by using high explosives to shoot two subcritical slugs of fissionable material together in a hollow tube. A second method used is that of implosion, in which a core of fissionable material is suddenly compressed into a smaller size and thus a greater density; because it is denser, the nuclei are more tightly packed and the chances of an emitted neutron's striking a nucleus are increased. The core of

UCP035318

EXHIBIT 38, PAGE 336

an implosion-type atomic bomb consists of a sphere or a series of concentric shells of fissionable material surrounded
by a jacket of high explosives, which, being simultaneously detonated, implode the fissionable material under
enormous pressures into a denser mass that immediately achieves criticality. An important aid in achieving criticality is
the use of a tamper; this is a jacket of beryllium oxide or some other substance surrounding the fissionable material
and reflecting some of the escaping neutrons back into the fissionable material, where they can thus cause more
fissions. In addition, "boosted fission" devices incorporate such fusionable materials as deuterium or tritium into the
fission core. The fusionable material boosts the fission explosion by supplying a superabundance of neutrons.





The three most common fission bomb designs, which vary considerably in material and arrangement.
*Encyclopædia Britannica, Inc.*

Fission releases an enormous amount of energy relative to the material involved. When completely fissioned, 1 kg (2.2
pounds) of uranium-235 releases the energy equivalently produced by 17,000 tons, or 17 kilotons, of TNT. The
detonation of an atomic bomb releases enormous amounts of thermal energy, or heat, achieving temperatures of
several million degrees in the exploding bomb itself. This thermal energy creates a large fireball, the heat of which can
ignite ground fires that can incinerate an entire small city. Convection currents created by the explosion suck dust and
other ground materials up into the fireball, creating the characteristic mushroom-shaped cloud of an atomic
explosion. The detonation also immediately produces a strong shock wave that propagates outward from the blast to
distances of several miles, gradually losing its force along the way. Such a blast wave can destroy buildings for several
miles from the location of the burst.

UCP035319

EXHIBIT 38, PAGE 337



A gigantic mushroom clou... ...5, 1945, after a U.S. aircraft ...

Large quanti...                                                                      1.5 to 3 km (1

such long-lived radioisotopes as strontium-90 and plutonium-239; even limited exposure to the fallout in the first few weeks after the explosion may be lethal, and any exposure increases the risk of developing cancer.



The harmful effects of radiation from nuclear bombing.
*Encyclopædia Britannica, Inc.*

## Development And Proliferation Of Atomic Bombs

The first atomic bomb was built in Los Alamos, New Mexico, during World War II under a program called the Manhattan Project. Los Alamos was approved as the site for the main atomic bomb scientific laboratory on November 25, 1942, by Brig. Gen. Leslie R. Groves and physicist J. Robert Oppenheimer and was given the code name Project Y. One bomb, using plutonium, was successfully tested on July 16, 1945, at a site 193 km (120 miles) south of Albuquerque, New Mexico.



UCP035320        4/10

EXHIBIT 38, PAGE 338

SoCalCHEVY.com   Learn More

2017 CHEVROLET SILVERADO 1500
MAKE A STRONG DECISION
FIND YOUR TAG
16% BELOW MSRP
ON SELECT 2017 SILVERADO 1500 PICKUPS IN STOCK!

SIMPLIFY YOUR DIGITAL LIFE

Brig. Gen. Leslie R. Groves (le... ... the Manhattan Project.
*Man...*

The first atomic bomb to be used in war... ...the United States on Hiroshima, Japan, on August 6, 1945. (*See* Sidebar: The Dec... ...plosion, which had the force of more than 15,000 tons of TNT, instantly and c... ...(several miles) of the heart of this city of 343,000 in... ...he death toll

...equal to 21,000 tons of TNT. The terrain and smaller size of Nagasaki reduced destruction of life and property, but 39,000 persons were killed and 25,000 injured; about 40 percent of the city's structures were destroyed or seriously damaged. The Japanese initiated surrender negotiations the next day.



THE FIRST ATOMIC BOMBS
The first atomic bomb was built in Los Alamos, New Mexico, during World War II under a top secret U.S. government program called the Manhattan Project. Los Alamos was approved as the site for the main atomic-bomb scientific laboratory on November 25, 1942, by Brigadier General Leslie R. Groves and physicist J. Robert Oppenheimer.

THE FIRST TEST
Code name: Trinity
Location: Alamogordo, New Mexico
Date: July 16, 1945, 5:29:45 AM
Bomb name: *Gadget*
Bomb type: plutonium-239 implosion
TNT equivalent: 21,000 tons

BOMB CUTAWAYS
For an atomic bomb to explode, a nuclear chain reaction must start.
Gun-assembly fission bomb
conventional explosive
primer apparatus
uranium-235
In a gun-assembly bomb, a mass of uranium-235 is fired down a "gun barrel" toward another mass of U-235 to start the reaction.
neutron initiator
plutonium-239 core
hard metal casing
uranium-238 tamper
two layers of high-explosive lenses
Implosion fission bomb
In an implosion bomb, a sphere of plutonium-239 is surrounded by high explosives that compress the plutonium.
to firing unit

NEW MEXICO
Los Alamos · Santa Fe
Albuquerque
193 km (120 mi)
Alamogordo

HIROSHIMA
Date: August 6, 1945, 8:15 AM
Bomb name: *Little Boy*
Bomb type: gun-assembly
Deployment: B-29 bomber *Enola Gay*, airburst at 580 m (1,900 ft) above the city
TNT equivalent: 15,000 tons (estimated)
Estimated casualties: 140,000 by year's end

JAPAN
Tokyo
The B-29 *Bockscar* spent 45 minutes over Kokura without sighting its aim point. It then proceeded to its secondary target, Nagasaki.
Kokura → Hiroshima
Nagasaki

NAGASAKI
Date: August 9, 1945, 11:02 AM
Bomb name: *Fat Man*
Bomb type: implosion
Deployment: B-29 bomber *Bockscar*, airburst at 500 m (1,650 ft) above the city
TNT equivalent: 21,000 tons (estimated)
Estimated casualties: 70,000 by year's end

© 2015 Encyclopædia Britannica, Inc.

The first atomic bomb was detonated on July 16, 1945, in the Trinity test at the Alamogordo Bombing ...
*Encyclopædia Britannica, Inc.*

UCP035321     5/10

EXHIBIT 38, PAGE 339

After the war, the United States conducted test explosions of atomic bombs in the Pacific Proving Grounds in the Marshall Islands (especially Bikini and Enewetak atolls) and in Nevada. In subsequent years, the Soviet Union (1949), Great Britain (1952), France (1960), China (1964), India (1974), Pakistan (1998), and North Korea (2006) tested fission weapons of their own. The great temperatures and pressures created by fission explosion are also used to initiate fusion and thus detonate a thermonuclear bomb. *See also* nuclear weapon.



In 1946 the United States began atmospheric...
Pacific. The fi...

*Stock footage courtesy Th...*



SIMPLIFY YOUR DIGITAL LIFE

**ADDITIONAL...**

   



VIEW ALL MEDIA ❯

**MORE ABOUT** atomic bomb

**32 REFERENCES FOUND IN BRITANNICA ARTICLES**

**Assorted References**

· comparison with thermonuclear bomb (*in* thermonuclear bomb)

· construction (*in* United States: War production)

· delivery by B-29 bomber (*in* B-29)

· explosion by Soviet Union (*in* 20th-century international relations: The division of Europe)

· nuclear weapons design (*in* nuclear weapon)

· viewed by Stimson (*in* Henry L. Stimson)

· weapons of mass destruction (*in* weapon of mass destruction (WMD))

EXHIBIT 38, PAGE 340

**SIDEBAR**

- Truman's decision to use the bomb (*in* The decision to use the atomic bomb)

**dropped on Japan (*in* Japan: The end of the war)**

- Hiroshima (*in* Hiroshima (Japan))

VIEW MORE

---

**EXTERNAL LINKS**                                                                          ⌄

---

**ARTICLE HISTORY**                                                                         ⌄



📝 FEEDBACK          Corrections? Update...                  ...editors with your feedback.

SIMPLIFY YOUR DIGITAL LIFE

KEEP R...                                                                    ...ICA LIFE

☰                                                                        🖼 🔗 🔍



**marketing**

the sum of activities involved in directing the flow of goods and services from producers to consumers. Marketing's principal function is to promote and facilitate exchange. Through marketing, individuals...

READ THIS ARTICLE ▸



**Electronics & Gadgets Quiz**

Take this electronics and gadgets quiz at encyclopedia britannica to test your knowledge of iPods, compact discs, and all things digital.

TAKE THIS QUIZ ▸



**computer**



**atom**

smallest unit into which matter can be divided without the release of electrically charged particles. It also is the smallest unit of matter that has the characteristic properties of a chemical element....

READ THIS ARTICLE ▸



**Gadgets and Technology: Fact or**

EXHIBIT 38, PAGE 341



device for processing, storing, and displaying information. Computer once meant a person who did computations, but now the term almost universally refers to automated electronic machinery. The first section...

**READ THIS ARTICLE** ▶

**Fiction?**

Take this science True or False Quiz at Encyclopedia Britannica to test your knowledge of cameras, robots, and other technological gadgets.

**TAKE THIS QUIZ** ▶

## fascism

political ideology and mass movement that dominated many parts of central, southern, and eastern Europe between 1919 and 1945 and that also had adherents in western Europe, the United States, South Africa,...

**READ THIS ARTICLE** ▶


SoCalCHEVY.com    Learn More
2017 CHEVROLET SILVERADO 1500
**MAKE A STRONG DECISION**
FIND YOUR TAG
**16%** BELOW MSRP
ON SELECT 2017 SILVERADO 1500 PICKUPS IN STOCK!



**11 of the World's Most Famous Warplanes**

World history is often defined by wars. During the 20th and 21st centuries, aircraft came

SIMPLIFY YOUR DIGITAL LIFE



☰                                         🔗 🔍



all military aircraft fall into one...

**READ THIS ARTICLE** ▶

**READ THIS LIST** ▶

## education

discipline that is concerned with methods of teaching and learning in schools or school-like environments as opposed to various nonformal and informal means of socialization (e.g., rural development projects...

**READ THIS ARTICLE** ▶



**Chemistry: Fact or Fiction?**

Take this Science quiz at Encyclopedia Britannica to test your knowledge of chemistry.

**TAKE THIS QUIZ** ▶

## slavery

condition in which one human being was owned by another. A slave was considered by law as property, or chattel, and was deprived of most of the rights ordinarily held by free persons. There is no consensus...

**READ THIS ARTICLE** ▶

**7 Deadliest Weapons in History**

https://www.britannica.com/technology/atomic-bomb

UCP035324        8/10

EXHIBIT 38, PAGE 342

The earliest known purpose-built weapons in human history date to the Bronze Age. Maces, which were little more than rocks mounted on sticks, had questionable value as hunting...

READ THIS LIST ▶

VIEW MORE



f  twitter  youtube  instagram  pinterest  ✉

About Us    About Our Ads    Partner Program    Contact Us    Privacy Policy    Terms of Use
©2017 Encyclopædia Britannica, Inc.



SIMPLIFY YOUR DIGITAL LIFE

 

https://www.britannica.com/technology/atomic-bomb

UCP035325

9/10

EXHIBIT 38, PAGE 343





EXHIBIT 38, PAGE 344

# EXHIBIT 39



**U.S.NRC**
United States Nuclear Regulatory Commission
*Protecting People and the Environment*

Home > NRC Library > Basic References > Glossary > Radioactivity

# Radioactivity

The property possessed by some elements (such as uranium) of spontaneously emitting energy in the form of radiation as a result of the decay (or disintegration) of an unstable atom. Radioactivity is also the term used to describe the rate at which radioactive material emits radiation. Radioactivity is measured in curies (Ci), becquerels (Bq), or disintegrations per second.. For related information, see Measuring Radiation.

*Page Last Reviewed/Updated Monday, April 10, 2017*

UCP035327

EXHIBIT 39, PAGE 345

# EXHIBIT 40



United States Nuclear Regulatory Commission

*Protecting People and the Environment*

Home > NRC Library > Basic References > Glossary > Atomic energy

# Atomic energy

The energy that is released through a nuclear reaction or radioactive decay process. Of particular interest is the process known as fission, which occurs in a nuclear reactor and produces energy usually in the form of heat. In a nuclear power plant, this heat is used to boil water in order to produce steam that can be used to drive large turbines. This, in turn, activates generators to produce electrical power. Atomic energy is more correctly called nuclear energy.

*Page Last Reviewed/Updated Monday, April 10, 2017*

EXHIBIT 40, PAGE 346

# EXHIBIT 41



Institute for the Analysis of Global Security

search | Search

| Home | About Us | Publications | Projects | IAGS in the News | On Camera |


United States
Energy Security Council


Another free public service from IAGS:
JOURNAL OF ENERGY SECURITY ▸▸


Lighthouse
ENERGY SECURITY BLOG ▸▸


Technology and Rare Earth Metals for National Security and Clean Energy
TREM Center


Support IAGS ▸▸


Set America Free Coalition ▸▸
Energy Independence through Fuel Choice


Mobility Choice Coalition ▸▸
Mobility Choices for a Secure America

# How much did the September 11 terrorist attack cost America?

Counting the value of lives lost as well as property damage and lost production of goods and services, losses already exceed $100 billion. Including the loss in stock market wealth -- the market's own estimate arising from expectations of lower corporate profits and higher discount rates for economic volatility -- the price tag approaches $2 trillion.

Among the big-ticket items:



The loss of four civilian aircraft valued at $385 million.

The destruction of major buildings in the World Trade Center with a replacement cost of from $3 billion to $4.5 billion.

Damage to a portion of the Pentagon: up to $1 billion.

Cleanup costs: $1.3 billion.

Property and infrastructure damage: $10 billion to $13 billion.

Federal emergency funds (heightened airport security, sky marshals, government takeover of airport security, retrofitting aircraft with anti-terrorist devices, cost of operations in Afghanistan): $40 billion.

Direct job losses amounted to 83,000, with $17 billion in lost wages.

The amount of damaged or unrecoverable property hit $21.8 billion.

Losses to the city of New York (lost jobs, lost taxes, damage to infrastructure, cleaning): $95 billion.

Losses to the insurance industry: $40 billion.

Loss of air traffic revenue: $10 billion.

UCP035329

EXHIBIT 41, PAGE 347

**Fall of global markets:** incalculable.

**More information:**

List of the victims
New York City Comptroller report: One Year later, The Fiscal Impact of 9/11 on New York City
The Milken Institute: The Impact of September 11 on U.S. Metropolitan Economies
International Labour Organization: The impact of the 2001-2002 crisis on the hotel and tourism industry

Property of The Institute for the Analysis of Global Security © 2003-2004. All rights reserved.

UCP035330

EXHIBIT 41, PAGE 348

# EXHIBIT 42

(http://wsj.com)

(http://www.facebook.com/sharer.php?
url=http%3A%2F%2Fgraphics%2Ewsj%2Ecom%2Fterror-
timeline-
since-911%2F&title=Timeline%3A%20Terror%20Attacks%20Linked%20to%20Islamists%20since%209%2F11)

# Timeline: Terror Attacks Linked to Islamists Since 9/11

In a series of related attacks across Paris, terrorists killed at least 129 people in an assault the French government blamed on Islamic State. Here are other attacks linked to Islamist groups or individuals over the years.

(Clarification: The list of terrorist attacks below is not intended to be exhaustive.)

By **WSJ News Graphics (https://twitter.com/WSJGraphics)**
Published Nov. 14, 2015

| Sort by | Date | Deaths ▼ | Region |
| --- | --- | --- | --- |



NORTH AMERICA
**Sept. 11, 2001, New York**

2,996 dead

The September 11 attacks kill nearly 3,000 people. Terrorists crash passenger jets into the Twin Towers of the World Trade Center in Manhattan and the Pentagon in Virginia, and a fourth airplane crashes in a western Pennsylvania field.

*PHOTO: ASSOCIATED PRESS*

UCP035331

EXHIBIT 42, PAGE 349



EASTERN EUROPE

**Sept. 1, 2004, Beslan, North Ossetia**

330 dead

A massacre leaves more than 330 dead, around half of them children, after Islamist terrorists take 1,200 people hostage in Beslan, North Ossetia, an autonomous Russian republic. The siege lasts for three days.

*A woman and a girl escape in Beslan. PHOTO: APTN/ASSOCIATED PRESS*

Related article » (http://www.wsj.com/articles/SB121122113835904159)

UCP035332

EXHIBIT 42, PAGE 350



MIDDLE EAST

**Oct. 31, 2015, Egypt**

224 dead

A Russian-operated jet crashes in Egypt, killing all 224 people on board, in what appears to have been a terrorist act. Islamic State claims responsibility.

*PHOTO: RUSSIA'S EMERGENCY MINISTRY/AGENCE FRANCE-PRESSE*

Related article » (http://www.wsj.com/articles/russian-passenger-jet-crashes-in-egypts-sinai-peninsula-1446281838)

UCP035333

EXHIBIT 42, PAGE 351



ASIA

**Oct. 12, 2002, Bali, Indonesia**

202 dead, in the final death toll

Indonesian officials blame al Qaeda for a car bomb that kills nearly 190 people on the Indonesian holiday island of Bali.

*Site of the attack in Bali. PHOTO: ASSOCIATED PRESS*

Related article » (http://www.wsj.com/articles/SB1034626542477954196)

UCP035334

EXHIBIT 42, PAGE 352



WESTERN EUROPE

**March 11, 2004, Madrid**

191 dead

Coordinated bomb attacks hit four Spanish commuter trains in Madrid, killing 191 people. Spanish investigators blame an al Qaeda-linked terror cell.

*Wreckage of a train hit by a bomb in Atocha, Madrid. PHOTO: AGENCE FRANCE-PRESSE/GETTY IMAGES*

Related article » (http://www.wsj.com/articles/SB107899319607552435)

UCP035335

EXHIBIT 42, PAGE 353



EASTERN EUROPE

**Oct. 23, 2002, Russia**

170 dead, 130 hostages and 40 hostage takers

Forty Chechen fighters seize Moscow's Dubrovka Theater and hold nearly 1,000 people hostage, killing two. Russian special forces storm the building after pumping a chemical agent into the ventilation system, killing all 40 terrorists and some 130 hostages because of an adverse reaction to the gas.

*A woman is escorted out of the theater in Moscow. PHOTO: ASSOCIATED PRESS*

Related article » (http://www.wsj.com/articles/SB1035398765975326831)

UCP035336

EXHIBIT 42, PAGE 354



ASIA

**Nov. 26, 2008, Mumbai**

166 dead

A 60-hour siege by 10 militants from Pakistan on India's biggest city and financial capital kills 166 people. India claims the terrorists who perpetrated the attacks on luxury hotels, a Jewish center and other sites were operatives of the Pakistan-based militant group Lashkar-e-Taiba.

*Taj Mahal hotel during the attack. PHOTO: REUTERS*

Related article » (http://www.wsj.com/articles/SB121122113835904159)

UCP035337

EXHIBIT 42, PAGE 355

# EXHIBIT 43

Bayside Reporting Company

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, ET AL., | ) ) ) | |
| PLAINTIFFS, | ) ) | CASE NO.: |
| VS. | ) ) | 2:16-cv-4435-PA-MRW |
| ATLANTIC SPECIALTY INSURANCE COMPANY, | ) ) ) | |
| DEFENDANT. | ) | |

**CONFIDENTIAL**

**EXHIBITS BOUND SEPARATELY**

VOLUME I

DEPOSITION OF PETER DONALD WILLIAMS

WEDNESDAY, FEBRUARY 1, 2017

REPORTED BY:  INGRID SUÁREZ EGNATUK
CSR NO. 3098

3820 DEL AMO BOULEVARD
SUITE 222
TORRANCE, CALIFORNIA 90503

(888) 229-9897
FAX (310) 214-1405
WWW.BAYSIDEDEPO.COM

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3          WESTERN DIVISION

4

5    UNIVERSAL CABLE         )   CASE NO. 2:16-cv-4435-PA-MRW
     PRODUCTIONS LLC, et al.,)
6                            )
         Plaintiffs,         )
7                            )
         vs.                 )
8                            )
     ATLANTIC SPECIALTY      )        **CONFIDENTIAL**
9    INSURANCE COMPANY,      )
                             )
10        Defendant.         )
     _____)

11

12

13

14          VOLUME I (Pages 1 - 260)

15       DEPOSITION OF PETER DONALD WILLIAMS

16        Wednesday, February 1, 2017

17

18

19

20

21

22

23   Reported by:  Ingrid Suárez Egnatuk
                   CSR No. 3098
24

25

EXHIBIT 43, PAGE 357

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW  Document 63  NFIDENTIAl04/24/17  Page 30 of 176  Page ID
#:4918

```
 1                    LOS ANGELES, CALIFORNIA

 2                 Wednesday, February 1, 2017

 3                       9:59 a.m.

 4

 5             THE VIDEOGRAPHER:  We on the record.

 6             This is the deposition of Peter Williams

 7     taken on behalf of the plaintiffs in the matter of

 8     Universal Cable Productions LLC vs. Atlantic

 9     Specialty Insurance Company pending before the

10     Superior -- excuse me.  Pending before the United

11     States District Court, Central District of

12     California, Case No. 2:16-cv-4435-PA-MRW.

13             It is February 1, 2017, and today we are

14     at 707 Wilshire Boulevard, Suite 4000, in

15     Los Angeles, California.

16             My name is Esrom Jayasinghe, a certified

17     legal video specialist and a notary with Verbatim

18     Video, located at 9725 Gladbeck Avenue in

19     Northridge, California.

20             This is the start of Media 1.  The time

21     now is 9:59.

22             Counsel, if you would kindly introduce

23     yourself and state your affiliation.

24             MS. COYOCA:  Good morning.  Lucia Coyoca,

25     Mitchell Silberberg & Knupp, by and on behalf of the
```

09:59 appears at line 5
09:59 appears at line 10
09:59 appears at line 15
10:00 appears at line 20
10:00 appears at line 25

6

EXHIBIT 43, PAGE 358

10:00  1    plaintiffs in this matter, Universal Cable

2    Productions and Northern Entertainment Productions.

3            MR. KEELEY:  Good morning.  I'm Michael

4    Keeley with Strasburger & Price.  I represent the

10:00  5    defendant, Atlantic Specialty Insurance Company.

6            THE REPORTER:  Raise your right hand,

7    please.

8            Do you solemnly swear or affirm the

9    testimony you are about to give in this deposition

10:08 10    will be the truth, the whole truth, and nothing but

11    the truth?

12            THE WITNESS:  I do.

13            THE REPORTER:  Thank you.

14

Confidential

10:08 15            PETER DONALD WILLIAMS,

16        having been first duly sworn, was

17        examined and testified as follows:

18

19                    EXAMINATION

10:08 20    BY MS. COYOCA:

21        Q.   Good morning, Mr. Williams.  As I

22    indicated, my name is Lucia Coyoca, and I represent

23    the plaintiffs in this matter.

24            Could you please state your full name and

10:00 25    address for the record.

7

EXHIBIT 43, PAGE 359

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 61-12   Filed 04/24/17   Page 32 of 176   Page ID #:4920
CONFIDENTIAL

10:14  1    OneBeacon?

2          A.   Claims manager for OneBeacon

3    Entertainment.

4          Q.   When in 2009 did you go to work for

10:14  5    OneBeacon Entertainment, approximately?

6          A.   May, I believe.

7          Q.   Who hired you?

8          A.   Well, the local president was a guy -- was

9    a man called Jack Cave.  But, I mean, I guess my

10:14 10   hiring was approved by the claims people in

11   Minnesota.  But Jack Cave was the man who reached

12   out to me.

13         Q.   What were your responsibilities when you

14   worked as a claims manager for OneBeacon

10:15 15   Entertainment?

16         A.   I was in charge of overseeing the claims

17   made by the policies issued by OneBeacon

18   Entertainment and for negotiating and settling the

19   claims that were within my authority.

10:15 20         Q.   Did you personally handle the adjustment

21   of claims, or did you have people working for you

22   who were assigned to particular claims?

23         A.   Primarily we had independent adjusters

24   assigned.  One or two claims I handled personally.

10:16 25         Q.   And those independent adjusters, were they

19

EXHIBIT 43, PAGE 360

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 51-14   Filed 04/24/17   Page 33 of 176   Page ID
#:4921
CONFIDENTIAL

10:20  1    thereafter to president of OneBeacon Entertainment.

2        Q.   When did you -- when were you promoted to

3    president of OneBeacon Entertainment?

4        A.   Towards the end of October, 2010.

10:20  5        Q.   I'm sorry.  I thought you had indicated

6    that in October of 2010 you were promoted to head of

7    underwriting, and you held that position for a short

8    time; is that correct?

9        A.   Very short time.

10:20 10        Q.   Okay.

11        A.   A matter of weeks.

12        Q.   A matter of weeks.  Okay.

13        A.   Yes.

14        Q.   And then subsequently, within a matter of

10:20 15    weeks, you became the president of OneBeacon

16    Entertainment; is that right?

17        A.   Yes.

18        Q.   Is OneBeacon Entertainment a separate

19    business entity?

10:21 20        A.   No.

21        Q.   What is it?

22        A.   It's a -- just a division of OneBeacon

23    Insurance Company.

24        Q.   Who promoted you to head of underwriting?

10:21 25        A.   The regional director from -- at the time,

23

www.baysidedepo.com
CONFIDENTIAL
Case 2:16-cv-04435-PA-MRW   Document 61-9   Filed 04/24/17   Page 34 of 176   Page ID #:4922

10:30  1    don't actually know.

2          Q.    Okay.

3          A.    Obviously, senior claims people at

4    OneBeacon -- OneBeacon hired him.

10:30  5    Q.    Got it.  That's fair.

6                So why did you hold the position of chief

7    underwriting officer for such a short period of time

8    before you were promoted to president?

9          A.    Oh.  Because Jack Cave and Martin Ridgers

10:30 10   left the company.  And so we consol- -- OneBeacon

11   consolidated the positions into one, president and

12   head of underwriting.

13         Q.    Now, when you became president of

14   OneBeacon Entertainment in approximately late

10:30 15   October of 2010, what were your responsibilities?

16         A.    I was then the president of the

17   underwriting division.  I was in charge of the

18   administration of the division, the underwriting

19   function, supervising the underwriters, supervising

10:31 20   the administration of the -- of the division from an

21   underwriting perspective.

22         Q.    And what, if any, relationship did you

23   have with respect to claims adjustment?

24         A.    None.  It's kept entirely separate between

10:31 25   claims and underwriting.

30

EXHIBIT 43, PAGE 362

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 52-10   Filed 04/24/17   Page 35 of 176   Page ID
#:4923
CONFIDENTIAL

11:31  1           A.    I'm global head of live products.

       2           Q.    What do you mean by "live products"?

       3           A.    Everything in the entertainment world

       4     which is not film or television.

11:31  5           Q.    In other words, music concerts, Broadway

       6     shows, any other forms of live entertainment?

