# EXHIBIT 4



# The Palestinians:
# Background and U.S. Relations

**Jim Zanotti**

Specialist in Middle Eastern Affairs

February 10, 2015

**Congressional Research Service**

7-5700

www.crs.gov

RL34074

**CRS REPORT**
Prepared for Members and
Committees of Congress

ATL005135

# Summary

This report covers current issues in U.S.-Palestinian relations. It also contains an overview of Palestinian society and politics and descriptions of key Palestinian individuals and groups—chiefly the Palestine Liberation Organization (PLO), the Palestinian Authority (PA), Fatah, Hamas (a U.S.-designated Foreign Terrorist Organization), and the Palestinian refugee population. The "Palestinian question" is important not only to Palestinians, Israelis, and their Arab state neighbors, but to many countries and non-state actors in the region and around the world—including the United States—for a variety of religious, cultural, and political reasons. U.S. policy toward the Palestinians is marked by efforts to establish a Palestinian state through a negotiated two-state solution to the Israeli-Palestinian conflict; to counter Palestinian terrorist groups; and to establish norms of democracy, accountability, and good governance. Congress has appropriated assistance to support Palestinian governance and development while trying to prevent the funds from benefitting Palestinians who advocate violence against Israelis. Since the signing of the Oslo Accord in 1993, Congress has committed more than $5 billion in bilateral assistance to the Palestinians, over half of it since mid-2007.

Among the issues in U.S. policy toward the Palestinians is how to deal with the political leadership of Palestinian society. Although Fatah and Hamas agreed to the June 2014 formation of a consensus PA government appointed by Fatah head and PA President Mahmoud Abbas, Hamas retains de facto control over security in the Gaza Strip, despite forswearing formal responsibility. The United States has sought to bolster Abbas—who also chairs the PLO—vis-à-vis Hamas, though some Members of Congress have manifested concern about Abbas's periodic dealings with Hamas, international diplomatic tactics, and perhaps increasingly authoritarian domestic leadership. Anticipation that Abbas may be approaching the end of his tenure may be fueling political posturing among possible successors and influencing Abbas's own decisions.

The United States has supported various rounds of Israeli-Palestinian negotiations for more than 20 years. Another round ended acrimoniously in April 2014. Lack of progress on the peace process with Israel has led Abbas and his colleagues to consider alternative pathways toward a Palestinian state. This approach was initially based on the strategy of obtaining more widespread international recognition of Palestinian statehood in the West Bank (including East Jerusalem) and the Gaza Strip, and now may also be encouraging or taking advantage of international legal and economic pressure on Israel to improve the Palestinian negotiating position. The PLO has not obtained membership in the United Nations, but a November 2012 resolution in the U.N. General Assembly identified "Palestine" as a "non-member state," and the U.N. Educational, Scientific and Cultural Organization (UNESCO) admitted "Palestine" in late 2011. The Palestinians are primed to accede to the Rome Statute of the International Criminal Court (ICC) in April 2015, and the ICC could conceivably investigate Israeli, Palestinian, or other individuals for alleged crimes committed in the West Bank and Gaza. Palestinian actions at the ICC or elsewhere could trigger existing legal restrictions on U.S. aid and greater congressional scrutiny of future aid.

The Gaza situation also presents a dilemma. Humanitarian and economic problems persist, especially in the wake of a summer 2014 conflict between Israel and Hamas. Israel and Egypt maintain tight control over access to and commerce with Gaza. They and other international actors seem reluctant to take direct action toward opening Gaza's borders fully because of legal, political, and strategic challenges to dealing with Hamas. Political support and economic assistance from Iran and other state or private benefactors may bolster Hamas's rule and, combined with other factors, exacerbate the Palestinian political divide.

# Contents

Issues for Congress ............................................................................................................. 1

Overview ............................................................................................................................. 2
    The "Palestinian Question," Israel, and Key Recent Developments ............................... 2
        Historical Background ............................................................................................. 2
        Present and Future Considerations .......................................................................... 5
        Summer 2014 Gaza Conflict and Other Israeli-Palestinian Unrest ......................... 8
        International Criminal Court Actions ..................................................................... 10
    Palestinian Leadership and Questions Regarding Succession ..................................... 12
        Mahmoud Abbas (aka "Abu Mazen") .................................................................... 12
        Possible Succession Scenarios and Anticipatory Effects ....................................... 13
    Demographic and Economic Profile ........................................................................... 15
    The Regional and International Context ...................................................................... 17
        In General ............................................................................................................. 17
        Palestinian Diplomatic Initiatives at the United Nations and Elsewhere ............... 17

Matters of General Congressional Interest ........................................................................ 19
    U.S. and International Assistance to the Palestinians .................................................. 19
        Overview .............................................................................................................. 19
        Palestinian International Initiatives: Effect on U.S. Aid ......................................... 20
    Terrorism and Militancy ............................................................................................ 22
        Hamas and Other Groups: Rockets and Other Methods ........................................ 22
        Assessing and Countering Threats ........................................................................ 25
    Palestinian Governance .............................................................................................. 25
        Palestinian Authority (PA) .................................................................................... 26
        Prospects for Economic Self-Sufficiency .............................................................. 27
        West Bank: PA and Israel ...................................................................................... 28
        Gaza: Hamas, PA, Israel, and Egypt (Sinai) ......................................................... 28

## Figures

Figure 1. Map of West Bank ................................................................................................ 7
Figure 2. Map of Gaza Strip ............................................................................................... 8
Figure 3. Approximate Range of Rockets from Gaza .......................................................... 24

## Tables

Table 1. Estimated Palestinian Population Worldwide ........................................................ 15
Table 2. Basic Facts for the West Bank and Gaza Strip ...................................................... 16
Table B-1. Various Prominent Palestinian Figures ............................................................. 42

ATL005137

## Appendixes

Appendix A. Key Palestinian Factions and Groups .................................................................... 31

Appendix B. Possible Successors to Mahmoud Abbas ............................................................... 42

## Contacts

Author Contact Information ........................................................................................................ 45

ATL005138

# Issues for Congress

Congress plays a significant role in U.S. policy toward the Palestinians, which is marked by efforts to establish a Palestinian state through a negotiated two-state solution to the Israeli-Palestinian conflict; to counter Palestinian terrorist groups; and to establish norms of democracy, accountability, and good governance. Since the signing of the Oslo Accord (Declaration of Principles) in 1993, Congress has committed more than $5 billion in bilateral assistance to the Palestinians. Recent annual U.S. bilateral assistance appropriations for the West Bank and Gaza Strip have been around $440 million—$370 million in economic aid and $70 million in non-lethal security assistance for the Palestinian Authority (PA) in the West Bank. See CRS Report RS22967, *U.S. Foreign Aid to the Palestinians*, by Jim Zanotti, for more detailed information on this topic. A number of other international actors have also sought to assist the PA. Additionally, the United States remains the largest single-state donor to the U.N. Relief and Works Agency for Palestine Refugees in the Near East (UNRWA).

Some Members of Congress question the continuation of U.S. budgetary, security, and/or developmental assistance to the Palestinians. Two concerns predominate. First, some Members oppose a Palestine Liberation Organization (PLO)/PA effort to pursue international initiatives outside negotiations with Israel, including at the United Nations and the International Criminal Court (ICC). Palestinian actions in late 2014 and early 2015 have enabled the ICC Prosecutor to open a preliminary examination into the "situation in Palestine" to determine "whether there is a reasonable basis to proceed with an investigation" against Israelis, Palestinians, or others.[1]

Second, some Members have opposed U.S. aid to the PA, or have sought to place it under increased scrutiny, after a new PA government was formed in June 2014 as a result of an agreement between Fatah (the faction that has traditionally dominated the PA) and Hamas. Although Hamas agreed to the government's formation, no Hamas members serve as government ministers, and a de facto split persists between Fatah-led authorities exercising means of control over the PA's West Bank areas of self-rule and Hamas-led groups exercising those means in Gaza.

The Consolidated and Further Continuing Appropriations Act, 2015 (P.L. 113-235), includes conditions on U.S. aid to the PA addressing these concerns, but the merits and sufficiency of these conditions remain subject to debate.

As Congress weighs the effectiveness and appropriateness of U.S. aid to the Palestinians and exercises oversight over Israeli-Palestinian developments, Members may consider the following:

- Prospects for a negotiated two-state solution between Israel and the PLO—with or without diplomatic measures relating to Palestinian statehood or international legal action involving Israelis and Palestinians.

- Threats of terrorism and armed conflict—both Israeli-Palestinian and intra-Palestinian—and options (military, political, economic) to prevent, counter, or mitigate these threats.

- The possible impact of regional developments and concerns over stability in Syria, Iraq, Egypt (especially the Sinai Peninsula), Lebanon, and Jordan.

---

[1] ICC Press Release, "The Prosecutor of the International Criminal Court, Fatou Bensouda, opens a preliminary examination of the situation in Palestine," January 16, 2015.

- Palestinian leadership and civil society developments, including (1) a continued de facto division of control between the PA in the West Bank and Hamas in Gaza; and (2) concerns about growing authoritarianism and succession disputes in the absence of elections and other institutional mechanisms, checks, or reforms.

- Palestinian economic development and humanitarian considerations.

# Overview

## The "Palestinian Question," Israel, and Key Recent Developments

The Palestinians are Arabs who live in the geographical area that constitutes present-day Israel, the West Bank, and the Gaza Strip, or who have historical and/or cultural ties to that area. Since the early 20th Century, the desire to establish an independent state in historic Palestine has remained the dominant Palestinian national goal. Over time, Palestinians have differed among themselves, with Israelis, and with others over the nature and extent of such a state and the legitimacy of various means to achieve it. Today, the "Palestinian question" focuses on whether and how Palestinians can overcome internal divisions and external opposition to establish a viable, independent state capable of fulfilling their shared national aspirations. Along with the Palestinians of the West Bank, Gaza, and East Jerusalem (which include approximately 2 million U.N.-registered refugees), an estimated 3 million Palestinian U.N.-registered refugees outside these territories, in addition to a wider diaspora, await a permanent resolution of their situation.[2]

### Historical Background

Historians have noted that the concept of Palestinian national identity is a relatively recent phenomenon and in large part grew from the challenge posed by increased Jewish migration to the area that now makes up Israel, the West Bank, and Gaza during the eras of Ottoman and British control in the first half of the 20th Century.[3] Palestinian political identity emerged during the British Mandate period (1923-1948), began to crystallize with the 1947 United Nations partition plan (General Assembly Resolution 181), and grew stronger following Israel's conquest and occupation of the West Bank and Gaza Strip in 1967. Although in 1947 the United Nations intended to create two states in Palestine—one Jewish and one Arab—only the Jewish state came into being. Varying explanations for the failure to found an Arab state alongside a Jewish state in mandatory Palestine place blame on the British, the Zionists, neighboring Arab states, the Palestinians themselves, or some combination of these groups.[4]

As the state of Israel won its independence in 1947-1948, roughly 700,000 Palestinians were driven or fled from their homes, an occurrence Palestinians call the *nakba* ("catastrophe"). Many from the diaspora ended up in neighboring states (Egypt, Syria, Lebanon, and Jordan) or in Gulf states such as Kuwait. Palestinians remaining in Israel became Israeli citizens. Those who were in

---

[2] See http://www.unrwa.org/where-we-work for a place-by-place breakdown of U.N.-registered refugees.

[3] See Rashid Khalidi, *Palestinian Identity: The Construction of Modern National Consciousness,* New York: Columbia Univ. Press, 1997.

[4] See, e.g., Edward Said, *The Question of Palestine*, New York: Times Books, 1979; Barry Rubin, *Israel: An Introduction*, New Haven: Yale University Press, 2012.

Page 45

ATL005140

the West Bank (including East Jerusalem) and Gaza were subject to Jordanian and Egyptian administration, respectively. With their population in disarray, and no clear hierarchical structure or polity to govern their affairs, Palestinians' interests were largely represented by Arab states with conflicting internal and external interests.

1967 was a watershed year for the Palestinians. In the June Six-Day War, Israel decisively defeated the Arab states who had styled themselves as the Palestinians' protectors, seizing East Jerusalem, the West Bank, and the Gaza Strip (as well as the Sinai Peninsula from Egypt and the Golan Heights from Syria). Thus, Israel gained control over the entire area that constituted Palestine under the British Mandate. Israel's territorial gains provided buffer zones between Israel's main Jewish population centers and its traditional Arab state antagonists. These buffer zones remain an important part of the Israeli strategic calculus to this day.

Ultimately Israel only effectively annexed East Jerusalem (as well as the Golan Heights), leaving the West Bank and Gaza under military occupation. However, both territories became increasingly economically interdependent with Israel. Furthermore, Israel presided over the settlement of thousands of Jewish civilians in both territories (although many more in the West Bank than Gaza)—officially initiating some of these projects and assuming security responsibility for all of them. Settlement of the West Bank in particular increased markedly once the Likud Party, with its vision of a "Greater Israel" extending from the Mediterranean Sea to the Jordan River, took power in 1977. This presented some economic and cultural opportunities for Palestinians, but also new challenges to their identity, property rights, civil liberties, morale, political cohesion, and territorial contiguity. These challenges persist and have since intensified.

The Arab states' humiliation in 1967, and Israeli rule and settlement of the West Bank and Gaza, allowed the Palestine Liberation Organization (PLO) to emerge as the representative of Palestinian national aspirations. Founded in 1964 as an umbrella organization of Palestinian factions and militias in exile under the aegis of the League of Arab States (Arab League), the PLO asserted its own identity after the Six-Day War by staging guerrilla raids against Israel from Jordanian territory. The late Yasser Arafat and his Fatah movement gained leadership of the PLO in 1969, and the PLO subsequently achieved international prominence on behalf of the Palestinian national cause—representing both the refugees and those under Israeli rule in the West Bank and Gaza—although often this prominence came infamously from acts of terrorism and militancy.

Although Jordan forced the PLO to relocate to Lebanon in the early 1970s, and Israel forced it to move from Lebanon to Tunisia in 1982, the organization and its influence survived. In 1987, Palestinians inside the West Bank and Gaza rose up in opposition to Israeli occupation (the first *intifada*, or uprising), leading to increased international attention and sympathy for the Palestinians' situation. In December 1988, as the intifada continued, Arafat initiated dialogue with the United States by renouncing violence, promising to recognize Israel's right to exist, and accepting the "land-for-peace" principle embodied in U.N. Security Council Resolution 242.[5] Many analysts believe that Arafat's turn to diplomacy with the United States and Israel was at least partly motivated by concerns that if the PLO's leadership could not be repatriated from

---

[5] UNSCR 242, adopted in 1967 shortly after the Six-Day War, calls for a "just and lasting peace in the Middle East" based on (1) "Withdrawal of Israeli armed forces from territories occupied in the [1967 Six-Day War]" and (2) "Termination of all claims or states of belligerency and respect for and acknowledgement of the sovereignty, territorial integrity and political independence of every State in the area and their right to live in peace within secure and recognized boundaries free from threats or acts of force."

Page 46

ATL005141

exile, its legitimacy with Palestinians might be overtaken by local leaders of the intifada in the West Bank and Gaza (which included Hamas). These concerns intensified when Arafat lost much of his Arab state support following his political backing for Saddam Hussein's 1990 invasion of Kuwait.

After direct secret diplomacy with Israel brokered by Norway, the PLO recognized Israel's right to exist in 1993, and through a succession of agreements (known as the "Oslo Accords"), gained limited self-rule for Palestinians in Gaza and parts of the West Bank—complete with democratic mechanisms; security forces; and executive, legislative, and judicial organs of governance under the PA. The Oslo Accords were gradually and partially implemented during the 1990s, but the expectation that they would lead to a final-status peace agreement has not been realized.

Many factors—including violence, leadership changes and shortcomings, rejectionist movements with sizeable popular followings (particularly Hamas on the Palestinian side), a continued Israeli security presence, expanded Israeli settlement of the West Bank and East Jerusalem, and international involvement—have contributed to the failure to complete the Oslo process. A second Palestinian intifada from 2000 to 2005 was marked by intense terrorist violence inside Israel and actions—asserted by Israel to be necessary to safeguard its citizens' security—by Israeli security forces that rendered much of the PA infrastructure built over the preceding decade unusable. There is a legal proceeding ongoing in a U.S. district court in New York to determine whether the PLO and PA will be civilly liable for allegedly supporting six terrorist attacks that took place in and around Jerusalem from 2002 to 2004.[6]

During the second intifada, U.S.- and internationally supported efforts to restart peace negotiations under various auspices failed to gain traction. After Arafat's death in 2004[7] and his succession by Mahmoud Abbas, Israel unilaterally withdrew its settlers and military forces from Gaza in 2005. However, the limited self-rule regime of the PA was undermined further by Hamas's legislative election victory in 2006, and its takeover of Gaza in 2007. These developments, along with subsequent violence and regional political changes, have since increased confusion regarding questions of Palestinian leadership, territorial contiguity, and prospects for statehood.

---

[6] Joseph Ax, "Bombing victims testify at U.S. trial on PLO role in Israel attacks," *Reuters*, February 2, 2015. The various attacks reportedly killed 33 and wounded more than 450 people. Damages of up to $3 billion are being sought. Previous liability cases have been brought in U.S. courts against banks allegedly used by Palestinian terrorists. "Dramatic PLO trial gives terror victims stage for redress," *Associated Press*, January 19, 2015.

[7] Arafat fell ill in Ramallah, West Bank, in October 2004, was transported to a military hospital in France, and died there. Records indicate that he died of a stroke resulting from a bleeding disorder caused by an unidentified underlying infection. Many Palestinians maintain that he was poisoned, with several theories blaming Israel and/or one or more of his Palestinian rivals or potential successors. Evidence revealed by Arafat's widow Suha indicating the presence of polonium on articles of Arafat's clothing led in August 2012 to French authorities opening an inquiry into his death and in November 2012 to the exhumation and reburial of his remains.

Three parties—the French probe, a Swiss medical laboratory, and a group of Russian experts appointed by the PA— have been involved in conducting tests on samples taken from Arafat's exhumed remains. Reports from these parties came out near the end of 2013, with the French team (reportedly) and the Russian team ruling out the poisoning theory and the Swiss laboratory offering "moderate backing for the theory." Palestinian officials have indicated that they will continue conducting investigations into Arafat's death. "Yasser Arafat died of natural causes - Russian report," *BBC News*, December 26, 2013.

**Page 47**

## Present and Future Considerations

Today, Fatah and Hamas are the largest Palestinian political movements (see **Appendix A** and **Appendix B**) for profiles of both groups and some of their leaders). The positions that their leaders express reflect the two basic cleavages in Palestinian society:

1. Between those (several in Fatah) who seek to establish a state by nonviolent means—negotiations, international diplomacy, civil disobedience—and those (Hamas) who insist on maintaining violence as an option; and

2. Between those (Fatah) who favor a secular model of governance and those (Hamas) who seek a society governed more by Islamic norms.

Many Palestinians assert that U.S. policy reflects a pro-Israel bias and a lack of sensitivity to PA President/PLO Chairman Mahmoud Abbas's domestic political rivalry with Hamas and other groups. During the past few years, lack of progress on the peace process with Israel has led Abbas and his colleagues to consider alternative pathways toward a Palestinian state. This approach was initially based on the strategy of obtaining more widespread international recognition of Palestinian statehood in the West Bank (including East Jerusalem) and the Gaza Strip, and now may also be encouraging or taking advantage of international legal and economic pressure on Israel to improve the Palestinian negotiating position. The Palestinians are also apparently adopting direct economic measures in opposition to Israeli actions.[8] For more information on Israeli-Palestinian issues, see CRS Report RL33476, *Israel: Background and U.S. Relations*, by Jim Zanotti.

According to reports, Abbas also periodically considers other alternative strategies for the West Bank. Such alternatives include encouraging greater Palestinian nonviolent resistance to Israel and even dissolving the PA altogether.[9] Some Palestinian and international intellectuals continue to advocate the idea of a "binational" or "one-state" idea as an alternative to a negotiated two-state solution, even though polls indicate that sentiment among Israelis and Palestinians leans predominantly toward separate states and national identities.[10]

The "Palestinian question" is important not only to Palestinians, Israelis, and their Arab state neighbors, but to many countries and non-state actors in the region and around the world—including the United States—for a variety of religious, cultural, and political reasons. Over the

---

[8] In February 2015, a Fatah Central Committee member announced that the PA would prevent products from six major Israeli companies from entering the West Bank, claiming that the decision came as a result of a "recent surge of Israeli violations, on top of which the takeover of large tracts of Palestinian lands for settlement purposes and Israel's illegal freeze of Palestinian tax revenues, collected on behalf of PA." "PA to Ban Six Israeli Products from West Bank Market," *WAFA – Palestinian News & Info Agency*, February 9, 2015.

[9] Those who support the idea of dissolving the PA apparently believe that Israel's motivation for agreeing to Palestinian sovereignty in the West Bank (and possibly Gaza) might increase considerably were it to again shoulder the full burden of governing the territory and its residents. Others dismiss the plausibility of the idea, largely over concerns about possible destabilization given the direct reliance of over 150,000 Palestinians (and their families) on PA employment. The Palestinian Center for Policy and Survey Research published a series of reports in 2013 on the possibility of collapse or dissolution of the PA under the title of *The Day After: How Palestinians Can Cope if the PA Ceases to Function*.

[10] See, e.g., Palestinian Center for Policy Survey and Research (PCPSR) Joint Israeli Palestinian Poll – June 2014; PCPSR Palestinian Public Opinion Poll No 54, January 15, 2015. Most scenarios envisioning a binational Israeli-Palestinian state would apparently fundamentally change or abrogate the Zionist nature of Israel's institutional and societal makeup. Such developments would by almost all accounts be unacceptable to a large majority of Israelis.

ATL005143

past 67 years, if not longer, the issue has been one of the most provocative in the international arena. Various global jihadist groups (including Al Qaeda), Iran, and others seeking to garner support for and/or mobilize Arab and Muslim sentiment against the United States, Israel, and/or other Western nations routinely use the Palestinian cause as a touchstone for their grievances. Analysts often debate whether the Palestinian question is truly central to the region's and world's problems, with some contending that more often than not it is used by various actors as a pretext to deflect attention from matters more central to their respective interests.

ATL005144

**Figure 1. Map of West Bank**

PA Governorates; Areas A, B, and C; and Selected Israeli Settlements



**Source:** CRS, adapted from the U.N. Office for the Coordination of Humanitarian Affairs.

**Notes:** All boundaries and depictions are approximate. Israeli settlements are not drawn to scale and do not reflect the full scope of Jewish residential construction in the West Bank and East Jerusalem. Areas A, B, and C were designated pursuant to the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip, dated September 28, 1995. H2 was designated pursuant to the Protocol Concerning the Redeployment in Hebron, dated January 17, 1997. Additional Israeli settlements exist within Area C but are not denoted, particularly a group of settlements with small populations located along the Jordanian border (the Jordan Valley).

Page 50

### Figure 2. Map of Gaza Strip



**Source:** U.N. Office for the Coordination of Humanitarian Affairs and UNOSAT, with additional data from UNRWA; adapted by CRS.

## Summer 2014 Gaza Conflict and Other Israeli-Palestinian Unrest

A summer 2014 conflict lasting approximately 50 days between Israel and Hamas (along with other Palestinian militants based in Gaza) was the third major conflict involving those parties in the past six years, with previous conflicts occurring in December 2008-January 2009 and November 2012. Though distinct, each arguably has featured mutual tests of military capability, domestic political cohesion, and deterrence in times of political change. Each of the three conflicts has also featured heated debate over respective culpability and the targeting or reckless endangerment of civilians, who have suffered death, injury, and massive displacement and

property damage. As with the previous conflicts, much international attention in the aftermath has focused on the still largely elusive tasks of:

- Improving humanitarian conditions and economic opportunities for Palestinians in Gaza; and

- Preventing Hamas and other militants from reconstituting arsenals and military infrastructure.

Egypt brokered an August 2014 cease-fire that—similar to the arrangements ending the other conflicts—contemplated subsequent talks involving Israel, Fatah, and Hamas to discuss possible ways to ease restrictions on Gaza's commerce and to address Israeli security concerns and concerns from humanitarian suppliers about possible diversion of resources to Hamas. An October 2014 international donor conference in Cairo garnered about $2.7 billion in pledges specifically for Gaza alongside a similar amount pledged for assistance to the Palestinians more generally.[11] However, reports indicate that importing construction materials remains complicated and is proceeding relatively slowly.[12] By all accounts, Hamas remains the key security provider in Gaza,

---

### Major Israel-Hamas Conflicts Since 2008

**_December 2008-January 2009_: Israeli codename "Operation Cast Lead"**

- Three-week duration, first meaningful display of Palestinians' Iranian-origin rockets, Israeli air strikes and ground offensive

- Political context: Impending leadership transitions in Israel and United States; struggling Israeli-Palestinian peace talks (Annapolis process)

- Fatalities: More than 1,100 (possibly more than 1,400) Palestinians; 13 Israelis (three civilians)

**_November 2012_: "Operation Pillar of Defense (or Cloud)"**

- Eight-day duration, Palestinian projectiles of greater range and variety, Israeli airstrikes, prominent role for Israel's Iron Dome anti-rocket system

- Political context: Widespread Arab political change, including rise of Muslim Brotherhood to power in Egypt; three months before Israeli elections

- Fatalities: More than 100 Palestinians, six Israelis (four civilians)

**_July-August 2014_: "Operation Protective Edge/Mighty Cliff"**

- About 50-day duration, Palestinian projectiles of greater range and variety, Israeli air strikes and ground offensive, extensive Palestinian use of and Israeli countermeasures against tunnels within Gaza, prominent role for Iron Dome

- Political context: Shortly after (1) unsuccessful round of Israeli-Palestinian peace talks, (2) PA consensus government formation and end of Hamas's formal responsibilities for governing Gaza, (3) prominent youth killings

- Fatalities: More than 2,100 Palestinians, 71 Israelis (five civilians), and one foreign worker

---

even though it forswears formal responsibility. For more information, see "Gaza: Hamas, PA, Israel, and Egypt (Sinai)" below.

In the fall of 2014, unrest spiked among Palestinians in Jerusalem, the West Bank, and even some Arab communities in Israel for a variety of reasons. Increasingly vigorous and occasionally

---

[11] "Donors pledge $5.4bn for Palestinians at Cairo summit," *BBC News*, October 12, 2014.

[12] Gisha – Legal Center for Freedom of Movement, "The Gaza Cheat Sheet," January 19, 2015. One proposal calculated to help loosen the commerce-security deadlock, facilitating exports from Gaza to the West Bank, has been implemented on a fairly small scale. Ibid.

Page 52

violent manifestations of Palestinian grievances appear to be connected with lingering resentment and new outrage over developments including

- Efforts by some Israelis to gain greater access to and greater worship permissions on the Temple Mount/Haram al Sharif (Noble Sanctuary) in Jerusalem's Old City.

- The burning to death in July 2014 of a Palestinian teenager in Jerusalem by Israeli extremists, apparently in retaliation for the June 2014 killings of three Israeli teenagers in the West Bank by Hamas-connected Palestinian militants.

- Various indications of direct or tacit Israeli official backing for greater Jewish settlement in East Jerusalem and the West Bank, including via announcements relating to land expropriation and construction of Jewish residential housing that are widely opposed internationally.

Some observers project that unrest and violence could spiral,[13] while others point to joint Israel-PA security efforts to prevent any such escalation in the West Bank.[14] Unlike during the two Palestinian intifadas (1987-1993 and 2000-2005), violent acts appear to occur mainly from individuals' own initiative rather than via direct political coordination.[15] Israel's police chief has said that a lack of apparent organization makes preventing violence more difficult,[16] though Israel is reportedly implementing a number of additional security measures.[17]

## International Criminal Court Actions

### *Overview*

Actions by the Palestinians related to the ICC and possible legal proceedings against Israeli nationals are likely to have a number of implications, including for U.S. aid to the Palestinians (see "Palestinian International Initiatives: Effect on U.S. Aid" below). Both Israel (facing national elections in March 2015) and the Palestinians deal with domestic pressure to act outside of negotiations in order to improve their positions vis-à-vis one another. In early January 2015, Palestinian leaders deposited an instrument of accession for the "State of Palestine" to become party to the Rome Statute of the ICC, after declaring acceptance in late December 2014 of ICC jurisdiction over crimes allegedly "committed in the occupied Palestinian territory, including East Jerusalem, since June 13, 2014." For information on the overall international diplomatic context, see "Palestinian Diplomatic Initiatives at the United Nations and Elsewhere" below.

As mentioned above, the ICC Prosecutor has opened a preliminary examination into the "situation in Palestine" to determine "whether there is a reasonable basis to proceed with an investigation" against Israelis, Palestinians, or others, having found that the Palestinians have the

---

[13] See, e.g., Avi Issacharoff, "The Jerusalem Intifada is underway, and it's going to get worse," *Times of Israel*, November 21, 2014.

[14] Ahmad Melham, "Despite Jerusalem unrest, West Bank remains quiet," *Al-Monitor Palestine Pulse*, November 26, 2014.

[15] William Booth and Ruth Eglash, "Fear of deadly 'religious war' between Jews and Muslims raised after synagogue attack," *Washington Post*, November 19, 2014.

[16] "Israel to destroy Jerusalem synagogue killers' homes," *CBS News*, November 18, 2014.

[17] Hazel Ward, "Israel Is Tightening Security After Knife Attacks," *Agence France Presse*, November 11, 2014.

proper capacity to accept ICC jurisdiction in light of the November 2012 adoption of U.N. General Assembly Resolution 67/19 (see "Palestinian Diplomatic Initiatives at the United Nations and Elsewhere" below).[18] Palestinian leaders publicly anticipate providing information to the ICC on alleged Israeli crimes regarding both the summer 2014 Israel-Gaza conflict and settlement activity in the West Bank. On January 6, 2015, the U.N. Secretary-General, who functions as the depositary for the Rome Statute, stated that the Statute "will enter into force for the State of Palestine on 1 April 2015."

The Obama Administration and some Members of Congress have criticized the Palestinians' ICC-related actions.[19] The State Department spokesperson has argued that the Palestinians are ineligible to accede to the Rome Statute[20] and has indicated opposition to an apparently retaliatory move by Israel to freeze the transfer of tax and customs revenues to the PA that Israel collects on the PA's behalf.[21]

## ICC Procedural Considerations[22]

The ICC can exercise jurisdiction over alleged genocide, war crimes, and crimes against humanity ("ICC crimes") that occur on the territory of or are perpetrated by nationals of an entity deemed to be a State

- after the Rome Statute enters into force for a State Party;

- during a period of time in which a non-party State accepts jurisdiction; or

- pursuant to a U.N. Security Council resolution referring the situation in a State to the ICC.

Palestinian accession and acceptance of jurisdiction grant the ICC Prosecutor authority to investigate all alleged ICC crimes committed after June 13, 2014, by any individual—Israeli, Palestinian, or otherwise—on "occupied Palestinian territory."

Palestinian actions do not ensure any formal ICC investigation or prosecution of alleged ICC crimes. A party to the Rome Statute can refer a situation to the Court and is required to cooperate with the Prosecutor in her investigations, but it is the role of the Prosecutor to determine whether to bring charges against and prosecute an individual. In addition, a case is inadmissible before the ICC if it concerns conduct that is the subject of "genuine" legal proceedings (as described in Article 17 of the Statute) brought by a state with jurisdiction, including a state (such as Israel) that is not party to the Statute. In light of this, Israeli military officials are reportedly debating the extent to which they should seek legal accountability for soldiers in connection with the summer 2014 Israel-Gaza conflict.[23]

---

[18] ICC Press Release, op. cit.

[19] See, e.g., a January 9, 2015, statement from four Senators at http://www.kirk.senate.gov/?p=press_release&id=1295.

[20] State Department Daily Press Briefing, January 7, 2015.

[21] State Department Daily Press Briefing, January 5, 2015.

[22] This section was authored by Matthew C. Weed, Analyst in Foreign Policy Legislation.

[23] "Israeli military divided over whether to probe wartime conduct by soldiers in Gaza," *Associated Press*, January 6, 2015.

Page 54

The ICC Prosecutor is required to notify all states with jurisdiction over a potential case, and such states are afforded the opportunity to challenge ICC jurisdiction over a case on inadmissibility grounds. For background information, see archived CRS Report R41116, *The International Criminal Court (ICC): Jurisdiction, Extradition, and U.S. Policy*, by Matthew C. Weed.

## Palestinian Leadership and Questions Regarding Succession

### Mahmoud Abbas (aka "Abu Mazen")

Abbas, by virtue of his status as the current PLO chairman, PA president, and head of Fatah, is generally regarded as the leader of the Palestinian national movement, despite Hamas's large measure of control over Gaza.

Born in 1935 in Safed in what is now northern Israel, Abbas and his family left as refugees for Syria in 1948 when Israel was founded. He earned a B.A. in law from Damascus University and a Ph.D. in history from Moscow's Oriental Institute.[24] Abbas was an early member of Yasser Arafat's Fatah movement, joining in Qatar, and became a top deputy to Arafat and head of the PLO's national and international relations department in 1980. Abbas initiated dialogue with Jewish and pacifist movements as early as the 1970s, and, as the head of the Palestinian negotiating team to the secret Oslo talks in the early 1990s, is widely seen as one of the main architects of the peace process.[25]

Abbas returned to the Palestinian territories in September 1995 and took residences in Gaza and Ramallah. Together with Yossi Beilin (then an Israeli Labor Party government minister), Abbas drafted a controversial "Framework for the Conclusion of a Final Status Agreement Between Israel and the PLO" (better known as the "Abu Mazen-Beilin Plan") in October 1995.[26] In March 2003, Abbas was named the first PA prime minister, but never was given full authority because Arafat (the PA president) insisted that ultimate decision-making authority and control over security services lie with him. Abbas resigned as prime minister in frustration with Arafat, the United States, and Israel in September 2003.

Following the death of Yasser Arafat in November 2004, Abbas succeeded Arafat as chairman of the PLO's Executive Committee, and he won election as Arafat's successor as PA president in January 2005 with 62% of the vote. His presidency has been marked by events that include

- Israel's 2005 unilateral withdrawal from Gaza;

---

[24] Some Jewish groups allege that Abbas's doctoral thesis and a book based on the thesis (entitled *The Other Side: The Secret Relationship Between Nazism and Zionism*) downplayed the number of Holocaust victims and accused Jews of collaborating with the Nazis. Abbas has maintained that his work merely cited differences between other historians on Holocaust victim numbers, and has stated that "The Holocaust was a terrible, unforgivable crime against the Jewish nation, a crime against humanity that cannot be accepted by humankind." "Profile: Mahmoud Abbas," *BBC News*.

[25] Yet, one of the Black September assassins involved in the 1972 Munich Olympics terrorist attack that killed 11 Israeli athletes has claimed that Abbas was responsible for financing the attack, even though Abbas "didn't know what the money was being spent for." Alexander Wolff, "The Mastermind," *Sports Illustrated*, August 26, 2002.

[26] The Abu Mazen-Beilin plan contemplated a two-state solution that, among other things, would create a special mechanism for governing Jerusalem that would allow it to function as the capital of both Israel and Palestine, and would resolve the Palestinian refugee issue by allowing return to Israel only in special cases and providing for a compensation regime and resettlement elsewhere in most others. Its existence was denied for five years until its text was made public in 2000. Text available at http://www.bitterlemons.org/docs/beilinmazen.html.

- the January 2006 Hamas legislative electoral victory;

- the June 2007 Hamas takeover of Gaza;

- the 2007-2008 U.S.-supported Annapolis negotiating process with Israeli Prime Minister Ehud Olmert; and

- subsequent diplomatic efforts that have alternated between negotiations with Israel and initiatives in various international fora.

Many reports indicate that Abbas has taken several actions and positions reluctantly, and is motivated by a complex combination of factors that include resisting challenges to his personal authority, preventing destabilization and violence, and maintaining as many political and diplomatic options as possible. Some analysts are concerned that, without a functioning Palestinian legislature and with the prospect of future PA elections uncertain, the rule of President Abbas is becoming less legitimate and more authoritarian and corrupt. In late 2014, reports emerged of informal congressional holds on proposed U.S. aid projects for the West Bank, indicating reluctance among some Members of Congress to benefit Abbas politically.[27]

Concerns about maintaining order and stability may have motivated Abbas and his closest associates to increase their personal control over events and public discourse in the West Bank in recent years. Some analysts interpreted the 2013 replacement of long-serving PA Prime Minister Salam Fayyad—generally seen by Western governments as a trusted interlocutor and an exceptionally competent official—with political neophyte Rami Hamdallah as a sign of Abbas's greater consolidation of power. Abbas simultaneously appointed or re-appointed some of his close associates to other key cabinet posts.[28] Various other reports have focused on the establishment of a PA anti-corruption commission and court as a means for Abbas to counter political foes,[29] and on his possible use of patronage to maintain loyalty.[30] Threats of violence against Israeli and PA security personnel in Palestinian refugee camps, as well as the emergence of independent camp leadership committees, may signal challenges to Abbas's domestic control.[31]

## Possible Succession Scenarios and Anticipatory Effects

Abbas's age and the lack of a clear successor to his leadership, as well as questions about the process by which a potential successor would be selected, have contributed to widespread speculation about who might lead the PLO and PA upon the end of his tenure. Abbas may be increasingly mindful of his legacy and how his subsequent statements and actions will impact that legacy. Given the anticipation and uncertainty regarding the timing and nature of a leadership change, rivalry among Abbas and various potential successors for domestic loyalty and support might be contributing to intensified political infighting and more demonstrative assertions of Palestinian national demands on Israel and other international actors.[32] According to one Israeli

---

[27] Julian Pecquet, "Congress (mostly) signs off on Palestinian aid," *Al-Monitor Congress Pulse*, November 26, 2014.

[28] These include Shukri Bishara, the finance minister; Muhammad Mustafa, deputy prime minister (who also has responsibility for economic affairs and chairs the Palestine Investment Fund); Ziad Abu Amr, another deputy prime minister; and Riyad al Malki, the foreign minister.

[29] See, e.g., "Arafat's moneyman targeted in highest-profile Palestinian corruption probe," *Associated Press*, May 17, 2012; Jonathan Schanzer, "When Palestinian Politics Get Personal," *weeklystandard.com*, January 26, 2012.

[30] Khaled Abu Toameh, "PLO: Battle for Succession Has Begun," Gatestone Institute, October 18, 2013.

[31] "A new type of settlement," *Economist*, October 12, 2013.

[32] See, e.g., Grant Rumley, "In Palestine, Mahmoud Abbas vs. Mohammad Dahlan," *nationalinterest.org*, January 3, (continued...)

Page 56

ATL005151

journalist's commentary, "the twenty-strong Fatah Central Committee has urged Abbas to introduce the new post of vice president, but he has refused to contemplate that suggestion for fear of jeopardizing his executive control over the PA, since the official in question could be viewed as his de facto heir apparent."[33] Abbas has also indefinitely postponed Fatah's Seventh Conference, originally scheduled for August 2014, which would presumably set forth the faction's platform and elect or reelect its leadership.

It is possible that Abbas could give up either the PLO position or the PA position and retain the other for some period of time. Given that the two entities are structurally and functionally separate (though their roles may overlap in some respects),[34] it is not guaranteed that one person would succeed to both leadership positions.

A succession could present Hamas with opportunities to increase its profile, especially if the succession process is slow and does not definitively concentrate power around one or more non-Hamas figures.[35] Hamas exercises a significant measure of control in Gaza, maintains a majority in the currently suspended Palestinian Legislative Council, and appears to have a significant number of loyal Palestinian supporters. Regional events in the past three years, as described in **Appendix A** below, have dealt some setbacks to Hamas both in its administration of Gaza and in its efforts to gather domestic and regional support for "resistance" against various Israeli activities concerning Palestinians. However, its ability to violently target Israelis and engage Israel's military in high-profile conflict remains an avenue for attracting popular Palestinian and wider Arab support.

Under Article 37 of the Palestinian Basic Law, it appears that if Abbas were to leave office, the speaker of the Palestinian Legislative Council (PLC) would take over his duties as president for a period not to exceed 60 days, by which time elections for a more permanent successor are supposed to take place. Although the PLC has not been in session since Hamas forcibly took control of Gaza in 2007 and Abbas dismissed the Hamas-led PA government in response, the PLC's speaker is Aziz Dweik, a member of Hamas. PA presidential elections only involve residents of the West Bank (including East Jerusalem) and Gaza, not diaspora Palestinians. Though Hamas members have not run in past presidential elections, one or more could potentially run in future elections.

In any case, the extent to which succession to the PA presidency will ultimately be determined by elections and/or under the Palestinian Basic Law is unclear. Abbas's term of office was supposed to be four years, with a new round of elections initially planned for 2009 that would have allowed Abbas to run for a second and (under the Basic Law) final term. However, the split between the Fatah-led PA in the West Bank and Hamas in Gaza has indefinitely postponed PA presidential and

---

(...continued)

2015. In January 2015, Abbas reportedly decided to cut off salaries to more than 200 Fatah officials and activities suspected of being affiliated with Muhammad Dahlan (for information on Dahlan, see **Table B-1**), triggering protests in Gaza and criticism from at least one Fatah leader. Khaled Abu Toameh, "Abbas' decision to cut salaries of Dahlan supporters causes revolt within Fatah," *jpost.com*, January 27, 2015.

[33] Ehud Yaari, "The Riddle of Succession in the Palestinian Authority," Washington Institute for Near East Policy, PolicyWatch 2252, May 14, 2014.

[34] For a description of the PLO, see **Appendix A**. For a description of the PA see "Palestinian Authority (PA)."

[35] In April 2013, Representative Peter Roskam introduced H.Res. 177: "Urging the Palestinian Authority and President Mahmoud Abbas to clarify a presidential succession plan, expand political freedom in the West Bank, and take preventative measures to limit the possibility of a Hamas takeover in the West Bank."

---

**Page 57**

ATL005152

legislative elections. Despite the consensus government's nominal formation in June 2014, elections may remain unlikely absent a change in the nature of Hamas's control over Gaza. In December 2009, the PLO's Central Council voted to extend the terms of both Abbas and the current PLC until elections can be held. It is possible that this precedent could lead to PLO action in selecting or attempting to select a successor to Abbas as PA president if elections are not held shortly after he leaves office.

See **Appendix B** for information on possible successors to Abbas.

## Demographic and Economic Profile

There are an estimated 4.62 million Palestinians living in the West Bank, Gaza Strip, and East Jerusalem (approximately 2.83 million in the West Bank and East Jerusalem, and 1.79 million in Gaza).[36] Of these, approximately 2 million are registered as refugees (in their own right or as descendants of the original refugees) from the 1947-1948 Arab-Israeli war. (In addition, approximately 540,000 Jewish Israeli citizens live in the West Bank and East Jerusalem.) Another some 3 million Palestinians live as refugees in Jordan, Lebanon, and Syria, in addition to non-refugees living in these states and elsewhere around the world.

**Table 1. Estimated Palestinian Population Worldwide**

| Country or Region | Population |
| --- | --- |
| West Bank, Gaza Strip, and East Jerusalem | 4,620,000 |
| Israel | 1,460,000 |
| Arab states | 5,340,000 |
| Other states | 675,000 |
| **Total** | **12,095,000** |

**Source:** Palestinian Central Bureau of Statistics, 2014.

West Bank Palestinians generally are wealthier, better educated, and more secular than their Gazan counterparts. The Palestinian population in the West Bank and Gaza has one of the highest growth rates in the world and is disproportionately young. According to the Palestinian Central Bureau of Statistics, 39.9% of the Palestinians in the territories as of 2013 were less than 15 years old. The youth bulge ensures that the population growth rate will remain high even as fertility rates decline. Possible implications were summarized thusly in a March 2009 Brookings Institution report:

> If young people are engaged in productive roles, the Palestinian youth bulge can be a positive factor in economic development. Human capital is the main comparative advantage that Palestinian Territories have over naturally resource-rich countries in the Middle East. Yet, as in any economy, a large cohort of young Palestinians will continue to exert pressure on the education system and labor markets.[37]

---

[36] Palestinian Central Bureau of Statistics (PCBS), 2014. PCBS also reports that an additional 1.46 million Palestinians live as Arab citizens of Israel.

[37] Nawtej Dhillon, "Beyond Reconstruction: What Lies Ahead for Young Palestinians," Brookings Institution, March 2009.

ATL005153

Palestinians are relatively well educated among Arab countries, with an adult literacy rate of 95%. (Jordan and Egypt, by comparison, have a 96% and a 74% adult literacy rate, respectively.)[38] The Palestinian population in the West Bank and Gaza is approximately 98% Sunni Muslim; approximately 1% is Christian of various denominations.[39]

### Table 2. Basic Facts for the West Bank and Gaza Strip

| Statistic | West Bank | Gaza Strip | Combined |
|---|---|---|---|
| Population (2014 est.) | 2,830,000 | 1,790,000 | 4,620,000 |
| Refugees (2015 est.) | 762,000 | 1,259,000 | 2,021,000 |
| Median age (2014 est.) | 22.4 | 18.2 | - |
| Population growth rate (2014 est.) | 2.0% | 2.9% | - |
| Real GDP growth rate (2014 est.) | 5.2% (Q2) | -10.5% (Q2) | 1.0% |
| GDP per capita (2013 est.) | $2,200 | $1,190 | $1,790 |
| Unemployment rate (2014 est.) | 16.0% (Q2) | 45.1% (Q2) | 25.0% |
| Inflation rate (2014 est.) | - | - | 2.0% |
| Exports (2013 est.) | - | - | $1.7 bil |
| Export commodities | stone, olives, fruit, vegetables | fruits, vegetables, flowers | - |
| Export partners (2012 est.) | - | - | Israel 81.8%, Arab states 13.9%, North America 2.2% |
| Imports (2013 est.) | | | $6.3 bil |
| Import commodities | food, consumer goods, construction materials, petroleum, chemicals | food, consumer goods | - |
| Import partners (2012 est.) | - | - | Israel 83.2%, Europe 10.0%, Arab States 4.0% |

**Sources:** Central Intelligence Agency, Palestinian Central Bureau of Statistics, World Bank, *Economist Intelligence Unit*, UNRWA.

**Sources:** Population figures exclude Israeli settlers.

---

[38] United Nations Children's Fund (UNICEF) data, available at http://www.childinfo.org/education_literacy.php.

[39] State Department International Religious Freedom Report for 2013.

ATL005154

# The Regional and International Context

## In General

Without sovereignty or a self-sufficient economy, Palestinians' fortunes depend to a large degree on the policies of other countries and international organizations with influence in the surrounding region. Almost every aspect of Palestinian existence has some connection with Israel given Israel's occupation of the West Bank; its effective unilateral annexation of East Jerusalem; and its large measure of control over borders, resources, and trade in both the West Bank and Gaza. Both Israelis and Palestinians continue to acknowledge that the United States helps define both regional and international frameworks within which they and other international actors address their mutual issues. Some observers believe that the Israeli-Palestinian conflict commands less U.S. attention than it deserves because issues in other areas of the region and world distract attention from it. Others suggest that U.S. involvement with and support to the Palestinians demonstrates that the United States does accord the conflict priority status despite many other existing global concerns.

Some observers argue that Arab states have been historically complicit in prolonging the plight of the Palestinians (and Palestinian refugees in particular) because doing so pressures Israel and serves Arab states' domestic interests by deflecting attention from domestic problems and by avoiding difficulties that might result from assimilating the refugees into their societies. It is unclear what effect ongoing political change in Arab states will have on the Palestinian question and its various Israeli and Palestinian stakeholders. Potential effects of political change could include intensified jockeying by powers such as Iran, Turkey, Egypt, and Saudi Arabia to use the Palestinian issue for regional influence, or further destabilization and use of neighboring territory by criminal or terrorist networks in Syria, Iraq, Lebanon, and Egypt's Sinai Peninsula.

## Palestinian Diplomatic Initiatives at the United Nations and Elsewhere

### Overview

As mentioned above, the PLO has pursued a number of international initiatives that are part of a broader effort to obtain greater international recognition of Palestinian statehood, and apparently to place international legal or economic pressure on Israel in order to strengthen the PLO's hand in negotiations. Some 130 out of 193 U.N. member states have reportedly formally recognized the state of Palestine that was declared by the PLO in 1988, mostly outside of the group of North American and Western European countries that are the PA's main financial patrons and exercise considerable political influence in the region. In the fall of 2014, Sweden became the first Western European country to formally recognize Palestinian statehood, and nonbinding resolutions in favor of recognition have been passed in houses of parliament in a number of other European countries, including the United Kingdom, France, and Spain. In December 2014, the European Parliament passed a resolution expressing support in principle for Palestinian statehood. Developments in Europe formally or symbolically providing greater recognition of Palestinian statehood may also be linked to these countries' stated concerns regarding Israel's policies.[40]

---

[40] For more details, see CRS Report RL33476, *Israel: Background and U.S. Relations*, by Jim Zanotti.

On November 29, 2012, the U.N. General Assembly (UNGA) adopted Resolution 67/19 by a vote of 138 member states in favor (including 14 European Union countries—France and Spain among them), 9 against (including the United States and Israel), and 41 abstentions. The resolution changed the permanent U.N. observer status of the PLO (recognized as "Palestine" within the U.N. system) from an "entity" to a "non-member state."[41]

In April 2014, with the most recent round of U.S.-mediated Israeli-Palestinian negotiations on the verge of collapse, Abbas and the PLO applied to join a number of international treaties and conventions. This contributed to ensuring the talks' discontinuation. In late 2014/early 2015, the Palestinians applied to join additional treaties and conventions, including the Rome Statute of the ICC (see "International Criminal Court Actions" above). This took place shortly after a U.N. Security Council vote on December 30, 2014, in which a Palestinian-backed, U.S.-opposed draft resolution regarding some contentious Israeli-Palestinian issues garnered only eight of the required nine votes for adoption.[42]

The United States and Israel have indicated concern that Palestinian recourse to international fora could undermine prospects for U.S.-mediated negotiations or stoke popular unrest. The Palestinians and Arab states are reportedly planning to arrange for the introduction of another U.N. Security Council draft resolution seeking to establish parameters for resuming Israeli-Palestinian talks, amid speculation that the change in composition of the Council from 2014 to 2015 might augur well for the draft resolution's chances at garnering nine votes. This could particularly be the case if the Palestinians accept a document with fewer compulsory terms than the one voted down on December 30. The United States has stated its willingness to veto draft resolutions that seek to dictate the terms of an Israeli-Palestinian final-status agreement outside negotiations. It is unclear whether U.S. officials would veto a document establishing broad parameters governing the negotiations' resumption, scope, and conduct.

### Efforts to Obtain Membership in the U.N. or U.N. Entities

In September 2011, PLO Chairman Abbas applied for Palestinian membership in the United Nations. The application remains pending in the Security Council's membership committee, whose members did not achieve consensus during 2011 deliberations.[43] The application for

---

[41] The PLO has had permanent observer status at the United Nations since 1974. Following the adoption of Resolution 67/19, "Palestine" maintains many of the capacities it had as observer entity—including participation in General Assembly debates and the ability to co-sponsor draft resolutions and decisions related to proceedings on Palestinian and Middle East issues. Despite its new designation as a "state," "Palestine" is not a member of the United Nations, and therefore does not have the right to vote or to call for a vote in the General Assembly on resolutions. However, in November 2013, the "State of Palestine" participated in the balloting for a judge for the International Tribunal for the Former Yugoslavia. Article 13, Section 2(d) of the Statute for the Tribunal (Annex to U.N. Doc. S/25704, adopted pursuant to U.N. Security Council Resolution 827 (1993), as subsequently amended) includes "non-Member States maintaining permanent observer missions at United Nations Headquarters" in the election of the tribunal's judges.

[42] U.N. Press Release: "Resolution in Security Council to Impose 12-Month Deadline on Negotiated Solution to Israeli-Palestinian Conflict Unable to Secure Nine Votes Needed for Adoption," December 30, 2014. Among other issues, the draft resolution would have affirmed "the urgent need" to attain a negotiated two-state solution within 12 months, and would have "decided" that the solution was to be based on a number of parameters, including "a full and phased withdrawal of the Israeli occupying forces, which will end the occupation that began in 1967 over an agreed transition period in a reasonable timeframe, not to exceed the end of 2017." See the text of the draft resolution at http://unispal.un.org/unispal.nsf/5ba47a5c6cef541b802563e000493b8c/a1252711015996d85257dbf00536b1c?OpenDocument.

[43] United Nations Security Council, "Report of the Committee on the Admission of New Members concerning the application of Palestine for admission to membership in the United Nations," S/2011/705, November 11, 2011. (continued...)

Page 61

ATL005156

Palestinian membership would likely face a U.S. veto if it came to a future vote in the Security Council. In the fall of 2011, the Palestinians obtained membership in the U.N. Educational, Scientific and Cultural Organization (UNESCO).[44]

Under U.S. laws passed in 1990 and 1994,[45] Palestinian admission to membership in UNESCO in 2011 triggered the withholding of U.S. assessed and voluntary financial contributions to the organization.[46] If the Palestinians were to obtain membership in other U.N. entities, the 1990 and 1994 U.S. laws might trigger withholdings of U.S. financial contributions to these entities. Such withholdings could adversely affect these entities' budgets and complicate the conduct of U.S. foreign policy within the U.N. system and other multilateral settings.

For more information on this topic, see CRS Report R43614, *Membership in the United Nations and Its Specialized Agencies*, by Luisa Blanchfield and Marjorie Ann Browne.

# Matters of General Congressional Interest

## U.S. and International Assistance to the Palestinians

### Overview

See CRS Report RS22967, *U.S. Foreign Aid to the Palestinians*, by Jim Zanotti, for a more detailed description of this topic and the particulars of U.S. assistance, the various conditions to which it is subject, and occasional informal congressional holds. The PA's dependence on foreign assistance is acute—largely a result of the distortion of the West Bank/Gaza economy in the 48 years since Israeli occupation began and the bloat of the PA's payroll since its inception about 21 years ago. Facing a regular annual budget deficit of over $1 billion, PA officials regularly seek aid from the United States and other international sources to meet the PA's financial commitments. Absent major structural changes in revenue and expenses, which do not appear likely in the near term, this dependence will likely continue. The effectiveness of U.S. assistance to the Palestinians in furthering U.S. policy objectives is challenged, logistically and strategically, by the shifting and often conflicting interests of Israel, the PLO, the PA, Fatah, and Hamas. Effectiveness is also challenged by the U.S. interagency process, as well as the need to coordinate activities and

---

(...continued)

Paragraph 19 of this report provides a summary of the varying views that committee members advanced regarding Palestinian membership: "The view was expressed that the Committee should recommend to the Council that Palestine be admitted to membership in the United Nations. A different view was expressed that the membership application could not be supported at this time and an abstention was envisaged in the event of a vote. Yet another view expressed was that there were serious questions about the application, that the applicant did not meet the requirements for membership and that a favourable recommendation to the General Assembly would not be supported."

[44] For more information, see CRS Report R42999, *The United Nations Educational, Scientific, and Cultural Organization (UNESCO)*, by Luisa Blanchfield and Marjorie Ann Browne.

[45] P.L. 101-246 (Foreign Relations Authorization Act, Fiscal Years 1990 and 1991) and P.L. 103-236 (Foreign Relations Authorization Act, Fiscal Years 1994 and 1995).

[46] In the Obama Administration's FY2016 budget request, it seeks "legislation that would provide authority to waive" these legislative restrictions. FY2016 Department of State, Foreign Operations, and Related Programs Congressional Budget Justification, p. 41. If Members of Congress sought to lift or modify these restrictions, they could amend the applicable legal provisions or propose stand-alone legislation.

assistance with other donor states and with international organizations and coordinating mechanisms such as the European Union, United Nations,[47] World Bank, the Office of the Quartet Representative, and the Ad Hoc Liaison Committee,[48] among others.

## Palestinian International Initiatives: Effect on U.S. Aid

The Palestinians have faced reprisals from the United States and Israel for various international initiatives, including informal congressional holds that occasionally delay disbursement of U.S. aid and temporary Israeli unwillingness to transfer tax and customs revenues due the PA.[49] The United States and Israel may be reluctant to adopt drastic or permanent measures because of concerns regarding the PA's financial fragility and a lack of Israeli appetite for stepping in to fill the void or calm the disorder that could result from undermining the self-rule institutions of Palestinians.

### *ICC*

Section 7041(i)(2)(A) of the Consolidated and Further Continuing Appropriations Act, 2015 (P.L. 113-235) prohibits U.S. Economic Support Fund (ESF) assistance for the Palestinian Authority (PA) if "the Palestinians initiate an International Criminal Court judicially authorized investigation, or actively support such an investigation, that subjects Israeli nationals to an investigation for alleged crimes against Palestinians." Some ESF assistance spent through private organizations in the West Bank and Gaza Strip would probably not be deemed "for the PA."

Some Members of Congress publicly favor an immediate curtailment of U.S. aid to the Palestinians in response to the ICC-related filings discussed above (see "International Criminal Court Actions"), with Senate (S. 34) and House (H.R. 277 and H.R. 364) proposals introduced in January 2015. Policy makers may debate which Palestinian actions might trigger the existing ICC-related aid restriction. U.S. policies and statements might influence Israel's willingness to resume the transfer of tax and customs revenues due the PA that it has withheld in response to the ICC-related filings.[50]

---

[47] Over the years, U.N. organs have set up a number of bodies or offices, as well as five U.N. peacekeeping operations, which have or had mandates or functions directly related to Palestine or the Arab-Israeli dispute.

[48] The Ad Hoc Liaison Committee is a coordinating mechanism for Israel, the PA, and all major international actors providing assistance to the Palestinians that was established in the mid-1990s to facilitate reform and development in the West Bank and Gaza in connection with the Oslo process. Norway permanently chairs the committee, which meets periodically in various international venues and is divided into sectors with their own heads for discrete issue areas such as economic development, security and justice, and civil society.

[49] CRS Report RS22967, *U.S. Foreign Aid to the Palestinians*, by Jim Zanotti. Under the 1994 Paris Protocol, Israel collects various tax and customs revenues on the PA's behalf. These amounts (generally more than $1 billion annually) make up a sizeable portion of the PA's budget. Jodi Rudoren, "Tensions Mount as Israel Freezes Revenue Meant for Palestinians," *New York Times*, January 3, 2015.

[50] In prepared testimony for a congressional hearing before the House Foreign Affairs Subcommittee on the Middle East and North Africa on February 4, 2015, David Makovsky of the Washington Institute for Near East Policy wrote that "One should assume it is unlikely that the tax revenue will be released until a new Israeli government is formed, perhaps sometime in late May. Stopgap moves are required – such as assistance from Europe and the Arabs – until a new government is formed." The PA has reportedly taken out bank loans to finance a portion of its salary payments for January 2015.

ATL005158

In previous public discussions of possible pros and cons of U.S. aid to the Palestinians, some have argued that despite alleged problems with Palestinian leadership, cutting aid could increase other countries' political influence at U.S. expense.[51] According to one media report, "for years, Israel has acted as a brake on efforts by pro-Israel members of Congress to cut off aid to Palestine during periodic flare-ups," presumably to preserve the PA's stability as a West Bank security provider.[52] According to the same report, Israel may be reconsidering its stance,[53] though some analysts have voiced caution about the possible effects of an aid cutoff.[54]

On January 29, 2015, 75 Senators signed a letter addressed to Secretary of State John Kerry opposing Palestinian initiatives respecting the ICC. The letter included the following passage:

> Although we believe it is in the interest of the United States for urgent humanitarian assistance to continue to be provided to the Palestinian people, we will not support assistance to the Palestinian Authority while you undertake a review of this matter.[55]

## United Nations and U.N. Specialized Agencies

In the event that the PLO's status in the United Nations or any U.N. specialized agency other than UNESCO approaches the level of membership, two separate provisions from Section 7041(i)(2) of P.L. 113-235 could be triggered. The first, which is subject to a waiver by the Secretary of State for national security reasons, would prevent Economic Support Fund aid (ESF) for the PA. The second could prohibit the President from permitting the PLO to maintain its representative office in Washington, DC. Every six months since the early days of the peace process in the mid-1990s, each successive President has waived a 1987 legal prohibition against the existence of a PLO representative office.[56]

These two provisions of Section 7041(i)(2) would be triggered if the Palestinians obtain "the same standing as member states or full membership as a state outside an agreement negotiated between Israel and the Palestinians" in the United Nations or any U.N. specialized agency other than UNESCO. If the second provision is triggered, a presidential waiver would only be eligible—after an additional 90 days—if the President certifies to Congress that the Palestinians have entered into "direct and meaningful negotiations with Israel."

---

[51] For example, in May 2014 congressional hearing testimony, Jonathan Schanzer of the Foundation for the Defense of Democracies stated, "You know, if we zero out Palestinian funding, then here is the big problem. You are going to have someone else come in and they are going to be worse. More than likely, you are going to see the Saudis, the Iranians, the Qataris, the Turks. They are all going to come in and they are not even going to hold the Palestinians to account at all." Transcript from hearing of the House Foreign Affairs Subcommittee on the Middle East and North Africa, May 8, 2014.

[52] John Hudson, "Defunding Palestine," *foreignpolicy.com*, January 7, 2015.

[53] Ibid.

[54] For example, in David Makovsky's prepared congressional hearing testimony of February 4, 2015, he wrote that "Withholding funding—over time—will lead to the collapse of the security cooperation and ultimately the PA, creating a vacuum that can be filled by radicalism."

[55] Text of letter available at http://www.rubio.senate.gov/public/index.cfm/files/serve/?File_id=72123469-50ce-4d35-972e-4d8ff013d000.

[56] Anti-Terrorism Act of 1987 (P.L. 100-204, §1003).

# Terrorism and Militancy

## Hamas and Other Groups: Rockets and Other Methods

Hamas (see **Appendix A** for an overview of the organization and its ideology, leadership, and external support) and seven other Palestinian groups have been designated Foreign Terrorist Organizations (FTOs) by the State Department: Abu Nidal Organization, Al Aqsa Martyrs' Brigades, Army of Islam, Palestine Liberation Front – Abu Abbas Faction, Palestine Islamic Jihad – Shaqaqi Faction, Popular Front for the Liberation of Palestine, and Popular Front for the Liberation of Palestine-General Command. Most Palestinian militant groups claim that they are opposed to peace with Israel on principle, but some—such as the Fatah-affiliated Al Aqsa Martyrs' Brigades—view militancy and terror as tactics that can be used to improve the Palestinians' negotiating position. Since Oslo in 1993, these groups have engaged in a variety of methods of violence, killing hundreds of Israelis—both military and civilian.[57] Palestinians who insist that they are engaging in asymmetric warfare with a stronger enemy point to the thousands of deaths inflicted on Palestinians by Israelis since 1993,[58] some through acts of terrorism aimed at civilians.[59]

A pronounced trend since Israel's disengagement from Gaza in 2005 has been an increased firing of rockets and mortars from the territory, where security remains controlled by Hamas. The thousands of rockets and mortars fired by Palestinians since 2001 have killed tens of Israelis and wounded hundreds.[60] The persistent threat of rocket fire has by most accounts had a broader negative psychological effect on Israelis living in targeted communities.[61] Because rockets are fired indiscriminately without regard for avoiding these communities, most neutral observers characterize this as tantamount to intentional targeting of civilians.

Over the past decade-plus, tunnels leading from Egypt's Sinai Peninsula have allowed militants to smuggle pre-fabricated rockets (many of which are thought to come from Iran) into Gaza, as well as raw materials for building rockets. Although Egyptian military actions since late 2013 have apparently constrained smuggling activities through Sinai-Gaza tunnels, media reports indicated that during the summer 2014 Israel-Gaza conflict, weapons smugglers continued to operate through the tunnels[62] as part of a wider regional network to supply Gaza-based militants. A July 2014 *New York Times* article stated that rockets are smuggled to Gaza "via ship and tunnel from Iran, Libya, Sudan and Syria and, increasingly, manufactured from water pipes and household

---

[57] Statistics available from B'Tselem (The Israeli Information Center for Human Rights in the Occupied Territories) website at http://www.btselem.org/statistics.

[58] Ibid.

[59] The most prominent attack by an Israeli civilian against Palestinians since 1993 was the killing of at least 29 Palestinians (and possibly between 10 to 23 more) and the wounding of about 150 more by Israeli settler Baruch Goldstein (a Brooklyn-born former military doctor) at the Ibrahimi Mosque (Mosque of Abraham) in the Cave of the Patriarchs in Hebron on February 25, 1994 (the Jewish holy day of Purim) while the victims were at prayer. See George J. Church, "When Fury Rules," *Time*, March 7, 1994. This incident has been cited by many analysts as a provocation for the Palestinian suicide bombing campaign that followed.

[60] http://www.btselem.org/statistics; "Rocket Threat to Israel: Palestinian Rocket & Mortar Attacks (February 2009-Present)," Jewish Virtual Library; "Q&A: Gaza conflict," *BBC News*, January 18, 2009.

[61] See, e.g., Irwin J. Mansdorf, "Unseen Scars of War: Psychological Consequences of the Hamas Attacks on the Israeli Civilian Population," Jerusalem Center for Public Affairs, July 20, 2014.

[62] "Exclusive: Militants, weapons transit Gaza tunnels despite Egyptian crackdown," *Reuters*, August 21, 2014;

ATL005160

items in what a senior Israeli intelligence officer called Gaza's 'high-tech' sector—about 70 makeshift factories staffed by 250 men and overseen by a few dozen engineers and chemists."[63] Gaza-manufactured rockets, which are mostly short-range and rudimentary, reportedly include some with ranges of 160 km (nearly 100 miles) or more.[64] Reports indicate that Hamas's rocket production capabilities and other military capacities have been augmented through Iranian technological assistance and training (provided either directly or by proxy through the Lebanese Shiite group Hezbollah).[65]

From the time of Oslo to the end of the second intifada, Palestinian terrorist groups often carried out suicide bombings, claiming approximately 700 Israeli lives (mostly civilians within Israel proper).[66] After peaking between 2001 and 2003, suicide bombings have largely ceased since early 2006. Many observers attribute the drop-off to enhanced Israeli security measures—the Israeli military's withdrawal from Gaza in 2005 and the general closure of its borders, the West Bank separation barrier, and tightening of border checkpoints. Additionally, some analysts have posited, as contributing factors, Hamas's entry into a position of power, the strengthening of PA security forces in the West Bank, and general Palestinian weariness regarding violence.

Isolated attacks still occur within Israel and the West Bank, often perpetrated by Palestinians using small arms or vehicles as weapons. Antipathy between Jewish settlers and Palestinian residents in the West Bank leads to occasional attacks on both sides. Militants also stage attacks and attempt to capture Israeli soldiers, including at or near Gaza border crossings, and since 2011 have engaged in a few instances of cross-border attack from redoubts within Egypt's Sinai Peninsula—an international border less vulnerable to Israeli reprisals.

---

[63] Jodi Rudoren, "From Gaza, an Array of Makeshift Rockets Packs a Counterpunch," *New York Times*, July 17, 2014. An Israeli analyst has claimed that some rockets used by Hamas are based on a Chinese design and were made in Syria after being licensed by the Chinese. Alastair Jamieson, "Hamas Firing China-Designed, Syria-Made M-302 Rockets: Israel," *NBC News*, July 10, 2014. One open-source intelligence report has shown Hamas fighters using what appear to be North Korean anti-tank guided missiles. Stijn Mitzer and Joost Oliemans, "North Korean anti-tank missiles in the Middle East," June 25, 2014, http://lewis.armscontrolwonk.com/archive/7370/oryx-blog-on-dprk-arms-exports.

[64] See, e.g., Jeremy Binnie, "Analysis: Hamas displays long-range rockets," *Jane's Defence Weekly*, December 17, 2014.

[65] See, e.g., Ronen Bergman, "How Hamas Beat Israel in Gaza," *New York Times*, August 10, 2014; Adnan Abu Amer, "With little help from Iran, Hamas fights Israel with homemade rockets," *Al-Monitor Palestine Pulse*, July 16, 2014.

[66] Suicide bombing figures culled from Israel Ministry of Foreign Affairs website at http://www.mfa.gov.il/MFA/Terrorism-+Obstacle+to+Peace/Palestinian+terror+before+2000/Suicide%20and%20Other%20Bombing%20Attacks%20in%20Israel%20Since.

## Figure 3. Approximate Range of Rockets from Gaza



**2001** The first Qassam rockets launched by Hamas barely cleared the border.

**2002-5** Hamas made slight improvements to the ranges of the homemade Qassam rockets.

**2006** Hamas possessed factory-made Katyusha-type rockets.

**2008** The possible range of attack nearly doubled. 2012 Hamas used Iranian Fadjr-5 rockets, smuggled through Sudan and Egypt, as well as locally-made M-75s.

**2014** Hamas used the Syrian-made M-302 for the first time.

By Joe Burgess and Karen Yourish

Sources: Palestinian Center for Human Rights; IHS Jane's; Global Security; Israeli Defense Forces; Meir Amit Intelligence and Terrorism Information Center; Israeli Ministry of Foreign Affairs; Jeffrey White, Washington Institute for Near East Policy

**Source:** *New York Times*, July 13, 2014.

ATL005162

### Assessing and Countering Threats

Israeli authorities express concern that Palestinian militants might soon acquire longer-range rockets and precision targeting capabilities that would increase the danger to larger population centers such as Tel Aviv. Nevertheless, Israeli Defense Minister Moshe Ya'alon was cited in September 2014 as saying that Hamas depleted 80% of its rocket and mortar arsenal during the summer 2014 Israel-Gaza conflict and that Israel's military efforts during the conflict "will give us quiet for a long time."[67]

The possibility that a more dangerous rocket threat could emerge in the West Bank—especially in light of Iran's apparent transfer of weapons production know-how to Palestinian militants based in Gaza—is one factor underlying Israeli reluctance to consider withdrawal without copious security guarantees. The possibility also exists of a coordinated or simultaneous rocket attack by Palestinian militants from Gaza and by Lebanese Hezbollah.

In addition to developing and deploying the Iron Dome anti-rocket system,[68] Israel also continually seeks U.S. and international help to slow or stop the Gaza smuggling network. These concerns have been heightened by periodic attacks in recent years from Palestinians based in Sinai, including occasional rocket fire aimed at the Israeli Red Sea port of Eilat. As discussed above, Egypt has taken robust measures to disrupt Sinai-Gaza tunnel traffic since late 2013. Egypt has even periodically closed its passenger/commercial crossing with Gaza at Rafah, apparently owing largely to Egyptian allegations of Hamas complicity with an October 2014 attack by the group Ansar Beit al Maqdis (now known as Sinai Province of the Islamic State, or IS-SP), which killed 33 Egyptian soldiers.[69] It is also reportedly in the process of establishing a Sinai-Gaza buffer zone.[70] Although some media reports point to possible links between Gaza-based militants and armed groups in Sinai,[71] Hamas leaders deny associating with IS-SP, underscoring possible Hamas disfavor or ambivalence towards the group and its proclaimed global jihadist aspirations, as well as a potentially competitive dynamic between the two groups for influence among militants and potential militants in Gaza.[72]

## Palestinian Governance

Achieving effective and transparent governance over the West Bank and Gaza and preventing Israeli-Palestinian violence, while facing a continued Israeli settler and military presence, has proven elusive since the limited self-rule experiment began in 1994. Many observers say that the

---

[67] "Yaalon: Hamas Missile Arsenal Depleted by 80%, Group in Strategic Crisis (VIDEO)," *Algemeiner*, September 29, 2014.

[68] For more information on Iron Dome, see CRS Report IN10158, *Israel's Iron Dome Anti-Rocket System: U.S. Assistance and Coproduction*, by Jeremy M. Sharp; CRS Report RL33476, *Israel: Background and U.S. Relations*, by Jim Zanotti; and CRS Report RL33222, *U.S. Foreign Aid to Israel*, by Jeremy M. Sharp.

[69] Yoni Ben Menachem, "Muhammad Dahlan and the Succession Battle for the PA Chairmanship," Jerusalem Center for Public Affairs, January 21, 2015.

[70] Ariel Ben Solomon, "Islamic State begins expanding Gaza buffer zone," *jpost.com*, January 4, 2015.

[71] Adnan Abu Amer, "Islamic State in Sinai poses threat to Hamas," *Al-Monitor Palestine Pulse*, November 20, 2014. For information on IS-SP, see CRS Report IN10199, *The Islamic State in Egypt: Implications for U.S.-Egyptian Relations*, by Jeremy M. Sharp.

[72] Abu Amer, "Islamic State in Sinai poses threat to Hamas," op. cit.

Page 68

task became even more difficult following the split established in 2007 between the Abbas-led PA in the West Bank and Hamas in Gaza.

## Palestinian Authority (PA)

The Palestinian National Authority (or Palestinian Authority, hereinafter PA) was granted limited rule (under supervening Israeli occupational authority) in the Gaza Strip and parts of the West Bank in the mid-1990s pursuant to the Oslo Accords.[73] Although not a state, the PA is organized like one—complete with democratic mechanisms; security forces; and executive, legislative, and judicial organs of governance. Ramallah is its de facto seat, but is not considered to be the PA capital because of Palestinian determination to make Jerusalem (or at least the part east of the 1967 lines) the capital of a Palestinian state. The executive branch has both a president and a prime minister-led cabinet, the Palestinian Legislative Council (PLC) is its legislature, and the judicial branch has separate high courts to decide substantive disputes and to settle constitutional controversies, as well as a High Judicial Council.[74] The electoral base of the PA is composed of Palestinians from the West Bank, Jerusalem, and the Gaza Strip.

After Hamas won January 2006 PLC elections, a factional standoff between Fatah and Hamas ensued—with Abbas as PA president and Hamas members as government ministers and a majority in the PLC.[75] These tensions ultimately led to armed conflict that led to Hamas's forcible takeover of the Gaza Strip in June 2007. In response to the Hamas takeover, PA President Abbas dissolved the Hamas-led government and appointed a "caretaker" technocratic PA government in the West Bank. The PLC is currently sidelined due to its lack of a quorum caused by the West Bank/Gaza split.

Because some PA leaders hold overlapping leadership roles within the PLO and various factions, it is difficult to gauge the degree to which Palestinians consider the PA truly authoritative or legitimate even within the West Bank. For example, until his death in 2004, Yasser Arafat served as PA president, PLO chairman, and head of Fatah. Following Arafat's death, Mahmoud Abbas has succeeded him in each of these roles. Many observers wonder how the PLO and PA will coordinate their functions and be regarded by the Palestinian people at a future point when the leadership of the two institutions and of Fatah might be different. It is possible that the PA could somehow forge an identity completely independent from (and perhaps in competition with) the PLO. Alternatively, the PLO might attempt to restructure or dissolve the PA (either in concert with Israel or unilaterally) pursuant to the claim that the PA is a constitutional creature of PLO agreements with Israel.[76]

---

[73] The relevant Israel-PLO agreements that created the PA and established its parameters were the Agreement on the Gaza Strip and the Jericho Area, dated May 4, 1994; and the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip, dated September 28, 1995.

[74] Human rights groups have voiced concern that the PA executive circumvents civilian courts that might check its power by employing military courts on a wider range of matters than the civilian courts deem proper. See, e.g., Report of the United Nations Fact-Finding Mission on the Gaza Conflict (aka "The Goldstone Report"), dated September 25, 2009, pp. 337-338, available at http://www2.ohchr.org/english/bodies/hrcouncil/specialsession/9/ FactFindingMission.htm.

[75] This time, the United States and Israel supported increasing the power of the PA presidency at the expense of the Hamas prime minister and cabinet—a turnabout from their 2003 approach to the organs of PA governance when Arafat was PA president and the two countries encouraged the PA to establish the office of prime minister as a hoped-for counterweight to Arafat.

[76] The PA was originally intended to be a temporary, transitional mechanism for the five-year period prescribed for (continued...)

Page 69

## Prospects for Economic Self-Sufficiency

Lacking a self-sufficient private sector, the Palestinians' economic prospects have historically depended on easy entry into and exit out of Israel for their workers and goods. Yet, following the outbreak of the second intifada in 2000, this access largely ceased. Israel constructed a West Bank separation barrier and increased security at crossing points. It now issues permits to control access, and periodically halts the flow of people and goods altogether. Alternatives to Palestinian economic interdependence with Israel would likely be

- to attract investment and build a self-sufficient economy, which is probably years if not decades away;

- to look to neighboring Egypt and Jordan (which struggle with their own political and economic problems) for economic integration; or

- to depend indefinitely upon external assistance.

For the West Bank and Gaza to attract enough long-term investment to become self-sufficient, most observers agree that uncertainties regarding the political and security situation and Israeli movement restrictions would need to be significantly reduced or eliminated.[77] The PA routinely faces crises in finding budgetary funds from donors or lending sources, occasionally even receiving emergency advances from Israel on the tax and customs revenues it regularly collects on the PA's behalf.

In the wake of Israel's tapping of natural gas fields off its coast, the PA has reportedly discussed the prospect of developing the Marine (sometimes known as "Marine A") gas field discovered off Gaza's coast in 2000 with the British-led private venture that controls the rights to the field.[78] Analysts have speculated about the possibility that the field could supply the Gaza Strip's energy-starved power plant.[79] Political and security concerns, particularly Hamas's security control over Gaza since June 2007, have complicated this issue. Uncertainty regarding Israeli-Palestinian relations and the PA's future, as well as an internal Israeli antitrust matter,[80] could affect the shipment of gas from resources off the Israel and Gaza coasts to Palestinians. Before the Israeli antitrust matter emerged in December 2014, the PA had agreed with the companies developing

---

(...continued)

final-status negotiations, not an indefinite administrative authority.

[77] See, e.g., World Bank, *Economic Monitoring Report to the Ad Hoc Liaison Committee*, September 22, 2014.

[78] Gwen Ackerman and Riad Hamade, "Palestinians Pin Hopes on Gas Project to Counter Donor Fatigue," *Bloomberg News*, January 28, 2014. A venture led by BG Group (formerly British Gas) discovered the Marine field. It has an estimated resource base of 1 tcf. Development of Marine could contribute to greater Palestinian economic and political self-sufficiency, perhaps freeing up Israeli energy resources for domestic consumption or export to other places. Simon Henderson, "Natural Gas in the Palestinian Authority: The Potential of the Gaza Marine Offshore Field," German Marshall Fund of the United States, March 2014. Reduced Palestinian dependence on Israel could either heighten or reduce Israeli-Palestinian tensions.

[79] A venture led by BG Group (formerly British Gas) discovered the Marine field in 2000. It has an estimated resource base of 1 tcf. Development of Marine could contribute to greater Palestinian economic and political self-sufficiency, perhaps freeing up Israeli energy resources for domestic consumption or export to other places. Simon Henderson, "Natural Gas in the Palestinian Authority: The Potential of the Gaza Marine Offshore Field," German Marshall Fund of the United States, March 2014. Reduced Palestinian dependence on Israel could either heighten or reduce Israeli-Palestinian tensions.

[80] Stanley Reed, "In Israel, Antitrust Regulator Reviews Natural Gas Development," *New York Times*, December 23, 2014.

Page 70

ATL005165

Israel's Leviathan field to export gas that would power a new generation plant in the northern West Bank if and when Leviathan comes online.[81] In addition to contemplating cooperation with Israel on energy, the PA agreed in December 2013 with Israel and Jordan on a plan to pursue a version of the Red Sea-Dead Sea canal that would provide discounted freshwater to Palestinians.[82]

## West Bank: PA and Israel

The PA administers densely populated Palestinian areas in the West Bank subject to supervening Israeli control under the Oslo agreements (see **Figure 1** above for map).[83] Israel Defense Forces (IDF) soldiers regularly mount arrest operations to apprehend wanted Palestinians or foil terrorist plots, and maintain permanent posts throughout the West Bank and along the West Bank's administrative borders with Israel and Jordan to protect Jewish settlers and broader security interests. In defining these security interests and claiming its military prerogatives, the IDF sometimes takes measures that involve the expropriation of West Bank land or dispossession of Palestinians from their homes and communities.

Coordination between Israeli and PA authorities generally takes place discreetly, given the political sensitivity for PA leaders to be seen "collaborating" with Israeli occupiers. In early 2002, at the height of the second intifada, Israel reoccupied PA-controlled areas of the West Bank (known as Operation Defensive Shield)—demolishing many official PA buildings, Palestinian neighborhoods, and other infrastructure; and reinforcing many Palestinians' opinion that Israel retained ultimate control over their lives.

Since 2007, many observers have noted signs of progress with PA security capabilities and West Bank economic development. It is less clear whether the progress they cite can be made self-sustaining absent a broader political solution with Israel, or can fuel a dynamic that could help to bring about such a solution.[84]

## Gaza: Hamas, PA, Israel, and Egypt (Sinai)[85]

Hamas's security control of Gaza presents a conundrum for the Abbas-led PA, Israel, and the international community. They have been unable to establish a durable political-security framework for Gaza that assists Gaza's population without bolstering Hamas. Breaking the deadlock on Gaza could include one or more of the following: (1) actually implementing a political reunification of Gaza with the West Bank under the current PA consensus governing arrangement, (2) a general opening of Gaza's borders, (3) a formal Hamas-Israel truce. Observers routinely voice concerns that if current arrangements continue, the massive unemployment and

---

[81] "Leviathan Partners Sign Deal with Palestinians," *Oil Daily*, January 7, 2014.

[82] For more details, see CRS Report RL33546, *Jordan: Background and U.S. Relations*, by Jeremy M. Sharp.

[83] The two agreements that define respective Israeli and PA zones of control are (1) the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip, dated September 28, 1995; and (2) the Protocol Concerning the Redeployment in Hebron, dated January 17, 1997. East Jerusalem is excluded from these agreements, as Israel has effectively annexed it.

[84] See, e.g., Jack Moore, "West Bank Gun Battle Exposes Growing Resentment Towards Palestinian Authority," *Newsweek*, February 5, 2015.

[85] For additional details on the Gaza-Sinai dynamic, see CRS Report RL33003, *Egypt: Background and U.S. Relations*, by Jeremy M. Sharp.

Page 71

ATL005166

dispiriting living conditions that have persisted and at points worsened since Israel's withdrawal in 2005 could contribute to further radicalization of the population, decreasing prospects for peace with Israel and for Palestinian unity and increasing the potential for future violence. Israel disputes the level of legal responsibility for Gaza's residents that some international actors claim it retains—given its continued control of most of Gaza's borders, airspace, maritime access, and various buffer zones within the territory.

Hamas's preeminence in Gaza can be traced to 2006-2007. After victory in the 2006 PA legislative elections, internal Hamas political and military leaders in the West Bank and Gaza gained greater power, and then consolidated this power in Gaza—while losing it in the West Bank—through violent struggle with Fatah in June 2007. Hamas's security forces have maintained power in Gaza ever since, even after its de facto government publicly relinquished responsibility in June 2014 to a PA government formed with Hamas's approval.

Hamas and other Palestinian militant groups used Gaza as a base for their attacks on Israel during the summer 2014 conflict, as they had in the two previous conflicts described above in 2008-2009 and 2012. As described above (see "Hamas and Other Groups: Rockets and Other Methods"), these groups smuggle weapons via ship and tunnel from various sources. See **Figure 2** above for a map of Gaza. Though Hamas has suffered from a measure of regional isolation due to a number of developments since 2011, and may be struggling to adjust to this reality, some observers assert that its abrogation of administrative responsibility in Gaza may serve its purposes—possibly allowing it to retain "veto power" over PLO and PA initiatives while seeking to reduce its accountability.[86]

Since Hamas's 2007 takeover of Gaza, Israeli and Egyptian authorities have maintained strict control over Gaza's border crossings.[87] This is ostensibly meant to deny Hamas materials to reconstitute its military capabilities, but also limits commerce and—in some cases—delays humanitarian assistance for Gaza's largely impoverished population. Hamas had routinely bypassed limitations on the import of construction materials and dual-use items by encouraging and facilitating the expansion of a network of smuggling tunnels leading into Gaza from Egypt's Sinai Peninsula. However, after Egypt's military regained national political control in July 2013, it disrupted Gaza's tunnel-based economy as part of a larger effort to counter Sinai-based insurgents. This contributed to a number of developments—energy shortages, higher prices and unemployment—that may have factored into Hamas's decision to agree to the June 2014 formation of a consensus PA government and to publicly forswear responsibility for Gaza. It may have also factored into Hamas's engagement in conflict against Israel in the summer of 2014.

In the aftermath of the summer 2014 conflict, the United Nations brokered a "Gaza Reconstruction Mechanism" among Israel, the PA, and Hamas. The mechanism is intended to distance Hamas from the reconstruction process by involving the PA and U.N. more directly and advancing the following objectives:

---

[86] See, e.g., Ehud Yaari, "Hamas Opts for the Hezbollah Model," Washington Institute for Near East Policy, Policywatch 2263, June 3, 2014.

[87] In November 2005, Israel and the PA signed an Agreement on Movement and Access, featuring U.S. and European Union participation in the travel and commerce regime that was supposed to emerge post-Gaza disengagement, but this agreement was never fully implemented. In September 2007, three months after Hamas's takeover of Gaza, the closure regime was further formalized when Israel declared Gaza to be a "hostile entity." In 2010, Israel eased restrictions on imports and on exports headed to destinations other than Israel and the West Bank, but widespread unemployment and poverty persist.

Page 72

a. Enable the [PA] to lead the reconstruction effort;

b. Enable the Gazan private sector;

c. Assure donors that their investments in construction work in Gaza will be implemented without delay;

d. Address Israeli security concerns related to the use of construction and other 'dual use' material.[88]

There has reportedly been minimal implementation of the mechanism, largely because of continuing stalemate among Israel, the PA, and Hamas regarding a variety of political- and security-related issues that had probably contributed to the summer conflict and, if unresolved, might precipitate future conflict.[89] In remarks made at the October conference in Cairo, Secretary of State John Kerry stated:

> This is the third time in less than six years that together with the people of Gaza, we have been forced to confront a reconstruction effort....
>
> Now, I don't think there's any person here who wants to come yet again to rebuild Gaza only to think that two years from now or less we're going to be back at the same table talking about rebuilding Gaza again because the fundamental issues have not been dealt with.... Even the most durable of ceasefires is not a substitute of security for Israel and a state and dignity for the Palestinians.[90]

In many respects, UNRWA and other international organizations and non-governmental organizations take care of the day-to-day humanitarian needs of many of Gaza's residents. They have played more significant roles during and after the summer 2014 conflict in providing temporary shelter, other assistance, and trying to facilitate reconstruction.[91] However, international donations have not kept pace with stated needs,[92] possibly at least partly owing to global economic factors as well as to humanitarian crises in Syria, Iraq, and other places. For more information on Palestinian refugees, see **Appendix A**.

---

[88] Text of document establishing the mechanism available at http://www.unsco.org/Gaza%20Reconstruction%20Mechanism%20Fact%20Sheet%209%20October%202014.pdf.

[89] Adel Zaanoun, "Gaza ripe for new explosion, analysts warn," *Agence France Presse*, December 21, 2014.

[90] Secretary of State John Kerry, Transcript of Remarks at the Gaza Donors Conference, Cairo, Egypt, October 12, 2014.

[91] UNRWA Gaza Situation Report 78, February 5, 2015; UNRWA Construction Projects, January 2015 Update.

[92] In December 2014, UNRWA Deputy Commissioner-General Margot Ellis said at UNRWA's 2015 pledging conference that "As we approach the end of 2014, the Agency still confronts a deficit of $35 million. We have temporarily suspended payments to creditors and already cannot but worry about 2015." UNRWA website, Remarks by Deputy Commissioner-General Margot Ellis at the General Assembly, December 4, 2014. See also UNRWA Gaza Situation Report 78, February 5, 2015, which states that "Due to lack of funding, and as warned since the 4th quarter of 2014, UNRWA was forced to suspend its cash assistance programme supporting repairs and providing rental subsidies to Palestine refugee families in Gaza."

Page 73

ATL005168

# Appendix A. Key Palestinian Factions and Groups

## Palestine Liberation Organization (PLO)

The Palestine Liberation Organization (PLO) is recognized by the United Nations (including Israel since 1993) as the sole legitimate representative of the Palestinian people, wherever they may reside. It is an umbrella organization that includes 10 Palestinian factions (but not Hamas or other Islamist groups). As described above, the PLO was founded in 1964, and, since 1969, has been dominated by the secular nationalist Fatah movement. Organizationally, the PLO consists of an Executive Committee,[93] the Palestinian National Council (or PNC, its legislature), and a Central Council.[94]

After waging guerrilla warfare against Israel throughout the 1970s and 1980s under the leadership of the late Yasser Arafat from exile in Jordan, Lebanon, and Tunisia, the PNC declared Palestinian independence and statehood in 1988. This came at a point roughly coinciding with the PLO's decision to publicly accept the "land-for-peace" principle of U.N. Security Council Resolution 242 and to contemplate recognizing Israel's right to exist. The declaration had little practical effect, however, because the PLO was in exile in Tunisia and did not define the territorial scope of its state.[95] The PLO recognized the right of Israel to exist in 1993 upon the signing of the Declaration of Principles (Oslo Accord) between the two parties.

While the PA maintains a measure of self-rule over various areas of the West Bank, as well as a legal claim to self-rule over Gaza despite Hamas's security presence,[96] the PLO remains the representative of the Palestinian people in negotiations with Israel and with other international actors. The PLO has a representative in Washington, DC (although it is not considered a formal diplomatic mission). Under the name "Palestine," the PLO is a member of UNESCO, maintains a permanent observer mission to the United Nations in New York and in Geneva as a "non-member state," and has missions and embassies in other countries—some with full diplomatic status. The PLO also is a full member of both the Arab League and the Organization of Islamic Cooperation.

---

[93] In addition to Abbas, the PLO Executive Committee includes such figures as Yasser Abed Rabbo, Saeb Erekat, Ahmed Qurei, and Hanan Ashrawi. A full listing can be found in "Abbas shuffles PLO Executive Committee, ousts Qaddoumi," *Ma'an*, September 14, 2009.

[94] The PNC is supposed to meet every two years to conduct business, and consists of approximately 700 members, a majority of whom are from the diaspora. The PNC elects the 18 members of the Executive Committee, who function as a cabinet—with each member assuming discrete responsibilities—and the Executive Committee elects its own chairperson. In August 2009, the PNC convened for the first time since 1998 when Mahmoud Abbas (Chairman of the PLO Executive Committee) called an extraordinary session in Ramallah to hold new Executive Committee elections. The Central Council is chaired by the PNC president and has over 100 members—consisting of the entire Executive Committee, plus (among others) representatives from Fatah and other PLO factions, the Palestinian Legislative Council, and prominent interest groups and professions. The Central Council functions as a link between the Executive Committee and the PNC that makes policy decisions between PNC sessions. See http://www.mideastweb.org/palestinianparties.htm#PLO as a source for much of the PLO organizational information in this paragraph.

[95] The declaration included the phrase: "The State of Palestine is the state of Palestinians wherever they may be." The text is available at http://www.mideastweb.org/plc1988.htm.

[96] The PA's legal claim to self-rule over Gaza is subject to the original Oslo-era agreements of the 1990s, the agreements between Israel and the PA regarding movement and access that were formalized in November 2005 shortly after Israel's withdrawal from Gaza, and the June 2014 formation of a PA government with formal sway over both the self-rule areas in the West Bank and Gaza.

## Fatah

Fatah, the secular nationalist movement formerly led by Yasser Arafat, has been the largest and most prominent faction in the PLO for decades. Since the establishment of the PA and limited self-rule in the West Bank and Gaza in 1994, Fatah has dominated the PA, except during the period of Hamas rule in 2006-2007. Yet, problems with internecine violence, widespread disenchantment with Fatah's corruption and poor governance, and the failure to establish a Palestinian state have led to popular disillusionment. The death of Arafat in 2004 removed a major Fatah unifying symbol, further eroding the movement's support as Mahmoud Abbas took over its leadership.

Additionally, the image of Fatah as the embodiment of Palestinian nationalism and resistance to Israeli occupation has gradually faded away. Although he is the head of the movement, Mahmoud Abbas generally carries out his PLO and PA leadership roles without close consultation with his nominal allies in Fatah.

For years, analysts have pointed to a split within Fatah between those of the "old guard" (mainly Arafat's close associates from the period of exile) and those of a "young guard" some believe to be more attuned to on-the-ground realities—personified by leaders such as the imprisoned (by Israel) but popular Marwan Barghouti. Cleavages and overlaps within and among these groups and the political coming-of-age of even younger Fatah partisans, combined with factors mentioned above that have eroded Fatah's support base and credibility, have created doubts regarding Fatah's long-term cohesion and viability.

Fatah's 1960s charter has never been purged of its clauses calling for the destruction of the Zionist state and its economic, political, military, and cultural supports.[97] Abbas routinely expresses support for "legitimate peaceful resistance" to Israeli occupation under international law, complemented by negotiations. However, some of the other Fatah Central Committee members are either less outspoken in their advocacy of nonviolent resistance than Abbas, or reportedly explicitly insist on the need to preserve the option of armed struggle.[98]

---

[97] This is the case even though Fatah is the predominant member faction of the PLO, and the PLO formally recognized Israel's right to exist pursuant to the "Letters of Mutual Recognition" of September 9, 1993 (although controversy remains over whether the PLO charter has been amended to accommodate this recognition).

[98] Itamar Marcus and Nan Jacques Zilberdik, Palestinian Media Watch Bulletin (translating and quoting various Arabic-language sources), January 18, 2011; Samuel Sokol, "Senior Palestinian Official Backtracks on 'End' of Israel Remarks," *Algemeiner*, September 26, 2011. The Al Aqsa Martyrs' Brigades is a militant offshoot of Fatah that emerged in the West Bank early in the second intifada and later began operating in Gaza as well. The group initially targeted only Israeli soldiers and settlers, but in 2002 began a spate of attacks on civilians in Israeli cities and in March 2002 was added to the State Department's list of Foreign Terrorist Organizations. According to terrorism experts, the group switched tactics to restore Fatah's standing among Palestinians at a time when Palestinian casualties were mounting, Hamas's popularity was rising, and Fatah was tainted by its cooperation with Israel during the Oslo years. Most of the Brigades' members were believed to have hailed from the Palestinian security forces. In line with the Abbas-led PA's effort to centralize control over West Bank security since Hamas's takeover of Gaza in mid-2007, the Brigades (mainly voluntarily, partly through various amnesty programs) disbanded or at least lowered its profile in the West Bank. However, some reports have recently speculated about a possible resurgence in militant activity by the Brigades. Ola al-Tamimi, "Is the West Bank witnessing a resurgence of Fatah's al-Aqsa Martyr Brigades?," *Al Akhbar English*, July 28, 2014.

**Page 75**

ATL005170

### Other PLO Factions and Leaders

Factions other than Fatah within the PLO include secular groups such as the Popular Front for the
Liberation of Palestine (PFLP, a U.S.-designated Foreign Terrorist Organization), the Democratic
Front for the Liberation of Palestine, and the Palestinian People's Party. All of these factions have
minor political support relative to Fatah and Hamas.

A number of Palestinian politicians and other leaders without traditional factional affiliation have
successfully gained followings domestically and in the international community under the PLO's
umbrella, even some who are not formally affiliated with the PLO. Although these figures—such
as Salam Fayyad, Hanan Ashrawi (a female Christian), and Mustafa Barghouti—often have
competing agendas, several of them support a negotiated two-state solution, generally oppose
violence, and appeal to the Palestinian intellectual elite and to prominent Western governments
and organizations.

## Hamas and Other Non-PLO Factions

### Hamas

#### *Overview and Ideology*

Hamas grew out of the Muslim Brotherhood, a religious and political organization founded in
Egypt in 1928 with branches throughout the Arab world. Since Hamas's inception, it has
maintained its primary base of support and particularly strong influence in the Gaza Strip, while
also having a significant presence in the West Bank and outside these territories in various Arab
countries. Hamas's politicization and militarization can be traced to the first Palestinian intifada
that began in the Gaza Strip in 1987 in resistance to what it terms the Israeli occupation of
Palestinian-populated lands.

Hamas combines Palestinian nationalism with Islamic fundamentalism. Its founding charter
commits the group to the destruction of Israel and the establishment of an Islamic state in all of
historic Palestine, comprised of present-day Israel, the West Bank, and Gaza.[99] Written in 1988,
Hamas's charter is explicit about the struggle for Palestine being a religious obligation. It
describes the land as a *waqf*, or religious endowment, saying that no one can "abandon it or part
of it." It calls for the elimination of Israel and Jews from Islamic holy land and portrays the Jews
in decidedly negative terms, citing anti-Semitic texts. Some Hamas leaders have stated or implied
that Hamas might be willing to contemplate a Palestinian state that does not include all of historic
Palestine, and then would be open to allowing Palestinians to revisit their stance vis-à-vis
Israel.[100] However, some observers maintain that a decisive majority of Hamas members are
unwilling to deviate from core principles of the movement—namely, its ability to resort to
violence and its unwillingness to agree to a permanent peace or territorial compromise with

---

[99] For the English translation of the 1988 Hamas charter, see http://avalon.law.yale.edu/20th_century/hamas.asp.

[100] Transcript of remarks (accessed in 2010) by Khaled Meshaal, "Charlie Rose," *PBS*, May 28, 2010: "If Israel
withdraws to the borders of 1967, and from East Jerusalem, that will become the capital of the Palestinian state with the
right of self—with the right of return for the refugees and with a Palestinian state with real sovereignty on the land and
on the borders and on the checkpoints. Then we—the Palestinian state will decide the future of the relationship with
Israel. And we will respect the decision that will reflect the viewpoint of the majority of the Palestinian people."

Page 76

ATL005171

Israel.[101] Its leaders generally do not indicate a willingness to disarm and publicly reject suggestions that a future Palestinian state be demilitarized. In July 2014, Hamas political bureau (or politburo) chief Khaled Meshaal made the following comments (via translation) on CBS's *Face the Nation*:

> I'm ready to coexist with the Jews, with the Christians and with the Arabs and non-Arabs and with those who agree with my ideas and those who disagree with them. However, I do not coexist with the occupiers, with the settlers.... When we have a Palestinian state, then the Palestinian state will decide on its policies.[102]

Hamas emerged in opposition to Palestinian nationalist leader Yasser Arafat and his secular Fatah movement in the West Bank and Gaza Strip in the 1980s and 1990s—largely by using violence against Israeli civilian and military targets just as Yasser Arafat's Palestine Liberation Organization (PLO) began negotiating with Israel. After Hamas took a leading role in attacks against Israeli targets, including multiple suicide bombings against civilians, during the second intifada between 2000 and 2005, the group decided to directly involve itself in politics shortly following Arafat's death in late 2004. In 2006, a year after the election of Fatah's Mahmoud Abbas to replace Arafat as Palestinian Authority (PA) president, and just a few months after Israel's military withdrawal from the Gaza Strip, Hamas scored a stunning electoral upset of Fatah in Palestinian Legislative Council elections. Subsequent efforts by Israel, the United States, and the international community to neutralize or marginalize Hamas by military, political, and economic means may have changed the outward nature of its influence, but have not squelched it.

Though some fundamental aspects of Hamas's operations and resourcing appear to remain fairly constant, a number of changes in the regional environment since 2011 may have affected them, including the following:

- Hamas's external political leadership's (or politburo's) departure from its longtime headquarters-in-exile in Damascus, Syria, in late 2011/early 2012 in connection with the Asad regime's security and military operations against Syrian Sunni Muslim groups.

- The July 2013 change in Egypt from a Muslim Brotherhood figure as president (who took power in 2012, a year after the removal of the longtime regime of Hosni Mubarak) to a military-backed regime, and the subsequent Egyptian military clampdown on Muslim Brotherhood activities and smuggling tunnels leading from Egypt's Sinai Peninsula to the Gaza Strip.

- Hamas's agreement to the formation of a new PA government for Gaza and parts of the West Bank in June 2014, which, as mentioned above, resulted in the nominal dissolution of a Hamas-led de facto government that had administered Gaza since June 2007.

- Hamas's summer 2014 conflict with Israel.

---

[101] CRS interview in September 2010 with U.S. analyst covering Middle East terrorism at major Washington, DC think tank.

[102] CBS *Face the Nation* transcript from July 27, 2014 of interview of Khaled Meshaal by Charlie Rose, available at http://www.cbsnews.com/news/face-the-nation-transcripts-july-27-2013-netanyahu-mashaal-klimkin-rogers-albright/.

## Leadership

The leadership structure of Hamas is opaque, and much of the open source reporting available on it cannot be independently verified. Hamas has a variety of movement-wide and regional leadership organs, and often seeks to distinguish among its political, military, and social branches. It is not entirely clear who controls overall strategy, policy, and financial decisions. The group's leadership features a range of personalities who apparently share many similarities but also maintain some variation in ideological, strategic, and tactical outlooks.

Overall policy guidance comes from a Shura Council, with reported representation from major constituent areas inside and outside the West Bank and Gaza.[103] Reportedly, Khaled Meshaal (based in Doha, Qatar) remains the overall political leader of Hamas (a position he has held for more than a decade), while Musa Abu Marzouk (based in Gaza), Ismail Haniyeh (based in Gaza), and Saleh al Aruri (based in Turkey) are deputy leaders with responsibility for exiles, Gaza, and the West Bank, respectively.[104] In the past decade, the politburo approved a more direct role for Hamas in Palestinian politics while reportedly maintaining a variety of funding sources (discussed below) and a militia armed largely by Iran. The militia, known as the Izz al Din al Qassam Brigades,[105] is led by Muhammad Deif.[106]

The internal dynamics of Hamas's leadership are unclear. Some reports indicate that Qassam Brigades leaders may have less cautious and more ideologically-driven views regarding costs and benefits of violence than many of Hamas's political leaders, and that they might use whatever publicity and advantages that may come to Hamas from its military capabilities as leverage within the movement to drive or control key decisions.[107] With the de facto Hamas government in Gaza now nominally disbanded, a possible concomitant reduction in the political leaders' prominence and control of funding streams may have reduced their influence somewhat within the movement.

In recent years, reports have indicated that Hamas leaders based outside Gaza might be seeking to move toward more nonviolent resistance in exchange for a significant role in the PLO, which is generally recognized internationally as the representative of the Palestinian national movement. Historically, groups splitting from Palestinian Muslim Brotherhood-inspired movements—such as Palestine Islamic Jihad – Shaqaqi Faction (PIJ) and several of Gaza's other militant groups—have gone in the other direction, seeking a more radical and violent approach.

External Hamas leaders have traditionally used control over funding streams as a means to exercise power within the movement. Given these leaders' lack of an on-the-ground presence in Gaza, if their control over outside funding has flagged, they might face obstacles to presenting themselves effectively as popular alternatives to or bureaucratic checks on Gaza-based leaders. Yet, upon the outbreak of conflict, Hamas's external leaders are probably better positioned to gain publicity than Gaza-based leaders who maintain low profiles for security reasons. Such leadership

---

[103] Hazem Balousha, "Hamas Re-Elects Meshaal for a Fourth Term," *Al-Monitor Palestine Pulse*, April 3, 2013.

[104] Ibid. Meshaal and Haniyeh are profiled in **Table B-1**.

[105] Izz al Din al Qassam was a Muslim Brotherhood member, preacher, and leader of an anti-Zionist and anti-colonialist resistance movement in historic Palestine during the British Mandate period. He was killed by British forces on November 19, 1935.

[106] For a profile of Deif, see Nidal Al-Mughrabi and Maayan Lubell, "Has Hamas military chief, Mohammed Deif, escaped death again?," *Reuters*, August 20, 2014.

[107] Shlomi Eldar, "The delusion of Hamas' military wing," *Al-Monitor Israel Pulse*, July 17, 2014.

Page 78

dynamics have the potential to influence critical decisions and their timing. For example, some media reports indicate that, during the summer 2014 Israel-Gaza conflict, Meshaal—ostensibly benefitting from a boost in prestige—had to be pressured to accept the cease-fire by Gaza-based leaders concerned about the risk of additional destruction.[108]

## External Support

Hamas reportedly receives external support from a number of sources, including some states and non-state groups or networks. Along with several other major non-PLO factions that absolutely reject or only conditionally accept the concept of peace with Israel, Hamas has historically received much of its political and material support from Iran. However, Iran apparently significantly decreased its funding of Hamas after 2011 due to Hamas's public break with the Asad regime in Syria, reportedly sending more assistance to PIJ.[109] Nevertheless, some reports indicate that Hamas's military capacities have been augmented through Iranian technological assistance and training (that had been provided either directly or via Lebanese Hezbollah),[110] and there are some indications that Hamas and Iran may be considering renewed closeness in their relations.[111]

Qatar, which hosts Hamas politburo chief Khaled Meshaal, has been identified by various Israeli sources as Hamas's main external source of funding.[112] Qatari officials deny that their government supports Hamas financially and argue that their policy is to support the Palestinian people. The U.S. government does not publicly describe the state of Qatar as providing material support or state sponsorship to Hamas. Qatar has reportedly provided at least one payment to about 24,000 former employees of the Hamas-led administration in Gaza who lost their salaries after the PA regained formal control in June 2014.[113] Turkey, which along with Qatar provides political support to Hamas,[114] has also been named in some reports as a financial backer, though it is unclear whether and to what extent this is the case.

In addition to external assistance from states, Hamas has other sources of support. According to the State Department's profile of Hamas in its Country Reports on Terrorism for 2013:

---

[108] See, e.g., Shlomi Eldar, "Zahar, Haniyeh pressured Meshaal into cease-fire," *Al-Monitor Israel Pulse*, August 27, 2014.

[109] Jay Solomon, "U.S., Israel Fear Pickup in Iranian Support of Hamas," *wsj.com*, July 30, 2014. Reportedly, Iran had provided Hamas with as much as $20-25 million per month. Robert Tait, "Iran cuts Hamas funding over Syria," *Telegraph*, May 31, 2013.

[110] See, e.g., Ronen Bergman, "How Hamas Beat Israel in Gaza," *New York Times*, August 10, 2014.

[111] Amira Hass, "Iran official tells Hamas daily: Willing to arm West Bank Palestinians too," *haaretz.com*, December 21, 2014; Adnan Abu Amer, "Hamas begins rapprochement with Hezbollah, Iran," *Al-Monitor Palestine Pulse*, January 27, 2015.

[112] Elhanan Miller, "Israel singles out Qatar as key Hamas terror sponsor," *Times of Israel*, July 23, 2014.

[113] Fares Akram and Jodi Rudoren, "Qatar Offers Cash to Pay Some Staff in Gaza Strip," *New York, Times*, October 28, 2014. Additionally, since 2013, Qatar has supposedly provided several million dollars for Gaza construction projects. Though Qatar has claimed to maintain control over its Gaza construction projects, some allege that these projects and Qatari-aided shipments of fuel into Gaza aid Hamas's military or logistical efforts, while others deny this. A Qatari official has reportedly indicated that any money it would contribute to Gaza going forward for humanitarian purposes would not go to Hamas. "Palestinian Official: Rebuilding Gaza Will Cost $6 Billion," *Reuters*, August 4, 2014.

[114] For congressional testimony on this subject, see transcript of hearing dated September 9, 2014 before the House Foreign Affairs Subcommittee on Middle East and North Africa.

> The group [Hamas] also raises funds in the Gulf countries and receives donations from
> Palestinian expatriates around the world through its charities, such as the umbrella
> fundraising organization, the Union of Good. However, recent efforts by the Egyptian
> military to destroy tunnels connecting Gaza with the Sinai have severely limited Hamas's
> access to weapons, smuggled goods, and construction materials.[115]

According to one mid-2014 analysis, Hamas may be "stepping up its own fundraising, not only
through traditional charitable organizations but also new business ventures," including "trade-
based money-laundering schemes."[116] This same analysis stated that "Hamas invests significant
energy into its fundraising and lobbying efforts in Europe and sees the region as an important
arena to further i[t]s strategic goals: fundraising for Hamas activities in the West Bank and Gaza
Strip under the guise of front organizations and lobbying for the repeal of the European Union's
designation of Hamas as a terrorist group."[117]

It is possible that one motive, perhaps among others, for Hamas's periodic resort to armed
conflict with Israel is to attract external support by

- concentrating regional and international attention on the difficulties Hamas and
  the people of Gaza apparently face; and

- demonstrating that Hamas can capably use resources committed to it against
  Israel.

Whether engaging in conflict with Israel is likely to increase Hamas's external support is unclear,
as many regional actors are preoccupied with their own situations or those of other countries such
as Iraq and Syria, and many (if not most) Arab leaders have been essentially adversarial to Hamas
since the Muslim Brotherhood lost power in Egypt in July 2013.[118] Declining global oil prices
could also affect support from Gulf states. However, it is possible that some supporters' or
potential supporters' calculations—including Iran's—could be affected by their perceptions of
Hamas's ability to maintain military capabilities threatening Israel despite Israeli efforts to
degrade them, and/or their perceptions of regional popular support for Hamas.[119] Even if Hamas's
capacity to directly harm Israel might be limited, it might calculate that its militia deters

---

[115] According to one source, Egypt closed "95% of the tunnels connecting Egypt to Gaza, economically devastating
Gaza as over 40% of Hamas's tax revenue came from tariffs on tunnel goods, amounting to a loss of around $460
million a year." John Hulsman, "Israel and Hamas both think they won in Gaza—This crisis is doomed to fester," *City
AM* (London), August 5, 2014.

[116] Matthew Levitt, "Kidnapped Israeli Teens Compel Scrutiny of Hamas's International Finances Going after the
'Hamas HQ in Europe,'" *newrepublic.com*, June 24, 2014.

[117] Ibid. In December 2014, the General Court of the European Union (EU) ruled that Hamas should be removed from
the EU's common list of designated terrorist organizations on procedural grounds related to the decision-making
process used in adding the group's military wing to the list in 2001. The EU External Action Service responded that the
ruling was not a political or substantive decision made by EU governments, and that restrictive measures against
Hamas will remain in place as an appeal process goes forward. The United States and Israel both urged the EU to
maintain its sanctions against Hamas. In addition to having listed Hamas's military wing on its common terrorist list
since 2001, the EU has listed its political wing since 2003. In addition, the EU common terrorist list includes two
charities that are believed to be related to Hamas: the U.S.-based Holy Land Foundation for Relief and Development;
and Al-Aqsa, e.V. (or the Al-Aqsa Foundation), located throughout Europe.

[118] Richard Engel, "Hamas Learns It Has Few Friends in Latest War with Israel," *NBC News*, August 6, 2014. See also
Nathan Thrall, "Faith-Based Diplomacy," *Matter*, September 18, 2014, stating: "Israel's actions in Gaza [during the
summer 2014 conflict] were given both tacit and overt support by Egypt, Jordan, Saudi Arabia, and the Fatah-
dominated Palestinian Authority."

[119] See, e.g., Solomon, op. cit.; Mirren Gidda, "Hamas Still Has Some Friends Left," July 25, 2014.

challenges from other armed groups in Gaza, and that engaging in its own periodic attacks or rocket fire against Israeli targets maintains its "resistance credentials."

## Other Rejectionist Groups

Several other small Palestinian groups continue to reject the PLO's decision to recognize Israel's right to exist and to negotiate a two-state solution. They remain active in the West Bank and Gaza and retain some ability to carry out terrorist attacks and other forms of violence to undermine efforts at cooperation and conciliation. Their activities sometimes complicate the challenges the Abbas-led PA and Hamas, respectively, face in maintaining security and internal order in the West Bank and Gaza—including when Gaza rocket attacks provoke Israeli reprisals. In Gaza, some observers speculate that Hamas permits or even supports some of these groups, including those which have presences in Egypt's Sinai Peninsula, without avowing ties to these groups. Such groups provide Hamas opportunities to tacitly permit or encourage attacks against Israel while avoiding direct responsibility.

### *Palestine Islamic Jihad – Shaqaqi Faction (PIJ)*

The largest of these other groups is Palestine Islamic Jihad – Shaqaqi Faction (PIJ), a U.S.-designated Foreign Terrorist Organization that, like Hamas, is an offshoot of the Muslim Brotherhood and receives support from Iran. PIJ's secretary-general since 1995 has been Ramadan Abdullah Muhammad Shallah, who is reportedly based in Damascus, Syria. Since 2000, PIJ has conducted several attacks against Israeli targets (including suicide bombings), killing scores of Israelis.[120] PIJ, estimated at a few hundred members, emerged in the 1980s in the Gaza Strip as a rival to Hamas. Inspired by the Iranian revolution, it combined Palestinian nationalism, Sunni Islamic fundamentalism, and Shiite revolutionary thought. PIJ seeks liberation of all of historic Palestine through armed revolt and the establishment of an Islamic state, but unlike Hamas has not established a social services network, formed a political movement, or participated in elections. Perhaps largely for these reasons, PIJ has never approached the same level of support among Palestinians as Hamas.

### *Popular Front for the Liberation of Palestine-General Command (PFLP-GC)*

Another—though smaller—Iran-sponsored militant group designated as an FTO is the Popular Front for the Liberation of Palestine-General Command (PFLP-GC). PFLP-GC is a splinter group from the PFLP and has a following among Palestinian refugees in Lebanon and Syria. PFLP-GC's founder and secretary-general is Ahmed Jibril. He is reportedly based in Damascus and allied with the Asad regime.

### *Salafist Militant Groups*

A number of small but potentially growing Palestinian Salafist-Jihadist militant groups evincing affinities toward groups such as Al Qaeda or the Islamic State organization (also known as ISIS or ISIL) have arisen in the Gaza Strip. Some Salafist groups reportedly include several former Hamas militia commanders who have become disaffected with Hamas's informal cease-fires with

---

[120] See footnote 66.

Israel and other actions they perceive as having moderated Hamas's stance. They do not currently appear to threaten Hamas's rule in Gaza. Yet, with enough influential adherents or outside support, these groups could possibly either pressure Hamas to renew active confrontation with Israel or pose a long-term challenge to its rule, either directly or by provoking action from Egypt or Israel.

# Palestinian Refugees

## In General

Of the some 700,000 Palestinians displaced during the 1947-1948 Arab-Israeli war, about one third ended up in the West Bank, one third in the Gaza Strip, and one third in neighboring Arab countries. They and their descendants now number approximately 5 million, with roughly one-third living in refugee camps in the West Bank, Gaza, Jordan, Lebanon, and Syria. Jordan offered Palestinian refugees citizenship, partly owing to its previous unilateral annexation of the West Bank (which ended in 1988), but the other refugees in the region are stateless and therefore limited in their ability to travel. Refugees receive little or no assistance from Arab host governments and many (including those who do not live in camps) remain reliant on the U.N. Relief and Works Agency for Palestine Refugees in the Near East (UNRWA) for food, health care, and/or education. For additional information on UNRWA (including historical U.S. contributions) and recent congressional action concerning it, see CRS Report RS22967, *U.S. Foreign Aid to the Palestinians*, by Jim Zanotti.

For many years, Congress has raised concerns about how to ensure that UNRWA funds are used for the programs it supports and not for terrorist activities or corrupt purposes. Refugee camps are not controlled or policed by UNRWA, but by the host countries or governing authorities.[121] Concerns also have been expressed about the content of textbooks and educational materials used by UNRWA, with claims that they promote anti-Semitism and exacerbate tensions between Israelis and Palestinians. UNRWA responds that the host country, not UNRWA, provides the textbooks and determines their content because students must take exams in host country degree programs. Additionally, UNRWA integrates human rights-themed education into its school programs.[122]

For political and economic reasons, Arab host governments generally have not actively supported the assimilation of Palestinian refugees into their societies. Even if able to assimilate, many Palestinian refugees hold out hope of returning to the homes they or their ancestors left behind or possibly to a future Palestinian state. Many assert a deep sense of dispossession and betrayal over never having been allowed to return to their homes, land, and property. Some Palestinian factions have organized followings among refugee populations, and militias have proliferated at various times in some refugee areas in Lebanon and Syria. The refugees exert significant pressure on both their host governments and the Palestinian leadership in the West Bank and Gaza to seek a solution to their claims as part of any final status deal with Israel.

---

[121] UNRWA's responsibilities are limited to providing its services to refugees and administering its own installations.

[122] See http://www.unrwa.org/what-we-do/human-rights-education.

## Summer 2014 Israel-Gaza Conflict

During the summer 2014 Israel-Gaza conflict, a number of incidents took place involving UNRWA schools. These included damage inflicted on some schools sheltering Palestinian civilians that led to a number of deaths and injuries, and also included possible illicit use of vacant UNRWA schools by Palestinian militants to store weapons. The incidents triggered public debate regarding actions both by Israel and by UNRWA.[123] In November 2014, U.N. Secretary-General Ban Ki-moon formed an independent board of inquiry. According to a November 10, 2014, statement attributable to the Spokesman for the Secretary-General:

> The Board will be led by Mr. Patrick Cammaert (The Netherlands) and includes, as its other members, Ms. Maria Vicien-Milburn (Argentina), Ms. Lee O'Brien (USA), Mr. Pierre Lemelin (Canada) and Mr. K.C. Reddy (India). It will review and investigate a number of specific incidents in which death or injuries occurred at, and/or damage was done to United Nations premises. The Board will also review and investigate incidents in which weapons were found to be present on United Nations premises. The Secretary-General expects that the Board will enjoy the full cooperation of all parties concerned.

Israel's government has stated its intention to cooperate with this board of inquiry, but has announced that it will not cooperate with a commission appointed by the U.N. Human Rights Council (UNHRC) that is investigating possible violations of international humanitarian and human rights law in Gaza and the West Bank since June 13, 2014.[124] As described above, in January 2015 ICC Prosecutor Fatou Bensouda opened a preliminary examination into the "situation in Palestine" dating from June 13, 2014. Such an examination might cover events from the summer 2014 conflict, and its announcement has triggered vigorous Israeli opposition in response.[125]

## Effects of Syria Conflict

The growing endangerment of Palestinian refugees in Syria as its internal conflict continues could have implications both on developments there and for factional politics in the West Bank and Gaza. According to UNRWA Deputy Commissioner-General Margot Ellis, as of December 4, 2014, of about 560,000 Palestinian refugees registered in Syria, more than 60% are displaced.[126]

---

[123] Scott Bobb, "At Least 15 Killed in Israeli Strike on Gaza Market," *Voice of America*, July 30, 2014; Michael Wilner, "Senators want UNRWA investigated over 'troubling' Gaza role," *jpost.com*, August 13, 2014.

[124] Maayan Lubell, "Israel to cooperate with U.N. Gaza war inquiry," *Reuters*, September 20, 2014. It is unclear how such an investigation will be similar to or differ from the UNHRC-mandated investigation undertaken following the December 2008-January 2009 Israel-Gaza conflict, known as the "Goldstone Report" and available at http://www2.ohchr.org/english/bodies/hrcouncil/docs/12session/A-HRC-12-48.pdf. Israel's military has opened a number of criminal investigations into incidents during the 2014 conflict in which Palestinian civilians were killed, possibly facilitating potential Israeli efforts to respond to the work of the UNHRC-appointed commission. Jeffrey Heller and Dan Williams, "Israel's military opens eight new probes into its Gaza war conduct," *Reuters*, December 7, 2014. William Schabas, the Canadian law professor who was initially selected to head the commission, resigned his place in February 2015 after Israel provided evidence that he had previously done paid work for the PLO. U.S. jurist Mary McGowan Davis was named to replaced Schabas. "Schabas resigns as head of U.S. Gaza inquiry panel," *JTA*, February 3, 2015.

[125] Joel Greenberg, "Netanyahu blasts international court over preliminary probe of war crimes claims," *McClatchyDC*, January 17, 2015.

[126] UNRWA website, Remarks by Deputy Commissioner-General Margot Ellis at the General Assembly, December 4, 2014.

In a December 1, 2014, meeting with CRS, Ellis stated that of the tens of thousands who have left Syria, approximately 44,000 are in Lebanon, 15,000 in Jordan,[127] 4,500 in Egypt, and 4,000 in Turkey, with smaller numbers in Gaza and further afield.

---

[127] According to UNRWA's website, Jordan stemmed the flow of Palestinian refugees from Syria over its borders after announcing a policy of non-entry in early 2013.

Page 84

# Appendix B. Possible Successors to Mahmoud Abbas

There are a number of leading Palestinian figures (see **Table B-1**), including some from Fatah and from Hamas, who might have prospects for succeeding Abbas as PLO chairman and/or PA president, or at least for influencing the process by which a successor or successors might be selected.

**Table B-1. Various Prominent Palestinian Figures**

| Name | Description |
|---|---|
| Marwan Barghouti (Fatah)<br><br>Source: BDalim | Barghouti (born 1959) appears to be very popular among Palestinians. He is generally viewed as a leader independent from the Fatah "old guard" and as pragmatic in dealings with both Israel and Hamas. He consistently outperforms other Fatah and Hamas leaders (including Abbas) in domestic polling regarding presidential preferences. Barghouti has been in an Israeli prison since 2002 for terrorism-related murder allegations (he was convicted in 2004) in connection with the second Palestinian intifada. Thus, it is unclear whether Israeli authorities would permit him to be released from prison, or to have dealings with him, if Palestinians chose him as a main national leader. In part due to Barghouti's imprisonment and resulting absence from public politics for more than a decade, it is also unclear whether the hope he may represent for many Palestinians would translate into effective and unifying national leadership. |
| Muhammad Dahlan (Fatah)<br><br>Source: MaanImages/Fadi Arouri | Dahlan (born 1961) is a former associate of Yasser Arafat's and Mahmoud Abbas's who was reportedly close to U.S. and Israeli officials as Fatah's main security enforcer in Gaza before Hamas's military takeover in 2007. In 2011, reported difficulties between Dahlan and Abbas led to his apparent expulsion from Fatah and exile to the United Arab Emirates. Since then, Dahlan and Abbas—through their respective loyalists—have reportedly feuded for influence and traded blame over past events, such as Yasser Arafat's mysterious death. Media reports speculate about Dahlan's possible use of patronage and supporters in Gaza, the West Bank, and internationally to increase his chances of succeeding or even displacing Abbas.[a] Some reports indicate that Hamas may be facilitating Dahlan's efforts to regain influence, despite past enmity, due to mutual interests in weakening Abbas.[b] |
| Salam Fayyad (Independent)<br><br>Source: http://www.radio-canada.ca | Fayyad (born 1952) served as PA prime minister under Abbas from 2007 until 2013, after having served as finance minister under Arafat and Abbas from 2002 until 2005. Though seen by many Western observers as a significant Palestinian leader for his efforts at reform and development, he is generally viewed domestically as a technocrat with an insignificant political base, though he won a parliamentary seat in 2006 as part of a small party. His experience, international reputation, and possible common cause with Dahlan or other popular Palestinian figures could nevertheless make him an attractive candidate to lead Palestinians in a time of transition.[c] Fayyad received multiple graduate degrees in the United States and worked for the International Monetary Fund. |

Page 85

ATL005180

| Name | Description |
|------|-------------|

**Majid Faraj (Fatah)**



Faraj (born 1962) was a leader of the first intifada, and joined the PA's Preventive Security Organization near the time of its inception in the mid-1990s. He emerged as a top security chief, becoming head of "military intelligence" in the National Security Forces in 2006, and head of the General Intelligence Service in 2009. He has reportedly become "Abbas's right-hand man on many sensitive portfolios," including the most recent round of U.S.-brokered negotiations with Israel,[d] and may be favored as a potential successor by some U.S. officials.[e]

Source: MaanImages

**Saeb Erekat (Fatah)**



Erekat (born 1955) is one of Abbas's closest associates and has been at the forefront of off-and-on PLO negotiations with Israel since the Madrid conference in 1991. Occasional leaks of his possible willingness to contemplate sensitive concessions in negotiations have led to outcries among the Palestinian public and could complicate efforts to designate him as a national leader. Erekat was educated in the United States and the United Kingdom.

Source: palestinenote.com

**Muhammad Shtayyeh (Fatah)**



Shtayyeh (born 1958) is another of Abbas's close associates with extensive experience in PLO negotiations with Israel and in PA ministries and a variety of economic development initiatives and educational endeavors in the West Bank. He received a Ph.D. in the UK.

Source: pecdar.ps

**Nabil Sha'ath (Fatah)**



Sha'ath (born 1938) directs Fatah's international relations, and has extensive experience as a PLO negotiator and PA minister. He also has a background in education and public planning and administration, and received multiple graduate degrees in the United States.

Source: arabi-press.com

**Jibril Rajoub (Fatah)**



Rajoub (born 1953) is a former West Bank security commander from the Arafat era[f] who was elected to Fatah's Central Committee in 2009. Quotes from the media indicate that Rajoub periodically makes remarks about Palestinian empowerment with potentially violent connotations regarding Israel.[g]

Source: GettyImages

Page 86

| Name | Description |
|------|-------------|
| **Yasser Abed Rabbo** (Independent)  Source: Issam Ramawi/Flash 90 | Abed Rabbo (born 1944) is the general secretary of the PLO Executive Committee and has served as a longtime advisor to Arafat and Abbas. He has belonged to a number of PLO factions. Since Abbas dismissed him from supervising PA media operations in 2012, they have reportedly had a mainly adversarial relationship, and media reports speculate that Abed Rabbo might be aiding the leadership aspirations of Dahlan and/or Fayyad.[h] |
| **Khaled Meshaal** (Hamas)  Source: Trango | Meshaal (born 1956) is the chief of Hamas's political bureau and has lived outside of the West Bank and Gaza in various Arab capitals since 1967.[i] He is currently based in Doha, Qatar. There is little or no indication that Meshaal would seek PA elective office, but his dealings with Abbas since 2011 indicate that he seeks to have Hamas join the PLO, perhaps as a precursor for it to play a controlling or major role. |
| **Ismail Haniyeh** (Hamas)  Source: idfblog.com | Haniyeh (born 1963) is reportedly Hamas's main political bureau representative for Gaza. He served as Hamas's designated "prime minister" in Gaza from June 2007 to June 2014, having previously served as PA prime minister from March 2006 to June 2007 following Hamas's victory in 2006 PLC elections. In Palestinian opinion polls for hypothetical PA presidential elections, Haniyeh sometimes runs close to or even ahead of Mahmoud Abbas in head-to-head pairings. |

a.    "A succession crisis," *Economist*, March 22, 2014.

b.    Yoni Ben Menachem, "Muhammad Dahlan and the Succession Battle for the PA Chairmanship," Jerusalem Center for Public Affairs, January 21, 2015. According to this online post, in the 1980s Dahlan shared an Israeli prison cell with Muhammad Deif, the commander of Hamas's military wing, the Izz al Din al Qassam Brigades. Ibid.

c.    Ibid.

d.    Yaari, "The Riddle of Succession in the Palestinian Authority," op. cit.; Grant Rumley, "Middle East Watchers: Keep Your Eye on Majid Faraj," *nationalinterest.org*, August 20, 2014.

e.    Tzvi Ben-Gedalyahu, "Obama's Hand-Picked Successor to Abbas Could Re-Ignite 'Peace Process,'" *jewishpress.com*, September 14, 2014.

f.    Rajoub headed the Preventive Security Organization (PSO) until 2002, and was alleged to have used repressive measures against a number of Arafat's opponents. Some reports claim that the PSO has received covert Western (including U.S.) assistance since the late 1990s.

g.    See, e.g., Cheryl K. Chumley, "Palestinian Authority deputy: If we had a nuke, we'd have bombed Israel," *Washington Times*, May 9, 2013.

h.    Grant Rumley, "In Palestine, Mahmoud Abbas vs. Mohammad Dahlan," *nationalinterest.org*, January 3, 2015.

Page 87

ATL005182

i.   For a detailed account of a failed Israeli Mossad attempt to assassinate Meshaal in 1997 in Jordan, and Meshaal's rise to power within Hamas, see Paul McGeough, *Kill Khalid: The Failed Mossad Assassination of Khalid Mishal and the Rise of Hamas*, New York: The New Press, 2009.

# Author Contact Information

Jim Zanotti
Specialist in Middle Eastern Affairs
jzanotti@crs.loc.gov, 7-1441

ATL005183

# EXHIBIT 5

# ISRAEL 2014 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Israel is a multi-party parliamentary democracy.  Although it has no constitution, the parliament, the unicameral 120-member Knesset, has enacted a series of "Basic Laws" that enumerate fundamental rights.  Certain fundamental laws, orders, and regulations legally depend on the existence of a "State of Emergency," which has been in effect since 1948.  Under the Basic Laws, the Knesset has the power to dissolve the government and mandate elections.  The nationwide Knesset elections in January 2013, considered free and fair, resulted in a coalition government led by Prime Minister Benjamin Netanyahu.  Security forces reported to civilian authorities.  (An annex to this report covers human rights in the occupied territories.  This report deals with human rights in Israel and the Israeli-occupied Golan Heights.)

During the year a number of developments affected both the Israeli and Palestinian populations.  From July 8 to August 26, Israel conducted a military operation designated as Operation Protective Edge, which according to Israeli officials responded to increases in the number of rockets deliberately fired from Gaza at Israeli civilian areas beginning in late June, as well as militants' attempts to infiltrate the country through tunnels from Gaza.  According to publicly available data, Hamas and other militant groups fired 4,465 rockets and mortar shells into Israel, while the government conducted 5,242 airstrikes within Gaza and a 20-day military ground operation in Gaza.  According to the United Nations, the operation killed 2,205 Palestinians.  The Israeli government estimated that half of those killed were civilians and half were combatants, according to an analysis of data, while the UN Office for the Coordination of Humanitarian Affairs recorded 1,483 civilian deaths--more than two-thirds of those killed--including 521 children and 283 women; 74 persons in Israel were killed, among them 67 combatants, six Israeli civilians, and one Thai civilian.  Further information on the human rights situation in the occupied territories is in the annex.

The most significant human rights problems were terrorist attacks targeting civilians and politically or religiously motivated societal violence; institutional and societal discrimination against Arab citizens of Israel, many of whom self-identify as Palestinian, including the Bedouin, in particular in access to equal education and employment opportunities; societal discrimination against women; and the treatment of refugees, asylum seekers, and irregular migrants.

Page 90

## ISRAEL AND THE OCCUPIED TERRITORIES                    2

Other human rights problems included institutional and societal discrimination against non-Orthodox Jews, some minority religious groups, and intermarried families, and labor rights abuses against foreign workers.

The government took steps to prosecute and punish officials who committed abuses regardless of rank or seniority.  The government proceeded with structural reforms to reduce impunity and increase accountability.

**Section 1. Respect for the Integrity of the Person, Including Freedom from:**

**a. Arbitrary or Unlawful Deprivation of Life**

There was one report the government or its agents committed arbitrary or unlawful killings.

On November 7, police shot and killed Israeli citizen Kheir al-Din Hamdan in Kafr Kana.  Police stated he tried to stab an officer during an officer's attempt to arrest Hamdan; police fired a warning shot in the air before shooting Hamdan in the chest.  Video footage of the event depicted Hamdan attacking a police vehicle and also raised questions as to whether police followed their rules of engagement.  The Department for Investigating Police Officers announced it was launching an investigation into the killing, and the results of the investigation were pending as of November 14.

The number of terrorist attacks increased during the year, including the kidnapping of Israeli and Palestinian civilians, and attempted terrorist attacks by infiltration through tunnels from the Gaza Strip.  According to the Israeli Defense Forces (IDF), there were 4,824 attacks and cross-border incidents originating from Gaza, including 4,435 rockets and mortars fired from the Gaza Strip by Hamas and other armed groups, that killed seven civilians; 223 cross-border incidents, including rocket and mortar shootings, infiltrations, and smuggling attempts from Egypt; 1,936 cross-border incidents originating from Lebanon by Palestinians living in Lebanon, Lebanese Hizballah, or other militants targeting Israeli towns or Israeli military patrols; and 1,137 cross-border incidents originating from Syria that killed one civilian.  Some cases were due to errant firing, but observers believed some cases were deliberate targeting of military patrols and Israeli civilian communities in the Golan Heights.

There were attacks by individuals and militant or terrorist groups targeting civilians.  On August 4, a large construction vehicle driven by a Palestinian struck

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor                    Page 91

ATL004796

and overturned an empty passenger bus in West Jerusalem's Shmuel HaNavi neighborhood, killing one and injuring several others, in what authorities called "a terrorist attack."  On November 10, a Palestinian attacker stabbed an Israeli soldier waiting at a bus station in Tel Aviv; the soldier later died of his wounds, and security forces apprehended the attacker.  On November 18, two Palestinians attacked worshippers within the Kehilat Bnai Torah synagogue in western Jerusalem with guns, knives, and axes, resulting in the deaths of four rabbis and a police officer.

## b. Disappearance

There were no reports of disappearances or politically motivated abductions.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law does not refer to a specific crime of torture but prohibits acts such as assault and pressure by a public official.  In 1999 the High Court of Justice ruled that, although torture and the application of physical or psychological pain were illegal, Israel Security Agency (ISA) interrogators may be exempt from criminal prosecution if they used such methods in extraordinary cases determined to involve an imminent threat or "ticking bomb" scenario.  Human rights organizations alleged that interrogation methods permitted by law and actually used by security personnel included beatings and forcing an individual to hold a stress position for long periods, while the government insisted it did not use any interrogation methods prohibited by the UN Convention against Torture.  Nongovernmental organizations (NGOs) continued to criticize other alleged detention practices they termed abusive, including isolation, sleep deprivation, and psychological abuse such as threats to interrogate family members or demolish family homes. Authorities stated the ISA held detainees in isolation only in extreme cases and when there was no alternative option and that isolation was not used as a means of augmenting interrogation, forcing a confession, or as punishment.  The government rejected claims that interrogations of minors breached the convention.

The Ministry of Justice Inspector for Complaints against ISA Interrogators took the testimony of detainees whom authorities had interrogated, then released and instituted a reform that allows representatives of the Public Committee Against Torture in Israel (PCATI) to be present in meetings between complainants and the inspector.  While the inspector stated that closing all pre-2013 complaint cases was

Country Reports on Human Rights Practices for 2014                    Page 92
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004797

**ISRAEL AND THE OCCUPIED TERRITORIES**                    4

a priority, all 2012 complaint cases remained pending before the inspector as of November 14.

The Turkel Commission was established to implement the findings of the 2010 report of the Public Commission to Examine the Maritime Incident--the interception and capture by the Israeli Navy of ships carrying humanitarian aid bound for Gaza. Following the publication of the Turkel Commission's Second Report in February 2013, the government set up a new complaint mechanism within the Ministry of Justice for allegations of torture and appointed an independent Inspector of Interrogee Complaints in February.

In February 2013 Palestinian Arafat Jaradat, whom Israeli security forces detained on February 18 for allegedly throwing stones near Hebron during 2012 protests against Israel's Operation Pillar of Defense, died in custody at Megido Prison. Israeli authorities stated an autopsy on Jaradat was "inconclusive." Palestinian authorities, who also conducted an autopsy, asserted Jaradat's body bore signs of torture. The government appointed a judge and police unit to investigate the death, and the investigation remained pending at the end of October.

In December, three members of the anti-intermarriage organization Lehava were arrested and reportedly confessed to setting fire to the Max Rayne Hand in Hand school in Jerusalem. Their attorney alleged his clients were subjected to threats, denial of sleep, and psychological pressure in questioning and moved to disqualify their confessions.

Following a temporary suspension of police use of Taser guns in 2013, and following the institution of updated operating and training procedures in April, the police commissioner reauthorized police to use Tasers.

**Prison and Detention Center Conditions**

The law provides prisoners and detainees the right to conditions that do not harm their health or dignity. Conditions in facilities run by the Israel Prison Service (IPS) generally met international standards, according to international and domestic NGOs. NGOs reported the government restricted NGO access to the Saharonim detention facility for African migrants and asylum seekers, although authorities stated the IPS did not limit the entry of visitors to the facilities holding persons who entered the country illegally. Authorities did not allow NGOs access inside the Holot facility until March. (Conditions in four facilities for security detainees are covered in the annex.)

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 93

ATL004798

**ISRAEL AND THE OCCUPIED TERRITORIES**          5

Physical Conditions:  At year's end there were 18,658 prisoners in IPS facilities in Israel and the occupied territories, including 217 minors.  Prison conditions were the same for male and female prisoners.  Security prisoners, the majority of whom were Palestinians from the West Bank, East Jerusalem, and Gaza, often faced harsher conditions from those of the general prison population, including administrative detention (holding suspected criminals indefinitely without presenting charges or going to trial), restricted family visits, ineligibility for temporary furloughs, and solitary confinement.  According to the government, as of November 12, there were 458 administrative detainees in IPS detention centers, a significant increase over the previous reporting year.  None was detained longer than four years (see section 1.d.).  No administrative detainees were minors or women.

Security prisoners organized a mass hunger strike between April 24 and June 24 to protest prison conditions and demand the government end administrative detention. Initially, 125 detainees took part in the strike, although the IPS reported the total number of participants over the course of the two-month protest reached 290 prisoners and detainees, with 70 hospitalized at various points.  One Palestinian administrative detainee, Ayman Tbaish (Atbisha), began a hunger strike to protest the conditions of his imprisonment March 3; he ended his 122-day hunger strike on June 30.

Death was rare in prisons and detention centers.  The family of a Palestinian prisoner who died on February 25 alleged he died of complications from an assault by prison guards, although the IPS maintained the prisoner died from a heart attack for which he was previously hospitalized.  On September 9, Palestinian security prisoner Raed Jaabari committed suicide in Eshel Prison in Beer Sheva.  Jaabari had been in prison for several weeks but was not on suicide watch.  Authorities stated they would establish a special commission of inquiry to investigate the incident.

All prisoners had access to potable water, and observers generally regarded food, sanitation, and medical care as adequate.  Nevertheless, PCATI claimed there was inadequate accommodation for Arab women prisoners in HaSharon Prison, including solitary confinement, failure to provide for hygienic and medical needs, denial of access to education and intolerance towards their religious sensibilities. NGOs reported lack of access to medical, legal, and social services in detention centers for irregular migrants but noted access to medical care greatly improved in the second half of the year.

Country Reports on Human Rights Practices for 2014          Page 94
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004799

## ISRAEL AND THE OCCUPIED TERRITORIES                              6

Social workers provided individual social and supportive treatment, with emphasis on identifying and providing services for trafficking victims, victims of abuse, and victims of sexual violations.

Administration:  Recordkeeping was adequate.  The law allows for alternatives to sentencing for nonviolent offenders, including community service.  Prisoners and detainees had reasonable access to visitors, including through a program of the International Committee of the Red Cross (ICRC) that brought prisoners' relatives from the West Bank and Gaza into the country for prison visits.  The ICRC and the government reported a complete cessation of family visits to all prisoners following the June 14 kidnapping and killing of three Israeli teenage citizens in the West Bank and a cessation of visitors to all Palestinian prisoners throughout Operation Protective Edge that continued for some weeks thereafter.  Visits to Fatah-associated detainees from the West Bank and East Jerusalem resumed on July 16, before resuming for all prisoners on September 13, but with specific rules. Visits to prisoners from Gaza resumed October 20.

Authorities allowed visits from lawyers even in the absence of active legal proceedings, and authorities stated that every inmate who requested to meet with an attorney was able to do so.  Travel restrictions on entry into the country, however, affected the access of lawyers and other visitors to some Palestinian prisoners.  Authorities permitted prisoners religious observance and to send and receive letters.

The law allows prisoners to submit a petition to judicial authorities alleging substandard prison conditions, and authorities investigated credible allegations of inhuman conditions, documented such investigations, and released the results publicly.  Additionally, the state comptroller serves as ombudsman and investigates public complaints against government institutions, including the IPS.

Independent Monitoring:  The ICRC regularly monitored IPS facilities and the two IDF provisional detention centers in accordance with its standard modalities.  It also visited detainees in interrogation centers.  PCATI reported authorities allowed it to study the pre-check and investigative materials from interrogations for the first time on October 24.  It intends to continue pressing for structural reforms, including mandatory video recordings of interrogations.  The Public Defenders' Office is officially responsible for monitoring and reporting on prison conditions, and it did so during the year.

Country Reports on Human Rights Practices for 2014                    **Page 95**
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004800

**ISRAEL AND THE OCCUPIED TERRITORIES**                    7

## d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention, and the government generally observed these prohibitions for all citizens.  Non-Israeli residents of the Israeli-occupied Golan Heights were subject to the same laws as Israeli citizens. Noncitizens of Palestinian origin detained on security grounds fell under military jurisdiction even if detained in Israel (see annex).  Until nullified by the High Court of Justice on September 22, a 2013 amendment to the 1954 Prevention of Infiltration Law allowed the government to detain newly arrived irregular migrants and asylum seekers for one year in the Saharonim facility and to hold irregular migrants indefinitely in Holot, a remote, open facility run by the IPS (see section 2.d.).  Most detention practices remained in place for 90 days following the High Court's decision.

On December 8, the Knesset passed a third amendment to the "Prevention of Infiltration" law.  The amended law limits detention time in Holot to 20 months, while allowing for new asylum seekers to be initially placed in Saharonim prison for up to three months.  The Supreme Court subsequently acceded to an NGO appeal to instate an injunction temporarily barring the summons of irregular migrants and asylum seekers to Holot; the court then lifted the injunction on the last day of the year.

**Role of the Police and Security Apparatus**

Under the authority of the prime minister, the ISA combats terrorism and espionage in the country and the occupied territories.  The national police, including the border police and the immigration police, are under the authority of the Ministry of Internal Security.  The IDF is responsible for external security and has no jurisdiction over citizens.  ISA forces operating in the occupied territories fall under the IDF for operations and operational debriefing.  Civilian authorities maintained effective control over the ISA and police forces, and the government has effective mechanisms to investigate and punish abuse and corruption.  The government took steps to investigate allegations of the use of excessive force by police and military.  Although there were no credible reports of impunity involving the security forces during the year, NGOs criticized the low number of indictments issued relative to the number of investigations opened and the high percentage of cases closed due to investigation failures by military police.

The Department for Investigation of Police Officers in the Ministry of Justice, established in 2013, assumed full responsibility for investigating complaints

Country Reports on Human Rights Practices for 2014                    Page 96
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004801

## ISRAEL AND THE OCCUPIED TERRITORIES                    8

against ISA bodies, including incidents involving the Israeli police and the border police occurring in Israeli territory and East Jerusalem and incidents that took place in the occupied territories but did not involve use of a weapon.  The position of inspector for complaints against the ISA interrogators was officially transferred from the ISA to the Ministry of Justice.  A new inspector assumed duties and began operating at the ministry in May; the unit in the ISA was disbanded.  The State Comptroller's Office also reviewed ISA interrogations.

Investigative responsibility for abuses by the IDF, including incidents involving a weapon in which police units were operating under IDF authority in the occupied territories, remained within the Ministry of Defense in the Military Police Criminal Investigations Department.

In January the cabinet secretary appointed a committee to implement the findings of the 2010 report of the Public Commission to Examine the Maritime Incident, (commonly known as the "Turkel Commission") to improve the efficacy, speed, and transparency of internal investigative processes.  Following Operation Protective Edge, IDF Chief of Staff Benny Gantz appointed Major General Noam Tibon to head a special investigative committee for incidents involving civilian deaths during the operation.  He stated the IDF intended to implement the recommendations of that committee.

On September 4, Israeli NGOs B'Tselem and Yesh Din stated that existing accountability mechanisms precluded serious internal investigations by the military and were marred by severe structural flaws that rendered them incapable of conducting professional investigations.

**Arrest Procedures and Treatment of Detainees**

By law police must have warrants based on sufficient evidence and issued by an authorized official to arrest a suspect.  Authorities generally informed such persons promptly of charges against them.  The law allows authorities to detain suspects without charge for 24 hours before bringing them before a judge, with limited exceptions allowing for up to 48 hours.  Authorities respected these rights for persons arrested in the country.  There was a functioning bail system, and detainees could appeal decisions denying bail.  Authorities allowed detainees to consult with an attorney in a timely manner, including one provided by the government for the indigent, and to contact family members promptly.

Country Reports on Human Rights Practices for 2014                    Page 97
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004802

## ISRAEL AND THE OCCUPIED TERRITORIES                                  9

According to the circumstances of each case, such as the severity of the alleged offense, status as a minor, risk of escape, or other factors, authorities either granted or denied bail to noncitizens of Palestinian origin detained for security violations. Authorities held most Palestinian minors (under age 18) arrested in the West Bank and Gaza in prisons in Israel but prosecuted them under the Israeli military law applicable to the occupied territories, which denies many of the rights they would be granted under Israeli law.  A person detained on security grounds may be prosecuted criminally or held as an administrative detainee or illegal combatant, according to one of three legal regimes.

First, under a temporary law on criminal procedures, repeatedly renewed since 2006, the IPS may hold persons suspected of a security offense for 48 hours prior to bringing them before a judge, with limited exceptions allowing the IPS to detain a suspect up to 96 hours before bringing the suspect before the senior judge of a district court.  In security-related cases, a person may be held for up to 35 days without an indictment (versus 30 days for other than security-related cases), and the law allows the court to lengthen the holding of a detainee on security grounds for an initial period of up to 20 days for interrogation without an indictment (versus 15 days for other than security-related cases).  Authorities may deny security detainees access to an attorney for up to 21 days.

Second, the 1979 Emergency Powers Law allows the defense ministry to detain persons administratively without charge for up to six months, renewable indefinitely.  Administrative detention was used as an exception when intelligence sources could not be presented as evidence for criminal proceedings.  On October 7, B'Tselem reported a significant increase in the number of administrative detainees as a result of operations associated with a search and arrest campaign in the West bank and arrests as part of the IDF ground operation in Gaza, as the number of administrative detainees rose from 152 at the end of 2013 to 473 detainees at the end of August.  The government reported there were 458 administrative detainees as of November 12.  An administrative detainee has the right to appeal any decision to lengthen detention to a military court of appeals and then to the Supreme Court, and detainees routinely did so.  The military courts may rely on classified evidence denied to detainees and their lawyers when determining whether to prolong administrative detention.

Third, the 2002 Illegal Combatant Law permits authorities to hold a detainee for 14 days before review by a district court judge, deny access to counsel for up to 21 days with the attorney general's approval, and allow indefinite detention subject to twice-yearly district court reviews and appeals to the Supreme Court.

Country Reports on Human Rights Practices for 2014                    Page 98
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004803

**ISRAEL AND THE OCCUPIED TERRITORIES**          10

Arbitrary Arrest:  There were no credible reports of arbitrary or false arrests, although some leaders of Arab-Israeli society questioned the high number of arrests of Arab-Israeli youths in conjunction with widespread June-August protests whom authorities subsequently released without charges.

Pretrial Detention:  Administrative detention continued to result in lengthy pretrial detention for Palestinian security detainees.  Authorities held most detainees for less than one year but held some for more than one year and a small number for more than two years.

Detention of Rejected Asylum Seekers or Stateless Persons:  The law affords foreign nationals suspected of immigration violations a hearing within four days of detention.  They have the right to, but no assurance of, legal representation.  According to the *Haaretz* newspaper, as of December 28, the government was holding 2,242 irregular migrants and asylum seekers under a June 2013 amendment to the 1954 Prevention of Infiltration Law, which defines all irregular border crossers as "infiltrators" and permits authorities to detain irregular migrants, including asylum seekers and their children, indefinitely.  Under the 1954 law and the 2013 amendment, an "infiltrator" could be released from a prison detention facility to an "open" detention facility, in which detainees may come and go freely during the day, although they must report for mandatory check-ins if the government did not begin to process the asylum claim within three months, did not decide the claim within nine months, or if three years elapsed from the time authorities first detained the unauthorized migrant.  The law, however, authorized the government to detain asylum seekers indefinitely in an open facility without assurance any refugee claims would be processed.  The law set the permitted length of detention for illegal entry at one year.  It also allowed the government to hold male African migrants and asylum seekers indefinitely in a remote open facility run by the IPS that is closed at night and requires three check-ins during the day.  The Hotline for Refugees and Migrants secured temporary release from open facilities for men who could prove they were fathers or husbands with spouses or children in the country.  Throughout the year thousands of African migrants and asylum seekers staged protests in Tel Aviv to oppose arbitrary detention, poor living conditions, and failure to adjudicate their claims for asylum.  On June 27, hundreds of African migrants and asylum seekers departed the open detention facility and marched to the Egyptian border.  Police arrested them two days later and returned them to the Saharonim prison to await trial.

Country Reports on Human Rights Practices for 2014          Page 99
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004804

ISRAEL AND THE OCCUPIED TERRITORIES                    11

On September 22, the High Court of Justice nullified the 2013 amendment to the 1954 Prevention of Infiltration Law and ordered the IPS to close the Holot facility within 90 days and end the mandatory roll call at the facility within two days of the ruling, although the ruling did not reverse the policy that Holot detainees could not seek employment.  The court called the practice of detaining newly arrived irregular migrants in Saharonim "a severe violation of their rights."  It challenged the government's assumption that most irregular migrants entered the country for economic reasons, noting the harsh conditions in Eritrea and Sudan, the two main countries of origin, and cited the government's practice of not enforcing repatriation to those countries.  In a report issued prior to the High Court ruling, Human Rights Watch (HRW) characterized the country's confinement of Eritreans and Sudanese in Holot as a breach of the international law prohibiting arbitrary detention.  HRW representatives said that the facility's isolation prevented persons from normal occupational and social activities, that they were not held for a lawful purpose such as facilitating deportation, and that they were held indefinitely with no effective means to challenge the decision to detain them.

On December 8, in response to the Supreme Court's decision, the Knesset passed a third amendment to the infiltration law.  The amended law limits detention time in Holot to 20 months, while allowing for new asylum seekers to be initially placed in Saharonim prison for up to three months.  A joint statement issued by a coalition of NGOs--including Amnesty International, Hotline for Refugees and Migrants, the African Refugee Development Center, and the Association for Civil Rights in Israel--declared their intent to appeal the amendment, which they contended would only continue to violate the rights of asylum seekers while doing nothing to address the underlying concerns about crime and other problems.  Amnesty International also noted the government continued efforts to encourage "voluntary" returns, including through agreements it made with foreign governments, which have not been made public and may offer no assurance of the protection of asylum seekers.  The Supreme Court subsequently acceded to an NGO appeal to instate an injunction temporarily barring the summons of irregular migrants and asylum seekers to Holot; the court then lifted the injunction on December 31.

## e. Denial of Fair Public Trial

The law provides for an independent judiciary, and the government generally respected judicial independence.  (The annex covers military court trials of Palestinians and others in the occupied territories.)

## Trial Procedures

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 100

ATL004805

**ISRAEL AND THE OCCUPIED TERRITORIES**                    12

The law provides for the right to a fair trial, and an independent judiciary generally enforced this right.

Defendants enjoy the rights to a presumption of innocence, to be informed promptly and in detail of the charges against them, to a fair trial without undue delay, and to adequate time and facilities to prepare their defense. They may not be compelled to testify or confess guilt, and may consult with an attorney, or if indigent, have one provided at public expense. Trials are public except when a court determines a closed trial is required to protect state security, foreign relations, a party's or witness's right to privacy, or a victim of a sexual offense. There are no trials by jury. Defendants have the right to confront witnesses against them, present witnesses and evidence on their behalf, access evidence held against them (except when the court determines such access would compromise national security), and appeal to the Supreme Court. The government may on security grounds withhold from defense lawyers evidence it gathered but did not use in its case against the accused. It must, however, make the evidence available to a court. The law allows the use of secret evidence against the accused in cases of espionage.

The Ministry of Justice determined the law allows the courts to consider secret evidence in reviewing the cases of Palestinians convicted in civilian courts and granted conditional release from prison as part of a prisoner exchange and later re-arrested for violating the terms of their release. In August a Nazareth court re-incarcerated seven individuals released in 2011 as part of the Gilad Shalit prisoner exchange to serve out their original sentences; according to the government, the prisoners were sent to prisons with openings appropriate for the individuals re-incarcerated, not necessarily the facilities from which the courts released them. The seven prisoners appealed their re-incarceration and the interpretation of law used to re-arrest them, and as of November 14, a hearing by the High Court was pending.

Security or military trials are open to the public, but, since authorities conduct them in a military camp, members of the public require an entry permit from the military. Authorities conducted certain trials in a closed setting for reasons of security or of protection of the identity of the minor, and these were not open to the public.

Military courts provide most of the procedural rights granted in civilian criminal courts. The 1970 evidentiary rules governing trials of Palestinians and others

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 101

ATL004806

## ISRAEL AND THE OCCUPIED TERRITORIES                    13

applicable in the occupied territories under military law are the same as evidentiary rules in criminal cases.  According to the Ministry of Justice, the law does not permit convictions based solely on confessions.  In military trials prosecutors often presented secret evidence not available to the defendant or counsel.  Counsel may assist the accused in such trials, and a judge may assign counsel to defendants.  Indigent detainees do not automatically receive free legal counsel for military trials, but almost all detainees had counsel, even in minor cases.  Court indictments are read in Hebrew and, unless the defendant waives this right, in Arabic.  Authorities translated all military court indictments into Arabic.  At least one interpreter is present for simultaneous interpretation in every military court hearing, unless the defendant waives that right.  Defendants may appeal through the Military Court of Appeals and then to the High Court of Justice.

### Political Prisoners and Detainees

There were no reports of citizen political prisoners or detainees.

### Civil Judicial Procedures and Remedies

An independent and impartial judiciary adjudicates lawsuits seeking damages for, or cessation of, human rights violations.  Administrative remedies exist, and court orders usually were enforced.  By law Palestinians may file suit to obtain compensation through civil suits in some cases, even when a criminal suit was unsuccessful and the actions against them were considered legal.

### f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions, and the government generally respected those prohibitions.  Separate religious court systems adjudicate matters such as marriage and divorce for the Jewish, Muslim, Christian, and Druze communities.  Each year an estimated 20,000 civil marriages, marriages of some non-Orthodox Jews, marriages in non-Orthodox ceremonies, marriages of a Jew to a non-Jew, or marriages of a Muslim woman to a non-Muslim must take place outside the country to be considered legal, as religious courts refuse to accept these marriages, and the country lacks a civil marriage law.  Many Jewish citizens objected to exclusive Orthodox control over aspects of their personal lives.  For example, the Orthodox Rabbinate did not consider to be Jewish approximately 322,000 citizens who considered themselves Jewish and who immigrated either as Jews or as family members of Jews; therefore, they may not be married, divorced, or buried in Jewish cemeteries in the country.  The estimated 20,000 Messianic Jews, who

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 102

ATL004807

believed Jesus is the Messiah and considered themselves Jews, also experienced these infringements on their personal lives, since the Orthodox Rabbinate did not consider them to be Jewish.  Authorities did not fully implement a law requiring the government to establish civil cemeteries, although the authorities stated 34 civil burial locations--civil burial plots within Jewish cemeteries--existed and 12 municipalities had authority to have civil burials.

In September a Kfar Saba court ruled the state had to compensate citizens who requested civil burials but did not live in towns where such burials could take place and, therefore, had to pay other municipalities for burial.  Usually, national health insurance covered some or all burial costs.  The NGO Hiddush noted that the Kfar Saba case highlighted that burial practices do not adequately address the needs of non-Jewish or secular citizens.

As defined by the government on security grounds, the Law of Citizenship and Entry in Israel, which is renewed annually and valid through April 2015, prohibits Palestinians from the West Bank or Gaza, including those who are spouses of Israeli residents or citizens, from obtaining resident status in East Jerusalem or Israel.  The law allows the entry of spouses of Israelis on a "staying permit," when the male spouse is age 35 or older and the female spouse is age 25 or older, and the law provides for exceptions in special cases.  The government approved 5,908 of 13,301 applications for family reunifications submitted from 2000 to March 2013; the law prevented other families from living together unless the citizen or resident family member chose to relocate to the West Bank or Gaza Strip.  Authorities required East Jerusalem residents who relocated to forfeit their Jerusalem identification cards.  The government may revoke the Jerusalem identification cards of those who have been away from Jerusalem for seven years, and the government may seek to revoke a Palestinian's Jerusalem identification card if the person obtains citizenship or residency in another country.  The only way to qualify for a Jerusalem residency and an identification card is to derive it from one's parents or through a spouse.  There is no immigration process, and one usually may not regain Jerusalem residency if it is revoked.  (The revocation of identity cards for Palestinian residents of East Jerusalem is addressed in more detail in the annex.)

## Section 2. Respect for Civil Liberties, Including:

## a. Freedom of Speech and Press

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 103

ATL004808

## ISRAEL AND THE OCCUPIED TERRITORIES                    15

The law provides for freedom of speech, including for members of the press, and the government generally respected these rights.  An independent press, an effective judiciary, and a functioning democratic political system combined to promote freedom of speech and of the press.

Freedom of Speech:  Individuals may criticize the government without reprisal. The law prohibits hate speech and incitement to violence, and the 1948 Prevention of Terrorism Ordinance prohibits expressing support for illegal or terrorist organizations.  Legislation from 2011 permitting civil cases for damages against citizens who publicly and knowingly advocate for anti-Israel boycotts remained unimplemented pending a judgment by the High Court on its constitutionality; an expanded hearing before nine justices took place in February.

The government did not press charges against Razi Nabulsi, detained by authorities in October 2013 on charges of incitement to violence and terrorism on social media, although it claimed that an examination of materials on his personal computer yielded statements calling for violence.  In July, Foreign Minister Avigdor Lieberman called for a boycott of Arab businesses taking part in a general strike supporting Palestinians in Gaza and condemning Operation Protective Edge. Some elected officials--but no government officials--responded by affirming the right of Arab citizens to express solidarity with Palestinians in Gaza.

In cases of speech that constitute incitement to violence, the law empowers police to limit freedom of expression.  Police filed an indictment against a person who created a social media group calling for revenge against Arabs and left-wing Israelis following the kidnapping and killing of three Israeli teenagers in the West Bank in June.

Press Freedoms:  The independent media were active and expressed a wide variety of views without restriction, although there were prohibitions on publicizing content liable to incite violence or discrimination on grounds of race, origin, religion, nationality, and gender.

Censorship or Content Restrictions:  All media organizations must submit to military censors any material relating to specific military issues or strategic infrastructure issues, such as oil and water supplies.  The censor's decisions may be appealed to the High Court of Justice, and the censor may not appeal a court judgment.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 104

ATL004809

**ISRAEL AND THE OCCUPIED TERRITORIES**                    16

News printed or broadcast abroad is subject to security censorship. The
government did not fine newspapers or other mass media for violating censorship
regulations during the year. The government regularly enacted restrictive orders
on sensitive security information and required foreign correspondents, as well as
local media, to abide by these orders.

Libel Laws/National Security:  There were reports authorities used security
justifications or slander or libel laws to censor public criticism.

In May, Shin Bet security service officials reportedly threatened a blogger with job
loss and imprisonment for posting a tweet seeking the identity of three Shin Bet
agents referred to a blog post about the interrogation of Palestinian minors.

In July the Israeli Broadcasting Authority banned a radio broadcast created by
B'Tselem, which intended to name Palestinian children killed in Gaza in the July
and August hostilities. The broadcasting authority justified the ban by claiming the
content was "politically controversial." In August the Israeli Supreme Court
rejected B'Tselem's appeal to overturn the decision.

**Internet Freedom**

There were no government restrictions on access to the internet. The government
monitored e-mail and internet chat rooms for security purposes. Internet access
was widely available, and approximately 70 percent of the country's inhabitants
used it regularly.

Police arrested an Arab Israeli following his posting of a negative comment on
social media criticizing an advocate of Christian recruitment to the IDF.
Individuals and NGOs obtained and disclosed the personally identifiable
information of persons peacefully expressing dissenting political opinions on
Operation Protective Edge and led campaigns to force the individuals' employers
to terminate them; the Hotline for Workers (Kav Laoved) tracked more than 30
cases of unlawful terminations from private companies, municipalities, and a state-
owned medical center due to political opinions expressed on social media.

On July 28, the Association for Civil Rights in Israel (ACRI) sent a letter to the
Council of Higher Education condemning action by multiple Israeli universities to
discipline students for social media postings discussing their opposition to
governmental policies and Operation Protective Edge or otherwise expressing
"radical and extreme" sentiments. According to ACRI, Hadassah Academic

Country Reports on Human Rights Practices for 2014          Page 105
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004810

**ISRAEL AND THE OCCUPIED TERRITORIES**                    17

College suspended a student who ridiculed injured IDF soldiers on her Facebook page, revoked her scholarship, banned her from campus, and reported her to police.

Politically motivated cyberattacks occurred.  For example, B'Tselem reported its website was hacked and that it was subjected to denial-of-service measures after it condemned the IDF killing of civilians in the Gaza Strip.

**Academic Freedom and Cultural Events**

The law prohibits institutions that receive state funding from engaging in commemoration of the Nakba, or "catastrophe," referring to the displacement of 80 percent of the Palestinian Arab population during Israel's 1948 War of Independence.  In May the Haifa District Court annulled Haifa University's decision to expel two Palestinian students for organizing a Nakba commemoration on campus and ordered the university to readmit the students.

A 2013 Supreme Court ruling prohibits Palestinian prisoners designated as "security prisoners" and held in Israeli prisons from obtaining higher education through correspondence courses.  A petition by the legal advocacy NGO Adalah challenging this policy was filed with the Supreme Court and was pending as of November 14.

**b. Freedom of Peaceful Assembly and Association**

The law provides for freedom of assembly and association, and the government generally respected these rights.

In July and August during Operation Protective Edge, authorities limited large gatherings citing concern for safety of participants should they need to seek shelter from rocket attacks.  According to NGOs and political organizations, police cancelled and then reinstated permits for antiwar protests in Tel Aviv in July and August, warning demonstrators during periods of cancellation that they would be arrested if their buses approached the event venue; these restrictions led to a significant decrease in planned participation.  The Ministry of Public Security declared that government policy towards handling of demonstrations and protests should apply universally in an equal manner to all races, genders, and religious and political groups.  The police commissioner stated police made efforts to allow demonstrations, even during politically sensitive times, while countering incidents of incitement to violence.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor                    Page 106

ATL004811

**ISRAEL AND THE OCCUPIED TERRITORIES**                    18

The turbulent political and social environment following the July 2 kidnapping and killing of a Palestinian teenager in East Jerusalem and the initiation of Operation Protective Edge prompted demonstrations in Arab and mixed communities across the country; some were peaceful and some were characterized by violence.  In June and July, police used force to disperse such demonstrations in Nazareth, Haifa, and an area with a high concentration of Arab-Israeli citizens in northeast-central Israel adjacent to the northern West Bank commonly known as the "Triangle" area.  Over the course of the demonstrations, authorities arrested approximately 1,500 Arab Israelis.  Of those arrested, authorities filed charges in 650 cases, of which 350 cases progressed to court action.  While some Arab-Israeli politicians and civil society organizations accused police of heavy-handed tactics in response to demonstrations, others noted the close coordination between Arab-Israeli municipal authorities and police and stated the high number of arrests may have prevented more serious violent clashes.  Protesters during this period, including Arab-Israeli members of the Knesset, reported rough handling and aggressive police tactics and alleged security forces did not act to protect antiwar demonstrators from violence by counterdemonstrators.

**c. Freedom of Religion**

See the Department of State's *International Religious Freedom Report* at www.state.gov/religiousfreedomreport/.

**d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons**

The law provides for freedom of internal movement, foreign travel, emigration, and repatriation, and the government respected these rights for citizens.  The Office of the UN High Commissioner for Refugees (UNHCR) and NGOs expressed concern over the government's actions in providing protection and assistance to some refugees, asylum seekers, and other persons of concern, including victims of trafficking, but not to others.  The UNHCR and NGOs raised specific concerns over the government's use of "voluntary" return of detained migrants; the government's failure to provide individual refugee status determinations for all migrants of sub-Saharan African origin, including Eritreans and Sudanese; and the government's continued use of "anti-infiltrator" laws, which impose long-term detention (including the possibility of indefinite detention in a restrictive facility) on all individuals who enter the country irregularly, including asylum seekers and their children.  The amended Prevention of Infiltration Law defined all irregular border crossers as "infiltrators" and gave authorities the

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 107

ATL004812

## ISRAEL AND THE OCCUPIED TERRITORIES                    19

discretion to detain these individuals for one year in prison or indefinitely in a restricted and isolated facility for unlawful entry, even if they requested asylum.

The government reported the arrival of 18 new irregular migrants through December 16, compared with 10,285 in 2012 before the government's completion of a fence on the border with Egypt.  The government attributed the decrease in arrivals to the Prevention of Infiltration law rather than the fence.

The government reported that as of December 16, 2,444 persons who entered Israel illegally through the Egyptian border in recent years were either placed in Holot or detained in Saharonim.  According to NGOs, some detainees were documented trafficking victims, older persons, persons with disabilities, pregnant women, single mothers, unaccompanied minors, and those suffering from poor physical or mental health that were unable to work and who were dependent on the capacities of their communities and NGOs to support their basic needs.  The Ministry of Interior released some identified victims of torture from the Saharonim facility and granted some fathers and husbands temporary stays of orders to report to a restrictive but open detention facility in response to Hotline for Refugees and Migrants petitions.  Regulatory procedures, however, forced many families to separate because regulations required male heads of household to report to Holot, and they did not have proper legal documentation to show their status as married with dependents.  The High Court of Justice's September 22 ruling on the 2013 amendment to the 1954 Prevention of Infiltration Law ordered the IPS to close the Holot facility within 90 days and cease a mandatory roll call at the facility within two days of the ruling, although the ruling did not reverse the policy that Holot detainees could not seek employment outside of the facility.  On December 8, the Knesset passed a third amendment to the Prevention of Infiltration law, which limits detention time in Holot to 20 months while allowing for new asylum seekers to be initially placed in Saharonim prison for up to three months.  ACRI petitioned the Supreme Court and received a temporary injunction barring additional summons to Holot, but the court acceded to the government's appeal of the injunction, and the practice of summons was reinstated as of December 31.  The court was to hear ACRI's appeal of the December 8 law in 2015.

Foreign Travel:  Citizens generally were free to travel abroad provided they had no outstanding military obligations and no administrative restrictions.  The government may bar citizens from leaving the country based on security considerations.  No citizen is permitted to travel to any state officially at war with the country without government permission.  In April the government detained and interrogated journalist Majd Kayyal for five days after he returned from a trip to

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 108

ATL004813

**ISRAEL AND THE OCCUPIED TERRITORIES**                    20

Lebanon, releasing him when a polygraph indicated he was innocent of the charge of "contacting a foreign agent."  Authorities subsequently obtained a court order, requiring renewal every 48 hours, which prohibited Kayyal from talking with a lawyer.

The legal advocacy NGO Adalah alleged the prohibition on travel to many Arab countries disproportionately discriminated against Arab-Israeli citizens and noted that Jewish Israelis were not detained upon return from similar trips to unauthorized countries.  The government required all citizens to have a special permit to enter "Area A" in the West Bank (the area, according to the Interim Agreement, in which the Palestinian Authority exercises civil and security responsibility), although the government allowed Palestinian citizens access without permits.  Following a High Court instruction to the government in November 2013 to implement new airport procedures, the Israel Airports Authority announced it had implemented new technology to ease screening procedures for Arab-Israeli citizens as of March 9, eliminating the practice of searching suitcases in the departure hall.

The government did not allow Palestinians from Gaza to enter Israel to access courts for tort damages filed against the Israeli security forces.

**Protection of Refugees**

Access to Asylum:  The law provides for granting temporary asylum, and the government has established a system for providing temporary protection for most asylum seekers.  There were continuing complaints about the accessibility, efficiency, and impartiality of the Interior Ministry's Refugee Status Determination Unit.  Authorities indicted one Ministry of Interior clerk for accepting a bribe and providing forged documents to an asylum seeker from Sudan.  There were other allegations that clerks accepted bribes to assist Eritreans in obtaining Ethiopian passports, and the Hotline for Migrant Workers claimed the immigration agency gave asylum seekers passports of other individuals to enable them to leave the country.  In November the immigration agency in the Ministry of Interior reduced from seven to three the number of branches providing services--including renewal of temporary permits--to asylum seekers from Eritrea and Sudan.  In response to complaints, authorities stated the ministry designed the reorganization to provide better services to all its clients, and the new center was better designed and more accessible.

Country Reports on Human Rights Practices for 2014                    Page 109
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004814

**ISRAEL AND THE OCCUPIED TERRITORIES**            21

Reportedly, the country also paid individuals to depart to foreign countries. These allegations raised concerns from the UNHCR and other organizations, questioning whether some persons have returned to face unsafe conditions, including torture. The UNHCR has been unable to monitor the asylum adjudication process since 2012. The Ministry of Interior concluded the examination of 453 of the 2,841 asylum requests filed through March by 1,468 Eritreans and 1,373 Sudanese. The government only approved refugee status for two Eritreans (the worldwide rate for protective or refugee status is 90 percent). Authorities have not granted asylum or refugee status to any Sudanese.

In May the State Comptroller issued a report criticizing the government's lack of an official policy with regard to irregular migrants residing in the country, specifically those not in holding facilities and not slated to leave the country. The report noted that it was "doubtful" the government's treatment of irregular migrants in society--particularly their limited access to health care, welfare benefits, and food--was consistent with the country's basic law on human rights. The report urged the ministers of interior and justice to implement a resolution to "uphold the basic dignity of migrants who are not being deported." HRW called upon the government to protect migrants better by allowing them access to basic services and employment.

As the government began to process individual status determinations for Sudanese and Eritreans outside of detention--who constituted approximately 85 percent of all asylum seekers in the country--it continued to give them renewable "conditional release" documents that deferred deportation and had to be renewed every few months. In late December 2013, NGOs and the UNHCR reported the government had reduced the validity of renewable documents to one month instead of four months with orders to report to the open facility. In August 2013 the interior minister announced the government planned to encourage these groups to leave willingly but did not specify whether individual asylum claims would be reviewed.

Government officials and media outlets periodically referred to asylum seekers as "infiltrators" and characterized them as directly associated with increases in crime, disease, and vagrancy. The government continued to implement protocols broadening the definition of crimes under which illegal migrants may be detained. The Hotline for Migrants and Refugees documented cases such as one in which authorities arrested an Eritrean woman after she filed and later withdrew a rape complaint. Authorities also arrested a Sudanese filmmaker after they found military equipment he was using in filming a movie in his apartment.

Country Reports on Human Rights Practices for 2014                Page 110
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004815

## ISRAEL AND THE OCCUPIED TERRITORIES               22

<u>Refoulement</u>:  The government provided some protection against the expulsion or return of refugees to countries where their lives or freedom could be threatened. The government continued a policy of encouraging the return of detainees and other migrants or asylum seekers to the migrant or asylum seeker's home country or, if that destination was unsafe, another foreign country.  The Hotline for Refugees and Migrants reported approximately 6,000 irregular migrants and asylum seekers departed the country through the voluntary return program--5,000 Sudanese during the year alone, according to HRW--and more than half of all those remaining in country registered to leave.

Most returnees were sent to Uganda or Rwanda, although their governments did not provide assurances of legal residency or the right to work, and the Israeli government did not confirm the existence of official agreements with these governments to accept migrants or asylum seekers.  Some Sudanese traveled further to refugee camps in Sudan or Chad.  The government provided returnees a $3,500 financial stipend (paid in dollars), and prior to the returnee's departure, the Population and Immigration Authority and the Custody Review Tribunal reviewed mandatory recorded video interviews and written statements of those who opted to participate in the voluntary return program.

NGO representatives said the government forced returnees in their video statements to disavow any desire to remain in the country, even should they be released from detention; the government maintained such statements were legally necessary to complete the voluntary return procedure.  NGO representatives stated that without publicly acknowledged agreements with foreign governments to accept refugees, the voluntary return program in some cases constituted refoulement.  Additionally, HRW reported authorities returned many individuals to their country of origin, although rarely directly.  Once authorities sent individuals to foreign countries, they did not receive permission to stay upon arrival and were, therefore, returned to their countries of origin.  HRW documented the treatment of some returnees whom authorities arrested upon their return to Sudan and Eritrea; authorities beat, threatened, and in some cases tortured them.

The Hotline for Refugees and Migrants collected testimony of IDF soldiers indicating authorities instructed them to contact Egyptian security forces if they identified "infiltrators" along the border fence.  They stated commanding officers ordered them to hit or shoot at the feet of individuals attempting to climb the fence, even if IDF members believed the individual to be an asylum seeker.

Country Reports on Human Rights Practices for 2014                    Page 111
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004816

## ISRAEL AND THE OCCUPIED TERRITORIES                    23

<u>Refugee Abuse</u>:  Communities with a large concentration of African migrants were occasionally targets of violence.  Following the August 2013 arrest of four persons for attacks that police believed were racially motivated, authorities indicted the four suspects, and the case continued as of September.  The Tel Aviv municipality dedicated a special police unit to combat violence and crime in the migrant community.

<u>Employment</u>:  Recognized refugees received renewable work visas, but renewable documents given to most asylum seekers explicitly read, "This is not a work visa." The government previously allowed asylum seekers to work in the informal sector but not to open their own businesses or to register to pay value-added tax, although the law does not prohibit this.  The government, however, reserves the right to demand unpaid value-added tax and levy substantial fines against businessmen for operating businesses without a tax exemption.  African asylum seekers in the Holot open facility for irregular border crossers may not work outside the facility, but some worked inside the facility for less than the minimum wage.  Some of the facility's services depended on detainee labor.

The law bars migrants from sending money abroad, limits the amount they may take with them when they leave to the minimum wage for the number of months they resided in the country, and defines taking money out of the country as a money-laundering crime.

<u>Access to Basic Services</u>:  Recognized refugees received social services, including access to the national health-care system, but the government did not provide asylum seekers with public social benefits such as health insurance.  The government stated it provided infirmary services, including laboratory services, medical imaging, and general and mental hospitalization services in the open Holot facility for individuals held there, including asylum seekers.  The government sponsored a mobile clinic and mother and infant health-care stations in south Tel Aviv that provided health and dental services, sexually transmitted disease treatment and evaluation, and prenatal and infant medical care.  In June a 37-year-old Holot resident with symptoms of a stroke waited three days before receiving medical treatment.  Once at a hospital, authorities revoked the order mandating his detention at Holot, paradoxically leaving him without funds for medical expenses. The head of the Knesset Committee on Foreign Workers, Michal Rosin, called the case "a multi-system failure of the first degree" and held the Holot facility and the Immigration Authority at fault.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 112

ATL004817

**ISRAEL AND THE OCCUPIED TERRITORIES**                    24

Temporary Protection:  The government provided temporary protection primarily to Eritrean and Sudanese asylum seekers.  The Ministry of Interior began processing asylum applications of Eritreans and Sudanese in detention during the year.  The ministry continued to reject the applications of almost all Eritrean detainees, concluding that military desertion provided insufficient grounds for presenting a subjective fear of persecution and disregarding further evidence presented on conditions in Eritrea should individuals return.

## Section 3. Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides citizens the ability peacefully to change their government, and citizens exercised this right through periodic, free, and fair elections based on universal suffrage.

## Elections and Political Participation

Recent Elections:  Observers considered parliamentary elections held in January 2013 free and fair.

Political Parties and Political Participation:  The Basic Law prohibits the candidacy of any party or individual that denies the existence of the State of Israel as the state of the Jewish people or the democratic character of the state or that incites racism. Otherwise, political parties operated without restriction or interference.  The Northern Islamic Movement continued its practice of prohibiting its members from running for local or national office and boycotting elections.

Participation of Women and Minorities:  Women and minorities participated in political life on the same legal basis as men or nonminority citizens.  In June the Knesset passed a law giving an additional 15 percent in campaign funding to municipal party lists composed of at least one-third women.  Although senior political and social leaders have often come from among veterans of the predominantly male IDF, women generally did not face cultural barriers in politics, including in leadership positions up to prime minister.  Women faced significant cultural barriers in political parties representing conservative religious movements and the Arab minority.  Following the 2013 parliamentary elections, the 120-member Knesset had 27 female members and 12 Arab members.  The 22-member cabinet included four women, but none was Arab; two women were deputy ministers.  Four members of the 15-member Supreme Court were women, and one was Arab.

Country Reports on Human Rights Practices for 2014                    Page 113
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004818

## Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials, and the government implemented these laws effectively.  There were reports of government corruption, although impunity was not a problem.

Corruption:  The media routinely reported on corruption.  The national police, the state comptroller, the attorney general, and the accountant general are responsible for combating official corruption.  These entities operated effectively and independently, and were sufficiently resourced.  NGOs that focused on anticorruption efforts operated freely without government interference.

The government continued to investigate and prosecute top political figures.  On May 13, the courts convicted former prime minister Ehud Olmert of accepting bribes during his tenure as mayor of Jerusalem.  A district court sentenced him to six years' imprisonment, two years of conditional imprisonment, and a fine of one million new Israel shekels (NIS) ($256,000).  In addition to Olmert, the court convicted nine other defendants and acquitted three.  Olmert aide Shula Zaken, who was convicted of bribery, began an 11-month prison term in July.  Zaken's submission of audio tape evidence to the Supreme Court triggered a decision to retry Olmert on charges on which the court previously acquitted him; the retrial began in September.

The government completed an investigation into the "Harpaz Affair," an alleged 2010 plot to undermine illegally the minister of defense's choice of IDF chief of staff.  The attorney general as of the end of the year was considering a police recommendation to indict officials, including former IDF chief of staff Gabi Ashkenazi and current cabinet secretary Avichai Mandelblit, although authorities cleared both of the most serious charge of obstructing the democratic system by overthrowing a civilian supervisor.

At year's end police announced the arrest of 31 suspects in a bribery and corruption ring in return for political kickbacks.  The undercover investigation leading to the arrests allegedly revealed a broad-based system in which cash was reportedly inappropriately allocated to NGOs in return for appointment of family members and the transfer of some of the payments back to public officials as bribes or benefits.  The fact that key suspects include senior members of the Yisrael Beyteinu Party headed by Avigdor Lieberman, specifically his spokesperson and Deputy Interior Minister Faina Kirschenbaum, triggered counter-

Country Reports on Human Rights Practices for 2014                    Page 114
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004819

## ISRAEL AND THE OCCUPIED TERRITORIES                26

allegations that Lieberman and his party were deliberately targeted ahead of general elections scheduled for 2015.  Police responded that the year-long investigation of the affair began before early elections were announced.

According to the government, in 2013 authorities investigated nine mayors due to suspicions of corruption.  No update was available at the end of the year.

Financial Disclosure:  Senior officials are subject to comprehensive financial disclosure laws, and their disclosures are verified by the Civil Service Commission.  Information in these disclosures is not made public without the consent of the person who submitted the disclosure.  There is no specific criminal sanction for noncompliance.

Public Access to Information:  The law requires governmental agencies to make internal regulations, administrative procedures, and directives available to the public.  The law was not effectively implemented by all governmental agencies.

## Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

Numerous domestic and international human rights groups operated without government restriction, investigating and publishing their findings on human rights cases.  Government officials were generally cooperative, responsive to their views, and routinely invited NGOs critical of the government to participate in Knesset hearings on proposed legislation.  Human rights NGOs have standing to petition the High Court directly regarding governmental policies and may appeal individual cases to the Supreme Court.  A unit in the Foreign Ministry maintained relations with certain international and domestic NGOs.  In 2013 the Ministerial Committee for Legislative Affairs approved a bill that limited donations NGOs may receive from foreign governments and organizations.  It would have imposed a 45 percent tax on contributions if the NGO engaged in activities such as advocating for a boycott, divestment, and sanctions against Israel; calling for the trial of IDF soldiers in international courts; or denying Israel's existence as a Jewish and democratic state.  Authorities halted the progress of the bill.

The Ministry of Interior continued to bar foreign nationals affiliated with certain pro-Palestinian NGOs and solidarity organizations entry into the country.  Authorities required some foreign nationals to sign declarations stating their understanding that "all relevant legal actions" would be taken against them, "including deportation and denial of entry into Israel for a period of up to 10

Country Reports on Human Rights Practices for 2014                Page 115
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004820

years," if they traveled through the country to Palestinian Authority-controlled areas without appropriate authorization.  The government stated this was done on an individual basis, not according to the activities or platform of the NGOs with which these persons were affiliated.

In August the director general of the National Civil Service program informed B'Tselem that it was withdrawing the organization's eligibility to employ national service volunteers, alleging the NGO's human rights work amounted to defamation and incitement against Israeli soldiers.  The Attorney General's Office halted implementation of the order following a petition by ACRI.

The United Nations or Other International Bodies:  The government generally cooperated with the United Nations and other international bodies.  The government reinstated its participation in the UN Human Rights Council, including the Universal Periodic Review process, although it did not reverse its 2013 partial suspension of its coordination with UNESCO.

Government Human Rights Bodies:  The state comptroller also served as ombudsman for human rights problems.  The ombudsman investigated complaints against statutory bodies that are subject to audit by the state comptroller, including government ministries, local authorities, government enterprises and institutions, government corporations, and their employees.  The ombudsman is entitled to use any relevant means of inquiry and has the authority to order any person or body to assist in the inquiry.

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

The law prohibits discrimination on the basis of race, sex, gender, disability, language, sexual orientation and gender identity, or social status, and the government was generally effective in enforcing these prohibitions.

## Women

Rape and Domestic Violence:  Rape, including spousal rape, is a felony punishable by 16 years in prison, or up to 20 years' imprisonment for rape under aggravated circumstances or if the perpetrator rapes or commits a sexual offense against a relative.  The government effectively enforced rape laws.  In 2013 authorities initiated 352 cases for spousal rape.  Through September 18, the government received almost 4,100 complaints of sexual offenses, of which 759 resulted in indictment, 511 were closed because the offender was unknown, 434 were closed

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 116

ATL004821

**ISRAEL AND THE OCCUPIED TERRITORIES**              28

for lack of evidence, 191 were closed for lack of public interest, and 2,193 were still open as of November 14.

From January to mid-October, police opened 18,250 domestic violence cases. Women filed the majority of complaints. According to police data, between January and May, 10 women were killed by their spouses. In October, Bussaina Abu Ghanem was killed in Ramle, the tenth woman in her extended family to be killed for "family honor" since the year 2000, according to a media report. Women in the community alleged police and community leaders did not take seriously their safety and fears. Meanwhile, the police built cases against some of the perpetrators but pointed to the challenges of investigating a domestic crime wherein family members were either fearful to cooperate with police and speak out or were complicit in the crime and willing to destroy evidence.

On November 14, the Ministry of Public Security issued a new 90-day temporary regulation allowing armed security guards to take their weapons home at the end of their shifts. This practice was prohibited by the Ministry of Publish Security in August 2013 after a coalition of NGOs raised concerns about the high rate of spousal killings by security guards using service weapons. According to ACRI, security guards' weapons were responsible for more than 30 killings in the last 10 years.

According to the Association of Rape Crisis Centers in Israel, the majority of rape victims did not report the crime to authorities due to social and cultural pressure. Women from certain Orthodox Jewish, Muslim, Bedouin, and Druze communities faced significant social pressure not to report rape or domestic abuse. Experts in the field of social work and domestic violence prevention highlighted the reluctance of many Arab women to avail themselves of social services due to societal pressure and personal affiliation as Palestinian. The government cooperated with The Abraham Fund Initiative on a pilot program to provide training for professionals in the field of domestic violence within the Arab community, bringing law enforcement officers, social workers, NGOs and religious leaders together to coordinate services for victims of domestic violence.

The Ministry of Social Affairs operated 14 battered women's shelters and a hotline for reporting abuse. The 14 shelters can accommodate 160 women and 320 children. Since November the shelters had cared for 136 women and 223 children. Police operated a call center to inform victims about their cases. Women's organizations provided counseling, crisis intervention, legal assistance, and shelters.

Country Reports on Human Rights Practices for 2014              Page 117
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004822

ISRAEL AND THE OCCUPIED TERRITORIES                    29

Female Genital Mutilation/Cutting (FGM/C):  The law prohibits FGM/C.  There were no reports of FGM/C on women age 18 or older.

Other Harmful Traditional Practices:  Cases of "honor" killings perpetrated in defense of family honor continued to occur within the Arab community, contributing to a disproportionate number of killings of Arab women.  Of five adult women killed in the northern part of the country in 2013, police determined two were the result of domestic violence, two were due to a family dispute, and one followed a romantic dispute.  In the southern part of the country, one woman was killed due to a family dispute (see also subsection Rape and Domestic Violence).

According to the Ministry of Welfare, 22 of its 88 centers for prevention and treatment of domestic violence operated in Arab communities.  In 2012 a total of 1,142 Arab women received treatment in these centers.  Additionally, the Ministry of Welfare operated two domestic violence shelters designated for Arab women and their children and two mixed shelters for Jewish and Arab women.  In 2012 eight Druze and 35 Bedouin and women stayed in these shelters.  Police conducted weekly assessments of threatened women to determine the level of threat and required protection, and worked with social welfare and NGOs to safeguard threatened women.

Sexual Harassment:  Sexual harassment is illegal but remained widespread.  The Equal Employment Opportunity Commission report for 2013 counted 27 complaints of sexual harassment in the workplace.

The law requires that suspected victims of harassment be informed of their right to assistance.  Penalties for sexual harassment depend on the severity of the act and whether blackmail is involved.  They range from two to nine years' imprisonment.  From January through September 18, police investigated 408 cases of sexual harassment, in which they served 97 indictments.  They closed 131 cases while 180 remained open.  Police notified all victims of their right to receive assistance from the Association of Rape Crisis Centers in Israel.  The law provides that victims may be informed of the progress on their cases through a computerized system and information call center.

Harassment based on gender segregation continued in some public places, including on public buses.  Following harassment and violent confrontation on a bus line in Beit Shemesh, the Ministry of Transportation and Road Safety and the

Country Reports on Human Rights Practices for 2014                    Page 118
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004823

**ISRAEL AND THE OCCUPIED TERRITORIES**                    30

High Court of Justice in 2011 adopted a settlement whereby communities that desire segregation on public transportation may continue this practice voluntarily, but buses must post signs clarifying that passengers are free to sit in any available seat.  Subsequently, the legal branch of the Israeli Religious Action Center sued several bus drivers who failed to uphold this policy and won damages of between NIS 8,000 and NIS 12,000 ($2,051 to $3,077) in each case.  The center claimed the civil suits had a positive effect on subsequent driver enforcement of the policy.

The Ministry of Transportation and Road Safety operates a 24-hour hotline to report complaints on public transportation, including segregation.

In March a court convicted a Haredi man from Jerusalem for sexually harassing a female soldier in 2012 because she was standing among a group of men on a bus.

Reproductive Rights:  Couples and individuals have the right to decide the number, spacing, and timing of having children, and they had the information and means to do so free from discrimination.  They also have the right to attain the highest standard of reproductive health, although social and religious pressure on women in Haredi communities often led them to seek approval from a rabbi to use contraception.

Discrimination:  In the secular criminal and civil courts, women and men enjoy the same rights, but religious courts--responsible for adjudication of family law, including divorce--limit the rights of Jewish, Christian, Muslim, and Druze women.  A Jewish woman is allowed to initiate divorce proceedings, but both the husband and wife must give consent in order to make the divorce final.  Because some men refused to grant divorces, thousands of women could not remarry or give birth to legitimate children.  In rare cases this rule happened in reverse, with women refusing to grant men divorces.  Rabbinical tribunals sometimes sanctioned a husband who refused to give his wife a divorce, while at the same time declining to grant the divorce without the husband's consent.

A Muslim woman may petition for and receive a divorce through the sharia courts without her husband's consent under certain conditions, and a marriage contract may provide for other circumstances in which she may obtain a divorce without his consent.  A Muslim man may divorce his wife without her consent and without petitioning the court.  Through ecclesiastical courts, Christians may seek official separations or divorces, depending on their denomination.  Druze divorces are performed by an oral declaration of the husband alone and then registered through the Druze religious courts, placing the disproportionate burden on the woman to

Country Reports on Human Rights Practices for 2014                    Page 119
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004824

## ISRAEL AND THE OCCUPIED TERRITORIES                31

immediately leave the home with her children.  A civil family court or a religious
court settles child custody, alimony, and property matters after the divorce, which
gives preference to the father unless it can be demonstrated that a child especially
"needs" the mother.

Although the law prohibits discrimination based on gender in employment and
wages and provides for class action antidiscrimination suits, a wage gap between
men and women persisted.  Women's salaries continued to average 66 percent of
men's in 2013, according to government statistics.  When calculated per working
hour, women's salaries averaged 84 percent of men's salaries.  Of complaints
received by the Equal Employment Opportunity Commission in 2013, 5 percent
related to gender discrimination and 34 percent related to pregnancy issues.

The Authority for the Advancement of the Status of Women in the Prime
Minister's Office (the authority) works to mainstream women's participation in the
government and private sector, and to combat sexual harassment and domestic
violence.  The authority requires every city, local council, and government
ministry to have an adviser working to advance women's issues.  A government
resolution requires ministers to appoint women to the directorates of government-
owned companies until representation reaches 60 percent (see also section 7).  The
law requires that at least one of two governmental representatives on the
Committee for Appointment of Religious Judges be a woman.

Discrimination in the form of gender segregation continued in some public places,
including in public health clinics and at the Western Wall.  The government
reached an agreement with Reform and Conservative Jewish religious movements
to establish a separate space for egalitarian prayer at the Robinson's Arch area, in
addition to the existing gender-segregated prayer areas where regulation prohibits
women from leading prayers, singing aloud, or holding or reading from Torah
scrolls.  Some groups alleged this compromise did not sufficiently accommodate
women who wanted to lead prayers in a women-only setting.  Non-Orthodox and
mixed gender groups used a temporary platform conceived by Religious Services
Minister Naftali Bennett for religious ceremonies such as bar and bat mitzvahs.

In ultra-Orthodox areas of Jerusalem, images of women in advertisements were
vandalized.

In March following the attorney general's 2013 adoption of the recommendations
of a Ministry of Justice team established to investigate the exclusion of women in
the public sphere, a government resolution declared segregation of women

Country Reports on Human Rights Practices for 2014          Page 120
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004825

## ISRAEL AND THE OCCUPIED TERRITORIES                  32

constituted a serious negative phenomenon requiring governmental corrective action.  The government also required all local authorities to provide assurances that segregation of women did not occur in public events, funerals, public transportation, or any other area of the public sphere.

In 2013 Finance Minister Lapid appointed a committee charged with examining gender aspects of the state budget and establishing guidelines for a policy to introduce gender analysis to the budgetary process.  The Knesset passed a law that gives a financial incentive of an additional 15 percent in campaign funding to municipal party lists composed of at least one-third women.  The Authority for the Advancement of the Status of Women continued to operate a hotline for complaints regarding the public exclusion of women.

In June the government adopted the recommendations of a committee that studied the status of women in public service, which included integrating women in 50 percent of senior managerial positions in the civil service (compared with 38 percent as of year's end) and recognizing hours worked from home for parents of younger children.

### Children

Birth Registration:  Children derive citizenship at birth within or outside of the country if at least one parent is a citizen.  Births are to be registered within 10 days of the delivery.  The country registers the births of Palestinians in Jerusalem, although Palestinian residents of Jerusalem reported delays in the process.

According to the National Council for the Child, 155,907 children in the country did not have citizenship and, therefore, lacked its corresponding rights.  The figure included children of legal and illegal foreign workers and children of mixed marriages, especially those between Arab-Israelis and Palestinian residents of the occupied territories.

According to NGOs the Ministry of Interior refused to list fathers' names or to give children their father's last names on the birth certificates of children without legal residency status in the country, including children of asylum seekers and migrant workers and children of international students and others who do not hold Israeli citizenship.  The Ministry of Interior requires parents without a permit to sign a form declaring they are "present illegally" in the country before issuing a birth certificate.  A petition to require the government to issue an official birth

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 121

ATL004826

document listing both parents' names remained pending before the High Court as
of November 14.

Education:  Primary and secondary education is free and universal through age 17.
The government continued implementing a 2007 law to make education
compulsory through grade 12, but a February decision by the Knesset Education
Committee postponed implementation of the Compulsory Education Law
(integrating children ages three to five) until the 2015-16 school year.  The
government continued to expand free public preschool beginning at or slightly
before age three.  The government did not enforce compulsory education, however,
in unrecognized Bedouin villages in the Negev, and Bedouin children, particularly
girls, continued to have the highest illiteracy rate in the country.  The government
operated separate school systems for Hebrew-speaking children and Arabic-
speaking children.  For Jewish children there were separate school systems for
religious and secular families.  At the beginning of the school year, parents and
teachers at a secular school in Beit Shemesh launched a partial strike protesting the
city's decision to allot half of the building to an ultra-Orthodox girls' school and
erect a wall separating the secular and ultra-Orthodox students; authorities
eventually removed the wall.  Individuals could choose to attend a school
regardless of ethnicity.  Approximately 400,000 students attended ultra-Orthodox
Jewish schools.  This growing population constituted 25 percent of all students.
The government funded 55 to 75 percent of the operating costs of recognized ultra-
Orthodox schools, which are required to teach a corresponding percentage of the
national curriculum.

Gaps existed in government education funding, according to a *Haaretz* newspaper
report, although the government worked to address these gaps.  During the year the
Ministry of Education spent approximately NIS 27,000 ($6,923) per student on
average at government religious Jewish high schools, NIS 24,800 ($6,359) at
government secular Jewish high schools, and NIS 21,100 ($5,410) at Arab high
schools.

Haredi political parties continued to oppose government regulation of Haredi
government-funded school systems.

Medical Care:  The government provides preventive health services to minors
without civil status who are younger than age six.  It also provides services similar
to those provided citizen children to noncitizen minors younger than age 18,
regardless of their legal status in country, if their parents register them in the
"Meuhedet" health-care fund.  This arrangement does not include minors whose

Country Reports on Human Rights Practices for 2014                    Page 122
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004827

## ISRAEL AND THE OCCUPIED TERRITORIES                34

guardian is a resident of the Palestinian Authority, and it does not cover pre-existing conditions.

Child Abuse:  The National Council of the Child received a number of complaints during the year of abuses related to health, availability of welfare services, education, physical and sexual abuse, child pornography, and poor educational environments.  According to the council's most recent available annual report, 48,984 cases of child abuse were reported in 2012.  Also according to the council, the incidence of reported child abuse increased from 8.7 victims per 1,000 youths younger than age 18 in 1995 to 18.9 victims per 1,000 in 2010.  In a survey of more than 10,000 youths, released by the council in November, 48.5 percent of Jewish youth and 67.7 percent of Arab youth reported they had been physically, emotionally, or sexually abused.  The council noted a significant gap between the percentage of youth who reported abuse in the survey and the 1.9 percent of the youth population that had reported abuse to social workers.  The law requires mandatory reporting of any suspicion of child abuse.  Police opened 7,874 cases of offenses against minors in 2013.

The law requires social service employees, medical and education professionals, and other officials to report indications that minors were victims of, engaged in, or coerced into prostitution, sexual offenses, abandonment and neglect, assault or abuse, and human trafficking.  The government stated police immediately attend to each case forwarded to them from the National Council for the Child or any other source.  Without distinction to ethnic or racial background, it assigned officers with special training in dealing with child abuse.  NGOs expressed concern, however, regarding police negligence in child abuse and domestic violence cases reported in minority communities.

The government provided specialized training to psychologists, offered a free psychological treatment program to treat child victims of sexual offenses, and operated a 24-hour emergency hotline.  The Ministry of Education operated a special unit for sexuality and for prevention of abuse of children and youth that assisted the education system in prevention and appropriate intervention in cases of suspected abuse of minors.

According to police in 2012, minors filed two-thirds of the more than 5,000 complaints of sex crimes.  The most common offense against minors--more than 50 percent of the cases--was molestation.  Approximately one-quarter of those complaints were for rape.

ATL004828

## ISRAEL AND THE OCCUPIED TERRITORIES                35

In September a court convicted Goel Ratzon on multiple rape charges; authorities believed he had as many as 32 "wives" and 49 children.  Charges against him included sex with a minor.  Knesset member Zehava Gal-On objected to Ratzon's acquittal on the charge of enslavement of one of his victims.

Early and Forced Marriage:  The law set the minimum age of marriage at 18, with some exceptions for younger children due to pregnancy and for couples over age 16 if the court permitted it due to unique circumstances.  In 2012 (the most recent year for which data were available), 472 boys and 2,227 girls married before age 18.

Female Genital Mutilation/Cutting (FGM/C):  The law prohibits FGM/C.  There were no reports of the practice since a single case in 2008.

Other Harmful Traditional Practices:  In September authorities charged a brother, a cousin, and two others for the June killing of 14-year-old Fatima Haib in Tuba Zanjariyya in an honor crime.

Sexual Exploitation of Children:  The law prohibits sexual exploitation of a minor and sets a penalty of seven years to 20 years in prison for violators, depending on the circumstances.  The law prohibits child pornography.  The minimum age for consensual sex is 16.  Consensual sexual relations with a minor between the ages of 14 and 16 constitute statutory rape punishable by five years' imprisonment.

The government supported a number of programs to combat sexual exploitation of children, including establishing an interministerial research team, preparing educational materials, and conducting numerous training sessions for government and police officials.

International Child Abductions:  The country is a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.  For information see the Department of State's report on compliance at travel.state.gov/content/childabduction/english/legal/compliance.html and country-specific information at travel.state.gov/content/childabduction/english/country/israel.html.

## Anti-Semitism

Jews constituted approximately 80 percent of the population.  The government defined crimes targeting Jews as nationalistic crimes relating to the overall

Country Reports on Human Rights Practices for 2014                Page 124
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004829

**ISRAEL AND THE OCCUPIED TERRITORIES**                                    36

Palestinian-Israeli conflict rather than anti-Semitism.  During a period of Jewish-Arab tension following the kidnapping and killing of a Palestinian teenage person in East Jerusalem in July, rioters in the Arab town of Qalanswa attacked some Jewish visitors to the town and burned a Jewish-owned vehicle.  In response police installed temporary checkpoints at entrances to certain Arab towns and advised Jewish Israelis not to enter.  Observers noted swastikas in graffiti targeted at both Jews and non-Jews.

The country is a leader within the Global Forum for Combating Anti-Semitism.

**Trafficking in Persons**

See the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

**Persons with Disabilities**

The Basic Laws provide a legal framework for prohibiting discrimination against persons with physical, sensory, intellectual, and mental disabilities in employment, education, air travel and other transportation, access to health care, and the provision of other state services.  Legislation mandates access to buildings, transportation, and physical accommodations and services in the workplace, and access to mental health services as part of government-subsidized health insurance.  On July 6, the minister of economy signed an Encouragement of Employment of Persons with Disabilities order requiring that 3 percent of the workforce of employers with more than 100 employees be persons with disabilities.  According to NGOs, government progress in enforcing these laws was limited.

Societal discrimination and lack of accessibility persisted in employment, transportation, housing, and education.  According to the Ministry of Industry, Trade, and Labor, the employment rate of persons with disabilities rose from 40 percent in 2007 to 51 percent in 2012.  The rate remained lower than the 74 percent employment rate for persons without disabilities.

According to 2012 statistics, gross per capita income of persons with disabilities was 73 percent of that of persons without disabilities, but net income was relatively higher at 80 percent.  The average monthly income of persons with severe disabilities was 36 percent lower than that of persons without disabilities.

Country Reports on Human Rights Practices for 2014                    Page 125
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004830

**ISRAEL AND THE OCCUPIED TERRITORIES** 37

The rate of persons with disabilities in the Arab community was 29 percent, compared with 17 percent in the Jewish population. Employment of Arab citizens with disabilities was 21 percent, compared with 49 percent for Jews with disabilities. Shortages of funding for Arab municipalities, including for education, adversely affected Arabs with disabilities.

The government reported improved access to interurban buses with 91 percent of municipal buses, 43 percent of inter-urban buses, and 73 percent of bus stops being accessible to persons with disabilities. Authorities projected 92 percent of central bus stops would be accessible to persons with disabilities by year's end. Ninety-five percent of train stations were accessible to persons with disabilities, with the remaining 5 percent scheduled to become accessible in 2015, according to the government.

Access to community-based independent living facilities for persons with disabilities, however, remained limited. According to the disability rights NGO Bizchut, more than 8,000 persons with intellectual disabilities lived in institutions and large hostels while only 1,500 lived in community-based settings. Following the government's decision to close private psychiatric hospitals, the government issued, but then rescinded, tenders for new small community-based housing units for persons with disabilities leaving these facilities. Reportedly, the government preferred to place them in existing institutions. Bizchut claimed there were prior complaints against several of these institutions. During the year the Ministry of Social Affairs announced a new program to move 900 persons with intellectual disabilities from institutions into community-based housing facilities within the next three years.

A family court restored legal capacity to a woman with a disability and removed her legal guardian in favor of a supported decision-making arrangement. Other laws passed during the year widen the scope of the Law Preventing Sexual Harassment to employees in sheltered vocational workshops, provide paternity leave to husbands whose wives cannot fully care for an infant due to a disability, and allow parents of children with disabilities to be absent from work for medical appointments as part of sick leave.

The law prioritizes access by persons with disabilities to public services, such as eliminating waiting in line as well as providing adapted seating and accessible facilities in public places other than buildings, such as public beaches, municipal parks, swimming pools, and cemeteries. For deaf and hard-of-hearing persons, the law provides for short message public announcement services.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 126

ATL004831

**ISRAEL AND THE OCCUPIED TERRITORIES**               38

The Commission for Equal Rights of People with Disabilities within the Ministry of Justice is responsible for protecting the rights of persons with disabilities and worked with government ministries to enact regulations.  The Unit for the Integration of Persons with Disabilities in the Labor Market, located within the Ministry of Economy, examined and promoted the employment of persons with disabilities.  The unit has three support centers designed to assist employers who wish to hire persons with disabilities.  During 2013, 474 employers applied to these centers for assistance, and 261 persons with disabilities found employment through their assistance.  The Ministry of Social Affairs and Social Services provided out-of-home placement and sheltered employment for persons with cognitive, physical, and communication disabilities.  As of November there were 3,750 persons with mental disabilities employed in sheltered employment, 1,350 employed in the open labor market in supported employment, and 1,700 in nonemployment day care.  The Ministry of Social Affairs and Social Services also handled criminal investigations involving persons with certain disabilities, whether they were victims or offenders, when police requested assistance.  The National Insurance Agency provided financial benefits and stipends, the Ministry of Health provided mental health and rehabilitation services, and the Ministry of Education provided special education services to persons with disabilities.  The Ministry of Economy allocated NIS 15 million ($3.8 million) for workplace modifications to accommodate persons with disabilities between 2007 and the end of the year.

**National/Racial/Ethnic Minorities**

Arab citizens faced institutional and societal discrimination.  Tensions between Arabs and Jews, sparked by two incidents of kidnapping and killing in the West Bank and East Jerusalem--one perpetrated by Palestinians against three Jewish Israelis, and one perpetrated by Jewish Israelis against a Palestinian--and exacerbated by hostilities between Israel and Hamas in Gaza during Operation Protective Edge in July and August, contributed to an increase in incidents of politically or religiously motivated violence throughout the country.

"Price tag" attacks (property crimes and violent acts by extremist Jewish individuals and groups) continued throughout the country, targeting Arab and some Jewish institutions, but were most pronounced in areas where Jews and Arabs cooperated commercially.  The government suggested assailants were attempting to incite the local populations against Jews who did business where they lived. The most common offenses, according to police, were attacks on vehicles, defacement of real estate, harm to Muslim and Christian holy sites, assault, and

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 127

ATL004832

**ISRAEL AND THE OCCUPIED TERRITORIES**                          39

damage to agricultural lands.  In Kafr Qasem assailants attacked local businesses, causing property damage and leaving graffiti indicating they targeted the businesses because they were Arab owned.  Other attacks occurred in Jerusalem, Baka al-Gharbiyya, Jish, Acre, Jaljulia, and Jaffa.  There were numerous incidents in which groups gathered to shout "death to Arabs" and to attack Arab drivers.

In June 2013, following a number of attacks including car burnings and desecration of a Christian Orthodox cemetery in Jaffa, the Security Cabinet authorized the minister of defense to declare groups that perpetrated such attacks as "illegal associations."  The minister did so in August 2013.  Subsequently, a dedicated police unit to handle these crimes began operations, and it became fully functional during the year.  In the first quarter of the year, authorities opened 63 cases and filed 21 indictments.

Indictments were filed against three suspects in the February 2013 attack on an Arab-Israeli municipal street cleaner in Tel Aviv, and proceedings continued in Tel Aviv District Court at the end of the year.  Following an August 8 attack on two Palestinians in Beit Hanina, authorities indicted 10 Jerusalem residents for assault and obstruction of justice.

Anti-assimilation organizations continued to oppose Arab-Jewish marriages.  In August the anti-intermarriage organization Lehava organized a protest outside the wedding of an Arab-Israeli man to a Jewish-Israeli woman who converted to Islam.  Israeli President Reuven Rivlin issued a statement congratulating the couple and endorsing their civil right to marry.  Lehava also pasted stickers on an Arab-Jewish bilingual school in the Negev warning Arab students, "Don't you dare touch a Jewess."  The Israeli Religious Action Center published a report highlighting the gendering of anti-Arab sentiment through exhortations to "protect" Jewish women from Arab men.

On November 29, members of Lehava reportedly set afire two first grade classrooms in the Arabic-Hebrew bilingual Max Rayne Hand in Hand school in West Jerusalem and scrawled graffiti with racist messages, including "Death to Arabs."  Prime Minister Netanyahu condemned the attack, as did Justice Minister Tzipi Livni and Housing Minister Uri Ariel in their visits to the school the following day.  On December 11, police announced they had arrested the Lehava members, who confessed to the attack; police also arrested other Lehava members, including the organization's leader Bentzi Gopstein.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 128

ATL004833

**ISRAEL AND THE OCCUPIED TERRITORIES**            40

The law exempts Arab citizens, except for the Druze, from mandatory military service, but a small percentage served voluntarily.  On March 13, the Knesset voted into law a conscription plan for Haredi (ultra-Orthodox) citizens; the law exempts those who were 18 or older when the law was passed.  Implementation lagged through the end of the year due to bureaucratic hurdles, and as of November the NGO the Movement for Quality Government in Israel petitioned the Supreme Court to invalidate the law because it granted too much favored treatment to the Haredi community.  Citizens who did not perform military service enjoyed fewer societal and economic benefits and sometimes were discriminated against in hiring practices.  Citizens generally were ineligible to work in companies with defense contracts or in security-related fields if they had not served in the military.  Some Druze opposed their inclusion in mandatory military service, and authorities jailed them for refusing to serve.  The government managed a National Civil Service program for citizens not drafted for military service, giving Arabs, some Haredi Jews, Orthodox Jewish women, and others the opportunity to provide public service in their own communities and thus be eligible for the same financial benefits accorded military veterans.  Many in the Arab community opposed the National Civil Service program because it operated under the auspices of government ministries associated with security.  There were multiple instances of Haredi communities ostracizing Haredi soldiers for serving in the military.

In January the Interior Ministry announced it had appointed or would appoint Arab representatives to the ministry's three committees of inquiry on redistricting and revenue sharing in the Negev, in response to a petition filed by ACRI.  The government continued to implement multi-year economic development and social advancement projects for Arab and other minority populations, which were authorized in 2010 and 2011.  The government employed affirmative action policies for Arabs and Druze in the civil service.  As of June the government had filled 1,421 of 1,730 positions in the civil service designated for "persons of the Arab population."  The Education Ministry continued implementing a plan to place 500 Arab teachers in positions in predominantly Jewish schools by 2020.  The plan offered partial solutions for many Arabs with teaching credentials who could not find work as teachers and for Hebrew-language schools that experienced a shortage of teachers in key subject areas including math, English, and science.

Resources devoted to education in Arabic were inferior to those devoted to education in Hebrew in the public education system, according to several NGOs, and some Arabs in ethnically mixed cities elected to study in Hebrew instead.  The Knesset Center for Research and Information documented a 39.6 percent drop in funding for day-care centers, nurseries, and after-school programs for the Arab

Country Reports on Human Rights Practices for 2014            Page 129
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004834

## ISRAEL AND THE OCCUPIED TERRITORIES 41

population.  The separate school systems produced a large variance in education quality:  35 percent of Muslim students, 45 percent of Druze students, 51 percent of Arab students studying at mainstream Hebrew schools, and 61 percent of Christian students passed the matriculation exam in 2014, according to the Knesset Center for Research and Information, compared with 76 percent of Jews, according to the Central Bureau of Statistics.  The government noted the Ministry of Science and Technology and the Ministry of Education operated programs to provide free matriculation-exam coaching to Arab students.  According to the government, the percentage of students in higher education who were Arab (approximately 26 percent) exceeded that of population percentage of young Arab adults (approximately 20 percent), although according to another statistic from the Council for Higher Education, 14 percent of university students were Arab.  The percentage of master's and doctoral degree students who were Arab was 9 percent and 4.5 percent, respectively, which was significantly lower than the Arab percentage of the country's total population but higher than in previous years.  The government attributed the increase to the opening of higher education institutions in peripheral areas more accessible to the Arab population.  Of all Arab students studying in universities, 68 percent were women.  The government operated several scholarship programs specifically targeting the Arab population.

Approximately 93 percent of land is in the public domain, including approximately 12.5 percent owned by the NGO Jewish National Fund (JNF), whose statutes prohibit sale or lease of land to non-Jews.  According to a 2005 attorney general ruling, the government may not discriminate against Arab citizens in marketing and allocating lands it manages, including those of the JNF.  As an interim measure, the government agreed to compensate the JNF for any land it leased to an Arab by transferring an equal amount of land from the Israel Lands Administration to the JNF.  Legal petitions against the JNF policy of leasing public land only to Jews continued at year's end.  The NGO Israel Land Fund continued its program to purchase Arab land throughout the country and market it to Jewish buyers, including in the diaspora.  The organization claimed all the land belonged to Jews and described as a "danger" the purchase of Jewish-owned lands by non-Jews.

New construction was illegal in towns that did not have an authorized outline plan for development, which is the legal responsibility of local authorities.  Arab communities that still lacked fully approved planning schemes could turn to their municipal authorities to develop them, according to the government.  As of August, according to the Ministry of Interior, 131 of 133 Arab localities had approved outline plans, of which 62 had been updated since 2000, 23 were undergoing statutory approval, and 22 more scheduled to have new draft plans in

Country Reports on Human Rights Practices for 2014                     Page 130
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004835

## ISRAEL AND THE OCCUPIED TERRITORIES                    42

progress by year's end.  The approved outline plans added an average of 70 percent to the land zoned for the communities, according to the government.  The NGO Mossawa said that it was aware of only 64 recognized Arab localities and that of these, 45 percent lacked authorized plans, that the update process was lengthy and frequently was rendered irrelevant after the 10-20 years required for approval, and that authorities overwhelmingly enforced violations against Arab citizens.  Localities were also responsible for initiating and submitting urban outline plans to the district committees, which approved any expansion of the municipalities.  The government allocated more than NIS 400 million ($102.6 million) for the development of industrial areas in Arab localities.

Arab communities in the country generally faced economic difficulties, and the Bedouin segment of the Arab population continued to be the most disadvantaged.  More than half the estimated 200,000 Bedouin population lived in seven government-planned communities.  Approximately 30,000 lived in the 11 recognized villages of the Nave Midbar and Al-Qasum Regional Councils, formerly the Abu Basma Regional Council, and approximately 60,000 Bedouins lived in 35 unrecognized tent or shack villages that did not have water and electricity or educational, health, and welfare services.  NGOs, Bedouin leaders, and the government noted that Bedouin towns ranked lowest on the country's standardized socioeconomic scale, with most ranking a one out of 10 and only Rahat, Hura, and Segev Shalom ranking two out of 10.  During Operation Protective Edge, Bedouin citizens risked injury or death from rocket attacks due to the lack of shelters and sirens in the recognized and unrecognized villages in the Negev.  On July 13, a rocket hit the edge of Al-Makimen village, severely injuring two sisters, and on July 19, another rocket hit the village of Al-Jrabah, killing a Bedouin man and injuring four of his relatives, including an infant.  The Supreme Court did not require the government to provide temporary shelters for Bedouin communities in response to an ACRI petition, although it mandated further discussion.

While 11 of 13 recognized villages had plans that define the areas of the village, in most areas residences were not connected to the electricity grid, there was no connection to the sewage disposal system, there were no paved roads, and only six villages had high schools, according to the Negev Coexistence Forum for Civil Equality.  Additionally, residents were responsible for providing their own water infrastructure to bring water from a central line to their property.

In the 35 unrecognized villages in the Negev claimed by various Bedouin tribes, the government viewed all buildings as illegal and subject to demolition.  In cases

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 131

ATL004836

## ISRAEL AND THE OCCUPIED TERRITORIES                    43

of demolitions with no agreement from the residents to relocate, the government levied fines against residents to cover expenses incurred in the course of demolitions.  Many Bedouin whose residences or structures were subjected to demolition orders elected to self-demolish to avoid being fined.

The government confirmed that from January to June, the government carried out 208 demolitions in recognized and unrecognized villages in the Negev in 2012, with an additional 356 homes demolished by Bedouins to avoid being fined.  The government noted its policy was to demolish "new vacant illegal structures" built without permits after 2010 and found in areas it determined to be state land, not belonging to any local authority.  The NGO Dukium recorded 1,261 demolitions of Bedouin buildings from 2012 to the middle of 2013 according to 551 separate demolition orders; Bedouins demolished 636 themselves to avoid being fined.  The government carried out 11 separate demolitions of the entire Al-Arakib village, which had been rebuilt on government land more than 60 times since 1998 despite multiple eviction orders, a 2007 Supreme Court decision, and police enforcement since 2010.  The Al-Arakib residents maintained the government should recognize claims to the land, while the government claimed the Al-Arakib tribes were "invaders" who "do not and did not have private ownership over the land."  In August a district court advised the government and the Bedouin leaders to solve their dispute through arbitration.  Arbitration failed, and the matter was pending before the court as of November 14.  In January a Beer Sheva court dismissed two indictments against protesters in Al-Arakib charged with attacking police officers and disturbing public order.  Of 14 original indictments on similar charges, the court dismissed or acquitted the accused in 13 cases; one case remained pending at year's end.

The government maintained a program to encourage Bedouins to relocate from unrecognized villages to established towns by providing low-cost land and compensation for demolition of illegal structures for those willing to move to designated permanent locations, but Bedouins often refused to participate in this program because they asserted that they owned the land or were given prior permission by the government to settle in their current locations.  Some residents were caught between court-ordered demolitions and the rejection of their designated relocation sites for reasons of overcrowding.  Additionally, many Bedouins complained that moving to government-planned towns would require them to surrender claims to land they had occupied for several generations and would separate them from their livelihood.  Conversely, the government claimed it was difficult and inefficient to provide services to clusters of buildings throughout the Negev that ignored planning procedures.  Some Bedouins continued to pursue

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 132

ATL004837

**ISRAEL AND THE OCCUPIED TERRITORIES**                    44

legal recognition of their 3,200 claims to parcels of land based on practices of land ownership and sales predating 1948. In 2013 Rabbis for Human Rights asserted that rates of crime and unemployment were higher in the government-established permanent locations for the Bedouin than in the unrecognized villages, creating a disincentive for relocation.

At the beginning of the year, the prime minister ordered a reorganization of the governmental authority handling Bedouin affairs, placing the authority within the Ministry of Agriculture. The minister of agriculture halted discussions of controversial proposed legislation on planning and compensation for Bedouin and met with NGOs and Bedouin representatives, including creators of an Alternative Master Plan for the Negev region that would support traditional lifestyles while extending services and civil rights to remote Bedouin communities. NGOs and Bedouin leaders noted that the implementation of the government plan for developing the Negev, with the resultant home demolitions and planned relocations of some Bedouin communities, continued apace in the absence of specific legislation to address Bedouin land claims. In May the Beer Sheva District Court rejected the state's appeal against a decision by a lower-level court to cancel 51 demolition orders against the homes of 500 Bedouin residents of al-Sira village.

The law bars family reunification when a citizen's spouse is a non-Jewish citizen of Iran, Iraq, Syria, or Lebanon. Citizens may apply for temporary visit permits for Palestinian male spouses age 35 or older or Palestinian female spouses age 25 or older, but they may not receive residency based on their marriage and have no path to citizenship. The government had yet to implement a policy in response to a 2010 Supreme Court recommendation that social services be provided to an estimated 5,000 Palestinian spouses of citizens granted "staying permits" to reside legally in Israel.

The government generally prohibited Druze citizens and residents from visiting Syria. The government, however, coordinated with the UN Disengagement Observer Force for Druze residents of the Golan Heights to attend college in Syria and permitted the Druze religious leadership to attend religious meetings in Damascus. The government also allowed noncitizen Druze residents from the Golan Heights to visit holy sites in Syria through the ICRC-managed pilgrimage program, but it had prevented family visitations since 1982. The government facilitated the entry of several hundred Syrian nationals, including Druze, to the country to receive medical treatment.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 133

ATL004838

**ISRAEL AND THE OCCUPIED TERRITORIES**                45

An estimated population of 130,000 Ethiopian Jews faced persistent societal discrimination, although officials and the majority of citizens quickly and publicly criticized discriminatory acts against them.  In December 2013 officials of Magen David Adom--a national organization that provides prehospital emergency services, national blood collection, storage, and distribution services, and acts as an auxiliary service to the IDF during times of war--holding a blood drive at the Knesset refused to accept blood from a Knesset member of Ethiopian descent, sparking an emergency session of the health committee to discuss discrimination faced by the Ethiopian community.  Magen David Adom blood-donation criteria prevented those who had lived in endemic malaria or AIDS areas from donating.

Continued reports of discrimination by Ashkenazi Jews of European descent against Sephardic (Mizrachi) Jews of Middle Eastern descent fueled a national debate on this topic.  Organizations representing Mizrachi Jews from various Middle Eastern countries claimed that government negligence in pursuing reparations for property losses for Jews from Arab countries and Iran had exacerbated social stratification along ethnic lines since the establishment of the state and during subsequent waves of (sometimes forced) immigration.

A survey commissioned by the Economy Ministry's Equal Employment Opportunity Commission found 42 percent of employers would prefer not to hire Arab men and 41 percent would prefer not to hire an Arab mother of young children.  Of all respondents 46 percent said they were reluctant to work with an Arab man, and 28 percent said the same of working with an Arab woman (see section 7.d.).

**Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity**

The law prohibits discrimination based on sexual orientation, and the government generally enforced these laws, although discrimination based on sexual orientation or gender identity persisted in some parts of society.  Lesbian, gay, bisexual, and transgender (LGBT) activists commented that 2013-14 marked a significant shift from achievements via court cases against the government in the field of civil and human rights for LGBT persons to active legislation by the government to extend rights to the community.  On August 12, the minister of interior announced that non-Jewish spouses of gay and lesbian married couples could immigrate under the Law of Return, even if one of the couple was not Jewish.  Members of the cabinet, including the prime minister, publicly voiced approval for giving same-sex couples the same surrogacy rights as heterosexual couples.  Representatives from the

Country Reports on Human Rights Practices for 2014                    Page 134
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004839

## ISRAEL AND THE OCCUPIED TERRITORIES                46

LGBT task force commented that the prime minister's support for such a measure in and of itself constituted a landmark in the struggle for equality for LGBT persons.  The minister of education and other elected officials, however, made disparaging comments about LGBT families.

An LGBT violence-prevention center and hotline established in 2012 reported it received 250 reports of violence and discrimination between August 2013 and August.

In February police arrested the chief state witness in the case against Hagai Felician, who had been indicted on homicide and attempted homicide charges in relation to a 2009 double killing at an LGBT youth club in Tel Aviv, on suspicion of fabricating evidence and obstruction of justice.  Because the witness was critical to proving Felician's involvement and motive, the case collapsed.

In 2013 the government established an interministerial team to examine the issue of West Bank residents who claimed to be in a life-threatening situation due to their sexual orientation and requested legal residency status in the country.  There is no mechanism for granting such persons legal status, leaving those who cannot return to the West Bank due to fear of persecution in limbo and vulnerability to human traffickers, violence, and exploitation.

In contravention of laws prohibiting such discrimination (see section 7.d.), there were reports of discrimination in the workplace against LGBT persons.  A study by the LGBT task force found that employers discriminated against approximately 80 percent of transgender persons, 50 percent of lesbians, and 20 percent of gay males in the hiring process or terminated them once their sexual orientation or gender identity was known.

Same-sex couples could face difficulties in renting a home, and the law allows private landlords to use discretion in determining to whom to rent, which in some cases allegedly could amount to discrimination.  The *Haaretz* newspaper reported that a law firm specializing in LGBT-related issues received reports of such incidents approximately once a week.

## HIV and AIDS Social Stigma

There were some reports of discrimination against persons with HIV/AIDS, including refusal by some doctors and dentists to provide care to HIV-positive persons.  Authorities ordered one dentist to pay damages and treat a patient to

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 135

ATL004840

## ISRAEL AND THE OCCUPIED TERRITORIES                47

whom he had refused treatment because of his HIV status, and the court ordered the dentist to cease discriminating on the basis of HIV status.

## Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law protects the right of workers to form and join independent unions, strike, earn the minimum wage and overtime, and bargain collectively.  The law specifically prohibits antiunion discrimination.  A labor court has discretionary authority to order the reinstatement of a worker who was fired for union activity.  The government respected these rights.

Court rulings and union regulations forbid simultaneous membership in more than one trade union.  Members of the General Federation of Labor in Israel (Histadrut) who pay affiliation fees may be elected to the union's leadership bodies regardless of ethnicity, religion, or gender.

Authorities generally respected workers' rights to free association and collective bargaining for citizens, although foreign workers often faced difficulties exercising these rights.  Worker organizations were independent of the government and political parties.

## b. Prohibition of Forced or Compulsory Labor

While the law prohibits forced or compulsory labor and criminalizes labor exploitation, the government did not enforce effectively laws concerning minimum employment conditions for foreign workers.  The passage of revised labor laws in 2012 increased penalties to NIS 35,000 ($8,974) and helped investigation procedures.

According to government statistics, there were approximately 75,000 legal foreign workers in the country and almost 15,000 illegal foreign workers.  Some workers, particularly foreign workers, experienced conditions of forced labor including the unlawful withholding of passports, restrictions on freedom of movement, limited ability to change or otherwise choose employers, nonpayment of wages, exceedingly long working hours, threats, sexual assault, and physical intimidation.  Foreign agricultural workers, construction workers, and nursing care workers-- particularly women--were among the most vulnerable to conditions of forced labor, including in particular nonpayment or withholding of wages.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 136

ATL004841

Also see the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

**c. Prohibition of Child Labor and Minimum Age for Employment**

The law provides for the protection of children from exploitation in the workplace and prohibits forced or compulsory labor.  Children age 14 and older may be employed during official school holidays in light work that does not harm their health.  Children age 15 and older who have completed education through grade nine may be employed as apprentices.  Regulations restrict working hours for youths between ages 16 and 18 in all sectors.

The government generally enforced these laws and conducted year-round inspections to identify cases of underage employment, with special emphasis on summer and school vacation periods.  Employers employed youth mainly in the food-catering sector and the entertainment and hospitality sectors.  In 2012 the government opened six child labor investigations against employers, including one in Jerusalem's central market.  In all six cases, authorities found violations, and in response, authorities issued 17 administrative warnings for employment of youth without a medical certificate and without provision of pay slips.  Additionally, authorities levied fines of NIS 35,000 ($8,974) in one case for employment of a youth under the legal age.

**d. Discrimination with Respect to Employment or Occupation**

The Equal Employment Opportunities Law prohibits an employer from discriminating against employees, contractors, or persons seeking employment on grounds of gender, sexual orientation, personal status, pregnancy, fertility treatments, in vitro fertilization treatments, parenthood, age, race, religion, nationality, country of origin, opinion, political affiliation, and army reserve service.  Discrimination is also prohibited with regard to working conditions, promotion, professional training, dismissal or severance payments, and retirement benefits or payments.

The Commission for Equal Employment Opportunities is charged with the implementation and civil enforcement of the Equal Employment Opportunities Law.  The 26-member commission includes one member each from organizations that promote employment rights for Arab Muslims, Arab Christians, Druze and Circassians, Haredim, immigrants, elderly persons, women, and army veterans.

ATL004842

Additionally, the commission must have adequate representation of citizens of Ethiopian descent and of persons with disabilities. No details were provided by the government regarding violations of the law or enforcement activities.

In March the Knesset amended the employment law to require public bodies that publish reports about workers' salaries to also address gender in their reports. In February the Knesset passed an amendment to the Women's Employment Law entitling male and female employees undergoing fertility treatments protection from dismissal for absence from work due to these treatments for up to two births per partner. The previous law allowed for only one birth.

As of September, 74 percent of government companies (78 of 105) were implementing adequate representation of women in their directorates. In 10 government corporations, only one additional woman director was needed to meet the requirements of the law.

## e. Acceptable Conditions of Work

The minimum wage is set annually on April 1 to equal 47.5 percent of the average income. The national minimum wage was NIS 23.12 ($5.92) per hour, and was slightly less for youths under the age of 18, who earned between 70 and 83 percent of the minimum wage. The law allows a maximum 43-hour workweek at regular pay and provided for paid annual holidays. Premium pay for overtime is set at 125 percent for the first two hours and 150 percent for any hour thereafter up to a limit of 15 hours of overtime per week. In March 2013 the Supreme Court ruled that labor law provisions for overtime pay do not apply to migrant workers who work as live-in caregivers for ill or elderly Israelis. An NGO reported the average salary of an Arab man was 43 percent lower than that of a Jewish man, and the salary of an Arab woman was 21 percent less than that of a Jewish woman.

The Labor Inspection Service, along with union representatives, enforced labor, health, and safety standards in the workplace, although resource constraints limited enforcement capacity. These standards were generally current and appropriate. By law workers may remove themselves from situations that endanger their health or safety without jeopardy to their employment, and the government protected this right. In 2013 authorities opened 450 investigations against employers for violating labor laws involving foreign workers, and the government imposed 28 fines, totaling NIS 2.1 million ($380,000). Additionally, authorities opened 20 criminal cases, all of which remained under investigation at year's end. The government investigated 21 workplace accidents involving foreign workers and

Country Reports on Human Rights Practices for 2014                    Page 138
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004843

conducted thousands of supervision visits to sites that employed large numbers of foreign workers.  From January through October, there were 55 fatal workplace accidents.  There was little information about protection and enforcement standards in the informal economy.

According to some NGOs, however, the country failed to enforce its labor laws fully with respect to minimum working conditions for foreign workers, and existing penalties were not sufficient to deter violations.  Many foreign workers earned significantly less than the minimum wage.  There were numerous documented cases of foreign laborers living in harsh conditions and subjected to debt bondage, but authorities prosecuted few employers.  In 2013 the government examined 327 complaints from foreign workers and filed nine indictments against employers.  Most complaints were determined not to meet the evidentiary threshold of a criminal violation, as required by labor courts.

The country had bilateral work agreements with Bulgaria, Moldova, and Romania to regulate recruitment fees of migrant workers in the construction sector, and it had an agreement with Thailand to regulate recruitment fees for migrant workers in the agricultural sector.  The entire recruitment process of foreign workers in these industries was coordinated solely through government offices.  The result was a steep decline in recruitment fees paid by migrant workers in the construction and agricultural sectors.  Most migrant construction workers prior to the signing of these agreements were Chinese who paid on average NIS 80,000 ($20,500) to recruiters.  By contrast Bulgarian construction workers paid approximately NIS 1,820 ($466) in recruitment fees within the framework of the bilateral agreement.  Likewise, recruitment fees for Thai migrant workers declined from approximately NIS 32,800 ($8,400) before the agreement to approximately NIS 7,300 ($1,900).  The agreements also provide for migrant workers to have information on their labor rights as well as a translated copy of their labor contract before they arrive in the country.  As a result of greater awareness of their legal rights and their reduced recruitment debt, more workers were willing to report labor violations to NGOs or quit their jobs and return home than prior to the agreements.

Research by NGOs into the living and working conditions of foreign construction and agriculture workers, however, continued to reveal violations of their rights.  In 2013 only 16 percent of Bulgarian workers said their labor conditions lived up to the terms of their contact, and 43 percent said they were not paid for overtime.  In 2013 the government opened 11 investigations against employers in the construction sector on suspicion of violating labor laws.  Labor violations by employers in the agricultural sector also remained widespread.  Observers noted

Country Reports on Human Rights Practices for 2014          Page 139
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004844

## ISRAEL AND THE OCCUPIED TERRITORIES                    51

that 217 Thai workers filed complaints in person with a local NGO about their
labor conditions in 2013.  These workers on average earned only 71 percent of the
minimum wage.  According to another NGO, 27 percent of Thai workers said their
labor conditions lived up to the terms of their contract after the country's bilateral
agreement.  In 2013 the government opened 120 investigations against employers
of Thai workers on suspicion of violating labor laws but issued only five fines,
amounting to a total of NIS 350,700 ($90,000).  The breadth of violations by
employers and the lack of penalties imposed by the government suggested
enforcement of labor laws in these industries was far from adequate despite the
bilateral agreements.

Some employers in the agricultural sector circumvent the bilateral agreement with
Thailand by recruiting students from poor countries to take part in agricultural
study programs on student visas and then forcing them to work in the agriculture
industry once they arrive in the country.  Employers required participants to pay
high fees to participate in what they believed were study programs, but there was
no supervision of their working or living conditions since they lacked work permits
and were ostensibly in the country for study.  A local NGO estimated there were
between 4,000 and 5,500 agricultural workers employed in this manner as of
August.

While bilateral work agreements in the construction and agricultural sectors
reduced the recruitment fees foreign workers paid in those industries, no such
agreements regulated recruitment to the home-care sector.  Abuse in the
recruitment of home-care workers remained widespread and included excessive
recruitment fees and false descriptions of the terms of employment contracts.
Live-in arrangements and lack of legal protections and inspections led to many
cases of exploitative working conditions for female migrant workers.  Local NGOs
filed hundreds of complaints on behalf of foreign caregivers, including allegations
of underpayment of wages, physical violence, sexual harassment, and unsuitable
employment conditions.

Country Reports on Human Rights Practices for 2014          Page 140
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004845

**ISRAEL AND THE OCCUPIED TERRITORIES**           52

### THE OCCUPIED TERRITORIES 2014 HUMAN RIGHTS REPORT

(INCLUDING AREAS SUBJECT TO THE JURISDICTION OF THE PALESTINIAN AUTHORITY)

## EXECUTIVE SUMMARY

The Palestinian Authority (PA), according to PA Basic Law, has an elected president and legislative council.  The PA exercised varying degrees of authority in restricted areas of the West Bank due to the Israel Defense Forces' (IDF) continuing presence, and none over Palestinian residents of East Jerusalem due to Israel's extension of Israeli law and authority to East Jerusalem in 1967 and an Israeli prohibition on any PA activity anywhere in Jerusalem.  Although PA laws apply in the Gaza Strip, the PA had little authority in the Gaza Strip, despite the formation of an interim government under the auspices of a Fatah-Hamas reconciliation agreement signed in May that only nominally gave the PA some control over that territory.  It has no authority over Israeli residents of the West Bank or Palestinian residents in Area C of the West Bank, over which Israel has security and civil control.  The PA has only civil control of area B in the West Bank and joint security control with Israel.  PA Prime Minister Rami Hamdallah governed the West Bank.  President Mahmoud Abbas, in office since elected to a four-year term in 2005, is also chairman of the Palestine Liberation Organization (PLO) and general commander of the Fatah party.  In the 2006 Palestinian Legislative Council (PLC) elections, candidates backed by Hamas won 74 of 132 seats in elections that generally met democratic standards; however, the PLC has not functioned since 2007.  In 2007 Hamas staged a violent takeover of PA government installations in the Gaza Strip and has since run a de facto government in the territory.  Both PA and Israeli security forces reported to civilian authorities. Hamas maintained control of security forces in the Gaza Strip.

In June, Palestinian extremists kidnapped and killed three Israeli teenage citizens-- Naftali Fraenkel, Gilad Shaar, and Eyal Yifrach, two of them minors--in the West Bank.  Following their kidnapping Israeli authorities increased incursions into Palestinian-controlled areas of the West Bank and detained more than six hundred Palestinians in a West Bank arrest campaign termed Operations Brother's Keeper. On July 2, three Israeli extremists kidnapped and killed 16-year-old Jerusalem resident Muhammad Abu Khdeir.  From July 8 to August 26, Israel conducted the military operation, Operation Protective Edge, which, according to Israeli officials, responded to a sharp increase in rockets deliberately fired from Gaza at Israeli civilian areas as well as militants' attempts to infiltrate Israel through tunnels from

Country Reports on Human Rights Practices for 2014                **Page 141**
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004846

Case 2:16-cv-04435-PA-MRW   Document 74-14   Filed 05/01/17   Page 104 of 360   Page ID #:5596

Gaza for the purpose of committing terrorist acts.  Hamas and other militant groups fired 4,465 rockets and mortar shells into Israel.  In response the Israeli government conducted 5,242 air strikes and a ground operation in Gaza.  According to the United Nations, the operation killed 2,205 Palestinians; according to the IDF, 74 persons in Israel were killed, among them 67 combatants, six Israeli civilians, and one Thai civilian.

The most significant human rights abuses across the occupied territories were excessive use of force against civilians, including killings; arbitrary arrest and associated torture and abuse, often with impunity, by multiple actors in the region; and restrictions on civil liberties, particularly in Gaza, where residents remained unable to hold their government accountable for such abuses.

Human rights problems under the PA in the West Bank included abuse and mistreatment of detainees, poor and overcrowded detention facilities, prolonged detention, and infringements on privacy rights.  Restrictions on freedom of speech, press, and assembly continued.  There were limits on freedom of association and movement.  Corruption, violence against women, and societal discrimination were serious problems.  At times the PA failed to condemn incidents of anti-Semitic expression.  Abuse of children and discrimination against persons with disabilities also were serious problems.  Discrimination based on sexual orientation and HIV/AIDS status persisted.  There were some limits on worker rights, and there was forced labor.  Child labor, including forced labor, also remained a serious problem.

Human rights abuses under Hamas included security forces killing, torturing, arbitrarily detaining, and harassing opponents, including Fatah members, and other Palestinians with impunity.  Terrorist organizations and militant factions in the Gaza Strip launched rocket and mortar attacks against civilian targets in Israel, and they did so at or near civilian locations in Gaza.  Gaza-based civil rights organizations reported prisoners were held in poor conditions in detention facilities in the Gaza Strip, and Hamas publicly executed a number of persons without trial.  Hamas also infringed on privacy rights.  Hamas restricted the freedoms of speech, press, assembly, association, religion, and movement of Gaza Strip residents.  Discrimination against women and domestic violence were serious problems.  Abuse of children and discrimination against persons with disabilities were problems.  Hamas frequently promoted anti-Semitism.  Discrimination based on sexual orientation and HIV/AIDS status persisted.  Restrictions on worker rights continued.  Forced labor, including by children, occurred.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 142

ATL004847

## ISRAEL AND THE OCCUPIED TERRITORIES                54

Human rights problems related to actions by Israeli authorities inside the West Bank and Gaza included reports of excessive use of force against civilians, including killings; abuse of Palestinian detainees, particularly during arrest and interrogation; austere and overcrowded detention facilities; improper use of security detention procedures; demolition and confiscation of Palestinian property; limitations on freedom of expression, assembly, and association; and severe restrictions on Palestinians' internal and external freedom of movement.  Violence by settlers against the Palestinian population continued to be a problem, as did inconsistent punishment of these acts by Israeli authorities.  The IDF maintained restrictions on movement into and out of the Gaza Strip and largely limited the travel of Palestinians out of Gaza to humanitarian cases and some business travelers.

The PA and Israeli authorities took steps to address impunity or reduce abuses, but there were criticisms they did not adequately pursue investigations and disciplinary actions related to violations.  Impunity was a major problem under Hamas.

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

## a. Arbitrary or Unlawful Deprivation of Life

In contrast with previous years, there were no reports that PA security services committed arbitrary or unlawful killings.

Palestinian terrorist groups and other unaffiliated individuals committed unlawful killings of Israeli civilians and security forces in Israel, as well as of Israeli civilians and security forces living and operating in the West Bank.  In June members of Hamas kidnapped and killed three Israeli teenagers, and on September 23, the IDF killed two Palestinians suspected of carrying out the attack.

In August 2013 during an operation by the PA Preventive Security Organization at Askar refugee camp in Nablus, Amjad Odeh died after being shot in unclear circumstances while camp residents protested the security forces' raid.  His death provoked further protests by hundreds of persons, some of whom damaged public and private property.  Lieutenant Adnan Dmeiri, spokesperson for the PA's security forces, announced on the day of the killing that authorities would open an official investigation, but at year's end there was no further information regarding the status of the investigation.

Country Reports on Human Rights Practices for 2014                Page 143
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004848

**ISRAEL AND THE OCCUPIED TERRITORIES**                    55

Hamas and other terrorist organizations launched at least 4,465 rockets and mortar rounds at Israel that indiscriminately targeted population centers during the July-August hostilities in Gaza.

News outlets alleged Hamas positioned its rocket launch sites in the Gaza Strip adjacent to schools, playgrounds, and hospitals, leading Israel to target those launch sites and putting civilians at risk.  On July 24, Israeli artillery shells hit Palestinians sheltering at a UN Relief and Works Agency (UNRWA) school in Beit Hanoun when heavy fighting between Israeli forces and militants occurred nearby, resulting in the deaths of 13 individuals and injury to more than 200 others. In other cases UNRWA found rockets stored inside a school.

There were multiple attacks on civilians and security forces in Jerusalem.  On July 2, three Israelis allegedly abducted and killed Palestinian teenager Muhammad Abu Khdeir.  On August 4, an unknown assailant shot and injured an IDF soldier on Mount Scopus near Hebrew University and then escaped on a motorcycle.

There were numerous acts of violence to include killings involving Israeli settlers and Palestinians in the West Bank (see section 6.).  On July 25, in three separate incidents IDF soldiers and an Israeli settler reportedly killed six Palestinians. Three were killed in Beit Ummar.  Two were killed in Huwwara near Nablus, with one reportedly killed by an Israeli settler and the other by the IDF.  Israeli police questioned and later released the settler who shot and killed a Palestinian in Beit Ummar on July 25.  Another Palestinian died in al-Aroub refugee camp north of Hebron when, according to the IDF, he reached for a soldier's weapon.  During that period observers reported skirmishes during the night in towns and villages across the West Bank.

On November 10, a Palestinian man stabbed three Israelis at the entrance of the Alon Shvut settlement in the West Bank, killing an Israeli woman.  A security guard subsequently shot and killed the attacker.

According to local media, Hamas unlawfully executed at least 55 persons in the Gaza Strip during Operation Protective Edge for allegedly collaborating with Israel.  For example, in July Hamas executed at least 30 alleged collaborators with Israel, according to the Palestine Press Agency.  According to the international nongovernmental organization (NGO) Human Rights Watch (HRW), Hamas executed 25 persons, including two women as reported by the Palestinian Center for Human Rights, between August 21 and August 23 for allegedly collaborating with Israel.  According to the Independent Council on Human Rights, 11 of the

Country Reports on Human Rights Practices for 2014          Page 144
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004849

**ISRAEL AND THE OCCUPIED TERRITORIES**                    56

persons executed on August 22 were inmates held in the Correction and Rehabilitation Center of Gaza:  eight were not convicted, one was sentenced to death, one was sentenced to life in prison, and one was sentenced to 15 years in prison.  By law the PA president must ratify each death penalty sentence, but Hamas did not contact the PA regarding these executions due to Hamas de facto control over the Gaza Strip.

The Israeli government killed Palestinian civilians as well as militants.  During the year Israeli forces killed 50 Palestinians in the West Bank and Jerusalem, compared with 27 Palestinians in the West Bank in 2013.  According to the NGO Defense for Children International-Palestine (DCI-Palestine), 13 of those killed in the West Bank were minors.

On March 10, Israeli soldiers shot and killed Raed Alaa a-Din Nafea Zeiter, a Palestinian and Jordanian citizen and a judge, after he argued with a soldier and shoved him.  Eyewitness accounts differed regarding the circumstances surrounding the incident.  Authorities announced an investigation but reported no progress by year's end.

On March 19, an IDF soldier shot and killed 14-year-old Yusef Sami Yusef al-Shwamrah after he went through a gap in the security barrier near Hebron, reportedly to harvest plants.  The subsequent investigation concluded with no charges filed against the involved soldiers.

On March 22, an IDF soldier shot and killed Muhammad Omar Saleh Abu Zeinah as he reportedly carried the body of Hamzah Abu al-Heija, whom IDF soldiers reportedly killed when they attempted to apprehend him.

On October 24, the IDF killed a 14-year-old Palestinian in the West Bank village of Silwad, claiming he was in the act of throwing a Molotov cocktail at the soldiers.

Israeli security forces killed four Palestinians during operations associated with Operation Brother's Keeper in June.  For example, on June 22, Israeli forces that entered Nablus as part of Operation Brother's Keeper killed Ahmad Khaled when he reportedly did not respond to their requests to stop moving toward them. Khaled reportedly suffered from mental illness.

There were numerous reports that Israeli security forces killed Palestinians during demonstrations.  On May 15, IDF soldiers shot and killed 17-year-old Nadim

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor                    Page 145

ATL004850

**ISRAEL AND THE OCCUPIED TERRITORIES** 57

Siyam Ahmad Nawarah and 16-year-old Muhammad Mahmoud Odeh Salameh during a demonstration at Bitunya checkpoint, the "Nakba Day killings." Salameh was shot in the back. Neither minor was throwing stones at the time of their shooting, but other demonstrators were throwing stones. Video showed neither person presented a direct and immediate threat to life when shot, since Israeli police were more than 100 yards away from the victims, according to the NGO DCI-Palestine. Authorities suspended an Israeli border police officer immediately following the incident and subsequently arrested and indicted him on November 11. His commander was also arrested for allegedly covering up the incident. On December 10, Ziyad Abu Ein, a former PA deputy minister, died after reportedly being beaten by Israeli security forces and inhaling tear gas at a demonstration. Israeli authorities announced an investigation but reported no progress as of year's end.

Despite the increase in Palestinian deaths, the IDF stated there was no change in IDF rules of engagement and reaffirmed that it permitted live fire only to protect against immediate mortal danger, not for crowd control. There were numerous reports security forces killed demonstrators, even when live fire was not used. On August 31, Israeli National Police (INP) killed a 16-year-old Palestinian boy in East Jerusalem. Police claimed the boy was shot in the leg with a sponge-tipped bullet, fell, hurt his head, and eventually succumbed to his injuries. An autopsy revealed he was shot in the head at close range with a rubber-coated bullet.

In July, the Israeli NGO B'Tselem accused the IDF of overusing live fire as a crowd-control measure during Palestinian demonstrations in the West Bank against Operation Protective Edge, resulting in the deaths of 13 Palestinians. For example, on July 22, an IDF soldier shot and killed Mahmoud Hamamreh in the West Bank village of Husan during clashes between the IDF and local residents, although the Palestinian press reported he was not participating in the demonstrations.

During the year there were a significantly higher number of Palestinian deaths at the hands of Israeli security forces than in past years as a result of Israeli military operations between July 8 and August 26. Israeli security forces killed at least 2,222 Palestinians in Gaza, including 2,205 during military operations associated with Operation Protective Edge and 17 during the rest of the year, according to B'Tselem, compared with nine Palestinians in 2013. Based on is analysis, the Israeli government estimated half of those killed were civilians and half were combatants, while the United Nations reported that 69 percent of those killed were civilians. According to the United Nations, more than 500 minors and nearly 300 women were killed.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 146

ATL004851

ISRAEL AND THE OCCUPIED TERRITORIES                    58

NGOs accused Israel of using disproportionate force and indiscriminate fire to
counter the threat posed by rockets launched from the Gaza Strip, resulting in
unnecessary and excessive civilian casualties.  On July 18, Israeli artillery
reportedly misidentified as militants four children on a Gaza beach; subsequent
shelling killed them.

NGOs singled out Israel's artillery bombardments targeting densely populated
areas as a significant cause of civilian casualties.  During Operation Protective
Edge, Israeli armed forces reportedly fired 30,000 shells into Gaza.  On August 1,
Israeli forces fired more than 1,000 artillery shells during a three-hour period into
Rafah, an area of Gaza that had not been evacuated.  Additionally, according to
press reports, 40 air strikes and some ground fighting resulted in an estimated 130
to 150 civilian deaths.  NGOs, including B'Tselem, were investigating each death
to determine the circumstances, such as whether there was a legitimate military
target nearby, whether the shelling was indiscriminate, and whether every family
received a warning before their home was bombed or shelled.

NGOs, including Amnesty International (AI), HRW, and B'Tselem, identified
several attacks that lacked a clear military target or used disproportionate force,
resulting in civilian casualties.  On November 5, AI released a report entitled
*Families under the Rubble:  Israeli Attacks on Inhabited Homes* that documented
eight cases in which Israeli forces allegedly attacked residential family homes in
Gaza without warning during Operation Protective Edge in July and August.
These attacks killed at least 104 civilians, including 62 children.  In the deadliest
incident documented in the report, an Israeli Air Force attack killed 36 members of
four families, including 18 children, when a three-story building reportedly was
struck without warning on July 29.  While AI identified possible military targets
within the building, it alleged that devastation caused to civilian lives and property
was clearly disproportionate to the military advantages gained by launching the
attack.

In September the Israeli Military Advocate General (MAG) announced a new fact-
finding mechanism to investigate claims of violations of the laws of armed
conflict.  As of December 9, the MAG reported that it had referred approximately
100 incidents for examination by the fact-finding mechanism and that
approximately 50 of these cases had subsequently been sent back to the MAG for
decision.  The MAG subsequently referred five of these cases for criminal
investigation.  The MAG decided to close an additional nine cases without opening
a criminal investigation after determining the forces' actions did not give rise to

Country Reports on Human Rights Practices for 2014                    Page 147
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004852

**ISRAEL AND THE OCCUPIED TERRITORIES**          59

reasonable grounds for suspicion of criminal behavior.  In a few of the cases, the MAG reportedly found no involvement of IDF forces in the incident under investigation.  The state comptroller also opened an investigation into Israeli military operations in Gaza in parallel with the intra-IDF fact-finding mission.

B'Tselem stated it rejected a request made by the MAG to provide information on "irregular" incidents that occurred during Operation Protective Edge on the grounds MAG-led investigations did not lead to meaningful investigations and prosecutions.

Apart from the July-August conflict, the Israeli government periodically launched strikes into the Gaza Strip against specific targets and in response to militant groups' rockets fired into Israel.  According to B'Tselem, these attacks killed six Palestinians participating in hostilities, seven Palestinians not participating in hostilities, and four who were the object of targeted killing.  IDF ground forces, tanks, ships, aircraft, and remote-controlled weapons fired on Palestinians inside the Gaza Strip.  IDF personnel maintained secure stations every several hundred yards along the border fence; each station contained weapons with potential firing ranges of nearly one mile.

There were also continued reports of Israeli forces killing Palestinians in restricted areas in the Gaza Strip.  Israel repeatedly warned Palestinians they were at risk of being shot if they came within 328 yards of the "buffer zone" separating Gaza from Israeli territory; however, Israel reportedly regularly enforced the buffer zone by firing toward Palestinians approaching at distances beyond 328 yards.  Israel reduced the buffer zone following Operation Protective Edge but continued to fire toward Palestinians approaching the border fence between Israel and Gaza.  On November 24, Israeli soldiers stationed along the border shot and killed Fadel Halawa as he reportedly searched for songbirds that nest close to the boundary with Israel.  This was the first killing of a Palestinian in the Gaza Strip after the August 26 cease-fire ended Operation Protective Edge.

**b. Disappearance**

In the West Bank, there were no reports of politically motivated disappearances. In the Gaza Strip, Hamas security operatives carried out extrajudicial detentions based on political affiliation.  Information concerning the whereabouts and welfare of those detained was not consistently or reliably available, and Hamas denied many of those detained due process or access to family and legal counsel.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 148

ATL004853

**ISRAEL AND THE OCCUPIED TERRITORIES**                    60

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The PA Basic Law, the collection of laws governing the area under PA control, prohibits torture or use of force against detainees; however, international human rights groups reported that torture and abuse remained a problem.  Despite the commitment by President Abbas to investigate reports of torture in the 2012 Independent Commission for Human Rights (ICHR) report, the PA Ministry of Interior took no action during the year.

As of December, Palestinian detainees held by PA security forces registered more than 168 complaints of abuse and torture with the ICHR, a significant increase from the previous year (145).  Reported abuses by PA authorities in the West Bank included forcing prisoners, including persons accused of affiliation with Hamas, to sit in a painful position for long periods; beating; punching; flogging; intimidation; and psychological pressure.  Independent observers noted that abuse was not systematic or routinely practiced in PA prisons, although some prisoners experienced abuse during arrest or interrogation.  The PA Corrections and Rehabilitation Centers Department, under the authority of the Ministry of Interior, continued to maintain a mechanism for reviewing complaints of prisoner abuse in civil prisons but reported no cases of inmate abuse by its staff.

As of December detainees held by Hamas filed at least 442 claims of torture and abuse with the ICHR, compared with 263 complaints during 2013.  HRW reported that the Hamas internal security, the drugs unit of the "civil police force," and "police" detectives tortured detainees.  In the Gaza Strip, security elements under the Hamas "Ministry of Interior" tortured and abused security detainees, persons associated with the PA or the Fatah political party, those held on suspicion of collaboration with Israel, civil society activists, journalists, and those who reportedly engaged in "immoral" activity.  Hamas also reportedly deployed undercover officers to assault such persons.  HRW reported that complaints of abuse included being forced to stand in uncomfortable stress positions; flogging; hand binding; suspension; blindfolding; punching; and beatings with clubs, electric cables, or hoses.

PA security forces also reportedly used these tactics against Palestinian minors.  In June DCI-Palestine reported on documented instances of abuse against children in PA custody from Areas A and B, including threats, beatings, and neglect by forces during arrest and detention.

Country Reports on Human Rights Practices for 2014                    Page 149
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004854

## ISRAEL AND THE OCCUPIED TERRITORIES                    61

Hamas reportedly took little or no action to investigate reports of torture, and reports and documentation of abuses were limited, due to victims' fear of retribution and lack of access to Gaza Strip prisoners' rights NGOs or PA officials.

Human rights organizations such as the Public Committee Against Torture in Israel (PCATI) reported that "physical interrogation methods" permitted by Israeli law and used by Israeli security personnel could amount to torture.  The methods included beatings, forcing an individual to hold a stress position for long periods, and painful pressure from shackles or restraints applied to the forearms.  Israeli officials stated they did not use techniques that could amount to torture.  Israeli and Palestinian NGOs continued to criticize these and other Israeli detention practices they termed abusive, including isolation, sleep deprivation, and psychological abuse, such as threats to interrogate spouses, siblings, or elderly parents or to demolish family homes.

Israeli authorities reportedly used similar tactics on Palestinian minors.  DCI-Palestine, Breaking the Silence, and other human rights NGOs claimed Israeli security services continued to abuse, and in some cases torture, to coerce confessions from minors who they frequently arrested on suspicion of stone throwing.  Tactics included beatings, long-term handcuffing, threats, intimidation, and solitary confinement.  For example, one detainee affidavit taken by DCI-Palestine alleged that in February authorities bound and blindfolded a minor, interrogated him without a lawyer, and kicked and punched him in the stomach and head.  In May, DCI-Palestine released its annual report on abuses for 2013, which reported that 76.5 percent of Palestinian children detained by the Israeli military in the occupied West Bank endured some form of physical violence during arrest, transfer, or interrogation--a slight increase from 2012.  During 2013 DCI-Palestine filed 15 complaints with Israeli authorities alleging mistreatment and torture of 10 children while in Israeli military detention, but there were no indictments by year's end.

In August 17-year-old Ahmad Abu Raida alleged the IDF captured him on July 23 in the Gaza Strip and used him as a "human shield"--forcing him at gunpoint to search for tunnels for five days, during which time the IDF interrogated him (including verbal and physical abuse) and deprived him of food and sleep.

In July and August, the Association for Civil Rights in Israel (ACRI) accused the INP of using excessive force and harsh tactics against civilians and demonstrators in Jerusalem, both while dispersing demonstrations and riots and while conducting arrests.  Responding to ACRI's allegations, the Israel National Police chief wrote

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor                    Page 150

ATL004855

**ISRAEL AND THE OCCUPIED TERRITORIES**                    62

that police used tactics proportional and appropriate to the unusual level of violence.

In July, Israeli border police were allegedly identified on video beating 14-year-old Tariq Abu Khdeir while he was handcuffed and possibly unconscious.  As of August the Israeli government reportedly indicted one officer in the case.

Additionally, ACRI accused the INP of arbitrarily using "skunk water" (a foul-smelling substance sprayed from high-pressure hoses attached to police vehicles), including, in the absence of any public disturbance, on houses, restaurants filled with patrons, and in crowded streets, causing harm to innocent residents.

**Prison and Detention Center Conditions**

The PA Ministry of Health reported prisoners in PA facilities, including in both the West Bank and the Gaza Strip, suffered from extremely bad conditions.

Prison conditions in the Gaza Strip were reportedly poor, although little information was available.

IDF detention centers for security detainees were less likely than Israeli civilian prisons to meet international standards.

Physical Conditions:  Most PA prisons continued to be crowded and lacked ventilation, heating, cooling, and lighting systems conforming to international standards.  Most prisons lacked sufficient space for programming, recreation, and medical-care services.  Inmates had access to potable water.  Food and sanitation services in PA prisons were adequate.  No deaths were reported in PA prisons from adverse conditions.  Authorities at times housed male juveniles with adult male prisoners.  Security services used separate detention facilities.  Conditions for women were virtually identical to those for men; however, some detention centers for women had limited outdoor recreation space.

Detention facilities in the Gaza Strip were reportedly below international standards.  HRW reported that prisoners in Gaza lacked potable water, food, and other basic necessities.

Some Israeli government facilities, such as the Ofer detention center, provided living space as small as 15 square feet per detainee.  In August 2013 B'Tselem reported that since 2009, 64 Palestinian minors had reported "extreme violence,"

Country Reports on Human Rights Practices for 2014                    Page 151
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004856

## ISRAEL AND THE OCCUPIED TERRITORIES                63

including sexual assault, by authorities in the Israeli police station in the settlement of Gush Etzion.  B'Tselem called for an end to violent interrogations and a thorough investigation of what it described as a "systemic" problem.  NGOs stated that poor conditions appeared to be used as an interrogation or intimidation method.  Prisoners also continued to claim inadequate medical care.  Detainees under Israeli control had access to potable water, adequate food, and acceptable sanitation, according to the International Committee of the Red Cross (ICRC).

According to NGO sources, Israeli government authorities held 6,303 Palestinians in Israeli prisons at the end of November, 5,527 of whom were Palestinian security prisoners or detainees, and the remainder were Palestinians who entered Israel illegally.  B'Tselem reported that at the end of November, Israel held 156 minors in Israeli prisons as security prisoners or detainees and 51 others who had entered Israel illegally.  Seventeen of the minors were between the ages of 12 and 15.

PCATI, DCI-Palestine, and Breaking the Silence noted that most reports of abuse or poor conditions occurred during arrest and interrogation, generally within the first 48 hours following arrest.

Administration:  Recordkeeping by PA authorities in the West Bank was adequate, with the Corrections and Rehabilitation Centers Department storing information on computers, but records were not publicly available.  By law any person sentenced to imprisonment for a term of not more than three months may petition the PA public prosecutor to put him to work outside the prison instead of carrying out the sentence of imprisonment, unless the judgment deprives him of that option.  Although the law allows for this option, the legal system did not have the capacity to implement such a process.  All PA civil police prisons allowed visitors on a weekly basis, permitted religious observance, provided a procedure for submitting complaints through a prison officer or directly to the warden, and had an investigation process for complaints.  The PA investigated allegations of mistreatment.  Although ombudsmen cannot serve on behalf of prisoners, the ICHR played an ombudsman role.

Little information was available about prison administration in the Gaza Strip.  HRW reported it had documented cases in which hospital officials allegedly refused to provide medical records that could be used as evidence of custodial abuse.

Recordkeeping by Israeli authorities in the West Bank was often only in Hebrew and therefore inaccessible to the Palestinian public.  There were no reports of

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 152

ATL004857

improvements in recordkeeping. There was an ombudsman. Detainees under Israeli control could have visitors. Human rights groups reported families of imprisoned Palestinians, particularly Gazans, had limited ability to visit prisoners. The ICRC and the Israeli government reported a complete cessation of family visits to all prisoners following the June 14 kidnapping and killing of three Israeli teenage citizens in the West Bank and a cessation of visitors to all Palestinian prisoners throughout Operation Protective Edge that continued for some weeks thereafter. Visits to Fatah-associated detainees from the West Bank and East Jerusalem resumed on July 16, before resuming for all prisoners on September 13, but with specific rules. Visits to prisoners from Gaza resumed October 20. After an extended hunger strike initiated by nearly 2,000 Palestinian detainees incarcerated in Israeli prisons, in 2012 Israel eased restrictions instituted in response to the 2006 capture of Israeli soldier Gilad Shalit. This included an end to solitary confinement of some prisoners, a resumption of family visits for prisoners from Gaza, and a limitation of administrative detention to six months. Authorities allowed detainees religious observance. NGOs claimed there was a systematic failure to investigate abuse claims. In July 2013 PCATI reported that, despite more than 776 complaints it filed since 1999, no torture complaint resulted in a criminal investigation, prosecution, or conviction. This remained a pattern during the year. PCATI reported that the government regularly dismissed complaints of abuse following a primary examination by an Israeli Security Agency (ISA) employee. NGOs reported that investigations into IDF and police abuse were slow and ineffective and rarely led to prosecutions. ISA facilities were exempt from regular independent inspections.

Independent Monitoring: The PA generally permitted the ICRC access to detainees and allowed regular inspections of prison conditions in accordance with the ICRC's standard modalities. Preliminary unpublished accounts by human rights groups, humanitarian organizations, and lawyers indicated that as in previous years, there were some difficulties in gaining access to specific detainees, depending on which security organization managed the facility.

The ICRC conducted monitoring visits to some prisoners in the Gaza Strip, but Hamas authorities denied its representatives permission to visit high-profile detainees and prisoners.

The Israeli government permitted visits by independent human rights observers. The government permitted the ICRC to monitor prison conditions in accordance with its standard modalities. NGOs sent representatives to meet with prisoners and inspect conditions in prisons, detention centers, and IDF facilities, except ISA

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 153

ATL004858

## ISRAEL AND THE OCCUPIED TERRITORIES                    65

detention and interrogation facilities, since security prisoners and facilities remained inaccessible to independent monitors.  Human rights groups reported delays and difficulties in gaining access to specific detainees and frequent transfers of detainees without notice.

### d. Arbitrary Arrest or Detention

Palestinian law prohibits arbitrary arrest and detention, and PA prosecutors generally charged suspects promptly as a requirement to detain them.  The PA criminal justice system, however, often did not lead to a prompt and speedy trial. Hamas also stated that the PA repeatedly detained individuals during the year based solely on their Hamas affiliation, especially following high-profile security sweeps.

Hamas reportedly practiced widespread arbitrary detention in the Gaza Strip, particularly against Fatah members, civil society activists, and others accused of publicly criticizing Hamas.

Israeli law provides safeguards against arbitrary arrest and detention, but key safeguards do not apply to Palestinian security detainees.  Palestinian security detainees are subject to the jurisdiction of Israeli military law, which permits eight days' detention before appearing before a military court.  There is no requirement that a detainee have access to a lawyer until after interrogation, a process that may last weeks.  The maximum period for such a detention order, according to military law, is 90 days; however, detention can be renewed if deemed necessary.  Denial of visits by family, outside medical professionals, or others outside the ISA, the IDF, or the prison service occurred.  NGOs reported persons undergoing interrogations often were held incommunicado for several weeks.  In the past the Israeli government denied such allegations.

In July and August, the INP arrested 36 members of the family of Muhammad Abu Khdeir (see section 1.a.), prompting accusations authorities targeted them unfairly. None were charged or tried for any offenses, and all were eventually released.

### Role of the Police and Security Apparatus

In West Bank Palestinian population centers, mostly "Area A" as defined by the Oslo-era agreements, containing 55 percent of the Palestinian population on approximately 18 percent of West Bank land area, the PA has formal responsibility for security and civil control.  Since 2002, however, following the outbreak of the

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 154

ATL004859

Second Intifada, Israeli security forces have regularly conducted security operations in Area A cities, often without coordinating with PA security forces.  In "Area B" territory in the West Bank, which contained 41 percent of the population on approximately 21 percent of the territory, mostly small Palestinian villages and farmland, the PA has civil control, but Israel and the PA maintain joint security control.  In "Area C," which contains Israeli settlements, military installations, and 4 percent of the Palestinian population in small villages, farmland, and open countryside on approximately 61 percent of the land area, Israel retains full civil and security control.

Six PA security forces operated in the West Bank.  Many of the security forces are under the PA Ministry of Interior operational control and follow the prime minister's guidance.  The Palestinian Civil Police have primary responsibility for civil and community policing.  The National Security Force conducts gendarmerie-style security operations in circumstances that exceed the capabilities of the civil police.  The Military Intelligence agency handles intelligence and criminal matters involving PA security force personnel, including accusations of abuse.  The Military Intelligence agency is responsible for investigations into allegations of abuse and corruption involving PA security forces and can refer cases to court.  The General Intelligence service is responsible for external intelligence gathering and operations; the Preventive Security Organization is responsible for both internal intelligence gathering and investigations related to internal security cases (for example, antiterrorism, weapons violations, and money laundering).  The Presidential Guard protects facilities and provides dignitary protection.  Generally, Palestinian security forces continued to demonstrate improved performance levels, especially while maintaining order during demonstrations on days of national significance to Palestinians, such as the "Nakba" and "Naksa" days.  The ICHR continued to report accusations of abuse and torture at the hands of the security forces to the PA.

The PA took significant steps to bring women into police forces in the West Bank to allow police work to cross societal gender barriers.  For example, the women on the PA police force can search under women's clothing for contraband.  In March the PA Presidential Guard established the Female Special Security Detachment, the first operational element for women in the PA security forces.

The PA made improvements in ensuring civilians are not tried by security sector courts.  There were some NGO reports, however, of unverified incidents of civilians being tried in military courts, which they noted made it unclear whether

Country Reports on Human Rights Practices for 2014          Page 155
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004860

security agencies, rather than the civil police, continued to detain civilians, including journalists.

In the Gaza Strip, forces under Hamas control maintained security.  Press and NGO reports suggested Hamas enforced strict control across all sectors of society.  Hamas "police" reportedly facilitated and benefited from illegal activity, such as the operation of smuggling tunnels.  Impunity remained a problem in the Gaza Strip.  The ICHR noted that the internal security services in the Gaza Strip prohibited field researchers from visiting detention centers and that authorities failed to respond to ICHR letters.  There were numerous instances in which Hamas failed to deter violence, such as rocket attacks into Israel during the year prior to the outbreak of hostilities in July.

Israeli authorities maintained their West Bank security presence through the IDF, ISA, INP, and border police.  Israeli authorities took some steps to investigate and punish abuse and corruption, but there were reports of failure to take disciplinary action in cases of abuse, although one border police officer was arrested and indicted for murder in the deaths of two Palestinians in Bitunya in May; his commander was indicted for allegedly covering up the incident (see section 1.a.).  The IDF continued to open investigations automatically of claims of abuse in military police custody.  NGOs stated that automatic investigations applied only to military activity in the West Bank, not to individuals reporting abuse in custody.  NGOs reported that impunity among Israeli security forces remained a problem, in part because mechanisms for investigating allegations were not effective.  Reports of abuse go to the Attorney General's Office; PCATI in June 2013 reported that authorities systematically disregarded abuse allegations.

According to B'Tselem, in 2011 Israel began investigating every case in which the IDF killed civilians in the West Bank not taking part in hostilities.  According to B'Tselem, during the year the IDF opened investigations into 31 incidents and closed one case.  Israeli law restricts the ability of Palestinians harmed by the acts of Israeli security forces to seek compensation in Israeli courts.

NGOs criticized Israeli accountability processes and efforts to investigate reports of killing of civilians.  On February 27, AI released a report entitled "Trigger Happy" that documented incidents of use of excessive force by Israeli soldiers against Palestinian civilians in the West Bank and claimed that existing mechanisms for investigating reports of human rights violations lacked transparency and impartiality.  On September 4, Israeli NGOs B'Tselem and Yesh Din released a statement stating that existing accountability mechanisms precluded

ATL004861

## ISRAEL AND THE OCCUPIED TERRITORIES                    68

serious investigations and were marred by severe structural flaws that rendered them incapable of conducting professional investigations.

According to Israeli and Palestinian NGO and press reports, the IDF and INP did not respond sufficiently to violence perpetrated against Palestinians by Israeli settlers in the West Bank.  Levels of settler violence decreased compared with 2013, according to the UN Office for the Coordination of Humanitarian Affairs (OCHA).  OCHA counted 329 incidents of settler violence as of December 29 (compared with 399 incidents in 2013) that resulted in Palestinian injuries or property damage.  Israeli forces injured approximately 96 Palestinians during settler-related incidents.  OCHA reported that 90 percent of Palestinian complaints of settler violence in recent years were closed without indictment.

As of December 29, Israeli security forces in the West Bank injured 5,865 persons; many injuries occurred during clashes in July and August during protests against the combat in Gaza.

ACRI stated Israeli security and justice officials operating in predominantly Palestinian East Jerusalem displayed bias against Palestinian residents in investigating incidents involving Palestinian and Israeli actors.  In several cases Palestinian residents in the West Bank sought to press charges against Israeli settlers or their security guards, but many complaints went uninvestigated despite the availability of evidence.

**Arrest Procedures and Treatment of Detainees**

PA law generally requires a warrant for arrest and provides for prompt judicial determination of the legality of detention, and these provisions were largely--but not uniformly--observed; however, there are exceptions that allow for arrest without a warrant.  PA law allows police to hold detainees for 24 hours if there is sufficient evidence to charge a suspect, and for up to 45 days with court approval. It requires that a trial start within six months or the detainee must be released. While some PA security forces reportedly detained persons outside of appropriate legal procedures, including without warrants and without bringing them before judicial authorities within the required time, there were no known detentions extending beyond the time limit without trial.  Bail and conditional release were available at the discretion of judicial authorities.  Authorities generally informed detainees of the charges against them, albeit sometimes not until interrogation. Authorities granted detainees access to a lawyer.  Palestinian courts consistently afforded the right to counsel to indigents charged with felony offenses.  Indigent

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 157

ATL004862

## ISRAEL AND THE OCCUPIED TERRITORIES                    69

defendants charged with misdemeanors, however, often did not receive counsel, although NGO efforts to represent indigent juveniles and adults in misdemeanor cases were at times successful.

In a number of cases, PA Military Intelligence reportedly exceeded its legal authority to investigate other security services' officers and detained civilians suspected of "security offenses," such as terrorist activities.  Hamas continued to charge that the PA detained individuals during the year solely on the basis of their Hamas affiliation, but the PA presented evidence it charged many of these individuals with criminal offenses under civil or military codes.

In the Gaza Strip, Hamas reportedly detained a large but unverifiable number of persons during the year, largely without recourse to legal counsel, judicial review, or bail.  HRW reported Hamas internal security arrested individuals without presenting warrants, delayed their transfer to the prosecutor's office (using incommunicado detention), did not inform families of detainees' whereabouts promptly, and denied detainees' access to a lawyer.  There also were instances in which authorities retroactively issued arrest warrants and used military warrants to arrest civilians.  In some cases authorities presented detainees to the military judiciary for civil cases.

Israeli authorities operated under military and civilian legal codes in the occupied territories.  Israeli military law applied to Palestinians in the West Bank, while Israeli settlers were under the jurisdiction of Israeli civil law.  Under Israeli military law, detainees can be held for up to 90 days without access to a lawyer, and authorities frequently transferred detainees from the West Bank to Israel for detention or interrogation.  The Israeli military courts had a conviction rate of more than 99 percent for Palestinians.  Authorities informed detainees of the charges against them during detention, but DCI-Palestine reported authorities did not inform minors and their families at the time of arrest.  Israeli authorities stated their policy was to post notification of arrests within 48 hours, but senior officers may delay notification for up to 12 days, effectively holding detainees incommunicado during the interrogation process.  A military commander may request that a judge extend this period indefinitely.  In accordance with the law, Israeli authorities generally provided Palestinians held in Israeli military custody inside Israel access to a lawyer of their choice (and provided lawyers for the indigent), but impediments to movement on West Bank roads or at crossings often made consultation difficult and delayed trials and hearings.  According to DCI-Palestine, most detained minors saw their lawyer for the first time when they appeared before a military court.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 158

ATL004863

**ISRAEL AND THE OCCUPIED TERRITORIES**                    70

NGOs claimed that, despite changes to the law in 2011 that categorized
Palestinians between the ages of 16 and 18 as minors, Israeli authorities frequently
failed to inform parents why children were detained or where they took Palestinian
minors when arrested.  Additionally, this amendment does not apply to detention
periods and other provisions of military orders.  For example, minors who are 16
and 17 years old have the same detention periods as adults under the law.  In April
2013 a military order reduced the time that Palestinian children between the ages
of 12 and 15 can be detained before appearing before a military court judge,
although there was no change for minors ages 16 and 17.  The NGO Military Court
Watch reported subsequently these detention times were still at least twice as long
as those applied to Israeli minors living in the West Bank.  According to Military
Court Watch, of the 1,004 minors detained in 2013, 343 had at least part of their
interrogations audio-visually recorded.  Nonetheless, the NGO was unaware of a
single case in which an audiovisual tape of an interrogation involving a minor was
made available to defense counsel prior to the first hearing.  There is no legal duty
to audio-visually record interrogations involving minors.  The IDF also entered
Palestinian homes at night either to arrest or to take pictures of minors.  DCI-
Palestine claimed authorities abused minors to coerce confessions (see section
1.c.), and according to human rights organizations, this treatment could amount to
torture in some cases.  In the past Israeli officials denied such allegations.  Military
authorities began providing translations into Arabic of some of the recent changes
to the military laws affecting minors.  NGOs reported a significant increase in
detentions of minors in the Jerusalem area, particularly detentions authorities never
registered in the Israeli prison system.

In March 2013 the UN Children's Fund (UNICEF) released its report *Children in
Israeli Military Detention Observations and Recommendations*, which stated that
"mistreatment of Palestinian children in the Israeli military detention system
appears to be widespread, systematic, and institutionalized."  Subsequently, the
Military Prosecutor for Judea and Samaria (West Bank) established a dialogue with
UNICEF on children's rights while in military detention and on specific actions
that can be undertaken to improve the protection of these children.  In October
2013 the IDF Central Command for the West Bank implemented a pilot test in the
West Bank that replaced the practice of night arrests of children suspected of
security offenses with a summons procedure.  UNICEF documented 24 instances
of summoning of children since the beginning of the pilot in Jenin and Hebron,
Nablus, and Ramallah governorates.  Despite the new procedures, some children
reportedly received summonses at night, and there were continued reports of

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 159

ATL004864

## ISRAEL AND THE OCCUPIED TERRITORIES                71

mistreatment during the subsequent interrogation process at the military detention
center or police station.

Israeli authorities continued to "administratively detain" (hold suspected criminals
indefinitely without presenting charges or going to trial) some persons on security
grounds.  Many NGOs called for the immediate end to administrative detention.  In
October, B'Tselem reported a steep rise in administrative detentions, in particular
during Operation Brother's Keeper.

The ISA continued its practice of incommunicado detention, including isolation
from monitors, legal counsel, and family throughout the duration of interrogation.
NGOs reported isolation was used to punish detainees or silence politically
prominent Palestinian detainees; however, according to the Israeli government, the
Israeli Prison Service does not hold detainees in separate detention punitively or to
induce confessions.  The Israeli government stated it does so only when a detainee
threatens himself or others and other options have been exhausted, or in some
cases during interrogation to prevent disclosure of information.  In such cases the
Israeli government maintained the detainee had the right to meet with ICRC
representatives, Israeli Prison Service personnel, and medical personnel if
necessary.

Arbitrary Arrest:  The ICHR reported that arbitrary arrest by the PA in the West
Bank was a common practice, particularly arrests based on political affiliation with
Hamas.  The organization received 341 complaints of arbitrary arrests based on
political affiliation in the West Bank as of November, a decline from the previous
year.  There were numerous reports PA security forces improperly detained
Palestinian journalists.  Security officials also arrested and abused Palestinians who
posted criticism of the PA online, including on their Facebook pages.

The ICHR received 648 complaints of arbitrary arrests by Hamas in the Gaza Strip
as of November.  Many of these arrests and detentions appeared to be politically
motivated, targeting political opponents and those suspected of ties to Israel.
HRW reported Hamas security forces assaulted and arbitrarily detained civil
society activists and peaceful protesters who had called for an end to the Fatah-
Hamas split.

Throughout the year there were reports Israeli security forces in Jerusalem and in
the West Bank arbitrarily arrested and detained numerous Palestinian protesters
and activists, particularly those participating in demonstrations against the

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor                Page 160

ATL004865

## ISRAEL AND THE OCCUPIED TERRITORIES          72

separation barrier or against killings of Palestinians, although no statistics were available regarding the total number of complaints of arbitrary arrest.

Pretrial Detention:  The ICHR reported on complaints of Palestinians detained by PA security services and not immediately released, even when courts ordered their release after determining their detentions were illegal.

It was unclear how long detainees in Hamas custody stayed in pretrial detention or what legal means, if any, Hamas used to detain individuals.

### e. Denial of Fair Public Trial

The PA Basic Law provides for an independent judiciary.  The PA generally respected judicial independence and the autonomy of the High Judicial Council and maintained authority over most court operations in the West Bank.  PA-affiliated prosecutors and judges stated that IDF prohibitions on movement in the West Bank, including restrictions on the ability to transport detainees and collect witnesses, hampered their ability to dispense justice.  Women served as judges in both the criminal and military court systems.

Until 2011 the PA's military court system had jurisdiction over crimes by civilians against state security or against the security forces.  After Palestinian NGOs criticized this practice, the PA mandated that civilians appear before civilian courts.  PA military justice court personnel stated they did not process any cases or bring charges against any civilians in 2013 or during the year, and the PA civilian court system handled all criminal cases against civilians.

The PA civil, magistrate, and religious courts handled civil suits and provided an independent and impartial judiciary in most matters, but there were unconfirmed reports of various political factions trying to influence judicial decisions.  Citizens have the right to file suits against the government but rarely did so.  Seldom-used administrative remedies are available in addition to judicial remedies.  Court orders were not always executed.

Hamas-appointed prosecutors and judges operated courts in the Gaza Strip, although the PA considered them illegal.  In 2012 HRW reported that "lawyers who are critical of Hamas, or who support Fatah, continue to practice before the courts but have themselves been the victims of threats and violations of due process and even torture."  No women served as criminal prosecutors in the Gaza Strip.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 161

ATL004866

## ISRAEL AND THE OCCUPIED TERRITORIES                73

Gaza Strip residents may file civil suits.  Unofficial anecdotal reports claimed Gaza Strip courts operated independently of the Hamas government and were at times impartial.  There were reports that enforcement of court orders improved.  HRW reported Hamas internal security regularly tried civil cases in military courts.

Israeli law provides for an independent judiciary, and the government generally respected civil court independence.  The IDF tried Palestinians accused of security offenses (ranging from rock throwing to membership in a terrorist organization to incitement) in military courts, which some NGOs claimed were inadequate and unfair.  Israeli law defines security offenses to include any offense committed under circumstances that might raise a suspicion of harm to Israel's security and which the IDF believes may be linked to terrorist activity.

**Trial Procedures**

PA law provides for the right to a fair trial, and an independent judiciary generally enforced this right.  Defendants enjoy a presumption of innocence.  Juries are not used.  Trials are public, except when the court determines privacy is required by PA security, foreign relations, a party's or witness' right to privacy, or protection of a victim of a sexual offense or an "honor" crime.  Defendants have the right to be present and to consult with an attorney in a timely manner during the trial, although during the investigation phase, the defendant only has the right to observe.  The law provides for legal representation, at public expense if necessary, in felony cases, but only during the trial phase.  Defendants can confront or question witnesses against them or present witnesses and evidence during the trial but not during the investigation phase; defendants also may review government-held evidence and have the right to appeal.  Suspects and defendants in the PA justice system have a right to remain silent when they are interrogated by the prosecutor according to the Palestinian penal procedure law.  Defendants also have a legal right to counsel during interrogation and trial.  Authorities generally observed these rights.

Hamas authorities in the Gaza Strip followed the same criminal procedure law as the PA in the West Bank but implemented the procedures unevenly.

Israeli authorities tried Israelis living in settlements in the West Bank and in East Jerusalem under Israeli civil law in the nearest Israeli district court.  Israeli civil law applied to Palestinian residents of Jerusalem.  Israeli military courts subjected West Bank Palestinians held by Israeli authorities to trial in Israeli military courts.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 162

ATL004867

**ISRAEL AND THE OCCUPIED TERRITORIES**          74

Military court trials of Palestinians and others in the occupied territories provide some, but not all, of the procedural rights granted in criminal courts.  The same evidentiary rules used in Israeli criminal cases apply; for example, convictions cannot be based solely on confessions.  In military trials, however, prosecutors often present secret evidence that is not available to the defendant or counsel.  Indigent detainees do not automatically receive free legal counsel for military trials, but almost all detainees had counsel, in part because NGOs represented them.  The military courts use Hebrew, but the defendant has the right to simultaneous interpretation at every hearing.  Various human rights organizations claimed the availability and quality of Arabic interpretation was insufficient, especially since most interpreters were not professionals but were instead bilingual Israelis performing mandatory military service.  Defendants can appeal through the Military Court of Appeals and petition the High Court of Justice.  Israeli military courts rarely acquitted Palestinians charged with security offenses, although they occasionally reduced sentences on appeal.  NGOs reported that military court records indicated more than 99 percent of cases heard resulted in a guilty verdict.

Several NGOs claimed Israeli military courts, which processed thousands of Palestinians in the West Bank during the year, were not equipped to adjudicate each case properly.  NGOs and lawyers reported it was better to plead guilty and receive a reduced sentence than to maintain innocence and go through a trial that could last months, if not more than a year.  Human rights lawyers also reported the structure of military trials--in military facilities with military officers as judges, prosecutors, and court officials, and with tight security restrictions--limited defendants' rights to public trial and access to counsel.

Signed confessions by Palestinian minors, written in Hebrew, a language most could not read, continued to be used as evidence against them in Israeli military courts.  NGOs reported these confessions often were coerced during interrogations.

**Political Prisoners and Detainees**

NGOs reported that arrests on political grounds occurred in the West Bank and Gaza.  There was no reliable estimate of the number of political prisoners the PA held during the year.

Hamas detained several hundred persons, allegedly because of their political affiliation, public criticism of Hamas, or collaboration with Israel, and held them for varying periods of time.  Numerous allegations of denial of due process and

ATL004868

some executions were associated with these detentions.  The ICRC had limited access to these prisoners.

The Palestinian NGO Addameer reported that Israel continued to detain 28 PLC members as of October.

Israeli authorities did not accord administrative detainees an opportunity to refute allegations or access the evidentiary material presented against them in court. Israeli authorities permitted the ICRC access to administrative detainees.  There were 461 administrative detainees as of December, an increase of 309 from the end of 2013.

**Civil Judicial Procedures and Remedies**

A citizen can file a suit against the PA, including on matters related to alleged abuses of human rights, but this was uncommon.

Gaza Strip residents may file civil suits, including those related to human rights violations.

Israeli law grants Palestinians the possibility of obtaining compensation in some cases of human rights violations, even when the acts were considered legal according to the law.

**Property Restitution**

In certain cases the IDF offered opportunities for compensation for demolished or seized homes (see section 1.f.), subject to an appraisal, verification, and appeals process; Palestinians generally refused such offers, citing a desire not to legitimize the confiscation.  The Israeli government sometimes charged demolition fees to demolish a home; this policy at times prompted Palestinians to destroy their own homes to avoid the higher costs associated with Israeli demolitions.  Palestinians had difficulty verifying land ownership in Israeli courts according to Israeli definitions of land ownership.

**f. Arbitrary Interference with Privacy, Family, Home, or Correspondence**

The PA required the attorney general to issue warrants for entry and searches of private property; however, Palestinian security services often ignored these requirements and entered homes without judicial authorization.

Country Reports on Human Rights Practices for 2014                 Page 164
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004869

**ISRAEL AND THE OCCUPIED TERRITORIES**                    76

There were no specific reports the PA harassed family members for alleged offenses by an individual, although NGOs reported this tactic was common.

Hamas authorities in the Gaza Strip frequently interfered arbitrarily with personal privacy, family, and home, according to reporting from local media and NGO sources.  NGOs reported numerous cases of home searches and property seizure without warrants targeting journalists, Fatah loyalists, civil society members, youth activists, and those whom Hamas security forces accused of criminal activity. Hamas forces monitored private communications systems, including telephones, e-mail traffic, and social media sites, by demanding passwords, access to personal information, and seizure of personal electronic equipment of detainees.  While Hamas membership did not appear to be a prerequisite for obtaining housing, education, or government services, authorities commonly reserved employment in some government positions in Gaza, such as the security services, for Hamas members only.  In several instances Hamas detained individuals for interrogation and harassment based on the purported actions of their family members, particularly prodemocracy youth activists.  HRW reported Hamas also arrested family members to put pressure on the perpetrator to surrender to authorities.

The IDF frequently raided Palestinian homes, including in Area A, most often at night, which it stated was due to operational necessity.  Under occupation orders only IDF officers of lieutenant colonel rank and above could authorize entry into Palestinian private homes and institutions in the West Bank without a warrant, based upon military necessity.  There were no reported cases of IDF soldiers punished for acting contrary to this requirement.

In the West Bank and Jerusalem, the Israeli Civil Administration (part of Israel's Ministry of Defense), the Jerusalem municipality, and the Ministry of Interior continued to demolish homes, cisterns, and other buildings and property constructed by Palestinians in areas under Israeli civil control on the basis that these buildings lacked Israeli planning licenses.  Authorities generally did not offer compensation in these cases.  Properties close to the separation barrier, IDF military installations, or firing ranges also remained subject to a heightened threat of demolition or confiscation.  NGOs expressed great concern over demolitions in Area C of the West Bank.  For example, on August 20, Israeli authorities demolished 11 residential structures, displacing 53 persons (including 33 children). Three of the demolished homes were 100-year-old historic structures built in Nablus.  The other targeted structures were located in two Bedouin communities and the village of al-Aqaba.

Country Reports on Human Rights Practices for 2014                    Page 165
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004870

**ISRAEL AND THE OCCUPIED TERRITORIES**                    77

As of December 29, Israel demolished 581 Palestinian-owned structures in Area C and East Jerusalem, displacing approximately 1,180 persons, compared with 660 structures and 1,100 persons in 2013.

In July the Israeli Ministry of Defense's Civil Administration revived a policy of "punitive demolitions," demolishing the home of a suspect in the April killing of an off-duty Israeli police officer in Hebron.  With the exception of one such demolition in East Jerusalem in 2009, Israeli authorities had halted punitive demolitions since 2005 following recommendations of a military commission that found the practice did not act as a deterrent.  In August authorities demolished the homes of two individuals suspected (although not captured, tried, or convicted) of the kidnapping and killing of three Israeli teenagers.  Authorities sealed with concrete the home of a third suspect in this crime.  According to NGOs, these demolitions displaced 23 individuals not charged with any criminal activity.  Authorities carried out another punitive home demolition on the home of the family of an individual suspected of killing an Israeli police officer.

HRW documented five instances of punitive demolitions as of November 22 and reported that Israeli authorities stated they would demolish seven more family homes of Palestinians suspected of killing Israelis, including five homes in East Jerusalem.  NGOs claimed these demolitions punished innocent family members and might amount to collective punishment.

Palestinians and human rights NGOs reported the IDF was largely unresponsive to Israeli settlers' actions against Palestinians in the West Bank, including demolition of property (see section 6, National/Racial/Ethnic Minorities).

**Section 2. Respect for Civil Liberties, Including:**

**a. Freedom of Speech and Press**

The PA Basic Law provides every person the right to freedom of thought, conscience, and expression, orally, in writing, or through any other form.  PA laws do not specifically provide for freedom of press; however, PA institutions applied aspects of a proposed 1995 press law as actual law.  Nonetheless, PA security forces in the West Bank and members of the Hamas security apparatus in the Gaza Strip continued to restrict freedom of speech and press.  In contrast with 2013, there were no slander cases reported during the year.

Country Reports on Human Rights Practices for 2014          Page 166
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004871

**ISRAEL AND THE OCCUPIED TERRITORIES**                    78

Israeli authorities also placed limits on certain forms of expression in the occupied territories.

Freedom of Speech:  Although no PA law prohibits criticism of the government, there were media reports PA authorities arrested some journalists and bloggers who either criticized or covered events that criticized the PA and PA officials.  For example, in March members of Palestinian security forces in civilian clothes attacked a Wattan TV crew, including reporter Ahmad Melhem and cameraman Ahmed Zaki, as they covered anti-PA activities in Ramallah.  Undercover security agents reportedly attempted to confiscate their cameras by force.  Security agents detained the Wattan TV crew and later released them only after they promised to stop their coverage and leave the area.  In addition to sometimes restricting reporters who criticized the PA government, there were several complaints during the year that the PA prevented journalists from covering events in the West Bank that were sympathetic to Hamas.

In the Gaza Strip, individuals publicly criticizing authorities risked reprisal by Hamas, including arrest, interrogation, seizure of property, and harassment.  Civil society and youth activists, social media advocates, and individuals associated with political factions accused of criticizing Hamas in public fora, such as on the internet, faced punitive measures, including raids on their facilities and residences, arbitrary detention, and denial of permission to travel outside Gaza.  The ICHR reported the detention of numerous protesters in the Gaza Strip.  In March journalist Oruba Othman received threats of punitive actions after she published a report in the Lebanese newspaper *al-Akhbar* on March 4 regarding how Hamas security force officers gave Friday's religious sermons in military uniform.  Othman reported to a local NGO that Iyad Albazam, the spokesperson for the Hamas "Ministry of Interior," claimed "the report is full of lies," and her Facebook page received threatening messages.  There were reports authorities harassed activists working to raise awareness on sensitive social matters, such as the role of women and domestic violence.  In March the Hamas General Intelligence services in the Gaza Strip prevented the Press House Foundation from holding a celebration to honor journalists in Gaza City, despite the Press House Foundation having obtained permission for the event from Hamas's "Ministry of Interior."

During the hostilities between Israel and Hamas in July and August, local media reported that 17 journalists--16 Palestinian and one Italian--were killed in the Gaza Strip during Israel's military offensive.  Many other journalists were injured.  Additionally, there were reports of a number of Israeli attacks against Palestinian media outlets in Gaza.  Israeli rockets targeted al-Aqsa TV channel on two separate

Country Reports on Human Rights Practices for 2014                    Page 167
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004872

## ISRAEL AND THE OCCUPIED TERRITORIES                    79

occasions, July 29 and 31.  The offices of al-Jazeera TV in Gaza were targeted on
July 22, when bullets were fired at the station's offices.  No injuries were reported
in that incident, but the Foreign Press Association (FPA) strongly condemned the
attack.  On July 19, two Israeli missiles hit and destroyed the offices of the
National Media Agency.  Also, on July 16, the Sawt al-Wattan radio station,
housed in the Dawood tower in Gaza, was shelled and three employees injured.

In Jerusalem displays of Palestinian political symbols were punishable by fines or
imprisonment, as were public expressions of anti-Israeli sentiment, but authorities
did not always enforce this restriction.  Israeli security officials regularly
prohibited or interrupted meetings or conferences held in Jerusalem affiliated with
the PLO or PA, or with PA officials in attendance.  For example, on October 2,
Israeli authorities banned an event in Jerusalem sponsored by the PLO entitled
"Altering the Character of Jerusalem:  The Forced Closure of Palestinian
Institutions in Palestine's Capital."  Many Palestinian journalists in Jerusalem
contended that Israeli forces coordinated with right-wing Israelis to prevent
Palestinian reports from being broadcast.  In May, Israeli security forces detained
Momen Shabanah, a cameraman, and Zaina Sandoka, a correspondent from Roya
TV, as they covered Israeli extremist attacks on residents of Jerusalem's Old City.
Israeli police told the crew they needed official permission to film, took their
camera, deleted their images, and temporarily detained them.

In a series of raids conducted throughout the West Bank during the summer, Israeli
security forces raided companies that facilitated media and confiscated equipment.
In June security forces raided the offices of Turbo Design and seized several
computers.  The firm, located in Ramallah, did work for the periodical *This Week
in Palestine*, UNRWA, the British Council, and a foreign diplomatic mission in
Jerusalem.

Press Freedoms:  Across the occupied territories, independent media operated with
restrictions.  The PA Ministry of Information requested Israeli reporters covering
events in the West Bank register with the ministry.  According to the PA deputy
minister of information, the ministry will give permission to any Israeli journalists
provided they do not live in an illegal settlement.  While officially the PA was
open to Israeli reporters covering events in the West Bank, Israeli reporters faced
pressures from Palestinian journalists not to attend PA press events.  In September,
*Haaretz* journalist Amira Hass was evicted from a conference at Beir Zeit
University in the West Bank, reportedly because of her Israeli nationality.

Country Reports on Human Rights Practices for 2014            Page 168
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004873

**ISRAEL AND THE OCCUPIED TERRITORIES**          80

In the West Bank, the PA placed some restrictions on independent media as well as
official media.  In May the PA lifted its distribution ban in the West Bank on the
twice-weekly, pro-Hamas *al-Risala* and the *Filistin* daily newspapers, but Israeli
authorities forced the Ramallah-based printing house to stop printing and
distributing them in the West Bank.  Al-Aqsa TV reportedly enjoyed some access
to work in the West Bank without harassment.

In the Gaza Strip, Hamas restricted independent media, especially non-Hamas-
affiliated press and media outlets.  In May, Hamas lifted its ban on three West
Bank-based newspapers--*al-Quds*, *al-Ayyam*, and *al-Hayat al-Jadida*.  Hostilities
in the Gaza Strip prevented their distribution from July 10 to August 27.  Hamas
authorities permitted the broadcast of reporting and interviews featuring officials
from the PA locally.  Hamas allowed, with some restrictions, the operation of non-
Hamas-affiliated broadcast media in the Gaza Strip.  The PA-supported Palestine
TV reportedly operated in the Gaza Strip.

During the July-August conflict in the Gaza Strip, Hamas allegedly harassed some
journalists, including several from Western outlets, to prevent them from reporting
on aspects of the hostilities that would reflect unfavorably on Hamas or possibly
divulge sensitive information.  These include photographs of Hamas fighters and
locations from which Hamas fighters fired rockets into Israel.  On August 11, the
FPA condemned what it called Hamas' "deliberate official and unofficial
incitement against journalists" and attempts to prevent journalists from covering
the conflict.  The FPA also alleged Hamas attempted to institute a vetting
procedure for journalists and charged that Hamas harassed, threatened, or
questioned foreign reporters working in Gaza.  Some journalists, including the *New
York Times* Jerusalem bureau chief, disputed some of FPA's claims.

Israeli authorities reportedly censored some security-related information on the
Gaza conflict.

In July 2013 Hamas closed *Ma'an* and *al-Arabiya* bureaus in Gaza and questioned
the *Ma'an* bureau chief over a report on the *Ma'an* website.  Authorities
subsequently allowed *Ma'an* and *al-Arabiya* to reopen their bureaus, but only
*Ma'an* chose to do so.  While the PA agreed to allow Gaza-based newspapers to be
distributed in the West Bank beginning in April, Israeli authorities intervened to
stop their publication.  In May the IDF raided the office of *al-Ayyam*, which had
agreed to print the three Gaza-based papers, and informed the managers it would
not allow the printing of the newspapers.  Israeli reports characterized the raid as
an attempt to shut down anti-Semitic publications in the West Bank.  Following the

Country Reports on Human Rights Practices for 2014          Page 169
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004874

## ISRAEL AND THE OCCUPIED TERRITORIES                    81

raid the three Gaza-based papers were not published or circulated in the West Bank.

In areas of the West Bank where Israel controls access, Palestinian journalists complained they were repeatedly prevented from covering stories because the IDF does not recognize any Palestinian press credentials or credentials provided by the International Federation of Journalists.  Few Palestinians held Israeli press credentials following Israeli revocation of the vast majority of their credentials during the Second Intifada, which began in 2000.  They reportedly also faced discrimination, harassment, and violence in Jerusalem.  Palestinian media companies operating in Jerusalem also faced difficulties.  In June, Israeli police raided the offices of Palestinian television production company Palmedia as it was broadcasting a live morning program *Sabah al-Khair Ya Quds* (Good Morning Jerusalem) for the Palestinian television.  Police forced the staff to stop the broadcast and arrested program director Nadir Beibers; cameraman Ashraf Al-Shweeki; and one of the guests.  Police claimed that authorities had not licensed the program and that it incited against Israel.  Authorities later released the journalists and guest.

Violence and Harassment:  There were numerous reports PA security forces harassed, detained (occasionally with violence), prosecuted, and fined journalists during the year.  Moreover, PA security forces also reportedly demanded at times the deletion of footage showing security personnel.  In February, Palestinian police and security reportedly tried to prevent journalists from covering a protest in front of the PA headquarters in Ramallah against the PA president's decision to meet with an Israeli delegation.  In July, Palestinian security forces stopped Filistin al-Yom TV's staff and other journalists from covering clashes in Jenin between youths and Israeli forces.  Authorities reportedly also coerced the journalists to go to the police station, where one journalist claimed police beat and threatened him.

Some Palestinian journalists claimed the PA attempted to prevent reporting from affiliates perceived to be Hamas-friendly or that it actively tried to prevent journalists from reporting on events sympathetic to Hamas.  In June, Palestinian security forces reportedly assaulted a group of journalists covering a sit-in organized by pro-Hamas protesters in Ramallah, who were demonstrating against political detentions of Hamas members by PA security forces.

Palestinian protesters also attacked journalists in the West Bank who they perceived to be Israeli.  In May, Palestinian protesters reportedly attacked two

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 170

ATL004875

Israeli journalists.  PA security forces intervened to protect the journalists and removed them from the area after they suffered minor injuries.

In June the FPA condemned PA security forces' behavior when undercover PA security officials attacked a CNN crew in Hebron; the attackers also damaged a video camera and accused the crew of "incitement."

In the Gaza Strip, journalists faced arrest, harassment, and other pressure from Hamas due to their reporting.  There were reports Hamas also summoned journalists for questioning in an effort to intimidate them.  Hamas also constrained journalists' freedom of movement during the year, attempting to ban access to some official buildings as well as several prodemocracy protests.  On May 15, Hamas security agents attacked with blackjacks and batons a group of journalists covering commemorations of Nakba Day in the Gaza Strip.  In June Hamas-affiliated police officers tried to prevent a Sawt al-Sha'b radio station correspondent from interviewing government employees in the al-Nuseirat area of the Gaza Strip.  Also in June, Gaza police officers assaulted an al-Wattan radio correspondent while he interviewed Gaza residents expressing resentment at Hamas's inability to pay their salaries; the correspondent suffered a concussion.

During the year the FPA reported several Hamas practices aimed at pressuring journalists working in Gaza.  These included efforts to establish "vetting procedures" that would effectively blacklist certain reporters, sending a series of intimidating text messages to journalists, and other harassment.

Throughout the year there were dozens of reported allegations that Israeli security forces actively worked to prevent Palestinian journalists from covering news stories in the West Bank.  These actions included preventing reporters from traveling through checkpoints within the West Bank, harassment from Israeli soldiers, and acts of violence against journalists.  In January, IDF soldiers reportedly fired tear gas canisters directly at a Wafa News Agency photographer as he covered weekly demonstrations in Kafir Kadoum village west of Nablus.

In January, Israeli military forces detained a correspondent from *al-Hayat al-Jadida* newspaper who covered Israeli home demolitions in the Jordan Valley. Security forces reportedly also injured several Palestinian reporters in the West Bank with the use of rubber bullets.  In April security forces reportedly repeatedly shot Ma'ath Mish'al, a photographer from the Turkish Anadoul News Agency, in his legs while he covered a weekly demonstration northwest of Ramallah.  Mish'al

ATL004876

**ISRAEL AND THE OCCUPIED TERRITORIES**                        83

reported to a local NGO that an Israeli soldier shot him at close range with unspecified munitions; twelve projectiles reportedly hit his legs.

In July reporters accused the IDF of using live ammunition against reporters. Israeli forces reportedly injured Thaer Abu Baker, a photographer and correspondent with Wafa News Agency, by using live ammunition at a march from Jenin to the al-Jalameh checkpoint in the West Bank.

Palestinian journalists also claimed that Israeli security forces detained Palestinian journalists and forced them to delete images and video under threat of violence or threats they would be arrested and placed under administrative detention if they did not comply.  In January, Mohamed Suboh, photographer for *Palnet News* website, was detained while covering an Israeli raid in the town of al-Khader west of Bethlehem.  Suboh told a local NGO that Israeli security forces informed him they would arrest him if he did not delete footage of the raid from his equipment.  On October 30, Israeli police reportedly assaulted and severely beat a volunteer correspondent for Huna al-Quds network Hazem Sandouqa who was covering clashes in Jerusalem.  Police detained him, forced him to delete the photographs in his camera, and threatened to assault him again if he took additional photographs.

Additionally, there were several claims in the West Bank and Jerusalem that Israeli forces failed to intervene when settlers attacked Palestinian journalists.  In March a group of armed Israeli settlers reportedly attacked three photojournalists near Beit Eil, north of Ramallah.  Israeli soldiers in the area reportedly intervened only after there was major damage to the reporters' vehicle.  In the same incident, two other Palestinian photographers were allegedly attacked by settlers, one of whom brandished a firearm, while attempting to photograph the attack on Momani.  The Israeli authorities later asked for footage of the incident to identify the settlers; however, the footage did not lead to any prosecutions during the year.

In March, Israeli soldiers detained Fida Nasser, a correspondent with Palestine Today TV, after Israeli settlers allegedly beat her and sprayed her with red wine. The FPA condemned several military incursions undertaken by Israeli forces in the West Bank to include shooting near the Aida Refugee Camp on March 13 where Israeli border police allegedly fired on a marked Associated Press vehicle as it obeyed instructions to leave.

Israeli authorities prevented Palestinian journalists resident in the West Bank from covering stories that occur in Jerusalem because they required an Israeli travel permit, and such a permit category for journalists does not exist.  Palestinian

Country Reports on Human Rights Practices for 2014                        Page 172
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004877

## ISRAEL AND THE OCCUPIED TERRITORIES                84

journalists who obtained permits for other reasons, as well as Jerusalem-resident journalists who identified themselves as Palestinian, reported incidents of harassment, racism, and occasional violence when seeking to cover news in Jerusalem, especially in and around the Old City.

In March a rubber bullet struck Reuters photographer Sinan Abu Mezr in his chest while he covered a demonstration that originated at the Damascus Gate in East Jerusalem to protest the killings of Palestinians in the West Bank.  Abu Mezr reported to a local press freedom NGO that soldiers fired a rubber bullet at him from an estimated distance of five to six yards while he covered Israeli soldiers arresting a protester.

Also in March, Israeli soldiers reportedly attacked a group of journalists covering an Earth Day commemoration in Jerusalem.  Agence France-Presse photographer Ahmed Algarbali reported to a local NGO that Israeli forces threw sound and gas grenades, and fired rubber bullets at the gathering estimated at 25 participants to disperse them.  Algarbali stated to the NGO, "I ran away from the grenades and bullets, but I was injured in my head from a rubber bullet that caused a deep wound of almost half an inch, and I was transferred to a hospital for treatment."  The journalists submitted a formal complaint to the Foreign Journalists' Syndicate claiming the injury resulted from deliberate targeting of journalists.  The soldiers reportedly denied the accusation against them; however, Algarbali claimed that the journalists provided video evidence to prove their charges.  Three other journalists were reportedly hit by rubber bullets in the same incident.

The FPA strongly condemned what it called "thuggish behavior and deliberate intimidation" demonstrated by Israeli border police against journalists and cameramen covering events at Damascus Gate on May 25 (Jerusalem Day).  Israeli police reportedly aggressively forced journalists to move far from the scene despite being in an area designated for the press; police reportedly pushed, kicked, and blocked other journalists from working.  Police also reportedly failed to protect journalists from aggression by pro-Israeli demonstrators against them.  Police prevented accredited journalists--Israelis, Palestinians, and foreigners alike--from covering the event.

Israeli air strikes injured or killed several journalists and their family members on the Gaza Strip, and there were allegations the Israeli government targeted journalists and media outlets.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 173

ATL004878

**ISRAEL AND THE OCCUPIED TERRITORIES**          85

There were numerous reports from journalists that Israeli authorities routinely harassed them when the journalists tried to report in Israeli-controlled areas of the West Bank.  There were also reports of Israeli authorities detaining, assaulting, or intimidating journalists.  On October 26, while covering confrontations between Palestinian youth and Israeli soldiers in Silwad village near Ramallah, Associated Press photographer Majdi Shtayyeh was hit by a bullet fired by an Israeli soldier.  Shtayyeh told local press that while he and a number of other journalists covered the clashes, a military vehicle stopped near them, and a soldier started firing rubber bullets in their direction at close range.  While at least one bullet hit his bulletproof vest, another one hit his arm.  The FPA condemned the attack and published a YouTube clip of the incident.  In December, two Israeli journalists, columnist Gideon Levy and photographer Alex Levac, were reportedly briefly detained by the Israeli army and questioned at a West Bank checkpoint as they attempted to re-enter Israel.  The Israeli newspaper *Haaretz* described the detention as an attempt to undermine the essential work of journalists.  Soldiers at the scene claimed the two journalists verbally abused and spit on security officers, a claim the two journalists denied.

Censorship or Content Restrictions:  The PA prohibits calls for violence, displays of arms, and racist slogans in PA-funded and controlled official media.  There were no confirmed reports of any legal action against, or prosecution of, any person publishing items counter to these PA guidelines.  Media throughout the occupied territories reported practicing self-censorship.

Civil society organizations reported Hamas censored television programs and written content, such as newspapers and books.

There were no reports the Israeli government monitored the media in the occupied territories.  Israeli authorities retain the right to review and approve in advance the printing of all Jerusalem-based Arabic publications for material perceived as a security threat.  Anecdotal evidence suggested Israeli authorities did not actively review the Jerusalem-based *al-Quds* newspaper or other Jerusalem-based Arabic publications.  Jerusalem-based publications reported that, based on previous experiences with Israeli censorship, over time they learned what was acceptable and self-censored publications accordingly.

There were complaints Israeli authorities pressured broadcasters to close operations.  In February threats from Israeli authorities forced Sheraa TV in Tulkarem to stop broadcasting temporarily.  In April, Israeli authorities sent a letter to Wattan TV in Ramallah demanding it stop broadcasting immediately or face

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 174

ATL004879

## ISRAEL AND THE OCCUPIED TERRITORIES                86

additional actions.  In June, Israeli forces raided the offices of Trance Media, a media services company, in Ramallah, Hebron, and Nablus and confiscated its equipment.

Hamas-backed news outlets alleged that Israeli forces intentionally disrupted their broadcasts during the July-August conflict.  In July Filistin al-Yom TV, Sawt al-Sha'b radio, Sawt al-Quds radio, and al-Aqsa radio broadcasts were disrupted; some reported that messages against Hamas were broadcast over the airwaves.

Palestinians alleged that Israeli authorities circumvented proper procedures as outlined in the Paris Protocols by going directly to the broadcasters, and it put independent stations in a difficult legal position because they received the proper licenses and frequencies from the Palestinian Ministry of Communications and yet Israeli authorities told them they did not have the right to broadcast.  In cases where Palestinian broadcasters ignored Israeli demands to close, Israeli authorities sometimes raided them and seized their equipment.

During the year Palestinian local broadcaster Wattan TV faced additional setbacks in its legal efforts to retrieve its foreign-funded equipment confiscated in 2012 by the IDF from its Ramallah Studio (in Area A of the West Bank).  In June the Israeli High Court of Justice rejected Wattan's petition challenging the confiscation of its equipment, following several hearings during which Wattan's lawyers were not allowed, for security reasons, to view the evidence the IDF presented against Wattan.  While attorneys for Wattan TV argued they effectively proved the broadcasts posed no threat to communications in Israel (such as airport communications), they complained about an opaque legal process that allowed the government to keep testimony even from the parties to the case based on security concerns.

As of the end of the year, Wattan was pursuing a new broadcasting frequency through the Palestinian-Israeli Joint Technical Committee.  Because the Israeli government and the Palestinian Authority do not agree on the process for assigning television frequencies to Palestinian media outlets--with the PA assigning frequencies through the International Telecommunication Union, and Israeli authorities insisting on using the joint technical committee, as specified in the Interim Agreement--the case was not decided by year's end.

Libel Laws/National Security:  While there were some accusations of slander or libel against journalists in the West Bank, there were no reports of legal action taken during the year by the PA.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor                Page 175

ATL004880

## ISRAEL AND THE OCCUPIED TERRITORIES                    87

There were reports, specifically during Operation Protective Edge, that Hamas used security justifications or slander or libel laws to censor public criticism.

There were reports Israeli authorities used security justifications or slander or libel laws to censor public criticism.  In April, Israeli authorities accused al-Quds.com correspondent Muhannad al-Adam of fabricating a story when he posted a photograph of a settlement product being served at a conference held by the Consumer Protection Association to announce the al-Quds Heritage and Creativity Festival.  The undersecretary of the ministry of Jerusalem affairs, in a Facebook posting, claimed the story could be considered libel.

### Internet Freedom

There were no PA restrictions on access to the internet; however, there were reports that the PA, Hamas, and Israel monitored e-mail and internet chat rooms. There were multiple instances in which the PA arrested or detained Palestinians because of their posts on social media.  On September 7, the PA Preventive Security Organization arrested and interrogated blogger Aslan Tawil from Fara'ta village near Qalqilila for his Facebook postings criticizing the Palestinian president.  On October 21, the Palestinian Intelligence Services arrested freelance photographer Ghassan Najajra at his home in Nahaleen village near Bethlehem and charged him with inciting violence against the Palestinian security forces. Najajra's lawyer stated that the accusations were based on Facebook postings written by his client.  He remained in custody until November 6.

Based on anecdotal reports from Palestinian civil society organizations and social media practitioners, Hamas authorities monitored the internet activities and postings of Gaza Strip residents.  Individuals posting negative reports or commentary about Hamas, its policies, or affiliated organizations faced questioning, and at times authorities required them to remove or modify online postings.  No information was available regarding punishment for not complying with such demands.

Israeli authorities did not restrict access to the internet; however, they monitored e-mail and internet chat rooms for security purposes.  During the year the Israeli government arrested a number of Palestinians for incitement, including for posts on social media.  For example, authorities arrested a Palestinian man from Hebron for creating a Facebook page called "The Intifada of Hebron."

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 176

ATL004881

**ISRAEL AND THE OCCUPIED TERRITORIES**          88

**Academic Freedom and Cultural Events**

In the West Bank, the PA did not restrict academic freedom, and there were no known reports of PA censorship of school curricula, plays, films, or exhibits in the West Bank.  Palestinian law provides for academic freedom, but individuals or officials from academic institutions reportedly self-censored curricula.  There were no reports the PA officially interfered with education during the year.  While there was no overt threat to academic freedom, faculty members knew there were security elements' present on university campuses among the student body and faculty, which may have led to self-censorship.

Public and UNRWA schools in Gaza followed the same curriculum as West Bank schools.  Palestinians in Gaza reported that generally there was limited interference by Hamas at the primary, secondary or university levels.  Nonetheless, Hamas reportedly interfered in teaching methodologies or curriculum deemed to violate Islamic identity, the religion, or "traditions" as defined by the de facto authority.  Hamas also interfered if there were reports of classes or activities that mixed genders.

In the Gaza Strip, Hamas authorities sought to disrupt some educational, cultural, and international exchange programs.  Palestinians in Gaza are routinely required to obtain exit permits prior to departing Gaza, and students participating in certain cultural and education programs (including programs sponsored by foreign governments and international organizations) can face questioning from de facto authorities, for example, on the purpose and duration of travel and how the visas were coordinated.  The de facto authorities can and did deny exit for travelers, whether through the Rafah crossing or the Erez crossing.

Hamas authorities also interfered in local cultural programs.  There were continued reports the de facto government suppressed cultural expression that might offend local religious and cultural values and identity.

The Israeli government at times prevented Palestinians from accessing education.  Israeli government forces destroyed at least 90 schools in the Gaza Strip during Operation Protective Edge; because refugees were sheltering in school buildings, the start of the 2014-15 school year was delayed.  Israeli restrictions on movement adversely affected academic institutions and access to education in the West Bank, because Israeli checkpoints, although they decreased in number, created difficulties for students and faculty commuting to schools and university campuses.  In

Country Reports on Human Rights Practices for 2014          Page 177
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004882

numerous instances students reported being late or missing days of classes due to significant delays at checkpoints (see section 2.d.).

The Israeli Supreme Court during the year upheld the 2000 Israeli ban on students from the Gaza Strip attending West Bank universities.  Generally, students in the Gaza Strip did not apply to West Bank universities because they understood Israel would deny permit requests.

During the year Israeli authorities prevented students at schools on the Temple Mount/Haram al-Sharif several times from reaching their classrooms.

Israeli travel restrictions also prevented students in the West Bank and Gaza from participating in study programs abroad.  Israeli officials denied Palestinians travel permits, thus preventing them to transit to Jerusalem for visa interviews or across the Allenby Bridge to Jordan.  In some instances students were asked to submit to security interviews prior to receiving permits and were detained after the security interview.  The travel challenges were particularly acute for Palestinians from Gaza, since Israeli authorities often denied travel permits through Erez.  In these instances Palestinians from Gaza could elect to travel through the Rafah crossing, but frequent border closures and limitations on travel also kept candidates from participating in programs.

**b. Freedom of Peaceful Assembly and Association**

**Freedom of Assembly**

Palestinian law permits public meetings, processions, and assemblies within legal limits.  It requires permits for rallies, demonstrations, and large cultural events, and the PA rarely denied them.  Both the PA and Hamas forces, however, broke up selected protests and demonstrations during the year.  Following two Hamas rallies in the West Bank in 2012 that disbanded without incident, the PA and Hamas agreed to ease their respective five-year bans on rallies.  Due to Hamas allegedly blowing up a number of houses in Gaza owned by leaders of Fatah, however, the PA decided to cancel its planned November 11 commemoration event honoring the 10th anniversary of former PA president Yasser Arafat's death.

In July 2013 HRW issued a press release calling upon the PA to investigate alleged police beatings and arbitrary arrests of demonstrators in Ramallah earlier that month.  According to HRW police injured 10 protesters and arrested five, including three whom police allegedly forcibly removed from a hospital where

ATL004883

they received emergency treatment.  In September 2013 AI issued a report stating
that the PA continued to use unwarranted force against demonstrators.

According to a Hamas decree, any public assembly or celebration in the Gaza Strip
requires prior permission, in contradiction of the PA Basic Law.  Generally, Hamas
did not permit Fatah members to hold rallies.  Activists reported Hamas officials
harassed women in public and impeded their ability to assemble peacefully.

Hamas officials also attempted to impede potential criticism of Hamas policies by
imposing arbitrary demands for the approval of meetings on political or social
topics.

The IDF continued to use a 1967 military order that effectively prohibited
Palestinian demonstrations and limited freedom of speech in the West Bank.  The
order stipulates that a "political" gathering of 10 or more persons requires a permit
from the regional commander of military forces.  The penalty for a breach of the
order is 10 years' imprisonment or a heavy fine.

Various NGOs noted the IDF demonstrated a lack of respect for freedom of
assembly and often responded to demonstrators aggressively.  Israeli security
forces used force, including live fire, against Palestinians and others involved in
demonstrations in the West Bank and East Jerusalem, killing 13 (see section 1.a.).
The IDF used force particularly against weekly protests in or near Areas B and C.
The IDF responded to protests with military crowd-control techniques or force,
using weapons such as tear gas and stun grenades to push back protesters, which
NGOs alleged often amounted to using nonlethal force in a lethal manner.

The IDF Central Command declared new areas of the West Bank to be "closed
military zones" and maintained the same designation for areas adjacent to the
separation barrier in the villages of Bil'in and Ni'lin every Friday during the hours
in which Palestinian, Israeli, and international activists regularly demonstrated.
There were frequent skirmishes between the protesters and IDF personnel.  IDF
and Israeli police personnel stationed on the far side of the barrier during weekly
protests in those villages responded to rock throwing with tear gas, stun grenades,
skunk water, sound bombs, and rubber-coated bullets.  Multiple human rights
organizations stated that the IDF's use of crowd control devices, including
shooting tear gas canisters directly at protesters, constituted lethal use of force.
There were reports the IDF killed at least one person with "nonlethal" crowd
control devices, including sponge rounds, which typically include an aluminum
base and plastic body.

Country Reports on Human Rights Practices for 2014                Page 179
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004884

**ISRAEL AND THE OCCUPIED TERRITORIES**           91

On January 1, an 85-year-old man in Kafr Qaddum reportedly died after inhaling tear gas when a tear gas canister fired at protesters commemorating the 49th anniversary of the Fatah movement landed inside his home.

ACRI continued to report arbitrary restrictions on the freedom of assembly in Jerusalem, including the use of unlawful arrests to intimidate demonstrators.

**Freedom of Association**

In the West Bank, the PA law allows freedom of association, but authorities sometimes limited it, including for labor organizations (see section 7.a.).  In August the media reported that PA security forces raided Future for Palestine, an NGO established by former PA prime minister Salaam Fayyad.

In the Gaza Strip, Hamas attempted to prevent various organizations from operating, including some it accused of being Fatah-affiliated, as well as private businesses and NGOs it deemed to be in violation of its interpretation of Islamic social norms.  The Hamas "Ministry of Interior" has supervisory powers over all NGOs, allowing the ministry to request documents, and there were instances where the de facto authorities temporarily shut down NGOs that did not comply. Activists reported women's rights groups faced significant pressure from Hamas.

Israel maintained prohibitions on some prominent Jerusalem-based Palestinian institutions, such as Orient House, which was the de facto PLO office in Jerusalem and has been closed since 2001, claiming the groups violated the Oslo Accords by operating on behalf of the PA in Jerusalem.

**c. Freedom of Religion**

See the Department of State's *International Religious Freedom Report* at www.state.gov/religiousfreedomreport/.

**d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons**

The PA Basic Law provides for freedom of movement, and the PA generally did not restrict freedom of movement.  The Basic Law does not specify regulations regarding foreign travel, emigration, or repatriation.

Country Reports on Human Rights Practices for 2014           Page 180
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004885

## ISRAEL AND THE OCCUPIED TERRITORIES                    92

Hamas authorities in the Gaza Strip restricted some foreign travel and required exit permits for Palestinians departing through the Gaza-Israel Erez crossing.  Hamas also prevented the exit of some Palestinians from Gaza to protest the purpose of their travel or coerce a behavior change, such as the payment of taxes and fines.  There were some reports unmarried women faced restrictions on their travel.

The IDF restricted Palestinians' movement within the occupied territories and for foreign travel, and, citing military necessity, it increased these restrictions at times.  In July security officials, citing "security reasons," denied 1,463 Palestinians exit to Jordan, although none was arrested, according to Palestinian police data.  This total was more than all denied in 2013 (1,266 persons).  Many reportedly lived abroad and endured economic and social hardship by being forced to stay abroad.

Barriers to movement included checkpoints, a separation barrier that divides the majority of the West Bank from Israel and East Jerusalem, internal road closures, and restrictions on the entry of persons and goods into and out of the West Bank and Gaza Strip.  Restrictions on movement affected virtually all aspects of life, including access to places of worship, employment, agricultural lands, schools, and hospitals, as well as the conduct of journalistic, humanitarian, and NGO activities.

During the year Israel eased the naval blockade off the Gaza Strip coast, extending fishing limits from three to six nautical miles, although from March to May, it temporarily reversed the limit to three miles, citing rocket fire.  Authorities towed fishermen who moved beyond the six-mile mark during the rest of the year to Israeli ports and detained them.

The PA, Hamas, and the Israeli government generally cooperated with humanitarian organizations in providing protection and assistance to internally displaced persons and refugees; however, both Hamas and Israeli officials constrained UNRWA's ability to operate freely in Gaza.  AI and HRW also reported that the Israeli government denied their employees permits to enter Gaza.

In-country Movement:  PA authorities did not interfere with movement within the West Bank.

Hamas authorities did not appear to enforce routine restrictions on internal movement within the Gaza Strip, although there were some areas to which Hamas prohibited access.  Increasing pressure to conform to Hamas's interpretation of Islamic norms led to significant restrictions on movement by women.

Country Reports on Human Rights Practices for 2014            Page 181
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004886

## ISRAEL AND THE OCCUPIED TERRITORIES                93

The Israeli government imposed significant restrictions on movement in the West Bank and between the West Bank and Jerusalem.  During Operation Brother's Keeper, parts of the West Bank were on "lockdown" with residents unable to leave their cities or villages.  Israeli authorities frequently prohibited travel between some or all West Bank towns and deployed "flying" (temporary) checkpoints.  Palestinians who lived in affected villages stated that such "internal closures" continued to have negative economic effects.  During periods of potential unrest and on some major Israeli, Jewish, and Muslim holidays, Israeli authorities enacted "comprehensive external closures," which precluded Palestinians from leaving the West Bank.  Generally, Palestinians could enter Israel and Jerusalem through 11 of 36 checkpoints between the West Bank and Israel.  The IDF also imposed temporary curfews confining Palestinians to their homes during arrest operations.  During the Muslim holy month of Ramadan, Israeli authorities increased restrictions on Palestinians entering Jerusalem and Israel, only allowing entry to Palestinian men age 50 and above and women age 40 and above.  In 2013 authorities allowed men above age 40, women and girls of all ages, and boys below 12 access without permits.  According to Israeli authorities, the number of Palestinians crossing checkpoints into Jerusalem on Fridays during Ramadan dipped significantly.  For example, on July 18, an estimated 16,300 persons crossed the checkpoints, as opposed to approximately 114,400 who crossed on the same date in 2013.

The Israeli government continued construction of the separation barrier, which ran largely inside the West Bank and along parts of the Green Line (the 1949 Armistice line).  By use of special permits, Israel continued to restrict movement and development within this area, including access by some international organizations.  NGOs reported that Israeli authorities allowed many Palestinians separated from their land access to their property only a few days each year.  Private security companies employed by the Israeli government controlled many points of access through the barrier, and international organizations and local human rights groups claimed these companies did not respond to requests to move goods and officials through the barrier.  Many Palestinians and NGOs reported there were higher levels of mistreatment at checkpoints run by security contractors than at those staffed by IDF soldiers.  The barrier affected the commute of children to school in Jerusalem and some farmers' access to land and water resources.  Palestinian farmers continued to report difficulty accessing their lands in Israeli-controlled Area C and in the seam zone, the closed area between the separation barrier and the Green Line.  The NGO Machsom Watch reported that more than 24 Palestinian villages had lands trapped in the seam zone, and a complicated Israeli

Country Reports on Human Rights Practices for 2014                Page 182
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004887

## ISRAEL AND THE OCCUPIED TERRITORIES          94

permit regime (consisting of more than 10 different permits) prevented Palestinians from fully using their lands.

Israel eased restrictions on access to farmland in the Gaza Strip near the boundary with Israel and to fishing areas along the coast.  Despite this easing, reports indicated Israel continued to enforce "buffer zone" restrictions on nonfarmers.  The buffer zone encompassed approximately 24 square miles, representing 17 percent of the Gaza Strip's territory.  OCHA estimated nearly 35 percent of the Gaza Strip's cultivable land was located within the restricted area.

Gaza's fishing waters were partially inaccessible to Palestinians due to Israeli restrictions, but in 2012 Israel eased restrictions on fishing along the coast by allowing fishermen to venture out to six nautical miles instead of the previous limit of three nautical miles.  Israel reduced the limit to three miles from March until May, due to rocket fire that raised security concerns.  The United Nations reported that the timing of the restriction was "of particular concern" and affected the livelihood of approximately 3,500 fishermen.  Israeli naval patrol boats strictly enforced this fishing limit, which was a reduction from 20 nautical miles, as designated under the 1994 Agreement on the Gaza Strip and Jericho Area (later incorporated into the 1995 Interim Agreement).  Israeli naval forces regularly fired warning shots at Palestinian fishermen entering the restricted sea areas, in some cases directly targeting the fishermen, according to OCHA.  The Israeli armed forces often confiscated fishing boats intercepted in these areas and detained the fishermen, while Palestinian fishermen reported confusion over the exact limits of the new fishing boundaries.

During the year Israeli security forces restricted movement around parts of Jerusalem, including the neighborhoods of Beit Hanina, Shufat, Silwan, Ras al-Amud, Wadi al-Joz, Al Tur, Jabal al-Mukabir, and Jerusalem's Old City, where forces established roadblocks and checkpoints.  Israeli security forces also blocked entrances to the Jerusalem neighborhood of Issawiya and frequently established checkpoints at other entrances, inspecting each person entering or leaving the neighborhood.  NGOs alleged Israeli authorities attempted to limit Palestinians' movement in areas under Israeli control.  Military authorities continued to restrict severely Palestinian vehicular and foot traffic in the commercial center of Hebron, citing a need to protect several hundred Israeli settler residents.  They prohibited Palestinians from driving on most roads in downtown Hebron and from walking on Shuhada Street and other roads in the Old City; however, Israeli settlers had free access to these roads.  The prohibition, which began in 2000, resulted in the closure of 1,829 businesses and 1,014 Palestinian housing units, according to

Country Reports on Human Rights Practices for 2014          Page 183
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004888

**ISRAEL AND THE OCCUPIED TERRITORIES**          95

B'Tselem; the IDF closed most shops on the street and sealed entrances to Palestinian houses.  Demolition orders in and around Hebron also threatened single buildings, family homes, and other civilian structures; in some cases authorities subjected entire villages such as Dkaika, southeast of Hebron, to demolition orders. During the year Israeli authorities demolished approximately 600 Bedouin structures, displacing 1,215 persons.

Foreign Travel:  PA authorities did not limit residents' foreign travel.

Hamas authorities in the Gaza Strip enforced movement restrictions on Palestinians attempting to exit Gaza to Israel via the Erez Crossing and to Egypt via the Rafah Crossing.  They occasionally prevented Fatah members and youth activists from exiting through either crossing.  Hamas authorities also restricted some foreign travel and required exit permits for Palestinians wishing to exit through the Gaza-Israel Erez crossing.

Following Operation Protective Edge, Israel partially eased the severe restrictions on movement and access to the Gaza Strip, imposed following Hamas's rise to power in 2007, by allowing cement, steel bars, and a doubling of aggregate materials through the Kerem Shalom crossing under a UN-brokered mechanism. Categories of individuals permitted to enter or exit the Gaza Strip at the Erez Crossing with Israel were largely limited to humanitarian cases; however, the Israeli government also continued to permit a limited number of businesspersons to cross during the year.

Restricted access to Jerusalem had a negative effect on patients and medical staff trying to reach the six Palestinian hospitals there that offered specialized care unavailable in the West Bank.  IDF soldiers at checkpoints subjected Palestine Red Crescent Society (PRCS) ambulances from the West Bank to harassment and delays or refused them entry into Jerusalem even in emergency cases.  When ambulances lacked access, medics moved patients across checkpoints from an ambulance on one side to a second ambulance (usually one of five East Jerusalem-based ambulances) or a private vehicle on the other side.  The PRCS reported hundreds of such actions taken against its teams and humanitarian services during the year.  Most incidents included blocking access to those in need, preventing their transport to specialized medical centers, or maintaining delays at checkpoints for periods sometimes lasting up to two hours.  Most incidents took place at the Qalandiyah and Az-'Za'ayyem checkpoints leading to Jerusalem, while the remainder took place at other checkpoints circling the West Bank.

Country Reports on Human Rights Practices for 2014          Page 184
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004889

## ISRAEL AND THE OCCUPIED TERRITORIES                    96

The IDF restricted students in the Gaza Strip from studying in the West Bank or Israel and limited West Bank Palestinians from university study in Jerusalem and Israel (see section 2.a.). Palestinians possessing Jerusalem identity cards issued by the Israeli government needed special documents to travel abroad. Upon individual requests by Palestinians, the Jordanian government issued passports to them.

According to NGOs, residency restrictions affected family reunification, which did not qualify as a reason to enter the West Bank. For a child in the Gaza Strip, Israeli authorities permitted access to a parent in the West Bank only if no other relative was resident in the Gaza Strip. Israeli authorities did not permit Palestinians who were abroad during the 1967 War, or whose residence permits the Israeli government subsequently withdrew, to reside permanently in the occupied territories. It was difficult for foreign-born spouses and children of Palestinians to obtain residency. Authorities required Palestinian spouses of Jerusalem residents to obtain a residency permit with reported delays of several years to obtain them.

Exile: Neither the PA nor Hamas imposed forced exile.

Continued Israeli revocations of Jerusalem identity cards amounted to forced exile to the occupied territories or abroad. According to HaMoked, an Israeli human rights organization, the Israeli Ministry of Interior again during the year renewed "temporary" orders authorizing the revocation of Jerusalem residency rights from legal residents. Between 1967 and 2013, Israel revoked the status of 14,309 Palestinians from East Jerusalem. In 2013 Israel revoked the residency permits of 106 Palestinians holding Jerusalem identification cards, including 50 women and 24 minors, and reinstated the residency of 35 Palestinians with Jerusalem identification cards. Reasons for revocation included having acquired residency or citizenship in another country, living "abroad" (including in the West Bank or the Gaza Strip) for more than seven years, or, most commonly, being unable to prove a "center of life," interpreted as full-time residency, in Jerusalem. Some Palestinians born in Jerusalem but who studied abroad reported losing their Jerusalem residency status.

## Internally Displaced Persons (IDPs)

OCHA estimated that by August 5, hostilities during Operation Protective Edge internally displaced approximately 520,000 persons in Gaza, who sought shelter in UNRWA schools, public buildings, or with host families. By late August UNRWA housed more than 293,000 IDPs in 85 UNRWA schools across Gaza and

Country Reports on Human Rights Practices for 2014                    Page 185
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004890

## ISRAEL AND THE OCCUPIED TERRITORIES                    97

an additional 45,000 in government schools, resulting in the postponement of the school year due to start on August 24.  The United Nations reported that as of late August, UNRWA registered an additional 137,000 IDPs living with host families.  The United Nations estimated 96,000 Palestinian refugee dwellings--more than twice as many homes as initially estimated--were damaged or destroyed, according to UNRWA's technical assessment completed on December 15.  At year's end UNRWA school buildings continued to serve as shelters for 19,010 IDPs as a result of Operation Protective Edge.

In the West Bank and East Jerusalem, OCHA estimated that house demolitions, as of December 29, displaced 1,177 individuals.  According to OCHA a number of policies drove displacement in the West Bank and East Jerusalem; these included displacements linked to settlement activity.  In Area C and East Jerusalem, authorities have demolished hundreds of Palestinian homes and other structures each year due to the lack of Israeli-issued building permits.  According to OCHA, restrictive planning makes it almost impossible for Palestinians to obtain permits, while providing preferential treatment for Israeli settlements.  OCHA noted that in many cases displacement results from a combination of factors, including settler violence, movement restrictions, and restricted access to services and resources.  Authorities also displaced Palestinians in East Jerusalem due to forced evictions, facilitating takeover of their property by settler organizations, and making it difficult for Palestinians to secure residency status.

In addition to demolition-related displacements, during the year the Israeli government carried out "punitive demolitions" of the homes of individuals suspected of serious crimes and the homes of their families (see section 1.f.).

UNRWA and humanitarian organizations provided services to aid IDPs in the Gaza Strip and West Bank, with some limitations due to Israeli restrictions on movement and border access.

**Protection of Refugees**

Access to Asylum:  There were no reports of persons seeking asylum in the occupied territories.  According to an UNRWA estimate, as of January 1, there were 754,411 registered Palestinian refugees in the West Bank and more than 1.24 million in the Gaza Strip, many living in 27 UNRWA-affiliated refugee camps, 19 of which were in the West Bank and eight in Gaza.  One-quarter of refugees in the West Bank lived in refugee camps.  The refugees included those displaced as a result of the 1948 conflict in Israel and their descendants.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 186

ATL004891

## ISRAEL AND THE OCCUPIED TERRITORIES                  98

Refugee Abuse:  The Israeli government obstructed refugee access to UNRWA-provided humanitarian assistance in the West Bank and the Gaza Strip.  UNRWA estimated that, prior to Operation Protective Edge, more than 70 percent of the population of the Gaza Strip depended on services provided by UNRWA.  Operation Protective Edge affected the entire population of the Gaza Strip, and by mid-August, UNRWA and the World Food Program began food distributions designed to reach the entire 1.8 million population of Gaza.

Israeli security operations in the West Bank and East Jerusalem rose significantly during the year, leading to a sharp increase in both injuries and fatalities to Palestinian refugees.  In 2013 UNRWA began reporting a sharp increase in the number of Palestinian refugees killed and injured during law enforcement activities carried out by Israeli security forces in the West Bank and East Jerusalem.  This trend continued during the year.  UNRWA observed increased IDF use of live ammunition during confrontations with Palestinian refugees.  According to UNRWA, in 2012 there were no Palestinian refugee fatalities and 38 injuries in confrontations with the IDF, none as a result of live ammunition.  In 2013 there were 17 fatalities among refugees, including 15 from the use of live ammunition, and 486 injuries, 49 caused by live ammunition.  As of August 26, there were 17 fatalities among refugees, including 16 from live ammunition, and 697 injuries in and around camps, including 142 caused by live ammunition.

Access to Basic Services:  All UNRWA projects in the West Bank and Gaza Strip required Israeli government permits.  Many planned UNRWA construction projects in the Gaza Strip remained pending approval by Israeli authorities.  Between March 2013 and August 2014, Israeli authorities approved only one new construction project, valued at more than $111 million, of 38 proposed projects UNRWA submitted for approval.  As of late 2012, UNRWA received Israeli approval for the construction of 2,909 housing units (equal to 29 percent of the 10,000 foreseen under the UNRWA Gaza Recovery and Reconstruction Plan).

During the first 11 months of the year, movement restrictions imposed by Israeli authorities on the West Bank resulted in the loss of 22 UNRWA staff days.  During that same period, on 16 occasions at checkpoints entering Jerusalem, Israeli authorities refused to permit UNRWA staff members in UN vehicles to cross without a vehicle search, which UNRWA stated would have violated UN immunity.  On one of these occasions, Israeli authorities carried out an unauthorized vehicle search in violation of the immunity of the United Nations.  On the other 15 occasions, the UN vehicle turned back in order to attempt crossing

Country Reports on Human Rights Practices for 2014                  Page 187
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004892

## ISRAEL AND THE OCCUPIED TERRITORIES                99

at a different checkpoint.  On 11 additional occasions, Israeli authorities carried out unauthorized searches of UNRWA vehicles at other West Bank checkpoints.  UNRWA reported that delivery of services was problematic in the area between the West Bank barrier and the 1949 armistice line, in particular in the Bartaa area and in three refugee communities near Qalqilya.  Essential infrastructure in the Gaza Strip, including water and sanitation services, continued to be in a state of severe disrepair prior to the outbreak of hostilities in July and August, due in part to an inability to import spare parts and components under Israeli import restrictions.  During Operation Protective Edge, Israeli armed forces destroyed electrical, water, and other public infrastructure.  Estimates of the cost to repair the damage ranged from 15.6 billion to as high as 31.2 billion Israeli new shekels ($4-$8 billion).

The deterioration of socioeconomic conditions during the year severely affected refugees in the Gaza Strip, even before Operation Protective Edge.  In 2013 the rate of food insecurity reached 56 percent among refugees, and UNRWA reported that food security continued to deteriorate due to regional developments, tunnel closures, and increases in food prices.

A shortage of school buildings during the year meant that quality of education was a major problem, resulting in a double-shift system, shorter hours, and a high number of students per classroom.  Prior to Operation Protective Edge, UNRWA operated 245 schools in 156 school buildings with more than 230,000 refugee students in the Gaza Strip.  During the 2013-14 school year, approximately 86 percent of UNRWA schools in the Gaza Strip operated on a double-shift system, with an average of 38 pupils per classroom.  During Operation Protective Edge, hostilities damaged 83 of these schools.

**Stateless Persons**

According to NGOs, 40,000 to 50,000 individuals in the Gaza Strip did not have identification cards recognized by Israel.  Some of these persons were born in the Gaza Strip, but Israel never recognized them as residents; some fled the Gaza Strip during the 1967 War; and some left Gaza for various reasons after 1967 and later returned.  A small number were born in the Gaza Strip and never left, and they had only Hamas-issued identification cards.  The Israeli government controlled the Palestinian Population Registry that would allow stateless persons to obtain status.

**Section 3. Respect for Political Rights: The Right of Citizens to Change Their Government**

Country Reports on Human Rights Practices for 2014                Page 188
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004893

**ISRAEL AND THE OCCUPIED TERRITORIES**                   100

The PA Basic Law provides Palestinians with the ability to elect their government through democratic means, but the PA has not held elections in the West Bank, East Jerusalem, or Gaza since 2006.  Residents of the Gaza Strip under Hamas since 2007 were unable to choose their own government or hold it accountable.  Civil society organizations in the Gaza Strip stated that Hamas authorities and other conservative Islamist groups did not tolerate public dissent, opponents, civic activism, or the promotion of values that ran contrary to their political and religious ideology.

### Elections and Political Participation

Recent Elections:  In 2006 the 132-member PLC was elected in a process under the PA Basic Law that international observers concluded generally met democratic standards in providing citizens the ability to change their government peacefully.  Hamas-backed candidates participated in the 2006 PLC elections as the "Change and Reform Movement" and won 74 of 132 seats.  Fatah won 45 seats, and independents and candidates from third parties won the remaining seats.  The PLC lacked a quorum and did not meet during the year.  Although the Israeli government and the PA followed mutually agreed guidelines for Palestinians residing in Jerusalem to vote in 2005 and 2006, Israeli authorities did not allow all Palestinians in Jerusalem to vote, and those who could vote were required to do so via post offices (of which there were few), thereby complicating their ability to vote.  No date was set for new national elections by year's end.

Political Parties and Political Participation:  The PA allowed a diversity of political parties to exist but limited the ability of Hamas members to campaign and organize rallies, although PA officials slightly eased this policy during the year.  In Gaza Hamas allowed other political parties to exist but severely restricted their activities.

Participation of Women and Minorities:  Legally women and minorities can vote and participate in political life on the same basis as men and nonminority citizens, although women faced significant social and cultural barriers in the West Bank.  There were 17 women in the 132-member PLC, which represented West Bank, Gaza, and East Jerusalem districts, and three women in the 23-member cabinet.  There were seven Christians in the PLC and two in the cabinet.  Women faced significant barriers to their political participation in Gaza.  Hamas excluded women from leadership positions.

### Section 4. Corruption and Lack of Transparency in Government

Country Reports on Human Rights Practices for 2014                   Page 189
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004894

Palestinian law provides criminal penalties for official corruption, and the government respected the law, making progress in investigations and prosecutions during the year.

Corruption:  The PA's anticorruption commission consisted of special prosecutors and an anticorruption court with a panel of three judges.  The court closed 13 cases during 2012 and averaged 10 months on each case.  The PA attorney general has responsibility for combating official corruption.  There were allegations of corrupt practices among Fatah officials, particularly the theft of public funds and international assistance funds.

In the Gaza Strip, local observers and NGOs alleged instances of Hamas complicity in corrupt practices, including preferential purchasing terms for real estate and financial gains from involvement in the illegal tunnel trade by the Hamas security forces, but authorities severely inhibited reporting and access to information.

Financial Disclosure:  PA ministers were subject to financial disclosure laws.

Public Access to Information:  PA law requires official PA institutions to "facilitate" acquisition of requested documents or information by any Palestinian, but it does not require agencies to provide such information.  Reasons for denial generally referred to privacy rights and the necessity of security.

## Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

Palestinian human rights groups and several international organizations generally operated without PA restriction, and officials cooperated with their efforts to monitor the PA's human rights practices.  Several PA security services, including the General Intelligence and Palestinian Civil Police, appointed official liaisons who worked with human rights groups.

In the Gaza Strip, Hamas routinely harassed civil society groups, including by dissolving and closing peaceful organizations.  Gaza-based NGOs reported that Hamas representatives appeared at their offices to assure compliance and summoned NGO representatives to police stations for questioning.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 190

ATL004895

## ISRAEL AND THE OCCUPIED TERRITORIES                102

Palestinian, Israeli, and international NGOs monitored the Israeli government's practices in the occupied territories and published their findings, although movement and access restrictions in the West Bank and Gaza Strip made it difficult to work.  The Israeli government permitted some human rights groups to hold and publish press conferences, and it provided the ICRC with access to most detainees.  NGOs reported temporary difficulty in reaching some areas in Gaza during the July-August hostilities.

The United Nations or Other International Bodies:  PA and Israeli officials generally cooperated with and permitted visits by UN representatives or other organizations, such as the ICRC, although there were numerous reports the Israeli government blocked the delivery of humanitarian aid.  There were numerous reports Hamas harassed members of NGOs and international organizations.

The United Nations and international NGOs reported continued difficulty accessing seam zone communities in the northwestern West Bank due to what they considered Israeli authorities' excessive demands for searches of personnel, including UN employees, based on their nationality.

In July the Human Rights Council established an international commission of inquiry "to investigate all alleged violations of international humanitarian law and international human rights law in the 'Occupied Palestinian Territory,' including East Jerusalem, particularly in the occupied Gaza Strip, in the context of the military operations conducted since June 13."  The government of Israel announced it would not cooperate with the commission of inquiry stating that it unfairly focused on Israel and not on terrorist attacks by Hamas.  In November the UN secretary-general announced a board of inquiry to investigate attacks on UN facilities in Gaza during Operation Protective Edge and incidents in which the IDF found weapons at those facilities.  The inquiry continued at year's end.

Government Human Rights Bodies:  The ICHR continued serving as the PA's ombudsman and human rights commission.  The ICHR issued monthly and annual reports on human rights violations within Palestinian-controlled areas; the ICHR also issued formal recommendations to the PA.  The ICHR was generally independent but faced resource shortages that limited its ability to work effectively.

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 191

ATL004896

## ISRAEL AND THE OCCUPIED TERRITORIES                 103

PA law prohibits discrimination based on race, gender, disability, language, or social status.  PA authorities worked to enforce these laws but often failed to do so.  Some laws are discriminatory.  For example, it is illegal for a Palestinian to sell land to Israelis, an offense punishable by death.

Hamas, despite remaining under the authority of Palestinian laws prohibiting discrimination, continued to implement discriminatory policies based on race, political affiliation, gender, and sexual orientation.

Many NGOs alleged Israeli actions in the West Bank and Gaza amounted to racial and cultural discrimination, citing legal differences between the treatment of Palestinians and Jewish settlers in the West Bank.

**Women**

Rape and Domestic Violence:  Rape is illegal under PA law, but the legal definition does not address spousal rape.  Laws that apply in both the West Bank and the Gaza Strip relieve of any criminal responsibility rapists who marry their victim.  Authorities generally did not enforce the law effectively in the West Bank or the Gaza Strip.  Punishment for rape is five to 15 years in prison.  Societal norms led to significant underreporting.  There were reports police treated rape as a social and not a criminal matter and that authorities released some accused rapists after they apologized to their victims.

PA law does not explicitly prohibit domestic violence, but assault and battery are crimes.  Authorities did not enforce the law effectively in domestic violence cases.  NGOs reported women were frequently unwilling to report cases of violence or abuse to police because of fear of retribution, and HRW reported that authorities prosecuted few domestic violence cases successfully in recent years.  Many women and girls stated they believed the legal system discriminated against women.  According to the PA's Central Bureau of Statistics, violence against wives, especially psychological violence, was common in the West Bank and the Gaza Strip.  Police often treated domestic violence as a social instead of criminal matter and regularly returned victims to assailants.

The mandate of the PA Ministry of Women's Affairs is to promote women's rights.  The ministry continued implementing its 2011-13 Cross-Sectoral National Gender Strategy, which seeks to promote gender equality and empower women.  This strategy highlights multiple challenges Palestinian women face that require the attention, cooperation, and coordination of public institutions, NGOs, and the

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 192

ATL004897

**ISRAEL AND THE OCCUPIED TERRITORIES**          104

private sector, as well as international and regional organizations supporting women's problems.  It serves as a reference for developing appropriate and gender-responsive policies to positively influence the socioeconomic and political conditions of women and men and enable women to enjoy fully their rights in equity within Palestinian society.

Female Genital Mutilation/Cutting (FGM/C):  There were reports FGM/C occurred in the past, but none during the year.

Other Harmful Traditional Practices:  Provisions of Palestinian law discriminate against women.  In 2011 President Abbas signed an amendment to the "honor killing" law that removed protection and leniency for perpetrators of crimes in defense of family honor, although some NGOs argued the amendment did not apply to the most relevant articles of the law and thus did not have a noticeable effect.  The Women's Center for Legal Aid and Counseling reported eight "honor killings" in the West Bank and Gaza through March.  The center reported the number of "honor killings" increased to 27 in 2013 from 13 in 2012.

Sexual Harassment:  No law specifically relates to sexual harassment, and it was a significant and widespread problem.  The Geneva Centre for the Democratic Control of Armed Forces and other NGOs reported that for some women, cultural taboos and fear of stigma compelled them to remain silent about sexual harassment.  Some young women claimed they were held responsible for provoking men's harassing behavior.  Authorities in Gaza harassed women for "un-Islamic" behavior, including being in public after dark and walking with an unrelated man.

Reproductive Rights:  Couples and individuals in the Gaza Strip, the West Bank, and Jerusalem had access to contraception.  They lacked information regarding family planning, although UNRWA continued holding workshops for Palestinian men, underscoring their role in family planning.  According to the UN Population Fund, in 2012, 39 percent of women ages 15 to 49 used a modern method of contraception.  There were at least 147 family planning centers in the West Bank and at least 20 in the Gaza Strip, according to the PA Ministry of Health.  High workload, poor compensation, and resource shortages across the occupied territories continued to affect skilled attendance during labor and postpartum care, much of which midwives provided.  Authorities, and community and international NGOs operated HIV/AIDS education, prevention, and screening programs, but there was limited information about the equality of services provided for women.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor          Page 193

ATL004898

### ISRAEL AND THE OCCUPIED TERRITORIES                    105

There were more deaths among mothers and newborns in the Gaza Strip than in the West Bank.  The PA Ministry of Health attributed continued increases in the number of home births to difficulties in reaching hospitals (see section 2.d.).

Discrimination:  While the law provides for equality of the sexes, it also discriminates against women, as do traditional practices.  Women can inherit, but not as much as men.  Men may take more than one wife; although they rarely did in urban areas, the practice was more common in small villages.  Women may add conditions to marriage contracts to protect their interests in the event of divorce and child custody disputes but rarely did so.  Societal pressure generally discouraged women from including divorce arrangements in a marriage contract.  Cultural restrictions associated with marriage occasionally prevented women from completing mandatory schooling or attending college.  Families sometimes disowned Muslim and Christian women who married outside their religious group.  Local officials sometimes advised such women to leave their communities to prevent harassment.

Hamas maintained control of the Gaza Strip and enforced a conservative interpretation of Islam on the Gaza Strip's Muslim population that particularly discriminated against women.  Authorities generally prohibited public mixing of the sexes.  Plainclothes officers routinely stopped, separated, and questioned couples to determine if they were married; premarital sex is a crime punishable by imprisonment.  Hamas's "morality police" also punished women for riding motorcycles, smoking cigarettes or water pipes, leaving their hair uncovered, and dressing "inappropriately" (that is, in Western-style or close-fitting clothing, such as jeans or T-shirts).  Women living in refugee camps in the Gaza Strip stated they felt unsafe using public bathing or latrine facilities and reported a lack of reliable sanitary materials.

Palestinian labor law states work is the right of every capable citizen; however, it regulates the work of women, preventing them from taking employment in dangerous occupations (see section 7.d.).  Women endured prejudice and, in some cases, repressive conditions at work.  Additionally, some employers reportedly provided preferential treatment to their male counterparts.  Women's participation in the workforce was extremely low, although gradually growing, according to PA statistics, with rates particularly low in Gaza.

Female education rates were high, particularly in the West Bank, and women's attendance at universities exceeded men's.  Female university students, however, reported discrimination by university administrators, professors, and their male

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 194

ATL004899

## ISRAEL AND THE OCCUPIED TERRITORIES                    106

peers, according to the Geneva Centre for the Democratic Control of Armed Forces.  In February, Hamas implemented a "modest" dress code at al-Aqsa University in Gaza, drawing criticism from the PA minister of higher education.

According to press and NGO reports, in some instances teachers in Gaza sent home girls not wearing conservative attire in Hamas-run schools, although enforcement was not systemic.

## Children

Birth Registration:  The PA registers Palestinians born in the West Bank and the Gaza Strip, and Israel requires the PA to transmit this information to the Israeli Civil Administration.  Since the PA does not constitute a state, it does not determine "citizenship" alone.  Children of Palestinian parents can receive a Palestinian identity card (issued by the Israeli Ministry of Defense's Civil Administration) if they are born in the occupied territories to a parent who holds a Palestinian identity card.  The PA Ministry of Interior and the Israeli Civil Administration both play a role in determining a person's eligibility.

Israel registers the births of Palestinians in Jerusalem, although Palestinian residents of Jerusalem reported delays in the process.

Education:  Education in PA-controlled areas is compulsory from age six through the ninth grade (approximately 16 years of age).  Education is available to all Palestinians without cost through high school.

In the Gaza Strip, primary education is not universal.  UNRWA and authorities in Gaza provided instruction.  In addition to the PA-provided curriculum, UNRWA provided specialized classes on human rights, conflict resolution, and tolerance.  There were reports Hamas instituted new courses on military training in its schools.

As of September, UNICEF reported 162 attacks on schools in the West Bank, amounting in some instances to periodic denial of access to education.  Israeli authorities and Israeli settlers were responsible for the attacks.  Instances included Israeli military operations inside or near schools, cases of military use of schools by Israeli security forces, and situations in which children lost school time as a result of the detention by Israeli security forces of teachers and schoolchildren while on their way to and from school, or as a result of Israeli security forces causing delays at checkpoints or due to the military convoys.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 195

ATL004900

**ISRAEL AND THE OCCUPIED TERRITORIES**          107

In Jerusalem, Palestinian children did not have access to the same educational resources as Israeli children, and NGOs reported that East Jerusalem needed an additional 2,200 classrooms to provide adequate space for Palestinian children to attend official schools (see section 6, National/Racial/Ethnic Minorities).

Child Abuse:  Child abuse was reportedly a widespread problem.  The law prohibits violence against children; however, PA authorities rarely punished perpetrators of family violence.

Israeli security forces also were responsible for violence against children in custody and during arrest (see section 1.c.) in the West Bank or near the Gaza Strip buffer zone, according to NGO and UN reports.

Doctors Without Borders reported the number of children with posttraumatic stress disorder and other anxiety disorders, including depression, increased in recent years.  The organization attributed a majority of the cases to trauma experienced during Israeli military incursions or as a result of settler violence.  UNICEF and other NGOs reported that children in the Gaza Strip experienced a range of physical and mental distress as a result of Operation Protective Edge, with at least 373,000 children requiring direct and specialized psychosocial support.  The UNICEF-led Child Protection Working Group finalized and disseminated the Child Protection Rapid Assessment and the Child Protection Response Strategy during the year.  Among the main findings of the rapid assessment, 100 percent of respondents confirmed there had been changes in children's behavior as a result of the psychological distress due to Operation Protective Edge, and 54 percent of respondents reported increased aggression toward children, noting that caregivers' attitudes towards children changed following the conflict.  The results of the Child Protection Rapid Assessment were used to improve targeted response to children in Gaza.

Early and Forced Marriage:  Palestinian law defines the minimum age for marriage as 18; however, religious law allows for marriage as young as 15 years old.  Child marriage did not appear to be widespread, according to NGOs, including the Women's Center for Legal Aid and Counseling, although there were reports of child marriage, particularly in the Gaza Strip.  In September a 15-year-old boy reportedly married a 14-year-old girl in Gaza.

Female Genital Mutilation/Cutting (FGM/C):  There were reports FGM/C involving children occurred, although no cases were documented during the year.

ATL004901

**ISRAEL AND THE OCCUPIED TERRITORIES**              108

Sexual Exploitation of Children:  The PA considers statutory rape a felony based on the Jordanian penal code of 1960, which also outlaws all forms of pornography. The minimum age for consensual sex is 18 years old.  Punishment for rape of a victim less than age 15 includes a minimum sentence of seven years.

Child Soldiers:  There were reports Hamas trained children as combatants.

Displaced Children:  Conflict and demolition orders (see section 2.d.) displaced children in the occupied territories.  B'Tselem reported 463 children were displaced due to home demolitions in the West Bank and East Jerusalem during the year.  UNRWA reported that as of December 18, 10,050 children remain displaced in the Gaza Strip as a result of Operation Protective Edge.

**Anti-Semitism**

Approximately 370,000 Jewish settlers lived in the West Bank.  The Jewish population in Gaza, aside from foreign nationals, was nonexistent.  There were an estimated 250,000 Jewish residents of East Jerusalem.

Rhetoric by some Palestinians and Muslim religious leaders included expressions of anti-Semitism and Holocaust denial.  Anti-Israel sentiment was widespread and sometimes crossed the line into anti-Semitism in public discourse, including media commentary longing for a world without Israel and glorifying terror attacks on Israelis.  Following a string of vehicle assaults by Palestinians on Israelis in Jerusalem, the Palestinian press and social media widely circulated cartoons encouraging such attacks.  During the July-August hostilities in the Gaza Strip, some commentators attempted to draw parallels between Israeli military action and Nazi Germany or Israeli bombardment and the 9/11 attacks in the United States. Israeli forces were at times dehumanized in Palestinian media; for example, in August an Israeli fighter pilot was depicted as a snake, and in July a columnist characterized the hostilities as a "battle of humanity against the dogs."  In July an imam in Jerusalem reportedly called for annihilating the Jews.

There were also instances in which Palestinian media outlets published content that was anti-Semitic.  In July an opinion piece published by the PA's *al-Hayat al-Jadida* mentioned "The Protocols of the Elders of Zion" and blood libel as if it were factual.  At times the PA failed to condemn incidents of anti-Semitic expression in official PA traditional and social media outlets.

Country Reports on Human Rights Practices for 2014              Page 197
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004902

**ISRAEL AND THE OCCUPIED TERRITORIES**          109

In the Gaza Strip and the West Bank, there were instances in which media outlets, particularly outlets controlled by Hamas, published and broadcast material that included anti-Semitic content, sometimes amounting to incitement to violence.  In July a televised Hamas sermon promised that Muslims would exterminate the Jews for taking Palestinian land.

## Trafficking in Persons

No PA law specifically prohibits trafficking in persons, and reportedly small numbers of children and adults experienced forced labor conditions in both the West Bank and the Gaza Strip.  There were reports some children worked in forced labor conditions in the West Bank, including in settlements.  These children reportedly faced exploitation and harassment.

NGOs reported employers subjected Palestinian men to forced labor in Israeli settlements in industry, agriculture, construction, and other sectors.  The PA was unable to monitor and investigate abuses in these areas and elsewhere because it does not control its borders and has limitations on its authority to work in Areas B and C.

## Persons with Disabilities

The Palestinian Disability Law was ratified in 1999, but NGOs complained of very slow implementation.  It does not mandate access to buildings, information, or communications, although UNRWA's policy was to provide accessibility in all new structures.  Disability rights NGO Bizchut reported a lack of accessible transportation services in East Jerusalem.

Palestinians with disabilities continued to receive uneven and poor quality services and care.  The PA depended on UN agencies and NGOs to care for persons with physical disabilities and offered substandard care for persons with mental disabilities.  There were reports Israeli authorities placed in isolation detainees deemed mentally disabled or a threat to themselves or others without a full medical evaluation.  According to Physicians for Human Rights-Israel, isolation of prisoners with mental disabilities was common.

Familial and societal discrimination against persons with disabilities existed in both the West Bank and the Gaza Strip.

## National/Racial/Ethnic Minorities

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor          Page 198

ATL004903

**ISRAEL AND THE OCCUPIED TERRITORIES**          110

According to OCHA an estimated 27,500 Bedouin live in Area C in the West Bank.  UNRWA registered many Bedouin as refugees, and Bedouins frequently inhabited areas designated by Israel as closed military zones or as areas planned for settlement expansion.  Forced displacement continued of Bedouin and herding communities in Area C, and many of these communities suffered from limited access to water, health care, education, and other basic services.

**Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity**

Palestinian law, based on the 1960 Jordanian penal code, prohibits consensual same-sex sexual activity, although the PA did not prosecute individuals suspected of such activity.  Societal discrimination based on cultural and religious traditions was commonplace, making the West Bank and Gaza challenging environments for lesbian, gay, bisexual, and transgender (LGBT) persons.  Some Palestinians claimed PA security officers and neighbors harassed, abused, and sometimes arrested LGBT individuals because of their sexual orientation or gender identity.  NGOs reported Hamas also harassed and detained persons due to their sexual orientation or gender identity.

**HIV and AIDS Social Stigma**

While the PA Ministry of Health provided treatment and privacy protections for patients with HIV/AIDS, societal discrimination against affected individuals was common.  Anecdotal evidence suggested societal discrimination against HIV/AIDS patients was also very common in Gaza.

**Other Societal Violence or Discrimination**

OCHA, the Jerusalem Legal Aid Society and Human Rights Center, and other NGOs reported attacks by Israeli settlers on Palestinians and their property in the West Bank.  The attacks included direct violence against Palestinian residents.  Some Israeli settlers reportedly used violence against Palestinians as harassment and to keep them away from land settlers sought to acquire.

Various human rights groups continued to claim settler violence was insufficiently investigated and rarely prosecuted.  Some groups attributed this circumstance in part to the Israeli Civil Administration's neglect of Palestinian complaints, as well as to Palestinian residents' reluctance to report incidents due to fears of settler

Country Reports on Human Rights Practices for 2014                    Page 199
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004904

retaliation or because they were discouraged by the lack of accountability in most cases.  The Israeli NGO Yesh Din reported that authorities closed more than 90 percent of Israeli investigations into offenses against Palestinians in the West Bank without indictments.

On January 6, IDF soldiers allowed masked Israeli settlers to enter the West Bank village of Urif, where they smashed the electric meter of the water reservoir under construction and threw stones at a nearby Palestinian home and the village school. A video recording provided to B'Tselem by a resident of Urif documented the incident.

On January 15, arsonists burned a mosque in the West Bank Palestinian village of Deir Istya.  The arsonists also spray-painted slogans in Hebrew on an exterior wall and door:  "Arabs out," "Hi from Qusra," and "Revenge for spilled blood in Qusra."  (Qusra is the West Bank village where on January 6 Palestinian residents captured and detained a group of Israeli settlers who they claimed were about to engage in violent acts.)

In May an IDF soldier in Hebron was filmed threatening to shoot a Palestinian and told the Palestinian that his job was "to protect Jews, not you."

On July 26, an Israeli settler shot and killed a Palestinian near the northern West Bank town of Huwara.  No action was taken against the Israeli settler by year's end.

In August, B'Tselem published a video that appeared to show IDF soldiers standing passively while Israeli settlers threw stones at Palestinians in Hebron. The soldiers intervened only when Palestinians threw stones in response; the soldiers then used crowd-control measures on the Palestinians.

During the year B'Tselem followed 12 cases in which Palestinians filed complaints with the Israeli police about incidents of settler violence.  According to B'Tselem none of these cases resulted in an indictment.

"Price tag" attacks (property crimes and violent acts by extremist Jewish individuals and groups in retaliation for activity they deemed antisettlement) continued.  For example, in February IDF soldiers allegedly sprayed anti-Arab graffiti in Beit Ummar in the West Bank.  In June vandals wrote "Death to Arabs" and "Price Tag" on a wall and allegedly attempted to attack a Palestinian man in Maale Adumim.  The Jerusalem district attorney indicted three Israelis in

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 200

ATL004905

connection with the incident, and the case was pending at year's end.  On October
1, a group of settlers burned a mosque in Aqraba village near the West Bank city of
Nablus.  Graffiti on the walls of the mosque read "Death to Arabs," "Revenge and
Paying the Price," and "Muhammed is a pig."

In July groups of Israelis, some of whom chanted "Death to Arabs," attacked
Palestinians in Jerusalem on at least two occasions, resulting in the hospitalization
of victims.  The INP arrested 10 suspects; as of August they awaited trial.

Access to social and commercial services in Israeli settlements in the West Bank,
including housing, education, and health care, was available only to Israelis.
Israeli officials discriminated against Palestinians in the West Bank and Jerusalem
regarding access to employment and legal housing by denying Palestinians access
to registration paperwork.  In both the West Bank and Jerusalem, Israeli authorities
placed often insurmountable obstacles in the way of Palestinian applicants for
construction permits, including the requirement they document land ownership in
the absence of a uniform post-1967 land registration process, high application fees,
and requirements that new housing be connected to often unavailable municipal
works.

According to B'Tselem, in 2000 Israel began curtailing the Palestinian population
registry by denying paperwork to Palestinians and effectively declaring
Palestinians illegal residents.  Some Palestinians defined as illegal residents faced
harassment, arrest, or deportation to the Gaza Strip.

The World Bank reported that Palestinians suffered water shortages, noting
approximately half of the domestic water supply for Palestinians was purchased
from Israel.  Oslo-era agreements limited Palestinians in the amount of water they
can draw from West Bank aquifers.  According to AI, Palestinians received an
average of 18.5 gallons of water per person per day, falling short of the World
Health Organization's standard of 26.5 gallons per person per day, the minimum
daily amount required to maintain basic hygiene standards and food security.
Political constraints limited the PA's ability to improve water network
management and efficiency, including the requirement for Israeli approval to
implement water-related projects and the PA's lack of authority in Area C to
prevent theft from the network, as well as the PA's own management problems.

During Operation Protective Edge, the IDF destroyed water and electricity
infrastructure in Gaza, resulting in severe water shortages and closing Gaza's only
power plant.  The Israeli military continued to destroy water cisterns, some of

Country Reports on Human Rights Practices for 2014                    Page 201
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004906

which donor countries had funded for humanitarian purposes. The Israeli military also destroyed unlicensed Palestinian agricultural wells, particularly in the Jordan Valley area of the West Bank, claiming they depleted aquifer resources.

Palestinians living within the borders of the Jerusalem Municipality, but cut off from it by the separation barrier, reported that the municipality failed to provide basic services, including water, police, and infrastructure. NGOs estimated that from March to June thousands of residents of Shufat refugee camp and Ras Khamis neighborhood suffered from limited access to water.

NGOs alleged that Jerusalem municipal and Israeli national policies aimed at decreasing the number of Palestinian residents of Jerusalem. Government-sponsored construction of new Israeli housing units continued, while building permits were difficult to obtain for Palestinian residents of Jerusalem, and homes built by Palestinian residents without legal permits were subjected to demolition. The Israeli NGOs Bimkom and Ir Amim stated that Palestinians in East Jerusalem continued to face barriers to purchasing property or obtaining building permits. Land owned or populated by Palestinians (including Israeli-Palestinians) was generally zoned for low residential growth. Approximately 30 percent of East Jerusalem was designated for Israeli residents. Palestinians were able in some cases to rent Israeli-owned property but were generally unable to purchase property in an Israeli neighborhood. Israeli NGOs stated that only 13 percent of all land in East Jerusalem was available for construction and that, in the Israeli neighborhoods of East Jerusalem, land was not available for Palestinian construction.

The Israeli government and Jewish organizations in Jerusalem made efforts to increase Israeli property ownership or underscore Jewish history in predominantly Palestinian neighborhoods of Jerusalem.

Although Israeli law entitles Palestinian residents of Jerusalem to full and equal services provided by the municipality and other Israeli authorities, the Jerusalem Municipality failed to provide sufficient social services, infrastructure, emergency planning, and postal service for Palestinian neighborhoods in Jerusalem. Palestinian residents constituted approximately 35 percent of Jerusalem's population but received only 10 to 15 percent of municipal spending. According to ACRI, 75 percent of Jerusalem Palestinians lived in poverty, and 82 percent of East Jerusalem children lived below the poverty line. Only 53 percent of students attended official municipal schools. There was a chronic shortage of more than 2,000 classrooms in East Jerusalem's official school system, and despite commitments made by Israeli authorities and a high court ruling that the

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 202

ATL004907

**ISRAEL AND THE OCCUPIED TERRITORIES**                114

municipality must fill the gap of missing classrooms in East Jerusalem by 2016, authorities built only 150 classrooms in the last five years.  The municipality reported that 400 classrooms were in various stages of planning or construction.  Bus services in Jerusalem were largely segregated between Israelis and Palestinians.  Light rail service completed in 2010 served both Palestinian and Israeli populations and crossed into East Jerusalem; NGOs reported, however, that of the 24 stops on the light rail, only five were in Palestinian neighborhoods.

## Section 7. Worker Rights

Fatah and Hamas signed a reconciliation agreement in April and PA President Abbas subsequently formed an interim government of independent technocrats, but the PA exerted only limited influence in Gaza.  Hamas continued to maintain de facto control of the government and worker rights in Gaza.

## a. Freedom of Association and the Right to Collective Bargaining

PA law provides for the rights of workers to form and join independent unions and conduct legal strikes.  The law requires collective bargaining to be conducted without any pressure or influence but does not explicitly provide for the right to collective bargaining.  Antiunion discrimination and employer interference in union functions are illegal, but the law does not specifically prohibit termination due to union activity.

The PA labor code does not apply to civil servants or domestic workers, although the law allows civil servants the right to form unions.  The requirements for legal strikes are cumbersome, and strikers had little protection from retribution.  Prospective strikers must provide written warning two weeks in advance of a strike (four weeks in the case of public utilities).  The PA Ministry of Labor can impose arbitration; workers or their trade unions face disciplinary action if they reject the result.  If the ministry cannot resolve a dispute, it can be referred to a committee chaired by a delegate from the ministry and composed of an equal number of members designated by the workers and the employer, and finally to a specialized labor court.

The government did not effectively enforce labor laws, and procedures were subjected to lengthy delays and appeals.  The PA's labor law had not been fully implemented at year's end, and labor unions claimed the current system benefitted employers.  Authorities had not established a specialized labor court as required by labor legislation.  Some judges received training in labor regulations, which

Country Reports on Human Rights Practices for 2014                **Page 203**
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004908

**ISRAEL AND THE OCCUPIED TERRITORIES**            115

reportedly improved the time to process a labor case to approximately one year. The PA enforced the prohibitions on antiunion discrimination and employer interference in union functions; however, it inconsistently enforced laws regarding freedom of association.  The PA did not seek to enforce collective bargaining rights for unions, with the exception of those representing PA employees.

Freedom of association and the right to collective bargaining were respected, with some significant exceptions.  On November 9, PA security forces arrested Bassam Zakarneh, head of the PA Public Employees Union, along with his deputy, following the completion of a long-term partial strike as well as a one-day full strike to protest the lack of a cost-of-living allowance.  The PA's Ministry of Labor released a statement justifying the arrests under a 2012 presidential declaration that the union "operated without union status" and was therefore in violation of PA laws.  Authorities subsequently released both men pending trial.  Public sector workers engaged in frequent protests and some strikes over the delayed payment of wages at the beginning of the year.  In September and November, the public employee union organized strikes aimed at securing a cost of living increase, among other demands.  The union canceled the strikes when the PA agreed to review and address the union's demands.

Labor unions were not independent of authorities and political parties.  In 2007 Hamas replaced Fatah-affiliated union leaders with Hamas members or sympathizers in the Gaza Strip, and during the year it maintained restrictions on union membership.

Two main labor unions in the West Bank (the Palestinian General Federation of Trade Unions and the Federation of Independent and Democratic Trade Unions and Workers) competed for membership and political recognition.  There were no reports of politically motivated terminations of union leaders.

Israeli law applies to Israeli settlements in the West Bank and Jerusalem, but it was not enforced uniformly.  Despite a 2008 high court ruling requiring Israeli law to be applied to workers in settlements, most settlements applied Jordanian labor law to Palestinian workers, which was the applicable law prior to 1967 and provides for lower wages and fewer protections than Israeli law.  Palestinian workers in Jerusalem often joined West Bank unions or the Israeli General Federation of Labor (Histadrut); however, they could not vote in Histadrut elections.

**b. Prohibition of Forced or Compulsory Labor**

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 204

ATL004909

**ISRAEL AND THE OCCUPIED TERRITORIES**          116

Forced labor occurred in the occupied territories.  PA law does not expressly forbid forced or compulsory labor.  A western government's labor research found no evidence of laws against trafficking children.  Women working as domestic workers were vulnerable to forced labor conditions in both the West Bank and the Gaza Strip, since the PA does not regulate domestic labor within households.  Forced child labor also occurred (see section 7.c.).

Also see the Department of State's Trafficking in Persons Report at www.state.gov/j/tip/rls/tiprpt/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The Palestinian Authority has no unified or comprehensive set of child labor laws.  The Unified Labor Law of 2000 and the Palestinian Child Law of 2004 prohibit the employment of any person less than age 15.  The law classifies children as those under age 18 years, and it restricts employment for those between 15 and 18.  The law permits hiring children between 15 and 18 for certain types of employment under set conditions.  The law allows children younger than age 15 to work for immediate family members under close supervision.

The law prohibits children from working more than 40 hours per week, operating certain types of machines and equipment, performing work that might be unsafe or damage their health or education, and working at night, in hard labor, or in remote locations far from urban centers.  The law was amended in 2012 by presidential decree to include provisions on child labor accompanied by explicit penalties for violations.  For example, the penalty for child labor in dangerous working conditions is a fine ranging from 1,000 to 2,000 Jordanian dinars ($1,410 to $2,820) per child.  Repeat offenders can be penalized by having the fines doubled and/or full or partial closure of their facility.

Due to inadequate resources and logistical difficulties, PA authorities did not effectively enforce the law.  The Ministry of Social Affairs is charged with coordinating efforts to protect children's rights, while the Ministry of Labor's Inspection and Protection Administration is responsible for enforcing the law.  The Ministry of Labor reported that 29 percent of its labor inspectors had training and experience in dealing with child labor, a proportion it recognized as insufficient, although an increase from prior years.  Many cases of child labor violations reportedly occurred in home environments, for example, on family farms, which were not open to labor ministry inspection.  Child protection officers with the Ministry of Social Affairs and Ministry of Labor reported that only employers who

Country Reports on Human Rights Practices for 2014          Page 205
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004910

hired children less than age 15 to work in dangerous conditions or hazardous jobs were referred to the attorney general for prosecution; the ministry referred only a few cases during the year.  The Ministry of Labor requires that employers keep lists of employees, including children, although some employers reportedly did not keep accurate records of children they employed, hiding them from inspection.  PA officials reported fining "numerous" persons after successful investigations conducted by the PA Ministry of Labor in recent years.  The ministry inspected only businesses operating in the formal economy and was unable to conduct investigations in the Gaza Strip.  It did not have access to Israeli-controlled Area C of the West Bank (nearly 60 percent of the West Bank), where child economic exploitation and labor were most likely to occur, according to PA officials.

The PA estimated 3.5 percent of children between the ages of 10 and 17 worked in the West Bank and Gaza.  Palestinian child laborers generally worked on family farms, in shops, as roadside and checkpoint street vendors, in car washes, in factories, or in small manufacturing enterprises.  They were vulnerable to forced labor.  Conditions were especially poor for Palestinian children working as street vendors, many of whom worked all day without food or water and were subjected to abuse.

During the year many smuggling tunnels, which had previously employed some children, closed.  Hamas reportedly did not enforce child labor laws in Gaza; in some cases Hamas reportedly encouraged children to work gathering gravel and scrap metal from bomb sites to sell to recycling merchants.  There were reports Hamas trained children as combatants.

The Israeli government stated it did not issue permits for Palestinian West Bank residents younger than age 18 to work in Israeli settlements, except in the Jordan Valley, where the law allows work permits for persons age 16 and older; however, according to the PA, children entered the settlements or crossed into Israel to seek work.  The PA reported that Palestinian children working in Israeli settlements in the West Bank without legal protection or labor inspectors faced security problems, exploitation, and harassment.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at www.dol.gov/ilab/reports/child-labor/findings/.

### d. Discrimination with Respect to Employment or Occupation

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 206

ATL004911

**ISRAEL AND THE OCCUPIED TERRITORIES**          118

The law and regulations do not prohibit discrimination regarding race, language, sexual orientation and/or gender identity, HIV-positive status or other communicable diseases, or social status.  Laws prohibit discrimination on the bases of gender and disabilities; however, the government did not effectively enforce those laws and regulations.

There was discrimination based on the above categories with respect to employment and occupation.  For further discussion of discrimination on the basis of gender, sexual orientation, HIV status, and disability, see section 6.

**e. Acceptable Conditions of Work**

The PA cabinet approved a minimum wage of 1,450 new Israel new shekels ($370) per month, which went into effect at the beginning of the year.  Palestinians working in Israeli settlements reported they continued to receive wages lower than the Israeli minimum wage, despite a 2008 high court ruling that Israeli labor laws apply to relations between Palestinian workers and Israeli employers in settlements in the occupied territories.  In 2011, the date of the most recent official estimate, the PA estimated 25.8 percent of the residents in the occupied territories lived below the poverty line.

According to PA law, the maximum official Sunday to Thursday workweek was 48 hours.  The law also allows for paid official and religious holidays, which may not be deducted from annual leave.  Workers must be paid time and a half for each hour worked beyond 45 hours per week and may not perform more than 12 hours of overtime work per week.

The PA Ministry of Labor was responsible for setting occupational health and safety standards, but its enforcement ability was limited, in part due to lack of staff. The ministry employed 42 labor inspectors during the year; ministry officials estimated they would need at least 300 inspectors to enforce the labor laws adequately.  The PA did not effectively monitor smaller worksites, which were at times below legal safety standards.  In 2013 the Ministry of Labor reported 752 workplace injuries, including 20 fatalities.  By law workers do not have the legal protection to remove themselves from situations that endangered their health or safety without jeopardy to their employment.

The PA was unable to monitor labor conditions in the Gaza Strip and had no authority to monitor labor safety in the 60 percent of the West Bank designated as Area C under the terms of Oslo-era agreements with Israel.  The ministry cannot

Country Reports on Human Rights Practices for 2014          **Page 207**
United States Department of State • Bureau of Democracy, Human Rights and Labor

ATL004912

enforce Palestinian labor law in seam zones, the area east of the Green Line and west of Israel's barrier wall, in Israel (where Palestinians were employed on permits or illegally), or in Israeli settlements in the West Bank. Israeli authorities did not conduct labor inspections in Israeli settlements, where Palestinian workers constituted a significant part of the workforce. The lack of a competent labor authority in the settlements increased workers' vulnerability to exploitation. NGOs such as Kav LaOved stated that exploitative practices in Israeli settlements were widespread. Israeli NGOs brought some cases in Israeli labor courts on behalf of Palestinian workers employed by enterprises in the settlements. The PA Ministry of Labor reported the number of Palestinians who raised cases against settlers during the year remained very low.

Working conditions with respect to minimum wage and occupational safety and health were poor. Reportedly, 59.9 percent of laborers (378,868 persons) worked in the large informal sector. Some of the activity included work in illegal smuggling tunnels between the Gaza Strip and Egypt, but the majority of the dangerous work conditions occurred across multiple jobs, including rubble and garbage collection, working as street vendors, manufacturing, construction, as car mechanics, in metal workshops, on poultry farms, in solid waste collection, collecting gravel, and in building demolition.

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

Page 208

ATL004913

# EXHIBIT 6

Case 2:16-cv-04435-PA-MRW   Document 74-14   Filed 05/01/17   Page 172 of 360   Page ID #:5664

A/HRC/29/CRP.4

Distr.: Restricted
24 June 2015

English only

**Human Rights Council**
**Twenty-nine session**
Agenda items 7
**Human rights situation in Palestine and other occupied Arab territories**

## Report of the detailed findings of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1* **

*Summary*

    The present document contains the detailed finding of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1. The commission's principal findings and recommendations are provided in document A/HRC/29/52.

---

  * Reproduced as received.
  ** The information contained in this document should be read in conjunction with the report of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1 (A/HRC/29/52).

GE.15-10383 (E)
*1510383*

Please recycle

Page 210

ATL004914

# Contents

| | | | Paragraphs | Page |
|---|---|---|---|---|
| I. | Introduction | ....................................................................................... | 1-5 | 3 |
| II. | Mandate and methodology | ................................................................... | 6-21 | 3 |
| | A. | Assessment of information and standard of proof ........................................... | 14-21 | 5 |
| III. | Legal framework | ................................................................................. | 22-52 | 7 |
| | A. | International humanitarian law ................................................................ | 23-37 | 7 |
| | B. | International human rights law ................................................................ | 38-46 | 12 |
| | C. | International criminal law ..................................................................... | 47-52 | 15 |
| IV. | Context | ............................................................................................ | 53-58 | 17 |
| V. | Principal findings and conclusions ............................................................ | 59-550 | 18 |
| | A. | The Gaza Strip and Israel .................................................................... | 59-502 | 18 |
| | B. | The West Bank, including East Jerusalem ................................................... | 503-550 | 133 |
| VI. | Impact | ............................................................................................. | 551-600 | 147 |
| | A. | Israel........................................................................................... | 556-572 | 148 |
| | B. | Gaza ............................................................................................ | 573-600 | 153 |
| VII. | Accountability | .................................................................................. | 601-667 | 160 |
| | A. | Israel............................................................................................ | 607-651 | 162 |
| | B. | Palestine ....................................................................................... | 652-661 | 176 |
| | C. | Assessment .................................................................................... | 662-667 | 179 |
| VIII. | Conclusions and recommendations ............................................................ | 668-685 | 180 |
| | A. | Concluding observations ...................................................................... | 668-675 | 180 |
| | B. | Recommendations.............................................................................. | 676-685 | 182 |

ATL004915

## I.   Introduction

1.      On 23 July 2014, the Human Rights Council, in its resolution S-21/1, decided to
"urgently dispatch an independent, international commission of inquiry to investigate all
violations of international humanitarian law and international human rights law in the
Occupied Palestinian Territory, including East Jerusalem, particularly in the occupied Gaza
Strip, in the context of the military operations conducted since 13 June 2014, whether
before, during or after, to establish the facts and circumstances of such violations and of the
crimes perpetrated and to identify those responsible, to make recommendations, in
particular on accountability measures, all with a view to avoiding and ending impunity and
ensuring that those responsible are held accountable, and on ways and means to protect
civilians against any further assaults, and to report to the Council at its twenty-eighth
session."   Pursuant to resolution S-21/1, the President of the Council appointed three
experts to the commission: William Schabas (Chair), Mary McGowan Davis and Doudou
Diène.

2.      The members of the commission formally began their work on 16 September 2014.
Following the resignation of Professor Schabas on 2 February 2015, the President of the
Council designated Justice Davis as the Chair. The Office of the United Nations High
Commissioner for Human Rights (OHCHR) established a secretariat to support the
commission. Notwithstanding the urgency expressed by the Council to dispatch the
commission, the secretariat was not fully constituted until the end of November 2014.

3.      The commission repeatedly requested Israel to cooperate, including by granting it
access to Israel and the Occupied Palestinian Territory, including the West Bank, East
Jerusalem and the Gaza Strip. Regrettably, Israel did not respond to these requests.
Subsequently, the commission learned from a press release that no such cooperation would
be forthcoming. The Government of Egypt, when requested to facilitate entry into the Gaza
Strip through the Rafah crossing, responded that it was not possible owing to the prevailing
security situation. The commission wishes to thank the Government of Jordan for
facilitating its two visits to Amman.

4.      The commission received full cooperation from the State of Palestine, including the
Permanent Observer Mission of the State of Palestine to the United Nations Office at
Geneva. It met with representatives of Palestinian ministries in Amman, who provided a
range of documents. The commission also spoke to members of the authorities in Gaza,
who submitted several written reports to the commission.

5.      The commission addressed to the Government of Israel and the Government of the
State of Palestine a list of questions relating to specific incidents and legal and policy
issues. A comparable list of questions was also sent to Hamas. Only the State of Palestine
responded to the requests.

## II.   Mandate and methodology

6.      The commission interpreted its mandate as requiring it to examine alleged violations
of international human rights law and international humanitarian law occurring between 13
June and 26 August 2014 across the Occupied Palestinian Territory, in particular in Gaza,
and in Israel, and to determine whether such violations had been committed. It examined
existing accountability mechanisms and their effectiveness, and the immediate and
continuing impact of the military operations on the affected populations and their
enjoyment of human rights. The commission considered that the victims and their human
rights were at the core of its mandate. Its activities were thus informed by the wish to

ATL004916

A/HRC/29/CRP.4

ensure that the voices of all victims are heard, and that the commission's recommendations will strengthen the protection of the civilian population in the Occupied Palestinian Territory and in Israel.

7.      The normative framework for the commission was international law, in particular international human rights law and international humanitarian law and, where applicable, international criminal law.

8.      The commission is grateful to the many victims and witnesses who shared their experiences and other relevant information. The fact that, despite its repeated requests, the commission was not granted access to the Occupied Palestinian Territory and Israel posed a challenge for conducting interviews in person with victims and witnesses and made viewing the sites where violations were alleged to have been committed impossible. Owing to the restrictions on movement preventing victims and witnesses from leaving Gaza, the commission obtained first-hand testimony by means of interviews conducted via Skype, videoconference and telephone. It conducted confidential interviews with victims and witnesses from the West Bank in Jordan (in November 2014 and January 2015) and with victims and witnesses from Israel in Geneva (in January 2015).  In October and December 2014, the commission called for written submissions and at the end of January, the deadline for receiving them was extended to 15 February 2015.   Notwithstanding this deadline, the commission continued to consider submissions until the finalization of the report.

9.      The commission is grateful for the valuable contribution made to its work by OHCHR, United Nations agencies and programmes, non-governmental organizations and experts. It thanks those non-governmental organizations, including human rights organizations, who work tirelessly to document individual cases of alleged violations of international human rights law and international humanitarian law in the region for their invaluable support. It notes that a number of Israeli non-governmental organizations were reluctant to cooperate with the Commission of Inquiry, fearing in some cases that there could be negative repercussions on their work.  In the case of some Palestinian non-governmental organizations, the decision to cooperate came at an extremely late stage of the commission's work.  Some sources requested that their submissions be treated confidentially for fear of the possible consequences of testifying before the commission, including for their safety. Primary responsibility for protecting victims, witnesses and other persons cooperating with the commission rests with their States of residence and nationality.[1]

10.     The commission considered holding public hearings to offer witnesses and victims from both sides the opportunity to speak directly to the international community.  However, this was not feasible in the timeframe accorded to the commission.  Given the delays in setting up the Secretariat, the lack of access to Gaza, Israel and the West Bank, the obstacles to freedom of movement for people in Gaza, and the importance of prioritizing the documentation of possible violations, the commission ultimately decided to focus on conducting individual meetings and interviews with victims and witnesses and issuing a public call for submissions.  The commission hopes to eventually make public as much of the material received as confidentiality permits.

11.     In order to document specific violations against children and the impact of the war on children, the commission interviewed representatives of local and international non-governmental organizations and United Nations agencies working on children's rights in Gaza, Israel and the West Bank. The commission also heard from medical doctors who

---

[1] Due to protection concerns, throughout this report witness testimony is referred to by using a witness number.

4

ATL004917

worked in hospitals in Gaza and the West Bank during last summer's hostilities, who described their impact on children's health.

12.     With a view to gathering information on the impact of the 2014 hostilities on women and girls, the commission interviewed members of international and local women's rights organizations who worked directly with women in Gaza during the hostilities. In addition, local organizations submitted information and a large number of signed and verified affidavits by female victims/witnesses in the Gaza Strip and the West Bank to the commission. The commission also interviewed Israeli women.

13.     Given its restricted access, its limited resources and the short time frame available for its inquiry, the commission selected incidents on the basis of certain criteria, in particular, the gravity of the allegations of violations of international humanitarian law and international human rights law; their significance in demonstrating patterns of alleged violations; access to victims, witnesses and supporting evidence; and the geographic location of the incident.

## A.     Assessment of information and standard of proof

14.     The commission and its secretariat conducted more than 280 interviews with victims and witnesses and received more than 500 written submissions and other documentation from a wide range of sources, including eyewitnesses, affidavits, medical reports, expert weapons analyses, satellite imagery, video film footage and other photographic evidence from incident sites and injury documentation, as well as written submissions, including expert legal opinions.  It reviewed information publicly available, including that on official websites of the Government of Israel.

15.     The commission used the totality of this information in making its assessments, while carefully considering the credibility and reliability of sources. It gave particular weight to first-hand testimonies, recognizing the limitations resulting from the fact that the interviews were done remotely, the lapse in time since the incidents occurred, and the possibility of reprisals.  In many cases, as a result of the constraints imposed on the commission, in particular in terms of access, it was not possible to establish with certainty the factual circumstances of a given incident.

16.     The commission decided to use the overall fatality figures provided by the UN Protection Cluster, which are based on a variety of different sources.  The methodology has been explained as follows: "The Protection Cluster is the mechanism for coordinating humanitarian action by humanitarian organizations (UN and non-UN) working in the protection sector.  OHCHR leads the Protection Cluster in the OPT.  OHCHR compiled figures on fatalities in its capacity as leader of the Protection Cluster. The methodology used involves the compilation of initial reports of fatalities from the media and other sources which are then crosschecked and verified in collaboration with a number of international, Palestinian and Israeli partner organizations. Where available, each individual's name, age, sex and place of death is determined, as well as their status as a civilian or combatant where possible. Multiple sources are cross-referenced, not only from media and various human rights organizations, but also information released by the IDF and by the Palestinian armed groups regarding the identity of combatants. Information from the Ministry of Health in Gaza is one, but not an exclusive, source of information. Verification of the information collected is continuing.  Figures are published on the website of OCHA on behalf of the Protection Cluster."[2]     While the casualty figures

---

[2]   A/HRC/28/80/Add.1, para.24, footnote 43.

gathered by the United Nations, Israel, the State of Palestine and non-governmental organizations differ, regardless of the exact proportion of civilians to combatants, the high incidence of loss of human life and injury during the 2014 hostilities is heartbreaking.

17.     In terms of fatality and casualty figures related to specific incidents, the commission, whenever possible, cross-checked information from witnesses against lists provided by different sources. However, in a number of cases, many members of the same family, often with similar names and children of more or less the same age were among the victims, which sometimes made it difficult to determine how many individuals actually were killed. In addition, divergent figures may have emerged because some people who were seriously injured during attacks died soon afterwards, either while being transported to or in a hospital or clinic.

18.     In terms of determining which weapons were used in the various incidents, the lack of cooperation by Israel made viewing the scenes of incidents and gathering first hand observation of damage and other related evidence - key to assessing the veracity of witness testimonies – impossible. The commission was therefore constrained to gather and evaluate witness statements and study photographic evidence showing injuries, damage and ordnance remnants that were provided by third party sources. In addition, the commission reviewed open source information as to the weapons resources; their delivery means; and their effects. All available materials relating to specific incidents were reviewed by a military expert – who has had extensive command and operational experience during the course of a long military career – to determine what kinds of weapons were most likely to have been used and whether they may reasonably have been employed given the specific tactical situation.

19.     Consistent with the practice of other United Nations fact-finding bodies,[3] the commission employed a "reasonable ground" standard in its assessment of incidents investigated and patterns found to have occurred. This means that the commission, on the basis of reliable and consistent information, was satisfied that "a reasonable and ordinarily prudent person would have reason to believe that such an incident or pattern of conduct had occurred."[4]  The assessment in each case considered two elements: 1) the reliability and credibility of the source, taking into account its nature and objectivity, the quality of previously submitted information and the methodology utilized by the source, and 2) the validity and veracity of the information itself on the basis of cross-checking witness testimony against photographic evidence and other materials relating to the same incidents provided by other sources.

20.     The factual conclusions formed the basis for the legal analysis of the individual incidents and their qualification as possible violations of international human rights law or humanitarian law. As the "reasonable ground" threshold is lower than the standard required in criminal trials, the commission does not make any conclusions with regard to the responsibility of specific individuals for alleged violations of international law.

21.      Finally, the commission notes that "[u]nder international humanitarian law and the Rome Statute, the death of civilians during an armed conflict, no matter how grave and regrettable, does not in itself constitute a war crime. International humanitarian law and the Rome Statute permit belligerents to carry out proportionate attacks against military objectives, even when it is known that some civilian deaths or injuries will occur. A crime occurs if there is an intentional attack directed against civilians [...] or an attack is launched

---

[3]   United Nations Office of the High Commissioner for Human Rights (OHCHR): *Commissions of Inquiry and Fact-finding-missions on international human rights and humanitarian law. Guidance and Practice.* 2015 at http://www.ohchr.org/Documents/Publications/CoI_Guidance_and_Practice.pdf

[4]   See also A/HRC/25/63, para.22

6

on a military objective in the knowledge that the incidental civilian injuries would be clearly excessive in relation to the anticipated military advantage […]."[5]

# III.   Legal Framework

22. The mandate of the commission is to investigate all alleged violations of international humanitarian law and international human rights law, in the occupied Palestinian territory, and to establish facts and circumstances of such violations and examine whether crimes were perpetrated. Consequently, the work of the commission was carried out within the framework of international humanitarian law, international human rights law and international criminal law.

## A.   International humanitarian law

23.    In situations of armed conflict, all parties to the conflict are bound by the applicable rules of international humanitarian law, whether customary or treaty based.

24.    With regard to treaty law, Israel is a party to the four Geneva Conventions of 12 August 1949 and its Additional Protocol III, relating to the adoption of a distinctive emblem, but has not ratified Additional Protocols I and II on the protection of victims of international armed conflicts and non-international armed conflicts. Israel is also a party to the Convention prohibiting Certain Conventional Weapons of 1980 and its Protocols I and IV on non-detectable fragments and blinding laser weapons, respectively, and amended Protocol II prohibiting, mines, booby-traps and other devices. While Israel has not ratified the Additional Protocols I and II to the 1949 Geneva Conventions, it accepts that some of their provisions accurately reflect customary international law.[6] While Israel is not a party to the Fourth Hague Convention on the War on Land and its annexed Regulations of 1907, the Government of Israel has recognized that the Regulations reflect customary international law.[7]

25.    The 1907 Hague Regulations, along with the Fourth Geneva Convention of 1949 and customary international humanitarian law contain the rules applicable to Israel's occupation of the West Bank, including East Jerusalem and the Gaza strip. Israel has stated that while it *de facto* applies the humanitarian provisions of the Fourth Geneva Convention of 1949, it does not recognize its *de jure* application to the occupied Palestinian territory.[8] This position was rejected by the International Court of Justice, which confirmed the *de jure* applicability of the Fourth Geneva Convention to the Occupied Palestinian Territory.[9]

---

[5] International Criminal Court, OTP response to communications received concerning Iraq, 9 February 2006.

[6] Israel, Ministry of Foreign Affairs, *IDF Conduct During the 2014 Gaza Conflict*, p. 2. http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015.

[7] Ibid.p.2. This is also the conclusion of the International Court of Justice in the Advisory opinion on the Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory of 9 July 2004, I.C.J. Reports 2004, para. 89.

[8] Meir Shamgar, *The Observance of International Law in the Administered Territories, Israel Yearbook on Human Rights*, vol. 1, 1971. When this article was published the author was Attorney General of Israel.

[9] *Legal Consequences of the Construction of a Wall in the Occupied Palestinian territory*, Advisory Opinion, 9 July 2004, I.C.J. Reports 2004, para. 101

ATL004920

26.     The Occupied Palestinian Territory is comprised of the West Bank, including East-Jerusalem and the Gaza strip. The Government of Israel adopts the position that since it withdrew its troops and settlers from Gaza in 2005 during the "disengagement", it no longer has effective control over what happens in Gaza and thus can no longer be considered as an occupying power under international law.[10] The commission agrees that the exercise of 'effective control' test is the correct standard to use in determining whether a State is the occupying power over a given territory, but notes that the continuous presence of soldiers on the ground is only one criterion to be used in determining effective control.

27.     International law does not require the continuous presence of troops of the occupying forces in all areas of a territory, in order for it to be considered as being occupied. In the *Naletelic* case, the ICTY held that the law of occupation also applies in areas where a state possesses the "capacity to send troops within a reasonable time to make its power felt."[11] The size of Gaza and the fact that it is almost completely surrounded by Israel facilitates the ability for Israel to make its presence felt.[12] This principle was confirmed by the United States Military Tribunal at Nuremberg which stated:

*It is clear that the German Armed Forces were able to maintain control of Greece and Yugoslavia until they evacuated them in the fall of 1944. While it is true that the partisans were able to control sections of these countries at various times, it is established that the Germans could at any time they desired assume physical control of any part of the country. The control of the resistance forces was temporary only and not such as would deprive the German Armed Forces of its status of an occupant.*[13]

28.     This analysis also applies to the Occupied Palestinian Territory which is considered a single territorial unit by the international community,[14] and by Israel in the Interim Agreement on the West Bank and Gaza, which recognized the West Bank and Gaza as a single territorial unit.[15]

29.     In addition to its capacity to send troops to make its presence felt, Israel continues to exercise effective control of the Gaza Strip through other means. According to the Interim agreement on the West Bank and the Gaza Strip, Israel maintains the control of Gaza's airspace and maritime areas, and any activity in these areas is subject to the approval of Israel. The facts since the 2005 disengagement, among them the continuous patrolling of the territorial sea adjacent to Gaza by the Israeli Navy and constant surveillance flights of IDF aircraft, in particular remotely piloted aircraft, demonstrate the continued exclusive control by Israel of Gaza's airspace and maritime areas which -- with the exception of limited fishing activities -- Palestinians are not allowed to use. Since 2000, the IDF has also continuously enforced a no-go zone of varying width inside Gaza along the Green Line fence. Even in periods during which no active hostilities are occurring, the IDF regularly

---

[10]   Israel, Ministry of Foreign Affairs, *The Background to the 2014 Gaza Conflict*, p. 8. http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015

[11]   ICTY, *Prosecutor v. Naletilic and Martinovic*, IT-98-34-T, Judgement of 31 March 2003, para. 217

[12]   Tristan Ferraro, *Determining the beginning and end of an occupation under international humanitarian law*, International Review of the Red Cross, Vol. 95, Number 885, 2012 : "any geographical contiguity existing between the belligerent states might play an important role in facilitating the remote exercise of effective control, for instance by permitting an Occupying Power that has relocated its troops outside the territory to make its authority felt within reasonable time."

[13]   *The Hostages Trial, Trial of Wilhelm List and others*, United States Military Trial at Nuremberg, Law Reports of the Trials of War Criminals, Volume VIII, p. 56

[14]   UNGA 64/94, 10 December 2009, which calls on Israel to respect the territorial unity of the Occupied Palestinian Territory, and refers to Gaza as part of that territory.

[15]   Article XI (1) of the Interim Agreement.

8

ATL004921

conducts operations in that zone,[16] such as land levelling. Israel regulates the local monetary market, which is based on the Israeli currency and has controls on the custom duties.[17] Under the Gaza Reconstruction Mechanism, Israel continues to exert a high degree of control over the construction industry in Gaza. Drawings of large scale public and private sector projects, as well as the planned quantities of construction material required, must be approved by the Government of Israel.[18] Israel also controls the Palestinian population registry, which is common to both the West Bank and Gaza, and Palestinian ID-cards can only be issued or modified with Israeli approval.[19] Israel also regulates all crossings allowing access to and from Gaza. While it is true that the Rafah crossing is governed by Egypt, Israel still exercises a large degree of control, as only Palestinians holding passports are allowed to cross, and passports can only be issued to people featuring on the Israeli generated population registry.

30.    The commission concludes that Israel has maintained effective control of the Gaza Strip within the meaning of Article 42 of the 1907 Hague Regulations. The assessment that Gaza continues to be occupied by Israel is shared by the international community as articulated by the General Assembly and has been reaffirmed by the International Committee of the Red Cross (ICRC) and the Prosecutor of the International Criminal Court (ICC).[20]

31.    In view of the 2005 disengagement, Israel's obligations under occupation law are consistent with the level of control it exercises,[21] and the rules of treaty and customary law of occupation by which it is bound remain those that are relevant to the functions that Israel continues to exercise as an occupying power.[22]

32.    The commission takes note that the State of Palestine, on 2 April 2014, acceded to the four Geneva Conventions of 12 August 1949 and the Additional Protocols I and II on the protection of victims of international armed conflicts and non-international armed conflicts and the Fourth Hague Convention on the War on Land and its annexed Regulations of 1907. In early January 2015 the State of Palestine acceded to Additional Protocol III to the 1949 Geneva Conventions; to the Convention prohibiting Certain Conventional Weapons of 1980 and its Protocols I and III, and to the Convention on Cluster Munitions of 2008.

33.    Israel and the Palestinian armed groups that are parties to the conflict are bound alike by the relevant rules of customary international law. These rules are relevant both to the treatment of civilians and persons *hors de combat* as well as to the conduct of

---

[16]    For example the IDF conducted 80 operations in the no-go zone in 2013, OCHA, Update on the Access Restricted Areas in the Gaza Strip, 1 July to 31 December 2013, p. 4, available at http://www.globalprotectioncluster.org/_assets/files/field_protection_clusters/Occupied_Palestinian/files/oPt_PC_ARA_Update_July-December_2013_EN.pdf

[17]    A/HRC/12/48, para. 278.

[18]    UNSCO, *Gaza Reconstruction Mechanism Fact Sheet*, October 2014.

[19]    Gisha, The Population Registry, 14 November 2011, http://gisha.org/en-blog/2011/11/14/the-population-registry.

[20]    Peter Maurer, *Challenges to international humanitarian law: Israel's occupation policy*, International Review of the Red Cross, Vol. 94, Number 888, p.1506; International Criminal Court, Office of the Prosecutor, *Situation on Registered Vessels of the Comoros, Greece and Cambodia*, 6 November 2014, *Article 53 (1) Report*, p. 17; General Assembly resolutions A/Res/64/92, A/Res/64/94, to be read jointly.

[21]    Peter Maurer, *Challenges to international humanitarian law: Israel's occupation policy*, International Review of the Red Cross, Vol. 94, Number 888, p. 1508.

[22]    Tristan Ferraro, *Determining the beginning and end of an occupation under international humanitarian law*, International Review of the Red Cross, Vol. 95, Number 885, p. 158.

hostilities. The commission recognizes the complexity of determining customary rules of
international law and therefore referred to analyses of custom by international tribunals as
well as to the Study on Customary International Humanitarian Law,[23] the contents of which
it considers as indicative of the existence of customary norms.[24]

34.     With regard to the conduct of hostilities, rules applicable to the conduct of the IDF
and Palestinian armed groups involved in the hostilities can be found in customary
international law. The commission notes that there are very little substantive differences in
this area of international humanitarian law between the rules applicable in international
armed conflict and non-international armed conflict. In relation to the 2014 hostilities in
Gaza between Palestinian armed groups and the IDF, Israel has noted that the classification
of the armed conflict as international or non-international is a matter of debate. Israel
further states that "under these circumstances Israel conducted its military operations during
the 2014 Gaza conflict in accordance with the rules of the Law of Armed Conflict
governing both international and non-international armed conflicts."[25]

35.     With regard to the treatment of civilians and persons *hors de* combat, in addition to
other applicable rules found in the above-mentioned treaties and in customary law, the
Palestinian armed groups that took part in the hostilities and Israel are bound alike by the
rules found in common article 3 of the Geneva Conventions. The International Court of
Justice has held that, although common article 3 relates to "conflicts which are not of an
international character," the rules contained in this article reflect elementary considerations
of humanity, and apply equally to international and non-international armed conflict.[26]

36.     Finally, common Article 1 of the Four Geneva Conventions of 1949, provides that
all "High Contracting Parties undertake to respect and ensure respect" for the four Geneva
Conventions in all circumstances. The International Court of Justice, based on this article
and on the general principles of humanitarian law, declared that States are under an
obligation not to encourage parties to a conflict to act in violation of international
humanitarian law.[27] State practice since the adoption of the Geneva Conventions has also
made clear that the obligations of common Article 1 are not limited only to those states

---

[23]  Jean Marie Henckaerts and Louise Doswal-Beck, *Customary International Humanitarian Law*,
Cambridge, 2006. The rules and the updated related practice are now available on the ICRC *Database
on customary international humanitarian law*, to which this report will refer to.

[24]  The Israeli High Court refers to the Study for the wording of customary norms, *Public Committee
against Torture in Israel v. Government of Israel*, HCJ 769/02, 11 December 2005, para 23.

[25]  Israel, Ministry of Foreign Affairs, *The 2014 Gaza Conflict: Factual and Legal Aspects*, IDF Conduct
During the 2014 Gaza Conflict, p. 1.
http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-
Aspects.aspx, accessed on 30 May 2015.

[26]  ICJ, *Case Concerning Military and Paramilitary Activities in and Against Nicaragua (Nicaragua v.
United States of America)*, I.C.J. Reports, 1986, p. 14, para 218.

[27]  ICJ, *Case Concerning Military and Paramilitary Activities in and Against Nicaragua (Nicaragua v.
United States of America)*, I.C.J. Reports, 1986, p. 14, para 220. In this case, owing to the fact that it
was dealing with allegations of support by the United States to armed groups in Nicaragua and that
Common Article 3 was applicable in the armed conflict in Nicaragua, the Court concluded: "The
Court considers that there is an obligation on the United States Government, in the terms of Article 1
of the Geneva Conventions, to "respect" the Conventions and even "to ensure respect" for them "in
al1 circumstances", since such an obligation does not derive only from the Conventions themselves,
but from the general principles of humanitarian law to which the Conventions merely give specific
expression. The United States is thus under an obligation not to encourage persons or groups engaged
in the conflict in Nicaragua to act in violation of the provisions of Article 3 common to the four 1949
Geneva Conventions…"

10

ATL004923

involved in an armed conflict;[28] rather all States "must exert their influence, to the degree possible, to stop violations of international humanitarian law."[29]

37.     Main principles on the conduct of hostilities:

- The principle of distinction requires that parties to a conflict distinguish between civilians and civilian objects on the one hand, and combatants[30] and military objectives on the other. Attacks may only be directed against the latter. In order for an object or building to be considered a military objective it must meet two cumulative criteria namely that (1) by its "nature, location, purpose or use [it] make[s] an effective contribution to military action" and, (2) the object's "total or partial destruction, capture or neutralization in the circumstances ruling at the time, offer[s] a definite military advantage."[31]

- The principle of proportionality prohibits attacks that are expected to cause incidental loss of life or injury to civilians or damage to civilian objects, which would be excessive in relation to the concrete and direct military advantage anticipated.[32]

- The principle of precautions in attack requires all parties to take all feasible measures to avoid and in any event to minimize incidental loss of civilian life, injury to civilians and damage to civilian objects. This includes: verifying that the target is a military objective and that the attack respects the proportionality requirement; choosing weapons and timing for the attack with a view to avoiding or minimizing civilian casualties; issuing advance warnings when feasible; and suspending an attack if it becomes apparent that it does not respect the principle of proportionality.[33]

---

[28] S/Res/681; General Assembly resolution A/Res/58/97; International Conference for the Protection of War Victims, Final Declaration, Geneva, 1993. ICRC, *Commentary on the Third Geneva Convention of 1949*, p.18: "The proper working of the system of protection provided by the Convention demands in fact that the States which are parties to it should not be content merely to apply its provisions themselves, but should do everything in their power to ensure that it is respected universally."

[29] ICRC, *Database on customary international humanitarian law*, Rule 144.

[30] For the purposes of distinction, the term "combatants" includes members of the armed forces and members of organized armed groups with a continuous combat function. In the context of this report, when the terms 'members of armed groups' or 'members of Palestinian armed groups' are used it is meant to include only those with a continuous combat function. The Commission adopts the approach of the ICRC "Interpretative guidance on the notion of direct participation in hostilities under international humanitarian law." The Commission notes that there has been criticism of the concept of 'continuous combat function.' Some have criticized the concept, for broadening the definition of direct participation in hostilities therefore raising the risk of erroneous targeting.  Others maintain that it is too restrictive and creates an imbalance between members of the armed forces of a state and members of an organized armed group. Civilians, who are not members of organized armed groups with a continuous combat function, may lose their protection from attack if they directly participate in the hostilities but only for the duration of that participation (Article 13(3) Additional Protocol II and 51(3) of Additional Protocol I).

[31] Article 52(2) Additional Protocol I. ICRC, *Database on customary international humanitarian law*, Rule 9

[32] Articles 51(5) and 57(2) Additional Protocol I. ICRC, *Database on customary international humanitarian law*, Rule 14

[33] Article 57 Additional Protocol I. ICRC, *Database on customary international humanitarian law*, Rules 15-21.

ATL004924

**B.    International human rights law**

38.    Israel is a state party to seven of the core human rights treaties: the International Convention on the Elimination of All Forms of Racial Discrimination, the International Covenant on Civil and Political Rights, the International Covenant on Economic, Social and Cultural Rights, the Convention against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment, the Convention on the Elimination of All Forms of Discrimination against Women, the Convention on the Rights of Persons with Disabilities, and the Convention on the Rights of the Child. It has also ratified the Optional Protocols to the Convention on the Rights of the Child on the involvement of children in armed conflict, and on the Rights of the Child on the sale of children, child prostitution and child pornography.

39.    Israel has maintained its position that it does not have human rights obligations in the Occupied Palestinian Territory based on two main arguments: (1) that the treaties are bound to the territory of the State party and do not apply to the extra-territorial actions of a State,[34] and (2) that the applicability of international human rights law and international humanitarian law are mutually exclusive.[35] The commission notes, however, that Israel has accepted to exercise its powers and responsibilities in the occupied territory "with due regard to internationally-accepted norms and principles of human rights and the rule of law."[36]

40.    The commission adopts the widely accepted interpretation that a situation of armed conflict or occupation does not release a State from its human rights obligations. The International Court of Justice, in *Nuclear Weapons* Advisory Opinion, held that the protection of the International Covenant for Civil and Political Rights does not cease in situations of armed conflict, except if derogated from[37] in conformity with article 4 of the Covenant. This position was confirmed by the ICJ in the Advisory Opinion on the Wall, in which the Court considered that "the protection offered by human rights conventions does not cease in case of armed conflict."[38]

41.    With regard to the human rights obligations of Israel in the Occupied Palestinian Territory, Israel is bound by those human rights treaties which it ratified. The ICJ concluded that the International Covenant on Civil and Political Rights, the International Covenant on Economic, Social and Cultural Rights and the Convention on the Rights of the Child are applicable.[39] The ICJ also noted that Israel's obligations under ICESCR include "an obligation not to raise any obstacle to the exercise of such rights in those fields where competence has been transferred to Palestinian authorities". [40]    The position of United Nations human rights treaty bodies corresponds to that of the ICJ, namely that as a State party to international human rights instruments, Israel continues to bear responsibility for

---

[34]  CCPR/C/ISR/4, para. 48
[35]  In its report to the Human Rights Council, Israel stated: "It is Israel's view that these two systems-of-law, which are codified in separate instruments, remain distinct and apply in different circumstances." CCPR/C/ISR/4, para. 47. See also, *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, Advisory Opinion, 9 July 2004, I.C.J. Reports 2004, para. 102.
[36]  Article XIV, Agreement on the Gaza Strip and the Jericho Area, 4 May 1994.
[37]  ICJ, *Legality of the Threat of Use of Nuclear Weapons,* Advisory Opinion, 8 July 1996, I.C.J Reports 1996 (I), para. 24.
[38]  *Legal Consequences of the Construction of a Wall in the Occupied Palestinian territory*, Advisory Opinion, 9 July 2004, I.C.J. Reports 2004, para. 106
[39]  *Legal Consequences of the Construction of a Wall in the Occupied Palestinian territory*, Advisory Opinion, 9 July 2004, I.C.J. Reports 2004, paras. 111-113.
[40]  *Legal Consequences of the Construction of a Wall in the Occupied Palestinian territory*, Advisory Opinion, 9 July 2004, I.C.J. Reports 2004, paras. 111-113.

ATL004925

implementing its human rights treaty obligations in the Occupied Palestinian Territory, to the extent that it continues to exercise jurisdiction in those territories.[41] The commission notes that Israel has, upon ratification of the International Covenant on Civil and Political Rights, according to article 4, derogated from its obligations under article 9 based on the State of Emergency proclaimed in 1948, which remains in force.

42.      Article 1 common to the International Covenant on Civil and Political Rights, and the International Covenant on Economic, Social and Cultural Rights, enshrines the right of all peoples to self-determination and establishes an obligation for States parties to these human rights conventions to promote and respect the realization of that right, in conformity with the Charter of the United Nations. With regard to the Occupied Palestinian Territory, the international court of justice observed that the "existence of a 'Palestinian people' is no longer in issue" and concluded that the right to self-determination is part of the 'legitimate rights' of the Palestinian people.[42]

43.      On 2 April 2014, the State of Palestine acceded to the International Covenant on Economic, Social and Cultural Rights, the International Covenant on Civil and Political Rights, the Convention on the Rights of the Child, the Convention on the Elimination of All Forms of Discrimination against Women, the Convention on the Rights of Persons with Disabilities, the International Convention on the Elimination of All Forms of Racial Discrimination, and the Convention against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment. On 7 April 2014, the State of Palestine acceded to the Optional Protocol to the Convention on the Rights of the Child on the Involvement of Children in armed conflict. Owing to the on-going Israeli occupation of the West Bank, including East Jerusalem and the Gaza strip, the extent of the obligations of the State of Palestine under the preceding instruments needs to be clarified by the human rights bodies established to monitor compliance with these specific treaties. The physical, legal and political context of the State of Palestine, including the fact that Palestinian territory continues to be occupied, may be of relevance. In the past, treaty bodies have recognized the obstacles faced by a State Party in implementing its obligations, when it does not have effective control over parts of its territory.[43]

44.      In the past, the Palestinian Authority, which exercises its powers in the Occupied Palestinian Territory pursuant to the various Israeli-Palestinian agreements,[44] has declared its commitment to respect international human rights law in a number of public

---

[41]   CCPR/C/ISR/CO/4. See also CCPR/C/ISR/CO/3: "The Committee therefore reiterates and underscores that, contrary to the State party's position, in the current circumstances, the provisions of the Covenant apply to the benefit of the population of the occupied territories, including in the Gaza Strip, with regard to all conduct by the State party's authorities or agents in those territories affecting the enjoyment of rights enshrined in the Covenant."

[42]   *Legal Consequences of the Construction of a Wall in the Occupied Palestinian territory*, Advisory Opinion, 9 July 2004, I.C.J. Reports 2004, para. 118

[43]   For instance, the Committee on the Rights of the Child concluded in the case of Cyprus: "The Committee notes that the State party, as a consequence of events which occurred in 1974 and which resulted in the occupation of part of the territory of Cyprus, is not in a position to exercise control over all of its territory and consequently cannot ensure the application of the Convention in areas not under its control. The fact that no information on children living in the occupied territories is available is a matter of concern to the Committee" CRC/C/15/Add.59

[44]   Agreement on the Gaza Strip and the Jericho Area, May 4, 1994, Agreement on the Preparatory Transfer of Powers and Responsibilities (Israel-PLO), August 29, 1994, Interim Agreement between Israel and the Palestinians, September 28, 1995.

ATL004926

undertakings.[45] These undertakings by the Palestinian Authority, the Palestinian Liberation Organisation and the Palestinian Legislative Council (PLC) have included assurances, decrees and declarations and various agreements under the Oslo Accords signed with Israel, which stated that both parties would exercise their powers and responsibilities with "due regard to internationally accepted norms and principles of human rights and the rule of law".[46] The Palestinian Basic Law[47] also contains a number of articles protecting human rights as well as a commitment to abide by major human rights instruments[48] The setting up of the Palestinian Independent Commission for Citizens' Rights in 1993 through a Presidential Decree also indicates a commitment by the Palestinian Authority to be bound by human rights.[49]

45.      With respect to the authorities in Gaza, it is worth recalling that non-State actors that exercise government-like functions and control over a territory are obliged to respect human rights norms when their conduct affects the human rights of the individuals under their control.[50] Moreover, Hamas has indicated that it "is determined (...) to promote the rule of law, the respect for the judiciary, the separation of powers, the respect for human

---

[45]   PLO chairman Yasser Arafat repeatedly stated that he and his Government were committed to respecting to all international human rights standards, for instance, to representatives of Amnesty International on 2 Oct 1993 and 7 Feb 1996.

[46]   For instance through article XIX of the Protocol Concerning Redeployment of the Interim Agreement of 28 September 1995, the PA also undertook that its police would exercise powers and responsibilities with due regard to internationally accepted human rights and the rule of law, and that it would be guided by the need to protect the public, respect human dignity, and avoid harassment. In addition, the PA has undertaken to respect specific human rights obligations in the context of its membership of the Euro Mediterranean partnership, which was established in November 1995 with the adoption of the Barcelona Declaration and which contains a human rights component, stating that members should respect fundamental human rights and freedom, and act in accordance with the United Nations Charter and the UDHR, as well as with the other obligations under international law, in particular those arising out of regional and international instruments to which they are party (Barcelona Declaration, 27-28 November 1995;
http://ec.europa.eu/external_relations/euromed/bd.htm).

[47]   http://www.palestinianbasiclaw.org/2002-basic-law.

[48]   Article 10 of the Basic Law states that "basic human rights and liberties shall be protected and respected" and that the "Palestinian National Authority shall work without delay to become a party to regional and international covenants and declarations that protect human rights". Its title two on "public rights and liberties" (articles 9 to 33) guarantee a range of civil rights to all persons (such as freedom from unlawful arrest, the right to fair trial, prohibition of torture and collective punishment, freedom of expression, freedom of religion, etc.) as well as the main economic and social rights.

[49]   Furthermore, article 31 of the Palestinian Basic Law provides for the establishment by law of an independent commission for human rights. In May 2005, PICCR submitted before the PLC a draft law for discussion and approval. This draft law confirms PICCR as the National Human Rights Commission in Palestine with Ombudsman function at its core.

[50]   A/HRC/10/22, para. 21. Also by way of example, in the joint report on Lebanon and Israel, a group of four Special Rapporteurs concluded that: "Although Hezbollah, a non-State actor, cannot become a party to these human rights treaties, it remains subject to the demand of the international community, first expressed in the Universal Declaration of Human Rights, that every organ of society respect and promote human rights. (…) It is especially appropriate and feasible to call for an armed group to respect human rights norms when it exercises significant control over territory and population and has an identifiable political structure," Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions, Philip Alston; the Special Rapporteur on the right of everyone to the enjoyment of the highest attainable standard of physical and mental health, Paul Hunt; the Representative of the Secretary-General on human rights of internally displaced persons, Walter Kälin; and the Special Rapporteur on adequate housing as a component of the right to an adequate standard of living, Miloon Kothari,(A/HRC/2/7), para. 19.

ATL004927

rights, the equality among citizens; to fight all forms of discrimination; to protect public liberties, including the freedom of the press and opinion ...".[51] Hamas has also confirmed its commitment to "respect (...) public liberties; to strengthen the establishment of democracy; to protect human rights (...); and its respect for international law and international humanitarian law insofar as they conform with our character, customs and original traditions".[52]

46.    The commission also recalls the Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law of 2005.[53] While they are not a binding international instrument, the fact that they were adopted by General Assembly resolution 60/147 of 16 December 2005 and have since then been referred to by multiple international, regional and national bodies[54] shows that they enjoy far-reaching support. The commission in particular stresses the provision that "victims and their representatives should be entitled to seek and obtain information on the causes leading to their victimization and on the causes and conditions pertaining to the gross violations of international human rights law and serious violations of international humanitarian law and to learn the truth in regard to these violations."

## C.    International criminal law

47.    An international crime has been defined as an "act universally recognized as criminal, which is considered a grave matter of international concern and for some valid reason cannot be left within the exclusive jurisdiction of the state that would have control over it in regular circumstances."[55] International crimes can be found in treaty as well as in customary law. International crimes have existed for several centuries; however, international criminal law has, during the twentieth century, greatly evolved and today addresses mainly the issue of individual criminal responsibility for a number of serious violations of international humanitarian law and international human rights law. Therefore in recent decades, international criminal tribunals have dealt mainly with war crimes, crimes against humanity and the crime of genocide.

48.    The four Geneva Conventions of 1949 establish a system to repress through penal sanctions a number of violations of the Geneva Conventions. Under article 146 of the Geneva Convention IV, the High Contracting Parties have the obligation to enact penal sanctions for these particular violations, described as grave breaches, search for those "alleged to have committed, or to have ordered to be committed" these acts and prosecute them "before their own courts," or hand over such persons to another State. Article 147 defines grave breaches as:

---

[51]   Speech delivered by Prime Minister Ismail Haniya at the conference organized by the PCHR on "The New Government and the Agenda for Human Rights". Gaza, June 2006.
[52]   Text of the National Unity Government programme delivered by then Prime Minister Ismail Haniya before the Palestinian Legislative Council, 17 March 2007.
http://www.islamicnews.com/Document/ShowDoc09.asp?DocID=91477&TypeID=9&TabIndex=2
[53]   Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law adopted and proclaimed by General Assembly resolution 60/147 of 16 December 2005. At:
http://www.ohchr.org/EN/ProfessionalInterest/Pages/RemedyAndReparation.aspx
[54]   See e.g.: A/HRC/24/42 A/HRC/22/52; also the Turkel Commission: p. 106.
[55]   The Hostages Trial, *Trial of Wilhelm List and others*, United States Military Trial at Nuremberg, Law Reports of the Trials of War Criminals, Volume VIII, p. 54

ATL004928

*".....those involving any of the following acts, if committed against persons or property protected by the present Convention: wilful killing, torture or inhuman treatment, including biological experiments, wilfully causing great suffering or serious injury to body or health, unlawful deportation or transfer or unlawful confinement of a protected person, compelling a protected person to serve in the forces of a hostile Power, or wilfully depriving a protected person of the rights of fair and regular trial prescribed in the present Convention, taking of hostages and extensive destruction and appropriation of property, not justified by military necessity and carried out unlawfully and wantonly."*

49.     In addition to the grave breaches of the Geneva Conventions, war crimes include other serious violations of the laws and customs of war applicable in both international and non-international armed conflict. These include, *inter alia*, violations of Common Article 3 of the Four Geneva Conventions,[56] as well the grave breaches contained in Additional Protocol I to the 1949 Geneva Conventions. The war crimes defined as grave breaches in the 1949 Geneva Conventions as well as the vast majority of other serious violations of the laws and customs of war are found in the Rome Statute of the International Criminal Court.[57]

50.     War crimes include crimes related to the violations of the rules on the conduct of hostilities. These include,[58] *inter alia*, directing attacks against civilians or civilian objects; launching an attack with the knowledge that incidental loss of life and damage to civilian objects would be excessive to the concrete and direct military advantage; launching indiscriminate attacks; the use of human shields; killing or wounding by resorting to perfidy; making medical units the object of an attack; making improper use of the distinctive emblems of the Geneva Conventions; declaring that no quarter will be given; the use of starvation as a method of warfare; acts whose primary purpose is to spread terror amongst the civilian population; and using a prohibited weapon. War crimes are also related to crimes against protected persons and property, which include, *inter alia,* murder or wilful killing; torture or inhuman treatment; extensive destruction or appropriation of property not justified by military necessity and carried out unlawfully and wantonly; collective punishments; and the taking of hostages.

51.     Individuals are criminally responsible if they commit, attempt to commit, plan, order, or instigate war crimes. Persons are also liable for a crime if they aid, abet or otherwise assist or facilitate the commission of a crime.[59] A military commander or another superior is not only individually responsible for crimes he may have ordered or instigated, but also for those crimes committed by forces under his command or effective control, when he knew or should have known that such acts were being or were about to be

---

[56]  Article 4 ICTR Statute, article 8 Statute of the ICC, article 3 Statute of the Special Court for Sierra Leone. See also ICTY, *Prosecutor v. Dusko Tadic*, Decision of 2 October 1995, IT-94-1-AR72.

[57]  Article 8(2).

[58]  While most of the acts described in the paragraph amount to war crimes in both international and non-international armed conflicts, there are some distinctions depending on the classification of the conflict (see for example article 8 of the Rome Statute of the ICC). In addition, in some cases the terminology used to describe an identical act will vary due to the classification of the conflict (for example 'murder' and 'wilful killing').

[59]  Article 25 Rome Statue of the ICC, article 7(1) of the Statute of the ICTY and article 6(1) of the Statute of the ICTR. See also ICRC, *Database on Customary International Humanitarian Law*, Rule 151.

ATL004929

committed and failed to take all necessary measures to prevent, punish or report the perpetrators of these acts.[60]

52.     The State of Palestine acceded to the Rome Statute of the International Criminal Court on 2 January 2015,[61] with the Statute entering into force on 1 April 2015. On 1 January 2015, the International Criminal Court received a declaration from the State of Palestine accepting the jurisdiction of the Court since 13 June 2014.[62] The Prosecutor of the International Criminal Court announced on 16 January 2015 the opening of a preliminary examination into the situation in Palestine in order to establish whether the Rome Statute criteria for opening an investigation are met.[63]

# IV.   Context

53.     The hostilities of 2014 erupted in the context of the protracted occupation of the West Bank, including East Jerusalem, and the Gaza Strip, and of the increasing number of rocket attacks on Israel. In the preceding months, there were few, if any, political prospects for reaching a solution to the conflict that would achieve peace and security for Palestinians and Israelis and realize the right to self-determination of the Palestinian people.

54.     The blockade of Gaza by Israel, fully implemented since 2007 and described by the Secretary-General as "a continuing collective penalty against the population in Gaza" (A/HRC/28/45, para. 70), was strangling the economy in Gaza and imposed severe restrictions on the rights of the Palestinians. Two previous rounds of hostilities in the Strip since 2008 had not only led to loss of life and injury but also weakened an already fragile infrastructure. Palestinians have demonstrated extraordinary resilience in recent years, living in an environment scarred by physical destruction and psychological trauma. In the West Bank, including East Jerusalem, settlement-related activities and settler violence continued to be at the core of most of the human rights violations against Palestinians. In the absence of any progress on the political front, the risk of a flare-up of the situation was evident.

55.     In the meantime, threats to the security of Israel remained all too real. Palestinian armed groups increasingly launched rockets during June and July 2014. The discovery of tunnels leading into Israel added to the sense of insecurity. According to one witness, residents of her kibbutz experienced regular panic attacks after a tunnel discovery in March 2014 and the explosion of an alleged tunnel exit on 8 July. Several other infiltration attempts were thwarted by the IDF during July and August.

56.     The events of summer 2014 were preceded by an agreement, reached on 23 April 2014 between the Palestinian Liberation Organization and Hamas, which sought to end

---

[60]   Article 28 Rome Statue of the ICC, article 7(2) of the Statute of the ICTY and article 6(2) of the Statute of the ICTR. See also ICRC, *Database on Customary International Humanitarian Law*, Rule 152

[61]   United Nations Treaty Collection, https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XVIII-10&chapter=18&lang=en

[62]   International Criminal Court, *Palestine declares acceptance of ICC jurisdiction since 13 June 2014*, ICC-CPI-20150105-PR1080. Available at: http://www.icc-cpi.int/en_menus/icc/press%20and%20media/press%20releases/Pages/pr1080.aspx

[63]   International Criminal Court, *The Prosecutor of the International Criminal Court, Fatou Bensouda, opens a preliminary examination of the situation in Palestine*, ICC-OTP-20150116-PR1083. Available at: http://www.icc-cpi.int/en_menus/icc/press%20and%20media/press%20releases/Pages/pr1083.aspx

ATL004930

Palestinian divisions. On 2 June 2014, President Abbas declared the formation of a Government of national consensus. The Government had yet to assume its full responsibilities in Gaza when active hostilities broke out in the Strip in July 2014, thereby leaving Hamas exercising government-like functions, as had been the case since June 2007.

57.    On 12 June 2014, three Israeli teenagers were kidnapped and brutally murdered in the West Bank. In response, Israel launched an extensive search and arrest operation, which lasted until the bodies of the teenagers were found on 30 June. On 2 July, a 16-year-old Palestinian teenager from East Jerusalem was viciously murdered by being burned alive and his body discovered in West Jerusalem in what appeared to be an act of revenge for the murdered Israeli teenagers. Tensions in the West Bank, including East Jerusalem, ran high, and were further fuelled by a rise in extreme anti-Palestinian rhetoric. Widespread protests and violent clashes ensued between Palestinians and the Israel Defense Forces.

58.    On 7 July 2014, the Israel Defense Forces commenced operation 'Protective Edge' in the Gaza Strip, with the stated objective of stopping the rocket attacks by Hamas and destroying its capabilities to conduct operations against Israel. The operation began during Ramadan, the Muslim month of fasting.  After an initial phase focused on airstrikes, on 17 July 2014, Israel launched a ground operation, which it declared sought to degrade "terror organisations' military infrastructure, and [… neutralize] their network of cross-border assault tunnels".  A third phase began on 5 August and was characterized by alternating ceasefires and on-going air strikes. The operation concluded on 26 August when both Israel and Palestinian armed groups adhered to an unconditional ceasefire.

## V.    Principal findings and conclusions

### A.    The Gaza Strip and Israel

#### 1.    Rocket, mortar and tunnel attacks against locations in Israel

59.    Up to ten organized armed groups, often linked to political movements of various ideologies, were active in Gaza in the summer of 2014. However, their military capacity and their level of involvement in the hostilities against the IDF varied significantly.  Several of these groups not only fired rockets and mortar shells but also participated in military engagements with the IDF.

60.    During the hostilities, the two largest and best-equipped groups, the Izz Al Din Al Qassam Brigades and Al Quds Brigades, regularly issued statements regarding attacks. Security experts have noted that while the Al Qassam Brigades may have targeted civilians in the past as part of its military strategy,[64] in 2014 its declared official policy was "to focus on military or semi-military targets and to avoid other targets, especially civilians."

61.    The Al Nasser Salah Al Din Brigades, which is the military wing of the Popular Resistance Committees was the third largest organized armed group operating in Gaza in 2014. The other groups with a similar type but lower level of engagement include: the Abu Ali Mustafa Brigades, the military wing of the Popular Front for the Liberation of Palestine or "PFLP"; the Gaza branch of the Al-Aqsa Martyrs Brigades, Fatah's military wing; the National Resistance Brigades;[65] and the military wing of the Democratic Front for the

---

64    https://dcaf.ch/content/download/98409/1517146/file/Entry-Points(EN).pdf
65    https://alethonews.wordpress.com/2014/04/14/dflp-militants-fire-3-mortar-shells-at-israeli-vehicles-in-gaza/

ATL004931

Liberation of Palestine (DFLP). Other, smaller armed groups are present in Gaza but it remains unclear whether they participated in the 2014 hostilities.

62.     While the relationship between Hamas and Islamic Jihad and their respective armed wings was a competitive one in the past, during the 2014 escalation in Gaza they are reported to have coordinated their actions[66]. In addition, it appears that other armed groups coordinated their military activities to a certain degree and also conducted joint operations. In an interview, the spokesman for Abu Ali Mustafa Brigades, the military wing of the Popular Front for the Liberation of Palestine, said there was a joint operations room where each Palestinian armed group had a representative. He indicated that they had carried out operations together.[67]

63.     The military capability of these groups is reported to have significantly improved in recent years. The Israel Defence Forces estimate the rocket arsenals of the Al Qassam Brigades and Al Quds Brigades at 6000 and 5500 respectively[68]. Whereas the majority of rockets can cover a range of up to 20 km, longer-range rockets appear to have been acquired by Palestinian armed groups in recent years (with a range of up to 200 km).[69]

64.     Amnesty International reports that these groups "have produced, upgraded or smuggled in thousands of BM-21 Grad rockets with ranges varying from 20 km to 48 km", in addition to locally produced rockets reaching as far as 80 km, such as the M-75 and J-80[70]. The majority of rockets fired by Palestinian groups have no guidance system.[71] Mortars, reportedly with a range of up to 8 km, have been actively used along the Green Line.[72] Other weapons include rocket-propelled grenades, home-made drones, SA 7 Grail anti-aircraft missiles, Kornet 9M133 anti-tank guided missiles, and a wide array of small arms, rifles, machine guns and hand grenades.[73]

---

[66]  Statement of W069.

[67]  Al-Akhbar, Abu Jamal: Military spokesman Abu Ali Mustafa Brigades¸ interview of 2 September 2014. http://www.al-akhbar.com/node/214694.

[68]  http://www.idfblog.com/blog/2014/07/10/6-million-lives-in-danger-the-deadly-rocket-arsenal-of-hamas/

[69]  Rockets - Qassam 1 (4 km), Qassam 2 (10 km). Qassam 3 (12 km), Grad (20 km), WS 1E upgraded Grad (45 km), Fadjr 5 or Gaza produced M75 or J 80 (75 km), M302 Khaibar or Gaza produced R 160 (100 – 212 km), 22mm Katyusha (30 km); see:
http://www.globalsecurity.org/military/world/para/hamas-qassam.htm
http://www.aerospaceweb.org/question/weapons/q0279.shtml
https://www.bing.com/images/search?q=hamas+rocket+types&id=5ECD09F1A672B81DE1194B648F144190A9CC61C3&FORM=IQFRBA

http://www.jewishpolicycenter.org/gaza-watch/data/
http://www.nbcnews.com/storyline/middle-east-unrest/hamas-firing-china-designed-syria-made-m-302-rockets-israel-n152461

[70]  https://www.amnesty.org/en/documents/mde21/1178/2015/en/, p.9; see also: Israel, Ministry of Foreign Affairs,  *Hamas' Violations of the Law,* footnote  9
http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015.

[71]  http://www.ohchr.org/Documents/Countries/PS/A.HRC.28.80.Add.1.doc ;
http://www.foreignaffairs.com/articles/141698/mark-perry/gazas-bottle-rockets

[72]  Amnesty International, *Unlawful and deadly. Rocket and Mortar Attacks by Palestinian Armed Groups during the 2014 Gaza/Israel Conflict,* March 2015, p.17.

[73]  Gaza Conflict Task Force commissioned by the Jewish Institute for National Security Affairs (JINSA), *2014 Gaza War Assessment: The New Face of Conflict,* Report of March 2015,  pp. 61-62

ATL004932

A/HRC/29/CRP.4

### a. Rocket and mortar attacks

65.    *"There have been many operations we carried out jointly with the brothers in Al-Qassam, such as hitting Tel Aviv, Beersheba and Ashdod as well as engaging the Special Forces east of Khan Younis."*

Abu Ahmad, spokesman of Saraya al-Quds[74]

66.    Between 7 July and 26 August 2014, Palestinian armed groups fired several thousand projectiles towards Israel killing six civilians.[75] According to Ministry of Health statistics, up to 1600 Israelis were injured, including over 270 children.[76] Of these, Magen David Adom, Israel's national emergency medical service, reported that it treated at least 836 people for different types of injuries, including 36 people wounded by shrapnel, 33 people hurt by shattered glass or building debris, and 159 people injured in the rush to reach shelters[77]. According to the United Nations, 4881 rockets and 1753 mortars were fired towards Israel during the summer[78]. Official information available from Israel has a lower figure of 4500 projectiles fired by Palestinian armed groups during this period, but it does not provide a breakdown between rockets and mortars.[79]

67.    As a result of the many projectiles fired during the 2014 hostilities, thousands of people in southern Israel left their homes[80] and moved to areas less affected by the attacks. The Government of Israel estimates that approximately 10,000 civilians were displaced, [81] and OCHA reports that as many as 70 per cent of residents in communities near Gaza left their homes.[82] Witnesses told the commission that, for instance, up to a quarter of the inhabitants of Kibbutz Nirim, located 1.7 km from Gaza, including 110 children[83], were displaced towards the north. Those who stayed had to run into shelters or safe rooms each time a siren warned them that a rocket or mortar had been fired in the vicinity.

---

[74]  Echorouk, *Exclusive Interview* with Abu Ahmad, the spokesman of Saraya al-Quds, 14 August 2014, carried by Free Palestine Agency,
http://www.palestinefree.com/index.php?id=26436#.VYGGj_mqpHw

[75]  For a list see Israel, Ministry of Foreign Affairs, *Hamas' Violations of the Law,* footnote 13
http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015.;
http://www.shabak.gov.il/English/EnTerrorData/Reports/Pages/Monthly0814.aspx,
http://www.shabak.gov.il/English/EnTerrorData/Reports/Pages/Monthlysummary%E2%80%93July2014.aspx ; http://www.idfblog.com/blog/2014/07/19/fallen-soldiers-operation-protective-edge/

[76]  Quoted in Israel, Ministry of Foreign Affairs, *Hamas' Violations of the Law,* p. 4
http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015.

[77]  http://www.mdais.com/316/7004.htm

[78]  UNDSS figures quoted by OHCHR: A/HRC/28/80/Add.1, para. 24

[79]  Israel, Ministry of Foreign Affairs, *Hamas' Violations of the Law*, p. 1
http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015.

[80]  Israel, Ministry of Foreign Affairs, *Hamas' Violations of the Law*, p. 9
http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015.

[81]  Israel, Ministry of Foreign Affairs, *The Threat to Israel's Civilian Population and Civil Defence Measures*, p. 16. http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015.

[82]  OCHA Occupied Palestinian Territory, Gaza Emergency Situation Report, 28 August 2014. Available at: http://www.ochaopt.org/documents/ocha_opt_sitrep_28_08_2014.pdf

[83]  Attachment to statement W269, a follow-up email to the interview

20

Communities within 2 km of Gaza were given 30 seconds or less to heed the warnings and in some cases this was reduced to as little as 3 seconds.[84]

68.     As a result of Israel's lack of cooperation and denial of access to its territory, the commission faced difficulty in identifying victims who had been injured in rocket attacks and was unable to examine individual cases in detail. However, the commission was able to speak to witnesses and victims of a number of mortar attacks which were the cause of the majority of civilian deaths in Israel.

**Rocket attacks**

69.     The Al Qassam Brigades issued a statement indicating that on 19 July 2014 they had fired three M75 rockets at the town of Dimona[85]. It appears that one of them killed Ouda Al Waj and injured at least 3 other people, including 2 children, in the nearby Bedouin settlement of Kaser Al-Ser.[86] These Bedouin settlements in the Negev Desert, which typically consist of makeshift houses, are not covered by the Iron Dome defence system or equipped with warning systems and shelters[87]. As pointed out by Amnesty International, the village of Kaser Al-Ser was recognized by the State of Israel in 1999, but its infrastructure remains rudimentary and it is threatened by demolition. According to Amnesty International, the family did not receive compensation from the authorities after the attack because the victim's home was due to be demolished anyway.[88]

70.     In addition, a number of other incidents were brought to the commission's attention. According to official Israeli sources, on 26 August 2014 at 6.30 a.m. a rocket hit a home in Ashkelon, injuring at least 20 people, including 3 children.[89] On 22 August 2014, a Grad rocket struck near Gan Yavne, injuring Netanel Maman, an IDF soldier on home leave, and five other people. Netanel Maman died a week later as a result of shrapnel injuries to his head. According to Israeli sources, Hamas claimed responsibility for that attack.[90] Additional information on several incidents in which rocket attacks injured civilians was provided in documentation published by Israel's Ministry of Foreign Affairs.[91] This also included information regarding incidents in which schools and other buildings dedicated to children were hit by rockets.[92]

---

[84]   W009; see also: Israel, Ministry of Foreign Affairs, *Hamas' Violations of the Law,*
       http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-
       Aspects.aspx, accessed on 30 May 2015. p. 7;
[85]   http://alresalah.ps/ar/post/97342; http://fpnp.net/site/news/25768
[86]   https://www.amnesty.org/en/documents/mde21/1178/2015/en/; Israel, Ministry of Foreign Affairs,
       *Hamas' Violations of the Law,* footnote 13
       http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-
       Aspects.aspx, accessed on 30 May 2015.
       http://www.mcclatchydc.com/2014/07/20/233867/israels-bedouin-defenseless-against.html
[87]   http://ua.amnesty.ch/urgent-actions/2014/08/203-14/ua-203-14-english;
       http://www.timesofisrael.com/negev-bedouin-defenseless-as-man-killed-4-injured-by-gaza-rocket/
[88]   https://www.amnesty.org/en/documents/mde21/1178/2015/en/, pp.20-21
[89]   MFA on 26 August 2014; at: http://mfa.gov.il/mfa/foreignpolicy/terrorism/pages/rise-in-rocket-fire-
       from-gaza-3-jul-2014.aspx
[90]   MFA on 29 August 2014; at: http://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Victims/Pages/Netanel-
       Maman.aspx
[91]   Israel, Ministry of Foreign Affairs, *The Threat to Israel's Civilian Population and Civil Defence
       Measures*, pp. 8-9  http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-
       Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015.
[92]   *Ibid.* pp. 12-13

ATL004934

**Mortar attacks**

71.     The commission examined the killings of four other people and an incident leading to one person being seriously injured by mortar fire close to the Green Line in Israel. According to information received, mortar attacks targeting Israeli towns near the Green Line increased significantly during the final week of the conflict.[93]

72.     **23 July mortar attack hitting a greenhouse:** On 23 July 2014, a 36 year-old agricultural migrant worker from Thailand was killed in a greenhouse located close to the Green Line fence in Netiv Ha'sara, Ashkelon Coast Regional Council, by shrapnel from a mortar shell, apparently fired by Hamas militants. Narakorn Kittiyangkul was hit while sitting next to an Israeli co-worker enjoying his lunch break. Amnesty International reported that a total of three shells fell in the area, with the third hitting the group of workers.[94] The witnesses said that the victim had been working on the farm for only a month.[95]

73.     The incident took place in a farm that borders the Israeli perimeter fence around the Gaza Strip in the north, close to the Erez crossing[96]where there is a small permanent military base. While the precise location of the strike is unknown, based on available information provided to Amnesty International by the Magen David Adom emergencies coordinator [97] and measurements on google maps, it is likely that the mortar landed in an area located between 100 and 800 meters from the military base. The commission notes that this military base appears to have been targeted by Palestinian armed groups several times during the hostilities.[98]

74.     Witnesses told the commission that in another incident several weeks later, the siren sounded and an explosion was heard resulting in damage to all the cars in Netiv Ha'sara. Many residents then decided to leave, including three other migrant co-workers of the Thai victim. Witnesses identified trauma and persistent fear of the tunnels as core features of everyday life for people in the kibbutz during the hostilities, and many members are said to require therapeutic counseling[99]:

*"It isn't post traumatic stress because it's on-going. It is sequential trauma, one thing after another. It wears you down and makes you more vulnerable."* [100]

75.     Several witnesses interviewed by the commission expressed empathy for the civilians in Gaza who they say are trapped in a warzone without access to economic opportunities and protection, such as shelters and radar systems.[101] For example, a witness stated:

---

93   Amnesty International, *Unlawful and deadly: Rocket and mortar attacks by Palestinian armed groups during the 2014 Gaza/Israel conflict*, 26 March 2015, p. 17

94   W010 and W011;  Amnesty International submission to the CoI, page 13. See also: http://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Pages/Rise-in-rocket-fire-from-Gaza-3-Jul-2014.aspx;

95   W010 and W011

96   W010 and W011; Amnesty International submission to the CoI, page 14.

97   Amnesty International, *Unlawful and deadly: Rocket and mortar attacks by Palestinian armed groups during the 2014 Gaza/Israel conflict*, 26 March 2015, p. 28

98   Mortar attack which hit Erez a military base at Erez on 15 July 2014 and mortar attack which hit the adjoining crossing on 24 August 2014

99   Refer to section VI. A. for further details.

100   W009.

101   W010, W011

ATL004935

*"As long as the people on the other side of the border don't have security and a way to live
side by side, this is going to continue. I want to tell this to the leaderships of both sides. We
need to achieve dignity and liberty for the other side as well."[102]*

76.    **22 August mortar attack on Kibbutz Nahal Oz:**  On 22 August 2014, Daniel
Tregerman, aged 4, was killed by a mortar shell in his home at Kibbutz Nahal Oz in the
Sha'ar Hanegev Region about 2 km from the Gaza Green Line. [103] The boy was playing
with his two younger siblings inside the house when a mortar struck the family car and
spread shrapnel that killed Daniel. His mother told the commission that the family had left
the kibbutz one day before the start of Operation "Protective Edge" because rockets had
been fired from Gaza over the previous two weeks. On 21 August, the family had returned
to the kibbutz because they believed that the violence was over, although they said their,
"suitcases remained ready because [they] knew that Hamas could break the ceasefire at any
time".[104] As the explosion occurred only three seconds after the siren warning, the parents
who had taken the two younger siblings to the safe room had no time to take Daniel with
them[105].

77.    In a media interview, Daniel's father said that his wife had wanted him to call for
help but he knew that their son had already died. In his words, "there was no need for
anyone to come […]. We are trying to leave this inferno and we are leaving Daniel
behind."[106] The father realized later that he himself was injured by shrapnel in the legs.[107]
Daniel's mother told the commission that on the same day her son died another woman was
injured by a Qassam rocket in the same kibbutz.[108] Daniel's mother described the 2014
hostilities as more violent than previous conflicts, particularly as the civilian population
was under a persistent threat of rocket and tunnel attacks. She called for an end to the
violence, which continues to cause suffering to mothers on both sides:

*"We the people living in Israel want to live in peace and not under threat of terrorism. I
would like our neighbours in Gaza to have a good and happy life and their children to go to
school, and they can do this if they do not live under terrorism."* [109]

78.    Israeli media sources report that over 90 rockets and mortar shells were fired from
Gaza into Israel on 22 August and sirens sounded across southern and central Israel as a
barrage of rockets was launched in the late afternoon.[110] According to OCHA, most of these
rockets were fired indiscriminately and they fell in open areas or were intercepted by the
Iron Dome System[111]. According to a media report of 26 August, the Al Qassam Brigades
stated that they had targeted the IDF's chief of staff, Benny Gantz, in Nahal Oz on Friday

---

[102]  W010
[103]  W040; see also: http://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Victims/Pages/Daniel-
Tragerman.aspx; and http://mfa.gov.il/MFA/InternatlOrgs/Issues/Pages/Letter-by-parents-of-Daniel-
Tregerman-to-UN-Secretary-General-Ban-Ki-moon-4-September-2014.aspx ;
[104]  W040
[105]  W040; Another witness who works with trauma victims in Israel confirmed that many Israeli families
with children who live close to the Gaza Green Line, evacuated the area during the 2014 hostilities.
Statement of W009 to the CoI; see also
http://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Victims/Pages/Daniel-Tragerman.aspx ;
http://www.ynetnews.com/articles/0,7340,L-4563633,00.html and Amnesty International submission
to the CoI, p 16.
[106]  http://www.ynetnews.com/articles/0,7340,L-4563633,00.html
[107]  Amnesty International submission to the CoI, page 16
[108]  Statement of W040 to the CoI
[109]  Statement of W009 to the CoI
[110]  http://www.timesofisrael.com/four-year-old-boy-killed-in-mortar-attack-on-shaar-hanegev/
[111]  https://www.ochaopt.org/documents/ocha_opt_sitrep_25_08_2014.pdf, p.3

ATL004936

22nd August. The Al Qassam Brigades had received information that a convoy including a senior Israeli officer would arrive and they believed it would be Benny Gantz and therefore directed mortar and rocket-propelled grenades at the area around the convoy.[112] The presence of Benny Gantz at Nahal Oz during the attack was confirmed and made public in Israeli media reports on 23 August.[113] According to a media article published on 24 August, Israeli security forces suspected that "Hamas has succeeded in identifying in a few incidents when and where VIP visits occur. On several such occasions, Hamas has launched rockets and fired mortar shells on the southern Kibbutzim during these visits."[114] Based on the information available, the commission cannot exclude that the intended target of the tragic attack of 22 August on Kibbutz Nahal Oz was the IDF Chief of Staff.

79.    **26 August mortar attack on Kibbutz Nirim:** On 26 August, Ze'ev Etzion and Shahar Melamed were killed by a mortar as they tried to repair the electricity lines that had been damaged by Palestinian projectiles earlier in the day in Kibbutz Nirim, Eshkol region. While three other people suffered minor injuries in the attack[115], Gad Yarkoni, who travelled to Geneva to speak to the commission, had to have both his legs amputated as a result of his injuries.[116] He saw his two colleagues lying close by and realized that his legs were severely injured when the alarm went off again and he could not move. It was not possible to evacuate him immediately by helicopter because the shelling continued despite the agreed ceasefire. He said he was flown to a hospital by helicopter and when he woke up there 13 days later, he was told that he had lost both legs.[117] The Al Qassam Brigades announced that they had targeted Kibbutz Nirim and various other communities in the vicinity of Gaza with 107 mm mortars on the day of the attack[118]. The type of weapon used was consistent with the testimony of kibbutz residents.[119]

80.    Residents of the kibbutz struggled to cope with the fear resulting from the loss of two community members, both of whom were said to have been key figures in the community.[120] One witness gave an account of the trauma experienced by the residents of the kibbutz during the summer as 150 mortars hit the area, despite the apparent absence of an IDF military base in the vicinity. He also said there had been no military activity in the area for two days prior to the attack.[121] However, another witness told the commission that tanks were deployed in the fields near the kibbutz at the time of the attack, although there were fewer than during the ground invasion because the IDF had already pulled out several units by 26 August.[122] This witness's house was also hit by a mortar on that day, which caused significant damage to the walls, the windows and the air conditioning system. This

---

[112]   Ajnad News, *Qassam emphasizes target Gantz on Gaza Border*. http://ajnad-news.com/site/ajnad/details.aspx?itemid=19178

[113]   Times of Israel, *IDF chief was at Kibbutz Nahal Oz when mortar shell there killed Daniel Tragerman*, 23 August 2014. http://www.timesofisrael.com/liveblog_entry/idf-chief-was-at-kibbutz-nahal-oz-when-mortar-shell-there-killed-daniel-tragerman/

[114]   Amos Harel and Gili Cohen, *Israel Assess: Hamas is launching rockets on the south during VIP visit's*, Haaretz, 24 August 2014. http://www.haaretz.co.il/news/politics/.premium-1.2413881

[115]   W074, see also http://www.timesofisrael.com/kibbutz-member-killed-by-mortar-shell-laid-to-rest/

[116]   W074, Gad Yarkoni on 15 January 2015

[117]   Statement of W074 to the CoI

[118]   https://twitter.com/qassam_arabic1/status/504191347684048898; see also: http://www.timesofisrael.com/kibbutz-member-killed-by-mortar-shell-laid-to-rest/ and http://www.haaretz.com/news/diplomacy-defense/1.612741

[119]   See Amnesty International submission to the CoI

[120]   W074; W269; see also: http://www.timesofisrael.com/kibbutz-member-killed-by-mortar-shell-laid-to-rest/

[121]   W074

[122]   W269

24

ATL004937

witness claimed that the mortar attacks reflected a strategy by Hamas to target Israeli civilians living close to Gaza, once the Palestinian armed groups realized that the Iron Dome defense system was more effective in larger cities in the north. The witness confirmed that a quarter of the 400-strong population of the kibbutz had been evacuated throughout the conflict to locations in the north. The evacuation, the third of its kind since 2008, was conducted according to the kibbutz's emergency plan, and was not orchestrated by the Israeli Government.

81.     **Eshkol Kindergarten:**  On 21 August at 10 a.m., a number of mortars that appear to have been fired from Gaza hit a kindergarten in Eshkol, located about 2 km from the Green Line, severely injuring one person.

82.     An eyewitness, Jehan Berman, told the commission that he and his wife had gone to the kindergarten to celebrate the birthday of their 3-year-old son. They first heard an alarm, followed by the sound of mortars five seconds later.  They moved inside the building where 17 children and 3 female guards were present. A first mortar hit, then two minutes later, a series of mortar strikes followed.

83.     *"We counted 13 mortars in total. One of the mortars hit a tree next to the school and, since it exploded in the air, all the debris fell towards the ground, crossed the window, crossed my upper left shoulder and then landed on the wall, at 15 cm from my wife. The debris fractured the scapula in 5 pieces, destroyed the cartilage and touched the lung as well. I fell on the ground and started screaming because I was in so much pain, although I did not lose consciousness. I felt a massive pain in my left hand. The ambulance arrived soon after. [...Later, in the hospital] I realised how lucky I was after I was informed that the debris travelled at just 2cm from a major artery in my heart. So I'm happy to be alive today. I am recovering from this nightmare but the road is long. My movements are extremely limited and I undergo daily physiotherapy sessions. [...] My aim now is to tell everyone what happened and to say that this needs to stop. In Eshkol living under the constant threat from Hamas is a real suffering."*[123]

**Factual assessment**

84.     According to the Government of Israel, approximately 4,000 of the 4,500 rockets and mortars fired by Palestinian armed groups were directed at Israeli cities, towns and residential communities; 250 landed accidentally in Gaza; and the rest were directed at IDF troops in Gaza.[124]

85.     The authorities in Gaza assured the commission that Palestinian armed groups did not target civilians and complied with international humanitarian law, and that any such action was not deliberate. They maintained that Palestinian rockets are 'primitive' and not very technologically advanced but nevertheless the factions attempted to direct their rockets at military targets in Israel.[125]

86.     The commission requested detailed information from the Government of Israel on where the rockets and mortars fired by Palestinian armed groups in Gaza actually landed so as to make a more detailed assessment of the proportion of cases in which they were directed at densely populated areas in Israel. Unfortunately, the Government of Israel did

---

[123]  W041
[124]  Israel, Ministry of Foreign Affairs, *Hamas Violations of the Law*, p.1. Available at: http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015.
[125]  Interview with Ghazi Hamad.

not provide a response, which made it difficult for the commission to determine the extent to which attacks directed at the civilian population in Israel.

87.     A letter was sent to the State of Palestine requesting information on the objective and targets of the rocket and mortar firing, as well as information on the type of rockets used by Palestinian armed groups in Gaza. A similar letter was sent to Hamas. The commission did not receive a response to these specific requests for information.

88.     The commission notes that a number of military objectives are located in various parts of Israel, in some cases in the immediate vicinity of built up areas such as the Hatzor airbase, or in the case of the IDF Headquarters, in the midst of a densely populated area. In addition, during the escalation of hostilities, the number of IDF positions in the south of Israel around Gaza, sometimes close to civilian communities, was higher than usual, as this area was used to position artillery and as a staging ground for the IDF ground operation in Gaza.[126]

89.     Several statements were made by armed groups indicating that in some cases, they intended to target military objectives in Israel. For instance, in a press conference the spokesperson of the National Resistance Brigades in Gaza said that the groups had fired projectiles towards "military positions along the Gaza border."[127] The examination of messages posted between 3 and 26 August 2014 on the unofficial English twitter account of the Al Qassam Brigades clearly distinguishes between attacks directed at Israeli cities and attacks targeting military objectives in Israel.[128]

90.     However, in the vast majority of individual rocket and mortar attacks, the commission does not have information on the intended targets, but notes that Palestinian armed groups announced that they intended to attack population centres in Israel[129] and declared responsibility for launches directed at different places in Israel.[130] For instance, on 7 July a communiqué of the Al Qassam Brigades stated, "Shelling military bases 'Nitifot, Ofokeem, Ashdod & Asqalan' with (35) missiles."[131] With regard to this statement the commission notes that it appears that the Al Qassam Brigades intended to target Israeli towns but decided to characterise them as military bases. On 3 August 2014, the Al Qassam Brigades issued a statement confirming their intention to target Israeli civilians in response to Israel's "targeting of Palestinian civilians in their homes and shelters."[132] On 8 August, Al Qassam Brigades tweeted, "All Zionist cities will be targeted daily until all of our demands are met."[133] In an Al Jazeera news report a member of the Al Qassam Brigades mortar unit, allegedly deployed along the Green Line in Khuza'a, declared that from their

---

[126] Amnesty International, *Unlawful and deadly. Rocket and Mortar Attacks by Palestinian Armed Groups during the 2014 Gaza/Israel Conflict*, March 2015, pp, 16-17.

[127] Al Watan Voice, *In a press conference for the National Resistance Brigades in Gaza: During the war, we launched 748 missiles and killed eight Israeli soldiers*, 27 August 2014. http://www.alwatanvoice.com/arabic/news/2014/08/27/583646.html

[128] @Qassam_English, account currently suspended. For instance on 25 August two tweets mention attacks on military bases: "Al-Qassam Brigades fired 3 mortars at a military base east of Nirim in response to Israel's attacks on Gaza, Palestine," or "Al-Qassam Brigades fired 2 mortars at military base Zikim in response to Israel's attacks on Gaza, Palestine"

[129] https://twitter.com/qassamenglish/status/497776823636623361 ;http://www.ohchr.org/Documents/Countries/PS/A.HRC.28.80.Add.1.doc

[130] www.saraya.ps/index.php?act=Show&id=36899, www.alqassam.ps/arabic/#!/ الأخبار;

[131] http://www.qassam.ps/statement-1506- Al_Qassam_Brigades_retaliate_with_35_missiles_on_Israeli_military_bases.html

[132] https://cintayati.files.wordpress.com/2014/08/al-qassam-no-life-is-more-precious-than-the-lives-of-our-people-3-aug-statement.jpg

[133] @qassamenglish, 8 August 2014. Account currently suspended

ATL004939

location they had attacked several "settlements and military concentrations."[134] During a press conference the spokesperson of the National Resistance Brigades in Gaza stated that the groups had fired projectiles towards "Israeli towns and settlements."[135] In addition, maps of some of the areas neighbouring Gaza showing the impact points of rockets and mortars provided in documentation made available by Israel, appear to indicate a concentration of impact points around built up areas close to the Green Line.[136]

91.     Mortar fire by the Palestinian armed groups appears to have often been aimed at specific targets and is more precise than the rockets in the armed groups' arsenal.[137] In numerous cases mortars fired by Palestinian armed groups targeted IDF forces.[138] While some of these attacks were directed at IDF troops inside Gaza,[139]  a number of mortar attacks were directed at IDF positions and troop concentrations inside Israel in the vicinity of the Gaza Strip. For instance, on 16 July 2014 IDF assembly zones close to the Erez crossing were targeted, resulting in the death of a civilian who was distributing food to soldiers.[140] The IDF acknowledges that approximately 10 IDF soldiers were killed along the Green Line seemingly in Israel, in the course of a number of attacks during which mortars appear to have been fired at IDF forces.[141]

92.     In a few instances it appears that Palestinian armed groups in Gaza attempted to warn civilians in Israel of attacks that might affect them. For example, according to information provided by the Ministry of Foreign Affairs of the State of Palestine, on 12 July 2014 an armed group in Gaza announced in Arabic and Hebrew that it would carry out an attack on Tel Aviv and specified the time at which the attack was to take place.[142] On another occasion, according to media reports, the Al Qassam Brigades issued a warning to airlines not to fly to Ben-Gurion airport as it considered the airport to include a military base.[143] On 20 August 2014, the Al Qassam Brigades, through a press release issued in English, once again warned international airlines not to fly into Tel Aviv starting from the

[134] Al-Jazeera, report of 6 August 2014. Reproduced on MEMRI TV, available at: http://www.memritv.org/clip/en/0/0/0/0/239/0/4404.htm

[135] Al Watan Voice, *In a press conference for the National Resistance Brigades in Gaza: During the war, we launched 748 missiles and killed eight Israeli soldiers,* 27 August 2014. http://www.alwatanvoice.com/arabic/news/2014/08/27/583646.html

[136] Israel, Ministry of Foreign Affairs, *Hamas Violations of the Law*, p.8. See also *The Threat to Israel's Civilian Population and Civil Defence Measures*, p. 16. Available at http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx. Accessed on 30 May 2015.

[137] Gaza Conflict Task Force commissioned by the Jewish Institute for National Security Affairs (JINSA), *2014 Gaza War Assessment: The New Face of Conflict,* Report of March 2015,  p. 40.

[138] Gaza Conflict Task Force commissioned by the Jewish Institute for National Security Affairs (JINSA), *2014 Gaza War Assessment: The New Face of Conflict,* Report of March 2015,  p. 40.

[139] Israel, Ministry of Foreign Affairs, *Legal Aspects: Hamas Violations of the Law*, p.1. Available at http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx. Accessed on 30 May 2015.

[140] See website of the Israeli Prime Minister's Office: http://www.pmo.gov.il/English/TerrorInjured/Pages/vicDrorHanin.aspx, or the website of the Israeli Ministry of Foreign Affairs: http://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Victims/Pages/Dror-Hanin.aspx

[141] IDF, *Fallen Soldiers of Operation Protective Edge.* https://www.idfblog.com/blog/2014/07/19/fallen-soldiers-operation-protective-edge/

[142] Response of the State of Palestine. Israel, Ministry of Foreign Affairs, *Hamas Violations of the Law*, footnote 18. Available at http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx. Accessed on 30 May 2015

[143] Reuters, *Hamas wing says it will target Israel's main airport*, 11 July 2014. Available at: http://in.reuters.com/article/2014/07/11/palestinians-israel-airport-idINKBN0FG0S620140711

following morning, and asked residents of communities located in the vicinity of Gaza to avoid returning home, or to remain inside shelters.[144]

**Legal analysis**

93.     Palestinian armed groups appear to have provided advance warning in a very few instances before launching attacks that may have killed Israeli civilians. In particular the commission notes that a warning was issued on 20 August 2014 through a press statement of the Al Qassam Brigades instructing residents of communities located in the vicinity of Gaza to avoid returning home, or to remain inside shelters until further notice[145]. This preceded the increased firing of mortars towards the areas in the Gaza "envelope" during the last week of the conflict.[146]

94.     The customary rule of international humanitarian law reflected in article 57(3) of Additional Protocol I,[147] provides that "effective advance warning shall be given of attacks which may affect the civilian population, unless circumstances do not permit." While the obligation to provide warnings is not absolute (for example if the element of surprise or the speed of response are essential in the attack), any warning issued must be effective. While international humanitarian law does not specify what the required elements are for a warning to be considered effective, the commission considers that two of the main requirements are (1) that the warning is crafted in a way that will be understood by those to whom it is addressed; and (2) that the warning can be acted upon, meaning that what the warning requires can be realistically complied with.

95.     With regards to the instances of warnings mentioned above, regardless of the legality of the attacks with which they are associated, it appears that they were of a nature that could be acted upon. Airlines were warned in advance of the possible targeting of the airport, providing them with the time to suspend flights. Warning civilians in Tel Aviv that a rocket would be fired in the direction of the city at 9 p.m. provided the opportunity for residents to seek shelter. Warning civilians to evacuate communities located in the vicinity of the Green Line could also realistically be acted upon because -- unlike in Gaza -- residents could flee to other areas of Israel less exposed to threats, in great part due to the existence of the Iron Dome system. The main concern regarding the effectiveness of these warnings is whether they fulfilled the first requirement of being understood. Indeed, this presupposes that those to whom the warning is addressed actually received it. It appears that the warnings were issued through the Internet and press statements. While in some cases, the warnings or certain parts were replicated in the media, it is not clear that the methods of transmission used could ensure that they reached the intended public. However, it is also not clear what other methods of transmitting the warnings were available to armed groups in Gaza.

96.     The issuing of warnings is only one of the precautionary measures described in article 57 of Additional Protocol I. Regardless of their effectiveness, the fact that warnings were issued does not relieve the attacking party of the other specific precautionary measures mentioned in article 57. The general obligation to take constant care to spare the

---

[144]   http://www.qassam.ps/statement-1509-
Press_Release_of_Abu_Obeida_Al_Qassam_spokesperson.html
[145]   http://www.qassam.ps/statement-1509-
Press_Release_of_Abu_Obeida_Al_Qassam_spokesperson.html
[146]   See also the graph on page 5 State of Israel, *Israel's Objectives and Phases of the 2014 Gaza* Conflict. Available at:
http://mfa.gov.il/ProtectiveEdge/Documents/Objectives_Phases_Operation.pdf.
Accessed on 30 May 2015
[147]   ICRC, *Database on customary international humanitarian law,* Rule 20

28

ATL004941

civilian population and objects remains valid throughout the attack, even if specific precautionary measures such as warnings have been implemented. Article 57(5) clearly establishes that the adoption of precautions does not modify the prohibition of attacking civilians and civilian objects or of launching indiscriminate attacks.

97.    The majority of projectiles fired by Palestinian armed groups consisted of rockets that at best were equipped with only rudimentary guidance systems and in the vast majority of cases had none at all. The ICRC Commentary on Additional Protocol I describes "long-range missiles which cannot be aimed exactly at the objective" as the primary example of means of combat which cannot be directed at a specific military objective.[148] The rockets available to armed groups in Gaza are unguided and inaccurate. Estimates, confirmed by the commission, indicate that the Fajr-5[149] and similar J-80 and M-75 rockets can land as far as 3 km from any intended target. The longer range rockets, such as the R-160, can land as far as 6 km away from the target because their accuracy decreases with range.[150] Such rockets cannot be directed at a specific military objective and therefore strikes employing these weapons constitute indiscriminate attacks in violation of the customary rule reflected in article 51(4) of Additional Protocol I.[151] The limitations of the military arsenals of Palestinian armed groups was advanced[152] as a reason for their failure to attack precisely military targets. The military capacity of the parties to a conflict is irrelevant to their obligation to respect the prohibition against indiscriminate attacks.

98.    While the commission cannot know what the intended target of each rocket attack was, statements made by Palestinian armed groups with regard to the firing of rockets indicate intent to direct those attacks against civilians. In addition, international tribunals have ruled that in certain circumstances, indiscriminate attacks may qualify as direct attacks against civilians.[153] The launching of rockets by Palestinian armed groups may therefore amount to war crimes.[154]

99.    The impossibility for Palestinian armed groups to direct rockets towards military objectives raises the question as to what military advantage the Palestinian armed groups could expect to obtain from launching these rockets. Given the apparent absence of any possible military advantage, and statements by Palestinian armed groups that they intended to hit Israeli cities, the commission cannot exclude the possibility that the indiscriminate rocket attacks may constitute acts of violence whose primary purpose is to spread terror amongst the civilian population, in violation of the customary rule reflected in article 51(2) of Additional Protocol I and article 13(2) of Additional Protocol II.[155]

100.    The commission cannot know what the intended targets of the different mortar attacks were because of the IDF military manoeuvres and the presence of numerous IDF

---

[148]   ICRC Commentary on Additional Protocol I, p. 621, para. 1958
[149]   Army Recognition, *Fadjr-5 333mm Multiple rocket launcher system,* indicating that the Fajr-5 has a circular error of probability of 4 per cent.
[150]   Amnesty International, *Unlawful and deadly. Rocket and Mortar Attacks by Palestinian Armed Groups during the 2014 Gaza/Israel Conflict,* March 2015, p.10.
[151]   ICRC, *Database on customary international humanitarian law,*  Rule 12
[152]   Interview with Ghazi Hamad
[153]   International Criminal Tribunal for the former Yugoslavia, *Prosecutor v. Galic,* case No. IT-98-29-T, Judgement, 5 December 2003, para. 57.
[154]   Article 8, Rome Statute of the ICC.
[155]   ICRC, *Database on customary international humanitarian law,* Rule 2. While not listed as a war crime in the Rome Statute of the ICC, the Appeals Chamber of the ICTY found that "customary international law imposed individual criminal liability for violations of the prohibition of terror against the civilian population." *Prosecutor v. Galic,* case No. IT-98-29-A, Judgement, 30 November 2006.

positions and bases in Israel in the vicinity of the Green Line during the hostilities. However, statements on unofficial twitter accounts apparently related to Al Qassam Brigades, as well as statements by members of armed groups in television news reports,[156] indicate in some cases, their intent to strike military objectives, whereas other statements clearly spell out the intent to target civilian communities.[157]

101.    As mortars can be directed at a specific target, if they were used to target civilians or civilian objects this would be a violation of the principle of distinction and would qualify as a direct attack against the civilian population and therefore amount to a war crime.[158]

102.    In the cases in which attacks were directed at military objectives located amidst or in close vicinity to civilians or civilian objects, mortars are not the most appropriate weapon. The imprecise nature of mortars makes it difficult for an attacking party using this weapon in an area in which there is a concentration of civilians to distinguish between civilians and civilian objects and the military objective of the attack, and to limit its effects as required by international humanitarian law. Therefore, the use of such weapons with wide area effects by Palestinian armed groups against targets located in Israeli towns and villages, and the possible indiscriminate effects, are likely to constitute a violation of the prohibition of indiscriminate attacks.[159]

103.    The use of mortars against military objectives located in populated areas also raises concerns with regard to the principle of precaution in attack. Indeed parties to the conflict must take all feasible precautions in the choice of weapons with a view to avoiding or at least to minimizing incidental civilian loss of life.[160]

### b.    Tunnels

104.    *"All the time I was living in fear. So if my husband forgot to lock a door or window I was hysterical that someone would come in and take one of the children. Eventually we decided to move."*[161]

Israeli mother

105.    According to the IDF, they discovered 32 tunnels, 14 of which extended beyond the Green Line into Israel.[162] The tunnels have been described by an IDF engineer as wide tunnels, in which a man can walk upright, dug deep beneath the surface with sides reinforced by layers of concrete and with internal communication systems.[163] In one tunnel, three motorcycles were allegedly found by the IDF. One witness who had seen one of the decommissioned tunnels said she was, "struck by the complexity of the tunnel and how well-built it was with a solid cement structure and a full electricity grid."[164]

---

[156]   Al-Jazeera, report of 6 August 2014. Reproduced on MEMRI TV, available at: http://www.memritv.org/clip/en/0/0/0/0/239/0/4404.htm

[157]   @Qassam_English

[158]   Rome Statue, article 8

[159]   Article 51(4) Additional Protocol I. ICRC, *Database on customary international humanitarian law*, Rule 11

[160]   Article 57 Additional Protocol I. ICRC, *Database on customary international humanitarian law*, Rule 17

[161]   W040

[162]   IDF: Operation Protective Edge by the Numbers at: www.idfblog.com/blog/2014/08/05/operation-protective-edge-numbers/

[163]   Daniel Rubenstein, *Hamas Tunnel Network: A Massacre in the* Making, Jerusalem Center for Public Affairs. http://jcpa.org/hamas-tunnel-network/

[164]   W076

ATL004943

106.    The discovery of these tunnels and their use by Palestinian armed groups during the hostilities caused great anxiety among Israelis that the tunnels might be used to attack civilians. One witness told the commission, "When it's quiet we get even more afraid because we don't know what things can come from the ground. Since April, everyone was afraid and uncomfortable about the tunnels." Another witness said, "There was a tunnel just behind the greenhouses. In a way, they are more scary than rockets because with the tunnels there's no chance of being warned. Some people won't let their children go outside."[165]

107.    Official Israeli sources describe "cross-border tunnel attacks" as one of "two primary means to target Israeli civilians,[166] explaining that, "Hamas placed tunnel openings close to residential communities in Israel". They provided four examples of incidents in which members of Palestinian armed groups emerged from tunnel exits located between 1.1 and 4.7 km from civilian homes. According to the Ministry of Foreign Affairs, in all these cases the members of armed groups encountered IDF troops "obstructing their ability to carry out attacks against civilians."[167]

108.    The commission cannot conclusively determine the intent of Palestinian armed groups with regard to the construction and use of these tunnels. However, the commission observes that during the period under examination, the tunnels were only used to conduct attacks directed at IDF positions in Israel in the vicinity of the Green Line, which are legitimate military targets. A resident of a kibbutz located 1.7 km from Gaza told the commission, "We hear that tunnels are mostly to harm soldiers but that doesn't stop families from being afraid".[168] Another witness explained how he had not been allowed, even as an Israeli journalist following soldiers, to go into a tunnel as it was too dangerous, "because every tunnel has not one exit in and out, they have multiple hatches for Hamas to be able to surprise soldiers."[169]

109.    The UN Secretary-General, briefing the Security Council following his visit to Israel and the OPT, which included a visit to a tunnel built by Palestinian armed groups, stated, "I fully understand the security threat to Israel from rockets above and tunnels below. At the same time, the scale of the destruction in Gaza has left deep questions about proportionality and the need for accountability."[170]

**2.    Air strikes on residential buildings in Gaza**

110.    *"I was sitting with my family by the table, ready to break the fast. Suddenly we were sucked into the ground. Later that evening, I woke up in the hospital and was told that my wife and children had died".[171]*

*"This war was different from previous wars, especially for women. Civilians were attacked particularly in their homes. The home is the domain of the women […]. Women are dependent on the home for their purpose and existence. They are the primary caretakers of the home and responsible for raising the children, for cooking, cleaning, clothing. Without*

---

[165]   W010

[166]   Israel, Ministry of Foreign Affairs *Hamas Violations of the Law*, p.1. Available at
http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-
Aspects.aspx. Accessed on 30 May 2015.

[167]   Israel, Ministry of Foreign Affairs *Hamas Violations of the Law*, p.12. Available at
http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-
Aspects.aspx. Accessed on 30 May 2015.

[168]   W006

[169]   Or Heller W072,

[170]   October 2014; at: http://www.un.org/sg/statements/index.asp?nid=8120

[171]   W013.

*this habitat the women lose their sense of purpose, and their sense of control. The outside realm, the public, is the man's sphere."[172]*

111.    The IDF carried out more than 6 000 airstrikes in Gaza during the 2014 Operation[173], from the first day throughout the Operation. These included targeted attacks on residential and other buildings. As a result, according to the Office for the Coordination of Humanitarian Affairs (OCHA), during the 2014 hostilities, 142 Palestinian families had three or more members killed in the same incident owing to the destruction of residential buildings, for a total of 742 fatalities.[174] An even higher figure is reported by some non-governmental organizations, which speak of 1066 people, including 370 children and 241 women, killed inside their homes.[175] In addition, IDF air strikes destroyed – in whole or in part – a significant number of houses.[176]

112.    The commission examined in detail 15 strikes on residential buildings in the Gaza Strip in which a total of 216 people were killed, including 115 children and 50 women. The commission conducted 37 interviews, reviewed confidential submissions from a variety of stakeholders, governmental and non-governmental, and consulted publicly available information. These include photos, satellite imagery and video materials. All available materials relating to each incident were reviewed by a military expert to determine the type of weapons most likely to have been used. The assessment included matching testimony of witnesses to a variety of indicators, such as photographs of injuries to persons, damage to buildings and surroundings, and remnants of weapons.

113.    Homes and buildings destroyed as a result of the air-land operation into Shuja'iya, Khuza'a and Rafah (often due to tank or artillery shells) are discussed in the chapter on ground operations (V.A.3). The present chapter therefore focuses on those residential buildings that were struck by what appears to have been targeted air strikes.

114.    By letter dated 10 February, the commission asked the Israeli authorities for information "on several general issues and…clarifying the factual circumstances of specific incidents". The commission specifically inquired about 13 out of the 15 incidents examined in this chapter as well as the strikes on high rise buildings in late August 2014. Israel was asked to explain the specific contribution of each building to the military actions of the Palestinian armed groups and how its destruction represented a military advantage for the IDF; what were the ranks and combat functions of members of armed groups if they were the target of the attack; what precautionary measures, including warnings and the choice of weapons, were employed; what was the number of fatalities resulting from each of the

---

[172]  W233.
[173]  Israel, Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*, p. 38 available at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf, accessed on 30 May 2015.
[174]  OCHA, Fragmented Lives, Humanitarian Overview 2014, March 2015, p. 6.
[175]  Al Mezan Center for Human Rights, Lawyers for Palestinian Human Rights (LPHR), 22 May 2015 up-date to a complaint submitted concerning large-scale destruction and damage to family houses in the Gaza Strip with associated profound loss of life and injury to Palestinian residents, during Israel's military operation between 7 July 2014 and 26 August 2014, 30 September 2014, original complaint available at: http://lphr.org.uk/legal-projects/gaza-accountability-project/; Physicians for Human Rights comes to a similar conclusion on the basis of their interviews with injured persons. Physicians for Human Rights, Findings of an Independent Medical Fact-Finding Mission, Gaza 2014, p. 36. At https://gazahealthattack.files.wordpress.com/2015/01/gazareport_eng.pdf. From now on referred to as Physicians for Human Rights, Findings of an Independent Medical Fact-Finding Mission, Gaza 2014.
[176]  UNITAR-UNOSAT speaks about "wide-spread destruction"; see: Impact of the 2014 Conflict in the Gaza Strip. UNOSAT Satellite Derived Geospatial Analysis, 2014, p. 11. At: https://unosat.web.cern.ch/unosat/unitar/publications/UNOSAT_GAZA_REPORT_OCT2014_WEB.pdf.

ATL004945

incidents; and whether any investigations had been initiated in relation to these strikes. No response was received from the Government of Israel. Therefore, to the extent possible, the commission assessed materials that are in the public domain. In particular, Israel published information on 8 attacks on homes that were examined by the General Staff Mechanism for Fact-Finding Assessments (FFAM) and the Military Advocate General (MAG), 3 of which are discussed in the present chapter[177]. The MAG's findings are referred to in the relevant sections of the text.

**a.   Airstrikes on buildings**

(i).   Al Hajj family home and neighbouring houses:

115.   On 10 July 2014 at around 2 a.m., the house of Mahmoud Al Hajj in Khan Younis was bombed, and all 8 members of the Al Hajj family[178] present were killed, including 2 children and 3 women. The bombing completely destroyed the house and damaged neighbouring houses of other members of the Al Hajj family, as well as the houses of the Al Athamna, Abu Libda and Shakshak families.[179] According to the witnesses interviewed by the commission, 20 people were injured[180], including 7 women and 4 children. The injured included at least 7 Al Athamna family members, 8 Al Halbi family members, and 2 Abu Libda family members.[181]

116.   The Al Hajj house was a two-storey building of 135 m$^2$. Photos reviewed by the commission show the complete destruction of the house and considerable damage to surrounding buildings[182]. On the basis of the available materials, which include testimonies and pictures of the site and of remnants of weapons, the commission considers that the weapon used was most likely a Joint Direct Attack Munition (JDAM)-guided bomb, either a GBU Mk 82 (500lbs) or GBU Mk 83 (1000lbs).

117.   The commission interviewed two witnesses who were in neighbouring houses at the time of the attack. One, a member of the Al Hajj family who lived about 50 metres south of the house, recounted that he heard sounds from a plane[183], followed by a large blast at 1.30 a.m. A second blast followed a few seconds later[184] shattering the doors and windows of the witness' own house. The witness went outside and saw people heading north to his sister's house.  When he arrived at the attacked house, he was shocked to see the Mahmoud Al Hajj family home completely destroyed, with all members of the family killed and covered by rubble and dust. According to the witnesses, twenty neighbouring houses, including those of the Abu Libda and Shakshak families were partially destroyed by the attack.[185] While 6 bodies were identified when pulled out from beneath the rubble, the remains of 2 of the

---

[177]   One of them, Shuja'iya market, is discussed in chapter V.A.3 on ground operations.
[178]   W078 and W077. See Al Wattan News,
- خاص لـ "وطن": بالفيديو... مجزرة "الحاج" تودي بحياة 8 أفراد ودمار 30 بيتًا , 15 July 2015
استشهدوا و هم نيام و دون سابق تحذير, and Gaza TV, 10 July 2014, at .
[179]   W078 and W077.  B'Tselem, Black Flag, January 2015.http://www.btselem.org/gaza_strip/2015_black_flag/al_haj_family
[180]   Palestinian Center for Human Rights (PCHR) reports 19 injured.
[181]   W078 and W077.  PCHR submission including list of persons killed and injured during the incident. B'Tselem, Black Flag, January 2015.
[182]   See photos on B'Tselem, Bombing of al-Haj home, Khan Yunis, 28 January 2015, at: http://www.btselem.org/gaza_strip/2015_black_flag/al_haj_family and PCHR submission including pictures of the site and of the remnants of weapons, drawing of the site and affidavits from witnesses.
[183]   PCHR submission.
[184]   W078.
[185]   W078.

33

ATL004946

children were completely obliterated as a result of the blast.[186] The witness told the
commission:

*"It was difficult to reach the victims because the house was totally destroyed. So, with a few
other men, I kept looking for survivors. I found my sister who was thrown to what used to
be the street outside her house. When I pulled her out she was unconscious and her right
leg was amputated. Another man helped me and we took her to the hospital in a private
car. There the doctors tried to save her life but she died aged 55. "[187]*

118.    The commission also spoke to another witness from the Al Athamna family, whose
house is located across the street from the Al Hajj family home and also sustained damage.
He was at home during the attack and described a "fire ball" from the direction of the west
hitting the house of the Al Hajj family, causing enormous destruction to it and to the
adjacent houses of several Al Athamna family members.[188] Several of his own relatives
were injured; the wife of his brother Mahmoud, Rajaa Al Athamna, aged 29, was pulled out
alive from the rubble after half an hour, but she now suffers from amnesia and cannot
recognize anyone from her family.[189]

119.    Both witnesses indicated that the Al Hajj house was situated in a residential area,
free from any military activity and that there had been no "roof-knock"[190] warning. One of
them said that about one week after the attack on the Al Hajj house, other houses in the
vicinity were targeted but in those cases the families had been warned by phone calls of an
imminent attack.[191] According to the Intelligence and Terrorism Information Centre, one of
the persons killed on 10 July 2015 was a member of the Al Qassam Brigades[192].

120.    The commission cannot determine with certainty whether or not a warning was
issued, because all the people inside the house during the attack were killed.

(ii)    Al Qassas family building

121.    On 21 July at around 4.30 p.m., two IDF missiles launched from the air hit the top
floor of the Al Qassas family five-storey building killing 9 people including 6 children and
3 women, one of them pregnant. Another 10 people were injured including 8 children and 1
woman. The youngest injured child was a baby who sustained burns to the face.[193]

122.    The Al Qassas house is located in the Shuja'iya neighbourhood, close to the Al
Jamal Abdel Naser street and the Al Tayam square. At the time of the attack about 41
persons resided in the building. In addition to 24 family members who habitually lived in
the building, another 17 relatives were staying there having fled their homes in the al
Zeitoun and Shuja'iya neighbourhoods after the IDF distributed leaflets warning residents
to leave.[194] The top floor was the home of Yasser Al Qassas, his pregnant wife Somaya, and

---

[186]   W078.
[187]   W078.
[188]   W077.
[189]   W077
[190]   See para. 235
[191]   W078
[192]   Intelligence and Terrorism Information Center. Preliminary, partial examination of the names of
        Palestinians killed in Operation Protective Edge; 28 July 2014 at http://www.terrorism-
        info.org.il/en/article/2070828 July 2014 , p. 17 ; at http://www.terrorism-
        info.org.il/Data/articles/Art_20687/E_124_14B_472268844.pdf
[193]   PCHR submission. See also B'Tselem, Black Flag, January 2015.
[194]   B'Tselem, Black Flag: The Legal and Moral Implications of the Policy of Attacking Residential
        Buildings in the Gaza Strip Summer 2014, January 2015, at

34

ATL004947

their nine children. The family was preparing for the *iftar* meal, the breaking of the fast at sunset, when the attack took place.[195]

123.   The commission spoke with two family members. One of them, who was present at the time of the attack, told the commission that most male relatives were not actually in the building at that time because they had rushed to the Daood Tower, about 300 metres away, which had been struck a few minutes earlier.[196] The witness, who stayed on the fourth floor, said that shortly after the men had left, two missiles hit the fifth floor of the Al Qassas building within an interval of a few minutes. The same witness indicated that he was not aware that any advance warning had been given.[197] Another family member interviewed by the commission arrived at the house to find that his two daughters aged 13 and 14 had died.[198] According to information the commission received, five people who were in the stairway at the time of the attack were injured.[199]

124.   None of the information collected by the commission suggests that there was a military target in the Al Qassas building. To date, the IDF has not made statements identifying the military objective of the strike, nor has it listed this incident among those under investigation.

125.   According to the commission's assessment, made on the basis of an analysis of plans of the building and photos of the destroyed eastern part of the apartment and of the walls of the northern part of the building with remnants of shrapnel[200], the IDF appears to have used Hellfire missiles. The method of the projectile's entry into the building, its trajectory, the small opening it created and the blast effect visible on the eastern side of the building, along with the extensive shrapnel damage observed, are consistent with the use of Hellfire Missiles.[201]

(iii)   Al Najjar home

126.   *"I was staying on the first floor and I was the only survivor from the first floor. When the attack took place, I was knocked out. I woke up at about 6 or so, in the hospital, and I later learnt that my sister, my mother and my children had all died. Even many of my relatives on the second floor had died. We all died that day, even those who survived."*

Witness interviewed by the commission[202]

127.   At 2.53 a.m. on 26 July, the Al Najjar family home in Khan Younis in southern Gaza was bombed.[203] Nineteen members of the same family, including 11 children and 5

---

[195]   W137.
[196]   W136.
[197]   W136. See also B'Tselem, Black Flag, January 2015.
[198]   W137.
[199]   Photo of the scene of the incident with marks of where people were killed and injured submitted by PCHR ; Ann Paq photos on B'Tselem web-site:
http://www.btselem.org/download/201501_black_flag_eng.pdf
[200]   PCHR submission.
[201]   These conclusions are based on witness statements and submissions which include building plans, photos of the site and of remnants of weapons.
[202]   W277.
[203]   Note that this case is different from the one examined by the Military Advocate General, which discusses an incident that occurred on 29 July 2014; IDF Military Advocate General's ('MAG): Decisions of the IDF MAG Regarding Exceptional Incidents that Allegedly Occurred During

(above the footnotes, separated by a rule:)
http://www.btselem.org/download/201501_black_flag_eng.pdf. From now on referred to as B'Tselem, Black Flag, January 2015.

women, were killed during the attack.[204]  The youngest victim was an eight-month-old baby. Five people present in the house sustained moderate and critical injuries.[205]

128.   The commission spoke with four witnesses to this attack, including three eye-witnesses, who were all taken to the hospital afterwards. One of them was a resident of Jawar, located about 1 km from the Green Line. On 18 July, the witness and his family had fled from their own home because of intensified fighting in the area and gone to his sister's house in Khan Younis. They had been at his sister's house for one week at the time of the attack. [206] The witnesses concurred that the strike took place at 2.53 a.m. Two said that they remember the precise time because it was only a few minutes after they got up to have *suhhur*, the last meal of the day during Ramadan until the breaking of the fast in the evening.[207]

129.   A fourth witness, who had been in a neighbouring house when the attack occurred, said that he could not see anything because the building was covered by a cloud of dust and debris. People started walking to the house looking for survivors but they realized that the entire building had been destroyed.[208] As he was searching through the debris, the witness came across the bodies of many family members. Everyone in his family died with the exception of one of his brothers. Many of the bodies were unrecognizable when they were pulled out of the rubble.[209]

130.   Two of the witnesses reported that there was no warning, no "roof-knock" missile, no phone calls, and no leaflets. According to them, no one in the family is affiliated with an armed group.[210] Another witness also denied that the house was hosting armed activity or that the attack had been preceded by warnings:

*No militias or fighters walked into our home or sought refuge in our home. None of us were fighting. We were not told that we would be attacked. We all got up to do the suhhur and nobody was expecting this. We did not have any reason to believe this attack was going to take place. No warning and no information was given. The attack came just like that. And I am still trying to understand why, given that I lost all of my family in this attack while all of them were sleeping.[211]*

131.   Photos taken after the attack show a large crater where the house had stood before.[212] The witness testimonies all describe immense devastation. Destruction at such scale appears to be the result of a large bomb, very likely a 1000lb or 2000lb-bomb.

Operation 'Protective Edge'- Update No. 4 of 11 June 2015; at http://www.law.idf.il/163-7353-en/Patzar.aspx
[204]   W273.
[205]   PCHR: On the 19th Day of the Israeli Offensive on Gaza 26 July 2014 at: http://www.pchrgaza.org/portal/en/index.php?option=com_content&id=10539:on-the-19th-day-of-the-israeli-offensive-on-gaza-before-declaration-of-humanitarian-truce-israeli-forces-escalated-attacks-against-palestinian-civilian20-members-of-one-family-including-11-children-and-5-women-killedisraeli-forces-attack-medical-cre&Itemid=194; OCHA, Occupied Palestinian Territory: see also Gaza Emergency Situation Report (as of 26 July 2014, 1500 hrs). At http://www.ochaopt.org/documents/ocha_opt_sitrep_27_07_2014.pdf.
[206]   W277.
[207]   W 034 and W276.
[208]   W034.
[209]   W034.
[210]   W276 and W034.
[211]   W277.
[212]   See e.g. Huffington Post, *Shocking Photos of Destruction in Gaza as Thousands Return Home During Truce*, 26 July 2014. At http://www.huffingtonpost.com/2014/07/26/gaza-destruction-

36

ATL004949

(iv)   Abu Jabr family home

132.   On 29 July at 12.30 a.m., a bomb was launched on the Abu Jabr family home in the Al Buraij refugee camp. Nineteen people[213] were killed and seven injured. Seventeen family members inside the house died including 6 children aged between one and four, and six women, one of whom was pregnant. Two other people who were visiting that evening with a member of the Abu Jabr family were killed as well.[214] Out of the 7 persons injured 3 were children and 4 were women.[215] The house was completely destroyed as a result of the attack. According to B'Tselem and witnesses interviewed by the commission, several different parts of Al Buraij camp were attacked during that night.[216]

133.   The Abu Jabr house is located on Abu Al Sa'ud Street in the Deir al Balah Governorate in central Gaza Strip. The 120 $m^2$ house had two floors and was comprised of several apartments belonging to members of the Abu Jabr family.[217]

134.   The commission interviewed a witness whose father and uncles owned the building and who arrived at the scene 15 minutes after the attack.[218] Upon arrival he followed the traces of smoke and went in to look for his parents, his brother and the rest of his family. He described a 7-meter deep hole where the house had been, leaving only rubble and cement blocks piled on top of each other.[219] The witness recounted how he began to search for survivors and how he later found out that his daughter and wife were killed in the attack. What he saw was "beyond imagination":

*I found the decapitated bodies of my uncle and daughter. My cousin was alive but died on the way to hospital. Another cousin's body was found sliced in two. We had ten corpses in the first ambulances. No other survivors were found. […] After having removed the cement I identified my cousin Dina's body. What I witnessed was horrible. She was 9 months pregnant and she had come from her home to her parents' house to have her baby. We could not imagine that she had passed away. Her stomach was ripped open and the unborn baby was lying there with the skull shattered. We kept searching for other corpses and found my uncle's wife. We had great difficulty removing all the pieces of cement from her body.[220]*

135.   The witness managed to extract some of the survivors from the ruins. Most of the family members' bodies had been cut into pieces or pulverized by the attack. The injured and dead were brought to Al Aqsa hospital. Upon arrival the witness realized that some family members were missing. He said that, to his knowledge, the area was residential and inhabited mainly by women and children. He was not aware of the family's having received any warnings to evacuate. He said that at times inhabitants are warned by small rockets but not his family.[221] These accounts, including the absence of "roof-knock" warnings, are

photos_n_5623908.html; The Guardian: *Gaza counts the cost of war: 'Whole families smashed under the rubble'*; 15 August 2014. At: http://www.theguardian.com/world/2014/aug/15/-sp-gaza-counts-cost-of-war-whole-families-smashed-under-the-rubble.

[213]   See also list at B'Tselem, Bombing of three houses belonging to the Abu Jaber family in al-Bureij, at http://www.btselem.org/gaza_strip/2015_black_flag/abu_jaber_family.

[214]   B'Tselem, Black Flag, January 2015.

[215]   PCHR submission. See also information available from B'Tselem, Black Flag, January 2015. Information on pregnant woman provided by W127.

[216]   W127.

[217]   W127. PCHR submission including building plans. B'Tselem describes it as consisting of two houses.

[218]   W127.

[219]   B'Tselem, Black Flag, January 2015.

[220]   W127.

[221]   W127.

supported by interviews conducted by B'Tselem with witnesses who were present in the proximity of the house during the attack[222].

136.    Photos submitted to the commission by different sources, including of children showing one boy with fractures and serious shrapnel and burn injuries, indicate that the house was completely destroyed.[223] On the basis of an analysis of pictures and testimonies, the commission concluded that the house was most likely levelled by the impact of either a GBU31 JDAM equipped 2000lb bomb or a GBU32 JDAM equipped 1000lb bomb.

(v)    Al Hallaq and Ammar family homes

137.    On 20 July 2014 at around 6.45 p.m., several air launched projectiles hit the Al Hallaq family apartment in the Al Remal neighbourhood of Gaza city, killing 7 members of the Al Hallaq family, including 3 children (one of them a one month old baby) and 3 women (one of whom was pregnant).[224] Four children of the Ammar family who lived in the apartment underneath were also killed.[225] Five Al Hallaq family members were injured, including one child.[226]

138.    The Al Hallaq apartment was located on the second floor of the Cordoba tower, Street one, in the western part of Gaza city.[227] The building has 10 floors; 5 apartments on the first and second floors were totally or partially destroyed by three missiles.[228] According to one of the witnesses, the third missile did not explode.[229] The missile strikes resulted in the collapse of the eastern wall of the building.[230]

139.    Twelve people were in the Al Hallaq apartment at the time of the attack, including 9 family members who were taking shelter in the flat having fled their homes in other neighbourhoods.[231] Another 12 persons were present in the Ammar family home.[232]

140.    The commission spoke to two survivors from the Al Hallaq family. One of them said that, because of intensified shelling very early that morning, his family had left the Shuja'iya neighbourhood along with many residents of the area. At 7 a.m. the family had moved to an apartment in the Al Remal neighbourhood that belonged to members of the extended family. The apartment was located on the second floor in a nine-storey building, in an area which the family perceived as the "safest place in Gaza" because it was far away from the Green Line.[233]

141.    The eyewitness said that at 6.30 p.m. all 12 members of the family were at home, preparing to break the Ramadan fast.[234] While the women were busy in the kitchen, the men

---

[222]   Haniya Abu Jaber, who was present in the house at the time of the attack and Nihad Abu Jaber, who was in the house next door. B'Tselem, Black Flag, January 2015.
[223]   Confidential submission 49.
[224]   Watania Palestinian news agency footage shows the victims' evacuation: https://www.youtube.com/watch?v=ehd1kXdDtwo.
[225]   W082. See also: Amnesty International, Families under the rubble, November 2014. At: https://www.amnesty.org/en/documents/MDE15/032/2014/en/. From now on referred to as Amnesty International, Families under the rubble, November 2014.
[226]   PCHR submission.
[227]   PCHR submission.
[228]   W082.
[229]   PCHR submission.
[230]   Amnesty International, Families under the rubble, November 2014.
[231]   W082. See also Amnesty International, Families under the rubble, November 2014.
[232]   Amnesty International, Families under the rubble, November 2014.
[233]   W081.
[234]   W082.

38

ATL004951

were watching television in the living room, and some were in the bedroom. Suddenly, there was a loud explosion. The witness said that the missile, which came from the eastern side, first hit the room where the children were playing, causing a large hole of 2 meters before it landed in the apartment below and killed three children in that apartment.[235] Information concerning the damage to the building is supported by photos submitted to the commission.[236]

142.    The second survivor confirmed that the family had moved to that apartment because they considered the area to be the safest place in Gaza, an assumption the family made based on leaflets and phone calls received from Israelis. The witness explained that in the first days of the conflict the family had received recorded IDF voice messages on their mobile phones directing them to move to the centre of Gaza. At the time of the attack, witness was watching television in the living room when at around 6.45 p.m. a missile killed 7 of his family members. The witness then tried to evacuate the 4 other survivors; while he was walking down the stairs he heard a second explosion in the apartment, which he thought was the result of a second missile. [237]

143.    Neither eyewitness was aware of any warnings prior to the attack and they insisted that there had been no military activity in the building. One witness said that this was the first time the area was targeted during the military operations in 2014 and that he did not know the reason for the attack. He added that the Al Remal neighbourhood is known as very peaceful and residential.[238] He also said that the area is too far from Israel to dig tunnels.[239] The same witness claimed that no family member belongs to the "Palestinian resistance".[240]

144.    In the commission's assessment, based on photographs of the site and of remnants of weapons and on eyewitness testimony, the building appears to have been targeted by precision guided AGM 114 Hellfire missiles. This weapon can be programmed to penetrate a cement building before detonating and typically causes this kind of damage[241].

(vi)    Balatah home

145.    "There were no warnings, no calls and no messages. Where is the humanity? Where is justice? And where is the United Nations who is meant to protect peoples' humanity?"

A witness interviewed by the commission[242]

146.    On 29 July at approximately 4 p.m.[243], the house of the Balatah family in Hay Al Qasasib Street in the Jabaliya refugee camp in North Gaza was struck. At the time of the attack, Abdel Karim Balatah was hosting his entire family as well as the family of his brother Naim Balatah and his son Nazami.[244] In total, 17 people were in the house.[245] The attack resulted in the killing of 11 members of the Balatah family, 5 of whom were

---

[235] W082.
[236] PCHR submission.
[237] W082.
[238] W081.
[239] W082.
[240] PCHR submission.
[241] This is consistent with findings by Amnesty International, Families under the rubble, November 2014.
[242] W125.
[243] Time varies between 3 and 4.30 p.m.; B'Tselem states 3 p.m. see: B'Tselem, Black Flag, January 2015. http://www.btselem.org/gaza_strip/2015_black_flag/balata_family
[244] W125.
[245] W124. See also B'Tselem, Black Flag, January 2015.

children, including a one-year old baby[246], and 5 women.[247] The Balatah family house and several neighbouring houses were extensively damaged, and 41 civilians, including 17 children and 5 women, were wounded.[248]

147.    The commission interviewed surviving members of the Balatah family who witnessed the strike.[249] The survivors told the commission that, at the time of the attack, the family had just finished a long meal in honour of the second day of the Eid, and most of the family members were taking a nap. At least two missiles struck the Balatah family home in the span of a few minutes.

148.    One of the witnesses said that the sound of a large explosion woke him up. He then saw a lot of smoke in the courtyard, but could not identify where it originated. As he stepped out of the house into the courtyard, another missile hit the house. The explosion was so powerful that it created a large vacuum effect and the witness felt his body being pulled by a strong "suction" effect generated by the explosion.[250] The witness then quickly returned to the house to look for his family members, only to find the body of his 8-year old nephew lying unconscious on the ground with his stomach and his head cracked open and the dead body of his one-year old grandson in the room upstairs.

149.    The witness tried to stop the young boy's bowels from falling out with his hands.[251] The witness also described how his wife collapsed when she saw her severely injured grandson. The witness fainted as he was accompanying his wife to a nearby school which had been transformed into a shelter. When he regained consciousness, he found himself at the Kamal Edwan hospital. The witness told the commission:

*"I am 52 years old and I have lost everything I cared for. In only a few minutes, they killed everyone and everything that was dear to me. They killed my dream, and my daughter's dream who wanted to be a doctor." [252]*

150.    According to the witnesses, all of those killed were civilians.[253] The witnesses were not aware of any warning preceding the attack. In fact, the brother and his family had sought refuge with Abdel Karim Balatah's family precisely because the IDF had warned his family earlier in the day to evacuate his own house in Jabaliya camp.[254]

151.    It appears that the eastern parts of the house were repeatedly hit. As a result, the walls between the staircase and the hallway, as well as those between the living room and bedroom were destroyed.[255] According to the information available to the commission, the damage to the building is most likely to have been caused by an AGM 114 Hellfire Missile launched by an aircraft. Given that a precision guided munition was probably used, it appears that the house was specifically targeted. This assessment is compatible with the witness's comment about being "sucked in", as the outward blast of a high explosive

---

[246]   W125.
[247]   See also list at B'Tselem, Black Flag, January 2015 and  PCHR submission
[248]   PCHR, On the 19th Day of the Israeli Offensive on Gaza: 26 July 2014. At:
        http://www.pchrgaza.org/portal/en/index.php?option=com_content&id=10539:on-the-19th-day-of-
        the-israeli-offensive-on-gaza-before-declaration-of-humanitarian-truce-israeli-forces-escalated-
        attacks-against-palestinian-civilian20-members-of-one-family-including-11-children-and-5-women-
        killedisraeli-forces-attack-medical-cre&Itemid=194.
[249]   W124 and 125.
[250]   W124.
[251]   W125
[252]   W125.
[253]   W124.
[254]   W124.
[255]   The PCHR submission includes maps, pictures, building plans and affidavits from family members.

ATL004953

detonation causes a vacuum, and the air rushing back in to fill the vacuum could lead a person close by to such a perception.

152.    The commission has not received any information suggesting that there was a military target in the house, and to date, the IDF has made no statement concerning the incident. It appears that no warning was issued.

(vii)   Al Dali Building

153.    On 29 July at around 7.30 a.m., an Israeli aircraft dropped an aerial bomb on the Al Dali building in Khan Younis, where the Abu Amr, Breikah, Al-Najjar and Mu'ammar families lived.[256] The strike resulted in the complete destruction[257] of the Al Dali building and serious damage to adjacent buildings. At least 33 people inside the house were killed, including 18 children and 6 women[258]. In addition, the damage caused by the attack to adjacent houses reportedly killed one member of the Al-Ramlawi family, a girl aged 9[259], and a member of the Abu Sitta family[260]. Another 21 people were injured, including 4 children, several of them critically.[261]

154.    The Al Dali building consisted of four apartments located on three levels including a basement.[262] At least 37 people were in the building at the time of the attack, which killed 15 members of the Abu Amr family, 7 members of the Breikah family[263], 7 members of the Al-Najjar family[264], and 4 of the Mu'ammar family.

155.    The commission spoke to three witnesses to this attack, all from the Abu Amr family. All indicated that there had been no warnings before the strike. One of the witnesses who lives next door and arrived at the scene moments after the attack, stated, "*I can assure you that my family received no warning of an incoming attack, or else they would have immediately informed me, given I live next door.*"[265] Another witness, who was not at home at the time of the attack, told the commission that "*nobody was doing anything to threaten; nobody was resorting to violence*". The witness kept pausing and saying that, whenever he thinks of that attack, he is reminded of the images of the bodies of children scattered everywhere. He explained that people were destroyed not only physically, but also emotionally and psychologically.[266]

---

[256]   Amnesty International, Families under the rubble, November 2014. See also B'Tselem, Bombing of al Dali Building, 28 January 2015, at
        http://www.btselem.org/gaza_strip/2015_black_flag/a_dali_building.
[257]   See e.g. photo at B'Tselem, Bombing of al Dali Building, 28 January 2015, at
        http://www.btselem.org/gaza_strip/2015_black_flag/a_dali_building.
[258]   B'Tselem, Black Flag, January 2015. See also Amnesty International, who reports 34 persons killed
        Amnesty International, Families under the rubble, November 2014.
[259]   B'Tselem, Black Flag, January 2015. See also: Amnesty International, Families under the rubble,
        November 2014.
[260]   Amnesty International, Families under the rubble, November 2014.
[261]   W045.
[262]   Amnesty International, Families under the rubble, November 2014.
[263]   6 according to B'Tselem, Black Flag, January 2015.
[264]   Note that MAG up-date 4 refers to an aerial attack that killed 8 members of the Al Najjar family in
        Khan Younis on 29 July. However, the number of persons killed in the Al Dali building is reported to
        be much higher than the figures put forward by the MAG. The commission could therefore not
        determine whether the MAG addressed this case. Decisions of the IDF MAG Regarding Exceptional
        Incidents that Allegedly Occurred During Operation 'Protective Edge'- Update No. 4, 11 June 2015.
[265]   W275.
[266]   W045.

156.    Given the scale of destruction visible on photos[267] and the testimonies, cross-checked with other available information, it appears that the weapon used was a large bomb, most likely a JDAM equipped 2000lb bomb.[268]

157.    Amnesty International identified 33-year old Ahmad Mu'ammar, who was killed in the attack, as a member of the engineering corps of the Saraya Al Quds Brigades, the armed wing of Islamic Jihad. A relative of Mu'ammar told Amnesty that he had an office at home, and remnants of a gun and a grenade-launcher were reportedly found in the rubble after the attack.[269]

(viii)    Al Batsh house

158.    On 12 July at around 9.30 p.m., at the time of the evening prayer, an airstrike carried out by IDF planes destroyed the two-storey house of Majed Al Batsh in the Tuffah neighbourhood of Gaza city. Two adjacent houses belonging to two brothers of Majed Al Batsh and a third house belonging to a neighbour were also severely damaged. At least 17 people were killed immediately[270], while one person died on 24 July as a result of his injuries. The dead included 6 children and 3 women, one of whom was pregnant.[271] According to the Ministry of Health, quoted in the media, 45 people were injured.[272] Al Mezan counted 16 injured[273], while Physicians for Human Rights reports more than 50 injured[274].

159.    One family member told the commission that the family had gathered in the house as is the custom during Ramadan. He had been in a nearby mosque when he heard planes, and had just come home and was praying when the attack began.[275] Another family member said that he was in the house with his cousins at the time of the strike, but he only realized what had happened when he woke up one week later in the hospital. He lost his right leg and the sight in his left eye.[276] The witnesses said that five of the women could not be

---

[267]    B'Tselem, Black Flag, January 2015.

[268]    This was also found by Amnesty International, Families under the rubble, November 2014.

[269]    Amnesty International, Families under the rubble, November 2014.

[270]    *W002 and W003. B'Tselem provides a list of 18, including one person who died later as a result of his injuries; at:  B'Tselem, At Sa'ed al hadad relates bombing of al-Batsh home in Gaza City no prior warning, which killed 18 family members, at http://www.btselem.org/testimonies/20140716_al_batsh; According to Al Mezan, 17 persons from the Al Batsh family died. See list of those killed in press release at Al Mezan, Gaza Diaries: 1: Airstrike Wipes out 17 from Al Batsh Family; an Outright War Crime, 13 July 2014, at http://www.mezan.org/en/post/19222/Gaza+Diaries%3A+1%3A+Airstrike+Wipes+out+17+from+A l+Batsh+Family%3B+an+Outright+War+Crime; Physicians for Human Rights stated that 16 persons present inside the house and 3 in neighbouring buildings and another unspecified person died See list of those killed in press release. Physicians for Human Rights, Findings of an Independent Medical Fact-Finding Mission, Gaza 2014, p. 134.*

[271]    W002 and W003. See also Al Mezan, Gaza Diaries: 1: Airstrike Wipes out 17 from Al Batsh Family; an Outright War Crime, 13 July 2014, at http://www.mezan.org/en/post/19222/Gaza+Diaries%3A+1%3A+Airstrike+Wipes+out+17+from+Al +Batsh+Family%3B+an+Outright+War+Crime.

[272]    Reuters, *Gaza death toll rises; Hamas fires rockets at Tel Aviv*, 12 July 2014, at http://uk.reuters.com/article/2014/07/12/uk-palestinians-israel-idUKKBN0FB08120140712.

[273]    Al Mezan, Gaza Diaries: 1: Airstrike Wipes out 17 from Al Batsh Family; an Outright War Crime, 13 July 2014, at http://www.mezan.org/en/post/19222/Gaza+Diaries%3A+1%3A+Airstrike+Wipes+out+17+from+Al +Batsh+Family%3B+an+Outright+War+Crime.

[274]    Physicians for Human Rights, Findings of an Independent Medical Fact-Finding Mission, Gaza 2014.

[275]    W001.

[276]    W002.

ATL004955

buried because their bodies had "evaporated", indicating that the blast disintegrated the bodies. The eyewitness said that no warning was given prior to the attack[277].

160.    On 14 July, the media reported that an IDF spokesperson said that the bombing was being "looked into"[278]. Some media claimed the target of the attack was the Gaza police chief, Major General Tayseer al-Batsh, who was visiting his cousin Majed at the time of the attack.[279] He was severely injured but survived. On 28 July the IDF dropped leaflets in Gaza city containing a list of persons who confronted the IDF and were killed. The list includes the names of Nahid Naim Al Batsh and Yazid Al Batsh.[280] According to the Intelligence and Terrorism Information Center, Bahaa Majed Al Batsh and Jalal Majed Al Batsh were affiliated with the Al Qassam Brigades.[281] All of them appear to have been killed during or as a result of the attack[282].

The commission does not have sufficient information to determine with certainty which weapon was employed, but, given the testimonies about its effects, it is likely that two JDAM equipped bombs (either 1000lb or 500lb) were used.

(ix)    Abu Jama family home

161.    On 20 July, at around 7.50 p.m., as the family was breaking the fast, a bomb was dropped on the three-storey home of the Abu Jama family in Abu Safar, an area near the al Zanneh neighbourhood of Bani Suheila, east of Khan Younis.[283] Of the 29 people who were in the house, 26 were killed, including 19 children and 5 women, 3 of whom were pregnant.[284]

162.    The three-storey building in Bani Suheila, east of Khan Younis, covered 250 m2 with two apartments on each floor. Five brothers and their families lived in the building, which had a total of 60 residents.[285] At the time of the attack, the families of four brothers, Tawfiq, Tayseer, Basem and Yasser, were in the building.[286] Twenty-five Abu Jama family members died, as well as Ahmad Sahmoud.[287] Tayseer was in a nearby mosque at the time

---

[277]   The witness's account is corroborated by Physicians for Human Rights, Findings of an independent medical fact-finding mission, 2014.

[278]   Al Jazeera, *Thousands of families flee north Gaza*, 14 July 2014, at http://www.aljazeera.com/news/middleeast/2014/07/thousands-families-flee-north-gaza-2014713131352463357.html.

[279]   Al Jazeera, *Thousands of families flee north Gaza*, 14 July 2014, at http://www.aljazeera.com/news/middleeast/2014/07/thousands-families-flee-north-gaza-2014713131352463357.html; Reuters, Gaza death toll rises; Hamas fires rockets at Tel Aviv, 12 July 2014, at http://uk.reuters.com/article/2014/07/12/uk-palestinians-israel-idUKKBN0FB08120140712; The New York Times, Palestinians Flee Northern Gaza as a Cease-Fire Appears Elusive, 13 July 2014, at http://www.nytimes.com/2014/07/14/world/middleeast/israel-gaza.html.

[280]   Leaflet submitted to the commission. An OHCHR report also makes reference to the two Al Batsh names on this leaflet: A/HRC/28/80/Add.1 at www.ohchr.org/.../PS/A.HRC.28.80.Add.1.doc

[281]   Intelligence and Terrorism Information Center. Preliminary, partial examination of the names of Palestinians killed in Operation Protective Edge; 28 July 2014 at http://www.terrorism-info.org.il/en/article/20708

[282]   B'Tselem, At Sa'eed al hadad relates bombing of al-Batsh home in Gaza City no prior warning, which killed 18 family members, at http://www.btselem.org/testimonies/20140716_al_batsh

[283]   Submission 5.

[284]   Submission 5; B'Tselem reports 25 killed; B'Tselem, Black Flag, January 2015. Note that the MAG refers to different NGO figures that the commission was unable to confirm.

[285]   Interview conducted by the commission with W013. B'Tselem stated that 37 persons living in the building.

[286]   Submission 5.

[287]   Submission 5.

of the attack.[288] Of the family members present in the house only the brothers Bassam and Tawfiq and 3-year-old Nour survived.[289]

163.    The Abu Jama home was completely destroyed.[290] According to an Amnesty International field worker who visited the scene, there was a crater consistent with the dropping of a large bomb.[291] The civil defence and ambulance crews who had arrived at the scene shortly after the incident continued searching for corpses under the rubble until the following morning.[292]

164.    The commission interviewed survivors of the attack. One of them told the commission that he was sitting with his family about to break the fast when suddenly they were all sucked into the ground.[293] He lost his wife, his eight children, his mother and a brother in the attack. The youngest child was 2 years old and the oldest 14.[294] The witness and the other two surviving family members are now homeless and receive no assistance from the United Nations Relief and Works Agency (UNRWA) or from the State.[295]

165.    While the brothers claimed that they were not aware of the presence of any visitors in the house and said that there was no advance warning,[296] B'Tselem and Amnesty International refer to reports that Ahmad Soliman Mahmoud Sahmoud, an alleged member of the Al Qassam brigades, was one of the victims.[297]

166.    While it is impossible to determine with certainty which weapon was used in this strike, given the reported large-scale destruction, it appears likely that it was a JDAM equipped bomb of unknown size.[298]

167.    On 6 December 2014, the MAG reported that:

"In reports received by the MAG Corps, and in correspondence from various NGOs, it was alleged that on 20 July 2014, 27 civilians were killed as a result of an IDF strike on the house of the Abu-Jama family in Khan Yunis. As a result, and in accordance with the MAG's investigation policy, the incident was referred to the FFAM. The factual findings and materials collated by the FFAM and presented to the MAG, indicated the existence of grounds for a reasonable suspicion that the incident involved a deviation from the rules

---

[288]  W014.

[289]  W013 and submission 5.

[290]  See also photo at B'Tselem, Bombing of the Abu Jama' home, Bani Suheila, 28 January 2015, at http://www.btselem.org/gaza_strip/2015_black_flag/abu_jame_family

[291]  Amnesty International, Families under the rubble, November 2014. See also B'Tselem, Black Flag, January 2015.

[292]  Submission 5.

[293]  W013.

[294]  W013.

[295]  W013.

[296]  W013 and W014. Also according to Amnesty International, surviving family members and neighbours denied knowing Sahmoud and claimed that he was not in the building at the time of the attack. One of the family members said he might have been outside the building. Amnesty International, Families under the rubble, November 2014, p. 18.

[297]  B'Tselem, Initial findings: 25 members of a single family killed when their house was bombed, apparently without warning,  July 2014, at http://www.btselem.org/press_releases/20140721_killing_of_abu_jame_familyand Amnesty International, Families under the rubble, November 2014.

[298]  This is compatible with findings by Amnesty International, Families under the rubble, November 2014, p.17.

44

ATL004957

*and procedures applicable to IDF forces. As a result, the MAG has ordered a criminal investigation into the incident."*[299]

(x)     Al Salam tower – Al Kilani and Derbass families

168.    On 21 July, at around 8 p.m., the nine-storey Al Salam tower in Gaza city was bombed,[300] killing all members of the Al Kilani and Derbass families who had sought shelter in the tower. In total, 11 people from those two families died including 5 children aged between 3 and 11.[301] It appears that a member of the Al Quds Brigades, who was on the fourth floor, was also killed.[302] The rest of the building was empty except for the family of Abdul Karim Madder, a lawyer on the second floor, all of whom escaped before the upper floors collapsed.[303]

169.    Ibrahim Al Kilani's brother told the commission that Ibrahim was an architect of German nationality, a man dedicated to his work and to his family who did not have links to militants.[304] Ibrahim, his wife and five children had left their home in Beit Lahiya after the IDF distributed leaflets instructing residents to leave the northern part of Gaza and move to the centre of the Strip. They decided to go to the house of his brother in the Tuffah neighbourhood, Gaza city. Ibrahim's brother said that because of the ongoing shelling in Tuffah, the Kilani family still felt insecure and moved to the Al Salam tower, where Inas Derbass's employer had an office.[305] Four siblings of Ibrahim's wife from the Derbass family, who were staying together with the Kilanis in the tower, were also killed.[306]

170.    The Al Salam tower is one of the high-rises in the Al-Remal neighbourhood in the centre of Gaza city. The building housed offices of lawyers, engineers, and commercial companies.[307] The area was considered to be safe because IDF leaflets had encouraged people to move to the centre of Gaza city.[308] The Derbass and Kilani families had moved to the 5th floor of the tower on 19 July, two days before the attack.[309] On 21 July, they were gathered for *iftar* when the sixth floor of the tower was struck causing the upper floors to collapse on the lower floors. One witness told the commission that he did not see the tower being hit but he heard what he thought were two missiles being fired. Another witness said he heard aircraft on the day of the attack in the area.[310]

---

[299]   Military Advocate General. Up-date of December 2014 at: http://www.law.idf.il/163-6958-en/Patzar.aspx

[300]   W114 was close to the site and said that he heard the firing of two missiles from a plane; W112 was working at a neighbouring building and said he heard F16 drones in the area that day and the days before.  Al Mezan told the commission that it was very likely a plane because it was a high-rise building and the top floors collapsed (meeting on 9 February 2015).

[301]   B'Tselem, Black Flag, January 2015.

[302]   B'Tselem, Black Flag, January 2015. See also IDF Military Advocate General's ('MAG): Decisions of the IDF MAG Regarding Exceptional Incidents that Allegedly Occurred During Operation 'Protective Edge'- Update No. 4 of 11 June 2015; at http://www.law.idf.il/163-7353-en/Patzar.aspx

[303]   PCHR submission; meeting with Al Mezan on 9 February; video showing a family fleeing down the stairs.

[304]   W115.

[305]   W115.

[306]   B'Tselem, Black Flag, January 2015.

[307]   PCHR submission.

[308]   Meeting with Al Mezan on 9 February 2015.

[309]   W114.

[310]   W114.

171.    Based on an analysis of photos[311], sketches and videos submitted to the commission
and testimonies from eyewitnesses, and given that no explosion was reported, it appears
that the tower was hit by a JDAM equipped 500 lb bomb, likely inert, as that would ensure
the collapse of the floors while minimizing collateral damage.

172.    Three witnesses interviewed by the commission, who either work at the tower or
close to it, were not aware of any warning issued before the attack. It appears that Al Salam
tower was the only building attacked in the densely populated neighbourhood and that the
area was calm before the strike. The witnesses said that they were unaware of any militants
or military activity in the building or in its vicinity.[312] According to a MAG statement of 11
June, the target was "Sha'aban Dachdouch, a senior commander in the Palestinian Islamic
Jihad"[313].    Sha'aban Dachdouch, who was killed in the strike, reportedly had been in and
out of the building several times in the days before the attack.[314]

173.    A cameraman working in a neighbouring building suddenly heard the sound of a
massive explosion and headed to the site of the incident. He told the commission that, when
he arrived at the tower, "no single body was intact". Although it was dusty and dark, he
could see a woman's body caught between two floors, and bodies that had landed on an
adjacent open area, including the corpse of a woman still holding her small child, who was
burned, in her arms.[315] Ibrahim Al Kilani's brother described to the commission how he
went to Al Shifa hospital after the attack and saw Ibrahim's head crushed and lungs
hanging out, one of his nephews decapitated, and his sister in law's corpse still holding
Elias, their youngest child, burned.[316] Two ambulance drivers said they recovered
children's bodies, charred and torn to pieces, and a woman holding a child.[317]

174.    According to the MAG, "regrettably, after the fact, there was an unforeseen collapse
in the upper floors of the building approximately half an hour after the attack. […] the
MAG found that the targeting process in question accorded with Israeli domestic law and
international law requirements. The decision to attack was taken by the competent
authorities and aimed at a lawful target – a senior commander in Palestinian Islamic Jihad,
who was indeed killed as a result of the attack. The attack complied with the principle of
proportionality, as at the time the decision was taken, it was considered that the collateral
damage expected from the attack would not be excessive in relation to the military
advantage anticipated from it, and this assessment was not unreasonable under the
circumstances. Moreover, the attack was carried out while undertaking a number of
precautionary measures which aimed to minimize the risk of collateral damage. Such
measures included, inter alia, the choice of munition to be used, and the method according
to which the attack was carried out. The fact that, in practice, a number of civilians who
were not involved in the hostilities were harmed, is a regrettable result, but does not affect
the legality of the attack ex post facto. In light of the above, the MAG did not find that the
actions of IDF forces raised grounds for a reasonable suspicion of criminal misconduct. As

---

[311]   See also photo at: B'Tselem, Bombing of an office building in a-Rimal neighbourhood Gaza City; 12
       people killed-11 members of the Dirbas and al-kilani families, and an operative of the Islamic Jihad,
       21 July 2014, 28 January 2015. At:
       http://www.btselem.org/gaza_strip/2015_black_flag/dirbas_and_kilani_families.
[312]   W115 and W113.
[313]   IDF Military Advocate General's ('MAG): Decisions of the IDF MAG Regarding Exceptional
       Incidents that Allegedly Occurred During Operation 'Protective Edge'- Update No. 4 of 11 June 2015;
       at http://www.law.idf.il/163-7353-en/Patzar.aspx
[314]   Submissions 5 and meeting with Al Mezan, 9 February 2015.
[315]   W112.
[316]   W115.
[317]   Submission 5.

ATL004959

a result, the MAG ordered the case to be closed, without opening a criminal investigation or ordering further action against those involved in the incident."[318]

(xi) **Kaware family home**

175.   The Kaware home was a three-storey building comprised of seven apartments, in which five families lived.[319] The owner of the house, Ahmed Mohamed Kaware, lived on the ground floor with his wife and three of their younger children. The remaining apartments were inhabited by their four older sons and their families. Their son Odeih Kaware, described as a police officer, lived with his wife and four children on the second floor.

176.   On 8 July around 3 p.m.[320], a guided bomb hit the Kaware family home in Khan Younis, killing 9 people, of whom 6 were children. According to the commission's assessment, on the basis of witness statements; photos of the site and of remnants of weapons; building plans;[321] the combination of damage caused; and the small amount of fragments shown; indicate that the house was most likely struck by a MPR 500 lb bomb fitted with JDAM.

177.   Prior to the attack, the IDF called the wife of Odeih Kaware whose family resided in the house, warning the family of an imminent attack and directing them to evacuate the building.[322] According to a family member interviewed by the commission, 3 to 5 minutes elapsed between the phone call and the first missile (possibly a warning missile),[323] which struck the water tank. According to another witness, the bomb hit the house about 10 minutes after the phone call.[324] A B'Tselem report stated that there was about an hour between the call and the warning missile, and several people who had left the house had started to return to check the damage done to the roof.[325] As a result of the strike, the roof of the home collapsed. One witness stated that people stayed in the house after the warning and attempted to "protect" the house and warn the pilot that there were civilians.[326] An unverified youtube video points in that direction as well.[327] However, several witnesses denied that anyone remained after the warning and stated that people attempted to evacuate

---

[318]  IDF Military Advocate General's ('MAG): Decisions of the IDF MAG Regarding Exceptional Incidents that Allegedly Occurred During Operation 'Protective Edge'- Update No. 4 of 11 June 2015; at http://www.law.idf.il/163-7353-en/Patzar.aspx

[319]  PCHR submission.

[320]  The exact time of the attack is unclear as witness accounts vary.

[321]  PCHR submission. See also photo at: B'Tselem, Bombing Family House of Activists in Armed Palestinian Groups Violates International Humanitarian Law, 9 July 2014. At: http://www.btselem.org/press_releases/20140709_bobming_of_houses_in_gaza.

[322]  W133 and W052.

[323]  W133 and W052.

[324]  W028.

[325]  B'Tselem, Bombing Family House of Activists in Armed Palestinian Groups Violates International Humanitarian Law, 9 July 2014. At: http://www.btselem.org/press_releases/20140709_bobming_of_houses_in_gaza.

[326]  W133 and W132.

[327]  8 July: Al-Aqsa TV reporter: "Witnesses are talking about a large crowd. The residents are still gathering to reach the Kaware family home in order to prevent the Zionist occupation's fighter planes from striking it."  Al-Aqsa TV host: "People are reverting to a method that was very successful once." Hamas spokesman Sami Abu Zuhri: "The people oppose the Israeli fighter planes with their bodies alone... I think this method has proven effective against the occupation. It also reflects the nature of our heroic and brave people, and we, the [Hamas] movement, call on our people to adopt this method in order to protect the Palestinian homes.http://palwatch.org/main.aspx?fi=111&fld_id=111&doc_id=12020

the building, but there was not sufficient time to do so. The witnesses denied that there were any organized attempts by the authorities to encourage residents to remain in the building.[328]

178.    While the number of casualties varies between 8 and 9, all sources concur that 6 children were killed during the attack.[329] The number of people injured ranges from 25 to 29.[330] The 3 adults killed were men. The witnesses claimed that they were unaware of any involvement of a member of the Kaware family in an armed group or of the use of the building for military purposes. An official Israeli website however described Odeih Kaware as being a senior Al-Qassam Brigades "terrorist operative"[331]

179.    On 10 September 2014, the Military Attorney General (MAG) announced that it had examined the case and indicated:

 *"that the aerial strike was carried out against the building due to its use for military purposes by Hamas, as was the case with numerous other residential buildings in the Gaza Strip"[332]. The MAG stressed that "Prior to the strike, the IDF provided precautions to the residents of the building to vacate the premises. These precautions included an individual phonecall and the firing of a non-explosive projective [sic] at the roof of the premises, as part of the 'knock on the roof' procedure. Following the provision of the precautions, the residents vacated the building. Subsequently, a number of people were identified as returning to the premises for unknown reasons."[333]*

180.    The MAG further stated that the pilot believed the residents had vacated the building, and subsequently dropped a bomb on the target. A short time after the projectile was launched, a number of people were seen returning to the premises; after the bomb had already been dropped, however, there was no technical possibility to divert the bomb or to cancel the attack[334]. Given that the attack was for military purposes and that a prior "individualized" warning was given:

 *"the MAG found that there was no fault in the actions of the IDF forces involved, and that despite the fact that the attack resulted in a regrettable outcome, it does not affect its legality post facto. In light of the above, the MAG did not find that the actions of the IDF forces raised grounds for a reasonable suspicion of criminal misconduct. As a result, the MAG ordered the case to be closed, without opening a criminal investigation or ordering further action against those involved in the incident. At the same time, the MAG*

---

[328]    The commission received information about a mosque call encouraging people to remain indoors. The commission was not able to verify this information.

[329]    W128, W052, W132 and W133 and PCHR submission. B'Tselem reports 9 persons to have been killed, of whom 5 under 14. See: Bombing family homes of activists in armed Palestinian groups violates international humanitarian law, 9 July 2014. At: http://www.btselem.org/press_releases/20140709_bobming_of_houses_in_gaza.

[330]    W132 and W133.

[331]    Israel Ministry of Foreign Affairs, *Hamas Again uses Civilians as Human Shields*, at http://www.mfa.gov.il/MFA/ForeignPolicy/Terrorism/Pages/Hamas-again-uses-Gazan-civilians-as-human-shields-July-2014.aspx. According to B'Tselem, Odeih Kaware is an activist in Hamas's military wing. See: Bombing family homes of activists in armed Palestinian groups violates international humanitarian law. 9 July 2014. At: http://www.btselem.org/press_releases/20140709_bobming_of_houses_in_gaza

[332]    Military Advocate General, Operation Protective Edge: Update re Individual Incidents, September 2014. At: http://www.mag.idf.il/163-6859-en/Patzar.aspx.

[333]    Military Advocate General, Operation Protective Edge: Update re Individual Incidents, September 2014. At: http://www.mag.idf.il/163-6859-en/Patzar.aspx.

[334]    Military Advocate General, Operation Protective Edge: Update re Individual Incidents, September 2014. At: http://www.mag.idf.il/163-6859-en/Patzar.aspx.

ATL004961

*recommended conducting an examination of the operational procedures involved in carrying out such strikes, in order to assess the potential for reducing the likelihood of such exceptional incidents in the future."[335]*

(xii)     Dheir family house

181.    On 29 July 2014, at approximately 4.30 a.m., a guided bomb was launched on the Dheir family house in Rafah. In total, 19 family members were killed including 9 children and 7 women[336]; one of the women was 6 months pregnant.[337] Another 3 children suffered serious injuries. Photos provided to the commission by two sources show a completely destroyed building, with only rubble and cement blocks remaining.[338]

182.    The three-storey house covered 250 square meters and was surrounded by an agricultural area.[339] Two apartments were located on each of the first two floors, whereas the third floor consisted of one large apartment. Five families comprising 27 members lived in the house including 7 men, 7 women and 13 children.[340]

183.    The commission interviewed two witnesses from the Dheir family who arrived at the house shortly after the attack. One of the witnesses said that only 3 of the 22 people present in the house survived, while 19 were killed. He claimed that his family had been living in that location for 20 years working as farmers, and none were members of armed groups. The witness lost his mother, his wife and his brother's entire family.[341]

184.    The witness had heard from a neighbour that the house was first "hit by a drone", so the neighbours warned the family to leave. Apparently about five minutes later "a real shot" followed[342]. When they went to recover the bodies, they found that many of those killed were just outside the house and others were in the rubble of the stairs, which indicates that they were trying to flee but did not manage to do so in time.[343]

185.    One witness said that the family grows vegetables and was supplying refugees in schools with food during the war, which the witness thinks might be the reason why they were targeted. According to the witness there were no fighters in the house or in the area at the time of the strike.[344] The Intelligence and Terrorism Information Centre, however, reported that Izat Dheir, a PIJ Al-Quds Battalions operative, was killed on 29 July in Rafah[345].

186.    It appears that, following a warning, a first bomb collapsed the structure followed closely by a second bomb that led to the total destruction of the building. The remaining crater and debris pile show the massive effects of the blast.[346] Based on the commission's

---

[335]   Military Advocate General, Operation Protective Edge: Update re Individual Incidents, September 2014. At: http://www.mag.idf.il/163-6859-en/Patzar.aspx.
[336]   PCHR submission.
[337]   W080.
[338]   PCHR submission including pictures of the site, maps, building plans and affidavits. See also picture – confidential submission 49.
[339]   W079.
[340]   W079 and W080.
[341]   W079.
[342]   W079.
[343]   W079.
[344]   W079.
[345]   Intelligence and Terrorism Information Center. Preliminary, partial examination of the names of Palestinians killed in Operation Protective Edge; 28 July 2014 at http://www.terrorism-info.org.il/en/article/20708
[346]   PCHR submission including building plans, pictures of the site and remnants from weapons.

assessment of pictures of the site and of remnants of weapons and on witness accounts, it appears that two MPR 500 JDAM equipped bombs struck the building.

### b. Groups of individuals with young children killed while outside

(i)   Al Sayam and Abu Sanimah families' houses

187.   *"A minute later […] the dust had settled and I saw my family all ripped to pieces. My family included my brothers, my wife and my children. Some were dead and others wounded. It was a very difficult thing to see. The majority of those who fell were women and children.[347]"*

188.   On 21 July at approximately 6.15 a.m., a missile appears to have been fired at the house of Ahmed Abu Sanimah in Othman Bin Affan Street in the Al Siyamat neighborhood of Rafah. The adjacent Al Sayam building has four floors and about 35-37 people were living in the building at the time of the attack[348]. As a result of the strike on the Sanimah house, shrapnel scattered and hit the northern walls of the Al Sayam family house. Terrified by the attack, many of the building's inhabitants ran out to the street in an attempt to escape. Soon after leaving their house, another missile hit the pavement in front of the Al Sayam family home.[349] As a result, 9 members of the Al Sayam family were killed in the street, while 2 died within 24 hours from their injuries.[350] The victims included 2 women and 7 children[351] (one of them a baby).[352] According to a witness, a 14-year-old died later as a result of the injuries sustained[353], which brought the death toll to 12. Another 6 people were injured, of whom 2 were women and 3 were children.[354]

189.   According to photos of the site[355], the area was hit by 3 missiles (some witnesses indicated that there were 5[356]). Within a few minutes ambulances arrived at the scene and transported the injured to Al Najjar hospital[357]. Three of those injured became disabled as a result of the attack.[358] The commission reviewed photos from the site, showing extensive damage to the Al Sayam family home caused by shrapnel.[359] Photos submitted to the commission by a journalist reveal big scars on the legs and stomach of one of the surviving Al Sayam children.[360]

190.   The commission interviewed two Al Sayam family members, one of whom survived the attack and a second who was in a mosque close by and rushed to the scene when he heard what had happened. The eyewitness told the commission:

---

[347] W144
[348] PCHR submission.
[349] W144. PCHR submission.
[350] W144; see list at PCHR, Weekly Report on Israeli Human Rights Violations in the Occupied Palestinian Territory (17- 23 July 2014).
[351] Indications of the age of one of the victims differ (just under or over 18 years old); since the witness interviewed by the commission said that he was 15, he is counted as a child.
[352] W144 and W145.
[353] W145. According to Physicians for Human Rights one person died later as a result of the injuries sustained. Physicians for Human Rights, Findings of an Independent Medical Fact-Finding Mission, Gaza 2014, pp. 204-208.
[354] W145.
[355] PCHR submission.
[356] W144.
[357] PCHR submission.
[358] W145.
[359] PCHR submission.
[360] Photos submission 49.

50

ATL004963

*I had a close look at the bodies. Only the upper part of my 9-year old daughter's body was left. My son Mohamed had his intestines coming out. My 16-year old cousin had lost his two legs. My son Mustapha, who was 5 meters away from me, had received shrapnel that almost completely severed his neck. My 16-year old nephew lost both his legs and arms. He asked for my help. I just really wanted him to die quickly. I didn't want him to go through so much suffering. There was also my one year old daughter who was in her mother's arms. We found her body on a tree... I myself lost my left arm …*[361]

191.   Both witnesses interviewed by the commission claimed that they were unaware of any family member's ties with armed groups or that there was any military activity in the vicinity.[362] One of the witnesses described the neighbourhood as quiet; no fighting or attacks had taken place in the area prior to the date in question. The eyewitness also stated that no warning was given in advance of the attack.[363] However, Physicians for Human Rights reports that there may have been a "roof-knock" warning, which shattered glass and killed one of the cousins.[364] According to the Intelligence and Terrorism Information Center, Mohammad Mahrous Salam Siam, allegedly affiliated with National Resistance Battalions, and Kamal Mahrous Salam Siam, allegedly affiliated with the Al Qassam Brigades, were killed in Rafah on 20 July.[365] While the date of the strike on the Al Sayam family was early in the morning on July 21, it could be that those two individuals, or one of them, may have been the target of the attack.

192.   On the basis of the photos of the site, the descriptions of the events, and the resulting damage, the commission concluded that the shrapnel in the Sayam house probably was caused by missile and artillery shells. The third strike, which caused the most casualties, was most likely from a missile, probably an AGM 114 Hellfire Missile. Indications of artillery fire could also be seen from the images, although these traces may have been the result of a later incident.

(ii)   Shuheibar children on the roof of the house

193.   *"His daughter Afnan called for him, she said "papa". He told her that they would be in the hospital in a minute and that she would be fine. Shrapnel was all over her body. As he was going downstairs carrying her, the walls were splashed with blood as she was bleeding so much. [...]What have these innocent children done?"* Father of an 8-year-old girl who died soon afterwards[366]

194.   On 17 July at around 5.30 p.m., a house on 30th street in Al Sabra, a densely populated neighbourhood in Gaza city, was attacked. Two brothers, Tareq and Wessam Shuheibar, their wives and their 9 children lived in the house.[367] On the day of the attack, other family members were visiting as is the custom during Ramadan. In total, there were 23 people in the house.[368] As a result of the missile strike, 3 children of the Shuheibar

---

[361]   W144.

[362]   W144.

[363]   W144.

[364]   Physicians for Human Rights, Findings of an Independent Medical Fact-Finding Mission, Gaza 2014, pp. 205.

[365]   Intelligence and Terrorism Information Center. Preliminary, partial examination of the names of Palestinians killed in Operation Protective Edge; 28 July 2014 at http://www.terrorism-info.org.il/en/article/20708

[366]   W178

[367]   W110 and W186.

[368]   *W110. See also B'Tselem, Wisam Shuheibar relates how a missile killed his 8-year-old daughter and her cousins, 7 and 10, while they were feeding pigeons on the roof, 17 July 2014. At: http://m.btselem.org/testimonies/20140721_gaza_wissam_shuheibar.*

family were killed and 2 were injured. A family member told the commission that the children had gone to the roof to feed the birds. The witness said that, before the war, the children used to spend a lot of time on the roof but during the conflict they would only go up to feed the birds. [369]

195.    Tareq and Wessam told the commission that they were lying down before sunset when they were awakened by the sound of a loud blast. They did not know at first that the explosion had taken place in their own house, but neighbours gathering outside alerted them that their roof had been hit. Wessam said that he saw an opening in the ceiling and water mixed with blood dripping down, so he went upstairs to check what had happened and found the five children lying on the ground. Jihad, aged 11, and Wessam, aged 9, were dead. The three remaining children, all severely injured, were taken to the hospital by passing cars.[370] One of them, Afnan, aged 9, was bleeding heavily and died soon after arriving at the hospital.[371]

196.    Basil, 10, was critically injured. He had four surgeries in his abdomen, his skull was fractured and his hand and shoulder shattered. After receiving treatment in Turkey, he was still not able to open his hand. Oday, 15, had fractures on his foot, wounds in his hand and underwent surgery on his abdomen.[372] Both children were suffering from the loss of the others.[373]

197.    The explosion pierced the roof and two floors below, destroyed the water tanks on the roof and shattered the house's windows and doors.[374] No strikes followed the first strike on the roof.[375] Based on the information available to the commission, including pictures showing penetration and damage and of remnants of weapons, it is likely that the weapon used was a 500 pound MPR bomb, a precise bomb used to penetrate concrete and destroy targets in lower floors or underground.

198.    Witnesses interviewed by the commission said that there had been no warning before the strike. They also insisted that there were no militants in the house, and that the neighbourhood was calm at the time of the attack.[376] Tareq and Wessam Shuheibar appear to have links to the Palestinian Authority police.[377]

200.    Witnesses told the commission that the surviving children were visibly affected by the loss of their siblings and cousins. The uncle of one of the victims said that after the incident his 8-year old son refused to go to school on his own and showed other signs of trauma. Other children in the family were afraid to play outside and woke up in the middle of the night screaming.[378]

(iii)    Al Farra family home

201.    On 1 August, at around 2.30 a.m., the roof of the Al Farra's three storey family home in Khan Younis, in a residential area far from the Green Line was hit[379], possibly by a "roof-knock".   As the family fled the house, a second missile struck a group of family

---

[369] W186.
[370] W186.
[371] W186.
[372] W110.
[373] W110 and W186.
[374] W110.
[375] W110 and W186.
[376] Meeting with Al Mezan on 9 February 2015.
[377] Meeting with Al Mezan on 9 February 2015.
[378] W110.
[379] W186; also meeting with Al Mezan on 9 February 2015.

52

ATL004965

members who were ahead of their relatives and had reached the end of the road opposite the house. Nine family members were killed on the street, 5 of them children aged between 4 and 12 and two women, one of whom was pregnant[380]. Two other family members were injured, including a 4-month-old baby who was in critical condition after being injured by shrapnel in the abdomen[381].

202. The commission spoke with the parents of three of the children who died. On the night of 1 August, in the wake of an announced ceasefire, the Al Farra family was sleeping when they were awakened by the sound of an explosion and broken glass. As neighbours alerted them that their roof had been hit and was on fire, the children were rushed downstairs and told by their parents to run out of the house in fear that a second strike may hit the house. In their pyjamas and bare feet, the children and four adults ran down a narrow road in front of their house. They were about 70 meters away from their house waiting for the remaining family members when a missile landed at their feet. [382]

203. One witness said that he does not know whether or not the first missile was a "roof-knock". The top floor was completely destroyed so the witness thinks that it may have been struck by more than one missile, but he did not see it. [383] When the family was in the street, they were directly hit by two consecutive strikes. Although the information available in this case is limited, on the basis of an analysis of the testimonies and cross-checked expert statements, it seems likely that both the house and the fleeing family were hit by precise guided munition, probably AGM 114 Hellfire Missiles.

204. Two eyewitnesses told the commission that no other house in the vicinity was hit before or after the attack on their home. They claimed that there were no militants in the area and they do not understand why their house was hit.[384] One family member said, "When we used to hear that people were hit and killed I thought 'maybe they are militants' but when it happened to the witness, a university professor, he thought: "Why do they kill us?"[385]

205. The mother told the commission that her three other children are traumatized by the loss of their siblings and relatives who lived with them in the house. She also mentioned that her children no longer excel at school, and one of them often wakes up screaming at night.[386]

206. The commission received information indicating that one of the male family members killed in the attack worked for Hamas, but it is unclear what his functions were. He lived on the top floor of the house, which was completely destroyed, but had not stayed there regularly after the start of the conflict. He was among the group of people who were killed in the street by the second strike.[387]

---

[380] B'Tselem, Families Bombed at home Gaza, 11 August 2014, at
http://www.btselem.org/gaza_strip/201407_families; see also Al-Haq, Field Updates from the Gaza Strip, 10 July 2014, at http://www.alhaq.org/documentation/weekly-focuses/821-al-haq-field-updates-from-the-gaza-strip.

[381] W097

[382] W097 told the COI that Civil Defence found two missiles: the one that hit inside the house from a drone and a second missile that hit the children on the street.

[383] W097.

[384] W097.

[385] W097.

[386] W187.

[387] Meeting with Al Mezan, 9 February 2015.

c. *Attacks on residential buildings and civilian objects that did not result in the killing of civilians.*

207.    *"Only after causing damage to the assets of Gaza's social elite, (…) , by bombing the city's residential high rises, did Hamas's profit-loss calculus change."* Former IDF General Yair Naveh[388]

208.    The commission received information about the wholesale destruction of more than 200 residential buildings targeted by air strikes, which did not result in the killing of civilians or Palestinian fighters since the buildings had been vacated before the attacks.[389] The following reports were brought to the commission's attention:

- On 12 July 2014, the house of Essam Al Da'alis in Al Nussairat refugee camp was attacked, without causing any casualties[390]. Mr Al Da'alis was described as the head of the financial and economic council of Hamas.[391] On the basis of the information available to it, the commission is unable to assess whether Mr. Al Da'alis had any combat function.

- On 16 July, in two separate incidents, a house belonging to Jamil Al Shanti[392], and the four-storey house belonging to Ismail Al Ashqar, in Jabaliya[393], both members of the Palestinian Legislative Council (PLC), were destroyed.

- On 25 July, the house of Salah Al Bardawil, also a member of the PLC, in Al Qarara village was attacked and reportedly levelled.[394]

- On 29 July 2014, the house belonging to Ismail Abdul Salam Ismail Haniya, Member of the Palestinian Legislative Council (PLC), in the west of Gaza City was destroyed[395].

- In a statement issued on 16 July 2014, the IDF Spokesperson listed the day's targets. He said: "among the targets attacked tonight was the operational infrastructure of Mahmoud Al-Za'ar, who serves as a member of the political bureau in the Gaza Strip, and head of the Political Committee and Foreign Liaison Department". B'Tselem pointed out that in this case the IDF did not mention any military activity carried out by Mr Za'ar, or how such activity might be connected to the house.[396]

209.    On 8 July, the IDF spokesperson stated that the IDF had attacked about 50 "terror targets" in the Gaza strip. "Among the targets, there were four houses of senior members of the Hamas terror organization involved in terror activities and in the guidance of missile fire on Israeli territory".[397] This was the first time that the IDF provided a rationale for its attacks on residential buildings. Although Israel's Minister of Defence, on 14 July, reportedly used similar language to refer to the attacks on houses and other civilian

---

[388]   Yair Naveh: *Deterrence against Non-State Actors: Thoughts following Operation Protective Edge*; The Institute for National Security Studies (INSS) Insight No. 663, 11 February 2015, p.3. At: http://www.inss.org.il/index.aspx?id=4538&articleid=8720
[389]   Submission 22.3.
[390]   Submission 22.3.
[391]   Haaretz: *IDF to the residents of northern Gaza: "evacuate until 12:00"*; 13 July 2014 at http://www.haaretz.co.il/news/politics/1.2374145
[392]   Submission 22.3.
[393]   Submission 22.3.
[394]   Submission 22.3.
[395]   Submission 22.3.
[396]   B'Tselem, Black Flag, January 2015.
[397]   IDF spokesperson. 8 July 2014. At: http://www.idf.il/1153-20876-he/Dover.aspx

ATL004967

objects[398], starting from 10 July, the IDF consistently argued that it was targeting terrorists, command centres, weapons caches, tunnels and munition depots located inside these houses[399]. In this context, Israel alleges that houses belonging to certain Hamas political leaders in Gaza were used for military purposes and gave examples of supposed command and control centres.[400]

210.   According to information available to the commission, four multi-storey buildings in different parts of Gaza were destroyed in the last days of the hostilities. The commission reviewed and analysed video and photographic evidence, and submissions it received dealing with these incidents[401].   The following are the summaries of the information furnished the commission on these four attacks:

- On 23 August, at approximately 10.30 p.m., the IDF carried out strikes against the Municipal Commercial Centre in Rafah, which used to occupy a 1 500 m2 plot. According to Amnesty International, following two warning missiles, three air-dropped bombs targeted the lower three floors and caused the destruction of numerous shops and offices in the four-storey building, rendering it unusable. The air strikes started a large fire inside the building, which could not be extinguished until the following day. Only a concrete skeleton was left.[402]

- On 23 August, the IDF targeted the Zafer 4 Tower, a 12-storey building located in Gaza City. According to submissions received by the commission, the Tower had become home to dozens of families; more than 400 individuals had fled their homes elsewhere and resided in the tower. The attack resulted in the complete destruction of the building. According to media accounts and reports from Palestinian NGOs, around 20 residents in surrounding buildings were injured.[403] Hamas assertedly situated several command and control centres on multiple floors of the "Zafer 4" building in Sabra Tal al-Hawa. "After providing several effective advance warnings to the building's occupants and neighbours, and verifying that it was fully vacated, the IDF struck the building on August 23. No civilians were harmed in the attack."[404]

---

[398]   According to press reports, Minister Ya'alo said: "We continue to smash Hamas and its infrastructure. They have suffered great damage. We have destroyed weapons-production capabilities, tunnels, terrorists' homes, and institutions and we will continue this activity today [...] When Hamas comes out of their hiding places they will discover the extent of the destruction and the damage that we have caused the organization that will make them regret that they entered this round of fighting against Israel". *Highlighted by the commission.* In: Jerusalem Post: Ya'alon: Hamas leaders will see destruction we inflicted when they come out of hiding. 14 July 2015. At: http://www.jpost.com/Operation-Protective-Edge/Yaalon-Hamas-leaders-will-see-destruction-we-inflicted-when-they-come-out-of-hiding-362691

[399]   IDF spokesperson. 10 July 2014. At http://www.idf.il/1153-20893-he/Dover.aspx

[400]   Israel, Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*, p. 22 at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf.   Accessed on 30 May 2015

[401]   United Nations Office for the Coordination of Humanitarian Affairs: Occupied Palestinian Territory: Gaza Emergency Situation Report (as of 26 August 2014) at: http://www.ochaopt.org/documents/ocha_opt_sitrep_26_08_2014.pdf ; Including the report of Amnesty International: Nothing is Immune': Israel's Destruction of Landmark Buildings in Gaza, December 2014. At https://www.amnesty.nl/sites/default/files/public/nothing_is_immune.pdf. From now on referred to as Amnesty International, Nothing is Immune, December 2014.

[402]   Submission 22.3; Amnesty International, Nothing is Immune, December 2014.

[403]   Amnesty International, Nothing is Immune, December 2014.   Forensic Architecture's TEJKA See Video: http://www.reuters.com/article/2014/08/24/us-mideast-gaza-idUSKBN0GM11320140824

[404]   Israel, Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*, p.23 at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf, Accessed on 30 May 2015

- On 25 August 2014, at about 12.05 a.m., the IDF carried out a number of strikes at the Italian Complex. The complex, located in Gaza City, is composed of a 16-storey tower with a commercial centre on the two bottom floors. The strikes severely damaged the complex when all the floors on one side of the tower collapsed. The residential part contained about 50 apartments. According to Amnesty International, the bottom two floors included a shopping mall with scores of shops, a branch office of Hamas's political wing and an office of the Ministry of Public Works and Housing of the Hamas authority. Most of the shops were severely damaged. According to the Gaza Ministry of Health, 25 people were injured in this attack. [405]

- On Tuesday, 26 August 2014, at approximately 4.30 a.m., the IDF conducted several air strikes against the 13-floor Al Basha Tower, located in the centre of Gaza City, levelling it completely. The Al Basha tower hosted about 30 apartments. According to Amnesty International, the tower was occupied primarily by businesses and news media offices, as well as by a number of educational institutions, many of which were closed during the hostilities.[406]

211.   These four strikes led to the buildings' total or nearly total destruction. None of the attacks resulted in deaths as the IDF took measures to ensure that all residents left the buildings before they were targeted by using, in all cases, the "knock on the roof" procedure. In three of the cases (the Gaza City buildings), some residents also received warning phone calls, instructing them to evacuate and to tell others to leave the building. In two cases (the Al-Basha Tower and the Italian Complex), messages were sent to residents directing them to maintain a distance of 300 m between them and the building, and to inform residents of surrounding buildings to do the same. In all four cases, residents evacuated the buildings, alerted others, and assisted persons who needed help, including the elderly, but they were unable to remove their personal belongings. It appears that most inhabitants lost all of their possessions.[407]

212.   Amos Yadlin, a former Israeli Air Force (IAF) General and head of the IDF Military Intelligence Directorate, stated: "[On]ly if Hamas were hit sufficiently hard would it be deterred from further fighting, and thus quiet would be restored in the south. (…) Only in the seventh week, when (…) multi-storey buildings in Gaza were struck, was Hamas hit hard enough to be deterred, and thereupon quiet was restored.''[408]

### d.   *Patterns and legal analysis*

213.   *International law also recognizes the important social, historical and cultural dimensions of housing, and the critical link between access to adequate housing and recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family.*[409]

214.   Based on its inquiries and on the review of submissions and publicly available information, the commission identified certain patterns with respect to IDF strikes on residential buildings. These are analysed in light of applicable international law.

---

[405]   Amnesty International, Nothing is Immune, December 2014.
[406]   Amnesty International, Nothing is Immune, December 2014.  Forensic Architecture's TEJKA
[407]   Amnesty International, Nothing is Immune, December 2014.
[408]   The Institute for National Security Studies, *The Lessons of Operation Protective Edge*, November 2014, p. 203. At
         http://www.inss.org.il/uploadImages/systemFiles/ZukEtanENG_final.pdf.
[409]   CESCR General Comment no. 4, paras 7 and 8.

56

ATL004969

| CASE | LOCATION | DATE | WARNING | POSSIBLE MILITARY OBJECTIVE IDENTIFIED | WEAPON likely used | KILLED | WOMEN | CHILDREN | INJURED |
|------|----------|------|---------|----------------------------------------|--------------------|--------|-------|----------|---------|
| Kaware | Khan Younis | 8 July 3 p.m. | Phone call; Roof-knock | Yes | JDAM equipped 500lb or 1000lb bomb | 9 | x | 6 | 25- 29 |
| Al Hajj | Khan Younis | 10 July 2 a.m. | No | Yes | JDAM equipped 500lb bomb | 8 | 3 | 2 | 19, 7 women and four children |
| Al Batsh | Tuffah, Gaza city | 12 July 9.30 p.m. | No | Yes | JDAM equipped bombs (either 500lb or 1000lb) | 19 | 3 | 6 | 16- 45 |
| Shuheibar children | Gaza city | 17 July 5.30 p.m. | No | No | JDAM equipped 500lb MPR bomb | 3 | x | 3 | 2 |
| Al Qassas | Shuja'iya | 20 July 4.30 p.m. | No | No | AGM 114 Hellfire Missiles | 9 | 3 | 6 | 10 including 8 children and 1 woman |
| Al Hallaq and Al Ammar | Al-Remal, Gaza city | 20 July 6.45 p.m. | No | No | AGM 114 Hellfire missiles | 7 + 4 from Ammar Family | 3 | 3 + 4 | Ammar family : 5 children injured |
| Abu Jama | Abu Safar; East of Khan Younis | 20 July 7.50 p.m. | No | Yes | JDAM equipped bomb, unknown size | 26 | 5 | 19 | 3 including 1 child |
| Al Sayam | Rafah | 21 July 6.15 a.m. | No (house next door was hit) | Yes | AGM 114 Hellfire Missiles | 11 | 2 | 7 | 8 including 2 women and 5 children |
| Kilani (Al Salam | Gaza city | 21 July 8 p.m. | No | Yes | JDAM equipped 500lb bomb | 11 | x | 5 | |
| Al Najjar | Khan Younis | 26 July 3 a.m. | No | No | JDAM equipped 1000lb or 2000lb bomb, | 19 | 5 | 11 | 6 |

ATL004970

A/HRC/29/CRP.4

| Abu Jabr | Al Buraij refugee camp | 29 July 12.30 a.m. | No | No | JDAM equipped 2000lb bomb | 19 | 6 | 6 | 7 including 4 women and 3 children |
|---|---|---|---|---|---|---|---|---|---|
| Dheir | Rafah | 29 July 4.30 a.m. | Possible roof-knock | Yes | JDAM equipped 500lb bomb | 19 | 7 | 9 | 3 children |
| Al Dali Building | Khan Yunis | 29 July 7.30 a.m. | No | Yes | JDAM equipped 2000lb bomb | 32 | 6 | 18 | 21 including 4 children |
| Balatah | Jabaliya refugee camp | 29 July 4 p.m. | No | No | AGM 114 Hellfire Missile | 11 | 5 | 5 | 41 including 17 children and 5 women |
| Al Farra | Khan Younis | 1 August 2.30 a.m. | Yes | Yes | AGM 114 Hellfire Missiles | 9 | 2 | 5 | 2, 1 a baby |
| **A total of 216 killed** | | | **Of whom 115 children** | | **And 50 women** | | | | |

## Military Objectives

215.   In many of the cases examined by the commission, as well as in incidents reported by local and international organizations, there is little or no information as to how residential buildings, which are *prima facie* civilian objects immune from attack, came to be regarded as legitimate military objectives. The commission recognizes the dilemma Israel faces in releasing information that would disclose the precise target of military strikes, as this information might be classified and jeopardize intelligence sources. In relation to "evidence of military use", official Israeli sources indicated that: "*In the context of wide-scale military operations, it is often extremely difficult to provide evidence demonstrating exactly why certain structures were damaged. While the IDF targets only military objectives, forensic evidence that a particular site was used for military purposes is rarely available after an attack. Such evidence is usually destroyed in the attack or, if time allows, removed by the terrorist organisations who exploited the site in the first place. It is therefore unsurprising that forensic evidence of military use cannot usually be traced following attacks. As is the case with most militaries, the IDF unfortunately cannot publicize detailed reasoning behind every attack without endangering intelligence sources and methods. The Law of Armed Conflict does not include any requirement or obligation to publicize such information.*"[410] However, in the commission's view, accepting that logic would undermine any efforts to ensure accountability. The key concept of international humanitarian law is the principle of distinction. Only once it has been established whether a specific attack distinguished between legitimate military objectives on the one hand, and civilians and civilian objects on the other hand, can compliance with the other principles, of proportionality and of precautions, be considered.

216.   More specifically, the information needed to enable an independent assessment of whether a given attack complied with international humanitarian law obligations must shed light on two criteria that need cumulatively to be fulfilled in order for a building to become

---

[410]   Israel, Ministry of Foreign Affairs, I*srael's Investigation of Alleged Violations of the Law of Armed Conflict*, p. 27. Accessed 30 May 2015.

58

ATL004971

a military objective: (1) does the object by its "nature, location, purpose or use make an effective contribution to military action" and, (2) would the object's "total or partial destruction, capture or neutralization in the circumstances ruling at the time, offer a definite military advantage."[411]

217.    This information must be released to independent and impartial mechanisms which have the effective power to ensure accountability (for a more detailed discussion of this see chapter VII below). The commission also notes that, while there may be limitations on publishing certain types of information, a minimum level of transparency is required from the point of view of assisting victims' quest for the truth and their right to effective remedies.

218.    In terms of the targeted house attacks, the commission calls upon Israel, at a minimum, to release information about what constituted the military objective within each house, and how targeting that objective effectively contributed to military action.

**Incidents Resulting in Deaths**

219.    In 6 cases examined by the commission, and in most cases reported on by NGOs, there is little or no information available as to why residential buildings, which are *prima facie* civilian objects immune from attack, were considered to be legitimate military objectives. In relation to each attack on a residential building that resulted in significant destruction and civilian deaths or injuries, the onus is on Israel to explain the factual elements that have rendered the house or the person(s) present inside a military target. In this regard, Israel should provide specific information on the effective contribution of a given house or inhabitant to military action and the clear advantage to be gained by the attack. Should a strike directly and intentionally target a house in the absence of a specific military objective, this would amount to a violation of the principle of distinction.[412] It may also constitute a direct attack against civilian objects or civilians, a war crime under international criminal law.[413] The commission wishes to emphasize that, in case of doubt, "whether an object which is normally dedicated to civilian purposes [...] is being used to make an effective contribution to military action, it shall be presumed not to be so used"[414]

220.    Indications of possible military objectives emerged in 9 of the 15 cases examined by the commission. In the Kaware case, the MAG indicated that "the aerial strike was carried out against the building due to its use for military purposes by Hamas"[415]. The attack on the Al Salam Tower was directed against an Islamic Jihad operative, according to the MAG. In addition, in four cases, there were possible links of family members or premises to Al Qassam (Abu Jama, Al Haj, Al Batsh, one Sayam family member); to Saraya Al Quds (Al Dali, Dheir); or to the Democratic Front for the Liberation of Palestine (one Sayam family member). In one incident, it appears that a person may have been targeted because he worked with Hamas (Al Farra). In these nine cases, while the commission is not in a position to ascertain why a residential building was attacked, the potential targets of the attack seem to have been mostly individuals who were or who could have been present in the building that was struck, indicating that one or several individuals were the likely target and not the building itself. In that context the commission underlines that the mere fact of being a member of the political wing of Hamas or any other organization in Gaza, or

---

[411]   AP I, article 52.2.
[412]   Additional Protocol (AP) I, articles 51 and 52.1
[413]   Rome Statue, article 8.
[414]   AP I, article 52.3, which reflects customary international law.
[415]   Military Advocate General. Up-date of December 2014 at: http://www.law.idf.il/163-6958-en/Patzar.aspx

working for the authorities (Al Farra case), is not sufficient in and of itself to render a person a legitimate military target. While the IDF indicated that it did not target Hamas lawmakers, politicians or law-enforcement officials because of their affiliation with Hamas, but only individuals who directly participate in hostilities or are members of organized armed groups[416], under international humanitarian law, a member of an armed group has to have a continuous combat function to constitute a legitimate military target.[417]

221.    In relation to the incidents where information about possible military objectives was available, the commission examined whether the attacks were in conformity with the principle of proportionality. The commission notes the official assertion that "During the 2014 Gaza Conflict, the IDF took steps to ensure the collection of all reasonably available, timely information regarding a target's surroundings, focusing in particular on civilians and civilian objects that may be in its vicinity at the time of the attack, regardless of whether an advance warning has been given. For example, remotely piloted aircraft flew over countless targets to monitor the presence of civilians in real time. In addition, the IDF routinely used engineers and damage-assessment specialists to assist with the assessment of expected collateral damage by considering the specific circumstances of each case (including the target's surroundings, the means and methods used in the attack, and so on)."[418] In most of the incidents examined by the commission and others[419], however, given the following circumstances: the fact that the targeted buildings except one were residential in nature; that they were located in densely populated areas; that the attacks were carried out when it could be expected that most family members would be at home (in the evening or at dawn when families gathered for *iftar* and *suhhur*, the Ramadan meals, or during the night when people were asleep); and that large weapons apparently meant to raze buildings were used; it is possible to conclude that a reasonable commander must have been aware that such an attack was likely to result in a high number of civilian casualties as well as in considerable destruction. Given the absence of information suggesting in each case that the anticipated military advantage at the time of the attack was such that the expected civilian casualties and damage to the targeted and surrounding buildings were not excessive, there are strong indications that these attacks could be disproportionate, and therefore amount to a war crime.[420]

**Destruction of houses not resulting in deaths**

222.    Other groups of cases discussed above (attacks against the houses of senior political figures and of high ranking members of armed groups when they were not present; and three high-rise buildings in the last days of the conflict[421]) also raise serious questions as to

---

[416]   Israel, Ministry of Foreign Affairs, *IDF Conduct During the 2014 Gaza Conflict*, p. 18; at: http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx. Accessed on 30 May 2015

[417]   ICRC, *Interpretative Guidance on the Notion of Direct Participation in Hostilities Under International Humanitarian Law*, p. 71.

[418]   Israel, Ministry of Foreign Affairs,*IDF Conduct of Operations during the 2014 Gaza Conflict*, p.41 at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf. Accessed 30 May 2015

[419]   B'Tselem, Black Flag, January 2015 and Amnesty International, Families under the rubble, November 2014.

[420]   Rome Statue, article 8.

[421]   The commission notes that, according to an official statement, "When analysing the proportionality of an attack, the IDF takes into account not only the expected harm to civilians, but also the expected damage to civilian objects. In a few situations during the 2014 Gaza Conflict, the IDF determined that the anticipated military advantage from certain attacks on large multi-storey buildings was sufficient to justify the collateral damage to property. Because the

ATL004973

the respect of the principle of distinction between civilian objects and military objectives. The commission has not received any specific information about the contribution of most of these buildings to the military effort of armed groups in Gaza and how their destruction offered a military advantage to Israel. The absence of that information, combined with statements by members of the Israeli Government and the IDF to the effect that "terrorists' homes and institutions"[422] and the home of a member of the political bureau in the Gaza strip were targeted, raise questions as to whether these targets constituted legitimate military objectives. The IDF later stated that many commanders of armed groups were using their homes as command centres and that it was the command centres, rather than the homes themselves, that were targeted.[423] Although issuing operational orders may be construed as using a home for military purposes, in order for it to become a military objective, its destruction must offer a definite military advantage at the time of the attack. The mere presence of a laptop or a mobile phone used for military purposes in the apartment, or the fact that meetings of a military nature had been held there in the past, are not sufficient to turn a civilian object into a military objective owing to the extremely limited military advantage the destruction of the home would offer. Indeed, a meeting can easily be held elsewhere, and mobile phones and laptops are portable and can be replaced when destroyed. As a military expert who provided information to the commission observed, a room that has in the past been used for meetings of a military nature and may also be so used in the future, in which there are no weapons or complex equipment and where there is no one present at the time of the attack, cannot be regarded as a legitimate military objective.[424] Regarding the destruction of high-rise buildings, a statement by an IDF General seems to suggest that the objective of these strikes was to exercise pressure on the "social elite" of Gaza by destroying the high-rises;[425] this can in no manner be considered as a legitimate military advantage under international humanitarian law.

223.    In the absence of precise information about the possible military use of these premises, the commission is unable to make a final assessment regarding the principle of distinction. However, the massive scale of destruction and the number of homes and civilian buildings attacked raise concerns that Israel's interpretation of what constitutes a "military objective" is broader than the definition provided by international humanitarian law[426].    Should attacks have been directed against buildings that did not constitute a military objective this may amount to a war crime.

---

IDF reasonably anticipated that each of the attacks would yield sufficiently significant military advantage from the destruction of multiple command and control centres and arms depots located in each building, the IDF carried out the attacks (after employing a multi-tiered system of warnings, including repeated phone calls to residents and neighbours). Israel, Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*, p. 43; at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf .Accessed 30 May 2015

[422]    See footnote 397

[423]    Lecture by MAG Major General Dani Efroni at the Institute for National Security Studies (INSS) conference: Challenges of Warfare in Densely Populated Areas, 2 December 2014, see IDF report on lecture : http://www.law.idf.il/163-6967-he/Patzar.aspx. Op. cit. note 235. http://www.idf.il/1153-20893-he/Dover.aspx

[424]    Meeting of the commission with Colonel (ret) Richard Kemp, 20 February 2015.

[425]    Yair Naveh, Maj. Gen. formerly served as Deputy Chief of Staff, as principal infantry and paratroopers commander, commander of the Gaza Division, Commander of the Home Front Command, and GOC Central Command: *Deterrence against Non-State Actors: Thoughts following Operation Protective Edge*; INSS Insight No. 663, 11 February 2015, p.3. At: http://www.inss.org.il/index.aspx?id=4538&articleid=8720.

[426]    Customary rule reflected in article 52 (2) API.

ATL004974

**Weapons used**

224.    Many of the strikes described in this chapter, e.g. on the Al Hajj, Al Dali, Abu Jama, Dheir, Abu Jabr and Al Batsh houses, apart from causing death and injury, led to the total or partial destruction of entire buildings as described by many witnesses and illustrated by pictures. This is also noted by UNITAR-UNOSAT, which, on the basis of its analysis of satellite imagery, found that "[m]any buildings across the Gaza Strip were likely struck by laser guided air dropped munitions which are capable of collapsing a large building with relatively moderate damage to surrounding areas. […] All are obviously visibly collapsed while surrounding buildings are not, though surrounding buildings certainly experienced some form of collateral damage from the munitions impacting the primary targets. Such damage examples are widespread within the interior of the Gaza Strip."[427]

225.    The cases examined and other available evidence show that large air-dropped weapons with highly destructive potential, widely employed during Operation "Protective Edge", were used in many incidents (see in particular the sections on Al Salam, Al Batsh, Al Dali and Abu Jama and the multi-storey buildings above). The commission notes Israel's assertion that "during the 2014 Gaza Conflict, whenever feasible, the IDF selected munitions that would minimise potential civilian casualties and injuries, while still achieving the objective sought. In this regard, whenever feasible, the IDF conducted pinpoint aerial strikes, using precision-guided munitions."[428] As an NGO conducting research on the use of weapons by Israel in Gaza last summer found: "Many of the aerial munitions used, while more accurate than their historic predecessors, still have a wide-area effect because of their size and power. One munition used by the Israeli Air Force is the Mk-84, a high-explosive bomb fitted with a guidance system that weighs 2,000lb."[429] Similarly, concerning the GBU-31, which appears to have been used in several of the cases described above, engineers and weapons designers reportedly stated the following:

*"The explosion creates a shock wave exerting thousands of pounds of pressure per square inch. By comparison, a shock wave of 12 psi will knock a person down; and the injury threshold is 15 pounds psi. The pressure from the explosion of a device such as the Mark-84 JDAM can rupture lungs, burst sinus cavities and tear off limbs hundreds of feet from the blast site, according to trauma physicians. When it hits, the JDAM generates an 8,500-degree fireball, gouges a 20-foot crater as it displaces 10,000 pounds of dirt and rock and generates enough wind to knock down walls blocks away and hurl metal fragments a mile or more. There is a very great concussive effect. Damage to any human beings in the vicinity would be pretty nasty."[430]*

226.    The above analysis has been confirmed by military experts consulted by the commission. In relation to the use of the GBU-32/MK-82, 1000lb bomb or the GBU-31/MK-84, 2000lb bomb, which were used in several of the above-mentioned incidents, regardless how precise the bomb is, it remains extremely questionable whether a weapon

---

[427]    UNITAR-UNOSAT: Impact of the 2014 Conflict in the Gaza Strip. UNOSAT Satellite Derived Geospatial Analysis; 2014; p. 11. At:
https://unosat.web.cern.ch/unosat/unitar/publications/UNOSAT_GAZA_REPORT_OCT2014_WEB.pdf

[428]    Israel, Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*, p. 38at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf, Accessed 30 May 2015.

[429]    Action on Armed Violence, Under fire Israel's artillery policies scrutinised, December 2014, p. 15. At: https://aoav.org.uk/wp-content/uploads/2015/03/AOAV-Under-Fire-Israels-artillery-policies-scrutinised.pdf.

[430]    San Diego Union Tribune, 21 March 2003 at:
http://legacy.utsandiego.com/news/world/iraq/20030321-9999_1n21bombs.html  (accessed on 22 April 2015).

62

ATL004975

with such a wide impact area allows its operators to adequately distinguish between civilians and civilian objects and the military objective of the attack, when used in densely populated areas. Attacks, which used this type of weapon in densely populated, built up areas of Gaza, are therefore likely to constitute a violation of the prohibition of indiscriminate attacks. [431]

**Groups of civilians with young children killed while outside**

227.    In three cases examined by the commission, groups of individuals were struck in the street or on the roof. The groups included young children, in two cases when they fled their houses (Al Sayam – 7 children killed and 3 injured, including one baby; and Al Farra – 5 children aged under 12 killed and one baby injured) and in one case while they were on the roof (three Shuheibar children killed, all under 12 years old).

228.    The commission notes that in all three cases precision weapons appear to have been used, which indicates that specific objectives were targeted. The onus is on Israel to make available information about those objectives and explain how attacking them contributed to military action. Only once that information is known can the legality of the attacks in terms of distinction, proportionality and precautions be assessed. Unless there were legitimate military objectives, the targeting of civilians not taking part in the hostilities would be a violation of the principle of distinction[432] and could constitute a direct attack against civilians, a war crime under international criminal law.[433]

229.    In the event that a member of an armed group was part of the group fleeing the house, as alleged in the Al Farra and possibly the Sayam cases, the attack raises questions with regard to the principles of proportionality and precautions. The IDF's surveillance capacity, combined with the likelihood that a group of persons fleeing a house that has just been bombed in the middle of the night would include a number of civilians, are strong indications that the IDF failed in its obligations to take all feasible measures to avoid or at least to minimize incidental harm to civilians.

230.    The commission notes that, according to official Israeli sources, the IDF abandoned air strikes when the presence of civilians was detected[434]. Therefore, since there are grounds to believe that the IDF had the capacity to determine the civilian nature of the (vast majority of people) in the groups fleeing the house and of the children on the roof, it may have breached its obligations to take all feasible measures to avoid or at least to minimize incidental harm to civilians. In addition, unless the anticipated military advantage of neutralizing a purported member of an armed group was such that the expected death of the civilians in the group, many of whom were children, would not be excessive, this attack could be deemed disproportionate.

**Precautions**

231.    The IDF has repeatedly stated that it takes precautionary measures that are more stringent than those required by international humanitarian law,[435] in order to protect

---

[431] AP I, article 51(4).
[432] AP I, articles 51 and 52.1
[433] Rome Statue, article 8.
[434] Israel Ministry of Foreign Affairs, *Israel minimizes civilian casualties*. At
http://mfa.gov.il/MFA/ForeignPolicy/Issues/Pages/Israel-minimizes-civilian-casualties.aspx.
[435] See IDF web-site: Aerial Strikes against Terrorists: Some Legal Aspects. At:
http://www.law.idf.il/592-6584-en/Patzar.aspx, see also the lecture by MAG Major General Dani
Efroni at the Institute for National Security Studies (INSS) conference: Challenges of Warfare in

ATL004976

civilians in Gaza. Some of the precautionary measures adopted by the IDF in the context of airstrikes during the summer of 2014 included: phone calls and text messages warning residents in targeted buildings, or those in the immediate vicinity, of an impending attack; dropping leaflets in a neighbourhood; delivering warning shots to the roof; and abandoning air strikes when the presence of civilians was detected.

### Timing

232.    In relation to the timing of attacks, in a number of the above incidents and incidents researched by others, the commission observes that Israeli authorities indicated that, with a view to minimizing collateral damage, "the Civil and Liaison Administration updated IDF operational entities with detailed information concerning prayer times and the iftar fast (during which times large family gatherings are held)".[436] Yet many of the attacks took place in the evening as families gathered for *iftar*, the Ramadan meal to break the fast, during the night when people were asleep; or in the early morning during suhhur, the last meal before dawn, which increased the likelihood that many persons, often entire families, were at home. If the target was an individual, it can be questioned whether the individual could not have been targeted at another time or location. This is particularly apparent in the strike on the Al Salam tower, where it appears that the target was a commander of Islamic Jihad's military wing, who, according to an eyewitness, had left the building several times in the days preceding the attack, which indicates that there may have been the possibility to target him elsewhere, when fewer civilians were in the vicinity. International humanitarian law requires that all feasible precautions must be taken to avoid or at least to minimize incidental loss of life and damage to civilian objects. This includes the choice of the timing of the attack.[437] There are concerns that this requirement may not have been complied with in some of the cases examined by the commission.

### Warnings and their effectiveness

233.    Warnings are reported to have been issued in two of the cases examined by the commission (Kaware and Dheir, although little is known in relation to the latter, as all persons present in the house died). In respect of two other cases (Al Sayam and Al Farra), unconfirmed reports indicate that there may have been "roof-knocks". In the remaining eleven cases, no reports of warnings were received. Similarly, Amnesty International examined eight cases of airstrikes in which civilians were killed and found that "in all cases, no prior warning was given to the civilian residents to allow them to escape."[438] Different types of warnings are reported to have been issued in advance of the strikes on three multi-storey buildings and one shopping centre in the last days of the conflict, which warnings appear to have been effective, since the buildings were vacated and nobody was killed. However, at least 25 people were injured as a result of the strikes.

234.    The commission notes that attacks on more than 200 residential buildings by air strikes resulted in no civilian casualties. This indicates that specific warnings by the IDF to inhabitants of these buildings were effective in many cases. This is further illustrated by the destruction, between 23 and 26 August 2014, of three buildings each housing several dozen apartments, which did not result in any civilian deaths. Residents of the buildings, and often

---

Densely Populated Areas, 2 December 2014, see IDF report on the lecture: http://www.law.idf.il/163-6967-he/Patzar.aspx.

[436] Israel Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*, p. 37 at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf, . Accessed 30 May 2015

[437] AP I, article 57(3). AP II article 13(1). ICRC, *Database customary international humanitarian law*, Rule 17.

[438] Amnesty International, *Families under the rubble*, November 2014, p. 5.

ATL004977

their neighbours, received phone calls instructing them to evacuate and in some cases warning them to keep a safe distance from the targeted buildings.[439] The commission considers that the issuing of warnings concerning specific air strikes, via phone calls and text messages is a good practice, through which Israel attempted to respect its obligation to give advance warnings of attacks, where feasible, so as to minimize civilian casualties. However, in a number of cases, these phone warnings did not comply with the requirement of international humanitarian law that parties to a conflict should provide "effective" advance warning of attacks that may affect the civilian population, unless circumstances do not permit.[440] According to State practice, warnings are not required when attacks necessitate the element of surprise, when they would put the security of the attacking forces at risk, or when speedy responses are needed.[441]

### "Roof-Knock" warnings

235.    According to official Israeli sources, "IDF assessments show that the employment of "roof knocking" was highly effective, preventing many civilian injuries and deaths during the 2014 Gaza Conflict."[442] The commission observes, however, that some of the incidents examined in this section raise serious concerns regarding the effectiveness of "roof-knocking".

236.    In some cases, it appears that concerned persons did not understand that their house had been the subject of a "roof-knock", such as the in case of the Dheir home, where the family in the house did not understand that the strike was a warning until they were told by a neighbour that they had to flee. While on their way out, 19 out of the 22 individuals present in the house died, including 9 children[443]. In two other cases,[444] families fled buildings following an air strike on the roof or top floor believing that the strike was a warning, only to be struck by a targeted missile once outside the house and on the street. On the basis of their research into large numbers of attacks of houses, many NGOs have expressed doubts about the effectiveness of the warnings issued during Operation Protective Edge.[445] For instance, B'Tselem indicated that "[t]his was especially so when the "knock on the roof" method was used while there were other attacks in progress in the vicinity and residents could not tell apart the smaller missile hitting the roof of their house. In other cases, residents who had been warned did leave the house, but people living nearby – who had not received a warning – were hurt when their homes also sustained damage in the attack."[446] The confusion caused by "roof-knocks" is understandable in such a densely populated area. Often, there are several buildings of 4, 5 or 6 floors adjoined.  When a roof is hit by a strike it thus becomes very difficult for people located on the lower floors to understand whether the warning was targeting their own building, or the one to the left, to the right, behind or in front, or across the narrow street; thus the "roof-knock" warning raises the question whether fleeing might put one more at risk than staying put.

---

[439]  Amnesty International, Nothing is Immune, 19 December 2014.

[440]  AP I, article 57(2).

[441]  Jean Marie Henckaerts and Louise Doswal-Beck, Customary International Humanitarian Law, Cambridge, 2006, p. 64.

[442]  Israel, Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*, p. 37 at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf. Accessed 30 May 2015.

[443]  W079 and W080.

[444]  See Sayam and Al Farra cases above.

[445]  B'Tselem, Black Flag, January 2015, p. 51, 52; see also: FIDH: Trapped and Punished: The Gaza Civilian Population under Operation Protective Edge, pp. 15-30; see also OCHA. Situation report, 14 July, p. 2, http://www.ochaopt.org/documents/ocha_opt_sitrep_15_07_2014.pdf; Physicians for Human Rights, Findings of an Independent Medical Fact-Finding Mission, Gaza 2014, p. 40 ff.

[446]  http://www.btselem.org/download/201501_black_flag_eng.pdf, p. 51, 52

ATL004978

237.   The short time lapse between the "roof-knock" strikes and the actual strike that resulted in the destruction of the building is also cause for concern. In cases documented by the commission[447] and by NGOs[448] only a few minutes (between 3 and 5) elapsed between the two strikes. If the "roof-knock" is the first warning, a few minutes are clearly not sufficient to allow a multi-storey building inhabited by families with children and elderly and sometimes disabled persons to be evacuated, taking into account the time required to realize that the strike was meant as a warning. In one case documented by an IDF video presenting an audio recording of a conversation between an IDF soldier and a resident of Gaza, while showing the image of a building surrounded by many others, the IDF officer only provides five minutes for the person to leave the house before a neighbouring building is destroyed.[449] The IDF video also highlights another problem that may render advance warnings ineffective. In an area with buildings all around, how can the recipient of such a "roof-knock" know which building he or she should avoid if this is not specified in the message? Based on the warning that a building close to one's own will be targeted, while a person may be willing to leave the house, he or she cannot know in what direction to escape. It seems that in such cases the phone call warnings are not effective as required by international humanitarian law. In addition, by giving a warning, the IDF accepted that the attack did not require the element of surprise; accordingly, there appears to be no reason why more time was not granted to the residents of the house to evacuate. This analysis was echoed by a military expert who provided information to the commissioners: "If you are giving a warning you know that you have lost the element of surprise and there is no reason for cutting it short".[450]

238.   Furthermore, according to a former Head of the International Law Department of the MAG Corps, the "roof-knock" technique was conceived as a final precautionary measure to make it clear that the IDF was serious about previous warnings and precautions and to give persons that may be affected by the impending attack an additional and possibly last opportunity to escape.[451] The use of "roof-knocking" as a complement to other warning methods was examined in one case by the commission,[452] and in a number of cases documented by non-governmental organizations.[453] However, the commission is unable to verify whether "roof-knocking" was systematically combined with other warnings and whether there were cases in which "roof-knocking" was the only form of specific – and ambiguous – warning civilians received.

239.   Based on its findings, the commission concludes that the "roof-knocking" technique is not effective, in particular if not combined with other specific warnings.

240.   The commission also underlines that the extent of its efforts deployed to provide warnings to the civilian population, and of their effectiveness, does not relieve an attacking party of its obligation to respect all the other principles on the conduct of hostilities, in particular distinction and proportionality. Nor does the fact that an effective warning has been given alter the civilian status of those who have not heeded the warning.

---

[447] See Dheir case above.

[448] Physicians for Human Rights, Findings of an Independent Medical Fact-Finding Mission, Gaza 2014, p. 43-44.

[449] IDF video showing a warning call that was made to the neighbour of building that was about to be targeted. Available at http://mfa.gov.il/MFA/ForeignPolicy/Issues/Pages/Israel-minimizes-civilian-casualties.aspx

[450] Meeting with Colonel (ret) Richard Kemp, 20 February 2015.

[451] Video conference with Daniel Reisner, 22 January 2015.

[452] See Kaware case above.

[453] E.g. Physicians for Human Rights, Findings of an Independent Medical Fact-Finding Mission, Gaza 2014, p. 43

ATL004979

241.    While the commission cannot know what precautionary measures were taken by the IDF in each attack, based on a number of cases, there are concerns that the IDF may not have done everything feasible to verify whether civilians were present in the buildings selected for attack and to assess whether the impending strike would result in civilian casualties and damage to civilian objects, which would be excessive in relation to the anticipated military advantage. The incidents examined in this section point to a potential failure by the IDF to take all appropriate measures to avoid or at the very least to minimize death and injury to civilians and damage to civilian objects.[454]

242.    The limited effectiveness of these precautionary measures must have become abundantly clear during the early days of the operation, given that many buildings were completely destroyed together with their inhabitants.  The apparent lack of steps taken to re-examine these measures in light of the mounting civilian toll suggests that Israel did not fully comply with its obligation to take all feasible precautions in attack.[455]

**Tactics of targeting residential buildings and impact on civilians including women and children**

243.    OCHA found that at least 142 Palestinian families had three or more members killed in the same incident as a result of attacks on residential buildings, amounting to a total of 742 fatalities.[456] Al Mezan and Lawyers for Palestinian Human Rights reported that at least 1,066 family members had been killed inside their homes[457], which means that a significant percentage of civilians killed during the conflict died inside their home as a direct result of air-strikes or artillery shelling of their neighbourhoods, making attacks on houses a key-feature of the conflict. This is consistent with findings by Physicians for Human Rights, which on the basis of numerous interviews, including with 68 persons with injuries, described "[a] consistent picture of people injured or killed while in, or very close to, their homes.[458] They also report that around 60 per cent of the incidents they researched involved attacks that took place either at home or in someone else's home.[459] The commission notes the large number of targeted attacks against residential buildings and that such attacks continued throughout Operation 'Protective Edge', even after the dire impact of these attacks on civilians and civilian objects became apparent, and were intensified again towards the end of the operation.[460]  In addition, figures show that strikes on homes and other buildings that were prima facie civilian, irrespective of whether or not civilians were killed or injured, were massive and destructive. These observations raise concern that these strikes may have constituted *military tactics reflective of a broader policy*, approved at least

---

[454] AP I, Article 52.

[455] This conclusion is supported by the ICTY in the *Kupreskic* Judgement of 2000. When discussing respect for the principle of distinction and proportionality, the trial chamber concluded that: a "pattern of military conduct may turn out to jeopardize excessively the lives and assets of civilians."

[456] OCHA, Fragmented Lives, March 2015, p. 4.

[457] Al Mezan Center for Human Rights, Lawyers for Palestinian Human Rights (LPHR), 22 May 2015 up-date to a complaint submitted concerning large-scale destruction and damage to family houses in the Gaza Strip with associated profound loss of life and injury to Palestinian residents, during Israel's military operation between 7 July 2014 and 26 August 2014, 30 September 2014, original complaint available at: http://lphr.org.uk/legal-projects/gaza-accountability-project/ .

[458] Physicians for Human Rights, *Findings of an Independent Medical Fact-Finding Mission*, Gaza 2014, p.40.

[459] Physicians for Human Rights, *Findings of an Independent Medical Fact-Finding Mission*, Gaza 2014, p.36.

[460] Response to the Israeli Embassy in London's reaction to the report by Amnesty International, Nothing is Immune, December 2014.  At: https://www.amnesty.org/en/documents/mde15/036/2014/en/.

tacitly by decision-makers at the highest levels of the Government of Israel[461]. Such tactics appear to have prioritized the perceived military objective over other considerations, disregarding the obligation to minimize effects on civilians. In this context, with respect to the importance of adhering to the principles of distinction and proportionality, the ICTY has ruled that in some circumstances a "pattern of military conduct may turn out to jeopardize excessively the lives and assets of civilians"[462].

244.    These tactics also rendered women and children particularly vulnerable to death and injury. Out of the 216 people killed as a consequence of the strikes discussed in this chapter, 50 were women. In 11 out of the 15 cases examined by the commission the strikes on residential buildings led to the death of between 3 and 7 women. Findings of several NGOs that point to significant numbers of female casualties, in particular as a result of strikes on residential buildings[463], reinforce this assessment. It appears that, as a result of these tactics, the percentage of women killed during the 2014 hostilities significantly increased in comparison with the conflict in 2009.[464] 115 children were killed in the 15 cases examined by the commission (more than half of all fatalities). Children were killed in all 15 incidents. In the attack on the Al Dali building in Khan Younis, 18 of the 31 people killed were children; in the attack on the Abu Jama home described above, 19 out of 26 killed were children.[465]

### 3.    Ground Operations

245.    *"We don't want to confuse the troops, and that's the story. When I teach people to fight in a war, the civilian population is not supposed to be there, and if it is, I persuade it to keep away. In peacetime security, soldiers stand facing a civilian population, but in wartime, there is no civilian population, just an enemy."* Head of the Doctrine Desk at the Infantry Corps HQ, Major Amitai Karanik [466]

---

[461]  In this context, see the ICTY's *Kupreskic* Judgement of 2000; see also: Amnesty report, p 6 and 42; see also  FIDH, Trapped and Punished: The Gaza Civilian Population under Operation Protective Edge, p. 29, 30, at https://www.fidh.org/IMG/pdf/report_gaza_fidh_march_2015.pdf.

[462]  ICTY in the *Kupreskic* Judgement of 2000.

[463]  According to NGO figures, 241 women were killed inside their homes, which means that about 82 percent of the 2014 female fatalities occurred in homes, compared to 46 percent of the male fatalities. See also B'Tselem: Black Flag and the infographic "Families bombed at home, Gaza, July-August 2014" based on preliminary figures on casualties in July:
http://www.btselem.org/gaza_strip/201407_families (in 72 incidents of bombing or shelling, 547 people were killed, including 125 women under the age of 60 and 29 people over the age of 60.

[464]  The percentage of women killed was significantly higher in 2014 (20.2 per cent of civilians) in comparison with the conflict in 2009 (14 per cent), calculated based on conservative NGO figures (B'Tselem quoted in A/HRC/12/48, p. 90). See also: PCHR, Through Women's eyes, 2014, which indicated that about 10 per cent of the civilians killed as a result of the 2008/09 escalation were women, whereas this figure rose to about 20 per cent in 2014.

[465]  370 of the children killed were reportedly killed inside their homes, i.e. over 66 per cent. Al Mezan Center for Human Rights, Lawyers for Palestinian Human Rights (LPHR), 22 May 2015 up-date to a complaint submitted concerning large-scale destruction and damage to family houses in the Gaza Strip with associated profound loss of life and injury to Palestinian residents, during Israel's military operation between 7 July 2014 and 26 August 2014, 30 September 2014, original complaint available at: http://lphr.org.uk/legal-projects/gaza-accountability-project/ .An infographic published by B'Tselem based on preliminary figures on fatalities as a result of "families bombed at home" in July shows that out of 547 persons killed, 250 were minors. B'Tselem, Families bombed at home, Gaza, July-August 2014, at: http://www.btselem.org/gaza_strip/201407_families.

[466]  BaYabasha, Ground Forces Journal. Avigail Bukobza: Involved fighting; October 2014, No. 29, p. 62 Unofficial translation. at:
http://www.scribd.com/doc/249616628/29-גליון-ביבשה

246.   After an initial air phase that started on 8 July, on 17 July 2015, the IDF launched a ground operation into Gaza. Official Israeli sources indicated that they did so to degrade "terror organisations' military infrastructure, and [… neutralize] their network of cross-border assault tunnels".[467]   This followed what Israel described as "a militant attack inside Israel on 17 July carried out through a tunnel from inside Gaza, the launch of an unmanned aerial vehicle (UAV) into Israeli airspace, an attempted infiltration by sea into Israel by Hamas naval commandos, continued rocket fire from Gaza and Hamas's refusal to accept a ceasefire."[468]   The ground operation combined the use of ground troops and armoured vehicles with the aim of destroying tunnels and debilitating Palestinian armed groups from launching attacks into Israel. The ground operation was preceded and accompanied by intense IDF shelling from the sea and from the air, as well as by fierce artillery fire.[469]

247.   Israel informed the UN's Board of Inquiry that "Hamas had been better prepared and armed than at the time of Operation Cast Lead in 2009 and Operation Pillar of Defense in 2012. It had prepositioned weapons and military equipment and prepared fighting positions in various locations to allow fighters to move freely without carrying weapons and to blend into the civilian population. Mosques, schools, hospitals and other civilian objects had been used to embed rockets, weapons caches and command centers. These conditions made it difficult for the IDF to distinguish "enemy" forces and activity from the civilian population…."[470]

248.   The commission focused its inquiries on the ground operations in the neighbourhoods of Shuja'iya (19-20 July), Khuza'a (20 July- 1 August), Rafah (1-3 August) and the operation targeting the market neighbourhood of Shuja'iya (30 July). The commission conducted 75 interviews in relation to the ground operations, reviewed confidential submissions from a variety of stakeholders, governmental and non-governmental, and consulted publicly available information, including satellite imagery, video and photo material.

249.   By letter dated 10 February 2015, the commission of inquiry requested the Israeli authorities to furnish information "on several general issues and clarify […] the factual circumstances of specific incidents". The letter specifically inquired about the military operations examined in this chapter, including the IDF criteria for distinguishing between military objectives and civilian objects; evaluation of proportionality; what precautionary measures were taken and the timeframes when warnings were given; the IDF doctrine on the use of artillery in densely populated areas; type and quantity of ordnance used; IDF policy with regard to medical assistance to wounded persons and which measures were taken to facilitate the evacuation of wounded civilians; the number of casualties; and whether any investigations were initiated. In addition, the letter referred to many of the specific incidents that are discussed below. The commission did not receive a response. Therefore, to the extent possible, the commission assessed materials in the public domain. In particular, the MAG issued a statement about the events at Shuja'iya market on 30 July. It is referred to in the relevant sections of the text.

250.   The combined impact of these ground operations has had a devastating impact on the population of Gaza, both in terms of human suffering as well as in terms of damage to the infrastructure. The four operations described below have resulted in the killing of at

---

[467] Israel Ministry of Foreign Affairs, *Israel's Objectives and Phases of the 2014 Gaza Conflict,* p. 3. at: http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx. Accessed 30 May 2015.
[468] Quoted in S/2015/286, p. 3
[469] OCHA, Situation Report, 18 July 2014
[470] S/2015/286; p.3

least 150 civilians, the total destruction of over 2000 homes, and the partial destruction of at least 2200 homes.

### a. Shuja'iya, 19 and 20 July 2014

251.   *"I was there and I can tell you, the earth moved under our feet."* Israel Defence Forces (IDF) artillery Officer present in Shuja'iya[471]

252.   *"The attacks were everywhere. Everything was coming under attack, the roads and the buildings; there was no safe haven in Shuja'iya. It would have been impossible. [...] We walked as the missiles kept arriving. We saw bodies of people in the streets. We came across the body of [..] an acquaintance of mine from our neighbourhood. We came across several other bodies of people. The corpses were of young and old persons, women, children, etc."* Witness from Shuja'iya[472]

253.   *"A hell of a pinpoint operation."* John Kerry, U.S. Secretary of State[473]

254.   *"Dozens more civilians, including children, have been killed in Israeli military strikes in the Ash Shuja'iyeh neighborhood in Gaza. I condemn this atrocious action. Israel must exercise maximum restraint and do far more to protect civilians."* UN Secretary-General Ban Ki-moon, 20 July 2014[474]

255.   The Shuja'iya neighbourhood is located in the northern part of the Gaza strip, east of Gaza city and close to the Green line. Shuja'iya is also one of the most densely populated neighbourhoods in Gaza, with a population of 92 000 concentrated in an area of around 6 km². The IDF alleged that numerous Palestinian armed groups had set up observation points in Shuja'iya and that the neighbourhood had developed into a significant network of tunnels and weapons caches serving as a platform for attacking Israel and resulting in "its deterioration from a civilian residential area into a terrorist fortress"[475].   The IDF also claimed that, between 8 and 20 July, Hamas fired over 140 rockets from Shuja'iya into Israel.[476] Israel's Ministry of Foreign Affairs added that ten tunnels were uncovered in the neighbourhood.[477]

256.   The commission interviewed over 40 witnesses - mostly from the areas of Baghdad, Al Mansoura and Al Nazzaz Streets - in relation to the ground operation in Shuja'iya. The commission also analysed submissions from a wide range of sources, confidential and public documents, including imagery, photos and videos. Below is a description of the most salient incidents in chronological order.

---

[471] Tamid Tothan, Association of artillery veteran's magazine. Yaakov Zigdon: *Shuja'iyas earth was moving*; September 2014, No. 57, Pg.18-19, unofficial translation. at: http://www.beithatothan.org.il/magazin/30_10_2014/book.html#p=19

[472] W126

[473] See video and report by the Washington Post, 20 July 2014, at: http://www.washingtonpost.com/blogs/post-politics/wp/2014/07/20/fox-confronts-kerry-with-hot-mic-comment-on-israel-hell-of-a-pinpoint-operation/

[474] OCHA: Gaza Emergency Situation Report of 22 July 2014. At: http://www.ochaopt.org/documents/ocha_opt_sitrep_22_07_2014.pdf

[475] IDF blog at: http://www.idfblog.com/blog/2014/07/20/shujaiya-hamas-terror-fortress-gaza/

[476] See IDF blog: http://www.idfblog.com/blog/2014/07/20/shujaiya-hamas-terror-fortress-gaza/

[477] Israel Ministry of Foreign Affairs. Operation Protective Edge: Israel under fire, IDF responds; 26 Aug 2014. At: http://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Pages/Rise-in-rocket-fire-from-Gaza-3-Jul-2014.aspx

ATL004983

**IDF warnings and displacement**

257.    Prior to launching the ground operation, the IDF issued warnings to the inhabitants
of Shuja'iya about its intention to attack several targets in the neighbourhood and called on
them to evacuate their homes and move to the centre of Gaza City until further notice[478] by
means of leaflets, loudspeaker announcements, telephone calls, text messages and radio
messages.[479] According to a witness, on 16 July, leaflets were dropped over Shuja'iya
announcing the IDF's intention to intensify their raids in the area and instructing people to
leave the city centre of Gaza[480].

258.    On 20 July 2014, OCHA reported that by 19 July "the majority of Ash Shuja'iyeh's
92 000 residents had remained in their homes, despite Israeli warnings during the previous
days. However, upon the intensification of bombardments, it is estimated that up to half of
them have now fled to Gaza City."[481]

**Ground operation and attack on IDF convoy**

259.    In the evening of 19 July 2014, the IDF's Golani Brigade started a ground operation
into Shuja'iya.  On 20 July at approximately 1.30 a.m., an explosive device was detonated
on an IDF armoured vehicle, causing the death of seven soldiers.  At the same time, in other
areas of Shuja'iya, IDF soldiers came under attack from Palestinian armed groups,
ultimately resulting in the death of another 6 IDF soldiers.[482]

260.    According to information received by the commission, the IDF then sought to
retrieve the bodies of the dead soldiers and the destroyed armoured vehicle, evacuate the
injured soldiers and respond to the Palestinian armed groups' counter-offensive. At the time
not all of the soldiers were accounted for, raising fear of a possible abduction. The media
reported the Israeli Minister of Defense Moshe Yallon as stating that the intensified shelling
aimed at rescuing a number of injured Israeli soldiers.[483] In this context, the IDF heavily
shelled the area for more than six hours. Witness statements, video and photo
documentation (including satellite imagery), United Nations Institute for Training and
Research Operational Satellite Applications Programme (UNITAR-UNOSAT) assessments
based on satellite imagery, media and IDF sources – all buttress a conclusion that extensive
amounts of explosive weapons, including artillery, mortars, and rockets were fired on
Shuja'iya by the Israeli Air Force. That initial shelling led to numerous casualties. A
paramedic who worked at the call centre of the relevant area in Shuja'iya, which sends
ambulances to people calling for help, recounted to B'Tselem that he and his colleagues
received "*more than 200 calls from the neighbourhood of a-Shujai'yeh. I can say with
almost absolute certainty that we received a call from every single house in the areas I
mentioned [a-Nazaz Street, a-Sha'ath Street, and al-Beltaji Street]. During the calls, we*

---

[478]   See IDF blog IDF Drops Warning Leaflets in Gaza. 17 July 2014 with texts at:
http://www.idfblog.com/blog/2014/07/17/idf-drops-warning-leaflets-gaza/

[479]   Ministry of Foreign Affairs web-site. Israel minimizes civilian casualties; 24 July 2014; at:
http://mfa.gov.il/MFA/ForeignPolicy/Issues/Pages/Israel-minimizes-civilian-casualties.aspx

[480]   W134; OCHA: Gaza Emergency Situation Report (as of 16 July 2014, 1500 hrs), p. 1; at:
http://www.ochaopt.org/documents/ocha_opt_sitrep_17_07_2014.pdf

[481]   OCHA Gaza Emergency Situation Report; 20 July 2014, p.2

[482]   Israel Ministry of Foreign Affairs. Operation Protective Edge: Israel under fire, IDF responds;
26 Aug 2014. At: http://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Pages/Rise-in-rocket-fire-from-
Gaza-3-Jul-2014.aspx

[483]   Isramedia. Statement by PM Netanyahu and DM Yaalon, 20 July 2014; at
http://www.isramedia.net/forum/2/%D7%97%D7%93%D7%A9%D7%95%D7%AA?p=33557

ATL004984

*could hear young children screaming in the background and women crying. People had been injured and killed in every home we got a call from.*"[484]

261.    The commission examined several incidents that occurred during the IDF's operation in Shuja'iya, taking testimonies from numerous witnesses, many of whom had survived attacks on their homes.

262**.    Al Helo family:** On 20 July at about 3 a.m., two missiles struck the house of Talal Mahmoud Hamed Al Helo, which is located next to Jihad Mahmoud Al Helo's house in Nasas Street in the Shuja'iya neighborhood. Shortly thereafter, Jihad Mahmoud Al Helo's own house was struck, and 11 Al Helo family members, including 4 children (among others 2 six-month old twins) and 4 women, were killed. The three-story house was totally destroyed.[485] Given the destruction caused and the witness testimonies, the weapon used was most likely a large explosive bomb.

263.    Talal Mahmoud Hamed Al Helo told the commission that he was at home with his wife and children and just had gotten up for *suhhur*. Suddenly he heard noise but did not understand what it was. Then his brother Jihad called to ask how they were doing because a missile had struck the third floor of Talal's house. The witness and his family were on the second floor of the house and had not realized that the noise was from their own home being hit. Minutes later, Jihad's house was hit twice. Talal Mahmoud Hamed Al Helo said that his house was shaking as if there were an earthquake. Talal looked out of his window and saw that the house of Jihad, with whom he had been talking just moments before, had simply disappeared and been transformed into rubble.[486]

264.    Talal confirmed that 11 people died as a result of the attack, and that rescuers did not arrive on the site until several hours later. The building was completely destroyed and it was extremely difficult to pull out the bodies. He added that they had not received any leaflets, calls or phone messages warning them about the imminent attack. The only thing that could have been a warning was the missile that hit their roof, which he had not noticed until his brother had called him, but to the witness it was never clear whether the projectile was a so-called "roof-knock". According to Talal, even if it was a warning, it would have given them too little time to leave.[487]

265.    Talal did not believe that his brother's house was hosting any militants or military targets because "these were houses that belonged to civilians with children and women." The witness had heard in the news that an Israeli soldier was kidnapped and assumed that the attacks on his neighbourhood were revenge attacks because "every time one of theirs dies or is kidnapped, we feel the consequences of it in our homes."[488] Talal told the commission that, had he known an attack was going to take place, he would have left the house with his family:

266.    "*I am not a fighter, I am a civilian and I care about the well-being of my family. Even if we had left there and then, the chances of our surviving the bombings would have been one per cent.*"[489]

---

[484]   Witness interviewed by B'Tselem; Paramedic and photojournalist killed during an attempt to evacuate wounded people from a-Shuja'iyeh; at:
http://www.btselem.org/testimonies/20140722_gaza_paramedic_ahmad_sabah
[485]   W126, PCHR submission
[486]   W126
[487]   W126
[488]   W126
[489]   W126

ATL004985

267.   **Ayyad family:** On 20 July, at 6.30 a.m., 11 members of the Ayyad family were killed by shells in Al Mansura Street, Shuja'iya, as they left their home to escape the shelling.[490]  In addition to those who normally resided in the house, the Ayyad family was hosting relatives who had sought shelter after being forced to leave their homes.[491] On 20 July, the area where the house is situated was shelled from 1 a.m. onwards. The witnesses described the family in a state of complete panic as the shelling intensified and they tried to gather everyone to escape.[492] Neighbours, including the Hajaj and Abed families, were also preparing to leave.[493] At around 6.30 a.m., the family left the house. They had gone about 70 meters when a shell hit the entrance, followed by two shells that struck a group of people fleeing and killed 11 family members, including 4 children and 5 women, one of whom was pregnant[494]. Another 7 persons were injured including 3 children and one woman.[495]

268.   One of the witnesses, Khalil Ahmed Ayad, recounted that he lost consciousness during the attack. When he woke up in the street, he realized that his left arm was seriously injured. It was later amputated.[496] Everyone around him was running and screaming and the air was thickened by a layer of dust. Two witnesses said that no one could move from that spot for over an hour and ambulances were unable to reach them due to ongoing IDF aerial bombings.[497]

269.   A family member told the commission that they were hit by shells while fleeing. The witness's wife, six months pregnant with twins, was killed in the attack.  When asked whether they had been given a warning, either at home or when they were fleeing, the witness said: [498]

270.   *"I am talking only about where I used to live and I can guarantee there were no warnings. Let me tell you this. Had we known an attack was coming, we, the men, might have decided to stay back, but we would never have let the women and children be exposed to such horror... They had bombed the ambulances and we were trying to find cars to take the wounded to the hospital."*

271.   The photos of the damage and of remnants of weapons received by the commission[499] are consistent with these testimonies and indicate that the weapons used were most likely 155 mm high explosive artillery shells, which have fuses set to air-burst and are designed to cause as much damage as possible to persons out in the open. The shells would have exploded just above the ground resulting in the high numbers of casualties reported and causing the shrapnel patterns displayed on the walls and vehicles, which were without signs of significant blast damage or cratering.

272.   **Al Jamal and Al Sheikh Khalil families:** On 20 July, two families came under attack by Israeli forces in Baltaji Street in the Shuja'iya neighbourhood. Four family members of the Al Jamal family were killed in the street by shells as they attempted to flee Shuja'iya. Three of those killed were children aged between 10 and 12. Another 7 persons were injured including 3 children and 2 women. The youngest child injured was a two year

---

[490]   W063
[491]   W194
[492]   W194, W063
[493]   W063, PCHR submission
[494]   W063, PCHR submission
[495]   A/HRC/28/80/Add.1, para.42; also PCHR submission, which reports 3 children killed.
[496]   W194
[497]   W063 and W194
[498]   W063
[499]   PCHR submission.

old boy.[500] Six members from the Al Sheikh Khalil family were killed inside their home in Baltaji Street, including 2 children and 4 women. Another two children were seriously injured.[501] It appears that one daughter died at the hospital as a result of the attack.[502]

273.    On 16 July, the IDF distributed leaflets in the Shuja'iya neighbourhood of Gaza City telling residents to leave the area. At around 7 a.m. on 20 July, 47503 members of the Al Jamal family fled their home in Tawfiq Street on foot to escape the heightened attacks in the area. Witnesses told the commission that they were heading towards Faray Street. As they walked, intense shelling and explosions were everywhere. Upon arrival at Faray Street, they found attacks there as well, so they continued walking trying to find a safe place. Some family members in the street were hit by mortars. Witnesses told the commission that no family members were affiliated with an armed group and that they were all civilians, most of them women and children.[504]

274.    The commission interviewed one member of the Al Sheikh Khalil family who lost his wife and his 4 and 15-year-old daughters.[505] The Al Sheikh Khalil family building is located in the northern part of the Baltaji Street. It is about 200 m$^2$ and has three floors; on the first floor, the witness's father Mohamed Abd Al Rahman Al Sheikh Khalil lived together with his son Abdel Rahman and his family. The witness lived on the second floor; no one lived on the third floor. In total the building housed three families, including at least 16 people.[506]

275.    According to a witness from the Al Sheikh Khalil family, who was inside his home during the attack, on 20 July at about 6 a.m., he heard many explosions outside in Al Baltaji Street. When he realized that mortars had struck the roof, family members went to the staircase for better protection. They attempted to request help from the Red Cross but were not successful.[507] At least five or six mortars hit the building.[508] It appears that the first shell struck the roof; a subsequent shell fell on the northern part of the house and another on the terrace on the first floor where people were standing. The witness opened the entrance door in order for the family to escape, but closed it again when he saw that the ambulances outside the building had been hit by mortars as well. The ambulances were destroyed. So the family remained inside, scared to leave the house.[509] After a few minutes a mortar struck the entrance of the house where the family was hiding. A witness and family member described to the commission that the house caught fire and some of the family members ran outside. They looked for ambulances that could take the injured to the hospital but when they found an ambulance, it was overloaded with patients.[510] According to the witness, there was a 2-hour ceasefire, but the family still had to wait for 6 hours before ambulances arrived at the scene. According to the same witness, four people died while awaiting the ambulances.[511]

---

500   W134, PCHR submission.
501   PCHR submission.
502   W204
503   PCHR reported 70 (PCHR submission)
504   W134 and W135
505   W204
506   PCHR submission
507   W204
508   W 204, PCHR submission
509   W204.
510   W204
511   PCHR submission

ATL004987

276.    The witness from the Al Sheikh Khalil family claimed that the building did not house any militants, or weapons.[512]

277.    The strike and shrapnel patterns reviewed on the basis of photos of the site and of remnants of weapons submitted to the commission[513] are consistent with witness statements and indicate that mortars were used during the attack.

278.    At around 7 a.m. on the same day, according to another witness, a military medical aid ambulance was directly struck twice while the witness and his colleague attempted to provide first aid to victims in the area. There were four persons in the vehicle, a driver, a photographer and two paramedics. The passengers were all hit, including while trying to flee the shelling. Two of them were killed and two injured.[514]

**Humanitarian pause**

279.    On 20 July at 1.30 p.m., a two-hour humanitarian pause jointly agreed to by the IDF and Hamas entered into force, which allowed many inhabitants of Shuja'iya to leave the area and journalists and ambulances to enter. During the humanitarian pause, members of Palestinian armed groups reportedly emerged from buildings and were seen out in the open.[515]

280.    At about 3.30 p.m., Salem Shamaly, a local resident who had joined a group of international volunteers while searching for his missing cousin, was killed. As the volunteers were crossing a small alley, they heard a shot. The group immediately divided into two and took cover at opposite ends of the alley. Shortly afterwards, Salem Shamaly moved out of the area where he was taking cover and was shot. As he lay injured on the ground, he was shot twice again and killed. This incident was recorded on video[516].

281.    Although most civilians left Shuja'iya on 20 July, some remained trapped as sporadic fighting continued over the following days and weeks. For instance, a video published by the IDF on 22 July shows how artillery was fired directly at the first row of houses in Shuja'iya. In the video, one officer states that these houses were being used by Hamas as observation outposts and tunnel exit points.[517] Another video, which includes statements from the commander of the Golani Brigade, demonstrates how IDF tanks and/or artillery located in Israel fired at buildings in Shuja'iya.[518]  Both videos suggest that the buildings near the Green line were being targeted and heavily damaged. This is supported by satellite images, which illustrate that many buildings near the Green Line were indeed destroyed.[519]

---

[512]  W204

[513]  PCHR submission, including building plans, photos of the site and of remnants of weapons used.

[514]  PCHR submission; Ahmad Sabah; Paramedic and photojournalist killed during an attempt to evacuate wounded people from Shuja'iya; at:
http://www.btselem.org/testimonies/20140722_gaza_paramedic_ahmad_sabah  and Akram Al Awoor cited in PHR Report (page 46)

[515]  W042

[516]  PCHR submission; see also: A/HRC/28/80/Add.1, para. 43;

[517]  IDF Spokesman official Video: Direct Artillery fire on Shuja'iya.; 27/07/2014. at:
http://youtu.be/uAkDHIrFzHg

[518]  Unofficial video produced by IDF artillery battalion 405; Minute 09:00-13:20. at:
https://www.youtube.com/watch?v=R3AmCfkhX_Y

[519]  Submission by UNITAR Operational Satellite Applications Programme (hereinafter: UNITAR-UNOSAT).

ATL004988

**Casualties and damage resulting from the operation in Shuja'iya**

282.   The exact number of casualties cannot easily be determined because some persons died later from their injuries, and many bodies were only recovered and buried after the IDF operation had finished.   According to the UN Protection Cluster, 55 civilians, including 19 children and 14 women, were killed on 19 and 20 July in Shuja'iya as a result of the IDF's actions[520].

283.   Haaretz, referring to IDF sources, indicates that "On July 20, some 600 artillery shells were fired in less than an hour at […] Shujaiyeh, in order to extract troops under fire. The required safety distances were considerably reduced, IDF figures show."[521]

284.   An IDF soldier interviewed by Breaking the Silence described the destruction in Shuja'iya as follows:

*"We knew that by the time we got there on Friday [July 18] there were not supposed to be any people in the area, since leaflets were dispersed and also because there wasn't very much left of the place. The artillery corps and the air force really cleaned that place up. […] in previous times we had entered Gaza, a D9 (armored bulldozer) would go in and everyone drove in its trail. But in this operation they decided to do something different – just to enter as an offensive. A row of tanks go in, they spread out wide, get into position, identify 'suspicious spots', fire as required. The rules of engagement were very, very lax. […] There was no such thing as requesting authorization. Just fire."[522]*

285.   By the end of the operation, according to UNITAR-UNOSAT, Shuja'iya was a "razed area", "likely levelled as a result of focused IDF demolitions efforts. UNITAR-UNOSAT analysis of imagery of 25 July shows ongoing IDF combat operations as armoured groups 'sequestered' a portion of Shejaiya within a perimeter. […] The destruction visible in these areas [Shejaiya] represents 100 % of buildings and thus would have required relatively significant efforts to achieve."[523] As a result, a total of 670 buildings in Shuja'iya were completely destroyed, 608 were severely damaged, 576 moderately damaged, and there were 273 visible impact craters[524], i.e. over 1800 buildings were affected.

**Statements by the IDF and Palestinian Armed Groups regarding the Shuja'iya events**

286.   According to press reports, Hamas accused the IDF of taking revenge on the civilian population for its military defeat in the battleground, promising to pursue the responsible leaders by all legal means[525]. Additionally, according to press reports, the Islamic Jihad

---

[520]   UN Protection Cluster figures of 31 May 2015.

[521]   Haaretz. Amos Harel and Gili Cohen: *Massive artillery shelling may have caused numerous civilian fatalities in Gaza*; 15 August 2014; at: http://www.haaretz.com/news/diplomacy-defense/.premium-1.610733#

[522]   Breaking the Silence. This is how we fought in Gaza; testimony 43, p. 110; at: http://www.breakingthesilence.org.il/testimonies/database/?tzuk=1

[523]   UNITAR-UNOSAT: Impact of the 2014 Conflict in the Gaza Strip. UNOSAT Satellite Derived Geospatial Analysis; 2014; p. 9; at: https://unosat.web.cern.ch/unosat/unitar/publications/UNOSAT_GAZA_REPORT_OCT2014_WEB.pdf

[524]   UNITAR-UNOSAT submission stressing that "Satellite imagery will only detect damage which is relatively catastrophic and affects the structural integrity of the building; damage such as bullet holes and shattered windows will not be detected."

[525]   Al-Jazeera news channel's website: *Palestinian Authority condemns Shuja'iya massacre and Hamas says it's a war crime*, 20 July 2014. At http://www.aljazeera.net/news/arabic/2014/7/20/%D8%A7%D9%84%D8%B3%D9%84%D8%B7%

movement issued a statement announcing that the crimes of Shuja'iya and Al Tuffah "revealed a level of brutality and hatred, which enemy leaders are possessed with, who are trying to save their faces after the painful strikes by the resistance to the aggressor army"[526]. 287.  According to the same press reports, the PFLP denounced "the crimes of the occupation."[527] The Al Qassam Brigades also claimed responsibility for the killing of 14 IDF soldiers, some of them by opening the doors of the damaged APC and "finishing them".[528]

289.    Israel did not respond to the commission's requests for clarifications in relation to these events. Therefore, the commission has to rely on information available in the public domain. According to press reports, the IDF itself acknowledged that civilian casualties had taken place in Shuja'iya. Commenting on these events, the IDF Chief of Staff stated the following:

"*I regret the civilian casualties, and it hurts me to see children and women injured. […] We cannot agree that Hamas will place civilians in front of us, so we warn, warn and deter. We have a moral obligation to do everything possible to avoid civilian casualties as much as possible, and we have a moral obligation to protect our citizens.[529]*"

290.    In relation to targets in Shuja'iya, the IDF, by means of an infographic to explain the significant destruction caused largely by air strikes[530], indicated that there were more than two dozen "terrorists'' houses' in Shuja'iya', including rocket launcher positions, tunnels, hideouts, combat posts, and firing positions for anti-tank missiles. [531] The IDF added that it had successfully targeted most of the sites highlighted in the infographic (which also included rocket launching positions and other targets). The IDF also posted a video, apparently showing the destruction of one tunnel in Shuja'iya,[532] claiming that it was one of "the many terror sites that had been identified and targeted by the IDF in Shuja'iya".

_____

D8%A9-%D8%AA%D8%AF%D9%8A%D9%86-
%D9%85%D8%AC%D8%B2%D8%B1%D8%A9-
%D8%A7%D9%84%D8%B4%D8%AC%D8%A7%D8%B9%D9%8A%D8%A9-
%D9%88%D8%AD%D9%85%D8%A7%D8%B3-
%D8%AA%D8%B9%D8%AF%D9%87%D8%A7-
%D8%AC%D8%B1%D9%8A%D9%85%D8%A9-%D8%AD%D8%B1%D8%A8;
http://www.aljazeera.net/news/arabic/2014/7/20/السلطة-تدين-مجزرة-الشجاعية-وحماس-تعدها-جريمة-حرب

526  Al-Hayat newspaper: "Holocaust" in Shuja'iya and al-Toffah, 70 martyrs and 400 injured, 21 July 2014. At  http://alhayat.com/Articles/3702019/-
%C3%92%E2%95%90%C3%90%C3%8C%E2%95%94--%C2%A6%C3%9D-
%E2%95%90%C3%9D%C3%9D-
%C3%83%C3%9F%C3%88%E2%95%A0%C3%83%E2%94%8C%C3%9D%E2%95%94-
%C2%B5%C3%83%C3%9F%E2%95%A9%C2%A6%C3%83%E2%95%90--70-
%C3%88%C3%95%C3%9D%C2%A4%C3%83%C2%AD-%C2%B5400-
%E2%95%A0%C3%90%C3%9D%E2%95%90  http://alhayat.com/Articles/3702019/-محرقة-في-حيبي-جريح-400وشهيداً-70--والتفاح-الشجاعية
527  ibid
528  Al-Modon: Gaza: Massacre in Shuja'iya and ambushes for the enemy, 20 July 2014. At  http://www.almodon.com/arabworld/9cd6f58c-cf5b-481b-b1d3-9aa1fdae2224
529  Hamodia: The Chief of General Staff Summarizes Operation Thus Far, 21 July 2014. At  http://hamodia.com/2014/07/21/chief-general-staff-summarizes-operation-thus-far
530  More than 270 craters can be seen in the neighbourhood. See: UNITAR/UNOSAT submission.
531  IDF blog: A Hamas fortress in a residential neighbourhood. At http://www.idfblog.com/wp-content/uploads/2014/08/Shujaiya-terror-sites.jpg
532  Official IDF Spokesman Video: IDF Demolishes Tunnel Used to Attack Golani Vehicle; 26/07/2014; at: http://youtu.be/WqVxMKto4Q8

77

291.    The Commander of the Golani Brigade praised the artillery support he received in Shuja'iya, including from the 405th battalion, which was in charge of artillery fire. "The artillery fired at very close range to us in order to support the rescue operations. The heavy shelling stopped the Rocket Propelled Grenade (RPG) fire," he said.[533]

292.    Breaking the Silence quotes an IDF soldier as describing that, when the news of the battle in Shuja'iya broke, "One of the most senior officials in the IDF, […] just marked off houses on an aerial photo of Shuja'iya, to be taken down. […] It's not like in every building that was struck in Shuja'iya there was some Hamas militant or somebody firing at our forces".[534]

**Summary legal analysis**

293.    The sheer number of shells fired, as well as the reported dropping of over 100 one-ton bombs in a short period of time in a densely populated area, together with the reported use of an artillery barrage, raise questions as to the respect by the IDF of the rules of distinction, precautions and proportionality. These methods and means employed by the IDF could not, in such a small and densely populated area, be directed at a specific military target and could not adequately distinguish between civilians and civilian objects and military objectives as required by IHL. The information available also indicates that during the Shuja'iya operation on 19 and 20 July the IDF violated the prohibition of treating several distinct individual military objectives in a densely populated area as one single military objective. Therefore, there are strong indications that the IDF's Shuja'iya operation on 19 and 20 July was conducted in violation of the prohibition of indiscriminate attacks and may amount to a war crime.[535]

294.    The Shuja'iya operation also raises serious concerns that the IDF did not conform with its obligation to take precautionary measures in attack. The choice of the methods and means used by the IDF cannot be reconciled with the obligation to take constant care to spare civilians and civilian objects or at the very least to minimize incidental loss of civilian life and damage to civilian objects in a densely populated area. It is questionable whether the use of such immense firepower in such a short period would have allowed the IDF: (1) to respect its obligation to do everything feasible to verify that the targets were military objectives; and (2) to assess whether the attack respected the principle of proportionality. In addition, the length of the intensive shelling (more than 6 hours), together with the observation and intelligence means that the IDF had at its disposal in Gaza, would have allowed those responsible for the attack to receive opportune information as to the dire impact of the shelling on civilians and civilian objects. The fact that the attack was allowed to continue under these conditions evidences the commander's failure to comply with his

---

[533]   Unofficial Video produced by IDF artillery battalion 405; Minute 09:00-13:20; at: https://www.youtube.com/watch?v=R3AmCfkhX_Y
[534]   Breaking the Silence. This is how we fought in Gaza; testimony 110, p. 234; at: http://www.breakingthesilence.org.il/testimonies/database/?tzuk=1
[535]   The International Criminal Tribunal for the former Yugoslavia stated in the *Galic Case* that "indiscriminate attacks, that is to say attacks which strike civilians or civilian objects and military objectives without distinction, may qualify as direct attacks against civilians," ICTY, *Prosecutor v.Galic*, case No. IT-98-29-T, Judgement, 5 December 2003, para. 57. The International Court of Justice in the Nuclear Weapons Case linked the prohibition of indiscriminate attacks to attacks against the civilian population, by stating that: "States must never make civilians the object of attack and must consequently never use weapons that are incapable of distinguishing between civilian and military targets." Para. 78. Article 8 of the Rome Statute of the International Criminal Court lists intentionally directing attacks against the civilian population or civilian objects as a war crime.

ATL004991

obligation to do everything feasible to suspend an attack if it becomes apparent that it does not conform to the principle of proportionality.

295.   While the IDF appears to have made substantial efforts, in the days prior to the operation, to warn the civilian population of its intention to intensify its attacks, this in no way alters the IDF's other legal obligations (related to the conduct of hostilities), and does not modify the protected status of civilians who remained in the area.

296.   The intense shelling, combined with the use of a large number of one-ton bombs, raise serious concerns about the respect for the principle of proportionality. While shelling had started in the late evening of 19 July, it changed in nature and significantly intensified around 1.30 a.m., just after seven IDF soldiers had been killed when the APC they were riding in was destroyed. The objective of the shelling and heavy bombardment appears mainly to have been force protection. The commission observes that the issue of force protection of the attacking force as an element in assessing proportionality is still unresolved[536]. While it is certainly true that the protection of soldiers who are coming under attack represents a concrete and direct military advantage, it is an "undisputed fact that force protection is not an overriding concern that could set aside all other considerations when assessing the proportionality of an attack".[537]   Although the proportionality analysis may properly take into consideration force protection and the neutralization of units of Palestinian armed groups, given the means and methods used by the IDF in Shuja'iya, it is possible to conclude that a reasonable commander would be aware of the potential for such an intense attack to result in the death of a high number of civilians. As such, it is highly likely that a reasonable commander would therefore conclude that the expected incidental loss to civilian life and damage and destruction of civilian objects would be excessive in relation to the anticipated military advantage of this attack. In addition, even if, at the moment of launching the attack, the initial assessment by the commander was that the attack was proportionate, he had an obligation to suspend the attack as soon as its disproportionate nature became apparent.

297.   The circumstances of the killing of Salem Shamaly indicate that a civilian was targeted in violation of the principle of distinction. The fact that he was shot twice while lying injured on the ground is indicative of an intent to kill a protected person (either owing to his civilian status or to the fact that he was hors de combat) and constitutes an act of wilful killing.

298.   The destruction and damaging of over 1800 houses in Shuja'iya alone, as a result of both targeted and indirect attacks, raise serious concerns about the IDF's conduct. This issue is addressed in detail at V.A.2.d.

299.   In spite of the significant destruction and credible allegations of civilian casualties, the commission is not aware of any on-going investigation carried out by the IDF into the events that took place in Shuja'iya on 19 to 20 July.

---

[536]   ICTY, *Final Report to the Prosecutor by the Committee Established to Review the NATO Bombing Campaign Against the Federal Republic of Yugoslavia*, 2000, available at http://www.icty.org/sid/10052#IIIwork :
"The questions which remain unresolved once one decides to apply the principle of proportionality include the following: [….] d) To what extent is a military commander obligated to expose his own forces to danger in order to limit civilian casualties or damage to civilian objects?"

[537]   Robin Geiss. *The Principle of Proportionality: 'Force Protection' as a Military Advantage*, Israel Law Review 45, p.74

ATL004992

### b. Khuza'a

300.    *"What happened last summer is something that I will never forget, ever. We should exist in this world in a spirit of cooperation, of love for life, of brotherhood. The situation in which we lived was incredible. My mother was injured and was bleeding and I was unable to help her because I was injured myself. They targeted the clinic with three rockets from drones. The neighbourhood of the clinic was hit by at least 25 or 30 explosions."* Dr. Kamel Qdeih, medical doctor in Khuza'a[538]

301.    "*I think from here, they (the Israelis) can sleep quietly. But handling the tunnels will not be enough to bring calm. The Palestinians have to understand that this does not pay off."* Col. Ofer Winter, Commander of the Givati Brigade.[539]

302.    Between 21 July and 1 August 2014, the IDF conducted a ground operation in and around Khuza'a, a village with about 11 000 inhabitants located on the south-eastern part of Gaza. The entry of IDF ground troops was preceded by a campaign of aerial attacks targeting a large number of residential buildings. According to the IDF, the objective of this operation was to destroy the extensive tunnel infrastructure that could be used by Palestinian armed groups to enter Israel. The IDF also claims to have found numerous weapons depots in Khuza'a.

303.    The commission spoke with 13 eyewitnesses and others who had witnessed events in Khuza'a. Likewise, the commission considered confidential and public reports and submissions relating to the ground operation in Khuza'a.

304.    The information provided by eyewitness accounts, satellite imagery and medical sources as well as third-party submissions, show high levels of destruction in Khuza'a as a result of the considerable force and firepower used in a densely inhabited civilian area. The resulting hardship experienced by the residents was exacerbated by restrictions on the movement of civilians and medical personnel, as well as by the harsh treatment of people trapped in a context of hostilities.

### Warnings

305.    The ground operation was preceded by warnings to the civilian population. The majority of Khuza'a witnesses who spoke to the commission stated that, during the week prior to the ground operation, they had been given warnings, mostly in the form of fliers dropped from airplanes. One of the witnesses told the commission that the family had received a recorded telephone message. Several witnesses said that they had chosen to stay despite the warnings owing to a variety of reasons. In some cases, local residents feared that there were no safer sanctuaries as other parts of Gaza were also coming under attack. In other cases, witnesses were afraid to leave because the attacks were taking place everywhere at once:

306.    *"Yes, we had received warnings through leaflets that were dropped from the air. The warning was issued on that same morning, but the attacks also started on that same day so it was a difficult choice as we feared the idea of fleeing while the attacks were taking place."*[540]

---

[538]   W268
[539]   Channel 10 News. Alon Ben Davids: With the Givaati fighters in Gaza: 26 August 2014; at: http://news.nana10.co.il/Article/?ArticleID=1071639; Minute 12:50
[540]   W259

ATL004993

307.    Witnesses estimated that about 70 per cent[541] of the population responded to the warnings and left Khuza'a in the days prior to 20 July without restrictions. Those who chose to leave the village on or after 20 July were frequently prevented from doing so by IDF troops in the streets connecting Khuza'a to the center of Khan Younis.[542]

**Ground operation**

308.    Information received by the commission indicates that on 18 July, large numbers of IDF units comprising ground troops, tanks and bulldozers were seen approaching and taking positions along the northern outskirts of Khuza'a. On 21 July 2014, the IDF attacked the access routes from Khuza'a to Khan Younis, causing craters and obstacles in the roads that would limit Khuza'a's inhabitants' access to the outside world.[543] From that moment on, nobody was allowed to move in or out of the village. It became a zone of active fighting and everything in it was turned into a target. Eyewitnesses indicated that IDF bulldozers demolished the first home in Khuza'a - reportedly belonging to Hussein Abu Reida - in the early hours of 20 July.[544] On 19, 20 and 21 July, Israeli aircraft gradually intensified their presence over Khuza'a and carried out strikes intermittently.  During these days, the IDF conducted manoeuvres apparently aimed at restricting movement in and out of Khuza'a[545]:

309.    *"On 21 July, the day before the start of the massive military offensive, the IDF was preparing for the assault. They started creating barriers consisting of soldiers standing side-by-side to create a human wall. On that day, they would confront anyone trying to leave Khuza'a with gas and smoke bombs."[546]*

310.    On 22 July, Khuza'a had been entirely surrounded by troops and isolated from surrounding communities and fragmented internally according to neighbourhoods, many of which were rendered inaccessible. None of its residents could move in or out of the village, the electricity was cut and reports indicate that many water tanks on the rooftops of homes were attacked and destroyed by the IDF. Neighbourhoods with homes sheltering hundreds of families came under intense fire from the air and the ground, in particular between 22 July and 25 July.[547] On 23 July, OCHA pointed to "reports that Khuza'a, east of Khan Yunis, was exposed to severe artillery fire overnight and today, as Israeli forces reportedly entered several hundred metres into the village."[548] According to the UN Protection Cluster, 68 persons, including at least 14 civlians, were killed.[549] One resident who was trapped in Khuza'a declared:

*"[...] the Israeli Air Force launched an enormous bombing campaign that was to be followed in hours by the ground offensive. The IDF set up a centre between Khuza'a and Israel, at about 2 or 3 km from the centre of Khuza'a. The IDF launched several strikes from that base which principally targeted civilian homes. The attacks killed about 50 civilians - within hours after its launch." [550]*

311.    The following is a testimony of another survivor of the operation in Khuza'a whose pregnant wife lost her unborn child as an indirect consequence of the attacks:

---

[541]  W268;
[542]  Confidential submission 22
[543]  Confidential submission 22, PCHR submission
[544]  W268
[545]  W270
[546]  W270
[547]  Confidential submission 22
[548]  Figures of 31 May 2015.
[549]  UN Protection Cluster figures of 31 May 2015
[550]  W270

ATL004994

*"The day of the attack, our house was targeted by several explosions. I cannot tell you what weapons were used or what the source of the bombs was. If I had to guess I would think they were being launched from tanks. The attacks were so intense, the sound of the explosions was so loud that we could not really distinguish each attack and from where the bombs were launched. […] My family really suffered for these attacks. Some of my family suffered injuries. My wife suffered a lot and that resulted in her pregnancy being "poisoned." We received some humanitarian assistance but it was more symbolic than anything. They distributed some medicine and food but in small amounts and infrequently. I did not receive any kind of assistance or compensation for the damage incurred by my house."*[551]

312.     The intensive attacks on Khuza'a continued throughout 23 and 24 July. Witnesses provided consistent accounts of heavy fire power used by the IDF and the seemingly indiscriminate nature of their attacks, which resulted in significant destruction, including of residential buildings, as well as other clinics, roads, electricity networks and public infrastructure.[552] It also appears that those civilians who did not respond to earlier warnings to abandon Khuza'a were prohibited from fleeing the village once the military operations were underway. Moreover, medical staff present in Khuza'a during the ground operation stated that medical goods and personnel were blocked from entering the village despite the urgency generated by the growing number of casualties.

**Destruction**

313.     According to UNITAR-UNOSAT's assessment, out of the 740 structures attacked in Khuza'a, a total of 453 buildings were completely destroyed, 181 buildings were severely damaged, 106 buildings were moderately damaged, and 163 impact craters were visible.[553] Also photos in the media show large-scale destruction[554]. Most of these building were levelled during the IDF ground operation in Khuza'a between 20 July and 1 August. According to witnesses interviewed by the commission and analysis of satellite imagery, the IDF used bulldozers to demolish residential buildings in Khuza'a, in addition to artillery and airstrikes. The ground operations in Khuza'a resulted in extensive damage to public infrastructure such as the water tower that serves the civilian population.[555]

**Alleged attacks on civilians trying to flee Khuza'a**

314.     The commission received information regarding allegations of attacks on individuals by the IDF as they were trying to flee. Some reported being fired on even when they made clear their civilian status by holding a white flag. In addition to the incidents described below, small groups of people were reported to have been fired at while trying to escape the fighting.[556]

315.     The commission learned that, on 23 July, civilians holding a white flag and attempting to leave Khuza'a were confronted by a group of IDF soldiers who allegedly prohibited them from exiting the village, and reportedly opened fire on them.

---

[551]  W259
[552]  See also UNITAR-UNOSAT submission;
[553]  UNITAR-UNOSAT submission. Note that "satellite imagery will only detect damage which is relatively catastrophic and affects the structural integrity of the building; damage such as bullet holes and shattered windows will not be detected."
[554]  http://www.telegraph.co.uk/news/worldnews/middleeast/gaza/11012640/Gaza-conflict-360-degree-panorama-of-flattened-town-of-Khuzaa-Gaza.html
[555]  Confidential submission 22
[556]  Confidential submission 22

ATL004995

316.   *"I don't know precisely how many IDF tanks had been deployed to Khuza'a;
however I heard there were around 150 tanks in and around Khuza'a, with the vast
majority of them situated along the perimeter of the village. Since our requests to the Red
Crescent and the International Red Cross did not succeed in providing us with support, we
decided to make a brave attempt at leaving the city en masse, believing that they would not
target the crowd if they understood it consisted of families and civilians. At about 10 a.m.
on 23 July, almost all of Khuza'a's remaining residents gathered in front of the clinic. We
were all civilians and unarmed, many men were bare-chested. We carried white flags to
show the IDF that we were civilians. At about 11.30, we started walking down Khalid Ibn
Walid Street en route out of Khuza'a."*

317.   *"We moved very slowly towards a line of IDF soldiers who were waiting for us and
preparing for confrontation. When we approached the soldiers, those of us who were in the
front lines started calling on the soldiers telling them, "We are civilians, please don't
shoot." When we were at 5 or 10 meters from the soldiers, they confronted us and told us,
"Return to your homes, we warned you to leave days ago. Why did you not leave?" They
did not allow anyone to leave, not even the women and children standing in front of them
who obviously did not represent any threat to them. When people refused to turn around,
they started using sound bombs and tightening their line. After that, we started retreating
and when we were about 100 or 200 meters away, they suddenly started firing at us.*[557]

318.   According to witnesses and submissions received by the commission, 11 people
were seriously injured in this incident while others suffered lighter injuries.[558] Human
Rights Watch reported similar allegations: One witness stated that he had fled his house
that same morning, following warnings issued by the IDF. As he walked with a group of 50
people towards the village of Abasan, the group came under small arms fire that killed his
cousin and injured the witness.[559] Eyewitnesses also told Human Rights Watch that, on 24
July, a group of 16 elderly men and adolescents carrying a white flag came under fire near
the Tawhid mosque, in the north-western part of Khuza'a, at around 8 p.m. One man died
on the spot and another died of his injuries in the following hours.[560]

319.   According to reports by the UN High Commissioner for Human Rights, on 24 July
2014, a 16-year-old girl with a disability fled her home in a wheelchair together with her
family. She was found dead on 1 August near the entrance to the village. The relatives of
the girl reportedly left her behind after the girl's brother – who was pushing her wheelchair
- was injured as they came under fire by the IDF.  The family made several efforts to
retrieve the girl in the following days but were unable to do so because of the incessant
attacks. When they finally recovered the girl's body, her injuries suggested that she had
died as a result of shelling.[561]

**House searches and human shields**

320.   The IDF carried out search operations in a large number of houses in Khuza'a in
order to hunt for tunnels and weapons caches. On one occasion, a civilian was shot and
killed. The commission also received reports of the use of human shields in the context of
the search operations.

---

[557]   W268 on 20 February 2015
[558]   PCHR submission
[559]   Human Rights Watch. Gaza: Israeli Soldiers Shoot and Kill Fleeing Civilians. Fighting in Khuza'a
        Shows Grave Dangers to Families Seeking Safety; 4 August 2014 ; at:
        http://www.hrw.org/news/2014/08/04/gaza-israeli-soldiers-shoot-and-kill-fleeing-civilians
[560]   Ibid and confidential submission 22
[561]   A/HRC/28/80/Add.1, para 44

ATL004996

A/HRC/29/CRP.4

321.   On 23 July, Israeli soldiers separated a 17-year-old boy, Ahmed Abu Reda, from his family at a Khuza'a checkpoint as the family was attempting to flee the violence. The soldiers kept the boy for five days, during which time he was interrogated repeatedly by an Arabic speaking soldier about the presence of armed groups and the location of tunnels. Ahmed Abu Reda's father described to the commission that his son was forced to undertake "risky tasks such as opening doors, inspecting rooms, switching the lights on and off to test whether secret explosives were being connected to the light switches, open fridges and other devices that may have detonated explosions." The boy was also forced to look for tunnels in basements and to sleep with the soldiers at the checkpoint.[562] The soldiers also threatened to unleash their dog on him and forced him to dig for tunnels. Ahmed was also compelled to sleep for four nights between rows of Israeli soldiers. On 10 September, the MAG ordered a criminal investigation into the incident[563]. In a newspaper article, an unnamed Israeli officer confirmed that the Israeli military had suspected Ahmed of being a militant and detained him during their ground operation in Gaza. His father's affiliation with Hamas was noted, namely, he held a senior position with the Tourism Ministry of the Gaza Government.[564]

322.   An eyewitness, Raghad Qdeih, told the commission that, on 25 July around 1 p.m., Israeli forces occupied the home of her uncle, Mohamed Tawfiq Qdeih, in Khuza'a. At the time of the attack, the witness, together with her uncle's extended family and friends were taking shelter on the ground floor. Most of the approximately 30 persons who had sought refuge in that house were women, children and elderly persons, including a man who was over 70 years old.[565] Both witnesses interviewed by the commission in relation to this incident insisted that these people were all civilians, and that none of them were affiliated to armed groups.[566] When the soldiers entered the house, Mohamed Tawfiq Qdeih was holding a white flag with one hand and his other hand was raised to show the soldiers that he was unarmed. He reportedly spoke to the soldiers in Hebrew, telling them that they were all civilians. Mohamed Tawfiq Qdeih was approaching the soldiers and, when he was about two meters away, the soldiers shot him twice and killed him. The women and children - among them the witness's daughter - were then ordered to leave the house, whereas all six men present were directed to stay in the building.[567] The women and children went to the house of the witness's father, Ramadan Qdeih, next door.

323.   The father of Raghad, Ramadan Qdeih, described to the commission that he witnessed the forces arriving at the house of his brother, Mohamed Qdeih, at around 1 p.m., in the process of which they demolished parts of it. About an hour later Israeli soldiers came to his own house. They ordered the people in the house to return to the place where they had previously sheltered, where the women stayed on the first floor. The owner of the house was taken to the second floor. From the window there, Ramadan Qdeih saw the men who had been held at his brother's house with Israeli soldiers standing behind them. The witness said that the men were naked with black plastic bags over their heads, handcuffed

---

[562]   W026

[563]   Military Advocate General. Operation Protective Edge: Update re Individual Incidents; 10 September 2014; at: http://www.law.idf.il/163-6859-en/Patzar.aspx?pos=2&newsFromDate=01/09/2014&newsToDate=30/09/2014

[564]   The New York Times, 26 August 2014, "The Israeli military confirmed that troops had suspected Ahmed of being a militant and detained him during their ground operation in Gaza, noting his father's affiliation with Hamas" and that the incident "had been sent to examination": http://www.nytimes.com/2014/08/25/world/middleeast/gaza-strip-palestinian-teenager-cites-ordeal-as-captive-of-israelis-soldiers.html?_r=0.

[565]   W051

[566]   W050, W051, W131

[567]   W051

84

ATL004997

and positioned in front of the windows facing outwards.[568] The soldiers then started shooting from behind the naked men, using them as human shields. This went on from about 1.30 to 6 pm. The men were later told by the soldiers that they were placed by the window in order to deter Hamas fighters from returning fire. The witness also stated that when he asked the Israeli soldiers about the fate of his brother, Mohamed Tawfiq, they lied and said he had been injured and was receiving medical care in a different room.[569]

**Arrest and ill-treatment while in detention**

324.    According to information reviewed by the commission, the IDF conducted arrests of dozens of Palestinian men and children throughout the duration of the operation in Khuza'a. Some were interrogated in locations in Gaza, while others were questioned in Israel. According to witnesses held by the IDF, detainees were interrogated about the names of Palestinian fighters, and the location of tunnels and weapons depots.

325.    A resident of Khuza'a told the commission that on 23 July, at about 9.30 p.m., he heard a number of loud explosions as he was attending evening prayers at Al Farouq Mosque. The witness rushed to his home which is located near Al Bassateen Street and gathered his family in the middle of the house where everyone lay down on the floor. Attacks were intense and the witness had the impression that his neighbourhood was being shelled both from the air and from the ground. This went on until 5 a.m. on 24 July. At that time they heard shooting outside the door of his house. Ten Israeli soldiers reportedly forced themselves into the house. The witness spoke to them in Hebrew to try and calm them down, but the soldiers reportedly told him to "shut up."[570] According to the witness, the soldiers handcuffed his son who has a mental disability. The soldiers subsequently put a casserole on the boy's head and four of them started kicking and punching him.  Then one of the soldiers began shooting between the legs of the boy. After a while, they took him away. When the witness asked the soldier to leave his son alone, the soldier apparently responded by saying, "shut up or we will take you." The witness said that the soldiers then forced the family to remain behind. The witness who speaks Hebrew and understood the insults that were being addressed to his family, stated "It is horrible what they said….but the children could not hear it." On 24 July at about 3 p.m., the men were all forced to undress and were taken outside. Two of his sons were then detained by the IDF. One was released six days later; the other was sentenced by an Israeli court to 45 months in prison. He is presently held in a prison in Israel.

326.    According to a submission, a detainee reported that he and other detainees were woken up in the middle of the night and forced to stand while being beaten. One detainee reported that IDF soldiers splashed water on him and on other detainees' faces and verbally abused them in Arabic.  Two detainees asserted that at the time of their arrest they were threatened if they refused to cooperate. One man was reportedly told that he would be killed and another one that his parents' house would be targeted. The report also documented another case in which a detainee who was held at a location within Israel was told that his house would be destroyed if he failed to cooperate.[571]

327.    A resident from the neighbourhood of Zanna in Khuza'a told the commission that on 17 July at about 6 p.m., as he left his home to get some water for his chickens, he was approached by a group of Israeli soldiers who confronted him and accused him of digging tunnels for Hamas. The soldiers shined a flashlight on his face and took him away. The

---

[568] W050; W051;W131
[569] W050; W051;W131
[570] W225
[571] Confidential submission 22

witness could see that there were some Palestinian "collaborators" with the soldiers. The witness heard them talk and thought that the "collaborators", having realized that he was not a very important target, so informed the soldiers and they stopped harassing him, but still decided to detain him.[572] The witness stated that he was then taken to a house he recognized as belonging to Mohamed Abdel Ghafour, which was full of soldiers with dogs. It was Ramadan and after spending 48 hours blindfolded in the house, the witness asked for water and food. He reportedly was told to shut up, and a soldier went through his pockets and took 8300 Shekels from him. When the soldiers removed the blindfold, one of the soldiers showed him the vast level of destruction visible from the window and allegedly told him "look at what we did."[573]

328.    Two days later, the witness was taken to a small room and interrogated about tunnels and weapons caches. The witness claims to have been beaten during the interrogation. He was then given a nylon uniform to wear and transferred to another location where he spent two weeks. He was reportedly held in a room with no windows and interrogated repeatedly about the same issues. At one point, the witness claims to have been forced to sit in a small seat, which he described as being approximately 20cm x 20cm. The soldiers then placed a bag on his face, which carried a terrible stench. He stated that for three days, the soldiers would throw cold water on his head whenever he tried to sleep.[574] The witness fell unconscious at some point and woke up several hours later, finding himself in a bigger cell with about ten other people. Finally, the witness was transferred to a court in Azabal Ashel, where he was sentenced to 28 days in prison. Having served his sentence, he was taken to the Erez crossing. When he asked about the 8500 shekels that had been confiscated earlier, he was told: "Ask Ismail Haniya."[575]

**Attack against a medical clinic and preventing ambulances from accessing Khuza'a**

329.    According to witnesses, Khuza'a's only clinic, Dr. Kamel Qdeih's Clinic, was struck by repeated Israeli air strikes on 23 and 24 July.[576] One of the doctors running the clinic recounted the following:

*"The clinic and its surroundings were hit by a number of rockets. About thirty people in total were killed, and several more injured in these attacks. They were mostly children and women. None of them were combatants. Among them was my brother who was killed before my own eyes. He was hit during that attack and collapsed. During that same night, when I was talking to the media, I told them that although this soldier killed my brother, the most precious person for me, I would still treat him (the soldier) just as I would anybody else because he is a human being and no human being deserves to be killed. I felt so much pain. It was the most painful experience of my life, being a doctor and not being able to save my brother's life. During that same night, I believe I saved the lives of numerous others."*

*"They targeted the clinic with three rockets from drones. There were at least 25 or 30 explosions in the neighbourhood. The attacks on the clinic continued also on the 24th. Our clinic was deprived of the most basic provisions to treat patients. [...] and in all this there was no communication or warnings. We were just attacked."[577]*

330.    The commission similarly understands that employees from the Ministry of Health and the Palestinian Red Crescent were prevented by the IDF from entering Khuza'a.

---

[572] W070
[573] W070
[574] W070
[575] W070
[576] Confidential submission 22
[577] W268

86

331.    *"On 22 July, attacks intensified. It was probably the most violent day for Khuza'a. I
call it the black day. The attacks were carried out for the most part from the air, by F16s
and drones. Tanks in and around Khuza'a were also firing intensely. The clinic was
overflowing with more patients than it could handle. I spent most of that night calling
colleagues from the Red Cross and other international organisations to request for help.
The Red Cross informed me that they were told by the Israelis that nobody would be
authorized into Khuza'a because it was a closed military zone. I immediately [...] reminded
them that they are a humanitarian organization that should be working to help the people
who are most in need. [...] On the following morning, I called our colleagues from the
Ministry of Health and the Palestinian Red Crescent. They too were unable to enter. Our
brothers from the Red Crescent however made a genuine attempt to enter into Khuza'a and
were stopped when their ambulance came under attack."* [578] *Delays in Evacuation of
Injured Civilians and Failure to Protect and Respect Medical Personnel*

*"I don't want to die. Don't leave me.* 7-year old Anas "Bader" Qdeih[579]

332.    The commission heard testimony and reviewed submissions describing how
wounded, sick and trapped civilians were deprived of medical care during the IDF
incursion into Khuza'a. According to those reports, the IDF repeatedly refused access to
medical teams. Palestinian Red Crescent Society (PRCS) ambulances spent a considerable
amount of time on the outskirts of Khuza'a waiting for a green light to enter the village to
evacuate the injured.[580]

- The commission understands that the Palestinian Red Crescent Society (PRCS)
  obtained access to enter Khuza'a only on 24 and 28 July, and that, on both days,
  the total time the medical crews were accorded to attend to the injured and recover
  dead bodies was between 40 and 90 minutes (after moving for several hours
  through destroyed streets and neighbourhoods, negotiating their way around tanks
  and soldiers and being subjected to searches). The delays meant that the
  ambulances could not transfer the injured to hospital quickly or go back to pick up
  more casualties.

- On 24 July, for example, according to witnesses, PRCS personnel were forced to
  carry the injured on their shoulders because the road was blocked, and the IDF
  refused to clear it. The IDF had opened the road on the way in but blocked it again
  while the ambulances were working inside Khuza'a.  Because of delays of more
  than three hours, one man who had a gunshot injury in his thigh had to have his
  leg amputated when he got to hospital.[581]

- On 24 July, according to witnesses, the PRCS ambulance found a 7-year-old boy,
  Anas "Bader" Qdeih, who was critically injured. He was taken to an IDF
  checkpoint in order to be transferred to the closest ambulance. The ambulance was
  kept waiting for at least 20 minutes in spite of the evident seriousness of the

---

[578] W268; Confidential submission 22
[579] W268; see also: Physicians for Human Rights. Gaza 2014. Findings of an independent medical fact-
finding mission; At https://gazahealthattack.files.wordpress.com/2015/01/gazareport_eng.pdf, p. 88;
See also video at http://www.aljazeera.com/programmes/aljazeeraworld/2014/08/khuzaa-attack-
aftermath-201481165544556845.html; min 13-26 (unverified)
[580] Confidential submission 22; confidential submission 33.
[581] Submission 22.2 See also W083.

87

ATL005000

victim's injuries and his being a child. The boy died before he could be transferred
to the ambulances that were waiting at the outskirts of the village[582].

- On 24 July, when a PCRS medical team entered Khuza'a, a person who asked for
their help was seriously injured by gunfire directly in front of them, according to
witnesses.[583]

333.    **The case of Ghalia Abu Reda:** A witness told the commission that he and his
family decided to leave their home in Khuza'a in accordance with the warnings issued by
the IDF prior to the launch of the ground operation.[584] As attacks were intensifying, they
fled Khuza'a in a state of complete panic, leaving behind one of the family members,
Ghalia Abu Reda, a woman aged about 70, in a wheelchair. Ghalia Abu Reda's cousin
stayed behind, in order to look after her for as long as possible, but eventually the cousin
too was compelled to leave. When the witness returned to the family home a few days later,
he found Ghalia Abu Reda's dead body. She had a bullet mark in her head and blood on her
face. The doctor who later examined the body told the witness that she had been shot from
close range, from a distance of about two metres.[585] Another member of the Abu Reda
family confirmed the above allegations to the commission. That witness stated that the
house was very close to the Green Line and that, some days or weeks later, an Israeli
soldier posted on twitter a picture of another IDF soldier offering water to Ghalia Abu
Reda:

*"The soldiers did this to pretend that they were human. They did not know that Gaza is
small, and that the picture would be recognized by the family. When the family returned to
Khuza'a they found Ghalia dead!"* [586]

**IDF and MAG statements**

334.    The IDF has not officially declared how many tunnels it found and destroyed in
Khuza'a, nor has it stated how many weapons caches it discovered. Colonel Ofer Winter
Commander of the Givati Brigade and the person in charge of the operation in Khuza'a,
was reported to have said:

*"There is no house that is not harbouring evil. It is amazing – every house.  All these
houses are full of explosives. This house here is a bunker and a Hamas command centre.
(…) You see, I lost my way; the last time I was here there were still buildings here."*[587]

335.    In relation to the events described above, the MAG ordered criminal investigations
into the 25 July killing of Mohamed Tawfiq Qdeih and two unspecified cases of abuse of
Khuza'a residents on 23 July 2014. The MAG also ordered the opening of four criminal
investigations into alleged looting of houses, some of which took place in Khuza'a.  On 18
March 2015, the MAG closed the cases of looting, as the victims declined to testify before

---

[582]  W268 on 20 February 2015; see also: Physicians for Human Rights. Gaza 2014. Findings of an
      independent medical fact-finding mission. At
      https://gazahealthattack.files.wordpress.com/2015/01/gazareport_eng.pdf, p. 88; See also video at
      http://www.aljazeera.com/programmes/aljazeeraworld/2014/08/khuzaa-attack-aftermath-
      201481165544556845.html ; min 13-26 (unverified)
[583]  Submission 22.2 See also W083.
[584]  W251
[585]  W251
[586]  W252
[587]  Channel 10 News. Alon Ben David: With the Givati fighters in Gaza; 26/07/2014; at:
      http://news.nana10.co.il/Article/?ArticleID=1071639; minute 6:39

88

ATL005001

the IDF.[588] The commission sought but could not verify reports by the Israeli authorities indicating that Palestinian armed groups or local authorities had forced individuals to stay in the neighbourhood.

**Legal analysis**

336.   The commission selected a number of features of the 20 July to 1 August ground operation in Khuza'a and analyzed them against international law:

337.   The reported *intensity of the shelling* and air strikes in Khuza'a between 22 and 24 July, which resulted in the destruction of residential buildings, medical clinics, roads, electricity networks and public infrastructure; the bulldozing of buildings throughout the ground operation; and the destruction of water tanks on roofs of buildings; raise concerns that the IDF shelling and airstrikes were not exclusively directed at military objectives. While the commission is not in a position to verify the extent of the use by armed groups of buildings in Khuza'a for military purposes, it appears highly unlikely that the 740 buildings either destroyed or damaged all made "an effective contribution to military action"[589]. The complete razing of some areas of Khuza'a, as shown in media images,[590] as well as other available information, indicate that the IDF may have treated several distinct individual military objectives in a densely populated area as one single military objective. This would be in violation of the prohibition of indiscriminate attacks, found in customary international law and reflected in article 51(5) of Additional Protocol I.[591] Therefore there are strong indications that elements of the IDF operation in Khuza'a may qualify as direct attacks against civilians or civilian objects and may thus amount to a war crime.[592]

338.   The allegations that civilians trying to flee Khuza'a on 21 July and 23 July 2014 were prevented from doing so raises significant questions as to the IDF's strict compliance with the general obligation to take all feasible precautions to avoid or at least to minimize incidental loss of civilian life. Indeed, allowing civilians to flee an area that is about to be subjected to heavy shelling and air strikes implicitly accords with the general obligation of parties to a conflict to take constant care to spare the civilian population.[593] The commission recognizes that the obligation is to take "feasible precautions", which means that not only humanitarian, but also military considerations can be taken into account when deciding on the precautions to be observed. However, in the absence of any information from Israel on the issue, the commission does not see any military consideration that could

---

[588]   Decisions of the IDF Military Advocate General regarding Exceptional Incidents that Occurred during Operation 'Protective Edge' – Update No. 2; 7 December 2014; At: http://www.law.idf.il/163-6958-en/Patzar.aspx

[589]   AP I article 52, para.2

[590]   The Telegraph, *Gaza Conflict: 360-degree panorama of flattened town of Khuza'a, Gaza*, 5 August 2014. http://www.telegraph.co.uk/news/worldnews/middleeast/gaza/11012640/Gaza-conflict-360-degree-panorama-of-flattened-town-of-Khuzaa-Gaza.html

[591]   International Committee of the Red Cross, *Customary International Humanitarian Law Database*, Rule 13

[592]   The International Criminal Tribunal for the former Yugoslavia stated in the Galic Case that "indiscriminate attacks, that is to say attacks which strike civilians or civilian objects and military objectives without distinction, may qualify as direct attacks against civilians," ICTY, *Prosecutor v. Galic*, case No. IT-98-29-T, Judgement, 5 December 2003, para. 57. The International Court of Justice in the Nuclear Weapons Case linked the prohibition of indiscriminate attacks to attacks against the civilian population, by stating that: "States must never make civilians the object of attack and must consequently never use weapons that are incapable of distinguishing between civilian and military targets." Para. 78. Article 8 of the Rome Statute of the International Criminal Court lists intentionally directing attacks against the civilian population or civilian objects as a war crime.

[593]   AP I article 57, para 1

have justified preventing civilians from fleeing. The IDF had already sacrificed any element of surprise by issuing a warning several days earlier, meaning that Palestinian armed groups were aware of the impending attack.

339.    While preventing members of armed groups from fleeing by mingling with civilians is hypothetically a valid military consideration [although such an argument has not been put forward], it does not, in the circumstances at hand, outweigh the humanitarian consideration of allowing a substantial group of civilians to evacuate an area that has or will shortly be subjected to heavy bombardment. When refusing to allow civilians to flee Khuza'a on 21 and 23 July, the IDF had full knowledge of their presence and therefore should have foreseen that an attack against the town using intense shelling and aerial bombardment would very likely be indiscriminate or disproportional. This also raises concern that not all feasible precautions to minimize danger to civilians were taken by the IDF in its attack against the town of Khuza'a.

340.    Article 23 of the 1907 Hague Regulations[594] proscribes the destruction of property unless such destruction is required by imperative military necessity. A similar provision in Geneva Convention IV prohibits an occupying power from destroying private or public property.[595] The extensive devastation, carried out by the IDF in Khuza'a, in particular the razing of entire areas of the town by artillery fire, air strikes and bulldozers, indicates that the IDF carried out destructions that were not required by military necessity. Article 147 of the Geneva Convention IV qualifies the extensive destruction of property "not justified by military necessity and carried out unlawfully and wantonly" as a grave breach of the Geneva Conventions. The massive destruction executed by the IDF in Khuza'a may therefore amount to a war crime, if all of these elements are met.

341.    The extent of the destruction combined with the statements made during the operation by the commander of the Brigade responsible for the Khuza'a operation to the effect that "Palestinians have to understand that this does not pay off," are indicative of a punitive intent in the action of the IDF in Khuza'a and may constitute collective punishment. Article 33 of Geneva Convention IV establishes that "collective penalties and likewise all measures of intimidation or of terrorism are prohibited."

342.    Information received by the commission suggests that in several cases Palestinians who had been *detained*, mostly in their homes in Khuza'a, had been insulted, beaten, threatened to be killed and otherwise ill-treated by IDF soldiers. In some cases the treatment described by some of the witnesses could amount to torture. Article 27 of Geneva Convention IV provides that "protected persons are entitled in all circumstances, to respect for their persons [and] their honour" and "shall at all times be humanely treated, and shall be protected especially against all acts of violence or threats thereof and against insults" and article 29 provides that irrespective of the individual responsibility of the soldiers, the party in whose hands the protected person finds himself, in this case Israel, is responsible for the treatment afforded.[596] In addition, the behaviour of IDF soldiers, as described by witnesses, if verified, amounts to a violation of article 10 of the International Covenant on Civil and Political Rights. In a number of these cases the treatment afforded to those

---

[594] Hague Regulations Respecting the Laws and Customs of War on Land, annexed to the Hague Convention IV of 1907

[595] Article 53, Geneva Convention IV of 1949

[596] The term "protected persons" is defined in article 4 of the Geneva Convention IV as "those who at a given moment and in any manner whatsoever, find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals." The behaviour described by witnesses also amounts to a violation of customary law as reflected in Common Article 3 to the four Geneva Conventions.

ATL005003

detained may qualify as inhuman or degrading treatment in violation of article 7 of the International Covenant on Civil and Political Rights, and article 16 of the Convention against Torture and may even amount to acts of torture as defined in article 1 of the same Convention. Such acts are described as war crimes and listed as a grave breach of the Geneva Conventions.[597]

343.   In addition to the two incidents in which people were allegedly used as human shields in Khuza'a, the commission examined a similar allegation in the case of a 60-year-old woman in Wadi Al Salqa, a village south east of Deir Al Balah, who was detained on 24 July by IDF soldiers.

344.   *"The soldiers interrogated me repeatedly and detained me in the house for three days, guarding me with a gun. They did not let me use the restroom and they didn't give me food or water. They took off my veil. I told them I was a widow from a long time and they told me that no one loved me, and that no one would ask about me if I disappeared. I was scared. I was told that I would remain with the soldiers, and I protested, telling them I was a woman and they were all men."*[598]

345.   The victim, a widow who lived alone on a small farm, told the commission that she was detained by four armed IDF soldiers close to her home.  After confiscating her keys, mobile phone and some money, the soldiers ordered her to remove her veil and go inside the house. There the victim was blindfolded and handcuffed, and, some hours later, taken eastwards to the house of her cousin, where she was interrogated about tunnels and members of the "resistance". The victim denied that she or her family had ties to any armed groups. When the soldiers told her that she would be staying with them for eight days, the victim responded that this was highly inappropriate as she is a woman and they are men. The soldiers mocked her saying that nobody would miss her anyway. Then they took her to an adjacent shack and at gunpoint forced her to enter an underground area while about 12 soldiers waited for her above. After 10 minutes, the soldiers ordered her back up and entered the underground area themselves. The victim remained captive in the home of her relative until 27 July, largely without access to water, food and a bathroom.  On 27 July, at around 1.45pm, the soldiers returned her belongings and left the house.[599]

346.   Based on the information available to the commission, the manner in which the Israeli soldiers forced Palestinian civilians to stand in windows, enter houses/underground areas and/or perform dangerous tasks of a military nature, constitutes a violation of the prohibition against the use of human shields contained in article 28 of Geneva Convention IV, and may amount to a war crime.[600] These incidents also raise concerns that in two of the cases, the IDF may have violated the obligation to hold persons deprived of their liberty in premises that are removed from the combat zone,[601] when detaining them for several days. The tasks the victims were ordered to perform by the soldiers jeopardized their lives and health. That conduct, together with the physical and/or psychological violence to which the victims were subjected by the soldiers, constitutes ill-treatment and may amount to torture.[602] In addition, should allegations that victims were coerced to provide information concerning armed groups and the whereabouts of relatives and tunnels be confirmed, this

---

[597] Article 8 Rome Statute of the International Criminal Court; article 147 Geneva Convention IV.

[598] W232.

[599] W232.

[600] Geneva Convention IV article 28, Article 51(7) Additional Protocol I Article 8 Rome Statute of the ICC. See also https://www.icrc.org/customary-ihl/eng/docs/v2_rul_rule97

[601] ICRC, *Database customary international humanitarian law*, rule 121.

[602] CAT, article 16 on degrading treatment. GC I, Art. 50; GC II, Art. 51; GC III, Art. 130; GC IV, Art. 147; ICC Statute, Art. 8(2)(a)(i); (ii); (iii); (viii); Art. 8(2)(b)(i); (iv); (x); (xxv) AP I, Art. 75, AP I, Arts.75(2)(a); (b)

ATL005004

would amount to a violation of article 31 of the Geneva Convention IV, which states that "no physical or moral coercion shall be exercised against protected persons, in particular to obtain information from them or from third parties."

347.    With regards to the treatment of the woman who was detained in Wadi Al Salqa, international humanitarian law provides that, "women shall be treated with all consideration due to their sex".[603] The detainee's cultural background should be taken into account when ensuring the respect for physical and moral integrity.[604] The IDF would therefore be under an obligation to hold the widow in Deir Al Balah under the immediate supervision of female guards.[605]

348.    Other incidents and alleged patterns of behavior in Khuza'a raise a number of concerns under international law that will be dealt with and analyzed in detail in subsequent sections of this report. These incidents include: the incidents in which civilians were allegedly shot at by IDF soldiers; attacks against ambulances; and the failure to provide medical assistance to wounded persons.

### c.   Rafah, 1 August 2014

349.    *"Hundreds of people had returned to their homes because of the declaration of ceasefire. They have been unexpectedly confronted with a barrage of missiles so most of them started fleeing from the eastern parts. They were fleeing in the hundreds, on motorcycles, cars or simply on foot. Entire families, including elderly, women and children were being attacked by tanks. The attacks were indiscriminate. A lot of these attacks happened in Bildesi Street, where many of the people were fleeing. There was an explosion about every 10 seconds. During these hours, we came across hundreds of corpses that had been torn into pieces."*[606]   Doctor, Al Najjar Hospital

350.    In response to the killing of two IDF soldiers and the capture of Lt. Hadar Goldin, the Reconnaissance Unit of the Givati Brigade launched a major military operation on the town of Rafah in the morning of 1 August, or "Black Friday" as it was dubbed in Gaza. When the operation started, Israeli forces acted on the basis of the assumption that Lt. Goldin might still be alive. He was proclaimed dead several hours later, following the discovery of his blood-stained effects. There are conflicting reports about whether the capture of the Lt. Goldin occurred before or after a ceasefire that was due to come into effect. According to official Israeli sources, hostilities resumed "following a ceasefire violation by Hamas and the attempted kidnapping of an IDF officer".[607]

351.    The commission spoke with 22 witnesses in relation to these events, among them victims, medical personnel and journalists. It also studied submissions, video and satellite imagery and public reports from relevant stakeholders.

352.    During the operation, the IDF closed off areas of Rafah to block movement in and out, presumably to prevent the captors from leaving the area with the captive soldier. Residents returning home that morning – following the announcement of a ceasefire – found themselves trapped with no access to safer sanctuaries, as Rafah was basically turned

---

[603]   Art. 27, para 2, Geneva Convention  IV.
[604]   Elements of Crimes for the International Criminal Court, Article 8 (2) (b) (xxi), footnote 49.
[605]   Article 76 Geneva Convention IV See also AP I Art. 75(5). CEDAW, General Recommendations nr. 30. http://www.ohchr.org/Documents/HRBodies/CEDAW/GComments/CEDAW.C.CG.30.pdf
[606]   W219
[607]   Israel's Investigation of Alleged Violations of the Law of Armed Conflict , p. 30; at: http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx

92

ATL005005

into a closed military zone. According to media accounts, the IDF fired over 1000 shells against Rafah within three hours[608] and dropped at least 40 bombs. Tanks and bulldozers demolished dozens of homes.[609] Inhabitants came under intense attacks in their homes and in the streets. Witnesses reported to the commission that dozens of homes were destroyed by IDF bulldozers. Ambulances and private vehicles trying to evacuate civilians from the fighting were also hit. As a result of the operation, virtually every person or building in Rafah became a potential military target.[610] Families gave accounts of dividing their children into separate groups before fleeing their homes, in the hope that only one group might be fired on and the others would survive.

353.    *"Before I left, I called my neighbour and agreed with her to divide into two groups, so that, if one group were targeted, the others would survive. I left with my two younger daughters, whereas my neighbour left with her daughter and my eldest daughter Asil. We reached a place called Mashrough Amer in Salahaddin Street and found a lot of vehicles that had been recently destroyed as they were still emitting fumes. [... ]We later learned from the news that Shawka, our neighbourhood, had been targeted by 600 missiles in the span of one hour. The area had been totally destroyed and, as far as I can remember, the missiles I witnessed appeared to have been fired from the ground, probably a tank. I understand that Rafah city was targeted mainly from the air. Al Shawka, however, is on the margins of Rafah and very close to the border. There, all the attacks were launched by tanks. When I returned home, I found my house partially destroyed by three missiles. The house was empty and nobody had been hurt."* Saleh Hussein Abu Mohsen from Rafah[611]

354.    A father described an incident in which three persons were killed and six injured, including himself, while trying to flee to safety.[612] Beginning on from 17 July, the family had moved from one refuge to another to avoid the shelling. When they arrived at Mashrou' Amer on 1 August around 11 a.m., tanks in front of the Sa'ad Sayel barracks fired at them. When they ran away in two groups, the eldest daughter was killed.[613] The commission understands that the fiercest attacks occurred during the first four hours following the rumored capture of Lt. Goldin. The bombardment was reported to have been most intense in the eastern neighbourhoods of Rafah, such as Mashru' Amer, Tannur, Hay al Jneina, Uruba Street, Al Shawka, Zallata, the Airport neighbourhood and Salahaddin street, with up to 95 per cent of the victims coming from these neighbourhoods.[614] Satellite imagery shared with the commission corroborates that the destruction was concentrated in these areas.[615]

355.    Doctors working at the Abu Yousef Al Najjar Hospital in Rafah told the commission that, in the last days of July, many civilians had rushed to the hospital not to seek medical care but *"because they felt that the hospital was the safest place for their families and*

---

608    Haaretz. Amos Harel and Gili Cohen: *Massive artillery shelling may have caused numerous civilian fatalities in Gaza.* 15 August 2014; at:
       http://www.haaretz.com/news/diplomacy-defense/.premium-1.610733#!
609    The Independent. Ahron Bregman: *You might not have heard of the 'Hannibal Protocol', but it's behind one of Israel's worst atrocities yet*; 20 August 2014. At:
       http://www.independent.co.uk/voices/comment/you-might-not-have-heard-of-the-hannibal-protocol-but-its-behind-one-of-israels-worst-atrocities-yet-9678780.html
610    See also: Haaretz. Gili Cohen: *Dozens of innocents killed in IDF's 'Hannibal' protocol.* 4 August 2014; at:
       http://www.haaretz.com/news/diplomacy-defense/.premium-1.608715
611    W171
612    Confidential submission 22
613    Confidential submission 22
614    W221, para 4 and W220, para 6
615    See UNITAR-UNOSAT submission and confidential submission 22.3

ATL005006

*children*.[616] On 1 August, as the security deteriorated, patients from Al Najjar hospital were transferred to the Kuwaiti hospital.[617] According to eyewitnesses, two missiles struck the Al Najjar hospital, which caused destruction to some of the infrastructure such as the windows, doors and the air conditioning system. Ambulances were also hit. For instance, at around 3 p.m., an ambulance transporting injured civilians in the Msabbeh neighbourhood was hit. The vehicle caught fire and three crew members and 5 other people were killed. The commission spoke with two ambulance workers from Al Najjar hospital who witnessed part of the incident. They said that, earlier on that day, the Al Bir Taka Mosque in northern Rafah had been hit and they were called to rescue the wounded. Three ambulances were dispatched, one of them driven by their colleague Atef Salah Ibrahim Al Zamali, who took a short-cut in order to save time. When the other two ambulances arrived at the scene a little while later, they found Atef's ambulance enveloped in flames, about 250 meters away from the mosque. They could not approach the vehicle due to the heat. While they were there, another strike on the burning ambulance caused a second explosion. The eyewitnesses thought that this second explosion was not caused by an airstrike, but by a mortar, as fragments of shrapnel exploded around the ambulance area.[618] The intense bombardment continued.[619] After extinguishing the fire, the Civil Defence managed to extract the burned bodies from the vehicle and found inside, in addition to the three ambulance crew members, the bodies of a man, a woman and three children. They discovered that the man was an elderly patient. The woman was his daughter who had asked to accompany him in order for her children to be evacuated to a safer place.[620]

356.    Dozens of shells struck the premises of the hospital, wounding a number of civilians and causing marginal damage to its infrastructure. The hospital was eventually evacuated and no other casualties were reported. The doctors also said the hospital received more than a thousand casualties on the first day of the operation alone.[621] According to the UN Protection Cluster, 100 fatalities were recorded in Rafah on 1 August 2014, including 75 civilians (24 children and 18 women). [622]

357.    Leaked audio recordings of IDF radio communications suggest that the fire was indiscriminate, with one Lt. Colonel telling his troops "to stop firing like morons" and another ordering a hesitant soldier, "Go, go, go![…] Give him another shell"[623]. According to a media report, the Givati Brigade Commander invoked the Hannibal Directive in response to the capture of the IDF soldier[624]:

*"[A]t 09:36, after speaking to the commander there I uttered a word no one wants to utter – Hannibal, i.e. abduction. I started planning an assault towards Rafah. I ordered all of our forces to move there, in order to prevent the abductors from moving".*

358.    The "Hannibal Directive" was devised in 1986 and is widely understood to be "a code word for an IDF order that states that in the case of abduction of a soldier, everything must be done to prevent the escape of the abductors or captors, using gunfire, even if it

---

[616] W219, para 7
[617] W221.
[618] W257, W258.
[619] W257.
[620] W258
[621] W258
[622] Figures from the UN Protection Cluster Working Group.
[623] Ynet. Yoav Zitun: *Hannibal Directive: Exclusive tapes reveal details of IDF's Black Friday*; 31 December 2014; at: http://www.ynetnews.com/articles/0,7340,L-4609436,00.html
[624] Ynet. Yoav Zitun: *Hannibal Directive: Exclusive tapes reveal details of IDF's Black Friday*; 31 December 2014; at: http://www.ynetnews.com/articles/0,7340,L-4609436,00.html

ATL005007

endangers the life of the soldier."[625] According to official Israeli sources, the "IDF General Staff Directive for Contending with Kidnapping Attempts [also known as the "Hannibal Directive"] provides methods and procedures for preventing and frustrating attempted kidnappings of Israeli nationals (both civilians and IDF soldiers). This Directive has been in force for decades and has been amended several times. […] As an operational order, however, the Directive's specific content is classified. As with other classified directives, revealing all of this Directive's contents would provide adversaries with the ability to frustrate its very purpose."[626] It appears that the procedure is premised on a very strong political commitment by Israel to do its utmost to ensure that no soldiers are captured by armed groups to avoid substantial leverage to armed groups in subsequent negotiations with Israel.[627]

359.    A press report quoting the commander of the IDF's Orev Unit provides a possible explanation for how the IDF viewed the goals of the 1 August operation in Rafah:

*"In such an event you do all to prevent the country from experiencing another turmoil as it underwent in the Gilad Shalit affair"[628]*

360.    While the Hannibal procedure was modified several times[629] , apparently to clarify that it did not call for the killing of captured soldiers, it appears still to be unusually expansive in terms of defining what targets are legitimate military objectives.

**IDF's and Palestinian armed group's version of events**

361.    The commander of the reconnaissance battalion of the Givati Brigade, Lieu Col Eli Gino, was reported as stating that, "The fire was proportionate, and when they kidnap a soldier, all means are kosher, even if it exacts a price"[630]. The press further quoted Col. Winter as saying that, "those who kidnap need to know they will pay a price. This was not revenge. They simply messed with the wrong brigade"[631]. The events of 1 August in Rafah are presently being considered by Israel's Military Attorney General for a possible criminal investigation.

362.    Israeli media reported on 15 April 2015 that an internal investigation by the IDF had concluded that no war crimes had been committed. Instead, the findings shed light on

---

[625]   The Association for Civil Rights in Israel reports 130 - 150. Letter to the Attorney General dated 10 August 2014.

[626]   Israel, Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*, p. 44 at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf , Accessed 30 May 2015.

[627]   See also: Haaretz. Anshel Pfeffer: *The Hannibal Directive, Why Israel risks the life of the soldier being rescued*; 3 August 2014; at:
  http://www.haaretz.com/news/diplomacy-defense/.premium-1.608693

[628]   Ynet News. Yoav Zitun: *Golani Commanders from the Rafah Battle – Our conscience is clear*; 24 September  2015; at:
  http://www.ynet.co.il/articles/0,7340,L-4568410,00.html

[629]   Israel, Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*, p. 44 at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf , Accessed 30 May 2015.
  see also The New Yorker. Ruth Margalit: *Hadar Golding and the Hannibal Directive*; 6 August 2014; at: http://www.newyorker.com/news/news-desk/hadar-goldin-hannibal-directive

[630]   The Times of Israel. Mitch Ginsburg: *Recordings shed harrowing new light on IDF's response to Gaza abduction; 30 December 2014*; at: http://www.timesofisrael.com/gaza-abduction-comes-to-life-in-recordings/#!

[631]   In an interview with Yediot Ahronot quoted by AP: Karin Lau and Ibrahim Barzak: *Israeli fire on Gaza town raises war crimes claim*, 31 August 2014. At: http://news.yahoo.com/israeli-fire-gaza-town-raises-war-crimes-claim-120049238.html;

ATL005008

operational flaws vis-à-vis the IDF's reaction to the capture of Lt. Hadar Goldin.[632] The media cite Givati Brigade commander Col. Winter as having stated that "[t]he brigade's plan of operation took into account the cease-fire going into effect and was based on a situation in which, by 8 a.m., the forces would cease attacks and only after securing the territory, would initiate searches for tunnels. However, this was not the situation, and when the cease-fire went into effect, forces from the patrol unit entered to search an area that had not been conquered and in an unsecured sector". The IDF apparently concluded that "from an analysis of the unit's actions, it can be determined that in contrast to standard warfare and the simple instructions given during Operation Protective Edge, here, as a brigade, we managed to confuse the fighters and to put them in an unreasonable situation.[633]

363.    With respect to Hamas's version of events, according to press reports, Hamas stated that "Israel pretends that one of its soldiers had been kidnapped to cover its crimes against the civilians in Gaza strip, and to divert the attention of international public opinion towards an Israeli prisoner with the Palestinian resistance." He added: "We have no information about an Israeli prisoner."[634] Also according to press reports, in a press release of 2 August, Al Qassam Brigades announced that it was not "aware of a missing soldier, nor his whereabouts or the conditions of his disappearance." [635]

**Summary Legal analysis**

364.    Several factual elements of the shelling and bombing in the Rafah area on 1 August 2014 lead to important concerns as to the conformity of this attack with international law.

365.    Information received by the commission concerning attacks on all vehicles in the area, including ambulances, as well as incidents in which groups of civilians appear to have been targeted by tank fire, raises serious concerns as to the respect by the IDF of the principle of distinction. The alleged invocation by IDF troops of the Hannibal Directive may indicate that the objective of targeting vehicles was to prevent the flight of those who had captured an IDF soldier[636]. While targeting a vehicle whose passengers are fighters and who are escaping with a captured soldier may be legitimate, the information reviewed by the commission reveals a different course of events.  In Rafah, **all** vehicles appear to have been targeted, irrespective of their civilian or military use. Civilian vehicles, including ambulances, are civilian objects and cannot be targeted unless they are used in a way that makes an effective contribution to the military action. International humanitarian law provides that in case of doubt whether an object that is normally used for civilian purposes is being used to make an effective military contribution, it shall be presumed not to be so used.[637] However, based on information collected by the commission, the opposite appears to have been the case on 1 August in Rafah, where all vehicles in a certain area were

---

[632] Ynet News: Yoav Zitun: *IDF's Gaza probe reveals Hamas outsmarted forces in Rafah*;15 April 2015; at: http://www.ynetnews.com/articles/0,7340,L-4647096,00.html

[633] The Jerusalem Post, *Preliminary investigation of 'Hannibal' incident: Operational mistakes, but no war crimes*, 15 April 2015 at: http://www.jpost.com/Arab-Israeli-Conflict/Details-of-probe-into-kidnapping-of-IDF-soldier-during-Gaza-war-leaked-398046
http://archive.aawsat.com/details.asp?section=4&article=781630&issueno=13031#.
VREy6Et5mw1

[634] http://archive.aawsat.com/details.asp?section=4&article=781630&issueno=13031#.
VREy6Et5mw1

[635] Sky News Arabia: Al Qassam says: we have no information about the missing Israeli soldier. 2 August 2014. At http://www.skynewsarabia.com/web/article/678484/القسام-علم-بالجندي-الإسرائيلي-المفقود

[636] Israel, Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*, p. 44 footnote 67 at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf , Accessed 30 May 2015.

[637] Article 52(3), Additional Protocol I

96

ATL005009

targeted. This amounts to a deliberate attack against civilians and civilian objects and may amount to a war crime.

366.    Statements made on IDF audio recordings, as well as the amount and types of ordnance fired at some Rafah neighbourhoods, also raise concern with regards to the respect by IDF forces of the principle of distinction. The alleged use of over 250 mortar shells, a statistical weapon with a wide impact area, in a densely populated area, as well as the firing of over 800 artillery and tank shells with wide area effects in a densely populated and built up area over the period of a few hours, indicate the use by the IDF of methods and means of combat which in the circumstances were of a nature to strike military objectives and civilians or civilian objects without distinction. This is demonstrated by the high number of shells that hit the Al Najjar hospital premises, and the number of civilians who were struck by shells in the street while attempting to flee. The attack of 1 August 2014, therefore, appears to have violated the prohibition of indiscriminate attacks.

367.    In relation to the "Hannibal Directive", the IDF has stressed that: "allegations that IDF directives, and particularly, the IDF General Staff Directive for Contending with Kidnapping Attempts (also known as the "Hannibal Directive"), permit IDF forces to exercise force in a manner that does not accord with the principle of proportionality, are incorrect. […] The Directive does not grant permission to violate the Law of Armed Conflict, including the rules relating to distinction and proportionality. To the contrary, and as with all IDF directives concerning combat situations, IDF forces are required to adhere to the Law of Armed Conflict at all times when implementing the directives' provisions. The use of unrestrained force is never permitted, even in the direst of circumstances."[638]

368.    Nevertheless, the attack in Rafah on "Black Friday" raises concerns with regard to the IDF's respect of the principle of proportionality. The invocation of the 'Hannibal Directive' and reported statements by IDF officers present during the attack provide a clear indication of the objective of the attack – namely preventing or putting an end to the capture by an armed group of an IDF soldier. Given the amount and type of ordnance used, as well as the likely presence of civilians in the area due to the announced ceasefire, a reasonable military commander should have known that such an attack could result in a high number of civilian casualties as well as in damage to civilian objects. In order for an attack to be considered proportionate, international law requires that the expected incidental loss of civilian life and damage to civilian objects not be excessive in relation to the concrete and direct military advantage anticipated.

369.    The latter point must be examined in depth. Preventing the capture or freeing a soldier from captivity may be conceived as a concrete and direct military advantage, albeit of a limited nature, since the loss of one soldier in a large army such as the IDF does not reduce its military capability. When doing so in a manner that is highly likely to result in the soldier's death, it further reduces the concrete and direct military advantage. On the other hand, some have argued that in such a case the proportionality test must take into account the strategic consideration of denying the armed groups the leverage they could obtain over Israel in negotiations for the release of the captured soldier.[639]

370.    The commission considers this an erroneous interpretation of international humanitarian law. The leverage that armed groups may obtain in negotiations does not depend solely on the capture of a soldier, but on how the Government of Israel decides to

---

[638]  Israel, Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*, p. 44 at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf , Accessed 30 May 2015.
[639]  John Merriam, Michael Schmitt, *Israeli Targeting: A Legal Appraisal*, Naval War College Review, Fall 2015, p. 13 (Forthcoming publication) available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2596836.

ATL005010

Case 2:16-cv-04435-PA-MRW   Document 74-14   Filed 05/01/17   Page 269 of 360   Page ID #:5761

react to the capture in the aftermath. The strategic military or political advantage sought is therefore not a concrete and direct military advantage as required by international humanitarian law. An assessment of the strategic and political advantage depends on a large number of *post facto* elements which are merely speculative for the commander on the ground at the moment he decides to launch the attack. Indeed, the proposed interpretation of the anticipated military advantage, which would allow for abstract political and long-term strategic considerations in carrying out the proportionality analysis, would have the consequence of emptying the proportionality principle of any protective element. The commission finds therefore that the IDF attack of 1 August 2014 in Rafah could have been expected to cause incidental loss of civilian life and damage to civilian objects which would be grossly excessive in relation to the anticipated concrete and direct military advantage, and may therefore amount to a war crime.

371.    What is more, the commission believes that the military culture resulting from such policy priorities may have been a contributing factor for the unleashing of massive firepower on Rafah, in total disregard for its impact on the civilian population. Applying the 'Hannibal Directive' in the context of a densely populated urban environment using heavy weaponry inevitably leads to violations of the principles of distinction and proportionality

372.    The nature of the attack, as well as statements reportedly made by an officer present in Rafah after the events[640], indicate that the IDF did not comply with its obligation to take constant care to spare civilians. Based on the information gathered by the commission, it does not appear that the IDF took all feasible precautions to adequately verify whether the targets of the attacks were indeed lawful military objectives and to choose the weapons used in the attack with a view to avoiding or at the very least to minimizing civilian casualties and damage to civilian objects.

373.    Finally, as the IDF had aerial assets over Rafah on "Black Friday", it is very likely that commanders on the ground quickly gained knowledge of the calamitous impact of the attacks on civilians and civilian objects. This knowledge of the likelihood that the intense bombardment would lead to significant casualties is illustrated by the warning given to the doctors in Al Najjar hospital to evacuate the hospital. Yet, even though the attack lasted several hours, it was not suspended. This may constitute a violation of the obligation to do everything feasible to suspend or cancel an attack when it becomes apparent it is not respecting the principles of distinction or proportionality.

374.    The strikes against the Al Najjar hospital and against ambulances in Rafah also raise concerns as to the respect by Israel of the obligation to protect medical units and transports in all circumstances.

### d.    Attack on neighbourhood of Shuja'iya market

375.    On 30 July 2014, the Israeli authorities announced a four-hour unilateral truce from 3 to 7 p.m. The IDF stated: "The humanitarian window will not apply to the areas in which IDF soldiers are currently operating," (…) "Residents must not return to areas that they have previously been asked to evacuate."[641] The Shuja'iya market neighborhood consists of the market and shops, homes and warehouses.

---

[640]    See para. 361
[641]    Times of Israel: Itamar Sharon, Lazar Berman and Marissa Newman: *Government resolves to intensify Gaza offensive, after 3 soldiers killed*; 30 July 2014; at: http://www.timesofisrael.com/day-23-us-and-israel-deny-report-of-harsh-obama-netanyahu-call-rockets-fired-on-ta-confusion-over-truce/

ATL005011

376.  **Al Selek family house:** On 30 July at about 3.30 p.m. according to the witnesses and 5 p.m. according to the IDF, the roof of the Al Selek family house located in the market neighbourhood was hit by shelling, killing 8 members of the Al Selek family, including 7 children aged between 3 and 9 and their grandfather aged 70.[642]. The IDF indicated that the shelling was in response to an anti-tank missile […] fired at IDF forces operating in the outskirts of Shuja'iya, at approximately 4.10 p.m. followed by "an intense and on-going burst of mortar fire, emanating from a built-up area in the neighbourhood, targeting the forces", resulting in the injury of an IDF soldier. According to the IDF, the commanders in the field believed that the shelling by Palestinian armed groups could provide cover for an attempt to capture a soldier.[643]

377.   The commission interviewed three family members who were present in the house during the attack and one witness who arrived at the scene a few minutes later. The witnesses who had been at the scene said that the family children were on the terrace playing when the house was hit 4 times, with the first 2 projectiles striking the roof.[644] They told the commission that, when they heard the first explosion, they started looking for the children, only to realize that the children had been playing on the rooftop with their grandfather. The witnesses and family members rushed to the terrace, where they found that seven children and their grandfather were dead. Another child was seriously injured. Witnesses stated that the attack was entirely unexpected because they believed that the truce, which had been announced on local TV stations, would prevail during these hours.[645] The witnesses insisted that nobody in the house was affiliated with an armed group and that their family house had never been targeted before.[646]

378.   The IDF fired another round of shells at the market neighbourhood, about 10 minutes after the shells hit the Al Selek family home, just as three ambulances and the paramedics arrived at the scene.[647] Many of the people who had gathered around the Al Selek house to try and help survivors came under attack by the second round of shelling. One journalist who witnessed the attack said that what stunned him was the apparent targeting of ambulances and journalists who had rushed to provide assistance to the injured and cover the incident.[648] One of the survivors said that he saw an ambulance being hit by a shell, which killed one paramedic and one journalist, and killed and injured others who were in the vicinity of the house.[649] The events at Shuja'iya market were further corroborated by a statement from a man who was injured in this incident and transferred to a hospital in Cairo.[650]

379.   These allegations are corroborated by two video recordings.[651] The videos show bystanders and journalists gathering in the street after the attack on the house and three ambulances and a fire truck arriving at the scene, with the sirens clearly audible. A few seconds later a large explosion is heard, the cameraman falls to the ground and dust covers the camera. One of the videos shows the dying cameraman continuing to film after the

---

[642]  W207 and W003.
[643]  IDF MAG, *Decisions of the IDF Military Advocate General regarding Exceptional Incidents during Operation 'Protective Edge' – Update No.3,* Available at: http://www.law.idf.il/163-7183-en/Patzar.aspx
[644]  W003,W004 and W207
[645]  W004
[646]  W003.
[647]  W004.
[648]  W200.
[649]  W207.
[650]  W061.
[651]  Video and other materials provided by W143.

incident, and the ambulances being hit by a rocket. There are persons on the ground asking for God's help. At least eleven explosions are heard, one every few seconds, following which dozens of injured persons can be seen in the street and three persons not moving any more.

380.   On the basis of the information available, it appears that the weapons the IDF used in this incident were high explosive 120 mm mortars, which have a circular error probability of 136 meters, and are therefore imprecise. Remnants of these shells were found inside and around the Al Selek house.

381.   As a result of the second round of shelling, 23 persons were killed, including 3 journalists, 1 paramedic, and 2 firemen. In addition, 178 others were injured, among them 33 children, 14 women, 1 journalist, and 1 paramedic. Four are reported to have died as a result of the injuries they sustained in this attack.[652]

382.   Hamas condemned the attack[653], and media reports indicate that an IDF spokeswoman stated that Shuja'iya "was not in the areas covered by its humanitarian pause."[654]

383.   A MAG statement relating to the incident indicates that the IDF identified the positions from which the shells were fired, but did not return fire immediately because they were thought to be civilian sites. At about 4.40 p.m., the IDF reportedly fired a number of rounds of smoke-screening shells. As this failed to end the mortar fire from the armed groups, at approximately 5 p.m., the IDF decided to return fire towards two of the identified points with five mortar rounds, and about 18 minutes later the forces fired another ten mortar shells. The IDF explains that it chose to use mortars as no aerial alternatives were available. The IDF stated that warnings for civilians to evacuate the area had been issued; that the forces believed that the likelihood of harming civilians by their fire was low; and that their lack of available real-time aerial surveillance did not allow them to identify civilian presence at the time of the attack, whereas previous surveillance had assessed that no civilians were present in open areas of the neighbourhood. According to the IDF, six of the deceased were militants.

384.   The MAG, having examined the case, "did not find that the actions of IDF forces raised grounds for a reasonable suspicion of criminal misconduct. As a result, the MAG ordered the case to be closed, without opening a criminal investigation or ordering further action against those involved in the incident."[655]

385.   While the commission cannot completely exclude the possibility that misfired shells by a Palestinian armed group may have resulted in injury to civilians, it has not received or found any information to support that version of events. Witness interviews and statements by the MAG, appear rather to confirm that it was the two rounds of mortar shells fired by

---

[652]   PCHR submission including pictures of weapons remnants;; see also figures from the Palestine Red Crescent Society which reported more than 250 people injured; 30-35 patients came to Al Quds Hospital, mostly with amputations and 4 of these people died. Quoted by: Physicians for Human Rights. Gaza 2014. Findings of an independent medical fact-finding mission. At https://gazahealthattack.files.wordpress.com/2015/01/gazareport_eng.pdf, p. 47 f
[653]   Ezzat al-Risheq, member of Hamas politburo: Zionist artillery shelling of people in Shuja'iya market. 30 July 2014. At: https://www.facebook.com/Izzat.risheq/posts/820890401262272
[654]   Al-Jazeera: *Mass casualties as Gaza market area bombed*. 30 July 2014. At: http://www.aljazeera.com/news/middleeast/2014/07/gaza-market-bombed-during-israel-army-pause-201473015342692600.html
[655]   IDF MAG Corps Website: Decisions of the IDF Military Advocate General regarding Exceptional Incidents during Operation 'Protective Edge' – Update No. 3; 03 March 2015; at: http://www.law.idf.il/163-7183-en/Patzar.aspx

100

ATL005013

the IDF that resulted in death and injury to civilians in the Shuja'iya market area. The commission takes note of the IDF's assertion that it did not have real-time surveillance and that it did not have aerial weapons platforms available. However, while the commission does not have inside knowledge of the workings of the IDF, it finds it difficult to believe that the IDF, with the substantial amount of aerial means available to it and the relatively small area of Gaza to cover, would leave troops coming under constant fire without any aerial surveillance for over 50 minutes.  In addition, owing to the proximity of several air bases, located merely a few minutes from Gaza, the commission also finds it difficult to understand why aerial platforms with more accurate and precise weapons than mortars were not available. The commission finds it hard to believe that the IDF had no knowledge of the presence of ambulances in the area in the aftermath of the initial strike, especially when the rescue crews, a fire truck, and three ambulances arrived at the scene with sirens blazing loudly. The commission notes that usual military practice in such cases makes use of 'forward fire controllers' who observe the target to direct artillery or air support. If this was the case in this incident, the commission cannot comprehend how the presence of many civilians and the arrival of rescue crews was not observed during an 18 minute period. Finally, the IDF assessment that the likelihood of hitting civilians was lower due to the fact that warnings had been issued two days earlier was plainly erroneous. On 20 July, 10 days earlier in the same neighbourhood, scores of civilians were killed by IDF shelling and bombing, despite warnings that had been issued in the previous days. The IDF and its commanders therefore must have been well aware that general warnings to evacuate were not automatically complied with and that civilians often refused to vacate their homes. Combined with the fact that this incident took place during a ceasefire, a reasonable military commander should have envisaged the likely presence of civilians in the area and should have carried out more extensive verifications before firing mortar shells with wide-area effects.

**Summary legal analysis**

386.   The attack raises a number of questions as to its conformity with the principles related to the conduct of hostilities.

387.   A number of elements of this incident indicate that the IDF did not respect the principle of precautions in attack. The fact that the IDF did not deploy real-time aerial surveillance for a period of over one hour points to a failure to do everything feasible to assess the presence of civilians and whether the attack could be expected to cause incidental "excessive" loss of civilian life. The decision by the IDF to use mortars, rather than availing themselves of more precise weapons, suggests that the IDF did not take all feasible precautions to choose means with a view to avoiding or at least minimizing civilian casualties. These decisions point to a failure by the IDF to take constant care to spare civilians, in violation of the customary international law principle as expressed in article 57 of Additional Protocol I.

388.   Mortars are considered à wide- area weapon which, if used in a built-up, densely populated area, are likely to strike military objectives and civilians without distinction – particularly given a scenario in which over 50 per cent of the 120 mm mortar shells fired are likely to fall between 136 and 300 metres from the intended target. Combined with the impact of the blast and fragmentation of the shell, this type of weapon is likely to injure or kill persons several hundred meters from the intended target. This appears to be confirmed by the video recording of the incident in which the different levels of sound from the blasts seem to indicate that the ten shells of the second round struck locations located quite far apart. The attack on the Shuja'iya market area therefore may have violated the prohibition

ATL005014

of indiscriminate attacks, contained in customary law as reflected in article 51(4) of
Additional Protocol I. Depending on the circumstances, this conduct may qualify as direct
attacks against civilians[656] and constitute a war crime.

### e.    Patterns and legal analysis

389.    Based on the above and on the review of submissions and publicly available
information, the commission identified certain patterns with respect to the IDF's operations
in Gaza in summer 2014. These are analysed against applicable international law.

**Protection of civilians, force protection and the Hannibal directive**

390.    *"[I]n operation Cast Lead, the commanders learned they can't risk the lives of their
subordinates just so New York Times reports will write a good word about them. We have
to make a huge effort to protect civilian life, this is a consensus. But where does it stop? I
say, if you warned the civilians that you are about to act, and many left and some stayed –
you have grounds to assume that they stayed because they wanted to. Because they want to
aid the terrorists by surrounding them with civilians. It is unacceptable to send soldiers
inside, to separate civilians from terrorists, to risk the lives of your soldiers in order to save
civilians; you have already made efforts to save them."[657]* Asa Kasher, one of the drafters
of the IDF Code of Ethics

391.    *"The idea was to minimize casualties on our side, and use as much of our arsenal as
was needed to eliminate any chance of there being someone inside."* IDF soldier testimony
gathered by Breaking the Silence[658]

392.    An examination of the IDF's operations in Shuja'iya, Rafah and events near the
Shuja'iya market on 30 July indicates that the protection of IDF soldiers was a major
consideration for the IDF, overruling and, at times eliminating, any concern for the impact
of its conduct on civilians. The examination of these ground operations leaves the
commission with the distinct impression that when soldiers' lives were at stake or there was
a risk of capture, the IDF disregarded basic principles on the conduct of hostilities, namely
the principles of distinction, proportionality and precautions.

393.    While international humanitarian law does not spell out whether the safety of the
attacking force is an element to be considered in the evaluation of military advantage when
assessing proportionality, and the weight to be given it when determining the precautions to
be taken in attack[659], the ICRC notes that under international humanitarian law members of
the armed forces "have the right to directly participate in hostilities, the corollary of which
is that they may also be lawfully attacked by the adversary."[660] Therefore it is inherent in

---

[656]    International Criminal Tribunal for the former Yugoslavia, *Prosecutor v.Galic,* case No. IT-98-29-T,
Judgement, 5 December 2003, para. 57.

[657]    Assa Kasher. Bayabasha, Ground Forces Magazine. Tomer Meir: *20 years IDF ethical code – two of
the members of the drafting committee discuss the codes relevance today;* Issue 28; January 2015,
page 44 at http://mazi.idf.il/6216-he/IGF.aspx

[658]    Breaking the Silence. This is how we fought in Gaza; testimony 5, p. 31, at:
http://www.breakingthesilence.org.il/testimonies/database/?tzuk=1

[659]    ICTY, *Final Report to the Prosecutor by the Committee Established to Review the NATO Bombing
Campaign Against the Federal Republic of Yugoslavia*, 2000, available at
http://www.icty.org/sid/10052#IIIwork :
"The questions which remain unresolved once one decides to apply the principle of proportionality
include the following: [….] d) To what extent is a military commander obligated to expose his own
forces to danger in order to limit civilian casualties or damage to civilian objects?"

[660]    ICRC, *International Humanitarian Law and the Challenges of Contemporary Armed Conflicts*, 28th
International Conference of the Red Cross and Red Crescent, 2003, p. 13

ATL005015

any armed conflict that members of armed forces are put in danger. The law of armed conflict regulates the conduct of parties to hostilities in particular by prohibiting the targeting of civilians and by limiting the amount of harm to which they are incidentally exposed when a military objective is attacked. While military considerations are legitimately taken into account, international humanitarian law provisions "clearly emphasize the protection of civilians and civilian objects."[661]

394.   The Humanitarian Policy and Conflict Research Project (HPCR) Manual on International Law Applicable to Air and Missile Warfare states that "the factoring in of such military considerations [the survival of military aircraft and their crews] may not result in a neglect of humanitarian obligations under the law of international armed conflict. This means that, whereas a particular course of action may be considered non-feasible due to military considerations (such as excessive risks to aircraft and their crews), some risks have to be accepted in light of humanitarian considerations."[662] The commission therefore affirms that military considerations, such as the safety of forces, including from capture, should not be an overriding factor for a reasonable commander weighing the proportionality of an attack. The protection of civilians must continually be taken into account and armed forces of parties to a conflict must accept some level of risk to their own fighters for that purpose.

395.   The commission notes with concern the appearance of new terminology in the debate relating to respect of international law during the latest hostilities. The term "enemy civilian" has been used by Asa Kasher, the drafter of the IDF Code of Ethics.[663] The commission believes that it is important to clarify that the concept of "enemy civilians" does not exist in international law. One of the most elementary principles of international humanitarian law is the obligation to distinguish between combatants and civilians; however it never establishes different categories of civilians. The commission reiterates that a civilian is a civilian regardless of nationality, race or the place where he or she lives.

**Warning and the continued protected status of civilians**

396.   As described above, prior to most attacks, the IDF sought to warn the population in advance by means of leaflets,[664] loudspeaker announcements, telephone and text messages and radio broadcasts, which led to the successful evacuation of some areas.[665] Several witnesses interviewed by the commission said that they had received warnings in the form of recorded telephone messages, text messages or through leaflets.

397.   While these general warnings appear to have saved the lives of many people who heeded them, in other cases, inhabitants did not leave home for a number of reasons. Thus,

---

[661]   *Ibid*

[662]   Commentary to Section A, Para. 1 (q); available at http://www.ihlresearch.org/amw/manual/

[663]   "I have argued at greater length elsewhere, no state has or should shoulder as much responsibility for the safety of enemy civilians as it does for its own people". Assa Kasher. The Ethics of Protective Edge, Jewish Review of Books, Fall 2014. Available at http://jewishreviewofbooks.com/articles/1104/the-ethics-of-protective-edge/

[664]   See IDF blog IDF Drops Warning Leaflets in Gaza. 17 July 2014 with texts at: http://www.idfblog.com/blog/2014/07/17/idf-drops-warning-leaflets-gaza/ . See also OCHA Gaza Emergency Situation Reports of late July 2014.

[665]   For a detailed discussion see also: Israel, Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*; p. 30-37; at: http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx. Accessed 30 May 2015.

ATL005016

OCHA reported on 20 July that the majority of the 92 000 inhabitants of Shuja'iya, a very densely populated neighbourhood of Gaza city, had remained in their homes[666].

398.   Based on the testimonies the commission has received, the following reasons were identified for residents' failure to leave:

- The fact that people were not sure in which direction to move as shelling and air strikes were taking place in many parts of Gaza. Some of the commission's witnesses who chose to remain despite warnings explained that they had decided to stay in their homes because they felt that they had nowhere else to go and crossings into Israel and Egypt were blocked. Others believed that certain areas would not be targeted as they were calm without military activity. One witness interviewed by the commission found the warnings in the media "confusing" and referred to them as "rumours".

- As the violence intensified, a sense of 'no safe place' spread, a factor repeatedly mentioned by witnesses interviewed by the commission and noted by the United Nations Office for the Coordination of Humanitarian Affairs (OCHA)[667] and NGOs[668]. The commission was also told by a number of inhabitants that they had decided to move to relatives' houses inside the same neighbourhood. Also, several of the families whose cases were examined by the commission and others[669] had moved in and out of several places which, they thought, would be safer, over the days and weeks prior to when they were attacked.

- Since most of the general warnings did not provide concrete timeframes and the conditions in shelters were poor, several inhabitants returned home to collect items they and their families needed.

399.   Against the backdrop of a densely populated small area such as Gaza, from which no exit or fleeing is possible, 44 per cent of which is either a no-go area or has been the object of evacuation warnings,[670] with, at times, 28 per cent of the population displaced,[671] and with severe constraints on humanitarian assistance, warnings cannot be expected to "empty" entire areas. Furthermore, the generalized and often unspecific warnings sometimes resulted in panic and mass displacement, further exacerbating the situation.[672]

400.   The commission notes that official Israeli sources indicated that "[a]lthough Hamas authorities actively encouraged civilians to ignore the IDF's warnings and refrain from evacuating, the IDF did not regard civilians who heeded such advice as voluntary human shields and thus legitimate targets for attack. Nor did the IDF discount such civilians for

---

[666]   OCHA Gaza Emergency Situation Report. 20 July 2014, p.2

[667]   OCHA, Gaza Initial Rapid Assessment, 9 September 2014, available at: http://www.ochaopt.org/documents/gaza_mira_report_9september.pdf , p. 7

[668]   "As a result, there was no guaranteed safe space in the Gaza Strip, nor were there any safe escape routes from it." Physicians for Human Rights. Gaza 2014. Findings of an independent medical fact-finding mission. At https://gazahealthattack.files.wordpress.com/2015/01/gazareport_eng.pdf, p. 38

[669]   See e.g. Kilani in the chapter on attacks on houses, where the family had moved from house to house. B'Tselem. Black Flag. January 2015, p. 55 and individual testimonies.

[670]   OCHA Gaza Emergency Situation report of 22 July. "Since the launch of the [Israeli ground offensive] over 120,000 have fled their homes and a three kilometre-wide strip, encompassing 44 per cent of Gaza's territory, has been declared by the Israeli military a 'buffer zone'.", p. 1; at: http://www.ochaopt.org/documents/ocha_opt_sitrep_23_07_2014.pdf

[671]   OCHA, Gaza Initial Rapid Assessment, 9 September 2014, available at: http://www.ochaopt.org/documents/gaza_mira_report_9september.pdf , p. 3

[672]   See e.g. B'Tselem: Black Flag. January 2015; p. 56 at: http://www.btselem.org/download/201501_black_flag_eng.pdf

ATL005017

purposes of its proportionality analyses."[673] However, several IDF statements and declarations describing their military objectives and tactics provide a strong indication that civilians remaining in the areas that had been "warned" were understood as having chosen to stay and could be regarded as legitimate targets. For instance, Major Amitai Karanik, Head of the Doctrine Desk at the Infantry Corps HQ acknowledged "We try to create a situation whereby the area where we are fighting is sterile, so any person seen there is suspected of engaging in terrorist activity. At the same time, we make the utmost effort to remove the population, whether this means dropping flyers or shelling."[674]

401.   The picture of "sterile" zones painted by the IDF appears to have had implications for the way in which IDF soldiers on the ground approached civilians who remained when they encountered them in Shuja'iya and Khuza'a.  For example, the commission received reports of IDF soldiers asking civilians why they were still in these locations in spite of the warnings.[675]  Such statements are reported to have led to the assumption by some IDF soldiers that the usual proportionality and distinction rules may have changed. Breaking the Silence, on the basis of multiple testimonies by soldiers, concluded: "The soldiers were briefed by their commanders to fire at every person they identified in a combat zone, since the working assumption was that every person in the field was an enemy. […] While official military orders allow for fire only after identifying a weapon, intent, and the enemy's realistic capability, many soldiers testified that they were told to shoot at any threat, imminent or suspected."[676]

402.   The customary rule of international humanitarian law reflected in article 57(3) of Additional Protocol I,[677] provides that "effective advance warning shall be given of attacks which may affect the civilian population, unless circumstances do not permit." While the obligation to provide warnings is not absolute (for example, if the element of surprise or the speed of response are essential in the attack), any warning issued must be effective. While international humanitarian law does not specify what elements are required for a warning to be considered effective, the commission considers that two of the main considerations are: (1) that the warning is crafted in a way that will be understood by those to whom it is addressed; and (2) that what the warning requires can realistically be complied with.

403.   In addition, the specific circumstances in which the civilian population found itself have to be taken into consideration, in particular the lack of any area that was considered safe by the population. All areas in Gaza, including those towards which the population was directed, had been or were likely to be hit by air strikes. In addition, the leaflets instructed the 92 000 strong population of Shuja'iya to move to neighbourhoods in central Gaza, which were already densely populated, for an undetermined period of time -- uncertainty which further complicated the possibility of following such instructions. Based on extensive knowledge of Gaza and its society, as well as on the experience of previous hostilities, the IDF should have been well aware of the limitations of the warnings issued. The general warnings that instructed people from entire neighbourhoods to evacuate to other parts of Gaza do appear to have saved many lives, which the commission acknowledges.  However, given the fact that in Gaza no area was considered safe, these

[673] Israel, Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*; p. 13, at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf, accessed 30 May 2015.

[674] Head of the Doctrine Desk at the Infantry Corps HQ, Major Amitai Karanik in BaYabasha, Ground Forces Journal; October 2014; No. 29, p. 62. *Unofficial translation*

[675] See e.g. W268

[676] Breaking the Silence. This is how we fought in Gaza; p. 18; at: http://www.breakingthesilence.org.il/testimonies/database/?tzuk=1

[677] ICRC, *Database Customary International Humanitarian Law*, Rule 20

general warnings to evacuate entire neighbourhoods did not respect the requirement of effectiveness in all cases.

404.    The issuing of warnings is only one of the precautionary measures described in article 57 of Additional Protocol I. Regardless of their effectiveness, the fact that warnings were actually issued does not dispense the attacking party from observing the other specific precautionary measures mentioned in article 57. The general obligation to take constant care to spare the civilian population and objects remains valid throughout the attack even if specific precautionary measures such as warnings have been implemented. Article 57(5) clearly establishes that the adoption of precautions does not modify the prohibition against attacking civilians and civilian objects. The issuing of warnings does not signify that the subsequent attack will be lawful. The stated effort to create a 'sterile combat zone' and to consider everyone in an area that has been the object of a warning as engaging in 'terrorist activity', could be construed as an attempt to use warnings to justify attacks against individual civilians. The commission wishes to emphasize that the only way in which a civilian loses his protection from attack is by directly participating in the hostilities.[678] Failure to leave an area following a warning can in no way be viewed as directly participating in the hostilities. To infer automatically from the fact that a general warning to evacuate has been issued for a given area, that anyone found inside the zone is an enemy or a person engaging in 'terrorist activity', or issuing instructions to this effect, contributes to creating an environment conducive to attacks against civilians.

405.    The commission notes the allegations that Palestinian armed groups may have told inhabitants to stay in their homes and disregard the warnings issued by the IDF[679] and addresses this issue in section V.A.5.

**Use of artillery and other explosive weapons in built up areas**

406.    *"In the first three weeks of the conquest of Iraq, in 2003, the U.S. armed forces captured cities and destroyed 1,600 armored vehicles of the Iraqi army, half of them tanks. In Gaza, the IDF fought against an enemy that had no armored vehicles, and Israeli soldiers probably saw no more than a few hundred armed Hamas militants. On average, an Israeli tank fired seven times as many shells a day as an American tank in Iraq. We fired more antitank missiles from the ground than the Americans, and twice as many Hellfire rockets from helicopters."* Ofer Shelah, Member of the Knesset Foreign Affairs and Defense Committee[680]

407.    *"The whole area gets blown up - gets hit with heavy barrage."* IDF soldier testimony collected by Breaking the Silence[681]

408.    As illustrated above, the IDF's ground operation was marked by significant use of explosive weapons with wide-area effects in densely populated areas, including the use of artillery and tank shells, mortars and air dropped high explosive munitions. The IDF

---

[678] Article 51(3) Additional Protocol I

[679] Israel, Ministry of Foreign Affairs, *Hamas' Violations of the Law,*
http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 19 May 2015.

[680] Quoted in Haaretz, 24 April 2015: This lawmaker won't let the Gaza War be pushed under the rug.

[681] Breaking the Silence. This is how we fought in Gaza; testimony 47, p. 116; see also p. 33 and 48, 49 where the same process is described; at:
http://www.breakingthesilence.org.il/testimonies/database/?tzuk=1

ATL005019

reported that during the operation, 5000 tons of munitions were supplied.[682] During Operation "Protective Edge," 14 500 tank shells and approximately 35 000 artillery shells were fired.[683] Haaretz quoted IDF information indicating that, before the end of July, after three weeks of fighting, 30 000 shells had been discharged, "four times as much as in Cast Lead in 2008".[684] The NGO "Action on Armed violence" (AOAV) observes that, while in Operation Cast Lead in 2008 3000 high-explosive artillery shells were fired, in 2014 there were 19 000, a 533% increase. Based on figures suggesting that over the course of 2014's fifty-day operation, a daily average of 680 artillery shells were fired in Gaza by the IDF (compared to 348 per day in the 2008-09 operation), AOAV questions whether the IDF policies regulating the use of artillery in densely populated areas may be too flexible and allow too much leeway to commanders on the ground.[685] The commission notes official Israeli statements indicating that artillery was used in urban areas only on an exceptional basis when neighbourhoods were known to be largely evacuated and followed stringent protocols.[686] Even with these strict conditions, the use of artillery with wide-area effects in densely populated areas resulted in a large number of civilian casualties and widespread destruction of civilian objects. The commission is therefore of the view that the use of such artillery is not appropriate in densely populated areas regardless of the legality of resorting to such weapons.

409.    The explosive power of these weapons and the amount of ordnance used is not the only cause of concern. The fact that indirect-fire systems such as 155mm artillery or mortars are considered 'statistical weapons' demonstrate that the wide area dispersal of their shells is an expected outcome, as this is how these weapons were designed to work.[687] Based on research into the use of weapons in Operation "Protective Edge", AOAV concludes: "The Doher [self-propelled artillery that fires the 155mm shells] is clearly a powerful and destructive weapon system. It is capable of firing large numbers of heavy, high explosive artillery shells across great distances in a short space of time. It is not, however, capable of firing these munitions in a precise manner. As such, AOAV believes that such weapon systems should not be used by the IDF in attacks against residential neighbourhoods or near to other populated areas." [688]

410.    Mortars are also considered as an area weapon which, if used in a built up, densely populated area, are likely to strike military objectives and civilians without distinction. When fired without forward observers (artillery observer or mortar fire controller guiding

---

[682]  IDF Website. Omer Shalit, Technological and Logistics Directorate: faster and more efficient: this is how munition is supplied to the fighting forces; 13/08/2014; at: http://www.idf.il/1133-21100-HE/IDFGDover.aspx

[683]  Bayabasha, IDF Ground Forces Magazine: 16 Facts on Operation cast led; Issue 29; October 2014 , page 47 at: http://mazi.idf.il/6216-he/IGF.aspx ;

[684]  Haaretz: Amos Harel and Gili Cohen: *Massive artillery shelling may have caused numerous civilian fatalities in Gaza.* 15 August 2014.

[685]  Action on Armed Violence: Under fire Israel's artillery policies scrutinised. December 2014, p. 14; At: https://aoav.org.uk/wp-content/uploads/2015/03/AOAV-Under-Fire-Israels-artillery-policies-scrutinised.pdf

[686]  Israel, Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*; p. 49, at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf, accessed 30 May 2015. See also following paragraph regarding MAG investigations;

[687]  Action on Armed Violence: Under fire Israel's artillery policies scrutinised. December 2014, p. 11; At: https://aoav.org.uk/wp-content/uploads/2015/03/AOAV-Under-Fire-Israels-artillery-policies-scrutinised.pdf

[688]  Action on Armed Violence: Under fire Israel's artillery policies scrutinised. December 2014, p. 12; At: https://aoav.org.uk/wp-content/uploads/2015/03/AOAV-Under-Fire-Israels-artillery-policies-scrutinised.pdf

the aim of these weapons), over 50% of the 120 mm mortar shells fired are likely to fall between 136 and 300 meters from the intended target. When a forward observer is used, a number of shells are nonetheless likely to fall at a certain distance from the intended target (up to several hundred meters away) due to the ranging process. Combined with the impact of the blast and fragmentation effects, this type of weapon may injure or kill persons several hundred meters from the object of the attack.

411.    With respect to the use of mortars, the commission notes that the MAG had already in 2010 recommended the formulation of more stringent definitions in military orders to govern the use of mortars in populated areas and in close proximity to sensitive facilities when examining an incident in which 120mm were used and caused casualties amongst civilians taking refuge inside an UNRWA school. According to an Israeli report, the IDF Chief of General Staff had already in 2010 ordered work to be undertaken on this issue.[689] The commission does not know whether this work was completed, but notes the similarities between the 2009 case, following which the review of definitions was ordered by the IDF, and the 2014 attack during which the Shuja`iya market neighbourhood was hit by approximately ten 120 mm mortar shells resulting in the death of 31 persons, the vast majority of them civilians. This indicates that, despite the MAG's 2009-2010 call for more stringent rules, the practice of using mortars in densely populated areas appears to be the same 5 years later.

412.    Another concern in this context is the safety distance for firing artillery near residential houses. According to Human Rights Watch, the "lethal radius for a 155mm high explosive projectile […] is reportedly between 50 and 150 meters and the expected casualty radius is between 100 and 300 meters [and] the error radius for a 155mm shell is usually 25 meters."[690] While the IDF has not so specified, its current rules appear to permit using 155mm artillery against targets located 100 metres from civilian homes (while the safety margin is 250 metres from IDF forces), as pointed out by a group of NGOs in 2006.[691] The commission notes that, according to official sources, "the IDF directives applicable to the

---

[689]    State of Israel Ministry of Foreign Affairs, *Gaza Operation Investigations: Second Update,* July 2010, para. 66. Available at:
http://www.mfa.gov.il/MFA_Graphics/MFA%20Gallery/Documents/GazaUpdateJuly2010.pdf

[690]    Stop Shelling Crowded Gaza City. Effect of 155mm Artillery Indiscriminate in Populated Areas. 16 January 2009. At: http://www.hrw.org/news/2009/01/16/israel-stop-shelling-crowded-gaza-city

[691]    On 8 November 2006, six Israeli and Palestinian human rights organizations (Physicians for Human Rights - Israel, Al Mezan Center Human Rights in Gaza, B'Tselem, The Gaza Community Mental Health Program, The Association for Civil Rights in Israel, and the Public Committee against Torture in Israel) appealed to the High Court of Justice to request that it issue a ruling regarding the decision to reduce the 'security zone' "for shells fired into the Gaza Strip. The army has made no attempt to deny the fact that a decision was taken to reduce the minimal space allowed between a civilian population and the area from which the army fires shells from 300 meters to only 100 meters. See: "B'Tselem calls for criminal investigation, on suspicion of war crimes, in the killings in Beit Hanun", 9 November 2006; at: http://www.btselem.org/press_releases/20061109; The High Court of Justice rejected the petition i.a. because the State announced "suspension of its use of the challenged method. Moreover, the State claimed that should the decision be taken to return to the use of this method there will be discussion over the relevant restrictions and regulations for its implementation. Therefore, the petition became moot and the Court decided it should not address it. Should the IDF decide to return to the use of firing artillery shells in and around Gaza, the petitioner could then ask for the HCJ to revisit this issue." Terrorism and Democracy, Issue No. 26, High Court of Justice Rejects Petition Related to IDF Use of Artillery Shells in Gaza. [HCJ 3261/06] January 31, 2011; available at: http://en.idi.org.il/analysis/terrorism-and-democracy/issue-no-26/high-court-of-justice-rejects-petition-related-to-idf-use-of-artillery-shells-in-gaza/ ; see also: Action on Armed Violence: Under fire Israel's artillery policies scrutinised. December 2014, p. 16; At: https://aoav.org.uk/wp-content/uploads/2015/03/AOAV-Under-Fire-Israels-artillery-policies-scrutinised.pdf

ATL005021

2014 Gaza Conflict set stringent restrictions on the use of HE [high explosives] artillery shells — restrictions that went above and beyond the IDF's obligations under the Law of Armed Conflict and which were imposed as a matter of policy. These directives generally prohibited the firing of HE shells into populated areas and required the observance of specified "safety margins," i.e. set distances from civilians. The current distances set forth for HE artillery were updated as part of the "lessons-learned" process the IDF conducted following the 2008-2009 Gaza Conflict. The IDF determined these distances on the basis of research conducted by technical experts, focusing on the accuracy of each artillery calibre and its dispersal range."[692] However, the fact that the shelling during Operation Protective Edge led to many deaths and injuries shows that the safety distance for artillery was insufficient to ensure the protection of civilians.

413    The concerns linked to the use of artillery in densely populated areas appear to be shared by some in the Israeli defence establishment. According to media reports the former Chief Legal Adviser to the Israel Defence Ministry wrote in 2008, that "Artillery fire can only be directed to relatively open areas…Artillery fire toward urban spaces is problematic if the estimation is that the chances of a shell hitting a [rocket] launcher is relatively small while the danger of many civilians being hurt is real."[693]

414.    Finally, the commission observes that the way in which Operation "Protective Edge" was conducted was not modified after initial episodes where artillery shelling resulted in significant civilian casualties.[694] This seems to indicate that the manner of operating in the incidents reviewed in this section may be in accordance with the IDF's current policies governing the use of imprecise and/or inaccurate weapons in densely populated areas, including the safety distance requirement.

415.    Article 51(4) of Additional Protocol I, which reflects customary international law, defines indiscriminate attacks as: "(a) those which are not directed at a specific military objective; (b) those which employ a method or means of combat which cannot be directed at a specific military objective; or (c) those which employ a method or means of combat the effects of which cannot be limited as required by this Protocol; and consequently, in each such case, are of a nature to strike military objectives and civilians or civilian objects without distinction." The large impact area of some of the explosive weapons used by the IDF during the ground operations, including the large air dropped bombs and 155mm shells; the sheer volume of ordnance fired towards areas of Gaza; and the imprecise nature of artillery, including mortars; make it difficult for an attacking party using those methods and means in a densely populated and built up area to distinguish between civilians and civilian objects and the military objective of the attack, and thus to limit the attack's effects as required by international humanitarian law. Therefore, the use of weapons with wide-area effects by the IDF in the densely populated, built up areas of Gaza, and the significant likelihood of lethal indiscriminate effects resulting from such weapons, are highly likely to constitute a violation of the prohibition of indiscriminate attacks. Depending on the

---

[692]    Israel, Ministry of Foreign Affairs, *IDF Conduct of Operations during the 2014 Gaza Conflict*, p. 23at: http://mfa.gov.il/ProtectiveEdge/Documents/IDFConduct.pdf , accessed 30 May 2015.

[693]    Cited in Mitch Ginsburg, "*Israel's artillery corps torn between precision and power*," The Times of Israel, 12 October 2014

[694]    Decisions of the IDF Military Advocate General regarding Exceptional Incidents during Operation 'Protective Edge' – Update No. 3 of 22 March 2015. At: http://www.law.idf.il/163-7183-en/Patzar.aspx

ATL005022

circumstances, such use may qualify as a direct attack against civilians,[695] and may therefore amount to a war crime.[696]

**Destruction**

416.    The number and types of weapons used in Shuja'iya, Rafah and Khuza'a resulted in significant destruction in those areas where fighting took place, as described in the above sections. In addition, UNITAR-UNOSAT, on the basis of an analysis of satellite imagery, observed that some areas were virtually "razed": "Concentrations of damage in the Gaza Strip are found along the Green Line with Israel where building demolition was widely apparent in the analysed satellite imagery. Specifically, 74% of all damaged and destroyed buildings, as well as craters, identified by UNOSAT analysts were found within 3 km of the Green Line. Analysis indicates that multiple districts within this area, such as Shejaia and Beit Hanoun, were almost completely razed with the vast majority of structures completely demolished."[697] UNITAR-UNOSAT also compared the damage resulting from the escalations of 2009 and 2014, and found an increase of 273 per cent in destroyed and severely damaged structures[698] Parts of Khuza'a also appear to have been completely obliterated. Testimonies of IDF soldiers collected by an NGO illustrate the destruction:

*"I got the impression that every house we passed on our way [into the Gaza Strip] got hit by a shell – and houses farther away too. It was methodical."[699]    "The tanks are already positioned somewhere, and they are starting to pound away at anything you might need to walk across, or anything in which they think some [enemy] might be. Just blasting things away."[700]*

417.    Breaking the Silence concluded: "In practice, for many combat forces, the damage to Palestinian property was not a consideration when determining the scope and force of fire."[701]

418.    The IDF has argued that the high number of buildings destroyed in Operation "Protective Edge" resulted from the targeting of terrorist infrastructure and intense fighting on the ground. However, the evidence gathered by the commission, including the assessment of the episodes above, video and photo materials, observations by UNITAR-UNOSAT and anecdotal testimonies by IDF soldiers, indicate that the vast scale of destruction may have been adopted as tactics of war. While the protection of IDF soldiers and the destruction of tunnels may have played a legitimate role in this, nonetheless the concentration of the destruction in areas close to the Green Line (which, in some places,

---

[695] International Criminal Tribunal for the former Yugoslavia, *Prosecutor v.Galic,* case No. IT-98-29-T, Judgement, 5 December 2003, para. 57.

[696] Rome Statue, article 8

[697] UNITAR-UNOSAT: Impact of the 2014 Conflict in the Gaza Strip. UNOSAT Satellite Derived Geospatial Analysis; 2014; p. 8; at: https://unosat.web.cern.ch/unosat/unitar/publications/UNOSAT_GAZA_REPORT_OCT2014_WEB.pdf

[698] UNITAR-UNOSAT: Impact of the 2014 Conflict in the Gaza Strip. UNOSAT Satellite Derived Geospatial Analysis; 2014; p. 23; at: https://unosat.web.cern.ch/unosat/unitar/publications/UNOSAT_GAZA_REPORT_OCT2014_WEB.pdf

[699] Breaking the Silence. This is how we fought in Gaza; testimony 14, p. 47; at: http://www.breakingthesilence.org.il/testimonies/database/?tzuk=1

[700] Breaking the Silence. This is how we fought in Gaza; testimony 40, p. 105; at: http://www.breakingthesilence.org.il/testimonies/database/?tzuk=1

[701] Breaking the Silence. This is how we fought in Gaza; testimony 6, p. 19; at: http://www.breakingthesilence.org.il/testimonies/database/?tzuk=1

ATL005023

amounted to up to 100 per cent); and the systematic way in which it appears to have been implemented subsequently in Beit Hanoun on 18-19 July, Shuja'iya on 20 and 21 July, and Khuza'a between 20 July and 1 August suggest that the IDF followed a pre-calculated pattern of wide-spread razing of neighbourhoods in certain areas.

419.    Article 23 of the 1907 Hague Regulations[702] prohibits the destruction of property unless such destruction is required by imperative military necessity. A similar provision in Geneva Convention IV prohibits an occupying power from destroying private or public property.[703] The extensive destruction carried out by the IDF in Shuja'iya, Khuza'a and other localities situated in proximity to the Green Line, in particular the razing of entire areas of these localities by artillery fire, air strikes and bulldozers indicates that the IDF carried out destructions that may not have been strictly required by military necessity. Article 147 of the Geneva Convention IV qualifies the extensive destruction of property "not justified by military necessity and carried out unlawfully and wantonly" as a grave breach of the Geneva Conventions. The wholesale levelling of certain areas of Gaza by the IDF, should it qualify as "unlawful" and "wanton", may amount to a war crime.

**Targeting of civilians**

420.    The present chapter describes a number of cases in which civilians, who were clearly not participating in the hostilities, appear to have been attacked in the street. The commission examined two incidents, in which civilians, including children, allegedly carrying white flags were fired upon by soldiers in Khuza'a.  In one case, a large group of people attempting to leave the village while holding white flags was attacked in front of a clinic. In another case, a man inside a house who carried a white flag and had his other hand raised to demonstrate the absence of a weapon was shot and killed in front of a group of approximately 30 people who had sought shelter in that house, among them many women, children and elderly. In a third incident, in Shuja'iya, a wounded man, Salem Shamaly, lying on the ground was shot again two times and killed. In all of these cases, the persons or groups of people targeted, according to information gathered by the commission, were civilians who were not directly participating in the hostilities and did not represent any threat to the IDF soldiers present in the area. Directing attacks against civilians constitutes a violation of the principle of distinction and may amount to a war crime. These acts may also constitute wilful killings, defined in article 147 of Geneva Convention IV. These acts also likely amount to an arbitrary deprivation of life in violation of article 6 of the International Covenant on civil and Political Rights.

**4.    Incidents relating to shelters, the power plant and ambulances**

*a.    Shelters*

421.    Owing to the insecurity resulting from airstrikes and ground operations throughout the Gaza Strip and following IDF instructions to evacuate, about 300 000 people moved to 85 UNRWA schools serving as Designated Emergency Shelters (DES) during Operation Protective Edge. According to reports reviewed by the commission, shelters were attacked seven times. The commission examined three incidents: the Beit Hanoun Co-educational A and D School (Beit Hanoun School) and Jabalia Elementary Girls A and B School (Jabalia School), which were directly hit, while in the case of the Rafah Preparatory Boys A School (Rafah School), a target next to it was struck by a precision guided missile. All the incidents resulted in deaths in the shelters – in total between 44 and 47 people died,

---

[702]   Hague Regulations Respecting the Laws and Customs of War on Land, annexed to the Hague Convention IV of 1907.
[703]   Article 53, Geneva Convention IV of 1949.

including 14 children and 4 women. The number of people injured in these incidents has not been firmly established, but amounts to at least 200. The commission interviewed several eyewitnesses to the incidents and reviewed affidavits from witnesses, satellite imagery and photos of the sites. The commission also received submissions, including from UN agencies, and reviewed publicly available information, in particular the summary report issued by the Board of Inquiry established by the UN Secretary-General to look into the incidents that affected UN facilities, with which inquiry the Government of Israel cooperated[704].

422. The commission also received information about damage to other UNRWA schools. On 21 July at approximately 4.50 p.m., UNRWA's Preparatory Girls A/B School in Maghazi was hit by three shells, two of which exploded, injuring one person. Despite coordination with Israeli authorities, the school was struck again on 22 July at approximately 10.15 a.m.. The attacks seriously endangered the life of the UNRWA staff members who had returned to the premises to investigate. On 23 July 2014, Deir al Balah Preparatory Girls School C was hit by a projectile, injuring one person. On 29 July, the roof of the Zaitoun Preparatory Girls School B was struck by a projectile above the southern stairwell, injuring about ten people inside the school.

**UNRWA Beit Hanoun Elementary Co-educational A and D School**

423. *"It was the worst day in my entire life. I will never forget it...This was hell, not war... My young daughter did not deserve to die." Father of a one-year old girl who died as a result of the attack on the school*[705]

424. UNRWA Beit Hanoun Elementary Co-educational A and D School, known as the Western school in the main urban center of Beit Hanoun, was within the extended "no-go zone" created by Israel during Operation Protective Edge706. On 18 July, thousands of Beit Hanoun residents had fled their homes and by 22 July, 4208 of them had sought shelter in the school.707 In order to deliver humanitarian assistance in that area UNRWA needed special authorization from the IDF.[708] As access was not guaranteed, UNRWA was at times unable to provide residents with food, water and other supplies for several days at a time.[709] As a result, a large number of people left the school,[710] while others resorted to bringing food and water from their homes or buying it outside the school.[711] On 24 July, at the time of the attack, approximately 450 people were in the school.[712]

425. On 24 July 2014, between 2.48 and 2.55 p.m.,[713] several Israeli artillery shells hit UNRWA's Beit Hanoun school, killing between 12 and 14[714] people, including children and women. At least 93 people were wounded[715], of whom 55 were reportedly children and

---

[704] S/2015/286.
[705] W119.
[706] S/2015/286, para. 26.
[707] W246.
[708] W030, see also S/2015/286, para. 28.
[709] W246 and submission 5.11.
[710] Human Rights Watch, Israel: In-Depth Look at Gaza School Attacks, 11 September 2014. At: http://www.hrw.org/news/2014/09/11/israel-depth-look-gaza-school-attacks.
[711] S/2015/286, para 28.
[712] S/2015/286, para. 30. Human Rights Watch (HRW) reports between 300 and 700 people were sheltered. In: Israel: In-Depth Look at Gaza School Attacks. 11 September 2014. At http://www.hrw.org/news/2014/09/11/israel-depth-look-gaza-school-attacks.
[713] S/2015/286, para. 32.
[714] S/2015/286, para. 32.
[715] S/2015/286, para. 32.

ATL005025

31 women.[716] The UN Board of Inquiry reported that "at least two 120 MM high explosive (HE) mortar projectiles struck the school, one hitting the middle of the schoolyard and a second the steps in front of the school's entrance."[717] Witnesses said that while they were waiting for the buses in the courtyard there was a strike on the school itself. There was general panic after the first strike with people searching for their relatives in the courtyard.[718]

426.    UNRWA was in regular contact with Israeli authorities, namely the Israeli Coordination and Liaison Administration (CLA) and Israel's Coordinator of Government Activities in the Territories (COGAT), and had given them the school's coordinates on twelve occasions. On the morning prior to the attack, UNRWA reiterated that the school was being used as a Designated Emergency Shelter[719].

427.    Heavy fighting between the IDF and Palestinian armed groups was reported in Beit Hanoun in the days prior to 24 July, including daily shelling in the vicinity of the school.[720] On July 23, as the security situation deteriorated, the ICRC visited the school in an attempt to evacuate it, but only 50 residents agreed to leave.[721] That night the shelling was so intense that residents moved inside the building. Eyewitnesses told the commission that on the afternoon of July 24, representatives of the municipality[722] came to the school to coordinate the evacuation of residents after they persuaded them that the school was no longer safe. Families started gathering their belongings in the courtyard so as to be ready when the buses arrived.[723] The UN Board of Inquiry refers to a witness who indicated that that same morning, the CLA had called upon UNRWA to vacate the school because an attack was imminent.[724] Owing to the security situation, UNRWA had asked the IDF for a time slot during the day during which to conduct a safe evacuation.[725] The fact that the attack occurred before implementation of an evacuation agreement indicates that the advance warning communicated to UNWRA by the IDF was not effective.

428.    On 24 July, UNRWA received a call from an IDF commander who inquired whether anyone was present in the cluster of four other schools in Beit Hanoun, located about 800 m from the Beit Hanoun Elementary Co-educational A and D School. He indicated that a Hamas arsenal hidden under this cluster of schools was going to be targeted.[726] UNRWA responded that they would check to see if any residents or staff were at the other schools. As they coordinated this inspection, Beit Hanoun A and D School was suddenly attacked,[727] although UNRWA had reconfirmed at least twice with the IDF that the announcement

---

[716]  According to W246. Human Rights Watch reports 60 persons wounded. Israel: In-Depth Look at Gaza School Attacks. 11 September 2014. At:  http://www.hrw.org/news/2014/09/11/israel-depth-look-gaza-school-attacks

[717]  S/2015/286, para. 32. See also: Human Rights Watch, Israel: In-Depth Look at Gaza School Attacks, 11 September 2014. At:  http://www.hrw.org/news/2014/09/11/israel-depth-look-gaza-school-attacks.

[718]  W119, W095, W108. Similar scene described by HRW.

[719]  Statement by UNRWA Commissioner General Pierre Krähenbühl, 24 July 2014. At http://www.unrwa.org/newsroom/official-statements/statement-unrwa-commissioner-general-pierre-kr%C3%A4henb%C3%BChl.

[720]  S/2015/286, para. 27.

[721]  S/2015/286, para. 29.

[722]  W246; see also S/2015/286, para. 231

[723]  W030.

[724]  See also S/2015/286, para. 27.

[725]  W030.

[726]  S/2015/286, para. 31. Also W030.

[727]  W030.

ATL005026

about an imminent attack on schools in Beit Hanoun did not refer to the UNRWA Beit Hanoun Elementary Co-educational A and D School, which served as a shelter[728].

429.   The witnesses interviewed by the commission said that they were not aware of rockets being fired from the elementary school or of militants operating in the vicinity.[729] UNRWA reported that the school guards, who monitored movements inside and outside of the school gate, had seen no suspicious activity in the area. Witnesses further told the commission that they were not aware of any attempts by Hamas to prevent people from leaving the elementary school, contrary to allegations by the IDF.[730]

430.   The media reported that Israel initially alleged that the attacks had been caused by Hamas rockets misfiring.[731] However, all witnesses interviewed by the commission said that there were at least four successive strikes. Subsequently, an IDF spokesperson said that soldiers returned fire at locations from which Palestinian missiles had been fired at them. On the day of the attack, the IDF posted this comment on its blog:

*"In recent days, Hamas has fired rockets from an area of Beit Hanoun where an UNRWA shelter is located. Last night, the Israel Defence Forces told the Red Cross to evacuate civilians from UNRWA's shelter in Beit Hanoun between the hours of 10 a.m. and 2 p.m. today. UNRWA and the Red Cross received the message. Hamas prevented civilians from evacuating the area during the window that the IDF gave them. Today, July 24, Hamas continued firing from Beit Hanoun. The IDF responded by targeting the source of the fire".[732]*

431.   According to the UN Board of Inquiry, the Government of Israel has affirmed that the UNWRA school was not the object of the attack.[733] On 7 December, the MAG announced that it had ordered a criminal investigation into this incident.[734]

432.   Human Rights Watch reported that the Beit Hanoun secondary school for boys was used during the hostilities by the IDF for military purposes.[735]

### UNRWA Jabalia Elementary Girls A and B School

433.   *"There is nowhere to be safe in Gaza. We thought that the school would be a safe place for me and my family. This was not the case. There is no way for me to get justice, I lost my husband and now I am dependent on my parents' good will, who have limited*

---

[728] S/2015/286, para. 31.

[729] S/2015/286, para. 27.

[730] W030; see also: Human Rights Watch Israel: In-Depth Look at Gaza School Attacks, 11 September 2014. At  http://www.hrw.org/news/2014/09/11/israel-depth-look-gaza-school-attacks

[731] The Guardian, *Israeli strike on Gaza school kills 15 and leaves 200 wounded*, 27 July 2014. At http://www.theguardian.com/world/2014/jul/24/israeli-strike-un-school-gaza-kills-women-children see also , Buzz feed news, What Really Happened When An Explosion Hit A U.N. School In Gaza, 28 July 2014. At http://www.buzzfeed.com/sheerafrenkel/what-really-happened-when-an-explosion-hit-a-un-school-in-ga#1mqx2qn. See also Human Rights Watch, Israel: In-Depth Look at Gaza School Attacks, 11 September 2014. At:  http://www.hrw.org/news/2014/09/11/israel-depth-look-gaza-school-attacks

[732] Israel Defence Forces, Hamas Fires from Populated Area, Prevents Civilian Evacuation, 24 July 2014. At http://www.idfblog.com/blog/2014/07/24/hamas/

[733] 32 S/2015/286, para. 33.

[734] Decisions of the IDF Military Advocate General regarding Exceptional Incidents that Occurred during Operation 'Protective Edge' – Update No. 2. 7 December 2014. At http://www.law.idf.il/163-6958-en/Patzar.aspx.

[735] Human Rights Watch, Israel, In-Depth Look at Gaza School Attacks, 11 September 2014. At: http://www.hrw.org/news/2014/09/11/israel-depth-look-gaza-school-attacks.

ATL005027

*means."* Woman at Jabalia School who lost her husband and whose children were injured.[736]

434.   UNRWA's Jabalia Elementary Girls A and B School, also known as the Abu Hussain School for girls, is located in the centre of Jabalia Refugee Camp. When it opened as a Designated Emergency Shelter (DES) on 16 July 2014, it was included in notifications to the Israeli CLA and COGAT. Prior to 30 July, Israeli agencies were notified 28 times in 14 days about the site's use as an UNRWA shelter, the last time on 29 July at 8.48 p.m.[737] UNRWA reported receiving confirmation of the CLA's receipt of several of the notifications. In addition, UNWRA was in contact with the Israeli agencies by email and telephone.[738] On 30 July at 4.45 a.m., according to the UN Board of Inquiry, "the school was hit by a barrage of four 155 MM high explosive (HE) projectiles, an artillery indirect fire weapon."[739]   Between 17 and 18 people were killed;[740] 17 of these were internally displaced persons registered with the DES. Amongst those killed were 3 children. One of the victims was an UNRWA staff member. The UN Board of Inquiry stated that at least 99 people were injured and that the school was significantly damaged.[741]

435.   At the time of the attack, the school sheltered about 3000 people from northern Gaza who had fled their homes following the shelling in their neighbourhoods and/or as a result of leaflets dropped by the IDF instructing residents to leave the area.[742] As a result, the Jabalia School was overcrowded with an estimated 50 families staying in each classroom.[743]

436.   At least one projectile landed outside the school premises, followed by several explosive projectiles which landed inside the school (with at least three direct impacts) and damaged several parts of the building.[744] This was confirmed by eyewitnesses interviewed by the commission who were taking shelter inside the School.[745] Submissions, including pictures and videos and publicly available material, reinforce these findings.[746]

437.   The commission was told that the area had been bombarded because on the days prior to the incident, the eastern part of the Jabalia camp had been the scene of armed

---

[736]   W058.
[737]   Statement by UNRWA Commissioner-General Pierre Krähenbühl, 30 July 2014. At http://www.unrwa.org/newsroom/official-statements/unrwa-strongly-condemns-israeli-shelling-its-school-gaza-serious.
[738]   Statement by UNRWA Commissioner-General Pierre Krähenbühl, 30 July 2014. At http://www.unrwa.org/newsroom/official-statements/unrwa-strongly-condemns-israeli-shelling-its-school-gaza-serious.
[739]   S/2015/286, para. 40.
[740]   Note that the UN Board of Inquiry reports 17 or 18 fatalities. S/2015/286, para. 40. Accounts on the exact number of victims and injured vary.
[741]   S/2015/286, para. 40.
[742]   S/2015/286, para. 37.
[743]   W054, W055, W056, W057, W058. See also submission 5.5 and 36. Witnesses complained about poor hygienic conditions in the school, lack of access to medical care (particularly pregnant women), lack of food, water and medicine.
[744]   S/2015/286, para 40.
[745]   W054, W055, W056, W057, W058.
[746]   Submission 49. See also Deadly Israeli shelling hits Gaza as peace talks continue, at http://www.dw.de/deadly-israeli-shelling-hits-gaza-as-peace-talks-continue/a-17821303. See also Temporary ceasefire allows UN to restock water, food, following another school attack, 4 August 2014. At http://www.un.org/apps/news/story.asp?NewsID=48405 and Photos: Israeli airstrike hits U.N. school. 31 July 2014. At http://america.aljazeera.com/multimedia/photo-gallery/2014/7/photos-israeli-airstrikehitsunschool.html

ATL005028

clashes between militants and the IDF.[747] The IDF had also shelled homes in the vicinity of the school in the weeks and days prior to the incident and, according to the IDF, Hamas had fired at Israeli armed forces from the vicinity of the school on 30 July.[748] However, the witnesses interviewed by the commission claimed that they had no knowledge about the activity or the presence of armed groups inside or in the vicinity of the school.[749] The UN Board of Inquiry was told that 29 July, the day prior to the incident, the vicinity of the school was calm.[750] On 31 July, an IDF spokeswoman was quoted in the media, asserting that "militants fired mortar shells at [Israeli] soldiers from the vicinity of the UNRWA school in Jabaliya."[751] According to witnesses, there was no advance warning of the strike.[752] This is consistent with the findings of the UN Board of Inquiry, which concluded that no warning had been given before the attack.[753]

438.    The MAG announced a criminal investigation into the incident, stating that "the factual findings collated by the FFA Mechanism and presented to the MAG, indicated the existence of grounds for a reasonable suspicion that the strike was not carried out in accordance with the rules and procedures applicable to IDF forces."[754]

**UNRWA Rafah Preparatory Boys A School**

439.    *"UNRWA is a safe place, that's why we sought shelter there…we were forced out from our homes... Enough bloodshed, why kill my children?"* Khalid Ali Ismail Abu Harba, who lost his 14 year-old son during the attack on Rafah School[755]

440.    On 3 August, between 10.40 and 10.45 a.m.[756], a precision-guided missile hit the street in front of the UNRWA Rafah Preparatory Boys A School in the densely populated centre of Rafah, killing 15 people,[757] of whom at least 7 were children, some as young as three years old. One of the people killed was an UNRWA guard.[758] At least 25 people were

[747] S/2015/286, para. 39.
[748] CNN transcripts of 30 July 2014; at
http://transcripts.cnn.com/TRANSCRIPTS/1407/30/sitroom.01.html
[749] W054, W058
[750] S/2015/286, para. 40.
[751] Al Jazeera, *Israeli fire kills nineteen in Gaza UN school*, 31 July 2014, at
http://www.aljazeera.com/news/middleeast/2014/07/gaza-un-school-hit-201473041918975321.html;
see also: IDF spokesperson speaking to the BBC: Gaza school: 'Israel does not target UN facilities'
says IDF. At  http://www.bbc.com/news/world-middle-east-28564500
[752] W055, W056
[753] S/2015/286, para. 40.
[754] Decisions of the IDF Military Advocate General regarding Exceptional Incidents that Occurred
during Operation 'Protective Edge' – Update No. 2, 12 July 2014, at http://www.mag.idf.il/261-6958-
en/Patzar.aspx.
[755] W121.
[756] S/2015/286, para. 43.
[757] S/2015/286,  para. 43.
[758] S/2015/286, para. 43. Al Mezan reported that 14 people were killed, 12 in the school and 2 on the
motorcycle, and that 25 people were injured. Meeting with Al Mezan on 9 February 2015. OHCHR
reports 12 killed, including 8 children. A/HRC/28/80/Add.1, however, at least two children
succumbed to their injuries after having been transferred to the hospital according to reports. See
submission 5.12.

116

ATL005029

injured.[759] Approximately 2700-2900 people displaced by the conflict were sheltering at the school at the time of the attack.[760]

441.   Rafah School was included in notifications to the CLA and COGAT from the time it opened as a shelter on 18 July 2014. In total, UNRWA provided at least 33 notifications to the relevant Israeli agencies listing the school in Rafah as a shelter over a 17-day span, with the last mention of its special status as an UNWRA shelter having been communicated on the morning of the incident.[761]

442.   The missile appears to have hit the ground 5 metres from the school gate. Eyewitnesses told the commission that children were outside the school, near the front gate, buying sweets from street vendors when there was an explosion on the pavement across the street, about 5 to 6 meters from the school gate.[762] One witness interviewed by the commission lost his son and his nephew, both aged 15, who were hit in the head by shrapnel and died soon after arriving at the hospital.[763] The two boys were selling food to the people sheltering in the school compound.[764] In addition, one of the witness's brothers, aged 30, suffered an injury to his neck from shrapnel and, as a result, is unable to speak, while his other brother, aged 38, was hit in the spine by shrapnel and is now paralyzed from the waist down.[765] Another witness who was inside the school grounds, a few meters away from the gate and suffered minor injuries, described how he saw children's bodies strewn about and torn into pieces.[766]

443.   In relation to Rafah School, the Government of Israel told the United Nations Board of Inquiry that "the IDF had fired an aerial-launched missile at the motorcycle, which had been carrying three militants from Palestinian Islamic Jihad. By the time it became apparent that the strike would coincide with the motorcycle passing by the school gate, it had no longer been possible to divert the missile."[767] The Israeli authorities announced that an examination has been undertaken at the request of the MAG.[768]

**Weapons stored at UNRWA schools**

444.   The UN Board of Inquiry reported that weaponry was stored in three UNRWA schools (Gaza Beach Elementary Co-educational "B" School, Jabalia Elementary "C" and Ayyobiya Boys School, and Nuseirat Preparatory Co-educational "B" School).[769] None of

---

[759]   S/2015/286, para. 43 and Human Rights Watch, Israel: In-Depth Look at Gaza School Attacks, 11 September 2014. At:
http://www.hrw.org/news/2014/09/11/israel-depth-look-gaza-school-attacks.

[760]   S/2015/286, para. 42.

[761]   Statement by UNRWA Commissioner, Pierre Krähnbühl, and Director of UNRWA operations in Gaza, Robert Turner. August 3 2014 at: http://www.unrwa.org/newsroom/official-statements/unrwa-condemns-israeli-strike-next-unrwa-school-killing-civilians

[762]   Human Rights Watch, Israel, In-Depth Look at Gaza School Attacks, 11 September 2014. At:
http://www.hrw.org/news/2014/09/11/israel-depth-look-gaza-school-attacks.

[763]   This appears to account for the disparities in numbers of fatalities reported.

[764]   Submission 5.12.

[765]   W121.

[766]   W103.

[767]   S/2015/286, para. 44; also, based on an inspection of the impact mark on the pavement, a hole in the concrete about 12 centimetres deep and 15 centimetres wide, Human Rights Watch concluded that the strike was most likely caused by a spike guided missile that produces fragments that reach up to 20 meters from impact. See: Israel: In-Depth Look at Gaza School Attacks. 11 September 2014. At http://www.hrw.org/news/2014/09/11/israel-depth-look-gaza-school-attacks

[768]   S/2015/286, para. 44.

[769]   S/2015/286, paras 49-82.

ATL005030

these schools was designated as a shelter at the time. The UN Secretary-General "was dismayed that Palestinian militant groups could put United Nations schools at risk by using them to hide their arms. [… ] The fact that they were used by those involved in the fighting to store their weaponry and, in two cases, probably to fire from is unacceptable."[770] The use of schools to store weapons is discussed in more detail in chapter V.A.5.

**Summary legal analysis**

445.   Imprecise weapons with a wide impact area were used in two incidents examined by the commission: 120 mm high explosive (HE) mortar projectiles in the case of the Beit Hanoun school and a barrage of four 155 mm high explosive (HE) projectiles in the Jabalia school case. The 2009 UN Board of Inquiry into similar incidents "found that, in firing 120 mm high explosive mortar rounds, the IDF had not maintained an adequate safety distance between whatever its target point might have been and the school," and that the "means of response to an identified source of mortar fire that would have carried the least risk to civilians and property, including the UNRWA school, would have been a precisely targeted missile strike."[771] In relation to the use of 155 mm, the 2009 Board concluded that, given all the circumstances, the firing by the IDF of artillery with high explosives and projectiles containing white phosphorous into, over or in such close proximity to UNRWA headquarters as to cause injuries to persons and very substantial damage to property was grossly negligent and amounted to recklessness."[772] While in 2014, there are no allegations that the IDF used white phosphorus, the same conclusions regarding the reckless use of artillery remain valid.

446.   The commission is thus of the view that, when choosing a weapon with a wide-area effects like artillery to strike a target located in a densely populated area – and adjacent to UNWRA schools being used as shelters – the IDF must have been aware that there was a strong likelihood that military objectives and civilian objects alike would be struck, raising serious concerns that the choice of means for the attack did not take into account the requirement to avoid, or at the very least minimize, incidental loss of civilian life. The commission notes that the rules on means and methods of attack do not proscribe the use of specific weapons like mortars or artillery per se, but they do impose the requirement that in choosing these means of waging an attack, the parties must consider the potential impact of such weapons on the safety of civilians. The decision by the IDF to use mortars in this incident, rather than availing themselves of more precise weapons, indicates that the IDF did not take all feasible precautions to choose means with a view to avoiding or minimizing civilian casualties.[773] The use of such weapons in the immediate vicinity of an UNRWA school sheltering civilians is highly likely to constitute an indiscriminate attack which, depending on the circumstances, may qualify as a direct attack against civilians,[774] and may therefore amount to a war crime[775].

447.   International humanitarian law contains an obligation to take all precautions that are feasible in order to limit the effects that an attack ultimately has on the civilian population. While considerations related to force protection might limit the extent of feasible precautions, such measures are still required. When taking precautionary measures, factors affecting incidental loss or damage must be taken into account, including the proximity to

---

[770]   S/2015/286 (Letter).
[771]   A/63/855–S/2009/250, paras 24 and 25.
[772]   A/63/855–S/2009/250, para 56.
[773]   Article 51(4) of Additional Protocol I, which reflects customary international law;
[774]   See also International Criminal Tribunal for the former Yugoslavia, *Prosecutor v.Galic*, case No. IT-98-29-T, Judgement, 5 December 2003, para. 57.
[775]   Rome Statue, article 8.

ATL005031

the target of protected objects. The principle of precaution further implies an obligation to learn from previous experiences. During Operation "Cast Lead" in 2008/2009, an attack on the vicinity of an UNRWA school in Jabalia led to the death of several civilians. In that context, the 2009 Board of Inquiry concluded that "the IDF did not make sufficient efforts or take adequate precautions to fulfil the responsibilities of the Government of Israel to protect United Nations personnel and civilians sheltering on United Nations premises and to protect United Nations premises and property."[776] Even though the attack against the UNRWA schools may not have been deliberate, the IDF is bound by the obligation of precautionary measures and verification of targets "to avoid attacks directed by negligence at civilians or civilian objects".[777]

448.    In terms of warnings, while the Israeli authorities was relying on the Coordination and Liaison Administration in order to facilitate communication between international organizations and the Israeli military, and while there seem to have been attempts to notify UNRWA about possible attacks in the case of Beit Hanoun, the incident suggests that communication between UNRWA and the IDF was not effective.[778] No warning appears to have been issued before the Jabalia incident. It therefore appears that the IDF may not have complied with its obligation to take all feasible precautions to avoid or at least to minimize incidental damage to civilian objects in the attacks on Beit Hanoun and Jabalia schools.

449.    As these attacks struck United Nations facilities, they also raise concern relating to the protection of United Nations premises from any form of interference under the 1946 Convention on the Privileges and Immunities of the United Nations. However, the commission will not examine this issue in detail as this body of law does not fall within the purview of its mandate.

### b.    *The Power Plant*

450.    The Gaza Strip has only one power plant that normally supplies about 30 per cent of the electricity in the strip, with the rest provided from Israel and Egypt. Under normal circumstances, the three sources cater to half of Gaza's overall electricity needs.[779]

451.    The power plant was the subject of several attacks in July 2014[780]:

| | |
|---|---|
| 23 July 11 a.m. | Two shells hit near the administration building, 1 shell struck the water treatment plant. |
| 24 July | The generator and the conference room were destroyed when shells hit the east side of the complex. |
| 28 July 7 p.m. | Shells struck close to the power station control room. |
| 29 July 3 a.m. | The power plant shut down when a section of the plant was completely destroyed. |

452.    As the result of shelling on 29 July 2014, one of the plant's fuel tanks exploded. The commission interviewed five witnesses to this attack and reviewed submissions and public reports. A witness explained to the commission that the civil defence force had not been

---

[776]  A/63/855–S/2009/250, para 27.
[777]  Sassòli and Quintin, 2014, op. cit., p. 88.
[778]  See also: S/2015/286.
[779]  OCHA: Gaza Crisis Appeal, 24 September 2014. At
       http://www.ochaopt.org/documents/gaza_crisis_appeal_9_september.pdf.
[780]  Human Rights Watch reports on a 5th attack. http://www.hrw.org/print/news/2014/08/10/gaza-
       widespread-impact-power-plant-attack.

ATL005032

able to stop the fire spreading so that it eventually destroyed almost an entire section of the plant and damaged other parts[781].

453.    In May 2015, official Israeli sources indicated that on 29 July, *"IDF tank shells unfortunately missed their intended target and hit fuel tanks serving Gaza's power plant (but not the power plant itself).  In this incident, IDF tank forces had legitimately directed an attack against several individuals who were believed to be carrying anti-tank rockets intended for immediate use."*[782] While the commission is unable to verify this account, it notes that the plant had been hit three times in the days prior to 29 July. On 9 July 2014, then Deputy Defence Minister Danny Danon called on his Government immediately to cut off fuel and electricity supplies to the Gaza Strip. He added that Israel needed to use all of the levers of pressure that it had at its disposal in order to coerce Hamas to accept a ceasefire.[783] This was also not the first time the power plant had been hit by the IDF (e.g. OCHA reported that six transformers of the power plant were destroyed in 2006 by an Israeli airstrike[784] and Israeli forces also hit the power plant during 2008/09's Operation "Cast Lead"[785]).

454.    Owing to the limited evidence available to the commission, it is unable to determine whether the power plant suffered incidental damage from an attack directed elsewhere, or whether it was the object of a deliberate attack. The commission notes that the electricity infrastructure servicing the civilian population constitutes a civilian object,[786] which is protected from attack unless it makes an effective contribution to military action, and its destruction offers a definite military advantage.[787] These objects are also protected by the customary law rule prohibiting parties to a conflict from attacking, destroying or rendering useless objects indispensable to the survival of the civilian population.[788] Deliberate targeting of such objects would be in violation of this prohibition.[789] The commission notes that the MAG referred the power plant incident of 29 July 2014 to the IDF's Fact-Finding Assessment Mission and its findings have been provided to the MAG. According to official

[781]  W068. See also: International Federation for Human Rights (FIDH): Trapped and Punished. The Gaza Civilian Population under Operation Protective Edge. March 2015 (from now on: FIDH report), page 50. At: https://www.fidh.org/IMG/pdf/report_gaza_fidh_march_2015.pdf;

[782]  Israel, Ministry of Foreign Affairs , *IDF Conduct During the 2014 Gaza Conflict*, p. 28. http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015

[783]  Jerusalem Post, *Deputy defence minister demands Israel cut off fuel, electricity supply to Gaza*, 9 July 2014. At http://www.jpost.com/breaking-news/deputy-defense-minister-demands-israel-cut-off-fuel-electricity-supply-to-gaza-362035; see also: Major-General Giora Eiland, the former head of Israel's National Security Council on 5 August 2014. At http://www.ynetnews.com/articles/0,7340,L-4554583,00.html

[784]  OCHA: The Humanitarian impact of Gaza's Electricity and Fuel Crisis, March 2012. At http://www.ochaopt.org/documents/ocha_opt_electricity_factsheet_march_2012_english.pdf.

[785]  B'Tselem, Operation Cast Lead, 1 January 2011 and 28 September 2014, at http://www.btselem.org/gaza_strip/castlead_operation; FIDH report, p. 50.

[786]  A list of categories of military objective proposed by the ICRC only included plants producing electricity mainly for military consumption. List cited in, ICTY, Final Report to the Prosecutor by the Committee Established to Review the NATO Bombing Campaign Against the Federal Republic of Yugoslavia, 2000, para. 39. Available at http://www.icty.org/sid/10052#IIIwork.

[787]  ICRC, *Database Customary International Humanitarian law*, rules 7 and 8. See also article 51(2) Additional Protocol I

[788]  ICRC, *Database Customary International Humanitarian law*, rule 54.

[789]  The prohibition contained in IHL treaty law (article 54(2) of Additional Protocol I, and article 14 of Additional Protocol II) requires that the attack be for the specific purpose of denying them their sustenance value. However, most State practice with regards to this rule does not seem to require this purpose. See: ICRC, *Customary International Humanitarian Law, Volume I: Rules*, p. 190.

ATL005033

Israeli sources, the "MAG's decision whether to order the opening of a criminal investigation into this incident is still pending."[790]

455.    If the strike against the power plant was accidental, as Israel claims, there remain nonetheless questions as to whether all appropriate precautions were taken by the IDF to avoid damage to a civilian object. The IDF's latest version of events concerning the 29 July incident says that it targeted several individuals alleged to be transporting weapons in the vicinity of the plant. If that is the case, the choice of means needs to be examined, namely whether tank shells were the most appropriate ammunition, and whether other types of ordnance, presenting fewer risks of incidental damage, could have been used instead. In addition, the fact that the power plant had been struck several times in the preceding days should have led the IDF to issue stringent orders to units operating near the power plant to exercise restraint, given the importance of the plant for the civilian population in Gaza. The IDF therefore appears not to have complied with its obligation to take all feasible precautions to avoid or at least to minimize incidental damage to civilian objects in the attack of 29 July that struck the power plant.

*c.    Ambulances*

456.    *"I hope you can help achieve justice for my colleague; I hope that you can persuade the Israelis to let us do our job without getting fired at." Ambulance driver[791]*

*"The International Committee of the Red Cross (ICRC) firmly condemns this extremely alarming series of attacks against humanitarian workers, ambulances, and hospitals. These are serious violations of the law of war. An immediate stop must be put to them."[792]*

457.    Three incidents that occurred during the ground operations in Shuja'iya, in Rafah and in Shuja'iya market are detailed above (see chapter V.A.3. on ground operations). According to witnesses, a military medical aid ambulance was directly hit twice while attempting to provide first aid to victims in Shuja'iya, resulting in two people being killed, one of them a rescue worker, and two injured. Ten days later, in Shuja'iya market, in a context of intense fire, a shell struck the ground close to three ambulances in the proximity of a house that had been attacked. As a result of the shelling, a paramedic and 22 other people were killed. In Rafah, on 1 August, eight people burned to death in an ambulance that was hit.

458.    In addition, the commission examined an incident that took place on 25 July, after 11 p.m., in Al Qarara village, Khan Younis. Two eyewitnesses and one witness told the commission that Mohammed Hassan Al Abadla an ambulance driver aged 26, came under fire while evacuating an injured person.[793] According to the witnesses, when the ambulance arrived at the location, the IDF instructed the crew to exit the vehicle and continue on foot. Mohammed Hassan Al Abadla and one of two volunteers got out of the ambulance and approached the patient with a flashlight on, as directed. They had walked about twelve metres when they came under fire and Mohammed Hassan Al Abadla was hit in the chest and thigh. Two ambulance teams that arrived a little later to rescue their wounded colleague also came under fire, despite earlier ICRC information that the IDF had approved their

---

[790]  Israel, Ministry of Foreign Affairs, *IDF Conduct During the 2014 Gaza Conflict*, p. 29. http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015

[791]  W117.

[792]  ICRC, Gaza and West Bank: Reaching out to all victims amidst growing crisis, 27 July 2014. At: https://www.icrc.org/eng/resources/documents/update/2014/07-27-gaza-west-bank-israel-civilians-and-humanitarian-workers.htm.

[793]  W083, W101, W087.

ATL005034

entry to the area.[794]  A third team was finally allowed to take Al Abadla to Nasser hospital
in Khan Younis, where he died shortly upon arrival.[795] The ambulances' movements were
at all times coordinated with the IDF through the ICRC.[796] According to the witnesses, all
ambulances were marked with the Palestinian Red Crescent Society (PRCS)'s emblem, and
Mohammed Hassan Al Abadla and his colleagues were wearing uniforms[797]. The MAG has
ordered a criminal investigation into this case[798], the outcome of which is pending.[799]

459.   The commission further interviewed several witnesses to an incident that occurred
on 25 July, at around 4.15 p.m., when a missile appears to have hit the back of a PRCS
ambulance during a rescue operation in Beit Hanoun. As a result, Aaed Al Borei, an
ambulance volunteer aged 29, was killed and two other rescuers inside the ambulance were
injured.[800] When another ambulance team was dispatched to respond, a missile hit the rear
part of this vehicle, which caught fire.  The ambulance had its siren and flashing red light
on and, at the time of the strike, the street was deserted.[801]   The two survivors told the
commission that the missile hit the vehicle with such force that it felt as if the "explosion
was inside the ambulance". They saw Aaed's body torn apart on the ground.[802] The back of
the ambulance was completely destroyed.[803]  During an additional rescue operation, another
ambulance apparently came under fire, wounding the driver. Aaed's burned body could
only be retrieved the following day.[804] On 7 December, the MAG announced that it had
ordered a criminal investigation into the incident.[805]

460.   In addition, in a number of instances, ambulances are reported to have been
prevented from evacuating the wounded from areas where the IDF was operating (in Beit
Hanoun, Khuza'a, Qarara, Shujai'ya and Beit Lahiya). According to the Palestinian Human
Rights Coalition, 407 Palestinians died as a result of delays in the delivery of medical
aid.[806] Some of these incidents, which occurred in Khuza'a, are discussed above. On several
occasions, the authorization for ambulances to access sites of military operations where
civilians were injured was delayed for days. The commission received heart-breaking
testimony and reports of people who saw their injured children and family members die
because ambulances arrived too late, sometimes hours or days after the attacks.

---

[794]  W083.

[795]  W083, W087, W101. See also WHO situation report 28 July. At
http://www.emro.who.int/images/stories/palestine/documents/WHO_Sitrep_on_Gaza__5_-
_July_28.pdf?ua=1

[796]  W083.

[797]  W083, W087, W101.

[798]  IDF MAG Corps Website, Decisions of the IDF Military Advocate General regarding Exceptional
Incidents during Operation 'Protective Edge' – Update No. 3, 07 December 2014; at:
http://www.law.idf.il/163-6958-en/Patzar.aspx?pos=13

[799]  COI interviewed two Palestinian Red Crescent Society (PRCS) ambulance workers, W087, W101,
who went to Erez crossing to testify before Israeli investigators.

[800]  Name and age in PRCS update report at http://www.palestinercs.org/reports/14-07-27-10-46-
05English%20Ops%20update%209%20-%2027%20July.pdf

[801]  According W180, W181.

[802]  W180, W181.

[803]  Submission 5.

[804]  W180, W181.

[805]  IDF MAG Corps Website, Decisions of the IDF Military Advocate General regarding Exceptional
Incidents during Operation 'Protective Edge' – Update No. 3, 07 December 2014; at:
http://www.law.idf.il/163-6958-en/Patzar.aspx?pos=13.

[806]  Al-Haq: Divide and conquer. A legal analysis of Israel's 2014 military offensive against the Gaza
Strip. 2015, p. 50.

ATL005035

461.   The commission notes the IDF's general allegation that Palestinian armed groups used ambulances to transport fighters, i.e. for military purposes. As no specific information was received in this regard, the commission is unable to verify this claim. In relation to the incidents highlighted above, the commission did not find any information, or receive any allegations indicating that the ambulances involved were used for a purpose other than their humanitarian function. Given the pivotal importance of ambulances and medical personnel in areas with a civilian presence where intense shelling takes place, reports of repeated strikes on ambulances that came to the rescue of injured staff are of particular concern, as they suggest that the ambulances and personnel may have been specifically targeted.

462.   The commission observed that the 2014 hostilities resulted in damage to 16 ambulances,[807] the death of 23 health personnel (16 of whom were on duty), and injury to least 83.[808]   At least 24 strikes[809] involving ambulances and medical personnel were reported. The "Medical Aid for Palestinians" organization reported the loss of 30 ambulances following attacks[810]. Many, if not most, of the reported strikes on ambulances that resulted in casualties, and in some cases, deaths appear to have occurred without there having been any obvious threat or military activity in the area. Furthermore, ambulances were marked with emblems, health workers wore uniforms, and the IDF had been notified repeatedly of their movements. In some incidents (Beit Hanoun and Khan Younis on 25 July and Rafah on 1 August), medical personnel and ambulances appear to have been hit by direct and targeted fire, while in other cases they were likely victims of indiscriminate shelling occurring in the area at the time.

463.   The commission notes that the MAG has ordered criminal investigations into two of the cases discussed above and recommends that the MAG investigations pay particular attention to allegations relating to health personnel and ambulances.

464.   Ambulances and medical personnel enjoy special protection under international humanitarian law. They are to be protected from attack under all circumstances. They only lose this protection if they are used outside of their humanitarian function to commit acts harmful to the enemy.[811] Some of the incidents above constitute a violation by the IDF of the prohibition of attacks on medical transports and medical personnel, and may amount to war crimes, in particular, if the vehicles or personnel attacked used the distinctive emblems of the Geneva Conventions.[812]

465.   In addition, the many reported incidents involving the blocking or delaying of ambulances raise serious concern as to the compliance by the IDF with their obligation to respect medical transport. This obligation is not limited to the prohibition against attacking such vehicles themselves, but also includes the obligation to refrain from interfering with their rescue work. As stated in the ICRC Commentary on article 21 of Geneva Convention IV, "The enemy should avoid interfering with them, but that is not enough; he must also allow them to carry out their work." Preventing or delaying ambulances may also constitute a violation of the obligation to collect and care for the wounded and sick as provided by

---

[807]   OCHA, Gaza Initial Rapid Assessment Report, 27 August 2014.

[808]   World Health Organization, Report of a field assessment of health conditions in the occupied Palestinian Territory (oPt), 22 March to 1 April 2015. See also OCHA, Gaza Initial Rapid Assessment Report, 27 August 2014.

[809]   Al Haq: Divide and conquer. A legal analysis of Israel's 2014 military offensive against the Gaza Strip. 2015, p. 50

[810]   Assessment mission of MAP/IDEALS medical team – East Jerusalem and Gaza. 9-14 August 2014, p. 11s

[811]   Geneva Convention IV articles 20-21, Additional Protocol I articles 15 and 21, Additional Protocol II, articles 9 and 11. See also, ICRC, *Customary International Law Database*, rules 25 and 29.

[812]   Article 8 Rome Statute of the ICC.

ATL005036

Common article 3 of the Geneva Conventions and the prescription that the wounded shall receive to the fullest extent practicable and with the least possible delay, the medical care and attention required by their condition.[813] Delaying medical care may also amount to a violation of the right to health and if it is confirmed that denial of access or delays to ambulances contributed to the death of sick and wounded persons, of the right to life.

**5.   Impact on the population in Gaza of the conduct of Palestinian armed groups**

466.   The commission of inquiry also examined the conduct of Palestinian armed groups in a densely populated environment and what measures, if any, were undertaken by the authorities in Gaza to protect civilians from the effects of attacks conducted by the IDF.

467.   In this context the commission notes the extensive allegations made by Israel, in some cases in great detail.[814] The commission regrets that it was unable to verify these individual allegations owing to Israel's denying the commission access to Gaza, and to Palestinian witnesses' fear of reprisals by armed groups and the local authorities if they provided information, in particular when doing so remotely.

468.   These obstacles to obtaining first-hand information were compounded by the difficulties Palestinian human rights organisations face in documenting violations by Palestinian armed groups. As stated by Amnesty International:

"*Palestinian human rights organizations faced huge difficulties documenting violations during the hostilities in Gaza, including cases where their researchers were killed or came under fire. Publishing information on violations by Palestinian armed groups can also be risky for local NGO's, particularly during periods of intense fighting and bombardment by Israel; human rights organizations and individual staff members have been threatened or attacked by Palestinian armed groups in the past.*"[815]

469.   Despite these drawbacks, the commission was able to identify certain patterns of behaviour of Palestinian armed groups which may have had a negative impact on the protection of the civilian population and of civilian objects in Gaza.

***Conducting military operations from within or near densely populated areas***

470.   The commission examined various sources of information related to the conduct of Palestinian armed groups in populated areas of Gaza, including the stockpiling of weapons and the firing of rockets, mortars and other weapons from very densely built up areas of Gaza city.

471.   Several reports by foreign journalists indicated that rockets were repeatedly fired from downtown Gaza. In a France24 video of 31st   July it is possible to see and hear the launch of a rocket in close proximity to the journalist while he was broadcasting live.[816] A follow-up news report by France24 indicated that the rocket launcher was located only 50 meters away from a hotel in which journalists were staying and 100 meters from a UN

---

[813]   Article 10 Additional Protocol I. See also articles 16 Geneva Convention IV and articles 7 and 8 Additional Protocol II.

[814]   See for example: Israel, Ministry of Foreign Affairs, *Hamas' Violations of the Law*. http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx.

[815]   Amnesty International, *Unlawful and deadly: Rocket and Mortar Attacks by Palestinian Armed Groups during the 2014 Gaza/Israel Conflict*, March 2015, p.41

[816]   Rocket fire caught live as France 24 correspondent reports from Gaza Strip, 49 seconds into https://www.youtube.com/watch?v=EaqWqjb4w6s

ATL005037

building.[817] In another incident, a NDTV foreign press crew filmed men who appear to be preparing a rocket launcher in an area reportedly surrounded by apartment buildings, and they recorded the launch of a rocket the following morning.[818] According to Amnesty International, in one incident a home in the al-Karama neighbourhood was hit by an IDF strike immediately after two rockets had been fired by Palestinian armed groups from the vicinity of the house.[819]

472.    Palestinian armed groups are alleged to have frequently placed command and control centres and firing positions in residential buildings, and to have stockpiled weapons, placed booby-traps and located tunnel entrances in prima facie civilian buildings. In particular, the commission notes the IDF asserts it found an Al-Qassam Brigades manual on urban warfare, which is said to explain the advantage of conducting military operations in populated areas and allegedly provides instructions on how to hide weapons in buildings. In a letter to Hamas, the commission requested information on the existence of such a manual and whether a copy could be made available to the commission. The commission did not receive a response. The IDF only presented a few selected pages of the manual on their website.[820] The commission was not able independently to verify the content of this manual or specific incidents.

473.    International humanitarian law prescribes that parties to the conflict should take all feasible precautions to protect the civilian population and civilian objects under their control from the effects of attacks and to the maximum extent feasible avoid locating military objectives within or near densely populated areas.[821] The commission notes that this obligation is not absolute and that even if there are areas that are not residential, Gaza's small size and its population density makes it particularly difficult for armed groups always to comply with these requirements. The ICRC Commentary on Additional Protocol I notes that several delegations of the Diplomatic Conference commented that for densely populated countries, the requirement to avoid locating military objectives within densely populated areas would be difficult to apply.[822]

474.    Pnina Sharvit-Baruch, a researcher at the Institute for National Security Studies, and former Head of the International Law Department of the IDF Military Advocate General, explained in a conference at the University of Haifa:

"*In a scenario like the Gaza Strip you cannot expect the other side or demand the other side to act only from empty areas, to go out of all the populated areas, fire only from there or from the beach area when no people are there, it's not something that is expected. Therefore to say that the fact that they are operating from populated areas, in itself is a war crime or is in breach of the law of armed conflict, is not a plausible argument[....] The*

---

[817]   http://www.france24.com/en/20140805-exclusive-video-hamas-rocket-launching-pad-near-gaza-homes-un-building/

[818]   http://www.ndtv.com/world-news/ndtv-exclusive-how-hamas-assembles-and-fires-rockets-641680

[819]   Amnesty International, *Unlawful and deadly: Rocket and Mortar Attacks by Palestinian Armed Groups during the 2014 Gaza/Israel Conflict*, March 2015, p.41

[820]   Israel, Ministry of Foreign Affairs, *Hamas' Violations of the Law*, pp.17, 40 -41 and 46-47. http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015. See also Gaza Conflict Task Force commissioned by the Jewish Institute for National Security Affairs (JINSA), *2014 Gaza War Assessment: The New Face of Conflict*, Report of March 2015,  p. 20

[821]   These customary rules (see ICRC, *Database on Customary international humanitarian law,* Rules 22 and 23) are reflected in article 58 of Additional Protocol I. Article 13 of Additional Protocol II expresses the principle that the "civilian population shall enjoy general protection against the dangers arising from military operations."

[822]   ICRC, *Commentary on the Additional Protocols of 8 June 1977, para. 2256*

ATL005038

*point is the fact that in this densely populated area the focus was on acting from places where the maximum civilians would be harmed. Not just from a populated area, but from a school, from a hospital, from a mosque when people are there, or telling people not to leave or not enabling people to leave, there is the gist of it [….]that is the challenge that we had to face." [823]*

475.    As mentioned by Ms. Sharvit-Baruch, in a number of instances, Palestinian armed groups appear to have conducted military operations within or in close proximity to sites benefiting from special protection under international humanitarian law, such as hospitals, shelters and places dedicated to religion and education.[824] The United Nations Board of Inquiry into specific incidents that occurred in the Gaza Strip between 8 July and 26 August 2014 found that in some cases Palestinian armed groups conducted military operations in the vicinity of UNRWA schools. In one case, it noted military activity by both Palestinian armed groups and the IDF in the vicinity of Beit Hanoun Elementary Co-educational "A" and "B" school, which was being used as an UNRWA designated emergency shelter.[825] In the case of the Jabaliya Elementary "C" and Ayyobiya Boys School, an area adjacent to the school was reportedly used by Palestinian armed groups to fire projectiles.[826] In the case of the Nuseirat Preparatory School Co-educational "B" School, the "presence of weapons and other evidence" indicates that Palestinian armed groups may have fired 120 mm mortars from the premises of the school.[827] In another case, media reports quoted the Greek Orthodox Archbishop in Gaza as stating that the church compound, in which approximately 2,000 civilians took refuge, was used by Palestinian armed groups to fire rockets.[828]

476.    Official Israeli sources also made allegations of specific incidents during which projectiles were fired from within or in the immediate vicinity of schools and mosques.[829] In addition, allegations were made to the effect that such locations were used to stockpile weapons and that tunnels led into or near these locations.[830]

477.    Medical facilities were also alleged to have been used by Palestinian armed groups to carry out military activities. The Israeli government's documentation details eight cases of projectiles being fired from the immediate vicinity of or from within the premises of

---

[823]  Pnina Sharvit-Baruch, speaking at the Conference: *The Israeli Democracy in War: Is the 'Edge' Protected?*, First Session: Legality of Military Activities during Operation "Protective Edge" According to International Law, 5 November 2014. Video recording available at: https://www.youtube.com/watch?v=Rqz3nQhoOlY&list=PLtX8ZCcA-Vap2SqfEEUBBsW0LPWs6W90M&index=1, minute 55:20.  Accessed on 30 May 2015.

[824]  ICRC, *Database on Customary international humanitarian law*, Rules 28, 29, 35 and 38

[825]  S/2015/286, United Nations Secretary-General, *Summary by the Secretary-General of the report of the United Nations Headquarters Board of Inquiry Into certain incidents that occurred in the Gaza Strip between 8 July 2014 and 26 August 2014*, para. 35

[826]  *Ibid*, para. 65

[827]  Ibid, paras 80 to 82.

[828]  CBN News, *Gaza Bishop: Hamas Used Church to Fire* Rockets. Avaialble at: http://www.cbn.com/cbnnews/insideisrael/2014/august/gaza-bishop-hamas-used-church-to-fire-rockets-/

[829]  Israel, Ministry of Foreign Affairs, *Hamas' Violations of the Law*, pp. 29-38. http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx. Accessed 30 May 2015

[830]  Israel, Ministry of Foreign Affairs, *Hamas' Violations of the Law*, pp.20-25, 29-32 and 35-38. http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx. Accessed 30 May 2015

ATL005039

medical facilities.[831] In one case, it is alleged that a booby trap in a clinic exploded, resulting in the death of three soldiers and injury to 14.[832] The commission was not able to independently verify these specific allegations. The commission also notes the claims concerning the apparent extensive use of Al-Wafa hospital and its surroundings to conduct military operations.[833] All relevant witnesses interviewed by the commission, including medical staff, rejected the allegation that the hospital was being used for military purposes before its evacuation. However, the commission cannot exclude the possibility that military activity took place within or around the hospital following its evacuation on 17 July 2014. Furthermore, several allegations[834] were made concerning the alleged use by Palestinian armed groups of ambulances to conduct military operations. However, only one specific allegation was provided in the documentation available from Israel and this lacked a date or location for the incident.[835] The commission has received no additional allegations concerning the improper use of ambulances.

478.    Given the number of cases in which Palestinian armed groups are alleged to have carried out military operations within or in the immediate vicinity of civilian objects and specifically protected objects, it does not appear that this behaviour was simply a consequence of the normal course of military operations. Therefore the obligation to avoid to the maximum extent possible locating military objectives within densely populated areas was not always complied with.

479.    Regarding the specific incidents, while the commission cannot determine the factual circumstances of each alleged incident, if it is confirmed that in using the aforementioned locations to conduct military operations, armed groups did so with the intent to use the presence of civilians or persons *hors de combat* in locations such as shelters or hospitals to prevent their military assets from being attacked, this would constitute a violation of the customary law prohibition to use human shields, reflected in article 51(7) of Additional Protocol I. Should this intent be proven, this conduct would amount to a war crime.[836]

480.    In addition, with regard to the alleged use of medical facilities and ambulances for military purposes, if the buildings or ambulances bore any distinctive emblem of the Geneva Conventions, such as the Red Crescent, this would amount to an improper use of a distinctive emblem and may, depending on the circumstances, amount to a war crime.[837] Article 7 of Protocol II to the Convention prohibiting Certain Conventional Weapons,[838] which reflects customary international law,[839] prohibits attaching or associating a booby-trap with an object entitled to special protection. Therefore the booby-trapping of a medical clinic would constitute a violation of international humanitarian law.

---

[831]  Israel, Ministry of Foreign Affairs, *Hamas' Violations of the Law*, pp. 22-23. Available at http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015

[832]  Israel, Ministry of Foreign Affairs, *Hamas' Violations of the Law*, pp. 47-48. Available at http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 30 May 2015.

[833]  Ibid, pp.20-21

[834]  Ibid, p. 20, see also: https://www.idfblog.com/blog/2014/07/28/hamas-uses-hospitals-ambulances-military-purposes/

[835]  Ibid, p. 22.

[836]  Article 8 Rome Statute of the ICC

[837]  Article 8(2)(b)(vii). In certain circumstances the death or serious injury would have to result from a treacherous act linked to the improper use of the emblem in order to amount to a war crime.

[838]  Protocol II to the 1980 CCW Convention as amended on 3 May 1996

[839]  ICRC, *Database on Customary international humanitarian law,* Rule 80.

ATL005040

*Measures to facilitate the removal of the civilian population from the vicinity of military objectives*

481.   During the hostilities the authorities in Gaza adopted some measures to assist civilians fleeing the areas most affected by the hostilities, such as setting up shelters for internally displaced persons.[840] The authorities in Gaza also informed the commission that a policy of evacuation was implemented in Beit Hanoun, Shuja'iya and Khuza'a when tensions mounted in those areas, and that more than 4,450 evacuation missions were conducted by the Palestinian civil defence.

482.   However, the commission is concerned that in the days prior to the start of the IDF ground operations, different representatives of the authorities in Gaza made several public declarations requesting Gaza residents not to heed the warnings issued by the IDF instructing residents of different neighbourhoods and towns to evacuate. For instance on 16 July, Hamas spokesperson Mushir al-Masri stated, "Palestinian civilians are standing up to the enemy with their steadfastness, resilience and belief that Allah will reward them, […] Rest assured, stay put at home as you've always done, do not respond to rumours and this psychological war being waged by the Zionist enemy. It's their desperate and wretched attempt to fragment the Palestinian domestic front. We are sure of our people's steadfastness."[841] On 13 July 2014, a journalist from Al Aqsa TV reported that "..the interior ministry also urged citizens not to obey the Occupation's warnings contained in leaflets calling on people of the Gaza border area to evacuate their homes. The interior ministry called upon people to ignore these warnings and to stay put."[842] On 15 July 2014, Mo'een Abu Okal, head of the popular committee for refugees, called upon citizens who had taken refuge at UNRWA premises to return home. He stressed that "the resistance" continues to confront and foil any incursion attempts.[843] While the commission cannot conclude that in making these declarations the authorities in Gaza had the specific intent to use the presence of civilians to protect Palestinian armed groups from attack, the declarations are a clear indication that the authorities in Gaza did not take all the necessary precautions to protect the civilian population under its control as required by international humanitarian law.[844]

483.   In one case of the bombing of a residential building examined by the commission, information gathered indicates that following a specific warning by the IDF that the house was to be targeted, several people went to the roof of the house in order to "protect" the house. Should they have been directed to do so by members of Palestinian armed groups, this would amount to the use of the presence of civilians in an attempt to shield a military objective from attack, in violation of the customary law prohibition to use human shields. With regard to this incident, the commission is disturbed by the reported call by the spokesperson of Hamas to the people in Gaza to adopt the practice of shielding their homes from attack by going up on their roofs. Although the call is directed to residents of Gaza, it can be seen and understood as an encouragement to Palestinian armed groups to use human shields.

---

[840]   For example the OCHA on 13 August, mentions the existence of 27 government shelters hosting close to 30,000 internally displaced persons , *Gaza Emergency Situation report 13 August 2014*, p. 2. Available at http://www.ochaopt.org/documents/ocha_opt_sitrep_13_08_2014.pdf

[841]   https://www.youtube.com/watch?v=ks_nlgjfPWM

[842]   http://mfa.gov.il/MFA/ForeignPolicy/Issues/Pages/Israel-protection-and-Hamas-exploitation-of-civilians-in-Operation-Protective-Edge-July-2014.aspx

[843]   Al Resala Press. Abu Okal: *We call upon UNRWA refugees to return home*, 15 July 2014 at: http://alresalah.ps/ar/post/97511/أبو-عوكل-ندعو-لاجئي-الأونروا-للعودة-لمنازلهم

[844]   Article 58, Additional Protocol I.  ICRC, *Database on Customary international humanitarian law*, Rule 22.

ATL005041

*Rockets landing short*

484.   Rockets fired by Palestinian armed groups in several cases appear to have malfunctioned or were fired carelessly and fell short, in some cases in densely populated areas of Gaza, causing deaths and injuries.

485.   For instance, according to OHCHR, on 20 July 2014 at 10 p.m., six civilians in locations north of the main cemetery in Al-Faluja neighbourhood of Jabalia sustained injuries when a rocket fired by Palestinian armed groups fell short and landed on a house north of the cemetery.[845]

486.   In another incident, which occurred in the afternoon of 28 July on the first day of the Eid holiday, an explosive hit Swaidi street next to a children's swing in the Al-Shati refugee camp in northern Gaza. Eleven children, between 5 and 14 years old, and two adults were killed and up to 45 people were injured, some seriously and many of them children.[846] According to witnesses it was the Eid holiday and a temporary ceasefire had been declared so parents were outside in the street celebrating with their children. The street was also more crowded than usual because many people displaced during the conflict had moved to the Al-Shati camp seeking safety.[847] Between 4 and 5 p.m. an explosive landed on the street between a food store and the children's swing where children were playing.  The single explosion spread a large amount of shrapnel across the area. Three eyewitnesses told the commission that the explosion threw children's bodies around and tore them to pieces.[848]

487.   The MAG announced on 7 December 2014 that following a thorough review of the incident by the Fact-Finding Assessments Mechanism (FFAM), "…such a strike by IDF forces could not be identified. However, Israel's technical systems recorded in real-time the path of a salvo of missiles fired from within the Gaza Strip, seemingly by Hamas or Palestinian Islamic Jihad, which landed in the medical clinics and in the Shati Refugee Camp at the time of the alleged incident…"[849] Hamas publicly denied this allegation and the Chief of Police in Gaza told the commission that the bomb disposal team that went to the Al-Shati playground found that the remnants of the weapons were Israeli.[850]

488.   The commission received information from NGO's who conducted field research and a UN source who collected information indicating that the explosion had been caused by a misfired Palestinian rocket.[851] One of them inspected the site after the attack and concluded that the impact of the explosion on the ground could not have been caused by an Israeli missile or artillery shell; the NGO also indicated that eyewitnesses had reported seeing a rescue team go to the place just after the attack, whose members did not collect the wounded but cleared and collected the remnants of the weapons.[852] In addition, two

---

[845]   A/HRC/28/80 Add. 1, para. 69
[846]   W098, W084. See also Amnesty International, *Unlawful and deadly: Rocket and Mortar Attacks by Palestinian Armed Groups during the 2014 Gaza/Israel Conflict*, March 2015, p.47.
[847]   W098, W085, W084.
[848]   W098, W085, W084. Also open sources' reports.
    http://english.palinfo.com/site/pages/details.aspx?itemid=63279. http://rt.com/news/176216-children-gaza-israel-strike/
[849]   http://www.mag.idf.il/261-6958-en/Patzar.aspx, accessed 30 May 2015
[850]   http://www.aljazeera.com/news/middleeast/2014/07/deaths-as-israel-resumes-gaza-strikes-20147281452469626.html.  http://maannews.net/eng/ViewDetails.aspx?ID=716699\.
    https://news.vice.com/article/israel-denies-responsibility-for-gaza-attack-that-killed-9-children.
    Interview of the commission with the Chief of Police in Gaza, Mr. Al Batsh.
[851]   Confidential submission. Amnesty International, *Unlawful and deadly: Rocket and Mortar Attacks by Palestinian Armed Groups during the 2014 Gaza/Israel Conflict*, March 2015, pp 51-52.
[852]   Confidential submission.

journalists who spoke to the commission also suggested the attacks had been caused by Palestinian rockets misfiring. One of them said that Hamas members had gone to the site immediately after the events and cleared away the debris. The other said he had been prevented by local authorities from going to the site of the attack.

489.  The commission found there was credible information pointing to the conclusion that a misfired Palestinian rocket was the source of this explosion. Given the gravity of the case, in which 11 children and 2 adults were killed in a place crowded with civilians, and the allegations that local authorities may have attempted to hide evidence of the cause of the incident, all relevant Palestinian authorities should conduct a thorough investigation of the case to determine the origin and circumstances of the attack.

### 6.  Executions of suspected "collaborators"

490.   *"There were corpses on top of each other in a pool of blood.[…] There was no respect for the body."*[853]

491.   *"Life has become impossible for the family due to the rejection by society and the stigma."*[854]

492.  Executions of individuals suspected of "collaborating" with Israel's intelligence services are not uncommon in Gaza. Since 2007, executions, sometimes without trial, have been used to punish alleged "collaborators". Whereas in 2010 and 2013 the local authorities in Gaza launched two major amnesty campaigns to persuade potential "collaborators" to give up this "cooperation", the 2014 hostilities were marked by an upsurge in extrajudicial executions of individuals alleged to have spied for Israel.  Most of the executions were public. The fact that the majority of the victims had been arrested and detained before the conflict prompts concerns that they were executed in order to increase pressure on Gaza's population, with a view to preventing others from spying.

493.  The commission conducted ten interviews with witnesses and examined other relevant materials, including official documents from the State of Palestine, NGO reports, lists with names of victims, twitter statements by Palestinian armed groups, and news items. Gathering reliable information on these executions was particularly challenging as family members of the victims and other persons with knowledge about the trials and executions generally were reluctant to give testimony.

494.  Based on its research, the commission documented summary executions of at least 21 persons, including one woman,[855] committed between 5 and 22 August 2014 in Gaza City, allegedly for being collaborators for Israel.[856] Five summary executions occurred on 5 August, one on 11 August, and at least 15 on 22 August. The people executed on 5 August, and at least 11 persons executed on 22 August, were taken from Al-Katiba prison where they had been held in the custody of the local authorities in Gaza and shot by firing squad.[857] Of these 16 executions, 8 persons had trials on-going and 2 had received prison sentences after conviction. The other 6 individuals had challenged death sentences imposed

---

[853]  W005
[854]  W022
[855]  W202
[856]  This figure on extrajudicial executions is lower than the one reported by HRW (25 persons) http://tinyurl.com/qdh2rwy and the figure communicated by Amnesty international (23 persons). The commission's figures are based on confirmed lists of names that were furnished by various sources in Gaza. (Testimony W202).
[857]  See also: Amnesty International: Strangling necks. May 2015; at: https://www.amnesty.org/en/documents/mde21/1643/2015/en/

under the PLO Revolutionary Penal Code of 1979 and were waiting for the decisions on their appeals.[858]

495.    On 7 August, Al Qassam Brigades, the armed branch of Hamas, claimed responsibility for the 5 August executions, declaring that the persons executed were "found guilty of giving information on the whereabouts of fighters and civilian houses".[859]  On 22 August, Al Qassam Brigades announced the execution of 11 persons in the morning[860] and 7 after the Friday prayers at Al Omari mosque[861].

496.    The 22 August executions occurred a day after three Al Qassam commanders were killed by the IDF in Rafah[862]  and were followed by the announcement of a security campaign against "collaborators" dubbed "Operation Strangling Necks".[863] In the morning of 22 August, 11 Al Katiba detainees were executed outside the abandoned Al Jawazat police station[864] and Hamas reportedly warned that "the same punishment would soon be imposed on others".[865] On the same morning, masked men reportedly read a Hamas statement outside Al Omari mosque announcing that several "collaborators" had been sentenced to death.[866] As worshippers were leaving the mosque, at least six persons were executed in front of them by masked men.[867]

497.    Several of the commission's interlocutors mentioned that some of the above alleged "collaborators" were ill-treated and tortured while in detention or under custody, including by beatings. Others have documented abduction and torture perpetrated by Hamas during the 2014 hostilities[868]. Although the commission was unable to verify these allegations, it recalls that torture and ill-treatment are prohibited under international law and require prompt and impartial investigations. It also appears that some of the executions and cases of ill-treatment were directed against persons who had links with Fatah and the Palestinian authorities' security forces and may have been acts of revenge.

498.    Representatives of the local authorities in Gaza told the commission that the executions were carried out by self-organized Palestinian factions operating in secrecy, without instructions from the authorities.[869] They informed the commission that the local

[858]   W024, W005, W022 and W023; see also: Amnesty International: Strangling necks. May 2015; at: https://www.amnesty.org/en/documents/mde21/1643/2015/en/;

[859]   News reports. http://tinyurl.com/psv72pw, http://www.ahdath.info/?p=11335, http://tinyurl.com/ms2z7lk; http://tinyurl.com/ots3rqd

[860]   https://twitter.com/qassam_arabic1/status/502741612347527168

[861]   https://twitter.com/kmmt727/status/502773666724052992

[862]   Sama news. 2 January 2015. At http://samanews.com/ar/index.php?act=post&id=223695

[863]   Al Majd, undated. At http://www.almajd.ps/?ac=showdetail&did=5898

[864]   Amnesty International: Gaza: Hamas must end summary executions as 'informers' face firing squad. 22 August 2014, at: https://www.amnesty.org/en/articles/news/2014/08/hamas-must-end-summary-executions-informers-face-firing-squad/

[865]   Amnesty International: Gaza: Hamas must end summary executions as 'informers' face firing squad. 22 August 2014, at: https://www.amnesty.org/en/articles/news/2014/08/hamas-must-end-summary-executions-informers-face-firing-squad/ ; BBC: Gaza: Hamas says 18 suspected informants executed. 22 August 2014. At http://www.bbc.com/news/world-middle-east-28896346

[866]   Amnesty International: Strangling necks. May 2015; p. 19; at: https://www.amnesty.org/en/documents/mde21/1643/2015/en/

[867]   Amnesty International: Strangling necks. May 2015; p. 19; at: https://www.amnesty.org/en/documents/mde21/1643/2015/en/

[868]   Amnesty International: Strangling necks. May 2015; p. 28-33; at: https://www.amnesty.org/en/documents/mde21/1643/2015/en/

[869]   W069 and W265; note also Abbas's statement quoted by Amnesty International;  Amnesty International: Gaza: Hamas must end summary executions as 'informers' face firing squad. 22 August

authorities had purportedly created a body to investigate allegations of extrajudicial killings. The Ministry of Interior of the State of Palestine said that "The Palestinian President and Government have frequently condemned the arbitrary executions carried out during the attack against the Gaza Strip, describing them as illegal. The Government of National Consensus, formed just days before the attack, did not have a presence on the ground in the Gaza strip effective enough to enable its judicial organs to investigate such acts. The Palestinian Public Prosecutor's Office has still not been able to exercise its legal jurisdiction by investigating and prosecuting the perpetrators of those actions."[870] The commission learned that a draft law to strengthen judicial and procedural safeguards for the prosecution of alleged "collaborators" and pave the way for the abolition of the death penalty has been put forward by the State of Palestine.[871] Government authorities have pledged to investigate 25 cases of summary executions that were brought to its attention once it recovers control over the Gaza strip.[872]

499.     The summary executions had devastating consequences that extend well beyond the acts themselves. Since they are widely perceived as evidence of the victims' guilt, the stigma that accompanies them "punishes" the relatives.  Witnesses spoke of the executions as indelible stains on the family's reputation and honour, which can be long-lasting and translate into various forms of discrimination, including in terms of access to education and employment. Witnesses described how relatives of those executed face exclusion and could not find jobs as a result of the executions. They also pointed out that they did not believe that there was any chance that the perpetrators would be brought to justice. Moreover, the witnesses requested that their identities remain confidential as they feared retaliation by members of the political leadership or by society at-large for speaking out. Although the local authorities told the commission that specialized social affairs committees had been set up to support the families of persons accused of collaboration, the far-reaching effects of stigma call for a stronger response to ensure that the civil, political, social and economic rights of the relatives are fully protected.

500.     With regard to the detainees taken from Al Katiba prison, where they had been in the custody of the local authorities in Gaza while their judicial proceedings were pending, the commission is concerned by the statement by the local authorities that the executions were carried out by Palestinian armed groups without any participation by the local authorities.  Given that ensuring the safety of the detainees was the responsibility of the authorities, the latter appear to have been complicit in the executions.

501.     The commission is of the view that inmates were transferred out of the prison and summarily executed with the apparent knowledge of the local authorities in Gaza, in violation of their obligation to protect the right to life and security of those in their custody. These extrajudicial executions, many of which were carried out in public, constitute a violation of both international humanitarian law and international human rights law. Article 6 of the International Covenant on Civil and Political Rights protects the right to life and cannot be derogated from, not even "in time of public emergency which threatens the life of the nation and the existence of which is officially proclaimed" (article 4). International human rights law imposes the duty on relevant authorities to investigate, prosecute and

2014, FN 20; at: https://www.amnesty.org/en/articles/news/2014/08/hamas-must-end-summary-executions-informers-face-firing-squad/

[870] HRC/NONE/2015/36, p. 7

[871] W167

[872] W167 and HRC/NONE/2015/36; State of Palestine, Ministry of Foreign Affairs: Reply to requests for clarification from the UN CoI on the 2014 Gaza Conflict

132

ATL005045

punish violations of the right to life, in line with the Principles on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions[873].

502.    Because of their link to the armed conflict, the extrajudicial executions constitute a violation of article 3 common to the 1949 Geneva Conventions, which, in relation to "persons taking no active part in the hostilities  […] and those placed "hors de combat" by […] detention, prohibits (a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture […]; (d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples" and amount to a war crime. Whoever is responsible for the killings, whether the Al Qassam Brigades, other Palestinian armed groups, or the local authorities, must be brought to justice.

## B.    The West Bank, including East Jerusalem

503.    On 12 June 2014, 19-year-old Eyal Yifrah and 16-year-olds Gilad Sha'er and Naftali Frenkel were abducted and brutally murdered. Last seen near the Israeli settlement bloc of Gush Etzion in the southern West Bank,[874] their bodies were discovered northwest of Hebron on 30 June 2014.[875] In response to their kidnapping, from 12 to 30 June 2014, Israel launched Operation 'Brother's Keeper', which the IDF stated aimed to find the three youths and simultaneously "weaken Hamas terror".[876] On 23 September 2014, the IDF declared that these objectives were met.[877]

504.    The period of June to September 2014 was marked by heightened tensions in the West Bank, including East Jerusalem. Israeli security forces (ISF) conducted widespread raids on Palestinian homes and other civilian buildings, carried out mass arrests, and detained large numbers of Palestinians, including children. Israel imposed severe restrictions on Palestinians' movement within and out of the West Bank, as well as on Palestinian access to the Al Aqsa Mosque. In addition, Israel resumed its practice of punitive house demolitions.

505.    During this period, there was also a stark rise in deaths and injuries of Palestinians by the ISF. These occurred in the context of protests by Palestinians in the West Bank against Israel's air and ground offensives into Gaza and ensuing clashes, as well as during confrontations between Palestinians and the ISF following the vicious murder of 16-year-old Mohammad Abu Khdeir, from the Shu'fat neighbourhood of East Jerusalem, who was found burnt to death in West Jerusalem on 2 July 2014, in an apparent act of revenge for the murdered Israeli teenagers. An increase in ISF search and arrest operations in refugee

---

[873]    adopted by Economic and Social Council resolution 1989/65; see: ohchr.org/Documents/ProfessionalInterest/executions.

[874]    https://www.idfblog.com/blog/2014/09/23/abductors-three-israeli-teenagers-targeted-hebron/ ; http://www.idf.gov.il/MFA/PressRoom/2014/Pages/Terrorists-responsible-for-abduction-and-murder-of-teens-apprehended-23-Sep-2014.aspx (accessed on 31 May 2015).

[875]    Israel Ministry of Foreign Affairs, Terrorists responsible for abduction and murder of teens apprehended, 23 September 2014, at http://mfa.gov.il/MFA/PressRoom/2014/Pages/Terrorists-responsible-for-abduction-and-murder-of-teens-apprehended-23-Sep-2014.aspx   (accessed on 31 May 2015)

[876]    https://www.idfblog.com/IDFsummary2014/ (accessed on 31 May 2015)

[877]    Israel Ministry of Foreign Affairs, Terrorists responsible for abduction and murder of teens apprehended, 23 September 2014, at http://mfa.gov.il/MFA/PressRoom/2014/Pages/Terrorists-responsible-for-abduction-and-murder-of-teens-apprehended-23-Sep-2014.aspx (accessed on 31 May 2015)

ATL005046

camps was also often the catalyst for confrontations.[878] According to information reviewed by the commission, during these clashes and confrontations, Palestinians threw stones and, in some cases, Molotov cocktails and fireworks; and in isolated instances fired live ammunition. The ISF used tear gas, rubber bullets, rubber-coated metal bullets, and regularly resorted to live ammunition.[879] There appear to have been spikes in the number of confrontations, including in refugee camps, in connection with key developments or incidents, such as the launch of Operation 'Protective Edge' and the killing of Mohammad Abu Khdeir.[880]

506.   During the month of July 2014, the Israel Security Agency recorded a "sharp increase in attacks and riots" by Palestinians in the West Bank and Jerusalem,[881] with 424 attacks in the West Bank and 83 in Jerusalem.[882] According to their records, the number of incidents declined in August 2014 (241 attacks in the West Bank and 69 in Jerusalem),[883] and again in September 2014 (89 attacks in the West Bank and 25 in Jerusalem).[884] There were no statistics available in the monthly reports of the Israel Security Agency during this period on incidents of settler violence. Nevertheless, the commission received information indicating that settler violence against Palestinians and their property continued unabated[885] in an ongoing climate of impunity,[886] and that settlement related activity was ongoing.[887]

507.   According to information received by the commission, after the abduction of the Israeli youths, tensions were further fueled by a rise in extreme anti-Palestinian rhetoric by some Israelis, notably in social media, inciting revenge and hatred against Palestinians; as well as reported harassment; and sometimes, attacks on Palestinians and damage to businesses employing Palestinians.[888] The anti-Palestinian rhetoric included sexual and negative references to female relatives of persons connected with armed groups and individuals killed during the conflict.[889]

---

[878]   Submission 46.2
[879]   UN OCHA Humanitarian Bulletin (June-August 2014)
[880]   Submission 46.2
[881]   The Israel Security Agency does not disaggregate data between East and West Jerusalem, but rather refers to Jerusalem.
[882]   Monthly summary – July 2014, at http://www.shabak.gov.il/SiteCollectionDocuments/Monthly%20summary%20–%20July%202014%20docx.pdf (accessed on 31 May 2015)
[883]   Monthly summary – August 2014, at http://www.shabak.gov.il/SiteCollectionDocuments/Monthly%20summary%20–%20August%202014.pdf (accessed on 31 May 2015)
[884]   Monthly summary – September 2014, at http://www.shabak.gov.il/SiteCollectionDocuments/Monthly%20summary%20–%20September%202014.pdf (accessed on 31 May 2015)
[885]   Joint submission from Aldameer Association for Human Rights, Al-Haq, Al Mezan Center for Human Rights, and the Palestinian Center for Human Rights
[886]   Yesh Din, Data Sheet, November 2014, at http://www.yesh-din.org/infoitem.asp?infocatid=636 (accessed on 31 May 2015)
[887]   Peace Now, Unprecedented land confiscation of 4,000 dunams near Bethlehem, 31 August 2014, and Alarming Developments on the Ground, 7 July 2014, at http://peacenow.org.il/eng/GvaotDecleration and http://peacenow.org.il/eng/3-New-Outposts respectively (accessed on 31 May 2015)
[888]   A/HRC/28/80/Add.1, para. 7.
[889]   Haaretz, *Israeli professor's 'rape as terror deterrent' statement draws ire*, 22 July 2014, at http://www.haaretz.com/news/national/.premium-1.606542#!;  The Daily Beast, Israeli Politician Declares 'War' on 'the Palestinian People', 7 July 2014, at http://www.thedailybeast.com/articles/2014/07/07/israeli-politician-declares-war-on-the-palestinian-people.html (accessed on 15 May 2015). The Facebook page, previously at: https://www.facebook.com/ayelet.benshaul.shaked/posts/596568183794945, has been removed.

ATL005047

508.    The commission received information indicating that Palestinian security forces suppressed a number of protests against the hostilities in Gaza, held in the West Bank. In addition, between 13 June and end September 2014, the Palestinian Authority allegedly arrested and detained 13 suspected political opponents or persons expressing dissenting views.[890] In isolated instances, those detained reported ill-treatment.[891]

**Mass arrest and detention**

509.    The ISF carried out mass arrests in the West Bank, including East Jerusalem, arresting over 2,050 Palestinians between June and end September 2014.[892] Many of those detained were released just a short time after their arrest, making it difficult to obtain an exact figure.[893] They included 27 members of the Palestinian Legislative Council and over 60 individuals who had been liberated as part of a 2011 prisoner exchange that secured the release of Israeli soldier Gilad Shalit.[894] The commission was informed that, in many cases, including those of children, families were not notified of the arrest and whereabouts of their relative.[895]

510.    The commission heard testimony relating to the arrest of about thirty young men of the Abu Khdeir family, including a 17-year-old minor, for allegedly throwing stones and destroying public property during the funeral of Mohamed Abu Khdeir in East Jerusalem on 4 July 2014. Police allegedly forced their way into one of the houses of the Abu Khdeir family at 3.00 a.m. to look for suspects, despite the plea by eight female family members who had been sleeping in light garments and asked for time to get dressed.[896] A 15-year-old Palestinian-American member of the family, Tareq Abu Khdeir, was also arrested and ill-treated by the ISF in East Jerusalem on 3 July.[897] He was reportedly placed under house arrest until 17 July when he was allowed to leave Israel and return to the United States of America. He was cleared of wrongdoing in January 2015.[898]

511.    Those arrested and detained included a significant number of children. In June, July and August 2014, the Israel Prison Service reported that 201, 191 and 200 children respectively, were in military detention.[899] Most children were reportedly held in pre-trial

---

[890]   Joint submission from Aldameer Association for Human Rights, Al-Haq, Al Mezan Center for Human Rights, and the Palestinian Center for Human Rights
[891]   Ibid.
[892]   Ibid., citing Addameer
[893]   A/HRC/28/80/Add.1, para. 14.
[894]   Ibid.
[895]   Submission from HaMoked
[896]   W193
[897]   Addameer, Urgent appeal, 4 July 2014, http://www.addameer.org/etemplate.php?id=706 ; The Guardian, Palestinian boy Mohammed Abu Khdeir was burned alive, says official, 5 July 2014, at http://www.theguardian.com/world/2014/jul/05/palestinian-boy-mohammed-abu-khdeir-burned-alive (accessed on 10 May 2015)
[898]   The Jerusalem Post, *Tariq Abu Khdeir cleared of wrongdoing*, 28 January 2015, at http://www.jpost.com/Arab-Israeli-Conflict/Tariq-Abu-Khdeir-cleared-of-wrongdoing-389198 (accessed on 31 May 2015)
[899]   Military Court Watch, Statistics - Palestinian 'security' prisoners in Israeli detention, at http://www.militarycourtwatch.org/page.php?id=J5V0bQevz8a19020AWwFbv7lxv2 (accessed on 31 May 2015). According to information received by the Commission, the total number of children detained during this period may have been higher since detention figures are provided at the end of each month and appear to exclude children who were arrested and released in the same month.

ATL005048

detention until the end of the judicial proceedings,[900] in relation to accusations of stone throwing; just under half of them were housed in places of detention located in Israel.[901] All were boys, with the exception of one girl; most were between 16 to 17 years old and a significant number aged between 14 and 15.[902]

512.    The detention of male family members negatively affected the well-being of the suspects' families, particularly the women and girls who were unprepared to take on the role as the head of households.[903] As a result of cultural, economic and legal inequalities, women remain dependent on male family members.[904]

**Administrative detention**

513.    According to information received by the commission, a significant number of those arrested were placed under administrative detention, without charge or trial. Administrative detainees appear before a military court judge but are not charged with any criminal offense.[905] Based on data provided to NGOs by the Israel Prison Service, the number of administrative detainees more than doubled, from 201 in early June to 449 in early August 2014. NGO B'Tselem recorded 473 administrative detainees, as at the end of August 2014, which appears to be the highest number of administrative detainees since April 2009. According to the Israel Prison Service, over 60 per cent of them had been held for three months or less; some 10 per cent for three to six months; some 13 per cent for six months to one year; some 13 per cent for one to two years; and four detainees for over two years. Some 70 per cent of them were held in facilities located inside Israel.[906] Usually issued for one to six months, administrative detention orders can be renewed indefinitely.[907]

514.    While administrative detention is not prohibited *per se* under international law, its use should be limited. Given the considerable number of people held in administrative detention, the commission is concerned that Israel appears to use this form of detention more broadly than justified by the law. Evidence on which the detention order is based is considered secret and is not disclosed to the detainees or their counsel, making it impossible for them to challenge the lawfulness of the detention and rendering any judicial review ineffective.[908] Moreover, the transfer of the majority of these detainees from occupied territory to prisons inside Israel is not only a violation of the Fourth Geneva Convention,[909] but also frequently means that family visits are not possible owing to access and movement restrictions.

---

[900]  Submission 43; see also Haaretz, *In Israel, a different fate for detained Palestinian youths*, 23 May 2014, at http://www.haaretz.com/news/diplomacy-defense/.premium-1.592352#! (accessed on 15 May 2015)

[901]  See paragraphs above for legal framework regarding the transfer of detainees outside occupied territory.

[902]  Military Court Watch, Statistics - Palestinian 'security' prisoners in Israeli detention, at http://www.militarycourtwatch.org/page.php?id=J5V0bQevz8a19020AWwFbv7lxv2 (accessed on 31 May 2015)

[903]  Submission 41

[904]  W283

[905]  A/HRC/28/80, para. 33

[906]  Submission from HaMoked;  B'Tselem, Israel holding more than 470 Palestinians in administrative detention – highest number in 5 years, 7 October 2014, at http://www.btselem.org/administrative_detention/20141007_spike_in_number_of_administrative_det ainees (accessed on 31 May 2015)

[907]  A/HRC/28/80, para. 33

[908]  For further details on the use administrative detention under international law, see A/67/372, para. 26.

[909]  Art. 76, Geneva Convention IV

ATL005049

515.    In its November 2014 concluding observations, the UN Human Rights Committee
expressed concern "at the continuing practice of administrative detention of Palestinians, at
the fact that in many cases the detention order is based on secret evidence and at the denial
of access to counsel, independent doctors and family contacts (arts. 4, 9, and 14)." It
recommended that Israel "[e]nd the practice of administrative detention and the use of
secret evidence in administrative detention proceedings, and ensure that individuals subject
to administrative detention orders are either promptly charged with a criminal offence, or
released."[910]

**Torture and ill-treatment of adults and children**

516.    No official data was available to the commission regarding interrogations by the
Internal Security Agency or on the use of torture under the justification of "defence of
necessity".[911] However, the commission reviewed information suggesting that cruel,
inhuman or degrading treatment or punishment was used extensively during interrogations
in the period under examination.[912] Indeed, such allegations were persistently raised by
persons arrested and detained and by persons detained prior to the period under
examination, who stated that they were re-interrogated.[913]

517.    Specifically in relation to children, the commission interviewed three 14 to 17-year-
old boys, who were arrested by ISF in East Jerusalem, Nablus and Jenin, in June, July and
early August respectively;[914] reviewed the affidavits and testimonies of a number of minors
arrested in the West Bank during this period, whose cases were documented by NGOs; and
spoke to two lawyers handling cases of Palestinian children detained in the West Bank.[915]
All of the children, whose testimonies were examined, said that they were subjected to
multiple forms of cruel, inhuman or degrading treatment involving soldiers, interrogators,
or prison guards during the various stages of arrest, transfer, interrogation and/or detention.

518.    These accounts are consistent with findings of UN bodies and NGOs in recent
years.[916] In November 2014, the Human Rights Committee expressed concern "at reports of
the use of torture and other ill-treatment in the State party's detention facilities, including

---

[910]   CCPR/C/ISR/CO/4, para. 10

[911]   Torture practised under the "defence of necessity" continues to be legal under Israeli law, as noted
with concern by the Human Rights Committee in November 2014 (CCPR/C/ISR/CO/4, para. 14).

[912]   Joint submission from Aldameer Association for Human Rights, Al-Haq, Al Mezan Center for
Human Rights, and the Palestinian Center for Human Rights; Public Committee Against Torture in
Israel, Israel - Briefing to the Human Rights Committee for the Committee's Review of the Fourth
Periodic Report on Israel, September 2014, at
http://www.stoptorture.org.il/files/PCATI%20submission%20to%20HRC%202014_0.pdf (accessed
on 27 May 2015)

[913]   Joint submission from Aldameer Association for Human Rights, Al-Haq, Al Mezan Center for
Human Rights, and the Palestinian Center for Human Rights; Public Committee Against Torture in
Israel, Israel - Briefing to the Human Rights Committee for the Committee's Review of the Fourth
Periodic Report on Israel, September 2014, at
http://www.stoptorture.org.il/files/PCATI%20submission%20to%20HRC%202014_0.pdf (accessed
on 27 May 2015)

[914]   W184; W170; W165

[915]   W094; W154

[916]   UNICEF, Children in Israeli Military Detention - Observations and Recommendations, February
2013; Military Court Watch, Children in Military Custody, 1 September 2014, at
http://www.militarycourtwatch.org/files/server/CHILDREN%20IN%20MILITARY%20CUSTODY
%20-%202%20YEARS%20ON%20(1).pdf; Submissions from Adalah and Aldameer Association for
Human Rights; A/68/379

ATL005050

widespread, systematic and institutionalized ill-treatment of Palestinian children",[917] and called on Israel to "take robust measures to eradicate torture and ill-treatment against adult and child detainees".[918]

**Raids on homes**

519.    *"At around 2 a.m., they shot a bomb and suddenly a wall collapsed. I saw blood coming out of my left arm, we were sure that we would die. At the time I didn't see the injuries in my leg... My wife tried to dial a number but she was missing one finger."* A Palestinian father of three[919]

520.    In the context of search and arrest operations, the ISF allegedly raided hundreds of Palestinian homes as well as charitable associations, universities and media outlets.[920] Reports indicated that the ISF often forcibly entered homes in the early hours of the morning, while family members were asleep,[921] and that many of the raids resulted in significant damage to property, and, in some cases, theft of valuables.[922] According to OCHA, approximately 1,400 houses were raided, including at least 280 cases of reported damage; and at least 47 houses were occupied by the ISF for periods ranging from several hours to a few days.[923]

521.    The homes of the Rushdi family were raided by an IDF unit shortly before 2.00 a.m. on 26 June 2014. According to eyewitness reports,[924] the Israeli authorities cut off the electricity supply to the area before launching the raid. Some 40 soldiers conducted a search into two adjacent houses belonging to the extended family. An elderly female family member, described by witnesses as frail, allegedly fell to the ground when soldiers forced their way inside the home and reportedly ransacked the furniture and equipment. The commission was informed that the victim suffered a stroke and that her calls for help went unheeded by the IDF. The elderly woman was moved to a room with her daughter-in-law, while four children, under the age of five, were held in a separate room. Family members made repeated pleas to the IDF for an ambulance, as the elderly woman's condition deteriorated, with blood emanating from her mouth; but their calls were allegedly ignored. Medical assistance finally came in the form of a doctor of the IDF over 90 minutes after the victim's collapse, and eventually of an ambulance at around 4.00 a.m., by which time the victim had died.

522.    On 11 August 2014, five members of the Aza'ar family were injured during a search and arrest operation by the IDF. The children, aged six, eight and fourteen, were wounded, as were their parents, allegedly after the IDF shot and shelled their house while searching for a suspect who, the IDF told the victims, had used their family home as a base from which to shoot at the soldiers. The victims said that they were not asked to evacuate the house before the IDF began its operation.[925]

---

[917]   CCPR/C/ISR/CO/4, para. 15
[918]   Ibid.
[919]   W146
[920]   Submission from Addameer Prisoner Support and Human Rights Association; OCHA, Protection of Civilians, Weekly Report, 17-23 June 2014; A/HRC/28/80/Add.1, para. 6
[921]   Joint submission from Aldameer Association for Human Rights, Al-Haq, Al Mezan Center for Human Rights, and the Palestinian Center for Human Rights
[922]   Ibid.; A/HRC/28/80/Add.1, para. 6
[923]   OCHA, Humanitarian Bulletin, monthly report, June - August 2014
[924]   W185; W190
[925]   W146 and W147

ATL005051

523.    The commission received information regarding the psychological impact of such operations on family members, particularly women, including stress and lack of sleep.[926] This was exacerbated in the case of raids conducted in night-time hours. In two of the incidents examined by the commission, women said that they were threatened, mistreated and interrogated by the IDF during raids on their homes,[927] and expressed a sense of humiliation as the situation challenged their physical and moral integrity. The women were questioned about male relatives and their whereabouts and connections to Palestinian armed groups without the presence of a female officer. In one of these cases, the soldiers allegedly denied the request of the women to get dressed before being questioned.[928] In the other case, the woman's brother-in-law was beaten severely in front of his children when he objected to his brother's wife being questioned on her own by male soldiers on the basis that it violated Palestinian cultural norms for a woman to be alone with men outside of her family. After the beating, the woman was allegedly taken into a separate room and interrogated by four soldiers for several hours.[929] Overall, during this period, child protection actors working in the West Bank noted a dramatic increase in psychosocial interventions to support children and their families, notably those affected by house raids.[930]

**Restrictions on movement**

524.    The period also saw intensified restrictions on movement for Palestinians in the West Bank, with residents of the Hebron area, and notably Hebron city, particularly adversely affected. As of the outset of Operation 'Brother's Keeper', Hebron's 680,000 residents were effectively cut off from the rest of the West Bank owing to a series of closures, checkpoints and other restrictions.[931] Male residents of Hebron aged 16 to 50 were prohibited from traveling to Jordan via the Allenby Bridge, which had been their only means to travel abroad.[932] The commission was informed that the Palestinian Police Crossing Administration recorded that Israeli authorities prevented 3,393 Palestinians from crossing the Allenby Bridge between 13 June and 13 August 2014, due to security preclusions, in comparison to 1,266 who were turned away over all of 2013.[933] It appears that many of the affected individuals were visiting their families in the West Bank, while studying or working abroad.[934] Among them was an engineer from the Jenin area who was working in Qatar. On 9 August 2014, the ISF at Allenby Bridge allegedly prevented him and his seven-year-old daughter from returning to Qatar via Jordan for 'security reasons'. He was thus separated from his wife and two other children who were in Jordan, and feared losing his job if he was unable to report to work.[935] Overall, restrictions on movement

---

[926] Women's Centre for Legal Aid and Counselling, Moving Forward despite a Precarious Existence, 31 July 2014, at http://www.wclac.org/english/userfiles/WCLAC%202014%20Semi%20Annual%20Report.pdf (accessed on 1 May 2015);
[927] W193; W214.
[928] W193
[929] W214
[930] OCHA, Humanitarian Bulletin, monthly report, June - August 2014
[931] Ibid.; A/HRC/28/80/Add.1, para. 19
[932] A/HRC/28/80/Add.1, para. 19; Submission from HaMoked
[933] Submission from HaMoked
[934] Ibid.; Joint submission from Aldameer Association for Human Rights, Al-Haq, Al Mezan Center for Human Rights, and the Palestinian Center for Human Rights
[935] Joint submission from Aldameer Association for Human Rights, Al-Haq, Al Mezan Center for Human Rights, and the Palestinian Center for Human Rights

ATL005052

prevented many Palestinians from accessing services, markets, education and workplaces and generated significant economic losses.[936]

525.    In relation to the right to liberty of movement, guaranteed under article 12 of the International Covenant on Civil and Political Rights, the Human Rights Committee called on Israel, in November 2014, to "take all necessary measures with a view to ensuring respect for the right to freedom of movement for Palestinians throughout the OPT, comprising the West Bank, including East Jerusalem, and the Gaza Strip, and ensure that any restrictions on freedom of movement are in line with its obligations under the Covenant."[937]

**Punitive home demolitions**

526.    According to information reviewed by the commission,[938] on 2 July 2014, the IDF demolished a home in Ithna, Hebron, belonging to the family of a suspect accused of killing an Israeli policeman in April 2014. As a result, a mother and her five children lost their home.[939] This was followed, on 18 August 2014, by the demolition of two homes and the sealing of a third,[940] of three persons suspected of involvement in the abduction and murder of the Israeli youths. On 30 June 2014, the families had been forcibly evacuated from their homes, and the ISF had allegedly set off explosions in the houses in order to render them uninhabitable. As a result of the actions on 30 June and 18 August 2014, 21 people, including at least 9 children, were displaced.[941] Orders to demolish or seal a house were issued in November 2014 for a further six homes in East Jerusalem of Palestinian suspects alleged to have carried out lethal attacks.[942]

527.    The commission notes the particular effect that home demolitions have on women and children. As a result of fixed gender roles and prevailing cultural norms, Palestinian women's lives are centred around the home and their presence in the public sphere is limited.[943]    The challenges women face in relation to home demolitions are exacerbated by

---

[936]    Submission from HaMoked; joint submission from Aldameer Association for Human Rights, Al-Haq, Al Mezan Center for Human Rights, and the Palestinian Center for Human Rights;  B'Tselem, Hebron District and its 680,000 residents under third day of closure: increasing reports of property damage in arrest raids, at
http://www.btselem.org/press_releases/20140617_collective_punishment_in_hebron_district (accessed on 31 May 2015); OCHA, Humanitarian Bulletin, monthly report, June - August 2014
[937]    CCPR/C/ISR/CO/4, para. 18.
[938]    A/HRC/28/80/Add.1, paras. 17-18, submission from HaMoked; joint submission from Aldameer Association for Human Rights, Al-Haq, Al Mezan Center for Human Rights, and the Palestinian Center for Human Rights; OCHA Protection of Civilians, Weekly Report, 12-18 August 2014. http://www.ochaopt.org/documents/ocha_opt_protection_of_civilians_weekly_report_2014 _8_22_english.pdf
[939]    Submission from HaMoked
[940]    Sealing involves the complete or partial closing off of rooms in a house with metal sheeting or by filling them with concrete. This can, at times, be an irreversible act.
[941]    OCHA Protection of Civilians Weekly Report, 12-18 August 2014
[942]    Special Rapporteurs on the situation of human rights in the Palestinian territories occupied since 1967 and on adequate housing as a component of the right to an adequate standard of living, and on the right to non-discrimination in this context, Palestinian homes must cease to be a target, UN human rights experts say, 25 November 2014, at
http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=15340&LangID=E (accessed on 31 May 2015); submission from HaMoked.
[943]    Women's Centre for Legal Aid and Counselling, Moving Forward despite a Precarious Existence, 31 July 2014, at

ATL005053

discrimination within the society itself,[944] including difficulties securing tenure and managing and accessing property and other assets.[945]

528.    In each case, the NGO HaMoked petitioned the High Court of Justice to challenge the legality of the home demolitions and prevent them from taking place.[946] According to the information received by the commission, the High Court of Justice repeatedly dismissed the petitions, with the exception of one case, in which it issued an order *nisi*, instructing the state to explain why it should not refrain from carrying out the demolition.[947] On 31 December 2014, the Court rejected a general public petition, presented by eight Israeli NGOs, against the policy of punitive home demolitions.[948] In its judgement, the Court accepted the State's reasoning that these demolitions were necessary on security grounds and in order to act as a deterrent.[949] The Court did add that, from time to time, State agencies should evaluate the effectiveness of such demolitions for deterrence purposes, to the extent possible, and bring data to the Court in the future, if so required.[950]

529.    With the exception of the punitive demolition of two homes in 2009, Israel had effectively suspended the practice of punitive home demolitions in 2005, after a military commission recommended that Israel stop resorting to house demolitions of "terrorists" in the West Bank as a means of deterrence against attacks on Israelis, and noted their adverse effects.[951] This had been a welcome development.

530.    The commission is therefore concerned about the resumption of a practice that risks further fueling hatred and the cycle of violence, rather than achieving its stated objective of deterrence. Moreover, punitive home demolitions are generally not subject to a judicial process to determine the guilt, or innocence, of the suspect or family members affected by the demolition. The impact of the punitive demolition of a home affects entire families, including those with no link to the alleged crime, and therefore constitutes collective punishment, in violation of international humanitarian law.[952] Bearing this in mind, the commission is concerned that the High Court of Justice did not accept the aforementioned petition against the policy of home demolitions, and rejected the claim that any demolition, "regardless of its specific circumstances, necessarily amounts to collective punishment".[953]

531.    Home demolitions also violate Israel's obligations under international human rights law, notably the rights to adequate housing (as a component of the right to an adequate standard of living), family life, and physical and mental health. In November 2014, the Human Rights Committee called on Israel to "[i]mmediately put an end to conducting punitive demolitions given their incompatibility with the State party's obligations under the

---

http://www.wclac.org/english/userfiles/WCLAC%202014%20Semi%20Annual%20Report.pdf (accessed on 1 May 2015)

944   Ibid.; W283
945   Norwegian Refugee Council, at http://womenshlp.nrc.no/countries/palestine-gaza/ (accessed on 15 May 2015)
946   Submission from HaMoked
947   Ibid.
948   According to HaMoked, on 15 January 2015, the organisations applied for another hearing of the petition before an expanded panel of justices.
949   HCJ 8091/14
950   Ibid.
951   The report of the military commission was not publicly available, but a presentation of slides, submitted to the High Court of Justice, can be found at: http://www.hamoked.org.il/items/110467.pdf. See slides 30 and 29.
952   Art. 33, Geneva Convention IV
953   HCJ 8091/14

ATL005054

Covenant and provide effective remedies to victims of destruction of property, forced eviction and forcible transfer".[954]

**Deaths and injuries of Palestinians during law enforcement activities**

532.   *"We were a number of young people in Bethlehem. We didn't have any arms. We were just shouting slogans. We weren't a threat to anyone, but at 8pm it happened."*[955] Palestinian human rights defender Farid Al Atrash, who was shot in the leg by live ammunition.

533.   According to the UN, between 12 June and 26 August 2014,[956] 27 Palestinians, including five children,[957] were allegedly killed and over 3,100 Palestinians, including 460 children, were injured by the ISF.[958] Documentation by NGOs suggests that this figure rose again by end September.[959] Of the 27 fatalities, the UN found that 14 "were incurred in clashes that erupted following protests against the hostilities in Gaza and restrictions on access to Al Aqsa Mosque", and seven took place in the context of confrontations during search and arrest operations. Nine of the fatalities, including three of the children, were killed in the Hebron area. Casualty figures represented a three-fold increase in comparison to the first five months of 2014.[960] The commission examined 14 cases of killings, including three children, and nine cases of injuries, of which three were children. Based on information collected by the commission, young persons in their late teens and early 20's were particularly at risk, in part due to their significant presence or participation during protests and their perceived or actual involvement in stone-throwing.

534.   On 20 July 2014, Farid Al Atrash, a Palestinian human rights defender, was injured in his leg after being hit by live ammunition during a demonstration in solidarity with the people in Gaza. He told the commission that he was peacefully participating in the demonstration in Bethlehem, when he was hit in the calf with live ammunition.[961] He said he heard no gunshot. Some protestors were allegedly throwing stones, and the IDF responded by using crowd dispersal techniques, such as sound bombs and tear gas.[962] Clashes between Palestinians and the IDF reportedly went on until the early hours of the morning. The victim explained that the protest had taken place near Al Qubba checkpoint (also known as checkpoint 300 near Rachel's Tomb) and that Israeli soldiers stationed behind the 'Wall' came out of the gate in the 'Wall' after the clashes intensified and confronted the protestors.

535.   On 25 July 2014, three Palestinian men - Hashem Abu Maria, Sultan Za'qiq and Abdelhamid Breighith - were killed during a demonstration that took place in the village of

---

[954]   CCPR/C/ISR/CO/4, para. 9

[955]   W155

[956]   This period represents the date when the three Israeli youths were abducted until the declaration of a ceasefire in Gaza.

[957]   A/HRC/28/80/Add.1, para. 10

[958]   OCHA, Humanitarian Bulletin, monthly report, June - August 2014

[959]   Joint submission from Aldameer Association for Human Rights, Al-Haq, Al Mezan Center for Human Rights, and the Palestinian Center for Human Rights; B'Tselem, Palestinians killed by Israeli security forces in the West Bank, after operation Cast Lead, at http://www.btselem.org/statistics/fatalities/after-cast-lead/by-date-of-death/westbank/palestinians-killed-by-israeli-security-forces (accessed on 31 May 2015)

[960]   OCHA, Humanitarian Bulletin, monthly report, June - August 2014 http://www.ochaopt.org/documents/ocha_opt_the_humanitarian_monitor_2014_10_03_english.pdf

[961]   W155

[962]   Ibid.; see also Panet at http://www.panet.co.il/article/831637

ATL005055

Beit Umar in the Hebron area to protest against the hostilities in Gaza. In its assessment of the incident, the commission relied on eyewitness testimony, as well as information gathered by OHCHR and NGOs.[963]

536.    According to the information reviewed, Hashem Abu Maria was killed first, when standing 100-250 metres away from a group of snipers stationed on the rooftop of a building. An eyewitness, standing next to the victim, told the commission that a masked sniper pointed a "long weapon" in their direction, "even if there was no stone throwing" from where they were standing.[964] The witness stated that a single bullet traversed Abu Maria's chest, making a four centimetre hole in his back, and injured another man, Mohammad Awad, in the head, before deflecting off a wall. Hashem Abu Maria was quickly transferred by protesters to an ambulance and taken to hospital, where he was pronounced dead. Mohammad Awad survived the incident. Hashem Abu Maria was a well-known civil society activist, who worked for the NGO Defence for Children International, in the Hebron area. Eyewitness testimony received by the commission corroborates the finding by OHCHR that Hashem Abu Maria was not taking part in the clashes.[965]

537.    According to the information available, Sultan Za'qiq was the second to be killed by live ammunition, after being felled by a single bullet. Abdelhamid Breighith was shot subsequently by live ammunition in his leg, as he tried to drag Sultan Za'qiq back behind a wall where they had earlier taken shelter from tear gas and rubber bullets that were fired against protestors, some of whom were throwing stones at the ISF.[966] Another shot hit Abdelhamid Breighith in the area of his abdomen.[967] The two men appeared to have been hit by a sniper stationed on a rooftop.[968] Both men were taken to hospital by ambulance, but neither survived. There was no indication that Abdelhamid Breighith had thrown stones.

538.    Neither Hashem Abu Maria nor Abdelhamid Breighith appear to have posed a direct or imminent threat to the IDF soldiers or any other persons. With regard to Sultan Za'qiq, Human Rights Watch gathered information indicating that he may have been throwing stones -- with his hand rather than a sling -- but was located some 35 metres from the nearest soldiers at the time he was shot, leading the organisation to conclude that "[u]nder the circumstances, it appears extremely unlikely that Za'aqiq posed an imminent lethal threat to Israeli forces".[969]

539.    In a separate incident on the same day (25 July 2014), 22-year-old Tayyeb Abu Shehadeh was killed in the village of Huwara in the Nablus area. According to eyewitness

---

[963]  W213; Human Rights Watch, Israel: Shooting Deaths after West Bank Protest Evidence Points to Unlawful Killings by Israeli Forces, 3 August 2014, at http://www.hrw.org/news/2014/08/03/israel-shooting-deaths-after-west-bank-protest-0 (accessed on 15 May 2015);  B'Tselem, 13 Palestinians killed by Israeli security forces in West Bank since Operation Protective Edge began: Excessive use of live fire suspected, 29 July 2014, at http://www.btselem.org/press_releases/20140729_13_palestinian_fatalities_since_gaza_operation_be gun (accessed on 15 May 2015);  A/HRC/28/80/Add.1, para. 13.

[964]  W213

[965]  A/HRC/28/80/Add.1, para. 13.

[966]  Information provided by Al Haq; see also Human Rights Watch, Israel: Shooting Deaths after West Bank Protest Evidence Points to Unlawful Killings by Israeli Forces, 3 August 2014, at http://www.hrw.org/news/2014/08/03/israel-shooting-deaths-after-west-bank-protest-0 (accessed on 15 May 2015)

[967]  Ibid.; information provided by Al Haq

[968]  Human Rights Watch, Israel: Shooting Deaths after West Bank Protest Evidence Points to Unlawful Killings by Israeli Forces, 3 August 2014, at http://www.hrw.org/news/2014/08/03/israel-shooting-deaths-after-west-bank-protest-0 (accessed on 15 May 2015)

[969]  Ibid.

143

ATL005056

testimony and other material reviewed by the commission,[970] he was shot by an Israeli soldier during clashes between Palestinians and the IDF. The clashes were triggered by the killing, earlier that day, of Khaled Odeh by a settler. Eyewitness testimony indicates that tear gas was used to disperse the protestors at the beginning of the clashes. Tayyeb Abu Shehadeh apparently hid in an alley and appeared at times to throw stones at the IDF. According to the information available, a soldier aimed his weapon at the alley and shot Tayyeb Abu Shehadeh in the face when he emerged. The victim was rushed to hospital in a private vehicle, but did not survive.

540.    Also on the evening of 25 July 2014, a Palestinian man sustained an injury to his leg by live ammunition fired by the IDF. The man told the commission that, in his professional capacity, he was covering a demonstration of several thousand Palestinians, who marched from the centre of Jenin towards the Jalama checkpoint in solidarity with the people of Gaza. Most of the demonstrators were dispersed by the IDF and prevented from reaching the checkpoint.    A group of some 150-200 men continued to advance towards the checkpoint, and allegedly threw stones and Molotov cocktails and burnt tyres.[971] The victim said that he continued to observe the events when he felt something metallic in his leg and then felt his leg was "on fire", before falling to the ground and losing consciousness. He noted that he had heard no sound of a bullet before he was hit.[972] A number of other Palestinians were allegedly injured during the incident and 19-year-old Basem Abu Al Rub was killed on the night of 25 to 26 July.[973]

541.    On the morning of 10 August 2014, 11-year-old Khalil 'Anati was killed near his house in the al-Fawwar refugee camp in Hebron. According to eyewitness testimony and other material reviewed by the commission,[974] a single live bullet, fired by an IDF solider, entered Khalil's back. Khalil was rushed to hospital in a private vehicle and died en route. Information available indicates that Khalil 'Anati was accompanied by a handful of other boys, some or all of whom may have thrown stones at military vehicles that entered the camp that morning. However, it appears that the area was calm at the time; that the soldiers in the vehicle did not use any non-lethal measures; and that they were not under any serious threat. These elements raise the question as to whether the soldier may have aimed directly at the boy.

542.    OHCHR concluded that the number of Palestinians killed by the ISF during this two-and-a-half month period was equivalent to the total number of Palestinians killed in

---

[970] W168; submission 4.2; B'Tselem, Palestinians killed by Israeli security forces in the West Bank, after operation Cast Lead, at http://www.btselem.org/statistics/fatalities/after-cast-lead/by-date-of-death/westbank/palestinians-killed-by-israeli-security-forces (accessed on 31 May 2015)

[971] W281;  joint submission from Aldameer Association for Human Rights, Al-Haq, Al Mezan Center for Human Rights, and the Palestinian Center for Human Rights; B'Tselem, 13 Palestinians killed by Israeli security forces in West Bank since Operation Protective Edge began: Excessive use of live fire suspected, 29 July 2014, at http://www.btselem.org/press_releases/20140729_13_palestinian_fatalities_since_gaza_operation_begun (accessed on 15 May 2015)

[972] W281

[973] W281; B'Tselem, 13 Palestinians killed by Israeli security forces in West Bank since Operation Protective Edge began: Excessive use of live fire suspected, 29 July 2014, at http://www.btselem.org/press_releases/20140729_13_palestinian_fatalities_since_gaza_operation_begun (accessed on 15 May 2015); OCHA Protection of Civilians report, 22 July – 4 August 2014; joint submission from Aldameer Association for Human Rights, Al-Haq, Al Mezan Center for Human Rights, and the Palestinian Center for Human Rights.

[974] W227 and W192; B'Tselem finds: No justification for live fire that killed 10-yr-old Khalil 'Anati in al-Fawwar R.C. on 10 Aug. 2014, 21 September 2014, at http://www.btselem.org/firearms/20140921_killing_of_khalil_anati; Submission 46.2

ATL005057

similar circumstances in the whole of 2013.[975] According to OCHA, nearly a quarter of Palestinian injuries in the West Bank between June and August 2014 were sustained as a result of live ammunition, marking a substantial increase in absolute and percentage terms[976] --- from 2 per cent in 2012.[977] According to OHCHR, the proportion of those injured by live ammunition was much lower in East Jerusalem than in the rest of the West Bank.[978]

543.    The commission is concerned about the regular resort by the ISF to live ammunition, including in situations where there is no direct or imminent threat to the ISF or other individuals. The use of live bullets inevitably raises the likelihood of death or serious injury. In this context, the commission highlights the apparent increasing trend of the ISF to use 0.22 inch calibre bullets in crowd control situations.[979] A statement made by the IDF commander in the West Bank on 9 September 2014 indicates that 0.22 bullets and other live ammunition were increasingly the munition of choice. He reportedly noted that "[i]n places where we used to fire tear-gas or rubber[-coated metal bullets], we now fire Rutger bullets and sometimes live bullets".[980] On several occasions, eyewitnesses or victims told the commission that they did not hear a bullet being fired.[981] In the aforementioned case of the man injured in the Jenin area, he was informed that the bullet removed from his leg was a 0.22 bullet.

544.    The pervasive use of live ammunition, in particular 0.22 inch caliber bullets, combined with the spike in fatalities and casualties arising out of Israel's law enforcement activities in the West Bank, appears to confirm a change in policy or in the open-fire regulations guiding IDF law enforcement operations in the West Bank, despite assurances by the Military Advocate General in 2009 that 0.22 bullets were not classified as riot control means and were not appropriate methods to deal with public disturbances.[982]

545.    In the West Bank, the ISF, including the IDF, act in a law enforcement capacity, and should therefore carry out their duties in accordance with the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials.[983] Principle 9 states that the use of firearms is authorized in extremely limited circumstances, namely in "self-defence or defence of others against the imminent threat of death or serious injury, to prevent the perpetration of a particularly serious crime involving grave threat to life, to arrest a person presenting such a danger and resisting their authority, or to prevent his or her escape, and only when less extreme means are insufficient to achieve these objectives. In any event, intentional lethal use of firearms may only be made when strictly unavoidable in order to protect life."

---

[975] A/HRC/28/80/Add.1, footnote 12
[976] OCHA, Humanitarian Bulletin, monthly report, June - August 2014
[977] OCHA, Humanitarian Bulletin, monthly report, June - August 2014
[978] A/HRC/28/80/Add.1, para. 10
[979] B'Tselem, Military steps up use of live 0.22 inch bullets against Palestinian stone-throwers, 18 January 2015, at http://www.btselem.org/press_releases/20150118_use_of_live_ammunition_in_wb (accessed on 15 May 2015); submission 46.2
[980] Ibid. (unofficial translation)
[981] E.g. W281; W155
[982] B'Tselem, Judge Advocate General to B'Tselem: 0.22-caliber bullets are not crowd-control measures, 9 July 2009, at http://www.btselem.org/press_releases/20090709
[983] In November 2014, the Human Rights Committee called on Israel to "[t]ake all necessary measures to prevent incidents of excessive use of force during law enforcement operations, including by ensuring that rules of engagement or open fire regulations of the State party's security forces in the West Bank, including East Jerusalem, and the Access Restricted Areas of Gaza, are consistent with article 6 of the Covenant and the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials", see CCPR/C/ISR/CO/4, para 13 (a).

546.    In relation to the Occupied Palestinian Territory, Israel is bound by article 6 of the International Covenant on Civil and Political Rights, which prohibits the arbitrary deprivation of life. The use of firearms against those not posing a threat to life or serious injury, and modifications in policy or issuance of orders allowing for such use, constitutes a violation of this prohibition and may, depending on the circumstances, amount to an act of wilful killing. The unjustified and illegal recourse to firearms by law enforcement officials may constitute a war crime when it takes place in the context of an international armed conflict, including a situation of military occupation, and in the event that the person killed was a protected person. In addition, the commission notes that the violation of the prohibition of wilful killing includes the intent to cause "serious bodily injury which, as it is reasonable to assume [the perpetrator] had to understand was likely to lead to death,"[984] which is a clear risk when using live ammunition.

**Settler violence and settlement related activity**

547.    Incidents of settler violence continued to be reported in the West Bank, including East Jerusalem during the summer of 2014.[985] There were allegations of physical assaults against Palestinians, stone-throwing against Palestinians and Palestinian cars, so-called "price tag" incidents,[986] and damage to Palestinian property. Cases of settlers opening fire with live ammunition against Palestinians were also recorded.[987] In one case examined by the commission, an 18-year-old Palestinian, Khaled 'Odeh, was allegedly killed by an Israeli settler during a demonstration in solidarity with the people of Gaza on 25 July 2014 in Huwara, Nablus. Some four others were also reportedly injured[988] when a settler driving past allegedly fired into the crowd.[989] Information received differed as to whether stones were thrown at the settler's vehicle by one or more of the demonstrators and if so whether the stone-throwing began before or after the shooting.[990] Eyewitness testimony indicates that Khaled 'Odeh was hit by a single bullet that entered his lower back.[991]

---

[984]   ICTY, *The Prosecutor v. Zejnil Delalic and Others,* IT-96-21-A, Appeals Chamber Judgement of 20 February 2001, para. 422

[985]   OCHA Protection of Civilians Weekly Reports: 10-16, 17-23 and 24-30 June 2014; 1-7, 8-14, and 15-21 July 2014; 22 July - 4 August 2014; 5-11, 12-18, and 19-25 August 2014

[986]   This refers to acts by settlers seeking to exact a "price" against Palestinians and their property in response to Israeli authorities' attempts to dismantle settlement outposts.

[987]   E.g. OCHA Protection of Civilians Weekly Report, 12-18 August 2014. See also joint submission from Aldameer Association for Human Rights, Al-Haq, Al Mezan Center for Human Rights, and the Palestinian Center for Human Rights; A/HRC/28/80/Add.1, para. 22.

[988]   W209; OCHA Protection http://www.ochaopt.org/documents/ocha_opt_protection_of_civilians_weekly_report_2014 _8_08_english.pdfof Civilians Report, 22 July - 4 August 2014

[989]   W209; B'Tselem, 13 Palestinians killed by Israeli security forces in West Bank since Operation Protective Edge began: Excessive use of live fire suspected, 29 July 2014, at http://www.btselem.org/press_releases/20140729_13_palestinian_fatalities_since_gaza_operation_be gun (accessed on 15 May 2015)

[990]   W209 suggests stone throwing followed the shooting, while OCHA suggests that the shooting preceded the shooting. See OCHA Protection http://www.ochaopt.org/documents/ocha_opt_protection_of_civilians_weekly_report_2014 _8_08_english.pdfof Civilians Report, 22 July - 4 August 2014. See also, B'Tselem, 13 Palestinians killed by Israeli security forces in West Bank since Operation Protective Edge began: Excessive use of live fire suspected, 29 July 2014, at http://www.btselem.org/press_releases/20140729_13_palestinian_fatalities_since_gaza_operation_be gun (accessed on 15 May 2015)

[991]   W209; W018

ATL005059

548.    On 25 August 2014, Israel's Civil Administration declared as State land some 4,000 dunams (990 acres) of land located within the boundaries of five Palestinian villages in the Bethlehem area.[992] Israeli media reported that the announcement followed a decision by the Israeli Government to take over the land in response to the abduction and killing of the three Israeli youths.[993] According to the Jerusalem Post, then Economy Minister Mr. Naftali Bennett praised the decision and said "What we did yesterday was a display of Zionism…Building is our answer to murder."[994] Once the process is complete,[995] it appears that this land may be incorporated into the Gush Etzion settlement bloc,[996] where the three Israeli youths were last seen before their abduction.

549.    The commission takes note of the extensive material available on violations of Palestinians' human rights resulting from Israeli settlements and settler violence.[997] Moreover, it concurs with the finding of the UN Secretary-General and other UN bodies that the construction and expansion of Israeli settlements are illegal under international law.[998] In November 2014, the Human Rights Committee urged Israel to "take all necessary measures to prevent violence perpetrated by the State party's settlers and protect Palestinians effectively when such violence occurs."[999]

**Conclusion**

550.    During the period under examination by the commission, the West Bank, including East Jerusalem, witnessed widespread human rights violations, including the fundamental right to life, which were overshadowed by the tragic events in Gaza. The commission considers that implementation of the 2014 recommendations by the Human Rights Committee cited above would represent a critical step towards ensuring the non-repetition of these violations in the future.

## VI.   Impact

551.    *"We should exist in this world in a spirit of cooperation, of love for life, of brotherhood."* Dr. Kamel Qdeih, a Palestinian doctor in Gaza[1000]

552.    *"As long as the people on the other side…don't have security and a way to live side by side, this is going to continue. I want to tell this to the leaderships of both sides. We need*

---

[992]   Peace Now, Unprecedented land confiscation of 4,000 dunams near Bethlehem, 31 August 2014, at
       http://peacenow.org.il/eng/GvaotDecleration (accessed on 31 May 2015)

[993]   Haaretz, *Israel appropriates massive tract of West Bank land*, 31 August 2014, at
       http://www.haaretz.co.il/news/diplomacy-defense/.premium-1.613319#!

[994]   Jerusalem Post, Bennett: *Building is Zionist answer to murder of 3 Israeli teens*, 1 September 2014, at
       http://www.jpost.com/Arab-Israeli-Conflict/Bennett-praises-decision-to-expand-state-land-in-West-
       Bank-Building-is-our-answer-to-murder-373087; see also quotes from several officials cited on Arutz
       Sheva on 4 September 2014, at http://www.inn.co.il/News/News.aspx/283300 (accessed on 28 May
       2015)

[995]   There is a process of endorsement, including a timeframe for the consideration of objections to the
       declaration and review of eventual petitions to the Supreme Court.  For more details, see
       A/HRC/28/44.

[996]   OCHA, Humanitarian Bulletin, monthly report, June - August 2014

[997]   E.g. A/HRC/28/44, paras 39-53.

[998]   See A/HRC/348 paras 4-5.

[999]   Human Rights Committee, Concluding observations on the fourth periodic report of Israel,
       CCPR/C/ISR/CO/4, para 16

[1000]  W268.

ATL005060

*to achieve dignity and liberty for the other side as well"*. An Israeli woman living near the Green Line. [1001]

553.   "*I see no difference between our blood and others' blood. I believe peace will eventually win.*" Israeli doctor from close to Tel Aviv.[1002]

554.    "*I am one of hundreds of Palestinian mothers who have lost their children. I lost my son Mohammad and he won't come back from school to sing to me....I don't want any other mother to go through what I went through*". Suha Abu Khdeir, mother of a 16-year-old boy who was murdered by being burnt alive in West Jerusalem.

555.   Palestinians and Israelis were profoundly shaken by the events of the summer of 2014 and many witnesses described the trauma that resulted from the violence they experienced. In particular, children on both sides were savagely affected by the events. As a result of their lengthy displacement and fear of what the future would bring, many reportedly suffered from bed-wetting, shaking at night, clinging to parents, nightmares and increased levels of aggressiveness.[1003]

## A.   Israel

556.    "*Thanks to our interceptor missile system, no physical damage was caused [to me], but the terrible feeling of running for your life cannot be intercepted or forgotten.*" Resident of Oranit, Israel.[1004]

557.   The 2014 conflict caused immense distress and disruption to Israeli civilians, particularly in the southern regions. The commission received numerous oral and written (101) testimonies and complaints addressed to the Human Rights Council (85) from Israelis who were exposed to the threat of rocket and mortar attacks and assaults from tunnels during the summer of 2014. The submissions recount the distress and anger of Israelis[1005] who point out three matters of particular concern to them: (i) the trauma caused by the constant threat of rocket attacks, infiltrations and displacement; (ii) insufficient time to carry out effective emergency procedures during attacks; and (iii) the adverse impact of the conflict on local businesses and the overall economy.

### Psychological Impact

558.    "*We could live so happily but instead we have tunnels [...]. There was a tunnel just behind the greenhouses. In a way, they are more scary than the rockets because with the tunnels, there's no chance of being warned. Some people won't let their children go outside because of that.*"[1006]

559.    "*Children couldn't speak, they were shaking at night, wetting the bed. Now, a lot of the children became more violent, they say it's post-trauma, children don't know how to cope with it.*"[1007]

---

[1001]   W010.
[1002]   Submission 26.53.
[1003]   Child Protection Working Group, Child Protection Rapid Assessment Report, October 2014 (available at http://cpwg.net/wp-content/uploads/sites/2/2015/03/Child-Protection-Rapid-Assessment-_-Gaza_2014.pdf).
[1004]   Email submission 26.15.
[1005]   W073.
[1006]   W010.
[1007]   W076

ATL005061

560.    Many Israelis experienced what they describe as indelible suffering caused by the constant threat of attacks by Palestinian armed groups. The stress and trauma had serious effects on their well-being, particularly for persons who live in the south in areas near Gaza. The commission interviewed several witnesses who indicated that the sound of rockets, the running to bomb shelters and the pervasive fear was seriously affecting their and especially their children's wellbeing. A witness who lives about 1.7 km from the Green Line told the commission that, during the height of the conflict, the alarms would sound several times a day and there would be on average six explosions a day 300 yards from her house. She said that this was much more frequent bombing than during previous hostilities. Although they received warnings, there was often not enough time to gather the children and take them to the shelter.[1008]

561.    While the fear of rocket and mortar strikes from Gaza has been long-standing, 2014 was characterized by the discovery of tunnels. Witnesses reported to the commission that inhabitants interpreted any sound of digging in the area near the Green Line as attempts by members of armed groups to infiltrate Israel. Moreover, members of the kibbutzim of southern Israel said that they regularly receive phone text messages from the IDF informing them of aborted infiltration attempts into their communities, and that these alerts have nurtured a persistent fear of potential attacks through tunnels linked to Gaza. For example, one witness told the commission that residents of her kibbutz continued to experience regular panic attacks after a tunnel discovery not far from where they live in March 2014, the explosion of an alleged tunnel exit on 8 July, and several other infiltration attempts that were thwarted by the army in July and August.[1009] Another witness observed that "You kind of get used to missiles and then there's this fear that people will come from the ground and hurt you. It makes no sense. And now everything is so quiet again and that's also strange."[1010] A mother described to the commission that many of the communities live in fear of the tunnels and that during the conflict the people in her kibbutz at times received "infiltration warnings". For instance, on one occasion she was walking to the kindergarten to pick up her children when an Israeli soldier stopped her and told her to return home because members of the armed groups had come out of the tunnels close to the kindergarten. The witness said she and the other mothers ran to the kindergarten and stayed there for 2-3 hours waiting, in fear for their own and their children's safety.[1011]

562.    An eyewitness informed the commission that, on 30 July 2014, he personally saw a tunnel that runs between the Deir Al Balah Refugee Camp and Kibbutz Kissufim in southern Israel[1012]. According to Israeli authorities, the IDF uncovered 32 tunnels during the conflict, 14 of which penetrated Israeli territory.[1013]

563.    The psychological impact of the conflict on Israeli civilians is also manifest in numerous accounts of anxiety disorders that were brought to the attention of the commission. Magem David Adom reports that 581 Israelis were treated for anxiety attacks during the conflict[1014], which placed these civilians at risk of mental health problems even after the end of hostilities. For example, a resident of Ashdod wrote to the commission

---

[1008]    W006.

[1009]    W075.

[1010]    W007.

[1011]    W006.

[1012]    W072.

[1013]    Israel, Ministry of Foreign Affairs, *Israel's Objectives and Phases of the 2014 Gaza Conflict*, p. 8-12. At: http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx. Accessed 30 May 2015

[1014]    Magen David Adom in Israel, Cease fire in Operation "Protective Edge" is holding MDA sums up 50 days of saving lives, 29 August 2014. At http://www.mdais.com/316/7004.htm.

ATL005062

about the way in which her fear of indiscriminate attacks significantly reduced her sense of safety and well-being, making her "lose peace of mind and security of person"[1015]. The psychological consequences reported in submissions from Israelis include fear, restlessness, decreased ability to focus, Post-Traumatic Stress Disorder and other stress-related symptoms. These effects were especially observed in children, for whom the summer holiday season became a daily struggle to cope with the anxiety induced by the sound of sirens. In one case, for example, a physician who lives in the village of Savyon near Tel Aviv reported that his 11 year-old girl became unable to sleep or take showers unsupervised after she was traumatized by the sound of alarms in July and August 2014[1016]. In another case, a nine-month-old baby, who was four-months-old during the conflict, developed a form of anxiety which made him panic at the sound of any alarm for months afterwards[1017]. A witness told the commission that her two grown stepdaughters were so traumatized by the repeated conflicts that one suffered from epileptic style seizures whenever she heard a rocket, while the other suffered from severe anxiety attacks.[1018]

564.   The events during the hostilities pushed entire communities in southern Israel to seek refuge in other parts of the country, and members of these communities were deeply affected by their experience of displacement. OCHA reports that 70 per cent of the 40,000 residents of the Gaza rim left their homes during Operation Protective Edge.[1019] A witness said that up to ten communities living along the Green Line were displaced[1020]. The population of a kibbutz of 500 dwindled to 15 during the hostilities according to a resident who spoke to the commission.[1021] Another witness said that no more than 55 people out of a population of 300 were left in a kibbutz at the end of August 2014.[1022] Children, particularly those who live in areas neighbouring Gaza, suffered worse mental health effects than adults as a result of the displacement. According to the Israeli authorities, over 20,000 children in southern communities migrated to the north during the conflict.[1023] A social worker who closely followed these children's experiences of displacement reported a number of symptoms, including restlessness, lack of sleep, inability to concentrate at school, and violent behaviour.[1024] Witnesses also informed the commission that some children in their communities had to undergo specialized treatment to cope with the threat of displacement.[1025] Some of the women interviewed by the commission left the southern region with their children to seek safety in northern Israel. During the displacement they had to rely on the good will of relatives, friends or strangers for accommodation and assistance. The situation was reported to have added to the burden of responsibilities on Israeli women.[1026] For instance, a mother of three in Kibbutz Sa'ad related the frightening experience of leaving her home with her children several times during the summer,

---

[1015]   Email submission in Hebrew number 31.
[1016]   Email submission 26.53.
[1017]   Email submission 26.23.
[1018]   W006.
[1019]   OCHA Occupied Palestinian Territory, Gaza Emergency Situation Report, 28 August 2014. At http://www.ochaopt.org/documents/ocha_opt_sitrep_28_08_2014.pdf
[1020]   W139.
[1021]   W076.
[1022]   Submission 24.2.7.
[1023]   Ministry of Foreign Affairs, at http://mfa.gov.il/ProtectiveEdge/Documents/Threat_to_%20Home_Front.pdf.
[1024]   W139.
[1025]   W140.
[1026]   W076, W006 and W008.

ATL005063

especially during the ground operations, when she stayed with relatives and friends in other parts of Israel.[1027]

**Emergency procedures**

565.    *"The missile shield [Iron Dome] is a mixed blessing. It has saved lives but because there's a shield the country cares less for small communities close to […Gaza] and cares more for bigger communities.[…]  There are 100 000 Bedouins in Israel living in tin shafts. They have no shelters. Israel did nothing to protect them. There should be a shield for these areas, like the shield for Tel Aviv."[1028]*

566.    The majority of rockets fired from Gaza during the 2014 conflict were successfully intercepted by Israel's missile defence system, Iron Dome.[1029] According to the IDF, the system uses a combination of radars and counteracting missiles to detect rockets fired at Israel and intercept them at remote locations without creating any harm.[1030] In addition to Iron Dome, the Israeli authorities adopted what they refer to as "passive defence measures", which include a combination of early warning sirens, public awareness campaigns on how to respond to the threat of terrorism, and the construction of shelters in public and private sites.[1031]

567.    In some cases Israeli authorities took steps to improve the emergency preparedness of communities in the south. For example, a resident of Moshav Netiv Ha'Asara said that an "armoured patrol vehicle was provided …by the army [and] additional bomb shelters were installed for foreign workers near their workplaces."[1032] However, Israeli witnesses told the commission that the emergency response procedures that are applied in their communities leave them little time to make their way to underground shelters or to access safe rooms within their homes during attacks.  In that context, Amnesty International found that "the conflict provided renewed evidence that vulnerable communities in Israel, particularly Bedouin villages in Israel's southern Negev/Naqab region, many of which are not officially recognized by the Israeli government, lacked protection."[1033] The time available for civilians to run for safety decreases dramatically in communities located within 2 km or less from the Green Line with Gaza to less than 30 seconds in most cases, and to less than 10 seconds in some[1034]. One of the witnesses told the commission that these emergency procedures have turned into a form of "routine" for Israelis of the south rather

[1027]   Email submission 26.59.

[1028]   W006.

[1029]   Ynetnews, Yoav Zitun, IDF: Iron Dome intercepted 90% of rockets, 15 August 2014, at http://www.ynetnews.com/articles/0,7340,L-4558517,00.html.See also: IAF website. Nadav Berger: The team that analyses the Iron Dome, 27 July 2014. At: http://www.iaf.org.il/4410-42214-HE/IAF.aspx

[1030]   Israeli Defense Force, One year ago today, Iron Dome intercepts first ever rocket, 5 April 2012, at http://www.idf.il/1283-15558-en/Dover.aspx.

[1031]   Israel, Ministry of Foreign Affairs, *The Threat to Israel's Civilian Population and Israel's Civil Defence Measures*, at http://mfa.gov.il/ProtectiveEdge/Documents/Threat_to_%20Home_Front.pdf.

[1032]   Email submission 26.20.

[1033]   Amnesty International: Unlawful and deadly: Rocket and mortar attacks by Palestinian armed groups during the 2014 Gaza/Israel conflict; 26 March 2015; at: https://www.amnesty.org/press-releases/2015/03/palestinian-armed-groups-killed-civilians-on-both-sides-in-attacks-amounting-to-war-crimes-during-2014-gaza-conflict/

[1034]   Home Front command website. Map of early warning alerts at: http://www.oref.org.il/1096-en/Pakar.aspx

ATL005064

than an exceptional measure, making everyday life in their communities particularly challenging[1035].

568.    According to Magen David Adom, 159 people were injured or traumatized as a result of stumbling or falling on their way to shelters.[1036] Israeli authorities report that two elderly women died as a result of heart failure while trying to seek cover in Haifa and Jerusalem[1037]. The commission received written submissions regarding the experience of older persons in northern cities of Israel, where most people live in apartment blocks, who suffered physical and mental traumas as they were making their way to shelters. In one case, a victim -- who refers to herself as an "old widow" living on her own -- said that she was not able to leave her home in Sderot for a month out of fear.[1038] In another, the grandson of an 89 year-old holocaust survivor, who currently lives in Ashkelon, said that his grandmother had to live through an average of 5 sirens a day during the summer and find a way to a shelter within 15 seconds without falling.[1039] The son of a 92 year-old lady who resides in Bat Yam near Tel Aviv described that his mother had to stay put during attacks, cry and pray for safety as she was too frail to even reach the staircase.[1040] Similar experiences were reported for children who were unable to reach shelters. For example, a resident of Kibbutz Be'erim in the Gaza rim told the commission that her children had to hide under the staircase and endure the stress of hearing sirens and loud explosions because 15 seconds was not enough time for them to move into an underground shelter.[1041]

**Economic impact**

569.    According to the Bank of Israel, Operation Protective Edge caused a contraction of output in the tourism and manufacturing sectors of about 903 040 000 USD (3.5 billion NIS), which represents 0.3 per cent of Israel's GDP.[1042] This, the Bank of Israel says, is comparable to the loss incurred during the 2006 Lebanon war. The Israeli authorities report that as of 28 January 2015, 4550 claims for compensation for direct damages, including to schools and houses, had been filed with the tax authority.  The tax authority estimates that total compensation for direct damages will reach approximately USD 25 million (100 million NIS). Indirect damage is estimated at 440 000 000 USD (1.7 billion NIS).[1043]

570.    Some southern Israeli communities bore more significant economic costs of the conflict than others; these costs were sometimes devastating for businesses that were obliged to invest in expensive security equipment and in psychological counselling for their workers[1044]. The commission learned, for instance, that the risk of conflict continues to

---

[1035]   W009.
[1036]   Magen David Adom in Israel, Cease fire in Operation "Protective Edge" is holding MDA sums up 50 days of saving lives, 29 August 2014. At http://www.mdais.com/316/7004.htm.
[1037]   Israel, Ministry of Foreign Affairs, *The Threat to Israel's Civilian Population and Israel's Civil Defence Measures*, at http://mfa.gov.il/ProtectiveEdge/Documents/Threat_to_%20Home_Front.pdf.
[1038]   Complaints LB68 and LB69 to the HRC.
[1039]   Email submission 26.18.
[1040]   Email submission 26.4 and 26.5.
[1041]   Submission 26.58.
[1042]   Bank of Israel, Excerpt from the "Bank of Israel – Annual Report for 2014" to be published soon: The effect of military conflicts on economic activity, 15 March 2015. At http://www.bankisrael.gov.il/en/NewsAndPublications/PressReleases/Pages/16-03-2015-MilitaryConflicts.aspx.
[1043]   Israel, Ministry of Foreign Affairs, *Hamas' Violations of the Law*; p.4. http://mfa.gov.il/MFA/ForeignPolicy/IsraelGaza2014/Pages/2014-Gaza-Conflict-Factual-and-Legal-Aspects.aspx, accessed on 19 May 2015.
[1044]   W140.

ATL005065

prevent economic actors from investing in the southern region of Eshkol.[1045] One of the witnesses who lives in a kibbutz of 500 individuals at 1.7 km from Gaza said that the local cloth factory stopped receiving orders during the conflict.[1046] Another witness reported that three migrant workers in her farming community left their jobs in the summer 2014 as they believed that the area was unsafe[1047].

571.    The commission received written affidavits and more than 100 photographic materials depicting the damage incurred to buildings, cars and livestock in southern communities as a result of mortar attacks. In one testimony the witness, who chairs the emergency team of his kibbutz of 300, said that 50 out of 160 houses were damaged by debris and milk production decreased during the conflict[1048]. Another witness who lives in kibbutz Nir-am said that her photography business in Beer Sheva stopped during the war as she was too afraid to take public transport, which made her run into debt together with many other members of the kibbutz[1049].

572.    The testimonies further highlight the interdependence between the social and economic fabrics of Gaza and Israel. For example, some of the Israeli witnesses and victims said that they were in contact with civilians in Gaza throughout the conflict and they exchanged expressions of support by telephone and on social media[1050]. These contacts constitute evidence of the fact that the conflict severed human and economic ties that had existed prior to the escalation of violence and the blockade that ensued in 2007 (many Palestinian men in Gaza who spoke to the commission mentioned that they – or their fathers – had worked at some point in their lives in the southern regions of Israel).

## B.    Gaza

573.    *"Behind the figures lie multiple individual destinies now torn apart, a reality no number can translate."* Pierre Kraehenbuehl, Commissioner-General of UNRWA[1051]

**Right to life and security**

574.    In Gaza, the scale of the devastation was unprecedented. The death toll alone speaks volumes: 2 251 Palestinians were killed, including 1462 Palestinian civilians with 299 women and 551 children.[1052] 11 231 Palestinians, including 3540 women and 3 436

---

[1045]   W141.
[1046]   W009.
[1047]   W010.
[1048]   Submission 24.2.7.
[1049]   Email submission 26.51.
[1050]   W009.
[1051]   UNRWA. Commissioner General press briefing on the situation in Gaza Strip; 14 July 2014; at: http://www.unrwa.org/newsroom/official-statements/commissioner-general-press-briefing-situation-gaza-strip
[1052]   United Nations Protection Cluster figures of 31 May 2015.  The Protection Cluster is the mechanism for coordinating humanitarian action by humanitarian organizations (UN and non-UN) working in the protection sector.  It is one of several such sectoral clusters.  OHCHR leads the Protection Cluster in the OPT.  OHCHR compiled figures on fatalities in its capacity as leader of the Protection Cluster. The methodology used involves the compilation of initial reports of fatalities from the media and other sources which are then crosschecked and verified in collaboration with a number of international, Palestinian and Israeli partner organizations. Where available, each individual's name, age, sex and place of death is determined, as well as their status as a civilian or combatant where possible. Multiple sources are cross-referenced, not only from media and various human rights organizations, but also information released by the IDF and by the Palestinian armed groups

ATL005066

children,[1053] were injured with almost 10 per cent suffering permanent disability as a result. While the casualty figures gathered by the UN, Israel, Palestine and non-governmental organizations differ, regardless of the exact proportion of civilians to combatants, the high incidence of loss of human life and injury in Gaza is heart-breaking; all the more so in the many cases in which several family members died together.

575.    Remnants of war continue to pose risks to life and physical security: the UN Mine Action Service (UNMAS) estimated that a minimum of 7000 explosive items wait to be recovered, including unexploded aircraft bombs. According to OCHA, in 2014, explosive remnants of war (ERW) accidents caused 10 fatalities and 23 injuries, especially affecting male youths.[1054] Many of the ERW are likely to be in abandoned shelters, destroyed homes, schools and other public and government infrastructures.

**Right to housing**

576.    Alongside the toll on civilian lives, there was enormous destruction of civilian property in Gaza: 18 000 housing units were destroyed in whole or in part.[1055] According to the Office of the Special Coordinator for the Middle East Peace Process, an estimated 80 000 homes and properties need to be rehabilitated.[1056] These "housing units" were not only the monetary equivalents of material investments. Many of them were homes. Obviously, owning a home is directly linked to the human rights to adequate housing and property, but losing a home also impacts on the enjoyment of a wide range of other human rights, including security, sanitation and health, privacy and family life.  Moreover, having a home has an emotional dimension – the place where memories are stored – and often many other items to which inhabitants' memories relate.  Having one's home destroyed or severely damaged means being deprived of more than a physical structure; it also directly impacts on the very essence of one's existence.

577.    At the height of last summer's hostilities, the number of internally displaced persons reached 500 000, which is equivalent to 28 per cent of the population. Many people were uprooted from their homes or temporary shelters multiple times. They had to cope with the stress and panic associated with feeling trapped and having no safe place to go.  Many fled to temporary shelters which were severely overcrowded and lacked adequate sanitary conditions.  The incidents involving UNRWA shelters and resulting deaths and injuries further compounded the lack of safety and security.

578.    The end of the hostilities did not necessarily mean respite: temporary and often inadequate accommodation arrangements offered little protection during the winter,

---

regarding the identity of combatants. Information from the Ministry of Health in Gaza is one, but not an exclusive, source of information. Verification of the information collected is continuing. Figures are published on the website of OCHA on behalf of the Protection Cluster.

[1053] Palestinian Ministry of Health, quoted in A/HRC/28/80/Add.1, para. 24.

[1054] OCHA Fragmented Lives. Humanitarian Overview 2014. March 2015.At http://www.ochaopt.org/documents/annual_humanitarian_overview_2014_english_final.pdf; See also report by Handicap International, Bombs under Rubble, January 2015, at: https://d3n8a8pro7vhmx.cloudfront.net/handicapinternational/pages/1949/attachments/original/14212 65536/HI_Report_Gaza_Bombs_under_Rubble.pdf?1421265536.

[1055] OCHA, Gaza Initial Rapid Assessment, 9 September 2014; at: http://www.ochaopt.org/documents/gaza_mira_report_9september.pdf, p. 4.

[1056] UNSCO, Fact sheet Gaza Reconstruction Mechanism. October 2014; at: http://www.unsco.org/Gaza%20Reconstruction%20Mechanism%20Fact%20Sheet%209%20October %202014.pdf

ATL005067

resulting in the deaths of at least four children.[1057] In May 2015 – many months after the violence had ended, about 100 000 people remain displaced in the Gaza Strip, according to OCHA estimates.[1058]

579.    In terms of the process of reconstruction, the Office of the Special Coordinator for the Middle East Peace Process reported in May 2015 that around 85 per cent of the households in need of construction materials had received materials.[1059] However, OCHA reported in April 2015 that reconstruction of six completely destroyed schools and eleven kindergartens had not yet begun, and the rehabilitation of seven Ministry of Health hospitals and 12 clinics had been slow.[1060] While there has been some progress in facilitating reconstruction through the creation of the "Gaza Reconstruction Mechanism" (GRM), created in September 2014 with a view to rehabilitating houses and infrastructure damaged during the 2014 hostilities, it has been far too slow and woefully inadequate to address the immense needs in Gaza.  The mechanism has been criticized for granting Israel considerable control over the entry of humanitarian assistance, while hampering the Palestinian authorities from assuming their responsibility as duty bearers and impeding the UN's function as a neutral facilitator and humanitarian actor.[1061]

**Electricity, water and sanitation**

580.    *"If there's no electricity, there's no water."* International Committee of the Red Cross (ICRC)[1062]

581.    The Gaza Strip has one power plant that normally supplies about 30 per cent of the *electricity* in the strip, the remaining being provided from Israel and Egypt. Under normal circumstances, the three sources provide for half of Gaza's overall electricity needs.[1063] The power plant was the subject of several attacks in July 2014, and had to shut down on 29 July as a result of an explosion of one of its fuel tanks following a hit by shells, as further elaborated above (see chapter V.A.4).

582.    As a result of that attack, and of damage to the electricity infrastructure more generally, including transmission and distribution lines, cabling, electricity poles and transformers,[1064] Gaza experienced power outages of 22 hours a day during the

---

[1057]   Shelter cluster report p.3. Confirmed by World Health Organization; at: http://www.maannews.com/eng/ViewDetails.aspx?id=752862.

[1058]   OCHA, Protection of civilians weekly highlights; Reporting period 28 April – 4 May 2015, at: http://www.ochaopt.org/poc28april-4may.aspx.

[1059]   UNSCO Fact sheet Gaza Reconstruction Mechanism. October 2014; at: http://www.unsco.org/Gaza%20Reconstruction%20Mechanism%20Fact%20Sheet%209%20October%202014.pdf.

[1060]   OCHA Humanitarian Bulletin. April 2015, at: http://www.ochaopt.org/documents/ocha_opt_the_humanitarian_monitor_2014_05_29_english.pdf.

[1061]   Submission 11.4

[1062]   Euro News, ICRC criticises attack on Gaza power plants, 31 July 2014, at http://www.euronews.com/2014/07/31/international-committee-of-the-red-cross-criticises-attacks-on-gaza-power-/.

[1063]   OCHA, Gaza Crisis Appeal; at: http://www.ochaopt.org/documents/gaza_crisis_appeal_9_september.pdf

[1064]   UNDP, Detailed Infrastructure Damage Assessment, Gaza 2014. 28 November 2014. At http://www.ps.undp.org/content/dam/papp/docs/Publications/UNDP-papp-research-dammageassessment2014.pdf. Bellow referred to as UNDP, Detailed Infrastructure Damage Assessment, November 2014.

ATL005068

hostilities.[1065] This acute shortage of power forced hospitals to operate at limited capacity; led to a drastic reduction in the pumping of water to households; and affected desalination plants and sewage treatment,[1066] which significantly impacted on a wide range of human rights, in particular the rights to health, water and sanitation. At the time, OCHA announced that Gaza was on "the brink of a public health crisis".[1067]

583.   In the medium term, the extensive damage to the electricity infrastructure is estimated to have increased the pre-existing electricity deficit by almost 20 per cent, reaching about 65 per cent.[1068] According to reports from December 2014, 15–20 per cent of the Gaza population had no access to electricity. The substantial shortfall in power supply continues to undermine the living conditions of people in Gaza, affecting the delivery of water supply, and wastewater treatment, as well as livelihood and health.[1069]

584.   Water and sanitation facilities in Gaza were also heavily affected by the escalation of violence[1070] with 63 water facilities damaged and 23 completely destroyed.  Key sewage facilities were partially destroyed, including 60 per cent of the treatment plants, 27 per cent of the pumping stations, and 33 000 meters of water and wastewater networks were damaged[1071].  In late August 2014, OCHA reported that about half a million people were directly affected by damage to water facilities,[1072] and one million by damage to wastewater facilities.[1073] In December 2014, water supply remained irregular for 20 per cent of people with interruptions at times lasting for five days.[1074]  As a result, many families had to rely on water tankers for their water supply.[1075] Overall, water-related cost increased, and doubled in some areas, decreasing access to drinking water of already vulnerable families.[1076]

---

[1065]   OCHA, Gaza Crisis Appeal; at:
http://www.ochaopt.org/documents/gaza_crisis_appeal_9_september.pdf. According to the report Divide and Conquer by Al Haq, outages lasted about 18 hours per day.

[1066]   Human Rights Watch, Widespread impact of power plant attack, 10 August 2014, at :
http://www.hrw.org/news/2014/08/10/gaza-widespread-impact-power-plant-attack , OCHA, Gaza Crisis Appeal, at: http://www.ochaopt.org/documents/gaza_crisis_appeal_9_september.pdf and ICRC, Gaza: Power plant destroyed, electricity and water supplies collapse; 30 July 2014 at:
https://www.icrc.org/en/document/gaza-power-plant-destroyed-electricity-and-water-supplies-collapse.

[1067]   OCHA, Gaza Crisis Appeal, 9 September 2014; at
http://www.ochaopt.org/documents/gaza_crisis_appeal_9_september.pdf

[1068]   UNDP, Detailed Infrastructure Damage Assessment, November 2014.

[1069]   UNDP, Detailed Infrastructure Damage Assessment, November 2014.

[1070]   World Bank. Gaza: Fact sheet August 1, 2014; at:
http://www.worldbank.org/content/dam/Worldbank/gaza-fact-sheet-final140801-ECR.pdf

[1071]   Gisha. Water officials in Gaza: 40% of the population with no access to running; at:
gisha.org/updates/3363. A/HRC/28/80/Add.1.

[1072]   According to UNDP, 97 per cent of the population had access to safe water supply networks prior to the war. However, OCHA reported that in 2013 only one quarter of the households in Gaza received running water every day, during several hours only. See UNDP, Detailed Infrastructure Damage Assessment, November 2014 and OCHA, The Gaza Strip: the Humanitarian Impact of Movement Restrictions on People and Goods, July 2013. At
http://unispal.un.org/unispal.nsf/3822b5e39951876a85256b6e0058a478/c01b65b9607d31fb85257b9d0046a70a?OpenDocument#sthash.7ZpapT5l.dpuf

[1073]   OCHA, Gaza Initial Rapid Assessment; 27 August 2014; at:
http://www.ochaopt.org/documents/gaza_mira_report_9september.pdf

[1074]   UNDP, Detailed Infrastructure Damage Assessment, November 2014.

[1075]   UNDP, Detailed Infrastructure Damage Assessment, November 2014.

[1076]   Submission 43.5.

ATL005069

**Right to education**

585.    Gaza's education sector was already overstretched prior to the hostilities – with a shortage of 200 schools in 2014, and almost 80 per cent of school classes running double shifts[1077]. The destruction of, and damage to 209 schools as a result of the conflict exacerbated these deficits.[1078] Three universities are reported to have been directly hit by Israeli strikes, while eight sustained collateral damage.[1079] 274 kindergartens were damaged and 11 were destroyed.[1080] Overall, the quality of education in Gaza is reported to have worsened, because classes are now larger, the time spent at school shorter[1081] and psychological and economic challenges are considerable, according to UNFPA.[1082]

**Right to an adequate standard of living**

586.    Many of the commission's interlocutors, when interviewed between November 2014 and February 2015, gave accounts of on-going displacement, loss of jobs as a result of injury, and loss of livelihoods. These individual stories lie behind the figures:

587.    The World Bank recently described the impact of the 2014 hostilities on Gaza's economy as follows: "Gaza Economy on the Verge of Collapse, Youth Unemployment Highest in the Region at 60%."   The report describes how blockades, wars and poor governance have strangled Gaza's economy, noting that the unemployment rate is now the highest in the world.[1083]   The report highlights the loss of economic capacity due to repair costs and the effects of the damaged infrastructure, loss of investor confidence, and an increasing trade deficit.[1084] Moreover, many inhabitants of Gaza had their agricultural lands damaged.[1085] Power and fuel shortages led to many facilities being forced to suspend production, which in turn led to the dismissal of workers. Combined with the fact that the economy was in dire straits already before the 2014 hostilities, including as a result of the blockade, these factors result in 39 per cent of the population living below the poverty line,[1086] which in turn impacts on the enjoyment of a wide range of human rights of the people in Gaza, including the rights to food, work, health, water and sanitation.

588.    Food insecurity increased during the conflict and in its aftermath. According to FAO, almost the entire population of Gaza was dependent on food aid during the

---

[1077]   OCHA, Situation report, 4 September 2014.
[1078]   OCHA, Occupied Palestinian Territory Gaza emergency Humanitarian Snapshot; as of 25 August 2014; at: http://www.ochaopt.org/documents/humanitarian_snapshot_25_august_2014_opt_v4.pdf A/HRC/28/80/Add.1
[1079]   Submission 43.2.
[1080]   Submission 34.2-3.
[1081]   90% of UNRWA schools and 85% of public schools are operating on double shifts across the Gaza strip, and 2 UNRWA schools in Gaza city were operating on triple shifts. This means that children would spend only between 2.5 to 4.5 hours per day in the school. Information provided by the Education Cluster coordination. And
http://www.ochaopt.org/documents/humanitarian_snapshot_25_august_2014_opt_v4.pdf
[1082]   OCHA, 2015 Strategic Response Plan oPt. At https://www.ochaopt.org/documents/srp_2015.pdf. Below referred to as OCHA, 2015 Strategic Response Plan oPt.
[1083]   The World Bank, Gaza Economy on the Verge of Collapse, 21 May 2015, at:
http://www.worldbank.org/en/news/press-release/2015/05/21/gaza-economy-on-the-verge-of-collapse
[1084]   The World Bank, Economic Monitoring Report to the Ad Hoc Liaison Committee, May 27, 2015, paras. 6, 28 and 44.
[1085]   Food and Agriculture Organization (FAO), Gaza: Damage to agriculture will have long lasting ffects; 14 August 2014; at: www.fao.org/news/story/en/item/240924/icode/.
[1086]   The World Bank, Economic Monitoring Report to the Ad Hoc Liaison Committee, May 27, 2015, par. 39.

157

ATL005070

conflict.[1087] While the estimated figures for food insecurity and persons depending on food aid has returned to a level similar to the period prior to the conflict, reaching about 57 per cent and 80 per cent respectively,[1088] this is partially due to increased imports by the private sector and the United Nations[1089] and aid inflows into Gaza.[1090] The output from the agriculture sector is estimated to have been reduced by 32 per cent compared to 2013.[1091] In this context, it should be recalled that the right to food is not primarily about food aid; it is rather about being able to feed oneself through an adequate livelihood.

589.   As an immediate consequence of the hostilities, *unemployment* was estimated to amount to 47.4 per cent in the third quarter of 2014, [1092] and 42.8 per cent in the fourth quarter,[1093] on average 11 per cent higher than before.[1094] According to the World Bank, unemployment in the Gaza Strip is now the highest in the world.[1095] Youth unemployment rates more than doubled in the second quarter of 2014 compared to the previous year, reaching about 67 per cent.[1096]

**Right to health**

590.   *Medical problems are more than the problems facing hospitals. It is difficult to maintain health without work, proper housing, food security, safe water and human security."* Dr. Mads Gilbert, a Norwegian doctor working in Gaza during the hostilities.[1097]

591.   While access to health care in Gaza was precarious even before the 2014 escalation – mainly as a result of restrictions imposed by the blockade – the fighting further weakened the medical infrastructure[1098]: one hospital and 5 primary health care clinics were destroyed and 15 hospitals and 51 clinics sustained damage, while tens of ambulances were rendered useless and health care personnel were decimated. The hostilities also further reduced access to health care of persons with serious or chronic illnesses. The number of people

---

[1087]   FAO, Gaza: Damage to agriculture will have long lasting effects; 14 August 2014; at:
www.fao.org/news/story/en/item/240924/icode/.

[1088]   OCHA, 2015 Strategic Response Plan oPt.. In July 2013, 57% of Gaza households were food insecure
and about 80% relied on food aid.
http://unispal.un.org/unispal.nsf/3822b5e39951876a85256b6e0058a478/c01b65b9607d31fb85257b9d
0046a70a?OpenDocument.For numbers in 2013 see also
http://unispal.un.org/unispal.nsf/3822b5e39951876a85256b6e0058a478/c01b65b9607d31fb85257b9d
0046a70a?OpenDocument and
http://documents.wfp.org/stellent/groups/public/documents/ep/wfp270840.pdf.

[1089]   Office on the United Nations Special Coordinator for the Middle East, Report to the Committee,
Brussels, 27 May 2015, par. 66.

[1090]   The World Bank, Economic Monitoring Report to the Ad Hoc Liaison Committee, May 27, 2015,
par. 7.

[1091]   The World Bank, Economic Monitoring Report to the Ad Hoc Liaison Committee, May 27, 2015,
par. 2.

[1092]   Office on the United Nations Special Coordinator for the Middle East, Report to the Committee,
Brussels, 27 May 2015, par. 24.

[1093]   UNRWA. Gaza refugee women: A life of many faces, 1 April 2014, at:
http://www.unrwa.org/galleries/photos/gaza-refugee-women-life-many-faces.

[1094]   The World Bank, Economic Monitoring Report to the Ad Hoc Liaison Committee, May 27, 2015,
par.4. Compare numbers in July 2013 at
http://unispal.un.org/unispal.nsf/3822b5e39951876a85256b6e0058a478/c01b65b9607d31fb85257b9d
0046a70a?OpenDocument.

[1095]   The World Bank, Economic Monitoring Report to the Ad Hoc Liaison Committee, May 27, 2015, p.
5.

[1096]   OCHA, 2015 Strategic Response Plan oPt.

[1097]   W123.

[1098]   Gaza Strip, Joint Health Sector Assessment Report, September 2014.

ATL005071

with permanent or long-term disabilities has increased; preliminary estimates indicate that up to one thousand children will be permanently disabled as a result of the hostilities in 2014.[1099]

592.    The commission also notes that the complicated mechanisms for the referral of patients abroad aggravate the situation.[1100] While the number of people who are granted permission to leave Gaza has increased, the number of requests has doubled from 32,827 (March-September 2014) to 60,998 (October-March 2015). The percentage of persons whose requests were denied has increased by 6.1 per cent.[1101]

593.    *"Children are afraid to die; they ask all the time if there will be another war."* Dr. Mona El Farra, a Palestinian doctor in Gaza [1102]

594.    Apart from significant limitations on access to health care, the events of the summer of 2014 also left deep marks in terms of trauma: many of the witnesses interviewed by the commission described a profound sense of hopelessness brought on by the experience of death, injury, destruction and/or loss of their homes, further exacerbated by the multiple displacements and, often, the current lack of prospects. Post-traumatic stress disorder and other stress-related symptoms have increased,[1103] and about 20 per cent of the population are estimated to be in need of long-term mental health assistance[1104], among them at least 373,000 children.[1105] According to the United Nations Children's Fund, in Gaza, more than 1,500 children have been orphaned.[1106] In some cases witnesses reported that children, even teenagers, had urine retention problems and woke up screaming during the night. An inter-agency Child Protection Rapid Assessment conducted among displaced families in Gaza in the aftermath of the conflict described the prevalence of nightmares and various levels of either apathy or aggressiveness and violence towards other children. [1107]

595.    The World Health Organization's mental health program coordinator in Gaza, Dr. Dyaa Saymah, told the commission that the current trauma response in Gaza was, "scattered and short term funded," while rehabilitation should be a long-term undertaking that requires sustained funding.[1108] He added:

*"... accumulated exposure to traumatic experiences can cause a significant change in personality: how they perceive the outside world, how they perceive their moral system, how such accumulative exposure to trauma can affect their future directions in their lives. There is also a risk of trans-generational trauma. That means the trauma experienced as children impacts on how as adults they perceive their future, how they will raise their own children and tell their story to their children. Their children will be affected by this. It is like a revolving door".*

---

[1099]   A/69/926-S/2015/409, para. 88.

[1100]   OCHA, 2015 Strategic Response Plan oPt.

[1101]   Office on the United Nations Special Coordinator for the Middle East, Report to the Committee, Brussels, 27 May 2015, par. 68.

[1102]   W032.

[1103]   The World Bank, Economic Monitoring Report to the Ad Hoc Liaison Committee, May 27, 2015, par. 39.

[1104]   Interview with WHO mental health program coordinator and Chief of UNICEF Gaza office. See also Joint Health Assessment report, October 2014 and OCHA, 2015 Strategic Response Plan oPt.

[1105]   OCHA, 2015 Strategic Response Plan oPt.

[1106]   United Nations Children's Fund.  State of Palestine, Humanitarian Situation Report, 23 October 2014 (http://available at www.unicef.org/mena/UNICEF_SoP_SitRep_23_October_2014.pdf), p. 1.

[1107]   Child Protection Working Group (CPWG) assessment report, October 2014.

[1108]   W106.

ATL005072

**Groups at particular risk**

596.    The commission observes that the above human rights restrictions have different impacts on groups with particular vulnerabilities. For instance, people with disabilities may suffer to a significantly larger extent from restrictions on access to health care than others; children are particularly vulnerable to obstacles in accessing education; women and girls, especially in the context of Gaza, may be more exposed to violence and loss of privacy than men and boys as a result of the loss of homes and displacement. Widows – almost 800 women were widowed last summer – are reported to face particular challenges.1109 Many of them face discrimination, as well as economic and social marginalization.1110 Many depend on male family members in terms of income and housing.[1111] Notably, the risk of losing custody of their children on the basis of discriminatory laws allegedly forced some women widowed during last year's hostilities to marry the brother of their deceased husband.[1112]

**Summary analysis**

597.    The 2014 hostilities have had an enormous impact on the lives of Palestinians and Israelis.  The scale of the devastation was unprecedented and the death toll and suffering from injuries and trauma speak volumes.

598.    The impact of the 2014 hostilities on the Gaza strip cannot be assessed separately from the blockade imposed by Israel.  In particular, the destruction and damage brought about by the escalation of violence last summer pose significant challenges to the enjoyment of the rights to an adequate standard of living, housing, food, water, sanitation, health and education of the population of Gaza. The damage to electricity infrastructure, critical for power supply and a whole range of services, including health services, water and sanitation has been devastating for the enjoyment of human rights in the short, medium and long-term. The continuing displacement of some 100 000 people deprives many of privacy, family life and may have consequences for physical security.

599.    In accordance with international human rights law, all parties have obligations to respect and take steps towards ensuring the realization of these rights, including Israel, the State of Palestine, the authorities in Gaza and the international community.  All relevant duty bearers and other stakeholders, including humanitarian agencies, NGOs and international donors must ensure that the relief and reconstruction efforts are based on human rights.   In that context, while fully aware of the need for Israel to address its security concerns, the commission believes that the Gaza Reconstruction Mechanism, put in place with the assistance of the United Nations to accelerate efforts to rebuild destroyed houses and infrastructure, is not a substitute for lifting the blockade.

---

[1109]  Al Mezan, Press Release on Women's International Day, 7 March 2015, at http://www.mezan.org/en/post/20091/On+International+Women's+Day+Al+Mezan+Calls+for+Protection+and+Respect+for+Women's+Rights+in+Palestin.

[1110]  Submission from UN Women; meetings with women's rights representatives on 2 and 11 December 2014; interview with W233. The Commission also received a submission from the Palestinian Working Women's Society for Development, including affidavits, as well as women who lost their spouses as a result of the conflict.

[1111]  Norwegian Refugee Council, Women's Housing, Land, and Property Rights in the Gaza Strip Information, 2013, http://www.nrc.no/arch/_img/9188182.pdf.

[1112]  Excerpt from an interview with a local women's rights representatives in Gaza interviewed by the Commission, W233.

160

ATL005073

600.   Ensuring accountability and guaranteeing the rights of all victims to an effective remedy will be a core prerequisite for breaking the cycle of violence and securing a life of peace and dignity in the region.

# VII.   Accountability

601.   This chapter examines the issue of accountability for victims of serious violations of international humanitarian law and gross violations of international human rights law alleged to have occurred during the period under examination by the commission.

**International legal framework**

602.   Israeli and Palestinian authorities have an obligation to investigate alleged violations of international humanitarian law and international human rights law and to hold accountable those responsible, as set out in the respective bodies of law.[1113]   In order to meet this obligation, States should initiate a range of accountability mechanisms, including: criminal proceedings against suspected perpetrators of alleged serious violations of international law, including international criminal law; disciplinary measures; and commissions of inquiry. Using complementary measures can contribute to efforts to ensure that all alleged violations are met with an appropriate response; that future violations are prevented; and that victims' rights are respected.[1114]

603.   In situations of armed conflict, including occupation, the authorities are required, at the very least, to "provide effective penal sanctions for persons committing, or ordering to be committed, any of the grave breaches" of the Geneva Conventions[1115] and other violations of international humanitarian law that amount to war crimes.[1116] In the context of law enforcement operations, at a minimum, States must investigate alleged violations of the right to life, resulting from use of force by State agents or where the responsible party may be a State agent, in accordance with international human rights law.[1117] International humanitarian law holds commanders and other superiors criminally responsible for war crimes committed by their subordinates if they "did not take all necessary and reasonable measures in their power to prevent their commission, or if such crimes had been committed, to punish the persons responsible."[1118] This is known as the doctrine of command or superior responsibility.

604.   In relation to the duty to investigate, human rights treaties, guidelines and principles elaborate standards against which investigations are evaluated in order to determine compliance with the law. Thus, investigations are assessed against the following criteria: independence; impartiality; thoroughness; effectiveness; and promptness;[1119] transparency is also an increasingly important element.[1120]

---

[1113]   Art. 2, International Covenant on Civil and Political Rights; Human Rights Committee General Comment No. 31, 2004; First Geneva Convention, art. 49, Second Geneva Convention, art. 50, Third Geneva Convention, art. 129, Fourth Geneva Convention, art. 146.

[1114]   E.g Cohen and Shany, *Beyond the grave breaches regime: the duty to investigate alleged violations of international law governing armed conflicts*, 2012, section 5.

[1115]   Art. 146, Geneva Convention IV. The grave breaches are defined in art. 147

[1116]   See for example, art. 85 of Additional Protocol I and art. 8, Rome Statute of the ICC.

[1117]   E/CN.4/2006/53, para. 35

[1118]   ICRC, *Database Customary International Humanitarian Law*, Rule 153

[1119]   For more details on these criteria, see A/HRC/15/50, paras 20-25, and The Public Commission to Examine the Maritime Incident of 31 May 2010 - Second Report – The Turkel Commission: Israel's Mechanisms for Examining and Investigating Complaints and Claims of Violations of the Laws of

ATL005074

605.   While international humanitarian law does not elaborate the same level of detail concerning investigations, these human rights standards apply at all times, including during situations of armed conflict.[1121] During active hostilities, there are circumstances that may constrain the ability of a State to fully meet these standards. Such circumstances should be assessed on a case-by-case basis and may affect the manner in which an investigation is carried out, but do not discharge the authorities from their duty to investigate in a meaningful way.[1122] Fortunately, in practice, States increasingly endeavour to meet these human rights standards when conducting investigations in relation to situations of armed conflict.[1123]

606.   International human rights law further sets out the obligation to ensure that individuals have accessible and effective remedies, including compensation, for gross violations of international human rights law and serious violations of international humanitarian law.[1124] Remedies include the victim's right to: (*a*) Equal and effective access to justice; (*b*) Adequate, effective and prompt reparation for harm suffered; and (*c*) Access to relevant information concerning violations and reparation mechanisms.[1125] Reparations include the following forms: restitution, compensation, rehabilitation, satisfaction and guarantees of non-repetition.[1126] Satisfaction includes a range of measures, *inter alia*: measures aimed at the cessation of continuing violations; verification of the facts and full and public disclosure of the truth; a public apology; and legal reform.[1127]

## A.   Israel

### 1.   Accountability mechanisms by Israel

607.   The MAG is at the heart of Israel's investigation system, as detailed by the UN committee of independent experts in its 2010 report.[1128] The MAG is a central component of the IDF military justice system, which also includes the Military Police Criminal Investigation Department (MPCID).[1129] Decisions on whether to open or close an

---

Armed Conflict According to International Law (hereinafter: Turkel Commission), pp.118-134, at http://www.turkel-committee.gov.il/files/newDoc3/The%20Turkel%20Report%20for%20website.pdf. See also Cohen and Shany, 2012, section 3.

[1120]   A/HRC/15/50, para. 21; Principles on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions Recommended by Economic and Social Council resolution 1989/65 of 24 May 1989; Turkel Commission pp. 134-7

[1121]   Art. 3 (b), Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law, 2005; E/CN.4/2006/53, para. 35; Turkel Commission, p.138. See also CCPR/C/ISR/CO/4, para. 6

[1122]   E/CN.4/2006/53, para. 36

[1123]   Cohen and Shany, 2012, sections 2.2 and 4.4

[1124]   Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law, 2005

[1125]   Ibid., principle 11

[1126]   Ibid., principles 19 to 23

[1127]   Ibid, principle 22

[1128]   For more details on the role and functions of the MAG in relation to investigations during armed hostilities, see A/HRC/15/50, para.s 35-39

[1129]   Israel, Ministry of Foreign Affairs, *Israel's Investigation of Alleged Violations of the Law of Armed Conflict*, p. 3  http://mfa.gov.il/ProtectiveEdge/Documents/IsraelInvestigations.pdf (accessed on 6 May 2015) Hereinafter MoFA.

ATL005075

investigation lie with the MAG. In the event that the MAG orders a criminal investigation to be carried out, the MPCID carries out the investigation and submits its findings to the MAG for a decision as to follow-up, which may include an indictment.

608.   Recently, Israel has taken noteworthy steps towards bringing its system of investigations into compliance with international standards. The most significant development was the establishment in 2010 by the Government of Israel of the Public Commission to Examine the Maritime Incident of 31 May 2010 (hereinafter: the Turkel Commission). The Turkel Commission was, in part, charged with examining "whether the mechanism for examining and investigating complaints and claims raised in relation to violations of the laws of armed conflict…conforms with the obligations of the State of Israel under the rules of international law".[1130] In February 2013, the Turkel Commission issued its second report, which concluded that "the examination and investigation mechanisms in Israel for complaints and claims of violations of international humanitarian law and the methods they practice, generally comply with the obligations of the State of Israel under the rules of international law".[1131] However, the Turkel Commission also found that "there are grounds for amending the examination and investigation mechanisms and that in several areas there are grounds for changing the accepted policy".[1132] Israel has implemented a number of the 18 recommendations issued by the Turkel Commission, as noted below, and established an inter-agency commission -- due to complete its work in the first half of 2015 -- to address implementation of the remaining ones.[1133]

609.   The commission is also aware that NGO B'Tselem announced, on 4 September 2014, that it would not assist the current military investigation mechanism, which it considered fundamentally flawed, thereby breaking with past practice. Along with NGO Yesh Din, it asserted that "the existing investigation mechanism precludes serious investigations and is marred by severe structural flaws that render it incapable of conducting professional investigations".[1134]

### *Investigations into the 2014 hostilities*

610.   The commission notes Israel's assertion that it will investigate "fully any credible accusation or reasonable suspicion of a serious violation of the Law of Armed Conflict" in relation to complaints and other information suggesting IDF misconduct during Operation 'Protective Edge'.[1135] As of 11 June 2015, the MAG reported that the MAG Corps continued to receive complaints pertaining to incidents that took place during the operation, and to try to identify incidents that may warrant examination or investigation.[1136] The MAG Corps stated that it looks into the credibility and concrete nature of each complaint or piece

---

[1130]   Turkel Commission, p.33
[1131]   Turkel Commission, p.49
[1132]   Turkel Commission, p.49
[1133]   MoFA: 2014 Gaza Conflict: Factual and Legal Aspects, pp.13-14, http://mfa.gov.il/ProtectiveEdge/Documents/IsraelInvestigations.pdf (accessed on 6 May 2015)
[1134]   Israeli human rights organizations B'Tselem and Yesh Din: Israel is unwilling to investigate harm caused to Palestinians, 4 September 2014, at http://www.btselem.org/press_releases/20140905_failure_to_investigate (accessed on 15 May 2015)
[1135]   MoFA: 2014 Gaza Conflict: Factual and Legal Aspects, p.1, http://mfa.gov.il/ProtectiveEdge/Documents/IsraelInvestigations.pdf (accessed on 6 May 2015)
[1136]   Decisions of the IDF MAG Regarding Exceptional Incidents that Allegedly Occurred During Operation 'Protective Edge'- Update No. 4 (hereinafter: MAG update no. 4), 11 June 2015, at http://www.law.idf.il/163-7353-en/Patzar.aspx (accessed on 12 June 2015)

ATL005076

of information suggesting IDF misconduct to determine what, if any, follow-up action is appropriate.[1137]

611.   In line with a recommendation made by the Turkel Commission,[1138] the IDF Chief of General Staff established a General Staff Mechanism for Fact-Finding Assessments (FFA Mechanism) to look into "Exceptional Incidents" during the 2014 hostilities.[1139] According to the MAG Corps, the FFA Mechanism is made up of a number of fact-finding assessment teams, each led by a senior IDF officer and comprising members with expertise on operational and legal issues, including on international law.[1140]   A senior officer with expertise in international law was also appointed to assist the head of the FFA Mechanism.[1141]   The MAG Corps noted that "[n]one of the fact-finding assessment teams' members served in the chain of command during Operation 'Protective Edge'".[1142]

612.   According to the MAG Corps, "[t]he task of the FFA Mechanism is to collate information and relevant materials in order to determine the facts with respect to Exceptional Incidents that occurred during the Operation. These efforts are intended to provide the Military Advocate General…with as much factual information as possible in order to enable the MAG to reach decisions regarding whether or not to open a criminal investigation, as well as for the purpose of a 'lessons-learned' process and the issuance of operational recommendations that will assist in preventing exceptional incidents in the future. Exceptional Incidents examined by the FFA Mechanism are those incidents where the MAG has decided that additional information is required in order to determine whether there exists reasonable grounds for suspicion of a violation of the law that would justify a criminal investigation."[1143]   Information collected and findings reached by the FFA Mechanism are then provided to the MAG to determine the appropriate next steps.[1144]   In specific cases, the MAG can also opt to directly open a criminal investigation, without an initial fact-finding assessment.

613.   Where the MAG deems the evidence before it to be sufficient to open a criminal investigation, the case is referred to "a special investigation team assembled by the Military Police's Criminal Investigation Division in order to investigate incidents alleged to have occurred during Operation 'Protective Edge'".[1145]   The MAG notes that this investigation team has collected testimonies from IDF soldiers and commanders, as well as from tens of Palestinian witnesses.[1146]

614.   As of 11 June 2015, the MAG reported that he had referred allegations with regard to approximately 190 incidents for examination by the FFA Mechanism. Of those, the FFA Mechanism had examined and referred 105 to the MAG for a decision on follow up action.[1147]   The MAG closed the cases of 19 of these incidents without opening a criminal investigation where he "did not find that the circumstances of the incident gave rise to

---

[1137]   Ibid; See also Decisions of the IDF Military Advocate General Regarding Exceptional Incidents During Operation 'Protective Edge'- Update No. 3 (hereinafter: MAG update no. 3), 22 March 2015, at http://www.law.idf.il/163-7183-en/Patzar.aspx (accessed on 10 May 2015)
[1138]   Turkel Commission recommendation no. 5, p.425
[1139]   MAG, Operation Protective Edge: Examinations and Investigation, 10 September 2014, at http://www.mag.idf.il/261-6858-en/Patzar.aspx (accessed on 10 May 2015)
[1140]   Ibid.
[1141]   Ibid.
[1142]   Ibid.; MAG update no. 4
[1143]   Ibid.
[1144]   Ibid.
[1145]   MAG update no. 3
[1146]   MAG update no. 4
[1147]   Ibid.

ATL005077

reasonable grounds for suspicion of criminal behavior" based on the assessment of the FFA Mechanism.[1148] However, in some of these latter cases, the MAG recommended reviewing operational methods; while in others, the MAG was unable to identify any involvement of IDF forces in the incident.[1149]  In some instances, the MAG referred the case back to the FFA Mechanism for further examination.[1150]

615.   In addition, the MAG ordered the opening of 15 criminal investigations "without the need for prior examination by the FFA Mechanism on the basis of allegations that indicated *prima facie* grounds for a reasonable suspicion of criminal misconduct".[1151] Two of these were closed without undertaking criminal or disciplinary proceedings, while the 13 others were either ongoing or completed and awaiting review by the MAG. The MAG ordered a criminal investigation into a further seven incidents following examination by the FFA Mechanism.[1152]

616.   In April 2015,[1153] the MAG issued the first indictments in relation to the 2014 hostilities. Two soldiers were accused of looting NIS 2,420 (over USD 600) from a Palestinian home in Shuja'iya, Gaza City. A third soldier was accused of assisting them. Two of the accused are also charged with obstruction of justice.[1154]

617.   Israel initiated two additional inquiries. According to media reports, the first one was conducted by the Foreign Affairs and Defense Committee of the Knesset. At the time of writing, the Committee's report was reportedly finalised, but has yet to be published.[1155] The second inquiry, announced by the State Comptroller in January 2015, is looking into "the procedure of decision- making by the military and political echelons during operation "Tzuk Eitan" (Protective Edge). The investigation will include aspects of international law, and also focus on the examination and investigational procedures within the IDF and the government".[1156] At the time of writing, the State Comptroller had not yet published his report.

### Compliance of Israel's investigations with international standards

618.   The commission is aware of Israel's arguments regarding the numerous practical challenges involved in examining and investigating alleged violations during the 2014 hostilities.[1157] Nevertheless, the commission is concerned about a number of procedural, structural and substantive shortcomings, which continue to compromise Israel's ability to adequately fulfil its duty to investigate. Many of these have been identified by the Turkel Commission, as well as by international human rights mechanisms.[1158] It should be noted

---

[1148] Ibid.
[1149] Ibid.
[1150] Ibid.
[1151] Ibid.
[1152] Ibid.
[1153] E.g. http://www.timesofisrael.com/soldiers-indicted-for-looting-during-gaza-war/#! (accessed on 5 May 2015)
[1154] MAG update no. 4
[1155] http://www.ynetnews.com/articles/0,7340,L-4630123,00.html (accessed on 31 May 2015)
[1156] Israel State Comptroller, The State Comptroller investigation of operation Tzuk Eitan- Protective at http://www.mevaker.gov.il/he/publication/Articles/Pages/2015.1.20-Tzuk-EItan.aspx?AspxAutoDetectCookieSupport=1 (accessed on 31 May 2015)
[1157] These are set out by Israel's Ministry of Foreign Affairs in MoFA: 2014 Gaza Conflict: Factual and Legal Aspects, pp.2&9, http://mfa.gov.il/ProtectiveEdge/Documents/IsraelInvestigations.pdf (accessed on 6 May 2015)
[1158] E.g. Human Rights Committee, Concluding observations on the fourth periodic report of Israel, CCPR/C/ISR/CO/4 (hereinafter: CCPR/C/ISR/CO/4), para. 6; and A/HRC/15/50, paras 90-95.

ATL005078

that the analysis below does not constitute a comprehensive review of Israel's system of investigations, but rather highlights a few key points, which, if addressed, would enhance the compliance of the system with international standards.

### *Independence and impartiality*

619.    As noted by the UN Committee of Experts in 2010 and 2011, a central failing of the investigation system stems from the dual responsibilities of the MAG, both as the legal advisor to the Chief of General Staff and other military authorities and as the supervisor of disciplinary law and of criminal investigations in the military.[1159] Along with the Attorney General, the MAG reportedly regularly participated in cabinet meetings regarding the 2014 hostilities.[1160] B'Tselem argues that "[m]edia reports and past experience indicate that almost all the decisions made during Operation Protective Edge were made after legal counsel was provided by the MAG and the attorney general".[1161] The MAG and the MAG Corps are also tasked with providing legal advice on operational issues before and during the hostilities, which directly influences actions taken by soldiers on the ground.[1162] The commission is aware that, since 2007, there has been an organizational separation of the units within the MAG Corps charged with law enforcement[1163] and those tasked with provision of legal advice,[1164] with a view to ensuring that "the military advocates in charge of the prosecution teams no longer engage in the provision of legal advice to the heads of the jurisdiction districts in which they operate", as noted by the Turkel Commission.[1165] At the same time, the International Law Department advises "IDF units with regard to operational activity during times of emergency and calm, including formulating a legal position on methods of warfare, operational plans and military targets".[1166] The involvement of the MAG in policy discussions concerning the hostilities, and the role of MAG Corps legal advisors in decisions taken by the IDF during combat continue to raise questions about the MAG's ability to carry out independent and impartial investigations, particularly with regard to cases where soldiers may be following commands authorised by the MAG and his subordinates, but nonetheless may be suspected of having violated international humanitarian law or international human rights law. Moreover, there is a need to ensure the robust application of international humanitarian law in the MAG's decisions as to whether to open or close criminal investigations. For example, the definition of "military objectives" has implications both for the MAG's operational guidance of troops on the ground and his later assessment of whether or not to refer a case for criminal investigation.

620.    Moreover, in the context of the 2014 hostilities, the FFA Mechanism appears to have replaced the operational debriefings for the purposes of informing the MAG as to

---

[1159] A/HRC/15/50, para 53. See also Cohen and Shany, 2012, section 4.3.2; A/HRC/16/24, para 12. http://www2.ohchr.org/english/bodies/hrcouncil/docs/16session/A.HRC.16.24_AUV.pdf

[1160] B'Tselem, Israeli authorities have proven they cannot investigate suspected violations of international humanitarian law by Israel in the Gaza Strip, 5 September 2014, at http://www.btselem.org/accountability/20140905_failure_to_investigate (accessed on 31 May 2015)

[1161] Ibid.

[1162] According to a submission received by the commission from Prof. Amichai Cohen, since Operation 'Cast Lead' (2008-09), lawyers have become more involved in the command structure and in operational decision-making.

[1163] The law enforcement sections are comprised of the military prosecution and the Military Defender's Office.

[1164] The legal advice units are made up of the Advice and Legislation Department, the Legal Advisor for the Territories of Judea and Samaria, and the International Law Department.

[1165] Turkel Commission, p.282-283. See also MoFA, p.4.

[1166] Turkel Commission, p.288

ATL005079

whether the circumstances of an incident of alleged violations of international humanitarian law merit opening an investigation. This is a welcome measure, given that, according to the MAG, the primary purpose of operational debriefings is as "an organizational tool in order to 'improve the performance of military units' and in order to learn lessons".[1167] This development is in line with the Turkel Commission, which recommended that "a *separate* mechanism shall be established in order to conduct a fact-finding assessment".[1168] It was unclear, at the time of writing, as to whether the FFA Mechanism will be limited to the 2014 hostilities, or whether it will also be implemented with respect to alleged violations that occurred subsequently in Gaza as well as in the West Bank.

621.    While the MAG is appointed by the civilian Minister of Defense, his appointment is made upon the recommendation of the IDF's Chief of General Staff,[1169] contrary to the recommendation made by the Turkel Commission that the MAG be appointed upon recommendation of a public professional committee.[1170] In addition, the tenure and promotion of the MAG are currently dependent on the discretion of his supervisors,[1171] thereby limiting his autonomy. The Turkel Commission suggested addressing this potential difficulty by restricting the MAG's term in office to six years and instituting a predetermined rank.[1172]

622.    It is important to mention that Israel has in place safeguards to preserve independence by means of civilian judicial oversight over decisions taken by the MAG, notably by the Attorney General and the Israeli Supreme Court, sitting as the High Court of Justice. With respect to the Attorney General, appeals can be made to him concerning MAG decisions, and he may intervene or examine a decision by the MAG. In April 2015, two directives were issued to this effect, and served to formalise this appeals process.[1173] In addition, to enhance the Attorney General's ability to carry out his oversight function, the Department of Special Operations (international law) was created in January 2010 in the office of the Attorney General.[1174] The Turkel Commission recommended that this be strengthened further by establishing a unit specializing in international humanitarian law in the Advice and Legislation Department at the Ministry of Justice.[1175]

623.    As for the High Court of Justice, it hears petitions submitted to it regarding alleged actions of the government and its agencies,[1176] and is therefore in a position to issue rulings in relation to decisions taken by the MAG on investigations into alleged violations during hostilities.[1177] However, in the past, the High Court of Justice has taken the position that its intervention in matters relating to the chief military prosecutor "should occur only in very exceptional circumstances".[1178] According to information reviewed by the commission, in

---

[1167]   Turkel Commission, p.381-2
[1168]   Turkel Commission, p.382 (recommendation no. 5)
[1169]   http://www.law.idf.il/320-en/Patzar.aspx (accessed on 10 May 2015)
[1170]   Turkel Commission recommendation no. 7
[1171]   Cohen and Shany, 2012, section 4.3.2
[1172]   Turkel Commission recommendation no. 7
[1173]   Directives 4.5003 and 9.1002 issued by the Attorney General; MAG update no. 4
[1174]   Submission from Prof. Amichai Cohen
[1175]   Turkel Commission recommendation no. 12, p. 428
[1176]   Turkel Commission, pp.316-317; submission from Prof. Amichai Cohen
[1177]   MAG, Operation Protective Edge: Examinations and Investigation, 10 September 2014, at http://www.mag.idf.il/261-6858-en/Patzar.aspx (accessed on 10 May 2015); B'Tselem, Israel's report to the UN misstates the truth, 4 February 2010, at http://www.btselem.org/gaza_strip/20100204_israels_report_to_un (accessed on 31 May 2015)
[1178]   HCJ 3292/07, Adalah v. Attorney General, 2011, at http://www.shali-law.co.il/index.php?option=com_content&view=article&id=79&Itemid=37 (accessed on 6 May 2015)

ATL005080

the majority of cases, the High Court of Justice has approved, in principle, the policy set by the MAG, and has rarely overturned a decision by the MAG.[1179]

### Promptness

624.    The MAG Corps stated that the "fact-finding assessment teams were instructed to complete their assignments within a short timeframe in order to ensure prompt and effective examinations".[1180] On 22 March 2015, the MAG Corps noted the "rapid pace" of progress of investigations undertaken by the MPCID.[1181] While welcome, the vague wording leaves open to interpretation the actual timeframe in which the investigations must be completed, leaving the process vulnerable to delays.

625.    As explained by the Turkel Commission, promptness "includes the obligations to quickly commence and conduct an investigation in a timely manner. An investigation conducted within a reasonable period of time contributes to the thoroughness and effectiveness of the investigation and also to public confidence in the investigative system, and to the sense that justice is achieved."[1182] On the basis of files it reviewed, the Turkel Commission found that "the duration of these investigations sometimes extends over many years."[1183] Delays in investigations can seriously compromise the collection of evidence, which is increasingly difficult to gather and may eventually be entirely lost the more time goes by. The Turkel Commission therefore recommended a timeframe of a few weeks for a decision by the MAG on possible initiation of an investigation; a timeframe to be set for conducting the actual investigation; and for the MAG, in coordination with the Attorney General, to set a period of time between the decision to open an investigation and the decision to adopt legal or disciplinary measures, or to close the case.[1184] Given that almost one year has elapsed since the end of the hostilities, questions arise regarding the promptness of the many investigations that are as yet incomplete.

### Thoroughness and effectiveness

626.    There is little information available as to how the relevant bodies collected or assessed evidence.[1185] The commission received indications that some attempt was made by the MAG to gather Palestinian eyewitness testimony as part of at least some investigations. However, a number of Palestinian witnesses interviewed by the commission said that they had not been contacted by an Israeli investigative team. In addition, it is unclear if other methods were used to ensure a thorough review of the facts, for example, undertaking autopsies or medical examinations, or to the extent possible. As noted above, the FFA Mechanism contains staff with expertise on operational and legal issues, including on international law, but no information was available as to whether staff are trained on investigation techniques and methodology, in line with international human rights standards.

---

[1179]  Submissions from Prof. Amichai Cohen and Adalah
[1180]  MAG, Operation Protective Edge: Examinations and Investigation, 10 September 2014, at http://www.mag.idf.il/261-6858-en/Patzar.aspx (accessed on 10 May 2015)
[1181]  MAG update no. 3
[1182]  Turkel Commission, pp. 397-8
[1183]  Turkel Commission, p. 398
[1184]  Turkel Commission recommendations no. 6 and 10.
[1185]  Submission 33

**168**

ATL005081

*Transparency*

627.    Israel has exerted efforts to increase transparency with regard to its investigations. This has included publication of four updates by the MAG regarding the status of assessments and investigations.[1186] Israel has also made attempts to inform the international community of progress in this regard through briefings to diplomats and UN officials in Geneva and New York,[1187] and through the publication of material on the hostilities on the website of the Ministry of Foreign Affairs.[1188] In line with the recommendation of the Turkel Commission for the MAG to state his reasons for declining to open an investigation,[1189] the MAG has included information concerning certain individual incidents in his aforementioned updates. Unfortunately, the Government of Israel did not reply to a letter sent by the commission on 10 February 2015, requesting information in relation to investigations, adherence to the basic principles of international humanitarian law, and specific incidents in Gaza and the West Bank. This would have been an opportunity to provide additional relevant information for inclusion in this report.

628.    However, a detailed reading of the information provided on many of the incidents in those updates provides little clarity on the assessment by the FFA Mechanism and the MAG. The MAG updates rather make brief references to military necessity, military targets, warnings provided, fulfillment of the requirement of the principle of proportionality or the targeting process, and so on, without supplying an adequate level of detail to support the reasoning justifying actions that resulted in civilian harm. Moreover, according to information received by the commission, lawyers representing complainants have been prevented from reviewing investigatory materials, on the basis of its classified nature;[1190] and complainants are often not informed of MAG decisions,[1191] despite the assertion by the MAG that he replies to individuals or organizations that have submitted complaints in writing.[1192]

629.    While the IDF is understandably limited in the information it makes publicly available by legitimate security concerns, there is a need to provide sufficient information for its updates to be meaningful.[1193] Information currently made available is very welcome, but is insufficient to allow for effective public and international scrutiny. The commission recognises that "the level of transparency expected of human rights investigations is not always achievable in situations of armed conflict, particularly as questions of national security often arise".[1194] Indeed, as noted by the UN Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions, "States may have tactical or security reasons not to disclose criteria for selecting specific targets….But without disclosure of legal rationale as well as the bases for the selection of specific targets (consistent with genuine security needs), States are operating in an accountability vacuum. It is not possible for the international community to verify the legality of a killing."[1195]

630.    **Case study:** One of the criminal investigations closed by the MAG without further legal proceedings had looked into the killing of four children on 16 July 2014. The boys

---

[1186]   These can be found at: http://www.law.idf.il/1007-en/Patzar.aspx
[1187]   16 and 25 February 2015 and 27 May 2015 in Geneva and 30 October 2014 in New York.
[1188]   These can be found at http://mfa.gov.il/ProtectiveEdge/Documents/IsraelInvestigations.pdf (accessed on 6 May 2015)
[1189]   Turkel commission recommendation no. 6
[1190]   Submission from Adalah
[1191]   Submission from Adalah
[1192]   MAG update no. 3 and no. 4
[1193]   Submission 33
[1194]   A/HRC/15/50, para 32. See also Cohen and Shany, 2012, section 2.2
[1195]   A/HRC/14/24/Add.6, para. 92

ATL005082

had been playing on a breakwater near the port in Gaza City, when they were hit by two missiles fired by Israeli forces from the air. According to the 11 June 2015 update of the MAG, the MPCID investigation found that the incident took place in an area, located on the breakwater, that was known to be a compound belonging to Hamas naval forces and was "utilized exclusively by militants".[1196] MPCID investigators learnt that an intelligence assessment indicated that operatives would gather in the compound to prepare for military activity against the IDF. Aerial surveillance then identified figures running into the compound, who were believed to be militants, and were not identified as children. On the basis of the investigation, the MAG concluded that "the attack process…accorded with Israeli domestic law and international law requirements".[1197]

631.   The commission also examined the killing of the four boys. Based on its own investigation, the commission found strong indications that the IDF failed in its obligations to take all feasible measures to avoid or at least minimize incidental harm to civilians. According to the International Committee of the Red Cross, "[i]n order to avoid the erroneous or arbitrary targeting of civilians entitled to protection against direct attack, it is…of particular importance that all feasible precautions be taken in determining whether a person is a civilian and, if so, whether he or she is directly participating in hostilities."[1198] International humanitarian law provides that, in case of doubt, the person in question must be presumed to be a civilian and therefore protected against direct attack.[1199] In relation to targeting decisions, the determination of civilian status "will have to take into account, *inter alia*, the intelligence available to the decision maker, the urgency of the situation, and the harm likely to result to the operating forces or to persons and objects protected against direct attack from an erroneous decision."[1200]

632.   In its evaluation of whether these criteria had been met in this specific case, the commission considered the following elements. Firstly, the boys were aged between 9 and 11 years, and were therefore small in stature in comparison to the size of an average adult. Secondly, there were no IDF soldiers in the area, as the ground operations had not commenced, nor were there any other persons in imminent danger, thus calling into question the urgency of launching the strike. From the information available, it would appear that the IDF could have more exhaustively verified whether those being targeted were taking a direct part in the hostilities or were members of armed groups with a continuous combat function. Thirdly, the compound was located in the centre of a city of almost 550,000 residents,[1201] between a public beach and an area regularly used by fishermen, and was visible from nearby hotels, where international journalists were staying. It could therefore not be ruled out that civilians, including children, might be present. These factual elements suggest that by assuming that the individuals were members of armed groups merely on the basis of their presence in a particular location, the IDF reversed the presumption of civilian status. In addition, the commission is concerned that the MAG appears to have validated this incorrect application of international humanitarian law.

633.   Concerning the investigation itself, the MAG explained that testimony was gathered from a large number of soldiers, and supplemented by video footage, media images and affidavits of 3 Palestinian witnesses. International journalists and other eyewitnesses,

---

[1196]   MAG update no. 4
[1197]   Ibid.
[1198]   ICRC, *Interpretive guidance on the notion of direct participation in hostilities under international humanitarian law*, 2009, p.76
[1199]   Arts 50 (1) and 52 (1), Additional Protocol I.
[1200]   Ibid.
[1201]   Palestinian Bureau of Statistics, 2014 figures, at
http://www.pcbs.gov.ps/Portals/_Rainbow/Documents/gza.htm (accessed on 31 May 2015)

ATL005083

including Palestinians, do not appear to have been questioned, despite many persons having witnessed the incident. This raises questions about the thoroughness of the investigation.

### Recommendations of UN Human Rights Treaty Bodies

634.    The UN Human Rights Committee has consistently urged States parties to undertake criminal investigations into serious human rights violations in order to bring perpetrators to justice.[1202] In November 2014, during its periodic examination of Israel's implementation of the International Convention on Civil and Political Rights, the Committee directed several recommendations to Israel regarding accountability. They included: to "…continue reforming its investigative system, including, as an initial step, by implementing the recommendations of the second report of the Turkel Commission. It should ensure that all human rights violations committed during its military operations in the Gaza Strip in 2008-2009, 2012 and 2014 are thoroughly, effectively, independently and impartially investigated, that perpetrators, including, in particular, persons in positions of command, are prosecuted and sanctioned in a manner commensurate with the gravity of the acts committed, and that victims or their families are provided with effective remedies, including equal and effective access to justice and reparations." Other recommendations call for investigations into all incidents involving the use of firearms by law enforcement officers and prosecutions of those responsible for excessive use of force during arrest operations, as well as into allegations of torture and ill-treatment, and that victims be provided with effective remedies.[1203]

### The West Bank, including East Jerusalem

635.    The system of investigations into allegations of violations of international law by the IDF in the West Bank during the period under consideration by the commission differs to some degree from that in Gaza. While the MAG remains central to the system in the West Bank, the FFA Mechanism (see above) has so far only been implemented in relation to the 2014 hostilities in Gaza. Based on the information available, the process of investigations in the West Bank appears to operate as it did prior to the June 2014 Operation "Brother's Keeper."

636.    Since April 2011, the MAG adopted a new investigation policy in the West Bank, whereby "every case in which uninvolved Palestinians are killed by IDF fire be investigated immediately by the Criminal Investigation Division" of the IDF Military Police Corps.[1204] According to the IDF, the policy does not apply in cases where the killing "occurred during an activity with clear elements of combat (e.g. fire exchange)".[1205] While this policy is an improvement, the broad exemption clause means that it does not yet fully comply with the legal requirement to investigate every fatality resulting from the use of force by a State agent.[1206]

637.    In cases of alleged violations against Palestinians not involving death, information available to the commission indicated that, in some cases, criminal investigations are directly opened, while in others, the MAG corps may initiate a preliminary inquiry to

---

[1202]    Human Rights Committee General Comment No. 31 (2004), para. 15.
[1203]    CCPR/C/ISR/CO/4, paras 13 and 15
[1204]    Israel Defence Forces, IDF Military Advocate General Implements New Investigation Policy in West Bank, 6 April 2011, at https://www.idfblog.com/blog/2011/04/06/idf-military-advocate-general-implements-new-investigation-policy-in-west-bank/ (accessed on 15 May 2015)
[1205]    Ibid.
[1206]    See section above entitled 'International legal framework' for an explanation of the legal analysis.

determine whether a criminal investigation is warranted.[1207] Preliminary inquiries are apparently often opened when the alleged violation occurred during a military operation and rely considerably on operational debriefings.[1208] Based on the outcome of the inquiry, the MAG decides whether a criminal investigation should be opened.

638.   The commission reviewed information pertaining to the use of operational debriefings as a means to inform the decision of the MAG as to whether to open a criminal investigation. The main shortcomings relate to the facts that: they are carried out by the same unit involved in the incident;[1209] they are generally based on soldiers' accounts without complementing this with evidence collected from victims and witnesses; those who carry them out are not trained investigators; there is no right of appeal against findings reached; and there is a risk that soldiers 'coordinate' their accounts of the incident.[1210] Moreover, there is no timeframe set for the finalisation of such debriefings, and, in practice, this can be a very long process,[1211] which may hamper any eventual criminal investigation. The Turkel Commission adds that "the operational debrief is not focused on questions of criminality".[1212] Also of concern is that such debriefs are not made public; complainants and victims are not informed of the outcome; and information contained therein is inadmissible as evidence in any subsequent prosecution.[1213] The commission hopes that the establishment of a FFA Mechanism with regard to the 2014 hostilities in Gaza may be a first step towards implementation of the same mechanism for incidents in Gaza thereafter and for incidents not involving death in the West Bank.

639.   During the period under examination, Israel has not published updates similar to those relating to Operation 'Protective Edge' regarding its investigations in the West Bank. However, from time to time, the MAG does publish his decision on a particular case, or provides such information to a requesting NGO. The commission has analysed one such document, dated 10 July 2014, which discloses the MAG's reasoning for closing an investigation into the case of a 14-year-old boy killed on 19 March 2014.[1214] The boy was shot with live ammunition by an IDF soldier while he was trying to cross through a breach in the 'Wall' to pick wild herbs, as reportedly previously done by Palestinians in the same area during this season without ramifications.[1215] The MPCID investigation concluded that the IDF acted in full accordance with open-fire regulations, and therefore found no grounds for criminal proceedings. The MPCID found that the shot was aimed at the boy's feet but actually hit his waist. The investigation appears to have been based on information

---

[1207]   Yesh Din, Data Sheet, September 2014, at http://www.yesh-din.org/userfiles/file/datasheets/YeshDin%20-%20DataSheet%20Metzach%209_14%20-%20Eng%20(1)%20(1).pdf (accessed on 31 May 2015)

[1208]   Turkel Commission, pp.335-9

[1209]   Cohen and Shany, 2012, sections 4.2.1 and 4.3.1

[1210]   Turkel Commission, p.381. See also Amnesty International, Trigger-happy: Israel's use of excessive force in the West Bank, February 2014, p.62, at
http://www.amnesty.org/en/documents/MDE15/002/2014/en/ (accessed on 31 May 2015)

[1211]   Turkel Commission, pp.381 and 339. See also Amnesty International, Trigger Happy, p.62

[1212]   Turkel Commission, p.382

[1213]   Turkel Commission, p.338

[1214]   The full text can be found at http://www.law.idf.il/163-6762-he/Patzar.aspx?pos=35 (accessed on 29 May 2015). Although the killing occurred just prior to the period under examination, the Commission deemed it important to include the case in order to shed light on the way investigations are handled by the MPCID and the MAG.

[1215]   B'Tselem, Responsibility for killing 14-year-old Palestinian lies primarily with commanders who ordered armed ambush, 26 March 2014, at
http://www.btselem.org/firearms/20140326_killing_of_yusef_a_shawamreh_deir_al_asal (accessed on 31 May 2015)

172

ATL005085

provided by the IDF, while the testimony of Palestinians present could not be obtained. An investigation by B'Tselem concluded that the boy "posed no danger to any other persons".[1216] For its part, the MPCID does not suggest that the boy was armed or that he posed a threat to the soldiers or anyone else.[1217] The reasoning outlined by the MAG gives an insight into the way in which the MPCID assesses information during its investigations. Although the MPCID did not cite any threat posed by the boy, the MAG still found no wrong-doing on the part of the IDF.

### 2.   Other factors that may hinder achieving accountability

***Investigations into the role of the political and military leadership in suspected violations of international humanitarian law and international human rights law***

640.   During the commission's examinations of incidents pertaining to IDF attacks on residential buildings, the use of artillery and other explosive weapons with wide-area effects in densely populated areas; the destruction of entire neighbourhoods in Gaza; and the regular resort to live ammunition by the IDF, notably in crowd control situations, in the West Bank; questions arose regarding the role of senior officials who set military policy. In many cases, individual soldiers may have been following agreed military policy, but it is the policy itself that may violate the laws of war. Currently, the FFA Mechanism focuses on so-called 'exceptional incidents' suggesting a rather narrow approach, which may fail to take into account violations of international law that result from an intentional policy or military command, which itself may fail to comply with international legal obligations.[1218] The commission's investigations also raise the issue of why the political and military leadership did not revise their policies or change their course of action, despite considerable information regarding massive death and destruction in Gaza, which in turn raises questions as to potential violations of international humanitarian law and criminal law by these officials. There is therefore a need to look into the various stages of decision-making, notably in the design, planning, ordering and oversight of the military operations.

641.   By way of example, on 21 July 2014, 13 days into the hostilities in Gaza, ten Israeli human rights organisations wrote to the Attorney General requesting that he instruct the political and command leadership to refrain from taking actions that may violate the laws of war. They also asked him to act to establish a mechanism to investigate decisions and guidelines of these leaders regarding the conduct of hostilities in Gaza.[1219] In a reply of 5 August 2014, the Attorney General noted that the IDF is instructed to act in accordance with international law, and that to ensure these obligations, the Government and military receive constant legal counsel. He added that inquiry and investigation mechanisms exist within the IDF and the Ministry of Justice, and gave no indication that he would follow up on the requests made by the human rights organisations.[1220] (Calls, made by eight NGOs in a letter to the Attorney General, for investigations at all levels into alleged violations during the 2008-09 hostilities in Gaza were reportedly met with a similar response from the Attorney General.)[1221] In the latest round of violence, no action is known to have been taken by the MAG, in the case of military commanders, and by the Attorney General, with

---

[1216]  Ibid.
[1217]  http://www.law.idf.il/163-6762-he/Patzar.aspx?pos=35 (accessed on 29 May 2015)
[1218]  Submission 33
[1219]  http://www.acri.org.il/en/wp-content/uploads/2014/07/NGOs-Letter-to-AG-Protective-Edge-Violations.pdf (accessed on 31 May 2015)
[1220]  http://www.acri.org.il/he/wp-content/uploads/2014/07/yoamash050814.pdf (accessed on 31 May 2015)
[1221]  http://www.btselem.org/download/20090120_acri_to_mazuz_on_castlead_investigations_eng.pdf ; http://www.btselem.org/press_releases/20090319 (accessed on 31 May 2015)

ATL005086

respect to military and civilian leadership, to initiate investigations into the role of senior officials. It is therefore unclear how the Attorney General is actively and wholly fulfilling his role to provide oversight of the MAG.

642.    Another accountability mechanism that the State may initiate is a public commission of inquiry to review policies and practices. As noted by the Israeli Ministry of Foreign Affairs, this was done in response to the Flotilla incident, with the establishment of the Turkel Commission.[1222] With regard to the 2014 hostilities, no such commission of inquiry has been initiated. Rather, for the time being, it is the State Comptroller who will undertake an examination of the decision-making process of the political and military echelons, with reference to international law. As noted by the Turkel Commission, it is state commissions of inquiry that would usually handle the investigation of incidents involving senior decision-makers. The commission notes that the State Comptroller does not appear in the list of bodies in Israel that investigate violations of international humanitarian law, outlined by the Turkel Commission.[1223]

643.    The State Comptroller does not appear to have a specific focus on assessing compliance with international law. For example, when looking into the Flotilla incident, the Turkel Commission explained that the "State Comptroller focused on the decision–making process within the Government with respect to its handling of the maritime incident and the interaction that took place between the political echelon and the IDF; intelligence matters; and the work of the public relations authorities."[1224] To attempt to mitigate the impact of a lack of specialised expertise, the Comptroller has brought in experts to assist with his current inquiry concerning the 2014 hostilities in Gaza in order to bolster existing capacity, notably in the field of international humanitarian law.[1225] The commission looks forward to reading the report of the State Comptroller and encourages its early publication. His inquiry should be supplemented by mechanisms - including criminal proceedings and disciplinary measures - that aim, where appropriate, to hold to account individuals who may have played a role in wrong-doing, regardless of their position in the hierarchy.

644.    Broadly speaking, the commission is not aware of any on-going investigations of senior officials for alleged violations of international humanitarian law or international human rights law. In this context, the Turkel Commission recommended that Israel enact "provisions that impose direct criminal liability on military commanders and civilian superiors for offenses committed by their subordinates",[1226] in line with the doctrine of command or superior responsibility.

### Domestic legislation

645.    As noted by the Turkel Commission, Israeli law does not include all acts defined as war crimes under international humanitarian law.[1227] Correspondingly, the Turkel Commission recommended that the Ministry of Justice "initiate legislation for all international criminal law offenses that do not have a corresponding domestic offense in Israeli criminal law."[1228] If implemented, this would be an important step towards ensuring

---

[1222]   MoFA, p.13
[1223]   Turkel Commission, pp. 387-8
[1224]   Turkel Commission, p.445
[1225]   The investigation will be aided by three experts: Prof. Michael Newton, Prof. Moshe Halbertal and Prof. Miguel Deutsch. Prof. Newton is an international law expert, with particular expertise on accountability, transnational justice, and conduct of hostilities.
[1226]   Turkel Commission recommendation no. 2; submission from Adalah. Note also that the doctrine of command responsibility is described in the international legal framework.
[1227]   Turkel Commission, pp.363-5
[1228]   Turkel Commission recommendation no. 1

ATL005087

that when convictions regarding allegations of serious international crimes are secured, they are met with sentences commensurate to the crime. As mentioned above, the Turkel Commission also recommended enacting legal provisions to incorporate the doctrine of command or superior responsibility in domestic legislation.

### Right to effective remedies and reparation

646.   The commission was not in a position to thoroughly examine victims' right to benefit from effective remedies and reparation in the timeframe available. However, it would like to emphasize that victims face significant obstacles that impede the fulfilment of this right. All Palestinian victims are confronted with similar difficulties, but impediments faced by Gazan victims are compounded by the particular context of the Gaza Strip, notably the Israeli-imposed blockade - which prevents Palestinians in Gaza from exiting the Strip and from entering Israel - and the recurrent bouts of active hostilities. Some of the main challenges are summarised below.

647.   A broadly defined legal exclusion within Israel's Law on the Liability of the State 5712-1952 (Civil Torts Law), known as the "combat action" exemption, prevents victims from claiming compensation from the Government of Israel for actions taken while "combat[ing] terror, hostile acts or insurrection", even when there are clear allegations of violations of international law.[1229] A further impediment for victims from Gaza to seek compensation for damages is the statute of limitations applied under the Civil Torts Law, which is reduced from the usual seven years to only two years from the day of the event during which the injury took place.[1230] Prior to this, in order to retain the possibility to make a claim, victims must submit written notice to the Ministry of Defence within 60 days. This procedure is particularly difficult to fulfil during active hostilities, especially when they last for an extended period of time, such as those of summer 2014.

648.   Restrictions on movement, which are almost total in the case of Gaza's residents, severely constrain victims' ability to claim compensation, in a number of ways. Routine procedures required of claimants, such as signatures by a claimant's lawyer, are often difficult, if not impossible, to accomplish. In addition, plaintiffs and witnesses from Gaza are routinely denied access to Israeli courts in civil lawsuits concerning compensation claims for cross-examination or for examination by medical specialists, due to the blockade. This almost complete closure of Gaza also restricts the entry of lawyers from Israel to Gaza and therefore effectively prevents in-person contact with their clients.

649.   High financial guarantees imposed on the plaintiff can be another factor that prevents Palestinian victims and their families from pursuing a claim in Israeli courts.[1231] The costs of making a claim include court and legal fees, as well as a guarantee that is assessed according to the likelihood of the success of the claim. Such costs are frequently beyond the means of Palestinians, especially in areas where poverty levels have risen substantially in recent years due to access and movement restrictions, such as Gaza.

### Past accountability

650.   Israel has failed to hold accountable those responsible for alleged grave violations of international humanitarian and human rights law resulting from IDF actions during recent past active hostilities in Gaza.[1232] According to the information available with regard to Operation "Cast Lead", of 52 criminal investigations opened into allegations of

---

[1229]   A/69/347, paras 61-69
[1230]   Submission from Adalah; A/69/347, paras 61-69
[1231]   Submission from Adalah; A/69/347, paras 61-69
[1232]   E.g. A/69/347, para 52.

ATL005088

wrongdoing, three cases were submitted to prosecution and resulted in four convictions. In three other cases, disciplinary action was taken against six officers.[1233] Those cases that were pursued before the courts were not in relation to the most serious violations alleged to have been committed during the 2008-09 operation. In relation to Operation "Pillar of Defense", as of April 2013, the MAG had not launched a single criminal investigation.[1234] In relation to both operations, policy level decisions and possible responsibility of members of the political, military and judicial establishments were not investigated. This, coupled with the very small percentage of prosecutions and convictions and the nature of the cases resulting in indictments, raise serious questions regarding the effectiveness of the current mechanisms to hold to account those responsible for the most serious alleged crimes, wherever they may have taken place.

651.    The picture is equally bleak when reviewing other data available. According to the information reviewed, of 36 investigations into the killings of Palestinians in the West Bank between April 2011 and early 2015, there had only been two indictments and one conviction.[1235] Moreover, Yesh Din found that between 2010 and 2013, only 2.2 per cent of investigations into alleged IDF offenses against Palestinians resulted in indictments.[1236] In rare cases between September 2000 and mid-2013 where convictions were secured, sentences were relatively short - in some cases very short - given that these cases involved deaths of civilians,[1237] raising questions as to whether sentences handed down were commensurate with the gravity of the crimes.[1238] With regard to allegations of torture and ill-treatment, NGO the Public Committee against Torture in Israel notes that over a 15-year period (1999 to 2014), not a single criminal investigation was opened into the hundreds of complaints that it and others have presented to the relevant authorities.[1239]

## B.   Palestine

652.    Little information was available to the commission, at the time of writing, regarding steps taken by the State of Palestine and the authorities in Gaza to conduct investigations into alleged serious violations of international humanitarian and gross violations of international human rights law.

653.    The commission is aware of the challenges faced by the State of Palestine to fulfil its duty in this regard, notably relating to lack of access to Gaza and to the divisions between

---

[1233] B'Tselem: Israeli authorities have proven they cannot investigate suspected violations of international humanitarian law by Israel in the Gaza Strip, 5 September 2014, at http://www.btselem.org/accountability/20140905_failure_to_investigate (accessed on 31 May 2015); A/HRC/28/80/Add.1, para 79

[1234] Ibid.

[1235] As explained above the change in policy in April 2011 regarding the automatic opening of investigations of Palestinian fatalities in incidents outside of "combat activity". See also A/HRC/28/80, para 18.

[1236] Yesh Din, Data Sheet, September 2014, at http://www.yesh-din.org/userfiles/file/datasheets/YeshDin%20-%20DataSheet%20Metzach%209_14%20-%20Eng%20(1)%20(1).pdf (accessed on 31 May 2015)

[1237] Yesh Din, Data Sheet, July 2013, at http://www.yesh-din.org/userfiles/file/datasheets/data%20sheet%20july%202013/ICAP%20Death%20cases%20investigations%20and%20indictments_July%202013_ENG.pdf (accessed on 31 May 2015)

[1238] This concern was also raised by the UN Secretary-General, see A/69/347, para. 53.

[1239] Public Committee Against Torture in Israel, Israel - Briefing to the Human Rights Committee for the Committee's Review of the Fourth Periodic Report on Israel, September 2014 at http://www.stoptorture.org.il/files/PCATI%20submission%20to%20HRC%202014_0.pdf (accessed on 27 May 2015)

ATL005089

the West Bank and Gaza. On 26 March 2015, the Ministry of the Interior of the State of Palestine informed the commission that, "[t]he Government of National Consensus, formed just days before the attack, did not have a presence on the ground in the Gaza Strip effective enough to enable it and its judicial organs to investigate such acts, and the Palestinian Public Prosecutor's Office has still not been able to exercise its legal jurisdiction by investigating and prosecuting the perpetrators of those actions."[1240] That said, the State of Palestine informed the commission of its willingness to conduct investigations as soon as the process of reconciliation is completed.[1241] Further, it noted that efforts are underway to unify the two judicial systems, including the Office of the Prosecutor, which have essentially been operating in parallel in the West Bank and Gaza for several years.[1242] In addition, the commission was informed that instructions were given to the Office of the Prosecutor (Gaza) to open investigations into a number of cases, with no further detail provided on the nature of those cases or what progress, if any, has been made.[1243]

654.    The commission takes note of the findings of the UN Committee of Experts in 2010 concerning investigations into violations allegedly committed by Palestinian actors before and after the 2008-09 hostilities[1244] conducted by the Palestinian Authority, through the Palestinian Independent Investigation Commission.[1245] In 2010, the Council of Ministers established a Ministerial Committee to follow up on the recommendations of the Palestinian Independent Investigation Commission report.[1246] However, at the time of writing, no information was available on the implementation of its report, presented to the Council of Ministers in February 2011.

656.    In its 2010 report, the Committee found that the Palestinian Independent Investigation Commission had "laid the groundwork for the commencement of proceedings against perpetrators and other measures suited to provide redress to the victims".[1247] However, the commission is not aware of any steps taken, several years on, to bring to justice the perpetrators of alleged violations connected with the hostilities of 2008-09 and 2014.[1248]

657.    As for the authorities in Gaza, they provided no information to the commission on specific cases or incidents in relation to which they may have opened an investigation. They told the commission that they had created a body to investigate allegations of extrajudicial killings. However, no information was forthcoming of the details of this body or of any investigation it may have initiated, nor of any other investigations it may have conducted, such as into allegations of indiscriminate rocket and mortar fire. There appears to be no concerted effort to investigate such allegations in line with international standards. Previous assessments by UN human rights bodies indicate that the authorities in Gaza have not conducted credible and genuine investigations into past escalations of hostilities in recent

---

[1240]   Reply to requests for clarification from the United Nations Independent Commission of Inquiry on the
        2014 Gaza Conflict from the Ministry of the Interior, State of Palestine (HRC/NONE/2015/36), p.7
        (translated from the Arabic)
[1241]   Meeting with State of Palestine Ministry of Interior
[1242]   Meeting with State of Palestine Office of the Prosecutor
[1243]   Ibid.
[1244]   As set out in A/HRC/12/48.
[1245]   A/HRC/15/50, paras 65-75 and 96-97
[1246]   A/HRC/15/50, para. 75
[1247]   A/HRC/15/50, para. 98
[1248]   A/HRC/16/24, paras  88-90; A/HRC/28/45, para. 30

ATL005090

years,[1249] and have, in particular, failed to conduct investigations into rocket and mortar attacks against Israel.[1250]

**International mechanisms**

658.    On 1 January 2015, the Government of the State of Palestine lodged a declaration under article 12(3) of the Rome Statute accepting the jurisdiction of the International Criminal Court (ICC) over alleged crimes committed "in the occupied Palestinian territory, including East Jerusalem, since June 13, 2014". On 2 January 2015, the Government of the State of Palestine acceded to the Rome Statute by depositing its instrument of accession with the UN Secretary-General. On 16 January 2015, as a matter of policy and practice, the Prosecutor of the ICC opened a preliminary examination into the situation in Palestine in order to establish whether the Rome Statute criteria for opening an investigation are met.[1251]

659.    During this examination, currently underway, the ICC seeks to reach a fully informed determination as to whether there is a reasonable basis to proceed with an investigation pursuant to the criteria established by the Rome Statute.[1252] The Court specifies that there are "no timelines provided in the Rome Statute for a decision on a preliminary examination",[1253] and that "[d]epending on the facts and circumstances of each situation, the Office will decide whether to continue to collect information to establish a sufficient factual and legal basis to render a determination; initiate an investigation, subject to judicial review as appropriate; or decline to initiate an investigation."[1254] The Court acts in an independent and impartial manner, examining alleged violations regardless of the identity of the perpetrator.  A central consideration for the Court, in all such preliminary examinations, is to assess whether there are credible national investigations and prosecutions underway; only in the absence of genuine national processes will the Court consider taking further action.

660.    On 2 April 2014, the State of Palestine acceded to seven of the nine core human rights treaties and one of the substantive protocols without reservation.[1255] The treaties entered into force on 2 May, 7 May and 2 July 2014 respectively, thereby formally

---

[1249] A/HRC/15/50, paras 100-101

[1250] A/HRC/16/24, para. 90

[1251] International Criminal Court, Palestine at http://www.icc-cpi.int/en_menus/icc/structure%20of%20the%20court/office%20of%20the%20prosecutor/comm%20and%20ref/pe-ongoing/palestine/Pages/palestine.aspx (accessed on 31 May 2015)

[1252] Specifically, under article 53(1) of the Rome Statute, the Prosecutor shall consider issues of jurisdiction, admissibility and the interests of justice in making this determination.  See International Criminal Court, The Prosecutor of the International Criminal Court, Fatou Bensouda, opens a preliminary examination of the situation in Palestine, 16 January 2015, at http://www.icc-cpi.int/en_menus/icc/press%20and%20media/press%20releases/Pages/pr1083.aspx (accessed on 31 May 2015)

[1253] Ibid.

[1254] Ibid.

[1255] The International Covenant on Civil and Political Rights; the International Covenant on Economic, Social and Cultural Rights; the Convention on the Elimination of All Forms of Discrimination against Women; the Convention on the Rights of Persons with Disabilities; the International Convention on the Elimination of All Forms of Racial Discrimination; the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; the Convention on the Rights of the Child; and the Optional Protocol to the Convention on the Rights of the Child on the Involvement of Children in armed conflict.

178

ATL005091

obligating the State of Palestine to uphold their provisions.[1256] Also on 2 April 2014, it acceded to Additional Protocol I of the Geneva Conventions of 1949. On 31 December 2014, the State of Palestine also acceded to 12 other international treaties, including the Geneva Conventions and their Additional Protocols II and III, and the 1968 Convention on the non-applicability of statutory limitations to war crimes and crimes against humanity.[1257] The Commission welcomes these accessions and the commitment, thereby, of the State of Palestine to adhere to these new legal obligations and to submit to scrutiny by the bodies that periodically monitor implementation of the treaties.

661.   Israel is not a State party to the Rome Statute. With regard to the ICC, a statement on the website of the State Comptroller, announcing the launch of his aforementioned inquiry (see above), states that "[a]ccording to principles of international law when a State exercises its authority to objectively investigate accusations regarding violations of the laws of armed conflict, this will preclude examination of said accusations by external international tribunals (such as the International Criminal Court in The Hague)."[1258] As elaborated in the legal framework above, Israel is bound by its obligations under international humanitarian law and international human rights law.

## C.   Assessment

662.   In recent years, Israel has taken significant steps aimed at bringing its system of investigations into compliance with international standards. The Turkel Commission, itself an initiative of the Government of Israel, has helped to give momentum to these efforts, and has provided concrete recommendations as to how to go about it, a number of which have already been implemented by Israel. Notwithstanding progress achieved to date, significant further changes are required to ensure that Israel adequately fulfils its duty to investigate, prosecute and hold perpetrators of alleged violations of international humanitarian law and international human rights law accountable, in line with international standards, as outlined above. The prompt implementation of all the recommendations elaborated by the Turkel Commission over two years ago would go a long way to realising this goal.

663.   Given that investigations into the 2014 hostilities are ongoing, it is too early to assess whether there have been appropriate prosecutions and convictions. Nevertheless, the commission is concerned that the only indictments to date, almost one year after the events, are in connection with the relatively minor offense of theft. It is further disturbed by the closure of the criminal investigation into the killing of the four boys on the beach (see paras 30-31) without further legal proceedings, despite strong indications that the actions of the IDF were not in conformity with international humanitarian law and that the investigation does not appear to have been carried out in a thorough manner. In relation to the West Bank, the commission was not in a position to examine investigations into the aforementioned 27 cases of Palestinian fatalities. Of 17 cases of killings of Palestinians between 16 June and 22 August 2014, B'Tselem was informed that a criminal investigation had been opened into 12 and a limited investigation had been launched into three cases; in

---

[1256]   OHCHR press briefing notes on Palestine, 2 May 2014, at
http://unispal.un.org/UNISPAL.NSF/0/262AC5B8C25B364585257CCF006C010D (accessed on 31
May 2015)

[1257]   For more details, see International Committee of the Red Cross at
https://www.icrc.org/applic/ihl/ihl.nsf/vwTreatiesByCountrySelected.xsp?xp_countrySelected=PS
(accessed on 31 May 2015)

[1258]   Israel State Comptroller, The State Comptroller investigation of operation Tzuk Eitan- Protective at
http://www.mevaker.gov.il/he/publication/Articles/Pages/2015.1.20-Tzuk-
EItan.aspx?AspxAutoDetectCookieSupport=1 (accessed on 31 May 2015).

ATL005092

one case, no response was received; and in another, the military was not aware of the incident.[1259]

664.    The commission is concerned that impunity prevails across the board for violations of international humanitarian and human rights law allegedly committed by Israeli forces, whether it be in the context of active hostilities in Gaza or killings, torture, and ill-treatment in the West Bank. Israel must break with its recent lamentable track record in holding wrong-doers accountable, not only as a means to secure justice for victims but also to ensure the necessary guarantees for non-repetition. Those responsible for suspected violations of international law at all levels of the political and military establishments must be brought to justice. An important factor in enabling such a process will be the implementation of the Turkel Commission's recommendations 1 and 2 concerning legal reform with regard to international criminal law offenses that are currently not found in Israeli law and to the incorporation of the doctrine of command or superior responsibility.

665.    The commission emphasizes that the rights of victims should be at the centre of any accountability process. Palestinian victims are systematically denied their right to effective remedies and reparation due to an array of obstacles. Victims – in some cases repeatedly suffering violations in recent years - have a right to know the truth and to receive restitution.

666.    Palestinian authorities have consistently failed to ensure that perpetrators of violations of international humanitarian law and international human rights law are brought to justice, and that Israeli victims are granted their right to effective remedies and reparation. With respect to the local authorities in Gaza, no steps appear to have been taken to initiate investigations into actions by Palestinian armed groups, seemingly due to a lack of political will. The Palestinian Authority claims that its failure to open investigations results from insufficient means to carry out investigations in a territory over which it has yet to re-establish unified control. The commission is concerned that continuing political divisions also contribute significantly to impeding justice for all victims of violations by Palestinian armed groups. The absence of measures to initiate criminal proceedings against alleged perpetrators calls into question the stated determination of the Palestinian Authority to achieve accountability. In line with their legal obligations, the authorities must take urgent measures to rectify this long-standing impunity.

667.    Comprehensive and effective accountability mechanisms for violations allegedly committed by Israel or Palestinian actors will be a key deciding factor as to whether Palestinians and Israelis are to be spared yet another round of hostilities and spikes in violations of international law in the future.

## VIII.    Conclusions and recommendations

### A.    Concluding observations

668.    **The commission was deeply moved by the immense suffering of Palestinian and Israeli victims, who have been subjected to repeated rounds of violence. The victims expressed their continued hope that their leaders and the international community would act more resolutely to address the root causes of the conflict so as to restore**

---

[1259]    B'Tselem, Follow-up: Military Police and MAG Corps investigations of civilian Palestinian fatalities in West Bank since new policy imposed, updated 30 May 2015, at http://m.btselem.org/accountability/military_police_investigations_followup (accessed on 27 May 2015).

ATL005093

human rights, dignity, justice and security to all residents of the Occupied Palestinian Territory and Israel. In relation to this latest round of violence, which resulted in an unprecedented number of casualties, the commission was able to gather substantial information pointing to serious violations of international humanitarian law and international human rights law by Israel and by Palestinian armed groups. In some cases, these violations may amount to war crimes. The commission urges all those concerned to take immediate steps to ensure accountability, including the right to an effective remedy for victims.

669.   With regard to Israel, the commission examined carefully the circumstances of each case, including the account given by the State, where available. Israel has, however, released insufficient information regarding the specific military objectives of its attacks. The commission recognizes the dilemma that Israel faces in releasing information that would disclose in detail the targets of military strikes, given that such information may be classified and jeopardize intelligence sources. Be that as it may, security considerations do not relieve the authorities of their obligations under international law. The onus remains on Israel to provide sufficient details on its targeting decisions to allow an independent assessment of the legality of the attacks conducted by the Israel Defense Forces and to assist victims in their quest for the truth.

670.   The commission is concerned that impunity prevails across the board for violations of international humanitarian law and international human rights law allegedly committed by Israeli forces, whether it be in the context of active hostilities in Gaza or killings, torture and ill-treatment in the West Bank. Israel must break with its recent lamentable track record in holding wrongdoers accountable, not only as a means to secure justice for victims but also to ensure the necessary guarantees for non-repetition.

671.   Questions arise regarding the role of senior officials who set military policy in several areas examined by the commission, such as in the attacks of the Israel Defense Forces on residential buildings; the use of artillery and other explosive weapons with wide-area effects in densely populated areas; the destruction of entire neighbourhoods in Gaza; and the regular resort to live ammunition by the Israel Defense Forces, notably in crowd-control situations, in the West Bank. In many cases, individual soldiers may have been following agreed military policy, but it may be that the policy itself violates the laws of war.

672.   The commission's investigations also raise the issue of why the Israeli authorities failed to revise their policies in Gaza and the West Bank during the period under review by the commission. Indeed, the fact that the political and military leadership did not change its course of action, despite considerable information regarding the massive degree of death and destruction in Gaza, raises questions about potential violations of international humanitarian law by these officials, which may amount to war crimes. Current accountability mechanisms may not be adequate to address this issue.

673.   With regard to Palestinian armed groups, the commission has serious concerns with regard to the inherently indiscriminate nature of most of the projectiles directed towards Israel by these groups and to the targeting of Israeli civilians, which violate international humanitarian law and may amount to a war crime. The increased level of fear among Israeli civilians resulting from the use of tunnels was palpable. The commission also condemns the extrajudicial executions of alleged "collaborators", which amount to a war crime.

ATL005094

674.    The Palestinian authorities have consistently failed to ensure that perpetrators of violations of international humanitarian law and international human rights law are brought to justice. The commission is concerned that continuing political divisions contribute significantly to the obstruction of justice for victims of violations by Palestinian armed groups. The absence of measures to initiate criminal proceedings against alleged perpetrators calls into question the stated determination of the Palestinian Authority to achieve accountability. In accordance with their legal obligations, the authorities must take urgent measures to rectify this long-standing impunity.

675.    Comprehensive and effective accountability mechanisms for violations allegedly committed by Israel or Palestinian actors will be a key deciding factor of whether Palestinians and Israelis are to be spared yet another round of hostilities and spikes in violations of international law in the future.

## B.    Recommendations

676.    The persistent lack of implementation of recommendations – made by previous commissions of inquiry, fact-finding missions, United Nations treaty bodies, special procedures and other United Nations bodies, in particular the Secretary-General and OHCHR – lies at the heart of the systematic recurrence of violations in Israel and the Occupied Palestinian Territory. Bearing in mind this wealth of guidance, the commission will not elaborate an exhaustive list of recommendations, which would repeat concerns registered by other bodies. Rather, the commission calls upon all duty bearers to implement fully all recommendations made by the above-mentioned bodies without delay in order to avert a crisis similar to that of summer 2014 in the future.

677.    The commission calls upon all parties to fully respect international humanitarian law and international human rights law, including the main principles of distinction, proportionality and precaution, and to establish promptly credible, effective, transparent and independent accountability mechanisms. The right of all victims to an effective remedy, including full reparations, must be ensured without further delay. In this context, the parties should cooperate fully with the preliminary examination of the International Criminal Court and with any subsequent investigation that may be opened.

678.    The commission also calls upon Israelis and Palestinians to demonstrate political leadership by both refraining from and taking active steps to prevent statements that dehumanize the other side, incite hatred, and only serve to perpetuate a culture of violence.

679.    The commission calls upon the Government of Israel to conduct a thorough, transparent, objective and credible review of policies governing military operations and of law enforcement activities in the context of the occupation, as defined by political and military decision-makers, to ensure compliance with international humanitarian law and human rights law, specifically with regard to:

(a)    The use of explosive weapons with wide-area effects in densely populated areas, including in the vicinity of specifically protected objects;

(b)    The definition of military objectives;

(c)    The tactics of targeting residential buildings;

(d)    The effectiveness of precautionary measures;

ATL005095

(e)     The protection of civilians in the context of the application of the Hannibal directive;

(f)     Ensuring that the principle of distinction is respected when active neighbourhoods are declared "sterile combat zones";

(g)     The use of live ammunition in crowd control situations.

680.    The review should also examine mechanisms for continuous review of respect for international humanitarian law and human rights law during military operations and in the course of law enforcement activities in the context of the occupation.

681.    The commission further calls upon the Government of Israel:

(a)     To ensure that investigations comply with international human rights standards and that allegations of international crimes, where substantiated, are met with indictments, prosecutions and convictions, with sentences commensurate to the crime, and to take all measures necessary to ensure that such investigations will not be confined to individual soldiers alone, but will also encompass members of the political and military establishment, including at the senior level, where appropriate;

(b)     To implement all the recommendations contained in the second Turkel report, in particular recommendation no. 2 calling for the enactment of provisions that impose direct criminal liability on military commanders and civilian superiors for offenses committed by their subordinates, in line with the doctrine of command responsibility;

(c)     To grant access to Israel and the Occupied Palestinian Territory for, and cooperate with, international human rights bodies and non-governmental organizations concerned with investigating alleged violations of international law by all duty bearers and any mechanisms established by the Human Rights Council to follow up on the present report;

(d)     To address structural issues that fuel the conflict and have a negative impact on a wide range of human rights, including the right to self-determination; in particular, to lift, immediately and unconditionally, the blockade on Gaza; to cease all settlement-related activity, including the transfer of Israel's own population to the occupied territory; and to implement the advisory opinion rendered on 9 July 2004 by the International Court of Justice on the legal consequences of the construction of a wall in the Occupied Palestinian Territory;

(e)     To accede to the Rome Statute.

682.    The commission calls upon the State of Palestine:

(a)     To ensure that investigations into violations of international humanitarian law and international human rights law, including international crimes, by the Palestinian Authority, the authorities in Gaza and Palestinian armed groups, where substantiated, comply with international human rights standards and that full accountability is achieved, including through criminal proceedings;

(b)     To accelerate efforts to translate the declarations on Palestinian unity into tangible measures on grounds that would enable the Government of national consensus to ensure the protection of human rights and to achieve accountability for victims.

683.    The commission calls upon the authorities in Gaza and Palestinian armed groups:

ATL005096

(a)     To respect the principles of distinction, proportionality and precaution, including by ending all attacks on Israeli civilians and civilian objects, and stopping all rocket attacks and other actions that may spread terror among the civilian population in Israel;

(b)     To take measures to prevent extrajudicial executions and eradicate torture, cruel, inhuman and degrading treatment; to cooperate with national investigations aimed to bring those responsible for violations of international law to justice; and to combat the stigma faced by families of alleged collaborators.

684.   The commission calls upon the international community:

(a)     To promote compliance with human rights obligations, and to respect, and to ensure respect for, international humanitarian law in the Occupied Palestinian Territory and Israel, in accordance with article 1 common to the Geneva Conventions;

(b)     To use its influence to prevent and end violations, and to refrain from encouraging violations by other parties;

(c)     To accelerate and intensify efforts to develop legal and policy standards that would limit the use of explosive weapons with wide-area effects in populated areas with a view to strengthening the protection of civilians during hostilities;

(d)     To support actively the work of the International Criminal Court in relation to the Occupied Palestinian Territory; to exercise universal jurisdiction to try international crimes in national courts; and to comply with extradition requests pertaining to suspects of such crimes to countries where they would face a fair trial.

685.   The commission recommends that the Human Rights Council consider conducting a comprehensive review of the implementation of the numerous recommendations addressed to the parties by its own mechanisms, in particular relevant commissions of inquiry and fact-finding missions and explore mechanisms to ensure their implementation.

---

ATL005097

# EXHIBIT 7



United Nations                                                                                                    A/RES/67/19

## General Assembly

Distr.: General
4 December 2012

---

**Sixty-seventh session**
Agenda item 37

# Resolution adopted by the General Assembly on 29 November 2012

[*without reference to a Main Committee (A/67/L.28 and Add.1)*]

### 67/19.  Status of Palestine in the United Nations

*The General Assembly*,

*Guided* by the purposes and principles of the Charter of the United Nations, and stressing in this regard the principle of equal rights and self-determination of peoples,

*Recalling* its resolution 2625 (XXV) of 24 October 1970,[1] by which it affirmed, inter alia, the duty of every State to promote, through joint and separate action, realization of the principle of equal rights and self-determination of peoples,

*Stressing* the importance of maintaining and strengthening international peace founded upon freedom, equality, justice and respect for fundamental human rights,

*Recalling* its resolution 181 (II) of 29 November 1947,

*Reaffirming* the principle, set out in the Charter, of the inadmissibility of the acquisition of territory by force,

*Reaffirming also* relevant Security Council resolutions, including resolutions 242 (1967) of 22 November 1967, 338 (1973) of 22 October 1973, 446 (1979) of 22 March 1979, 478 (1980) of 20 August 1980, 1397 (2002) of 12 March 2002, 1515 (2003) of 19 November 2003 and 1850 (2008) of 16 December 2008,

*Reaffirming further* the applicability of the Geneva Convention relative to the Protection of Civilian Persons in Time of War, of 12 August 1949,[2] to the Occupied Palestinian Territory, including East Jerusalem, including with regard to the matter of prisoners,

*Reaffirming* its resolution 3236 (XXIX) of 22 November 1974 and all relevant resolutions, including resolution 66/146 of 19 December 2011, reaffirming the right of the Palestinian people to self-determination, including the right to their independent State of Palestine,

---

[1] Declaration on Principles of International Law concerning Friendly Relations and Cooperation among States in accordance with the Charter of the United Nations.

[2] United Nations, *Treaty Series*, vol. 75, No. 973.

12-47974



**Please recycle**



ATL005122

*Reaffirming also* its resolutions 43/176 of 15 December 1988 and 66/17 of 30 November 2011 and all relevant resolutions regarding the peaceful settlement of the question of Palestine, which, inter alia, stress the need for the withdrawal of Israel from the Palestinian territory occupied since 1967, including East Jerusalem, the realization of the inalienable rights of the Palestinian people, primarily the right to self-determination and the right to their independent State, a just resolution of the problem of the Palestine refugees in conformity with resolution 194 (III) of 11 December 1948 and the complete cessation of all Israeli settlement activities in the Occupied Palestinian Territory, including East Jerusalem,

*Reaffirming further* its resolution 66/18 of 30 November 2011 and all relevant resolutions regarding the status of Jerusalem, bearing in mind that the annexation of East Jerusalem is not recognized by the international community, and emphasizing the need for a way to be found through negotiations to resolve the status of Jerusalem as the capital of two States,

*Recalling* the advisory opinion of the International Court of Justice of 9 July 2004,[3]

*Reaffirming* its resolution 58/292 of 6 May 2004 affirming, inter alia, that the status of the Palestinian territory occupied since 1967, including East Jerusalem, remains one of military occupation and that, in accordance with international law and relevant United Nations resolutions, the Palestinian people have the right to self-determination and to sovereignty over their territory,

*Recalling* its resolutions 3210 (XXIX) of 14 October 1974 and 3237 (XXIX) of 22 November 1974, by which, respectively, the Palestine Liberation Organization was invited to participate in the deliberations of the General Assembly as the representative of the Palestinian people and was granted observer status,

*Recalling also* its resolution 43/177 of 15 December 1988, by which it, inter alia, acknowledged the proclamation of the State of Palestine by the Palestine National Council on 15 November 1988 and decided that the designation "Palestine" should be used in place of the designation "Palestine Liberation Organization" in the United Nations system, without prejudice to the observer status and functions of the Palestine Liberation Organization within the United Nations system,

*Taking into consideration* that the Executive Committee of the Palestine Liberation Organization, in accordance with a decision by the Palestine National Council, is entrusted with the powers and responsibilities of the Provisional Government of the State of Palestine,[4]

*Recalling* its resolution 52/250 of 7 July 1998, by which additional rights and privileges were accorded to Palestine in its capacity as observer,

*Recalling also* the Arab Peace Initiative adopted in March 2002 by the Council of the League of Arab States,[5]

*Reaffirming its commitment*, in accordance with international law, to the two-State solution of an independent, sovereign, democratic, viable and contiguous State

---

[3] See A/ES-10/273 and Corr.1.
[4] See A/43/928, annex.
[5] A/56/1026-S/2002/932, annex II, resolution 14/221.

Page 396

ATL005123

of Palestine living side by side with Israel in peace and security on the basis of the pre-1967 borders,

*Bearing in mind* the mutual recognition of 9 September 1993 between the Government of the State of Israel and the Palestine Liberation Organization, the representative of the Palestinian people,

*Affirming* the right of all States in the region to live in peace within secure and internationally recognized borders,

*Commending* the Palestinian National Authority's 2009 plan for constructing the institutions of an independent Palestinian State within a two-year period, and welcoming the positive assessments in this regard about readiness for statehood by the World Bank, the United Nations and the International Monetary Fund and as reflected in the Ad Hoc Liaison Committee Chair conclusions of April 2011 and subsequent Chair conclusions, which determined that the Palestinian Authority is above the threshold for a functioning State in key sectors studied,

*Recognizing* that full membership is enjoyed by Palestine in the United Nations Educational, Scientific and Cultural Organization, the Economic and Social Commission for Western Asia and the Group of Asia-Pacific States and that Palestine is also a full member of the League of Arab States, the Movement of Non-Aligned Countries, the Organization of Islamic Cooperation and the Group of 77 and China,

*Recognizing also* that, to date, 132 States Members of the United Nations have accorded recognition to the State of Palestine,

*Taking note* of the 11 November 2011 report of the Security Council Committee on the Admission of New Members,[6]

*Stressing* the permanent responsibility of the United Nations towards the question of Palestine until it is satisfactorily resolved in all its aspects,

*Reaffirming* the principle of universality of membership of the United Nations,

1.     *Reaffirms* the right of the Palestinian people to self-determination and to independence in their State of Palestine on the Palestinian territory occupied since 1967;

2.     *Decides* to accord to Palestine non-member observer State status in the United Nations, without prejudice to the acquired rights, privileges and role of the Palestine Liberation Organization in the United Nations as the representative of the Palestinian people, in accordance with the relevant resolutions and practice;

3.     *Expresses the hope* that the Security Council will consider favourably the application submitted on 23 September 2011 by the State of Palestine for admission to full membership in the United Nations;[7]

4.     *Affirms its determination* to contribute to the achievement of the inalienable rights of the Palestinian people and the attainment of a peaceful settlement in the Middle East that ends the occupation that began in 1967 and fulfils the vision of two States: an independent, sovereign, democratic, contiguous and

---

[6] S/2011/705.

[7] A/66/371-S/2011/592, annex I.

viable State of Palestine living side by side in peace and security with Israel on the basis of the pre-1967 borders;

5.    *Expresses the urgent need* for the resumption and acceleration of negotiations within the Middle East peace process based on the relevant United Nations resolutions, the terms of reference of the Madrid Conference, including the principle of land for peace, the Arab Peace Initiative[5] and the Quartet road map to a permanent two-State solution to the Israeli-Palestinian conflict[8] for the achievement of a just, lasting and comprehensive peace settlement between the Palestinian and Israeli sides that resolves all outstanding core issues, namely the Palestine refugees, Jerusalem, settlements, borders, security and water;

6.    *Urges* all States and the specialized agencies and organizations of the United Nations system to continue to support and assist the Palestinian people in the early realization of their right to self-determination, independence and freedom;

7.    *Requests* the Secretary-General to take the necessary measures to implement the present resolution and to report to the General Assembly within three months on progress made in this regard.

*44th plenary meeting*
*29 November 2012*

———————

———————
[8] S/2003/529, annex.

4

ATL005125