# EXHIBIT 147

Page 1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    WESTERN DIVISION

4

5    UNIVERSAL CABLE PRODUCTIONS,          Case No.

     INC., LLC, a Delaware limited         2:16-cv-04435-PA-MRW

6    liability company and NORTHERN

     ENTERTAINMENT PRODUCTIONS, LLC,

7    a Delaware limited liability

     company,

8

               Plaintiff,

9

          vs.

10

     ATLANTIC SPECIALTY INSURANCE

11   COMPANY, a New York insurance

     company's,

12

               Defendants.

13

     _____

14

15                    CONFIDENTIAL

16        VIDEOTAPED DEPOSITION of ANDREA GARBER

17              LOS ANGELES, CALIFORNIA

18              FRIDAY, APRIL 14, 2017

19                     VOLUME 1

20

21

22

23   Reported by

     Daryl Baucum, RPR, CRR, RMR, CSR No. 10356

24

25   Job No. CS2588507

Page 2

1             UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4

5   UNIVERSAL CABLE PRODUCTIONS,          Case No.

    INC., LLC, a Delaware limited         2:16-cv-04435-PA-MRW

6   liability company and NORTHERN

    ENTERTAINMENT PRODUCTIONS, LLC,

7   a Delaware limited liability

    company,

8

              Plaintiff,

9

        vs.

10

    ATLANTIC SPECIALTY INSURANCE

11  COMPANY, a New York insurance

    company,

12

              Defendants.

13

    _____

14

15

16

17         VIDEOTAPED DEPOSITION of ANDREA GARBER,

18      at 11377 West Olympic Boulevard, Suite 700,

19      Los Angeles, California, beginning at

20      9:01 a.m., and ending at 7:09 p.m., on Friday,

21      April 14, 2017, before Daryl Baucum, RPR, CRR,

22      RMR, CSR No. 10356.

23

24

25

Page 12

1    interested in the outcome in any way.

2              If there are objections to proceeding,

3    please, state them at the time of your appearance

4    beginning with the noticing attorney.

5              MR. KEELEY:  Michael Keeley with

6    Strasburger and Price in Dallas on behalf of the

7    defendant Atlantic Specialty Insurance Company.

8              MS. COYOCA:  Lucia Coyoca, Mitchell,

9    Silberberg and Knupp, by and on behalf of plaintiffs

10   Universal Cable Productions and Northern

11   Entertainment Productions.

12             THE VIDEOGRAPHER:  Thank you.

13             The witness will be sworn in and counsel

14   may begin the examination.

15

16                     ANDREA GARBER,

17             having been first duly sworn, was

18             examined and testified as follows:

19

20                     EXAMINATION

21   BY MR. KEELEY:

22       Q    Good morning, Ms. Garber.  My name is Mike

23   Keeley.  We met briefly off the record but just so

24   you know, I represent the defendant in this lawsuit,

25   Atlantic Specialty Insurance Company.

Page 73

1    assumes facts not in evidence, but you may answer

2    the question.

3              THE WITNESS:  I was aware that there was a

4    war exclusion.

5    BY MR. KEELEY:

6        Q    Until the "Dig" claim was submitted by

7    NBC/Universal, had you ever had an experience with a

8    claim that involved the war exclusion?

9        A    No.

10       Q    Had you ever had any experience

11   negotiating the terms of war exclusions?

12       A    No.

13       Q    Until the "Dig" claim was submitted, did

14   you have any discussions with anyone on behalf of

15   Atlantic concerning the war exclusions of any of the

16   polices?

17             MS. COYOCA:  Objection; potentially calls

18   for attorney-client privileged information.

19             I would caution you not to provide any

20   information if there was an attorney present at

21   those conversations or there was privileged

22   information conveyed during any such conversations.

23   Otherwise, you may answer the question.

24             MR. KEELEY:  My question was whether she

25   had discussions with anybody at Atlantic concerning

Page 74

1    the war exclusions.

2              MS. COYOCA:  I apologize.  I withdraw

3    those objections.

4              You can answer the question.

5              MR. KEELEY:  Thank you.

6              THE WITNESS:  No.

7    BY MR. KEELEY:

8         Q    Did you have any -- until the "Dig" claim

9    was submitted prior to that point in time, did you

10   have any discussions with anyone at Atlantic as to

11   whether or not there was coverage for acts of terror

12   or terrorism under the policies that Atlantic

13   issued?

