## Al Shabaab[44]

The Somalia-based Al Shabaab group remains a key terrorist threat in East Africa. In addition to assassinations and suicide bombings inside Somalia, it has also conducted attacks in countries contributing to the African Union Mission in Somalia (AMISOM), which is mandated with countering the group and helping to stabilize the country. Al Shabaab's 2013 attack against the Westgate mall in Nairobi killed at least 67, and the group has continued to attack Kenyan towns along the border—including a 2015 attack on Kenya's Garissa University that killed 148. Al Shabaab has also conducted suicide attacks in Djibouti. While AMISOM-led forces have succeeded in pushing the group out of Somalia's capital, Mogadishu, and other major southern cities, Al Shabaab has proven resilient and adaptable, and by some accounts acts as a "shadow government' in Somalia.[45]

Al Shabaab leaders have threatened attacks in the United States and against U.S. citizens and targets in the region. At least five U.S. citizens have been killed in Al Shabaab attacks in East Africa since 2010. In February 2016, Al Shabaab demonstrated its ability to conceal a bomb in a laptop computer that was detonated by a suicide bomber onboard a Somali airliner. (It detonated before the plane reached cruising altitude and thus did not destroy the aircraft.) Al Shabaab's ability to recruit abroad and the presence of foreign fighters, among them U.S. citizens, in Somalia have been of significant concern to U.S. policymakers.

# Ideology

## Al Qaeda Messaging on the Islamic State

Since the rise of the Islamic State, Al Qaeda's public messaging has refocused on clarifying the rules for jihad and on discrediting the Islamic State's leadership and tactics. In September 2013 Zawahiri issued *General Guidelines for Jihad*. In this document he lays out the group's priorities, beginning with the United States:

> The purpose of targeting America is to exhaust her and bleed her to death, so that it meets the fate of the former Soviet Union and collapses under its own weight as a result of its military, human, and financial losses. Consequently, its grip on our lands will weaken and its allies will begin to fall one after another.[46]

Nevertheless, the majority of the document is spent outlining a code of conduct for jihadist fighters operating locally. Zawahiri states that fighters should avoid clashing with local governments. Emphasizing that jihad is a long-term struggle, Zawahiri urges groups to, when possible, "pacify" any conflict with local rulers so as to create "safe bases" and a permissive operating environment.

Zawahiri also orders fighters to "avoid fighting the deviant sects" (Shi'a, Ismailis, Ahmadis, and Sufis) unless attacked, and even then, "we must make it clear that we are only defending ourselves. Those from amongst them who do not participate in the fight against us and their families, should not be targeted." Zawahiri also instructs followers to "avoid meddling" with Christian, Sikh, and Hindu communities in Muslim lands. He states that followers should make

---

[44] Prepared by Lauren Blanchard, Specialist in African Affairs.

[45] Remarks by Matt Bryden at the Center for Strategic and International Studies event, "The Race Against Time in Somalia," March 24, 2016.

[46] Ayman al Zawahiri, "General Guidelines for Jihad," *Al Sahab Media*, September 2013.

Page 1697

clear to these communities that, "we do not seek to initiate a fight against them, since we are engaged in fighting the head of disbelief (America); and that we are keen to live with them in a peaceful manner after an Islamic state is established."

Finally, Zawahiri states that fighters must not harm other Muslims, and should refrain from killing non-combatants—even if they are families of those who fight Al Qaeda. He instructs fighters to avoid targeting their enemies in public spaces such as mosques and markets, where an attack could harm other Muslims or noncombatants.

In September 2015, Zawahiri issued the first of a series of audio statements entitled "The Islamic Spring." In these audio statements, Zawahiri draws on historical and Koranic sources to attack the legitimacy of the Islamic State. Zawahiri's objections to the Islamic State include:

- **Declaring a caliphate by force without consultation with other jihadist authorities.** Zawahiri argues that a caliphate can only be established through consultation and consensus, not through the unilateral actions of a small group. In Episode 4, he declares that "taking power by force without consultation violates sharia."[47] He adds that while Al Qaeda fully intends to establish an Islamic caliphate, "it will be a caliphate that follows the prophet's path and not some wrongful kingdom taken by force through car bombs and blasts."

- **Declaring a caliphate prematurely.** Zawahiri states that conditions are not yet right for the declaration of a caliphate. He argues that a true caliphate does not come into existence merely by declaring it as such. In Episode 3, he states that before establishing a caliphate, there are "truths that must exist in reality and on the ground," not just "hopes and desires."[48]

- **Killing other Muslims.** Throughout the series, Zawahiri repeatedly condemns the shedding of blood among different jihadist factions. In Episode 2, he calls on fighters to avoid infighting, "for the sin of killing a Muslim is great."[49] He adds that it is not permissible to seize money or equipment from rival jihadist groups.

