LUCIA E. COYOCA (SBN 128314)
  lec@msk.com
VALENTINE A. SHALAMITSKI (SBN 236061)
  vas@msk.com
DANIEL M. HAYES (SBN 240250)
  dmh@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Attorneys for Plaintiffs
Universal Cable Productions LLC and
Northern Entertainment Productions LLC

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, and NORTHERN ENTERTAINMENT PRODUCTIONS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY,<br><br>Defendant. | CASE NO. 2:16-cv-4435-PA-MRW<br><br>**DECLARATION OF AMBASSADOR DENNIS ROSS IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Opposition Memorandum; Notice of Lodging Statement of Genuine Issues and Additional Material Facts; Statement of Genuine Issues and Additional Material Facts; Evidentiary Objections; Table of Contents of Evidence; Declarations of George Walden, Matthew Levitt, Harold Koh, Ty Sagalow, and Lucia Coyoca Filed / Lodged Concurrently Herewith]<br><br>Date: May 22, 2017<br>Time: 1:30 p.m.<br>Ctrm.: 9A, First St Courthouse |

# DECLARATION OF AMBASSADOR DENNIS ROSS

I, Ambassador Dennis Ross, declare as follows:

1. I have been retained as an expert witness on behalf of Plaintiffs Universal Cable Productions LLC and Northern Entertainment Productions LLC (collectively, "Plaintiffs") in this action. I make this Declaration in support of Plaintiffs' Motion for Partial Summary Judgment. I have personal knowledge of the facts set forth herein, and if called as witness, I could and would competently testify thereto.

2. Attached hereto as **Exhibit B** is a true and correct copy of my expert report pursuant to F.R.C.P. 26(a)(2)(B) in this matter, which report is incorporated herein as though set forth in full. I hold the opinions set forth therein in full, and if called as a witness could and would competently testify thereto.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20 day of April, 2017, at Washington, DC.

_____
Ambassador Dennis Ross

# EXHIBIT B

## REBUTTAL REPORT OF AMBASSADOR DENNIS ROSS

1.      I am the William Davidson Distinguished Fellow at the Washington Institute for Near East Policy.  On March 17, 2017, I submitted an expert report in the case titled *Universal Cable Productions et al. v. Atlantic Specialty Insurance,* No. CV 16-4435-PA (MRWx) (C.D. Ca. 2017) that details my credentials.

2.      I have been asked by counsel for Plaintiffs Universal Cable Productions LLC ("UCP") and Northern Entertainment Productions LLC ("NEP") (collectively "Plaintiffs") to review and comment on the expert reports submitted by Ingrid de Frankopan, Frank Lowenstein, and John Quigley.

3.      I have reviewed each of these reports.  There are multiple arguments made in them.  My rebuttal will not address all of the arguments, and instead, my comments focus on those statements and arguments that are the most problematic from a U.S. foreign policy standpoint.  In particular, my rebuttal will focus on the assertions that:  (1) Palestine/Hamas was and is a state or state-like entity, respectively; and (2) Hamas was involved in a war with Israel during the summer of 2014.  As explained in my original report and below, the Israel/Hamas hostilities during the summer was rooted in terrorist actions and not a traditional conflict.

4.      In the Quigley report on p. 4, Professor Quigley opines that:  "I do not believe Palestine has to be considered a state for there to have been war.  But Palestine was and is a state."  His arguments in support of finding that "Palestine was and is a state" are not correct.  The facts on which Professor Quigley relies, i.e. that no other state claims Gaza and that Gaza was occupied by Egypt after the 1948 war and Israel after 1967, do not make Palestine a state.  The Oslo agreements in the 1990's between Israel and the PLO accepted that a Palestinian Authority, with rights of limited self-government, would be established in the West Bank *and*

1

Gaza as part of an interim process of negotiations. Those interim negotiations were not intended to automatically result in recognition of statehood for Palestine. Instead, the target for the negotiations during the five year interim period was to address issues which would resolve the final status of the Palestinian Authority at the end of the five year period, such as control of borders, security, settlements, refugees and Jerusalem.

