1   LUCIA E. COYOCA (SBN 128314)
      lec@msk.com
2   VALENTINE A. SHALAMITSKI (SBN 236061)
      vas@msk.com
3   DANIEL M. HAYES (SBN 240250)
      dmh@msk.com
4   MITCHELL SILBERBERG & KNUPP LLP
    11377 West Olympic Boulevard
5   Los Angeles, CA 90064-1683
    Telephone:  (310) 312-2000
6   Facsimile:  (310) 312-3100

7   Attorneys for Attorneys for Plaintiffs
    Universal Cable Productions LLC and
8   Northern Entertainment Productions LLC

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                  WESTERN DIVISION

12  UNIVERSAL CABLE                    CASE NO. 2:16-cv-4435-PA-MRW
    PRODUCTIONS LLC, and
13  NORTHERN ENTERTAINMENT             **DECLARATION OF LUCIA E.**
    PRODUCTIONS LLC,                   **COYOCA IN SUPPORT OF**
14                                     **OPPOSITION TO DEFENDANT'S**
                 Plaintiffs,           **MOTION FOR SUMMARY**
15                                     **JUDGMENT**
16       v.                            [Opposition Memorandum; Notice of
                                       Lodging Statement of Genuine Issues
17  ATLANTIC SPECIALTY                 and Additional Material Facts;
    INSURANCE COMPANY,                 Statement of Genuine Issues and
18                                     Additional Material Facts; Evidentiary
                 Defendant.            Objections; Table of Contents of
19                                     Evidence; Declarations of George
                                       Walden, Matthew Levitt, Dennis Ross,
20                                     Harold Koh, and Ty Sagalow Filed /
                                       Lodged Concurrently Herewith]
21
                                       Date:      May 22, 2017
22                                     Time:      1:30 p.m.
                                       Ctrm.:     9A, First St Courthouse
23

24

25

26

27

Mitchell     28
Silberberg &
Knupp LLP

8838944.1
            DECLARATION OF LUCIA E. COYOCA IN SUPPORT OF OPPOSITION
            TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## DECLARATION OF LUCIA E. COYOCA

I, Lucia E. Coyoca, declare:

1.     I am an attorney duly licensed to practice law in the State of California and before this Court.  I am, through my professional corporation, a partner in the law firm of Mitchell Silberberg & Knupp LLP, attorneys of record for Plaintiffs Universal Cable Productions LLC ("UCP") and Northern Entertainment Productions LLC (collectively, "Plaintiffs") in the above-captioned matter.  I make this declaration in opposition to Plaintiffs' Motion For Partial Summary Judgment. Unless otherwise indicated, I have personal knowledge of the following facts and, if called and sworn as a witness, could and would competently testify thereto.

2.     Attached hereto as **Exhibit 51** is a true and correct copy of a document produced by Aon in this action as AONNBCU0003902-3903, an email between Martin Ridgers, George Walden and Wanda Phillips, dated December 13, 2009.

3.     Attached hereto as **Exhibit 52** is a true and correct copy of a document produced by Aon in this action as AONNBCU0003965-3966 and attached as Exhibit 42 to the deposition of Susan Weiss, an email between Martin Ridgers, George Walden, Susan Weiss and Wanda Phillips, dated December 16, 2009.

4.     Attached hereto as **Exhibit 53**  is a true and correct copy of Insurance Services Office, Inc. (ISO) form number CG 00 02 04 13, and accessed and downloaded from LexisNexis at my direction on Saturday, April 29, 2017.

5.     Attached hereto as **Exhibit 54** is a true and correct copy of ISO form number CA 00 20 03 10, and accessed and downloaded from LexisNexis at my direction on Saturday, April 29, 2017.

6.     Attached hereto as **Exhibit 55** is a true and correct copy of a document produced by Atlantic in this action as ATL004098-4101, an Atlantic entertainment production policy issued to Publicis Groupe/MMS USA Holdings, Inc.

Mitchell
Silberberg &
Knupp LLP

1

**DECLARATION OF LUCIA E. COYOCA**

8838866.1

7.      Attached hereto as **Exhibit 56** is a true and correct copy of Richard Nixon: "Campaign Statement About Crime and Drug Abuse.," October 28, 1972, available online at The American Presidency Project, http://www.presidency.ucsb.edu/ws/?pid=3665, and accessed and downloaded at my direction on May 1, 2017.

8.      Attached hereto as **Exhibit 57** is a true and correct copy of Ronald Reagan: "Radio Address to the Nation on Federal Drug Policy," October 2, 1982, available online at The American Presidency Project, http://www.presidency.ucsb.edu/ws/?pid=43085, and accessed and downloaded at my direction on May 1, 2017.

9.      Attached hereto as **Exhibit 58** is a true and correct copy of Lyndon B. Johnson: "Annual Message to the Congress on the State of the Union.," January 8, 1964, available online at The American Presidency Project, http://www.presidency.ucsb.edu/ws/?pid=26787, and accessed and downloaded at my direction on May 1, 2017.

10.      Attached hereto as **Exhibit 59** is a true and correct copy of the article *Bill O'Reilly: War on Christmas won by the good guys, but insurgents remain*, available at http://www.foxnews.com/opinion/2016/12/15/bill-oreilly-war-on-christmas-won-by-gcxxl-guys-but-insurgents-remain.print.html, and accessed and downloaded at my direction on April 30, 2017.

11.      Attached hereto as **Exhibit 60** is a true and correct copy of the article *Three reasons why the New York Times' War on Christmas is all wrong*, available at http://www.foxnews.com/opinion/2016/12/22/three-reasons-why-new-york-times-war-on-christmas-denial-is-all-wrong.print.html , and accessed and downloaded at my direction on April 30, 2017.

12.      Attached hereto as **Exhibit 61** is a true and correct copy of the article *How the 'War on Christmas' Controversy Was Created*, available at

**DECLARATION OF LUCIA E. COYOCA**

Mitchell Silberberg & Knupp LLP

8838866.1

1   https://www.nytimes.com/2016/12/19/us/war-on-christmas-controversy.html, and

2   accessed and downloaded at my direction on April 30, 2017.

3        13.    Attached hereto as **Exhibit 62** is a true and correct copy of an

4   International Risk Management Institute, Inc. article, *Attack on America: The*

5   *Insurance Coverage Issues*, dated September, 2001, available at

6   https://www.irmi.com/articles/expert-commentary/attack-on-america-the-insurance-

7   coverage-issues-(part-1-war-risk-exclusions), and accessed and downloaded at my

8   request on May 1, 2017.

9        14.    Attached hereto as **Exhibit 63** is a true and correct copy of a Los

10   Angeles Times Article *"Act of War" Exclusion Doesn't Apply to Attacks, Insurers*

11   *Say*, dated September 17, 2001, available at

12   http://articles.latimes.com/2001/sep/17/business/fi-46595, and accessed and

13   downloaded at my direction on May 1, 2017.

14        15.    Attached hereto as **Exhibit 64** is a true and correct copy of an

15   Insurance Journal article, *A Look at Invoking War Exclusions*, dated October 10,

16   2001, available at

17   http://www.insurancejournal.com/magazines/legalbeat/2001/10/08/18482.htm, and

18   accessed and downloaded at my direction on May 1, 2017.

19        16.    Attached hereto as **Exhibit 65** is a true and correct copy of the

20   Encyclopedia Brittanica description of Arab-Israeli wars, available at

21   https://www.britannica.com/event/Arab-Israeli-wars, and accessed and downloaded

22   at my direction on May 1, 2017.

23        17.    Attached hereto as **Exhibit 66** is a true and correct copy of the parties'

24   Joint Stipulation re: Discovery Motion, filed on April 27, 2017 as ECF No. 69 in

25   this action.

26        18.    Attached hereto as **Exhibit 67** are true and correct copy of excerpts

27   from the February 8, 2017 Deposition Transcript of Theresa Gooley.

28

Mitchell
Silberberg &
Knupp LLP

3

**DECLARATION OF LUCIA E. COYOCA**

8838866.1

19.     Attached hereto as **Exhibit 68** are true and correct copy of excerpts from the February 3, 2017 Deposition Transcript of Daniel Gutterman.

20.     Attached hereto as **Exhibit 69** is a true and correct copy of a document produced by Atlantic in this action as ATL000294, an email from Daniel Gutterman to himself, dated July 18, 2014.

21.     Attached hereto as **Exhibit 70** is a true and correct copy of a document produced by Atlantic in this action as ATL000501, an email chain between Daniel Gutterman and Pamela Johnson, dated July 16, 2014.

22.     Attached hereto as **Exhibit 71** is a true and correct copy of a document produced by Atlantic in this action as ATL001560-ATL001561, an email chain between Daniel Gutterman and Pamela Johnson, dated July 16, 2014.

23.     Attached hereto as **Exhibit 72** are true and correct copy of documents produced by Atlantic in this action as ATL001635, ATL001636-ATL001686, a Westlaw cover email to Pamela Johnson and an attached case, *Holiday Inns Inc. v. Aetna Ins. Co.*, 571 F. Supp. 1460 (S.D.N.Y. 1983), dated July 17, 2014.

24.     Attached hereto as **Exhibit 73** is a true and correct copy of Atlantic's General Claim Practices guidelines produced by Atlantic in this action as ATL 000735-744 and attached as Exhibit 15 to the deposition of Daniel Gutterman.

25.     Attached hereto as **Exhibit 74** is a true and correct copy of the Foreign Policy article *Take Away Their Guns – Then We'll Talk*, dated August 28, 2014, accessed and downloaded at my direction on May 1, 2017.

26.     Attached hereto as **Exhibit 75** is a true and correct copy of the National Post article *Gaza's marvels of engineering; Hamas gunmen can live in tunnels for weeks*, dated August 9, 2014, accessed and downloaded at my direction on May 1, 2017.

27.     Attached hereto as **Exhibit 76** is a true and correct copy of the Jerusalem Post article *IDF announces major operation in Gaza as rocket fire*

1   *escalates in South*, dated July 7, 2014, accessed and downloaded at my direction on

2   May 1, 2017.

3         I declare under penalty of perjury under the laws of the United States of

4   America that the foregoing is true and correct.

5         Executed May 1, 2017, at Los Angeles, California.

6

7                                */s/ Lucia E. Coyoca*

8                                   Lucia E. Coyoca

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 51

| | |
|---|---|
| **From**: | Ridgers, Martin K. [MRidgers@ebi-ins.com] |
| **Sent**: | 12/13/2009 10:30:00 PM |
| **To**: | George_Walden@ars.aon.com; Phillips, Wanda M. [WPhillips@ebi-ins.com] |
| **CC**: | Ridgers, Martin K. [MRidgers@ebi-ins.com] |
| **Subject**: | nbc manuscript Martin 2009 1212.doc |
| **Attachments**: | image001.jpg; nbc manuscript Martin 2009 1212.doc |

George,

I have made changes, I did not do everything you requested but believe that coverage is provided.  Where I did make a change I have marked this in GREEN.  The other colour is to remind me to amend the referrence to a term in the policy as they probably do not match.  This will be done after I have someone reorder the terms predominantly in the General Conditions.

Please let me know your thoughts.

Yours truly,



A Member of the OneBeacon Insurance Group

*Martin Ridgers*, CPCU

Senior Vice President

Entertainment Brokers International

A member of the OneBeacon Insurance Group

License No. 0773887

mridgers@ebi-ins.com

Direct Tel: 310.954.3970

Tel 310.824.0111 / Fax 310.824.5733

Mobile: 310-418-4772

Visit our website at http://www.ebi-ins.com for applications, news and product information.

This e-mail and any attachments to it, is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (310) 824-0111 or by e-mail.

Visit our website at http://www.ebi-ins.com for applications, news and product information.

Confidentiality notice: The information contained in this email message including attachments is confidential and is intended only for the use of the individual or entity named above and others who have been specifically authorized to receive it.  If you are not the intended recipient, you are hereby notified that any use, unauthorized dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please delete immediately or if any problems occur with transmission, please notify me immediately by telephone at (310) 824-0111.  Thank you.

CONFIDENTIAL                                                                                     AONNBCU0003902

CONFIDENTIAL
AONNBCU0003903

# EXHIBIT 52

| From: | Ridgers, Martin K. [MRidgers@ebi-ins.com] |
|---|---|
| Sent: | 12/16/2009 9:49:00 PM |
| To: | George Walden [George_Walden@ars.aon.com]; susan_weiss@ars.aon.com |
| CC: | Phillips, Wanda M. [WPhillips@ebi-ins.com]; Ridgers, Martin K. [MRidgers@ebi-ins.com] |
| Subject: | Martin's_Final_Form Rev 1_2009 1216.doc |
| Attachments: | image001.jpg; Martin's_Final_Form Rev 1_2009 1216.doc |

**EXHIBIT
42**
4-18-2017
WEISS - I
Lori Scinta, RPR, CSR 4811

George,

Attached is the wording with the final changes you and I reviewed. I still need to make sure that Peter is OK with the changes we made but I believe unless there are some major problems this will not be changed significantly as we have already reviewed the wording overall.

The present wording is not properly formatted and we may have to amend some of the punctuation when we move items around and but there is intended to be no wording changes.

I believe that all of our hard work will provide NBC with a unique policy and I hope we have teh opportunity to meet with teh risk management staff. Thank you very much for your patience and we appreciate working with you all.

Please call me with any thoughts or comments.

Yours truly,



**Entertainment Brokers
International**
*years in the spotlight*

A Member of the OneBeacon Insurance Group

*Martin Ridgers*, CPCU

Senior Vice President

Entertainment Brokers International

A member of the OneBeacon Insurance Group

License No. 0773887

mridgers@ebi-ins.com

Direct Tel: 310.954.3970

Tel 310.824.0111 / Fax 310.824.5733

Mobile: 310-418-4772

Visit our website at http://www.ebi-ins.com for applications, news and product information.

This e-mail and any attachments to it, is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (310) 824-0111 or by e-mail.

Visit our website at http://www.ebi-ins.com for applications, news and product information.

Confidentiality notice: The information contained in this email message including attachments is confidential and is intended only for the use of the individual or entity named above and others who have been specifically authorized to receive it. If you are

CONFIDENTIAL

AONNBCU0003965

not the intended recipient, you are hereby notified that any use, unauthorized
dissemination, distribution, or copying of this communication is strictly prohibited.  If
you have received this communication in error, please delete immediately or if any
problems occur with transmission, please notify me immediately by telephone at (310) 824-
0111.  Thank you.

CONFIDENTIAL

AONNBCU0003966

EXHIBIT 52, PAGE 9

# EXHIBIT 53

*FORM-NUMBER: CG 00 02 04 13*

# FORM-NUMBER: CG 00 02 04 13

ADDED-DATE: September 4, 2012

This insurance policy is proprietary to and copyrighted by Insurance Services, Inc. (ISO). It may be used for reference purposes but may not be used for any other purposes or on behalf of any entity that is not a licensee of ISO for the line of insurance and jurisdiction to which it applies without ISO's written consent. For consent, or to verify licensee status, contact ISO Customer Service at 1-800-888-4ISO.

 Full Text of ISO Report - There is an additional charge for the Word Document (DOC - 162K)

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** -- Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **VI** -- Definitions.

## SECTION I -- COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

### 1. Insuring Agreement

**a**. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

UCP035347

FORM-NUMBER: CG 00 02 04 13

**(1)** The amount we will pay for damages is limited as described in Section **III** -- Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments -- Coverages **A** and **B**.

**b**. This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" did not occur before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

**(3)** A claim for damages because of the "bodily injury" or "property damage" is first made against any insured, in accordance with Paragraph **c**. below, during the policy period or any Extended Reporting Period we provide under Section **V** -- Extended Reporting Periods.

**c**. A claim by a person or organization seeking damages will be deemed to have been made at the earlier of the following times:

**(1)** When notice of such claim is received and recorded by any insured or by us, whichever comes first; or

**(2)** When we make settlement in accordance with Paragraph **a**. above.

All claims for damages because of "bodily injury" to the same person, including damages claimed by any person or organization for care, loss of services, or death resulting at any time from the "bodily injury", will be deemed to have been made at the time the first of those claims is made against any insured.

All claims for damages because of "property damage" causing loss to the same person or organization will be deemed to have been made at the time the first of those claims is made against any insured.

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

UCP035348

FORM-NUMBER: CG 00 02 04 13

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.
This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;
if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph (1), (2) or (3) above.
However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

UCP035349

FORM-NUMBER: CG 00 02 04 13

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

## f. Pollution

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception

UCP035350

FORM-NUMBER: CG 00 02 04 13

does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".
However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**
"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".
This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.
This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

UCP035351

FORM-NUMBER: CG 00 02 04 13

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

UCP035352

FORM-NUMBER: CG 00 02 04 13

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** -- Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

### k. Damage To Your Product
"Property damage" to "your product" arising out of it or any part of it.

### l. Damage To Your Work
"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

### m. Damage To Impaired Property Or Property Not Physically Injured
"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

### n. Recall Of Products, Work Or Impaired Property
Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

UCP035353

FORM-NUMBER: CG 00 02 04 13

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** -- Limits Of Insurance.

## COVERAGE B -- PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

**a**. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** -- Limits Of Insurance; and

UCP035354

FORM-NUMBER: CG 00 02 04 13

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments -- Coverages **A** and **B**.

**b**. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business, but only if:

**(1)** The offense was committed in the "coverage territory";

**(2)** The offense was not committed before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

**(3)** A claim for damages because of the "personal and advertising injury" is first made against any insured, in accordance with Paragraph **c**. below, during the policy period or any Extended Reporting Period we provide under Section **V** -- Extended Reporting Periods.

**c**. A claim made by a person or organization seeking damages will be deemed to have been made at the earlier of the following times:

**(1)** When notice of such claim is received and recorded by any insured or by us, whichever comes first; or

**(2)** When we make settlement in accordance with Paragraph **a**. above.
All claims for damages because of "personal and advertising injury" to the same person or organization as a result of an offense will be deemed to have been made at the time the first of those claims is made against any insured.

## 2. Exclusions

This insurance does not apply to:

### a. Knowing Violation Of Rights Of Another
"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

### b. Material Published With Knowledge Of Falsity
"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

### c. Material Published Prior To Policy Period
"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the Retroactive Date, if any, shown in the Declarations.

### d. Criminal Acts
"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

UCP035355

FORM-NUMBER: CG 00 02 04 13

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods -- Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b**. and **c**. of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

UCP035356

FORM-NUMBER: CG 00 02 04 13

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE C -- MEDICAL PAYMENTS

## 1. Insuring Agreement

**a**. We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

UCP035357

FORM-NUMBER: CG 00 02 04 13

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations; provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b**. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

## 2. Exclusions

We will not pay expenses for "bodily injury":

**a. Any Insured**
To any insured, except "volunteer workers".

**b. Hired Person**
To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**
To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**
To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**
To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**
Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A**.

## SUPPLEMENTARY PAYMENTS -- COVERAGES A AND B

UCP035358

FORM-NUMBER: CG 00 02 04 13

**1**. We will pay, with respect to any claim we investigate or settle or any "suit" against an insured we defend:

**a**. All expenses we incur.

**b**. Up to $ 250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c**. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d**. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $ 250 a day because of time off from work.

**e**. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f**. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g**. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.
These payments will not reduce the limits of insurance.

**2**. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a**. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b**. This insurance applies to such liability assumed by the insured;

**c**. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d**. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e**. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f**. The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

UCP035359

FORM-NUMBER: CG 00 02 04 13

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** -- Coverage **A** -- Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f**. above, are no longer met.

## SECTION II -- WHO IS AN INSURED

**1**. If you are designated in the Declarations as:

**a**. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b**. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c**. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d**. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e**. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2**. Each of the following is also an insured:

UCP035360

FORM-NUMBER: CG 00 02 04 13

**a**. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by; you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b**. Any person (other than your "employee" or "volunteer worker") or any organization while acting as your real estate manager.

**c**. Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d**. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3**. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a**. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b**. Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

UCP035361

FORM-NUMBER: CG 00 02 04 13

**c**. Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III -- LIMITS OF INSURANCE

**1**. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

    **a**. Insureds;

    **b**. Claims made or "suits" brought; or

    **c**. Persons or organizations making claims or bringing "suits".

**2**. The General Aggregate Limit is the most we will pay for the sum of:

    **a**. Medical expenses under Coverage **C**;

    **b**. Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

    **c**. Damages under Coverage **B**.

**3**. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4**. Subject to Paragraph **2**. above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5**. Subject to Paragraph **2**. or **3**. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

    **a**. Damages under Coverage **A**; and

    **b**. Medical expenses under Coverage **C**
because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6**. Subject to Paragraph **5**. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7**. Subject to Paragraph **5**. above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the

UCP035362

FORM-NUMBER: CG 00 02 04 13

Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV -- COMMERCIAL GENERAL LIABILITY **CONDITIONS**

### 1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

### 2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

**a**. You must see to it that we are notified as soon as practicable of an "occurrence" or offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense. Notice of an "occurrence" or offense is not notice of a claim.

**b**. If a claim is received by any insured, you must:

**(1)** Immediately record the specifics of the claim and the date received; and

**(2)** Notify us as soon as practicable.
You must see to it that we receive written notice of the claim as soon as practicable.

**c**. You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or a "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d**. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

### 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

**a**. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b**. To sue us on this Coverage Part unless all of its terms have been fully complied with.

UCP035363

FORM-NUMBER: CG 00 02 04 13

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b**. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c**. below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is effective prior to the beginning of the policy period shown in the Declarations of this insurance and applies to "bodily injury" or "property damage" on other than a claims-made basis, if:

**i**. No Retroactive Date is shown in the Declarations of this insurance; or

**ii**. The other insurance has a policy period which continues after the Retroactive Date shown in the Declarations of this insurance;

**(ii)** That is Fire, Extended Coverage, Builders' Risk, Installation Risk or similar coverage for "your work";

**(iii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iv)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(v)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g**. of Section I -- Coverage **A** -- Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit".

UCP035364

FORM-NUMBER: CG 00 02 04 13

If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

## 5. Premium Audit

**a**. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b**. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c**. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

## 6. Representations

By accepting this policy, you agree:

**a**. The statements in the Declarations are accurate and complete;

**b**. Those statements are based upon representations you made to us; and

**c**. We have issued this policy in reliance upon your representations.

## 7. Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a**. As if each Named Insured were the only Named Insured; and

UCP035365

FORM-NUMBER: CG 00 02 04 13

**b**. Separately to each insured against whom claim is made or "suit" is brought.

### 8. Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

### 9. When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

### 10. Your Right To Claim And Occurrence Information

We will provide the first Named Insured shown in the Declarations the following information relating to this and any preceding general liability claims-made Coverage Part we have issued to you during the previous three years:

**a**. A list or other record of each "occurrence", not previously reported to any other insurer, of which we were notified in accordance with Paragraph **2.a**. of the Section **IV** -- Duties In The Event Of Occurrence, Offense, Claim Or Suit Condition. We will include the date and brief description of the "occurrence" if that information was in the notice we received.

**b**. A summary by policy year, of payments made and amounts reserved, stated separately, under any applicable General Aggregate Limit and Products-Completed Operations Aggregate Limit.

Amounts reserved are based on our judgment. They are subject to change and should not be regarded as ultimate settlement values.

You must not disclose this information to any claimant or any claimant's representative without our consent.

If we cancel or elect not to renew this Coverage Part, we will provide such information no later than 30 days before the date of policy termination. In other circumstances, we will provide this information only if we receive a written request from the first Named Insured within 60 days after the end of the policy period. In this case, we will provide this information within 45 days of receipt of the request.

We compile claim and "occurrence" information for our own business purposes and exercise reasonable care in doing so. In providing this information to the first Named Insured, we make no representations or warranties to insureds, insurers, or others to whom this information is furnished by or on behalf of any insured. Cancellation or nonrenewal will be effective even if we inadvertently provide inaccurate information.

## SECTION V -- EXTENDED REPORTING PERIODS

**1**. We will provide one or more Extended Reporting Periods, as described below, if:

**a**. This Coverage Part is canceled or not renewed; or

**b**. We renew or replace this Coverage Part with insurance that:

**(1)** Has a Retroactive Date later than the date shown in the Declarations of this Coverage Part; or

UCP035366

FORM-NUMBER: CG 00 02 04 13

**(2)** Does not apply to "bodily injury", "property damage" or "personal and advertising injury" on a claims-made basis.

**2**. Extended Reporting Periods do not extend the policy period or change the scope of coverage provided. They apply only to claims for:

**a**. "Bodily injury" or "property damage" that occurs before the end of the policy period but not before the Retroactive Date, if any, shown in the Declarations; or

**b**. "Personal and advertising injury" caused by an offense committed before the end of the policy period but not before the Retroactive Date, if any, shown in the Declarations.
Once in effect, Extended Reporting Periods may not be canceled.

**3**. A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the policy period and lasts for:

**a**. Five years with respect to claims because of "bodily injury" and "property damage" arising out of an "occurrence" reported to us, not later than 60 days after the end of the policy period, in accordance with Paragraph **2.a**. of the Section **IV** -- Duties In The Event Of Occurrence, Offense, Claim Or Suit Condition;

**b**. Five years with respect to claims because of "personal and advertising injury" arising out of an offense reported to us, not later than 60 days after the end of the policy period, in accordance with Paragraph **2.a**. of the Section **IV** -- Duties In The Event Of Occurrence, Offense, Claim Or Suit Condition; and

**c**. Sixty days with respect to claims arising from "occurrences" or offenses not previously reported to us.
The Basic Extended Reporting Period does not apply to claims that are covered under any subsequent insurance you purchase, or that would be covered but for exhaustion of the amount of insurance applicable to such claims.

**4**. The Basic Extended Reporting Period does not reinstate or increase the Limits of Insurance.

**5**. A Supplemental Extended Reporting Period of unlimited duration is available, but only by an endorsement and for an extra charge. This supplemental period starts when the Basic Extended Reporting Period, set forth in Paragraph **3**. above, ends.
You must give us a written request for the endorsement within 60 days after the end of the policy period. The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.
We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

**a**. The exposures insured;

**b**. Previous types and amounts of insurance;

**c**. Limits of Insurance available under this Coverage Part for future payment of damages; and

**d**. Other related factors.

UCP035367

FORM-NUMBER: CG 00 02 04 13

The additional premium will not exceed 200% of the annual premium for this Coverage Part.

This endorsement shall set forth the terms, not inconsistent with this section, applicable to the Supplemental Extended Reporting Period, including a provision to the effect that the insurance afforded for claims first received during such period is excess over any other valid and collectible insurance available under policies in force after the Supplemental Extended Reporting Period starts.

**6**. If the Supplemental Extended Reporting Period is in effect, we will provide the supplemental aggregate limits of insurance described below, but only for claims first received and recorded during the Supplemental Extended Reporting Period.

The supplemental aggregate limits of insurance will be equal to the dollar amount shown in the Declarations in effect at the end of the policy period for such of the following limits of insurance for which a dollar amount has been entered:

General Aggregate Limit Products-Completed Operations Aggregate Limit

Paragraphs **2**. and **3**. of Section **III** -- Limits Of Insurance will be amended accordingly. The Personal and Advertising Injury Limit, the Each Occurrence Limit and the Damage To Premises Rented To You Limit shown in the Declarations will then continue to apply, as set forth in Paragraphs **4., 5**. and **6**. of that section.

## SECTION VI -- DEFINITIONS

**1**. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a**. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b**. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2**. "Auto" means:

**a**. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b**. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3**. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4**. "Coverage territory" means:

**a**. The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b**. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a**. above; or

UCP035368

FORM-NUMBER: CG 00 02 04 13

**c**. All other parts of the world if the injury or damage arises out of:

 **(1)** Goods or products made or sold by you in the territory described in Paragraph **a**. above;

 **(2)** The activities of a person whose home is in the territory described in Paragraph **a**. above, but is away for a short time on your business; or

 **(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

 provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a**. above or in a settlement we agree to.

**5**. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6**. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7**. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8**. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

 **a**. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

 **b**. You have failed to fulfill the terms of a contract or agreement;
 if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**9**. "Insured contract" means:

 **a**. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

 **b**. A sidetrack agreement;

 **c**. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

 **d**. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

 **e**. An elevator maintenance agreement;

 **f**. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

UCP035369

FORM-NUMBER: CG 00 02 04 13

Paragraph **f**. does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11**. "Loading or unloading" means the handling of property:

**a**. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b**. While it is in or on an aircraft, watercraft or "auto"; or

**c**. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;
but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a**. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b**. Vehicles maintained for use solely on or next to premises you own or rent;

**c**. Vehicles that travel on crawler treads;

**d**. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

UCP035370

FORM-NUMBER: CG 00 02 04 13

**e**. Vehicles not described in Paragraph **a., b., c**. or **d**. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

    **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    **(2)** Cherry pickers and similar devices used to raise or lower workers;

**f**. Vehicles not described in Paragraph **a., b., c**. or **d**. above maintained primarily for purposes other than the transportation of persons or cargo.

    However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

    **(1)** Equipment designed primarily for:

    **(a)** Snow removal;

    **(b)** Road maintenance, but not construction or resurfacing; or

    **(c)** Street cleaning;

    **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13**. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14**. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    **a**. False arrest, detention or imprisonment;

    **b**. Malicious prosecution;

    **c**. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    **d**. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    **e**. Oral or written publication, in any manner, of material that violates a person's right of privacy;

    **f**. The use of another's advertising idea in your "advertisement"; or

UCP035371

FORM-NUMBER: CG 00 02 04 13

**g**. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15**. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16**. "Products-completed operations hazard":

**a**. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b**. Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17**. "Property damage" means:

**a**. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b**. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
For the purposes of this insurance, electronic data is not tangible property.
As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from, computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

UCP035372

FORM-NUMBER: CG 00 02 04 13

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a**. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b**. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a**. Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b**. Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c**. Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a**. Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b**. Includes:

UCP035373

Page 28 of 28

FORM-NUMBER: CG 00 02 04 13

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

Copyright 2012 Insurance Services Office, Inc.
ISO Policy Forms

**End of Document**

UCP035374

# EXHIBIT 54

*FORM-NUMBER: CA 00 20 03 10*

**ISO Policy Forms  > Commercial Lines of Business  > COMMERCIAL AUTO  > MOTOR CARRIER COVERAGE FORM**

# FORM-NUMBER: CA 00 20 03 10

---

ADDED-DATE: January, 2009

This insurance policy is proprietary to and copyrighted by Insurance Services, Inc. (ISO). It may be used for reference purposes but may not be used for any other purposes or on behalf of any entity that is not a licensee of ISO for the line of insurance and jurisdiction to which it applies without ISO's written consent. For consent, or to verify licensee status, contact ISO Customer Service at 1-800-888-4ISO.

 Full Text of ISO Report - There is an additional charge for the Word Document (DOC - 150K)

---

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section VI -- Definitions.

## SECTION I -- COVERED AUTOS

Item Two of the Declarations shows the "autos" that are covered "autos" for each of your coverages. The following numerical symbols describe the "autos" that may be covered "autos". The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos".

