571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

ever got through their terms without finding Jumblatt a determined adversary." [FN46]

>    FN46. Randal dep. at 39–40.

In describing the politics of Lebanon, one must guard against the simplification of labels. The phrase "National Movement" has a unified, solid sound to it. It is true that the component parts of the National Movement stood to the left of center. But among those component parts, there was wide diversity. The National Movement was described thus by Moussa Prince, a Beirut resident and lawyer called as a witness at trial by Aetna:

>    "It is a movement in which are grouped parties and tiny groups which go all the way from the ultrareligious up to and including the extreme left." [FN47]

>    FN47. Tr. 153.

Standing in general political opposition to the National Movement was the Lebanese Front, a coalition of predominantly right of center organizations whose principal objective was to maintain intact the *status quo* created by the National Pact of 1943, which I have previously described. The identifiable components of the Lebanese Front were as follows:

The Phalange (previously described)

The Party of Liberal Nationalists ("P.N.L."), the party founded by Camille Chamoun

Al Tanzim or the "Organization," a predominantly Maronite group

The Guards of the Cedars, an extremist right-wing organization particularly interested in the expulsion of all Palestinians from Lebanon

The Zghartan Liberation Army, a Maronite group centered in the Zgharta region of Lebanon. This group was organized by Tony Franjieh, the son of former president Suleiman Franjieh

The Permanent Congress of the Lebanese Orders of Monks, an organization of Maronite clergy [FN48]

>    FN48. R.A. 53–59.

Some of the parties, organizations and groups described *supra* were, at various times and in various degrees, allied with or influenced by foreign interests. But they were indigenous to Lebanon. We must also consider three foreign sources of direct impact upon Lebanon. These are the Palestinians, Syria and Israel.

**\*1475** (e) *The Palestinians*

The parties do not dispute much of the factual background regarding the Palestines in Lebanon.[FN49] "From 1948 onwards ... Palestinians fled from their homeland in the face of Israeli conquest or harassment, or merely through fear." [FN50] Some stopped first on the West Bank of the Jordan River; then, as that was overrun by Israelis, they moved into Jordan proper. [FN51] But many Palestinians came to Lebanon as a result of the fighting in 1948; and around Beirut "they formed a kind of necklace in a semi-circle going from West Beirut and the Mediterranean, in an arc around to East Beirut." [FN52]

>    FN49. See R.A. 75–80.

>    FN50. DOAC at p. 2.

>    FN51. *Ibid.*

>    FN52. Randal dep. at 88. The witness added:

>    "Some people have made the bad joke that the necklace turned out to be a choker."

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001653

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

The Palestinians who first settled around Beirut anticipated returning to Palestine soon. However, the years wore on, and that did not occur. The 1967 Arab-Israeli war inflicted a stunning defeat, in six days, upon the Arab armies. Prior to that time, the Palestinians in Lebanon were regarded as refugees. There was a heavy Lebanese police presence in and around the refugee camps. Few Palestinians were granted Lebanese citizenship. But in the aftermath of the 1967 war, with the Arab countries bewildered and cast down by their defeat, the Palestinians "remained as kind of a symbol of Arab purity and the refusal to accept that defeat." Concomitantly, in Lebanon a greater militancy arose on the part of the Palestinians, and a lessening of Lebanese government control. This period of time also saw the emergence of Yasser Arafat and his associates as the controlling force in the Palestine Liberation Organization ("P.L.O.").[FN53]

FN53. Randal dep. at 88–89.

The P.L.O. had been established in 1964 by the Arab League. Its goal was the creation of a Palestinian state, if necessary by use of force. The P.L.O. established training camps and staging areas in Jordan, Syria and Lebanon. The Palestine Liberation Army ("P.L.A.") had originally been created as the purported military arm of the P.L.O., but by the 1970's the primary military arm of the P.L.O. in Lebanon was el Fatah, led by Arafat.[FN54]

FN54. R.A. 75; DOAC at p. 49.

In 1969, the P.L.O. entered into an agreement with the Lebanese government which gave the P.L.O. the right to establish armed units and training grounds within the refugee camps, provided that Lebanese sovereignty was respected and maintained. This was the so-called "Cairo Agreement" of November 3, 1969, pertinent portions of which appear in the margin.[FN55]

FN55. The Cairo Agreement appears in English translation in Khalidi, *Conflict and Violence in Lebanon: Confrontation in the Middle East,* Harvard University Center for International Affairs (1979) at pp. 185–187. The agreement recites preliminarily that:

"... In consonance with the bonds of brotherhood and common destiny, relations between Lebanon and the Palestinian revolution must always be conducted on the bases of confidence, frankness, and positive cooperation for the benefit of Lebanon and the Palestinian revolution and within the framework of Lebanese sovereignty and security."

The "Palestinian presence in Lebanon" was then "reorganized" on the basis of the following governing principles:

"1. The right of work, residence, and movement for Palestinians currently residing in Lebanon;

"2. The formation of Local Committees composed of Palestinians in the camps to care for the interests of Palestinians residing in these camps in cooperation with the local Lebanese authorities within the framework of Lebanese sovereignty;

"3. The establishment of posts of the Palestinian Armed Struggle inside the camps for the purpose of cooperation with the Local Committees to ensure good relations with the Lebanese authorities. These posts shall undertake the task of regulating and determining the presence of arms in the camps within the framework of Lebanese security and the interests of the Palestinian

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001654

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

revolution;

"4. Palestinians resident in Lebanon are to be permitted to participate in the Palestinian revolution through the Palestinian Armed Struggle and in accordance with the principles of the sovereignty and security of Lebanon."

There follows an agreement "to facilitate commando activity" by specified means. The agreement concludes:

"13. It is understood that the Lebanese authorities, both civil and military, shall continue to exercise all their prerogatives and responsibilities in all areas of Lebanon in all circumstances;

"14. The two delegations affirm that the Palestinian armed strugle [sic] is an activity in the interest of Lebanon as well as in that of the Palestinian revolution and all Arabs; ..."

The Cairo Agreement was signed by General Emile Bustani, commander of the Lebanese Army and head of the Lebanese delegation, and by Arafat as head of the Palestinian delegation, in the presence of the minister of foreign affairs and war minister of the United Arab Republic.

**\*1476** Syria refused to tolerate the use of its own territory as a base for direct infiltration of and attacks on Israel because of the threat of reprisals. By 1970, the P.L.O. presence in Jordan was significant and threatened the sovereignty of the Hashemite Kingdom. In September 1970 (so-called "Black September") the Jordanian Army began a series of operations which ultimately led to the expulsion of the P.L.O. from Jordan. After the expulsion of the P.L.O. from Jordan, Lebanon became the center of Palestinian operations against Israel.

As a result of guerrilla activities directed against Israel by Palestinian organizations operating out of Lebanon, Israel countered by making reprisal raids, principally in southern Lebanon. These raids drove significant portions of the predominantly Shi'ite population to urban areas, principally Beirut, and exacerbated the problems of poverty in and around the capital.

The reprisal raids also drove an increasing number of Palestinians into Lebanon and north to Beirut. The influx of Palestinians was opposed by the Maronites and many Sunni Moslems who feared that the Palestinian immigrants would be mobilized into an active force in Lebanese politics. Moslem and Christian nationalists opposed the presence of the Palestinians because they were seen as an affront to Lebanese sovereignty.

The Lebanese government was unable to oppose effectively the Israeli military power or to expel the P.L.O. militias as had been done in Jordan, because of the possibility of censure by other Arab countries and because of the support to the P.L.O. within the Moslem populace and the lower ranks of the army. [FN56]

FN56. R.A. 77–80.

**(f)** *Syria*

Syria borders Lebanon on the north and east. It is ruled by the Ba'ath Party, which at the pertinent times was "run by the Alamite," a "break-away Shia sect." [FN57] Syria's president was Hafez Assad, a "pragmatic ... leader who had brought stability to his country after twenty years of upheavals." [FN58] Syria was hostile to Israel, and critical of Egyptian president Sadat's accommodation with that nation in 1975.[FN59] The Israelis, in turn, "have made of the Syrians a kind of special devil." [FN60]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001655

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

FN57. Randal dep. at 50.

FN58. Bulloch, DOAC at p. 5.

FN59. *Id.* at 4.

FN60. Randal dep. at 51.

Syria's relations with the Palestinians play an important part in events. Prior to 1973, "the Syrians saw in the Palestinians a useful irregular arm of their own power, and so supported and supplied them, while at the same time trying to exert control through their domination of Saiqa, militarily the most powerful of the commando groups, which was under the direct orders of Syrian Army Intelligence." [FN61] But disenchantment with Egypt caused Syria's president Assad to think in terms of "the leadership of the whole Arab world." [FN62] This concept necessitated a Palestinian presence in Lebanon subject to Syrian control. The steps Syria took to implement that policy are discussed *infra.*

FN61. DOAC at p. 4.

FN62. *Id.* at 5.

(g) *Israel*

Israel is Lebanon's southern neighbor. At the pertinent times, Palestinian commandoes **\*1477** frequently raided Israeli settlements from bases in southern Lebanon. Israel would retaliate vigorously. One commentator suggests that Israel's attacks upon southern Lebanon, which did more harm to the relatively impecunious Shia inhabitants of the area than to the mobile Palestinians, were intended to polarize the factions in Lebanon, to the ultimate disadvantage of the Palestinian presence there. [FN63] Be that as it may, the strife on the Lebanese-Israeli border and the inability of the Lebanese Army to control the Palestinians or protect the Shia population from the Israelis con-

stituted another source of growing unrest.

FN63. Bulloch, DOAC at p. 28.

VII.
*The Events of 1975 and 1976*

Having considered the parties, organizations, persons, and nations involved, let us return to the events of 1975 and 1976.

The attitudes and objectives of the identifiable interests appear clearly from the evidence.

As for the Christian right—I use these labels *faute de mieux,* although they are not as precise as they sound—its main purpose was the preservation of the status quo. [FN64] That is perhaps understandable, since the National Pact of 1943 gave the Christians the presidency of the Republic and a six-to-five parliamentary majority in perpetuity. Over the succeeding years, "the Maronites in particular and the Christians in general had amassed a disproportionate share of the country's capital ..." [FN65] The Christian factions also had the subsidiary aim of controlling or expelling the Palestinians, [FN66] since "if the Palestinians were not subjugated quickly, they would provide the muscle which the growing Leftist movement lacked." [FN67] The Palestinian presence became a particular concern of the Phalange. [FN68] ,[FN69]

FN64. Bulloch dep. at 313; deposition of Lucien George, Lebanon-born correspondent of the French newspaper *Le Monde,* called as a deposition witness by Aetna, at dep. 19–20; Randal dep. at 186–188.

FN65. DOAC at p. 2.

FN66. Bulloch dep. at 313.

FN67. DOAC at p. 4.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001656

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

FN68. Bulloch dep. at 313.

FN69. George dep. at 22–23.

Bulloch in his deposition testimony summarized the position of the right-wing groups:

"Q Did the Right announce any positions?

"A Their stated aims again were made at press conferences which I attended, and interviews, and publications.

"They wanted to establish the authority of the state by which they meant they don't want to have the Palestinians as the state within the state in Lebanon, as they saw it, and also opposed the Left-wing aims and wanted to maintain the status quo, that is, to continue the confessional system and to continue to have a Christian as the president of the country." Dep. at 141.

As for the left-wing groups, Bulloch testified:

"The Left-wing grouping announced several times, including by Jumblatt himself, in the press conference that I attended, that they wanted an overall change in the system of government in Lebanon, that they wanted to change the National Covenent, [sic] and in particular they wanted to alter the provision that the president should also be a Christian and they wanted to alter the six to five ratio.

"Various things like that.

"They wanted to enlarge the parliament to be divided equally between Christian and Moslem deputies to get away from the system of direct representation of various religious groups." Dep. at 140–41.

The basic purpose of the Palestinians in Lebanon was also described by Bulloch in his deposition testimony:

**\*1478** "Q Did the Palestinians voice any positions as to conditions in lebanon?

"A The Palestinians' aim was to be allowed to carry on as they had been doing before in Lebanon. They didn't want to be involved in a war there.

"Their aim was to, their stated aim was to be allowed to go back to their homeland to establish their own state, and Palestinian leaders said on many occasions that they didn't want to be diverted from that by having to fight their Arab brothers in any other countries." Dep. at 143.

Bulloch expands on the Palestinians' situation in *Death of a Country,* a useful discussion that I quote at some length:
"The Palestinians, for their part, had no real desire to fight in Lebanon. Their leaders realized that the diplomatic gains of the past could all be lost if they became embroiled in Lebanese domestic politics or bogged down in a costly war. The Lebanon was not their home, nor did they want it as a new homeland. They were committed to the idea of returning to Palestine, of establishing a state there. To do that, they had to have a base and they knew very well that Lebanon was the last place left open to them. They had been brutally expelled from Jordan five years earlier, and the memories of that savage experience were still vivid. They had to preserve their one safe haven and they had to show that they could not be dominated or suppressed by anyone, least of all by the weak Lebanese State or the unofficial Phalangist Party." Pp. 41–42.

The positions of Syria and Israel have already been described. Syria opposed Israel, sensed its own

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001657

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

star rising in the Arab world, and sought to control the Palestinians in Lebanon. In addition, Syria wished Lebanon to remain a base of operations for the P.L.O. because Syria did not want the P.L.O. operating from its own territory.[FN70] Israel sought to protect its northern boundary, and to discomfit the Palestinians in Lebanon.

FN70. R.A. 85.

These were the motivating attitudes of those involved with Lebanon at the beginning of 1975. Two additional factors are particularly worth noting. The first is that there were wide differences of opinion and allegiance between the groups which heretofore have been listed under the labels "right" or "left." The use of those labels derives from an almost inevitable journalistic or political shorthand; but they should not obscure the substantial degree of fragmentation in beliefs and objectives. A number of trial witnesses attest to this reality, which was particularly true of the interests on the left. Of those interests, Lucien George said:

"In order to achieve this change of system, there was a whole variety, a spectrum of positions, which went from reform with muscle to pure revolution." Dep. at 22.

And Bulloch, testifying at his deposition, described as accurate an article which he dispatched from Beirut on August 11, 1976, in which he wrote:
"On the Left the Palestinians are hopelessly split. The major group within the Palestine Liberation Organization, Fatah, would be willing to try to reach a compromise. But the organizations of the so-called Rejection Front want no negotiations at all, and in Beirut one man with a gun wrecks any cease fire. The left-wing alliance led by Mr. Kamal Jumblatt is just as divided. Mr. Jumblatt himself is a Druze, feudal landowner and clan chieftain bent on destroying the very system which allows him to exercise power.... Lebanon has always been a collection of feudal fiefdoms rather than a homogeneous state and even in the pseudo-sophistication of Beirut each neighborhood owed its allegiance to a family or a party rather than to a government." Dep. at 270–271.

A second significant factor had to do with the particular right-wing response to left-wing suggestions of political reform. That *1479 reaction was extreme, and fed in large measure upon fear. Thus Randal testified:

"But such were the tensions within the society, especially seen from the narrow prism of the Maronite Catholics, that any change in the status quo was considered tantamount to revolutionary, and, as a result, this country went off the graph because nobody could say to the Christian Maronites: Stop it, you are not being asked to give away the whole farm. All they are asking for is this.

"Because they, through centuries of real and imagined and remembered suffering and persecution, had come to the conclusion that if they gave a fingernail away, it was all over." Dep. at 186–187.

These peoples, the products of this history, inhabiting this country, surrounded by these forces, were plunged almost inevitably, it would now seem, into the months of violence and destruction which give rise to the present litigation. And surely one must on occasion raise one's eyes from the fine print of the insurance policy and the legal precedents which govern the rights and obligations of HI and Aetna, and mourn the tragedy that has befallen this lovely country and its people.

But I return to my proper task. As described under Point V, *supra,* the fighting which first caused damage to the Holiday Inn occurred in October, 1975. During the earlier months of 1975, other violent incidents had

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001658

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

occurred which, in part at least, helped set the stage for the fighting in the Kantari district of Beirut which involved the Holiday Inn and other hotels. The parties are in substantial agreement concerning the more prominent of these incidents, which will now be re-counted.[FN71]

> FN71. The discussion of events prior to October, 1975 is derived from R.A. 87–92, 94–104, except where otherwise indicated in the footnotes.

