1   LUCIA E. COYOCA (SBN 128314)
        lec@msk.com
2   VALENTINE A. SHALAMITSKI (SBN 236061)
        vas@msk.com
3   DANIEL M. HAYES (SBN 240250)
        dmh@msk.com
4   MITCHELL SILBERBERG & KNUPP LLP
    11377 West Olympic Boulevard
5   Los Angeles, CA 90064-1683
    Telephone:  (310) 312-2000
6   Facsimile:  (310) 312-3100

7   Attorneys for Plaintiffs
    Universal Cable Productions LLC and
8   Northern Entertainment Productions LLC

9                   UNITED STATES DISTRICT COURT

10       CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

11   UNIVERSAL CABLE                      CASE NO. 2:16-cv-4435-PA-MRW
     PRODUCTIONS LLC and
12   NORTHERN ENTERTAINMENT               The Honorable Percy Anderson
     PRODUCTIONS LLC,
13                                        **CORRECTED MEMORANDUM
                   Plaintiffs,            OF POINTS AND AUTHORITIES
14                                        IN OPPOSITION TO
           v.                             DEFENDANT'S MOTION FOR
15                                        SUMMARY JUDGMENT**
     ATLANTIC SPECIALTY
16   INSURANCE COMPANY,                   [Notice of Lodging Statement of
                                          Genuine Issues and Additional
17                 Defendant.             Material Facts; Statement of Genuine
                                          Issues and Additional Material Facts;
18                                        Memorandum of Points and
                                          Authorities re: Evidentiary Objections;
19                                        Table of Contents of Evidence;
                                          Declarations of George Walden,
20                                        Matthew Levitt, Dennis Ross, Harold
                                          Koh, Ty Sagalow, and Lucia Coyoca
21                                        filed / lodged concurrently herewith]

22                                        Date:    May 22, 2017
                                          Time:    1:30 pm
23                                        Ctrm.:   9A, First Street
                                                   Courthouse
24

25

26

27

28

─────────────────────────────────────────────
**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO ATLANTIC'S MOTION FOR SUMMARY JUDGMENT**

8838960.1

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

I.  PRELIMINARY STATEMENT .................................................................. 1

II.  STATEMENT OF ADDITIONAL MATERIAL FACTS ........................... 1

    A.  Drafting of the Policy ................................................................... 2

III.  ARGUMENT ............................................................................................ 4

    A.  Atlantic Has Breached The Contract By Denying The Claim on the Basis of the War Exclusions ............................................. 4

        1.  The "Ordinary and Popular" Meaning Is Not The Standard For Interpreting the War Exclusions ........................... 5

        2.  Exclusion 1 (War) Does Not Exclude The Claim Because Its  Special Meaning Requires A Conflict Between Sovereigns  or Quasi-Sovereigns ............................................ 6

        3.  Exclusion 2 (Warlike Action) Does Not Apply Because There Was No "Warlike Action," Hamas' Is Not A "Military Force," and Hamas Is Not A Qualifying "Other Authority" ................................................................ 12

        4.  Exclusion 3 Does Not Apply Because Hamas' Attacks Were Not An Insurrection or Rebellion .................................. 14

        5.  Exclusion 4 (Weapon of War) Does Not Apply Because Universal's Loss Was Not Caused By A Weapon Using Atomic Fission or Radioactive Force ...................................... 16

        6.  Any Ambiguity In The Exclusions Must Be Interpreted In Universal's Favor ......................................................... 19

    B.  Atlantic's Failed to Conduct a Thorough and Unbiased Investigation and Its Summary Judgment On The Bad Faith Claim Fails ............................................................................. 23

IV.  CONCLUSION ....................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Burger v. Emps. Ret. Sys.*,
  101 Call App. 2d 700 (1951) ................................................................... 9

*Darnall v. Day*,
  240 Iowa 665 (1949) ............................................................................. 11

*E.M.M.I. Inc. v. Zurich American Ins. Co.*,
  32 Cal. 4th 465 (2004) ........................................................................... 8

*Ennar Latex v. Atlantic Mut. Ins. Co.*,
  1995 U.S. Dist. LEXIS 7386 (S.D.N.Y. May 30, 1995) ....................... 6

*Gagliormella v. Met. Life Ins. Co.*,
  122 F. Supp. 246 (D. Mass. 1954) .......................................................... 9

*Girdler Corp. v. Charles Eneu Johnson & Co*,
  95 F. Supp. 713 (1951) .................................................................... 10, 11

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006) .............................................................................. 11

*Hamdi & Ibrahim Mango Co. v. Reliance Ins. Co.*,
  291 F.2d 437 (2d Cir. 1961) .................................................................. 13

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) ......................................................................... 11, 13

*Holiday Inns Inc. v. Aetna Ins. Co.*,
  571 F. Supp. 1460 (S.D.N.Y. 1983) ...................................... 6, 7, 12, 13

*In re September 11 Litigation*,
  751 F.3d 86 (2d Cir. 2014) ................................................................... 11

*Int'l Dairy Eng'g Co. v. Am. Home Assurance Co.*,
  352 F. Supp. 827 (N.D. Cal. 1970), *aff'd* 474 F.2d 1242 (9th Cir.
  1973) ........................................................................................................ 9

*Kaiser v. Hopkins*,
  6 Cal. 2d 537 (1936) ............................................................................. 10

i

Mitchell
Silberberg &
Knupp LLP

*N.Y. Life Ins. Co. v. Durham*,
   166 F.2d 874 (10th Cir. 1948) .................................................................. 9

*Pan Am. World Airways v. Aetna Cas. & Surety Co.*,
   505 F.2d 989 (2d Cir. 1974) ...................................5, 6, 7, 9, 12, 13, 14

*Stucker v. College Life Ins. Co.*,
   208 N.E.2d 731 (Ind. Ct. App. 1965) .................................................... 9

*Vandegrift v. Bd. of Supervisors*,
   23 Cal. App. 3d 228 (Cal. Ct. App. 1972)............................................ 10

*W. Reserve Life Ins. Co. v. Meadows*,
   152 Tex. 559 (1953) ............................................................................... 9

*Weiss v. Arab Bank, PLC*,
   2007 U.S. Dist. LEXIS 94029 (E.D.N.Y. Dec. 21, 2007)................... 13

*Weissman v. Metro. Life Ins. Co.*,
   112 F. Supp. 420 (S.D. Cal. 1953) ........................................................ 9

*Wilkinson v. Equitable Life Assurance Soc.*,
   151 N.Y.S.2d 1018 (1956) ...................................................................... 9

**STATUTES**

California Civil Code
   §1636 ........................................................................................................ 8
   §1644 ................................................................................................... 5, 6

Mitchell
Silberberg &
Knupp LLP

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO ATLANTIC'S MOTION FOR SUMMARY JUDGMENT**

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  PRELIMINARY STATEMENT

In a desperate attempt to convince this Court that *terrorist* attacks against Israeli civilians launched by the terrorist group Hamas should be excluded by certain *war* exclusions in the policy, Defendant Atlantic Specialty Insurance Company ("Atlantic") makes a series of facially implausible and legally unsupportable arguments intended to effectively (and in some cases, literally) re-write the operative insurance policy in this case.  At the end of the day, Atlantic knew the risks attendant to producing a show in Israel, and Atlantic should have included a terrorism exclusion in the policy if it did not want to pay for the losses stemming from those known risks.  Having failed to do so, Atlantic is now penalizing Universal for pulling its cast and crew out of harm's way, legitimizing a universally-regarded terrorist organization, and contorting beyond recognition the meaning of long-establish war exclusions in an effort to convert them into a pseudo-terrorism exclusion.  The Court should not permit this.  Instead, pursuant to California statute and case law, the Court should apply the well-documented and longstanding special meaning of the war exclusions and determine that the war exclusions do not preclude coverage.

