LUCIA E. COYOCA (SBN 128314)
  lec@msk.com
VALENTINE A. SHALAMITSKI (SBN 236061)
  vas@msk.com
DANIEL M. HAYES (SBN 240250)
  dmh@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Attorneys for Plaintiffs
Universal Cable Productions LLC and
Northern Entertainment Productions LLC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC and NORTHERN ENTERTAINMENT PRODUCTIONS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY,<br><br>Defendant. | CASE NO. 2:16-cv-4435-PA-MRW<br><br>**DECLARATION OF HAROLD HONGJU KOH IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Opposition Memorandum; Notice of Lodging Statement of Genuine Issues and Additional Material Facts; Statement of Genuine Issues and Additional Material Facts; Evidentiary Objections; Table of Contents of Evidence; Declarations of George Walden, Matthew Levitt, Dennis Ross, Ty Sagalow, and Lucia Coyoca Filed / Lodged Concurrently Herewith]<br><br>Date: May 22, 2017<br>Time: 1:30 p.m.<br>Ctrm.: 9A, First St Courthouse |

DECLARATION OF HAROLD HONGJU KOH IN SUPPORT OF OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# DECLARATION OF HAROLD HONGJU KOH

I, Harold Hongju Koh, declare as follows:

1. I have been retained as an expert witness on behalf of Plaintiffs Universal Cable Productions LLC and Northern Entertainment Productions LLC (collectively, "Plaintiffs") in this action. I make this Declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment. I have personal knowledge of the facts set forth herein, and if called as witness, I could and would competently testify thereto.

2. Attached hereto as **Exhibit C** is a true and correct copy of my rebuttal expert report pursuant to F.R.C.P. 26(a)(2)(B) in this matter, which report is incorporated herein as though set forth in full. I hold the opinions set forth therein in full, and if called as a witness could and would competently testify thereto.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of April, 2017, at London, England, United Kingdom.

*/s/ Harold Hongju Koh*
Harold Hongju Koh

# EXHIBIT C

# REBUTTAL REPORT OF PROFESSOR HAROLD HONGJU KOH

1. *Initial Questions Presented*

I am Sterling Professor of International Law and former Dean (2004-09) of Yale Law School in New Haven, Connecticut, where I have taught international law since 1985; I served as Legal Adviser of the United States Department of State from 2009-2013. On March 17, 2017, I submitted an expert report in *Universal Cable Productions et al. v. Atlantic Specialty Insurance Company,* No. CV 16-4435-PA (MRWx) (C.D. Ca. 2017) ("3/17/17 Koh Report") that detailed my credentials[1] and reasons for answering "No" to the following two questions:

    a. Under international law, did the hostilities occurring between Hamas and Israel during the summer of 2014 constitute "war"?

    b. Under international law, did Hamas' actions, launching mortars and rockets into Israel during the summer of 2014, constitute "acts of war"?

2. *Additional Question Presented*

In this Rebuttal Report, I have been asked to review the expert reports submitted by Frank Lowenstein, John Quigley and Ingrid de Frankopan on behalf of defendant Atlantic Specialty Insurance Company ("Atlantic"), and to comment on their conclusions. I also have been asked to opine on the following additional questions:

    c. Under international law, did Hamas' actions, launching mortars and rockets into Israel during the summer of 2014, constitute an insurgency or rebellion?

---

[1] 3/17/17 Koh Report, para. 2.

    d.  Under international law, did Hamas' actions, launching mortars and rockets into Israel during the summer of 2014, involve the use of "weapons of war[2]?"

