1  MARC J. SHRAKE (SBN 219331)
   mjs@amclaw.com
2  ANDERSON, MCPHARLIN & CONNERS LLP
   707 Wilshire Boulevard, Suite 4000
3  Los Angeles, California 90017-3623
   Telephone: (213) 236-1691
4  Facsimile: (213) 622-7594

5  MICHAEL KEELEY *(Pro Hac Vice)*
   michael.keeley@strasburger.com
6  TONI SCOTT REED *(Pro Hac Vice)*
   toni.reed@strasburger.com
7  CARLA C. CRAPSTER *(Pro Hac Vice)*
   carla.crapster@strasburger.com
8  STRASBURGER & PRICE, LLP
   901 Main Street, Suite 6000
9  Dallas, Texas 75202
   Telephone: (214) 651-4300
10 Facsimile: (214) 651-4330

11 Attorneys for Defendant
   Atlantic Specialty Insurance Company

12

13           UNITED STATES DISTRICT COURT

14    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

15

16 UNIVERSAL CABLE                  Case No. 2:16-cv-04435-PA-MRW
   PRODUCTIONS LLC, a Delaware
17 limited liability company, and    **DEFENDANT ATLANTIC**
   NORTHERN ENTERTAINMENT            **SPECIALTY INSURANCE**
18 PRODUCTIONS LLC, a Delaware       **COMPANY'S CORRECTED**
   limited liability company,        **OPPOSITION TO PLAINTIFFS'**
19                                    **MOTION FOR PARTIAL**
                                      **SUMMARY JUDGMENT**
20            Plaintiffs,

21                                    [*Filed Concurrently with Declarations of*
   vs.                               *Peter D. Williams; Declarations of Frank*
22                                    *G. Lowenstein; Declaration of Carla C.*
                                      *Crapster; and [Proposed] Order; Statement of*
23 ATLANTIC SPECIALTY                 *Genuine Disputes; Request for Judicial*
   INSURANCE COMPANY, a New          *Notice; Volume of Evidence; Objections to*
24 York insurance company,           *Plaintiffs' Evidence and [Proposed] Order;*
                                      *Motion to Strike Plaintiffs' Evidence and*
25            Defendant.             *[Proposed] Order*]

26

27

28

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Date:  May 22, 2017
Time:  1:30 p.m.
Place:  Courtroom 9A
Judge:  Honorable Percy Anderson
Discovery Cutoff:  June 2, 2017
Pretrial Conference:  June 16, 2017
Trial:  July 25, 2017

ANDERSON, McPHARLIN & CONNERS LLP
Lawyers
707 Wilshire Boulevard, Suite 4000
Los Angeles, California 90017-3623

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S**
**CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

I.       INTRODUCTION .......................................................................................... 1

II.      BACKGROUND ............................................................................................. 1

         A.       A Brief History of Israel and Palestine ............................................ 1

         B.       The 50-Day War ................................................................................ 2

         C.       The Devastation of the War .............................................................. 3

         D.       The Policy .......................................................................................... 4

         E.       Adding Dig to the Policy ................................................................... 5

III.     ARGUMENT ................................................................................................... 6

         A.       Key Threshold Issues: The Ordinary Meaning Governs and the
                  Policy Cannot Be Construed Against Atlantic As It Is the
                  Plaintiffs' Form .................................................................................. 6

                  1.       The Plain Meaning Controls ................................................... 6

                  2.       The Policy Cannot be Construed Against Atlantic—It Is
                           the Property of Aon and Plaintiffs, Not Atlantic ................... 7

         B.       Plaintiffs Have Judicially Admitted The Facts Necessary to Apply
                  the Insurrection/Rebellion Exclusion of the Policy ......................... 9

         C.       The Warlike Actions Exclusion Applies ......................................... 12

                  1.       The Warlike Exclusion Is Broader Than the War Exclusion ....... 12

                  2.       Israel is a Sovereign – And The Plaintiffs Left Because of
                           Israel's Actions ..................................................................... 14

         D.       War: The Ordinary Meaning (And the Plaintiffs' More Technical
                  Meaning) Fit the Definition of the 50-Day War .............................. 16

                  1.       The Ordinary Meaning Applies ............................................. 16

                  2.       There is No Need for a Dichotomy Between War and
                           Terror .................................................................................... 17

                  3.       Even under the Plaintiffs' Definition, There was Still War
                           Because Hamas is a Quasi-Sovereign or De Facto
                           Government ........................................................................... 19

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

i

1    E.    The Political Question Doctrine is Irrelevant Here .................................. 20

2    F.    Weapons of War ........................................................................................ 23

3    G.    Atlantic Does Not Concede that the Insuring Clause Applies ................ 24

4    IV.    CONCLUSION ......................................................................................... 25

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ANDERSON, McPharlin & Conners LLP**
Lawyers
707 Wilshire Boulevard, Suite 4000
Los Angeles, California 90017-3623

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S**
**CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*American Title Ins. Co. v. Lacelaw Corp.*,
861 F.2d 224 (9th Cir. 1988).................................................................. 10

*Baker v. Carr*,
369 U.S. 186 (1969).............................................................................. 21

*Boumedienne v. Bush*,
553 U.S. 723 (2008).............................................................................. 22

*Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*,
971 F.2d 272 (9th Cir. 1992).................................................................. 12

*Clarendon Nat'l Ins. Co. v. Foley & Bezek*,
LLP, No. CV-00-11641-RJK, 2001 U.S. Dist. LEXIS 18443 .................................. 6

*Ctr. for Biological Diversity v. Hagel*,
80 F. Supp. 3d 991, 1001 (N.D. Cal. 2015) .................................................. 21

*Discover Prop. & Cas. Ins. Co. v. Blair*,
EDCV-13-00290-VAP-DTBx, 2014 U.S. Dist. LEXIS 128029 (C.D. Cal.
Aug. 26, 2014)....................................................................................... 6

*Ennar Latex v. Atlantic Mutual Insurance Co.*,
No. 94CIV150, 1995 U.S. Dist. LEXIS 7386 (S.D.N.Y. May 30, 1995) .................. 13

*Estates of Ungar v. Palestinian Auth.*,
304 F. Supp. 2d 232 (D.R.I. 2004)......................................................... 2, 20

*Hamdan v. Rumsfeld*,
548 U.S. 557 (2006).............................................................................. 17

*Hamdi & Ibrahim Mango Co. v. Reliance Ins. Co.*,
291 F.2d 437 (2d Cir. 1961) ............................................................. 14, 19

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004).............................................................................. 17

*Holiday Inns, Inc. v. Aetna Insurance Co.*,
571 F. Supp. 1416 (S.D.N.Y. 1983).................................................... 13, 20

*Home Ins. Co. v. Davila*,
212 F.2d 731 (1st Cir. 1954) .................................................................. 11

*In re Marzook*,
924 F. Supp. 565 (S.D.N.Y. 1996).................................................... 2, 20

*In re September 11 Litig.*,
751 F.3d 86 (2d Cir. 2013).............................................................. 17, 18

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

*In re September 11 Litig.,*
  931 F. Supp. 2d 496 (S.D.N.Y. 2013) ............................................................ 17

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
  478 U.S. 221 (1986) ........................................................................................ 21

*Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.,*
  368 F. Supp. 1098 (S.D.N.Y. 1973) ..........................................................13, 14

