# EXHIBIT 113

**From:** Garber, Andrea (NBCUniversal)
**Sent:** July 14, 2014 10:03 AM
**To:** Binke, Mark (NBCUniversal);Richmond, Randi (NBCUniversal)
**Cc:** Ford, Kurt B (NBCUniversal)
**Subject:** RE: DIG

Hi, Mark -

We can discuss further on our call.

Thanks,
Andrea

-----Original Message-----
From: Binke, Mark (NBCUniversal)
Sent: Monday, July 14, 2014 9:46 AM
To: Garber, Andrea (NBCUniversal); Richmond, Randi (NBCUniversal)
Cc: Ford, Kurt B (NBCUniversal)
Subject: Re: DIG

What is the criteria for it to be "war"?  Who declares it, govt of israel?


----- Original Message -----
From: Garber, Andrea (NBCUniversal)
Sent: Monday, July 14, 2014 09:41 AM
To: Richmond, Randi (NBCUniversal)
Cc: Binke, Mark (NBCUniversal); Ford, Kurt B (NBCUniversal)
Subject: RE: DIG

Hi, Randi -

At this point, I need a summary of where you are in the production schedule, what you have been advised of by security regarding the imminent peril to your operations, what you are doing to address that (one week push at this time) and how that will impact production. We would like to get this over to the carrier as soon as possible to follow the phone call I had with them on Friday.

If there is an actual "declaration of war" we will have an issue with coverage under the policy because there is a broad exclusion for acts of war.  The exclusion includes "war-like acts" but the carrier did not bring this up when I spoke to them.

I see that you and Mark will be calling in an hour.  Speak to then.

Thanks,
Andrea

-----Original Message-----
From: Richmond, Randi (NBCUniversal)
Sent: Monday, July 14, 2014 9:32 AM
To: Garber, Andrea (NBCUniversal)
Cc: Binke, Mark (NBCUniversal); Ford, Kurt B (NBCUniversal)
Subject: DIG

Andrea what do you need from me with regards to details to start a claim?

Is there any risk of the situation in Israel changing status 'ie: declaration of war' that could impeed us getting a claim?

# EXHIBIT 114

| | |
|---|---|
| **From:** | Binke, Mark (NBCUniversal) ████████████████████ |
| **Sent:** | July 09, 2014 6:34 AM |
| **To:** | Wachtel, Jeff (NBCUniversal);Dolcemaschio, Steve (NBCUniversal);Rothstein, Richard M (NBCUniversal) |
| **Subject:** | Fw: DIG Update |
| **Attachments:** | Israel Update 090714 (4).pdf |

FYI

**From:** Smith, Stephen (NBCUniversal)
**Sent:** Wednesday, July 09, 2014 06:16 AM
**To:** Richmond, Randi (NBCUniversal); Binke, Mark (NBCUniversal)
**Subject:** DIG Update

Hi Randi and Mark,

Please see the DIG update below and attached maps for the situation country wide, details of events over the last 48hrs and a review of the situation similar to this in 2012. I've highlighted what I think are the key points.

**Current Situation**

**Reports indicate that five rockets were fired from the Gaza Strip towards Tel Aviv this morning, July 9. According to initial reports, the rockets were intercepted by Israel's Iron Dome missile defence system. No casualties have been reported.**

Rockets fired towards central Israel, including Jerusalem and Tel Aviv, during the evening hours of July 8. Long-range rockets also impacted in Hadara, north of Tel Aviv.
Overnight, Israel reportedly struck some 160 militant targets in the Gaza Strip, in addition to killing a senior Islamic Jihad leader and members of his family.

Following the firing of numerous rockets towards central Israel on July 8, this morning's barrage indicates that Gaza-based militants, specifically Hamas and Islamic Jihad, are intent on continuing such longer-range attacks. In this context, additional rockets against Tel Aviv, Jerusalem, and other major population centers in central Israel should be expected for the duration of July 9. In line with Israel's overnight response, **Israel is likely to view this morning's barrage as a further escalation and will likely continue to respond with more extensive attacks against the Gaza Strip within the next 24 to 48 hours.**

The IDF strikes on Gaza overnight targets included 120 underground launchers and 10 tunnels, a naval police base and domestic security offices, and the homes of eight senior Hamas member which the army says served as command centres and were used in coordinating the rocket fire on Israel's south.
Egypt brokered a truce in the conflict two years ago, but its military-backed government is hostile toward Islamist Hamas and there were no immediate signs of intervention to halt the current fighting. Talks on a ceasefire are purportedly on going.

Hamas has said it could restore calm if Israel halted the Gaza offensive, once again committed to a 2012 ceasefire truce and freed the prisoners it detained in the West Bank last month, these conditions will not be met.

**Latest from US State Dept. Regional Security Officer Jerusalem**

Things are settling down in some of the East Jerusalem neighbourhoods that have seen the recent clashes.
But things remain "tense" in many of these neighbourhoods.  Friday prayers should be a good indicator on how things are going.
**The Gaza rocket activity is a new and emerging concern.  Very unpredictable.  We had 4 rockets shot towards Jerusalem last night, with reports of at least 3 impacts on the outskirts of Jerusalem.**

**Update from contact  based in Tel Aviv**

**Situation currently in escalation phase following period of relative calm. Current situation likely to last for between 7 and 10 days. Current rocket attacks not causing significant casualties in Israel. Iron Dome missile defence system working but only used for missiles landing near populated areas.** Likely escalation in Israel response with air and missile attacks targeting remotely operated and hidden rocket launchers and targeted killings of Hamas operatives. No appetite from Israeli Arab population for an uprising.

**Embassy and Vendor Info**

- US Consulate in Tel Aviv operating with "minimal staffing".
- No update on advice from State Dept.
- FCO updated on current incidences of rocket fire and retaliatory strikes and no travel zones, situational awareness
- **No advice to leave country or not to travel to Israel from any government authority or vendor.**

 Overall travel risk rating raised to MEDIUM due to escalating conflict with Gaza-based militants by Control Risk/International SOS one of our security vendors.

**Current Security Advice**

Those operating or residing in the 40-80 km range of the Gaza Strip, including Tel Aviv and Jerusalem, should adhere to all IDF Home Front Command guidelines regarding early warning sirens for incoming rockets. In case you hear a siren, seek shelter in a protected area and remain inside for at least 10 minutes.
No travel within 20 km of the Gaza Strip at this time.
Avoid nonessential travel within 20-40 km of the Gaza Strip due to increasing cross border violence. Adhere to all IDF Home Front Command guidelines regarding early warning sirens for incoming rockets. In case you hear a siren, seek shelter in a protected area and remain inside for at least 10 minutes.
As a general security precaution, those operating or residing in Israel, particularly within the 20-40 km range of the Gaza Strip, should ensure that contingency and emergency  are updated due to the potential for a further deterioration in the security situation. For the duration of July 8 and
In the coming days, those operating or residing in Jerusalem are advised to avoid travel to the areas of Shuafat, Beit Hanina, Silwan, and Wadi al-Joz, as well as the vicinity of the Temple Mount/al-Aqsa Mosque Compound and the Damascus Gate given the potential for further unrest. Maintain heightened vigilance throughout East Jerusalem and the Old City for the same reason. Avoid nonessential travel to Arab-Israeli towns, particularly Nazareth, I'billin, Qalansawe,

**Upcoming Locations**

- Tel Aviv

- Netzer-Sireni
- Haifa
- Jerusalem
- Nebi-Musa
- Kfar Edomim
- Jaffa

**Key Factors to Consider**

**Fluid, rapidly changing and unpredictable situation**
**Different Risk appetites for locals and non-Israeli cast and crew**
Crew have been issued with advice on no travel areas and emergency response processes
Location scouts continuing with mostly local team
Next block of filming due to recommence on the 20th July through 7th August
Air defence system operating effectively
Additional training for non-local staff on emergency response procedures
     Comparison with previous events

**Stephen Smith**
**Head of Security, Europe**
**International Security & Crisis Management**

+44 (0) 20 3618 5082 (office)

**NBCUniversal**
NBCUniversal International
1 Central St Giles
St Giles High Street
London WC2H 8NU
United Kingdom
www.nbcuni.com

# NBCUniversal

NBCUniversal **O&TS** Operations & Technical Services | **Global Security**

## Israel Dig Update

This document is current as of 09 July 2014. Any updates will be completed by Stephen Smith/Chris Biggs. The document may be shared internally.

**Compiled:** 09 July 2014
**Compiled by:** Chris Biggs
**Distribution:**

| Name | Role |
|---|---|
| Stephen Smith | Head of Security, Europe |

**Current Situation:**

| Situation Name | Dig Production |
|---|---|
| Unit/Business Affected | |
| Location | Jerusalem, Tel Aviv, Haifa |
| Dates | July 2014 |



**SitRep Update**

**NBCUniversal**                    **O&TS**
                        Operations & Technical Services | **Global Security**

The Israeli air force expanded its offensive against Hamas militants in Gaza early Wednesday, as rocket fire on Israel's south, center and coastal plain continued.

Israel has attacked more than 160 targets since Tuesday and more than 170 rockets have been fired from Gaza during the same period, according to Israel Defense Forces estimates. Long-range rockets have reached Tel Aviv, Jerusalem and as far north as Hadera. The Iron Dome defense system has intercepted more than 45 rockets in the last 24 hours.

The IDF strikes on Gaza overnight targeted some 120 underground launchers and 10 tunnels, a naval police base and domestic security offices, and the homes of eight senior Hamas member which the army says served as command centres and were used in coordinating the rocket fire on Israel's south.

Egypt brokered a truce in the conflict two years ago, but its military-backed government is hostile toward Islamist Hamas and there were no immediate signs of intervention to halt the current fighting. Talks on a ceasefire are purportedly on going.

Hamas has said it could restore calm if Israel halted the Gaza offensive, once again committed to a 2012 ceasefire truce and freed the prisoners it detained in the West Bank last month.

**Incidents 09 07 14**

- Gaza death toll between 25-35, with at least 300 injured.

- Iron Dome defense system deployed near Jerusalem, following large amounts of long range missiles fired from Gaza.

- Public bomb shelters opened in Tel Aviv and Jerusalem.

- Hamas claims responsibility for firing of 4 rockets on Jerusalem, 4 on Tel Aviv, 12 on Ashdod and 1 on Haifa.

- 5 Rockets fired towards Tel Aviv, 4 intercepted successfully, 1 landed in the sea, no injuries. Rockets aimed at Ben Gurion Airport.

- Rocket fired towards Jerusalem hit a residents building in Jerusalem, no injuries reported.

- Due to rocket attacks, U.S. Embassy in Tel Aviv to operate in minimal staffing.

- The European hospital in Gaza has been hit by Israel fighter jets, casualties reported.

- Rocket landed in Hadera area, city between Tel Aviv and Haifa, 60 miles from Gaza.

- Gunmen from Hamas landed on the shore near Zikim adjacent to the Gaza border, where a kibbutz and a military base are located. Four gunmen were killed.

NBCUniversal



Global Security

**Operation Pillar of Defence (14 – 21 November 2012)**

Operation Pillar of Defence was an eight-day Israel Defence Forces (IDF) operation in the Hamas-governed Gaza Strip, officially launched on 14 November 2012 with the killing of Ahmed Jabari, chief of the Gaza military wing of Hamas.

The operation was preceded by a period with a number of mutual Israeli–Palestinian responsive attacks. According to the Israeli government, the operation began in response to the launch of over 100 rockets at Israel during a 24-hour period, an attack by Gaza militants on an Israeli military patrol jeep within Israeli borders, and an explosion caused by IEDs, which occurred near Israeli soldiers, on the Israeli side of a tunnel passing under the Israeli West Bank barrier. The Israeli government stated that the aims of the military operation were to halt rocket attacks against civilian targets originating from the Gaza Strip and to disrupt the capabilities of militant organizations.

During the course of the operation, the IDF claimed to have struck more than 1,500 sites in the Gaza Strip, including rocket launchpads, weapon depots, government facilities, and apartment blocks. Gaza officials said 133 Palestinians had been killed in the conflict: 79 militants, 53 civilians, and a policeman. They estimated that 840 Palestinians were wounded.

During the operation, Hamas, the al-Qassam Brigades and the Palestinian Islamic Jihad (PIJ) further intensified their rocket attacks on Israeli cities and towns firing over 1,456 rockets into Israel, and an additional 142 which fell inside Gaza itself. Palestinian militant groups used weapons including Iranian-madeFajr-5, Russian-made Grad rockets, Qassams, and mortars. Some of these weapons were fired into Rishon LeZion, Beersheba, Ashdod, Ashkelon, and other population centres. Tel Aviv was hit for the first time since the 1991 Gulf War, and rockets were fired at Jerusalem. The rockets killed three Israeli civilians in a direct hit on a home in Kiryat Malachi.

By the end of the operation, six Israelis had been killed, two hundred forty were injured, and more than two hundred had been treated for anxiety. About 421 rockets were intercepted by Israel's Iron Dome missile defence system, another 142 fell on Gaza itself, 875 fell in open areas, and 58 hit urban areas in Israel. A bus in Tel Aviv was bombed by an Arab-Israeli, injuring 28 civilians

The conflict sparked widespread protests in the West Bank, leading to an upsurge in clashes between Palestinians and the IDF. On 14 November, two Israelis were lightly injured when their vehicle was stoned near Gush Etzion. The road from Jerusalem to Gush Etzion was closed as a result of fierce protests.

On 18 November, a 31-year-old Palestinian man participating in a demonstration in Nabi Saleh was killed by Israeli fire. The IDF, which described the protest as "illegal and violent", launched an investigation into the incident. By 19 November, over 50 Palestinians had been reported injured during solidarity protests held in East Jerusalem, Ramallah, Bethlehem, Beit Ummar, and Qalandia.

**Latest Updates Wednesday 9 July 2014:**

**2:58 P.M.** Two additional rockets intercepted over Sderot. (Gili Cohen)

**NBCUniversal**    **O&TS** NBCUniversal Operations & Technical Services    **Global Security**

**2:40 P.M.** Hamas claims responsibility for the rocket fire on Israel's north. The attack was aimed at Haifa, the group says. (Jack Khoury)

**2:30 P.M.** Fires break out at two locations in the Sha'ar Hanegev Regional Council due to rocket explosions. (Shirley Seidler)

**2:24 P.M.** Rocket sirens sound in Zichron Ya'akov, north of Hadera. Sirens also sound in the Hof Hacarmel Regional Council and the Sharon Plain. (Eli Ashkenazi)

**2:20 P.M.** Two rockets fired from Gaza are intercepted over the southern Israeli city of Sderot. (Shirley Seidler)

**2:00 P.M.** The Iron Dome intercepts a rocket fired from Gaza toward the southern Israeli city of Kiryat Gat. (Shirley Seidler)

**1:24 P.M.** Three rockets explode in the Be'er Tuvia Regional Council; no damage reported. Two other rockets hit, one in a town in the Yoav Regional Council and another in an open area in the Eshkol Regional Council. (Shirley Seidler)

**1:11 P.M.** A rocket explodes in a town in the Eshkol Regional Council; the siren fails to sound. Another rocket explodes near a kibbutz in the Sha'ar Hanegev Regional Council, sparking a fire. (Shirley Seidler)

**12:40 P.M.** A father and son were killed in an Israeli airstrike in Gaza, the Palestinian news agency Ma'an reports.

**12:30 P.M.** *Defense Minister Moshe Ya'alon says during a security briefing that the operation against Hamas is to be expanded in the coming days.* According to Ya'alon, the Israeli strikes in Gaza have destroyed weapons, terror infrastructure, command centers, Hamas institution, government buildings and terrorists' homes.

"We are killing terrorists of different ranks, and this operation will persist and intensify," he says. "For our part, this doesn't have to be a short battle. We will continue hitting Hamas and other terrorist groups hard."

**12:10 P.M.** A spokesman for the Egyptian president says that intensive efforts to negotiate a cease-fire between Israel and Hamas are ongoing. (Jack Khoury)

**12:09 P.M.** A rocket explodes near Kiryat Malakhi, sparking a fire at a farm. Two other rockets hit open areas in the Eshkol Regional Council. (Shirley Seidler)

**12:05 P.M.** Sirens go off in Be'er Tuvia and Gedera; sounds of explosions ensue. Evidently, rockets fired toward the area were intercepted.

Iron Dome intercepts three rockets fired toward Ashdod. (Gili Cohen)

**11:50 A.M.** The IDF confirms that an antiaircraft missile, evidently a Strela, was fired toward an Israeli air force plane after the start of Operation Protective Edge. (Gili Cohen)

NBCUniversal  Global Security

**11:36 A.M.** Palestinian sources say an 80-year-old woman has been killed in an IDF attack on central Gaza. (Jack Khoury)

**10:40 A.M.** Rocket intercepted over Ashkelon, another strikes near school; several people suffering from shock (Shirley Seidler).

**10:25 A.M.** Vandals spray paint anti-Arab slogans in several Jerusalem neighborhoods; police open an investigation. (Nir Hasson)

**10:10 A.M.** Palestinian President Mahmoud Abbas asks Egyptian President Abdel-Fattah al-Sissi to intervene in the escalating violence between Israel and militants in Gaza. Abbas says he has spoken with Hamas leaders, who are interested in a cease-fire. The Egyptian envoy in the Palestinian Authority says that talks between the sides are ongoing but an agreement has yet to be reached. (Jack Khoury)

**10:05 A.M.** The rockets that were fired on central Israel earlier Wednesday were aimed at Ben-Gurion Airport, Palestinian sources report. (Jack Khoury)

The Iron Dome intercepts a rocket fired toward Ashdod. (Shirley Seidler)

**9:54 A.M.** An IAF strike in Beit Hanoun in northern Gaza kills a motorcyclist and wounds one other person.

Hamas claims responsibility for rockets fired on Tel Aviv earlier Wednesday. (Jack Khoury)

**9:40 A.M.** The Israel Air Force strikes targets in the Gaza Strip. (Gili Cohen)

**9:33 A.M.** 24 Palestinians have been killed and 200 wounded since start of operation on Monday night, according the Gaza health ministry.

**8:50 A.M.** The Iron Dome missile defense system intercepts two rockets fired toward central Israel. (Gili Cohen)

**8:42 A.M.** Two rockets explode in the Eshkol Regional Council; a farm is damaged. (Shirley Seidler)

**8:30 A.M.** Rocket sirens ring across central Israel; explosions heard. (Haaretz)

**8:26 A.M.** Two rockets explode near a town in the Shaar Hanegev Regional Council. (Shirley Seidler)

**8:15 A.M.** Since the launch of the IAF's Operation Protective Edge on Monday night, 225 rockets were fired from Gaza toward Israel; 40 were intercepted by the Iron Dome. The air force has struck 434 targets in Gaza so far as part of the operation.

**Additional Maps**



# NBCUniversal



# EXHIBIT 115

| From: | Smith, Stephen (NBCUniversal) |
|---|---|
| Sent: | July 21, 2014 4:17 AM |
| To: | Binke, Mark (NBCUniversal) |
| Cc: | Richmond, Randi (NBCUniversal) |
| Subject: | Security Update |

Mark,

Security summary for the past 48 hours;

No overall deescalation but a decrease in rocket fire from Gaza to Israel whilst ground offensive is underway. Disturbances in a number of cities in Israel. No change to NBC security position. At this time there has been no deescalation in the the conflict and the threat to personnel resulting in serious injury or loss of life remains considerable and there are no current security controls that would allow NBCU Security to guarantee the safety and security of our personnel without the prospect of serious injury or loss of life

Despite Hamas and Israel agreeing to a "humanitarian ceasefire" in the Gaza City neighborhood of Shujaiyya to last from 13:30-15:30 (local time), reports indicate that the truce collapsed within an hour. The ceasefire was brokered by the International Committee of the Red Cross (ICRC).

Meanwhile, the IDF Spokesperson Unit stated that they found 10 tunnel openings in Shujaiyya, while claiming that the area is central for Hamas operations and that 140 rockets have been fired into Israel from the neighborhood since the beginning of "Operation Protective Edge" July 8.

- Decrease in number of rockets being launched at central Israel, while there has been a notable decrease in overall rocket fire towards the country from the Gaza Strip with only a number of rockets reportedly landing in open areas within the Eshkol Regional Council
- A large demonstration was reported in the West Bank City of Ramallah during the afternoon hours of July 20 with minor clashes being recorded

During the early morning hours of July 20, the Israel Defense Forces (IDF) Spokespersons Unit confirmed that the military expanded ground operations in the Gaza Strip with unconfirmed reports indicating that the expansion was initiated during the overnight hours of July 19-20. Reports indicate that as part of the operations, the IDF began shelling parts of eastern Gaza City, particularly the neighborhood of Shujaiyya.

Reports indicate that at least 17 Israeli soldiers have been injured thus far.

The Spokespersons unit also stated that 70 Hamas militants were killed during the IDF ground operations as of the late night on July 19. Reports also indicate that the entrance to a large tunnel leading to the Gaza Strip was uncovered near Netiv Ha'asara during the morning hours of July 20.

- During the morning hours of July 20, Color Red Alert sirens were reported in two separate incidents, separated by approximately one hour, in central Israeli cities of Raanana, Herzliya with rockets reportedly intercepted over north Tel Aviv and Rishon Letzion by the Iron Dome missile defense system. Meanwhile, several barrages of

rockets were reportedly fired towards Ashkelon and Beer Sheva, along with other locales within the 40 km range of the Gaza Strip border. One direct hit was reported in Ashkelon, leading to damage to nearby buildings, but no reports of injuries.

- Meanwhile, reports indicate that the anti-war demonstrations in Haifa in the late evening hours of July 19 devolved into unrest as right wing activists attacked the demonstrators with bottles and stones. During the incident, a bus was also stoned, while several police officers were reportedly injured as they were arresting members from both sides of the clashes. Reports indicate that police used stun-grenades and water cannons to disperse the crowds.
- Several arrests were also reported in Tel Aviv during confrontations as right-wing activists reportedly attempted to disrupt an anti-war demonstration at Habima Square. Additionally, reports indicate that Arab youths staged riots in East Jerusalem, throwing stones and Molotov cocktails at security forces in Issawiya, Shuafat, Tur, and at the Qalandiya checkpoint.


Sent from my iPad

# EXHIBIT 116

| From: | Smith, Stephen (NBCUniversal) ██████████████████ |
|---|---|
| Sent: | June 16, 2014 11:46 AM |
| To: | Potter, Paige (NBCUniversal) |
| Cc: | Hallock, Whitney (NBCUniversal);Yass, Warren (NBCUniversal);Gray, Debbie (NBCUniversal);Araujo, Charlie (NBCUniversal);Richmond, Randi (NBCUniversal);Binke, Mark (NBCUniversal);Rothstein, Richard M (NBCUniversal) |
| Subject: | Update: Dig Security Situation |

All,

Current Security Situation

**Israel & Palestinian Territories Tactical: Search continues for abducted Israeli youths.**

- Deterioration in general security situation effecting East Jerusalem and areas bordering the West Bank in particular.
- Increase in security and military activity.
- Increase in demonstrations/ disturbances and violent attacks.
- The security situation remains fluid and subject to rapid change.
- In the past 48 hours, the extent of Israeli military operations in Hebron and its environs have significantly increased, highlighted by the deployment of over 2,500 IDF soldiers to the area. While at this time operations remain limited to searches and intelligence gathering, Israeli military build ups, deployment of Iron Dome missile batteries, and limited activation of military reserves, suggest that the IDF is prepared for broader altercations, including armed confrontations with militants, civil unrest in Palestinian urban centers, or a more significant military offensive. However, at this time the IDF continues to remain focused on preventing the transfer of the captives from the West Bank in general, and the Hebron area in particular, underlined by military closures and restrictions on movement in Hebron, and throughout the entirety of the Palestinian Territories.  That said, it remains possible that the captives have already been transferred to the Gaza Strip or Sinai Peninsula.
- During the evening hours of June 15, a shooting incident was recorded along Highway 60 near Bethlehem, with unconfirmed reports indicating that the shooting originated from a vehicle and was directed toward a Border Police checkpoint located in a tunnel. No injuries were recorded; however, heightened security has been reported in the area, while gunshot casings were discovered in the vicinity. At the time of writing, Highway 60 has been closed to traffic from Jerusalem to the Gush Etzion area.
- In addition, reports indicate that scuffles broke out in the vicinity of Jerusalem's Damascus Gate between Arab residents and Jewish individuals returning from the Western Wall, with bottles and rocks thrown.
- Further reports indicate that several Jewish youth threw rocks at a Palestinian vehicle near Beit Illit, while residents of Ariel blocked a nearby road to Palestinian traffic during a gathering in the evening hours of June 15.
- Finally, exchanges of gunfire have been recorded in the vicinity of a home in Hebron, also during the evening hours of June 15, with the reported use of an explosive charge open the door. IDF reinforcements have been dispatched to the city. Clashes have also been reported between Palestinian protesters and Israeli security forces in the vicinity of the Ofer Prison, located three kilometers southwest of Ramallah, and near the village of Hawara, south of Nablus.

Pre production Actions

Pre production technical site visits by International Security and local vendor MAX security completed.
Security risk assessment completed.
Crisis management planning completed.
Security briefing containing situational awareness,travel security advice, security escalation and response process etc. completed and cast and crew briefed.
Stephen Smith from International Security present during first week of filming in Old City and Muslim Quarter.
Intel exchange with security vendors, International Security Analyst, Erin Noordeloos, OSAC.
Meeting with US Embassy RSO Jerusalem by Stephen Smith.

Current Actions

Update to staff on security issues, situational awareness and no travel areas to be issued tonight/tomorrow.
Filming at Damascus Gate/Old City rearranged from this week to next.
No current issues with filming in Jaffa or Ramle.
Increase in location security personnel arranged.
Daily updates from Stephen Smith to Randi Richmond and wider group as required.
Daily updates from MAX security to Stephen Smith.
Intel monitoring and reporting.

I will update as I receive further information.

Regards

Stephen

Sent from my iPad

On 16 Jun 2014, at 17:41, "Potter, Paige (NBCUniversal)"  wrote:

Hi All,

Confirming 11AM PST. Please use the below dial-in and passcode. I will send an Outlook invite shortly.



Best,
Paige Potter
Universal Cable Productions



100 Universal City Plaza

Building 1440/13th Floor

**From:** Hallock, Whitney (NBCUniversal)
**Sent:** Monday, June 16, 2014 9:36 AM
**To:** Smith, Stephen (NBCUniversal); Potter, Paige (NBCUniversal); Yass, Warren (NBCUniversal); Gray, Debbie (NBCUniversal)
**Subject:** RE: CALL: Dig Security Situation

Richard Rothstein is avail.

**From:** Smith, Stephen (NBCUniversal)
**Sent:** Monday, June 16, 2014 9:17 AM
**To:** Potter, Paige (NBCUniversal); Yass, Warren (NBCUniversal); Hallock, Whitney (NBCUniversal); Gray, Debbie (NBCUniversal)
**Subject:** Re: CALL: Dig Security Situation

I am available.

**From:** Potter, Paige (NBCUniversal)
**Sent:** Monday, June 16, 2014 05:13 PM
**To:** Yass, Warren (NBCUniversal); Hallock, Whitney (NBCUniversal); Gray, Debbie (NBCUniversal); Smith, Stephen (NBCUniversal)
**Subject:** CALL: Dig Security Situation

Hello All,

Per Randi Richmond's request, would you or your exec be available for a call today to discuss the Dig security issue? Randi is available from 11AM PST- 5PM PST.

Attendees,
Mark Binke
Stephen Smith
Brian Brady
Erin Noordeloos
Richard Rothstein
Randi Richmond

Best,
Paige Potter
Universal Cable Productions

F: 818-866-2562
100 Universal City Plaza
Building 1440/13th Floor

# EXHIBIT 117

| From: | Smith, Stephen (NBCUniversal) |
|---|---|
| Sent: | May 01, 2014 3:15 AM |
| To: | Richmond, Randi (NBCUniversal) |
| Subject: | RE: DIG in Israel |

Good Morning Randi,

Thank you for the update.

To ensure the security at the venue and that provided by the dignitaries attending the event provide the required level of protection I will visit the venue when in-country to assess.

I am in contact with our news team in Tele Aviv to ensure we have accurate and timely information relating to any direct threats to the production and in general changes to the security landscape. I have also engaged with MAX security.

Peace talks between Palestinian representatives and Israel have stalled in recent weeks, and the new agreement between Fatah, the Palestinian faction engaged in negotiations, and Hamas, considered a terrorist organisation by the US and Israel, has decreased the likelihood of a comprehensive peace accord and may also effect the threat level in certain areas. We monitor events such as this to measure the impact they have on threat levels and changes to the risk profile of specific productions and locations.

I have reviewed the current crisis response capability in-country with our contractors and have identified the following resources available over and above the location security and response available from MAX Security. When locations, numbers of personnel involved and their nationality etc. have been confirmed I will update further.

The following resource can be called upon; (The numbers represent the number of vendors available)

- Air Ambulance 16
- Air Charter 15
- Rotary 5
- Security Providers 10
- Maritime Security Providers 4
- Medical Service Providers 4
- Medical Escort Providers 8
- Repatriation Mortal Remains 4
- Specialist Services 5

Nearest Centre's of Medical Excellence

Israel has 1st world healthcare available. With 4 doctors per every 1000 members of the population.

Evacuation Options



Political Considerations
.    Benign / Safe borders - Can change daily
.    Local Closed Source Advisors - 5
.    Stable Political Governance - Yes
.    Kidnap and Ransom Capability - Yes
.    Significant Political Events imminent - No

I will keep you update as events progress.

Regards

Stephen


-----Original Message-----
From: Richmond, Randi (NBCUniversal)
Sent: 30 April 2014 20:17
To: Smith, Stephen (NBCUniversal)
Subject: DIG in Israel

Stephan I wanted to bring you up to speed on something we are planning.
On May 27th we are planning a publicity cocktail reception followed by our cast dinner at the Mamilla Hotel in Jerusalem.
http://www.mamillahotel.com

The cocktail reception, in the hotel, will include numerous dignitaries and ministers of parliament as well as the Mayor of Jerusalem alongside our producers and cast.
Dinner will be only cast and crew on the roof top.
I am not sure if this requires anything more from your end outside of typical hotel security as well as those the ministers likely travel with.

Let me know if you need more details.

Also, I was curious if the tensions in Israel have risen with the peace talk breakdown. Is this something that needs monitoring? I believe you are working on a crisis plan should anything get heated.
Please confirm.

Thank you.

Randi Richmond
VP, Production, UCP / NBCUniversal

818 777 4657 off

# EXHIBIT 118

| | |
|---|---|
| **From:** | Richmond, Randi (NBCUniversal) |
| **Sent:** | June 14, 2014 5:16 AM |
| **To:** | Smith, Stephen (NBCUniversal) |
| **Subject:** | Fw: PM to Kerry: Feared abductions a result of Hamas entry into government | The Times of Israel |

Fyi. We have added a day in the old city. We will be shooting thursday night 6/19 from 6p until 6a near Armenian church and damascas gate. Please keep an eye on this issue and advise.

**From:** Jay Footlik
**Sent:** Friday, June 13, 2014 03:52 PM Pacific Standard Time
**To:** Richmond, Randi (NBCUniversal)
**Subject:** PM to Kerry: Feared abductions a result of Hamas entry into government | The Times of Israel

Good we're not in Jerusalem next week.  Could be heightened tensions and certainly heightened security.

http://www.timesofisrael.com/livni-urges-kerry-to-help-locate-missing-teens/

# PM to Kerry: Feared abductions a result of Hamas entry into government

Prime Minister Benjamin Netanyahu told US Secretary of State John Kerry on Friday that since the announcement of a unity government between the Fatah-led PLO and Hamas in April, "the situation on the ground has been destructive."

Netanyahu and Kerry were speaking in a scheduled conversation following the feared kidnappings of three teenage yeshiva students in the West Bank overnight Thursday.



"This is the result of letting a murderous terrorist organization enter the Palestinian government," the PM said.

Netanyahu said Friday he holds Palestinian Authority President Mahmoud Abbas responsible for their well-being.

Kerry also spoke Friday with Abbas regarding the suspected abduction. According to Israel Radio, the secretary of state expressed his concern for the welfare of the three youths and said he hoped they would soon be reunited with their families.

"We are working with the government of Israel and with the Palestinian Authority to try to ensure the situation is resolved quickly and that the three teenagers are safely reunited with their families," State Department spokeswoman Marie Harf said Friday

General Adnan al-Damiri, spokesman for the Palestinian Authority's security services, described Netanyahu's remarks, holding Abbas accountable, as "mad."

He said the PA had no authority in the Gush Etzion area, a settlement bloc under total Israeli civilian and military control.

"Even if there was an earthquake, Netanyahu would blame the Palestinian Authority," he told AFP.

Another Palestinian official said the PA security services were "cooperating" with Israel to gather information on the teenagers' disappearance.

At a meeting in London Friday, Justice Minister Tzipi Livni urged Kerry to help secure the safe release of the three yeshiva students by working alongside Abbas to locate the teenagers.

Israel's security forces were continuing their large-scale operation Friday to locate the three teenagers, and roadblocks were set up around the West Bank to prevent the possible transfer of the three to the Gaza Strip.

The searches were focused around the Palestinian village of Dura and the South Hebron Hills, according to reports.

A senior defense official said that Israel was operating on the working assumption that the feared kidnappings were a hostage situation.

The official told Channel 2 that authorities were waiting for better intelligence surrounding the events or for a Palestinian group to take responsibility. A Salafist jihadi organization called Dawlat al Islam issued a claim of responsibility for the incident, but it was not clear whether the claim had any credibility.

Brig. Gen. Motti Almoz, the commander of the IDF Spokesperson's Unit, said Friday evening that security forces were doing everything possible to locate the youths.

Earlier Friday, US Ambassador in Israel Dan Shapiro was briefed on the fact that one of the three teenagers was a dual Israeli-American citizen.

Palestinian prisoners in Israel were celebrating the news of the feared kidnappings, according to Channel 2. Over 100 Palestinian prisoners have been on hunger strike to protest their detention without charge.

A senior Islamic Jihad official on Friday called on Palestinians to kidnap Israeli citizens, arguing that Israel had proven in the past that it was willing to negotiate the release of Palestinian security prisoners in exchange for the lives of its civilians.

Palestinian Islamists have repeatedly called to kidnap Israelis, including to use them as bargaining chips to extract the release of Palestinian security prisoners.

The Ezzedine al-Qassam Brigades,the armed branch of Hamas, issued a statement warning that "the occupier will never have security," but without referring specifically to the missing three.

The Prime Minister's Office said Friday that, since the beginning of the year, the Shin Bet has foiled 14 attempts to kidnap Israelis.

Netanyahu called the families of the three teenagers, urging them to stay strong, and telling them the State of Israel would do everything possible for their sons. He promised to keep them updated.

Netanyahu met Friday with Defense Minister Moshe Yaalon, Public Security Minister Yitzhak Aharonovitch, IDF Chief-of-Staff Lt.-Gen. Benny Gantz and the Shin Bet at the Defense Ministry headquarters in Tel Aviv for a security assessment.

The three students were reported missing Thursday night after witnesses said they had been seen hitching rides home at around 10 p.m. from their yeshiva in Gush Etzion.

The IDF spokesperson's office said they lost contact with the three Thursday overnight.

"Since the morning, we have been engaged in operational activity designed to find [them] and bring them [back]," said Almoz. "Over the past several hours, there has been a very large intelligence effort to try and determine what happened with those youths since they disappeared."

Facts that might interfere with the ongoing investigation, he said, were being withheld at this time.

A torched car with Israeli license plates was found in an undisclosed location in the West Bank, the IDF said, adding that checks were underway to determine the connection, if any.



A burnt car which may be connected to the disappearance of three Israeli teenagers in the West Bank is taken away near Hebron, Friday, June 13, 2014. (Photo credit: AP/Nasser Shiyoukhi)

Earlier Friday, Palestinian media reported a firefight between Israeli military forces and Palestinian gunmen in the South Hebron Hills region. According to a report in the Palestinian Ma'an news agency, large IDF forces raided the village of Yatta in the Hebron region and searched houses there. The military had set up road blocks in the area.

