MARC J. SHRAKE (SBN 219331)
 mjs@amclaw.com
ANDERSON, MCPHARLIN & CONNERS LLP
707 Wilshire Boulevard, Suite 4000
Los Angeles, California 90017-3623
Telephone: (213) 236-1691
Facsimile: (213) 622-7594

MICHAEL KEELEY *(Pro Hac Vice)*
 michael.keeley@strasburger.com
TONI SCOTT REED *(Pro Hac Vice)*
 toni.reed@strasburger.com
CARLA C. CRAPSTER *(Pro Hac Vice)*
 carla.crapster@strasburger.com
STRASBURGER & PRICE, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330

Attorneys for Defendant
Atlantic Specialty Insurance Company

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, a Delaware limited liability company, and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY, a New York insurance company,<br><br>Defendant. | Case No. 2:16-cv-04435-PA-MRW<br><br>**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>[*Filed concurrently with Declaration of Carla C. Crapster; Reply to Plaintiffs' Statement of Genuine Issues and Additional Material Facts, and Atlantic's Other Rebuttal Evidence; Reply to Plaintiffs' Objections to Atlantic's Evidence; Objections to Plaintiffs' Opposition Evidence; Request for Judicial Notice; and Volume of Evidence*] |

Date: May 22, 2017
Time: 1:30 p.m.
Place: Courtroom 9A
Judge: Honorable Percy Anderson
Discovery Cutoff: June 2, 2017
Pretrial Conference: June 16, 2017
Trial: July 25, 2017

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................................i

TABLE OF AUTHORITIES .......................................................................................ii

I.   INTRODUCTION..............................................................................................1

II.  ARGUMENT AND AUTHORITIES ................................................................1

    A.   The War Exclusion ....................................................................................1

    B.   The Warlike Actions Exclusion.................................................................4

    C.   The Exclusion for Insurrection, Rebellion, or Revolution ........................6

    D.   The Weapons of War Exclusion ................................................................7

    E.   The Drafting of the Policy: This *is* the Plaintiffs' Language and They Have Waived Any Argument of Mistaken Drafting..........................7

    F.   All Claims of Bad Faith Fail....................................................................10

III. CONCLUSION.................................................................................................12

i

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aetna Cas. & Surety Co. v. Richmond*
   76 Cal.App.3d 645 (Cal. Ct. App. 1977) ............................................................... 8

*Bay Cities Paving & Grading v. Lawyers' Mut. Ins. Co.*,
   855 P.2d 1263 (Cal. 1993) ..................................................................................... 4

*Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*,
   971 F.2d 272 (9th Cir. 1992) ............................................................................... 12

*Ennar Latex v. Atlantic Mutual Insurance Co.*,
   No. 94 Civ. 150, 1995 U.S. Dist. LEXIS 7386, at *10-11 (S.D.N.Y. May 30, 1995) ....................................................................................................................... 1

*Fireman's Fund Ins. Co. v. Fibreboard Cop.*,
   182 Cal. App. 3d 462 (Cal. Ct. App. 1986) .................................................... 9, 10

*Gagliormella v. Met. Life Ins. Co.*,
   122 F. Supp. 246 (D. Mass. 1954) ..................................................................... 4, 5

*Hadland v. NN Inv'rs Life Ins. Co.*,
   24 Cal. App. 4th 1578 (Cal. Ct. App. 1994) ......................................................... 8

*Hamdi & Ibrahim Mango Co. v. Reliance Ins. Co.*,
   291 F.2d 437 (2d Cir. 1961) .................................................................................. 5

*Holiday Inns Inc. v. Aetna Ins. Co.*,
   571 F. Supp. 1460 (S.D.N.Y. 1983) ............................................................. 1, 2, 3

*Home Ins. Co. v. Davila*,
   212 F.2d 731 (1st Cir. 1954) .............................................................................. 6, 7

*Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*,
   368 F. Supp. 1098 (S.D.N.Y. 1973) ...................................................................... 2

*Pan Am. World Airways v. Aetna Cas. & Sur. Co.*,
   505 F.2d 989 (2d Cir. 1974) ......................................................................... 1, 2, 6

