# EXHIBIT 158

MARC J. SHRAKE (SBN 219331)
    mjs@amclaw.com
ANDERSON, MCPHARLIN & CONNERS LLP
707 Wilshire Boulevard, Suite 4000
Los Angeles, California 90017-3623
Telephone: (213) 236-1691
Facsimile: (213) 622-7594

MICHAEL KEELEY (*Pro Hac Vice*)
    michael.keeley@strasburger.com
TONI SCOTT REED (*Pro Hac Vice*)
    toni.reed@strasburger.com
CARLA C. CRAPSTER (*Pro Hac Vice*)
    carla.crapster@strasburger.com
STRASBURGER & PRICE, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330

Attorneys for Defendant
Atlantic Specialty Insurance Company

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, a Delaware limited liability company, and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, a Delaware limited liability company,<br><br>                Plaintiffs,<br><br>        vs.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY, a New York insurance company,<br><br>                Defendant. | Case No. 2:16-cv-04435-PA-MRW<br><br>**DECLARATION OF CARLA C. CRAPSTER IN SUPPORT OF ATLANTIC SPECIALTY INSURANCE COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>Date:  May 22, 2017<br>Time:  1:30 p.m.<br>Place:  Courtroom 9A<br>Judge:  Honorable Percy Anderson<br>Discovery Cutoff:  June 2, 2017<br>Pretrial Conference:  June 16, 2017<br>Trial:  July 25, 2017 |

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, McPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1    I, Carla C. Crapster, declare:

2    1.    I am an attorney duly licensed to practice law in the State of Texas and

3    admitted *pro hac vice* before this Court.  I am a partner in the law firm of Strasburger &

4    Price LLP, attorneys of record for the defendant Atlantic Specialty Insurance Company

5    ("Atlantic") in the above-captioned matter.  I make this declaration in support of

6    Atlantic's Motion for Summary Judgment.   I have personal knowledge of the following

7    facts and, if called and sworn as a witness, could and would competently testify thereto.

8    2.    The parties in this case have agreed to stipulate to the authenticity of the

9    documents produced to one another in the discovery process in this case. This

10   agreement was confirmed in writing on April 12, 2017.

11   3.    A true and correct copy of Excerpts of the Theresa A. Gooley Wolf

12   Deposition Transcript (taken on February 8, 2017) is filed herewith as Exhibit 159.

13   4.    A true and correct copy of Excerpts of the Stephen Smith Deposition

14   Transcript (taken on April 18-19, 2017) is filed herewith as Exhibit 160.

15   5.    A true and correct copy of Excerpts of the Susan Weiss Deposition

16   Transcript (taken on April 18, 2017) is filed herewith as Exhibit 161.

17   6.    A true and correct copy of Excerpts of the Peter Donald Williams

18   Deposition Transcript (taken on February 1, 2017) is filed herewith as Exhibit 162.

19   7.    A true and correct copy of Atlantic Specialty Insurance Company's Third

20   Amended Responses to First Set of Interrogatories Propounded by Plaintiffs Universal

21   Cable Productions LLC and Northern Entertainment Productions LLC, is attached as

22   Exhibit 163.

23   8.    A true and correct copy of 2016 Human Rights Reports – Secretary's

24   Preface,    which    was    found    at    https://www.state.gov/j/drl/rls/hrrpt/

25   humanrightsreport/ index.htm#wrapper is filed herewith as Exhibit 164.

26   9.    A true and correct copy of United Nations General Assembly Resolution

27   adopted by the Human Rights Council – A/HRC/RES/S-21/1, which was found at

28

1  http://ap.ohchr.org/Documents/sdpage_e.aspx?b=10&se=158&t=11 is filed herewith

2  as Exhibit 165.

3      10.    A true and correct copy of Congressional Research Service Careers

4  Website, which was found at https://www.loc.gov.crsinfo/ is filed herewith as Exhibit

5  166.

6      11.    A true and correct copy of Office of The Historian – Milestones: 1945-

7  1952 – The Arab-Israeli War of 1948, which was found at

8  https://history.state.gov/milestones/1945-1952/arab-israeli-war is filed herewith as

9  Exhibit 167.

10      12.    A true and correct copy of Geopolitical Intelligence and Risk Analysis -

11  Max Security Website, which was found at https://www.max-

12  security.com/geopolitical-intelligence/ is filed herewith as Exhibit 168.

