# EXHIBIT 164

## 2016 Human Rights Reports – Secretary's Preface

Promoting human rights and democratic governance is a core element of U.S. foreign policy. These values form an essential foundation of stable, secure, and functioning societies. Standing up for human rights and democracy is not just a moral imperative but is in the best interests of the United States in making the world more stable and secure. The 2016 *Country Reports on Human Rights Practices* (The Human Rights Reports) demonstrate the United States' unwavering commitment to advancing liberty, human dignity, and global prosperity.

This year marks the 41st year the Department of State has produced annual Human Rights Reports. The United States Congress mandated these reports to provide policymakers with a holistic and accurate accounting of human rights conditions in nearly 200 countries and territories worldwide, including all member states of the United Nations and any country receiving U.S. foreign assistance. The reports cover internationally recognized individual civil, political, and worker rights, as set forth in the Universal Declaration of Human Rights and other international instruments.

The Human Rights Reports reflect the concerted efforts of our embassies and consulates to gather the most accurate information possible. They are prepared by human rights officers at U.S. missions around the world who review information available from a wide variety of civil society, government, and other sources. These reports represent thousands of work-hours as each country team collects and analyzes information. The Department of State strives to make the reports objective and uniform in scope and quality.

The Human Rights Reports are used by the U.S. Legislative, Executive, and Judicial Branches as a resource for shaping policy and guiding decisions, informing diplomatic engagements, and determining the allocation of foreign aid and security sector assistance. The Human Rights Reports are also used throughout the world to inform the work of human rights advocates, lawmakers, academics, businesses, multilateral institutions, and NGOs.

The Department of State hopes these reports will help other governments, civil society leaders, activists, and individuals reflect on the situation of human rights in their respective countries and work to promote accountability for violations and abuses.

Our values are our interests when it comes to human rights. The production of these reports underscores our commitment to freedom, democracy, and the human rights guaranteed to all individuals around the world.

I hereby transmit the Department of State's *Country Reports on Human Rights Practices for 2016* to the United States Congress.

*Rex W. Tillerson*
*Secretary of State*

# EXHIBIT 165



United Nations

**A**/HRC/RES/S-21/1

# General Assembly

Distr.: General
24 July 2014

Original: English

---

**Human Rights Council**
**Twenty-first special session**
23 July 2014

Resolution adopted by the Human Rights Council

## S-21/1
## Ensuring respect for international law in the Occupied Palestinian Territory, including East Jerusalem

*The Human Rights Council*,

*Guided* by the purposes and principles of the Charter of the United Nations and the Universal Declaration of Human Rights,

*Recalling* General Assembly resolution 60/251 of 15 March 2006 and Human Rights Council resolutions 5/1 and 5/2 of 18 June 2007,

*Reaffirming* the right to self-determination of the Palestinian people and the inadmissibility of the acquisition of land by the use of force, as enshrined in the Charter,

*Affirming* the applicability of international human rights law and international humanitarian law, in particular the Geneva Convention relative to the Protection of Civilian Persons in Time of War, of 12 August 1949,[1] to the Occupied Palestinian Territory, including East Jerusalem,

*Reaffirming* that all High Contracting Parties to the Fourth Geneva Convention[1] are under the obligation to respect and ensure respect for the obligations arising from the said Convention in relation to the Occupied Palestinian Territory, including East Jerusalem, and reaffirming their obligations under articles 146, 147 and 148 with regard to penal sanctions, grave breaches and the responsibilities of the High Contracting Parties,

*Gravely concerned* at the lack of implementation of the recommendations contained in the report of the United Nations Fact-Finding Mission on the Gaza Conflict of 2009,[2] and convinced that lack of accountability for violations of international law reinforces a culture of impunity, leading to a recurrence of violations and seriously endangering the maintenance of international peace,

*Noting* that 9 July 2014 marked the tenth anniversary of the adoption of the advisory opinion by the International Court of Justice on the legal consequences of the construction

---

[1] United Nations, *Treaty Series*, vol. 75, No. 973.
[2] A/HRC/12/48.

GE.14-09250  (E)



Please recycle 

of a wall in the Occupied Palestinian Territory and that no progress has been made on its implementation, and affirming the urgent need to respect and ensure respect for international humanitarian law and international human rights law in this regard,

*Firmly convinced* that justice and respect for the rule of law are the indispensable bases for peace, and stressing that prevailing long-standing and systemic impunity for international law violations has created a justice crisis in the Occupied Palestinian Territory that warrants action, including accountability for international crimes,

*Noting* the systematic failure by Israel to carry out genuine investigations in an impartial, independent, prompt and effective way, as required by international law, on violence and offences carried out against Palestinians by the occupying forces and settlers and to establish judicial accountability over its military actions in the Occupied Palestinian Territory, including East Jerusalem,

*Emphasizing* the obligations of Israel as the occupying Power to ensure the welfare and safety of the Palestinian civilian population under its occupation in the West Bank, including East Jerusalem, and in the Gaza Strip, and noting Israel's wilful abdication and rejection of its obligations in this regard,

*Noting* that the deliberate targeting of civilians and other protected persons and the perpetration of systematic, flagrant and widespread violations of applicable international humanitarian law and international human rights law in situations of armed conflict constitute grave breaches and a threat to international peace and security,

*Deploring* the massive Israeli military operations in the Occupied Palestinian Territory, including East Jerusalem, since 13 June 2014, which have involved disproportionate and indiscriminate attacks and resulted in grave violations of the human rights of the Palestinian civilian population, including through the most recent Israeli military assault on the occupied Gaza Strip, the latest in a series of military aggressions by Israel, and actions of mass closure, mass arrest and the killing of civilians in the occupied West Bank,

*Expressing grave concern* at the critical humanitarian situation in the Gaza Strip, including in particular the forced displacement of tens of thousands of Palestinian civilians, the crisis in access to adequate water and sanitation services affecting nearly 1 million people, and the extensive damage to electricity infrastructure resulting in 80 per cent of the population receiving electricity only four hours a day, and underlining the importance of providing emergency humanitarian assistance to them and other victims,

*Welcoming* the establishment of the Palestinian national consensus Government on 2 July 2014 as an important step towards Palestinian reconciliation, which is crucial for achieving a two-State solution based on the pre-1967 borders and lasting peace, and emphasizing that the situation of the occupied Gaza Strip is unsustainable as long as it remains geographically, politically and economically separated from the West Bank,

1. *Strongly condemns* the failure of Israel, the occupying Power, to end its prolonged occupation of the Occupied Palestinian Territory, including East Jerusalem, in accordance with international law and relevant United Nations resolutions;

2. *Condemns in the strongest terms* the widespread, systematic and gross violations of international human rights and fundamental freedoms arising from the Israeli military operations carried out in the Occupied Palestinian Territory since 13 June 2014, particularly the latest Israeli military assault on the occupied Gaza Strip, by air, land and sea, which has involved disproportionate and indiscriminate attacks, including aerial bombardment of civilian areas, the targeting of civilians and civilian properties in collective punishment contrary to international law, and other actions, including the targeting of medical and humanitarian personnel, that may amount to international crimes, directly resulting in the killing of more than 650 Palestinians, most of them civilians and more than

2

170 of whom are children, the injury of more than 4,000 people and the wanton destruction of homes, vital infrastructure and public properties;

3.     *Condemns* all violence against civilians wherever it occurs, including the killing of two Israeli civilians as a result of rocket fire, and urges all parties concerned to respect their obligations under international humanitarian law and international human rights law;

4.     *Calls for* an immediate cessation of Israeli military assaults throughout the Occupied Palestinian Territory, including East Jerusalem, and an end to attacks against all civilians, including Israeli civilians;

5.     *Welcomes* the initiative of Egypt, supported by the League of Arab States, and calls for all regional and international actors to support this initiative in view of securing a comprehensive ceasefire;

6.     *Demands* that Israel, the occupying Power, immediately and fully end its illegal closure of the occupied Gaza Strip, which in itself amounts to collective punishment of the Palestinian civilian population, including through the immediate, sustained and unconditional opening of the crossings for the flow of humanitarian aid, commercial goods and persons to and from the Gaza Strip, in compliance with its obligations under international humanitarian law;

7.     *Calls upon* the international community, including the States Members of the United Nations, international financial institutions and intergovernmental and non-governmental organizations, as well as regional and interregional organizations, to provide urgently needed humanitarian assistance and services to the Palestinian people in the Gaza Strip, including by supporting the emergency appeal launched by the United Nations Relief and Works Agency for Palestine Refugees in the Near East on 17 July 2014;

8.     *Expresses grave concern* at the rising number of incidents of violence, destruction, harassment, provocation and incitement by extremist Israeli settlers illegally transferred to the Occupied Palestinian Territory, including East Jerusalem, against Palestinian civilians, including children, and their properties, and condemns in the strongest terms the resulting perpetration of hate crimes;

9.     *Expresses deep concern* at the condition of Palestinian prisoners and detainees in Israeli jails and detention centres, in particular following the arrest by Israel of more than 1,000 Palestinians since 13 June 2014, and calls upon Israel, the occupying Power, to immediately release all Palestinian prisoners whose detention is not in accordance with international law, including all children and all members of the Palestinian Legislative Council;

10.     *Underlines* the importance of ensuring the protection of all civilians, emphasizes the continued failure of Israel to protect the Palestinian civilian population under its occupation as demanded by international law, and in this context calls for immediate international protection for the Palestinian people in the Occupied Palestinian Territory, including East Jerusalem, in accordance with the relevant provisions of the Charter of the United Nations, international humanitarian law and international human rights law;

11.     *Recommends* that the Government of Switzerland, in its capacity as depositary of the Fourth Geneva Convention,[1] promptly reconvene the conference of High Contracting Parties to the Convention on measures to enforce the Convention in the Occupied Palestinian Territory, including East Jerusalem, and to ensure its respect in accordance with article 1 common to the four Geneva Conventions,[3] bearing in mind the

---

[3]   United Nations, *Treaty Series*, vol. 75, Nos. 970–973.

statement adopted by the Conference of the High Contracting Parties on 15 July 1999, and the Declaration adopted by the Conference on 5 December 2001;

12.    *Requests* all relevant special procedures mandate holders to urgently seek and gather information on all human rights violations in the Occupied Palestinian Territory, including East Jerusalem, according to their respective mandates, and to include their observations in their annual reports to the Human Rights Council;

13.    *Decides* to urgently dispatch an independent, international commission of inquiry, to be appointed by the President of the Human Rights Council, to investigate all violations of international humanitarian law and international human rights law in the Occupied Palestinian Territory, including East Jerusalem, particularly in the occupied Gaza Strip, in the context of the military operations conducted since 13 June 2014, whether before, during or after, to establish the facts and circumstances of such violations and of the crimes perpetrated and to identify those responsible, to make recommendations, in particular on accountability measures, all with a view to avoiding and ending impunity and ensuring that those responsible are held accountable, and on ways and means to protect civilians against any further assaults, and to report to the Council at its twenty-eighth session;

14.    *Requests* the cooperation, as appropriate, of other relevant United Nations bodies with the commission of inquiry to carry out its mission, and requests the assistance of the Secretary-General and the United Nations High Commissioner for Human Rights in this regard, including in the provision of all administrative, technical and logistical assistance required to enable the commission of inquiry and special procedures mandate holders to fulfil their mandates promptly and efficiently;

15.    *Requests* the High Commissioner to report on the implementation of the present resolution, including on measures taken with regard to ensuring accountability for the serious violations of international humanitarian law and human rights in the Occupied Palestinian Territory, including East Jerusalem, to the Human Rights Council at its twenty-seventh session;

16.    *Decides* to remain seized of the matter.

*2nd meeting*
*23 July 2014*

[Adopted by a recorded vote of 29 to 1, with 17 abstentions. The voting was as follows:

*In favour*:
Algeria, Argentina, Brazil, Chile, China, Congo, Costa Rica, Côte d'Ivoire, Cuba, Ethiopia, India, Indonesia, Kazakhstan, Kenya, Kuwait, Maldives, Mexico, Morocco, Namibia, Pakistan, Peru, Philippines, Russian Federation, Saudi Arabia, Sierra Leone, South Africa, United Arab Emirates, Venezuela (Bolivarian Republic of), Viet Nam

*Against*:
United States of America

*Abstaining*:
Austria, Benin, Botswana, Burkina Faso, Czech Republic, Estonia, France, Gabon, Germany, Ireland, Italy, Japan, Montenegro, Republic of Korea, Romania, the former Yugoslav Republic of Macedonia, United Kingdom of Great Britain and Northern Ireland]

————————

4

# EXHIBIT 166

# Congressional Research Service
## Careers

<u>The Library of Congress</u> > Congressional Research Service Careers

Print      Subscribe      Share/Save      Give Feedback

## Congressional Research Service Careers



The Congressional Research Service (CRS) works exclusively for the United States Congress, providing policy and legal analysis to committees and Members of both the House and Senate, regardless of party affiliation. As a legislative branch agency within the Library of Congress, CRS has been a valued and respected resource on Capitol Hill for more than a century.

CRS is well-known for analysis that is authoritative, confidential, objective and nonpartisan. Its highest priority is to ensure that Congress has 24/7 access to the nation's best thinking.

This website provides information about our organization, career opportunities and our services to Congress.

### Current Vacancies

- <u>Administrative Support Clerk (Vacancy #: VAR000087)</u>
- <u>Analyst in Income Security (Vacancy #: VAR000034)</u>
- <u>Instructional Design Coordinator (Vacancy #: VAR000045)</u>
- <u>Analyst in Telecommunications Policy (Vacancy #: VAR000046)</u>
- <u>Cataloging and Metadata Librarian (Vacancy #: VAR000095)</u>
- <u>Specialist in Immigration Policy (Vacancy #: VAR000073)</u>
- <u>Analyst in Environmental Policy (Vacancy #: VAR000077)</u>
- <u>Legislative Attorney (Civil Rights, First Amendment, and Administrative Law) (Vacancy #: VAR000099)</u>

Learn about other <u>career opportunities</u>.

1879

# EXHIBIT 167



**MILESTONES: 1945–1952**

# The Arab-Israeli War of 1948

The Arab-Israeli War of 1948 broke out when five Arab nations invaded territory in the former Palestinian mandate immediately following the announcement of the independence of the state of Israel on May 14, 1948. In 1947, and again on May 14, 1948, the United States had offered de facto recognition of the Israeli Provisional Government, but during the war, the United States maintained an arms embargo against all belligerents.



*Raising the Flag signified the Conclusion of the Conflict*

On November 29, 1947, the United Nations General Assembly adopted Resolution 181 (also known as the Partition Resolution ) that would divide Great Britain's former Palestinian mandate into Jewish and Arab states in May 1948. Under the resolution, the area of religious significance surrounding Jerusalem would remain under international control administered by the United Nations. The Palestinian Arabs refused to recognize this arrangement, which they regarded as favorable to the Jews and unfair to the Arab population that would remain in Jewish territory under the partition. The United States sought a middle way by supporting the United Nations resolution, but also encouraging negotiations between Arabs and Jews in the Middle East.

The United Nations resolution sparked conflict between Jewish and Arab groups within Palestine. Fighting began with attacks by irregular bands of Palestinian Arabs attached to local units of the Arab Liberation Army composed of volunteers from Palestine and neighboring Arab countries. These groups launched their attacks against Jewish cities, settlements, and armed forces. The Jewish forces were composed of the Haganah, the underground militia of the Jewish community in Palestine, and two small irregular groups, the Irgun, and LEHI. The goal of the Arabs was initially to block the Partition Resolution and to prevent the establishment of the Jewish state. The Jews, on the other hand, hoped to gain control over the territory allotted to them under the Partition Plan.

After Israel declared its independence on May 14, 1948, the fighting intensified with other Arab forces joining the Palestinian Arabs in attacking territory in the former Palestinian mandate. On the eve of May 14, the Arabs launched an air attack on Tel Aviv, which the Israelis resisted. This action was followed by the invasion of the former Palestinian mandate by Arab armies from Lebanon, Syria, Iraq, and Egypt. Saudi Arabia sent a formation that fought under the Egyptian command. British trained forces from Transjordan eventually intervened in the conflict, but only in areas that had been designated as part of the Arab state under the United Nations Partition Plan and the corpus separatum of Jerusalem. After tense early fighting, Israeli forces, now under joint command, were able to gain the offensive.

Though the United Nations brokered two cease-fires during the conflict, fighting continued into 1949. Israel and the Arab states did not reach any formal armistice agreements until February. Under separate agreements between Israel and the neighboring states of Egypt, Lebanon, Transjordan, and Syria, these bordering nations agreed to formal armistice lines. Israel gained some territory formerly granted to Palestinian Arabs under the United Nations resolution in 1947. Egypt and Jordan retained control over the Gaza Strip and the West Bank respectively. These armistice lines held until 1967 . The United States did not become directly involved with the armistice negotiations, but hoped that instability in the Middle East would not interfere with the international balance of power between the Soviet Union and the United States.

1881

# EXHIBIT 168



# Geopolitical Intelligence and Risk Analysis

**The next step in staying a step ahead.**

The geopolitical landscape has never been more uncertain. Political upheaval, social unrest and economic turmoil can spell disaster for the unwary business that isn't prepared for what lies ahead. This is no time to find your way in the dark. If you're operating in one of the world's more volatile regions, you owe it to yourself and your people to be informed. That takes intelligence. Not the garden variety of intelligence that offers a general view of events. But intel based on a unique understanding of the regions you're working in. And your place in it.

**Geopolitical intelligence done more intelligently.**

MAX Intelligence Services knows your part of the world because we're part of it too. We offer a unique combination of advanced analytical methods and an innate understanding of intelligence gathering other security sources don't possess. Our intelligence team works with regional field ops who know every corner of the territory they cover. That's not something every intelligence gathering source does. What it means for you is intelligence that's more timely, more relevant and completely customized. So you can make more informed assessments of the risks you face. And the actions to take.

**Intelligence and risk analysis with an added dimension.**

The world's a complex place. And if you're working in a dangerous part of it, there's a lot you need to understand. Not just to survive, but to thrive. We formulate our intelligence reports with the belief that in today's world there's a treasure trove of resources to draw on, from traditional media to social media to reliable local contacts. So why not exploit them all to develop a detailed picture of what's really going on in those regions that matter most to you. That triangulation of intelligence gathering is unique in this business. What it does is give you a more accurate, more dimensional view of regional trends and events that help you stay informed, and be ready, anywhere in the world you may be.

**This is as much about you as about the world.**

Who you are, how you operate and what you need to know are just as important to actionable intelligence as the quality of the information itself. And we know that each level of your security structure has different needs when it comes to intelligence reporting. Our subscription packages target each need, covering the full scope of issues from day to day activities that require specific actions to overriding trends with insights to help you manage long term risk.

1884

**Mitigating risk through timely intelligence and analysis.**

There's one reason for you to rely on intelligence. To stay a step ahead. To be able to assess risk and take the proactive steps that will keep your business operations status quo in a world where status quo never seems to be the norm. Our regional intelligence packages give you multiple assets. They provide an in-depth knowledge of the region or regions you're working in, along with updates and insights on issues and trends you need to know about, because they can directly affect your business.

**From the bigger picture to local incidents.**

Our regional subscription packages give you a range of reports and analysis, from incident alerts to reviews of cultural and political trends to strategic summaries of an entire region. With MAX, you'll know how anything from a parliamentary election to a street demonstration can impact your business. All delivered in a customized subscription package tailored to the regions and topics you need to be on top of.

**The world turns to us to mitigate risk.**

It's common sense. The more tailored the intelligence is to your specific needs, the more useful it is to your decision making process. And in an era where business and geopolitical events are increasingly intertwined, that intelligence had better be timely, relevant and actionable. Maybe that's why leading companies and organizations, from Fortune 500s to government agencies, have come to depend on MAX for intelligence they can directly link to vital decision making. That's the kind of intelligence you can depend on us to deliver.

**I would like to know more about MAX Security Geopolitical Intelligence and Risk Analysis Services. Please contact me.**

| FIRST NAME | LAST NAME | COMPANY EMAIL | TELEPHONE | **SUBMIT** |

1885

# EXHIBIT 169



# Tactical Intelligence Reports

**A step ahead for what may happen next.**

In a volatile world, political upheaval, social unrest, even natural events can spell disaster for the unwary business at a moment's notice. This is no time to find your way in the dark. If you're operating in one of the world's more volatile regions, you need to be ready. That takes intelligence. Not the garden variety of updates and alerts. But real-time intelligence based on a unique understanding of the regions you're working in. And your place in it.

**Tactical intelligence and security intelligence reports done more intelligently.**

MAX Intelligence Services knows your part of the world because we're part of it too. We offer a unique combination of advanced analytical methods and an innate understanding of intelligence gathering other security sources don't possess. Our intelligence team works with regional field ops who know every corner of the territory they cover. That's not something every intelligence gathering source does. What it means for you is tactical intelligence that enables you to make the decisions you need to make as events are unfolding.

**Giving intelligence an added dimension.**

A game-changing event can happen anywhere, at any time. The more volatile the region you're operating in, the more you have to be on alert. And the faster you have to respond. You need intelligence that's not only timely, but clear, reliable and actionable. We formulate our tactical reports with the belief that in today's world there's a treasure trove of resources to draw on, from traditional media to social media to reliable local contacts. So why not exploit them all to develop a verifiable picture of precisely what's happening. That triangulation of intelligence gathering is unique in this business. What it gives you is an up to the minute picture of events as they're unfolding – from national uprisings to local traffic jams, infrastructure failures and bureaucratic logjams. What it means is that when there's no time to think, you can act. And feel confident you've made the right decision.

**Real-time tactical reporting for real-life decisions.**

**Tactical intelligence isn't theoretical**. It's information that can save a life, or an entire organization, in a split second. MAX gives you that intel in real-time, with ongoing updates so insightful, news organizations rely on them. And it's precisely the intel you need. Our regional subscription packages are customized based on the countries you're

1887

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 18 of 144   Page ID #:9145

operating in. They're as comprehensible as they are comprehensive. So while there's nothing easy about managing crises, our reports mak          r for you to do your job.

**This is as much about you as about the world.**

Who you are, how you operate and what you need to know are just as important to actionable intelligence as the quality of the information itself. And we know that each level of your security structure has different needs when it comes to intelligence reporting. Our tactical reports are part of comprehensive regional subscription packages that target each need. They offer a full range of reporting, from day to day activities that require specific actions to over-riding trends with insights to help you manage long-term risk.

**Mitigating risk through timely information.**

There's one reason for you to rely on intelligence. To stay a step ahead. To be able to assess risk and take the proactive steps that will keep your business operations status quo in a world where status quo never seems to be the norm. Our regional intelligence packages give you multiple assets. They provide an in-depth knowledge of the region or regions you're working in, along with up-dates and insights on issues and trends you need to know about, because they can directly affect your busi-ness.

**The right intel at the right time and place.**

Our tactical intelligence reports give you real-time information on local security issues. And we keep you in the loop with a steady stream of updates as events unfold. This is accurate, actionable infor-mation completely relevant to your organization. Because you customize the package based on your countries of interest. With MAX, you'll know how to mitigate the impact of anything from a traf-fic jam to a militant attack.

**The world turns to us for security intelligence reports and strategic insight.**

It's common sense. The more tailored the security intelligence report is to your specific needs, the more useful it is to your decision making process. And in an era where business and geopolitical events are increasingly intertwined, that intelligence had better be timely, relevant and actionable. Maybe that's why leading companies and organizations, from Fortune 500s to government agencies, have come to depend on MAX for intelligence they can directly link to vi-tal decision making. That's the kind of intelligence you can depend on us to deliver.

**I would like to know more about MAX Security Tactical Intelligence Services and Security Intelligence Reports. Please contact me.**

| FIRST NAME | LAST NAME | COMPANY EMAIL | TELEPHONE | **SUBMIT** |

# EXHIBIT 170



حركة المقاومة الإسلامية (حماس)
The Islamic Resistance Movement ( Hamas )
(http://hamas.ps/ar)

| | May 6 2017 |
|---|---|
| Hamas leadership in prison commander congratulates Haniyeh ☑ | ◀ |
| Meshaal. the text of the speech to announce Haniyeh as Hamas ☑ | ◀ May 6 2017 |
| Learn Ismail Haniyeh, the new Hamas leader ☑ | ◀ May 6 2017 |
| Mashaal declared victory Haniyeh headed by Hamas ☑ | ◀ May 6 2017 |
| Haniyeh, head of the Political Bureau of Hamas ☑ | ◀ May 6 2017 |

News    البيانات/data (http://hamas.ps/ar/category/1    The official position (http://hamas.ps/ar/categories/3

(http://hamas.ps/ar)

## The document of principles and public policies

May / May 2017 19:36 01



The Islamic Resistance Movement

HAMAS - Palestine

حركة المقاومة الإسلامية

حمـاس – فلسطين

https://www.addtoany.com/share#url=http%3A%2F%2Fhamas.ps%2Far%2Fpost%2F7293&title=%D8%AD%D8%B1%D9%83%D8%A9%20%D8%A7%D9%84%D9%85%D9%82%D8%A7

(%20%D9%88%D8%AB%D9%8A%D9%82%D8%A9%20%D8%A7%D9%84%D9%85%D8%A8%D8%A7%D8%AF%D8%A6%20%D9%88%D8%A7%D9%

(facebook#/) (twitter#/) (google_plus#/) (whatsapp#/)

(facebook#/)    (twitter#/)    (google_plus#/)    (whatsapp#/)

## The document of principles and public policies

s.ps/ar/uploads/documents/599abf9aafa1b76837c1242eb229e87b.pdf

Praise be to Allah, Lord of the Worlds, and prayers and peace be upon the Messengers and the Imam of the Mujahideen, and his family and companions.

Introduction:

Palestine Land of the Arab Palestinian people, which grew, and it is proven, and it belonged, and it spilled over and contact Palestine Land of the highest prestige of Islam, raising its sanctuary , and to extend the spirit and fair value, and the foundations of the doctrine of defend and fortify.

Palestine issue of the people of the world 's inability to guarantee their rights and recover usurped from him and remained his land suffering from

1890

one of the worst forms of occupation in this world

Palestine seized by the Zionist project current anti-racist humanity, founded a false statement ( the Balfour Declaration), and the recognition of the usurper entity, and to impose a fait accompli fire strongly

Palestine resistance that will remain constant until the completion of editing, and the achievement of return, and building fully sovereign state and Jerusalem as its capital.

Palestine true partnership between the Palestinians with all their affiliations, in order to achieve the goal of liberation High.

Palestine spirit of the nation, the central case, humanitarian spirit and conscience of the neighborhood.

In this document deepens our experience, share unknowable, and founded our view, moving our journey on the floors and premises and columns solid and constants well established, kept the public image, and highlights the road parameters, and promote national unity assets, and a common understanding of the issue and draw business principles and limits flexibility.

**Definition of Movement:**

1. The Islamic Resistance Movement "Hamas" is a Palestinian liberation movement and resistance to a national Islamic, aimed at the liberation of Palestine and the face of the Zionist project, its terms of reference of Islam in its premises and objectives and means.

**Land of Palestine:**

2. Palestine with its boundaries from the Jordan River in the east to the west Mediterranean, and from the head of Naqoura to the north or south Rishrash regional and indivisible unit, which is the land of the Palestinian people and his homeland. And that the expulsion of the Palestinian people from their land and dispersion, and the establishment of a Zionist entity on them, does not negate the right of the Palestinian people in the entire land, nor establish any right of the Zionist usurper in which the entity.

3. Palestine Islamic Arab land, a land of divine blessing, has its own position in the heart of every Arab and Muslim.

**The people of Palestine:**

4. The Palestinians are Arab citizens who resided in Palestine until 1947, whether out of them or from where he remained; and all born of a Palestinian Arab father after this date, inside or outside Palestine, it is a Palestinian.

5. Palestinian personal recipe authentic, necessary, do not go away, which is transmitted from parents to children; and the calamities that befell the Palestinian people, by the Zionist occupation and the policy pursued by the displacement, does not lose his personality and his affiliation nor denied. As well as the Palestinian cause does not get another nationality in the loss of national identity and rights.

6. The Palestinian people are one people, with all his children at home and abroad, and with all religious, cultural and political components.

**Islam and Palestine:**

7. Palestine in the heart of the Arab and Islamic nation, and retain the particular importance, wherein the house of the Bible that God bless him, the Holy Land which God blessed the worlds, a kiss of the first Muslims, and the ascension of Prophet Muhammad - peace be upon him - and His ascension to heaven , and the cradle of Christ - peace be upon him - and in Theraha the remains of thousands of prophets and companions and the Mujahideen, a land based on the right - in the Bible and the environs of the house of Jerusalem - who do not harm them from pious nor let them down until God 's command comes.

8. Hamas Islam movement understood by including aspects of all life, and the validity of every time and place, and the spirit of moderation moderate; believes it is the religion of peace and tolerance, in which the followers of religions and religions live in security and safety; also believes that Palestine was and will remain a model of coexistence, tolerance and creativity of civilization.

9. Hamas believes that the message of Islam came to the values of truth, justice, freedom and dignity, and the prohibition of injustice in all its forms, and the criminalization of the unjust , whatever their religion, race, gender , or nationality; and that Islam is against all forms of extremism , religious, ethnic and sectarian fanaticism, a religion that educates his followers on the response of aggression the victory of the oppressed, and urging them to giving and giving and sacrifice in defense of their dignity and their land and their people and their holy places.

**Jerusalem:**

1891

Islamic Resistance Movement - Hamas - Document General principles and objectives

10. Jerusalem is the capital of Palestine, and its religious, historical and cultural prestige, Arab, Islamic and human; and all Islamic sanctities and Christianity, is the inalienable right of the Palestinian people and Arab and Islamic nation, nor give it up or negligence in any part of it; and that

11. all measures of the occupation in Jerusalem Judaization and settlement and falsification of the facts and blur the features non - existent Al - Aqsa Mosque sincere to the right of our people and our nation, not to occupy any right in it, and its plans and procedures and attempts to Judaize Al - Aqsa and divide it null and illegitimate.

**Refugees right of return:**

12. The Palestinian issue is , in essence , the issue of occupied land and the people displaced; the right of return of Palestinian refugees and displaced persons to their homes from which they were expelled or prevented from returning to it, both in the territories occupied in 1948 or 1967 (ie , all of Palestine), is right normal, individually and collectively, confirmed by divine law and the fundamental principles of human rights, international law, a right inalienable from any party whatsoever, Palestinian, Arab or international.

13. Hamas rejects all projects and attempts aimed at the liquidation of the refugee issue, including attempts to resettle them outside of Palestine, and projects of the alternative homeland; and stresses that the refugees and displaced Palestinians to compensate for the damage resulting from the displacement and the occupation of their land is the inherent right of the right of return, and is after the implementation of this right, and eliminates their right to return does not detract from it.

**Zionist project:**

14. The Zionist project is a racist project, aggressive, current, Expansive, based on the rape of the rights of others, and hostile to the Palestinian people and their aspirations for freedom, liberation and return and self - determination; and that the Israeli entity is a tool of the Zionist project and its base of aggression.

15. The Zionist project is not aimed at the Palestinian people only, but is the enemy of the Arab and Islamic nation, and is a real by danger and threat seriously to its security and interests, as it is hostile to their aspirations for unity and renaissance and liberation, the head of the cause of what ails the nation today, and is a Zionist project, too, a threat to international peace and security, and the humanitarian community and the interests and stability.

16. Hamas confirms that the conflict with the Zionist project is not a conflict with the Jews because of their religion; and Hamas is not locked in a struggle against the Jews because they are Jews, but locked in a struggle against the Zionist occupiers , the aggressors; while the leaders of the occupation are they using Jews and Jewish slogans in the conflict, and a description of their entity usurping them .

17. Hamas rejects the persecution of any person or detract from the rights on a national, religious or sectarian basis, and considers that the Jewish problem of anti-Semitism and the persecution of Jews , mainly associated with the phenomena of European history, not on the Arabs and Muslims do not Muarithm. And that the Zionist movement -alta managed under the auspices of the occupation of Palestine Gharbah- power model is the most dangerous occupation of the settlement, which is still most parts of the world, which must go away from Palestine.

**The position of the occupation and a political settlement:**

18. is lacking each of the statement , "Balfour" instrument of the British Mandate over Palestine, and the decision of the United Nations partition of Palestine, and all consequent or Mathlha of decisions and actions; and that the "Israel" void ab initio, which is contrary the rights of the Palestinian people 's inalienable, and his will and the will of the nation, and human rights guaranteed by international conventions, particularly the right to self - determination.

19. does not recognize the legitimacy of the Zionist entity; and that all occurred in the land of Palestine from occupation or settlement or Judaization or change the parameters or falsification of facts is false; The rights no statute of limitations.

20. No waiver of any part of the land of Palestine, whatever the reasons and circumstances and pressures, no matter how long the occupation. Hamas rejects any alternative to the complete liberation of Palestine, from the sea to blamed her. However - and not at all mean the recognition of the Zionist entity does not waive any of the Palestinian rights - Hamas considers that the establishment of full sovereignty of an independent Palestinian state and Jerusalem as its capital, on the fourth of June 1967 lines, with refugees and displaced persons return to their homes , which brought out of which, it is a compromise formula and a common national.

1892

21. Hamas emphasizes that accessories Oslo agreements contrary to the rules of international law , jus in that they arranged obligations contrary to the rights of the Palestinian people 's inalienable, and therefore the movement rejects these agreements, and the consequent obligations (detrimental to the interests of our people, especially coordination (security cooperation .

22. Hamas rejects all agreements, initiatives and projects aimed at the settlement of the liquidation of the Palestinian cause or detract from the rights of the Palestinian people, and that any position or initiative or a political program should not affect these rights, and may not be opposers or contradicts them.

23. Hamas confirms that the oppression of the Palestinian people and the rape of their land and deported them can not be called peace. Any adjustments are based on this basis, it will not lead to peace; and will continue the resistance and jihad to liberate Palestine a legitimate right and a duty and an honor for all our people and our nation.

**Resistance and Liberation:**

24. The liberation of Palestine is the duty of the Palestinian people in particular, and the duty of the Arab and Islamic nation in general, it is also a humanitarian responsibility in accordance with the requirements of truth and justice. And that work circles of Palestine , whether or Arab national or Islamic humanitarian or integrated circuits are harmonious, do not oppose them.

25. The resistance to the occupation, the means and methods of all, is a legitimate right guaranteed by divine laws and international norms and laws, and in the heart of which armed resistance is the strategic choice to protect the constants and the recovery of the Palestinian people 's rights.

26. Hamas rejects prejudice to the resistance and its weapons, and emphasizes the right of our people in the development of the means of resistance and its mechanisms. And that resistance management in terms of escalation or truce, or in terms of the diversity of means and methods, the whole falls within the conflict management process, not at the expense of the principle of resistance.

**Palestinian political system:**

27. The real Palestinian state is the result of liberation, nor an alternative to the establishment of full sovereignty of the Palestinian state on all Palestinian national soil, with Jerusalem as capital.

28. Hamas believes in and adheres to the management of Palestinian relations on pluralism and democratic choice and national partnership and acceptance and adoption of the dialogue base, so as to enhance the unity and joint action, in order to achieve national goals and aspirations of the Palestinian people.

29. Palestine Liberation Organization and the national framework for the Palestinian people at home and abroad must be preserved, with the need to develop and rebuild the foundations of democracy, ensure the participation of all components and the forces of the Palestinian people, and so as to maintain Palestinian rights.

30. Hamas confirms the need for Palestinian institutions and national authorities based on the democratic foundations of a sound and well - established, in the forefront of free and fair elections, and the national partnership base, according to a program and a clear strategy defined, upholds the rights and resistance, and meet the aspirations of the Palestinian people.

31. Hamas emphasizes that the role of the Palestinian Authority must be in the service of the Palestinian people and protect the security and rights of national and his project.

32. Hamas confirms the need for the independence of the Palestinian national decision, and not wagering third parties, and at the same time emphasizes the responsibility of Arabs and Muslims and their duty and their role in the liberation of Palestine from the Zionist occupation.

33. The various components of the society of personalities and symbols and dignitaries and institutions of civil society, youth and student groups, trade unions and women, working to achieve national goals, is an important tributary to the process of community building and the resistance and liberation.

34. The role of Palestinian women in the construction of the basis of the present and the future, as it was always in the history of the Palestinian industry, a pivotal role in the resistance and liberation and the building of the political system.

**Arab and Islamic nation:**

35. Hamas believes that the question of Palestine is the central issue of the Arab and Islamic nation.

36. Hamas believes in the unity of the nation with all the diverse components, and see the need to avoid anything that would tear the row and unity of the nation.

37. Hamas believes in cooperation with all countries supporting the rights of the Palestinian people, and refuses to interfere in the internal affairs of States, and refuses to engage in disputes and conflicts between them. And adopts Hamas ' openness to the various countries of the world policy, especially the Arab and Islamic; and seeks to build balanced relations, the criterion combining the requirements of the Palestinian cause and the interests of the Palestinian people, and between the interests of the nation and its renaissance and security.

**International humanitarian side:**

38. The Palestinian issue with humanitarian and major international dimensions of the issue; and that advocacy and support is a humanitarian and cultural mission, imposed by the requirements of the right to justice and common human values.

39. The liberation of Palestine , from a legal and humanitarian work hand project required by the necessities of self - defense, and the right of natural peoples to self - determination.

40. believes Hamas, in its relations with the countries of the world and its peoples, the values of cooperation, justice, freedom, and respect for the will of the peoples.

41. Hamas welcomes the positions of States, organizations and bodies in support of the rights of the Palestinian people, and salutes the world and the supporters of the cause; also condemns the support of any party or by the Zionist entity, or to cover up its crimes and aggression against the Palestinians, and calls for the prosecution of Zionist war criminals.

42. Hamas rejects attempts to dominate the Arab and Islamic nation, and rejects attempts to dominate the other nations and peoples, and condemns any form of colonialism, occupation, discrimination, injustice and aggression in the world.

_ The Islamic Resistance Movement Hamas

May 2017

(To download an electronic version of the document (here) (http://hamas.ps/ar/uploads/documents/599abf9aafa1b76837c1242eb229e87b.pdf

Sh

**f** (https://www.facebook.com/dialog/fe
وثيقة=app_id=821126294630108&link=http://hamas.ps/ar/post/7293&picture=http://hamas.ps/ar/uploads//images/6a10ad78978207b8e84c538c17fba8a.png&n
دئ والسياسات العامة=description&بهذه الوثيقة تتعمق تجربتُنا، وتشترك أفهامُنا، وتتأسّس نظرتُنا، وتتحرك مسيرتُنا على أرضيات ومنطلقات وأعمدة متينة وثوابت راسخة،
ظ الصورة العامة، وتُبرز معالمَ الطريق، وتعزّز أصولَ الوحدة الوطنية، والفهمَ المشترك للقضية، وترسم مبادئ العمل وحدود
نة.=redirect_uri=http://hamas.ps/ar&display=popup&

**🐦** (https://twitter.com/share?وثيقة المبادئ والسياسات العامة=url=http://hamas.ps/ar/post/7293&hashtags=حماس)

https://plus.google.com/sha
(url=http://hamas.ps/ar/post/

Most read

5/6/2017   Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 25 of 144   Page ID
#:9152
Islamic Resistance Movement - Hamas - Document general principles and policies

The document of principles and public policies



"Hamas launches "document principles and public policies



Information Office: Amendment of the date of the official announcement of the political document



Mashaal: Hamas document is based on openness and development, without prejudice to the constants



1895

Qassam occupation gives 24 hours to meet the demands of the prisoners



## Opinion articles (http://hamas.ps/ar/category/8/مقالات الرأي)



Your government is lying to you (؟!)

📅 April 2017, 23

(حكومتكم-تكذب-عليكم؟!)http://hamas.ps/ar/post/7250/



Support the implementation of the prisoners and their document

📅 April 2017, 23

(مساندة-الأسرى-بتطبيق-وثيقتهم)http://hamas.ps/ar/post/7249/

## From the press (http://hamas.ps/ar/category/4/من-الصحافة)



Center for Human Rights highlights the forced feeding of prisoners at risk

📅 May 2017, 06

(مركز-حقوقي-يسلط-الضوء-على-مخاطر-التغذية-القسرية-على-الأسرى)http://hamas.ps/ar/post/7318/



Turkish parliamentarian: document Hamas leap forward

📅 May 2017, 04

(برلماني-تركي-وثيقة-حماس-قفزة-للأمام)http://hamas.ps/ar/post/7311/

1896

# EXHIBIT 171


## MEETINGS COVERAGE

SECURITY COUNCIL

SC/11482

18 JULY 2014

# Gaza Crisis Resulted from Collective Failure to Achieve Political Solution to Israeli-Palestinian Conflict, Security Council Told

Security Council

7220th Meeting (PM)

In a meeting today to address the devastating impacts of the violence engulfing Gaza — claiming civilian lives and threatening an already troubled region — the United Nations senior political official told the Security Council the attacks and retaliations were frustrating hopes of any de-escalation.

Briefing the 15-member body, Jeffrey Feltman, Under-Secretary-General for Political Affairs, said that the intensification of violence that the United Nations had been attempting to head off was becoming a reality in and around Gaza. The crisis was the result of a collective failure to advance a political solution to the Israeli-Palestinian conflict, he said, urging the international community to assume its responsibility to restore a serious prospect of a two-State solution, while warning against "temporary fixes".

He expressed the Secretary-General's concern that the escalation would increase the already "appalling death toll" among Gazan civilians. Israel had legitimate security concerns, he said, condemning the indiscriminate rockets fired from Gaza, numbering more than 2,000 since 8 July, with more than half striking Israel. At the same time, he was shocked at Israel's response, which had claimed the lives of hundreds of Palestinian civilians, including four children on a beach in Gaza City and three more children yesterday.

A ceasefire was indispensable and urgent, he said, adding that unless the root causes of the escalation were addressed, "this dreadful violence" would return again and again. Offering a prescription once calm was restored, he urged an end to weapons smuggling and to the blockade, as well as returning Gaza to "one Government". He warned: "We cannot return to the status quo ante — a concern which Palestinians and Israelis share."

He called on all parties to bring an immediate end to indiscriminate firing of rockets by Hamas into Israel and Israeli retaliatory action. Civilians must be protected, as well as the integrity of United Nations premises, and humanitarian aid should be allowed to reach all in need. At the same time, he cautioned that the "bigger picture" not be forgotten, highlighting, in particular, impacts on Lebanon and the potential grave danger to stability in the Golan.

The Permanent Observer for the State of Palestine emphasized that the Palestinian Authority had engaged continuously in efforts to secure a comprehensive ceasefire, yet Israel had continued to wage war with the massive ground invasion of the Gaza strip, which was now threatening the safety of the entire Palestinian civilian population.

He called on the Security Council, once again, to uphold its Charter duties and implement its resolutions regarding the Palestinian-Israeli conflict. The Council should adopt a resolution condemning Israeli military aggression in Gaza and ensuring the lifting of the blockade and the protection of the Palestinian people. Should the Council fail to respond to those appeals, "we would have no recourse but to turn to the judicial bodies of the United Nations and the international system".

1898

Israel's representative told the Council: "We did everything in our power to avoid this." In the face of the attacks, his country had been "left with no choice" but to have the Israel Defense Forces enter Gaza, he said, adding that the Prime Minister had accepted every ceasefire offered, even while the country was under attack. Despite that, Hamas had rejected every overture.

The Israel Defense Forces were fighting in Gaza, but they were not fighting the people of Gaza, he emphasized, adding that the army was operating against only terrorist targets and genuinely regretted any civilian loss of life. In the nine years since Israel's withdrawal from Gaza, Hamas had fired rockets "each and every month". When Israel informed the international community of the thousands of rockets being smuggled into Gaza by Hamas, it had been met with silence.

Speakers around the room called for a ceasefire between the parties and a return to the negotiating table. Nigeria's representative warned that "violence begets violence", making political solutions impossible. France's delegate urged both Hamas and the Israel Defense Forces to cease fire, as civilians were bearing the brunt of the attacks. "More war will not bring more security," said the representative of Luxembourg, adding "it will only bring more tragedy".

Also speaking were representatives of Jordan, United States, China, Australia, Chile, Lithuania, United Kingdom, Chad, Russian Federation, Argentina, Republic of Korea and Rwanda.

The meeting began at 3:10 p.m. and ended at 5:10 p.m.

Briefing

JEFFREY FELTMAN, Under-Secretary-General for Political Affairs, said that the intensification of violence that the United Nations had been attempting to head off was becoming a reality in and around Gaza. It was more dismaying that signs of hope had been emerging for a ceasefire, which Egypt had been brokering. Following a temporary pause, militants had resumed firing projectiles from the Gaza Strip "frustrating our hopes" of a de-escalation. Shortly after those firings, Israeli Prime Minister Benjamin Netanyahu announced the launch of a ground operation into Gaza. Four ground incursions had been conducted, accompanied by some 90 airstrikes, mostly within the access-restricted areas. The Israel Defense Forces also fired some 357 tank shells, while their Navy fired 150 shells. Militants had fired some 127 rockets and 29 mortar shells at Israel. Approximately 20 Palestinian houses had been hit, 26 Palestinians had been killed and another 116 injured. One Israeli soldier had been killed.

He expressed the Secretary-General's concern that the escalation would increase the already "appalling death toll" among Gazan civilians. He noted that Israel had legitimate security concerns, condemning the indiscriminate rocket fire from Gaza, but he was alarmed at Israel's heavy response. The Secretary-General was also shocked by the Israeli strike that killed four children on a beach in Gaza City on 16 July, as well as the killing of three more children yesterday. The violence must end, he stressed.

Since 8 July, he continued, more than 2,000 rockets had been fired from Gaza into Israel with 1,100 of them striking Israel and hundreds intercepted by the Iron Dome. Two Israelis had been killed, including one civilian. Twelve Israeli soldiers and 365 Israeli civilians had been injured. During the same period, some 261 Palestinians, a majority of them civilians, including at least 48 women and more than 50 children, had been killed and more than 1,600 injured as a result of some 1,900 Israeli strikes on Gaza from land, air and sea. Additionally, more than 1,800 Palestinian's homes had been destroyed or damaged.

Based on the understanding of November 2012, there was a humanitarian pause, which would have helped Egypt facilitate a ceasefire. Although Israel had accepted the Egyptian proposal for a ceasefire, Hamas had tabled counter-proposals that were not acceptable to Israel. The Palestinian Authority had also expressed its support of a ceasefire and President Mahmoud Abbas had been engaged with both regional and world leaders in an appeal to end the crisis, meeting yesterday with Egyptian President Abdel Fattah Al Sisi in Cairo. Both Presidents had agreed on the necessity of an immediate ceasefire and on the urgency of holding a donors' conference to start rebuilding the Gaza Strip.

1899

President Abbas, he reported, had also indicated that in the event of a ceasefire, he would be willing to redeploy Palestinian Authority forces along the Philadelphi Corridor between Gaza and Egypt for the reopening of the Rafah border crossing under their supervision.  That would be a key component of bringing Gaza back under one legitimate Palestinian Government.  President Abbas had also written to the Secretary-General requesting that Palestine be placed under an international protection system administered by the Organization.

He called on all parties to bring an immediate end to indiscriminate firing of rockets by Hamas into Israel and Israeli retaliatory action, and to ensure the protection of civilians and the integrity of United Nations premises.  The placing of approximately 20 rockets in a vacant school in Gaza of the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA) was a flagrant violation of its premises' inviolability.  A ceasefire was indispensable and urgent.  The Agency had been providing shelter for around 48,000 Gazans who had nowhere to flee following warnings by the Israel Defense Forces.  However, the Agency's resources were being stretched thin.  The root causes must be addressed.  "We cannot return to the status quo ante — a concern which Palestinians and Israelis share," he said.

Since the Security Council's 9 July meeting on the implementation of resolution 1701 (2006), he said, at least 11 rockets had been launched from the United Nations Interim Force in Lebanon (UNIFIL) towards Israel in five separate incidents, between 11 and 18 July.  In addition, the Lebanese Armed Forces had found and dismantled two rockets set to launch towards Israel.  Israeli forces had retaliated on all occasions firing across the Blue Line.  The Interim Force, in coordination with the Lebanese Armed Forces, was maintaining an enhanced operational presence on the ground.  Turning to the 1974 Disengagement of Forces Agreement between Israel and Syria, he noted that, among several incidents of engagement, explosions and rockets from the Bravo side had impacted the Alpha side, leading to return fire by Israeli forces.

"While we focus on Gaza today, we must not forget the bigger picture," he said.  The escalation in Gaza had repercussions in the West Bank, including in East Jerusalem, with clashes occurring among demonstrators on both sides.  Restrictions had been placed this morning on Palestinian access to the holy places in the Old City.  The situation on the ground was ultimately the result of a collective failure to advance a political solution to the conflict.  Temporary fixes would no longer do, he said, urging the international community to assume its responsibility to restore a "serious prospect" for a two-State solution and bring an end to the decades-long conflict and occupation.  That was the only way to make a ceasefire last, break the endless cycle of attack and retaliation and ensure a durable peace for generations of Palestinians and Israelis alike.  The Secretary-General would leave for the region tomorrow to express solidarity with Israelis and Palestinians and, in coordination with regional and international actors, help work towards ending the violence and finding a way forward.

Statements

RIYAD MANSOUR, Permanent Observer for the State of Palestine, said that while the Palestinian Authority had engaged continuously in efforts to secure a comprehensive ceasefire, Israel had continued to wage war on the Palestinian people, with the massive ground invasion of the Gaza strip now threatening the safety of the entire Palestinian civilian population.  Hundreds had been killed, the majority of which he maintained were women and children, and homes and infrastructure had been destroyed, displacing thousands of families.  It could not be justified by any means.  Listing the names and ages of some of the dead, he said war crimes, crimes against humanity and systematic human rights violations were being committed by Israel.

He called on the Security Council once again to uphold its Charter duties and act forthwith to implement its resolutions regarding the Palestinian-Israeli conflict and on protection of civilians and children in armed conflict.  Should the Council fail to respond to those appeals, "we would have no recourse but to turn to the judicial bodies of the United Nations and the international system", he said.  He called on the Council to adopt a resolution that condemned Israeli military aggression in Gaza and demanded its immediate cessation, the lifting of the Israeli blockade and the protection of the Palestinian people, since Israel, the occupying Power, had clearly forfeited its legal obligation to do so.  He appealed to the international community to provide emergency humanitarian assistance to Gaza.

RON PROSOR ( Israel) said that, in the face of attacks, kidnapping and jihadist activities, his country had been "left with no choice" but to have the Israel Defense Forces enter Gaza to restore a sustained calm there while degrading Hamas's capabilities.  "We did everything in our power to avoid this," he said, noting that Prime Minister Netanyahu had accepted every ceasefire offered, even while Israel was under attack.  Despite that, Hamas had rejected every overture; Israel "faces an enemy who lives by violence and celebrates death".  The Israel Defense Forces were fighting in Gaza, but they were not fighting the people of Gaza.  " Israel ceases and Hamas fires," he said, calling on the international community to "stand now

1900

with Israel" to prevent the next barrage of rockets, kidnappings and suicide attacks and, once and for all, remove the "threat of terrorism casting a dark shadow on the people of Israel". His country had shown great restraint in the face of unrestrained aggression. During recent ceasefires, Hamas had continued to defiantly fire rockets at Israel and had sent heavily armed terrorists through tunnels towards the Kibbutz Sufa. "No country in the world would tolerate such an assault on its citizens," he stressed.

He said the Israeli army did not "aspire" to harm any innocent people; it was operating only against terrorist targets and genuinely regretted any civilian loss of life. At the same time, there was "no line Hamas will not cross", no depth to which they would not sink, no site off-limits. Hamas was storing weapons in family homes and establishing headquarters in hospitals. UNRWA said yesterday it had found missiles in the basement of a school. Hamas was targeting Israeli citizens while hiding behind Palestinian civilians. How many more Palestinians must fall before President Abbas, who was President of a unity Government that included a "murderous terror group", would finally break his partnership with Hamas? In the nine years since Israel's withdrawal from Gaza, Hamas had fired rockets "each and every month". When Israel informed the international community of the thousands of rockets being smuggled into Gaza by Hamas, it had been met with silence; it was time it faced the consequences of its inaction. Israel wanted to live in peace, but it was being forced to wage a war against a terrorist group committed to its destruction.

EIHAB OMAISH ( Jordan) said he had called for this meeting on behalf of the Arab Group. He rejected and condemned, in the strongest terms, what he described as Israel's aggression in Gaza, which he said had caused hundreds to become martyrs. He asked how the world could be so unmoved by the death of children, calling on Israel to immediately end military operations, withdraw from the Gaza Strip and stop targeting civilians anywhere. In that light, he supported the Egyptian initiative for a ceasefire. Jordan had increased the capacity of its health facilities for the wounded in Gaza and sought more humanitarian aid for the residents of the enclave. Only a political solution based on an equitable two-State strategy would sustainably end the violence, he stressed.

SAMANTHA POWER ( United States) said she was deeply concerned over the impact of the crisis on both Israeli and Palestinian civilians and cited President Barak Obama's strong support for Israel's right to self-defence, as well as his plea to stem the suffering in Gaza by de-escalating the violence. Even though Hamas had squandered efforts to establish a ceasefire, her country was accelerating efforts to end the fighting. She welcomed the humanitarian pause, saying that the situation in Gaza was grave and getting worse. Calling for protection of civilians, she condemned the use of UNRWA schools and other civilian facilities to store weaponry. She also called for the end of rocket fire from Gaza and de-escalation of hostilities. "Too much blood has been shed," she said.

LIU JIEYI ( China) expressed deep concern at the situation, condemning use of force that resulted in civilian deaths. He urged the parties to immediately cease hostilities and for Israel to remove its troops from Gaza and lift the blockade. He called on the Council to take a strong stand to protect civilians and preserve peace and stability in the Middle East. Both parties must immediately agree to a ceasefire and refrain from action that would again raise tension. His Government was in contact with both parties and would soon send another delivery of humanitarian aid to Gaza. The re-emergence of violence there underlined the importance of a political solution to the Israeli-Palestinian conflict. Israel must create the environment for the resumption and success of those talks.

U. JOY OGWU ( Nigeria) said that despite the calls from around the world for a de-escalation of the violence, the conflict had worsened. Israel's response must be proportionate and in concert to international law. The killing of women and children was unconscionable. Hamas must also cease its attacks, as "violence begets violence", making political solutions impossible. Leaders on both sides must show restraint and the international partners must do everything possible to forge a return to negotiations, which was the only way to a sustainable peace. The doors to a diplomatic solution must remain open towards a two-State solution.

GÉRARD ARAUD ( France) pointed out that the current violence had not been unprecedented. Each and every time conflict broke out it was the inhabitants who were caught between the rockets and the firing. History in the meantime kept repeating itself, as a deadly spiral continued, with peace more and more unattainable. The Council's priority should be to obtain a ceasefire, and his country's Foreign Affairs Minister was in the region to support that goal. Hamas rockets must stop, as must the strikes by the Israel Defense Forces, as civilians were bearing the brunt of those attacks. Paying tribute to the many humanitarian agencies in the regions, which were discharging a "holy mission", he said Gaza should not be a base to destroy Israel, nor should it be a prison. He called for an immediate ceasefire and for parties to accept the Quartet's recommendations. Because "misery swells the ranks of Hamas", he also called for the lifting of the blockade. Meaning must

1901

Gaza Crisis Resulted from Collective Failure to Achieve Political Solution to Israeli-Palestini...   Page 5 of 6
Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 32 of 144   Page ID
#:9159

be restored to the political process, and Europeans, Arabs, and Americans must, side by side, assist parties to transcend their fears.  Twenty years of traditional efforts had not worked.  New ideas and renewed efforts were needed to help the parties along a path which they were reluctant to take.

PHILIPPA KING ( Australia) called for steps to reduce tensions and to restore peace.  She said the decision by Hamas to reject the Egyptian-brokered ceasefire proposals, and the continued firing of rockets indiscriminately into Israel, was "inexcusable".  With that, she urged the parties to find a peaceful resolution.  She condemned the murders of three Israeli teenagers and the murder of a Palestinian teenager on 2 July, which had led to the current escalation.  She called for restraint from all parties and for an end to the escalation of violence by restoring the November 2012 ceasefire.  She urged both Israel and the Palestinians to resume negotiations towards a just and lasting two-State solution.

CRISTIÁN BARROS MELET ( Chile) deplored the lack of a commitment by the parties to de-escalate the conflict in Gaza and southern Israel.  He supported United Nations efforts to facilitate a ceasefire and warned against the targeting of civilians, including children, by both parties, condemning as well the use of schools for storing weaponry.

DAINIUS BAUBLYS ( Lithuania) deplored the growing number of civilian casualties and expressed concern that the violence could increase further.  She strongly condemned Hamas' launching of rockets, as well as the storing of weaponry in schools.  Recognizing the right of Israel to defend itself, she stressed, however, that the country must abide strictly by humanitarian law.  She urged leaders of both parties to immediately commit to negotiating a ceasefire, and reiterated her country's support for a two-State solution.

MARK LYALL GRANT ( United Kingdom) called for an immediate de-escalation and ceasefire agreement, with steps taken to address the underlying causes of the conflict.  He welcomed the Egyptian initiative in that light, as well as the humanitarian pause and condemned rocket fire at civilian areas.  He stressed however, that in exercising its right to self-defence, Israel must take all measures to avoid civilian casualties.  He also called for unhindered humanitarian access to Gaza, noting his Government's strong support for UNRWA.  As part of a ceasefire, a viable verification and monitoring mission should be considered, and efforts to improve conditions in Gaza should be increased.  However, only a negotiated two-State solution could bring about durable peace.

MAHAMAT ZENE CHERIF ( Chad) expressed his outrage by the indiscriminate violence and called on Israel to stop all ground and air offences aimed at schools, civilians and hospitals.  He urged Palestinians to cease all attacks against Israel, including rocket firing across borders.  After decades on the United Nations agenda, there had been no hope of settling the Palestinian question.  The situation was dangerous to the region and the world, and the Council must act firmly and swiftly to put an end to the violence and create the conditions necessary for peace.  With the Gaza blockade thwarting economic activities and fuelling an almost 50 per cent unemployment rate, the Palestinian population was marginalized and living in poverty.  How then could they believe in something called a peace process? The situation was a threat to international peace and security and dialogue must be re-engaged for a fair lasting peace based on a two-State solution.  Israel should not use inter-Palestinian issues to undermine the process.

VITALY I. CHURKIN ( Russian Federation) called for an end to the armed conflict as the victims were increasingly civilian women and children.  It was also alarming to hear reports of Israel's attacks on hospitals and residential housing.  International and humanitarian law called for demilitarizing civilian areas, yet Hamas also had been found to be utilizing schools for military purposes and to fire on residential parts of Israel.  He backed Egypt's initiative, which could be the basis for a truce and ceasefire by both parties.  Gaza must be under a single unified Government, as called for in Security Council resolutions.  The Quartet also needed to step up its efforts and design solutions elaborated jointly with the Arabs to ensure they were part of the solution.

SYLVIE LUCAS ( Luxembourg) said the crisis represented one of the greatest diplomatic failures.  "More war will not bring more security.  It will only bring more tragedy," she stated, recounting the recent killing of several young boys on the beach in Gaza.  Israel had the right to protect itself from rockets, but its actions should be proportionate and protect civilians.  The recent death toll, including so many women and children, was shocking.  All parties were fully obligated to protect civilians trapped by the hostilities; that applied to Hamas as well.  Noting the 20 rockets found in a school in Gaza, she stressed that it was unconscionable to play with the lives of children in that way.  All international efforts should focus on the cessation of the hostilities, she said, calling on all parties to cease fire and voicing support for Egypt's initiative, as well as for the Secretary-General's upcoming visit to the region.

1902

MARÍA CRISTINA PERCEVAL ( Argentina) firmly condemned the fact that the Council's calls for peace had been disregarded, that a ground offensive had begun and that rocket fire continued into Israel.  She urged both parties to support Egypt's efforts to negotiate an immediate and lasting ceasefire.  Conditions underpinning the conflict must be then dealt with, including improvement in the conditions in Gaza and consolidation of one political voice for the Palestinians.  Genuine negotiations according to internationally agreed parameters must become a priority again.  Her country was committed to help the Council fulfil its responsibilities in that context.  Deeming the leaders on both sides responsible for this tragic situation, she stressed that impunity must not prevail.

OH JOON ( Republic of Korea) expressed deep concern over the accelerating turmoil in the Middle East and its effect on civilians on both sides.  He condemned indiscriminate rocket attacks into Israel and at the same time was alarmed by the increasing toll on Palestinian civilians.  The humanitarian situation was also dire; in that context, he commended the work of UNRWA and welcomed the humanitarian pause.  He called for maximum restraint from both sides and redoubled efforts to negotiate an immediate ceasefire.  He affirmed that the only long-term solution to the violence was a negotiated two-State solution.

EUGÈNE-RICHARD GASANA (Rwanda), speaking in his national capacity and recalling Council action over the past month on violence in the Middle East, said unfortunately the parties on the ground had not heeded those calls.  He urged more humanitarian pauses and expressed strong support for the Egyptian ceasefire agreement.  Hamas must halt its rocket fire and Israel must exercise maximum restraint.  For a long-term solution, he called on the Quartet and the rest of the international community to redouble efforts for a negotiated two-State peace.

 **For information media. Not an official record.**

# EXHIBIT 172



HOME (/) /  OUR WORK

# OUR WORK

OCHA mobilizes humanitarian assistance for people in need, and it delivers its mandate through five core functions:



### Coordination

(/our-work/coordination)
OCHA is responsible for bringing together humanitarian actors to ensure a coherent response to emergencies. The aim is to assist people when they most need relief or protection. A key pillar of the OCHA mandate is to "coordinate effective and principled humanitarian action in partnership with national and international actors".



### Humanitarian Financing

(/our-work/humanitarian-financing)
In a humanitarian crisis, humanitarian actors in the field can immediately provide life-saving assistance using pooled funds managed by OCHA. There are two types of pooled funds: the Central Emergency Response Fund (CERF) and country-based pooled funds (CBPFs). CERF receives voluntary contributions year-round to provide immediate funding to UN agencies and IOM for life-saving humanitarian action anywhere in the world. CBPFs allow donors to pool their contributions to specific emergencies and can finance the relief activities of a broad range of partners, including national and international NGOs.

1905



## Policy

(/our-work/policy)

Policy development is defined as one of OCHA's three core functions. It aims to support effective and principled humanitarian action, saving lives and reducing suffering. It also underpins the role of the Under-Secretary-General/Emergency Relief Coordinator as principal advisor to the Secretary-General on humanitarian issues.



## Advocacy

(/our-work/advocacy)

OCHA has a unique mandate to speak out on behalf of the people worst affected by humanitarian situations. As the organization tasked with coordinating international humanitarian response, our ultimate goal is to save more lives and reduce the impact of conflicts and natural disasters. Whether we're mobilizing relief money after a massive earthquake, ensuring vulnerable communities are protected, or raising awareness of forgotten crises, it's our job to keep world attention focused on humanitarian issues.



## Information Management

(/our-work/information-management)

Managing information during a humanitarian emergency is a crucial part of any operation. The humanitarian community recognizes the importance of gathering reliable data on the locations of people in need, what they urgently need, who is best placed to assist them, and the value of this information for effective and timely humanitarian assistance.

# OCHA's Humanitarian Programme Cycle: How we manage humanitarian response

The humanitarian programme cycle (HPC) is a coordinated series of actions undertaken to help prepare for, manage and deliver humanitarian response. It consists of five elements coordinated in a seamless manner, with one step logically building on the previous and leading to the next.

Successful implementation of the humanitarian programme cycle is dependent on effective emergency preparedness, effective coordination with national/local authorities and humanitarian actors, and information management.

Click below to learn more about the HPC elements.

1906



## Related Features



(/story/evaluating-humanitarian-response-major-crises)

Evaluating humanitarian response to major crises (/story/evaluating-humanitarian-response-major-crises)



(/story/iraq-%E2%80%9Cwe-feel-safe-here%E2%80%9D)

Iraq: "We feel safe here" (/story/iraq-%E2%80%9Cwe-feel-safe-here%E2%80%9D)

✉ (mailto:?subject=OUR%20WORK&body=) f (https://www.facebook.com/sharer/sharer.php?
u=http%3A%2F%2Fwww.unocha.org%2Four-work) 🐦 (https://twitter.com/intent/tweet?text=OUR%20WORK -
&url=http%3A%2F%2Fwww.unocha.org%2Four-work) 🇬+ (https://plus.google.com/share?
url=http%3A%2F%2Fwww.unocha.org%2Four-work) 🇮🇳 (https://www.linkedin.com/shareArticle?
mini=true&url=http%3A%2F%2Fwww.unocha.org%2Four-
work&title=OUR%20WORK&summary=&source=http%3A%2F%2Fwww.unocha.org%2Four-work)

## NEWS & UPDATES



Latin America and Caribbean: Over 10.6 million affected by disasters in 2016 (/story/latin-
america-and-caribbean-over-106-million-affected-disasters-2016)



South Sudan: CERF provides lifeline to emergency response activities (/story/south-sudan-
cerf-provides-lifeline-emergency-response-activities)

# Core Publications

1908

# EXHIBIT 173

Home    Mission Team    Contact    Sitemap        26 April 2017

ABOUT PALESTINE    STATUS OF PALESTINE    MISSION DOCUMENTS    UN RESOLUTIONS    CONFERENCES    PALESTINE PROGRAMMES

SPECIAL MEETINGS AND EVENTS    INTERNATIONAL INSTRUMENTS

You are here: Home / About Palestine / Diplomatic Relations

## Diplomatic Relations

The State of Palestine currently enjoys bilateral recognition from 137 States. Many States extended recognition to the State of Palestine following the Declaration of Independence by the Palestine National Council on 15 November 1988 in Algeirs, Algeria. Other States recognized the State of Palestine in the recent period following extensive bilateral and multilateral diplomatic efforts. Below you will find a list of those States which have extended recognition to the State of Palestine and their corresponding date of recognition.

Show 50 ▼ entries        Search: _____

| State | Date of Recognition |
|-------|---------------------|
| Afghanistan | 16 November 1988 |
| Albania | 17 November 1988 |
| Algeria | 15 November 1988 |
| Angola | 6 December 1988 |
| Antigua & Barbuda | 22 September 2011 |
| Argentina | 6 December 2010 |
| Azerbaijan | 15 April 1992 |
| Bahrain | 15 November 1988 |
| Bangladesh | 16 November 1988 |
| Belarus | 19 November 1988 |
| Belize | 9 September 2011 |
| Benin | May 1989 |
| Bhutan | 25 December 1988 |
| Bolivia | 17 December 2010 |
| Bosnia & Herzegovina | 27 May 1992 |
| Botswana | 19 December 1988 |
| Brazil | 3 December 2011 |

Search this website ...    Search

STAY CONNECTED



Follow @Palestine_UN

UN Membership Submission



Click to enable Adobe Flash Player

Find Your Favorite Topic

1967 2014forPalestine Abbas Advancement of women application Assistance Children Dr. Riyad Mansour East Jerusalem Gaza Gaza Strip General Assembly Geneva Conventions ICC ICJ international law Israel Israeli Occupation Israeli Practices Israeli Settlement Jerusalem Kerry Letter occupation Open Debate Palestine Palestine at the UN Palestine Mission to the UN Palestinian Children Peace refugees Secretary-

1910

| | |
|---|---|
| Brunei Darussalam | 17 November 1988 |
| Bulgaria | 25 November 1988 |
| Burkina Faso | 21 November 1988 |
| Burundi | 22 December 1988 |
| Cambodia | 21 November 1988 |
| Cape Verde | 24 November 1988 |
| Central African Republic | 23 December 1988 |
| Chad | 1 December 1988 |
| Chile | 7 January 2011 |
| China | 20 November 1988 |
| Comoros | 21 November 1988 |
| Congo (Republic of) | 5 December 1988 |
| Costa Rica | 5 February 2008 |
| Cote d' Ivoire | |
| Cuba | 16 November 1988 |
| Cyprus | 18 November 1988 |
| Czech Republic | 18 November 1988 |
| Democratic People's Republic of Korea | 24 November 1988 |
| Democratic Republic of Congo | 18 December 1988 |
| Djibouti | 17 November 1988 |
| Dominica | 19 September 2011 |
| Dominican Republic | 15 July 2009 |
| Ecuador | 27 December 2010 |
| Egypt | 18 November 1988 |
| El Salvador | 25 August 2011 |
| Ethiopia | 4 February 1989 |
| Equatorial Guinea | May 1989 |
| Gabon | 12 December 1988 |
| Gambia | 18 November 1988 |
| Georgia | 25 April 1992 |
| Ghana | 29 November 1988 |
| Grenada | 25 September 2011 |
| Guatemala | 9 April 2013 |

General **security council** settlements settler
settler terror **State of Palestine** Status of Palestine
United Nation **united nations** United
States **UNRWA UN Security**
Council **War Crimes** West Bank

WP Cumulus Flash tag cloud by Roy
Tanck requires Flash Player 9 or better.

## CALENDAR OF POSTS

*April 2017*

| M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

« Mar

## ARCHIVES

ARCHIVES

Select Month ▼

Showing 1 to 50 of 137 entries    ‹ Previous   <u>Next</u> ›

Like 414   G+1

## Recent Posts

- Statement by Ambassador Dr. Riyad Mansour before the United Nations Security Council, Open Debate on the Situation in the Middle East, including the Palestine Question, New York, 20 April 2017 20 April 2017
- 13 April 2017 – Palestinian Prisoners Day 13 April 2017
- 31 March 2017 – New Illegal Israeli Settlement 31 March 2017
- 23 March 2017 – Israel Continues to Violate Security Council Resolution 2334 28 March 2017
- 7 February 2017 – Israeli Illegal So-Called "Regularization Bill" 08 February 2017
- 1 February 2017 – Israeli Settlement Crimes and Provocations 01 February 2017
- 27 January 2017 – Additional Israeli Illegal Settlement Activities and Provocations 30 January 2017

## STAY CONNECTED



## Mission of the State of Palestine to the UN

- About Palestine
  - Government of the State of Palestine
  - Palestine Liberation Organization
  - Diplomatic Relations
- Status of Palestine
  - Membership Application
  - Resolutions & Reports on Status
- Mission Documents
  - Statements
  - Identical Letters
  - Press Releases
  - Mission Reports on GA
  - Fact Sheets
- UN Resolutions
  - General Assembly
  - 10th Emergency Special Session
  - Security Council
  - The Wall – Landmark Documents
- Conferences
- Palestine Programmes
- Special Meetings and Events
  - Arria-Formula Meetings of the Security Council
    - May 2016: Protection of Civilians
    - Oct 2016: Illegal Israeli Settlements: Obstacles to Peace and the Two-State Solution
  - Palestine Flag at the UN
    - Raising of Palestine's Flag at the United Nations
  - International Day of Solidarity with the Palestinian People Observances
    - 29 November 2016
  - 2017: International Year to End the Israeli Occupation
  - International Year of Solidarity with the Palestinian People 2014
    - 2014 for Palestine Events
    - 2014 for Palestine Statements
- International Instruments
  - Treaties & Conventions
- Home
- Mission Team
  - Welcome Message
  - Ambassador
  - Former Ambassadors
- Contact
  - Internships
- Sitemap

Diplomatic Relations

1913

# EXHIBIT 174

# U.S. Department of State
## Diplomacy in Action

<u>Bureau of Democracy, Human Rights and Labor (/j/drl/)</u>
## Country Reports on Human Rights Practices for 2014
<u>Secretary's Preface</u>
<u>Translations (http://www.humanrights.gov/dyn/hrr-translations/)</u> | <u>Other Years (/j/drl/rls/hrrpt/index.htm)</u>
| <u>Basic Text (/j/drl/rls/hrrpt/2014/index.htm)</u> | <u>Slideshow (/j/drl/photos/hrr)</u>

**HUMANRIGHTS.GOV** <u>(http://www.humanrights.gov/)</u>

<u>Learn more (http://www.humanrights.gov/)</u> about the U.S. Government's engagement on human rights abroad

# Secretary's Preface

The fundamental struggle for dignity has been a driving force in human history worldwide, and what drives us toward it is a set of universal values and aspirations.

Life, liberty, and the pursuit of happiness are ideals that cannot be contained by national boundaries or ocean shores.

That is why it is especially troubling that so many people in so many places face grotesque restrictions on their freedoms and rights from their own governments.

For far too many people, 2014 was defined by suffering and abuse perpetrated by terrorist groups exploiting religious discourse and divisions to advance their totalitarian ideology, or by governments, such as Syria, sometimes acting in the name of combatting terrorism.

In parts of the Middle East and Africa, violent extremists have made it clear that not only do they have zero regard for human rights; they have zero regard for human life, period. We've seen groups like ISIL burn human beings alive, barbarically behead prisoners, sell girls into slavery, and execute innocents widely and indiscriminately.

Almost every week brings new examples of just how far the evil of these groups reaches.

We all witnessed the brutality and nihilism of the horrific attacks by Pakistani Taliban and Boko Haram on schoolchildren, the assassinations of *Charlie Hebdo* journalists, and numerous outrages and killings carried out by ISIL. The rise of ISIL was in part a consequence of, and illustrated the dangers of, atrocities committed by the government of Syria and failures of inclusive governance in Iraq.

Meanwhile, governments in China, Egypt, Eritrea, Ethiopia, Iran, Russia, and Saudi Arabia, among others, continued to stifle free and open media and the development of civil society through the imprisonment of journalists, bloggers, and non-violent critics. In Thailand, the military overthrew a democratically-elected government, repealed the constitution, and severely limited civil liberties; subsequent efforts by the military government to rewrite the country's constitution and recast its political institutions raised concerns about lack of inclusivity in the process.

In the face of all this, the human aspiration for political liberty and honest, non-abusive governance remained strong.

Around the world, more people chose their leaders in competitive elections than ever before. On every continent, celebrations marked the 25th anniversary of the fall of the Berlin Wall, while the same demands for human rights and accountable governance that gave rise to that historic day continue to spread.

1915

Case 2:16-cv-04435-PA-MRW    Document 97-10   Filed 05/08/17   Page 46 of 144   Page ID
#:9173

In Afghanistan, millions of people defied threats of violence to choose a new President representing the country's first peaceful transfer of power from one elected government to another. India's parliamentary contest in April 2014 was one of the largest elections in history. Indonesia's young democracy saw a peaceful electoral transition to a leader who had challenged its traditional centers of power. Tunisia held its first free and fair presidential election since the 2011 revolution.

Activists in countries like Russia and Venezuela showed enduring strength and courage despite increasing restrictions, harassment, and incarceration in their peaceful pursuit of dignity and freedom.

As President Obama said to the United Nations General Assembly in September 2014, "all of us – big nations and small – must meet our responsibility to observe and enforce international norms. We are here because others realized that we gain more from cooperation than from conquest. We call upon others to join us on the right side of history – for while small gains can be won at the barrel of a gun, they will ultimately be turned back if enough voices support the freedom of nations and peoples to make their own decisions… [We] will not shy away from the promise of the Universal Declaration of Human Rights…We choose to work for the world as it should be."

As I travel the world in my capacity as Secretary of State, I regularly meet with brave individuals who risk their lives each and every day to advance human rights. They do so in spite of the threat of violence, and in the face of government attempts to silence their voices.

We at the Department of State will continue to press governments to uphold fundamental freedoms. We remain committed to advocating on behalf of civil society and speaking out for the protection of human rights for all individuals.

Now in their 39th year, these annual Congressionally-mandated reports provide a picture of how the promise of the Universal Declaration of Human Rights is being fulfilled. They help promote awareness regarding the reality of human rights in many of the dark corners of the world and the glimpses of light that brave and committed human rights defenders provide.

They are used by the Department of State and other government agencies needs to guide American foreign policy, and by Congress in its determination and allocation of foreign aid and security sector assistance. They also signal to the human rights defenders and activists under siege that the U.S. government recognizes their struggle and stands with civil society in its unending effort to preserve human rights.

I hereby transmit the Department of State's *Country Reports on Human Rights Practices for 2014* to the United States Congress.

*John F. Kerry*
*Secretary of State*

---

---

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department.
External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.
Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, download Adobe Acrobat Reader (http://get.adobe.com/reader/).

1916

# EXHIBIT 175

## ARTICLE: A HOLISTIC APPROACH TO THE CONFLICT OF ISRAEL AND PALESTINE: WHERE WE ARE NOW AND WHERE WE CAN GO

Spring, 2013

**Reporter**

19 Ann. Surv. Int'l & Comp. L. 105 *

**Length:** 24467 words

**Author:** _Oraneet Orevi_*

* J.D., May _2013_, Golden Gate University School of Law. My deepest gratitude and special thanks to Cara B. Hughes for her editing expertise and for challenging me to think critically about _conflicts_, to be a more effective social justice activist, and to believe in myself.

## Highlight

OVERVIEW

 The Israeli-Palestinian _conflict_ has spanned over six decades, resulting in brutal deaths of civilians, assassinations of political figures, and casualties of countless soldiers on both sides. Dominant discourse on the _conflict_ focuses largely on the prevalence of violence and State-figures' failure to properly address the issue. This paper will take a different _approach_ by exploring the legality under International Law of the continual expansion of Israeli settlements in the West Bank and by illuminating the peacebuilding efforts of grassroots organizations focused on education, uniting communities, and engaging international actors. A discussion of the history is important not only to inform present context, but also to impart wisdom and lessons from our past that may inform our present and future. However, there is only so much criticism a _conflict_ _can_ undergo before it becomes destructive and staggering. While Part One focuses on the settlements, Part Two moves beyond the focus of a critical eye on the _conflict_ toward an emphasis on education and peacebuilding efforts activists have taken to promote a _holistic approach_ to achieving a lasting and just peace.

 In light of this paper's topic on settlements and non-violence, it is important for me to acknowledge and address that I am an Israeli-American living in the United States. I have the privilege of not experiencing the _conflict_ on a daily basis contrary to that of my family living in _Israel_, the Palestinians living in _Palestine_, [1] and the Palestinian citizens living within the borders of _Israel_. Finally, during the most recent peak of violence in _Palestine_ and _Israel_ between Hamas and the Israeli government, it is imperative to recognize the suffering of both Palestinians and Israelis subjected to the violence and demand that it stop. This article is dedicated to them.

 PART ONE - AN EXAMINATION OF THE CONSTRUCTIONS AND EXPANSION OF JEWISH SETTLEMENTS AND ITS EFFECTS IN THE WEST BANK UNDER INTERNATIONAL HUMANITARIAN LAW - LAWS OF ARMED _CONFLICT_

## Text

[*106]

I. INTRODUCTION

---

[1] For the purposes of this article and to further contextualize this paper, the West Bank and Gaza (or what is slated to be the future Palestinian State) will be referred to as _Palestine_.

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 49 of 144   Page ID #:9176

Page 2 of 34

19 Ann. Surv. Int'l & Comp. L. 105, *106

The Israeli government has authorized the continuing construction of residential dwellings in the West Bank area of what will eventually be part of the Palestinian state. [2] With *Israel*'s expansion efforts has come destruction of property and transfer of populations. [3] While *Israel* maintains that the construction and expansion of settlements is a legal exercise of its sovereign right, [4] Palestinian officials sees it as an obstacle to peace that undermines a two-state solution and the Palestinian right to self-determination. [5] Furthermore, the international community views the Israeli settlement policies as violations of international law. [6] Section I will explore the legitimacy of Israeli actions in pursuing the settlement [*107] policies in light of obligations under International Humanitarian Law - Laws of Armed *Conflict* (IHL-LOAC).

Section II will examine the history of the Israeli-Palestinian *conflict* to illuminate how *Israel* came to be an Occupying Power. It will show how *Israel*'s policies regarding the settlements in the West Bank, as well as *Israel*'s actions to accommodate construction and implementation of the settlements, are inconsistent with *Israel*'s obligations as an Occupying Power delineated in the Fourth Geneva Convention (4GC) and Protocol I Additional to the Geneva Convention (P1AGC). Section III will show how the Israeli-Palestinian *Conflict* could be characterized as an international armed *conflict* in which peoples are fighting against colonial domination, alien occupation, and racist regimes (CARs) in the exercise of their right of self-determination. Part IV concludes that *Israel* is in violation of International Humanitarian Law for its expansionist efforts and continued construction of Israeli settlements in the West Bank.

II. *ISRAEL* AS AN OCCUPYING POWER THAT VIOLATES ITS OBLIGATIONS UNDER INTERNATIONAL HUMANITARIAN LAW - LAWS OF ARMED *CONFLICT*.

A. History of the establishment of the State of *Israel* and the armed *conflict* that led to Israeli occupation of the West Bank

In November 1947, the United Nations General Assembly proposed Resolution 181 to recommend a Partition Plan for two separate states in British-Mandated *Palestine*: a Jewish State and a Palestinian State. [7] The surrounding Arab nations and Palestinian Arabs rejected the recommendation and refused to adopt Resolution 181. [8] However,

---

[2] Joel Greenberg, After U.N. vote, Netanyahu authorizes new building in settlements, THE WASHINGTON POST (November 30, 2012), *http://articles.washingtonpost.com/2012-11-30/world/355858511maaleh-adumim-israeli-construction-denunciations-from-palestinian-officials.* (last visited May 27, *2013*).

[3] Aid agencies call for immediate end to demolitions and settlement expansion as *Israel* displaces Palestinians acrossthe West Bank, THE UNITED NATIONS INFORMATION SYSTEM ON THE QUESTION OF *PALESTINE* (UNISPAL)(May 1, *2013*), *http://unispal.un.org/UNISPAL.NSF/0/998B72485D85EBD385257B5E004DF3F8.* (last visited May 25, *2013*).

[4] *Israel* Ministry of Foreign Affairs, *http://mfa.gov.il/MFA/ForeignPolicy/FAQ/Pages/FAQPeaceprocesswithPalestiniansDec2009.aspx#Settlements.* (last visited May 25, *2013*).

[5] Palestinian official: Israeli settlements are main obstacle to peace, MIDDLE EAST MONITOR (May 21, *2013*), *http://www.middleeastmonitor.com/news/middle-east/6079-palestinian-official-israeli-settlements-are-main-obstacle-to-peace-.* (last visited May 25, 3013).

[6] Yuval Ginbar, Israeli Settlement in the Occupied Territories as a Violation of Human Rights: Legal and Conceptual Aspects 25 B'TSELEM (Yael Stein March 1997), available at *http://www1.idc.ac.il:549/2004/* 13009.pdf.

[7] Nicholas Rostow, The Historical and Legal Contexts of *Israel*'s Borders, 77, JERUSALEM CENTER FOR PUBLIC AFFAIRS, available at *http://www.jcpa.org/text/israel-rights/kiyum-rostow.pdf*

[8] PUBLIC BROADCAST STATION, History of the Israeli-Palestinian *Conflict*, (December 2001), *http://www.pbs.org/pov/pdf/promiese/promises-timeline.pdf.* (last visited Apr. 12, 2012).

the Jews accepted the recommendation and proceeded to establish the Jewish State of *__Israel__* on 14 May 1948.  [9]
The United Nations accepted the proclamation of the State of *__Israel__*, despite the fact that the newly founded state
"was established on a more extensive territory than recommended in the partition plan."  [10] As a result of the
establishment of *__Israel__*, five Arab armies attacked *__Israel__*, including Transjordan (*__now__* [*108] Jordan), Egypt, Iraq,
Saudi Arabia, and Syria.  [11] After the hostilities ended, *__Israel__* signed four Armistice Agreements to institute a
ceasefire with Jordan, Egypt, Syria, and Lebanon.  [12] The Armistice Agreement between *__Israel__* and the Hashemite
Jordan Kingdom, signed on 3 April 1949, established demarcation lines between Israeli and Jordanian forces; the
borders came to be known as the Green Line.  [13]

 The borders of the Armistice Agreement indicated that the West Bank remained under the control of Jordanian
occupation and were intended to be temporary until a final peace settlement could be reached.  [14] On 25 April
1950, Jordan annexed the West Bank, declaring the West Bank as sovereign Jordanian territory and offering
Jordanian citizenship to the Palestinian residents of the West Bank.  [15] However, Jordanian assertion of State
sovereignty over the West Bank was pronounced illegal by the international community and was recognized by only
two states, the United Kingdom and Pakistan.  [16]

 On 5 June 1967, *__Israel__* executed a pre-emptive strike on Egypt that ultimately drew Jordan and Syria into a
regional war  [17] known as the 1967 Arab-Israeli War.  [18] By the end of the war, *__Israel__* took control of the West Bank
and other territories outside of the agreed upon Israeli borders in the Jordan-*__Israel__* Armistice Agreement.  [19] In
doing so, *__Israel__* took control overland that had been previously mandated as the Palestinian homeland. While the
international community considers the West Bank occupied by *__Israel__* after the 1967 Arab-Israeli War, *__Israel__* insists
that its control of the West Bank does not make it an "occupied territory," but rather a "disputed territory."  [20]  [*109]

 B. Occupied Territories vs. Disputed Territories

---

[9]  Id.

[10]  Sara Yarden, The Right to Self Determination, DIAKONIA (26 August 2009), *http://www.diakonia.se/sa/node.asp?node=3142*.
(last visited Mar. 18, 2012) (noting that *__Israel__* included some of the territories that were to be reserved for the Palestinian
Mandate).

[11]  Rostow, supra note 7, at 78.

[12]  UNITED NATION SECURITY COUNCIL, HASHEMITE JORDAN KINGDOM-*__ISRAEL__* ARMISTICE AGREEMENT
(DOCUMENT          S/1302/REV.1       1/       3       April       1949),       available       at
*http://unispal.un.org/UNISPAL.NSF/0/F03D55E48F77AB698525643B00608D34*.

[13]  Id.

[14]  Id.

[15]  PHILLIP ROBINS, HISTORY OF JORDAN 73 (Cambridge University Press 2004).

[16]  Three  Myths  About  the  'Occupation,'  JERUSALEM  CENTER  FOR  PUBLIC  AFFAIRS,  available  at
*http://jcpa.org/text/occupation* responses.pdf.

[17]  Key  Maps,  BBC  NEWS,  *http://news.bbc.co.uk/2/shared/spl/hi/middleeast/03/v3israelpalestinians/maps/html/sixdaywar.stm*.
(last visited May 28, *__2013__*).

[18]  PUBLIC BROADCAST STATION, supra note 8, at 3. The 1967 Arab-Israeli War is known as The Six Day War to Israelis and
as al-Naksah or "the setback" to Palestinians.

[19]  Id.

[20]  *__Israel__*  Ministry  of  Foreign  Affairs,  Israeli  Settlements  and  International  Law,  (May  20,  2001),
*http://www.mfa.gov.il/MFA/Peace+Process/Guide+to+the+Peace+Process/Israeli+Settlements+and+International+Law.html*.
(last visited Feb. 20, 2012).

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 51 of 144   Page ID #:9178

Page 4 of 34

19 Ann. Surv. Int'l & Comp. L. 105, *109

*Israel*'s interpretation of the Fourth Geneva Convention forms the basis of its contention that the West Bank is not an occupied territory. Article 2 of the Fourth Geneva Convention defines occupation as territory that includes "all cases of partial or total occupation of the territory of a High Contracting Party by another High Contracting Party." [21] *Israel* interprets this applicable provision of the Fourth Geneva Convention to mean that a territory only becomes occupied when a High Contracting Party that is a signatory to the Fourth Geneva Convention conquers territory of another High Contracting Party that is a signatory to the same. Thus, *Israel* maintains that because the West Bank was not under the sovereign control of any State before 1967, the West Bank could not be considered "occupied" when *Israel* seized control in the 1967 War.

 On the other hand, the United Nations (UN) is unpersuaded that the application of the laws relating to occupation or "belligerent occupation" is contingent upon sovereign control of a territory. The UN has consistently referred to the territories won by *Israel* after the 1967 War as "occupied territories."  [22] An interpretation of occupation that does not include a sovereign control element has been reinforced in the language used by several actors within the international community to refer to the *conflict*. For example, after the 1967 War, the UN Security Council passed Resolution 242 requiring the "withdrawal of *Israel* armed forces from territories occupied in the recent *conflict*." [23] Another example occurred in October 2001, when UN Special Rapporteur, John Durgard, stated unequivocally in his report to the I.C.J. that *Israel* is an Occupying Power that is indeed occupying the territories, because *Israel* has the military capacity to exercise control over the West Bank and employs its military to do so.  [24] Furthermore, the UN International Court of Justice issued an advisory opinion entitled, "Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory" stating,

 At the close of its analysis, the Court notes that the territories situated between the Green Line and the former eastern boundary of *Palestine* under the Mandate were occupied by

 **[*110]**

 *Israel* in 1967 during the armed *conflict* between *Israel* and Jordan. Under customary international law, the Court observes, these were therefore occupied territories in which *Israel* had the status of occupying Power. Subsequent events in these territories have done nothing to alter this situation. The Court concludes that all these territories (including East Jerusalem) remain occupied territories and that *Israel* has continued to have the status of occupying Power. [25]

 The Israeli Supreme Court itself has declared that the Fourth Geneva Convention applies to the West Bank - or Judaea and Samaria - and in doing so, defined that area as an occupied territory. In the case, Jam'iyyat Iskan al-Mu'aliman al-Mahddudat al-Mas'uliyyah, Teacher's Housing Cooperative Society Duly Registered at Judea and Samaria Headquarters v. Commander of IDF Forces in Judea and Samaria et al Piskei Din, Justice Aharon Barak wrote, "as regards the obligation of the occupying state vis-<grave>a-vis the international community, the Fourth Geneva Convention are found both in customary international law and treaty-based law, to which *Israel* is sic party,

---

[21]  Geneva Convention (IV)Relative to the Protection of Civilian Persons in Time of War art. 2, Aug. 12, 1949, 75 UNTS 287, available at *http://www.icrc.org/ihl.nsf/full/380*.

[22]  S.C. RES. 242, (22 Nov. 1967), available at *http://unispal.un.org/unispal.nsf/0/7D35E1F729DF491C85256EE7* 00686136. (emphasis added).

[23]  Id.

[24]  Report of the Special Rapporteur of the Commission on Human Rights on the situation of human rights in the Palestinian territories occupied by *Israel* since 1967 4 Annex I to Request for an Advisory Opinion Submitted by *Palestine* (October 2001), available at *http://domino.un.org/pdfs/Annex.pdf*.

[25]  Summary of the Advisory Opinion on Legal Consequences of Construction of a Wall in the Occupied Palestinian Territories (emphasis added), INTERNATIONAL COURT JUSTICE (9 July 2004), available at *http://www.icj-cij.org/docket/files/131/1677.pdf*.

19 Ann. Surv. Int'l & Comp. L. 105, *110

and they apply to the West Bank." [26] Because the applicable provisions of the Fourth Geneva Convention regulate an occupying power that has occupied territory **_now_** under the High Contracting Power's control, the Israeli Supreme Court's application of the Fourth Geneva Convention to the West Bank reveals that it considers the West Bank to be an occupied territory. And again, on 30 May 2004, the Israeli Supreme Court, High Court of Justice, referenced in the case Beit Sourik Village Council v. The Government of **_Israel_**, that "**_Israel_** has been holding the areas of [the West Bank] in belligerent occupation" since 1967. [27]

Indeed, **_Israel_**'s own Foreign Minister's legal counsel, Theodore Meron, "noted with embarrassment, **_Israel_** itself had recognized the status of the West Bank as an occupied territory by publishing military decrees declaring explicitly that it could respect the Geneva Conventions." [28]

Nevertheless, the Israeli government maintains the territories are not occupied and the United Nations' interpretation is not determinative of **[*111]** the issue. However, it is my position that **_Israel_** is an Occupying Power, because the Israeli conquest of land reserved for a Palestinian State establishes an occupation. Therefore, the following sub-sections of Part II explore the applicability of international humanitarian laws to the armed **_conflict_** as it pertains to **_Israel_**'s obligations as an Occupying Power of the West Bank.

C. Characterization of the Palestinian-Israeli **_Conflict_** and Application of IHL-LOAC Obligations in the Context of an Occupying Power

Assuming the UN Security Council's position is correct that **_Israel_** is occupying the West Bank, then the **_conflict_** could be classified as a Common Article 2 traditional state v. state international armed **_conflict_** in which the Hague Convention, Four Geneva Conventions, and both Additional Protocols apply. However, if **_Israel_**'s position that the territories are not occupied is assumed, then the **_conflict_** could be classified as one of the following: an international armed **_conflict_** under CARs (colonial domination, alien occupation, racist regime, self determination), a Common Article 3 non-international internal armed **_conflict_**, or a Common Article 3 Non-international armed **_conflict_**. This section will examine the first two potential classifications in turn, because they are the most applicable to the Israeli-Palestinian **_conflict_**.

1. State Versus State International Armed **_Conflict_**

In order for the Israeli-Palestinian **_conflict_** to be characterized as a traditional international armed **_conflict_**, both parties to the **_conflict_** must be a State. While it is not contested that **_Israel_** established its independence in 1948, the question of **_Palestine_** achieving statehood is more complicated and thus requires further analysis. From an international legal standpoint, the achievement of statehood for the **_Palestine_** Authority (PA) would result in the characterization of a State v. State armed **_conflict_**. Therefore, if **_Palestine_** is recognized as a State, all Four Geneva Conventions, the Hague Regulations, and both Additional Protocols to the Geneva Conventions would apply to the Israeli-Palestinian **_conflict_**. As a result, the Israeli government and the PA would be forced to comply with a larger body of applicable laws of armed **_conflict_** (listed above) with the exception of those laws that were not ratified by the PA or **_Israel_**, namely the Hague Regulations and Additional Protocols, in which case the application of customary law status would have to be established. Statehood **_can_** be proven by either: 1) being a recognized member of the United Nations or 2) by having attributes of statehood. **[*112]**

**_Palestine_** has recently been deemed a non-member observer State, but it does not enjoy full membership recognition in the UN. In November 2012, member States of the UN voted on the bid for Palestinian statehood. One hundred thirty eight of the 193 States of the UN recognized the State of **_Palestine_**, not including the United States

---

[26]  Ginbar, supra note 6, at 6.

[27]  Beit Sourik Village Council v. The Government of **_Israel_**, High Court of Justice 2056/04, **_Israel_**: Supreme Court, 30 May 2004, available at _http://elyon1.court.gov.il/fileseng/04/560/020/a28/04020560.a28.pdf._

[28]  TOM SEGEV, 1967: **_ISRAEL_**, THE WAR, AND THE YEAR THAT TRANSFORMED THE MIDDLE EAST 576 (Metropolitan Books 2005). (emphasis added).

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 53 of 144   Page ID
#:9180

Page 8 of 34

19 Ann. Surv. Int'l & Comp. L. 105, *112

and **_Israel_** who opposed the move.  [29] As a result of the majority vote, the United Nations General Assembly "resolution elevated [**_Palestine_**'s] status from 'non-member observer entity' to 'non-member observer state.'"  [30] As a non-member observer State, **_Palestine_** is in the same position as The Vatican, for instance, but like it, **_Palestine_** cannot vote on any resolutions. It is notable that when the former republic of Yugoslavia was broken up into six separate States, recognition only required the formal acknowledgement by one other UN member State.  [31] Therefore, some may argue that the 138 votes were sufficient to establish Palestinian statehood.

However, one of the five permanent members of the Security Council, the United States, opposed the bid and would likely respond accordingly if the matter were brought to the Security Council.  [32] Because observer status does not require Security Council approval, **_Palestine_** has still not received full membership recognition in the United Nations.  [33]

Accordingly, there are contradicting views as to whether non-member observer State status accords statehood to **_Palestine_**. Therefore, it is necessary to conduct an additional analysis of **_Palestine_**'s statehood under a different set of criteria - the attributes of statehood as set out in the Montevideo Convention. To establish that **_Palestine_** has become a de facto State, the Montevideo Convention of 1933 on the Rights and Duties of States (hereinafter the Montevideo Convention) sets out the traditional criteria for (and attributes of) statehood including: 1) a permanent population 2) defined territory 3) government and 4) the capacity to enter into relations with other states.  [34]  **[*113]**

Before delving into the substantive analysis of statehood, an explanation of the Palestinian Liberation Organization (PLO) and Palestinian Authority (PA) is necessary. The PLO was established in 1964 and was later "recognized as 'the sole legitimate representative of the Palestinian people' at the 1974 Arab League Summit in Rabat Morocco." [35] The PA is a subsidiary agency of the PLO, temporarily "established as a result of the 1993 Oslo Declaration of Principles," but thus far "remains the governing body of the autonomous areas in the West Bank and the Gaza Strip." [36] The temporal aspect of the PA's control has to do with the fact that the PA was created as an interim administrative body until a final status negotiation commences. While the PLO conducts foreign relations, however, the PA has no foreign relations powers. For purposes of avoiding the use of the term "**_Palestine_**" in the analysis of statehood for **_Palestine_**, PLO and PA will be used interchangeably.

The PA exhibits several attributes of statehood. It is uncontested that the PA has a permanent population - Palestinians.  [37] For example, the Israeli human rights organization, B'Tselem, estimated in its 2012 Annual Report, that there are approximately 2.5 million Palestinians living in the West Bank. According to the Central Intelligence

---

[29] Louis Charbonneau, Palestinians Win Implicit U.N. Recognition of Sovereign State, REUTERS (November 29, 2012), _http://www.reuters.com/article/2012/11/29/us-palestinians-statehood-idUSBRE8AR0EG20121129_. (last visited Jan. 26, **_2013_**).

[30] David Ariosto, Michael Pearson, U.N. Approves Palestinian 'observer state' bid, CNN (November 30, 2012), _http://www.cnn.com/2012/11/29/world/meast/palestinian-united-nations_. (last visited Jan. 27, **_2013_**).

[31] LORI F. DAMROSCH ET. AL, INTERNATIONAL LAW CASES AND MATERIALS 315 (Louis H. Higgins 2001).

[32] But cf. infra text accompanying note 53.

[33] Ariosto, supra note 30.

[34] Montevideo Convention on the Rights and Duties of States (1933), 165 L.N.T.S. 19

[35]    PLO-PA    Comparison    Chart,    PROCON.ORG,    _http://israelipalestinian.procon.org/view.additional-resource.php?resourceID=904_. (last visited May 15, **_2013_**).

[36] Id.

[37] Iain Scobbie, Alon Margalit, Sarah Hibbin, Recognizing Palestinian Statehood, YALE JOURNAL OF INTERNATIONAL AFFAIRS, available at _http://yalejournal.org/2011/08/recognizing-palestinian-statehood/_.

19 Ann. Surv. Int'l & Comp. L. 105, *113

Agency, an estimated 2,164,311 Palestinians are living in the West Bank as of July **_2013_**. [38] Palestinians have been around since long before the establishment of **_Israel_** and although there is no specified number requirement for a population to be permanent, [39] a large number of Palestinians live in the occupied territories, identify themselves as Palestinians, and have the reproductive capabilities to procreate. Therefore, the PA has a permanent population.

 Establishing statehood under the Montevideo Convention also requires that the State have a defined territory. As reflected in various resolutions and opinions, the UN has formally named the territories controlled by **_Israel_** the "Occupied Palestinian Territories" (OPT). For example, UN Security Council Resolutions 242 and 338 demand that **_Israel_** withdraw from the territories it occupied in the 1967 War, including the West **[\*114]** Bank, and withdraw to the 1949 armistice lines. [40] This demand indicates that the territories occupied by **_Israel_** during the war constitute the territories of the Palestinian State.  MAP 1
[SEE TABLE IN ORIGINAL]


et

 However, according to the agreement between Jordan and **_Israel_**, the armistice lines were not intended to be final borders. Pursuant to Article II(2), the demarcation lines proposed by the agreement were "without prejudice to future territorial settlements or boundary lines or claims of either Party related thereto." [41] Therefore, the Armistice Agreement "was not intended to be a final settlement of border disputes, but was a provisional measure intended to facilitate the transition from a truce to a future permanent peace settlement in the region." [42] Nevertheless, in 1948 when **_Israel_** was applying for UN membership, U.S. representative to the UN Security Council, Phillip Jessup, argued in favor stating, "both reason and history demonstrate that the concept of territory does not necessarily include precise delimitation of the boundaries of that territory." [43] Subsequently, **_Israel_** was recognized as a State. Therefore, the lack of exact boundaries did not hinder statehood for **_Israel_**. Many renowned scholars on the topic support Phillip Jessup's reasoning, asserting that past practice reveals that "the existence of full defined **[\*115]** frontiers is not required" to establish a defined territory. [44] Thus, although it does not follow the traditional criteria for statehood, lack of exact boundaries is not fatal to the determination of whether or not **_Palestine_** has a defined territory.

 The third element of statehood established under the Montevideo Convention mandates that there be a government. The PLO **_can_** be considered a government in that it has been recognized by the international community as the representative of the Palestinian people. As mentioned above, in 1974, the UN General Assembly (GA) recognized the Palestinian Liberation Organization as the official representative of the Palestinian people in Resolution 3236. [45] Thereafter, in Resolution 3237, the GA granted the PLO observer status in the UN,

---

[38]   Human Rights in the Occupied Territories: Annual Report 2011 3 B'TSELEM, available at _http://www.btselem.org/sites/default/files2/2011annualreporteng.pdf_; see also The World Factbook, Central Intelligence Agency, _https://www.cia.gov/library/publications/the-world-factbook/geos/we.html_.

[39]   DAMROSCH, supra note 31, at308.

[40]   Scobbie, supra note 37.

[41]   Rostow, supra note 7, at 78.

[42]   Yoav Tadmor, The Palestinian Refugees of 1948: The Right to Compensation and Return, 411, TEMPLE INTERNATIONAL AND COMPARATIVE LAW JOURNAL (Fall 1994), 8 TMPICLJ 403.

[43]   DAMROSCH, supra note 31, at 306.

[44]   CHRIS N. OKEKE, CONTROVERSIAL SUBJECTS OF CONTEMPORARY INTERNATIONAL LAW: AN EXAMINATION OF THE NEW ENTITIES OF INTERNATIONAL LAW AND THEIR TREATY MAKING CAPACITY 88 (Rotterdam University Press 1973), (citing Ian Brownlie, op. cite., p.67).

[45]   G.A. Res. 3210 (XXIX) [1974]; 3236 (XXIX) [1974].

19 Ann. Surv. Int'l & Comp. L. 105, *115

which allowed the PLO to have similar rights to other members of the UN except for voting on resolutions. [46] Also, in 1993, **_Israel_** officially recognized the PLO as the representative of the Palestinian people in the international treaty known as the Israeli-Palestinian Declaration of Principles on Interim Self-Government Arrangements. This treaty "provided for a transitional period of Palestinian self-rule in the West Bank and the Gaza Strip," [47] in which "**_Israel_** hadtransferred to the PA certain governmental powers and responsibilities." [48] As a result of this treaty, the PA has exclusive security and civil control over Area A (darker shaded area) and civil control over Area B (lighter shaded area) in the map on the previous page. [49] Combined, these areas constitute 27.9% of the West Bank. Area C (not delineated on the map) is wholly controlled by **_Israel_**. [50]

 However, the UN Secretary-General has clarified, "**_where_** a revolutionary government presents itself as representing a State, in rivalry to an existing government, the question at issue should be...whether the new government exercises effective authority within **[*116]** the territory of the State and is habitually obeyed by the bulk of the population." [51]

 While the fact that **_Israel_** transferred control to the PA during the Oslo Accords maybe significant, the transfer of control was both limited in terms of governmental power and scope of territory. For example, while "the PA delivers governmental services to about 40 percent of the West Bank, the remaining 60 percent of the West Bank and East Jerusalem are controlled by **_Israel_**." [52] Because the bulk of the population includes large numbers of Palestinians living in Areas B and C who are subject to Israeli military rule, the PA does not have effective authority over the entire territory of the West Bank. Therefore, there is a strong argument that the PA falls short in establishing a government with effective authority over its territory. [53]

 The fourth and final element required to satisfy the Montevideo Convention definition of statehood is an established capacity to enter into relations with other States. This element is a non-issue, as it is uncontested that the PLO has demonstrated and is capable of entering into relations with other States, including **_Israel_**. The most obvious example of course is the seminal 1993 Oslo Accords or Oslo Peace Process, in which **_Israel_** and the PLO attempted to reach a peace agreement. [54] Because the PLO has entered into, and has the ability to enter into,

---

[46]    G.A.    Res.    3237    (XXIX)    [1974],    available    at    _http://daccess-dds-ny.un.org/doc/RESOLUTION/GEN/NR0/738/38/IMG/NR073838.pdf?OpenElement_.

[47] Central Intelligence Agency, The World FactBook, _https://www.cia.gov/library/publications/the-world-factbook/geos/we.html_.

[48] Scobbie, supra note 37.

[49] Haim Gvirtzman, Maps of Israeli Interests in Judea and Samaria Determining the Extent of the Additional Withdrawals, BEGIN-SADAT CENTER FOR STRATEGIC STUDIES, _http://www.biu.ac.il/Besa/books/maps.htm_. (last visited May 1, **_2013_**).

[50] Id.

[51] The rules established in this memo apply to the PA, because this **_conflict_** is classified as an international armed **_conflict_** in self-determination to overthrow an alien occupation, See infra pp. 28-29. Characterization of the **_Conflict_** as an International Armed **_Conflict_** under CARs). from the Secretary-General to the President of the Security Council on the Legal Aspects of the Problem of Representation in the United Nations, U.N. Doc. S/1466 (March 9, 1950), available at _http://www.historyofmacedonia.org/IndependentMacedonia/UN.html_. (last visited May 27, **_2013_**) (emphasis added).

[52] Scobbie, supra note 37.

[53] It is interesting to note however, that the United States does not apply the "effective authority" analysis when considering if the government prong of the Montevideo Convention has been satisfied. Rather, the comment in the Restatement proffers a considerably easier standard: "there must be some authority exercising governmental functions and able to represent the entity in international relations" _RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW § 201_ cmt. d (1987) (emphasis added). Were the United States to apply the Restatement to an evaluation of **_Palestine_**'s statehood, **_Palestine_** would likely meet the criteria for recognition.

[54] PUBLIC BROADCAST STATION, supra note 8, at 6.

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 56 of 144   Page ID #:9183

Page 9 of 34

19 Ann. Surv. Int'l & Comp. L. 105, *116

agreements with members of the United Nations including but not limited to **_Israel_**, the PLO satisfies this element of statehood.

 Although the PA and the PLO have strong arguments to posit that they exhibit the four attributes of statehood, not all of them, namely a government with effective control, **_can_** be definitively proven to establish **_Palestine_** as a de facto state. Thus, assuming the PA has not achieved **[*117]** statehood, the Israeli-Palestinian **_conflict_** should not be characterized as a traditional State v. State armed **_conflict_**.

 However, assuming also that the arguments proffered in Section II establish that the West Bank is occupied by **_Israel_**, **_Israel_**'s actions with respect to the settlement policies must be consistent with the international legal obligations of an Occupying Power. The applicable principles of IHL - LOAC that delineate **_Israel_**'s obligations as an Occupying Power are set forth in the Fourth Geneva Convention of 1949 and Protocol I Additional to the Geneva Conventions.

 2. Application of the Fourth Geneva Convention of 1949

 **_Israel_** contends that the Fourth Geneva Convention does not apply de jure to the West Bank, because the West Bank is not an occupied territory. However, the International Court of Justice held in an advisory opinion that:

 [The Geneva Convention] is applicable when two conditions are fulfilled: that there exists an armed **_conflict_** ...; and that the **_conflict_** has arisen between two contracting parties. If those two conditions are satisfied, the Convention applies, in particular, in any territory occupied in the course of the **_conflict_** by one of the contracting parties. [55]

 Assuming the first condition is satisfied by the arguments set forth in Part II regarding establishment of the West Bank as an occupied territory, the Fourth Geneva Convention is applicable to **_Israel_**'s actions in the West Bank if it **_can_** be established that **_Israel_** was a contracting party. **_Israel_** and Jordan ratified the Geneva Conventions of 1949 on June 7, 1951 and May 29, 1951, respectively, thus making them both parties to the Conventions when the 1967 War broke out. [56] In paragraph 91, the I.C.J. explicitly states that because **_Israel_** had ratified the Fourth Geneva Convention in 1951, it was a party to the Convention at the time of the war in 1967. Furthermore, the Court notes that the interpretation above "reflects the intention of the drafters of the Fourth Geneva Convention to protect civilians who find themselves...in the hands of the **[*118]** occupying Power...regardless of the status of the occupied territories." Therefore, the Geneva Convention applies to the West Bank and **_Israel_** must act consistently with the obligations of an Occupying Power therein.

 U.N. Security Council (U.N.S.C.) resolutions 446, 452, and 465 condemn **_Israel_**'s policy of building settlements in the occupied territories, and the U.N.S.C. has taken the position that establishing settlements in the occupied territories constitutes a "flagrant violation" of the Convention. [57] Furthermore, the I.C.J. concluded in its Advisory Opinion requested by the General Assembly that the "Israeli settlements in the Occupied Palestinian Territory (including East Jerusalem) have been established in breach of international law." [58]

---

55  Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory, Advisory Opinion, Int'l Ct. of Justice, <para> 177 (Jul. 9, 2004), available at _http://www.icj-cij.org/docket/files/131/1671.pdf_.

56  Geneva Conventions of 1949,75 U.N.T.S. 31, 75 U.N.T.S. 85, 75 U.N.T.S. 135, 75 U.N.T.S. 267, available at _http://www.icrc.org/eng/war-and-law/treaties-customary-law/geneva-conventions/index.jsp_.

57  S.C. Res. 446, available at _http://unispal.un.org/UNISPAL.NSF/0/BA123CDED3EA84A5852560E50077C2DC_.

58  In Advisory Opinion requested by U.N. General Assembly, International Court of Justice concludes that Jewish Settlements in the occupied territory are unlawful and that, despite **_Israel_**'s undoubted right of self-defense against terrorism, construction of wall on that occupied territory is violating customary international law and several conventions on human rights and humanitarian law to which **_Israel_** belongs, TRANSNATIONAL LAW ASSOCIATES (International Law Update Vol. 10, July 2004), _http://www.internationallawupdate.com/09/in-advisory-opinion-requested-by-u-n-general-assembly-international-court-of-justice-concludes-that-jewish-settlements-in-occupied-palestinian-territory-are-unlawful-and-that-despite-israels-undo/_.

19 Ann. Surv. Int'l & Comp. L. 105, *118

Article 47 of the Fourth Geneva Convention of 1949 states, "Protected persons who are in occupied territory shall not be deprived...of the benefits of the present Convention...by any annexation by [the Occupying Power] of the whole or part of the occupied territory. [59] Therefore, **_Israel_** is violating this provision if: 1) Palestinians are protected persons and 2) **_Israel_** has annexed the whole or part of the occupied territory.

According to Article 4 of the Fourth Geneva Convention, Palestinians are considered protected persons if they are "those who, at a given moment and in any manner whatsoever, find themselves, in case of a **_conflict_** or occupation, in the hands of a Party to the **_conflict_** or Occupying Power of which they are not nationals." [60] It has already been established that there is a **_conflict_** or occupation (see analysis above), so the remaining question is whether Palestinians are in the hands of a Party to the **_conflict_** or Occupying Power of which they are not nationals. "The Palestinian residents of the Occupied Territories are not Israeli citizens and cannot participate in Israeli national elections," except for those living in annexed East Jerusalem who were offered Israeli citizenship if **[*119]** they renounced any other citizenship. [61] **_Israel_** could argue that Palestinians are not protected people, because they have elected not to receive Israeli citizenship for political reasons. However, the PLO is a Party to this **_conflict_** and has been affirmed by **_Israel_** and the United Nations to be the official representative of the Palestinian people. [62] Furthermore, as referenced above, Palestinians in the West Bank under Area A are under the control of the PA. Thus, because Palestinians are "a people," they are protected persons.

With respect to annexation, the UN Security Council and General Assembly passed Resolution 2253 and Resolution 2254 deploring **_Israel_**'s de facto annexation of East Jerusalem and parts of the West Bank. [63] Furthermore, newly elected UN Special Rapporteur Professor Richard Falk stated recently, "**_Israel_** is implementing a deliberate policy of forcing Palestinians out of their homes and off their land, in order to establish more illegal settlements and to proceed with the de facto annexation of the West Bank." [64]

By taking control of the West Bank, **_Israel_** had informally annexed East Jerusalem because that land was considered occupied land belonging to Jordan. Within the first ten years after the 1967 War, **_Israel_** "set up border-area settlements, called 'nahalim,' that were populated with young Israelis and were intended to help stem infiltration of Palestinian guerrillas and provide a first line of defense against conventional attack by Arab armies." [65] The areas **_where_** **_Israel_** established settlements include the highland ridges of the West Bank overlooking the Jordan Valley. [66] By deliberately establishing settlements in and around the perimeter of territories within the West Bank, **_Israel_** created a border of control within these areas to keep Palestinians out, thereby annexing these areas. The Israeli settlements (shown as small triangle shaped objects in the map) **[*120]** and settlement blocks (shown as non-uniform shaped masses in the map) in the West Bank **_can_** be seen in the map below. [67] MAP 2

---

[59] Geneva Convention (IV), supra note 21, at art. 47.

[60] Id. at art. 4.

[61] George E. Bisharat, Land, Law, and Legitimacy in **_Israel_** and the Occupied Territories 528 AMERICAN UNIVERSITY LAW REVIEW, 1994, 43 AMULR 467, available at http://digitalcommons.wcl.american.edu/cgi/viewcontent.cgi?article=1537&context=aulr.

[62] G.A. Res. 3210 (XXIX) [1974]; 3236 (XXIX) [1974].

[63] G.A. Res. 2253, available at http://unispal.un.org/UNISPAL.NSF/0/A39A906C89D3E98685256C29006D4014; G.A. Res. 2254, available at http://unispal.un.org/UNISPAL.NSF/0/3E28F2C76EBEA214852560DF00575C0E.

[64] UN Special Rapporteur Condemns **_Israel_** of De Facto Annexation of the West Bank, THE ISRAELI COMMITTEE AGAINST HOUSE DEMOLITIONS (February 21, 2012), available at http://www.icahd.org/?p=8177.

[65] Bisharat, supra note 61, at 531.

[66] Ibid.

[67] see Israeli Settlements in the West Bank, Key Maps, BBC News, http://news.bbc.co.uk/2/shared/spl/hi/middleeast/03/v3israelpalestinians/maps/html/settlementscheckpoints.stm.

[SEE TABLE IN ORIGINAL]

et

In 1980, **_Israel_** passed a bill declaring the Holy City of Jerusalem as the capital of **_Israel_**, finalizing the unilateral annexation of East Jerusalem - an action that the international community condemned. [68] To further evidence the annexation of East Jerusalem, **_Israel_** provided Palestinian residents living within East Jerusalem the option to receive Israeli citizenship as opposed to other Palestinian Arabs living in other parts of the West Bank who cannot attain Israeli citizenship even if they wanted it. [69]

**_Israel_** may argue that it has not annexed all of the West Bank, as Area A is solely under PA control and the PA also has partial control of Area B. However, the provision does not require annexation of the entire occupied territory in order to establish a violation. Rather, annexation in "whole or part of the Occupied Territory" constitutes a violation of Article 47. [70] Therefore, because **_Israel_** has annexed parts of the West **[*121]** Bank and East Jerusalem, it is arguably in violation of Article 47 of the Fourth Geneva Convention.

Article 49 of the Fourth Geneva Convention contains two provisions pertaining to Occupying Powers that are particularly relevant to settlement expansionist activities conducted by **_Israel_**. The first relevant portion of the provision states, "Individual or mass forcible transfers, as well as deportations of protected persons from occupied territory to the territory of the Occupying Power...are prohibited, regardless of their motive." [71] Therefore, **_Israel_** is in violation of this portion of Article 49 if **_Israel_** conducts 1) Individual or mass forcible transfers or 2) deportations of protected persons from occupied territory to the territory of **_Israel_**.

In 1994, "the Civil Administration [of **_Israel_**] ordered the eviction of dozens of Jahalin [Palestinian Bedouin] families from land that was intended as a new settlement neighborhood" for the expansion of the Ma'ale Adumim settlement. [72] The community decided to petition the Israeli High Court of Justice against the military order, because they refused to move out of their homes. However, the Court denied their petition and by 1995, the Israeli army forcibly evicted the Jahalin from their homes and relocated them to a site next to the Jerusalem municipal garbage dump." [73] These acts of the Israeli government constitute a transfer, because Palestinians had to move from their established homes in the occupied territories to another area in the West Bank, the dump-site. Furthermore, these transfers were considered mass transfers, because the 1995 transfer was followed by two more movements of other Jahalin families in 1997 and 1998 from their established homes to the same location. [74] Finally, these **_can_** be classified as forcible transfers, because the Palestinians' attempt to petition the Israeli HCJ evidences their clear intention not to leave their homes. The Palestinians ultimately moved, however, solely because their petition was denied and the Israeli army subsequently removed them from their homes.

---

[68] Pierre Tristam, Jerusalem as the Capital of **_Israel_**: Legal Status or Illegal Occupation?, ABOUT.COM, _http://middleeast.about.com/od/arabisraeliconflict/a/me081005g.htm_. (last visited May 30, **_2013_**).

[69] Bethany M. Nikfar, Families Divided: An Analysis of **_Israel_**'s Citizenship and Entry into **_Israel_** Law Para. 69 NORTHWESTERN UNIVERSITY SCHOOL OF LAW (Spring 2005), available at _http://www.law.northwestern.edu/journals/jihr/v3/5/Nikfar.pdf_.

[70] Geneva Convention (IV), supra note 21, at art. 47.

[71] Id.

[72] Amnesty Int'l, Stop the Transfer: **_Israel_** About to Expel Bedouin to Expand Settlements 6 (February 2012), available at _http://www.amnesty.org/en/library/asset/MDE15/001/2012/en/0b66dcc1-bb09-4a0d-8560e10ac19f8f9e/_ mde150012012en.pdf.

[73] Id.

[74] Id.

19 Ann. Surv. Int'l & Comp. L. 105, *121

*Israel* insists that because the principle regarding individual or mass forcible transfers or deportations was drafted immediately following the Second World War, it is not relevant to the situation of the Palestinians. *Israel* contends, [*122]

As International Red Cross' authoritative commentary to the Convention confirms, the principle was intended to protect the local population from displacement, including endangering its separate existence as a race, as occurred with respect to the forced population transfers in Czechoslovakia, Poland and Hungary before and during the war. This is clearly not the case with regard to the West Bank and Gaza. [75]

Despite *Israel*'s contentions, this provision of Article 49 does indeed pertain to the situation of Palestinians, because the ICRC commentary to the provision indicates that it seeks to prevent "physical and mental suffering endured by these 'displaced persons,' among whom there were a great many women, children." [76] The broad and general purpose of Article 49 is to protect displaced persons, specifically women and children who may be affected by a transfer, and thus, the provision is not narrowly limited only to transfers resulting from World War II. Moreover, other international conventions designed to specifically protect victims of World War II, like the Refugee Convention, were limited temporally and geographically. Thus, in the absence of such restrictions, it stands to reason that the Article was intended to endure time and space. Therefore, *Israel*'s mass forcible transfers of Palestinians to other locations in the West Bank violates Article 49.

The second relevant portion of Article 49 states, "the Occupying Power shall not deport or transfer parts of its own civilian population into the territory it occupies." [77] Therefore, *Israel* is in violation of this portion of the provision if they are deemed to have: 1) deported current occupants or 2) transferred parts of its own civilian population into the West Bank.

Israeli settlements and outposts were established in the occupied territories with the intention to be inhabited by Jewish settlers. [78] According to the U.S. Central Intelligence Agency, there are approximately 311,100 Israeli settlers living in the West Bank and approximately 186,929 Israeli settlers living in East Jerusalem, in settlements or outposts. [79] As of December 2011, there are over 124 Israeli settlements in the West Bank and approximately 100 outposts (not including East Jerusalem). Outposts are essentially Jewish settlements, but they are not recognized as settlements by the Israeli Ministry of the [*123] Interior, because *Israel* contends they were established by Israeli settlers allegedly without Israeli approval. [80] While all settlements receive governmental support for infrastructure, construction, and establishment of public institutions, [81] outposts "were built [by settlers] without government approval, without land being formally allocated, without an approved building plan, and in some instances on privately-owned Palestinian land." [82] However, like settlements, outpost "construction has been aided by the government and carried out with the knowledge of the military." [83]

*Israel* first began constructing settlements in 1948 and "until the end of the 1970s, the Government of *Israel* claimed that the settlements were established on the grounds of military necessity and security, [pursuant to Article

---

[75] *Israel* Ministry of Foreign Affairs, supra note 20.

[76] Geneva Convention (IV), supra note 21, at art. 49.

[77] Id.

[78] Fact About Settlements, Jewish Virtual Library, http://www.jewishvirtuallibrary.org/jsource/Peace/settlements.html. (last visited January 17, *2013*).

[79] supra note 47.

[80] B'TSELEM, supra note 38, at 37.

[81] B'TSELEM, supra note 6, at 7.

[82] B'TSELEM, supra note 38, at 39.

[83] B'TSELEM, supra note 38, at 39.

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 60 of 144   Page ID #:9187

Page 13 of 34

19 Ann. Surv. Int'l & Comp. L. 105, *123

27 of the Fourth Geneva Convention], but it has since abandoned this position." [84] With respect to settlements built after that time, **_Israel_** contends that each Israeli citizen decides privately, of his own free will, to move to the settlement, and therefore because the settlers' movement is entirely voluntary, **_Israel_** is not in violation of this provision. [85] However, the movement of settlers to the West Bank is not entirely voluntary, because the Israeli government has "implemented a vigorous and systematic policy to encourage Jewish Israeli citizens to move from **_Israel_** to the West Bank." [86] While the settlers still have the agency to reject such a move, the Israeli government is providing large incentives to impact their decision, making settler transfers not entirely voluntary. For example, these incentives include financial benefits to Jewish Israeli citizens and favoritism in the form of support granted to local authorities that serve settlements in the West Bank as opposed to settlements in **_Israel_**. [87]

Additionally, **_Israel_** purports that the construction of settlements on seized land in the West Bank is justified by **_Israel_**'s law of eminent domain, which grants **_Israel_** an absolute right to do what it pleases with **[*124]** its sovereign land. [88] However, using **_Israel_**'s position that the West Bank is disputed territory and therefore not under the sovereign control of any State, **_Israel_** may not invoke the defense of eminent domain. By providing incentives for its Jewish citizens to leave **_Israel_** and move to settlements or illegally constructed outposts located in occupied territory of the West Bank, **_Israel_** is transferring parts of its civilian population and therefore, is in violation of this provision of Article 49.

3. Application of Protocol I Additional to the Geneva Convention

**_Israel_** has not ratified either of the Additional Protocols to the Geneva Convention. [89] Therefore, **_Israel_** is not required to adhere to the provisions therein unless the Additional Protocols or any of their provisions have ripened into international customary law. While the Israeli government and some scholars contend that the additional protocols have not yet ripened into customary law, there has been significant international recognition that certain applicable provisions regarding the obligations of an Occupying Power have attained customary law status. Provision 4 of Article 85 of Protocol I Additional regards violations of Article 49 of the Fourth Geneva Convention as grave breaches of the treaty. [90] Provision 5 in Article 85 of Protocol I Additional to the Geneva Convention deems grave breaches of the Geneva Conventions or of this Protocol, war crimes. [91] Therefore, because **_Israel_** is in violation of the provisions of Article 49 of the Fourth Geneva Convention (discussed above), **_Israel_**'s actions may be deemed war crimes if this provision has ripened into international customary law.

For an international instrument to ripen into customary international law, opinio juris requires consistent action by states because those states believe there is a manner in which they are obligated to act. The Israeli government and Professor Robbie Sabel of Hebrew University in Jerusalem contend that Protocol I has not attained customary

---

[84] Richard Goldstone, Report of the United Nations Fact-Finding Mission on the Gaza **_Conflict_** 47 United Nations General Assembly, Human Rights Council A/HRC/12/48 (25 September 2009), available at _http://www2.ohchr.org/english/bodies/hrcouncil/docs/12session/A-HRC-12-48.pdf_.

[85] **_Israel_** Ministry of Foreign Affairs, supra note 20.

[86] Elisha Efrat, The West Bank and Gaza Strip: A Geography of Occupation and Disengagement 38 (Routledge 2006).

[87] Id.

[88] Ian Lustick, **_Israel_** and the West Bank after Elon Moreh: The Mechanics of De Facto Annexation 564 MIDDLE EAST JOURNAL (Middle East Institute 1981).

[89] Goldstone, supra note 84, at 72.

[90] Protocol Additional I to the Geneva Conventions of 1949, 1125 U.N.T.S. 3, Article 85(4) and 85(5), available at _http://www.icrc.org/ihl.nsf/full/470?opendocument_.

[91] Id.

law status. [92] However, "there has been international recognition that the concept of war crimes and grave breaches are applicable in internal, as well as international armed ***conflicts***," because this particular provision has **[*125]** ripened into customary law. [93] For example, "the ICTY and International Criminal Tribunal for Rwanda (ICTR) have convicted individuals of committing war crimes in non-international ***conflicts***" despite the treaties governing internal armed ***conflicts*** containing no grave breach provisions. [94] Therefore, grave breaches of the Geneva Convention ***can*** amount to war crimes in customary international law. Under such an analysis, and assuming they are found in breach of Art. 49, ***Israel*** could conceivably be found guilty of not only grave breach, but war crimes as well.

III.ARMED ***CONFLICT*** TO OVERTHROW A FOREIGN OPPRESSIVE REGIME IN THE NAME OF SELFDETERMINATION (CARS)

A.Current state of armed ***conflict*** between ***Israel*** and the Palestinians

Although "the Geneva Conventions do not provide an authoritative definition of 'armed ***conflict***,'" [95] persuasive authority established in the Prosecutor v. Tadic and Prosecutor v. Haradinaj cases decided by the International Criminal Tribunal for the former Yugoslavia (ICTY) Appeals Chamber provide a test and factors to determine the existence of an armed ***conflict***. In Tadic, the ICTY generally explains, "an armed ***conflict*** exists whenever there is a resort to armed force between States or protracted armed violence between governmental authorities and organized armed groups." [96] The court then clarified in the Haradinaj case that this explanation for what constitutes an armed ***conflict*** may be understood as a two-prong test: 1) ***Conflict*** reaches a requisite level of intensity and 2) Parties to the ***conflict*** are organized. [97]

According to the Haradinaj case, the Trial Chamber considered many factors to assess intensity including:

number, duration and intensity of individual confrontations; the type of weapons and other military equipment used; the number and calibre of munitions fired; the number of persons and type of

**[*126]**

forces partaking in the fighting; the number of casualties; the extent… of material destruction; and the number of civilians fleeing combat zones. The involvement of the UN Security Council may also be a reflection of the intensity of a ***conflict***. [98]

---

[92] Dr. Robbie Sabel, The Problematic Fourth Geneva Convention: Rethinking the International Law of Occupation, HEBREW UNIVERSITY FACULTY OF LAW (July 16, 2003), available at *http://jurist.law.pitt.edu/forum/forumnew120.php*.

[93] GARY D. SOLIS,THE LAW OF ARMED ***CONFLICT***: INTERNATIONAL HUMANITARIAN LAW IN WAR 99 (Cambridge University Press 2010).

[94] Id. at 101.

[95] Id.(citing Derek Jinks, "The Applicability of the Geneva Conventions to the 'Global War on Terrorism,'" 46-1 Virginia J. of Int'l L. (2006), 1,20-1).

[96] Prosecutor v. Dusko Tadic (Appeal Judgment), IT-94-1-A, Int'l Criminal Tribunal for the former Yugoslavia (ICTY), 2 Oct. 1995, para. 60.

[97] Prosecutor v. Haradinaj (Trial Judgment), IT-04-84-T, International Criminal Tribunal for the former Yugoslavia (ICTY), 3 April 2008, para. 38, 49-50.

[98] Id. at para. 49.

During both Intifadas [99] and still today, Palestinians have resorted to the use of arms to combat Israeli rule. For example, some have employed suicide bombers to target Israeli civilians in bus stations. [100] The suicide bombings have taken place in Israeli cities including but not limited to Tel-Aviv. [101] *Israel* has retaliated by initiating targeted killings of Palestinians suspected of terrorism in Gaza. [102] Both the suicide bombings and the targeted killings have occurred in territories of a High Contracting Power, *Israel*. The intensity and duration elements of an armed *conflict* have been established by the fact that more than seventy suicide bombings since the first Intifada, all aimed at Israeli civilians, and the targeted killings sometimes result in destroying schools or homes in Gaza *where* the suspected terrorists are residing. [103]

To elaborate on the second prong, the court states, "an armed *conflict* *can* exist only between parties that are sufficiently organized to confront each other with military means." [104] While "state governmental authorities have been presumed to dispose of armed forces that satisfy this criterion," the organization of armed groups is not as clear-cut. [105] Therefore, the court relies on several factors to determine when the organization criterion for armed groups is fulfilled, including the following:

the existence of a command structure and disciplinary rules and mechanisms within the group; the existence of a headquarters;

[*127]

the fact that the group controls a certain territory; the ability of the group to gain access to weapons, other military equipment, recruits and military training; its ability to plan, coordinate and carry out military operations, including troop movements and logistics; its ability to define a unified military strategy and use military tactics; and its ability to speak with one voice and negotiate and conclude agreements such as cease-fire or peace accords. [106]

The second prong, whether the armed groups are sufficiently organized to confront one another with military means must be applied to both *Israel* and the Palestinians. *Israel* meets the second prong, because there is a presumption that State governmental authorities have the requisite level of organization. [107] Therefore, the question is whether Palestinians *can* meet the criterion of an organized armed group. As mentioned above, the PA has control of Area A and partial control of Area B, so this speaks to the factor delineated above regarding the group's control over a certain territory. Also, the PLO has the Palestinian Liberation Army (PLA) and the PA has the Palestinian Security and Police Forces, both of whom give the Palestinians the ability to gain access to weapons,

---

[99]  Intifadas are known as the Palestinian and Arab violent uprisings directed at Israeli civilians beginning in late 1987 and continuing sporadically into the early 1990s. The uprisings manifested as suicide bombings of Israeli hotels, buses, and other public places and were exercised in protest against Israeli occupation of the West Bank and Gaza Strip.

[100]  *Israel* Ministry of Foreign Affairs, Suicide and Other Bombing Attacks in *Israel* Since the Declaration of Principles (Sept 1993), *http://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Palestinian/Pages/Suicide%20and%20 Other%20Bombing%20Attacks%20in%20Israel%20Since.aspx.* (last visited May 30, *2013*).

[101]  *Israel's* History of Bomb Blasts, BBC NEWS, *http://news.bbc.co.uk/* 2/hi/middleeast/1197051.stm (last visited May 30, *2013*).

[102]  Johannes Haushofer, Both Sides Retaliate in the Israeli-Palestinian *Conflict*, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES OF AMERICA, available at *http://www.pnas.org/content/107/42/17927.full.*

[103]  Katherine Iliopoulos, *Israel* Institutes Proceedings in Relations to Gaza War, CRIMES OF WAR, *http://www.crimesofwar.org/commentary/israel-institutes-proceedings-in-relation-to-gaza-war/.* (last visited May 30, *2013*).

[104]  Prosecutor, supra note 97, at para. 60.

[105]  Id.

[106]  Prosecutor, supra note 97, at para. 70.

[107]  Prosecutor, supra note 97, at para. 60.

other military equipment, recruits, and military training.  [108] Finally, the PLO's actions during the Oslo Accords and subsequent attempts to negotiate peace agreements and cease-fires reflect its ability to speak with one voice and negotiate and conclude agreements such as cease-fire or peace accords. Therefore, Palestinians are sufficiently organized to establish the second prong.

 Next, according to Tadic, "International humanitarian law applies from the initiation of such armed **conflicts** and extends beyond the cessation of hostilities until a general conclusion of peace is reached; or, in the case of internal **conflicts**, a peaceful settlement is achieved."  [109] Any intermittent temporary cease-fire agreements during the **conflict** were just that, temporary, and therefore they did not bring military operations to a close in these regions. Thus, although the suicide bombings or targeted killings may not necessarily be taking place at this very moment, international humanitarian law still applies to this **conflict** and it is characterized as a current armed **conflict**, because no peace has been reached yet.  **[*128]**

 Therefore, an armed **conflict** currently exists between **Israel** and the Palestinians, because as discussed above, the requisite level of intensity has been met by the amount, duration, and type of violence exchanged, both parties are sufficiently organized to confront each other with military means, and no final peace agreement has been reached yet.

B.Characterization of the **Conflict** as an International Armed

 1. **Conflict** under CARS

 Despite some evidence to characterize the Israeli-Palestinian **conflict** as a State v. State armed **conflict**, the overwhelming evidence indicates that the **conflict** is an international armed **conflict** in self-determination to overthrow an oppressive regime - or CARs (colonial domination, alien occupation, racist regime, self determination). Specifically, the General Assembly, Security Council, and the International Court of Justice have affirmed the right of the Palestinian people to self-determination.  [110] Dr. Christian Nwachukwu Okeke, Professor of Law and Director of the LLM and SJD International Legal Studies Programs at Golden Gate University clarifies and eloquently proposes that "the essential consideration is whether the demand of a given people or nation to assert their right of declaring the nature of their socio-political status is basically recognized and encouraged."  [111] Thus, based on Dr. Okeke's **approach**, Palestinians have a right of self-determination, because the U.N.G.A., U.N.S.C., I.C.J., and majority of member States in the U.N. basically recognized and encouraged the Palestinian right of self-determination via resolutions, opinions, and approval of the Palestinian bid for statehood, respectively.

 Breaking down the analysis further, one **can** establish an armed **conflict** in the name of self-determination if there are a people who are fighting in the exercise of their right of self-determination. However, it should be noted that the term "people" has not been precisely defined.  [112] Nevertheless, a San Francisco based attorney who practices human rights and humanitarian law full time, Karen Parker, provided a definition of "people" at her Presentation to the First International Conference on the Right to Self-Determination in Geneva in August 2000. She asserts that for a people to possess the right of self-determination, they must have: 1) a history of independence or self-rule in an identifiable territory 2) a  **[*129]**  distinct culture and 3) a will and capability to regain self-governance.  [113] Finally, self-determination emanates from some type of foreign occupation. Because Israeli occupation over the Palestinian

---

[108]     PLO-PA     Comparison     Chart,     PROCON.ORG,     *http://israelipalestinian.procon.org/view.additional-resource.php?resourceID=904*.

[109]  Prosecutor, supra note 96, at para. 70.

[110]  Advisory Opinion, supra note 55.

[111]  OKEKE, supra note 44, at 116.

[112]  Reference RE Secession of Quebec, Supreme Court of Canada, [1998] 2 S.C.R. 217 (**Can**.).

[113]  Karen Parker, Presentation to First International Conference on the Right to Self-Determination United Nations, ASSOCIATION FOR HUMANITARIAN LAWYERS (August 2000), available at *http://www.guidetoaction.org* /parker/selfdet.html.

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 64 of 144   Page ID #:9191

Page 17 of 34

19 Ann. Surv. Int'l & Comp. L. 105, *129

Occupied Territories (specifically the West Bank for the purposes of this paper) has been established above, this element need not be discussed further.

First, although the Palestinians do not have a history of independence, since they did not adopt or implement the Palestinian Mandate, they do have self-rule in an identifiable territory. For example, as discussed previously, the PA has sole control over Area A and partial control of Area B in the West Bank. This control of the PA is likely sufficient control for the purposes of self-rule, because it would not seem reasonable for self-rule to be as high a standard as forming a government. [114] Furthermore, the West Bank is an identifiable territory; it has been recognized as such by the United Nations in various resolutions, [115] by the United States in The World Factbook, [116] by the Israeli Government who refers to the West Bank as Judea and Samaria, [117] and by the international community. Therefore, the Palestinians are self-ruled by the PA in the identifiable territory, the West Bank.

Second, the Palestinians have a distinct culture, because they share a common cultural foundation. For instance, the majority of Palestinians share a common religion, Islam, and they also speak the same language, Arabic. [118] These characteristics are wholly different from a large majority of the population of _Israel_ who are Jewish and speak Hebrew. [119] Thus, Palestinians have a distinct culture.

Third, the history of Palestinians and the goals of the PA reflect that Palestinians have a will and capability to regain self-governance. Since the establishment of the state of _Israel_, Palestinians have had the will to govern themselves as demonstrated by their attempts to establish a Palestinian State in the territories they deem to be their homeland. For example, with respect to the Partition Plan of the UNGA, the **[*130]** "Palestinians considered the proposal unrepresentative of the demographic distribution of Jews and Arabs living in _Palestine_ at that time, and so rejected it," because they wanted to establish _Palestine_ in a larger territory. [120] Therefore, although they rejected the recommendation, they did so to ensure future establishment of a Palestinian homeland that would encompass all the territories to which they felt entitled.

Because all three elements have been satisfied, the Palestinians are a people who may exercise their right to self-determination. Therefore, there is a strong argument and international support that the Israeli-Palestinian **_conflict_** is characterized as a CARs armed **_conflict_** in the name of self determination. The IHL-LOAC instruments that apply to this type of characterization are all four Geneva Conventions and Protocol I Additional to the Geneva Conventions, but because the provisions applying to an Occupying Power have been discussed above, the provisions discussed below will not include those detailing the obligations of an Occupying Power.

C. Application of the Fourth Geneva Convention **_where_** **_Israel_** is not deemed to be an Occupying Power

Article 147 of the Fourth Geneva Convention states that unlawful deportations or transfers of persons protected by the Fourth Geneva Convention are deemed grave breaches. Thus, _Israel_'s actions may be deemed a grave breach if the settlement expansionist efforts have led to the unlawful transfer of protected persons. [121] Because Jahalin Bedouins are Palestinians, Palestinians are protected persons, and the transfer of the Jahalin Palestinians has already been established (see above), the issue is whether this article would still apply to _Israel_ not deemed an

---

[114] Again, because no law has provided a precise definition of a "people," various interpretations are up for debate.

[115] G.A Res. 3236 (XXIX) [1974]; see also supra note 55.

[116] Central Intelligence Agency, supra note 47.

[117] _Israel_ Ministry of Foreign Affairs, Judea and Samaria, (January 1, 2004), _http://www.mfa.gov.il/MFA/Facts+About+Israel/Israel+in+Maps/Judea+and+Samaria.htm_. (last visited May 30, **_2013_**).

[118] Central Intelligence Agency, supra note 47.

[119] Central Intelligence Agency, supra note 47.

[120] PUBLIC BROADCAST STATION, supra note 8, at 2.

[121] Geneva Convention (IV), supra note 21.

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 65 of 144   Page ID
#:9192

Page 18 of 34

19 Ann. Surv. Int'l & Comp. L. 105, *130

Occupying Power and whether the transfer is unlawful. The ICRC commentary indicates this provision refers to breaches of Articles 45 or 49 and Article 45 is not a provision that deals with the obligations of an Occupying Power. Therefore, Article 147 applies. The ICRC commentary also indicates that transfer is not unlawful "in cases ***where*** the safety of the protected persons may make them absolutely necessary." [122]

Jahalin have been transferred to an area in Jerusalem near the municipal dumpsite. Some Israeli officials have tried to argue that they were transferred for their own protection. However, ***Israel*** admitted that the **[*131]** reason for the transfer was to expand the Ma'Aleh Adumim Settlement Bloc. [123] Moreover, "settlers in the nearby settlements consistently harass the Bedouin communities and attack their property with virtual impunity." [124] For example, settler attacks against Palestinians have included: destroying olive trees and other Palestinian personal property, throwing rocks at Palestinians, gunfire, assault, forcing Palestinians off their land, making threats, theft of crops, and torching of fields. [125] "From September 2000 to the end of 2011, B'Tselem submitted 352 complaints to the ***Israel*** Police" and in the same time period, B'Tselem submitted 57 complaints of incidents in which it was suspected that security forces stood idly by during acts of violence by settlers against Palestinians. [126] Therefore, the transfer is unlawful because it was clearly done for expansion purposes and not for the protection of the Jahalin; instead of ensuring the safety of Palestinians, the Israeli Police has actually allowed violence against Palestinians to occur with impunity. As a result, ***Israel***'s actions of wrongfully transferring Jahalin Palestinians may amount to a grave breach.

IV. CONCLUSION

Since 1967, ***Israel*** has engaged in operations to construct and expand settlements for Jewish Israeli citizens. As part of the expansionist efforts, ***Israel*** has demolished Palestinian homes and structures to accommodate the construction of settlements and roads to connect them. These demolitions have led to the forcible transfer of Palestinians to other parts of the Occupied Palestinian Territories as well as to transfer parts of its civilian population from ***Israel*** to the occupied territories of the West Bank. As a result of ***Israel***'s construction of settlements and expansionist efforts, ***Israel*** is in violation of International Humanitarian Law - Laws of Armed ***Conflict*** including the Fourth Geneva Convention, Protocol II Additional to the Geneva Conventions, and Common Article 3.

While it is necessary to recognize and address the potential obstacles to peace in order to validate the struggles of the ***conflict***, a ***holistic approach*** to the ***conflict*** also requires a robust discussion of the work being done on both sides to promote peace. This shift in the discourse on ***Israel*** and ***Palestine*** is necessary to assure Palestinians and Israelis that there is a partner for peace and to educate the international community about how peace and change ***can*** be accomplished. **[*132]**

PART TWO - METHODS OF NON-VIOLENCE AS PROGRESS TOWARD A LASTING RESOLUTION OF THE ***CONFLICT***

I. INTRODUCTION

Although the Israeli government and Palestinian Liberation Organization (PLO) entered into peace agreements known as the Oslo Accords in 1993 and resumed peace talks in 2000, they proved unsuccessful. However, much work has been done on the ground with Palestinians, Israelis, and interested communities in the Diaspora to make progress towards peace; these grassroots efforts have not received the proper recognition and support they

---

[122] ICRC Commentary on Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, available at *http://www.icrc.org/ihl.nsf/COM/380-600169?OpenDocument*.

[123] Amnesty Int'l, supra note 72, at 3.

[124] Id.

[125] B'TSELEM, supra note 38, at 44.

[126] Id.

deserve. It is my contention that - like the women's rights movement and movement for LGBT equality in *Israel* - a lasting peace and *holistic approach* to *conflict* resolution between Israelis and Palestinians *can* only come from a revolution inspired by the people. Such a movement would then serve as a catalyst for agreements between the governments to ensue. It is vital for Palestinians, Israelis, and the international community to be aware of and engage in the peacebuilding efforts on the ground.

 Part one needs to be followed by a discussion of grassroots efforts. Working on the ground with everyday people is vital to the promotion of understanding on both sides. It fuels the momentum of populace-based movements, builds consensus on the terms of a peace agreement, and mobilizes the current governments to sincerely negotiate with one another to end the *conflict*. It follows that a discussion of the *conflict* is incomplete without education about the presence of non-violence, as it is an essential piece to peacebuilding and making progress toward resolution of the Israeli-Palestinian *conflict*. Education about existing grassroots organizing is therefore necessary to validate our past, accept our present, and make strides towards how we envision the future between *Israel* and *Palestine* - one of a lasting and sustainable peace.

 Section II highlights several grassroots organizations engaged in various non-violent peacebuilding methods. It will discuss how these diverse methods of non-violence, particularly when taken in conjunction with one another, are a necessary component for making progress toward ending the *conflict*. Section III illuminates the importance of emigrant community involvement and Section IV provides specific information about how to get involved in the grassroots, non-violent movement toward a lasting peace in *Israel* and *Palestine*. Part V concludes that methods of non-violence are an essential piece to a lasting peace in *Israel* and *Palestine*.  **[\*133]**

II.METHODS OF NON-VIOLENCE UTILIZED BY GRASSROOTS ORGANIZATIONS THAT ARE A NECESSARY COMPONENT OF PEACEBUILDING AND *CONFLICT* RESOLUTION.

 Various methods of non-violence are being utilized by various grassroots organizations working diligently and constructively to build peace and make progress toward ending the *conflict*. The methods of non-violence necessary to make progress towards achieving a lasting peace include: dialogue and reconciliation, utilization of media, public education, political outreach and advocacy, parallel programs in *Palestine* and *Israel* to build consensus, "constructive unilateralism," [127] youth leadership programs, education of and involvement of the Diaspora, and coalition building across community lines. Each one of these methods of non-violence will be represented and carefully articulated by the work of the following organizations: The Parents Circle, Combatants for Peace, OneVoice, Seeds of Peace, Shatil of the New *Israel* Fund, and Blue White Future. However, for non-violent methods to be successful, there must be widespread education about the non-violent movement, so that it may gain momentum through public education about and accessibility to these methods.

A. The Parents Circle - Family Forum (PCFF)

 "The Parents Circle - Families Forum (PCFF) is a joint Palestinian-Israeli organization of over 600 families, all of whom have lost a close family member as a result of the prolonged *conflict*." [128] The PCFF conducts face-to-face Reconciliation Programs, public and media activities, and member activities.

1. Dialogue and Reconciliation

---

[127] Constructive Unilateralism is a term coined by Blue White Future, a non-partisan political movement based in Tel Aviv-Yaffo, *Israel*; see *http://bluewhitefuture.org/the-new-paradigm-2012/*.

[128] The Parents Circle - Family Forum, Introduction, *http://www.theparentscircle.org/Content.aspx?ID=2#.UKmFcOOe8s0*. (last visited November 29, 2012).

As part of the face-to-face Reconciliation Program, "every year, members of the Parents Circle meet over 30,000 youth and adults - Israelis and Palestinians" [129] to share their personal narratives about losing their family member(s) to the **_conflict_** and to emphasize the joint message of reconciliation. [130] "These meetings convey a message of **[*134]** dialog sic and the possibility of reconciliation" as an alternative to violence. [131] Consequently, the audience members listening to the narratives will likely identify with the Israeli or Palestinian PCFF member who shares a similar story to them. Because the Israeli and Palestinian PCFF members are sharing their narratives in the same physical space, alongside one another, the audience members will also hear the stories of the other side in a potentially non-threatening way. Thus, with the clear objective of sharing their narratives, the PCFF members are able to demonstrate "an understanding of the needs of the other" to the audience. [132]

2. Media Outlets as Education and Counter-Narratives for NonViolence

Utilizing media on an even larger scale, the PCFF spreads the message beyond its own membership that reconciliation is possible and a prerequisite to achieving a sustainable peace. For example, PCFF created "Good Intentions" - a TV drama series about a Palestinian and an Israeli woman who worked together on a cooking show. They develop a strong connection despite their respective families' strong disapproval of their jobs in working with "the enemy." [133] The series "seeks to show the humanity of both sides...of the **_conflict_** through the experiences of these two women." Using fictitious characters based on real stories, it demonstrates that the **_conflict_** is not as black and white as our collective consciousness allows us to believe. [134] Art has a very real impact on how we view ourselves and people in communities different from our own. Thus, by providing Palestinian and Israeli women and girls with a character they **_can_** identify with, the show has the potential to inspire people to see themselves having positive interactions with those deemed to be the enemy.

More recently, PCFF released the film, "Two-Sided Story," which "documents the reactions when Israelis and Palestinians from different generations, backgrounds and political persuasions meet, talk, and get to know each other as human beings." [135] The twenty-seven Israeli and Palestinian participants in this dialogue workshop in the Palestinian city of Beit Jala included: "Bereaved families, Orthodox Jews and religious **[*135]** Muslims, settlers, ex soldiers in the Israeli army, ex security prisoners, citizens of the Gaza strip, kibbutz members, second generation holocaust survivors, non violent activists and more." [136] This film reveals that it is possible "to acknowledge the story of 'the other,' to show empathy and to express a desire for reconciliation." [137]

---

[129] The Parents Circle - Families Forum, Video Gallery, _http://www.theparentscircle.org/VideoGallery.aspx_. (last visited November 30, 2012).

[130] The Parents Circle - Families Forum, Dialogue Meetings, _http://www.theparentscircle.org/Content.aspx?ID=9#.UKmrQOOe8s0_. (last visited November 30, 2012).

[131] The Parents Circle - Families Forum, supra note 129.

[132] The Parents Circle - Families Forum, supra note 130.

[133] Sara Sorcher, Finding Peace Through Food & Entertainment, ABC NEWS (25 July 2008), _http://abcnews.**go**.com/International/story?id=5448893&page=1#.UKomKeOe8s0_. (last visited May 30, **_2013_**).

[134] Id.

[135] United States Institute of Peace, PeaceMedia, _http://peacemedia.usip.org/resource/trailer-two-sided-story-%E2%80%93-parents-circle-families-forum_. (last visited May 30, **_2013_**).

[136] Parents Circle - Family Forum, Two-Sided Story, _http://www.theparentscircle.com/Twofacesen.aspx?ID=50#.UKoumeOe8s0_. (last visited November 30, 2012).

[137] Facebook event initation, _http://www.facebook.com/events/384381641618546/_. (last visited August 22, **_2013_**).

Television and film are easy ways to disseminate information to large audiences and shape the way we view the ***conflict***. Media largely focuses on the violence of the ***conflict***<--> arguably to boost ratings <-->and in doing so, further fuels feelings of anger and division amongst involved groups of the ***conflict***. At the very least, television and films about the peaceful aspects of the ***conflict*** are imperative to creating a balance. Media outlets, such as those employed by PCFF, reveal an alternative to violence. Notably, those people most negatively impacted by the ***conflict*** are successfully utilizing it. The more wide-reaching non-violent media becomes, the greater chance it will have of influencing the way people conceive of and engage with the ***conflict***.

Admittedly, the number of Palestinians engaged in dialogue and reconciliation in the last few years has decreased significantly due to the financial crisis, fatigue, and anti-normalization campaigns.  [138] Some Palestinians and radical activists are adamantly opposed to efforts of dialogue and reconciliation, because they "perceive activities that [do not] challenge the occupation directly as normalization, or acceptance of the status quo." [139]

However, members of this anti-normalization movement are missing the point. No method alone, violent or non-violent, ***can*** directly change the status quo overnight. Change comes gradually by both direct and indirect means that work together to transform the minds of the involved parties. The fact that Combatants for Peace, a dialogue and reconciliation based organization has "maintained a steady level of activity over time" shows that minds are being transformed and the non-violent method of dialogue and reconciliation is making progress. [140]  **[*136]**

Without the dialogue and reconciliation effort, the non-violent movement would have had no platform on which to discuss more non-violent methods to challenge the status quo. To overcome the barriers of changing the status quo, dialogue and reconciliation efforts must be exercised and vigorously coupled with, political outreach and advocacy, public education, and utilization of other non-violent methods. However, to quash the dialogue and reconciliation efforts altogether would unravel the non-violent movement and undo the progress made toward ending the ***conflict***. Human connection is the foundation of the non-violent movement and the driving force motivating and uniting the people to challenge the status quo.

B. Combatants For Peace (CFP)

Combatants for Peace (hereinafter CFP) is a movement jointly started by Palestinians and Israelis who formerly partook in violence within the ***conflict***, but who have since abandoned their violent means and forged a united front to achieve a just resolution to the ***conflict*** via dialogue and reconciliation. Their shared vision for a lasting and fair resolution to the ***conflict*** is "to terminate the Israeli occupation, to halt the settlement project and to establish a Palestinian state with its capital in East Jerusalem, alongside the State of ***Israel***." [141] CFP seeks to raise consciousness about the suffering of both sides, "to educate toward reconciliation and non-violent struggle in both societies," and to place political pressure on both Governments by operating in the following ways:

 <bullet> To continue with the combatants' meetings, which allow each side to understand the other's narrative, via the ***approach*** of reconciliation rather than ***conflict***.

 <bullet> To implement an educational lecture series in public forums on both sides (universities, youth groups, schools etc.). The lectures will be given jointly by an Israeli and a Palestinian veteran, who will concentrate on the transition from violent struggle to the recognition of the limits of violence…

 <bullet> To set up Bi-National media teams which will act in order to influence public opinion in ***Israel***, ***Palestine*** and the rest of the world.

---

[138]  Ophir Bar-Zohar, Peace Activists are sick of talking about soccer, HA'ARETZ (25 April 2012), available at *http://www.haaretz.com/news/national/peace-activists-are-sick-of-talking-about-soccer-1.426396*.

[139]  Id.

[140]  Id.

[141]  Combatants for Peace, About, *http://cfpeace.org/?pageid=2*. (last visited May 26, ***2013***).

[*137]

<bullet> To participate in demonstrations and other non-violent actions against the occupation as a bi-national group. [142]

1. Dialogue and Reconciliation and Public Education

Combatants for Peace utilizes dialogue and reconciliation, public education, and political outreach and advocacy as methods of non-violence to make progress toward resolution of the **_conflict_**. A theme that permeates throughout the personal stories of former vets on the website is that dialogue and reconciliation allow for mutual understanding. [143] This theme is significant because mutual understanding yields validation of both sides. This validation has resulted in a personal transformation of the most violent people in the **_conflict_** to believe that non-violence is a necessary step in making progress toward peace and resolving the **_conflict_**. [144]

The implementation of lectures adds a layer of public education to the dialogue and reconciliation method. Educating the public with a united front of historically opposed former violent extremists is a showing of solidarity. This solidarity promotes compassion and understanding in the audience because they **_can_** identify with the representative of their nation. By instilling compassion and understanding in the audience, CFP has used a combination of dialogue and reconciliation and public education to inspire a transformation in the audience. Alternatively, CFP at the very least has provided the audience with a reason to explore dialogue and reconciliation as a method of non-violence toward ending the **_conflict_**.

The dialogue and reconciliation method has had success within this organization and in separate armed **_conflicts_**. In a different **_conflict_**, an organization called Conciliation Resources launched a Dialogue Series in 2011 to play a part in reaching a peace agreement on 7 October 2012 between the government of the Philippines and the Moro Islamic Liberation Front (MILF). This agreement "signaled an end to more than four decades of armed **_conflict_** in Mindanao." [145] The dialogue and reconciliation efforts used in this instance are examples of when non-violence methods yield effective results and positive change. [*138]

In the Israeli-Palestinian context, the dialogue and reconciliation efforts within CFP have stopped the cycle of violence between some of the most egregious offenders in the **_conflict_**: former Israeli soldiers who illegally attacked and killed Palestinian civilians and Palestinians who attempted a suicide bombing. These changed Israelis and Palestinians have been working together to promote a message of non-violence that will transform the minds of the people into wanting to end the **_conflict_** using non-violent means.

2. Political Outreach and Advocacy

In addition, Combatants for Peace supplements its dialogue and reconciliation and public education efforts with political outreach and advocacy. For example, CFP representatives regularly meet with ministers and political parties to promote non-violent positions within the political scene. On the Palestinian side, members of the movement have met the President Mr. Mahmoud Abbas twice and a third meeting is planned in the near future." [146] Unlike some political activists who demonstrate against **_Israel_** or Palestinians for the sole purpose of protesting, CFP actually uses the momentum of its demonstrations to put pressure on political leaders. This pressure is more

---

[142] Id.

[143] Combatants for Peace, Personal Stories, _http://cfpeace.org/?cat=6_. (last visited May 24, **_2013_**).

[144] Id.

[145] Conciliation Resources, _http://www.c-r.org/resources/historic-agreement-paves-way-peace-mindanao_. (last visited December 12, 2012).; see also Global Peace Foundation, Global Peace Convention, _http://www.globalpeace.org/our-work/global-peace-convention_.

[146] Combatants for Peace, Projects, Meetings with Ministers and Political Parties, _http://cfpeace.org/?cat=7&storyid=873_. (last visited November 12, 2012).

effective than blind protesting, because CFP is intentional in selecting its audience and is coming from a place of compassion rather than from attacking its audience.

However, as will be discussed in section C below, no political pressure is seemingly strong enough to sway the current Israeli Government or the Palestinian Government in Gaza - Hamas; they have made it clear, especially during the recent violence, that they have no intention of pursuing negotiation peace talks or resolving the **_conflict_**. Rather, under these circumstances, more drastic measures must be taken - there must be a collective transformation of people's minds so that the change comes from a revolution of the people.

While revolutions often entail violence and chaos, the revolution I am referring to is one of progress through calculated and intentional non-violence, inspired by a ground swell of the population to make social and legal changes. This ground swell of progress through the use of non-violence is not a new concept to Israeli culture or history.  [*139]

In fact, the women's movement in **_Israel_** had a recent legal victory due to the tenacity and bravery of women committed to change and equality. Previously in **_Israel_**, women were legally forbidden from wearing tallitot [147] and tefillin while praying at the Western Wall, a holy site for the three major monotheistic religions - Judaism, Christianity, and Islam. Tallitot and Tefillin are religious garb that ultra-Orthodox Judaism reserves for only men to wear. Ultra-Orthodox Judaism also forbids women to read from the Torah (Jewish Bible) out loud in front of male congregants. During prayer, men and women are forbidden from sitting together, and are thus divided into two sections - male and female - separated by a barrier. Pursuant to this rule, a separation barrier is in place at the Western Wall, but there is no designated area for differing religious observers to pray at the Western Wall in accordance with their own customs.

On December 1, 1988, the "first International Jewish Feminist Conference was held in Jerusalem," **_where_** "one hundred Jewish women gathered for a prayer service and Torah reading at the Kotel," many of them wearing a prayer shawl or tallit. [148] Although the women's service was held in the back of the women's section, away from the ultra-Orthodox observers, [149] ultra-Orthodox men and women at the site became enraged and disrupted the women's service, verbally and physically assaulting the women for disobeying ultra-Orthodox customs. However, these women, who began a coalition called the Women of the Wall, continued their Torah reading out loud, exercising their right of religious freedom on a regular, monthly basis. [150]

In response, **_Israel_** codified the ultra-Orthodox customs into law on December 31, 1989. As a result and on many occasions, Israeli police detained and arrested women praying at the Western Wall for wearing tallitot and tefillin; the arrests were based on the charge that the women's religious customs were disturbances to the public order. [151] However, in spite of the law and opposition by the ultra-Orthodox faction in **_Israel_**, the Women of the Wall maintained their strong conviction of religious gender equality, filing numerous petitions and appeals with the Israeli  **[*140]**  Supreme Court and continuing their monthly Torah service at the Western Wall. [152]

---

[147] Tallitot is the Hebrew word for prayer shawls and the singular term is tallit.

[148] Women of the Wall, History, _http://womenofthewall.org.il/about/history/._ (last visited May 27, **_2013_**).

[149] Marcy Oster, Women Should Not Have Been Arrested at Western Wall, Judge Rules, JTA (April 25, **_2013_**), _http://www.jta.org/**2013**/04/25/news-opinion/**israel**-middle-east/women-should-not-have-been-arrested-at-western-wall-judge-rules_. (last visited May 27, **_2013_**).

[150] Women of the Wall, supra note 148.

[151] Id.

[152] Id.

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 71 of 144   Page ID #:9198

Page 24 of 34

19 Ann. Surv. Int'l & Comp. L. 105, *140

Recently, on 25 April _**2013**_, "the Jerusalem District Court ruled... that customs change and women should not be arrested for wearing prayer shawls at the site." [153] Also in April _**2013**_, "an envoy appointed by Prime Minister Benjamin Netanyahu...proposed adding a mixed-gender section for non-Orthodox denominations of Judaism," so that they would be able to observe their religious customs at the Western Wall as well. [154]

Additionally, the LGBTQ movement in _**Israel**_ has followed a similar trajectory of starting out with groups of advocates whose voices gained momentum and ultimately resulted in concrete law and policy changes. A significant portion of activism began in media and popular cultural events. In 1993, the Israeli TV network, Arutz 2, began to regularly dedicate air-time to LGBTQ social and political topics. [155] "In 1997, Education Minister Zvulun Hammer sought to ban an Educational Television program on homosexual teenagers. The Association for Civil Rights in _**Israel**_, joined by several gay rights organizations, petitioned the High Court to overturn Hammer's decision," and the "Court ordered Hammer to permit the program to be aired." [156] In 1998, despite violent protests by the conservative right, annual gay pride parades began to take place in _**Israel**_. By 2006, Jerusalem served as host to the World Pride Festival. [157]

Within less than a decade, these types of civic engagement and activist campaigns around LGBTQ issues began to generate enough political pressure and will to change laws and policies in _**Israel**_. Example changes include recognition of gay marriages performed abroad in 2006 [158] and **[*141]** application of the Law of Return to the non-Jewish gay husband of an immigrant. [159]

While the fight for women and LGBTQ equality in _**Israel**_ is far from over, the leaps and bounds that _**Israel**_ has made regarding these issues is derived from the commitment and fervor of grassroots organizations and ordinary Israeli people non-violently fighting for equal rights. From the example of these two Israeli movements, it becomes clear that political pressure must come from a larger scale, collective transformation of the people. That transformation _**can**_ be achieved via parallel programs in _**Israel**_ and _**Palestine**_, uniting the ordinary people on both sides to elect respective governments that reflect their true desires for peacebuilding and negotiations.

C. OneVoice

OneVoice is "an international grassroots movement" that amplifies the voice of mainstream Israelis and Palestinians, empowering them ...to forge consensus for _**conflict**_ resolution and build a human infrastructure capable of mobilizing themselves toward a negotiated, comprehensive and permanent agreement between _**Israel**_ and _**Palestine**_." [160] OneVoice has four programs including: OneVoice _**Israel**_, OneVoice _**Palestine**_, OneVoice Europe, and OneVoice International. Engaging its many programs, OneVoice utilizes various methods of non-

---

[153] Jewish 'Women Of The Wall' Plan Further Court Battles Over Prayer Rights At Western Wall, REUTERS, _http://www.huffingtonpost.com/**2013**/04/28/women-of-the-wall-n3173669.html_. (last visited May 28, _**2013**_).

[154] Id.

[155] LEE WALZE, BETWEEN SODOM AND EDEN: A GAY JOURNEY THROUGH TODAY'S CHANGING _**ISRAEL**_ 151 (2000).

[156] GaytlvGuide, Significant Dates and Developments, _http://www.gaytlvguide.com/start-here/gay-rights-in-**israel**_. (last visited May 28, _**2013**_).

[157] Michael T. Luongo, Jerusalem Hosts World Pride, THE WORLD CONGRESS OF GAY, LESBIAN, BISEXUAL, AND TRANSGENDER JEWS, _http://www.glbtjews.org/_ article.php3?idarticle=205. (last visited May 28, _**2013**_).

[158] Ruth Eglash, Jerusalem Registers Its First Gay Couple, JPOST.COM, _http://www.jpost.com/**Israel**/Jerusalem-registers-its-first-gay-couple_ (2007). (last visited May 28, _**2013**_).

[159] Raphael Ahren, Ministry Grants Citizenship to Gay Spouse of Immigrant, HAARETZ, available at _http://www.haaretz.com/weekend-/anglo-file/ministry-grants-citizenship-to-gay-spouse-of-immigrant-1.382066_ (2011).

[160] OneVoice, _http://www.onevoicemovement.org/_. (last visited November 14, 2012).

19 Ann. Surv. Int'l & Comp. L. 105, *141

violence, such as crafting parallel programs in **_Israel_** and **_Palestine_** to build consensus, holding youth leadership programs, doing political outreach, and educating the Diaspora.

1. Parallel Programs in **_Israel_** and **_Palestine_** to Build Consensus

OneVoice **_Israel_** and OneVoice **_Palestine_** have parallel programs for each of its own populations to build consensus on what each side needs to resolve the **_conflict_** peacefully. The nature of these parallel programs is to appeal to each side's national self-interests in order to build a solid consensus. According to OneVoice, "progress at the negotiating table is only one step in the process of reaching an agreement that **_can_** be implemented. An end to the **_conflict_** will only come when the leaders come to an agreement that their peoples are ready to understand, accept, **[\*142]** and support." [161] Thus, the first step to reaching an agreement is consensus regarding the needs of each side.

In 2009, OneVoice administered a "Public Polling" phase to find out what the Palestinian and Israeli public cares most about and the people would like to see included in a final agreement. [162] In addition to eliciting the core issues and positions of the Israeli and Palestinian populations, "thoughtful polling was used to engage and inform ordinary people, highlight existing agreement, bolster moderate views, expose extreme positions, and ultimately build consensus and even peace." [163] The public polling phase, therefore did "not merely gauge public opinion, but engaged the public in crafting consensus on the issues at the heart of the **_conflict_**." [164]

According to the polling phase conduct by OneVoice, the top twelve most urgent issues for Palestinians (from most urgent to least) are:

1. Establishing an independent sovereign state of **_Palestine_** (97%)

2. The rights of refugees (95%)

3. Agreement on the future of Jerusalem (94%)

4. Agreement on managing Holy sites (91%)

5. Security for **_Palestine_** (90%)

6. Settlements in the Occupied Territories/West Bank (89%)

7. Rights to natural resources (88%)

8. Agreeing on borders for **_Israel_** and **_Palestine_** (77%)

9. Peace between **_Israel_** and the Arab World (35%)

10. Peace between **_Israel_** and Lebanon (31%)

11. Peace between **_Israel_** and Syria (30%)

12. Security for **_Israel_** (21%) [165]

---

[161] OneVoice, Programs, Public Polling, *http://onevoicemovement.com/programs/polling.php* (emphasis added). (last visited May 30, **_2013_**).

[162] Id.

[163] Id.

[164] Id.

[165] OneVoice, Programs, Part 1. The Shape of an Agreement, *http://onevoicemovement.com/programs/pollingpart1.php#substance.* (last visited May 30, **_2013_**).

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 73 of 144   Page ID #:9200

Page 28 of 34

19 Ann. Surv. Int'l & Comp. L. 105, *142

The top twelve most urgent issues for Israelis are:

1. Security for **_Israel_** (77%)

2. Agreement on the future of Jerusalem (68%)

3. Rights to natural resources (62%)

4. Agreement on managing Holy sites (57%)

5. Agreeing on borders for **_Israel_** and **_Palestine_** (49%)  **[*143]**

6. Peace between **_Israel_** and Jordan (47%)

7. Peace between **_Israel_** and Egypt (46%)

8. Peace between **_Israel_** and the Arab World (37%)

9. Peace between **_Israel_** and Lebanon (36%)

10. Peace between **_Israel_** and Syria (36%)

11. Establishing an independent sovereign state of **_Palestine_** (33%)

12. Settlements in the Occupied Territories/West Bank (33%) [166]

Although what is the most urgent issue for one group is not the top issue for the other, it is profoundly noteworthy that each side is concerned about the top twelve urgent issues of the other side in some capacity. Specifically, the polling phase revealed that the vast majority (approximately 75% of each side) of Palestinians and Israelis would accept a two state solution as a basis for a peace agreement. [167] These results were then analyzed and prepared into a report, but more importantly they were used as a basis from which to launch and inform the next phase, Town Hall Meetings. [168]

Once the poll results were gathered, OneVoice held town hall meetings to convert the outreach from individual level engagement of the peacebuilding process to that of a community level engagement. [169] These meetings served to "surface issues and break taboos, while building understanding that ending the **_conflict_**, ending the occupation, ensuring security, and achieving a two state solution is possible." [170]

Building national consensus about what each side wants is imperative to resolution of the **_conflict_**, because the consensus **_can_** inform the content and structure of a peace agreement. The content and structure of the peace agreement **_can_** then be used as a framework for the government to engage in negotiations. With a growing civilian interest in pursuing **_where_** each side's national self-interests overlap, the people of the **_conflict_** will have the opportunity to put pressure on the government to enter into negotiations or elect officials to government who reflect the people's desire for peace and negotiation.

---

[166] Id.

[167] Id.

[168] OneVoice, supra note 161.

[169] OneVoice, Programs, Breaking Taboos, _http://www.onevoicemovement.org/programs/townhall.php_. (last visited November 16, 2012).

[170] Id.

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 74 of 144   Page ID #:9201

Page 27 of 34

19 Ann. Surv. Int'l & Comp. L. 105, *143

An example of the changing consciousness of the Israeli people was the Israeli audience's positive reaction to President Obama's recent address **[*144]** in March **_2013_**. [171] Despite President Obama making some less than traditionally conservative statements, him and his speech were received very well by the young Israelis. For example, when Obama stated that peace is necessary, and security for **_Israel_** is not possible without "the realization of an independent and viable **_Palestine_**," the audience gave President Obama a standing ovation. [172] Obama also stated, "the Palestinian peoples' right to self-determination, their right to justice, must also be recognized," and his words were met with cheering and applauding by the Israeli audience. [173] Finally, Obama adamantly asserted, "Israelis must recognize that continued settlement activity is counterproductive to the cause of peace," and again, the Israeli audience responded with clapping and unwavering support. [174] The positive reaction of Israelis to President Obama's speech is a testament to the fact that more Israelis share these progressive views about peace than the media leads us to believe; change is happening.

When people change their minds, they elect officials who reflect their beliefs and put pressure on their current elected officials to make tangible strides toward changing the status quo. As mentioned above, it is clear that neither the Israeli Government nor the Palestinian elected government in Gaza seem interested in resuming peace talks or resolving the **_conflict_**. Violence has escalated by both Hamas and the Netanyahu government, and Netanyahu's continual expansion of settlements on what will eventually be part of the Palestinian State are an obstacle to peace that undermines a two-State solution.

However, the Israeli reaction described above is not just a spectacle; the change in Israeli consciousness is having a real impact. This shift that Israelis are moving in a more progressive direction was evident in the most recent Israeli elections held in late January **_2013_**. The far right wing electoral alliance, Likud Beiteinu headed by Netanyahu, won far less seats in the current Israeli Parliament, decreasing dramatically from 42 down to 31 seats. [175] Replacing those seats is a growing centrist party **[*145]** known as "Yesh Atid," meaning "there is a future" in Hebrew, who received 19 seats, and the third largest contingency is the Labour party with 15 seats. [176] "Erel Margalit of Labour said the results indicated 'a protest vote against Netanyahu' and that the huge social justice protests that swept **_Israel_** 18 months ago 'were not a fringe phenomena. Perhaps some of it is moving from the streets into the political arena.'" [177]

While the far right still has the most seats, this move towards the center is a reflection of the changing nature of the Israeli consciousness. This changing Israeli consciousness has been prompted by the more progressive contingency and is likely (at least in part) a result of the positive methods of non-violence. Thus, to unite the ordinary people of **_Palestine_** and **_Israel_** to elect new governments or sway their current elected officials, the movement needs youth leadership programs, education programs in the Diaspora, political outreach advocacy, and coalition building across community lines.

---

[171] Grace Wyler, Obama Just Finished His Speech In **_Israel_**, And People Are Already Saying He Made History BUSINESSINSIDER (March 21, **_2013_**), _http://www.businessinsider.com/obama-**israel**-speech-2013-3_. (last visited May 28, **_2013_**) (President Obama spoke to an audience of Israelis in Jerusalem, most of whom were university students. It should be noted that Jerusalem is one of the most religious and politically conservative cities in **_Israel_**.)

[172] Erin Delmore, Obama to Young Israelis: 'You are not alone,' MSNBC, _http://tv.msnbc.com/**2013**/03/21/watch-live-president-obama-speaks-to-israelis/_. (see video at 27:55) (last visited May 28, **_2013_**).

[173] Id. (see video at 31:44).

[174] Id. (see video at 39:27).

[175] Harriet Sherwood, Binyamin Netanyahu suffers setback as centrists gain ground in **_Israel_** election Results give narrowest of victories to the prime minister's rightwing-religious block, THE GUARDIAN, (January 23, **_2013_**), _http://www.guardian.co.uk/world/**2013**/jan/22/**israel**-elections-binyamin-netanyahu_. (last visited February 20, **_2013_**).

[176] Id.

[177] Id.

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 75 of 144   Page ID #:9202

Page 28 of 34

19 Ann. Surv. Int'l & Comp. L. 105, *145

2. Youth Leadership Program

The OneVoice Youth Leadership Program is run on two separate tracks - OneVoice **_Israel_** and OneVoice **_Palestine_**. OneVoice **_Israel_** conducts lectures on Israeli university campuses about the OneVoice movement and holds initial training seminars to teach youth leadership skills. It also holds an advanced seminar to designate OneVoice Ambassadors the "responsibility and reward of representing the Movement before different audiences - on a college tour, in Town Hall Meetings, in meetings with supporters and donors oversees, or at events with groups from abroad." [178] These lectures and seminars then prepare the youth to become OneVoice Trainers who "represent the Movement at conferences and events" including "being interviewed as spokespersons for OneVoice in print and broadcast media, joining delegations to the World Economic Forum, and meeting with dignitaries on behalf of the Movement." [179]

OneVoice **_Palestine_** also has a training program, which has been completed by 1,500 youth activists spanning across 8 West Bank cities and has developed a pilot program for youth in Gaza. OneVoice **_Palestine_** **[*146]**

supports the youth leaders in planning and implementing youth initiatives that serve their communities and help spread the OneVoice message and recruit new members. The purpose of these activities is to empower their youth leaders, give them more responsibility, strengthen their relationships with their local communities, and promote OneVoice as a real grassroots movement interested in civic engagement [180]

These Israeli and Palestinian parallel youth programs strengthen the respective national communities and create a united front on each side. By creating a united a front, OneVoice is ensuring that the people on each side stay engaged in the end goal, resolution of the **_conflict_**. Furthermore, the existence of these parallel programs provides each group with the reassurance that when the people are ready, there is someone to talk to and negotiate with on the other side. [181]

3. Education Programs and Political Outreach in the Diaspora

OneVoice Europe and OneVoice International Programs engage the people living outside of **_Israel_** and **_Palestine_**, including students and political leaders in the UK and US. As part of the International Education Program, OneVoice organized tours for Palestinians and Israelis living the **_conflict_** everyday to interface with, and provide a better understanding to, their families, friends, and supporters abroad. "The program shares the reality on the ground with American, Europeans and many other international audiences, and offers them the opportunity to experience the **_conflict_** through the eyes of ordinary Israelis and Palestinians who work tirelessly to achieve Middle East peace." [182] In the United States alone, "more than 19,000people have attended OneVoice regional tour events on over 100 U.S. university campuses and community centers." [183]

OneVoice Europe initiated political outreach and education programs to address the Anti-**_Israel_** and Anti-Palestinian communities in Europe who were increasingly taking extreme positions and further polarizing the **_conflict_**. [184] "In 2011, OneVoice Europe launched a new Outreach and Education Programme sic that continues

---

[178] OneVoice, OneVoice-**_ISRAEL_**, _http://onevoicemovement.com/programs/onevoice-**israel**.php._ (last visited May 30, **_2013_**).

[179] Id.

[180] Id.

[181] OneVoice, About OneVoice, _http://www.onevoicemovement.org/about-onevoice/activities.php_ (last visited May 30, **_2013_**).

[182] OneVoice, Programs, OneVoice INTL, _http://www.onevoicemovement.org/programs/onevoice-international.php._ (last visited May 30, **_2013_**).

[183] Id.

[184] OneVoice, Programs, OneVoice EUROPE, _http://www.onevoicemovement.org/_ programs/onevoice-europe.php. (last visited May 30, **_2013_**).

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 76 of 144   Page ID
#:9203

Page 29 of 34

19 Ann. Surv. Int'l & Comp. L. 105, *146

the work [done in **_Israel_** and **[*147]** **_Palestine_**] on university campuses in the form of **_conflict_** resolution training sessions and student support." [185] The "Outreach and Education Programme" is:

a future-focused initiative, engaging its participants in forward-thinking dialogue about solutions, rather than backward-looking debate about historical narratives. Its potential to build bridges between communities, empower moderate students, and promote **_conflict_** resolution is powerful and unique, involving members of British, Palestinian, and Israeli society from many faiths and backgrounds. [186]

Community and university leaders meet for "an in depth **_conflict_** resolution and leadership training session, with the aim of empowering them to carry on such discussion activities and to continue promoting a transformation of attitudes within their own communities." [187] This education model is imperative to non-violently combat the anger and hatred incited by the media. It provides a constructive way for the international community to engage in what ordinary Palestinians and Israelis really want - peace.

OneVoice Europe has also reached out to the political community by organizing meetings with the Right Honorable David Miliband Foreign Secretary and by liaising with former Prime Minister Tony Blair and the Quartets representative to the Middle East. Additionally, OneVoice Europe has successfully organized a rally in Parliament square "attended by over 300 members of the public and 30 parliamentarians" to demand that the OneVoice principles be used **_going_** forward and to prioritize the **_conflict_** and future negotiations. [188] Thus, political outreach has allowed "grassroots to be heard at the highest level of the international community." [189]

Recently "in 2011, Shadow Middle East Minister Stephen Twigg commended [OneVoice's] work to the House of Commons, calling on the Foreign Secretary William Hague to join him in recognizing the movement and its achievements." [190] International political involvement is yet another way for the international community to constructively engage in promoting negotiations to end the **_conflict_**. Political advocacy is also **[*148]** another powerful tool that **_can_** be used to spread information about methods of non-violence. In addition to the separate youth programs in **_Israel_** and **_Palestine_** and education of youth and students abroad, it is important to engage the youth of **_Palestine_** and **_Israel_** in a coexisting environment so that they **_can_** develop positive associations with one another and share that experience with the older generations.

D. Seeds of Peace

Seeds of Peace is a non-profit organization that conducts a three-week intensive **_conflict_** resolution program for youth ages 14-16 from regions of **_conflict_**. The children (also known as "Seeds") coexist in a camp in Maine, United States and engage in "hours of discussion guided by professional facilitators" to "confront each other directly over their competing historical narratives and share their personal experiences of the **_conflict_**." [191] After "the Seeds have reached new thresholds for understanding perspectives," they return to their respective homes. At home, the organization provides year round local programs for the graduates to ensure their continual development as effective peace builders. [192] "Seeds of Peace offers more targeted programs and advanced skills training as

---

[185] Id.

[186] Id.

[187] Id.

[188] Id.

[189] Id.

[190] Id.

[191] Seeds of Peace, International Camp, _http://www.seedsofpeace.org/?pageid=770_. (last visited May 30, **_2013_**).

[192] Id.

alumni move into their university years and begin their careers, leveraging their unique relationships, understanding, and skills to shift the landscape of _**conflict**_ and peace in the Middle East." [193]

 Youth programs do not just promote education and understanding amongst the young, but also help bridge the older generations to the younger progressive movements. While older generations are more likely to have stories of pain and suffering that have been compounded by time and anger, the younger generation has had less time to process and internalize their stories of pain and loss into deeply imbedded hatred. Children are resilient; they have more energy, more free time, and a more probable chance of mustering enough forgiveness to work towards a resolution in comparison to their older counterparts. Thus, the younger generation that is exposed to and generally more inclined to progressive thinking _**can**_ and likely will have a transformative impact on older generations. [194]
  **[*149]**

 In line with this thought, the younger the children involved in these programs, the sooner they will be exposed to a positive interaction with their alleged enemy and the better chance that they will have to work through any pain and suffering caused by the _**conflict**_. The sooner young children have these interactions and engage in _**conflict**_ resolution work, the more likely it is that when and if they do experience loss and pain, they will still pursue methods of non-violence to resolve the _**conflict**_, because they have the most to lose if the status quo is maintained. The inherent intergenerational work accomplished by youth programs ensures long lasting progress toward peace efforts. Young people involved in the program feel a sense of empowerment and responsibility, which will inspire them to transform the minds of their parents and to carry on their activism into their adult life.

E. Shatil of the New _**Israel**_ Fund

 Creating coalitions across community lines, Shatil of the New _**Israel**_ Fund bridges existing gaps between Israeli civilians and non-Jewish Arabs living within the borders of _**Israel**_.

 Shatil was founded by the New _**Israel**_ Fund to help build and strengthen civil society in _**Israel**_. They work for social change together with activists, organizations, networks, grass-roots groups and social movements in _**Israel**_ and worldwide. They aspire toward a society based on equality of all citizens and residents of _**Israel**_ - a society that believes in the principles of social, economic and environmental justice and works to achieve them; a society that promotes human and civil rights, respects religious and cultural differences, and recognizes the importance of shared society. [195]

 Shatil has various initiatives working on a myriad of aspects in Israeli civil society, including: twenty-two (22) religious and feminist organizations working against the exclusion of women from the public sphere, The Umbrella Forum for Bedouin Education, The Coalition against Immigrant Under-employment, and Yachdav for the Prevention of Violence in the Ethiopian Family, to name only a few.

 To promote a unified Israeli society, Shatil has a "Shared Society" initiative, which "is working to establish a society in which all groups feel a sense of belonging and shared ownership - facilitating Arab **[*150]** Jewish dialogue and joint action to address the root causes of _**conflict**_, alleviate tensions and develop interim and long-term solutions." [196] Shatil utilizes strategic tools and methodologies to accomplish this goal, including 1) "Formation and capacity-building of Arab-Jewish leadership groups to effect change 2) Consulting and training of activists and organizations in the use of constructive tactics 3) 'Workplace Dialogue,'" which creates a safe space for the "facilitation of Arab-Jewish dialogue groups in institutions, enterprises and organizations to advance equality in workplace policies and

---

[193] Seeds of Peace, Middle East Programs, _http://www.seedsofpeace.org/?pageid=1252_.

[194] See Welsh-Huggins, Personal ties _**can**_ change gay marriage attitudes, FOXNEWS.COM (12 May 2012), _http://www.foxnews.com/us/2012/05/12/personal-ties-**can**-change-gay-marriage-attitudes/_. (last visited May 30, _**2013**_).

[195] New _**Israel**_ Fund, Shatil, Shared Society, _http://www.shatil.org.il/english/change/shared-society/_. (last visited June 29, 2012).

[196] Id.

Case 2:16-cv-04435-PA-MRW Document 97-10 Filed 05/08/17 Page 78 of 144 Page ID #:9205

Page 31 of 34

19 Ann. Surv. Int'l & Comp. L. 105, *150

practices [197] and 4) Leadership training "for creating new visions and the practical skills to mobilize and implement them." [198]

The various programs and initiatives of Shatil serve the vast diverse population within *Israel*, which allows for coalition building across community lines. These human connections between different and historically opposed communities will strengthen the collective Israeli identity to be one that is inclusive of people from all ethnic backgrounds and religions. In turn, this inclusivity will promote understanding, internal peace, and a solid core for making progress toward peace with Palestinians.

F. Blue White Future (BWF)

Utilizing the methods of non-violence discussed above establishes a strong foundation of political activism, creates consensus for the goal of two separate states, and builds momentum for constructive change and progress toward peace negotiations. Blue White Future (hereinafter BWF) employs this momentum by promoting a process called constructive unilateralism - "a move by either party that helps to further the achievement of two states." [199] According to BWF, constructive unilateralism "is in line with the two-state vision as described in the many blueprint proposals for a two state solution" and "a constructive unilateral move will not become an obstacle once the parties resume negotiations." [200] An example of constructive unilateralism was the Israeli disengagement from Gaza in 2005. Accordingly, BWF urges the Israeli Government and the Palestinians to take measures of constructive **[*151]** unilateralism even before peace negotiations occur to aid that process. [201] Thus, "the underlying principle of the new paradigm calls for gradually creating a reality of two states by performing a series of gradual constructive unilateral steps." [202]

The most obvious next steps for the Israeli Government are to halt construction and expansion of settlements in the West Bank and to "enact a law that allows for voluntary evacuation, compensation and eventual absorption of settlers presently residing [within the Occupied territory of the West Bank], to encourage settlers who wish to relocate" to *Israel* proper. [203] BWF also insists "*Israel* should prepare a national plan for the absorption of the settlers who would relocate to *Israel* proper, whether before or after an agreement is signed. Such a plan should have urban, vocational, social, psychological and other appropriate components" to compensate these settlers. [204] "According to recent polls, nearly 30 percent of the 100,000 settlers [living in the Occupied West Bank] would accept compensation and quickly relocate into *Israel* proper." [205] Therefore, taking the constructive unilateral step to assist those settlers who voluntarily wish to leave the settlements would be a feasible process with incentives and compensation and not similar to the arguably traumatic disengagement of Gaza in 2005. [206]

---

[197] Id. ("An example of this mediated intervention is their successful on-*going* program with the professional and administrative staff at the multicultural Safed College.").

[198] Id.

[199] White Paper - A New Paradigm for the Israeli-Palestinian Political Process:Promoting Two States for Two People via Constructive Unilateralism with International Support, The New Paradigm 2012, BLUE WHITE FUTURE (January 6, 2012), available at *http://bluewhitefuture.org/the-new-paradigm-2012/*.

[200] Id.

[201] Id.

[202] Id.

[203] Id.

[204] Id.

[205] Gilead Sher, Op Ed: Steps *Israel* Should Take to Control its Destiny, BLUE WHITE FUTURE (October 11, 2012), *http://bluewhitefuture.org/news-category/news/*. (last visited January 11, ***2013***).

[206] Id.

19 Ann. Surv. Int'l & Comp. L. 105, *151

The next step for the Palestinians is to halt all acts of violence and terrorism against the State of _**Israel**_ and its residents. The various Palestinian Governments, but mainly Hamas, must unilaterally cease any and all acts of violence and take measures to stop their own Palestinian citizens from engaging in any violence or acts of terrorism. However, constructive unilateralism should not only be reserved to _**Israel**_ and _**Palestine**_. The international community has more resources to assist with these processes, and therefore should contribute as well. [207] **[*152]**

III. WHAT IS AT STAKE FOR US ABROAD?

Although the aforementioned methods of non-violence are actively being utilized by a myriad of non-profit organizations, the Palestinian-Israeli _**conflict**_ is still underway because there is not enough media attention, education about the non-violent movement, or access to information about how to get involved. Therefore, it is no surprise that the people's collective consciousness about the _**conflict**_ has not yet been transformed and more work must be done to that end.

Simply put, it is in the global interest as well as in the national self-interest of Americans to get involved in securing a peace agreement between the Israeli and Palestinian Governments. The international community and the U.S. cannot afford to financially support a _**conflict**_ that is unsustainable. On the international front, many surrounding Arab nations provide weapons and military contributions to Hamas, further perpetuating the cycle of violence. Instead, this aid should be provided in the form of resources, such as food, water, education, and health assistance. If the neighboring States are really concerned with the plight of the Palestinian people, then their contributions should be geared toward the prosperity of the people, not the destruction of _**Israel**_. Similarly, U.S. tax money _**goes**_ toward providing arms to the Israeli military, so the U.S. _**can**_ and should use this fact to leverage a peace negotiation.

Like any armed _**conflict**_, the Israeli-Palestinian _**conflict**_ has created negative environmental repercussions that have a global effect. [208] Thus, the international community and _**can**_ and should get more involved in the _**conflict**_ to address and ideally prevent these environmental harms from occurring. Finally, all first-world superpower States with a lot of privilege and pull in the U.N. should put at least some of their resources into achieving peace if for no other reason than to bolster international security, and thereby national security.

According to OneVoice:

Israelis and Palestinians equally share the role and responsibility to propel their leaders toward the two-state solution that resolves all final status issues and establishes an independent Palestinian state, based on the borders of 1967, at peace with _**Israel**_. This _**can**_

**[*153]**

only be achieved if the international community embraces its role, helping realize the vision of the movement through constructive engagement and action. [209]

The international community has an ethical obligation to _**Israel**_, _**Palestine**_, and its respective people to engage in peacebuilding efforts that promote negotiations. International direct engagement and activism to end the Palestinian-Israeli _**conflict**_ may help bridge gaps between communities abroad. These historically polarized and

---

[207] While eventual dismantling of the settlements is a necessary step to make progress towards peace and will probably be a condition to the peace negotiations, this process and how to achieve complete settlement disengagement for the settlers who do not wish to leave voluntarily is in and of itself likely not considered a non-violent procedure. Therefore, it is outside the scope of this paper.

[208] Eugenia Ferragina, The Effects of the Israeli-Palestinian _**Conflict**_ on Water Resources in the Jordan River Basin, GLOBAL ENVIRONMENT, available at _http://www.globalenvironment.it/ferragina.pdf_.

[209] OneVoice, supra note 182.

19 Ann. Surv. Int'l & Comp. L. 105, *153

unaffiliated groups may even develop a **_holistic approach_** to **_conflict_** resolution that **_can_** be applied in all international political spheres.

IV. HOW **_CAN_** WE BECOME INVOLVED?

The first and most important way to get involved is to get educated about the non-violent work being done. The second and easiest way to get involved is to donate money to any one or more of the organizations committed to ending the **_conflict_** in a non-violent way. The third way to get involved is to write letters to senators, congressman, and the president to request that they prioritize the Israeli-Palestinian **_conflict_** and promote negotiations between both governments. The fourth and most rewarding way to get involved is to check out the links below and attend a local program, become an active member of an organization committed to non-violent work, volunteer in an internship, engage in community work regarding this or any other **_conflict_**, and/or practice any one or more of the methods of non-violence.

| Name of | Websites Regarding Specific Ways to Get |
|---|---|
| **Organization** | **Involved** |
| Parents | |
| | http://theparentscircle.com/MalingList.aspx |
| Circle | |
| Family | |
| Forum | |
| Combatants | |
| | http://cfpeace.org/?pageid=123# |
| For Peace | |
| OneVoice | |
| | http://onevoicemovement.org/get-involved/ |
| International | |
| | http://www.onevoicemovement.org/programs/ |
| | IEP/ documents/ |
| | TrainingSeminarApplication04.02.12.pdf |
| | |
| New **_Israel_** | http://www.nif.org/get-involved |
| Fund | |
| | |
| **_Israel_** | http://www.ipcri.org/IPCRI/GetInvolved.html |
| | |
| **_Palestine_** | |
| Center for | |
| Research | |
| and | |
| Information | |

et

If we in the Diaspora are truly concerned with achieving a lasting and just peace in **_Palestine_** and **_Israel_**, we must seek out information about this movement, instead of being victims to the only aspect of the **_conflict_** **[*154]** that the media seeks to portray which are violence and destructive criticism.

V. CONCLUSION

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 81 of 144   Page ID #:9208

Page 34 of 34

19 Ann. Surv. Int'l & Comp. L. 105, *154

 The status quo in **_Israel_** and **_Palestine_** is not sustainable. The escalating violence and current governments of both sides are a reflection of the people's omnipresent fear of the other side. However, we do not have to sit idly by. Dialogue and reconciliation are the first steps to peacefully combating fear, because they promote understanding. Understanding will inform counter narratives of the **_conflict_** like non-violence and peacebuilding. Non-violence will be echoed in and utilized by media to educate the public. Educating the public will inspire political outreach and advocacy. Political activism will strengthen parallel programs in **_Palestine_** and **_Israel_** that build consensus among the people. Youth leadership programs **_can_** further bolster consensus among the people, because youth play a part in transforming the minds of the older generations and collective consciousness. Education about consensus reached in **_Palestine_** and **_Israel_** must reach the Diaspora so the Diaspora **_can_** do its part to support the consensus with constructive unilateralism to end the **_conflict_**. The non-violent movement in **_Palestine_**, **_Israel_**, and abroad will inspire coalition building across community lines everywhere. Finally, when the people are provided with the tools and resources to work with one another on a grassroots level, they will be united to change the status quo. They will both elect new governments that share their beliefs and desires for peace and resolution to the **_conflict_** or put pressure on current governments to resume and conclude final peace negotiations. This transformation of the government and people using methods of non-violence is an essential piece to a lasting peace in **_Israel_** and **_Palestine_**.

Annual Survey of International & Comparative Law

Copyright (c) **_2013_** Annual Survey of International & Comparative Law

Golden Gate University School of Law

**End of Document**

# EXHIBIT 176

# NOTE & COMMENT: VIOLATIONS OF INTERNATIONAL CRIMINAL LAW IN THE ISRAELI-PALESTINIAN CONFLICT: WHY THE INTERNATIONAL CRIMINAL COURT SHOULD NOT PROSECUTE IN THE "INTERESTS OF JUSTICE"

Fall, 2015

**Reporter**
29 Temp. Int'l & Comp. L.J. 275 *

**Length:** 20045 words

**Author:** By: **_Emily Christian_**\*

\* J.D. Candidate, Temple University James E. Beasley School of **_Law_**, 2016; B.A., Anthropology, Boston University, 2012. Thanks to the staff and editors of the Temple **_International_** and Comparative **_Law_** Journal for their time and support **_in_** helping make this paper the best it can be. A very special thanks to Professor Meg deGuzman for contributing her incredible expertise and guidance throughout this process.

# Text

[*275]

I. Introduction

On April 1, **_2015_**, Palestine acceded to the jurisdiction of the **_International Criminal Court_** (ICC). [1] Established **_in_** 1998 by the Rome Statute, [2] the ICC is a permanent, independent **_international_** tribunal that holds those who **_violate_** **_international criminal law_** accountable. [3] The ICC has jurisdiction over states that have both signed and ratified the Rome statute. [4] The ICC can investigate and **_prosecute_** crimes such as genocide, war crimes, and crimes against humanity. [5] With the establishment of the ICC, state signatories to the Rome Statute can invoke ICC jurisdiction for crimes committed on the signatory's territory or for crimes committed by a national of a signatory state. [6] However, the ICC can only investigate or **_prosecute_** cases when the involved states are either unable or unwilling to investigate or **_prosecute_** the conduct themselves. [7] Furthermore, the [*276] ICC only **_prosecutes_**

---

[1] Russian Television, Palestine gets ICC Membership, Opening Door to Israel War Crimes **_Prosecution_**, RT QUESTION MORE (Apr. 1, **_2015_**, 1:59 PM), http://rt.com/news/245793-palestine-icc-israel-crimes/.

[2] Rome Statute of the **_International Criminal Court_**, Jul. 17, 1998, 2187 U.N.T.S. 90 [hereinafter Rome Statute].

[3] ICC at a Glance, Int'l Crim. Ct., http://www.icc-cpi.int/en_menus/icc/about%20the% 20court/icc%20at%20a%20glance/Pages/icc%20at%20a%20glance.as px (last visited Sept. 21, **_2015_**).

[4] Am. Non-Gov't Org. Coal. for the ICC, Jurisdiction of the ICC, AMICC, http://www. amicc.org/icc/jurisdiction (last visited Oct. 4, **_2015_**).

[5] Id.

[6] Jurisdiction and Admissibility, ICC at a Glance, Int'l. Crim. Ct., http://www.icc-cpi.int/en_menus/icc/about%20the%20court/icc%20at%20a %20glance/Pages/jurisdiction%20and%20admissibility.aspx (last visited Oct. 31, **_2015_**).

[7] Understanding the ICC, Int'l Crim. Ct. 1, http://www.icccpi.int/iccdocs/PIDS/publication s/UICCEng.pdf (last visited Sept. 21, **_2015_**) ("The **_International Criminal Court_** is **_not_** a substitute for national **_courts_**. According to the Rome Statute, it is the duty of

29 Temp. Int'l & Comp. L.J. 275, *276

individuals for **_violations_** of **_international law_** and is **_not_** concerned with general disputes between states or groups. [8]

Once a state has joined the ICC, the state may refer cases to the **_court_** and request that the ICC begin an official investigation. [9] The ICC Prosecutor will then determine whether enough evidence exists to move a case forward: specifically, whether it appears a crime has been committed within the **_court_**'s jurisdiction. [10] When a crime [11] is thought to have been committed, the Prosecutor has the discretion to decline to investigate or **_prosecute_** an individual accused of such crimes if doing so would **_not_** be **_in_** the "interests of justice." [12] **_In_** order to set out the Office of the Prosecutor's understanding of the concept of the interests of justice, former ICC Prosecutor Luis Moreno-Ocampo's office issued a policy paper **_in_** September 2007, which interpreted the "interests of justice" [13] very narrowly. The policy paper states that the Prosecutor should decline to **_prosecute_** **_in_** only the rarest of circumstances and that fact that **_prosecutions_** would interfere with the peace process should **_not_** factor into the Prosecutor's decision. [14] However, the paper also **_noted_** that the former Prosecutor's interpretation of the "interests of justice" [15] is subject to revision by future Prosecutors. [16]

Palestine has accepted ICC jurisdiction for alleged **_violations_** of **_international law_** - committed by both Palestine and Israel - that occurred since June 13, 2014. [17] This acceptance of jurisdiction means that the current ICC Prosecutor, Fatou Bensouda, may choose to investigate and **_prosecute_** potential war crimes that occurred between Israel and Palestine **_in_** the summer of 2014 during a three-week **_conflict_** that has come to be known as Operation Protective Edge. [18]

---

every State to exercise its **_criminal_** jurisdiction over those responsible for **_international_** crimes. The **_International Criminal Court_** can only intervene where a State is unable or unwilling genuinely to carry out the investigation and **_prosecute_** the perpetrators.").

[8] Id. Disputes between groups or states are handled by the **_International Court_** of Justice, the judicial body of the United Nations. Id. at 4.

[9] Id. at 17.

[10] Id.

[11] These crimes are genocide, war crimes, crimes against humanity, and the crime of aggression, when the conditions for the exercise of the **_Court_**'s jurisdiction over the latter are fulfilled. Id. at 13.

[12] Rome Statute, supra **_note_** 2, at art. 53.

[13] Id.

[14] Int'l **_Criminal Court_** Office of the Prosecutor, The Interests of Justice, 3 n. 5 (Sept. 2007), _http://www.icc-cpi.int/iccdocs/asp_docs/library/organs/otp/ICC-OTPInterestsOfJustice_ .pdf.

[15] Rome Statute, supra **_note_** 2, at art. 53.

[16] See Int'l **_Criminal Court_** Office of the Prosecutor, supra **_note_** 14, at 1 ("This a policy document of the Office of the Prosecutor and, as such, it does **_not_** give rise to rights **_in_** litigation and is subject to revision based on experience and **_in_** the light of legal determinations by the Chambers of the **_Court_**.").

[17] Palestine, Int'l Crim. Ct., _http://www.icccpi.int/en_menus/asp/states%20parties/a_ sian% 20states/Pages/Palestine.aspx (last visited Jan. 30, **_2015_**).

[18] See Amnesty **_International_** Report 2014/15, Amnesty Int'l, _https://www.amnesty.org/en/_ countries/middle-east-and-north-africa/israel-and-occupied-palestinian-territories/report-israel-and-occupied-palestinian-territories/ (last visited Oct. 4, **_2015_**) (describing Operation Protective Edge).

**[\*277]**  There has **not** yet been a situation **in** which the ICC prosecutor has declined to investigate or **prosecute** based on the "interests of justice."  [19] However, the current situation between Israel and Palestine warrants the exercise of prosecutorial discretion **not** to investigate or **prosecute**. The ICC Prosecutor should decline to investigate and **prosecute** the conduct that took place during Operation Protective Edge because doing so would **not** be **in** the "interests of justice" as described **in** Article 53 of the Rome Statute.  [20] This is because **prosecution**, while providing some obvious benefits like accountability for past conduct and deterrence of future conduct, would likely prevent any future peace negotiations and would further complicate an already tense **conflict**. As mentioned, the former ICC Prosecutor interpreted the meaning of the "interests of justice" narrowly enough to essentially foreclose considering whether **prosecution** could interfere with the peace process.  [21] Fatou Bensouda, however, is **in** a position to change that official interpretation.  [22] Even if the Prosecutor chooses **not** to broaden the current office's interpretation of the meaning of the "interests of justice," the United Nations Security Council (UNSC) can defer the ICC's investigation - **in** theory, indefinitely - if an investigation would significantly interfere with the interests of peace and stability.  [23] If the Prosecutor declines to broaden its official interpretation of the "interests of justice," then the UNSC should choose to defer the investigation until the parties are much closer to reaching a lasting peace solution.

Part II discusses the ICC **in** more detail and addresses the jurisdictional powers the ICC holds, as determined by the Rome Statute. Part II also provides an overview of the "interests of justice" under Article 53 of the Rome Statute. Part III explains the history of the **conflict** between Israel and Palestine from the late 19th century to the occurrence of Operation Cast Lead **in** 2008-2009. Part IV discusses the current **conflict** between Israel and Palestine, including Operation Cast Lead **in** 2008-2009 and Operation Protective Edge **in** 2014. Part IV will also address the specific conduct that gave rise to Palestine's referral to the ICC. Finally, Part V argues that the Prosecutor should decline to **prosecute** the conduct that took place during Operation Protective Edge because **prosecution** would significantly interfere with the peace efforts **in** the **Israeli-Palestinian conflict** and would therefore **not** be **in** the "interests of justice" under Article 53 of the Rome Statute.

II. The **International Criminal Court**, its Powers, and its Jurisdiction

 The ICC was established **in** response to historical difficulties **in** the  **[\*278]**  investigation and **prosecution** of war crimes.  [24] The **international** community sought the establishment of an independent, permanent tribunal after the end of the Cold War.  [25] At this time, **international criminal** tribunals existed for specific **conflicts**, such as those **in** Rwanda and **in** the former Yugoslavia, which spurred the **international** community's desire for a permanent tribunal that could exercise jurisdiction over a wider variety of situations.  [26] The ICC was created **in** 1998 by the Rome Statute, and officially came into effect **in** 2002.  [27] The **court** hears **criminal** cases and tries **violations** of the most serious **international** crimes, including genocide, crimes against humanity, war crimes, and the crime of

---

[19]  Int'l **Criminal Court** Office of the Prosecutor, supra **note** 14, at 4 ("The Prosecutor has **not** yet made a decision **not** to investigate or **not** to proceed with a **prosecution** because it would **not** serve the interests of justice."); Rome Statute, supra **note** 2, at art. 53.

[20]  Rome Statute, supra **note** 2, at Art. 53.

[21]  Int'l **Criminal Court** Office of the Prosecutor, supra **note** 14, at 8.

[22]  Id. at 1.

[23]  Rome Statute, supra **note** 2, at art. 16.

[24]  See About the **Court**, Int'l Crim. Ct., http://www.icccpi.int/en_menus/icc/about%20the% 20court/Pages/about%20the%20court.aspx (last visited Sept. 22, 2014) (discussing the establishment of the ICC).

[25]  Id.

[26]  Id.

[27]  Id.

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 86 of 144   Page ID #:9213

Page 4 of 28

29 Temp. Int'l & Comp. L.J. 275, *278

aggression. [28] Palestine has invoked ICC jurisdiction for conduct that has taken place since Operation Protective Edge. [29] As a result, the ICC may investigate and _**prosecute**_ individuals who have been accused by either Israel or Palestine as having committed war crimes during Operation Protective Edge.

A. The Rome Statute

 The Rome Statute established the ICC and details what types of crimes may be heard by the _**court**_. [30] As of this writing, 123 countries have ratified the Rome Statute, meaning the ICC may exercise jurisdiction over those countries if necessary. [31] However, the ICC is a _**court**_ of last resort. [32] Where the ICC has jurisdiction over a member state, it cannot _**prosecute**_ individuals accused of war crimes if a signatory to the Rome Statute has already investigated or _**prosecuted**_ that individual, unless it seems as though that investigation or _**prosecution**_ was _**not**_ legitimate. [33] This rule is known as the principle of complementarity. [34] According to the Rome Statute, the ICC may hear cases involving genocide, crimes against humanity, war crimes, and crimes of aggression. [35]

 **[*279]**

B. ICC Jurisdiction and Prosecutor's Discretion

 The ICC has jurisdiction if one of three situations applies: (1) "the accused is a national of a State Party or a State otherwise accepting the jurisdiction of the _**court**_;" (2) "the crime took place on the territory of a State Party or a State otherwise accepting the jurisdiction of the _**Court**_;" or (3) "the United Nations Security Council has referred the situation to the Prosecutor, irrespective of the nationality of the accused or the location of the crime." [36] The ICC may have jurisdiction _**in**_ any of these contexts, but only over parties that have ratified the Rome Statute. [37] Israel signed the Rome Statute _**in**_ 1998, but never ratified it because it was "opposed to a clause _**in**_ the Rome Statute that criminalizes the transfer, directly or indirectly, by an occupying power of parts of its own civilian population into the territory it occupies … ." [38] Even today, Israel has _**not**_ ratified the Rome Statute. [39]

---

[28] Rome Statute, supra _**note**_ 2, at art. 5.

[29] See Palestine, Int'l Crim. Ct., supra _**note**_ 17 (stating that the Palestinian government has accepted ICC jurisdiction since June 13, 2014, meaning that the ICC may only investigate and _**prosecute**_ conduct that took place after this date).

[30] What is the Rome Statute?, Int'l Crim. Ct., _http://www.icc-cpi.int/en_menus/icc/about_ %20the%20court/frequently%20asked%20questions/Pages/3.aspx (last visited Apr. 20, _**2015**_).

[31] The States Parties to the Rome Statute, Int'l Crim. Ct., _http://www.icc-cpi.int/en_ menus/asp/states%20parties/Pages/the%20states%20parties%20to %20the%20rome%20statute.aspx (last visited Feb. 15, _**2015**_).

[32] ICC at a Glance, Int'l Crim. Ct., supra _**note**_ 3.

[33] Id.

[34] Jurisdiction and Admissibility, ICC at a Glance, Int'l. Crim. Ct., supra _**note**_ 6.

[35] Rome Statute, supra _**note**_ 2, at art. 5.

[36] Jurisdiction and Admissibility, ICC at a Glance, Int'l. Crim. Ct., supra _**note**_ 6.

[37] Ratification and Implementation, Coal. for the Int'l Crim. Ct., http://www.iccnow. org/?mod=ratimp (last visited Oct. 5, _**2015**_); See also Jurisdiction and Admissibility, ICC at a Glance, Int'l. Crim. Ct., supra _**note**_ 6 (stating that the _**court**_ does _**not**_ have universal jurisdiction but may exercise jurisdiction if the accused is a national of a State Party or a State otherwise accepting the jurisdiction of the _**Court**_).

[38] Victor Kattan, The Implications of Joining the ICC after Operation Protective Edge, 44 J. of Palestine Stud. 61, 62-63 (2014).

[39] Id. at 63.

29 Temp. Int'l & Comp. L.J. 275, *279

Palestine, however, acceded to the Rome Statute on January 2, **_2015_**, after much encouragement from the **_international_** community and much discouragement by countries such as Israel and the United States. [40] The Rome Statute became effective on April 1, **_2015_**, which gave the ICC jurisdiction over allegations of **_violations_** of **_international_** **_law_** that took place **_in_** Palestine after that date. [41] **_In_** addition, Palestine has accepted retroactive jurisdiction dating back to June 13, 2014, meaning that the ICC has jurisdiction over any **_violation_** of **_international_** **_law_** on Palestinian territory that took place after that date. [42]

Even if a state has invoked ICC jurisdiction, the decision of whether to investigate or **_prosecute_** a particular case rests with the Prosecutor. [43] Under Article 53 of the Rome Statute, the Prosecutor must consider three factors **_in_** deciding whether to **_prosecute_**:

 [*280]

1. The Prosecutor shall, having evaluated the information made available to him or her, initiate an investigation unless he or she determines that there is no reasonable basis to proceed under this Statute. **_In_** deciding whether to initiate an investigation, the Prosecutor shall consider whether:

(a) The information available to the Prosecutor provides a reasonable basis to believe that a crime within the jurisdiction of the **_Court_** has been or is being committed;

(b) The case is or would be admissible under article 17; and

(c) Taking into account the gravity of the crime and the interests of victims, there are nonetheless substantial reasons to believe that an investigation would **_not_** serve the interests of justice. [44]

 If the Prosecutor's decision whether to open a formal investigation is based solely on subsection (c) above, then that decision is referred to the ICC's Pre-Trial Chamber:

2. If, upon investigation, the Prosecutor concludes that there is **_not_** a sufficient basis for a **_prosecution_** because:

(a) There is **_not_** a sufficient legal or factual basis to seek a warrant or summons under article 58; (b) The case is inadmissible under article 17; or (c) A **_prosecution_** is **_not_** **_in_** the interests of justice, taking into account all the circumstances, including the gravity of the crime, the interests of victims and the age or infirmity of the alleged perpetrator, and his or her role **_in_** the alleged crime; the Prosecutor shall inform the Pre-Trial Chamber and the State making a referral under article 14 or the Security Council **_in_** a case under article 13, paragraph (b), of his or her conclusion and the reasons for the conclusion. [45]

3. (a) At the request of the State making a referral under article 14 or the Security Council under article 13, paragraph (b), the Pre-Trial Chamber may review a decision of the Prosecutor under paragraph 1 or 2 **_not_** to proceed and may request the Prosecutor to reconsider that decision.

---

40  See John Hudson, Israel, U.S. Slam Palestinian Bid to Join **_International Criminal Court_**, Foreign Pol'y (Dec. 31, 2014), _http://foreignpolicy.com/2014/12/31/israel-u-s-slam-palestinian-bid_ -to-join-**_international-criminal-court_**/ (discussing Israel's and the United States' unfavorable reactions to Palestine's signing onto the Rome Statute); see also Palestine, Int'l Crim. Ct. (discussing Palestine's accession to the Rome Statute on January 2, 2105).

41  Joe Lauria, Palestinians to Join **_International Criminal Court_**, U.N. Chief Says, Wall St. J. (Jan. 7, **_2015_**, 12:12 AM), _http://www.wsj.com/articles/palestinians-to-join-**_international-criminal-court_**-1420607546_.

42  Palestine, Int'l Crim. Ct. supra **_note_** 17.

43  Rome Statute, supra **_note_** 2, at art. 53.

44  Id. at art. 53. Article 17, mentioned **_in_** subparagraph (b) above, refers to the three situations **_in_** which the ICC may have jurisdiction over a case. Id. at art.17.

45  Id. at art. 53 (emphasis added).

(b) **_In_** addition, the Pre-Trial Chamber may, on its own initiative, review a decision of the Prosecutor **_not_** to proceed if it is based solely on paragraph 1 (c) or 2 (c). **_In_** such a case, the decision of the Prosecutor shall be effective only if confirmed by the Pre-Trial Chamber. [46]

 The office of former ICC Prosecutor Luis Moreno-Ocampo issued a policy paper **_in_** 2007 which concluded that the "interests of justice" language quoted above should be interpreted narrowly, **_not_** taking into account whether or **_not_** **[*281]** **_prosecution_** would impact overall peacemaking efforts. [47] However, the language quoted above should be interpreted broadly. The Prosecutor should decline to investigate and **_prosecute_** the potential **_violations_** of **_international criminal law_** that took place during Operation Cast Lead because, despite "taking into account the gravity of the crimes and the interests of the victims, there are nonetheless substantial reasons to believe that an investigation would **_not_** serve the interests of justice." [48] The investigation and **_prosecution_** would **_not_** serve the interests of justice because such acts would destroy any possibility of further peace talks between Israel and Palestine. A more detailed discussion of Article 53 and the "interests of justice" [49] is discussed **_in_** Parts IV and V.

## C. Deferring Investigation Under Article 16

 If the Prosecutor chooses **_not_** to broaden the interpretation described **_in_** the policy paper, then investigation of a matter can be deferred under Article 16 of the Rome Statute. [50] **_In_** the event that the Prosecutor does **_not_** interpret the "interests of justice" **_in_** the broad manner proposed here, then the Prosecutor should defer investigation indefinitely, or at least until some measure of peace has been achieved. Furthermore, the **_international_** community should **_not_** interfere **_in_** the **_conflict_** by imposing **_criminal_** sanctions because, as discussed below, **_criminal prosecutions_** will interfere with direct peace negotiations.

For cases **_in_** which there is compelling evidence that ICC investigation and **_prosecution_** would deter the peace process, the U.N. Security Council may defer the ICC investigation process for a renewable period of twelve months. [51] Nick Grono, CEO of the Freedom Fund, **_notes_** "such authority should only be exercised as a last resort, when there is a compelling case that the benefits of peace will outweigh the harm done to the cause of accountability." [52] Here, the benefits of peace, such as ending an ongoing **_conflict_** and the associated death and destruction, [53] arguably outweigh the risks [54] of holding the individuals who are **[*282]** potentially guilty of war crimes accountable - although, of course, this is never an easy question to answer. ICC **_prosecution_** certainly has

---

[46] Id. at art. 53.

[47] Int'l **_Criminal Court_** Office of the Prosecutor, supra **_note_** 14, at 8. See Section E infra for a further discussion of the policy paper and the narrow interpretation of the "interests of justice."

[48] Id. at art. 53.

[49] Id. at art. 53.

[50] See Rome Statute, supra **_note_** 2, at art. 16 (describing the ability of the Prosecutor to defer to the State's investigation).

[51] Id. at art. 16, art. 53.

[52] Nick Grono, The Role of the **_International Criminal Court_** **_in_** Peace Processes: Mutually Reinforcing or Mutually Exclusive? Inst. of Pub. Pol'y Res. (Nov. 28, 2006), http://www. crisis group.org/en/publication-type/commentary/the-role-of-the-**_international_**-crimina l-**_court_**-**_in_**-peace-processes.aspx.

[53] Id.

[54] See, e.g., Elizabeth Peet, Why is the **_International Criminal Court_** So Bad at **_Prosecuting_** War **_Criminals_**?, The Wilson Q. (June 15, **_2015_**), http://wilsonquarterly.com/stories/why-is-the-**_international-criminal-court_**-so-bad-at-**_prosecuting-war-criminals_**/ (arguing that a cumbersome **_international_** judicial process does **_not_** serve nations well, and a better way to hold individuals accountable would be through independent national inquiries complemented with **_prosecutions_** within the nation's judicial system).

29 Temp. Int'l & Comp. L.J. 275, *282

significant benefits. [55] ***Prosecution*** would hold those responsible for committing human rights ***violations*** accountable. [56] ICC ***prosecution*** also serves a deterrent purpose by demonstrating that the ***international*** community will take allegations of human rights seriously. [57] Kenneth Roth, director of Human Rights Watch, has argued that the mere threat of official ICC involvement has already had a deterrent effect on violence ***in*** the area. [58] Finally, ICC ***prosecution*** could be beneficial for the ICC itself. [59] Following through on an official investigation or ***prosecution*** could legitimize the ICC's reputation ***in*** the ***international*** community - the ***court*** could sorely use a reputation boost after dropping charges against Kenyan President Uhuru Kenyatta ***in*** December 2014, and after indicting but failing to track down Sudanese President Omar al-Bashir ***in*** 2009. [60] The ICC's failure to fully investigate and ***prosecute*** these cases has shown that the ICC has tried, but failed, to put alleged violators of ***international law*** behind bars. [61]

Despite these benefits to ***prosecution***, the Prosecutor should still decline to investigate and ***prosecute*** Palestine or Israel because the benefits that peace would provide outweigh the need for individual accountability and deterrence. Regardless of whether the Prosecutor chooses to decline ***prosecution*** under Article 53 or the U.N. Security Council chooses to defer under Article 16, the argument is still the same: investigation and ***prosecution*** should be declined - or at least deferred - because the investigation and ***prosecution*** would significantly interfere with the peace process between Israel and Palestine. [62] The benefits that peace between Israel and Palestine would provide do ***not*** require much explanation. One such benefit is that peace ***in*** that part of the Middle East would set the stage for peace throughout the rest of the region. [63]

   [*283]  The ***Israeli-Palestinian conflict*** has endured for decades, and any attempt at peace thus far has failed. [64] The fact that Palestine signed onto the Rome Statute has only made the ***conflict*** more intense. [65] ***In*** an effort to force the collapse of the Palestinian government, Israel froze tax revenues that Israel collects on behalf of

---

[55]  See Elizabeth B. Ludwin King, Does Justice Always Require ***Prosecution***? The ***International Criminal Court*** and Transitional Justice Measures, SelectedWorks, 7 (Aug. 2012), *http://works.bepress.com/elizabeth_ludwinking/4/* (listing the benefits to ***prosecuting*** individuals suspected of human rights abuses).

[56]  Id.

[57]  See James Reini, Palestine ICC entry to shake up peace process, Al Jazeera (Mar. 31, ***2015***, 10:07 AM), *http://www.aljazeera.com/news/**2015**/03/palestine-icc-entry-shake-peace-proce* ss-150331085009541.html (stating that the ICC's deterrent effect can reduce the war crimes that undermine the trust needed to get to peace).

[58]  Id.

[59]  Id.

[60]  Id.

[61]  Id.

[62]  Contra id. (stating that ICC involvement ***in*** the ***conflict*** could be a game changer by establishing the trust between Israel and Palestine necessary to break the impasse ***in*** peace talks).

[63]  George Mitchell, Opinion, ***Israeli-Palestinian*** Peace is Needed Now, Boston Globe (Sept. 8, 2014), *http://www.bostonglobe.com/opinion/2014/09/07/**israeli-palestinian**-peace-needed-now* /xhBUr7GXi3EVSdFR6TVD9M/story.html ("***In*** the highly volatile Middle East, instability ***in*** one part of the region feeds instability ***in*** another part. Resolution of the ***Israeli-Palestinian conflict*** would dramatically improve America's credibility ***in*** the region and could make it possible for Israel and the Sunni-dominated monarchies to work together to combat their common foe: extremist forces across the region.").

[64]  Id.

[65]  Palestine and the ICC: See you ***in court***, The Economist (Jan. 10, ***2015***), http://www. economist.com/news/middle-east-and-africa/21638151-will-joining-***international-criminal-court***-further-palestines-cause-see-you.

29 Temp. Int'l & Comp. L.J. 275, *283

Palestine, equaling $ 127 million - or two thirds of Palestine's monthly budget. [66] Israel has also threatened to expand its settlement activity further into the West Bank. [67] Additionally, Israeli officials said that if Palestine acceded to the Rome Statute, Israel would end peace negotiations. [68] These threats have **_not_** yet been acted on, and the frozen funds have been released - but this could all change if Palestine files a state referral and the ICC chooses to open a formal investigation. [69]

While individual accountability for those who committed war crimes would serve the "interests of justice" [70] based on the Office of the Prosecutor's narrow interpretation, the pressing need for a solution to the **_conflict_** should take precedence, even if it means impunity for individual aggressors. The Prosecutor must consider whether individual accountability under the **_law_** is more important than ending a **_conflict_** that has been going on for decades and has shown no signs of ending. There are, of course, significant moral questions involved. [71] However, given the severity and length of the **_conflict_**, the Prosecutor should strongly consider whether individual accountability would advance or hinder the peace process.

III. Background of the **_Israeli-Palestinian_** **_Conflict_**

 Israel and Palestine have been **_in_** **_conflict_** for over a century. [72] This section **[*284]** explores the history of the overall **_conflict_** **_in_** order to shed light on its severity and to support the argument that **_prosecuting_** the conduct that took place during Operation Protective Edge would **_not_** serve the interests of justice. This is because **_prosecution_** will **_not_** act to resolve the deep-roots of a **_conflict_** that has endured since the late nineteenth century. [73]

A. Pre-Gaza War

 The tension between Israel and Palestine began **_in_** the late nineteenth century when the Zionist movement arose as a result of anti-Semitic sentiment **_in_** Russia. [74] Such treatment led the Zionists to seek a Jewish homeland, which resulted **_in_** a wave of Jewish immigration into Palestine. [75] Jews continued to immigrate to Palestine both to escape mistreatment by their native countries and to reach the goal of establishing a true Jewish nation. [76] This

---

[66] Id.

[67] Id.

[68] Id. ("An application [to the ICC] would also effectively spell the end of talks to establish an independent Palestinian state: never again, [Israeli officials] said, would Israel negotiate with Palestinians over the future of Jerusalem, an issue that would have to be the cornerstone of any agreement since both sides claim it as their capital.").

[69] Raphael Ahren, As Palestinians Join ICC Wednesday, Will War Crimes Complaints Quickly Follow?, Times of Israel (Mar. 31, **2015**, 6:22 AM), _http://www.timesofisrael.com/as-pales_ tinians-join-icc-both-sides-hope-to-avoid-escalation.

[70] Rome Statute, supra **_note_** 2, at art. 53.

[71] Cf. Grono, supra **_note_** 52 (stating that, regardless of atrocities that were committed, perpetrators may be able to secure de facto immunity when ICC **_prosecutions_** are trumped by the needs of the peace process).

[72] David Mennie, The Role of the **_International_** Covenant on Civil and Political Rights **_in_** the **_Israeli-Palestinian_** **_Conflict_**: Should Israel's Obligations Under the Covenant Extend to Gaza and the Other Occupied Palestinian Territories?, _21 Transnat'l L. & Contemp. Probs. 511, 515 (2012)._

[73] Id.

[74] Id.

[75] _Id. at 515._

[76] _Id. at 516._

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 91 of 144   Page ID
#:9218

Page 9 of 28

29 Temp. Int'l & Comp. L.J. 275, *284

movement into Palestine caused tension between the Jewish immigrants and the Arabs who were already living ***in*** Palestine leading to the development of a Palestinian nationalist movement. [77]

This already chilly relationship became even more so during World War I. [78] ***In*** an effort to appease both Arabs and Jews, while simultaneously defeating the Ottoman Empire and retaining Russia and the United States as allies, Great Britain entered into ***conflicting*** agreements with the Zionists and the Arabs regarding which group would be able to live ***in*** Palestine. [79] On one hand, Great Britain promised the Arabs that it would support an independent Arab state ***in*** Palestine ***in*** exchange for the Arabs' promise to rebel against the Ottoman Empire. [80] On the other hand, Great Britain's Foreign Secretary Arthur Balfour wrote ***in*** a letter to Lord Rothschild, one of the leaders of the Jewish community ***in*** Great Britain, that Britain would support the movement for a Jewish homeland ***in*** Palestine. [81] The letter, known as the Balfour Declaration, was published ***in*** the London Times ***in*** **[*285]** 1917 and spurred public support for this Jewish homeland. [82]

This uncertainty continued through 1920, when Britain obtained sole control of Palestine, and through the end of World War II when Britain relinquished control. [83] Britain asked the U.N. to determine which of its promises it should keep. [84] The U.N. Special Committee on Palestine (UNSCOP) had two options. [85] A majority suggested dividing Palestine into an independent Arab state and an independent Jewish state. [86] A minority suggested a single-state solution. [87] ***In*** 1947, UNSCOP determined that a two-state solution was the best course of action, and as a result decided that the Zionists were entitled to what ended up being fifty-six percent of Palestine. [88] The State of Israel was created on May 14, 1948, amid much violence and bloodshed between the Arabs and Zionists. [89]

The declaration of the State of Israel only caused more unrest ***in*** the area. Jordan, Egypt, Syria, Iraq, and Lebanon invaded the new state ***in*** the Israeli-Arab War of 1948. [90] The war ended with the Armistice Agreements of 1949, which put Egypt ***in*** control of the Gaza Strip and the Sinai Peninsula, Jordan ***in*** control of the West Bank, and Syria

---

[77] Id.

[78] See Mennie, supra ***note*** 72 at 516-18 (stating that following the resolution to divide Palestine into an independent Arab state and an independent Jewish state, the Arabs were outraged, and war broke out between the Palestinian Arabs and the Jews).

[79] See id. ("Great Britain engaged ***in*** a sort of "juggling act' ***in*** an attempt to further its own national interests while appeasing both the Arabs and the Jews. This effort took the form of a series of declarations and agreements, all of which left at least one party unhappy and, ***in*** the end, led to further ***conflict*** and hostilities between the Arabs and Jews.").

[80] See id., at 516; see also Crisis Guide: The ***Israeli-Palestinian Conflict***, Council on Foreign Rel., *http://www.cfr.org/israel/crisis-guide-**israeli-palestinian-conflict**/p13850?gclid=C* L6zrZWglMECFTQQ7Aodlw4Abg (last visited Sept. 28, ***2015***) (providing an interactive presentation on, inter alia, the timeline of the ***Israeli-Palestinian conflict*** and British involvement circa the Palestinian Mandate).

[81] See Mennie, supra ***note*** 72, at 517 (quoting the Balfour Declaration).

[82] Id. at 517.

[83] Id. at 517-18.

[84] Id. at 518.

[85] Id.

[86] Id.

[87] Mennie, supra ***note*** 72, at 518.

[88] Id.; see G.A. Res. 181 (II) (Nov. 28, 1947) (recommending the termination of the British Mandate, the withdrawal of British troops, and the delineation of boundaries between separate Arab and Jewish States).

[89] Mennie, supra ***note*** 72, at 519.

[90] Id.

29 Temp. Int'l & Comp. L.J. 275, *285

*in* control of Golan Heights. [91] Israel reclaimed these territories *in* 1967 during the Six-Day War. [92] Since then, these territories have experienced significant and continuous ***conflict***. [93] The Gaza Strip, controlled after the Six-Day War by Israeli security forces, was relinquished *in* 2005 under a ""disengagement plan,' which provided "for the unilateral removal from the Gaza Strip of Israeli security forces and Israeli civilians living *in* settlements.'" [94] Israel claimed that the disengagement meant that it no longer occupied the Gaza Strip, and therefore Israel no longer had a duty to the area or its residents. [95]

The duty to occupy territories is spelled out *in* provisions of the Hague Convention (II), the Fourth Geneva Convention, and customary norms **[*286]** of ***international law***. [96] Under the Hague Convention (II), an occupying power should take all steps to ensure public order and safety. [97] The Fourth Geneva Convention vests the occupying forces with responsibility to ensure the welfare of the civilians who fall under the control of foreign military authority. [98] However, Israel has continued to occupy the area from an ***international law*** perspective, because the test for occupation is whether the accused occupier effectively controls the area. [99] As a result, Israel had the duty to "reduce the impact of military occupation on civilian life to the maximum extent possible," as required by the Hague Convention and the Fourth Geneva Convention. [100]

A significant source of the hostilities between Israel and Palestine is Israel's continued occupation of Palestine. [101] Israel continues to build settlements *in* the West Bank, East Jerusalem, and the Golan Heights - all of which are areas under occupation. [102] Such settlements are widely considered to be illegal under Article 49 of the Fourth Geneva Convention, which states that an "occupying Power shall ***not*** deport or transfer parts of its own civilian population into the territory it occupies." [103]

---

[91] Id.

[92] Id.

[93] See id. at 519-20 (***noting*** that Israel imposed de facto military rule from the end of the Six-Day War through disengagement *in* 2005, during which time tensions ran high and Palestinian leaders initiated two intifada).

[94] Id. at 520.

[95] George E. Bisharat, Israel's Invasion of Gaza *in* ***International Law***, *38 Denv. J. Int'l L. & Pol'y 41, 49-51 (2009)* (***noting*** that the Fourth Geneva Convention imposes a duty upon occupying powers to ensure the welfare of the residents of the occupied area).

[96] *Id. at 50-51.*

[97] *Id. at 51.*

[98] Id.

[99] See *id. at 48-50* (***noting*** that the test for occupation is ***not*** the existence of permanent military forces, but rather whether the accused occupier effectively controls the area).

[100] *Id. at 50-51.*

[101] Illegal Israeli Settlements, Council for Eur. Palestinian Rel., *http://thecepr.org/* index.php?option=com_content&view=article&id= 115:illegalisraelisettlements&catid=6:memos &Ite mid=34 (last visited Sept. 28, ***2015***).

[102] Id.

[103] Geneva Convention Relative to the Protection of Civilian Persons *in* Time of War art. 49, Aug. 12, 1949, *6 U.S.T. 3516,* 75 U.N.T.S. 287 [hereinafter Fourth Geneva Convention]; see also Israel's Settlement Policy *in* the Occupied Palestinian Territory, Am. Friends Service Committee, *https://www.afsc.org/resource/israel%E2%80%99s-settlement-policy-occupied-pale* stinian-territory (last visited Sept. 29, ***2015***) (providing an overview of Israeli policies as they pertain to settlements *in* occupied territories).

29 Temp. Int'l & Comp. L.J. 275, *286

Aside from the Israeli settlements, more recent unrest _**in**_ the Gaza Strip has been due to Hamas taking control of the Palestinian parliament _**in**_ 2006. [104] _**In**_ June 2007, Hamas members effectively gained control of the Gaza Strip by winning the majority of seats of Palestinian Parliament, and as a result, Israel declared Palestine a "hostile territory." [105] This has led to significant violence between Israel and Hamas, and _**in**_ December 2008, Israel commenced Operation Cast Lead, a three-week offensive _**in**_ the Gaza Strip, _**in**_ response to increased rocket fire from Palestine. [106] Individuals from Palestine and Israel accused each side of committing war crimes and possibly crimes against humanity. [107] The _**conflict**_ that spans from **[*287]** Operation Cast Lead to the present will be discussed _**in**_ the parts that follow.

B. Attempts at Peace Throughout the _**Conflict**_

 Efforts to bring an end to the _**Israeli-Palestinian**_ _**conflict**_ have existed as long as the _**conflict**_ itself. [108] This section explains the attempts at peace between Israel and Palestine, starting with the Oslo Accords of 1993. [109] The Oslo Accords represent an agreement between Israel and the Palestine Liberation Organization (PLO) [110] to formally recognize one another and end the _**conflict**_ peacefully. [111] _**In**_ 1993, Israeli and PLO officials met secretly _**in**_ Oslo, Norway to discuss a potential process to end the _**conflict**_. [112] By August 1993, Israel and the PLO decided upon a "Declaration of Principles." [113] The Declaration states that Israel and Palestine agreed on the following:

(1) A staged Israeli withdrawal from two areas, the Gaza Strip and the West Bank town of Jericho, (2) the creation of a Palestinian Authority to govern Palestinians _**in**_ those areas until the election of a governing council to conduct affairs for five years whilst a permanent settlement was negotiated, (3) the creation of a Palestinian police force, and (4) Israeli control over external security and foreign relations and Palestinian control over domestic affairs during the five-year interim period. Permanent status negotiations were to commence by the beginning of third year of the interim period. The agreement on contentious issues - Jerusalem, refugees, settlements, security

---

[104] Mennie, supra _**note**_ 72, at 521.

[105] Id.

[106] See Bisharat, supra _**note**_ 95, at 41-42 (describing the commencement of Operation Cast Lead).

[107] Operation Cast Lead and the specific accusations involved will be discussed _**in**_ Part IV. See generally Jim Zanotti et al., Cong. Research Serv., Israel and Hamas: _**Conflict**_ _**in**_ Gaza (2008-2009) (2009), _http://fas.org/sgp/crs/mideast/R40101.pdf_.

[108] See Timeline of the Arab-Israeli _**Conflict**_ and Peace Process, Inst. for Curriculum Services, _http://www.icsresources.org/content/factsheets/ArabIsraeliTi_ meline.pdf (last visited Oct. 30, _**2015**_) (indicating that the day after Israel was proclaimed an independent state, a war ensued and Arab countries refused to enter into a peace agreement with Israel).

[109] See generally The Oslo Accords and the Arab-Israeli Peace Process, U.S. Dep't of St. Off. of the Historian, _https://history.state.gov/milestones/1993-2000/oslo_ (last visited Oct. 30, _**2015**_).

[110] The Palestinian Liberation Organization is an organization made up of "numerous organizations of the resistance movement, political parties, popular organizations, and independent personalities and figures from all sectors of life," and is focused on the Palestinian national movement. What is the Palestinian National Organization (PLO)?, ProCon (last updated May 16, 2008), _http://israelipalestinian.procon.org/view.answers.php?questi_ onID=386. It was "recognized as representative of the Palestinian people by all Arab States at their Summit _**in**_ 1974, [and] was given observer status at the United Nations the same year." Id.

[111] Oslo Explained, Al Jazeera (Sept. 13, 2013 1:55 AM), _http://america.aljazeera.com/_ articles/2013/9/13/oslo-accords-explained.html.

[112] Id.

[113] Id.

29 Temp. Int'l & Comp. L.J. 275, *287

arrangements, borders, relations and cooperation with other neighbours, and other issues of common interest - were to be resolved **_in_** permanent status negotiations, reserved for discussion at a later stage. [114]

   **[*288]**  Essentially, the goal of the Oslo Accords was to outline a process **_in_** order to exchange land for peace. [115] **_In_** furtherance of this goal, Oslo II was signed **_in_** 1995. [116] Oslo II called for additional withdrawals by Israeli troops **_in_** exchange for Palestine's commitment to security **_in_** the area. [117]

After the Oslo Accords, on July 11, 2000, Israeli and Palestinian officials met for a summit at Camp David **_in_** the United States. [118] The Camp David Summit essentially signaled the failure of the Oslo Accords and the beginning of a new wave of violence between Israel and Palestine. [119] Furthermore, several other attempts at peace took place after the Oslo Accords and the Camp David Summit. [120] One such attempt was a 2003 roadmap towards permanent stability, including the creation of a permanent, two-state solution to the **_conflict_**. [121] Directed by the U.N., the European Union, Russia, and the United States, the roadmap was comprised of three phases, all of which aligned with the original goals of Oslo I. [122] The first phase "included a halt to violence on both sides, Palestinian political reform, and a halt to Israeli settlement construction." [123] The second phase "referred **[*289]** to the option

---

[114] Peace Plans Since 1967, BICOM, _http://www.bicom.org.uk/resources/timelines/peace-plans/_ (last visited Oct. 30, **_2015_**) (follow "1993 - Declaration of Principles (Oslo I)" drop-down).

[115] Shattered Dreams of Peace: The Negotiations, PBS, _http://www.pbs.org/wgbh/pages/_ frontline/shows/oslo/negotiations/ (last visited Apr. 23, **_2015_**).

[116] Peace Plans Since 1967, supra **_note_** 112 (follow "1995 - **_Israeli-Palestinian_** Interim Agreement (Oslo II)" drop-down).

Oslo II calls for further Israeli troop redeployments beyond the Gaza and Jericho areas. Under the agreement, Israel was first scheduled to redeploy from the major Palestinian population centres **_in_** the West Bank (the "second redeployment') and later from all rural areas (the "third redeployment'), with the exception of Israeli settlements and the Israeli-designated military areas. The IDF retained responsibility for the safety of the citizens of Israel, and Israel released numerous Palestinian prisoners who had **_not_** been involved **_in_** the killing of Israelis. For its part, the Palestinian Authority assumed responsibility for civil affairs and security, including the commitment to prevent terror attacks on Israel.

   Id.

[117] Id.

[118] Ceri                   Au,            Camp           David             Summit,            Time, _http://content.time.com/time/specials/2007/article/0,28804,1644149_1644147_1644135,00.html_ (last visited Oct. 30, **_2015_**).

[119] BICOM, supra **_note_** 112 (follow "2000 - Camp David II Summit" drop-down).

[Israeli and Palestinian officials] met at Camp David to discuss permanent status issues and negotiate a solution to the **_Israeli-Palestinian_** **_conflict_** **_in_** accordance with the September 1993 accord (Oslo I). However, no formal agreement was reached at Camp David. American and Israeli negotiators put forward bold ideas that would have affected issues such as borders, Jerusalem, settlements, the prospects for Palestinian statehood and refugees ... . [A] wave of Palestinian violence erupted **_in_** September 2000 (the second intifada).

   Id.

[120] See id. (showing a timeline of peace attempts after the Camp David Summit).

[121] See id. (follow "2003 - Performance-based Roadmap to a Permanent Two-State Solution" drop-down) (indicating that the roadmap was aimed at permanently settling the **_Israeli-Palestinian_** **_conflict_**).

[122] See id. ("The Roadmap specified three phases, with timelines, target dates and benchmarks, aimed at bringing Israelis and Palestinians towards the ultimate goal of a comprehensive and permanent settlement of the **_Israeli-Palestinian_** **_conflict_**.").

[123] Id.

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 95 of 144   Page ID
#:9222

Page 13 of 28

29 Temp. Int'l & Comp. L.J. 275, *289

of a Palestinian state within interim borders." [124] The last phase called for a final official agreement to end the ***conflict***. [125] Both Israel and Palestine accepted this proposal, but the plan never took effect. [126] Violence continued on both sides, and Israel failed to halt settlement activity. [127]

Given the level of violence taking place ***in*** the region, these attempts at peace have ***not*** been successful ***in*** the long term. [128] Israeli Prime Minister Benjamin Netanyahu recently declared his opposition to a two-state solution, causing many to wonder whether the Oslo peace process has permanently failed. [129] Attempts are currently being made, however, to resurrect the peace process. [130] One such attempt is calling for a two-state solution by using the ICC as leverage. [131] There is an indication that the United States may support a resolution by the U.N. Security Council calling for a two-state solution if the ICC chooses ***not*** to investigate or ***prosecute*** the conduct that took place during Operation Protective Edge. [132] While Israel may ***not*** be amenable to such a plan, it may be inclined to agree considering the alternative: having its citizens potentially held liable for war crimes. [133] Palestine, however, is likely to agree to such a plan:

> President Mahmoud Abbas consistently threatened to "go to the ICC" and attempted to leverage ratification of the Rome Statute against progress ***in*** the peace talks and recognition of statehood. Ultimately, Abbas couldn't withhold ratification and referral any longer without being perceived as a vacuous propagator of empty threats. But there is little point ***in*** denying: if Abbas could exchange an ICC investigation for concessions towards Palestinian statehood and conclusive negotiations, **[\*290]** he would do so ***in*** a heartbeat. [134]

If the ICC chooses to formally investigate or ***prosecute*** the most current offenses, this new attempt at peace is likely to be destroyed. The ***Israeli-Palestinian conflict*** has existed for the past 100 years without a lasting peace agreement, [135] and if the ICC chooses to ***prosecute*** the most current offenses, tensions between Israel and Palestine would only worsen, making direct negotiations much more difficult. As a result, this new attempt at peace

---

[124] BICOM, supra ***note*** 112 (follow "2003 - Performance-based Roadmap to a Permanent Two-State Solution" drop-down).

[125] Id.

[126] See id. ("Though both sides accepted the Roadmap ***in*** principle, it was ***not*** successfully implemented.").

[127] The Road Map, Global Pol'y F., *https://www.globalpolicy.org/component/content* /article/189-israel-palestine/38357-the-road-map.html (last visited Oct. 5, ***2015***).

[128] See Rick Gladstone & Jodi Rudoren, Abbas Says Palestinians Are No Longer Bound by Pacts with Israel, N.Y. Times, Oct. 1, ***2015***, at A4 ("The ***Israeli-Palestinian conflict*** is the most protracted dispute vexing the United Nations since the organization's founding 70 years ago.").

[129] See Mark Kersten, On the Table: Trading Justice for Peace ***in*** Palestine, Just. ***in Conflict*** (Mar. 20, ***2015***), *http://justiceinconflict.org/2015/03/20/on-the-table-trading-justice-for-peace-in-palestine/* ("Anyone ***in*** favour of reviving the Oslo peace process is almost surely disparaging the results of Israel's election which secured Benjamin Netanyahu a fourth term as Prime Minister … . Still, it may be premature to call the Oslo peace process dead.").

[130] See id. (indicating that Washington may ramp up efforts to push for a two-state solution at the U.N. Security Council by using the ***International Criminal Court*** as leverage).

[131] Id.

[132] Id.

[133] See id. ("The Palestine Liberation Organization's top diplomat ***in*** the United States [stated] the Palestinians would move forward with plans to use the ICC to try to hold Israel accountable for alleged war crimes during last summer's war ***in*** Gaza.").

[134] Id.

[135] See Timeline of the Arab-Israeli ***Conflict*** and Peace Process, supra ***note*** 108 (showing disagreements from as early as 1915 ***in*** the McMahon-Hussein Correspondence through today).

is likely to be destroyed. A plan like this, which exchanges accountability for peace, raises the extremely difficult question of whether peace is more important than accountability. [136] The ICC Prosecutor has the power to decline to investigate or **prosecute** the conduct that took place during Operation Protective Edge, [137] and she should exercise that power **in** order to further the interests of peace. The ICC's impact on the peace process will be more deeply discussed **in** later parts of this **comment**.

IV. The Current State of the **Israeli-Palestinian Conflict**: From Operation Cast Lead to Present

 July 7, 2014 marked the beginning of the most recent military **conflict** between Israel and Palestine, creating another wave of tension between the two parties as they continue to engage **in** hostilities that started several decades ago. [138] The current hostilities represent only the latest round of fighting **in** a **conflict** between Israel and Palestine that has existed over the past several decades. [139] Israel and Hamas, a Palestinian Islamist organization with a military wing, were engaged **in** a similar **conflict in** 2008-2009, called Operation Cast Lead. [140] Upon accusations that both Israel and Hamas were committing what could be considered war crimes, the United Nations (U.N.) initiated a fact-finding mission **in** Gaza, which was **[*291]** concluded by an official report authored by Justice Richard Goldstone. [141] The report concluded that both Israel and Palestine had engaged **in** conduct that constituted war crimes and possibly crimes against humanity. [142] Goldstone and his colleagues recommended that Israel and Palestine conduct an impartial and thorough investigation of each party's conduct within six months. [143] If, after six months, the U.N. determined that any internal investigations were improper, Goldstone recommended that the issue be referred to the ICC. [144] Since then, credible and independent investigations have **not** occurred, [145] and the conduct that took place has **not** been officially investigated or **prosecuted** by an **international** tribunal. [146] The following section describes Operation Cast Lead and Operation Protective Edge **in** detail and describes the **violations** of **international criminal law** that allegedly took place during these offensives.

---

[136] See Kersten, supra **note** 127 (questioning whether an imperfect peace that sacrifices accountability is better than the continuation of protracted **conflict**).

[137] See Timeline of the Arab-Israeli **Conflict** and Peace Process, supra **note** 108 (describing Operation Protective Edge as an aim to stop attacks of destruction against Israel).

[138] See Max Fisher, 9 Questions about the Israel-Palestine **conflict** you were too embarrassed to ask, Vox, *http://www.vox.com/2014/7/17/5902177/9-questions-about-the-israel-palestine-conflict-you-were-too* (last updated July 17, 2014, 7:30 AM) (providing basic historical, ethnographic, and political background for the July 2014 **conflict**); Q&A: 2014 Hostilities between Israel and Hamas, Hum. Rts. Watch (Aug. 3, 2014), *http://www.hrw.org/news/* 2014/08/03/qa-2014-hostilities-between-israel-and-hamas (addressing issues relating to **international** humanitarian **law** governing the 2014 **conflict** between Israel and Hamas **in** question and answer format).

[139] See Bisharat, supra **note** 95, at 47-48 (describing Israel's activities **in** the Gaza Strip from the British Mandate to present).

[140] See id. at 57-63 (outlining the major events leading up to Operation Cast Lead, specifically the institution of an Israeli blockade of Gaza **in** response to Hamas' ascension to power).

[141] See Milenia Sterio, The Gaza Strip: Israel, Its Foreign Policy, and the Goldstone Report, *43 Case W. Res. J. Int'l L. 229, 231 (2010)* (discussing the impetus for the fact-finding mission and its public reception by both sides and their allies).

[142] Press Release, Human Rights Council, UN Fact Finding Mission Finds Strong Evidence of War Crimes and Crimes Against Humanity Committed During the Gaza **Conflict**; Calls for End to Impunity, U.N. Press Release A/HRC/12/48 (Sept. 15, 2009).

[143] Id.

[144] Id.

[145] Russian Television, supra **note** 1.

[146] Kenneth Roth, The Palestinians' Decision to Join the ICC Deserves Support, Hum. Rts. Watch (Jan. 15, **2015**), *http://www.hrw.org/news/**2015**/01/14/palestinians-decision-join-icc-deserves-support* ("The Palestinian Authority is **not** known to

29 Temp. Int'l & Comp. L.J. 275, *291

A. Operation Cast Lead

 Israel invaded Gaza *in* Operation Cast Lead on January 3, 2009 *in* response to rocket fire on Israel from Palestine.
[147] Israel claimed that the invasion was "necessary to halt rocket fire from the Gaza Strip into Southern Israel and
was, therefore, an exercise of Israel's sovereign right of self-defense." [148] Despite Israel's claims that the invasion
was necessary, the ***international*** community accused the Israel Defense Force of several ***violations*** of
***international law***, including ***violations*** that could be considered war crimes or crimes against humanity within the
definition of the Geneva Conventions and the Rome Statute. [149]

One such accusation is that Israel failed to distinguish between civilian and military targets and used lethal force
against civilians and private property *in violation* of the customary principles of distinction and proportionality. [150]
The **[*292]** principle of distinction mandates that during war, the parties involved must distinguish between
legitimate military objectives and civilians. [151] The principle of proportionality states that "launching an attack which
may be expected to cause incidental loss of civilian life, injury to civilians, damage to civilian objects, or a
combination thereof, which would be excessive ***in*** relation to the concrete and direct military advantage anticipated,
is prohibited." [152]

During the three weeks of Operation Cast Lead, Israel struck several civilian targets, including mosques, schools,
roads, police stations, and the U.N. headquarters. [153] Palestinian-American legal scholar Noura Erakat specifically
***noted*** "Israeli forces killed some 1,300 Palestinians, including 280 children, and injured approximately 4,300 others,
including 1,100 children. Civilians comprised nearly 70 percent of the Palestinian death toll. The aerial and ground
offensive also destroyed 2,400 homes, 29 schools, 121 commercial and industrial workshops, 60 police stations,
and 30 mosques." [154] Only thirteen Israelis, including three civilians, were killed during that period. [155] Other
statistics suggest that the offensive resulted *in* $ 2 billion of damage to infrastructure, and that "food prices soared
to three times the pre-***conflict*** level, damage to water wells and pipes led to water shortages, and hospitals -
damaged during the fighting - struggled to treat the massive amount of injuries with diminished availability of space

---

have initiated any such investigations. The Israeli military prosecutor occasionally conducts investigations but hardly ever
***prosecutes*** anyone. The most serious punishment imposed *in* recent years for abuse against Palestinians was a 7 1/2-month
prison term for an Israeli soldier who stole a credit card.").

[147] Bisharat, supra ***note*** 95, at 41.

[148] Id.

[149] See id. at 43 ("There is substantial evidence that Israel committed numerous ***violations*** of ***international law***, *in* some cases
amounting to war crimes or crimes against humanity … .").

[150] See id. at 70-74 (providing evidence that indicates Israel may have failed to distinguish between civilian and military targets);
Customary IHL Rule 1. The Principle of Distinction Between Civilians and Combatants, Int'l Committee of the Red Cross, https://
*www.icrc.org/customary-ihl/eng/docs/v1_cha_chapter1_rule1* (defining civilians and combatants *in* the ***international***
humanitarian ***law*** context).

[151] See id. ("The parties to the ***conflict*** must at all times distinguish between civilians and combatants. Attacks may only be
directed against combatants. Attacks must ***not*** be directed against civilians.").

[152] Customary IHL Rule 14. Proportionality *in* Attack, Int'l Committee of the Red Cross, (Dec. 22, ***2015***)
*https://www.icrc.org/customary-ihl/eng/docs/v1_cha_chapter4_rule14*.

[153] See Bisharat, supra ***note*** 95, at 71 (discussing that Israel appeared to target the private sector during Operation Cast Lead).

[154] Noura Erakat, Operation Cast Lead: The Elusive Quest for Self Defense Under ***International Law***, *36 Rutgers L. Rec. 164,
164 (2009)* (footnotes omitted).

[155] Id.

29 Temp. Int'l & Comp. L.J. 275, *292

and supplies." [156] It is this alleged use of disproportionate force against Palestinian civilians, caused by a failure to distinguish between civilian and military targets, which was the main focus of Richard Goldstone's 2009 investigation. [157]

Although much of the evidence gathered after Operation Cast Lead suggests that Israel committed the majority of potential *violations* of *international law*, there was also a significant number of accusations against Palestine during this same period. [158] Most of these accusations were made against Hamas and other **[*293]** Palestinian militant groups. [159] Amnesty *International* suggested that Hamas launched several rockets into Israel, killing three Israeli civilians. [160] Hamas is also alleged to have launched long-range missiles, which it smuggled from Egypt. [161] These long-range missiles cannot be sufficiently aimed toward a specific target, which suggests that they endanger significant numbers of Israeli civilians. [162] The use of such missiles suggests a *violation* of the principle of distinction since the missiles cannot be deliberately aimed at legitimate Israeli military targets versus civilians. [163]

## B. The Goldstone Report

 Responding to the conduct that took place during Operation Cast Lead, the United Nations Human Rights Council passed a resolution *in* 2009, directing an investigation of "all *violations* of *international* human rights *law* and *international* humanitarian *law* that might have been committed at any time *in* the context of the military operations that were conducted *in* Gaza during the period from December 27, 2008, and January 18, 2009, whether before, during, or after." [164] The fact-finding mission was headed by Justice Richard Goldstone, a former judge *in* South Africa's Constitutional *Court*, and a former prosecutor at the *International Criminal* Tribunals for former Yugoslavia and Rwanda. [165] *In* Goldstone's report published *in* September 2009, the mission concluded that both Israel and Palestine had committed acts that may amount to war crimes or crimes against humanity. [166]

## C. Operation Protective Edge

---

[156] Major Joshua L. Kessler, The Goldstone Report: Politicization of the *Law* of Armed *Conflict* and Those Left Behind, *209 Mil. L. Rev. 69, 71-72 (2011).*

[157] See Stephanie Nebehay, South African to Head U.N. Rights Inquiry *in* Gaza, Reuters (Apr. 3, 2009, 10:16 AM), *http://www.reuters.com/article/2009/04/03/us-palestinians-israel-inqui* ry-idUSTRE5321K820090403 (discussing Goldstone's plans to investigate the substantial allegations of war crimes).

[158] See Amnesty Int'l, Israel/Gaza Operation "Cast Lead': 22 Days of Death and Destruction 140 (2009) (showing cases of Israeli civilian casualties).

[159] See *id. at 74* ("Hamas and other armed groups also endangered Palestinian civilians by failing to take all feasible precautions *in* the conduct of their military activities.").

[160] See id. at 3 ("The armed wing of Hamas and other Palestinian armed groups launched several hundred rockets and mortars into southern Israel, killing three civilians and injuring dozens of others.").

[161] See id. (suggesting longer range Grad-type rockets were smuggled into Gaza via tunnels from Egypt and that these unguided rockets cannot be directed at specific targets).

[162] Id.

[163] Amnesty Int'l, Israel/Gaza Operation "Cast Lead': 22 Days of Death and Destruction, supra *note* 153, at 74.

[164] See Kessler, supra *note* 156, at 72 (citing United Nations Gen. Assembly Human Rights Council, Human Rights Council, Human Rights *in* Palestine and Other Occupied Arab Territories: Report of the United Nations Fact Finding Mission on the Gaza *Conflict*, at 13, U.N. Doc. A/HRC/12/48 (Sept. 15, 2009) [hereinafter Goldstone Report]).

[165] Goldstone Report, supra *note* 164, at 13.

[166] Id. at 423-29.

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 99 of 144   Page ID #:9226

Page 17 of 28

29 Temp. Int'l & Comp. L.J. 275, *293

Between Operation Cast Lead and today, the situation *in* Gaza has only worsened. [167] While attempts at peace talks have taken place since Operation Cast **[*294]** Lead, none have been successful. [168] *In* July 2013, U.S. Secretary of State John Kerry visited Israel several times *in* an attempt to encourage peace talks between Israel and Palestine. [169] Israel expressed its plan to continue settlements *in* the West Bank, while Palestine resisted the plan and called it a "major obstacle to the success of negotiations." [170] However, the parties agreed to continue talks for nine months. [171] The peace talks eventually broke down because Israel backed out of a promise to release captured Palestinian soldiers and because it announced another plan to build additional settlements *in* East Jerusalem. [172]

After Operation Cast Lead, Israel and Palestine engaged *in* violent clashes on a few occasions before Operation Protective Edge. [173] Operation Protective Edge began *in* July 2014 after three Israeli teenagers were abducted and murdered by members of Hamas on June 12, 2014. [174] *In* response, three Israeli extremists **[*295]** kidnapped and murdered a Palestinian teenager on July 2, 2014. [175] The ensuing rocket fire from both Palestine and Israel

---

[167] See Occupied Palestinian Territory: Gaza Emergency Situation Report, United Nations Off. for the Coordination of Humanitarian Aff. (OCHA) (Sept. 4, 2014, 8:00 AM), *http://www.ochaopt.org/documents/ocha_opt_sitr* ep_04_09_2014.pdf ("The scale of damage resulting from the 50-day escalation *in* hostilities is unprecedented since the beginning of the Israeli occupation *in* 1967.").

[168] See Kerry *in* Jerusalem to Keep Peace Talks Alive, Al Jazeera (Nov. 6, 2013, 1:06 PM), *http://www.aljazeera.com/news/middleeast/2013/11/kerry-jerusalem-keep-peace-talks-goin* g-20131169341141872.html (detailing John Kerry's involvement *in* the renewed peace talks between Israel and Palestine after a five-year break *in* negotiations between the two states).

[169] Id.

[170] Id.

[171] Id.

[172] See John Glaser, John Kerry: Israel is To Blame for the Breakdown *in* Peace Talks, Antiwar.com (Apr. 9, 2014), *http://antiwar.com/blog/2014/04/09/john-kerry-israel-is-to-blame-for-the-breakdown-in-peace-talks/* (summarizing John Kerry's testimony before the Senate Foreign Relations Committee that Israel's failure to return prisoners and the addition of settlements were to blame for the collapse of peace talks); see also John Glaser, EU Report: Israeli Settlements Deliberate Strategy to Block Palestinian State, Antiwar.com (Feb. 27, 2013), *http://news.antiwar.com/2013/02/27/eu-report-israeli-settlements-deliberate-strategy-to-block-palestinian-state/* (discussing an internal EU report finding that Israel's construction of Jewish settlements was a deliberate strategy to sabotage peace talks).

[173] See, e.g., Israeli Troops Killed *in* Gaza Border Clashes, BBC (March 26, 2010, 10:55 PM), *http://news.bbc.co.uk/2/hi/middle_east/8589529.stm* (describing how two Israeli soldiers were killed by Hamas *in* the Gaza Strip *in* March 2010); Israel Launches Strikes on Gaza After Attacks, Al Jazeera (Aug. 19, 2011, 12:07 PM), *http://www.aljazeera.com/news/middle* east/2011/08/201181893519247218.html (reporting that Israel launched air strikes on Gaza after Hamas killed eight Israelis during attacks on Israeli vehicles); Ludovica Iaccino, Israel's Operation Protective Edge: Body Count of Multiple Gaza Attacks, Int'l Bus. Times (July 14, 2014, 6:41 PM), *http://www.ibtimes.co.uk/israels-operation-protective-edge-body-count-multiple* -gaza-attacks-1456029 (describing Israel Defence Forces' Operation Returning Echo, which killed Zohair al-Qaisi, Secretary General of the Popular Resistance Committees, and resulted *in* civilian casualties on both sides, and Operation Pillar of Defence, *in* which 133 Palestinians and six Israelis were killed).

[174] See Hamas Admits to Kidnapping and Killing Israeli Teens, NPR (Aug. 22, 2014, 12:06 AM), *http://www.npr.org/2014/08/22/342318367/hamas-finally-admits-to-kidnapping-and-killing-israeli-teens* (detailing Hamas' military wing's announcement that they kidnapped the Israeli teens to spark a Palestinian uprising); see also Gaza-Israel **Conflict**: Is the Fighting Over?, BBC (Aug. 26, 2014), *http://www.bbc.com/news/world-middle-east-28252155* ("Rocket fire from militants *in* Gaza and Israeli air strikes on the territory increased after the abduction and killing of three Israeli teenagers *in* June, which Israel blamed on Hamas and which led to a crackdown on the group *in* the West Bank.").

[175] See Itamar Sharon, Abu Khdeir murder suspect gives chilling account of killing, The Times of Israel (Aug. 12, 2014, 4:40 AM), *http://www.timesofisrael.com/we-said-they-took-three-of-ours-lets-take-one-of-theirs/* (detailing the confessions of the three

29 Temp. Int'l & Comp. L.J. 275, *295

resulted *in* significant loss of human lives and damage to infrastructure. [176] As *in* Operation Cast Lead, both Israel and Palestine have been accused of committing war crimes during this latest offensive. [177] As of August 26, 2014, when the parties declared ceasefire, 2,131 Palestinians had been killed, including 1,473 civilians, 501 of which were children. [178] 71 Israelis had been killed, including 4 civilians. [179] 110,000 people were displaced from their homes, and 450,000 could *not* reach clean water. [180] Human Rights Watch determined that the conduct by both Israel and Palestine *in* the most recent round of hostilities likely amounted to war crimes. [181]

D. Palestine's Accession to the ICC

 Palestine chose to join the ICC after several attempts at peace talks proved unsuccessful. [182] Until 2014, Palestine had repeatedly caved to pressure from Israel **[*296]** and the United States and declined to accept ICC jurisdiction. [183] *In* 2014, the United States and Israel opposed the Palestinian U.N. draft resolution calling for a full

---

Israeli individuals who kidnapped and killed a Palestinian boy *in* response to Hamas' kidnapping and murder of three Israeli teenagers).

[176] See OCHA, supra *note* 167.

[177] See Al-Haq, An Open Letter to the Media on Israel's "Operation Protective Edge," 33 Wash. Rep. on Middle E. Aff. 11 (Sept. 2014) (arguing that to end the cycle of violence between Israel and Palestinian resistance groups, both sides have to desist *in* their *violations* of *international law*).

[178] See OCHA, supra *note* 167 (offering statistics on the overall fatalities and damage from Operation Protective Edge).

[179] Id.

[180] See id. (stating that 110,000 people remain *in* emergency shelters or with host families and 450,000 people did *not* have access to municipal water due to damage and/or low pressure).

[181] Human Rights Watch documented a number of unlawful acts and shared their statistics with the ICC *prosecution* regarding casualties and displacement as a result of Operation Protective Edge:

Israeli forces intensively bombarded the Gaza Strip from the air, land, and sea, severely affecting the civilian population. According to the UN Office for the Coordination of Humanitarian Affairs, more than 2,250 Palestinians were killed, including 1,563 civilians, of whom 538 were children and 306 were women. Five months after the hostilities ended, thousands of unexploded remnants of war remain dispersed throughout the Gaza Strip, and about 100,000 people are still displaced; some 22,000 homes were destroyed or severely damaged during the *conflict*. Palestinian armed groups fired thousands of indiscriminate rockets toward Israeli population centers; stored rockets *in* empty school buildings; summarily executed alleged Palestinian "collaborators" with Israel; and deployed their forces without apparently taking all feasible precautions to prevent harm to civilians, *in* *violation* of *international law*. Sixty-seven Israeli soldiers and five civilians *in* Israel, one a child, were killed.

 Palestine: ICC Prosecutor Opens Initial Inquiry, Hum. Rts. Watch (Jan. 29, *2015*), *http://www.hrw.org/news/2015/01/29/palestine-icc-prosecutor-opens-initial-inquiry*.

[182] By joining the ICC, Palestine is able to file war-crimes charges against Israel for their attacks on the Gaza Strip. John Hudson, Israel, U.S. Slam Palestinian Bid to Join the *International Criminal Court*, Foreign Pol'y (Dec. 31, 2014), *http://foreignpolicy.com/2014/12/* 31/israel-u-s-slam-palestinian-bid-to-join-*international-criminal-court*/. The United States sharply criticized this move as a hindrance to peace negotiations:

Abbas's move is *in* line with a strategic shift by the Palestinians to internationalize the *conflict* with Israel after decades of American-brokered peace talks failed to achieve meaningful results. The most recent attempt, led by Secretary of State John Kerry, collapsed entirely *in* mid-2014, leaving the prospect of new negotiations looking more remote than ever.

 Id.

[183] Id.; see also Raji Sourani, Operation Cast Lead five years on: "We are still demanding justice,' Al Jazeera (Jan. 19, *2015*), *http://www.aljazeera.com/indepth/opinion/2014/01/*                    operation-cast-lead-five-years-are-still-demanding-justice-

29 Temp. Int'l & Comp. L.J. 275, *296

withdrawal of Israeli forces and establishment of a Palestinian state. [184] After the opposition of the United States *in* the U.N., repeated failed peace talks and the occurrence of Operation Protective Edge, Palestine - feeling "betrayed" by the United States - chose to act against the wishes of both the United States and Israel and sign the Rome Statute. [185] This would allow the ICC to investigate any alleged war crimes that took place during Operation Protective Edge. [186]

On December 31, 2014, Mahmoud Abbas, President of the State of Palestine, signed a declaration officially accepting ICC jurisdiction over Palestine for conduct that took place between the parties after June 13, 2014. [187] Accepting ICC jurisdiction since June 13, 2014 means that the ICC may investigate and **prosecute** any potential **violations** of **international law** committed by either Palestine or Israel within Palestine's borders after that time. [188] As a result, the ICC will **not** be able to investigate any conduct that took place during Operation Cast Lead *in* 2008-2009 or, interestingly, the abduction and murder of three Israeli teenagers by members **[\*297]** of Hamas on June 12, 2014, just one day before the date for which Palestine accepted ICC jurisdiction. [189] As of this writing, the ICC has decided to open preliminary investigations into the conduct that took place during Operation Protective Edge *in* order to determine whether enough information exists to move a case forward. [190]

The fact that Palestine accepted ICC jurisdiction does **not** mean that the ICC will definitely **prosecute** any conduct that has taken place. [191] The ICC is a **court** of last resort. [192] According to the principle of complementarity, the

---

2014188116566380.html ("Significant pressure has been exerted on the government of Palestine to prevent it from joining the ICC. To its shame, the Palestinian government has so far buckled under this pressure.").

[184] See Herb Keinon, Benjamin Netanyahu Lauds US, Australia for Efforts to Reject Palestinian UN bid, Jerusalem Post (Dec. 31, 2014), *http://www.jpost.com/Breaking-News/Netanyahu-lauds-US-Australia-for-helping-to-reject-Palestinian-bid-in-UN-386232*.

[185] See Hudson, supra **note** 40 ("Abbas and other Palestinian leaders, by contrast, made clear Wednesday that they felt betrayed by the vote, which they said left them no choice but to seek justice at the ICC.").

[186] Id.

[187] **In** a formal declaration, President Mahmoud Abbas accepted the Jurisdiction of the **International Criminal Court** on behalf of Palestine:

**In** conformity with Article 12, paragraph 3, of the Rome Statute of the **International Criminal Court**, … the Government of the State of Palestine hereby recognizes the jurisdiction of the **Court** for the purpose of identifying, **prosecuting**, and judging authors and accomplices of crimes within the jurisdiction of the **Court** committed *in* the occupied Palestinian territory, including East Jerusalem, since June 13, 2014.

Mahmoud Abbas, Declaration Accepting the Jurisdiction of the **International Criminal Court** (Dec. 31, 2014), *http://www.icc-cpi.int/iccdocs/PIDS/press/Palestine_A_12-3.pdf*.

[188] See Russian Television, supra **note** 1 (explaining how Palestine's ICC membership allows the ICC Prosecutor to conduct a preliminary examination to see if there is a reasonable basis to proceed with a full investigation and charges).

[189] Id.

[190] See Rachel Shabi, Palestine at the ICC: of course Israel hates it, Al Jazeera (Jan. 19, **2015**, 10:36 AM), *http://www.aljazeera.com/indepth/opinion/2015/01/palestine-icc-israel-gaza-war-150119102708790.html* (describing the Israeli and U.S. reactions to Palestine's decision to obtain ICC jurisdiction and the subsequent preliminary investigation).

[191] Russian Television, supra **note** 1 (statement of Fatou Bensouda) ("A preliminary examination is **not** an investigation but a process of examining the information available *in* order to reach a fully informed determination on whether there is a reasonable basis to proceed to a (full) investigation.").

[192] Roth, supra **note** 146.

29 Temp. Int'l & Comp. L.J. 275, *297

Prosecutor will **_prosecute_** only if the parties to a **_conflict_** are unable or unwilling to investigate themselves. [193] The Prosecutor has historically decided **_not_** to investigate or **_prosecute in_** certain situations for this reason. [194] On one hand, it is possible that, given Palestine's relatively new government, the Prosecutor may find that Palestine does **_not_** possess the infrastructure necessary to credibly investigate or **_prosecute_** conduct by its own people. [195] On the other hand, it is possible the Prosecutor will find that Israel is able to adequately address its own conduct, as it had promised to do after Operation Cast Lead, leaving only Palestine's conduct after June 13 open to ICC investigation. [196]

It is impossible to know what the ICC will decide until it has completed its preliminary investigations. [197] Additionally, even if the ICC does choose to get involved, it is unclear how and when the ICC's investigations will take place. [198]   **[*298]** After the ICC's preliminary investigation is complete, the current ICC Prosecutor, Fatou Bensouda, could choose to continue the investigation immediately or to postpone doing so indefinitely. [199] The Prosecutor should decline to complete the investigation or **_prosecute_** the conduct that Palestine has referred to the ICC because doing so would **_not_** be **_in_** the interests of justice. A discussion of how the ICC has interpreted the phrase "interests of justice" [200] is required, because the current interpretation of the phrase is unnecessarily narrow and should be broadened.

E. The ICC Policy Paper on the "Interests of Justice"

The "interests of justice" [201] is a phrase whose meaning, at first glance, may be difficult to understand. It may also seem that the interpretation of that phrase is left entirely up to the Prosecutor. [202] **_In_** 2005, **_in_** response to the

---

[193]  See William Burke-White, Israel should welcome Palestine's ICC entry, The Daily Star (Jan. 20, **_2015_**), _http://www.dailystar.com.lb/Opinion/Commentary/_**_2015_**_/Jan-20/284644-israel-should-welcome-palestines-icc-entry.ashx_        ("... prosecutors usually refrain from pressing charges when countries have taken all available steps to avoid the commission of **_international_** crimes.").

[194]  See id. ("For example, the ICC declined to investigate alleged crimes by European governments **_in_** Iraq. Similarly, the **_International_** **_Criminal_** Tribunal for the former Yugoslavia has declined to **_prosecute_** suspected war crimes by NATO members **_in_** Bosnia and Kosovo.").

[195]  Id. ("The Palestinian Authority [as opposed to the Israeli Government] has relatively little infrastructure to ensure that its forces comply with **_international_** humanitarian **_law_**. It has sometimes seemed willing to overlook or even sanction **_violations_** that target Israeli civilians.").

[196]  See id. ("Israel has an excellent domestic legal system and a track record of investigating and **_prosecuting_** its own when they breach **_international_** humanitarian **_law_**."); see also Mahmoud Abbas, supra **_note_** 187 (recognizing ICC jurisdiction for acts committed **_in_** Palestinian territory since June 13, 2014).

[197]  Russian Television, supra **_note_** 1.

[198]  See Amira Howeidy, What's Next after Palestine's ICC Bid?, Al-Ahram Wkly. (Jan. 8, **_2015_**, 1:52 PM), _http://weekly.ahram.org.eg/News/10109/19/What-next-after-Palestines-ICC-bid-.aspx_ (discussing potential outcomes of the ICC's involvement **_in_** Gaza).

[199]  See Victor Kattan, The Implications of Joining the ICC after Operation Protective Edge, 44 J. of Palestine Stud. 61, 67 (2014) ("The problem with ad hoc declarations is that the prosecutor is **_not_** obligated to open an investigation. She could just sit on the case. It should **_not_** be forgotten that it took Moreno-Ocampo almost three years to announce that his office was **_not_** the appropriate body to decide whether Palestine was a state.").

[200]  Rome Statute, supra **_note_** 2, at art. 53.

[201]  Id.

[202]  The Meaning of "the Interests of Justice" **_in_** Article 53 of the Rome Statute, Hum. Rts. Watch (Jun. 1, 2005), _http://www.hrw.org/news/2005/06/01/meaning-interests-justice-article-53-rome-statute_ (explaining that "the interests of justice" is

confusion about how to interpret the phrase, the Office of the Prosecutor consulted with various non-governmental organizations to solicit their opinions on the proper interpretation of the "interests of justice." [203] After this consultation, the Office of the Prosecutor issued a policy paper *in* 2007 putting forth its interpretation of the "interests of justice." [204]

The Office of the Prosecutor emphasizes *in* its policy paper that whether an investigation or ***prosecution*** would be *in* the "interests of justice" [205] according to Article 53 depends on the specific facts and circumstances of a particular case. [206] Generally, there is a presumption *in* favor of ***prosecution*** once the Prosecutor has determined *in* its preliminary investigation that enough evidence exists to move the case forward. [207] This presumption is **not** surprising, given the purpose of the ICC: [*299] to "put an end to impunity and to ensure that the most serious crimes do **not** go unpunished." [208] The Prosecutor may rebut this presumption by concluding that the investigation or ***prosecution*** would **not** serve the interests of justice. [209] The policy paper ***notes*** that the "interests of justice" [210] consideration under Article 53(1)(c) applies only if the Prosecutor chooses **not** to open an investigation or ***prosecution***. [211] It is very difficult to predict which situations will or will **not** warrant a decision **not** to ***prosecute***. [212] However, the Prosecutor has listed several general factors to consider when determining whether or **not** ***prosecution*** would **not** be *in* the "interests of justice:" [213] the gravity of the crimes involved, the interests of the victims, and the circumstances of the accused (the accused's age, infirmity, and role *in* the crime). [214] The policy paper emphasizes that a decision **not** to investigate or ***prosecute*** based on 53(1)(c) should be reserved for exceptional cases and should **not** be taken lightly - the purpose of the Rome Statute is to ensure that the ICC

---

an important factor for the Prosecutor to consider-subject to review of the Pre-Trial Chamber-when deciding whether to initiate an investigation).

[203] Rome Statute, supra ***note*** 2, at art. 53; see Human Rights Watch, The Meaning of "the Interests of Justice" *in* Article 53 of the Rome Statute, supra ***note*** 194 ("***In*** [The Consultation Proposal on the Interests of Justice] the OTP [Office of the Prosecutor] solicited ***comments*** by NGOs regarding the meaning of the phrase "*in* the interests of justice' *in* the Rome Statute.").

[204] Int'l ***Criminal Court*** Office of the Prosecutor, supra ***note*** 14.

[205] Rome Statute, supra ***note*** 2, at art. 53.

[206] Int'l ***Criminal Court*** Office of the Prosecutor, supra ***note*** 14, at 1.

[207] Id.

[208] Id. at 9.

[209] See id. (explaining that the Prosecutor can choose to rebut the presumption *in* favor of ***prosecution***, but this may be subject to review of the Pre-Trial Chamber).

[210] Rome Statute, supra ***note*** 2, at art. 53.

[211] Int'l ***Criminal Court*** Office of the Prosecutor, supra ***note*** 14, at 3.

[212] Id. at 1 ("The paper deliberately does **not** enter into detailed discussions about all of the possible factors that may arise *in* any given situation. Experience demonstrates very clearly that each situation is different. It is also ***noted*** that the Statute itself does **not** try to elaborate on the specific factors or circumstances that should be taken into account *in* consideration of the interests of justice issue. The approach taken by the Office of the Prosecutor is therefore bound to offer only limited clarification *in* the abstract: as is the case with many legal problems *in* jurisdictions throughout the world, the particular approach taken will necessarily have to depend on the facts and circumstances of the case or situation.").

[213] Rome Statute, supra ***note*** 2, at art. 53.

[214] Int'l ***Criminal Court*** Office of the Prosecutor, supra ***note*** 14, at 2.

29 Temp. Int'l & Comp. L.J. 275, *299

**prosecutes** individuals who have committed the most serious crimes against the signatories to the Rome Statute, and the ICC should remain true to that purpose whenever possible. [215]

Significantly, the policy paper stated that the Prosecutor should **not** consider an investigation or **prosecution's** impact on overall peacemaking efforts. [216] The Prosecutor at the time, Luis Moreno-Ocampo, chose to interpret the "interests of justice" [217] very narrowly, as applying only to matters of **criminal** justice rather than taking a broader interpretation of justice that could include the effect of **prosecution** on peace talks. [218]

The Prosecutor is **not** bound by the narrow interpretation of the "interests of [*300] justice" [219] that was advanced **in** the policy paper. [220] The policy paper was written **in** 2007, before Fatou Bensouda, the current Prosecutor, assumed her title. [221] The current Prosecutor is able to - and should - revisit and broaden this interpretation by issuing another policy paper on this issue. [222] The phrase "interests of justice" [223] was highly ambiguous until the issuance of the Policy Paper **in** 2007. [224] The phrase was arguably left ambiguous **in** the statute on purpose, because "justice can mean different things to different people and **in** different situations." [225] As discussed above, if the Prosecutor chooses to follow this old interpretation and open an official investigation without considering its impact on peace or stability, that **prosecution** may still be deferred for renewable twelve-month periods upon a resolution by the U.N. Security Council if it concludes that the potential ICC investigation or **prosecution** would threaten peace or security. [226]

V. The ICC Should Decline to **Prosecute** Based on the Interests of Justice

 Once a matter is before the ICC, a decision by the prosecutor **not** to **prosecute** should be a last resort. [227] There has **not** yet been a situation **in** which the Prosecutor has declined to **prosecute** based on the "interests of justice"

---

[215]  See id. at 3 (highlighting the exceptional nature of deciding **not** to go forward with an investigation).

[216]  Id. at 8 ("The concept of the interests of justice established **in** the Statute, while necessarily broader than **criminal** justice **in** a narrow sense, must be interpreted **in** accordance with the objects and purposes of the Statute. Hence, it should **not** be conceived of so broadly as to embrace all issues related to peace and security.").

[217]  Rome Statute, supra **note** 2, at art. 53.

[218]  Ludwin King, supra **note** 55.

[219]  Rome Statute, supra **note** 2, at art. 53.

[220]  See generally Henry Lovat, Delineating the Interests of Justice: Prosecutorial Discretion and the Rome Statute of the **International Criminal Court**, *35 Denv. J. Int'l L. & Pol'y 275 (Winter 2006).*

[221]  See Office of the Prosecutor, Coalition for the Int'l Crim. Ct., http://www.iccno w.org/?mod=prosecutor (last visited Sept. 23, **2015**) ("Ms. Fatou Bensouda of Gambia was elected by consensus as Prosecutor of the ICC on 12 December 2011. Ms. Fatou Bensouda was sworn-**in** on 15 June 2012.").

[222]  Ludwin King, supra **note** 55, at 24-25.

[223]  Rome Statute, supra **note** 2, at art. 53.

[224]  Lovat, supra **note** 202, at 275.

[225]  Id. at 277.

[226]  Rome Statute, supra **note** 2, at 100; See also Mark Kersten, Palestine and the ICC: a Piece of Justice or a Peace for Justice? Just. Hub (April 1, **2015**), *https://justicehub.org/article/* palestine-and-icc-piece-justice-or-peace-justice (discussing whether Palestine's decision to involve the ICC will disrupt the Middle East peace process).

[227]  Grono, supra **note** 52.

29 Temp. Int'l & Comp. L.J. 275, *300

228 under Article 53 of the Rome Statute. 229 The current **_conflict_** between Israel and Palestine should be one such situation. The Prosecutor should take into account whether **_prosecution_** that would highly impede, if **_not_** outright destroy, peace negotiations should be declined as **_not_** serving the interests of justice.

The meaning of the "interests of justice" 230 under Article 53 should be interpreted broadly to allow the Prosecutor to decline to **_prosecute_** **_in_** cases where **[*301]** efforts to achieve peace and stability would be significantly deterred by an investigation or **_prosecution_**. However, as discussed, the Office of the Prosecutor determined **_in_** its 2007 policy paper that it would **_not_** take into account considerations of peace and stability. 231

Several scholars disagree with the policy paper's interpretation of the "interests of justice," 232 arguing that the Rome Statute gives the Prosecutor significant leeway to decline to investigate or **_prosecute_** based on the existence of ongoing peace efforts. 233 Elizabeth Ludwin King, an assistant professor at Wake Forest **_Law_** School, also argues that the presumption of ICC **_prosecution_** can be detrimental if it gets **_in_** the way of peace processes: "[a] single focus on trials as the preferred method of transitional justice fails to recognize the nuances inherent **_in_** any post-**_conflict_** or mid-**_conflict_** environment. Especially when a **_conflict_** is ongoing, governments may decide that the best path forward is to pursue peace." 234 Considerations of peace have taken precedence over those of justice on a few occasions. 235 One such occasion took place **_in_** the Democratic Republic of the Congo (DRC). 236 The President of the DRC chose to directly negotiate with rebel leader Bosco Ntangada, who had been indicted by the ICC. 237 When questioned about the decision, the President stated "why do we choose to work with Mr. Bosco, a person sought by the ICC? Because we want peace now. **_In_** Congo, peace must come before justice." 238 Additionally, **_in_** South America during the 1970s, truth commissions were employed rather than **_criminal_** **_prosecutions_**. 239 Some former military dictators were given amnesty **_in_** exchange for participation **_in_** the truth commissions, and such commissions contributed to peace and stability **_in_** the region by providing closure to victims and to the region at large. 240

---

228 Rome Statute, supra **_note_** 2, at art. 53.

229 Int'l **_Criminal_** **_Court_** Office of the Prosecutor, supra **_note_** 14, at 4 ("The Prosecutor has **_not_** yet made a decision **_not_** to investigate or **_not_** to proceed with a **_prosecution_** because it would **_not_** serve the interests of justice.").

230 Rome Statute, supra **_note_** 2, at art. 53.

231 See Int'l **_Criminal_** **_Court_** Office of the Prosecutor, supra **_note_** 14, at 8.

232 Rome Statute, supra **_note_** 2, at art. 53.

233 See infra pp. 32-33. The conclusions of these scholars will be discussed **_in_** detail below.

234 Ludwin King, supra **_note_** 55, at 8.

235 Id. at 2-3, 8 (discussing how concessions to options besides **_prosecution_** have been made or have been discussed **_in_** the interests of justice **_in_** Uganda, South America, and the Democratic Republic of Congo).

236 Id. at 8.

237 Id. at 8-9.

238 Id. (quoting David Smith, Congo **_Conflict_**: The "Terminator' Lives **_in_** Luxury While Peacekeepers Look On, The Guardian (Feb. 5, 2010), _http://www.theguardian.com/world/2010_ /feb/05/congo-child-soldiers-ntaganda-monuc).

239 Id. at 3.

240 Ludwin King, supra **_note_** 55, at 3. Some South American countries passed amnesty **_laws_** **_in_** exchange for the former military dictators' testimony regarding their roles **_in_** forced disappearances and other human rights abuses that took place during the military regimes. Id.

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 106 of 144   Page ID #:9233

Page 24 of 28

29 Temp. Int'l & Comp. L.J. 275, *301

While the **_prosecution_**'s impact on peace efforts is **_not_** directly addressed **_in_** Article 53, the Prosecutor's power to defer an investigation based on the "interests of justice" [241] could - and should - be interpreted to mean that the Prosecutor may defer such an investigation because it would severely impede peace efforts:

 [*302]

If a **_prosecution_** is likely to stall settlement efforts and thereby result **_in_** many more future civilian deaths, then justice may **_not_** be served **_in_** this larger sense, even if it is served by reference to a narrow concept of **_criminal_** justice focusing only on the gravity of the particular past crime being charged. [242]

 Recall that under Article 53, the Prosecutor can decline to investigate if there is "no reasonable basis to proceed." [243] Robert Mnookin, a Harvard **_Law_** professor and Director of Harvard's Negotiation Research Project, argues that the language of the statute suggests that the Prosecutor may consider an investigation's impact on the peace process **_in_** deciding whether **_prosecution_** is **_in_** the "interests of justice:" [244] "This broad standard permits the Prosecutor substantial discretion to decline to pursue crimes, including for the reason that the pursuit of a crime will **_not_** further the interests of peace." [245] Additionally, recall that the prosecutor may consider such factors as the "interests of victims" [246] **_in_** considering whether a **_prosecution_** would serve the "interests of justice." [247] The Prosecutor should consider whether **_prosecuting_** individuals **_in_** an unstable, ongoing **_conflict_** would serve the interests of the victims, if the **_prosecutions_** are unlikely to end further large-scale damage to life and property. [248] This depends on the individual outlook of the victims themselves: do the victims value permanent peace over individual accountability? [249] While it is impossible to get into the mind of each victim, it is arguable that ending the **_conflict_** would greater benefit the victims than ICC **_prosecution_**.

Investigating and **_prosecuting_** the conduct that took place during Operation Protective Edge would raise some practical issues. [250] First, it is impossible for the Prosecutor to fully investigate and **_prosecute_** every case over which the ICC has jurisdiction because the **_court_** lacks the time and resources to do so. [251] The conduct that took place during Operation Protective Edge was horrific and resulted **_in_** [*303] significant destruction of life and property. [252] However, it is simply **_not_** possible for the ICC to thoroughly investigate every crime that took place or

---

[241] Rome Statute, supra **_note_** 2, at art. 53.

[242] Brian D. Lepard, How Should the ICC Prosecutor Exercise His or Her Discretion? The Role of Fundamental Ethical Principles, _43 J. Marshall L. Rev. 553, 566_ (2009-2010).

[243] Rome Statute, supra **_note_** 2, at 118-19.

[244] Id. at art. 53.

[245] Robert H. Mnookin, Rethinking the Tension Between Peace and Justice: the **_International_** **_Criminal_** Prosecutor as Diplomat, _18 Harv. Negot. L. Rev. 145, 161 (Spring 2013)._

[246] Rome Statute, supra **_note_** 2, at art. 53(1)(c).

[247] Id. at art. 53.

[248] Farid Mohammed Rashid, The "Interests of Justice"Under the ICC Prosecutor Power: Escaping Forward, **_in_** U. of E. London Sch. of L. and Soc. Sci. 53, 57-58 (Crossing Conceptual Boundaries, 2013).

[249] Id.

[250] See Mnookin, supra **_note_** 221, at 157-58 (discussing the resource constraints put on the ICC Prosecutor and the ability to **_prosecute_** when one state does **_not_** want to comply).

[251] Id.

[252] See, e.g., Thomas Escritt & Anthony Deutsch, ICC opens examination of **_Israeli-Palestinian_** **_conflict_**, Reuters (Jan. 17, **_2015_**), _http://www.reuters.com/article/2015/01/17/us-icc-palestinians-examination-idUSKBN0KP1PR20150117._

29 Temp. Int'l & Comp. L.J. 275, *303

to try and punish every individual that was responsible. Obviously the ICC is useful, *in* theory, for individual accountability and deterrent purposes. But each individual involved *in* the *conflict* cannot be held responsible, given the scale of the *conflict* and the time and resources of the ICC. Interpreting "justice" on a broad scale by concluding that "justice" has been served when the parties are at peace rather than when individuals have been *prosecuted* avoids this practical problem of ICC *prosecution*.

Second, the Prosecutor cannot gain access to accused individuals or to crucial evidence without the support and cooperation of the member states: "any investigation or *prosecution* taken without regard for the interests of peace is unlikely to succeed when centrally important state parties refuse to cooperate because they believe the prosecutor's actions would jeopardize a vital interest *in* peacemaking." [253] Individual *criminal prosecutions* are better suited to stable situations, *not* situations like the *Israeli-Palestinian conflict*, which is still ongoing. [254] Due to the ongoing *conflict* and the difficulty *in* identifying the specific individuals responsible, it seems unlikely that either Israel or Palestine will cooperate with an investigation or *prosecution* - this is why the ICC became involved *in* the first place. With these considerations *in* mind, the Prosecutor should revisit and broaden her office's interpretation of the "interests of justice" [255] under Article 53 of the Rome Statute, and consider an investigation's or *prosecution*'s impact on peace processes.

A. *Prosecution*'s Potential Impact on *International* Relations

Palestine's decision to accept ICC jurisdiction has been met with some criticism from the *international* community, especially from the United States and, *not* surprisingly, Israel. The United States has condemned the decision, arguing that Palestine has no standing to join an *international* tribunal because it is *not* a sovereign state. [256] The United States also argued that Palestine's decision will make any potential peace talks impossible and promised that the decision will be met with a strong response. [257] Such response may include the United States cutting off **[*304]** aid to Palestine, which receives around $ 400 million per year from the United States. [258] A U.S. State Department spokesman *noted* that "the place to resolve the differences between the parties is through direct negotiation, *not* unilateral actions by either side." [259]

Israel has spoken out strongly against the decision. As of December 31, 2014, Israel froze the collection of tax revenue on behalf of Palestinians, making it extremely difficult for Palestine to pay about 160,000 Palestinian civil servants. [260] Additionally, Israel has urged allied ICC member states, such as Australia and Germany, to stop

---

[253] Mnookin, supra *note* 221, at 158.

[254] Rashid, supra *note* 223, at 61 ("During stable situations, *criminal prosecution* may become a desirable option. This happens, essentially, *in* situations, where the alleged perpetrators have been defeated, and have had no further role *in* the given society. The perpetrators usually cease to hold power and can be apprehended with no fear of the renewed explosion of violence.").

[255] Rome Statute, supra *note* 2, at art. 53.

[256] Doina Chiacu, U.S. says Palestine *not* qualify to be part of ICC: State Department, Reuters (Jan. 7, *2015*), http://www.reuters.com/article/*2015*/01/07/us-palestinians-israel-un-usa-idUSKBN0KG1YL20150107.

[257] See Hudson, supra *note* 40 (discussing Israel's and the United States' unfavorable reactions to Palestine's signing onto the Rome Statute).

[258] Id.

[259] Escritt & Deutsch, supra *note* 252.

[260] Dalia Hatuqa, Palestine faces backlash over ICC move, Al Jazeera (Jan. 20, *2015*), http://www.aljazeera.com/news/middleeast/*2015*/01/palestine-faces-backlash-over-icc-move-201511912371278649.html.

funding the ICC.  [261] Israel has also questioned why Palestine would make the risky move of accepting ICC jurisdiction, arguing that "the Palestinians may have more to lose by joining the ICC than Israel given the [Palestinian Authority's] unity deal with Hamas, which [Israeli Prime Minister Benjamin Netanyahu] called "an avowed terrorist organization which, like ISIS, carries out war crimes.'"  [262] The mere fact that Palestine has invoked ICC jurisdiction has clearly intensified the tension between Israel and Palestine. This tension will only worsen if the ICC decides to move forward with a formal investigation or ***prosecutions***. Israel has categorically stated that it will be unwilling to resume peace negotiations if the ICC proceeds with an investigation or ***prosecution***: ""We want a long-term agreement with the Palestinians based on mutual trust, ***not*** one-sided political steps,' Israeli deputy foreign ministry spokesperson, Alon Melchior, told Al Jazeera. "We believe the ***international*** community will put pressure on the PA to stop their ICC steps, as it is ***in*** their interest, too.'"  [263]

The ICC's involvement has also impacted the United States' attitude toward the ***conflict***, which is significant because the United States has been an important mediator ***in*** peace talks between Israel and Palestine.  [264] Mark Kersten, a consultant and teacher who specializes ***in*** ***international criminal law***, ***notes***:

The United States is unlikely to view the ICC as a welcome actor ***in*** the region. Nor is it likely to see the ICC as a lever that can help to facilitate peace. Instead, the ICC will continue to be viewed as threatening to throw a monkey wrench into any plans for peace talks [and] … the **[*305]** question of Palestine's status should be resolved through peace talks among local parties and should exclude external actors, such as the ICC, which would seek to inject external judgments about justice or accountability into a peace process. [265]

If the ICC chooses to investigate and/or ***prosecute*** the conduct that took place during Operation Protective Edge, then the possibility of direct negotiations - widely considered to be the only viable route to peace between Israel and Palestine - will cease to exist.  [266] According to the Israeli Ambassador to the U.N. at a Security Council meeting ***in*** January 2013, "there [is] only one road to statehood, and … it "runs through direct negotiations between Jerusalem and Ramallah.' There [are] no shortcuts; no quick fixes or instant solutions. Peace must be negotiated, and ***not*** imposed."  [267] The U.N. representative from the United States ***noted*** that an end to the ***conflict*** via a two-state solution can only be accomplished by both Israel's and Palestine's "commitment to direct negotiations on all final status issues, without preconditions."  [268] ICC investigation or ***prosecution*** would take that route to peace off of the table and would unilaterally impose a solution to the ***conflict*** without regard to negotiations.  [269]

As discussed above, the United States is reportedly considering backing a U.N. Security Council resolution that would pressure Israel and Palestine to resume direct negotiations ***in*** exchange for the ***international*** community's

---

[261] Id.

[262] Hudson, supra ***note*** 40.

[263] Mel Frykberg, Palestinians Build Case Against Israel at ICC, Al Jazeera (Aug. 30, ***2015***), http://www.aljazeera.com/news/***2015***/08/palestinians-build-case-israel-icc-150 82308254 1915.html.

[264] Mark Kersten, Palestine's Accession to the ICC May Strengthen Peace-first ***not*** Rights-based Approach, Just. ***in Conflict*** (Apr. 16, ***2015***),  http://justiceinconflict.org/***2015***/04/ 16/palestines-accession-to-the-icc-may-strengthen-peace-first-***not***-rights-based-approach/.

[265] Id.

[266] Press Release, AIPAC, Palestinian ICC Effort Undermines Prospects for Peace (Apr. 17, ***2015***) (on file with author).

[267] Press Release, Security Council, Peace Process between Israelis, Palestinians Entering Critical Period, Concerted Action Vital to Salvage Two-State Solution, Top Envoy Tells Security Council, U.N. Press Release SC/10895 (Jan. 23, 2013).

[268] Id.

[269] John Hudson & Colum Lynch, From Tel Aviv to Turtle Bay, Foreign Pol'y (Mar. 18, ***2015***), http://foreignpolicy.com/***2015***/03/18/from-tel-aviv-to-turtle-bay-israel-palestinians-un-res olution/.

agreement to encourage the ICC *__not__* to proceed with an official investigation or *__prosecution__*. [270] A decision *__not__* to investigate or *__prosecute__* would maximize the potential for the resurrection of direct peace talks between Israel and Palestine. Despite the fact that these talks have been unsuccessful *__in__* years past, they are likely to be more successful upon the passage of a U.N. resolution because increased pressure from the *__international__* community would ensure that the negotiations stay on track. [271]

B. Why Would *__Criminal Prosecutions__* Interfere with the Peace Process?

It is important to consider why, exactly, *__criminal prosecutions__* would interfere with the peace process. As discussed above, the vast majority of the allegations are **[*306]** against Israelis. [272] Although Palestine has exposed its own people to *__prosecution__*, the vast majority of the evidence is against Israel, *__not__* Palestine. [273] Israel has already responded extremely negatively to Palestine's decision to refer Operation Protective Edge to the ICC, as has the United States (who has been essential *__in__* brokering peace talks between the parties). [274]

Those facing *__prosecution in__* other situations have responded *__in__* a fashion that has negatively impacted the peace process. When the ICC indicted the president of Sudan, Omar-al Bashir, he called for all humanitarian aid organizations to leave the country immediately. [275] *__In__* Uganda, LRA leader Joseph Kony refused to sign a comprehensive peace agreement unless he was granted amnesty from *__criminal prosecutions__*:

Many blamed the ICC, suggesting that Kony never felt secure enough to come out of the bush. *__In__* the words of Father Carlos Rodriguez, "nobody can convince a rebel leader to come to the negotiating table and at the same time tell him that when the war ends he will be brought to trial.' [276]

The fact that the *__Israeli-Palestinian conflict__* is still ongoing means that peace should come before justice. It is unlikely that those facing *__prosecution__* will willingly attempt to negotiate for a final peace solution. *__Criminal prosecutions__* are best left for post-*__conflict__* situations rather than situations *__in__* which a *__conflict__* is still ongoing.

There are significant moral questions involved when considering whether an individual who has committed significant *__violations__* of *__international law__* should be granted immunity from *__criminal prosecutions__*. This *__comment__* does *__not__* intend to argue that *__criminal prosecutions__* should never occur. Rather, it argues that the ICC should *__not prosecute__* the conduct that Palestine has referred to it at this time. *__Prosecutions__* should occur after peace and stability has occurred *__in__* the region. *__Prosecutions__* are *__not__* likely to be the justice mechanism that is best suited to this particular *__conflict__*, as it is still ongoing. At this time, *__criminal prosecutions__* on an *__international__* level will further complicate an already extremely complicated and tense *__conflict__*.

V. Conclusion

---

[270] Id.

[271] See generally id.

[272] See supra Part IV, Section C for more information about specific damage alleged to have been caused by Israel during Operation Protective Edge.

[273] See Reini, supra *__note__* 57 (discussing the relative merits of either side of the case and recent legal battles between Israeli and Palestinian interests *__in__* U.S. *__Court__*).

[274] See, e.g., Kersten, supra *__note__* 237; Hudson & Lynch, supra *__note__* 269.

[275] Ludwin King, supra *__note__* 55, at 25.

[276] Mark Kersten, Peace, justice, and politics *__in__* Northern Uganda, Eur. Council on Foreign Rel., *http://www.ecfr.eu/ijp/case/uganda* (last visited Sept. 23, *__2015__*).

29 Temp. Int'l & Comp. L.J. 275, *306

The **_conflict_** between Israel and Palestine has existed since the late 19th **[\*307]** century. [277] Several attempts at peace talks since then have failed. [278] Palestine has appealed to the ICC **_in_** an attempt to have Israel answer for the war crimes and crimes against humanity that it allegedly committed during Operation Protective Edge. [279] The ICC has opened preliminary investigations to determine whether to begin an official investigation that could ultimately lead to **_prosecutions_**. [280] The Prosecutor should decline to officially investigate or **_prosecute_** the situation because an investigation or **_prosecution_** would **_not_** serve the "interests of justice." [281] That phrase should be interpreted broadly **_in_** order to allow for the Prosecutor to decline to **_prosecute_** if such **_prosecution_** would significantly interfere with the peace process. However, if the Prosecutor declines to broaden its interpretation that it put forth **_in_** its 2007 policy paper, then the U.N. Security Council should defer the ICC's steps toward **_prosecution_** - ideally indefinitely, but at least until significant steps are taken towards peace. An investigation and/or **_prosecution_** by the ICC would interfere with the peace process because such investigation or **_prosecution_** would essentially block the possibility of the resumption of direct negotiations - considered by many to be the only viable option for peace between Israel and Palestine.

Temple **_International_** & Comparative **_Law_** Journal
Copyright (c) **_2015_** Temple **_International_** and Comparative **_Law_** Journal
Temple **_International_** and Comparative **_Law_** Journal

---

**End of Document**

---

[277] See Timeline of the Arab-Israeli **_Conflict_** and Peace Process, supra **_note_** 108.

[278] Id.

[279] See Russian Television, supra **_note_** 1.

[280] See Reini, supra **_note_** 57 (discussing Prosecutor Bensouda's preliminary examination into possible **_prosecution_**).

[281] Rome Statute, supra **_note_** 2, at art. 53.

# EXHIBIT 177

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 112 of 144   Page ID
#:9239

# The Middle East: The Origins of Arab-Israeli Wars

Avi Shlaim

in Ngaire Woods, ed., Explaining International Relations since 1945 (Oxford: Oxford University Press, 1996), 219-40.

The Middle East has been one of the most volatile and violent subsystems of the international political systems since the end of the Second World War. Postwar history in the Middle East has been punctuated by an unusually high number of full-scale, inter-state wars. The aim of this chapter is to explore the underlying causes of the largest category of Middle Eastern wars, namely, the Arab-Israeli wars. Wars which are not directly related to the Arab-Israeli conflict, like the Yemen war of 1961-64 and the Iran-Iraq war of 1980-88, lie outside the scope of this chapter. Within the scope of this chapter are all seven major Arab-Israeli wars: the 1948 Palestine war, the 1956 Suez war, the June 1967 Six-Day War, the 1969-70 War of Attrition, the October 1973 Yom Kippur war, the 1982 Lebanon war, and the 1991 Gulf war. It is the origins of these wars which will be examined here in an attempt to see whether any general patterns emerge.

## The Level-of-Analysis Problem

In dealing with the origins of wars, as with any other class of international events, it is important to be clear about the level of analysis. J. David Singer, in a famous article, identified the two most widely employed levels of analysis in International Relations: the international system and the national sub-systems. The first level of analysis focuses on the international system and its impact on the behaviour of states. The second focuses on domestic influences on states' behaviour vis-א-vis other states. The first level of analysis has the advantage of giving generalizable and parsimonious explanations of the external behaviour of states whereas the second level calls for richer detail, greater depth and more intensive portrayal of the domestic roots of international events.[1]

Another well-known treatment of the level of analysis problem in International Relations is the book by Kenneth Waltz, Man, the State and War. This book is more directly relevant to the present inquiry than J.David Singer's article because it deals specifically with the causes of war. Waltz discusses the contribution which classical political theory makes to our understanding of the nature and causes of war. He does so by identifying three principal themes or images of international relations: war as the consequence of the nature and behaviour of man, as the outcome of the internal organization of states, and as the product of international anarchy.[2]

In Waltz's analysis the state is the most important actor in international politics and the principal cause of war in the international system. All three images are concerned with influences that incline the state to go to war: the first image stresses the personality and beliefs of the leader as a cause of war; the second image stresses domestic political forces as the cause of war; while the third image stresses the regional and international power game as the cause of war. Waltz's conclusion is that the first two sets of influences are relatively unimportant whereas the third set of influences is critical. In other words, states do not resort to war because of the personality of the leader or because of their domestic political structure or ideology but because of pressures emanating from the international environment.

Waltz's three images of international relations constitute a useful analytical framework for thinking about the causes of war. One of the strengths of the framework lies in its universal applicability. The framework can be employed to analyse the causes of a single war or a series of wars in any region at any period in history. The post-1945 Middle East is no exception. If applied to the outbreak of Arab-Israeli wars, this framework would suggest three lines of inquiry: the psychological factors rooted in human nature, the organizational and ideological factors rooted in the domestic environment, and the systemic factors rooted in the international environment. The framework would also suggest that systemic factors are much more important than the other two sets of factors in explaining the outbreak of Arab-Israeli wars.

Yet, precisely because it is so broad and all-encompassing, Waltz's analytical framework is less than ideal for the purposes of this particular chapter. In the first place, there is no justification for assuming a priori that systemic factors connected with the regional and international power-game are more important than the other factors in motivating

states to go to war. This is an empirical question which can only be answered after reviewing the relevant empirical evidence. Secondly, the relative weight of individual, domestic, and systemic influences is likely to vary from one Arab-israeli war to another. Thirdly, these three sets of influences cannot always be fitted into neat and separate categories because they intermingle and shade into one another.

A different analytical framework is therefore proposed here, a framework tailored to the particular circumstances of the Middle East. This framework identifies three central factors that contribute to the outbreak of wars in the Middle East: the Arab-Israeli conflict, inter-Arab relations, and the involvement of the Great Powers in the affairs of the region. Like Waltz's framework, this alternative analytical framework involves a three-fold division. But whereas Waltz's three levels are the individual, the state and the international system, this framework focuses attention on three sets of interaction between states. States are the principal unit of analysis in this framework. The states in question are Israel, her Arab neighbours and the Great Powers: Britain, France, the United States and the Soviet Union. These states dominated the international politics of the Middle East in the aftermath of the Second World War. And it is the policies and actions of these states which are assumed to be the principal cause of war in the region. A word of explanation about the three factors that make up this framework of analysis may therefore be in order.

**Israel, the Arab States and the Great Powers**

The conflict between Israel and the Arabs is one of the most profound and protracted conflicts of the twentieth century and the principal precipitant of wars in the Middle East. There are two major dimensions to this conflict: the Israeli-Palestinian dimension and the Israeli-Arab dimension. The origins of the conflict go back to the end of the nineteenth century when the Zionist movement conceived the idea of building a national home for the Jewish people in Palestine. This project met with bitter opposition on the part of the Arab population of the country. The upshot was a clash between two national movements for possession of Palestine. There were two peoples and one land, hence the conflict.

The neighbouring Arab states became involved in this conflict on the side of the Palestinian Arabs in the 1930s. After the creation of the State of Israel in 1948, the main weight of the conflict shifted from the local or inter-communal level to the inter-state level. In 1967 the conflict was further complicated by Israel's capture of the West Bank from Jordan, the Golan heights from syria and the Sinai peninsula from Egypt. From this point on, these states had a direct territorial dispute with Israel quite apart from their commitment to the Palestinian cause.

On the root cause of the conflict there are widely divergent views. Most Arabs maintain that the root cause of the conflict is the dispossession and dispersal of the Palestinian Arabs, an original sin which was compounded by Israel's subsequent territorial acquisitions. In their view, Israel is an inherently aggressive and expansionist state and the real source of violence in the region.[3]  Most Israelis, on the other hand, maintain that the root cause of the conflict is not territory but the Arab rejection of Israel's very right to exist as a sovereign state in the Middle East. According to this view, the basic Arab objective is the liquidation of the State of Israel while Israel acts only in self-defence and in response to the Arab challenges.[4]  But whatever one's view of the origins and nature of the Arab-Israeli conflict, there can be no doubt that this conflict has been a major cause of wars in the Middle East.

A second source of tension and instability which at least on one occasion, in June 1967, helped to tip the balance in favour of war, is to be found in the relations among the Arab states. In theory all Arab states subscribe to the ideal of Arab unity but in practice inter-Arab relations are characterized more by conflict than by co-operation. Israel is widely held to be one of the few solid pillars propping up Arab unity, the one issue on which all Arabs, whatever their other differences may be, can agree. Opposition to Israel follows naturally from the belief that the inhabitants of the various Arab states, including the Palestinians, form a single nation and that Israel has grossly violated the sacred rights of this nation.

A distinction needs to be made, however, between the rhetorical and the operational levels of Arab foreign policy. Whereas at the rhetorical level the Arab states were largely united in their commitment to oppose Israel, at the operational level they remained deeply divided. The conservative states tended to advocate containment of the Jewish state, while the radical states tended to advocate confrontation. For this reason, the conventional wisdom on Israel's role

1983

in inter-Arab relations is not entirely convincing. As a number of scholars have pointed out, the conflict with Israel has imposed enormous strain on the inter-Arab system.[5]  Far from serving as a goad to unity,the question of how to deal with Israel has been a serious source of dissension and discord in inter-Arab politics.

A third source of instability and war in the Middle East is the involvement of the Great Powers in the affairs of the region. Two features of the Middle East help to account for the interest and rivalry it has evoked among the Great Powers in the twentieth century: its geostrategic importance and its oil reserves. Great Power involvement is not a unique feature of the Middle East but one that affects, in varying degrees, all regions of the world. What distinguishes the Middle East is the intensity, pervasiveness and profound impact of this involvement. No other part of the Third World has been so thoroughly and ceaselessly caught up in Great Power rivalries. No other sub-system of the international political system has been as penetrated as the Middle East.[6]

The dominant Great Powers in the Middle East were the Ottoman Empire until its dissolution in 1918, Britain and France until, roughly, the Suez war of 1956, the United States and the Soviet Union from Suez until the dissolution of the Soviet Union in 1991, and the United states on its own since 1991. So much stress has been laid on the role of these external powers that the history of the modern Middle East, in the words of Malcolm Yapp, has often been written as though the local states were `driftwood in the sea of international affairs, their destinies shaped by the decisions of others.'[7]  Yet this is a false picture, popular as it is with Middle Easterners and outsiders alike. From Yapp's detailed historical survey it emerges quite clearly that the dominant feature in the relations between international and regional powers is the manipulation of the former by the latter.[8] A perceptive survey of the period 1955-1967 by Fawaz Gerges reaches the same conclusion: the superpowers were rarely able to impose their will on the smaller states of the Middle East.[9]  Although the local states depended on their respective superpower patrons for diplomatic support, economic aid and the supply of arms, they managed to retain considerable freedom of action. Yet no account of the origins of Arab-israeli wars would be complete if it ignored the role played by outside powers.

When the role of the Great Powers is considered alongside the other two factors - the Arab-Israeli conflict and inter-Arab relations - we begin to get some idea as to why the international politics of the Middle East are so complex, endemically unstable, and prone to violence and war. Against this background what is surprising is not that seven full-scale Arab-Israeli wars have erupted in the postwar period,but that some of the other crises in this volatile region did not end up in war. Our next task is to assess the relative weight of these three factors in the origins of each successive Arab-Israeli war, bearing in mind that these factors often interact in complex and curious ways.

**The 1948 Palestine War**

The 1948 Arab-Israeli war was the climax of the conflict between the Jewish and Palestinian national movements which had been three decades in the making. As the mandatory power in Palestine, Britain had repeatedly tried and failed to find a solution that would reconcile the two rival communities in the country. In February 1947, the British cabinet decided to refer the problem to the United Nations and the struggle for Palestine entered its most critical phase. The United Nations, on 29 November 1947, passed its famous resolution which proposed the partition of Palestine into two states, one Jewish and one Arab. The Jews accepted the partition plan; all the Arab states and the Palestinians rejected it vehemently. The Palestinians launched a campaign of violence to frustrate partition and Palestine was engulfed by a civil war in which the Jews eventually gained the upper hand. At midnight on 14 May 1948, upon expiry of the British mandate, the Jews proclaimed the establishment of an independent state which they called Israel. The following day the regular armies of the Arab states intervened in the conflict, turning a civil war into the first full-scale Arab-Israeli war, a war which ended in defeat for the Arabs and disaster for the Palestinians.

Arab solidarity in the struggle for Palestine was more apparent then real. The Arab states, loosely organized in the Arab League, loudly proclaimed their solidarity with the Palestine Arabs and promised to provide money and arms. But behind the rhetoric of solidarity, the reality was one of national selfishness and dynastic rivalries, notably between King Farouk of Egypt and King Abdullah of Jordan. King Abdullah who had reached a secret agreement with the Jewish Agency to partition Palestine at the expense of the Palestinians, was reluctant to play the part assigned to him in the Arab League's invasion plan. The Arab League's invasion plan was designed to prevent the creation of a Jewish state whereas his plan was to let the Jews have their state and annex to his kingdom much of territory assigned by the

1984

The Middle East The Origins of Arab-Israeli Wars                    Page 4 of 13
Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 115 of 144   Page ID
#:9242

UN to the Arab state.[10]  Divisions of this kind go a long way to explain the failure of the Arab states to coordinate their diplomatic and military strategies in the battle for Palestine.

Of the Great Powers Britain was most directly involved in the lead up to the Palestine war. Britain's policy during the twilight of the Palestine mandate is a subject of some contention. Pro-Zionist writers have assigned to Britain a large share of the blame for the outbreak of the Palestine war, claiming that Britain armed and encouraged her Arab allies to wade into Palestine and destroy the Jewish state at birth. There is no evidence, however, to sustain this charge, and considerable evidence to suggest that Britain tried to persuade the Arabs not to resort to war.[11]

On the other hand, Britain refused to assume responsibility for implementing the UN partition plan on the grounds that the use of force would be required. So the real charge against Britain is not that she plotted war against the infant Jewish state but that her abdication of responsibility at the critical moment allowed Palestine to slide into chaos, violence and bloodshed.

America played a less central but equally controversial role in the events surrounding the Palestine war. American policy was a series of swings of the pendulum between the pro-Zionist White House and the pro-Arab State Department. In the fall of 1947, against the advice of the State Department, President Harry Truman decided to support partition. In March 1948, the State Department concluded that partition was impracticable and submitted instead a proposal for a United Nations trusteeship over Palestine. Both Truman and the State Department later urged the Jews to delay their declaration of independence and undertake on-the-spot negotiations in Palestine. But when the Jews proclaimed their state, Truman, without consulting the State Department, accorded it immediate de facto recognition.

If America was first to accord de facto recognition to the State of Israel, the Soviet Union was first to accord de jure recognition. The Soviet Union supported partition and the creation of a Jewish state chiefly in order to weaken the British position in the Middle East. In early 1948 the Soviet Union permitted the emigration of Eastern European Jews and sent a shipment of 10,000 rifles and 450 machine-guns. During the summer of 1948, in violation of the UN embargo, the Jews received more substantial shipments of arms from the Eastern bloc which helped to tip the military balance against their opponents.

The critical factor in the outbreak of the Palestine war was thus the dispute between the Jews and the Arabs. The Palestinian attack on the Jews provoked the civil war while the Arab invasion in May 1948 provoked the official war. Inter-Arab rivalries contributed much less to the outbreak of this war than they did to the subsequent military defeat. None of the Great Powers wanted war in Palestine but Britain lost control of the situation while support from Washington and Moscow encouraged the Jews to proceed to statehood by force of arms.
The 1956 Suez War

If in 1948 the Great Powers played only a limited role on the Middle East stage, in 1956 the reverse was true. The war which broke out in October 1956 pitted Britain, France and Israel against Egypt. One of the many paradoxes of this war was that Britain and Israel, despite the bitter legacy of the past, joined arms to attack an Arab state which had long been associated with Britain. Another paradox was that Britain and France, old sparring partners in the Middle East, found themselves on the same side in this war.

The motives which produced this unlikely alliance are not difficult to fathom. Britain was the primary mover. After the Free Officers' revolution of July 1952, Britain came under growing pressure to withdraw its forces from the strategically important Suez Canal base. With Colonel Gamal Abdel Nasser as President, Egypt became the standard-bearer of radical pan-Arab nationalism. Prime Minister Anthony Eden regarded Nasser as the chief enemy of the British presence in Egypt and as the chief threat to the entire British position in the Arab world. Comparing Nasser with Hitler, Eden was convinced that the right response to this challenge was confrontation, not appeasement. For Eden, Nasser's nationalization of the Suez Canal in July 1956 was the last straw. He concluded that Nasser would have to be removed from power if Britain were to maintain her position as a Great Power in the Middle East. The French also regarded Nasser as an enemy, not least because of his arms supplies to the Algerian rebels, and they too firmly set their face against appeasement. To the Israelis Nasser was a bitter and dangerous foe and they were particularly troubled by his actions in closing the Gulf of Aqaba to Israeli shipping and in sending fedayeen units across the border into Israel. But it was the Czech arms deal of September 1955 which began to tip the balance in the Israeli cabinet in favour of a

1985

The Middle East The Origins of Arab-Israeli Wars                Page 5 of 13
Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 116 of 144   Page ID
#:9243

preemptive strike against Egypt.

Thus the three countries had their own reasons for wanting to go to war with Egypt. But although their war aims were not identical, they were all united by the determination to knock Nasser off his perch. The French took the lead in mediating between Israel and Britain and in organising the secret meeting on 22 October 1956 at which the infamous collusion took place. At this meeting a plan of action was agreed and embodied in what became known as the Protocol of Sèvres. The tripartite attack on Egypt a week later proceeded broadly in line with this plan. Collusion led directly to the collision at Suez.

One of the distinguishing characteristics of Suez was that it was the result of a war plot. Indeed, while conspiracy theories are common, especially in the Middle East, Suez is one of the few genuine war plots of modern history. Britain, France and Israel deliberately, carefully and secretly planned their joint attack on Egypt. The Arab world was deeply divided in the mid-1950s between the radical states led by Egypt and the conservative monarchies led by Iraq but this division was not a direct cause of the Suez war. Similarly, the Soviet Union and the United States, though increasingly involved in the affairs of the Middle East, played no direct part in the events that led to war. Once the war broke out, the Soviet Union scored some cheap propaganda points by threatening rocket attacks against the attackers while the real pressure for halting the attack came from Washington. The crucial factor in the origins of the Suez war was the convergence of British, French and Israeli plans to inflict a military defeat on Egypt and to bring about the downfall of Nasser.

**The Six-Day War**

Whereas the Suez war had been the result of deliberate planning, the Arab-Israeli war of June 1967 was the result of a crisis slide. President Nasser appeared to challenge Israel to a duel but most observers agree that he neither wanted nor expected a war to take place. What he did do was to embark on an exercise in brinkmanship which went over the brink. On 13 May 1967 Nasser received a Soviet intelligence report which claimed that Israel was massing troops on Syria's border. Nasser responded by taking three successive steps which made war virtually inevitable: he deployed his troops in Sinai near Israel's border, he expelled the United Nations Emergency Force from Sinai, and, on 22 May, he closed the Straits of Tiran to Israeli shipping. On 5 June Israel seized the initiative and launched the short, sharp war which ended in a resounding military defeat for Egypt, Syria and Jordan.

The decisive factor in triggering the crisis that led to the Six-Day War was inter-Arab rivalries. It may sound perverse to suggest that the war owed more to the rivalries between the Arab states than to the dispute between them and Israel, but such a view is supported by the facts. The Arab world was in a state of considerable turmoil arising out of the conflict and suspicions between the radical and the conservative regimes. A militant Ba'th regime rose to power in Syria in February 1966 and started agitating for a war to liberate Palestine. President Nasser came under growing pressure to stop hiding behind the skirts of the United Nations and to come to the rescue of the embattled regime in Damascus. Nasser suspected his Syrian allies of wanting to drag him into a war with Israel while they suspected that, if push came to shove, he would leave them to face Israel on their own. Nasser's first move, the deployment of the Egyptian army in Sinai, was not intended as a prelude to an attack on Israel but as a political manoeuvre designed to deter the Israelis and to shore up his prestige at home and in the Arab world. This move, however, started a chain reaction which Nasser was unable to control.

In early May 1967 the old quarrel between Israel and the Arabs seemed almost irrelevant. As Malcolm Kerr observed in The Arab Cold War, the Arabs were more preoccupied with one another than they were with Israel. Even when the Israelis first appeared on the scene, they were merely there as a football for the Arabs, kicked onto the field first by the Syrian hot-heads and then again by Nasser. The Israelis, however, took a different view of themselves. It became a case of the football kicking the players.[12]

The superpowers did very little to prevent the slide towards war. The Soviets fed Nasser with a false report about Israeli troop concentrations and supported his deployment of Egyptian troops in Sinai in the interest of bolstering the left-wing regime in Damascus and in the hope of deterring Israel from moving against this regime. Their subsequent attempts to restrain Nasser had very little effect. They probably hoped to make some political gains by underlining their

1986

own commitment to the Arabs and the pro-Israeli orientation of American foreign policy. But they seriously miscalculated the danger of war and they were swept up in a fast-moving crisis which they themselves had helped to unleash.

America features very prominently in Arab conspiracy theories purporting to explain the causes and outcome of the June war. Mohamed Heikal, Nasser's confidant, for example, claims that Lyndon Johnson was obsessed with Nasser and that he conspired with Israel to bring him down.[13]  Such explanations, however, are transparently self-serving in that they assign all the blame for the war to America and Israel and overlook the part played by Arab provocations and miscalculations.

In fact, the American position during the upswing phase of the crisis was hesitant, weak and ambiguous. President Johnson initially tried to prevent a war by restraining Israel and issuing warnings to the Egyptians and the Soviets. Because these warnings had no visible effect on Nasser's conduct, some of Johnson's advisers toyed with the idea of unleashing Israel against Egypt. Johnson himself was decidedly against giving Israel the green light to attack. His signals to the Israelis amounted to what William Quandt termed `a yellow light' but, as for most motorists, the yellow light amounted to a green light.[14]

**The War of Attrition**

The March 1969-August 1970 Israeli-Egyptian War of Attrition was a direct result of the problems created for the Arab world by the Six-Day War. Israel had not only won a resounding military victory but ended the war in possession of large tracts of Arab land - the Golan Heights, the West Bank and the Sinai peninsula. UN Resolution 242 of 22 November 1967 called on Israel to withdraw from these occupied territories in return for peace with the Arabs but the Israelis and the Arabs interpreted Resolution 242 rather differently and Israel's position progressively hardened. Israel became attached to the new territorial status quo and was confident of her ability to maintain this status quo indefinitely. Her strategy was to sit tight on the new case-fire lines until the Arabs had no alternative but to accept her terms for a settlement.

For a short period the Arabs closed ranks against the common enemy and the bitter consequences of defeat but the old divisions gradually reasserted themselves. The main division was between the advocates of a political settlement and those who believed that what was taken by force could only be recovered by force. At the summit conference held in Khartoum in late August 1967, these divisions were papered over by means of a resolution which was dubbed the three `noes' of Khartoum - no recognition, no negotiations and no peace with Israel. The conference demonstrated the uselessness of pan-Arabism as a framework for deciding a realistic policy towards Israel. The political option was rejected even at a time when an Arab military option palpably and painfully was not available. While Arab unity was preserved at the declaratory level, at the practical level each Arab state was left to decide for itself how to go about recovering the territory it had lost.

President Nasser adopted a strategy which fell into three phases: the purely defensive phase of re-equipping and reorganizing the Egyptian armed forces, leading to the second phase of active deterrence, which would be followed finally by the liberation of the territory that had been lost. Nasser's central aim after the 1967 defeat was to lift the Middle East dispute from the local level, at which Israel had demonstrated its superiority, to the international level. He therefore set out to involve the Soviet Union as deeply as possible in the Middle East problem. If a satisfactory political settlement could be reached with Soviet help, that would be fine, but if a political solution could not be found, the Soviet Union would be under some obligation to help Egypt develop a military option against Israel.[15]

The Soviet Union stepped up considerably its material and military support to Syria and Egypt after the 1967 defeat and it also became deeply involved in the diplomacy of the Middle East dispute. Although it was opposed to the resumption of all-out war, it supported the Egyptian commando raids across the Suez Canal which developed, by March 1969, into what became known as the War of Attrition.

Nasser decided to begin a war of attrition only after it became clear that diplomacy alone could not dislodge Israel from Sinai and after enlisting Soviet support for limited military action against Israel. The aim of the war was to bring

1987

about Israel's withdrawal from Sinai. The strategy adopted was that of a limited but prolonged war which would exact heavy casualties, exhaust Israel psychologically, and impose an intolerable burden on her economy. Israel's aim during the run-up to the War of Attrition and during the war itself was to preserve the territorial, political and military status quo created by the Six-Day War. In all other Arab-Israeli wars, the side that started the war did so in order to preserve the status quo. This was true of the Arabs in 1948 and of Israel in 1956 and 1967. In the War of Attrition, the side that started the war, Egypt, was not out to defend but to change the status quo.[16]

**The Yom Kippur War**

   The War of Attrition ended in a military draw between Israel and Egypt and it was followed by a deadlock on the diplomatic front which was not broken until 6 October 1973 when Egypt and Syria launched their well-coordinated surprise attack against Israel. The Yom Kippur War can be traced to three factors: the failure of all international initiatives for the resolution of the Arab-Israeli dispute; the emergence of an Arab coalition which was able and willing to do battle with Israel; and the steady flow of arms from the superpowers to their regional clients.

   International initiatives for the resolution of the Arab-Israeli conflict failed largely as a result of Israeli intransigence. After Anwar Sadat succeeded Gamal Abdel Nasser as President in September 1970, there was a distinct shift in Egyptian policy away from military activity towards the quest for a political solution. Sadat's public declaration in February 1971 of his readiness for a peaceful agreement with Israel was a significant turning-point in the generation-old conflict. But the deadlock over the implementation of UN Resolution 242 could not be broken because Israel flatly refused to return to the lines of 4 June 1967. On 4 February 1971, Sadat put forward his own plan for an interim settlement, based on a limited Israeli pull-back from the Suez Canal and the reopening of the canal for international shipping, but this plan, too, was rejected by Israel. Continued Israeli stone-walling persuaded Sadat, by November 1972, that a resort to force was essential in order to break the pattern of standstill diplomacy. From that point he started planning the military offensive which was code-named `Operation Spark'.

   Under the leadership of Golda Meir, Israel kept raising her price for a political settlement just when Egypt became convinced of the need for a historic compromise. Immobilism was the hallmark of Mrs. Meir's foreign policy. Holding on to the territories acquired in 1967 gradually replaced the quest for a settlement as Israel's top priority. Mrs Meir continued to proclaim Israel's desire for peace but this was a pious hope rather than a plan of action. Her actual strategy was to let Sadat sweat it out, with his range of options constantly  narrowing, until he was left with no choice but to accept Israel's terms for a settlement. The consequences of this strategy were to miss the opportunities for a peaceful settlement of the dispute and drive Israel's opponents to launch another round of fighting.

   Israel's intransigence gave the Arab states a powerful incentive to set aside their differences and formulate a joint strategy for the recovery of their territory. The early 1970s were an era of rapprochement and growing co-operation in inter-Arab politics. Relations between Egypt and Syria developed into an effective strategic partnership and the relations between Egypt and Saudi Arabia also improved after Nasser's death. On the Arab side, Sadat was the main mover and planner on the road to war. His strategy was to mobilize all the resources of the Arab world, including the use of the oil weapon, for the forthcoming confrontation with Israel. It was he who took the lead in forging the alliance with Syria, in setting strictly limited aims for the joint operation, and in provoking the international crisis in which the superpowers, he believed, were bound to intervene in order to secure a settlement.

   Soviet policy in the period 1970-1973 was inconsistent and contradictory. The Soviet Union's overall policy of detente with the United States led it to behave with great caution in the Middle East. It was Moscow's refusal to give Egypt the weapons she needed to have a viable military option against Israel that prompted Sadat, in July 1972, to expel the Soviet military advisers from his country. By the beginning of 1973, however,the Soviets resumed arms supplies to Egypt in the knowledge that an offensive against Israel was being planned. The Soviets continued to urge their Arab allies to avoid war while supplying them with sufficient arms to enable them to resume hostilities.[17]

   The United States contributed to the outbreak of the Yom Kippur War indirectly and inadvertently by supporting the Israeli policy of trying to maintain an untenable status quo. Republican President Richard Nixon and his National Security Adviser, Henry Kissinger, approached the Middle East from a globalist perspective and sought to keep the

1988

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 119 of 144   Page ID #:9246

Soviet Union out of the area. They perceived Israel as a strategic asset and a bastion of regional stability. They embraced the Israeli thesis that a strong Israel was the best deterrent to war in the Middle East. In accordance with this thesis, they provided Israel with economic and military aid on an ever growing scale while declining to put pressure on her to return to the pre-1967 lines. Even after Sadat expelled the Soviet advisers, the Americans persisted in this standstill diplomacy which eventually drove Egypt and Syria not to accept Israel's terms for a settlement but to resort to war.

**The 1982 Lebanon War**

   The 1982 Lebanon war was the result of the unresolved dispute, or only partially resolved dispute, between Israel and the Arabs. The origins of this war can be traced back to the rise to power in Israel of the right-wing Likud Party headed by Menaham Begin in 1977. It was Israel's invasion of Lebanon in June 1982 which started the war in Lebanon and provoked the clash with the PLO and Syrian forces on Lebanon's territory. Officially the war was called `Operation Peace for the Galilee' to suggest that its purpose was purely defensive, to secure the Galilee against attacks from the PLO forces stationed in southern Lebanon. But the broader aims of the war were to create a new political order in Lebanon, to establish Israeli hegemony in the Levant and to pave the way to the absorption of the West Bank in line with the Likud's nationalistic ideology of Greater Israel. In this sense, the Israeli invasion of Lebanon was only the culmination of a long process of Israeli intervention in domestic and regional Arab politics.[18]

   Internal political divisions in Lebanon and inter-Arab rivalries did not directly cause the war but they facilitated and encouraged Israeli intervention. Lebanon itself had no territorial dispute with Israel and had only half-heartedly participated in the 1948 Arab-Israeli war. But the weakness of the Lebanese state and the fragmentation of Lebanese politics not only permitted but invited intervention by outside powers, notably Syria and Israel. Palestinian presence in Lebanon greatly added to this internal turmoil which in 1976 erupted into a civil war. Syria intervened in the civil war on the side of the Christian forces against the Lebanese left and the PLO. By maintaining a large military presence in Lebanon, Syria became the de facto arbiter of Lebanese politics. And this accentuated further the geopolitical contest between Syria and Israel for mastery in the Levant.[19]

   Another major rift in the Arab world opened up when President Sadat signed the Camp David accords with Israel in 1978 and a peace treaty in 1979. Throughout the Arab world Sadat was denounced as a traitor and Egypt was drummed out of the Arab League. President Hafez al-Assad was one of Sadat's fiercest critics, arguing that the only way to negotiate with Israel is by maintaining a united Arab front. Sadat argued in self-defence that Egypt's peace treaty with Israel was only a first step towards comprehensive peace in the Middle East. The Likud government, however, exploited Egypt's disengagement from the conflict in order to press its strategic advantage against the rest of Israel's Arab opponents and especially against the Palestinians.

   The chief architect of Israel's war in Lebanon was defence minister Ariel Sharon. A ruthless and cynical politician, he was also a great believer in using force to solve political problems. Sharon's `big plan' had a number of objectives. The first objective was to destroy the military infrastructure of the PLO in southern Lebanon and thereby to break the backbone of Palestinian resistance to the imposition of permanent Israeli rule over the West Bank. The second objective was to help Bashir Gemayel, leader of one of the Christian militias, in his bid for power so as to bring about a new political order in Lebanon and one which was expected to be amenable to a peace agreement with Israel. The third objective was to defeat the Syrian forces in Lebanon and to replace the Syrian protectorate of the country with an Israeli protectorate. In short, the idea was to use Israel's military power in order to accomplish a politico-strategic revolution round Israel's eastern and northern borders. It was not the much-vaunted Israeli aspiration to peaceful co-existence with the Arabs that inspired this war but Sharon's relentless drive to assert Israeli hegemony over the entire region.[20]

   Israeli propaganda surrounding the invasion dwelt on the security threat posed by the PLO presence in southern Lebanon. But in July 1981 the United States had negotiated a cease-fire between the two arch-enemies, the PLO and Israel, and over the next year the border between Lebanon and Israel remained quiet. It was not the military power of the PLO but its growing political moderation that provoked anxiety in Jerusalem. The war party was simply waiting for a pretext to invade Lebanon and on 3 June 1982 a pretext arrived in the form of an assassination attempt against the Israeli ambassador in London. The attempt was ordered not by the PLO but by the renegade terrorist, Abu Nidal. But on 6 June, six Israeli divisions crossed the border into Lebanon, signalling that a full-scale war was intended rather than

                                                                          1989

The Middle East The Origins of Arab-Israeli Wars                    Page 9 of 13
Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 120 of 144   Page ID
#:9247

a small retaliatory raid.

The United States played only a limited role in the events leading up to the war in Lebanon while the Soviet role was negligible. Neither superpower was particularly interested in Lebanon but they became involved in response to promptings by their local allies. Israeli propaganda charged the Soviet Union with aiding and abetting the PLO. But Soviet policy, as usual, was confused and contradictory. It is true that the Soviets enabled the PLO to stockpile large quantities of weapons in Lebanon but at the same time they were urging the PLO to suspend military action and to moderate its position so as to open the way to a political solution. The arms were given reluctantly to placate the PLO and enable it to negotiate from a position of relative strength.

The United states was dragged into the Lebanese quagmire by her importunate Israeli ally. Republican President Ronald Reagan looked at the Middle East through Cold War spectacles and held decidedly pro-Israeli views. To secure American backing Israeli officials stressed that their plan would weaken the pro-Soviet forces in the Middle East: Syria, the PLO, and the radical factions in Lebanon. At a meeting in Washington  in May 1982, Secretary of State Alexander Haig told Ariel Sharon that the United States would understand a military move only in response to an `internationally recognized provocation'. Sharon chose to interpret Haig's convoluted statement as a `green light' to invade Lebanon. While the Reagan administration did not positively desire war in Lebanon, it had not done enough to prevent it. On 1 September 1982 President Reagan belatedly announced his plan for a Palestinian homeland in association with Jordan. It was a good plan but, like so many other plans for the peaceful settlement of the Arab-Israeli dispute, it foundered on the rocks of Israeli intransigence.

**The 1991 Gulf War**

Iraq's invasion and annexation of Kuwait on 2 August 1990 provoked a protracted and tense international crisis which culminated in war on 16 January 1991. All the Arab states of the Middle East and the Gulf, Israel, Iran, Turkey, and the great powers were involved, in one way or another, in the Gulf crisis and war. By far the most important factor in precipitating this war, however, was the crisis in inter-Arab relations. The Gulf war even surpassed the Six-Day War as the nadir of pan-Arabism in the post-World War II era.

The Gulf war had its origins in an Arab-Arab conflict which Saddam Hussein, the President of Iraq, tried, with only partial success, to turn into an Arab-Israeli conflict and which ended up as a conflict between the Western powers and Iraq - the first major conflict of the post-Cold War era.

Iraq's invasion of Kuwait was the last chapter in the Iran-Iraq war. During this war, which was started by Iraq in 1980 and lasted eight years, the oil-rich Gulf states and the Western powers helped create a monster in the shape of Saddam Hussein. Nevertheless, they expected this monster to behave reasonably after the war, at least as far as their interests were concerned. But on 2 August 1990, Saddam suddenly turned against his makers by gobbling up Kuwait.

Saddam accused Kuwait of stealing Iraqi oil by extracting more than its share from the Rumaila oil field, which straddles the border between the two countries,and of inflicting massive losses in oil revenue on Iraq by exceeding its OPEC production quota, thereby depressing the price. But Saddam's motives for annexing Kuwait went well beyond this technical dispute over oil quotas and oil prices. Saddam was a gambler playing for big stakes. He annexed Kuwait for both economic and geopolitical reasons. He was strapped for cash, so he went on a big bank raid. But he also wanted to improve Iraq's access to the Persian Gulf and to secure her dominance over the entire region. In 1990, as in 1980, he moved against a neighbouring country as part of the same drive for power, wealth, territorial expansion, and military aggrandizement. The second move, however, was a considerably more serious violation of international law than the first because it was an attempt to snuff out an independent state and a member of the United Nations.

The Arabs were so deeply divided in their response to the Iraqi invasion of Kuwait that not even the fiction of a unified Arab nation could be sustained. Sudan, South Yemen and the PLO sided with Iraq. Egypt and Jordan wanted to mediate, to work out an Arab solution to the dispute and to forestall outside intervention. Nearly all the other Arab states denounced the Iraqi invasion and some perceived it is a threat to their own security. The merger of Iraq and Kuwait would have been a formidable combination both in economic and in geopolitical terms. It was widely suspected

1990

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 121 of 144   Page ID
#:9248

that Saddam's next target would be the Saudi oil-fields just across the border from Kuwait. Syria was another potential target. Syria and Iraq were united by the same Ba'th ideology but divided by bitter enmity and there was a danger that Iraq would sooner or later seize the opportunity to settle old scores. Thus, some of the most conservative regimes in the Arab world found themselves on the same side as the more radical regimes in opposing the Iraqi invasion of Kuwait.

Israel's position in the Gulf crisis and war was distinctly anomalous. On the one hand, Iraqi aggression against a fellow Arab country seemed to support the often-repeated Israeli claim that much of the violence and instability in the Middle East is unrelated to the Arab-Israeli conflict. On the other hand, by posing as the champion of Palestinian national rights, Saddam managed to mobilize a significant degree of Arab popular opinion, secular as well as Islamic, on his side. On 10 August 1990, Saddam shrewdly proposed a possible Iraqi withdrawal from Kuwait if Israel withdrew from all occupied Arab territory. This proposal, though rejected outright by both Israel and America, created some sort of a linkage between the Gulf crisis and the Arab-Israeli crisis. For the remainder of the Gulf crisis, Israel tried to maintain a very low profile. Even Iraqi missile attacks on Israeli population centres, following the outbreak of hostilities, could not elicit military retaliation on Israel's part. This uncharacteristic Israeli forbearance ultimately defeated Saddam's efforts to turn an Arab-Arab conflict into an Arab-Israeli one.

The Soviet Union, in the final stages of disintegration, was unable to play an independent role in dealing with the crisis and America was left to do all the running. The Iraqi annexation of Kuwait presented America with a series of challenges - to its interests in oil, to its interests in Saudi Arabia and to its prestige in the Gulf. It also challenged the old territorial order that Britain and France had imposed on the region after the breakup of the Ottoman Empire. Each of these challenges was serious enough; the combination ensured that Iraq's aggression would not go unanswered.

America refused to negotiate, and took the lead in sending troops to the Gulf, building up an impressively large coalition, passing all the necessary resolutions in the United Nations and issuing an ultimatum to Iraq. When Iraq failed to comply, America and her allies launched Operation Desert Storm. The two aims of the operation were to eject the Iraqi forces out of Kuwait and to restore the Kuwaiti government and these aims were quickly and easily achieved. The overthrow of Saddam Hussein, the villain of the piece, was not an official war aim but his survival in power certainly took some of the sheen off the allied victory.

**Conclusion**

This brief survey of the origins of Middle East wars reveals a bewildering array of political forces operating in the region. The three factors identified at the beginning of this chapter - the Arab-Israeli conflict, inter-Arab relations and Great Power involvement - are unquestionably all important in explaining the causes of war. Yet the relative weight of each factor varies considerably from war to war. Naturally enough, in the majority of Middle East wars, the most salient factor was the Arab-Israeli conflict. Inter-Arab relations were a salient factor in the outbreak of the Six-Day War of June 1967 and the 1991 Gulf War. Great Power involvement is not as salient a factor as the first two but it did contribute to the outbreak of the Suez war and the Gulf war.

Keeping in mind the three levels of analysis suggested by Kenneth Waltz helps us to make sense of the complex forces that culminated in seven full-scale Arab-Israeli wars. Far from leaving us with the impression of bewildering complexity, this analytical device helps us to pinpoint the salient factors in the making of each of these wars. Our empirical survey, however, illustrates not only the strengths but the limitations of this analytical device. Waltz suggests that level three (systemic factors) is much more important than level two (domestic factors) or level one (personality factors) in explaining why states go to war. Our survey suggests that the three levels of analysis intermingle and shade into one another. While systemic factors are indeed critical in shaping foreign policy, domestic and personality factors also play a part. It is too simplistic therefore to confine an account of the origins of a war to one level of analysis, however significant and revealing it might be. The other two levels of analysis also need to be taken into consideration and, just as importantly, the inter-relationship between the three levels needs to be explored.

Britain's decision to attack Egypt in 1956, for example, cannot be adequately explained in terms of Britain's Great Power interests in the region; Eden's personal and highly subjective image of Nasser as another Hitler was a crucial ingredient in this decision. Similarly, Nasser's actions during the crisis of May-June 1967 were shaped much more by a

1991

Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 122 of 144   Page ID #:9249

desire to bolster his personal prestige at home and in the Arab world than they were by a desire to challenge Israel to a duel. Finally, Israel's decision to invade Lebanon in 1982 owed much more to the Greater Israel ideology of the Likud and to Ariel Sharon's incorrigibly aggressive instincts than to any external threat.

   To sum up, when discussing the origins of each Arab-Israeli war, the aim should not be to single out one factor but to assess the relative weight of various factors. Because there are so many factors at play, and because these factors are so closely related to one another, it is difficult to determine the precise causes of each Arab-Israeli war. But difficulty should not be confused with impossibility.

**Notes:**

[1] J. David Singer, `The Level-of-Analysis Problem in International Relations', in Klaus Knorr and Sidney Verba, eds., The International System: Theoretical Essays (Princeton, 1961), pp. 77-92.

[2] Kenneth N. Waltz, Man, the State and War: A Theoretical Analysis (New York, 1959).

[3] See, for example, David Hirst, The Gun and the Olive Branch: The Roots of Violence in the Middle East (London, 1977).

[4] See, for example, Yehoshafat Harkabi, Arab Strategies and Israel's Response (New York, 1977).

[5] Malcolm Kerr, The Arab Cold War: Gamal Abd al-Nasir and his Rivals, 1958-1970 (London, 1971); Michael C. Hudson, Arab Politics: The Search for Legitimacy (New Haven, 1977); Fouad Ajami, The Arab Predicament: Arab Political Thought and Practice since 1967 (Cambridge, updated edn. 1992); and Stephen M. Walt, The Origins of Alliances (Ithaca, 1987).

[6] L. Carl Brown, International Politics and the Middle East: Old Rules, Dangerous Game (Princeton, 1984), p. 4.

[7] M.E. Yapp, The Near East since the First World War (London, 1991), p. 3.

[8] Ibid., p. 438.

[9] Fawaz A. Gerges, The Superpowers and the Middle East: Regional and International Politics, 1955-1967 (Boulder, 1994).

[10] Avi Shlaim, Collusion Across the Jordan: King Abdullah, the Zionist Movement and the Partition of Palestine (Oxford, 1988).

[11] Ilan Papp`, Britain and the Arab-Israeli Conflict, 1948-51 (London, 1988).

[12] Kerr, The Arab Cold War, p. 126.

[13] Mohamed Heikal, 1967: Al-Infijar [1967: The Explosion] (Cairo, 1990), pp. 371-72.

[14] William B. Quandt, Peace Process: American Diplomacy and the Arab-Israeli Conflict since 1967 (Washington D.C., 1993), p.48.

[15] Mohamed Heikal, The Road to Ramadan (London, 1975), pp. 46 and 165.

[16] Yaacov Bar-Siman-Tov, The Israeli-Egyptian War of Attrition, 1969-1970 (New York, 1980), p. 3.

[17] Mohamed Heikal, Sphinx and Commissar: The Rise and Fall of Soviet Influence in the Arab World (London, 1978), pp. 253-54; and Galia Golan, Soviet Policies in the Middle East: From World War II to Gorbachev (Cambridge, 1990), pp. 82-85.

[18] Kirsten E. Schulze, `The Politics of Intervention: Israel and the Maronites, 1920-1984' (D.Phil. thesis, University of Oxford, 1994).

[19] Patrick Seale, Asad: the Struggle for the Middle East (London, 1988).

[20] For a fuller account see Avi Shlaim, `Israeli Interference in Internal Arab Politics: The Case of Lebanon', in Giacomo Luciani and Ghassan Salam`, eds., The Politics of Arab Integration (London, 1988), pp. 232-55.

**SUGGESTIONS FOR FURTHER READING**

  • Fouad Ajami, The Arab Predicament: Arab Political Thought and Practice since 1967 (Cambridge, updated edn. 1992). A searching examination of the changes in Arab society in the aftermath of the June War.
  • Sidney D. Bailey, Four Arab-Israeli Wars and the Peace Process (London, 1982). A detailed account of the 1948, 1956, 1967 and 1973 wars with an emphasis on United Nations Peacemaking. Includes numerous appendices of UN reports and resolutions.
  • L. Carl Brown, International Politics and the Middle East: Old Rules, Dangerous Game (Princeton, 1984). Reflections on international politics in the Middle East by a historian of the region.

                                                                                        1992

- Trevor N. Dupuy, Elusive Victory: the Arab-Israeli Wars, 1947-1974 (London, 1978). A full and balanced account of the wars written by an American military historian.
- Yair Evron, The Middle East: Nations, Superpowers and Wars (London, 1975). An analysis of international politics in the Middle East mainly in the period 1967 - 1973.
- Fawaz A. Gerges, The Superpowers and the Middle East: Regional and International Politics, 1955-1967 (Boulder, 1994). A perceptive analysis of the relationship between superpowers and local powers and of the origins of the 1956 and 1967 wars.
- Galia Golan, Soviet Policies in the Middle East: From World War II to Gorbachev (Cambridge, 1990). A general account of Soviet policies in the Middle East which includes a chapter on every major war.
- Yehoshafat Harkabi, Arab Strategies and Israel's Response (New York, 1977). An analysis of the aims of the two sides in the conflict by one of the leading Israeli students of the Arab-Israeli conflict.
- Mohammed Heikal, Sphinx and Commissar: The Rise and Fall of Soviet Influence in the Middle East (London, 1978). An illuminating inside account of Soviet-Arab relations, written by a prominent Egyptian journalist who was close to Nasser.
- Chaim Herzog, The Arab-Israeli Wars (London, 1982). An Israeli view of the Arab-Israeli wars written by a former Director of Military Intelligence and President of the State of Israel.
- l.David Hirst, The Gun and the Olive Branch: The Roots of Violence in the Middle East (London, 1977). An account of the escalation of violence since the 1880s which focuses on the relations between the Jews and the Palestinian Arabs.
- Netanel Lorch, One Long War: Arab versus Jew since 1920 (Jerusalem, 1976). A brief account of the Arab-Israeli conflict, with a chapter on every major war, written by an Israeli military historian.
- Elizabeth Monroe, Britain's Moment in the Middle East, 1914-1971 (London, 1981). A general account of British policies in the Middle East which also covers the evolution of the Arab-Israeli conflict.
- Ritchie Ovendale, The Origins of the Arab-Israeli Wars (London, 1984, 2nd edn., 1992). Relies mainly on British official documents to trace the origins of the 1948 and 1956 wars. Very sketchy about subsequent wars.
- William Quandt, Peace Process: American Diplomacy and the Arab-Israeli Conflict since 1967 (Washington DC, 1993). A highly informative and readable account of American policy.
- Nadav Safran, Israel - the Embattled Ally (Cambridge, 1978). An informative account of Israel and America in international politics.
- Peter Shearman and Phil Williams (eds.), The Superpowers, Central America and the Middle East (London, 1984). A collection of essays on Soviet and American policies towards the Middle East.
- Avi Shlaim, War and Peace in the Middle East: A Critique of American Policy (New York, 1994). A brief introduction to the international politics of the Middle East since the end of the First World War.
- Steven Spiegel, The Other Arab-Israeli Conflict: Making America's Middle East Policy from Truman to Reagan (Chicago, 1985). A president-by-president account of America's involvement in the Arab-Israeli conflict.
- M.E. Yapp, The Near East since the First World War (London, 1991). A comprehensive political history with many insights on the involvement of the Middle East in international politics and a useful annotated bibliography.

## CHRONOLOGY

| | |
|---|---|
| 29 Nov. 1947 | UN resolution for the partition of Palestine. |
| Dec. 1947-May 1948 | Civil war in Palestine. |
| 15 May 1948 | Proclamation of the State of Israel and outbreak of the Palestine war. |
| Feb.-July 1949 | Israel concludes armistice agreements with Egypt, Jordan, Lebanon and Syria. |
| May 1950 to | Tripartite Declaration (Britain, France and the United States) on regulating the supply of arms the Middle East. |
| July 1952 | Free Officers' revolution in Egypt. |
| Feb. 1955 | The Baghdad Pact concluded between Iraq and Turkey. |
| Sept. 1955 | The Czech arms deal. |
| Sept. 1955 | Military pact between Egypt and Syria. |
| July 1956 | Egypt nationalizes the Suez Canal. |

1993

The Middle East The Origins of Arab-Israeli Wars                    Page 13 of 13
Case 2:16-cv-04435-PA-MRW   Document 97-10   Filed 05/08/17   Page 124 of 144   Page ID
#:9251

| | |
|---|---|
| 29 Oct. 1956 | Outbreak of the Suez war. |
| March 1957 | Israeli withdrawal from Sinai. |
| Feb. 1958 | Syria and Egypt merge to form the United Arab Republic (UAR). |
| July 1958 | Revolution in Iraq. |
| Jan. 1964 | The Palestine Liberation Organization (PLO) founded on the initiative of the Arab League to represent the Palestinians. |
| Feb. 1966 | Left-wing coup in Syria followed by increased PLO activity against Israel. |
| 5-10 June 1967 | The Six-Day War. |
| 1 Sept. 1967 | Arab League summit at Khartoum: "The three noes". |
| 22 Nov. 1967 | UN Security Council resolution 242. |
| March 1969-Aug. 1970 | The Israeli-Egyptian War of Attrition. |
| Sept. 1970 | Jordanian civil war, "Black September". |
| 28 Sept. 1970 | Nasser dies and Anwar el-Sadat succeeds. |
| Feb. 1971 | Israel rebuffs Sadat's peace overture. |
| July 1972 | Sadat expels Soviet military advisers. |
| 6-25 Oct. 1973 | The Yom Kippur War. |
| 22 Oct.1973 | UN Security Council resolution 338 calls for direct negotiations. |
| 21 Dec. 1973 | Geneva peace conference. |
| 18 Jan. 1974 | Israeli-Egyptian disengagement agreement. |
| 31 May 1974 | Israeli-Syrian disengagement agreement. |
| 26-29 Oct. 1974 | Arab League summit at Rabat recognizes PLO as "the sole legitimate representative of the Palestinian people". |
| 4 Sept. 1975 | Israeli-Egyptian interim agreement, Sinai II. |
| 1975-76 | Outbreak of the Lebanese civil war. |
| June 1976 | Syrian military intervention in Lebanon. |
| May 1977 | Likud defeats Labour in Israeli elections. |
| 1 Oct. 1977 | Joint statement by the US and the USSR for reconvening the Geneva peace conference. |
| Nov. 1977 | Sadat's historic visit to Jerusalem. |
| 2-5 Dec. 1977 | Arab Front of Steadfastness and Opposition meets in Tripoli. |
| 6-18 Sept. 1978 | The Camp David Accords signed by Israel and Egypt. |
| 2-5 Nov. 1978 | Arab League summit at Baghdad denounces the Camp David Accords. |
| Feb. 1979 | The Iranian Revolution. |
| March 1979 | Treaty of Peace between Egypt and Israel signed in White House. |
| Nov. 1979 | Soviet invasion of Afghanistan. |
| Sept. 1980 | Outbreak of war between Iraq and Iran. |
| 6 Oct. 1981 | Sadat is assassinated and Husni Mubarak succeeds. |
| April 1982 | Israeli withdrawal from Sinai completed. |
| 6 June 1982 | Israel invades Lebanon. |
| 1 Sept. 1982 | The Reagan plan for Middle East peace. |
| July 1985 | Israel withdraws from Lebanon, but forms "security zone" in the south. |
| Dec. 1987 | The Intifada begins. |
| 2 Aug. 1990 | Iraq invades Kuwait |
| 16 Jan 1991 | Outbreak of the Gulf War |
| Oct 1991 | Madrid Peace Conference |
| June 1992 | Labour defeats Likud in Israeli elections. |
| 13 Sept. 1993 | Israel and the PLO sign the Oslo accord. |
| 26 Oct. 1994 | Israel and Jordan sign peace treaty. |

Back

1994

# EXHIBIT 178

1   LUCIA E. COYOCA (SBN 128314)
       lec@msk.com
2   VALENTINE A. SHALAMITSKI (SBN 236061)
       vas@msk.com
3   MITCHELL SILBERBERG & KNUPP LLP
    11377 West Olympic Boulevard
4   Los Angeles, CA 90064-1683
    Telephone:  (310) 312-2000
5   Facsimile:  (310) 312-3100

6   Attorneys for Plaintiffs
    Universal Cable Productions LLC and
7   Northern Entertainment Productions LLC

8

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11                         WESTERN DIVISION

12   UNIVERSAL CABLE                    CASE NO. 2:16-cv-4435-PA-MRW
     PRODUCTIONS LLC, *et al*.,
13                                      The Honorable Percy Anderson
                Plaintiffs,
14                                      **PLAINTIFFS' INITIAL**
              v.                        **DISCLOSURES**
15
     ATLANTIC SPECIALTY
16   INSURANCE COMPANY,

17              Atlantic.

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs Universal Cable Productions LLC ("UCP") and Northern Entertainment Productions LLC ("Northern Entertainment") (UCP and Northern Entertainment, collectively, "Plaintiffs") hereby make the following initial disclosures pursuant to the parties' agreement and Rule 26(a)(1) of the Federal Rules of Civil Procedure ("FRCP").

## I.   Witness Disclosures—FRCP 26(a)(1)(A)(i)

Plaintiffs have not yet completed their investigation of this action, and may discover additional witnesses; however, excluding potential impeachment witnesses, Plaintiffs currently believe the following persons are likely to have discoverable information that Plaintiffs may use to support their claims:

1.   **Kurt Ford** – Mr. Ford has or may have discoverable information regarding Plaintiffs' claims, including information concerning the delay, postponement, and relocation of the *Dig* production out of Israel (the "*Dig* Claim"), and the expenses and costs Plaintiffs incurred in connection therewith. Mr. Ford may be contacted through the undersigned counsel of record for Plaintiffs.

2.   **Randi Richmond** – Ms. Richmond has or may have discoverable information regarding the *Dig* Claim, and the expenses and costs Plaintiffs incurred in connection with the delay, postponement, and relocation of the *Dig* production out of Israel. Ms. Richmond may be contacted through the undersigned counsel of record for Plaintiffs.

3.   **BJ Markus** – Ms. Markus has or may have discoverable information regarding the *Dig* Claim, and the expenses and costs Plaintiffs incurred in connection with the delay, postponement, and relocation of the *Dig* production out of Israel. Ms. Markus may be contacted through the undersigned counsel of record for Plaintiffs.

4.   **Mark Binke** – Mr. Binke has or may have discoverable information regarding the *Dig* Claim and the expenses and costs Plaintiffs incurred in

Mitchell Silberberg & Knupp LLP

8052719.1

1

1997

connection with the delay, postponement, and relocation of the *Dig* production out of Israel.  Mr. Binke may be contacted through the undersigned counsel of record for Plaintiffs.

5.   **Curt Williams** – Mr. Williams has or may have discoverable information regarding the *Dig* Claim and the expenses and costs Plaintiffs incurred in connection with the delay, postponement, and relocation of the *Dig* production out of Israel.  Mr. Williams may be contacted through the undersigned counsel of record for Plaintiffs.

6.   **Stephen Smith** – Mr. Smith has or may have discoverable information regarding the security conditions of the *Dig* production during the summer of 2014, and the delay, postponement, and relocation of the *Dig* production out of Israel.  Mr. Smith may be contacted through the undersigned counsel of record for Plaintiffs.

7.   **Andrea Garber** – Ms. Garber has or may have discoverable information regarding the insurance policy at issue, *i.e.*, the Motion Picture/Television Producers Portfolio Policy No. MP00163-04 (the "Policy") issued by Atlantic Specialty Insurance Company ("Atlantic"), the claims made thereunder including the *Dig* Claim, and the addition of *Dig* as an insured production.  Ms. Garber has or may also have discoverable information regarding prior policies issued by Atlantic.  Ms. Garber may be contacted through the undersigned counsel of record for Plaintiffs.

8.   **Susan Weiss** – Ms. Weiss has or may have discoverable information regarding the Policy and/or prior policies issued by Atlantic and claims thereunder, including the *Dig* Claim.  Ms. Weiss may be contacted through the undersigned counsel of record for Plaintiffs.

9.   **Peter Williams** – Plaintiffs believe Mr. Williams is or was Atlantic's agent, and an agent, employee, or representative of OneBeacon Insurance Group, Ltd. and/or OneBeacon Entertainment LLC.  Plaintiffs believe Mr. Williams has or

Mitchell
Silberberg &
Knupp LLP

8052719.1

2

1998

may have discoverable information regarding Atlantic's coverage determination and its denial of the *Dig* Claim, and Atlantic's handling and the impact of other claims made by Plaintiffs under the Policy.

10.   **Pamela Johnson** – Plaintiffs believe Ms. Johnson is or was Atlantic's agent, and an agent, employee, or representative of OneBeacon Insurance Group, Ltd. and/or OneBeacon Entertainment LLC.  Plaintiffs believe Ms. Johnson has or may have discoverable information regarding Atlantic's coverage determination and its denial of the *Dig* Claim, and Atlantic's handling and the impact of other claims made by Plaintiffs under the Policy.

11.   **Theresa Gooley** – Plaintiffs believe Ms. Gooley is or was Atlantic's agent, and an agent, employee, or representative of OneBeacon Insurance Group, Ltd. and/or OneBeacon Entertainment LLC.  Plaintiffs believe Ms. Gooley has or may have discoverable information regarding Atlantic's coverage determination and its denial of the *Dig* Claim, and Atlantic's handling and the impact of other claims made by Plaintiffs under the Policy.

12.   **Daniel Gutterman** – Plaintiffs believe Mr. Gutterman is or was Atlantic's agent, and an agent, employee, or representative of OneBeacon Insurance Group, Ltd. and/or OneBeacon Entertainment LLC.  Plaintiffs believe Mr. Gutterman has or may have discoverable information regarding Atlantic's coverage determination and its denial of the *Dig* Claim, and Atlantic's handling and the impact of other claims made by Plaintiffs under the Policy.

## II.   Document Disclosures—FRCP 26(a)(1)(A)(ii)

Plaintiffs have not completed their investigation of this action, and therefore may discover additional documents and/or tangible things.  The categories of documents that are currently known in Plaintiffs' possession, custody, or control which Plaintiffs may use to support their claims (other than solely for impeachment), include:

1.      Atlantic Specialty Motion Picture/Television Producers Portfolio Policy No. MP00163-04, and related documents.

2.      Prior policies issued by Atlantic Specialty to NBCUniversal Media LLC including, *e.g.*, Policy Nos. MP00163-03, MP00163-02, MP00163-01, MP00163-00, and related documents.

3.      Claims-related documents and correspondence, including with Atlantic and/or its agents/representatives, relating to the *Dig* Claim, other claims under the Policy, and/or prior policies issued by Atlantic.

4.      Documents relating to the payments made to purchase the Policy, and/or prior policies issued by Atlantic.

5.      Documents, including publicly-available U.S. government documents as cited in the First Amended Complaint, regarding Hamas, the Gaza Strip, and the events during the summer of 2014 and/or prior to that time.

6.      Documents regarding the expenses and costs incurred by Plaintiffs relating to the *Dig* Claim and satisfaction of the self-insured retention under the Policy.

7.      Documents regarding the expenses and costs incurred and to-be-incurred by Plaintiff in connection with enforcing coverage of the *Dig* Claim under the Policy.

## III.   Computation of Damages—FRCP 26(a)(1)(A)(iii)

At this time, Plaintiffs estimate their damages in an amount not less than $6.9 million in expenses and costs incurred in connection with the delay, postponement, and relocation of the *Dig* production.  These expenses and costs fall squarely within the definition of the Extra Expense coverage under the Policy which Atlantic was obligated to, but did not pay.

Plaintiffs will make the documents on which its damages computation is based available for inspection and copying as provided for under FRCP 34.

1    Plaintiffs also claim damages to be determined at trial for Atlantic's tortuous

2    breach of an insurance contract, including but not limited to Plaintiffs' legal fees,

3    expenses, and costs incurred as a result of their efforts to obtain coverage under the

4    Policy, punitive damages, and other relief as provided by law.

5    Plaintiffs also seek pre-judgment and other interest on all of the above

6    amounts to the full extent permitted by law, in an amount to be determined at trial.

7

8    **IV.    Insurance—FRCP 26(a)(1)(A)(iv)**

9    Not applicable.

10

11    Plaintiffs reserve the right to supplement these disclosures should discovery

12    or other investigation reveal witnesses and/or other information relevant to their

13    claims in this action.

14

15    DATED:  September 16, 2016          LUCIA E. COYOCA
                                          VALENTINE A. SHALAMITSKI
16                                         MITCHELL SILBERBERG & KNUPP LLP

17

18                                         By: /s/ Lucia E. Coyoca
                                               Lucia E. Coyoca
19                                             Attorneys for Plaintiffs
                                               Universal Cable Productions LLC and
20                                             Northern Entertainment
                                               Productions LLC
21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

8052719.1

## <u>PROOF OF SERVICE</u>

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California, I am over the age of eighteen years and am not a party to this action; my business address is Mitchell Silberberg & Knupp LLP, 11377 West Olympic Boulevard, Los Angeles, CA 90064-1683, and my business email address is bag@msk.com.

On September 16, 2016, I served a copy of the foregoing document(s) described as **PLAINTIFFS' INITIAL DISCLOSURES** on the interested parties in this action at their last known address as set forth below by taking the action described below:

| | |
|---|---|
| Marc J. Shrake, Esq.<br>Anderson, McPharlin & Conners LLP<br>707 Wilshire Boulevard<br>Suite 4000<br>Los Angeles, CA 90017-3623<br><br>Telephone:  (213) 236-1691<br>Facsimile:  (213) 622-7594<br><br>Email:  mjs@amclaw.com | Michael Keeley, Esq.<br>John R. Riddle, Esq.<br>Carla C. Crapster, Esq.<br>Strasburger & Price, LLP<br>901 Main Street<br>Suite 4400<br>Dallas, TX 75202<br><br>Telephone:  (214) 651-4300<br>Facsimile:  (214) 651-4330<br><br>Email:<br>michael.keeley@strasburger.com<br>john.riddle@strasburger.com<br>carla.crapster@strasburger.com |

☑ **BY PLACING FOR COLLECTION AND MAILING:** I placed the above-mentioned document(s) in sealed envelope(s) addressed as set forth above, and placed the envelope(s) for collection and mailing following ordinary business practices.  I am readily familiar with the firm's practice for collection and processing of correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at 11377 West Olympic Boulevard, Los Angeles, California 90064-1683 in the ordinary course of business.

☑ **BY ELECTRONIC MAIL**:  I served the above-mentioned document electronically on the parties listed at the email addresses above and, to the best of my knowledge, the transmission was complete and without error in that I did not receive an electronic notification to the contrary.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on September 16, 2016, at Los Angeles, California.

_____
Bertha A. García

Mitchell Silberberg & Knupp LLP

8052719.1

2002

# EXHIBIT 179

LUCIA E. COYOCA (SBN 128314)
  lec@msk.com
VALENTINE A. SHALAMITSKI (SBN 236061)
  vas@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Plaintiffs
Universal Cable Productions LLC and
Northern Entertainment Productions LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY,<br><br>Defendant. | CASE NO. 2:16-cv-4435-PA-MRW<br><br>**AMENDED NOTICE OF TAKING DEPOSITION OF PAMELA JOHNSON**<br><br>Date: February 9, 2017<br>Time: 10:00 a.m.<br>Location: 33 South Sixth Street<br>Suite 4400<br>Minneapolis, MN 55402 |

TO DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil Procedure, Plaintiffs Universal Cable Productions LLC and Northern Entertainment Productions LLC ("Plaintiffs") will take the deposition of Pamela Johnson (originally noticed for January 23, 2017) on February 9, 2017, at 10:00 a.m., at the offices of Meagher & Greer, PLLP, 33 South Sixth Street, Suite 4400, Minneapolis, MN 55402.

Mitchell
Silberberg &
Knupp LLP

1    The deposition will be taken before a certified court reporter, and will

2  continue from day-to-day (weekends and holidays excluded) until complete, unless

3  the parties agree otherwise.

4    Plaintiffs intend to record the testimony by audio and video technology, in

5  addition to recording the testimony by stenographic means through the instant

6  display of the testimony, including by means of "Livenote" or other comparable

7  software.  Plaintiffs reserve the right to use the videotaped deposition at trial.

8

9  DATED:  February 7, 2017          LUCIA E. COYOCA
                                     VALENTINE A. SHALAMITSKI
10                                   MITCHELL SILBERG & KNUPP LLP

11

12                                   By:  /s/ Lucia E. Coyoca
                                          Lucia E. Coyoca
13                                        Attorneys for Plaintiffs
                                          Universal Cable Productions LLC and
14                                        Northern Entertainment
                                          Productions LLC
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# **PROOF OF SERVICE**

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

4

5

     I am employed in the County of Los Angeles, State of California, I am over the age of eighteen years and am not a party to this action; my business address is Mitchell Silberberg & Knupp LLP, 11377 West Olympic Boulevard, Los Angeles, CA 90064-1683, and my business email address is bag@msk.com.

6

7

     On February 7, 2017, I served a copy of the foregoing document(s) described as **AMENDED NOTICE OF TAKING DEPOSITION OF PAMELA JOHNSON** on the interested parties in this action at their last known address as set forth below by taking the action described below:

8

9

10

11

12

13

14

15

16

Marc J. Shrake, Esq.
Anderson, Mcpharlin & Conners LLP
707 Wilshire Boulevard
Suite 4000
Los Angeles, CA 90017-3623

Phone:    (213) 236-1691
Fax:      (213) 622-7594

Email:  mjs@amclaw.com

*Attorneys for Defendant Atlantic Specialty Insurance Company*

Michael Keeley, Esq.
John R. Riddle, Esq.
Carla C. Crapster, Esq.
Strasburger & Price, LLP
901 Main Street
Suite 6000
Dallas, TX 75202

Phone:    (214) 651-4300
Fax:     (214) 651-4330

Email: michael.keeley@strasburger.com; john.riddle@strasburger.com; carla.crapster@strasburger.com

*Attorneys for Defendant Atlantic Specialty Insurance Company*

17

18

19

☑   **BY ELECTRONIC MAIL**:  I served the above-mentioned document electronically on the parties listed at the email addresses above and, to the best of my knowledge, the transmission was complete and without error in that I did not receive an electronic notification to the contrary.

20

     I declare under penalty of perjury under the laws of the United States that the above is true and correct.

21

     Executed on February 7, 2017, at Los Angeles, California.

22

23

                             Bertha A. García

24

25

26

27

28

# EXHIBIT 180

MARC J. SHRAKE (SBN 219331)
 mjs@amclaw.com
ANDERSON, MCPHARLIN & CONNERS LLP
707 Wilshire Boulevard, Suite 4000
Los Angeles, California 90017-3623
Telephone: (213) 236-1691
Facsimile: (213) 622-7594

MICHAEL KEELEY *(Pro Hac Vice)*
 michael.keeley@strasburger.com
TONI SCOTT REED *(Pro Hac Vice)*
 toni.reed@strasburger.com
CARLA C. CRAPSTER *(Pro Hac Vice)*
 carla.crapster@strasburger.com
STRASBURGER & PRICE, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330

Attorneys for Defendant
Atlantic Specialty Insurance Company

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, *et al.*, | CASE NO. 2:16-cv-4435-PA-MRW |
| Plaintiffs, | **DECLARATION OF FRANK G. LOWENSTEIN IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| ATLANTIC SPECIALTY INSURANCE COMPANY, | |
| Defendant. | |

## DECLARATION OF FRANK G. LOWENSTEIN

1. My name is Frank G. Lowenstein. I am over the age of twenty-one years, of sound mind, legally competent to render this Declaration, and suffer no

**1**
**2**

mental disabilities. The facts stated in this Declaration are within my personal knowledge and are true and correct.

**3**
**4**
**5**
**6**

2. From 2005 to 2008, I served as Senior Foreign Policy Advisor to Senator John Kerry and directed the Senate Foreign Relations Committee's Subcommittee on Near East and South and Central Asian Affairs, which included responsibility for all Israeli-Palestinian issues.

**7**
**8**
**9**
**10**
**11**

3. In January of 2009, Senator Kerry became Chairman of the Senate Foreign Relations Committee and I took over as the Committee's Chief Counsel, which included responsibility for all legal matters before the Committee. In March of 2010, I became the Staff Director of the Committee and served in that capacity until September of 2011.

**12**
**13**
**14**
**15**
**16**
**17**

4. During my service in the Senate, I travelled extensively with Senator Kerry throughout the region, including numerous trips to Iraq, Syria, Afghanistan, Pakistan and Israel and the West Bank. In January of 2009, I travelled to Gaza Strip with Senator Kerry in the aftermath of Operation Cast Lead to review the conditions and receive briefings on reconstruction efforts.

**18**
**19**
**20**
**21**
**22**
**23**
**24**

5. In February of 2013, I joined the State Department as the Deputy Special Envoy for Israeli-Palestinian Negotiations and Senior Advisor to the Secretary of State. In this capacity, I played a central role in the Israeli-Palestinian negotiations that took place from August 2013 until April 2014, travelling frequently to Israel and the West Bank. On June 27, 2014, I became the Special Envoy for Israeli-Palestinian Negotiations, initially in an Acting capacity.

**25**
**26**
**27**

6. As Special Envoy, I was the senior official at the State Department with responsibility for Israeli and Palestinian issues, including policy formation, speech writing and press guidance. I met regularly with senior Israeli and

**28**

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

2

**DECLARATION OF FRANK G. LOWENSTEIN**

2009

**1**

**2**

Palestinian officials and travelled with Secretary Kerry on all trips related to Middle East peace.

**3**

**4**

**5**

**6**

**7**

**8**

**9**

7. I also served as the United States representative to the Middle East Quartet. The Quartet, which also includes the European Union, the Russian Federation and the United Nations, was created by the international community in 2002 to advance Middle East peace. In this capacity, I travelled with the other Quartet envoys throughout the Middle East and Europe to engage key stakeholders on Israeli-Palestinian issues, including the situation in Gaza.

**10**

**11**

**12**

**13**

**14**

**15**

**16**

**17**

**18**

8. During the Gaza war in July of 2014, I travelled with Secretary Kerry to Cairo and Israel as part of U.S. efforts to help negotiate a ceasefire agreement between Israel and Hamas. Secretary Kerry and I were in daily contact with Prime Minister Netanyahu and his national security team during this period, and we met in person with the Prime Minister and senior Israeli security officials at the Ministry of Defense in Tel Aviv at the height of the war, when Ben Gurion airport was closed on July 23, 2014. I also spent over a week in Cairo in August of 2014 monitoring the ceasefire negotiations between Israel and the Palestinians.

**19**

**20**

**21**

**22**

**23**

**24**

**25**

**26**

**27**

9. As a result of: 1) my service as a Senior Foreign Policy Advisor to Senator John Kerry, 2) my directing the Senate Foreign Relations Committee's Subcommittee on Near East and South and Central Asian Affairs, 3) my serving as the Chief Counsel of the Senate Foreign Relations Committee, 4) my service as Staff Director of the Committee, 5) my service as Deputy Special Envoy for Israeli-Palestinian Negotiations, and 6) my service as Special Envoy for Israeli-Palestinian Negotiations, and my monitoring of ceasefire negotiations between representatives of Israel and the Palestinians, and based upon my other involvement in the area, including

**28**

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

3

**DECLARATION OF FRANK G. LOWENSTEIN**

2010

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

1  as stated above, I learned many of the facts involving the history and

2  relationship between Israel and Hamas, and many of the facts involved in

3  the conflict between Israel and Hamas, both during July and August 2014,

4  and during the prior wars between Israel and Hamas. The following is one

5  such fact I learned in my official capacities set forth above, and upon

6  which I relied in carrying out my official duties as set forth above, and I

7  am certain that the following fact is true and accurate, as set forth below:

8  10. Hamas maintains control over its side of the border between Gaza and

9  Israel and between Gaza and Egypt, and it has checkpoints at crossings

10  that anyone attempting to enter Gaza from Israel or Egypt must pass

11  through. These checkpoints are important to Hamas as they provide it with

12  a significant element of control over Gaza and a revenue stream, as well. It

13  is therefore inaccurate to state that Hamas does not control Gaza's borders.

14  11. I declare under penalty of perjury under the laws of the United States of

15  America and the State of California that the foregoing is true and correct.

16

17

18  Frank G. Lowenstein
   Frank G. Lowenstein

19

20

21

22

23

24

25

26

27

28

8913355.1/SP/15247/0131/042817

4

**DECLARATION OF FRANK G. LOWENSTEIN**

2011

# EXHIBIT 181

1  MARC J. SHRAKE (SBN 219331)
    mjs@amclaw.com
2  ANDERSON, MCPHARLIN & CONNERS LLP
    707 Wilshire Boulevard, Suite 4000
3  Los Angeles, California 90017-3623
    Telephone: (213) 236-1691
4  Facsimile: (213) 622-7594

5  MICHAEL KEELEY *(Pro Hac Vice)*
    michael.keeley@strasburger.com
6  TONI SCOTT REED *(Pro Hac Vice)*
    toni.reed@strasburger.com
7  CARLA C. CRAPSTER *(Pro Hac Vice)*
    carla.crapster@strasburger.com
8  STRASBURGER & PRICE, LLP
    901 Main Street, Suite 6000
9  Dallas, Texas 75202
    Telephone: (214) 651-4300
10 Facsimile: (214) 651-4330

11 Attorneys for Defendant
    Atlantic Specialty Insurance Company
12

13            **UNITED STATES DISTRICT COURT**

14            **CENTRAL DISTRICT OF CALIFORNIA**

15                 **WESTERN DIVISION**

16

17 UNIVERSAL CABLE PRODUCTIONS          CASE NO. 2:16-cv-4435-PA-MRW
    LLC, *et al.*,
18                                      **DECLARATION OF PETER D.**
              Plaintiffs,               **WILLIAMS**
19
           v.
20
    ATLANTIC SPECIALTY
21 INSURANCE COMPANY,

22            Defendant.

23

24          **DECLARATION OF PETER D. WILLIAMS**

25      1.     My name is Peter D. Williams. I am over the age of twenty-one years,

26 of sound mind, legally competent to render this Declaration, and suffer no mental

27

28

_____
                **DECLARATION OF PETER D. WILLIAMS**

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  disabilities. The facts stated in this Declaration are within my personal knowledge
2  and are true and correct.

3      2.    In my deposition in this lawsuit I testified that in order for Exclusion 4
4  of the policy Atlantic issued to NBCUniversal to apply, there had to be some kind of
5  atomic or radioactive involvement. However, I was mistaken. This testimony came
6  after an extremely long day of my deposition and, when I answered this question, I
7  assumed it pertained to the typical weapons of war exclusion I was used to dealing
8  with, which is much narrower than the one in the policy Atlantic issued to
9  NBCUniversal. The typical exclusion is in fact limited to atomic or radioactive
10  weapons, or nuclear fission. However, the one in the policy Atlantic issued to
11  NBCUniversal was based upon a manuscripted insurance policy prepared by Aon
12  and submitted to Atlantic for consideration. The weapons of war exclusion in that
13  policy is actually much broader, and pertains to any and all weapons of war, not just
14  those that are atomic or radioactive, or include nuclear fission. Thus, it is my belief
15  that the weapons of war exclusion of the Atlantic policy issued to NBCUniversal
16  excludes coverage for plaintiffs' losses.

17      3.    I was personally involved in claims involving losses from the attacks
18  that occurred on September 11, 2001, and I have personal knowledge of how some
19  insurers with which I am familiar handled these claims. I am specifically aware that
20  there were insurers who indicated at first they would invoke the war exclusion to
21  losses resulting from 9/11. But representatives of Congress lobbied insurance
22  companies not to do so. Thus, many insurers made the decision not to apply the war
23  exclusion at Congress's urging.

24      I declare under penalty of perjury under the laws of the United States of
25  America that the foregoing is true and correct.

26
27  _____
    Peter D. Williams
28

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

2
**DECLARATION OF PETER D. WILLIAMS**

2014