LUCIA E. COYOCA (SBN 128314)
  lec@msk.com
VALENTINE A. SHALAMITSKI (SBN 236061)
  vas@msk.com
DANIEL M. HAYES (SBN 240250)
  dmh@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone:  (310) 312-2000
Facsimile:  (310) 312-3100

Attorneys for Plaintiffs
Universal Cable Productions LLC and
Northern Entertainment Productions LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC and NORTHERN ENTERTAINMENT PRODUCTIONS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY,<br><br>Defendant. | CASE NO. 2:16-cv-4435-PA-MRW<br><br>The Honorable Percy Anderson<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS LLC AND NORTHERN ENTERTAINMENT PRODUCTIONS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Reply to Atlantic's Statement of Genuine Disputes of Material Facts and Additional Material Facts; Evidentiary Objections to Atlantic's Additional Material Facts; and Response to Atlantic's Objections to Evidence filed concurrently herewith]<br><br>Date:        May 22, 2017<br>Time:        1:30 pm<br>Ctrm.:       9A, First St. Courthouse<br><br>File Date:    June 20, 2016<br>Trial Date:   July 25, 2017 |

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ...................................................................1

II. STATEMENT REGARDING THE FACTS .................................................2

III. ARGUMENT ............................................................................................2

   A.  "Ordinary and Popular Meaning" Is Not The Standard For
       Interpreting The War Exclusions ....................................................2

   B.  Atlantic's Red Herring Argument About Policy Drafting..................7

   C.  Atlantic Cannot Merge The Separate Concepts Of "War" And
       "Terrorism" To Escape Coverage ...................................................10

   D.  Exclusion 1 Does Not Apply As A Matter of Law...........................12

       1.  The political question doctrine mandates deference to the
           U.S. government's determination that Hamas is not a
           sovereign or quasi-sovereign ....................................................12

       2.  As a matter of law, Hamas lacks sufficient attributes of
           sovereignty to be a sovereign or quasi-sovereign....................14

   E.  Exclusion 2 Does Not Apply As A Matter of Law...........................15

   F.  Exclusion 3 Does Not Apply As A Matter of Law...........................17

   G.  Exclusion 4 Does Not Apply As A Matter of Law...........................19

   H.  Atlantic's Interpretations Of The War Exclusions Are Absurdly
       Broad ...........................................................................................22

   I.  Any Ambiguity In Any Of The Four War Exclusions Must Be
       Interpreted In Universal's Favor....................................................23

   J.  Universal Suffered A Loss Falling Within The Scope Of The
       Extra Expense Coverage ...............................................................23

IV. CONCLUSION ........................................................................................25

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

### CASES

4

*Airlift Int'l, Inc. v. United States*,
    335 F. Supp. 442 (S.D. Fla. 1971)........................................................................15

5

6

*AIU Ins. Co. v. Super. Ct.*,
    51 Cal. 3d 807 (1990) ......................................................................................9

7

8

*Boumedienne v. Bush*,
    553 U.S. 723 (2008) ......................................................................................13

9

10

*Clarendon Nat'l Ins. Co. v. Foley & Bezek, LLP*,
    2001 U.S. Dist. LEXIS 18443 (C.D. Cal. July 26, 2001) ....................................4

11

*Discover Prop. & Cas. Ins. Co. v. Blair*,
    2014 U.S. Dist. LEXIS 128029 (C.D. Cal. Aug. 26, 2014) .................................4

12

13

*E.M.M.I. Inc. v. Zurich Am. Ins. Co.*,
    32 Cal. 4th 465 (2004)...........................................................................6, 12, 23

14

15

*Ennar Latex v. Atlantic Mut. Ins. Co.*,
    1995 U.S. Dist. LEXIS 7386 (S.D.N.Y. May 30, 1995)................................8, 13

16

17

*Fireman's Fund Ins. Co. v. Fibreboard Corp.*,
    182 Cal. App. 3d 462 (1986) ...............................................................................8

18

19

*Foster v. Arcata Assocs.*,
    772 F.2d 1453 (9th Cir. 1985) ...........................................................................20

20

21

*Garcia v. Truck Ins. Exchange*,
    36 Cal. 3d 426 (1984) .........................................................................................8

22

23

*Gray v. Zurich Ins. Co.*,
    65 Cal. 2d 263 (1966) .......................................................................................16

24

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) ..........................................................................................11

25

26

*Hamdi & Ibrahim Mango Co. v. Reliance Ins. Co.*,
    291 F.2d 437 (2d Cir. 1961) ..............................................................................17

27

28

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) ..........................................................................................11

ii

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Harris v. Glens Falls Ins. Co.*
  6 Cal. 3d 699 .................................................................................... 16

*Holiday Inns, Inc. v. Aetna Ins. Co.,*
  571 F. Supp. 1460 (S.D.N.Y. 1983) ...................................... 3, 5, 15, 16

*Home Ins. Co. v. Davila,*
  212 F.2d 731 (1st Cir. 1954) ............................................................. 18

*In re September 11 Litig.,*
  751 F.3d 86 (2d Cir. 2014) ................................................................ 11

*Ins. Co. of N. Am. v. Elec. Purification Co.,*
  67 Cal. 2d 679 (1967) .................................................................... 4, 23

*Jordan v. Allstate Ins. Co.,*
  116 Cal. App. 4th 1206 (2004) ............................................................ 4

*Kennedy v. Allied Mut. Ins. Co.,*
  952 F.2d 262 (9th Cir. 1991) ............................................................. 20

*MacKinnon v. Truck Ins. Exch.,*
  31 Cal. 4th 635 (2003) ................................................... 6, 17, 21, 22

*Minkler v. Safeco Ins.,*
  49 Cal. 4th 315 (2010) ................................................................. 7, 23

*Oetjen v. Cent. Leather Co.,*
  246 U.S. 297 (1918) ................................................................... 12, 13

*OneBeacon Ins. Co. v. T. Wade Welch & Assocs.,*
  841 F.3d 669 (5th Cir. 2016) ............................................................. 22

*Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.,*
  368 F. Supp. 1098 (S.D.N.Y. 1973) ..................................................... 8

*Pan Am. World Airways, Inc. v. Aetna Cas. & Surety Co.,*
  505 F.2d 989 (2d Cir. 1974) ............................... 3, 9, 12, 15, 16, 17, 18

*Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co.,*
  282 F. 976 (2d Cir. 1922) .................................................................. 15

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Mitchell
Silberberg &
Knupp LLP

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page(s)**

3

*Safeco Ins. Co. v. Robert S.*,

4

26 Cal. 4th 758 (2001) ................................................................. 6, 9, 11, 21, 23

5

*Schaffer v. Clinton*,

6

240 F.3d 878 (10th Cir. 2001) ........................................................................... 10

7

*Schleimer v. Strahl*,

8

219 Cal. App. 2d 613 (1963) ............................................................................... 4

9

*Sony Computer Entm't Am., Inc. v. Am. Home Assur. Co.*,

10

532 F.3d 1007 (9th Cir. 2008) ............................................................................. 4

11

*State of Cal. v. Cont'l Ins. Co.*,

55 Cal. 4th 186 (2012) ......................................................................................... 8

12

*State Farm Mut. Auto. Ins. Co. v. Jacober*,

13

10 Cal. 3d 193 (1973) ..................................................................................... 6, 16

14

*State Farm Mut. Auto. Ins. Co. v. Mrozek*,

15

29 Cal. App. 3d 113 (1972) ............................................................................... 21

16

*Steven v. Fid. & Cas. Co.*,

17

58 Cal. 2d 862 (1962) ........................................................................................ 16

18

*Ungar v. PLO*,

19

402 F.3d 274 (1st Cir. 2005) ....................................................................... 13, 14

20

*Wible v. Aetna Life Ins. Co.*,

375 F. Supp. 2d 956 (C.D. Cal. 2005) ............................................................... 10

21

*Younis Bros. & Co. v. Cigna Worldwide Ins. Co.*,

22

899 F. Supp. 1385 (E.D. Pa. 1995) ................................................................... 18

23

### STATUTES

24

California Civil Code

25

§ 1644 ............................................................................................................. 2, 3

26

### OTHER AUTHORITIES

27

3 Jeffrey E. Thomas et al., *New Appleman on Insurance Law Library*

28

*Edition* § 18.03 (2016) ................................................................................... 3, 8

Mitchell
Silberberg &
Knupp LLP

iv

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES

## I.   PRELIMINARY STATEMENT

This case involves an insurance coverage dispute between an insurance company, Atlantic,[1] and its insured, Universal.  In such cases, it is well-settled law that certain insurance-specific rules and principles apply to the interpretation of the parties' Policy, including:  coverage is broadly construed; exclusions must be clearly and unambiguously stated, and are narrowly construed in favor of coverage; and ambiguities, if any, are resolved against the insurer in favor of coverage.

