Case 1:03-cv-06978-GBD-SN Document 104-2 Filed 03/10/04 Page 11 of 50
Case 2:16-cv-04435-PA-MRW Document 108-3 Filed 05/16/17 Page 1 of 205 Page ID
#:11162

for-profit and ostensible charitable organizations within the United States, commonly known as the SAAR Network, the majority of which maintained offices at 555 Gross Street, Herndon, VA. The SAAR Network of businesses and charities was created to provide funding, money laundering and other material support to terrorist organizations, including al Qaida. In March of 2003, federal authorities executed search warrants at the offices of IIRO in Washington, DC, in connection with an ongoing federal investigation of the illegal activities of the Northern Virginia and Washington based charities and for-profit enterprises within the SAAR Network. Through that investigation, the details of which are further discussed herein, federal authorities determined that the IIRO and MWL offices in Washington, DC provided funding and material support to al Qaida and Hamas.

147. The IIRO further sponsored al Qaida through its participation in the Saudi Joint Relief Committee. As set forth previously, the SJRC offices in Pristine, Kosovo served as a cover for al Qaida operatives. Furthermore, between 1998 and 2000, the Kingdom of Saudi Arabia, through SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with SJRC bureaus.

148. As the forgoing demonstrates, IIRO has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

149. The September 11th Attack was a direct, intended and foreseeable product of IIRO's participation in al Qaida's jihadist campaign.

## WORLD ASSEMBLY OF MUSLIM YOUTH

150. World Assembly of Muslim Youth (WAMY) is a subsidiary body of the MWL, with more than 60 offices throughout the world.

EXHIBIT 9, PAGE 1466

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 12 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 2 of 205   Page ID
#:11163

151.     Like the MWL, WAMY is an agency, instrumentality and organ of the Kingdom of Saudi Arabia. The Kingdom controls and directs WAMY operations, appoints and terminates WAMY personnel, provides WAMY with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls WAMY's operations. In many countries, WAMY conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

152.     As set forth previously, senior officials of the MWL have expressly acknowledged that the MWL and its subsidiary bodies are agencies, instrumentalities and organs of the Kingdom of Saudi Arabia.

153.     WAMY has long acted as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

154.     Through its offices in Peshawar, Pakistan, WAMY has provided extensive support to al Qaida operatives, Afghan warlords and al Qaida affiliated Khasmiri terrorists. In November 2001, Pakistani intelligence officials, operating in conjunction with the Federal Bureau of Investigation, raided WAMY's Peshawar, Pakistan offices, based on its suspected ties to al Qaida militants. The close relationship between that WAMY office and al Qaida was vividly confirmed shortly after the search, when an employee of the office hand-delivered a recorded message from Osama bin Laden to the local media.

155.     According to Indian officials, Nazir Qureshi, an Assistant Secretary General of WAMY, has supplied money and other assets to Khasmiri terrorist groups associated with al Qaida.

EXHIBIT 9, PAGE 1467

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 13 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 3 of 205   Page ID
#:11164

156.    Mohammed Ayyub Thukar, President of the World Khasmir Freedom
Movement and a principal financier of the al Qaida affiliated Hizbul Mujihadeen, served
as a WAMY official during exile in Saudi Arabia.

157.    WAMY has provided military training to prospective jihadists, and
members of the organization have fought under Gulbadin Hekmatyar's Hizb e Islami in
Afghanistan. On February 19, 2003, the United States government designated
Hekmatyar pursuant to Executive Order 13224, based on his affiliation with al Qaida.

158.    Philippine authorities are currently investigating links between WAMY's
offices in the Far East and al Qaida operations in the region.

159.    WAMY also has served as a distribution channel for training
documentation between the al Qaida leadership in Afghanistan and operational cells
throughout the world. When he was arrested in 1992, Ahmed Ajaj, who was
subsequently convicted for his role in the 1993 World Trade Center bombing, had in his
possession an al Qaida Manual entitled "*Military Lessons In The Jihad Against The
Tyrants*" which detailed how to establish and maintain clandestine operational sales. The
manual was distributed to Ajaj by WAMY. The same manual was subsequently
recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in
1998.

160.    In 1992, Abdullah Bin Laden, Osama bin Laden's brother, established a
WAMY office within the United States, in Falls Church, Virginia. At least through 1998,
Abdullah Bin Laden served as the president of WAMY's U.S. operations. WAMY's
U.S. office was part of the SAAR Network of businesses and charities created to provide
funding, money laundering and other material support to terrorist organizations, including
al Qaida. WAMY's U.S. operations were raided by federal authorities in conjunction

63

EXHIBIT 9, PAGE 1468

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 14 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 4 of 205   Page ID
#:11165

with the ongoing investigation of the SAAR Network's material sponsorship of al Qaida and affiliated FTOs.

161.    WAMY also has provided financial support to the U.S. based Council on American Islamic Relations (CAIR), a civil rights organization which received its initial seed money from the Holy Land Foundation for Relief and Development.  On December 4, 2001, the Treasury Department listed Holy Land Foundation for Relief and Development as a specially designed terrorist pursuant to Executive Order 13224.

162.    WAMY has also supported al Qaida affiliated extremists through its participation in the Islamic Coordination Council, an umbrella organization established in Peshawar, Pakistan in 1985 to coordinate and maximize the funding of the mujihadeen in Afghanistan.  Other members of the ICC included HRO, Saudi Red Crescent and Qatar Charitable Society.  Following the withdrawal of Soviet forces from Afghanistan, the ICC continued to sponsor mujhadeen elements which joined Osama Bin Laden's al Qaida.

163.    WAMY further sponsored al Qaida through its participation in the SJRC. As set forth previously, the SJRC offices in Pristine, Kosovo served as a cover for al Qaida operatives.  Furthermore, between 1998 and 2000, the Kigdom of Saudi Arabia, through SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with SJRC bureaus.

164.    WAMY is closely affiliated with defendant BIF.  In fact, WAMY and BIF shared a common address in Peshawar, Pakistan, and frequently shared common officers and directors.  As outlined in further detail herein, BIF long has provided material support and resources to al Qaida.

64

EXHIBIT 9, PAGE 1469

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 15 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 5 of 205   Page ID
#:11166

165.   As the forgoing demonstrates, WAMY has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

166.   The September 11th Attack was a direct, intended and foreseeable product of WAMY's participation in al Qaida's jihadist campaign.

## AL HARAMAIN ISLAMIC FOUNDATION

167.   Defendant al Haramain Islamic Foundation (al Haramain) is a Saudi Arabia-based ostensible charity, with branch offices in approximately 49 countries.

168.   Al Haramain is an agency, instrumentality and organ of the Kingdom of Saudi Arabia. The Kingdom controls and directs al Haramain operations, appoints and terminates al Haramain personnel, provides al Haramain with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls al Haramain's operations. In many countries, al Haramain conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

169.   Al Haramain officials have acknowledged that their operations are under the control and direction of the Kingdom of Saudi Arabia. According to al Haramain's general director, Sheik Aqeel al-Aqeel, "we work under the supervision of Saudi government." Al-Aqeel has also acknowledged that more than 95% of al Haramain's funding comes directly from the Kingdom of Saudi Arabia. In an August 25, 2002 report posted on al Haramain's website, the Chairman of the Africa Committee of al Haramain, al-Sheikh Muhmad al Tujri, declared that al Haramain's activities in Kenya were under the "direct supervision" of the Saudi embassy in that country. A separate report on al

65

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 16 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 6 of 205   Page ID
#:11167

Haramain's website that month indicated that the Saudi Interior Minister had directed the organization to provide assistance to Afghani refugees.

170.    Al Haramain has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

171.    International investigations have confirmed al Haramain's direct complicity in al Qaida's operations and attacks throughout the world. On March 11, 2002, the United States designated the Bosnia and Herzegovina branches of al Haramain, based on their extensive and pervasive involvement in the funding of al Qaida's activities in those two countries. In describing the close links between the two al Haramain offices and terrorist activity, the United Nations Security Counsel Committee Concerning al Qaida and the Taliban succinctly stated as follows:

> The Somalia and Bosnia branches had been directly implicated in al Qaida funding activities. Al Haramain Somalia had funneled money to al-Ittihad al-Islami, a designated terrorist group, by disguising the funds as contributions for an orphanage project and for Islamic School and Mosque construction. The Bosnia office was linked to al-Jemaah al-Islamiyah, al-Masriyah and to Osama Bin Laden.

172.    On January 22, 2004, the United States designated the al Haramain branches in Indonesia, Kenya, Tanzania and Pakistan as well. The Indonesian Office of al Haramain had diverted funds to al Qaida affiliated terrorists for weapons procurement, and directly funded the deadly October 12, 2002 Bali nightclub bombing. According to Omar al-Faruq, a senior al Qaida official apprehended in Southeast Asia, al Haramain served as a primary source of al Qaida funding throughout Southeast Asia.

EXHIBIT 9, PAGE 1471

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 17 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 7 of 205   Page ID
#:11168

173.   In the press release issued in conjunction with the designation of the

Kenyan and Tanzanian offices of al Qaida, the Treasury Department described al

Haramain's extensive involvement in terrorist activity within Africa as follows:

- As early as 1997, U.S. and other friendly authorities were informed that the Kenyan branch of AHF was involved in plotting terrorist attacks against Americans. As a result, a number of individuals connected to AHF in Kenya were arrested and later deported by Kenyan authorities.
- In August 1997, an AHF employee indicated that the planned attack against the U.S. Embassy in Nairobi would be a suicide bombing carried out by crashing a vehicle into the gate of the Embassy. A wealthy AHF official outside East Africa agreed to provide the necessary funds. Information available to the U.S. shows that AHF was used as a cover for another organization whose priorities include dislike for the U.S. government's alleged anti-Muslim stance and purposed [sic] U.S. support for Christian movements fighting Islamic countries.
- Also in 1997, AHF senior activities in Nairobi decided to alter their (then) previous plans to bomb the U.S. Embassy in Nairobi and instead sought to attempt the assassination of U.S. citizens. During this time period, an AHF official indicated he had obtained five hand grenades and seven "bazookas" from a source in Somalia. According to the information available to the U.S., these weapons were to be used in a possible assassination attempt against a U.S. official.
- Information available to the U.S. shows that a former Tanzania AHF director was believed to be associated with UBL [Usama Bin Laden] and was responsible for making preparations for the advance party that planned the August 7, 1998 bombings of the U.S. Embassies in Dar Es Salaam, Tanzania, and Nairobi, Kenya. As a result of these attacks, 224 people were killed.
- Shortly before the dual-Embassy bombing attacks in Kenya and Tanzania, a former AHF official in Tanzania met with another conspirator to the attacks and cautioned the individual against disclosing knowledge of preparations for the attacks. Around the same time, four individuals led by an AHF official were arrested in Europe. At that time, they admitted maintaining close ties with EIJ and Gamma Islamiyah.
- Wadih-El-Hage, a leader of the East African al Qaida cell and personal secretary to UBL [Usama Bin Laden], visited the Kenya offices of AHF before the 1998 dual Embassy attacks. Searches conducted by authorities revealed that El-Hage possessed contact information for a senior AHF official who was head of AHF's Africa Committee, then overseeing authority for AHF's offices in Kenya and Tanzania.
- In early 2003, individuals affiliated with AHF in Tanzania discussed the status of plans for an attack against several hotels in Zanzibar. The scheduled

EXHIBIT 9, PAGE 1472

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 18 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 8 of 205   Page ID
#:11169

attacks did not take place due to increased security by local authorities, but planning for the attacks remained active.

- Information made available to the U.S. shows that AHF offices in Kenya and Tanzania provided support, or act for or on behalf of al Qaida and AIM.

174. The Pakistan office of al Haramain provided funding and logistical support for the acquisition and delivery of Zenit missiles, Sting anti-aircraft missiles, and hand held anti-tank weapons to al Qaida and al Qaida affiliated militants. In addition, the Pakistan office was closely associated with Makhtab al-Khidmat, the organization co-founded by Osama Bin Laden to support the Jihad against the Soviets in Afghanistan. In 2000, the Director of Makhtab al-Khidmat instructed that funds be deposited into al Haramain accounts in Pakistan, and from there transferred to other accounts.

175. Al Haramain has also sponsored al Qaida activity within Europe, through the al Nur Mosque. According to German officials, the al Nur Mosque served as a meeting place, recruitment center and base of operations for al Qaida within Germany. At the direction of the Kingdom of Saudi Arabia, al Haramain contributed in excess of $1 million dollars to the Mosque, funding the purchase of the land for the Mosque as well as its construction.

176. Al Haramain also sponsored al Qaida operations in Chechnya and Kosovo through its participation in the Saudi Joint Relief Committee. As set forth previously, the SJRC offices in Pristine, Kosovo served as a cover for al Qaida operatives. Furthermore, between 1998 and 2000, the Kigdom of Saudi Arabia, through SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with SJRC bureaus.

177. On February 19, 2004, in conjunction with its ongoing investigation of Al Haramain's extensive involvement in al Qaida's global operations, federal officials executed a search warrant against property purchased on behalf of Al Haramain in the United States, located in Ashland, Oregon. The search was conducted pursuant to a

EXHIBIT 9, PAGE 1473

Case 1:03-cv-06978-GBD-SN Document 104-2 Filed 03/10/04 Page 19 of 50
Case 2:16-cv-04435-PA-MRW Document 108-3 Filed 05/16/17 Page 9 of 205 Page ID
#:11170

criminal investigation into violations of the Internal Revenue Code, Money Laundering Control Act and Bank Secrecy Act.

178.    As the forgoing demonstrates, al Haramain has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

179.    The September 11th Attack was a direct, intended and foreseeable product of al Haramain's participation in al Qaida's jihadist campaign.

### SAUDI HIGH COMMISSION

180.    The Saudi High Commission is a Saudi Arabia-based charity, established by Prince Slaman bin Abdul Aziz al Saud.

181.    The Saudi High Commission is an agency, instrumentality and organ of the Kingdom of Saudi Arabia. The Kingdom controls and directs Saudi High Commission operations, appoints and terminates Saudi High Commission personnel, provides the Saudi High Commission with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls the Saudi High Commission's operation. In many countries, the Saudi High Commission conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

182.    The Saudi High Commission has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

183.    According to Bosnian officials, al Qaida mujihadeen fighters began entering Bosnia-Herzegovina in 1992, frequently disguised as relief workers for the Saudi High Commission.

69

EXHIBIT 9, PAGE 1474

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 20 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 10 of 205   Page ID
#:11171

184.    For the next ten years, the Saudi High Commission funneled millions of dollars to al Qaida operations in Bosnia. To this date, investigators have been unable to account for approximately $41 million donated to the charity.

185.    In September 2000, Prince Salman received a letter from a Bosnian association called the "Mothers of Srebrenica and Podrinje" advising Prince Salman that funds donated to the Saudi High Commission were being improperly diverted.

186.    In October 2001, officials of the U.S. government raided the Sarajevo offices of the Saudi High Commission. During the raid, investigators found computer hard drives with photographs of the World Trade Center before and after its collapse, as well as photographs of the United States embassies in Kenya and Tanzania and the U.S.S. Cole. Investigators also discovered files on pesticides and crop dusters, information about how to make fake state department badges, and photographs and maps of Washington, marking prominent government buildings.

187.    Following the raid, the Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance described the Saudi High Commission as a front for radical and terrorism-related activities, stating:

> Members of the SFOR (stabilization forces) have on
> premises on the Saudi high commission relief for Bosnia
> and Herzegovina confiscated some documentation for
> which it can be claimed with certainty that it does not
> belong in the scope of work of a humanitarian organization
> . . .

188.    As the forgoing demonstrates, the Saudi High Commission has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

EXHIBIT 9, PAGE 1475

Case 1:03-cv-06978-GBD-SN  Document 104-2  Filed 03/10/04  Page 21 of 50
Case 2:16-cv-04435-PA-MRW  Document 108-3  Filed 05/16/17  Page 11 of 205  Page ID
#:11172

189.    The September 11th Attack was a direct, intended and foreseeable product of Saudi High Commission's participation in al Qaida's jihadist campaign.

## SAUDI RED CRESCENT SOCIETY

190.    The Saudi Red Crescent Society (Saudi Red Crescent) is a Saudi Arabia-based ostensible charity, which conducts operations throughout the world.

191.    The Saudi Red Crescent is an agency, instrumentality and organ of the Kingdom of Saudi Arabia.  The Kingdom controls and directs Saudi Red Crescent operations, appoints and terminates Saudi Red Crescent personnel, provides the Saudi Red Crescent with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls the Saudi Red Crescent's operation.  In many countries, the Saudi Red Crescent conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

192.    The Saudi Red Crescent has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

193.    Throughout the 1980's the Saudi Red Crescent provided extensive financial and logistical support to the mujihadeen in Afghanistan.  During this time, the Saudi Red Crescent was populated and run by Islamic militants who would become the future founders of al Qaida.  Indeed, Wa'el Julaidan served as an officer of the Saudi Red Crescent for many years, and continued to fill that role following the establishment of al Qaida.  Ayman-Zawahiri, al Qaida's second in command, joined the Saudi Red Crescent in 1985.  In 1995, he presented himself as a representative of the Saudi Red Crescent and raised $500,000 in the San Francisco area.

71

EXHIBIT 9, PAGE 1476

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 22 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 12 of 205   Page ID
#:11173

194.   Following the withdrawal of Soviet troops from Afghanistan, the Saudi Red Crescent redirected its efforts towards the fulfillment of the objectives of the newly established al Qaida movement.

195.   The Saudi Red Crescent's integral role in the growth and development of the nascent al Qaida movement has been confirmed by documents seized in Bosnia and Herzegovina, during the searches of the BIF's offices. As set forth previously, during those searches, investigators recovered a list of orders from Osama Bin Laden regarding the management of Islamic charities. On point 10 of his list, Bin Laden urges the creation of a committee to receive and distribute donations to al Qaida, and suggests the participation of the Saudi Red Crescent, Rabita Trust and the Relief Agency.

196.   During that same search, investigators found a letter on Saudi Red Crescent stationary to Abu Rida, another founding member of al Qaida, requesting that "weapons be inventoried." At the bottom of the letter is a note from Osama Bin Laden to Wa'el Julaidan stating that al Qaida has an extreme need for weapons.

197.   Saudi Red Crescent employees have repeatedly been implicated in al Qaida attacks and plots. In 1996, two Sudanese members of the Saudi Red Crescent, Muhammed Ali Syad and Bashir Babar Quadim, were arrested in connection with the 1995 Egyptian Embassy bombing in Pakistan.

198.   In 2001, two administrators for the Saudi Red Crescent in Bosnia, Boumediene Lakhdar and Nechle Mohammed, were arrested for plotting terrorist attacks against the U.S. and British Embassies in Sarajevo.

199.   In October of 2001, Pakistan deported several dozen representatives of the Saudi Red Crescent, after confirming their affiliation with al Qaida.

72

EXHIBIT 9, PAGE 1477

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 23 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 13 of 205   Page ID
#:11174

200.    The Saudi Red Crescent further sponsored al Qaida through its participation in the SJRC. As set forth previously, the SJRC offices in Pristine, Kosovo served as a cover for al Qaida operatives. Furthermore, between 1998 and 2000, the Kigdom of Saudi Arabia, through SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with SJRC bureaus.

201.    As the forgoing demonstrates, Saudi Red Crescent has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

202.    The September 11th Attack was a direct, intended and foreseeable product of Saudi Red Crescent's participation in al Qaida's jihadist campaign.

## SAUDI JOINT RELIEF COMMITTEE FOR KOSOVO AND CHECHNYA

203.    As set forth previously, the Saudi Joint Relief Committee (SJRC) is a body established by the Kingdom of Saudi Arabia to coordinate ostensible relief efforts among several charitable organizations under its control and direction in Kosovo and Chechnya. The purported charities comprising the SJRC include the IIRO, Saudi Red Crest Society, WAMY, al Haramain Foundation, and Islamic Endowments and Makk Establishment, among others.

204.    Between 1998 and 2000, the Kingdom of Saudi Arabia, through SJRC, diverted more than $74 million dollars to al-Qaida members and loyalists affiliated with SJRC bureaus. Throughout this time, the committee was under the supervision and control of Saudi Interior Minister Prince Naif Bin Abdul Aziz.

205.    The United Nation's mission in Kosovo has declared that the SJRC office in Pristina, Kosovo, served as a cover for several al-Qaida operatives, including Adel

EXHIBIT 9, PAGE 1478

Case 1:03-cv-06978-GBD-SN  Document 104-2  Filed 03/10/04  Page 24 of 50
Case 2:16-cv-04435-PA-MRW  Document 108-3  Filed 05/16/17  Page 14 of 205  Page ID
#:11175

Muhammad Sadi Bin Kazam and Wa'el Hamza Julaidan, both of whom served as Directors of SJRC.

206.    As the forgoing demonstrates, SJRC has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

207.    The September 11th Attack was a direct, intended and foreseeable product of SJRC's participation in al Qaida's jihadist campaign.

### RABITA TRUST

208.    Defendant Rabita Trust is a subsidiary body of the MWL, with headquarters in Lahore, Pakistan and offices throughout the world.  Rabita Trust is an agency, instrumentality and organ of the Kingdom of Saudi Arabia.  The Kingdom controls and directs Rabita Trust operations, appoints and terminates Rabita Trust personnel, provides Rabita Trust with virtual all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls Rabita Trust operations.  In many countries, Rabita Trust conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

209.    As set forth previously, senior officials of the MWL have expressly acknowledged that the MWL and its subsidiary bodies are agencies, instrumentalities and organs of the Kingdom of Saudi Arabia.

210.    Rabita Trust has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

211.    Rabita Trust's direct participation in al Qaida's operations dates to the establishment of Bin Laden's terrorist movement, as confirmed by the internal al Qaida

74

Case 1:03-cv-06978-GBD-SN    Document 104-2    Filed 03/10/04    Page 25 of 50
Case 2:16-cv-04435-PA-MRW    Document 108-3    Filed 05/16/17    Page 15 of 205    Page ID
#:11176

document recovered from BIF's computer files in which Osama bin Laden suggests Rabita Trust's involvement in a committee to collect and distribute funds to al Qaida.

212.    Rabita Trust's material sponsorship of al Qaida has been facilitated by the direct participation of senior al Qaida officials in the management and operation of Rabita Trust. In fact, Rabita Trust was, for several years prior to September 11, 2001, headed by al Qaida founding member Wa'el Hanza Julaidan.

213.    In addition, Rabita Trust has shared common officers and directors with several other charities operating within al-Qaida's infrastructure, including the MWL and SAAR Network of charities and businesses. Abdullah Omar Naseef served as a Chairman of Rabita Trust and as Secretary General of the MWL. Naseef is also an Officer of Makkahl-Mukarramah, Inc., a Virginia based charity operating within the SAAR network. The Vice Chairman of the Board of Trustees of Rabita Trust, Abdullah al-Obaid, also served as an Officer of the MWL and Sanabell al-Kheer organizations within the SAAR network. Al-Obaid also serves as a Senior Executive of al-Watania Poultry in Saudi Arabia, one of the many businesses owned by Suleiman Abdel Aziz al-Rajhi, the founder of the SAAR Network, member of the Board of Directors of IIRO, CEO of al Rajhi Banking and Investment and a defendant herein.

214.    Given its pervasive and ongoing involvement in al-Qaida's operations, and the direct participation of senior al Qaida officials in its management, the United States government designated Rabita Trust as a Specially Designated Global Terrorist on October 12, 2001 pursuant to Executive Order 13224.

215.    As the forgoing demonstrates, Rabita Trust has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

EXHIBIT 9, PAGE 1480

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 26 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 16 of 205   Page ID
#:11177

216.   The September 11th Attack was a direct, intended and foreseeable product of Rabita Trust's participation in al Qaida's jihadist campaign

## GLOBAL RELIEF FOUNDATION

217.   Defendant Global Relief Foundation is an ostensible charity organized under the law of Illinois in 1992.

218.   On October 18, 2002, the United States government designated Global Relief Foundation under the authority of Executive Order 13224.  Prior to that designation and the consequent blocking of its assets, Global Relief Foundation had long acted as a fully integrated component of al-Qaida's logistical and financial support infrastructure, and provided material support and resources to al-Qaida and affiliated FTOs

219.   In the press release issued in conjunction with the designation of Global Relief Foundation, the Treasury Department described Global Relief Foundation extensive and long-term involvement in furthering the objectives of the al-Qaida movement as follows:

> TREASURY DEPARTMENT FACT SHEET ON THE
> GLOBAL RELIEF FOUNDATION
>
> The Global Relief Foundation (GRF), also known as
> Fondation Secores Mondial (FSM), and its officers and
> directors have connections to, and have provided support
> for and assistance to, Usama Bin Laden (UBL), al Qaida,
> and other known terrorist groups.  These includes groups
> previously designated by the United States under President
> Bush's September 2001 Executive Order 13224 regarding
> terrorism and included on the United Nation's 1267
> Sanctions Committee's consolidated list of individuals and
> entities whose assets are required to be frozen pursuant to
> UN Security Council Resolutions (UNSCRs) 1267 and
> 1390.

EXHIBIT 9, PAGE 1481

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 27 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 17 of 205   Page ID
#:11178

Links to UBL and al-Qaida:

Rabih Hadad, a senior GRF official who co-founded GRF and served as its President throughout the 1990s and in the year 2000, worked for Makhtab al-Khidamat (MAK) in Pakistan in the early 1990s. MAK was co-founded by Sheik Abdullah Azzam and UBL in the 1980s and served as the precursor organization to al Qaida. MAK was designated by President Bush in E.O. 13224 and was subsequently included on the UN 1267 Sanctions Committee's consolidated list. The organization has helped funnel fighters and money to the Afghan resistance in Peshuwar, Pakistan, and establish recruitment centers worldwide to fight the soviets. Azzam, who served as a mentor to UBL, was killed in 1989. He is also regarded as a historical leader of HAMAS, which was designated under E.O. 13224. At a recent immigration hearing, Haddad conceded that he met Azzam in Pakistan and characterized him as a "hero."

In addition, GRF has provided financial and other assistance to, and received funding from, individuals associated with al Qaida. Mohammad Galeb Kalaje Zouaydi, a suspected financier of al Qaida's worldwide terrorist efforts, was arrested in Europe in April 2002. GRF has admitted receiving funds from Zouaydi.

GRF and FSM personnel had multiple contacts with Wadih El-Hage, UBL's personnel secretary when UBL was in Sudan. El-Hage was convicted in a U.S. District Court in May 2001, for his role in the UBL-directed 1998 bombings of the U.S. embassies in Kenya and Tanzania. At the time that El-Hage was playing an active role in an al-Qaida terrorist cell in Kenya, he was in contact with GRF. For example, documents recovered from a search in Kenya indicated that El-Hage was in contact with GRF after he returned from visiting al Qaida leadership in Afghanistan in February 1997. GRF has acknowledged that El-Hage and Nabil Sayadi, FSM's director in Belgium, were in contact during this period.

Links to Taliban and Other Entities and Background:

A GRF employee also dealt with officials of the Taliban, which at the time was an entity subject to U.S. Sanctions pursuant to United States E.O. 13129 (prohibiting trade and

77

EXHIBIT 9, PAGE 1482

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 28 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 18 of 205   Page ID
#:11179

most transactions with the Taliban because it provided a safe haven and base of operations for UBL and al-Qaida) and subject to international sanctions pursuant to UNSCs 1267 and 1333. In November 2001, during the air strikes in Afghanistan, a GRF medical relief coordinator traveled to Kabul, against the advice of the U.S. Department of State, and engaged in dealings and negotiations with Taliban officials until the collapse of the Taliban regime.

A set of photographs and negatives discovered in 1997 in a trash dumpster outside of GRF's office in Illinois depict large shipping boxes displayed under a GRF banner. The boxes were full of sophisticated communications equipment, including approximately 200 handheld radio transceivers, long-range radio antennas, and portable power packs, with an estimated total value of $120,000. Other photographs depict fighters armed with automatic rifles, a sandbagged bunker with a radio antenna mounted outside, and mutilated corpses with the name "KPI" (Kashmir Press International) printed alongside. Yet another photograph displays two dead men with the caption "Hizbul Mujahideen," a known terrorist organization operating in the Kashmir region. On the reverse side of the photograph was handwritten in Arabic, "two martyrs killed by the Indian government."

GRF has stocked and promoted audiotapes and books authored by Sheik Abdullah Azzam, discussed above, which glorify armed jihad, including "The international conspiracy against Jihad" and "The Jihad in its present stage." Despite Azzam's terrorist background, GRF has enthusiastically promoted Azzam's materials to the public: "His [Azzam's] theology is a sea, his words are jewels, and his thoughts are a light for those who are holding the smoldering embers. He lived the Jihad experiences of the 20[th] century in Afghanistan… and Palestine, and produced a new theory for saving the [Islamic] nation from disgrace, shame, weakness, and submission to others."

GRF has published several Arabic newsletters and pamphlets that advocate armed action through jihad against groups perceived to be un-Islamic. For example, one 1995 GRF pamphlet reads, "God equated martyrdom through JIHAD was supplying funds for the JIHAD effort. All contributions should be mailed to: GRF." Another GRF newsletter requested donations "for God's cause – they [the Zakat funds] are disbursed for equipping the raiders, for the

78

EXHIBIT 9, PAGE 1483

Case 1:03-cv-06978-GBD-SN Document 104-2 Filed 03/10/04 Page 29 of 50
Case 2:16-cv-04435-PA-MRW Document 108-3 Filed 05/16/17 Page 19 of 205 Page ID
#:11180

purchase of ammunition and food, and for their [the Mujahideen's] transportation so that they can raise God the Almighty's word… it is likely that the most important of disbursement of Zakat in our times is on the jihad for God's cause…"

GRF received $8,521.00 from The Holy Land Foundation for Relief and Development (HLF) in 2000. HLF, a Dallas, Texas base Islamic charitable organization, was designated under E.O. 13224 on December 4, 2001, and under the European Union's regulation (EC) No. 2580/2001 on June 17, 2002, for its ties to terrorism. HLF's designation was upheld in a recent decision by a U.S. District Court.

220. As the forgoing demonstrates, Global Relief Foundation has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

221. The September 11th Attack was a direct, intended and foreseeable product of Global Relief's participation in al Qaida's jihadist campaign.

## THE SAAR NETWORK

222. Beginning in the 1980s, several prominent and wealthy sponsors of al Qaida's global jihad began establishing a network of interrelated ostensible charities, think tanks and for-profit businesses within the United States, commonly referred to as the "SAAR Network," to generate and surreptitiously transfer funds to terrorist organizations, including al-Qaida.

223. Many of the organizations within the SAAR Network were established and funded by, or closely affiliated with, defendant Suleiman Abdul Aziz al Rajhi, including SAAR Foundation, SAAR International, Safa Group, Mar-Jac Poultry, Mar-Jac Holdings, Inc., Safa Trust, Inc. and Aradi, Inc.

224. By September 11, 2001, more than one hundred ostensible charities and for-profit businesses functioned under the umbrella of the SAAR Network, including the

79

EXHIBIT 9, PAGE 1484

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 30 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 20 of 205   Page ID
#:11181

U.S. branches of the MWL, IIRO and WAMY. Other organizations operating within the SAAR Network included defendants African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investment, Inc., Mena Corporation, Reston Investments, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., Success Foundation and York Foundation.

225.    Many of the organizations operating within the SAAR Network are related by common management and parent/subsidiary relationships. The vast majority of the entities within the Network maintained no physical presence at their purported principal place of business.

226.    The entities operating within the SAAR Network have long acted as fully integrated components of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

227.    On March 20 and 21, 2002, federal authorities raided the offices of the SAAR Network entities, the vast majority of which were located at a single address in Herndon, Virginia, as well as the residences of several prominent SAAR Network officials, pursuant to a search warrant issued by the United States District Court for the Eastern District of Virginia.

228.    The ongoing investigation of the SAAR network entities, which prompted the March 2002 searches, has revealed that SAAR entities' funds have been transferred to Youssef Nada and Ahmed Idris Nasreddin, both of whom have been designated under Executive Order 13224 based on their material support and sponsorship of al-Qaida. The funds were transferred through Bank al-Takwa and Akida Bank Private Ltd., two Bahamas based banks controlled by Nada and Nasreddin. Both of those banks have been designated by the U.S. government pursuant to Executive Order 13224, based on their

EXHIBIT 9, PAGE 1485

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 31 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 21 of 205   Page ID
#:11182

involvement in financing radical groups throughout the world, including Hamas and al Qaida, both before and after the September 11th attack.

229.    The ongoing investigation of the SAAR Network has also revealed that SAAR entities, including the U.S. branch of the IIRO and Sana-bell, Inc., engaged in financial transactions with Bait Ul-mal, Inc., (BMI, Inc.) an Islamic investing firm established by defendant Soliman Biheiri in New Jersey in 1996.  According to federal authorities, BMI and its affiliates have transferred funds to terrorists and terrorist organizations, including al Qaida, Yasin al-Qadi, Musa Abu Marzook, Mohammad Salah and Hamas.

230.    During the course of the federal investigation into BMI's financing of terrorism, a BMI accountant contacted an FBI agent and stated that "funds the accountant was transferring overseas on behalf of the company may have been used to finance the Embassy bombings in Africa."

231.    As the forgoing demonstrates, the SAAR Network has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

232.    The September 11th Attack was a direct, intended and foreseeable product of the SAAR Network's participation in al Qaida's jihadist campaign.

### BLESSED RELIEF (MUWAFAQ) FOUNDATION

233.    The Blessed Relief Foundation, also known as the Muwafaq Foundation, is an ostensible charity established by defendant Yasin al-Qadi.

234.    Blessed Relief has long acted as a fully integrated component of al-Qaida's financial and logistical infrastructure, and provided material support and resources to al-Qaida and affiliated FTOs.  According to the U.S. government, the

81

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 32 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 22 of 205   Page ID
#:11183

Blessed Relief Foundation is a front organization through which wealthy Saudis send millions of dollars to al Qaida.

235.    On October 12, 2001, the United States government designated Yasin al-Qadi and the Blessed Relief Foundation under Executive Order 13224, based on their longstanding and integral role in advancing the al-Qaida movement.

236.    As the forgoing demonstrates, Blessed Relief Foundation has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

237.    The September 11th Attack was a direct, intended and foreseeable product of Blessed Relief Foundation's participation in al Qaida's jihadist campaign.

### TAIBAH INTERNATIONAL AID ASSOCIATION

238.    Taibah International Aid Association (Taibah) is a charitable organization headquartered in Falls Church, Virginia. Taibah was co-founded by Abdullah A. Bin Laden in 1991.

239.    Taibah International has long acted as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to al-Qaida and affiliated FTOs.

240.    Taibah International has been particularly active in furthering al Qaida's efforts to establish a base of operations in Bosnia. Mustafa al-Kadar, one of five al-Qaida members arrested in 2001 for plotting to attack the United States Embassy in Bosnia, gained entry into Bosnia and Bosnian citizenship rights based on his employment with Taibah International.

