1

2

3                    UNITED STATES DISTRICT COURT

4                   CENTRAL DISTRICT OF CALIFORNIA
                            WESTERN DIVISION
5

6    UNIVERSAL CABLE PRODUCTIONS      )
     LLC, ET AL.,                     )
7                                     )
                                      )
8           PLAINTIFFS,               )
                                      )
9           V.                        )   CV 16-4435-PA(MRWX)
                                      )
10                                    )   LOS ANGELES, CALIFORNIA
     ATLANTIC SPECIALTY INSURANCE     )
11   COMPANY,                         )
                                      )   MAY 24, 2017
12                                    )   (9:20 A.M. TO 10:25 A.M.)
                                      )   (10:42 A.M. TO 10:47 A.M.)
13          DEFENDANT.                )
     _____ )

14

15                            HEARING

16        BEFORE THE HONORABLE MICHAEL R. WILNER
                UNITED STATES MAGISTRATE JUDGE
17

18   APPEARANCES:            SEE NEXT PAGE

19   COURT REPORTER:         RECORDED; COURT SMART

20   COURTROOM DEPUTY:       VERONICA PIPER

21   TRANSCRIBER:            DOROTHY BABYKIN
                             COURTHOUSE SERVICES
22                           1218 VALEBROOK PLACE
                             GLENDORA, CALIFORNIA  91740
23                           (626) 963-0566

24

25   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
     TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF UNIVERSAL CABLE PRODUCTIONS LLC:

 3              MITCHELL SILBERBERG & KNUPP LLP
                BY:  VALENTINE A. SHALAMITSKI
 4                   ATTORNEY AT LAW
                11377 WEST OLYMPIC BOULEVARD
 5              LOS ANGELES, CALIFORNIA  90064

 6
      FOR THE DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY:
 7
                STRASBURGER & PRICE LLP
 8              BY:  CARLA C. CRAPSTER
                     ATTORNEY AT LAW
 9              901 MAIN STREET
                SUITE 6000
10              DALLAS, TEXAS  75202

11              ANDERSON MC PHARLIN & CONNERS LLP
                BY:  MARC J. SHRAKE
12                   ATTORNEY AT LAW
                707 WILSHIRE BOULEVARD
13              SUITE 4000
                LOS ANGELES, CALIFORNIA  90017
14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                        I N D E X
CV 16-4435-PA(MRWX)                         MAY 24, 2017
2
PROCEEDINGS:   PLAINTIFFS' MOTION TO COMPEL
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1          LOS ANGELES, CALIFORNIA; WEDNESDAY, MAY 24, 2017; 9:20 A.M.

