UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

| Present: The Honorable | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Kamilla Sali-Suleyman | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**   IN CHAMBERS - COURT ORDER

Before the Court are cross-motions for summary judgment filed by plaintiffs Universal Cable Productions LLC ("UCP") and Northern Entertainment Productions LLC ("NEP") (together, "Plaintiffs") and by defendant Atlantic Specialty Insurance Company ("Atlantic"). (Docket Nos. 57, 61.) Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that these matters are appropriate for decision without oral argument.

**I.   Background**

This is an insurance-coverage dispute brought by Plaintiffs against their insurer, Atlantic. Plaintiffs' operative First Amended Complaint (Docket No. 10) alleges claims for breach of contract and breach of the covenant of good faith and fair dealing. The claims are based on Atlantic's refusal to cover expenses incurred by Plaintiffs when, during the summer of 2014, conditions in Israel caused Plaintiffs to postpone and then relocate the production of their television show.

   **A.   Events in the Summer of 2014**

UCP began filming its television show Dig in Israel in June 2014. Plaintiffs' Statement of Unconverted Facts ("SUF") 29, Docket No. 63; Atlantic's SUF 27, Docket No. 57-1.[1/] At the time that the Dig pilot episode started filming, on June 2, 2014, conditions in Israel were considered safe. Plaintiffs' SUF 29, 30; Atlantic's SUF 29, 30. However, conditions began to destabilize when three Israeli teenagers were kidnapped on June 12, 2014. Hamas was suspected of being involved in the

---

[1/]   The facts presented by the parties are largely the same with respect to the two motions. Because there are relatively few relevant facts and they are not in dispute, the parties' various requests for judicial notice (Docket Nos. 57-2, 62, 74-2, 78, 97) are denied, and evidentiary objections are overruled, as moot unless stated otherwise herein. To the extent they are not moot, the Court overrules any objections relating to the form of evidence rather than the admissibility of facts. See Fed. R. Civ. P. 56(c)(2); see also Frazer v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

kidnapping. Plaintiffs' SUF 31, 32; see Atlantic's SUF 35. Production of the Dig pilot episode was completed on June 26, 2014. Plaintiffs' SUF 33; Atlantic's SUF 67. The show then went on hiatus for pre-production and for preparation to film the next five episodes, with production scheduled to resume on July 20, 2014. Plaintiffs' SUF 34; Atlantic's SUF 67. On or about June 30, 2014, the bodies of the three missing teenagers were found, and it was again reported that there were signs of Hamas's involvement. Plaintiffs' SUF 35; see Atlantic's SUF 36. After allegations were made that Hamas was responsible for the murders, Hamas began firing rockets into Israel, and Israel took action to protect its civilian citizens and to stop Hamas's attacks. Plaintiffs' SUF 36; see Atlantic's SUF 47-48.

Due to the deteriorating security conditions, on July 8, 2014, the United States Department of State issued safety and security of civilians advisories in and around Israel and Jerusalem. Plaintiffs' SUF 37, 38. That same day, Israel launched "Operation Protective Edge," an offensive campaign against Hamas. Atlantic's SUF 56; see Plaintiffs' SUF 36. The production's security team assessed the situation as tensions increased throughout early July. Plaintiffs' SUF 39; see Atlantic's SUF 31-34, 43-44, 52-55, 57. Ultimately, on July 10, 2014, the security team advised the production team that "the security environment in Israel currently prohibits NBCU Security from being able to guarantee the safety and security of our employees, production partners and associated crew and talent." Plaintiffs' SUF 40; see Atlantic's SUF 60, 63.

Thus, on July 11, 2014, UCP decided to postpone, for one week, production of the Dig episodes that had been scheduled to resume on July 20, 2014. Plaintiffs' SUF 41; Atlantic's SUF 68. That same day, UCP informed Atlantic that due to safety concerns for the cast and crew, production of the show was being postponed. Plaintiffs' SUF 42. UCP also told Atlantic that UCP might be compelled to move the Dig production to another location if conditions did not improve. Plaintiffs' SUF 43. On July 16, 2014, the situation deteriorated to the point that the State Department reported that "right now the potential we're looking at is . . . an even greater escalation of violence" in and around Israel. Plaintiffs' SUF 44. UCP decided to move the Dig production out of Israel, and informed Atlantic of its decision on July 17, 2014. Plaintiffs' SUF 45, 46; see Atlantic's SUF 71. Production was relocated to Croatia and New Mexico, and as a result of the delay and relocation, Plaintiffs incurred expenses. Plaintiffs' SUF 47, 48; Atlantic's SUF 72.

The conflict causing the move was referred to worldwide as a war or, because Israel continued Operation Protective Edge for nearly 50 days (between July 8 and August 26, 2014), as the "50-Day War." See Atlantic's SUF 80, 105-08, 110, 111, 113-37.[2] During this time, Hamas and other militant

---

[2] Plaintiffs object to the news sources cited by Atlantic as irrelevant, improper lay opinion, lacking foundation, and hearsay. The news reports are relevant to a lay person's understanding of the meaning of the term "war" generally and of the summer 2014 conflict specifically. Here, and elsewhere, facts concerning events after the decision to relocate the Dig production are relevant at least insofar as they provide context about the conflict. Plaintiffs' other objections are overruled as they relate only to form, and regardless, the news sources are appropriate subjects of judicial notice. See Von Saher v. Norton