       7           A.    Correct.  Motor sports, sports.

       8           Q.    When you began working for OneBeacon

       9     initially, was NBCUniversal a client?

11:32 10           A.    No.

      11           Q.    Who brought NBCUniversal in as a client?

      12           A.    I think it was my predecessor, Martin

      13     Ridgers.

      14           Q.    When did NBCUniversal begin to be insured

11:32 15     for purposes of its production portfolio by

      16     OneBeacon?

      17           A.    I believe that was 2010, as far as I

      18     recall.

      19           Q.    Were you involved in the negotiations with

11:32 20     NBCUniversal with respect to the coverage?

      21           A.    Yes.

      22           Q.    What was your role?

      23           A.    They were represented by the brokers,

      24     Aon/Ruben in New York.  So through my New York

11:33 25     office, obviously it was a big client, a big policy,

                                                              58

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 61-12  Filed 04/24/17   Page 36 of 176   Page ID
#:4924
CONFIDENTIAL

11:33 1    we negotiated backwards and forwards on the terms

2    and conditions of the policy.  Aon actually produced

3    the wording and wanted us to use their wording for

4    NBC, which was based primarily on the previous

11:33 5    carrier.  So there was some negotiation on that

6    wording, also price level of SIR.

7         Q.   Who at Aon/Ruben was responsible for

8    negotiating the terms of that initial 2010 policy?

9         A.   George Walden, W-A-L-D-E-N.

11:33 10        Q.   Anyone else?

11        A.   Not that I recall.  He's the main -- the

12    head of the New York office.

13        Q.   And who from OneBeacon Entertainment was

14    primarily responsible for negotiating the policy?

11:34 15        A.   Well, myself and, to a lesser extent,

16    Wanda Phillips, our OneBeacon underwriter in

17    New York.

18        Q.   Wanda Phillips, you indicated, is the

19    OneBeacon underwriter in New York; is that correct?

11:34 20        A.   She was.  Correct.

21        Q.   She was?

22        A.   Yes.

23        Q.   You indicated that Martin Ridgers, you

24    believed, first brought the client in; is that

11:34 25    correct?

59

11:34    1          A.    I believe so.  Yes.

         2          Q.    All right.  It wasn't based on your

         3    contacts?

         4          A.    No.

11:34    5          Q.    Okay.  Yet at the time you were working as

         6    the claims manager; is that not correct?

         7          A.    Yes.

         8          Q.    Okay.  Why were you involved in the

         9    underwriting of the policy, then?

11:35   10          A.    The -- well, it started when I was in

        11    claims.  Obviously continued, as I transferred.

        12                For a manuscript endorse- -- manuscript

        13    policy of this nature, it's common to -- in fact, it

        14    was regular -- to involve claims, as this was not

11:35   15    OneBeacon's standard policy but was language being

        16    brought to us by the broker.

        17          Q.    Wanda Phillips, the underwriter in

        18    New York, she still -- does she continue to work for

        19    OneBeacon, to the best of your knowledge?

11:35   20          A.    No, she does not.

        21          Q.    Do you know who she currently works for?

        22          A.    Yes.

        23          Q.    Who?

        24          A.    Allianz.

11:36   25          Q.    And when did she leave OneBeacon?

                                                                    60

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 60-12   Filed 04/24/17   Page 38 of 176   Page ID
CONFIDENTIAL
#:4926

11:36   1          A.    Spring of last year, I believe, April

2    time.

3          Q.    From start to finish, what's your best

4    estimate of the period of time that it took to

11:36   5    negotiate the policy?

6          A.    Oh.   A relatively long time.   Six months.

7    Obviously not on a daily basis, but over a period of

8    time.

9          Q.    Of course.

11:36  10          With respect to the setting of the

11    premium, what was your input on that issue?

12          A.    I had discussions with Wanda Phillips as

13    to where we wanted the self-insured retention to be,

14    versus estimated premium.   Between us we landed on a

11:37  15    number that we were prepared to -- to write the

16    policy at.

17          Q.    Now, your reference to SIR, that's the

18    self-insured retention?

19          A.    Yes.

11:37  20          Q.    And what was your involvement with respect

21    to the setting of the self-insured retention?

22          A.    Again, discussions with the broker, with

23    Wanda Phillips as to where we wanted that SIR to be

24    to protect -- I mean, it's -- the SIR versus

11:37  25    premium, the larger the SIR, the less premium you

61

www.baysidedepo.com
CONFIDENTIAL
Case 2:16-cv-04435-PA-MRW   Document 60-12   Filed 04/24/17   Page 39 of 176   Page ID #:4927

12:00  1    respect to the setting of reserves on claims?

2          A.   No.

3          Q.   Were you kept informed as to the reserve

4    that had been set?

12:01  5    A.   Yes.

6          Q.   Okay.  Turning to Exhibit 1, are you

7    familiar with this document?

8          A.   Yes.

9          Q.   What is it?

12:01 10    A.   It's the insurance policy issued to

11   NBCUniversal Media for the period effective

12   January 1, 2014.

13         Q.   So when you previously indicated that

14   there -- the last policy was an 18-month policy, is

12:01 15   this the policy to which you were referring?

16         A.   Yes.

17         Q.   Okay.  This policy incepted on January 1,

18   2014.

19              Do you see that?

12:01 20    A.   Yes.

21         Q.   So to the best of your understanding, the

22   renegotiations as to the renewal of the policy would

23   have occurred approximately September 30, 2013?

24         A.   Began probably.  Yes.

12:02 25         Q.   What involvement did you have with respect

74

EXHIBIT 43, PAGE 367

12:12  1    provided as to why it should not be increased,

2    either the SIR or the premium?

3         A.   Not specifically, no.

4         Q.   What policy language was changed in the

12:13  5    2014-2015 policy versus the 2013 policy, generally?

6         A.   I can't specifically recall.  I do recall

7    there was some discussions around coverage for delay

8    in travel, which they wanted added to the policy.

9         Q.   And what do you mean by "delay in travel"?

12:13 10        A.   If an actor gets stuck at an airport due

11   to bad weather and can't make it to the production

12   on time, then a claim could occur.

13        Q.   And OneBeacon did agree to make that

14   change; is that right?

12:13 15        A.   As far as I recall, yes.

16        Q.   Any others?

17        A.   Not that I specifically recall.

18        Q.   Can you please turn to Bates control

19   ATL003103.  That would be the Section III - Extra

12:14 20   Expense portion of the policy.  And the Bates

21   numbers are those that are stamped on the right

22   corner.

23        A.   Sorry.  What was the number again?

24        Q.   3103.

12:14 25        A.   Yes.

82

EXHIBIT 43, PAGE 368

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 61-18   Filed 04/24/17   Page 41 of 176   Page ID #:4929
CONFIDENTIAL

12:14  1          Q.   Are you familiar with this section of the

      2     policy?

      3          A.   Yes.

      4          Q.   What is extra expense coverage?

12:14  5          A.   It grants coverage for the extra expense

      6     to complete a production in the event of primarily

      7     physical loss or damage to facilities or property.

      8          Q.   Directing your attention to Section 1,

      9     Insuring Agreement, No. 1, and then the subparts (a)

12:15 10     through (h) --

     11               Do you see those?

     12          A.   Yes.

     13          Q.   -- what's your understanding of the

     14     requirement as to the loss in terms of whether it

12:15 15     has to fall within one of these categories?

     16               MR. KEELEY:  Objection.  Vague.

     17               THE WITNESS:  The -- the loss, in order

     18     for it to fall within one of these categories, has

     19     to -- has to arise in circumstances which puts it

12:15 20     into one of these categories.

     21     BY MS. COYOCA:

     22          Q.   (a) through (h); is that right?

     23          A.   Yes.

     24          Q.   Okay.  And looking to subpart (g),

12:15 25     "Imminent peril" --

                                                            83

EXHIBIT 43, PAGE 369

www.baysidedepo.com
CONFIDENTIAL
Case 2:16-cv-04435-PA-MRW   Document 61-19   Filed 04/24/17   Page 42 of 176   Page ID #:4930

12:15  1              Do you see that?

       2        A.   Yes.

       3        Q.   Okay.

       4              -- what's your understanding of imminent

12:15  5    peril?

       6        A.   Imminent peril is a coverage that is given

       7    on production policies if -- to -- it's a temporary

       8    coverage given to a production that needs to move

       9    out of harm's way in the event a hurricane is

12:16 10    coming, a flood is coming, a wildfire is coming.  So

      11    the physical loss or damage doesn't actually have to

      12    occur.  It's just imminent that it might occur and,

      13    therefore, it's obviously prudent to get out of

      14    harm's way.

12:16 15        Q.   Have you dealt with imminent peril claims

      16    in the past prior to the DIG claim in 2014?  Had

      17    you?

      18        A.   Yes.

      19        Q.   How many, estimate, in your entire career?

12:16 20    Just an estimate.

      21        A.   I don't know.  Maybe 50.

      22        Q.   And out of those 50 approximate claims

      23    involving imminent peril, how many were related to

      24    some type of weather condition?  Just an estimate.

12:17 25        A.   Probably most.  So 80 percent, if not

                                                            84

EXHIBIT 43, PAGE 370

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 51-12  Filed 04/24/17   Page 43 of 176   Page ID
#:4931
CONFIDENTIAL

12:25  1    such claims do you recall?  Estimate.

2          A.   Oh, maybe 10, 12.  I can't . . . . . .

3          Q.   And were the claims arising out of a delay

4    in production of a -- of some kind of filmed

12:26  5    entertainment that was being experienced as a result

6    of the riots?

7          A.   Yes.

8          Q.   All involved production delays on filmed

9    entertainment; is that right?

12:26 10          A.   Films and television shows.  Yes.

11          Q.   Right.  By "filmed entertainment," I mean

12    either television or feature theatrical films.

13               None of them arose out of delay or

14    cancellation of some kind of live entertainment?

12:26 15          A.   Oh.  I don't recall.  Probably there

16    were -- there were claims arising from live

17    entertainment.  I can't specifically recall.

18          Q.   You can't recall back to 1994?

19          A.   No.

12:26 20          Q.   Okay.  Can you please turn to page 3120 of

21    Exhibit 1.

22               Are you familiar with this endorsement?

23          A.   Yes.

24          Q.   Are you familiar with the Terrorism Risk

12:27 25    Insurance Act, TRIA?

91

EXHIBIT 43, PAGE 371

www.baysidedepo.com

CONFIDENTIAL

```
12:27    1            A.    Yes.

         2            Q.    Is this a TRIA endorsement?

         3            A.    Yes.

         4            Q.    What do you understand it to mean?

12:27    5            A.    That the insured has opted for what we

         6    call TRIA coverage on their policy.

         7            Q.    And what does that mean?

         8            A.    That in the event of a TRIA event, as

         9    defined by the government, then the policy would

12:28   10    respond.  But as an insurance company, we would be

        11    able to claim certain monies back from the

        12    government.

        13            Q.    Okay.  Look at paragraph A, Amendment.

        14               Do you see that?

12:28   15            A.    Yes.

        16            Q.    Can you please read paragraph A, that

        17    first paragraph, out loud.

        18            A.    "Any exclusion of terrorism in this

        19               Coverage Part or Policy, or attached to such

12:28   20               Coverage Part or Policy by endorsement, is

        21               hereby amended to the effect that such

        22               exclusion does not apply to a," quote,

        23               "'certified act of terrorism,'" end quote.

        24            Q.    Okay.  So is it your understanding that

12:29   25    pursuant to this language, that it applies to a
```

92

EXHIBIT 43, PAGE 372

www.baysidedepo.com
CONFIDENTIAL

12:29  1    situation where there is an exclusion for terrorism

2    someplace in the policy?

3        A.   Yes.

4        Q.   Okay.  Is there a terrorism exclusion in

12:29  5    this policy?

6        A.   No.

7        Q.   So would this -- I'm sorry.  And then if

8    you look above A, Amendment, there is a listing of

9    the insurance coverages that are modified by this

12:29  10   endorsement.

11            Do you see that?

12       A.   Yes.

13       Q.   Is "extra expense" listed there?

14       A.   Extra -- extra expense, well, it's listed

12:29  15   as "commercial inland marine coverage part," which

16   is how these policies are characterized.

17       Q.   So the "commercial inland marine coverage

18   part" is -- the extra expense is a component of the

19   commercial inland marine coverage part?

12:30  20       A.   The portfolio policy is part.

21       Q.   I'm sorry.  I want to make sure I

22   understand that answer.

23            The commercial inland marine coverage

24   part, what specific sections of this policy is that

12:30  25   referring to?

93

EXHIBIT 43, PAGE 373

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 61-21   Filed 04/24/17   Page 46 of 176   Page ID #:4934
CONFIDENTIAL

```
12:30    1        A.    All of it.

         2        Q.    The entire policy?

         3        A.    Yes.

         4        Q.    And in the entire policy, is there a

12:30    5    terrorism exclusion that appears and applies to any

         6    of the coverage parts?

         7        A.    No.  I don't believe so.

         8        Q.    Does this endorsement apply in the event

         9    that there is no terrorism exclusion in the policy?

12:31   10        A.    Yes.  It still applies.

        11        Q.    How does it apply?

        12        A.    Well, you still have coverage for -- for

        13    TRIA sitting over and above your terror- -- your

        14    terrorism coverage.

12:31   15        Q.    By law?

        16        A.    Yes.

        17        Q.    Not necessarily by anything that's

        18    provided for in this endorsement; isn't that right?

        19        A.    If the insured has opted for the TRIA

12:31   20    coverage.  Yes.

        21        Q.    Well, when you say if the insured has

        22    opted for TRIA coverage, where in the policy does it

        23    indicate whether or not the insured opts for TRIA

        24    coverage?

12:31   25        A.    They have to sign a declaration or the
```

94

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 56-11 CONFIDENTIAL Filed 04/24/17   Page 47 of 176   Page ID
#:4935

12:31  1  broker has to sign a declaration on their behalf if

2  they decline TRIA coverage.

3        Q.  Okay.  So what's your understanding of the

4  law in terms of -- just as an insurance industry

12:32  5  executive, what's your understanding of the law with

6  respect to TRIA coverage?  Who does it apply to?

7          MR. KEELEY:  Objection.  Calls for a legal

8  conclusion.

9          THE WITNESS:  It specifies the types of

12:32 10  policy which are covered by the TRIA agreement.

11  Every policy we sell that is covered by TRIA, we

12  have to give the insured the option to buy TRIA

13  coverage or opt out of the TRIA coverage.

14  BY MS. COYOCA:

12:32 15        Q.  Okay.  And in the event that an insurer

16  seeks to exclude loss resulting out of terrorism,

17  which is a certified act of terrorism under the TRIA

18  endorsement, does the TRIA Act, the Terrorism Risk

19  Insurance Act, limit how much the insurance company

12:32 20  can cap that loss?

21          MR. KEELEY:  Objection.  Calls for a legal

22  conclusion.

23          THE WITNESS:  Yeah.  Specifically I can't

24  recall the terms of the TRIA endorsement.

12:33 25  / / /

95

EXHIBIT 43, PAGE 375

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 61-12   Filed 04/24/17   Page 48 of 176   Page ID
#:4936
CONFIDENTIAL

12:33  1    BY MS. COYOCA:

       2        Q.   Where did the TRIA -- or out of what

       3    situation did the TRIA coverage arise?

       4        A.   9/11.

12:33  5        Q.   After 9/11, in your experience, was there

       6    a growth of exclusions for terrorism being applied

       7    in insurance policies by the insurance industry?

       8        A.   Yes.

       9        Q.   And is it your understanding whether or

12:33 10    not TRIA was -- was passed by Congress in order to

      11    address that issue?

      12        A.   My understanding -- not to address that

      13    issue.  No.

      14        Q.   What issue do you think Congress was

12:33 15    trying to address with TRIA?

      16             MR. KEELEY:  Objection.  Calls for

      17    speculation.

      18             THE WITNESS:  That if an act of terrorism

      19    of 9/11 magnitude or bigger occurred, the insurance

12:34 20    companies could not necessarily absorb that loss

      21    without a backstop of help from the government.

      22    BY MS. COYOCA:

      23        Q.   Okay.  But the insurance companies could

      24    seek to exclude the loss by -- altogether by having

12:34 25    a terrorism exclusion in their policies; isn't that

                                                              96

EXHIBIT 43, PAGE 376

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW Document 61-12 Filed 04/24/17 Page 49 of 176 Page ID #:4937
CONFIDENTIAL

12:34 1    right?

2              MR. KEELEY:  Objection.  Vague.  Calls for

3    speculation.

4              THE WITNESS:  Yes.

12:34 5    BY MS. COYOCA:

6       Q.   And is it your understanding that TRIA was

7    not intended to address that concern with respect to

8    the increase in applications of terrorism exclusions

9    in insurance coverages for commercial policies in

12:34 10   the U.S.?

11             MR. KEELEY:  Objection.  Calls for

12   speculation.

13             THE WITNESS:  One aspect of it was that --

14   my understanding was the government still wanted

12:35 15   insurance companies to offer terrorism coverage.

16   The insurance companies were concerned if an event

17   like 9/11 or greater occurred, they would be

18   bankrupt.

19   BY MS. COYOCA:

12:35 20      Q.   Thank you.

21             So -- well, let's just leave it at that.

22             Can you please turn to page 3083.

23             MR. KEELEY:  Lucia, do you mind if we take

24   a short break while I run down the hall now?

12:35 25             MS. COYOCA:  Sure.

97

EXHIBIT 43, PAGE 377

```
12:35   1              THE VIDEOGRAPHER:  Off record, 12:35.

        2              (At 12:35 p.m. a luncheon recess was

        3              taken, the proceedings to be resumed at

        4              1:20 p.m.)

12:35   5

        6                    AFTERNOON SESSION

        7

        8              (At 1:45 p.m. the proceedings were

        9              resumed at the same place.)

12:35  10

       11              THE VIDEOGRAPHER:  On record, 1345.

       12

       13                   EXAMINATION (Resumed)

       14    BY MS. COYOCA:

01:45  15         Q.   Okay.  Referring back to Exhibit 1.  And

       16    I'm on page 3083, Mr. Williams.

       17              Are you there?

       18         A.   Yes.

       19         Q.   The section labeled III, "Exclusions

01:46  20    Applicable to All Sections of this Policy" --

       21              Do you see that?

       22         A.   Yes.

       23         Q.   -- I want to ask you some questions about

       24    this section.

01:46  25              First of all, what's your understanding of
```

                                                            98

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 60-12   Filed 04/24/17   Page 51 of 176   Page ID
#:4939
CONFIDENTIAL

```
01:46  1    what this exclusion applies to?

       2         A.   Well, these -- these series of exclusions

       3    apply to war, warlike action, insurrection,

       4    rebellion, and radioactive war, nuclear war.

01:46  5         Q.   Okay.  With respect to -- and then -- I'm

       6    sorry.  If it you turn the page, there's four more

       7    provisions.

       8         A.   Yes.

       9         Q.   So this is -- this is all -- is this all

01:47 10    generally referred to as the "war exclusion" or the

      11    "war exclusions"?

      12         A.   Well --

      13         Q.   How do you --

      14         A.   Well -- no.  I mean, the -- No. 8 isn't a

01:47 15    war exclusion.  No. 7 is not a war exclusion, or

      16    No. 6.

      17              So the first would be characterized as war

      18    exclusions --

      19         Q.   Okay.

01:47 20         A.   -- in general terms.

      21         Q.   I just want to use the terminology that

      22    you're comfortable with.

      23              Colloquially, do you refer to it as the

      24    war exclusions?

01:47 25         A.   These --
```

99

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 63-12 FILED 04/24/17   Page 52 of 176   Page ID
CONFIDENTIAL
#:4940

01:47   1          Q.    1 through 5?

        2          A.    1 through 5, yes, the war exclusions.

        3          Q.    Okay.  Prior to the DIG claim, had you

        4     ever been involved in considering whether one of the

01:47   5     five enumerated war exclusions should apply to a

        6     claim at any point in your career?

        7          A.    Yes.

        8          Q.    When?

        9          A.    Following 9/11, the incidents in 9/11.

01:48  10          Q.    And a series of incidents that arose out

       11     of 9/11 -- or excuse me.  A series of claims that

       12     arose out of 9/11?

       13          A.    Yes.

       14          Q.    More than one claim, in other words?

01:48  15          A.    Yes.

       16          Q.    And at that point you were working for a

       17     private insurance adjuster; is that right?

       18          A.    Yes.

       19          Q.    Which one?

01:48  20          A.    Crawford & Company.

       21          Q.    Okay.  Approximately how many such claims

       22     were you involved in?

       23          A.    10 or 12.

       24          Q.    Generally, if it is common to all 10 or

01:48  25     12, were these claims relating to entertainment

                                                                 100

EXHIBIT 43, PAGE 380

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 62-12   Filed 04/24/17   Page 53 of 176   Page ID
CONFIDENTIAL
#:4941

01:49   1    productions that were stopped?

2           A.   Yes.  Or music productions.

3           Q.   And were they for live entertainment or

4    for filmed entertainment?

01:49   5           A.   Both.

6           Q.   Was there a war exclusion or a series of

7    war exclusions in the insurance policies that

8    covered the losses that you're referring to right

9    now, if you recall, just generally?

01:49  10              MR. KEELEY:  Objection.  Vague.

11              THE WITNESS:  Yes, there was.

12    BY MS. COYOCA:

13           Q.   And is it your recollection that there

14    was -- there were war exclusions in each of the

01:49  15    policies that concerned the 10 to 12 post 9/11

16    losses that you adjusted?

17           A.   Yes.

18           Q.   Was the war exclusion applied to any of

19    those losses?

01:50  20              MR. KEELEY:  Objection.  Vague.

21              THE WITNESS:  Ultimately, no.

22    BY MS. COYOCA:

23           Q.   Were there any terrorism exclusions in any

24    of the policies that applied to the 10 to 11 [sic]

01:50  25    post 9/11 claims that you adjusted?

101

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW  Document 55-14  Filed 04/24/17  Page 54 of 176  Page ID #:4942
CONFIDENTIAL

01:50   1       A.    No.

2       Q.    If you can answer generally as to all 10

3   to 12 of the delays in production that were a result

4   of the 9/11 situation, were -- was there a payout on

01:51   5   each of the claims?

6       A.    Yes.

7       Q.    When you were adjusting those losses and

8   considering those claims, did you consider whether

9   or not the war exclusions applied to the claims?

01:51  10       A.    Yes.

11       Q.    Did you conclude that they should be

12   applied to the claims?

13       A.    I was an independent adjuster. So it

14   wasn't my job to conclude coverage.

01:52  15       Q.    Okay. But did you make a recommendation

16   to the insurer with respect to coverage?

17       A.    No.

18       Q.    Since 2010 when Atlantic or -- excuse me.

19   Well, actually, let's -- let's start that over.

01:52  20       Could you please turn to the first page of

21   Exhibit 1.

22       You'll see in the top right-hand corner

23   the insurer is listed as being Atlantic Specialty

24   Insurance Company.

01:52  25       Do you see that?

102

EXHIBIT 43, PAGE 382

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 60-2 Filed 04/24/17   Page 55 of 176   Page ID
CONFIDENTIAL
#:4943

01:52  1        A.    Yes.

       2        Q.    How is Atlantic Specialty Insurance

       3   Company affiliated with OneBeacon Insurance?

       4        A.    To my knowledge, they're a wholly owned

01:52  5   company.

       6        Q.    And what is the relationship between

       7   Atlantic Specialty Insurance and OneBeacon

       8   Entertainment?

       9        A.    OneBeacon Entertainment had authority to

01:53 10   write insurance policies on Atlantic Specialty

      11   Insurance Company's paper.

      12        Q.    And what do you mean by Atlantic's paper?

      13   Their forms?  Their forms of insurance?

      14        A.    Yes.  Their forms of insurance and -- and

01:53 15   OneBeacon owned several companies.  So we had

      16   authority to write on different companies.

      17        Q.    Okay.  I understand generally what you're

      18   saying, but I'd like the record to be clear.

      19              So OneBeacon Insurance, the parent entity,

01:53 20   had several subsidiaries that acted as the

      21   underwriter on the various lines of insurance that

      22   they sold; is that correct?

      23        A.    I think it's a misuse of the word

      24   "underwriter."  The actual insurance company on

01:54 25   which the policy is issued was Atlantic Specialty

                                                              103

EXHIBIT 43, PAGE 383

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document CONFIDENTIAL 04/24/17   Page 56 of 176   Page ID
#:4944

01:54  1   Insurance Company.

2          Q.   And the relationship to Atlantic Specialty

3   Insurance Company to OneBeacon Entertainment, you've

4   indicated that OneBeacon Entertainment had the

01:54  5   authority to write policies on Atlantic's insurance

6   forms; is that correct?

7          A.   Yes.

8          Q.   Did you work for Atlantic Specialty

9   Insurance Company?

01:54  10         A.   No.

11         Q.   And OneBeacon Entertainment, you testified

12   previously, is a division of OneBeacon Insurance; is

13   that correct?

14         A.   Yes.

01:54  15         Q.   OneBeacon Entertainment is not a separate

16   company altogether?

17         A.   That's correct.  They are not.

18         Q.   When you were -- in your role at OneBeacon

19   Entertainment, when you were seeking to have a

01:55  20   policy issued to a client on Atlantic's forms, is

21   there anyone at Atlantic that you needed to consult

22   with prior to doing so?

23         A.   No.

24         Q.   Does Atlantic Specialty Insurance

01:55  25   Company -- does it have a separate location where it

104

EXHIBIT 43, PAGE 384

01:55  1     does business apart from where OneBeacon does

       2     business?

       3          A.   Not that I'm aware of, no.

       4          Q.   Okay.  With respect to the war exclusions

01:56  5     that we were discussing previously on page 3083,

       6     3084 -- the one on 3084, were you involved in 2010

       7     or any point forward in considering whether this

       8     exclusion needed to be modified?

       9          A.   No.

01:56 10          Q.   To your knowledge, during the period of

      11     time that you were at OneBeacon, was this language

      12     ever modified?

      13          A.   Not to my knowledge.

      14          MS. COYOCA:  Okay.  I'd like to mark as

01:57 15     Exhibit 2 an e-mail chain that is labeled Bates

      16     control ATL000745 through 748.

      17               (Exhibit 2 was marked

      18               for Identification.)

      19     BY MS. COYOCA:

01:57 20          Q.   Mr. Williams, just take a moment to

      21     briefly familiarize yourself with this document if

      22     you could, please.  Please let me know when you're

      23     ready to accept questions.

      24          A.   Okay.

01:59 25          Q.   Okay.  You'll notice that the first in the

                                                              105

EXHIBIT 43, PAGE 385

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 60-12   Filed 04/24/17   Page 58 of 176   Page ID
#:4946
CONFIDENTIAL

02:52  1    thanking them for their agreement to the quotation;

2    is that right?

3        A.    Yes.

4        Q.    During the negotiations over the 2013 --

02:53  5    excuse me.