14        A    No, I didn't have any discussions, myself,

15   about that.

16        Q    Do you think other persons had discussions

17   about terrorism with Atlantic?

18             MS. COYOCA:  Objection; potentially calls

19   for speculation.

20             You may answer the question.

21             THE WITNESS:  I don't really know what the

22   context of the discussions were.

23   BY MR. KEELEY:

24        Q    What are the discussions you are talking

25   about?

Page 114

1   BY MR. KEELEY:

2       Q    Were you involved in having the production

3   of "Dig" declared to the policy?

4       A    Yes, as an employee of Aon.

5       Q    I'm sorry?

6       A    Yes, as an employee of Aon.

7       Q    And you mentioned a little bit earlier

8   about declaring productions to the policy.

9            Can you explain what that means, please.

10      A    What a new production came up and I was

11  advised that something new was about to start or was

12  going -- had a calendar to start, I would fill out a

13  pretty brief form that talked about the budget, the

14  time period, the location, any cast members that we

15  knew needed to be covered right away.

16           And I would forward that document to Wanda

17  through Bernadette.  The recipient was Bernadette

18  and ultimately to got to Wanda, and that was usually

19  their first notice that a new production was

20  starting up and would be covered under the policy.

21      Q    Was there a typical process that would be

22  followed after you submitted that form in declaring

23  a new production to the policy?

24      A    This was all between by E-mail.  So I

25  would submit it to them.  They would respond to me

Page 121

1              You may answer the question.
2              THE WITNESS:  I believe they could decline
3    to underwrite at all but we never had that
4    experience.
5    BY MR. KEELEY:
6         Q    So did you submit a form to Atlantic and
7    request it to declare "Dig" to the policy?
8         A    Yes, I did.
9         Q    And did you have any discussions with
10   anyone at Atlantic about declaring "Dig" to the
11   policy?
12        A    Yes, I did.
13        Q    Who did you have those discussions with?
14        A    With Wanda Philips and Peter Williams.
15        Q    Do you remember how many discussions you
16   had with Wanda Phillips?
17        A    My recollection is the initial phone call.
18        Q    Was Mr. Williams also on that call or was
19   it just Ms. Phillips?
20        A    Peter Williams was on the call, as well.
21        Q    Did you have any other discussions with
22   Wanda Phillips?
23             MS. COYOCA:  Objection; vague and
24   ambiguous.
25             Do you mean with respect to the topic of

```
                                              Page 123
 1          MS. COYOCA:  Objection; assumes facts not
 2   in evidence.
 3          You can answer the question.
 4          THE WITNESS:  No.
 5   BY MR. KEELEY:
 6      Q    So why did you do that here?
 7      A    Because Israel was a unique location and I
 8   thought that we could get some additional questions
 9   and need to provide more information with regard to
10   that location.
11      Q    Why did you feel Israel was a unique
12   location?
13      A    Based on what I read in the newspaper.
14      Q    Because there is a lot of conflict over
15   there, right, between Hamas and Israel?
16      A    Not necessarily between those two parts
17   but, you know, what you read or hear about in our
18   news leads you to believe that there is issues there
19   that we don't have here.
20      Q    And by "issues," you mean fighting?
21      A    Random violence.
22      Q    What do you mean by "random violence"?
23      A    Unprovoked violence against people that
24   don't necessarily have a relationship.
25          I had heard in, you know, newspaper
```

Page 124

1    accounts and on radio about situations at

2    marketplaces and cafes and so forth, just, you know,

3    over the course of time, where people were injured,

4    not for any apparent reason.  It was random.

5         Q    So you had heard about suicide bombings.

6         A    I don't really know that I had heard about

7    suicide bombings in Israel.

8         Q    Have you ever been to Israel?

9         A    No.

10        Q    What could you recall that you heard about

11   Israel as far as random acts of --

12             MS. COYOCA:  Have you finished the

13   question?

14   BY MR. KEELEY:

15        Q    -- random acts of violence?

16             MS. COYOCA:  Objection; relevance, also,

17   vague and ambiguous.

18             MR. KEELEY:  Relevance?  Come on.

19             MS. COYOCA:  Yes, as to this witness's

20   knowledge.