- **Sowing discord within jihadist ranks, benefiting the enemy.** Zawahiri's repeated calls for an end to infighting stems from his concern that such conduct ultimately benefits the United States. In Episode 1, he rhetorically asks:

  > As we face this campaign now, is this dispute pleasing or displeasing to the Americans? Does it please or displease the enemies when Al-Baghdadi and those with him rebel against Al-Qa'ida, break their confirmed pledge of allegiance, openly rebel against their amir, attack the governance of Mullah Omar, whose name they used to shout, declare a caliphate based on a pledge from unknown individuals, and call on the mujahideen to dissent and break their pledges, resulting in all kinds of disputes and tumult?[50]

Despite Zawahiri's animosity for the group, many of the differences he describes between Al Qaeda and the Islamic State appear to be tactical rather than strategic. In recognition of this, Zawahiri throughout his "Islamic Spring" series repeatedly calls on all jihadist fighters, including those of Al Qaeda and the Islamic State, to cooperate on the battlefield for the sake of their common enemy. In Episode 2, Zawahiri states,

---

[47] OSE Report TRR2015100561575345, October 5, 2015.
[48] OSE Report TRL2015092183805913, September 21, 2015.
[49] OSE Report TRR20150911311667655, September 12, 2015.
[50] OSE Report TRN2015091004392901, September 9, 2015.

> Despite these grievous errors, I call upon all of the mujahideen in the Levant and Iraq to cooperate and coordinate their efforts to stand as one in confronting the Crusaders, secularists, Nusayris [derogatory reference to Alawites], and Safavids, even if they do not recognize the legitimacy of Al-Baghdadi's state and his group, not to mention his caliphate. The matter is bigger than not recognizing the legitimacy of their state or their claim to establishing a caliphate, for the ummah is being subjected to a savage Crusader campaign and we must set out to push back its assailants.[51]

This ideological affinity raises the possibility, and the expectation among terrorism analysts, that extremist operations in the region will continue regardless of the fate of the Islamic State organization. Al Qaeda's willingness to cooperate with Islamic State fighters may leave the group in a position to absorb some of these fighters if the Islamic State's leadership is ultimately defeated in Syria and Iraq. And while the majority of Zawahiri's focus in this series is on discrediting the group, he does not neglect the ultimate goal of attacks against the United States. In Episode 2, Zawahiri states,

> I call upon all Muslims who can inflict harm in countries of the Crusader coalition to not hesitate [...] I believe that we should focus now on bringing the war to the backyard, cities, and facilities of the Crusader West, and most importantly, America. They must learn that as they bomb, they shall be bombed; as they kill, they shall be killed; as they harm, they shall be harmed; and as they destroy, burn, and exterminate, they shall be destroyed, burned, and exterminated. They must know that war is a shared fate, and that retribution is part of the nature of this work.[52]

# Selected Policy Responses

U.S. strategy to combat Al Qaeda in the Middle East and Africa combines limited troop deployments, training and equipping of local forces, financial sanctions, and programs on countering violent extremism (CVE). The U.S. approach to particular affiliates has varied depending on factors such as the operating environment, the capabilities of local forces, and legal considerations, as discussed below.

---

**U.S. Government Terminology: Affiliated v. Associated Forces**

The Authorization for Use of Military Force (AUMF, P.L. 107-40) enacted by Congress in September 2001 is the primary law authorizing U.S. operations against Al Qaeda and the Taliban.[53] U.S. administrations later established categories of Al Qaeda-linked groups, each of which carries potentially distinct legal and policy implications. The terms below do not appear in the original AUMF text; rather, they have been delineated in a series of subsequent legal rulings and executive branch strategy papers.

**Associated Forces:** organized, armed groups that have entered the fight alongside Al Qaeda or the Taliban, and are co-belligerents with Al Qaeda or the Taliban in hostilities against the United States or its coalition partners.[54] Once established as co-belligerents, associated forces are considered legal targets of U.S. military force per the laws of armed conflict—which are commonly interpreted to permit a country at war to use force against those fighting alongside its enemy.

**Affiliates:** groups that have aligned with Al Qaeda. This includes associated forces as well as groups and individuals

---

[51] OSE Report TRR2015091311667655, September 12, 2015.

[52] Ibid.

[53] For additional background on the AUMF, see CRS Report R43983, *2001 Authorization for Use of Military Force: Issues Concerning Its Continued Application*, by Matthew C. Weed.

[54] Testimony of Stephen W. Preston, General Counsel of the Department of Defense, before the Senate Committee on Foreign Relations, May 21, 2014.