5. Statehood was not a part of the interim negotiations established by the Oslo agreements and was not a predetermined outcome of those interim negotiations. Among other reasons why the issue of statehood for Palestine was not addressed in the interim negotiations is that Israel did not want to commit that Palestinian statehood would necessarily be the end result of the negotiations, and the PLO did not want to admit that it had to negotiate to establish a state.

6. At no point during this interim period did the U.S. ever adopt a position on whether statehood should be the outcome of the negotiations. In fact, the U.S. government would not adopt a position supporting statehood for the Palestinians as an objective until the fall of 2001 during the George W. Bush administration.[1] It would take until June 24, 2002 for President Bush to spell out in a speech his view of a possible Palestinian state. But in the speech, President Bush made his support contingent, explaining U.S. support for creation of a Palestinian state required three things: that the "Palestinians embrace democracy, confront corruption, and firmly reject terror."[2]

7. On p. 5 of his report, Professor Quigley states unequivocally that: "The United States deals with Palestine as a state." In reality, the U.S. has never done so. No administration

---

[1] The Clinton parameters, of which I was a principal author, were presented at the end of the Clinton administration. These parameters, which addressed the possibility of a Palestinian state, were not American policy. They were a bridging proposal to suggest a possible way forward, and President Clinton told the Israeli and Palestinian negotiators that if these ideas were not accepted, they would leave with him when he left office.

[2] Hamas, of course, was designated a terrorist organization in 1997 by the Secretary of State. And, it has never rejected terror. "Full text of George Bush's speech," *The Guardian*, June 25, 2002, https://www.theguardian.com/world/2002/jun/25/israel.usa

— not Clinton, not Bush 43, and not Obama — ever treated "Palestine" as a state. As President Clinton's chief negotiator on the peace issue, I can say categorically the administration did not deal with Palestine as a state. In fact, the administration had to go to Congress every 6 months to preserve a waiver that permitted the administration to deal directly with the PLO in any capacity.

8. Moreover, contrary to Professor Quigley's statements on p. 5 of his report regarding the Bush administration's "roadmap to peace," the roadmap was not, to use Professor Quigley's words, "premised on Palestine's status as a state." The roadmap was merely a guide to negotiations. The roadmap would evolve only as each phase was completed and implemented. Among other things, phase one of the roadmap required the Palestinians to remove the infrastructure of terror and corruption that existed in the Palestinian Authority and under Yasser Arafat.[3] Thus, it is factually wrong for Professor Quigley to say that phase one required only "a few weeks" to shore up "institutions of governance." Phase one went far beyond that, and required the Palestinians at least initially to appoint leaders that were not compromised by terrorism, to build a practicing democracy based on tolerance and civil society, and take steps to create a new constitutional framework.[4]

9. As stated by then President Bush: "True reform will require entirely new political and economic institutions based on democracy, market economics and action against terrorism."[5] The focus on ensuring that a Palestinian state would not be built on a foundation of terror and corruption guided President Bush's approach on this issue. At the time, Yasser Arafat remained in control of the PLO. President Bush's June 24, 2002 speech called for a new leadership in

---

[3] *See* https://2001-2009.state.gov/r/pa/prs/ps/2003/20062.htm (A Performance-Based Roadmap to a Permanent Two-State Solution to the Israeli-Palestinian Conflict; Phase I: Ending Terror And Violence, Normalizing Palestinian Life, and Building Palestinian Institutions -- Present to May 2003)
[4] *Id.*
[5] "Full text of George Bush's speech," *The Guardian*, June 25, 2002, https://www.theguardian.com/world/2002/jun/25/israel.usa

place of Yasser Arafat. These far-reaching goals could not have taken only "a few weeks" to accomplish, as stated by Professor Quigley, particularly with Arafat continuing to run the Palestinian Authority. It is simply wrong to say that phase one would be completed in a few weeks when the focal point of terror and corruption remained in power. Moreover, a state with provisional borders could only be established in phase two if phase one had been implemented. Phase one never was implemented, and therefore the process never progressed to phase two.