## A. Description Of Covered Auto Designation Symbols

| Symbol | Description Of Covered Auto Designation Symbols | |
|---|---|---|
| 61 | Any "Auto" | |
| 62 | Owned "Autos" | |
| | Only | Only the "autos" you own (and for Liability Coverage any "trailers" you don't own while connected to a power unit you own). This includes those "autos" you acquire ownership of after the policy begins. |

UCP035375

FORM-NUMBER: CA 00 20 03 10

| Symbol | Description Of Covered Auto Designation Symbols | |
|---|---|---|
| 63 | Owned Private Passenger Type "Autos" Only | Only the "private passenger type" "autos" you own. This includes those "private passenger type" "autos" that you acquire ownership of after the policy begins. |
| 64 | Owned Commercial "Autos" Only | Only those trucks, tractors and "trailers" you own (and for Liability Coverage any "trailers" you don't own while connected to a power unit you own). This includes those trucks, tractors and "trailers" you acquire ownership of after the policy begins. |
| 65 | Owned "Autos" Subject To No-fault | Only those "autos" you own that are required to have no-fault benefits in the state where they are licensed or principally garaged. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the no-fault law in the state where they are licensed or principally garaged. |
| 66 | Owned "Autos" Subject To A Compulsory Uninsured Motorists Law | Only those "autos" you own that, because of the law in the state where they are licensed or principally garaged, are required to have and cannot reject Uninsured Motorists Coverage. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement. |
| 67 | Specifically Described "Autos" | Only those "autos" described in Item Three of the Declarations for which a premium charge is shown (and for Liability Coverage any "trailers" you don't own while attached to any power unit described in Item Three). |
| 68 | Hired "Autos" Only | Only those "autos" you lease, hire, rent or borrow. This does not include any "private passenger type" "auto" you lease, hire, rent or borrow from any member of your household, any of your "employees", partners (if you are a partnership), members (if you are a limited liability company), or agents or members of their households. |
| 69 | "Trailers" In Your Possession Under A Written Trailer | Only those "trailers" you do not own while in your possession under a written "trailer" or equipment interchange agreement in which you assume liability for "loss" to the "trailers" |

UCP035376

FORM-NUMBER: CA 00 20 03 10

| Symbol | Description Of Covered Auto Designation Symbols | |
|---|---|---|
| | Or Equipment | while in your possession. |
| | Interchange | |
| | Agreement | |

| Symbol | Description Of Covered Auto Designation | |
|---|---|---|
| 70 | Your "Trailers" In The Possession Of Anyone Else Under A Written Trailer Interchange Agreement | Only those "trailers" you own or hire while in the possession of anyone else under a written "trailer" interchange agreement. When Symbol 70 is entered next to a Physical Damage Coverage in Item Two of the Declarations, the Physical Damage Coverage exclusion relating to "loss" to a "trailer" in the possession of anyone else does not apply to that coverage. |
| 71 | Non-owned "Autos" Only | Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "private passenger type" "autos" owned by your "employees" or partners (if you are a partnership), members (if you are a limited liability company), or members of their households but only while used in your business or your personal affairs. |
| 79 | Mobile Equipment Subject To Compulsory Or Financial Responsibility Or Other Motor Vehicle Insurance Law Only | Only those "autos" that are land vehicles and that would qualify under the definition of "mobile equipment" under this policy if they were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where they are licensed or principally garaged. |

## B. Owned Autos You Acquire After The Policy Begins

**1**. If Symbols **61, 62, 63, 64, 65, 66** or **79** are entered next to a coverage in Item Two of the Declarations, then you have coverage for "autos" that you acquire of the type described for the remainder of the policy period.

2. But, if Symbol **67** is entered next to a coverage in Item Two of the Declarations, an "auto" you acquire will be a covered "auto" for that coverage only if:

**a**. We already cover all "autos" that you own for that coverage or it replaces an "auto" you previously owned that had that coverage; and

**b**. You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

UCP035377

FORM-NUMBER: CA 00 20 03 10

## C. Certain Trailers, Mobile Equipment And Temporary Substitute Autos

If Liability Coverage is provided by this coverage form, the following types of vehicles are also covered "autos" for Liability Coverage:

**1**. "Trailers" with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.

**2**. "Mobile equipment" while being carried or towed by a covered "auto".

**3**. Any "auto" you do not own while used with the permission of its owner as a temporary substitute for a covered "auto" you own that is out of service because of its:

    **a**. Breakdown;

    **b**. Repair;

    **c**. Servicing;

    **d**. "Loss"; or

    **e**. Destruction.

## SECTION II -- LIABILITY COVERAGE

## A. Coverage

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos". However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".

We will have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

## 1. Who Is An Insured

The following are "insureds":

    **a**. You for any covered "auto".

    **b**. Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

    **(1)** The owner, or any "employee", agent or driver of the owner, or anyone else from whom you hire or borrow a covered "auto".

UCP035378

FORM-NUMBER: CA 00 20 03 10

**(2)** Your "employee" or agent if the covered "auto" is owned by that "employee" or agent or a member of his or her household.

**(3)** Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

**(4)** Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), a lessee or borrower of a covered "auto" or any of their "employees", while moving property to or from a covered "auto".

**(5)** A partner (if you are a partnership), or member (if you are a limited liability company) for a covered "auto" owned by him or her or a member of his or her household.

**c.** The owner or anyone else from whom you hire or borrow a covered "auto" that is a "trailer" while the "trailer" is connected to another covered "auto" that is a power unit, or, if not connected, is being used exclusively in your business.

**d.** The lessor of a covered "auto" that is not a "trailer" or any "employee", agent or driver of the lessor while the "auto" is leased to you under a written agreement if the written agreement between the lessor and you does not require the lessor to hold you harmless and then only when the leased "auto" is used in your business as a "motor carrier" for hire.

**e.** Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.
However, none of the following is an "insured":

**(1)** Any "motor carrier" for hire or his or her agents or "employees", other than you and your "employees":

**(a)** If the "motor carrier" is subject to motor carrier insurance requirements and meets them by a means other than "auto" liability insurance.

**(b)** If the "motor carrier" is not insured for hired "autos" under an "auto" liability insurance form that insures on a primary basis the owners of the "autos" and their agents and "employees" while the "autos" are leased to that "motor carrier" and used in his or her business.

However, Paragraph **(1)** above does not apply if you have leased an "auto" to the for-hire "motor carrier" under a written lease agreement in which you have held that "motor carrier" harmless.

**(2)** Any rail, water or air carrier or its "employees" or agents, other than you and your "employees", for a "trailer" if "bodily injury" or "property damage" or a "covered pollution cost or expense" occurs while the "trailer" is detached from a covered "auto" you are using and:

**(a)** Is being transported by the carrier; or

**(b)** Is being loaded on or unloaded from any unit of transportation by the carrier.

## 2. Coverage Extensions

### a. Supplementary Payments
We will pay for the "insured":

UCP035379

FORM-NUMBER: CA 00 20 03 10

**(1)** All expenses we incur.

**(2)** Up to $ 2,000 for the cost of bail bonds (including bonds for related traffic law violations) required because of an "accident" we cover. We do not have to furnish these bonds.

**(3)** The cost of bonds to release attachments in any "suit" against the "insured" we defend, but only for bond amounts within our Limit of Insurance.

**(4)** All reasonable expenses incurred by the "insured" at our request, including actual loss of earnings up to $ 250 a day because of time off from work.

**(5)** All court costs taxed against the "insured" in any "suit" against the "insured" we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the "insured".

**(6)** All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" against the "insured" we defend; but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance. These payments will not reduce the Limit of Insurance.

**b. Out-of-state Coverage Extension** While a covered "auto" is away from the state where it is licensed we will:

**(1)** Increase the Limit of Insurance for Liability Coverage to meet the limit specified by a compulsory or financial responsibility law of the jurisdiction where the covered "auto" is being used. This extension does not apply to the limit or limits specified by any law governing "motor carriers" of passengers or property.

**(2)** Provide the minimum amounts and types of other coverages, such as no-fault, required of out-of-state vehicles by the jurisdiction where the covered "auto" is being used.
We will not pay anyone more than once for the same elements of "loss" because of these extensions.

## B. Exclusions
This insurance does not apply to any of the following:

### 1. Expected Or Intended Injury
"Bodily injury" or "property damage" expected or intended from the standpoint of the "insured".

### 2. Contractual
Liability assumed under any contract or agreement. But this exclusion does not apply to liability for damages:

**a**. Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

**b**. That the "insured" would have in the absence of the contract or agreement.

### 3. Workers' Compensation

UCP035380

FORM-NUMBER: CA 00 20 03 10

Any obligation for which the "insured" or the "insured's" insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law or any similar law.

**4. Employee Indemnification And Employer's Liability**

"Bodily injury" to:

**a**. An "employee" of the "insured" arising out of and in the course of:

**(1)** Employment by the "insured"; or

**(2)** Performing the duties related to the conduct of the "insured's" business; or

**b**. The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **a**. above.

This exclusion applies:

**(1)** Whether the "insured" may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

But this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits or to liability assumed by the "insured" under an "insured contract". For the purposes of the coverage form, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

**5. Fellow Employee**

"Bodily injury" to:

**a**. Any fellow "employee" of the "insured" arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business; or

**b**. The spouse, child, parent, brother or sister of that fellow "employee" as a consequence of Paragraph **a**. above.

**6. Care, Custody Or Control**

"Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "insured" or in the "insured's" care, custody or control. But this exclusion does not apply to liability assumed under a sidetrack agreement.

**7. Handling Of Property**

"Bodily injury" or "property damage" resulting from the handling of property:

**a**. Before it is moved from the place where it is accepted by the "insured" for movement into or onto the covered "auto"; or

**b**. After it is moved from the covered "auto" to the place where it is finally delivered by the "insured".

**8. Movement Of Property By Mechanical Device**

UCP035381

FORM-NUMBER: CA 00 20 03 10

"Bodily injury" or "property damage" resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto".

### 9. Operations

"Bodily injury" or "property damage" arising out of the operation of:

**a**. Any equipment listed in Paragraphs **6.b**. and **6.c**. of the definition of "mobile equipment"; or

**b**. Machinery or equipment that is on, attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

### 10. Completed Operations

"Bodily injury" or "property damage" arising out of "your work" after that work has been completed or abandoned.
In the exclusion, your work means:

**a**. Work or operations performed by you or on your behalf; and

**b**. Materials, parts or equipment furnished in connection with such work or operations.

Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in Paragraph **a**. or **b**. above.
Your work will be deemed completed at the earliest of the following times:

**(1)** When all of the work called for in your contract has been completed.

**(2)** When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

**(3)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

### 11. Pollution

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**a**. That are, or that are contained in any property that is:

**(1)** Being transported or towed by, handled, or handled for movement into, onto or from, the covered "auto";

**(2)** Otherwise in the course of transit by or on behalf of the "insured"; or

**(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

UCP035382

FORM-NUMBER: CA 00 20 03 10

**b**. Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c**. After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a**. above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

**(1)** The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraphs **6.b**. and **6.c**. of the definition of "mobile equipment".

Paragraphs **b**. and **c**. above of this exclusion do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

**(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

**(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

## 12. War

"Bodily injury" or "property damage" arising directly or indirectly out of:

**a**. War, including undeclared or civil war;

**b**. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c**. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

## 13. Racing

Covered "autos" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply while that covered "auto" is being prepared for such a contest or activity.

## C. Limit Of Insurance

Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for the total of all damages and "covered pollution

UCP035383

FORM-NUMBER: CA 00 20 03 10

cost or expense" combined, resulting from any one "accident" is the Limit of Insurance for Liability Coverage shown in the Declarations.

All "bodily injury", "property damage" and "covered pollution cost or expense" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident".

No one will be entitled to receive duplicate payments for the same elements of "loss" under this coverage form and any Medical Payments Coverage endorsement, Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage endorsement attached to this Coverage Part.

## SECTION III -- TRAILER INTERCHANGE COVERAGE

### A. Coverage

**1**. We will pay all sums you legally must pay as damages because of "loss" to a "trailer" you don't own or its equipment under:

### a. Comprehensive Coverage
From any cause except:

**(1)** The "trailer's" collision with another object; or

**(2)** The "trailer's" overturn.

### b. Specified Causes Of Loss Coverage
Caused by:

**(1)** Fire, lightning or explosion;

**(2)** Theft;

**(3)** Windstorm, hail or earthquake;

**(4)** Flood;

**(5)** Mischief or vandalism; or

**(6)** The sinking, burning, collision or derailment of any conveyance transporting the "trailer".

### c. Collision Coverage
Caused by:

**(1)** The "trailer's" collision with another object; or

**(2)** The "trailer's" overturn.

**2**. We have the right and duty to defend any "insured" against a "suit" asking for these damages. However, we have no duty to defend any "insured" against a "suit" seeking damages for any "loss" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends for a coverage when the Limit of Insurance for that coverage has been exhausted by payment of judgments or settlements.

### 3. Coverage Extensions

UCP035384

FORM-NUMBER: CA 00 20 03 10

The following apply as **Supplementary Payments**. We will pay for you:

**a**. All expenses we incur.

**b**. The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance.

**c**. All reasonable expenses incurred at our request, including actual loss of earnings up to $ 250 a day because of time off from work.

**d**. All court costs taxed against the "insured" in any "suit" against the "insured" we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the "insured".

**e**. All interest on the full amount of any judgment that accrues after entry of the judgment; but our duty to pay interest ends when we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.
These payments will not reduce the Limit of Insurance.

## B. Exclusions

**1**. We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

### a. Nuclear Hazard

**(1)** The explosion of any weapon employing atomic fission or fusion; or

**(2)** Nuclear reaction or radiation, or radioactive contamination, however caused.

### b. War Or Military Action

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**2**. We will not pay for loss of use.

### 3. Other Exclusions
We will not pay for "loss" due and confined to:

**a**. Wear and tear, freezing, mechanical or electrical breakdown.

**b**. Blowouts, punctures or other road damage to tires.
This exclusion does not apply to such "loss" resulting from the total theft of a covered "auto".

## C. Limit Of Insurance

UCP035385

EXHIBIT 54, PAGE 48

FORM-NUMBER: CA 00 20 03 10

The most we will pay for "loss" to any one "trailer" is the least of the following amounts:

**1**. The actual cash value of the damaged or stolen property at the time of the "loss".

**2**. The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

**3**. The Limit of Insurance shown in the Declarations.

## D. Deductible

For each covered "trailer", our obligation to pay:

**1**. The actual cash value of the damaged or stolen property at the time of the "loss" will be reduced by the applicable deductible shown in the Declarations.

**2**. The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality will be reduced by the applicable deductible shown in the Declarations.

**3**. The damages for "loss" that would otherwise be payable will be reduced by the applicable deductible shown in the Declarations prior to the application of the Limit of Insurance shown in the Declarations.

## SECTION IV -- PHYSICAL DAMAGE COVERAGE

## A. Coverage

**1**. We will pay for "loss" to a covered "auto" or its equipment under:

### a. Comprehensive Coverage

From any cause except:

**(1)** The covered "auto's" collision with another object; or

**(2)** The covered "auto's" overturn.

### b. Specified Causes Of Loss Coverage

Caused by:

**(1)** Fire, lightning or explosion;

**(2)** Theft;

**(3)** Windstorm, hail or earthquake;

**(4)** Flood;

**(5)** Mischief or vandalism; or

**(6)** The sinking, burning, collision or derailment of any conveyance transporting the covered "auto".

### c. Collision Coverage

Caused by:

UCP035386

FORM-NUMBER: CA 00 20 03 10

**(1)** The covered "auto's" collision with another object; or

**(2)** The covered "auto's" overturn.

## 2. Towing -- Private Passenger Type Autos

We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered "auto" of the "private passenger type" is disabled. However, the labor must be performed at the place of disablement.

## 3. Glass Breakage -- Hitting A Bird Or Animal -- Falling Objects Or Missiles

If you carry Comprehensive Coverage for the damaged covered "auto", we will pay for the following under Comprehensive Coverage:

**a**. Glass breakage;

**b**. "Loss" caused by hitting a bird or animal; and

**c**. "Loss" caused by falling objects or missiles.

However, you have the option of having glass breakage caused by a covered "auto's" collision or overturn considered a "loss" under Collision Coverage.

## 4. Coverage Extension

### a. Transportation Expenses

We will also pay up to $ 20 per day to a maximum of $ 600 for temporary transportation expense incurred by you because of the total theft of a covered "auto" of the "private passenger type". We will pay only for those covered "autos" for which you carry either Comprehensive or Specified Causes Of Loss Coverage. We will pay for temporary transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered "auto" is returned to use or we pay for its "loss".

### b. Loss Of Use Expenses

For Hired Auto Physical Damage, we will pay expenses for which an "insured" becomes legally responsible to pay for loss of use of a vehicle rented or hired without a driver, under a written rental contract or agreement. We will pay for loss of use expenses if caused by:

**(1)** Other than collision only if the Declarations indicate that Comprehensive Coverage is provided for any covered "auto";

**(2)** Specified Causes Of Loss only if the Declarations indicate that Specified Causes Of Loss Coverage is provided for any covered "auto"; or

**(3)** Collision only if the Declarations indicate that Collision Coverage is provided for any covered "auto".

However, the most we will pay for any expenses for loss of use is $ 20 per day, to a maximum of $ 600.

## B. Exclusions

UCP035387

FORM-NUMBER: CA 00 20 03 10

**1**. We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

   **a. Nuclear Hazard**

   **(1)** The explosion of any weapon employing atomic fission or fusion; or

   **(2)** Nuclear reaction or radiation, or radioactive contamination, however caused.

   **b. War Or Military Action**

   **(1)** War, including undeclared or civil war;

   **(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or

   **(3)** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**2**. We will not pay for "loss" to any of the following:

   **a**. Any covered "auto" while in anyone else's possession under a written "trailer" interchange agreement. But this exclusion does not apply to a loss payee; however, if we pay the loss payee, you must reimburse us for our payment.

   **b**. Any covered "auto" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. We will also not pay for "loss" to any covered "auto" while that covered "auto" is being prepared for such a contest or activity.

   **c**. Tapes, records, discs or similar audio, visual or data electronic devices designed for use with audio, visual or data electronic equipment.

   **d**. Any device designed or used to detect speed-measuring equipment such as radar or laser detectors and any jamming apparatus intended to elude or disrupt speed-measurement equipment.

   **e**. Any electronic equipment, without regard to whether this equipment is permanently installed, that reproduces, receives or transmits audio, visual or data signals.

   **f**. Any accessories used with the electronic equipment described in Paragraph **e**. above.

**3**. Exclusions **2.e.** and **2.f.** do not apply to equipment designed to be operated solely by use of the power from the "auto's" electrical system that, at the time of "loss", is:
   a. Permanently installed in or upon the covered "auto";

   **b**. Removable from a housing unit which is permanently installed in or upon the covered "auto";

   **c**. An integral part of the same unit housing any electronic equipment described in Paragraphs **a**. and **b**. above; or

   **d**. Necessary for the normal operation of the "auto" or the monitoring of the "auto's" operating system.

UCP035388

FORM-NUMBER: CA 00 20 03 10

**4**. We will not pay for "loss" due and confined to:

   **a**. Wear and tear, freezing, mechanical or electrical breakdown.

   **b**. Blowouts, punctures or other road damage to tires.
   This exclusion does not apply to "loss" resulting from the total theft of a covered "auto".

**5**. We will not pay for "loss" to a covered "auto" due to "diminution in value".

## C. Limits Of Insurance

**1**. The most we will pay for "loss" in any one "accident" is the lesser of:

   **a**. The actual cash value of the damaged or stolen property as of the time of "loss"; or

   **b**. The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

**2**. $ 1,000 is the most we will pay for "loss" in any one "accident" to all electronic equipment that reproduces, receives or transmits audio, visual or data signals which, at the time of "loss", is:

   **a**. Permanently installed in or upon the covered "auto" in a housing, opening or other location that is not normally used by the "auto" manufacturer for the installation of such equipment;

   **b**. Removable from a permanently installed housing unit as described in Paragraph **2.a.** above or is an integral part of that equipment; or

   **c**. An integral part of such equipment.

**3**. An adjustment for depreciation and physical condition will be made in determining actual cash value in the event of a total "loss".

**4**. If a repair or replacement results in better than like kind or quality, we will not pay for the amount of the betterment.

## D. Deductible

For each covered "auto", our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to "loss" caused by fire or lightning.

## SECTION V -- MOTOR CARRIER CONDITIONS

The following conditions apply in addition to the Common Policy Conditions:

## A. Loss Conditions

### 1. Appraisal For Physical Damage Loss

If you and we disagree on the amount of "loss", either may demand an appraisal of the "loss". In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

UCP035389

FORM-NUMBER: CA 00 20 03 10

**a**. Pay its chosen appraiser; and

**b**. Bear the other expenses of the appraisal and umpire equally.
If we submit to an appraisal, we will still retain our right to deny the claim.

## 2. Duties In The Event Of Accident, Claim, Suit Or Loss

We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:

**a**. In the event of "accident", claim, "suit" or "loss", you must give us or our authorized representative prompt notice of the "accident" or "loss". Include:

**(1)** How, when and where the "accident" or "loss" occurred;

**(2)** The "insured's" name and address; and

**(3)** To the extent possible, the names and addresses of any injured persons and witnesses.

**b**. Additionally, you and any other involved "insured" must:

**(1)** Assume no obligation, make no payment or incur no expense without our consent, except at the "insured's" own cost.

**(2)** Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit".

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit".

**(4)** Authorize us to obtain medical records or other pertinent information.

**(5)** Submit to examination at our expense, by physicians of our choice, as often as we reasonably require.

**c**. If there is a "loss" to a covered "auto" or its equipment you must also do the following:

**(1)** Promptly notify the police if the covered "auto" or any of its equipment is stolen.

**(2)** Take all reasonable steps to protect the covered "auto" from further damage. Also keep a record of your expenses for consideration in the settlement of the claim.

**(3)** Permit us to inspect the covered "auto" and records proving the "loss" before its repair or disposition.

**(4)** Agree to examination under oath at our request and give us a signed statement of your answers.

## 3. Legal Action Against Us

No one may bring a legal action against us under this coverage form until:

**a**. There has been full compliance with all the terms of this coverage form; and

UCP035390

FORM-NUMBER: CA 00 20 03 10

**b**. Under Liability Coverage, we agree in writing that the "insured" has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the "insured's" liability.

### 4. Loss Payment -- Physical Damage Coverages

At our option we may:

**a**. Pay for, repair or replace damaged or stolen property;

**b**. Return the stolen property at our expense. We will pay for any damage that results to the "auto" from the theft; or

**c**. Take all or any part of the damaged or stolen property at an agreed or appraised value.
If we pay for the "loss", our payment will include the applicable sales tax for the damaged or stolen property.

### 5. Transfer Of Rights Of Recovery Against Others To Us

If any person or organization to or for whom we make payment under this coverage form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "accident" or "loss" to impair them.

## B. General Conditions

### 1. Bankruptcy

Bankruptcy or insolvency of the "insured" or the "insured's" estate will not relieve us of any obligation under this coverage form.

### 2. Concealment, Misrepresentation Or Fraud

This coverage form is void in any case of fraud by you at any time as it relates to this coverage form. It is also void if you or any other "insured", at any time, intentionally conceals or misrepresents a material fact concerning:

**a**. This coverage form;

**b**. The covered "auto";

**c**. Your interest in the covered "auto"; or

**d**. A claim under this coverage form.

### 3. Liberalization

If we revise this coverage form to provide more coverage without additional premium charge, your policy will automatically provide the additional coverage as of the day the revision is effective in your state.

### 4. No Benefit To Bailee -- Physical Damage Coverages

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this coverage form.

UCP035391

FORM-NUMBER: CA 00 20 03 10

## 5. Other Insurance -- Primary And Excess Insurance Provisions

**a**. While any covered "auto" is hired or borrowed from you by another "motor carrier", this coverage form's liability coverage is:

**(1)** Primary if a written agreement between you as the lessor and the other "motor carrier" as the lessee requires you to hold the lessee harmless.

**(2)** Excess over any other collectible insurance if a written agreement between you as the lessor and the other "motor carrier" as the lessee does not require you to hold the lessee harmless.

**b**. While any covered "auto" is hired or borrowed by you from another "motor carrier" this coverage form's liability coverage is:

**(1)** Primary if a written agreement between the other "motor carrier" as the lessor and you as the lessee does not require the lessor to hold you harmless, and then only while the covered "auto" is used exclusively in your business as a "motor carrier" for hire.

**(2)** Excess over any other collectible insurance if a written agreement between the other "motor carrier" as the lessor and you as the lessee requires the lessor to hold you harmless.

**c**. While a covered "auto" which is a "trailer" is connected to a power unit, this coverage form's Liability Coverage is:

**(1)** Provided on the same basis, either primary or excess, as the liability coverage provided for the power unit if the power unit is a covered "auto".

**(2)** Excess if the power unit is not a covered "auto".

**d**. Any Trailer Interchange Coverage provided by this coverage form is primary for any covered "auto".

**e**. Except as provided in Paragraphs **a., b., c**. and **d**. above, this coverage form provides primary insurance for any covered "auto" you own and excess insurance for any covered "auto" you don't own.

**f**. For Hired Auto Physical Damage Coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own. However, any "auto" that is leased, hired, rented or borrowed with a driver is not a covered "auto".

**g**. Regardless of the provisions of Paragraphs **a., b., c., d**. and **e**. above, this coverage form's Liability Coverage is primary for any liability assumed under an "insured contract".

**h**. When this coverage form and any other coverage form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our coverage form bears to the total of the limits of all the coverage forms and policies covering on the same basis.

## 6. Premium Audit

UCP035392

FORM-NUMBER: CA 00 20 03 10

**a**. The estimated premium for this coverage form is based on the exposures you told us you would have when this policy began. We will compute the final premium due when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the first Named Insured will be billed for the balance, if any. The due date for the final premium or retrospective premium is the date shown as the due date on the bill. If the estimated total premium exceeds the final premium due, the first Named Insured will get a refund.

**b**. If this policy is issued for more than one year, the premium for this coverage form will be computed annually based on our rates or premiums in effect at the beginning of each year of the policy.

**7. Policy Period, Coverage Territory**

Under this coverage form, we cover "accidents" and "losses" occurring:

**a**. During the policy period shown in the Declarations; and

**b**. Within the coverage territory.
The coverage territory is:

**(1)** The United States of America;

**(2)** The territories and possessions of the United States of America;

**(3)** Puerto Rico;

**(4)** Canada; and

**(5)** Anywhere in the world if:

**(a)** A covered "auto" of the "private passenger type" is leased, hired, rented or borrowed without a driver for a period of 30 days or less; and

**(b)** The "insured's" responsibility to pay damages is determined in a "suit" on the merits, in the United States of America, the territories and possessions of the United States of America, Puerto Rico, or Canada or in a settlement we agree to.
We also cover "loss" to, or "accidents" involving, a covered "auto" while being transported between any of these places.

**8. Two Or More Coverage Forms Or Policies Issued By Us**

If this coverage form and any other coverage form or policy issued to you by us or any company affiliated with us apply to the same "accident", the aggregate maximum Limit of Insurance under all the coverage forms or policies shall not exceed the highest applicable Limit of Insurance under any one coverage form or policy. This condition does not apply to any coverage form or policy issued by us or an affiliated company specifically to apply as excess insurance over this coverage form.

## SECTION VI -- DEFINITIONS

**A**. "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

UCP035393

FORM-NUMBER: CA 00 20 03 10

**B**. "Auto" means:

**1**. A land motor vehicle, "trailer" or semitrailer designed for travel on public roads; or

**2**. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**C**. "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

**D**. "Covered pollution cost or expense" means any cost or expense arising out of:

**1**. Any request, demand, order or statutory or regulatory requirement that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**2**. Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

"Covered pollution cost or expense" does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**a**. That are, or that are contained in any property that is:

**(1)** Being transported or towed by, handled, or handled for movement into, onto or from the covered "auto";

**(2)** Otherwise in the course of transit by or on behalf of the "insured"; or

**(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

**b**. Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c**. After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a**. above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

**(1)** The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraph **6.b**. or **6.c**. of the definition of "mobile equipment".

UCP035394

FORM-NUMBER: CA 00 20 03 10

Paragraphs **b**. and **c**. above do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

**(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

**(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**E**. "Diminution in value" means the actual or perceived loss in market value or resale value which results from a direct and accidental "loss".

**F**. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**G**. "Insured" means any person or organization qualifying as an insured in the Who Is An Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

**H**. "Insured contract" means:

**1**. A lease of premises;

**2**. A sidetrack agreement;

**3**. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**4**. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**5**. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement; or

**6**. That part of any other contract or agreement, entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

An "insured contract" does not include that part of any contract or agreement:

**a**. That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing; or

**b**. That pertains to the loan, lease or rental of an "auto" to you or any of your employees, if the "auto" is loaned, leased or rented with a driver; or

UCP035395

EXHIBIT 54, PAGE 58

FORM-NUMBER: CA 00 20 03 10

   **c**. That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a covered "auto" unless the covered "auto" is used in your business as a "motor carrier" for hire as in Section **II**, Paragraph **A.1.d**. of the Who Is An Insured provision.

**I**. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**J**. "Loss" means direct and accidental loss or damage.

**K**. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   **1**. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   **2**. Vehicles maintained for use solely on or next to premises you own or rent;

   **3**. Vehicles that travel on crawler treads;

   **4**. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      **a**. Power cranes, shovels, loaders, diggers or drills; or

      **b**. Road construction or resurfacing equipment such as graders, scrapers or rollers;

   **5**. Vehicles not described in Paragraph **1., 2., 3**. or **4**. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      **a**. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      **b**. Cherry pickers and similar devices used to raise or lower workers; or

   **6**. Vehicles not described in Paragraph **1., 2., 3**. or **4**. above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

      **a**. Equipment designed primarily for:

      **(1)** Snow removal;

      **(2)** Road maintenance, but not construction or resurfacing; or

      **(3)** Street cleaning;

      **b**. Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

UCP035396

FORM-NUMBER: CA 00 20 03 10

**c**. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**L**. "Motor carrier" means a person or organization providing transportation by "auto" in the furtherance of a commercial enterprise.

**M**. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**N**. "Private passenger type" means a private passenger or station wagon type "auto" and includes an "auto" of the pickup or van type if not used for business purposes.

**O**. "Property damage" means damage to or loss of use of tangible property.

**P**. "Suit" means a civil proceeding in which:

**1**. Damages because of "bodily injury" or "property damage"; or

**2**. A "covered pollution cost or expense", to which this insurance applies, are alleged. "Suit" includes:

**a**. An arbitration proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" must submit or does submit with our consent; or

**b**. Any other alternative dispute resolution proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" submits with our consent.

**Q**. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**R**. "Trailer" includes a semitrailer or a dolly used to convert a semitrailer into a trailer. But for Trailer Interchange Coverage only, "trailer" also includes a container.

Copyright 2009 Insurance Services Office, Inc.
ISO Policy Forms

UCP035397

# EXHIBIT 55

**Policy Number: DI00368-03**
Renewal of Number: DI00368-02

| | |
|---|---|
| **DICE PRODUCERS PORTFOLIO DECLARATIONS** |  |

**Atlantic Specialty Insurance Company**
150 Royall Street
Canton, MA 02021

**Item 1. Named Insured and Mailing Address**
Publicis Groupe/MMS USA Holdings, Inc.



**Agent Name and Address**

Item 2. Policy Period      From:     10-01-2012          To:   10-01-2013
At 12:01AM Standard Time at the Mailing Address Shown Above

Item 3. Coverage

|  | Limit of Liability Each Loss | Deductible Each Loss |
|---|---|---|
| A.   Props, Sets & Wardrobe | | |
| B.   Extra Expense | | |
| C.   Third Party Property Damage | | |
| D.   Miscellaneous Equipment | | |
| E.   Negative Film | | |
| F.   Faulty Stock | | |
| G.   Cast | | |
| Optional Coverage Endorsements | | |
| Civil Authority | | |
| Money and Currency | | |
| Electronic Data Processing   - Hardware | | |
| - Software | | |
| - Extra Expense | | |
| Library Stock | | |
| Strike Coverage | | |

Item 4. Policy Premium
   Deposit Premium
   Taxes, Surcharges & Fees
   Total

Item 5. Form(s) and Endorsement(s) made a part of the policy at time of issue:
   Per form ILU 003 Attached

Item 6. Insurance is provided against those perils and for those coverages under those sections for which a specific amount or limit of liability is shown in schedules incorporated herein, subject to all terms of the policy and all forms and endorsements made a part hereof.

Countersigned:

Date: 12-17-2012

THIS POLICY TOGETHER WITH THE POLICY CONDITIONS, COVERAGE PARTS AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY

**DI DEC 100 (08-06)**                                                                                    **Page 1**

**ATL004098**





caused by that fire if the fire would be covered under this Coverage.

Exclusions a.(1) through a.(3) apply whether or not the loss event results in widespread damage or affects a substantial area.