On February 26, 1975, a group of fishermen in Sidon began demonstrating against the establishment of a new company formed principally by Camille Chamoun which they viewed as a threat to their livelihood. Riots, demonstrations of sympathy and scattered violence continued through March 3, 1975. Political opinion became polarized over the Lebanese Army's role in these clashes. Certain members of the Moslem establishment accused the Lebanese Army of oppressing the workers. The Moslem establishment demanded a reorganization of the Army to give Moslems an equal participation in command. Members of the Christian community acclaimed the part played by the Army in upholding law and order. Both Pierre Gemayel and Camille Chamoun and their followers rejected the Moslems' demands for reorganization of the Army. [FN72]

> FN72. Palestinian commandoes effectively supported the Moslems in the fighting at Sidon, which Bulloch regarded as significant: "... the Sidon events had shown the Palestinians in a new light: they had proved they were ready to help the Lebanese Left and the largely Moslem section of the poorest stratum of society in disputes which had nothing at all to do with the Palestinian movement as such." DOAC at p. 36.

On April 13, 1975, a bus with Palestinian and Lebanese passengers was ambushed by a group of armed Phalangists in retaliation for the assassination of two Phalangists and Gemayel's bodyguard earlier that day. Twenty-seven passengers were killed. This became known as the "Ain Rumanah" incident after the district through which the bus was travelling at the time of the attack.

These incidents triggered heavy fighting between Phalangist militias on the one hand, and National Movement and Palestinian militiamen on the other.[FN73]

> FN73. Again, one must guard against the assumption that the militias were all formally structured or readily identifiable. Some were. But others operating in Beirut were described in his deposition by W. Nathaniel Howell, Jr., political officer in the United States Embassy at the time:
>
> > "... it was almost impossible to identify, unless you knew a neighborhood, who the armed men in the neighborhood were.... Everyone controlled little areas of territory." Dep. at 22, 26.
>
> George McMurtrie Godley, American Ambassador to Lebanon who was in Beirut from February 26, 1974 to January 13, 1976, described the situation thus:
>
> > "The military factions you might typify by what occurred around the Holiday Inn where you had at the outset, when I was there, Christians occupying Holiday Inn. You had Moslems wanting to take it. Holiday Inn was right, you might say, on the borderline between the predominantly Christian areas and the predominantly Moslem areas. There you had rather well-organized military factions where

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001659

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

men were holding an area and other men were attacking it.

"The opposite end of the spectrum would be where you had these military organizations, paramilitary organizations, going around with sheer vandalism, hooliganism, robbery, destroying. There were many actions that we frankly could not classify.

"There would be nighttime murdering. No one would know who was doing it and to whom. Mortar shells would fall in an area killing people, destroying property. We could not really identify that. We would say the Christian area was mortared or the Moslem area was mortared. We assumed it was by the opposite, but we didn't know who was doing it." Tr. 577.

**\*1480** Despite a cease fire agreement on April 16, 1975, sporadic machinegun and bazooka fire and bombings continued. The then prime minister, Rashid al-Solh, refused to declare a state of emergency or to order Army intervention.

On April 26, 1975, Jumblatt announced that he and his supporters in the National Movement would no longer participate in any government with representatives of the Phalange. On May 15, 1975, after further resignations from his cabinet, Solh resigned as prime minister.

On May 23, 1975, President Franjieh appointed retired Brigadier General Noureddine Rifai as prime minister to head a military cabinet. The military cabinet was immediately opposed by Rashid Karami and by Jumblatt. On May 26, 1975 Rifai resigned. Two days later, Karami was asked to form a cabinet.

In late June, fighting renewed between Maronites and P.F.L.P. commandoes in Zgharta, and between local Shi'ite and Maronite clans in the Baalbek.

On July 1, 1975, Karami announced his cabinet, which excluded representatives of the Phalange, as well as representatives of parties under the leadership of Jumblatt.

There followed a period of calm, or at least surface calm.[FN74] During that period, Jumblatt issued a public call for reform. Basically, he asked for the end of the allocation of political power along religious lines, not just executive but of the whole administration of government. Jumblatt did not accompany the program which he urged with any threat, explicit or implied.[FN75] Jumblatt's program consisted of a number of specific points, including a collegial command of the Army, replacing the Maronite command; a limitation upon the powers of the president and an increase of those of the prime minister; the election of the prime minister by the parliament, rather than his appointment by the president; a reform of parliament itself, which would cause the Christians to lose the majority of the seats that had been allocated to them in the National Pact of 1943; and greater equality in the civil service.[FN76] But nothing came of Jumblatt's suggested reforms.

FN74. Randal dep. at 45.

FN75. *Id.* at 43–45.

FN76. George dep. at 23–25.

"By the end of August 1975 the fighting had begun once again, and for all technical purposes did not stop until October, November 1976."[FN77] The fighting in the Kantari area of Beirut, which involved the hotel district and has been previously described, formed a part of this strife.

FN77. Randal dep. at 45. I suspect the phrase "for all technical purposes" should read "for

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001660

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

all practical purposes."

As recounted in detail under Point V *supra,* the fighting which damaged the Holiday Inn may be broken down into relatively identifiable times and phases. These are:

(a) late October, 1975: the Mourabitoun's assault upon the Murr Tower, with fire exchanged between the Tower, the streets, and the Holiday Inn and other hotels.

(b) November to December 6, 1975: intermittent hostilities, occasional exchanges of fire between hotels in rival hands.

***1481** (c) mid-December, 1975: greatly accelerated fighting subsequent to "Black Saturday" incident.

(d) late December, 1975 to late March, 1976: a return to intermittent fighting in the hotel district, the Phalange maintaining a redoubt in West Beirut which included the Holiday Inn.

(e) March 21–26, 1976: capture of Holiday Inn from Phalange by Mourabitoun, reinforced by P.L.O. and Lebanese Arab Army units.

The period between late December, 1975 and mid-March, 1976 was marked by two significant spheres of activity: political efforts to end the strife, and the interventions of Syria.

Again, much of what immediately follows has been stipulated by the parties in the Requests to Admit.

On December 15, 1975, fighting tapered off in Beirut after P.L.O. leaders worked out a cease-fire agreement with Moslem leftist groups. P.L.O. military police began to take over key Moslem positions in the downtown and hotel districts. The Lebanese Army set up liaison commissions in rightist held positions, including the Holiday Inn. Despite the cease-fire in Beirut, fighting continued in outlying areas.[FN78]

FN78. R.A. 127–128.

In middle and late December, representatives of the Syrian and Saudi Arabian governments, as well as the P.L.O., attempted to mediate the disputes. Some Moslem leftist groups, such as the I.N.M., were opposed to such attempts and turned to the Iraqi and Libyan governments for support. The December fighting marked the first involvement of militias controlled by conservative Moslem leaders such as Mr. Saib Salam, a former premier, in the disturbances.[FN79]

FN79. R.A. 130.

In early January, 1976, the Phalangists and P.N.L. attacked the two Palestinian refugee camps of Tel Zataar and Jisr al Pasha and blockaded the roads to the camps. Shi'ites from al Naba attacked the Phalangists in support of the Palestinian efforts to close the road.[FN80]

FN80. R.A. 132.

On January 6, 1976, Yasser Arafat announced that the P.L.O. would not tolerate the continuing siege of the two refugee camps and that it stood prepared to break it by force if necessary. Up to this point, the P.L.O. had remained inactive, despite military involvement by the various Palestinian splinter groups on the Moslem and radical leftist sides.[FN81]

FN81. R.A. 133.

On January 10, 1976 the Mourabitoun and other leftist forces reactivated the battle front in downtown Beirut in an effort to relieve pressure on the Palestinian camps. The Holiday Inn was reoccupied by Phal-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001661

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

angist militiamen. Fighting continued on both fronts through January 14. By January 15, there were hostilities virtually everywhere in Lebanon. During the remainder of January 1976, the Moslem slums of Quarantina and Ashrafya were captured after battle with Christian forces. The Christian towns of Damour, Saadiyat and Jiyeh were militarily taken by National Movement forces.[FN82]

    FN82. R.A. 134–136.

In early 1976, the Lebanese Army began to disintegrate, with men deserting to join confessional groups or to go home.[FN83]

    FN83. R.A. 137. See also n. 36, *supra.*

On January 18, 1976, Prime Minister Karami, having failed to impose a cease-fire, announced his resignation. On January 20, a Syrian delegation arrived in Lebanon to attempt the mediation of a cease-fire. On January 24, 1976, Prime Minister Karami withdrew his resignation when it appeared that most of the parties, with the exception of Mr. Chamoun, would support the Syrian mediation.[FN84]

    FN84. R.A. 138–139.

On or about January 22, 1976 a cease-fire was entered into, which was policed in part **\*1482** by PLA units and by remnants of the Lebanese Army and the Internal Securities Forces ("FSI"), which, like the army, had also begun to disintegrate along confessional lines.[FN85]

    FN85. R.A. 137, 141.

On February 14, 1976 President Franjieh announced a new National Covenant for Lebanon's political and economic system. This program provided for an equal number of Moslem and Christian deputies in the parliament, provided that prior restrictions on the activities of Palestinian organizations within Lebanon would be enforced, provided for certain modifications in the confessional basis in which certain government posts were awarded, and provided that the President was to remain a Maronite Christian. Various member groups of the National Movement criticized this new covenant, and Jumblatt refused to join the government of national unity which the new covenant contemplated.[FN86]

    FN86. R.A. 142–143.

The split-up of the Lebanese Army, which had begun in late January 1976, accelerated over the next two months. New sectarian militias were formed, such as Lt. Khatib's Lebanese Arab Army. Many of the soldiers and lower ranks of officers joined the Lebanese Arab Army, while a sizable number joined the Phalangists, P.N.L., and President Franjieh's private militia.

On March 11, 1976, Brigadier General Aziz Ahdab, a Moslem military commander in the Beirut area, with some rightist support, announced the imposition of a state of emergency and called for the resignation of President Franjieh and his government. President Franjieh refused to resign. As demonstrated in greater detail *infra,* no substantive developments occurred as the result of Ahdab's action.

Beginning in late March, 1976, the Syrian government mounted diplomatic initiatives to establish a cease-fire. Finally, on April 9, armoured units of the regular Syrian Army entered Lebanon. Simultaneously, Syrian naval units began a blockade of ports used by the Moslem and leftist militias of the National Movement, and by Palestinian militias (i.e., Tyre, Sidon, and Tripoli). A cease-fire was immediately agreed upon. On April 16, 1976, after a summit meeting in Damascus between Arafat and Syrian President Assad, the Syrian armoured units were pulled back from Lebanese territory. Fighting per-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**571 F.Supp. 1460**
**(Cite as: 571 F.Supp. 1460)**

sisted in various parts of the country. On May 8, 1976 the Lebanese parliament elected Elias Sarkis to succeed Franjieh as President of the republic when the latter's term ended in September. After Sarkis' election, fighting between Christian militias on the one hand and Moslem, leftist, and Palestinian militias on the other hand continued.

On June 1, 1976, Syrian Army units crossed the Lebanese border and advanced on various fronts into Lebanon, thereby establishing a military presence in the country which remains to this day. Fighting among various factions continued, the Syrians aligning themselves against National Movement and Palestinian militias. It is not necessary to describe the fighting at this stage of events in any detail. Sarkis formally succeeded Franjieh as President of Lebanon on September 23, 1976. Ultimately Saudi Arabian leaders called a summit meeting of Arab countries in Riyadh to force Syria and the other parties to accept a cease-fire. The decisions reached at the Riyadh summit of October 1976 were accepted, and law and order began to return to most of Lebanon, at least for the time being. Of course, the years to come held much additional suffering for Lebanon, but those are facts beyond the scope of this litigation.

The preceding paragraphs, as the footnotes indicate, are drawn from the admissions forming a part of the record. Certain aspects must be considered in greater detail. One of these is the intervention of Syria in Lebanese affairs.

We have seen from the stipulated facts that Syria participated with others in December, 1975 in an unsuccessful attempt at mediation. Syria also participated in negotiations **\*1483** which produced the January 22, 1976 cease-fire, which persuaded Prime Minister Karami to withdraw his resignation. That cease-fire was policed by units of the Palestine Liberation Army ("P.L.A.").

The P.L.A. was controlled by the Syrian government. Its soldiers were Palestinians but the officers were Syrian, who took their orders from the Syrian general command.[FN87] In January, 1976 Syria sent the P.L.A. into Lebanon. It moved into Beirut and took up positions along the "Green Line," the recognized interface between Moslem west Beirut and Christian east Beirut. The P.L.A. tried to clear a zone on each side of the line to aid in reducing the fighting.[FN88] P.L.A. units also attempted to take over positions from various warring factions. In particular, in west Beirut the P.L.A. took over positions from Palestinian irregulars. Understandably enough, those irregulars at first greeted the Palestinian Liberation Army warmly, regarding its troops as having come in on their side. In point of fact, however, the P.L.A. had come in as a peace-keeping force on orders of the Syrian government, not for the purpose of assisting any particular faction to prevail.[FN89]

> FN87. Bulloch dep. at 76; Randal dep. at 52–53.

> FN88. Bulloch dep. at 85–86.

> FN89. *Id.* at 77.

This Syrian-directed use of the P.L.A. in Lebanon in January, 1976 reflected a significant change in attitude on the part of Syria. Syria had originally assisted the National Movement on the left, and the Palestinians. However, by early December the Syrian government became concerned that a radical Palestinian-backed government was emerging from the continuing conflict in Lebanon. Syria did not want to live next door to such a regime.[FN90] Accordingly Syria took the risk, which one witness characterized as "enormous" of "switching sides even at the expense of eventually having to crush, not so much the left, but the Palestinians."[FN91]

> FN90. Randal dep. at 49–50.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001663

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

FN91. *Id.* at 50.

Initially Syria hoped that the very thought of its taking such a position would bring about a cessation of the fighting. But that did not materialize. Syria then became increasingly concerned about what Israel would do. These circumstances prompted American Secretary of State Kissinger to act as an "honest broker" between the Syrians and the Israelis, suggesting to the latter that they should, together with Syria, prefer a Lebanese government in the hands of conservative Christians rather than one run by Lebanese leftist radicals backed by Palestinians. This suggestion bore fruit; Kissinger achieved a *modus vivendi* between Syria and Israel; and Israel did not react adversely when, in January, 1976, the Syrian-directed P.L.A. first entered Lebanon in an effort to keep the peace.[FN92]

> FN92. *Id.* at 51–52. In Randal's view, the Syrian presence in Lebanon took the form of Syrian-officered P.L.A. troops, rather than Syrian troops in Syrian uniforms, because American diplomats, in order to placate Israel, told Syria to keep the lowest possible profile. Dep. at 70.

At the same time, Syrian leaders sought to woo and restore importance to the traditional Sunni Moslem moderate leadership which had been weakened by the fighting. This effort represented another means of attempting to restore peace.[FN93]

FN93. *Id.* at 58.

As we know, these initial Syrian efforts to restore peace to Lebanon did not succeed. In Randal's view, the Syrians proved "remarkably inept." [FN94] The judgment seems harsh. While order was not immediately restored as the result of Syrian intervention, the prospects of that were surely remote, given Lebanon's

recent history. In any event, divisive events continued. One of these was the final disintegration of the Lebanese Army into Christian and Moslem factions. Lt. Khatib, the Moslem officer who raised a mutiny in several garrisons, viewed his career as frustrated by the Maronite***1484** military superstructure and set himself the objective of breaking up the army. He was manipulated in that regard by el Fatah, the mainstream P.L.O. organization. Khatib named the Moslem units that followed him the "Lebanese Arab Army." Its members gravitated toward a "conglomerate side," including at that point, moderate Sunni Moslems, leftist parties, and Palestinians. [FN95] In late January Khatib went so far that he "shot up a convoy of cars taking the Syrian foreign minister Khaddam back to Damascus." [FN96] As the army broke up, the Lebanese Arab Army obtained much artillery and heavy equipment. By March the national Lebanese army had "ceased to exist, either going to one side or the other." [FN97]

FN94. *Id.* at 70.

FN95. *Id.* at 71–73; see also n. 36, *supra.*

FN96. Randal dep. at 71.

FN97. *Id.* at 72–73.

Another disappointment for peace lay in Jumblatt's previously noted rejection of President Franjieh's reforms, announced on February 14, 1976.

On March 11, 1976 General Ahdab made his televised demand for Franjieh's resignation. It is necessary to consider the Ahdab incident more closely. Ahdab and a few supporters seized the radio and television station in Beirut, "close to the hotel area where sporadic fighting was still going on," and "declared that he was taking over, called on President Franjieh to resign, and said a new government would be formed in a week." [FN98] Ahdab made a few follow-up an-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001664

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

nouncements, but "[n]one of this had any effect at all. Franjieh ignored the whole thing and never even acknowledged that a move against him had been made." FN99

FN98. Bulloch, DOAC at p. 122.