In short, none of Atlantic's arguments provide viable grounds on which to grant summary judgment in favor of Atlantic.  To the contrary, these arguments clarify why Plaintiffs' Universal Cable Productions LLC ("UCP) and Northern Entertainment Productions LLC ("Northern") (collectively "Universal") motion for partial summary judgment should be granted.

### II.  STATEMENT OF ADDITIONAL MATERIAL FACTS

Universal filed its own Motion for Partial Summary Judgment, and the Court is no doubt well aware of the factual background of the case given the cross-motions filed by the parties.  Thus, Universal will not burden the Court with a

1

repetitive recitation of the main facts of the case, which are set forth in Universal's Motion for Summary Judgment (ECF No. 61-1).  Below are additional facts as to the drafting of the policy that are relevant to the issues raised by Atlantic's Motion.

### A.   <u>Drafting of the Policy</u>

Atlantic issued its first production policy to NBCUniversal Media LLC ("NBCUniversal") beginning January 1, 2010 ("the Policy").  Statement of Genuine Issues and Additional Material Facts ("SGI") ¶154.  Aon, NBCUniversal's insurance broker, negotiated the placement of the Policy with Atlantic, providing an initial draft policy form to Atlantic in the fall of 2009.  *Id.* 155, 156.  The war exclusions in Aon's initial draft of the policy form sent to Atlantic excluded coverage for loss caused directly or indirectly by:

> A.   War, including undeclared or civil war; or
>
> B.   Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
>
> C.   Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.
>
> Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
> D.   Any weapon of war *employing* atomic fission or radioactive force whether in time of peace or war; (emphasis added)

*Id.* ¶ 157.

On behalf of NBCUniversal, George Walden of Aon negotiated the Policy's terms with Atlantic underwriter Martin Ridgers, over the course of several months in late 2009 and early 2010.  *Id.* ¶ 158.  Atlantic made extensive changes and revisions to the draft policy form.  *Id.* ¶ 159.  On December 16, 2009 Martin Ridgers sent George Walden an email regarding the drafting of the Policy, indicating "you should not find anything that significantly changes the coverage as we have discussed.  ***Please let NBC know we are working very hard to provide a broader form.***  (Emphasis added.)  *Id.* ¶ 160.  In the draft attached to that email,

2

one of Mr. Ridgers' changes appears in the "War Exclusions," below the Aon draft

exclusion for loss caused by a "weapon of war." The following language was

added:

> E Any weapon employing atomic fission, atomic fusion or
> radioactive force; or
>
> (b) Nuclear reaction or radiation, or radioactive contamination from
> any other cause. But if nuclear reaction or radiation, or radioactive
> contamination results in fire, we will pay for the direct loss or
> damage caused by that Fire if the fire would be covered under this
> policy.

(Formatting anomalies are as they appear in the draft.) *Id.* ¶ 161.

(AONNBCU0004067). Mr. Ridgers also struck out Aon's form "nuclear reaction

or nuclear radiation or radioactive contamination" exclusion. *Id.*

A final form of the Policy was agreed to by the parties on December 17,

2009 which was referred to by Atlantic and Aon as "12-17-2009 Martin's Final

Form." *Id.* ¶ 163, 164. Atlantic confirmed that it agreed to bind the Policy based

on the language agreed to in "Martin's Final Form." *Id.* ¶ 164.[1] Significantly, the

weapon of war exclusion in "Martin's Final Form" from December 17, 2009,

excludes loss caused by: "Any weapon of war *employing* atomic fission or

radioactive force, whether in time of peace or war" (emphasis added). *Id.* ¶ 165.

While the parties had negotiated other policy terms after they agreed to use

Martin's Final Form in December 17, 2009, they did not further revise or change

the War Exclusions. *Id.* ¶ 167. However, in the final version of the Policy, which

Atlantic sent to Aon on March 26, 2010, the word "employing" in the "weapon of

---

[1] The first three War Exclusions in the Policy are nearly identical to the war
exclusions set forth in the draft policy form that was negotiated in December 2009,
These exclusions are also used in Insurance Services Office ("ISO") forms
available to all insurers nationwide. SGI ¶172. The only difference is that
Exclusion 3 in the Policy adds the following sentence: "Such loss or damage is
excluded regardless of any other cause or event contributed concurrently or in any
sequence to the loss" to the end of Exclusion 3. *Id.* ¶ 171. In Aon's original draft,
and in "Martin's Final Form 12-17-2009," that sentence applies to Exclusions 1, 2,
and 3. *Id.* ¶ 157, 165.

3

war" section was changed to "including." *Id.* ¶ 168, 169, 171 ("any weapon of war *including* atomic fission or radioactive force, whether in time of peace or war …" (Policy, General Conditions, § III) (emphasis added)).  Atlantic *never* disclosed to Aon or NBCUniversal that it had changed the language of Exclusion 4 to something different than what was agreed to in December, 2009, or that the change in language was intended to substantively change and broaden the meaning or scope of the exclusion. *Id.* ¶ 170.

This detail review of wording is important.  Interpretation of the four "war exclusions" in the Policy ultimately govern whether the *Dig* claim is covered.  The final version of the war exclusions in the Policy provide there is no coverage for loss caused directly or indirectly by:

> 1.  War, including undeclared or civil war; or
>
> 2.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or,
>
> 3.  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.  Such loss or damage is excluded regardless of any other cause or event contributed concurrently or in any sequence to the loss.
>
> 4.  Any weapon of war including atomic fission or radioactive force, whether in time of peace or war;

*Id.* ¶ 171.  (Policy, General Conditions, § III).  (Exclusions 1-4 above are referred to as "the War Exclusions" and each individual part is referred to by number.)  None of the words used in the War Exclusions are specifically defined in the Policy. *Id.*

### III.   ARGUMENT

#### A.   Atlantic Has Breached The Contract By Denying The Claim on the Basis of the War Exclusions

Atlantic denied the Dig claim, on the basis that the War Exclusions apply. They do not.  Exclusions 1 ("war") and 2 ("warlike action by a military force") do

4

not apply because, according to well-developed insurance industry meanings of these terms, the conflict must be between two sovereigns or quasi-sovereigns, and Hamas, a designated terrorist organization, is neither.  Moreover, Exclusion 2 requires hostile actions engaged in by a "military force," and as a matter of law, Hamas' militia does not qualify.  Exclusion 3 (insurrection, rebellion) requires a rebel group acting with specific intent to overthrow the government of a state, and install itself instead as the legitimate successor government.  Hamas has no such intent; rather, it challenges Israel's very right to exist as a state. As Hamas declared in its establishment charter, its intent is to obliterate Israel (not take over as the next ruling government).  SGI ¶ 190.  Exclusion 4 (weapon of war) is not applicable because it excludes only losses caused by a weapon using atomic fission/radioactive force, and no such weapon was used in the conflict between Hamas and Israel.