  3.  To respond first to questions c. and d., in my professional opinion as an international lawyer, the answers to these two questions are also no. In the summer of 2014, the terrorist group Hamas was not engaged in an "insurgency or rebellion," as that term is traditionally understood by international lawyers: i.e., an organized effort by a group of armed rebels to overthrow the civilian government of a State, and to install itself instead as the legitimate successor government of the State. When Hamas engaged in attacks against Israeli civilians during the summer of 2014, Hamas was plainly not seeking to displace the government of Israel in order to rule Israel as Israel's legitimate government. Instead, its stated purpose was, is and always has been the destruction of the State of Israel altogether. Hamas is seeking to establish a state of Palestine in place of the State of Israel, not to launch a rebellion or insurgency designed to help it take over as a lawful successor to the Israeli government. Furthermore, under the circumstances presented here, the indiscriminate launching of mortars and rockets by Hamas from civilian sites into Israel against civilian populations during the summer of 2014 did not constitute the use of "weapons of war" as that term has been traditionally understood under international law.[3] Instead, in that factual setting, Hamas' indiscriminate firing of mortars and rockets into Israel, which landed upon civilians and civilian areas, constituted the use of weapons of terrorism for terrorist acts, conduct that falls outside the norms of warfare.

---

[2] It is my understanding that the relevant insurance policy's exclusion regarding "weapons of war" actually states: "Any weapon of war *including atomic fission or radioactive force*, whether in time of peace or war." (Emphasis added.) I do not believe Atlantic maintains that any weapons involving atomic fission or radioactive force were used during the Hamas/Israeli conflict. However, it is my understanding that Atlantic contends this exclusion is not limited to weapons that employ the use of atomic fission or radioactive force, and instead purportedly applies to *any* "weapon of war" generally. Therefore, my rebuttal report addresses the concept of "weapons of war" generally, notwithstanding the textual limitation stated on the face of the exclusion.

[3] Koh Report, para. 6.

3. *<u>Additional Materials Reviewed</u>*

In preparing this Rebuttal Report, I have reviewed the following case-specific documents:

    a. The expert report of Atlantic's Expert Ingrid Detter de Frankopan dated March 17, 2017 ("de Frankopan Report").

    b. The expert report of Atlantic's Expert Frank Lowenstein dated March 17, 2017 ("Lowenstein Report").

    c. The expert report of Atlantic's Expert John Quigley dated March 17, 2017 ("Quigley Report").

    d. The expert report of Atlantic's Expert Anthony Clark dated March 17, 2017 ("Clark Report").

    e. The expert report of Plaintiffs' Expert Ty R. Sagalow dated March 17, 2017 ("Sagalow Report").

    f. The expert report of Plaintiffs' Expert Dennis Ross, dated March 17, 2017 ("Ross Report").

    g. The rebuttal expert report of Plaintiffs' Expert Matthew Levitt dated March 24, 2017 ("Levitt Rebuttal Report").

4. *<u>"War" and "Acts of War," as Distinguished from "Terrorist Acts," Under International Law</u>*

My Initial Report explained that under international law, whether

> "several or many uses of force will rise to the level of sovereign 'war' or 'acts of war' depends on three factors: (1) the *nature* of the act; (2) the *geographic location* of the act; and (3) the *sovereign nature* of the actor …. Absence of any one of these elements—nature of the act, location of the act, and sovereign nature of the actor—is sufficient to place a particular violent act outside valid categorization as an 'act of war.'"[4]

---

[4] Id., para. 8 (emphasis in original).

3

With respect to the first element — the nature of the act — I explained the difference between "terrorist acts" — indiscriminate attacks on civilian populations — and *bona fide* "acts of war" in the legal sense: "Nation-states, and international law in general, are reluctant to dignify such terrorist acts by private networks with the sovereign label 'war,' or 'acts of war' which international law reserves — in the rare cases where it is used — for undeniably sovereign acts by sovereign governments recognized as legitimate actors in the world community."[5] With respect to the second element — the location of the act — I specified that "war" transpires on active battlefields; and "[u]nder the modern laws of warfare, also called International Humanitarian Law (IHL), all the world is not a battlefield."[6] And with respect to the third element — the sovereign nature of the actor — I noted that whether an actor who commits certain violent acts is deemed capable of warfare depends on "the degree to which that actor has been politically recognized as a legitimate participant in international politics and relations," i.e., is (a) a recognized foreign state (b) that has been recognized as a legitimate foreign government, (c) as part of an established governmental chain of command originating in a recognized foreign leader."[7] Under these important distinctions recognized by international law, the acts committed by Hamas in the summer of 2014 did not constitute "war" in any — much less all — of these three senses: they were not (1) "acts of war" (2) committed on active battlefields by (3) politically legitimate sovereign actors.