*Pan American World Airlines, Inc. v. Aetna Casualty & Surety Co.,*
  505 F.2d 989 (2d Cir. 1974) ........................................................................12, 20

*Puerto Rico Maritime Shipping Auth. v. ICC,*
  645 F.2d 1102 (D.C. Cir. 1981) ...................................................................... 23

*Resendiz v. Cnty. Of Monterey,*
  No. 14-cv-05495-LHK, 2015 U.S. Dist. LEXIS 86034 (N.D. Cal. June 30,
  2015) ............................................................................................................... 10

*Sony Computer Entm't Am., Inc. v. Am. Home Assur. Co.,*
  532 F.3d 1007 (9th Cir. 2008) .......................................................................... 6

*Ungar v. PLO,*
  402 F.3d 274 (1st Cir. 2005) .......................................................................21, 22

*United States v. El-Mezain,*
  664 F.3d 467 (5th Cir. 2011)..........................................................................2, 20

*Weiss v. Arab Bank,*
  No. 06 cv 1623, 2007 U.S. Dist. LEXIS 94029 (E.D.N.Y. Dec. 21, 2007) ............ 13

*Zivotofsky v. Clinton,*
  566 U.S. 189 (2012) ........................................................................................ 21

**STATE CASES**

*Fireman's Fund Ins. Co. v. Fibreboard Corp.,*
  182 Cal. App. 3d 462 (1986) ............................................................................ 9

*Garcia v. Truck Ins. Exch.,*
  36 Cal. 3d 426 (Cal. 1984) ............................................................................... 8

*Jordan v. Allstate Ins. Co.,*
  116 Cal. App. 4th 1206 (Cal. Ct. App. 2004) ................................................... 7

*People v. James,*
  94 Cal. Rptr. 3d 576 (Cal. Ct. App. 2009) ...................................................... 24

**FEDERAL STATUTES**

8 U.S.C. § 1189 ................................................................................................... 21

18 U.S.C. § 2333 ................................................................................................. 18

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S
CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

18 U.S.C. § 2336(a) ................................................................................................ 18

26 U.S.C.S. § 5845(f) .............................................................................................. 24

**STATE STATUTES**

Cal. Civ. Code § 1641 .......................................................................................... 12

Cal. Civ. Code § 1644 ............................................................................................ 6

**OTHER AUTHORITIES**

Dictionary.com, http://www.dictionary.com/browse/overthrow ........................... 10

GARNER'S DICTIONARY OF LEGAL USAGE 439 (3d ed. Oxford 2011) ..................... 23

H.R. Rep. No. 102-1040 (1992) .............................................................................. 18

Merriam Webster Online, https://www.merriam-
       webster.com/dictionary/muezzin .................................................................. 10

Oxford Living Dictionaries,
       https://en.oxforddictionaries.com/definition/authority ........................... 12

S. Rep. No. 90-1501 (1968) .................................................................................... 24

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1611 (1976) ..................... 10

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S
CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

The plaintiffs' alleged loss results from moving the production of a TV show out of Israel when fighting there between Israelis and Palestinians became so intense that Israel was no longer safe. But Atlantic's policy does not cover the losses incurred as a result of this move because it includes broad exclusions relating to war. It bars coverage for not just undeclared war, but also war*like* actions, weapons of war and insurrection or rebellion. All these exclusions apply. In fact, the plaintiffs have judicially admitted all the facts necessary for the insurrection exclusion to apply. And as to war and war*like*, their ordinary meaning controls this case, under a California statute, which undermines the plaintiffs' position entirely because it is clear that the ordinary meaning of war encompasses this deadly conflict. Countless news outlets and prominent politicians used the word "war" when discussing it, including, embarrassingly enough for plaintiffs, NBC News and MSNBC, which are affiliated with the named insured on the policy: NBCUniversal Media, LLC. The plaintiffs also rest their position on the faulty premise that the Court must accept any reasonable interpretation they offer. This is not the law when, as here the policy is the *insured's* form. This is the plaintiffs' own policy, and any ambiguities in it must be construed against them. For all these reasons and those discussed below, Atlantic asks the Court to deny the plaintiffs' motion for summary judgment and enter judgment for Atlantic.

## II.     BACKGROUND

The plaintiffs glide over the magnitude of the 50-Day War and the devastating impact it had on Palestinians and Israelis for obvious reasons: when it becomes clear what a long and intense conflict it was, only the word "war" can accurately describe it.

### A.     A Brief History of Israel and Palestine

There are two primary competing Palestinian political parties or organizations. SGI 102. Fatah is the largest faction of the confederated multi-party Palestinian

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

Liberation Organization, and is currently led by Yasser Arafat's successor, Mahmoud Abbas. SGI 102. Hamas is a Palestinian Islamic military and socio-political movement that formed in 1987. SGI 102. It has maintained its primary base of political support and military command in the Gaza Strip. SGI 102. In 2006, Hamas won a majority of the seats in the Palestinian Legislative Council. SGI 106. And in 2007, Hamas gained control over the Gaza Strip, where it currently governs and carries out "political, military and social welfare activities . . . ." SGI 107-08; *see also United States v. El-Mezain*, 664 F.3d 467, 485-486 (5th Cir. 2011) (Hamas has a military, political, and social service branch that runs hospitals and schools); *Estates of Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 250 (D.R.I. 2004) ("Hamas operates through a political branch and a military branch."); *In re Marzook*, 924 F. Supp. 565, 568 (S.D.N.Y. 1996). As plaintiffs' own security team recognized, Hamas governs the Gaza Strip. SGI 268-69

**B.     The 50-Day War**

In June 2014, Hamas and Fatah agreed to establish a "consensus" or "unity" Palestinian Authority government, much to Israel's anger, as it refused to deal with Hamas, whose Charter commits it "to the destruction of Israel and the establishment of an Islamic State in all of historic Palestine. SGI 103, 112-13. Tensions soon thereafter began to build between Israelis and Palestinians. SGI 134. On June 12, 2014, three Israeli teenagers were kidnapped. SGI 134. "In response, Israel launched an extensive search and arrest operation." SGI 136. These teenagers were later killed, allegedly by Hamas militants. SGI 135. Because plaintiffs were already in Israel to film *Dig*, the head of security for NBCUniversal Media, LLC ("NBCU")[1] was closely monitoring events, and sent an e mail on June 15, 2014, summing up the building tension, noting that Israel had deployed 2,500 soldiers for "searches and intelligence

---

[1] This is the named insured on the Policy; the plaintiffs' are indirect subsidiaries of NBCU. SGI 120.

gathering," and had deployed the Iron Dome missile batteries and begun activating military reserves. SGI 139-40.

On July 2, Israelis abducted and killed a Palestinian teenager, burning him alive in what appeared to be an act of revenge. SGI 141. Palestinians began launching rockets into Israel, which deployed its Air Force to retaliate with deadly airstrikes. SGI 148-51. As demonstrated by plaintiffs' own security alerts, the fighting between Israel and Hamas slowly escalated on a daily basis as each side retaliated with "tit-for-tat" responses. SGI 151. As the fighting worsened with almost daily barrages of missiles, rockets and fighter jet attacks, on July 8, 2014, Israel launched "Operation Protective Edge," an official offensive campaign against Hamas. SGI 155. Israel continued this Operation for 50 days (between July 8 and August 26, 2014), hence the name given world-wide to the conflict, the "50-Day War" or "Gaza War." SGI 179. During this time, "Hamas and other militant groups fired 4,465 rockets and mortar shells into Israel, while the [Israeli] government conducted 5,242 airstrikes within Gaza and a 20-day military ground operation in Gaza." SGI 180. Both Hamas and Israel carried out seaborne attacks against each other, while Israel pummeled Hamas from the air. SGI 157.