*AFP contributed to this report.*

Sent from my iPhone

# EXHIBIT 119

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 1

1          CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

2

3                   UNITED STATES DISTRICT COURT

4                  CENTRAL DISTRICT OF CALIFORNIA

5                        WESTERN DIVISION

6    _____
                                   )
7    UNIVERSAL CABLE               )
     PRODUCTIONS LLC, a            )
8    Delaware limited             )
     liability company, and       )
9    NORTHERN ENTERTAINMENT        )
     PRODUCTIONS LLC, a            )
10   Delaware limited             )
     liability company,           )
11                                 )
              Plaintiffs,          )
12                                 )
        vs.                        ) Case No.
13                                 ) 2:16-cv-04435-PA-MRW
     ATLANTIC SPECIALTY            )
14   INSURANCE COMPANY, a New )
     York insurance company,       )
15                                 )
              Defendants.          )
16   _____)

17

18       VIDEOTAPED DEPOSITION OF STEPHEN SMITH

19              Los Angeles, California

20              Tuesday, April 18, 2017

21                    Volume I

22   Reported by:
     LORI M. BARKLEY
23   CSR No. 6426

24   Job No. 2588512

25   PAGES 1 - 392

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 2

```
 1       UNITED STATES DISTRICT COURT
 2       CENTRAL DISTRICT OF CALIFORNIA
 3              WESTERN DIVISION
 4
 5   _____
     UNIVERSAL CABLE      )
 6   PRODUCTIONS LLC, a    )
     Delaware limited      )
 7   liability company, and )
     NORTHERN ENTERTAINMENT )
 8   PRODUCTIONS LLC, a    )
     Delaware limited      )
 9   liability company,    )
                           )
10        Plaintiffs,      )
                           )
11   vs.              ) Case No.
                      ) 2:16-cv-04435-PA-MRW
12   ATLANTIC SPECIALTY    )
     INSURANCE COMPANY, a New )
13   York insurance company, )
                           )
14        Defendants.     )
     _____)
15
16
17       Videotaped deposition of STEPHEN SMITH,
18   Volume I, taken on behalf of Defendant, at 11377 West
19   Olympic Boulevard, 9th Floor, Los Angeles,
20   California, beginning at 9:12 a.m. and ending at 7:23
21   p.m., on Tuesday, April 18, 2017, before LORI M.
22   BARKLEY, Certified Shorthand Reporter No. 6426.
23
24
25
```

Page 3

```
 1  APPEARANCES:
 2  For Plaintiff:
 3    MITCHELL SILBERBERG & KNAPP LLP
 4    BY: DANIEL M. HAYES
 5    Attorney at Law
 6    11377 West Olympic Boulevard
 7    Los Angeles, California 90064-1683
 8    310.312.3216
 9    dmh@msk.com
10  For Defendant:
11    STRASBURGER & PRICE, LLP
12    BY: TONI SCOTT REED
13    Attorney at Law
14    901 Main Street, Suite 6000
15    Dallas, Texas 75202-3794
16    214.651.4345
17    toni.reed@strasburger.com
18
19  Also Present:
20    Tania Hoff
21    (Vice President Litigation
22     NBCUniversal Television Group)
23
24  Videographer:
25    Grant Cihlar
```

Page 4

```
 1              INDEX
 2  WITNESS            EXAMINATION
 3  STEPHEN SMITH
 4  Volume I
 5
 6      BY MS. SCOTT REED         22
 7
 8
 9          EXHIBITS
10  NUMBER       DESCRIPTION       PAGE
11  Exhibit 101  Second Amended Notice of taking   27
12      Deposition of Stephen Smith
13
14  Exhibit 102  Max Security Intelligence      114
15      Report, dated July 17, 2014,
16      Bates numbered UCP18093 through
17      UCP18097
18
19  Exhibit 103  Travel Tracker Report from      164
20      Control Risks and International
21      SOS, Bates Stamped UCP2306
22      through UCP2307
23
24
25
```

Page 5

```
 1  INDEX (Continued):
 2          EXHIBITS
 3  NUMBER       DESCRIPTION       PAGE
 4  Exhibit 104  Travel Tracker Proactive E-mail,   176
 5      dated April 21, 2014, Bates
 6      numbers UCP2606 through UCP2607
 7
 8  Exhibit 105  E-mail String, Bates numbers      182
 9      UCP3562 through UCP3564
10
11  Exhibit 106  E-mail String, dated May 22,      184
12      2014, Bates number UCP1877
13      through UCP1887
14
15  Exhibit 107  E-mail String, Bates numbered      203
16      UCP1873 through UCP1876
17
18  Exhibit 108  Article printed off of the link    206
19      www.timesofisrael.com
20
21  Exhibit 109  Notice of Corporate            190
22      Representative Deposition
23
24
25
```

2 (Pages 2 - 5)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 18

1  INDEX (Continued):
2              EXHIBITS
3  NUMBER         DESCRIPTION        PAGE
4  Exhibit 182  Max Security Intelligence      378
5            Report, dated July 11, 2014
6
7  Exhibit 183  Max Security Intelligence      379
8            Report, dated July 12, 2014
9
10 Exhibit 184  Max Security Intelligence      380
11            Report, dated July 12, 2014
12
13 Exhibit 185  E-mail String between Steve    380
14            Smith and Mr. Binkie and
15            Ms. Richmond, dated July 14,
16            2014
17
18 Exhibit 186  Max Security Intelligence      381
19            Report, dated July 15, 2014
20
21 Exhibit 187  Max Security Intelligence      381
22            Report, dated July 15, 2014
23
24
25

Page 20

1  INDEX (Continued):
2
3         INSTRUCTION NOT TO ANSWER
4         Page    Line
5         197     15
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 19

1  INDEX (Continued):
2              EXHIBITS
3  NUMBER         DESCRIPTION        PAGE
4  Exhibit 188  Max Security Intelligence      382
5            Report, dated July 15, 2014
6
7  Exhibit 189  Max Security Intelligence      383
8            Report, dated July 15, 2014
9
10 Exhibit 190  Max Security Intelligence      383
11            Report, dated July 16, 2014
12
13 Exhibit 191  Max Security Intelligence      384
14            Report, dated July 16, 2014
15
16 Exhibit 192  E-mail from Steve Smith to     385
17            Mr. Binkie copied to
18            Ms. Richmond, dated July 16,
19            2014
20
21 Exhibit 193  Security Alert, dated July 16, 387
22            2014
23
24
25

Page 21

1    Los Angeles, California, Tuesday, April 18, 2017
2              9:12 a.m.
3
4        VIDEO OPERATOR:  Good morning.  We're on the
5   record.  The time is 9:12 a.m., on April 18th, 2017.
6        This is the video recorded deposition of
7   Stephen Smith.  My name is Grant Cihlar, here with
8   our court reporter, Lori Barkley.  We are here from
9   Veritext Legal Solutions at the request of counsel
10  for Defendant.
11        This deposition is being held at Mitchell
12  Silberberg & Knapp LLP in Los Angeles, California.
13        The caption of this case is University Cable
14  Productions, et al., versus Atlantic Specialty
15  Insurance Company.
16        The case number is 216-cv-04435-PA-MRW.
17        Please note that audio and video recording
18  will take place unless all parties agree to go off
19  the record.  Microphones are sensitive and may pick
20  up whispers, private conversations, and cellular
21  interference.
22        I am a notary public.  I am not related to
23  any party in this action, nor am I financially
24  interested in the outcome in any way.
25        If there are any objections to proceeding,

6 (Pages 18 - 21)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 22

1 please state them at the time of your appearance,
2 beginning with the noticing attorney.
3      MS. SCOTT REED:  Good morning.  I'm Toni
4 Scott Reed of Strasburger & Price.  I represent the
5 defendant, Atlantic Specialty Insurance Company.
6      MR. HAYES:  Dan Hayes of Mitchell
7 Silberberg & Knapp LLP on behalf of Plaintiffs.
8      VIDEO OPERATOR:  Thank you.
9      The witness may be sworn in and counsel may
10 begin the examination.
11
12      STEPHEN SMITH,
13 having been administered an oath, was examined and
14 testified as follows:
15
16      EXAMINATION
17 BY MS. SCOTT REED:
18   Q.  Good morning, sir.
19   A.  Good morning.
20   Q.  Would you please state your full name for
21 the record.
22   A.  Stephen David Smith.
23   Q.  Mr. Smith, my name is Toni Scott Reed, and
24 as I said in the introduction for this deposition
25 today, I represent the defendant, Atlantic Specialty

Page 23

1 Insurance Company.
2      Do you understand that?
3   A.  I do.
4   Q.  Are you aware that there is a civil lawsuit
5 that is being litigated in a Federal District Court
6 in California, United States, between Universal Cable
7 Productions and Northern Entertainment Production as
8 Plaintiffs and Atlantic Specialty as Defendant?
9   A.  Yes.
10   Q.  Have you been made aware of the pleadings
11 that are in that lawsuit?
12   A.  I don't understand what that means.
13   Q.  Have you reviewed any of the filings that
14 have been made with the federal court?
15   A.  Yes.
16   Q.  Which ones have you reviewed?
17   A.  I reviewed a lot of different filings.
18   Q.  Did you review the complaint?
19   A.  Not to my knowledge.
20   Q.  That's what starts the lawsuit.  You don't
21 believe you have?
22   A.  No, I don't -- I don't believe I have.
23   Q.  Have you reviewed the answer that was filed
24 by Atlantic Specialty in the lawsuit?
25   A.  No, not as far as I'm aware.

Page 24

1   Q.  What sorts of documents were you referring
2 to when you gave an affirmative answer about review?
3      MR. HAYES:  Object to any information that
4 calls for attorney/client privileged communications
5 in terms of what documents I decided to show him to
6 prepare him for this deposition.
7 BY MS. SCOTT REED:
8   Q.  You may answer, sir.
9   A.  Can you repeat the question?
10   Q.  What sorts of documents were you referring
11 to when you gave an affirmative answer about review?
12   A.  E-bills and reports relating to my part in
13 this event.
14   Q.  And what was your part in this event?
15   A.  I was the, at the time, the head of security
16 for NBCUniversal.
17   Q.  Who's your current employer?
18   A.  NBCUniversal.
19      MR. HAYES:  Toni, I don't mean to interrupt
20 your flow, but I think now is probably a good time to
21 put on the record what we discussed before the
22 deposition began.
23      MS. SCOTT REED:  I will get to it very
24 shortly, Counsel.
25   Q.  What is your current title, please, sir?

Page 25

1   A.  Director international security.
2   Q.  How long have you held that post?
3   A.  For two years, approximately.
4   Q.  Was that a promotion?
5   A.  It was.
6   Q.  What position did you hold before?
7   A.  Head of security, Europe.
8   Q.  And when did you receive that promotion?
9   A.  Approximately two years ago, yeah, around
10 about this time two years ago.
11   Q.  Can you say about what time of year in terms
12 of month?
13   A.  Not exactly.
14   Q.  General:  Spring, summer?
15   A.  April, you know, roundabout spring.
16   Q.  Approximately April of 2015?
17   A.  Correct, to the best of my recollection.
18   Q.  And you work for NBCUniversal, not
19 NBCUniversal International?
20   A.  I -- I don't know which entity is on my
21 contract, to be quite -- to be quite frank.
22   Q.  What's your best understanding of your
23 employer's name?
24   A.  NBCUniversal.
25   Q.  Can you tell me what that is?

7 (Pages 22 - 25)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 26

1    A.   It's a media organization.
2    Q.   What does it do?
3    A.   It makes movies, TV shows, and runs theme
4 parks.
5    Q.   Anything else?
6    A.   Well, I'm -- no, very generally television.
7 It does TV news.
8    Q.   TV news under what banners or names?
9    A.   NBC News, MSNBC, CNBC.
10   Q.   Any others?
11   A.   I don't know.
12       MR. HAYES:  Okay.  So I feel -- I feel
13 compelled to -- to clarify the record here.
14       Mr. Smith is being presented here right now
15 in his individual capacity.  That was what was
16 noticed.  He's testifying in his individual capacity.
17       I made you aware before the deposition began
18 that after his individual deposition is concluded,
19 we're willing to allow you to ask him questions in
20 his capacity as a designee for plaintiffs in response
21 to certain Rule 30(b)(6) topics, specifically
22 Topics 19 and 30.
23       As you know, Plaintiffs have objected to
24 those topics among others, including on the basis
25 that they call for legal conclusions.

Page 27

1       As we discussed in our meet and confer, we
2 do not intend our witness to answer questions that
3 would require him to apply law to fact or make legal
4 conclusions.  However, we are prepared to offer
5 Mr. Smith to testify about the facts regarding the
6 conflict in and around the production locations in
7 Israel that were considered in deciding to leave
8 Israel when the 30(b)(6) portion of his deposition
9 begins.
10       But to be clear, right now, presently
11 Mr. Smith is testifying in his individual capacity.
12 BY MS. SCOTT REED:
13   Q.   Mr. Smith, your counsel seems determined to
14 dictate the order, so out of gentility, I will go
15 with it that way.
16       I'll go ahead and give you a deposition
17 notice that you can review, and you can tell me
18 you're appearing here in this capacity.
19       Let me hand you Atlantic 101, please, sir.
20       (Exhibit 101 was marked for identification by
21 the court reporter and is attached hereto.)
22       MR. HAYES:  Thank you.
23 BY MS. SCOTT REED:
24   Q.   Can you identify Atlantic 101 as a Second
25 Amended Notice of Taking Deposition of Stephen Smith?

Page 28

1       MR. HAYES:  You can answer, if you know.
2       MS. SCOTT REED:  Counsel, I'm going to
3 object to coaching the witness.
4       MR. HAYES:  By saying that he can answer?
5 Okay.
6       THE WITNESS:  I didn't realize it was a
7 question, sorry.
8 BY MS. SCOTT REED:
9    Q.   The question was:  Can you identify
10 Atlantic 101 as a Second Amended Notice of Taking
11 Deposition of Stephen Smith?
12   A.   And that is this documentation here?
13   Q.   Yes, sir.
14   A.   All right.  Yes, I can.
15   Q.   Have you seen that document before today?
16   A.   No.
17   Q.   Are you appearing here pursuant to a request
18 that your deposition be given in this case?
19   A.   As far as I'm aware.
20       MR. HAYES:  Toni, I have a housekeeping
21 matter, if we could go off the record, just with --
22 with respect to how you're numbering the exhibits.
23       VIDEO OPERATOR:  Off the record?
24       THE REPORTER:  Toni, is that okay?
25       VIDEO OPERATOR:  We are off the record.  The

Page 29

1 time is 9:22 a.m.
2       MS. SCOTT REED:  Don't you think we should
3 do that on the record, Dan?
4       MR. HAYES:  We can if you'd like, but --
5       VIDEO OPERATOR:  Should we go back --
6       MR. HAYES:  It's up to Toni.  If she wants
7 to go back on the record, that's fine, but I'd like
8 for you to hear what I have to say first, so you can
9 decide whether you want it on the record.
10       THE REPORTER:  Toni, off the record or on
11 the record?
12       MS. SCOTT REED:  We'll be off right now.
13       THE REPORTER:  Okay.
14       MS. SCOTT REED:  Thank you.
15
16       (Whereupon a discussion was held off
17       the record.)
18
19       VIDEO OPERATOR:  We're back on the record.
20 The time is 9:24 a.m.
21       Please continue.
22 BY MS. SCOTT REED:
23   Q.   Mr. Smith, off the record there was a
24 discussion about why this is numbered 101, and it's
25 purposefully done, so today we're going to begin the

8 (Pages 26 - 29)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 30

1 numbering at 101, and I will be showing you a number
2 of documents and they're going to be numbered
3 sequentially after that.
4     Do you understand that?
5   A.  Yes.
6   Q.  And is that acceptable with you?
7   A.  Yes.
8   Q.  Very good.
9     So when we went off the record at your
10 counsel's request, we were discussing this notice of
11 deposition.  You're appearing here today based upon
12 your understanding that you have been requested to
13 testify in the case, correct?
14  A.  Yes.
15  Q.  And based upon your familiarity with the
16 matter that's in dispute, do you agree that you do
17 have personal knowledge about events that relate to
18 that dispute?
19  A.  Yes.
20  Q.  And can you tell me generally what you
21 believe your personal knowledge to be in terms of
22 subject matter, broad subject matter?
23    MR. HAYES:  Objection, vague.
24    THE WITNESS:  The security situation around
25 production in Israel.

Page 31

1 BY MS. SCOTT REED:
2   Q.  Anything else?
3   A.  That's in very -- very broad terms.
4   Q.  Were you personally involved in monitoring
5 and reporting the security situation in and around
6 Israel?
7   A.  I was.
8     MR. HAYES:  Objection, vague.
9 BY MS. SCOTT REED:
10  Q.  And specifically, were you involved in
11 reviewing and reporting the security situation around
12 Israel associated with a production that's referred
13 to as "Dig"?
14    MR. HAYES:  Same objection.
15    You can answer.
16    THE WITNESS:  Yes.
17 BY MS. SCOTT REED:
18  Q.  Do you know what Dig is?
19    MR. HAYES:  Objection, vague.
20    Go ahead.
21    THE WITNESS:  It's -- it was a TV
22 production.
23 BY MS. SCOTT REED:
24  Q.  Can you tell me about it generally?
25  A.  In terms of the premise of the production?

Page 32

1   Q.  Just generally what you came to know about
2 the production.
3   A.  The production came from the U.S. to Israel
4 to film.
5     And do you want to know what the premise of
6 the story was?  Or the actual production?
7   Q.  The actual production, if you will, please,
8 sir.
9     MR. HAYES:  Objection, vague.
10    THE WITNESS:  The -- the production had a
11 number of personnel and -- from the United States,
12 and -- sorry, from North America, working with an
13 Israeli production company to make the production Dig
14 in various locations in Israel.
15 BY MS. SCOTT REED:
16  Q.  Can you tell me generally what those various
17 locations were?
18  A.  I can't tell you all of them.  They included
19 Jaffa.  They included various areas within Jerusalem.
20  Q.  Any others?
21  A.  I -- I can't recall.  It's three years ago,
22 the exact names of them.
23  Q.  Mr. Smith, let me go back to the time that
24 you were holding the title of head of security for
25 Europe for NBCUniversal.

Page 33

1     What years did you hold that position,
2 please, sir?
3   A.  I joined universal in 2013, and I was
4 promoted in 2015.
5   Q.  What was the first position you held in
6 2013?
7   A.  Head of security Europe.
8   Q.  Did you have a physical office location in
9 connection with that job?
10  A.  Yes.
11  Q.  Where was your physical office located?
12  A.  London.
13  Q.  Were you ever located or officed any other
14 place as your central location?
15  A.  What do you mean by "central"?
16  Q.  Well, your home base, if you will.
17    MR. HAYES:  Objection, vague.
18    THE WITNESS:  No.
19 BY MS. SCOTT REED:
20  Q.  And what is your work address?
21  A.  No. 1 --
22    THE REPORTER:  No. 1 what?
23    THE WITNESS:  St. Giles High Street.  One.
24 BY MS. SCOTT REED:
25  Q.  And has that been the same address the

9 (Pages 30 - 33)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 34

1 entire time you worked for NBCUniversal?
2    A.  No.  I previously was based at 55 New Oxford
3 Street, which is also in London.
4    Q.  And what were you at that address?
5    A.  From 2013 probably till about November 2014,
6 I can't be exact, though.
7    Q.  What was the reason for your physical
8 location move?
9
10       (Whereupon Ms. Hoff entered the
11       deposition proceedings.)
12
13       THE WITNESS:  I have no idea, to be honest,
14 why they decided to move us.
15 BY MS. SCOTT REED:
16    Q.  Everyone at your office location moved to
17 another office location?
18    A.  People moved around, that was all it was.
19 It was only 50 meters between the two buildings.
20    Q.  While you have been employed by
21 NBCUniversal, have you always been home based in
22 London?
23    A.  In terms of my permanent base?
24    Q.  Yes, sir.
25    A.  Yes.

Page 35

1    Q.  Did you have a non-permanent base?
2       MR. HAYES:  Objection, vague.
3       THE WITNESS:  I honestly don't understand
4 what that means.
5 BY MS. SCOTT REED:
6    Q.  Well, you were the one who described that
7 as -- in terms of your permanent base.
8       Do you recall that?
9    A.  Yes, London's my permanent base.
10    Q.  All right.
11    A.  Yeah.
12    Q.  And so I was just trying to figure out if
13 there is a distinction in terms of another alternate
14 location you have or part-time location?
15       MR. HAYES:  Objection, vague.
16       THE WITNESS:  I work right across
17 international.
18 BY MS. SCOTT REED:
19    Q.  I'm sorry?
20    A.  I work across all of international, so
21 that's outside of the Americas.
22    Q.  That's presently?
23    A.  Yes.
24    Q.  When you were head of security Europe, what
25 was your territory?

Page 36

1       MR. HAYES:  Objection, vague.
2       THE WITNESS:  My territory was wherever I
3 was asked to work.
4       MS. SCOTT REED:  Could we have an
5 announcement of the entry to the room, please?
6       MR. HAYES:  Sure.  This is Tania Hoff.
7       MS. HOFF:  NBCUniversal.
8       MS. SCOTT REED:  Thank you.
9    Q.  When you were head of security Europe, did
10 you have colleagues who were head of security for
11 other geographic regions of the world?
12    A.  Yes.  There were people who were in
13 different positions in geographical regions.
14    Q.  Can you tell me who they were?
15    A.  And we had Erin Noordeloos, who was director
16 international security.  We had, at that time, Brian
17 Brady, who was vice-presidents based out of L.A.  We
18 have, and had, Tom McCarthy, chief security officer,
19 based in New York.
20    Q.  Any others?
21    A.  We had Tom McFadden based in New York.
22    Q.  What is his title?
23    A.  VP, global security.
24    Q.  Any others?
25    A.  At the time we had Don Bradley.

Page 37

1    Q.  What was his title?
2    A.  I believe he was a director.
3    Q.  Director of?
4    A.  Director, global security.
5    Q.  Was there any other person who had a
6 designation as head of security for a geographic area
7 other than Europe?
8    A.  I can't recall.
9    Q.  Did I understand earlier that you were
10 indicating your territory as head of security Europe
11 was anything outside of the Americas?
12       MR. HAYES:  Objection, vague, misstates
13 testimony.
14       THE WITNESS:  The -- the title refers to the
15 European landmass, but I would work anywhere where I
16 was asked to work.
17 BY MS. SCOTT REED:
18    Q.  Can you give me examples outside of Europe
19 where you were asked for work while you were head of
20 security Europe?
21    A.  Israel, South Africa, China, Singapore.  I
22 can't recall any other destinations when I was head
23 of security for Europe.
24    Q.  And what were you asked to do in Israel?
25       MR. HAYES:  Objection, vague.

10 (Pages 34 - 37)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 38

1    THE WITNESS: My role with the company is
2 security risk management. I manage risk for the
3 business, identify risk.
4 BY MS. SCOTT REED:
5    Q. What projects were you asked to handle in
6 Israel, or productions if that's a more precise way
7 to ask it?
8    A. I was asked to support the Dig production
9 from our security crisis management role.
10    Q. What is the security crisis management role?
11    A. To insure we can keep our personnel, our
12 assets, our reputation, and our content safe and
13 secure, and mitigate risk.
14    Q. Did you ever support any other productions
15 in Israel?
16    A. Not to my knowledge.
17    Q. What about in your career, over the course
18 of your career, have you handled security related to
19 any other production that was ongoing in Israel?
20    MR. HAYES: Objection, vague.
21    THE WITNESS: Not to my knowledge.
22 BY MS. SCOTT REED:
23    Q. To the best of your recollection, was the
24 Dig production the first where you had needed to
25 oversee security within or around Israel?

Page 39

1    MR. HAYES: Objection, vague.
2    THE WITNESS: Can you -- can you repeat the
3 question, please.
4 BY MS. SCOTT REED:
5    Q. To the best of your recollection, was the
6 Dig production the first production where you had
7 needed to oversee security for something that was
8 being produced in and around Israel?
9    A. Yes.
10    MR. HAYES: Same objection.
11 BY MS. SCOTT REED:
12    Q. Do you have any experience in security with
13 the broader Middle East?
14    MR. HAYES: Objection, vague.
15    THE WITNESS: I'd -- I'd ask you to clarify
16 the question. It's a very, very broad question
17 you've asked here. What --
18 BY MS. SCOTT REED:
19    Q. In the course of your career, specifically
20 focusing on security operations --
21    A. Yeah.
22    Q. -- have you been involved in productions in
23 the Middle East? And I'm describing that as broader
24 than just Israel.
25    MR. HAYES: Objection, vague.

Page 40

1    THE WITNESS: I'm not sure that was the same
2 question you asked me the first time, so I'm getting
3 a bit confused here what exactly the question is.
4 BY MS. SCOTT REED:
5    Q. Well, I had asked you: Other than Dig, had
6 you ever worked on security for anything that was
7 produced in Israel?
8    A. No.
9    Q. You told me you had not. So I'm broadening
10 to discuss the Middle East region.
11    Have you worked in connection with security
12 in the Middle East region on any productions?
13    A. No.
14    MR. HAYES: Objection, vague.
15 BY MS. SCOTT REED:
16    Q. Let me focus back, please, sir.
17    At the time when you were head of security
18 Europe, can you describe for me your job duties?
19    A. I was responsible for the security of
20 personnel, assets, events, content, and company
21 reputation for the United Kingdom and Europe.
22    Q. And can you describe for the court more
23 particularly what that means you would actually do as
24 your work?
25    A. I had a fairly broad agreement that would

Page 41

1 include assessing risk to all of the categories I
2 previously mentioned, mitigating risk, writing
3 security protocols and policy, designing security
4 systems, producing security reports, conducting
5 security assessments.
6    Q. Anything else you can think of?
7    A. Identifying and mitigating risk is the
8 primary role, and responding to emergency and crisis
9 situations.
10    Q. Did you personally have involvement in the
11 decision to move the Dig production out of Israel?
12    MR. HAYES: Objection, vague.
13    THE WITNESS: I provided information to the
14 company regarding the security situation in Israel.
15 BY MS. SCOTT REED:
16    Q. Did you make any recommendations about what
17 should happen with production based upon the
18 information that you provided?
19    A. I did.
20    Q. And what was or were the recommendations?
21    A. At --
22    MR. HAYES: Objection, vague.
23    THE WITNESS: At what point? Is there a
24 specific date that this question refers to?
25

11 (Pages 38 - 41)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 42

1 BY MS. SCOTT REED:
2    Q.  Let me see if you can help me narrow that
3 down.
4        The subject matter I was covering was the
5 decision to move the production of Dig out of Israel,
6 so is there a particular timeframe when you provided
7 one or more recommendations?
8    A.  Yes, there is.
9    Q.  All right.  Will you start with the
10 earliest?
11   A.  You -- sorry.  I'm -- I would need to see
12 paperwork to get us in the correct chronological
13 order.  You know, this is three years ago now.
14       I provided information continuously when the
15 production was being planned, when it was active,
16 during the process of the decision making to remove
17 the production, and post that decision.
18   Q.  And the subject matter I'm focusing on right
19 now is the actual decision that was made to move
20 production out of Israel.  And my question to you
21 was:  Did you make a recommendation in regard to that
22 decision?
23       MR. HAYES:  Objection, vague.
24       THE WITNESS:  I provided the company with
25 recommendations regarding the security situation and

Page 43

1 the security of personnel in Israel.
2 BY MS. SCOTT REED:
3    Q.  Did you make a recommendation as to whether
4 production should be moved at any particular time?
5    A.  I would need to see the -- the actual
6 paperwork, so I can say "yes" or "no," I provided a
7 recommendation around a security situation, and
8 whether we, given the security situation, could
9 guarantee the safety and security of personnel.
10   Q.  So separate and apart from reviewing
11 documents, you do not have an independent
12 recollection today about whether you made an actual
13 recommendation on whether production should be moved?
14       MR. HAYES:  Objection, misstates his
15 testimony.
16       THE WITNESS:  I don't know.
17 BY MS. SCOTT REED:
18   Q.  So sitting here today, you don't know if you
19 made a recommendation about whether production should
20 be moved?
21       MR. HAYES:  Same objection.
22       THE WITNESS:  I don't know.  I would need to
23 see the paperwork to find the exact wording of what
24 my recommendation was.  I made recommendations to the
25 security situation in Israel.

Page 44

1 BY MS. SCOTT REED:
2    Q.  So separate and apart from the particular
3 wording, let me ask you as a security professional,
4 what recommendations did you provide in connection
5 with the decision to move Dig out of Israel?
6    A.  I stated to the company that we could not
7 guarantee the safety or security of personnel in
8 Israel given the security situation, and after
9 assessment from multiple sources of the risk.
10   Q.  So your recommendation related to the
11 guarantee of safety or security of personnel?
12       MR. HAYES:  Objection, misstates testimony.
13       THE WITNESS:  I would need to see the -- the
14 actual -- the paperwork that supports that to be able
15 to answer that question.
16 BY MS. SCOTT REED:
17   Q.  Okay.  Separate and apart from the wording
18 that was -- that was eventually put on paper, can you
19 tell me as a security professional conceptually
20 speaking what your recommendation was about whether
21 production should be moved out of Israel?
22       MR. HAYES:  Objection, vague.
23       THE WITNESS:  As I said previously, I would
24 need to see the paperwork to be able to answer that
25 question in the way its being put to me.  I made a

Page 45

1 recommendation that we could not guarantee the -- the
2 safety and security of personnel in Israel.
3 BY MS. SCOTT REED:
4    Q.  Anything else that you recall independent of
5 looking at the papers?
6    A.  I carried out an --
7       THE REPORTER:  I carried out a what?
8       THE WITNESS:  I carried out an assessment of
9 risk before, during, and after the production,
10 measuring risk, from multiple sources of information,
11 and presenting my findings to the company, to make a
12 decision.
13 BY MS. SCOTT REED:
14   Q.  All right -- pardon me, I'm sorry.  I'm
15 focusing at this point on the particular timing about
16 recommendations of whether to move the production out
17 of Israel.
18       Other than what you've discussed regarding
19 inability to guarantee safety and security of
20 personnel, are there any other recommendations that
21 you recall providing in connection with the decision
22 to move Dig out of Israel?
23       MR. HAYES:  Objection, asked and answered.
24       THE WITNESS:  I provided recommendations as
25 I said previously before, during, and after.

12 (Pages 42 - 45)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 46

1 BY MS. SCOTT REED:
2    Q.   If --
3    A.   -- the production was in place and I'm not
4 able to say without looking at the paperwork exactly
5 what those recommendations were.
6    Q.   What about specifically the timing when the
7 decision was made to move Dig out of Israel, do you
8 recall any other recommendations that you made
9 particular to that time?
10        MR. HAYES:  Objection, vague, asked and
11 answered.
12        THE WITNESS:  I would have to see the
13 paperwork to give you an answer to that question.
14 BY MS. SCOTT REED:
15    Q.   All right, sir.  Have you given a deposition
16 in a United States civil case before today?
17    A.   No.
18    Q.   Have you given a deposition in any sort of
19 legal proceeding before today?
20    A.   Where we -- I've not given a deposition, no.
21    Q.   Have you given some other form of testimony?
22    A.   Yes.
23    Q.   And what was that, please, sir?
24    A.   I've given witness statements, I've given
25 evidence, and I've been a witness.

13 (Pages 46 - 49)

Veritext Legal Solutions

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 56

1   Q.  Aitken.  Do you report to Mr. Aitken?
2   A.  Yes.
3   Q.  Is he your boss in the organizational chart?
4   A.  Yes.
5   Q.  And which of the other personnel report to
6  you?
7   A.  All of the other personnel excluding Gur
8  Uppal.
9   Q.  And to whom does Gur report?
10   A.  No.  Gur, G-U-R, G-U-R, Gur.
11   Q.  Gur?
12   A.  No.  Gur, G-U-R.
13   Q.  G-U-R, Gur.
14   A.  Yeah.  And he reports directly to
15  Mr. Aitken.
16   Q.  Will you go back to the summer of 2014,
17  please, sir, when the Dig production was in Israel
18  and then moving out of Israel, was there an
19  international security and crisis management group or
20  division then?
21   A.  Yes.
22   Q.  And can you tell me who made up that
23  division this summer of 2014?
24   A.  Erin Noordeloos, director, international
25  security.

Page 57

1       Stephen Smith, head of security Europe.
2       Chris Biggs, security analyst, international
3  security.
4       Kathleen Mullins, PA and projects
5  coordinator, international security.
6       And, Rebecca Cameron, director, business
7  continuity.
8       No, sorry.  I'm not sure, business
9  continuity manager, not director, sorry.
10   Q.  And was Erin Noordeloos a male or female?
11   A.  A female.
12   Q.  Female Erin?
13   A.  Yes.
14   Q.  Did you report to Ms. Noordeloos at that
15  time?
16   A.  Yes.
17   Q.  And did the remainder of the personnel
18  you've identified report to you?
19   A.  No.  They reported to Ms. Noordeloos.
20   Q.  All right.  So the four of you were direct
21  reports to Ms. Noordeloos?
22   A.  Yes.
23   Q.  In the summer of 2014 when you were working
24  in connection with the Dig production, did you have
25  direct reports who reported to you for purposes of

15 (Pages 54 - 57)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 58

1 their work?
2    A. No, no.
3    Q. Is international security and crisis
4 management a division or section of NBCUniversal?
5       MR. HAYES: Objection, vague.
6       THE WITNESS: Yes.
7 BY MS. SCOTT REED:
8    Q. How do you describe it?
9    A. It is part of the Global Security
10 Organization.
11    Q. What else is part of the Global Security
12 Organization for NBCUniversal?
13       MR. HAYES: Objection, vague.
14       THE WITNESS: We have security personnel in
15 a number of locations, business continuity, disaster
16 recovery personnel, in a number of locations.
17 BY MS. SCOTT REED:
18    Q. And all that makes up Global Security
19 Organization?
20       MR. HAYES: Objection, lacks foundation.
21       THE WITNESS: Yes.
22 BY MS. SCOTT REED:
23    Q. Are there any other groups or divisions that
24 fall within this umbrella of Global Security
25 Organization?

Page 59

1       MR. HAYES: Objection, vague and lacks
2 foundation.
3       THE WITNESS: Environment and health and
4 safety fall within the group as well.
5 BY MS. SCOTT REED:
6    Q. Is risk management a part of Global Security
7 Organization?
8    A. No.
9    Q. Where does risk management fall under the
10 organization of NBCUniversal?
11    A. I don't know.
12       MR. HAYES: Objection, vague, lacks
13 foundation.
14 BY MS. SCOTT REED:
15    Q. As part of your work in the international
16 security and crisis management, do you have occasion
17 to interact with risk management?
18    A. I have had.
19    Q. On Dig did you interact with risk
20 management?
21       MR. HAYES: Objection, vague, lacks
22 foundation.
23       THE WITNESS: Yes.
24 BY MS. SCOTT REED:
25    Q. Who within risk management?

Page 60

1    A. I can't remember.
2    Q. What interaction did you have with risk
3 management in connection with Dig?
4       MR. HAYES: Objection, vague, lacks
5 foundation.
6       THE WITNESS: To my recollection, exchange
7 of information.
8 BY MS. SCOTT REED:
9    Q. Were you providing the information or
10 receiving the information?
11       MR. HAYES: Same objections.
12       THE WITNESS: I can't recall.
13 BY MS. SCOTT REED:
14    Q. Do you provide -- do you recall providing
15 information of any kind to risk management?
16       MR. HAYES: Same objections.
17       THE WITNESS: I can't recall.
18 BY MS. SCOTT REED:
19    Q. Will you need to be refreshed with
20 documents?
21    A. It would help.
22    Q. Can you remember the reason that you were
23 interacting with risk management?
24       MR. HAYES: Objection, vague, lacks
25 foundation.

Page 61

1       THE WITNESS: I can't recall.
2 BY MS. SCOTT REED:
3    Q. Do you have a specific memory that you did
4 have interaction with risk management on the Dig
5 project?
6       MR. HAYES: Objection, vague, lacks
7 foundation.
8       THE WITNESS: Yes.
9 BY MS. SCOTT REED:
10    Q. Do you remember with how many personnel
11 within risk management?
12       MR. HAYES: Same objections.
13       THE WITNESS: No.
14 BY MS. SCOTT REED:
15    Q. To the best of your understanding, is risk
16 management a separate division under the NBCUniversal
17 umbrella, so to speak?
18       MR. HAYES: Same objections.
19       THE WITNESS: Separate from what?
20 BY MS. SCOTT REED:
21    Q. International security and crisis
22 management.
23       MR. HAYES: Same objections.
24 BY MS. SCOTT REED:
25    Q. Or pardon me, Global Security or the Global

16 (Pages 58 - 61)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 62

1 Security Organization.
2       MR. HAYES: Same objections.
3       THE WITNESS: Yes.
4 BY MS. SCOTT REED:
5    Q.  Did you know any of the personnel who worked
6 in risk management?
7       MR. HAYES: Same objections.
8       THE WITNESS: No.
9 BY MS. SCOTT REED:
10   Q.  When you interacted with risk management on
11 Dig, would that have been the first time you were
12 introduced to risk management?
13      MR. HAYES: Same objections.
14      THE WITNESS: To NBCUniversal risk
15 management?
16 BY MS. SCOTT REED:
17   Q.  Yes, sir.
18   A.  Yes.
19   Q.  What was your understanding of the reason
20 you were interacting with risk management on the Dig
21 project?
22      MR. HAYES: Same objections.  Vague, lacks
23 foundation.
24      THE WITNESS: I provide information to a
25 number of functions.

Page 63

1 BY MS. SCOTT REED:
2    Q.  Did someone tell you that you needed to
3 provide information to that function?
4       MR. HAYES: Same objections.
5       THE WITNESS: I can't recall.
6 BY MS. SCOTT REED:
7    Q.  Would you have to review the documents in
8 order to determine that?
9       MR. HAYES: Same objections.
10      THE WITNESS: It would help.
11 BY MS. SCOTT REED:
12   Q.  In your work for NBCUniversal, outside of
13 Dig, have you ever had another occasion to interact
14 with risk management?
15      MR. HAYES: Same objections.
16      THE WITNESS: I can't recall.
17 BY MS. SCOTT REED:
18   Q.  Do you know one way or the other sitting
19 here today?
20   A.  No.
21   Q.  Mr. Smith, are you a citizen of the United
22 Kingdom?
23   A.  Yes.
24   Q.  Have you spent any time in the United States
25 in formal education or study?

17 (Pages 62 - 65)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 72

1    Q.  So prior to today you weren't familiar with
2  the name Northern Entertainment Production?
3    A.  No.
4    Q.  Do you have any way to know whether it is
5  associated with Universal -- NBCUniversal?
6       MR. HAYES:  Objection, asked and answered,
7  lacks foundation.
8       THE WITNESS:  Well, I do because there's a
9  document in front of me that's got it in connection
10  with it.
11  BY MS. SCOTT REED:
12    Q.  Other than that?
13    A.  No.
14    Q.  Do you have any background or experience
15  with that entity?
16       MR. HAYES:  Same objections.
17       THE WITNESS:  I honestly can't recall.
18  BY MS. SCOTT REED:
19    Q.  So in 2014 and up to this point in time, if
20  you describe what area or division within
21  NBCUniversal you work, what label do you use?
22       MR. HAYES:  Objection, vague.
23       THE WITNESS:  International security and
24  crisis management.
25

Page 73

1  BY MS. SCOTT REED:
2    Q.  And is that a part of the global security
3  operations you were describing?
4    A.  Yes.
5    Q.  Do you provide security for all of the
6  different aspects of NBCUniversal as part of the
7  international security and crisis management group?
8       MR. HAYES:  Objection, vague, lacks
9  foundation.
10       THE WITNESS:  I provide security crisis
11  management support to personnel, assets across
12  international.
13  BY MS. SCOTT REED:
14    Q.  And across the NBCUniversal group as a
15  whole?
16       MR. HAYES:  Objection, vague, lacks
17  foundation.
18       THE WITNESS:  With a number of groups.
19  BY MS. SCOTT REED:
20    Q.  Does the international security and crisis
21  management group provide security support for the
22  news organizations?
23       MR. HAYES:  Same objections.
24       THE WITNESS:  Yes.
25

19 (Pages 70 - 73)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 74

1 BY MS. SCOTT REED:
2   Q.  Does that include NBC?
3   A.  Yes.
4       MR. HAYES:  Same objections.
5       THE WITNESS:  Yes.
6 BY MS. SCOTT REED:
7   Q.  Does that include MSNBC?
8       MR. HAYES:  Same objections.
9       THE WITNESS:  It has.
10 BY MS. SCOTT REED:
11   Q.  And does that include CNBC?
12       MR. HAYES:  Same objections.
13       THE WITNESS:  Yes.
14 BY MS. SCOTT REED:
15   Q.  Have you personally been involved in
16 providing security support to NBC news?
17       MR. HAYES:  Objection, vague.
18       THE WITNESS:  Yes.
19 BY MS. SCOTT REED:
20   Q.  In what areas of the world, please, sir?
21   A.  Postterrorist attacks, and in Europe, in
22 Brussels, and in Nice, in particular.  I also provide
23 information and intelligence to the news teams.
24   Q.  And which news teams?
25   A.  NBC news teams.