*Powell v. Cent. Cal. Fed. Sav. & Loan Assn.*,
   59 Cal. App. 3d 540 (Cal. Ct. App. 1976) ............................................................ 9

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

*Thrifty Payless, Inc. v. The Americana at Brand, LLC,*
   218 Cal. App. 4th 1230 (Cal. Ct. App. 2013) ................................................................9

*Weiss v. Arab Bank, PLC,*
   No. 06 CV 1623, 2007 U.S. Dist. LEXIS 94029 (E.D.N.Y. Dec. 21, 2007) ..............6

**STATUTES**

26 U.S.C.S. § 5845(f) ........................................................................................................7

California Civil Code § 1644 ............................................................................................1

California Civil Code § 1654 ..........................................................................................10

**OTHER AUTHORITIES**

GARNER'S DICTIONARY OF LEGAL USAGE 439 (3d ed. Oxford 2011) ..........................7

S. Rep. No. 90-1501 (1968) ..............................................................................................7

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

## I.     INTRODUCTION

The plaintiffs have not raised a genuine issue of material fact as to any of the exclusions Atlantic contends apply here, and they certainly have not raised a genuine issue on their claim of bad faith. In fact, if anything, many of their arguments illuminate how baseless their contentions are in this case, confirming that Atlantic should prevail and that the plaintiffs' claim of bad faith is frivolous.

## II.     ARGUMENT AND AUTHORITIES

### A.     The War Exclusion

The plaintiffs argue that there is an "established" insurance meaning of "war," and that courts have "repeatedly" held that war can exist only between two sovereigns or quasi-sovereigns. Doc. 85 at p. 6. But they cite *two* cases for this proposition: *Pan Am. World Airways v. Aetna Cas. & Sur. Co.*, 505 F.2d 989 (2d Cir. 1974) and *Holiday Inns Inc. v. Aetna Ins. Co.*, 571 F. Supp. 1460 (S.D.N.Y. 1983).[1] *Ennar Latex v. Atlantic Mutual Insurance Co.*, at which the plaintiffs cite, is inapposite as it did not even involve a war exclusion but instead involved a policy that *covered* the risk of war but had a narrow exception for commandeering of the insured goods by a government—which was the subject of the case. No. 94 Civ. 150, 1995 U.S. Dist. LEXIS 7386, at *10-11 (S.D.N.Y. May 30, 1995). Two non-binding cases are hardly enough to overcome the binding California Civil Code § 1644, which requires application of the ordinary meaning of war, or the other cases that Atlantic cited in its motion that afford the word "war" its ordinary meaning.

In any event, both *Pan Am* and *Holiday Inns* actually support Atlantic's position. Both cases held that highly distinguishable events were not acts of war, but suggested that events like those at issue here *are* war, or at least warlike. The district court *Pan Am* case held that fighting between Israelis and the "Fedayeen," defined as

---

[1] Appleman's provides no further support; it relies primarily on *Pan Am*. Doc. 85 at 6 (citing 3-18 New Appleman on Insurance Law Library Edition § 18.03 (2016)).

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

Palestinians forces, was warlike, as Atlantic argued in its motion for summary judgment. Doc. 57 at p. 19 (quoting *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 368 F. Supp. 1098, 1106 (S.D.N.Y. 1973)).

*Holiday Inns* held that war can exist between de facto governments, which are entities that "stake out and maintain adverse claims to territory, accompanying those claims with declarations of independence and sovereignty." 571 F. Supp. at 1500. Here, Hamas controls Gaza, part of Palestine, which 137 nations around the world recognize as a state. Atlantic's Statement of Uncontroverted Fact ("SUF") 9, 11-15, Atlantic Specialty's Reply to Plaintiffs' Statement of Genuine Issues, and Atlantic Specialty's Other Rebuttal Evidence In Support of Its Reply ("RSI") 224-26. Hamas claims not only control over Gaza but also over all of Israel, which it believes is its homeland, and which it seeks to recover through the destruction of Israel. SUF 10, 149, 190, RSI 249. The fighting in *Holiday Inns* was between Syria, the Palestinian Liberation Organization ("PLO"), and "Lebanese rightists who considered themselves the defenders of the Lebanese state"—known as the "Phalange." *Id.* at 1501. The court noted that Lebanon was a true sovereign, but that the Phalange was *not* its official militia, but a private militia. Although Syria was also a nation, its intervention into the fray "was for peacekeeping purposes." *Id.* And as to the PLO, the court held only that it did not claim "attributes of sovereignty or exercising the powers of de facto government, *within the context of its presence in Lebanon*." *Id.* at 1502 (emphasis added). Yasser Arafat, "the titular leader of the P.L.O.," seemed to want to avoid involvement with Lebanese politics. *Id.* Though some other Palestinian fighters eventually clashed with the Phalange militia, that did "not change this analysis." *Id.* Here, however, it is Hamas that governs Gaza and Hamas that fought with Israel.