13      13.    A true and correct copy of Tactical Intelligence Reports – Max Security

14  Webpage, which was found at https://www.max-security.com/tactical-intelligence/ is

15  filed herewith as Exhibit 169.

16      14.    A true and correct copy of Islamic Resistance Movement – Hamas –

17  Document general principles and policies, which was found at

18  https://hamas.ps/ar/post/7293/ is filed herewith as Exhibit 170.

19      15.    A true and correct copy of United Nations Meetings Coverage:  Gaza

20  Crisis Resulted From Collective Failure to Achieve Political Solution to Israeli-

21  Palestinian Conflict, Security Council Told (July 18, 2014) is filed herewith as Exhibit

22  171.

23      16.    A true and correct copy of United Nations Office for the Coordination of

24  Humanitarian Affairs Website entitled "Our Work," which was found at

25  http://www.unocha.org/our-work is filed herewith as Exhibit 172.

26      17.    A true and correct copy of The Permanent Observer Mission of the State

27  of Palestine to the United Nations New York webpage, entitled "Diplomatic

28

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

Relations," which was found at http://palestineun.org/about-palestine/diplomatic-relations/ is filed herewith as Exhibit 173.

18.     A true and correct copy of County Reports on Human Rights Practices for 2014 – Secretary's Preface, https://www.state.gov/j/drl/rls/hrrpt/2014humanrightsreport/index htm#wrapper is filed herewith as Exhibit 174.

19.     A true and correct copy of the article "A Holistic Approach to the Conflict of Israel and Palestine:  Where We Are Now And Where We Can Go, 19 Ann. Surv. Int'l & Comp. L. 105" is filed herewith as Exhibit 175.

20.     A true and correct copy of "Note & Comment:  Violations of International Criminal Law in the Israeli-Palestinian Conflict:  Why the International Criminal Court Should Not Prosecute in the "Interest of Justice", 29 Temp. Int'l & Comp. L.J. 275 is filed herewith as Exhibit 176.

21.     A true and correct copy of The Middle East:  The Origins of Arab-Israeli Wars, which was found at http://users.ox.ac.uk/~ssfc0005/The%20Middle%20East%20The%20Origins%20of%20Arab-Israeli%20Wars.html is filed herewith as Exhibit 177.

22.     A true and correct copy of the Plaintiffs' Initial Disclosures in this case, produced on September 16, 2016, is filed herewith as Exhibit 178.

23.     The plaintiffs had noticed the deposition of Pamela Johnson for February 9, 2017. A true and correct copy of the deposition notice setting her deposition for February 9, 2017, is filed herewith as Exhibit 179. The day before the deposition, however, the plaintiffs decided to postpone her deposition, and have not taken it yet.

24.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1    Executed May 8, 2017, at Dallas, Texas.

2

3                                                    _____
4                                                        Carla C. Crapster

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

8940579.1/SP/15247/0131/050817

1733

# EXHIBIT 159

Page 1

1                   UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
2                       WESTERN DIVISION
    --------------------------------------------------
3

    UNIVERSAL CABLE PRODUCTIONS LLC,
4   a Delaware limited liability company,
    and NORTHERN ENTERTAINMENT PRODUCTIONS, LLC,
5   a Delaware limited liability company,
6                   Plaintiffs,          Case No.
                                         2:16-cv-4435-PA-MRW
7   -vs-
8   ATLANTIC SPECIALTY INSURANCE COMPANY,
    a New York insurance company,
9
                    Defendant.
10
    --------------------------------------------------
11
12   ** CONTAINS CONFIDENTIAL PORTIONS BOUND SEPARATELY **
              *  PAGE 36 & PAGES 66-67  *
13
                    VIDEOTAPED DEPOSITION
14
                            OF
15
                    THERESA A. GOOLEY WOLF
16
                         VOLUME 1
17
                  Wednesday, February 8, 2017
18
19
20
21
22
23
24
    Job No. 118730
25   Reported By:  Amy L. Larson, RPR

1735

1           MS. COYOCA:  Good morning.  My

2      name is Lucia Coyoca, C-O-Y-O-C-A, of

3      Mitchell, Silberberg & Knupp.  I represent

4      the plaintiffs in this matter.