In a desperate bid to deny Universal the terrorism coverage for which Universal paid substantial premiums, Atlantic ignores every single one of these insurance-specific rules and principles of interpretation.  Instead, Atlantic tries to turn this into a general contract case by, among other things, arguing that the insurance-specific rules and principles should not apply, and that the War Exclusions should be interpreted in an undefined "colloquial" sense, instead of in accordance with the insurance industry custom and practice and the meaning used by the parties in the Policy.  The Court should decline Atlantic's invitation to ignore controlling insurance law rules and principles.  The War Exclusions each have a long-standing and established meaning in the insurance context that accords with the insured's expectations, insurance industry custom and practice, and U.S. foreign policy.

Under those established meanings, which must control, the terrorist attacks by Hamas in July 2014 do not constitute (1) war, (2) warlike action by the military force of a government, sovereign, or other authority, (3) insurrection, or (4) use of a weapon of war including atomic fission or radioactive force.  (Indeed, it is not clear why Atlantic continues to argue for application of Exclusions 3 and 4 given that *Atlantic's own witnesses have testified that those Exclusions do not apply*.)

Accordingly, the Court should reject Atlantic's argument that losses caused by terrorist attacks launched by the terrorist group Hamas against Israeli civilians can

---

[1] All capitalized terms are as defined in Universal's motion for partial summary judgment ("Motion"), unless otherwise indicated.

Mitchell
Silberberg &
Knupp LLP

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

1  be excluded from coverage by the War Exclusions, and enforce Atlantic's obligation

2  to cover losses incurred by Universal due to those acts of terrorism.

3  **II.     STATEMENT REGARDING THE FACTS**

4         The Court is aware of the facts set forth in Universal's Motion (ECF No. 61-

5  1) and Universal's opposition to Atlantic's cross-motion for summary judgment (*id*.

6  No. 85), which will not be repeated here.  As a point of clarification for the Court's

7  consideration, however, Universal believes it is important to single out the improper

8  and misleading manner in which Atlantic repeatedly conflates, and sometimes

9  references interchangeably, on the one hand (a) Hamas, which is a terrorist

10  organization established in 1987 and based in the Gaza Strip, and, on the other hand,

11  (b) Palestinians, a population residing in among other places, the West Bank, the

12  Gaza Strip, Jordan, and Israel, and (c) the Palestinian Authority ("PA"), an entity

13  established pursuant to the Oslo Accords and which recognizes Israel.  These three

14  distinct groups cannot be equated or conflated:  Hamas' stated goal is to terrorize

15  and wipe out from existence Israel and Israelis; Palestinians as a whole and the PA

16  specifically do not share that goal.

17  **III.    ARGUMENT**

18         **A.     "Ordinary and Popular Meaning" Is Not The Standard For
19                 Interpreting The War Exclusions**

20         As detailed in Universal's Motion (pp. 10-11), the words used in the War

21  Exclusions have a well-established special and technical meaning and therefore must

22  be interpreted as such by this Court pursuant to California Civil Code Section 1644

23  ("Section 1644").  In its opposition, Atlantic argues that the War Exclusions should

24  instead be interpreted based solely on the purported "ordinary and popular"

25  meanings of the words used in the War Exclusions.  Opp., pp. 6-7, 16-17.  Atlantic is

26  wrong.

27         To make its argument seem more plausible, Atlantic intentionally omits the

28  following underlined language when quoting from Section 1644:

Mitchell
Silberberg &
Knupp LLP

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

> The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; ***unless*** used by the parties in a technical sense, or unless a special meaning is given to them by usage, ***in which case the latter must be followed***.

*Id.* (emphasis added).  Atlantic's reluctance to acknowledge the full text of the statute is understandable, given how significantly the omitted language impacts the analysis in this case.  Here, any proposed "ordinary and popular" interpretation would not apply because the terms of the Policy have technical and special meanings that "must" be used.

First, the War Exclusions have long been interpreted and defined by the courts and insurance industry custom and practice to have a special meaning.  *See* SUF[2] ¶¶ 62-66 (particularly since 9/11, war and terrorism are two separate concepts in the insurance industry:  "an underwriter cannot merge the two concepts and say that 'an act of terrorism' can be also an 'act of war'").  As noted in Appleman, the leading insurance treatise, because "war," "warlike," and "insurrection" are generally not defined in an insurance policy, they "have been subject to judicial interpretation."  3 Jeffrey E. Thomas et al., *New Appleman on Insurance Law Library Edition* § 18.03[9][b]-[c] (2016) (discussing, *inter alia*, *Pan Am. World Airways, Inc. v. Aetna Cas. & Surety Co.*, 505 F.2d 989, 1012-13 (2d Cir. 1974) ("war" and "warlike" exclusions require the existence of a conflict between two sovereigns or quasi-sovereigns) and *Holiday Inns, Inc. v. Aetna Ins. Co.*, 571 F. Supp. 1460, 1466 (S.D.N.Y. 1983) ("[T]he specific intent to overthrow the established government is a *sine qua non* of an insurrection.")).

Atlantic cannot claim ignorance of the insurance industry-accepted special meaning of the War Exclusions.  Rather, "that is a definition of which [the insurer] had at least constructive knowledge at the time it entered into the policy in suit."  *Holiday Inns*, 571 F. Supp. at 1494.  Indeed, Atlantic cited Appleman's definition of

---

[2] SUF references are to the Statement of Uncontroverted Facts in support of Universal's Motion (ECF No. 61-1).  SGI references are to Universal's Statement of Genuine Issues and Additional Material Facts in opposition to Atlantic's cross-motion (ECF No. 81).

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

"war" in its denial letter, as follows:  "Appleman on Insurance discusses exclusions for war, including the meaning of war and similar terms.  "War is 'a course of hostility' between 'states or state-like entities.'"  ECF No. 61-8 (Ex. 12, p. 88).

Second, the parties used the War Exclusions in the Policy—both when Atlantic first issued the Policy in 2010, and then when *Dig* was added as an Insured Production under the Policy in 2013/2014—in a technical sense, and certainly with the understanding that acts of terrorism, like those by the terrorist group Hamas, would be covered.  *See* SUF ¶¶ 16-28 (Aon and Universal representatives understood that *Dig* was to be shot in Israel with attendant additional security risks, and that the production would be insured against acts of terrorism in Israel, including acts by known terrorist groups); ¶¶ 62-66 (After the events of 9/11, insureds reasonably expect that terrorism and war are two separate risks, which will be underwritten and evaluated by an insurance company separately); SGI ¶¶ 154-176 (when drafting and negotiating the 2010 Policy, the parties intended to use the insurance industry War Exclusions, in accordance with the Insurance Services Office's ("ISO") forms; and Atlantic knows how to draft a terrorism exclusion); *see also Ins. Co. of N. Am. v. Elec. Purification Co.*, 67 Cal. 2d 679, 688-689 (1967) (courts "should not interpret the provision 'to remove from the coverage of the policy a risk against which the circumstances under which and the purposes for which the policy was written indicate the insured intended to protect himself'").[3]