241.    Based on substantial evidence of pervasive involvement in al Qaida's activities within Bosnia, police raided the offices of Taibah International on December

EXHIBIT 9, PAGE 1487

Case 1:03-cv-06978-GBD-SN Document 104-2 Filed 03/10/04 Page 33 of 50
Case 2:16-cv-04435-PA-MRW Document 108-3 Filed 05/16/17 Page 23 of 205 Page ID
#:11184

13, 2001. The raid and subsequent investigation of Taibah International's financial records confirmed that Taibah International diverted donated funds to al Qaida and al Qaida affiliated militants in Bosnia.

242. The investigation further revealed that Taibah International facilitated the entry of al Qaida members into Bosnia by falsely claiming that those terrorists would be serving as employees for the organization in the region.

243. Within Bosnia, Taibah International worked closely with the Global Relief Foundation and Saudi High Commission, from which it received the vast majority of its funding.

244. Taibah International has been directly implicated in al Qaida operations outside of Bosnia as well, including the 1998 United States Embassy bombings in Kenya and Tanzania.

245. Samir Sala and Abdulrahman Alamoudi, two officers of Taibah International's United States branch, are intimately affiliated with several organizations within the SAAR network. According to Alamoudi's resume, he served as Executive Assistant to the President of SAAR Foundation between 1985 and 1990. Alamoudi also served as President of the Hajj Foundation and Secretary of Success Foundation.

246. On August 16, 2003, officials of Britain's National Terrorist Financial Investigations Unit detained Alamoudi when he attempted to travel from London, England to Damascus, Syria. A search of al-Amoudi's belongings conducted by United Kingdom customs officers discovered approximately $340,000 in sequentially numbered $100 dollar bills, two U.S. passports and one Yemeni passport.

247. Federal officials arrested Alamoudi when he returned to the United States on September 28, 2003. In an eighteen count indictment filed shortly thereafter, federal

83

EXHIBIT 9, PAGE 1488

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 34 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 24 of 205   Page ID
#:11185

authorities charged Alamoudi with engaging in prohibited financial transactions with the Libyan government, misuse of a passport, procuring naturalization by fraudulent means, and failure to report foreign bank accounts. According to federal officials, Alamoudi used his control of Taibah International, Success Foundation and the Happy Hearts Trust to funnel money to al Qaida through various al Qaida funds, including the designated terrorist organizations Global Relief Foundation and The Foundation for Human Rights and Humanitarian Relief, which supported al Qaida operatives associated with the millennium bombing plot.

248.    On December 15, 2001, FBI officials interviewed Ali Hamid el-Tayeb, and employee of Taibah International's Saraejvo, Bosnia office. El-Tayeb advised FBI officials that Mohamed el-Nagmy was, at that time, an employee of the Bosnian offices of both Taibah International and Global Relief Foundation.

249.    On December 14, 2001, Bosnian Federation Police searched the offices of Global Relief Foundation. The search confirmed Global Relief Foundation's sponsorship of al Qaida's activities in Bosnia and elsewhere. Accordingly, Bosnian officials shut down Global Relief Foundation's operations in the country.

250.    On February 21, 2002, FBI officials interviewed Mustafa Ait-Idar, another employee of Taibah's Bosnian offices, who confirmed that Taibah International assumed representation of Global Relief Foundation's interests after the Bosnian government closed Global Relief Foundation's offices in Bosnia.

251    As the forgoing demonstrates, Taibah International has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

EXHIBIT 9, PAGE 1489

Case 1:03-cv-06978-GBD-SN  Document 104-2  Filed 03/10/04  Page 35 of 50
Case 2:16-cv-04435-PA-MRW  Document 108-3  Filed 05/16/17  Page 25 of 205  Page ID
#:11186

252.    The September 11th Attack was a direct, intended and foreseeable product
of Taibah International's participation in al Qaida's jihadist campaign.

## AL QAIDA'S PARTNERS IN THE INTERNAIONAL BANKING SYSTEM

253.    During testimony before Congress, U.S. Treasury Department General
Counsel David Authauser estimated that al Qaida had an annual budget of approximately
$35 million in the years leading up to September 11, 2001.

254.    Like any global criminal enterprise, al Qaida's survival required that it
develop safe and efficient mechanisms to launder and distribute the funds required to
sustain its global operations to individuals and entities operating within its infrastructure
throughout the world.

255.    The scope of al Qaida's global operations, the number of entities operating
within its infrastructure, and the extent of its funding required that al Qaida resort to the
international banking system to facilitate the distribution and laundering of its funds.  At
the same time, al Qaida needed to avoid triggering any of the regulatory devices
developed by the international banking system to identify money laundering and illicit
financial transactions.

256.    Al Qaida gained access to the international banking system, and concealed
the illicit nature of the transactions it conducted through that system, by establishing its
own financial institutions in under-regulated jurisdictions, and by establishing
relationships with banks operating within the Islamic banking system that shared al
Qaida's perverse worldview and were willing collaborators in its global jihad.

257.    Like the charity defendants, the financial institutions established by al
Qaida and its partner banks within the Islamic banking system operated as fully
integrated components of the al Qaida's financial and logistical infrastructure.  These

EXHIBIT 9, PAGE 1490

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 36 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 26 of 205   Page ID
#:11187

banks knowingly maintained accounts for individuals and organizations operating within al Qaida's infrastructure, and facilitated transfers between those entities. Many of these banks also directly funded al Qaida's global operations. Once deposited with or laundered through one of the banks operating within its infrastructure, al Qaida could move funds throughout the world by exploiting correspondent banking relationships.

258.    Absent the material support and sponsorship of the banks operating within its infrastructure, as further detailed herein, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global scale.

## THE AL TAQWA FINANCIAL NETWORK

259.    Bank Al Taqwa was established in 1988 by defendants Youssef Mustafa Nada and Ahmed Idris Nasreddin. Bank Al Taqwa is a close affiliate of Al Taqwa Management Organization, which changed its name in the spring of 2000 to the Nada Management Organization. Youssef Nada also controlled Al-Taqwa Trade, Property and Industry Company, Ltd., B.A. Taqwa for Commerce and Real Estate Company, Ltd., and Nada International Anstalt.

260.    In addition to his interest in Bank Al Taqwa, Ahmed Idris Nasreddin controlled the Mega-Malaysian Swiss, Gulf and African Chamber, Gulf Centre SRL, Nascoservice SRL, Nasco Business Residence Centre SAS, Nasreddin Company Nasco SAS, Nasreddin Foundation, Nascotex and Nasreddin International Group, Ltd. Holding.

261.    Defendants Nada and Nasreddin also maintained controlling interests in the Akida Bank.

86

EXHIBIT 9, PAGE 1491

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 37 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 27 of 205   Page ID
#:11188

262.    The corporations and organizations controlled by Nada and Nasreddin are

deeply intertwined, and have long provided financial services and other forms of material

support to al Qaida.

263.    Nada and Nasreddin serve on the Boards of each other's banks and

companies and, in many cases, operate those organizations from the same locations using

the same employees.  Nada and Nasreddin, and the companies they controlled, were

closely tied in with several Islamic charities and business ventures, which have been

linked to al Qaida financing, including the Milan Islamic Center, a major al Qaida

recruiting center in Europe.

264.    On November 7, 2001, the United States government designated Youssef

Nada, Bank Al Taqwa, its affiliated businesses and key executives, under Executive

Order 13224.  Thereafter, on April 19, 2002, the United States Government designated

Ahmed Idris Nasreddin pursuant to Executive Order 13224.

265.    On August 29, 2002, the United States Government designated an

additional fourteen companies associated with Nada and Nasreddin pursuant to Executive

Order 13224.

266.    In the press statement issued in conjunction with the August 29, 2002

designations, the Treasury Department stated as follows:

> Based on information available to Italy and the United
> States, Youssef Nada ("Nada") and Ahmed Idris Nasreddin
> ("Nasreddin"), through commercial holdings, operated an
> extensive financial network providing support for terrorist
> related activities.  In the case of Nada and Nasreddin, this
> involves an extensive conglomeration of businesses from
> which they derive their income or through which they
> conduct transactions.  Based on evidence of their support of
> terrorism, Nada and Nasreddin were previously designated
> by the international community as financiers of terror.
> Nada was designated by the United States on November 7,
> 2001, and by the United Nations on November 9, 2001.

87

EXHIBIT 9, PAGE 1492

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 38 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 28 of 205   Page ID
#:11189

Nasreddin was designated by the G7 on April 19, 2002, and by the United Nations on April 24, 2002.

Nasreddin's corporate holdings and financial network provide direct support for Nada and Bank Al Taqwa, which was also previously designated by the United State on November 7, 2001, and the United Nations on November 9, 2001. This designation of 14 additional entities owned or controlled by either Nada or Nasreddin will further restrict their assets and their network by precluding these companies from being used to provide funding or support for terrorism.

Nasreddin and Nada, who have worked closely together for many years, are both Directors of Bank Al Taqwa and the Akida Bank. Nada holds a controlling interest in Bank Al Taqwa and Nasreddin holds a controlling interest in Akida Bank. Bank Al Taqwa and Akida Bank are not functional banking institutions in the conventional sense. They are shell companies lacking a physical presence and sharing the same address in the Bahamas where they were licensed. For this reason, the licenses of Bank Al Taqwa and Akida Bank have been revoked by the Bahamian government.

Bank Al Taqwa, for which Nasreddin is a Director, was established in 1988 with significant backing from the Muslim Brotherhood. They have been involved in financing radical groups such as the Palestinian Hamas, Algeria's Islamic Salvation Front and Armed Islamic Group, Tanzania's On-Nahda, and Osama Bin Laden and his al Qaida organization. Bank Al Taqwa was established in the Bahamas and is a close affiliate of the Al Taqwa Management Organization, which changed its name in the spring of 2000 to the Nada Management Organization. In 1997, it was reported that the $60 million collected annually for Hamaas was moved to Bank Al Taqwa accounts. As of October, 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden and as of late September 2001, Osama bin Laden and his al Qaida organization received financial assistance from Youssef M. Nada.

Nada and Nasreddin own or control a number of business entities through direct ownership, control, or in cooperation with each other. Fourteen of these entities are being designated in furtherance of the prior designation of these two individuals to disrupt their use of assets under their ownership or control that could be used to finance terrorist activities.

EXHIBIT 9, PAGE 1493

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 39 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 29 of 205   Page ID
#:11190

267.    Many of al Qaida's most significant individual sponsors and supporters have held positions with one or more of the corporations and organizations controlled by Nada and Nasreddin.  Youssef Al-Qardawi, a member of the Muslim Brotherhood, and Abdel Fattah Abu Ghadda, a member of the Syrian Muslim Brotherhood, both serve on Al Taqwa's Shariah Board.  Albert Friedrich Armand Huber (a/k/a Ahmed Huber), and Ali Ghalib Himmat, both Executive Order 13224 designees, both served as officers of the bank.  In addition, Suleiman Abdul Aziz Al Rajhi worked for the Akida Bank in the Bahamas.  Al Rajhi is the CEO of Al Rajhi Banking and Investment, a member of the Board of Directors of IIRO, and the founder of the SAAR Network of charities and businesses.

268.    As the forgoing demonstrates, the al Taqwa financial network has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

269.    The September 11th Attack was a direct, intended and foreseeable product of the al Taqwa financial network's participation in al Qaida's jihadist campaign.

### AL BARAKAAT GROUP

270.    The Al Barakaat Group is a financial conglomerate, headquartered in Dubai, that operates in 40 countries, including the United States.  The founder of the organization, Shaykh Ahmed Nur Jimale, has close links with Osama bin Laden and has used the organizations within the Al Barakaat Group to facilitate the financing of al Qaida and other terrorist organizations.

271.    The Al Barakaat Group includes business ventures in telecommunications, construction and currency exchange.  According to former Treasury Secretary, John

89

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 40 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 30 of 205   Page ID
#:11191

O'Neill, the Al Barakaat Companies are "a principal source of funding, intelligence and money transfers for bin Laden."

272.    On November 7, 2001, the United States Government designated Al Barakaat Exchange LLC and the following affiliated organizations pursuant to Executive Order 13224, based on their material support and sponsorship of al Qaida:  Aaron Money Wire Service, Inc., Al Baraka Exchange LLC, Al-Barakaat, Al-Barakaat Bank, Al-Barakat Bank of Somalia, Al-Barakat Finance Group, Al-Barakat Financial Holding Company, Al-Barakat Global Telecommunications, Al-Barakat Group of Companies Somalia Limited, Al-Barakat International (a/k/a Baraco Co.), Al-Barakat Investments, Al-Barakat Wiring Service, Baraka Trading Company, Barakaat Boston, Barakaat Construction Company, Barakaat Enterprise, Barakaat Group of Companies, Barakaat International, Barakaat International Foundation, Barakaat International, Inc., Barakaat North America, Inc., Barakaat Red Seat Telecommunications, Barakaat Telecommunications Co. Somalia, Barakat Bank and Remittances, Barakat Computer Consulting (BCC), Barakat Consulting Group (BCG), Barakat Global Telephone Company, Barakat International Companies (BICO), Barakat Post Express (BPE), Barakat Refreshment Company, Barakat Wire Transfer Company, Barakat Telecommunications, Ltd. (BTelco), Barako Trading Company, LLC, Global Services International, Parka Trading Company, Red Sea Barakat Company, Ltd, Somalia International Relief Organization, Somalia Internet Company and Somalia Network AB.

273.    As the forgoing demonstrates, the Al Barakaat Group has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

EXHIBIT 9, PAGE 1495

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 41 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 31 of 205   Page ID
#:11192

274.   The September 11th Attack was a direct, intended and foreseeable product of the Al Barakaat Group's participation in al Qaida's jihadist campaign.

## AL RAJHI BANKING AND INVESTMENT GROUP

275.   Al Rajhi Banking and Investment Corporation (Al Rajhi Bank) is a Saudi Arabia based bank with 400 branch offices within the Kingdom, and 17 subsidiaries across the world.

276.   Al Rajhi Bank is a family owned enterprise, in which defendant Suleiman Abdel Aziz Al Rajhi holds the largest personal investment. Suleiman Abdel Aziz Al Rajhi serves as the Chairman and Managing Director of Al Rajhi Bank.

277.   Suleiman Abdel Aziz Al Rajhi also serves on the Board of Directors of the IIRO, and as a member of the Ibn Baz Foundation, which is chaired by Prince Salman. Al Rajhi is also the founder and principal fiancier of many of the ostensible charities and for-profit enterprises comprising the SAAR Network.

278.   Al-Rajhi Bank has served as one of al Qaida's preferred banks for many years, maintaining accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the IIRO, MWL, WAMY, BIF and Al Haramain, among others.

279.   In cooperation with the charities operating within al Qaida's infrastructure, Al Rajhi Bank advertises the existence and numerical designations of the accounts it maintains for those charities throughout the Muslim world, and provides a mechanism to allow al Qaida's supporters to deposit funds directly into those accounts. Through this mechanism, Al Rajhi Bank facilitates al Qaida's fundraising efforts.

EXHIBIT 9, PAGE 1496

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 42 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 32 of 205   Page ID
#:11193

280.    The accounts maintained by Al Rajhi on behalf of the charities operating within al Qaida's infrastructure, and in particular accounts it maintained for al Haramain and IIRO, have been used to transfer funds to al Qaida cells throughout the world.

281.    Al Rajhi Bank has long known that the accounts it maintained for many ostensible charities were being used to solicit and transfer funds to terrorist organizations, including al Qaida. In fact, Suleiman Abdul Aziz Al Rajhi directly participates in the management, funding and operation of several of those charities, including the MWL and IIRO.  Through his involvement in the affairs of those charities, Al Rajhi has known, for a period of many years, of their extensive sponsorship of al Qaida's operations, and consequently that the accounts maintained by Al Rajhi Bank on behalf of those organizations were being used to channel funds to al Qaida.

282.    Despite this knowledge, Al Rajhi Bank has continued to maintain those accounts.  In doing so, Al Rajhi knowingly provided financial services and other forms of material support to al Qaida.

283.    As the forgoing demonstrates, Al Rajhi Bank has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

284.    The September 11th Attack was a direct, intended and foreseeable product of Al Rajhi Bank's participation in al Qaida's jihadist campaign.

## NATIONAL COMMERCIAL BANK

285.    The National Commercial Bank was established in 1950 by Salim bin Mahfouz, father of defendant Khalid bin Mahfouz.

286.    With his father's death in 1996, Khalid bin Mahfouz became Presdient and CEO of National Commercial Bank.  Khalid bin Mahfouz served as President and CEO

EXHIBIT 9, PAGE 1497

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 43 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 33 of 205   Page ID
#:11194

of National Commercial Bank until 1999, when the Kingdom of Saudi Arabia bought out bin Mahfouz's controlling interest in the bank.

287.    Since 1999, the Kingdom of Saudi Arabia has owned a controlling interest in National Commercial Bank, and operated the bank as an agency, instrumentality and organ of the Kingdom.

288.    Throughout the 1980s and early 1990s, the National Commercial Bank was closely related to, and often worked in collaboration with, the Bank of Credit and Commerce International (BCCI), a banking institution in which Khalid bin Mahfouz held a substantial equitable interest and served as the CEO. A federal investigation into BCCI's operations revealed extensive involvement in corrupt practices, including money laundering, hiding assets, the obstruction of a Senate investigation and the sponsorship of international terrorism.

289.    A 1992 U.S. Senate Investigative Report regarding BCCI's fraudulent activities directly implicated National Commercial Bank in BCCI's corrupt practices, including the manipulation of financial markets, arms trafficking and sponsorship of international terrorism, including handling the finances of Abu Nidal and his terrorist organization.

290.    Consistent with the findings of the Senate Investigative Report, National Commercial Bank has served as one of al Qaida's preferred banks for many years, maintaining accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the IIRO, MWL, WAMY, BIF, Blessed Relief (Muwafaq) Foundation and al Haramain, among others. Under the supervision of Suleiman Abdul Aziz al-Rajhi, National Commercial Bank also managed the budget of SJRC.

EXHIBIT 9, PAGE 1498

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 44 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 34 of 205   Page ID
#:11195

291.    In cooperation with the charities operating within al Qaida's infrastructure, National Commercial Bank advertises the existence and numerical designations of the accounts it maintains for those charities throughout the Muslim world, and provides a mechanism to allow al Qaida supporters to deposit funds directly into those accounts. Through this mechanism, National Commercial Bank facilities al Qaida's fundraising efforts.

292.    The accounts maintained by National Commercial Bank on behalf of the charities operating within al Qaida's infrastructure, and in particular accounts it maintains for IIRO, SJRC and Blessed Relief Foundation, have been used to transfer funds to al Qaida cells throughout the World.  During the 1990s, National Commercial Bank channeled in excess of $74 million to al Qaida through IIRO, and also transferred significant funding to al Qaida through Blessed Relief Foundation accounts it maintained.

293.    National Commercial Bank has long known that the accounts it maintains for many ostensible charities were being used to solicit and transfer funds to terrorist organizations, including al Qaida.  In fact, Khalid bin Mahfouz directly participates in the management, funding and operation of several of those charities, including the Blessed Relief Foundation and BIF.  Through his involvement in the affairs of those charities, bin Mahfouz has known, for a period of many years, of their sponsorship of al Qaida's operations, and consequently that the accounts maintained by National Commercial Bank on behalf of those organizations were being used to channel funds to al Qaida.

294     Despite this knowledge, National Commercial Bank has continued to maintain those accounts.  In doing so, National Commercial Bank has knowingly provided financial services and other forms of material support to al Qaida.

94

EXHIBIT 9, PAGE 1499

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 45 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 35 of 205   Page ID
#:11196

295.    Through accounts with the National Commercial Bank, wealthy relatives
of defendant Abdulrahman Alamoudi, residing within Saudi Arabia, have transferred
large sums of money to Alamoudi to support terrorist operations.

296.    As the forgoing demonstrates, National Commercial Bank has, for a
period of many years, provided critical financial and logistical support to al Qaida in
relation to that terrorist organization's global jihad.

297.    The September 11th Attack was a direct, intended and foreseeable product
of National Commercial Bank's participation in al Qaida's jihadist campaign.

## AL BARAKA INVESTMENT AND DEVELOPMENT CORPORATION

298.    Al Baraka Investment and Development Compant (Al Baraka) is a wholly
owned subsidiary of Dallah al Baraka Group, LLC.  Al Baraka is headed by defendant
Saleh Kamel.

299.    Al Baraka has knowingly maintained accounts for many of the charity
defendants that operate within al Qaida's infrastructure, including the IIRO, MWL,
WAMY, BIF and Al Haramain, among others.

300.    In cooperation with the charities operating within al Qaida's infrastructure,
Al Baraka advertises the existence and numerical designations of the accounts it
maintains for those charities throughout the Muslim world, and provides a mechanism to
allow al Qaida's supporters to deposit funds directly into those accounts.  Through this
mechanism, Al Baraka facilitates al Qaida's fundraising efforts.

301.    The accounts maintained by Al Baraka on behalf of the charities operating
within al Qaida's infrastructure, and in particular accounts it maintained for al Haramain,
have been used to transfer funds to al Qaida cells throughout the world.  Accounts

EXHIBIT 9, PAGE 1500

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 46 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 36 of 205   Page ID
#:11197

maintained by Al Baraka on behalf of al Haramain have served as a principal vehicle for funding al Qaida's operations in Bosnia, according to Bosnian officials.

302.    Al Baraka has long known that the accounts it maintained for many ostensible charities were being used to solicit and transfer funds to terrorist organizations, including al Qaida.

303.    Despite this knowledge, Al Baraka has continued to maintain those accounts. In doing so, Al Baraka knowingly provided financial services and other forms of material support to al Qaida.

304.    In addition, Al Baraka has provided substantial support to al Qaida through its subsidiaries and affiliates, including Al Shamal Islamic Bank, Tadamon Islamic Bank and al Aqsa Bank, as further described herein.

305.    As the forgoing demonstrates, Al Baraka has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

306.    The September 11th Attack was a direct, intended and foreseeable product of Al Rajhi Bank's participation in al Qaida's jihadist campaign.

## DAR-AL-MAAL AL ISLAMI

307.    Beginning in the early 1980's, Saudi Arabia channeled massive financial support for the spread of Wahhabism, the radical brand of Islam at the heart of the al Qaida ideology, through a complex banking system that had at its center two entities: Dar-Al-Maal Al Islami ("DMI"), chaired until recently by Prince Mohammed Al Faisal Al Saud; and Dallah Al-Baraka. Endowed with enormous funding, these institutions served the Saudi government's goals in two ways:  they helped to boost the Kingdom's

EXHIBIT 9, PAGE 1501

Case 1:03-cv-06978-GBD-SN  Document 104-2  Filed 03/10/04  Page 47 of 50
Case 2:16-cv-04435-PA-MRW  Document 108-3  Filed 05/16/17  Page 37 of 205  Page ID
#:11198

financial preeminence in the Arab World, and they gave extensive support for radial Islamic causes.

308.   DMI, or the House of Islamic money, was created on July 29, 1981 and is headquartered in Switzerland. Its main subsidiaries are the Islamic Investment Company of the Gulf, the Faisal Islamic Bank of Bahrain, and Faisal Finance. Until October 1983, the President of DMI was defendant Ibrahim Kamel.

309.   Kamel was replaced as President of DMI on October 17, 1983 by Prince Mohammad Al Faisal Al Saud, who ran the Bank until the year 2000.

310.   Like other Islamic banking institutions, DMI abides by *sharia* or Islamic law, which prohibits the earning or payment of interest. DMI operates by participating in investments, sharing profits on projects, and earning fees for services performed. One of the obligations imposed on Islamic banking systems under *sharia* is the duty to contribute and manage Zakat funds. Consistent with this obligation, Islamic banking institutions set aside a percentage of funds associated with each transaction as Zakat. As a practical matter, these funds disappear from the bank's books and can be used to fund radical Islamic organizations.

311.   DMI has actively sponsored and supported the al Qaida movement through several of its subsidiaries, including but not limited to, the Islamic Investment Company of the Gulf, the Faisal Islamic Bank of Bahrain, Faisal Finance, Tadamon Islamic Bank, and Al Shamal Islamic Bank, as described herein.

312.   Mohammad Al Faisal Al Saud chairs Islamic Investment Company of the Gulf, as well as Faisal Islamic Bank of Sudan. Osama bin Laden's brother, Haydr Mohammad bin Laden, served as a Director of the Islamic Investment Company of the Gulf.

EXHIBIT 9, PAGE 1502

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 48 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 38 of 205   Page ID
#:11199

## FAISAL ISLAMIC BANK – SUDAN

313.    Faisal Islamic Bank of the Sudan is a subsidiary of the Islamic Investment
Company of the Gulf. Faisal Islamic Bank of the Sudan is one of the founders of Al
Shamal Islamic Bank, which was largely capitalized by Osama bin Laden.

314.    Faisal Islamic Bank of Sudan has long provided financial services and
other forms of material support to al Qaida.

315.    During the 2001 trial of the al Qaida conspirators who conducted the 1998
African Embassy bombings in Kenya and Tanzania, Jamal Ahmed Al-Fadl, al Qaida's
financial chief in Khartoum, Sudan, testified that al Qaida maintained accounts with the
Faisal Islamic Bank of the Sudan.

316.    At all times material hereto, Faisal Islamic Bank of Sudan knew that al
Qaida cells maintained accounts with the bank, and that those accounts were being used
to launder and distribute funds for al Qaida operations and terrorist attacks.

317.    Despite its express knowledge that accounts it maintained were being used
to launder and distribute funds for al Qaida operations and terrorist attacks, Faisal Islamic
Bank continued to maintain those accounts. In doing so, Faisal Islamic Bank knowingly
provided financial services and other forms of material support to al Qaida.

318.    As the forgoing demonstrates, Faisal Islamic Bank has, for a period of
many years, provided critical financial and logistical support to al Qaida in relation to
that terrorist organization's global jihad.

319.    The September 11th Attack was a direct, intended and foreseeable product
of Faisal Islamic Bank's participation in al Qaida's jihadist campaign.

EXHIBIT 9, PAGE 1503

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 49 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 39 of 205   Page ID
#:11200

## AL SHAMAL ISLAMIC BANK

320.    Al Shamal Islamic Bank (Al Shamal Bank) was established in the

Republic of Sudan in or around 1983.

321.    When Osama bin Laden relocated al Qaida's leadership structure to the

Sudan in 1991, he invested heavily in businesses and infrastructure projects in the Sudan,

in order to strengthen al Qaida's collaborative relationship with the ruling National

Islamic Front regime.  Bin Laden's extensive investment in the Sudan during this period

is described in a 2002 Congressional Research Service Report as follows:

> In 1991, bin Laden relocated to Sudan with the approval of
> Sudan National Islamic Front (NIF) leader Hasan al-Turabi.
> There, in concert with NIF leaders, [bin Laden] built a
> network of businesses including an Islamic bank (Al
> Shamal), an import/export firm, and firms that exported
> agricultural products.  An engineer by training, bin Laden
> also used his family connections in the construction
> business to help Sudan build roads and airport facilities.
> The business in Sudan… enabled him to offer safe haven
> and employment in Sudan to al Qaida members, promoting
> their involvement in radical Islamic movements in their
> countries of origin (especially Egypt) as well as anti-US
> terrorism.

322.    According to the State Department, bin Laden invested approximately $50

million in Al Shamal Bank.  Other shareholders of Al Shamal Bank include defendant

Saleh Abdullah Kamel, Omar Abdullah Kamel, al Baraka Investment and Development,

Faisal Islamic Bank and the Sudanese Government.

323.    According to published reports, Osama bin Laden remains the principal

shareholder in Al Shamal Bank.

324.    Al Shamal Bank has long provided financial services and other forms of

material support to al Qaida.

99

EXHIBIT 9, PAGE 1504

Case 1:03-cv-06978-GBD-SN   Document 104-2   Filed 03/10/04   Page 50 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 40 of 205   Page ID
#:11201

325.     Al Shamal Bank has maintained accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the IIRO, MWL, WAMY, BIF and al Haramain, among others.

326.     The accounts maintained by Al Shamal Bank, on behalf of the charities operating within al Qaida's infrastructure, have been used to transfer funds to al Qaida cells throughout the world.

327.     Al Shamal Bank also maintained accounts on behalf of, and invested capital in, many of the commercial enterprises established by Osama bin Laden in the Sudan to fund al Qaida's global operations, including:  Wadi al-Aqiq Company, Ltd.; Ladin International Company; Taba Investment Company, Ltd.; al-Hijrah for Construction and Development; and the Themar al Mubaraka Company.

328.     According to Al Shamal Bank's general manager, Mohammad S. Mohammad, Al Shamal also maintained three personal accounts for Osama bin Laden between 1992 and 1997.  Bin Laden wired al Qaida member Essam al Ridi $230,000 from one of those accounts to purchase a used jet in Arizona.  According to al Ridi, bin Laden wanted the plane to ship Stinger anti-aircraft missiles from Pakistan to Sudan.

329.     According to Jamal Ahmed Mohamed al Fadl, an al Qaida operative convicted in the 1998 bombings of the U.S. embassies in Kenya and Tanzania, al Qaida used accounts at Al Shamal Bank to finance terrorist operations, including the embassy attacks.  Al Fadl further testified that al Qaida operatives maintained accounts at the bank openly, and regularly received disbursements from accounts at the bank to fund their activities.

330.     Al Shamal Bank has long known that the accounts it maintained for Osama bin Laden, members of al Qaida, and many businesses and ostensible charities,

EXHIBIT 9, PAGE 1505

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 1 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 41 of 205   Page ID
#:11202

were being used to solicit and transfer funds to terrorist organizations, including al Qaida.
Despite this knowledge, Al Shamal Bank has continued to maintain those accounts  In
doing so, Al Shamal Bank knowingly provided financial services and other forms of
material support to al Qaida.

331.   The transfer of funds to al Qaida through accounts maintained by the Al
Shamal Bank has been facilititated by the direct involvement of several senior al Qaida
officials in the bank's management and operation.  Defendant Adel Abdul Jalil Batterjee
serves as the Chairman of Al Shamal Islamic Bank.  As discussed previously, Batterjee is
a senior official of al Qaida, and has served as a chairman of BIF and WAMY.
Batterjee's longstanding involvement in al Qaida's global operations is detailed at length
in the U.S. government's Santiago proffer in the criminal prosecution of Enaam Arnaout.

332.   As the forgoing demonstrates, Al Shamal Bank has, for a period of many
years, provided critical financial and logistical support to al Qaida in relation to that
terrorist organization's global jihad.

333.   The September 11th Attack was a direct, intended and foreseeable product
of Al Shamal Bank's participation in al Qaida's jihadist campaign.

## TADAMON ISLAMIC BANK

334.   Tadamon Islamic Bank is a Sudanese based banking institution,
established in or around 1983.

335.   The shareholders of Tadamon Islamic Bank include al Baraka Investment
and Development Corporation, Saleh Abdullah Kamel, National Company for
Development and Trade, Dubai Islamic Bank and Faisal Islamic Bank of Sudan.

336.   Tadamon Islamic Bank has long provided financial services and other
forms of material support to al Qaida.

101

EXHIBIT 9, PAGE 1506

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 2 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 42 of 205   Page ID
#:11203

337.    According to Jamal Ahmed Mohamed al Fadl, an al Qaida operative convicted in connection with the 1998 bombings of the U.S. embassies in Kenya and Tanzania, Tadamon Islamic Bank openly managed accounts of al Qaida operatives, including Abdouh al Mukhlafi, who served as Osama bin Laden's bodyguard while al Qaida's leadership structure was in the Sudan.

338.    Tadamon Islamic Bank is also a shareholder of Al Shamal Bank, another institution that has provided material support and sponsorship to al Qaida.

339.    At all times material hereto, Tadamon Islamic Bank was aware that al Qaida cells maintained accounts with the bank, and that those accounts were being used to launder and distribute funds for al Qaida operations and terrorist attacks.

340.    Despite its express knowledge that accounts it maintained were being used to launder and distribute funds for al Qaida operations and terrorist attacks, Tadamon Islamic bank continued to maintain those accounts.  In doing so, Tadamon Islamic Bank knowingly provided financial services and other forms of material support to al Qaida.

341.    As the forgoing demonstrates, Tadamon Islamic Bank has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

342.    The September 11th Attack was a direct, intended and foreseeable product of Tadamon Islamic Bank's participation in al Qaida's jihadist campaign.

### DUBAI ISLAMIC BANK

343.    Dubai Islamic Bank is a financial institution headquartered in the United Arab Emirates, which holds significant equitable interests in Tadamon Islamic Bank, Al Shamal Bank and entities associated with al Baraka Bank.

EXHIBIT 9, PAGE 1507

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 3 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 43 of 205   Page ID
#:11204

344.    Dubai Islamic Bank has long provided financial services and other forms
of material support to al Qaida, including the transfer of financial resources to al Qaida
operatives who participated in the planning and execution of the September 11th Attack
and African Embassy bombings.

345.    Investigations into the financing of the September 11th Attack have
confirmed that Mustafa Ahmed al Hisawi, a senior al Qaida financial official, transferred
funds from an account at the Dubai Islamic Bank to September 11th hijackers Marwan al
Sheehi and Mohamed Atta.

346.    Dubai Islamic Bank has long known that accounts it maintained were
being used to to launder and distribute funds for al Qaida operations and terrorist attacks.

347.    Despite its express knowledge that accounts it maintained were being used
to launder and distribute funds for al Qaida operations and terrorist attacks, Dubai Islamic
bank continued to maintain those accounts.  In doing so, Dubai Islamic Bank knowingly
provided financial services and other forms of material support to al Qaida.

348.    Dubai Islamic bank has further sponsored al Qaida through its interest in
Al Shamal Bank, Al Tadamon Bank and various al Baraka entities.

349.    As the forgoing demonstrates, Dubai Islamic Bank has, for a period of
many years, provided critical financial and logistical support to al Qaida in relation to
that terrorist organization's global jihad.

350.    The September 11th Attack was a direct, intended and foreseeable product
of Dubai Islamic Bank's participation in al Qaida's jihadist campaign.

EXHIBIT 9, PAGE 1508

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 4 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 44 of 205   Page ID
#:11205

## ISLAMIC DEVELOPMENT BANK

351.    Islamic Development Bank formally began operations in 1975 under the
rules of the organization of the Islamic Conference System, in accordance with the
principles of Islamic *sharia*.

352.    Of the 54 national shareholders, Saudi Arabia is by far the largest,
contributing 27.33% of the subscribed capital.

353.    Islamic Development Bank has allocated significant grants to several
Islamic Centers in the United States, including the Al-Noor School in Brooklyn, New
York, an institution which advocates Islamic extremism and jihad.

354.    In July of 1999, the Islamic Development Bank gave a grant of $250,000
for the Washington based Counsel on American Islamic Relations (CAIR) for
refurbishment of its offices.  Since September 11, 2001, three CAIR officials have been
indicted by the Federal Government on terrorist charges.  CAIR received a substantial
portion of its initial seed money from the Holy Land Foundation for Relief and
Development, an organization designated under Executive Order 13224 on December 4,
2001.  CAIR has also received assistance from WAMY.

355.    Through its funding of ostensible charities operating within al Qaida's
infrastructure, Islamic Development Bank has long provided material support and
resources to al Qaida.

356.    The September 11th Attack was a direct, intended and foreseeable product
of Islamic Development Bank's participation in al Qaida's jihadist campaign.