 2                  THE COURT:  ALL RIGHT.  LET'S CALL THE UNIVERSAL

 3    MATTER.

 4                  THE CLERK:  CV 16-4435-PA(MRWX), UNIVERSAL CABLE

 5    PRODUCTION VERSUS ATLANTIC SPECIALTY INSURANCE COMPANY.

 6                  COUNSEL, PLEASE STATE YOUR APPEARANCES.

 7                  MR. SHALAMITSKI:  GOOD MORNING, YOUR HONOR.

 8                  VALENTINE SHALAMITSKI, MITCHELL SILBERBERG & KNUPP,

 9    FOR THE PLAINTIFFS.

10                  THE COURT:  GOOD MORNING.

11                  MR. SHRAKE:  GOOD MORNING, YOUR HONOR.

12                  MARC SHRAKE FOR ATLANTIC SPECIALTY INSURANCE COMPANY.

13                  THE COURT:  MR. SHRAKE.

14                  MS. CRAPSTER:  AND CARLA CRAPSTER, ALSO FOR ATLANTIC

15    SPECIALITY INSURANCE COMPANY.

16                  THE COURT:  ALL RIGHT.  GOOD MORNING, MS. CRAPSTER.

17                  ALL RIGHT.  THE MATTER IS ON FOR ANOTHER DISCOVERY

18    MOTION.  THIS IS UNIVERSAL CABLE'S MOTION FOR FURTHER DISCOVERY

19    RESPONSES.  THIS HAS TO DO WITH A REQUEST FOR A SEARCH OF

20    COMPUTERIZED RECORDS HAVING TO DO WITH OTHER CLAIMS INVOLVING

21    THE TERROR AND WAR PROVISIONS AND POLICIES THROUGHOUT THE

22    ATLANTIC COMPANIES.

23                  I TOOK A LOOK AT THE MOTION.  AND WE'LL CALL IT A

24    FOOT OF ATTACHED MATERIALS FROM PLAINTIFF.

25                  I LOOKED AT ATLANTIC'S RESPONSE AS WELL AS A REPLY
```

1   SUBMISSION FROM UNIVERSAL.

2           WHERE IS MR. HAYES TODAY?

3           MR. SHALAMITSKI:  HE'S IN DEPOSITION.

4           THE COURT:  OH, OKAY.  WOULD YOU PLEASE FOLLOW UP

5   WITH HIM AND LET HIM KNOW THAT AFTER OUR LAST DISCUSSION I WENT

6   BACK AND I CONFIRMED THAT MATLOCK WAS INDEED AN NBC TELEVISION

7   SHOW.  BUT IT WAS ONE OF THE RARE SHOWS.

8           THIS WAS A TOPIC OF DISCUSSION.  WE DON'T HAVE TO GO

9   TOO DEEP INTO IT.  YOU DON'T HAVE TO TAKE A NOTE ON IT.  BUT IT

10  WAS AN NBC SHOW FOR A NUMBER OF YEARS.  AND THEN IT WAS ONE OF

11  THE RARE SHOWS THAT CHANGED NETWORKS.  AND IT WAS ON ABC.  THIS

12  WAS ANDY GRIFFITH AS A COUNTRY LAWYER.  AND WE'VE HAD SOME

13  COUNTRY-LAWYER DISCUSSIONS IN OUR CASE SO FAR.  SO, I WAS RIGHT

14  PARTLY.  IT WAS AN NBC SHOW, WHICH IS YOUR CLIENT.  AND THEN IT

15  BECAME AN ABC SHOW.  AND WE DON'T HAVE TO TALK ABOUT THEM.

16          ALL RIGHT.  SO, MR. SHALAMITSKI, DID I PRONOUNCE THAT

17  CORRECT?

18          MR. SHALAMITSKI:  YES, YOUR HONOR.

19          THE COURT:  GOOD.

20          IF I COULD HAVE YOU AT THE LECTERN BECAUSE I'VE GONE

21  THROUGH YOUR MATERIALS.  AND I WANT TO MAKE SURE I'M NOT -- I'M

22  NOT SORT OF CHASING MY TAIL ON THIS.

23          THE ISSUE OF THE COSTS TO COMPLY WITH THE DISCOVERY

24  REQUESTS ARE WILDLY DIVERGENT.  AND WHETHER I GO WITH YOUR

25  NUMBER AND COSTS OR THE DEFENSE'S NUMBER AND COSTS IS AN ISSUE

6

1  THAT I THINK IS SECONDARY HERE.  BECAUSE I NEED TO HEAR A VERY

2  CLEAR STATEMENT FROM YOU WHY IT IS THAT DISCOVERY REGARDING

3  OTHER CLAIMS IS RELEVANT TO THE CLAIMS AND DEFENSES IN THIS

4  ACTION.

5          IT FEELS TO ME VERY MUCH LIKE BOTH SIDES KIND OF WENT

6  PAST THAT REAL QUICKLY.  BUT IT BECOMES KEY TO THE RULE 26

7  ANALYSIS THAT I'M GOING TO BE ASKED TO MAKE WITH RESPECT TO

8  THIS -- THIS ISSUE.

9          SO, WALK -- WALK ME THROUGH THE PURPOSE OF CONDUCTING

10  DISCOVERY OF OTHER CLAIMS RELATED TO OTHER POLICIES AND OTHER

11  CLIENTS HERE.

12          MR. SHALAMITSKI:  SURE, YOUR HONOR.

13          BEFORE I GO INTO THE SPECIFIC REASONS, SINCE THERE'S

14  AT LEAST FIVE OF THEM, WHAT WE NEED TO UNDERSTAND HERE IS THAT

15  EVEN THOUGH THE POLICY OF ONE INSURED TO THE OTHER INSURED MAY

16  BE DIFFERENT IN MANY RESPECTS.  THE WAR EXCLUSIONS AND THE

17  TERRORISM EXCLUSIONS ARE GENERALLY STANDARD.

18          SO, FROM POLICY TO POLICY THOSE ARE UNLIKELY TO

19  DIFFER OR UNLIKELY TO DIFFER SIGNIFICANTLY.

20          THE COURT:  OKAY.  SO, THE LANGUAGE OF THE POLICIES

21  IS JUST GOING TO BE CUT AND PASTED BECAUSE IT'S A PRE-PRINTED

22  NONNEGOTIABLE FORM.

23          MR. SHALAMITSKI:  IT DEPENDS.  IT COULD DEPEND, BUT

24  GENERALLY YES.

25          THE COURT:  OKAY.

1          MR. SHALAMITSKI:  SO, WITH THAT IN -- WITH THAT

2     EXPLANATION, THERE ARE AT LEAST FIVE REASONS WHY THESE OTHER

3     CLAIMS ARE RELEVANT TO THIS CASE.

4          EACH PARTY FILED A MOTION FOR SUMMARY JUDGMENT --

5          THE COURT:  UH-HMM.

6          MR. SHALAMITSKI:  -- ARGUING INTERPRETATION OF THE

7     POLICY AND INTERPRETATION SPECIFICALLY OF THE WAR EXCLUSIONS.

8          SO, THE FIRST REASONS ARE THE CLAIMS IRRELEVANT IS

9     BECAUSE IT GOES TO THE UNDERSTANDING BY ATLANTIC WHAT THE WAR

10    EXCLUSIONS MEANT.

11         THE COURT:  AND --

12         MR. SHALAMITSKI:  BECAUSE --

13         THE COURT:  AND HOW IS THAT RELEVANT?

14         HOW IS ATLANTIC'S UNDERSTANDING OF THE CLAIM

15    RELEVANT?

16         MR. SHALAMITSKI:  ATLANTIC'S UNDERSTANDING OF WHAT

17    THE WAR EXCLUSION MEANS, WHICH COULD BE GLEANED BY OTHER CLAIMS

18    AND HOW THEY HANDLED TERRORISM VERSUS WAR AND THOSE EXCLUSIONS

19    IN CONNECTION WITH THE OTHER CLAIMS IN CONNECTION WITH

20    TERRORIST ACTS IN OTHER CLAIMS AND HOW THEY HANDLED IT THERE

21    AND INTERPRETED THE WAR EXCLUSION IN THOSE POLICIES, ARE

22    RELEVANT TO ATLANTIC'S UNDERSTANDING OF THE SAME WAR EXCLUSION

23    PROVISION IN THIS POLICY.

24         AND UNDERSTANDING OF THE PARTIES IS ONE OF THE THINGS

25    THAT THE COURT -- THE COURT LOOKS AT WHEN THE COURT INTERPRETS

1    THE CONTRACT.  SO, THAT'S REASON NUMBER ONE.

2              THE COURT:  OKAY.

3              MR. SHALAMITSKI:  REASON NUMBER TWO --

4              THE COURT:  I'M NOT SURE THAT'S WHAT YOU FOLKS SAID

5    ON SUMMARY JUDGMENT.

6              BUT GO AHEAD.  WE'LL COME BACK TO THAT ONE.

7              MR. SHALAMITSKI:  OKAY.

8              REASON NUMBER TWO IS OTHER CLAIMS CAN SHOW THAT

9    ATLANTIC INCONSISTENTLY HANDLED THE TERRORISM CLAIMS AS -- AS

10   WHEN WE REFERRED TO THEM.

11             AND WHETHER OR NOT THE INSURED HANDLED CLAIMS ARISING

12   OUT OF THE TERRORIST ACTS, ONE WAY OR THE OTHER OR WHETHER THEY

13   FLIP FLOPPED, THAT IS RELEVANT TO THE INTERPRETATION OF THE

14   POLICY AS THE CASES RECOGNIZE.

15             AND AS INDEED PAMELA JOHNSON, WHO IS THE VICE

16   PRESIDENT OF ATLANTIC, WHO IS ASSIGNED --

17             THE COURT:  I READ THE -- I READ THE DEPOSITION

18   EXCERPT.  YEAH.

19             MR. SHALAMITSKI:  OKAY.  SO, SHE SAID --

20             THE COURT:  SHE SAID SHE WANTED TO BE CONSISTENT.

21             MR. SHALAMITSKI:  EXACTLY.

22             THE COURT:  OKAY.

23             MR. SHALAMITSKI:  SO, THAT'S REASON NUMBER TWO.

24             REASON NUMBER THREE IS IF OTHER CLAIMS CAN SHOW THAT

25   THERE WAS A TERRORIST ACT BY A RECOGNIZED TERRORIST GROUP --

1  AND ATLANTIC SAID, SURE, HERE, WE'RE GOING TO PAY YOUR CLAIM.

2  AND WE'RE NOT GOING TO INVOKE THE WAR EXCLUSION, IT'S JUST

3  GOING TO SHOW THAT THE INTERPRETATION THAT ATLANTIC URGED IN

4  ITS MOTION FOR SUMMARY JUDGMENT AND OVERRULING THE CASE IS

5  WRONG.

6      NUMBER FIVE -- OH, SORRY, NUMBER FOUR, IT'S KIND OF

7  FLIP SIDE OF NUMBER THREE.  THE SAME CLAIMS WILL SHOW THAT OUR

8  INTERPRETATION, MEANING UNIVERSAL'S, IS THE CORRECT ONE,

9  MEANING THAT THE WAR EXCLUSION SHOULD NOT APPLY HERE BECAUSE IT

10  WAS A CLAIM THAT WAS CAUSED BY THE TERRORIST ACTS.

11      AND NUMBER FIVE IS THE OTHER CLAIMS AND THE WAY THAT

12  ATLANTIC HANDLED OTHER TERRORIST ACTS THAT CAUSED SOME KIND OF

13  A LOSS IS RELEVANT TO ATLANTIC'S COURSE OF DEALING, WHICH,

14  AGAIN, GOES TO THE INTERPRETATION OF THE CALLS.

15      AND I SUPPOSE A RELATED NUMBER SIX IS THE COURTS CAN

16  LOOK TO THE INSURANCE INDUSTRY'S UNDERSTANDING OF THE POLICY

17  TERMS OR EXCLUSIONS IN DETERMINING WHAT THE POLICY MEANT OR

18  WHAT THE INSURED INTENDED IT TO BE.

19      AND, SO, IF THERE ARE CLAIMS -- I MEAN --

20      THE COURT:  NO, NO.  NOT THE INSURED.  THE INSURER.

21      MR. SHALAMITSKI:  PARDON?

22      THE COURT:  NOT THE INSURED BUT THE INSURER.

23      MR. SHALAMITSKI:  YES.  I'M SORRY.  I MISSPOKE.

24      THE COURT:  YEAH.  YOU'RE -- YOU'RE THE INSURED.

25      MR. SHALAMITSKI:  YES.

1               THE COURT:  OKAY.

2               MR. SHALAMITSKI:  I MISSPOKE.  SORRY.

3               THE COURT:   THAT'S OKAY.

4               MR. SHALAMITSKI:  SO, THAT COULD GO TO THE INSURING'S

5    INDUSTRY -- SORT OF A PIECE OF IT.  OBVIOUSLY, WE HAVE AN

6    EXPERT -- AN EXPERT, AN INSURANCE EXPERT.  THEY HAVE AN

7    INSURANCE EXPERT.  THEY DISAGREE ON CERTAIN POINTS, BUT --

8    THAT'S NUMBER SIX.

9               THE COURT:  OKAY.

10               SO, HERE'S -- I DIDN'T -- I DIDN'T GO THROUGH YOUR

11    SUMMARY JUDGMENT PAPERS IN GREAT DETAIL.  THAT'S TEED UP IN

12    FRONT OF JUDGE ANDERSON.  AND I SAW HE TOOK YOUR HEARING OFF

13    CALENDAR.

14               BUT THE ISSUE -- THE ISSUE IS DOES THIS CONDUCT IN

15    THE HAMAS ACTION FALL IN OR OUT OF THIS -- OF THIS -- THE TERMS

16    OF THE POLICY, CORRECT?

17               MR. SHALAMITSKI:  CORRECT.

18               THE COURT:  YEAH.  I MEAN, THERE'S NO QUESTION OF

19    FACT THAT DID HAMAS ACT.  THAT'S NOT A QUESTION OF FACT.  I

20    MEAN, WE KNOW THEY FIRED ROCKETS OR PEOPLE GOT SCARED.  AND

21    THEY SHUT DOWN THE PRODUCTION, RIGHT?  I MEAN, THAT'S NOT A

22    QUESTION OF FACT.  OR IT MAY BE A QUESTION OF FACT, BUT THAT'S

23    NOT OUR ISSUE HERE TODAY.

24               MR. SHALAMITSKI:  CORRECT.

25               THE COURT:  OKAY.

1             I MEAN, I THOUGHT I HEARD A DISCUSSION IN ONE OF OUR

2      EARLIER CALLS THAT ISSUES REGARDING THE POLICY INTERPRETATION

3      WERE A QUESTION OF LAW FOR YOUR DISTRICT JUDGE TO MAKE.

4             AM I WRONG THERE?

5             MR. SHALAMITSKI:  NO, YOUR HONOR.  YOU'RE NOT WRONG.

6             EACH SIDE PRETTY MUCH ARGUES THAT IT IS A QUESTION

7      FOR THE DISTRICT JUDGE -- FOR THE COURT TO DECIDE THE

8      INTERPRETATION OF THE CONTRACT.

9             HOWEVER, EACH SIDE ALSO SAYS -- WELL, AT LEAST I CAN

10     SPEAK FOR UNIVERSAL --

11            THE COURT:  SURE.

12            MR. SHALAMITSKI:  -- THAT THE POLICY LANGUAGE IS NOT

13     AMBIGUOUS.  AND IT MEANS WHAT IT MEANS IN THE INSURANCE

14     INDUSTRY.  AND IT MEANS WHAT IT MEANS WHEN THE PARTIES ENTERED

15     THEY HAD THE UNDERSTANDING.