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

groups fired over 4,000 rockets and mortar shells into Israel, while the Israeli government conducted over 5,000 airstrikes within Gaza and a 20-day military ground operation in Gaza. Atlantic's SUF 81; see also Plaintiffs' SUF 36, 82. Hamas and Israel carried out seaborne attacks against each other, while Israel also attacked Hamas from the air. Atlantic's SUF 58, 59, 61; see also Docket No. 58 ("Atlantic's Volume of Evidence") Ex. 4 at 52; Atlantic's Volume of Evidence Ex. 5 at 90.[3/] News outlets, the State Department, and the United Nations all reported well over 2,000 Palestinian fatalities, of which at least half were civilians. Atlantic's Volume of Evidence Exs. 4, 5, 36, 60, 69, 73; see Atlantic's SUF 83, 119, 128, 132. It was reported that approximately 11,000 Palestinians were wounded. Atlantic's Volume of Evidence Ex. 4 at 704; see Atlantic's SUF 84. The Israeli Defense Force reportedly lost 67 soldiers and 6 Israeli citizens. Atlantic's Volume of Evidence Ex. 5 at 90; see also Atlantic's Volume of Evidence Ex. 4 at 52 (reporting more than 71 Israeli fatalities, including 5 civilians); Atlantic's Volume of Evidence Ex. 36 at 704 (same). According to a State Department report, "by August 5, hostilities during Operation Protective Edge internally displaced approximately 520,000 persons in Gaza." Atlantic's Volume of Evidence Ex. 5 at 185; see Atlantic's SUF 86. Approximately 10,000 Israelis reportedly were displaced by the conflict. See Atlantic's SUF 86. The damage to infrastructure also was severe: Israeli armed forces destroyed electrical, water, and other public infrastructure, with damage estimates ranging from the equivalent of $4-8 billion. See Atlantic's SUF 87, 88.

    **B.    Hamas**

The Palestinian political identity emerged between 1923 and 1948. Atlantic's SUF 1. In 1947, the United Nations intended to create two states in what are now Israel and Palestine, one Jewish and one Arab. Atlantic's SUF 2. For reasons that are still disputed, it founded only the Jewish state, Israel. Atlantic's SUF 2. In June 1967, the Six-Day War occurred, and Israel gained control over the entire area that constituted Palestine. Atlantic's SUF 6, 7. However, Israel only effectively annexed East Jerusalem and the Golan Heights, leaving the West Bank and Gaza Strip under military occupation. Atlantic's SUF 8.

---

Simon Museum of Art at Pasadena, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." (internal quotation marks omitted)); see also Fed. R. Evid. 201(c)(1) ("The court[] may take judicial notice on its own . . . .").

[3/]    Atlantic's Exhibits 4 and 5 are reports from the United States Congressional Research Service and the State Department's Bureau of Democracy, Human Rights and Labor, respectively. Plaintiffs' objections both to these documents and to Atlantic's cited SUFs are overruled to they extent they relate only to the form of the evidence offered. Moreover, Atlantic has requested that the Court take judicial notice of these exhibits, and the Court concludes that judicial notice is appropriate. See, e.g., United States ex rel. Modglin v. DJO Global Inc., 48 F. Supp. 3d 1362, 1381-82 (C.D. Cal. 2014) ("Under Rule 201, the court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

    In the 1990s, the Palestinian Authority ("PA") was granted limited rule in the Gaza Strip and parts of the West Bank. Atlantic's SUF 11. In 2005, Israel unilaterally withdrew its military forces and all of its civilians from Gaza, leaving at least some amount of control to the PA. Atlantic's SUF 12. According to a Congressional Research Service report, "[a]lthough [it is] not a state, the PA is organized like one—complete with democratic mechanisms; security forces; and executive, legislative, and judicial organs of governance." Atlantic's Volume of Evidence Ex. 4 at 69; Atlantic's SUF 20. The Congressional Research Service identifies Fatah and Hamas as the largest Palestinian political movements, although Hamas also has been characterized as a terrorist group. Atlantic's Volume of Evidence Ex. 4 at 48, 65; Atlantic's Volume of Evidence Ex. 8 at 401, 406-07, 408 n.12, 412.[4]

    In 2006, Hamas (or at least Hamas-backed candidates) won a majority of the seats in the Palestinian Legislative Council. See Atlantic's SUF 13; see also Atlantic's Volume of Evidence Ex. 4 at 69, 72; Atlantic's Volume of Evidence Ex. 8 at 406. And since 2007, when Hamas took over the Gaza Strip from competing factions by force, Hamas has exercised some amount of power and has performed political, military and social welfare activities there. See Atlantic's SUF 14-15. In June 2014, Hamas reached a new agreement with Fatah to establish a consensus PA government. Atlantic's SUF 18.

    C.    **The Insurance Policy and Claim Underlying This Action**

    Beginning in January 2010, following extensive negotiations, Atlantic issued a production policy to NBCUniversal Media, LLC ("NBCUniversal"), insuring against certain risks commonly incurred in connection with television productions. Plaintiffs' SUF 2-4; see Atlantic's SUF 92. The policy was renewed from year to year until issuance of the policy at issue here, Motion Picture/Television Producers Portfolio Policy No. MP00163-04 (the "Policy"), which had an eighteen-month policy period from January 1, 2014 to June 30, 2015. Plaintiffs' SUF 5, 6; Atlantic's SUF 93-94. NBCUniversal is the first Named Insured under the Policy. Plaintiffs' SUF 7; Atlantic's SUF 92. UCP and NEP are production companies and indirect subsidiaries of NBCUniversal, and they are also Named Insureds under the Policy. Plaintiffs' SUF 8, 9; Atlantic's SUF 26. Television productions were added as Insured Productions to the Policy on an individual basis. Plaintiffs' SUF 14.