6              During the negotiations over the policy

7    for the period from January 1, 2014, to January 2 --

8    to June 30, 2015, the 18-month policy --

9        A.    Yes.

02:53 10        Q.    -- did you have any internal discussions

11    as to whether a terrorism exclusion should be added

12    to the policy?

13        A.    No.

14        Q.    Did you have any discussions with anyone

02:53 15    at Aon with respect to adding a terrorism exclusion?

16        A.    No.

17        Q.    During the initial drafting of the 2010

18    policy, did you ever review and consider a terrorism

19    exclusion being added to the policy?

02:54 20        A.    Not that I recall.

21        Q.    Prior to 9/11, prior to the 9/11 policy

22    year?

23        A.    Correct.  Not that I recall.

24        Q.    Okay.

02:54 25              For the second policy year, which would

139

www.baysidedepo.com
CONFIDENTIAL
Case 2:16-cv-04435-PA-MRW   Document 60-12   Filed 04/24/17   Page 59 of 176   Page ID #:4947

| | | |
|---|---|---|
| 02:54 | 1 | have been Jan. 1, 2011, to Jan. 1, 2012, did you |
| | 2 | consider or -- did you consider adding a terrorism |
| | 3 | exclusion to the policy? |
| | 4 | A.   No. |
| 02:54 | 5 | Q.   Same question for each of the years |
| | 6 | forward in terms of the NBCUniversal policy. |
| | 7 | Did you consider adding a terrorism |
| | 8 | exclusion to the policy? |
| | 9 | A.   Not that I recall. |
| 02:54 | 10 | Q.   Okay.  I'd like to -- |
| | 11 | THE VIDEOGRAPHER:  Are we at a good point |
| | 12 | to do a media change, Counsel? |
| | 13 | MS. COYOCA:  Sure.  Yes. |
| | 14 | THE VIDEOGRAPHER:  This is the end of |
| 02:55 | 15 | Media 2.  Off record at 1454. |
| | 16 | (Recess from 2:54 p.m. to 3:06 p.m.) |
| | 17 | THE VIDEOGRAPHER:  Back on record. |
| | 18 | Commencing Media 3 of the deposition of Peter |
| | 19 | Williams. |
| 03:06 | 20 | On record at 1506. |
| | 21 | MS. COYOCA:  I'm going to mark as the next |
| | 22 | exhibit, Exhibit 5, an e-mail chain that's labeled |
| | 23 | ATL000794 through 796. |
| | 24 | (Exhibit 5 was marked |
| 03:07 | 25 | for identification.) |

140

EXHIBIT 43, PAGE 387

```
03:07    1              MS. COYOCA:  Mike, did I give you two

         2   copies?

         3              MR. KEELEY:  No.  Just one.  Do you need

         4   it back?

03:07    5              MS. COYOCA:  No.  I'm good.

         6        Q.   Please let me know -- please take a moment

         7   to review it, Mr. Williams, and let me know when

         8   you're ready for questions.

         9        A.   Okay.

03:08   10        Q.   This e-mail chain, the entire thing,

        11   appears to be about adding a new production to the

        12   policy; is that right?

        13        A.   Yes.

        14        Q.   Okay.  And it was a production that was

03:08   15   going to be filmed in Israel.

        16              Do you see that?

        17        A.   Yes.

        18        Q.   Did each individual production need to be

        19   added to the policy as an insured production?

03:08   20        A.   Yes.  Yes.  As a TV show.  Yes.

        21        Q.   Okay.  Prior to this December 3 e-mail --

        22   and you received a copy by it being forwarded by

        23   Ms. Phillips, apparently, on the same day -- were

        24   you aware that there was a new NBCUniversal

03:09   25   production that was going to be shot in Israel?
```

141

EXHIBIT 43, PAGE 388

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 51-12   Filed 04/24/17   Page 61 of 176   Page ID
CONFIDENTIAL
#:4949

03:09   1          A.   No.  I don't believe so.

        2          Q.   Is this the first time you learned about

        3   it, this e-mail exchange on December 3?

        4          A.   I believe so.  Yes.

03:09   5          Q.   In the -- in the first e-mail from

        6   Ms. Garber to Ms. Phillips, at the conclusion of the

        7   e-mail she asked, "Please let me know what your

        8   concerns may be on this."

        9          Do you see that?

03:09  10          A.   Yes.

       11          Q.   What concerns did OneBeacon have with

       12   respect to the filming of a television production in

       13   Israel?

       14          A.   The safety of the cast and crew with

03:10  15   relation to any potential terrorist activities or

       16   interruption to production, as well as the usual,

       17   issues of filming overseas, travel delays,

       18   et cetera.

       19          Q.   But the first concern was the safety of

03:10  20   the cast and crew with relation to any potential

       21   terrorism activities; is that right?

       22          A.   Yes.  Or interruption of production as a

       23   result of that.

       24          Q.   Did you discuss those concerns with

03:10  25   Ms. Phillips?

                                                              142

EXHIBIT 43, PAGE 389

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 54-14 Filed 04/24/17   Page 62 of 176   Page ID #:4950
CONFIDENTIAL

03:12  1    asking OneBeacon what its concerns were?

       2              MR. KEELEY:  Objection.  Calls for

       3    speculation.

       4              THE WITNESS:  They have to declare each

03:12  5    production to us.  We get to underwrite each

       6    production individually.

       7    BY MS. COYOCA:

       8         Q.   But regardless of whether OneBeacon wanted

       9    the production, it was going to be insured under the

03:12 10    policy; is that right?

      11         A.   In theory, the idea is that we ensure

      12    whatever NBC Television makes.  Yes.

      13         Q.   Okay.  At the time that this initial

      14    period of discussion about adding DIG as an insured

03:12 15    production, was there any discussion about any

      16    increase in premium or increase in the SIR as a

      17    result of shooting in a location, a foreign

      18    location, where there would be the possibility of

      19    terrorism?

03:13 20         A.   Not that I specifically recall.

      21         Q.   Now, given that the production was going

      22    to be shot in Israel and there was a concern,

      23    potential concern regarding terrorist activities

      24    interrupting a production, this is the beginning of

03:13 25    December, 2013, the same time the renewal was being

                                                         144

EXHIBIT 43, PAGE 390

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 6 CONFIDENTIAL/24/17   Page 63 of 176   Page ID
#:4951

03:13  1    discussed, did you consider adding a terrorism

2    exclusion or seeking to add a terrorism exclusion to

3    the policy at that time?

4        A.    No.

03:13  5        Q.    Why not?

6        A.    Well, we're willing to cover terrorism on

7    a production policy because terrorism tends to be a

8    small, isolated event.  In the entertainment world,

9    it's a good risk.  You have to -- it would be pretty

03:14 10   unlucky for a film to be in the exact location where

11   a suicide bomber bombs a bus.  So terror- -- at that

12   time terrorism was not normally excluded from film

13   policies.

14       Q.    So that's a risk that OneBeacon was

03:14 15   willing to take?

16       A.    Yes.  Because it's a relatively controlled

17   underwritable risk, assessable risk.

18       Q.    I understand you probably can't recall the

19   details of the timing of such conversations.  But

03:14 20   generally can you describe for me what your

21   conversations were with Ms. Phillips about the

22   addition of a production that was going to be shot

23   in Israel.

24       A.    Yes.  It didn't concern me too much as

03:15 25   long as it was going to be mainly in Tel Aviv, in a

145

EXHIBIT 43, PAGE 391

03:15  1    controlled environment such as a studio.  They make

2    television shows in Israel all the time.  So it was

3    kind of, okay, if they're not going to the -- maybe

4    to the West Bank or close to the West Bank where the

03:15  5    suicide bombers tend to be, Jerusalem, where the

6    suicide bombers tend to be, it was -- it was find

7    out more information.  This is not necessarily

8    something we would say, "Absolutely not.  We can't

9    do this."

03:15  10        Q.   Okay.  You've indicated that one of the

11   factors was that you were looking to whether or

12   not -- what the location was in terms of it being a

13   controlled environment.

14        And you wanted to assess whether or not it

03:16  15   was going to be an area where suicide bombers tend

16   to be, such as in the West Bank or possibly in

17   Jerusalem; is that correct?

18        A.   That was one of my concerns.  Yes.

19        Q.   Okay.  And were you -- were you aware of

03:16  20   the possibility of suicide bombers in Israel at this

21   point in time, at the end of 2013?

22        A.   Yes.

23        Q.   And what group or groups were you aware of

24   that were engaged in activities -- in suicide

03:16  25   bombing activities in Israel during that period?

146

EXHIBIT 43, PAGE 392

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 60-44 Filed 04/24/17   Page 65 of 176   Page ID #:4953
CONFIDENTIAL

03:16  1        A.   Oh, I don't know that I knew the names of

2     the groups.  I assume they were, in the general

3     term, Palestinians.

4        Q.   We'll look at a series of documents, but I

03:17  5     wanted to ask you, without looking at any documents,

6     do you recall any conversations that you had with

7     Andrea Garber or Susan Weiss or anyone at Aon about

8     the new production being shot in Israel?

9        A.   No.  Not specifically.  No.

03:17 10        Q.   Do you recall any conversations with

11     anyone at OneBeacon other than Ms. Phillips about

12     the prospect of shooting in Israel?

13        A.   No.

14        Q.   To the best of your recollection, was

03:17 15     there anyone aside from yourself and Ms. Phillips

16     involved in the addition of DIG as an insured

17     production to the policy?

18        A.   No.  No.

19            MS. COYOCA:  I'd like to mark as the next

03:18 20     exhibit an e-mail exchange with attachments dated

21     December 12, 2013.  Excuse me.  I'm sorry.  Let me

22     start over.

23            I want to mark as the next exhibit -- I

24     believe we're at Exhibit 6 -- an e-mail exchange,

03:18 25     and it's labeled AONNBCU0001478 through 1568.

147

EXHIBIT 43, PAGE 393

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 61-11   Filed 04/24/17   Page 66 of 176   Page ID
#:4954
CONFIDENTIAL

03:23  1        Q.   Okay.  First of all, was this the

2    application that was used each time a production

3    needed to be added to the policy?

4        A.   I believe so.  Yes.

03:24  5        Q.   Did you review this information at or

6    about the time the parties were discussing adding

7    DIG as an insured production?

8        A.   This particular document?

9        Q.   Uh-huh.

03:24 10        A.   Probably not.  It contains nothing new

11    over and above the e-mail we previously discussed.

12        Q.   Okay.  In the paragraph that is the last

13    paragraph on page 1418, Ms. Garber --

14        A.   Yes.

03:24 15        Q.   -- indicates, begin quotes, "We would like

16    to avoid any deviation from our standard policy

17    terms, if possible," close quotes.

18             Do you see that?

19        A.   Yes.

03:24 20        Q.   Was there a mechanism pursuant to which

21    OneBeacon could have deviated from the policy terms

22    and sought more money from NBCUniversal for shooting

23    this DIG production in Israel?

24        A.   Yes.

03:25 25        Q.   What was that mechanism?

150

EXHIBIT 43, PAGE 394

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 51-11  Filed 04/24/17   Page 67 of 176   Page ID
#:4955
CONFIDENTIAL

03:25   1          A.    Well, as each production is declared and

        2   underwritten, which could seek to change or modify

        3   the terms of the policy, applicable to that

        4   production.

03:25   5          Q.    And was there a discussion, do you recall,

        6   about increasing the amount of the self-insured

        7   retention as a result of shooting in Israel?

        8          A.    Not that I recall.

        9          Q.    So the only deviation that would have --

03:25  10   from the policy terms which would have been a

       11   possibility would have been the higher charge in

       12   premium for this particular production; is that

       13   right?

       14          A.    No.  I could have -- there could have been

03:25  15   a variety of things, increased deductibles, higher

       16   premium, potential exclusion of filming in certain

       17   areas.  I mean, there was a variety of ways we could

       18   have discussed it.

       19          Q.    Okay.  So let's just take that apart.

03:26  20          One way is the increased deductible, and

       21   you've already described that scenario; is that

       22   right?

       23          A.    Yes.

       24          Q.    Okay.  And, again, to confirm, do you

03:26  25   recall having any specific conversations with anyone

                                                        151

EXHIBIT 43, PAGE 395

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 62 Filed 04/24/17   Page 68 of 176   Page ID
#:4956
CONFIDENTIAL

03:26 1    about there -- about there being an increased

2    deductible as a result of the DIG production?

3        A.   I seem to recall discussing with Wanda

4    Phillips whether we wanted to increase the

03:26 5    deductible for the civil authority coverage.

6        Q.   And what was your discussion in that

7    regard?

8        A.   Whether it -- whether it was a possibility

9    of increasing that deductible or putting on a

03:27 10   deductible.

11       Q.   And what -- what are you referring to when

12   you indicate civil authority coverage?

13       A.   There's coverage in the policy in event a

14   civil authority prevents you from filming, withdraws

03:27 15   a permit, blocks a street.  So that -- that was a

16   concern.  If there was an isolated incident in

17   Jerusalem, such as a bomb, you know, suicide bomber,

18   they might prevent the insured from going on the

19   street and filming that day.

03:27 20       Q.   And did you come to a conclusion as to

21   whether the deductible should be increased for the

22   civil authority coverage?

23       A.   I can't recall.

24       Q.   You also indicated that another way that

03:27 25   OneBeacon could have deviated from the standard

152

EXHIBIT 43, PAGE 396

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 66-14   Filed 04/24/17   Page 69 of 176   Page ID #:4957
CONFIDENTIAL

```
03:28   1    policy terms as a result of adding DIG to the policy

        2    was a potential of -- a potential exclusion of

        3    filming in certain areas; is that right?

        4         A.   Could have been in extreme circumstances,

03:28   5    although the broker would never accept such a

        6    restriction.

        7         Q.   Okay.  Was that discussed with respect to

        8    DIG?

        9         A.   No.  I don't believe so.  Again, they --

03:28  10    this information was they were filming in a

       11    relatively, you know, controlled environment in a

       12    studio in Tel Aviv, limited exposure in Jerusalem,

       13    what we felt was the primary risk was assessable.

       14         Q.   But you did understand there were going to

03:28  15    be outside filming being done, exterior shooting

       16    being done in Jerusalem, did you not?

       17         A.   Yes.

       18         Q.   Okay.  Did you ask for any type of

       19    exclusion, though, with respect to those -- exterior

03:29  20    filming in Jerusalem?

       21         A.   No.

       22         Q.   Did you have a discussion with Wanda or

       23    anyone at OneBeacon about having an exclusion for

       24    certain types of filming with respect to the DIG

03:29  25    production?
```

153

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 60-12  CONFIDENTIAL 04/24/17   Page 70 of 176   Page ID
#:4958

```
03:29   1        A.    No.  No.

        2        Q.    Did you have a discussion with anyone at

        3   Aon with respect to excluding certain types of

        4   exterior shooting in Jerusalem?

03:29   5        A.    No.

        6        Q.    You did not -- OneBeacon did not impose

        7   such a condition on the shooting in DIG; is that

        8   correct?

        9        A.    Correct.

03:30  10        Q.    I want to refer you to the second

       11   paragraph in Ms. Garber's December 11 e-mail.  Are

       12   you there?

       13        A.    Yes.

       14        Q.    It begins, "In addition to the

03:30  15   information."

       16        A.    Yes.

       17        Q.    Can you please read out loud beginning "In

       18   addition to the information."  I'll tell you when to

       19   stop.

03:30  20        A.    "In addition to the information that

       21        is provided on the form, I have the following

       22        further details.  While in Israel, the

       23        production will be based in Tel Aviv and the

       24        majority of filming will be done in that city.

03:30  25        Of the total 70 day shoot, approximately
```

154

EXHIBIT 43, PAGE 398

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 60-12   Filed 04/24/17   Page 71 of 176   Page ID #:4959
CONFIDENTIAL

03:30  1          20 days will involve shooting only on the west

       2          side of Jerusalem."

       3          Q.   Okay.  Let's stop right there.

       4               So with respect to the shooting that would

03:30  5     be done on the west side of Jerusalem, did you take

       6     into account that the filming would be occurring on

       7     the west side in assessing the risk of adding DIG as

       8     an insured production?

       9          A.   I don't know if we took into account the

03:31 10     west side of Jerusalem.  We took into account it was

      11     in Jerusalem.

      12          Q.   Okay.  But you weren't concerned with

      13     particular parts of the city; is that right?

      14          A.   No.

03:31 15          Q.   Please begin reading again.  "These will

      16     not be 20 continuous days."

      17          A.    "These will not be 20 continuous days

      18          but will follow the needs of each episode.

      19          The work in Jerusalem will be mostly exterior

03:31 20          shooting and will involve public streets and

      21          areas that will look like archaeological dig

      22          sites."

      23          Q.   Okay.  Let's stop right there.

      24               So Ms. Garber is telling you that as to

03:31 25     the filming that's going to occur in Jerusalem, it's

                                                              155

EXHIBIT 43, PAGE 399

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 60-12   Filed 04/24/17   Page 72 of 176   Page ID
CONFIDENTIAL
#:4960

03:31  1   going to be mostly exterior sites, is she not?

2          A.    Yes.

3          Q.    Now, previously I believe you indicated

4   that in assessing the risk, your understanding was

03:31  5   there was going to be mostly studio filming; is that

6   right?

7          A.    Yes.

8          Q.    All right.  So the fact that there would

9   be 20 days out of a 70-day shoot that would be

03:32 10   exterior shots in Jerusalem did not cause you a

11   great deal of concern because you believed that the

12   remainder or a good portion of the remaining days

13   were going to be shot in the studio?  Is that what

14   you're saying?

03:32 15          A.    Will be shot in Tel Aviv.  Yes.

16          Q.    Okay.  I'm just trying to understand where

17   your comment is coming from with respect to the

18   majority of filming, you believed, would be

19   occurring in a studio.

03:32 20          A.    The majority of filming did occur in a

21   studio.

22          Q.    Okay.  But what about this e-mail

23   indicates to you that the majority of filming will

24   be done inside, in the studio?  The reference to Tel

03:32 25   Aviv?

156

EXHIBIT 43, PAGE 400

www.baysidedepo.com
CONFIDENTIAL

03:33   1          A.   No.  It says it's a 70-day shoot and will

       2   involve 20 days in Jerusalem.  The other 50 are in

       3   Tel Aviv.

       4          Q.   Right.

03:33   5          A.   The majority of the filming will be done

       6   in the city.

       7          Q.   Right.  In that city, in Tel Aviv?

       8          A.   Yeah.

       9          Q.   And you understood that reference to

03:33  10   "Tel Aviv" to mean that was mostly going to be

      11   interior studio filming?

      12          A.   Yes.

      13          Q.   And where did you form that understanding,

      14   or how did you form that understanding?

03:33  15          A.   When you shoot interiors, you're in an

      16   interior location.  Maybe the misunderstanding on

      17   your part is when I say a "studio," I'm not thinking

      18   about Warner Bros. or NBC.

      19          Q.   No.  Actually, that's not -- that's not

03:33  20   the issue.  What I'm talking about is that you

      21   obviously formed an understanding that the majority

      22   of shooting that would be done in Israel would be

      23   done -- the majority of shooting of interior scenes

      24   that was done in Israel would be done in Tel Aviv,

03:33  25   which meant to you that that would be primarily

                                                                 157

EXHIBIT 43, PAGE 401

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 63-11  Filed 04/24/17   Page 74 of 176   Page ID
CONFIDENTIAL
#:4962

03:34 1   interior shots because of the number of available

2   studio facilities in Tel Aviv.

3        Is that what you're saying?

4        A.   Yes.   Primarily -- I wouldn't say all

03:34 5   50 days would be necessarily interiors, but the

6   majority of them would be interiors.

7        Q.   But you did understand that there was

8   certainly the possibility that exterior filming

9   could occur in Tel Aviv as well?

03:34 10       A.   Oh.   Yes.   Yeah.

11       Q.   Now, when you were listing the things that

12   you thought could possibly be a deviation from the

13   policy terms in adding DIG as an insured production,

14   you referenced increased deductibles.

03:34 15       Do you recall that testimony?

16       A.   Yes.

17       Q.   Do you recall discussing increasing the

18   deductible with respect to any aspect of the DIG

19   production other than what you've discussed in terms

03:35 20   of civil authority?

21       A.   No.   That was the discussion I recall.

22       Q.   And then at the bottom of page 1418,

23   Ms. Garber indicates, "Please confirm coverage at

24   your earliest opportunity."

03:35 25       Do you see that?

158

EXHIBIT 43, PAGE 402

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 61-12   Filed 04/24/17   Page 75 of 176   Page ID
#:4963
CONFIDENTIAL

03:35 1      A.   Yes.

2            Q.   So she is asking for OneBeacon to confirm

3       that DIG will be added as an insured production, is

4       she not?

03:35 5      A.   Yes.

6            Q.   Okay.  But your testimony previously was

7       that you didn't think that OneBeacon could turn down

8       a production; is that right?

9            A.   I said it's not the object of the policy

03:35 10     that we could turn it down.

11           Q.   Got it.  Okay.

12               So you could consider applying some type

13      of deviation to the policy, as opposed to just

14      simply saying flat-out, "no," you won't cover the

03:36 15     risk?

16           A.   Yes.

17           Q.   And then Ms. Milinovic responds in the

18      next e-mail to Andrea Garber on December 12 that it

19      was okay to declare DIG Season 1 to the current

03:36 20     policy.

21               Do you see that?

22           A.   Which one?

23           Q.   So if you go down to the bottom of

24      page 1480 --

03:36 25     A.   Yes.

159

EXHIBIT 43, PAGE 403

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 52-11   Filed 04/24/17   Page 76 of 176   Page ID
CONFIDENTIAL
#:4964

03:36  1          Q.    -- there is an e-mail from Bernadette

2      Milinovic to Andrea Garber dated December 12.

3                Do you see that?

4          A.    Oh.  Yes.  Yes.  I have it.

03:36  5          Q.    And she indicates to Andrea that it was

6      okay to declare DIG Season 1 to the current policy.

7                Do you see that?

8          A.    Yes.

9          Q.    And then the next e-mail in the chain is

03:36 10      from Ms. Garber back to Ms. Milinovic asking if she

11      could advise NBC that coverage would roll over into

12      the next policy period with no additional terms

13      based on the information she had provided.

14                Do you see that?

03:37 15          A.    Yes.

16          Q.    Okay.  And then the response from

17      Ms. Milinovic was that she would have to get back to

18      Andrea on that because she had to speak to Wanda.

19                Do you see that?

03:37 20          A.    Yes.

21          Q.    Were you aware there was some urgency

22      attached to NBCUniversal's request that DIG be added

23      as an insured production?

24          A.    Not that I recall.

03:37 25          Q.    Look at the next e-mail which -- in time

160

EXHIBIT 43, PAGE 404

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 61-12   Filed 04/24/17   Page 77 of 176   Page ID #:4965
CONFIDENTIAL

03:37   1   which begins on page 1479.  It's from Andrea Garber

     2   to Bernadette Milinovic.

     3            Do you see that?

     4      A.   Yes.

03:37   5      Q.   And in the e-mail she's asking if there

     6   would be confirmation on adding DIG to the upcoming

     7   policy that would incept on 1/1/13.

     8            Do you see that?

     9      A.   Yes.

03:38  10      Q.   And she said production is anxious about

    11   this one.

    12            Do you see that?

    13      A.   Yes.

    14      Q.   Did Ms. Garber ever indicate to you at any

03:38  15   point in time, either during that initial call or

    16   subsequent to it during December, 2013, you know,

    17   "We need to get this decision made quickly.  We need

    18   to get this done"?

    19      A.   Not that I recall.

03:38  20      Q.   The next e-mail in the chain is

    21   Ms. Milinovic indicating that Wanda Phillips was --

    22   would get back to her as soon as she got out of her

    23   meeting.

    24      A.   Right.

03:38  25      Q.   Is that your understanding of that e-mail

                                                              161

EXHIBIT 43, PAGE 405

www.baysidedepo.com
CONFIDENTIAL
Case 2:16-cv-04435-PA-MRW   Document 61-2   Filed 04/24/17   Page 78 of 176   Page ID
#:4966

03:39  1    shooting in Morocco?

2         A.    I don't -- I don't recall any discussion.

3         Q.    Ultimately, at the end of the day, do you

4    know if there were any change or deviation in the

03:40  5    policy terms with respect to adding DIG as an

6    insured production?

7         A.    I can't recall.

8         Q.    Did you ask Ms. Phillips or anyone at

9    OneBeacon to do any type of investigation as to the

03:41 10    current state of affairs in Israel at the time they

11    were seeking to add DIG as an insured production?

12         A.    I don't recall specifically asking

13    anybody.  No.

14         Q.    Did Ms. Phillips ever advise you or tell

03:41 15    you that she had looked at the situation in Israel

16    at the time?

17         A.    No.  I can't -- I can't specifically

18    recall.

19         Q.    Do you recall there being any information

03:41 20    or assessment being done of the conditions in Israel

21    in December or -- 2013 or January, 2014, when DIG

22    was being added as an insured production?

23         A.    By whom?  Sorry.

24         Q.    I want to know if you became aware from

03:41 25    any source, from anyone at OneBeacon, as to such an

163

EXHIBIT 43, PAGE 406

03:41 1    assessment being done.

2         A.   Oh.   No.   I can't recall.

3         Q.   Are you aware of whether anyone from

4    OneBeacon asked NBCUniversal or Aon whether they

03:42 5    could provide any type of assessment of the security

6    conditions in Israel at the time?

7         A.   No.   I can't recall.

8              MS. COYOCA:   Okay.   I'd like to mark as

9    Exhibit 7 an e-mail exchange that's labeled Bates

03:43 10   label AONNBCU 000188 [sic] through 189.

11             (Exhibit 7 was marked

12             for identification.)

13   BY MS. COYOCA:

14        Q.   Please let me know when you're ready for

03:43 15   questions.

16        A.   Yes.

17        Q.   Looking at the first in time in the e-mail

18   chain from -- the e-mail from Susan Weiss to Wanda

19   Phillips and Peter Williams on Saturday, June 7, at

03:44 20   8:02 a.m. with cc's to Deborah Kizner and Andrea

21   Garber, do you have any reason to believe you didn't

22   receive this e-mail at the time that it's dated?

23        A.   No.

24        Q.   Do you recall that there was claim that

03:45 25   related to a heart attack being suffered by the

164

EXHIBIT 43, PAGE 407

www.baysidedepo.com
CONFIDENTIAL
Case 2:16-cv-04435-PA-MRW   Document 48-11   Filed 04/24/17   Page 80 of 176   Page ID
#:4968

04:24   1    sample wording.

        2           Do you see that?

        3       A.   Yes.

        4       Q.   Do you know, did Ms. Phillips ever send

04:24   5    sample wording?

        6       A.   I don't know specifically.

        7       Q.   With respect to that time frame, July 10,

        8    when did you first hear about the DIG claim?

        9       A.   Clarify "DIG claim."

04:25  10       Q.   The DIG claim that is the subject of this

       11    lawsuit.