21             MR. KEELEY:  Good gosh.

22             MS. COYOCA:  As to this witness's

23   knowledge or what she had heard.

24             You may answer the question.

25             THE WITNESS:  Well, I think I just told

Page 125

1    you when you asked me what did I mean by "random
2    violence," what I had heard was generally over the
3    course of time that people unrelated or citizenry
4    were subjects of violence.
5    BY MR. KEELEY:
6        Q    Were you aware that there were ongoing
7    disputes between Israel and Palestine?
8            MS. COYOCA:  Objection; relevance as to
9    this witness's knowledge, also, vague and ambiguous
10   as to what you mean by "Palestine."
11   BY MR. KEELEY:
12       Q    Were you aware at the time you asked
13   Atlantic to declare "Dig" to the policy that there
14   were ongoing conflicts between Israel and
15   Palestinians?
16           MS. COYOCA:  Objection; potentially calls
17   for -- well, vague and ambiguous, relevance as to
18   this witness's knowledge, also, as to the word
19   "Palestinians," but you may answer the question.
20           THE WITNESS:  I don't study the Middle
21   East.  So I would have had a passing knowledge based
22   on hearing the news that there were issues in Israel
23   and that there was an issue with the Palestinian
24   potential for a state, you know, what we see in the
25   news.

Page 126

1  BY MR. KEELEY:

2      Q    Sure.

3      A    But it's a passing -- it's a passing

4  understanding.  It's not something that I knew the

5  ins and outs of then or now.

6      Q    Were you aware that alleged terror groups

7  in either the West Bank or Gaza would periodically

8  fire missiles into Israel?

9          MS. COYOCA:  Objection; relevance as to

10  this witness's knowledge, also, outside the -- vague

11  and ambiguous as to the use of the term "missiles"

12  and "periodically," also, assumes facts not in

13  evidence.

14          You can answer the question.

15          THE WITNESS:  I really was not acutely

16  aware that there was missile fire.  My understanding

17  was that it was more on-the-street issues.

18  BY MR. KEELEY:

19      Q    More random acts of violence on the

20  streets of Jerusalem?

21      A    Yes.

22      Q    Or Israel?

23      A    Israel, yes.

24      Q    You had not heard from time to time

25  rockets would be fired into Israel?

Page 127

1           MS. COYOCA:  Objection; misstates the

2    witness's testimony, also, relevance.

3           MR. KEELEY:  I am asking her the question.

4    I am not stating testimony.  I am asking her a

5    question, Lucia.

6           MS. COYOCA:  No, Mr. Keeley, you said you

7    had not heard from time to time rockets would be

8    fired into Israel.  You are, therefore, asking her

9    with respect to her prior testimony as to whether

10   she had heard that.  That is a misstatement of her

11   prior testimony.  The objection stands.

12   BY MR. KEELEY:

13       Q    Ms. Garber, notwithstanding your prior

14   testimony, what I am trying to find out is at the

15   time that you declared "Dig", had you heard that

16   from time to time rockets would be fired into

17   Israel?

18           MS. COYOCA:  Objection; relevance.

19           You may answer the question.

20           THE WITNESS:  No.

21   BY MR. KEELEY:

22       Q    Did you have any awareness at the time

23   that you declared "Dig" to the policy that there had

24   been prior hand-to-hand combat between Israel and

25   various factions of Palestinians?

Page 134

1    didn't want to change anything.

2         Q    So you said he said look at the extra

3    expense coverage and maybe increase the deductible

4    or something along those lines?

5         A    Right.

6         Q    Is that what we said?

7         A    That is my recollection.

8         Q    Did he say anything about modifying any of

9    the coverage language of the policy?

10             MS. COYOCA:  Well, objection, asked and

11   answered.

12             You can answer the question.

13             THE WITNESS:  I don't recall him saying

14   anything about changing the terms of the coverage.

15   BY MR. KEELEY:

16        Q    Do you recall Mr. Williams saying anything

17   else other than what you have just testified to?

18        A    I don't recall anything else.

19        Q    Did you express to them that there was

20   some urgency in getting this production declared to

21   the policy?

22        A    No, I don't recall telling them that.  It

23   was up to me to send off the declaration form, so.