> against whom the Obama Administration considers the United States is not authorized to use force based on the authorities granted by the AUMF.[55] The United States may use force against affiliates that have been further classified as associated forces.
>
> **Adherents:** individuals who form collaborative relationships with Al Qaeda or act on its behalf or in furtherance of its goals—including by engaging in violence—regardless of whether such violence is directed at the United States.[56]
>
> **Al Qaeda "Inspired":** Groups or individuals not affiliated with identified terror organizations but inspired by the Al Qaeda narrative.[57]
>
> The 2011 National Strategy for Counterterrorism includes the following footnote: "Affiliates is not a legal term of art. Although it includes Associated Forces, it additionally includes groups and individuals against whom the United States is not authorized to use force based on the authorities granted by the Authorization for the Use of Military Force, P.L. 107-40, 115 Stat. 224 (2001). The use of Affiliates in this strategy is intended to reflect a broader category of entities against whom the United States must bring various elements of national power, as appropriate and consistent with the law, to counter the threat they pose. Associated Forces is a legal term of art that refers to cobelligerents of al-Qa'ida or the Taliban against whom the President is authorized to use force (including the authority to detain) based on the Authorization for the Use of Military Force, P.L. 107-40, 115 Stat. 224 (2001).

## Military Operations

Defense Department officials in 2015 stated that the United States has used military force under the 2001 AUMF against the following Al Qaeda groups: Al Qaeda in Afghanistan, AQAP in Yemen, individuals who are part of Al Qaeda in Libya and Somalia, the Nusra Front, and the Khorasan Group.[58] In some cases U.S. forces have relied on unmanned aerial vehicles to target Al Qaeda militants, particularly outside areas of active hostilities.[59]

- **Afghanistan.** Approximately 2,000 out of the remaining 9,800 U.S. troops are performing counterterrorism combat missions, primarily against Al Qaeda and its associated forces in Afghanistan. U.S. forces continue to try to find and to target—primarily using manned and unmanned aircraft—senior Al Qaeda operatives in Afghanistan.
- **Yemen.** Defense Department recently reported that U.S. strikes had killed approximately 81 AQAP members in Yemen in the first half of 2016.[60] In June 2015, a U.S. strike killed AQAP leader Nasser al Wuhayshi.
- **Libya.** A U.S. strike in Libya in June 2015 sought (reportedly unsuccessfully) to kill AQIM splinter-faction leader Mokhtar Bel Mokhtar.[61]
- **Somalia.** Officials confirmed several successful strikes against Al Shabaab targets in Somalia in 2016.[62] This includes a March strike on an Al Shabaab

---

[55] 2011 National Strategy for Counterterrorism. Note: previous versions of the National Strategy for Counterterrorism were issued in 2003 and 2006. http://www.whitehouse.gov/sites/default/files/counterterrorism_strategy.pdf.

[56] Ibid.

[57] See for example, "Strategy for Homeland Defense and Defense Support of Civil Authorities," Department of Defense, February 2013. http://www.defense.gov/news/Homelanddefensestrategy.pdf.

[58] Remarks by Stephen W. Preston, General Counsel of the Department of Defense, as delivered to the annual meeting of the American Society of International Law, Washington, DC, April 10, 2015.

[59] See White House Office of the Press Secretary, "Fact Sheet: U.S. Policy Standards and Procedures for the Use of Force in Counterterrorism Operations Outside the United States and Areas of Active Hostilities," May 23, 2013. See also, U.N. General Assembly Human Rights Council, "Report of the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism, Ben Emmerson," March 11, 2014.

[60] U.S. Defense Department, "Centcom Announces Yemen Counterterrorism Strikes," June 3, 2016.

[61] Source: Eric Schmitt, "U.S. Airstrike in Libya Targets Planner of 2013 Algeria Attack," June 14, 2015.

training camp that killed an estimated 150 militants, whom U.S. officials described as posing a "direct threat" both to AMISOM forces and to U.S. forces in the region working with AMISOM.[63] In September 2014, a U.S. strike killed Al Shabaab's leader, Ahmed Godane.[64]

- **Syria.** Coalition strikes in July 2015 killed Khorasan member and French national David Drugeon, described by U.S. military officials as an Al Qaeda operative and explosives expert.[65] In October 2015, U.S. strikes killed Sanafi al Nasr, a Saudi national whom military officials described as a leading financial figure in the Khorasan Group. In April 2016, U.S. military officials stated that U.S. strikes had targeted a "senior Al Qaida operational meeting in northwest Syria," killing several Al Qaeda operatives.[66]