10. As for the Obama administration, it strongly resisted the PLO's effort to gain UN Security Council support for Palestine to become a member of the United Nations and its efforts to be recognized at least as a non-member state of the United Nations. The U.S. was successful in preventing a vote in the Security Council as to the PLO's efforts to be recognized as a member or non-member state of the United Nations. The U.S. also opposed the resolution in the United Nations General Assembly ("the General Assembly") to give the "Palestine Observer Mission" (the PLO representative group in the United Nations) the status of a non-member observer state. That resolution passed in the General Assembly, but the passage of that resolution did not and does not change American foreign policy on the issue. Since the beginning of the Oslo process each American administration has been willing to recognize "Palestine" as a state *only if* it should emerge from a negotiated outcome with Israel.

11. The General Assembly adoption of a resolution over U.S. opposition came as no surprise. For a long time there has been a systematic bias against Israel and in favor of the Palestinians in the General Assembly. Votes in the General Assembly routinely support any resolution the Palestinians seek—no matter that it calls for. Within the UN system, the bias has been especially pronounced in the Human Rights Council ("UNHRC"). Established in June 2006, Israel has been a special target of its resolutions. During its first ten years, from June 2006

to June 2016, the UNHRC adopted 135 resolutions, 68 of which criticized Israel.[6] Many of the world's most egregious violators of human rights — China, Congo, and Cuba — serve on the UNHRC, and have been left largely unscathed while the focus remains riveted on Israel.

12.     Although the U.S. has largely been alone among its allies in opposing one-sided resolutions against Israel and in favor of the Palestinians, the United Kingdom has recently signaled a change.  On March 24, 2017, the British Ambassador to the United Nations, Julian Braithwaite, declared that:  "Today we are putting the Human Rights Council on notice.  If things do not change in the future we will adopt a policy of voting against all resolutions concerning Israel's conduct in the occupied Syrian and Palestinian territories."[7]

13.     In order to validate his claim that Palestine is a state, Professor Quigley makes much of the fact that the Prosecutor of the International Criminal Court ("ICC") accepted a declaration filed by Palestinian advocates giving the Court jurisdiction over acts committed "in the occupied Palestinian territory, including East Jerusalem since June 13, 2014."  As Professor Quigley notes, the declaration could be accepted only if the Prosecutor treated Palestine as a state.  But, once the General Assembly voted to accept the Palestine Observer Mission as a non-member observer state, the Prosecutor of the ICC had little choice in the matter.  After all, the ICC was established as an independent institution but with a clear connection to the United Nations system.  Prior to the General Assembly vote to recognize Palestine as a non-member observer state, the Prosecutor had rejected all previous efforts by the PLO to bring cases for investigation against Israel.  Here the bias built into the General Assembly in favor of the Palestinians — and very much against U.S. policy of Democratic and Republican administrations

---

[6] UN Watch, "UN Proportionality," August 23, 2016, https://www.unwatch.org/un-israel-key-statistics/
[7] Anne Gearan, "U.S. Diplomat accuses U.N. of bias against Israel," Washington Post, March 24, 2017, https://www.washingtonpost.com/world/national-security/trump-administration-condemns-what-it-calls-anti-israel-bias-at-un/2017/03/24/e8e76ef8-10d3-11e7-9d5a-a83e627dc120_story.html?utm_term=.92863c42a788

alike — led to the Prosecutor's position. The key fact remains, however, that none of this in any way changed the policy of the U.S. government against recognizing Palestinian statehood.

14. Of course, perhaps most significantly, none of the foregoing changes the fact that Gaza is not a separate state. If a state of Palestine is ever established, it will be comprised of the West Bank and Gaza, not just Gaza. Hamas controls only Gaza which according to the Oslo agreements defined the West Bank and Gaza as a "single territorial unit." Hamas is certainly not in control of what the Palestinians hope will be established as the state of "Palestine." Moreover, Hamas continues to call for and tries to carry out terrorist actions against Israelis. (The backdrop to the fighting in 2014 was the kidnapping and murder of three Israeli teenagers by Hamas operatives in the West Bank.)