## II. EXCLUSIONS

a.  We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

(2)  (a)  War, including undeclared or civil war;

(b)  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(c)  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

(3)  (a)  Any weapon employing atomic fission, atomic fusion or radioactive force; or

(b)  Nuclear reaction or radiation, or radioactive contamination from any other cause. But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage

**Policy Number: DI00368-04**
Renewal of Number: DI00368-03



| | |
|---|---|
| **DICE PRODUCERS PORTFOLIO DECLARATIONS** | Atlantic Specialty Insurance Company<br>150 Royall Street<br>Canton, Massachusetts 02021 |

Item 1. Named Insured and Mailing Address              Agent Name and Address

Publicis Groupe/MMS USA Holdings, Inc

Item 2. Policy Period          From:   10/01/2013              To:   10/01/2014
                               At 12:01AM Standard Time at the Mailing Address Shown Above

Item 3. Coverage

|   |                                          | Limit of Liability Each Loss | Deductible Each Loss |
|---|------------------------------------------|------------------------------|----------------------|
| A. | Props, Sets & Wardrobe                  | $                            | $                    |
| B. | Extra Expense                           | $                            | $                    |
| C. | Third Party Property Damage             | $                            | $                    |
| D. | Miscellaneous Equipment                 | $                            | $                    |
|    | Includes Non-Owned Auto PD              | $                            |                      |
| E. | Negative Film                           | $                            | $                    |
| F. | Faulty Stock & Camera Processing        | $                            | $                    |
| G. | Cast                                    | $                            | $                    |
|    | Optional Coverage Endorsements          |                              |                      |
|    | Accounts Receivable                     | $                            | $                    |
|    | Producers Indemnity Coverage            | $                            | $                    |
|    | Confiscation                            | $                            | $                    |
|    | Civil Authority Coverage                | $                            | $                    |
|    | Money and Currency                      | $                            | $                    |
|    | Resumption of Operations                | $                            | $                    |
|    | Strike Coverage                         | $                            | $                    |

Item 4. Policy Premium                        $
        Taxes, Surcharges & Fees              $
        Total                                 $
        Deposit Premium                       $

Item 5. Form(s) and Endorsement(s) made a part of the policy at time of issue:
Per ILU 003 Attached

Item 6. Insurance is provided against those perils and for those coverages under those sections for which a specific amount or limit of liability is shown in schedules incorporated herein, subject to all terms of the policy and all forms and endorsements made a part hereof.

Countersigned:
Date: _____          By: _____
                                                         Authorized Representative

THIS POLICY TOGETHER WITH THE POLICY CONDITIONS, COVERAGE PARTS AND FORMS
AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY

**ATL004100**





(3) (a) War, including undeclared or civil war;

(b) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(c) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

(4) (a) Any weapon employing atomic fission, atomic fusion or radioactive force; or

(b) Nuclear reaction or radiation, or radioactive contamination from any other cause. But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage caused by that fire if the fire would be covered under this policy.

Exclusions a.(1) through a.(4) apply whether or not the loss event results in widespread damage or affects a substantial area.



## V. EXCLUSIONS APPLICABLE TO ALL COVERAGES OF THIS POLICY

**a.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

# EXHIBIT 56

5/1/2017                                          Richard Nixon: Campaign Statement About Crime and Drug Abuse.





The American
Presidency Project
Needs Your Support

Make a Gift

Consider a
*tax-deductible*
donation &
click here

Document Archive
• Public Papers of the Presidents
• State of the Union
   Addresses & Messages
• Inaugural Addresses
• Farewell Addresses
• Weekly Addresses
• Fireside Chats
• News Conferences
• Executive Orders
• Proclamations
• Signing Statements
• Press Briefings
• Statements of
   Administration Policy
• Economic Report of the President
• Debates
• Convention Speeches
• Party Platforms
• 2016 Election Documents
• 2012 Election Documents
• 2008 Election Documents
• 2004 Election Documents
• 1960 Election Documents
• 2017 Transition
• 2009 Transition
• 2001 Transition
Data Archive
Data Index
Media Archive
Audio/Video Index
Elections
Election Index
Florida 2000
Links
Presidential Libraries

View Public Papers by
Month and Year
Month ▼   Year ▼

☐ INCLUDE documents
from the Office of the Press
Secretary

☐ INCLUDE election
campaign documents
View PPPUS

Search the Entire
Document Archive
Enter keyword: [   ] ❓

# RICHARD NIXON
XXXVII *President of the United States: 1969-1974*

381 - Campaign Statement About Crime and Drug Abuse.
October 28, 1972

Like 13K
Tweet
G+1

COLLECTION:
*Public Papers
of the Presidents*

Richard Nixon
1972
Font Size:
Ⓐ Ⓐ Ⓐ

🖶 Print
Share

The American
Presidency Project
**facebook**

Name:
The American
Presidency Project

Fans:
13328
Promote Your Page Too

FROM the day we took office, this Administration has made the battle against crime and drug abuse one of our highest domestic priorities.

During the two preceding Administrations, serious crime in America had increased by 122 percent. Drug addiction had mushroomed into a national scandal during those permissive years, with the number of heroin addicts in this country more than doubling from 1965 to 1969.

Now, through the outstanding efforts of our local police forces and with massive Federal support, we have succeeded in stopping the spiraling growth in criminal activity. The FBI crime index showed an increase of only one percent for the first half of this year--the closest the Nation has come to an actual decrease since the index began 12 years ago. In nearly half of our Nation's largest cities-- including Cleveland, Columbus, Youngstown, Akron, and Purina, Ohio--crime has already begun to decrease.

As a result of our total war on drug abuse, the rate of growth in new heroin addiction has declined dramatically since 1969. By next June, we will have created the capacity to treat up to 250,000 heroin addicts annually--a thirty-fold increase over the amount of federally funded drug treatment which existed when I took office.

A key to our successes against the drug menace has been the all-out attack on drug pushers. The pusher's crime is one of the most reprehensible known to man-the enslavement of other human beings to a life of degradation, dependence, and suffering. The punishment for this crime must be strict, and it must be certain.

We can be encouraged that Federal narcotics law enforcement officials are arresting pushers at twice the rate of the previous Administration, that illicit drug seizures have quadrupled in the past 4 years, and that more narcotics traffickers are being brought to justice than ever before.

Here in Ohio, the Federal Government has already put almost $6 million of treatment funds into communities across the State, with further grants nearing completion. The U.S. Office for Drug Abuse Law Enforcement, which I created last January, is currently working with State and local enforcement officials in Cleveland, Columbus, and Cincinnati to root out the heroin traffickers and bring them to justice.

Similar efforts are being pressed in other cities throughout the country, but much still remains to be done. To keep the pressure on, I intend to take the following steps:

--I will urge the Congress to appropriate whatever funds are needed for Federal drug law enforcement and to build the clinics needed to treat those addicts who seek help.

--I will expand our present massive funding for local law enforcement assistance, and will again ask the Congress to enact my proposal for law enforcement special revenue sharing.

--I will appoint judges who will help to strengthen the peace forces as against the criminal forces in our country, and who will oppose without equivocation the permissive trend toward light or suspended sentences for convicted drug pushers.

--I will ask the Congress to amend the Federal drug statutes so as to require tough, mandatory sentences for heroin traffickers.

--I will not hesitate to suspend all military and economic assistance to any country which condones or protects the international drug traffic.

UCP035398

EXHIBIT 56, PAGE 65

Richard Nixon: Campaign Statement About Crime and Drug Abuse


AND    OR    NOT

Limit by Year
From: 1789 ▼
To  : 2017 ▼
Limit results per page
30 ▼

☐ INCLUDE documents from the Office of the Press Secretary

☐ INCLUDE election campaign documents

Search

Instructions
You can search the Public Papers in two ways:

**1. Search by Keyword and Year**
You can search by keyword and choose the range of years within your search by filling out the boxes under Search the Public Papers.

**2. View by Month and/or Year**
Select the month and/or year you would like information about and press View Public Papers. Then choose a Public Paper and the page will load for you.

*Search Engine provided by the Harry S. Truman Library. Our thanks to*
*Jim Borwick and Dr. Rafee Che Kassim at Project Whistlestop for critical assistance in the implementation of the search function, and to Scott Roley at the Truman Library for facilitating this collaboration.*

--I will continue to carry out my 10-year reform program for the Federal prison system.

My goal for the next 4 years is for every American city to begin realizing the kind of victories in the war on crime which we have already achieved in the Nation's Capital--where the crime rate has been cut in half since my Administration took office, and where heroin overdose deaths have almost disappeared.

This kind of progress can and must be made all across America. By winning the war on crime and drugs, we can restore the social climate of order and justice which will assure our society of the freedom it must have to build and grow.

---

*Note: The statement was released at Cleveland, Ohio, prior to an 85-mile Presidential motorcade through eastern Ohio communities between Cleveland and Youngstown.*

---

**Citation:** Richard Nixon: "Campaign Statement About Crime and Drug Abuse.," October 28, 1972. Online by Gerhard Peters and John T. Woolley, *The American Presidency Project*. http://www.presidency.ucsb.edu/ws/?pid=3665.

© 1999-2017 - Gerhard Peters and John T. Woolley - The American Presidency Project ™



EXHIBIT 56, PAGE 66        UCP035399

2/2

# EXHIBIT 57

5/1/2017                                    Ronald Reagan: Radio Address to the Nation on Federal Drug Policy



  

## RONALD REAGAN
XL *President of the United States: 1981-1989*

**Radio Address to the Nation on Federal Drug Policy**
October 2, 1982

Like 13K

Tweet

G+1



**The American Presidency Project Needs Your Support**

**Make a Gift**

Consider a *tax-deductible* donation & click here

**Document Archive**
- Public Papers of the Presidents
- State of the Union Addresses & Messages
- Inaugural Addresses
- Farewell Addresses
- Weekly Addresses
- Fireside Chats
- News Conferences
- Executive Orders
- Proclamations
- Signing Statements
- Press Briefings
- Statements of Administration Policy
- Economic Report of the President
- Debates
- Convention Speeches
- Party Platforms
- 2016 Election Documents
- 2012 Election Documents
- 2008 Election Documents
- 2004 Election Documents
- 1960 Election Documents
- 2017 Transition
- 2009 Transition
- 2001 Transition

**Data Archive**
Data Index

**Media Archive**
Audio/Video Index

**Elections**
Election Index
Florida 2000

**Links**
Presidential Libraries

**View Public Papers by Month and Year**
[Month ▼]  [Year ▼]

☐ INCLUDE documents from the Office of the Press Secretary

☐ INCLUDE election campaign documents

[View PPPUS]

**Search the Entire Document Archive**
Enter keyword: ❓
[                    ]

*The President.* My fellow Americans, those of you who tuned in a few weeks ago may remember that the topic of my broadcast was crime. Well, this week I'd like to narrow that subject down to drugs, an especially vicious virus of crime.

In the last few days, I've had two reports on drugs in America. First, Nancy returned from a trip to Alabama, Mississippi, and Arkansas-one of the many trips she's made, talking to young people and their parents about the drug epidemic. Well, I thought it might be fitting if she told you herself of what she's learned about the drug problem. So, Nancy.

*Mrs. Reagan.* Thank you.

To everyone at home, I have to tell you that few things in my life have frightened me as much as the drug epidemic among our children. I wish I could tell you all the accounts I've heard—stories of families where lying replaces trust, hate replaces love; stories of children stealing from their mothers' purses; stories of parents not knowing about drugs, and then not believing that the children were on them, and finally not understanding that help was available. I've heard time and again of children with excellent grades, athletic promise, outgoing personalities, but who, because of drugs, became shells of their former selves.

I won't burden you with all the terrifying statistics, but there's one that's especially troubling. While the health of most Americans has been improving, young people between 15 and 24 have a higher death rate than 20 years ago. And alcohol and drugs are one reason for this.

But there are also some very positive signs on the prevention and treatment fronts, especially with the parents movement. People finally are facing up to drug abuse. They're banding together, and they're making real progress. And I just want to say a heartfelt "thank you" to all those people out there who are working so hard to get drug abuse under control.

*The President.* Thank you, Nancy.

Now, regarding the other report I mentioned. In the next few days we'll announce the administration's new strategy for the prevention of drug abuse and drug trafficking. This is a bold, confident plan, and I'm elated. For too long the people in Washington took the attitude that the drug problem was so large nothing could be done about it. Well, we don't accept this sit-on-your-hands kind of thinking. We've decided to do more than pay lip service to the problem, and we started where narcotics crime was the worst: south Florida.

This garden spot had turned into a battlefield for competing drugpushers who were terrorizing Florida's citizens. I established a task force under Vice President Bush's leadership to help the citizens of south Florida fight back. As part of a coordinated plan, we beefed up the number of judges, prosecutors, and law enforcement people. We used military radar and intelligence to detect drug traffickers, which, until we changed the law, could not be done. We increased efforts overseas to cut drugs off before they left other countries' borders.

Well, the results of our task force have been dramatic. The Vice President tells me drug-related arrests are up over 40 percent, the amount of marijuana seized is up about 80 percent, and the amount of cocaine seized has more than doubled. The important thing is we're hurting the traffickers. It's true that when we close off one place they can move somewhere else. But one thing is different now: We're going to be waiting for them. To paraphrase Joe Louis, they can run but they can't hide.



COLLECTION:
*Public Papers of the Presidents*

Ronald Reagan
1982: Book II
Location:

United States
Maryland
Font Size:
A A A

🖨 Print
Share

The American Presidency Project

facebook
Name:
The American Presidency Project

Fans:
13328
Promote Your Page Too

UCP035400

EXHIBIT 57, PAGE 67

5/1/2017

Ronald Reagan: Radio Address to the Nation on Federal Drug Policy



○ AND  ○ OR  ○ NOT

**Limit by Year**

From : 1789 ▾
To   : 2017 ▾

Limit results per page
30 ▾

☐ *INCLUDE* documents from the Office of the Press Secretary

☐ *INCLUDE* election campaign documents

[ Search ]

**Instructions**

You can search the Public Papers in two ways:

**1. Search by Keyword and Year**
You can search by keyword and choose the range of years within your search by filling out the boxes under Search the Public Papers.

**2. View by Month and/or Year**
Select the month and/or year you would like information about and press View Public Papers. Then choose a Public Paper and the page will load for you.

*Search Engine provided by the Harry S. Truman Library. Our thanks to Jim Borwick and Dr. Rafee Che Kassim at Project Whistlestop for critical assistance in the implementation of the search function, and to Scott Roley at the Truman Library for facilitating this collaboration.*

The strategy I just received will help us duplicate the south Florida experience for the entire United States. We're undertaking a narcotics policy that might be termed "hot pursuit." We're not just going to let them go somewhere else; we're going to be on their tail.

Now, you probably wonder why I'm so optimistic. Well, for the first time, the actions of the different Government agencies and departments dealing with narcotics are being coordinated. There are 9 departments and 33 agencies of Government that have some responsibility in the drug area, but until now, the activities of these agencies were not being coordinated. Each was fighting its own separate battle against drugs. Now, for the very first time, the Federal Government is waging a planned, concerted campaign.

Previous administrations had drug strategies, but they didn't have the structure to carry them out. We now have that structure.

In addition to the enforcement element, our strategy will also focus on international cooperation, education, and prevention-which Nancy's very interested in—detoxification and treatment and research.

The mood toward drugs is changing in this country, and the momentum is with us. We're making no excuses for drugs—hard, soft, or otherwise. Drugs are bad, and we're going after them. As I've said before, we've taken down the surrender flag and run up the battle flag. And we're going to win the war on drugs.

Till next week, thanks for listening, and God bless you.

---

*Note: The President spoke at 12:06 p.m. from Camp David, Md.*

---

**Citation:** Ronald Reagan: "Radio Address to the Nation on Federal Drug Policy," October 2, 1982. Online by Gerhard Peters and John T. Woolley, *The American Presidency Project.* http://www.presidency.ucsb.edu/ws/?pid=43085.

Home     Contact

© 1999-2017 - Gerhard Peters and John T. Woolley - The American Presidency Project ™



708,236 Pageviews
Apr 1st - May 1st

UCP035401

EXHIBIT 57, PAGE 68

# EXHIBIT 58



The American Presidency Project™

John Woolley and Gerhard Peters

HOME   DATA   DOCUMENTS   ELECTIONS   MEDIA   LINKS



## LYNDON B. JOHNSON
### XXXVI President of the United States: 1963-1969

91 - Annual Message to the Congress on the State of the Union.
January 8, 1964

Like 13K

Tweet

G+1

The American Presidency Project Needs Your Support

Make a Gift

Consider a tax-deductible donation & click here



**Document Archive**
• Public Papers of the Presidents
• State of the Union Addresses & Messages
• Inaugural Addresses
• Farewell Addresses
• Weekly Addresses
• Fireside Chats
• News Conferences
• Executive Orders
• Proclamations
• Signing Statements
• Press Briefings
• Statements of Administration Policy
• Economic Report of the President
• Debates
• Convention Speeches
• Party Platforms
• 2016 Election Documents
• 2012 Election Documents
• 2008 Election Documents
• 2004 Election Documents
• 1960 Election Documents
• 2017 Transition
• 2009 Transition
• 2001 Transition
**Data Archive**
Data Index
**Media Archive**
Audio/Video Index
**Elections**
Election Index
Florida 2000
**Links**
Presidential Libraries

**View Public Papers by Month and Year**
[Month ▼]  [Year ▼]

☐ INCLUDE documents from the Office of the Press Secretary

☐ INCLUDE election campaign documents

[View PPPUS]

**Search the Entire Document Archive**
Enter keyword: [       ] [?]

[ As delivered in person before a joint session ]

Mr. Speaker, Mr. President, Members of the House and Senate, my fellow Americans:

I will be brief, for our time is necessarily short and our agenda is already long.

Last year's congressional session was the longest in peacetime history. With that foundation, let us work together to make this year's session the best in the Nation's history.

Let this session of Congress be known as the session which did more for civil rights than the last hundred sessions combined; as the session which enacted the most far-reaching tax cut of our time; as the session which declared all-out war on human poverty and unemployment in these United States; as the session which finally recognized the health needs of all our older citizens; as the session which reformed our tangled transportation and transit policies; as the session which achieved the most effective, efficient foreign aid program ever; and as the session which helped to build more homes, more schools, more libraries, and more hospitals than any single session of Congress in the history of our Republic.

All this and more can and must be done. It can be done by this summer, and it can be done without any increase in spending. In fact, under the budget that I shall shortly submit, it can be done with an actual reduction in Federal expenditures and Federal employment.

We have in 1964 a unique opportunity and obligation--to prove the success of our system; to disprove those cynics and critics at home and abroad who question our purpose and our competence.

If we fail, if we fritter and fumble away our opportunity in needless, senseless quarrels between Democrats and Republicans, or between the House and the Senate, or between the South and North, or between the Congress and the administration, then history will rightfully judge us harshly. But if we succeed, if we can achieve these goals by forging in this country a greater sense of union, then, and only then, can we take full satisfaction in the State of the Union.

II.

Here in the Congress you can demonstrate effective legislative leadership by discharging the public business with clarity and dispatch, voting each important proposal up, or voting it down, but at least bringing it to a fair and a final vote.

Let us carry forward the plans and programs of John Fitzgerald Kennedy--not because of our sorrow or sympathy, but because they are right.

In his memory today, I especially ask all members of my own political faith, in this election year, to put your country ahead of your party, and to always debate principles; never debate personalities.

For my part, I pledge a progressive administration which is efficient, and honest and frugal. The budget to be submitted to the Congress shortly is in full accord with this pledge.

It will cut our deficit in half--from $10 billion to $4,900 million. It will be, in proportion to our national output, the smallest budget since 1951.



COLLECTION:
Public Papers of the Presidents

Lyndon B. Johnson 1963-64: Book I
Location:

★ ★ ★ ★ ★
★ ★ ★

District of Columbia Washington

Font Size:
A A A

Print

Share

The American Presidency Project
facebook

Name:
The American Presidency Project

Fans:
13328
Promote Your Page Too

UCP035402

5/1/2017                                    Lyndon B. Johnson: Annual Message to the Congress on the State of the Union.



○ AND   ○ OR   ○ NOT

[                    ]

**Limit by Year**
From : 1789 ▾
To   : 2017 ▾
Limit results per page
30 ▾

☐ *INCLUDE* documents from the Office of the Press Secretary
☐ *INCLUDE* election campaign documents

[ Search ]

**Instructions**
You can search the Public Papers in two ways:

**1. Search by Keyword and Year**
You can search by keyword and choose the range of years within your search by filling out the boxes under Search the Public Papers.

**2. View by Month and/or Year**
Select the month and/or year you would like information about and press View Public Papers. Then choose a Public Paper and the page will load for you.

*Search Engine provided by the Harry S. Truman Library. Our thanks to Jim Borwick and Dr. Rafee Che Kassim at Project Whistlestop for critical assistance in the implementation of the search function, and to Scott Roley at the Truman Library for facilitating this collaboration.*

It will call for a substantial reduction in Federal employment, a feat accomplished only once before in the last 10 years. While maintaining the full strength of our combat defenses, it will call for the lowest number of civilian personnel in the Department of Defense since 1950.

It will call for total expenditures of $97,900 million--compared to $98,400 million for the current year, a reduction of more than $500 million. It will call for new obligational authority of $103,800 million--a reduction of more than $4 billion below last year's request of $107,900 million.

But it is not a standstill budget, for America cannot afford to stand still. Our population is growing. Our economy is more complex. Our people's needs are expanding.

But by closing down obsolete installations, by curtailing less urgent programs, by cutting back where cutting back seems to be wise, by insisting on a dollar's worth for a dollar spent, I am able to recommend in this reduced budget the most Federal support in history for education, for health, for retraining the unemployed, and for helping the economically and the physically handicapped.

This budget, and this year's legislative program, are designed to help each and every American citizen fulfill his basic hopes--his hopes for a fair chance to make good; his hopes for fair play from the law; his hopes for a full-time job on full-time pay; his hopes for a decent home for his family in a decent community; his hopes for a good school for his children with good teachers; and his hopes for security when faced with sickness or unemployment or old age.

III.

Unfortunately, many Americans live on the outskirts of hope--some because of their poverty, and some because of their color, and all too many because of both. Our task is to help replace their despair with opportunity.

This administration today, here and now, declares unconditional war on poverty in America. I urge this Congress and all Americans to join with me in that effort.

It will not be a short or easy struggle, no single weapon or strategy will suffice, but we shall not rest until that war is won. The richest Nation on earth can afford to win it. We cannot afford to lose it. One thousand dollars invested in salvaging an unemployable youth today can return $40,000 or more in his lifetime.

Poverty is a national problem, requiring improved national organization and support. But this attack, to be effective, must also be organized at the State and the local level and must be supported and directed by State and local efforts.

For the war against poverty will not be won here in Washington. It must be won in the field, in every private home, in every public office, from the courthouse to the White House.

The program I shall propose will emphasize this cooperative approach to help that one-fifth of all American families with incomes too small to even meet their basic needs.

Our chief weapons in a more pinpointed attack will be better schools, and better health, and better homes, and better training, and better job opportunities to help more Americans, especially young Americans, escape from squalor and misery and unemployment rolls where other citizens help to carry them.

Very often a lack of jobs and money is not the cause of poverty, but the symptom. The cause may lie deeper in our failure to give our fellow citizens a fair chance to develop their own capacities, in a lack of education and training, in a lack of medical care and housing, in a lack of decent communities in which to live and bring up their children.

But whatever the cause, our joint Federal-local effort must pursue poverty, pursue it wherever it exists--in city slums and small towns, in sharecropper shacks or in migrant worker camps, on Indian Reservations, among whites as well as Negroes, among the young as well as the aged, in the boom towns and in the depressed areas.

Our aim is not only to relieve the symptom of poverty, but to cure it and, above all, to prevent it. No single piece of legislation, however, is going to suffice.

We will launch a special effort in the chronically distressed areas of Appalachia.

We must expand our small but our successful area redevelopment program.

We must enact youth employment legislation to put jobless, aimless, hopeless youngsters to work on useful projects.

We must distribute more food to the needy through a broader food stamp program.

We must create a National Service Corps to help the economically handicapped of our own country as the Peace Corps now helps those abroad.

UCP035403

We must modernize our unemployment insurance and establish a high-level commission on automation. If we have the brain power to invent these machines, we have the brain power to make certain that they are a boon and not a bane to humanity.

We must extend the coverage of our minimum wage laws to more than 2 million workers now lacking this basic protection of purchasing power.

We must, by including special school aid funds as part of our education program, improve the quality of teaching, training, and counseling in our hardest hit areas.

We must build more libraries in every area and more hospitals and nursing homes under the Hill-Burton Act, and train more nurses to staff them.

We must provide hospital insurance for our older citizens financed by every worker and his employer under Social Security, contributing no more than $1 a month during the employee's working career to protect him in his old age in a dignified manner without cost to the Treasury, against the devastating hardship of prolonged or repeated illness.

We must, as a part of a revised housing and urban renewal program, give more help to those displaced by slum clearance, provide more housing for our poor and our elderly, and seek as our ultimate goal in our free enterprise system a decent home for every American family.

We must help obtain more modern mass transit within our communities as well as low-cost transportation between them.

Above all, we must release $11 billion of tax reduction into the private spending stream to create new jobs and new markets in every area of this land.

IV.

These programs are obviously not for the poor or the underprivileged alone. Every American will benefit by the extension of social security to cover the hospital costs of their aged parents. Every American community will benefit from the construction or modernization of schools, libraries, hospitals, and nursing homes, from the training of more nurses and from the improvement of urban renewal in public transit. And every individual American taxpayer and every corporate taxpayer will benefit from the earliest possible passage of the pending tax bill from both the new investment it will bring and the new jobs that it will create.

That tax bill has been thoroughly discussed for a year. Now we need action. The new budget clearly allows it. Our taxpayers surely deserve it. Our economy strongly demands it. And every month of delay dilutes its benefits in 1964 for consumption, for investment, and for employment.

For until the bill is signed, its investment incentives cannot be deemed certain, and the withholding rate cannot be reduced-and the most damaging and devastating thing you can do to any businessman in America is to keep him in doubt and to keep him guessing on what our tax policy is. And I say that we should now reduce to 14 percent instead of 15 percent our withholding rate.

I therefore urge the Congress to take final action on this bill by the first of February, if at all possible. For however proud we may be of the unprecedented progress of our free enterprise economy over the last 3 years, we should not and we cannot permit it to pause.

In 1963, for the first time in history, we crossed the 70 million job mark, but we will soon need more than 75 million jobs. In 1963 our gross national product reached the $600 billion level--$100 billion higher than when we took office. But it easily could and it should be still $30 billion higher today than it is.

Wages and profits and family income are also at their highest levels in history--but I would remind you that 4 million workers and 13 percent of our industrial capacity are still idle today.

We need a tax cut now to keep this country moving.

V.

For our goal is not merely to spread the work. Our goal is to create more jobs. I believe the enactment of a 35-hour week would sharply increase costs, would invite inflation, would impair our ability to compete, and merely share instead of creating employment. But I am equally opposed to the 45- or 50-hour week in those industries where consistently excessive use of overtime causes increased unemployment.

So, therefore, I recommend legislation authorizing the creation of a tripartite industry committee to determine on an industry-by-industry basis as to where a higher penalty rate for overtime would increase job openings without unduly

UCP035404

increasing costs, and authorizing the establishment of such higher rates.

VI.

Let me make one principle of this administration abundantly clear: All of these increased opportunities--in employment, in education, in housing, and in every field-must be open to Americans of every color. As far as the writ of Federal law will run, we must abolish not some, but all racial discrimination. For this is not merely an economic issue, or a social, political, or international issue. It is a moral issue, and it must be met by the passage this session of the bill now pending in the House.

All members of the public should have equal access to facilities open to the public. All members of the public should be equally eligible for Federal benefits that are financed by the public. All members of the public should have an equal chance to vote for public officials and to send their children to good public schools and to contribute their talents to the public good.

Today, Americans of all races stand side by side in Berlin and in Viet Nam. They died side by side in Korea. Surely they can work and eat and travel side by side in their own country.

VII.

We must also lift by legislation the bars of discrimination against those who seek entry into our country, particularly those who have much needed skills and those joining their families.

In establishing preferences, a nation that was built by the immigrants of all lands can ask those who now seek admission: "What can you do for our country?" But we should not be asking: "In what country were you born?"

VIII.

For our ultimate goal is a world without war, a world made safe for diversity, in which all men, goods, and ideas can freely move across every border and every boundary.

We must advance toward this goal in 1964 in at least 10 different ways, not as partisans, but as patriots.

First, we must maintain--and our reduced defense budget will maintain--that margin of military safety and superiority obtained through 3 years of steadily increasing both the quality and the quantity of our strategic, our conventional, and our antiguerilla forces. In 1964 we will be better prepared than ever before to defend the cause of freedom, whether it is threatened by outright aggression or by the infiltration practiced by those in Hanoi and Havana, who ship arms and men across international borders to foment insurrection. And we must continue to use that strength as John Kennedy used it in the Cuban crisis and for the test ban treaty--to demonstrate both the futility of nuclear war and the possibilities of lasting peace.

Second, we must take new steps--and we shall make new proposals at Geneva--toward the control and the eventual abolition of arms. Even in the absence of agreement, we must not stockpile arms beyond our needs or seek an excess of military power that could be provocative as well as wasteful.

It is in this spirit that in this fiscal year we are cutting back our production of enriched uranium by 25 percent. We are shutting down four plutonium piles. We are closing many nonessential military installations. And it is in this spirit that we today call on our adversaries to do the same.

Third, we must make increased use of our food as an instrument of peace--making it available by sale or trade or loan or donation-to hungry people in all nations which tell us of their needs and accept proper conditions of distribution.

Fourth, we must assure our pre-eminence in the peaceful exploration of outer space, focusing on an expedition to the moon in this decade--in cooperation with other powers if possible, alone if necessary.

Fifth, we must expand world trade. Having recognized in the Act of 1962 that we must buy as well as sell, we now expect our trading partners to recognize that we must sell as well as buy. We are willing to give them competitive access to our market, asking only that they do the same for us.

Sixth, we must continue, through such measures as the interest equalization tax, as well as the cooperation of other nations, our recent progress toward balancing our international accounts.

This administration must and will preserve the present gold value of the dollar.

Seventh, we must become better neighbors with the free states of the Americas, working with the councils of the OAS, with a stronger Alliance for Progress, and with all the men and women of this hemisphere who really believe in liberty and justice for all.

UCP035405

EXHIBIT 58, PAGE 72

Lyndon B. Johnson: Annual Message to the Congress on the State of the Union.

Eighth, we must strengthen the ability of free nations everywhere to develop their independence and raise their standard of living, and thereby frustrate those who prey on poverty and chaos. To do this, the rich must help the poor--and we must do our part. We must achieve a more rigorous administration of our development assistance, with larger roles for private investors, for other industrialized nations, and for international agencies and for the recipient nations themselves.

Ninth, we must strengthen our Atlantic and Pacific partnerships, maintain our alliances and make the United Nations a more effective instrument for national independence and international order.

Tenth, and finally, we must develop with our allies new means of bridging the gap between the East and the West, facing danger boldly wherever danger exists, but being equally bold in our search for new agreements which can enlarge the hopes of all, while violating the interests of none.

In short, I would say to the Congress that we must be constantly prepared for the worst, and constantly acting for the best. We must be strong enough to win any war, and we must be wise enough to prevent one.

We shall neither act as aggressors nor tolerate acts of aggression. We intend to bury no one, and we do not intend to be buried.

We can fight, if we must, as we have fought before, but we pray that we will never have to fight again.

IX.

My good friends and my fellow Americans: In these last 7 sorrowful weeks, we have learned anew that nothing is so enduring as faith, and nothing is so degrading as hate.

John Kennedy was a victim of hate, but he was also a great builder of faith--faith in our fellow Americans, whatever their creed or their color or their station in life; faith in the future of man, whatever his divisions and differences.

This faith was echoed in all parts of the world. On every continent and in every land to which Mrs. Johnson and I traveled, we found faith and hope and love toward this land of America and toward our people.

So I ask you now in the Congress and in the country to join with me in expressing and fulfilling that faith in working for a nation, a nation that is free from want and a world that is free from hate--a world of peace and justice, and freedom and abundance, for our time and for all time to come.

---

**Citation:** Lyndon B. Johnson: "Annual Message to the Congress on the State of the Union.," January 8, 1964. Online by Gerhard Peters and John T. Woolley, *The American Presidency Project*. http://www.presidency.ucsb.edu/ws/?pid=26787.

Home    Contact

© 1999-2017 - Gerhard Peters and John T. Woolley - The American Presidency Project ™



UCP035406

EXHIBIT 58, PAGE 73

# EXHIBIT 59



 Print | Close

# Bill O'Reilly: War on Christmas won by the good guys, but insurgents remain

Published December 15, 2016

You may remember about 10 years ago, "The O'Reilly Factor" began spotlighting companies that refused to say the words "Merry Christmas."

In fact, some of those businesses actually ordered their employees not to say that. Well, that culture war issue ignited. And we won. Most companies stopped the nonsense and Merry Christmas became a common greeting once again. For me, it was interesting to go through that, because some on the far left actually denied there was any controversy at all and claimed that I fabricated it. More lies from a crew that is incapable of telling the truth.

Anyway, this year the American Family Association, based in Tupelo, Miss., Elvis' hometown, has issued its annual "naughty or nice" list. That tells the public which businesses are Christmas-friendly and which are not. This year, the following companies are rated five-star nice: Cracker Barrel, Hobby Lobby, Kirkland's, Lowe's, Michael's and Walmart. I remember at one time, Lowe's was a problem. But obviously that's turned around.