FN99. *Id.* at p. 123.

Ahdab's television appearance did apparently prompt a majority of the Lebanese parliament to ask Franjieh to resign. Franjieh refused to do so, encouraged in that refusal by Pierre Gemayel, the leader of the Phalange.FN100 Ahdab's purported coup came to nothing. No one was following him.FN101 He vanished back into the obscurity from which he had sprung.

FN100. Randal dep. at 78–79.

FN101. Bulloch wrote:

"Whatever the textbooks say, command of a television station alone is not enough; some forces capable of taking real action have to be deployed and Brigadier Ahdab had none available."

DOAC at p. 122.

But these events temporarily discouraged Syria's efforts at mediation. During January, February and early March a three-man Syrian delegation consisting of the foreign minister, the army chief of staff, and the head of the air force spent most of their time in Lebanon, "trying to talk out political settlement among the warring sides." However, following Ahdab's television performance "the Syrians threw up their hands and temporarily went home." FN102

FN102. Randal dep. at 76.

Although the Syrian mediating team had withdrawn from Lebanon, the Syrian government continued its efforts. Various actors in the drama were directed to come to Damascus to be lectured; evidently they felt obliged to go. "Lieutenant Khatib had been summoned to Damascus for the moves 'his' forces were making against President Franjieh; then the conservative Moslem leaders, Karami, Salam and Assad, were called to Syria in their turn to be given instructions." FN103 But for the time being, Syrian attempts to control events in Lebanon had clearly failed; and further violence mushroomed.

FN103. DOAC at p. 123.

One incident, much referred to in the evidence at trial, involved another Lebanese Moslem officer, one Major Daher, who commanded a unit of the newly defeated Lebanese Arab Army. Although Khatib was of central importance to the army's disintegration, as to Moslem units other than his own "his direct control was minimal, as each unit formed an autonomous group which took orders from no-one." FN104 Daher, who **\*1485** commanded a well-armed unit, also decided that Franjieh should resign. Operating with a sympathetic colleague, Daher directed two armored columns of the Lebanese Arab Army in a pincers movement against the presidential palace at Baabda. This occurred on March 15.FN105 The columns' advance was blocked by P.L.A. and Saiqa units under the command of Syrians, who said they would not permit Daher's force to get through to the palace. But Daher was in artillery range, and on March 23 began a bombardment of the palace, where Franjieh was then resident. FN106

FN104. DOAC at p. 122.

FN105. The date is derived from the New York Times News Index at p. 837. I may judicially notice such journalistic reports for chronological, non-controversial details. *Ope*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001665

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

*Shipping, Ltd. v. Allstate Ins. Co.,* 687 F.2d 639, cert. denied 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 946.

FN106. Bulloch dep. at 111–112; DOAC at p. 123.

Another violent incident involved the Holiday Inn itself. I refer to the fighting between March 21 and 26 which finally wrestled the structure from the hands of the Phalange. Up to this time, the Phalange had used the Holiday Inn as "a strong point, a firing platform"; it was the right wing forces' furthest outpost in west Beirut, and important to their morale.[FN107] Over the prior six months the fire between the Phalangists and left wing forces had been "intermittent" and the latter's attacks upon the structure "desultory." [FN108] But now, launching "a new offensive ... following the failure of Syrian attempts to control events in Lebanon," [FN109] the Mourabitoun were joined in their assault upon the Holiday Inn by Palestinians, particularly el Fatah, and by Lebanese Arab Army units with armored cars.[FN110] "[I]t was Khatib's Lebanese Arab Army that provided the Army; [FN111] it was the Fatah regular troops that did the fighting." [FN112] By March 26, as previously noted, the Phalange had been finally driven from the Holiday Inn, and it ceased to be a prominent object of strife.[FN113]

FN107. Bulloch dep. at 113, 175.

FN108. *Id.* at 113; DOAC at 124.

FN109. DOAC at 123.

FN110. Bulloch dep. at 113.

FN111. Thus in original. The context suggests "Army" should read "armor."

FN112. Randal dep. at 80.

FN113. As previously stated, HI claims under the policy for damages inflicted from October, 1975 to April 9, 1976. It is not clear from the record why the latter date was selected. No doubt the battered Inn received some further hits between March 26 and April 9, or even thereafter. But the damage for which HI seeks to recover had to all practical effect been inflicted by March 26.

The failure of the Syrian negotiations, and Franjieh's refusal to resign also had an effect upon Jumblatt. Until then, the evidence before me shows Jumblatt had worked to reform the Lebanese governmental structure without uttering threats. Jumblatt appears to have laid considerable stress upon Franjieh's perceived inadequacies as president. As noted, Franjieh had announced his proposed political reforms on February 14. Jumblatt's note to Syrian foreign minister Khaddam rejecting the reforms was reported on February 28.[FN114] At this point Jumblatt's role was that of a politician, exploring political solutions. But when in mid-March Franjieh declined the parliamentarian's suggestion that he resign, Jumblatt "emerges from the shadows as the undisputed overall military, as well as political, leader of this combination side, and all of a sudden the cease fire collapses." [FN115] That is something of an exaggeration; the evidence makes it clear enough that life and lines of authority in Lebanon were so fragmented that nation-wide cease fires did not begin or end at the command of a single individual. However, Jumblatt's public pronouncements underwent a discernible change in March of 1976. He formed the so-called Fakhreddin Army, an exclusively Druze force named after a 17th century Druze leader, and began calling "for the **\*1486** overthrow of the system" [FN116] and for "war." [FN117] The precise timing of these pronouncements is not permitted by the evidence; the closest we can come is the press report on March 15 that "Jumblatt warns of leftist revolution if Franjieh does not resign." [FN118] At about this time Jumblatt's Druze followers began to fight with Chris-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001666

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

tians in the Shuf, that mountainous region in south-eastern Lebanon which had been the traditional Druze territory.[FN119]

> FN114. New York Times Index at p. 836.

> FN115. Randal dep. at 79.

> FN116. *Id.* at 46.

> FN117. George dep. at 26.

> FN118. New York Times News Index at p. 837.

> FN119. DOAC at pp. 68, 123–24.

Two qualifications must be made with respect to Jumblatt's position and pronouncements in mid and late March of 1976. The first is that he was entirely capable of exaggerated statements of accomplishment or intent. This is true of politicians everywhere, but perhaps more so in Lebanon than elsewhere. While in March Jumblatt was saying things like "I will drink Maronite blood from their very skulls," Randal, who testified to the statement, thought it right in his evidence to observe that "Jumblatt was a man who, among his other accomplishments, had something of the ham actor in him."[FN120] And Bulloch held the view that notwithstanding Palestinian and Druze belligerence in March, Jumblatt and Arafat preferred *au fond* a political compromise. Bulloch writes in *Death of a Country* at p. 127:

> FN120. Randal dep. at 47–48.

"Yet Arafat and Jumblatt were both still prepared to compromise; Jumblatt, for all his inflammatory rhetoric, would still have settled for something very like the old Lebanon, so long as it was governed in accordance with his programme of relatively minor reforms aimed only at giving the Moslems of the country equal opportunities with the Christians. Arafat wanted an end to a war which was doing nothing but harm to the Palestinian cause and the return of conditions which would allow him to continue his basic struggle for the establishment of a State of Palestine."

In hopeful pursuit of those preferences, Jumblatt and Arafat "accepted a pressing invitation to visit Damascus," Jumblatt reaching the Syrian capital on March 28.[FN121] But nothing constructive came of the meetings.[FN122]

> FN121. DOAC at pp. 127–28.

> FN122. *Ibid.*

Secondly, to the extent that Jumblatt transformed bellicose words into action, he did so contrary to the advice of everyone else, particularly the Palestinians. Randal testified at p. 48 of his deposition:

"A. Jumblatt kept saying, 'I am going to keep going.' Everybody else said, 'Stop, let's have a cease fire. This is going too far.'

"Jumblatt's feeling in March 1976 was that he had bitten his teeth and he was determined to keep on going.

"He refused to take the advice of his Palestinian allies, who were dragged into that campaign much against their wisdom. He refused to listen to the Syrians, literally with fatal consequences, and not just for himself."

(The phrase "bitten his teeth" appears in the transcript; it is likely the witness said "bit in his teeth.")

George testified that Jumblatt "pulled the Palestinians into battle."[FN123] Arafat, returning to Lebanon after the late March meeting in Damascus with Syrian

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001667

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

president Assad, argued for a truce, in implementation of a policy of caution and restraint. But "this time neither Jumblatt nor the more extreme leaders such as Ibrahim Kleilat of the Mourabitoun would have anything to do with such a policy." [FN124] In these circumstances, and as previously recounted, regular Syrian forces entered Lebanon, first on April 9, 1976 and again on June 1; fighting**1487** finally stopped as the result of the Riyadh accord in October, 1976.

FN123. George dep. at 26.

FN124. DOAC at p. 128.

VIII.

*The Question of Coverage Under the Policy*

I now consider the question of whether Aetna has proved that the damage to the Holiday Inn falls within an excluded peril. Aetna argues for the applicability of three excluded perils: insurrection, civil war, and war. I examine them in turn.

(1) *Insurrection.*

[8] Under Judge Frankel's formulation, affirmed by the Second Circuit in *Pan Am,* "insurrection" for insurance purposes means "(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers." As noted under Point IV, *supra, Pan Am's* definition of "insurrection" is derived primarily from *Home Insurance Co. v. Davila, supra. Davila* speaks in terms of "maximum" and "minimum" objectives. A group may pursue both. Within the context of the Puerto Rican strife involved in *Davila,* the "maximum objective" would have been "the overthrow of the insular government, with a provisional Nationalist government in *de facto* control of the Island." 212 F.2d at 738. Chief Judge Magruder then offers this illuminating analysis:

"The minimum objective might have been to create a series of local disturbances, or 'civil commotions',

in various towns of Puerto Rico, to embarrass and discredit the insular government, to dramatize the fact that there were 'patriots' in Puerto Rico prepared to die for the ideal of freedom, for propaganda purposes to fire a shot 'heard around the world'. If that objective, upon a more realistic appraisal of the possibilities, had been the only objective of the Nationalist leaders, then we would agree that the outbreaks of October 30, 1950, did not constitute an 'insurrection' within the meaning of the particular insurance policies. But if the Nationalist leaders, however inept they might have been in their calculations and preparations, had also in mind the maximum objective aforesaid, then the uprising was an 'insurrection'; and no less so, as we have above indicated, even if reasonable men might conclude that this objective was not possible of accomplishment." *Ibid.*

My task is to apply these criteria, by which an "insurrection" is identified for insurance purposes, to the evidence adduced at trial. I am concerned with damage inflicted upon the Holiday Inn during the period October, 1975 through April 9, 1976. Events prior and subsequent to that period may be of some assistance in understanding events falling within those dates. But the case turns upon the relevant period; and the essential nature of the violent acts which turned the Holiday Inn from a functioning hotel to a wreck cannot be altered by events before or after those acts. In *Spinney's, supra,* Justice Mustill made that distinction within the context of the "civil war" exclusion. Justice Mustill was concerned with the destruction of insured commercial property in Beirut in January, 1976. He wrote:

"... I cannot find that by January, 1976, matters had advanced between massive civil strife and virtual anarchy to the stage of a civil war. *Perhaps they did later, but that is not for decision here.*" [1980] 1 Lloyd's L.Rep. at 432 (emphasis added).[FN125]

FN125. I do not cite the English court's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001668

Page 34

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

judgment in *Spinney's,* on this point or any other, as precedent for findings of fact in my own judgment. That is because the evidence in the record of this trial constitutes the basis for this Court's findings, not the evidence adduced before another tribunal at a different trial. But I am free, as in the point of relevance under discussion, to accept Justice Mustill's legal analysis; or to adopt as useful his characterization of conditions in Lebanon if it conforms to the evidence in the trial before me.

Under leading American authority, the test for insurrection is two-pronged: was there an identifiable "group or movement"; and, if so, did that group or movement have the requisite intent to overthrow the established **\*1488** government and assume at least *de facto* governmental control itself?

Applying these criteria to the facts revealed by the evidence, I find without difficulty that the earlier violence which damaged the Holiday Inn cannot be regarded as an insurrection. By "earlier violence" I mean the events from October, 1975 to mid-March, 1976, when the Holiday Inn was finally wrested from Phalangist hands. I will deal separately with those later events.

The first reported damage to the Holiday Inn, apparently relatively minor in nature, occurred in late October, 1975. That damage was related to the Mourabitoun's seizure of the Murr Tower during the attack on the Kantari district which began on October 25. Having seized the Murr Tower, the Mourabitoun and other leftist forces were able to fire upon the Holiday Inn and other Phalange-held hotels. By November 26, when the HI executive Reedijk was able to return to Beirut and inspect the Holiday Inn, the top-floor restaurant was not operational; a relatively small number of rooms had been destroyed or damaged; all guests had left; only a skeleton staff of hotel employees remained; and Phalangist militia occupied

the Holiday Inn, using it as a shooting and observation platform, much as the Mourabitoun used the Murr Tower. This set the pattern for the next few months, until the leftists finally seized the Holiday Inn. The fighting would vary in intensity. Sometimes the firing was sporadic. At other times it would flare up, as in the aftermath of the Black Sunday incident in early December, when the last HI employees left the Holiday Inn, leaving the structure occupied only by Phalangists. It is a fair inference that during this period the Holiday Inn continued to receive incremental damage, although the precise amounts cannot be stated.

The contending forces' objectives during this period—late October, 1975 to mid-March, 1976—may fairly be summarized as efforts by leftist groups, primarily the Mourabitoun, to reduce the redoubt in Moslem western Beirut, centering on the hotel district, held by rightest groups, primarily the Phalange; and efforts by the latter to hold on to that redoubt.

These forces and these objectives do not constitute an insurrection. Neither prong is satisfied. Taking them in inverse order, no faction in this "hotel district" fighting can be identified as "acting for the specific purpose of overthrowing the constituted government and seizing its powers." The Phalangists and other right-wing groups cannot be so regarded. Their purpose was to preserve a status quo which favored their interests.

The Mourabitoun launched the Kantari attack, under the direction of the Independent Nasserite leader Kleilat, then (in Bulloch's phrase) in the process of transforming himself "from a back-street gangster into a politician." That perception, which I accept, does not square with Kleilat as the head of an insurrectionary government; and indeed there is no evidence that the Mourabitoun had such a far-reaching objective. Their objective was to expand that area in West Beirut over which they held control, at the expense of the Phalange. In the parlance of today's domestic gangs, they wished to enlarge their turf. Seizure

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001669

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

of the Murr Tower—the immediate target whose capture led directly to the first destructive exchanges of fire with the Holiday Inn—was incident to that effort, nothing more, nothing less. The Mourabitoun were motivated against the Phalange by religious differences, economic inequities, and political distrust. These were the three causes of strife in Lebanon among the indigenous Lebanese factions (putting aside the Palestinians and the Syrians). But there is no evidence that the Mourabitoun or Kleilat, in initiating the fighting which engulfed the Holiday Inn, were attempting the overthrow of the constitutionally structured government of Lebanon, and to seize its powers.

I have found that, in their October, 1975 attack, the Mourabitoun were joined by some Saiqa militiamen and by fighters of radical Palestinian organizations. This does not change the analysis. The Saiqa was a "Palestinian organization controlled by Syria."**\*1489** [FN126] Syria, as we have seen, was not at the pertinent times committed to the overthrow of the Lebanese government: quite the contrary. Similarly, we have seen that the Palestinians, regarding Lebanon as their last safe haven, sought to avoid becoming "embroiled in Lebanese domestic politics." [FN127] Whatever may have motivated those individuals who participated in this early fighting involving the Holiday Inn, it cannot be said that they then belonged to a group which had as its "maximum objective" the overthrow of the Lebanese government.

FN126. Bulloch dep. at 36.

FN127. DOAC at p. 41.