### 1. The "Ordinary and Popular" Meaning Is Not The Standard For Interpreting the War Exclusions

Contrary to Atlantic's argument, the War Exclusions should not be interpreted based solely on the "ordinary and popular" meanings of the words used because the words used have a well-established special and technical meaning. Cal. Civ. Code §1644 ("The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; ***unless*** used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter ***must be used***.") (emphasis added).

Here, the special and technical meaning of the War Exclusions has been extensively documented through case law.  In fact, these are standard insurance company exclusions (in the words of the district court *Pan Am* decision, "ancient boiler-plate clauses"), with a substantial body of case law regarding how they are to be interpreted.

5

**2.    Exclusion 1 (War) Does Not Exclude The Claim Because Its Special Meaning Requires A Conflict Between Sovereigns or Quasi-Sovereigns**

In its motion, Atlantic conveniently ignores the established insurance special meanings of the term "war" used in Exclusion 1.  Specifically, in the insurance context, courts have repeatedly held that the term "war" requires the existence of a conflict between two sovereigns or quasi-sovereigns (*i.e.* states or de facto states).  *See Pan Am. World Airways v. Aetna Cas. & Surety Co.*, 505 F.2d 989, 1012 (2d Cir. 1974); *Holiday Inns Inc. v. Aetna Ins. Co.*, 571 F. Supp. 1460, 1464-65 (S.D.N.Y. 1983); *Ennar Latex v. Atlantic Mut. Ins. Co.*, 1995 U.S. Dist. LEXIS 7386, at *12-16 (S.D.N.Y. May 30, 1995) (holding on motion for summary judgment that war risk policy exclusions did not preclude coverage).  *See* 3-18 New Appleman on Insurance Law Library Edition § 18.03 (2016).  The special meaning of Exclusion 1 controls here.  Cal. Civ. Code. § 1644.

*Pan Am* is the leading and definitive war exclusion case, in which the Second Circuit performed an extensive "historical analysis" of the war exclusions, "updating the ancient insurance phrases within the general context of [the twentieth] century's tragic Middle East strife."[2]  *Holiday Inns,* 571 F. Supp. at 1462.  In *Pan Am*, and the cases that follow it, war is defined as hostilities between sovereigns and quasi-sovereigns.  This definition was based on close examination of case law as to the insurance meaning of "war," informed by international law principles.  505 F. 2d at 1012-15.  In *Pan Am*, the court determined that exclusions for "war" and "warlike operations by a military force" did *not* exclude coverage for the hijacking of a plane by a Palestinian terrorist organization, the Popular Front for the Liberation of Palestine ("PFLP").  *Id.* at 1015.  The insurers, who had issued a policy with war exclusions similar to those at issue here, argued the loss

---

[2] Ironically, while insisting that an undefined "ordinary and popular" meaning applies and that Universal's definition of "war" is "outdated," Atlantic cites only to war exclusion cases that pre-date *Pan Am*, 505 F. 2d 989.

6

was due to "war" or "warlike operations" because the PFLP was ostensibly waging a "guerrilla war" against either or both Israel and the United States.  *Id.* at 1013.

After examining the history of the war exclusions, and the history of the Middle East since the creation of Israel as a state, the court held the war exclusions did not apply because the hijackers were "the agents of a radical political group, rather than a sovereign government," and also lacked significant attributes of sovereignty to qualify as a quasi-sovereign.  *Id.* at 1015.  The court expressly noted the insurers knew of the possibility of such political hijackings, but had "failed to exclude political risks in words descriptive of today's world events" and thus "acted at their own peril."  *Id.* at 1001.

*Holiday Inns* followed *Pan Am,* and found that exclusions for "war" and "warlike operations" did not preclude coverage for losses incurred by the insured during widespread and months-long violence and fighting between various religious factions in Beirut, Lebanon.  571 F. Supp. at 1467-72.  Among other things, because the parties engaged in the fighting were militant political groups, not sovereign or quasi-sovereign entities, the war exclusions did not apply.  *Id.* at 1501.  While Syria, a sovereign country, did participate in the fighting, its adversaries were not sovereign states; rather, various militant factions fought to displace one another for supremacy in the region.  *Id.* at 1501-03.

### a. Atlantic's Undefined and Unreasonable "Ordinary and Popular" Interpretation of "War" Does Not Apply

Atlantic ignores the well-developed case law on this issue and argues the terms should be construed using some undefined "ordinary" and "popular" sense of the word "war" that does not take account of *who* is fighting.  Motion at 9-12.  But that argument has already been rejected by courts that have considered it. *See Holiday Inns*, 571 F. Supp. at 1464 (rejecting a "common meaning" definition of the war exclusions, noting that "[i]n commercial litigation arising out of insurance policies, words and phrases are construed 'for insurance purposes' – a context quite

7

1  different from those of politics or journalism").[3]  And for good reason.  Atlantic's

2  interpretation is so vague that if applied, an insured would have no way of knowing

3  what might or might not be covered.

4  　　　　While Atlantic claims there is some California-specific interpretation of war

5  that relies on the personal feelings and opinions of ordinary people at the time of the

6  loss, that is not (and cannot be) the case.  If Atlantic's position was the rule, then

7  insureds and insurers could never know the scope of coverage at the time of

8  contracting, because interpretation of the contract would be dependent on the

9  common understanding of the terms at some future point in time.  In fact, the

10  appropriate rule of interpretation is to look to the intention of the parties at the time of

11  contracting.  Cal. Civ. Code §1636; *E.M.M.I. Inc. v. Zurich American Ins. Co.,* 32

12  Cal. 4th 465, 470 (2004).  Thus Atlantic's focus on what journalists or politicians

13  called the hostilities at the time Universal's loss occurred is misplaced.

14  　　　　Simply citing to various individuals and news sources that have used the word

15  "war" to describe the events in Israel surrounding the *Dig* claim, as Atlantic does in

16  pages 9-11 of its motion, does not establish that there was in fact a "war" under the

17  Policy.  Indeed, the word "war" is used colloquially by the media, politicians, and

18  every day people to mean many different and varied things:  from Presidents Nixon's

19  and Reagan's "war on drugs," to President Johnson's "war on poverty" to the media's

20  reporting on the "war on Christmas," it is clear that "war," as used in the Policy,

21  cannot be interpreted to encompass everything that a newscaster or even a President

22  might describe as "war."  SGI ¶¶ 179-181.

23  　　　　In short, without the limiting principle that the hostilities or conflict be

24  between two sovereigns or quasi-sovereigns, the Exclusions would extend far beyond

25  their intended scope and lead to absurd results.  *Cf. MacKinnon*, 31 Cal. 4th at 650

---

26  [3] Atlantic's current "common understanding" position is also inconsistent with the

27  position Atlantic took when it denied the *Dig* Claim.  In its denial letter, Atlantic cited case authorities holding that "war" requires hostilities between sovereign or

28  quasi-sovereigns, and argued that there was a war here because Hamas is a quasi-sovereign.  SGI ¶ 209.

8

1  (rejecting insurer's argument that dictionary meanings of "irritant" or "discharge"

2  should apply in pollution exclusion because application would result in absurdities

3  and deny coverage in situations that reasonably should be covered).