    5. *<u>The Misunderstanding of "War" in Atlantic's Experts' Reports</u>*

Generally speaking, the de Frankopan, Lowenstein and Quigley Reports blur these critical distinctions and sweep all of Hamas' 2014 actions under the colloquial lay use of the

---

[5] Id., para. 9. See also id., para. 10.
[6] Id., para. 9.
[7] Id., para. 9.

4

term "war," as applied by the media, instead of applying precise legal definitions of "war" as applied by international lawyers. My Initial Report noted that:

> "[l]ike laypeople, international lawyers still tend to refer to 'war' and 'peace' in colloquial speech, interviews, article and lecture titles, and the like. But when speaking precisely and in legal terms, modern international lawyers rarely refer to "war," which is generally a course of hostilities engaged in by governments of nation-states that exhibit significant attributes of national sovereignty."[8]

Taken literally, the sweeping opinions expressed by Atlantic's experts would: (1) convert all terrorist attacks on civilian populations into acts of war; (2) transform much of the world, and all of Israel, into active battlefields; and (3) legitimize many terrorist acts by Hamas into acts of legitimate political sovereigns. Such a transformation would have two perverse effects. First, it would reward Hamas for its brutal and indiscriminate attacks on civilians by granting it the respect reserved by international law for sovereign acts. As Ambassador Dennis Ross correctly stated in his expert report,

> "Any recognition of Hamas as a sovereign or quasi-sovereign entity would only serve to reinforce the notion that it is somehow a pseudo-state like actor, a position that the U.S. has firmly rejected. A finding by a U.S. Court that is contrary to established U.S. foreign policy would be a great disservice to the efforts of the past four presidential administrations to try to find a peaceful solution to the historic Palestinian/Israeli conflict that has plagued that region for decades."[9]

Second, as Ty R. Sagalow explained in his expert report, in insurance contracts:

> "war exclusions do not apply to acts of terrorism even if such acts were in alleged 'response' to an act by a sovereign nation, since to do so would largely eliminate the need for (and thus a decision not to include) a terrorism exclusion as terrorist organizations commonly try to justify their hostile acts in this manner. …With respect to U.S. insureds, industry custom and practice attempts, whenever possible, to take positions consistent with the U.S. Government when it comes to the identity of terrorist organizations and not to elevate such organizations to the level of a sovereign (or quasi-sovereign) nation status against the position taken by the United States Government."[10]

---

[8] Id., para. 6.
[9] Ross Report at para. 24.
[10] Sagalow Report at paras. 39-40.

In my professional opinion as an international lawyer, for a U.S. Court to adopt the unnuanced positions stated in Atlantic's Expert Reports could both disrupt U.S. foreign policy and distort international law. It would stretch the international legal rules governing "war" beyond recognition, and wrongfully punish those U.S. companies who engage in lawful commerce within parts of the state of Israel that might come under terrorist attack, by rendering much of their activity uninsurable.

6. *<u>Traditional "War" For Purposes of War Exclusion Clauses Is Not The Same As "Armed Conflict" In Modern International Humanitarian Law</u>*