As the conflict wore on, it became increasingly clear to plaintiffs that Israel was planning a ground invasion. SGI 161. On July 17, Israel's ground forces did in fact invade Gaza. SGI 172-74. In the ensuing days and weeks, Israel escalated its airstrikes and attacked with tanks and soldiers on the ground. SGI 173, 175.

Although there were several attempts to broker a ceasefire, all but the last were unsuccessful. SGI 177. Finally, on August 26, 2014, both sides agreed to an indefinite ceasefire, drawing the war to a close. SGI 178.

## C.    The Devastation of the War

The 50 days of intense fighting left both Israelis and Palestinians ravaged. Palestinian fatalities totaled at least 2,220, at least half of whom were civilians. SGI

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

182. Approximately 11,000 Palestinians were wounded. SGI 183. The Israeli Defense Force lost 67 soldiers and 6 Israeli citizens. SGI 184. "[B]y August 5, hostilities during Operation Protective Edge internally displaced approximately 520,000 persons in Gaza." SGI 185. Approximately 10,000 Israelis were displaced by the war. SGI 185. The damage to infrastructure was also severe, with "Israeli armed forces destroy[ing] electrical, water, and other public infrastructure," with damage estimates ranging from 15.6 billion to as high as 31.2 billion Israeli new shekels ($4- $8 billion). SGI 186-87.

**D.    The Policy**

The policy at issue is a Motion Picture/Television Producers Portfolio, which was effective from January 1, 2014, through June 30, 2015 (the "Policy"). SGI 207. As discussed more thoroughly below, the Policy is the result of extensive negotiations between the parties, and the plaintiffs actually claim the Policy as *their* property. SGI 188-90, 201-02, 205, 217-18.

The relevant part of the Policy agrees to pay certain losses that are:

1. [A] direct result of an unexpected, sudden or accidental occurrence entirely beyond your control to include:

….

(g) Imminent peril, defined as certain, immediate and impending danger of such probability and severity to persons or property that it would be unreasonable or unconscionable to ignore. SGI 208.

The Policy also contains war-related exclusions, like most policies do, with one important difference, as acknowledged by plaintiffs' own risk management department: the war exclusions are broad,[2] excluding coverage not just for war, but also warlike actions and even weapons of war:

---

[2] SGI 214.

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1    This policy does not insure against loss or damage caused directly or
2    indirectly by:
3    1.  War, including undeclared or civil war; or
4    2.  Warlike action by a military force, including action in hindering or
5    defending against an actual or expected attack, by any government,
6    sovereign or other authority using military personnel or other agents; or
7    3.  Insurrection, rebellion, revolution, usurped power, or action taken by
8    governmental authority in hindering or defending against any of these.
9    Such loss or damage is excluded regardless of any other cause or event
10   that contributes concurrently or in any sequence to the loss; or
11   4.  Any weapon of war including atomic fission or radioactive force,
12   whether in time of peace or war[.] SGI 209 (Emphasis added).

## E.    Adding *Dig* to the Policy

As the plaintiffs pointed out in their memorandum, they added *Dig* to the
Policy in December 2013. SGI 191.  The plaintiffs were represented by Aon, "the
leading global provider of risk management, insurance and reinsurance brokerage"
services in the country. SGI 188-89.  As discussed below, the Policy belongs to Aon
and NBCU.  See Section III.A.2 on pages 7-9 below. Thus, Aon was well aware of the
coverage for imminent peril and of the broad war exclusions.  If the plaintiffs or Aon
were concerned about war breaking out in the Middle East while *Dig* was being filmed
there, they could have requested additional coverage for it. They never did. Andrea
Garber was the Aon employee involved in declaring *Dig* to the Policy.  SGI192.  Ms.
Garber knew that Israel was a "unique" location, based on what she had read in the
newspapers, and realized that there could be random violence there.   SGI 193.
Unfortunately, she only had a "passing knowledge" of the Middle East, and she had
not been in touch with plaintiffs' security team.  SGI 194. Understandably then, she
never raised with Atlantic the possibility of deleting the war exclusions from the

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  Policy or adding additional insurance. SGI 196. After this coverage issue arose,

2  NBCU representatives asked Garber whether she had discussed the war exclusions

3  with Atlantic; there was a call in which "[e]verything got rehashed again back to when

4  we first declared the production and why additional insurance was not purchased."

5  SGI 197.

6  ### III.  ARGUMENT

7  **A.  Key Threshold Issues: The Ordinary Meaning Governs and the Policy**

8  **Cannot Be Construed Against Atlantic As It Is the Plaintiffs' Form**

9  It is first necessary to address two of the plaintiffs' faulty arguments, as their

10  position in the brief rests on them entirely. First, the ordinary meaning controls here.

11  Second, the Policy must be construed against the plaintiffs, as this is NBCU's policy.

12  ### 1.  *The Plain Meaning Controls*

13  The plaintiffs' position depends on the Court's applying a technical definition

14  of "war" and "warlike." But the plaintiffs misleadingly truncate the controlling

15  California statute on this point in their brief. What the statute actually states is that

16  words in a contract "are to be understood in their ordinary and popular sense, rather

17  than according to their strict legal meaning; *unless* used by the parties in a technical

18  sense, or unless a special meaning is given to them by usage." Cal. Civ. Code § 1644

19  (emphasis added). The plaintiffs must introduce some evidence to show that the

20  parties intended to use the words in the contract in a technical sense before that sense

21  can govern. *Sony Computer Entm't Am., Inc. v. Am. Home Assur. Co.*, 532 F.3d 1007,

22  1013 (9th Cir. 2008) ("Because there is no evidence that the parties intended the term

23  to carry a technical meaning, the ordinary and popular meaning of the term

24  governs."); *Discover Prop. & Cas. Ins. Co. v. Blair*, EDCV-13-00290-VAP-DTBx, 2014

25  U.S. Dist. LEXIS 128029, *22-23 (C.D. Cal. Aug. 26, 2014) ("As there is nothing to

26  indicate that the parties intended 'load capacity' to have a technical or special

27  meaning, the Court interprets the term in its ordinary and popular sense."); *Clarendon*

28

**ANDERSON, McPHARLIN & CONNERS LLP**
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S
CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

*Nat'l Ins. Co. v. Foley & Bezek*, LLP, No. CV-00-11641-RJK, 2001 U.S. Dist. LEXIS 18443, *12 (C.D. Cal. July 26, 2001) (Court applied ordinary meaning of "sanction" where there was no evidence that insured attached any technical or special meaning to the term.); *Jordan v. Allstate Ins. Co.*, 116 Cal. App. 4th 1206, 1218 (Cal. Ct. App. 2004) (no particular or technical meaning could govern because there was no evidence that the term at issue had a particular or technical meaning "understood by the parties at the time the policy was issued").