Page 75

1   Q.  Any others?
2   A.  CNBC, I've provided support for CNBC in
3 Southeast Asia, specifically in Indonesia, in
4 Jakarta.
5   Q.  And do you provide security support to NBC
6 news in connection with the Middle East?
7       MR. HAYES:  Objection, vague.
8       THE WITNESS:  If required.
9 BY MS. SCOTT REED:
10   Q.  Can you recall over the course of your
11 career if you've been asked to do that?
12   A.  I've provided support to the NBC news bureau
13 based in Israel, and had exchanges of information,
14 particularly -- particularly relating to the Dig
15 production, and the events around it.
16   Q.  And what communications did you have with
17 the NBC news organization in regard to the Dig
18 production or events around it?
19       MR. HAYES:  Objection, lacks foundation.
20       THE WITNESS:  The security situation in the
21 country at the time.
22 BY MS. SCOTT REED:
23   Q.  Does that mean that you were reporting the
24 security situation to the NBC news operation just as
25 you were to the Dig production?

Page 76

1       MR. HAYES:  Objection, vague, lacks
2 foundation.
3       THE WITNESS:  No.  No, it doesn't mean that.
4 BY MS. SCOTT REED:
5   Q.  Can you explain to me what you were
6 referring to?
7   A.  I -- I exchanged information regarding the
8 security situation in Israel at some point, but I
9 didn't exchange information with them throughout the
10 production length.
11   Q.  I see.
12       So it was a more limited period of time you
13 were providing security-related information to NBC
14 news?
15       MR. HAYES:  Objection, misstates testimony,
16 lacks foundation.
17       THE WITNESS:  I was sharing information with
18 them.
19 BY MS. SCOTT REED:
20   Q.  Do I understand correctly, then, that you
21 were sharing security information with NBC news
22 sometime in the summer of 2014?
23       MR. HAYES:  Objection, lacks foundation,
24 vague.
25       THE WITNESS:  That's my recollection.

Page 77

1 BY MS. SCOTT REED:
2   Q.  Yes, sir.
3       And was there any time other than that, that
4 you provided security information to NBC news
5 relating to Israel?
6       MR. HAYES:  Objection, vague, lacks
7 foundation.
8       THE WITNESS:  I can't recall.
9 BY MS. SCOTT REED:
10   Q.  What have you done to prepare for your
11 deposition today, sir?
12   A.  Could you be more specific?  It's, you know,
13 I've traveled from the United Kingdom.
14   Q.  Okay.  And other than that, what have you
15 done to prepare to give your testimony today?
16   A.  I've reviewed documentation relating to the
17 production.
18   Q.  Anything else?
19   A.  I -- yes.
20   Q.  What else?
21   A.  I made some notes of my own to refresh my
22 memory.
23   Q.  And have you brought those today?
24   A.  There's a book under my desk that has six
25 lines of abbreviations.

20 (Pages 74 - 77)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 82

1 international law?
2    A.  No.
3       MR. HAYES: Objection --
4 BY MS. SCOTT REED:
5    Q.  Do you have any education or training in the
6 Middle East history?
7       MR. HAYES: Objection, vague.
8       THE WITNESS: No.
9 BY MS. SCOTT REED:
10    Q.  Do you have any education or training in
11 modern Middle East politics or development?
12       MR. HAYES: Objection, vague, lacks
13 foundation.
14       THE WITNESS: No.
15 BY MS. SCOTT REED:
16    Q.  Have you undertaken any independent review
17 or investigation to try to familiarize yourself with
18 current events in Israel leading up to the Dig
19 production?
20       MR. HAYES: Same objections.
21       THE WITNESS: Yes.
22 BY MS. SCOTT REED:
23    Q.  And what was that, please, sir?
24    A.  I receive information from multiple sources
25 relating to the security situation in Israel and the

Page 83

1 Middle East, in general. And I receive reports from
2 NBC security personnel regarding that information.
3    Q.  Were you in the process -- or were you in
4 the -- in the habit of gathering that information
5 before you were involved in the Dig production?
6       MR. HAYES: Objection, vague, lacks
7 foundation.
8       THE WITNESS: I gather and review
9 information everywhere NBCUniversal has operations,
10 so the Middle East would have come into that. I
11 receive intelligence on a daily basis from multiple
12 sources regarding the security situation,
13 particularly relating to terrorism throughout the
14 world.
15 BY MS. SCOTT REED:
16    Q.  So as just part of your general corporate
17 responsibilities, do you maintain a certain level of
18 reporting to you about security across all areas
19 where you may have an interest for NBC?
20       MR. HAYES: Objection, vague, lacks
21 foundation.
22       THE WITNESS: Yes.
23 BY MS. SCOTT REED:
24    Q.  Sorry. That's a distracting.
25       MR. HAYES: Would you -- would you mind,

Page 84

1 Toni, I think we've been going about an hour and ten,
2 would you mind if we took a quick break?
3       MS. SCOTT REED: That's fine.
4       MR. HAYES: Thanks.
5       VIDEO OPERATOR: We are off the record. The
6 time is 10:25 a.m.
7
8       (Recess taken.)
9
10       VIDEO OPERATOR: We're back on the record.
11 The time is 10:45 a.m.
12       Please continue.
13 BY MS. SCOTT REED:
14    Q.  Mr. Smith, before we took our break, I was
15 asking you about your general job responsibilities
16 and you were explaining to me that you gather and
17 review information everywhere NBCUniversal has
18 operations, just as a general matter.
19       Do you recall that discussion?
20       MR. HAYES: Objection, misstates testimony.
21       THE WITNESS: Yes.
22 BY MS. SCOTT REED:
23    Q.  So part of your ongoing job responsibilities
24 is that you try to maintain a general awareness of
25 all sorts of situations anyplace NBCUniversal might

Page 85

1 have operations?
2       MR. HAYES: Same objection, and it's vague
3 and ambiguous.
4       THE WITNESS: Yes.
5 BY MS. SCOTT REED:
6    Q.  And separate and apart from that generalized
7 information gathering that you have, do you have a
8 more particularized approach when it comes to a
9 specific production that you're going to be working
10 with?
11       MR. HAYES: Same objections. Vague and
12 lacks foundation.
13       THE WITNESS: Yes.
14 BY MS. SCOTT REED:
15    Q.  So before you knew that you would be working
16 in connection with the Dig production, were you
17 maintaining any kind of specific focus on reviewing
18 security issues associated with Israel?
19    A.  I was maintaining focus on all locations
20 that NBCUniversal had personnel or assets, and Israel
21 is one of those locations.
22    Q.  What sort of personnel or assets were
23 involved in Israel before Dig?
24    A.  There is a news bureau there, but
25 specifically, I track travelers to locations

22 (Pages 82 - 85)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 86

1 throughout the world, so I need to have knowledge of
2 security landscape where travelers may -- may go to,
3 and that includes in the Middle East.
4    Q.  The Middle East as a whole as opposed to
5 Israel specifically?
6    A.  I generally deal in continents or regions,
7 so I would speak about Southeast Asia, about China,
8 slightly different because of geographical size, but
9 we would talk of the Middle East, Africa, dependent
10 on circumstances.
11    Q.  So before the Dig production had been
12 mentioned to you and you knew that you would be
13 working with it, were you maintaining any particular
14 focus in regard to security updates on Israel?
15       MR. HAYES:  Objection, vague, lacks
16 foundation.
17       THE WITNESS:  I receive security updates on
18 all locations where NBC has personnel and assets and
19 travelers.
20 BY MS. SCOTT REED:
21    Q.  And I'm asking you particular to the
22 timeframe before you were working on the Dig
23 production, were you doing some particular work that
24 focused on Israel?
25       MR. HAYES:  Same objections.

Page 87

1       THE WITNESS:  I wasn't doing particular work
2 focusing on Israel.
3 BY MS. SCOTT REED:
4    Q.  Were you doing -- prior to the Dig
5 production, were you doing particular work focusing
6 on the Middle East?
7       MR. HAYES:  Same objections.
8       THE WITNESS:  I do general work and receive
9 multiple sources of information relating to locations
10 where NBCUniversal have personnel, productions, and
11 travelers, and that includes Israel and the Middle
12 East.
13 BY MS. SCOTT REED:
14    Q.  So speaking about your -- your general
15 maintenance of information about Israel and the
16 Middle East, can you tell me the sources of the
17 information that you're talking about gathering?
18       MR. HAYES:  Objection, vague and lacks
19 foundation.
20       THE WITNESS:  The same organizations that I
21 mentioned earlier.  So I have information from OSAC.
22 I receive information from Control Risk Group.  I
23 receive information from, amongst others, a company
24 called Northcott Global Solutions.  We review open
25 source information from media organizations.

Page 88

1 BY MS. SCOTT REED:
2    Q.  Any others in your general information
3 gathering?
4    A.  We receive information from the U.S. State
5 Department, the U.K. Foreign and Commonwealth Office,
6 and particularly from my own NBCU analysts prospects.
7       THE REPORTER:  What analysts?
8       THE WITNESS:  NBCU.
9 BY MS. SCOTT REED:
10    Q.  And who are those NBCU analysts?
11    A.  Chris Biggs.
12    Q.  Anyone else?
13    A.  At that time, no.
14    Q.  And at that time you're talking about 2014?
15    A.  Yes.
16    Q.  Can you tell me what OSAC is?
17    A.  OSAC is a U.S. Government organization that
18 provides security crisis management and emergency
19 information and intelligence to U.S. companies and
20 individuals who are a member of the organization.  It
21 stands for the Oversee Security Advisory Council.
22    Q.  Is NBCUniversal a member?
23       MR. HAYES:  Objection, vague, lacks
24 foundation.
25       THE WITNESS:  I'm a member.

Page 89

1 BY MS. SCOTT REED:
2    Q.  Oh, personally?
3    A.  Yes.
4    Q.  Mr. Smith is the member?
5    A.  Yes.
6    Q.  I see.
7       Can you tell me what Control Risk Group is?
8    A.  It's a crisis management and security
9 company.
10    Q.  Right.
11    A.  They also provide intelligence relating to
12 security and terrorist activity globally.
13    Q.  Is that a private organization?
14    A.  It's a private company.
15    Q.  Does one have to be a subscriber to obtain
16 that information or report?
17    A.  Some of their information can be gathered
18 without being a subscriber.
19    Q.  Is NBCUniversal a subscriber?
20    A.  Yes.
21    Q.  What is Northcott Global?
22    A.  The same as the other company.  They're a
23 crisis management and security response private
24 company.
25    Q.  Do you have to be a subscriber or member to

23 (Pages 86 - 89)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 90

1  get their updates?
2    A.  Yes.
3    Q.  Is NBCUniversal a subscriber or member?
4    A.  No.
5    Q.  Is Mr. Smith a subscriber or member?
6    A.  No.
7    Q.  How do you obtain that information?
8    A.  We were in 2014, a subscriber.  We paid them
9  a licensing fee to access their resource.  We no
10  longer pay them for our access.
11    Q.  When -- when did the payment for access
12  cease?
13    A.  2016.
14    Q.  Are you using a different source in place of
15  Northcott?
16    A.  We -- well, we use a company called IHS,
17  which Mr. Biggs receives intelligence updates with
18  and he disseminates them to myself amongst others.
19    Q.  When you talked about open source media, who
20  does that involve?
21        MR. HAYES:  Objection, vague, lacks
22  foundation.
23        THE WITNESS:  It could involve most
24  media organizations, whether it be television --
25  television media, direct media.  So a multitude of

Page 91

1  sources.
2  BY MS. SCOTT REED:
3    Q.  Are you the person who reviews and gathers
4  that information or is there someone else who does
5  that?
6        MR. HAYES:  Objection, vague, lacks
7  foundation.
8        THE WITNESS:  Are we talking about now just
9  to clarify, in 2017?
10  BY MS. SCOTT REED:
11    Q.  Yes.
12    A.  No, I'm not.
13    Q.  Who does that now?
14    A.  We have a group of people who work for the
15  Global Response and Intelligence Center, GRIC.
16    Q.  And do they actually gather that information
17  and synthesize and report it?
18    A.  Yes.
19    Q.  Is that a part -- is the GRIC a part of
20  NBCUniversal?
21    A.  Yes.
22    Q.  In 2014 what was the method of gathering the
23  open source or media information?
24        MR. HAYES:  Objection, vague, lacks
25  foundation.

Page 92

1        THE WITNESS:  I used Chris Biggs.
2  BY MS. SCOTT REED:
3    Q.  Would Mr. Biggs review media coverage and
4  synthesize it and provide it to you?
5    A.  Yes.
6    Q.  Did you have a protocol set up with a list
7  of media organizations that he would particularly
8  refer to?
9        MR. HAYES:  Objection, vague, lacks
10  foundation.
11        THE WITNESS:  Not to my knowledge.
12  BY MS. SCOTT REED:
13    Q.  Did you ask him to look at any particular
14  media sources?
15        MR. HAYES:  Objection, vague, lacks
16  foundation.
17        THE WITNESS:  Not to my knowledge.
18        MS. SCOTT REED:  Counsel, can you explain to
19  me the basis for objections on, "did you ask him to
20  look at any particular media sources?" that that
21  lacks foundation?
22        MR. HAYES:  Sure.  When?  In what context?
23  Your questions aren't related to anything in
24  particular.  You're asking questions that are
25  unbounded, and I think they're confusing the witness.

Page 93

1  BY MS. SCOTT REED:
2    Q.  Mr. Smith are you confused?
3    A.  I'm very easily confused.
4    Q.  Are you confused by the line of questioning
5  that we're engaging in right now about 2014 and
6  Mr. Biggs and looking at media sources?
7    A.  I -- I would prefer if the questioning
8  was -- was more specific.  It seems to be very
9  general.  And I'm struggling to give you answers
10  that -- because of -- it's not a specific question.
11        It's a very general question.  So I can't
12  give a "yes" or a "no" answer.
13    Q.  So starting with my question:  How was media
14  information gathered in 2014; you recall that?
15    A.  Yes.
16    Q.  And you told me that Mr. Biggs did that?
17    A.  Yes.
18    Q.  Okay.  In 2014 when Mr. Biggs was gathering
19  the media information, did you ask him to refer to
20  any particular media sources?
21    A.  Not that I recall.
22    Q.  Would NBC News be a source that you would
23  expect to be consulted?
24        MR. HAYES:  Objection, vague, lacks
25  foundation, calls for speculation.

24 (Pages 90 - 93)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 94

```
 1      THE WITNESS:  I would.
 2 BY MS. SCOTT REED:
 3   Q.  Again, I'm talking about 2014 when you're
 4 gathering media sources, would it have been your
 5 expectation that NBC News would be a media source
 6 that you would refer to?
 7      MR. HAYES:  Objection, vague, lacks
 8 foundation.
 9      THE WITNESS:  It would be one of the sources
10 that we would gather information from.
11 BY MS. SCOTT REED:
12   Q.  All right.  Sir, would you also put MSNBC
13 into that list that you would gather information from
14 in 2014?
15      MR. HAYES:  Objection, vague, lacks
16 foundation.
17      THE WITNESS:  I would not.
18 BY MS. SCOTT REED:
19   Q.  That wasn't a news organization that you
20 necessarily referred to?
21   A.  No.
22   Q.  And why was that?
23   A.  They don't really have any resonance in
24 the -- outside of the USA.
25   Q.  Was CNBC a news media source that you would
```

Page 96

```
 1 foundation.
 2      THE WITNESS:  He may or he may not.
 3 BY MS. SCOTT REED:
 4   Q.  And is Mr. Biggs going to be the best source
 5 of information about which media sources he actually
 6 reviewed in any given time?
 7      MR. HAYES:  Objection, vague, lacks
 8 foundation.
 9      THE WITNESS:  I can't say.  You would have
10 to ask Mr. Biggs.
11 BY MS. SCOTT REED:
12   Q.  To the best of your knowledge, Mr. Biggs
13 would have to address that instead of you?
14      MR. HAYES:  Objection, vague, lacks
15 foundation.
16      THE WITNESS:  Yes.
17 BY MS. SCOTT REED:
18   Q.  All right.  At this point I want to direct
19 your attention to the time period when the Dig
20 production was brought to you to participate in.
21   A.  Yep.
22   Q.  Do you recall that occurring?
23      MR. HAYES:  Objection, vague.
24      THE WITNESS:  Yes.
25
```

Page 97

```
 1 BY MS. SCOTT REED:
 2   Q.  And can you give me a general estimate in
 3 terms of month and year when that would have
 4 occurred?
 5      MR. HAYES:  Same objection.
 6      THE WITNESS:  Early 2013.  I can't be any
 7 more specific than that without consulting the
 8 paperwork.
 9 BY MS. SCOTT REED:
10   Q.  2013 is what you're saying?
11      MR. HAYES:  Objection, vague.
12      THE WITNESS:  No, 2014, sorry.  2014, yeah.
13 BY MS. SCOTT REED:
14   Q.  Is the best of your recollection that the
15 production Dig was bought to your attention in the
16 early part of 2014?
17   A.  To the best of my recollection.
18   Q.  What were you asked to do?
19      MR. HAYES:  Objection, vague, lacks
20 foundation.
21      THE WITNESS:  I was asked if I would provide
22 very generally, security support.
23 BY MS. SCOTT REED:
24   Q.  Who made the request to you?
25   A.  The request came from Erin Noordeloos, via
```

25 (Pages 94 - 97)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 98

1 Brian Brady.
2    Q.  And at that point was Ms. Noordeloos your
3 supervisor or boss?
4    A.  Yes.
5    Q.  And who was Mr. Brady?
6    A.  Mr. Brady was the VP of security based in
7 L.A.
8    Q.  Did he report to Ms. Noordeloos?
9    A.  No.
10   Q.  Did she report to him?
11   A.  No.
12   Q.  Can you tell me organizationally speaking,
13 where they lined up?
14   A.  Erin was a director.  Brian Brady was a
15 vice-president.  So he was senior, but they had no
16 reporting line.
17   Q.  Is Erin the only person you spoke to in
18 regard to the request being put to you to become
19 involved in Dig?
20      MR. HAYES:  Objection, vague.
21      THE WITNESS:  I can't recall.
22 BY MS. SCOTT REED:
23   Q.  And I'm speaking about the timeframe when it
24 was first brought to your attention, sir.
25   A.  I can't recall who -- who else I may have

Page 99

1 spoken to.  I would need to consult with paperwork
2 from that time.
3    Q.  What did -- what did Erin communicate to you
4 about Dig?
5    A.  That there was going to be a production in
6 Israel, there had been a request for security
7 support, and was I able and willing to support.
8    Q.  And what was your response?
9    A.  Yes.
10   Q.  Did she ask you at that time if you had
11 prior experience dealing specifically with Israel?
12   A.  No.
13   Q.  Prior to joining NBCUniversal, in your other
14 corporate security jobs, did your responsibilities
15 involve international security?
16   A.  Yes.
17   Q.  In what regard?
18   A.  In regard to providing security support
19 outside of the United Kingdom.
20   Q.  In which other areas?
21   A.  Western Europe.
22   Q.  Anything else?
23   A.  Not to my recollection.
24   Q.  When Ms. Noordeloos made the request to you
25 to become involved in Dig, did you feel like you had

Page 100

1 the necessary expertise to provide that support to
2 Dig?
3      MR. HAYES:  Objection, vague.
4      THE WITNESS:  Yes.
5 BY MS. SCOTT REED:
6    Q.  And why did you feel that way?
7    A.  I had at the time, approximately 35 years of
8 experience in security crisis management, risk
9 management, and emergency response.
10   Q.  Anything particular to Israel?
11   A.  All of the areas I mentioned before
12 applicable to the management of security, crisis and
13 emergency response.
14   Q.  Yes, sir.
15      And did you have any prior job experience
16 applying your skills in Israel?
17   A.  No.
18   Q.  What are the first steps you took after the
19 production of Dig was brought to your attention, in
20 terms of pursuing your work?
21      MR. HAYES:  Objection, vague.
22      THE WITNESS:  Gathering information from the
23 production company in terms of location, production
24 premise, numbers of personnel, length of time we
25 would be in country, relationships with other

Page 101

1 production services companies, and gathering
2 information on the security situation specifically to
3 Israel and to the region in general.
4 BY MS. SCOTT REED:
5    Q.  When you said gathering information from the
6 production company, who was that for Dig?
7    A.  My contact was in the main Randi Richmond.
8    Q.  Who employed Randi Richmond?
9    A.  I don't know.
10   Q.  Was it something that was part of
11 NBCUniversal?
12      MR. HAYES:  Objection, asked and answered,
13 calls for speculation.
14      THE WITNESS:  She's an NBCUniversal
15 employee, to the best of my knowledge.
16 BY MS. SCOTT REED:
17   Q.  Yes, sir.
18      And do you know any more particularly than
19 that where -- where she fits into the organizational
20 structure?
21      MR. HAYES:  Objection, calls for
22 speculation.
23      THE WITNESS:  She's a vice-president of
24 productions.
25

26 (Pages 98 - 101)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 102

1  BY MS. SCOTT REED:
2     Q.  For NBCUniversal?
3        MR. HAYES:  Same objection.
4        THE WITNESS:  To the best of my knowledge.
5  BY MS. SCOTT REED:
6     Q.  And what was her particular role for Dig so
7  far as you understood?
8     A.  She was one of the senior production team
9  who had oversight and management of the production.
10    Q.  Was she your main contact in terms of
11 production?
12    A.  Yes.
13    Q.  Were there other members of the production
14 team that over time, you also communicated with or
15 interacted with?
16    A.  Yes.
17    Q.  With who were they?
18    A.  Mark Binkie.
19    Q.  Anyone else?
20    A.  Kurt Ford, Kurt.
21    Q.  C-O-T-T?
22    A.  No.  K-U-R-T.
23    Q.  Oh, Kurt, pardon me.
24    A.  Yeah.
25    Q.  Kurt Ford?

Page 103

1     A.  Yep.
2     Q.  All right.  Any others?
3     A.  There were others, but I interacted with a
4  producer, Mark Winemaker.
5     Q.  Can you recall any others at this time?
6     A.  There were others and I had interaction with
7  via e-mail reporting and face to face meetings in
8  Israel and elsewhere.
9     Q.  When you were describing -- pardon me,
10 initial steps you mentioned reviewing the --
11 situation -- security situation in Israel and the
12 region, what did you do particularly for that?
13    A.  I asked Chris Biggs to gather information
14 from as many sources as possible.  So paid for
15 sources, governmental sources.
16       THE REPORTER:  So what sources?
17       THE WITNESS:  Paid for, yes.
18       THE REPORTER:  Paid for?
19       THE WITNESS:  Yeah.
20       Governmental sources, open source
21 intelligence and to prepare information for me so we
22 could assess the risk.
23 BY MS. SCOTT REED:
24    Q.  After you made that assignment to him, did
25 he prepare a report or wrap up or a summary for you?

Page 104

1     A.  He -- he supplied me with information.
2     Q.  Was it in the form of a written report?
3     A.  I can't recall exactly if it was.  There
4  were a number of reports that Chris Biggs gave me.
5     Q.  And when you say there were a number of
6  reports, over what period of time, please, sir?
7     A.  From the initial notification of the
8  production until weeks after the production ended, we
9  provided -- we reviewed consistently and constantly
10 intelligence and information feeds and disseminated
11 them as necessary.
12    Q.  Was there information, and when I say
13 information, I'm talking about primary sources or
14 reports that you personally would review as opposed
15 to Mr. Biggs reviewing and providing to you?
16       MR. HAYES:  Objection, vague, lacks
17 foundation.
18       THE WITNESS:  Yes.
19 BY MS. SCOTT REED:
20    Q.  Can you tell me in connection with the Dig
21 matter which primary sources you would look at,
22 yourself?
23       MR. HAYES:  Same objections.
24       THE WITNESS:  OSAC, the FCO, it's the
25 Foreign and Commonwealth Office of the United

Page 105

1  Kingdom.
2  BY MS. SCOTT REED:
3     Q.  Any others?
4     A.  I also consulted personally with the
5  regional security officer of the state department.
6     Q.  Where was that person located?
7     A.  I met with him in Jerusalem.
8     Q.  When was that, please, sir?
9     A.  I can't remember the exact dates, but
10 it's -- I believe it's contained within the
11 documentation.
12    Q.  So it was a face-to-face meeting?
13    A.  Yes.
14    Q.  What information did you gather in the
15 context of that meeting?
16    A.  I gathered information regarding the
17 security situation in Israel and Jerusalem in
18 particular.
19    Q.  Can you remember today what descriptions
20 were provided to you Israel or Jerusalem?
21       MR. HAYES:  Objection, vague, lacks
22 foundation.
23       THE WITNESS:  I can remember generally what
24 we discussed, particularly around filming in east
25 Jerusalem.

27 (Pages 102 - 105)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 106

1 BY MS. SCOTT REED:
2    Q.  Can you tell me about that, please, sir?
3    A.  The RSO, regional security officer, said at
4 the time there was no information or intelligence to
5 suggest we could not film there.
6    Q.  At the time you visited with that officer,
7 were there other productions out of the United States
8 ongoing in Israel, any part of it?
9       MR. HAYES:  Objection, vague, lacks
10 foundation.
11      THE WITNESS:  I don't know.
12 BY MS. SCOTT REED:
13   Q.  Did you ask him, as part of that meeting,
14 whether there were other television or movie
15 productions that were ongoing?
16   A.  I don't recall.
17   Q.  What was the result of this initial review
18 of the security situation in your mind?  In other
19 words, what -- what general information or
20 observations did you make as a result of this initial
21 review?
22      MR. HAYES:  Objection, vague, lacks
23 foundation, compound.
24      THE WITNESS:  We documented the security
25 threats from any number of sources and we also

Page 107

1 documented the mitigation to those threats.  We
2 investigated the security threats particular to each
3 location and took information from multiple sources
4 to compare and contrast.
5 BY MS. SCOTT REED:
6    Q.  Did you draw conclusions as a result of that
7 initial review?
8    A.  Yes.
9    Q.  What were your conclusions?
10   A.  That it was safe to proceed with the
11 production in the locations that they had proposed
12 with the security provision and mitigation that we
13 advised.
14   Q.  After your initial reviews that you have
15 described, what were the next steps or work that you
16 engaged in connection with Dig?
17      MR. HAYES:  Objection, vague, lacks
18 foundation.
19      THE WITNESS:  I had conversations and
20 communication with the production with organizations
21 who provide us with information on security, crisis
22 management, emergency response.  I reviewed this and
23 I prepared documentation that would support the
24 security provision in country for the production and
25 also crisis management response.

Page 108

1 BY MS. SCOTT REED:
2    Q.  What is Max Security Solutions?
3    A.  They're our security vendor.
4    Q.  Did you engage Max Security Solutions to
5 work with NBCUniversal in connection with the Dig
6 production?
7    A.  I did.
8    Q.  What was Max Security Solutions hired to do?
9    A.  They were hired to provide security
10 personnel to support the production on the ground and
11 they also provided security intelligence.
12   Q.  Did they provide security intelligence in a
13 written form?
14   A.  Yes.
15   Q.  And what sort of written form did those
16 take?
17   A.  Reports.
18   Q.  Were they provided to you on a regular
19 basis?
20   A.  They were.
21   Q.  What was the regularity?
22   A.  There was no consistent -- it wasn't hourly
23 or daily.  Whenever there was information to report,
24 they would report it.
25   Q.  And did Max Security make the determination

Page 109

1 of when they thought there was information that
2 needed to be reported to you?
3      MR. HAYES:  Objection, calls for
4 speculation.
5      THE WITNESS:  I can't speak on behalf of Max
6 Security.  Max Security's information was independent
7 of me.  I wasn't involved in the gathering of any of
8 that information or deciding when it would be
9 provided.
10 BY MS. SCOTT REED:
11   Q.  Do you know how it was gathered?
12   A.  No.
13   Q.  Do you know what operations Max Security
14 maintains in or around Israel?
15      MR. HAYES:  Objection, vague, lacks
16 foundation.
17      THE WITNESS:  I have a very, very general
18 idea from dealing with that they provide security for
19 a number of operations in Israel and throughout the
20 world.
21 BY MS. SCOTT REED:
22   Q.  And were you advised how they went about
23 gathering the security information that they would
24 convey to you?
25   A.  No.

28 (Pages 106 - 109)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 110

1    Q.   Did you ever discuss with them what their
2  sources of information were?
3        MR. HAYES: Objection, asked and answered.
4        THE WITNESS: No.
5  BY MS. SCOTT REED:
6    Q.   Was it your understanding that
7  representatives of Max Security Solutions were
8  physically present in the areas that they reported
9  on?
10       MR. HAYES: Objection, vague, lacks
11  foundation, asked and answered.
12       THE WITNESS: They were based in Israel and
13  they had personnel with the production team and they
14  were providing reports on Israel and the production
15  location. So yes.
16  BY MS. SCOTT REED:
17   Q.   So to break that down, Max Security
18  Solutions was an Israel-based company?
19   A.   They're -- they're an Israeli company.
20  Whether they're -- whether they are a permanently
21  based there, I really don't know, because they have
22  an office in New York, offices other places.
23   Q.   Is it your understanding that they
24  maintained personnel in various parts of Israel?
25   A.   Yes.

Page 111

1    Q.   And do you know what the job functions of
2  those various personnel were?
3        MR. HAYES: Objection, vague.
4        THE WITNESS: No.
5  BY MS. SCOTT REED:
6    Q.   Were some personnel from Max Security
7  Solutions specifically assigned to the Dig
8  production?
9        MR. HAYES: Objection, vague, calls for
10  speculation.
11       THE WITNESS: Yes.
12  BY MS. SCOTT REED:
13   Q.   Do you know what sorts of people were
14  assigned to the Dig production?
15       MR. HAYES: Objection, vague.
16       THE WITNESS: Security personnel.
17  BY MS. SCOTT REED:
18   Q.   Armed security?
19   A.   No.
20   Q.   Unarmed security?
21   A.   Yes.
22   Q.   And what was their function to be?
23   A.   To provide security resource to help insure
24  the safety of the cast, crew, and assets.
25   Q.   Were they physically present when filming

Page 112

1  would occur?
2    A.   Yes.
3    Q.   Did they stay with cast and crew if cast and
4  crew were in the country but not working?
5    A.   No.
6    Q.   What were the other job functions that you
7  hired Max Security Solutions to provide for you
8  outside of unarmed security?
9    A.   Max Security provided information by way of
10  intelligence reports.
11   Q.   And was that part of their engagement that
12  you hired them to do?
13   A.   Yes.
14   Q.   You testified earlier that they were regular
15  but they weren't necessarily daily; is that accurate?
16       MR. HAYES: Objection, misstates testimony.
17       THE WITNESS: Yes.
18  BY MS. SCOTT REED:
19   Q.   Was there a requirement that they give you a
20  daily report, whether there was anything to report or
21  not?
22   A.   Are you talking -- I need to clarify. Are
23  you talking about the security personnel working with
24  the cast and crew or are you talking about
25  intelligence reports it is?

Page 113

1    Q.   I'm talking about intelligence reports for
2  purposes of this question.
3    A.   Okay. Just repeat the question, then,
4  please.
5    Q.   Yes, sir.
6        Was there a requirement for them to provide
7  a daily intelligence report?
8    A.   No, not to my knowledge. It wasn't decided
9  that it was a daily intelligence report, to my
10  knowledge.
11   Q.   Was your expectation that they would update
12  you as they thought they needed to update you?
13   A.   As appropriate.
14   Q.   Were there other reports that they provided
15  along the lines of discussing what was occurring on
16  site for production?
17       MR. HAYES: Objection, vague.
18       THE WITNESS: There was communication
19  regarding what was happening with -- on the ground
20  with the production.
21  BY MS. SCOTT REED:
22   Q.   How would that communication be made to you?
23  Verbally or in writing?
24   A.   Both, depending on the situation.
25   Q.   And if it was in writing what sorts of

29 (Pages 110 - 113)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 114

1 things would merit a written report?
2       MR. HAYES: Objection, vague, calls for
3 speculation.
4       THE WITNESS: Security situation on the
5 ground relating directly to the production.
6 BY MS. SCOTT REED:
7   Q.  Can you recall any security situations on
8 the ground that caused them to give you a written
9 report about what had occurred in production?
10      MR. HAYES: Objection, vague.
11      THE WITNESS: I can't recall whether they
12 did or didn't.
13      THE REPORTER: I can't recall what?
14      THE WITNESS: Whether they did or didn't.
15      MS. SCOTT REED: Let me hand you what's been
16 marked as Exhibit 102, please, sir.
17      MR. HAYES: Thank you.
18      (Exhibit 102 was marked for identification by
19   the court reporter and is attached hereto.)
20      MS. SCOTT REED: For the record this is
21 Bates numbered UCP18093 through 18097.
22   Q.  Are you familiar with Bates numbers?
23   A.  No.
24   Q.  Bottom right-hand corner, there is a legend
25 with letters and numbers.

Page 115

1       Do you see that? All the way to the corner,
2 yes, sir, where it says: UCP18093. That's a marking
3 that's been put on by the plaintiffs in the case in
4 order to identify it.
5   A.  Okay.
6   Q.  So when I handed you a document today, I'll
7 refer to that number just for purposes of
8 identification.
9   A.  Okay.
10   Q.  It was not a part of the original document,
11 but it's been placed on during this lawsuit. I'm
12 going to ask you questions about this particular
13 document, Exhibit 102.
14   A.  Okay.
15   Q.  Are you ready for that? Can you identify
16 Exhibit 102 as a July 17th, 2014, Max Security
17 Intelligence report?
18   A.  Yes.
19   Q.  Was this directed to you via e-mail?
20   A.  Yes.
21   Q.  Do you see your e-mail address or -- or
22 notation at the top of the document, Smith, Stephen,
23 NBCUniversal?
24   A.  Yes.
25   Q.  Was in the method by which you would receive

Page 116

1 updates on security intelligence from Max Security
2 Intelligence, the entity?
3   A.  It was one of.
4   Q.  One of the ways?
5   A.  Yes.
6   Q.  Can you identify for me the other ways you
7 would get updates on intelligence reports?
8   A.  Face to face meetings and also telephone
9 conversations.
10   Q.  Is this format that's shown in Exhibit 102
11 the sole way that you would receive written
12 intelligence reports?
13   A.  No.
14   Q.  How else would you receive written
15 intelligence reports from Max Security Intelligence?
16   A.  Via e-mail.
17   Q.  Which this is, correct?
18   A.  This is an e-mail?
19   Q.  Yes, sir.
20      MR. HAYES: Objection, vague.
21      THE WITNESS: I also received reports that
22 aren't in the form of a -- a structured report, they
23 are just in the form of an e-mail update. This is --
24 this is a report that's been e-mailed.
25

Page 117

1 BY MS. SCOTT REED:
2   Q.  All right, sir. I understand now.
3   A.  Yeah.
4   Q.  In addition to receiving a report via
5 e-mail, you would also receive e-mails from them?
6   A.  Yes.
7   Q.  And what types of information would they
8 communicate in an e-mail that was not a formal
9 security report like this?
10   A.  Information relating to the security
11 situation within Israel and specifically relating to
12 the production.
13   Q.  Was the information, that is the formal
14 report, communicated in this e-mail to you, created
15 particularly for NBCUniversal?
16      MR. HAYES: Objection, vague, calls for
17 speculation.
18      THE WITNESS: I don't know whether it was or
19 wasn't.
20 BY MS. SCOTT REED:
21   Q.  Do you know whether Max Security would
22 provide this identical security document or update to
23 other clients?
24      MR. HAYES: Objection, asked and answered.
25      THE WITNESS: I don't know either way.

30 (Pages 114 - 117)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 118

1 BY MS. SCOTT REED:
2    Q.   As part of the retention of Max Security
3 Intelligence to work on the Dig production, was one
4 of their job responsibilities to make security
5 reports like this to you in writing?
6    A.   Yes.
7    Q.   What would you do when you would receive a
8 security report like this one?
9        MR. HAYES:  We're referring to Exhibit 102?
10       MS. SCOTT REED:  Correct, Exhibit 102.
11       THE WITNESS:  I would read the information
12 particularly relating to the assessment of the
13 information.
14 BY MS. SCOTT REED:
15    Q.   When you say "assessment," are you referring
16 to a particular portion of this document?
17    A.   On page 18094 there's an assessment of the
18 initial intelligence.
19    Q.   Yes.
20    A.   Highlight -- how I would respond to these
21 reports would depend on the information and the
22 circumstances of when and where they were received.
23    Q.   Was it your normal practice any time a
24 written security report like this would come in from
25 Max Security be to read it?

Page 119

1    A.   Yes.
2    Q.   And would you try to do so as soon as you
3 could after receipt?
4    A.   As soon as was practical.
5    Q.   Yes, sir.
6        And did you do anything to independently
7 verify the information that was being provided?
8    A.   Throughout the production, prior to first --
9 at first notification, during the production, up
10 until the end of my involvement, we verified through
11 multiple sources of information including from
12 U.S. Government agencies, from the U.K. government,
13 from paid-for sources and from media, we used
14 multiple sources of information to assess and
15 evaluate risk and how to mitigate it.  We look for
16 information that can be confirmed by other sources
17 and I look for gaps and abnormalities.
18    Q.   Were those steps taken in order to confirm
19 the accuracy of what was provided to you in something
20 like Exhibit 102 --
21       MR. HAYES:  Objection --
22 BY MS. SCOTT REED:
23    Q.   -- or separate and apart?
24       MR. HAYES:  Sorry.  Objection, vague, lacks
25 foundation.