In short, both *Pan Am* and *Holiday Inns* involved very different circumstances from those presented here: the detonation of an empty airplane in what was essentially a protest, given that no passengers were killed (505 F.2d at 993) and several

2

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

small bands of fighters acting contrary to the wishes of their governments (571 F. Supp. at 1500-02). This case involves a lengthy and deadly clash between two groups whose long and storied history of fighting speaks for itself. Palestinians' desire, and Hamas's in particular, to both have exclusive rule over the territory currently known as Palestine, have Palestine be a nation recognized by all (which is a goal they are close to achieving),[2] and their desire to take Israel due to its religious significance and claim Jerusalem as their capital city, is well documented and indisputable. RSI 227.

In sum, the plain meaning of war warrants summary judgment for Atlantic, but even under the plaintiffs' cases, Atlantic should prevail because Palestinians, and Hamas in particular, are *certainly* a group that govern themselves and that have "staked out" and maintain an adverse claim to the territory known as Palestine, and declare their independence and sovereignty, which *Holiday Inns* holds is enough for Hamas to be able to engage in a war. *Id.* SUF 9, 11-15, 20-24, RSI 224-25, 227.

Thus, even under the plaintiffs' cases, there was a "war." And the ordinary meaning of "war" certainly encompasses the 50-Day War. Plaintiffs are notably silent on the awkward fact that their security personnel and news affiliates called this a war. SUF 105-11, 43-46. NBCU, through its branch that keeps the public informed, called this a war. SUF 105-11. Even their own risk management employee, Malika Adams, warned that the war exclusion might apply. SUF 98-100. But the branch that wants insurance coverage now argues that it is not only incorrect to call this event a war but also so unreasonable that Atlantic should be charged with *bad faith* for reaching that conclusion. That the plaintiffs' own affiliates publicly proclaimed this a war, and its employees privately did the same, should be deeply persuasive to the Court—as should all the other news outlets and world leaders that referred to the conflict as a war. It is the severity, the length, and the "organized" nature of the hostilities that

---

[2] 137 countries currently recognize the state of Palestine. RSI 225.

3

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

1  made this a war in the mind of the people. SUF 141-46. *Gagliormella v. Met. Life Ins. Co.*, 122 F. Supp. 246, 249 (D. Mass. 1954) (holding that the Korean War was a war for insurance purposes because it involved "organized hostilities," which presents the type of risk that is nearly impossible to underwrite).That is what matters—not other nations' political views on the official status of those embroiled in the deadly fighting.

The plaintiffs' argument that Atlantic's approach (in other words, California's required approach of applying the ordinary meaning) will leave insurers and insureds unclear about the scope of coverage at the time of contracting defies common sense. Insurance policies are *always* forward-looking and depend on whether certain events occur in the future. Moreover, the plaintiffs' proposed rule—that war is only between sovereigns or quasi-sovereigns—offers no more certainty. If the United States and Canada had a small skirmish between their military forces that lasted a few hours and killed only a handful of people before the respective countries quickly came to their senses and put an end to all hostilities, would an undeclared war have occurred? The plaintiffs' proffered definition offers no answer. The degree and severity of fighting should always be a factor—merely defining the status or nature of a group resolves nothing. War exclusions will always need to be carefully applied to the facts at issue.