5           MS. SCOTT REED:  My name is

6      Toni Scott Reed of the law firm

7      Strasburger & Price.  I represent the

8      defendants Atlantic Specialty Insurance

9      Company, as well as this witness presented

10      here today.

11           THE VIDEOGRAPHER:  And will the

12      court reporter please swear in the witness.

13

14                THERESA A. GOOLEY,

15      a witness in the above-entitled action,

16      after having been first duly sworn, was

17      deposed and says as follows:

18

19                  EXAMINATION

20  BY MS. COYOCA:

21  Q.  Good morning, Ms. Gooley.  Could you please

22      state your full name and address for the

23      record.

24  A.  Sure.  It's Theresa Anne, A-N-N-E, Gooley,

25      G-O-O-L-E-Y, Wolf, W-O-L-F.  And you want my

1   BY MS. COYOCA:

2   Q.   And what was your position when you were

3        first hired at OneBeacon?

4   A.   Again in claims.  I was the vice-president of

5        claims, so initially I oversaw the -- the

6        financial institution group and what --

7        what -- what is called the government risk

8        group and then the energy group.

9   Q.   And how long did you handle that position

10       overseeing the financial institution group,

11       the government group and the energy group?

12  A.   The government group I -- I've -- my whole

13       tenure at -- at OneBeacon I -- I oversaw.

14       Energy I oversaw -- OneBeacon ultimately

15       moved out of the -- out of energy, and so I

16       oversaw that up through the time that they

17       moved out of the energy in -- I'm trying to

18       think.  I can't remember the exact date.  I

19       want to say it probably was sometime in 2013,

20       but I don't remember the exact date.

21  Q.   What about the financial institutions group?

22  A.   So the financial institutions group, I

23       oversaw that group probably for about four

24       years, and then it transitioned over to

25       somebody else within OneBeacon.

1  Q.  And when you say you oversaw the financial
2      institution group or the energy group,
3      et cetera, what do you mean by the words
4      "oversaw"?
5  A.  Each of -- each of those divisions within
6      OneBeacon had a claim manager and so I
7      oversaw that claim manager.
8  Q.  What position, if -- if there were any
9      different positions other than a
10     vice-president of claims, did you hold while
11     you were employed by OneBeacon?
12 A.  I think my position at all times was
13     vice-president of claims.  I think -- strike
14     that.  My -- it is -- my position at all
15     times was vice-president of claims.  The
16     groups that I oversaw changed during the
17     course of my tenure at OneBeacon.
18 Q.  Other than the three groups that you've
19     already mentioned, what other groups did you
20     oversee?
21 A.  I oversaw the technology group, and the
22     accident and health group, and the
23     entertainment group.  I just want to make
24     sure I'm not missing one.  And the
25     environmental group or excess and surplus.

1     with respect to her investigation of the

2     claim?

3  A.  I would guess that she did.  Again, I -- I

4     simply can't remember.

5  Q.  Okay.  Other than the Dig claim, can you

6     recall any other instance while you were

7     working for OneBeacon where you or anyone

8     working for you considered the potential

9     applicability of the war exclusion?

10 A.  Not that I'm aware of.

11 Q.  Prior to working for OneBeacon, did you have

12    any circumstances pursuant to which you were

13    reviewing the potential applicability of the

14    war exclusion to a claim?

15 A.  No.

16 Q.  While you were at St. Paul Travelers, did you

17    have responsibility for seeing any

18    entertainment-related claims?

19 A.  No, I did not.

20 Q.  Do you currently have any responsibility for

21    overseeing entertainment-related claims?

22 A.  No, I do not.

23 Q.  In terms of overseeing Ms. Johnson's

24    management of entertainment-related claims,

25    what specifically were your duties?

1    A.   Again, I worked with Pamela on any

2         particularly large claims, any particular

3         claims that had significant coverage issues,

4         and then worked with her on staffing issues,

5         you know, reviewed claims, claim loads,

6         things of that nature.