---

[3] Contrary to Atlantic's argument (Opp., pp. 6-7), there is no *per se* requirement that the insured must introduce direct evidence of the parties' intent for the special or technical meaning to be applied.  For example, in *Schleimer v. Strahl*, the court interpreted the undefined policy term "commercial block policy" in a technical sense based on the insurance industry meaning, not any direct evidence of the parties' intent.  219 Cal. App. 2d 613, 615, 617 (1963).  None of the cases cited by Atlantic (Opp.  6-7) warrant a different result:  *Sony Computer Entm't Am., Inc. v. Am. Home Assur. Co.*, 532 F.3d 1007, 1013 (9th Cir. 2008) (neither the insurer nor the insured presented evidence of the parties' intent, and the policy term at issue, "negligent publication," had no insurance industry custom and practice meaning); *Discover Prop. & Cas. Ins. Co. v. Blair*, 2014 U.S. Dist. LEXIS 128029, *22 (C.D. Cal. Aug. 26, 2014) (the term "load capacity" was undefined in the policy or any prior case law, and was unambiguous); *Clarendon Nat'l Ins. Co. v. Foley & Bezek, LLP*, 2001 U.S. Dist. LEXIS 18443, *12 (C.D. Cal. July 26, 2001) (neither the insurer nor the insured presented evidence of the parties' intent); *Jordan v. Allstate Ins. Co.*, 116

4

1   Either of the above two grounds is a sufficient basis for rejecting Atlantic's

2   specious argument that an "ordinary" meaning should be applied to the War

3   Exclusions.  But Atlantic's argument should also be rejected for the additional

4   reason that it runs contrary to both controlling and persuasive on point case law:

5   • Atlantic's argument that the War Exclusions must be interpreted using

6   an "ordinary and popular" meaning has already been rejected by courts that have

7   considered it.  *See Holiday Inns*, 571 F. Supp. at 1464 (rejecting a "common

8   meaning" definition of the war exclusions, and noting that "[i]n commercial

9   litigation arising out of insurance policies, words and phrases are construed 'for

10   insurance purposes'—a context quite different from those of politics or journalism").

11   For this reason, and as further discussed herein, Atlantic's reliance on colloquial

12   references to the Hamas/Israel conflict in 2014 as a "war" by journalists, politicians,

13   and others (Opp. at pp. 16-17) is unavailing.[4]

14   • Applying Atlantic's undefined "ordinary and popular" meaning of the

15   War Exclusions, which Atlantic argues should be interpreted based on circumstantial

16   evidence about how the general public refers to an event years after the time of

17

_____

18   (...continued)

19   Cal. App. 4th 1206, 1218 (2004) (same, and the term "dry rot" had no insurance
industry custom and practice meaning).  In any event, Universal *has* presented ample

20   evidence that the parties intended or were presumed to use the War Exclusions in
their technical *and* special meaning.  (*See infra* Section III.A.)

21   [4] Atlantic's reliance on selected colloquial references also ignores a legion of news
reports and analysis that describe the Hamas/Israel conflict as something other than a

22   "war."  SGI ¶ 105 (*e.g.*, *IDF announces major operation in Gaza as rocket fire
escalates in south*, The Jerusalem Post, July 7, 2014 ("Barrage of Gaza rockets fired

23   at southern Israel as IDF prepares for escalation; Iron Dome intercepts 12
projectiles.");  *Gaza's marvels of engineering; Hamas gunmen can live in tunnels*

24   *for weeks*, The Financial Post, August 9, 2014 (Hamas' tunnels "lead 'from mosque
to mosque; mosque to house; house to hospital; kindergarten to house ... Lest there

25   be any doubt about the tunnels' purpose, the IDF found weapons, army uniforms and
motorcycles, along with chloroform and handcuffs - a macabre 'kidnapping kit.'");

26   *Take Away Their Guns -- Then We'll Talk*, Foreign Policy, August 28, 2014 ("For
more than 50 days this summer, Israeli population centers were terrorized by

27   rockets, mortars, cross-border infiltration into Israel by sea, and repeated attempts by
Hamas and the other terrorist factions to murder and kidnap Israelis through the use

28   of tunnels.")).

Mitchell
Silberberg &
Knupp LLP

5

1   contracting,[5] is contrary to the axiomatic insurance rules that:

2       (a)     An exclusion in an insurance policy precludes coverage only if it is

3   "expressly and unambiguously excluded," using "plain and clear" language.  *State*

4   *Farm Mut. Auto. Ins. Co. v. Jacober*, 10 Cal. 3d 193, 200-01 (1973); *MacKinnon v.*

5   *Truck Ins. Exch.*, 31 Cal. 4th 635, 639 (2003);

6       (b)     "[I]nsurance coverage is 'interpreted broadly so as to afford the greatest

7   possible protection to the insured, [whereas] . . . exclusionary clauses are interpreted

8   narrowly against the insurer.'"  *MacKinnon*, 31 Cal. 4th at 648; and

9       (c)     Where there are several reasonable interpretations of an exclusion, the

10  court "must resolve the ambiguity in favor of the insured, consistent with the

11  insured's reasonable expectations."  *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th

12  465, 473 (2004); *Safeco Ins. Co. v. Robert S.*, 26 Cal. 4th 758, 766 (2001) (reversing

13  grant of summary judgment to defendant insurance company because the insured

14  reasonably expected coverage for the claim purportedly excluded).

15      Each of the above settled rules of insurance policy construction defeats

16  Atlantic's argument for applying an undefined "ordinary and popular" meaning to

17  the War Exclusions.  If applied, Atlantic's interpretation would be contrary to the

18  reasonable expectations of its insured and, moreover, the insured would have no way

19  of knowing what might or might not be excluded from coverage.  Such an absurd

20  result cannot be permitted.  *See MacKinnon*, 31 Cal. 4th at 650 (rejecting an

21  insurer's broad interpretation of a pollution exclusion based on "ordinary" or

22  dictionary definitions of policy terms because it is a "basic fallacy" that "the

23  meaning of policy language is to be discovered by citing one of the dictionary

24  meanings of the key words," and holding that the insurer's proposed definition was

25  "too broad to meaningfully define" the exclusion; rather, the exclusion was properly

26  interpreted based on the history of the development of the exclusion in the insurance

---

[5] Atlantic's ex-post theory of contract interpretation is particularly problematic given that Atlantic's expert witnesses have opined that the meaning of the term "war" has changed dramatically over time since 9/11, and also after the Policy incepted.

Mitchell
Silberberg &
Knupp LLP

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

industry).

Finally, Atlantic has utterly failed to provide an "ordinary and popular" definition of "war" or "warlike"—instead arguing that Atlantic will know it if it is a "war" or "warlike" when they see it. *See* Atlantic's Motion, pp. 12-13 (ECF No. 95-5). Universal, however, has provided definitions of these terms—*i.e.*, the primary Merriam-Webster Dictionary definition of the term "war," which requires "a state of usually open and declared armed hostile conflict between states or nations." *See* Opp. to Atlantic's Motion, p. 19 (ECF NO. 85). "Warlike," in turn must be connected to the actions of sovereigns/quasi-sovereigns in a "war." *Id.*, pp. 12-14. Therefore, Universal's Motion should be granted even under the "ordinary and popular" interpretation (which does not apply) of the War Exclusions because Universal's definitions are the only ones presently before the Court for consideration.

### B.   <u>Atlantic's Red Herring Argument About Policy Drafting</u>

The California Supreme Court has recited the rules of insurance policy interpretation in California as follows:

> Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. If contractual language is clear and explicit, it governs. If the terms are ambiguous [*i.e.*, susceptible of more than one reasonable interpretation], we interpret them to protect the objectively reasonable expectations of the insured. [I]f these rules do not resolve a claimed ambiguity … [then] ambiguities are to be resolved against the insurer. The tie-breaker rule of construction against the insurer stems from the recognition that the insurer generally drafted the policy and received premiums to provide the agreed protection.

*Minkler v. Safeco Ins.*, 49 Cal. 4th 315, 321 (2010) (internal citations and quotation marks omitted).