### ARAB BANK, PLC

357.    Arab Bank, PLC is a financial institution headquartered in Egypt, with
branch offices throughout the world, including offices in New York.

EXHIBIT 9, PAGE 1509

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 5 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 45 of 205   Page ID
#:11206

358.    Arab Bank has long provided financial services and other forms of material support to terrorist organizations, including al Qaida.

359.    Spanish investigators have confirmed that al Qaida transferred money to the Spanish logistical cell that funded the September 11th Attack through Arab Bank. Arab Bank accounts have also been used to distribute funds to al Qaida cells in other parts of the world.

360.    Arab Bank also maintains accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the IIRO, MWL, WAMY, BIF, Blessed Relief (Muwafaq) Foundation and al Haramain, among others. The Kingdom of Saudi Arabia uses these accounts to fund al Qaida operations, and as the principal vehicle for supporting Palestinian suicide attacks.

361.    More recently, Israeli officials seized funds associated with several accounts maintained by Arab Bank on behalf of known Hamas fronts. These accounts were identified to Israeli officials by Arab Bank employees, confirming the bank's specific knowledge that accounts it maintained were being used to sponsor terrorist activity.

362.    Arab Bank has long known that accounts it maintained were being used to solicit and transfer funds to terrorist organizations, including al Qaida. Despite this knowledge, Arab Bank has continued to maintain those accounts. In doing so, Arab Bank knowingly provided financial services and other forms of material support to al Qaida

363.    As the forgoing demonstrates, Arab Bank has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

EXHIBIT 9, PAGE 1510

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 6 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 46 of 205   Page ID
#:11207

364.    The September 11th Attack was a direct, intended and foreseeable product of Arab Bank's participation in al Qaida's jihadist campaign.

## SAUDI AMERICAN BANK

365.    Saudi American Bank is a financial institution headquarted in Riyadh, Saudi Arabia. Saudi American Bank was established by royal decree in 1980, and operates as an agency and instrumentality of the Kingdom of Saudi Arabia.

366.    Saudi American Bank has long provided financial services and other forms of material support to terrorist organizations, including al Qaida.

367.    Saudi American Bank financed many of the projects undertaken by Osama bin Laden and al Qaida in the Sudan during the years that the al Qaida leadership structure operated from that country, including the construction of major roads and the Port of Sudan airport. The Saudi Binladin Group and Mohamed Binladin Organization provided technical assistance on these projects.

368.    Through its participation in the projects undertaken by Osama bin Laden in Sudan, Saudi American Bank knowingly provided material support and resources to al Qaida.

369.    Saudi American Bank has maintained accounts for many of the ostensible charities that operate within al Qaida's infrastructure, including MWL, WAMY, IIRO and al Haramain, among others.

370.    In cooperation with the charities operating within al Qaida's infrastructure, Saudi American Bank advertises the existence and numerical designation of the accounts it maintains for those charities throughout the Muslim world, and provides a mechansim to allow al Qaida supporters to deposit funds directly into those accounts. Through this mechanism, Saudi American Bank facilities al Qaida's fundraising efforts.

106

EXHIBIT 9, PAGE 1511

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 7 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 47 of 205   Page ID
#:11208

371.    The accounts maintained by Saudi American Bank on behalf of the charities operating within the al Qaida's infrastructure, and in particular, accounts it maintained for IIRO, WAMY and al Haramain, have been used to transfer funds to al Qaida cells throughout the World.

372.    Saudi American Bank has long known that accounts it maintained for many ostensible charities were being used to solicit and transfer funds to terrorist organizations, including al Qaida. Despite this knowledge, Saudi American Bank has continued to maintain those accounts. In doing so, Saudi American Bank knowingly provided financial services and other forms of material support to al Qaida.

373.    Saudi American Bank also serves as the Saudi Arabia correspondent for many other banks within al Qaida's infrastructure, including Al Shamal Bank.

374.    As the forgoing demonstrates, Arab Bank has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

375.    The September 11th Attack was a direct, intended and foreseeable product of Arab Bank's participation in al Qaida's jihadist campaign.

## AL QAIDA'S SPONSORS AND PARTNERS IN THE BUSINESS COMMUNITY

376.    Al Qaida has established numerous for-profit businesses throughout the world, to augment the funding it receives from its State sponsors, wealthy donors and the charities and banks operating within its infrastructure.

377.    Like al Qaida's charity and banking partners, these businesses operate as fully integrated components of al Qaida's financial and logistical infrastructure.

378.    While in Sudan, Osama bin Laden established numerous businesses to provide income for al Qaida's operations. These business ventures included: Wadi al

EXHIBIT 9, PAGE 1512

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 8 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 48 of 205   Page ID
#:11209

Aqiq Company, Ltd, a holding firm; Ladin International Company, an import/export concern; Taba Investment Company, Ltd., a currency trading firm; al-Hijrah for Construction and Development, a construction enterprise which performed several significant infrastructure projects on behalf of the ruling National Islamic Front; and the Themar al Mubaraka Company, an agricultural concern.

379.    Among the projects bin Laden's al-Hijrah Construction firm performed for the Sudanese Government were the construction of the Tahaddi Road linking Khartoum with Port Sudan, and the construction of a modern international airport near Port Sudan.

380.    Osama bin Laden's al-Hijrah Construction firm received significant support in relation to the projects it performed in Sudan from the Saudi Binladin Group, a Saudi Arabia conglomerate established by bin Laden's father, Mohamed bin Laden, and owned to this date by members of the bin Laden family, including Osama bin Laden.

381.    Saudi Binladin Group is run by Osama bin Laden's brother, Bakr bin Laden, and the board of directors includes Saleh Gazaz, Mohammed Baharuth, Abdullah bin Said, Mohammed Nur Rahimi, Tarek bin Laden, and Omar bin Laden.

382.    During the holy war against the Soviet occupation of Afghanistan, the Saudi Binladin Group materially assisted Osama bin Laden in his efforts to provide material suport to the mujihadeen fighters.

383.    After the Soviet Union withdrew from Afghanistan, Osama bin Laden returned to Saudi Arabia to work for the Saudi Binladin Group.  Between 1989 and 1991, while working for the Saudi Binladin Group, Osama bin Laden began establishing the infrastructure for his al Qaida network.

EXHIBIT 9, PAGE 1513

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 9 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 49 of 205   Page ID
#:11210

384.    When Osama bin Laden moved the al Qaida infrastructure to the Sudan in
1991, he continued to maintain a close relationship with the Saudi Binladin Group and
the members of his family who controlled the conglomerate.

385.    Through its participation in the projects undertaken by Osama bin Laden
in Sudan and support of the businesses Osama bin Laden established in that country,
Saudi Binladin Group knowingly provided material support and resources to al Qaida.

386.    Al Qaida has established business enterprises to support its operations
throughout Europe as well.

387.    Beginning in 1996, several members and sponsors of al Qaida developed a
money laundering scheme involving Saudi and Spanish companies, in order to finance al
Qaida operational cells in Europe, the Middle East and Asia.

388.    The entities operating within this network included defendants Mushayt
for Trading Establishment, Proyectos Y Promociones Iso, Afamiasl Cobis, Abrash
Company, Promociones Y Construcciones Tetuan Pricote S.A., Contratas Gioma,
Eurocovia Obrassa, Mohammed Ali Sayeed Mushayt, Proyectos Y Promociones Paradise
SL, Proyectos Edispan.  The masterminds of this network of companies were Ghasoub al
Abrash Ghalyoun and Muhammad Galab Kalaje Zouaydi, al Qaida's European financial
chief.

389.    Zouaydi arrived in Madrid in 1998 from Jeddah, Saudi Arabia, where he
had operated a trading and investment company called Mushayt For Trading
Establishment.  Upon arrival in Spain, he established or helped to establish several other
companies, including a small housing and construction business.

390.    Money was filtered into the Spanish companies by wire transfer from
Saudi Arabia, contributions from unidentified investors and cash deposits.  According to

109

EXHIBIT 9, PAGE 1514

Case 1:03-cv-06978-GBD-SN  Document 104-3  Filed 03/10/04  Page 10 of 50
Case 2:16-cv-04435-PA-MRW  Document 108-3  Filed 05/16/17  Page 50 of 205  Page ID
#:11211

Spanish prosecutors, Mushayt for Trading Establishment sent nearly $700,000 to Spain between 1996 and 2001.

391.     The Spanish network of businesses provided income streams for al Qaida cells in Europe and the Middle East, including the German al Qaida cell which planned and carried out the September 11th Attack.

392.     Spanish investigators have confirmed that the Spanish network sent funds to Mahmoud Darkazanly and Abdul Fattah Zammar, two Syrian born businessmen who had close ties with the German al Qaida cell.  According to German officials, Darkazanly belonged to "the most intimate circle of Mohammad Atta."

393.     Transfers between the Spanish network, German al Qaida cell, Darkazanly and Zammar were laundered through the Al Rajhi Bank.

394.     The Spanish network also facilititated the preliminary filming of potential targets for the September 11th Attack, including the World Trade Center.  Ghasoub al Abrash Ghalyoun, Zouaydi's business partner, traveled to the United Stat4es in 1997 to film potential targets.

395.     In addition to providing funding for al Qaida's European cells, Mushayt for Trading Establishment sheltered and supported other Muslim radicals including Nabil Nanakli Kosaibati.  Kosaibati was convicted for terrorist activities within Yemen.  During his trial, he acknowledged that he was recruited and trained to use arms and explosives by the Saudi Intelligence Agency, and that Saudi Intelligence "sent him to Yemen in 1996 as an active Saudi Intelligence agent."  Kosaibati's testimony thus confirms the Kingdom of Saudi Arabia's direct participation in terrorist activity.

396.     As the foregoing demonstrates, the businesses established by al Qaida, and those with which it has partnered, have, for a period of many years and in diverse regions

EXHIBIT 9, PAGE 1515

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 11 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 51 of 205   Page ID
#:11212

throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

397.    The September 11th Attack was a direct, intended and foreseeable product of the participation of al Qaida's businesses and business partners in the terrorsit organization's jihadist campaign.

## KINGDOM OF SAUDI ARABIA, SAUDI ROYAL FAMILY AND SAUDI ELITES

398.    More than any other factor, al Qaida's phenomenal growth and development into a sophisticated global terrorist network were made possible by the massive financial, logisitcal and other support it received from the Kingdom of Saudi Arabia, members of the Saudi Royal Family, and prominent members of Saudi society.

399.    As further described herein, the Kingdom of Saudi Arabia has established, funded, managed, maintained, directed and controlled many of the ostensible charities and banks that operate within al Qaida's support infrastructure.  These agencies and instrumentalities of the Kingdom of Saudi Arabia have served as the primary vehicle for raising, laundering and distributing funds on behalf of al Qaida, since the organization's inception. The vast majority of these funds have been provided by the Kingdom of Saudi Arbia and members of the Saudi Royal Family.  In addition, purported charities, operating as arms of the Kingdom, have provided arms, false travel documentation, physical assets and logistical support to al Qaida.  In many cases, the Kingdom of Saudi Arabia has appointed senior members of the al Qaida movement to high ranking positions within the charities it controlled, thereby providing a cover for their terrorist activity and facilitating the provision of material support and resources to al Qaida. Al Qaida has planned and coordinated terrorist attacks from branch offices of the charities, including branches which operated from within Saudi embassies throughout the world.

111

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 12 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 52 of 205   Page ID
#:11213

400.     The Kingdom of Saudi Arabia and members of the Saudi Royal Family have known, for a period of many years, of the pervasive involvement of the Kingdom's charities and banks in funding and sustaining al Qaida's support infrastructure. In 1994, a French delegation led by French Interior Minister Charles Pasqua visited Saudi officials, including Saudi Minister of Interior Prince Naif, to discuss the French government's deep concerns regarding the pervasive involvment of the Saudi charities in the sponsorship and funding of terrorist organizations. In 1999 and again in 2000, U.S. officials visited Saudi Arabia to raise the same concerns.

401.     Despite these pleas from the international community, the Kingdom of Saudi Arabia continued to funnel enormous amounts of money and other resources to the charities supporting al Qaida's operations.

402.     As Osama bin Laden had publicly announced that his organization's principal objective was to wage war with the United States, and al Qaida had in fact conducted several attacks against U.S. interests over the years, it is clear that the Kingdom of Saudi Arabia and members fo the Royal Family knew and intended that the funding and support funneled to al Qaida through the charities and banks would be used to attack U.S. interests.

403.     The Kingdom of Saudi Arabia also used its relationship with the Taliban regime in Afghanistan as a tool for sustaining al Qaida between 1991 and 1996.

404.     During this time period, the Taliban regime openly harbored Osama bin Laden and the al Qaida leadership structure, and allowed al Qaida to maintain training camps throughout Afghanistan.

405.     The relationship between the Taliban and al Qaida was truly symbiotic. In exchange for the support it received from the Taliban, al Qaida helped to train and fought

112

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 13 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 53 of 205   Page ID
#:11214

alongside Taliban fighters in the conflict against the Northern Alliance, and the two organizations shared resources with one another.

406.     As a result of its support for al Qaida, the international community imposed sanctions on the Taliban.  Despite that fact, the Kingdom of Saudi Arabia extended formal diplomatic relations to the Taliban, and provided funding and logistical support to sustain the regime.

407.     The Kingdom of Saudi Arabia knew and intended that the financial and logistical support it provided to the Taliban would materially benefit al Qaida, by virtue of the close relationship and near identity between the two organizations.

408.     Through its funding, management and operation of the charities and banks, and support of the Taliban regime, the Kingdom of Saudi Arabia has provided the very infrastructure that enabled al Qaida to grow from a small group of extremists into a highly sophisticated global terrorist network.  The infrastructure, funding and other forms of material support provided by the Kingdom of Saudi Arabia, as described herein, have fueled al Qaida's growth and development, and sustained the organization since its inception.

409.     Absent the infrastructure, funding and other forms of material support provided by the Kingdom of Saudi Arabia, al Qaida would have remained a regional extremist organization, without the capacity to conduct large scale acts of terrorism on a global scale, such as the September 11th Attack.

410.     In addition to the support funneled to al Qaida through its state controlled banks and charities, ongoing investigations throughout the world have increasingly revealed that officials of the Saudi government have provided direct financial and logistical support to al Qaida cells in Europe and the United States, including al Qaida

EXHIBIT 9, PAGE 1518

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 14 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 54 of 205   Page ID
#:11215

members who participated directly in the planning, coordination and execution of the September 11th Attack

411.    According to senior officials within the United States government, the Joint Congressional Inquiry into the September 11th attack revealed that a Saudi intelligence official named Omar al Bayoumi provided direct assistance to Kalid al-Midhar and Nawaf Al Hazmi, two of the September 11th hijackers.

412.    When al-Midhar and Al Hazmi arrived in Los Angeles, Al-Bayoumi, a Saudi citizen and prominent member of San Diego's Muslim community, traveled to Los Angeles to meet them. Immediately before doing so, Al-Bayoumi visited the Saudi consulate in Los Angeles. At the consulate, Al Bayoumi met with Fahad Al-Thumairy, a Saudi diplomat who was stripped of his diplomatic visa and later barred from the United States, based on suspected ties to terrorism.

413.    Following their meeting, Al-Bayoumi facilitated the future hijackers' settlement in the San Diego community, and paid two months rent for an apartment on their behalf.

414.    According to various sources, Al-Bayoumi is an intelligence agent of the Kingdom of Saudi Arabia. There is substantial credible evidence to support this conclusion. In or around 1994, Al-Bayoumi was hired by Dallah Avco, a division of the Dallah al-Baraka business group, to work on an aviation project commissioned by the Saudi government.

415.    Al-Bayoumi remained in the employment of Dallah Avco for the next seven years. For five of those seven years, the Saudi government reimbursed Dallah Avco for Al-Bayoumi's salary and Al-Bayoumi was considered a Saudi civil servant.

EXHIBIT 9, PAGE 1519

Case 1:03-cv-06978-GBD-SN  Document 104-3  Filed 03/10/04  Page 15 of 50
Case 2:16-cv-04435-PA-MRW  Document 108-3  Filed 05/16/17  Page 55 of 205  Page ID
#:11216

416.    Mysteriously, although the project for which Al-Bayoumi was allegedly hired was based in Saudi Arabia, Al-Bayoumi moved to the United States in August of 1994 and began taking English classes at San Diego State University's College of Extended Studies.

417.    Dallah Avco records indicate that, as of 1999, Dallah Avco sought to terminate Al-Bayoumi's annual employment contracts. To that end, a Dallah Avco official wrote to the Saudi aviation authority saying "the company is not willing to renew the period for another year and we wish this to be known."

418.    In response, the aviation authority sent an urgent letter advising Dallah Avco that the Saudi government wanted Al-Bayoumi's contract renewed "as quickly as possible."

419.    Witnesses have reported that Al-Bayoumi had access to "seemingly endless" funds while in the United States. In fact, despite the modest salary he was paid as a Dallah Avco employee, Al-Bayoumi was able to front $400,000 for the purchase of a mosque.

420.    The Joint Inquiry's investigation also revealed that Al-Bayoumi received monthly checks in January 1999 from Princess Haifa, wife of Prince Bandar, through an intermediary named Osama Basnan. Some of the money Al-Bayoumi received from Princess Haifa ended up in the hands of the two September 11th hijackers.

421.    Ongoing investigations by German authorities into the Hamburg al Qaida cell that coordinated and planned the September 11th Attack have revealed that members of the Hamburg cell received direct support from Saudi officials as well. In the course of their investigation of the German cell that planned and carried out the September 11th Attack, German officials uncovered evidence that members of the cell were in close and

EXHIBIT 9, PAGE 1520

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 16 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 56 of 205   Page ID
#:11217

regular contact with Muhammad Jaber Fakihi, the head of the Islamic Affairs Department
of the Saudi Embassy in Berlin. The German authorities' efforts to investigate
connections between Fakihi and Mounir Mutasedek, a senior member of the Hamburg
cell, have been frustrated by the Saudi government, which has refused to cooperate in the
investigation.

422.    Fakihi was instrumental in obtaining funding for the Al-Nur Mosque,
which served as a meeting place, recruitment center and base of operations for al Qaida
within Germany. In his official capacity as a minister of the Saudi government, Fakihi
solicited and obtained funding for the Mosque from Saleh bin Abdulaziz Al-Ashaikh, the
Saudi Minister of Islamic Affairs and chairman of al Haramain.

423.    As the foregoing demonstrates, the Kingdom of Saudi Arabia has, for
many years and in diverse regions throughout the world, played a central and critical role
in funding, facilitating and supporting al Qaida's global operations.

424.    Absent the material support and resources provided to al Qaida by the
Kingdom of Saudi Arabia, al Qaida would have remained a regional extremist
organization, incapable of conducting large scale acts of international terrorism.

425.    The September 11th Attack was a direct, intended and foreseeable product
of the Kingdom of Saudi Arabia's participation in al Qaida's jihadist campaign.

426.    Several members of Saudi Arabia's Royal Family have played particularly
integral roles in the sponsorship of al Qaida's operations, acting in both their official and
personal capacities.

427.    Prince Sultan bin Abdulaziz al Saud (Prince Sultan) is the Second Deputy
Prime Minister and Minister of Defense and Aviation of the Kingdom of Saudi Arabia.
In addition, Prince Sultan is the Chairman of the Supreme Council for Islamic affairs,

116

Case 1:03-cv-06978-GBD-SN Document 104-3 Filed 03/10/04 Page 17 of 50
Case 2:16-cv-04435-PA-MRW Document 108-3 Filed 05/16/17 Page 57 of 205 Page ID
#:11218

established by King Fahd in 1994 to oversee and control charitable organizations with operations within the Kingdom of Saudi Arabia.

428. Prince Sultan has long provided material support and resources to al Qaida.

429. In his capacity as Chairman of the Supreme Council, Prince Sultan has known, for a period of many years, that Saudi-based charities were providing material support and resources to al Qaida. Rather than intervening to stem the flow of money and support from the charities to al Qaida, Prince Sultan has used his authority as Chairman of the Supreme Council to facilitate and ensure the continuing sponsorship of al Qaida by those charities.

430. In addition, Prince Sultan provided substantial funding, in both his official and private capacities, to several charities deeply involved in the sponsorship of al Qaida's global operations, including the IIRO, MWL, WAMY and al Haramain Foundation. In 1995, Dr. Ahmad Muhammad Ali, the then Secretary General of the MWL, publicly confirmed that much of the IIRO's funding was provided by Prince Sultan. In 1998, Prince Sultan donated 5 million Saudi Riyals to a joint charity drive of the IIRO and Sanabel al-Kheer. During a television fundraising campaign for the MWL, Prince Sultan donted 1 million Saudi Riyals. In 2002, he donated more than $250,000 to a joint fundraising drive of the IIRO, WAMY and al Haramain.

431. At all times material hereto, Prince Sultan knew and intended that the contributions he made to IIRO, WAMY, MWL, Sanabel al-Kheer and al Haramain Foundation would be used to fund al Qaida's global operations and acts of international terrorism.

117

Case 1:03-cv-06978-GBD-SN Document 104-3 Filed 03/10/04 Page 18 of 50
Case 2:16-cv-04435-PA-MRW Document 108-3 Filed 05/16/17 Page 58 of 205 Page ID
#:11219

432. Through his official and personal acts, as described herein, Prince Sultan has provided critical financial and logistical support to al Qaida for a period of many years.

433. Prince Naif bin Abdulaziz al Saud (Prince Naif) is the Saudi Minister of Interior.

434. Prince Naif has long provided material support and resources to al Qaida.

435. In his capacity as Minister of Interior, Prince Naif has been, for many years, responsible for the oversight of charities based within Saudi Arabia, including the operations of the SJRC, MWL, IIRO, Saudi Red Crescent, WAMY and al Haramain Foundation.

436. Between 1998 and 2000, while the SJRC was under the supervision and control of Prince Naif, the Kingdom of Saudi Arabia diverted $74 million to al Qaida members and loyalists through the SJRC.

437. Prince Naif also heads the Saudi Committee for Relief to Afghans, a government body that oversees and coordinates the operations of several Saudi charities in Afghanistan, including al Haramain. In this position, Prince Naif has channeled substantial financial and logistical support to sustain al Qaida's presence and operations in Afghanistan.

438. As Minsiter of Interior, Prince Naif also is responsible for counter-terrorism coordination and implementation within the Kingdom. Rather than using that authority to disrupt al Qaida's global operations, Prince Naif has used the position to protect al Qaida's support infrastructure.

439. This conduct is not surprising given Prince Naif's documented history of sponsoring terrorist activity throughout the world. For many years, he has served as the

EXHIBIT 9, PAGE 1523


Case 1:03-cv-06978-GBD-SN Document 104-3 Filed 03/10/04 Page 19 of 50
Case 2:16-cv-04435-PA-MRW Document 108-3 Filed 05/16/17 Page 59 of 205 Page ID
#:11220

head of the Saudi Committee for Support of the Al Quds Intifada, through which the
Kingdom of Saudi Arabia has distributed literally millions of dollars to support and
sponsor terrorist attacks in Israel and the Palestinian Territories.

440. In addition, Prince Naif has denied al Qaida's responsibility for the
September 11th Attack publicly. Interviewed in November 2002, Prince Naif stated:

> We put big question marks and asked who committed the
> events of September 11[th] and who benefited from them . . .
> I think they [the Zionists] are behind these events . . . I
> cannot still believe that 19 youths, including 15 Saudis,
> carried out the September 11 attacks with the support of bin
> Laden and his al-Qa'ida organization. It's impossible. I
> will not believe that these people have the power to do so
> horrendous an attack.

441. In a 2003 letter to Prince Bandar bin Abdul Aziz al Saud, Senator Charles
Schumer asked that Prince Naif be replaced as Interior Minister, citing Prince Naif's
"well-documented history of supporting terrorist financing and ignoring the evidence
when it comes to investigating terrorist attacks on Americans."

442. Prince Naif has made significant personal contributions to Saudi-based
charities that he knew to be sponsors of al Qaida's global operations as well, including
IIRO, MWL, WAMY, BIF, the Saudi High Commission, SJRC and al Haramain, among
others.

443. At all times material hereto, Prince Naif knew and intended that the
contributions he made to IIRO, WAMY, MWL, Sanabel al-Kheer and al Haramain
Foundation would be used to fund al Qaida's global operations and acts of international
terrorism.

444. Through his official and personal acts, as described herein, Prince Naif has
provided critical financial and logistical support to al Qaida for a period of many years.

119

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 20 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 60 of 205   Page ID
#:11221

445.    Prince Turki al-Faisal bin Abdulaziz al-Saud (Prince Turki) headed Saudi Arabia's general intelligence service, the Istakhbarat, between 1977 and 2001, and now serves as the Saudi ambassador to the United Kingdom.

446.    Prince Turki has long provided material support and resources to al Qaida.

447.    While under the direction of Prince Turki, the Istakhbarat provided massive financial aid and material support to the Taliban.  At the time, al Qaida and the Taliban maintained a symbiotic and mutually supportive relationship.

448.    Prince Turki knew and intended that the support provided to the Taliban by the Kingdom of Saudi Arabia under his direction would materially benefit al Qaida, by virtue of the close relationship and near identity between the two organizations.

449.    In his capacity as head of the Istakhbarat, Saudi intelligence officials under his supervision directly participated in the operations of terrorist organizations, including al Qaida.  As set forth previously, Nabil Kosaibati, a member of the Spanish al Qaida cell, was recruited and trained to use arms and explosives by the Saudi intelligence service, while it was under the control of Prince Turki.  Kosaibati was convicted for terrorist activities in Yemen, and confessed that Saudi intelligence "sent him to Yemen in 1996 as an active Saudi intelligence agent."  Similarly, Omar Al-Bayoumi provided material support and assistance to two of the September 11th hijackers in his capacity as a representative of the Saudi intelligence service, while that agency was being directed by Prince Turki.

450    In his capacity as the head of the Saudi intelligence service, Prince Turki also arranged a meeting between senior Iraqi intelligence officials and Osama bin Laden, and thereby helped to foster a collaborative relationship between Iraqi intelligence and al Qaida.

120

EXHIBIT 9, PAGE 1525

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 21 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 61 of 205   Page ID
#:11222

451.    Prince Turki has made significant personal contributions to Saudi-based charities that he knew to be sponsors of al Qaida's global operations as well, including IIRO, MWL, WAMY, BIF, the Saudi High Commission, SJRC and al Haramain, among others. In addition, Prince Turki has coordinated the sponsorship of al Qaida by several wealthy members of Saudi society.

452.    At all times material hereto, Prince Turki knew and intended that the contributions he made to IIRO, WAMY, MWL, Sanabel al-Kheer and al Haramain Foundation would be used to fund al Qaida's global operations and acts of international terrorism.

453.    Through his official and personal acts, as described herein, Prince Turki has provided critical financial and logistical support to al Qaida for a period of many years.

454.    Prince Salman bin Abdul Aziz al Saud (Prince Salman) is the Mayor of Riyadh. Prince Salman founded the Saudi High Commission in 1992. By early 2001, the Saudi High Commission had raised 1.68 billion Riyals through a variety of fundraising mechanisms.

455.    Prince Salman has long provided material support and resources to al Qaida.

456.    When he founded the Saudi High Commission, Prince Salman fully intended that the organization would serve as a vehicle for funding and supporting Islamic militants in Bosnia, including elements of the al Qaida movement.

457.    During the ensuing years, Prince Salman knew that the Saudi High Commission was, in fact, supporting al Qaida's efforts in Bosnia. In September 2000, Prince Salman received a letter from a Bosnian association called the "Mothers of

EXHIBIT 9, PAGE 1526

Case 1:03-cv-06978-GBD-SN Document 104-3 Filed 03/10/04 Page 22 of 50
Case 2:16-cv-04435-PA-MRW Document 108-3 Filed 05/16/17 Page 62 of 205 Page ID
#:11223

Srebrenica and Podrinje" advising Prince Salman that funds donated to the Saudi High
Commission were being improperly diverted.

458.    In October 2001, officials of the U.S. government raided the Sarajevo
offices of the Saudi High Commission. During the raid, investigators found computer
hard drives with photographs of the World Trade Center before and after its collapse, as
well as photographs of the United States embassies in Kenya and Tanzania and the U.S.S.
Cole. Investigators also discovered files on pesticides and crop dusters, information
about how to make fake State Department badges, and photographs and maps of
Washington, marking prominent government buildings.

459.    Following the raid, the Financial Police of the Federation of Bosnia
Herzegovina Ministry of Finance described the Saudi High Commission as a front for
radical and terrorism-related activities, stating:

> Members of the SFOR (stabilization forces) have on
> premises on the Saudi high commission relief for Bosnia
> and Herzegovina confiscated some documentation for
> which it can be claimed with certainty that it does not
> belong in the scope of work of a humanitarian organization
> . . .

460.    To this date, investigators have been unable to account for approximately
$41 million donated to the charity.

461.    Prince Salman has donated substantial funds to several other charities that
operate within al Qaida's infrastructure, including the IIRO, WAMY and al Haramain
Foundation. In 1999, Prince Salman donated approximately $400,000 during a joint
fundraising event of the IIRO, WAMY and al Haramain Foundation. In 1998, Prince
Salman donated 1 million Saudi Riyals during a joint fundraising drive of the IIRO and
Sanabel al-Kheer.

EXHIBIT 9, PAGE 1527

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 23 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 63 of 205   Page ID
#:11224

462.     In addition, Prince Salman has been instrumental in raising funds for charities within al Qaida's infrastructure from third parties.  During a 1994 conference sponsored by the IIRO and Sanabel al-Kheer, Prince Salman publicly stated that he had personally raised more than 6 million Saudi Riyals for Sanabel and IIRO from wealthy Saudi citizens.

463.     At all times material hereto, Prince Salman knew and intended that the contributions he made to, and funds he raised on behalf of, IIRO, WAMY, MWL, Sanabel al-Kheer and al Haramain Foundation would be used to fund al Qaida's global operations and acts of international terrorism.

464.     Through his official and personal acts, as described herein, Prince Salman has provided critical financial and logistical support to al Qaida for a period of many years.

465.     Prince Abdullah al Faisal (Prince Abdullah) is a former official of the Saudi Ministry of Interior, and has served as the de facto ruler of Saudi Arabia since King Fahd's stroke in 1999.  In addition to his role within the Saudi government, Prince Abdullah maintains significant business interests, including a controlling stake in al Faisal Group Holding Co., and its predecessor-in-interest, al Faisaliah Group.  Al Faisal Group is the representative agent in Saudi Arabia of several international companies.

466.     In his capacity as de-facto head of the Kingdom of Saudi Arabaia, Prince Abdullah has consistently appointed al Qaida supporters and collaborators to head the charities controlled by the Kingdom.  Prince Abdullah has done so in order to ensure that the charities would continue to serve as vehicles for sponsoring and sustaining terrorist organizations, including al Qaida.

EXHIBIT 9, PAGE 1528

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 24 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 64 of 205   Page ID
#:11225

467.     Prince Abdullah has made significant personal contributions to Saudi-based charities that he knew to be sponsors of al Qaida's global operations as well, including IIRO, MWL, WAMY, BIF, the Saudi High Commission, SJRC and al Haramain, among others.

468.     At all times material hereto, Prince Abdullah knew and intended that the contributions he made to IIRO, WAMY, MWL, Sanabel al-Kheer and al Haramain Foundation would be used to fund al Qaida's global operations and acts of international terrorism.

469.     According to FBI records, September 11th hijacker Hani Saleh Hanjour maintained a registered address in Taif, Saudi Arabia, under the name of al Faisaliah. That address corresponds with the branch office of al Faisaliah Group in Taif. This evidence thus establishes a direct link between Prince Abdullah's business concerns and one of the September 11th hijackers.

470.     There is substantial evidence that Prince Abdullah engaged in transactions with Mushayt for Trading establishment, the funding mechanism for the Spanish al Qaida cell. Muhammed Galeb Klaje Zouaydi, who founded the network of companies which served as a vehicle for financing al Qaida's activities in Europe, served for many years as Prince Abdulah's accountant. During the period of time that Mushayt for Trading was laundering money for the Spanish cell, Prince Abdulah and Zouaydi maintained a business partnership.

471.     Through his official and personal acts, as described herein, Prince Abdullah has provided critical financial and logistical support to al Qaida for a period of many years.

EXHIBIT 9, PAGE 1529

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 25 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 65 of 205   Page ID
#:11226

472.    Prince Mohamed al Faisal al Saud (Prince Mohamed) has long provided material support and resources to al Qaida.

473.    Prince Mohamed served, for many years, as the CEO of Dar al Maal al Islami. Dar al Maal al Islami is the ultimate parent of Faisal Islamic Bank of the Sudan, one of the principal shareholders of the Al Shamal Bank. Prince Mohamed chairs both the Al Shamal Bank and Faisal Islamic Bank of the Sudan.

474.    In his capacity as chairman of Dar al Maal al Islami, Faisal Islamic Bank of the Sudan and Al Shamal Bank, Prince Mohamed has facilitated the material sponsorship of al Qaida by those entities, as further detailed herein.

475.    Prince Mohamed has made significant personal contributions to Saudi-based charities that he knew to be sponsors of al Qaida's global operations as well, including IIRO, MWL, WAMY, BIF, the Saudi High Commission, SJRC and al Haramain, among others.

476.    At all times material hereto, Prince Mohamed knew and intended that the contributions he made to IIRO, WAMY, MWL, Sanabel al-Kheer and al Haramain Foundation would be used to fund al Qaida's global operations and acts of international terrorism.

477.    Through his official and personal acts, as described herein, Prince Mohamed has provided critical financial and logistical support to al Qaida for a period of many years.

478.    Prince Bandar bin Sultan bin Abdul Aziz al Saud (Prince Bandar) is the Ambassador of the Kingdom of Saudi Arabia to the United States.

125

EXHIBIT 9, PAGE 1530

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 26 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 66 of 205   Page ID
#:11227

479.    In his capacity as Ambassador to the United States, Prince Bandar has directed millions of dollars in embassy funds to charities operating within al Qaida's infrastructure, including the IIRO.

480.    Prince Bandar has also contributed millions of dollars of his personal wealth to charities operating within al Qaida's infrastructure, including the IIRO.

481.    Federal authorities are currently investigating transactions involving Saudi embassy bank accounts with Riggs National Corporation, including personal accounts belonging to Prince Bandar and his wife, Princess Haifa. The investigation focuses on transactions totaling tens of millions of dollars in cash, that were not properly reported, and the possible funneling of those funds to terrorist organizations.

482.    Through his official and personal acts, as described herein, Prince Bandar has provided critical financial and logistical support to al Qaida for a period of many years.

483.    Al Qaida also has benefited immensely from the support and sponsorship of prominent members of Saudi society, who are closely affiliated with the Saudi Royal Family. As described herein, these individuals have used the tremendous wealth and authority conferred upon by them by virtue of their privileged status within Saudi society to fuel al Qaida's growth and development, and to support al Qaida's global jihad. While publicly portraying themselves as legitimate business leaders and generous benefactors of worthy charitable causes, these individuals are, in a very real sense, members of the al Qaida movement.