16            AND UNIVERSAL SAYS THE POLICY SHOULD BE INTERPRETED

17     THIS WAY.  ON THE OTHER HAND, ATLANTIC ALSO I THINK SAYS THAT

18     THE POLICY IS CLEAR.

19            THE COURT:  UH-HMM.

20            MR. SHALAMITSKI:  AND IT SHOULD BE INTERPRETED A

21     DIFFERENT WAY.  SO, BOTH SIDES SAY, YEP, THAT'S AN ISSUE FOR

22     THE COURT AND AN ISSUE OF LAW.  BUT AT THE SAME TIME ARGUABLY

23     THERE IS A DISPUTE THAT COULD TURN ON THE FACTS AS TO WHETHER

24     OR NOT THE POLICY IS AMBIGUOUS.

25            AND THAT'S ACTUALLY CAN BE REASON NUMBER SEVEN, THAT

1    THE OTHER CLAIMS ARE DISCOVERABLE.  BECAUSE IF THERE IS -- IF

2    ATLANTIC HANDLED THE TERRORIST CLAIMS ONE WAY AND ANOTHER WAY

3    IN ANOTHER CLAIM, THAT WOULD SHOW THAT ATLANTIC'S ARGUMENT THAT

4    IT'S AMBIGUOUS AND SHOULD BE INTERPRETED THE WAY THAT THEY SAY

5    IT SHOULD BE INTERPRETED IS NOT CORRECT.  RATHER, IT WOULD

6    PROVE THAT THE POLICY IS AMBIGUOUS.

7         AND THEN ALL THE INSURANCE POLICY CONSTRUCTION RULES

8    WILL KICK IN, WHICH WOULD GO TO IF IT'S AMBIGUOUS AND THERE IS

9    MORE THAN ONE REASONABLE INTERPRETATION, THEN, THE

10   INTERPRETATION SHOULD GO IN THE WAY OF THE INSURED.

11        THE COURT:  SEE, I'M MOSTLY WITH YOU.  BUT WHEN YOU

12   TALK ABOUT A REASONABLE INTERPRETATION OF THE POLICY LANGUAGE

13   -- OKAY.  THE WORD "REASONABLE" DOESN'T MEAN SUBJECTIVE.

14   OKAY.

15        IT -- I HAVEN'T HEARD YOU SAY, AND I HAVEN'T READ IN

16   YOUR SUMMARY JUDGMENT PAPERS THAT IF -- THAT THERE'S AN ISSUE

17   AS TO WHETHER ATLANTIC HAD A SUBJECTIVELY DIFFERENT

18   INTERPRETATION OF THE POLICY.  THE POLICY IS WHAT IT IS.  IT'S

19   A DOCUMENT WITH FOUR CORNERS.  AND WHEN A FEDERAL COURT LOOKS

20   AT IT TO DETERMINE WHAT WAS THE REASONABLE INTERPRETATION OF

21   THAT LANGUAGE, I DON'T UNDERSTAND WHY -- WHY WE GET INTO

22   SUBJECTIVITY AT ALL.  I MEAN, THAT'S THE PAROL EVIDENCE ISSUE.

23        AND IF THE LANGUAGE ON ITS FACE IS SUBJECT TO

24   REASONABLE INTERPRETATION, I JUST DON'T -- I JUST DON'T

25   UNDERSTAND HOW THE PREVIOUS ACTION IS RELEVANT TO AN OBJECTIVE

1   EVALUATION OF THIS.  AND I'M ALSO LOOKING VERY CLEARLY AT THE

2   LANGUAGE THAT YOU FOLKS HAVE PUT INTO YOUR BRIEFS THAT SAYS,

3   WELL, LOOK, IF THERE IS AMBIGUITY, THEN, WE WIN BECAUSE WE'RE

4   THE INSURED.

5          BUT, AGAIN, AMBIGUITY IS BASED ON THE LANGUAGE

6   ITSELF.  I'M NOT SURE -- AND I READ -- I READ THE PHILLIPS

7   CASE.  AND I READ A COUPLE OF THE OTHER CASES ABOUT GETTING TO

8   AMBIGUITY WHERE THERE ISN'T AN ISSUE ON THAT.

9          GO AHEAD.

10          MR. SHALAMITSKI:  I SUPPOSE -- OKAY.  SO, THE

11   LANGUAGE AND THE POLICY, WHAT ATLANTIC'S POSITION IS IS THERE

12   IS THIS CIVIL CODE SECTION 1644 THAT SAYS WORDS IN A CONTRACT

13   SHOULD BE INTERPRETED ACCORDING TO THEIR COMMON AND ORDINARY --

14   I'M SORRY IF I'M GETTING THE EXACT WORDING WRONG -- SENSE AND

15   NOT IN THE LEGAL SENSE UNLESS THE PARTIES USED THOSE WORDS IN A

16   TECHNICAL SENSE OR UNLESS A SPECIAL MEANING IS ASSIGNED TO

17   THOSE WORDS BY THE USAGE.

18          AND IF THAT'S TRUE, THEN, THE LATTER MUST BE APPLIED.

19          SO, I THINK THAT'S WHERE THESE CONCEPTS COME IN.

20          ATLANTIC IS ARGUING, NO, WAR SHOULD BE INTERPRETED

21   JUST LIKE A JOE DOE WOULD UNDERSTAND IT WHEN HE IS -- HE OR SHE

22   IS WALKING ON THE STREET AND SOMEBODY TELLS HIM, OKAY.  SO,

23   TELL ME THIS.  IF THERE WERE ROCKETS FIRED, AND THAT MANY

24   PEOPLE GOT HURT, AND THIS HAPPENED AND THAT HAPPENED, IS THAT A

25   WAR.

1          AND IF JOE DOE SAYS IT LOOKS LIKE IT, THAT ATLANTIC

2     SAYS WHAT THE INTERPRETATION SHOULD BE.

3          ON THE OTHER HAND WHAT UNIVERSAL'S POSITION IS IS THE

4     WAR EXCLUSION, IT'S A STANDARD INSURER'S CLAUSE AND EXCLUSION

5     THAT HAS BEEN IN EXISTENCE FOR A WHILE.  AND IT HAS BEEN

6     INTERPRETED AND IT HAS BEEN ASSIGNED MEANING BY THE COURTS --

7          THE COURT:  UH-HMM.

8          MR. SHALAMITSKI:  -- WHICH LOOKED AT THE EXCLUSION.

9     AND ESPECIALLY AFTER 9/11, THERE WAS A -- THERE WAS A SORT OF A

10    SEPARATION IN THE INSURANCE INDUSTRY BETWEEN TERROR VERSUS WAR.

11    SO, THERE IS TERROR EXCLUSION.  THERE IS WAR EXCLUSION.

12         AND, SO, UNIVERSAL'S POSITION IS IS AT THE TIME OF

13    THE CONTRACTS WHEN THE POLICY WAS ENTERED, WHAT CONTROLS HERE

14    IS THE INSURANCE INDUSTRY CUSTOM AND PRACTICE.  AND THAT WAS

15    INFORMED INCLUDING BY THE COURT DECISIONS THAT SAID WAR IS NOT

16    WHAT JOE DOE WOULD SAY ON THE STREET, BUT WAR IS A CONFLICT

17    BETWEEN SOVEREIGNS -- QUASI SOVEREIGNS AND SO FORTH.

18         AND, SECONDLY, WHAT UNIVERSAL'S POSITION IS IS THE

19    WAR EXCLUSION SHOULD BE INTERPRETED IN ACCORDANCE WITH WHAT THE

20    INSURED AND THE INSURER UNDERSTOOD THOSE EXCLUSIONS TO BE AT

21    THE TIME THAT THEY CONTRACTED.  AND AT THAT TIME THEY

22    UNDERSTOOD THE WAR EXCLUSION TO MEAN WHAT THE INSURANCE CUSTOM

23    AND PRACTICE WAS BECAUSE IT WASN'T --

24         THE COURT:  AND WERE YOU ABLE TO TAKE DISCOVERY ON

25    THAT?

1            MR. SHALAMITSKI:  WE'RE STILL IN THE PROCESS.

2            THE COURT:  WELL, BUT I MEAN WERE YOU ABLE TO TALK TO

3    AN ATLANTIC REPRESENTATIVE ABOUT THE COMPANY'S SUBJECTIVE

4    UNDERSTANDING OF THESE TERMS AT THE TIME THAT THE CONTRACT WAS

5    ENTERED INTO?

6            MR. SHALAMITSKI:  IT'S STILL IN -- IT'S STILL IN THE

7    PROCESS BECAUSE THE POLICY -- SOME QUESTIONING DID TAKE PLACE

8    AND, SAY, FORMER PRESIDENT OF ATLANTIC OFFERED INTERPRETATION

9    OF THERE'S MORE THAN ONE EXCLUSION -- OFFERED INTERPRETATION OF

10   CERTAIN EXCLUSIONS THAT COMPORT WITH UNIVERSAL'S

11   INTERPRETATION.

12           SO DID ONE -- SO DID THERESA GOOLEY, WHO IS THE --

13   WHO IS THE SUPERVISOR OF PAMELA JOHNSON.  SHE OFFERED HER

14   INTERPRETATION OF ONE OF THE WAR EXCLUSIONS THAT COMPORTS WITH

15   OUR INTERPRETATION.

16           AND WE'VE NOTICED THE DEPOSITION SUBPOENA -- AND IT'S

17   STILL PENDING -- TO DEPOSE THE PERSON WHO WAS AT ATLANTIC AT

18   THE TIME THAT THE POLICY WAS DRAFTED.

19           THE COURT:  UH-HMM.

20           MR. SHALAMITSKI:  AND, SO, IT'S STILL IN THE PROCESS.

21   AND, YES, WE ARE SEEKING DISCOVERY ON THAT ISSUE.

22           THE COURT:  OKAY.  OKAY.

23           SO, YOU'VE SEEN THE DECLARATIONS AND YOU'VE SEEN THE

24   TESTIMONY FROM THE INSURANCE PEOPLE THAT THEY DON'T HAVE --

25           LET ME NOT GUESS THE LANGUAGE --

1          (PAUSE IN PROCEEDINGS.)

2          THE COURT:  THAT THEY'VE TALKED TO THEIR CHIEF CLAIMS

3     OFFICER, THEIR SENIOR VICE PRESIDENT OF CLAIMS, CHIEF CLAIMS

4     COUNSEL, AND FORMER EMPLOYEES IN THE ENTERTAINMENT DIVISION

5     ABOUT SIMILAR TYPES OF CLAIMS.  AND THEY HAVE NO INFORMATION.

6     THEY'VE DONE A SEARCH GOING BACK TO 2013, WHICH I TAKE IT IS --

7     HAS SOME RELEVANCE TO THIS CASE.  MAYBE THAT'S WHEN THE POLICY

8     CAME INTO EFFECT.  I DON'T KNOW.  AND THAT'S ALL THEY KNOW.

9          AND YOU FOLKS HAVE GONE BACK AND INDEPENDENTLY FOUND

10    A COUPLE OF CLAIMS RELATED TO 9/11 2001.

11         BUT WHAT ELSE IS OUT THERE?

12         MR. SHALAMITSKI:  THAT'S THE POINT OF DISCOVERY.  WE

13    DON'T KNOW.  AND ATLANTIC SAYS THEY -- AND ATLANTIC SAYS THEY

14    DON'T KNOW.

15         BUT THE CLAIMS THAT WERE LOCATED AS -- AS SET FORTH

16    IN THE PAPERS THAT WERE THE LOSSES THAT WERE FILED IN 2003, TWO

17    LAWSUITS, EACH INVOLVED ONE BEACON.  ONE BEACON IS ATLANTIC --

18    ONE BEACON -- WHEN I REFER -- ONE --

19         SORRY.  ONE BEACON INSURANCE COMPANY IS -- IS UNDER

20    ATLANTIC.  SO, WHEN THE REFERENCE WAS IN THE CASES TO ONE

21    BEACON, IT EQUALS ATLANTIC FOR ALL PURPOSES.

22         THE COURT:  OKAY.  OKAY.

23         MR. SHALAMITSKI:  OKAY.

24         THE COURT:  BECAUSE I HAD NO IDEA.  LIKE, THERE WAS

25    SOMETHING ABOUT ONE BEACON --

1          MR. SHALAMITSKI:  OH, YEAH.

2          THE COURT:  -- GOT BOUGHT OR SOLD.

3          MR. SHALAMITSKI:  OKAY.

4          THE COURT:  AND I HAD NO IDEA WHAT THAT MEANT.

5          MR. SHALAMITSKI:  RIGHT.

6          BUT REGARDLESS -- SO, ONE BEACON FOR ALL PURPOSES

7    EQUALS ATLANTIC.  AND THOSE CLAIMS, IT'S NOT LIKE IT WAS A

8    CLAIM THAT COULD HAVE PASSED UNNOTICED BY ANYBODY WHO IS IN THE

9    KNOW AND, PARTICULARLY, IN THE INSURANCE INDUSTRY.

10         THE AMOUNT THAT ONE BEACON EQUALS ATLANTIC PAID OUT

11   IN THAT ACTION -- IN ONE OF THOSE ACTIONS IS $185 MILLION.

12   IT'S NOT A SMALL CLAIM.

13         SO, I HAVE NO REASON TO QUESTION --

14         THE COURT:  I'M SORRY.  ONE BEACON PAID $115 MILLION

15   ON THAT CLAIM?

16         MR. SHALAMITSKI:  185.

17         THE COURT:  OKAY.

18         MR. SHALAMITSKI:  SO, A TINY CLAIM.  AND, SURE, THE

19   RESPONSES SAY, NO, DON'T KNOW, DON'T REMEMBER.  BUT 185

20   MILLION, IT'S -- IT'S -- IT'S -- IT'S AT LEAST STRANGE OR

21   WHATEVER WORD TO PICK --

22         THE COURT:  OKAY.

23         MR. SHALAMITSKI:  -- THAT NOBODY COULD REMEMBER THAT

24   CLAIM.

25         THE COURT:  ALL RIGHT.  YOU'RE SKEPTICAL.  I GET IT,

1  MR. SHALAMITSKI.

2           CAN I ASK YOU ACTUALLY TO JUST STEP TO THE SIDE.  LET

3  ME --

4           YOU FOLKS CAN HANG OUT AT THE TABLE.  THAT'S FINE.

5           (PROCEEDING HEARD IN UNRELATED MATTER,

6           9:40 A.M. TO 9:43 A.M.)

7           THE COURT:  OKAY.  LET'S GO BACK TO UNIVERSAL.

8           ALL RIGHT.  AND I APOLOGIZE FOR THE INTERRUPTION.

9  BUT I JUST --

10          MR. SHALAMITSKI:  NOT AT ALL.

11          THE COURT:  -- WITHOUT PEOPLE RUNNING IN AND OUT OF

12  THE COURTROOM, I WANT TO MAKE SURE YOU GET MY ATTENTION HERE --

13          MR. SHALAMITSKI:  NOT AT ALL.

14          THE COURT:  -- ON A CASE THAT'S SIGNIFICANT.

15          SO -- ALL RIGHT.  SO, THERE WAS -- OBVIOUSLY,

16  INSURANCE CASES OF SIGNIFICANCE WITH RESPECT TO THE ACTUAL 9/11

17  EVENTS, AND, YOU KNOW, SOME INFORMATION WITH RESPECT TO

18  SPECIFIC CLAIMS, BUT OTHER THAN THOSE -- THOSE TWO CASES --

19          AND YOU DON'T KNOW WHAT'S OUT THERE -- AND YOU

20  HAVEN'T GOTTEN AN ANSWER FROM THE COMPANY AS TO WHAT'S OUT

21  THERE --

22          MR. SHALAMITSKI:  CORRECT.

23          THE COURT:  OKAY.

24          MR. SHALAMITSKI:  SO, THE TWO REPOSITORIES OF

25  DOCUMENTS THAT ARE AT ISSUE HERE -- AND THE REASON WHY WE

1  DIDN'T GET AN ANSWER IS BECAUSE DURING MEET AND CONFERS IN

2  RESPONSE TO THE QUESTIONS, WELL, HOW CAN YOU DO IT, HOW CAN YOU