    As relevant to this dispute, Section III of the Policy, entitled "Extra Expense," provided in pertinent part: "We agree to pay to you such loss (as defined in Paragraph VII) not including loss of earnings or profit, as you sustain by reason of such extra expense you necessarily incur as a result of the interruption, postponement, cancellation, relocation, curtailment or abandonment of an Insured Production . . . ." Atlantic's Volume of Evidence Ex. 44 at 798. Among the qualifications to coverage was the requirement that "[t]he loss must be a direct result of an unexpected, sudden or accidental occurrence entirely beyond your control to include[, among other things,] . . . [i]mminent peril, defined

---

[4]    Atlantic's Exhibit 8 is another report from the Congressional Research Service. As with the exhibits previously discussed, the Court overrules Plaintiffs' objections to this document and also concludes that it is an appropriate subject of judicial notice.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

as certain, immediate and impending danger of such probability and severity to persons or property that it would be unreasonable or unconscionable to ignore." Id. The "Exclusions" portion of this section did not expressly exclude losses caused by acts of terrorism. See id. at 799-801; see also Plaintiffs' SUF 13.

Aon/Albert G. Ruben Insurance Services, Inc. ("Aon"), NBCUniversal's insurance broker, submitted an application to Atlantic for Dig to be added to the Policy as an Insured Production on December 11, 2013. Plaintiffs' SUF 15-16. The application disclosed that production would take place, in large part, in Israel. Plaintiffs' SUF 17. Aon specifically addressed with Atlantic the higher risks associated with producing a television show in Israel. Plaintiffs' SUF 21-24. Atlantic expressed concerns about safety and security but was advised that the production would have an NBCUniversal security team on site as well as coordination with the mayor of Jerusalem and the local police. Plaintiffs' SUF 21, 22. Notwithstanding the implementation of additional security for the production, Aon expressly told Atlantic: "we would like to avoid any deviation from our standard policy terms if possible." Plaintiffs' SUF 24, 25; see Atlantic's SUF 91, 102. On December 12, 2013, and again on January 14, 2014, Atlantic accepted and confirmed coverage for Dig as an Insured Production under the Policy without requiring that any Policy terms be changed. Plaintiffs' SUF 26, 27. Specifically, Atlantic did not add any new or Israel-specific exclusions or endorsements to the Policy, or otherwise change the Policy in any way. Plaintiffs' SUF 27. Atlantic also did not communicate that it intended to exclude from coverage attacks or violence by terrorist groups in Israel; coverage for acts of terrorism was not specifically discussed at all. Plaintiffs' SUF 28.

The Policy did include certain other exclusions. As relevant here, the Policy excluded losses caused directly or indirectly by:

1. War, including undeclared or civil war; or

2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; . . . .

Atlantic's Volume of Evidence Ex. 44 at 778. The policy also included a third exclusion for insurrection and similar events and a fourth exclusion for weapons of war, but the Court need not address these two exclusions in detail. The four exclusions are referred to herein collectively as the "War Exclusions." The words used in the War Exclusions are not defined in the Policy.

On July 15, 2014, Aon submitted to Atlantic a formal notice of the claim on NBCUniversal's and UCP's behalf (the "Claim"). Plaintiffs' SUF 49; Atlantic's SUF 101. Atlantic investigated and evaluated coverage but ultimately denied the Claim, which it explained in a July 28, 2014 letter to NBCUniversal. Plaintiffs' SUF 50-52; see Garber Decl. Ex. 12. In its denial letter, Atlantic conceded that the Claim constituted "imminent peril" and therefore triggered the Extra Expense coverage under the Policy, stating: "Rockets launched [by Hamas] toward areas where filming is taking place would no

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

doubt reasonably constitute a 'certain, immediate and impending danger of such probability and severity to person or property that it would be unreasonable or unconscionable to ignore.' . . . The question now is not whether the loss falls within the insuring clause but whether the war exclusion or the terrorism coverage applies." Plaintiffs' SUF 52, 55; see Garber Decl. Ex. 12 at 87; see also Plaintiffs' SUF 56. Atlantic "concluded that the extra expense associated with the move is not covered under [the Policy] because of the exclusion for war and warlike actions." Plaintiffs' SUF 53; see Garber Decl. Ex. 12 at 87-89. Atlantic's letter discussed the first and second War Exclusions but did not provide comparable analysis of the third and fourth War Exclusions. Garber Decl. Ex. 12 at 87-89.

  **D.**  **Procedural History**

  Plaintiffs filed this action on June 20, 2016. (Docket No. 1.) The operative First Amended Complaint (Docket No. 10) alleges claims for breach of contract and breach of the covenant of good faith and fair dealing. Presently before the Court are the parties' cross-motions for summary judgment. Atlantic seeks summary judgment on both of Plaintiffs' claims, while Plaintiffs seek summary judgment only on their claim for breach of contract.

**II.**  **Legal Standard**

  Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986). "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986); see also Musick v. Burke, 913 F.2d 1390, 1394 (9th Cir. 1990). The moving party must affirmatively show the absence of such evidence in the record, either by deposition testimony, the inadequacy of documentary evidence, or by any other form of admissible evidence. See Celotex, 477 U.S. at 322. The moving party has no burden to negate or disprove matters on which the opponent will have the burden of proof at trial. See id. at 325.

  As required on a motion for summary judgment, the facts are construed "in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). However, the nonmoving party's allegation that factual disputes persist between the parties will not automatically defeat an otherwise properly supported motion for summary judgment. See Fed. R. Civ. P. 56(c). A "mere 'scintilla' of evidence will be insufficient to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" Fazio v. City & Cnty. of San Francisco, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting Anderson, 477 U.S. at 249, 252). Otherwise, summary judgment shall be entered.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

**III.    Discussion**

It is not disputed that absent the War Exclusions, the Claim would have fallen within the Policy's scope of coverage. Plaintiffs' SUF 52, 55; see Garber Decl. Ex. 12 at 87. The central issue in the parties' motions is whether any of the Policy's War Exclusions applied to the Claim.

Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Id. § 1638. Generally, "[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ." Id. § 1639.

By statute, "[t]he words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." Cal. Civ. Code § 1644. "Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense." Id. § 1645. But "if the meaning a layperson would ascribe to contract language is not ambiguous, [California courts] apply that meaning." AIU Ins. Co. v. Superior Court, 799 P.2d 1253, 1264 (Cal. 1990) (in bank).

"In general, interpretation of an insurance policy is a question of law that is decided under settled rules of contract interpretation. While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." State v. Cont'l Ins. Co., 281 P.3d 1000, 1004 (Cal. 2012) (citations omitted) (internal quotation marks omitted). Following the principle that ambiguities should be resolved against the party causing them, see Cal. Civ. Code § 1654, "[i]n the insurance context, [California courts] generally resolve ambiguities in favor of coverage. Similarly, [California courts] generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured." AIU, 799 P.2d at 1264 (footnote omitted) (citations omitted). But "where the policyholder does not suffer from lack of legal sophistication or a relative lack of bargaining power, and where it is clear that an insurance policy was actually negotiated and jointly drafted, [courts] need not go so far in protecting the insured from ambiguous or highly technical drafting." Id. at 1265.

  **A.  The First War Exclusion**

The first War Exclusion excludes coverage for loss caused by "[w]ar, including undeclared or civil war." Atlantic's Volume of Evidence Ex. 44 at 778. The parties dispute whether to give "war" its ordinary and popular meaning, as Atlantic contends is appropriate, or a specialized insurance definition, as Plaintiffs contend is appropriate.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

      1.      Ordinary Meaning

      Applying the word's ordinary and popular sense, the Court has little trouble concluding that the events occurring in Israel and Gaza in the summer of 2014 constituted war.  The conflict following the June 2014 kidnapping and subsequent murder of three Israeli teenagers entailed rocket fire and mortar shells from Hamas into Israel, airstrikes and a ground operation in Gaza by Israel, and seaborne attacks from both sides.  In the end, there were substantial casualties on both sides, many wounded, hundreds of thousands displaced, and billions of dollars in damage to infrastructure.  To be sure, these figures reflect the entire 50-day period of hostilities, which continued for over a month after the Dig production was moved out of Israel.  However, these numbers give a sense of the degree of violence, which indisputably began, and continued to escalate, prior to the decision to relocate.  Such a conflict easily would be considered a "war" by a layperson.  See Haynes v. Farmers Ins. Exch., 89 P.3d 381, 389 (Cal. 2004) (stating that an insurance policy "should  be read as a layman would read it and not as it might be analyzed by an attorney or an insurance expert.").  This assessment also is confirmed by the references to the conflict as a war by news outlets around the world.

      Dictionaries further confirm this conclusion.  Prior to the time of the Policy's issuance, Black's Law Dictionary defined (and still defines) war as "[h]ostile conflict by means of armed forces, carried on between nations, states, or rulers, or sometimes between parties within the same nation or state; a period of such conflict," or, more simply, "[a] dispute or competition between adversaries."  War, Black's Law Dictionary (9th ed. 2009); War, Black's Law Dictionary (10th ed. 2014).  Similarly,  Merriam-Webster's Collegiate Dictionary defined (and continues to define) war as, among other things, "a state of hostility, conflict, or antagonism" or "a struggle or competition between opposing forces or for a particular end." War, Merriam-Webster's Collegiate Dictionary (10th ed. 2001); War, Merriam-Webster, https://www.merriam-webster.com/dictionary/war (last accessed October 5, 2017).  Indeed, Black's Law Dictionary even notes the term "mixed war," which refers to "[a] war between a nation and private individuals."  War, Black's Law Dictionary (9th ed. 2009); War, Black's Law Dictionary (10th ed. 2014).  Clearly, then, the ordinary meaning of "war" applies to the summer 2014 conflict, as it arose between two adversaries or opposing forces and it reflected a high degree of hostility.

      Courts need not "belabor the question of whether [a word] is ambiguous in the abstract or in some hypothetical circumstance"; "[t]he proper question is whether the word is ambiguous in the context of this policy and the circumstances of this case."  Bay Cities Paving & Grading v. Lawyers' Mut. Ins. Co., 855 P.2d 1263, 1271 (Cal. 1993) (emphasis in original).  Here, the events causing the relocation of the Dig production constitute a "war," and therefore the first War Exclusion applies.  Consequently, regardless of the circumstances of the Policy's negotiation, the Court has no reason to construe the terms of the Policy against Atlantic.  See Producers Dairy Delivery Co. v. Sentry Ins. Co., 718 P.2d 920, 924 (Cal. 1986) ("It is a basic principle of insurance contract interpretation that doubts, uncertainties and ambiguities arising out of policy language ordinarily should be resolved in favor of the insured in order

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

to protect his reasonable expectation of coverage. It is also well established, however, that this rule of construction is applicable only when the policy language is found to be unclear." (citations omitted)).[5]