       12       A.   Just -- the exact date, it was around

       13    about that time.  I believe it was a Friday

       14    afternoon.  So it would have been about then.

04:25  15       Q.   How did you become aware of it?

       16       A.   I recall receiving a phone call, I

       17    believe, from Susan Weiss.  But it was Susan Weiss

       18    and Andrea Garber on the phone.

       19       Q.   And what did they tell you?

04:25  20       A.   Well, specifically I can't recall the

       21    exact language.  But they told me they had had

       22    advice from their security people that there was

       23    some hostilities going on in Israel.  The security

       24    people could not guarantee the safety of the cast

04:25  25    and crew.  And a decision had been made to delay

                                                            185

EXHIBIT 43, PAGE 408

www.baysidedepo.com
CONFIDENTIAL
Case 2:16-cv-04435-PA-MRW   Document 69-12   Filed 04/24/17   Page 81 of 176   Page ID
#:4969

04:26   1   sending the cast and crew back to Israel for one

2   week.

3       Q.   Do you recall any other specifics that

4   they told you about the situation?

04:26   5       A.   No.

6       Q.   Did you have any understanding as to why

7   security had indicated that the situation was no

8   longer safe for cast and crew?

9       A.   Apparently, according to them, a number of

04:26  10   rockets had been fired backwards and forwards in

11   Israel, and the hope was the situation would calm

12   down in the coming days.

13       Q.   When you say "rockets had been fired

14   backwards and forwards," do you mean rockets had

04:26  15   been fired from a location outside of Israel into

16   Israel and that rockets had been fired from Israel

17   into that other location?

18       A.   Well, that was my understanding of what

19   they were telling me.  Yes.

04:27  20       Q.   And is that what they specifically

21   indicated to you during that phone call?

22       A.   I don't know if they used those exact

23   words.  That was my understanding of what they were

24   saying.

04:27  25       Q.   Okay.  Where were the rockets coming from,

186

EXHIBIT 43, PAGE 409

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 112  Filed 04/24/17   Page 82 of 176   Page ID #:4970
CONFIDENTIAL

04:29   1              MR. KEELEY:  Okay.

        2              MS. COYOCA:  We don't need to mark it as

        3    an exhibit.  We're happy to follow along.

        4        Q.   Now, we were looking at a series of

04:29   5    e-mails, and the last one we looked at had been

        6    dated July 10.

        7              Do you recall that in Exhibit 9?

        8        A.   Yes.  Yes.

        9        Q.   The Friday after that is July 11.

04:29  10              Do you see that?

       11        A.   Yes.

       12        Q.   So is it your understanding or your best

       13    recollection that you had that conversation around

       14    July 11?

04:30  15        A.   I believe so.  Yes.

       16        Q.   What time of day was the call?

       17        A.   As I recall, it was late on a Friday

       18    afternoon.

       19        Q.   Were you in California at the time of

04:30  20    receipt of the call?

       21        A.   Yes.

       22        Q.   Other than yourself, Ms. Weiss, and

       23    Ms. Garber, was there anyone else on the call that

       24    you recall?

04:30  25        A.   Not that I recall.

                                                          189

EXHIBIT 43, PAGE 410

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 60-2CONFIDENTIAL 04/24/17   Page 83 of 176   Page ID
#:4971

04:30  1          Q.   How long did the call last?

       2          A.   I don't think it was a long call.  So

       3   maybe 10 minutes or so.

       4          Q.   Who did the talking in terms of the

04:30  5   explanation of the situation that precipitated the

       6   call?

       7          A.   I think Andrea did.

       8          Q.   You've indicated to me that you believe

       9   that Ms. Garber described a situation where there

04:31 10   were hostilities occurring; that security could no

      11   longer guarantee safety of the DIG cast and crew;

      12   that rockets were being fired backwards and

      13   forwards; and that a decision had been made to delay

      14   sending cast and crew back in for one week; is that

04:31 15   correct?

      16          A.   Yes.

      17          Q.   Can you think of anything else that

      18   Ms. Garber told you during that call?

      19          A.   That they intended to make the claim under

04:32 20   the imminent peril section of the policy.  Oh.  I'm

      21   sorry.  And I think the approximate costs were

      22    Redacted , estimated.

      23          Q.   What did you tell Ms. Garber in response,

      24   if anything?

04:32 25          A.   Well, as far as I recall, I acknowledged

                                                            190

EXHIBIT 43, PAGE 411

04:38  1    notice of claim I believe a few days later, maybe

       2    the Tuesday of the following week.

       3         Q.   You remember these dates very well.

       4              Do you -- have you looked at any documents

04:38  5    recently in order to refresh your recollection on

       6    dates?

       7              MR. KEELEY:  Objection.  Argumentative.

       8              THE WITNESS:  I've reviewed some

       9    documents.  Yes.

04:38 10    BY MS. COYOCA:

      11         Q.   What did you review?

      12         A.   Some e-mail correspondence with my name on

      13    it.

      14         Q.   Anything else?

04:38 15         A.   The ultimate denial letter that was sent.

      16         Q.   Anything else?

      17         A.   No.

      18         Q.   Have you ever reviewed the Complaint that

      19    was filed in this case?

04:39 20         A.   No.

      21         Q.   Approximately, what was the volume of

      22    e-mails that you reviewed that had your name on it?

      23         A.   There wasn't that many.  Maybe -- I don't

      24    know -- four or five, six at the most, if that many.

04:39 25         Q.   Did they all concern this DIG claim, the

                                                            194

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 57-12   Filed 04/24/17   Page 85 of 176   Page ID
CONFIDENTIAL
#:4973

```
04:56    1            THE WITNESS:  No.  That's not right.  She

         2    didn't -- she didn't reach a conclusion.  It was a

         3    general discussion of the war risk exclusions in

         4    that policy.

04:56    5    BY MS. COYOCA:

         6         Q.   Okay.  Let's try it again.

         7              Use of the word "sovereign," we've

         8    established that Ms. Johnson is the one who used the

         9    word "sovereign power"; is that right?

04:57   10         A.   Well, to -- I mean, it may be I asked,

        11    "Does it have to be a sovereign power?"

        12         Q.   Okay.

        13         A.   It's a common phrase within the war

        14    exclusions.

04:57   15         Q.   Okay.  And I'm sorry.  You believe that

        16    the war exclusion language actually references there

        17    being no need for a sovereign power to be involved;

        18    is that correct?

        19         A.   As -- at that time?

04:57   20         Q.   Uh-huh.

        21         A.   No.  I was asking at that time.  In

        22    general discussion, she said, "The war risk

        23    exclusion may apply."

        24              I said, "Okay.  Does it have to be a

04:57   25    sovereign power" on -- on -- and it was a general
```

206

EXHIBIT 43, PAGE 413

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 61-12   Filed 04/24/17   Page 86 of 176   Page ID
#:4974
CONFIDENTIAL

04:57 1    discussion.  It was not a conclusion in any way,

2    shape, or form.

3         Q.   Okay.  Is it your testimony that your best

4    recollection is that you asked, in response to her

04:57 5    indicating that the war risk exclusion applied, that

6    you asked the question of whether it had to be a

7    sovereign power?

8         A.   To the best of my recollection, I believe

9    I did.

04:58 10         Q.   Why did you ask that question?

11         A.   I was aware that most policy -- most war

12    risk exclusions have some mention of sovereign

13    power.

14         Q.   But prior to this claim, had you ever

04:58 15    addressed a -- the possibility of applicability of a

16    war risk exclusion to any other OneBeacon claim?

17         A.   No.

18         Q.   Had you ever looked at the OneBeacon war

19    exclusion?

04:58 20         A.   I would have looked at it.  Yes.

21         Q.   No.  No.  I mean before -- before this DIG

22    claim.

23         A.   Yes.  I mean, in my general position as

24    head of underwriting, the review of policies is part

04:59 25    of my job.

207

EXHIBIT 43, PAGE 414

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 60-11   CONFIDENTIAL 04/24/17   Page 87 of 176   Page ID
#:4975

```
05:26   1    Exhibit 11 a document labeled Bates control

        2    ATL001132 through 1192.

        3              (Exhibit 11 was marked

        4              for identification.)

05:27   5              THE WITNESS:  Do you want me to read all

        6    60 pages?

        7    BY MS. COYOCA:

        8         Q.   I do not.  But what I would like you to do

        9    is to refresh your recollection with respect to the

05:27  10    e-mail exchanges.  And I believe the e-mail

       11    exchanges end on 1137, and the remainder of the

       12    document is the policy.

       13              And let me know when you're ready for

       14    questions.

05:28  15         A.   Okay.

       16         Q.   Okay.  I want to ask you about an e-mail

       17    that was sent by Daniel Gutterman on July 15 at

       18    4:14 p.m.  And it appears at the bottom of

       19    page 1133.

05:29  20              Do you see the e-mail that begins "Hi

       21    Peter"?

       22         A.   Yes.

       23         Q.   Could you please read that e-mail out

       24    loud.

05:29  25         A.   "Hi Peter.
```

221

EXHIBIT 43, PAGE 415

05:29   1            "Per the below, you spoke with Andrea

  2        Garber/Susan Weiss about this.

  3            "Any chance you happen to suggest that

  4        they push for more than just the week, since

05:29   5        the crew needs to be advised at least one week

  6        in advance for a push and since a ground war

  7        still might occur (per this report from CBS

  8        news two days ago)."

  9      Q.   Okay.  Does this refresh your recollection

05:29 10  that Mr. Gutterman was sending you e-mails about the

11  claim?

12      A.   Yes.

13      Q.   Okay.

14      A.   Sorry.  This is the news report I

05:29 15  remembered him sending.

16      Q.   Ah.  Okay.  Got it.

17         Did he send you any other news reports?

18      A.   I don't believe so.

19      Q.   What was your understanding as to why

05:30 20  Mr. Gutterman was asking you about advising the

21  client or recommending to the client that they push

22  for one more week since a ground war still might

23  occur?  Why was he asking that?

24      A.   I don't know at the time.  I mean, I can't

05:30 25  recall.

222

EXHIBIT 43, PAGE 416

www.baysidedepo.com
CONFIDENTIAL
Case 2:16-cv-04435-PA-MRW   Document 60-11   Filed 04/24/17   Page 89 of 176   Page ID #:4977

05:35   1       Q.   She also indicated, begin quotes:

2            "Danny and I had a conversation with Susan

3       and Andrea today about what the production's

4       plans were, but we didn't make any

05:35   5       representations about whether there was

6       coverage but we also did not alert them that

7       this might not be a covered claim," close

8       quotes.

9            Do you see that?

05:36  10       A.   Yes.

11       Q.   You then responded to Ms. Johnson with a

12   cc to Mr. Gutterman at 7:53 p.m., I'm assuming,

13   Pacific time, and -- could you please read your

14   response out loud.

05:36  15       A.   "Why is it not a covered claim they

16       have imminent peril.  Unless you are going to

17       invoke the war exclusion.

18       "I am available between 1 and 3 my time."

19       Q.   Okay.  So as of July 15 -- I'm sorry.

05:36  20            First of all, what did you mean by this

21   e-mail?

22       A.   Exactly what it says.  I was asking if

23   they were raise -- if they had considerations of

24   coverage issues, I was asking them why.  The only

05:36  25   thing I could think of was that the -- the war risk

227

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 60-4 CONFIDENTIAL 04/24/17   Page 90 of 176   Page ID
#:4978

05:56 1   of whether or not they were applicable?

2      A.   Yes.

3      Q.   During your call with Ms. Johnson on

4   July 16, did you discuss the separate subparts of

05:57 5   the war exclusions?

6      A.   I -- I believe we did.  Yes.

7      Q.   What was discussed in terms of each of the

8   four sections?

9      A.   I believe we went through or Pamela went

05:57 10  through the different exclusions.  There was a

11  discussion as to which -- which ones of the

12  exclusions could apply.

13     Q.   And this is on -- this is on July 16;

14  correct?

05:57 15     A.   Yes.

16     Q.   And what was -- to your -- best of your

17  recollection, what was the discussion with respect

18  to Prong 1?

19     A.   It states that war, including undeclared

05:58 20  or civil war, is excluded.

21     Q.   Understood.

22      But what was discussed in terms of the

23  possible applicability or inapplicability of

24  Prong 1 --

05:58 25     A.   Well --

243

EXHIBIT 43, PAGE 418

www.baysidedepo.com
CONFIDENTIAL

05:58  1         Q.    -- to the DIG claim?

       2         A.    The war -- it doesn't have to be declared

       3   as a war in order for the exclusion to apply.

       4         Q.    Is that what was discussed?

05:58  5         A.    I believe so.  Yes.

       6         Q.    Was there any other discussion with

       7   respect to whether there were other requirements in

       8   order for the exclusion to apply?

       9         A.    That -- well, there had to be a war first.

05:58 10   It doesn't matter.  It didn't have to be declared or

      11   declared as a war.

      12         Q.    And what was your understanding as to the

      13   definition of the term "war," if you had one at that

      14   point in time?

05:59 15         A.    I don't think we had a definition of "war"

      16   at that time.

      17         Q.    And was there a discussion that you

      18   need -- that OneBeacon needed to research what that

      19   definition was in order to determine whether or not

05:59 20   it was applicable, Prong 1?

      21         A.    Specifically, I can't recall -- don't know

      22   because we went to No. 2.

      23         Q.    No.  No.  I understand.

      24               But what I'm asking you is:  You indicated

05:59 25   you went through each of the prongs and had a

                                                                    244

EXHIBIT 43, PAGE 419

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 61   CONFIDENTIAL 04/24/17   Page 92 of 176   Page ID
#:4980

05:59  1    discussion; is that correct?

2         A.   Yes.

3         Q.   So -- so other than the discussion about

4    the war not needing to be declared, was there any

05:59  5    other discussion about the applicability or

6    inapplicability of Prong 1?

7         A.   Well, I believe I testified it has to be a

8    war.

9         Q.   Okay.  And in your mind, as you were

06:00 10    talking about it, what did you understand that word

11    to mean?

12         A.   Widespread hostile actions.

13         Q.   And how did you form that understanding?

14         A.   I think that would be my general

06:00 15    understanding of what a war is.

16         Q.   Did you have any understanding as to

17    whether the participants in the hostilities, their

18    status, if it mattered?

19         A.   No.  It could be -- no.  No, I didn't.

06:00 20    Q.   So if two people are fighting, punching

21    each other and hitting each other, and a claim is

22    made, is that war?

23         MR. KEELEY:  Objection.  Improper

24    foundation.

06:01 25    THE WITNESS:  Based on that simple

245

EXHIBIT 43, PAGE 420

06:01  1    explanation, probably not a war.  It's not

       2    widespread hostilities.

       3    BY MS. COYOCA:

       4         Q.   Okay.  Say there is a big brawl involving

06:01  5    25 men on a production who are fighting, is that a

       6    war?

       7         A.   No.  I would not characterize that as a

       8    war.

       9         Q.   Okay.  What do you mean by "widespread

06:01  10   hostilities"?  What has to be -- what's the extent

       11   of widespread?

       12        A.   Indiscriminate killing, bombing, action by

       13   armed forces, military weapons being used.

       14        Q.   But it did not -- it does not matter who

06:01  15   is involved in the hostilities, whether it's a

       16   government or anyone in control of a particular

       17   territory or any political group, none of that

       18   matters in terms of whether or not it's a war; is

       19   that right?

06:02  20        A.   No.  I don't believe that's what I

       21   testified, it doesn't matter.  It's -- that can be

       22   some aspect of the consideration.  Yes.

       23        Q.   Okay.  So when you indicated that, to you,

       24   the definition of "war" means widespread

06:02  25   hostilities, anything other than widespread

                                                            246

www.baysidedepo.com
Case 2:16-cv-04435-PA-MRW   Document 60-4  Filed 04/24/17   Page 94 of 176   Page ID
#:4982
CONFIDENTIAL

06:02  1    hostilities necessary in order for it to qualify as

       2    a war, in your mind?

       3         A.   No.  By definition, widespread hostilities

       4    becomes -- becomes a war.

06:02  5         Q.   And the fact -- and the status of the

       6    participants in the widespread hostilities, does

       7    that matter in terms of the definition of widespread

       8    hostilities?  Does it play a role at all in your

       9    def- -- in your mind?

06:03 10         A.   In my mind?

      11         Q.   Uh-huh.

      12         A.   It plays a role.  It's not the defining

      13    definition.

      14         Q.   No.  I'm not asking you if it's the

06:03 15    defining definition.  I'm just asking:  Does it play

      16    a role?

      17         A.   Yes.  It could play a role.

      18         Q.   Do you think that there's a requirement

      19    that there be some form of government or state actor

06:03 20    or quasi state actor involvement in the hostilities

      21    in order for it to be a war?

      22              MR. KEELEY:  Objection.  Calls for a legal

      23    conclusion.

      24              THE WITNESS:  Yes.  All of that, all of

06:03 25    what you said.  Not all -- I mean, one of what you

                                                            247

EXHIBIT 43, PAGE 422

www.baysidedepo.com
CONFIDENTIAL
Case 2:16-cv-04435-PA-MRW   Document 60-2   Filed 04/24/17   Page 95 of 176   Page ID #:4983

06:08  1    or rebellion.  I don't recall specific discussion on

2    that.

3         Q.   Do you believe there was discussion, and

4    you just don't recall it, or you don't know one way

06:09  5    or the other?

6         A.   I don't know one way or the other.

7         Q.   What about Prong 4?

8         A.   Yes.  We had no reason to believe any

9    nuclear activity had occurred.

06:09 10         Q.   So in your view, Prong 4 means that there

11    has to be some kind of nuclear involvement?

12         A.   Well, atomic or radioactive, yes.

13         Q.   Needs to be either atomic, radioactive, or

14    nuclear?

06:09 15         A.   Well, the word "nuclear" is not mentioned.

16    I'm not a scientist.  I don't want to get into a

17    discussion into what's atomic and what's nuclear.

18         Q.   Got it.

19              But it has to be -- it needs to involve

06:09 20    either atomic fission, whatever that is, or

21    radioactive force, whatever that is?

22         A.   That would appear what No. 4 is.  Yes.

23         Q.   Okay.  So in your view, as of July 16, you

24    did not believe that Prong 4 applied; is that right?

06:10 25         A.   Yes.

252

EXHIBIT 43, PAGE 423

1       I declare under penalty of perjury that I have

2    read the foregoing transcript of my deposition

3    testimony, taken on Wednesday, February 1, 2017, at

4    _Fot Wilshire, Blvd_____, and that, with the

5    following exceptions which I have hand-marked on the

6    transcript, the same is a true record of the testimony

7    given by me at that deposition:

8

9    Page/Line      Should read           Reason for change:

10   _21 Line 6._   ___$5 million___      Misspoke

11   24 line 22     _Name is Incorrect_   Mistaken.

12   _____      _____     _____

13   _____      _____     _____

14   _____      _____     _____

15   _____      _____     _____

16   _____      _____     _____

17   _____      _____     _____

18   _____      _____     _____

19   _____      _____     _____

20   _____      _____     _____

21   _____      _____     _____

22

23

24   _3/3/17_____          _____

25   Date                         Peter Donald Williams

EXHIBIT 43, PAGE 424

www.baysidedepo.com
CONFIDENTIAL

10:21   1   New Jersey.   And please don't ask me his name 'cause

2   I -- he left shortly thereafter as well.   So I can't

3   remember his name.

4       Q.   Okay.   So after the lady in Minnesota that

10:22   5   was only there for a short period of time when you

6   were working, when she left in 2009, who did you

7   begin reporting to?

8       A.   Actually, she left at -- sorry.   She left

9   about the time I was promoted.   So I didn't report

10:22   10   to anybody else.   It was a period of weeks there

11   where a new head of claims came in, Mr. Sean Duffy.

12   But I never actually reported to him.

13       Q.   Okay.

14       A.   But if I did, on paper I reported to him

10:22   15   for a matter of weeks before I transferred to the

16   underwriting position.

17       Q.   Okay.   So let's just make sure we've got

18   this clear.

19           The woman that you originally reported

10:22   20   to --

21       A.   Sorry.   Can I just -- it's Bonnie

22   Henderson, was her name.

23       Q.   That helps.

24       A.   Yes.   Sorry.

10:23   25       Q.   As opposed "to the lady in Minnesota."

24

EXHIBIT 43, PAGE 425

CONFIDENTIAL

10:17  1        A.    Yes.

2        Q.    So in that period in May, 2009, when you

3    initially began working for the company, what was

4    your level of authority?

10:17  5        A.    I can't specifically recall.

6    Approximately $50 million, I believe.

7        Q.    So you could make a decision to settle a

8    claim so long as it was below the amount of

9    $50 million on your own authority; is that correct?

10:17  10        A.    Correct.  I should explain, that was

11    the -- in the beginning you don't get any authority,

12    and then they increase it.  So it was increased in

13    incremental amounts, probably 10 initially, 25, and

14    then subsequently higher.

10:18  15        Q.    So when you first began working for

16    OneBeacon in May of 2009, what was your level of

17    authority?

18        A.    That would have been low, as it always is

19    when you're new to a company, maybe 5 or 10 million.

10:18  20        Q.    And subsequently it increased; is that

21    correct?

22        A.    Correct.

23        Q.    Until it rose to the level of 50 million?

24        A.    I think so.  Yes.  Not that we had any

10:18  25    claims of that level.

21

EXHIBIT 43, PAGE 426

CONFIDENTIAL

```
 1
 2
 3
 4
 5
 6
 7
 8              I declare under penalty of perjury that
 9         the foregoing testimony is true and correct.
10
11              Executed at _____ Los Angeles _____,
12         this __3rd__ day of _____ March _____,
13         20 _17_..
14
15
16
17              PETER DONALD WILLIAMS
18
19
20
21
22
23
24
25
```

EXHIBIT 43, PAGE 427

# EXHIBIT 44

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, et al.,) | ) | CASE NO. 2:16-cv-4435-PA-MRW |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ATLANTIC SPECIALTY INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

DEPOSITION OF DANIEL SPENCER GUTTERMAN

Friday, February 3, 2017

Reported by:  Ingrid Suárez Egnatuk
              CSR No. 3098

1

EXHIBIT 44, PAGE 428

```
 1                    LOS ANGELES, CALIFORNIA

 2                    Friday, February 3, 2017

 3                         9:27 a.m.

 4

 5          THE VIDEOGRAPHER:  We are on the record.

 6          This is the deposition of Daniel

 7   Gutterman, taken on behalf of the plaintiffs in

 8   the matter of Universal Cable Productions LLC vs.

 9   Atlantic Specialty Insurance Company pending in

10   the United States District Court, Central District

11   of California, Western Division, Case No.

12   2:16-cv-4435-PA-MRW.

13          It is February 3, 2017, and today we are

14   at 707 Wilshire Boulevard, Suite 4000 in

15   Los Angeles, California.

16          My name is Esrom Jayasinghe, a Certified

17   Legal Video Specialist and a notary with Verbatim

18   Video, located at 9725 Gladbeck Avenue in

19   Northridge, California.

20          This is the start of Media 1.  The time

21   now is 9:28.

22          And, Counsel, if you would kindly state

23   your appearance.

24          MR. HAYES:  Dan Hayes of Mitchell

25   Silberberg & Knupp on behalf of plaintiffs.
```

7

EXHIBIT 44, PAGE 429

1          MR. KEELEY:  Michael Keeley of

2   Strasburger & Price on behalf of Atlantic Specialty

3   Insurance Company, defendant.

4          THE VIDEOGRAPHER:  Please proceed.

5          THE REPORTER:  Raise your right hand,

6   please.

7          Do you solemnly swear or affirm the

8   testimony you are about to give in this deposition

9   will be the truth, the whole truth, and nothing but

10   the truth?

11          THE WITNESS:  Yes.

12          THE REPORTER:  Thank you.

13

14          DANIEL SPENCER GUTTERMAN,

15          having been first duly sworn, was

16          examined and testified as follows:

17

18                    EXAMINATION

19   BY MR. HAYES:

20      Q.   Good morning, Mr. Gutterman.

21      A.   Good morning.

22      Q.   Please spell your full name for the

23   record.

24      A.   Daniel Spencer Gutterman, D-A-N-I-E-L

25   S-P-E-N-C-E-R G-U-T-T-E-R-M-A-N.

                                                          8

1      A.    That's correct.  I don't recall.

2      Q.    Can you think of any documents that might

3    refresh your recollection on that point?

4      A.    No.

5      Q.    Okay.  Where did you go to high school?

6      A.    Druid Hills High School, in Atlanta,

7    Georgia.

8      Q.    And I'm assuming you got a high school

9    diploma?

10     A.    Yes.

11     Q.    What years did you attend?

12     A.    1993 to 1997.  I'm -- yes.  Oh.  Wait.

13   I'm sorry.  That's incorrect.

14           1988 to 1993.  I just told you the date I

15   went to college.

16     Q.    When did you begin -- strike that.

17           You're a current employee of who?

18     A.    One Beacon Entertainment.

19     Q.    Are you certain that's the entity that is

20   your employer?

21     A.    Yes.

22     Q.    Okay.  And how long have you been employed

23   by One Beacon Entertainment?

24     A.    Since 2013.

25     Q.    Do you remember the month?

                                                    35

1     that time period.

2          Q.   What do you believe war is now?

3          A.   Two parties fighting over land or

4     governance or going up -- armies, tanks, missiles.

5          Q.   Anything else?

6          A.   No.

7          Q.   Just to be clear, I'm asking:  If you were

8     tasked with giving your best definition of what war

9     is, what would you say?

10         A.   It's really -- it's hard to define it.  I

11    just know it when I see it.  It's -- again, when

12    reviewing for -- when reviewing the articles and

13    information I found online during this time period,

14    it -- everything I saw was a war.

15         Q.   Is your understanding today of what war is

16    based on the work that you did in connection with

17    the DIG claim?

18         A.   I'm sorry.  Could your repeat the

19    question.

20         Q.   Is your understanding today of what "war"

21    means based on the work that you did in connection

22    with the DIG claim that's at issue in this lawsuit?

23              MR. KEELEY:  Object.  Vague.

24    BY MR. HAYES:

25         Q.   Do you understand what I mean by "DIG

45

1   people got hurt.  So the week before that, it was

2   very, very rowdy in there as well.

3        Q.   All right.  So let's talk about the

4   insurance claims that arose out of that incident.

5   No.

6             All right.  So let's -- we've talked about

7   your education, you r prior employment.  Let's start

8   talking now about your employment at OneBeacon.

9             Okay?

10        A.   Okay.

11        Q.   What is your title today?

12        A.   Senior entertainment investigator.

13        Q.   What was your title when you began?

14        A.   The same.

15        Q.   Has it ever been different?

16        A.   No.

17        Q.   Do you have an understanding of what your

18   job duties are as senior entertainment claims

19   investigator?

20        A.   Yes.

21        Q.   Have those responsibilities changed at any

22   time from the beginning of your employment until

23   today?

24        A.   Yes.

25        Q.   When?

89

1      Q.    Yes.  In your research into whether or not

2   the loss was caused by a war.