24        Q    Do you recall whether NBC was anxious to

25   get the production declared to the policy?

Page 369

1    BY MR. KEELEY:

2        Q    And have you been criticized by anybody

3    for not doing so?

4             MS. COYOCA:  Objection; relevance.

5             THE WITNESS:  No.

6             MS. COYOCA:  Also, vague and ambiguous.

7             You can answer.

8             THE WITNESS:  No, I haven't.

9             MS. COYOCA:  Exhibit Number, please?

10            THE COURT REPORTER:  40.

11            (Defendants' Exhibit 40 was marked for

12            identification by the court reporter and

13            is attached hereto.)

14   BY MR. KEELEY:

15       Q    Do you recognize Exhibit 40 as a series of

16   E-mails between you and Andrea Garber on July 17,

17   2014?

18            MS. COYOCA:  Objection; vague and

19   ambiguous to the extent you asked about E-mails

20   between "you and Andrea Garber."

21   BY MR. KEELEY:

22       Q    Excuse me.  Between you and Susan Weiss.

23       A    Yes, I do recognize it.

24       Q    The second E-mail on the exhibit is an

25   E-mail from you to Susan Weiss dated July 17 at

Page 370

```
 1   6:26.
 2           Do you see that?
 3      A    I do.
 4      Q    And you say -- actually, let me strike
 5   that.
 6           Go down to the E-mail on the bottom of
 7   page 40.  It's from Susan Weiss to you.  She says,
 8               "Just send it under separate cover.
 9           How did the calls go?"
10           Do you see that?
11      A    Uh-huh.
12      Q    Do you know what calls she was referring
13   to?
14      A    Likely, my internal phone calls.
15      Q    With other persons at NBC?
16      A    Yes.
17      Q    And then in response, five minutes later,
18   you say,
19               "Thanks.  Got it.  Everyone was very
20           disappointed."
21           Would you read the rest of that E-mail to
22   me, please.
23           MS. COYOCA:  I am going to object on the
24   grounds you haven't read the sentence correctly.
25
```

Page 371

1  BY MR. KEELEY:

2      Q    Let's do this.  Why don't you read the

3  entirety of your E-mail to Susan Weiss for me,

4  please.

5      A    (Reading):

6              "Thanks.  Got it.  Everyone was very

7              disappointed.  Everything got rehashed

8              again back to when we first declared the

9              production and why additional insurance

10             was not purchased.  They really want me to

11             have that follow-up call with Peter so

12             hopefully, we can do that in the morning."

13     Q    Do you know what you are referring to

14  there when you say "and why additional insurance was

15  not purchased"?

16          MS. COYOCA:  Well, objection, the document

17  speaks for itself.

18          THE WITNESS:  The question certainly came

19  up.

20  BY MR. KEELEY:

21     Q    So the question about why you did not

22  obtain additional insurance was raised by persons at

23  NBC?

24     A    Yes.

25     Q    So you were misremembering when you told

Page 372

1    me it was not raised?

2          MS. COYOCA:  Objection; misstates the

3    witness's prior testimony.

4          THE WITNESS:  I thought your question was

5    were you criticized.

6    BY MR. KEELEY:

7       Q    Are you telling me that the question was

8    raised as to why you didn't obtain additional

9    insurance but you were not criticized for it?

10         MS. COYOCA:  Objection; argumentative,

11   vague and ambiguous as to you what mean by

12   "criticized," also, misstates the witness's prior

13   testimony.

14         You may answer the question.

15         THE WITNESS:  When the question was asked,

16   we had a very reasonable answer.  I didn't feel

17   criticized when the question was asked why we didn't

18   purchase additional insurance.

19   BY MR. KEELEY:

20      Q    So you didn't feel like you were being

21   criticized?

22         MS. COYOCA:  Objection; relevance, also,

23   vague and ambiguous as to "criticized."