## Efforts to Build Regional Partners' Military Capability[67]

The Administration has described its efforts to train local partners as a necessary complement to U.S.-led counterterrorism operations. In 2015, President Obama stated,

> ... it is not enough for us to simply send in American troops to temporarily set back organizations like ISIL, but to then, as soon as we leave, see that void filled once again with extremists. It is going to be vital for us to make sure that we are preparing the kinds of local ground forces and security forces with our partners that can not only succeed against ISIL, but then sustain in terms of security and in terms of governance.[68]

To counter Al Qaeda and its affiliates, the United States works with local military and security forces in countries such as Afghanistan, Yemen, and Somalia. Building capable partner forces in these countries may be seen to further a range of objectives that, taken together, help partners to better manage their regional security challenges. These include: sustaining gains made by U.S. forces, minimizing the need for a large U.S. presence, and preventing the establishment of AQ safe havens that could be used as a launch pad for attacks against the United States.

Capacity-building efforts have at times involved direct military strikes in what U.S. officials have termed "self-defense" of U.S. personnel accompanying partner forces. And in some cases, the Administration has expanded its threshold for the use of direct force beyond the specific targeting of Al Qaeda. For example, the Administration broadened its justification for direct U.S. military action in Somalia in 2015, indicating in a notification to Congress consistent with the War Powers Resolution that its operations in Somalia were carried out not only "to counter Al Qaeda and

---

(...continued)

[62] See, for example, Department of Defense Press Briefing by Pentagon Press Secretary Peter Cook in the Pentagon Briefing Room, April 4, 2016.

[63] Department of Defense Press Briefing by Pentagon Press Secretary Peter Cook in the Pentagon Briefing Room, March 8, 2016.

[64] White House, Statement by the Press Secretary on the Death of Ahmed Godane, September 5, 2014.

[65] Department of Defense Press Briefing by Pentagon Press Secretary Peter Cook in the Pentagon Briefing Room, September 22, 2015.

[66] Department of Defense Press Briefing by Pentagon Press Secretary Peter Cook in the Pentagon Briefing Room, April 4, 2016.

[67] For additional information, see CRS Report R44313, *What Is "Building Partner Capacity?" Issues for Congress*, coordinated by Kathleen J. McInnis.

[68] White House Office of the Press Secretary, "Remarks by the President on Progress in the Fight Against ISIL," July 6, 2015.

Page 1701

associated elements of Al Shabaab" (as previously reported), but also "in support of Somali forces, AMISOM forces, and U.S. forces in Somalia."[69]

- **Afghanistan.** In December 2014, the United States and its international partners transferred the lead domestic security role in Afghanistan from NATO forces to the ANDSF. About 9,800 U.S. troops and about 5,000 international partner forces remain in Afghanistan, tasked primarily with training, advising, and assisting the ANDSF. In June 2016, President Obama announced that 8,400 troops will remain in Afghanistan until the end of his term in 2017.[70]

- **Yemen.** In April 2016, "small numbers" of U.S. military personnel were authorized to deploy to Yemen to support operations against AQAP.[71] U.S. military officials confirmed in May 2016 that some U.S. military personnel had returned to Yemen and were operating in a liaison capacity out of the port city of Al Mukalla.[72]

- **North Africa and the Sahel.** The U.S. approach to AQIM and affiliated groups relies largely on bolstering the domestic counterterrorism capabilities of the North African and Sahel countries where these groups operate. The Trans-Sahara Counter-Terrorism Partnership (TSCTP) in North-West Africa includes military and police train-and-equip programs, counter-radicalization programs, and public diplomacy efforts. Additional assistance is provided bilaterally to countries in the region.

- **Somalia.** U.S. efforts against Al Shabaab include a limited U.S. military "train, advise, and accompany" mission inside Somalia, and help to train, equip, and supply AMISOM forces. U.S. officials in March 2016 stated that a "small number" of U.S. forces were involved in a separate ground raid against Al Shabaab militants in Somalia, reiterating that U.S forces operated in a "train, advise, and accompany mode, as they have been in the past in Somalia."[73] AFRICOM in early 2014 confirmed the presence of U.S. military advisors in Mogadishu, who formed part of a military coordination cell with Somali security forces and AMISOM.[74]

## Targeted Sanctions

Another aspect of the U.S. counterterrorism strategy against Al Qaeda involves limiting the group's ability to finance its operations, in part by ensuring that the group and its supporters are unable to access the U.S. financial system. According to the 9/11 Commission, some $300,000 of

---

[69] The White House, *Letter from the President to the Speaker of the House of Representatives and the President Pro Tempore of the Senate Regarding the War Powers Resolution*, December 11, 2015.