15. Another argument that has been advanced for a finding that Hamas is the government of a state is the one set forth by Professor Ingrid de Frankopan on p. 13 of her report. She contends that, because Gaza City is the largest city in Gaza, it is therefore the capitol of Gaza. (She cites no authority for the proposition that the largest city in a state is its capitol.) Therefore, she contends, since Hamas controls Gaza City, it is the government of Gaza. This argument would be rejected by Hamas itself. To be sure, Hamas would not claim that it controls all of what it hopes will be the state of "Palestine" nor would it seek to claim a statehood status based on controlling Gaza or its largest city, Gaza City. Hamas might well claim it controls Gaza, but it would not want to imply that Gaza City is the capital of anything. For Hamas and the Palestinian Authority alike, they want only one capital to be recognized for Palestinians and that is Jerusalem. They would never suggest otherwise.

16. Professor Quigley also argues, on p. 6 of his report, that the hostilities between Gaza and Israel during the summer of 2014 constituted a war because "they arose out of an

international belligerency." He contends, Gaza became a "territory under belligerent occupation" during the hostilities of 1967, and therefore, "[a]ny hostilities between an organized military force in Gaza on the one hand and Israel on the other constitute a continuation of the 1967 war." The very premise of Professor Quigley's argument as to belligerent occupation of Gaza is based on Israel controlling access to Gaza even after it withdrew all its settlers and soldiers from Gaza in 2005, and that this belligerent occupation began after what Professor Quigley refers to as "the 1967 war." The first problem with Professor Quigley's argument is that during the 1967 war, Israel took control of Gaza from Egypt, not from the Palestinians. Israel subsequently withdrew from the Sinai pursuant to the Egyptian-Israeli Peace Treaty reached in March of 1979—a peace agreement which was facilitated by then U.S. President Jimmy Carter. Thus, Israel and Egypt are not currently at war; there is a peace between the two countries.

17. Moreover, Israel does not control the Egyptian border into Gaza; Egypt does. The Egyptian government has generally kept its border with Gaza closed. Contrary to Professor Quigley's statement on p. 6 that Israel "controlled entry into and exit from Gaza," Israel does not control the Egyptian access points to and from Gaza. The Egyptian government does, and it rarely opens the border crossing at Rafah. Even when it does, it tends to allow people and not goods to cross. By comparison, Israel permits an average of 800 trucks a day to go through its crossings into Gaza. Not only has the Egyptian/Gaza border been closed except on rare occasions to let Palestinians leave Gaza, but Egypt also has sought systematically to destroy the smuggling tunnels that have been dug by and for Hamas to prevent weapons from flowing back and forth between the Sinai desert and Gaza.

18. Significantly, Egypt's relationship with Gaza over the last few years has been shaped by a perception that Hamas' support for Islamist groups in the Sinai constitutes a threat to

7

the country. Egypt cooperated with Israel in reaching the cessation of hostilities in 2014, rejecting the terms that were being pushed by Turkey and Qatar which are countries sympathetic to Hamas. Egypt may have conducted talks to end the hostilities with a joint delegation of Hamas and Fatah(as Mr. Lowenstein notes on p. 11 of his report), but this was done to bring Fatah into the process and have Fatah gain credit with Palestinians for helping to end the suffering in Gaza. In other words, Egypt was seeking to promote the Palestinian Authority and weaken Hamas.