Also on the Christmas-friendly list: Ace Hardware, Banana Republic, Bass Pro Shops, Bed Bath and Beyond, Books-A-Million, Dick's Sporting Goods, Home Depot, JC Penney, Kmart, L.L. Bean, Marshall's, Neiman Marcus, Proflowers.com, Rite Aid, Sam's Club and Toys R Us.

All of those companies use the word "Christmas" in their advertising and promotion.

Now, the naughty companies that kind of marginalized Christmas: Barnes & Noble, Best Buy, Foot Locker, The Gap, The Limited, Nordstrom, Office Depot, Office Max, Petsmart, Staples and Victoria's Secret.

According to the AFA, those companies are not in the Christmas spirit. And that's bad news for them, because Donald Trump is on the case.

"We're going to start saying Merry Christmas again!" he told a rally earlier this week. "How about all those department stores they have the bells and they have the red walls and they have the snow but they don't have Merry Christmas? I think they're going to start putting up Merry Christmas."

Or they will be deported. But seriously, does the Christmas deal really matter? Since the War on Christmas has basically been won, this is a cleanup operation. But the information is valid. Many Americans celebrate Christmas because they believe that Jesus is the savior and his birth should be honored. And because it's a federal holiday, there is no reason to diminish Christmas or insult those who believe in it. Don't like Christmas? Ignore it.

Companies and stores that embrace Christmas obviously will attract folks who feel the same way. The O'Reilly Factor is just happy that most Americans see Christmas as a positive experience. And we're happy we could contribute to that.

Merry Christmas!

*Bill O'Reilly currently serves as the host of FOX News Channel's (FNC) The O'Reilly Factor (weekdays 8PM/ET), the most watched cable news show for the past 13 years. He joined the network in 1996 and is based in New York. Click here for more information on Bill O'Reilly.*

Print | Close

**URL**
http://www.foxnews.com/opinion/2016/12/15/bill-oreilly-war-on-christmas-won-by-good-guys-but-insurgents-remain.html

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. All market data delayed 20 minutes. New Privacy - New Terms of Use (What's New) - FAQ

UCP035407

EXHIBIT 59, PAGE 74

# EXHIBIT 60



 Print   ✖ Close

# Three reasons why the New York Times' War on Christmas denial is all wrong

By Jordan Lorence

Published December 22, 2016

Fox News

The New York Times recently published an article purporting to trace the history of the "War on Christmas."  The article concludes that "there is no evidence of an organized attack on Christmas in the United States," and expressed skepticism about the "alleged liberal antagonism toward the holiday."

As the author would tell it, Fox News host Bill O'Reilly stirred up the passions of his viewers based on a book written in 2005 by another Fox News host, John Gibson, entitled "The War on Christmas."

John Gibson interviewed me for that book, and I detailed the legal battles I and others had fought against Christmas censorship from the mid-1980s.  I even wrote a book in 1987 on the topic that detailed ongoing efforts to suppress celebrating or observing the religious aspects of Christmas – the birth of Jesus Christ.

I can confidently say that the "War on Christmas" was not concocted by people at Fox News in 2005. It really happened. I know because I was there.

Here are three ways the New York Times article got it wrong about the "War on Christmas":

**1. The "War On Christmas" is real, and started well before Fox News even existed**

Here's just one example. When I worked at Concerned Women for America, we litigated a case against the Seminole County, Florida School District in 1985 in which officials at the Tuscawilla Middle School removed the songs, "Silent Night" and "Hanukkah Dance" from the middle school choir concert on the objection of one parent.

Officials at another school in the same district at a different school stopped a second grader, Olivia Myers, from passing out homemade Christmas cards to her classmates because they had a sticker of Jesus on them.

At another middle school in the district, the PTA sponsored a contest to decorate classroom doors. The two students selected to create the art for one classroom door chose a nativity scene of Jesus' birth, and the teacher ordered it removed because of perceived Establishment Clause concerns.

Just before trial, we settled the case out of court with the school district changing its policy to allow school music programs to "contain music that is religious in nature."  It also allowed the school to "use themes traditionally associated with a particular holiday season" and to allow classroom displays of religious themes if they were not prompted by the teacher and contained nonreligious symbols.  And the school paid some monetary damages to the students involved.

I litigated this case.  It was not made up by Fox News (which did not exist until 1996) or by anyone else.  And this is not an isolated incident. The ACLU and its allies provoked many more examples of Christmas censorship with its lawsuits.

**2. The ACLU filed numerous lawsuits to suppress public observances of Christmas**

Beginning in the 1970's, the American Civil Liberties Union (ACLU) has filed many lawsuits to stop Christmas observances in public schools, city halls, and other governmental entities.  The New York Times quotes a carefully worded statement by an ACLU spokesperson that downplays the concerted efforts the ACLU and its allies engaged in to censor Christmas in public venues in the past.  The ACLU's efforts were real and systematic. They created an atmosphere of fear and intimidation and disinformation about what the law said about Christmas.

The ACLU has filed suit to keep school districts from singing religious Christmas carols. It has also filed suits to prevent the display of nativity scenes and other Christmas symbols like a Christmas tree and a menorah.

UCP035408

EXHIBIT 60, PAGE 75

The ACLU lost a major case it filed in 1980 to eliminate the singing of religious Christmas carols in public schools.  A federal appeals court ruled that singing religious songs could have a legitimate pedagogical purpose in a public school.  In fact, there is no court decision anywhere that says it is unconstitutional to sing religious songs, including Christmas carols, in public schools. Yet many people wrongly believe that.  When I spoke about this topic, I would carry a copy of the court decision ruling against the ACLU's extreme views to show disbelieving audience members that it existed.

In another case the ACLU lost, the Supreme Court upheld the city's use of the nativity scene because it also contained a number of secular Christmas symbols, such as Santa's sleigh and carolers.  However, the Supreme Court did declare in another ACLU lawsuit in 1989 that a nativity scene violates the Constitution, adding to the cultural zeitgeist that celebrating Christmas publicly was somehow inappropriate.

So the ACLU conducted a litigation campaign to suppress the observance of Christmas in public schools and other government venues.  Some of the cases succeeded, but many failed.  And all of these cases occurred well before the existence of Fox News. These are just a few examples.

**3. People resisted the "War on Christmas" because they knew firsthand it was real**

Fox News did not rile up gullible people to fight a war against Christmas that did not exist.  This out-of-touch thinking by the New York Times assumes that most people who watch Fox News are easily manipulated.  People responded to John Gibson's book and Bill O'Reilly's protests against these efforts to suppress Christmas because they had experienced it firsthand.

Many knew from their own experience that businesses, feeling that social pressure, began ordering their workers to say "Happy Holidays" rather than "Merry Christmas."  That happened to me. In the early 2000's, I was flying on Continental Airlines in December.  As we landed, the flight attendant wished us all, "Happy Holidays" over the intercom.  As we disembarked, I asked the flight attendant if Continental Airlines would allow her to say, "Merry Christmas" to the passengers on the plane.  "Oh no," she said.  "I would be written up if I did that."

Alliance Defending Freedom looked into this matter and others like it. We saw many such instances around the nation.  We also learned that 92% of all Americans – which includes many non-Christians – celebrate Christmas.  Even so, businesses who are free to have their employees wish people a Merry Christmas opted to suppress the greeting.  Many public schools violated the freedom of speech rights of their students by censoring their Christmas art projects and Christmas carols.

In 2003, the problem became so widespread that ADF formally launched an effort to combat the fear, intimidation and disinformation spread by the ACLU and its allies via these Christmas censorship lawsuits – two years before John Gibson published his book.

And we've had some success. The more extreme forms of Christmas censorship that we saw 10 and 20 years ago seem to be receding, due to the efforts by ADF and many others to bring a balanced, reasonable approach to the Christmas observances. People agreed with ADF and Fox News and others that the War on Christmas was real and wanted an end to hostilities.

Our increasingly diverse nation tends to fragment unless we have common values or touch points that bring us together. A holiday that points us to love one another as God first loved us, and has us give generously to others is something many people think worthy of preserving and that everyone benefits by doing so. That is why so many people agreed to resist the efforts to suppress the religious aspects of Christmas.

The New York Times missed this important aspect of this cultural phenomenon with its scoffing denial that Christmas censorship ever happened. So, next time the New York Times runs a piece like this, perhaps its author should talk to people who were actually in the fight, not just those who started it.

Merry Christmas.

*Jordan Lorence serves as Senior Counsel at Alliance Defending Freedom. ADF is a non-profit legal organization advocating for your right to freely live out your faith.*

🖨 Print      ✖ Close

---

URL
http://www.foxnews.com/opinion/2016/12/22/three-reasons-why-new-york-times-war-on-christmas-denial-is-all-wrong.html

---

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. All market data delayed 20 minutes. New Privacy - New Terms of Use (What's New) - FAQ

UCP035409

EXHIBIT 60, PAGE 76

# EXHIBIT 61

**The New York Times** | https://nyti.ms/2i0YUFG

U.S.

# How the 'War on Christmas' Controversy Was Created

By LIAM STACK    DEC. 19, 2016

It's that time of year again, folks. It's time for the War on Christmas.

What is that, you may ask? The short answer: a sometimes histrionic yuletide debate over whether the United States is a country that respects Christianity.

For the longer answer, keep reading.

The idea of a "War on Christmas" has turned things like holiday greetings and decorations into potentially divisive political statements. People who believe Christmas is under attack point to inclusive phrases like "Happy Holidays" as (liberal) insults to Christianity.

For over a decade, these debates have taken place mainly on conservative talk radio and cable programs. But this year they also burst onto a much grander stage: the presidential election.

At a rally in Wisconsin last week, **Donald J. Trump** stood in front of a line of Christmas trees and repeated a campaign-trail staple.

9

ARTICLES REMAINING

**Get 50% off for one year.** Offer ending soon.

UCP035410

EXHIBIT 61, PAGE 77

said. "Merry Christmas. So, Merry Christmas everyone. Happy New Year, but Merry Christmas."

Christmas is a federal holiday celebrated widely by the country's Christian majority. So where did the idea that it is threatened come from?

**What is the "War on Christmas"?**

The most organized attack on Christmas came from the Puritans, who banned celebrations of the holiday in the 17th century because it did not accord with their interpretation of the Bible.

Fast forward 400 years, and the idea of a plot against Christmas gained wide publicity when Fox News promoted a 2005 book by a radio host, John Gibson, that alleged liberal antagonism toward the holiday, according to Dan Cassino, a professor at Fairleigh Dickinson University.

Mr. Gibson said in an interview that he was "amazed" by the uproar his book caused.

He said it primarily focused on an issue that rarely happens anymore: educators and local officials banning nonreligious symbols like Santa Claus or Christmas trees out of a mistaken belief that displaying them violated the Constitution.

Mr. Gibson said the book had taken on a life of its own over the years — and that it had never dwelled on the political implications of "Happy Holidays."

He attributed the firestorm to two things: The book's take-no-prisoner's title ("The War on Christmas: How the Liberal Plot to Ban the Sacred Christian Holiday Is Worse Than You Thought") and the Fox News host Bill O'Reilly.

"It wasn't really me. I think it was more Bill, to tell you the truth," he said. "When Bill made it an issue, it went mega."

Indeed, Mr. O'Reilly has returned to the theme of a war on Christmas again and

9
**ARTICLES REMAINING**          **Get 50% off for one year.** Offer ending soon.

UCP035411

EXHIBIT 61, PAGE 78

situation into secular progressive politics" because they wanted "a new America, and traditional Christmas isn't a part of it."



That argument became a sweeping shorthand for conservative anxieties, Mr. Cassino said.

"They say the next step after saying 'Happy Holidays' is abortion on demand and euthanasia," he said. "That's a hell of a slippery slope, but that's the argument being made."

A study by Fairleigh Dickinson University found that watching Fox News increased the likelihood that someone would believe in the War on Christmas by 5 to 10 percent.

**9**
ARTICLES REMAINING          **Get 50% off for one year.** Offer ending soon.

UCP035412

EXHIBIT 61, PAGE 79

"That culture war issue ignited and we won," he said last Tuesday, later adding,
"Donald Trump is on the case."

### Is this a real thing?

There is no evidence of an organized attack on Christmas in the United States.

The Rev. Barry W. Lynn, the executive director of Americans United for
Separation of Church and State, said the annual uproar is based on "stories that only
sometimes even contain a grain of truth and often are completely false." He has
spent years pushing back against it.

"This politicizing of the whole issue is mind-boggling to me," Mr. Lynn said,
"and it has been for well over a decade."

He added, "They see this as some kind of a politically correct effort, but I see it
as reasonable to not use Christmas references as just an accommodation of the
reality of America."

People who believe Christmas is under attack often blame the American Civil
Liberties Union. Earlier this month, the A.C.L.U. in Indiana filed a lawsuit on behalf
of a resident of Knightstown, Ind., who objected to a Latin cross displayed atop the
town's official Christmas tree. The cross was removed.

Daniel Mach, director of the A.C.L.U. program on freedom of religion and belief,
said his organization has also defended people's right to engage in Christmas-related
activity, including a Pennsylvania inmate who wanted to organize a communal
prayer.

"Christmas celebrations in this country are alive and well," Mr. Mach said. "And
as long as the government itself isn't promoting religious doctrine those celebrations
are entirely constitutional."

### What does the "war" look like in practice?

9

ARTICLES REMAINING        Get 50% off for one year. Offer ending soon.

UCP035413

EXHIBIT 61, PAGE 80

Association based in Tupelo, Miss., publishes a "Naughty and Nice" list every year to castigate companies it believes are "censoring 'Christmas.' "

"There are secular forces in our country that hate Christmas because the word itself is a reminder of Jesus Christ," the group said on its website. "They want to eradicate anything that reminds Americans of Christianity."

Entries on the 2016 naughty list include Barnes & Noble, Best Buy and Victoria's Secret. Starbucks has come under fire for several years for seasonal cup designs that emphasize winter weather or social harmony over Christmas greetings.



**Starbucks Coffee**
@Starbucks

Follow

Friends, baristas, and customers drawn in one continuous line—reminding us we're all connected.
💚

**9**

ARTICLES REMAINING

**Get 50% off for one year.** Offer ending soon.

UCP035414

EXHIBIT 61, PAGE 81

Last year, Mr. Trump criticized Starbucks at a rally in Illinois.

"Maybe we should boycott Starbucks?" he said.

Mr. Cassino said the boycott calls have had some success in pressuring businesses. "Retailers are taking this seriously, and thinking about these issues in a way they never did before," he said.

### "Merry Christmas" or "Happy Holidays"?

The greeting "Happy Holidays" has been in use as a Christmas greeting for more than 100 years. But it has grown in popularity in recent decades as people have tried to be inclusive and sensitive to those of other faiths and the nonreligious.

The controversy appears to have shifted opinion about the proper greeting. Mr. Cassino wrote in the Harvard Business Review this month that the number of people who said they preferred to to hear "Happy Holidays" has decreased sharply in the last 10 years, from 41 percent to 25 percent. "Merry Christmas" remained popular. Indeed, President Obama, a Christian, has frequently uttered the phrase.

It should be noted that Jews, Muslims and others who do not celebrate Christmas often say they are not offended by a hearty "Merry Christmas."

So perhaps there is hope for peace on earth, or at least cable television.

---

© 2017 The New York Times Company

---



9

**ARTICLES REMAINING**

**Get 50% off for one year.** Offer ending soon.

---

UCP035415

EXHIBIT 61, PAGE 82

# EXHIBIT 62



# Expert Commentary

Home  »  Expert Commentary

# Attack on America: The Insurance Coverage Issues



In part 1 of this article, IRMI research analysts conclude that most property and casualty war risk exclusions do not apply to claims arising from the September 11 terrorist attacks on America. In part 2 they explore how other policy provisions are likely to be applied to these claims.

👤 Christine Fuge, CPCU, CRIS                                    ⏱ September 2001

UCP035416

👤 Jack P. Gibson, CPCU, CRIS, ARM

👤 Robin Olson, CPCU, CRIS, ARM

📁 Terrorism Risk Management and Insurance

"America is at war!" The entire world reacted with shock and horror in response to the September 11 terrorist attacks. However, risk and insurance professionals reacted with added trepidation not felt by the general public when they heard President George W. Bush utter these words and Colin Powell echo them during interviews by similarly describing the events as an act of war. This fear deepened with speculation that Congress might actually declare war against the perpetrators. If the attack really could be classified as "an act of war" in the traditional sense, insurers could legitimately deny coverage for many types of claims.

The immediate off-the-cuff reaction of most knowledgeable insurance professionals was that the attack was not an event intended to be excluded by war risk insurance exclusions. But only a detailed review of the actual language could confirm or deny this conclusion.

The research analysts of IRMI have undertaken just such a review and concluded that the standard insurance industry exclusions should not preclude coverage for most claims expected to arise from the attacks. This article briefly reviews the apparent industry position on the war risk exclusion issue and then discusses some of the insurance coverage implications of the unprecedented events of September 11.

## Industry Leaders Respond

Whenever disaster strikes, insurers must determine how to apply coverage under their policies. This may seem a simple case of following the terms and conditions contained in the policies, however, substantial public policy and public relations implications can come into play, particularly following a major disaster.

In the wake of the recent attacks, it was obvious that any denial of claims based on the war risk exclusion would come with a hefty public relations price tag. Plus, there existed the possibility that governmental mandates would override such a decision in any case. At best, such a claim denial would be viewed as un-American. But the financial implications of accepting what may ultimately amount to $40+ billion in covered insurance claims could force some insurers to take that chance and deny coverage.

Fearing this, Representative Michael Oxley, chairman of the Financial Services Committee of the U.S. House of Representatives, sent a letter to the National Association of Insurance Commissioners (NAIC) on September 17 asking the insurance industry to confirm that it would *not* invoke war risk exclusions to deny coverage for pending claims. In pertinent part, the letter stated:

EXHIBIT 62, PAGE 84

...there has been some concern that companies may deny coverage to victims of this tragedy based on exclusions for "acts of war." While news releases from individual companies lead us to believe that this is unlikely, it would be completely unacceptable if it were to occur. Any attempt to evade coverage obligations by either primary insurers or reinsurers based on such legal maneuvering would not only be unsupportable and unpatriotic—it would tear at the faith of the American people in the insurance industry.

As mentioned in Chairman Oxley's letter, a number of insurance industry leaders had already taken a definitive pro-coverage position on the issue. Douglass W. Leatherdale of the St. Paul Companies may have said it best, "But our task now, as a part of the insurance industry, is to help our clients recover from this horrific event... We are not going to hide behind the war exclusion for these acts of terrorism." Other industry leaders, such as AIG's chairman, Maurice Greenberg, also took this position in the financial press.

Then, on September 19, two major insurer trade associations affirmed the industry's position. In a press release, the National Association of Independent Insurers (NAII) stated, "In reference to concerns expressed in Chairman Oxley's letter, NAII wishes to confirm that insurers have strongly indicated that they do not intend to invoke the 'act of war' exclusion. This is a non-issue and all insurers we have heard from are treating the losses as covered claims."

Similarly, the National Association of Mutual Insurance Companies (NAMIC) made a statement of its own "that its member companies will honor their contracts and will proceed to adjust and pay claims in a responsible manner just as they have done when other disasters have struck this country."

Our analysis below shows that these insurers are not just doing the right thing from a public policy perspective. Most of the policies they write probably obligate them to respond in any case.

# Pertinent Case Law

When considering insurance coverage for the events of September 11, by far the most important question is the applicability of war exclusions in the various property and liability policies that might be called on to respond. Most insurance contracts contain war exclusions. Although the language varies from one standard form to another—and may vary even more among nonstandard contracts—many of the same terms occur again and again:

- war (declared or undeclared)
- civil war
- military action
- insurrection
- rebellion
- revolution

EXHIBIT 62, PAGE 85

- usurped power
- governmental action to hinder or defend against a military attack

Not surprisingly, the interpretation of insurance policy war exclusions has not been extensively litigated. But the terms employed in such exclusions have acquired more or less settled meanings over the years. An instructive exercise in establishing the meaning of war exclusion language—especially as it applies to the World Trade Center and Pentagon attacks—is the decision by the U. S. Second Circuit Court of Appeals in *Pan American World Airways v Aetna Casualty and Surety Co.*, 505 F2d 989 (1974).

The case involved a dispute between an aircraft hull insurer and a war risk insurer over coverage for the hijacking and destruction of a commercial aircraft. If the actions of the hijackers (members of the Popular Front for the Liberation of Palestine or PFLP) were considered acts of "war" or "insurrection," then the war risk insurer would pay. If not, then the hull insurer could not invoke its policy's war exclusion and would have to pay the loss.

While the insurance at the center of *Pan American v Aetna* was a property policy, the language of the exclusion being invoked is mirrored in other lines as well: property and liability, commercial and personal. The exclusions considered by the court are shown in Figure 1.

---

**Figure 1**

**War Exclusions Litigated in *Pan American v Aetna***

This policy does not cover: …

1. capture, seizure, arrest, restraint or detention or the consequences thereof or of any attempt thereat, or any taking of the property insured or damage to or destruction thereof by any Government or governmental authority or agent (whether secret or otherwise) or by any military, naval or usurped power, whether any of the foregoing be done by way of requisition or otherwise and whether in time of peace or war and whether lawful or unlawful (this subdivision 1. shall not apply, however, to any such action by a foreign government or foreign governmental authority following the forceful diversion to a foreign country by any person not in lawful possession or custody of such insured aircraft and who is not an agent or representative, secret or otherwise, of any foreign government or governmental authority);
2. war, invasion, civil war, revolution, rebellion, insurrection or warlike operations, whether there be a declaration of war or not.

---

The hull insurer's argument presented the war exclusion language as an attempt to rule out coverage for an entire spectrum of concerted violent acts. Given the nature of the hijacking and destruction of the plane, the insurer maintained that such an act had to fall somewhere along the spectrum that began with "riot and civil

EXHIBIT 62, PAGE 86

commotion [also excluded in the policy]," moved on to "insurrection" and "warlike operations," and ending with "war." The circuit court rejected this argument:

> Each of the exclusionary terms has dimensions besides the level of violence. For example, for there to be a "riot" three or more actors must gather in the same place; for there to be an "insurrection" there must be an intent to overthrow a lawfully constituted regime; for there to be a "war" a sovereign or quasi-sovereign must engage in hostilities.

One by one, the Second Circuit rejected the applicability of the war exclusion terms to a terrorist attack. It pointed out that:

> English and American cases dealing with the insurance meaning of "war" have defined it in accordance with the ancient international law definition: war refers to and includes only hostilities carried on by entities that constitute governments at least de facto in character.

The court similarly declined to follow the insurer's argument that terrorist acts constitute a kind of "guerilla war" that falls in practical terms within the language of the exclusion:

> The [insurer's] alternate theory that the loss resulted from a guerrilla war between the PFLP and the United States is wholly untenable. The only evidence that the PFLP and the United States were at war consists of the PFLP's self-serving propaganda, propaganda claiming that the PFLP was effectively at war with the entire Western World. Such radical rhetoric cannot affect the outcome of this insurance case.

> There is no warrant in the general understanding of English, in history, or in precedent for reading the phrase "warlike operations" to encompass (1) the infliction of intentional violence by political groups (neither employed by nor representing governments) (2) upon civilian citizens of non-belligerent powers and their property (3) at places far removed from the locale or the subject of any warfare. (4) This conclusion is merely reinforced when the evident and avowed purpose of the destructive action is not coercion or conquest in any sense, but the striking of spectacular blows for propaganda effects.

The circuit court justices also pointed out that language specifically excluding acts of terrorism, in general, or hijacking, in particular, have been employed in insurance policies for some time. Since such specific and unambiguous language was available to the insurer, the court said, the insurer should bear the burden of failing to use it.

Not only does it appear from the record that various clauses which would have excluded the present loss were in common use, but it appears that the General Policy Committee of the USAIG, which supplied the forms for the present all risk insurance, realized by May, 1970, that "current war risk exclusions do not appear to be effective against intentional damage such as might be caused by hijackings, by bombs placed in aircraft by political activists, by riotous acts, etc." See 368 F Supp at 1119. When the all risk insurers failed to exclude "political risks in words descriptive of today's world events," they acted at their own peril.

In summary, the Second Circuit justices upheld the judgment of the federal district court that the policy's war risk exclusion did "not describe a violent and senseless intercontinental hijacking carried out by an isolated band of political terrorists." That judgment seems equally relevant to the death and destruction inflicted by another band of political terrorists on September 11, 2001.

## The Standard Policy War Risk Exclusions

The remainder of this article examines the issues involved with the various property and casualty insurance policies that are likely to be called on to cover losses stemming from the recent terrorist attacks. These include:

- Commercial property insurance policies
- Commercial general liability insurance policies
- Commercial auto insurance policies
- Personal auto insurance policies
- Homeowners insurance policies
- Workers compensation insurance policies

Many of these policies are either written on standard policy forms drafted for industry use by industry rating organizations—such as Insurance Services Office, Inc. (ISO), or National Council on Compensation Insurance (NCCI)—or on nonstandard forms that are patterned after the standard forms. This analysis focuses on the standard language since it is so prevalent. Nonstandard language would require specific analysis to determine how it differs from the standard language. In particular, the analyst would need to look for specific inclusion of "acts of terrorism" or similar language within the list of excluded perils of a war exclusion.

All the standard policies listed above contain war risk exclusions except for the NCCI workers compensation policy. While the exclusions in the various forms vary slightly from each other, they are extremely similar.

One important commonality they contain, along with most nonstandard forms, is that they do not specifically exclude damage or loss resulting from terrorist acts. Instead, they exclude only loss or damage from perils like war, warlike action, and insurrection—the same perils considered in *Pan American v Aetna*.

EXHIBIT 62, PAGE 88

This makes any such war risk exclusion inapplicable to damage resulting from terrorism for the same reasons enumerated in *Pan American v Aetna*.

To illustrate, consider the war exclusion found in the three ISO commercial property causes of loss forms, shown in Figure 2.

---

**Figure 2**

**ISO Commercial Property War Exclusion**

f. War and Military Action

1. War, including undeclared or civil war;
2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

*Source:* Forms CP 10 10 10 00, CP 10 20 10 00, and CP 10 30 10 00, Copyright, Insurance Services Office, Inc., 1999

---

The first thing to note about the ISO commercial property form war exclusion is the conspicuous absence of any mention of terrorism or terrorist acts. The question then becomes, "Would such acts be contemplated within the plain meaning of the language that is used?"

The exclusion is made up of three parts.

- Item (1) is simply an exclusion of damage by war. Terrorism is clearly not war in the conventional sense, in that it is not carried out by large groups of armed military personnel who are being directed by a governing authority.
- Item (2) excludes damage caused by "warlike action by a military force...." Terrorism would not qualify under this portion of the exclusion either. Terrorism involves isolated destructive actions taken by a relative few individuals, rather than a military attack by an army.
- Item (3) is an exclusion of damage in connection with rebellion, revolution, or civil war. These are actions taken by armed groups of citizens in order to take control of the government away from those currently in power. This portion of the exclusion, too, is clearly inapplicable to terrorist action. While terrorists acts can be committed by a nation's own citizens, they are committed by a few individuals, rather than by a large armed force. The usual aim of these destructive acts is to frighten or discourage, and perhaps to influence public opinion for a given cause, rather than to gain control of the government.

The structure of the exclusions contained in the standard ISO commercial auto, commercial general liability, homeowners, and personal auto policies varies slightly from the commercial property form exclusion shown above, but they are so similar that a detailed analysis of the provisions yields the same conclusion. These war risk exclusions cannot be reasonably applied to preclude coverage for claims arising from the events of September 11. We also examined a handful of war exclusions in nonstandard forms and came to the same conclusion.

## Conclusion

In the vast majority of cases, there is no war risk or terrorist act exclusion in property and casualty insurance policies that would apply to deny coverage for claims arising from the recent terrorist attacks. In the aftermath of this tragedy, the question is whether, in the future, insurers will modify their insurance policies to specifically exclude or limit coverage for loss arising from terrorist acts. Given the public policy and public relations implications of such a move, however, this may be difficult to achieve or enforce. Time will tell.

While determining that the war risk exclusion does not apply is a major step toward finding coverage in any policy, other policy provisions must also be considered. In Attack on America: The Insurance Coverage Issues, Part 2, we examine some of these other coverage issues.

---

*Note:* See other terrorism articles on IRMI.com.

---

Opinions expressed in Expert Commentary articles are those of the author and are not necessarily held by the author's employer or IRMI. Expert Commentary articles and other IRMI Online content do not purport to provide legal, accounting, or other professional advice or opinion. If such advice is needed, consult with your attorney, accountant, or other qualified adviser.

---

## Like This Article?                                                    ✕

## IRMI Update

IRMI Update is a free newsletter providing you with thought-provoking industry commentary every other week, including links to free articles from industry experts. You will get two new, practical risk management tips every month and be the first to receive important news regarding IRMI Conferences and webinars.

Learn More

EXHIBIT 62, PAGE 90

> ▶ Featured Video



## Featured Products



### Quality Risk Management Fieldbook

This step-by-step guide is not a textbook but is the perfect resource if you lead a small business, nonprofit, government entity, or political subdivision and do not have risk management expertise or staff. Everything is included to help you work alongside your insurance agent to protect and preserve your organization. Learn more.



### Glossary of Insurance and Risk Management Terms

This best-seller from IRMI gives you quick answers to questions involving unfamiliar insurance terminology. The definitions are written in plain English with a focus on practical application. Learn more.

> More Products

© 2000-2017 International Risk Management Institute, Inc. (IRMI). All rights reserved.

# EXHIBIT 63

# Los Angeles Times | ARTICLE COLLECTIONS

← Back to Original Article

AFTER THE ATTACK

# 'Act of War' Exclusion Doesn't Apply to Attacks, Insurers Say

September 17, 2001 | From Reuters

Some leading U.S. and European insurers say the destruction of the World Trade Center was not an act of war and therefore covered under most insurance policies.

If other insurers take the same view, that means insurance companies around the world will have to pay out the $30 billion or so in claims expected by industry experts from the attack.

"The acts-of-war exclusion does not apply to Tuesday's events," insurer Chubb Corp. said last week. The Warren, N.J.-based business insurer expects to pay out as much as $200 million for the attack.

Under most property and liability policies, acts of war are excluded to protect insurers from overwhelming claims in the event of a war. Some analysts had suggested that insurers might invoke the exclusions to avoid payment.

Although President Bush has repeatedly called the attack an "act of war," it is generally accepted that the exclusion applies only in the case of a declared war between two or more sovereign nations.

"I have no doubt that the insurance industry has no other choice at all than to pay, for political reasons as well," said Bruno Porro, a member of the executive committee at the world's second-largest reinsurance group, Zurich, Switzerland-based Swiss Re, in an interview published in the Finanz und Wirtschaft newspaper Saturday.

Swiss Re has said it expects more than $700 million in claims.

Claims probably would not be disallowed under terrorism exclusions either, Porro said. "Terror damage has to be covered because insurance polices, especially in the United States, do not mention this as a rule," he said. To settle such an issue, Porro called for a broad, industrywide agreement on how to resolve claims.

Other U.S. insurers agreed that the attack was not an act of war.

"No life or disability claims for the events of Sept. 11 will be refused on the basis of a war exclusion," Ed Zore, chief executive of life insurer Northwestern Mutual, said this week.

Northwestern is the United States' leading individual life insurer and has received a handful of claims from families of policyholders who were on airplanes used in Tuesday's attacks.

Hartford Financial Services, which sells car, home, business and life insurance, also has said the act-of-war exclusion would not apply.

---

# Los Angeles Times  Copyright 2017 Los Angeles Times

Index by Keyword | Index by Date | Privacy Policy | Terms of Service

UCP035425

EXHIBIT 63, PAGE 92

# EXHIBIT 64





View this article online: http://www.insurancejournal.com/magazines/legalbeat/2001/10/08/18482.htm

# A Look at Invoking War Exclusions

The destruction of the World Trade Center on Sept. 11, was a disaster from a variety of points of view. President Bush is right: it was the embodiment of evil, as are most terrorist attacks on civilians. It is also a national security nightmare. One that will curtailed the easy comings-and-goings of Americans within their own country.

The World Trade Center terrorist attack is also an insurance catastrophe with insured losses placed insured losses as high as $72 billion. Obviously, uninsured losses are going to be 10 times that amount or more. More than a hundred thousand jobs, for example, have been eliminated since Sept. 11. Surely, not all of those riffs were caused by the attack, even though some companies are trying to make things look that way.