Thus this particular fighting may be characterized as an "insurrection" only if the immediate participants, who lacked the requisite intent, may somehow be identified with a larger group or movement which entertained that intent. But it is not possible, on the evidence, to do that, and for two reasons. The first is

that labels such as "left," "right," "Christian" and "Moslem" suggest a degree of cohesion and unity of purpose which did not exist. I have previously referred to this point. Politics and the social order in Lebanon were fragmented. Politicians and military leaders did not exist in the western democratic sense. I do not say this in a pejorative manner; my only purpose is to convey the reality of Lebanon. The major figures—men like Gemayel, Chamoun, and Jamayel—were part modern politicians, part feudal barons, part generals, part religious leaders. Their constituencies and militias were intensely personal. The lesser political figures—such as Franjieh, Karami, and Sarkis—held office in large measure at the sufferance of the leaders of the major private constituencies. And there was a myriad of lesser groups, loyal to relatively minor individuals. The Mourabitoun, headed by Kleilat, furnish an example. Unifying political themes—Republican and Democratic, Conservative, Labor and Liberal—were missing in Lebanon. George Godley, United States Ambassador to Lebanon from February, 1974 to mid-January, 1976, testified that "no two Lebanese agreed on politics without forming a new political party." [FN128] This may be something of an exaggeration, but it captures the Lebanese experience accurately enough. Political fragmentation was closely mirrored by the military structure (or lack of it). Bulloch wrote that Lebanon "was the stomping ground of more than 40 private armies, engaged in free-for-all battles over turf, power and money." Parties to Lebanese violence frequently included a "melange of feudal lords, Mafia dons, religious zealots, modern totalitarians, intellectuals, the defenders of hearth and home and people who simply [had] nothing better to do." [FN129] And it follows that groups cannot accurately be placed under labels which suggest cohesion or unity of purpose. On the evidence before me, I adopt Justice Mustill's useful discussion in *Spinney's, supra,* at 416:

FN128. Tr. 569.

FN129. The quotations are from Bulloch's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001670

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

news dispatches, Def.Ex. 4 to his deposition.

"... many commentators have been forced, in the interests of brevity, to employ composite expressions such as the 'Christian right' and the 'Moslem left', and indeed I will so do in this judgment. While these provide a useful shorthand, I am satisfied that they represent a great over-simplification of the complexities of Lebanese politics—at least if they are understood as conveying that to be a Christian in the Lebanon is necessarily to have politics of the 'right'. No doubt a majority of Christians would be found to share a majority of the opinions loosely labelled 'right-wing'. But the religious and political orientations did not necessarily run side by side. I do not doubt that there were those of conservative cast who were non-Christians; conversely with the 'left', which had many supporters who were not Moslem, and included important groups of an exclusively political and non-confessional character. Moreover, the terms tend misleadingly to suggest a degree of unity which was not **\*1490** present, since elements lying on the same side of the rough division between 'Christian left' and 'Moslem right' would often be sharply at odds with one another: not only on matters of internal politics, but on the larger question of the part which Lebanon should play in the modern world. Again, the Palestinian organisations, themselves far from being in mutual accord, cannot accurately be identified with the indigenous Lebanese radicals."

Because all this is so, no basis exists for imbuing the actual participants in the fighting which damaged the Holiday Inn with an insurrectionary intent that might have been harbored by other factions of a general, "leftist" persuasion.

In point of fact, however, no general insurrectionary intent is demonstrated at this time. To the extent that there was an identifiable grouping of the left,[FN130] it was the National Movement, with Jumblatt as its chief spokesman;[FN131] and Jumblatt, at least prior

to mid-March, 1976, remained committed to the political process of reform.

FN130. I need not further consider the objectives of the right-wing groups, except to observe again that they were in the main devoted to preserving the governmental status quo, and hence cannot be regarded as insurrectionary.

FN131. While HI and Aetna agree that Jumblatt should be so characterized, again one should not infer a unity of mind and purpose that did not exist among the National Movement parties. Justice Mustill said in *Spinney's* of the leftist parties in *Spinney's* at 431:

"For all that Mr. Jumblatt appears on occasion to have been presented as their spokesman, he was a point of intersection of converging views rather than the leader of a united front."

The evidence in the case at bar points to the same conclusion. Jumblatt had firm control over, and could speak authoritatively for, only the Druze.

In April, 1975 Jumblatt and his supporters said that they would no longer participate in any Lebanese government with representatives of the Phalange. But that is not a declaration of insurrectionary intent to overthrow the constitutional government, any more than is the refusal of a particular political party to serve in a proposed coalition government. The Karami government formed in July, 1975 excluded both Phalangists and Jumblatt supporters. During the ensuing temporary calm, Jumblatt issued his call for reforms, unaccompanied by any threats. The reforms were not accepted by those who favored the status quo; but Jumblatt had not changed his political posture

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001671

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

from reformer to insurrectionary at the time of the earlier fighting which damaged the Holiday Inn occurred.

In sum, prior to the events of mid-March, 1976 there is no basis for contending that the Holiday Inn was damaged by the actions of an identifiable group or movement whose purpose was to overthrow the constituted government and seize its powers. I am led to that conclusion not only by Aetna's failure to sustain its burden of proving either necessary criterion of an "insurrection," but also by the considerable evidence in the record negating the existence of those criteria. To the evidence already discussed I add the testimony of Ambassador Godley, who was the United States' envoy to Lebanon, resident in Beirut, from February 26, 1974 to January 13, 1976 (see n. 73 *supra*). Godley said of the period of his service:

"... as of the time we were out there we did not refer to it knowingly with responsibility as a civil war. We couldn't help but note that you had a central government, or the vestiges of a central government, still in operation, and as far as we were aware we could not identify any important element that was seeking to overthrow that central government. Most of the elements wanted, I think, for the central government to continue. Many of them wanted to see it modified in some manner, but I don't ever recall anyone saying, 'We have to throw out these rascals,' or 'We have to change dramatically the structure of the Lebanese Government.'" Tr. 597–98.

Godley was responding to a question about a "civil war" in Lebanon, but having in **\*1491** mind the requisite intent, his answer is equally probative on the existence *vel non* of an insurrection.

Godley had prefaced that testimony with his impression of the nature of the fighting in progress at the time:

"... we did know that your die-hard, your extreme Christian, wanted to kill Moslems the saye [sic] way the Moslems, the die-hard Moslems, the extremists, wanted to kill Christians. By that time, thinking back on it as I have been, we, ourselves, were very, very confused in that nobody could clearly be identified.

"Earlier, there was a mention that Kamal Jumblatt had seven points. I don't think that the majority of the people shooting at Christians would have said, 'I'm doing this for Kamal Jumblatt's seven points.'

"We would always ask ourselves, 'Why are these people risking their lives, their fortunes, their businesses, in this fracas?'

"The best answer we could come up with was that it was sort of an inheritance. I mean we here in this court, we have in this country the fighting in the Kentucky Mountains where the McCoys and the Hatfields have been fighting for generations. There is a lot of that in the Lebanon.

"We have had this conflict, we have had this strife, and suddenly the lid blows off. By golly, we can go out and shoot people—so they go out and they shoot people.

"Added to this tragic situation was sheer vandalism, robbery, and with the disappearance of authority the unruly elements were able to come to the surface. Some of them could commit robbery in the name of a supposedly recognized political organization. Others just went out and committed robbery for the sake of robbing." Tr. 580–82.

To his knowledge, no group or faction was seeking to overthrow the Lebanese government.[FN132] A wholly disinterested witness called by HI, Godley's evidence on this point is to the same effect as Aetna's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001672

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

equally disinterested witnesses, the journalists Bulloch, Randal, and George.

FN132. Tr. 583.

Aetna's brief (p. 46) seeks to dismiss Godley's testimony as "based on insufficient knowledge, experience, background and study." I do not agree. Godley is not an amateur diplomat, rewarded for campaign contributions to the political party in power. He was a professional foreign service officer since 1941. After holding lesser positions, he served as director of the State Department's Office of Central African Affairs (1962–1964), Ambassador to the Congo (1964–1966), and Deputy Assistant Secretary of State for East Asian and Pacific Affairs (1968–1973), before being posted to Lebanon. Godley was experienced in sensing and reporting upon the affairs of troubled parts of the world. If while Ambassador in Beirut he and his staff "could not identify any important element that was seeking to overthrow [the] central government," that is persuasive evidence that no such group with that specific intent existed.

Godley left Lebanon in mid-January, 1976, for health reasons. But the other evidence to which I have referred demonstrates the continuing validity of his observation that no "important element" was seeking to overthrow the central government. It must of course be recognized that as 1976 began President Franjieh was coming under increased criticism from many quarters. However, the key question in Lebanese affairs during these months remained whether an accommodation and lasting cease-fire could be achieved politically, through suggested reforms of the existing system possibly including a presidential resignation, a species of political reform not unknown in recent American history. As previously noted, in February, 1976 Franjieh announced a new national covenant with modifications of the confessional allocation of power. Jumblatt refused to agree to Franjieh's suggested reforms because he regarded them as inadequate. In April, 1975 those who favored the status quo

had rejected Jumblatt's suggested reforms as too extreme. The point is that throughout this period, the leaders of the **\*1492** principal contending groups were attempting to restructure the Lebanese political system, not destroy it. No group can be identified as intending to put an end to the constituted government and seize the machinery of government for itself.

That is true, notwithstanding Brigadier Ahdab's television appearance in early March, 1976. Ahdab's public pronouncements might at first blush appear to satisfy the *Pan Am* criterion of insurrectionary intent. But no one responded to Ahdab's proclamation that the government was abrogated. Franjieh paid no attention. Certain parliamentarians suggested that Franjieh resign, but subsided when he did not. Ahdab's performance was pure Glendower. [FN133] Although under *Davila* a group's objective of overthrowing the government may be insurrectionary even if "quixotic," there must still be an identifiable group. As a practical matter, Ahdab marched alone and no one came when he called for them. Nor is there any evidence that his action caused, directly or indirectly, any of the fighting which damaged the Holiday Inn.

FN133. "*Glendower:* I can call spirits from the vasty deep.

"*Hotspur:* Why, so can I, or so can any man;

"*Hotspur:* But will they come when you do call for them?"

*Henry IV,* Part I, III, i, 53.

I come, then, to the latter half of March, 1976. Fierce fighting involved the Holiday Inn between March 21 and 26. During that period the Phalangists were driven from the inn by the Mourabitoun, assisted by Palestinians from Fatah and heavy equipment furnished by the Lebanese Arab Army. Significant addi-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001673

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

tional damage was inflicted on the structure. The parties do not suggest, at least in their submissions to date, that an allocation of damages according to particular periods of time is possible. The policy excludes damage "contributed to" by an excepted cause. If circumstances in Lebanon changed in mid-March, to bring about a more cohesive structure and that specific intent to overthrow the government which is a pre-requisite to a state of "insurrection"; and if the later fighting over the Holiday Inn "directly or indirectly, proximately or remotely" arose out of an insurrection; then Aetna may plausibly argue that the entire claim fails, under the particular exclusion language in the policy.

Jumblatt is the key to the argument. "[B]y the spring of 1976 he was calling for the overthrow of the system, physical overthrow of the system," Randal testified. "There was no turning back, after he decided in March, 1976, to move ahead with the war, at a time when both his Christian adversaries and his Palestinian allies were telling him to compromise." [FN134] As noted, on March 15 Jumblatt warned of a "leftist revolution" if Franjieh did not resign. [FN135] If Jumblatt's call for the physical overthrow of the system accurately reflected his intent, and if the fighting over the Holiday Inn in late March constituted a response to that call and an attempt to further that intent, a defense might be made out.

FN134. Randal dep. at 42–43.

FN135. See text at n. 118, *supra*.

This line of argument is, in my view, the only one available to Aetna on the evidence. It is a reasonable interpretation of events in Lebanon at this particular time. But there are other reasonable interpretations available.

One is that Jumblatt's pronouncements were largely "inflammatory rhetoric," his real objective being "something very like the old Lebanon," altered only by "relatively minor reforms aimed only at giving the Moslems of the country equal opportunities with the Christians." At least that was Bulloch's view of Jumblatt as expressed in his book, from which I have previously quoted. That is a limited objective, more consistent with that of recent social legislation in this country than with the "maximum objective" of government overthrow articulated in *Davila* as the essential element of insurrection.

Alternatively, Jumblatt may have meant everything he said in mid-March, but not have motivated those who stormed the Holiday Inn during March 21–26. That violence was a direct continuation of the Mourabitoun's effort to reduce the Phalange's **\*1493** redoubt in west Beirut. Kleilat, the Mourabitoun leader, had his own separate persona and following. There is no compelling evidence in the record that Kleilat or the Mourabitoun were acting in response to Jumblatt's pronouncements, or seeking to overthrow and replace the constitutional Lebanese government.[FN136] That was true of the earlier events, when the battle for the Kantari district began. It is equally true of the events in late March, 1976. It is at least equally reasonable to conclude from the evidence that Kleilat and his followers were at all pertinent times motivated not by an intent to do away with the Lebanese government and assume its powers, but by the much more modest objective of pushing the Phalange (a rival militia which cannot be equated with the government) out of a particular section of the city of Beirut. That is not an insurrectionary intent, under the cases.

FN136. Aetna cites Ambassador Godley for testimony that "on March 21, 1976 Jumblatt 'announced that a total and irreversible military campaign would be waged' by the National Movement and its allies." Main Brief at 54. In point of fact, Godley did not testify in those words. Counsel for Aetna read to Godley excerpts from a book by one Pro-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001674

Page 40

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

fessor Khalidi, *Conflict and Violence in Lebanon.* Khalidi was a Palestinian. Godley at Tr. 641. Counsel read to Godley this passage from p. 55 of Khalidi's book:

"Political developments were overtaken by military developments. On the 21st of March, upon Jumblatt's announcement that a total and irreversible military campaign would be waged, the National Movement, now backed by Khatib's armor and artillery, as well as by Palestinian militiamen, opened a major offensive in the Beirut hotel area and penetrated deep into Phalangist-held territory."

Tr. 644–45.

Although Godley said he "would not quibble" with this account, Tr. 645, it has no probative value, since Godley had left Lebanon by this time and had no personal knowledge of the events, and Professor Khalidi (unlike that other author of a book about Lebanon, Jonathan Bulloch) was not called as a witness. Therefore I can give no weight to the suggestions in Khalidi's book that the "National Movement" opened an offensive in the hotel area on March 21, and did so in response to Jumblatt's announcement. It was the Mourabitoun who, with assistance, captured the Holiday Inn from the Phalangists; and the Mourabitoun's objectives cannot be safely equated with those of the National Movement (assuming that the objectives of the latter can be sufficiently identified). The Mourabitoun "came out of the woodwork" as a "bunch of gangsters," although with increasing strength they became a political force. See also text at fn. 9, *supra.*

The Mourabitoun were assisted in their capture of the Holiday Inn from the Phalange by Palestinians from Fatah and equipment from the Lebanese Arab Army. The presence of these forces do not foreclose a reasonable interpretation of something other than insurrectionary intent. The Fatah was Arafat's constituency. All the evidence is that Arafat wished to avoid confrontation with the Lebanese government or involvement with the country's politics. The participation of Fatah fighters in the final assault upon the Holiday Inn is equally consistent with a Palestinian reaction to the Phalange's attacks in January upon the Palestinian refugee camps.[FN137] While the disaffected Lebanese Arab Army made equipment available to the Mourabitoun and the Palestinians, it was (on this interpretation of the evidence) in aid of an objective that cannot be characterized as insurrectionary.

FN137. See text at n. 80, *supra.*

What it comes down to is this. "From the welter of conflicting evidence, reasonable men might draw any of a number of conflicting conclusions," *Pan Am* at 1018, about whether at least some of the damage to the Holiday Inn was caused by those acting with "the crucial element" of intent to overthrow and replace the government of Lebanon. *Id.* at 1019. But I am not required to choose among these possible interpretations. Under *Pan Am,* it was Aetna's burden to prove that crucial element of intent. Aetna has not sustained that burden. Its defense based upon the exclusion of "insurrection" fails.

2. *Civil War.*

If the analysis in *Pan Am* is strictly followed, Aetna's failure to prove the existence of an insurrection is equally fatal to its defense based upon "civil war." The Second Circuit said in *Pan Am* at 1017:

**\*1494** "In the district court the all risk insurers relied on every term in clause 2 except 'invasion.'

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001675

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

Thus, aside from 'war' and 'warlike operations,' they claimed that the loss was excluded from coverage by each of 'civil war,' 'revolution,' 'rebellion,' and 'insurrection.' Their efforts soon focused on the last of these terms, because all parties agreed that if the loss was not caused by an 'insurrection,' then it could not have been caused by any of the other clause 2 terms relating to civil disorders. *'Insurrection' presents the key issue because 'rebellion,' 'revolution,' and 'civil war' are progressive stages in the development of civil unrest, the most rudimentary form of which is 'insurrection.'* See *Home Insurance Co. v. Davila,* 212 F.2d 731, 736 (1st Cir.1954); cf. *The Brig Army Warwick (The Prize Cases),* 67 U.S. (2 Black) 635, 666, 17 L.Ed. 459 (1862)." (emphasis added).