### b.    Atlantic Relies On Outdated And Inapt Cases

5       Atlantic can point to no case that contradicts the *Pan Am* definition of war as

6  between sovereigns or quasi-sovereigns.  Indeed, the war exclusion cases it cites,

7  in addition to predating *Pan Am*, all involve hostilities between sovereign nations,

8  and some expressly affirm that the conflict *must* be between sovereigns or

9  belligerents.[4]  *See, e.g. Int'l Dairy Eng'g Co. v. Am. Home Assurance Co.*, 352 F.

10  Supp. 827 (N.D. Cal. 1970), *aff'd* 474 F.2d 1242 (9th Cir. 1973) (war, within the

11  meaning of the policy exclusion, meant "one belligerent against another"); *W.*

12  *Reserve Life Ins. Co. v. Meadows*, 152 Tex. 559, 565 (1953) ("Every forcible

13  contest between two governments, *de facto* or *de jure*, is war").  Tellingly,

14  Atlantic's war exclusion cases are all from wars between nations:  World War II,[5]

15  the Korean War,[6] and the Vietnam War.[7]  These cases deal with issues that are

16  entirely irrelevant here, such as whether war exclusions apply when war has not

17  been officially declared (*Gagliormella, Weissman, Western Reserve Life,*

18  *Wilkinson)*, or when all hostilities have ceased but a war has not officially been

19  declared over (*N.Y. Life v. Durham*).  Significantly, none address the situation

20  presented here, where violence caused by a political terrorist group lacking

21  significant attributes of sovereignty causes the loss.

---

22  [4] "Belligerents" means "enemy ***nations*** at war with one another."  *Pan Am*, 505

23  F.2d at 1012  (emphasis added).

23  [5] *Burger v. Emps.' Ret. Sys.*, 101 Cal. App. 2d 700, 702 (1951); *N.Y. Life Ins. Co.*

24  *v. Durham,* 166 F.2d 874, 876 (10th Cir. 1948).

25  [6] *Gagliormella v. Met. Life Ins. Co.*, 122 F. Supp. 246, 248 (D. Mass. 1954);
*Weissman v. Metro. Life Ins. Co.*, 112 F. Supp. 420, 421 (S.D. Cal. 1953); *Stucker*

26  *v. College Life Ins. Co.*, 208 N.E.2d 731, 732 (Ind. Ct. App. 1965); *W. Reserve Life*
*Ins. Co. v. Meadows*, 152 Tex. 559, 565 (1953); *Wilkinson v. Equitable Life*

27  *Assurance Soc.*, 151 N.Y.S.2d 1018, 1021 (1956).

27  [7] *Int'l Dairy Eng'g Co. v. Am. Home Assurance Co.*, 352 F. Supp. 827, 829 (N.D.

28  Cal. 1970).

9

1    Atlantic also mischaracterizes the holdings of entirely inapposite cases

2  outside of the insurance industry, to make them appear more directly applicable.

3  For example, *Vandegrift v. Bd. of Supervisors*, 23 Cal. App. 3d 228 (Cal. Ct. App.

4  1972) dealt with a California state statute that, unlike the Policy here, included

5  express definitions of "war" for its purposes, and found the Vietnam War was a

6  war, though undeclared.  In *Kaiser v. Hopkins*, 6 Cal. 2d 537, 538 (1936), the court

7  interpreted a tax exemption for those who had served in "time of war."  The issue

8  was whether a soldier who enlisted and served after the World War I armistice, but

9  before formal declaration of the end of the war, was entitled to the exemption.

10  There was no question as to whether there had been a war.  Instead, the court

11  analyzed the "ordinary" meaning of the phrase "time of war" (not "war"), and

12  concluded it only lasted through the end of fighting.  *Id.*  Nothing in *Vandegrift* or

13  *Kaiser* supports the application of a vague and undefined "ordinary" meaning of

14  "war," rather than the specific insurance industry meaning set forth in case law.

15    Atlantic also incorrectly claims *Girdler Corp. v. Charles Eneu Johnson &*

16  *Co*, 95 F. Supp. 713 (1951), stands for the proposition that "war" generally "refers

17  to the presence of hostilities, and not a *technical* sense of war."  Therein, the court

18  interpreted a contract allowing for use of a patented process during World War II.

19  The contract permitted payment of a reduced royalty rate during the "war period,"

20  which ended six months after "cessation of hostilities."  *Id.* at 714.  The case

21  analyzed whether "cessation of hostilities" meant the day Japan formally

22  surrendered, or later when President Truman officially declared: "hostilities have

23  terminated."  *Id.*  The case did *not* hold "war" means "hostilities" generally of any

24  kind.  The hostilities at issue (World War II) was clearly a conflict among

25  sovereign nations, and the very purpose of the contract was to assist in the war

26  effort.  *Id.*  Significantly, there was ***no discussion*** of the "technical" meaning of

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO ATLANTIC'S MOTION FOR SUMMARY JUDGMENT**

1   war. [8]  *Id.*

2        Atlantic also attempts to side-step the sovereignty/quasi-sovereignty

3   requirement by insisting that the United States "engages in war with terrorist

4   organizations."  Motion at 15.  For support, it cites to two inapposite habeas corpus

5   cases regarding the meaning of "enemy combatants," decided entirely outside of

6   the insurance context.  *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006); *Hamdi v.*

7   *Rumsfeld*, 542 U.S. 507 (2004).  Therein, the courts noted the President and

8   Congress responded to the September 11 attacks by labeling them "acts of war."

9   Significantly, regardless of whether the 9/11 attacks were called "acts of war" in

10  other contexts, the insurance industry did *not* invoke the war exclusions to preclude

11  coverage for claims arising out of 9/11, expressly recognizing that these were

12  terrorist acts, not "war" or "warlike activities."  SGI ¶184.  Thus, neither *Hamdan*

13  nor *Hamdi* has any relevance as to the insurance meaning of the word "war." [9]  *Id.*

14       Atlantic also misleadingly cites *In re September 11 Litigation*, 751 F.3d 86,

15  89 (2d Cir. 2014) to support its argument that the 9/11 attack was a "war."

16  Atlantic's citation to *In re September 11 Litigation* for this proposition is

17  disingenuous given the court's clear directive that "its 'holding as to the act-of-war

18  defense [under CERCLA] ***should be read narrowly***, fitting the facts of this case

19  only' [and that its] decision ***was not necessarily applicable in contexts presenting***

20  ***different considerations, such as 'cognate laws of insurance***….'"  *Id.* at 90

21  (emphasis added).

22

23

---

24  [8] Similarly, *Darnall v. Day*, 240 Iowa 665 (1949) dealt with a lease entered into
    during World War II, that provided for certain improvements to be made "on or
25  before one year after the war has ended," when supplies would be more readily
    available.  *Id.* at 667.  The lease clearly referred to World War II – there was no
26  question of whether a "war" was happening—and again the issue was whether the
    war ended when the "hostilities" between the nations ceased or when the war was
27  formally declared over.  *Id.* at 671.

    [9] In any event, neither the U.S. Government nor Israel officially characterized the
28  July 2014 conflict with Hamas as a "war".  SGI ¶ 223.