Much of the confusion in the Atlantic Expert Reports stems from their consistent blurring of traditional notions of "war" with the more precise, modern legal term "armed conflict," which is often used by the International Committee of the Red Cross, States Parties to the Geneva Conventions, and governmental, intergovernmental and nongovernmental organizations under modern international humanitarian law. Indeed, many modern international lawyers have ceased to use the traditional terms "Law of War" or "International Humanitarian Law," in favor of the more nuanced legal notion of "Law of Armed Conflict" ("LOAC"). For understandable reasons, the various interpreters of international humanitarian law — e.g., International Committee of the Red Cross, the States Parties to the Geneva Conventions, and various governmental, intergovernmental and nongovernmental organizations concerned with the protection of human rights — have sought assiduously to ensure the broadest possible application of international humanitarian law in any and all situations that arguably involve armed conflict of any kind. For that reason, they have argued for broad application of both traditional international law rules of *jus ad bellum* (the law that governs when a state may go to war) and *jus in bello* (the law regarding the conduct of war, particularly the treatment of civilians and other noncombatants as governed by the Four Geneva Conventions of 1949 and the two Additional Protocols thereto) to

6

international and non-international armed conflicts alike. The clear purpose of these international law interpreters in broadly applying the terms "armed conflict" in such circumstances is to ensure that terrorists cannot escape legal responsibility under *international humanitarian law* for their gross violations of international law, simply by claiming that their brutal actions during armed conflict do not constitute "war" or "acts of war." But as the expert witness report of Ty R. Sagalow explains, that admirable and desirable policy goal of seeking the broadest possible application of international humanitarian law in situations of violent conflict does not mechanistically translate to the entirely different legal setting presented here: namely, whether and under what circumstances an insurance company may escape legal responsibility under *domestic insurance law* by invoking the terms "war," "acts of war," "weapons of war," or "insurgency or rebellion" to trigger exclusion of insurance coverage in particular situations.[11] The mere fact that Israel engaged in defensive use of security measures to protect its civilian population in response to Hamas' indiscriminate attacks on civilians did not abruptly transform a grave counterterrorism episode into a "war."

> a. ***Types of "armed conflict"*** Under modern international law, to say that a nation-state is engaged in "armed conflict" means that that nation-state is fighting against either another nation-state or an organized, armed group in a sustained struggle of a particular nature, intensity, and scope. That armed conflict can be one of two traditional kinds: international armed conflict ("IAC") between two nations or a non-international armed conflict ("NIAC"), as declared by either the participating states or by the International Committee of the Red Cross. Thus, for example, the United States' conflict against Germany during World War II represented a textbook *international armed conflict*: an armed conflict between two nation-states. The traditional *non-international armed*

---

[11] Id.

7

*conflict* (NIAC) is exemplified by armed struggle of the type seen in Colombia at the end of the twentieth-century: a government versus a nonstate actor (such as the Colombian rebel group FARC) in a civil conflict that does not cross national borders. In recent years, international law has come to recognize that non-international armed conflicts can also embrace conflict that crosses borders as conducted between a nation-state and a private transnational terrorist network. Thus, for example, since 2001, the United States has engaged in a non-international armed conflict with the terrorist group Al Qaeda and its associated forces that has raged in such theaters of armed conflict as Afghanistan, Iraq, and Yemen. Although such a conflict does cross national borders, it has nevertheless been treated as "non-international," because it is not an armed conflict between two nation-states, but rather, between a nation-state and a private, transnational terrorist network. To serve IHL's broad humanitarian purposes, the International Committee of the Red Cross and other interpreters of international humanitarian law understandably argue that international humanitarian law should apply to impose responsibility on participants in all of these "armed conflict" settings. Much of the discussion in the de Frankopan, Lowenstein, and Quigley Reports blurs the more precise, modern categorizations under international law that distinguish "armed conflicts" of these various types with traditional, colloquial notions of "war" — of the kind seen in the media and which may be used in common lay discourse. Israel's decision to take necessary security measures in response to Hamas' indiscriminate terrorist attacks did not suddenly transform an historical episode of counterterrorism or noninternational armed conflict into a full-fledged "war."

b. **_Social science reports labeling armed conflicts of certain magnitudes as "war" have no legal meaning._** The de Frankopan Report cites various social science articles that

8

provide data that social scientists may apply as proxies or "rules of thumb" to conduct empirical analyses of hostilities that might be called "war," for social science purposes.[12] But these reports have no relevance here, because they are not — and do not purport to be — international *legal* analyses intended to provide precise legal definitions of "war" under international humanitarian law or for purposes of "war exclusion clauses" of U.S. domestic insurance law.