The plaintiffs offer *no* evidence that the parties intended to use "war" in a technical sense. No such evidence exists. To the contrary, NBCU's representative, Andrea Garber, had *no* discussions with Atlantic concerning the war exclusions in the policy until the *Dig* Claim was submitted.  SGI 199. Susan Weiss, plaintiff's insurance broker with Aon, who was involved in negotiations of the policy, also testified that she recalled no discussions with Atlantic about the war exclusions before the *Dig* claim arose.  SGI 200. As these depositions confirm, there is no evidence that the parties used the word "war" or "warlike" in a technical sense or gave it some special meaning.

The only "evidence" the plaintiffs cite as support for applying a technical definition is outdated and non-binding case law from New York. These cases are no evidence of how the *parties* in this lawsuit used the word war. Those cases are also distinguishable to the extent they apply some definition of "war" other than the ordinary meaning because California law governs here, and Section 1644 expressly requires application of the ordinary meaning unless there is evidence that the parties intended a technical usage, which does not exist here.

2.    *The Policy Cannot be Construed Against Atlantic—It Is the Property of Aon and Plaintiffs, Not Atlantic*

The plaintiffs' position also depends entirely on the Court agreeing that they prevail as long as they offer some reasonable interpretation of the Policy. That doctrine does not apply here. As the California Supreme Court has explained, the

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S
CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

doctrine of construing policies against insurers exists only because, in the normal course, the insurance company does not negotiate with the insured but instead offers policies on a take-it-or-leave-it basis. *Garcia v. Truck Ins. Exch.*, 36 Cal. 3d 426 (Cal. 1984). In *Garcia*, the California Supreme Court went on to hold that where these factors are absent and the insurer and insured *negotiated* the terms of the policy and the insured enjoyed substantial bargaining power with the carrier, the doctrine does not apply. *Id.* Here, the roles are actually reversed in that plaintiffs' powerful insurance broker, Aon, created a special manuscripted policy just for NBCU, and Aon, to this day, claims that it and NBCU "own" that very policy.  SGI 205, 217-18. That manuscripted form was submitted to Atlantic, and what was eventually issued was the result of "extensive negotiations" between Aon and Atlantic over certain terms not at issue here. SGI 201-02. But, there were no negotiations over the war exclusions, and thus they resulted from the form submitted by Aon.  SGI 203.  The Policy at issue in this case is substantively the same policy, and the war exclusions are exactly the same—the parties renewed the first policy several times. SGI 206-07.

Importantly, in 2015, when NBCU began shopping around for a new carrier, Aon submitted the actual Policy—the very same one at issue in this case, with Atlantic's name still on it—to other insurers, explaining: "It is a manuscripted policy **that is the property of Aon** . . . . They are looking to keep this same form at renewal." SGI 217. (emphasis added). Conspicuously, the Policy was  stamped on every page as follows: CONFIDENTIAL PROPERTY OF AON." SGI 218. Ms. Weiss confirmed this in a deposition, stating that the Policy "was a form that was created for a specific client [NBCUniversal] addressing a specific client's needs." SGI 204. The deposition continued:

> A [Weiss]: It's common language that we might say it belongs to Aon
>
> because it's a negotiation that took place on behalf of our client. So, yes,

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1   I would say this form should not be used by Atlantic Mutual for another

2   one of Atlantic's clients.

3   Q: Because, in your view, it's proprietary of Aon?

4   A: And to the client.

5   Q: And to NBCUniversal?

6   A: Correct. SGI 205.

7   There could be no clearer evidence that this policy was negotiated extensively by, was

8   unique to, and belongs to NBCU. In Aon's view, it would not even be proper for

9   Atlantic to use the same language with another insured. The Policy is not Atlantic's–it

10   is NBCU's, and the Policy therefore cannot be construed against Atlantic. Instead, the

11   Policy must be construed against *the plaintiffs* to the extent there is any ambiguity. *See*

12   *Fireman's Fund Ins. Co. v. Fibreboard Corp.*, 182 Cal. App. 3d 462, 468 (1986) (when the

13   language in an insurance policy is the insured's, the language is construed against them).

14   **B.    Plaintiffs Have Judicially Admitted The Facts Necessary to Apply the**

15   **Insurrection/Rebellion Exclusion of the Policy**

16   Atlantic firmly believes that the war and warlike exclusions of the Policy apply.

17   Plaintiffs argue that they do not because Hamas is neither a sovereign nor quasi-

18   sovereign. But if Hamas is not at least a quasi-sovereign (which it clearly is) then the

19   only other way to view it is as a political group committed to the overthrow of Israel.

20   As a result, its actions in July and August 2014 amount to an insurrection or rebellion.

21   In their memorandum, Plaintiffs concede that to establish the application of

22   Exclusion 3, "Atlantic must prove [only] that Hamas had the intent to 'overthrow the

23   established government [of Israel] and assume at least *de facto* governmental control."

24   SGI 263. In the very next paragraph of their memorandum, plaintiffs admit that

25   "Hamas rejects the very right of Israel to exist. Hamas's stated intent, as expressed in

26   its founding charter published in 1988, is to destroy Israel, establish a separate Islamic

27   fundamentalist Palestinian state, and raise 'the banner of Allah over every inch of

28

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S**
**CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

Palestine.'" SGI 264. Atlantic agrees with this judicial admission[3] by the plaintiffs. And though the plaintiffs go on to maintain that Hamas had no intent to "effectuate regime change," their contention is belied by their own admission that Hamas's intent is to "destroy Israel [and] establish a separate Islamic fundamentalist Palestinian state, and raise 'the banner of Allah over every inch of Palestine.'" SGI 264. The word "destroy" is a synonym for overthrow. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1611 (1976) ("to cause the downfall of: bring low: DEFEAT, DESTROY, RUIN"); *see also* Dictionary.com, http://www.dictionary.com/browse/overthrow (defining overthrow, in part, as "to *put an end to* by force, as a government or institution" and listing as synonyms: "defeat; destruction; ruin"). Moreover, as the plaintiffs concede, Hamas does not *just* want to destroy Israel. It wants to destroy Israel so that it can establish "an Islamic state in all of historic Palestine, comprised of present-day Israel, the West Bank, and Gaza." SGI 103; *see also* Hamas Charter at Article 9 (listing as one of its objectives fighting against Israel so that "homelands be retrieved and from its mosques would the voice of the mu'azen[4] emerge declaring the establishment of the state of Islam, so that people and things would return each to their right places …."). In short, "overthrow" means destroy and replace, and because the plaintiffs have now judicially admitted that Hamas had this exact intent, the plaintiffs cannot prevail.

Plaintiffs go on to maintain that, despite Hamas's overall objective to destroy Israel, its intention in 2014 was merely to retaliate for Israel's allegations that Hamas was responsible for the kidnapping of three Israeli teens and to "terrorize, injure,

---

[3] A judicial admission is a fact asserted in a pleading—which conclusively binds the party. *See American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988); *Resendiz v. Cnty. Of Monterey*, No. 14-cv-05495-LHK, 2015 U.S. Dist. LEXIS 86034, *17 (N.D. Cal. June 30, 2015).

[4] A mu'azen (usually spelled muezzin) is the announcer of daily prayers. *See* Merriam Webster Online, https://www.merriam-webster.com/dictionary/muezzin.