Page 120

1        THE WITNESS:  I couldn't -- I couldn't say
2 specifically in relation to this document whether I
3 did or didn't.
4 BY MS. SCOTT REED:
5    Q.   Over the course of your dealings with Max
6 Security Intelligence, did you find their
7 intelligence briefings to be reliable?
8        MR. HAYES:  Objection, vague.
9        THE WITNESS:  They were reliable, yes.
10 BY MS. SCOTT REED:
11    Q.   Did you -- over the course of dealing with
12 Max Security Intelligence, do you -- did you find
13 their written intelligence reports to be accurate?
14       MR. HAYES:  Objection, vague, lacks
15 foundation.
16       THE WITNESS:  Intelligence support by their
17 very nature means I can't answer yes or no, because
18 accuracy depends on a review post incident, so it's
19 very difficult to say with any great confidence
20 whether it's yes or no.
21       Some may be accurate, some may not be
22 accurate.  It would be unfair of me to -- to say
23 either way.  That's the very nature of information
24 intelligence.
25

Page 121

1 BY MS. SCOTT REED:
2    Q.   In terms of facts that they would pass along
3 or report, were there instances when you noted that
4 they were not supported?
5        MR. HAYES:  Objection, vague, lacks
6 foundation.
7        THE WITNESS:  Not to my recollection.
8 BY MS. SCOTT REED:
9    Q.   Overall dealing with the Max Security
10 Intelligence written reports that came into you, did
11 you find them to be an authoritative source of
12 information that you could rely upon?
13       MR. HAYES:  Objection, vague, lacks
14 foundation.
15       THE WITNESS:  I found them to be useful.
16 BY MS. SCOTT REED:
17    Q.   And did you rely upon them in doing your
18 work and carrying out your duties?
19       MR. HAYES:  Objection, vague, lacks
20 foundation.
21       THE WITNESS:  Max intelligence reports were
22 one of a number of -- of information and intelligence
23 sources that I used to inform my activity in
24 supporting the production.
25

31 (Pages 118 - 121)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 122

1 BY MS. SCOTT REED:
2    Q.  So to be clear about Max Security
3 Intelligence written reports in particular such as
4 Exhibit 102, did you rely upon written reports such
5 as 102 in carrying out your work for NBCUniversal?
6       MR. HAYES:  Objection, vague, lacks
7 foundation.
8       THE WITNESS:  They were one of a number of
9 intelligence sources that I used to carry out my
10 role.
11 BY MS. SCOTT REED:
12    Q.  Yes, sir.
13       And right now, I'm just focusing on the Max
14 Security -- Max Security Intelligence written
15 reports.
16       Can you confirm for the court that you did
17 rely upon Max Security Intelligence reports as one of
18 the sources that you used to carry out your work for
19 NBCUniversal on Dig?
20       MR. HAYES:  Objection, vague, lacks
21 foundation.
22       THE WITNESS:  Yes.
23       MS. SCOTT REED:  Thank you, sir.
24       He needs to change the tape.
25       VIDEO OPERATOR:  We are off the record.  The

32 (Pages 122 - 125)

Veritext Legal Solutions

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 128

1    Q.  Did you provide any updates for mitigation
2 as filming actually began?
3    A.  Yes.
4    Q.  Do you recall what any of those were?
5    A.  I would have to refer back to documentation.
6    Q.  And at the point in time where you gave the
7 assessment that NBCUniversal could no longer
8 guarantee the security and safety of personnel, was
9 that a mitigation?
10    A.  Yes.
11    Q.  And why do you refer to a conclusion like
12 that as a mitigation?
13       MR. HAYES:  Objection, vague, lacks
14 foundation.
15       THE WITNESS:  Any -- advisory action is a
16 mitigation.  By removing people from a dangerous
17 location is mitigating the risk.  My job's about
18 assessing and providing solutions to risk.
19 BY MS. SCOTT REED:
20    Q.  Was your solution by that point in the
21 production that you're referring to, about no longer
22 guaranteeing safety, security of personnel, that
23 personnel had to be removed from Israel?
24       MR. HAYES:  Objection, vague, lacks
25 foundation.

Page 129

1       THE WITNESS:  My advice was that we could
2 not guarantee the safety and security of the
3 personnel and assets at that time given the
4 information from multiple sources that we had
5 assessed.
6 BY MS. SCOTT REED:
7    Q.  Does it fall to someone other than you to
8 make the ultimate decision to remove personnel?
9    A.  Yes.
10    Q.  And do you know who that was for purposes of
11 the Dig production?
12    A.  No.
13    Q.  In any initial trip to Israel, can you tell
14 me what you discussed with the production team?
15       MR. HAYES:  Objection, vague, lacks
16 foundation.
17       THE WITNESS:  I discussed the security
18 implications of individual locations, of
19 transportation accommodation, of what security
20 mitigation we would need to provide.
21 BY MS. SCOTT REED:
22    Q.  Who from production did you meet with
23 face-to-face during that visit to Israel?
24    A.  I met with a number of people including
25 Randi Richmond, Mark Binkie, the production filming

33 (Pages 126 - 129)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

**Page 162**

1 hypothetical.
2    THE WITNESS: Yes, I do.
3 BY MS. SCOTT REED:
4    Q. All right, sir. And do you recall it today?
5    A. No.
6    Q. Were you familiar with Max Security
7 Solutions before they were hired to work on the Dig
8 production?
9    A. No.
10    Q. Were they recommended or identified to you
11 by someone at NBCUniversal?
12    A. Yes.
13    Q. Who was that?
14    A. I can't recall.
15    Q. Did that person have prior experience with
16 Max Security?
17    MR. HAYES: Objection, calls for
18 speculation, lacks foundation.
19    THE WITNESS: I have no idea.
20 BY MS. SCOTT REED:
21    Q. Did you take steps to vet Max Security or
22 assess its capabilities before you hired it?
23    MR. HAYES: Objection, vague, compound.
24    THE WITNESS: Yes.
25

**Page 163**

1 BY MS. SCOTT REED:
2    Q. What did you do?
3    A. I met them in person. I met them in country
4 with their senior management team and discussed their
5 experience, their background, and I also spoke with
6 peers in the security industry.
7    Q. Peers of yours who work with other
8 companies?
9    A. Yeah, other -- other security personnel.
10    Q. Well, can you identify any of them who --
11    A. No, I can't recall.
12    Q. -- knew Max?
13    Based upon your personal interaction with
14 Max did you find them to be having the appropriate
15 level of experience and expertise to do what you
16 needed them to do?
17    MR. HAYES: Objection, vague, lacks
18 foundation.
19    THE WITNESS: Which -- which part of what
20 they did? Providing security personnel? Providing
21 intelligence?
22 BY MS. SCOTT REED:
23    Q. Providing intelligence.
24    A. I found them to be -- yes.
25    Q. And did you find their work to be good and

**Page 164**

1 reliable work when they were providing security
2 intelligence reports to you?
3    MR. HAYES: Objection, vague, lacks
4 foundation.
5    THE WITNESS: Reliable's a very speculative
6 word when you're dealing with security intelligence.
7 As I said earlier, you need to look at multiple
8 resources, and it's easy to look back on information
9 that's been provided and point out gaps,
10 abnormalities, or faults.
11 BY MS. SCOTT REED:
12    Q. Were you pleased with the quality of work
13 they provided to you in terms of their security and
14 intelligence reporting?
15    MR. HAYES: Objection, vague, lacks
16 foundation.
17    THE WITNESS: Yes.
18    MS. SCOTT REED: Let me hand you
19 Exhibit 103, please, sir.
20    (Exhibit 103 was marked for identification by
21    the court reporter and is attached hereto.)
22    MS. SCOTT REED: For the record, Exhibit 103
23 is Bates numbered UCP2306 through 2307.
24    Q. Can you identify what this is, please,
25 Mr. Smith.

**Page 165**

1    A. It's a -- it's a travel tracker report from
2 Control Risks and International SOS.
3    THE REPORTER: From Control ...
4    THE WITNESS: Control Risks.
5    THE REPORTER: International?
6    THE WITNESS: SOS.
7 BY MS. SCOTT REED:
8    Q. What is Control Risks, International SOS?
9    A. Control Risks is a security and crisis
10 management company. International SOS is an NBC
11 vendor who provides travel, security, and medical
12 response throughout the world. They also track our
13 travelers as part of a travel tracker program.
14    Q. Can you explain to the court what a travel
15 tracker proactive e-mail is?
16    A. It's an e-mail informing myself about people
17 in country at the time, in the next 24 hours, and in
18 the coming week. This one refers to Israel.
19    Q. And can you identify this as a July 9th,
20 2014 travel tracker proactive e-mail that you
21 received?
22    A. Yes.
23    Q. Was this one of the sources of information
24 that you had incoming about security conditions in
25 Israel?

42 (Pages 162 - 165)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 166

1    A.  Yes.
2       Q.  And did you rely upon reports such as this
3  one when you received them for doing your work on
4  Dig?
5          MR. HAYES:  Objection, vague, lacks
6  foundation.
7          THE WITNESS:  I didn't rely on one source of
8  information.  I utilized multiple sources of
9  information.
10  BY MS. SCOTT REED:
11      Q.  Yes, sir.
12         And is Exhibit 103 an example of one of the
13  types of sources that you would rely upon?
14         MR. HAYES:  Objection, vague, lacks
15  foundation.
16         THE WITNESS:  It's an example of one, yes.
17  BY MS. SCOTT REED:
18      Q.  And you would rely upon a report like this,
19  among others, when you received it?
20         MR. HAYES:  Objection, vague, lacks
21  foundation.
22         THE WITNESS:  I'm -- I'm getting a bit
23  confused what do you mean by "rely upon."  I wouldn't
24  base any of my actions on this specific piece of
25  information that's here.  I would verify what I'm

43 (Pages 166 - 169)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 170

1  rating of 1 to 5. Some companies raise -- use a
2  rating of low, medium, high, extreme, and medium is
3  not a -- you know, it's one of a number of ways of
4  describing the situation.
5  BY MS. SCOTT REED:
6      Q.  Were you engaging in ongoing monitoring of
7  the security situation in Israel on July the 9th?
8      A.  Yes.
9      Q.  Were you reviewing, among other things,
10  travel warnings that were being issued?
11     A.  Yes.
12     Q.  Were you aware that, according to sources
13  that were reporting, more than 200 rockets had been
14  fired from Gaza and targeted Israel since the IDF
15  launched operative -- Operation Protective Edge on
16  July the 8th?
17          MR. HAYES: Objection, lacks foundation.
18          THE WITNESS: I was reviewing all
19  information available.
20  BY MS. SCOTT REED:
21     Q.  And do you recall reviewing information that
22  was reported from multiple sources that there had
23  been significant rockets fired from Gaza to target
24  Israel since the IDF launched Operation Protective
25  Edge on July 8?

Page 171

1          MR. HAYES: Objection, vague, lacks
2  foundation.
3          THE WITNESS: I was reviewing multiple
4  sources of information, and any escalation, any
5  direct evidence, would have been part of that review.
6  BY MS. SCOTT REED:
7      Q.  Did you note escalation in the activity that
8  was aimed from Gaza to Israel and out of Israel back
9  toward Gaza in July of 2014?
10          MR. HAYES: Objection, vague, lacks
11  foundation.
12          THE WITNESS: Noting and assessing
13  escalation and conflict is part of the risk
14  management and security process, not just on this
15  date but throughout an event of production.
16  BY MS. SCOTT REED:
17     Q.  Yes, sir.
18          And in the first two weeks of July of 2014,
19  as part of your work on the Dig production, did you
20  note that that was an uptick in activity?
21     A.  Yes.
22     Q.  And were there out of the ordinary sorts of
23  events beginning to occur?
24          MR. HAYES: Objection, vague, lacks
25  foundation.

Page 172

1          THE WITNESS: What do you mean by out of the
2  ordinary? You know, could you be slightly more
3  specific?
4  BY MS. SCOTT REED:
5      Q.  Sure.
6      A.  200 rockets fired from Gaza?
7      Q.  Right.
8      A.  You know, is that out of the ordinary in
9  your opinion?
10          Because I don't really know what you mean by
11  out of the ordinary.
12     Q.  Let me try to improve 'cause I'm -- I'm
13  speaking to you from a lay perspective, and, of
14  course, you're coming to this from a security
15  perspective. So I'll try to improve.
16     A.  Okay.
17     Q.  All right. So you were in Israel during
18  production and filming for Dig, correct?
19     A.  Correct.
20     Q.  And you personally could look around and
21  sort of see the situations, and you were continuing
22  to receive security updates, right?
23          MR. HAYES: Objection, vague, lacks
24  foundation, misstates prior testimony.
25          THE WITNESS: I was receiving security

Page 173

1  information from multiple sources.
2  BY MS. SCOTT REED:
3      Q.  Yes. And you could assess for yourself
4  based upon observing the conditions there how
5  security was at that point in time?
6          MR. HAYES: Objection, vague, lacks
7  foundation, misstates prior testimony.
8          THE WITNESS: Depending on the location I
9  was in, but, you know, I can't vouch for --
10  personally for every single instance that's
11  happening.
12  BY MS. SCOTT REED:
13     Q.  Sir, I'm talking about what you personally
14  observed.
15          When you were in various locations could you
16  personally observe what the security situation was
17  according to your own observations?
18          MR. HAYES: Objection, vague, lacks
19  foundation, misstates prior testimony.
20          THE WITNESS: I -- I honestly don't really
21  understand what the -- what the question is.
22          Are we still talking about this document
23  here or are we just talking -- I really don't
24  understand.
25

44 (Pages 170 - 173)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 174

1  BY MS. SCOTT REED:
2     Q.  All right, sir.  I'm talking about, if you
3  will, establishing a baseline for your observations
4  for while filming was actually going on in the series
5  Dig.
6        Did you observe what the conditions were on
7  the ground while you were there during filming?
8        MR. HAYES:  Objection, vague, lacks
9  foundation.
10       THE WITNESS:  I observed and I also
11 documented what the conditions were.
12 BY MS. SCOTT REED:
13    Q.  All right, sir.  Now, let me move you
14 forward in time to July the 9th where there is
15 reporting that there was more than 200 rockets fired
16 from Gaza to target Israel.
17       Would that have been an uptick in activity
18 versus the days that you were there?
19       MR. HAYES:  Objection, vague.
20       THE WITNESS:  I would need to review
21 documentation to confirm how many rockets, etc., were
22 fired, but it was certainly an increase than when I
23 first went to Israel.
24 BY MS. SCOTT REED:
25    Q.  So when you assessed security for the Dig

Page 175

1  project, did you report anything to NBCUniversal
2  along the lines that it would be typical for 200
3  rockets to be fired out of Gaza toward Israel during
4  filming?
5        MR. HAYES:  Objection, vague, lacks
6  foundation.
7        THE WITNESS:  I would need to refer to the
8  security report that I prepared prior to the
9  production and -- being undertaken.
10 BY MS. SCOTT REED:
11    Q.  And, sir, just based upon your general
12 knowledge and your experience, would this been --
13 would this have been a significant amount of rocket
14 fire to be occurring between July 8th and July 9th?
15       MR. HAYES:  Objection, vague, lacks
16 foundation.
17       THE WITNESS:  Yes.
18 BY MS. SCOTT REED:
19    Q.  When there was an uptick in activity with
20 the rocket fire between July 8th and July 9th, being
21 an example, did you discuss returning to Israel in
22 order to make personal observations?
23       MR. HAYES:  Objection, vague, lacks
24 foundation.
25       THE WITNESS:  I can't recall.

Page 176

1  BY MS. SCOTT REED:
2     Q.  Did you consider going back to Israel during
3  the filming hiatus to observe what was going on?
4     A.  I can't recall.
5     Q.  You can't recall whether you in your own
6  head thought about it?
7     A.  Yes, I don't know whether I did or whether I
8  didn't.  I can't recall.
9        MS. SCOTT REED:  Let me hand you what's been
10 marked as Exhibit 104, please, sir.
11       (Exhibit 104 was marked for identification by
12       the court reporter and is attached hereto.)
13       MR. HAYES:  Thanks.
14 BY MS. SCOTT REED:
15    Q.  For the record this is Bates numbered
16 UCP2606 through 2607.
17       Mr. Smith, can you identify Exhibit 104 as
18 an April 21st, 2014 travel tracker proactive e-mail
19 directed to you via -- via e-mail?
20    A.  Yes.
21    Q.  And do you have any reason to doubt you
22 received this report on or about April the 21st?
23    A.  No.
24    Q.  Would you receive travel tracker proactive
25 e-mails on a regular basis, as in daily or weekly, or

Page 177

1  only on significant reporting events?
2        MR. HAYES:  Objection, vague, lacks
3  foundation, calls for speculation.
4        THE WITNESS:  I don't recall how often I
5  would receive them or the -- yeah.
6  BY MS. SCOTT REED:
7     Q.  Over the course of all your work on Dig,
8  were the travel tracker proactive e-mails one of the
9  various sources incoming to you that you would have
10 reviewed?
11       MR. HAYES:  Objection, vague, lacks
12 foundation.
13       THE WITNESS:  Yes.
14 BY MS. SCOTT REED:
15    Q.  Did you pass these along to Mr. Biggs?
16       MR. HAYES:  Objection, vague, lacks
17 foundation.
18       THE WITNESS:  To my knowledge, he receives
19 them directly.
20 BY MS. SCOTT REED:
21    Q.  I want to ask you about the section that's
22 entitled:  Travel briefing, at the bottom of the
23 page, the last sentence of the paragraph.  It says
24 (as read):
25       The militant group opposes the

45 (Pages 174 - 177)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 178

1 current ceasefire between Israel and
2 the Palestinian Islamic Movement,
3 Hamas, which governs Gaza.
4     Do you see that?
5 A.   Yes.
6 Q.   Do you have a familiarity with Hamas?
7     MR. HAYES:  Objection, vague.
8     THE WITNESS:  I have knowledge of Hamas.
9 BY MS. SCOTT REED:
10 Q.   And have you gained that knowledge as part
11 of your work providing corporate security for
12 NBCUniversal?
13 A.   And other entities.
14 Q.   Did you study Hamas prior to taking your job
15 at NBCUniversal for any purpose?
16 A.   No.
17 Q.   Can you describe your familiarity with Hamas
18 governing Gaza?
19     MR. HAYES:  Objection, vague, lacks
20 foundation, misstates testimony.
21     THE WITNESS:  Hamas is a terrorist
22 organization.  I wouldn't refer to them as the -- the
23 governments or governing Gaza.  To my mind, they are
24 a designated terrorist organization.
25     The contents of this report is neither

Page 179

1 written nor controlled by me.  I'm interested in what
2 it's actually telling me about specific events, not
3 their interpretation of whether a group governs or
4 otherwise.
5 BY MS. SCOTT REED:
6 Q.   Do you disagree with the statement here that
7 Hamas governs Gaza?
8 A.   I have -- I don't have enough knowledge to
9 say whether they do or don't.  To me Hamas are a
10 terrorist organization as designated by the
11 U.S. Government.
12 Q.   Well, as part of your work on Dig, did you
13 undertake any review of Hamas and its role in
14 government of Gaza?
15 A.   My role does not involve looking at who
16 governs certain areas.  That's completely outside of
17 my remit.  My remit involves assessing --
18     THE REPORTER:  My what; remit?
19     THE WITNESS:  My remit, R-E-M-I-T.
20     My remit involves assessing risk from
21 multiple sources and providing mitigation.  I'm not
22 involved in political analysis, historical analysis,
23 or the designation of who governs a particular
24 territory.
25

Page 180

1 BY MS. SCOTT REED:
2 Q.   So sitting here today, you don't have any
3 background or information that would afford you the
4 opportunity to say whether Hamas is governing Gaza
5 presently?
6     MR. HAYES:  Objection, misstates his
7 testimony and asked and answered.
8     THE WITNESS:  I don't know -- I have no idea
9 either way whether they do or don't.  They're a
10 terrorist organization.
11 BY MS. SCOTT REED:
12 Q.   Do you have any familiarity with elections
13 that were held in Palestine whereby Hamas was elected
14 to seats in parliament?
15     MR. HAYES:  Objection, lacks foundation,
16 vague.
17 BY MS. SCOTT REED:
18 Q.   Do you have any background or information
19 regarding Hamas participating in the actual
20 government of Palestine in 2014?
21     MR. HAYES:  Objection, lacks foundation,
22 vague.
23     THE WITNESS:  No.
24 BY MS. SCOTT REED:
25 Q.   So if an authority describes the fact that

Page 181

1 Hamas governs Palestine, you would not have the
2 factual basis or expertise to dispute that?
3     MR. HAYES:  Objection, vague, lacks
4 foundation, argumentative, improper hypothetical.
5     THE WITNESS:  I would engage with people who
6 did know the answer, and that's why I have analysts.
7 And that's why I get multiple sources of information.
8 Whether somebody describes somebody as the government
9 is not my area of expertise.  My area of expertise is
10 looking at risk and mitigating against risk.
11 BY MS. SCOTT REED:
12 Q.   So you would testify to the court that you
13 do not have the factual basis or expertise to provide
14 a conclusion to the court about whether Hamas is the
15 governing authority of Gaza?
16     MR. HAYES:  Objection, lacks foundation,
17 vague, asked and answered, improper hypothetical.
18     THE WITNESS:  I don't know either way.
19 BY MS. SCOTT REED:
20 Q.   Do you hold yourself out as having the
21 background or expertise to provide an opinion?
22 A.   An opinion on ...
23 Q.   An opinion on or a conclusion on whether
24 Hamas is the governing authority of Palestine.
25     MR. HAYES:  Objection, asked and answered,

46 (Pages 178 - 181)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 182

1  vague, ambiguous, lacks foundation, harassing.
2       THE WITNESS: No.
3       MS. SCOTT REED: Let me hand you what's been
4  marked as Exhibit 105, please, sir.
5       (Exhibit 105 was marked for identification by
6   the court reporter and is attached hereto.)
7       MS. SCOTT REED: For the record Bates
8  numbered UCP3562 through 3564.
9    Q.  Mr. Smith, can you identify Exhibit 105 as
10 an e-mail string, the final of which is from you to
11 Ms. Richmond, dated May 1st, 2014?
12   A.  Yes.
13   Q.  Let me direct you, please, sir, after good
14 morning, Randi, and thank you for the update, down to
15 the third paragraph, which begins: Peace talks.
16      Can you read that first sentence for the
17 record, please, sir.
18   A.  (As read):
19        Peace talks between Palestine
20       representatives and Israel have
21       stalled in recent weeks, and the new
22       agreement between Fatah, the
23       Palestine faction engaged in
24       negotiations, and Hamas, considered
25       a terrorist organization by the

Page 183

1        U.S. and Israel, has decreased the
2        likelihood of a comprehensive peace
3        accord, and may also affect the
4        threat levels --
5       THE REPORTER: Wait, wait. Slow down.
6       THE WITNESS: Sorry.
7       THE REPORTER: Affect the likelihood of
8  a ...
9       THE WITNESS: And may also affect the threat
10 level in certain areas.
11 BY MS. SCOTT REED:
12   Q.  What is the new agreement between Fatah and
13 Hamas that you're referring to?
14      MR. HAYES: Objection, lacks foundation.
15      THE WITNESS: I can't recall.
16 BY MS. SCOTT REED:
17   Q.  At the time that you wrote this, were you
18 familiar with the new agreement between Fatah and
19 Hamas?
20      MR. HAYES: Objection, lacks foundation.
21      THE WITNESS: I may not be the author of
22 this information that you're referring to.
23 BY MS. SCOTT REED:
24   Q.  Sir, my question was: At the time you wrote
25 this, were you familiar with the new agreement

Page 184

1  between Fatah and Hamas --
2       MR. HAYES: Objection, vague --
3  BY MS. SCOTT REED:
4    Q.  -- as indicated in your e-mail?
5       MR. HAYES: Objection, vague, lacks
6  foundation.
7       THE WITNESS: Well, I just said I don't know
8  if I wrote this.
9  BY MS. SCOTT REED:
10   Q.  Regardless of whether you wrote it or not,
11 at the time of this communication, May 1st, were you
12 familiar with a new agreement between Fatah and
13 Hamas?
14      MR. HAYES: Objection, vague, lacks
15 foundation.
16      THE WITNESS: Not that I can -- I don't know
17 either way.
18      MS. SCOTT REED: Let me hand you what's been
19 marked as Exhibit 106, please, sir, for the record
20 Bates number UPC -- pardon me -- UCP1877 through
21 1887.
22      (Exhibit 106 was marked for identification by
23   the court reporter and is attached hereto.)
24 BY MS. SCOTT REED:
25   Q.  Mr. Smith, can you identify this as an

47 (Pages 182 - 185)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 204

1    Q.   Did Ms. Richmond forward to you information
2   out of a "Times of Israel" article regarding current
3   events in and around June the 13th, 2014?
4    A.   I'll need some time just to review the
5   paperwork.
6        MR. HAYES:  Would you, Miss, would you mind
7   repeating that question?  I'm not getting it on the
8   real time clearly.
9
10       (Whereupon the record was read by
11       the reporter as follows:
12       "Q.  Did Ms. Richmond forward to
13       you information out of a "Times of
14       Israel" article regarding current
15       events in and around June the 13th,
16       2014?")
17
18       MR. HAYES:  Objection, lacks foundation.
19       THE WITNESS:  Going from this e-mail, yes.
20   BY MS. SCOTT REED:
21   Q.   And did you review the information that she
22   sent to you regarding abductions?
23   A.   I wouldn't be able to say if I reviewed this
24   information or any other information, but I looked at
25   multiple streams of information.  Whether I reviewed

Page 203

1   BY MS. SCOTT REED:
2    Q.   Mr. Smith, will you please refer to the
3   documents that have been marked Exhibits 107 and 108.
4        MS. SCOTT REED:  For the record, Exhibit 107
5   is UCP1873 through 1876.
6        (Exhibit 107 was marked for identification by
7        the court reporter and is attached hereto.)
8        MR. HAYES:  I'm sorry, we -- we have now
9   designated I think -- did you skip 107 and 108?
10       MS. SCOTT REED:  I just handed them to him
11   and to you.
12       MR. HAYES:  Okay.  I thought you had
13   designated the notices, okay.
14   BY MS. SCOTT REED:
15   Q.   Mr. Smith, can you identify Exhibit 107 as
16   an e-mail string, the final of which was directed to
17   you by Randi Richmond, dated June 14th, 2014?
18   A.   Yes.
19   Q.   Did you receive this e-mail from
20   Ms. Richmond?
21   A.   The e-mail was certainly sent to me and I'm
22   making a presumption that I received it.
23   Q.   Do you have any reason to doubt that you
24   received this?
25   A.   No.

Page 205

1   this, I wouldn't be able to tell you.  I reviewed
2   multiple streams of information and I specifically
3   remember the abduction.
4    Q.   You do?
5    A.   Yes.
6    Q.   And what about the abduction made it stand
7   out in your mind?
8    A.   The fact that three teenagers, to my
9   recollection, had been abducted and eventually
10   murdered.
11   Q.   Were you aware of those facts before
12   Ms. Richmond sent you this communication asking you
13   to keep an eye on the issue?
14   A.   I don't know one way or the other.
15   Q.   Do you recall this being new news to you
16   when she sent it?
17   A.   I don't recall.
18   Q.   Did you keep an eye on this situation and
19   advise Ms. Richmond and others in production about
20   it?
21   A.   I advised throughout the production, post,
22   during, and preproduction, from a multitude of
23   sources.
24   Q.   Did you actually view the "Times of Israel"
25   article that she included the link for?

52 (Pages 202 - 205)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 206

1    A.   I've -- I have no way of knowing one way or
2  the other.
3    Q.   Would that have been your practice to do so
4  if your, I'm going to call her your client, sent you
5  a link to an article, it would have been your
6  ordinary practice to review the article?
7    A.   My ordinary practice would vary depending on
8  the circumstances, so I can't say one way or the
9  other whether I reviewed the link or not.  My memory
10 doesn't serve me whether I did or not.
11   Q.   All right.  Would you look at Exhibit 108,
12 please, sir, which for the record is the article
13 printed off of the link www.timesofisrael.com.
14       (Exhibit 108 was marked for identification by
15    the court reporter and is attached hereto.)
16 BY MS. SCOTT REED:
17   Q.   Have you seen that article before today?
18   A.   Can you just give me a couple minutes?
19   Q.   Certainly.
20   A.   I would not be able to say with any
21 certainty one way or the other.
22   Q.   Did you review security reports or
23 intelligence reports that included the information
24 about the teenagers being abducted?
25   A.   Yes, I did.

Page 207

1    Q.   And did you review security reports or media
2  reports that talked about Prime Minister Benjamin
3  Netanyahu linking that to Hamas?
4    A.   The actual specifics of what the reports
5  contained, I wouldn't be able to tell you one way or
6  the other.  I would have to refer to documentation.
7    Q.   Would you refer, please, sir, to the middle
8  of the page of Exhibit 107, that's the e-mail string
9  under the large heading that says (as read):
10       PM to carry, feared abductions as
11       a result of Hamas entry into
12       government.
13       Do you see that headline?
14   A.   Yes.
15   Q.   All right.  Would you read the first
16 paragraph under that, please, sir.
17   A.   (As read):
18       Prime Minister Benjamin Netanyahu
19       told U.S. Secretary of State John
20       Kerry on Friday that since the
21       announcement of a unity
22       government --
23       THE REPORTER:  On Friday?  Slow down a
24 little bit.
25       THE WITNESS:  I'm sorry.  (As read):

Page 208

1        That since the announcement of a
2     unity government between the Fatah
3     led PLO and Hamas in April, "the
4     situation on the ground has been
5     destructive."
6  BY MS. SCOTT REED:
7    Q.   When you received this information from
8  Ms. Richmond, did you do anything to look into this
9  announcement of a unity government between the Fatah
10 led PLO and Hamas?
11   A.   That's really not my -- my area of
12 expertise.  I assess risk in the security of
13 individuals, based on circumstances around terrorist
14 attacks, increased threats.  I'm not somebody who
15 deals with political analyses, geopolitical topics.
16   Q.   Did you look into whether the announcement
17 of a unity government between that Fatah led PLO and
18 Hamas was having an impact on security situation in
19 Israel?
20       MR. HAYES:  Objection, vague, and asked and
21 answered.
22       THE WITNESS:  I would receive information
23 from a variety of sources and I also, as discussed
24 previously, I employ an analyst to look at this type
25 of information very generally.

Page 209

1  BY MS. SCOTT REED:
2    Q.   Do you remember receiving security updates
3  or intelligence reports that indicated that the fact
4  that Fatah and Hamas had formed a unity government
5  was having an impact on the security situation in
6  Israel?
7        MR. HAYES:  Objection, vague, lacks
8  foundation.
9        THE WITNESS:  I don't remember one way or
10 the other.
11 BY MS. SCOTT REED:
12   Q.   If you had seen reporting that the unity
13 government between that Fatah and Hamas was leading
14 to security issues on the ground in Israel, would you
15 have further investigated it?
16   A.   I --
17       MR. HAYES:  Objection, vague, improper
18 hypothetical.
19       THE WITNESS:  I employ an analyst who would
20 review that type of information, but whether --
21 whether some group is referred to as a government, a
22 unity government, is immaterial to me.  I'm dealing
23 with the facts about the security situation on the
24 ground.
25

53 (Pages 206 - 209)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 210

1 BY MS. SCOTT REED:
2     Q.  Is the subject of a unity government between
3 that Fatah and Hamas, if it was reported to having an
4 effect on security on the ground in Israel, something
5 you would have asked Mr. Biggs to analyze?
6     A.  I asked Mr. Biggs to analyze all information
7 that comes our way.  Whether I asked him to look at
8 this specifically, I can not say.
9     Q.  So would you have just viewed this as
10 something that in ordinary course he should have
11 looked into?
12     MR. HAYES:  Objection, vague lacks
13 foundation.
14     THE WITNESS:  I would expect him in the
15 thoroughness of his job to look at all of the
16 information that was available to him.  Whether he
17 did or not, this particular document, I don't know.
18 BY MS. SCOTT REED:
19     Q.  After this kidnapping of the teenagers
20 became public, did the security situation in Israel
21 change in any way that you observed?
22     MR. HAYES:  Objection, lacks foundation.
23     THE WITNESS:  The security situation did
24 change and I received multiple reports regarding the
25 changes, and -- and uptick in an unpredictable

Page 211

1 security landscape.
2 BY MS. SCOTT REED:
3     Q.  What was the uptick?
4     A.  There was an increase in Israeli military
5 and police activity across the country, and there was
6 also the threat of increased terrorist activity and
7 further kidnappings.
8     Q.  Committed by whom, or suspected that could
9 be committed by whom?
10     A.  Well, to be quite frank either side.
11     Q.  Was there -- I'm sorry.
12     A.  Terrorist organizations and individuals on
13 the Israeli side, not Israeli military and police,
14 but also talking about attacks, kidnappings, and
15 revenge.
16     Q.  And what about from the Palestinian side,
17 was there a reporting of an uptick of that potential
18 possibility?
19     MR. HAYES:  Objection, vague, lacks
20 foundation.
21     THE WITNESS:  There was an increase across
22 the country and threats of further activity was
23 obvious, and we were receiving information to that
24 effect.
25

Page 212

1 BY MS. SCOTT REED:
2     Q.  And was the threat that there would be
3 activity carried out against Israel?
4     MR. HAYES:  Objection, vague.
5     THE WITNESS:  The -- there is always some
6 type of -- there always was some type of threat.
7 The threat was increasing throughout the time we were
8 in Israel, the threat from reprisals, the threat from
9 terrorist attacks, the threat from people just simply
10 using knives, yes, the threat was increasing.
11 BY MS. SCOTT REED:
12     Q.  After the kidnapping became public, what
13 increased activity in terms of missiles or border
14 fire occurred from Palestine or Gaza into Israel?
15     MR. HAYES:  Objection, vague, lacks
16 foundation.
17     THE WITNESS:  I would have to refer to
18 paperwork to confirm what that was.
19 BY MS. SCOTT REED:
20     Q.  Did you note over the weeks following
21 June 14th that there was increased activity in terms
22 of missiles and other bombing materials being
23 launched out of Gaza or Palestine and into Israel?
24     MR. HAYES:  Objection, vague, lacks
25 foundation.

Page 213

1     THE WITNESS:  There was an increase
2 throughout the time the production was in Israel in
3 terms of the risk from terrorism and the risk from
4 further conflict.
5 BY MS. SCOTT REED:
6     Q.  Yes, sir.
7     And specifically was there increased missile
8 fire out of Gaza or Palestine directed into Israel?
9     A.  I would -- I would have to check the exact
10 dates, but throughout the production, yes, this
11 increased.
12     Q.  Yes, sir.
13     And did it continue even after production
14 was moved?
15     A.  Yes.
16     Q.  And when I said "it," I'm referring to
17 missile fire out of Gaza or Palestine into Israel.
18 Is that what continued even after production moved
19 out of Israel?
20     A.  Yes, that's my understanding.
21     Q.  And did the intensity of that continue to
22 increase over time?
23     MR. HAYES:  Objection, lacks foundation.
24     THE WITNESS:  I wouldn't be able to tell you
25 without consulting paperwork or, you know,

54 (Pages 210 - 213)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 214

1 intelligence relating directly to that type.
2 BY MS. SCOTT REED:
3   Q.  Over this time period, beginning middle of
4 June and going on through the summer, was there also
5 rocket fire, missiles directed out of Israel toward
6 Palestine or Gaza?
7       MR. HAYES:  Objection, vague, lacks
8 foundation.
9       THE WITNESS:  I would have to check the
10 paperwork for exact time, dates, and the period and
11 escalation process to be able to answer that question
12 fully.
13 BY MS. SCOTT REED:
14   Q.  Do you recall that there was an uptick in
15 activity of bombings either by missiles or other
16 weaponry out of Israel aimed toward Palestine or
17 Gaza?
18       MR. HAYES:  Objection, vague, lacks
19 foundation.
20       THE WITNESS:  I would have to check the
21 paperwork relating to that specific time and
22 intelligence that I was receiving.
23 BY MS. SCOTT REED:
24   Q.  Yes, sir.
25       But those were -- the timeframe you were

Page 215

1 focusing on was the summer of 2014, correct?
2   A.  Yes.  But this specific timeframe and
3 whether it was an escalation and when things
4 happened, I would have to refer to paperwork.  I
5 would have to refer to the notes, the reports that I
6 exchanged throughout this time period.
7   Q.  Would you describe the use of force from
8 Palestine or Gaza into Israel and Israel into
9 Palestine or Gaza as mutual?
10       MR. HAYES:  Objection, vague, lacks
11 foundation.
12       THE WITNESS:  It's really not my area of
13 expertise, that's not what I'm employed to do.  If --
14 if you're asking opinion, I haven't -- haven't
15 thought about it.  I'm dealing with facts on the
16 ground.  What's actually the risk to the people and
17 our assets there?
18       I haven't thought about that at all, whether
19 it's mutual, whether it's one side stronger than the
20 other.
21 BY MS. SCOTT REED:
22   Q.  Well, I don't mean one side stronger than
23 the other.  I mean that both sides were participating
24 in -- is it accurate that Israel was taking offensive
25 strikes against Palestine or Gaza?

Page 216

1       MR. HAYES:  Objection, vague, lacks
2 foundation?
3       THE WITNESS:  What time period are you
4 talking about here?
5 BY MS. SCOTT REED:
6   Q.  Summer of 2014.
7       MR. HAYES:  Same objections.
8       THE WITNESS:  Israel certainly responded to
9 the attacks.
10 BY MS. SCOTT REED:
11   Q.  And they did so by offensive action directed
12 at Palestine and/or Gaza?
13       MR. HAYES:  Objection, vague, lacks
14 foundation and compound.
15       THE WITNESS:  They took offensive action.
16 BY MS. SCOTT REED:
17   Q.  And did Palestine and Gaza take offensive
18 action against Israel during this same timeframe?
19       MR. HAYES:  Objection, vague, lacks
20 foundation.
21       THE WITNESS:  Yes, that's my understanding.
22 But it's not my area of expertise.
23 BY MS. SCOTT REED:
24   Q.  Was there escalation over the period of the
25 summer of 2014?