Likewise, the argument that "war" *could* be stretched to absurd lengths is meritless. Atlantic does not argue that this was a verbal or ideological "war." That "war" might be ambiguous in another context is irrelevant—it is not ambiguous here, and courts need not "belabor the question of whether [a word] is ambiguous in the abstract or in some hypothetical circumstance … the proper question is whether the word is ambiguous in the context of this policy and the circumstances of this case." *Bay Cities Paving & Grading v. Lawyers' Mut. Ins. Co.*, 855 P.2d 1263, 1271 (Cal. 1993).

### B. The Warlike Actions Exclusion

The Policy moots any doubts that this was a war with the exclusion for war*like* acts. The inclusion of this language makes clear that the intent behind the Policy was

4

exactly what *Gagliormella* stated is the purpose of war exclusions: to prevent insurers from having to bear the risk of "organized hostilities." 122 F. Supp. at 249.

The plaintiffs attempt to distinguish *Hamdi & Ibrahim Mango Co. v. Reliance Ins. Co.*, 291 F.2d 437, 439 (2d Cir. 1961), and in doing so, betray their own failure to read both the case and the relevant history. The fighting at issue in that case *did* involve Palestinians. To suggest otherwise, the plaintiffs cite an Encyclopedia Brittanica article about *all* Arab-Israeli wars that have ever occurred, and that has only a few sentences about the 1948 war. *See* Plaintiffs' SUF 188. That article notes that the war began after May 14, 1948, when Israel declared its independence. *Id.* But the fighting that destroyed the goods at issue in *Hamdi* took place in *April* 1948. 291 F.2d at 439. The U.S. State Department's Office of the Historian (a slightly more authoritative source than Encyclopedia Brittanica) explains that fighting began in November 1947 after "the *Palestinian* Arabs" refused to recognize a U.N. resolution that gave Israel control over religiously significant land. RSI 228. This "sparked conflict between Jewish and Arab groups within Palestine." RSI 229. "Fighting began with attacks by irregular bands of Palestinian Arabs attached to local units of the Arab Liberation Army composed of volunteers from Palestine and neighboring Arab countries." RSI 230. It was only after Israel declared its independence on May 14, 1948 that fighting intensified and "other Arab forces join[ed] the Palestinian Arabs in attacking territory in the former Palestinian mandate." RSI 231. *This* is when other nations (Lebanon, Syria, Iraq, and Egypt) became embroiled in the war. RSI 232.  But again, in *Hamdi,* the insured goods at issue were destroyed before all this. And yet the Court still held: "[The district court] found that a state of war existed in Haifa on April 21-22, 1948, when the goods stored at the Haifa port were destroyed. This finding is supported by the record and is a reasonable inference from the testimony adduced at the trial." *Id.* at 442. This is a directly on-point holding that undermines the plaintiffs' position.

5

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

The plaintiffs' other arguments are no less full of holes and errors. They rely on *Weiss v. Arab Bank, PLC*, No. 06 CV 1623, 2007 U.S. Dist. LEXIS 94029 (E.D.N.Y. Dec. 21, 2007), which is an Anti-Terrorism Act case and thus inapposite. Doc. 93 at p. 18. They can say nothing to address Atlantic's argument that Israel's actions incited Hamas's increased violence, which is what caused the plaintiffs' alleged loss. In fact, their choice of words on this topic—calling Atlantic's contention the "indirect causation" argument (Doc. 85 at p. 13)—is particularly damaging because the Policy excludes loss resulting directly *or indirectly* from warlike actions. SUF 96. And calling the facts of *Pan Am* "precisely parallel to the events" of this war[3] is flat-out offensive to both the Israelis and Palestinians who lost their lives in this tragic conflict, not to mention the thousands more who were wounded and the *hundreds* of thousands deeply affected by the damage to their homes and infrastructure. SUF 82-88. The detonation of one *empty* airplane pales in comparison. *Pan Am*, 505 F.2d at 993.