7    Q.   When you say you worked with her on large

8         claims, what specifically did that entail?

9    A.   Well, if she had -- if we had any particular

10        large claims, she would flag -- flag them up

11        to me and we would generally have a

12        conversation about the particular claims, and

13        depending on the nature of the claim, may

14        have several conversations.

15   Q.   Did you review the work that Ms. Johnson had

16        done in investigating claims?

17   A.   Generally, no.

18   Q.   Would you -- when discussing particular

19        claims with Ms. Johnson, would you question

20        her with respect to the steps that she had

21        taken to investigate a claim?

22   A.   I -- I may question her to make sure that I

23        understood what we had done and what her

24        conclusions were and, you know, what she

25        based those conclusions on.

1    Q.   Were there any occasions that you can recall

2         where you would direct Ms. Johnson to go back

3         and do additional work in investigating a

4         claim?

5    A.   No.

6    Q.   While you were overseeing Ms. Johnson's work,

7         did you provide any type of guidance with

8         respect to the steps that should be

9         undertaken when investigating a claim?

10   A.   Generally, no.  Pamela is an expert in the

11        area.  To the extent we have a discussion and

12        we think of something that we would want to

13        probe further, we'd go forward with that, but

14        I trusted Pamela's judgment.

15   Q.   You indicated that Ms. Johnson was an expert

16        in the area; is that correct?

17   A.   Yes.

18   Q.   What did you base that conclusion on?

19   A.   She has significant experience handling

20        entertainment claims.  She also was a trial

21        lawyer, has significant trial experience.

22        She's very bright, very articulate, and she

23        knows a lot of the players in the industry.

24   Q.   And when you say, "She knows a lot of players

25        in the industry," what industry are you

Page 162

1          ten.

2     BY MS. COYOCA:

3     Q.   When did Ms. Johnson tell you that she had

4          made a decision to deny the Dig claim based

5          on the war exclusion?

6                    MS. SCOTT REED:   Objection to

7          form, lack of foundation, assumes facts not

8          in evidence.

9                    THE WITNESS:   Pamela didn't tell

10         me she decided to deny the claim, we talked

11         about what her investigation was, what her

12         conclusions were, and then we made a decision

13         whether or not to deny the claim.

14    BY MS. COYOCA:

15    Q.   So the decision was made jointly?

16    A.   She recommended it and I approved it.

17    Q.   When did Ms. Johnson first recommend to you

18         that the claim should be denied?

19    A.   It would have been sometime in late July,

20         around the 22nd, I think, sometime in that

21         range.

22    Q.   Did Ms. Gooley tell you -- excuse me, I'm

23         sorry.

24                   Did Ms. Johnson tell you that she

25         was making the recommendation to deny the

Page 165

1    A.  I believe at some point he -- he did.

2    Q.  When?

3    A.  I can't remember the exact date.  It would

4        have been after we made a recommendation to

5        deny the claim.

6    Q.  As of July 18, had a decision been made to

7        recommend to deny the claim?

8    A.  I'm -- I -- I don't -- I don't know if by

9        that point we had made the decision or not.

10       I simply can't remember.

11   Q.  At the time that Ms. Johnson indicated to you

12       that she believed the claim should be denied,

13       recommended it, did you ask Ms. Johnson to

14       perform any other research or any other

15       analysis before you accepted her

16       recommendation?

17   A.  When Pamela and I had discussions about

18       whether or not to deny, whether or not the

19       claim was covered or not, I didn't ask her to

20       go out and do additional research, no.

21   Q.  Other than Mr. Duffy's response thanking you

22       for the e-mail that appears below on

23       Exhibit 32, did you have any further response

24       from Mr. Duffy to this particular e-mail?

25   A.  I -- I can't remember.  I don't know.

Page 167

1   A.   I don't think she did, no.

2   Q.   Do you know why she didn't?

3   A.   I think she probably just overlooked it.

4   Q.   Did you have a conversation with her after

5        the letter went out that the change you had

6        requested be made had not been made?

7   A.   No.

8   Q.   Okay.

9              MS. COYOCA:  I'd like to mark as

10       exhibit, I believe we're at 33, an e-mail and

11       attachment labeled Bates control ATL001847

12       through 1865.