Atlantic contends that, even though it received millions in premiums to provide coverage to Universal, the tie-breaker rule of construing ambiguities against the insurer does not apply here. Opp., pp. 7-9. Atlantic offers three arguments in support of its position, none of which is availing.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

First, Atlantic argues that the Policy should not be construed against Atlantic because the Policy terms were purportedly negotiated between Universal's insurance broker, Aon, and Atlantic.  This argument is factually incorrect.  The War Exclusions (which Atlantic concedes were not negotiated) are standard insurance clauses that are interpreted against the insurer, in accordance with the insured's reasonable expectations.  Indeed, for decades *before* Atlantic underwrote the Policy at issue, the War Exclusions were already "standard – indeed, too standard – *insurers'* clauses, not terms tailored to the risk in negotiations."  *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 368 F. Supp. 1098, 1122 (S.D.N.Y. 1973) (emphasis added).  The War Exclusions thus were and are available in standard insurance form policies, and specifically here, the War Exclusions came from those standard insurance forms and were not written by either Aon or Universal.[6]  SGI ¶¶ 154-175.

Indeed, the ***only*** party that made any revisions to the War Exclusions is ***Atlantic***.  *Id*.  Specifically, Exclusions 3 (insurrection) and 4 (weapon of war) differ slightly from the standard form language because Atlantic revised the language of those provisions during the drafting process.  *Id*. ¶¶ 157-171.  Thus, the War Exclusions here should be construed against Atlantic—the insurer and the party who introduced any purported ambiguity into the War Exclusions.  *See, e.g.*, *State of Cal. v. Cont'l Ins. Co.,* 55 Cal. 4th 186, 195 (2012).[7]

---

[6] *See also* 3 *New Appleman on Insurance Law Library Edition*, § 18.03 (quoting the identical war exclusions in an ISO Commercial General Liability form).

[7] The two cases Atlantic cites for its argument that *contra proferentem* does not apply if the insured participated in the drafting of the policy are inapposite here and certainly do not compel a different result.  In *Garcia v. Truck Ins. Exchange*, the policy was unambiguous.  36 Cal. 3d 426, 436 (1984).  The party seeking coverage was not the insured, but rather a purported third-party beneficiary of the policy advancing an interpretation contradicted by uncontroverted testimony of one of the negotiating parties.  *Id*. at 436-437.  Here, Atlantic introduced purported ambiguities into the War Exclusions, which were supposed to be standard *insurer's* clauses.  In *Fireman's Fund Ins. Co. v. Fibreboard Corp.*, the court found that the insured's interpretation was not reasonable, and directly contradicted by the testimony of the negotiating parties, so the court did not apply *contra proferentem* at all.  182 Cal. App. 3d 462, 470 (1986).  This is not the case here.

Mitchell
Silberberg &
Knupp LLP

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    Additionally, the policy of construing ambiguous language in favor of the

2   insured is intended to protect the reasonable expectations of the insured and place on

3   the insurer the burden of clearly and unambiguously stating any exclusions.  *See*

4   *Safeco*, 26 Cal. 4th at 763; *Pan Am*, 505 F.2d at 999, 1003.  That is especially

5   relevant here, because Atlantic has a terrorism exclusion that it chose not to insert

6   into the Policy.  Accordingly, absent a terrorism exclusion in the Policy, Universal

7   reasonably expected that losses caused by acts of terrorism perpetrated by a known

8   terrorist group such as Hamas would be covered by the Policy.  SUF ¶¶ 16-28, 62-

9   66; SGI ¶¶ 154-176.  This makes *contra proferentem* particularly applicable here.

10    Second, Atlantic argues that *contra proferentem* should not apply because

11   Aon marked the Policy with the legend "confidential property of Aon" when Aon

12   shopped the Policy to other insurance carriers in 2015.  This is completely

13   immaterial.  As detailed above, the War Exclusions came from standard insurance

14   forms and were not written by either Aon or Universal, and Atlantic was the only

15   party who made revisions to the otherwise standard War Exclusions.

16    Third, Atlantic argues that the War Exclusions should not be construed against

17   it as the insurer because Aon is a "powerful insurance broker."  Controlling case law

18   says otherwise.  Insurance contracts in general, and standard insurer's provisions in

19   particular, are interpreted against the insurer even if the insured is legally

20   sophisticated and possesses significant negotiating leverage.  *AIU Ins. Co. v. Super.*

21   *Ct.*, 51 Cal. 3d 807, 823-24 (1990) (noting that the insured "possesses both legal

22   sophistication and substantial bargaining power," and resolving "ambiguities in

23   favor of coverage" where "the provisions in question were [not] actually negotiated

24   or jointly drafted" but rather, were "highly uniform in content and wording"

25   insurer's provisions).

26    In short, Atlantic is the insurer here, and therefore the War Exclusions must be

27   interpreted in favor of Universal under the rules of insurance law.

28

Mitchell
Silberberg &
Knupp LLP

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

### C.   Atlantic Cannot Merge The Separate Concepts Of "War" And "Terrorism" To Escape Coverage

Atlantic incorrectly argues that "plaintiffs attempt to create a false dichotomy between war and terror."  *See* Opp., pp. 17-19.  The dichotomy is real, and it is recognized by the insurance industry.

Contrary to Atlantic's argument, the insurance industry does distinguish between acts of war and acts of terror.  SUF ¶¶ 62-66.  Shortly after 9/11, members of the U.S. House Financial Services Committee sent a letter to the National Association of Insurance Commissioners, emphasizing that the government's use of "war"-like language to describe the 9/11 attack was simply rhetoric and not a reflection of the reality of the terrorist nature of the attack, and exhorting the insurance industry not to invoke "act of war" exclusions to escape coverage obligations for the 9/11 attacks.[8]  And indeed, the "insurance industry did not exclude 9/11 losses based on application of any war exclusions, recognizing that they were terrorist acts."  *Id*. ¶ 62; SGI ¶ 184; *see also* Declaration of Peter Williams ¶ 3 (ECF No. 74-9) (the insurance industry did not apply war exclusions to the 9/11 losses; Mr. Williams is Atlantic's former President, designated by Atlantic as a non-retained insurance expert in this case).  Thus, the insurance industry acknowledges the important distinction between war and terrorism.

The fact that the insurance industry distinguishes between war and terrorism is also evidenced by the development of separate standard industry war exclusions and terrorism exclusions.  Indeed, terrorism exclusions exist in standard ISO forms and Atlantic itself has a standard terrorism exclusion that it can use when it wants to specifically exclude acts of terrorism from coverage.  SUF ¶ 64; SGI ¶ 172-75.

---

[8] Congressional Leaders Urge Industry to 'Fulfill, September 20, 2001, at http://www.insurancejournal.com/news/national/2001/09/20/14323.htm. The Court can take judicial notice of this document, as well as the dictionary definitions cited herein in response to Atlantic's argument in its opposition. *See, e.g.*, *Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 965 (C.D. Cal. 2005); *Schaffer v. Clinton*, 240 F.3d 878, 885 n.8 (10th Cir. 2001).

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    Here, because the Policy does *not* expressly exclude acts of terrorism from coverage

2    (SUF ¶ 13), by definition it covers losses caused by those terrorist acts.

3        The California Supreme Court decision in *Safeco* is particularly instructive

4    here.  In *Safeco*, the policy at issue had an exclusion for "any illegal act."  26 Cal.

5    4th at 763.  The insurer argued that the exclusion should be interpreted to bar

6    coverage for any violation of criminal law.  *Id*.  The court rejected the argument:

7            Had Safeco wanted to exclude criminal acts from coverage, it
             could have easily done so. Insurers commonly insert an
8            exclusion for criminal acts in their liability policies . . . .
             Because Safeco chose not to have a criminal act exclusion,
9            instead opting for an illegal act exclusion, we cannot read into
             the policy what Safeco has omitted. To do so would violate the
10           fundamental principle that in interpreting contracts, including
             insurance contracts, courts are not to insert what has been
11           omitted.

12   *Id*. at 763-64 (citations omitted).  Similarly, "Atlantic knows how to draft a terrorism

13   exclusion" (SUF ¶ 64), so if Atlantic had wanted to exclude acts of terrorism from

14   coverage it could easily have added a terrorism exclusion to the Policy.  But Atlantic

15   did not do so.

16       Not surprisingly, Atlantic cites no case law that actually supports its argument

17   that acts of war are not distinguished from acts of terror in the insurance context.  In

18   fact, Atlantic affirmatively misrepresents the holding of the primary case (*In re*

19   *September 11 Litig.*, 751 F.3d 86 (2d Cir. 2014)) on which it relies to make this

20   argument.  In *In re September 11 Litig.*, the court stated that "its 'holding as to the

21   act-of-war defense [under CERCLA **should be read narrowly**, fitting the facts of

22   this case only' [and that its] decision **was not necessarily applicable in contexts**

23   **presenting different considerations, such as 'cognate laws of insurance'** . . ."  *Id*.