484.    Dr. Sulaiman bin Ali al-Ali (a/k/a Sulaiman Kabbara), is a wealthy Saudi businessman, a member of the IIRO Executive Committee, and a member of the Shura Council of the Kingdom of Saudi Arabia. Al-Ali invested approximately $10 million in

EXHIBIT 9, PAGE 1531

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 27 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 67 of 205   Page ID
#:11228

the U.S. based operations of the IIRO, which operated within the SAAR Network of companies established to support al Qaida's global operations. Al-Ali also served as a member of Sana-Bell, Inc. investment firm, and was responsible for executing and managing Sana-Bell's investments. In 1992, he gave over $2.1 million in Sana-Bell charitable assets to investment projects controlled by BMI, Inc., the New Jersey based investment firm established by Soliman Bihieri. As stated previously, Bihieri was indicted by federal prosecutors based on his material support and sponsorship of terrorist organizations, including al Qaida. During the period of time al-Ali controlled the investments of Sana-Bell, millions of dollars of donations disappeared without explanation. Through IIRO and Sana-Bell, al-Ali also invested heavily in Global Chemical Corporation. According to the Federal Bureau of Investigation, IIRO dispersed in excess of $1,000,000 to Global Chemical Corporation between 1993 and 1997. Based on IIROs's 1995 IRS form 990, al Ali's total investment in Global Chemical would appear to exceed $2 million. Global Chemical was intimately associated with Taibah International. On January 9, 1997, Global Chemical's Chicago headquarters were raided by FBI agents as part of an investigation into its involvement in money laundering, fraud, and possible ties to terrorist activities. Al-Ali was also affiliated with the Kuwait based Lajnet al-Dawa, a relief organization designated by the United States government under Executive Order 13224 based on its intimate affiliation with al Qaida. Al-Ali has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

EXHIBIT 9, PAGE 1532

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 28 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 68 of 205   Page ID
#:11229

485.    Through his various for-profit enterprises and involvement with charities
and individuals operating within al Qaida's infrastructure, Sulaiman bin al-Ali has long
provided material support and resources to al Qaida.

486.    Ibrahim Muhammad Afandi co-founded Sana-Bell, Inc.'s Washington, DC
branch, along with defendant Saleh Kamel. In addition to his affiliation with Sana-Bell,
Inc., Afandi is a board member of the IIRO, the chairman of al-Afandi Establishment, the
CEO of al-Afandi Germany, CEO of Sky Muzen Holding Co., BV, CEO of Saudi
Industrial Services Company, Founder of the Great Saudi Development & Investment
Co., founder of the Arabian Company for Development and Investment Limited,
Chairman of the National Committee of Saudi Contractors, former general manager and
shareholder of al-Amoudi Group, owner of Gang Ranch, Skylight Corporation and BSA
Investments, and a partner in African Company of the Sudan, along with Al Rajhi Bank
and Dallah al-Baraka. Afandi is identified as one of al Qaida's principal financiers on
the Golden Chain. In his role as a member of the IIRO, he has actively participated in
that ostensible charity's sponsorship of al Qaida's operations. Afandi has made
substantial contributions to many of the charities operating within al Qaida's
infrastructure, with full knowledge that those funds would be used to support al Qaida's
operations and terrorist attacks.

487.    Through his various for-profit enterprises and involvement with charities
and individuals operating within al Qaida's infrastructure, Ibrahim Muhammad Afandi
has long provided material support and resources to al Qaida.

488.    Defendant Yassin al-Qadi is a Saudi national, who has long provided
material support and resources to al Qaida. Al-Qadi founded the Blessed Relief
(Muwafaq) Foundation in Delaware in 1992, and ran the organization from 1992 through

EXHIBIT 9, PAGE 1533

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 29 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 69 of 205   Page ID
#:11230

1997. Blessed Relief was registered in the Channel Islands, and run from Jeddah, Saudi Arabia. The charity was endowed, in large part, by Khalid bin Mahfouz, head of the National Commercial Bank of Saudi Arabia. As set forth previously, the United States government designated al-Qadi and the Blessed Relief Foundation under Executive Order 13224 on October 12, 2001, based on their pervasive involvement in sponsoring al Qaida's operations. Al-Qadi is also the Vice President of the Saudi Arabian Company M.M. Badkook Co. for Catering and Trading, owned by Talal Mohammed Badkook, with whom al-Qadi co-founded the Blessed Relief Foundation. Al-Qadi is also the director of Global Diamond Resources, a company in which several members of Osama bin Laden's family have invested and served as officers. Al-Qadi is also a member of the Board of Directors of New Diamond Holdings. Along with Musa Abu Marzook, a prominent Hamas figure, al-Qadi financed the BMI, Inc. investment firm, incorporated in New Jersey by Soliman Bihieri. As set forth previously, a BMI accountant advised FBI officials that the funds he transferred overseas on behalf of BMI were used to finance the embassy bombings in Africa. Al-Qadi has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

489.    Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Yassin al-Qadi has long provided material support and resources to al Qaida.

490.    Defendant Dr. Jamal Barzinji is a Saudi national who has long provided material support and resources to al Qaida. Barzinji has served as a board member of the International Institute of Islamic Thought and WAMY. Barzinji was an officer of Safa Trust, Mar-Jac Poultry and SAAR Foundation, three entities within the SAAR Network.

EXHIBIT 9, PAGE 1534

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 30 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 70 of 205   Page ID
#:11231

In his capacity as President of Safa Trust, Barzinji held authority over eighteen (18) bank accounts for Safa entities. Barzinji is also a business associate of Yousef Nada and a trustee and officer of the Imana Mutual Funds Trust. Barzinji was also a board member of the American Muslim Council, headed by Abdurahman Alamoudi. According to federal authorities, Barzinji "committed and conspired to: transit money internationally for the purpose of promoting offenses against foreign nations involving murder or the destruction of property by means of explosive, fire, kidnapping or extortion...; provide material support or resources to foreign terrorist organizations...; and provide material support or conceal or disguise the source of ownership of material support intended for use in preparation for or in carrying out a terrorist act." Barzinji has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

491.    Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Barzinji has long provided material support and resources to al Qaida.

492.    Defendant Samir Salah was a founder of the Safa Trust, and an officer of several other companies within the SAAR Network. In addition, Salah helped establish Bank al Taqwa in the mid 1980s. Salah was also deeply involved with the operations of Taibah International. Salah has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

130

EXHIBIT 9, PAGE 1535

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 31 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 71 of 205   Page ID
#:11232

493.    Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Samir Salah has long provided material support and resources to al Qaida.

494.    Defendant Suleiman Abdel Aziz al Rajhi is a Saudi national who has long provided material support and resources to al Qaida. Al Rajhi is Chairman and Managing Director of al Rajhi Banking and Investment Corporation, and the primary financier of the SAAR Foundation and many of the organizations which operated within the SAAR Network of charities and businesses. Al Rajhi also serves on the board of directors of the IIRO. Al Rajhi is identified on the Golden Chain as one of al Qaida's principal financiers. Al Rajhi has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

495.    Al Rajhi has close ties to the Saudi Royal Family and government, as evidenced by the fact that several members of the Saudi Royal Family are employed by, or serve as officers of, businesses owned or controlled by al Rajhi. For example, Prince Mohammad bin Nayef bin Abdel Aziz al Saud, the Assistant Deputy Minister of the Interior of Saudi Arabia, serves as the Chairman of Al Rajhi Commercial Foreign Exchange. Abdallah bin Yahya al Muallimi, the Secretary General of the Jeddah Province, serves as board member in the same company. Prince Faisal Ibn Muhamad Ibn Saud is the Chairman of al Rajhi Yamama Cement Company. Prince Turki Ibn Muhamad Ibn Abdul Aziz Ibn Turki is a board member of al Rajhi Yamama Cement Company.

EXHIBIT 9, PAGE 1536

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 32 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 72 of 205   Page ID
#:11233

496.     Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Suleiman Abdel Aziz al Rajhi has long provided material support and resources to al Qaida.

497.     Khalid bin Mahfouz is a wealthy Saudi national, and one of al Qaida's principal individual financiers.  For many years, bin Mahfouz owned a controlling interest in National Commercial Bank, and served as President and CEO of that institution.  While under his control, National Commercial Bank provided extensive financial services and other forms of material support to al Qaida, as described herein. Bin Mahfouz also endowed the Blessed Relief Foundation, founded by Yassin al-Qadi. Khalid bin Mahfouz's son, Abdulrahman bin Mahfouz, served as Director of the Blessed Relief Foundation.  When he endowed the Blessed Relief Foundation, Khalid bin Mahfouz specifically knew that it was established to serve as a vehicle for funding and otehrwise supporting terrorist organizations, including al Qaida.  As stated previously, the U.S. government designated the Blessed Relief Foundation under Executive Order 13224, based on its extensive involvement in al Qaida's global operations.  Khalid bin Mahfouz is also intimately associated with the International Development Foundation, another charity operating within al Qaida's support infrastructure.  Khalid bin Mahfouz is identified on the Golden Chain as one of al Qaida's principal financiers, and has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

498.     Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Khalid bin Mahfouz has long provided material support and resources to al Qaida.

132

EXHIBIT 9, PAGE 1537

Case 1:03-cv-06978-GBD-SN  Document 104-3  Filed 03/10/04  Page 33 of 50
Case 2:16-cv-04435-PA-MRW  Document 108-3  Filed 05/16/17  Page 73 of 205  Page ID
#:11234

499.    Sheikh Adel Abdul Batterjee is a wealthy Saudi businessman, a senior al Qaida official and one of that terrorist organization's principal individual financiers. Batterjee's longstanding involvement in al Qaida's global operations is detailed at length in the U.S. government's Santiago proffer in the Enaam Arnaout prosecution.  Batterjee is the current Chairman of Al Shamal Bank, and one of its largest shareholders.  Under Batterjee's direction, Al Shamal Bank has provided extensive financial services and other forms of material support to al Qaida, as further discussed herein.  Batterjee has also served as a senior official of BIF and Secretary General of WAMY.  Through those positions, Batterjee directly supported al Qaida's global operations.  Batterjee has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

500.    Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Sheikh Adel Abdul Batterjee has long provided material support and resources to al Qaida.

501.    Saleh Abdullah Kamel is a wealthy Saudi businessman and one of al Qaida's principal individual financiers.  Kamel is a shareholder in Al Shamal Bank and Tadamon Islamic Bank, and Chairman of al Baraka Financial Institution.  As further discussed herein, all three of those institutions are deeply involved in providing financial services and other forms of material support to al Qaida.  Saleh Kamel also co-founded the U.S. branch of Sana-Bell, Inc., an enterprise established to provide revenues to sustain the U.S. operations of the IIRO.  In founding Sana-Bell, Inc., Saleh Kamel knew and intended that it would be used as a vehicle for funding terrorist organizations, including al Qaida, through IIRO and the SAAR Network.  Kamel is identified on the

EXHIBIT 9, PAGE 1538

Case 1:03-cv-06978-GBD-SN    Document 104-3    Filed 03/10/04    Page 34 of 50
Case 2:16-cv-04435-PA-MRW    Document 108-3    Filed 05/16/17    Page 74 of 205    Page ID
#:11235

Golden Chain as one of al Qaida's principal financiers, and has made substantial

contributions to many of the charities operating within al Qaida's infrastructure, with full

knowledge that those funds would be used to support al Qaida's operations and terrorist

attacks.

502.    Through his various for-profit enterprises and involvement with charities

and individuals operating within al Qaida's infrastructure, Saleh Kamel has long provided

material support and resources to al Qaida.

503.    Youssef Jameel is a wealthy Saudi businessman and CEO of Abdul Lateef

Jameel Group. Jameel is identified on the Golden Chain as one of al Qaida's principal

financiers, and has made substantial contributions to many of the charities operating

within al Qaida's infrastructure, including a one time contribution of 8 million Sauid

Riyals to support the Saudi Red Crescent. Jameel contributed to the charities operating

within al Qaida's infrastructure with full knowledge that the contributed funds would be

used to support al Qaida's operations and terrorist attacks.

504.    Through his various for-profit enterprises and involvement with charities

and individuals operating within al Qaida's infrastructure, Saleh Kamel has long provided

material support and resources to al Qaida.

505.    Bakr bin Laden is Osama bin Laden's brother, and the head of Saudi

Binladin Group. Under Bakr bin Laden's control, Saudi Binladin Group has provided

substantial material support and assistance to al Qaida, as further detailed herein. Bakr

bin Laden is identified on the Golden Chain as one of al Qaida's principal financiers, and

has made substantial contributions to many of the charities operating within al Qaida's

infrastructure. Bakr bin Laden was one of the largest single donors to a 1992 fundraiser

for the IIRO, which raised 19 million Saudi Riyals for Bonsian "relief" efforts. Bakr bin

EXHIBIT 9, PAGE 1539

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 35 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 75 of 205   Page ID
#:11236

Laden contributed to the charities operating within al Qaida's infrastructure with full knowledge that the contributed funds would be used to support al Qaida's operations and terrorist attacks.

506.    Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Bakr bin Laden has long provided material support and resources to al Qaida.

507.    Abdullah bin Laden is Osama bin Laden's nephew, and the founder of the U.S. branch of WAMY.  Abdullah bin Laden served as President of WAMY's U.S. operations for many years.  As further discussed herein, the U.S. branch of WAMY operated within the SAAR Network as a vehicle for funding and otherwise sponsoring al Qaida's global operations.

508.    Through his involvement with WAMY and other charities and individuals operating within al Qaida's infrastructure, Abdullah bin Laden has long provided material support and resources to al Qaida.

## SUDAN

509.    The Republic of Sudan (Sudan) has long provided material support and resources to al Qaida, including para-military training, indoctrination, money, travel documentation, safe passage and refuge.

510.    Defendant Sudan openly harbored defendant Osama bin Laden and many top al Qaida lieutenants between 1991 and 1996.  During that time, as further described above, the Sudanese government permitted Osama bin Laden to establish al Qaida training camps, set up front companies to move assets and generate new revenues, and to use the cloak of Sudan's state sovereignty to shield al Qaida's operations.

EXHIBIT 9, PAGE 1540

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 36 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 76 of 205   Page ID
#:11237

511.    In 1996, the Sudanese government permitted Osama bin Laden to move to Afghanistan, where he was welcomed as an honored guest of the ruling Taliban government, rather than surrendering him to international authorities for prosecution.

512.    Defendant Sudan continues to harbor members of the al Qaida terrorist network, as well as members of affiliated FTOs, and has recently permitted al Qaida and other associated terrorist organizations to re-establish training camps within Sudan, and to otherwise use Sudan as a base to organize their operations and support compatriots elsewhere.

513.    In addition to its extensive direct support of al Qaida, defendant Sudan has long provided material support and resources to defendants Egyptian Islamic Jihad and Hezbollah.

514.    By virtue of its merger with Egyptian Islamic Jihad, and affiliation with Hezbollah, al Qaida has materially benefited from Sudan's sponsorship of those FTOs.

515.    As the forgoing demonstrates, the Sudan has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

516.    The September 11th Attack was a direct, intended and foreseeable product of the Sudan's participation in al Qaida's jihadist campaign.

### SYRIAN ARAB REPUBLIC

517.    Defendant Syrian Arab Republic (Syria) has long provided material support and resources to al Qaida.

518.    According to the U.S. government, Syria has provided safe haven, financial and logistical assistance, training facilities and political support for Hezbollah. In addition, Syria has for many years facilitated weapons shipments from Iran to

EXHIBIT 9, PAGE 1541

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 37 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 77 of 205   Page ID
#:11238

Hezbollah. As set forth above, Hezbollah is, in effect, an agency and instrumentality of the Syrian government.

519.    By virtue of its affiliation with Hezbollah, al Qaida has materially benefited from Syria's sponsorship of that FTO.

520.    Between 1992 and 2003, defendant Syria continually purchased crude oil from defendant Iraq, in violation of United Nations Security Council resolutions and sanctions programs designed to inhibit Iraq's ability to use funds derived from the sale of Iraq's natural resources to promote international terrorism and pursue the development of weapons of mass destruction. Through its state controlled bank, Syria assisted Iraq in laundering revenues realized by Iraq through the illegal oil sales, and through other illicit activities.

521.    Syria's violations of the United Nations Security Council resolutions and sanctions programs, as described above, enabled Iraq to maintain and expand its terrorist sponsorship programs, including its provision of material support and resources to al Qaida and affiliated FTOs, persons, organizations, commercial entities and other parties.

522.    Defendant Syria knew, or should have known, that al Qaida and affiliated FTOs, persons, organizations, commercial entities and other parties would materially benefit from Syria's illegal crude oil purchases from Iraq, and from the assistance Syria provided to Iraq in laundering revenues from the illegal oil sales and other illicit activities.

523.    As the forgoing demonstrates, Syria has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

EXHIBIT 9, PAGE 1542

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 38 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 78 of 205   Page ID
#:11239

524.    The September 11th Attack was a direct, intended and foreseeable product of Syria's participation in al Qaida's jihadist campaign.

## THE ISLAMIC REPUBLIC OF IRAN

525.    Defendant Islamic Republic of Iran (Iran) has long provided material support and resources to al Qaida.

526.    According to United States intelligence reports, the relationship between Iran and al Qaida dates to the early 1990's, when al Qaida officials met with Iranian intelligence officials to establish an anti-American partnership.

527.    According to the testimony of a former member of the Iranian Ministry of Information and Security, Iran provided direct support to al Qaida in relation to the 1996 bombing attack on the U.S. military base in Dahran, Saudi Arabia. The joint participation by Iran and al Qaida in that operation strengthened their relationship, and prompted increased Iranian support for al Qaida's operations.

528.    Later that same year, a delegation from al Qaida led by Saif al Adel came to Iran to discuss the establishment of an al Qaida base in the region between Iran and Afghanistan. As a result of those meetings, Iran and al Qaida agreed to establish a joint base for training of al Qaida and Hezbollah militants.

529.    In or around this same time, Saif al Adel moved to Iran, and began coordinating al Qaida operations from the sanctity of Iran's borders.

530.    Shortly before September 11, 2001, members of al Qaida leadership, including Saad bin Laden, met with Iranian officials to secure a safe place of retreat for the future al Qaida leadership following the September 11th Attack. The U.S. government has confirmed that Saad bin Laden and several other senior al Qaida officials

EXHIBIT 9, PAGE 1543

Case 1:03-cv-06978-GBD-SN  Document 104-3  Filed 03/10/04  Page 39 of 50
Case 2:16-cv-04435-PA-MRW  Document 108-3  Filed 05/16/17  Page 79 of 205  Page ID
#:11240

retreated to Iran from Afghanistan in the wake of the Septmeber 11th Attack, and are being harbored by Iran to this day.

531.    Iran permits those al Qaida officials to use the cloak of Iran's state sovereignty to shield al Qaida's operations, including the recruitment of new members, training of terrorist cells, and coordination, planning and funding of terrorist attacks throughout the world.

532.    In addition to its extensive direct support of al Qaida, defendant Iran has long provided material support and resources to Egyptian Islamic Jihad, Salafist Group for Call and Combat and Hezbollah. As set forth above, Hezbollah is, in effect, an agency and instrumentality of the Iranian government.

533.    By virtue of its merger with Egytpian Islamic Jihad, and affiliation with Salafist Group for Call and Combat and Hezbollah, al Qaida has materially benefited from Iran's sponsorship of those FTOs. Indeed, according to the testimony of Ali Mohamed, a U.S. green beret who pleaded guilty to conspiring with defendant Osama bin Laden to bomb U.S. embassies in Africa, Iran used Hezbollah to supply explosives and explosives training to al Qaida operatives.

534.    As the forgoing demonstrates, Iran has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

535.    The September 11th Attack was a direct, intended and foreseeable product of Iran's participation in al Qaida's jihadist campaign.

EXHIBIT 9, PAGE 1544

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 40 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 80 of 205   Page ID
#:11241

## REPUBLIC OF IRAQ

536.    The Republic of Iraq has long provided material support and resources to al Qaida.

537.    According to the U.S. government, defendant Iraq has harbored senior members of the al Qaida terrorist network.  Iraq permitted those al Qaida operatives to use the cloak of Iraq's state sovereignty to shield al Qaida's operations, including the recruitment of new members, training of terrorist cells, and coordination, planning and funding of terrorist attacks throughout the world.

538.    At all times material hereto, defendant Iraq operated terrorist training camps within its borders, at which defendant Iraq provided training to members of various terrorist organizations, including members of the al Qaida terrorist network.  One such camp was equipped with a commercial airliner fuselage, used by defendant Iraq to train terrorist operatives, including al Qaida members, in hijacking techniques and procedures.

539.    As the forgoing demonstrates, Iraq has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

540.    The September 11th Attack was a direct, intended and foreseeable product of Iraq's participation in al Qaida's jihadist campaign.

## PLAINTIFFS' INJURIES

541.    At the time of the September 11th Attack, plaintiff Federal provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit A hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of

140

EXHIBIT 9, PAGE 1545

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 41 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 81 of 205   Page ID
#:11242

Exhibit A.[1]  In accordance with the terms of the applicable policies of insurance, plaintiff
Federal has made payments to the insureds identified in Exhibit A in an aggregate
amount in excess of $1,305,520,292.20, as set forth in greater detail in Column D of
Exhibit A, and expects that it will make additional payments in the future, in
compensation for damages resulting from the September 11th Attack.  By virtue of its
payments to its insureds, plaintiff Federal is subrogated to its insureds' rights of recovery
against any responsible third parties.

542.    At the time of the September 11th Attack, plaintiff Pacific Indemnity
provided property insurance coverage to the corporations, companies, partnerships,
affiliations, persons, trusts and other parties identified in Column A of Exhibit B hereto,
relative to property and/or business interests located at the corresponding addresses
identified in Column B of Exhibit B.[2]  In accordance with the terms of the applicable
policies of insurance, plaintiff Pacific Indemnity has made aggregate payments to the
insureds identified in Exhibit B in an amount in excess of $9,542,008.43, as set forth in
greater detail in Column D of Exhibit B, and expects that it will make additional
payments in the future, in compensation for damages resulting from the September 11th
Attack.  By virtue of its payments, plaintiff Pacific Indemnity is subrogated to its
insureds' rights of recovery against any responsible third parties.

543.    At the time of the September 11th Attack, plaintiff Chubb Custom
provided insurance coverage to the corporations, companies, partnerships, affiliations,
persons, trusts and other parties identified in Column A of Exhibit C hereto, relative to
the property and/or business interests located at the corresponding addresses identified in
Column B of Exhibit C.[3]  In accordance with the terms of the applicable policies of

---

[1]    Exhibit A is expressly incorporated herein by reference.
[2]    Exhibit B is expressly incorporated herein by reference.
[3]    Exhibit C is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1546

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 42 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 82 of 205   Page ID
#:11243

insurance, plaintiff Chubb Custom has made payments to the insureds identified in
Exhibit C in an aggregate amount in excess of $612,585, as set forth in greater detail in
Column D of Exhibit C, and expects that it will make additional payments in the future,
in compensation for damages resulting from the September 11th Attack. By virtue of its
payments to its insureds, plaintiff Chubb Custom is subrogated to its insureds' rights of
recovery against any responsible third parties.

544. At the time of the September 11th Attack, plaintiff Chubb Indemnity
provided insurance coverage to the corporations, companies, partnerships, affiliations,
persons, trusts and other parties identified in Column A of Exhibit D hereto, relative to
property and/or business interests located at the corresponding addresses identified in
Column B of Exhibit D.[4] In accordance with the terms of the applicable policies of
insurance, plaintiff Chubb Indemnity has made payments to the insureds identified in
Exhibit D in an aggregate amount in excess of $3,771,622.01, as set forth in greater detail
in Column D of Exhibit D, and expects that it will make additional payments in the
future, in compensation for damages resulting from the September 11th Attack. By virtue
of its payments to its insureds, plaintiff Chubb Indemnity is subrogated to its insureds'
rights of recovery against any responsible third parties.

545. At the time of the September 11th Attack, plaintiff CICC provided
insurance coverage to the corporations, affiliations, companies, partnerships, persons,
trusts and other parties identified in Column A of Exhibit E hereto, relative to property
and/or business interests located at the corresponding addresses identified in Column B of
Exhibit E.[5] In accordance with the terms of the applicable policies of insurance, plaintiff
CICC has made payments to the insureds identified in Exhibit E in an aggregate amount

---

[4]     Exhibit D is expressly incorporated herein by reference.
[5]     Exhibit E is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1547

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 43 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 83 of 205   Page ID
#:11244

in excess of $44,547,557.24, as set forth in greater detail in Column D of Exhibit E, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack. By virtue of its payments to its insureds, plaintiff CICC is subrogated to its insureds' rights of recovery against any responsible third parties.

546.    At the time of the September 11th Attack, plaintiff CICNJ provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit F hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit F.[6] In accordance with the terms of the applicable policies of insurance, plaintiff CICNJ has made payments to the insureds identified in Exhibit F in an aggregate amount in excess of $410,681.69, as set forth in greater detail in Column D of Exhibit F, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack. By virtue of its payments to its insureds, plaintiff CICNJ is subrogated to its insureds' rights of recovery against any responsible third parties.

547.    At the time of the September 11th Attack, plaintiff Great Northern provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit G hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit G.[7] In accordance with the terms of the applicable policies of insurance, plaintiff Great Northern has made payments to the insureds identified in Exhibit G in an aggregate amount in excess of $598,504,108.30, as set forth in greater

---

[6]     Exhibit F is expressly incorporated herein by reference.
[7]     Exhibit G is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1548

Case 1:03-cv-06978-GBD-SN    Document 104-3    Filed 03/10/04    Page 44 of 50
Case 2:16-cv-04435-PA-MRW    Document 108-3    Filed 05/16/17    Page 84 of 205    Page ID
#:11245

detail in Column D of Exhibit G, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack. By virtue of its payments to its insureds, plaintiff Great Northern is subrogated to its insureds' rights of recovery against any responsible third parties.

548.  At the time of the September 11th Attack, plaintiff Vigilant provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit H hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit H.[8] In accordance with the terms of the applicable policies of insurance, plaintiff Vigilant has made payments to the insureds identified in Exhibit H in an aggregate amount in excess of $41,545,872.30, as set forth in greater detail in Column D of Exhibit H, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack. By virtue of its payments to its insureds, plaintiff Vigilant is subrogated to its insureds' rights of recovery against any responsible third parties.

549.  At the time of the September 11th Attack, plaintiff Zurich provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit I hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit I.[9] In accordance with the terms of the applicable policies of insurance, plaintiff Zurich has made payments to the insureds identified in Exhibit I in an aggregate amount in excess of $783,686,766.26, as set forth in greater detail in Column D of Exhibit I, and expects that it will make additional payments in the future, in compensation for damages

---

[8]  Exhibit H is expressly incorporated herein by reference.
[9]  Exhibit I is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1549

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 45 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 85 of 205   Page ID
#:11246

resulting from the September 11th Attack.  By virtue of its payments to its insureds,
plaintiff Zurich is subrogated to its insureds' rights of recovery against any responsible
third parties.

550.    At the time of the September 11th Attack, plaintiff American Guarantee
provided insurance coverage to the corporations, companies, partnerships, affiliations,
persons, trusts and other parties identified in Column A of Exhibit J hereto, relative to
property and/or business interests located at the corresponding addresses identified in
Column B of Exhibit J.[10]  In accordance with the terms of the applicable policies of
insurance, plaintiff American Guarantee has made payments to the insureds identified in
Exhibit J in an aggregate amount in excess of $44,407,749.17 as set forth in greater detail
in Column D of Exhibit J, and expects that it will make additional payments in the future,
in compensation for damages resulting from the September 11th Attack.  By virtue of its
payments to its insureds, plaintiff American Guarantee is subrogated to its insureds'
rights of recovery against any responsible third parties.

551.    At the time of the September 11th Attack, plaintiff American Zurich
provided insurance coverage to the corporations, companies, partnerships, affiliations,
persons, trusts and other parties identified in Column A of Exhibit K hereto, relative to
property and/or business interests located at the corresponding addresses identified in
Column B of Exhibit K.[11]  In accordance with the terms of the applicable policies of
insurance, plaintiff American Zurich has made payments to the insureds identified in
Exhibit K in an aggregate amount in excess of $2,356,183.61 as set forth in greater detail
in Column D of Exhibit K, and expects that it will make additional payments in the
future, in compensation for damages resulting from the September 11th Attack.  By virtue

---

[10]     Exhibit J is expressly incorporated herein by reference.
[11]     Exhibit K is expressly incorporated herein by reference.

145

EXHIBIT 9, PAGE 1550

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 46 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 86 of 205   Page ID
#:11247

of its payments to its insureds, plaintiff American Zurich is subrogated to its insureds' rights of recovery against any responsible third parties.

552.    At the time of the September 11th Attack, plaintiff Assurance of America provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit L hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit L.[12]  In accordance with the terms of the applicable policies of insurance, plaintiff Assurance of America has made payments to the insureds identified in Exhibit L in an aggregate amount in excess of $2,417,600.19 as set forth in greater detail in Column D of Exhibit L, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its payments to its insureds, plaintiff Assurance of America is subrogated to its insureds' rights of recovery against any responsible third parties.

553.    At the time of the September 11th Attack, plaintiff Colonial American provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit M hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit M.[13]  In accordance with the terms of the applicable policies of insurance, plaintiff Colonial American has made payments to the insureds identified in Exhibit M in an aggregate amount in excess of $21,400, as set forth in greater detail in Column D of Exhibit M, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its

---

[12]     Exhibit L is expressly incorporated herein by reference.
[13]     Exhibit M is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1551

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 47 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 87 of 205   Page ID
#:11248

payments to its insureds, plaintiff Colonial American is subrogated to its insureds' rights of recovery against any responsible third parties.

554.    At the time of the September 11th Attack, plaintiff Fidelity provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit N hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit N.[14]  In accordance with the terms of the applicable policies of insurance, plaintiff Fidelity has made payments to the insureds identified in Exhibit N in an aggregate amount in excess of $1,636,903.02 as set forth in greater detail in Column D of Exhibit N, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its payments to its insureds, plaintiff Fidelity is subrogated to its insureds' rights of recovery against any responsible third parties.

555.    At the time of the September 11th Attack, plaintiff Maryland provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit O hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit O.[15]  In accordance with the terms of the applicable policies of insurance, plaintiff Maryland has made payments to the insureds identified in Exhibit O in an aggregate amount in excess of $448,063.19, as set forth in greater detail in Column D of Exhibit O, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its

---

[14]    Exhibit N is expressly incorporated herein by reference.
[15]    Exhibit O is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1552

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 48 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 88 of 205   Page ID
#:11249

payments to its insureds, plaintiff Maryland is subrogated to its insureds' rights of recovery against any responsible third parties.

556.    At the time of the September 11th Attack, plaintiff Northern provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit P hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit P.[16]  In accordance with the terms of the applicable policies of insurance, plaintiff Northern has made payments to the insureds identified in Exhibit P in an aggregate amount in excess of $1,288,908.39 as set forth in greater detail in Column D of Exhibit P, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its payments to its insureds, plaintiff Northern is subrogated to its insureds' rights of recovery against any responsible third parties.

557.    At the time of the September 11th Attack, plaintiff Steadfast provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit Q hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit Q.[17]  In accordance with the terms of the applicable policies of insurance, plaintiff Steadfast has made payments to the insureds identified in Exhibit Q in an aggregate amount in excess of $392,783.63, as set forth in greater detail in Column D of Exhibit Q, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its

---

[16]    Exhibit P is expressly incorporated herein by reference.
[17]    Exhibit Q is expressly incorporated herein by reference.

148

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 49 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 89 of 205   Page ID
#:11250

payments to its insureds, plaintiff Steadfast is subrogated to its insureds' rights of recovery against any responsible third parties.

558.    At the time of the September 11th Attack, plaintiff Valiant provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit R hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit R.[18]  In accordance with the terms of the applicable policies of insurance, plaintiff Valiant anticipates that it may make payments to the insureds identified in Exhibit R in an aggregate amount in excess of $3,500, as set forth in greater detail in Column D of Exhibit R, and expects that it will make additional payments in the future in compensation for damages resulting from the September 11th Attack.  By virtue of any such payments to its insureds, plaintiff Valiant will become subrogated to its insureds' rights of recovery against any responsible third parties.

559.    At the time of the September 11th Attack, plaintiff One Beacon, through policies of insurance issued by One Beacon or by its predecessors in interest, General Accident, Commercial Union and CGU, provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit S hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit S.[19]  In accordance with the terms of the applicable policies of insurance, plaintiff One Beacon has made payments to the insureds identified in Exhibit S in an aggregate amount in excess of $185,805,247.79, as set forth in greater detail in Column D of Exhibit S, and expects that it will make additional payments in the future, in compensation for damages resulting from the

[18]    Exhibit R is expressly incorporated herein by reference.
[19]    Exhibit S is expressly incorporated herein by reference.

149

EXHIBIT 9, PAGE 1554

Case 1:03-cv-06978-GBD-SN   Document 104-3   Filed 03/10/04   Page 50 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 90 of 205   Page ID
#:11251

September 11th Attack. By virtue of its payments to its insureds, plaintiff One Beacon is
subrogated to its insureds' rights of recovery against any responsible third parties.

560. At the time of the September 11th Attack, plaintiff Crum & Forster
provided insurance coverage to the corporations, companies, partnerships, affiliations,
persons, trusts and other parties identified in Column A of Exhibit T hereto, relative to
property and/or business interests located at the corresponding addresses identified in
Column B of Exhibit T.[20] In accordance with the terms of the applicable policies of
insurance, plaintiff Crum & Forster has made payments to the insureds identified in
Exhibit T in an aggregate amount in excess of $44,300.08, as set forth in greater detail in
Column D of Exhibit T, and expects that it will make additional payments in the future,
in compensation for damages resulting from the September 11th Attack. By virtue of its
payments to its insureds, plaintiff Crum & Forster is subrogated to its insureds' rights of
recovery against any responsible third parties.

561. At the time of the September 11th Attack, plaintiff North River provided
insurance coverage to the corporations, companies, partnerships, affiliations, persons,
trusts and other parties identified in Column A of Exhibit U hereto, relative to property
and/or business interests located at the corresponding addresses identified in Column B of
Exhibit U.[21] In accordance with the terms of the applicable policies of insurance,
plaintiff North River has made payments to the insureds identified in Exhibit U in an
aggregate amount in excess of $3,405,966.77, as set forth in greater detail in Column D
of Exhibit U, and expects that it will make additional payments in the future, in
compensation for damages resulting from the September 11th Attack. By virtue of its

---

[20]    Exhibit T is expressly incorporated herein by reference.
[21]    Exhibit U is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1555

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 1 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 91 of 205   Page ID
#:11252

payments to its insureds, plaintiff North River is subrogated to its insureds' rights of recovery against any responsible third parties.

562.    At the time of the September 11th Attack, plaintiff United States Fire provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit V hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit V.[22]  In accordance with the terms of the applicable policies of insurance, plaintiff United States Fire has made payments to the insureds identified in Exhibit V in an aggregate amount in excess of $75,397,757.11, as set forth in greater detail in Column D of Exhibit V, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its payments to its insureds, plaintiff United States Fire is subrogated to its insureds' rights of recovery against any responsible third parties.