3  SEARCH IT, HOW YOU CAN GET THE ANSWER BECAUSE PEOPLE'S MEMORIES

4  MAY DIFFER.  THEY'RE OBVIOUSLY NOT AS COMPLETE AS THE

5  DOCUMENTS.

6        AND THE TWO THINGS IS THE C.W.S., WHICH IS THE

7  DATABASE -- I THINK IT'S SHORTHAND FOR --

8        THE COURT:  WELL, I READ -- I READ THAT MATERIAL.

9  IT'S JUST --

10        MR. SHALAMITSKI:  -- CLAIM WORK -- CLAIM WORK AND

11  STATION --

12        THE COURT:  YEAH.  ONE HAS -- ONE HAS THE -- ONE HAS

13  THE NOTES AND ONE HAS --

14        MR. SHALAMITSKI:  RIGHT.

15        THE COURT:  -- OTHER THINGS.

16        YEAH, I GOT IT.

17        MR. SHALAMITSKI:  SO, 2013 DATE, THERE'S NO

18  SIGNIFICANCE IN THIS CASE OTHER THAN THAT THAT'S WHAT ATLANTIC

19  PICKED.  AND THEY PICKED IT BECAUSE THEY USED THE IN-HOUSE I.T.

20  DEPARTMENT --

21        THE COURT:  YEP.

22        MR. SHALAMITSKI:  -- TO DO SOMETHING.  AND -- AND IN

23  THE GRAND SCHEME OF THINGS, MACHINES -- LIKE COMPUTER MACHINES

24  DIFFER.

25        SO, IN-HOUSE PEOPLE COULD ONLY DO 2 GIGABYTES AT A

1  TIME.

2          THE COURT:  UH-HMM.

3          MR. SHALAMITSKI:  BUT IF YOU USE THE MACHINE THAT

4  THE EDISCOVER VENDOR IS USING, THEY'RE HUGE.  SO, THEY COULD

5  PROCESS NOT 2 GIGABYTES BUT THEY CAN PROCESS TERABYTES WITH NO

6  PROBLEM AT ALL.

7          SO, THAT'S I THINK WHERE THE TIMING COMES -- THE

8  TIMING COMES IN AND WHY THE EDISCOVERY IS NECESSARY.  BECAUSE,

9  SURE, IF WE CAN KEEP EMPLOYING IN-HOUSE I.T., IT WILL TAKE A

10  LONG TIME.  BUT THAT'S THE POINT OF EDISCOVERY.  I MEAN, WE'RE

11  IN 2017.  AND IT'S NOT UNHEARD OF TO HANDLE TERABYTES AND EVEN

12  MORE DATA IN CASES.

13          THE COURT:  IT IS NOT UNHEARD OF TO HANDLE TERABYTES

14  IN CASES.

15          IT IS, HOWEVER, MY RESPONSIBILITY TO BALANCE THAT

16  WITH THE LIKELIHOOD OF YOU FINDING SOMETHING THAT IS RELEVANT

17  TO YOUR CASE.  THAT'S FUNDAMENTAL TO RULE 26(B).

18          MR. SHALAMITSKI:  SURE.  NO DISAGREEMENT THERE.

19          AND THERE IS LIKELY TO BE -- I MEAN, WE HAVE TWO --

20          THE COURT:  WHY?

21          MR. SHALAMITSKI:  WELL, WE HAVE TWO CLAIMS ALREADY.

22          THE COURT:  RIGHT.

23          MR. SHALAMITSKI:  SO, WE DON'T KNOW.

24          THE COURT:  YEAH.  I MEAN, I WAS WATCHING THE

25  TELEVISION THAT DAY.  THAT WAS -- THAT WAS OBVIOUS THAT THERE

1    WERE GOING TO BE INSURANCE CLAIMS FROM THAT.

2              AND I DON'T KNOW THAT I HAVE A FACTUAL BASIS TO

3    DETERMINE THAT IT'S LIKELY THAT THERE ARE OTHER TERROR AND

4    WAR-BASED CLAIMS HERE.

5              MR. SHALAMITSKI:  WELL, THERE WERE THOSE.  AND THE --

6    THE WAY THAT THE REQUEST IS STRUCTURED NOW IN TERMS OF FINE.

7    BECAUSE -- BECAUSE IN THE MEET AND CONFERS WE'RE LIKE, WELL,

8    OKAY.  SO, SEARCH JUST HAMAS BECAUSE HAMAS IS -- THAT'S  IT.

9              AND ATLANTIC -- AGAIN, THE POSITION WAS THAT, NO, WE

10   CAN'T BECAUSE OF THE WAY OUR SYSTEM WORKS.  WE CAN'T JUST DO

11   IT.

12             THE COURT:  TO THE TECHNICAL LIMITATIONS.  I GOT IT.

13             MR. SHALAMITSKI:  RIGHT.

14             AND, SO, AT THIS POINT IT'S NOT LIKE WE'RE ASKING

15   OKAY.  SEARCH FOR "TERROR."  AND I GUESS THAT WORD IS NOT THAT

16   FREQUENTLY USED, BUT IT COULD -- I MEAN, IT WILL APPEAR IN THE

17   POLICY, OR IT COULD APPEAR IN THE INSURANCE POLICY SO THAT WILL

18   RENDER A LOT OF SEARCH RESULTS.

19             BUT, AGAIN, GOING BACK TO THE EDISCOVERY COMPANY THAT

20   SPECIALIZES IN THIS, THEY COULD CREATE A BULLETIN SEARCH THAT

21   WILL USE JUST THOSE -- THE NAMES OF THE TERRORIST GROUPS.

22             AND ONCE THEY CREATE THE SEARCH AND THEY RUN IT,

23   THEY'RE GOING TO SEE HOW MANY DOCUMENTS THERE ARE.  AND IF IT

24   COMES UP WITH HUNDREDS OF THOUSANDS, THEN, SOMEBODY WOULD NEED

25   TO PUT THE THINKING CAP ON AND ADJUST THOSE BULLETIN SEARCHES.

1          AND THAT GOES TO THE POINT WHAT ATLANTIC MADE IN

2     THEIR PAPERS THAT, LOOK, THOSE SEARCHES WILL TURN UP THE

3     DOCUMENTS THAT WE ALREADY LOOKED AT.  AND WE'LL HAVE TO LOOK AT

4     THEM AGAIN.

5          WELL, NO.  WHAT EDISCOVERY COMPANY WILL DO IS THEY

6     WILL LOAD THE DOCUMENTS THAT WERE ALREADY LOOKED AT.  AND

7     THEY'RE JUST GOING TO ELIMINATE THEM, MEANING THERE IS A

8     PROCESS THAT'S CALLED LIKE "DE-DUPING," MEANING ALL THE

9     DUPLICATES WILL BE ELIMINATED.  WHAT YOU'VE ALREADY REVIEWED,

10    THE SYSTEM IS GOING TO RECOGNIZE IT.  THOSE ARE GOING TO BE

11    ELIMINATED.

12         IF THE SEARCH COMES BACK WITH, OKAY. THERE IS -- THAT

13    MAY --

14         THE COURT:  AGAIN, THOUGH, IN THE HOPE THAT THERE ARE

15    CLAIMS THAT DIRECTLY RELATE TO THE WAR AND TERROR EXCLUSIONS,

16    EVEN THOUGH FOR AT LEAST SOME PERIOD OF TIME SOME PRETTY

17    KNOWLEDGABLE AND COMPETENT PEOPLE AT THE COMPANY HAVE SAID WE

18    HAVEN'T HAD THOSE.

19         MR. SHALAMITSKI:  BECAUSE THEY MIGHT NOT HAVE BEEN

20    INVOLVED OR -- AGAIN, WE'RE GOING BACK TO THE

21    185-MILLION-DOLLAR CLAIM THAT THEY SOMEHOW DIDN'T REMEMBER.

22         THE COURT:  WELL, LET'S GET AN ANSWER ON THAT BECAUSE

23    THAT'S A BIT NEFARIOUS.

24         WHY DOESN'T THE COMPANY NOT REMEMBER THINGS RELATED

25    TO 9/11?

 1          MS. CRAPSTER IS GOING TO -- WE'LL KEEP GOING BACK AND

 2   FORTH ON THIS.

 3          MS. CRAPSTER, I HAD PROBLEMS FOLLOWING THAT IN YOUR

 4   PAPERS.  I SAW THERE WAS -- AT THIS LENGTHY FOOTNOTE ON PAGE 10

 5   WHERE ATLANTIC IS EXPLORING WHAT IT KNEW THEN.

 6          WALK ME THROUGH THAT.

 7          MS. CRAPSTER:  YEAH.  SO, THERE'S NOTHING NEFARIOUS

 8   ABOUT THIS, YOUR HONOR.  THERE'S A COMPLETELY VALID EXPLANATION

 9   FOR IT.

10          FIRST OF ALL, ATLANTIC IS THE PLAINTIFF IN THIS CASE.

11   THIS IS A SUBROGATION CLAIM.  SO, ATLANTIC -- OR TECHNICALLY IT

12   IS ONE BEACON, WHICH IS ABOVE ATLANTIC.  MR. SHALAMITSKI HAD

13   THAT BACKWARDS.  BUT ONE BEACON --

14          THE COURT:  ONE BEACON IS THE PARENT OF ATLANTIC.

15          MS. CRAPSTER:  CORRECT.

16          THE COURT:  GOT IT.

17          MS. CRAPSTER:  ONE BEACON ALONG WITH DOZENS OF OTHER

18   INSURANCE COMPANIES FILED A SUBROGATION CLAIM AGAINST ROUGHLY A

19   HUNDRED OR MORE DEFENDANTS, ALL OF WHICH WERE EITHER TERRORIST

20   ORGANIZATIONS THEMSELVES OR ENTITIES THAT HAD SOME SORT OF

21   AFFILIATION WITH TERRORIST ORGANIZATIONS --

22          THE COURT:  SO, ONE BEACON PAID CLAIMS TO --

23          MS. CRAPSTER:  TO INSUREDS, CORRECT.

24          IN 2001 --

25          THE COURT:  INDIVIDUAL -- INDIVIDUALS OR BUSINESSES

24

1   OR BOTH?

2           MS. CRAPSTER:  I DON'T KNOW THE DETAILS OF THAT, YOUR

3   HONOR.  BUT I KNOW THE CLAIMS WERE PAID, AND THERE WAS A

4   SUBROGATION LAWSUIT BROUGHT.  AND THE 185-MILLION-DOLLAR FIGURE

5   IS, AS I UNDERSTAND IT, AN AMOUNT THAT WAS PAID TO ONE BEACON

6   ALONG WITH ALL THE OTHER INSURANCE COMPANY DEFENDANTS.

7           THE REASON THAT NO ONE --

8           THE COURT:  WAIT.  ONE BEACON -- ONE BEACON COLLECTED

9   $185 MILLION?

10          MS. CRAPSTER:  WELL, NO, YOUR HONOR.  THAT WOULD HAVE

11  BEEN SPLIT BETWEEN ALL OF THE INSURANCE COMPANY PLAINTIFFS IN

12  THE CASE.  I CAN'T TELL YOU OFF THE TOP OF MY HEAD -- OR I

13  CAN'T TELL YOU AS A STAND HERE TODAY WHAT AMOUNT, IF ANY, ONE

14  BEACON ULTIMATELY COLLECTED ON THAT.

15          HOWEVER, THE SIGNIFICANCE OF THAT TO THIS MOTION HERE

16  TODAY IS VIRTUALLY NONEXISTENT.  WHAT HAPPENED WAS ONE BEACON

17  SOLD A CHUNK OF ITS BUSINESS.  AND THIS SUBROGATION CLAIM WAS

18  ONE OF THE ASSETS THAT WAS SOLD.  IT SOLD IT TO A COMPANY

19  CALLED "ARMOUR."  THAT SALE WAS INITIATED IN 2012 AND IT

20  FINALLY CLOSED IN 2014.  AND AS A RESULT OF THAT, NO ONE HAD

21  FOCUSED ON THIS CLAIM FOR QUITE SOME TIME.

22          AND AS I UNDERSTAND IT, THE CASE IS STILL GOING ON

23  TODAY.  THE LATEST FILING WAS IN APRIL OF THIS YEAR.

24          BUT, AGAIN, ONE BEACON -- NEITHER ATLANTIC NOR ONE

25  BEACON HAS HAD IT ON ITS RADAR BECAUSE IT WAS AN ASSET THAT WAS

1    SOLD TO ARMOUR, AGAIN, IN A SALE THAT CLOSED IN 2014.

2            SO, THE EMPLOYEES THAT YOU WERE REFERENCING THAT WE

3    HAVE INQUIRED, WHICH, AS YOU NOTED, ARE VERY HIGH-UP PEOPLE IN

4    THE COMPANY.  THE PERSON WHO WE ASKED THAT PROBABLY HAS THE

5    MOST EXPERIENCE AND THE MOST RELEVANT EXPERIENCE IS SEAN DUFFY

6    WHO IS THE CHIEF CLAIMS OFFICER.  HE OVERSEES ALL CLAIMS OVER

7    ONE BEACON.

8            SO, HE HAS RESPONSIBILITY FOR --

9            THE COURT:  FOR WHAT PERIOD OF TIME?

10           MS. CRAPSTER:  SO, HE BEGAN AT ONE BEACON IN 2010.

11   SO, HIS MEMORY GOES BACK TO 2010.  AND WE HAVE INQUIRED OF HIM.

12   PLAINTIFFS HAVE INQUIRED OF HIM DURING HIS DEPOSITION WHETHER

13   HE HAS ANY KNOWLEDGE OF ANY CLAIMS INVOLVING WAR OR TERROR.

14   AND HE HAS MADE CLEAR THAT HE DOES NOT.

15           THE COURT:  OKAY.

16           SO, THERE'S NOT MUCH DOUBT THAT ONE BEACON OR ARMOUR

17   -- SORRY.  I'M GETTING THAT BACKWARDS -- THAT ONE BEACON PAID

18   CLAIMS TO INSUREDS IN CONNECTION WITH 9/11.

19           MS. CRAPSTER:  I BELIEVE THAT'S CORRECT.

20           THE COURT:  OKAY.

21           AND ON THAT BASIS THERE'S NOR REASON TO BELIEVE THAT

22   THERE WAS ANY DISPUTE ABOUT APPLICABILITY OF WAR OR TERROR

23   APPLICATION -- EXCLUSIONS.

24           MS. CRAPSTER:  NOT THAT I'M AWARE OF AS WE STAND HERE

25   TODAY.  THE PLAINTIFFS JUST BROUGHT THIS TO OUR ATTENTION ON

1  MAY 12TH.  SO, NEITHER ATLANTIC NOR ONE BEACON HAS HAD AN

2  OPPORTUNITY TO GO BACK AND LOOK FOR AND CERTAINLY NOT FIND THE

3  CLAIMS FILES THAT ARE RELEVANT TO THOSE UNDERLYING CLAIMS --

4  UNDERLYING SUBROGATION CASE.

5          THE COURT:  OKAY.

6          MS. CRAPSTER:  BUT WE'VE MADE CLEAR TO THE PLAINTIFFS

7  THAT WE ARE CONTINUING TO LOOK FOR THAT.  AND AS I'VE SAID, YOU

8  KNOW, WE'VE ONLY HAD ABOUT 9 -- 10 OR 11 DAYS' NOTICE AS WE

9  STAND HERE TODAY.  BECAUSE THIS WAS NOT A CLAIM THAT WAS ON

10  ANYBODY'S RADAR.  IT WAS NOT A LAWSUIT THAT WAS ON ANYONE'S

11  RADAR.

12          AND OBVIOUSLY BECAUSE OUR SEARCHES DID NOT GO ALL THE

13  WAY BACK TO 2001, THERE'S NO REASON THAT WE WOULD IDENTIFIED

14  THESE CLAIMS WITH THE SEARCHES THAT WE'VE MADE BEFORE.

15          SO, WE'VE MADE CLEAR TO THE PLAINTIFFS THAT WE ARE

16  CONTINUING TO LOOK FOR THE CLAIM FILES THAT ARE RELATED TO THIS

17  LAWSUIT.  AND WE'RE HAPPY TO DO THAT.

18          THE COURT:  WELL, THE LAWSUIT OR THE UNDERLYING