    2.    Technical Meaning

Plaintiffs do not present specific evidence from the negotiation or drafting of the Policy reflecting the parties' intention to use any technical or special meaning of "war." Rather, Plaintiffs provide expert testimony that the insurance industry distinguishes between war and terrorism, and Plaintiffs argue that "in the insurance context, courts have repeatedly held [war to] require the existence of a conflict between two sovereign or quasi-sovereign entities." (Plaintiffs' Mem. P. & A. in Supp. of Plaintiffs' Mot. at 10; see Plaintiffs' Mem. P. & A. in Opp'n to Atlantic's Mot. at 6.) Plaintiffs cite three cases to support the latter argument: Pan Am. World Airways v. Aetna Cas. & Sur. Co., 505 F.2d 989 (2d Cir. 1974); Holiday Inns Inc. v. Aetna Ins. Co., 571 F. Supp. 1460 (S.D.N.Y. 1983); and Ennar Latex v. Atl. Mut. Ins. Co., No. 94 CIV 150 (JFK), 1995 WL 325640, 1995 U.S. Dist. LEXIS 7386 (S.D.N.Y. May 30, 1995). Plaintiffs also cite Weiss v. Arab Bank, PLC, No. 06 CV 1623(NG)(VVP), 2007 WL 4565060, 2007 U.S. Dist. LEXIS 94029 (E.D.N.Y. Dec. 21, 2007), for the proposition that Hamas is a terrorist group and cannot constitute a military force of any origin. Weiss involved civil claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 et seq., and specifically involved an analysis of whether liability was precluded by an exception for acts of war. However, the statute specifically defines "act of war," see 18 U.S.C. § 2331(a), and so the case is of little use here.

Regardless of the decisions in these three cases, which are not binding on this Court, California law requires the Court to apply the Policy's terms pursuant to their ordinary and popular sense. Plaintiffs provide no direct evidence that the parties or Aon had in mind the more restrictive meaning of "war" discussed in Pan Am or Holiday Inns when the Policy was negotiated. Even accepting Plaintiffs' assertions about industry custom and their absolute distinctions between war, on the one hand, and the acts of terrorist groups, on the other, Plaintiffs' arguments fail because Plaintiffs wrongly assume that Hamas must be considered a terrorist group for all purposes.

For the reasons discussed in the previous section, the meaning that a layperson would give to "war" is not ambiguous and encompass the summer 2014 conflict, and so the Court must apply that meaning. See AIU, 799 P.2d at 1264. Plaintiffs' attempt to present an alternative meaning as reflecting the parties' intended special or technical meaning fails because it contradicts the clear language of the Policy. See Supervalu, Inc. v. Wexford Underwriting Managers, Inc., 96 Cal. Rptr. 3d 316, 325 (Ct. App. 2009) ("The problem is that the declarants suggest an industry definition of occurrence that is antithetical to the contractual language. . . . Parol evidence is not admissible to flatly contradict the

---

[5] Moreover, Aon, who negotiated the Policy with Atlantic, was not unsophisticated, and the terms of the Policy generally followed from Aon's standard form. There thus is no reason why the Court should construe any ambiguity in the first War Exclusion against Atlantic. See AIU, 799 P.2d at 1264-65.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

express terms of an agreement. The contractual language is not reasonably susceptible to Supervalu's interpretation." (citation omitted) (internal quotation marks omitted)). In the common meaning, "war" can include conflicts both between sovereign entities and between other groups; the word does not require a detailed assessment of the structure of one or more of the parties to the conflict or their precise international standing. Plaintiffs offer no evidence to demonstrate that the individuals negotiating the Policy intended anything other than the plain and ordinary meaning, and the fact that other courts have interpreted similar insurance policy provisions in a different manner does not alter this Court's conclusion. See id. ("Section 1644 does not trump this analysis. Supervalu did not advert to evidence that the parties used occurrence in a technical sense or gave it special meaning. By this we mean that the declarants did not set forth evidence that the parties negotiated the contract language. They simply declared the meaning given to the word in the industry. Under section 1645, technical words cannot be interpreted as usually understood by persons in the insurance industry if the words are clearly used in a different sense. . . . Moreover, section 1644 is just one of many rules, and it is still subject to the prohibition . . . against extrinsic evidence that does not support a reasonable interpretation. And, in our view, the policy language is clear and explicit and does not involve an absurdity. Pursuant to sections 1638 and 1639, the language must govern.").

At any rate, Pan Am and Holiday Inns are distinguishable from this case. In Pan Am, the Second Circuit considered whether the hijacking and subsequent destruction of an aircraft by two men acting for the Popular Front for the Liberation of Palestine ("PFLP") fell within an insurance policy exclusion for war. The court remarked that "[t]he cases establish that war is a course of hostility engaged in by entities that have at least significant attributes of sovereignty" and that "English and American cases dealing with the insurance meaning of 'war' have defined it in accordance with the ancient international law definition: war refers to and includes only hostilities carried on by entities that constitute governments at least de facto in character." 505 F.2d at 1012. In that case, the exclusion was held not to apply because "the loss of the [aircraft] was in no sense proximately caused by any 'war' being waged by or between recognized states. The PFLP has never claimed to be a state. The PFLP could not have been acting on behalf of any of the states in which it existed when it hijacked the [aircraft], since those states uniformly opposed hijacking." Id. at 1013. The court rejected the argument that a guerilla group could wage a "war," explaining that other cases "imply that a guerrilla group must have at least some incidents of sovereignty before its activity can properly be styled 'war.'" Id. Ultimately, the court held that no such conflict was present in the case before it because the hijacking's connection to any war between the PFLP and Israel was too tenuous. Id. at 1015. The court also noted:

> The loss of the Pan American 747 was not caused by any act that is recognized as a warlike act. The hijackers did not wear insignia. They did not openly carry arms. Their acts had criminal rather than military overtones. They were the agents of a radical political group, rather than a sovereign government.