3      A.    I don't know if I did or not.

4      Q.    Did you ever consider whether or not Hamas

5   had indicia of sovereignty in that research?

6      A.    Please define "indicia."

7      Q.    Did you ever consider whether Hamas was in

8   any way like a sovereign nation in that research?

9      A.    I did not.

10      Q.    Why not?

11      A.    My involvement in this claim was it was

12   assigned to me.  But eventually this claim was

13   almost dealt with primarily by Pam- -- by Pamela.

14   And so that type of research would have been handled

15   at that point by her.

16      Q.    Did you ever seek to determine in your

17   research whether or not Hamas was a terrorist

18   organization?

19      A.    I don't recall.

20      Q.    Did you ever seek to determine in your

21   research whether the loss at issue was caused by

22   terrorism?

23      A.    I don't recall.

24      Q.    Did anybody at OneBeacon ever seek to

25   determine whether the loss at issue in connection

150

1        A.   I don't know if anyone did or not.  I did

2   not.

3        Q.   Should somebody have researched that?

4        A.   Yes.  But it doesn't change the fact that

5   it was a war.

6        Q.   Despite what John Kerry says; right?

7             MR. KEELEY:  Objection.  Argumentative.

8   Misleading.  Assumes facts not in evidence.

9             MR. HAYES:  This is going to be

10   Exhibit 29.

11             (Exhibit 29 was marked

12             for identification.)

13   BY MR. HAYES:

14        Q.   Do you recognize the e-mail chain marked

15   Exhibit 29?

16        A.   Yes.

17        Q.   What is it?

18        A.   It appears to be an e-mail chain.

19        Q.   Is this an e-mail chain that you

20   participated in?

21        A.   Yes.

22        Q.   I want you to look at the initiating

23   e-mail on page ATL 1549.

24        A.   Okay.

25        Q.   It says:

295

EXHIBIT 44, PAGE 435

```
 1              "Hi Wanda -

 2              "Please confirm that NBCU's 'DIG' was

 3         declared.  Also, please advise if the Israel

 4         portion was approved.  I see the Toronto part

 5         was in ImageNow."

 6              Do you see that?

 7         A.   Yes.

 8         Q.   What did you mean by that, those three

 9    sentences?

10         A.   Whether -- sorry.  "Please confirm that

11    NBCU's DIG was declared," asking her whether or not

12    the production had been declared by the

13    production -- to the broker and the broker declared

14    it to us.

15         Q.   Okay.  Why did you want to know that?

16         A.    If it had not been declared, there is

17    potential that we wouldn't have covered any claim

18    that came from it just because it wouldn't have been

19    a declared production.

20         Q.   Okay.  Then the next sentence is, "Also,

21    please advise if the Israel portion was approved."

22              Why did you ask that question?

23         A.   Because the claim was about Israel.

24         Q.   Why did you want to know whether or not it

25    was approved, the Israel portion?
```

296

```
 1         A.    Just to confirm that it was.

 2         Q.    Okay.  Wanda responds:

 3               "The production was . . . declared, and we

 4         approved the filming in Israel with terms."

 5               Do you see that?

 6         A.    Yes.

 7         Q.    And you ask:

 8               "Thank you for the response!

 9               "What were the terms?"

10               Do you see that?

11         A.    Yes.

12         Q.    And then she responds:

13               "We approved filming in East Jerusalem and

14         Tel Aviv.  NBC Security team is to remain

15         involved and continue working with production.

16         We required that production work with the local

17         production company Keshet and coordination with

18         the local police."

19               Do you see that?

20         A.    Yes.

21         Q.    What does that mean to you?

22         A.    Those were the terms that Wanda, as the

23    underwriter, agreed to with the broker.

24         Q.    How does that bear on the coverage

25    determination, if at all?
```

297

1        A.    I don't know.

2        Q.    Okay.

3              THE VIDEOGRAPHER:  About two minutes,

4    Counsel.

5              MR. HAYES:  This is going to be

6    Exhibit 30.

7              (Exhibit 30 was marked

8              for identification.)

9    BY MR. HAYES:

10       Q.    Do you recognize the document marked

11   Exhibit 30?

12       A.    Yes.

13       Q.    Why did you say here:

14             "Please review the policy language for

15       Extra Expense.  The wording for Civil Unrest

16       and the exclusions for it are not like other

17       policies . . . "?

18             Do you know why you said that?

19       A.    No.

20       Q.    It says at the top:

21             "It looks like we need to have a lot of

22       further discussion about this.  Please call me

23       first thing in the morning."

24             Do you recall having that conversation?

25       A.    I do not.

                                                    304

1    I declare under penalty of perjury that I have

2   read the foregoing transcript of my deposition

3   testimony, taken on Wednesday, February 3, 2017, at

4   _____, _____, and that, with the

5   following exceptions which I have hand-marked on the

6   transcript, the same is a true record of the testimony

7   given by me at that deposition:

8

9   Page/Line        Should read              Reason for change:

10   305/20          YES                      I MISSPOKE WHEN I SAID "NO"

11   _____       _____    _____

12   _____       _____    _____

13   _____       _____    _____

14   _____       _____    _____

15   _____       _____    _____

16   _____       _____    _____

17   _____       _____    _____

18   _____       _____    _____

19   _____       _____    _____

20   _____       _____    _____

21   _____       _____    _____

22

23

24   3/7/17                      _____

25   Date                        Daniel Spencer Gutterman



1      Q.   Do you recall why she said, "We need to
2   have a lot of further discussion"?
3      A.   I did not.
4      Q.   What did you do to search for documents in
5   this case, if anything?
6      A.   I'm sorry.  Can you ask the question
7   again.
8      Q.   Did you do anything to search for
9   documents in connection with this case?
10      A.   What type of documents?
11      Q.   Any documents, electronic or paper.
12      A.   Well, once again, once we got the claim
13   and it came in, I went on Google.
14      Q.   In connection with this litigation, did
15   you search for documents in the discovery process?
16      A.   Oh.  I looked to see if I had a hard file.
17   I looked everywhere, and I didn't see anything.
18      Q.   Okay.  And did you look for electronic
19   documents?
20      A.   No. "Yes, I misspoke when I said no."
21      MR. HAYES:  Okay.  Are we out of time?
22      THE VIDEOGRAPHER:  Yes.
23      MR. HAYES:  Okay.
24      THE WITNESS:  Not that I recall, I don't.
25      THE REPORTER:  There was a stipulation.

305





```
 1
 2
 3
 4
 5
 6
 7
 8              I declare under penalty of perjury that
 9      the foregoing testimony is true and correct.
10
11              Executed at _____10:04 am PT_____,
12      this _7th_ day of _MARCH_____,
13      20 _17_.
14
15
16                    _____[signature]_____
17              DANIEL SPENCER GUTTERMAN
18
19
20
21
22
23
24
25
```

137

# EXHIBIT 45

1                 UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
2                      WESTERN DIVISION

    ----------------------------------------------------
3

    UNIVERSAL CABLE PRODUCTIONS LLC,
4   a Delaware limited liability company,
    and NORTHERN ENTERTAINMENT PRODUCTIONS, LLC,
5   a Delaware limited liability company,
6               Plaintiffs,          Case No.
                                  2:16-cv-4435-PA-MRW
7   -vs-                              MASTER CAPTION
8   ATLANTIC SPECIALTY INSURANCE COMPANY,
    a New York insurance company,
9
                Defendant.
10
    ----------------------------------------------------
11
12  ** CONTAINS CONFIDENTIAL PORTIONS BOUND SEPARATELY **
              *  PAGE 36 & PAGES 66-67  *
13
                  VIDEOTAPED DEPOSITION
14
                          OF
15
                 THERESA A. GOOLEY WOLF
16
                       VOLUME 1
17
               Wednesday, February 8, 2017
18
19
20
21
22
23
24
    Job No. 118730
25  Reported By:  Amy L. Larson, RPR

EXHIBIT 45, PAGE 443

1          MS. COYOCA:  Good morning.  My

2     name is Lucia Coyoca, C-O-Y-O-C-A, of

3     Mitchell, Silberberg & Knupp.  I represent

4     the plaintiffs in this matter.

5          MS. SCOTT REED:  My name is

6     Toni Scott Reed of the law firm

7     Strasburger & Price.  I represent the

8     defendants Atlantic Specialty Insurance

9     Company, as well as this witness presented

10     here today.

11          THE VIDEOGRAPHER:  And will the

12     court reporter please swear in the witness.

13

14          THERESA A. GOOLEY,

15        a witness in the above-entitled action,

16        after having been first duly sworn, was

17        deposed and says as follows:

18

19          EXAMINATION

20  BY MS. COYOCA:

21  Q.  Good morning, Ms. Gooley.  Could you please

22     state your full name and address for the

23     record.

24  A.  Sure.  It's Theresa Anne, A-N-N-E, Gooley,

25     G-O-O-L-E-Y, Wolf, W-O-L-F.  And you want my

EXHIBIT 45, PAGE 444

1   Q.  And when you say you oversaw the financial

2      institution group or the energy group,

3      et cetera, what do you mean by the words

4      "oversaw"?

5   A.  Each of -- each of those divisions within

6      OneBeacon had a claim manager and so I

7      oversaw that claim manager.

8   Q.  What position, if -- if there were any

9      different positions other than a

10     vice-president of claims, did you hold while

11     you were employed by OneBeacon?

12  A.  I think my position at all times was

13     vice-president of claims.  I think -- strike

14     that.  My -- it is -- my position at all

15     times was vice-president of claims.  The

16     groups that I oversaw changed during the

17     course of my tenure at OneBeacon.

18  Q.  Other than the three groups that you've

19     already mentioned, what other groups did you

20     oversee?

21  A.  I oversaw the technology group, and the

22     accident and health group, and the

23     entertainment group.  I just want to make

24     sure I'm not missing one.  And the

25     environmental group or excess and surplus.

1   Q.   So with respect to the technology group, I

2        believe you indicated that you oversaw five

3        to six individuals in that group; is that

4        correct?

5   A.   No, five to six claim managers of the

6        different groups, technology, government,

7        risk, entertainment.

8   Q.   Got it.  So for -- so for each individual

9        group, so for technology group was there just

10       one claim manager?

11  A.   For the technology group, as they grew it

12       changed, but there was one claim manager and

13       then at some point there were a few direct

14       reports to that claim manager.  There are

15       also a number of claim handlers who weren't

16       direct reports to the claim manager who

17       handled the technology-related claims.

18  Q.   Okay.  Focusing on the entertainment group --

19  A.   Perfect.

20  Q.   -- what was the -- who did you oversee at the

21       entertainment group?

22  A.   Pamela Johnson.

23  Q.   Okay.  What was Pamela Johnson?

24  A.   She was the -- the claim manager, I'm not

25       sure if that was the exact title, but the

1       claim manager of the entertainment group.

2   Q.  Was there more than one claims manager for

3       the entertainment group while you were

4       overseeing it?

5   A.  She was the head claim person.  At some point

6       just before I left, we had another individual

7       come in and was a claim manager, but not

8       parallel -- it wouldn't have been a parallel

9       position to Pamela Johnson.

10  Q.  When you say not a parallel position, what do

11      you mean?

12  A.  Pamela -- Pamela oversaw the -- the whole

13      entertainment group and then reported up to

14      me.  Her oversight included all the

15      individual claim handlers that handled the

16      entertainment claims and then loosely the

17      other groups that handled other -- that

18      handled other entertainment claims.

19              After Pamela's departure we had --

20      we hired a claim manager but he did not -- he

21      didn't have the experience Pamela did, so he

22      wasn't brought in at the level Pamela was.

23  Q.  And Pamela Johnson, when she was the claims

24      manager, you indicated that there were

25      various claims handlers that reported to her;

EXHIBIT 45, PAGE 447

1        particular claim.

2    BY MS. COYOCA:

3    Q.  Have you ever used -- heard the use of the

4        term claims investigator used in the context

5        of OneBeacon?

6    A.  No, no.

7    Q.  Was Danny Gutterman a claims investigator?

8    A.  Again, I don't know his formal title.  It

9        definitely wasn't that.  I think he was a

10       claims handler, that's what -- that's how I

11       would refer to Danny.

12   Q.  So if Mr. Gutterman indicated, for example,

13       on his e-mail designations at the bottom of

14       his e-mails that he was a claims

15       investigator, that would just be a colloquial

16       use of the term investigator?

17               MS. SCOTT REED:  Objection to

18       form, calls for speculation.

19   BY MS. COYOCA:

20   Q.  To the best of your understanding.

21   A.  To the best of my understanding, maybe

22       that's -- that's part of what his job may

23       entail, so that may be why he made that

24       representation.  I don't know.

25   Q.  But -- but from your understanding, the

1    Q.   To your knowledge, is there any terrorism

2         exclusion in this policy?

3    A.   I don't believe there is a terrorism

4         exclusion.

5    Q.   Did you ever ask Ms. Johnson to research and

6         look at the issue of whether the activities

7         could be characterized as being terrorist

8         activities as opposed to a war?

9    A.   No.

10   Q.   Did you direct anyone at OneBeacon that was

11        involved in the management of the claim or

12        the handling of the claim, to investigate

13        whether or not these acts in Israel

14        constituted terrorist acts as opposed to a

15        war?

16   A.   No.

17   Q.   Did you ask Ms. Johnson to look at the status

18        of Hamas as designated by Israel?

19   A.   No, I did not.

20   Q.   Did you ask Ms. Johnson to look at the

21        United Nations designation of Hamas, its

22        status?

23   A.   I didn't ask her to look at it, but she may

24        have looked at it.

25   Q.   Do you recall relying on her investigation as

EXHIBIT 45, PAGE 449

1          Israel was warlike action.  Hamas is a

2          military force, Israel has a military force.

3          At a minimum, it's an other -- Hamas is an,

4          "Other authority using military personnel or

5          agents."

6     Q.   Did you discuss -- when you say you think you

7          discussed it, do you think that you discussed

8          the fact that exclusion 2 was broader than

9          exclusion 1, narrower, the exact same in

10         scope?

11    A.   It's -- it's a different -- it's not the --

12         it's not the exact same exclusion, it's

13         warlike action by a military force.  That

14         would suggest to me that it has even broader

15         implication.

16    Q.   You indicated you did not discuss

17         exclusion 3; is that correct?

18               MS. SCOTT REED:  Objection to

19         form, misstates prior testimony.

20               THE WITNESS:  I imagine that we

21         discussed it.  I think we -- and I'm -- just

22         let me read through it, whether or not they

23         believed it was applicable.  (Reviews

24         document.)

25               I'm sure we talked about it and we

EXHIBIT 45, PAGE 450

1        came -- and it wouldn't have appeared to be

2        applicable to the NBC claim.

3    BY MS. COYOCA:

4    Q.  Do you recall if prong 3 was invoked as being

5        one of the grounds for denial of the claim?

6    A.  Again, I'd have to look at the -- at the

7        actual letter that we sent out.

8    Q.  And what about prong 4, do you recall having

9        discussions about prong 4?

10   A.  I don't recall this -- any express

11       discussions.  Again, it would be based on,

12       you know, our pattern and practice, and we

13       would have run through all four.

14   Q.  Did OneBeacon end up concluding that prong 4

15       applied?

16   A.  I think, yeah, prong -- excuse me, prong 4

17       would apply, any weapon of war, whether in

18       time of peace or war.  I mean, I think we --

19       I think missiles, ground troops, war planes,

20       those are weapons of war.

21   Q.  Was prong 4 invoked in the denial of coverage

22       letter --

23   A.  Again, I'd have to look at the denial letter.

24   Q.  Were you involved in any -- any telephone

25       conferences or any conversations with

EXHIBIT 45, PAGE 451

```
 1          too limited.
 2     Q.   Did you point that out to Ms. Johnson when
 3          you were reviewing the letter?
 4     A.   I don't recall that I did.
 5     Q.   Could you please read the sentence that
 6          begins, "Black's Law Dictionary"?
 7     A.   "Black's Law Dictionary defines a," paren,
 8          "war," close paren, "as," paren, "hostile
 9          conflict by means of armed forces," comma,
10          "carried on between nations," comma, "states
11          or rulers," comma, "or sometimes between
12          parties within the same nation or state,"
13          period, close paren.
14     Q.   Do you believe that statement is correct?
15                    MS. SCOTT REED:  Objection to the
16          extent it calls for a legal conclusion.
17                    THE WITNESS:  Yeah, I mean, that's
18          correct that's -- that's how Black's Law
19          Dictionary defines war.
20     BY MS. COYOCA:
21     Q.   Do you believe that's the correct definition
22          of war?
23                    MS. SCOTT REED:  Objection to the
24          extent it calls for a legal conclusion.
25                    THE WITNESS:  I believe that's one
```

EXHIBIT 45, PAGE 452

1          of the definitions of war, yes.

2     BY MS. COYOCA:

3     Q.   Do you believe there are others?

4     A.   Yes.

5     Q.   Are they recited or cited in this letter?

6     A.   There's a -- she said, "A leading dictionary

7          of international law defines an act of war as

8          the use of force or other action by one state

9          against another which they acted against

10         recognizes as an act of war either by the use

11         of retaliatory force or declaration of war.

12         Another dictionary defines an act of war as a

13         measure of force which one party, using

14         military instruments as power, implements

15         against another party in an international

16         armed conflict."

17              So there's -- she cites -- recites

18         Appleman, Black's Law Dictionary, a

19         dictionary of international and comparative

20         law, and The Handbook of Humanitarian Law and

21         Armed Conflicts.

22    Q.   Okay.  Do you believe that the definitions

23         which she's cited in their totality, all of

24         them that are contained in the letter, do you

25         believe that they're the correct definitions

1    Q.   Keeping your attention to Exhibit 18, the

2         July 28, 2014, letter, on the fifth page of

3         the letter labeled Bates control ATL0000098,

4         under, "Analysis," there's a section

5         entitled, "Imminent Peril."  I'd like to ask

6         you a question about that.  Are you there?

7    A.   Yes.

8    Q.   Great.  Do you agree with Ms. Johnson's

9         statements made in that paragraph that the

10        situation in Israel constituted imminent

11        peril?

12   A.   I'm just going to read through it, but

13        presumably I do, because I approved the

14        letter.  (Reviews document.)  Yes.

15   Q.   The two grounds that I see that are invoked

16        in the July 28 letter is subparagraph 1 of

17        the war exclusions and subparagraph 2.  I do

18        not see the third or fourth subparagraphs

19        invoked.  Do you -- do you agree?

20             MS. SCOTT REED:  Objection; form,

21        assumes facts not in evidence.

22             THE WITNESS:  We -- yeah, we -- we

23        reference the -- the first prong of the war

24        exclusion and then we reference paragraph 1

25        and paragraph 2, warlike action by a military

1              THE WITNESS:  It's cited -- I

2         mean, she cites it in the policy piece.  But

3         in terms of the analysis, she -- analysis she

4         focuses just on the first paragraph and the

5         second paragraph of the war, what I refer to

6         as the war exclusions.

7    BY MS. COYOCA:

8    Q.  Did you speak to Ms. Johnson as to why she

9         did not address the third prong of the war

10        exclusions in the Analysis section of the

11        denial letter?

12   A.  I don't recall that conversation, no.

13   Q.  Did you ever tell Ms. Johnson that the third

14        prong should also be invoked as a grounds for

15        exclusion of the Dig claim?

16   A.  The third prong?

17   Q.  Yes.

18   A.  Or the third paragraph?

19   Q.  The third paragraph of the war exclusions,

20        subparagraph 3.

21   A.  No.

22   Q.  Was OneBeacon denying the claim on the basis

23        of the third paragraph, subparagraph 3 of the

24        war exclusions?

25   A.  The paragraph that begins, "Insurrection,

1      rebellion, revolution"?

2   Q.   Yes.

3   A.   No.

4   Q.   Did you ever tell Ms. Johnson that she should

5        address the fourth prong of the war exclusion

6        with respect to any weapon of war in the

7        Analysis section of the coverage denial

8        letter?

9   A.   We discussed the fourth prong, but I don't

10       recall telling her to expressly include

11       the -- it in the analysis of the coverage

12       position.

13  Q.   In the coverage denial letter, is OneBeacon

14       relying on the fourth prong, the fourth --

15       the subparagraph 4 of the war exclusions in

16       denying the Dig claim?

17  A.   Yes, OneBeacon would be.  The fourth prong

18       says, "Any weapon of war," so any weapon of

19       war necessarily would be included in any

20       warlike action by a military force, war

21       including undeclared war, any weapon of war I

22       think would -- would fall within that, and in

23       here it would -- warlike action, again,

24       you're using a weapon of war, so it would be

25       included within 1 and 2.

1    addressed in the coverage denial letter?

2                    MS. SCOTT REED:  I'm sorry,

3         Counsel, I -- I just missed your question, do

4         you mind it if I --

5    BY MS. COYOCA:

6    Q.   Do -- did you ever have any discussions with

7         Ms. Johnson about the fact that the third and

8         the fourth prongs of the war exclusions were

9         not addressed in the coverage denial letter?

10                    MS. SCOTT REED:  Objection to

11        form, vague and ambiguous and misstates the

12        facts in evidence and this witness's prior

13        testimony.

14                    THE WITNESS:  So, again, the --

15        the third paragraph I don't think is

16        applicable, and so necessarily we wouldn't

17        have included it in the letter.

18                    The fourth paragraph is applicable,

19        but based on the analysis of the application

20        of war, including undeclared or civil war and

21        warlike actions by a military force, that

22        would include the use of any weapon of war.

23   BY MS. COYOCA:

24   Q.   Did you ever ask Ms. Johnson about the fact

25        that the fourth prong of the war exclusion

EXHIBIT 45, PAGE 457

Page 304

```
 1                          ERRATA SHEET
 2   Case Name:  Universal Cable Productions, LLC,
                 et al. vs. Atlantic Specialty
 3               Insurance Co.
     Deposition Date:  2-8-17
 4   Deponent:  Theresa A. Gooley Wolf
 5   Pg.  Line  Now Reads      Should Read  Reason

 6   ___  ____  _____    _____  _____

 7   ___  ____  _____    _____  _____

 8   ___  ____  _____    _____  _____

 9   ___  ____  _____    _____  _____

10   ___  ____  _____    _____  _____

11   ___  ____  _____    _____  _____

12   ___  ____  _____    _____  _____

13   ___  ____  _____    _____  _____

14   ___  ____  _____    _____  _____

15   ___  ____  _____    _____  _____

16   ___  ____  _____    _____  _____

17   ___  ____  _____    _____  _____

18   ___  ____  _____    _____  _____

19   ___  ____  _____
20                                   _____
                                     Signature of Deponent
21
22
     SUBSCRIBED AND SWORN BEFORE ME THIS  6   DAY OF
23   March      , 2017.
24   _____
     (Notary Public)   MY COMMISSION EXPIRES: 1/31/20
25
```

EHRICH L. KOCH
Notary Public-Minnesota
My Commission Expires Jan 31, 2020

EXHIBIT 45, PAGE 458

# EXHIBIT 46

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                  WESTERN DIVISION

 4

 5   UNIVERSAL CABLE PRODUCTIONS,        Case No.

     INC., LLC, a Delaware limited       2:16-cv-04435-PA-MRW

 6   liability company and NORTHERN

     ENTERTAINMENT PRODUCTIONS, LLC,

 7   a Delaware limited liability

     company,

 8

             Plaintiff,

 9

        vs.

10

     ATLANTIC SPECIALTY INSURANCE

11   COMPANY, a New York insurance

     company's,

12

             Defendants.

13

     _____

14

15                  CONFIDENTIAL

16       VIDEOTAPED DEPOSITION of ANDREA GARBER

17             LOS ANGELES, CALIFORNIA

18             FRIDAY, APRIL 14, 2017

19                  VOLUME 1

20

21

22

23   Reported by

     Daryl Baucum, RPR, CRR, RMR, CSR No. 10356

24

25   Job No. CS2588507
```

1        LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 14, 2017

2                         9:01 A.M.

3

4              THE VIDEOGRAPHER:  Good morning.  We're on

5     the record.

6              The time is 9:01 a.m. on April 14, 2017.

7              This is the video recorded deposition of

8     Andrea Garber.

9              My name is Grant Celar, here with our

10    court reporter Daryl Baucum.  We are here from

11    Veritext Legal Solutions at the request of counsel

12    for Defendant.

13             This deposition is being held at Mitchell,

14    Silberberg and Knupp, in Los Angeles, California.

15             The caption of this case is Universal

16    Cable Productions versus Atlantic Specialty

17    Insurance Company.  The case number is

18    216CV04435PAMRW.

19             Please, note that audio and video

20    recording will take place unless all parties agree

21    to go off the record.  Microphones are sensitive and

22    my pick up whispers, private conversations and

23    cellular interference.

24             I am a notary public.  I am not related to

25    any party in this action.  Nor am I financially

EXHIBIT 46, PAGE 460

1    interested in the outcome in any way.

2           If there are objections to proceeding,

3    please, state them at the time of your appearance

4    beginning with the noticing attorney.

5           MR. KEELEY:  Michael Keeley with

6    Strasburger and Price in Dallas on behalf of the

7    defendant Atlantic Specialty Insurance Company.

8           MS. COYOCA:  Lucia Coyoca, Mitchell,

9    Silberberg and Knupp, by and on behalf of plaintiffs

10   Universal Cable Productions and Northern

11   Entertainment Productions.

12          THE VIDEOGRAPHER:  Thank you.

13          The witness will be sworn in and counsel

14   may begin the examination.

15

16                  ANDREA GARBER,

17          having been first duly sworn, was

18          examined and testified as follows:

19

20                  EXAMINATION

21   BY MR. KEELEY:

22      Q    Good morning, Ms. Garber.  My name is Mike

23   Keeley.  We met briefly off the record but just so

24   you know, I represent the defendant in this lawsuit,

25   Atlantic Specialty Insurance Company.

EXHIBIT 46, PAGE 461

1  excluded.  It doesn't matter if it's war or not.

2          There is a distinction in the policy

3  between those things.  So I can't answer your

4  question when you lump them all together.

5          (Defendants' Exhibit 38 was marked for

6          identification by the court reporter and

7          is attached hereto.)

8  BY MR. KEELEY:

9     Q    Let me show you what has been marked

10  Exhibit 38.

11         Do you recognize that as the policy -- the

12  production policy issued by Atlantic to NBC that is

13  the subject of the current lawsuit?

14    A    Yes.

15    Q    And you will see the Bates numbering down

16  at the bottom right-hand corner "ATL."  Turn to

17  ATL 1585 and 1586, if you would, please.  Actually,

18  it's 1585 where the weapons of war exclusion is.

19         Do you see that under the fourth

20  exclusion?

21    A    Uh-huh.

22    Q    Will you read the fourth exclusion.

23    A    (Reading):

24         "Any weapon of, war including atomic

25         fission or radioactive force, whether in

```
 1              time of peace or war."
 2      Q     So this doesn't draw a distinction between
 3   non-atomic fission weapons and atomic fission.
 4              It just says any loss caused directly or
 5   indirectly by any weapon of war is excluded.
 6              MS. COYOCA:  Objection; potentially calls
 7   for a legal conclusion, legal conclusion, vague and
 8   ambiguous.  This witness is not competent to testify
 9   with respect to the legal interpretation of this
10   policy.
11              THE WITNESS:  Well, actually, I wouldn't
12   read this as any weapon of war.  I think to me, this
13   says the weapon of war that includes atomic
14   fission -- that the weapon, itself, has to include
15   atomic fission.
16   BY MR. KEELEY:
17      Q     The way you read the fourth exclusion is
18   it has to be a weapon of war involving atomic
19   fission?
20      A     Right.
21      Q     Would it make a difference if it didn't
22   have to include atomic fission?
23              MS. COYOCA:  Objection; calls for a legal
24   conclusion, improper hypothetical, calls for opinion
25   testimony from a lay witness, vague and ambiguous.
```

EXHIBIT 46, PAGE 463

```
1    STATE OF _____)
                                               )  Ss.
2    COUNTY OF _____)

3

4          I, DARYL BAUCUM, a Certified Shorthand

5    Reporter of the State of California, do hereby

6    certify;

7          That the foregoing proceedings were taken

8    before me at the time and place herein set forth,

9    at which time the witness named in the foregoing

10   proceeding was placed under oath; that a record

11   of the proceedings was made by me using machine

12   shorthand which was thereafter transcribed under my

13   direction; and that the foregoing pages contain a

14   full, true and accurate record of all proceedings

15   and testimony to the best of my skill and ability.