24         THE WITNESS:  I didn't feel criticized.

25

Page 381

1                           DECLARATION
2
3
4
5              I, ANDREA GARBER, do hereby declare that I
6    have read the foregoing transcript; that I have made
7    any corrections as appear noted, in ink, initialed
8    by me, or attached hereto; that my testimony as
9    contained herein, as corrected, is true and correct.
10             I declare under the penalties of perjury
11   under the laws of the State of California that the
12   foregoing is true and correct.
13             This declaration is executed this _____
14   day of _____, 2017, at
15   _____, California.
16
17
18
19
     _____
20                     ANDREA GARBER
21
22
23
24
25

Page 382

1  STATE OF _____ )
                                              )  Ss.
2  COUNTY OF _____ )

3

4          I, DARYL BAUCUM, a Certified Shorthand

5  Reporter of the State of California, do hereby

6  certify;

7          That the foregoing proceedings were taken

8  before me at the time and place herein set forth,

9  at which time the witness named in the foregoing

10 proceeding was placed under oath; that a record

11 of the proceedings was made by me using machine

12 shorthand which was thereafter transcribed under my

13 direction; and that the foregoing pages contain a

14 full, true and accurate record of all proceedings

15 and testimony to the best of my skill and ability.

16          I further certify that I am neither

17 financially interested in the outcome nor a relative

18 or employee of any attorney or any party to this

19 action.

20          IN WITNESS WHEREOF, I have subscribed my

21 name this 15th day of April 2017.

22

23

24          _____

            DARYL BAUCUM, CSR No. 10356

25

```
                                              Page 383

 1                    Veritext Legal Solutions
                 290 W. Mt. Pleasant Ave. - Suite 2260
 2                   Livingston, New Jersey 07039
                 Toll Free: 800-567-8658  Fax: 973-629-1287
 3

 4
        _____, 2017
 5
      To:  Lucia E. Coyoca, Esq.
 6
      Case Name: Universal Cable Productions  v. Atlantic Specialty
 7              Insurance Company
 8    Veritext Reference Number: 2588507
 9    Witness:  Andrea Garber      Deposition Date:  4/14/2017
10
      Dear Sir/Madam:
11
      Enclosed is the original transcript with signature page and
12    errata sheet.
13    Please have the witness read and sign the enclosed
14    transcript per the instructions at the deposition.
15
16    Should you need any assistance, please contact our office.
17
18
19
20    Sincerely,
21
22    Production Department
23
24    Encl.
25    cc:  Michael Keeley, Esq.
```

```
                                                               Page 384

 1          CASE NAME: Universal Cable Productions  v. Atlantic

                     Specialty Insurance Company

 2          ASSIGNMENT NO.: 2588507

            ASSIGNMENT DATE: 4/14/2017

 3

 4

 5

 6           INSTRUCTIONS FOR READING/CORRECTING YOUR DEPOSITION

 7

 8

 9           To assist you in making corrections to your deposition

10           testimony, please follow the directions below. If

11           additional pages are necessary, please furnish them and

12           attach the pages to the back of the errata sheet.

13

14           This is the final version of your deposition transcript.

15

16           Please read it carefully.  If you find any errors or

17           changes you wish to make, insert the corrections on the

18           errata sheet beside the page and line numbers.

19

20           Do NOT make any changes directly on the transcript.

21

22           Do NOT change any of the questions.

23

24           After completing your review, please sign the last page

25           of the errata sheet, above the designated "Signature" line.
```

Veritext Legal Solutions

Page 385

1              ERRATA SHEET
          VERITEXT CORPORATE SERVICES
2              800-567-8658
   ASSIGNMENT NO. 2588507
3  CASE NAME: Universal Cable Productions  v. Atlantic
   Specialty Insurance Company
   DATE OF DEPOSITION: 4/14/2017
4  WITNESS' NAME: Andrea Garber
5  PAGE/LINE(S)/   CHANGE          REASON
6  _____/_____/_____/_____
7  _____/_____/_____/_____
8  _____/_____/_____/_____
9  _____/_____/_____/_____
10 _____/_____/_____/_____
11 _____/_____/_____/_____
12 _____/_____/_____/_____
13 _____/_____/_____/_____
14 _____/_____/_____/_____
15 _____/_____/_____/_____
16 _____/_____/_____/_____
17 _____/_____/_____/_____
18 _____/_____/_____/_____
19 _____/_____/_____/_____
20 _____/_____/_____/_____
21

      _____ Subject to the above changes, I certify
22            that the transcript is true and correct
23    _____ No changes have been made. I certify
              that the transcript is true and correct
24

   _____    _____
25 Signature                     Date

Veritext Legal Solutions