[70] "Obama Says He Will Keep More Troops in Afghanistan Than Planned," *New York Times*, July 6, 2016.

[71] The White House, *Letter from the President to the Speaker of the House of Representatives and the President Pro Tempore of the Senate Regarding the War Powers Resolution*, June 13, 2016.

[72] Department of Defense Press Briefing by Pentagon Press Secretary Peter Cook in the Pentagon Briefing Room, May 9, 2016.

[73] Department of Defense Press Briefing by Pentagon Press Secretary Peter Cook in the Pentagon Briefing Room, March 10, 2016.

[74] "U.S. has deployed military advisors to Somalia, officials say," *Washington Post*, January 10, 2014.

*Al Qaeda and U.S. Policy: Middle East and Africa*

the overall $400,000-$500,000 cost of the September 11, 2011, attacks passed through U.S. bank accounts.[75] A 2015 assessment by the Department of the Treasury stated,

> [t]he central role of the U.S. financial system within the international financial system and the sheer volume and diversity of international financial transactions that in some way pass through U.S. financial institutions expose the U.S. financial system to TF [terrorist financing] risks that other financial systems may not face.[76]

Targeted financial sanctions administered and enforced by Treasury's Office of Foreign Assets Control (OFAC), are used to identify, disrupt, and prevent terrorists—including those linked to Al Qaeda—from accessing the U.S. financial system.

In 1998, Treasury designated Al Qaeda as a Foreign Terrorist Organization (FTO) following Al Qaeda's bombing of U.S. embassies in Kenya and Tanzania. The designation banned U.S. financial transactions with the group and allowed U.S. law enforcement to freeze any U.S.-held assets. Osama bin Laden was also added to the Treasury Department's list of Specially Designated Nationals (SDN). After the 9/11 attacks, Al Qaeda was listed as a Specially Designated Global Terrorist (SDGT) entity under Executive Order (E.O.) 13224, which authorizes the U.S. government to block the assets (within U.S. jurisdiction) of individuals and entities that commit or pose a significant risk of committing acts of terrorism, as well as the assets of individuals or entities that provide support, services, or assistance to designated terrorist groups. In its 2015 Terrorist Assets Report, the Treasury Department stated that $13 million in Al Qaeda-linked funds in the United States had been blocked as of 2015 under SDGT, SDT, and FTO programs.[77]

Given that many Al Qaeda financiers are based outside of the United States, U.S. agencies have also sought to build ties with partner countries to broaden the reach of financial sanctions and bolster enforcement. In 1999, the United Nations Security Council established the Al Qaeda Sanctions Committee pursuant to resolution 1267 (UNSCR 1267). The resolution requires all U.N. member states to freeze the assets of, prevent the entry into or transit through their territories by, and prevent the direct or indirect supply, sale, and transfer of arms and military equipment to any individual or entity associated with Al Qaeda or Osama bin Laden. The committee maintains a list of individuals and entities associated with Al Qaeda, toward which member states must apply an asset freeze, travel ban, and arms embargo. In December 2015, UNSCR 2253 expanded the list to include the Islamic State, and the list is now known as the ISIL (Da'esh) & Al Qaida Sanctions List. As of June 2016, the sanctions list included 258 individuals and 75 entities.

In addition to imposing financial sanctions, the above designations also include restrictions on travel designed to limit terrorist mobility. Through the Terrorist Interdiction Program (TIP) the State Department provides funding and technical training for countries to screen passengers at ports of entry. As part of TIP, the State Department has provided high-counterterrorism-priority countries with the PISCES screening system (Personal Identification Secure Comparison and Evaluation System) to facilitate immigration processing and to exchange information with State Department officials on suspected terrorist transit.[78]

---

[75] National Commission on Terrorist Attacks upon the United States, Thomas H. Kean, and Lee Hamilton. 2004. *The 9/11 Commission report: final report of the National Commission on Terrorist Attacks upon the United States*.

[76] U.S. Department of the Treasury, National Terrorist Financing Risk Assessment, June 12, 2015.

[77] U.S. Department of the Treasury, Terrorist Assets Report 2015, Office of Foreign Assets Control, https://www.treasury.gov/resource-center/sanctions/Programs/Documents/tar2015.pdf.

[78] Written testimony of Acting Coordinator for Counterterrorism Justin Siberell before the House Foreign Affairs (continued...)

*Al Qaeda and U.S. Policy: Middle East and Africa*

## Countering Violent Extremism

The Obama Administration has emphasized countering violent extremism (CVE) programs to attempt to counter the reach of groups like the Islamic State and Al Qaeda. In a July 2015 speech, President Obama stated, "ultimately, in order for us to defeat terrorist groups like ISIL and al Qaeda it's going to also require us to discredit their ideology [...] Ideologies are not defeated with guns; they're defeated by better ideas—a more attractive and more compelling vision."[79] Obama added that the United States would work with international partners and Muslim communities to counter terrorist propaganda.