19. In Mr. Lowenstein's report, he argues on p. 11 that the conflict during the summer of 2014 constituted "a war regardless of whether one characterizes Hamas as a terrorist organization or a semi-sovereign," or, "[a]t a minimum, it is obvious that these events constituted warlike action by a military force." However, he cites no authority for either proposition. These statements are directly contrary to U.S. foreign policy as to Hamas and statements made by the U.S. State Department as the 2014 hostilities were ongoing, which did not recognize the hostilities as a war and instead characterized the events as acts of terrorism.[8]

20. In support of his position that the events were "war" or "warlike," Mr. Lowenstein discusses the United Nations Official Commission of Inquiry statistics that show that Hamas and other Palestinian armed groups fired 4881 rockets and 1753 mortars toward Israel. (Lowenstein Report, p. 7.) This is part of his argument to say the weapons used by Hamas and those used by Israel supposedly prove this was a war. But Hamas aimed its unguided rocket and mortars at Israeli residential areas and could not and did not discriminate between military and

---

[8] Mr. Lowenstein's argument that Secretary Kerry at times referred to the hostilities as war (p. 8), and therefore that makes it a war, is unavailing. Any short hand colloquial references by the Secretary of State to "war" does not convert the hostilities into something different than what U.S. foreign policy already has recognized to be terrorism.

8

civilian targets which is the very definition of terror.[9] Yes, Israel mobilized considerable forces to try to stop Hamas from firing unguided rockets and mortars at its populated areas, a number that, as Lowenstein observes on p. 9, totaled an average of 90 rockets and mortars a day. Hamas, however, was engaged not in a military campaign against Israel military targets, but a terror campaign against Israeli citizens. Professor de Frankopan argues on p. 17 of her report that the fact that "an entity is a 'terror organization' does not necessarily mean that all its acts are 'terror acts.'" But Hamas' targets in Israel during the hostilities were civilian. Moreover, it embedded its rockets in civilian areas, including in schools, hospitals, and mosques. At one point even the United Nations Relief and Work Agency (UNRWA), the UN agency charged with providing assistance to Palestinian refugees in Gaza, discovered twenty rockets hidden in one of its schools, and issued a condemnatory press release: "This is a flagrant violation of the inviolability of its premises under international law."[10]

21. In Mr. Lowenstein's report, on p. 12, he also argues that Hamas' actions in the summer of 2014 "could commonly be understood as an insurrection or rebellion against Israel." This argument ignores what is commonly considered to be "insurrection" or "rebellion" under international law or U.S. foreign policy. As noted in the Rebuttal Report submitted by Harold Koh, an "insurgency" or "rebellion" is "an organized effort by a group of armed rebels to overthrow the civilian government" of a state, with the goal of "install[ing] itself instead as the legitimate successor government." Koh Rebuttal, p. 2. Here, Hamas rejects Israel's very right to exist, and seeks to destroy the state of Israel altogether, not to install itself as the successor government in Israel.

---

[9] BBC, "Amnesty: Hamas rocket attacks amounted to war crimes," http://www.bbc.com/news/world-middle-east-32053999
[10] Quoted in Max Fisher, "Yes, Gaza militants hide rockets in schools, but Israel doesn't have to bomb them," Vox, July 17, 2014, http://www.vox.com/2014/7/17/5912189/yes-gaza-militants-hide-rockets-in-schools-but-israel-doesnt-have-to

22. Hamas' actions during the summer of 2014 were no different than the terrorist efforts that Hamas has sought to carry out for years. Hamas regards all the land that makes up Israel — including the land that is neither disputed or occupied within the June 4, 1967 lines — as part of an Islamic trust. Hamas' actions in the summer of 2014 were not an attempt to take over the government of Israel; instead, they were a continuation of Hamas' ongoing use of terror to try to kill and demoralize Israelis. Hamas is a terrorist organization. Its purpose is not to rebel against Israel but to destroy it and replace it with an Islamic Caliphate.

23. In summary, it has been the consistent American foreign policy of both republican and democratic administrations alike not to recognize Hamas as anything but a terrorist organization, and its acts of aggression and hostilities towards non-Palestinians to be anything but terrorism. No administration since Hamas was first established in the 1980's has adopted any policy which would give Hamas any recognition, credence or legitimacy. The findings in this case should not undercut that longstanding American policy.

Dated: April 28, 2017

*Dennis Ross*

Ambassador Dennis Ross