Many insurance companies are taking out large ads in The New York Times, and elsewhere, indicating that they will pay claims on an expedited basis. Some life insurance companies are not requiring straight documentation as to proof of death. One wonders if all of these commitments will remain over time. One also worries that the insurance industry may be in for some serious difficulties.

I.

One of the commitments some insurers have undertaken is to refrain from invoking war exclusions. A number of different types of insurance policies exclude losses which result from war. Many life insurance policies have contained such exclusions. Maritime marine insurance customarily contains such an exclusion, as does marine cargo insurance. These kinds of exclusions are even found in some types of property insurance, travel insurance, and some types of umbrella coverages. It is doubtful they even arguably apply to Sept. 11.

Historically, war exclusions applied only during the interval between the declaration of war and the signing of a peace treaty. Most contemporary war exclusions are not so rigid. Most exclusions currently in use exclude otherwise covered injuries resulting from war, "whether declared or undeclared."

War has always been a state of affairs which existed between sovereign powers, i.e., countries. The only exceptions have been rebellion and insurrection. Thus, transnational terrorism not instigated by a sovereign power cannot be war. Consequently, war exclusions could not apply.

The fact that political officials in the United States, such as President Bush himself, consistently described what happened at the World Trade Center as an act of war, is irrelevant.

The attack on Pearl Harbor was an act which initiated a state of war. There were legal controversies at the time as to whether it constituted war. Then again, the attack on Pearl Harbor is sharply distinguished from the attack on the World Trade Center. The attack on Pearl Harbor was an assault on a military installation for an obviously

UCP035426

EXHIBIT 64, PAGE 93

military purpose, whereas the World Trade Center is not a legitimate military target, and there has been no military follow-up.

Thus, it is almost certain that, notwithstanding President Bush's language to the contrary, the attack on the World Trade Center was not an act of war. War exclusions, therefore, do not apply. Of course, there is now a good deal of talk about how the United States has become embroiled in a new kind of war–about how the war on terrorism is a brand new thing. Nevertheless, given that exclusionary language, when ambiguous, is construed in favor of the policyholder, it is doubtful that war exclusions will apply.

II.

These matters do not come up in court very often. When they do come up, they can be complicated. One significant case is Pan American World Airways v. Aetna Casualty. This case was tried in Federal Court for the Southern District of New York and subsequently appealed to the federal Second Circuit.

On Sept. 6, 1970, a PanAm flight to New York was highjacked about 45 minutes after it had taken off from Amsterdam. The highjackers flew the plane to Beirut and then on to Egypt. The highjackers put the passengers off the plane there and then blew it up.

PanAm had purchased both all-risk aviation insurance and war-risk insurance. The question was which group of insurers had to pay. The all-risk insurers put on a huge amount of evidence regarding the history of war and political tensions in the Middle East. The war-risk insurers also introduced a good deal of evidence regarding violent controversies in the Middle East. None of that evidence was much good. The war-risk insurers also demonstrated that the all-risk insurers thought that their war exclusions might be ambiguous in the context of political highjackings.

Two sub-exclusions were significant. One of them excluded coverage for losses due to or resulting from capture or seizure of any property by any governmental authority, any military authority, or by any authority which has usurped governmental authority. The second exclusion barred coverage for losses resulting from "war, invasion, civil war, revolution, rebellion, insurrection, or war-like operations, whether there be a declaration of war or not[.]" In addition, the all risk policies excluded losses resulting from riots and "civil commotion."

The Second Circuit thought that the all risk insurers' best arguments were that the highjackers constituted a usurped power and that the highjackers were engaged in war-like operations. The Second Circuit rejected the former argument upon the grounds that the usurped power–such as guerilla movement–must have at least some of the indicia of sovereign power under international law.

The appellate judges appear to believe that the argument based upon war-like operations had some plausibility. On the other hand, the panel thought that in order for there to be war-like operations, there had to be a war, even if an undeclared one. To be sure, war-like operations could occur in regions geographically remote from the area of the war. There still must be a war, and the war-like operations must be a means for waging that war.

In the end, the Second Circuit said, "there is no basis whatsoever for any claim that the insured of PanAm was involved in any war-like operation. It carried no cargo of military stores. It carried no cargo destined for a theater of war. Its owner was not the national of any Middle Eastern belligerent. Pan American serves no routes to any Middle Eastern belligerent. When the war occurred, the aircraft was not near or over the territory of any belligerent or any theater of war."

The reasoning in the PanAm case applies to the World Trade Center problems.

III.

In another, more recent case, International Multi-Foods Corporation sued Commercial Union Insurance Company arising out of an incident in which the Russian police seized a shipment of frozen food incident to its

UCP035427

investigation of black-market bribery and customs evasion. A federal court in the Southern District of New York decided this case in 2000.

CU had issued Multi-Foods' property insurance and tried to invoke a war risk exclusion. One of the provisions of that exclusion barred coverage for losses caused by "capture, seizure, arrest, restraint, or detainment (piracy excepted)." The insurer thought that the concepts of capture and seizure applied.

The district court thought otherwise. This language, it observed, appeared in the context of an exclusion entitled "War Exclusion Clause," and amidst a group of other exclusionary words which were clearly restricted to situations or war.

IV.

One hears a good deal of loose talk these days about exclusions for terrorism. I have never seen one, and there are no reported cases involving such an exclusion.

With less than a month having passed since the attack, it would be surprising if any lawsuits have been filed involving insurance disputes. We all know, however, that they will come. Business interruption evaluation will be a sticky problem. Moreover, we have no idea what kind of problems will come up under liability policies. And issues of reinsurance will be even more intractable. Of course, most of them will be subject to arbitration.

*Quinn is an Austin attorney with the law firm of Bell, Turney, Coogan and Richards. He litigates and testifies on insurance-related problems and is currently the chair of the Insurance Section of the State Bar of Texas. He also is a Visiting Professor of Law at the University of Texas-Austin.*

**More from Insurance Journal**

Today's Insurance Headlines | Most Popular | Legal Beat

UCP035428

EXHIBIT 64, PAGE 95

# EXHIBIT 65

# Arab-Israeli wars



An Israeli tank driving past wounded soldiers during the Yom Kippur War (1973), the fourth …

*David Rubinger—Time Life Pictures/Getty Images*

**Arab-Israeli wars,** series of military conflicts between Israeli and various Arab forces, most notably in 1948–49, 1956, 1967, 1973, and 1982.

The first war immediately followed Israel's proclamation of statehood on May 14, 1948. Arab forces from Egypt, Transjordan (Jordan), Iraq, Syria, and Lebanon occupied the areas in southern and eastern Palestine not apportioned to the Jews by the United Nations (UN) partition of Palestine and then captured east Jerusalem, including the small Jewish quarter of the Old City, in an effort to forestall the creation of a Jewish state in Palestine. The Israelis, meanwhile, won control of the main road to Jerusalem through the Yehuda Mountains ("Hills of Judaea") and successfully repulsed repeated Arab attacks. By early 1949 the Israelis managed to occupy all of the Negev up to the former Egypt-Palestine frontier, except for the Gaza Strip. Between February and July 1949, as a result of separate armistice agreements between Israel and each of the Arab states, a temporary frontier was fixed between Israel and its neighbours.

Tensions mounted again with the rise to power of Egyptian President Gamal Abdel Nasser, a staunch Pan-Arab nationalist. Nasser took a hostile stance toward Israel. In 1956 Nasser nationalized the Suez Canal, a vital waterway connecting Europe and Asia that was largely owned by French and British concerns. France and Britain responded by striking a deal with Israel—whose ships were barred from using the canal and whose southern port of Elat had been blockaded by Egypt—wherein Israel would invade Egypt; France and Britain would then intervene, ostensibly as peacemakers, and take control of the canal. In October 1956 Israel invaded Egypt's Sinai Peninsula. In five days the Israeli army captured Gaza, Rafaḥ, and Al-ʿArīsh—taking thousands of prisoners—and occupied most of the peninsula east of the Suez Canal. The Israelis were then in a position to open sea communications through the Gulf of Aqaba. In December, after the joint Anglo-French intervention, a UN Emergency Force was stationed in the area, and Israeli forces withdrew in March 1957. Though Egyptian forces had been defeated on all fronts, the Suez Crisis, as it is sometimes known, was seen by Arabs as an Egyptian victory. Egypt dropped the blockade of Elat. A UN buffer force was placed in the Sinai Peninsula.

Arab and Israeli forces clashed for the third time June 5–10, 1967, in what came to be called the Six-Day War (or June War). In early 1967 Syria intensified its bombardment of Israeli villages from positions in the Golan Heights. When the Israeli Air Force shot down six Syrian MiG fighter

UCP035429

EXHIBIT 65, PAGE 96



Israeli armoured troop unit entering Gaza during the Six-Day War, June 6, 1967.

*© The State of Israel Government Press Office*



Israeli tanks advancing on the Golan Heights during the Six-Day War between Arab and Israeli …

*Assaf Kutin/© The State of Israel Government Press Office*

jets in reprisal, Nasser mobilized his forces near the Sinai border, dismissing the UN force there, and he again sought to blockade Elat. In May 1967 Egypt signed a mutual defense pact with Jordan.

Israel answered this apparent Arab rush to war by staging a sudden air assault, destroying Egypt's air force on the ground. The Israeli victory on the ground was also overwhelming. Israeli units drove back Syrian forces from the Golan Heights, took control of Gaza and the Sinai Peninsula from Egypt, and drove Jordanian forces from the West Bank. Importantly, the Israelis were left in sole control of Jerusalem.

The sporadic fighting that followed the Six-Day War again developed into full-scale war in 1973. On October 6, the Jewish holy day of Yom Kippur (thus "Yom Kippur War"), Israel was attacked by Egypt across the Suez Canal and by Syria on the Golan Heights. The Arab armies showed greater aggressiveness and fighting ability than in the previous wars, and the Israeli forces suffered heavy casualties. The Israeli army, however, reversed early losses and pushed its way into Syrian territory and encircled the Egyptian Third Army by crossing the Suez Canal and establishing forces on its west bank.

Israel and Egypt signed a cease-fire agreement in November and peace agreements on January 18, 1974. The accords provided for Israeli withdrawal into the Sinai west of the Mitla and Gidi passes, while Egypt was to reduce the size of its forces on the east bank of the canal. A UN peacekeeping force was established between the two armies. This agreement was supplemented by another, signed on September 4, 1975. On May 31, 1974, Israel and Syria signed a cease-fire agreement that also covered separation of their forces by a UN buffer zone and exchange of prisoners of war.

On March 26, 1979, Israel and Egypt signed a peace treaty formally ending the state of war that had existed between the two countries for 30 years. Under the terms of the Camp David Accords, as the treaty was called, Israel returned the entire Sinai Peninsula to Egypt, and, in return, Egypt recognized Israel's right to exist. The two countries subsequently established normal diplomatic relations.

On June 5, 1982, less than six weeks after Israel's complete withdrawal from the Sinai, increased tensions between Israelis and Palestinians resulted in the Israeli bombing of Beirut

UCP035430

and southern Lebanon, where the Palestine Liberation Organization (PLO) had a number of strongholds. The following day Israel invaded Lebanon, and by June 14 its land forces reached as far as the outskirts of Beirut, which was encircled; but the Israeli government agreed to halt its advance and begin negotiations with the PLO. After much delay and massive Israeli shelling of west Beirut, the PLO evacuated the city under the supervision of a multinational force. Eventually, Israeli troops withdrew from west Beirut, and the Israeli army had withdrawn entirely from Lebanon by June 1985.

Hostility continued, however. On December 9, 1987, rioting broke out among Palestinian Arabs living in the Israeli-occupied territories of the Gaza Strip and the West Bank and in Jerusalem. The Palestinian demonstrations and riots continued in the following years and took on the character of a mass popular rebellion (known as the *intifāḍah*, or "shaking off") directed against continued Israeli occupation of the West Bank and the Gaza Strip. In 1993 Israel and the PLO reached an agreement (known as the Oslo Accords) that involved mutual recognition and envisaged the gradual implementation of Palestinian self-government in the West Bank and Gaza Strip before a permanent peace settlement. The process was fraught with difficulty, however, and violence in the form of a second *intifāḍah* erupted in 2000. Violence ebbed and flowed in subsequent years, sometimes reaching the level of full-scale war between Israeli forces and Palestinian police and irregulars.

"Arab-Israeli wars". *Encyclopædia Britannica. Encyclopædia Britannica Online.* Encyclopædia Britannica Inc., 2017. Web. 01 May. 2017 <https://www.britannica.com/event/Arab-Israeli-wars>.

UCP035431

EXHIBIT 65, PAGE 98

# EXHIBIT 66

1    LUCIA E. COYOCA (SBN 128314)
        lec@msk.com
2    VALENTINE A. SHALAMITSKI (SBN 236061)
        vas@msk.com
3    DANIEL M. HAYES (SBN 240250)
        dmh@msk.com
4    MITCHELL SILBERBERG & KNUPP LLP
     11377 West Olympic Boulevard
5    Los Angeles, CA 90064-1683
     Telephone:  (310) 312-2000
     Facsimile:  (310) 312-3100
6
7    Attorneys for Plaintiffs
     Universal Cable Productions LLC and
     Northern Entertainment Productions LLC
8
9    MARC J. SHRAKE (SBN 219331)
     mjs@amclaw.com
10   ANDERSON, MCPHARLIN & CONNERS LLP
     707 Wilshire Boulevard, Suite 4000
11   Los Angeles, CA 90017-3623
     Telephone:  (213) 236-1691
     Facsimile:  (213) 622-7594
12
13   MICHAEL KEELEY (*Admitted Pro Hac Vice*)
        michael.keeley@strasburger.com
14   JOHN R. RIDDLE (*Admitted Pro Hac Vice*)
        john.riddle@strasburger.com
15   CARLA C. CRAPSTER (*Admitted Pro Hac Vice*)
        carla.crapster@strasburger.com
16   STRASBURGER & PRICE, LLP
     901 Main Street, Suite 4400
17   Dallas, TX 75202
     Telephone:  (214) 651-4300
     Facsimile:  (214) 651-4330
18
19   Attorneys for Defendant
     Atlantic Specialty Insurance Company

20              UNITED STATES DISTRICT COURT

21              CENTRAL DISTRICT OF CALIFORNIA

22   UNIVERSAL CABLE                   CASE NO. 2:16-cv-4435-PA-MRW
     PRODUCTIONS LLC, *et al.*,
23                                     **JOINT STIPULATION RE:**
                Plaintiffs,            **DISCOVERY MOTION**
24
           v.                          Judge:        Hon. Michael R. Wilner
25
     ATLANTIC SPECIALTY                File Date:         June 20, 2016
26   INSURANCE COMPANY,                Discovery Cutoff:  June 2, 2017
                                       Pre-Trial Conf.:   June 16, 2017
27              Defendant.             Trial Date:        July 25, 2017

28
     ─────────────────────────────────
                                    1
                    JOINT STIPULATION RE: DISCOVERY MOTION
     8830706.1/46250-00001

1    Pursuant to Local Rule 7-1, Plaintiffs Universal Cable Productions LLC and

2   Northern Entertainment Productions LLC ("Plaintiffs") and Defendant Atlantic

3   Specialty Insurance Company ("Defendant," and together with Plaintiffs, the

4   "Parties"), hereby submit the following joint stipulation to resolve Disputed Issue

5   No. 3 addressed in Plaintiffs' April 5, 2017 motion to compel discovery (ECF Nos.

6   43, 44) ("Plaintiffs' April 5, 2017 Discovery Motion").

7    1.    Plaintiffs' April 5, 2017 Discovery Motion addressed four disputed

8   issues.

9    2.    Disputed Issue No. 3 concerns Plaintiffs' assertion that Defendant has

10   failed to conduct a reasonable and sufficient search for documents concerning other

11   instances in which it has considered the applicability of a war exclusion to an

12   insurance claim.  Plaintiffs requested an order compelling Defendant to conduct a

13   further search in the absence of certain unqualified admissions.  *See* ECF Nos. 43,

14   43-3, 44.

15    3.    Defendant opposed Plaintiffs' April 5, 2017 Discovery Motion, and

16   specifically opposed the relief requested in connection with Disputed Issue No. 3,

17   summarized above.

18    4.    On April 10, 2017, Magistrate Judge Michael R. Wilner conducted a

19   telephone conference regarding Plaintiffs' April 5, 2017 Discovery Motion.  Lucia

20   E. Coyoca and Daniel M. Hayes participated on behalf of Plaintiffs.  Michael

21   Keeley, Toni Scott Reed, and Carla C. Crapster participated on behalf of Defendant.

22   Following the telephone conference, the Parties hereby stipulate that Disputed Issue

23   No. 3 may be resolved by the following order:

24       At trial in this matter, the following stipulated fact shall be

25       read to the jury as part of the evidentiary record:  "Other

26       than in connection with the *Dig* Claim and one other claim

27       evidenced by the email labeled ATL000785-ATL000788,

28       and after conducting a diligent and reasonable inquiry of

2

JOINT STIPULATION RE: DISCOVERY MOTION

8830706.1/46250-00001

1    current and former employees and a thorough search of all

2    reasonably accessible records, Atlantic has found no

3    evidence that it considered the application of a war

4    exclusion (the exclusions set forth in General Conditions,

5    Section III(1)-(4) of the policy at issue in this lawsuit, or

6    any similar war exclusion language) to an insurance claim

7    submitted to it for handling."

8         5.    Therefore, the Parties jointly request that the Court enter the proposed

9 order submitted concurrently with this joint stipulation, resolving Disputed Issue

10 No. 3 addressed in Plaintiffs' April 5, 2017 Discovery Motion.

11                         Respectfully submitted,

12 DATED:  April 27, 2017       LUCIA E. COYOCA
                             VALENTINE A. SHALAMITSKI
13                       DANIEL M. HAYES
                       MITCHELL SILBERBERG & KNUPP LLP

14

15

16                   By:  */s/*  Daniel M. Hayes
                       Daniel M. Hayes
17                       Attorneys for Plaintiffs
                       Universal Cable Productions LLC and
18                       Northern Entertainment Productions LLC

19 DATED:  April 27, 2017       MARC J. SHRAKE
                       ANDERSON, MCPHARLIN & CONNERS LLP
20

21                        -and-

22                     MICHAEL KEELEY
                       JOHN R. RIDDLE
23                       CARLA C. CRAPSTER
                       STRASBURGER & PRICE, LLP
24

25                   By:  */s/*  Carla C. Crapster
26                       Carla C. Crapster
                       Attorneys for Defendant
27                       Atlantic Specialty Insurance Company

28

3

8830706.1/46250-00001

1

### **Attestation Regarding Signatures**

2       I, Daniel M. Hayes, attest that all signatories listed, and on whose behalf the

3   filing is submitted, concur in the filing's content and have authorized the filing.

4

5                   By: */s/* Daniel M. Hayes

6                         Daniel M. Hayes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

JOINT STIPULATION RE: DISCOVERY MOTION

8830706.1/46250-00001

# EXHIBIT 67

Page 1

1                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
2                         WESTERN DIVISION
      ----------------------------------------------------
3

      UNIVERSAL CABLE PRODUCTIONS LLC,
4     a Delaware limited liability company,
      and NORTHERN ENTERTAINMENT PRODUCTIONS, LLC,
5     a Delaware limited liability company,
6                    Plaintiffs,            Case No.
                                        2:16-cv-4435-PA-MRW
7     -vs-
8     ATLANTIC SPECIALTY INSURANCE COMPANY,
      a New York insurance company,
9
                    Defendant.
10
      ----------------------------------------------------
11
12    ** CONTAINS CONFIDENTIAL PORTIONS BOUND SEPARATELY **
                *  PAGE 36 & PAGES 66-67  *
13
                    VIDEOTAPED DEPOSITION
14
                            OF
15
                    THERESA A. GOOLEY WOLF
16
                         VOLUME 1
17
                Wednesday, February 8, 2017
18
19
20
21
22
23
24
      Job No. 118730
25    Reported By:  Amy L. Larson, RPR

Page 5

1    THE VIDEOTAPED DEPOSITION OF THERESA A. GOOLEY

2    WOLF, taken on this 8th day of February, 2017, at

3    the Law Offices of Meagher & Greer, PLLP, 33 South

4    Sixth Street, Suite 4400, Minneapolis, MN 55402,

5    commencing at approximately 10:08 a.m.

6

7                    P R O C E E D I N G S

8

9              THE VIDEOGRAPHER:  This is the

10    start of tape labeled number 1 of the

11    videotaped deposition of Theresa Gooley in

12    the matter Universal Cable Productions, LLC

13    v. Atlantic Specialty Insurance Company in

14    the United States District Court, Central

15    District of California, Western Division.

16              This deposition is being held at

17    Meagher & Geer on February 8th, 2017, at

18    approximately 10:08 a.m.  My name is Ben

19    Abraham, I'm the legal video specialist from

20    TSG, Incorporated, headquartered at 747 Third

21    Avenue, New York, New York.  The court

22    reporter is Amy Larson in association with

23    TSG Reporting.

24              Will counsel please introduce

25    yourselves.

EXHIBIT 67, PAGE 104

Page 6

1          MS. COYOCA:  Good morning.  My

2     name is Lucia Coyoca, C-O-Y-O-C-A, of

3     Mitchell, Silberberg & Knupp.  I represent

4     the plaintiffs in this matter.

5          MS. SCOTT REED:  My name is

6     Toni Scott Reed of the law firm

7     Strasburger & Price.  I represent the

8     defendants Atlantic Specialty Insurance

9     Company, as well as this witness presented

10    here today.

11         THE VIDEOGRAPHER:  And will the

12    court reporter please swear in the witness.

13

14              THERESA A. GOOLEY,

15        a witness in the above-entitled action,

16        after having been first duly sworn, was

17        deposed and says as follows:

18

19                  EXAMINATION

20    BY MS. COYOCA:

21    Q.  Good morning, Ms. Gooley.  Could you please

22        state your full name and address for the

23        record.

24    A.  Sure.  It's Theresa Anne, A-N-N-E, Gooley,

25        G-O-O-L-E-Y, Wolf, W-O-L-F.  And you want my

Page 31

1          independent of Pamela, no.

2     Q.   Right.   That's what I'm asking.   Other than

3          the mentoring relationship that he had with

4          Ms. Johnson as a result of working with her

5          directly, did he attend any formal training

6          classes or seminars that was -- that were

7          directed towards learning how to read an

8          insurance policy?

9     A.   Not that I'm aware of.

10    Q.   This case concerns a claim regarding the

11         television show Dig.   You're aware of that,

12         are you not?

13    A.   Yes.

14    Q.   Okay.   Prior to -- just setting to the side

15         the Dig claim, did you have any experience

16         reviewing any coverage determinations that

17         were made as to any other extra expense

18         claims?

19    A.   I know that I've -- I worked with Pamela on

20         other claims.   I can't recall specific claims

21         at this time, though.

22    Q.   You can't recall any other claims relating to

23         entertainment claims or any other extra

24         expense claims?

25    A.   Any other extra expense claims.

Page 38

1      with respect to her investigation of the

2      claim?

3   A.  I would guess that she did.  Again, I -- I

4      simply can't remember.

5   Q.  Okay.  Other than the Dig claim, can you

6      recall any other instance while you were

7      working for OneBeacon where you or anyone

8      working for you considered the potential

9      applicability of the war exclusion?

10  A.  Not that I'm aware of.

11  Q.  Prior to working for OneBeacon, did you have

12     any circumstances pursuant to which you were

13     reviewing the potential applicability of the

14     war exclusion to a claim?

15  A.  No.

16  Q.  While you were at St. Paul Travelers, did you

17     have responsibility for seeing any

18     entertainment-related claims?

19  A.  No, I did not.

20  Q.  Do you currently have any responsibility for

21     overseeing entertainment-related claims?

22  A.  No, I do not.

23  Q.  In terms of overseeing Ms. Johnson's

24     management of entertainment-related claims,

25     what specifically were your duties?

Page 39

1    A.   Again, I worked with Pamela on any

2         particularly large claims, any particular

3         claims that had significant coverage issues,

4         and then worked with her on staffing issues,

5         you know, reviewed claims, claim loads,

6         things of that nature.

7    Q.   When you say you worked with her on large

8         claims, what specifically did that entail?

9    A.   Well, if she had -- if we had any particular

10        large claims, she would flag -- flag them up

11        to me and we would generally have a

12        conversation about the particular claims, and

13        depending on the nature of the claim, may

14        have several conversations.

15   Q.   Did you review the work that Ms. Johnson had

16        done in investigating claims?

17   A.   Generally, no.

18   Q.   Would you -- when discussing particular

19        claims with Ms. Johnson, would you question

20        her with respect to the steps that she had

21        taken to investigate a claim?

22   A.   I -- I may question her to make sure that I

23        understood what we had done and what her

24        conclusions were and, you know, what she

25        based those conclusions on.

1    Q.   Were there any occasions that you can recall

2         where you would direct Ms. Johnson to go back

3         and do additional work in investigating a

4         claim?

5    A.   No.

6    Q.   While you were overseeing Ms. Johnson's work,

7         did you provide any type of guidance with

8         respect to the steps that should be

9         undertaken when investigating a claim?

10   A.   Generally, no.  Pamela is an expert in the

11        area.  To the extent we have a discussion and

12        we think of something that we would want to

13        probe further, we'd go forward with that, but

14        I trusted Pamela's judgment.

15   Q.   You indicated that Ms. Johnson was an expert

16        in the area; is that correct?

17   A.   Yes.

18   Q.   What did you base that conclusion on?

19   A.   She has significant experience handling

20        entertainment claims.  She also was a trial

21        lawyer, has significant trial experience.

22        She's very bright, very articulate, and she

23        knows a lot of the players in the industry.

24   Q.   And when you say, "She knows a lot of players

25        in the industry," what industry are you

Page 50

1    circumstances where we may -- we may have

2    retained an independent adjuster.

3    Q.  What if the factual circumstances of the

4        claim involved an area that was not of common

5        understanding or knowledge?

6                MS. SCOTT REED:  Objection; vague,

7        ambiguous.

8    BY MS. COYOCA:

9    Q.  You can answer the question.

10   A.  I'm trying to think of a particular type of

11       claim where we wouldn't have the common

12       understanding or knowledge.  Again, we might

13       retain independent -- an independent adjuster

14       to help us with a slice of it, but, again, we

15       feel at least the way OneBeacon is structured

16       that we have -- we have the skill level and

17       the experience to handle claims.

18   Q.  You indicated in one of your prior answers

19       that you want to make sure that you do a

20       thorough investigation.  What do you mean by

21       thorough investigation?

22   A.  A thorough investigation is we want to make

23       sure that we look at what we see as the

24       totality of the evidence and the information

25       and then reach a conclusion.  So, again, it

Page 52

1    A.   That's correct.   That's correct, yes.

2    Q.   When you indicated the need to do a thorough

3         investigation, was it -- was it important not

4         to rush an investigation?

5                   MS. SCOTT REED:   Objection; vague.

6                   THE WITNESS:   I think that you're

7         always balancing facts, right?   I mean,

8         thorough could take ten years if you want to

9         do that.   I mean, you always have to balance

10        it with the timing, both whether the insured

11        needs an answer quickly or -- so we balance

12        both of those.   We want to do a thorough

13        investigation, but we also have time

14        pressures to get it done in a timely fashion.

15   BY MS. COYOCA:

16   Q.   If there's a time pressure to get it done in

17        a certain time frame, but there is a question

18        about whether a claim is covered or not

19        covered, wouldn't a potential option be to

20        issue a reservation of rights on the claim,

21        again, speaking to a first-party claim?

22                  MS. SCOTT REED:   Objection; vague.

23                  THE WITNESS:   I mean, I think

24        there's several options.   If you're

25        continuing with your investigation and you

Page 61

1    circumstance where it would not be important

2    to know the origin of the loss?

3              MS. SCOTT REED:  Objection; vague,

4    ambiguous, calls for speculation.

5              THE WITNESS:  I -- I imagine in

6    the liability context.  I don't know that it

7    necessarily would be imperative to know the

8    origin of the basis of the claims.  But in

9    most circumstances, I think you probably

10   would want to know that.

11             MS. COYOCA:  Right.

12   BY MS. COYOCA:

13   Q.  And, again, I'm -- I'm just focusing on

14       first-party claims.  So with respect to a

15       first-party claim, can you envision any type

16       of claim where it would not be important to

17       know the origin of the loss?

18             MS. SCOTT REED:  Vague, ambiguous,

19   calls for speculation.

20             THE WITNESS:  Not at this time,

21   no.

22   BY MS. COYOCA:

23   Q.  When a claim is being investigated and

24       coverage is being assessed, do you think it's

25       important to go back to the underwriter?

1    A.   No.

2    Q.   Why not?

3    A.   Because when you look at coverage, the

4         language of the policy is clear and

5         unambiguous.  You apply the law -- you apply

6         the -- the policy as it is written and you

7         investigate and look at the facts.

8    Q.   What if the claim -- excuse me.

9              What if the language of the policy

10        is not clear or unambiguous, do you think if

11        that circumstance it's important to go back

12        to the underwriter?

13             MS. SCOTT REED:  Objection; vague.

14             THE WITNESS:  I think that, again,

15        you look at the language of the policy.  To

16        the extent -- and I'm not suggesting to the

17        extent there's an argument that there is an

18        ambiguity, then you look at what the common

19        sense meaning of the policy is.  I don't know

20        that I would go back to the underwriter.

21   BY MS. COYOCA:

22   Q.   So in your view, in terms of your experience

23        and expertise in handling insurance claims,

24        you don't think that it's an important thing

25        to go back to the underwriter to try to gain

1   Q.   At any point in time that you were involved

2        with the claim, did you gain an understanding

3        of what it exactly is that Mr. Gutterman was

4        doing?

5   A.   I know that he was looking at different

6        outside, you know, articles, things like

7        that.  But my primary correspondence --

8        communication -- my communication was with

9        Pamela.

10  Q.   Did you have any conversations with

11       Ms. Johnson about the work that Mr. Gutterman

12       was doing?

13  A.   I -- I don't recall.

14  Q.   Did you have any conversations with her

15       specifically about the outside sources, the

16       articles that Mr. Gutterman was consulting

17       with?

18  A.   No.

19  Q.   Did you provide any direction to Ms. Johnson

20       in terms of the use of Mr. Gutterman as a

21       resource to locate sources of information?

22  A.   No, I did not.

23  Q.   Directing your attention to the first e-mail

24       in the chain of Exhibit 31, which is the

25       July 16 e-mail from Pamela Johnson to

1    Q.   And what was your understanding as to what

2         the coverage would be?

3    A.   I'd have to see the policy.

4    Q.   There's a reference in the e-mail in the

5         second to the last line to the, "Israeli

6         Hamas conflict."  Do you see that?

7    A.   I do.

8    Q.   At or about this time frame in July 2014,

9         what was your understanding of what Hamas was

10        or is?

11   A.   It's an organization or a -- in the

12        Middle East in the Gaza Strip.

13   Q.   And, again, just focusing back on July 16,

14        did you know anything further about Hamas

15        other than it was an organization in the

16        Middle East in Gaza Strip?

17   A.   I mean, you know, just general things that

18        you hear in the news, et cetera.

19   Q.   Right.  That's what I'm trying to get at.

20        What was your general understanding based on

21        news sources of what Hamas is?

22   A.   Well, just what I said, it's in the

23        Middle East, I mean...

24   Q.   Okay.  Did you -- did you know what kind of

25        activities Hamas engaged in?

1            MS. SCOTT REED:  Object to form,

2      foundation.

3            THE WITNESS:  They -- I mean,

4      yeah, generally, they engage in quite a few

5      different activities.

6  BY MS. COYOCA:

7  Q.  What activities were you aware of as of July

8      2014 that Hamas engaged in?

9  A.  Just, you know, the bombing and the conflict

10      back and forth within Israel.

11  Q.  And what was your understanding as to what

12      the conflict was with Israel?

13  A.  At that time?

14  Q.  Uh-huh.

15  A.  Well, I think there's a whole number -- a

16      whole number of issues as to what the

17      conflict is, I guess.  But, you know, at that

18      time I just -- I understood that, you know,

19      they were -- they were launching missiles

20      back and forth at each other.

21  Q.  Okay.  So it was your understanding that the

22      conflict involved Hamas and Israel launching

23      missiles back and forth at each other; is

24      that correct?

25  A.  That's part of it.  I mean, this is just an

1    initial e-mail, so I wanted to have a

2    conversation with Pamela.