Aetna argues that this proposition "that insurrection, rebellion, revolution and civil war are simply progressive points on the same line" was agreed upon by counsel in *Pan Am;* that Aetna does not agree; and that on a proper construction of its opinion, "[t]he meaning of the term 'civil war' was not addressed by the Second Circuit in the *Pan Am* case." Main brief at 33–34.

I do not read Judge Hays' opinion that way. It is apparently true that counsel for the parties in *Pan Am* agreed on the proposition in question. But the Second Circuit was free to accept or reject the concept. In my view, the court accepted it in the italicized sentence in the passage I have quoted. Judge Hays' opinion does not simply recite a stipulation of counsel. It cites *Davila* and *The Brig Army Warwick (The Prize Cases),* 67 U.S. (2 Black), 635, 666, 17 L.Ed. 459 (1862) as authority. That is appropriate enough, since *Davila* quotes the following language from *The Prize Cases:*

"Insurrection against a government may or may not culminate in an organized rebellion, but a civil war always begins by insurrection against the lawful authority of the Government. A civil war is never solemnly declared; it becomes such by its acci-

dents—the number, power, and organization of the persons who originate and carry it on. When the party in rebellion occupy and hold in a hostile manner a certain portion of territory; have declared their independence; have cast off their allegiance; have organized armies; have commenced hostilities against their former sovereign, the world acknowledges them as belligerents, and the contest a *war.*" 67 U.S. (2 Black) at 666–67 (emphasis in original).

And, in the Supreme Court opinion, this language immediately follows:

"*They* claim to be in arms to establish their liberty and independence, in order to become a sovereign State, while the sovereign party treats them as insurgents and rebels who owe allegiance, and who should be punished with death for their treason." *Id.* 67 U.S. (2 Black) at 667 (emphasis in original).

Aetna points out, correctly, that the *Prize Cases* decision did not construe an insurance policy. The issue was whether a "war" was in progress between the Union and the Confederacy, thereby justifying President Lincoln's blockade and seizure of ships under recognized principles of international law. The distinction may be conceded, but international law appropriately "provides a starting place for our inquiry" into insurance law. *Pan Am* at 1012 n. 12.

This Court, in two more recent cases concerning the Sandinista uprising against the Somoza government in Nicaragua, followed the quoted language from *Pan Am* as a holding by the Second Circuit on the definition of "civil war" for insurance purposes. *Wilker Brothers Co. v. Lumbermen's Mutual Casualty Co.,* 529 F.Supp. 113, 116 (S.D.N.Y.1981); *Ope Shipping, Ltd. v. Allstate Insurance Co.,* 521 F.Supp. 342, 349 (S.D.N.Y.1981).

In these circumstances, I regard the quoted language from *Pan Am* as a holding on the insurance meaning of "civil war." Furthermore, that is a defini-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001676

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

tion of which Aetna had at least constructive knowledge at the time it entered into the policy in suit.

It follows that Aetna's failure to prove the requisite intent for an "insurrection" dooms its effort to defend on the theory of *1495 "civil war." The intent of participants in an insurrection is "overthrowing the constituted government and seizing its powers." That is, as the Second Circuit aptly observed in *Pan Am,* a more "rudimentary" form of intent than that which motivates participants in a civil war. The latter individuals, as described by the Supreme Court in the *Prize Cases,* "have declared their independence; have cast off their allegiance;" and "have commenced hostilities against their former sovereign;" they "claim to be in arms to establish their liberty and independence, in order to become a sovereign State..." And the "sovereign party" thus threatened "treats them as insurgents and rebels who owe allegiance, and should be punished with death for their treason." These expressions of intent and purpose were, not surprisingly, found by the Court to exist during the American Civil War. [FN138]

> FN138. Aetna relies in its briefs on a subsequent statement in the *Prize Cases,* 67 U.S. (2 Black) at 667–68:
>
> "The true test of its existence, as found in the writing of the sages of the common law, may be thus summarily stated: 'When the regular course of justice is interrupted by revolt, rebellion, or insurrection, so that the Courts of Justice cannot be kept open, *civil war exists* and hostilities may be prosecuted on the same footing as if those opposing the Government were foreign enemies invading the land.' "
>
> Aetna interprets this language to mean that if the law courts are closed, it must be a civil war, and contends that the courts in

Beirut were in fact closed by the fighting. The evidence on the point is in conflict, but in any event I cannot agree that the Supreme Court intended this single factor to be determinative, particularly in view of its recitation of other factors several paragraphs earlier. The same language from the *Prize Cases* was cited to Justice Mustill in *Spinney's,* who declined to find a civil war in Lebanon. I agree with his analysis, at 429:

> "... the learned Judge cannot properly be understood as laying down a test which would hold good in all circumstances for all time, and which can be applied directly to the words wherever they appear in a contract: for such a test would manifestly be too narrow."

Applying the *Pan Am* definitions, a "civil war" was found to exist in Nicaragua during 1978 and 1979 by Judge Pollack in *Ope Shipping, supra,* and by Judge Brieant in *Wilker Brothers Co., supra.* The incumbent government was that of General Somoza. Somoza, a dictator, constituted the entire government. There was no president, prime minister, parliament or constitution in any meaningful sense. In consequence, when the Sandinista National Liberation Front undertook activities in 1978 to "oust General Somoza"; declared publicly on June 1, 1979 that "the hour for the overthrow of President Somoza has arrived," and called for "insurrection," with fighting thereafter breaking out in the principal cities; and named "a provisional government of five leaders (a Junta)" on June 18,[FN139] a civil war was clearly under way. Somoza's person and the sovereign Nicaraguan state were synonymous. Depose one, and you depose the other. In these circumstances, this Court held that insured vessels owned by Somoza, seized by revolutionary crew members in June, 1979, and turned over to the revolutionary government "which came into power on or about July 20, 1979," *id.* at 344, were lost

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

to their assured owners as the result of "civil war," so that the policy exclusion applied.

> FN139. The quotations are from *Ope Shipping, supra,* at 345. Judge Pollack relied for those declarations, acts and dates upon the New York Times Index "for the chronology as a backdrop to better understanding of the evidentiary data in the trial record—a chronology from sources whose accuracy so far as set forth herein cannot reasonably be questioned. See Rule 201, Federal Rules of Evidence." *Id.* at 344. I have in the case at bar made a comparable use of Rule 201.

Judge Pollack in *Ope Shipping* observed that "[t]he relevant history of the civil war during that period is also chronicled (in part) in *Productos Carnic, S.A. v. Central American Beef & Trading Co.,* 621 F.2d 683 (5th Cir.1980), where the Fifth Circuit said at 685:

> "Insurrection, armed conflict, battles in the street, terrorist attacks, riots, war, revolution, and the overthrow of a dictator permeate this appeal. General Anastasio Somoza was forced to resign as President of Nicaragua on July 17, 1979. The new government promptly nationalized**\*1496** a great portion of the vast holdings of Somoza and his family, including a small Nicaraguan meat processing company—already close to bankruptcy—Productos Carnic, S.A."

In *Wilker Brothers, supra,* Judge Brieant applied the "civil war" exclusion to damage to the assured's Nicaraguan factory during July, 1979, before the conclusion of the strife resulting from the efforts to change the Nicaraguan government. 529 F.Supp. at 115. The Court characterized events in Nicaragua as follows:

> "The change of administration in Nicaragua oc-

curred as a result of a civil war or insurrection, as a result of which the Sandinistas, with a little help from their friends (in Washington, D.C. and elsewhere) procured the overthrow of the government after a considerable amount of civil commotion and street fighting." *Id.* at 113.

Two English insurance cases prior to *Spinney's* deal with "civil war." In *Pesquerias y Secadeos de Bacalao de Espana, S.A. v. Beer,* 1 All E.R. 845 (H. L.1949), *aff'g.* 80 Lloyd's List L.R. 318 (C.A.1947), *rev'g.* 79 Lloyd's List L.R. 417 (K.B.1946), insured vessels were taken by a Basque militia which remained loyal to the Republican government of Spain. The vessels were used for armed patrol purposes and to transport refugees. These actions were taken in response to the approach of the army of General Mola, whose troops had risen in insurrection at the call of General Franco. Franco had landed in Spain and issued "a declaration of war against the Republican government"; the aim of Franco and his followers "was to overthrow the Government of the Republic by force of arms." Judgment of Lord Greene, M.R., for the Court of Appeal, at 80 Lloyd's List L.R. 323, 324 (C.A.1947). The Court of Appeal held, and the House of Lords agreed, that a "civil war" fell within the excluded peril "war-risks," and that what was happening in Spain constituted a "civil war."

Four of the law lords in *Pesquerias y Secadeos* construed the Court of Appeal's decision in *Curtis & Sons v. Mathews,* [1918] 2 K.B. 825, *aff'd.* [1919] 1 K.B. 425 (C.A.1918) as holding that events during the 1916 Easter rising in Dublin constituted a "civil war." So construed, the House of Lords in *Pesquerias y Secadeos* approved the Court of Appeal's holding in *Curtis & Sons.* 1 All E.R. at 847 (H.L.1949). In *Curtis & Sons* various persons proclaimed a Provisional Government of Ireland, occupied public buildings in Dublin, claimed the support of "gallant allies in Europe" (the Central Powers were then at war with the United Kingdom), and did battle with military forces of the Crown, during which insured property was

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001678

Page 44

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

damaged.

Neither of these cases undertakes to define in detail what a "civil war" is for insurance purposes. But the facts fit the pattern of American authority. Franco and his followers in Spain and the Irish rebels of the Easter rising have in common with the American Confederacy and the Nicaraguan Sandinistas a casting off of all allegiance to the established government, a proclamation of a new government, and the waging of war to oust the former and establish the latter.

In *Spinney's, supra,* Justice Mustill concluded on the evidence before him that a civil war did not exist in Lebanon in January, 1976. At point in his judgment, Judge Mustill appears to adopt a rationale different from the other cases, American and English, that have considered the point. He says at 430:

"But where the term is used in ordinary speech I am not convinced that a desire to seize or retain the reins of state is the only motive which can ever put the contestants into a state of civil war. If all the other requirements are satisfied, I believe that there would be a civil war if the objective was not to seize complete political power, but (say) to force changes in the way in which power is exercised, without fundamentally changing the existing political structure. Again, other requirements being satisfied, I believe that there would be a civil war if the participants were activated by tribal, racial or ethnic animosities. Nevertheless, one should, in my view, always begin by **\*1497** inquiring whether the parties have the object of seizing or retaining dominion over the whole or part of the state. If it is found that they do not, there may still be a civil war; but it will then be necessary to look closely at the events to see whether they display the degree of coherence and community of purpose which helps to distinguish a war from a mere tumultuous internal upheaval."

This is the only case of which I am aware which

suggests that "civil war" may exist even if no party has "the object of seizing or retaining dominion over the whole or part of the state." With respect, this suggestion seems to me wrong. It cannot square with American authority as declared in *Pan Am,* which, drawing upon *Davila* and the *Prize Cases,* holds in essence that "the specific purpose of overthrowing the constituted government and seizing its powers" is a necessary element of both "insurrection" and "civil war." And Justice Mustill himself returns to what I regard as the mainstream of authority when he says at 431:

"It may not be unfair to say that the government had been reduced to the level of an ineffectual spectator, standing powerless on the sidelines. But none of the participants (or at least of the major groupings) was at this stage fighting to supplant it; and still less did they claim already to have supplanted it, by establishing a government of their own (notwithstanding certain isolated evidence of the occasional use of phrases such as 'provisional government', which can hardly be taken at their face value). Nor were the combatants setting out to establish a separate state, split off from the existing territory of the Lebanon. As I have said, partition was not in January, 1976, a live political issue."

And again, at the same page:
"It is also true that these groups came into violent conflict with others of the opposite opinion. But this conflict was a reflection of the views held, not a means of imposing them on the nation as a whole .... [I]f one asks whether the Moslems and radicals were engaged in an all-out concerted effort to change the constitution by force, it seems to me plainly that they were not. Thus, I do not find in the Lebanese struggle, in the shape which it possessed in January, 1976, the indicia of a civil war, in the more usual sense of the term."

Aetna has not proved the existence of a "civil war" for insurance purposes under American authority. There was prolonged violence and much blood-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001679

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

shed; and during the course of that violence the Holiday Inn was much damaged. But the Mourabitoun, in seeking to dislodge the Phalange from the Holiday Inn, were not acting for the specific purpose of overthrowing the Lebanese government. They did not proclaim a casting off of allegiance to that government; they did not proclaim or seek to establish a government of their own. That is equally true of other factions who assisted the Mourabitoun in the fighting around the Holiday Inn, or the more general groupings with whom those factions could, at various times and for certain purposes, be intermittently identified. An attack upon a Phalangist-held series of hotels in West Beirut was neither an attack upon the existing government of Lebanon nor an effort to set up another government. The Phalange supported the status quo because that was the view of its leader, Pierre Gemayel; but the Phalange was not the government. As in the concept of "insurrection," it is only the events of late March, 1976, that furnish an arguable basis for the finding of a civil war; but the proof or intent and objective fails, essentially for the same reasons previously discussed.

Within the context of a casting off of allegiance to the state, Aetna lays stress upon the concept of partition of Lebanon. I fully accept, as the cases indicate, that the partitioning of a sovereign state into separate parts may be an objective of participants in a civil war. As we have seen, in *Spinney's, supra,* Justice Mustill said in part at 431: "Nor were the combatants setting out to establish a separate state, split off from the existing territory of the Lebanon." And, as Aetna points out, the American Confederacy was not attempting to overthrow the entire United States government, **\*1498** in the sense of seeking to impose its sovereignty and form of government upon all the states of the Union.

However, a civil war whose objective is partition of the state (as opposed to imposing a new form of government upon the entire state, as in Nicaragua) demonstrates the same basic characteristics referred to in the cases. In respect of that part of the state sought to be partitioned away, the constituted government is sought to be overthrown, and its powers seized; liberty and independence are pursued, in order that a new sovereign state may emerge in the partitioned territory; allegiance to the former state, at least within the boundaries of the partitioned territory, is irrevocably cast off.

Aetna has failed to prove that any of the factions involved in any way with the damage to the Holiday Inn embraced partition of Lebanon as a specific objective. It is true that Bulloch referred in his evidence to a "de facto partition of the country" as a result of the fighting.[FN140] Randal testified that partition became a de facto reality as of January, 1976, both in the city and the countryside.[FN141] There is no question but that identifiable geographic areas came to be dominated and populated by one group or another. For example, the "green line" dividing east (Christian) from west (Moslem) Beirut is a manifestation of de facto partition of the city. But this is not the sort of partition which must be shown to demonstrate the existence of a civil war. That "de facto partition" which results from force of circumstance is not the same as a partition which is the specific objective of one of the contending sides. It is in that latter sense that the Confederacy sought to partition the Union. There is no persuasive evidence of the existence of such an intent or objective in Lebanon at the pertinent times.

FN140. Tr. 157–58.

FN141. Randal dep. at 137.

Ambassador Godley, speaking of events through January, 1976, expressed the view that while "partition was mentioned principally as a threat by the Christians against the Moslems, ... we didn't take it seriously.... We always felt in the embassy that that was a pipe dream.... Then I felt, as did my colleagues, that cantonization [Godley's synonym for partition]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001680

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

was an impossible solution to the Lebanese situation at that time." [FN142] Bulloch wrote in a newspaper dispatch of August 13, 1976 that Pierre Gemayel had spoken of the "possibility of a Maronite state being established," and wrote further on August 14 that Gemayel, as head of the Phalange, "made it clear that partition of the country was being considered." [FN143] Even taking these declarations at their face value (as opposed to tactical threats, not to be taken seriously, as Godley testified of an earlier time), they fall well short of constituting a fixed and immutable purpose. Furthermore, declarations in August of 1976 are of questionable probative weight in determining state of mind and intent in March, 1976. Two of Aetna's own witnesses negated partition as an objective of their respective factions: Moussa Prince of the National Liberal Party (allied with the right),[FN144] and Nidim Samra of the Syrian Nationalist Social Party (allied with the left). [FN145] I give greater weight to this testimony than to that of Randal, who expressed the view that the actions of certain Christian rightists, in January, 1976, "whether they admitted it or not, and some of the more candid leaders did admit it, was an effort to set up partition." [FN146] I do not accept that, at the times with which I am concerned, the Christian right wing had embarked upon a deliberate course of action to achieve partition. It is more accurate to say that these factions had as their objective the preservation of the status quo over all Lebanon. Partition might come; it might prove to be a useful threat; but it **\*1499** was not an objective at these particular times, either of the right wing factions or of the factions on the left. On this point, the evidence before me leads me to the same conclusion as that expressed by Justice Mustill in *Spinney's* on the evidence before him:

FN142. Tr. 590–91.