While Atlantic assails Universal for relying on a purportedly "outdated" definition, the real problem is that Atlantic issued a policy using inapplicable war exclusions that have been around for decades and do not exclude losses caused by terrorism.  Particularly in the post 9/11 insurance world, if Atlantic intended to exclude such risks, it should have told Universal that when Dig was accepted to the Policy and added an express terrorism exclusion.  SGI ¶ 184.

### 3. Exclusion 2 (Warlike Action) Does Not Apply Because There Was No "Warlike Action," Hamas' Is Not A "Military Force," and Hamas Is Not A Qualifying "Other Authority"

Exclusion 2 requires (i) "warlike action," (ii) "by a military force," of a "government, sovereign or other authority."  Atlantic's argument that these elements are satisfied because (1) the Israeli army responded to the attacks by Hamas, and (2) Hamas has military forces and is some kind of "authority" in Gaza (Motion at 17-18) are completely unavailing.

First, *Pan Am* and its progeny established that, like Exclusion 1 ("war"), Exclusion 2 ("warlike"), requires a conflict between two sovereigns or quasi-sovereigns.[10]  *Pan Am,* 505 F. Supp. 1015-17; *Holiday Inns*, 571 F. Supp. at 1499-1503. As described above (*supra* pp. 4-11), that element is not satisfied here.

Second, *Pan Am* also established that "warlike operations" (akin to "warlike action") are limited to actions in furtherance of war or hostilities between nations, by individuals or groups employed by or representing governments, in or on the way to a theater of war.  Atlantic's half-hearted attempt to distinguish *Pan Am,* or suggest that its analysis does not apply here, is unavailing.  Hamas' attacks are precisely parallel to the events in *Pan Am.*  Therein, the court found "warlike operations" did not "encompass (1) the infliction of intentional violence by political groups (neither employed by nor representing governments) (2) upon

---

[10] This interpretation is consistent with the language of the exclusion. Given the placement of "other authority" immediately *after* government or sovereign (i.e., "government, sovereign or other authority") there clearly is a relational link to the preceding two entities, meant to encompass notions of quasi-sovereignty.

12

civilian citizens of non-belligerent powers and their property (3) at places far removed from the locale or the subject of any warfare." *Pan Am*, 505 F. 2d at 1015-16; 4-29 Appleman on Insurance Law Lib. Edtn. § 29.05 (2016).

Third, in any event, a terrorist group cannot constitute a "military force of any origin." *Weiss v. Arab Bank, PLC*, 2007 U.S. Dist. LEXIS 94029, at *14-20 (E.D.N.Y. Dec. 21, 2007) (holding that Hamas is a terrorist group thus not a "military force"). In *Holiday Inns,* the court found extended hostilities and destruction of buildings were not "warlike operations" despite the fighting between militant factions, because they were not sovereign or quasi-sovereigns. 571 F. Supp. at 1501.

Atlantic argues the exclusion requires only "a" (singular) military force, and applies because Israel's military took action to defend Israeli civilians against Hamas' attacks. Atlantic attempts to foist blame on Israel, claiming "Israel's escalation of the violence caused Hamas to increase its attacks." Motion at 17. This indirect causation argument does not work. The Israeli military's responsive actions took place in *Gaza.* SGI ¶ 185. Imminent peril was created by the production crew's concern over Hamas' indiscriminate rocket fire from Gaza into Israel, not by any conduct of the Israeli army directed against Hamas. *Id.* ¶¶ 186, 187.

Moreover, Atlantic's cases are inapposite. As usual, Atlantic fails to distinguish between Hamas and other Palestinian groups or even Middle Eastern countries, lumping them all together. Atlantic cites *Hamdi & Ibrahim Mango Co. v. Reliance Ins. Co.*, 291 F.2d 437 (2d Cir. 1961) for the general proposition that cases have found "conflicts between Israelis and Palestinians were 'warlike.'" Motion at 18.  *Hamdi* dealt with the destruction of cargo in the port of Haifa during the 1948 Arab-Israeli War. These losses occurred near the theater of war, while a war was being waged between Israel and a coalition of Arab *states* (Egypt, Jordan, Iraq, Syria, and Lebanon), *i.e.* between and among sovereigns. SGI ¶ 188. (Levitt Report/Rebuttal report). To suggest this case finds that "conflicts between

13

Israelis and Palestinians" are considered warlike is troubling.  The war of 1948 was fought between Israel and Arab states, *not* Israel and Palestinians.

Atlantic disingenuously cites to dicta in the district court *Pan Am* decision that suggests the possibility that certain actions between the "fedayeen forces and Israelis" could be considered "warlike"  368 F. Supp. at 1130.  However, the court actually held, and the Second Circuit affirmed:

> [T]here is no … precedent for reading the phrase "warlike operations to encompass the infliction of intentional violence by political groups (neither employed by nor representing governments) upon civilian citizens of non-belligerent powers and their property far removed from the locale or the subject of any warfare.

*Id.* at 1129.

The same is true here.  Hamas, in the summer of 2014, was a political group, not the government of a hoped for state of Palestine.  Moreover, it was not attacking Israel for any "warlike" purpose (such as obtaining territory), and there were no hostilities between belligerent powers.

### 4. Exclusion 3 Does Not Apply Because Hamas' Attacks Were Not An Insurrection or Rebellion

As discussed above, as to Exclusions 1 (war) and 2 (warlike action by a military force), Atlantic incorrectly argues the definitions of "war" and "warlike" set forth in *Pan Am* should not apply.  However, as to Exclusion 3 ("insurrection, rebellion, revolution"), Atlantic flip-flops and argues *Pan Am's* definition *does* control.  Motion at pp. 22-23.  Atlantic's inconsistent position and reliance on four separate and differing War Exclusions underscores the problems with Atlantic's analysis, as the court in *Pan Am* pointed out:

> "[I]nsurer[] recognize[s] that each of the exclusions is ambiguous or has only uncertain application to the facts.  The … insurer['s] shotgun approach [in asserting application of several exclusions using varied terms] belies its claim that these terms have certain fixed meanings."

14

1  505 F. 2d at 1005 (internal citations omitted).

2      As to Exclusion 3, Atlantic concedes *Pan Am's* "insurance meaning of

3  insurrection" applies.  505 F. 2d at 1017.  Thus, for any part of Exclusion 3 to

4  apply, Atlantic must prove Hamas had the specific intent and "purpose of

5  overthrowing the constituted government [of Israel] and seizing its powers."  *Id*.

6  ("rebellion" and "revolution" "are progressive stages in the development of civil

7  unrest, the most rudimentary form of which is 'insurrection'").

8      *Pan Am* provides a cogent example of an "insurrection:" when the

9  Nationalist Party of Puerto Rico attempted to overthrow the constituted

10  government of Puerto Rico, so that the Nationalist Party could govern Puerto Rico

11  instead.  505 F.2d at 1017-18.  The case Atlantic relies on, *Younis Bros. & Co. v.*

12  *Cigna Worldwide Ins. Co.*, follows *Pan Am* and confirms that for "insurrection" to

13  occur, there must be a state nationalist group or movement which seeks to take

14  control over that state's governmental powers.  899 F. Supp. 1385, 1393 (E.D. Pa.