7. *<u>The Misunderstandings Described Above Result In Various Overbroad And Inaccurate Statements Being Asserted In Atlantic's Expert Reports</u>*

- One of the primary problems with the expert reports submitted by Atlantic is that in many instances, the reports do not cite to any authority for the positions asserted. This persistent lack of citation to legal authorities results in the repeated blurring referenced above, confusing critical distinctions between precise legal concepts of "war" versus "armed conflict," and the application of rules of engagement in armed conflict to acts of terrorism.[13] For example, Ms. de Frankopan's report cites no authority for the proposition in para. 33 that: "If a situation cannot be qualified as 'war' it may be classified as 'war-like' activities, for which the threshold is lower." "War-like activities" is not a term recognized by international law. Similarly, in para. 36, Ms. de Frankopan states: "The Parties that engage in war do not have to be 'recognized' as States or even 'belligerents' by their enemy." Again, she cites no authority for that statement,

---

[12] See, e.g., de Frankopan Report, para. 42 (citing Uppsala Conflict Data Program); para. 24 (citing *The Changing Character of War Programme* at Oxford University); and para. 25 (citing *The Correlates of War Project* at the University of Michigan).

[13] The examples outlined herein are only illustrative, and do not address all of the statements made in Plaintiffs' Expert Reports without any underlying authority cited.

9

which would allow large-scale official violence against armed gangs, for example, to be treated as "war."[14]

- Similarly, paragraph 35 of Ms. de Frankopan's report makes the totally unsupported statement that: "*By any standards*, should it be disputed that this was a 'war,' there is no question that it certainly involved 'war-like' hostilities by two military forces, bearing in mind the type of heavy weapons used as well as rockets, anti-aircraft guns, grenades, and mines." (Emphasis added.) First, her blanket reference to "any standards" without specifying the particular standards to which she is referring is problematic; by strict international law standards, "war-like" actions have no meaning. Second, she cites no authority to support her statement regarding the various types of weapons used. Third, she fails to identify whether the weapons she is referencing were used by Hamas or by Israel, or both, or address the ramifications of Hamas' *indiscriminate* use of mortars and rockets against Israeli civilian targets. According to Dr. Levitt, the weapons that were used *by Hamas* during the hostilities in the summer of 2014 were rockets and mortars, launched from civilian sites in Gaza,[15] that lacked directional controls which would enable the launcher to direct the attack at specific military targets.[16] Under the *jus in bello* rules, attacks against civilians launched from civilian sites violate several conventions that apply to armed conflict, as noted

---

[14] There are other statements interspersed throughout which are simply characterizations of the hostilities, that have no authoritative support indicated at all. For example, in paragraph 16 of her report, Ms. de Frankopan asserts: "It is this conflict that became known, by all authorities, as the 50-Day War or the Gaza War." She does cite not a single international legal authority, let alone "all [legal] authorities" for this plainly colloquial statement.
[15] Levitt Report, pps. 23-24
[16] Levitt Report, p. 22, UN report from the commission of inquiry established pursuant to Human Rights Council resolution S-21/199
https://unispal.un.org/DPA/DPR/UNISPAL.NSF/5ba47a5c6cef541b802563e000493b8c/d9b813ba823bf05585257e6c 004e12ef?OpenDocument

10

- above, but those conventions treat such acts as acts of terrorism, not as acts of warfare.