10

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S**
**CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

ANDERSON, MCPHARLIN & CONNERS LLP
Lawyers
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

and/or kill Israeli's civilian population." This argument SGIfers from three critical defects. First, there is no admissible evidence to support the allegation.[5]  Second, the admissible evidence is that Hamas's actions in 2014 were intended to overthrow Israel. SGI 266-67. Finally, even if Hamas had a narrow "minimum objective," its "maximum objective" was to overthrow Israel. *See, e.g, Home Ins. Co. v. Davila*, 212 F.2d 731, 732 (1st Cir. 1954). *Davila* involved an insurance claim for buildings that had been burned in an "uprising staged … by a little band of extremists calling themselves the Nationalist Party of Puerto Rico." *Id.* at 732. The insurance policy at issue barred coverage for loss resulting from insurrection, rebellion, or revolution. *Id.* The court reasoned that insurrections need not have as their *sole* purpose the overthrow of a government—rather, there could be a "minimum objective" and a "maximum objective." There, the court noted that the "maximum objective" was an overthrow of the Puerto Rican government, while the minimum objective "might have been to create a series of local disturbances or 'civil commotions', [sic] in various towns of Puerto Rico, to embarrass and discredit the insular government, to dramatize the fact that there were 'patriots' in Puerto Rico prepared to die for the ideal of freedom, for propaganda purposes to fire a shot 'heard round the world.'" *Id.* at 738. This "minimum objective" did not change the overarching "maximum objective," however unlikely to be achieved and "however inept [the leaders] might have been in their calculations and preparations." *Id.* As long as there was an intent to overthrow— destroy and replace—the government, there was an insurrection. *Id.*

Under *Davila*, this Court need not concern itself with any minor objectives Hamas had. It is SGIficient that Hamas's overarching, ultimate, "maximum objective" is to destroy and replace the Israeli state with an Islamic one. SGI 103, 206-07. Hamas's own charter makes this clear, as the plaintiffs have judicially admitted.

---

[5] Atlantic has a motion to strike on file arguing that the plaintiffs' evidence on this point (Plaintiffs' SGI 181) is faulty and inadmissible.

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

**C.**      **The Warlike Actions Exclusion Applies**

    *1.*      *The Warlike Exclusion Is Broader Than the War Exclusion*

    Plaintiffs' memorandum on Exclusion 2, for warlike action, is telling. They conveniently, but incorrectly, combine their discussion of Exclusions 1 and 2, war and warlike action. But the two are separate exclusions in the Policy, and under California law they cannot mean the same thing. CAL. CIV. CODE § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."); *Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 278-79 (9th Cir. 1992) ("It is 'a fundamental rule of contract interpretation' that 'a contract should be interpreted so as to give meaning to each of its provisions.'"). Plaintiffs ignore that the war*like* exclusion in the Policy is much broader than Exclusion 1, which precludes coverage for war, including undeclared or civil war (itself quite broad). Exclusion 2 goes even further—excluding coverage for war*like* action . . . by any government, sovereign or other authority using military personnel or other agents." SGI 209.

    This inclusion of the phrase "other authority" in Exclusion 2 is a significant point of variance between Exclusion 1 and 2. This phrase makes clear that the exclusion applies even if the insured's loss results from the warlike action of some entity that falls short of qualifying as a government or sovereign. "Authority" means: "A person or organization having political or administrative power and control." Oxford Living Dictionaries, https://en.oxforddictionaries.com/definition/authority. Here, there can be no legitimate question that Hamas is at least an "authority." In fact, the plaintiffs' representatives have referred to Hamas as the entity that "governs" Gaza and have referred to the "Hamas Government." SGI 268-69.

    The cases the Plaintiffs rely on are either inapposite because they involved much narrower exclusions, or they support Atlantic's position. In *Pan American World Airlines, Inc. v. Aetna Casualty & Surety Co.*, 505 F.2d 989, 994 (2d Cir. 1974), the

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

exclusion under review did not cover "war, invasion, civil war, revolution, rebellion, insurrection or warlike operations, whether there be a declaration of war or not." The exclusion was silent on what type of entity could conduct warlike action. In *Holiday Inns, Inc. v. Aetna Insurance Co.*, 571 F. Supp. 1416, 1463 (S.D.N.Y. 1983), the exclusion for warlike actions also included no language on what type of entity might carry out warlike operations. The exclusion in *Ennar Latex v. Atlantic Mutual Insurance Co.*, No. 94CIV150, 1995 U.S. Dist. LEXIS 7386, *10 (S.D.N.Y. May 30, 1995), was not a true war exclusion, but excluded coverage for the "consequences of civil war, revolution, rebellion, insurrection, or strife arising therefrom, or from the consequences of the imposition of martial law, military or usurped power or piracy." Finally, *Weiss v. Arab Bank*, No. 06 cv 1623, 2007 U.S. Dist. LEXIS 94029, *13 (E.D.N.Y. Dec. 21, 2007), involved the Anti-Terrorism Act ("ATA"), and thus is completely distinguishable. As discussed more thoroughly below, the ATA provides an avenue of recovery to U.S. nationals injured by an act of international terrorism. But the Act does not apply when the injury is "by reason of an *act of war*." *Id.* (emphasis added). It says nothing about warlike acts.

In short, the plaintiffs' cases involve much narrower exclusions. This makes it all the more damaging to the plaintiffs' position that one of their cases actually supports Atlantic's position. The district court decision in *Pan Am*, which the Second Circuit affirmed, held that fighting between Palestinian forces and Israelis *was* warlike. *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 368 F. Supp. 1098 (S.D.N.Y. 1973). That case involved the hijacking and detonation of an airplane by the Popular Front for the Liberation of Palestine ("PFLP") in Beirut. The PFLP landed the plane and removed all passengers before exploding the aircraft. *Id.* at 1101. The policy excluded loss resulting from war and "warlike operations." And although the court held that the destruction of an airplane was *not* a "warlike operation," it did so only because the PFLP was not "employed by or representing" a government *and* because

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

the event took place "far removed from the locale or the subject of any warfare." *Id.* at 1130. Critically, however, the court also held: "Battles between fedayeen forces and Israelis, bombings of Israeli territory, and other forms of comparable violence, whether called 'guerilla' or 'commando' or whatever, *were probably 'warlike' in a pertinent sense.*" *Id.* (emphasis added). The term "fedayeen" referred to "Palestinian groups … organized, mostly by young men, all dedicated in their ways to Arab reconquest of Palestine." *Id.* at 1106. In short, the Second Circuit concluded that "warlike" refers to actual fighting between Palestinian forces and Israelis in Israel and Palestine—*precisely* what is at issue here. And again, the court reached this conclusion even without policy language making clear that the warlike action can be by any "other authority."

Another case held that fighting between Israeli and Palestinian forces was "warlike." *Hamdi & Ibrahim Mango Co. v. Reliance Ins. Co.*, 291 F.2d 437 (2d Cir. 1961); *Pan Am.*, 368 F. Supp. 1098, *aff'd* 505 F.2d 989 (2nd Cir. 1974). *Hamdi* involved the 1948 war between Israelis and Palestinians. That war began after the U.N. created a Jewish state but not an Islamic one. SGI 95. In *Hamdi*, the insured shipped goods to the sea port of Haifa in Palestine in 1948. Some of the goods were "destroyed by mortar fire during the clash between the Israelis and the Arabs in Haifa." *Id.* at 439. The goods were insured, but the policy at issue contained an exclusion for "warlike operations." *Id.* at 441. The court held that the loss due to the destruction by mortar fire resulted from "warlike operations." *Id.* at 443. Under this case law and the ordinary meaning of "warlike actions" by any "other authority," Exclusion 2 applies.