Page 217

1       MR. HAYES:  Objection, vague, lacks
2 foundation.
3       THE WITNESS:  Can you be more specific?
4 Escalation in?
5 BY MS. SCOTT REED:
6   Q.  Escalation of the violent activity directed
7 out of Israel into Gaza and/or Palestine and violent
8 activity out of Palestine or Gaza into Israel.
9       MR. HAYES:  Same objections, and it is
10 compound.
11       THE WITNESS:  Yes.
12 BY MS. SCOTT REED:
13   Q.  And did that continue for a period of weeks?
14       MR. HAYES:  Objection, vague, lacks
15 foundation.
16       THE WITNESS:  The actual time period, again,
17 I would have to refer to -- refer to notes.
18 BY MS. SCOTT REED:
19   Q.  And based upon the amount of time that
20 production was ongoing and the amount of time it was
21 stopped and moved, in your memory, was that
22 escalation continuing for a matter of weeks?
23       MR. HAYES:  Objection, vague, lacks
24 foundation.
25       THE WITNESS:  Sorry, I'm going to have to

55 (Pages 214 - 217)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 218

1 ask you to repeat that question. I didn't quite
2 understand it.
3 BY MS. SCOTT REED:
4     Q.  Setting the context of the question, which
5 is the amount of time production was ongoing in
6 Israel, the amount of time it was stopped, and the
7 amount of time it took to move out of Israel, was it
8 your recollection that this back and forth offensive
9 activity continued for a matter of weeks?
10       MR. HAYES:  Objection, vague, lacks
11 foundation.
12       THE WITNESS:  Yes.
13 BY MS. SCOTT REED:
14     Q.  And was it your recollection that that
15 offensive activity, which occurred back and forth,
16 continued for a matter of months?
17       MR. HAYES:  Same objections, vague, lacks
18 foundation.
19       THE WITNESS:  No.
20 BY MS. SCOTT REED:
21     Q.  Without looking at paperwork, are you able
22 to put a general timeframe around these milestone
23 activities that you're talking about in terms of
24 escalation?
25       MR. HAYES:  Objection, vague, lacks

Page 220

1 paperwork.
2 BY MS. SCOTT REED:
3     Q.  Were you asked to continue to provide those
4 security reports even after the decision was made to
5 move the production out of Israel?
6       MR. HAYES:  Same objections.
7       THE WITNESS:  Yes.
8 BY MS. SCOTT REED:
9     Q.  And who made the request, please, sir?
10       MR. HAYES:  Same objections.
11       THE WITNESS:  One of the production team,
12 L.A. based production team.
13 BY MS. SCOTT REED:
14     Q.  Can you recall if it was a gentleman or a
15 lady?
16     A.  It was a gentleman. I'm almost certain,
17 yes.
18     Q.  Can you recall who?
19     A.  I believe it was Mark Binkie.
20     Q.  Mr. Binkie asked that the reports continue?
21     A.  Yes, that's my recollection.
22     Q.  And did you continue to report on the
23 offensive activity that was going back and forth
24 between these two sides until it ended with a
25 ceasefire?

Page 219

1 foundation.
2       THE WITNESS:  Well, I think it's clear.
3 It's documented when I made my recommendation to the
4 business, and I don't think that's -- that's in any
5 doubt, and that was as a direct result of the
6 assessment of multiple streams of information and
7 intelligence from multiple sources, and in my role, a
8 safeguarding of the security of assets and personnel.
9 BY MS. SCOTT REED:
10     Q.  Did the activity offensive both ways
11 continue even after the move out of Israel?
12       MR. HAYES:  Objection, vague, lacks
13 foundation.
14       THE WITNESS:  Yes.
15 BY MS. SCOTT REED:
16     Q.  Did you continue to monitor it even after
17 Dig moved out of Israel?
18       MR. HAYES:  Same objections.
19       THE WITNESS:  Yes.
20 BY MS. SCOTT REED:
21     Q.  Do you know how much longer you continued to
22 provide reports to NBCUniversal after the move?
23       MR. HAYES:  Same objection -- same
24 objections.
25       THE WITNESS:  I would have to refer to

Page 221

1       MR. HAYES:  Objection, vague, lacks
2 foundation.
3       THE WITNESS:  I honestly couldn't tell you
4 if I stopped before there was a ceasefire
5 announcement or continued after.
6 BY MS. SCOTT REED:
7     Q.  Were you aware there was a ceasefire?
8     A.  I was.
9     Q.  Do you know who negotiated the ceasefire?
10     A.  No. Not without referring to the -- the
11 paperwork. It's not my -- again, it's not my area of
12 expertise.
13     Q.  Do you know whether the two opposing sides
14 in this conflict abided by the ceasefire?
15       MR. HAYES:  Objection, vague, lacks
16 foundation.
17       THE WITNESS:  No.
18 BY MS. SCOTT REED:
19     Q.  Presently, are you reporting to anyone at
20 NBCUniversal in regard to security conditions in
21 Israel?
22     A.  No.
23     Q.  Are there any ongoing productions in Israel
24 right now that NBCUniversal is pursuing?
25     A.  Not to my personal knowledge.

56 (Pages 218 - 221)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 222

1    Q.   To your personal knowledge, have there been
2  any productions actually filmed in Israel since Dig
3  moved out by NBCUniversal?
4    A.   Not to my personal knowledge.
5    Q.   Would you look at Exhibit 111, please, sir,
6  for the record, Bates UCP2524 through 2529.
7       (Exhibit 111 was marked for identification by
8    the court reporter and is attached hereto.)
9  BY MS. SCOTT REED:
10   Q.   Can you identify this, please, sir, as a
11  June 15th, 2014, Max Security Analysis sent to you by
12  e-mail?
13   A.   Yes.
14   Q.   Did you receive this?
15   A.   Well, it's certainly been e-mailed to me. I
16  can't recall if I received -- I received and read
17  this specific document.
18   Q.   Do you have any reason to doubt that you
19  received this on or about the time that is shown?
20   A.   I have no reason to doubt or confirm whether
21  I received and read this. So I can't confirm -- I
22  can't confirm either way.
23   Q.   Do you have any reason to doubt that you
24  received this particular document that's shown
25  addressed to you?

Page 223

1    A.   I -- I don't have any reason to doubt it,
2  but I also don't have any reason to confirm that I
3  read it.
4    Q.   Is this report from Max Security Analysis
5  something that you would have expected to receive
6  from them based upon these conditions on the ground?
7       MR. HAYES:  Object, vague, and lacks
8  foundation.
9       THE WITNESS:  Yes.
10  BY MS. SCOTT REED:
11   Q.   Is this report providing information to you
12  in regard to the kidnapping of the three teenagers
13  and the aftermath of it?
14       MR. HAYES:  Objection, vague, lacks
15  foundation.
16       THE WITNESS:  The report mentions that
17  particular incident.
18  BY MS. SCOTT REED:
19   Q.   Yes, sir.
20       And does it also mention that the Israeli
21  Defense Forces, IDF, initiated a broad search and
22  rescue operation with significant troop deployments?
23   A.   The information in front of me states that,
24  yes.
25   Q.   On the second page, was there also

Page 224

1  discussion about rockets being fired from the Gaza
2  Strip toward Israeli territory?
3       MR. HAYES:  Objection, the document speaks
4  for itself.
5       THE WITNESS:  That's information contained
6  within the document.
7       MS. SCOTT REED:  All right, sir.  Let's
8  allow the tape to be changed at this point.  I'm
9  going to hand you two more exhibits.
10       VIDEO OPERATOR:  We are off the record.  The
11  time is 2:37 p.m., and this is the end of the second
12  media.
13
14       (Recess taken.)
15
16       VIDEO OPERATOR:  This is the beginning of
17  the third media.  We're back on the record.  The time
18  is 2:46 p.m.
19       Please continue.
20  BY MS. SCOTT REED:
21   Q.   Mr. Smith, we were looking at Exhibit 111
22  before the break.  Do you still have that in front of
23  you?
24   A.   I do.
25   Q.   All right.  And will you also put

Page 225

1  Exhibit 112, newly marked, in front of you, please,
2  sir?
3       (Exhibit 112 was marked for identification by
4    the court reporter and is attached hereto.)
5       MS. SCOTT REED:  For the record 112 is
6  UPC2160 through 2161.
7    Q.   Can you identify Exhibit 112 as an e-mail
8  string dated June 15th between you and Ms. Randi
9  Richmond?
10   A.   Yes.
11   Q.   I want to refer you, please, sir, to the
12  middle e-mail, which is from you to Ms. Richmond,
13  it's stamped 7:28 a.m. Pacific Standard Time.
14       Do you see what I'm referring to?
15   A.   Yes.
16   Q.   And is this a report or update that you
17  provided to Ms. Richmond?
18   A.   Yes.
19   Q.   Will you look please, sir, under the heading
20  that says:  Current situation?  I'm going to ask you
21  to look at those four paragraphs next to Exhibit 111,
22  please, sir.
23       Can you verify that you have quoted
24  Exhibit 111, it's first four paragraphs, verbatim,
25  into your Exhibit 112 message?

57 (Pages 222 - 225)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 226

1    A.  Yes.
2    Q.  Did you rely upon the information provided
3  to you in Exhibit 111 in order to report that to your
4  client?
5       MR. HAYES:  Objection, vague, lacks
6  foundation.
7       THE WITNESS:  Yes.
8  BY MS. SCOTT REED:
9    Q.  And is there a reason you chose to quote it
10  verbatim?
11    A.  With all information and intelligence, if I
12  believe that it's setting out an accurate picture and
13  is relevant, then there's no reason for me to change
14  it.  And that's common.
15    Q.  So in this circumstance, did you believe the
16  Max Security Analysis provided to you under the
17  section current situation to be accurate and
18  relevant?
19    A.  I certainly believed it was relevant and
20  should be shared.
21    Q.  All right.  Sir.  Let me ask you to put
22  Exhibit 113 in front of you.
23       (Exhibit 113 was marked for identification by
24       the court reporter and is attached hereto.)
25       MS. SCOTT REED:  For the record this is

Page 227

1  UCP1091 through 1092.
2    Q.  Can you identify this as an e-mail string
3  between you and Ms. Richmond, dated June 15th, 2014?
4    A.  Yes.
5    Q.  Is this a further report and update that you
6  provided to Ms. Richmond?
7    A.  Yes.
8    Q.  Will you look at the last paragraph on that
9  first page, sir, please, that begins in the past
10  48 hours.
11       Do you have it?
12    A.  Yes.
13    Q.  All right.  And will you also look at
14  Exhibit 111, the second page under the title:
15  Assessments, which also begins in the past 48 hours.
16       Do you see it?
17    A.  I do.
18    Q.  Have you quoted verbatim out of Exhibit 111
19  from Max Security Analysis and put that into your
20  report to Ms. Richmond of June 15th?
21    A.  That forms part of the report, and it's --
22       THE REPORTER:  I'm sorry.  That forms part
23  of the report?
24       THE WITNESS:  Yes, and it's the same.
25

Page 228

1  BY MS. SCOTT REED:
2    Q.  Yes, sir.
3       And you relied upon Exhibit 111 in your
4  preparation and report to Ms. Richmond of June 15th
5  reflected in Exhibit 113?
6       MR. HAYES:  Object -- objection, vague,
7  lacks foundation.
8       THE WITNESS:  I relied upon some of the
9  information for my update of June the 15th.  There
10  was also information, other intelligence involved in
11  writing this update, not all of it contained within
12  Exhibit 111.
13       As I've said previously, we use multiple
14  forms of intelligence from multiple sources.
15  BY MS. SCOTT REED:
16    Q.  Yes, sir.
17       And in this instance when you wrote
18  Exhibit 113, you relied upon and quoted verbatim a
19  section out of Exhibit 111 from Max Security
20  Analysis, correct?
21       MR. HAYES:  Objection, vague, lacks
22  foundation.
23       THE WITNESS:  I quoted.  I did not rely upon
24  that information.  As you can see, the document
25  actually contains other information that is not in

Page 229

1  Exhibit 111, the first two paragraphs, for instance.
2  BY MS. SCOTT REED:
3    Q.  So when you quoted verbatim the first
4  paragraph under assessments of the Max Security
5  report and copy that into your report to
6  Ms. Richmond, you did not rely upon the Max Security
7  report to do that?
8       MR. HAYES:  Objection, vague, lacks
9  foundation.
10       THE WITNESS:  I believed it was important to
11  circulate the information.  I wouldn't rely upon one
12  source of information.
13  BY MS. SCOTT REED:
14    Q.  Is Exhibit 111 one of the sources that you
15  relied upon to prepare Exhibit 113?
16       MR. HAYES:  Objection, vague, lacks
17  foundation.
18       THE WITNESS:  Yes.
19       MS. SCOTT REED:  All right, sir.
20       Let me hand you what's been marked as
21  deposition Exhibit 114.
22       (Exhibit 114 was marked for identification by
23       the court reporter and is attached hereto.)
24  BY MS. SCOTT REED:
25    Q.  Can you identify this as a June 15th Max

58 (Pages 226 - 229)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 230

1 Security Intelligence report, and an e-mail from
2 Mr. Kenion directed to you on June 15th, 2014?
3    A.  Yes.
4    Q.  And for the record, Exhibit 114 is UCP2491
5 through 2495.
6        Did you receive Exhibit 114 from Mr. Kenion
7 and Max Security?
8    A.  Yes.
9    Q.  Do you recall Mr. Kenyon giving you a
10 recommendation to avoid the old city of Jerusalem at
11 this point?
12    A.  I don't recall other than reading it on
13 this -- this exhibit.
14    Q.  Did you pass along that recommendation to
15 NBCUniversal?
16    A.  I would need to check with other paperwork
17 to confirm whether I did or didn't.
18    Q.  Would you look at page 2 of Exhibit 114,
19 please, sir, under:  Assessments.  The first sentence
20 under assessments says (as read):
21        While an uptick in incidents of
22        rocket fire from the Gaza Strip has
23        been recorded during the past week,
24        tonight's attacks represent a
25        notable escalation given the

Page 231

1        targeting of a major southern city.
2        Do you see that?
3    A.  Yes.
4    Q.  Did you have follow-up discussions with
5 Mr. Kenion about that report?
6    A.  I would need to refer to other documentation
7 to confirm.
8    Q.  Would your discussion with him have been in
9 writing?
10    A.  I'm really -- I really couldn't say either
11 way whether -- whether it was in writing, whether it
12 was face to face.  I -- I can't confirm without
13 looking at other paperwork.
14    Q.  When upticks in these violent incidents
15 going back and forth were occurring, were you having
16 direct conversations with Mr. Kenion?
17        MR. HAYES:  Objection, vague, lacks
18 foundation.
19 BY MS. SCOTT REED:
20    Q.  By telephone or some other voice-to-voice
21 communication?
22    A.  I was having conversations, receiving
23 e-mails and reports from Mr. Kenion and Max Security,
24 amongst others.
25    Q.  And my question is specifically directed to

Page 232

1 Mr. Kenion.  Were you having telephone conversations
2 or voice-to-voice communication with him as the
3 escalation of violence back and forth between these
4 two opposing sides increased?
5    A.  I --
6        MR. HAYES:  Objection, vague, lacks
7 foundation.
8        THE WITNESS:  I was in communication with
9 Mr. Kenion.
10 BY MS. SCOTT REED:
11    Q.  And do you recall that there were telephone
12 conversations?
13    A.  I was in communication with Mr. Kenion.
14    Q.  Yes, sir --
15    A.  Whether they were e-mails, telephone
16 conversations, they were both.
17    Q.  You believe there were both types?
18    A.  Yes.
19    Q.  And was Mr. Kenion continuing to report to
20 you as activities developed?
21        MR. HAYES:  Objection, vague, lacks
22 foundation.
23        THE WITNESS:  Mr. Kenion was.
24        MS. SCOTT REED:  Let me hand you
25 Exhibit 115, please, sir, for the record, UCP1165

Page 233

1 through 1168.
2        (Exhibit 115 was marked for identification by
3        the court reporter and is attached hereto.)
4 BY MS. SCOTT REED:
5    Q.  Can you identify this as an e-mail string
6 between yourself and Ms. Randi Richmond beginning
7 June 15th and continuing through June the 16th?
8        MR. HAYES:  Objection, the document speaks
9 for itself.
10        THE WITNESS:  The document I have in front
11 of me doesn't go to June the 16th.
12 BY MS. SCOTT REED:
13    Q.  The first page UCP1165?
14        MR. HAYES:  You gave us a different
15 document, Counsel.  The document that we've marked
16 115 is UCP815 through 817; is that correct?
17        Mr. Smith, is that the same one you have?
18        THE WITNESS:  Yes.
19        MS. SCOTT REED:  Then I'll apologize,
20 Counsel.
21    Q.  And, Mr. Smith, when I read the Bates
22 numbers into the record, 1165 through 1168, nobody
23 said:  That's not what I have.
24        MR. HAYES:  All right.  So let's just clear
25 up the record, then.  Exhibit 115 is a document

59 (Pages 230 - 233)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 234

1 marked UCP815 through UCP817. It's a three-page
2 document.
3 BY MS. SCOTT REED:
4     Q. Mr. Smith, can you identify that is an
5 e-mail string between you and Ms. Richmond on
6 June the 15th?
7     MR. HAYES: By that, you mean 115?
8     MS. SCOTT REED: Correct.
9     THE WITNESS: Yes.
10     MS. SCOTT REED: Let me hand you
11 Exhibit 116, if I may, please, sir, UCP1165 through
12 1168.
13     (Exhibit 116 was marked for identification by
14     the court reporter and is attached hereto.)
15 BY MS. SCOTT REED:
16     Q. Can you identify this as an e-mail string
17 between yourself and Ms. Randi Richmond from
18 June 15th, continuing through June the 16th?
19     A. Yes.
20     Q. Is this another security update that you
21 provided to Ms. Richmond?
22     A. Which document are you referring to?
23     Q. Exhibit 116 that's before you, sir.
24     A. Yes.
25     Q. Would you put Exhibit 114 next to it, sir,

Page 235

1 turn to page 2 of Exhibit 14 -- pardon me,
2 Exhibit 114. Top of the page under the line that
3 goes across, says (as read):
4         Reports indicate that two rockets
5     were fired.
6     Do you see that?
7     A. I do.
8     Q. And the first three paragraphs that are
9 there, do you note those?
10     A. Yes.
11     Q. All right. Sir?
12     And will you confirm for me that you copied
13 those three paragraphs verbatim and put them into
14 one -- Exhibit 116 on the second page of your e-mail
15 to Ms. Richmond of Sunday, June 15th, that is time
16 stamped 10:58 p.m., Pacific Time?
17     MR. HAYES: Ms. Reed, if we're going to
18 continue with the questions about whether or not
19 something was copied verbatim, I'm just going to ask
20 the witness to make sure that it is truly verbatim
21 before asking.
22     These documents can be compared and it can
23 be determined whether the language is the same,
24 but --
25     MS. SCOTT REED: Object to coaching the

Page 236

1 witness and speaking objections on the record.
2     MR. HAYES: I don't know what I was
3 coaching --
4     MS. SCOTT REED: Not permitted under the
5 federal rules.
6     MR. HAYES: I'm not sure what I was coaching
7 him on, but if the question is going to be whether or
8 not it was copied verbatim, I just want to make sure
9 that we're -- we're looking at both documents and
10 making sure that it is, in fact, verbatim.
11 BY MS. SCOTT REED:
12     Q. Did you take the coaching, Mr. Smith?
13     A. No.
14     Q. You weren't listening to Mr. Hayes?
15     A. No, I was listening. I had -- but I didn't
16 take it as coaching.
17     Q. Can you confirm that the first three
18 paragraphs on the second page of Exhibit 114 were
19 copied verbatim and put into your e-mail to Randi
20 Richmond that is June 15th, 10:59 p.m., that's page 2
21 of Exhibit 116?
22     A. No, that's not correct.
23     Q. Okay. What's incorrect, please, sir?
24     A. There's a clarifying paragraph at the top.
25     Q. Fair enough, sir. I'm not -- I'm not

Page 237

1 referring to your intro paragraph, "the current
2 advisement."
3     Please look at the next three: "Reports
4 indicate," "also, during," and "in addition."
5     A. Yes.
6     Q. Those three were copied out of the Max
7 Security report?
8     A. Yes, but they were not the top three as --
9 as you said in your question.
10     Q. I apologize and I'll clarify.
11     When you wrote to Randi Richmond, June 15th,
12 2014, time stamped 10:58 p.m., I would like you to
13 skip the first paragraph with the introductory
14 language and refer to the next three, which begin,
15 "reports indicate," "also, during," and "in
16 addition."
17     Do you see those three in your e-mail?
18     A. Yes.
19     Q. Did you take those verbatim out of
20 Exhibit 114, second page, the first three paragraphs
21 under the line that runs across the page?
22     A. Yes. But I would like to clarify that the
23 third paragraph has been highlighted on the report
24 of -- on the information on 10:58 on 116, the third
25 paragraph has been highlighted. It's not highlighted

60 (Pages 234 - 237)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 238

1  in the original document.
2      Q.  All right.  So you bolded that third bullet
3  point?
4      A.  Yes.
5      Q.  All right.  Sir.
6          And otherwise, is there any change to the
7  actual language?
8          MR. HAYES:  Objection, the document speaks
9  for itself.
10         THE WITNESS:  No.
11         MS. SCOTT REED:  Let me hand you
12  Exhibit 117, please, sir.
13         (Exhibit 117 was marked for identification by
14     the court reporter and is attached hereto.)
15         MS. SCOTT REED:  For the record UCP2237
16  through 2340.
17     Q.  Can you identify this as a June 16th, 2014
18  Max Security Intelligence report sent to you via
19  e-mail?
20     A.  Yes.
21     Q.  Do you recall receiving this particular
22  report?
23     A.  I don't recall.
24     Q.  Do you have any reason to doubt that you
25  received it?

Page 239

1      A.  No.
2      Q.  As the activity was ticking up in Israel in
3  the summer of 2014, were you expecting to receive a
4  pretty continuous flow of information from Max
5  Security?
6          MR. HAYES:  Objection, vague, lacks
7  foundation.
8          THE WITNESS:  I received, to my knowledge, a
9  continuous flow of information from Max and other
10  sources.
11  BY MS. SCOTT REED:
12     Q.  And did you expect that to be the case based
13  upon the activities that were developing?
14         MR. HAYES:  Objection, vague, lacks
15  foundation.
16         THE WITNESS:  Yes.
17  BY MS. SCOTT REED:
18     Q.  Would you look at the second page, please,
19  sir, under: Assessments.  And the second sentence
20  that begins (as read):
21         As a result, the potential for
22         additional rocket strikes into
23         Israel from Gaza-based militants
24         will remain elevated as Hamas is
25         unlikely to take significant

Page 240

1          measures to prevent or may encourage
2          fringe groups including PIJ
3          militants from staging such attacks.
4          Do you see that?
5      A.  Yes.
6      Q.  And it goes on to discuss rocket launches,
7  particularly those toward Israeli urban centers, are
8  likely to be met with retaliation.
9          Do you see that reference?
10     A.  Yes.
11     Q.  Do you recall receiving reports on this
12  uptick in activity and the retaliatory nature of it?
13         MR. HAYES:  Objection, vague, lacks
14  foundation.
15         THE WITNESS:  I received reports throughout
16  the production and there was an increase in activity
17  that was detrimental to the security landscape and
18  the safety and security of our personnel.
19  BY MS. SCOTT REED:
20     Q.  As you were reviewing the events that were
21  occurring -- beginning in mid June and carrying
22  through the summer, did you note that they were
23  retaliatory in nature?
24         MR. HAYES:  Objection, vague, lacks
25  foundation.

Page 241

1          THE WITNESS:  No.  They -- the language that
2  somebody would use in the -- their report to describe
3  something is not something that I would really take
4  into account.  What I'm looking at is actually what's
5  happened.
6          If somebody calls it retaliatory or some
7  other term.  That's not what influenced my decision.
8  What I'm dealing with here is facts, what actually
9  happened.  Not the description of it that somebody
10  applies to it.
11  BY MS. SCOTT REED:
12     Q.  Let me make my question more clear.  As you
13  were receiving the factual descriptions of what was
14  going on back and forth, did you conclude that there
15  were retaliatory actions being taken by each side
16  against the other?
17         MR. HAYES:  Objection, vague, lacks
18  foundation.
19         THE WITNESS:  No.  I concluded that there
20  was a deterioration in the security situation that
21  was affecting our ability to make sure our people
22  were safe.  There was an uptick in activity.  Whether
23  it was retaliatory or not, wasn't something that I
24  would take into account.
25

61 (Pages 238 - 241)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 242

1 BY MS. SCOTT REED:
2    Q.  You wouldn't take into the account -- you
3 wouldn't take into account the fact that if one side
4 did something, the other side was going to respond in
5 kind?
6    A.  I take into account the activity, not
7 whether it's retaliatory or not, just the facts of
8 what is happening.  To me, it really didn't make any
9 difference which side started it and which side
10 retaliated.
11    Q.  Did you notice offensive activity by both
12 sides of this conflict occurring?
13       MR. HAYES:  Objection, vague, lacks
14 foundation.?
15       THE WITNESS:  There was an increase in
16 activity detrimental to the security situation in
17 Israel.
18 BY MS. SCOTT REED:
19    Q.  And what specifically was that
20 deterioration?
21       MR. HAYES:  Same objections.  Vague, lacks
22 foundation.
23       THE WITNESS:  The risk of terrorist attacks,
24 kidnappings, murder, random attacks on personnel,
25 rockets, people having to take cover.

Page 243

1 BY MS. SCOTT REED:
2    Q.  Beginning in the middle of June, how
3 frequently were rockets being fired at Israel?
4       MR. HAYES:  Objection, vague, lacks
5 foundation.
6       THE WITNESS:  I would have to refer to
7 documentation to -- to tell you that.
8 BY MS. SCOTT REED:
9    Q.  Would you describe it as a consistent basis?
10       MR. HAYES:  Objection, lacks foundation,
11 vague.
12       THE WITNESS:  I'm not going to use your
13 language of whether it was consistent or not.  There
14 was a deterioration in the security situation across
15 Israel through June and July.
16 BY MS. SCOTT REED:
17    Q.  Through June and July was there an uptick in
18 the number of rockets which were being fired at
19 Israel?
20       MR. HAYES:  Asked and answered.
21       THE WITNESS:  Yes.
22 BY MS. SCOTT REED:
23    Q.  During June and July, was there an uptick in
24 mortars being fired at Israel?
25       MR. HAYES:  Asked and answered, vague.

Page 244

1       THE WITNESS:  I'm not an expert on what type
2 of weaponry was used, whether it was rockets,
3 mortars, hand grenades, whatever, that's not my area
4 of expertise, what type of weaponry was used.
5 BY MS. SCOTT REED:
6    Q.  Do you know the difference between rockets
7 and mortars?
8    A.  No.
9    Q.  Have you undertaken any sort of study to
10 learn what the difference is?
11    A.  No.  It's not my -- it's not my
12 responsibility as a -- a corporate security manager
13 managing risk.  The fact that types of weaponry are
14 used ultimately that are going to cause a
15 deterioration in the security situation.
16    Q.  Did you note any other weaponry that was
17 being fired out of Gaza or Palestine and directed to
18 Israel over that period of June and July?
19    A.  Did I personally note?
20    Q.  Yes, sir.
21       As you were doing the vast reviews that
22 you're talking about?
23       MR. HAYES:  Objection, argumentative, vague,
24 lacks foundation.
25       THE WITNESS:  I don't remember referring to

Page 245

1 something as vast reviews.  Is that a statement I
2 made?  I don't understand.  Was that a question or a
3 statement that you made?  I'm confused.
4 BY MS. SCOTT REED:
5    Q.  Shall I take out the adjective "vast"?
6    A.  I would just prefer to have the question
7 again, please.
8    Q.  Did you note any other weaponry that was
9 being fired out of Gaza or Palestine and directed at
10 Israel over the period of June and July as a result
11 of all of the security and intelligence information
12 you were reviewing?
13    A.  Are you referring to did I note in person?
14 Did I witness it --
15    Q.  No, sir.
16    A.  -- or did I mention it in security reports?
17    Q.  Did you, in doing all this review and study
18 that you're talking about of the sources coming in,
19 gain an understanding, or form an understanding of
20 what weaponry was being fired out of Gaza or
21 Palestine and into Israel?
22    A.  No.  I just knew there was a variety of
23 weaponry being used.
24    Q.  And is it accurate that some of the weaponry
25 was actually landing in Israel?

62 (Pages 242 - 245)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 246

1     MR. HAYES:  Objection, vague, lacks
2 foundation.
3     THE WITNESS:  To my knowledge.
4 BY MS. SCOTT REED:
5     Q.   And tell me all the areas of Israel where
6 you were informed, based upon the research you were
7 reviewing, that weaponry landed within Israel.
8     A.   I would have to consult with my notes and
9 the security document -- documentation I received at
10 the time.  Weaponry was fired towards Ben Gurion
11 airports.  It was fired towards Tel Aviv, and
12 multiple other locations within Israel.
13    Q.   Were there occasions when that airport was
14 closed as a result of incoming fire or threatened
15 incoming fire?
16    A.   Yes.
17         MS. SCOTT REED:  Hand you Exhibit 118,
18 please, sir.
19         (Exhibit 118 was marked for identification by
20         the court reporter and is attached hereto.)
21         MS. SCOTT REED:  For the record UCF1155
22 through 1157.
23    Q.   Can you identify Exhibit 118 as an e-mail
24 string which culminates in an e-mail from you to
25 Paige Potter, copied to others, dated June 16th,

Page 247

1 2014, at 11:46 a.m.?
2     A.   Yes.
3     Q.   Who's Paige Potter?
4     A.   I don't recall.
5     Q.   Who is Whitney Hallock?
6     A.   I don't recall.
7     Q.   Who is Warren Yass?
8     A.   I don't recall.
9     Q.   Who is Debbie Gray?
10    A.   Don't recall.
11    Q.   Who is Charles Araujo?
12    A.   I don't recall.
13    Q.   You recognize Ms. Richmond's name?
14    A.   Yes.
15    Q.   And Mr. Binkie's name?
16    A.   Yes.
17    Q.   And who is Richard Rothstein?
18    A.   He's one of the senior production personnel.
19    Q.   What was the purpose of sending this
20 June 16th, 24 (sic) report to this broader
21 distribution list?
22         MR. HAYES:  Objection, vague, lacks
23 foundation.
24         THE WITNESS:  The report is a security
25 situation update.  Why these other people are on it,

Page 248

1 I can't recall.
2 BY MS. SCOTT REED:
3     Q.   When you say a "security situation update,"
4 is that distinguished from the types of e-mails we've
5 seen you reporting to Ms. Richmond up to this point?
6         MR. HAYES:  Objection, vague, lacks
7 foundation.
8         THE WITNESS:  No.
9 BY MS. SCOTT REED:
10    Q.   What were the main points that you intended
11 to communicate in this document?
12         MR. HAYES:  Objection, vague.
13         THE WITNESS:  By reviewing the document, I
14 was conveying the current security situation.  Again,
15 gained from sources, information I believed pertinent
16 to be shared, and also actions that we had
17 undertaken, and we'd undertake.
18 BY MS. SCOTT REED:
19    Q.   As of June 16th, were you making any
20 different recommendations in regard to safety or
21 security of filming?
22         MR. HAYES:  Objection, vague, lacks
23 foundation.
24         THE WITNESS:  From what point?  Because I
25 was making recommendations on the 10th of July to

Page 249

1 leave, to leave the country, so there obviously were.
2         Are you talking pre or post this e-mail?
3 And what document are you comparing it to?
4 BY MS. SCOTT REED:
5     Q.   I'm looking at 118, and my question to you
6 was:  As of this June 16th report, were you making
7 recommendations that were different than what was in
8 place up to June 16th about safety and security for
9 filming?
10         MR. HAYES:  Objection, vague, lacks
11 foundation.
12         THE WITNESS:  Up -- I would have to compare
13 it to all the other reports that I compiled.  There
14 was a -- there was an escalation and then --
15 escalation in violence, deterioration in the security
16 situation.  And -- but I would doctor to compare it
17 and contrast it to all the other reports as I do with
18 information I receive.
19 BY MS. SCOTT REED:
20    Q.   Was your general or overall point to
21 communicate that there was a deterioration in general
22 security and an escalation in activity?
23         MR. HAYES:  Objection, vague, lacks
24 foundation.
25         THE WITNESS:  Yes.

63 (Pages 246 - 249)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 250

1 BY MS. SCOTT REED:
2    Q.  Would you look, please, sir, at the fifth
3 bullet point that begins in the past 48 hours, you're
4 reporting to your colleagues at NBCUniversal that the
5 extent of Israeli military operations in Hebron and
6 its environments had significantly increased.
7        Do you see that?
8    A.  Yes.
9    Q.  And it was highlighted by the deployment of
10 over 2500 IDF soldiers to the area.
11       Do you see that?
12   A.  I do.
13   Q.  Was this a significant uptick in military
14 activity based upon your research to that point?
15   A.  Yes.
16       MS. SCOTT REED:  Let me hand you
17 Exhibit 119, please, sir.
18       (Exhibit 119 was marked for identification by
19    the court reporter and is attached hereto.)
20       MS. SCOTT REED:  For the record UCP1129
21 through 1130.
22   Q.  Can you identify Exhibit 119 as an e-mail
23 string between you and Ms. Richmond, copied to
24 others, dated June the 17th, 2014?
25   A.  Yes.