### C. The Exclusion for Insurrection, Rebellion, or Revolution

The plaintiffs' argument on the insurrection exclusion confirms that it applies. They state that a "real" insurrection is an effort to "rid" a country of one government "and to replace it" with another. Doc. 85 at p. 15. As the plaintiffs have already judicially admitted, Hamas has made *explicitly* clear that its intent is to "rid" Israel of its Jewish government so that it can establish an Islamic state there, claim Jerusalem as the Palestinian capital, and "raise the banner of Allah over every inch of Palestine." Doc. 85 at p. 9-10. It is not clear what the plaintiffs envision as an insurrection or rebellion if not this. This is plainly Hamas's overarching or "maximum" objective. *See, e.g., Home Ins. Co. v. Davila*, 212 F.2d 731, 732 (1st Cir. 1954) (holding that insurrections can have "maximum" objectives of overthrowing governments but also "minimum objectives" of, for example, causing disturbances to draw attention to the

---

[3] Doc. 85 at p. 12.

6

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

1 cause). Hamas also made clear that it had "minimum objectives" of stopping what
2 they perceived to be Israeli interference with life in Gaza. Doc. 93 at p. 22-23. Atlantic
3 recited this evidence because this minimum objective *also* satisfies the definition of an
4 insurrection. Hamas was attempting to rid Gaza of the government interference of
5 Israel so that Palestinians alone could have complete control over Palestinian lands.
6 *Id.* This too satisfies the definition of an insurrection or revolution.

### D. The Weapons of War Exclusion

The plaintiffs' argument on the "weapons of war" exclusion is primarily that the contract should not be read as written. Atlantic addresses this waived argument below. The plaintiffs also argue that Atlantic is "inserting" the "but not limited to" after the word "including." But that is what "including" *means*. GARNER'S DICTIONARY OF LEGAL USAGE 439 (3d ed. Oxford 2011) (emphasis added). The plaintiffs also contend that interpreting the exclusion to refer to all weapons of war, and not just nuclear ones, would be too broad. They offer the example of a rifle—but rifles are not regulated "destructive devices" like bazookas, missiles, and mortars. The National Firearms Act lists missiles and rockets as "destructive devices." 26 U.S.C.S. § 5845(f). A Senate Report discussing the Act noted that Congress had reached a "specific declaration and finding that … destructive devices (such as bazookas, mortars, antitank guns, bombs, missiles, etc.,) … are primarily weapons of war and have no appropriate sporting use or use for personal protection." S. Rep. No. 90-1501, at 28 (1968). Rifles are obviously different, as any hunter could tell you. Reading the exclusion properly to refer to true weapons of war (such as the tanks, fighter jets, missiles, gunboats, and mortars involved in this war) is not overly broad—it is perfectly logical and fits with the other exclusions relating to war and warlike actions.

### E. The Drafting of the Policy: This *is* the Plaintiffs' Language and They Have Waived Any Argument of Mistaken Drafting

The plaintiffs' argument on the "weapons of war" exclusion is primarily that

7

the Policy does not say what the plaintiffs intended. It is initially critical to note that the plaintiffs admit that the first three war-related exclusions are exactly what NBCU presented to Atlantic in the manuscripted policy it prepared. Doc. 85 at p. 2 (the language quoted as the "initial draft of the policy form sent to Atlantic" is the same language that appears in Exclusions 1, 2, and 3 in the Policy). These three, at the very least, should therefore be interpreted against the plaintiffs.

As to Exclusion 4, the plaintiffs' argument is fatally flawed for three reasons. First, the evidence they rely on is inadmissible parol evidence. Second, even if the Court were to consider this evidence, it is riddled with gaps and lacks a proper foundation. The declaration of George Walden, the plaintiffs' sole evidence for this point, does not identify when the change from "employing" to "including" occurred. He does not know who made the change or the story behind it. Given that any such change occurred approximately eight years ago (in 2009), it is unlikely to ever become clear. But one fact *is* clear (the third reason why the plaintiffs' argument fails): the first policy Atlantic issued to NBCU had the word "including" instead of "employing," and so has every policy since then, including the Policy at issue.[4] SUF 165. In California, the rule is that "receipt of a policy and its acceptance by the insured without an objection binds the insured as well as the insurer and he [or she] cannot thereafter complain that he [or she] did not read it or know its terms. It is a duty of the insured to read his [or her] policy." *Hadland v. NN Inv'rs Life Ins. Co.*, 24 Cal. App. 4th 1578, 1586 (Cal. Ct. App. 1994) (quoting *Aetna Cas. & Surety Co. v. Richmond* 76 Cal.App.3d 645, 652 (Cal. Ct. App. 1977). "A reasonable person will read the coverage provisions of an insurance policy to ascertain the scope of what is covered." *Id.* In either ignorance or defiance of this law, plaintiffs seem to argue that they should not