13                   (Whereupon, Exhibit 33 was

14                   marked for identification.)

15              MS. COYOCA:  Counsel, I appear to

16       be missing one of my exhibits, so I suggest

17       we take a quick break and I will locate it

18       and we can start again.

19              THE VIDEOGRAPHER:  It's 3:05 p.m.

20       We're going off the record.

21                   (Whereupon, a brief recess

22                   was taken.)

23              THE VIDEOGRAPHER:  It's 3:20 p.m.

24       We're back on the record and this begins DVD

25       number 4.

Page 304

1                          ERRATA SHEET
2     Case Name:  Universal Cable Productions, LLC,
                  et al. vs. Atlantic Specialty
3                 Insurance Co.
      Deposition Date:  2-8-17
4     Deponent:  Theresa A. Gooley Wolf
5     Pg.  Line  Now Reads    Should Read  Reason

6     ___  ___  _____  _____  _____

7     ___  ___  _____  _____  _____

8     ___  ___  _____  _____  _____

9     ___  ___  _____  _____  _____

10    ___  ___  _____  _____  _____

11    ___  ___  _____  _____  _____

12    ___  ___  _____  _____  _____

13    ___  ___  _____  _____  _____

14    ___  ___  _____  _____  _____

15    ___  ___  _____  _____  _____

16    ___  ___  _____  _____  _____

17    ___  ___  _____  _____  _____

18    ___  ___  _____  _____  _____

19    ___  ___  _____  _____  _____
20

21                              _____
                                Signature of Deponent
22
      SUBSCRIBED AND SWORN BEFORE ME THIS ____ DAY OF
23    _____, 2017.
24    _____
      (Notary Public)   MY COMMISSION EXPIRES:_____
25

1745

Page 305

1    STATE OF MINNESOTA   )
                          ) ss
2    COUNTY OF ANOKA      )
3
            Be it known that I took the foregoing
4    deposition of Theresa A. Gooley Wolf, Volume 1, on
     February 8, 2017, in Minneapolis, Minnesota;
5
            That I was then and there a notary public
6    in and for the County of Anoka, State of Minnesota,
     and that by virtue thereof, I was duly authorized
7    to administer an oath;
8            That the witness was by me first duly
     sworn to testify to the truth, the whole truth and
9    nothing but the truth relative to said cause;
10           That the foregoing transcript is a true
     and correct transcript of my stenographic notes in
11   said matter;
12           That the witness reserved the right to
     read and sign the transcript;
13
            That I am not related to any of the
14   parties hereto, nor interested in the outcome of
     the action;
15
            WITNESS MY HAND AND SEAL this 21st day of
16   February, 2017.
17
18           _____

             Amy L. Larson, RPR
19           My Commission Expires 01/31/2018
20
21
22
23
24
25

1746

# EXHIBIT 160

CONFIDENTIAL

1

1    CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

2

3              UNITED STATES DISTRICT COURT

4              CENTRAL DISTRICT OF CALIFORNIA

5                    WESTERN DIVISION

6    _____
                                     )
7    UNIVERSAL CABLE                 )
     PRODUCTIONS LLC, a              )
8    Delaware limited                )
     liability company, and         )
9    NORTHERN ENTERTAINMENT          )
     PRODUCTIONS LLC, a              )
10   Delaware limited                )
     liability company,             )
11                                   )
             Plaintiffs,             )
12                                   )
        vs.                          )  Case No.
13                                   )  2:16-cv-04435-PA-MRW
     ATLANTIC SPECIALTY              )
14   INSURANCE COMPANY, a New )
     York insurance company,        )
15                                   )
             Defendants.             )
16   _____)

17

18        VIDEOTAPED DEPOSITION OF STEPHEN SMITH

19              Los Angeles, California

20              Tuesday, April 18, 2017

21                    Volume I

22   Reported by:
     LORI M. BARKLEY
23   CSR No. 6426

24   Job No. 2588512

25   PAGES 1 - 392

CONFIDENTIAL

2

<pre>
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                       WESTERN DIVISION