24   at 90 (emphasis added).

25       Atlantic also cites to two *habeas corpus* cases regarding the meaning of

26   "enemy combatants" which are not applicable in the insurance context:  *Hamdan v.*

27   *Rumsfeld*, 548 U.S. 557 (2006) and *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004).

28       In light of both the insurance industry's acknowledgment of a distinction

Mitchell
Silberberg &
Knupp LLP

11

between war and terrorism, and Atlantic's failure to include a terrorism exclusion in the Policy, Universal reasonably expected and understood that the Policy covers acts of terrorism and that the War Exclusions would not affect that coverage.  SUF ¶¶ 16-28; SGI ¶¶ 154-176.  And it is "the insured's reasonable expectations" that control here.  *E.M.M.I.*, 32 Cal. 4th at 473.

### D.  Exclusion 1 Does Not Apply As A Matter of Law

Under the *Pan Am* insurance definition of Exclusion 1 (war), to qualify as a "war" a conflict must be between two sovereigns or quasi-sovereigns.[9]  Atlantic admits that Hamas is not a sovereign.  SUF ¶ 68; *see* Opp., pp. 19-22 (making no argument that Hamas qualifies as a sovereign).  Atlantic also fails to establish that Hamas is a quasi-sovereign for at least two reasons:  (1) under the political question doctrine, the Court must defer to the U.S. government's designation of Hamas as a terrorist organization, and not grant Hamas (or Gaza) status as a quasi-sovereign; and, (2) Hamas lacks the requisite attributes of sovereignty to qualify as a quasi-sovereign.

#### 1.  The political question doctrine mandates deference to the U.S. government's determination that Hamas is not a sovereign or quasi-sovereign

The executive branch's determinations on matters of foreign policy, such as recognition of sovereigns or quasi-sovereigns, are binding on the courts:

> Who is the sovereign, *de jure* or *de facto* [*i.e.*, quasi-sovereign], of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens and subjects of that government.  This principle has always been upheld by this court, and has been affirmed under a great variety of circumstances.

*Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918).

Atlantic fails to address this mandatory directive, and fails to cite a single *insurance* case where the court considered the political questions doctrine and

---

[9] As noted, in its denial letter, Atlantic cited authorities holding that "war" requires hostilities between sovereign or quasi-sovereigns, and argued that there was a war here because Hamas is a quasi-sovereign.  *And see* SGI ¶ 209.

1    declined to apply it.[10]  There is no such case.  Indeed, the only case Universal is

2    aware of in the insurance context fully heeded the directive of *Oetjen* and ruled in

3    favor of the insured, because a ruling for the insurance carrier would have required

4    the court to make a determination "whether the [military group at issue in that case]

5    is the [*de facto*] Liberian government for purposes of this exclusion."  *Ennar Latex*

6    *v. Atlantic Mut. Ins. Co.*, 1995 U.S. Dist. LEXIS 7386, at *13 (S.D.N.Y. May 30,

7    1995).  As the court explained:  "It is not for this Court to recognize a de facto [*i.e.*,

8    quasi] government; rather, that is the role of the executive branch."  *Id.* at *14.

9            Atlantic also disingenuously argues that it is not asking this Court to declare

10   Hamas a quasi-sovereign or sovereign, but rather that "all Atlantic asks the Court to

11   do is acknowledge the equally obvious and uncontested fact that Hamas has control

12   over Gaza."  Opp., p. 22.  There are two problems with this argument.  First, the

13   factual premise of Atlantic's request is incorrect because Hamas does not have

14   control over Gaza.  SUF ¶ 74-75 (Hamas does not have control over the borders,

15   ports, or airspace of Gaza).  Second, if Atlantic is telling the truth, then its request

16   for judicial recognition of Hamas' purported control of Gaza serves no valid

17   purpose.  Without a finding of law that Hamas' purported control of Gaza

18   establishes Hamas as a quasi-sovereign, Atlantic loses.

19           As detailed in Universal's Motion (pp. 16-18; and *see* SUF ¶¶ 20, 67-72), the

20   Court should defer to the U.S. executive branch's foreign policy determinations that

21   Hamas is a terrorist organization, and not a sovereign or quasi-sovereign, and on that

22   basis find as a matter of law that Exclusion 1 (and Exclusion 2 (*see infra* Section

---

23   [10] *None* of the cases Atlantic cites (Opp., pp. 21-22) are *insurance* cases and none

24   support Atlantic's argument that the recognition of sovereigns/quasi-sovereigns is
     not a political question.  *Ungar v. PLO* considered the issue of sovereign immunity
     from suits, and concluded that the PA is not entitled to immunity under the Anti-

25   Terrorism Act.  402 F.3d 274, 294 (1st Cir. 2005).  *Boumedienne v. Bush* is a *habeas

26   corpus* case, which recognized the "uncontested fact that the United States, by virtue
     of its complete jurisdiction and control over the [Guantanamo Bay] base, maintains

27   *de facto* sovereignty over this territory."  553 U.S. 723, 755 (2008).  The Supreme
     Court obviously did not recognize a new sovereign/quasi-sovereign (*e.g.*, Hamas, as

28   Atlantic seeks here) but was referring to an undisputed existing sovereign—the
     United States.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Mitchell
Silberberg &
Knupp LLP

1    III.E)) do not apply here.

2        **2.    As a matter of law, Hamas lacks sufficient attributes of**
3             **sovereignty to be a sovereign or quasi-sovereign**

4        In its opposition (pp. 19-20), Atlantic argues in conclusory fashion that Hamas

5    possesses sufficient attributes of sovereignty to be recognized as a quasi-sovereign.

6    Atlantic's argument and evidentiary showing are both deficient.

7        To begin with, Atlantic fails to address the attributes of sovereignty detailed in

8    Universal's Motion:  (1) formal recognition by other sovereigns; (2) the right to

9    control borders; (3) sovereign or diplomatic immunity; and, (4) control as the

10   government of meaningful territory.  Hamas does not possess any of these attributes.

11   *See* Universal's Motion, pp. 18-20 (*and see* SUF ¶¶ 20, 67-70, 72, 73, 74, 75, 77).

12       Instead, Atlantic argues, in a highly misleading manner (see *supra* Section II),

13   that Hamas should be conflated with all Palestinians or the PA in order to imbue

14   Hamas with the "trappings of state."  Opp., pp. 19-20.  The three groups (Hamas,

15   Palestinians, and the PA) cannot be equated or conflated:  Hamas is a genocidal

16   terrorist group seeking to annihilate Israel and Israelis; the PA and all Palestinians

17   do not.

18       Moreover, Atlantic is wrong to believe that conflating Hamas with the PA (or

19   pointing out that Hamas is part of the PA) confers on Hamas sufficient indicia of

20   sovereignty to qualify as a quasi-sovereign.  Courts have already held that the

21   overarching PA (comprised of multiple factions) does not have sufficient "control"

22   over its territory to establish its own sovereignty.  *See Ungar*, 402 F.3d at 291-92.  If

23   the overarching PA does not have sufficient control over the West Bank and Gaza to

24   satisfy the sovereignty test, then Hamas, which has only some control over only

25   Gaza, by definition cannot satisfy this element.

26       In sum, as a matter of law, Hamas lacks sufficient attributes of sovereignty to

27   qualify as a quasi-sovereign.  And because Hamas is not a sovereign or quasi-

28   sovereign, Exclusion 1 (and Exclusion 2, discussed below) do not apply.