563.    At the time of the September 11th Attack, plaintiff American Alternative provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit W hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit W.[23]  In accordance with the terms of the applicable policies of insurance, plaintiff American Alternative has made payments to the insureds identified in Exhibit W in an aggregate amount in excess of $2,590,862.56, as set forth in greater detail in Column D of Exhibit W, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue

---

[22]       Exhibit V is expressly incorporated herein by reference.
[23]       Exhibit W is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1556

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 2 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 92 of 205   Page ID
#:11253

of its payments to its insureds, plaintiff American Alternative is subrogated to its insureds' rights of recovery against any responsible third parties.

564.     At the time of the September 11th Attack, plaintiff Great Lakes provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit X hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit X.[24]  In accordance with the terms of the applicable policies of insurance, plaintiff Great Lakes has made payments to the insureds identified in Exhibit X in an aggregate amount in excess of $51,682,223.62, as set forth in greater detail in Column D of Exhibit X, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its payments to its insureds, plaintiff Great Lakes is subrogated to its insureds' rights of recovery against any responsible third parties.

565.     At the time of the September 11th Attack, plaintiff Princeton Excess provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit Y hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit Y.[25]  In accordance with the terms of the applicable policies of insurance, plaintiff Princeton Excess has made payments to the insureds identified in Exhibit Y in an aggregate amount in excess of $3,796,292.50, as set forth in greater detail in Column D of Exhibit Y, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue

---

[24]     Exhibit X is expressly incorporated herein by reference.
[25]     Exhibit Y is expressly incorporated herein by reference.

152

Case 1:03-cv-06978-GBD-SN Document 104-4 Filed 03/10/04 Page 3 of 50
Case 2:16-cv-04435-PA-MRW Document 108-3 Filed 05/16/17 Page 93 of 205 Page ID
#:11254

of its payments to its insureds, plaintiff Princeton Excess is subrogated to its insureds' rights of recovery against any responsible third parties.

566.    At the time of the September 11th Attack, plaintiff Amlin provided insurance coverage to the corporations, partnerships, person, trusts and other parties identified in Column A of Exhibit Z hereto, relative to property, business interests and/or scheduled events located at the corresponding addresses identified in Column B of Exhibit Z.[26]  In accordance with the terms of the applicable policies of insurance, plaintiff Amlin has made payments to the insureds identified in Exhibit Z in an aggregate amount in excess of  $66,991,142.12, £9,093, and 28.70CAD as set forth in greater detail in Column D of Exhibit Z and expects it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its payments to its insureds, plaintiff Amlin is subrogated to its insureds' rights of recovery against any responsible third parties.  Amlin further reserves its rights of recovery against any responsible third parties for any additional payments it may make on behalf of its insureds arising out of the September 11th Attack.

567.    At the time of the September 11th Attack, Certain Underwriters at Lloyd's, comprised of Syndicate 33, represented by plaintiff Hiscox participated in providing insurance coverage to the corporations, partnerships, person, trusts and other parties identified in Column A of Exhibit AA hereto, relative to property, business interests and/or scheduled events located at the corresponding addresses identified in Column B of Exhibit AA.[27]  In accordance with the terms of the applicable policies of insurance, plaintiff Hiscox has made payments to the insureds identified in Exhibit AA in an aggregate amount in excess of $228,774,228.62 as set forth in greater detail in Column D

---

[26]    Exhibit Z is expressly incorporated herein by reference.
[27]    Exhibit AA is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1558

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 4 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 94 of 205   Page ID
#:11255

of Exhibit AA and expects it will make additional payments in the future in compensation for damages resulting from the September 11th Attack. By virtue of its payments to its insureds, plaintiff Hiscox is subrogated to its insureds' rights of recovery against any responsible third parties. Hiscox further reserves its rights of recovery against any responsible third parties for any additional payments it may make on behalf of its insureds arising out of the September 11th Attack.

568.   At the time of the September 11th Attack, plaintiff Allstate provided insurance coverage to the corporations, partnerships, person, trusts and other parties identified in Column A of Exhibit BB hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit BB.[28] In accordance with the terms of the applicable policies of insurance, plaintiff Allstate has made payments to the insureds identified in Exhibit BB in an aggregate amount in excess of $12,945,647.78, as set forth in greater detail in Column D of Exhibit BB and expects it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack. By virtue of its payments to its insureds, plaintiff Allstate is subrogated to its insureds' rights of recovery against any responsible third parties.

569.   At the time of the September 11th Attack, plaintiff Old Colony provided insurance coverage to the corporations, partnerships, person, trusts and other parties identified in Column A of Exhibit CC hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit CC.[29] In accordance with the terms of the applicable policies of insurance, Old Colony has made payments to the insureds identified in Exhibit CC in an aggregate amount in excess of $5,100, as set forth in greater detail in Column D of Exhibit CC and expects it will

---

[28]    Exhibit BB is expressly incorporated herein by reference.
[29]    Exhibit CC is expressly incorporated herein by reference.

154

EXHIBIT 9, PAGE 1559

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 5 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 95 of 205   Page ID
#:11256

make additional payments in the future, in compensation for damages resulting from the September 11th Attack  By virtue of its payments to its insureds, plaintiff Old Colony is subrogated to its insureds' rights of recovery against any responsible third parties.

570.    At the time of the September 11th Attack, plaintiff Continental Insurance provided insurance coverage to the corporations, partnerships, person, trusts and other parties identified in Column A of Exhibit DD hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit DD.[30] In accordance with the terms of the applicable policies of insurance, plaintiff Continental Insurance has made payments to the insureds identified in Exhibit DD in an aggregate amount in excess of $542,627, as set forth in greater detail in Column D of Exhibit DD and expects it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its payments to its insureds, plaintiff Continental Insurance is subrogated to its insureds' rights of recovery against any responsible third parties.

571.    At the time of the September 11th Attack, plaintiff Commercial Insurance Company of Newark, NJ provided insurance coverage to the corporations, partnerships, person, trusts and other parties identified in Column A of Exhibit EE hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit EE.[31]  In accordance with the terms of the applicable policies of insurance, plaintiff Commercial Insurance Company of Newark, NJ has made payments to the insureds identified in Exhibit EE in an aggregate amount in excess of $141,343, as set forth in greater detail in Column D of Exhibit EE and expects it will make additional payments in the future, in compensation for damages resulting from the September 11th

---

[30]     Exhibit DD is expressly incorporated herein by reference.
[31]     Exhibit EE is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1560

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 6 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 96 of 205   Page ID
#:11257

Attack. By virtue of its payments to its insureds, plaintiff Commercial Insurance Company of Newark, NJ is subrogated to its insureds' rights of recovery against any responsible third parties.

572.    At the time of the September 11th Attack, plaintiff CNA Casualty provided insurance coverage to the corporations, partnerships, person, trusts and other parties identified in Column A of Exhibit FF hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit FF.[32]  In accordance with the terms of the applicable policies of insurance, plaintiff CNA Casualty has made payments to the insureds identified in Exhibit FF in an aggregate amount in excess of $25,771, as set forth in greater detail in Column D of Exhibit FF and expects it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its payments to its insureds, plaintiff CNA Casualty is subrogated to its insureds' rights of recovery against any responsible third parties.

573.    At the time of the September 11th Attack, plaintiff Continental Insurance Company of New Jersey provided insurance coverage to the corporations, partnerships, person, trusts and other parties identified in Column A of Exhibit GG hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit GG.[33]  In accordance with the terms of the applicable policies of insurance, plaintiff Continental Insurance Company of New Jersey has made payments to the insureds identified in Exhibit GG in an aggregate amount in excess of $39,073, as set forth in greater detail in Column D of Exhibit GG and expects it will make additional payments in the future, in compensation for damages resulting from the September 11th

---

[32]      Exhibit FF is expressly incorporated herein by reference.
[33]      Exhibit GG is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1561

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 7 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 97 of 205   Page ID
#:11258

Attack. By virtue of its payments to its insureds, plaintiff Continental Insurance Company of New Jersey is subrogated to its insureds' rights of recovery against any responsible third parties.

574.    At the time of the September 11th Attack, plaintiff Fidelity and Casualty Company of New York provided insurance coverage to the corporations, partnerships, person, trusts and other parties identified in Column A of Exhibit HH hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit HH.[34] In accordance with the terms of the applicable policies of insurance, plaintiff Fidelity and Casualty Company of New York has made payments to the insureds identified in Exhibit HH in an aggregate amount in excess of $79,856, as set forth in greater detail in Column D of Exhibit HH and expects it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack. By virtue of its payments to its insureds, plaintiff Fidelity and Casualty Company of New York is subrogated to its insureds' rights of recovery against any responsible third parties.

575.    At the time of the September 11th Attack, plaintiff Glens Falls provided insurance coverage to the corporations, partnerships, person, trusts and other parties identified in Column A of Exhibit II hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit II.[35] In accordance with the terms of the applicable policies of insurance, plaintiff Glens Falls has made payments to the insureds identified in Exhibit II in an aggregate amount in excess of $36,239, as set forth in greater detail in Column D of Exhibit II and expects it will make additional payments in the future, in compensation for damages resulting from the

---

[34]    Exhibit HH is expressly incorporated herein by reference.
[35]    Exhibit II is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1562

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 8 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 98 of 205   Page ID
#:11259

September 11th Attack.  By virtue of its payments to its insureds, plaintiff Glens Falls is subrogated to its insureds' rights of recovery against any responsible third parties.

576.    At the time of the September 11th Attack, plaintiff Ben Franklin provided insurance coverage to the corporations, partnerships, person, trusts and other parties identified in Column A of Exhibit JJ hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit JJ.[36]  In accordance with the terms of the applicable policies of insurance, plaintiff Ben Franklin has made payments to the insureds identified in Exhibit JJ in an aggregate amount in excess of $6,442, as set forth in greater detail in Column D of Exhibit JJ and expects it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its payments to its insureds, plaintiff Ben Franklin is subrogated to its insureds' rights of recovery against any responsible third parties.

577.    At the time of the September 11th Attack, plaintiff Seneca provided insurance coverage to the corporations, partnerships, person, trusts and other parties identified in Column A of Exhibit KK hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit KK.[37]  In accordance with the terms of the applicable policies of insurance, plaintiff Seneca has made payments to the insureds identified in Exhibit KK in an aggregate amount in excess of $4,039,407.18, as set forth in greater detail in Column D of Exhibit KK and expects it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its payments to its insureds, plaintiff Seneca is subrogated to its insureds' rights of recovery against any responsible third parties.

---

[36]     Exhibit JJ is expressly incorporated herein by reference.
[37]     Exhibit KK is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1563

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 9 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 99 of 205   Page ID
#:11260

578.    At the time of the September 11th Attack, plaintiff Federal provided
workers' compensation insurance coverage to the employers identified in Column A of
Exhibit LL hereto, for the benefit of the employees identified in Column B of Exhibit LL,
in accordance with the workers' compensation laws of the States identified in Column C
of Exhibit LL. [38]  As a result of the September 11th Attack, while in the course and scope
of their employment, the employees identified in Column B of Exhibit LL were injured
or killed.  As a result of such injuries and deaths, and in accordance with the terms of the
applicable policies of insurance, plaintiff Federal has made workers' compensation
benefit payments, including, but not limited to, payments for medical bills, funeral
expenses, death benefits and wage replacement benefits to, or on behalf of, either injured
employees, dependents of deceased employees, or statutory designees, as identified in
Column D of Exhibit LL (hereinafter "claimants"). Plaintiff Federal may be obligated to
make future payments of workers' compensation benefits to, or on behalf of certain
claimants, for which a claim is made herein.  By virtue of the payments described above,
plaintiff Federal is subrogated to any right, claim, demand or cause of action that exists or
may exist for the benefit of those claimants and employers arising from the September
11th Attack and resulting injuries to claimants or death to claimants' decedents.

579.    To the extent required by the applicable workers' compensation statute,
plaintiff Federal has provided the requisite notice to claimants, in writing via certified or
registered mail, that their failure to commence an action against the defendants within the
specific statutorily prescribed time limit would operate as an assignment of their cause of
action against the defendants to the Plaintiff.  Claimants failed to commence such an
action and the cause of action against the defendants to recover damages for injuries or

---

[38]        Exhibit LL is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1564

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 10 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 100 of 205   Page ID
#:11261

death to claimants, or claimants' decedents, arising out of the September 11th Attack was thereby duly assigned to plaintiff Federal pursuant to the applicable workers' compensation statute.

580.    At the time of the September 11th Attack, plaintiff Pacific provided workers' compensation insurance coverage to the employers identified in Column A of Exhibit MM hereto, for the benefit of the employees identified in Column B of Exhibit MM, in accordance with the workers' compensation laws of the States identified in Column C of Exhibit MM.[39]  As a result of the September 11th Attack, while in the course and scope of their employment, the employees identified in Column B of Exhibit MM were injured or killed.  As a result of such injuries and deaths, and in accordance with the terms of the applicable policies of insurance, plaintiff Pacific has made workers' compensation benefit payments, including, but not limited to, payments for medical bills, funeral expenses, death benefits and wage replacement benefits to, or on behalf of, either injured employees, dependents of deceased employees, or statutory designees, as identified in Column D of Exhibit MM (hereinafter "claimants"). Plaintiff Pacific may be obligated to make future payments of workers' compensation benefits to, or on behalf of certain claimants, for which a claim is made herein.  By virtue of the payments described above, plaintiff Pacific is subrogated to any right, claim, demand or cause of action that exists or may exist for the benefit of those claimants and employers arising from the September 11th Attack and resulting injuries to claimants or death to claimants' decedents.

581.    To the extent required by the applicable workers' compensation statute, plaintiff Pacific has provided the requisite notice to claimants, in writing via certified or

---

[39]        Exhibit MM is expressly incorporated herein by reference.

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 11 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 101 of 205   Page ID
#:11262

registered mail, that their failure to commence an action against the defendants within the specific statutorily prescribed time limit would operate as an assignment of their cause of action against the defendants to the Plaintiff. Claimants failed to commence such an action and the cause of action against the defendants to recover damages for injuries or death to claimants, or claimants' decedents, arising out of the September 11th Attack was thereby duly assigned to plaintiff Pacific pursuant to the applicable workers' compensation statute.

582.   At the time of the September 11th Attack, plaintiff Great Northern provided workers' compensation insurance coverage to the employers identified in Column A of Exhibit NN hereto, for the benefit of the employees identified in Column B of Exhibit NN, in accordance with the workers' compensation laws of the States identified in Column C of Exhibit NN.[40]   As a result of the September 11th Attack, while in the course and scope of their employment, the employees identified in Column B of Exhibit BB were injured or killed. As a result of such injuries and deaths, and in accordance with the terms of the applicable policies of insurance, plaintiff Great Northern has made workers' compensation benefit payments, including, but not limited to, payments for medical bills, funeral expenses, death benefits and wage replacement benefits to, or on behalf of, either injured employees, dependents of deceased employees, or statutory designees, as identified in Column D of Exhibit NN (hereinafter "claimants"). Plaintiff Great Northern may be obligated to make future payments of workers' compensation benefits to, or on behalf of certain claimants, for which a claim is made herein. By virtue of the payments described above, plaintiff Great Northern is subrogated to any right, claim, demand or cause of action that exists or may exist for the

---

[40]      Exhibit NN is expressly incorporated herein by reference.

161

EXHIBIT 9, PAGE 1566

Case 1:03-cv-06978-GBD-SN  Document 104-4  Filed 03/10/04  Page 12 of 50
Case 2:16-cv-04435-PA-MRW  Document 108-3  Filed 05/16/17  Page 102 of 205  Page ID
#:11263

benefit of those claimants and employers arising from the September 11th Attack and resulting injuries to claimants or death to claimants' decedents.

583.  To the extent required by the applicable workers' compensation statute, plaintiff Great Northern has provided the requisite notice to claimants, in writing via certified or registered mail, that their failure to commence an action against the defendants within the specific statutorily prescribed time limit would operate as an assignment of their cause of action against the defendants to the Plaintiff. Claimants failed to commence such an action and the cause of action against the defendants to recover damages for injuries or death to claimants, or claimants' decedents, arising out of the September 11th Attack was thereby duly assigned to plaintiff Great Northern pursuant to the applicable workers' compensation statute.

584.  At the time of the September 11th Attack, plaintiff Vigilant provided workers' compensation insurance coverage to the employers identified in Column A of Exhibit OO hereto, for the benefit of the employees identified in Column B of Exhibit OO, in accordance with the workers' compensation laws of the States identified in Column C of Exhibit OO. [41]  As a result of the September 11th Attack, while in the course and scope of their employment, the employees identified in Column B of Exhibit CC were injured or killed. As a result of such injuries and deaths, and in accordance with the terms of the applicable policies of insurance, plaintiff Vigilant has made workers' compensation benefit payments, including, but not limited to, payments for medical bills, funeral expenses, death benefits and wage replacement benefits to, or on behalf of, either injured employees, dependents of deceased employees, or statutory designees, as identified in Column D of Exhibit OO (hereinafter "claimants"). Plaintiff Vigilant may be

[41]  Exhibit OO is expressly incorporated herein by reference.

162

EXHIBIT 9, PAGE 1567

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 13 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 103 of 205   Page ID
#:11264

obligated to make future payments of workers' compensation benefits to, or on behalf of certain claimants, for which a claim is made herein. By virtue of the payments described above, plaintiff Vigilant is subrogated to any right, claim, demand or cause of action that exists or may exist for the benefit of those claimants and employers arising from the September 11th Attack and resulting injuries to claimants or death to claimants' decedents.

585.    To the extent required by the applicable workers' compensation statute, plaintiff Vigilant has provided the requisite notice to claimants, in writing via certified or registered mail, that their failure to commence an action against the defendants within the specific statutorily prescribed time limit would operate as an assignment of their cause of action against the defendants to the Plaintiff. Claimants failed to commence such an action and the cause of action against the defendants to recover damages for injuries or death to claimants, or claimants' decedents, arising out of the September 11th Attack was thereby duly assigned to plaintiff Vigilant pursuant to the applicable workers' compensation statute.[42]

586.    At the time of the September 11th Attack, plaintiff One Beacon, through policies of insurance issued by One Beacon or by its predecessor in interest General Accident, provided workers' compensation insurance coverage to the employers identified in Column A of Exhibit PP hereto, for the benefit of the employees identified in Column B of Exhibit PP, in accordance with the workers' compensation laws of the

---

[42]       Plaintiff Vigilant is bringing its claim for workers' compensation payments made to claimant(s) under the workers' compensation laws of New Jersey in the name of such claimant(s), and/or their personal representatives in the case of deceased employees, to the use of plaintiff Vigilant, pursuant to Exhibit OO hereto. For purposes of protecting the identities of the individuals involved, pursuant to the accompanying Motion for Entry of a Confidentiality Order, the names of such plaintiffs/claimants are being set forth in Exhibit OO and incorporated herein to the same extent as if specifically identified in the caption and body of this Complaint.

EXHIBIT 9, PAGE 1568

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 14 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 104 of 205   Page ID
#:11265

States identified in Column C of Exhibit PP.[43]  As a result of the September 11th Attack,
while in the course and scope of their employment, the employees identified in Column B
of Exhibit PP were injured or killed.  As a result of such injuries and deaths, and in
accordance with the terms of the applicable policies of insurance, plaintiff One Beacon
has made workers' compensation benefit payments, including, but not limited to,
payments for medical bills, funeral expenses, death benefits and wage replacement
benefits to, or on behalf of, either injured employees, dependents of deceased employees,
or statutory designees, as identified in Column D of Exhibit PP (hereinafter "claimants").
Plaintiff One Beacon may be obligated to make future payments of workers'
compensation benefits to, or on behalf of certain claimants, for which a claim is made
herein.  By virtue of the payments described above, plaintiff One Beacon is subrogated to
any right, claim, demand or cause of action that exist or may exist for the benefit of those
claimants and employers arising from the September 11th Attack and resulting injuries to
claimants or death to claimants' decedents.

     587.   To the extent required by the applicable workers' compensation statute,
plaintiff One Beacon has provided the requisite notice to claimants, in writing via
certified or registered mail, that their failure to commence an action against the
defendants within the specific statutorily prescribed time limit would operate as an
assignment of their cause of action against the defendants to the Plaintiff.  Claimants
failed to commence such an action and the cause of action against the defendants to
recover damages for injuries or death to claimants, or claimants' decedents, arising out of
the September 11th Attack was thereby duly assigned to plaintiff One Beacon pursuant to
the applicable workers' compensation statute.[44]

---

[43]     Exhibit PP is expressly incorporated herein by reference.
[44]     Plaintiff One Beacon is bringing its claim for workers' compensation payments made to
claimant(s) under the workers' compensation laws of New Jersey in the name of such claimant(s), and/or

EXHIBIT 9, PAGE 1569

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 15 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 105 of 205   Page ID
#:11266

588.    At the time of the September 11th Attack, plaintiff American Employers provided workers' compensation insurance coverage to the employers identified in Column A of Exhibit QQ hereto, for the benefit of the employees identified in Column B of Exhibit QQ, in accordance with the workers' compensation laws of the States identified in Column C of Exhibit QQ. [45]  As a result of the September 11th Attack, while in the course and scope of their employment, the employees identified in Column B of Exhibit EE were injured or killed.  As a result of such injuries and deaths, and in accordance with the terms of the applicable policies of insurance, plaintiff American Employers has made workers' compensation benefit payments, including, but not limited to, payments for medical bills, funeral expenses, death benefits and wage replacement benefits to, or on behalf of, either injured employees, dependents of those employees killed, or statutory designees, as identified in Column D of Exhibit EE (hereinafter "claimants").  Plaintiff American Employers may be obligated to make future payments of workers' compensation benefits to, or on behalf of certain claimants, for which a claim is made herein.  By virtue of the payments described above, plaintiff American Employers is subrogated to any right, claim, demand or cause of action that exists or may exist for the benefit of those claimants and employers arising from the September 11th Attack and resulting injuries to claimants or death to claimants decedents.

589.    To the extent required by the applicable workers' compensation statute, plaintiff American Employers has provided the requisite notice to claimants, in writing via certified or registered mail, that their failure to commence an action against the

---

their personal representatives in the case of deceased employees, to the use of plaintiff One Beacon, pursuant to Exhibit PP hereto.  For purposes of protecting the identities of the individuals involved, pursuant to the accompanying Motion for Entry of a Confidentiality Order, the names of such plaintiffs/claimants are being set forth in Exhibit PP and incorporated herein to the same extent as if specifically identified in the caption and body of this Complaint.

[45]     Exhibit QQ is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1570

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 16 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 106 of 205   Page ID
#:11267

defendants within the specific statutorily prescribed time limit would operate as an assignment of their cause of action against the defendants to the Plaintiff. Claimants failed to commence such an action and the cause of action against the defendants to recover damages for injuries or death to claimants, or claimants' decedents, arising out of the September 11th Attack was thereby duly assigned to plaintiff American Employers pursuant to the applicable workers' compensation statute.

590.   At the time of the September 11th Attack, plaintiff One Beacon America provided workers' compensation insurance coverage to the employers identified in Column A of Exhibit RR hereto, for the benefit of the employees identified in Column B of Exhibit RR, in accordance with the workers' compensation laws of the States identified in Column C of Exhibit RR.[46]   As a result of the September 11th Attack, while in the course and scope of their employment, the employees identified in Column B of Exhibit RR were injured or killed. As a result of such injuries and deaths, and in accordance with the terms of the applicable policies of insurance, plaintiff One Beacon America has made workers' compensation benefit payments, including, but not limited to, payments for medical bills, funeral expenses, death benefits and wage replacement benefits to, or on behalf of, either injured employees, dependents of deceased employees, or statutory designees, as identified in Column D of Exhibit RR (hereinafter "claimants"). Plaintiff One Beacon America may be obligated to make future payments of workers' compensation benefits to, or on behalf of certain claimants, for which a claim is made herein. By virtue of the payments described above, plaintiff One Beacon America is subrogated to any right, claim, demand or cause of action that exists or may exist for the

---

[46]      Exhibit RR is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1571

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 17 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 107 of 205   Page ID
#:11268

benefit of those claimants and employers arising from the September 11th Attack and resulting injuries to claimants or death to claimants' decedents.

591.    To the extent required by the applicable workers' compensation statute, plaintiff One Beacon America has provided the requisite notice to claimants, in writing via certified or registered mail, that their failure to commence an action against the defendants within the specific statutorily prescribed time limit would operate as an assignment of their cause of action against the defendants to the Plaintiff. Claimants failed to commence such an action and the cause of action against the defendants to recover damages for injuries or death to claimants, or claimants' decedents, arising out of the September 11th Attack was thereby duly assigned to plaintiff One Beacon America pursuant to the applicable workers' compensation statute.

592.    At the time of the September 11th Attack, plaintiff Camden provided workers' compensation insurance coverage to the employers identified in Column A of Exhibit SS hereto, for the benefit of the employees identified in Column B of Exhibit SS, in accordance with the workers' compensation laws of the States identified in Column C of Exhibit SS. [47] As a result of the September 11th Attack, while in the course and scope of their employment, the employees identified in Column B of Exhibit SS were injured or killed. As a result of such injuries and deaths, and in accordance with the terms of the applicable policies of insurance, plaintiff Camden has made workers' compensation benefit payments, including, but not limited to, payments for medical bills, funeral expenses, death benefits and wage replacement benefits to, or on behalf of, either injured employees, dependents of deceased employees, or statutory designees, as identified in Column D of Exhibit SS (hereinafter "claimants"). Plaintiff Camden may be obligated to

---

[47]      Exhibit SS is expressly incorporated herein by reference.

167

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 18 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 108 of 205   Page ID
#:11269

make future payments of workers' compensation benefits to, or on behalf of certain

claimants, for which a claim is made herein. By virtue of the payments described above,

plaintiff Camden is subrogated to any right, claim, demand or cause of action that exists

or may exist for the benefit of those claimants and employers arising from the September

11th Attack and resulting injuries to claimants or death to claimants' decedents.

593.    To the extent required by the applicable workers' compensation statute,

plaintiff Camden has provided the requisite notice to claimants, in writing via certified or

registered mail, that their failure to commence an action against the defendants within the

specific statutorily prescribed time limit would operate as an assignment of their cause of

action against the defendants to the Plaintiff. Claimants failed to commence such an

action and the cause of action against the defendants to recover damages for injuries or

death to claimants, or claimants' decedents, arising out of the September 11th Attack was

thereby duly assigned to plaintiff Camden pursuant to the applicable workers'

compensation statute.[48]

594.    At the time of the September 11th Attack, plaintiff Homeland provided

workers' compensation insurance coverage to the employers identified in Column A of

Exhibit TT hereto, for the benefit of the employees identified in Column B of Exhibit TT,

in accordance with the workers' compensation laws of the States identified in Column C

of Exhibit TT.[49] As a result of the September 11th Attack, while in the course and scope

of their employment, the employees identified in Column B of Exhibit TT were injured

---

[48]        Plaintiff Camden is bringing its claim for workers' compensation payments made to claimant(s)
under the workers' compensation laws of New Jersey in the name of such claimant(s), and/or their personal
representatives in the case of deceased employees, to the use of plaintiff Camden, pursuant to Exhibit SS
hereto. For purposes of protecting the identities of the individuals involved, pursuant to the accompanying
Motion for Entry of a Confidentiality Order, the names of such plaintiffs/claimants are being set forth in
Exhibit SS and incorporated herein to the same extent as if specifically identified in the caption and body of
this Complaint.
[49]        Exhibit TT is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1573

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 19 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 109 of 205   Page ID
#:11270

or killed. As a result of such injuries and deaths, and in accordance with the terms of the applicable policies of insurance, plaintiff Homeland has made workers' compensation benefit payments, including, but not limited to, payments for medical bills, funeral expenses, death benefits and wage replacement benefits to, or on behalf of, either injured employees, dependents of deceased employees, or statutory designees, as identified in Column D of Exhibit TT (hereinafter "claimants"). Plaintiff Homeland may be obligated to make future payments of workers' compensation benefits to, or on behalf of certain claimants, for which a claim is made herein. By virtue of the payments described above, plaintiff Homeland is subrogated to any right, claim, demand or cause of action that exists or may exist for the benefit of those claimants and employers arising from the September 11th Attack and resulting injuries to claimants or death to claimants' decedents.

595.    To the extent required by the applicable workers' compensation statute, plaintiff Homeland provided the requisite notice to claimants, in writing via certified or registered mail, that their failure to commence an action against the defendants within the specific statutorily prescribed time limit would operate as an assignment of their cause of action against the defendants to the Plaintiff. Claimants failed to commence such an action and the cause of action against the defendants to recover damages for injuries or death to claimants, or claimants' decedents, arising out of the September 11th Attack was thereby duly assigned to plaintiff Homeland pursuant to the applicable workers' compensation statute.

596.    At the time of the September 11th Attack, plaintiff United States Fire provided workers' compensation insurance coverage to the employers identified in Column A of Exhibit UU hereto, for the benefit of the employees identified in Column B

EXHIBIT 9, PAGE 1574

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 20 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 110 of 205   Page ID
#:11271

of Exhibit UU, in accordance with the workers' compensation laws of the States identified in Column C of Exhibit UU. [50] As a result of the September 11th Attack, while in the course and scope of their employment, the employees identified in Column B of Exhibit UU were injured or killed. As a result of such injuries and deaths, and in accordance with the terms of the applicable policies of insurance, plaintiff United States Fire has made workers' compensation benefit payments, including, but not limited to, payments for medical bills, funeral expenses, death benefits and wage replacement benefits to, or on behalf of, either injured employees, dependents of deceased employees, or statutory designees, as identified in Column D of Exhibit UU (hereinafter "claimants"). Plaintiff United States Fire may be obligated to make future payments of workers' compensation benefits to, or on behalf of certain claimants, for which a claim is made herein. By virtue of the payments described above, plaintiff United States Fire is subrogated to any right, claim, demand or cause of action that exists or may exist for the benefit of those claimants and employers arising from the September 11th Attack and resulting injuries to claimants or death to claimants' decedents.

597.   To the extent required by the applicable workers' compensation statute, plaintiff United States Fire has provided the requisite notice to claimants, in writing via certified or registered mail, that their failure to commence an action against the defendants within the specific statutorily prescribed time limit would operate as an assignment of their cause of action against the defendants to the Plaintiff. Claimants failed to commence such an action and the cause of action against the defendants to recover damages for injuries or death to claimants, or claimants' decedents, arising out of

---

[50]     Exhibit UU is expressly incorporated herein by reference.

EXHIBIT 9, PAGE 1575

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 21 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 111 of 205   Page ID
#:11272

the September 11th Attack was thereby duly assigned to plaintiff United States Fire

pursuant to the applicable workers' compensation statute.

## COUNT I
### PLAINTIFFS V. ALL DEFENDANTS
### TRESPASS

598.   Plaintiffs incorporate the previous allegations by reference.

599.   The September 11th Attack constituted an intentional and unlawful

trespass upon the real and personal property of plaintiffs' insureds, to which plaintiffs'

insureds did not consent.

600.   As set forth above, the September 11th Attack was a direct, intended and

foreseeable product of a larger conspiracy among the defendants to commit acts of

international terrorism against the United States, its nationals and allies.

601.   The conspiracy among the defendants to commit acts of international

terrorism against the United States, its nationals and allies, included the provision of

material support and resources to defendant al Qaida and affiliated foreign states, FTOs,

persons, organizations, commercial entities and other parties.

602.   The co-defendants knew, or should have known, that their provision of

material support and resources to al Qaida and affiliated foreign states, FTOs, persons,

organizations, commercial entities and other parties would result in an unlawful trespass

upon the real and personal property of plaintiffs' insureds.

603.   The damages suffered by plaintiffs, as described in greater detail herein

and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid

trespass upon the real and personal property of plaintiffs' insureds.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and

severally, for an amount in excess of $4,500,000,000, treble damages pursuant to 18

171

Case 1:03-cv-06978-GBD-SN Document 104-4 Filed 03/10/04 Page 22 of 50
Case 2:16-cv-04435-PA-MRW Document 108-3 Filed 05/16/17 Page 112 of 205 Page ID
#:11273

U.S.C. §2333 and 18 U.S.C. §1964, punitive damages, pre and post-judgment interest, costs of this action, attorney's fees and such other and further relief as the Court may deem appropriate under the circumstances.

<div align="center">

**COUNT II**
**PLAINTIFFS V. ALL DEFENDANTS**
**WRONGFUL DEATH**

</div>

604. Plaintiffs incorporate the previous allegations by reference.

605. As a result of the September 11th Attack, certain of plaintiffs' insureds' employees were killed, as set forth in the Exhibits attached hereto.

606. As a result of the intentional, willful and malicious killing of plaintiffs' insureds' employees, the family members of plaintiffs' insureds' decedent employees have suffered severe and permanent injuries, damages and losses, including, but not limited to, the following:

      a)     Economic damages, including but not limited to pecuniary losses, past and future wage losses, loss of support, loss of services, loss of parental care and guidance, and loss of prospective inheritance; and

      b)     Non-economic damages, including but not limited to the loss of consortium, solatium, society, companionship, care, comfort, love, mental anguish, bereavement and grief.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount in excess of $20,000,000,000, treble damages pursuant to 18 U.S.C. §2333 and 18 U.S.C. §1964, punitive damages, pre and post-judgment interest, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

<div align="center">172</div>

EXHIBIT 9, PAGE 1577

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 23 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 113 of 205   Page ID
#:11274

### COUNT III
### PLAINTIFFS V. ALL DEFENDANTS
### SURVIVAL ACTION

607.  Plaintiffs incorporate the previous allegations by reference.

608.  As a result of their deaths, plaintiffs' insureds' decedent employees lost
the enjoyment of life that they would have had if they had not been killed.

609.  Before their deaths, plaintiffs' insureds' decedent employees suffered
conscious pain and suffering, and fear of their impending deaths.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and
severally, for an amount in excess of $10,000,000,000, treble damages pursuant to 18
U.S.C. §2333 and 18 U.S.C. §1964, punitive damages, pre and post-judgment interest,
costs of this action and such other and further relief as the Court may deem appropriate
under the circumstances.

### COUNT IV
### PLAINTIFFS V. ALL DEFENDANTS
### ASSAULT AND BATTERY

610.  Plaintiffs incorporate the previous allegations by reference.

611.  As a result of the September 11th Attack, the employees of plaintiffs'
insureds were placed in apprehension of harmful and/or offensive bodily contact, and
were subjected to offensive and harmful contact to which they did not consent, as a result
of which they were killed or seriously injured.

612.  The employees of plaintiffs' insureds who were injured but not killed as a
result of the September 11th Attack suffered serious and permanent personal injuries,
severe mental and emotional anguish and suffering, impairment of their respective
earning capacities, which impairment will continue indefinitely into the future, as well as
financial losses and expenses.

173

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 24 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 114 of 205   Page ID
#:11275

613.    The employees of plaintiffs' insureds who were injured but not killed as a result of the September 11th Attack have been obligated to receive and undergo medical attention and care and to expend various amounts of money and incur various expenses for the treatment of their injuries, and will be obligated to continue to expend additional sums of money or incur further such expenses for an indefinite period of time.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount in excess of $10,000,000,000, treble damages pursuant to 18 U.S.C. §2333 and 18 U.S.C. §1964, punitive damages, pre and post-judgment interest, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

<div align="center">

**COUNT V**
**PLAINTIFFS V. ALL DEFENDANTS**
**INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL**
**DISTRESS**

</div>

614.    Plaintiffs incorporate the previous allegations by reference.

615.    The defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United State, its nationals and allies, including the September 11th Attack, would result in the murder and serious injury of innocent persons, leaving the victims and their family members with severe and permanent physical, psychological and emotional injuries.