19  CLAIMS THAT GOT PAID.  I MEAN, FROM UNIVERSAL'S PERSPECTIVE

20  THEY DON'T REALLY CARE ABOUT YOUR SUBROGATION CASE.  THE

21  COMPANY SUBJECTIVELY MADE THE DECISION TO MAKE PAYMENT ON THOSE

22  -- TO ITS INSUREDS, CORRECT?

23          MS. CRAPSTER:  I BELIEVE THAT'S CORRECT.

24          THE COURT:  OKAY.  THAT'S WHAT'S RELEVANT TO YOUR

25  CASE?

1            MR. SHALAMITSKI:  YES, YOUR HONOR.

2            AND I'M LOOKING AT EXHIBIT 9 IN OUR FILING.  I KNOW

3   IT'S BIG, BUT IF I JUST --

4            THE COURT:  YES.  YES, IT IS, SIR.

5            MR. SHALAMITSKI:  BUT THAT JUST UNDERSCORE THAT TO

6   SAY THAT, OH, THAT CLAIM WAS NOT IN OUR RADAR IS STRANGE.

7            AND IF YOUR HONOR TAKES A LOOK AT EXHIBIT 9, PAGE

8   1,554, AND THERE IS --

9            THE COURT:  HANG ON A SECOND.

10           MR. SHALAMITSKI:  SORRY.

11           THE COURT:  IF YOU WANT ME TO LOOK AT IT, YOU'VE GOT

12  TO LET ME PULL ME UP.

13           MR. SHALAMITSKI:  PLEASE.  YES.

14           THE COURT:  1500 --

15           MR. SHALAMITSKI:  54.

16           THE COURT:  54.

17           (PAUSE IN PROCEEDINGS.)

18           THE COURT:  OKAY.  I HAVE IT.

19           MR. SHALAMITSKI:  IN PARAGRAPH 559, IN BLACK AND

20  WHITE IT SAYS THAT ONE BEACON PAID --

21           THE COURT: WHAT AM I LOOKING AT?

22           MR. SHALAMITSKI:  PARDON?

23           THE COURT:  WHAT IS THIS?

24           MR. SHALAMITSKI:  IT'S THE COMPLAINT.  IT'S THAT --

25  THE SUBROGATION COMPLAINT.

1          THE COURT:  OKAY.  YOU'RE SAYING THAT -- LIKE I

2  SHOULD UNDERSTAND WHAT THIS IS, SIR.  WHEN YOU SUBMIT A FOOT OF

3  PAPER --

4          MR. SHALAMITSKI:  I'M SORRY.  IT'S THE SUBROGATION

5  COMPLAINT THAT WE'RE TALKING ABOUT.

6          THE COURT:  OKAY.

7          MR. SHALAMITSKI:  AND THIS NUMBER CAME UP.  AND YOUR

8  HONOR WAS ASKING, WELL, WAS IT 185 THAT ONE BEACON RECEIVED OR

9  WAS IT SPLIT UP.

10          NO.  IT'S ONE BEACON ITSELF PAID $185 MILLION.

11  BECAUSE ALL THESE PARAGRAPHS THEY SPLIT UP ALL OF THE INSURANCE

12  COMPANIES SEPARATELY.  SO, IN EACH PARAGRAPH IT SAYS, WHATEVER,

13  VALIANT PAID YAY MUCH.  ONE BEACON PAID YAY MUCH.  CRUM &

14  FORSTER PAID YAY MUCH.

15          THE COURT:  OKAY.  SO, YOU HAVE THAT INFORMATION.

16          MR. SHALAMITSKI:  NO.  BUT I MEAN I THOUGHT THE

17  QUESTION AROSE AS TO, OH, MAYBE THEY DIDN'T PAY.  OR MAYBE IT

18  WAS SPLIT UP SUCH THAT THE AMOUNT WAS DE MINIMIS.

19          NO.  IT WAS STILL 185 MILLION.  AND THIS COMPLAINT IF

20  YOUR HONOR FLIPS TO THE FIRST PAGE OF EXHIBIT 9, IT WAS BY A

21  NUMBER OF INSURANCE COMPANIES, BUT IT WAS VERSUS NOT JUST

22  HAMAS, BUT IT WAS VERSUS A LOT OF TERRORIST GROUPS, TERRORIST

23  AFFIL- --

24          THE COURT:  YES.  THEY SUED AL-QAEDA.

25          MR. SHALAMITSKI:  CORRECT.

1           THE COURT:  GOT IT.

2           MR. SHALAMITSKI:  SO, NOT ON THE RADAR JUST BECAUSE

3    HAMAS DEFAULTED EARLY ON AND THEREFORE THERE WAS NO

4    RECOLLECTION BY ANYBODY.  AND ASKING A PERSON WHO GOT EMPLOYED

5    IN 2010 IS NOT ENOUGH.

6           SO, AGAIN, WE'RE GOING BACK TO THEIR -- GOT TO BE

7    SOMETHING --

8           THE COURT:  YEAH, BUT HOW IS A LAWSUIT AGAINST

9    AL-QAEDA RELEVANT TO A POLICY INTERPRETATION HERE?

10          MR. SHALAMITSKI:  THAT'S JUST TO PROVE THAT THERE

11   WERE CLAIMS, INSURANCE CLAIMS THAT WERE MADE IN CONNECTION WITH

12   THE TERRORIST ATTACKS THAT WERE PAID IN THE AMOUNT OF 185

13   MILLION.  SO THERE WERE CLAIMS.

14          THE COURT:  RIGHT.

15          MR. SHALAMITSKI:  THERE WERE NO ONE CLAIM.

16          THE COURT:  THERE WAS 185 MILLION DOLLARS OF CLAIMS

17   PAID TO THE VICTIMS IN THE WORLD TRADE CENTER OR WHICHEVER --

18          MR. SHALAMITSKI:  BY ONE BEACON.  NOT JUST BY ALL

19   INSURANCE COMPANIES.  BY ONE BEACON.

20          THE COURT:  GOT IT.

21          MR. SHALAMITSKI:  SORRY.  JUST MAYBE I BUTTED IN, BUT

22   I THOUGHT THERE WAS AN ISSUE AS TO WHETHER OR NOT ATLANTIC

23   ACTUALLY PAID -- PAID IT.

24          THE COURT:  YOU TOLD ME SHE PAID -- SHE TOLD ME THEY

25   PAID.

1          MR. SHALAMITSKI:  OKAY.  I THOUGHT THERE WAS AN ISSUE

2    AS TO WHETHER THERE WAS SPLIT UP OR IF IT WAS -- IF ATLANTIC --

3    IF ONE BEACON PAID OR NOT PAID.  I'M SORRY IF I MISUNDERSTOOD.

4          THE COURT:  OKAY.

5          MS. CRAPSTER:  SO, YOUR HONOR, AGAIN, AS I STAND HERE

6    TODAY I JUST DON'T HAVE THE DETAILS ON THE CLAIMS THAT ARE

7    UNDERLYING THAT SUBROGATION LAWSUIT.  THEY'RE OBVIOUSLY ABOUT

8    16 YEARS OLD AS WE STAND HERE TODAY.  AND WE'VE MADE VERY CLEAR

9    TO THE PLAINTIFFS THAT OUR SEARCH DID NOT GO BACK TO 2001.

10   WE'VE MADE CLEAR FROM THE BEGINNING THAT THIS CASE --

11         THE COURT:  THE SUBROGATION LAWSUIT -- I DON'T -- I

12   DON'T UNDERSTAND HOW -- I MEAN, HAMAS HAS NOT COME IN AND SAID

13   WE'RE NOT A TERRORIST ORGANIZATION IN THAT CASE.  I UNDERSTAND

14   THEY DEFAULTED IN THAT CASE.

15         I DON'T UNDERSTAND HOW ANYTHING IN THE SUBROGATION

16   CASE IS AT ALL RELEVANT TO INTERPRETATION OF THE UNDERLYING

17   INSURANCE POLICY.

18         MS. CRAPSTER:  I DON'T BELIEVE THAT IT IS, YOUR

19   HONOR.

20         THE COURT:  OKAY.

21         MS. CRAPSTER:  WE DON'T SEE ANY RELEVANCE BETWEEN THE

22   SUBROGATION CASE AND THIS CASE.

23         THE COURT:  THE DETERMINATION TO PAY THE CLAIMS --

24         MS. CRAPSTER:  WELL --

25         THE COURT:  -- MAY WELL BE RELEVANT IF THERE'S

1   SOMETHING --

2           MS. CRAPSTER:  WE BELIEVE --

3           THE COURT:  -- IF THAT'S SOMETHING THAT'S DIRECTLY

4   RELATED TO THIS CASE.

5           MS. CRAPSTER:  SO, YOUR HONOR, IT'S OUR POSITION THAT

6   THE CLAIMS OF OTHER INSUREDS DO NOT HAVE THE RELEVANCE.  AND WE

7   BELIEVE THAT THE CALIFORNIA LAW IS FIRMLY ON OUR SIDE ON THAT

8   POINT.  SOME OF THE CASES THAT WE'VE CITED MADE THAT QUITE

9   CLEAR.  THE SAN DIEGO UNIFIED PORT AUTHORITY CASE AND THE

10  COLLINS VERSUS J.C. PENNEY CASE HAVE LANGUAGE IN THEM STATING

11  THAT EVEN IF THE CLAIMS -- THE OTHER CLAIMS AT ISSUE HAD

12  INVOLVED THE EXACT SAME EXCLUSIONS, THE COURT --

13          THE COURT:  SEE, I READ THE COLLINS CASE DIFFERENTLY.

14  I READ THE COLLINS CASE SIGNIFICANTLY DIFFERENTLY.  I READ THE

15  COLLINS CASE THAT THE COURT MADE A TRADITIONAL RULE 26 BURDEN

16  AND EXPENSE AND LIKELIHOOD OF RELEVANT MATERIAL DETERMINATION.

17          MS. CRAPSTER:  WELL, I BELIEVE THAT'S CORRECT, YOUR

18  HONOR.

19          HOWEVER, I THINK THE COURT NOTED THAT THERE WAS SOME

20  RELEVANCE OF THESE OTHER CLAIM FILES ONLY TO THE EXTENT THAT

21  THEY WOULD DEMONSTRATE THAT THERE WAS A PATTERN AND PRACTICE OF

22  DENYING THE SAME TYPES OF CLAIMS.

23          THE COURT:  WELL --

24          MS. CRAPSTER:  SO THAT WAS THE RELEVANCE HOOK AS TO

25  THE OTHER CLAIMS FILES.

1              IN TERMS OF THE POLICY INTERPRETATION, THE COURT

2      STATED THAT IT DIDN'T UNDERSTAND --

3              THE COURT:  SEE, I DON'T UNDERSTAND -- SEE, I DON'T

4      UNDERSTAND THE NATURE OF THE UNDERLYING CAUSES OF ACTION HERE.

5              ONE IS BREACH OF CONTRACT.  YOU WERE SUPPOSED TO PAY;

6      YOU DIDN'T PAY.

7              MS. CRAPSTER:  CORRECT.

8              THE COURT:  WE HAVE A CONTRACT.  THE TERMS ARE OR ARE

9      NOT AMBIGUOUS.  OKAY.  AND THERE MAY POTENTIALLY BE SOME

10     DISCOVERY AVAILABLE ON THAT.  THAT'S THE PHILLIPS DECISION THAT

11     PLAINTIFFS CITE.  ALTHOUGH IN PHILLIPS THERE WAS A CLEAR

12     UNDERSTANDING.  IT WAS LIKE A DOZEN CASES ALREADY IDENTIFIED

13     THAT DO INVOLVE THIS.  AND THERE MIGHT BE SOME INFORMATION TO

14     BE DERIVED FROM THAT.

15             MS. CRAPSTER:  THAT IS CORRECT, YOUR HONOR.

16             I BELIEVE --

17             THE COURT:  IS THAT A FAIR SUMMARY?  OKAY.  BECAUSE I

18     DON'T THINK IT WAS FAIRLY PRESENTED BY THE PARTIES.

19             GO AHEAD.

20             MS. CRAPSTER:  THE PHILLIPS CASE IS A DISTRICT OF

21     NEVADA CASE, WHICH I BELIEVE WAS APPLYING NEVADA LAW.  SO,

22     THAT'S OBVIOUSLY NOT A BINDING DECISION HERE.

23             THE COURT:  IS CALIFORNIA LAW MATERIALLY DIFFERENT?

24             MS. CRAPSTER:  WELL, I BELIEVE IT IS, YOUR HONOR, IN

25     THAT THE CASES THAT TALK ABOUT THE RELEVANCE OF CLAIMS -- OTHER

1    INSURANCE CLAIMS FILES SEEM TO SUGGEST THAT THE COURTS DON'T

2    SEE ANY RELEVANCE.  WHEN YOU'RE TALKING ABOUT POLICY

3    INTERPRETATION ISSUES --

4              THE COURT:  WHAT'S YOUR BEST CASE ON THAT?

5              MS. CRAPSTER:  THE COLLINS CASE AS I WAS MENTIONING

6    BEFORE.

7              PAGES 16 TO 17 THE COURT STATED:

8               "THAT THERE WAS A THRESHOLD DISPUTE ABOUT

9                WHETHER AN EXCLUSION APPLIED.  IT IS

10               UNCLEAR HOW THIS DISPUTE WOULD BE ADVANCED

11               BY DISCOVERY OF ANY OTHER INSURANCE CLAIM

12               FILE EVEN IF A CLAIM UNDER THE SAME POLICY

13               PROVISION ALSO HAD BEEN DENIED."

14             AND THE SAN DIEGO UNIFIED PORT DISTRICT --

15             THE COURT:  HANG ON A SECOND.  HANG ON A SECOND.

16   BECAUSE I THINK YOU GAVE ME A LEXIS CITE AND I ONLY HAVE

17   WESTLAW.  SO --

18             MS. CRAPSTER:  OH, I APOLOGIZE, YOUR HONOR.

19             THE COURT:  THAT'S ALL RIGHT.

20             ALL RIGHT.  WELL --

21             (PAUSE IN PROCEEDINGS.)

22             THE COURT:  WELL, I MEAN, I SEE THAT LANGUAGE.  I

23   ALSO SEE THAT THE COURT GOT VERY QUICKLY INTO THE RULE 26

24   BURDEN AND COST ISSUE.

25             SO, I'LL TAKE ANOTHER LOOK AT IT LATER.

1           MS. CRAPSTER:  YEAH.  AS I UNDERSTOOD IT, YOUR HONOR,

2    WHAT THE COURT WAS STATING WAS THAT THERE COULD BE SOME

3    POTENTIAL RELEVANCE TO THE BAD FAITH CLAIM BECAUSE THAT BAD

4    FAITH CLAIM WAS TIED TO WHETHER THERE WAS A GENERAL BUSINESS

5    PRACTICE OF REPEATEDLY DENYING THE SAME TYPES OF CLAIMS.

6           THE COURT:  IS THAT AN ALLEGATION IN THIS CASE?

7           MS. CRAPSTER:  NO, IT IS NOT.

8           THE COURT:  IS IT?  I KNOW THERE'S A BAD FAITH CLAIM,

9    BUT IS IT JUST BAD FAITH DENIAL OR A BAD FAITH PATTERN AND

10   PRACTICE.

11          MR. SHALAMITSKI:  IT'S BAD FAITH DENIAL.  BUT THAT'S

12   EXACTLY THE POINT WHY COLLINS IS INAPPOSITE -- THAT COLLINS IS

13   DISTINGUISHABLE.  BAD FAITH BASIS IS NOT THE ONLY BASIS FOR

14   RELEVANCY.  THE SEVEN REASONS THAT I GAVE THAT GO TO

15   INTERPRETATION --

16          THE COURT:  I THOUGHT IT WAS EIGHT?