Id. at 1015.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

In <u>Holiday Inns</u>, the court considered whether an insurance policy with an exclusion for, among other things, war covered damage to a hotel in Beirut, Lebanon, between October 1975 and April 1976 during a conflict among different religious factions. Following <u>Pan Am</u>, the <u>Holiday Inns</u> court stated that "[f]or insurance purposes . . . '[w]ar can exist between quasi-sovereign entities.' It follows that 'war' does <u>not</u> include 'conflicts waged by guerrilla groups regardless of such groups' lack of sovereignty.'" 571 F. Supp. at 1465 (emphasis in original) (quoting <u>Pan Am.</u>, 505 F.2d at 1013). In another portion of the opinion, the court added that "<u>Pan Am</u> does not undertake detailed definitions of 'entities that have at least significant attributes of sovereignty,' 'governments at least de facto in character,' and 'quasi-sovereign entities.' To my mind the phrases appear to be interchangeable." <u>Id.</u> at 1499. Thus, "[i]t is not sufficient to achieve such status that the group or entity in question occupy territory within the boundary of the sovereign state upon the consent of that state's <u>de jure</u> government. That is so, even if that government's consent extends to permitting its guests to exercise considerable control and autonomy within the camps or other facilities in which they dwell. 'De facto governments' manifest 'attributes of sovereignty' when they stake out and maintain adverse claims to territory, accompanying those claims with declarations of independence and sovereignty." <u>Id.</u> at 1500.

The <u>Holiday Inns</u> court ultimately concluded that the war exclusion at issue in that case did not apply, explaining why different groups were not quasi-sovereigns:

> There is no substance to th[e] suggestion [that the Phalange had quasi-sovereign status]. I accept that the Phalange, and those factions allied with them, "considered themselves the defenders of the Lebanese state," or, to state it more precisely, the defenders of the status quo. But it hardly follows that the Phalange, in defending the state, became the state, or achieved any attributes of sovereignty, as those attributes are defined by case law. The Phalange was a private militia. Its chief was Pierre Gemayel. The sovereign state of Lebanon was administered de jure by its government, consisting of president, prime minister, lesser ministers, and parliament. The most important officers of the government were President Franjieh and Prime Minister Karami. They never left office during the pertinent times. Subsequently, Sarkis succeeded Franjieh as president, as the result of parliamentary action. The parliament functioned under considerable difficulty, to be sure, but it functioned nonetheless; there was always an identifiable Lebanese government . . . .
>
> . . .
>
> Aetna contends that the P.L.O. was a quasi-sovereign entity; and since a time came when Syrian forces were in combat with Palestinians, a war existed between Syria and the P.L.O. I reject this argument for several reasons.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

> First, I do not accept that the P.L.O. claimed or demonstrated those attributes of sovereignty which the cases require. The P.L.O. was formed in 1964, when representatives of various Palestinian groups met in Jerusalem for the purpose. . . . [The Cairo Agreement with the Lebanese government in November 1969] governed the continuing Palestinian presence in Lebanon. . . . [T]he P.L.O. in this document specifically recognized Lebanese sovereignty and undertook not to disturb it.
>
> In consequence, the Palestinians' presence in Lebanon occurred with the consent of the de jure government. . . .
>
> . . .
>
> Secondly, the Palestinians in Lebanon did not have that unified structure and purpose which Aetna's references to the P.L.O. would suggest. In point of fact, the Palestinians within Lebanon were divided among themselves as to what the policy should be. . . .
>
> While the P.L.O. received certain recognitions and courtesies from the United Nations and the Arab League, they do not rise to the level of the status of a sovereign state, or that of an entity exercising the powers of de facto government within the boundaries of the Republic of Lebanon.

571 F. Supp. at 1501-02.

Here, whatever its precise status, Hamas is neither a guerrilla group nor a private militia as discussed in those cases; it is a distinct group that exercises control, directly or indirectly, over the Gaza Strip, and it engages in common governmental activities. Unlike the PFLP, discussed in Pan Am, Hamas seeks to establish a state and exercises power in the PA. Hamas is a readily identifiable group that was openly engaged in a protracted campaign of violence during the 2014 conflict, and it is apparent from news characterizations of the hostilities as a war that Hamas's actions would best be described, to put it mildly, as having military overtones.

As to Holiday Inns, unlike the Phalange, Hamas participated in the formation of the government in Palestine and the continuing exercise of government-like powers. To put it another way, Hamas is not as distinct from the PA in the Gaza Strip as the Phalange was from the Lebanese government. And unlike the P.L.O., Hamas is not subject to any agreement not to disturb the Israeli government – indeed, Hamas's charter commits it "to the destruction of Israel and the establishment of an Islamic state in all of historic Palestine." Atlantic's SUF 10; see Plaintiffs' SUF 80, 81.

Hamas is not the only Palestinian political faction, and the parties do not dispute that the factions fundamentally disagree as to how to achieve their objective of establishing a state of Palestine.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

Plaintiffs' SUF 80.  But in June 2014, just prior to the conflict, Hamas agreed with Fatah to establish a PA government, demonstrating Hamas's power in the area and its ties to the government-like authority serving the area.  Thus, even if often described as a terrorist organization, Hamas has sufficient characteristics of a sovereign entity that it can wage "war" within the meaning of the Policy.