16         I further certify that I am neither

17   financially interested in the outcome nor a relative

18   or employee of any attorney or any party to this

19   action.

20         IN WITNESS WHEREOF, I have subscribed my

21   name this 15th day of April 2017.

22

23

24         _____

           DARYL BAUCUM, CSR No. 10356

25
```

EXHIBIT 46, PAGE 464

# EXHIBIT 47

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3                   WESTERN DIVISION
 4   _____
                                    )
 5   UNIVERSAL CABLE PRODUCTIONS    )
     LLC, a Delaware limited        )
 6   liability company; and         )
     NORTHERN ENTERTAINMENT         )
 7   PRODUCTIONS LLC, a Delaware    )
     limited liability company,     )
 8                                  )
               Plaintiffs,          )
 9                                  )
         vs.                        )Case No.
10                                  )2:16-cv-04435-PA-MRW
     ATLANTIC SPECIALITY INSURANCE  )
11   COMPANY, a New York insurance  )
     company,                       )
12                                  )
               Defendant.           )
13   _____)
     _____
14
15
16        VIDEOTAPED DEPOSITION OF SUSAN WEISS
17             Los Angeles, California
18             Tuesday, April 18, 2017
19                    Volume I
20
21   Reported by:
     LORI SCINTA, RPR
22   CSR No. 4811
23
24
25   Job No. CS2590363
```

EXHIBIT 47, PAGE 465

1          Los Angeles, California, Tuesday, April 18, 2017

2                         10:06 A.M.

3

4          THE VIDEOGRAPHER:  We are on the record at

5     10:06 A.M. on April 18th, 2017.  This is the

6     video-recorded deposition of Susan Weiss.

7          My name is Julian Shine, here with our

8     court reporter, Lori Scinta.  We are here from

9     Veritext Legal Solutions at the request of counsel

10    for defendant.

11          This deposition is being held at 555 South

12    Flower Street in Los Angeles, California.  The

13    caption of this case is Universal Cable Productions,

14    LLC, et al., versus Atlantic Specialty Insurance

15    Company, case No. 2:0016-cv-04435-PA-MRW.

16          Please note that audio and video recording

17    will take place unless all parties agree to go off

18    the record.  Microphones are sensitive and may pick

19    up whispers, private conversations and cellular

20    interference.

21          I am not authorized to administer an oath.

22    I am not related to any party in this action, nor am

23    I -- nor am I financially related to -- financial

24    interested in the outcome in any way.

25          If there are any objections to proceeding,

EXHIBIT 47, PAGE 466

1   please state them at the time of your appearance.

2   And we will begin with appearances on the noticing

3   attorney.

4          MR. KEELEY:  Michael Keeley from

5   Strasburger & Price on behalf of the defendant,

6   Atlantic Specialty Insurance Company.

7          MS. COYOCA:  Lucia Coyoca, Mitchell

8   Silberberg & Knupp, on behalf of Plaintiffs Northern

9   Entertainment Productions and UCP.

10         MR. LANDIS:  John Landis on behalf of the

11  witness and Aon/Albert G. Ruben.

12         MR. HAZZARD:  Yakub Hazzard, in-house

13  counsel, NBCUniversal.

14         MR. ATALLAH:  John Atallah, Foley &

15  Lardner, for the witness and AON.

16         THE VIDEOGRAPHER:  Thank you.

17         The witness will be sworn in, and counsel

18  may begin the deposition.

19

20                 SUSAN WEISS,

21  having been administered an oath, was examined and

22  testified as follows:

23

24  ///

25  ///

EXHIBIT 47, PAGE 467

```
 1        Q    How did you come about to work at
 2   Aon/Albert G. Ruben?
 3        A    Aon was one of my clients when I worked at
 4   Chubb.
 5        Q    So did they recruit you to come work at Aon
 6   or did you apply for the position?
 7        A    They recruited me.
 8        Q    Who recruited you?
 9        A    Brian Kingman and Stacie Wright.
10        Q    What is Aon versus Albert G. Ruben?
11        A    I don't understand the question.
12        Q    So you said you went to work for Aon/Albert
13   G. Ruben.
14             Is that the same company?
15        A    Yes.
16        Q    Have you remained employed with Aon since
17   1997?
18        A    Yes.
19        Q    All right.  What positions have you held
20   with Aon during that time?
21        A    I was an account executive.  I was an
22   assistant vice president.  I was a senior vice
23   president.
24             And now I'm still an officer of the
25   company, but I am the national contingency director.
```

EXHIBIT 47, PAGE 468

1      Q    What did you do as an account executive at

2    Aon?

3      A    I gave oversight to various accounts.

4      Q    What does that mean, you gave "oversight"?

5      A    I would put together the insurance programs

6    for various clients with a team of people.

7      Q    Were you typically involved in negotiation

8    of policy language?

9      A    Sometimes.

10     Q    How long were you an account executive?

11     A    I don't recall.

12     Q    Approximately how long?

13     A    Maybe five years.

14     Q    What did you do as an assistant vice

15   president?

16     A    Same thing.

17     Q    It was just a promotion --

18     A    Yes.

19     Q    -- as far as the title.

20          Okay.  And then did your responsibilities

21   change when you became a senior VP?

22     A    A few more things were added on, but

23   similar activities.

24     Q    What type of things were added on?

25     A    I was involved more in the leadership of

EXHIBIT 47, PAGE 469

1    Q   When did your title change to national

2    contingency director?

3    A   I believe it was August of 2016 -- or, no,

4    September of 2016.

5    Q   Do you any longer have any responsibilities

6    for the relationship between Aon and NBCUniversal?

7    A   No.

8    Q   Were you involved in the dealings with

9    NBCUniversal when it first came to Aon to obtain a

10   production policy?

11   A   No.

12   Q   You had no -- no involvement in that?

13   A   I don't really understand the question.

14   Q   Sure.  Let me rephrase it.

15   So you're aware that Aon was involved in

16   negotiating a motion picture TV policy between

17   Atlantic Insurance Company and NBCUniversal?

18   A   Yes.

19   Q   Did you have any involvement in the

20   discussions about that policy?

21   A   Yes.

22   Q   What was your involvement, generally?

23   A   I worked with individuals within the

24   company and with the carrier to negotiate terms and

25   conditions for a policy with Atlantic Mutual.

EXHIBIT 47, PAGE 470

1    BY MR. KEELEY:

2         Q    Eventually, Atlantic issued a policy to

3    NBCUniversal, correct?

4         A    Yes.

5         Q    And that was for the 2010-2011 policy year?

6         A    Yes.

7         Q    And it was renewed from 2011 to 2012,

8    correct?

9         A    Yes.

10        Q    And then from 2012 to 2013, correct?

11        A    Yes.

12        Q    And then from 2013 to 2014?

13        A    Yes.

14        Q    And then for the 2014 policy year, it was

15   actually renewed for an 18-month period; is that

16   correct?

17        A    Yes.

18        Q    And then after that policy expired,

19   2014-2015, Aon assisted NBC in taking the policy to

20   the market; is that right?

21        A    We marketed the program.

22        Q    All right.  And do you recall what

23   insurance companies you marketed it to?

24        A    Yes.

25             MS. COYOCA:  Objection.  Relevance.

EXHIBIT 47, PAGE 471

```
 1    speculation, vague and ambiguous.

 2    BY MR. KEELEY:

 3         Q    You don't -- you don't think that had

 4    anything to do with NBC's decision?

 5         A    No.

 6         Q    Okay.  You say in the third sentence in

 7    that first paragraph, "It is a manuscripted policy

 8    form that is the property at Aon, so I ask that you

 9    keep this confidential."

10         Do you see that?

11         A    Yes.

12         Q    Was that statement accurate when you made

13    it?

14         A    Yes.

15         Q    What do you mean it was a "manuscripted

16    form"?

17         A    It wasn't anyone's standard policy form.

18         Q    It was a form that was created as a result

19    of significant negotiations between NBCUniversal and

20    Atlantic; is that accurate?

21         A    Yes.

22         Q    You say that, "the form is the property of

23    Aon," what do you mean by that?

24         A    It was a form that was created for a

25    specific client addressing a specific client's
```

EXHIBIT 47, PAGE 472

1  needs.  Aon had already gone through all the

2  negotiations with Atlantic Mutual.  And we didn't

3  want random carriers copying a form that belonged to

4  Aon and a carrier and -- without permission.

5      Q   But your letter does not say it's the

6  property of Aon and a carrier.  It says it's the

7  property of Aon, correct?

8      A   Yes.

9      Q   And that's what you meant when you wrote

10 this letter, that it was the property of Aon,

11 correct?

12         MS. COYOCA:  Objection.  Relevance,

13 opinion, document speaks for itself.

14         THE WITNESS:  It's common language that we

15 might say it belongs to Aon because it's a

16 negotiation that took place on behalf of our client.

17         So, yes, I would say this form should not

18 be used by Atlantic Mutual for another one of

19 Atlantic's clients.

20 BY MR. KEELEY:

21      Q   Because, in your view, it's proprietary to

22 Aon?

23      A   And to the client.

24      Q   And to NBCUniversal?

25      A   Correct.

EXHIBIT 47, PAGE 473

1        THE VIDEOGRAPHER:  We are back on the

2    record at 11:13 A.M.

3    BY MR. KEELEY:

4        Q   Ms. Weiss, have you had a chance to review

5    Exhibit 42?

6        A   Yes.

7        Q   Do you recognize this as a true and

8    accurate copy of an email from Martin Ridgers to

9    yourself and George Walden dated September 16th,

10   2009?

11       A   Yes.

12       Q   In the next-to-last paragraph of the

13   letter, Mr. Ridgers says, "I believe all of our hard

14   work will provide NBC with a unique policy."

15           Do you see that?

16       A   Yes.

17       Q   Do you agree that the policy that was

18   eventually issued to NBC was unique?

19           MS. COYOCA:  Objection.  Relevance,

20   opinion.

21           MR. LANDIS:  Join.

22           THE WITNESS:  Yes.

23   BY MR. KEELEY:

24       Q   Why do you think the policy was unique?

25       A   Aon worked very long and hard with

EXHIBIT 47, PAGE 474

1    OneBeacon to create a form that met with the

2    client's needs and was broader than most.

3        Q   Tell me how the policy that was eventually

4    issued was broader than most.

5            MS. COYOCA:  Objection.  The document

6    speaks for itself, calls for a legal conclusion,

7    calls for speculation, opinion testimony.

8            MR. LANDIS:  Join.

9            THE WITNESS:  I can't give specifics.

10   There are far too many.

11   BY MR. KEELEY:

12       Q   Give me some examples of why you agree that

13   the policy was unique.

14       A   We had met with the client and had many

15   discussions on subtle nuances to wording that they

16   were looking for.

17           We analyzed their exposure and tried to

18   come up with a form that met most of their needs.

19       Q   And was Atlantic generally receptive to the

20   subtle nuanced changes that you wanted to be made?

21           MS. COYOCA:  Objection.  Assumes facts not

22   in evidence, calls for speculation.

23           MR. LANDIS:  Join.

24           THE WITNESS:  Not always.  It -- it was a

25   joint effort.

1    Q   What is that document?

2    A   It appears to be a draft version of the

3    NBCU policy form.

4        MR. LANDIS:  Can I just interpose an

5    objection, Mike -- or not an objection, a question.

6        Is this the whole document or is this just

7    part of it?

8        MR. KEELEY:  This is one of the ones that

9    we received from you last night, I think, or

10   yesterday afternoon.  My understanding is they were

11   sent as separate .pdfs, and this is the entirety of

12   one of the .pdfs.

13       MR. LANDIS:  Yeah, that was my question, is

14   whether it was just the entirety of the document.

15   So we can check.

16   BY MR. KEELEY:

17   Q   So do I understand correctly that different

18   drafts of the policy would go back and forth between

19   Aon and Atlantic with one or the other making

20   redline changes to the policy?

21   A   Yes.

22   Q   Okay.  And this is simply an example of one

23   of those drafts?

24   A   Yes.

25   Q   Do you know who made the changes on this

Veritext Legal Solutions

800-567-8658                                    973-410-4040

EXHIBIT 47, PAGE 476

```
 1    civil authority coverage under the policy to you

 2    during that call?

 3          A   I don't recall.

 4          Q   What about the imminent peril coverage?

 5    Did she mention that?

 6          A   Don't recall.

 7          Q   Okay.  And that would have been July 11th,

 8    2014, correct?

 9          A   Yes.

10          Q   Did you and she, then, call Peter Williams?

11          A   Yes.

12          Q   That same day?

13          A   Yes.

14          Q   How soon after that -- well, was it as part

15    of that call that you conferenced Mr. Williams in,

16    or did you hang up and do something else before

17    calling him?

18          A   I'm pretty certain I conferenced him in.

19          Q   Okay.  And so sitting here today, you

20    cannot recall any details that Ms. Garber told you

21    about the tensions that were building up between

22    Hamas and Israel, only that tensions were building

23    up?

24          A   Yes.

25          Q   Okay.  So then you conferenced Mr. Williams
```

EXHIBIT 47, PAGE 477

```
 1   in, correct?
 2        A   Yes.
 3        Q   Were you able to reach him?
 4        A   I don't recall.
 5        Q   Do you recall that eventually you and
 6   Ms. Garber did speak with Peter Williams?
 7        A   Yes.
 8        Q   Do you recall it being on the same day?
 9        A   Yes.
10        Q   Okay.  Do you recall how long that
11   telephone call lasted?
12        A   No.
13        Q   Do you recall whether it was more or less
14   than five minutes?
15        A   More.
16        Q   Do you recall whether it was more or less
17   than ten minutes?
18        A   More.
19        Q   Do you recall whether it was more or less
20   than 15 minutes?
21        A   No.
22        Q   Okay.  Did you take the lead on that call
23   or did Ms. Garber?
24            MR. LANDIS:  Object to the form.
25            MS. COYOCA:  Join.
```

EXHIBIT 47, PAGE 478

```
 1    BY MR. KEELEY:
 2         Q    Do you know what I mean by saying --
 3         A    Yes.
 4         Q    Okay.
 5         A    I believe I may have taken the lead.
 6         Q    Tell me everything you can recall telling
 7    Mr. Williams during that call.
 8         A    I recall us discussing that production had
 9    been on hiatus, that they were getting ready to
10    start up and that things had heated up with Hamas
11    and that production did not feel it was safe, at
12    that point in time, to start shooting again.
13              That the security detail had advised things
14    may ease up in about a week and that was what
15    production was thinking of doing.
16         Q    They were thinking of doing what?
17         A    Pushing for a week.
18         Q    Okay.  When you say "pushing for a week,"
19    that means delaying the shooting?
20         A    Correct.
21         Q    Delaying the startup of the shooting for a
22    week?
23         A    Yes.
24         Q    Okay.  I take it since Ms. Garber had not
25    provided you any of the details of the tensions and
```

EXHIBIT 47, PAGE 479

# EXHIBIT 48

 the *WHITE HOUSE*   *PRESIDENT BARACK OBAMA*      

≡

## Briefing Room

Your Weekly Address

**Speeches & Remarks**

Press Briefings

Statements & Releases

White House Schedule

Presidential Actions

   Executive Orders

   Presidential Memoranda

   Proclamations

Legislation

   Pending Legislation

   Signed Legislation

   Vetoed Legislation

Nominations & Appointments

Disclosures

**The White House**
Office of the Press Secretary

For Immediate Release                                      July 16, 2014

SHARE THIS:

# Remarks by the President on Foreign Policy



TWITTER

FACEBOOK

**UCP000274**

James S. Brady Press Briefing Room                    

5:44 P.M. EDT

THE PRESIDENT:  Good afternoon, everybody.  I want to briefly discuss the important actions we're taking today in support of Ukraine.  Before I do, I want to take a few minutes to update the American people on some pressing foreign policy challenges that I reviewed with Secretary Kerry this afternoon.

First of all, I thanked Secretary Kerry and our outstanding civilian and military leaders in Afghanistan for their success in helping to break the impasse over the presidential election there.  Thanks to their efforts and, of course, thanks to the Afghans and the courage of the two candidates, both of whom I spoke to last week, the candidates have agreed to abide by the results of a comprehensive and internationally supervised audit that will review all the ballots, and to form a unity government.  If they keep their commitments, Afghanistan will witness the first democratic transfer of power in the history of that nation.

This progress will honor both candidates who have put the interests of a united Afghanistan first, the millions of Afghans who defied threats in order to vote, and the service of our troops and civilians who have sacrificed so much.  This progress reminds us that even as our combat mission in Afghanistan ends this year, America's commitment to a sovereign, united, and democratic Afghanistan will endure –- along with our determination that Americans are never again threatened by terrorists inside of Afghanistan.

Second, John updated me on the negotiations with Iran over its nuclear program.  Over the last six months, Iran has met its commitments under the interim deal we reached last year -- halting the progress of its nuclear program, allowing more inspections and rolling back its more dangerous stockpile of nuclear material.  Meanwhile, we are working with our P5-plus-1 partners and Iran to reach a comprehensive agreement that assures us that Iran's program will, in fact, be peaceful and that they won't obtain a nuclear weapon.

Based on consultations with Secretary Kerry and my national security team, it's clear to me that we have made real progress in several areas and that we have a credible way forward.  But as we approach a deadline of July 20th under the interim deal, there are still some significant gaps between the international community and Iran, and we have more work to do.  So over the

**UCP000275**

EXHIBIT 48, PAGE 481

next few days, we'll continue consulting with Congress -- and our team will continue discussions with Iran and our partners –- as we determine whether additional time is necessary to extend our negotiations.

Third, we continue to support diplomatic efforts to end the violence between Israel and Hamas.  As I've said repeatedly, Israel has a right to defend itself from rocket attacks that terrorize the Israeli people.  There is no country on Earth that can be expected to live under a daily barrage of rockets.  And I'm proud that the Iron Dome system that Americans helped Israel develop and fund has saved many Israeli lives.

But over the past two weeks, we've all been heartbroken by the violence, especially the death and injury of so many innocent civilians in Gaza —- men, women and children who were caught in the crossfire.  That's why we have been working with our partners in the region to pursue a cease-fire -- to protect civilians on both sides.  Yesterday, Israel did agree to a cease-fire. Unfortunately, Hamas continued to fire rockets at civilians, thereby prolonging the conflict.

But the Israeli people and the Palestinian people don't want to live like this. They deserve to live in peace and security, free from fear.  And that's why we are going to continue to encourage diplomatic efforts to restore the cease-fire, and we support Egypt's continued efforts to bring this about.  Over the next 24 hours we'll continue to stay in close contact with our friends and parties in the region, and we will use all of our diplomatic resources and relationships to support efforts of closing a deal on a cease-fire.  In the meantime, we're going to continue to stress the need to protect civilians -- in Gaza and in Israel –- and to avoid further escalation.

Finally, given its continued provocations in Ukraine, today I have approved a new set of sanctions on some of Russia's largest companies and financial institutions. Along with our allies, with whom I've been coordinating closely the last several days and weeks, I've repeatedly made it clear that Russia must halt the flow of weapons and fighters across the border into Ukraine; that Russia must urge separatists to release their hostages and support a cease-fire; that Russia needs to pursue internationally-mediated talks and agree to meaningful monitors on the border.  I've made this clear directly to Mr. Putin. Many of our European partners have made this clear directly to Mr. Putin.  We have emphasized our preference to resolve this issue diplomatically but that

**UCP000276**

EXHIBIT 48, PAGE 482

we have to see concrete actions and not just words that Russia, in fact, is committed to trying to end this conflict along the Russia-Ukraine border.  So far, Russia has failed to take any of the steps that I mentioned.  In fact, Russia's support for the separatists and violations of Ukraine's sovereignty has continued.

On top of the sanctions we have already imposed, we are therefore designating selected sectors of the Russian economy as eligible for sanctions.  We are freezing the assets of several Russian defense companies.  And we are blocking new financing of some of Russia's most important banks and energy companies.  These sanctions are significant, but they are also targeted -- designed to have the maximum impact on Russia while limiting any spillover effects on American companies or those of our allies.

Now, we are taking these actions in close consultation with our European allies, who are meeting in Brussels to agree on their next steps.  And what we are expecting is that the Russian leadership will see, once again, that its actions in Ukraine have consequences, including a weakening Russian economy and increasing diplomatic isolation.

Meanwhile, we're going to continue to stand with the Ukrainian people as they seek to determine their own future.  Even in the midst of this crisis, they have made remarkable progress these past few months.  They held democratic elections, they elected a new president, they're pursuing important reforms, and they signed a new association agreement with the European Union.  And the United States will continue to offer our strong support to Ukraine to help stabilize its economy and defend its territorial integrity because -- like any people -- Ukrainians deserve the right to forge their own destiny.

So in closing, I'll point out the obvious.  We live in a complex world and at a challenging time.  And none of these challenges lend themselves to quick or easy solutions, but all of them require American leadership.  And as Commander-in-Chief, I'm confident that if we stay patient and determined, that we will, in fact, meet these challenges.

Thanks very much.


END
5:53 P.M. EDT


**UCP000277**

EXHIBIT 48, PAGE 483



**HOME**     **BRIEFING ROOM**     **ISSUES**     **THE ADMINISTRATION**     **PARTICIPATE**     **1600 PENN**

En Español | Accessibility | Copyright Information | Privacy Policy | USA.gov

**UCP000278**

EXHIBIT 48, PAGE 484

# EXHIBIT 49

INTERNET ARCHIVE
WaybackMachine
73 captures
21 Jan 14 - 16 Apr 16

http://travel.state.gov/content/passports/english/alertswarnings/israel-travel-warnin    Go

MAR    JUL    AUG    Close
◄    24    ►
2013    2014    2015    Help

• 📧 Contact Us •  🇺🇸 Find U.S. Embassies & Consulates

SEARCH 🔍

# Israel, The West Bank and Gaza Travel Warning

LAST UPDATED: JULY 21, 2014

**The U.S. Department of State warns U.S. citizens of the risks of traveling to Israel, the West Bank and Gaza due to ongoing hostilities.**  The Department of State recommends that U.S. citizens consider the deferral of non-essential travel to Israel and the West Bank and reaffirms the longstanding strong warning to U.S. citizens against any travel to the Gaza Strip.  This Travel Warning replaces the Travel Warning issued on February 3, 2014.

The security environment remains complex in Israel, the West Bank, and Gaza, and U.S. citizens need to be aware of the risks of travel to these areas because of the current conflict between Hamas and Israel.  The Department of State continues its longstanding strong warning to U.S. citizens against travel to the Gaza Strip; U.S. government employees are not allowed to conduct official or personal travel there.  Please see the section below on the situation in the Gaza Strip.  Because of the security situation, the U.S. Embassy in Tel Aviv and its annexes are currently operating at reduced staffing and the Consular Section of the Embassy is providing only emergency consular services.  The U.S. Consulate General in Jerusalem is currently maintaining normal operations, including consular services.

Long-range rockets launched from Gaza since July 8, 2014 have reached many locations in Israel – including Tel Aviv, cities farther north, and throughout the south of the country. Some rockets have reached Jerusalem and parts of the West Bank, including Bethlehem and Hebron.  While many rockets have been intercepted by the Iron Dome missile defense system, there have been impacts that have caused damage and injury.  In light of the ongoing rocket attacks, U.S. citizen visitors to and U.S. citizen residents of Israel and the West Bank should familiarize themselves with the location of the nearest bomb shelter or other hardened site, if available.  Visitors should seek information on shelters from hotel staff or building managers.  Consult city municipality websites, such as those for Jerusalem and Tel Aviv, for lists of public bomb shelters and other emergency preparedness information.  Visitors should follow the instructions of the Home Front Command on proper procedures in the event of rocket attacks.

Travelers should avoid areas of Israel in the vicinity of the Gaza Strip due to the real risks presented by small arms fire, anti-tank weapons, rockets, and mortars, as attacks from Gaza can come with little or no warning.  Both Embassy and Consulate General personnel are currently not permitted to travel south of greater Tel Aviv without prior approval.  On July 17, 2014 Israel announced the commencement of ground operations in Gaza. Visitors to these areas should remain aware of their surroundings and should take note of announcements and guidance provided by the Home Front Command.

Ben Gurion Airport is currently open and commercial flights are operating normally, although delays and cancellations can occur. Travelers should check with their airline prior to their planned travel to verify the flight schedule.  U.S. citizens seeking to depart Israel or the West Bank are responsible for making their own travel arrangements.

We are not evacuating U.S. citizens out of Israel.  U.S. government-facilitated evacuations occur only when no safe commercial alternatives exist. Evacuation assistance is provided on a cost-recovery basis, which means the traveler must reimburse the U.S. government for travel costs. The lack of a valid U.S. passport may hinder U.S. citizens' ability to depart the country and may slow the U.S. Embassy or Consulate General's ability to provide assistance.

U.S. citizens who do travel to or remain in Israel, the West Bank and Gaza should take into consideration the rules governing travel by U.S. government employees:

• U.S. government personnel are not permitted to conduct official or personal travel to the Gaza Strip;

**UCP000292**

EXHIBIT 49, PAGE 485

... personnel are ~~prohibited from traveling~~ ... West Bank; ... for official ... with special security arrangements coordinated by the U.S. Consulate General in Jerusalem; Currently, because of the security situation, U.S. government personnel are not permitted to travel south of greater Tel Aviv without prior approval;

- U.S. government personnel must notify Embassy Tel Aviv's Regional Security Officer before traveling in the areas of the Golan Heights and are prohibited from traveling east of Rt. 98 in the Golan Heights;
- U.S. government personnel are not permitted to use public buses anywhere in Israel or the West Bank due to past attacks on public transportation.