In May 2016, the State Department and USAID released a joint strategy on countering violent extremism, which defined CVE as

> proactive actions to counter efforts by violent extremists to radicalize, recruit, and mobilize followers to violence and to address specific factors that facilitate violent extremist recruitment and radicalization to violence. This includes both disrupting the tactics used by violent extremists to attract new recruits to violence and building specific alternatives, narratives, capabilities, and resiliencies in targeted communities and populations to reduce the risk of radicalization and recruitment to violence.[80]

USAID oversees CVE programs in the Middle East and Africa alongside the State Department's Bureau of Counterterrorism and Countering Violent Extremism, while the Department of Homeland Security focuses on outreach to domestic, particularly Muslim, communities. Some CVE components fall within broader regional programs, and some are designed to counter a range of violent extremists—including, but not limited to, Al Qaeda. Examples of CVE programs in the Middle East and Africa include:

- Transition Initiatives for Stabilization (TIS-Somalia), managed by USAID. The program has supported more than 650 infrastructure, education, training, and cultural programs in 16 of Somalia's 18 regions, focusing on areas liberated from Al Shabaab by the Somali National Army and AMISOM.[81]
- Countering Violent Extremism in the Middle East and North Africa (CoVE-MENA), managed by USAID. The program's first pilot project, the Maghreb-Sahel CSO, brings together representatives from civil society organizations (CSOs) from six regional countries to facilitate cross-border CVE exchanges and to bolster CSO networking and capacity building.[82]

---

(...continued)
Subcommittee on Terrorism, Nonproliferation & Trade, May 17, 2016.

[79] White House Office of the Press Secretary, "Remarks by the President on Progress in the Fight Against ISIL," July 6, 2015.

[80] Department of State & USAID Joint Strategy on Countering Violence Extremism, May 2016.

[81] Fact Sheet: Transition Initiatives for Stabilization (TIS-Somalia), USAID.

[82] USAID, Quarterly Performance Report No.4, Countering Violent Extremism in the Middle East & North Africa (CoVE-MENA) Maghreb-Sahel Pilot, October 29, 2015.

# Legislation and Issues for Congress

## Authorization for the Use of Military Force[83]

U.S. military action against Al Qaeda and its affiliates has continued for almost 15 years in multiple countries located in several regions of the world. The authority for such continuing and expanding action against Al Qaeda, the proper interpretation of such authority, and the role of Congress in overseeing and updating such authority, however, have been points of contention between Congress and the executive branch for most of that 15-year period. Such debate continues regarding the use of force against Al Qaeda, associated groups, and its affiliates, although much of the attention on issues related to presidential use of military force has in recent years shifted to the military campaign against the Islamic State.

Many observers, including some Members of Congress, have identified several concerns about continued use of force under existing authorities and what some see as expansive concepts of inherent presidential authority to use military force:

- **No termination date for existing authorizations.** Neither the 2001 AUMF nor the Authorization for Use of Military Force Against Iraq Resolution of 2002 (2002 AUMF; P.L. 107-243), both of which have been relied upon as authority to combat Al Qaeda, certain associated groups, and its "successor" the Islamic State, include language sunsetting their respective authorities on a certain date or laying out conditions under which the authorities would terminate. Some argue that this could lead to these authorities being relied upon permanently by successive Administrations to use force against Al Qaeda and many other related terrorist groups.

- **Geographic scope of military action.** Although the original theater of military action against Al Qaeda was Afghanistan, Al Qaeda members cross national borders or recruit new members in other countries. In addition, the network of Al Qaeda affiliates operates in multiple countries in the Middle East, South Asia, and North, West, Central, and East Africa. Because of terror networks' ability to operate transnationally, the use of force against Al Qaeda and certain linked groups has led to a massive increase in the geographic scope of military operations without additional authorization from Congress.

- **Timeliness of language in existing authorizations.** The 2001 AUMF authorizes the use of military force against those who perpetrated the September 11, 2001, terror attacks and those who cooperated or aided them, while the 2002 AUMF authorizes force to defend against the "continuing threat posed by Iraq," originally a reference to the Saddam Hussein regime. While the language of both authorizations can be and has been interpreted to provide authority for the continuing use of military force, some argue that these existing authorizations must be amended or replaced to reflect current realities and future developments concerning U.S. military counterterrorism efforts.[84]

---

[83] Prepared by Matthew C. Weed, Specialist in Foreign Policy Legislation. For additional information, see CRS Report R43983, *2001 Authorization for Use of Military Force: Issues Concerning Its Continued Application*, by Matthew C. Weed.