3    Q.  I completely understand, but --

4    A.  Yeah.

5    Q.  -- I'm just asking for your -- your baseline

6        level of knowledge prior to getting into the

7        claim, I want -- I'd like to know what --

8        gain your understanding of Hamas is and what

9        the conflict was about, so that's the reason

10       for the questions.

11              The -- the -- I'd like to focus on

12       the missiles going back and forth.  Was it

13       your understanding that Israel was launching

14       missiles at Hamas in Gaza?

15   A.  That's my understanding, yes.

16   Q.  What was your understanding as to the reasons

17       why there was the conflict?

18   A.  You mean generally why there's a conflict

19       between the two or the express reasons at

20       this time?

21   Q.  Generally.

22   A.  Generally?  I -- I mean, there's a whole host

23       of reasons.  I mean, it goes back to, you

24       know, thousands of years ago.  But first and

25       foremost, it's over the -- over the land,

1     over...

2  Q.  And what land would that be?

3  A.  Well, it's Israel.

4  Q.  And this is not meant to be a history test, I

5       really just would like to understand your

6       base level of knowledge prior to getting into

7       the investigation of the land.  What -- what

8       was the -- of the claim.

9            When you say there was a conflict

10      over the land and a conflict over the land of

11      Israel, what was that conflict?

12  A.  Well, again, you know, there's -- there's --

13      they're fighting back and forth, there's

14      Gaza, there's the west bank, I mean, there --

15      and that's my understanding of what was going

16      on.

17  Q.  And you consider Gaza to be separate, you

18      knew that it was separate from the West

19      Bank --

20            MS. SCOTT REED:  Objection --

21  BY MS. COYOCA:

22  Q.  -- at the time in July 2014 when this claim

23      first surfaced; is that right?

24            MS. SCOTT REED:  Objection to

25      form, foundation, misstates the witness's

1        testimony.

2                    THE WITNESS:  Yes.  I mean, the

3        West Bank is up in this part of Israel,

4        (indicating), and the Gaza Strip is down --

5        down in the lower part, (indicating), so...

6                    MS. COYOCA:  Okay.  And let the

7        record reflect that the witness was using her

8        hands to distinguish that there were two

9        different areas where the two land groups

10       were located.

11   BY MS. COYOCA:

12   Q.  Is that right?

13   A.  That's correct.

14   Q.  Okay.  Now, as to the -- as to your

15       understanding of the reason why this

16       particular July 2014 conflict came into

17       existence, what was your understanding as to

18       that?

19   A.  At this time?

20   Q.  Uh-huh.

21   A.  At this time I -- I had just -- Pamela had

22       just let me know, so I -- I needed to talk to

23       her.  I didn't have any particular

24       understanding at that time.

25   Q.  Got it.  You responded the next day on

Page 142

1          she looked at indicated it was a war.

2     BY MS. COYOCA:

3     Q.   In Ms. Johnson's investigation of the facts

4          and circumstances concerning the claim, did

5          she investigate whether or not Hamas was a

6          terrorist organization?

7                    MS. SCOTT REED:  Objection to

8          form, lack of foundation, speculation.

9                    THE WITNESS:  She -- she did look

10         at Hamas, yes.

11    BY MS. COYOCA:

12    Q.   But did she look to see whether or not Hamas

13         had been designated as a terrorist

14         organization by the U.S. government?

15    A.   I don't --

16                   MS. SCOTT REED:  Objection; calls

17         for speculation.

18                   THE WITNESS:  I don't believe she

19         looked at whether the U.S. government

20         designated Hamas as a terrorist organization.

21    BY MS. COYOCA:

22    Q.   Did you ask Ms. Johnson to consider whether

23         or not Hamas was a terrorist organization in

24         the context of reviewing the claim?

25    A.   No.

1        How did you learn that Ms. Johnson

2    had told NBC Universal that the Dig claim was

3    going to be denied on the basis of the war

4    exclusion?

5    A.  I -- Pamela would have told me that she was

6    going to reach out to NBC and Aon and let

7    them know that our position was that the

8    exclusion precluded coverage.

9    Q.  Were you involved in that conversation or

10   that notice to NBC Universal and Aon that the

11   claim was going to be denied based on the war

12   exclusion?

13   A.  I don't think that I was, no.

14   Q.  Were you told before the call took place to

15   advise NBC Universal and Aon that the claim

16   was being denied?

17   A.  I'm sure that I was.

18   Q.  And is it -- do you know how the

19   communication was delivered?  In other words,

20   by e-mail, telephone call, in-person meeting,

21   do you know?

22   A.  I -- my understanding was via telephone.

23   Q.  And do you know when that telephone

24   conversation took place?

25   A.  I think it was the evening of the 17th.

Page 170

1   Q.   So by the evening of the 17th, the decision

2        already had been made that the claim should

3        be denied?

4   A.   Based on the -- yeah, that we believed it was

5        not covered.

6   Q.   And I believe you indicated previously that

7        you first received notice about the claim the

8        day after Aon had tendered the claim; is that

9        right?

10  A.   I think Aon tendered it to OneBeacon on

11       Tuesday, so the 15th, I believe, of July, and

12       Pamela sent me an e-mail on the 16th.  So,

13       yeah, the day after.

14  Q.   Okay.  So between July 15 and July 17, the

15       investigation was done, the legal analysis

16       was completed, a decision was made to deny

17       the claim on the basis of the war exclusion;

18       is that correct?

19            MS. SCOTT REED:  Objection to

20       form, lack of foundation, assumes facts not

21       in evidence.

22            THE WITNESS:  By the 17th we

23       believed we had enough information based on

24       our investigation to make the decision to

25       deny the claim.

Page 171

BY MS. COYOCA:

Q.  Do you know how long Ms. Johnson worked on
    the claim before making that recommendation
    to you that the claim should be denied based
    on the war exclusion?

A.  I don't -- I don't, no.

Q.  Did you ever ask Ms. Johnson if she had
    consulted with any experts on the
    Middle Eastern region with regard to the
    facts and circumstances about this claim?

A.  I never asked her that, no.

Q.  Do you know if she did consult with any
    Middle East experts before making the
    decision to recommend to deny the claim?

A.  She did not consult with any -- anyone from
    the Middle East.

Q.  So between July 17 and the time that a denial
    letter went out, what was your involvement,
    if anything, in terms of the claim?

A.  So on the 17th Pamela had the conversation
    with Aon and NBC.  On the 18th, I believe
    that is when we sent it out to coverage
    counsel to get their opinion.  We received
    their opinion the following Monday, so that
    would be 21st.  Of course we looked at the

Page 178

1                    MS. SCOTT REED:  Objection to

2         form, vague, ambiguous, calls for

3         speculation.

4                    THE WITNESS:  On -- from

5         OneBeacon's perspective and my perspective as

6         well, we don't deny a claim unless we believe

7         it's not covered.  So when I say a hundred

8         percent, there's always a chance someone can

9         disagree, but it's 99 percent that we don't

10        deny a claim unless we believe it's not

11        covered.  We don't enter that decision

12        lightly.

13   BY MS. COYOCA:

14   Q.  Were you concerned at all in terms of the

15        short time frame that -- in which the

16        analysis, the investigation, the review of

17        information and the legal analysis that was

18        performed, the short time frame in which it

19        was done?

20                   MS. SCOTT REED:  Objection to

21        form, vague, ambiguous.

22                   THE WITNESS:  My -- we can -- we

23        moved as quickly as we could on this

24        particular claim.  I know that NBC wanted an

25        answer right away.  Aon had pushed OneBeacon

1    very hard to get an answer as soon as

2    possible and so that's why there's this --

3    why everything was turned around.  We did it

4    to accommodate the insured, but we did do a

5    thorough investigation.

6  BY MS. COYOCA:

7  Q.  If you had not been pushed, or if OneBeacon

8    had not been pushed by the insured and Aon to

9    get a decision out as quickly as possible,

10   would you have taken more time in the

11   investigation?

12            MS. SCOTT REED:  Objection; calls

13   for speculation.

14            THE WITNESS:  I think we -- I

15   think we had enough information, we did a

16   thorough investigation.  We would not have

17   issued a coverage position if we didn't feel

18   confident that we had done a thorough

19   investigation, so I think we would have put

20   out an opinion in a -- in a condensed time

21   frame given the nature of the claim.

22  BY MS. COYOCA:

23  Q.  But would you have put out an opinion within

24   two days after the claim had first been

25   asserted?

Page 180

1           MS. SCOTT REED:  Objection to

2       form, vague, ambiguous as to the reference

3       you're making.

4                THE WITNESS:  I think --

5                MS. COYOCA:  No, that's

6       actually -- I want to respond to that.

7                THE WITNESS:  Okay.

8   BY MS. COYOCA:

9   Q.  Would you have put out a determination as to

10      no coverage if there had been no pressure

11      from Aon or the insured in two days?

12               MS. SCOTT REED:  Objection to

13      form, misstates prior testimony.

14               THE WITNESS:  If we thought we had

15      all the information we needed to make a

16      coverage position -- to take a coverage

17      position, we would have provided it.

18  BY MS. COYOCA:

19  Q.  Can you recall any other instances in any

20      entertainment claims that you reviewed while

21      you were at OneBeacon where a coverage

22      determination was made in two days?

23               MS. SCOTT REED:  Objection to

24      form.

25               THE WITNESS:  I'm not aware of any

1      claim.

2   BY MS. COYOCA:

3   Q.   Would you consider two days to be a

4        relatively expedited time frame?

5   A.   I would think that's, yes, fairly expedited.

6   Q.   Okay.  Turning to Exhibit 33 and the

7        attachment to Exhibit 33, is this the draft

8        of Ms. Johnson's letter with respect to the

9        Dig claim that you reviewed before it was

10       sent out?

11  A.   May I have a moment to look at it, please?

12  Q.   Sure.  Absolutely.

13  A.   (Reviews document.)  This is the letter

14       Pamela sent to me.

15  Q.   The draft letter?

16  A.   Yes.

17  Q.   You indicated previously that you had a

18       suggested change as to language in the first

19       paragraph; is that correct?

20  A.   That's correct.

21  Q.   What change were you referring to?

22            MS. SCOTT REED:  Objection; asked

23       and answered.

24            THE WITNESS:  I think it was the

25       second to the last sentence of the first

Page 184

1        imagine Pamela just overlooked it.

2    BY MS. COYOCA:

3    Q.   Were you concerned at all about the original

4         draft as it went out in the final indicating

5         that the decision was based on, among other

6         things, consultation with counsel, were you

7         concerned at all about the timing of the

8         decision in terms of coverage counsel's

9         opinion not having been procured by the time

10        the decision had already been made?

11              MS. SCOTT REED:   Objection; lack

12        of foundation, it misstates the facts in

13        evidence.

14              THE WITNESS:   Would you be good

15        enough to restate your question?

16              MS. COYOCA:   Yeah, sure.

17   BY MS. COYOCA:

18   Q.   So the decision that the claim was going to

19        be denied was conveyed to counsel by

20        July 17th; is that correct?

21   A.   It was conveyed to NBC and Aon on July 17th.

22   Q.   Excuse me.  I'm sorry.  Yes, it was conveyed

23        to Aon and NBC, to the insured, by July 17th,

24        correct?

25   A.   Correct.

EXHIBIT 67, PAGE 128

Page 188

1      questions and comments from Mr. Williams or

2      just that she was simply giving him notice

3      that it was going out?

4                    MS. SCOTT REED:  Objection;

5      speculation.

6                    THE WITNESS:  Again, I'm -- you

7      know, I'm sure she wanted to give him an

8      opportunity to see it before it went out.

9      Whether he had any questions or comments,

10     questions or comments about the content or

11     concerns, explanations, I don't know.

12                    MS. COYOCA:  Okay.

13   BY MS. COYOCA:

14   Q.  I'd like to show you the final version of the

15       letter.  It's already been marked as

16       Exhibit 18.  Let me know when you're ready

17       for questions.

18   A.  Okay.  (Reviews document.)  I'm ready.

19   Q.  Okay.  Turning to page 5 of the letter

20       labeled Bates control 98, there is a heading

21       entitled -- under, "Analysis," entitled,

22       "Terrorism coverage."  Do you see that?

23   A.  I do.

24   Q.  Do you agree with the statements that

25       Ms. Johnson is making in this paragraph?

```
 1   A.  I'm -- I don't think those -- those
 2       statements are correct in terms of the
 3       terrorism coverage.
 4   Q.  And why not?
 5   A.  Because I think -- I have to look at the
 6       earlier OneBeacon reference, the terrorism
 7       endorsement.
 8   Q.  And are you specifically referring to the,
 9       "Coverage for certified acts of terrorism,
10       caps on losses"?
11   A.  I'd have to see it.  Yes.
12   Q.  That would be page ATL 3120.
13   A.  Yes.
14   Q.  Okay.  So you said that you don't believe
15       that the statements are correct in terms of
16       the terrorism coverage.  What do you think is
17       incorrect about the statements?
18   A.  Well, the -- when you look at the endorse --
19       or the endorsement, I'm looking at, it says,
20       "Any exclusion of terrorism in this coverage
21       part or policy or attached to such covered
22       part or policy by endorsement is hereby
23       amended."  The policy doesn't have a
24       terrorism exclusion, so there's nothing to
25       amend --
```

1    Q.   Okay.

2    A.   -- so it's really not applicable.

3    Q.   So it's not applicable at all?

4    A.   This endorsement isn't, no.

5    Q.   Okay.  The -- the statement that the

6         terrorism coverage should not apply here,

7         because under its terms the act must be part

8         of an effort to coerce or influence the

9         United States population or government, is

10        that a correct statement?  In order for there

11        to be coverage for an act of terrorism, must

12        the act have been part of an effort to coerce

13        or influence the United States population or

14        government?

15   A.   I don't -- I don't know -- I don't have the

16        terrorism coverage, so I can't really comment

17        on that.

18   Q.   Do you know, is there specific coverage under

19        the policy, a coverage part that is coverage

20        for acts of terrorism?

21   A.   I'd have to look through the policy.

22   Q.   Okay.

23   A.   (Reviews document.)  I'm not seeing anything.

24   Q.   Okay.  So assuming there is no specific

25        provision providing for terrorism coverage

Page 197

1     page, "The policy contains coverage for

2     certified acts of terrorism."  Do you see

3     that?

4  A.  I see that.

5  Q.  Do you believe that the only coverage under

6     the policy is for certified acts of terrorism

7     as that term is defined in the endorsement?

8  A.  I'd have to run through the policy again.

9     (Reviews document.)

10             MS. SCOTT REED:  I'm going to

11     object to the form as vague and ambiguous.

12             THE WITNESS:  So on this, though,

13     I mean what -- what's being cited is -- is

14     the endorsement and we talked about the fact

15     that it -- or the endorsement is not

16     applicable, so -- so I apologize, can you ask

17     me your question again?

18             MS. COYOCA:  Right.

19  BY MS. COYOCA:

20  Q.  What I'm asking is:  Do you believe that the

21     only coverage under the policy as to

22     terrorism is for certified acts of terrorism

23     as it's defined in that endorsement?

24             MS. SCOTT REED:  Objection; vague,

25     ambiguous.

1          THE WITNESS:  Again, this is an

2    endorsement that modifies -- that provides

3    certain coverage in the event of an

4    exclusion, there's not -- that exclusion

5    doesn't exist, so I'm not sure that the

6    endorsement -- the endorsement is not

7    applicable.

8    BY MS. COYOCA:

9    Q.  So it shouldn't have been referenced in the

10    letter at all?

11    A.  Correct.

12    Q.  Turning to page 6 of the letter, there's a

13    paragraph that begins, "Appleman on

14    insurance"; do you see that paragraph?

15    A.  I do.

16    Q.  Can you please read that paragraph out loud?

17    A.  Yes.  "Appleman on insurance discusses

18    exclusions for war, including the meaning of

19    war and similar terms.  War is," paren, "a

20    course of hostility," paren, "between,"

21    paren, "states or state-like entities,"

22    period, close paren.  "To constitute a

23    de facto state, a group must have," paren,

24    "significant attributes of sovereignty,"

25    close paren, "and the application of this

Page 253

1          indicate that they're all page 3, correct?

2    A.   Correct.

3    Q.   All right.  So -- so looking at the Bates

4         control label numbers, 708, the last page of

5         the letter, the paragraph that begins, "You

6         seem to assert"; do you see that?

7    A.   I do.

8    Q.   Could you please read that sentence out loud?

9    A.   "You seem to assert that a government that is

10        deemed to be a terrorist organization cannot

11        have sufficient sovereignty to fall within

12        the war exclusion."

13   Q.   Okay.  Focusing specifically on legal

14        authority, did you look at any legal

15        authority to support that proposition?

16                  MS. SCOTT REED:  Objection to

17        form, vague and ambiguous.

18              Legal support for your proposition,

19        Ms. Coyoca?

20                  MS. COYOCA:  No, the proposition

21        that is stated in the sentence.

22                  MS. SCOTT REED:  Which is a

23        restatement of your proposition.  I just want

24        to clarify for the record what you're asking

25        the witness to do.

1              MS. COYOCA:  I believe that

2        Ms. Gooley knows, but let me ask it directly

3        then.

4    BY MS. COYOCA:

5    Q.  Did you look at any legal authority for the

6        proposition that a government that is deemed

7        to be a terrorist organization can also have

8        sufficient sovereignty to fall within the war

9        exclusion?

10              MS. SCOTT REED:  Objection to

11        form, assumes facts not in evidence and legal

12        conclusion.

13              THE WITNESS:  I don't recall

14        looking at anything specific, but what it's

15        stating is that a terrorist organization can

16        still be -- can be a sovereignty, and then it

17        refers to North Korea and Saddam Hussein,

18        which are --

19              MS. COYOCA:  Right.

20              THE WITNESS:  Yeah.

21    BY MS. COYOCA:

22    Q.  I see the words that are written there, but

23        what I'm specifically asking is:  Did you

24        read any cases that stood for that

25        proposition that you just indicated?

1   A.   I myself did not read any cases.

2   Q.   Did you ask Ms. Johnson to research and

3        provide some legal authority for the

4        proposition?

5   A.   For the proposition in the first sentence?

6   Q.   Yes, that a terrorist organization could also

7        have sufficient sovereignty to fall within

8        the war exclusion?

9               MS. SCOTT REED:  I'm going to

10       object to the form of the question.  It's

11       vague and ambiguous and it misstates the

12       first -- the first sentence.  The first

13       sentence restates and summarizes what she

14       supposes to be your position, Ms. Coyoca.  It

15       does not state the position of OneBeacon, so

16       the record is going to be garbled on this

17       with asking it that way.

18  BY MS. COYOCA:

19  Q.   You can answer the question.

20  A.   Whether I asked her for authority --

21  Q.   Yes.

22  A.   -- as whether or not a terrorist organization

23       can be a sovereignty or fall within the war

24       exclusion?

25  Q.   Yes.

1    A.    No.

2    Q.    Further on in that paragraph, beginning with

3          the sentence, "Further, as explained above";

4          do you see that?

5    A.    I do.

6    Q.    Could you read that portion of the paragraph

7          through to the conclusion of the paragraph?

8    A.    Sure.  "Further, as explained above, the

9          Israeli government participated in the

10         conflicts and invaded Gaza.  There is no

11         question that the Israeli government is

12         identified by the majority of the world

13         governments as a legitimate sovereign, not a

14         terrorist organization."

15   Q.    Is it OneBeacon's position, based on your

16         understanding, that in order for the war

17         exclusion to -- to apply, it was sufficient

18         for there to be only one sovereign government

19         involved in the hostilities?

20   A.    Are you talking about the prong 1 of the war

21         exclusion, war or --

22   Q.    Prong 1.

23   A.    War -- I mean, prong 1, I don't -- I don't

24         think one necessarily has to be -- whether

25         it's sufficient to just have one as a

Page 275

1    of NBC, because our analysis is based on the

2    claim regardless of whether or not the

3    account is profitable for underwriting.

4  Q.  Did you ever have any conversations when

5       discussing the Dig claim with Peter Williams

6       about the profitability of the account?

7  A.  I don't recall having any discussions about

8       that.

9  Q.  Have you ever discussed the Dig claim with

10      Wanda Phillips?

11 A.  I don't think I had a discussion with

12      Wanda about it, no.

13 Q.  As part of Ms. Johnson's investigation and

14      handling of the Dig claim, did you ask her

15      whether or not she had taken steps to ensure

16      that Dig was an insured production under the

17      policy?

18 A.  I don't recall asking her that specifically.

19      I would have assumed that she would have done

20      all -- all those steps.

21 Q.  Did you keep a separate file with respect to

22      the Dig claim while you were employed by

23      OneBeacon?

24 A.  I -- I don't -- I may have had a file with

25      the policy in it.  I don't recall.

Page 304

```
 1                          ERRATA SHEET
 2   Case Name:  Universal Cable Productions, LLC,
                 et al. vs. Atlantic Specialty
 3               Insurance Co.
     Deposition Date:  2-8-17
 4   Deponent:  Theresa A. Gooley Wolf
 5   Pg.   Line   Now Reads      Should Read   Reason

 6   ___   ____   _____       _____     _____

 7   ___   ____   _____       _____     _____

 8   ___   ____   _____       _____     _____

 9   ___   ____   _____       _____     _____

10   ___   ____   _____       _____     _____

11   ___   ____   _____       _____     _____

12   ___   ____   _____       _____     _____

13   ___   ____   _____       _____     _____

14   ___   ____   _____       _____     _____

15   ___   ____   _____       _____     _____

16   ___   ____   _____       _____     _____

17   ___   ____   _____       _____     _____

18   ___   ____   _____       _____     _____

19
20      EHRICH L. KOCH
        Notary Public-Minnesota
        My Commission Expires Jan 31, 2020
21                                    Signature of Deponent
22
     SUBSCRIBED AND SWORN BEFORE ME THIS  6  DAY OF
23   March      2017.
24
     (Notary Public)    MY COMMISSION EXPIRES: 1/31/20
25
```

EXHIBIT 67, PAGE 139

# EXHIBIT 68

```
                 UNITED STATES DISTRICT COURT

               CENTRAL DISTRICT OF CALIFORNIA

                     WESTERN DIVISION


UNIVERSAL CABLE          )   CASE NO. 2:16-cv-4435-PA-MRW
PRODUCTIONS LLC, et al.,)
                         )
        Plaintiffs,      )
                         )
        vs.              )
                         )
ATLANTIC SPECIALTY       )
INSURANCE COMPANY,       )
                         )
        Defendant.       )
                         )
```

DEPOSITION OF DANIEL SPENCER GUTTERMAN

Friday, February 3, 2017

Reported by:  Ingrid Suárez Egnatuk
              CSR No. 3098

1

**Video Deposition**

```
 1                 LOS ANGELES, CALIFORNIA

 2                 Friday, February 3, 2017

 3                      9:27 a.m.

 4

 5          THE VIDEOGRAPHER:  We are on the record.

 6          This is the deposition of Daniel

 7   Gutterman, taken on behalf of the plaintiffs in

 8   the matter of Universal Cable Productions LLC vs.

 9   Atlantic Specialty Insurance Company pending in

10   the United States District Court, Central District

11   of California, Western Division, Case No.

12   2:16-cv-4435-PA-MRW.

13          It is February 3, 2017, and today we are

14   at 707 Wilshire Boulevard, Suite 4000 in

15   Los Angeles, California.

16          My name is Esrom Jayasinghe, a Certified

17   Legal Video Specialist and a notary with Verbatim

18   Video, located at 9725 Gladbeck Avenue in

19   Northridge, California.

20          This is the start of Media 1.  The time

21   now is 9:28.

22          And, Counsel, if you would kindly state

23   your appearance.

24          MR. HAYES:  Dan Hayes of Mitchell

25   Silberberg & Knupp on behalf of plaintiffs.
```

7

**Video Deposition**

```
 1              MR. KEELEY:  Michael Keeley of

 2   Strasburger & Price on behalf of Atlantic Specialty

 3   Insurance Company, defendant.

 4              THE VIDEOGRAPHER:  Please proceed.

 5              THE REPORTER:  Raise your right hand,

 6   please.

 7              Do you solemnly swear or affirm the

 8   testimony you are about to give in this deposition

 9   will be the truth, the whole truth, and nothing but

10   the truth?

11              THE WITNESS:  Yes.

12              THE REPORTER:  Thank you.

13

14              DANIEL SPENCER GUTTERMAN,

15              having been first duly sworn, was

16              examined and testified as follows:

17

18                    EXAMINATION

19   BY MR. HAYES:

20       Q.   Good morning, Mr. Gutterman.

21       A.   Good morning.

22       Q.   Please spell your full name for the

23   record.

24       A.   Daniel Spencer Gutterman, D-A-N-I-E-L

25   S-P-E-N-C-E-R G-U-T-T-E-R-M-A-N.
```

8

**Video Deposition**

```
 1         Q.    Did any of the materials involve a

 2   terrorism exclusion?

 3         A.    I don't believe so.  No.

 4         Q.    Now I want you to think back to the tests,

 5   both tests that you took.

 6               Okay?

 7         A.    Okay.

 8         Q.    Was a war exclusion at issue in connection

 9   with any of the questions that you answered on any

10   of those tests, either of those tests?

11         A.    Not that I can recall.

12         Q.    How about a terrorism exclusion?  Was that

13   the subject of either of those tests?

14         A.    Not that I can recall.

15         Q.    This Florida license, does it have --

16   withdraw that.

17               Does being licensed in Florida come with

18   continuing education requirements?

19         A.    Yes.

20         Q.    And what are those requirements?

21         A.    24 hours of continuing education over the

22   course of two years.

23         Q.    So every two years you have to prove that

24   you've done 24 hours of continuing education?

25         A.    Correct.
```

77

1    Q.   And have you been licensed long enough to

2  have to submit your continuing education?

3    A.   Yes.

4    Q.   "Yes"?

5         One time?

6    A.   Correct.

7    Q.   How many hours did you complete for that

8  first period?

9    A.   Either 24 or 25.

10   Q.   And what does that continuing education

11 consist of?

12   A.   Taking online courses that involve

13 different subjects.

14   Q.   What subjects?

15   A.   It could be all across the insurance

16 board.

17   Q.   Have you ever taken an online class in

18 connection with this continuing education

19 requirement relating to a war exclusion?

20   A.   I don't -- I don't remember doing so.  No.

21   Q.   Have you ever taken an online class

22 relating to this continuing education requirement

23 related to a terrorism exclusion?

24   A.   I don't remember.

25   Q.   Have you ever taken an online class

78

**Video Deposition**

1  power go out potentially, but I don't remember the

2  specific questions.

3       Q.   How about any continuing education on

4  issues that pertained to entertainment-related

5  insurance policies?

6       A.   I don't remember.

7       Q.   Okay.  Same questions for your study

8  leading up to your test.

9            Did any of that study include study of

10  policies related to the entertainment industry?

11       A.   No.  And I'm just realizing your first

12  question was about my license.  The answer's the

13  same both times around.  The continuing education as

14  well as the -- no.  I don't remember.

15       Q.   Okay.  So let's just make sure we have

16  this clear.

17       A.   Yeah.

18       Q.   We've got the studying you did for your

19  license to take the test.  That's No. 1.  We've got

20  the test itself which you took twice, and we've got

21  the continuing education that you've done since

22  passing the test.

23            With respect to that universe, did you

24  ever study the war exclusion?

25       A.   Not that I recall.  No.

                                                    80

**Video Deposition**

1     Q.   Did you ever study a terrorism exclusion?

2     A.   That I recall.  No.

3     Q.   Did you ever study entertainment

4 industry-related insurance coverage?

5     A.   Not that I can recall.  No.

6     Q.   Did you ever study insurance coverage

7 similar to the extra expense coverage at issue in

8 this case which starts at 3103 of the policy?

9     A.   I don't remember if I took a course about

10 extra expense or not.

11     Q.   Okay.  Has your Florida license ever been

12 suspended?

13     A.   No.

14     Q.   Has it ever been revoked?

15     A.   No.

16     Q.   So from the time you obtained it after

17 that second test until today, it's been in it place

18 consistently?

19     A.   Yes.

20     Q.   Is there a process in Florida for

21 consumers to file complaints against licensees, if

22 you know?

23     A.   I don't know definitively.  But for some

24 reason, something in my head is saying that I

25 remember seeing something like that.

81

**Video Deposition**

1    A.   If that's the person that was the person

2  that brought us the claim.  Yes.

3    Q.   Or a broker?

4    A.   Yes.

5    Q.   Anybody else you would contact first

6  besides the insured or a broker?

7    A.   If -- if there was a vendor that was the

8  one that was complaining about not being paid and

9  they had gotten -- they had been -- they had

10  received a certificate of insurance from one of our

11  insureds, that would be who I would speak with.

12    Q.   Would you read the policy?

13    A.   Eventually.  But typically I would start

14  with getting the facts of loss.

15    Q.   Okay.  What would you do if you had a

16  question about the scope of coverage?

17    A.   Usually I discuss it with my supervisors

18  and then discuss it with the underwriters to see

19  what their intent was.  And then depending on where

20  we go from there, discussing it with the brokers and

21  ultimately discussing it with the insureds,

22  assuming, of course, we already have facts of loss

23  and we know that there's certainly a question that

24  coverage is not -- that an exclusion could

25  potentially apply.

                                                      172

**Video Deposition**

```
 1              THE WITNESS:  No.

 2   BY MR. HAYES:

 3       Q.    Part of the discussion with the insured

 4   is, "Why do you think there's coverage?"

 5              Is that accurate?

 6       A.    No.

 7       Q.    Okay.

 8       A.    Not necessarily.  I mean, again, sometimes

 9   the insureds understand that there is an issue, and

10   then there's other times when the insureds just

11   don't -- don't get it.  And then you say, "Okay.

12   Well, explain to me."

13              So, yes, occasionally there will be times

14   when I've brought up, "Okay.  Explain to me more do

15   why you believe that there's coverage for this."

16       Q.    Okay.  And if it's a situation where you

17   say, "Why do you believe there is coverage for

18   this," what do you do with the information they give

19   you?

20       A.    Review the policy again to see how we

21   determine -- basically, redo everything I did the

22   first time around.  Again, speak with my

23   supervisors, speak with the underwriters, and then

24   speak again with the broker.

25              We really want to find coverage.  I mean,
```

174

**Video Deposition**

```
 1    that's -- I was taught that from Peter and from
 2    Pamela over and over and over again.  So if we can
 3    find it, we'll do so.  We want people to -- we want
 4    to find coverage.
```

```
 5        Q.   Is that one of the things that you are
 6    taught in the continuing education that you
 7    participate in for your Florida license?
 8        A.   Not in those words.  I mean, this is --
 9    this is word for word what I was told by Peter and
10    Pamela.  I mean, that's where it came from.
11        Q.   "Word for word," you're referring to your
12    statement that "we really want to find coverage"?
13        A.   That's what -- yeah.  We don't want to
14    deny claims unless we have to.
15        Q.   So if finding coverage is your objective
16    in every case, how do you go about achieving that
17    objective?
18        A.   Look through every aspect of the policy,
19    make sure that there's no other -- other policies
20    that are out there, see if any other coverage could
21    potentially apply, see if there's any endorsements
22    that are out there that we didn't necessarily know
23    about; and, again, speaking with the underwriters.
24    Maybe there's things that we missed.
25            And when I said "word for word," I meant
```

175

1          Okay?

2     A.   Uh-huh.

3     Q.   My understanding from your testimony was

4  that when you received the claim, you understood

5  your role to be, one, review the facts of the loss;

6  two, review the research that you did; and, three,

7  applying that research to the policy.

8          That's what you understood at the time

9  that you -- your role would be in adjusting the

10 claim?

11    A.   Well, as well as speaking with the insured

12 and the broker.  Yes.  Sorry.  I didn't realize that

13 that wasn't one of the ones.

14    Q.   When you received the claim, what did you

15 understand would be the research that would need to

16 be conducted?

17    A.   Googling websites, news sites, to

18 determine -- to just get a better understanding of

19 what was going on over there.

20    Q.   When you say "understanding of what was

21 going on over there," what do you mean exactly?

22    A.   I don't recall my exact headspace.  But I

23 don't believe I really had a very good understanding

24 at that time period of what was occurring in Israel

25 at that time.

                                                    205

1      Q.   You mean what physically was occurring on

2   the ground?

3      A.   Yes.

4      Q.   And what were you -- what kinds of things

5   were you looking for in your searches, in your

6   Google searches?

7      A.   Just to gain knowledge of what was

8   occurring on the ground there.

9      Q.   Okay.  And why did it matter what was

10  occurring on the ground?