FN143. Ex. 13 and 14 to Bulloch deposition.

FN144. "We were ourselves against the partition." Tr. 246.

FN145. "We don't believe in partition." Tr. 359.

FN146. Randal dep. at 59, 60, 65–66.

"... the population was still very mixed, and anyone attempting by force to parcel up the country on religious lines would have faced a most formidable problem. Possibly certain Christian leaders felt that if all else failed a partition would be better than the progressive erosion of what they saw as the distinctive character and sovereignty of Lebanon by the pressures of Pan-Arabism and Palestinian nationalism. But no faction was fighting under the banner of partition, and whatever exactly may have been in the minds of the leadership, the prime and avowed object of the Christian groups was to keep the Lebanon as it was." *Id.* at 425.

Aetna has failed to prove that the damage to the Holiday Inn is covered by the "civil war" exclusion in the policy of insurance.

(2) *War.*

In *Pan Am,* at 1012–1013, the Second Circuit defined war as:

"... a course of hostility engaged in by entities that have at least significant attributes of sovereignty. Under international law war is waged by states or state-like entities."

The insurance definition is essentially the same: "English and American cases dealing with the insurance meaning of 'war' have defined it in accordance with the ancient international law definition: war refers to and includes only hostilities carried on by entities that constitute governments at least de facto in character."

And *Pan Am* adds this observation and authority:

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001681

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

"War can exist between quasi-sovereign entities. Cf. *Hamdi & Ibrahim Mango Co. v. Reliance Insurance Co.,* 291 F.2d 437, 442 (2d Cir.1961)."

*Pan Am* does not undertake detailed definitions of "entities that have at least significant attributes of sovereignty," "governments at least de facto in character," and "quasi-sovereign entities." To my mind the phrases appear to be interchangeable. Some enlightenment as to what these labels mean is found in the cases.

In *Pan Am,* the Popular Front for the Liberation of Palestine, which hijacked the insured plane, maintained its largest numerical presence in Jordan. See Judge Frankel's opinion for this Court at 368 F.Supp. 1107–08. At the time pertinent to that case, "fedayeen" groups of which the PFLP was one [FN147] had come "increasingly to assume control over administration and discipline within the refugee camps." *Id.* at 1109. Judge Frankel continued:

> FN147. "Fedayeen" are Arab individuals committed to political objectives to the point of preparedness to die for them. They are dedicated to the reconquest of Palestine from Israel. *Pan Am* at 368 F.Supp. 1106 n. 6.

"With the not necessarily enthusiastic acquiescence of the Jordanian Government, fedayeen vehicles bore their own license plate identifications. Camps for military training, particularly for commando-type operations, were run and exclusively controlled by fedayeen organizations." *Ibid.*
The judge then had to consider, *inter alia,* whether the PFLP's destination of the aircraft constituted a loss from the excluded cause of a "military or usurped power" in Jordan. Judge Frankel held that "occupation of ground by sufferance of the *de jure* government is clearly insufficient" to constitute a group as a "military or usurped power." *Id.* at 1129. The judge continued:

"The record does not sustain on any theory the notion of the PFLP as a 'military or usurped power.' They had not at any pertinent time seized or controlled any territory *over the opposition of the Jordanian government.* They 'occupied' a training camp at Salt while the fedayeen were being tolerated generally—a barren and exiguous facility containing some caves, tents, and rudimentary structures. Then they 'seized' Dawson's Field just **\*1500** before the September 6 hijacking. But that strip was an unoccupied area on a desert plateau. Neither *the uncontested occupation* of the Salt camp nor the brief episode at Dawson's Field constituted such 'control of territory' as the phrase connotes." *Id.* at 1130 (emphasis added).

On appeal, the Second Circuit agreed with the district court that the PFLP could not be regarded as a military or usurped power, citing *Insurance Co. v. Boon,* 95 U.S. (5 Otto) 117, 127, 24 L.Ed. 395 (1877) for the proposition that "usurped power is either the power exerted by invading foreign enemies or by an internal armed force in rebellion 'sufficient to supplant the laws of the land and displace the constituted authorities.' " 505 F.2d at 1011.

While in the case at bar Aetna does not rely upon the exclusion of "military or usurped power," the foregoing discussion is pertinent because the Second Circuit in *Pan Am,* also holding that the "war" exclusion did not apply, stated at 1012:

"The PFLP was not a de facto government in the context of 'war' for substantially the same reasons that it was not a government in the context of 'military ... or usurped power.' "

Rejecting the concept of a loss caused by "war" in *Pan Am,* the Second Circuit noted that "[t]he PFLP has never claimed to be a state," and that cases such as *Curtis & Sons, supra,* and *Pesquerias y Secaderos,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001682

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

*supra,* to the extent relevant, imply "that a guerrilla group must have at least some incidents of sovereignty before its activities can properly be styled 'war.' " *Id.* at 1013. The "incidents of sovereignty" in those latter cases included, as we have seen, the seizure of territory contrary to the will of the *de jure* government, and proclamation by the insurgents of a rival, supplanting government.

In *Pan Am,* the Second Circuit referred us to *Hamdi & Ibrahim Mango Co. v. Reliance* **Insurance** *Co.,* 291 F.2d 437, 442 (2d Cir.1961), for the proposition that: "**War** can exist between quasi-sovereign entities." *Hamdi* involved the loss of **insured** cargo originally scheduled for overland transportation from Detroit to New York and Baltimore, and from there by sea to the port of Haifa in what was then Palestine, and finally overland to Amman, Jordan. The goods were landed at Haifa; but in the meantime, "hostilities had broken out in Palestine between the **Israelis** and the Arabs after the resolution of partition adopted by the General Assembly of the United Nations on November 24, 1947." 291 F.2d at 439. Certain of the shipments were destroyed by mortar fire during the clash between the **Israelis** and the Arabs in Haifa on April 21–22, 1948. Judge Sugarman held for this court that "a state of **war** existed in Haifa on April 21–22, 1948, when the goods stored at the Haifa port were destroyed," *id.* at 442, and held that the loss was **excluded** from coverage by the terms "hostilities or **warlike** operations." The Second Circuit affirmed. In *Pan Am,* the Second Circuit explained the result in *Hamdi* by stating: "Arguably, the loss was not caused by fighting between governments, but all of the other indicia of **warlike** operations were present." 505 F.2d at 1017.

In my view, these authorities help to define a "de facto government" or a "quasi-sovereign entity." It is not sufficient to achieve such status that the group or entity in question occupy territory within the boundary of the sovereign state upon the consent of that state's *de jure* government. That is so, even if that government's consent extends to permitting its guests to exercise considerable control and autonomy within the camps or other facilities in which they dwell. "De facto governments" manifest "attributes of sovereignty" when they stake out and maintain adverse claims to territory, accompanying those claims with declarations of independence and sovereignty. This is the clear thrust of the cases previously discussed. *Hamdi, supra,* falls within that category because the Arabs and the Israelis bitterly contested control and sovereignty over that portion of former Palestine which had been partitioned so as to constitute the new state of Israel.

In the light of these authorities, I turn to Aetna's contention that a "war" in Lebanon during the relevant period of time caused or contributed to the damage to the Holiday Inn.

**\*1501** Aetna argues that the conflict in Lebanon involved "three clearly-defined independent entities, each having the attributes of sovereignty or, at the very least, quasi-sovereignty." Main Brief at 75. These three entities are said to be: Syria; the P.L.O.; and "the Lebanese rightists who considered themselves the defenders of the Lebanese state." *Ibid.* Since as the evidence shows it was primarily the Phalange whose presence in the Holiday Inn triggered the fighting that led to the damage to that structure, I must focus upon that group in evaluating Aetna's claim of quasi-sovereign status.

There is no substance to that suggestion. I accept that the Phalange, and those factions allied with them, "considered themselves the defenders of the Lebanese state," or, to state it more precisely, the defenders of the status quo. But it hardly follows that the Phalange, in defending the state, became the state, or achieved any attributes of sovereignty, as those attributes are defined by case law. The Phalange was a private militia. Its chief was Pierre Gemayel. The sovereign state of Lebanon was administered *de jure* by its government, consisting of president, prime minister, lesser

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001683

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

ministers, and parliament. The most important officers of the government were President Franjieh and Prime Minister Karami. They never left office during the pertinent times. Subsequently, Sarkis succeeded Franjieh as president, as the result of parliamentary action. The parliament functioned under considerable difficulty, to be sure, but it functioned nonetheless; there was always an identifiable Lebanese government; the Lebanese rightists who considered themselves the defenders of the Lebanese state cannot reasonably be regarded as contesting the sovereignty of that state, or as proclaiming any rival sovereignty or quasi-sovereignty of their own. The most that can be said is that as the power of the central government to control affairs in Lebanon diminished, groups such as the Phalange came to the fore in conducting the fighting in certain areas. But that is not sufficient, under the cases, to endow the Phalange or comparable entities with the attributes of sovereignty or quasi-sovereignty.

Syria participated in the fighting in Lebanon; and Syria is, of course, a sovereign state. However, to invoke the policy exclusion for "war," Aetna must show that the damage to the Holiday Inn was caused or contributed to by fighting between Syria and another governmental entity. As Judge Frankel observed for this Court in *Pan Am*, at 368 F.Supp. 1130, "the term 'war' has been defined almost always as the employment of force *between* governments or entities essentially like governments, at least *de facto*."

When Syria intervened militarily in Lebanese affairs, its forces entered the territory of another sovereign state. But this involvement did not give rise to a war between the governments of Syria and Lebanon. On the contrary: the evidence makes it clear that, at the pertinent times, Syria's intervention was for peace-keeping purposes, specifically directed towards sustaining the Lebanese government in its then existing form. Syria became involved in Lebanon not as the result of a war with Lebanon or any other sovereign state, but rather as the result of a "brokered" diplo-

matic arrangement, also involving the United States and Israel, which was intended to preserve the state of Lebanon.

Syrian and Syrian-controlled forces did become involved in fighting in Lebanon. As of March 28, 1976, one witness estimated that 10,000 PLA and Saiqa troops were stationed in the country.[FN148] Initially these forces were deployed to stabilize and patrol the "green line" in Beirut, and to assist in the preservation of a cease-fire. At a later time, as previously described, these Syrian-controlled forces blocked a Lebanese Arab Army assault on the presidential palace. As strife in Lebanon continued, the Syrians sent in regular army infantry and army divisions, which became engaged in combat with leftist and Palestinian forces. However, none of these activities demonstrates that the cause, or a contributing cause, of *1502 the damage to the Holiday Inn was a "war" involving Syria. The events of June, 1976 and thereafter are irrelevant, because they fall outside the period of time with which I am concerned. In any event, Syria was never at war with another sovereign or quasi-sovereign.

FN148. Bulloch dep. at 180–181.

Aetna contends that the P.L.O. was a quasi-sovereign entity; and since a time came when Syrian forces were in combat with Palestinians, a war existed between Syria and the P.L.O. I reject this argument for several reasons.

First, I do not accept that the P.L.O. claimed or demonstrated those attributes of sovereignty which the cases require. The P.L.O. was formed in 1964, when representatives of various Palestinian groups met in Jerusalem for the purpose. Arafat headed el Fatah, the largest and most powerful of these groups, and in consequence became chairman of the P.L.O.[FN149] In that capacity, Arafat headed the Palestinian delegation which negotiated the Cairo Agreement with the Leb-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

anese government in November, 1969. As previously noted, it was that agreement which governed the continuing Palestinian presence in Lebanon. The text of the agreement recites the signatories' cooperation "within the framework of Lebanese sovereignty and security." Paragraph 13 provides that "the Lebanese authorities, both civil and military, shall continue to exercise all their prerogatives and responsibilities in all areas of Lebanon in all circumstances..." In short, the P.L.O. in this document specifically recognized Lebanese sovereignty and undertook not to disturb it.

> FN149. See discussion in *Pan Am* at 368 F.Supp. 1106.

In consequence, the Palestinians' presence in Lebanon occurred with the consent of the *de jure* government. It is in contemplation of law no different from that consensual presence on the part of the PFLP in Jordan which was held in *Pan Am* to fall short of an attribute of sovereignty. In Lebanon we deal with larger numbers, but the principle is the same.

There is evidence from which I could find that certain right-wing individuals believed that Arafat had not kept his promise to respect Lebanese sovereignty. Certainly the Phalange was increasingly motivated to move against the growing Palestinian presence, centered in the various refugee camps. But it does not follow that the P.L.O. was claiming the attributes of sovereignty, or exercising the powers of de facto government, within the context of its presence in Lebanon. As far as Arafat, the titular leader of the P.L.O., was concerned, the evidence shows that his purpose was to avoid involvement with Lebanese politics, and by doing so maintain that peaceful and cooperative presence sought to be achieved by the Cairo Agreement. The fact that Palestinian fighters, including members of the Fatah, eventually came into conflict with the Phalange militia (in the refugee camps and hotel district of Beirut) and with Syria and Syrian-controlled forces (in the mountains to the east) do not change this analysis.

Secondly, the Palestinians in Lebanon did not have that unified structure and purpose which Aetna's references to the P.L.O. would suggest. In point of fact, the Palestinians within Lebanon were divided among themselves as to what the policy should be. Thus Bulloch wrote, in a dispatch dated August 12, 1976: [FN150]

> FN150. See Bulloch dep. at 270.

"On the Left the Palestinians are hopelessly split. The major group within the Palestine Liberation Organization, Fatah, would be willing to try to reach a compromise. But the organizations of the so-called Rejection Front want no negotiations at all, and in Beirut one man with a gun wrecks any cease fire."

That is an equally apt description of conditions at the time when the Holiday Inn was involved in fighting.

While the P.L.O. received certain recognitions and courtesies from the United Nations and the Arab League, they do not rise to the level of the status of a sovereign state, or that of an entity exercising the powers of de facto government within the boundaries of the Republic of Lebanon.

**\*1503** Finally, assuming *arguendo* that the P.L.O./Palestinians in Lebanon should be regarded as a quasi-sovereign entity, they were not conducting a war with another governmental entity which caused or contributed to damage to the Holiday Inn. Although the Mourabitouns' successful recapture of the Holiday Inn in March, 1976 took place with the assistance of Fatah fighters, the Palestinian effort was directed against the Phalange, which for the reasons stated *supra* cannot be equated with the sovereign state of Lebanon or its established government. As for the Palestinians' combat with Syrian forces to the east, that conflict occurred after the relevant period, and is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001685

571 F.Supp. 1460
**(Cite as: 571 F.Supp. 1460)**

not causally connected in any way to the damage to the Holiday Inn.

Aetna has failed to prove that the loss was caused or contributed to by the excluded peril of "war."

## CONCLUSION

[9] Aetna, as an all risk insurer, had the burden of proving that the damage to the Holiday Inn was caused by a peril whose consequences were excluded by the policy. It undertook to show that the damage resulted from "insurrection," "civil war," or "war," as those terms are used in insurance policies. Having failed to sustain that burden, Aetna is liable under the policy.

Elements of intent, purpose, and sovereign status lie at the heart of these concepts. In *Pan Am* the Second Circuit defined those elements, several months before the policy in suit was negotiated. Aetna had to prove them. From the welter of trial evidence, some of it impassioned, some more objective, Aetna derives a number of arguments and theories, some more plausible than others. But even the more plausible theories are countered by equally reasonable interpretations of the proven facts which undermine the defense. That is the essence of Aetna's failure of proof.

The Holiday Inn was damaged by a series of factional "civil commotions," of increasing violence. The Lebanese government could not deal effectively with these commotions. The country came close to anarchy. But the constitutional government existed throughout; the requisite intent to overthrow it has not been proved to the exclusion of other interpretations; and there was no "war" in Lebanon between sovereign or quasi-sovereign states.

Because the existence of none of the excluded causes has been demonstrated at the pertinent times, the provision in the policy excluding their remote or indirect consequences does not come into play. HI paid a negotiated additional premium for "civil commotion" coverage, as part of its all risk policy. It is entitled to recover on that policy.