15  1995) ("[T]he National Patriotic Front… headed by Taylor and the Independent

16  National Patriotic Front… headed by Prince Johnson" sought to seize power over

17  Liberia, with the specific intent "to rid the country [Liberia] of the government of

18  Samuel Doe [then President of Liberia] and to replace it with [Taylor or Johnson]

19  as head of state").  (S*ee also* SGI ¶ 189 –"insurgency" is "an organized effort by a

20  group of armed rebels to overthrow the civilian government of a State, and to

21  install itself instead as the legitimate successor government of the State").

22      Here, Atlantic offers two pieces of evidence to support its claim that

23  Exclusion 3 applies.  However, each proves the exact opposite—that Exclusion 3

24  does *not* apply, because Hamas was not seeking to overthrow the government of

25  Israel in order to rule Israel as its next legitimate government.  SGI ¶ 191.  First,

26  Atlantic argues there was "insurrection" because Hamas' purpose, as stated in its

27  establishment charter, is "the destruction of Israel and the establishment of an

28  Islamic state in all of historic Palestine, comprised of present-day Israel, the West

15

Bank, and Gaza." SUF ¶ 10 (Hamas' charter also states: "Israel will exist and will continue to exist until Islam will obliterate it, just as it obliterated others before it"). SGI ¶ 190. The annihilation of a state in order to replace it with a different state is not "insurrection," "rebellion," or "revolution" under the *Pan Am* definition. For insurrection to exist, there must be a nationalist group or movement which seeks to take control over the state's governmental powers, not obliterate the state to establish an entirely different state.

Second, Atlantic argues that Hamas' Qassam Brigades' website states that "All [Hamas] seek[s] is for the occupation to leave us alone…." SUF ¶ 148. Atlantic's logic on this point is hard to follow. This statement appears to stand for the proposition that Hamas does not want to interact at all with Israel. It does *not* show that Hamas wants to take over the function of governing Israel *qua* Israel. Thus, Atlantic cannot establish Hamas had "the specific intent to overthrow the established government [which] is a *sine qua non* of an insurrection." *Holiday Inns*, 571 F. Supp. at 1466.

Finally, Atlantic cannot establish there are no questions of fact as to application of this Exclusion when Atlantic's own senior claims supervisor, Theresa Gooley, who was charged with overseeing the investigation and decision as to the *Dig* Claim, testified that Exclusion 3 did *not* apply.("[T]he third [exclusion] I don't think is applicable, and so necessarily we wouldn't have included it in the letter.") SGI ¶ 192.

### 5.   Exclusion 4 (Weapon of War) Does Not Apply Because Universal's Loss Was Not Caused By A Weapon Using Atomic Fission or Radioactive Force

On its face, Exclusion 4 (Weapon of War) does not apply because none of the weapons used in the conflict included (i.e., used) atomic fission or radioactive force. Atlantic, however, implausibly argues that Exclusion 4 should be interpreted more broadly to encompass virtually any type of weapon that could be used in war. But Atlantic concedes that its interpretation can only be even semi-plausible if one

16

1   impermissibly inserts new language into the clause to make it read:  "Any weapon of
2   war including [but not limited to] atomic fission or radioactive force, whether in time
3   of peace or war."  (Atlantic's insertion.)  Motion at pp. 20-22.

4          Atlantic's unreasonable interpretation of Exclusion 4 violates the most basic
5   rule of policy interpretation, is contrary to the coverage purchased by Universal
6   and Universal's expectation and understanding, and would lead to absurd results.

7          First, Atlantic's interpretation, by inserting words into the provision, is
8   contrary to "the fundamental principle … in interpreting … insurance contracts,
9   not to insert what has been omitted."  *Safeco*, 26 Cal. 4th at 763-64.

10         Second, Atlantic's impermissibly broad interpretation of Exclusion 4
11  contravenes the actual coverage that was purchased, and frustrates the reasonable
12  expectation and understanding of the insureds.  The undisputed facts establish that
13  the parties intended for Exclusion 4 to exclude loss caused by "Any weapon of war
14  *employing* atomic fission or radioactive force whether in time of peace or war."
15  This is the language that was negotiated by Mr. Walden and Mr. Ridgers, and
16  Atlantic expressly agreed to bind coverage using "Martin's Final Form."  *See* SGI
17  ¶¶ 193, 195 (there was no agreement to "broaden" the meaning of Exclusion 4).
18  Under these circumstances, the Court "must resolve the ambiguity in favor of the
19  insured, consistent with the insured's reasonable expectations" *E.M.M.I. Inc.*, 32
20  Cal. 4th at 473; *Safeco*, 26 Cal. 4th at 763 (same).  Indeed, Atlantic's position is
21  tantamount to fraud on the insured.  *See id*. ¶¶ 193-196.

22         "When, through fraud, mistake, or accident, a written contract fails to
23  express the real intention of the parties, such intention is to be regarded, and the
24  erroneous parts of the writing disregarded."  Cal. Civ. Code §1640.  Notably,
25  Atlantic's interpretation contradicts the interpretation offered by its own witness,
26  Peter Williams, the former President of OneBeacon Entertainment.  Mr. Williams
27  stated in his declaration that he was "the person in charge of approving the policy
28  wording when Aon first brought it to Atlantic in 2010, and any changes along the

1    way."  Yet Mr. Williams testified that Exclusion 4 did *not* apply to the Claim

2    because no weapons employing atomic fission or radioactive force were used.  SGI

3    ¶¶ 201, 202.

4         Third, Atlantic's interpretation violates the rule that the "language in a

5    [policy] must be interpreted as a whole …."  *MacKinnon*, 31 Cal. 4th at 648.  Here,

6    immediately below Exclusion 4 in the Policy is another exclusion (no. 5) that

7    directly relates to Exclusion 4, and makes it clear that *both* exclusions are tied to

8    loss causes by atomic, radioactive, or nuclear force, whatever the source is:

9    "Nuclear reaction or radiation, or radioactive contamination ***from any other***

10   ***cause***."  SGI ¶ 198 (Policy, General Conditions, § III.5 (emphasis added)).  Thus,

11   properly interpreted, Exclusion 4 precludes coverage for loss from a "weapon of

12   war" employing or using atomic fission or radioactive force, and Exclusion 5

13   precludes coverage for loss "from any other cause" of nuclear or radioactive

14   nature.[11]

15        Fourth, Atlantic's interpretation is unreasonable and impermissibly

16   overbroad because it would lead to the absurd result that losses caused by the use

17   of *any* type of weapon would be excluded.  *State Farm Mut. Auto. Ins. Co. v.*

18   *Mrozek*, 29 Cal. App. 3d 113, 117 (1972) (a "contract should reasonably receive

19   such interpretation as will make it reasonable and avoid absurdities").  Under

20   Atlantic's incorrect interpretation, if a disgruntled former employee were to come

21   on a production set with a rifle and start shooting people, there would be no

22   _____

[11] Atlantic's interpretation also makes no logical sense.  Neither "atomic fission"

23   nor "radioactive force" is, by itself, a "weapon."  Instead, they are processes by
     which a nuclear reaction powering a "weapon" can be created.  *See* Encyclopædia

24   Britannica Online, https://www.britannica.com/technology/atomic-bomb; U.S.
     Nuclear Regulatory Commission ("USNRC"), Glossary, Glossary, Radioactivity,

25   available at https://www.nrc.gov/reading-rm/basic-ref/glossary/radioactivity.html.
     *See* Request for Judicial Notice ("RJN") filed concurrently herewith.  In fact, these

26   processes can be used for entirely civilian purposes, such as generating electricity.
     *See* USNRC, Glossary, Atomic Energy, available at https://www.nrc.gov/reading-

27   rm/basic-ref/glossary/atomic-energy.html.  Thus, Exclusion 4 for a "weapon of war"
     including atomic fission or radioactive force" can mean only one thing:  a

28   "weapon" that uses or includes in that "weapon" either atomic fission or
     radioactive force (*e.g.*, an atomic bomb).