- As yet another example, Ms. de Frankopan states, in paragraph 50: "The overarching definition of war is: sustained combat, involving organized armed forces, resulting in a minimum of 1,000 battle related fatalities (later specified as 1,000 battle-related fatalities within a 12 month period). Again, she does not cite any legal authority as to her "definition" of war, which appears to be based not on legal precedent, but on some social science "rule of thumb." Yet even if this definition were to be accepted, the purported casualty number requirements alone fall well below this threshold, given that, as pointed out by Dr. Levitt in his rebuttal report, in paragraph 18, prior to the time that Plaintiffs made the decision to move the production out of Israel on July 16, 2017, the total number of Palestinians that had died in the conflict was 220 and one Israeli had been killed.

- Professor Quigley's Report similarly rests on four mistaken assumptions:[17] First, he regularly and mistakenly uses the term "Gaza-Israel hostilities of 2014," asserting "that the plain meaning of the term 'war' includes the conflict that occurred in 2014 between Gaza and Israel."[18] Yet Israel was engaged in hostilities with a terrorist organization, Hamas, not with the territory of Gaza, which is not a nation-state, and which, as Dr. Levitt pointed out, "has never been a sovereign territory."[19] Second, Professor Quigley claims that "Hamas need not have been a government or quasi-government for the conflict to have been considered a war," notwithstanding my point in paragraph 4 above, that under

---

[17] Quigley Report p. 4.
[18] Id.
[19] Levitt Report p. 8.

11

international law, the existence of "war" depends, *inter alia*, on the sovereign nature of the actor. [20] Third, the Quigley Report insists that Israel's conflict with Hamas is in fact "between two states," based on three shifting rationales: first, that "the Hamas Administration in Gaza constitutes part of the governing authority of the State of Palestine;" second, that Hamas is a "de facto administrator of the territory," and third, taking the opposite tack, because the violence "arose in a situation of belligerent occupation." [21] Yet in fact—as the Levitt Report notes—"Hamas in the Gaza Strip is not recognized as a legitimate government by the United Nations, other multilateral organizations, or the vast majority of countries around the world, including the United States." Finally, even if, as the Quigley Report notes, "the law that was applied to the hostilities was humanitarian law," as noted in paragraph 6 above, the understandable decision of the International Committee of the Red Cross and other interpreters to apply IHL broadly to reach various terrorist activities tells us nothing about which acts a U.S. Court should exclude from insurability because under U.S. insurance law, they constitute the kind of "war" that triggers a war exclusion clause in an insurance contract.

- As to the Lowenstein Report, again, there are too many instances where colloquial statements are made without any supporting authority in international law. For sake of brevity, virtually none of the statements made on pages 3-9 in the Factual Background section are supported by citations to specific legal authorities, as opposed to various media accounts. The Report makes general reference to

---

[20] Quigley Report p. 4.
[21] Id.

12

- documents that are listed in Exhibits 2 or 3, but again, gives no indication as to which of the documents supports particular points.

- On page 9, the Lowenstein Report offers the opinion that under the plain, ordinary meaning of the term "war," the Hamas/Israeli conflict "cannot be considered to be anything but a war." However, nowhere does Mr. Lowenstein's report state what the standard *under international law* is for determining what is and is not a "war," as opposed to a lay understanding or usage of that term. Failing to distinguish between those colloquial notions of what a lay person may consider to be genuine "war" and "warlike" action, versus the precise definitions accorded to the terms under international law, fails to recognize the important critical distinctions between them described in my initial report and repeated above. The same holds true as to the analysis concerning application of the rules of engagement in "armed conflict" to acts of terrorism. Application of those rules of engagement does not convert what is otherwise terrorism into "war" or "warlike action," nor does it mean that the various losses that were sustained resulted from the use of "weapons of war," rather than because of various acts of terrorism.

8. ***Conclusion.*** For all of the foregoing reasons, this Rebuttal Report adheres to the position taken in my Initial Report of March 17, 2017. In my opinion as an expert on international law, the particular factual circumstances at issue here did not amount to "war," "acts of war," "insurgency or rebellion," or "acts committed by weapons of war," as those terms have been defined under international law.

Respectfully submitted,

_____     _April 28, 2017_____
HAROLD HONGJU KOH                                    Date

13