## 2. *Israel is a Sovereign – And The Plaintiffs Left Because of Israel's Actions*

Plaintiffs must concede that Israel employed its military force as it battled Hamas with its army, navy, and air force. SGI 150, 157, 173, 175. And it was surely the combined effect of Israel's military actions and Hamas's response that made Israel such a dangerous place in July and August 2014. Israel's escalation of the violence

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

caused Hamas to increase its attacks. Hamas made this clear in statements published on the Qassam Brigades' website: that its operations against Israel were "part of the response campaign against the occupation assault on the Gaza Strip, and the continued targeting of Palestinian civilians and their installations in the West Bank." SGI 265. It is also clear from the circumstances and NBCU's own recital of the facts. In early 2014, when the plaintiffs were considering whether to film in Israel, NBCU's security team thought it "highly unlikely" that there would be any real threat of rocket fire into Israel. SGI 123. That all changed, however, when tensions began to escalate in June 2014, after a unity government was formed and the three Israeli teenagers were kidnapped. SGI 112, 134. NBCU's security team opined that after the kidnapping, which caused Israel to deploy soldiers into Palestinian territory, there was a risk for a "broader escalation of hostilities." SGI 137. The security team also advised that *Israeli measures* "may alter the status quo, increasing the potential for related retaliatory attacks or military operations." SGI 138. The security reports on which Smith relied also noted a pattern of "*tit-for-tat exchanges* between the Israeli military and Gaza based militants." SGI 151. As a result of the escalation of hostilities, by July 1, 2014, NBCU's security team no longer viewed Israel as safe, as it had a few months earlier—it began advising *no* travel to Israel. SGI 152. It also noted: "A Gaza war would become more likely if Hamas or other Gaza-based militants responded with several dozen rockets per day into southern Israel over a sustained period. *A broader war would result in a much higher likelihood of Hamas using Fajr-5 rockets, capable of reaching Tel Aviv.*" SGI 143. Smith, the head of security, also stated: "As a consequence of the increasing rate and range of Palestinian rocket and mortar fire, *along with Israel's reported decision to intensify retaliatory airstrikes, there is an increased threat of rocket attacks against Israel towns and cities located at a greater distance from Gaza.*" SGI 154. NBCU's own statements recognize what is indisputable: Israel's attacks were causing significantly increased rocket-fire from Hamas. As a result, it was not only the warlike actions of Hamas that

caused the loss but the warlike actions of Israel, which the plaintiffs cannot dispute is a government, sovereign, or other authority.

**D.    War: The Ordinary Meaning (And the Plaintiffs' More Technical Meaning) Fit the Definition of the 50-Day War**

*1.    The Ordinary Meaning Applies*

Because the "ordinary" and "popular" sense of "war" governs in this case, it is highly relevant that the world populace (including news outlets bearing the NBC name) referred repeatedly to the 2014 conflict as a war. The following is a list, by no means complete, of news outlets that used the word "war" when discussing the conflict: *NBC News*, *MSNBC*, CBS News, CNN, The Wall Street Journal, The New York Times, The Washington Post, Time Magazine, U.S. News and World Report, the Los Angeles Times, The Atlantic, USA Today, The Chicago Tribune, The Chicago Sun Times, The Houston Chronicle, the Denver Post, The Dallas Morning News, Newsday, Haaretz News (an Israeli news outlet), BBC News, The Guardian, The Times of India, The Sydney Morning Herald, China Daily, The Daily Mail, and Salon. SGI 220-52.

Even the plaintiffs' own representatives referred to the conflict as a "war," stating, among other references to war: "A broader *Gaza war* would become more likely if Hamas or other Gaza-based militants responded with several dozen rockets per day into southern Israel over a sustained period. A broader *war* would result in a much higher likelihood of Hamas using Fajr-5 rockets, capable of reaching Tel Aviv." SGI 143. Even one of *Dig*'s cast members, through her lawyer, recognized the conflict amounted to "war." SGI 163. The lawyer wrote to several NBCU employees imploring them to stop production: "We can't imagine the production will continue in a war zone under continuing air raid sirens." SGI 164. After receiving no response, he wrote: "Not the sort of e-mails I expected to be met with silence. Can you guys please

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

let us know what is going on? Would you send your child into a war zone?" SGI 164. Finally, he wrote that "the area is quite literally a war zone." SGI 165.

In addition, world leaders referred to the conflict as a war, including former Secretary of State John Kerry, Hillary Clinton, the Australian Minister of Foreign Affairs, members of the U.S. Congress, and *Israeli* officials (who refuse to negotiate with Hamas because they consider them terrorists). SGI 256-61, 271. In short, the ordinary and popular meaning of "war" governs, and the ordinary and even not-so-ordinary populace around the world chose to use the word "war" to describe the 2014 conflict.

### 2.    There is No Need for a Dichotomy Between War and Terror

The plaintiffs attempt to create a false dichotomy between war and terror. But, in today's world, they *can and do* overlap. The plaintiffs offer 9/11 as a reason that the 50-Day War is *not* a war. They contend that if the degree and severity of a conflict is what matters, then 9/11 was an act of war, which—they argue—it clearly was not. The plaintiffs are apparently unaware that both the United States Supreme Court and the Second Circuit have held that the events of 9/11 *was* an act of war. *Hamdan v. Rumsfeld*, 548 U.S. 557, 594 (2006); *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004); *see also In re September 11 Litig.*, 751 F.3d 86, 89 (2d Cir. 2013). "Two Presidents, several congresses, and the U.S. Supreme Court have characterized the military and political response of the United States to the attacks of September 11 as a 'war.'" *In re September 11 Litig.*, 931 F. Supp. 2d 496 (S.D.N.Y. 2013).  And then-President George Bush, speaking to a joint session of Congress on national television on September 28, 2001, declared that the enemies of freedom—al Qaeda—had committed an act of war on the United States. SGI 262. *In re September 11 Litigation* is particularly important as it held that "an act of terror and devastation that provokes the response of war, itself becomes an 'act of war.'" 931 F. Supp. 2d at 511. This key holding undermines the plaintiffs' position in this case that there must be a stark dichotomy between war and

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S**
**CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

1  terror, or any suggestion that they left only because of Hamas's actions, not those of

2  Israel.

3       The Second Circuit also stated expressly that war and terror can overlap. The

4  case held that the 9/11 attacks were "acts of war" for purposes of the Comprehensive

5  Environmental Response, Compensation, and Liability Act ("CERCLA"), which

6  provides coverage for certain environmental clean-up costs. 751 F.3d at 88-89. The

7  plaintiffs sought costs incurred in remediating a building contaminated by the attack.

8  But because CERCLA does not cover "acts of war," the court concluded that

9  CERCLA did not provide relief. In so holding, the Court rejected the plaintiffs'

10 reliance on cases involving the Anti-Terrorism Act (ATA). The ATA authorizes

11 victims of terror to sue those behind terrorist acts (including those who financially

12 back terrorists). 18 U.S.C. § 2333. It specifically carves out loss sustained "by reason

13 of an act of war." 18 U.S.C. § 2336(a). According to the House Report behind the

14 ATA, the ATA *must* distinguish between war and terrorism to provide recovery for

15 injuries resulting from terrorist activities while barring recovery for injuries caused by

16 military actions of recognized governments engaged in war. H.R. Rep. No. 102-1040

17 at 7 (1992). For that reason, the Second Circuit held that ATA cases are not relevant

18 in other contexts that need not distinguish between war and terror. The court held:

19 "the ATA is designed precisely to differentiate between acts of terrorism and acts of

20 war, while CERCLA is silent as to terrorism. Indeed, in the CERCLA context, an

21 event may be both an act of war and an act of terrorism; under the ATA regime, it

22 may not." 751 F.3d at 93.