Page 251

1    Q.  Do you continue to report the higher levels
2 of activity and the intensification of action to
3 NBCUniversal in Exhibit 119?
4        MR. HAYES:  Objection, vague, lacks
5 foundation.
6        THE WITNESS:  I continued to report the
7 security situation again gathered from a variety of
8 sources, and how it would affect our production and
9 the safety and security of our personnel and assets.
10 BY MS. SCOTT REED:
11   Q.  Were you continuing to note increasing
12 military activity?
13       MR. HAYES:  Objection, vague, lacks
14 foundation.
15       THE WITNESS:  Are you referring to point 3,
16 bullet point 3, where it says:  Threat of military
17 activity?
18 BY MS. SCOTT REED:
19   Q.  I'm referring generally to your second
20 paragraph where you're discussing IDF activity, high
21 level of military preparedness and other comments.
22   A.  The information --
23       MR. HAYES:  Hold on.
24       THE WITNESS:  Sorry.
25       MR. HAYES:  Objection, misstates the

Page 252

1 document, vague and lacks foundation.
2        Go ahead.
3        THE WITNESS:  The information I was
4 receiving was telling me this, and I believed it was
5 pertinent to pass on.
6 BY MS. SCOTT REED:
7    Q.  Yes, sir.
8        So was one of your points to communicate
9 here the increasing level of military activity that
10 was occurring?
11   A.  Yes.
12       MS. SCOTT REED:  Let me hand you
13 Exhibit 120, please, sir.
14       (Exhibit 120 was marked for identification by
15    the court reporter and is attached hereto.)
16       MS. SCOTT REED:  For the record UCP1860
17 through 1863.
18   Q.  Can you identify Exhibit 120 as a June 22nd,
19 2014 Max Security Intelligence report provided to you
20 by e-mail?
21   A.  It's a Israel and Syria alert.  That's what
22 the document I see is, that's how it's been sent to
23 me on the subject heading.
24   Q.  Yes, sir.
25       And is it a Max Security Intelligence report

Page 253

1 of a similar style and setup that we've looked at in
2 various other exhibits today?
3    A.  Yes.
4        MR. HAYES:  Objection --
5 BY MS. SCOTT REED:
6    Q.  Was it sent to you by e-mail?
7    A.  Yes.
8    Q.  Was this report regarding Israel and Syria
9 something you were monitoring as part of your Dig
10 work?
11       MR. HAYES:  Objection, vague, lacks
12 foundation.
13       THE WITNESS:  We were monitoring a number of
14 intelligence and information feeds regarding the
15 security situation in Israel and surrounding
16 countries.
17 BY MS. SCOTT REED:
18   Q.  And was this report about Israel and Syria
19 pertinent to the analysis you were providing in
20 connection with the Dig production?
21   A.  This, and other information may have been
22 used to update and inform.
23       MS. SCOTT REED:  I'm going to hand you
24 Exhibit 121, please, sir.
25

64 (Pages 250 - 253)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 254

1    (Exhibit 121 was marked for identification by
2  the court reporter and is attached hereto.)
3    MS. SCOTT REED:  For identification UPC --
4  pardon me, UCP2576 through 2578.
5    Q.  Can you identify this that's an e-mail
6  string between you and Ms. Richmond, among others,
7  that concludes with your June 22nd e-mail and
8  Ms. Richmond's June 23rd response?
9    A.  Yes.
10   Q.  Would you look down under: Hi Randi, down
11 to the second paragraph where you report (as read):
12       Two rockets fired from Gaza Strip
13       towards Israel during the morning
14       hours of June 22.  Israeli Air Force
15       fighter jets target four militant
16       sites in Gaza Strip.
17       Do you see that?
18   A.  Yes.
19   Q.  Was this information you were gathering from
20 the various sources that you were reviewing on an
21 ongoing basis?
22   A.  Yes.
23   Q.  Do you also report to her about Palestinians
24 being killed?
25   MR. HAYES:  Objection, vague, lacks

Page 255

1  foundation.
2    THE WITNESS:  It's contained within this
3  document, yes.
4  BY MS. SCOTT REED:
5    Q.  And do you also report to her that these
6  reported incidents are amidst an ongoing military
7  operation that was an effort to retrieve the
8  kidnapped teens?
9    MR. HAYES:  Objection, vague, lacks
10 foundation.
11   THE WITNESS:  Yes.
12 BY MS. SCOTT REED:
13   Q.  You say this is -- you're referring to the
14 military operation which is entering into tenth day.
15   Do you see that?
16   MR. HAYES:  Objection, vague,
17 mischaracterizes the document.
18   THE WITNESS:  Yes.
19 BY MS. SCOTT REED:
20   Q.  Was that Operation Protective Edge?
21   MR. HAYES:  Objection, vague, calls for
22 speculation.
23   THE WITNESS:  I have no idea.
24 BY MS. SCOTT REED:
25   Q.  Were you aware that the Israelis named the

Page 256

1  military operation that they undertook during the
2  month of -- or during -- let's just say summer of
3  2014?
4    A.  Was I aware?
5    Q.  Were you aware that the Israelis gave an
6  operation name to some of the offensive actions they
7  were taking, or defensive actions they were taking in
8  the summer of 2014?
9    A.  Yes.
10   Q.  And what was that military action called?
11   A.  I honestly can't remember.
12   Q.  Do you have to review a document to say
13 that --
14   A.  I -- I would -- yes.
15   Q.  During this time was Ms. Richmond continuing
16 to ask you for updates on these events and
17 occurrences?
18   A.  Yes.
19   MS. SCOTT REED:  Let me hand you Exhibit
20 122, please, sir.
21   (Exhibit 122 was marked for identification by
22 the court reporter and is attached hereto.)
23   MS. SCOTT REED:  UCP3782 through 3785.
24   Q.  Can you identify this that's a Max Security
25 Intelligence report of June 23rd, 2014, sent to you

Page 257

1  via e-mail?
2    A.  Yes.
3    Q.  Was this part of the information that you
4  were reviewing in connection with your work on Dig?
5    A.  Yes.
6    MS. SCOTT REED:  Let me hand you
7  Exhibit 123, please, sir.
8    (Exhibit 123 was marked for identification by
9  the court reporter and is attached hereto.)
10   MS. SCOTT REED:  UCP2205 through 2207.
11   Q.  Can you identify Exhibit 123 as a June 24th,
12 2014 Max Security Intelligence report provided to you
13 via e-mail?
14   A.  Yes.
15   Q.  Under the solid line, sir, after:  "Please
16 be advised," do you see the introductory statement
17 which says (as read):
18       Reports indicate that the Iron
19       Dome Missile Defense System
20       intercepted to rockets fired from
21       the Gaza Strip toward the southern
22       city of Ashkelon, while a third
23       rocket landed in an open field in
24       the Hof Ashkelon Regional Council on
25       June 24th, with no damage being

65 (Pages 254 - 257)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 258

1    reported?
2    A.  Yes.
3    Q.  Was that information that you recall
4  receiving at the time?
5    A.  I -- I don't recall receiving it, but I'm
6  not -- I'm not disputing that I received it.
7    Q.  Would rocket fire into these areas that are
8  described have been new developments or new areas
9  that were under attack or under danger?
10      MR. HAYES:  Objection, vague, lacks
11  foundation.
12      THE WITNESS:  I would have to refer to
13  further security documentation and reports to confirm
14  or dispute whether these are new locations that were
15  being targeted or not.
16  BY MS. SCOTT REED:
17    Q.  Were you trying to monitor which exact
18  geographic locations in Israel were being targeted?
19    A.  I was trying to monitor which locations were
20  being targeted that were near our personnel or
21  assets.
22    Q.  Would you look down under assessments,
23  please, sir, which states (as read):
24      Given the recent pattern of
25      tit-for-tat exchanges between the

Page 259

1      Israeli Military and Gaza-based
2      militants, as well as the fact that
3      the recent rocket fire targeted a
4      major Israeli city, we assess that
5      there remains a heightened potential
6      for localized IAF reprisal attacks
7      over the coming 24 to 48 hours.
8      Do you see that?
9    A.  Yes.
10    Q.  And did you recall receiving reports like
11  this one?
12    A.  I received a number of reports, and I -- I
13  don't really understand the question because all of
14  these reports are like this one.  There are security
15  intelligence reports.  They're all describing
16  different incidents that took place.
17    Q.  Yes, sir.
18      And were there any incidences where you
19  discovered based upon your research that Max Security
20  Intelligence reported something to you that was
21  inaccurate in terms of the facts?
22      MR. HAYES:  Objection, vague, lacks
23  foundation.
24      THE WITNESS:  Now, are you talking about at
25  the time because --

Page 260

1  BY MS. SCOTT REED:
2    Q.  Yes.
3    A.  Well, the accuracy of -- or inaccuracy of
4  the multiple intelligence and information streams
5  that we receive, it happens.  Some get things right,
6  some get things wrong.  And I couldn't tell you
7  unless I went through them verbatim which were
8  correct, which were advisory and which were wrong.
9    Q.  Based --
10    A.  That's the nature of intelligence.
11    Q.  And based upon the facts that were being
12  reported to you by Max Security Intelligence, did you
13  ever have a situation where you raised a concern that
14  Max Security Intelligence was not providing accurate
15  or reliable information to you?
16      MR. HAYES:  Objection, vague, lacks
17  foundation.
18      THE WITNESS:  I don't recall one way or the
19  other.
20  BY MS. SCOTT REED:
21    Q.  In the security parlance when you talk about
22  a tit-for-tat exchange between the Israeli Military
23  and Gaza-based militants, can you describe for the
24  cord what that means?
25      MR. HAYES:  Objection, vague, lacks

Page 261

1  foundation, misstates the document.
2      THE WITNESS:  Can you just repeat the
3  question, please?
4  BY MS. SCOTT REED:
5    Q.  In security parlance, when you talk about a
6  tit-for-tat exchange between the Israeli Military and
7  Gaza-based militants, can you describe for the court
8  what that means?
9      MR. HAYES:  Objection, lacks foundation.
10      You're quoting from a document that he did
11  not author.
12      THE WITNESS:  Yeah, it's not my document.
13  I'm not talking about this.  This is somebody else's
14  language who's described it as tit-for-tat.
15  That's -- I wasn't the author of this document, so
16  I'm not talking about this.  It wasn't me that --
17  that wrote the document.
18  BY MS. SCOTT REED:
19    Q.  No, sir.  I -- I didn't ask you whether you
20  wrote in and I didn't imply that you wrote it.
21      I said in the security parlance, which is
22  your field, correct, when a security person writes to
23  you in the security context and talks about a
24  tit-for-tat exchange, can you describe for the court
25  what that means?

66 (Pages 258 - 261)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 262

1     MR. HAYES:  Objection, lacks foundation,
2 vague, and calls for speculation.
3     THE WITNESS:  Tit-for-tat means one side
4 doing one thing and one side doing another.  I'd just
5 like to say that's not the question that you
6 originally asked me.  That's why I said I'm not the
7 author of this.
8     MR. HAYES:  You originally said "you."  Just
9 to clear up the record.
10 BY MS. SCOTT REED:
11    Q.  You understand that I'm just trying to
12 understand in security talk, if one writer who's
13 communicating to another person in the security field
14 talks about tit-for-tat exchanges, can you describe
15 for the court what that is indicating?
16    MR. HAYES:  Objection, vague, lacks
17 foundation, calls for speculation.
18    THE WITNESS:  I -- I think tit-for-tat is a
19 term that most people would understand what that
20 means, and they'd also understand that when it's
21 referenced with exchanges one side was doing one
22 thing and the other side was responding in kind.
23 BY MS. SCOTT REED:
24    Q.  All right.  Sir.  Thank you.
25    A.  I'm trying to answer the questions that are

Page 263

1 asked, not anything else.
2    Q.  I'd like to refer you, please, sir, down to
3 the bottom this assessments paragraph, the last
4 sentence that's on that page.  (As read):
5         In such a scenario there remains
6         an increased potential for an
7         escalation between Gaza militants
8         and the IDF, which could result in
9         air strikes on Hamas infrastructure
10        in Gaza, as well as an increased
11        frequency of rocket fire from the
12        Gaza Strip.
13        Do you see that reference?
14    A.  Yes.
15    Q.  And was that a concern that you were
16 processing and reporting on during this time period?
17    MR. HAYES:  Objection, vague, lacks
18 foundation.
19    THE WITNESS:  I was reporting on the
20 deterioration of the security situation at that time.
21 BY MS. SCOTT REED:
22    Q.  Oh, pardon me.
23    In the latter part of June, had you
24 developed a concern that there was an increased
25 potential for escalation between the Gaza militants

Page 264

1 and the IDF, which could result in air strikes on
2 Hamas infrastructure and Gaza as well as rocket fire
3 from the Gaza Strip toward Israel?
4     MR. HAYES:  Objection, vague, lacks
5 foundation.
6     THE WITNESS:  Sorry.  Am I supposed to be
7 looking at a document here to answer that question
8 or?  Or is it just a general question?
9 BY MS. SCOTT REED:
10    Q.  It's a general question.  Based upon your
11 experience, expertise, background and the work you
12 were doing, by this point in June, had you developed
13 a concern that there was an increased potential for
14 escalation between Gaza militants and the IDF, which
15 could result in air strikes on Hamas infrastructure
16 in Gaza, as well as rocket fire from the Gaza Strip
17 towards Israel?
18    A.  There was a deterioration in the security
19 landscape and situation, and that's information would
20 have been contained within intelligence reports that
21 I received.
22    Q.  It would have been?
23    A.  I -- yes.
24    Q.  Were you passing along those concerns to
25 your NBCUniversal colleagues?

Page 265

1     MR. HAYES:  Objection, misstates testimony.
2     THE WITNESS:  Throughout this production,
3 postproduction, during production, and preproduction,
4 I supplied information to a number of NBCU personnel
5 relating to the security situation in Israel, and the
6 safety and security of their personnel.
7 BY MS. SCOTT REED:
8    Q.  And would your concerns about that
9 intensification we were just discussing have been
10 included in those various reports?
11    MR. HAYES:  Objection, vague, misstates
12 testimony.
13    THE WITNESS:  I would supply pertinent
14 information related to the deterioration of the
15 security situation in country.
16 BY MS. SCOTT REED:
17    Q.  Did you continue to notice a deterioration
18 of the security situation in Israel after June the
19 24th?
20    A.  Yes.
21    MS. SCOTT REED:  Let me hand you
22 Exhibit 124, please, sir.
23    (Exhibit 124 was marked for identification by
24    the court reporter and is attached hereto.)
25    MS. SCOTT REED:  For the record, UCP2704

67 (Pages 262 - 265)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 266

1 through 2706.
2    Q.  Can you identify Exhibit 124 as a June 29th,
3 2014 Max Security Intelligence report provided to you
4 via e-mail?
5    A.  Yes.
6    Q.  And the title of this document, about a
7 third of the way down the page, says (as read):
8        Israel and Palestinian
9        Territories Tactical: Rocket
10       barrage reported from Gaza Strip
11       toward Israel on June 29th;
12       retaliation likely.
13       Do you see that?
14   A.  Yes.
15   Q.  Do you recall receiving this report?
16   A.  No.
17   Q.  What's the Iron Dome Antimissile Battery
18 System?
19   A.  Without trying to appear facetious, it's
20 kind of in the title.
21   Q.  What does it do?
22   A.  It stops missiles, brings missiles down.
23 It's an antimissile system, that's what it says.
24 That's how -- that's the kind of definitive
25 description of exactly what it is.

Page 267

1        It's referred to as the Iron Dome, and it's
2 an antimissile battery system so it brings missiles
3 down.
4    Q.  How is it deployed?
5        MR. HAYES:  Objection, vague, lacks
6 foundation.
7        THE WITNESS:  I have no idea.
8 BY MS. SCOTT REED:
9    Q.  Are these things mobile?
10       MR. HAYES:  Same objections.
11       THE WITNESS:  I have no idea.
12 BY MS. SCOTT REED:
13   Q.  Did you undertake any study of the Iron Dome
14 Antimissile Battery System as part of your work for
15 the Dig production?
16   A.  I didn't undertake any study, no.
17   Q.  Did you take any efforts to better
18 understand what the Iron Dome system is or how it
19 operates?
20   A.  I received information about the Iron Dome.
21   Q.  The second paragraph of this report states
22 that (as read):
23       During the overnight hours of
24       June 28 to 29 the Israeli Air Force,
25       IAF, conducted air strikes against

Page 268

1        12 militant sites in the Gaza Strip
2        in response to a rocket barrage
3        earlier on June 28th.
4        Do you see that?
5    A.  I do.
6    Q.  Was that reporting that you received on or
7 about June 29th?
8    A.  As contained within this document.
9    Q.  Was the assessment provided to you on
10 June 29th by Max Security that there was a continued
11 concern or potential for broader escalation between
12 Israel on one side and Gaza-based militants on the
13 other?
14       MR. HAYES:  Objection, vague, lacks
15 foundation.
16       THE WITNESS:  Are you referring to actual
17 wording that's contained within this documentation,
18 this document, this exhibit?
19 BY MS. SCOTT REED:
20   Q.  I am referring to the generalized
21 information in the assessment that is reported to you
22 by Max Security Intelligence?
23       MR. HAYES:  Objection, vague, lacks
24 foundation.
25       THE WITNESS:  Could you repeat your

Page 269

1 question, please.
2 BY MS. SCOTT REED:
3    Q.  Was the assessment provided to you on
4 June 29th by Max Security that there was a continued
5 concern or potential for broader escalation between
6 Israel on one side and Gaza-based militants on the
7 other?
8        MR. HAYES:  Objection, vague, lacks
9 foundation, document speaks for itself.
10       THE WITNESS:  Yes.
11       MS. SCOTT REED:  Let me hand you
12 Exhibit 125, please, sir.
13       (Exhibit 125 was marked for identification by
14       the court reporter and is attached hereto.)
15       MS. SCOTT REED:  For the record UCP2518.
16   Q.  Can you identify this as an e-mail that
17 Ms. Richmond sent you on June 30th, 2014?
18   A.  I can't.
19       Can I ask for the air conditioning to be
20 turned down a bit?
21       MR. HAYES:  Yeah.  Can we take a break and
22 handle that, and I think this is -- we've been going
23 about an hour.
24       Do you have a question pending?
25       MS. SCOTT REED:  I have a question pending.

68 (Pages 266 - 269)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 270

1  I can't tell if he answered.
2     MR. HAYES:  Yeah.  Why don't you answer the
3  question that's -- that she asked, and then let's
4  take a break.
5  BY MS. SCOTT REED:
6     Q.  Can you identify this as an e-mail that
7  Ms. Richmond sent to you on June 30th, 2014?
8     A.  Yes.
9     MR. HAYES:  Okay.
10     VIDEO OPERATOR:  We are off the record.  The
11  time is 3:39 p.m.
12
13     (Recess taken.)
14
15     VIDEO OPERATOR:  We're back on the record.
16  The time 3:59 p.m.
17     Please continue.
18     MR. HAYES:  Toni -- I'm sorry, Toni.  I
19  really think we need to get clarification on this
20  Rule 30(b)(6) issue, and I don't know where we ended
21  in our -- in our colloquy before.  We told you during
22  the meet and confer that we objected to many of your
23  topics on various grounds.
24     Notwithstanding that, we've offered
25  Mr. Smith here today to testify about the facts,

Page 273

1     A.  Yes.
2     Q.  By June the 30th had filming concluded on
3  the portion that was ongoing to then?
4     A.  I would really have to refer to a calendar
5  to get the exact dates.
6     Q.  Based upon Ms. Richmond's statement, do you
7  believe that to be accurate?
8     A.  Yes.
9     Q.  And did you understand from her
10  communication to you that the next shooting was
11  anticipated to begin July the 20th?
12     A.  From the information contained in this
13  e-mail, yes.
14     Q.  And would she have been your best source of
15  information for that scheduling note?
16     A.  Yes.
17     MS. SCOTT REED:  Let me hand you
18  Exhibit 126, please, sir.
19     (Exhibit 126 was marked for identification by
20     the court reporter and is attached hereto.)
21     MS. SCOTT REED:  For the record, UCP2579
22  through 2582.
23     Q.  Mr. Smith, can you identify Exhibit 126 as a
24  June 30th, 2014 Max Security Intelligence report
25  communicated to you via e-mail including by e-mail of

69 (Pages 270 - 273)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 274

1  Mr. Kenion?
2     A.  Yes.
3     Q.  And does this report reflect the news that
4  there was a discovery of three bodies of those
5  teenagers who were kidnapped?
6     A.  Yes.
7     Q.  Did this raise concern for you that this
8  would further escalate the mutual exchange of
9  violence that's going on?
10    A.  It raised concerns that there would be a
11 further deterioration in the security and landscape
12 within Israel that could have a direct effect on NBCU
13 personnel and assets.  Whether it was as a result of
14 exchange wasn't something that I was particularly
15 concerned about; whether it was an exchange.
16       What I was concerned about was that this was
17 evidence that there was going to be a further
18 deterioration in the security situation that could
19 directly affect the production.
20    Q.  Did you have a return -- did you have a
21 concern regarding retaliation by both sides in
22 response to news coming out?
23    A.  No.  My concern was around the deterioration
24 of the general security situation, not whether it was
25 retaliatory or otherwise.  I only deal with the facts

Page 275

1  as reported.
2       What I'm concerned about is where the
3  rockets -- was it likely to be an increase in
4  terrorist activity in response to this deterioration.
5     Q.  Were you concerned about increasing rockets
6  being fired into Israel?
7     A.  I was concerned about that, amongst other
8  things.  And the general deterioration of the
9  security situation that would directly affect the
10 production of NBCU personnel and assets.
11    Q.  Were you concerned about missiles or mortars
12 or other types of fire being directed to Israel?
13    A.  In terms of the weaponry?
14    Q.  Yes, sir.
15    A.  Yeah.  It really is not my area of
16 expertise.  I was just concerned about the overall
17 deterioration of the security situation.  Whether it
18 was mortars or whether it was missiles, whether it
19 was small arms fire, the security situation was
20 deteriorating generally across the board.
21       There was a likelihood that there would a
22 further deterioration and also an increased
23 likelihood of activity that could directly affect the
24 safety and security of our personnel.
25    Q.  Was there a further deterioration in Israel

Page 276

1  following this announcement?
2     A.  I would have to check the paperwork to
3  understand the exact timeline, but throughout June
4  and into July there was a further deterioration of
5  the security situation.
6     Q.  Yes.  But did the deterioration ever slow or
7  stop before the time that you said you could no
8  longer protect personnel?
9        MR. HAYES:  Objection, vague, lacks
10 foundation.
11       THE WITNESS:  To give you an exact answer, I
12 would have to check the security reports that I
13 prepared, and I couldn't say if there was a lull in
14 any particular day without referencing the security
15 documentation --
16 BY MS. SCOTT REED:
17    Q.  I'm sorry.
18    A.  Sorry.  I wouldn't be able to state without
19 looking at the documentation if it was a continuous
20 ramping up or if it was one day in particular where
21 there was just very little activity happening.
22       THE REPORTER:  Where it was what?
23       THE WITNESS:  Very little activity
24 happening.
25

Page 277

1  BY MS. SCOTT REED:
2     Q.  Just looking back on this, after
3  experiencing the full range of it --
4     A.  Yeah.
5     Q.  -- do you remember any slowdown in this
6  build of hostilities from late June through the time
7  when you said you could no longer protect securing
8  your safety of personnel?
9        MR. HAYES:  Objection, vague, lacks
10 foundation.
11       THE WITNESS:  I would have to, to give you
12 an exact answer, look at the paperwork.  In very
13 general terms, the security situation deteriorated
14 throughout June and July.
15 BY MS. SCOTT REED:
16    Q.  And did it pick up pace in terms of its
17 deterioration?
18    A.  It did.
19    Q.  And why do you describe it that way?
20    A.  You described it as picking up pace.  I just
21 agreed with that.  I didn't describe it as picking up
22 pace.
23    Q.  Fair enough.
24    A.  This is -- you know, this is other people's
25 language, and that's not what I deal in.  I just deal

70 (Pages 274 - 277)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 278

1 with facts, so ...
2    Q.   You agreed with my characterization that
3 there -- the pace just continued to pick up in the
4 deterioration.
5       Can you describe to me what events or facts
6 that you deal in that caused you to agree with that
7 characterization?
8       MR. HAYES:  Objection, misstates testimony,
9 vague, lacks foundation.
10      THE WITNESS:  Yeah.  To give you in very
11 broad terms, there were retaliations about the
12 abduction of the three Israeli teenagers and their
13 murder.  There were rocket attacks.
14      My focus was on the increasing likelihood of
15 activity, particularly terrorist activity, that could
16 affect the production and the ability to ensure the
17 safety and security of personnel.
18 BY MS. SCOTT REED:
19    Q.   Now, are you telling the court that all
20 activity that was directed out of Gaza at Israel was
21 terrorist activity?
22      MR. HAYES:  Objection, lacks foundation,
23 argumentative, vague.
24      THE WITNESS:  No.
25

Page 279

1 BY MS. SCOTT REED:
2    Q.   Are you an expert in what constitutes
3 terrorism?
4       MR. HAYES:  Objection, lacks foundation,
5 vague.
6       THE WITNESS:  No.
7 BY MS. SCOTT REED:
8    Q.   And would you tell the court in this case
9 that all the rocket fire out of Palestine or Gaza
10 directed at Israel was terrorism?
11      MR. HAYES:  Objection, vague, lacks
12 foundation as to what he would tell the court.  I'm
13 not clear.
14      THE WITNESS:  No, it's not my area of
15 expertise.  So I'm here to assess the risk to our
16 personnel and assets, not to describe whether
17 something is terrorist activity or not.
18 BY MS. SCOTT REED:
19    Q.   All right.  Well, you've been careful to use
20 the word "terrorism" in a number of answers that
21 you've given, so I need to clarify for the record if
22 you're saying that all the rocket fire that came out
23 of Palestine or Gaza directed at Israel in the summer
24 of 2014 was terrorism?
25      MR. HAYES:  You've asked whether he's an

71 (Pages 278 - 281)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 290

22    Q.  I'm referring you back, please, sir, to
23 Exhibit 126.  Would you look under assessments,
24 please, sir.  The second full paragraph, about a
25 third of the way down, this report to you discusses

Page 291

1 the potential for intensified response against areas
2 in Israel will be elevated.
3         Do you see that?
4
5         (Whereupon Ms. Hoff left the
6          deposition proceedings.)
7
8         THE WITNESS:  Yes.
9 BY MS. SCOTT REED:
10    Q.  Was that a concern that you had at this time
11 period as well?
12    A.  About the escalation and deterioration of
13 the security situation?
14    Q.  Yes, sir.
15    A.  Yes.
16        MS. SCOTT REED:  Let me hand you
17 Exhibit 127, please, sir, UCP2092 through 2093.
18        (Exhibit 127 was marked for identification by
19        the court reporter and is attached hereto.)
20 BY MS. SCOTT REED:
21    Q.  Can you identify Exhibit 127 as an e-mail
22 string between you and Ms. Randi Richmond as well as
23 others?
24    A.  Yes.
25    Q.  And at the top of the page is that a report

Page 292

1 in your June 30th, 2014 e-mail, timestamped
2 12:09 p.m., that you sent to Ms. Richmond and
3 Mr. Binkie?
4    A.  Yes.
5    Q.  Would you put Exhibit 126 next to 127,
6 please, sir.
7        In Exhibit 127, your first two paragraphs
8 which begin "unconfirmed reports indicates," and
9 "reports indicate."
10        Do you see those?
11    A.  In 127?
12    Q.  127.
13    A.  Yes.
14    Q.  Are those two paragraphs quoted verbatim out
15 of Exhibit 126 beginning at the bottom of the page
16 where it says "unconfirmed reports"?
17    A.  Yes.
18    Q.  Did you use the language that was provided
19 to you by Max Security in Exhibit 126 in order to
20 make your report to NBCUniversal?
21    A.  Did I use the language?
22    Q.  Yes, sir.
23    A.  I -- I used the statements.  I cut and
24 pasted the information they sent to me on these
25 two -- these two paragraphs.  This is their language.

Page 293

1 They've written it.  I've cut it and pasted it into
2 another e-mail.
3        It's not something I'm relying upon.
4 There's other information contained with this --
5 within this update.
6    Q.  Sir, is it accurate that you quoted verbatim
7 two paragraphs that are in Exhibit 126 and placed
8 them wholesale into your Exhibit 127?
9        MR. HAYES:  Objection, document speaks for
10 itself.
11        THE WITNESS:  I already agreed.
12 BY MS. SCOTT REED:
13    Q.  All right.  Where did you get the
14 information in the paragraph that begins "travel to
15 Israel may continue"?
16    A.  I don't know.
17    Q.  Did you paraphrase it from page 3 of
18 Exhibit 126?
19    A.  The -- actual -- the actual statements
20 on the phrase -- paraphrase, "travel to Israel may
21 continue," has been used in various documents
22 throughout the -- here as exhibits.
23    Q.  Yes, sir.
24        And is the entire substance that you have in
25 your paragraphs, "travel to Israel may continue and

74 (Pages 290 - 293)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 294

1  our personnel need to avoid," a paraphrase of what
2  was reported in Exhibit 126 on the final page --
3  pardon me -- on the third page?
4      MR. HAYES:  Objection, vague.
5      THE WITNESS:  Yes.
6      MS. SCOTT REED:  All right.  So let me hand
7  you Exhibit 128.
8      (Exhibit 128 was marked for identification by
9    the court reporter and is attached hereto.)
10     MS. SCOTT REED:  For the record UCP2503
11 through 2506.
12  Q.  Can you identify Exhibit 128 as a June 30th,
13 2014 Max Security alert that was provided you via
14 e-mail including an e-mail from Mr. Kenion?
15  A.  Yes.
16  Q.  Did you receive this report from Max
17 Security?
18  A.  It would appear so.
19  Q.  Would this have been one of the sources that
20 you relied upon and studied in order to formulate
21 your overall assessment of the situation as of
22 June 30th?
23     MR. HAYES:  Objection, vague, lacks
24 foundation.
25     THE WITNESS:  It would have been one of the

Page 295

1  sources.  It certainly wouldn't have been the source
2  that I relied upon.
3  BY MS. SCOTT REED:
4   Q.  Yes, sir.
5      Is it one of the sources that you relied
6  upon?
7   A.  Yes, it would be.
8      MR. HAYES:  Same objections.
9      MS. SCOTT REED:  Here's Exhibit 129, sir.
10 For the record UCP2790 through 2800.
11     (Exhibit 129 was marked for identification by
12   the court reporter and is attached hereto.)
13 BY MS. SCOTT REED:
14  Q.  Can you identify Exhibit 129 as a July 1st,
15 2014 e-mail from Chris Biggs to you with a Word and
16 PDF attachment, apparently?
17  A.  Yes.
18  Q.  Would you turn to the attachment, please,
19 sir, which is entitled at the top:  Israel Dig
20 update.
21     Do you see that?
22  A.  2791?
23  Q.  2791, yes, sir.
24  A.  Yes.
25  Q.  It says (as read):

Page 296

1      Compiled 1st of July, 2014,
2      compiled by Chris Biggs.
3      Do you see that?
4   A.  I do.
5   Q.  Did Mr. Biggs author this package?
6      MR. HAYES:  Objection, vague, lacks
7  foundation.
8      THE WITNESS:  No, I wouldn't use the
9  language that he authored it.  He, as it says here,
10 compiled it.  He's not the author of all of the
11 information contained within here, and that's quite
12 apparent.  It's analysis from the BBC.  There's
13 analysis from IHS.
14 BY MS. SCOTT REED:
15  Q.  Did you compile any of the information that
16 is reflected in this exhibit attachment to 129?
17  A.  I have no idea.
18  Q.  Do you recall having any input into the
19 actual drafting or assembly of this document?
20  A.  I don't recall one way or another.
21  Q.  Did you participate in any decisions about
22 what would be included in the document?
23  A.  I don't recall.
24  Q.  What was the purpose of Israel Dig update
25 dated 1st of July, 2014?

Page 297

1   A.  I think that's self-explanatory.  It was
2  a -- an update of what was happening and an analysis
3  of information from several sources.
4   Q.  Who's the intended audience?
5   A.  I have no idea.  I couldn't say one way or
6  another at this time whether it was for my own update
7  or it was to be shared later.
8   Q.  Do you recall sharing it with anyone within
9  NBCUniversal?
10  A.  I would need to look at other information to
11 be able to confirm or deny.
12  Q.  Did you review this upon receipt from
13 Mr. Biggs?
14  A.  I don't know.
15  Q.  Would it have been your ordinary practice to
16 review something like this if he provided it to you?
17  A.  Yes.
18  Q.  Do you have any reason to doubt that you
19 reviewed this on or about the time you received it?
20  A.  No.
21  Q.  Was part of Mr. Biggs' work monitoring
22 reporting on this conflict as reported by BBC?
23  A.  Yes.
24  Q.  Was part of Mr. Biggs' work in connection
25 with the Dig production monitoring news coverage by

75 (Pages 294 - 297)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 298

1 NBC News?
2    A.  I wouldn't be able to say definitively if
3 that was one of the sources that he used.  You would
4 really have to ask Chris.
5    Q.  Would it be your expectation that he would
6 monitor the coverage on NBC News about this?
7    A.  No, not necessarily so.  NBC News doesn't
8 get a great deal of resonance outside of the U.S., to
9 be quite honest.
10    Q.  You mentioned that there was a location in
11 Israel, correct?
12    A.  There's an NBC News bureau there.
13    Q.  Yes, sir.
14    A.  Yeah.
15    Q.  All right.  And does it report -- does the
16 NBC News bureau that's located in Israel report on
17 events in Israel?
18    A.  To the best of my knowledge, yes.
19    Q.  Did you personally monitor any news coverage
20 that was made of the escalation, the hostilities that
21 were occurring, the summer of 2014 as it was carried
22 on NBC News?
23    A.  Not to my recollection because NBC News is
24 not a channel that I particularly follow.  It
25 doesn't -- it doesn't have any resonance to me.  I

Page 299

1 generally follow the BBC.
2    Q.  All right.  Sir.  And do you monitor NBC
3 News coverage as it's provided online either in print
4 or videos that are carried online?
5    A.  Not -- very, very rarely.  Only when I'm in
6 the States, really.  Frankly, again, it doesn't cover
7 topics that I'm generally affected by.
8    Q.  Is it your testimony today that NBC News was
9 not covering this conflict in the summer of 2014?
10    A.  No.
11    Q.  Do you believe NBC News was covering the
12 conflict in summer of 2014?
13        MR. HAYES:  Objection, calls for
14 speculation.
15        THE WITNESS:  It's guesswork, but yeah --
16 yeah.
17 BY MS. SCOTT REED:
18    Q.  You believe it was?
19    A.  I believe it was 'cause it was a -- major
20 event in the world.
21    Q.  Would you look at the fourth page of
22 Exhibit 129, please, sir, where it says analysis IHS.
23        What does IHS stand for?
24    A.  IHS is one of the security and intelligence
25 providers that provides us with information.  It's

Page 300

1 one of the multiple sources that we use.
2    Q.  And by the summer of 2014 had you subscribed
3 to that or become a member such that you were
4 receiving these updates?
5    A.  I personally hadn't.  Erin was a member,
6 which passed to Chris, when she left the business.
7 Erin Noordeloos.  I personally wasn't.
8    Q.  If Ms. Noordeloos was a member, did that
9 mean that your group could access that information?
10    A.  I couldn't say definitively, but I know that
11 Chris was accessing it through her -- through her
12 account.
13    Q.  The next section of this report has a recent
14 incidents log that's on page 2793 and 2794.
15        Do you see that?
16    A.  Yes.
17    Q.  Were these compiled out of the various
18 sources that you and Mr. Biggs were reviewing?
19        MR. HAYES:  Objection, vague, lacks
20 foundation.
21        THE WITNESS:  They were compiled by
22 Mr. Biggs, and I would imagine they were compiled
23 from, as you said, various sources.
24 BY MS. SCOTT REED:
25    Q.  Would you turn to the numbered page UCP2795,

Page 301

1 please, sir.
2        What does this chart represent?
3    A.  The -- the -- the chart -- this chart here?
4    Q.  Yes.
5        Where do I find the threats to Israel?
6    A.  This is a very general risk analysis chart.
7 This is used across multiple different spheres, and
8 it's really not something that I then or now would
9 pay any attention to because it's -- it's pretty
10 speculative.
11        It's -- it's essentially just the way the
12 document is written and compiled.  It doesn't mean
13 anything.  I certainly wouldn't use this information
14 on this page to form my opinion.
15    Q.  What does it say about Israel, though,
16 regardless of whether you'd rely upon this or not?
17 Does it have an assessment that you can point me to
18 about the security situation in Israel?
19    A.  No, no.  That's the point.  It's a very
20 general assessment from what I can see in this.  It's
21 just been included as part of the document structure.
22        MS. SCOTT REED:  Let me hand you
23 Exhibit 130, please, sir.
24        (Exhibit 130 was marked for identification by
25    the court reporter and is attached hereto.)

76 (Pages 298 - 301)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 302

1      MS. SCOTT REED: For the record UCP2473
2 through 2476.
3    Q.  Can you identify Exhibit 130 as a July 1st,
4 2014 Max Security Intelligence report directed to you
5 via e-mail?
6    A.  Yes.
7    Q.  Did you receive this report as part of your
8 job in gathering information regarding security for
9 Dig?
10    A.  Yes.
11    Q.  Does this report include factual
12 descriptions addressing rockets fired from the Gaza
13 Strip toward Israel?
14    A.  Yes.  Paragraph 2, it mentions it.
15    Q.  Is it a further description overall of
16 intensification of the conflict?
17      MR. HAYES:  Objection, vague, lacks
18 foundation.
19      THE WITNESS:  Yes.
20 BY MS. SCOTT REED:
21    Q.  Upon your review of this document did you
22 continue to hold the view or concern that the
23 security situation would continue to deteriorate?
24    A.  Yes.
25      MS. SCOTT REED:  Let me hand you

Page 303

1 Exhibit 131, please, sir.  For the record UCP1971
2 through 1972.
3      (Exhibit 131 was marked for identification by
4    the court reporter and is attached hereto.)
5 BY MS. SCOTT REED:
6    Q.  Can you identify this as an e-mail string
7 between you and Ms. Randi Richmond and others
8 culminating with a July 1st, 2014 e-mail?
9    A.  Yes.
10    Q.  The top e-mail is the one I'd like to direct
11 your attention to, please, sir.  Mr. Binkie writes to
12 you (as read):
13        Stephen, Israel hit Hamas and
14        Gaza with several targeted strikes.
15        Would like to hop on the phone today
16        to discuss the ongoing security and
17        safety of our cast and crew.  Want
18        to know what measures are being
19        taken to ensure our employees are
20        protected.  Thanks.
21        Do you see that?
22    A.  Yes.
23    Q.  Did you have a call after this that involved
24 Mr. Binkie or others?
25    A.  I would have to check my calendar.  I would

Page 304

1 have no reason to doubt that call was undertaken.
2    Q.  Does your electronic calendar you testified
3 about here today reflect phone calls that you would
4 have had about your work on Dig?
5    A.  If they were conference -- pardon me --
6 conference calls, then yes.
7    Q.  And what would constitute a conference call
8 such that it would make it on your electronic
9 calendar?
10    A.  When there were multiple participants it's
11 easier to have one number for them to dial into, and
12 generally the calls we had were multiple
13 participants.
14      MS. SCOTT REED:  I've handed you
15 Exhibit 132, sir, which is UCP1065 through 1067.
16      (Exhibit 132 was marked for identification by
17    the court reporter and is attached hereto.)
18 BY MS. SCOTT REED:
19    Q.  Do you see that?
20    A.  Yes.
21    Q.  Is this an e-mail that you sent to
22 Mr. Binkie and Ms. Richmond on July 1, 2004?
23    A.  Yes.
24    Q.  Have you changed your recommendations on
25 travel as of this communication?

Page 305

1    A.  Yes.
2    Q.  And how did your recommendations change?
3    A.  I've advised not to travel unless it's
4 absolutely necessary and business imperative.
5    Q.  What are you waiting to learn further about
6 the full extent of the Israeli response?
7      MR. HAYES:  Objection, vague, lacks
8 foundation.
9      THE WITNESS:  The Israeli response in
10 particular?
11 BY MS. SCOTT REED:
12    Q.  Yes, sir.
13    A.  I'm -- is it contained within this document?
14    Q.  You said --  I'm referring to your second
15 paragraph:  Do not travel to Israel.
16      Do you see that?
17    A.  Yes.
18    Q.  And then your next phrase is (as read):
19        Until the full extent of the
20        Israeli response is clearer.
21      What extent of the Israeli response were you
22 waiting to know more about?
23    A.  I wanted to understand how they were going
24 to respond in kind and if it was -- happened to be
25 the introduction of a ground offensive, that would

77 (Pages 302 - 305)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 306

1 have implications in terms of the response and an
2 uptick in terrorist activity, incursions into Israel
3 from terrorist groups.
4      THE REPORTER:  And what into Israel?
5      THE WITNESS:  Incursions.
6      THE REPORTER:  Incursions?
7      THE WITNESS:  Yes.
8 BY MS. SCOTT REED:
9   Q.  Now, you just used the word "terror" and
10 "terrorist" in that response.
11      What are you classifying as terrorist
12 activity or terrorists?
13   A.  Hamas and their supporters.
14   Q.  And are you testifying to the court in this
15 case that all the actions taken by Hamas directed at
16 Israel were terrorism?
17      MR. HAYES:  He's testifying in response to
18 your questions.  He's answering your questions.
19      MS. SCOTT REED:  Objection to the speaking
20 objection.  The witness has, again, made a statement
21 I'm entitled to follow up on.
22      MR. HAYES:  You can ask him what he means.
23      MS. SCOTT REED:  Will you get this to work?
24      THE REPORTER:  Can we go off the record?
25      MS. SCOTT REED:  Yes.

Page 307

1      VIDEO OPERATOR:  We are off the record.  The
2 time is 4:41 p.m.
3
4      (Whereupon a discussion was held off
5      the record.)
6
7      VIDEO OPERATOR:  We're back on the record.
8 The time is 4:42 p.m.
9      Please continue.
10 BY MS. SCOTT REED:
11   Q.  Mr. Smith, in your last answer you made a
12 specific reference to wanting to know whether there
13 would be an uptick in terrorist activity.
14      What were you referring to?
15   A.  Did I not answer that previously?
16      Hamas terrorists and their supporters and
17 others; others engaging in terrorist activity within
18 Israel.
19   Q.  Are you testifying to the court in this case
20 that all the actions taken by Hamas that were
21 directed toward Israel in the summer of 2014 were
22 terrorist acts?
23      MR. HAYES:  Objection, lacks foundation,
24 vague.  Object to the characterization.
25      THE WITNESS:  No.