---

[4] Despite this, the plaintiffs strangely argue that Atlantic "never disclosed" to them that the word "including" appeared in the Policy. This is apparently a concession that no one at NBCU read the Policy (or its four predecessors with identical language).

8

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

be bound by the plain meaning of the word "including." But not only are the plaintiffs bound by what is in the Policy (and what was in the *four* earlier iterations of it), they have also waived any argument on this point for purposes of this case. To contend that the Policy includes a mistake and should say something else to reflect the parties' true intent, the plaintiffs must *plead* that there is a mistake in the Policy and do so with specificity. *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1243 (Cal. Ct. App. 2013) ("Mistake must be pleaded with some particularity so that there is a clear recitation of facts showing how, when and why the mistake occurred."). The plaintiffs have not pleaded that the contract includes a mistake. *See* First Amended Complaint Doc. 10. This is a particularly egregious oversight given that the word "including" was in the very first policy that Atlantic issued to NBCU and has been in every policy since then (including the Policy at issue). SUF 165. NBCU had years to decide that the Policy contained a mistake, but they have never argued it until filing their Opposition. The issue is waived and moot.

   The only history of the Policy that *is relevant* is that it was heavily negotiated and that the language is (but for *perhaps* the sole word "including"), as the plaintiffs admit, *not* Atlantic's. The import of this history is that the Policy cannot be construed against Atlantic, but must instead be construed against the plaintiffs. *Fireman's Fund Ins. Co. v. Fibreboard Cop.*, 182 Cal. App. 3d 462, 470 (Cal. Ct. App. 1986); *see also Powell v. Cent. Cal. Fed. Sav. & Loan Assn.*, 59 Cal. App. 3d 540, 550-51 (Cal. Ct. App. 1976) (lender not entitled to have its loan agreement construed against the bank because it was sophisticated and the contract at issue was not one of adhesion—one offered on a take-it-or-leave-it basis). *Pan Am*'s decision to apply contra proferentem does not change this binding California case law one bit. *Pan Am* applied contra proferentem because the insurer there duplicitously argued that the dispute was really one between two insurers, when it was not, and because it offered only the vague assertion that Pan American was a large and sophisticated company. Here, the evidence is not merely

that NBCU is sophisticated (though it is, and was represented by a highly sophisticated broker). SUF 89-90, 155, 158. Instead, the evidence is that the policy language *came from the plaintiffs*. To this day, they continue to claim it as their property. Doc. 93 at p. 8-9. This is precisely the situation that *Fibreboard* held requires construing the policy against the insured. 182 Cal. App. 3d at 470. California Civil Code § 1654 also requires this result. It states: "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Here, any uncertainty (certainly as to Exclusions 1 through 3, which the plaintiffs concede is entirely their language), was "caused by" the plaintiffs, as those words are what they brought to Atlantic. SUF 91-92, 102-03, 156-57, 161.

### F. All Claims of Bad Faith Fail

Atlantic's evidence that its position is not one taken in bad faith comes not *just* from the fact that Malika Adams—an employee of NBCU's parent company—agrees with the exact position that Atlantic takes here. SUF 98-100. It comes from all the other evidence discussed in Atlantic's opening brief, including that: (1) NBCU's news affiliates (among many other news outlets) called this a war, (2) NBCU's security personnel charged with reporting the facts to the plaintiffs' producers called it a war, (3) even a representative of one of the actors called it a war, (4) Atlantic's position is rooted in application of a California statute that requires application of the ordinary meaning (and the fact that the plaintiffs have no evidence that the parties intended the Policy's language to have anything but its ordinary meaning), and (5) even the case law the plaintiffs cite supports Atlantic's position.