 4

    _____
 5                            )
    UNIVERSAL CABLE           )
 6  PRODUCTIONS LLC, a        )
    Delaware limited          )
 7  liability company, and    )
    NORTHERN ENTERTAINMENT    )
 8  PRODUCTIONS LLC, a        )
    Delaware limited          )
 9  liability company,        )
                              )
10          Plaintiffs,       )
                              )
11    vs.                     ) Case No.
                              ) 2:16-cv-04435-PA-MRW
12  ATLANTIC SPECIALTY        )
    INSURANCE COMPANY, a New  )
13  York insurance company,   )
                              )
14          Defendants.       )
    _____ )
15

16

17          Videotaped deposition of STEPHEN SMITH,

18  Volume I, taken on behalf of Defendant, at 11377 West

19  Olympic Boulevard, 9th Floor, Los Angeles,

20  California, beginning at 9:12 a.m. and ending at 7:23

21  p.m., on Tuesday, April 18, 2017, before LORI M.

22  BARKLEY, Certified Shorthand Reporter No. 6426.

23

24

25
</pre>

CONFIDENTIAL

22

1  please state them at the time of your appearance,

2  beginning with the noticing attorney.

3          MS. SCOTT REED:  Good morning.  I'm Toni

4  Scott Reed of Strasburger & Price.  I represent the

5  defendant, Atlantic Specialty Insurance Company.

6          MR. HAYES:  Dan Hayes of Mitchell

7  Silberberg & Knapp LLP on behalf of Plaintiffs.

8          VIDEO OPERATOR:  Thank you.

9          The witness may be sworn in and counsel may

10  begin the examination.

11

12                    STEPHEN SMITH,

13  having been administered an oath, was examined and

14  testified as follows:

15

16                    EXAMINATION

17  BY MS. SCOTT REED:

18      Q.   Good morning, sir.

19      A.   Good morning.

20      Q.   Would you please state your full name for

21  the record.

22      A.   Stephen David Smith.

23      Q.   Mr. Smith, my name is Toni Scott Reed, and

24  as I said in the introduction for this deposition

25  today, I represent the defendant, Atlantic Specialty

CONFIDENTIAL

40

1         THE WITNESS:  I'm not sure that was the same
2    question you asked me the first time, so I'm getting
3    a bit confused here what exactly the question is.
4    BY MS. SCOTT REED:
5         Q.   Well, I had asked you:  Other than Dig, had
6    you ever worked on security for anything that was
7    produced in Israel?
8         A.   No.
9         Q.   You told me you had not.  So I'm broadening
10   to discuss the Middle East region.
11              Have you worked in connection with security
12   in the Middle East region on any productions?
13        A.   No.
14              MR. HAYES:  Objection, vague.
15   BY MS. SCOTT REED:
16        Q.   Let me focus back, please, sir.
17              At the time when you were head of security
18   Europe, can you describe for me your job duties?
19        A.    I was responsible for the security of
20   personnel, assets, events, content, and company
21   reputation for the United Kingdom and Europe.
22        Q.    And can you describe for the court more
23   particularly what that means you would actually do as
24   your work?
25        A.    I had a fairly broad agreement that would

CONFIDENTIAL

41

1  include assessing risk to all of the categories I

2  previously mentioned, mitigating risk, writing

3  security protocols and policy, designing security

4  systems, producing security reports, conducting

5  security assessments.

6      Q.   Anything else you can think of?

7      A.   Identifying and mitigating risk is the

8  primary role, and responding to emergency and crisis

9  situations.

10     Q.   Did you personally have involvement in the

11 decision to move the Dig production out of Israel?

12          MR. HAYES:  Objection, vague.

13          THE WITNESS:  I provided information to the

14 company regarding the security situation in Israel.

15 BY MS. SCOTT REED:

16     Q.   Did you make any recommendations about what

17 should happen with production based upon the

18 information that you provided?

19     A.   I did.

20     Q.   And what was or were the recommendations?

21     A.   At --

22          MR. HAYES:  Objection, vague.

23          THE WITNESS:  At what point?  Is there a

24 specific date that this question refers to?

25

CONFIDENTIAL

140

1  foundation.

2          THE WITNESS:  Intelligence reporting comes

3  in various forms depending on the source.