Mitchell
Silberberg &
Knupp LLP

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

### E.   Exclusion 2 Does Not Apply As A Matter of Law

Exclusion 2 ("warlike action by a military force") does not apply because insurance case law is clear that "warlike action" must, at a minimum, be connected to the actions of sovereigns or quasi-sovereigns.  *See Pan Am*, 505 F.2d at 1015 (rejecting notion that terrorist act carried out in furtherance of purported "guerrilla war" was a "warlike act," when the perpetrators were "the agents of a radical political group, rather than a sovereign government"); *see also Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co.*, 282 F. 976, 979 (2d Cir. 1922) ("warlike" is connected to "war":  "'hostilities' is intended to describe an actual operation, offensive or defensive, in the conduct of war, and 'warlike operations' as operations in time of war.  The peril must be due directly to some hostile action, if it be considered a warlike risk."); *Airlift Int'l, Inc. v. United States*, 335 F. Supp. 442, 448 (S.D. Fla. 1971) (same:  flight carrying cargo between Philippine Islands and Saigon during Vietnam War was not "warlike operation" because the point of departure was not a "war base").

Atlantic argues that Exclusion 2 ("warlike") must be "broader" than Exclusion 1 ("war") and that Universal's reading of the two clauses as both requiring the involvement of two sovereigns or quasi-sovereigns would render the clauses completely redundant.  Opp., p 12.  Atlantic is wrong.  Universal agrees that the term "warlike" is intended to cover a broader range of activities then the term "war." But while the range of activities covered by the two exclusions may differ, the case law expressly holds that both exclusions have an overlapping limitation providing that the underlying activities (whatever they may be) must be engaged in by two sovereigns or quasi-sovereigns.  *Pan Am*, 505 F.2d at 1015-16 ("warlike operations" do not "encompass [1] the infliction of intentional violence by political groups (neither employed by nor representing governments) [2] upon civilian citizens of non-belligerent powers and their property [3] at places far removed from the locale or the subject of any warfare"); *Holiday Inns Inc.*, 571 F. Supp. at 1501 (shelling of

Mitchell Silberberg & Knupp LLP

15

1  buildings by militant religious factions not "warlike" because they were not
2  sovereign or quasi-sovereigns.).  Thus, Universal's reading of the two clauses does
3  not render them redundant.

4      Atlantic also argues that the "ordinary and popular" meaning of Exclusion 2
5  "must" be "much broader" than the still-undefined "ordinary and popular" meaning
6  of Exclusion 1 (Opp., p. 12), and therefore must be broad enough to encompass the
7  conflict between Israel and Hamas in July 2014.  Notably, however, Atlantic fails to
8  offer any definition for the terms "war" (Exclusion 1) or "warlike actions by a
9  military force" (Exclusion 2), instead arguing that "you know it when you see it."
10 *See* Atlantic's Motion, pp. 12-13 (ECF No. 95-5); SUF ¶ 60.  This is the antithesis of
11 the clear, plain language that is required of insurance policy exclusions.  *Jacober*, 10
12 Cal. 3d at 201 ("an insurer cannot escape its basic duty to insure by means of an
13 exclusionary clause that is unclear"); *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 269
14 (1966) ("any exception to the performance of the basic underlying obligation must
15 be so stated as clearly to apprise the insured of its effect"); *Steven v. Fid. & Cas.*
16 *Co.*, 58 Cal. 2d 862, 878 (1962) (holding that exclusionary clauses "must be
17 conspicuous, plain and clear"); *Harris v. Glens Falls Ins. Co.* 6 Cal. 3d 699,
18 701(1972) ("the burden rests upon the insurer to phrase exceptions and exclusions in
19 clear and unmistakable language").

20     Atlantic next argues that the phrase "other authority" in Exclusion 2 is broad
21 enough to include Hamas.  Opp., p. 12.  The case law discussed above and the rules
22 of construing the exclusions narrowly, however, make clear that the term "other
23 authority" means a quasi-sovereign.  *See Jacober*, 10 Cal. 3d at 201-02; *Pan Am*,
24 505 F.2d at 1015-16; *Holiday Inns*, 571 F. Supp. at 1501.  And this interpretation
25 makes sense because "other authority" is in a list following "government, [and]
26 sovereign;" if literally any "authority" were sufficient, then there would be no need
27 to enumerate government and sovereign as separate examples.  *See* SUF ¶ 12.
28 Indeed, if Atlantic's interpretation that any "authority" qualifies as an "other

Mitchell
Silberberg &
Knupp LLP

16

1    authority," it would broaden the exclusion in a way that leads to absurd results—*i.e.*,

2    a gang leader could theoretically qualify as an "other authority" in charge of a

3    "military force."  Such absurd results are not permitted.  *See MacKinnon*, 31 Cal. 4th

4    at 650.

5         The cases cited by Atlantic do not hold otherwise and, if anything, confirm

6    that Exclusion 2 does not apply.  *Hamdi & Ibrahim Mango Co. v. Reliance Ins. Co.*,

7    291 F.2d 437 (2d Cir. 1961), for example, dealt with the destruction of cargo in the

8    port of Haifa during the 1948 Arab-Israeli War, while a war was being waged

9    between Israel and a coalition of Arab ***states*** (Egypt, Jordan, Iraq, Syria, and

10   Lebanon), *i.e.*, between and among sovereigns.  SGI ¶ 188.  And *Pan Am*, as

11   discussed above, affirmed that "warlike" actions must be connected to hostilities

12   between sovereigns or quasi-sovereigns, and not "the infliction of intentional

13   violence by political groups (neither employed by nor representing governments)."

14   505 F.2d at 1015-16.

15        Finally, Atlantic incorrectly argues that Exclusion 2 applies because Israel's

16   counter-terrorism operation in Gaza purportedly caused Universal's loss in Israel.

17   Opp., pp. 14-15.  In July 2014, when the *Dig* Claim arose, the Israeli Army

18   conducted a counter-terrorism operation in *Gaza* (Operation Protective Edge), with

19   the purpose of rooting out terrorism infrastructures including the terror tunnels,

20   preventing further terrorist attacks, and reducing Hamas' strike capabilities.  SGI

21   ¶ 185.  The imminent peril that caused the *Dig* Claim, however, was created by

22   Hamas' indiscriminate rocket fire *from* Gaza *into* Israel, where the *Dig* production

23   was stationed, not by any conduct of the Israeli Army directed against Hamas *in*

24   Gaza.  *Id.* ¶¶ 186, 187.

25        Therefore, Exclusion 2 does not apply as a matter of law.

26        **F.    Exclusion 3 Does Not Apply As A Matter of Law**

27        As an initial matter, it is not clear why Atlantic believes that it has a good

28   faith basis for invoking Exclusion 3 ("insurrection, rebellion, revolution") given that

Mitchell
Silberberg &
Knupp LLP

17

1  Atlantic's own senior claims supervisor, Theresa Gooley, who was charged with

2  overseeing the *Dig* Claim, testified that Atlantic's coverage team concluded in July

3  2014 that Exclusion 3 did ***not*** apply.  SUF ¶ 83 ("[T]he third [exclusion] I don't

4  think is applicable, and so necessarily we wouldn't have included it in the [coverage

5  denial] letter.")  Atlantic simply ignores this in its opposition.

6        Whether or not there is a good faith basis for making it, Atlantic's argument

7  for applying Exclusion 3 certainly has no legal merit.  Abandoning its "ordinary and

8  popular" theory of interpretation, Atlantic argues that the insurance meaning of

9  insurrection, as interpreted by case law, applies to Exclusion 3.  Opp. 9-11.  Thus,

10  for Exclusion 3 to apply, Atlantic must prove that Hamas had the specific intent and

11  "purpose of overthrowing the constituted government [of Israel] and seizing its

12  powers," so that Hamas could rule over the state of Israel and its citizens.  *Pan Am*,

13  505 F.2d at 1017.  Atlantic cannot satisfy these requirements.