616.    The defendants' actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11th Attack, were intentional, malicious, willful, unconscionable, reckless and/or negligent.

<div align="center">174</div>

EXHIBIT 9, PAGE 1579

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 25 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 115 of 205   Page ID
#:11276

617.    As a direct and proximate result of the defendants' intentional, malicious, willful, unconscionable, reckless and/or negligent actions, plaintiffs' assignors have suffered and will continue to suffer severe and permanent emotional distress and anxiety, psychological distress and permanent mental injury and impairment, requiring ongoing and long-term expenses for medical services, counseling and care, as well as other economic losses.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount in excess of $10,000,000,000, treble damages pursuant to 18 U.S.C. §2333 and 18 U.S.C. §1964, punitive damages, pre and post-judgment interest, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT VI
## PLAINTIFFS V. ALL DEFENDANTS
## TORTURE VICTIM PROTECTION ACT

618.    Plaintiffs incorporate the previous allegations by reference.

619.    The conduct of the defendants, as described in greater detail above, subjected the employees of plaintiffs' insureds to torture and/or extrajudicial killing, within the meaning of the Torture Victim Protection Act, Pub.L. 102-256, 106 Stat. 73.

620.    The actions of the defendants in furtherance of the extrajudicial killing and torture of plaintiffs' insureds' employees were carried out under actual or apparent authority, or color of law, of a foreign nation or nations.

621.    The defendants' actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11th Attack, were in violation of the law of nations.

175

EXHIBIT 9, PAGE 1580

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 26 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 116 of 205   Page ID
#:11277

622.    Pursuant to the Torture Victim Protection Act, the defendants are liable for the extrajudicial killing and torture of the employees of plaintiffs' insureds.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount in excess of $25,000,000,000, treble damages pursuant to 18 U.S.C. §2333 and 18 U.S.C. §1964, punitive damages, pre and post-judgment interest, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

<div align="center">

**COUNT VII**
**PLAINTIFFS V. ALL DEFENDANTS**
**CONSPIRACY**

</div>

623.    Plaintiffs incorporate the previous allegations by reference.

624.    As set forth in greater detail above, the defendants conspired to commit acts of international terrorism against the United States, its nationals and allies, which conspiracy included the provision of material support and resources to defendant al Qaida and affiliated foreign states, FTOs, persons, organizations, commercial entities and other parties.

625.    The September 11th Attack was a direct, foreseeable and intended product of the conspiracy among the defendants to commit acts of international terrorism against the United States, its nationals and allies.

626.    The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid conspiracy among the defendants to commit acts of international terrorism against the United States, its nationals and allies.

EXHIBIT 9, PAGE 1581

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 27 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 117 of 205   Page ID
#:11278

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount in excess of $35,000,000,000, treble damages pursuant to 18 U.S.C. §2333 and 18 U.S.C. §1964, punitive damages, pre and post-judgment interest, costs of this action, attorney's fees and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT VIII
## PLAINTIFFS V. ALL DEFENDANTS
### 18 U.S.C. § 1962(a) – CIVIL RICO

627.    Plaintiffs incorporate the previous allegations by reference.

628.    In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealings in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.

629.    The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount in excess of $35,000,000,000, treble damages pursuant to 18 U.S.C. §2333 and 18 U.S.C. §1964, punitive damages, pre and post-judgment interest, costs of this action, attorney's fees and such other and further relief as the Court may deem appropriate under the circumstances.

EXHIBIT 9, PAGE 1582

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 28 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 118 of 205   Page ID
#:11279

### COUNT IX
### PLAINTIFFS V. ALL DEFENDANTS
### AIDING AND ABETTING

630.    Plaintiffs incorporate the previous allegations by reference.

631.    Through the material support and resources provided to al Qaida, the co-defendants aided and abetted al Qaida in its campaign to commit acts of international terrorism against the United States, its nationals, and allies.

632.    The September 11th Attack was a direct, intended and foreseeable product of the aiding and abetting of al Qaida by the co-defendants.

633.    The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid aiding and abetting of al Qaida by the co-defendants, acting individually and in concert with one another.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount in excess of $35,000,000,000, treble damages pursuant to 18 U.S.C. §2333 and 18 U.S.C. §1964, punitive damages, pre and post-judgment interest, costs of this action, attorney's fees and such other and further relief as the Court may deem appropriate under the circumstances.

### COUNT X
### PLAINTIFFS V. ALL DEFENDANTS
### 18 U.S.C. § 2333

634.    Plaintiffs incorporate the previous allegations by reference.

635.    The September 11th Attack constitutes an act of international terrorism within the meaning of 18 U.S.C. § 2331.

178

EXHIBIT 9, PAGE 1583

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 29 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 119 of 205   Page ID
#:11280

636.    As a result of the September 11th Attack, plaintiffs' insureds suffered injuries to their real and personal property, as described in greater detail herein and in the Exhibits attached hereto.

637.    As a result of the September 11th Attack, the employees of plaintiffs' insureds suffered injuries to their person, as described in greater detail herein and in the Exhibits attached hereto.

638.    By virtue of their participation in the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11th Attack, the defendants are liable to plaintiffs for threefold all damages resulting from the September 11th Attack, costs of this suit and attorney's fees, pursuant to 18 U.S.C. § 2333.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount in excess of $35,000,000,000, treble damages pursuant to 18 U.S.C. §2333 and 18 U.S.C. §1964, punitive damages, pre and post-judgment interest, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

<div align="center">

**COUNT XI**
**PLAINTIFFS V. ALL DEFENDANTS**
**NEGLIGENCE**

</div>

639.    Plaintiffs incorporate the previous allegations by reference.

640.    As set forth above, the September 11th Attack was a direct, intended and foreseeable product of a larger conspiracy among the defendants to commit acts of international terrorism against the United States, its nationals and allies.

641.    The conspiracy among the defendants to commit acts of international terrorism against the United States, its nationals and allies, included the provision of

179

EXHIBIT 9, PAGE 1584

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 30 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 120 of 205   Page ID
#:11281

material support and resources to defendant al Qaida and affiliated foreign states, FTOs,
persons, organizations, commercial entities and other parties.

642.    By virtue of their participation in the conspiracy to commit acts of
international terrorism against the United States, its nationals and allies, including the
September 11th Attack, the defendants negligently, intentionally, recklessly, willfully and
wantonly breached duties of care owed to plaintiffs and the employees of plaintiffs'
insureds.

643.    The damages suffered by plaintiffs and plaintiffs' assignors, as described
in greater detail herein and in the Exhibits attached hereto, were the direct and proximate
result of the aforesaid breaches of care by the defendants.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and
severally, for an amount in excess of $35,000,000,000, treble damages pursuant to 18
U.S.C. §2333 and 18 U.S.C. §1964, punitive damages, pre and post-judgment interest,
costs of this action, attorney's fees and such other and further relief as the Court may
deem appropriate under the circumstances.

## COUNT XII
## PLAINTIFFS V. ALL DEFENDANTS
## PUNITIVE DAMAGES

644.    Plaintiffs incorporate the previous allegations by reference.

645.    The defendants' actions in furtherance of the conspiracy to commit acts of
international terrorism against the United States, its nationals and allies, were intentional,
malicious, willful, unconscionable and reckless.

646.    By virtue of their intentional, willful, unconscionable and reckless actions,
defendants are jointly and severally liable to plaintiffs for punitive damages.

EXHIBIT 9, PAGE 1585

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 31 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 121 of 205   Page ID
#:11282

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for punitive damages in an amount in excess of $200,000,000,000.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, as follows:

Count I – Trespass – Plaintiffs demand an amount in excess of $4,500,000,000 for property damage, business interruption losses, workers' compensation benefit payments, and other specified damages;

Count II – Wrongful Death – Plaintiffs demand an amount in excess of $50,000,000 for each wrongful death assignor;

Count III – Survival Action - Plaintiffs demand an amount in excess of $25,000,000 for each wrongful death assignor;

Count IV – Assault and Battery - Plaintiffs demand an amount in excess of $15,000,000 for each assignor;

Count V – Intentional and/or Negligent Infliction of Emotional Distress - Plaintiffs demand an amount in excess of $20,000,000 for each assignor;

Count VI – Torture Victim Protection Act - Plaintiffs demand an amount in excess of $50,000,000 for each assignor;

Count VII – Conspiracy – Plaintiffs demand an amount in excess of $50,000,000 for each assignor, and Plaintiffs demand an amount in excess of $4,500,000,000 for property damage, business interruption losses, workers' compensation benefit payments and other specified damages;

Count VIII – Civil RICO – Plaintiffs demand treble damages for an amount in excess of $150,000,000 for each assignor, and in an amount in excess of $13,500,000,000 for property damage, business interruption losses, workers' compensation benefit payments and other specified damages;

Count IX – Aiding and Abetting – Plaintiffs demand an amount in excess of $50,000,000 for each assignor, and an amount in excess of $4,500,000,000 for property damage, business interruption losses, workers' compensation benefit payments and other specified damages;

Count X – Violation of 18 U.S.C. § 2333 – Plaintiffs demand treble damages for an amount in excess of $150,000,000 for each assignor, and in an amount in excess of $13,500,000,000 for property damage, business

EXHIBIT 9, PAGE 1586

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 32 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 122 of 205   Page ID
#:11283

interruption losses, workers' compensation benefit payments and other specified damages;

Count XI – Negligence   Plaintiffs demand an amount in excess of $50,000,000 for each assignor, and an amount in excess of $4,500,000,000 for property damage, business interruption losses, workers' compensation benefit payments and other specified damages;

Count XII – Punitive Damages – Plaintiffs demand punitive damages for an amount in excess of of $300,000,000 for each assignor, and for an amount in excess of $60,000,000,000 for property damage, business interruption losses, workers' compensation benefit payments and other specified damages.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all claims so triable.

Dated: New York, New York
        March 10, 2004

COZEN O'CONNOR

Attorneys for Plaintiffs

BY:    *Elliot Feldman*

STEPHEN A. COZEN, ESQUIRE
ELLIOTT R. FELDMAN, ESQUIRE
SEAN P. CARTER, ESQUIRE
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000

**and**

*Michael J. X*

MICHAEL J. SOMMI, ESQ (MJS-7910)
45 Broadway Atrium, 16th Floor
New York, NY 10006
(212) 509-9400

EXHIBIT 9, PAGE 1587

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 33 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 123 of 205   Page ID
#:11284

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the "First Amended Complaint" is

being served upon all counsel of record in the consolidated action listed under docket

number 03 MD 1570, either by ordinary mail, first class, postage prepaid, or via electronic

mail, on the 10th day of March, 2004.  Please see attached service list.

COZEN O'CONNOR

BY: _Elliot Feldman_
ELLIOTT R. FELDMAN, ESQUIRE
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000

OF COUNSEL:
STEPHEN A. COZEN, ESQUIRE
SEAN P. CARTER, ESQUIRE
JOHN M. POPILOCK, ESQUIRE
LISA CALVO HAAS, ESQUIRE
J. SCOTT TARBUTTON, ESQUIRE
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 34 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 124 of 205   Page ID
#:11285

ALL EXHIBITS APPENDED TO PLAINTIFFS' COMPLAINT

ARE FILED UNDER SEAL PURSUANT TO THE ORDER ISSUED

BY THE HONORABLE ROBERT PATTERSON, JR.,

DATED SEPTEMBER 9, 2003

Case 1:03-cv-06978-GBD-SN Document 104-4 Filed 03/10/04 Page 35 of 50
Case 2:16-cv-04435-PA-MRW Document 108-3 Filed 05/16/17 Page 125 of 205 Page ID
#:11286

## SERVICE LIST (MDL)

*Federal Insurance Company, et al. v. Al Qaida, et al., U.S. District Court for the Southern District of New York,*
*1:03CV6978 (Judge Richard Casey)*

**Plaintiff's Counsel**          **Defendant's Counsel**

Nancy Luque Esq.
Donna M. Scheinbach Esq.
GrayCary
1625 Massachusetts Avenue, N.W.
Suite 300
Washington, DC 20036-2247

*Counsel for International Institute of Islamic
Thought, Taha Jaber Al-Alwani, York
Foundation, Sterling Management Group,
Sterling Charitable Gift Fund, Safa Trust, Reston
Investments, Inc., Mena Corporation, Heritage
Education Trust, Grove Corporate, Inc., African
Muslim Agency, Muhammad Ashraf, M. Omar
Ashraf, Iqbal Yunus, M. Yaqub Mirza, Sanabel
Al-Kheer, Inc., Sana-Bell, Inc., Mar-Jac
Investments, Inc., Jamal Barzinji, International
Institute of Islamic Thought*

Nancy H. Dutton, Esquire
DUTTON & DUTTON, PC
5017 Tilden Street, NW
Washington, DC 20016

*Counsel for HRH Bandar bin Sultan bin
Abdulaziz, HRH Princess Haifa Al-Faisal*

Wilmer Parker, Esquire
Gillen Parker & Withers, LLC
One Securities Centre, Suite 1050
3490 Piedmont Rd., NE
Atlanta, GA 30305

*Counsel for Mar-Jac Poultry*

EXHIBIT 9, PAGE 1590

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 36 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 126 of 205   Page ID
#:11287

Christopher R. Cooper, Esquire
BAKER BOTTS, LLP
The Warner
1299 Pennsylvania Avenue, NW
Washington, DC  20004-2400

*Counsel for Prince Sultan Bin Abdulaziz Al Saud*


James M. Cole, Esquire
BRYAN CAVE LLP
700 Thirteenth Street, NW
Washington, DC  20005-3960

*Counsel for Prince Nayef Bin Abdulaziz Al Saud*


Louis R. Cohen, Esquire
WILMER, CUTLER & PICKERING
2445 M. St., NW
Washington, DC  20037-1420

*Counsel for Prince Mohammed Al Faisal Al Saud*


Mark C. Hansen, Esquire
Michael J. Guzman, Esquire
Michael K. Kellogg, Esquire
KELLOG, HUBER, HANSEN, TODD &
EVANS, PLC
1615 M Street, NW, Summer Square, Suite 400
Washington, DC  20036-3209

*Counsel for Prince Turki Al Faisal bin
Abdulaziz-Al Saud*

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 37 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 127 of 205   Page ID
#:11288

*Ashton, et al. v. Al Qaeda, et al., U.S. District Court for the Southern District of New York,*
*1:02CV6977 (Judge Richard Casey)*

### Plaintiff's Counsel

### Defendant's Counsel

James P. Kreindler, Esquire
Marc S. Moller, Esquire
Justin T. Green, Esquire
Andrew J. Maloney, Esquire
Paul S. Edelman, Esquire
Francis G. Fleming, Esquire
David C. Cook, Esquire
Robert J. Spragg, Esquire
Noah H. Kushlefsky, Esquire
Blanca I. Rodriguez, Esquire
Steven R. Pounian, Esquire
Milton G. Sincoff, Esquire
David Beckman, Esquire
KREINDLER & KREINDLER
100 Park Avenue
New York, NY  10007

James P. McGarry, Esquire
BARASCH McGARRY SALZMAN PENSON
& LIM
11 Park Place
New York, NY  10007

Michel Baumeister, Esquire
BAUMEISTER & SAMUELS, PC
One Exchange Place
New York, NY  100006

Kenneth P. Nolan, Esquire
SPEISER KRAUSE NOLAN & GRANITO
Two Grand Central Tower
140 East 45th Street, 34th Floor
New York, NY  100007

Aaron J. Broder, Esquire
LAW FIRM OF AARON J. BRODER &
JONATHAN C. REITER
350 Fifth Avenue, Suite 2811
New York, NY  10118

Louis R. Cohen, Esquire
David P. Donovan, Esquire
WILMER CUTLER & PICKERING
2445 M Street, N.W.
Washington, D.C.  20037

*Counsel for Prince Ohamed al Faisal al Saud*

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 38 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 128 of 205   Page ID
#:11289

*Ashton, et al. v. Al Qaeda, et al., U.S. District Court for the Southern District of New York,*
*1:02CV6977 (Judge Richard Casey)*

**Plaintiff's Counsel**                    **Defendant's Counsel**

David Jarosławicz, Esquire
JAROSLAWICZ & JAROS, ESQUIRES
150 William Street
New York, NY  10038

EXHIBIT 9, PAGE 1593

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 39 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 129 of 205   Page ID
#:11290

## SERVICE LIST

*Tromsky, et al. v. Osama Bin Laden, et al., U.S. District Court for the Southern District of New York,
1:02CV7300 (Judge John Martin)*

### Plaintiff's Counsel                                  Defendant's Counsel

J. David O'Brien, Esquire
ATTORNEY AT LAW
20 Vesey Street, Suite 700
New York, NY  10007

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 40 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 130 of 205   Page ID
#:11291

## SERVICE LIST

*Salvo, et al. v. Al Qaeda Islamic Army, et al., U.S. District Court for the Southern District of New York,*
*1:03CV5071 (Unassigned)*

**Plaintiff's Counsel**                    **Defendant's Counsel**

Donald J. Nolan, Esquire
NOLAN LAW GROUP
20 North Clark Street, 30th Floor
Chicago, IL  60602

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 41 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 131 of 205   Page ID
#:11292

## SERVICE LIST

*York, et al. v. Al Qaeda Islamic Army, et al., U.S. District Court for the Southern District of New York,*
*1:03CV5493 (Unassigned)*

**Plaintiff's Counsel**

**Defendant's Counsel**

Michel F. Baumeister, Esquire
Dorthea M. Capone, Esquire
Douglas A. Latto, Esquire
BAUMEISTER & SAMUELS, PC
One Exchange Plaza
New York, NY  10006

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 42 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 132 of 205   Page ID
#:11293

## SERVICE LIST

*Burnett, et al. v. Al Baraka Inv. and Dev. Corp., et al., U.S. District Court for the District of Columbia,
1:02CV1616 (Judge James Robertson)*

| Plaintiff's Counsel | Defendant's Counsel |
|---|---|

Ronald L. Motley, Esquire
Joseph F. Rice, Esquire
Jodi Westbrook Flowers, Esquire
Donald Migliori, Esquire
Michael Elsner, Esquire
Anne McGinness Kearse, Esquire
Elizabeth Smith, Esquire
MOTLEY RICE, LLC
28 Brideside Boulevard
P.O. Box 1792
Mount Pleasant, SC  29465

Alan Gerson, Esquire
ATTORNEY AT LAW
4221 Lenore Lane
Washington, D.C.  20008

Harry Huge, Esquire
ATTORNEY AT LAW
Market Street North
401 Ninth Street, N.W., Suite 450
Washington, D.C.  20004

Martin McMahon, Esquire
Christopher Smith, Esquire
MARTIN F. McMAHON & ASSOCIATES
1150 Connecticut Avenue, N.W., Suite 900
Washington, D.C.  20036

*Counsel to Saleh Abdullah Kamel
Al Baraka Investment & Development
Corporation*

Roger C. Simmons, Esquire
Matthew H. Simmons, Esquire
Victor E. Cretella, III, Esquire
GORDON & SIMMONS, LLC
131 West Patrick Street,
P.O. Box 430
Frederick, MD 21705-0430

*Counsel for Zahir H. Kazmi*

Alan R. Kabat, Esquire
Lynne Bernabei, Esquire
BERNABEI & KATZ, PLLC
1773 T Street, N.W.
Washington, D.C.  20009-7139

*Counsel for Soliman J. Khuderia
Soliman H.S. Al Buthe
Al Haramain Islamic Foundation, Inc.*

Case 1:03-cv-06978-GBD-SN  Document 104-4  Filed 03/10/04  Page 43 of 50
Case 2:16-cv-04435-PA-MRW  Document 108-3  Filed 05/16/17  Page 133 of 205  Page ID
#:11294

*Burnett, et al. v. Al Baraka Inv. and Dev. Corp., et al., U.S. District Court for the District of Columbia,*
*1:02CV1616 (Judge James Robertson)*

| **Plaintiff's Counsel** | **Defendant's Counsel** |
|---|---|
| John D'Amato, Esquire<br>Guy Molinari, Esquire<br>RUSSO SCARNARDELLA &<br>D'AMATO, PC<br>1001 Forest Avenue<br>Staten Island, NY 10310 | Christopher M. Curran, Esquire<br>Frank Panopoulos, Esquire<br>WHITE & CASE, LLP<br>601 Thirteenth Street, N.W.<br>Washington, D.C. 20005<br><br>*Counsel to Al Rajhi Banking & Investment*<br>*Corporation* |
| William N. Riley, Esquire<br>R. Douglas Hailey, Esquire<br>Mark K. Dudley, Esquire<br>Amy Ficklin DeBrota, Esquire<br>Mary Beth Ramey, Esquire<br>YOUNG RILEY DUDLEY & DeBROTA<br>3815 River Crossing Parkway, Suite 340<br>Indianapolis, IN 46240 | Maher Hanania, Esquire<br>Kamal Nawash, Esquire<br>HANANIA, KHEDER & NAWASH<br>6066 Leesburg Pike, #101<br>Falls Church, VA 22041<br><br>*Counsel for Abdul Rahman Al-Amoudi*<br>*Tarik Hamdi*<br>*World Assembly of Muslim Youth*<br>*Mohammed Hussein Al-Almoudi* |
| Jack Codray, Esquire<br>CODRAY LAW FIRM<br>40 Calhoun Street<br>Charleston, SC 29401 | Nancy Luque, Esquire<br>Donna M. Scheinbach<br>GrayCary<br>1625 Massachusetts Avenue, N.W.<br>Suite 300<br>Washington, D.C. 20036-2247<br><br>*Counsel for Grove Corporate Inc.*<br>*SAFA Trust*<br>*Reston Investments, Inc.*<br>*York Foundation*<br>*Heritage Education Trust*<br>*MAR-JAC Investments, Inc.*<br>*International Institute of Islamic Thought*<br>*African Muslim Agency* |
| Paul J. Hanly, Jr., Esquire<br>HANLY & CONROY, LLP<br>415 Madison Avenue<br>New York, NY 10017-1111 | John D. Skahow, Esquire<br>KING & SPALDING, LLP<br>1730 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20006-4706<br><br>*Counsel for Arab Bank PLC* |

EXHIBIT 9, PAGE 1598

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 44 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 134 of 205   Page ID
#:11295

*Burnett, et al. v. Al Baraka Inv. and Dev. Corp., et al., U.S. District Court for the District of Columbia,*
*1:02CV1616 (Judge James Robertson)*

| **Plaintiff's Counsel** | **Defendant's Counsel** |
|---|---|
| | |

Thomas E. Mellon, Jr., Esquire
John A. Corr, Esquire
Stephen A. Corr, Esquire
MELLON WEBSTER & SHELLY
87 North Broad Street
Doylestown, PA  18901

Michael Hadeed, Jr., Esquire
BACKER HADEED KELLOGG AND
BERRY, PC
5501 Backlick Road, Suite 220
Springfield, VA  22151

*Counsel for Al Haramain Islamic Foundation,*
*Inc.*
*Muslim World League Offices-NY*
*Muslim World League*
*Success Foundation, Inc.*
*Mohamed S. Omeish*

Don Howarth, Esquire
Suzelle M. Smith, Esquire
Robert D. Brian, Esquire
HOWARTH & SMITH
800 Wilshire Boulevard, Suite 750
Los Angeles, CA  90017

William H. Jeffress, Esquire
Christopher R. Cooper, Esquire
Sara Kropf, Esquire
BAKER BOTTS, LLP
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2400

*Counsel for HRH Prince Sultan bin Abdulaziz*
*Al-Saud*
*Khaled Bin Mahfouz*
*Bakr M. bin Laden*
*Omar M. Bin Laden*

Samuel L. Davis, Esquire
DAVIS SAPERSTEIN & SALOMON, PC
375 Cedar Lane
Teaneck, NJ  07666

Louis R. Cohen, Esquire
Gregory S. Chernack, Esquire
WILMER CUTLER & PICKERING
2445 M Street, N.W.
Washington, D.C.  20037
and

Sanford Rubenstein, Esquire
RUBENSTEIN AND RYNECKI
16 Court Street
Brooklyn, NY  11241

David P. Donovan, Esquire
WILMER CUTLER & PICKERING
1600 Tysons Boulevard, 10th Floor
McLean, VA  22102

*Counsel for HRH Prince Mohamed al Faisal al*
*Saud*

EXHIBIT 9, PAGE 1599

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 45 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 135 of 205   Page ID
#:11296

*Burnett, et al. v. Al Baraka Inv. and Dev. Corp., et al., U.S. District Court for the District of Columbia,
1:02CV1616 (Judge James Robertson)*

| Plaintiff's Counsel | Defendant's Counsel |
|---|---|

Michael N. Block, Esquire
SULLIVAN PAPAIN BLOCK MCGRATH &
CANNAVO, PC
120 Broadway Avenue, 18th Floor
New York, NY 10271

Wilmer Parker, Esquire
GILLEN PARKER & WITHERS, LLC
One Securities Centre, Suite 1050
3490 Piedmont Road, N.E.
Atlanta, GA 30305

*Counsel for Mar-Jac Poultry, Inc.*

Vincent F. Pitta, Esquire
Milton Mollen, Esquire.
HERRICK FEINSTEIN, LLP
2 Park Avenue
New York, NY 10016

Mark C. Hansen, Esquire
Michael K. Kellogg, Esquire
Michael J. Guzman, Esquire
KELLOGG HUBER HANSEN TODD &
EVANS, PLLC
Sumner Square, Suite 400
1615 M Street, N.W.
Washington, D.C. 20036-3209

*Counsel for HRH Prince Turki Al-Faisal bin
Abdulaziz Al-Saud*

Robert Conason, Esquire
GAIR GAIR CONSASON STEIGMAN &
MACKAUF
80 Pine Street
New York, NY 10005

Matthew H. Kirkland, Esquire
FULBRIGHT & JAWORSKI
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

*Counsel for Nimir Petroleum, LLC*

J.D. Lee, Esquire
LEE LEE & LFF
422 S. Gay Street
Knoxville, TN 37902

Thomas P. Steindler, Esquire
McDERMOTT WILL & EMORY
600 13th Street, N.W.
Washington, D.C. 20005

*Counsel for Yousef Jameel
Yassin Abdullah Al Kadi*

EXHIBIT 9, PAGE 1600

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 46 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 136 of 205   Page ID
#:11297

*Burnett, et al. v. Al Baraka Inv. and Dev. Corp., et al., U.S. District Court for the District of Columbia,*
*1:02CV1616 (Judge James Robertson)*

<table>
<tr><td align="center"><u>**Plaintiff's Counsel**</u></td><td align="center"><u>**Defendant's Counsel**</u></td></tr>
<tr><td>

Gary O. Galiher, Esquire
GALIHER DEROBERTIES NAKAMURA
ONO & TAKITANI
610 Ward Avenue, Suite 200
Honolulu, HI 96814

</td><td>

Stephen J. Brogan
Jonathan C. Rose
Timothy J. Finn
James E. Gauch
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001

*Attorneys for Defendant SBG*

</td></tr>
<tr><td>

Anthony M. Sellitto, Jr., Esquire
OLIVER & SELLITTO
205 Bond Street
Asbury Park, NJ 07712

</td><td>

Ronald S. Liebman, Esquire
Mitchell R. Berger, Esquire
Ugo A. Colella, Esquire
PATTON BOGGS, LLP
2550 M Street, N.W.
Washington, D.C. 20037

*Counsel for National Commercial Bank*

</td></tr>
<tr><td>

Kenneth Sacks, Esquire
SACKS AND SACKS, LLP
150 Broadway, 4th Floor
New York, NY 10038

</td><td>

Henry S. Weisburg, Esquire
Brian H. Polovoy, Esquire
SHEARMAN & STERLING, LLP
599 Lexington Avenue
New York, NY 10022-6069

and

</td></tr>
<tr><td>

Clare Sproule, Esquire
EPSTEIN BECKER & GREEN, PC
250 Park Avenue
New York, NY 10177-1211

</td><td>

Jonathan L. Greenblatt, Esquire
SHEARMAN & STERLING, LLP
801 Pennsylvania Avenue, N.W., Suite 900
Washington, D.C. 20004-2604

*Counsel for Saudi American Bank*

</td></tr>
<tr><td>

George P. Blakely, Esquire
NOTRE DAME LAW SCHOOL
One Notre Dame Circle
Notre Dame, IN 46556

</td><td>

Roger E. Warin, Esquire
Christopher T. Lutz, Esquire
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

*Counsel for Mohammad Adbullah Aljomaih*

</td></tr>
</table>

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 47 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 137 of 205   Page ID
#:11298

*Burnett, et al. v. Al Baraka Inv. and Dev. Corp., et al., U.S. District Court for the District of Columbia,
1:02CV1616 (Judge James Robertson)*

| **Plaintiff's Counsel** | **Defendant's Counsel** |
|---|---|

Edward D. Robertson, Esquire
Mary D. Winter, Esquire
ROBERTSON FRICKELTON ROBERTSON
& OBETZ
200 Madison Street, Suite 100
Jefferson City, MO 65101

Michael J. McManus
Brian Arthur Coleman
DRINKER BIDDLE
1500 K Street NW
Suite 1100
Washington, DC 20005

*Counsel for Delta Oil Company*

Peter J. Kahn
Thomas C Viles
WILLIAMS & CONNOLLY
725 Twelfth St. NW
Washington, DC 20005

*Counsel for Abdul Rahman Bin Kahlid Bin
Mafouz*

John C. Millian
GIBSON DUNN & CRUTCHER
1050 Connecticut Ave. NW
Washington, DC 20036

*Counsel for Salahuddin Abduljawad*

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 48 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 138 of 205   Page ID
#:11299

## SERVICE LIST

*Doe v. Al Baraka Inv. And Dev. Corp., et al., U.S. District Court for the District of Columbia,*
*1:02CV1980 (Judge James Robertson)*

**Plaintiff's Counsel**                    **Defendant's Counsel**

Larry Klayman, Esquire
JUDICIAL WATCH, INC.
501 School Street, Suite 700
Washington, D.C.  20024

EXHIBIT 9, PAGE 1603

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 49 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 139 of 205   Page ID
#:11300

## SERVICE LIST

*Havlish, et al. v. Bin Laden, et al. v. U.S. District Court for the District of Columbia,*
*1:02CV305 (Judge James Robertson)*

| **Plaintiff's Counsel** | **Defendants** |
|---|---|

**Plaintiff's Counsel**

Thomas E. Mellon, Jr., Esquire
John A. Corr, Esquire
Stephen A. Corr, Esquire
Joseph A. Cullen, Jr. Esquire
MELLON WEBSTER & SHELLY
87 North Broad Street
Doylestown, PA 18901

Don Howarth, Esquire
Suzelle M. Smith, Esquire
Robert D. Brain, Esquire
HOWARTH & SMITH
800 Wilshire Blvd., Suite 750
Los Angeles, CA 90017

Richard D. Burbridge, Esquire
Stephen B. Mitchell, Esquire
Jefferson W. Gross, Esquire
BURBRIDGE & MITCHELL
215 South State Street # 920
Salt Lake City, UT 84111-2311

J.D. Lee, Esquire
David C. Lee, Esquire
LEE LEE & LEE
422 South Gay Street
Knoxville, TN 37902

Ronald L. Motley, Esquire
Jodi Westbrook Flowers, Esquire
Anne McGinness Kearse, Esquire
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465

**Defendants**

Thomas P. Steindler, Esquire
McDERMOTT WILL & EMORY
600 13th Street, N.W.
Washington, D.C. 20005

*Counsel for Yousef Jameel*
*Yassin Abdullah Al Kadi*

Ronald S. Liebman, Esquire
Mitchell R. Berger, Esquire
Ugo A. Colella, Esquire
PATTON BOGGS, LLP
2550 M Street, N.W.
Washington, D.C. 20037

*Counsel for National Commercial Bank*

John D. Skahow, Esquire
KING & SPALDING, LLP
1730 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-4706

*Counsel for Arab Bank PLC*

Case 1:03-cv-06978-GBD-SN   Document 104-4   Filed 03/10/04   Page 50 of 50
Case 2:16-cv-04435-PA-MRW   Document 108-3   Filed 05/16/17   Page 140 of 205   Page ID
#:11301



*Havlish, et al. v. Bin Laden, et al. v. U.S. District Court for the District of Columbia.*
*1:02CV305 (Judge James Robertson)*

**Plaintiff's Counsel**                                            **Defendants**

Edward H. Rubenstone, Esquire
Marcel L. Groen, Esquire
GROEN LAMM GOLDBERG &
RUBENSTONE, LLC
Four Greenwood Square, Suite 200
Bensalem, PA  19020

William N. Riley, Esquire
R. Douglas Hailey, Esquire
Mark K. Dudley, Esquire
Amy Ficklin DeBrota, Esquire
Mary Beth Ramey, Esquire
RAMEY HAILEY & RILEY
3815 River Crossing Parkway, Suite 340
Indianapolis, IN  46240

Donald J. Winder, Esquire
John Warren May, Esquire
WINDER & HASLAM, PC
175 West 200 South, Suite 4000
P.O. Box 2668
Salt Lake City, UT  84110-2668

# EXHIBIT 10

| | |
|---|---|
| **From:** | Crapster, Carla <Carla.Crapster@strasburger.com> |
| **Sent:** | Monday, May 08, 2017 9:18 PM |
| **To:** | Hayes, Daniel; Shalamitski, Valentine; Coyoca, Lucia |
| **Cc:** | Keeley, Michael; Reed, Toni |
| **Subject:** | UCP v. Atlantic - Response to Your E-mail re 30(b)(6) Objections |

Dan,

I apologize for the delay, but as I'm sure you can appreciate, we've been tied up with our reply papers.  Our responses are below:

1.     Burdensomeness:  We offered to provide a Declaration as we thought it might be more persuasive to you.  And, it also is something we will use if a motion becomes necessary.  But, given your comments, we will simply provide you an explanation of why the search is overly burdensome, and we'll also answer your question about the search tool used by OneBeacon.  First, OneBeacon does not have a case management system, and so data is not manipulated  in its own repository system.  The search tool it uses for emails is Microsoft Exchange 2013.  It does not have a search tool for notes or for documents uploaded into the system.  While OneBeacon is able to utilize PowerGrep, it has to create  its own search tool before implementing a search for notes and documents.  Apparently the result is a search of 2 gigabytes of data at a time.  In order to do a search for emails, OneBeacon first needs to restore the emails to the system.  This takes half the time, and then running the search takes the rest of the time.  In order to determine if there are any claims involving the  war exclusion, terrorism, Hamas, Fatah and Israel, as your topics would require, OneBeacon normally would search through emails, notes and documents.  However, based upon similar recent searches, OneBeacon's Director of IT has estimated just to search through emails of the 620 employees who were in claim roles since January 2010, would take approximately 496 working days.  This is not 24 hours a day, but just during working hours because they have found that too many problems occur when searches are unattended and the searches must be restarted.  To then search through documents, it would take an even longer period of time; in other words, it would take longer than 496 working days to search through documents.  On top of this, OneBeacon did not go paperless until sometime in 2010, and even then, paper files were kept by some employees.  Those files are kept largely at off-site storage locations, and as you can imagine, it would likely take 1,000s of hours to search through such files.  We assume you would not insist on such a manual search, but we point this out as you have not yet limited your requests.  Finally, your topics also include all Atlantic policy forms that include  the WAR EXCLUSION and all policy forms that include an exclusion for terrorism.  The only way to do an accurate search would be to search each and every policy issued by OneBeacon during the designated time period.  As you can imagine, this would take hundreds if not thousands of hours.  Once the electronic documents ore obtained, lawyers in our firm would then need to search through the documents.  During the initial production we had six or seven lawyers working for a couple of

1

weeks.