17          GO AHEAD.

18          MR. SHALAMITSKI:  MAYBE IT WAS EIGHT.

19          THOSE ARE THE -- THOSE ARE THE INDEPENDENT OF THE BAD

20   FAITH REASON FOR THE RELEVANCY.  SO, SURE, COLLINS HAD TO DO

21   WITH BAD FAITH.  AND IT SAID THAT THE INSURER -- THE INSURED

22   SOUGHT DOCUMENTS THERE IN COLLINS TO SUPPORT ALLEGATIONS THAT

23   THE INSURER MISREPRESENTED THE INSURANCE POLICY AND PATTERN AND

24   PRACTICE.  BOTH.

25          NO, WE'RE NOT ALLEGING PATTERN AND PRACTICE HERE.

1  BUT THE BAD-FAITH BASIS IS NOT THE ONLY BASIS FOR RELEVANCE.

2          SAME PROBLEM IS WITH J&M THAT ATLANTIC CITES AND SAN

3  DIEGO.

4          OH, AND BY THE WAY, J&M SAID:

5          "OTHER CLAIMS, DOCUMENTS ACTUALLY ARE DISCOVERABLE."

6  BUT IT WENT INTO THE BURDEN ANALYSIS.

7          IN SAN DIEGO, THERE ARE TWO BASES FOR RELEVANCE THAT

8  WERE ARGUED.  ONE WAS BAD FAITH.  AGAIN, NOT WHAT WE'RE ARGUING

9  IN OUR MOTION.  AND THE SECOND WAS INTERPRETATION.  HOWEVER,

10  THE REASONS THAT I STATED AND THE GROUNDS THEY WERE NOT

11  ADVANCED.

12          SO, NONE OF THE THREE CASES THAT ATLANTIC CITES ARE

13  ON POINT.

14          THE COURT:  WELL --

15          (PAUSE IN PROCEEDINGS.)

16          MS. CRAPSTER:  YOUR HONOR, IF I COULD JUST RESPOND TO

17  ONE POINT ON THE J&M CASE.

18          THE COURT:  SURE.

19          MS. CRAPSTER:  THAT CASE HELD THAT THERE COULD BE

20  SOME LIMITED RELEVANCY VALUE TO OTHER CLAIMS INVOLVING THE

21  EXACT SAME POLICY AT ISSUE.

22          ONE OF THE PROBLEMS WITH THE PLAINTIFF'S REQUEST IN

23  THIS CASE IS THAT IT'S NOT REMOTELY NARROWLY TAILORED.

24  ONE BEACON HAS 15 DIVISIONS OF INSURANCE.  AND THEY HAVE NOT

25  ASKED US TO SEARCH ONLY THE ENTERTAINMENT DIVISION.  THEY

1    HAVEN'T NARROWED IT TO ANY PARTICULAR TYPE OF POLICY.

2              THE COURT:  WILL YOU?

3              MS. CRAPSTER:  WILL -- I'M SORRY?  WILL WE?

4              THE COURT:  WILL YOU SEARCH IF IT'S NARROWER -- IF

5    IT'S NARROWED?

6              MS. CRAPSTER:  POTENTIALLY, YOUR HONOR.

7              BUT THE TIMEFRAME IS ALSO ONE OF THE MOST SIGNIFICANT

8    ISSUES HERE.  GOING OVER A 16-YEAR PERIOD IS GOING TO IMPOSE A

9    SIGNIFICANT BURDEN EVEN IF WE DO NARROW IT TO A PARTICULAR

10   DIVISION.

11             THE COURT:  WELL, WHERE DO THE 2000TH -- WAS IT 13

12   DATE?  WHERE DID THAT COME FROM?

13             MS. CRAPSTER:  SO, THE -- ATLANTIC INITIALLY IN

14   RESPONSE TO THE FIRST SET OF DISCOVERY REQUESTS THAT WE

15   RECEIVED WE DID A SEARCH OF THE IMAGE ANALYSIS SYSTEM, WHICH IS

16   ONE OF THE DATABASES THEY'RE ASKING US TO SEARCH NOW.  THAT'S

17   ESSENTIALLY ATLANTIC'S DOCUMENT MANAGEMENT SYSTEM.  SO, THAT'S

18   WHERE THEY STORE ANY DOCUMENTS THAT ARE ELECTRONICALLY STORED.

19             SO, WE DID A SEARCH OF THAT SYSTEM FROM THE DATE OF

20   THE SEARCH, WHICH WAS LATE LAST YEAR, THROUGH JULY OF 2013.

21   AND WE'VE DONE A VERY THOROUGH SEARCH --

22             THE COURT:  MY QUESTION WAS, WHY 2013?

23             MS. CRAPSTER:  OH, I'M SORRY.

24             THAT WAS ROUGHLY A THREE-AND-A-HALF YEAR LOOK-BACK

25   FROM WHERE WE WERE SITTING AT THE TIME.  AND WE FELT LIKE THAT

1   WAS CERTAINLY A REASONABLE AMOUNT OF TIME.  AND WE --

2         THE COURT:  WE JUST PICKED IT.

3         MS. CRAPSTER:  WELL, I'M NOT SURE THAT THAT'S EXACTLY

4   CORRECT, YOUR HONOR.  I MEAN, THERE'S GOT TO BE SOME

5   DEMARCATION LINE.  WE OBVIOUSLY COULDN'T HAVE SEARCHED THE

6   ENTIRE IMAGE ANALYSIS SYSTEM FOR THE REASONS THAT WE'VE MADE

7   CLEAR IN OUR RESPONSE BRIEF.  IT'S COMPLETELY UNWIELDY CLOSE TO

8   FLAT OUT IMPOSSIBLE.

9         SO, WE HAD TO PICK SOME DEMARCATION LINE AND WE

10  WANTED TO MAKE ABSOLUTELY SURE THAT WE WERE ENCOMPASSING WITHIN

11  OUR SEARCH ANYTHING THAT COULD POTENTIALLY RELATE TO CERTAINLY

12  THE 50-DAY WAR THAT'S AT ISSUE IN THIS CASE, AND ANYTHING

13  RELATED TO THE PARTICULAR CLAIM THAT'S AT ISSUE, AND ANY

14  DISCUSSIONS THAT MIGHT HAVE BEEN HAD ABOUT THIS POLICY GOING

15  BACK ROUGHLY A YEAR OR SO.

16        SO, IT WASN'T AN ARBITRARY DATE.  WE FELT THAT THAT

17  WAS A REASONABLE PERIOD OF TIME TO BE SEARCHED.

18        THE COURT:  WELL, SAYING IT'S REASONABLE MEANS YOU'VE

19  GOT TO GIVE ME A REASON.  IF THE REASON IS IT WAS ABOUT A YEAR

20  BEFORE THE POLICY CAME INTO PLAY, YOU KNOW, THAT'S THE REASON.

21  THAT'S WHY I ASKED THE QUESTION.

22        MS. CRAPSTER:  THAT'S CORRECT, YOUR HONOR.

23        THE COURT:  I MEAN, IT'S NOT LIKE THAT'S WHEN THE

24  SYSTEM WENT ON LINE.  IT'S NOT WHEN WE TOOK OVER THE BUSINESS.

25  IT'S NOT WHEN UNIVERSAL BECAME A CLIENT.  I MEAN, THAT'S -- I'M

1    JUST TRYING TO FIGURE OUT, YOU KNOW, WHETHER IT WAS ARBITRARY

2    OR NOT.  AND THE ONLY WAY I GET THAT IS IF I GET THE REASONING.

3            MS. CRAPSTER:  SO, AS I SAID, WE WANTED TO BE

4    ABSOLUTELY SURE WE CAPTURED ANYTHING RELEVANT TO THIS POLICY

5    AND TO THIS CLAIM.  AND TO BE SURE THAT WE WERE DOING THAT, WE

6    WENT BACK ABOUT A YEAR FROM THE TIME OF THE CLAIM.

7            THE COURT:  SO, HERE'S WHAT KIND OF BAFFLED ME.  YOUR

8    RESPONSE PAPERS WERE ALMOST EQUALLY WEIGHTED.  THEY CAN'T HAVE

9    IT.  IT'S NOT GOING TO HAPPEN, NO HOW, NO WAY, NOT RELEVANT,

10   NOT GOING TO GO ANYWHERE AND WE DON'T HAVE ANYTHING.

11           AND, THEN, ALTERNATIVELY, OKAY.  WE DON'T OBJECT TO

12   THE PLAINTIFFS RUNNING THIS SEARCH AT THEIR OWN EXPENSE AS LONG

13   AS YOU GET TO SEE WHAT THE VENDORS COME UP WITH FIRST.

14           WHY DON'T I JUST DO THAT?

15           MS. CRAPSTER:  WE DON'T HAVE A PROBLEM WITH THAT,

16   YOUR HONOR.  I MEAN, WE'VE MADE VERY CLEAR --

17           THE COURT:  WHY DON'T I DO THAT?

18           MR. SHALAMITSKI:  BECAUSE THE AMOUNT IS ABSOLUTELY

19   UNREASONABLE AND OVERSTATED.  THAT'S JUST NOT THE WAY THE

20   DISCOVERY WORKS.

21           THE COURT:  WHY DON'T I LET YOU SEND YOUR VENDOR IN

22   BECAUSE YOU'VE GOT SOME GREAT VENDORS, FANTASTIC VENDORS.  YOU

23   CAN PAY THE COST.  BUT BEFORE MATERIAL FLOWS FROM YOUR VENDORS,

24   ATLANTIC GETS TO REVIEW THE MATERIALS FOR RELEVANCE.  AND, YOU

25   KNOW, THERE'S OBVIOUSLY A HUGE PRIVILEGE ISSUE THAT'S STILL

1    PENDING HERE.

2              MR. SHALAMITSKI:  WELL --

3              THE COURT:  WHAT'S WRONG WITH A TRADITIONAL COST

4    SHIFT UNDER RULE 26?

5              MR. SHALAMITSKI:  WELL, THREE THINGS.  FIRST --

6              THE COURT:  OH, YOU LIKE YOUR NUMBERED LISTS, SIR.  I

7    LIKE THAT.  OKAY.

8              MR. SHALAMITSKI:  AND IT FLOWS.

9              FIRST, WE'VE BEEN AT IT WITH ATLANTIC FOR A LONG

10   TIME.

11             THE COURT:  OKAY.

12             MR. SHALAMITSKI:  AND WE KEPT ASKING, WELL, HOW CAN

13   YOU DO IT.  WE'VE ASKED THE QUESTION YOUR HONOR ASKED, CAN YOU

14   DO IT FOR THE ENTERTAINMENT DIVISION.  THE ANSWER WAS NO.

15   BECAUSE WE DON'T HAVE A SEPARATE SET OF DOCUMENTS, OR WE DON'T

16   HAVE A SEPARATE DATABASE WITH JUST THE ENTERTAINMENT DIVISION.

17   SO, WE'VE GOT TO DO IT ALL, AND WE'VE GOT TO DO IT ALL BY

18   IN-HOUSE, WHICH WILL TAKE FOREVER.

19             THE COURT:  OKAY.

20             WELL, LET'S SAY WE KICK IN THE DOOR AND YOU CAN SEND

21   YOUR FOLKS IN.

22             MR. SHALAMITSKI:  PLUS, THE ISSUE ABOUT, OH, THE

23   POLICIES ARE DIFFERENT.  WELL, A WAR EXCLUSION IS GENERALLY

24   STANDARD AS WE ALREADY DISCUSSED.

25             AND WHAT WE'VE ASKED IS, WELL, PLEASE GIVE US THE --

1    WHATEVER VARIATIONS YOU'RE TALKING ABOUT, IF THERE ARE

2    VARIATIONS.

3              AGAIN, THE ANSWER WAS --

4              THE COURT:  VARIATIONS IN WHAT?  THE POLICIES?

5              MR. SHALAMITSKI:  ON THE WAR EXCLUSION, IF THERE ARE

6    VARIATIONS ON THE WAR EXCLUSION OR TERRORISM EXCLUSION.  OR IF

7    THEY'RE ALL THE SAME.

8              THE COURT:  THE POLICIES ISSUED TO CUSTOMERS?  IS

9    THAT WHAT YOU WANT?

10             MR. SHALAMITSKI:  THE TERRORISM EXCLUSION OR WAR

11   EXCLUSION, MEANING, THOSE ARE GENERALLY STANDARD.  BUT WHAT

12   WE'RE SAYING IF THERE ARE VARIATIONS, THEN, GIVE US WHATEVER

13   VARIATIONS THERE ARE, THAT YOU USE --

14             THE COURT:  OF THE POLICY AND THE RIDER ITSELF?

15             MR. SHALAMITSKI:  OF THE EXCLUSION.  I MEAN, THE

16   POLICY ITSELF CAN BE -- I MEAN, WHATEVER THE TERMS ARE.

17             BUT WHAT'S AT ISSUE HERE DIRECTLY IN THIS CASE AND IN

18   THIS DISCOVERY IS THE EXCLUSIONS, EXCLUSIONS WITH TERRORISM

19   ACTS, EXCLUSIONS FOR WAR.

20             THE COURT:  SO, YOU WANT THE RIDER -- YOU WANT

21   DIFFERENT ITERATIONS OF THE RIDERS THAT ATLANTIC HAS USED IN

22   TERMS OF THE WAR AND THE TERROR EXCLUSIONS?

23             MR. SHALAMITSKI:  YES.

24             SO, WE ASKED FOR THAT.  ATLANTIC SAID, NOPE, NO WAY

25   TO DO THAT BECAUSE WE JUST DON'T KEEP IT, AND WE'LL HAVE TO

1    LOOK AT EACH SINGLE POLICY INDIVIDUALLY.

2              WELL, SURPRISE.  30(B)(6) COMES IN.  THE QUESTION IS

3    ASKED.  AND THE ANSWER IS, WELL, YEAH, SURE.  THERE IS A

4    DIVISION THAT DEALS WITH THE FORMS ACROSS ALL OF OUR DIVISIONS

5    TO THE EXTENT THEY'RE USED INTERCHANGEABLY.

6              ONE DAY AFTER WE FILED THE MOTION FOR SUMMARY

7    JUDGMENT, HERE YOU GO.  HERE'S THE FORMS.

8              SO, WE GO PRODUCE SEVERAL FORMS AFTER WE FILED THE

9    MSJ.  AND BEFORE WE'RE TOLD THERE IS JUST NO -- THERE IS JUST

10   NO WAY.

11             THE COURT:  OKAY.  BUT THAT'S -- THAT'S --

12             MR. SHALAMITSKI:  I'M JUST GETTING TO WHY WE SHOULD

13   NOT BE DOING THE COST SHIFTING.

14             SO, ATLANTIC HAD AN OBLIGATION UNDER THE FEDERAL

15   RULES TO CONDUCT A REASONABLE SEARCH.  AND WHEN THEY SAY THAT,

16   OH, WE ASKED DUFFY WHO WAS EMPLOYED SINCE 2010, HE DIDN'T

17   REMEMBER ANYTHING.  BUT AT THE SAME TIME DUFFY'S EMAILS WEREN'T

18   EVEN SEARCHED.

19             THAT'S NOT REASONABLE.

20             AND, THEN, JUST HAVING THE IN-HOUSE --

21             THE COURT:  I THINK THEY ARGUED A -- I THINK THEY

22   PROVIDED A REASON IN THE PAPERS THAT HE -- WHAT WAS THE REASON

23   THAT WAS ARTICULATED?

24             MS. CRAPSTER:  SO, MR. DUFFY, AS I WAS EXPLAINING

25   BEFORE, HE OVERSEES ALL CLAIMS FOR ONE BEACON, WHICH HAS 15

1    DIVISIONS.  SO, HE HAS, YOU KNOW, A FRACTIONAL INTEREST IN EACH

2    INDIVIDUAL CLAIM THAT'S PRESENTED TO HIM.  AND OBVIOUSLY, YOU

3    KNOW, CLAIMS OF SIGNIFICANCE ARE PRESENTED TO HIM, BUT HE'S NOT