The language of the particular policy provisions at issue in Ennar Latex sufficiently differ from those here that the case is of little aid.  Plaintiffs' most detailed discussion of the case comes in Plaintiffs' argument that Hamas may not be considered a sovereign or a quasi-sovereign as a policy matter.  (See Plaintiffs' Mem. P. & A. in Supp. of Plaintiffs' Mot. at 17.)  Plaintiffs argue that only the Executive Branch can decide whether Hamas is a quasi-sovereign, asserting that "[w]ere this Court to find that Hamas is a sovereign or quasi-sovereign, it would damage U.S. interests and policies in the Middle East by conferring on Hamas a legitimacy that would be contrary to the foreign policy position of the U.S. government."  (Id. at 17-18.)  In Ennar Latex, the court concluded that the claimed loss was covered by a special war-risk policy, and in doing so, the court reasoned that the group responsible for the loss was distinct from the country's government.  See 1995 WL 325640, at *5-6.  The court remarked that "[i]t is not for this Court to recognize a de facto government; rather, that is the role of the executive branch."  Id. at *5.  Notwithstanding the Ennar Latex court's comment, this Court is not aware, and Plaintiffs do not identify, any list of quasi-sovereigns that the United States maintains that this Court could somehow subvert by acknowledging Hamas's obvious power in Gaza.  Moreover, the United States's designation of Hamas as a terrorist organization does not mean that it cannot also be a de facto government for purposes of this dispute.  The Secretary of State may designate any "foreign organization" as a "foreign terrorist organization" if it engages in "terrorist activity" threatening the United States—the statute does not say that a government cannot be designated such an organization.  See 8 U.S.C. § 1189.

In sum, the Policy at issue in this case is not ambiguous, and the Court cannot consider anything other than the plain meaning of its words.  However, even under a more restrictive interpretation of "war" suggested by Plaintiffs, the expenses incurred as a result of the summer 2014 conflict fall within the Policy's first War Exclusion.  Atlantic therefore properly denied coverage for the Claim.

### B. The Second War Exclusion

The second War Exclusion applies to loss caused by "[w]arlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents."  Atlantic's Volume of Evidence Ex. 44 at 778.  As with the first War Exclusion, Plaintiffs argue that there was no "warlike action" because Hamas is not a sovereign or a quasi-sovereign.  Atlantic contends that the expenses incurred in this case were caused by the escalation of hostilities following Israel's use of its military and that, regardless, Hamas's attacks qualify as warlike actions by the "military force" of an "other authority."

It is true that courts have held in other contexts that Hamas is a terrorist group and therefore not a sovereign or a military force.  See Weiss, 2007 WL 4565060, at *6 ("To describe, in common parlance,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

as the Complaint does, that the terrorists engage in military or paramilitary-type activities does not mean that HAMAS . . . is a 'military force' within the meaning of the ATA's 'act of war' exclusion. On the contrary, as explained above, there is no sound basis for concluding that the term 'military force,' as used in the ATA, encompasses designated terrorist groups."). But the fact that courts in other contexts or the ATA distinguish between acts of terrorism and the actions of a sovereign's military does not change that interpretation of the Policy in this case turns on the Policy's language as understood in its words' ordinary and popular sense. See Cal. Civ. Code §§ 1638, 1644.

A lay reading of the first two War Exclusions suggests that the second War Exclusion is broader than the first. Whatever meaning is ascribed to "war," the term "warlike actions" contemplates additional events not falling within that meaning. See *Warlike*, Merriam-Webster's Collegiate Dictionary (10th ed. 2001) (defining "warlike" as, among other things, "of, relating to, or useful in war" or "befitting or characteristic of war or a soldier"); Warlike, Merriam-Webster, https://www.merriam-webster.com/dictionary/warlike (last accessed October 5, 2017) (same); see also *-like*, Merriam-Webster's Collegiate Dictionary (10th ed. 2001) (defining the adjective combining form "-like" as "resembling or characteristic of"); Like, Merriam-Webster, https://www.merriam-webster.com/dictionary/like (last accessed October 5, 2017) (same). The Court has already concluded that the Israeli-Hamas conflict in the summer of 2014 is accurately labeled a war, but even if it is not, the hostilities–on both sides–certainly qualify as "warlike."

Indeed, much of the Court's discussion in the previous section applies here was well. While Hamas may not be formal government and the PA may not be a state, Hamas qualifies as a quasi-sovereign or something sufficiently similar for purposes of this dispute. In the summer 2014 conflict, both sides attacked from land, sea, and air, using weapons such as missiles and rockets. Such hostilities could only be described as "warlike action by . . . military force[s]." And because the Exclusion contemplates an "other authority['s]" "warlike action" using "other agents" – which are distinguished from "military personnel" – the Policy does not require that military force have been used by a formal military. This indicates that the second War Exclusion does not depend on the determination of sovereignty that Plaintiffs suggest. Because Hamas, a sufficiently sovereign entity, took warlike action using military force, the second War Exclusion applies.

Dictionaries confirm that the ordinary meaning of the terms in the second War Exclusion is broader than the restrictive meaning offered by Plaintiffs. The definition of "military" may, but does not always, require some tie to a formal sovereign state. See *Military*, Merriam-Webster's Collegiate Dictionary (10th ed. 2001) (defining "military," when used as an adjective, as, among other things, "of or relating to soldiers, arms, or war" or "of or relating to armed forces"); Military, Merriam-Webster, https://www.merriam-webster.com/dictionary/military (last accessed October 5, 2017) (same); *Military*, Black's Law Dictionary (9th ed. 2009) ("[o]f, relating to, or involving the armed forces" or "[o]f, relating to, or involving war"); *Military*, Black's Law Dictionary (10th ed. 2014) (same). The same is true of the word "authority." See *Authority*, Merriam-Webster's Collegiate Dictionary (10th ed. 2001) (defining "authority" as, among other things, "persons in command; specif : GOVERNMENT"); Authority, Merriam-Webster, https://www.merriam-webster.com/dictionary/authority (last accessed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

October 5, 2017) (same); *Authority*, Black's Law Dictionary (9th ed. 2009) (defining the term as, among other things, "[g]overnmental power or jurisdiction" or "[a] governmental agency or corporation that administers a public enterprise"); *Authority*, Black's Law Dictionary (10th ed. 2014) (providing, among others, the following definitions: "[t]he power a person has through an official position; governmental power or jurisdiction"; and "[a]n official organization or government department with particular responsibilities and decision-making powers; esp., a governmental agency or corporation that administers a public enterprise"). Neither of these terms necessarily requires the formal recognition of sovereign status that Plaintiffs would require of Hamas for the second War Exclusion to apply.