## Major Metropolitan Areas in Israel

Personal safety conditions in major metropolitan areas, including Tel Aviv and Haifa and their surrounding regions, are comparable to or better than those in other major global cities. Please see below for specific information regarding Jerusalem. Visitors should observe appropriate personal security practices to reduce their vulnerability to crime, particularly late at night or in isolated or economically depressed areas, including in the countryside. Visitors are advised to avoid large gatherings or demonstrations and keep current with local news, which is available through numerous English language sources.

The Government of Israel has had a long-standing policy of issuing gas masks to its citizens and, starting in 2010, it began issuing replacement masks. It stopped this distribution process in early 2014 in response to regional events. Visitors and foreign residents in Israel are not issued masks and must individually procure them, if desired. The U.S. Embassy and Consulate General do not provide gas masks for persons who are not U.S. government employees or their dependents. For further emergency preparedness guidance, please visit the website of the Government of Israel's Home Front Command, which provides information on how to choose a secure space in a home or apartment, as well as a list of the types of protective kits (gas masks) issued by the Government of Israel to its citizens.

## Gaza Vicinity

The Department of State recommends against travel to areas of Israel in the vicinity of the Gaza Strip. Travelers should be aware of the risks presented by the current military conflict between Hamas and Israel. On July 17, 2014 Israel announced the commencement of ground operations in Gaza. Travelers in the regions immediately bordering Gaza may encounter small arms fire, anti-tank weapons, rockets, and mortars launched from inside Gaza toward Israeli cities and towns. These attacks can come with little or no warning. Visitors to these areas should remain aware of their surroundings and of the location of bomb shelters and should take note of announcements and guidance provided by the Home Front Command.

Travelers should also be aware of the heightened state of alert maintained by Israeli authorities along Israel's border with Egypt. There have been cross-border incidents from Egypt, including rocket attacks and ground incursions, such as an attack that took place in August 2013 and one on January 20, 2014. Rockets were fired from Sinai in the direction of Eilat on July 15, 2014.

## Northern Israel

Rocket attacks into Israel from Lebanon have occurred without warning along the Israeli-Lebanese border. Tensions have increased along portions of the Disengagement Zone with Syria in the Golan Heights as a result of the internal conflict occurring in Syria. Sporadic gunfire has occurred along the border region. There have been several incidents of mortar shells and light arms fire impacting on the Israeli-controlled side of the zone as a result of spillover from the fighting in Syria. Travelers should be aware that cross-border gunfire can occur without warning. Furthermore, there are active land mines in areas of the Golan Heights, so visitors should walk only on established roads or trails. The Syrian conflict is sporadic and unpredictable. U.S. government personnel must notify the Embassy's Regional Security Office in advance if they plan to visit the Golan Heights and are prohibited from traveling east of Rt. 98 in the Golan Heights.

## Jerusalem

U.S. citizens should be aware of the possibility of isolated street protests, particularly within the Old City and areas around Salah Ed-Din Street, Damascus Gate, Silwan, and the Sheikh Jarrah neighborhood. Travelers should exercise caution at religious sites on Fridays and on holy days, including during Ramadan. U.S. government employees are prohibited from entering the Old City on Fridays during the month of Ramadan due to congestion and security-related access restrictions.

U.S. government employees are prohibited from transiting Independence Park in central Jerusalem during the hours of darkness due to reports of criminal activity.

The Consulate General notes that recent demonstrations and clashes in several East Jerusalem areas, such as Shufat, Beit Hanina, Mt. of Olives, As Suwaneh, Abu Deis, Silwan, Shuafat Refugee Camp, inside the Old City (near Lions Gate), Issawiyeh, and Tsur Baher appear to have diminished, although the possibility exists of renewed clashes in the same areas during evenings.

**UCP000293**

https://web.archive.org/web/20140724171638/http://travel.state.gov/content/passports/engl...    5/18/2016

the clashes and demonstrations. U.S. citizens and other foreigners in the area should be careful. The Israel National Police (INP) are continuing to patrol many of the neighborhoods that have had clashes and may restrict vehicular traffic in some of these neighborhoods without notice. We advise citizens not to enter any neighborhoods restricted by the INP and to avoid all locations that have active clashes ongoing.

The Shufat neighborhood of Jerusalem remains off-limits for official U.S. personnel and their families at night until further notice. The Old City of Jerusalem is also off-limits every day after dark for official U.S. personnel and their families until further notice. Official U.S. personnel are restricted from the Old City of Jerusalem at all times on Fridays during Ramadan. The Friday restriction is part of our standard policy, due to overall congestion and large crowds, and is not related to recent events.

## The West Bank

The Department of State urges U.S. citizens to exercise caution when traveling to the West Bank.  Demonstrations and violent incidents can occur without warning, and vehicles are regularly targeted by rocks, Molotov cocktails, and gunfire on West Bank roads.  U.S citizens have been killed in such attacks.  There have also been an increasing number of violent incidents involving Israeli settlers and Palestinian villagers in the corridor stretching from Ramallah to Nablus, including attacks by Israeli settlers on Palestinian villages in which U.S. citizens have suffered injury or property damage, and attacks by Palestinians on settlements. U.S. citizens can be caught in the middle of potentially dangerous situations, and some U.S. citizens involved in political demonstrations in the West Bank have sustained serious injuries.  The Department of State recommends that U.S. citizens, for their own safety, avoid all demonstrations.  During periods of unrest, the Israeli Government may restrict access to the West Bank, and some areas may be placed under curfew.  All persons in areas under curfew should remain indoors to avoid arrest or injury.  Security conditions in the West Bank may hinder the ability of consular staff to offer timely assistance to U.S. citizens.

Personal travel in the West Bank by U.S. government personnel and their families is permitted to the towns of Bethlehem and Jericho and on Routes 1, 443, and 90.  Personal travel is also permitted to Qumran off Route 90 by the Dead Sea, as are stops at roadside facilities along Routes 1 and 90.  All other personal travel by U.S. government personnel in the West Bank is prohibited. U.S. government personnel routinely travel to the West Bank for official business, but do so with special security arrangements.

## The Gaza Strip

The Department of State strongly urges U.S. citizens to avoid all travel to the Gaza Strip, which is under the control of Hamas, a foreign terrorist organization.  U.S. citizens in Gaza are advised to depart immediately.  The security environment within Gaza, including its border with Egypt and its seacoast, is dangerous and volatile.  Exchanges of fire between the Israel Defense Forces and militant groups in Gaza take place regularly, and civilians have been caught in the crossfire in the past.  Although the Rafah crossing between Gaza and Egypt normally allows for some passenger travel, prior coordination with local authorities -- which could take days or weeks to process -- is generally required, and crossing points may be closed for days or weeks.  Travelers who enter the Gaza Strip through the Rafah crossing must also exit through the Rafah crossing, and those entering the Gaza Strip may not be able to depart at a time of their choosing.  Many U.S. citizens have been unable to exit Gaza or faced lengthy delays in doing so.  Furthermore, the schedule and requirements for exiting through the Rafah crossing are unpredictable and can involve significant expense.  Because U.S. citizen employees of the U.S. government are not allowed to enter the Gaza Strip or have contact with Hamas, the ability of consular staff to offer timely assistance to U.S. citizens, including assistance departing Gaza, is extremely limited.

## Entry/Exit Difficulties

Some U.S. citizens holding Israeli nationality, possessing a Palestinian identity card, or who are of Arab or Muslim origin have experienced significant difficulties in entering or exiting Israel or the West Bank. U.S. citizens planning to travel to Israel, the West Bank, or Gaza should consult the detailed information concerning entry and exit difficulties in the Country Specific Information.

Contact the Consular Section of the U.S. Embassy for information and assistance in Israel, the Golan Heights, and ports of entry at Ben Gurion Airport, Haifa Port, the northern (Jordan River/Sheikh Hussein) and southern (Arava) border crossings connecting Israel and Jordan, and the border crossings between Israel and Egypt.  An embassy officer can be contacted at (972) (3) 519-7575 from Monday through Friday during working hours.  The after-hours emergency number is (972) (3) 519-7551.

Contact the Consular Section of the U.S. Consulate General in Jerusalem for information and assistance in Jerusalem, the West Bank, the Gaza Strip, and the Allenby/King Hussein Bridge crossing between the West Bank and Jordan, at (972) (2) 630-4000 from Monday through Friday during working hours.  The after-hours emergency number is (972) (2) 622-7250.

## For More Information

**UCP000294**

EXHIBIT 49, PAGE 487

The Department of State urges U.S. citizens who live or travel in Israel, the West Bank or Gaza to enroll in the U.S. Department of State's Smart Traveler Enrollment Program (STEP) in order to obtain the most current information on travel and security within Israel, the West Bank and Gaza.  Enrollment in STEP makes it easier for the Embassy or Consulate to contact U.S. citizens in case of emergency.

For information on "What the Department of State Can and Can't Do in a Crisis," please visit the Bureau of Consular Affairs' Emergencies and Crisis link at www.travel.state.gov

For the latest security information, U.S. citizens traveling abroad should regularly monitor the Department of State's Internet website where the Worldwide Caution, Country Specific Information for Israel, the West Bank and Gaza, Travel Warnings, and Travel Alerts can be found, including the current Travel Warning for Israel, the West Bank and Gaza.  You can also follow the Bureau of Consular Affairs on Twitter and Facebook.  Up-to-date information on security conditions can also be accessed at http://israel.usembassy.gov, http://jerusalem.usconsulate.gov or on the Embassy and Consulate General Facebook pages.

Up-to-date information on travel and security in Israel, the West Bank and Gaza can also be obtained by calling 1-888-407-4747 toll-free in the United States and Canada, or, for callers outside of the United States and Canada, on a regular toll-line at 1-202-501-4444.  These numbers are available from 8:00 a.m. to 8:00 p.m. Eastern Time, Monday through Friday (except U.S. federal holidays).

**Embassies & Consulates**

- About Us
- Newsroom
- Passport Statistics
- Legal Considerations

- Find a U.S. Embassy or Consulate
- Contact Us
- Careers
- Consular Notification and Access

STAY CONNECTED

- Dipnote Blog
- Facebook
- Flickr

- @travelgov
- Youtube
- RSS

- travel.state.gov
- U.S. Passports & International Travel
- Students Abroad
- U.S. Visa
- Intercountry Adoption
- International Parental Child Abduction

Privacy • Copyright & Disclaimer • FOIA • No FEAR Act Data • Office of the Inspector General • USA.gov • GobiernoUSA.gov

This site is managed by the Bureau of Consular Affairs, U.S. Department of State.

**UCP000295**

EXHIBIT 49, PAGE 488

# EXHIBIT 50

Yale Law School
LILLIAN GOLDMAN LAW LIBRARY
in memory of Sol Goldman

THE AVALON PROJECT *Documents in Law, History and Diplomacy*

| Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 - |

## Hamas Covenant 1988

### The Covenant
### of the
### Islamic Resistance Movement

#### 18 August 1988

#### In The Name Of The Most Merciful Allah

"Ye are the best nation that hath been raised up unto mankind: ye command that which is just, and ye forbid that which is unjust, and ye believe in Allah. And if they who have received the scriptures had believed, it had surely been the better for them: there are believers among them, but the greater part of them are transgressors. They shall not hurt you, unless with a slight hurt; and if they fight against you, they shall turn their backs to you, and they shall not be helped. They are smitten with vileness wheresoever they are found; unless they obtain security by entering into a treaty with Allah, and a treaty with men; and they draw on themselves indignation from Allah, and they are afflicted with poverty. This they suffer, because they disbelieved the signs of Allah, and slew the prophets unjustly; this, because they were rebellious, and transgressed." (Al-Imran - verses 109-111).

Israel will exist and will continue to exist until Islam will obliterate it, just as it obliterated others before it" (The Martyr, Imam Hassan al-Banna, of blessed memory).

"The Islamic world is on fire. Each of us should pour some water, no matter how little, to extinguish whatever one can without waiting for the others." (Sheikh Amjad al-Zahawi, of blessed memory).

#### In The Name Of The Most Merciful Allah

Introduction
Praise be unto Allah, to whom we resort for help, and whose forgiveness, guidance and support we seek; Allah bless the Prophet and grant him salvation, his companions and supporters, and to those who carried out his message and adopted his laws - everlasting prayers and salvation as long as the earth and heaven will last. Hereafter:

O People:
Out of the midst of troubles and the sea of suffering, out of the palpitations of faithful hearts and cleansed arms; out of the sense of duty, and in response to Allah's command, the call has gone out rallying people together and making them follow the ways of Allah, leading them to have determined will in order to fulfill their role in life, to overcome all obstacles, and surmount the difficulties on the way. Constant preparation has continued and so has the readiness to sacrifice life and all that is precious for the sake of Allah.

Thus it was that the nucleus (of the movement) was formed and started to pave its way through the tempestuous sea of hopes and expectations, of wishes and yearnings, of troubles and obstacles, of pain and challenges, both inside and outside.

When the idea was ripe, the seed grew and the plant struck root in the soil of reality, away from passing emotions, and hateful haste. The Islamic Resistance Movement emerged to carry out its role through striving for the sake of its Creator, its arms intertwined with those of all the fighters for the liberation of Palestine. The spirits of its fighters meet with the spirits of all the fighters who have sacrificed their lives on the soil of Palestine, ever since it was conquered by the companions of the Prophet, Allah bless him and grant him salvation, and until this day.

This Covenant of the Islamic Resistance Movement (HAMAS), clarifies its picture, reveals its identity, outlines its stand, explains its aims, speaks about its hopes, and calls for its support, adoption and joining its ranks. Our struggle against the Jews is very great and very serious. It needs all sincere efforts. It is a step that inevitably should be followed by other steps. The Movement is but one squadron that should be supported by more and more squadrons from this vast Arab and Islamic world, until the enemy is vanquished and Allah's victory is realised.

Thus we see them coming on the horizon "and you shall learn about it hereafter" "Allah hath written, Verily I will prevail, and my apostles: for Allah is strong and mighty." (The Dispute - verse 21).

"Say to them, This is my way: I invite you to Allah, by an evident demonstration; both I and he who followeth me; and, praise be unto Allah! I am not an idolator." (Joseph - verse 107).

Hamas (means) *strength and bravery* -(according to) Al-Mua'jam al-Wasit: c1.

## Definition of the Movement

#### Ideological Starting-Points

### Article One:

The Islamic Resistance Movement: The Movement's programme is Islam. From it, it draws its ideas, ways of thinking and understanding of the universe, life and man. It resorts to it for judgement in all its conduct, and it is inspired by it for guidance of its steps.

EXHIBIT 50, PAGE 489

The Islamic Resistance Movement's Position With the Moslem Brotherhood Group:

## Article Two:

The Islamic Resistance Movement is one of the wings of Moslem Brotherhood in Palestine. Moslem Brotherhood Movement is a universal organization which constitutes the largest Islamic movement in modern times. It is characterised by its deep understanding, accurate comprehension and its complete embrace of all Islamic concepts of all aspects of life, culture, creed, politics, economics, education, society, justice and judgement, the spreading of Islam, education, art, information, science of the occult and conversion to Islam.

### Structure and Formation

## Article Three:

The basic structure of the Islamic Resistance Movement consists of Moslems who have given their allegiance to Allah whom they truly worship, - "I have created the jinn and humans only for the purpose of worshipping" - who know their duty towards themselves, their families and country. In all that, they fear Allah and raise the banner of Jihad in the face of the oppressors, so that they would rid the land and the people of their uncleanliness, vileness and evils.

"But we will oppose truth to vanity, and it shall confound the same; and behold, it shall vanish away." (Prophets - verse 18).

## Article Four:

The Islamic Resistance Movement welcomes every Moslem who embraces its faith, ideology, follows its programme, keeps its secrets, and wants to belong to its ranks and carry out the duty. Allah will certainly reward such one.

### Time and Place Extent of the Islamic Resistance Movement:

## Article Five:

Time extent of the Islamic Resistance Movement: By adopting Islam as its way of life, the Movement goes back to the time of the birth of the Islamic message, of the righteous ancestor, for Allah is its target, the Prophet is its example and the Koran is its constitution. Its extent in place is anywhere that there are Moslems who embrace Islam as their way of life everywhere in the globe. This being so, it extends to the depth of the earth and reaches out to the heaven.

"Dost thou not see how Allah putteth forth a parable; representing a good word, as a good tree, whose root is firmly fixed in the earth, and whose branches reach unto heaven; which bringeth forth its fruit in all seasons, by the will of its Lord? Allah propoundeth parables unto men, that they may be instructed." (Abraham - verses 24-25).

### Characteristics and Independence:

## Article Six:

The Islamic Resistance Movement is a distinguished Palestinian movement, whose allegiance is to Allah, and whose way of life is Islam. It strives to raise the banner of Allah over every inch of Palestine, for under the wing of Islam followers of all religions can coexist in security and safety where their lives, possessions and rights are concerned. In the absence of Islam, strife will be rife, oppression spreads, evil prevails and schisms and wars will break out.

How excellent was the Moslem poet, Mohamed Ikbal, when he wrote:

"If faith is lost, there is no security and there is no life for him who does not adhere to religion. He who accepts life without religion, has taken annihilation as his companion for life."

### The Universality of the Islamic Resistance Movement:

## Article Seven:

As a result of the fact that those Moslems who adhere to the ways of the Islamic Resistance Movement spread all over the world, rally support for it and its stands, strive towards enhancing its struggle, the Movement is a universal one. It is well-equipped for that because of the clarity of its ideology, the nobility of its aim and the loftiness of its objectives.

On this basis, the Movement should be viewed and evaluated, and its role be recognised. He who denies its right, evades supporting it and turns a blind eye to facts, whether intentionally or unintentionally, would awaken to see that events have overtaken him and with no logic to justify his attitude. One should certainly learn from past examples.

The injustice of next-of-kin is harder to bear than the smite of the Indian sword.

"We have also sent down unto thee the book of the Koran with truth, confirming that scripture which was revealed before it; and preserving the same safe from corruption. Judge therefore between them according to that which Allah hath revealed; and follow not their desires, by swerving from the truth which hath come unto thee. Unto every of you have we given a law, and an open path; and if Allah had pleased, he had surely made you one people; but he hath thought it fit to give you different laws, that he might try you in that which he hath given you respectively. Therefore strive to excel each other in good works; unto Allah shall ye all return, and then will he declare unto you that concerning which ye have disagreed." (The Table, verse 48).

The Islamic Resistance Movement is one of the links in the chain of the struggle against the Zionist invaders. It goes back to 1939, to the emergence of the martyr Izz al-Din al Kissam and his brethren the fighters, members of Moslem Brotherhood. It goes on to reach out and become one with another chain that includes the struggle of the Palestinians and Moslem Brotherhood in the 1948 war and the Jihad operations of the Moslem Brotherhood in 1968 and after.

Moreover, if the links have been distant from each other and if obstacles, placed by those who are the lackeys of Zionism in the way of the fighters obstructed the continuation of the struggle, the Islamic Resistance Movement aspires to the realisation of Allah's promise, no matter how long

UCP035339

EXHIBIT 50, PAGE 490

that should take. The Prophet, Allah bless him and grant him salvation, said:

"The Day of Judgement will not come about until Moslems fight the Jews (killing the Jews), when the Jew will hide behind stones and trees. The stones and trees will say O Moslems, O Abdulla, there is a Jew behind me, come and kill him. Only the Gharkad tree, (evidently a certain kind of tree) would not do that because it is one of the trees of the Jews." (related by al-Bukhari and Moslem).

**The Slogan of the Islamic Resistance Movement:**

## Article Eight:

Allah is its target, the Prophet is its model, the Koran its constitution: Jihad is its path and death for the sake of Allah is the loftiest of its wishes.

# Objectives

Incentives and Objectives:

## Article Nine:

The Islamic Resistance Movement found itself at a time when Islam has disappeared from life. Thus rules shook, concepts were upset, values changed and evil people took control, oppression and darkness prevailed, cowards became like tigers: homelands were usurped, people were scattered and were caused to wander all over the world, the state of justice disappeared and the state of falsehood replaced it. Nothing remained in its right place. Thus, when Islam is absent from the arena, everything changes. From this state of affairs the incentives are drawn.

As for the objectives: They are the fighting against the false, defeating it and vanquishing it so that justice could prevail, homelands be retrieved and from its mosques would the voice of the mu'azen emerge declaring the establishment of the state of Islam, so that people and things would return each to their right places and Allah is our helper.

"...and if Allah had not prevented men, the one by the other, verily the earth had been corrupted: but Allah is beneficient towards his creatures." (The Cow - verse 251).

## Article Ten:

As the Islamic Resistance Movement paves its way, it will back the oppressed and support the wronged with all its might. It will spare no effort to bring about justice and defeat injustice, in word and deed, in this place and everywhere it can reach and have influence therein.

# Strategies and Methods

**Strategies of the Islamic Resistance Movement: Palestine Is Islamic aqf:**

## Article Eleven:

The Islamic Resistance Movement believes that the land of Palestine is an Islamic Waqf consecrated for future Moslem generations until Judgement Day. It, or any part of it, should not be squandered: it, or any part of it, should not be given up. Neither a single Arab country nor all Arab countries, neither any king or president, nor all the kings and presidents, neither any organization nor all of them, be they Palestinian or Arab, possess the right to do that. Palestine is an Islamic Waqf land consecrated for Moslem generations until Judgement Day. This being so, who could claim to have the right to represent Moslem generations till Judgement Day?

This is the law governing the land of Palestine in the Islamic Sharia (law) and the same goes for any land the Moslems have conquered by force, because during the times of (Islamic) conquests, the Moslems consecrated these lands to Moslem generations till the Day of Judgement.

It happened like this: When the leaders of the Islamic armies conquered Syria and Iraq, they sent to the Caliph of the Moslems, Umar bin-el-Khatab, asking for his advice concerning the conquered land - whether they should divide it among the soldiers, or leave it for its owners, or what? After consultations and discussions between the Caliph of the Moslems, Omar bin-el-Khatab and companions of the Prophet, Allah bless him and grant him salvation, it was decided that the land should be left with its owners who could benefit by its fruit. As for the real ownership of the land and the land itself, it should be consecrated for Moslem generations till Judgement Day. Those who are on the land, are there only to benefit from its fruit. This Waqf remains as long as earth and heaven remain. Any procedure in contradiction to Islamic Sharia, where Palestine is concerned, is null and void.

"Verily, this is a certain truth. Wherefore praise the name of thy Lord, the great Allah." (The Inevitable - verse 95).

**Homeland and Nationalism from the Point of View of the Islamic Resistance Movement in Palestine:**

## Article Twelve:

Nationalism, from the point of view of the Islamic Resistance Movement, is part of the religious creed. Nothing in nationalism is more significant or deeper than in the case when an enemy should tread Moslem land. Resisting and quelling the enemy become the individual duty of every Moslem, male or female. A woman can go out to fight the enemy without her husband's permission, and so does the slave: without his master's permission.

Nothing of the sort is to be found in any other regime. This is an undisputed fact. If other nationalist movements are connected with materialistic, human or regional causes, nationalism of the Islamic Resistance Movement has all these elements as well as the more important elements that give it soul and life. It is connected to the source of spirit and the granter of life, hoisting in the sky of the homeland the heavenly banner that joins earth and heaven with a strong bond.

If Moses comes and throws his staff, both witch and magic are annulled.

"Now is the right direction manifestly distinguished from deceit: whoever therefore shall deny Tagut, and believe in Allah, he shall surely take hold with a strong handle, which shall not be broken; Allah is he who heareth and seeth." (The Cow - Verse 256).

**Peaceful Solutions, Initiatives and International Conferences:**

EXHIBIT 50, PAGE 491

**Article Thirteen:**

Initiatives, and so-called peaceful solutions and international conferences, are in contradiction to the principles of the Islamic Resistance Movement. Abusing any part of Palestine is abuse directed against part of religion. Nationalism of the Islamic Resistance Movement is part of its religion. Its members have been fed on that. For the sake of hoisting the banner of Allah over their homeland they fight. "Allah will be prominent, but most people do not know."

Now and then the call goes out for the convening of an international conference to look for ways of solving the (Palestinian) question. Some accept, others reject the idea, for this or other reason, with one stipulation or more for consent to convening the conference and participating in it. Knowing the parties constituting the conference, their past and present attitudes towards Moslem problems, the Islamic Resistance Movement does not consider these conferences capable of realising the demands, restoring the rights or doing justice to the oppressed. These conferences are only ways of setting the infidels in the land of the Moslems as arbitraters. When did the infidels do justice to the believers?

"But the Jews will not be pleased with thee, neither the Christians, until thou follow their religion; say, The direction of Allah is the true direction. And verily if thou follow their desires, after the knowledge which hath been given thee, thou shalt find no patron or protector against Allah." (The Cow - verse 120).

There is no solution for the Palestinian question except through Jihad. Initiatives, proposals and international conferences are all a waste of time and vain endeavors. The Palestinian people know better than to consent to having their future, rights and fate toyed with. As in said in the honourable Hadith:

"The people of Syria are Allah's lash in His land. He wreaks His vengeance through them against whomsoever He wishes among His slaves It is unthinkable that those who are double-faced among them should prosper over the faithful. They will certainly die out of grief and desperation."

**The Three Circles:**

## Article Fourteen:

The question of the liberation of Palestine is bound to three circles: the Palestinian circle, the Arab circle and the Islamic circle. Each of these circles has its role in the struggle against Zionism. Each has its duties, and it is a horrible mistake and a sign of deep ignorance to overlook any of these circles. Palestine is an Islamic land which has the first of the two kiblahs (direction to which Moslems turn in praying), the third of the holy (Islamic) sanctuaries, and the point of departure for Mohamed's midnight journey to the seven heavens (i.e. Jerusalem).

"Praise be unto him who transported his servant by night, from the sacred temple of Mecca to the farther temple of Jerusalem, the circuit of which we have blessed, that we might show him some of our signs; for Allah is he who heareth, and seeth." (The Night-Journey - verse 1).

Since this is the case, liberation of Palestine is then an individual duty for very Moslem wherever he may be. On this basis, the problem should be viewed. This should be realised by every Moslem.

The day the problem is dealt with on this basis, when the three circles mobilize their capabilities, the present state of affairs will change and the day of liberation will come nearer.

"Verily ye are stronger than they, by reason of the terror cast into their breasts from Allah. This, because they are not people of prudence." (The Emigration - verse 13).

**The Jihad for the Liberation of Palestine is an Individual Duty:**

## Article Fifteen:

The day that enemies usurp part of Moslem land, Jihad becomes the individual duty of every Moslem. In face of the Jews' usurpation of Palestine, it is compulsory that the banner of Jihad be raised. To do this requires the diffusion of Islamic consciousness among the masses, both on the regional, Arab and Islamic levels. It is necessary to instill the spirit of Jihad in the heart of the nation so that they would confront the enemies and join the ranks of the fighters.