[84] See, e.g., Letter from Rosa Brooks et al. to President Barack Obama, February 10, 2015, https://www.justsecurity.org/wp-content/uploads/2015/02/AUMF-Sunset-Letter.pdf.

- **Presidential authority under Article II of the Constitution.** Some argue that the 2001 AUMF has been stretched to include military action that was not originally contemplated by Congress. Both the Bush and Obama Administrations, however, have argued that the President's authority as Chief Executive and Commander-in-Chief under Article II of the Constitution authorizes action against Al Qaeda and other related terror groups in many cases even if an existing legislative authorization does not extend to such action.[85] If there is an imminent threat to the United States, its citizens, military or civilian personnel, or interests, the President has argued he has stand-alone constitutional authority to use military force as Commander-in-Chief. As Chief Executive, both Administrations have argued the President can also use military force as part of conducting the foreign policy of the United States. In some instances of U.S. strikes against Al Qaeda-linked groups, it is unclear from Administration statements which legal justification the Administration relied upon to conduct the strike. Some in Congress have disagreed with this interpretation of inherent presidential power, and have called on Congress to define and place limits on the President's authority to use military force against terror groups such as Al Qaeda and its affiliates.
- **Constitutional role of Congress.** Many Members of Congress have proposed legislation to amend, replace, and/or repeal the 2001 AUMF and 2002 AUMF, and have called on Congress to fulfill its constitutional role afforded it through the power to declare war and other related war powers. These Members have argued that perceived problems with presidential overreach concerning the use of military force against Al Qaeda and its affiliates, as well as other uses of military force, in part stem from Congress's unwillingness to conduct effective oversight and revisit existing legislation to ensure the President is using military force in accordance with the Constitution and the will of Congress, insofar as Congress has authority in those areas.

## FY2016-FY2017 Appropriations for Foreign Operations and Defense

In December 2015, Congress appropriated FY2016 funds for foreign operations and defense in the Consolidated Appropriations Act, 2016 (P.L. 114-113, H.R. 2029). There were no specific appropriations limited to Al Qaeda, although the act did permit funds not to exceed $1.16 billion to be used to provide training or equipment to coalition forces supporting the U.S. military and stability operations in Afghanistan, as well as to counter the Islamic State.

The Administration's FY2016 budget request had included a request for $42.5 billion in Overseas Contingency Operations (OCO) funding for Operation Freedom's Sentinel in Afghanistan (formerly known as Operation Enduring Freedom) to train, advise, and assist Afghan forces and to conduct counterterrorism operations against the remnants of Al Qaeda.

In February 2016, the Obama Administration released its preliminary FY2017 budget requests for foreign operations and defense. Select specific requests related to Al Qaeda include:

---

[85] See U.S. Congress, Senate Committee on Foreign Relations, hearing on authorization for use of military force, 113th Cong., 2nd sess., May 21, 2014 (testimony of Mary McLeod, Principal Deputy Legal Adviser, Department of State, and Stephen Preston, General Counsel, Department of Defense).

Page 1706

- $2.5 billion for programs in Afghanistan, including military training and assistance and countering extremism.
- $45 million in Foreign Military Financing (FMF-OCO) for Tunisia to counter threats from terrorist organizations, including those affiliated with Al Qaeda, notably AQIM.
- $5.8 million in Nonproliferation, Antiterrorism, Demining, and Related Programs (NADR)-OCO funds for Yemen to counter terrorist threats including those from AQAP.
- $66.5 million in State Department- and USAID-administered funds for TSCTP activities to build the capacity of participant countries in North-West Africa to counter the threat posed by terrorist groups in the region, including AQIM and its splinter and offshoot factions.
- $24.2 million in State Department- and USAID-administered funds for the Partnership for East Africa Counter-Terrorism (PREACT).
- $277 million in State Department-administered funds for AMISOM and Somali security forces fighting Al Shabaab.[86]
- $450 million in Defense Department Counter-Terrorism Partnership Fund (CTPF) for programs to build the counterterrorism capacity of countries in Africa to counter AQIM, Al Shabaab, and other terrorist groups (including Boko Haram, which has pledged allegiance to the Islamic State).
- $250 million in defense funding for the Syria train and equip program. The overarching authority for the program provided in the FY2015 NDAA (P.L. 113-291) authorizes U.S. assistance for the purpose of defending the United States from the Islamic State as well as from threats posed by terrorists in Syria.