11     A.   'Cause we received a claim that involved

12  what was going on on the ground there.

13     Q.   But did you have any sense of what you

14  would use that information for once you found it?

15  And by "information," I mean the information as to

16  what was going on on the ground in Israel.

17     A.   To help my bosses and myself understand

18  more of what -- just knowledge, just plain

19  knowledge.  We didn't -- I didn't have an under- --

20  what was your question?  I did not know what I would

21  use that information for beyond just learning what

22  was going on.

23     Q.   Why did you need to know what was going on

24  to evaluate the claim?

25     A.   Research is always beneficial.

206

**Video Deposition**

1      Q.   But why in this case did you need to know

2  what was actually going on on the ground to evaluate

3  the claim for extra expense coverage?

4      A.   Why did I need to?  It was just -- it was

5  almost just an automatic response.  It's just I'd

6  like to know as much as I possibly can.

7      Q.   So you weren't looking for anything in

8  particular?  You were just looking for anything out

9  there relating to the situation in Israel as it was

10 unfolding?

11     A.   I guess that's a fair statement.  Yes.

12     Q.   Were you -- were you using search terms?

13 How did you search for the information?

14     A.   I have no idea what I did then.

15     Q.   You have no idea what you did on the

16 Internet to search for information?

17     A.   At that time, no, I don't recall.

18     Q.   Did you use Google?

19     A.   I don't recall.  I'm -- my main word

20 search sites are Yahoo!, Google, and Bing, and

21 barely ever Bing.  So Google is my main one.

22     Q.   And did you search using keywords?

23     A.   I don't recall.

24     Q.   So you say that your initial understanding

25 of what your role would be was review the facts of

207

1   BY MR. HAYES:

2       Q.   If we wanted to try to determine whether

3   you actually looked up the definition of "war," are

4   there documents we could refer to to try to figure

5   out that?

6       A.   I believe there was a time period when

7   Pamela and I were sending each other links.  I don't

8   remember if that was before or after this.  In terms

9   of whether I looked something up specifically, I

10  wouldn't -- I don't know.

11      Q.   Did you ever look up the definition of

12  "terrorism"?

13      A.   I don't -- I don't recall doing so.  No.

14      Q.   Did you ever do any Google searches aimed

15  at determining what terrorism was or what terrorism

16  meant?

17      A.   Not that I remember.

18      Q.   Why not?

19      A.   Nothing we were seeing looked like

20  terrorism, and I never had a terrorism claim before.

21  So I don't think it came into my head.

22      Q.   When you say "nothing we were seeing

23  looked like terrorism," what do you mean, "nothing

24  we were seeing"?

25      A.   I believe it was a video, the one that I

                                                    264

**Video Deposition**

```
 1   speculation.

 2             THE WITNESS:  I don't know.

 3   BY MR. HAYES:

 4        Q.   What about Israeli teenagers being

 5   kidnapped by Hamas?  Would that be terrorism, in

 6   your mind?

 7             MR. KEELEY:  Object.  Vague.  Lacks

 8   foundation.

 9             THE WITNESS:  I guess so.

10   BY MR. HAYES:

11        Q.   You say you know it when you see it,

12   terrorism, that is; right?

13        A.   Yes.

14        Q.   Okay.  Do you think the U.S. Government is

15   in a position to know terrorism when it sees it?

16        A.   Yes.

17        Q.   Who is in a better position to know

18   terrorism when they see it, you or the U.S.

19   Government?

20        A.   The U.S. Government.

21        Q.   Who is in a better position, you or John

22   Kerry?

23        A.   John Kerry.

24        Q.   Did you ever search the Internet or search

25   any resource to determine what the United States
```

266

```
 1    Government's position was on the conduct in Israel

 2    perpetrated by Hamas, whether or not that was

 3    terrorism?  Did you ever look and see what the U.S.

 4    Government thought?

 5         A.   Yes.

 6         Q.   When?

 7         A.   I don't recall.

 8         Q.   Was it before or after OneBeacon denied

 9    the claim on July 28, 2014?

10         A.   After.

11         Q.   Not before?

12         A.   Correct.

13         Q.   Okay.  When you looked to see what the

14    U.S. Government thought about the conduct, what did

15    you find?

16         A.   About what?

17         Q.   Whether or not the U.S. Government thought

18    the acts perpetrated by Hamas on Israel constituted

19    terrorism?

20              MR. KEELEY:  Objection.  Vague.

21              THE WITNESS:  You mean that specific time

22    period?  I don't -- no, I did not look that up.  I'm

23    sorry.

24    BY MR. HAYES:

25         Q.   You said you didn't try to determine what
```

267

**Video Deposition**

1    the U.S. Government thought about Hamas's conduct

2    prior to the July 28, 2014 denial letter; is that

3    correct?

4         A.   Correct.

5         Q.   But you also said that at some point after

6    the denial letter, you did seek to determine what

7    the U.S. Government thought; right?

8         A.   I don't recall.  I'm sorry.

9         Q.   You don't recall whether or not you did

10   that?

11        A.   Look that up, no, I don't recall if I did

12   or not.

13        Q.   Okay.  Why didn't you seek to determine

14   what the United States Government thought of Hamas's

15   conduct prior to the July 28, 2014 denial?

16        A.   I really wasn't involved in the claim that

17   much at that point.

18        Q.   The claim came to you.

19        A.   Yes.  But as we discussed earlier, at some

20   point Pamela became the lead person that was running

21   this claim.  She was the one at that particular time

22   period that if she was looking things up.

23        Q.   But at some point you were the one

24   searching the Internet for information pertinent to

25   the coverage decision; right?

268

**Video Deposition**

```
 1        A.    It didn't.
 2        Q.    Why not?  Why did you ask what the terms
 3   were?
 4        A.    Because they potentially could have
 5   beared [sic] on -- on the claim.
 6        Q.    But these terms did not, in your opinion?
 7        A.    No.
 8        Q.    Why did OneBeacon require that the
 9   production work with local production company Keshet
10   in coordination with the local police?
11        A.    I don't know.  I don't deal with the
12   underwriting side.
13        Q.    Why did OneBeacon require that the NBC
14   Security team remain involved?
15        A.    I don't know.  I don't work with the
16   underwriting side.
17        Q.    Did you ask Wanda in connection --
18        A.    No.
19        Q.    You did not?
20        A.    Not that I recall, no.
21        Q.    Did you have any conversations with Wanda
22   outside of the four corners of Exhibit 29?
23        A.    Not that I can recall.
24        Q.    Did you have any -- did you call her on
25   the phone?
```

298

**Video Deposition**

```
 1          A.   Not that I can recall.

 2          Q.   Did you follow up with any other questions

 3    in response to her last e-mail on Exhibit 29?

 4          A.   Not that I can recall.

 5          Q.   What if OneBeacon required the NBC

 6    Security team to remain involved because OneBeacon

 7    was worried about loss as a result of terrorism in

 8    Israel?

 9               MR. KEELEY:  Objection.  Vague.

10    Assume- -- objection.  Vague.  Assumes facts not in

11    evidence.

12    BY MR. HAYES:

13          Q.   Would that have been relevant to your

14    decision whether or not there was coverage?

15               MR. KEELEY:  Same objections.

16               THE WITNESS:  Will you ask the question

17    again, please.

18    BY MR. HAYES:

19          Q.   The e-mail from Wanda says that OneBeacon

20    required NBCU to coordinate with local police.  It

21    also says that OneBeacon required NBC to remain

22    involved -- the NBC Security team to remain involved

23    and continue working with production.

24               Do you see that?

25          A.   Yes.
```

299

1   of it, did you come upon anything that OneBeacon did

2   not do in connection with the --

3        A.   From what I've currently read, no.

4        Q.   Okay.  Look at page 2, where it says:

5             "Determine the need for outside vendors to

6        assist in the investigation, such as surveyors,

7        attorneys, engineers, accountants, fire

8        experts, salvor, etc., and assign

9        responsibility to such vendors, when

10       appropriate."

11            Who determined the need for outside

12   vendors?

13       A.   That would have been Pamela.

14       Q.   Okay.  Did she determine whether or not an

15   independent adjuster who had dealt with a war

16   exclusion or a terrorism exclusion should be

17   consulted?

18       A.   I don't know.

19       Q.   Okay.  Did that question ever come up, to

20   your knowledge?

21       A.   Not that I can recall.

22       Q.   Okay.  Look at page 7.  It says:

23            "All claims-related communications,

24       written and oral, should be documented in the

25       claims file.  This includes, but is not limited

302

1         I declare under penalty of perjury that I have

2    read the foregoing transcript of my deposition

3    testimony, taken on Wednesday, February 3, 2017, at

4    _____, _____, and that, with the

5    following exceptions which I have hand-marked on the

6    transcript, the same is a true record of the testimony

7    given by me at that deposition:

8

9    <u>Page/Line</u>     <u>Should read</u>     <u>Reason for change:</u>

10   305/20     YES.     I MISSPOKE WHEN I SAID "NO"

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22

23

24   3/7/17 _____     _____

25   Date     Daniel Spencer Gutterman

EXHIBIT 68, PAGE160

308

1
2
3
4
5
6
7
8        I declare under penalty of perjury that
9     the foregoing testimony is true and correct.
10
11       Executed at ___10:04 AM PT___,
12       this __7th__ day of ___March___,
13       20 __17__.
14
15
16
17                    
                      DANIEL SPENCER GUTTERMAN
18
19
20
21
22
23
24
25

EXHIBIT 68, PAGE161



I declare under penalty of perjury that the foregoing testimony is true and correct.

Executed at ___10:14 am PT___,

this __7th__ day of __MARCH__,

20 _17_.

_____
DANIEL SPENCER GUTTERMAN

137

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 69

| | |
|---|---|
| **From:** | Gutterman, Daniel S. <DGutterman@OneBeacon.com> |
| **Sent:** | Friday, July 18, 2014 7:27 PM |
| **To:** | Gutterman, Daniel S. <DGutterman@OneBeacon.com> |
| **Subject:** | |

July 8 - Just an hour before the Hamas salvo of rockets, its military wing made a statement on al-Aqsa TV saying it only started firing rockets on Monday in response to "Israeli aggression against Palestinians in the West Bank, Jerusalem and Gaza." - See more at: http://www.middleeasteye.net/news/israels-army-prepared-ground-assault-gaza-official-275282816#sthash.bfUjC1jB.dpuf

July 9 - Army spokesman Lt. Col. Peter Lerner says warplanes early Wednesday attacked more than 160 sites including Hamas command centres and 118 concealed rockets launching sites.
The Israeli military has launched airstrikes on more than 200 targets in Gaza since the start of what it calls "Operation Protective Edge," hitting more than 50 targets on Tuesday alone.

July 15 - Netanyahu said Israel would have liked to see a diplomatic solution, but would keep attacking until rocket fire stops and Hamas' military capabilities are diminished. The Israeli leader said he would "widen and increase" the campaign against Hamas, but it remains unclear if that will include a ground offensive.

July 15 – 7th day of Operation Protective Edge - http://www.haaretz.com/news/diplomacy-defense/1.604898#!

Best Regards,

**Danny Gutterman**
**OneBeacon Entertainment**
Sr. Entertainment Claims Investigator
(781) 332-8550

ATL000294

EXHIBIT 69, PAGE 163

# EXHIBIT 70

| | |
|---|---|
| **From:** | LIT_Johnson, Pamela <PJohnson2@OneBeacon.com> |
| **Sent:** | Wednesday, July 16, 2014 2:36 PM |
| **To:** | Gutterman, Daniel S. <DGutterman@OneBeacon.com> |
| **Subject:** | RE: Sources on Israel/Hamas conflict |

Today: http://www.timesofisrael.com/idf-ground-incursion-in-gaza-very-likely/

**Pamela A. Johnson, Esq.** Assistant Vice President | OneBeacon Entertainment
tel: 952.852.2455 | PamelaJohnson@onebeacon.com
onebeaconentertainment.com

**From:** Gutterman, Daniel S.
**Sent:** Wednesday, July 16, 2014 2:20 PM
**To:** Johnson, Pamela A.
**Subject:** RE: Sources on Israel/Hamas conflict

From July 7:
http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-violence-continues/#!


Best Regards,

**Danny Gutterman**
**OneBeacon Entertainment**
Sr. Entertainment Claims Investigator
(781) 332-8550

**From:** Johnson, Pamela A.
**Sent:** Wednesday, July 16, 2014 12:03 PM
**To:** Gutterman, Daniel S.
**Subject:** Sources on Israel/Hamas conflict

http://www.middleeasteye.net/news/israels-army-prepared-ground-assault-gaza-official-275282816

http://globalnews.ca/news/1438089/israel-strikes-hamas-targets-in-gaza-to-stop-rocket-fire/

http://globalnews.ca/news/1451058/israel-hamas-to-pay-price-for-its-no-to-truce/

http://www.washingtonpost.com/world/israel-accepts-truce-plan-hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-923ecc0c7d23_story.html

**Pamela A. Johnson, Esq.** Assistant Vice President | OneBeacon Entertainment
tel: 952.852.2455 | PamelaJohnson@onebeacon.com
onebeaconentertainment.com

ATL000501

# EXHIBIT 71

From:      Johnson, Pamela A.
Sent:      Wed 7/16/2014 7:35 PM (GMT-00:00)
To:        Gutterman, Daniel S.
Cc:
Bcc:
Subject: RE: Sources on Israel/Hamas conflict


Today:  http://www.timesofisrael.com/idf-ground-incursion-in-gaza-very-likely/


**Pamela A. Johnson, Esq.** Assistant Vice President  | OneBeacon Entertainment

tel: 952.852.2455  | PamelaJohnson@onebeacon.com

onebeaconentertainment.com


**From:** Gutterman, Daniel S.
**Sent:** Wednesday, July 16, 2014 2:20 PM
**To:** Johnson, Pamela A.
**Subject:** RE: Sources on Israel/Hamas conflict


From July 7:

http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-violence-continues/#!


Best Regards,


**Danny Gutterman**

**OneBeacon Entertainment**

Sr. Entertainment Claims Investigator

(781) 332-8550


ATL001560

EXHIBIT 71, PAGE 165

**From:** Johnson, Pamela A.
**Sent:** Wednesday, July 16, 2014 12:03 PM
**To:** Gutterman, Daniel S.
**Subject:** Sources on Israel/Hamas conflict

http://www.middleeasteye.net/news/israels-army-prepared-ground-assault-gaza-official-275282816

http://globalnews.ca/news/1438089/israel-strikes-hamas-targets-in-gaza-to-stop-rocket-fire/

http://globalnews.ca/news/1451058/israel-hamas-to-pay-price-for-its-no-to-truce/

http://www.washingtonpost.com/world/israel-accepts-truce-plan-hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-923ecc0c7d23_story.html

**Pamela A. Johnson, Esq.** Assistant Vice President | OneBeacon Entertainment

tel: 952.852.2455 | PamelaJohnson@onebeacon.com

onebeaconentertainment.com

ATL001561

# EXHIBIT 72

From:        westlaw@westlaw.com
Sent:        Thu 7/17/2014 6:51 PM (GMT-00:00)
To:          LIT_Johnson, Pamela
Cc:
Bcc:
Subject:     War Exclusion
Attachments: Westlaw_Document_13_51_57.doc


**Westlaw Delivery Summary Report for JOHNSON,PAMELA**

Your Search:              insur! /p war or warlike /p exclu! /p israel!
Date/Time of Request:     Thursday, July 17, 2014 13:51 Central
Client Identifier:        NBC
Database:                 ALLCASES
Citation Text:            571 F.Supp. 1460
Lines:                    2915
Documents:                1
Images:                   0
Recipient(s):             pamelajohnson@onebeacon.com


The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

ATL001635

Westlaw.

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

C

United States District Court,
S.D. New York.

HOLIDAY INNS INC., Holiday Inns Inc. (Lebanon),
Plaintiffs,
v.
AETNA INSURANCE COMPANY, Defendant.
AETNA INSURANCE COMPANY, Third-Party
Plaintiff,
v.
AMERICAN COMMONWEALTH ASSURANCE
COMPANY, LTD., Third-Party Defendant.

No. 77 Civ. 2623–CSH.
Sept. 19, 1983.

Insured brought action against insurer to recover under all-risk policy when insured's hotel in Beirut, Lebanon, was severely damaged. The District Court, Haight, J., held that insurer failed to establish that damage to the hotel fell within excluded perils of insurrection, civil war, or war.

Ordered accordingly.

West Headnotes

**[1] Insurance 217 ☞2199**

217 Insurance
  217XVI Coverage—Property Insurance
    217XVI(A) In General
      217k2196 Evidence
        217k2199 k. Burden of Proof. Most Cited Cases
  (Formerly 217k429.1(1))

Under an all-risk policy, insured need not prove cause of loss but need only prove existence of all-risk policy and loss of covered policy, and insurer then has burden of proving that proximate cause of loss was included within one of terms of exclusion.

**[2] Insurance 217 ☞1835(2)**

217 Insurance
  217XIII Contracts and Policies
    217XIII(G) Rules of Construction
      217k1830 Favoring Insureds or Beneficiaries; Disfavoring Insurers
        217k1835 Particular Portions or Provisions of Policies
          217k1835(2) k. Exclusions, Exceptions or Limitations. Most Cited Cases
  (Formerly 217k146.7(6))

Exclusions in insurance policy will be given interpretation which is most beneficial to insured.

**[3] Insurance 217 ☞2140**

217 Insurance
  217XVI Coverage—Property Insurance
    217XVI(A) In General
      217k2139 Risks or Losses Covered and Exclusions
        217k2140 k. In General. Most Cited Cases
  (Formerly 217k417.5(1))

To avoid coverage, it is not sufficient for all-risk insurers' case for them to offer a reasonable interpretation under which loss is excluded; they must demonstrate that interpretation favoring them is the only reasonable reading of at least one of relevant

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001636

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

terms of exclusion.

**[4] Insurance 217 ⚷1835(2)**

217 Insurance
    217XIII Contracts and Policies
       217XIII(G) Rules of Construction
         217k1830 Favoring Insureds or Beneficiaries; Disfavoring Insurers
           217k1835 Particular Portions or Provisions of Policies
             217k1835(2) k. Exclusions, Exceptions or Limitations. Most Cited Cases
    (Formerly 217k146.7(1))

Contra proferentem defines the scope of coverage as much as if it were a clause in all-risk policies; experienced all-risk insurers must expect exclusions drafted by them to be construed narrowly against them.

**[5] Insurance 217 ⚷2165(1)**

217 Insurance
    217XVI Coverage—Property Insurance
      217XVI(A) In General
        217k2139 Risks or Losses Covered and Exclusions
          217k2165 Proximate Cause
            217k2165(1) k. In General. Most Cited Cases
    (Formerly 217k417.5(1))

Where all-risk policy excludes loss or damage due to or resulting from enumerated perils, those words limit inquiry concerning proximate cause to facts immediately surrounding loss.

**[6] Insurance 217 ⚷1825**

217 Insurance

217XIII Contracts and Policies
    217XIII(G) Rules of Construction
      217k1825 k. Particular Words or Terms. Most Cited Cases
    (Formerly 217k146.5(5))

**Insurance 217 ⚷2159**

217 Insurance
    217XVI Coverage—Property Insurance
      217XVI(A) In General
        217k2139 Risks or Losses Covered and Exclusions
          217k2159 k. War or Civil Commotion; Riot. Most Cited Cases
    (Formerly 217k146.5(5))

For insurance purposes, war can exist between quasi-sovereign entities.

**[7] Insurance 217 ⚷2159**

217 Insurance
    217XVI Coverage—Property Insurance
      217XVI(A) In General
        217k2139 Risks or Losses Covered and Exclusions
          217k2159 k. War or Civil Commotion; Riot. Most Cited Cases
    (Formerly 217k417.5(1))

For purposes of determining coverage under all-risk policy, guerilla group must have at least some incident of sovereignty before its activities can properly be styled "war."

**[8] Insurance 217 ⚷1825**

217 Insurance
    217XIII Contracts and Policies
      217XIII(G) Rules of Construction

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001637

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

217k1825 k. Particular Words or Terms.
Most Cited Cases
(Formerly 217k146.5(5))

**Insurance 217 ☞2159**

217 Insurance
217XVI Coverage—Property Insurance
217XVI(A) In General
217k2139 Risks or Losses Covered and
Exclusions
217k2159 k. War or Civil Commotion;
Riot. Most Cited Cases
(Formerly 217k146.5(5))

"Insurrection" for insurance purposes means a
violent uprising by a group or movement acting for
specific purpose of overthrowing constituted gov-
ernment and seizing its powers.

**[9] Insurance 217 ☞2159**

217 Insurance
217XVI Coverage—Property Insurance
217XVI(A) In General
217k2139 Risks or Losses Covered and
Exclusions
217k2159 k. War or Civil Commotion;
Riot. Most Cited Cases
(Formerly 217k417.5(1))

All-risk insurer failed to establish that damage to
a hotel in Beirut, Lebanon, fell within excluded peril
of insurrection, civil war, or war, although hotel was
damaged by series of factional "civil commotion" of
increasing violence and Lebanese government could
not deal effectively with those commotions, and
country came close to anarchy, where the constitu-
tional government existed throughout and there was
no war in Lebanon with a sovereign or qua-
si-sovereign state.

**\*1461** Peter Megargee Brown, Cadwalader, Wicker-
sham & Taft, New York City, for plaintiffs Holiday
Inns, Inc. and Holiday Inns (Lebanon) Inc.; Richard H.
Walker, New York City, John W. McConomy,
Memphis, Tenn., of counsel.

Rein, Mound & Cotton, New York City, for defendant
Aetna Ins. Co.; Ernest E. Rosenberg, Arthur N. Brook,
Andrew Maneval, New York City, of counsel.

MEMORANDUM OPINION AND ORDER
HAIGHT, District Judge:

Plaintiffs Holiday Inns, Inc. ("HI") and Holiday
Inns (Lebanon), Inc. ("HI–L") bring this action
against defendant Aetna Insurance Company ("Aet-
na") to recover under an insurance policy in force
when plaintiffs' hotel in Beirut, Lebanon was severely
damaged by events occurring during a period from
October, 1975 to April 9, 1976. Aetna contends that
the damage resulted from excluded causes. This
Court's opinion of June 20, 1979 held that Aetna had
the burden of proving that proposition. After extensive
pre-trial discovery, the issue of coverage under the
policy was tried to the Court without a jury. The
quantum of plaintiffs' recovery, assuming coverage,
was reserved. Thus this decision is limited to whether
or not the loss is covered by the policy.

I.

*The Decision of the Second Circuit in Pan American
World Airways, Inc. v. Aetna Casualty & Surety Co.*

For reasons that will become apparent, I begin
with an incident occurring over the skies of London on
September 6, 1970. On that day members of the Pop-
ular Front for the Liberation of Palestine ("PFLP")
hijacked a Pan American jet aircraft. The aircraft
ultimately landed at Cairo where, after all passengers
were evacuated, the hijackers destroyed it.

Pan Am instituted suit because none of the several
insurers whose policies covered the aircraft accepted
coverage. The litigation resolved itself into a struggle

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001638

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

between the "all risk" insurers and the "war risk" insurers, the latter's policies being intended to cover causes of loss excluded under the all risk policies. Affirming the judgment of this Court, 368 F.Supp. 1098 (S.D.N.Y.1973) (Frankel, D.J.), the Second Circuit held the all risk insurers liable because "none of the all risk exclusions, considered in a light most favorable to the insured, fairly describes the cause of the present loss." *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.,* 505 F.2d 989, 1022 (2d Cir.1974) (hereinafter "*Pan Am*").

The Second Circuit decided *Pan Am* on October 15, 1974. At that time HI was negotiating, through brokers, with present defendant Aetna the all risk policy forming the subject matter of the case at bar. That policy issued under date of March 11, 1975. The "Aetna" involved in *Pan Am* was a different company. But the Second Circuit, in a scholarly, 33-page opinion by Judge Hays, with encyclopedic citation of authority,**\*1462** placed the insurance industry on notice when it declared certain principles of insurance law applicable to, and defined terms appearing in, all risk property policies. It often happens that insurers and their insureds, litigating the question of coverage, draw analogies to judgments of prior centuries. The Second Circuit performed that historical analysis in *Pan Am,* updating the ancient insurance phrases within the general context of this century's tragic Middle East strife; and it did so during the gestation period of the very policy in suit. *Pan Am* accordingly figures prominently in this Court's judgment. But first I consider the origin of the policy, and its dispositive terms.

II.

*The Origin of the Policy in Suit.*

HI is a Tennessee corporation which, among other business activities, owns and operates lodging establishments throughout the world. HI carries property insurance on these establishments. Prior to 1969, HI carried insurance on its foreign property through the American Foreign Insurance Association ("AFIA"), an unincorporated association which acts

as a foreign department for a group of leading American insurance companies, including Aetna. In 1969 HI switched its foreign insurance to American International Underwriters ("AIU"), a competitor of AFIA.

One of HI's foreign properties was a building it operated as a hotel in Beirut, Lebanon. HI had leased the building in June, 1969 from the Saint Charles City Center, a Lebanese corporation. At the pertinent times HI–L, a Tennessee corporation and wholly-owned subsidiary of HI, had succeeded to HI's rights under the lease with St. Charles City Center.

From 1969 the AIU policy covered HI's foreign properties, including the Beirut hotel, which was called (consistent with corporate worldwide practice) the "Holiday Inn." The AIU policy was renewed yearly until 1975. It was not renewed that year for the reasons described below.

During the summer of 1974 John J. Geary, AFIA's resident vice president in Chicago, decided to try to recapture the insurance of HI's foreign properties. Geary knew William A. Day, in charge of HI's insurance matters, and William G. Miller, his associate. Geary opened up negotiations with them. The HI executives were receptive. In putting together a proposal, Geary worked with Claude Lair, a property underwriter in New York whose function it was to review, accept or reject risks, and to determine premiums for the risks his principals would accept.

Lair's first quotation on behalf of insurers was summarized by Geary thus: "They said they would give riots, strikes and civil commotion in Europe and riot, strike elsewhere." [FN1] This means that the insurers were offering broader coverage for HI properties located in Europe than in other parts of the world. In Europe, the insurers proposed to cover damage caused, *inter alia,* by riots, strikes and "civil commotion"; elsewhere, civil commotion coverage was not offered.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001639

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

FN1. Geary dep. at 51.

Geary argued with Lair about the Beirut hotel. That discussion took place on February 26, 1975. Geary viewed Beirut as "the Paris of the Middle East"; he urged Lair to extend civil commotion coverage to the hotel there because "it would be better for the insured." [FN2] Lair finally agreed, but told Geary "you ought to get more money," because as originally quoted "the rate did not contemplate civil commotion." [FN3] Geary then advised Day at HI that, in respect of the Beirut property, "I now have permission from New York to extend that, to change it from riot, strike to SRCC." [FN4] Geary was pleased to have persuaded the New York underwriter because "it sweetened the policy**1463** for Holiday Inns" by providing "broader coverage." [FN5]

FN2. *Id.* at 54.

FN3. *Id.* at 56.

FN4. *Id.* at 61. "SRCC" is shorthand for "strike, riot, civil commotion."

FN5. *Ibid.*

Negotiations between AFIA and HI culminated in a policy issued by Aetna, an AFIA member, on March 11, 1975. Civil commotion coverage for the Beirut property was specifically included. HI paid an additional premium for it.

III.
*The Pertinent Provisions of the Policy.*

The policy consists of a printed form, typed additional provisions, and a number of printed or typed endorsements. The intricacies of their interrelationship were considered in this Court's prior opinion of June 20, 1979, familiarity with which is assumed. It is not necessary to repeat the exercise. Nor need HI have

done so in its post-trial brief at 20–26; Aetna does not dispute the identity or wording of the controlling provisions. Cf. Aetna post-trial brief at 1.

In short, Aetna issued HI an all risk policy covering against "all risks ... of direct physical loss or damage to the above described property from any external cause except as hereinafter provided." The exclusions upon which Aetna relies appear in Form 1301, endorsement No. 5 to the policy. That endorsement provides in pertinent part:

"2. This insurance does not cover:—

"a) Loss or damage caused by any of the perils hereby insured against, if such loss or damage either in origin or extent is directly or indirectly, proximately or remotely, occasioned by or contributed to by any of the following occurrences, or, either in origin or extent, directly or indirectly, proximately or remotely, arises out of or in connection with any of such occurrences, namely:—

"War, invasion, act of foreign enemy, hostilities or warlike operations (whether war be declared or not), civil war, mutiny, insurrection, revolution, conspiracy, military or usurped power."

Aetna contends that the damage to the Holiday Inn in Beirut was caused by human forces constituting the excluded perils of insurrection, civil war, and war.

The quoted exclusions in Form 1301 are preceded by the provision which extended civil commotion coverage to the Beirut property. The form also provides:

"1. This policy covers physical loss or damage to the property insured (including loss or damage due to fire or explosion) directly caused by persons taking part in riots or civil commotion or by strikers or locked-out workers or by persons of malicious

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001640

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

intent acting in behalf of or in connection with any political organization; also loss of or damage to the property insured (including loss or damage due to fire or explosion) directly caused by the action of any lawfully constituted authority in connection with the foregoing perils only."

IV.

*Principles and Definitions Declared by the Second Circuit in the Pan Am Case.*

A. *Legal Principles*

It is now useful to review the pertinent principles declared by the Second Circuit in *Pan Am.*

[1] 1. Under an all risk policy, the insured need not prove the cause of the loss. It need only prove the existence of the all risk policy, and the loss of the covered policy. The insurer then has "the burden of proving that the proximate cause of the loss ... was included within one of the terms of exclusion." 505 F.2d at 999.[FN6]

> FN6. It is possible for all risk insurers to draft language casting the burden of proof of causation upon the insured where the insurer denies coverage on the basis of an excluded peril. *Spinney's (1948) Ltd. v. Royal Insurance Co., Ltd.,* [1980] 1 Lloyd's L.Rep. 406 (Q.B.), is such a case; see the clause reproduced at 411. Indeed, certain portions of the policy in suit contained such language. But I held in my prior opinion that, in the circumstances of the case, the language did not operate to relieve Aetna of the burden of proof and cast it upon HI. I do not reiterate the reasons here.

**\*1464** [2] 2. Exclusions "will be given the interpretation which is most beneficial to the assured." *Ibid.*

[3] 3. To avoid coverage, "it is not sufficient for the all risk insurers' case for them to offer a reasonable interpretation under which the loss is excluded; they must demonstrate that an interpretation favoring them is the only reasonable reading of at least one of the relevant terms of exclusion." *Id.* at 1000. This principle is described by the Second Circuit as a manifestation of the rule of construction contra proferentem.

[4] 4. Contra proferentem "defines the scope of coverage as much as if it were a clause in the all risk policies"; experienced all risk insurers must expect "the exclusions drafted by them to be construed narrowly against them," *id.* at 1003–04.

[5] 5. Where an all risk policy excludes "loss or damage due to or resulting from" enumerated perils, these words limit the inquiry concerning proximate cause "to the facts immediately surrounding the loss." That is to say, "the causation inquiry stops at the efficient physical cause of the loss; it does not trace events back to their metaphysical beginnings." It is "a mechanical test of proximate causation for insurance cases, a test that looks only to the 'causes nearest to the loss.'" At least, that is so in respect of a policy worded like that in *Pan Am;* the Court of Appeals added the *caveat:* "if the insurer desires to have more remote causes determine the scope of exclusion, he may draft language to effectuate that desire." *Id.* at 1006–07.

6. In commercial litigation arising out of insurance policies, words and phrases are construed "for insurance purposes"—a context quite different from those of politics or journalism. Thus the Second Circuit summarized the issue in *Pan Am:*

> "We are asked on this appeal to determine which of the various underwriters that insured the aircraft must bear the cost of the loss. This determination depends on whether the September 6 hijacking was

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001641

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

proximately caused by an agency fairly described, *for insurance purposes,* by any of the exclusions contained in a group of identical all risk aviation policies—policies which, if not for the exclusions, would cover the loss." *Id.* at 993 (emphasis added).