Journalists and politicians invariably referred to these events in Lebanon as a "civil war." They do so today. The Court's task, however, is to give the words at issue their insurance meaning; and to place the burden of proof in accordance with law. At the end of that exercise, I find for HI on the question of coverage.

The foregoing constitutes the Court's findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

In consequence, HI is entitled to entry of judgment on the issue of liability under the policy. The parties are directed to explore the possibility of settling the quantum of damages, failing which a reference will be ordered. Counsel are directed to advise the Court by letter of their progress in that regard, not later than sixty (60) days from the date of this Memorandum. Following entry of the judgment on liability, the case will be placed on the Suspense Docket of this Court pending counsel's report on damages negotiations.

Settle judgment on notice.

D.C.N.Y.,1983.
Holiday Inns Inc. v. Aetna Ins. Co.
571 F.Supp. 1460

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATL001686

# EXHIBIT 73

## GENERAL CLAIMS PRACTICES

These are general practices. The facts and circumstances of a given claim, together with applicable law, dictate reasonable and appropriate claim handling.

1. **Claims Processing**

   Claims personnel should take the following steps in adjusting claims.

   - Acknowledge receipt promptly as further discussed Section **7. Communications**. Depending on circumstances, this may include:

     o an explanation of the claims process, if necessary

     o any documentation that must be provided

     o the assignment of claims to outside vendors

     o loss mitigation

     o protection of the insurer's rights, including any necessary reservations; and,

     o advice of the applicable policy limits and any deductibles.

   - Properly identify on written communications with the insured the pertinent insuring company (e.g., Atlantic Specialty Insurance Company, Homeland Insurance Company of New York, etc.).

   - For bodily injury claims, make every effort to secure claimant social security number, date of birth, and gender information in order to properly report to ISO BI database and CMS for Medicare. Please refer to **the Medicare Section 111 Policies & Procedures and Training Guide resource, linked here.**

   - Verify policies, including the policy terms, potentially applicable coverage type(s) (e.g. GL, E&O, Umbrella, Lawyers Professional, Protection & Indemnity, First Party Property, etc.), potentially applicable coverage forms, policy limits, Self-Insured Retentions and deductibles, potentially applicable coverage triggers (occurrence, claims made, etc.), retroactive dates if applicable, and endorsements.

   - Review and assess coverage provided to the insured by applicable policies issued by us in accordance with applicable state law.



Exhibit 15

Gutterman - 2-3-17

1

ATL000735

- Commence investigation promptly as informed by review of coverage and the circumstances of the notice received.

- Determine the need for outside vendors to assist in the investigation, such as surveyors, attorneys, engineers, accountants, fire experts, salvor, etc., and assign responsibility to such vendors, when appropriate.

- Collect documents pertinent to the type of claim, and investigate sources of information (e.g. photos, diagrams, surveys, plans, reports, law enforcement materials, web site information, court dockets, deposition summaries, witness statements, etc.), and include these documents in file.

- Compare the facts discovered through investigation to the pertinent policy coverages and applicable law. Evaluate and determine whether and to what extent the policy responds to the claim.

- Promptly and thoroughly communicate the coverage position to the insured(s), and, if required, to the claimant(s).

- In general, mark claims involving coverage disputes "Sensitive" in the CWS Claim Folder.

- Formulate a strategy for resolution of the claim.

- Communicate with the insured(s) when appropriate at key points in the claims adjustment process.

- Follow up with insured(s) regarding liability, damages, and outstanding coverage issues on a regular basis.

- Ensure that the appropriate file notes and documentation are maintained.

- Adequately and timely reserve the file and update reserves when appropriate.

- Issue payments on the file in a reasonable and timely manner.

**2.**   **Claim File Documentation (Paper & Electronic)**

- Claims personnel should document the claim file in such a way as to provide a complete understanding of our activities with respect to the claim.

- Initial file documentation should include the following:

  o   Initial contact;

2

ATL000736

- o   Initial factual report;

- o   Coverage review including policy period; and,

- o   Investigation plan.

- Documentation should outline further work to be completed in addition to what has transpired since the last report.

- File notes should reflect resolution strategy throughout the life of the claim.

- Documentation of the claim file should be timely entered and properly identified for easy retrieval.

- To protect privacy of medical records, attorney – client and other privileged communications, and internal coverage communications, the adjuster should properly mark such file note entries as "Company."

- Draft documents, whether in paper or electronic form, are not part of the claim file since they are not finished or complete documents. Incomplete or unfinished documents should not be retained. All completed or finished documents are final documents and must be retained.

- Upon closing the file, the claims handler should make a closing note documenting the reason for closure and resolving any outstanding issues relating to coverage, deductible, etc.

**3.**   **Policy Provisions**

**First Party Claims**

- Claims personnel should review and evaluate applicable policy provisions, which may include the declarations page, endorsements, terms, conditions, limitations, warranties, limits, deductibles, valuation, etc.

- Claims personnel should identify the cause of loss for which the insured is making the claim.

- Claims personnel should confirm that the date of loss falls within the policy period and investigate, evaluate, and identify the scope and extent of coverage for the cause of loss.

3

ATL000737

- Claims personnel should disclose to the insured making claim pertinent benefits, coverages, or other relevant provisions of a policy or contract under which a claim is presented.

- Claims personnel should document any inability or unwillingness by the insured making the claim to exhibit property. Claims personnel should reserve rights and should not issue a denial for such inability or unwillingness unless the file is properly documented.

**Third Party Claims**

- Potential claims, also known as "notice-only" or "incident" claims, do not generally contain a demand for damages.

- Regardless of how the claim is tendered, claims personnel should determine whether a tender is an actual or potential claim by reviewing whether there has been a demand for damages against the policyholder and whether the demand is being tendered for coverage under an applicable policy(ies).

- Claims personnel should determine whether there is a duty to defend the claim, a duty to defend under reservation of rights, or no potential for coverage for the claim as soon as practicable.

- Claims personnel should evaluate coverage throughout the life of the claim, particularly as new information affecting coverage is developed during the course of the claim file.

**4.   Coverage Determinations**

- Unless modified by a Practical Guidelines applicable to a particular business segment, claims personnel should affirm, deny, or issue a reservation of rights with respect to coverage within a reasonable time following notice and investigation of claims, being mindful of jurisdictional requirements. In most cases, this communication should be written and should be sent within 30 days of our receipt of the claim, or as required by state law.

- When appropriate, the adjuster may consider referring the claim for review by coverage counsel or consult appropriate legal resources, including internal Claims Legal resources.

- In the course of an ongoing investigation of facts relating to coverage, the claim handler should provide the insured a reservation-pending-investigation letter within the 30 day timeframe, or as required by state law. A writing giving a more detailed explanation of coverage should then be provided to the

4

ATL000738

insured in a timely fashion after receipt of the information requested for the coverage investigation.

- In the course of an ongoing coverage investigation, it is a good practice for the claim handler to provide a preliminary assessment of coverage within 90 days of tender and update the coverage position as additional information makes such update appropriate.

- In any case involving a coverage issue, file notes pertaining to the coverage issues should reference:

  o   relevant policy provisions;

  o   relevant facts and allegations; and,

  o   the coverage determination.

- Coverage denials should be in writing and include the grounds for the denial. The applicable policy provisions, conditions and exclusions relied upon in the decision to deny coverage should be referenced.

- Where required in the jurisdiction, claimants should be notified that they may have the matter reviewed by the appropriate state Department of Insurance or other appeals process.

- The insured should be advised that coverage positions on claims are subject to reevaluation as new information pertaining to the claim is developed and should be invited to keep us advised of those changes so that the position can be readdressed, if appropriate.

- Claims should be held open for at least 90 days after issuing a denial, or longer if the adjuster is aware that the insured intends to contest the denial, with a notation in the file when closed

**5.**   **Counsel Retention & Management**

- Wherever possible, claims personnel should select counsel from the preferred counsel list for the respective business segment. Selection of counsel not on the preferred list should be based on expertise in the field, comparable rate to preferred counsel in that jurisdiction, and agreement to comply with our billing and reporting Guidelines.

- Expectations for defense counsel on litigated claims are set forth in the Defense Counsel Case Handling Guidelines. Claim handlers should send the Guidelines to defense counsel as soon as that counsel is retained.

5

ATL000739

- In the event defense counsel is independent counsel for the insured, claim handlers should send the Guidelines to that counsel with the explanation that the Guidelines represent our experience as to what constitute reasonable and necessary defense costs.

- Claims personnel should also obtain from defense counsel an estimate of defense costs that will be incurred throughout the life of the claim, which should be updated no less frequently than twice a year.

- For litigated claims, claims personnel should be actively involved with counsel in the investigation, evaluation and resolution and not rely solely on counsel.

## 6.   Reserving

- Reserves should be timely established based on exposure in light of the totality of the circumstances presented by the individual claim.

- Reserves should be based upon all information available at the time, including due consideration of potential future developments.

- Reserves should be revisited throughout the life of the claim.

- As reserves are posted, the adjuster should perform appropriate internal reporting.

- Claims personnel must' obtain appropriate authority before making reserve decisions in excess of their authority.

## 7.   Communications

- Claims personnel should be courteous and professional at all times and should adopt a courteous and professional tone in all communications, no matter the format or purpose of those communications.

- Within 14 days (and preferably within 1 – 3 days) after initial notice of loss or claim to our agent or notice to us directly, claims personnel should acknowledge receipt of notice of loss or claim.

- Claims personnel should respond promptly, as defined by applicable law and circumstances of the communication to pertinent communications that require a response.

6

ATL000740

- Unless modified by a Practical Guidelines applicable to a particular business segment, when a tender involves a potential claim, claims personnel should advise the insured in writing of receipt of notice, as well as what, if any, activity will be undertaken in response to the potential claim.

- When it appears that an anticipated loss or damage may exceed available per claim / occurrence / aggregate limits, claims personnel should notify the insured in order that the insured may report to any excess carriers and for the insured's planning.

- Claims personnel, when appropriate, should provide necessary claims forms, instructions and reasonable assistance with such forms promptly to claimants / insureds so that they may be given the opportunity to comply with policy conditions and our requirements.

- All claims-related communications, written and oral, should be documented in the claims file. This includes, but is not limited to, electronic communications, such as e-mail, as well as paper communications and notes of oral communications.

- Coverage letters and other external communications in final form, when transmitted electronically, should be sent in PDF format.

- Instant messaging and chat programs or applications or other types of communication that offer real-time direct transmission of text or video-based messages from sender to receiver or multiple receivers should not be used for substantive communication concerning claims.

**8.   Claim File Evaluation & Resolution**

**General**

- Review exposure by assessing potential liability, causation, loss and damages.

- Claims personnel should actively gather facts on a claim and should not wait for formal discovery in litigation or for appraisal to investigate.

- Examine whether additional insurance carried by the insured or some other party involved in the loss may apply to the claim or loss.

- Investigate and evaluate any potential for contribution, indemnification or subrogation as early as possible. Promptly identify, notify and, if appropriate, pursue responsible parties and their insurers.

7

ATL000741

- The applicable statutes of limitations and contractual limitations periods should be noted.

- Claims personnel should coordinate subrogation and recovery efforts through the Director of Subrogation.

- A decision not to pursue a potential source of recovery should be explained in the file.

- Claims personnel must obtain appropriate authority before setting reserves and resolving a claim.

## First Party Claims

- Claims personnel should assess the loss and apply policy valuation.

- Claims personnel should determine if the insured has met their burden of proving loss by a covered peril, where applicable.

- Claims personnel should communicate acceptance or denial to a first party claimant within twenty one (21) days following receipt of a properly-executed proof of loss, or as required by applicable state laws.

- If additional time is needed to determine acceptance or denial, claims personnel should provide notice to the claimant within twenty one (21) days following receipt of the properly-executed proof of loss, or as required by applicable state laws. Claims personnel should then provide updates to the first party claimant at 45-day intervals by letter stating reasons additional time is needed.

- Claims personnel should review the applicable policy for specific instructions regarding settlements, such as the proper methods for valuation of the loss, co-insurance or deductibles, and other calculations.

- Claims personnel should prepare loss statements with appropriate deductions, deductibles, and salvage.

- Claims personnel must obtain appropriate approvals for claim payments or denials.

- The undisputed portions of the loss should be paid promptly.

## Third Party Claims

8

ATL000742

EXHIBIT 73, PAGE 225

- Claims personnel's evaluation of liability, causation and damages should reflect consideration of facts developed through the claim investigation and the impact of those facts on the insured's exposure.

- Claims personnel should evaluate applicable legal issues that may affect the liability of a party, such as contractual damage limitations, comparative negligence, contribution rights, indemnification obligations, common law and statutory defenses, causation, etc.

- Claims personnel should review developments (liability, causation, and damages) promptly to assess whether any change to evaluation is warranted.

- In litigated matters where defense counsel has been assigned, claims personnel should be actively involved in the formulation of a negotiation strategy. It is generally good practice to advise the insured about settlement strategy in advance of any mediation or settlement conference.

- Negotiations should be conducted consistent with settlement authority. If the disposition of a claim requires more dollar authority than claims personnel have, he/she should seek that authority from the claim manager.

- If coverage has been confirmed, liability and causation are clear and damages have been assessed, a reasonable offer of settlement should be extended based upon the available information.

- In a claim involving multiple coverages, payment should be tendered to payees within thirty (30) days when the payment is not in dispute and the payment will terminate known liability under the particular coverage involved.

- Releases should be secured for all claimants and must be secured for claimants with legal representation. When any affiliate of ours is to be named in a release:

  o The release should state the correct legal name of the underwriting company listed on the policy under which the claim was presented; and,

  o The release should also name the affiliated adjusting or servicing entity (generally, OneBeacon Insurance Company or Atlantic Specialty Insurance Company).

### Negotiations with Unrepresented Parties

- If the statute of limitations on a claim is approaching and may affect an unrepresented claimant's rights, claimant should be notified of the statute of limitations issue before continuing negotiations.

9

ATL000743

    o   For first party claimants, we should provide notice at least 30 days before the date on which such time limit may expire.

    o   For third party claimants, we should provide notice at least 60 days before the date on which such time limit may expire.

**Special Investigations**

- Claims personnel should be familiar with the fraud indicators for their particular business line. When indicators appear to be present in a claim, claims personnel should contact the Special Investigations Unit for assistance.

9. **Supervisory Oversight**

- Supervisors should periodically review claim files to determine compliance with the principles in our **CORE PRINCIPLES** and **GENERAL CLAIMS PRACTICES**. This review may also accomplish the following objectives:

    o   evaluation of the adequacy of the reserve;

    o   assessment of additional investigation that may be needed; and,

    o   statement of disposition strategy.

- A Supervisory Review should be performed 90 days following the date a claim file is created and then as deemed appropriate thereafter while the claim remains open. The file notes should reflect the reviewer's analysis of the three items above and provide any applicable direction to claims personnel for future handling of the claim.

10

ATL000744

# EXHIBIT 74

# Take Away Their Guns -- Then We'll Talk

Foreign Policy

August 28, 2014 Thursday 12:18 AM EST

Copyright 2014 Newstex LLC All Rights Reserved

**Length:** 1092 words

**Byline:** Avigdor Liberman

## Body

Aug 27, 2014 (Foreign Policy:http://www.foreignpolicy.com/ Delivered by Newstex)

There is an almost obsessive general focus on how to achieve a solution to the Israeli-Palestinian conflict. But somehow, in all the talk, the means to achieve a solution are most often confused with the end result. The end result is surely peace and security, for Israel, the Palestinians, and the people of the region. But amid attempts to move forward toward peace and security, Hamas remains the biggest obstacle to any solution -- despite the fact that nearly every agreement reached between Israel and her neighbors has required the terrorist group to disarm.

For more than 50 days this summer, Israeli population centers were terrorized by rockets, mortars, cross-border infiltration into Israel by sea, and repeated attempts by Hamas and the other terrorist factions to murder and kidnap Israelis through the use of tunnels. These tunnels were also used for smuggling rockets, other arms, and material used to build weapons and rocket-launching pads. They were a crucial component of Hamas's military capabilities.

This latest conflict proves once again that Hamas is not a legitimate political actor or interlocutor. The group has attained its power and control only through the barrel of a gun or from behind a rocket's launching pad. Hamas seeks to achieve its long-stated goals of destroying the State of Israel and the genocide of the Jewish people through violent jihad and by disseminating fear, not just among Israelis, but also among Palestinians, whom it sees as mere tools in its bloody strategy.