18

coverage because a rifle is a weapon that is used in wars.  *See MacKinnon*, 31 Cal. 4th at 650 (rejecting insurer's broad interpretation argument, as it would result in absurdities and denial of coverage in situations that reasonably should be covered). This would be an absurd result, in contravention of the purchased coverage as understood by the insured.  *See* SGI ¶¶ 194, 195.

Fifth, even assuming that Exclusion 4 also covers weapons other than just weapons using atomic fission or radioactive force, the Exclusion still does not apply here because Hamas' rockets were not weapons of *war*.  Instead, they were weapons *of terror*.  *See id*. ¶ 187.

### 6.    Any Ambiguity In The Exclusions Must Be Interpreted In Universal's Favor

At a minimum, there is a disputed issue of fact as to the meaning of "war," given that Universal's interpretation is consistent with the primary Merriam-Webster Dictionary definition of the term "war," which requires "a state of usually open and declared armed hostile conflict between states or nations."  *See MacKinnon*, 31 Cal. 4th at 649 (the Court may look to dictionary definitions to provide guidance as to the reasonable interpretation of a policy term).

In *Minkler v. Safeco Ins.* the Supreme Court recited the rules of policy interpretation in California.  As stated in *Minkler:* "'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions.' *Bank of the West v. Superior Court,* Cal. 4th 1254, 1264 (1992) 2; *see* Civ. Code, § 1636.…  'If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect 'the objectively reasonable expectations of the insured.' *Bank of the West*, 2 Cal. 4th at 1265, quoting *AIU Ins. Co. v. Superior Court* 51 Cal. 3d 807, 822 (1990) .…  If these rules do not resolve a claimed ambiguity … [then] ambiguities are to be resolved against the insurer. *Bank of the West*, 2 Cal. 4th at 1264.  The 'tie-breaker' rule of construction against the insurer stems from the recognition that the insurer

19

1  generally drafted the policy and received premiums to provide the agreed

2  protection."  49 Cal. 4th 315, 321 (2010).

3       Thus, the court looks first to the policy to give effect to the parties' intent.  If

4  that can be determined from the four corners of the policy, in clear and

5  unambiguous language, the inquiry ends.  However, if the policy is ambiguous, *i.e.*

6  capable of more than one reasonable construction, the court must look to the

7  reasonable expectations of the insured.  Finally, if there are two reasonable

8  interpretations, the court must construe the provision in the insured's favor.

9  *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 473 (2004); *Safeco Ins. Co.*

10  *v. Robert S.*, 26 Cal. 4th 758, 763 (2001) (reversing summary judgment to

11  defendant insurance company because the insured reasonably expected coverage

12  for the claim purportedly excluded); *see also Pan Am. World Airways, Inc. v.*

13  *Aetna Cas. & Sur. Co.,* 368 F. Supp. 1098, 1118 (S.D.N.Y. 1973).

14       An exclusion precludes coverage only if it is "expressly and unambiguously

15  excluded," using "conspicuous, plain, and clear" language.  *State Farm Mut. Auto.*

16  *Ins. Co. v. Jacober*, 10 Cal. 3d 193, 200-02 (1973); *MacKinnon*, 31 Cal. 4th at 639.

17  Thus, "insurance coverage is 'interpreted broadly so as to afford the greatest

18  possible protection to the insured,. . . [whereas] exclusionary clauses are

19  interpreted narrowly against the insurer.'"  *MacKinnon v. Truck Ins. Exch.*, 31 Cal.

20  4th 635, 648 (2003) (citation omitted); *HS Servs. v. Nationwide Mut. Ins. Co.*, 109

21  F.3d 642, 645 (9th Cir. 1997) ("Exclusionary clauses are strictly construed.").

22       Where there are two reasonable interpretations of an exclusion, the court

23  "***must resolve the ambiguity in favor of the insured***, consistent with the insured's

24  reasonable expectations."  *E.M.M.I. Inc.*, 32 Cal. 4th at 473 (emphasis added);

25  *Safeco*, 26 Cal. 4th at 763.  To prevail, the insurer must prove "its interpretation is

26  the ***only*** reasonable interpretation."  *MacKinnon*, 31 Cal. 4th at 655.  This rule of

27  construction is often connected to the maxim of *contra proferentum.  See Pan Am.*

28  *World Airways, Inc. v. Aetna Cas. & Sur. Co.,* 505 F.2d 989, 1003 (2d Cir. 1974).

20

1      Atlantic claims that Universal cannot invoke *contra proferentum* because its

2  broker at one point referred to the policy as a "manuscript" policy, which Atlantic

3  (incorrectly) interprets to mean that Aon drafted the policy.  Motion at p. 9.[12]  The

4  *Pan Am* district court rejected a similar argument by the "all-risk" insurer-

5  defendants in that case, who sought to avoid coverage through application of the

6  war exclusions.  *Pan Am*, 368 F. Supp. at 1118.  The court noted the war

7  exclusions were "standard – indeed, too standard – insurer's clauses, not terms

8  tailored to the risk in negotiations," available in form policies, and even if they had

9  been specifically negotiated, "general rules about claims for exclusions would

10  probably require the usual kind of showing [i.e. clear and conspicuous language]

11  by the all-risk defendants."  *Id.* at 1118, 1122.  The Second Circuit affirmed,

12  holding that "if the district court erred in its application of *contra proferentem*, it

13  erred in the direction of giving it too ***little*** weight," noting the maxim "has special

14  relevance as a rule of construction when an insurer fails to use apt words to

15  exclude a known risk."   *Pan Am*, 505 F.2d at 1000, 1003 (emphasis added).

16      Moreover, the policy for construing ambiguous language in favor of the

17  insured goes beyond the rationale that the insurer is usually the drafter, as it also

18  serves to protect the reasonable expectations of the insured and properly places on

19  the insurer the burden of clearly and unambiguously stating any exclusions.

20  *Safeco*, 26 Cal. 4th at 763; *Pan Am*, 505 F. 2d at 999, 1003.  This is particularly

21  true where the insurer knows that the exclusions are ambiguous in the context of a

22  known risk, and the insurer ". . .did not employ exclusionary terms. . .which would

23  have clarified the ambiguity."  *Pan Am*, 505 F. 2d at 999.

24  _____

25  [12] *Fireman's Fund Ins. Co. v. Fibreboard Corp.* does not compel a different result.
   Therein, the court found the insured's interpretation was not reasonable, and
   directly contradicted by the testimony of the negotiating parties, so the court did

26  not apply *contra proferentum* at all.  182 Cal. App. 3d 462, 470 (1986).  In *Garcia
   v. Truck Ins. Exchange*, the policy was likewise unambiguous.  36 Cal. 3d 426, 436

27  (1984).  The party seeking coverage was not the insured, but rather a purported
   third-party beneficiary of the policy advancing an interpretation contradicted by

28  uncontroverted testimony of one of the negotiating parties.  *Id.* at 343, 436.