23      Similarly, here, there is no need for a complete dichotomy between war and

24 terror. Although the Policy does not explicitly exclude terrorism, it also does not

25 explicitly *grant* coverage for terrorism. It is—like CERCLA—"silent as to terrorism."

26 There is thus no need to strain to distinguish between what is war alone and what is

27 terror alone. Though the "imminent peril" coverage could theoretically apply to

28

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S**
**CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

ANDERSON, McPHARLIN & CONNERS LLP
Lawyers
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

threats of terrorism (car bomb threats, for example), it does not exist for that sole purpose, and normally applies in other situations, such as dangerous weather events. (For example, Atlantic paid Plaintiffs over $2,012,180 in "imminent peril" losses it incurred from the filming of various television shows affected by superstorm Sandy in 2012.) SGI 210. Similarly, the exclusions do not expressly preclude coverage for terror, but they do bar coverage for acts of terror if those acts amount to war or warlike actions by a military force, or involve weapons of war, or involve an insurrection. Thus, while there might well have been coverage under the Policy's imminent peril provision if Plaintiffs had to delay shooting due to a car bomb explosion where they would be filming, the war-related exclusions would preclude coverage if the same filming was postponed or cancelled because Hamas's army had entered Jerusalem through border tunnels and engaged in a ground battle with Israel's military.

There is, in short, no basis for the argument that, in the insurance context, terrorists can never wage war. Just as the Second Circuit and the United States Supreme Court have concluded that the United States' battle with Al-Qaeda constituted war, here Israel's battle with Hamas constituted war. While Hamas has all the vestiges of a quasi-government and a quasi-sovereign, Al-Qaeda is much less formalized. SGI 273. The United States was at war with Al-Qaeda, and Israel was at war with Hamas.

### 3. Even under the Plaintiffs' Definition, There was Still War Because Hamas is a Quasi-Sovereign or De Facto Government

Even if Hamas must be a quasi-sovereign for the war and warlike actions exclusions to apply, it clearly is. *Hamdi*, 291 F.2d 437, holds that Palestinian forces can be de facto governments, as the *Holiday Inns* case recognized. *Holiday Inns* stated that *Hamdi*, which involved another Palestinian organization that desired to take back Israel, was an example of a case involving a "de facto" government—an entity that

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S
CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1   maintains adverse claims to territory and accompanies those claims with declarations

2   of independence and sovereignty—because "the Arabs and Israelis bitterly contested

3   control and sovereignty over that portion of the former Palestine which had been

4   partitioned so as to constitute the new state of Israel." 571 F. Supp. at 1500.

5         Moreover, according to *Pan Am*, a "de facto" government is "a force

6   [controlling] a substantial territory with trappings of state." *Pan Am.*, 505 F.2d at 1009.

7   Hamas has governed the Gaza Strip since 2007. SGI 107-08. It "employs civil service

8   employees in various ministries, including health and education. SGI 115. It also runs

9   an ad hoc judicial system and has "branches that conduct its political, military and

10  social welfare activities." SGI 108, 116. Hamas is a force or authority governing

11  substantial territory with all the trappings of a state. *El-Mezain*, 664 F.3d at 485-486;

12  *Estates of Ungar v. Palestinian Auth.*, 304 F. Supp. 2d at 250; *In re Marzook*, 924 F. Supp.

13  at 568. Even the plaintiffs' own representatives referred to "the Hamas *Government*"

14  and to the "Hamas-governed Gaza Strip." SGI 268-69. And the U.S. Congressional

15  Research Service has stated that the PA, of which Hamas was a part, is, "organized

16  like [a state]—complete with democratic mechanisms; security forces; and executive,

17  legislative, and judicial organs of governance." SGI 114. "The executive branch has

18  both a president and a prime minister-led cabinet, the Palestinian Legislative Council

19  ("PLC") is its legislature, and the judicial branch has separate high courts to decide

20  substantive disputes and to settle constitutional controversies, as well as a High

21  Judicial Council." SGI114. Hamas was elected to control the PLC in 2006. SGI 106.

22  Hamas also controls its side of the Israel-Gaza border and Egypt-Gaza border. SGI

23  275. Moreover, official reports by the U.S. Congressional Research Service and the

24  U.S. State Department refer to Hamas as Gaza's de facto government. SGI 109.

25  **E.      The Political Question Doctrine is Irrelevant Here**

26        The plaintiffs are attempting to turn this case into one with hot political issues,

27  hopefully too hot for this Court to handle. But it simply is not. The plaintiffs contend

28

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S
CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

ANDERSON, MCPHARLIN & CONNERS LLP
Lawyers
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

that it would be against "U.S. Policy" to conclude that Hamas was in control of Gaza and the de facto government there. But there is no list of *quasi*-sovereigns the U.S. maintains that this Court would somehow subvert by acknowledging Hamas's obvious control over Gaza. The plaintiffs certainly offer no such list. And the U.S.'s designation of Hamas as a terrorist organization in no way means that it cannot also be a de facto government. The Secretary of State may designate any "foreign organization" as a "foreign terrorist organization" if it engages in "terrorist activity" threatening the United States—the statute says nothing about whether the organization can be a government. 8 U.S.C. § 1189.

The argument that the political question doctrine applies is meritless. "At the outset, it is important to note that the political question doctrine is a 'narrow exception' to the typical rule that provides that the 'Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid.'" *Ctr. for Biological Diversity v. Hagel*, 80 F. Supp. 3d 991, 1001 (N.D. Cal. 2015) (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012)). That responsibility will sometimes involve resolution of "issues [that] have political implications." *Id.* But it is not proper to apply the political question doctrine "merely because [a court's] decision may have significant political overtones." *Id.* Instead, "not every matter touching on politics is a political question ... and more specifically, ... it is 'error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'" *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 229-30 (1986) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1969)).

In fact, one of the cases the plaintiffs cite holds that this type of issue is not a political question. *Ungar v. PLO*, 402 F.3d 274 (1st Cir. 2005) (vacated and remanded on other grounds). That case involved a suit under the Anti-Terrorism Act against the Palestinian Liberation Organization ("PLO"). The PLO argued that it was protected from the claims by sovereign immunity. To analyze the issue, the court had to decide

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S
CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

whether "the defendants have set forth SGIficient evidence to support their claim of immunity – no more and no less." *Id.* at 280. The court held that the "immunity decision neither signaled an official position on behalf of the United States with respect to the political recognition of Palestine nor amounted to the usurpation of a power committed to some other branch of government." *Id.* at 280-81. The court therefore went on to consider whether the PLO had *sovereign* immunity. *Ungar* supports an obvious conclusion: what this Court decides in the context of an insurance dispute is not an "official position" on what governments the U.S. recognizes. Moreover, the United States Supreme Court recently held that although its precedent has stated that sovereignty is a political question, those statements "referred not to sovereignty in the general, colloquial sense, meaning the exercise of dominion or power … but sovereignty in the narrow, legal sense of the term, meaning a claim of right." *Boumedienne v. Bush*, 553 U.S. 723, 754 (2008). Thus, the Court held, it was perfectly proper to "take notice of the obvious and uncontested fact that the United States, by virtue of its complete jurisdiction and control over [the U.S. base in Guantanamo Bay], maintains *de facto* sovereignty over this territory," even though Cuba had *de jure* sovereignty over it. *Id.* at 755. Here, all Atlantic asks the Court to do is acknowledge the equally obvious and uncontested fact that Hamas has control over Gaza. This will not be an "official position" by the U.S.—it will address the colloquial and general meaning of the "de facto government" and "quasi-sovereign." There is no support for the plaintiffs' reliance on the political question doctrine—it is a specious attempt to avoid the obvious conclusion that Hamas was in control of Gaza.