78 (Pages 306 - 309)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 313

```
 1     MR. HAYES:  Yes.
 2     VIDEO OPERATOR:  We are off the record.  The
 3 time is 4:48 p.m., and this is the end of the third
 4 media.
 5
 6     (Recess taken.)
 7
 8     VIDEO OPERATOR:  This is the beginning of
 9 the fourth media.  We're back on the record.  The
10 time is 4:56 p.m.
11     Please continue.
12     MS. SCOTT REED:  Mr. Smith, I've handed you
13 what's been marked as deposition Exhibit 133, for the
14 record UCP2519 through 2520.
15     (Exhibit 133 was marked for identification by
16     the court reporter and is attached hereto.)
17 BY MS. SCOTT REED:
18   Q.  Can you identify that document, please, sir.
19   A.  Yes.
20   Q.  What is it?
21   A.  It's a country risk forecast in travel
22 security online and document from Control Risks.
23   Q.  Did you receive this on or about July 1st,
24 2014?
25   A.  Yes, it appears so.
```

79 (Pages 310 - 313)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 314

1  Q.  Was this one of the sources of information
2  that you were receiving updates from during your
3  ongoing work on the Dig project?
4  A.  Yes.
5     MS. SCOTT REED:  Let me hand you Exhibit
6  134, please, sir.
7     (Exhibit 134 was marked for identification by
8  the court reporter and is attached hereto.)
9     MS. SCOTT REED:  UCP-2240 through 2242.
10  Q.  Can you identify Exhibit 134 as a July 1st,
11  2014 Max Security Intelligence update sent to you via
12  e-mail?
13  A.  Yes.
14  Q.  Did you receive this document on or about
15  July the 1st?
16  A.  Yes.
17  Q.  Was this one of the sources of information
18  that you received as a part of your ongoing work on
19  the Dig production?
20  A.  Yes.
21     MS. SCOTT REED:  Let me hand you
22  Exhibit 135, please, sir.
23     (Exhibit 135 was marked for identification by
24  the court reporter and is attached hereto.)
25     MS. SCOTT REED:  UCP2363 through 2365 --

Page 315

1  pardon me -- UCP2363 through 2367.
2  Q.  Can you identify this as an e-mail Chris
3  Biggs provided to you July 2nd, 2014?
4  A.  Yes.
5  Q.  Was this in the nature of a compilation of
6  security information that Mr. Biggs was providing to
7  you as part of his responsibilities on Dig?
8  A.  Yes, appears so from the information in
9  front of me.
10  Q.  At the top in bold it says, IHS (as read):
11     Killing of Israeli abductees
12     increases pressure on Israeli
13     government to retaliate militarily
14     raising war and unrest risk.
15     Do you see that?
16  A.  I do.
17  Q.  Do you know whether he's quoting something
18  from IHS?
19  A.  It's -- it's not a quote.  The -- the entire
20  analysis and risk implications, to my understanding,
21  is a cut and paste of IHS information.  That's why
22  it's referenced IHS and he's referenced Reuters in
23  the story below, and he's referenced Al Jazeera.
24     THE REPORTER:  He's referenced what?
25     THE WITNESS:  Al Jazeera.

Page 316

1     MR. HAYES:  Al Jazeera.
2  BY MS. SCOTT REED:
3  Q.  Is it your understanding that Mr. Biggs was
4  summarizing for you information that he drew from
5  IHS, Reuters, and Al Jazeera as sources?
6     MR. HAYES:  Objection, misstates his
7  testimony.
8     THE WITNESS:  Sorry.  Can you just repeat
9  your question?  Sorry.
10  BY MS. SCOTT REED:
11  Q.  Is it your understanding that Mr. Biggs was
12  summarizing for you information that he drew from
13  IHS, Reuters, and Al Jazeera as sources?
14     MR. HAYES:  Same objection, asked and
15  answered.
16     THE WITNESS:  Yeah.  I wouldn't say
17  summarizing.  What he's done here is provided me with
18  information, and the information from IHS is a
19  summary.  And he hasn't, to my knowledge, added or
20  subtracted from this.  It is information that they've
21  provided.
22  BY MS. SCOTT REED:
23  Q.  In the IHS description, about halfway
24  through the paragraph on analysis, there is a
25  reference to fear of provoking a Third Intifada.

Page 317

1     Do you see that?
2  A.  Yes.
3  Q.  What is a Third Intifada?
4  A.  I -- I don't know what the literal
5  translation of intifada is.
6  Q.  Do you know generally speaking or
7  conceptually speaking what that refers to?
8     MR. HAYES:  Objection, vague.
9     THE WITNESS:  Generally speaking, it refers
10  to a conflict.  I don't know what the literal
11  translation of it is.
12  BY MS. SCOTT REED:
13  Q.  Did you review this information when
14  Mr. Biggs provided it to you?
15  A.  I wouldn't be able to say definitively
16  either way, but I have no reason to doubt that I did.
17  Q.  Was this the type of information that you
18  were in the process of gathering and processing as
19  part of your work on the Dig production?
20     MR. HAYES:  Objection, vague, lacks
21  foundation.
22     THE WITNESS:  It's the type of information.
23  What I'm interested in is the who, what, where of
24  what is exactly happening, what's -- what people are
25  expecting to happen, and the general security

80 (Pages 314 - 317)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 318

1 situation.
2 BY MS. SCOTT REED:
3    Q.   Would you look at the IHS section, please,
4 sir, under:  Risk implications.  Halfway through the
5 paragraph the sentence is (as read):
6            A broader Gaza war would become
7        more likely if Hamas or other
8        Gaza-based militants responded with
9        several dozen rockets per day into
10       southern Israel over a sustained
11       period.
12       Do you see that?
13   A.   Yes.
14   Q.   And the next sentence (as read):
15           A broader war would result in a
16       much higher likelihood of Hamas
17       using FAJR-5 rockets capable of
18       reaching Tel Aviv.
19       Do you see that sentence?
20   A.   Yes.
21   Q.   What's a FAJR-5 rocket?
22   A.   No idea.
23   Q.   Did you have a discussion with anyone about
24 the possibility of a broader war occurring?
25   A.   I had discussions around an -- the

Page 319

1 escalation -- the escalation and in the conflict and
2 the deterioration in the security situation and -- in
3 Israel.
4        The information contained in this is
5 somebody else's language as well, you know, so it's
6 not necessarily that I'm going to use the words that
7 they've used.
8    Q.   Yes, sir.
9        My question to you is:  Since IHS is making
10 comments about the likelihood of a broader Gaza war,
11 did you discuss with anyone at any time the
12 likelihood of a broader Gaza war?
13   A.   Are you asking me if I used those words, "a
14 broader Gaza war"?  Is that -- is that what the
15 question is asking me?
16   Q.   The question is about this concept that IHS
17 is discussing.
18   A.   Yes --
19       MR. HAYES:  Objection, vague.  Objection,
20 vague, lacks foundation.
21       THE WITNESS:  Yeah, I -- I thought I
22 answered that.  The question before was the same
23 question.  I answered it.  I -- I had -- we'd have
24 discussions around the -- an escalation in the
25 conflict.

Page 320

1 BY MS. SCOTT REED:
2    Q.   Did any of your other sources that you
3 gathered information from other than IHS make reports
4 about their analysis of what might lead to a broader
5 Gaza war?
6    A.   I don't --
7        MR. HAYES:  Objection, vague.
8        THE WITNESS:  I don't know.  I'd need to see
9 documentation.
10       MS. SCOTT REED:  Let me hand you
11 Exhibit 126, please, sir, UCP3672 through 3674.
12       THE WITNESS:  Thank you.
13       (Exhibit 136 was marked for identification by
14    the court reporter and is attached hereto.)
15 BY MS. SCOTT REED:
16   Q.   Can you identify Exhibit 136 as an e-mail
17 string between you and Ms. Richmond and Mr. Binkie on
18 July the 2nd, 2014?
19   A.   Yes.
20   Q.   Is the last e-mail, the bottom e-mail in the
21 string from you, timestamped 2:31 a.m. Pacific
22 Standard Time, your update to your NBCUniversal
23 colleagues on and as of July the 2nd?
24       MR. HAYES:  Objection, vague, lacks
25 foundation.

Page 321

1        THE WITNESS:  It's an information on the --
2 as it says in the document "current security
3 situation analysis," and then the heading misspelled
4 security update and analysis.
5 BY MS. SCOTT REED:
6    Q.   All right.  Down in the section that says:
7 Risk implications, do you include a discussion that
8 (as read):
9            A broader Gaza war would become
10       more likely if Hamas or other
11       Gaza-based militants responded with
12       several dozen rockets per day into
13       southern Israel over a sustained
14       period?
15   A.   I -- I wouldn't use the word "discussion."
16 I've put in information that I believe has been taken
17 from the IHS report, one -- in Exhibit 135.
18   Q.   All right.  Sir.  And is the next sentence
19 that (as read):
20           A broader war would result in a
21       much higher likelihood of Hamas
22       using FAJR-5 rockets capable of
23       reaching Tel Aviv.
24       Also something you took out of Exhibit 135,
25 specifically the IHS portion?

81 (Pages 318 - 321)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 322

1    A.  Yes.
2    Q.  Why did you choose to include these
3  sentences about a broader Gaza war or a broader war
4  in your discussion that you provided to Mr. Binkie
5  and Ms. Richmond?
6       MR. HAYES:  Objection, lacks foundation,
7  mischaracterizes the document.
8       THE WITNESS:  The information needed to be
9  shared.
10 BY MS. SCOTT REED:
11   Q.  You felt it was of a -- character or type
12 that it was important to bring it to NBCUniversal
13 attention?
14   A.  Yes.
15      MS. SCOTT REED:  Let me hand you
16 Exhibit 137, please, sir.
17      (Exhibit 137 was marked for identification by
18      the court reporter and is attached hereto.)
19      MS. SCOTT REED:  UCP2676 through 2680.
20   Q.  Can you identify Exhibit 137 as a July 2nd,
21 2014 Max Security Intelligence report provided to you
22 via e-mail?
23   A.  Yes.
24   Q.  Is this a further reporting of development
25 that you received from Max Security as part of their

Page 323

1  work on the Dig production?
2    A.  Yes.
3    Q.  Does this reflect the type of information
4  that you were gathering as part of your ongoing work
5  on the Dig production?
6    A.  Yes.
7       MS. SCOTT REED:  Let me direct you to
8  Exhibit 138, please, sir, UCP2219 through 2223.
9       (Exhibit 138 was marked for identification by
10      the court reporter and is attached hereto.)
11 BY MS. SCOTT REED:
12   Q.  Can you identify Exhibit 138 as a July 3rd,
13 2014 Max Security Intelligence report provided to you
14 via e-mail?
15   A.  Yes.
16   Q.  Did you receive this report from Max
17 Security?
18   A.  I have no reason to doubt that I did.
19   Q.  And would you have reviewed it very closely
20 upon your receipt of it?
21   A.  I may have reviewed it.  Whether I reviewed
22 it very closely is -- you know, I -- I can't say.  I
23 don't know.  You know, one person's very closely is
24 another person's thoroughly and -- and is another
25 person's scanning it.

Page 324

1       I wouldn't be able to -- to tell you now
2  with any certainty what I did with the report or --
3  you know, I have no reason to doubt that I reviewed
4  it.
5    Q.  Upon receipt of information such as this on
6  July the 3rd, did you continue to conclude the
7  escalation was going to continue?
8    A.  Yes.
9    Q.  And was Exhibit 138 the type of information
10 that you were gathering in order to perform your job
11 duties in connection with the Dig production?
12   A.  Yes.
13      MS. SCOTT REED:  Let me hand you
14 Exhibit 139, please, sir, UCP2592 through 2593.
15      (Exhibit 139 was marked for identification by
16      the court reporter and is attached hereto.)
17 BY MS. SCOTT REED:
18   Q.  Can you identify this as an e-mail string
19 between you and Brian Brady of July 3rd, 2014?
20   A.  Yes.
21   Q.  Who's Mr. Brady?
22   A.  A -- Brian Brady was the VP.  I didn't
23 realize he was deputy chief security officer.  He was
24 L.A. based.  He was the individual that first
25 introduced the production to Erin and I.

Page 325

1    Q.  This was the person in L.A. who contacted
2  you?
3    A.  Originally, yes.
4    Q.  He refers to a gentleman called David Harel
5  in his e-mail at the bottom.
6       Do you see that?
7    A.  Yes.
8    Q.  Did you reach out to Mr. Harel?
9    A.  I don't recall reaching out to him, but the
10 company that's referenced, Asero, I believe sent some
11 information.
12   Q.  Did you --
13   A.  The name doesn't -- sorry -- the name
14 doesn't have any resonance.
15   Q.  Did you retain Asero to provide some sort of
16 reporting or do some sort of work on the Dig
17 production?
18   A.  No, not to my knowledge.  The -- they -- I
19 believe they did send some information, which was
20 quite possibly unsolicited.
21   Q.  Do you know what kind of business Asero was?
22   A.  No.
23   Q.  This indicates it was out of Tel Aviv.
24      Was that what you learned about it?
25   A.  Only from this document.

82 (Pages 322 - 325)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 326

1       MS. SCOTT REED:  Let me hand you
2   Exhibit 140, please, sir, UCP-2099.
3       (Exhibit 140 was marked for identification by
4   the court reporter and is attached hereto.)
5   BY MS. SCOTT REED:
6   Q.  Can you identify Exhibit 140 as an e-mail
7   from you to Ms. Noordeloos and Mr. Brady of July 3rd,
8   2014?
9   A.  Yes.
10  Q.  What was the purpose of this communication,
11  please, sir.
12  A.  To update both Erin Noordeloos and Brian
13  Brady on my advice.
14  Q.  At this point in time was Ms. Noordeloos
15  your boss?
16  A.  Yes.
17  Q.  Was she the person to whom you directly
18  reported in your duties and responsibilities?
19  A.  Notionally, yes.  I would at times report
20  directly to Tom McCarthy if something was of relevant
21  importance, but she was my line manager.
22      THE REPORTER:  She was my what manager?
23      THE WITNESS:  Line.
24      THE REPORTER:  Line manager.  Okay.
25

Page 327

1   BY MS. SCOTT REED:
2   Q.  Was Mr. McCarthy Ms. Noordeloos' boss?
3   A.  Yes.
4   Q.  And where does Brian Brady fall into the
5   organizational structure vis-à-vis Ms. Noordeloos?
6   A.  There's no direct line management.  He's
7   just part -- he was just part of the wider team.  He
8   introduced the production to Erin and I.  He's the
9   gentleman in the previous document, 139.
10  Q.  Could you read the first sentence of this
11  e-mail, please, sir, aloud:
12  A.  (As read):
13      Hi, both.  FYI, I have advised
14      the Dig production based on the
15      current --
16      THE REPORTER:  I have advised the Dig
17  production based on the ...
18      THE WITNESS:  (As read):
19      -- current security situation
20      and the intel and analysis we have
21      from a variety of sources that if
22      the current security situation
23      persists or deteriorates further, we
24      should not be shooting in Jerusalem.
25

Page 328

1   BY MS. SCOTT REED:
2   Q.  Is this the first occasion when you have
3   made this particular recommendation in connection
4   with the Dig production?
5       MR. HAYES:  Objection, vague, lacks
6   foundation.
7       THE WITNESS:  I would have to review against
8   other -- other documentation.  I -- I'm pretty sure
9   earlier on in some of these e-mails I've mentioned
10  not shooting in Jerusalem.
11  BY MS. SCOTT REED:
12  Q.  You refer to intel and analysis we have from
13  a variety of sources.
14      Do you see that?
15  A.  Yes.
16  Q.  And among those intel and analysis you have
17  from a variety of sources, would that include the Max
18  Security reports?
19  A.  They would be one of the sources, yes.
20  Q.  And were other sources the types that you've
21  identified during your testimony today?
22  A.  Yes.
23  Q.  Were you and Mr. Biggs the people who were
24  gathering that intel and analysis from a variety of
25  sources?

Page 329

1   A.  Yes.
2   Q.  Were there others within NBCUniversal who
3   would have been gathering the information that you're
4   referring to here?
5   A.  We had a group called Global Watch, which
6   was the precursor to, I mentioned earlier, the
7   G-R-I-C, the GRIC.  They -- they may well have been,
8   and Erin certainly was involved at some point in
9   gathering information.
10      MS. SCOTT REED:  I hand you Exhibit 141,
11  please, sir.
12      (Exhibit 141 was marked for identification by
13  the court reporter and is attached hereto.)
14      MS. SCOTT REED:  This is UCP2727 through
15  2731.
16  Q.  Can you identify Exhibit 141 as a July 3rd,
17  2014 report from Max Security Intelligence forwarded
18  to you via e-mail including by e-mail of Mr. Kenion?
19  A.  Yes.
20  Q.  Is this one of the sources of information
21  that you would have received in carrying out your
22  work on the Dig production?
23  A.  Yes.
24  Q.  Did this report continue to indicate to you
25  an increase in hostilities?

83 (Pages 326 - 329)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 330

1    A.  Yes.
2    Q.  Did it report an uptick in the number of
3  rockets fired toward Israel?
4        MR. HAYES:  Objection, document speaks for
5  itself.
6  BY MS. SCOTT REED:
7    Q.  Can you answer?
8    A.  Oh, sorry, yes.
9        MS. SCOTT REED:  Let me hand you
10 Exhibit 142, please, sir, UCP3924 through 3926.
11       (Exhibit 142 was marked for identification by
12       the court reporter and is attached hereto.)
13 BY MS. SCOTT REED:
14   Q.  Can you identify Exhibit 142 as an e-mail
15 from you to Mr. McCarthy and Ms. Noordeloos dated
16 July 3rd, 2014?
17   A.  Yes.
18   Q.  Were you including in this information that
19 you had received from Max Security updates?
20   A.  Yes.
21   Q.  And are you, again, reporting in this
22 instance that your advice, given the present security
23 conditions, is not to -- well, no.  Let me restate my
24 question.
25       Have you changed your advice in connection

Page 331

1  with this communication on July the 3rd?
2        MR. HAYES:  Objection, vague, lacks
3  foundation.
4        THE WITNESS:  No.  Advice is still that we
5  should not film in Jerusalem.
6  BY MS. SCOTT REED:
7    Q.  And what information had you processed in
8  order to lead you to make the recommendation at this
9  point in time that there should not being filming in
10 Jerusalem?
11   A.  The security environment in Jerusalem was
12 very, very unstable and unpredictable in nature.
13 Activity, terrorist, demonstration, is extremely
14 difficult to predict and also to secure against.
15 Many of the areas that we were going to film in
16 Jerusalem were in areas where conflicts were taking
17 place.  There was demonstrations.  There was people
18 being stopped.  There was rocks being thrown, etc.
19 It wasn't a safe environment.
20   Q.  Were there rockets and mortars being aimed
21 at Jerusalem by this time?
22   A.  I don't know.  I'd need to consult the
23 security reports.
24   Q.  Did you have reports that there were sirens
25 going off in Jerusalem by this time?

Page 332

1    A.  Certainly around this time.
2    Q.  And what would the sirens indicate from a
3  security standpoint?
4        MR. HAYES:  Objection, vague, lacks
5  foundation.
6        THE WITNESS:  That there's -- that was going
7  to be an incoming rocket attack and people were to
8  shelter in place or go to a place, a shelter -- a
9  place of safety, shelter.
10       MS. SCOTT REED:  Let me hand you
11 Exhibit 143, please, sir.
12       (Exhibit 143 was marked for identification by
13       the court reporter and is attached hereto.)
14       MS. SCOTT REED:  UCP1975 through 1976.
15   Q.  Can you identify this as an e-mail entitled
16 security message from Dig on July 3rd, 2014, that's
17 directed to you from Penelope Kennedy?
18   A.  Yes.
19   Q.  Who's Penelope Kennedy?
20   A.  No idea.
21   Q.  What is Distroscenechronize?
22   A.  No idea.  I don't know.  Can I -- can I just
23 add some clarification around this particular
24 document?  If you -- if you go to page 2 --
25   Q.  Yes, sir.

Page 333

1    A.  -- it actually looks as if I have originally
2  sent this because it's got my -- I created this, and
3  somehow it's been forwarded on by Penelope Kennedy.
4  But I have no idea who Penelope Kennedy is.  I don't
5  know if it's somebody with the local production team
6  or ...
7    Q.  So is it your recollection that you wrote
8  this security message to be distributed?
9    A.  It would appear so.  It's my signature
10 blocks on page 2.
11   Q.  Who would be the intended audience for this
12 type of security message?
13   A.  This would be for the -- the crew.
14   Q.  And you're warning about the deterioration
15 of the situation affecting Jerusalem in this, among
16 other things?
17   A.  Yes.
18   Q.  Your third bullet point states (as read):
19       Increase in rocket attacks on
20       Southern Israel emanating from Gaza.
21       Do you see that?
22   A.  Yes.
23   Q.  Was that information that you'd gathered
24 from your various incoming sources of intel?
25   A.  Yes.

84 (Pages 330 - 333)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 334

1    Q.    And the forth bullet point says (as read):
2        General increase in security and
3    military activity.
4        Do you see that?
5    A.    Yes.
6    Q.    Was that information you'd gathered from the
7 various sources you had incoming?
8    A.    Yes.
9        MS. SCOTT REED:  Let me hand you
10 Exhibit 144, please, sir.
11        (Exhibit 144 was marked for identification by
12    the court reporter and is attached hereto.)
13 BY MS. SCOTT REED:
14    Q.    Can you identify Exhibit 144 as a July 4th,
15 2014 e-mail to you from Mr. Biggs?
16    A.    Yes.
17    Q.    Was this a further report on information
18 that Mr. Biggs was compiling as part of his work on
19 the Dig project?
20    A.    Yes.
21    Q.    Was this for wider distribution from just
22 you?
23    A.    It was only originally distributed to me.
24 It was sent to me, and I would have to look at other
25 documentation up to see if we drew any analysis or

Page 335

1 recommendations or we passed it on in its -- in its
2 raw form.
3        MS. SCOTT REED:  Let me hand you
4 Exhibit 145, please, sir.
5        (Exhibit 145 was marked for identification by
6    the court reporter and is attached hereto.)
7        MS. SCOTT REED:  This is UCP3971 through 72.
8    Q.    Can you identify Exhibit 145 as an e-mail
9 from you to Ms. Noordeloos and Mr. McCarthy dated
10 July 5th?
11    A.    Yes.
12    Q.    And a string among those parties.
13    A.    Yes.
14    Q.    Ms. Noordeloos writes to you (as read):
15        Hi, Stephen.  Given that reports
16        suggest that even with a ceasefire
17        may not reduce hostilities, I think
18        it is prudent to see what the result
19        is from the request to law
20        enforcement.
21    Do you see that communication to you?
22    A.    I do.
23    Q.    Were you discussing with her what
24 arrangements might be -- might be put into place in
25 order to film in east Jerusalem?

Page 336

1    A.    Yes.
2    Q.    Did you continue those discussions after
3 July the 5th with her?
4    A.    I would need to see other documentation to
5 confirm that.
6        MS. SCOTT REED:  Let me show you
7 Exhibit 146, please, sir.
8        (Exhibit 146 was marked for identification by
9    the court reporter and is attached hereto.)
10        MS. SCOTT REED:  UCP2149 through 2154.
11    Q.    Can you identify Exhibit 146 as a July 5th,
12 2014 Max Security report sent to you via e-mail?
13    A.    Yes.
14    Q.    Did you receive this report on or about July
15 the 5th?
16    A.    Yes.
17    Q.    And would you have reviewed it as part of
18 your ongoing work on the Dig production?
19    A.    This is the type of documentation and
20 information that I would review, whether I
21 specifically reviewed this documentation then.  But I
22 have no -- I have no reason to doubt -- doubt that.
23    Q.    The first part of the text indicates
24 (as read):
25        Ground sources reported on

Page 337

1        July 5th that an Iron Dome
2        Antimissile Battery has been
3        deployed by Israel Defense Forces,
4        IDF, to the Tel Aviv area.
5        Do you see that?
6    A.    Yes.
7    Q.    Was that a new area that was the subject of
8 strikes or attempted strikes by Hamas?
9    A.    I'm afraid I'm not able to answer that.
10    Q.    Do you recall attempted attacks or attacks
11 spreading to the Tel Aviv area at some point during
12 your monitoring?
13    A.    Yes.
14    Q.    And would that have been an expansion of the
15 areas that Hamas was targeting within Israel?
16    A.    Yes.
17    Q.    Were those areas farther away for Hamas to
18 strike out of Gaza?
19        MR. HAYES:  Objection, vague, lacks
20 foundation.
21        THE WITNESS:  It is my understanding, yes.
22        MS. SCOTT REED:  Let me hand you
23 Exhibit 147, sir.
24        (Exhibit 147 was marked for identification by
25    the court reporter and is attached hereto.)

85 (Pages 334 - 337)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 338

1     MS. SCOTT REED:  UCP2422 through 2426.
2    Q.  Can you identify Exhibit 147 as a July 7th,
3 2014 security report from Max Security Intelligence
4 directed to you via e-mail?
5    A.  Yes.
6    Q.  Did you receive this July 7th security
7 update?
8    A.  I have no reason to doubt that I received
9 it.
10    Q.  Is this the type of information that you
11 were gathering for your work providing security for
12 the Dig production?
13    A.  Yes.
14    Q.  On the second page under the heading:
15 Assessments, was Max Security Intelligence continuing
16 to advise that there was increased potential for an
17 escalation in hostilities between Hamas and others in
18 Palestine on one side and Israelis on the other?
19    A.  How far down is that -- sorry -- in this
20 assessment?
21    Q.  Just the first half of the first paragraph
22 regarding assessments.
23     MR. HAYES:  Objection, document speaks for
24 itself.
25     THE WITNESS:  Yes.

Page 339

1 BY MS. SCOTT REED:
2    Q.  In the second half of that first paragraph,
3 sir, there is a reference to Hamas' military wing,
4 the Izz Al-Din Al-Qassam brigades.
5     Do you see that?
6    A.  I do.
7    Q.  Do you know what the Izz Al-Din Al-Qassam
8 brigades is?
9    A.  No.
10    Q.  And are you familiar with Hamas' having a
11 military wing?
12    A.  I -- I don't know the structure of Hamas.
13    Q.  Are you familiar with any of the military
14 capabilities of Hamas' military wing?
15     MR. HAYES:  Objection, vague, lacks
16 foundation.
17     THE WITNESS:  No.
18 BY MS. SCOTT REED:
19    Q.  As part of your work on the Dig production,
20 did you undertake any sort of study or review of
21 Hamas' military wing or its capabilities?
22     MR. HAYES:  Objection, vague, lacks
23 foundation.
24     THE WITNESS:  No.
25     Did you get that?

Page 340

1     No.  Sorry.
2     MS. SCOTT REED:  Hand you Exhibit 148,
3 please, sir.
4     (Exhibit 148 was marked for identification by
5     the court reporter and is attached hereto.)
6     MS. SCOTT REED:  This is UCP2569, and
7 clipped to it is a printout of the link to
8 Haaretz.com.
9    Q.  Can you identify the first page marked 2569
10 as an e-mail from Mr. Biggs to you?
11    A.  Yes.
12    Q.  And in this, was he including a link to an
13 article that was at Haaretz.com?
14    A.  Yes.
15    Q.  Did you open that link and review the news
16 report?
17    A.  I couldn't say definitively yes or no, but I
18 have no reason to doubt that.
19    Q.  Was this information that Mr. Biggs was
20 gathering as part of his work on the Dig production?
21    A.  Yes.
22    Q.  And was this information that you and he
23 were reviewing and processing in order to continue to
24 report to NBCUniversal?
25    A.  Yes.

Page 341

1     MS. SCOTT REED:  Let me hand you
2 Exhibit 149, please, sir, UCP1865.
3     (Exhibit 149 was marked for identification by
4     the court reporter and is attached hereto.)
5 BY MS. SCOTT REED:
6    Q.  Can you identify Exhibit 149 as an e-mail
7 from Mr. Biggs to you and Ms. Noordelos of July 7,
8 2014?
9    A.  Yes.
10    Q.  Was Mr. Biggs reporting additional factual
11 developments to you regarding a response to Gaza
12 rockets?
13    A.  He's reported factual developments and
14 hearsay as well in this document.  So the first line
15 I take to be a factual statement.  The second one is
16 a -- by the fact it starts early leaks from cabinet
17 meeting, it's -- would come from sources we may not
18 be able to confirm.
19     MS. SCOTT REED:  Let me hand you
20 Exhibit 150, please, sir.
21     (Exhibit 150 was marked for identification by
22     the court reporter and is attached hereto.)
23     MS. SCOTT REED:  UCP2816 through 2820.
24    Q.  Can you identify Exhibit 150 as a July 7th
25 Max Security Intelligence report sent to you via

86 (Pages 338 - 341)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 342

1  e-mail?
2      A.  Yes.
3      Q.  Did you receive this Max Security report on
4  or about July the 7th?
5      A.  Yes.
6      Q.  Would you have reviewed this information on
7  receiving it from Max Security?
8      A.  I have no reason to doubt that I did.
9      Q.  Was this the type of information that you
10  were gathering as part of your work in connection
11  with the Dig production?
12      A.  Yes.
13      Q.  Does part of this report indicate that
14  cross-border fire between the Israel defense forces,
15  IDF, and Gaza-based militants escalated during the
16  evening hours of July 7?
17          MR. HAYES:  Objection, document speaks for
18  itself.
19          THE WITNESS:  Yes.
20  BY MS. SCOTT REED:
21      Q.  In the next paragraph did Max Security
22  report to you as part of its work for NBCUniversal
23  that on the ground dozens of rockets and mortars have
24  been fired toward Southern Israeli communities
25  bordering the Gaza Strip while numerous Israeli air

Page 343

1  strikes were reported into Gaza as well?
2          MR. HAYES:  Objection, document speaks for
3  itself.
4          THE WITNESS:  Yes.
5  BY MS. SCOTT REED:
6      Q.  Did this report of July 7th indicate to you
7  that there continued to be an intensification of the
8  mutual activity back and forth between Palestine or
9  Hamas on one side and Israel on the other?
10          MR. HAYES:  Objection, vague and lacks
11  foundation.
12          THE WITNESS:  Yes.
13  BY MS. SCOTT REED:
14      Q.  And did you take this report as further
15  evidence that escalation was continuing?
16      A.  Yes.
17          MS. SCOTT REED:  Let me hand you
18  Exhibit 151, sir, UCP1855 through 1856.
19          (Exhibit 151 was marked for identification by
20      the court reporter and is attached hereto.)
21  BY MS. SCOTT REED:
22      Q.  Can you identify Exhibit 151 as an e-mail
23  from you to Ms. Richmond on July the 8th, 2014?
24      A.  Yes.
25      Q.  As part of this report, did you either quote

Page 344

1  or summarize the information you'd received from Max
2  Security in Exhibit 150?
3          MR. HAYES:  Objection, vague, lacks
4  foundation, and compound.
5          THE WITNESS:  Yes.
6  BY MS. SCOTT REED:
7      Q.  Did you quote part of it?
8      A.  Yes.
9      Q.  Did you summarize other parts of it?
10      A.  Yes.
11      Q.  Did you rely upon Exhibit 150, the July 7th
12  security report from Max Security, in order to
13  provide information in your report that's documented
14  as Exhibit 151?
15          MR. HAYES:  Objection, vague, lacks
16  foundation.
17          THE WITNESS:  Information from Exhibit 150
18  is included in the information in Exhibit 151.
19  BY MS. SCOTT REED:
20      Q.  And you relied upon Exhibit 150 in order to
21  quote or summarize that information?
22          MR. HAYES:  Same objections.
23          THE WITNESS:  Yes.
24  BY MS. SCOTT REED:
25      Q.  In Exhibit 151, you state toward the top

Page 345

1  (as read):
2          Summarizing the info below, there
3          is significant risk of an escalation
4          as conditions for a ceasefire are
5          unlikely to be acceptable.
6          Do you see that?
7      A.  Yes.
8      Q.  Was that your conclusion as of July the 8th?
9      A.  Yes.
10      Q.  Did you believe that things would continue
11  to intensify following July the 8th based upon the
12  information you had gathered?
13      A.  Yes.
14      Q.  Were you predicting any stop or cessation of
15  the hostilities as of July the 8th?
16          MR. HAYES:  Objection, vague, asked and
17  answered.
18          THE WITNESS:  No.
19          MS. SCOTT REED:  Let me hand you
20  Exhibit 152, please, sir.
21          (Exhibit 152 was marked for identification by
22      the court reporter and is attached hereto.)
23          MS. SCOTT REED:  UCP1845 through 1849.
24      Q.  Can you identify Exhibit 152 as a July 8th,
25  2014 Max Security Intelligence report sent to you via

87 (Pages 342 - 345)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 346

1  e-mail?
2     A.  Yes.
3     Q.  Did you receive this on or about July the
4  8th?
5     A.  That's correct.
6     Q.  Did you review it soon after or close in
7  time to your receipt?
8     A.  I have no reason to doubt that I did.
9     Q.  Was this the type of information that you
10  were in the process of gathering as part of your work
11  on the Dig production?
12     A.  Yes.
13     Q.  Did you conclude based upon this report
14  that's labeled Exhibit 152 that there was a
15  continuing likelihood of escalation of the
16  hostilities?
17     A.  Yes.
18     Q.  Did this report to you that the rocket fire
19  into southern Israel was continuing?
20        MR. HAYES:  Objection, document speaks for
21  itself.
22        THE WITNESS:  The information is in the
23  document, yes.
24  BY MS. SCOTT REED:
25     Q.  And at the bottom of the first page did Max

Page 347

1  Security report to you that on July 7th,
2  approximately 100 rockets and mortars were fired into
3  Israel, primarily targeting border communities?
4        MR. HAYES:  Objection, document speaks for
5  itself.
6        THE WITNESS:  Yes, that's in the document.
7  BY MS. SCOTT REED:
8     Q.  And was that information important to you in
9  the context of assessing the security of the Dig
10  production?
11     A.  Yes, as part of the overall intelligence
12  picture.
13        MS. SCOTT REED:  Let me hand you
14  Exhibit 153, please, sir.
15        (Exhibit 153 was marked for identification by
16     the court reporter and is attached hereto.)
17        MS. SCOTT REED:  For the record, UCP2813 and
18  attached to it a printout of the Haaretz.com
19  reference in the e-mail.
20     Q.  Can you identify Exhibit 153 as an e-mail to
21  you from Mr. Biggs on July 8th, 2014?
22     A.  Yes.
23        MR. HAYES:  Has this document been produced;
24  this attachment?
25        MS. SCOTT REED:  UCP2813.

88 (Pages 346 - 349)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 352

```
1  foundation.
2       THE WITNESS:  Yes.
3       MS. SCOTT REED:  Let me hand you
4  Exhibit 155, please, sir.
5       (Exhibit 155 was marked for identification by
6    the court reporter and is attached hereto.)
7       MS. SCOTT REED:  UCP2294 through 2301.
8    Q.  Can you identify Exhibit 155 as another
9  compilation of e-mails that Mr. Biggs was sending you
10 on July the 8th?
11   A.  Yes.
12   Q.  Based upon your review of Exhibit 155, was
13 Mr. Biggs continuing to give you updated information
14 over the course of July the 8th as part of the work
15 he was doing for the Dig production?
16   A.  Yes.
17   Q.  Was he monitoring events on a developing
18 basis on July the 8th?
19       MR. HAYES:  Objection, vague, calls for
20 speculation.
21       THE WITNESS:  Yes.
22       MS. SCOTT REED:  Let me hand you
23 Exhibit 156, please, sir, UCP2681 through 2682.
24       (Exhibit 156 was marked for identification by
25    the court reporter and is attached hereto.)
```

Page 351

```
1       MS. SCOTT REED:  Let me hand you
2  Exhibit 154, sir.
3       THE WITNESS:  Thank you.
4       (Exhibit 154 was marked for identification by
5    the court reporter and is attached hereto.)
6       MS. SCOTT REED:  UCP2046 through 2052.
7    Q.  Can you identify this as an e-mail that
8  Mr. Biggs sent to you on July 8th, 2014?
9    A.  Yes.
10   Q.  And does he attach to it various other
11 information that he's gathered from different
12 sources?
13       MR. HAYES:  Objection, document speaks for
14 itself, calls for speculation.
15       THE WITNESS:  The -- the actual maps that he
16 has included in here, these will be his own maps.
17 He's produced them.  That would be my understanding
18 of this.
19 BY MS. SCOTT REED:
20   Q.  And where he is making other typewritten
21 notes about events, is it your understanding that
22 this is information he was gathering as part of his
23 ongoing work in providing security to the Dig
24 production?
25       MR. HAYES:  Objection, vague, lacks
```

Page 353

```
1  BY MS. SCOTT REED:
2    Q.  Can you identify Exhibit 156 as the travel
3  tracker proactive e-mail sent to you on July 8th,
4  2014?
5    A.  Yes.
6    Q.  And does this report air raid warnings were
7  sounding in various areas in Israel?
8    A.  Yes.
9    Q.  Is this further evidence of escalation to
10 you in part of your gathering information on the Dig
11 production?
12   A.  Yes.
13   Q.  And was Exhibit 156 an example of the type
14 of information that was coming into you as part of
15 your work in connection with the Dig production?
16   A.  Yes.
17       MS. SCOTT REED:  Gentleman, can we take at a
18 break here?
19       MR. HAYES:  Sure.
20       VIDEO OPERATOR:  We are off the record.  The
21 time is 5:48 p.m.
22
23       (Recess taken.)
24
25       VIDEO OPERATOR:  We're back on the record.
```

89 (Pages 350 - 353)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 354

1 The time is 6:03 p.m.
2      Please continue.
3      MS. SCOTT REED:  Mr. Smith, I put
4 Exhibit 157 in front of you, UCP1669.
5      (Exhibit 157 was marked for identification by
6      the court reporter and is attached hereto.)
7 BY MS. SCOTT REED:
8    Q.  Can you identify that as a July 8th e-mail
9 stream between you and Mr. Binkie, among others?
10   A.  Yes.
11   Q.  And at this point are you being asked to
12 assess what to do about production that's going to
13 resume?
14   A.  I am in the original e-mail; in July 8th
15 one.
16   Q.  So as of July the 8th were you undertaking a
17 review to make a recommendation to NBCUniversal?
18     MR. HAYES:  Objection, vague, lacks
19 foundation.
20     THE WITNESS:  I was gathering information as
21 a result of the escalation and deterioration in the
22 security situation.
23     MS. SCOTT REED:  Will you refer to
24 Exhibit 158, please, sir, UCP2477 through 2478.
25

Page 355

1      (Exhibit 158 was marked for identification by
2      the court reporter and is attached hereto.)
3 BY MS. SCOTT REED:
4    Q.  Can you identify this as a July 8th, 2014
5 travel tracker proactive e-mail sent to you?
6    A.  Yes.
7    Q.  Was this information of the sort that you
8 were gathering as part of your work on the Dig
9 production?
10   A.  Yes.
11   Q.  Can you confirm that you received that?
12   A.  At this stage I have no reason to doubt that
13 I did.
14     MS. SCOTT REED:  Let me hand you
15 Exhibit 159, please, sir, another July 8th, 2014
16 travel tracker proactive e-mail.
17     Can you identify it as such?
18     (Exhibit 159 was marked for identification by
19     the court reporter and is attached hereto.)
20     THE WITNESS:  Yes.
21 BY MS. SCOTT REED:
22   Q.  This is UCP1977 through 78.
23     Was this another piece of information that
24 you received when you were undertaking your review in
25 connection with the Dig production?