The other charges the plaintiffs outline in their response brief are spurious. They contend that Atlantic "misrepresented the terms of the TRIA endorsement." Doc. 85 at p. 24. Policy included an endorsement that referenced TRIA (Terrorism Risk Insurance Act). RSI 233. That endorsement gives the insured back coverage for

10

acts of terrorism, to the extent any other provision of the policy took it away, if the act of terrorism that caused the loss was "certified" as an act of terrorism by the U.S. Secretary of Treasury (and others). In Atlantic's denial letter, it explained that this particular provision would not be operative here and would not give NBCU back any coverage because the events of 2014 were not "certified" acts of terrorism. RSI 234. This is indisputably true; the plaintiffs do not contend otherwise. Atlantic cannot possibly have misrepresented anything by making the factually true statement that the endorsement did not provide the plaintiffs with any additional coverage here.

The "failure to investigate" allegation is disingenuous. The plaintiffs deceitfully argue that Atlantic reviewed *one* case before denying this claim but have *no* evidence to support such a claim. And their argument that Atlantic provided its coverage decision to NBCU quickly is evidence of Atlantic's *good* faith. NBCU notified Atlantic of its claim on July 15, 2014, and immediately, NBCU began demanding that Atlantic provide an instantaneous coverage decision. RSI 235. Atlantic did not deny coverage two days later, as the plaintiffs state. Instead, as Atlantic's denial letter recites, Atlantic held a call with NBCU on July 17, 2014, during which Atlantic did exactly what it should have done: it honestly conveyed to the plaintiffs that it was "seriously considering" whether the war exclusions applied. RSI 236. Critically, one reason for providing Atlantic's initial thoughts was NBCU's demand that this decision was *urgent*. RSI 237. *See also* Plaintiffs' Additional Material Fact No. 207. A frustrated NBCU then insisted that Atlantic carry out *all* steps it needed to take before providing a coverage decision within mere days. Unbelievably, the plaintiffs now attempt to hold against Atlantic its efforts to provide a coverage decision as quickly as NBCU demanded. In light of the plaintiffs' current efforts to cast Atlantic's accommodation of their request as evidence of bad faith, NBCU's pleas for Atlantic to hurry now appear to be the efforts of a shrewd insured to set Atlantic up for a claim of bad faith.

11

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

Moreover, the plaintiffs' claim fails because they have not identified what it is that Atlantic could or should have discovered by conducting a different investigation. The plaintiffs seem to suggest that the fact Atlantic should have discovered is that the U.S. designates Hamas as a terrorist organization. But Atlantic *knew* this before it issued the denial—it recited it in the denial letter. RSI 238. ("Even though many, including Israel and the United States, consider Hamas to be a terrorist group, it is the government of a territory that is involved in the conflict."). Finally, the Ninth Circuit has held that an insurer does not have "a duty to conduct a thorough investigation of a claim if a genuine issue concerning the insurer's liability exists." *Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 283 (9th Cir. 1992). If the insurer's position is "as a matter of law … not so unreasonable as to be a mere pretext for avoiding further investigation" and "a genuine issue did exist concerning liability," then bad faith for failure to investigate cannot stand. *Id.*

## III.   CONCLUSION

The plaintiffs' position in this case is Janus-faced. One branch of NBCU has taken a position completely inconsistent with another one. Not only that, but the plaintiffs' representatives internally called this a war and believed that the war exclusion might apply while they are outwardly so indignant at the thought of calling this a war that they seek punitive damages for bad faith. The plaintiffs' claims withstand neither an accurate history lesson nor an honest evaluation of the law.

DATED: May 8, 2017

>             MICHAEL KEELEY *(Pro Hac Vice)*
>             TONI SCOTT REED *(Pro Hac Vice)*
>             CARLA C. CRAPSTER *(Pro Hac Vice)*
>             STRASBURGER & PRICE, LLP
>             By:   */s/ Michael Keeley*
>                      Michael Keeley
>             Attorneys for Defendant ATLANTIC SPECIALTY INSURANCE COMPANY

12

**DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**