4  BY MS. SCOTT REED:

5      Q.  So if Control Risk Group was providing

6  updates to you during this time period in summer of

7  2014, would they be a generalized report on all areas

8  of the globe where you had interests or would they be

9  individual and specific broken down?

10         MR. HAYES:  Objection, vague, lacks

11  foundation.

12         THE WITNESS:  They're actually a mixture

13  because they provide specific information on tracking

14  travelers, and they provided specific information

15  relating to travelers in Israel and the security

16  situation in Israel.

17  BY MS. SCOTT REED:

18     Q.  As all of that generalized information is

19  coming in, was there a particular person who was

20  assigned to mine through it, so to speak, and

21  synthesize information that was particular to Dig?

22         MR. HAYES:  Objection, vague, lacks

23  foundation.

24         THE WITNESS:  Particular to issues in

25  Israel, Chris Biggs is my analyst.  It's his job to

CONFIDENTIAL

141

1  gather the information and make it into workable and
2  actionable intelligence.
3  BY MS. SCOTT REED:
4      Q.   So in 2014 was it part of his job
5  responsibilities to go through the various incoming
6  information that you were receiving and to highlight
7  for you issues that would be pertinent to the Dig
8  production?
9          MR. HAYES:  Objection, vague, lacks
10  foundation.
11          THE WITNESS:  Yes, he would provide me with
12  information from multiple sources.
13  BY MS. SCOTT REED:
14      Q.   Did Mr. Biggs directly receive the Max
15  Security Intelligence written security reports?
16      A.   I don't know if he received them directly or
17  I forwarded them on to him.  I can't recall.  He
18  certainly had sight of the Max Intelligence reports.
19      Q.   Did you have Mr. Biggs review them in
20  addition to you reviewing the Max Security
21  Intelligence reports?
22      A.   That's his job.  He's an analyst.  He
23  gathers information from multiple sources and, if
24  necessary, makes recommendations to me, points out
25  consistency or inconsistency, looks at sources of

CONFIDENTIAL

142

1  information.

2      THE REPORTER:  Looks at what?

3      THE WITNESS:  Sources.  That's the role of

4  an analyst, really.

5  BY MS. SCOTT REED:

6    Q.  Yes, sir.

7      And if these Max Security Intelligence

8  reports were incoming to you via e-mail, did you make

9  an assignment to him to review them in addition to

10  you reviewing them?

11      MR. HAYES:  Objection, vague, lacks

12  foundation.

13      THE WITNESS:  Chris -- Chris knows what he's

14  doing, and we have a working relationship.  He

15  understands how to work with me, how to review

16  information.  His job is to gather information from a

17  multitude of sources.  It could be intelligence

18  reports.  It could be Twitter.  It could be news

19  channels.

20      He can make personal assessments or he can

21  provide raw information for somebody else to make an

22  assessment from these multiple sources.  We don't

23  rely and wouldn't rely on one source of information

24  on most occasions.

25

CONFIDENTIAL

391

1         I declare under penalty of

2      perjury under the laws of the State

3      of California that the foregoing is

4      true and correct.

5         Executed on _____, 2017, at

6      _____, _____.

7

8

9

10     _____

11          SIGNATURE OF WITNESS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

392

1  STATE OF CALIFORNIA      ) ss.

2  COUNTY OF LOS ANGELES    )

3

4          I, Lori M. Barkley, CSR No. 6426, do hereby

5  certify:

6          That the foregoing deposition testimony

7  taken before me at the time and place therein set

8  forth and at which time the witness was administered

9  the oath;

10         That the testimony of the witness and all

11 objections made by counsel at the time of the

12 examination were recorded stenographically by me, and

13 were thereafter transcribed under my direction and

14 supervision, and that the foregoing pages contain a

15 full, true and accurate record of all proceedings and

16 testimony to the best of my skill and ability.

17         I further certify that I am neither counsel

18 for any party to said action, nor am I related to any

19 party to said action, nor am I in any way interested

20 in the outcome thereof.

21         IN WITNESS WHEREOF, I have subscribed my

22 name this 19th day of April, 2017.

23

24         _____

25              LORI M. BARKLEY, CSR No. 6426