14        First, the pertinent case authorities, including the lone case cited by Atlantic,

15  *Home Ins. Co. v. Davila*, provide that an "insurrection" must be an ***intra-state***

16  conflict, wherein a state nationalist group seeks to take control over that state's

17  government, in order to rule that state as its next legitimate government.  *See Davila*,

18  212 F.2d 731, 732 (1st Cir. 1954) (the Nationalist Party of Puerto Rico was

19  purportedly seeking to take control of the government of Puerto Rico); *Younis Bros.*

20  *& Co. v. Cigna Worldwide Ins. Co.*, 899 F. Supp. 1385, 1393 (E.D. Pa. 1995)

21  ("[T]he National Patriotic Front… headed by Taylor and the Independent National

22  Patriotic Front… headed by Prince Johnson" sought to seize power over Liberia,

23  with the specific intent "to rid the country [Liberia] of the government of Samuel

24  Doe [then President of Liberia] and to replace it with [Taylor or Johnson] as head of

25  state."); *Pan Am*, 505 F.2d at 1017 ("'rebellion,' 'revolution,' and 'civil war' [*i.e.*,

26  all—internal conflicts] are progressive stages in the development of civil unrest, the

27  most rudimentary form of which is 'insurrection'"); Cambridge Dictionary

28  ("insurrection"—"an organized attempt by a group of people to defeat their

Mitchell
Silberberg &
Knupp LLP

18

government or ruler and take control of the country, usually by violence"), at http://dictionary.cambridge.org/us/dictionary/english/insurrection.

Here, it is undisputed that Hamas is an external, non-Israeli organization that poses an existential threat to the State of Israel, not an Israeli nationalist group seeking to take control over Israel's government in order to rule Israel as its next legitimate government.  *See* SUF ¶¶ 19, 20, 67-82.

Second, Atlantic has not established that Hamas had the specific intent and purpose of overthrowing the Israeli government in order to rule over the state of Israel and its citizens.  For example, Atlantic has not presented evidence that Hamas' goal is to unseat the Prime minister of Israel or take over the Israeli Knesset.  *And see* SUF ¶¶ ¶80, 82; SGI ¶ 190.

Instead, Atlantic argues that this requirement is satisfied because Hamas has the genocidal aim of annihilating and destroying Israel and killing every Israeli in the process, in order to replace Israel with an Islamic state.  *See* Opp., pp. 9-10; *see also* ECF No. 58-4 (Ex. 4 to Atlantic's Evid., p. 76:  Hamas "calls for the elimination of Israel and Jews from Islamic holy land and portrays the Jews in decidedly negative terms, citing anti-Semitic texts.").  In Atlantic's view, the goal of killing the entire population of a state, destroying the government of the state and the state itself, and replacing the state with a different, Islamic, state is exactly the same as overthrowing the civil government of a state in order to rule that state and its citizens as the next legitimate government.  That simply cannot be the case.

Exclusion 3 accordingly does not apply here as a matter of law.

### G.    Exclusion 4 Does Not Apply As A Matter of Law

As detailed in Universal's Motion (pp. 22-25), Exclusion 4 ("weapon of war including atomic fission or radioactive force") does not apply on its face because none of the weapons used in the conflict included (*i.e.*, used) atomic fission or radioactive force.  Nothing in Atlantic's opposition leads to a different conclusion.

1    As an initial matter, it is worth noting that Atlantic has not addressed the

2    testimony of Peter Williams, Atlantic's former President in charge of the division

3    that issued the Policy and a man designated by Atlantic as a non-retained insurance

4    expert, in which he unambiguously stated that Exclusion 4 did ***not*** apply to the *Dig*

5    Claim "because it required atomic or radioactive involvement."  SUF ¶ 85.  Instead,

6    Atlantic has attempted to manufacture a disputed issue of fact by putting into

7    evidence a declaration from Mr. Williams that directly contradicts his sworn

8    deposition testimony by claiming that Exclusion 4 does not require atomic or

9    radioactive involvement.  *See* Declaration of Peter Williams ¶ 2 (ECF No. 74-9).

10   The Court should disregard this sham declaration.  *Kennedy v. Allied Mut. Ins. Co.*,

11   952 F.2d 262, 266 (9th Cir. 1991) ("a party cannot create an issue of fact by an

12   affidavit contradicting his prior deposition testimony"); *Foster v. Arcata Assocs.*,

13   772 F.2d 1453, 1462 (9th Cir. 1985) ("If a party who has been examined at length on

14   deposition could raise an issue of fact simply by submitting an affidavit

15   contradicting his own prior testimony, this would greatly diminish the utility of

16   summary judgment as a procedure for screening out sham issues of fact.").

17   Mr. Williams' sworn deposition testimony is consistent with the undisputed

18   facts in this case, which establish that the parties intended for Exclusion 4 to exclude

19   loss caused by "Any weapon of war *employing* atomic fission or radioactive force

20   whether in time of peace or war."  *See* SGI ¶¶ 155-71.  This is the language to which

21   Aon and Atlantic expressly agreed when Atlantic bound coverage using "Martin's

22   [Atlantic's representative] Final Form."  *Id*. ¶¶ 193, 195.  And there was no

23   agreement to "broaden" the meaning of Exclusion 4 based on Atlantic's subsequent

24   undisclosed replacement of the word "employing" with the word "including."  *Id*.

25   Mr. William's sham affidavit cannot create a genuine issue of fact as to this point,

26   especially given that his role, if any, in the negotiation or drafting of the Policy was

27   extremely limited.  *See* ECF No. 77, ¶ 6.  *See Kennedy*, 952 F.2d at 266; *Foster*, 772

28   F.2d at 1462.

Mitchell
Silberberg &
Knupp LLP

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNIVERSAL'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

In any event, Atlantic's interpretation of Exclusion 4 as "Any weapon of war including [but not limited to] atomic fission or radioactive force" (Atlantic's insertion; *see* ECF No. 95-5, p. 20) cannot apply because it violates every basic rule of insurance contract interpretation:

(a)     "[T]he fundamental principle … in interpreting … insurance contracts, [is] not to insert what has been omitted." *Safeco*, 26 Cal. 4th at 764. Yet here, Atlantic admits that its interpretation is only plausible if it can insert the words "but not limited to" into Exclusion 4 after the word "including."

(b)     The "language in a [policy] must be interpreted as a whole." *MacKinnon*, 31 Cal. 4th at 648. Here, immediately below Exclusion 4 in the Policy is another exclusion (no. 5) that directly relates to Exclusion 4, and makes it clear that *both* exclusions are tied to loss causes by atomic, radioactive, or nuclear force, whatever the source is: "Nuclear reaction or radiation, or radioactive contamination *from any other cause*." SGI ¶ 198 (Policy, General Conditions, § III.5 (emphasis added)). Exclusion 4 thus precludes coverage for loss from a "weapon of war" using atomic fission/ radioactive force, and Exclusion 5 precludes coverage for loss "from any other cause" of nuclear/radioactive nature. This interpretation is also confirmed by the punctuation marks among Exclusions 1 through 5: *i.e.*, Exclusions 1, 2, and 3 are separated by semicolons, with a *period* at the end of Exclusion 3; Exclusion 4 then starts after that period, and connects to Exclusion 5 by a semicolon, with another *period* at the end of Exclusion 5. *See* SGI ¶ 96.

(c)     A "contract should reasonably receive such interpretation as will make it reasonable and avoid absurdities." *State Farm Mut. Auto. Ins. Co. v. Mrozek*, 29 Cal. App. 3d 113, 117 (1972); *See MacKinnon*, 31 Cal. 4th at 650 (rejecting insurer's broad interpretation argument, as it would result in absurdities and denial of coverage in situations that reasonably should be covered). Atlantic's unreasonable and impermissibly overbroad interpretation would lead to the absurd result that losses caused by the use of *any* type of weapon would be excluded, such

Mitchell
Silberberg &
Knupp LLP

21

1    as if a disgruntled former employee were to come on a production set with a rifle or

2    a combat knife (available at Walmart) and start shooting or stabbing people.[11]

3        Finally, even assuming that Exclusion 4 also covers weapons other than just

4    weapons using atomic fission or radioactive force, the Exclusion still does not apply

5    here because Hamas' rockets were not weapons of *war*.  Instead, they were weapons

6    *of terror*.  *See* SUF ¶ 20, 82, 87, 88.