2.    Atlantic Divisions:  Dewar; International Marine; Surety; Entertainment; Environmental; Special Property; Accident & Health; Program; Architects and Engineers; Healthcare; Management Liability; Financial Institutions; Financial Services; Government Risks; and Technology.

3.    Topics 19, 20 and 24:  Frankly, we are surprised this topic remains as it was the subject of protracted meet and confers in connection with your written discovery requests.  But, we do  object to this topic, as indicated in our earlier objections.

4.    Topics 25(d), 26(d) and 27(d):  We assumed these topics were limited to the war exclusions in the policy at issue, but to the extent they relate to all policies as defined, then we certainly do object.

5.    Topic 36:  This topic relates to forms and our representative will be prepared on this topic.

6.    Topic 37:  For the reasons discussed above, we cannot prepare a representative on this topic without undue burden.

7.    Topics 39 and 40:  For the reasons discussed above, we cannot prepare a representative on these topics without undue burden.

8.    Topic 41:  This topic relates to forms and our representative will be prepared on this topic.

9.    Topics 42 and 43:  We're not sure why you would be surprised about these topics.  You have asked for all instances since over a 16 ½ year period in which anyone on behalf of Atlantic has characterized Hamas as a terrorist organization or taken the position that certain acts by Hamas constitute acts of terrorism.  This would literally require a search of every single

2

document, electronic and otherwise, in Atlantic's system, and it would also require Atlantic to speak with all current and former employees.  Thus, we cannot prepare a witness on this topic, nor on 43 for the reasons discussed above.

10.Topics 52 and 53:  Our representative will be prepared on these topics.

Summary:  In summary, we will have someone prepared on all topics, though on the ones set forth above, it will be to explain that they cannot fully testify for the reasons discussed above.

Finally, we will present a second representative to testify on topics 15-18, 48 and 49 at a later date.  We should be able to provide a date or dates tomorrow.

Thank you,
Carla

---

*This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Strasburger & Price, LLP immediately -- by replying to this message or by sending an email to postmaster@strasburger.com -- and destroy all copies of this message and any attachments. Thank you.*

---

EXHIBIT 10, PAGE 1608

# EXHIBIT 11

MITCHELL SILBERBERG & KNUPP LLP
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Daniel M. Hayes
Partner
(310) 312-3216 Phone
(310) 231-8436 Fax
dmh@msk.com

May 12, 2017

**VIA EMAIL ONLY**

Michael Keeley
Toni Scott Reed
Carla C. Crapster
Strasburger & Price, LLP
901 Main Street
Suite 6000
Dallas, Texas 75202

**Re:** **Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Company**

Dear Counsel:

We write in regard to serious deficiencies in your document productions and documents searches that have been identified this week.

**I.      Insufficient Document Productions**

Please confirm that you will produce the following documents immediately:

1.      All documents, including claims handling manuals and claims handling documents, from the Share Point site described by both Mr. Stone and Mr. Duffy. *See, e.g.,* pp. 138-140 of the rough transcript of Mr. Stone's deposition.

Mr. Stone testified that there are roughly 10 documents on the Share Point site, including two documents that were produced by Atlantic (the general claims practices and core principles). However, Mr. Stone testified about other documents on the Share Point site that would be directly responsive to Request for Production 34: All DOCUMENTS that RELATE to ATLANTIC'S or ONEBEACON'S standards for the investigation, processing, review, and/or assessment of insurance claims," as well as Request No. 10: "[A]ll DOCUMENTS that RELATE to YOUR investigation, evaluation, consideration, and denial of the DIG CLAIM, and YOUR claims handling with respect to the DIG CLAIM"; No. 14: "All of YOUR files, including file jackets and labels, and all other DOCUMENTS that RELATE to PLAINTIFFS' claim that YOU breached YOUR coverage obligations in connection with the POLICY and/or the DIG CLAIM"; and No. 21: "All claims handling manuals, guidelines, policy statements, instructions, and other DOCUMENTS from January 1, 2010 through the present that RELATE to YOUR procedures in assessing, handling, or addressing insured's claims pursuant to commercial insurance products."

For example, Mr. Stone testified: "there is a -- I think an additional document about triggers for claims legal when we need to let our internal claims legal group know about matters, what the escalation process is. And I don't recall offhand what -- what the other documents are. Q. Do you

11377 West Olympic Boulevard, Los Angeles, California 90064-1683
Phone: (310) 312-2000 Fax: (310) 312-3100 Website: WWW.MSK.COM

8872269.1/46250-00001

recall generally what they pertain to? A. I think generally they pertain to, you know, issues regarding just general claims processes." Rough Deposition Transcript of Mr. Stone, 139:14-24.

Likewise, Mr. Duffy testified today that the Share Point site included a set of protocols for claims handling, including a trigger for how to handle a claim that exceeds $1 million.

These documents relating to standards for claims handling have not been produced, and are directly relevant to Universal's claims, both in determining whether the claim was properly denied and to demonstrate Atlantic's bad faith in evaluating the claim.

2.      All weekly sheets regarding claims conferences (as testified to by Pamela Johnson) reflecting discussions of the *Dig* claim, any other claim involving potential application of a terrorism exclusion, and/or any claim arising out of any action by Hamas or the Israel/Palestine conflict.

Ms. Johnson testified that she had weekly calls with the claims handlers "to talk about the rotating claims that each claim handler had and I would fill out a sheet with regard to each of the claims and what the plan of action was after we reviewed the claim." Johnson Rough Depo. Transcript, pp. 59:10-16. Ms. Johnson further testified those documents went into a specific folder. *See* Johnson Rough Depo. Transcript, 60:5-19: "Q. Did those sheets go into the claim file? A. Well, certainly the claim adjuster could put those notes into the file. I think occasionally I would put it into the file, but generally speaking those claim notes, those -- the evaluation would be made on that specific sheet and kept in a -- in a folder. Q. What was that folder called? A. Probably entertainment claims. I don't specifically remember. Q. Was the folder segregated by claim or was it all entertainment claims that were aggregated for that week in which the sheets were prepared? A. Right, it was segregated by week."

These weekly sheets should have been reviewed to determine their responsiveness to, at a minimum, Requests for Production Nos. 1, 6, 10, 14, 41, 42, 43, 44, 49. At a minimum, we demand you produce the weekly sheets from the weeks surrounding the *Dig* Claim.

3.      You agreed to search for "any communications that reflect its analysis and/or assessment of the profitability of the Policy, and to the extent Atlantic finds any such communications that have not been produced, it will produce them to Plaintiffs." Given that agreement, and that these documents are responsive to Requests for Production propounded in the first set of discovery (e.g., Requests Nos. 1, 6-9, 26-30), we must demand that you commit to producing all of them by Monday, or we will be forced to move to compel your production.

## II.      Deficient Searches

Ms. Crapster's description of purported burden in her email of May 8, and Mr. Stone's Rule 30(b)(6) testimony on Topics Nos. 54 and 55, regarding Atlantic's search for and collection of documents, reveal that Atlantic's search for responsive documents has been completely inadequate.

4.      As to emails, it appears that Atlantic has relied on the Microsoft Exchange and/or Outlook search capability to search emails, which is notoriously unreliable. Further, Mr. Stone

May 12, 2017
Page 3

testified that the search did not include Mr. Duffy's or Mr. Crosby's emails, even though both were parties to internal correspondence regarding the *Dig* Claim and Atlantic identified Mr. Duffy in response to Interrogatories Nos. 1 and 2 as one of the individuals involved in evaluating and considering the *Dig* Claim, and responsible for Atlantic's decision to deny the *Dig* Claim.

5.      As to Atlantic's search of its document system, "Image Now," it appears that search was carried out by Atlantic's internal IT team, without the help of any e-discovery vendor.  Nor was an e-discovery vendor approached to determine the possibility of using efficient e-discovery tools to search the system, rather than the in-house tools that purportedly took 14 days (as opposed to the 30 and 60 day claims you have made to us in meet-and-confer calls) to complete an insufficient search that only went back to July, 2013.

6.      As to Atlantic's CWS system, which is a database of all claims files to 2002, Mr. Stone testified that system was not searched *at all*.  Nor was an e-discovery vendor contacted to see whether there was a way to search the system.

7.      Further, we now know that Atlantic has a Share Point site with relevant documents which have not been produced (though Mr. Stone testified that *he* reviewed the Share Point site in preparation for the Rule 30(b)(6) deposition, and thought it would take about 20 minutes to produce all the documents from it).

8.      Atlantic has repeatedly represented that it conducted searches by asking individuals if they remembered any claims regarding Hamas or other terrorist organizations, or Atlantic's position as to Hamas' status as a terrorist organization.  These searches were clearly insufficient. Namely, based on a quick Internet search this weekend, we determined that OneBeacon, along with other insurance companies, filed two lawsuits against several terrorist organizations, including Hamas, for claims paid out for losses due to attacks by these terrorist organizations. *Federal Insurance, Et Al V. Al Qaida, Et Al*, Case No. 1:03cv6978 (S.D.N.Y, filed Sept. 10, 2003); *In Re: Terrorist Attacks on September 11*, 2001, Case No. 1:03-MD-01570 (S.D.N.Y., filed December 10, 2003).

Those lawsuits should have been identified, at a minimum, in response to Interrogatories Nos. 22 and 23.  Interrogatory 22 asks Atlantic to identify any instance ("including, without limitation, in the context of litigation") in which Atlantic or OneBeacon has characterized Hamas as a terrorist organization or taken the position that certain acts by Hamas constitute acts of terrorism. Interrogatory 23 asks Atlantic to identify any insurance claims made under an Atlantic or OneBeacon policy that relate to Hamas or any conflict between Israel and Hamas/Palestine.  As your own responses reveal, the representation that nobody at OneBeacon could recall any instances in which Atlantic characterized Hamas as a terrorist organization or took the position that certain acts by Hamas constitute acts of terrorism claim was never verified.  *See* Responses to Interrogatories Nos. 22 and 23: "[NOTE: STILL NEED TO CONFIRM THIS FACT.]".

Further, we expect that there would be documents responsive to Requests for Production Nos. 41, 42, 43, 44, 48, and 49 in the files related to those litigations and/or the underlying claim files for the claims made by the insureds that led to the subrogation claims.  Atlantic has a duty to

8872269.1/46250-00001

May 12, 2017
Page 4

search those files and also to do a more thorough search (not merely relying on individuals' memories) to determine there are no other responsive documents.

<div align="center">***</div>

Please be prepared to meet and confer about these issues today at 11:00 a.m. Pacific, or we will have no choice but to move to compel the production of the documents identified in Section I above, and a proper search and/or sanctions to remedy the deficiencies identified in Section II, above.

Sincerely,

Daniel M. Hayes
Partner of
MITCHELL SILBERBERG & KNUPP LLP

8872269.1/46250-00001

# EXHIBIT 12

| | |
|---|---|
| **From:** | Reed, Toni <Toni.Reed@strasburger.com> |
| **Sent:** | Friday, May 12, 2017 2:52 PM |
| **To:** | Hayes, Daniel; Coyoca, Lucia; Shalamitski, Valentine |
| **Cc:** | Keeley, Michael; Crapster, Carla |
| **Subject:** | UCP v. Atlantic - Completion of 30(b)(6) Testimony |

Dan,

Atlantic will be producing the following as completion of testimony for the topics included in the Plaintiffs' Notice of Deposition for the Atlantic Corporate Representative:

1. Peter Williams – May 19 at 2:00 p.m. pacific (in Los Angeles at our local counsel's office, 707 Wilshire Blvd., 40th Floor, Los Angeles, CA 90017) (Topics 15-18);

2. Dennis Crosby – as already set for May 17 in Atlanta, Georgia (specific address - Hait & Kuhn, 11545 Park Wood Circle, Suite C, Alpharetta, GA 30005) (Topics 48-49).

Will you please respond with your designations of the individuals who will testify as corporate representatives, in response to the 30(b)(6) Notice served on Plaintiffs?  Will Mr. Ford be appearing on any of those subjects next week?

Thank you in advance for your response.

Best regards,
Toni Scott Reed

**Toni Scott Reed** • Strasburger & Price, LLP
901 Main Street, Suite 6000, Dallas, TX 75202
214.651.4345 • Fax 214.659.4091 • Strasburger.com

---

*This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Strasburger & Price, LLP immediately -- by replying to this message or by sending an email to postmaster@strasburger.com -- and destroy all copies of this message and any attachments. Thank you.*

---

EXHIBIT 12, PAGE 1613

| | |
|---|---|
| **From:** | Hayes, Daniel |
| **Sent:** | Sunday, May 14, 2017 10:17 PM |
| **To:** | 'Reed, Toni'; Coyoca, Lucia; Shalamitski, Valentine; Beckman-Straus, Naomi |
| **Cc:** | 'Keeley, Michael'; 'Crapster, Carla'; Kohler, Daniel |
| **Subject:** | RE: UCP v. Atlantic - Hayes Letter of May 12 |
| **Attachments:** | 5-14-2017 letter Hayes to Reed (8875484).pdf |

Toni,

We have not received any further response regarding the issues set forth in our May 12 letter and discussed during our call on Friday.  Please respond to the attached letter before 10:00 a.m. Pacific tomorrow (Monday).

Thank you,

Dan



**Daniel M. Hayes** | **Partner, through his professional corporation**
T: 310.312.3216 | dmh@msk.com
**Mitchell Silberberg & Knupp LLP** | **www.msk.com**
11377 W. Olympic Blvd., Los Angeles, CA 90064

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

**From:** Hayes, Daniel
**Sent:** Friday, May 12, 2017 8:33 PM
**To:** 'Reed, Toni'; Coyoca, Lucia; Shalamitski, Valentine; Beckman-Straus, Naomi
**Cc:** Keeley, Michael; Crapster, Carla; Kohler, Daniel
**Subject:** RE: UCP v. Atlantic - Hayes Letter of May 12

Toni, as you know our deadline to file motions to compel is Monday, so please respond before Monday and ASAP.

Thank you,

Dan



**Daniel M. Hayes** | **Partner, through his professional corporation**
T: 310.312.3216 | dmh@msk.com
**Mitchell Silberberg & Knupp LLP** | **www.msk.com**
11377 W. Olympic Blvd., Los Angeles, CA 90064

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY

EXHIBIT 12, PAGE 1614

PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

**From:** Reed, Toni [mailto:Toni.Reed@strasburger.com]
**Sent:** Friday, May 12, 2017 2:58 PM
**To:** Hayes, Daniel; Coyoca, Lucia; Shalamitski, Valentine; Beckman-Straus, Naomi
**Cc:** Keeley, Michael; Crapster, Carla
**Subject:** UCP v. Atlantic - Hayes Letter of May 12

Dan,

I hope your afternoon is going well.

As indicated in our earlier call today, we acknowledge receipt of your letter dated May 12, 2017.  We have reviewed your letter, and also participated in the call with you today.  We are in the process of working to address the topics of the letter.  We will be responding.  I do not have further information to report at this time, as the work to respond is ongoing.  We will provide our responses in writing to you as soon as we are able.  We anticipate follow-up with you on Monday.

Best regards,
Toni Scott Reed

**Toni Scott Reed** • Strasburger & Price, LLP
901 Main Street, Suite 6000, Dallas, TX 75202
214.651.4345 • Fax 214.659-4091 • Strasburger.com

---

*This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Strasburger & Price, LLP immediately -- by replying to this message or by sending an email to postmaster@strasburger.com -- and destroy all copies of this message and any attachments. Thank you.*

---

EXHIBIT 12, PAGE 1615

**MITCHELL SILBERBERG & KNUPP LLP**
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Daniel M. Hayes
Partner
(310) 312-3216 Phone
(310) 231-8436 Fax
dmh@msk.com

May 14, 2017

**VIA EMAIL ONLY**

Michael Keeley
Toni Scott Reed
Carla C. Crapster
Strasburger & Price, LLP
901 Main Street
Suite 6000
Dallas, Texas 75202

**Re:    Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Company**

Dear Counsel:

We write with respect to the serious breach of Atlantic's discovery obligations that were identified during the depositions of Pamela Johnson, Sean Duffy, and Atlantic's Rule 30(b)(6) corporate designee last week.  This letter continues our efforts to resolve those deficiencies that were identified as to Atlantic's search for and production of responsive documents in this case. This letter supplements our conference on Friday, May 12 as to these issues, and responds to your email of Friday evening stating that you "anticipate" following up with us on Monday, May 15.  As you know, the deadline to file motions to compel in the case is tomorrow Monday, May 15.  Given that deadline, Plaintiffs intend to file a motion to compel unless Atlantic confirms, by no later than 10 am tomorrow, Monday, May 15, that it will do the following:

1)  Engage an outside e-discovery vendor to complete a proper search of the databases identified in Section I below;

2)  Produce all documents described in Section II below by 6 pm, Monday, May 15; and,

3)  To the extent any additional documents which Atlantic produces reveal supplemental areas of questioning about which Plaintiffs could have deposed Atlantic's witnesses, Atlantic must agree to produce those witnesses that Plaintiffs identify after reviewing such documents, in Los Angeles within the next two weeks, and Atlantic must agree to bear all costs and fees associated with the re-opened depositions.

We also write to confirm that Atlantic has agreed to produce any and all communications reflecting Atlantic's analysis and/or assessment of the profitability of the Policy (responsive to Requests for Production propounded in the first set of discovery, *e.g.*, Requests Nos. 1, 6-9, 26-30) by the close of business on Monday, May 15.

11377 West Olympic Boulevard, Los Angeles, California 90064-1683
Phone: (310) 312-2000 Fax: (310) 312-3100 Website: WWW.MSK.COM

**I.      Searches to be Conducted of:  (1) the Share Point, Image Now, and CWS databases; (2) any database maintained by the "Enterprise Underwriting" group; and, Sean Duffy and Dennis Crosby's emails.  To be completed and all documents produced by Friday, May 19.**

Atlantic's verified response to RFP No. 34 states Atlantic:  "has already produced the documents that governed the handling of the claim that is the subject of this litigation."  However, both Mr. Stone and Mr. Duffy testified as to the existence of a "Share Point" database which contain guidelines for claims handling that were *not* produced.

In addition, you have repeatedly argued that it would be too burdensome for Atlantic to search for form policies or exclusions because they purportedly are scattered throughout several different divisions of the company.  However, directly contradicting your representations, Mr. Stone testified there is a single department at Atlantic, the "Enterprise Underwriting" group, which "oversees forms that cross over various business units and in general forms that all business units may use."

Moreover, Atlantic has represented that it conducted its searches by making "inquiries with its employees who oversee, and former employees who previously oversaw, the claims handling for the entertainment division of Atlantic and with employees of OneBeacon who oversee claims for all of OneBeacon's divisions."  However, these inquiries apparently failed to uncover the fact that OneBeacon previously sued the very terrorist organization, Hamas, that caused the losses in this matter.

Because these witnesses have now clearly and unequivocally established that Atlantic failed to comply with its discovery obligations, Plaintiffs demand that Atlantic engage an independent outside e-discovery vendor to image and search the document repositories outlined below, and confirm that any responsive documents located in such repositories will be produced no later than Friday, May 19.

       **1.      Locations of Documents to be Searched**

- Sean Duffy's emails – Mr. Duffy testified his emails were preserved as a result of the litigation hold established at the onset of this case.  However, Mr. Stone testified that Mr. Duffy's emails were ***not*** searched.

- Dennis Crosby's emails – Similarly, it is now clear that Mr. Crosby's emails were not searched.  We demand that Atlantic promptly search and immediately produce all responsive documents to permit Plaintiffs time to review such documents before his deposition on May 17, 2017.

- Image Now –  You previously represented that it took Atlantic's internal IT department 30 days, and at other times represented that it took 60 days, to conduct searches of Image Now to locate responsive documents.  You claimed the searches took that long to complete (however long it actually did take) because the searches were being run 2 gigabytes at a time.  Completely contradicting your prior statements, Mr. Stone testified that the search of the Image Now database took 14 days.  These inconsistent reports raise serious questions as to the efficacy

May 14, 2017
Page 3

and reliability of Atlantic's prior searches.  Thus, we hereby demand that Atlantic engage an independent outside e-discovery vendor to run the searches for responsive documents that Atlantic has claimed would be too onerous or burdensome to conduct.

- CWS Database – As with Image Now, an outside e-discovery vendor would be able to image this critical database and run targeted searches in an efficient manner.

### 2.      Timeframe for Searches

Atlantic's arbitrary and unilateral decision to limit its search for responsive documents dating from July 2013 forward, and its refusal to go back further in time, underscores the significant problems with Atlantic's searches.  Plaintiffs requested a look-back to January 2001 for a specific reason – the way the insurance industry addressed terrorism changed significantly in the aftermath of September 11.  As has been made abundantly clear in the parties' summary judgment papers, how Atlantic treats losses caused by terrorism (and terrorist groups like Hamas), and its use (or election not to use) terrorism exclusions in its policies is directly relevant to the contract interpretation issues in this case.  And, given that Atlantic's witnesses have testified that *Dig* was a unique claim, a more expansive time period is appropriate in order to capture all potentially responsive documents regarding other prior relevant claims.

As we noted in our letter and during our call, One Beacon previously sued Hamas asserting subrogation rights as a result of claims that One Beacon apparently paid out as a result of Hamas' actions.  Documents regarding these cases are directly responsive to Interrogatory Nos. 22 and 23.  However, Atlantic's purported search apparently did not return *any* information about these cases – despite the fact that pleading documents regarding these cases were easily found through a general Internet search.  Atlantic's failure to identify *any* documents or information regarding these cases brings into stark relief the inappropriateness of limiting the search to July 2013 forward.

### 3.      Search Terms

You brought up the issue of search terms on the call, suggesting that you would consider searching Mr. Duffy's emails but only for documents that mention "*Dig*."  This is clearly insufficient.  How Atlantic has handled similar claims, including claims for acts by terrorist organizations, is clearly relevant to both the contract interpretation issues and Plaintiffs' bad faith claim.  Given the demonstrated inadequacies of Atlantic's prior discovery efforts, Atlantic should conduct searches pursuant to search terms that Plaintiffs propose.  To the extent issues arise with respect to these terms, we will seek the assistance of Judge Wilner.  A privilege review would be conducted once responsive documents are identified; however, the documents should be produced directly by the e-discovery vendor, and a privilege log of any withheld documents must promptly be produced.

8875415.2/46250-00001

May 14, 2017
Page 4

## II.    Specific Documents Identified During Depositions – To be produced by 6 pm, May 15

### 1.    Claims Handling Documents from Share Point Site

As discussed in our letter and our call, both Mr. Stone testified that there are roughly 10 documents on a Share Point file that are guidelines and instructions for the claims handling process and which are therefore responsive, at a minimum, to RFP No. 21.  There is no burden to producing these documents, as Mr. Stone testified it would take about 20 minutes to do so.  Please confirm you will produce all documents from the Share Point site by 6 pm on Monday so that Plaintiffs will be able to use them in the upcoming depositions.

### 2.    Weekly Sheets Regarding Claims Conferences

Ms. Johnson testified she filled out a "sheet" containing information about claims that she discussed with the entertainment claims handlers that she supervised in her weekly meetings with them, and that she kept these sheets in folders "segregated by week," which information was then aggregated and submitted to her supervisor on a monthly basis.  You have not produced any weekly "sheets" containing information about *Dig*.  During our call, you told us Atlantic has not produced any such "sheets" because you did "research" and determined none existed.  First, we are not satisfied by this vague description of "research."  Second, even if the results of your "research" are correct, and there was no claim sheet ever filled out containing information about *Dig*, that is also relevant to whether Atlantic followed its own processes and procedures in evaluating the *Dig* claim.

Thus, we are willing to narrow our request to the complete file of claims sheets from the entertainment division for the weeks surrounding the *Dig* claim and the exchange of letters regarding the denial, namely July 7, 2014-September 26, 2014.  This will allow Plaintiffs to evaluate:  1) whether your research was correct and there were no claim sheets containing information regarding *Dig*, and 2) to determine how other claims during the same time frame were handled as a comparison to *Dig*.  To the extent there is any confidential information in these documents, the protective order in this case should be more than sufficient to protect such information, particularly given that Plaintiffs are not a competitor of Atlantic.  Moreover, as with the claims handling documents, the burden of obtaining these sheets is very low, as Ms. Johnson testified they were all kept in folders by week, so Atlantic should be able to simply make copies of the folders for the requested weeks.  Please confirm that you will produce these documents by 6 pm on Monday so that Plaintiffs will be able to use these documents during the upcoming depositions.

### 3.    Dennis Crosby Documents

Mr. Stone testified that Mr. Crosby's emails were not searched (and therefore not produced).  Mr. Crosby is being deposed on Wednesday.  Please confirm that Mr. Crosby's emails will be searched and all emails responsive to any of Plaintiffs' Requests for Production of Documents will be produced no later than 6 pm on Monday.

8875415.2/46250-00001

EXHIBIT 12, PAGE 1619

May 14, 2017
Page 5

4.      **Hamas Claims and Subrogation Litigation Files**

We have identified at least two lawsuits filed by One Beacon and other insurers against Hamas
and other terrorist organizations in our prior letter, *Federal Insurance, Et Al v. Al Qaida, Et Al*,
Case No. 1:03cv6978 (S.D.N.Y, filed Sept. 10, 2003); *In re: Terrorist Attacks on September 11,
2001*, Case No. 1:03-MD-01570 (S.D.N.Y., filed December 10, 2003).  The claim files that
correspond to the claims precipitating this litigation, and all documents related to such claims,
must be produced.  Further, all non-privileged documents from the litigation files, including
those in the possession of One Beacon's attorneys, Cozen O'Connor, must be immediately
produced.

<p align="center">****</p>

You have previously represented that all searches have been completed.  However, the
deficiencies outlined above and in our prior letter make it abundantly clear this is not the case.
Plaintiffs have been severely prejudiced by Atlantic's failure to produce highly relevant and
responsive documents prior to the depositions of critical witnesses.  Production of all identified
documents and files, a professional search of Atlantic's documents by an independent e-
discovery vendor, and the opportunity to re-open depositions of witnesses who were deposed
before their relevant documents were produced is the only way to begin to mitigate this
prejudice.  *See Owen v. No Parking Today, Inc.*, 280 F.R.D. 106, 111 (S.D.N.Y. 2011) (ordering
deposition re-opened and costs paid for by defendant where defendant had repeatedly
misrepresented his search and the availability of documents, and avoided producing relevant
documents regarding other employees that plaintiff had repeatedly requested, until after his
deposition).

          Please provide us with your substantive response no later than 10 am, Monday, May 15.

Sincerely,

Daniel M. Hayes
Partner of
MITCHELL SILBERBERG & KNUPP LLP

8875415.2/46250-00001

EXHIBIT 12, PAGE 1620

# EXHIBIT 13

**Strasburger**
ATTORNEYS AT LAW

MICHAEL KEELEY
(214) 651-4718
Direct Fax (214) 659-4121
Michael.Keeley@strasburger.com

May 15, 2017

Daniel M. Hayes, Esq.                                        Via E-mail
Mitchell Silberberg & Knupp LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683

Re:   *Universal Cable Productions LLC and Northern Entertainment Productions
      LLC v. Atlantic Specialty Insurance Company*; Case No. 2:16-cv-04435-PA-
      MRW, pending in the United States District Court for the Central District of
      California, Western Division

Dan,

We have received and carefully reviewed your May 12, 2017 letter, and considered
the questions you raised during our phone call that also took place on May 12.

As to point number one in your letter, you have requested the production of the
documents that Mr. Stone referenced that are stored on the "Share Point" site.
These documents are entirely irrelevant to this lawsuit. We have already produced
the two manuals that would have governed the handling of the claim at issue in this
suit. The other guidelines merely provide additional guidance to claims handlers in
specific lines of insurance regarding issues that come up only in connection with
that type of insurance. For example, there is a specific set of guidelines regarding
the handling of claims that arise in the worker's compensation area, and another for
"medical excess" claims. These additional guidelines are outside the scope of what
Federal Rule of Civil Procedure 26 permits, as they have nothing to do with this
lawsuit. Nonetheless, to avoid a discovery dispute, Atlantic will produce all the
documents that it stores on the Share Point site.

Point number two in your letter relates to the "weekly sheets." We have been
informed that there are no such sheets that relate to the *Dig* claim, Hamas, or
Israel. There is therefore nothing to produce.

**Strasburger & Price, LLP**

901 Main Street, Suite 6000 | Dallas, Texas 75202.3794 | 214.651.4300 tel | 214.651.4330 fax | www.strasburger.com

Austin | Collin County | Dallas | Houston | San Antonio | New York, N.Y. | Washington, D.C. | Mexico City - Strasburger & Price, SC

EXHIBIT 13, PAGE 1621

Strasburger
ATTORNEYS AT LAW

Daniel M. Hayes, Esq.
May 15, 2017
Page 2

Regarding point number three in your letter, we will produce responsive documents on Monday, May 15, 2017.

Regarding point number four in your letter, you have offered no explanation for your statement that Microsoft Exchange and Outlook are "notoriously unreliable." This does not fit with Atlantic's knowledge or experience. The initial electronic search that was performed late last year in connection with this case searched the e-mails of Pamela Johnson, Theresa Gooley, Danny Gutterman, Peter Williams, and Wanda Phillips, as they were the only people who were involved in the analysis and handling of this claim. As you know, Mr. Duffy's and Mr. Crosby's involvement was tangential. We have no expectation that a search of their e-mails will result in the production of any additional e-mails given that they would have had no occasion to discuss this case with anyone other than the persons whose e-mails were searched. Nonetheless, to rule out definitively the possibility that there are any remaining e-mails, we will run a search for the words "Dig," "Hamas," "Israel," "Jerusalem," "Tel Aviv," "war," "terror," and "NBC" in Mr. Duffy's and Mr. Crosby's e-mails dating back to July 2013, and provide you the results of that search as quickly as possible.

As to point five in your letter, you do not appear to be asking Atlantic to take any affirmative steps. We disagree with your implied suggestion that Atlantic has any obligation to employ an outside e-discovery vendor. We have stated before that if the plaintiffs will pay for the costs of running additional expensive searches, Atlantic will accommodate the request and have the searches run. But as we have made clear before, we believe the information you are seeking is irrelevant (for example, many of your requests for production demand that we search all claim files going back to January 1, 2001 for the word "war") and that the burden therefore substantially outweighs any potential benefit of running the search, making it improper under Rule 26. Without more context, we cannot respond to your comment about the 14-day searches versus the 30- or 60-day searches. We have had many conversations about searches that would take significant time and you must be more specific before making accusations about misstatements.

Regarding point six, as we stated to you on the telephone, Atlantic does not have the capability to run key-word searches on the CWS system. But that does not mean that the CWS system was not searched "*at all*" as you state. To the contrary, documents appended to claims files in CWS are also stored in a separate database

**Strasburger**
ATTORNEYS AT LAW

Daniel M. Hayes, Esq.
May 15, 2017
Page 3

that is searchable and that Atlantic did search. Atlantic has already produced the responsive non-protected and non-privileged documents found from that search in previous productions.

Regarding point seven, this is duplicative of your point 1, and is addressed above.

Finally, as to point eight, Atlantic first objects to the plaintiffs' raising this at the eleventh hour, on Friday, May 12, when motions to compel are due on Monday, May 15, especially since you state in your letter that you have apparently known about the case you reference since "this weekend," which seems to refer to May 6th or 7th, 2017. You have given Atlantic virtually no time to consider your request or find the documents that you are demanding.

Atlantic has never made *any* statements inconsistent with the existence of the case that you reference. Instead, Atlantic has always made clear that it had conducted an electronic search that dated back to July 2013, and then made additional inquiries to employees regarding their memory on whether Atlantic had ever handled any claims involving Hamas or taken a position on whether Hamas was a terrorist organization. *See* Atlantic's Responses to Interrogatories Nos. 22 and 23. Atlantic's responses were truthful— no one at Atlantic recalls any such claims. Since receiving your letter, Atlantic has begun to investigate the history behind this subrogation lawsuit (which, as you know, was brought in 2003). As Mr. Duffy explained in an answer to a question on this issue, in 2012, OneBeacon Insurance Group Ltd. announced that it would be selling part of its business to Armour Group Holdings Ltd. The sale closed in 2014. The subrogation claim you referenced was an asset transferred to Armour. No one at either Atlantic or OneBeacon has had any dealings with it since then. Atlantic contacted the lead counsel of record in that case, and he confirmed that he reports to Armour in connection with that case.

As a result of this sale to Armour, it is possible that neither Atlantic nor OneBeacon has any files relating to the lawsuit or the underlying subrogation claim. Based on the search that Atlantic has had time to run since receiving your letter on May 12, Atlantic has been unable to locate any files relating to either the lawsuit or the claim. Atlantic will, however, continue to search and discuss with the lead attorney in the case (who reports to Armour) the possibility of providing any such files to Atlantic.

EXHIBIT 13, PAGE 1623

**Strasburger**
ATTORNEYS AT LAW

Daniel M. Hayes, Esq.
May 15, 2017
Page 4

We will continue to keep you apprised of the developments on this front. To the extent you intend to file a motion to compel or a motion for sanctions on Monday, May 15, 2017, Atlantic requests that you attach this letter as an Exhibit so that the Court will have the full picture of the disputes.

Sincerely,

Michael Keeley
MK/mg

8956075.1/SP/15247/0131/051517

EXHIBIT 13, PAGE 1624

# EXHIBIT 14

From:     Gooley, Theresa A.
Sent:     Thu 7/17/2014 2:51 PM (GMT-00:00)
To:       Johnson, Pamela A.
Cc:
Bcc:
Subject: RE: Act of War exclusion - Are you available for a short call?


Pamela,


Would you send me the policy before our call?


Theresa


**Theresa A. Gooley, Esq.** VP Claims | **OneBeacon Insurance Group**

601 Carlson Parkway | Suite 600 | Minnetonka, MN 55305

tel: 952.852.2467 | fax: 888.553.9530 | tgooley@onebeacon.com


**From:** Johnson, Pamela A.
**Sent:** Wednesday, July 16, 2014 1:44 PM
**To:** Gooley, Theresa A.
**Subject:** Act of War exclusion - Are you available for a short call?
**Importance:** High


Theresa,


OBE is dealing with an imminent peril claim for NBC stemming from a production that has shut down due to the rocket fire into Tel Aviv and Jerusalem.  I want to make sure that OBE takes a position that is consistent with the rest of OneBeacon in interpreting the exclusion for warlike actions by a military force.  I was thinking that Tech or other business units might also have claims arising from the Israeli/Hamas conflict.  Do you have time for a quick call to discuss how to get continuity among business units?