4    KEEPING TRACK OF EVERY SINGLE CLAIM THAT'S ONGOING IN

5    ONE BEACON OR ATLANTIC AT ANY GIVEN TIME.

6              BECAUSE OF THAT --

7              THE COURT:  ALL RIGHT.

8              HERE'S WHERE I AM.  AND I'M GOING TO GIVE YOU FOLKS A

9    COUPLE OF OPTIONS BECAUSE YOU --

10             OH, GO AHEAD.  YOU WANT TO TALK.

11             MR. SHALAMITSKI:  NO, JUST ONE MORE THING.

12             IN THE COST-SHIFTING FACTORS --

13             THE COURT:  YEP.

14             MR. SHALAMITSKI:  -- IS THE LACK OF FACTORS.

15   OBVIOUSLY, IT'S MY VIEW, IT'S UNIVERSAL'S VIEW, THAT ALL THOSE

16   FACTORS WILL GO IN OUR FAVOR.  SO, COST-SHIFTING IS NOT

17   APPROPRIATE.  BECAUSE ATLANTIC HAD AN OBLIGATION TO DO IT.

18   WE'VE BEEN  AT IT FOR A LONG TIME.  AND THEY JUST COULDN'T

19   FIGURE OUT THE CORRECT WAY TO DO IT.  AND NOW THEY'RE AGAINST

20   THE WALL.  THEY GO AND GET THE ESTIMATES FOR $800,000.  AND

21   MOST OF IT IS BASED ON, OH, WE HAVE TO HOST ALL THESE TERABYTES

22   --

23             THE COURT:  I WASN'T PARTICULARLY --

24             MR. SHALAMITSKI:  -- WHEREAS THE EDISCOVERY JUST

25   DOESN'T WORK --

1          THE COURT:  I WASN'T PARTICULAR SWAYED BY

2    THREE-QUARTERS OF A MILLION DOLLARS TO DO A SEARCH.  I DON'T

3    CARE HOW BIG THAT COMPUTER IS.  AND THAT WAS EYE-POPPING AND

4    NOT PARTICULARLY PERSUASIVE.  YOU GOT ME THERE.  OKAY.

5          MS. CRAPSTER:  WELL, YOUR HONOR, WHAT I CAN TELL YOU

6    FROM THAT IS THAT THAT IS A FORMAL PROPOSAL THAT WE RECEIVED

7    FROM A WELL-KNOWN, RESPECTED EDISCOVERY VENDOR.  AND THAT'S --

8    I MEAN, YOU CAN SEE FROM THE --

9          THE COURT:  GOOD.  GOOD.  HE'S DONE SOME SHOPPING FOR

10   YOU.  HE'S GOT SOMEONE WHO WILL DO IT CHEAPER.

11          I MEAN, HERE'S -- HERE'S WHERE I'M COMING DOWN.

12          I HAVE REAL PROBLEMS WITH THE BREADTH OF THE REQUESTS

13   FROM UNIVERSAL.  OKAY.  JUST ON ITS FACE, EVERY PIECE OF PAPER

14   AS TO EVERY CLAIM ON THIS POLICY ACROSS THE COMPANY GOING BACK

15   IN TIME, ON ITS FACE THAT'S ENORMOUS.  AND TO ASK AN INSURANCE

16   COMPANY TO LOOK FOR THAT RAISES UNBELIEVABLE RULE 26 ISSUES.

17          I'M ALSO NOT WILDLY SWAYED AS TO THE RELEVANCE IN YOU

18   OBTAINING INFORMATION THAT'S GOING TO ASSIST THE DISTRICT COURT

19   IN INTERPRETING THIS POLICY.  I RECOGNIZE THAT THERE IS SOME

20   LANGUAGE IN SOME CASES THAT SOMETIMES IF THERE IS AN AMBIGUITY

21   THERE MIGHT BE SOMETHING OF USE IN SEEING HOW PREVIOUS ISSUES

22   HAVE BEEN HANDLED.  I GOT THAT.

23          BUT THAT DOESN'T TAKE AWAY FROM THE RULE 26 ANALYSIS.

24   AND EVEN VERY RELEVANT INFORMATION DOES NOT HAVE TO BE

25   DISCOVERED AND DOES NOT HAVE TO BE TURNED OVER IF COST, BURDEN

1    AND LIKELIHOOD OF OBTAINING IT OUTWEIGHS THESE THINGS.  THAT'S

2    JUST FUNDAMENTAL.  AND THAT IS FRONT AND CENTER WITH THE COURTS

3    SINCE THE REVISIONS OF RULE 26 IN DECEMBER OF 2015.

4         I ALSO AM A LITTLE BIT CONFUSED AS TO THE LIKELIHOOD

5    OF ANYTHING ACTUALLY BEING THERE.  THERE IS SOMETHING VERY

6    SPECULATIVE ABOUT THIS OTHER THAN THE CONCESSION PULLED OUT OF

7    THE COMPANY BY THE PLAINTIFF THAT THERE ARE SOME CLAIMS RELATED

8    TO THE 9/11 DISASTER.  BUT OTHER THAN THAT, I DON'T HAVE

9    ANYTHING OTHER THAN PLAINTIFF'S SUPPOSITION THAT THERE ARE

10   OTHER CLAIMS THAT ARE SOMEHOW RELEVANT HERE.  AND, YOU KNOW, I

11   HAVE SOME EVIDENTIARY BASIS FROM COMPANY EXECUTIVES THAT

12   THERE'S NOTHING ELSE THERE.  SO THAT ALL GOES INTO THE MIX.

13        BUT THE CONCESSION FROM THE COMPANY THAT WE DON'T

14   OBJECT TO A SEARCH AS LONG AS PLAINTIFF PAYS FOR IT SEEMS TO

15   TAKE ALL OF THIS AND THROW IT OUT THE WINDOW.

16        AND, SO, THE QUESTION IS WHETHER I CAN FIND A WAY TO

17   APPROPRIATELY HAVE A SEARCH EXECUTED IN A COST EFFECTIVE AND

18   TIMELY MANNER SO THAT IF THERE IS ANYTHING, THAT DISCOVERY CAN

19   FLOW.  AND IF PLAINTIFF HAS FOUND SOME ROCKET SCIENTIST WHO CAN

20   DO IT CHEAPLY AND QUICKLY, I DON'T SEE ANY PROBLEM WITH THAT.

21        NOW, MR. SHALAMITSKI MAKES SOME INTERESTING

22   OBSERVATIONS ABOUT DISCOVERY MISCONDUCT AND DELAYS AND SOME

23   OTHER THINGS THAT, YOU KNOW, PERHAPS EQUITABLY I SHOULD

24   CONSIDER IN TERMS OF HOW I SET THIS UP.  AND I MAY WANT TO GIVE

25   SOME THOUGHT TO THAT.

1          I WILL ALSO POTENTIALLY DO THAT IN LIGHT OF THE FACT

2     THAT THIS IS A BIG CASE, A COMPLEX CASE WITH SOME VERY

3     HIGH-POWERED LAWYERS DOING SOME VERY HARD CORE LITIGATING HERE.

4     AND RECOGNIZING THAT THERE MAY BE SOME ERRORS, AND THERE MAY BE

5     SOME ROAD BLOCKS THAT COME UP IN THE COURSE OF A CASE LIKE

6     THIS.

7          AND, SO, YOU KNOW, THE MASSIVE SWORD THAT'S BEEN

8     WIELDED BY UNIVERSAL, YOU KNOW, GIVE US EVERY PIECE OF PAPER IN

9     THE HOUSE WHICH WAS LED BY THE HUGE SHIELD OF WE'RE NOT GOING

10    TO GIVE YOU ANYTHING, AND IF WE DO, WE'RE ONLY GOING TO LOOK

11    BACK A COUPLE OF YEARS, AND THEN THE BACK AND FORTH AND THEN

12    THE BACK AND FORTH.  AND THINGS DRIBBLING OUT.

13         IT'S A MESS.  IT'S A MESS.  IT MAY BE A MESS ON BOTH

14    SIDES.  SO, HERE ARE THE TWO OPTIONS THAT I WANT YOU TO GIVE

15    SOME REAL THOUGHT TO.

16         NUMBER ONE, SEND YOU OUT IN THE HALL AND YOU SEE IF

17    NOW THERE IS SOMETHING TO BE WORKED OUT.

18         OR, TWO, YOU COME BACK AND SAY, NO, JUDGE, YOU

19    DECIDE.

20         I THINK YOU HAVE A SENSE AS TO HOW I MAY COME DOWN,

21    WHICH IS, IN THE FACE OF A LACK OF AN OBJECTION BY THE COMPANY,

22    PERHAPS I SEND PLAINTIFF'S PEOPLE IN SCRAMBLING THROUGH YOUR

23    FILES ON YOUR DIME.  THAT'S NOT GOING TO LOOK GOOD ON THE

24    RECORD.  SCRAMBLING THROUGH ATLANTIC'S FILES, ARMOUR'S FILES,

25    BEKINS FILES, WHATEVER THE COMPANY, IS ON UNIVERSAL'S DIME.

1   YOU MAY GET WHAT YOU WANT.  IT MAY COST YOU.  AND IT MAY BE

2   THAT YOUR FOLKS ARE GOING TO SIT DOWN AND TAKE A LOOK AT A TON

3   OF STUFF.

4          GO AHEAD.

5          MS. CRAPSTER:  WELL, YOUR HONOR, I WAS JUST GOING TO

6   SAY ONE OF OUR REQUESTS FOR FEE SHIFTING IS THE FEE SHIFTING OF

7   THE ATTORNEY TIME THAT IT'S GOING TO TAKE FOR THE REVIEW OF

8   HOWEVER MANY THOUSANDS OF DOCUMENTS COME BACK FROM THIS.

9          AND IF THIS SEARCH IS GOING TO BE UNDERTAKEN -- AND

10  WE CONTINUE TO BELIEVE THAT THERE IS NO POTENTIAL RELEVANCE FOR

11  ANY INFORMATION THAT THEY MIGHT DISCOVER.

12         AND ONE POINT THAT I WANTED TO MAKE ON THAT, YOUR

13  HONOR, IS THAT THIS IS ALL -- THIS SEARCH AND THE RELEVANCE OF

14  THIS SEARCH HINGES ON THE FACT THAT OTHER CLAIMS INVOLVING

15  TERRORIST ORGANIZATIONS ARE GOING TO HAVE RELEVANCE.

16         OUR POSITION IN THIS CASE IS THAT THE ARGUMENT THAT

17  HAMAS IS A TERRORIST ORGANIZATION, WHICH, THEREFORE, MEANS IT

18  CAN'T ENGAGE IN A WAR IS JUST A RED HERRING.  WE BELIEVE THAT

19  THE TERM "WAR" DEPENDS ON THE NATURE AND THE EXTENT OF THE

20  HOSTILITIES AND NOT WHAT ONE COUNTRY HAS DESIGNATED ONE OF THE

21  ACTORS IN THAT DISPUTE OR CONFLICTS TO BE.

22         SO, YOU KNOW, IT'S THE -- THE FACT THAT THEY HAVE --

23         THE COURT:  IS THAT THE POSITION THAT THE COMPANY HAS

24  TAKEN WITH RESPECT TO PREVIOUS CLAIMS?

25         MS. CRAPSTER:  WELL, I MEAN, THAT WOULD ASSUME THAT

1    WE'VE HAD OTHER CLAIMS WHERE THE WAR EXCLUSION --

2              THE COURT:  YES, IT WOULD.

3              MS. CRAPSTER:  -- SPECIFICALLY HAS COME UP.

4              THE COURT:  YES, IT WOULD.  AND THE SCOPE OF

5    DISCOVERY IS BROADER THAN THE SCOPE OF ADMISSIBILITY AT TRIAL,

6    CORRECT?

7              MS. CRAPSTER:  CORRECT.

8              THE COURT:  OKAY.  SO, WE'RE TRYING TO FIGURE OUT THE

9    ANSWER TO THE FUNDAMENTAL QUESTION OF HAVE THERE BEEN OTHER

10   SITUATIONS, OTHER CASES, OTHER CLAIMS.

11             WE'VE GOT A FAIRLY STRAIGHT ANSWER FROM 2013 TO THE

12   PRESENT.  NO.

13             WE HAVE A SOMEWHAT STRAIGHTFORWARD ANSWER FROM -- IS

14   IT MR. DUFFY? -- OR OTHER PEOPLE THAT -- 'TILL ABOUT 2010, WE

15   DON'T THINK SO.

16             HOW AM I DOING SO FAR?  OKAY.

17             AND THEN FOR THE PERIOD OF TIME SINCE THE PLAINTIFFS

18   HAVE -- AS ARBITRARILY AS ANYBODY ELSE SAID LET'S GO BACK TO

19   THE BEGINNING OF TIME OR JANUARY OF 2001, HOW ABOUT THAT PERIOD

20   OF TIME.

21             MS. CRAPSTER:  WE DO NOT HAVE INFORMATION ABOUT THE

22   PERIOD OF 2001 THROUGH ROUGHLY 2010.

23             THE COURT:  AND THERE MAY NOT BE ANYTHING TO REVIEW.

24             MS. CRAPSTER:  CORRECT.  WELL, THAT'S POSSIBLE --

25             THE COURT:  BUT --

1          MS. CRAPSTER:  -- YOUR HONOR.

2          THE COURT:  BUT I'M AMENABLE TO CONSIDERING IF A

3    LAWYER HAS TO SIT DOWN ON THIS, THERE MAY -- THERE MAY WELL BE

4    A FEE SHIFT.  AND THAT FEE SHIFT MAY HAVE BEEN IN PLACE HAD YOU

5    FOLKS GOTTEN INTO THAT AGREEMENT ON DAY ONE.

6          OKAY.  IT'S A BIG ASK FROM -- FROM UNIVERSAL.

7          MS. CRAPSTER:  IT IS A BIG ASK, YOUR HONOR.

8          THE COURT:  OH, NO.  I WANT TO HEAR FROM --

9          HE WANTED TO SAY SOMETHING.

10          GO AHEAD, SIR.

11          MR. SHALAMITSKI:  WAIT.  BUT THIS IS NOT A SMALL

12    AMOUNT.  DISCOVERY GOES BOTH WAYS.  UNIVERSAL HAS ENGAGED --

13    ANY DISCOVERY SPECIALISTS HAVE BEEN PAYING FEES.  THE SEARCHES

14    THAT WE RAN WERE COMPLEX.  WE HAD MASSIVE REVIEW.  ATLANTIC

15    SAYS IT PRODUCED 6,000 --

16          THE COURT:  SEARCHES -- SEARCHES OF WHAT?

17          MR. SHALAMITSKI:  FOR DOCUMENTS, FOR WHATEVER -- FOR

18    -- IN RESPONSE TO ATLANTIC'S DISCOVERY.

19          SO --

20          THE COURT:  YEAH.  BUT YOU WEREN'T ASKED TO SEARCH

21    ACROSS EVERYTHING THAT NBC UNIVERSAL HAS DONE IN EVERY LINE OF

22    ITS BUSINESS.

23          MR. SHALAMITSKI:  THAT --

24          THE COURT:  GIVE US -- SEARCH EVERYTHING ABOUT EVERY

25    GAME SHOW, EVERYTHING WITH -- EVERY THEME PARK.  NBC UNIVERSAL

1   IS A MASSIVE COMPANY.

2           MR. SHALAMITSKI:  RIGHT.  BUT STILL THERE WERE

3   SEARCHES -- THERE WERE MASSIVE SEARCHES.  THERE WERE MASSIVE

4   REVIEWS.

5           WE'VE ENGAGED IN EDISCOVERY -- OF EDISCOVERY COMPANY.

6   ATLANTIC PRODUCED 6,000 SOMETHING OR 7,000 ROUGHLY.  WE'VE

7   PRODUCED 38 -- 37,000 PAGES OF DOCUMENTS IN THIS CASE.

8           WE'VE REVIEWED OUR DOCUMENTS --

9           THE COURT:  I'M NEVER IMPRESSED BY THAT.  I MEAN, IF

10  YOU PHOTOCOPIED THE PHONE BOOK A FEW TIMES, I MEAN --

11          MR. SHALAMITSKI:  DID NOT DO THAT.