Regardless, Israel is indisputably a sovereign state, and its actions directly or indirectly contributed to the situation that caused postponement and relocation of the Dig production. It is not disputed that Israel took action to counter Hamas's attacks. Thus, Israel, too, took warlike action using military force, and for this additional reason, the second War Exclusion applies. Indeed, the clear language of the second War Exclusion requires warlike action only by one side, and so application of the Exclusion does not depend on Hamas's status.

For each of these reasons, the second War Exclusion precludes coverage for the Claim.

### C. The Third and Fourth War Exclusions

The parties also dispute whether the third and fourth War Exclusions apply to the Claim. Because the Court has concluded that the first and second War Exclusions apply, the Court need not address the other War Exclusions.

### D. Bad Faith

Atlantic contends that it cannot be held to have acted in bad faith because it properly denied coverage, and even if not, its interpretation that the War Exclusions applied was reasonable. In opposition, Plaintiffs argue the opposite on both counts, and also argue that Atlantic failed to properly investigate the Claim.

"It has long been recognized in California that '[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' This principle applies equally to insurance policies . . . ." Kransco v. Am. Empire Surplus Lines Ins. Co., 2 P.3d 1, 8 (Cal. 2000) (citation omitted). "[T]here are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." Love v. Fire Ins. Exch., 271 Cal. Rptr. 246, 255-56 (Ct. App. 1990); see Grebow v. Mercury Ins. Co., 194 Cal. Rptr. 3d 259, 272 (Ct. App. 2015).

Here, the Court has concluded that the Claim fell within the first and second War Exclusions, Atlantic properly denied coverage, and therefore there was no breach of contract. As a result, the claim

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

of bad faith or unfair dealing must fail. See Kransco, 2 P.3d at 14 ("Of course, without coverage there can be no liability for bad faith on the part of the insurer."); see also Avery Dennison Corp. v. Allendale Mut. Ins. Co., 310 F.3d 1114, 1117 (9th Cir. 2002) ("Except perhaps in highly extraordinary circumstances, California does not permit recovery on a bad faith claim unless insurance benefits are due under the policy."). However, even if the Court concluded otherwise, the Court still would find that Atlantic did not deny the claim in bad faith.

An insurer must have withheld benefits for an unreasonable reason or without proper cause in order to be found to have acted in bad faith. See Love, 271 Cal. Rptr. at 255-56. The California Court of Appeal has explained:

> . . . ['A]llegations which assert such a claim must show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement. Just what conduct will meet these criteria must be determined on a case by case basis and will depend on the contractual purposes and reasonably justified expectations of the parties."
>
> . . .
>
> It is now settled law in California that an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract.

Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co., 108 Cal. Rptr. 2d 776, 784 (Ct. App. 2001) (citations omitted); see Century Sur. Co. v. Polisso, 43 Cal. Rptr. 3d 468, 487 (Ct. App. 2006).

Here, there is, at the very least, a reasonable argument that the Claim fell within the first and second War Exclusions. Indeed, Atlantic's letter denying coverage of the Claim reflected much the same analysis. (See Garber Decl. Ex. 12.) Atlantic therefore cannot be said to have acted on an unreasonable basis or without proper cause.

It is true, as Plaintiffs argue, that "an insurer [must] fully inquire into possible bases that might support the insured's claim before denying it." Wilson v. 21st Century Ins. Co., 171 P.3d 1082, 1087 (Cal. 2007). Plaintiffs rely primarily on the fact that Atlantic made a decision within a few days and on

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4435 PA (MRWx) | Date | October 6, 2017 |
|---|---|---|---|
| Title | Universal Cable Productions LLC, et al. v. Atlantic Specialty Insurance Co. | | |

their own arguments that the War Exclusions do not apply because Hamas is a terrorist organization, not a government that is recognized by the United States. (Plaintiffs' Opp'n at 23-24.) Even if Atlantic's decision-making occurred abnormally quickly, Atlantic did not act in bad faith just because it reached a coverage decision with which Plaintiffs disagree, or that it did so promptly. Nor did Atlantic overlook unfavorable facts by not considering whether the United States had designated Hamas a terrorist organization. Plaintiffs wrongly assume again that "war" within the meaning of the Policy depends on the status bestowed on one of the combatant groups by a third-party government, and that it is unreasonable to believe otherwise.

Finally, Plaintiffs contend that Atlantic fraudulently misrepresented the terms of an endorsement to the Policy to falsely claim that there was no terrorism coverage. (Plaintiffs' Opp'n at 24.) But Atlantic's denial letter simply quoted the endorsement and stated that "[t]he terrorism coverage should not apply." (See Garber Decl. Ex. 12 at 87.) Atlantic's use of the definite article "the" and its reference to specific language in the endorsement make it clear that Atlantic was discussing only that particular provision; Atlantic did not, as Plaintiffs would suggest, make any broad statements about whether the Policy covered acts of terrorism. (See Garber Decl. Ex. 12.)

"An insurer's good or bad faith must be evaluated in light of the totality of the circumstances surrounding its actions." Wilson, 171 P.3d at 1088. In the circumstances of this case, Atlantic acted reasonably in denying coverage. Accordingly, Plaintiffs' claim of bad faith must fail.

## Conclusion

Atlantic is entitled to summary judgment on both of Plaintiffs' causes of action in the First Amended Complaint, and Plaintiffs' motion for partial summary judgment must be denied. The Court will enter a Judgment consistent with this order.

IT IS SO ORDERED.