It is necessary that scientists, educators and teachers, information and media people, as well as the educated masses, especially the youth and sheikhs of the Islamic movements, should take part in the operation of awakening (the masses). It is important that basic changes be made in the school curriculum, to cleanse it of the traces of ideological invasion that affected it as a result of the orientalists and missionaries who infiltrated the region following the defeat of the Crusaders at the hands of Salah el-Din (Saladin). The Crusaders realised that it was impossible to defeat the Moslems without first having ideological invasion pave the way by upsetting their thoughts, disfiguring their heritage and violating their ideals. Only then could they invade with soldiers. This, in its turn, paved the way for the imperialistic invasion that made Allenby declare on entering Jerusalem: "Only now have the Crusades ended." General Guru stood at Salah el-Din's grave and said: "We have returned, O Salah el-Din." Imperialism has helped towards the strengthening of ideological invasion, deepening, and still does, its roots. All this has paved the way towards the loss of Palestine.

It is necessary to instill in the minds of the Moslem generations that the Palestinian problem is a religious problem, and should be dealt with on this basis. Palestine contains Islamic holy sites. In it there is al- Aqsa Mosque which is bound to the great Mosque in Mecca in an inseparable bond as long as heaven and earth speak of Isra` (Mohammed's midnight journey to the seven heavens) and Mi'raj (Mohammed's ascension to the seven heavens from Jerusalem).

"The bond of one day for the sake of Allah is better than the world and whatever there is on it. The place of one's whip in Paradise is far better than the world and whatever there is on it. A worshipper's going and coming in the service of Allah is better than the world and whatever there is on it." (As related by al-Bukhari, Moslem, al-Tarmdhi and Ibn Maja).

"I swear by the holder of Mohammed's soul that I would like to invade and be killed for the sake of Allah, then invade and be killed, and then invade again and be killed." (As related by al-Bukhari and Moslem).

**The Education of the Generations:**

## Article Sixteen:

UCP035341

EXHIBIT 50, PAGE 492

It is necessary to follow Islamic orientation in educating the Islamic generations in our region by teaching the religious duties, comprehensive study of the Koran, the study of the Prophet's Sunna (his sayings and doings), and learning about Islamic history and heritage from their authentic sources. This should be done by specialised and learned people, using a curriculum that would healthily form the thoughts and faith of the Moslem student. Side by side with this, a comprehensive study of the enemy, his human and financial capabilities, learning about his points of weakness and strength, and getting to know the forces supporting and helping him, should also be included. Also, it is important to be acquainted with the current events, to follow what is new and to study the analysis and commentaries made of these events. Planning for the present and future, studying every trend appearing, is a must so that the fighting Moslem would live knowing his aim, objective and his way in the midst of what is going on around him.

"O my son, verily every matter, whether good or bad, though it be the weight of a grain of mustard-seed, and be hidden in a rock, or in the heavens, or in the earth, Allah will bring the same to light; for Allah is clear-sighted and knowing. O my son, be constant at prayer, and command that which is just, and forbid that which is evil: and be patient under the afflictions which shall befall thee; for this is a duty absolutely incumbent on all men. Distort not thy face out of contempt to men, neither walk in the earth with insolence; for Allah loveth no arrogant, vain-glorious person." (Lokman - verses 16-18).

### The Role of the Moslem Woman:

## Article Seventeen:

The Moslem woman has a role no less important than that of the moslem man in the battle of liberation. She is the maker of men. Her role in guiding and educating the new generations is great. The enemies have realised the importance of her role. They consider that if they are able to direct and bring her up they way they wish, far from Islam, they would have won the battle. That is why you find them giving these attempts constant attention through information campaigns, films, and the school curriculum, using for that purpose their lackeys who are infiltrated through Zionist organizations under various names and shapes, such as Freemasons, Rotary Clubs, espionage groups and others, which are all nothing more than cells of subversion and saboteurs. These organizations have ample resources that enable them to play their role in societies for the purpose of achieving the Zionist targets and to deepen the concepts that would serve the enemy. These organizations operate in the absence of Islam and its estrangement among its people. The Islamic peoples should perform their role in confronting the conspiracies of these saboteurs. The day Islam is in control of guiding the affairs of life, these organizations, hostile to humanity and Islam, will be obliterated.

## Article Eighteen:

Woman in the home of the fighting family, whether she is a mother or a sister, plays the most important role in looking after the family, rearing the children and embuing them with moral values and thoughts derived from Islam. She has to teach them to perform the religious duties in preparation for the role of fighting awaiting them. That is why it is necessary to pay great attention to schools and the curriculum followed in educating Moslem girls, so that they would grow up to be good mothers, aware of their role in the battle of liberation.

She has to be of sufficient knowledge and understanding where the performance of housekeeping matters are concerned, because economy and avoidance of waste of the family budget, is one of the requirements for the ability to continue moving forward in the difficult conditions surrounding us. She should put before her eyes the fact that the money available to her is just like blood which should never flow except through the veins so that both children and grown-ups could continue to live.

"Verily, the Moslems of either sex, and the true believers of either sex, and the devout men, and the devout women, and the men of veracity, and the women of veracity, and the patient men, and the patient women, and the humble men, and the humble women, and the alms-givers of either sex who remember Allah frequently; for them hath Allah prepared forgiveness and a great reward." (The Confederates - verse 25).

### The Role of Islamic Art in the Battle of Liberation:

## Article Nineteen:

Art has regulations and measures by which it can be determined whether it is Islamic or pre-Islamic (Jahili) art. The issues of Islamic liberation are in need of Islamic art that would take the spirit high, without raising one side of human nature above the other, but rather raise all of them harmoniously an in equilibrium.

Man is a unique and wonderful creature, made out of a handful of clay and a breath from Allah. Islamic art addresses man on this basis, while pre-Islamic art addresses the body giving preference to the clay component in it.

The book, the article, the bulletin, the sermon, the thesis, the popular poem, the poetic ode, the song, the play and others, contain the characteristics of Islamic art, then these are among the requirements of ideological mobilization, renewed food for the journey and recreation for the soul. The road is long and suffering is plenty. The soul will be bored, but Islamic art renews the energies, resurrects the movement, arousing in them lofty meanings and proper conduct. "Nothing can improve the self if it is in retreat except shifting from one mood to another."

All this is utterly serious and no jest, for those who are fighters do not jest.

### Social Mutual Responsibility:

## Article Twenty:

Moslem society is a mutually responsible society. The Prophet, prayers and greetings be unto him, said: "Blessed are the generous, whether they were in town or on a journey, who have collected all that they had and shared it equally among themselves."

The Islamic spirit is what should prevail in every Moslem society. The society that confronts a vicious enemy which acts in a way similar to Nazism, making no differentiation between man and woman, between children and old people - such a society is entitled to this Islamic spirit. Our enemy relies on the methods of collective punishment. He has deprived people of their homeland and properties, pursued them in their places of exile and gathering, breaking bones, shooting at women, children and old people, with or without a reason. The enemy has opened detention camps where thousands and thousands of people are thrown and kept under sub-human conditions. Added to this, are the demolition of houses, rendering children orphans, meting cruel sentences against thousands of young people, and causing them to spend the best years of their lives in the dungeons of prisons.

In their Nazi treatment, the Jews made no exception for women or children. Their policy of striking fear in the heart is meant for all. They attack people where their breadwinning is concerned, extorting their money and threatening their honour. They deal with people as if they were the worst

UCP035342

EXHIBIT 50, PAGE 493

4/24/2017

war criminals. Deportation from the homeland is a kind of murder.

To counter these deeds, it is necessary that social mutual responsibility should prevail among the people. The enemy should be faced by the people as a single body which if one member of it should complain, the rest of the body would respond by feeling the same pains.

**Article Twenty-One:**

Mutual social responsibility means extending assistance, financial or moral, to all those who are in need and joining in the execution of some of the work. Members of the Islamic Resistance Movement should consider the interests of the masses as their own personal interests. They must spare no effort in achieving and preserving them. They must prevent any foul play with the future of the upcoming generations and anything that could cause loss to society. The masses are part of them and they are part of the masses. Their strength is theirs, and their future is theirs. Members of the Islamic Resistance Movement should share the people's joy and grief, adopt the demands of the public and whatever means by which they could be realised. The day that such a spirit prevails, brotherliness would deepen, cooperation, sympathy and unity will be enhanced and the ranks will be solidified to confront the enemies.

Supportive Forces Behind the Enemy:

**Article Twenty-Two:**

For a long time, the enemies have been planning, skillfully and with precision, for the achievement of what they have attained. They took into consideration the causes affecting the current of events. They strived to amass great and substantive material wealth which they devoted to the realisation of their dream. With their money, they took control of the world media, news agencies, the press, publishing houses, broadcasting stations, and others. With their money they stirred revolutions in various parts of the world with the purpose of achieving their interests and reaping the fruit therein. They were behind the French Revolution, the Communist revolution and most of the revolutions we heard and hear about, here and there. With their money they formed secret societies, such as Freemasons, Rotary Clubs, the Lions and others in different parts of the world for the purpose of sabotaging societies and achieving Zionist interests. With their money they were able to control imperialistic countries and instigate them to colonize many countries in order to enable them to exploit their resources and spread corruption there.

You may speak as much as you want about regional and world wars. They were behind World War I, when they were able to destroy the Islamic Caliphate, making financial gains and controlling resources. They obtained the Balfour Declaration, formed the League of Nations through which they could rule the world. They were behind World War II, through which they made huge financial gains by trading in armaments, and paved the way for the establishment of their state. It was they who instigated the replacement of the League of Nations with the United Nations and the Security Council to enable them to rule the world through them. There is no war going on anywhere, without having their finger in it.

"So often as they shall kindle a fire for war, Allah shall extinguish it; and they shall set their minds to act corruptly in the earth, but Allah loveth not the corrupt doers." (The Table - verse 64).

The imperialistic forces in the Capitalist West and Communist East, support the enemy with all their might, in money and in men. These forces take turns in doing that. The day Islam appears, the forces of infidelity would unite to challenge it, for the infidels are of one nation.

"O true believers, contract not an intimate friendship with any besides yourselves: they will not fail to corrupt you. They wish for that which may cause you to perish: their hatred hath already appeared from out of their mouths; but what their breasts conceal is yet more inveterate. We have already shown you signs of their ill will towards you, if ye understand." (The Family of Imran - verse 118).

It is not in vain that the verse is ended with Allah's words "if ye understand."

## Our Attitudes Towards:

### A. Islamic Movements:

**Article Twenty-Three:**

The Islamic Resistance Movement views other Islamic movements with respect and appreciation. If it were at variance with them on one point or opinion, it is in agreement with them on other points and understandings. It considers these movements, if they reveal good intentions and dedication to Allah, that they fall into the category of those who are trying hard since they act within the Islamic circle. Each active person has his share.

The Islamic Resistance Movement considers all these movements as a fund for itself. It prays to Allah for guidance and directions for all and it spares no effort to keep the banner of unity raised, ever striving for its realisation in accordance with the Koran and the Prophet's directives.

"And cleave all of you unto the covenant of Allah, and depart not from it, and remember the favour of Allah towards you: since ye were enemies, and he reconciled your hearts, and ye became companions and brethren by his favour: and ye were on the brink of a pit of fire, and he delivered you thence. Allah declareth unto you his signs, that ye may be directed." (The Family of Imran - Verse 102).

**Article Twenty-Four:**

The Islamic Resistance Movement does not allow slandering or speaking ill of individuals or groups, for the believer does not indulge in such malpractices. It is necessary to differentiate between this behaviour and the stands taken by certain individuals and groups. Whenever those stands are erroneous, the Islamic Resistance Movement preserves the right to expound the error and to warn against it. It will strive to show the right path and to judge the case in question with objectivity. Wise conduct is indeed the target of the believer who follows it wherever he discerns it.

"Allah loveth not the speaking ill of anyone in public, unless he who is injured call for assistance; and Allah heareth and knoweth: whether ye publish a good action, or conceal it, or forgive evil, verily Allah is gracious and powerful." (Women - verses 147-148).

### B. Nationalist Movements in the Palestinian Arena:

**Article Twenty-Five:**

The Islamic Resistance Movement respects these movements and appreciates their circumstances and the conditions surrounding and affecting them. It encourages them as long as they do not give their allegiance to the Communist East or the Crusading West. It confirms to all those who are integrated in it, or sympathetic towards it, that the Islamic Resistance Movement is a fighting movement that has a moral and enlightened look of life

UCP035343

EXHIBIT 50, PAGE 494

and the way it should cooperate with the other (movements). It detests opportunism and desires only the good of people, individuals and groups alike. It does not seek material gains, personal fame, nor does it look for a reward from others. It works with its own resources and whatever is at its disposal "and prepare for them whatever force you can", for the fulfilment of the duty, and the earning of Allah's favour. It has no other desire than that.

The Movement assures all the nationalist trends operating in the Palestinian arena for the liberation of Palestine, that it is there for their support and assistance. It will never be more than that, both in words and deeds, now and in the future. It is there to bring together and not to divide, to preserve and not to squander, to unify and not to throw asunder. It evaluates every good word, sincere effort and good offices. It closes the door in the face of side disagreements and does not lend an ear to rumours and slanders, while at the same time fully realising the right for self-defence.

Anything contrary or contradictory to these trends, is a lie disseminated by enemies or their lackeys for the purpose of sowing confusion, disrupting the ranks and occupy them with side issues.

"O true believers, if a wicked man come unto you with a tale, inquire strictly into the truth thereof; lest ye hurt people through ignorance, and afterwards repent of what ye have done." (The Inner Apartments - verse 6).

## Article Twenty-Six:

In viewing the Palestinian nationalist movements that give allegiance neither to the East nor the West, in this positive way, the Islamic Resistance Movement does not refrain from discussing new situations on the regional or international levels where the Palestinian question is concerned. It does that in such an objective manner revealing the extent of how much it is in harmony or contradiction with the national interests in the light of the Islamic point of view.

### C. The Palestinian Liberation Organization:

## Article Twenty-Seven:

The Palestinian Liberation Organization is the closest to the heart of the Islamic Resistance Movement. It contains the father and the brother, the next of kin and the friend. The Moslem does not estrange himself from his father, brother, next of kin or friend. Our homeland is one, our situation is one, our fate is one and the enemy is a joint enemy to all of us.

Because of the situations surrounding the formation of the Organization, of the ideological confusion prevailing in the Arab world as a result of the ideological invasion under whose influence the Arab world has fallen since the defeat of the Crusaders and which was, and still is, intensified through orientalists, missionaries and imperialists, the Organization adopted the idea of the secular state. And that it how we view it.

Secularism completely contradicts religious ideology. Attitudes, conduct and decisions stem from ideologies.

That is why, with all our appreciation for The Palestinian Liberation Organization - and what it can develop into - and without belittling its role in the Arab-Israeli conflict, we are unable to exchange the present or future Islamic Palestine with the secular idea. The Islamic nature of Palestine is part of our religion and whoever takes his religion lightly is a loser.

"Who will be adverse to the religion of Abraham, but he whose mind is infatuated? (The Cow - verse 130).

The day The Palestinian Liberation Organization adopts Islam as its way of life, we will become its soldiers, and fuel for its fire that will burn the enemies.

Until such a day, and we pray to Allah that it will be soon, the Islamic Resistance Movement's stand towards the PLO is that of the son towards his father, the brother towards his brother, and the relative to relative, suffers his pain and supports him in confronting the enemies, wishing him to be wise and well-guided.

"Stand by your brother, for he who is brotherless is like the fighter who goes to battle without arms. One's cousin is the wing one flies with - could the bird fly without wings?"

### D. Arab and Islamic Countries:

## Article Twenty-Eight:

The Zionist invasion is a vicious invasion. It does not refrain from resorting to all methods, using all evil and contemptible ways to achieve its end. It relies greatly in its infiltration and espionage operations on the secret organizations it gave rise to, such as the Freemasons, The Rotary and Lions clubs, and other sabotage groups. All these organizations, whether secret or open, work in the interest of Zionism and according to its instructions. They aim at undermining societies, destroying values, corrupting consciences, deteriorating character and annihilating Islam. It is behind the drug trade and alcoholism in all its kinds so as to facilitate its control and expansion.

Arab countries surrounding Israel are asked to open their borders before the fighters from among the Arab and Islamic nations so that they could consolidate their efforts with those of their Moslem brethren in Palestine.

As for the other Arab and Islamic countries, they are asked to facilitate the movement of the fighters from and to it, and this is the least thing they could do.

We should not forget to remind every Moslem that when the Jews conquered the Holy City in 1967, they stood on the threshold of the Aqsa Mosque and proclaimed that "Mohammed is dead, and his descendants are all women."

Israel, Judaism and Jews challenge Islam and the Moslem people. "May the cowards never sleep."

### E. Nationalist and Religious Groupings, Institutions, Intellectuals, The Arab and Islamic World:

The Islamic Resistance Movement hopes that all these groupings will side with it in all spheres, would support it, adopt its stand and solidify its activities and moves, work towards rallying support for it so that the Islamic people will be a base and a stay for it, supplying it with strategic depth an all human material and informative spheres, in time and in place. This should be done through the convening of solidarity conferences, the issuing of explanatory bulletins, favourable articles and booklets, enlightening the masses regarding the Palestinian issue, clarifying what confronts it and the conspiracies woven around it. They should mobilize the Islamic nations, ideologically, educationally and culturally, so that these peoples would be

UCP035344

### EXHIBIT 50, PAGE 495

equipped to perform their role in the decisive battle of liberation, just as they did when they vanquished the Crusaders and the Tatars and saved human civilization. Indeed, that is not difficult for Allah.

"Allah hath written, Verily I will prevail, and my apostles: for Allah is strong and mighty." (The Dispute - verse 21).

## Article Thirty:

Writers, intellectuals, media people, orators, educaters and teachers, and all the various sectors in the Arab and Islamic world - all of them are called upon to perform their role, and to fulfill their duty, because of the ferocity of the Zionist offensive and the Zionist influence in many countries exercised through financial and media control, as well as the consequences that all this lead to in the greater part of the world.

Jihad is not confined to the carrying of arms and the confrontation of the enemy. The effective word, the good article, the useful book, support and solidarity - together with the presence of sincere purpose for the hoisting of Allah's banner higher and higher - all these are elements of the Jihad for Allah's sake.

"Whosoever mobilises a fighter for the sake of Allah is himself a fighter. Whosoever supports the relatives of a fighter, he himself is a fighter." (related by al-Bukhari, Moslem, Abu-Dawood and al-Tarmadhi).

### F. Followers of Other Religions: The Islamic Resistance Movement Is A Humanistic Movement:

## Article Thirty-One:

The Islamic Resistance Movement is a humanistic movement. It takes care of human rights and is guided by Islamic tolerance when dealing with the followers of other religions. It does not antagonize anyone of them except if it is antagonized by it or stands in its way to hamper its moves and waste its efforts.

Under the wing of Islam, it is possible for the followers of the three religions - Islam, Christianity and Judaism - to coexist in peace and quiet with each other. Peace and quiet would not be possible except under the wing of Islam. Past and present history are the best witness to that.

It is the duty of the followers of other religions to stop disputing the sovereignty of Islam in this region, because the day these followers should take over there will be nothing but carnage, displacement and terror. Everyone of them is at variance with his fellow-religionists, not to speak about followers of other religionists. Past and present history are full of examples to prove this fact.

"They will not fight against you in a body, except in fenced towns, or from behind walls. Their strength in war among themselves is great: thou thinkest them to be united; but their hearts are divided. This, because they are people who do not understand." (The Emigration - verse 14).

Islam confers upon everyone his legitimate rights. Islam prevents the incursion on other people's rights. The Zionist Nazi activities against our people will not last for long. "For the state of injustice lasts but one day, while the state of justice lasts till Doomsday."

"As to those who have not borne arms against you on account of religion, nor turned you out of your dwellings, Allah forbiddeth you not to deal kindly with them, and to behave justly towards them; for Allah loveth those who act justly." (The Tried - verse 8).

### The Attempt to Isolate the Palestinian People:

## Article Thirty-Two:

World Zionism, together with imperialistic powers, try through a studied plan and an intelligent strategy to remove one Arab state after another from the circle of struggle against Zionism, in order to have it finally face the Palestinian people only. Egypt was, to a great extent, removed from the circle of the struggle, through the treacherous Camp David Agreement. They are trying to draw other Arab countries into similar agreements and to bring them outside the circle of struggle.

The Islamic Resistance Movement calls on Arab and Islamic nations to take up the line of serious and persevering action to prevent the success of this horrendous plan, to warn the people of the danger eminating from leaving the circle of struggle against Zionism. Today it is Palestine, tomorrow it will be one country or another. The Zionist plan is limitless. After Palestine, the Zionists aspire to expand from the Nile to the Euphrates. When they will have digested the region they overtook, they will aspire to further expansion, and so on. Their plan is embodied in the "Protocols of the Elders of Zion", and their present conduct is the best proof of what we are saying.

Leaving the circle of struggle with Zionism is high treason, and cursed be he who does that. "for whoso shall turn his back unto them on that day, unless he turneth aside to fight, or retreateth to another party of the faithful, shall draw on himself the indignation of Allah, and his abode shall be hell; an ill journey shall it be thither." (The Spoils - verse 16). There is no way out except by concentrating all powers and energies to face this Nazi, vicious Tatar invasion. The alternative is loss of one's country, the dispersion of citizens, the spread of vice on earth and the destruction of religious values. Let every person know that he is responsible before Allah, for "the doer of the slightest good deed is rewarded in like, and the does of the slightest evil deed is also rewarded in like."

The Islamic Resistance Movement consider itself to be the spearhead of the circle of struggle with world Zionism and a step on the road. The Movement adds its efforts to the efforts of all those who are active in the Palestinian arena. Arab and Islamic Peoples should augment by further steps on their part; Islamic groupings all over the Arab world should also do the same, since all of these are the best-equipped for the future role in the fight with the warmongering Jews.

"..and we have put enmity and hatred between them, until the day of resurrection. So often as they shall kindle a fire of war, Allah shall extinguish it; and they shall set their minds to act corruptly in the earth, but Allah loveth not the corrupt doers." (The Table - verse 64).

## Article Thirty-Three:

The Islamic Resistance Movement, being based on the common coordinated and interdependent conceptions of the laws of the universe, and flowing in the stream of destiny in confronting and fighting the enemies in defence of the Moslems and Islamic civilization and sacred sites, the first among which is the Aqsa Mosque, urges the Arab and Islamic peoples, their governments, popular and official groupings, to fear Allah where their view of the Islamic Resistance Movement and their dealings with it are concerned. They should back and support it, as Allah wants them to, extending to it more and more funds till Allah's purpose is achieved when ranks will close up, fighters join other fighters and masses everywhere in

UCP035345

EXHIBIT 50, PAGE 496

the Islamic world will come forward in response to the call of duty while continuously proclaiming: Hail to Jihad. Their cry will reach the heavens and will go on being resounded until liberation is achieved, the invaders vanquished and Allah's victory comes about.

"And Allah will certainly assist him who shall be on his side: for Allah is strong and mighty." (The Pilgrimage - verse 40).

## The Testimony of History

**Across History in Confronting the Invaders:**

### Article Thirty-Four:

Palestine is the navel of the globe and the crossroad of the continents. Since the dawn of history, it has been the target of expansionists. The Prophet, Allah bless him and grant him salvation, had himself pointed to this fact in the noble Hadith in which he called on his honourable companion, Ma'adh ben-Jabal, saying: O Ma'ath, Allah throw open before you, when I am gone, Syria, from Al-Arish to the Euphrates. Its men, women and slaves will stay firmly there till the Day of Judgement. Whoever you should choose one of the Syrian shores, or the Holy Land, he will be in constant struggle till the Day of Judgement."

Expansionists have more than once put their eye on Palestine which they attacked with their armies to fulfill their designs on it. Thus it was that the Crusaders came with their armies, bringing with them their creed and carrying their Cross. They were able to defeat the Moslems for a while, but the Moslems were able to retrieve the land only when they stood under the wing of their religious banner, united their word, hallowed the name of Allah and surged out fighting under the leadership of Salah ed-Din al-Ayyubi. They fought for almost twenty years and at the end the Crusaders were defeated and Palestine was liberated.

"Say unto those who believe not, Ye shall be overcome, and thrown together into hell; an unhappy couch it shall be." (The Family of Imran - verse 12).

This is the only way to liberate Palestine. There is no doubt about the testimony of history. It is one of the laws of the universe and one of the rules of existence. Nothing can overcome iron except iron. Their false futile creed can only be defeated by the righteous Islamic creed. A creed could not be fought except by a creed, and in the last analysis, victory is for the just, for justice is certainly victorious.

"Our word hath formerly been given unto our servants the apostles; that they should certainly be assisted against the infidels, and that our armies should surely be the conquerors." (Those Who Rank Themselves - verses 171-172).

### Article Thirty-Five:

The Islamic Resistance Movement views seriously the defeat of the Crusaders at the hands of Salah ed-Din al-Ayyubi and the rescuing of Palestine from their hands, as well as the defeat of the Tatars at Ein Galot, breaking their power at the hands of Qataz and Al-Dhaher Bivers and saving the Arab world from the Tatar onslaught which aimed at the destruction of every meaning of human civilization. The Movement draws lessons and examples from all this. The present Zionist onslaught has also been preceded by Crusading raids from the West and other Tatar raids from the East. Just as the Moslems faced those raids and planned fighting and defeating them, they should be able to confront the Zionist invasion and defeat it. This is indeed no problem for the Almighty Allah, provided that the intentions are pure, the determination is true and that Moslems have benefited from past experiences, rid themselves of the effects of ideological invasion and followed the customs of their ancestors.

**The Islamic Resistance Movement is Composed of Soldiers:**

### Article Thirty-Six:

While paving its way, the Islamic Resistance Movement, emphasizes time and again to all the sons of our people, to the Arab and Islamic nations, that it does not seek personal fame, material gain, or social prominence. It does not aim to compete against any one from among our people, or take his place. Nothing of the sort at all. It will not act against any of the sons of Moslems or those who are peaceful towards it from among non-Moslems, be they here or anywhere else. It will only serve as a support for all groupings and organizations operating against the Zionist enemy and its lackeys.

The Islamic Resistance Movement adopts Islam as its way of life. Islam is its creed and religion. Whoever takes Islam as his way of life, be it an organization, a grouping, a country or any other body, the Islamic Resistance Movement considers itself as their soldiers and nothing more.

We ask Allah to show us the right course, to make us an example to others and to judge between us and our people with truth. "O Lord, do thou judge between us and our nation with truth; for thou art the best judge." (Al Araf - Verse 89).

The last of our prayers will be praise to Allah, the Master of the Universe.

| Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 - |

© 2008 Lillian Goldman Law Library
127 Wall Street, New Haven, CT 06511.

Avalon Statement of Purpose   Contact Us   Yale Law Library   University Library   Yale Law School   Search Morris   Search Orbis

EXHIBIT 50, PAGE 497