# Outlook

Al Qaeda and its affiliate groups continue to evolve, reflecting internal debates as well as reactions to competitors such as the Islamic State. Possible future trends include:

- **Increase in small-scale attacks.** Former CIA Deputy Director Michael Morell in 2015 described an altered threat landscape since the attacks of September 11. He stated that, "the change is defined by a reduction of the threat from the original al Qa'ida organization but a significant expansion of the threat from the emerging groups, a reduction in the threat of large, spectacular attacks but a skyrocketing rise in the threat of small-scale attacks."[87] Other U.S. officials have warned that Al Qaeda affiliates, seeking to compete with the attention garnered by the Islamic State, are countering with high-publicity attacks on soft targets such as hotels.[88] AQIM in 2015-2016 claimed attacks against hotels in Ivory Coast, Burkina Faso,

---

[86] $167 million in CIPA for UNSOS, $110 million for AMISOM TCCs and Somali security forces under the Somalia bilateral request.

[87] Michael Morell, *The Great War of Our Time: The CIA's Fight Against Terrorism—From al Qa'ida to ISIS*, pp304-305.

[88] Brian Dodwell, "A view from the CT foxhole: Brigadier General Donald C. Bolduc, Commander, Special Operations Command Africa," *CTC Sentinel*, May 25, 2016.

and Mali. The group and its offshoots also continue to conduct attacks against members of the U.N. peacekeeping mission in Mali, MINUSMA.

- **Potential for AQ leadership resurgence in Afghanistan.** Despite the reportedly reduced capabilities of Al Qaeda leadership, there is concern that AQ leaders could once again find sanctuary with the Taliban in Afghanistan, particularly following the withdrawal of U.S. forces from the country. Once safely established, AQ leadership could reconstitute its capabilities and eventually regain the capacity to conduct large-scale attacks. Zawahiri had previously pledged allegiance to Afghan Taliban leader Akhtar Muhammad Mansur, and in June 2016 pledged allegiance to Mansur's successor, Haibatullah Akhunzada.[89] In his *Islamic Spring* series, Zawahiri offers a general plan for establishing a caliphate, stating that the first step is strengthening the Islamic Emirate in Afghanistan [the Taliban].[90]

- **Stretching of U.S. resources.** Morell also noted that the Arab Spring has bolstered Al Qaeda by challenging governance at the local level. In some cases, this has created safe havens from which the group can operate, and which supply recruits, money, and weapons. The geographic dispersal of Al Qaeda-linked groups, he argued, has stretched the diplomatic, intelligence, and military resources of the United States. Unlike the Islamic State, which is geographically tethered to specific territory it seeks to defend, Al Qaeda groups are fluid and move across a wide expanse of terrain—arguably increasing their resilience under attack. To counter them effectively may require the development of U.S. relationships with a range of regional partners.

- **Competition and adaptation.** Al Qaeda's attempt to reassert leadership within the jihadist community could place pressure on the group to accelerate the implementation of what it had previously described as long-term goals. Although Zawahiri has declared that conditions are not ready for the establishment of a caliphate, some observers point to indications that the Nusra Front (now known as the Levant Conquest Front) is preparing to establish an Islamic emirate in parts of northern Syria under its control.[91] Others argue that, despite competition and conflict between the Islamic State and Al Qaeda, their shared objectives overshadow their differences, suggesting that in the next five years the two groups could merge or establish some degree of tactical cooperation.[92]

Despite the heightened focus on the Islamic State since its territorial expansion in 2014, U.S. military and intelligence officials remain concerned about the threat posed by Al Qaeda and its affiliated groups, some of which have already attempted attacks inside the United States—notably the multiple foiled airliner attacks attempted by AQAP. As policymakers examine the broad landscape of terrorist threats, they may wish to consider whether and how the risks posed to the United States and U.S. interests from the Islamic State and Al Qaeda differ, and how U.S. counterterrorism policy can be best positioned to address and balance both threats.

---

[89] OSE TRR2016061112755024, "Ayman Al Zawahiri Pledges Allegiance to New Taliban Leader, Vows to 'Establish a Caliphate,'" June 11, 2016.

[90] OSE TRO2015100644888543, "Al-Qa'ida Leader Declares Conditions 'Not Ready' for Caliphate, ISIL Leaders 'Fanatics,'" October 6, 2015.

[91] Charles Lister, "Al Qaeda is about to establish an emirate in northern Syria," *Foreign Policy*, May 4, 2016.

[92] Bruce Hoffman, "The Coming ISIS- al Qaeda Merger," *Foreign Affairs*, March 29, 2016.

## Author Contact Information

Carla E. Humud
Analyst in Middle Eastern and African Affairs
chumud@crs.loc.gov, 7-7314