Comparable reasoning appears in *Spinney's (1948) Ltd. v. Royal Insurance Co. Ltd., supra,* a case which like that at bar involved the violence in Lebanon in 1975 and 1976. Mr. Justice Mustill was asked by one of the litigants to inquire of the Secretary of State for Foreign Affairs whether the situation in Lebanon constituted a "civil war" (that being an excluded peril under the policy in suit). The judge declined to do so:

"The issue is not whether the events in Lebanon were recognized by the United Kingdom as amounting to a civil war in the sense in which the term is used in Public International Law with the corollary that this country would, if the occasion had arisen, have accorded to the participants the rights and demanded of them the duties appropriate to belligerents. The question here is whether there was a civil war within the meaning of the policy. The two questions are not the same, and a pronouncement by the Secretary of State on one will not suffice to decide the other: (citing cases) ... When deciding whether the excepted perils apply, the ascertainment of primary facts is only one step in the process. The real problem is to interpret what was happening, in the light of the words used in the policy.... Answering the question would require the Secretary of State to ascertain the meaning of the words used in the policy, and unless the Court could be sure that the Secretary of State and the Court were adopting the same interpretation, the exercise would serve only to confuse...." [1980] 1 Lloyd's L.Rep. at 426.

**B. *Policy Definitions***

The all risk insurers in *Pan Am* argued that the aircraft's destruction at the hands of hijackers fell within a number of excluded**1465** perils. They included "war," "civil war," and "insurrection." These are the exclusions upon which Aetna relies in the case at bar. The *Pan Am* policy also excluded "riots" and "civil commotion" from coverage. As noted *supra,* the Aetna policy covers damage from such causes. The Second Circuit's definitions of these phrases, declared in *Pan Am* at a time when the policy in suit was being negotiated in the New York underwriting market, are of obvious significance to this Court.

1. *War*

Having reviewed English and American cases, 505 F.2d at 1012–1015, the Second Circuit concluded in *Pan Am* that "war is a course of hostility engaged in by entities that have at least significant attributes of sovereignty." *Id.* at 1012. The court summarizes the definition:

"English and American cases dealing with *the insurance meaning* of 'war' have defined it in accordance with the ancient international law definition: war refers to and includes only hostilities carried on by entities that constitute governments at least de facto in character." *Ibid.* (emphasis added; note again the emphasis on definition for insurance purposes).

[6][7] For insurance purposes, then, "[w]ar can exist between quasi-sovereign entities." It follows that "war" does *not* include "conflicts waged by guerrilla groups regardless of such groups' lack of sovereignty." The Second Circuit in *Pan Am* rejected that contention by the all risk insurers, holding instead that "a guerrilla group must have at least some incidents of sovereignty before its activities can properly be styled 'war.' " *Id.* at 1013.

The all risk insurers' reliance upon the "war" exclusion failed in *Pan Am* because the PFLP, to which the hijackers belonged, had not been accorded by Middle Eastern states "the rights of a government....

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001642

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

No Arab state recognized the PFLP. The fact that the PFLP received financial support from several states does not give it the status of a 'quasi-sovereign.' " Nor could the PFLP's own exaggerated rhetoric, proclaiming itself to be "at war with the entire Western World," change the practical realities. The court held the "war" exclusion inapplicable in *Pan Am* because the hijackers who constituted the efficient physical cause of the loss "were the agents of a radical political group, rather than a sovereign government." *Id.* at 1015.

*2. Insurrection*

After disposing of the all risk insurers' reliance upon the exclusion for "warlike operations"—a phrase appearing in the Aetna policy but which Aetna does not press—the *Pan Am* court dealt with the insurance meaning of "insurrection." The Second Circuit coupled its consideration of "insurrection" with that of "civil war," for reasons which appear from its analysis at 505 F.2d 1017:

"In the district court all risk insurers relied on every term in clause 2 except 'invasion.' Thus, aside from 'war' and 'warlike operations,' they claimed that the loss was excluded from coverage by each of 'civil war,' 'revolution,' 'rebellion,' and 'insurrection.' Their efforts soon focused on the last of these terms, because all parties agreed that if the loss was not caused by an 'insurrection,' then it could not have been caused by any of the other clause 2 terms relating to civil disorders. 'Insurrection' presents the key issue because 'rebellion,' 'revolution,' and 'civil war' are progressive stages in the development of civil unrest, the most rudimentary form of which is 'insurrection.' See *Home Insurance Co. v. Davila,* 212 F.2d 731, 736 (1st Cir.1954); cf. *The Brig Amy Warwick* (The Prize Cases), 67 U.S. (2 Black) 635, 666, 17 L.Ed. 459 (1862). The district court accordingly confined its inquiry to insurrection, see 368 F.Supp. at 1123–1124, and we shall do the same."

Judge Frankel, writing for this Court in *Pan Am,* held that for insurance purposes "insurrection" means "(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers." 368 F.Supp. at 1124. Judge Frankel relied **\*1466** upon *Home Insurance Co. v. Davila,* 212 F.2d 731 (1st Cir.1954), an opinion by Chief Judge Magruder which the Second Circuit characterized in *Pan Am* as "the chief case on the insurance meaning of insurrection." 505 F.2d at 1017.

*Davila* involved violent acts in Puerto Rico by members of the Nationalist Party of Puerto Rico, a band of extremists possessing a rudimentary military organization with cadets, officers, and a training program. Four carloads of Nationalists arrived at a town where the insured's property was located, set fire to it, battled the police, impeded the firemen, and ran up the Nationalist flag. The insurers defended on the exclusion of "insurrection" as a covered peril. The First Circuit reversed a jury verdict for the insured and remanded for a new trial because the trial judge improperly failed to instruct the jury that "if the Nationalist leaders had the 'maximum objective' of overthrowing the government, then a jury might find that the loss was caused by an insurrection." That revolutionary purpose need not be objectively reasonable; "[a]ny intent to overthrow, no matter how quixotic, is sufficient." *Pan Am,* paraphrasing *Davila* at 505 F.2d 1018. But an intent to overthrow the established government is essential to the existence of an insurrection.

The necessity of that element of intent is clear from the Second Circuit's application of the *Davila* rule to the facts in *Pan Am.* The defense of "insurrection" was rejected because:

"... the all risk insurers did not support their burden of proving that at the time of the loss the PFLP intended to overthrow King Hussein." 505 F.2d at 1018.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001643

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

Reviewing the evidence, Judge Hays' opinion quoted a statement by the PFLP founder that the "aim of the Palestinian resistance was not to overthrow the Jordanian regime, but merely to put pressure on it." *Ibid.* The analysis concludes:

"From the welter of conflicting evidence, reasonable men might draw any of a number of conflicting conclusions about the PFLP's motives on September 6. One of those reasonable conclusions is that the PFLP did not intend to overthrow King Hussein when it hijacked the Pan American 747. The hijacking was designed to attract world attention to the Palestinian cause and to accumulate 'victories' as an example to other groups. It was a 'symbolic blow' in the PFLP's fight against the United States. The all risk insurers failed to carry the burden of proving the crucial element of PFLP intent." *Id.* at 1018–19.

This language is significant not only because it demonstrates that the specific intent to overthrow the established government is a *sine qua non* of an insurrection. The Second Circuit analysis also measures the weight of the burden of proof falling upon an all risk insurer who relies upon excluded perils. It is not sufficient for the insurer to prove a set of circumstances from which the requisite intent is one of several plausible conclusions that a reasonable fact-finder could draw. The insurer must prove the existence of "the crucial element of intent"; and its proof must negate the existence of differing intents or purposes which, if present, would result in policy coverage.

### 3. *Civil War*

The Second Circuit did not deal at length with "civil war" in *Pan Am* because it regarded "insurrection" and "civil war" as "progressive stages in the development of civil unrest, the most rudimentary form of which is 'insurrection.' " Thus if there was no insurrection, there could by definition have been that higher form of strife, a civil war. The Second Circuit's discussion indicates that the litigants in *Pan Am* all

accepted this proposition. To the extent that *Pan Am* defines "civil war," it must surely be read to require that specific intent to overthrow established government which is also essential to an insurrection. This subject is further dealt with under Point VIII(2), *infra.*

### 4. *Civil Commotion; Riot*

In dealing with "civil commotion" and "riot," the Second Circuit said in *Pan Am* **\*1467** that these terms "have a domestic flavor that contrasts sharply with the sense of the terms employed in the other clauses," such as "war," which admits "of application to occurrences with international contexts." *Id.* at 1019. The court continues:

"Insurance authorities are in accord on the local nature of these perils. 'Civil commotion ... import[s] occasional local or temporary outbreaks of unlawful violence.' 11 G. Couch, Cyclopedia of Insurance Law 42:487 (2d ed. 1963); *Boon v. Aetna Insurance Co.,* 3 Fed.Cas. p. 871 (No. 1,639) (C.C.D.Conn.1874), rev'd on other grounds, 95 U.S. 117, 5 Otto 117, 24 L.Ed. 395 (1877); Adel Salah El Din, Aviation Insurance Practice, Law & Reinsurance 112–13 (1971). Riots and civil commotion are purely 'domestic disturbances.' *Rogers v. Whittaker,* [1917] 1 K.B. 942, 944. There is no authority for the proposition that riots or civil commotion are other than local, domestic disturbances." *Ibid.*

Because this is so, the Second Circuit held that "civil commotion does not comprehend a loss occurring in the skies over two continents." *Id.* at 1020. Judge Frankel's definition of civil commotion was approved: "essentially a kind of domestic disturbance," referring to disorders "such as occur among fellow-citizens or within the limits of one community," the Second Circuit adding:

"For there to be a civil commotion, the agents causing the disorder must gather together and cause a disturbance and tumult." *Id.* at 1020.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001644

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

As for "riot," the Second Circuit approved Judge Frankel's definition:

"... a riot occurs when some multitude of individuals gathers and creates a tumult." *Id.* at 1021.

Taking the principles and definitions declared in *Pan Am* as constituting the binding law in this Circuit, I turn now to the events which resulted in the damage to the Holiday Inn in Beirut. I first consider the immediate causes of the damage, physical and mechanical, to be followed by an overview of the circumstances in which those events occurred.

V.

*The Damage to the Holiday Inn, Beirut.*

The Republic of Lebanon has a surface of roughly 4,000 square miles. Lebanon measures 135 miles from north to south, and is approximately 35 miles wide at its broadest point. Lebanon borders Israel on the south, Syria on the north and east, and the Mediterranean Sea on the west.

The capital, Beirut, is the largest city in Lebanon, situated on the Mediterranean coast, midway along the country's length. The main roads from Beirut lead north along the coast to the ports of Jounieh and Tripoli; south along the coast to the ports of Sidon and Tyre; and east to Damascus, the capital of Syria.

At the times with which this case is concerned Beirut was divided. Ultimately this division was manifested by the so-called "Green Line," which bisected the city in a north-south direction, into East Beirut and West Beirut. The Lebanese population of East Beirut was predominantly Christian; West Beirut was predominantly Moslem. Beirut was also ringed by a number of camps housing Palestinian refugees.

The Holiday Inn, Beirut, first opened for operation in 1974. It was a 26-floor structure which, during its brief operative life, had a revolving restaurant on the top floor, a nightclub on the 25th floor, some 400 guest rooms, office spaces, and a ground floor lobby and the usual public rooms. The Holiday Inn was located in the north-eastern quadrant of West Beirut, close to the port facilities. A number of other first-class hotels were in this area, including the Intercontinent, the Phoenicia, the Hilton, and the Saint Georges, the latter being directly on the water. Just to the south of this grouping of hotels lay Kantari, a residential and commercial district occupied for the most part by Moslems. The Holiday Inn, while one of the taller buildings in Beirut, was not the tallest: that distinction belonged to the Murr Tower, a concrete **\*1468** structure which in October of 1975 was nearing completion several blocks to the south-east of the Holiday Inn.

On Saturday, October 25, 1975, a battle began for possession and control of the Kantari district. Kantari, in West Beirut, "was a rather expensive residential area lying between the city center to the west, the newly built international hotels to the north [of which the Holiday Inn was one], the commercial district to the east and poorer Moslem suburbs to the south." [FN7] There had been fighting in Lebanon for some seven months; but the battle for Kantari marked the emergence of a new fighting force on the streets of Beirut. This was the Mourabitoun, the militia force of the Independent Nasserite Organization. The existence of the Independent Nasserite Organization was well known; it was one of numerous groups comprising what may generally be described as the "Moslem left" (as opposed to the Christian right). What had not been realized was that the Independent Nasserite Organization had a large and effective militia. These were the Mourabitoun. [FN8] On October 25, 1975, the Mourabitoun organized an attack from one of the Moslem suburbs to the south, driving west into Kantari toward the sea front. The Independent Nasserites and the Mourabitoun were directed by Ibrahim Kleilat, who was about to be "transformed from a back-street gangster into a politician" by the events which began on October 25. [FN9]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001645

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

FN7. The quotation is from *Death of a Country* (Weidenfeld and Nicolson, London, 1977), by John Bulloch, at p. 12. Bulloch, an English journalist resident in Beirut at the pertinent times, gave deposition evidence on behalf of Aetna. A copy of his book was marked defendant's exhibit 5 at Bulloch's deposition and received into evidence at trial without objection as "support for Mr. Bulloch's testimony." Tr. 112. The book is a useful recitation of a trained observer's observations. It is subsequently cited as "DOAC."

FN8. Bulloch dep. at 58.

FN9. DOAC, photograph caption following p. 90.

In their attack upon the Kantari district, the Mourabitoun were joined by some Saiqa militiamen. The Saiqa was a Palestinian commando organization, backed by Syria. The Mourabitoun were also joined by fighters of the radical Palestinian organizations Popular Democratic Front for the Liberation of Palestine ("P.D.F.L.P.") and Popular Front for the Liberation of Palestine ("P.F.L.P."). The opponents of these forces consisted of militiamen from the Phalange and the Party of Liberal Nationalists ("P.N.L."). The Phalange was organized along paramilitary lines in the mid-1930's. It drew most of its support from the Christian population of Lebanon, although some Moslems were also to be found in its ranks. The Phalangist Party was directed by Sheikh Pierre Gemayel, a leading Maronite Christian. By 1975, the Phalange was the largest of the predominantly Christian groups, with the largest and best armed militia. The P.N.L., also predominantly Christian, had been founded by Camille Chamoun, a former president of Lebanon. Its militia, called the Tigers, numbered at least 3,500 men in 1975.[FN10]

FN10. Much of the discussion under this and succeeding headings is derived from HI's requests for admission promulgated to Aetna under Rule 36, F.R.Civ.P., and Aetna's responses thereto. "Though Rule 36 has not been resorted to as much as some of the other discovery rules, it is a valuable time saver when properly used." 8 Wright and Miller, *Federal Practice and Procedure* (1970) at 704. The case at bar demonstrates the truth of this assertion when the parties are represented by skilled advocates who deal with each other and the Court in a spirit of professional good faith. References to the requests are designated "R.A." I have, of course, made use of the requests only to the extent that Aetna admits them. The discussion in this paragraph is derived from R.A. 53, 54, 62, and 107.

The population of the Kantari district was mixed, but it was under the control of the Phalange. The Phalangists living in Kantari were not full-time militiamen; they were members of their party whose job it was to defend their own area if called upon to do so. For this purpose, they retained in their homes such weapons as machine guns, rifles, rocket launchers, and grenades. In view of the prevailing circumstances,**1469** the Phalangists kept people on guard each night.[FN11]

FN11. Bulloch dep. at 59–60.

The Mourabitoun had as their particular objective, during the attack launched on October 25, the Murr Tower, then under construction at the end of Selim Boustiany Street. As noted, the Murr Tower was the tallest building in Beirut, several blocks to the southeast of the Holiday Inn. The Murr Tower was defended by units of Phalangist militia. After launching some diversionary attacks down other

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001646

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

streets, which had the effect of drawing some Phalangist militia away from the Murr Tower, the Mourabitoun launched a frontal attack upon the Murr Tower, "an ordinary infantry type attack assault, using assault rifles, grenades, machine guns, rockets." [FN12] The remaining Phalangist guards around the base of the Tower responded with machine guns, rifles, rocket launchers, and grenades. Substantially outnumbered, the Phalangists retreated to the first floor of the Murr Tower, and from there were able to hold off the attackers for several hours; but eventually, all Phalangists guarding the Murr Tower were killed, and the Mourabitoun succeeded in taking the Tower. Having done so, they went up into its higher floors, from which they could command a wide field of fire.[FN13]

FN12. *Id.* at 61.

FN13. *Id.* at 61–62; DOAC, pp. 15–16.

As the fighting in Kantari progressed, the bells of the Christian churches were rung, and all Phalangists in the area turned out to resist the Mourabitoun. In other parts of Kantari, the Phalangists were able to repel the attacks; the quick seizure of the Murr Tower constituted the Mourabitoun's main success of the night.[FN14]

FN14. DOAC at p. 16.

Having seized the Murr Tower, the Mourabitoun installed sand bags and heavy machine guns on the top floors. By doing so, the Mourabitoun were able to harass Phalangist street movements in several directions. "After their quick success in Kantari, the Mourabitoun seemed to run out of steam"; in this, their first appearance in the streets, the Mourabitoun "had fought tenaciously and well to prove themselves a match for any of the other proliferating private armies.... Having made their point, they were content to sit back for a while, to collect the spoils of war and leave it to their leaders to reap the political harvest."

[FN15]

FN15. *Id.* at p. 24.

In November and December, 1975, fighting continued in this part of Beirut. The Phalangist militia continued to hold the hotels in the sea front district, including the Holiday Inn. In consequence, there was fighting between the Phalangist militia in these hotels, and the leftist forces in the surrounding areas. Fire was exchanged between the Murr Tower and the sea front hotels. In addition, people on the ground would fire at the hotels. The weapons used included machine guns, rocket launchers, and rifles.[FN16]

FN16. Bulloch dep. at 68–69.

In October of 1975, the European comptroller for HI was Jan Reedijk. Reedijk was based in Brussels, and those in charge of the Holiday Inn, Beirut reported to him. Reedijk happened to be in Memphis, Tennessee, the HI headquarters, when he first heard that the Holiday Inn, Beirut had suffered damage. At some time in November, 1975, Reedijk, while in Memphis, received a telephone call from a Mr. Saikali, the local comptroller in charge of the Holiday Inn, Beirut. Saikali told Reedijk that the Holiday Inn had been occupied by Phalangist militia, and that the hotel had incurred "some damage, but nothing major."[FN17] After having been assured that it was safe to do so, Reedijk went to Beirut on November 26, 1975 and inspected the hotel in the company of the local managers. Reedijk stayed in Beirut only one day. At the time the Phalangists moved into the Holiday Inn, there were only about fifty guests resident **\*1470** there; they were moved out, and this constituted the last time that guests stayed at the Holiday Inn.[FN18] During his examination of the building, Reedijk observed that the top-floor restaurant was not operational. Its windows had been shot out, and fire and water damage had taken place. Twelve private accommodation rooms had been totally destroyed; 15 rooms were partially

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001647

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

damaged by fire; and there were about 35 additional rooms with slight damage consisting of torn or burned curtains and broken glass.[FN19]

FN17. Reedijk dep. at 8.

FN18. *Id.* at 10.

FN19. *Id.* at 29.

Another Holiday Inn employee connected with the Holiday Inn, Beirut who first heard about the fighting while in Memphis was Nabil Chartouni, a Lebanese, who in October of 1975 was vice-president for Middle East development of the Holiday Inns organization. He was stationed at the Holiday Inn, Beirut. In late October 1975, Chartouni was in Memphis attending a business conference. He received a telephone call from his secretary at the Holiday Inn, Beirut, Maria Kazandjian. Chartouni had heard of the Holiday Inn having sustained some damage on the news; Ms. Kazandjian then telephoned him, and said: "Everything is terrible. We are down in the basement now, all the employees and quite a few of the guests, and the bombardment is continuous and the fighting is continuous." Kazandjian did not specify who was doing the bombarding or the fighting, except to say that "some elements were fighting in the hotel, mainly Phalangists." [FN20]

FN20. Chartouni dep. at 10.

Chartouni returned to Beirut in mid-November, at which time he found the hotel empty of guests. When he returned, he found that the hotel facade was damaged in several places. It had been hit by rockets; glass windows had been broken; there was fire damage inside the rooms on several floors; and some looting had taken place. Chartouni XBT at 18. The hotel was closed to guests.[FN21]

FN21. *Id.* at 13, 15, 18, 22.

Upon his return, Chartouni took charge of the Holiday Inn, Beirut. His main objective was to protect the hotel and maintain the status quo by keeping the damage to an absolute minimum, and trying through his contacts in the area to keep the combatants from coming into the hotel. As noted, Chartouni was not in the hotel when it was first damaged; but on the basis of the reports he received, and his own knowledge of conditions in Beirut, he identified the forces who entered the Holiday Inn when the Mourabitoun launched their attack and seized the Murr Tower as "a hodge podge of various people who happened to be Christian or Moslem at that time, to be fighting on the same side, trying to gain control of a certain area.... You can call them Rightists." [FN22]

FN22. *Id.* at 25  28.

During the period between late October and December 6, 1975, there was "little activity" of a hostile nature in Beirut; "the 'hotels front' was the most active, with the Leftists holding the Palm Beach and Excelsior, and occasionally trading fire with the Phalangists in the Holiday Inn, Saint Georges and Phoenicia." [FN23] On December 6, 1975, the fighting sharply escalated as the result of what came to be known as "Black Saturday." On the night before, four Phalangist leaders were found murdered on the outskirts of a village in the Christian area. While the murderers were unknown, "it was presumed that it was some Moslem Leftist Palestinian 'factions' and therefore many of the armed Christian individuals went into the streets basically in the port area of Beirut, and they slaughtered many Moslem people." [FN24] Moslem leaders sought to prevent a comparable retaliation; [FN25] but **\*1471** some Moslems retaliated "and slaughtered several Christian people." [FN26] In particular, the Moslem leaders could not stop a punitive assault launched against Phalangist militia men holding the hotel area of Kantari. "Ibrahim Kleilat's Mourabitoun began the assault, spurred on by their determination to exact vengeance for what had hap-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001648

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

pened over the previous two days, and were successful in throwing the Phalangist defenders out of the Saint Georges and Phoenicia hotels, causing considerable casualties to the defenders...." [FN27]

FN23. DOAC at pp. 93–94.

FN24. Chartouni dep. at 38. In point of fact, hundreds of unarmed Moslems were murdered in Beirut. The parties agree that "Black Saturday ... marked the start of the most serious fighting in Beirut to date." R.A. 122.

FN25. DOAC at p. 97.

FN26. Chartouni dep. at 30.

FN27. DOAC at p. 98.

These events manifested themselves to Chartouni in the Holiday Inn when Phalangist militia men came into the hotel, shortly after "Black Saturday" to take up positions. It is indicative of the extent to which labels tend to blur in Lebanon that the first Phalangist entering the Holiday Inn with weapons was named "Mohamed"; Chartouni asked him "what in hell" he was doing with the Rightists if his name was Mohamed, and received the answer that the last time the Phalangists were in the Holiday Inn, "there was eight of us here, Moslems, out of 30"—"it has nothing to do with being Christian or Moslem. We are just fighting for a good cause." [FN28] Other militia men came into the Holiday Inn; Chartouni decided that it was time to get his employees out. No government agencies were available to send assistants to evacuate the Holiday Inn employees; eventually the American Embassy sent two personnel carriers in response to Chartouni's statement (untruthful, but surely excused by the exigencies of the situation) that two American citizens were trapped in the hotel. At this time, the Holiday Inn had on the premises a skeleton staff of about 30; when the hotel was operating, the staff numbered 500 em-

ployees. [FN29]

FN28. Chartouni dep. at 40.

FN29. *Id.* at 40–43.

Chartouni and certain other Holiday Inn employees were evacuated to the Phoenicia hotel where they remained for some time until the Phoenicia came under increasing fire from Leftist factions that had seized the Saint Georges hotel. At this time, "fire was raging all over the place"; from the Phoenicia, Chartouni could observe that the Saint Georges hotel had been looted and was then set on fire.[FN30] He could also observe the Holiday Inn, which remained in the hands of the Phalangists. The Holiday Inn was coming under fire from both the Murr Tower and from the Saint Georges. Chartouni could see fires breaking out "from various floors" at the Holiday Inn. [FN31] Eventually Chartouni was able to leave the Phoenicia hotel in armoured carriers sent by the Lebanese Army. Chartouni spent several days in the mountains, and then formed the desire to get out of Lebanon at that time, "because I felt it was a futile exercise any more to try to protect the hotel." [FN32] Chartouni departed Beirut to visit his family in Austria on or about December 13, 1975. While he returned to Beirut periodically for meetings and other business, he did not again go to the hotel district. [FN33]

FN30. *Id.* at 50.

FN31. *Id.* at 59.

FN32. *Id.* at 57, 64.

FN33. *Id.* at 65.

The post-Black Saturday fighting saw the Mourabitoun on the attack and the Phalangists being driven back. However, the Phalangists held their last defensive line near their headquarters, "and after more

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001649

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

than a week the battle ground to a halt as the left-wing militia realized they had taken all the ground they could, and stood no chance of scoring the outright victory they had sought." [FN34] That left a Phalangist redoubt jutting into western Beirut; a redoubt which included the Holiday Inn.

>    FN34. DOAC at p. 98.

During the December fighting, the Holiday Inn had been reoccupied by members of rightist militias. Parts of the hotel were set afire and numerous floors were hit by grenades. By Friday, January 2, 1976, the **\*1472** Holiday Inn was totally unattended by and inaccessible to the hotel's employees.[FN35]

>    FN35. R.A. 131.

The Holiday Inn was finally wrested from Phalangist hands during fierce fighting between March 21 and 26, 1976. The Mourabitoun were reinforced by units of the Palestinian Liberation Organization ("PLO"), and by officers and men of the so-called "Lebanese Arab Army," [FN36] who brought heavy military equipment to the task. Rockets and shells smashed into the building. The Phalangist defenders were killed in floor-to-floor fighting. By a ruse the Phalangists recaptured two floors of the Holiday Inn, but could not hold them, and the Phalangist reinforcements were wiped out in an armoured-car led assault the next day. During this fighting the Holiday Inn changed hands several times. By March 23, however, it was occupied by Moslem and Palestinian leftists.[FN37] "This time the Inn was properly and effectively garrisoned, and ceased to be fought over, though it was frequently used as a sniper position by Palestinians or Mourabitoun and made movement hazardous on the harbour road in East Beirut." [FN38]

>    FN36. Under the pressure of events in Lebanon, the Lebanese Army was breaking up. Ahmed Khatib, a Moslem lieutenant, led a

breakaway movement in the Bekaa Valley and proclaimed himself head of the "Lebanese Arab Army." Bulloch describes what transpired in DOAC at p. 115:

>    "Whole garrisons and barracks followed his lead, arresting Christian commanders and replacing them with Moslems; at least forty tank crews defected to this new Moslem Army with their vehicles. At the same time, Christian units sided openly with the Right, so that the long-feared split in the Army, avoided in 1958, took place in 1976."

>    Eventually "the regular Lebanese Army itself was left as a rump force consisting mainly of headquarters' staff." *Id.* at p. 119.

>    FN37. DOAC at p. 124; R.A. 146.

>    FN38. DOAC at pp. 124–25.

## VI.

*Lebanon: Its Population, Parties, Leaders, and Neighbors.*

We must now step back from the immediate, physical causes of the damage to the Holiday Inn, and examine the historical, social and political context within which that violence took place.

Prior to World War I, present-day Lebanon and Syria, its neighbor to the north and east, were controlled by Turkey. Following the defeat of the Central Powers in the war, the Turkish Empire was redistributed. The area presently comprising Lebanon and Syria was detached from Turkey, and given to France for administration under Mandate by the League of Nations. The Mandate became effective in 1923, and ended in 1943. As the French withdrew, Lebanon in its modern political form emerged.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

(a) *Population*

In 1975 and 1976, the population of Lebanon was estimated to be in excess of 3 1/2 million. Included among the native Lebanese, Christian and Moslem, were some 350,000 Palestinians who had come from other lands, in circumstances to be related *infra*.[FN39]

    FN39. R.A. 22.

The Christian population consisted primarily of Maronites, Greek Orthodox, Greek Catholics, and other sects.[FN40] The Moslem population was divided among the Sunni, Shi'ite and Druze sects.[FN41]

    FN40. R.A. 23.

    FN41. DOAC at p. 26.

(b) *Political Structures*

The political system in Lebanon today is based upon both the written Lebanese Constitution and the unwritten, so-called "National Pact" entered into when France granted Lebanon independence in 1943.

The Constitution establishes a Republic and a secular state which is headed by a President who is elected by the Chamber of Deputies for a six-year term. The head of the government is the Prime Minister—sometimes referred to as the Premier—who is appointed by the President. Members of **\*1473** the Chamber of Deputies are elected directly by the people according to the electoral laws of the country.[FN42]

    FN42. R.A. 27.

The National Pact provides that the President of the Republic must always be a Maronite Christian; the Prime Minister a Sunni Moslem; and the President of the Chamber of Deputies a Shi'ite Moslem. The National Pact also provides for proportional representation by Moslems and Christians in the Chamber of Deputies in accordance with a fixed ratio. The ratio is fixed on the basis of a population census of 1923, and provides for six Christian representatives to every five Moslem representatives.[FN43]

    FN43. R.A. 28.

This allocation of political power along religious lines came to be known as the "confessional" system. It carried over into the Army, where the senior officer corps was predominantly Maronite Christian.

(c) *Political Leaders*

From 1970 until September 1976, the President of Lebanon was Suleiman Franjieh, a Maronite Christian. Elias Sarkis, another Christian, became President in September 1976.

Camille Chamoun, also a Christian leader, was President of Lebanon from 1952 to 1958. In addition, he was the founder and leader of the Party of Liberal Nationalists ("P.L.N."). In June of 1975, Chamoun became the Minister of the Interior. In this capacity he controlled Lebanon's Internal Security Forces ("F.S.I.") from June 1975 through the middle of 1976.

Pierre Gemayel was the leader of the Kataeb Party, also known as the Phalange (to which prior reference has been made), during the early 1970's.

Rashid Karami was a prominent Sunni Moslem leader who served as Prime Minister under President Franjieh from May 1975 through November 1976. Karami had been Prime Minister eight times prior to this appointment. As Prime Minister, Karami was the Commander-in-Chief of the Lebanese Army.

Kamal Jumblatt was a prominent Druze leader from the central mountain region of the Chouf. Jumblatt was the founder of the Progressive Socialist Party ("P.S.P."), and advocated the abolition of the sectarian system of representation in Parliament and public office. Jumblatt also served as the chief spokesman for

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001651

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

the National Movement (see *infra* ). He was assassinated in March 1977.[FN44]

> FN44. The discussion under this subheading is derived from R.A. 31–36.

(d) *Political Parties and Organizations*

In 1969 a confederation of left of center political parties was formed which bore the name "National Movement." The parties agree that the following identifiable organizations or groups were members of the National Movement:

The Progressive Socialist Party ("P.S.P.")

The Independent Nasserite Movement ("I.N.M.") or Independent Nasserite Organization ("I.N.O.") whose military arm was the Mourabitoun. They have been previously mentioned in connection with the damage to the Holiday Inn

The Lebanese Communist Party ("L.C.P.")

The Organization of Communist Action ("O.C.A.")

The Syrian Social Nationalist Party ("S.S.N.P.")

The Ba'ath Socialist Party (Syria): Lebanese Branch

The Ba'ath Socialist Party (Iraq): Lebanese Branch

The Arab Socialist Union in Lebanon ("A.S.U.L.")

The Union of the Forces of Working People—the corrective movement

The Populist Nasserite Organization ("P.N.O.")

The Arab Socialist Action Party

The Movement of the Disinherited (a predominantly Shi'ite organization which **\*1474** split with the National Movement in 1976)

The 24th of October Democratic Socialist Movement

The National Christian Front

Many of these parties, organizations or groups which comprised the National Movement had militia of varying sizes. From time to time, and in varying degrees, they had members of various religious persuasions. To the extent that generalizations are possible, and has previously been stated, the members of the National Movement were politically to the left of center.[FN45]

> FN45. R.A. 37–51.

In 1975 and 1976 the chief spokesman of the National Movement was the Druze leader, Kamal Jumblatt. For three hundred years prior to the mid-19th century the Druze dynasties had controlled what is present day Lebanon. However, after a series of battles between 1840 and 1860, the Druze were gradually overcome by the Maronite Christians, who emerged as the dominant community, consisting themselves of seventeen officially recognized sub-communities or sub-sects. The Druze, smaller in numbers, ceded political power, but remained more powerful than their absolute numbers would have suggested. At the times pertinent to this action, Jumblatt was the leader of the Druze, and of the National Movement. Jumblatt was described by Jonathan Randal, the correspondent for the Washington Post in Lebanon at the time, who was called by Aetna to give deposition testimony:

> "He was a king-maker in independent Lebanon. No president of the Republic was ever elected without his support, and very few presidents of the Republic

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001652