During this summer's conflict, Hamas used Gaza's civilian population as human shields. The group also executed dozens of people it described as "collaborators," none of whom had any relationship with Israel, as a scare tactic against potential dissenters. Hamas's tactics are reminiscent of the radical groups in Syria and Iraq, the Islamic State and the Nusra Front.

It should thus be entirely obvious that unless Hamas is disarmed and its only tools of control removed, there can be no peace and security. Any discussion on opening up entry points into Gaza, increasing access to the sea for Gazans, or any steps necessary for the revitalization of the Strip and its inhabitants cannot take place while it is occupied and terrorized by Hamas.

Disarming Hamas is not a new idea launched during Operation Protective Edge. The group is officially considered a terrorist organization by many nations around the world, including the United States, the European Union, Canada, Japan, and Egypt. Historically, demilitarizing Hamas and other Palestinian terrorist organizations has been a key part of various agreements and understandings between Israel and the Palestinians.

The Interim Agreement on the West Bank and the Gaza Strip[1], which formed a central part of the so-called Oslo Process signed in 1995, specifically stated that "Except for the Palestinian Police and the Israeli military forces, no other armed forces shall be established or operate in the West Bank and the Gaza Strip" and "no organization, group or individual in the West Bank and the Gaza Strip shall manufacture, sell, acquire, possess, import or otherwise introduce into the West Bank or the Gaza Strip any firearms, ammunition, weapons, explosives."

The Wye River Memorandum[2], negotiated in 1998, laid the onus on the Palestinian Authority to effectively create a legal framework to demilitarize Hamas and other terrorist groups and "implement a systematic program for the

UCP035432

Take Away Their Guns -- Then We'll Talk

collection and appropriate handling of all such illegal items" like firearms, ammunition, or weapons in areas under Palestinian jurisdiction.

The demand for demilitarization of terrorist groups is laid out in the strongest terms in the Performance-Based Roadmap to a Permanent Two-State Solution to the Israeli-Palestinian Conflict, known as the Road Map[3], released and accepted by all parties in 2003.

The very first active component of the Road Map specifically demands that "Palestinians declare an unequivocal end to violence and terrorism and undertake visible efforts on the ground to arrest, disrupt, and restrain individuals and groups conducting and planning violent attacks on Israelis anywhere." Most importantly, the Road Map requires that the "Palestinian Authority security apparatus begins sustained, targeted, and effective operations aimed at confronting all those engaged in terror and dismantlement of terrorist capabilities and infrastructure."

Furthermore, in 2001, the United Nations Security Council unanimously adopted, under Chapter VII of the United Nations Charter, Resolution 1373[4], a series of counterterrorism measures legally binding on all U.N. member states. The resolution dictates that all states shall refrain from providing "any form of support, active or passive," to terrorists. In this regard, the continued acceptance of Hamas's infrastructure of terror also contravenes international law.

For the end of the decades-long conflict between Israel and the Palestinians to be achieved, those who strenuously, violently fight against any form of peace must not be allowed the means to do so. In our conflict, Hamas, which has neither interest in nor intent toward peace, has to be diminished. The terrorist group is a malevolent force. It continually hijacks any possibility of a better future for the peoples of the region. It must not be allowed to maintain its stockpiles of weapons.

The circumstances in Gaza must be changed radically. Israel fully supports a broad international effort to provide all the necessary means to rebuild the civilian infrastructure and economy in Gaza, provided there is a concerted parallel effort to prevent Hamas from rearming itself with weapons systems and rebuilding its terrorist infrastructure. Hamas cannot be allowed to rebuild its military force and prevent the essential international aid being directed to the Palestinian residents. Ultimately, the best guarantee for rebuilding Gaza and developing its economy will be demilitarization.

As long as Hamas remains armed, its weapons represent the strongest and most violent veto of peace and security for Israelis and Palestinians alike.

MAHMUD HAMS/AFP/Getty Images

[1]: https://www.knesset.gov.il/process/docs/heskemb_eng.htm        [2]: http://www.knesset.gov.il/process/docs/wye_eng.htm        [3]: http://2001-2009.state.gov/r/pa/prs/ps/2003/20062.htm        [4]: http://www.un.org/en/sc/ctc/specialmeetings/2012/docs/United%20Nations%20Security%20Council%20Resolution%201373%20(2001).pdf

**Load-Date:** August 27, 2014

---

UCP035433

EXHIBIT 74, PAGE 229

# EXHIBIT 75

# Gaza's marvels of engineering; Hamas gunmen can live in tunnels for weeks

National Post (f/k/a The Financial Post) (Canada)

August 9, 2014 Saturday, National Edition

Copyright 2014 National Post All Rights Reserved

**Section:** WORLD; Pg. A18

**Length:** 872 words

**Byline:** Felice Friedson, The Media Line

## Body

Israelis have been aghast at the scope of the Trojan-horse-like network of tunnels built by the hardline Islamists in the Gaza Strip and revealed to their horrified gaze during Operatio Protective Edge.

These elaborate feats of engineering - complete with ventilation systems, electricity and stashes of food - could allow armed Hamas fighters to strike at will, penetrating kibbutzes and other communities near the border with the Gaza Strip.

Some people are even talking of a possible "Israeli 9/11." There are dozens, if not hundreds, of these tunnels, explains Major Arieh Shalicar of the Israeli Defense Forces (IDF).

They lead "from mosque to mosque; mosque to house; house to hospital; kindergarten to house ... It is estimated that gunmen are able to live inside a tunnel for weeks at a time, apparently sustained by the quantities of dates and water left behind."

Lest there be any doubt about the tunnels' purpose, the IDF found weapons, army uniforms and motorcycles, along with chloroform and handcuffs - a macabre "kidnapping kit."

"Basically, a Hamas terrorist can enter one of these tunnels in civilian clothes without arms and pop up somewhere else, fully clothed in an Israeli army uniform brandishing a Kalashnikov, ready to attack someone," Maj. Shalicar says.

Destroying the tunnels was the main objective of Operation Protective Edge. Israeli forces say they located and destroyed 32 of them, including 14 running underneath the Gaza-Israeli border.

But the structures had already proved their worth - they enabled the terrorists to ambush Israeli soldiers and led to high numbers of casualties.

Last October, IDF intelligence located entrances to an elaborate tunnel just a few hundred metres from Kibbutz Ein Hashlosha.

Users must climb down a steep slope to reach its entrance, then crawl through the deceptively small opening.

Coming from the desert's summer heat and humidity into the coolness of a subterranean concrete-lined structure, it was surprising to find oneself able to stand erect and see far enough to sense distance - and lots of it.

UCP035434

Gaza's marvels of engineering; Hamas gunmen can live in tunnels for weeks

Though visibility is limited by the dearth of ambient light and helped only slightly by the lighting unit attached to a reporter's camera, the vast dimension of the expanse was perceptible, the elaborate nature of the structure striking. Like many of Hamas's tunnels, this one is lined with concrete and equipped with an array of cables, conduits, finished ceilings, communication lines and pulley systems. It's estimated it took several years and millions of dollars to build - mostly by hand, using a jackhammer and shovels.

Now, Israelis are asking how the tunnels could have been constructed literally underneath their noses.

"Who knew what when?" is only the first to be directed to the Netanyahu administration. Consider as well the apparently undetected noise and dirt accompanying the construction that used scores of tons of cement - perhaps the most often-cited example of substances usually banned for delivery into the Gaza Strip since Israel initiated its blockade in 2007.

The passage of goods and people in and out of the territories is overseen by the Co-ordinator of Government Activities in the Territories, which answers to the Israeli Defense Ministry. Its spokesman, Guy Inbar, says building materials were barred from entering the territory after the tunnels were discovered in October. An exception was later made for programs run by the United Nations, U.S. or European organizations.

But tunnels have been part of the Gaza scene for decades. In September 1989, terror mastermind Mahmoud Al-Mahbrouh used one to evade Israeli security forces.

By the mid-1990s, they were being dug from Rafah into Egypt, big enough for children to crawl through to bring in cigarettes. The structures quickly proliferated as a blackmarket trade mushroomed to sidestep the Israel blockade, smuggling in just about everything customers wanted, including ammunition and other military hardware.

More recently, the tunnels became more sophisticated and complex, designed to serve as staging platforms for terror-related activities.

But the burning question remains: How do you detect the tunnels? Although scores of proposals have been submitted to the Israeli Defense Ministry's Administration for the Development of Weapons &; Technological Infrastructure, no one has yet come up with the answer.

That's because the technology must be dual-purpose: it must cover a wide area and be able to locate a man-sized tunnel buried more than a few metres underground, says Dr. Eado Hecht, a defence analyst for the Begin-Sadat Centre in Jerusalem.

The Hamas tunnels are usually 20 metres deep - which puts them out of range of the current technology even if the searchers have a rough idea of their location. Instead, Israel must rely its intelligence and information gathered in house-to-house searches.

In addition, destroying a tunnel is a lengthy and complex operation, says Dr. Hecht. Just blowing up the entrance or some of the airshafts leaves most of the tunnel intact, so Hamas sappers will be able to dig bypass sections and continue to use the structure. Therefore, the entire length of the tunnel and its branches must be located, mapped and completely destroyed.

The Media Line

## Graphic

Jack Guez, The Associated Press; Some of Hamas' tunnels are lined with concrete and equipped with an array of cables, conduits, finished ceilings, communication lines and pulley systems. Israelis are asking why the noise and dirt from construction wasn't detected. As well, cement is usually barred under the Israeli blockade.;

**Load-Date:** August 9, 2014

UCP035435

Gaza's marvels of engineering; Hamas gunmen can live in tunnels for weeks

**End of Document**

UCP035436

# EXHIBIT 76

# IDF announces major operation in Gaza as rocket fire escalates in south

Jpost.com (The Jerusalem Post online edition)

July 7, 2014 Monday

Copyright 2014 The Jerusalem Post. Provided by Syndigate.info, an Albawaba.com company All Rights Reserved



**Length:** 1191 words

## Body

Barrage of Gaza rockets fired at southern Israel as IDF prepares for escalation; Iron Dome intercepts 12 projectiles; sirens sound in Ashdod, Ashkelon, Beit Shemesh and Rehovot.

Video: Itsik Mavzelayev
The Israel Defense Forces announced after midnight Monday that it has launched a major operation against Hamas in the Gaza Strip.
The operation has been given the code name "Operation Protective Edge."
IAF fighter planes and aircraft are currently flying sorties over Gaza seeking terror targets, Israel Radio reported.

#IDF has commenced Operation Protective Edge in #Gaza against #Hamas, in order to stop the terror #Israel's citizens face on a daily basis

- IDF (@IDFSpokesperson) July 7, 2014
Heavy rocket barrages slammed into southern Israel on Monday evening, triggering air raid sirens across wide areas, including the Hof Ashkelon Regional Council, Sderot, Rehovot and Beit Shemesh.
Seven long-range Palestinians rockets were intercepted over Ashdod, and five over Netivot.
Some 30 rockets were fired from Gaza in the Monday night barrage. A total of 80 rockets slammed into southern Israel throughout the day and evening.
The attacks came shortly after a senior military source said the IDF is taking "significant steps" to prepare itself for a stepped up campaign of attacks against Hamas in Gaza. He spoke as Palestinian projectile fire from the Strip continued unabated.
(Video: Iron Dome interceptions, filmed from Rehovot)
The Iron Dome defense system intercepted seven rockets over Ashdod on Monday night and five over Netivot after Gaza terrorists fired a barrage of projectiles at southern Israel. A man in Ashdod was injured from shrapnel.
Sixteen projectiles also landed in open areas near the southern city of Beersheba, according to the IDF Spokesperson's Unit.
Air raid sirens were heard on Monday in the outskirts of Jerusalem and Tel Aviv, but an Israeli police spokesman said they were false alarms.
The armed wing of Hamas Izz al-Din al-Qassam took responsible for the latest barrage of rocket fire on Israel on Monday night.
The Home Front Command has instructed the municipalities of Ashkelon, Ashdod, Beersheba, and Gaza border communities to open public bomb shelters in anticipation of long-range Hamas rocket attacks.
"We can't avoid dealing with Gaza because there is noise [security developments] in other arenas," the source said, referring to rioting by Arab Israelis and in Palestinian districts of east and north Jerusalem.

UCP035437

IDF announces major operation in Gaza as rocket fire escalates in south

The IDF's steps to enhance preparedness on the Gaza border include the calling up of 1,500 reserves, and the setting up of infantry assault units on the Gaza border, in case "a decision is made" for an offensive in Gaza, the source said.

"We are ready for an escalation," the source said, adding that Hamas is not only failing to prevent other terror groups from firing projectiles at southern Israel, it is taking an active and dominant part in the recent attacks.
Most of the projectiles landing in southern Israel are mortar shells, and the rate of rocket fire is low, the source said, but all of the projectile fire has to stop, he added.

"We're taking steps now... ahead of the possibility that the escalation increases. We're preparing for a gradual increase in the use of force, and increasing our rate of attacks [on terror targets in Gaza]," he stated.

A majority of the reserves will be sent to unit headquarters and Home Front Command units, and some are Border Police who will replace conscripted forces currently on duty in the West Bank, freeing them up for deployment to Gaza.

"The message to Hamas is clear. A ceasefire without conditions," the source said. "Last Thursday, I said quiet would be met with quiet. Now, we see that this hasn't happened."
Addressing the deaths of seven Hamas members in a tunnel in south Gaza, the source said they died as a result of explosives they planted in an underground assault tunnel aimed at an IDF target. "This was designed to enable a significant terror attack," the source said. "In recent days, we have operated in this area, and we will continue to act against the threat of tunnels in the coming days," he added.

The seven Hamas members did not die as a result of an Israeli air strike, the source explained. The tunnel was found by the army a few days ago. "Last night, for reasons that are unclear, Hamas decided to handle the explosives. They handled bombs that were in the tunnel, and were ready to go off against military targets. The explosives went off, leading to seven casualties," said the source.

The Security Cabinet met Monday for the fourth time in eight days, amid  the continuous pounding of the western Negev from the Gaza Strip, the  tension in Jerusalem, and rioting in some Israeli-Arab areas.
Earlier, on Sunday night, the IDF struck a terrorist rocket launching crew in Gaza that was "about to launch a rocket" at Israel, he added. The cell did not belong to Hamas. Two of its members were killed in the air strike.

The Israel Air Force struck an attack tunnel in southern Gaza that was aimed at carrying out a terror attack against Israeli civilians, the IDF said Monday evening. The air strike is a "targeted defensive measures" carried out in accordance with the latest security evaluation, the IDF added.
The Israel Air Force struck 18 targets across Gaza between Sunday night and Monday afternoon, and Palestinian sources said nine combatants - seven of them Hamas members - were killed in the Strip.

Two members of a Palestinian rocket launching crew were killed in central Gaza in an IAF strike. The IDF said the men were preparing to fire rockets into southern Israel.
A few hours later, the IAF launched two waves of air strikes, striking nine targets in the first wave, and five targets in the second. Most of the targets were underground rocket launchers and terrorist operations centers.
Seven Hamas fighters were killed and four people were wounded in the attacks, Hamas's armed wing, the Al-Kassam Brigades, said in a statement.
Hamas spokesman Sami Abu Zuhri accused Israel of committing a "grave escalation" and threatened to retaliate, saying Israel would "pay the price."
Throughout Monday, terrorists in Gaza fired rockets at southern regions near the Gazan border, and fired one long-range projectile at Be'ersheba in the morning as well. The latter rocket exploded in an open area outside of the city, triggering air raid sirens. There were no injuries or damages in that attack.
The IAF struck three underground rocket launchers in northern Gaza in the late afternoon.

UCP035438

IDF announces major operation in Gaza as rocket fire escalates in south

Rocket fire persisted in the Sha'ar Hanegev, Sdot Negev, Eshkol, and Sderot regions. A soldier was lightly injured by shrapnel from a rocket on Monday in Eshkol. By midday, some 15 projectiles fired from Gaza exploded in southern regions, and that number grew to 20 by 2 pm.

An IDF unit carrying out routine operations on the border with southern Gaza came under fire on Monday morning. The unit was attacked with an RPG and gunfire. Soldiers returned fire into Gaza. There were no injuries among soldiers in the cross-border attack.

Khaled Abu Toameh, Herb Keinon and Reuters contributed to this report.

**Load-Date:** July 7, 2014

---

**End of Document**

UCP035439

EXHIBIT 76, PAGE 235