1    Here, as in *Pan Am*, the first two "war exclusions" use standard language

2    used throughout the insurance industry and in ISO form policies available to all

3    insurers (SGI ¶ 172, 174).[13]   Thus, Atlantic's position that Aon was the drafter of

4    these exclusions is incorrect.  Moreover, to the extent Exclusions 3 and 4 differ

5    slightly from standard form language, it is Atlantic that introduced these

6    ambiguities during the drafting process.  SGI ¶ 157-171.   As the party that

7    introduced the ambiguity, *contra proferentum* should be applied against Atlantic's

8    interpretation and in favor of Universal's.  *See, e.g. State of Cal. v. Cont'l Ins. Co.*,

9    55 Cal. 4th 186, 195 (2012).

10    Setting aside the drafting history of the exclusions, it is clear Atlantic had

11    available to it policy language that would have excluded the known risk of

12    violence by Hamas, which makes *contra proferentem* particularly applicable here.

13    (SGI ¶ 176)  *See Pan Am*, 505 F.2d at 999; *c.f. Safeco*, 26 Cal. 4th at 763.  It would

14    have been simple enough for Atlantic to remove any ambiguity by including

15    language that would have clearly excluded the risk of terrorist violence by

16    extremist Palestinian groups.  The *Pan Am* court cited to language available on a

17    form insurance policy from 1969, for "any act of one or more persons, *whether or*

18    *not agents of a sovereign Power*, for political or terrorist purposes and whether the

19    loss or damage resulting therefrom is accidental or intentional."  *Pan Am*, 505 F.2d

20    989 (emphasis added).  Had the *Pan Am* defendants so revised their policy, the loss

21    might have been excluded.  *Id.  See also Houston Exploration Co. v. Wellington*

22    *Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 467 (Tex. 2011) (similar exclusion

23    language).  Similarly, had Atlantic added language like the above, the parties

24    would not now be debating the meaning of the standard-issue war exclusions.

25

26

---

27    [13] *See* 3-18 New Appleman on Insurance Law Library Edition § 18.03 (2016)
(quoting the identical war exclusions in an ISO Commercial General Liability form
and pointing out that these terms are not defined in the policy and so have been
28    subject to judicial interpretation).

**B.** **Atlantic's Failed to Conduct a Thorough and Unbiased Investigation and Its Summary Judgment On The Bad Faith Claim Fails**

Atlantic argues that because it is purportedly entitled to summary judgment on Universal's breach of contract claim, Atlantic is also entitled to summary judgment on the bad faith claim. Motion at 23. Because Atlantic's motion fails with respect to the contract claim, it fails here as well.

Atlantic also argues it is entitled to summary judgment on the bad faith claim "because reasonable minds cannot differ as to whether there is a genuine coverage dispute at issue here." Motion at 24. Atlantic's analysis as to the existence of a genuine dispute is wrong, and Atlantic woefully misjudges the factual issues in dispute on the bad faith claim.

According to the California Supreme Court: "The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 723 (2007). "Just what conduct will meet [the] criteria must be determined on a case by case basis and will depend on the contractual purposes and reasonably justified expectations of the parties." *Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990).

Here, Atlantic's *only* "evidence" to defeat bad faith is that a Comcast employee stated—outside the full context of the policy at issue and before the Imminent Peril claim arose—that "a war exclusion may come into play." SUF ¶¶ 97-99. This "evidence" is insufficient for summary judgment on a bad faith claim, particularly when contrasted with the wealth of evidence showing that Atlantic's investigation and denial was not reasonable. *See Wilson*, 42 Cal. 4th at 723.

Universal has presented evidence that Atlantic failed to evaluate Universal's claim objectively, fairly, or thoroughly, conducted a biased "investigation," and made a decision on a claim of first impression over a period of just a few days—

23

1   based primarily on conducting Google searches, reviewing a single case, and

2   ignoring key facts, such as U.S. government determinations about the status of

3   Hamas, Gaza, and the Israel/Hamas conflict, which mandate coverage of the Claim.

4   SGI ¶¶ 203-208.  Instead, in its rushed and biased investigation, Atlantic focused

5   solely on those facts which purportedly supported denial of the Claim.[14]  *Id.*

6          Moreover, Atlantic's position with respect to each of the four War Exclusions,

7   is patently unreasonable.  As to Exclusions 1 and 2, Atlantic misrepresented the

8   terms of the TRIA endorsement to falsely claim that there was no terrorism

9   coverage.  SGI ¶¶ 209-211.  As to Exclusion 3, Theresa Gooley, Atlantic's senior

10  claims supervisor who was charged with overseeing the *Dig* Claim, testified that it

11  did *not* apply.  *Id*. ¶ 192.  As to Exclusion 4, Mr. Williams, President of One Beacon

12  at the time the *Dig* Claim was denied, testified that Exclusion 4 did *not* apply.  *Id*. ¶

13  202.  The drafting history as to Exclusion 4, and Atlantic's subsequent invocation of

14  a broader interpretation than what the parties agreed to, also strongly supports a bad

15  faith finding.

16         These circumstances—particularly Atlantic's failure to evaluate the Claim

17  fairly and objectively and its behavior in conducting a biased investigation—

18  precludes summary judgment on the claim.  *Wilson*, 42 Cal. 4th at 721-723  ("A trier

19  of fact may find that an insurer acted unreasonably if the insurer ignores evidence

20  available to it which supports the claim.  The insurer may not just focus on those

21  facts which justify denial of the claim.").[15]

22

---

23  [14] Indeed, Atlantic's claim "investigator" did not even attempt to determine
24  whether Hamas was designated by the U.S. as a terrorist group prior to denial of
    the claim.  SGI ¶¶ 213-215.

25  [15] *See also Guebara v. Allstate Ins. Co., 237 F.3d 987, 996 (9th Cir. 2001)* ("[B]ad
    faith claims based on biased investigations" should go "to a jury" where the carrier
26  had misrepresented the nature of the investigatory proceedings, or lied to the
    insured, or failed to conduct a thorough investigation).*Tomaselli v. Transamerica
27  Ins. Co.*, 25 Cal. App. 4th 1269, 1281-82 (1994) ("The inferences argued by [the
    insured], however, paint a more sinister view:  a scenario of an insurer searching
28  for ways to avoid paying the claim…"); *Mariscal v. Old Republic Life Ins. Co.*, 42
    Cal. App. 4th 1617, 1624 (1996) ("An insurance company may not ignore evidence

1  **IV.**   **CONCLUSION**

2       Based on all of the foregoing, Atlantic fails its to meet its burden to show that

3  it is entitled to summary judgment on either the claim for breach of contract or the

4  claim for breach of good faith and fair dealing.  Atlantic's Motion should be denied.

5  DATED:  May 1, 2017          MITCHELL SILBERBERG & KNUPP LLP

6

7                         By:/s/ Lucia E. Coyoca
                              Lucia E. Coyoca
8                             Attorneys for Plaintiffs Universal Cable
                              Productions LLC and Northern Entertainment
9                             Productions LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  _____
    (…continued)
28  which supports coverage.  If it does so, it acts unreasonably towards its insured and
    breaches the covenant of good faith and fair dealing.").

25