Moreover, even if the U.S. did maintain official positions on whether entities exercise dominion or control over a territory (which it does not), and even if it were improper for a court to address that question (which *Boumedienne* and *Ungar* reject), Atlantic's proposed holding is *consistent* with official reports by the Congressional

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000

LOS ANGELES, CALIFORNIA 90017-3623

22

1  Research Service and U.S. State Department, which refer to Hamas's control over
2  Gaza and call it Gaza's de facto government. SGI 109.[6]

3  **F.   Weapons of War**

4        The Policy bars coverage for "weapons of war including atomic fission or
5  radioactive force, whether in time of peace or war." The word "including" "should
6  not be used to introduce an exhaustive list, *for it implies that the list is only partial.*"
7  GARNER'S DICTIONARY OF LEGAL USAGE 439 (3d ed. Oxford 2011) (emphasis
8  added). "It is hornbook law that the use of the word including indicates that the
9  specified list … is illustrative, not exclusive." *Puerto Rico Maritime Shipping Auth. v. ICC*,
10 645 F.2d 1102 n.26 (D.C. Cir. 1981). The plaintiffs recast the word "including" as
11 "using." But that it not what it says. Moreover, atomic fission and radioactive force
12 are examples of weapons of war. The citizens of Hiroshima and Nagasaki, Japan
13 would certainly agree. These are forces that are put to grievously violent use in atomic
14 bombs. And the fact that atomic fission may also be used to generate energy is
15 irrelevant. Many substances and objects capable of being weapons are also used for
16 good. With the terrifying advent of germ warfare, germs can be weapons of war, but
17 can also be used to prevent disease through vaccines. That a thing can be used for
18 good or evil does not mean it is not an example of a weapon. And, in the context of
19 germ warfare, the germ itself is the weapon—not the syringe or the gas or any other
20 vehicle used to deliver it—just as here, it is the deadly force of atomic fission and
21 radioactive force that are weapons. The plaintiffs' argument that the phrase "other
22 cause" in Exclusion 5 (barring coverage for "Nuclear reaction or radiation, or
23 radioactive contamination from any other cause") is a reference back to Exclusion 4
24 has no support. Instead, the exclusion plainly bars coverage for radioactive
25 contamination that comes from nuclear reaction or radiation or any other cause.

26
27  [6] And the plaintiffs' own representatives have referred to the "Hamas Government"
    and the "Hamas-governed Gaza strip." SGI 268-69.
28

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S
CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

1  The plaintiffs left out of fear from weapons of war, namely, the rockets,

2  mortars, and missiles that Hamas was firing into Israel. SGI 149, 162, 170. There can

3  be no disputing that these are weapons of war. One California court called a ".50-

4  caliber BMG rifle"—a weapon far less dangerous than a mortar, missile, or rocket—a

5  "weapon of war," reasoning that it had "the capacity to destroy or seriously damage

6  'vital public and private buildings, civilian, police and military vehicles,'" among other

7  things, and that it was not the type of weapon "typically possessed by law-abiding

8  citizens for lawful purposes such as sport hunting or self-defense." *People v. James*, 94

9  Cal. Rptr. 3d 576, 585-86 (Cal. Ct. App. 2009). This definition applies to mortars,

10  rockets, and missiles, as the U.S. Congress has confirmed—the National Firearms Act

11  lists missiles and rockets as "destructive devices." 26 U.S.C.S. § 5845(f). A Senate

12  Report discussing the Act noted that Congress had reached a "specific declaration and

13  finding that … destructive devices (such as bazookas, mortars, antitank guns, bombs,

14  missiles, etc.,) … are primarily weapons of war and have no appropriate sporting use

15  or use for personal protection." S. Rep. No. 90-1501, at 28 (1968) (emphasis added).

16  The plaintiffs' argument that Hamas used weapons of terror versus weapons of war is

17  hollow; the nature of a weapon does not change depending on who wields it.

18  **G.   Atlantic Does Not Concede that the Insuring Clause Applies**

19  To be clear, Atlantic believes that this 50-day war was a sudden, unexpected

20  event. But the plaintiffs have created a problem with their own argument.  They

21  contend that they left Israel because of terrorist conduct that does not rise to the level

22  of war.  If there was nothing out of the ordinary about these attacks, and they do not

23  rise beyond the level of terrorism, then plaintiffs' claim fails because they cannot

24  prove they left Israel as a result of "an unexpected, sudden" occurrence as the Policy

25  requires. SGI 208. Tragically, acts of terrorism in Israel are relatively normal, as the

26  plaintiffs acknowledged in a report prepared assessing whether it would be safe to

27  film in Israel. SGI 124, 127-28. The plaintiffs knew when they went to Israel that

28

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

Hamas might well fire rockets in their general direction while they were there. SGI 125-26. As the plaintiffs' e-mails make clear, the threat posed by rocket-fire into Israel was not a sudden or unexpected risk. Though an all-out war was unexpected and sudden, the plaintiffs, through their stubborn insistence that this was not a war, essentially argue that there was no material difference between the 50-Day War and the usual threat of rocket-fire from Hamas. But the risk of some rocket fire from Hamas was not unexpected and certainly not sudden, and the plaintiffs offer no evidence to the contrary. Summary judgment in their favor is thus not warranted.

## IV. CONCLUSION

The context of this case is tragic and complex, but the issues presented here are not. The plain meaning of the Policy governs, and no one can deny that the plain meaning of "war" encompasses the 2014 50-Day War, which countless people referred to as a war. But even the plaintiffs concede that there is a war or warlike action if Hamas is at least a de facto government. Hamas *controls* Gaza and both the plaintiffs' representatives and agencies of the U.S. Government have referred to it as the de facto government over Gaza. It is also, however, an entity that seeks to destroy and replace the Israeli government because they view Israel as their homeland. This is the very definition of overthrow. And the plaintiffs concede that if the plaintiffs were attempting to overthrow Israel, then coverage cannot apply. For all these reasons and the others discussed above, Atlantic respectfully requests that the Court deny the plaintiffs' motion for summary judgment.

DATED: May 3, 2017

MICHAEL KEELEY *(Pro Hac Vice)*
TONI SCOTT REED *(Pro Hac Vice)*
CARLA C. CRAPSTER *(Pro Hac Vice)*
STRASBURGER & PRICE, LLP
By:   /s/ Michael Keeley
Michael Keeley
Attorneys for Defendant ATLANTIC SPECIALTY
INSURANCE COMPANY

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S
CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**