Page 356

1    A.  Yes.
2    Q.  Were you considering information such as 158
3 and 159 in making your recommendations that
4 NBCUniversal had requested?
5      MR. HAYES:  Objection, vague, lacks
6 foundation.
7      THE WITNESS:  Sorry, that's putting me off.
8 BY MS. SCOTT REED:
9    Q.  Oh, that's yours?
10     MR. HAYES:  No, it's mine.
11     THE WITNESS:  Oh, is it?
12     MR. HAYES:  It's okay.  Go ahead.
13     MS. SCOTT REED:  Let me hand you
14 Exhibit 160, please, sir.
15     (Exhibit 160 was marked for identification by
16     the court reporter and is attached hereto.)
17     MS. SCOTT REED:  UCP2828 through 2831.
18   Q.  Can you identify this as a July 8th, 2014
19 Max Security Intelligence report that you received
20 via e-mail?
21   A.  Yes.
22   Q.  Is this a sort of information that you
23 received -- that you were receiving as part of your
24 ongoing work on the Dig production?
25   A.  Yes.

Page 357

1    Q.  Was this part of the information that you
2 were gathering leading up to making a recommendation
3 to NBCUniversal about the next set of production?
4      MR. HAYES:  Objection, vague, lacks
5 foundation.
6      THE WITNESS:  Information such as this would
7 have been part of the assessment process.
8      MS. SCOTT REED:  Let me hand you
9 Exhibit 161, please, sir.
10     (Exhibit 161 was marked for identification by
11     the court reporter and is attached hereto.)
12     MS. SCOTT REED:  UCP913 to 914.
13   Q.  Can you identify this as an e-mail string
14 beginning with an e-mail from you of July 9th, 2014?
15   A.  Yes.
16   Q.  And are you reporting that additional
17 rockets against Tel Aviv, Jerusalem, and other major
18 population centers in central Israel should be
19 expected?
20     MR. HAYES:  Objection, document speaks for
21 itself, lacks foundation.
22     THE WITNESS:  Yes.
23 BY MS. SCOTT REED:
24   Q.  Is this information that you were
25 considering as part of your ongoing work on assessing

90 (Pages 354 - 357)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 358

1 security for the Dig production?
2   A.  Yes.
3   Q.  And was this information that you were
4 considering as part of your process of making a
5 recommendation about whether to resume production?
6       MR. HAYES:  Objection, lacks foundation.
7       THE WITNESS:  Could you just repeat that
8 question?  Sorry, I'm -- please.  Sorry.
9       MS. SCOTT REED:  All right.  My screen's
10 off.
11      (Whereupon the record was read by
12      the reporter as follows:
13        "Q.  And was this information
14      that you were considering as part of
15      your process of making a
16      recommendation about whether to
17      resume production?")
18      THE WITNESS:  My recommendation was around
19 the security implications.  I wouldn't recommend
20 whether the production could or not resume.  I would
21 recommend whether it was safe and secure to do so.
22 BY MS. SCOTT REED:
23   Q.  All right.  With that clarification, was
24 that information that you were considering as part of
25 your recommendation that you were going to give

Page 359

1 regarding safety and security?
2   A.  Yes.
3       MS. SCOTT REED:  Let me hand you
4 Exhibit 162, please, sir, UCP2181 through 2188.
5       (Exhibit 162 was marked for identification by
6       the court reporter and is attached hereto.)
7 BY MS. SCOTT REED:
8   Q.  Can you identify this as an e-mail from
9 Mr. Biggs including an Israel Dig update for July the
10 9th?
11   A.  Yes.
12   Q.  Did Mr. Biggs compile this as part of his
13 ongoing work in regard to the Dig production?
14   A.  Yes.
15      MS. SCOTT REED:  Let me hand you
16 Exhibit 163, please, sir.
17      (Exhibit 163 was marked for identification by
18      the court reporter and is attached hereto.)
19      MS. SCOTT REED:  UCP2405 through 06.
20   Q.  Can you identify this as a July 9th, 2014
21 e-mail from you to Mr. McCarthy and Ms. Noordeloos?
22   A.  Yes.
23   Q.  Were you arranging a call with those
24 colleagues to discuss the security situation?
25   A.  Yes.

Page 360

1   Q.  Did you reach a conclusion based upon that
2 call as to what you would put into your assessment of
3 the security situation?
4       MR. HAYES:  Objection, vague, lacks
5 foundation.
6       THE WITNESS:  Yes.
7 BY MS. SCOTT REED:
8   Q.  What was the conclusion that you reached in
9 the call?
10   A.  I'm not sure if it was this -- in terms of
11 my advice?  Can you -- sorry, just clarify that.  I'm
12 a bit hazy about the question there, sorry.
13   Q.  Yes.
14   A.  About the advice I was going to give?
15   Q.  Yes, sir.
16   A.  Yeah.  So on or around this time we had
17 calls with people to discuss the deterioration in the
18 security situation and whether we were able to
19 guarantee to the best of our ability the security and
20 safety of our personnel and assets.
21   Q.  And was there a conclusion that you reached
22 on that subject?
23   A.  Not at this point, I don't believe.
24   Q.  Was it at a later point?
25   A.  Yes, that's my belief.

Page 361

1       MS. SCOTT REED:  Let me hand you 164,
2 please, sir.
3       (Exhibit 164 was marked for identification by
4       the court reporter and is attached hereto.)
5       MS. SCOTT REED:  UCP2683 through 2684.
6   Q.  Can you identify Exhibit 164 as a July 9th,
7 2014 country risk forecast and travel security online
8 you received via e-mail?
9   A.  Yes.
10   Q.  Was this another example of the information
11 that you had incoming as part of your job to gather
12 information to assess the security for the Dig
13 project?
14   A.  Yes.
15      MS. SCOTT REED:  Let me hand you
16 Exhibit 165, please, sir, UCP658 through 666.
17      (Exhibit 165 was marked for identification by
18      the court reporter and is attached hereto.)
19 BY MS. SCOTT REED:
20   Q.  Can you identify this as an e-mail string in
21 which you were involved and where you directed a July
22 9th e-mail to Randi Richmond and Mark Binkie?
23   A.  I can.
24   Q.  And did you direct this to Ms. Richmond and
25 Mr. Binkie as the production personnel to report to

91 (Pages 358 - 361)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 362

1  them about your assessment?
2       MR. HAYES:  Objection, vague, lacks
3  foundation.
4       THE WITNESS:  Yes.
5  BY MS. SCOTT REED:
6    Q.  And attached to this is a July 9th, 2014
7  Israel Dig update prepared by Mr. Biggs, correct?
8    A.  That's correct.
9    Q.  Had you reached a collusion about the
10 recommendation on security that you have by this
11 point on July the 9th?
12      MR. HAYES:  Objection, vague, lacks
13 foundation.
14      THE WITNESS:  I couldn't say exactly at what
15 point I reached the conclusion.
16 BY MS. SCOTT REED:
17   Q.  Do you know on what day of the month?
18      MR. HAYES:  Same objections.
19      THE WITNESS:  I -- I don't know if it was
20 the 9th or the 10th of July.  It was around -- it was
21 around -- around that time.
22 BY MS. SCOTT REED:
23   Q.  July 9 or 10?
24   A.  My -- my recommendation was on July the
25 10th, which is my recollection when the conclusion

Page 363

1  was reached.
2    Q.  July 10th is when you communicated your
3  conclusion?
4    A.  Yeah, that's my understanding, yeah.
5       MS. SCOTT REED:  Will you look at 166,
6  please, sir.
7       (Exhibit 166 was marked for identification by
8       the court reporter and is attached hereto.)
9       MS. SCOTT REED:  UCP2393.
10   Q.  Can you identify this as an e-mail from
11 Mr. Biggs to you on July 9th reporting further
12 factual events or news reports?
13   A.  I can.
14   Q.  Can you identify Exhibit 167 as another
15 e-mail from Mr. Biggs, July 9th, reporting further
16 facts or news reports?
17      (Exhibit 167 was marked for identification by
18      the court reporter and is attached hereto.)
19      THE WITNESS:  Yes.
20 BY MS. SCOTT REED:
21   Q.  And is this information that you and
22 Mr. Biggs were compiling as part of your assessment
23 of the security situation in Israel?
24   A.  Yes.
25      MS. SCOTT REED:  Let me hand you 168,

Page 364

1  please, sir, UCP2821.
2       (Exhibit 168 was marked for identification by
3       the court reporter and is attached hereto.)
4  BY MS. SCOTT REED:
5    Q.  Can you identify this as an e-mail string of
6  July 9th, 2014 in which you were involved?
7    A.  Yes.
8       MS. SCOTT REED:  Here's 169, please, sir,
9  UCP2324.
10      (Exhibit 169 was marked for identification by
11      the court reporter and is attached hereto.)
12 BY MS. SCOTT REED:
13   Q.  Can you identify this as a July 9th, 2014
14 e-mail you sent to Brian Brady to report further
15 events and summaries?
16   A.  Yes.
17   Q.  And did you report that you were still in an
18 escalation phase?
19      MR. HAYES:  Objection, vague, lacks
20 foundation, document speaks for itself.
21      THE WITNESS:  Yes.
22 BY MS. SCOTT REED:
23   Q.  Were you expecting on July 9th a continuing
24 intensification of the two-sided interactive activity
25 that was going on?

Page 365

1       MR. HAYES:  Objection, vague, lacks
2  foundation.
3       THE WITNESS:  I expected an escalation; an
4  escalation of the conflict and a deterioration in the
5  security situation.
6       MS. SCOTT REED:  Let me hand you 170,
7  please, sir, UCP2372 through 2376.
8       (Exhibit 170 was marked for identification by
9       the court reporter and is attached hereto.)
10 BY MS. SCOTT REED:
11   Q.  Can you identify this as a July 9th, 2014
12 Max analysis that was sent to you by e-mail?
13   A.  Yes.
14   Q.  What's Operation Protective Edge?
15   A.  It's the name given by the Israeli Defense
16 Force to their operations in this conflict.
17   Q.  And do you see the indication that Israel
18 launched Operation Protective Edge on July the 7th?
19   A.  On the first line, yes.
20   Q.  Yes, sir.
21      And was this information that you received
22 from the Max analysis report the type that you were
23 gathering and incorporating into your assessment of
24 security for Dig?
25      MR. HAYES:  Objection, vague, lacks

92 (Pages 362 - 365)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 366

1 foundation.
2          THE WITNESS:  Yes.
3 BY MS. SCOTT REED:
4     Q.  Did the information that's provided in
5 Exhibit 170 inform your thinking on conclusions that
6 you reached either that day or July the 10th?
7          MR. HAYES:  Objection, vague, lacks
8 foundation.
9          THE WITNESS:  I've no reason to doubt that
10 this information and other information from other
11 sources would have been part of the overall analysis
12 and review.
13 BY MS. SCOTT REED:
14     Q.  Let me --
15     A.  I wouldn't rely on one source of information
16 or one company's information or intelligence.  I
17 would look, as I've said earlier, for multiple
18 sources of information.
19     Q.  Would this have been one of the sources that
20 you were considering?
21     A.  Yes.
22          MS. SCOTT REED:  Let me hand you 171,
23 please, sir.
24          (Exhibit 171 was marked for identification by
25          the court reporter and is attached hereto.)

Page 367

1          MS. SCOTT REED:  UCP2468 through 70.
2     Q.  Can you identify this as a July 10th, 2014
3 e-mail from Mr. Biggs to you and Ms. Noordeloos?
4     A.  I can.
5     Q.  And is this information that Mr. Biggs was
6 reporting as a result of the work he was doing
7 assessing security for the Dig production?
8     A.  Yes.
9          MS. SCOTT REED:  Let me hand you
10 Exhibit 172, please, sir.
11          (Exhibit 172 was marked for identification by
12          the court reporter and is attached hereto.)
13 BY MS. SCOTT REED:
14     Q.  Can you identify this as a July 10th travel
15 tracker proactive e-mail?
16     A.  I can.
17     Q.  Was this part of the information that you
18 were receiving in connection with your work of
19 assessing the security situation for Dig?
20     A.  Yes.
21     Q.  Can you identify Exhibit 173, please, sir,
22 as a July 10th, e-mail --
23          (Exhibit 173 was marked for identification by
24          the court reporter and is attached hereto.)
25

Page 368

1 BY MS. SCOTT REED:
2     Q.  -- as a July 10th e-mail from you to
3 Ms. Richmond and Mr. Binkie titled security summary?
4     A.  Yes.
5     Q.  Was this further information that you were
6 reporting to your production colleagues in regard to
7 your assessment?
8     A.  That's correct.
9     Q.  And is this factual information that you
10 gathered based upon all of your review and analysis
11 that you were doing?
12          MR. HAYES:  Objection, lacks foundation,
13 vague.
14          THE WITNESS:  I couldn't say a hundred
15 percent all of the information is -- is factual, but
16 it's certainly information I would pass on, what
17 needed to be passed on.
18 BY MS. SCOTT REED:
19     Q.  Was it information that you were
20 communicating in the context of the assessment that
21 you were making for security on Dig?
22     A.  Yes.
23     Q.  Can you identify Exhibit 174, please, sir,
24 as a July 10th e-mail from you to Mr. McCarthy and
25 Ms. Noordeloos included in a string of e-mails?

Page 369

1          (Exhibit 174 was marked for identification by
2          the court reporter and is attached hereto.)
3          THE WITNESS:  That's correct.
4 BY MS. SCOTT REED:
5     Q.  In the top third of the e-mail there's a
6 bold question (as read):
7               Stephen, what is the
8          recommendation with regards to
9          ongoing production given the state
10          of affairs?
11          Do you see that?
12     A.  Yes.
13     Q.  In response did you actually make a
14 recommendation to the production side for the Dig?
15     A.  Yes.
16     Q.  Was that verbal or in writing or both?
17     A.  My recollection is that it was both.
18          MS. SCOTT REED:  Let me hand you
19 Exhibit 175, please, sir.
20          (Exhibit 175 was marked for identification by
21          the court reporter and is attached hereto.)
22 BY MS. SCOTT REED:
23     Q.  UCP4034 through 4036.
24          Can you identify this as an e-mail string of
25 July 10th, 2014 in which you were involved?

93 (Pages 366 - 369)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 370

1   A.  Yes.
2   Q.  Erin is writing (as read):
3       Both Stephen and I concur that if
4       both the cast are unwilling to
5       travel and the reports from the
6       ground show that there is no lull or
7       cessation at this point, we are at a
8       point where we need to make a
9       decision.  It appears they want us
10      to make the decision for them.
11      Do you know what she's referring to?
12      MR. HAYES:  Objection, misstates the
13  document.  The document states -- speaks for itself.
14      THE WITNESS:  On whether they should
15  continue with the production in Israel at this stage.
16      MS. SCOTT REED:  Let me hand you
17  Exhibit 176.
18      (Exhibit 176 was marked for identification by
19      the court reporter and is attached hereto.)
20  BY MS. SCOTT REED:
21      Q.  Can you identify Exhibit 176 as a July 10th
22  e-mail that you sent to Ms. Noordeloos and copied
23  Mr. Biggs?
24      A.  Yes.
25      Q.  Is this wording that you were putting

Page 371

1   together in order to document in writing what your
2   assessment was?
3       MR. HAYES:  Objection, vague, lacks
4   foundation.
5       THE WITNESS:  Yeah.  It -- it was wording
6   that we were going to make in a communication to the
7   production heads.
8       MS. SCOTT REED:  And let me show you
9   Exhibit 177, sir.
10      (Exhibit 177 was marked for identification by
11      the court reporter and is attached hereto.)
12  BY MS. SCOTT REED:
13      Q.  Is this the actual written form that went to
14  Mr. Binkie as part of production?
15      MR. HAYES:  Objection, vague, lacks
16  foundation.
17      THE WITNESS:  Yes.
18  BY MS. SCOTT REED:
19      Q.  And is this the final recommendation that
20  you made in connection with security at this time?
21      MR. HAYES:  Objection, vague.
22      THE WITNESS:  This was my recommendation
23  then.  There were other recommendations over a period
24  of time on whether to return, whether the security
25  situation had changed, whether there had been a

Page 372

1   cessation, an escalation.  But on this particular
2   day, this was my advice to the production.
3   BY MS. SCOTT REED:
4       Q.  In the first full paragraph, it's stated
5   (as read):
6           This is to advise you that the
7       security environment in Israel
8       currently prohibits NBCU security
9       from being able to guarantee the
10      safety and security of our
11      employees, production partners, and
12      associated crew and talent.
13      Is that your recommendation, so to speak?
14      A.  Yes.
15      Q.  This is the way you stated the conclusion?
16      A.  Yes.
17      Q.  And what does this mean?
18      A.  It means given the situation, the
19  analysis -- pardon me -- the analysis of all of the
20  information, the continued escalation, the likelihood
21  of further detrimental security activity, whether in
22  the form of terrorist attacks, whether in the form of
23  rocket attacks, that the security environment was not
24  acceptable for us to continue with that production in
25  those locations at this particular time.

Page 373

1       Q.  And was that throughout Israel as opposed to
2   your recommendation earlier, which had been
3   Jerusalem?
4       A.  Yes.
5       Q.  So at this point you have broadened your
6   assessment to say security cannot be guaranteed
7   across Israel?
8       A.  Yes.
9       Q.  And in security speak, is this the way you
10  say this is my assessment?
11      MR. HAYES:  Objection, vague, lacks
12  foundation.
13      THE WITNESS:  Yes, in security speak.  It
14  could be worded differently.  This is a statement to
15  be circulated amongst people with no knowledge of
16  security.
17      MS. SCOTT REED:  Let me hand you
18  Exhibit 178, please, sir.
19      (Exhibit 178 was marked for identification by
20      the court reporter and is attached hereto.)
21  BY MS. SCOTT REED:
22      Q.  Can you identify 178 as a July 10th Max
23  Security Intelligence report that you received via
24  e-mail?
25      A.  I can.

94 (Pages 370 - 373)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 374

1    Q.   And was this information that you were
2 gathering as part of your process in assessing
3 security for Dig?
4    A.   Yes.
5    Q.   Did this information inform, at least in
6 part, the conclusion you had reached that you could
7 not guarantee security at this point in time?
8        MR. HAYES:  Objection, vague, lacks
9 foundation.
10       THE WITNESS:  It's also after the -- the
11 decision has been made for my advice.  It's the type
12 of information that was used.  This particular
13 document, actually, my understanding is after the
14 decision's been made.
15 BY MS. SCOTT REED:
16   Q.   Did you continue to gauge the security
17 situation even after you provided your assessment on
18 July the 10th?
19   A.   Yes.
20   Q.   Did you continue to provide analysis or
21 assessment on whether hostilities were ramping up or
22 not?
23   A.   I did.
24   Q.   And what sort of conclusions did you reach
25 after July 10th about whether hostilities were

Page 375

1 ramping up?
2        MR. HAYES:  Objection, vague.
3        THE WITNESS:  Hostilities were ramping up.
4 There was no cessation.  At that time there was no
5 long-term prospect of a ceasefire, and the security
6 situation hadn't changed enough for the production to
7 continue, in my opinion.
8        MS. SCOTT REED:  Let me hand you
9 Exhibit 179, please, sir.
10       (Exhibit 179 was marked for identification by
11    the court reporter and is attached hereto.)
12 BY MS. SCOTT REED:
13   Q.   Can you identify 179 as a July 11th, 2014
14 Max Security Intelligence report that you received
15 via e-mail?
16   A.   Yes.
17   Q.   Does this contain information that you were
18 gathering as part of your process of assessing
19 security for the Dig production?
20   A.   Yes.
21   Q.   Did this continue to inform your assessment
22 that you had on an ongoing basis after July the 10th?
23       MR. HAYES:  Objection, vague, lacks
24 foundation.
25       THE WITNESS:  Yes.

Page 376

1 BY MS. SCOTT REED:
2    Q.   At any point after July the 10th, did you
3 change your assessment and say that you could assure
4 safety or security for NBCUniversal personnel?
5    A.   In relation to the Dig production or in
6 relation to other travelers attending for -- for --
7 for other events?
8    Q.   Specifically for the Dig production.
9    A.   No, not -- not to my knowledge.  But we did
10 have travelers, three travelers, go.  I'm not sure it
11 was directly related to Dig.  It may well have been,
12 but it wasn't -- they weren't --
13   Q.   In terms of the Dig production itself, after
14 your July 10th recommendation did you ever change
15 that; in other words, reverse it to say:  We can
16 assure safety or security for a Dig production?
17   A.   No, not -- that's not my recollection.
18 There was three travelers.  From my memory, there was
19 three travelers who traveled shortly after.  Whether
20 they were connected to the production directly, I'm
21 not sure.
22   Q.   So let me just focus on the production
23 itself.
24   A.   Right.
25   Q.   Did you ever change your assessment that you

Page 377

1 issued on July 10th to say that you could guarantee
2 safety for actual production?
3    A.   No, not -- that's not my recollection, no.
4        MS. SCOTT REED:  Let me hand you
5 Exhibit 180, please, sir.
6        (Exhibit 180 was marked for identification by
7    the court reporter and is attached hereto.)
8 BY MS. SCOTT REED:
9    Q.   Can you identify Exhibit 180 as a July 11th,
10 2014 e-mail from Mr. Biggs to you, again
11 communicating information or updates about the
12 conditions in Israel?
13   A.   That's correct.
14   Q.   And was this information that you and he
15 were assessing as part of your ongoing work for the
16 Dig production?
17   A.   Yes.
18   Q.   Did this continue to inform your assessment
19 that you could not guarantee safety or security for
20 the production?
21   A.   It did.
22       MS. SCOTT REED:  Let me hand you
23 Exhibit 181.
24       (Exhibit 181 was marked for identification by
25    the court reporter and is attached hereto.)

95 (Pages 374 - 377)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 378

1 BY MS. SCOTT REED:
2    Q. Can you identify Exhibit 181 as an e-mail
3 from you to Mr. Binkie providing a security update?
4    A. That's correct.
5    Q. Were you communicating to Mr. Binkie the
6 types of information that you had been gathering as
7 part of your work on the Dig security assessment?
8    A. Yes.
9        MS. SCOTT REED: Let me show you
10 Exhibit 182.
11       (Exhibit 182 was marked for identification by
12     the court reporter and is attached hereto.)
13 BY MS. SCOTT REED:
14    Q. Can you identify Exhibit 182 as a July 11th
15 Max Security Intelligence report you received by
16 e-mail?
17    A. Yes, that's correct.
18    Q. Was this information that you were gathering
19 as part of your ongoing assessment of security for
20 the Dig production?
21    A. Yes.
22    Q. Did this information inform the ongoing
23 assessment that you were making about safety and
24 security for Dig?
25    A. Yes.

Page 379

1        MS. SCOTT REED: Let me hand you
2 Exhibit 183, please, sir.
3       (Exhibit 183 was marked for identification by
4     the court reporter and is attached hereto.)
5 BY MS. SCOTT REED:
6    Q. Can you identify this as a July 12th, 2014
7 Max Security Intelligence report you received by
8 e-mail?
9    A. Yes, I can.
10    Q. Was this information that you were gathering
11 as part of your ongoing assessment of security for
12 Dig?
13       MR. HAYES: Objection, vague, lacks
14 foundation.
15       THE WITNESS: Yes.
16 BY MS. SCOTT REED:
17    Q. And did you review this information as part
18 of your ongoing assessment that you were making in
19 terms of safety or security for the Dig production in
20 Israel?
21       MR. HAYES: Same objections.
22       THE WITNESS: I have no reason to doubt that
23 I did.
24       MS. SCOTT REED: Let me hand you
25 Exhibit 184, please, sir.

Page 380

1        (Exhibit 184 was marked for identification by
2     the court reporter and is attached hereto.)
3 BY MS. SCOTT REED:
4    Q. Can you identify that as a July 12th, 2014
5 Max Security Intelligence report communicated to you
6 by e-mail?
7    A. I can.
8    Q. Did you receive this report as part of your
9 ongoing work in assessing security for the Dig
10 production?
11    A. Yes.
12    Q. Did this information continue to inform the
13 assessment that you were providing on an ongoing
14 basis about the Dig production?
15    A. Yes.
16    Q. Can you identify Exhibit 185 as a July 14th,
17 2014 e-mail string between you and Mr. Binkie and
18 Ms. Richmond?
19       (Exhibit 185 was marked for identification by
20     the court reporter and is attached hereto.)
21       THE WITNESS: Yes.
22 BY MS. SCOTT REED:
23    Q. Is this a continuing summary of information
24 that you were providing to the production side?
25    A. That's correct.

Page 381

1    Q. Can you identify Exhibit 186 as a July 15th,
2 2014 Max Security Intelligence report sent to you by
3 e-mail?
4    A. It is July 14th, this one.
5        (Exhibit 186 was marked for identification by
6     the court reporter and is attached hereto.)
7 BY MS. SCOTT REED:
8    Q. All right. Sir, did you receive that as
9 part of your ongoing work on Dig?
10    A. I have no reason to doubt that I did.
11    Q. And was it information that you continued to
12 assess while you were reviewing security for Dig?
13    A. Yes.
14    Q. Can you identify Exhibit 187 as a July 15th,
15 2014 Max Security Intelligence report?
16       (Exhibit 187 was marked for identification by
17     the court reporter and is attached hereto.)
18       THE WITNESS: Yes.
19 BY MS. SCOTT REED:
20    Q. And were you in receipt of this by e-mail on
21 or about July 15th?
22    A. That's correct.
23    Q. Did you receive this as part of your ongoing
24 work in assessing security for Dig?
25    A. I have no reason to doubt that I did.

96 (Pages 378 - 381)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 382

1    Q.  And did information in this report continue
2  to inform the assessment that you were making for
3  NBCUniversal?
4        MR. HAYES:  Objection, vague, lacks
5  foundation.
6        THE WITNESS:  Yes.
7  BY MS. SCOTT REED:
8    Q.  Can you identify Exhibit 188 as a July 15th
9  Max Security Intelligence report that you received
10  via e-mail?
11        (Exhibit 188 was marked for identification by
12    the court reporter and is attached hereto.)
13        THE WITNESS:  Yes.
14  BY MS. SCOTT REED:
15    Q.  Did you receive this as part of your ongoing
16  work that you were performing in regard to Dig?
17    A.  Yes.
18    Q.  And did it continue to inform the assessment
19  that you were providing in terms of safety and
20  security to the Dig production?
21        MR. HAYES:  Objection, vague, lacks
22  foundation.
23        THE WITNESS:  Yes.
24  BY MS. SCOTT REED:
25    Q.  Can you identify Exhibit 189 as a July 15th

Page 383

1  Max Security Intelligence report that you received
2  via e-mail?
3        (Exhibit 189 was marked for identification by
4    the court reporter and is attached hereto.)
5        THE WITNESS:  Yes, I can.
6  BY MS. SCOTT REED:
7    Q.  Did you receive this Max Security report as
8  part of your ongoing work in assessing security for
9  the Dig project?
10    A.  I have no reason to doubt that I did.
11    Q.  And did this information that was provided
12  to you by Max Security inform the ongoing assessment
13  that you were making in regard to safety and security
14  for the production?
15        MR. HAYES:  Objection, vague, lacks
16  foundation.
17        THE WITNESS:  Yes.
18  BY MS. SCOTT REED:
19    Q.  Can you identify Exhibit 190 as a July 16th,
20  2014 Max Security Intelligence report that you
21  received via e-mail?
22        (Exhibit 190 was marked for identification by
23    the court reporter and is attached hereto.)
24        THE WITNESS:  Yes.
25

Page 384

1  BY MS. SCOTT REED:
2    Q.  Did you receive this as part of your ongoing
3  work in assessing security for the Dig project?
4    A.  Yes.
5    Q.  Did this information inform or continue to
6  inform the assessment that you were making on an
7  ongoing basis about safety and security for Dig?
8        MR. HAYES:  Objection, vague, lacks
9  foundation.
10        THE WITNESS:  Yes, I have no reason to doubt
11  that it did.
12        MS. SCOTT REED:  Let me hand you
13  Exhibit 191, please, sir.
14        (Exhibit 191 was marked for identification by
15    the court reporter and is attached hereto.)
16  BY MS. SCOTT REED:
17    Q.  Can you identify this as a July 16th, 2014
18  Max Security Intelligence report that you received
19  via e-mail?
20    A.  Yes, I can.
21    Q.  Did this information continue to inform the
22  assessment that you were making in regard to safety
23  and security for the Dig production?
24    A.  Yes.
25    Q.  Can you identify Exhibit 192 as a July 16th,

Page 385

1  2014 e-mail from you to Mr. Binkie copied to
2  Ms. Richmond?
3        (Exhibit 192 was marked for identification by
4    the court reporter and is attached hereto.)
5        THE WITNESS:  Yes, I can.
6  BY MS. SCOTT REED:
7    Q.  And is this a communication that you were
8  asked to provide to the production side?
9    A.  I'm -- I'm not sure if I was asked to
10  provide a further statement or I just provided it of
11  my own volition.
12    Q.  And in this you're communicating that the
13  current attempts to broker a ceasefire have stalled.
14        Do you see that?
15    A.  Yes.
16    Q.  And was that significant to your assessment
17  on your ongoing review of safety and security for
18  Dig?
19    A.  Yes.
20    Q.  Why was that, sir?
21    A.  Because it meant that there was no cessation
22  in the violence.  There was no long-term or even
23  short-term/medium-term prospect that the security
24  situation would -- would change to allow the safe and
25  secure protection of our assets.

97 (Pages 382 - 385)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 386

1   Q.  You report here that (as read):
2       During the period of Israeli
3       acceptance, it is estimated that
4       47 rockets were fired from Gaza
5       toward Israel.
6       Do you see that?
7   A.  Yes.
8   Q.  And did that inform the assessment that you
9   were providing at this point?
10   A.  That was part of the assessment, yes --
11   Q.  So as of -- pardon me.
12   A.  Yes, sorry.
13   Q.  As of July the 16th, 2014 were you still
14  providing a security assessment that you could not
15  guarantee the safety and security of personnel for
16  production in Israel?
17   A.  Yes.
18   Q.  Was the situation worse on July 16th than
19  you assessed it to be on July the 10th?
20   A.  I would have to refer to other information
21  to answer that accurately.
22   Q.  Is your overall feeling that after your
23  recommendation on July 10th, things were either at a
24  sustained level or increasing in hostility?
25       MR. HAYES:  Objection, vague, lacks

Page 387

1   foundation.
2        THE WITNESS:  My -- my assessment was that
3   there was no cessation of violence and the situation
4   had not improved.
5   BY MS. SCOTT REED:
6    Q.  Did you predict that there was or assess
7   that there was not a likelihood of cessation either?
8    A.  Yes.
9    Q.  Can you identify Exhibit 193 as a July 16th,
10  2014 security alert that you received via e-mail?
11       (Exhibit 193 was marked for identification by
12       the court reporter and is attached hereto.)
13       THE WITNESS:  Yes, I can.
14  BY MS. SCOTT REED:
15   Q.  Did this information continue to inform your
16  assessment of the security situation for the Dig
17  production?
18   A.  Yes.
19       MR. HAYES:  Objection.
20       THE WITNESS:  Sorry.
21       MR. HAYES:  Vague, lacks foundation.
22  BY MS. SCOTT REED:
23   Q.  You're reporting in this that -- or pardon
24  me -- Max Security is stating in this that (as read):
25       Israel's cabinet approved the

Page 388

1       call-up of an additional
2       8,000 reservists, bringing the total
3       number of troops called up to
4       50,000.
5       Do you see that?
6    A.  I do.
7    Q.  And was this one of the sources that
8   reported that information to you?
9    A.  Yes.
10       MR. HAYES:  Objection, vague, lacks
11  foundation.
12  BY MS. SCOTT REED:
13   Q.  Did that information affect the assessment
14  that you were providing on an ongoing basis about
15  safety and security for Dig?
16   A.  That would have formed part of my assessment
17  and how I came to the conclusions; that and other
18  information sources.
19  BY MS. SCOTT REED:
20   Q.  And did that fact continue to cause you to
21  conclude that you could not assure safety or security
22  for production in Israel?
23       MR. HAYES:  Objection, vague, lacks
24  foundation.
25       THE WITNESS:  That was a -- a number of

Page 389

1   factors that were taken into conversation.
2   BY MS. SCOTT REED:
3    Q.  Yes, sir.
4       And was that one of them?
5    A.  Yes.
6       MS. SCOTT REED:  He needs to change the
7   tape.
8       MR. HAYES:  Why does he need to change the
9   tape?  Is it seven hours?
10       VIDEO OPERATOR:  Yeah.  I was just
11  indicating that was the seven-hour --
12       MS. SCOTT REED:  Oh, I'm sorry, I
13  misunderstood.  All right.  Then stop me when we get
14  there.  I thought we had a hard break.
15       VIDEO OPERATOR:  Right.  Just to be clear,
16  we hit that time where you were looking at, but we've
17  got -- we have more time.
18       MR. HAYES:  What does that mean?
19       VIDEO OPERATOR:  I've got to think carefully
20  here.
21       MS. SCOTT REED:  Let's go off the record for
22  a moment.
23       VIDEO OPERATOR:  We're off the record.  The
24  time is 6:42 p.m.
25

98 (Pages 386 - 389)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 390

1      (Recess taken.)
2
3      VIDEO OPERATOR:  This is the beginning of
4  the fifth media.  We're on the record at 7:23 p.m.
5      We're going off the record at 7:23 p.m., and
6  this concludes today's testimony given by Stephen
7  Smith.
8      Total number of media used was five and will
9  be retained by Veritext Legal Solutions.
10
11      (TIME NOTED:  7:23 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 392

1  STATE OF CALIFORNIA      ) ss.
2  COUNTY OF LOS ANGELES    )
3
4      I, Lori M. Barkley, CSR No. 6426, do hereby
5  certify:
6      That the foregoing deposition testimony
7  taken before me at the time and place therein set
8  forth and at which time the witness was administered
9  the oath;
10      That the testimony of the witness and all
11  objections made by counsel at the time of the
12  examination were recorded stenographically by me, and
13  were thereafter transcribed under my direction and
14  supervision, and that the foregoing pages contain a
15  full, true and accurate record of all proceedings and
16  testimony to the best of my skill and ability.
17      I further certify that I am neither counsel
18  for any party to said action, nor am I related to any
19  party to said action, nor am I in any way interested
20  in the outcome thereof.
21      IN WITNESS WHEREOF, I have subscribed my
22  name this 19th day of April, 2017.
23
24
25      LORI M. BARKLEY, CSR No. 6426

Page 391

1      I declare under penalty of
2  perjury under the laws of the State
3  of California that the foregoing is
4  true and correct.
5      Executed on _____, 2017, at
6  _____, _____.
7
8
9
10      _____
11      SIGNATURE OF WITNESS
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 393

1      ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS
          800-567-8658
2  ASSIGNMENT NO. CS2588512
3  CASE NAME: Universal Cable Productions  v. Atlantic Specialty
   Insurance Company
   DATE OF DEPOSITION: 4/18/2017
4  WITNESS NAME: Stephen Smith
5
6  PAGE/LINE(S)    CHANGE         REASON
7  _____/_____ / _____ / _____
8  _____/_____ / _____ / _____
9  _____/_____ / _____ / _____
10 _____/_____ / _____ / _____
11 _____/_____ / _____ / _____
12 _____/_____ / _____ / _____
13 _____/_____ / _____ / _____
14 _____/_____ / _____ / _____
15 _____/_____ / _____ / _____
16 _____/_____ / _____ / _____
17 _____/_____ / _____ / _____
18 _____/_____ / _____ / _____
19 _____/_____ / _____ / _____
20
       Stephen Smith
21 (Notary not required in California)
   SUBSCRIBED AND SWORN TO
22 BEFORE ME THIS _____ DAY
   OF _____, 2017.
23
24   NOTARY PUBLIC
25 MY COMMISSION EXPIRES_____

99 (Pages 390 - 393)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 394

```
 1          Veritext Legal Solutions
            290 W. Mt. Pleasant Ave. - Suite 3200
 2          Livingston, New Jersey 07039
            Toll Free: 800-227-8440  Fax: 973-629-1287
 3
 4  _____, 2017
 5  To: Daniel M. Hayes, Esq
 6  Case Name: Universal Cable Productions  v. Atlantic Specialty
    Insurance Company
 7
    Veritext Reference Number: 2588512
 8
    Witness: Stephen Smith       Deposition Date: 4/18/2017
 9
10  Dear Sir:
11  Enclosed please find a deposition transcript. Please have the witness
12  review the transcript and note any changes or corrections on the
13  included errata sheet, indicating the page, line number, change, and
14  the reason for the change. Have the witness' signature at the bottom
15  of the sheet notarized except in California where they are signing
16  under penalty of perjury and forward the errata sheet back to us at
17  the address shown above.
18
19  If the jurat is not returned within thirty days of your receipt of
20  this letter, the reading and signing will be deemed waived.
21
22  Sincerely,
23  Production Department
24  Encl.
25  Cc: Toni S. Reed, Esq
```

100 (Page 394)