7        Exclusion 4 therefore does not apply as a matter of law.

8    ### H.    Atlantic's Interpretations Of The War Exclusions Are Absurdly Broad

9        As noted above with respect to each of the Exclusions 1 through 4, Atlantic's

10   interpretations are so broad and vague that, if applied, they would lead to an absurd

11   result.  *See MacKinnon*, 31 Cal. 4th at 652 (rejecting an insurer's proposed definition

12   of an exclusion which was "too broad to meaningfully define" the exclusion;

13   insurer's interpretation would result in absurdities and denial of coverage in

14   situations that reasonably should be covered).  Indeed, this is not the first time

15   Atlantic has taken such an unreasonable position as to interpretation of its policy

16   exclusions.  In a recent case, Atlantic/OneBeacon disputed coverage based on a prior

17   knowledge exclusion under a legal malpractice insurance policy it had issued to a

18   law firm.  *OneBeacon Ins. Co. v. T. Wade Welch & Assocs*., 841 F.3d 669, 674 (5th

19   Cir. 2016) ($28 million verdict against Atlantic).  The Fifth Circuit decisively

20   rejected Atlantic's interpretation of the prior knowledge exclusion because it was so

21   broad as to be "facially absurd" and would render the policy's coverage "illusory."

22   *Id*. 677.

23       This Court should similarly reject Atlantic's untenable and overbroad

24   interpretations of Exclusions 1 through 4 here.

25   
26   [11] Atlantic's interpretation also makes no logical sense.  Neither "atomic fission" nor
     "radioactive force" is, by itself, a "weapon."  *See* ECF No. 85, p. 11 n.11.  Instead,
27   they are processes by which a nuclear reaction powering a "weapon" can be created.
     *Id*. Exclusion 4 for a "weapon of war including atomic fission or radioactive force"
28   can accordingly mean only one thing:  a "weapon" that uses or includes in that
     "weapon" either atomic fission or radioactive force (*e.g.*, an atomic bomb).

Mitchell
Silberberg &
Knupp LLP

22

**I.      Any Ambiguity In Any Of The Four War Exclusions Must Be Interpreted In Universal's Favor**

None of the War Exclusions apply here as a matter of law.  But if for some reason the Court believes that both parties' interpretations of the War Exclusions are plausible, then at most it can be said that the Policy language is ambiguous.  As set forth herein, any such ambiguity must be construed in Universal's favor, and against Atlantic, and therefore Universal's interpretations control as a matter of law.

If the War Exclusions are ambiguous, then the Court must interpret the War Exclusions in accordance with the reasonable expectations of the insured.  *Minkler*, 49 Cal. 4th at 321; *E.M.M.I.*, 32 Cal. 4th at 473; *Safeco*, 26 Cal. 4th at 763; *Ins. Co. of N. Am.*, 67 Cal. 2d at 688-89.  Here, Universal reasonably expected that Atlantic insured *Dig* against acts of terrorism in Israel, including by terrorist groups like Hamas.  *See* SUF ¶¶ 16-28 *and Ins. Co. of N. Am.*, 67 Cal. 2d at 689 (courts "should not interpret the provision 'to remove from the coverage of the policy a risk against which the circumstances under which and the purposes for which the policy was written indicate the insured intended to protect himself'").

And even if the Court finds that Universal has not adequately established its reasonable expectations, the Court still must construe the War Exclusions in Universal's favor, and against Atlantic, because Atlantic cannot prove that "its interpretation is the ***only*** reasonable interpretation."  *See Minkler*, 49 Cal. 4th at 321; *E.M.M.I.*, 32 Cal. 4th at 473 (emphasis added); *accord Safeco*, 26 Cal. 4th at 763; *Ins. Co. of N. Am.*, 67 Cal. 2d at 689.  At a bare minimum, Universal's interpretation is *a* plausible interpretation, and therefore Universal's interpretation controls.  *Id.*

Accordingly, based on black letter insurance law and the undisputed evidence in this case, Universal's Motion should be granted.

**J.      Universal Suffered A Loss Falling Within The Scope Of The Extra Expense Coverage**

Universal established in its Motion (p. 9) that the *Dig* Claim falls within the scope of coverage of the Policy which, by its terms, covers those extra expenses

Mitchell
Silberberg &
Knupp LLP

23

associated with interruption, postponement, or relocation of an Insured Production as a result of "imminent peril."  SUF ¶ 10.  Atlantic has admitted that the facts and circumstances that caused the postponement and move of the *Dig* production constitute "imminent peril."  *Id*. ¶¶ 52, 54, 56.  And, even without Atlantic's admission, there can be no dispute that Hamas' launching of rockets into Israel during July 2014 constituted imminent peril.  *Id*. ¶¶ 29-32, 35-45.

In its opposition, Atlantic does not dispute that "imminent peril" existed in July 2014.  Opp., pp. 24-25.  Instead, Atlantic argues that Universal must also establish that its "imminent peril" was "unexpected, sudden, or accidental" and that Universal has not done so.  *Id*.; *see* SGI ¶ 95 (Insuring Clause No. 1:  "The loss must be a direct result of an unexpected, sudden or accidental occurrence entirely beyond your control to include: . . . (g) Imminent peril, defined as certain, immediate and impending danger of such probability and severity to persons or property that it would be unreasonable or unconscionable to ignore.").

Bizarrely, Atlantic argues that Hamas' rocket attacks were "sudden [and/or] unexpected" if you label them as acts of "war," but not "sudden [and/or] unexpected" if you label them as acts of "terrorism."  Opp., pp. 24-25.  This makes no sense.  The objective characteristics of an event are immutable, and do not change based on the label applied to them after the fact.  Here, Hamas' launching of rockets was objectively "unexpected [and/or] sudden," regardless of its characterization as terrorism (which it was) or a "war" (which it was not).  As Universal established, the *Dig* pilot episode commenced filming in Israel on June 2, 2014, and before June 2, conditions in Israel were considered safe for filming.  SUF ¶¶ 29, 30.  No one "expected" Hamas' subsequent kidnapping and murder of three Israeli teenagers, or Hamas' barrage of rockets to terrorize Israelis to retaliate for the allegations that Hamas murdered the teens.  *Id*. ¶¶ 31, 32, 35-45.  The fact that it is common knowledge that terrorist attacks sometimes occur in Israel does not change this analysis.

Mitchell
Silberberg &
Knupp LLP

24

1    In any event, under the terms of the Policy, an event of "imminent peril" is

2 by definition "unexpected, sudden, or accidental."  That is because Insuring Clause

3 No. 1 provides that a loss is covered if it is the "direct result of an unexpected,

4 sudden or accidental occurrence beyond your control *to include*:," and then

5 enumerates a series of eight examples of such qualifying losses, including

6 "imminent peril."  ECF No. 61-10 (Ex. 18, p. 65) (emphasis added).  Each of those

7 examples, including "imminent peril," therefore must qualify as a covered loss.

8 Thus, Atlantic's admission that the events in Israel constituted "imminent peril" is

9 also an admission that the events were "unexpected, sudden or accidental."

10    Indeed, elsewhere in its opposition Atlantic concedes that terrorist acts *are*

11 within the "imminent peril" coverage of the Policy and, thus, within the coverage

12 of Insuring Clause No. 1.  Opp. pp. 18-19 ("Though the 'imminent peril' coverage

13 could theoretically apply to threats of terrorism (car bomb threats, for example), it

14 does not exist for that sole purpose").  And Atlantic's President, Mr. Williams, also

15 testified that the Policy covers terrorist acts.  *See* SUF ¶¶ 13, 23.

16    Based on the foregoing, Universal fully satisfied its burden to prove that the

17 *Dig* Claim is within the scope of the extra expense coverage of the Policy.  On the

18 other hand, as a matter of law, Atlantic cannot meet its burden to prove that the

19 *Dig* Claim is excluded from coverage by any of the War Exclusions.

20 **IV.   CONCLUSION**

21    For the foregoing reasons, and for the reasons stated in Universal's Motion,

22 none of the War Exclusions apply to preclude coverage of the *Dig* Claim.

23 Universal's Motion should therefore be granted.

24    Respectfully submitted,

25 DATED:  May 8, 2017           MITCHELL SILBERBERG & KNUPP LLP

26                              By:  /S/ Lucia E. Coyoca

27                                  Lucia E. Coyoca
                                   Attorneys for Plaintiffs Universal Cable
28                                 Productions LLC and Northern Entertainment
                                   Productions LLC

Mitchell
Silberberg &
Knupp LLP

25