EXHIBIT
31

**ATL001571**


EXHIBIT 14, PAGE 1625

Best,


**Pamela A. Johnson, Esq.** Assistant Vice President  | OneBeacon Entertainment

tel: 952.852.2455  | PamelaJohnson@onebeacon.com

onebeaconentertainment.com

ATL001572

EXHIBIT 14, PAGE 1626

# EXHIBIT 15

1           UNCERTIFIED ROUGH DRAFT TRANSCRIPT
2    DEPOSITION OF:  Pamela A. Johnson, Volume 1
     DATE TAKEN:  5/8/17
3

     DISCLAIMER:
4

         This uncertified rough draft transcript is
5    unedited and uncertified and may contain
     untranslated words, a note made by the reporter, a
6    misspelled proper name, and/or word combinations
     that do not make sense.  All such entries will be
7    corrected on the final certified transcript which
     we will deliver to you in accordance with your
8    requested delivery arrangements.
         Due to the need to correct entries prior to
9    certification, this rough draft transcript can be
     used only for the purposes of annotating counsel's
10   notes and cannot be used or cited in any court
     proceedings or to distribute to other parties in
11   the case who have not purchased a transcript copy.
12   CONSENT:  BY OPTING FOR THIS ROUGH DRAFT
     TRANSCRIPT, YOU HAVE AGREED:
13       (1) To purchase the final transcript at the
     agreed-upon rate: (2) Not to furnish this rough
14   draft transcript, either in whole or in part, on
     disk or hard copy, via modem or computer, or by
15   any other means, to any party or counsel to the
     case.
16
17
18
19
20
21
22
23
24
25

EXHIBIT 15, PAGE 1627

Rough Transcript

1           THE VIDEOGRAPHER:  This is the

2      start of tape labeled number 1 of the

3      videotaped deposition of Pamela Johnson in

4      the matter Universal Cable Productions, LLC,

5      V Atlantic Specialty insurance company in the

6      United States district court, central

7      division of California, western division,

8      this deposition is being held at 33 South 6th

9      street, Suite 4400, Minneapolis, Minnesota,

10     55402, on May 8th, 2017, at approximately

11     9:19 a.m.  My name is Ben Abraham I'm the

12     legal video specialist from TSG reporting

13     incorporated headquartered at 747 third

14     avenue New York, New York, the court reporter

15     is aim pea Larson will counsel please

16     introduce yourselves.

17           MS. COYOCA:  Good morning, Lucia

18     Coyoca, Mitchell, Silberberg & Knupp on

19     behalf of plaintiffs Universal Cable

20     Productions and Northern Entertainment

21     Productions.

22           MR. BRAZ:  Avi Braz, in house

23     counsel for plaintiffs.

24           MS. REED:  I'm Toni Scott Reed,

25     Strasburger & Price, I represent the

Rough Transcript

Page 3

1      defendant Atlantic Specialty Insurance

2      Company and the witness here today.

3              THE VIDEOGRAPHER:  And will the

4      court reporter please swear in the witness.

5

6                   PAMELA JOHNSON,

7          a witness in the above-entitled action,

8          after having been first duly sworn, was

9          deposed and says as follows:

10

11                  EXAMINATION

12   BY MS. COYOCA:

13   Q.  Good morning, Ms. Johnson, as we just

14       indicated off the record my name is Lucia

15       Coyoca and I represent the plaintiffs in this

16       matter.  Could you please state your full

17       name and address for the record?

18   A.  My name is Pamela Ann Johnson.

19   Q.  And your address?

20   A.  385 Washington Street.

21   Q.  And that's here in Minneapolis?

22   A.  It's in St. Paul.

23   Q.  St. Paul.  Have you ever been deposed before?

24   A.  I have.

25   Q.  How many times?

EXHIBIT 15, PAGE 1629

Rough Transcript

1    claims personnel for future handling of the

2    claim.  Do you see that?

3    A.  I do.

4    Q.  What was your practice with respect to taking

5        action in order to comply with this

6        directive?

7    A.  So --

8            MS. REED:  Objection vague

9        ambiguous assumes facts not in evidence.

10           THE WITNESS:  So as I explained we

11       would have these calls every week to talk

12       about the rotating claims that each claim

13       handler had and I would fill out a sheet with

14       regard to each of the claims and what the

15       plan of action was after we reviewed the

16       claim.  So in some -- in some cases we would

17       talk about the claim, we would look at the

18       reserve and you know I would make a note that

19       says, you know, everything is on track or

20       fine.  If there was some specific action that

21       needed to be taken with regard to reserving

22       or investigation or resolving the claim then

23       I would make a note of that and those -- each

24       of those separate -- the documentation with

25       regard to each of those were kept and provide

Rough Transcript

Page 60

1        today my supervisor.

2    BY MS. COYOCA:

3    Q.  Did those sheets have is a name?

4    A.  If they did I don't recall them.

5    Q.  Did those sheets go into the claim file?

6    A.  Well, certainly the claim adjuster could put

7         those notes into the file.  I think

8         occasionally I would put it into the file,

9         but generally speaking those claim notes,

10        those -- the evaluation would be made on that

11        specific sheet and kept in a -- in a folder.

12   Q.  What was that folder called?

13   A.  Probably entertainment claims.  I don't

14        specifically remember.

15   Q.  Was the folder segregated by claim or was it

16        all entertainment claims that were aggregated

17        for that week in which the sheets were

18        prepared?

19   A.  Right, it was segregated by week.

20                   THE WITNESS:  Would you mind if we

21        took a short break.

22                   MS. COYOCA:  That's fine.

23                   THE VIDEOGRAPHER:  It's 10:29 a.m.

24        we're going off the record.

25                   (Whereupon, a brief recess was

EXHIBIT 15, PAGE 1631

Rough Transcript

Page 346

1    as to whether or not Hamas could be

2    considered quasi sovereign or some other form

3    of -- of state that could potentially engage

4    in a war.

5                 MS. REED:  Counsel by my count

6    we've hit our seven hours.

7                 MS. COYOCA:  Okay.  Thank you.

8                 THE WITNESS:  Thank you.

9                 THE VIDEOGRAPHER:  It's 6:47 p.m.

10   we're going off the record.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 15, PAGE 1632

# EXHIBIT 16

Page 1

1            UNCERTIFIED ROUGH DRAFT TRANSCRIPT
2

    DEPOSITION OF:  Aaron Stone - 30(b)(6)
3    DATE TAKEN:  5-10-17
4    DISCLAIMER:
5        This uncertified rough draft transcript is
    unedited and uncertified and may contain
6    untranslated words, a note made by the reporter, a
    misspelled proper name, and/or word combinations
7    that do not make sense.  All such entries will be
    corrected on the final certified transcript which
8    we will deliver to you in accordance with your
    requested delivery arrangements.
9        Due to the need to correct entries prior to
    certification, this rough draft transcript can be
10   used only for the purposes of annotating counsel's
    notes and cannot be used or cited in any court
11   proceedings or to distribute to other parties in
    the case who have not purchased a transcript copy.
12

    CONSENT:  BY OPTING FOR THIS ROUGH DRAFT
13   TRANSCRIPT, YOU HAVE AGREED:
        (1) To purchase the final transcript at the
14   agreed-upon rate: (2) Not to furnish this rough
    draft transcript, either in whole or in part, on
15   disk or hard copy, via modem or computer, or by
    any other means, to any party or counsel to the
16   case.
17
18
19
20
21
22
23
24
25

EXHIBIT 16, PAGE 1633

Rough Draft

Page 2

1          THE VIDEOGRAPHER:  This is the

2      start of tape labeled number 1 of the video

3      recorded deposition of Aaron Stone in the

4      matter of Universal Cable Productions, LLC,

5      et al. v Atlantic Specialty Insurance Company

6      in the United States District Court, Central

7      District of California, Western Division.

8      This deposition is being held at 33 South 6th

9      Street, Minneapolis, Minnesota on May 9th,

10     2017, at approximately 10:06 a.m.  My name is

11     Ben Abraham, I'm the legal video specialist

12     in association with TSG Reporting

13     headquartered at 747 Third Avenue New York,

14     New York.  The court reporter is Amy Larson

15     in association with TSG Reporting.  Counsel

16     please introduce yourselves.

17          MR. HAYES:  Dan Hayes, Mitchell

18     Silberberg & Knupp on behalf of plaintiffs.

19          MR. KEELEY:  Daniel Keeley

20     Strasburger & Price for the defendants

21     Atlantic Specialty.

22          THE VIDEOGRAPHER:  Will the court

23     reporter please swear in the witness.

24

25          AARON STONE,

EXHIBIT 16, PAGE 1634

Rough Draft

Page 3

1         a witness in the above-entitled action,

2         after having been first duly sworn, was

3         deposed and says as follows:

4

5                    EXAMINATION

6    BY MR. HAYES:

7    Q.  Good morning, Mr. Stone.

8    A.  Good morning.

9    Q.  Have you ever had your deposition taken

10       before?

11   A.  I have.

12   Q.  How many times?

13   A.  Four times.

14   Q.  When was the last time?

15   A.  Three weeks ago.

16   Q.  Okay.  And the time before that?

17   A.  The time before that was approximately five

18       years ago.

19   Q.  Okay.  So I'm going to go over a few of the

20       ground rules for deposition.  You will have

21       heard all of these before but I just want to

22       make sure we're on the same page, okay?

23   A.  Yes.

24   Q.  First ground rule and actually all of these

25       ground rules stem from the fact that this

EXHIBIT 16, PAGE 1635

Rough Draft

Page 134

```
 1   Q.  Mr. Stone, do you recognize the document
 2       marked Exhibit 5?
 3   A.  (Reviews document.)  Yes.
 4   Q.  What is it?
 5   A.  The document is the general claims practices
 6       that are in place for adjusting claims for
 7       Atlantic Specialty.
 8   Q.  How long have those general claims practices
 9       set forth in Exhibit 5 been in place at
10       Atlantic?
11   A.  They were implemented in September 2012.
12   Q.  And they've been in place since September
13       2012 to the current date?
14   A.  Correct.
15   Q.  I want you to look at Exhibit 6.  Do you
16       recognize that document?
17   A.  (Reviews document.)  Yes.
18   Q.  What is it?
19   A.  This document is the core principals which
20       again applies to anyone adjusting claims for
21       Atlantic Specialty.
22   Q.  And when did these core principals first go
23       into effect at Atlantic?
24   A.  They were also implemented in September of
25       2012.
```

EXHIBIT 16, PAGE 1636

1   Q.   And they've been in effect since that date

2        through the present?

3   A.   Correct.

4   Q.   Both the general claims practices set forth

5        in Exhibit 5 and the core principals set

6        forth in Exhibit 6 apply to the entertainment

7        division since 2012; is that correct?

8   A.   Correct.

9   Q.   Are there any other general -- strike that.

10       Are there any other rules or procedures or

11       principals or protocols that apply to the

12       claims handling process at Atlantic since

13       2012?

14  A.   Other than the general claims practices and

15       core principals I'm aware of only one other

16       modified claim document or claim policy if

17       you will and it is only used by ocean marine

18       since they are adjust are maritime claims and

19       some of their time limitations and/or things

20       are different than the other claims that are

21       regularly adjusted within Atlantic Specialty.

22       Other than that other document, there are no

23       other claims policies or practices or

24       manuals.

25  Q.   How does that ocean marine policy differ from

EXHIBIT 16, PAGE 1637

Rough Draft

1      claim occurring, those primarily again being

2      Danny Gutterman, Elyse Reinke and Christine

3      Powers but I also spoke to Lucy Lopez who is

4      an adjuster in our Los Angeles office and

5      also Steve Baltzell who supervises that group

6      and then reviewed -- you know reviewed

7      documents as a result of the electronic

8      search that we did.

9   Q.  Does the claims manual identified by Peter

10      Williams in his deposition which applied

11      specifically to the entertainment division

12      exist today?

13  A.  It does not.

14  Q.  Why not?

15  A.  It's our position that it never existed.

16  Q.  When you say our position you mean Atlantic's

17      --

18  A.  It's Atlantic's.  There is no record other

19      than Mr. Williams deposition testimony of

20      believing that he drafted a document like

21      that that it existed.

22  Q.  Did you ask Sean Duffy?

23  A.  Yes, I did.

24  Q.  What did he say?

25  A.  He said to his knowledge it never existed.

EXHIBIT 16, PAGE 1638

Rough Draft

Page 138

1    Q.  Did you ask Peter Williams?

2    A.  I have not spoken with Peter Williams.

3    Q.  Is there a place at Atlantic where manuals --

4        strike that.  Is there a specific place at

5        Atlantic where claims handling manuals

6        reside?

7    A.  Yes.

8    Q.  Where?

9    A.  These manuals as well as the -- the one I

10       indicated that exists for ocean marine are on

11       the claims share point site and they are

12       accessible by all claims employees within the

13       company.

14   Q.  And was the claims share point site searched

15       in connection with this case?

16   A.  It was searched in the sense that I have

17       looked at it.

18   Q.  What does that mean?

19   A.  That means I physically opened it up and

20       looked at the documents that are maintained

21       on that site.

22   Q.  Did you look at all the documents?

23   A.  Yes, there's not -- there's not that many.

24   Q.  How many are there?

25   A.  I think there's less than 10.

EXHIBIT 16, PAGE 1639

Rough Draft

Page 139

1   Q.   So I presume one of them is Exhibit 5; is

2        that right?

3   A.   Yes, one is the general claims practices.

4   Q.   One is Exhibit 6, the core principals; is

5        that right?

6   A.   Correct.

7   Q.   What are the other eight?

8   A.   I don't know if -- if 10 is a specific

9        number, but, again, one of them is the -- the

10       ocean marine, I guess we'll call it

11       supplementary manual, if you will, as it

12       supplements the core principals and the

13       general claims practices.  The other

14       documents housed on that site are -- there is

15       a -- I think an additional document about

16       triggers for claims legal when we need to let

17       our internal claims legal group know about

18       matters, what the escalation process is.  And

19       I don't recall offhand what -- what the other

20       documents are.

21   Q.   Do you recall generally what they pertain to?

22   A.   I think generally they pertain to, you know,

23       issues regarding just general claims

24       processes.  I think there may be something in

25       there about, you know, how the claims are set

EXHIBIT 16, PAGE 1640

Rough Draft

Page 140

1       up in the system and things of that nature.

2   Q.  How about recordkeeping?

3   A.  I believe the recordkeeping requirements are

4       contained in the general claims practices.

5   Q.  Did you review the share point site in

6       preparation for your deposition today?

7   A.  Other than reviewing it to educate myself as

8       to this particular topic I did not review it

9       again immediately prior to the deposition.

10  Q.  When did you review it?

11  A.  I reviewed it I think three or four weeks

12      ago.

13  Q.  And you reviewed every document on it?

14  A.  I looked at the documents that were in there,

15      yes.

16  Q.  How long would it take to produce those

17      documents, to print them and produce them?

18  A.  Probably 20 minutes, half an hour.

19  Q.  Okay.  With respect to this additional

20      document for triggers for claims legal, what

21      is claims legal?

22  A.  Claims legal is our internal coverage lawyer

23      group.  It's headed by Chris Paar.

24  Q.  Is -- strike that.  Was Pamela Johnson part

25      of claims legal when she was employed by

Rough Draft

1      Atlantic?

2    A.   No.

3    Q.   Was anyone in claims legal consulted about

4         the Dig claim at any time?

5    A.   I -- I don't think so.  I don't know for

6         sure.

7    Q.   Would there be a record of that if it -- if

8         claims legal had been consulted?

9    A.   That would -- it would be or it should be

10        documented in the claim file if there was

11        consultation with claims legal.

12   Q.   What are the triggers for involving claims

13        legal?

14   A.   Obviously if there's any litigation against

15        the company we have to let them know.  If we

16        have a policy limits demand on a claim that

17        the insured wants us to pay we have to let

18        them know.  They are generally available to

19        assist with providing coverage opinions and

20        generally are able to assist with other

21        matters related to coverage and the group is

22        different today than it was at the time this

23        claim was submitted.

24   Q.   Who made up the group at the time the claim

25        was submitted?

EXHIBIT 16, PAGE 1642

Page 145

1        what the expectations are for the base line

2        of claims handling and things that go on with

3        the adjustment of claims for Atlantic

4        Specialty.  Individual business units may

5        feel that there is a need to expound upon

6        those depending on their relationship with

7        their insureds, the broker community

8        expectations, other things.  So rather than

9        you know redrafting this on an ad hoc basis

10       as other business units may have implemented

11       their own additional practical guidelines, I

12       assume that it was left open so this could be

13       a document that, you know, would stand and

14       would not have to be revised on -- on a

15       regular basis if there were other business

16       units that chose to do that.

17   Q.  How did Atlantic go about confirming that the

18       entertainment claims manual that Peter

19       Williams described never existed?

20   A.  Well as I indicated I spoke to the

21       individuals that I've already mentioned,

22       asked them specifically if they had ever seen

23       any claims manual that was specific to

24       entertainment claims that may have been

25       drafted by Peter Williams or anyone else for

EXHIBIT 16, PAGE 1643

Rough Draft

1      that matter, and no one had ever -- had ever

2      seen a document like that.

3   Q.  Did you do anything else?

4   A.  Again, other than looking at the -- at the

5      share point site.

6   Q.  Did anybody else at Atlantic do anything else

7      other than you talking to the people you

8      listed and is looking at the share point site

9      to confirm whether or not the manual

10      pertaining to entertainment claims that Peter

11      Williams described ever existed?

12          MR. KEELEY:  Object calls for

13      speculation.

14          THE WITNESS:  That is what I did.

15      I don't know if other people may have -- have

16      done other things.

17          MR. HAYES:  Okay.

18   BY MR. HAYES:

19   Q.  I want you to look at topics 54 and 55 of

20      Exhibit 1.

21   A.  (Complies.)

22   Q.  What did you do to prepare to testify on

23      these topics today?

24   A.  In addition to reviewing all the materials

25      that I've testified to previously, we did

EXHIBIT 16, PAGE 1644

1    conduct an electronic search and in

2    connection with -- and I touched on that a

3    little bit earlier but you mentioned who were

4    some of the people that I spoke to, in the IT

5    department we discussed this with Joe Topale,

6    T-O-P-A-L-E, head of IT, also discussed it

7    with Susan Donovan who reports to Joe.  Susan

8    was involved in helping us create the initial

9    setting up the search and helping us with the

10   parameters for the initial search that we did

11   that went back to July 1, 2013, that involved

12   reviewing the e-mails of five employees,

13   Peter Williams, Danny Gutterman, Pamela

14   Johnson, Theresa Gooley and Wanda Phillips

15   and also then ran the search or assisted in

16   putting together the search to go through the

17   P drives which are the personal drives of

18   those individuals and then also help set up

19   and conduct the search of our document system

20   which resulted in I believe retrieval of over

21   36,000 documents and to give you an idea of

22   kind of the scope for that search for the

23   e-mails alone for those five individuals it

24   took one day to do the -- do the data back up

25   or retrieve the data and then it took a day

EXHIBIT 16, PAGE 1645

Page 148

1        to run the search and so in talking more

2        recently with -- with Joe and Susan in our IT

3        department to try to get an idea of, you

4        know, if we were going to conduct additional

5        searches kind of what the -- what the

6        magnitude of that search would be, we asked

7        them about if we were to search the e-mails

8        only of all current and former Atlantic

9        claims adjusters, how long would that take.

10       I confirmed with HR that from January 1,

11       2010, until the present, there have been 620

12       claims adjusters that have is worked for

13       Atlantic specialty both current and past and

14       with that information we asked Susan and Joe

15       roughly how long it would take to do the data

16       back up retrieval and then run a search of

17       those employees e-mails for you know various

18       terms similar to what we had done in the

19       prior search and they indicated that that

20       search, number one, was larger in magnitude

21       by far than any other search we'd been asked

22       to conduct but would roughly take 496 working

23       days.

24  Q.   Did anyone search Sean Duffy's documents?

25             MR. KEELEY:  For?

EXHIBIT 16, PAGE 1646

Rough Draft

Page 149

1           MR. HAYES:  Purposes of this

2      litigation.

3           THE WITNESS:  The -- the document

4      system that was searched was not limited to

5      employees.  The e-mail search that was

6      conducted was limited to those five

7      employees.

8   BY MR. HAYES:

9   Q.  Sean Duffy was not one of them, right?

10  A.  He was not.

11  Q.  Was Dennis Crosby?

12  A.  He was not.

13  Q.  Okay.  How long would it take to search Sean

14      Duffy's e-mails?

15  A.  If -- if it took, you know, basically two

16      days to search five employees e-mails, I

17      would assume it would -- and you know we're

18      talking about the same time parameters I

19      would imagine it would take that period of

20      time or less.

21  Q.  How about Dennis Crosby's?

22  A.  The same.

23  Q.  How about Sean Duffy's e-mails all the way

24      back to when he first started at OneBeacon?

25  A.  Here again that's not my area of expertise,

EXHIBIT 16, PAGE 1647

Page 150

1      but certainly it would take longer I would

2      imagine than a -- than a few days.

3   Q.  I want you to turn to the page marked 736 of

4      Exhibit 5.

5   A.  (Complies.)

6   Q.  There's a reference in the middle of the page

7      to the CWS claim folder.  What is that?

8   A.  CWS is our claim system and I believe the

9      acronym is claim work station and it is the

10     program -- I mean it's basically the

11     electronic file, claim file, so the adjusters

12     go into CWS and input data regarding the

13     policy, the coverage, the limits, if there's

14     a deductible or a self-insured retention,

15     they put in file notes and they can append

16     documents to the claim file in CWS.

17  Q.  How far back does it go?

18  A.  CWS I believe came on line in 2002.

19  Q.  How far back does it go, 2002?

20  A.  2002, yes.

21  Q.  Okay.

22  A.  There was a different system being used

23     before that.

24  Q.  And can you search it?

25  A.  CWS does not have a search functionality.  I

EXHIBIT 16, PAGE 1648

Page 151

```
 1         discussed this with both Joe Topale and Susan
 2         Donovan and another individual who oversees
 3         CWS named Tony Dipena and they indicated in
 4         order to search CWS they would have to create
 5         the program to do it.
 6    Q.   How long --
 7    A.   It does not have its own internal search
 8         functionality.
 9    Q.   How long would that take?
10    A.   They said in terms of building it from
11         scratch and testing it it would take between
12         one and two weeks.
13    Q.   Do you know whether or not any discovery
14         consultant can image the information in CWS
15         and search that information with his or her
16         own dedicated search tools?
17    A.   I don't know.
18    Q.   Okay.  Has CWS been searched in connection
19         with this case?
20    A.   At this point it has not.
21    Q.   Other than building a program from scratch,
22         has anyone at Atlantic or any representative
23         of Atlantic looked into or researched whether
24         a third party electronic discovery vendor
25         could devise a way to search CWS?
```

EXHIBIT 16, PAGE 1649

Rough Draft

Page 152

1    A.   To the extent that I have had conversations

2         with the IT department we have not discussed

3         that particular issue.  Whether they have

4         discussed that previously in regards to other

5         search requests, I don't know what the answer

6         would be.

7    Q.   What software does CWS run on?

8    A.   It's -- it's its own created system.  I don't

9         know that it runs on -- on any particular

10        software, so it's not like, for example, for

11        our e-mails we use micro soft out look which

12        has a search functionality which is why, you

13        know, searching through e-mails is generally

14        faster.  When we -- when we searched the

15        document system, which is a system called

16        image now, for the three and a half year

17        period that we had talked about previously it

18        took approximately 14 days to search for

19        those documents.

20   Q.   What does that mean 14 days of machine time

21        searching --

22   A.   14 days of machine time, the -- the search

23        tool that they have for the documents is I

24        believe called power grip and it has the

25        ability to search 2 gigabyte of data at a

EXHIBIT 16, PAGE 1650

Rough Draft

Page 153

```
1        time.
2    Q.  Has anyone at Atlantic explored through any
3        discovery vendor whether image now can be
4        searched faster with dedicated search tools?
5    A.  I -- I do not -- I don't know.  I can tell
6        you that in speaking with Joe Topale that he
7        is aware of prior to this case we have had a
8        total of 99 requests to do electronic
9        searches to Atlantic Specialty and that the
10       one that we conduct indeed this case was one
11       of the largest ones.
12   Q.  What information is housed on image now?
13   A.  Image now is simply the document system where
14       documents are up loaded and then they can be
15       -- they will either reside in image now or
16       the adjuster can take a further step and
17       physically attach them to a claim file.
18   Q.  In CWS?
19   A.  In CWS correct.
20   Q.  So to the extent the entertainment claims
21       manual that Peter Williams testified about
22       ever existed it might be on image now; is
23       that right?
24   A.  I suppose theoretically.  Someone would have
25       had to take the step to up loading it into
```

EXHIBIT 16, PAGE 1651

Page 154

```
 1        that system.
 2   Q.   Did anyone check image now to see if that
 3        entertainment claims manual resides on image
 4        now?
 5   A.   I don't believe any of the search terms that
 6        were involved in the prior search of our
 7        document system would have -- would have
 8        identified a document like that.
 9   Q.   When you say it took 14 machine days to
10        conduct the searches of image now, does that
11        literally mean that the computers were on
12        running for 14 days straight?
13   A.   My understanding from talking to our IT
14        people is that, again, because of the
15        limitation of the search tool of only being
16        able to -- to -- to handle 2 gigabytes of
17        information at a time, that the amount of --
18        of data that was -- that was responsive to
19        the search parameters that, yes, it took 14
20        days to go through all of that data.
21   Q.   How far back does image now go?
22   A.   I think image now goes back contemporaneous
23        to when CWS came on line, but I'm not sure.
24   Q.   And do you know how much total data is
25        currently housed on image now in terms of
```

EXHIBIT 16, PAGE 1652

1       gigabytes or terabytes do you have any idea?

2   A.  I don't.

3   Q.  Who would know the answer to that question?

4   A.  Probably Joe Topale or Susan Donovan.

5   Q.  And image now was searched back to 2013, July

6       of 2013?

7   A.  July 1, 2013.

8   Q.  That's right?

9   A.  Yes.

10  Q.  And how long would it take to search the

11      universe of image now for the key words that

12      Atlantic used to search it back to 2013?

13  A.  We -- I talked about that with both Joe and

14      Susan and neither one of them could -- could

15      offer a definitive answer other than we

16      wouldn't be able to do it.  Number one, we

17      wouldn't have the -- the ability -- the

18      storage ability to retrieve all of the data

19      in order to search it and then the -- the

20      amount of time that it would take would be,

21      you know, beyond -- I mean, beyond thousands

22      of days.

23  Q.  And did Atlantic consult a third party

24      discovery expert or vendor to determine

25      whether image now could be searched in its

EXHIBIT 16, PAGE 1653

Rough Draft

1        entirety faster than that?

2    A.  I don't know.

3    Q.  Who would know the answer to that question?

4    A.  Probably Joe Topale.

5    Q.  Do you know Danny Gutterman?

6    A.  I do.

7    Q.  Danny Gutterman had his deposition taken in

8        this case and he testified that claims

9        personnel at Atlantic really want to find

10       coverage.

11   A.  I think, not speaking for -- you know, for

12       other carriers but in other places that I

13       have worked and at OneBeacon that is the

14       overriding philosophy is that when claims

15       come in we try to find coverage if at all

16       possible.  We've sold a product to the -- to

17       the insured, they're -- you know, they're a

18       business partner of ours and if there's a

19       covered loss we want to find coverage for it

20       we want to pay what we owe.

21   Q.  So would you agree in evaluating an insurance

22       claim Atlantic is supposed to look for

23       support for an insurance position that a

24       claim is covered?

25   A.  I think we look at -- try to get at much

Rough Draft

Page 198

1    Q.   Beginning when, what year?

2    A.   I don't know.

3    Q.   Prior to 2013?

4    A.   I don't know.

5                   MR. HAYES:   This is going to be

6         Exhibit 15.

7                   (Whereupon, Deposition Exhibit 15

8         was marked for identification.)

9    BY MR. HAYES:

10   Q.   Do you recognize the document marked Exhibit

11        15?

12   A.   Yes.

13   Q.   What is it?

14   A.   It is the first three pages of a production

15        portfolio policy.

16   Q.   What is a production portfolio policy?

17   A.   It would be policy primarily issued in the

18        entertainment group to insureds that were

19        engaged in television or -- or movie

20        productions.

21   Q.   And is this a policy form that Atlantic

22        drafted?

23   A.   It appears to be so, yes.

24   Q.   When did Atlantic draft this form?

25   A.   I don't know.

EXHIBIT 16, PAGE 1655

Rough Draft

Page 201

1          request a five-minute break.  I think I may

2          be done with this session of the 30(b)(6).

3                         THE VIDEOGRAPHER:  It's 4:31 p.m.

4          we're going off the record.

5                         (Whereupon, a brief recess

6                         was taken.)

7                         THE VIDEOGRAPHER:  It's 4:41 p.m.

8          we're back on the record.

9                         MR. HAYES:  Okay.  So I'm done for

10         today, but reserve the rest of my questions

11         for the second session of the 30(b)(6).

12                        MR. KEELEY:  All right.  We'll

13         reserve questions.

14                        THE VIDEOGRAPHER:  It's 4:41 p.m.

15         we're going off the record.

16

17

18

19

20

21

22

23

24

25

EXHIBIT 16, PAGE 1656

# EXHIBIT 17

Rough Transcript

Page 1

1          UNCERTIFIED ROUGH DRAFT TRANSCRIPT

2

    DEPOSITION OF:  Sean Duffy
3   DATE TAKEN:  5-11-17

4   DISCLAIMER:

5       This uncertified rough draft transcript is
    unedited and uncertified and may contain
6   untranslated words, a note made by the reporter, a
    misspelled proper name, and/or word combinations
7   that do not make sense.  All such entries will be
    corrected on the final certified transcript which
8   we will deliver to you in accordance with your
    requested delivery arrangements.

9        Due to the need to correct entries prior to
    certification, this rough draft transcript can be
10  used only for the purposes of annotating counsel's
    notes and cannot be used or cited in any court
11  proceedings or to distribute to other parties in
    the case who have not purchased a transcript copy.

12

    CONSENT:  BY OPTING FOR THIS ROUGH DRAFT
13  TRANSCRIPT, YOU HAVE AGREED:

    (1) To purchase the final transcript at the
14  agreed-upon rate: (2) Not to furnish this rough
    draft transcript, either in whole or in part, on
15  disk or hard copy, via modem or computer, or by
    any other means, to any party or counsel to the
16  case.

17

18

19

20

21

22

23

24

25

EXHIBIT 17, PAGE 1657

Rough Transcript

Page 2

1          THE VIDEOGRAPHER:  This is the

2     start of media number 1 of the video recorded

3     deposition of Sean Duffy in the matter

4     Universal Cable Productions, LLC, et al., V

5     Atlantic Specialty insurance company in the

6     United States district court, central

7     district of California, western division.

8     This deposition is being held at 33 South 6th

9     Street, Minneapolis, Minnesota, on May 11th

10    of 2017 at approximately 10 a.m., my name is

11    Ben Abraham, I'm the legal video specialist

12    in TSG Reporting incorporated headquartered

13    at 747 third avenue, New York, New York the

14    court reporter is Amy Larson in association

15    with TSG Reporting counsel please introduce

16    yourself.

17          MR. HAYES:  Dan Hayes of Mitchell

18    Silberberg and Knupp on behalf of the

19    plaintiffs.

20          MR. KEELEY:  Michael Keeley with

21    Strasburger & Price on behalf of the

22    defendants Atlantic Specialty insurance

23    company.

24          THE VIDEOGRAPHER:  Will the court

25    reporter please swear in the witness.

EXHIBIT 17, PAGE 1658

Rough Transcript

Page 192

```
 1    BY MR. HAYES:

 2    Q.  Did you search for any e-mails that might be

 3         relevant to this case in kegs with this

 4         litigation?

 5    A.  Did I personally?

 6    Q.  Yes.

 7    A.  No.

 8    Q.  Did anybody else?

 9    A.  Did anybody else do what.

10    Q.  Search your e-mails for relevant information

11         in this litigation?

12    A.  I don't know.

13    Q.  Did you say you don't know?

14    A.  I assume they did.

15    Q.  Why do you assume they did?

16    A.  Because I assume it was a part of our

17         discovery response.  I have no idea.

18    Q.  Okay.

19    A.  I don't get involved in those things.

20    Q.  Did anybody tell you that they were searching

21         your e-mails for purposes of responding to

22         discovery in this case or for any other

23         reason?

24    A.  I don't recall one way or the other but it's

25         possible.
```

EXHIBIT 17, PAGE 1659

Rough Transcript

Page 220

1      maintained where was it maintained?

2   A.   With the adjuster.

3   Q.   And did it go to storage after the claim was

4        resolved?

5   A.   Pursuant to whatever our document retention

6        policies are, yes he.

7   Q.   Do you know what OneBeacon's document

8        retention policies are?

9   A.   I have no idea.

10  Q.   Do your e-mails get deleted after a certain

11       amount of time if you do not actively

12       preserve them?

13              MR. KEELEY:   Objection asked and

14       answered he just answered it Dan he told you

15       he doesn't know.

16              THE WITNESS:   I don't fully

17       understand how the system works but we have

18       many controls in place that allow the

19       retrieval of e-mail over a certain period of

20       time I just honestly don't know how that

21       fully works.

22  BY MR. HAYES:

23  Q.   Were your e-mails preserved in connection

24       with this case?

25  A.   So once this was a litigation hold because

EXHIBIT 17, PAGE 1660

Rough Transcript

1       litigation had occurred presumably yes

2       litigation hold was placed on my e-mails

3       which means they're held I assume in

4       definitely until the matter is resolved.

5   Q.  Do you know one way or the other whether your

6       e-mails were preserved?

7   A.  Which e-mails?

8   Q.  Any of your e-mails?

9   A.  I just answered that post litigation a

10      litigation hold was placed and my e-mails

11      would have been preserved.

12  Q.  You said presumably so you were issued a

13      litigation hold is that what you're saying?

14  A.  Yes.

15  Q.  Okay.  Understood.  And did you take any

16      actions to reserve your e-mails?

17  A.  No that's done electronically.

18  Q.  So it's your understanding that your e-mails

19      were preserved electronically by somebody

20      else after the litigation hold was instituted

21      is that your understanding?

22  A.  Correct.

23  Q.  Okay.

24  A.  I have so many litigation holds that my

25      e-mails are generally kept in definitely.

EXHIBIT 17, PAGE 1661

Rough Transcript

Page 254

1           MR. HAYES:  Can we take a five

2      minute break.

3           MR. KEELEY:  Another break.

4           THE VIDEOGRAPHER:  It's 4:45 p.m.

5      we're going off the record.

6           (Whereupon, a brief recess was

7      taken.)

8           THE VIDEOGRAPHER:  It's 5:08 p.m.

9      and we're back on the record.

10           MR. HAYES:  I have no further

11      questions.

12           MR. KEELEY:  We'll reserve.

13           THE VIDEOGRAPHER:  It's 5:08 p.m.

14      and we're going off the record.

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 17, PAGE 1662