12          THE COURT:  WELL --

13          MR. SHALAMITSKI:  BUT IT -- AS TO --

14          THE COURT:  YOU CERTAINLY FILED IT WITH ME.

15          MR. SHALAMITSKI:  AS -- THAT'S JUST TO SHOW THAT

16  THOSE CASES WERE MASSIVE.  SO, IF THEY MISSED THAT, WHO KNOWS.

17          AND, AGAIN, I MEAN, WE DON'T HAVE THE INFORMATION OF

18  WHAT IS OUT THERE.  THEREFORE, WE'RE SEEKING THIS DISCOVERY.

19          BUT AS TO COST-SHIFTING, UNIVERSAL ABSOLUTELY OPPOSES

20  SHIFTING ATTORNEY'S FEES.  WE HAVE -- WE SPEND A TON OF TIME IN

21  ATTORNEY TIME REVIEWING DOCUMENTS IN RESPONSE TO ATLANTIC'S

22  REQUEST.

23          THIS REQUEST SEEKS WHAT WE BELIEVE CAN BE VERY

24  CRUCIAL INFORMATION.  AND IF ATLANTIC HAD ENGAGED AN EDISCOVERY

25  VENDOR EARLIER IN THE CASE OR, AT LEAST, GAVE SOME INDICATION

1  AS TO WHAT CAN BE DONE, THE COSTS WOULD HAVE BEEN PROBABLY EVEN

2  LESS.

3          AND AS TO COST-SHIFTING, I MEAN, IF YOUR HONOR IS

4  GOING TO CONSIDER IT, YOUR HONOR -- IF YOUR HONOR IS GOING TO

5  CONSIDER IT AND ATTORNEY'S FEES AGAIN, UNIVERSAL'S POSITION IS

6  ABSOLUTELY NOT.

7          BUT AS TO COST-SHIFTING OF THE EDISCOVERY FIRM, THEN,

8  IF YOUR HONOR CONSIDERS THAT, THEN, YOUR HONOR COULD PLEASE

9  CONSIDER THE -- SOME -- SOME TYPE OF AN ALLOCATION.  BECAUSE

10  WE'RE SCRAMBLING.  AND WE'RE HERE BECAUSE WE'RE LOOKING FOR

11  STUFF AND WE'RE FINDING IT OURSELVES AS OPPOSED TO ATLANTIC

12  TELLING US.

13          MS. CRAPSTER:  YOUR HONOR, IF I COULD JUST MAKE A

14  QUICK POINT.

15          THERE'S A SPECIFIC LIST OF FACTORS AS TO WHAT MERITS

16  FEE SHIFTING AND WHAT DOESN'T.  AND THE FACT THAT UNIVERSAL MAY

17  HAVE ALREADY REVIEWED A BUNCH OF DOCUMENTS -- AND RESPONDING TO

18  OUR REQUESTS FOR PRODUCTION IS OBVIOUSLY NOT ON THAT LIST --

19  THE MOST IMPORTANT TWO FACTORS THAT COURTS LOOK AT ARE THE

20  EXTENT TO WHICH THE REQUEST IS NARROWLY TAILORED, WHICH AS YOUR

21  HONOR HAS NOTED, IT'S NOT REMOTELY NARROWLY TAILORED.  AND THE

22  AVAILABILITY OF THE INFORMATION FROM OTHER SOURCES.

23          AS THE PLAINTIFFS HAVE ALREADY DEMONSTRATED, THEY'RE

24  ABLE TO SEARCH ON PACER AND THE INTERNET FOR ANY OTHER CASES

25  INVOLVING TERRORIST ORGANIZATIONS.  AND APPARENTLY THEY'VE

1   ALREADY PROVIDED TO THE COURT THE ONES THAT THEY WERE --

2            THE COURT:  OKAY.  THAT'S --

3            MS. CRAPSTER:  -- ABLE TO FIND.

4            THE COURT:  OKAY.  THAT WAS JUST A WILD SCRAMBLE INTO

5   NOTHING.

6            THEY WANT TO KNOW ABOUT HOW THE COMPANY HAS TREATED

7   CLAIMS.  NOT HOW THE COMPANY HAS LITIGATED THESE THINGS.  OKAY.

8            AND, SO, I MEAN, THAT WAS NOT PARTICULARLY COMPELLING

9   BECAUSE THERE ARE SOME THINGS THAT THE COMPANY EXCLUSIVELY HAS

10  WITH RESPECT TO HOW IT'S HANDLED CLAIMS AND HOW IT'S

11  INTERPRETED THESE CLAUSES.

12           HOWEVER, YOU KNOW, THAT RUNS RIGHT INTO

13  ATTORNEY-CLIENT ISSUES.  AND, YOU KNOW, I WAS REALLY NOT

14  THRILLED WITH HOW UNIVERSAL HANDLED THAT IN THE LAST SET OF

15  MOTIONS HERE.

16           SO, WHY DON'T WE DO THIS.  WHY DON'T WE TAKE A BREAK.

17  WHY DON'T YOU STEP OUT INTO THE HALLWAY.  I'LL COME BACK IN,

18  LIKE, 15 OR 20 MINUTES.

19           IF YOU WANT TO WORK SOMETHING OUT AND NOT HAVE ME

20  COME DOWN ON THIS, YOU KNOW, I THINK -- I THINK YOU SHOULD BOTH

21  BE MOTIVATED TO DO SOMETHING HERE.  I UNDERSTAND YOU'VE GOT

22  CLIENTS YOU'VE GOT TO DEAL WITH.  I UNDERSTAND YOU HAVE TO MAKE

23  SOME PHONE CALLS, BUT THIS -- THIS IS A MESS.  AND I WANT TO

24  GIVE YOU ONE CLEAR SHOT TO SEE IF YOU CAN RESOLVE SOMETHING

25  WORKABLE ON YOUR OWN WITHOUT COURT INTERVENTION.

1           SO, IT'S ABOUT 10 OF 11:00.  I'LL BE BACK IN ABOUT 15

2    MINUTES.  AND WE'LL SEE WHERE WE ARE.

3           MR. SHALAMITSKI:  THANK YOU, YOUR HONOR.

4           THE COURT:  ALL RIGHT.

5           THANK YOU, BOTH.

6           (RECESS AT 10:25 A.M. TO 10:42 A.M.)

7           THE COURT:  OKAY.

8           ALL RIGHT.  CONTINUING WITH THE UNIVERSAL MATTER.

9           WHERE ARE WE, SIR?

10          MR. SHALAMITSKI:  UNFORTUNATELY, THE PARTIES COULD

11   NOT REACH ANY TYPE OF AN AGREEMENT.

12          THE COURT:  OKAY.

13          MS. CRAPSTER:  YOUR HONOR, IF I COULD JUST BE HEARD

14   ON A FEW MORE POINTS VERY QUICKLY.

15          (PAUSE IN PROCEEDINGS.)

16          MS. CRAPSTER:  YEAH?

17          THE COURT:  GO AHEAD.

18          MS. CRAPSTER:  OKAY.

19          YOUR HONOR, WE -- AS MR. SHALAMITSKI SAID, WE'RE NOT

20   ABLE TO REACH A DEAL.  BUT WE CONTINUE TO BELIEVE THAT THE

21   RELEVANCE IS THE MOST IMPORTANT ISSUE AND THAT THERE IS NO

22   RELEVANCE.

23          I ALSO WANTED TO ADDRESS THE POINT THAT YOU HAD MADE

24   BEFORE ABOUT SOME SUGGESTION OF DISCOVERY MISCONDUCT IN THIS

25   CASE.

1              THE COURT:  NO.  NOPE.  DON'T WANT TO HEAR IT.

2              MS. CRAPSTER:  OKAY.

3              I JUST HAD ONE QUICK FINAL POINT, YOUR HONOR.

4              THE COURT:  OKAY.

5              MS. CRAPSTER:  THIS REQUEST -- I THINK I PUT THIS IN

6    MY DECLARATION -- IT WAS ATTACHED TO OUR RESPONSE BRIEF.  THIS

7    IS -- THIS IS A NEW REQUEST THAT WE'VE BEEN POSED WITH, THE

8    SUGGESTION THAT WE SEARCH BACK TO SEPTEMBER 12, 2001 FOR THE

9    NAMES OF THE ENTITIES THAT ARE DESIGNATED FOREIGN TERRORIST

10   ORGANIZATIONS.  THERE'S NOT A REQUEST FOR PRODUCTION THAT ASKS

11   FOR THAT.  AND IT WAS NEWS TO US WHEN WE RECEIVED THE MOTION ON

12   -- I BELIEVE IT WAS MAY 16TH THAT THAT'S WHAT THE PLAINTIFFS

13   WERE ASKING FOR.

14              SO, WE'VE GOT AN ISSUE WITH THAT AS WELL, YOUR HONOR.

15   WE BELIEVE THAT THE MEET AND CONFER REQUIREMENTS WERE NOT MET

16   AND THAT THIS IS ESSENTIALLY AN ATTEMPT FOR THE PLAINTIFFS TO

17   TRY TO MORE NARROWLY TAILOR AN EARLIER DISCOVERY REQUEST, WHICH

18   WAS EVEN MORE BROAD, WHICH WAS, GIVE US A SEARCH OF ALL CLAIMS

19   DATING BACK TO JANUARY 1ST OF 2001 FOR ANY CLAIMS RELATING TO

20   ACTS OF TERROR.

21              SO, THEY'VE NOW ATTEMPTED TO NARROW THIS AT THE

22   ELEVENTH HOUR.

23              AND, AGAIN, THE FIRST WE HEARD OF THIS PROPOSAL WAS

24   IN THE MOTION THAT WAS MADE ON MAY 16TH.  WE NEVER CONFERRED

25   ABOUT THE POSSIBILITY OF SEARCHING FOR THE FOREIGN TERRORIST

1    ORGANIZATIONS DATING BACK TO SEPTEMBER 12TH, 2001.

2              SO, WE DO TAKE ISSUE WITH THAT, YOUR HONOR, THAT IT'S

3    ESSENTIALLY JUST AN ATTEMPT TO PUT A NEW DISCOVERY REQUEST ON

4    THE TABLE WHEN THE TIME FOR THAT HAS PASSED.

5              THE COURT:  WHICH IS -- FOR ALL THE PAPER I HAVE

6    HERE, WHAT IS THE RELEVANT REQUEST FOR PRODUCTION OF DOCUMENTS?

7              WHAT'S THE LAST ONE THAT PLAINTIFFS HAVE SERVED?

8              MR. SHALAMITSKI:  IT'S, YOUR HONOR, 41, 42, 43, 44,

9    48, AND 49.

10             THE COURT:  RIGHT.

11             WHAT DOCUMENT IS IT?

12             MR. SHALAMITSKI:  OH, I'M SORRY.

13             THE COURT:  THAT'S ALL RIGHT.

14             WHERE DO I FIND IT?

15             (PAUSE IN PROCEEDINGS.)

16             THE COURT:  BECAUSE YOUR EXHIBIT 1 IS ATLANTIC'S

17   RESPONSE TO YOUR FIRST SET OF PRODUCTION REQUESTS.

18             IS THAT IT?

19             MR. SHALAMITSKI:  NO.  IT'S EXHIBIT NUMBER 4, YOUR

20   HONOR.

21             THE COURT:  EXHIBIT NUMBER 4, WHICH IS THEIR RESPONSE

22   TO YOUR SECOND REQUEST FOR PRODUCTION, RIGHT?

23             MR. SHALAMITSKI:  CORRECT.

24             THE COURT:  OKAY.  SO, THAT'S THEIR RESPONSE, DATED

25   MARCH OF THIS YEAR, RIGHT?

1            MR. SHALAMITSKI:  CORRECT, YOUR HONOR.

2            THE COURT:  OKAY.

3            AND WHEN DID YOU SERVE THE REQUEST THAT THIS RESPONSE

4    IS RESPONDING TO?  THAT'S A TERRIBLE SENTENCE.

5            MR. SHALAMITSKI:  ON FEBRUARY 2, YOUR HONOR.

6            THE COURT:  ON FEBRUARY.  GOT IT.  OKAY.

7            MR. SHALAMITSKI:  FEBRUARY 2.

8            THE COURT:  OKAY.

9            MS. CRAPSTER, ARE YOU ON BOARD WITH THAT?

10           MS. CRAPSTER:  I DON'T HAVE THAT IN FRONT OF ME, BUT

11   I BELIEVE THAT SOUNDS CORRECT.

12           THE COURT:  OKAY.

13           MR. SHALAMITSKI:  YOUR HONOR, IN TERMS OF THE NEW

14   REQUEST SUGGESTION, THAT'S EXACTLY THE POINT OF THIS MOTION.

15   AFTER MEET AND CONFERRING SO LONG AND ASKING ATLANTIC, WELL,

16   CAN YOU SEARCH FOR HAMAS, THEY SAID, NO, CAN'T.

17           SO, NOW, THIS REQUEST IS AN ATTEMPT TO NARROW AND

18   TAILOR, BUT -- BUT -- BUT UNIVERSAL TAKES ISSUE WITH THE --

19   THAT IT'S A NEW REQUEST.  IT'S NOT A NEW REQUEST.  IT'S AN

20   ATTEMPT TO NARROW AND TAILOR AND USE THE BOULEAN SEARCHES TO

21   COME UP WITH THE SUBSET OF DOCUMENTS THAT IS NARROWER.

22           THE COURT:  ALL RIGHT.  WELL, I DON'T HAVE THE

23   ORIGINAL DEFINITIONS HERE.  WHAT I HAVE IS ON PAGE 105 I HAVE

24   THE RECITATION THAT THE REQUEST -- THIS IS NUMBER 42:

25           "ALL DOCUMENTS THAT RELATE TO THE CONSIDERATION

1              BY ATLANTIC OR ONE BEACON OF POLICY TERMS THAT

2              EXCLUDE LOSS CAUSED BY TERRORISM FOR THE PERIOD

3              '01 THROUGH THE PRESENT."

4              AND I ASSUME THAT THERE ARE SIMILAR ONES TO THAT.

5              MR. SHALAMITSKI:  CORRECT, YOUR HONOR.

6              THE COURT:  OKAY.  GOT IT.

7              MR. SHALAMITSKI:  AND NOW WHAT THE ISSUE IS THOSE

8    DATABASES, THE CLAIMS, WORK, STATION, C.W.S., AND THE IMAGE NOW

9    AND C.W.S., THAT'S THE REPOSITORY THAT HOLDS CLAIMS FILES.

10             THE COURT:  GOT IT.

11             MR. SHALAMITSKI:  SO, IF IT'S A HIT, IT CAN JUST BE

12   PULLED OUT.  AND THAT'S IT.

13             THE COURT:  IF IT'S A HIT, THEY CAN JUST PULL IT OUT.

14   I GOT IT.

15             OKAY.  ALL RIGHT.

16             ANYTHING ELSE?

17             MS. CRAPSTER:  NO, YOUR HONOR.

18             THE COURT:  OKAY.  I'LL GET YOU A RULING SOMETIME

19   THIS WEEK.

20             THANK YOU.

21             MR. SHALAMITSKI:  THANK YOU, YOUR HONOR.

22             (PROCEEDINGS ADJOURNED AT 10:47 A.M.)

23

24

25

1                              C E R T I F I C A T E

2

3

4              I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

5       FROM THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE

6       ABOVE-ENTITLED MATTER.

7

8

9

10      /S/ DOROTHY BABYKIN                      5/28/17

11      _____        _____

12      FEDERALLY CERTIFIED TRANSCRIBER          DATED

13      DOROTHY BABYKIN

14

15

16

17

18

19

20

21

22

23

24

25