**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS, LLC, a Delaware limited liability company; NORTHERN ENTERTAINMENT PRODUCTIONS, LLC, a Delaware limited liability company, | No.17-56672 |
| | D.C. No. 2:16 cv-04435 PA |
| *Plaintiffs-Appellants*, | |
| | OPINION |
| v. | |
| ATLANTIC SPECIALTY INSURANCE COMPANY, a New York insurance company, | |
| *Defendant-Appellee.* | |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted March 4, 2019
Pasadena, California

Filed July 12, 2019

Before: Ransey Guy Cole, Jr.,[*] A. Wallace Tashima,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Tashima

---

**SUMMARY[**]**

---

**Insurance Law**

The panel reversed in part and vacated in part the district court's summary judgment in favor of Atlantic Specialty Insurance Company in a diversity insurance coverage action brought by Universal Cable Productions against its insurer, Atlantic.

Universal sought to recover for expenses incurred when they moved production of the television series *Dig* out of Jerusalem after Hamas fired rockets from Gaza into Israel. Atlantic denied coverage based on the insurance policy's war exclusions.

The panel applied California law.

Under the doctrine of contra proferentem, any ambiguity in a policy exclusion is generally construed against the

---

[*] The Honorable Ransey Guy Cole, Jr., United States Chief Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

insurer and in favor of the insured.  The panel declined to apply contra proferentem either in favor of Universal's interpretation, or in favor of Atlantic.

The panel held that the district court erred in holding that Atlantic met its burden of demonstrating that the first two war exclusions applied.  The panel further held that to the contrary, the record demonstrated that neither exclusion applied here, and Atlantic breached its insurance contract by denying Universal coverage on that basis.  Specifically, the panel held that Atlantic breached its contract when it denied coverage by defining Hamas' conduct as "war" and "warlike action by a military force."   The panel also held that the district court erred when it failed to apply the specialized meaning, pursuant to Section 1644 of the California Civil Code, of those two terms. The panel held that the specialized meaning of both "war" and "warlike action by a military force" required hostilities to be between either de jure or de facto sovereigns, and Hamas constituted neither. The panel directed the entry of summary judgment in favor of Universal on these two exclusions.

Because the district court did not address the third war exclusion – whether Hamas' actions constituted "insurrection, rebellion, or revolution" – the panel remanded for the district court to address that question in the first instance.

The panel held that the district court's summary judgment on Universal's bad faith claim was predicated on its erroneous analysis of the first and second war exclusions. Because the panel concluded that Atlantic breached its contract, and because there were remaining triable issues of fact, the panel vacated the grant of summary judgment on

Universal's bad faith claim, and remanded for further proceedings.

The panel denied Atlantic's motion to strike as moot. The panel denied Atlantic's request for sanctions.

## COUNSEL

Amanda Kate Bonn (argued) and Kalpana Srinivasan, Susman Godfrey LLP, Los Angeles, California; Jacob W. Buchdahl, Susman Godfrey LLP, New York, New York; for Plaintiffs-Appellants.

Margaret A. Grignon (argued) and Anne M. Grignon, Grignon Law Firm LLP, Long Beach, California; Michael Keeley and Carla. C. Crapster, Strasburger & Price LLP, Dallas, Texas; for Defendant-Appellee.

## OPINION

TASHIMA, Circuit Judge:

In late June and through July of 2014, Hamas fired rockets from Gaza into Israel.  Because of these hostilities, the plaintiffs, Universal Cable Productions, LLC, and Northern Entertainment Productions, LLC (collectively "Universal"), moved the production of their television series *Dig* out of Jerusalem.  Universal incurred significant expenses during this move and filed an insurance claim for coverage of those costs under a television production insurance policy (the "Policy").

Universal's insurer, defendant Atlantic Specialty Insurance Company ("Atlantic"), denied coverage, stating that although the Policy covered expenses related to terrorism, the hostilities were excluded from coverage. Atlantic relied on the Policy's war exclusions, which excluded coverage for expenses resulting from "war," "warlike action by a military force," or "insurrection, rebellion, [or] revolution." Atlantic concluded that Hamas' actions were excluded acts of war.

Universal responded that these war exclusions did not apply because the terms had a specialized meaning in the insurance context. Specifically, "war" and "warlike action by a military force" required hostilities between de jure or de facto sovereigns. Universal argued that Hamas was not acting as a sovereign, and thus its actions were not excluded from coverage.

The district court granted summary judgment to Atlantic and held that, instead of the specialized meanings of "war" and "warlike action," the relevant definitions were the ordinary and plain meanings of each term. The district court held that under its interpretation, Hamas' actions clearly constituted "war" and "warlike action by a military force," rather than acts of terrorism. Based on its interpretation of those two exclusions, the district court also granted summary judgment to Atlantic on Universal's bad faith claim.[1]

Although this case concerns the Israeli-Palestinian conflict and hostilities between different factions in the region, the legal analysis boils down to simple contractual

---

[1] The district court did not reach the third war exclusion, i.e., whether Hamas' actions constituted "insurrection, rebellion, or revolution."

interpretation.  Section 1644 of the California Civil Code requires us to apply the specialized meaning of a term – instead of the plain, ordinary meaning – when that specialized meaning has been developed from customary usage in a given industry and when both parties have constructive notice of that usage.  Both "war" and "warlike action by a military force" have a specialized meaning in the insurance context and the parties had, at the least, constructive notice of the meaning.  The district court erred when it failed to apply that meaning.  Under that specialized meaning, both "war" and "warlike action by a military force" require hostilities between either de jure or de facto sovereigns, and Hamas constitutes neither.

Accordingly, we reverse the district court's entry of summary judgment in favor of Atlantic on the first two war exclusions and hold that Atlantic breached its contract when it denied coverage by defining Hamas' conduct as "war" or "warlike action by a military force."  Because the district court did not address the third war exclusion – whether Hamas' actions constituted "insurrection, rebellion, or revolution" – we remand for the district court to address that question in the first instance.  The district court's grant of Atlantic's motion for summary judgment on Universal's bad faith claim turned on its erroneous analysis of the first two war exclusions; accordingly, we vacate the grant of summary judgment on Universal's bad faith claim and remand for proceedings consistent with this opinion.

UNIVERSAL CABLE V. ATLANTIC SPECIALTY INS.      7

# I. Background

## A. Historical Background

We begin with the history between Israel, Palestine, and Hamas.[2]  The Palestinian political identity emerged between 1923 and 1948.   Jim Zanotti, *Cong. Research Serv.*, RL34074, *The Palestinians: Background and U.S. Relations* 2 (2015) ("2015 CRS Palestine Report").  In 1947, the United Nations intended to create two states in what are now Israel and Palestine – one Jewish and one Arab – but for reasons that are still disputed, the U.N. ultimately founded only the Jewish state of Israel.  *Id.*  In June 1967, Israel gained control over the entire area that had historically constituted Palestine. *Id.* at 3.  Ultimately, Israel annexed only East Jerusalem and the Golan Heights, leaving the West Bank and Gaza under Israeli occupation, but not under Israeli governance.  *Id.*

In the mid-1990s, the Palestinian Authority was granted limited rule in Gaza and parts of the West Bank.  *Id.* at 4, 26. In 2005, Israel unilaterally withdrew from Gaza, leaving control to the Palestinian Authority.  *Id.* at 47. According to a U.S. Congressional Research Service report, "[a]lthough not a state, the [Palestinian Authority] is organized like one – complete with democratic mechanisms; security forces; and executive, legislative, and judicial organs of governance." *Id.* at 26.   The legislative branch is called the Palestinian Legislative Council.  *Id.*  Fatah and Hamas are the largest Palestinian political movements.  *Id.* at 48.

---

[2] We rely on the parties' submissions in the record to conduct this brief historical analysis of the conflict.

8      UNIVERSAL CABLE V. ATLANTIC SPECIALTY INS.

Hamas was founded in 1987. Jim Zanotti, *Cong. Research Serv.*, R41514, *Hamas: Background and Issues for Congress* 400 (2010) ("2010 CRS Hamas Report"). Hamas is committed "to the destruction of Israel and the establishment of an Islamic State in all of historic Palestine, comprised of present-day Israel, the West Bank, and Gaza." 2015 CRS Palestine Report at 33. Hamas' command center is in Gaza. *Id.* In 2006, Hamas won a majority of the seats in the Palestinian Legislative Council. *Id.* at 26. Since then, Hamas has provided social services in the Gaza Strip, collected revenue, established a judicial branch of sorts, and received some assistance from foreign governments. According to the Congressional Research Service, there has been tension between Hamas' activities as a "militant organization uncompromisingly opposed to Israel in defiance of international opprobrium" and Hamas' activities as a "de facto government in Gaza." 2010 CRS Hamas Report at 17. Hamas itself has drawn "a bright line bifurcating the organization's leadership from its members in the Gaza government." *Id.* at 18. Furthermore, the same Report notes that any reference "to the government in Gaza as the 'Hamas regime' does not mean that all or even most of the people employed in ministries, civil service positions, and even security forces are necessarily members of Hamas or even Hamas sympathizers." *Id.* at 19.

In June 2014, Hamas reached an agreement with Fatah to establish a consensus Palestinian Authority government. 2015 CRS Palestine Report at 1. As part of the agreement, Hamas agreed to give up any formal responsibility for governing Palestine, and Hamas' members no longer served as government ministers. *Id.* at 1, 29. Nevertheless, Hamas' security forces remained in Gaza and have continued to exercise some control there. *Id.* at 29.

The United States has never recognized Palestine or Gaza as sovereign territorial nations, nor has it ever recognized Hamas as a sovereign or quasi-sovereign (i.e., a de jure or de facto government).  In fact, since 1997, the United States has designated Hamas as a Foreign Terrorist Organization under the Immigration and Nationality Act, 8 U.S.C. § 1189(a)(1). Since 2007, Hamas has had a history of firing rockets into Israel.  The United States has continued to designate Hamas as a Foreign Terrorist Organization and does not negotiate or enter into treaties with Hamas.

## B.  Factual Background

For the period from January 1, 2014, to June 30, 2015, Atlantic issued a television production insurance policy to Universal.  The Policy covered losses that are "a direct result of an unexpected, sudden or accidental occurrence entirely beyond your control to include . . . [i]mminent peril, defined as certain, immediate and impending danger of such probability and severity to persons or property that it would be unreasonable or unconscionable to ignore."  The Policy, which was negotiated before December 2013, covered loss caused by terrorism if that loss was not otherwise excluded.

The relevant exclusions for our analysis are the four war exclusions:

1.  *War*, including undeclared or civil war; or

2.  *Warlike action* by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other

> authority using military personnel or other agents; or
>
> 3. *Insurrection, rebellion, revolution*, usurped power, or action taken by the governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event contributed concurrently or in any sequence to the loss.
>
> 4. Any weapon of war including atomic fission or radioactive force, whether in time of peace or war . . . .

Universal's broker, Aon/Albert G. Ruben Insurance Services, Inc., initially sent the first three exclusions above to Atlantic. The language was standard insurance industry form language from the Insurance Service Office, Inc.'s ("ISO") standard Form No. CA00200310. Atlantic subsequently edited some of the policy language and added the fourth war exclusion.

On December 3, 2013, Universal's broker emailed Atlantic about three developments: (1) noting "that there is a production in development that is tentatively starting up in February 2014 and filming in Israel," specifically in "Tel Aviv and Jerusalem"; (2) stating "[w]e wanted to get some feedback from you on what issues we may have covering the production under the blanket policy – any additional premiums or exclusions beyond our standard terms"; and (3) asking Atlantic to let Universal "know what [Atlantic's] concerns may be on this."

The broker then had a discussion with Atlantic "regarding issues they may have with the project entitled 'Dig,' potentially working in Israel." During that conversation, Atlantic indicated it "understands that [Universal] takes seriously safety and security precautions on every production but that they were particularly concerned about those precautions in this locale." As a result, Atlantic asked Universal to provide "specific information regarding the security efforts that will be taken during the course of principal photography." Atlantic then concluded that it would "not be imposing any additional premium or additional coverage terms on *Dig* relating to the work in Israel," the "primary reason for [which] is [its] confidence in the safety and security measures that will be taken during the production." Atlantic did not change the policy's terms, add any exclusions – such as a terrorism exclusion – or charge any additional premium.

### 1. June 2014 Conflict

After *Dig* began production in Israel, three Israeli teenagers were kidnapped on June 12, 2014, and Hamas was suspected of involvement in the kidnappings. On June 30, 2014, the bodies of the three missing teenagers were recovered, and there were signs indicating Hamas was involved. On July 2, 2014, a Palestinian teenager was abducted and killed by Israelis, presumably in retaliation for the kidnapping of the Israeli teens. In late June or early July 2014, Hamas began firing rockets from Gaza into Israeli civilian populations, significantly increasing the number of

attacks around July 8.[3]   Israel responded by launching a campaign against Hamas, called "Operation Protective Edge."

On July 8, the U.S. State Department issued a warning regarding the "safety and security of civilians" in Israel, specifically in Jerusalem. *Dig* filming was scheduled to take place in Jerusalem over the next few weeks. Two days later, the Universal security team advised the *Dig* production team that the "security environment in Israel currently prohibits NBCU Security from being able to guarantee the safety and security of our employees, production partners and associated crew and talent." The security team indicated that "current rocket attacks" appeared "to target locations to be used in forthcoming filming" and it was concerned about "acts of terrorism within Israel."

## 2. Denial of Claim Coverage

On July 11, 2014, the day after receiving the security team's advice, Universal decided to postpone production for a week and informed Atlantic. Four days later, Universal's broker notified Atlantic in writing of Universal's claim relating to the one-week delay of *Dig*. Atlantic's Chief Underwriting Officer, Peter Williams, then wrote in an internal email to the claims investigator stating that the claim was a "covered claim they have immanent [sic] peril. Unless you are going to invoke the war exclusion." Atlantic's senior claims investigator responded to Williams:

---

[3] Atlantic argues Hamas began firing rockets in mid-June, but Universal argues it was early July. Because the escalating conduct in early July likely caused Universal to relocate production, July is the relevant time period for our analysis.

> Any chance you happen [sic] to suggest that they push for more than just the week, since the crew needs to be advised at least one week in advance for a push and since a ground war still might occur.

The next day, Atlantic's Assistant Vice President stated internally that "it looks like we need to have a lot further discussion about this."  Atlantic had never applied the war exclusions before this claim.

Due to escalating violence, Universal decided to move the *Dig* production out of Israel altogether and notified Atlantic of that decision on July 17, 2014  That same day – two days after Universal's broker submitted the initial written claim – Atlantic denied coverage under the war exclusions. Atlantic's supervising claims examiner could not recall any other claim where a coverage determination was made in two days, stating that this denial occurred on an expedited timeframe.  During the two days between the filing of the claim and Atlantic's denial of coverage, Atlantic employees engaged in the following analysis:  They conducted Google searches for news articles about Hamas and Israel and reviewed one case, in which the court declined to apply war exclusions to the act of Palestinian and Lebanese sub-national groups bombing a hotel in Beirut.  *See Holiday Inns Inc. v. Aetna Ins. Co.*, 571 F. Supp. 1460, 1503 (S.D.N.Y. 1983). Atlantic did not consult the policy's underwriter about the intent regarding the exclusions, although its usual practice was to engage in such a consultation.

Two weeks after denying coverage, Atlantic sent Universal a denial letter.  Atlantic's letter stated that "[r]ockets launched toward areas where filming is taking

place would no doubt reasonably constitute" a covered imminent peril.  Atlantic also stated, however, that "[t]he question now is not whether the loss falls within the insuring clause but whether the war exclusion" applies.  Atlantic concluded that "the extra expense associated with the move is not covered under [the Policy] because of the exclusion for war and warlike action" – the first and second war exclusions.

## C.  Procedural History

Universal filed suit against Atlantic, asserting claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  During litigation, Atlantic took the position that all four contractual war exclusions barred coverage.

Following discovery, Atlantic moved for summary judgment on both claims.  Universal filed a cross-motion for partial summary judgment on its first claim: Atlantic breached the contract.  In June 2017, the district court granted Atlantic's motion in a short minute order without further explanation.  Four months later, the district court issued a written order granting Atlantic's motion and denying Universal's motion, holding that the first two war exclusions barred coverage and that Atlantic did not act in bad faith.  With regard to the war exclusions, the district court concluded that under California law, the exclusions should be understood in their popular and ordinary sense and that "[s]uch a conflict easily would be considered a 'war' by a layperson."  The district court rejected Universal's argument that "war" has a special meaning through usage in the insurance industry.  The district court did not address the third and fourth exclusions.

## II.  Standard of Review

Summary judgment orders are reviewed de novo.  *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 777 (9th Cir. 2014) (en banc).  We must view [] "the evidence in the light most favorable to the nonmoving party" and "determine 'whether there are any genuine issues of material fact and whether the district court correctly applied the law.'"  *Pension Tr. Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 949 (9th Cir. 2002) (internal quotation marks and citation omitted).

"Because the interpretation of an insurance policy is a question of law, this Court must make its own independent determination of the meaning of the relevant contract language."  *Conestoga Servs. Corp. v. Exec. Risk Indem.*, 312 F.3d 976, 981 (9th Cir. 2002).  "The burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded."  *MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1213 (Cal. 2003).

The parties do not dispute that the claimed loss is a covered "imminent peril."  Thus, Atlantic bears the burden of demonstrating that the war exclusions require denial of coverage.  *See id*.

## III.  Contra Proferentem Does Not Apply

With regard to interpreting the Policy's language, both parties argue that any ambiguity should be construed in their favor.  Under the doctrine of contra proferentem, any ambiguity in an exclusion is generally construed against the insurer and in favor of the insured.  *Fireman's Fund Ins. Co. v. Fibreboard Corp.*, 227 Cal. Rptr. 203, 206 (Ct. App. 1986).

16     UNIVERSAL CABLE V. ATLANTIC SPECIALTY INS.

When the language in a policy is proposed by the insured, however, the language is not construed against the insurer and may even be interpreted against the insured. *Id*. at 207. Furthermore, when two sophisticated parties negotiate the terms of the policy, the insured generally cannot invoke the doctrine of contra proferentem. *Garcia v. Truck Ins. Exch.*, 682 P.2d 1100, 1106 (Cal. 1984). "[W]here the policyholder does not suffer from lack of legal sophistication or a relative lack of bargaining power, and where it is clear that an insurance policy was actually negotiated and jointly drafted, we need not go so far in protecting the insured from ambiguous or highly technical drafting." *AIU Ins. Co. v. Superior Court*, 799 P.2d 1253, 1265 (Cal. 1990).[4]

The district court, citing *AIU*, held that there was no presumption in favor of Universal here because (1) Universal's broker provided the contested language to Atlantic, and (2) Universal is a sophisticated party with bargaining power. In *AIU*, the insured "unquestionably possesse[d] both legal sophistication and substantial bargaining power." *Id.* The question was whether the disputed policy term had a technical meaning (as the insurer contended) or had a plain and ordinary meaning (as the insured contended). *Id.* The record lacked any evidence that the provision in question had been negotiated or jointly drafted. *Id.* Because there was no evidence the parties intended to adopt a technical meaning, which would have excluded coverage for the insured, the Supreme Court of California held that the ambiguity would be resolved against

---

[4] California courts impute an insurance broker's expertise to its customer/principal. *See Fireman's Fund*, 227 Cal. Rptr. at 206 ("[T]wo large corporate entities, each represented by specialized insurance broker or risk managers, negotiated the terms of the insurance contracts.").

the party responsible for the inclusion of the provision:  the insurer.  *Id.*

Universal argues that, similarly, any ambiguity here should be construed against the insurer.  Atlantic responds that, unlike *AIU*, Universal's broker provided the policy language in question, and any ambiguity should instead be construed against the party that offered the language: Universal.

Universal counters that "a distinction must be made between a broker requesting certain language cut-and-pasted from other policies issued by an insurer and a broker drafting or editing specific policy language."  8 Bus. & Comm. Litig. Fed. Cts. § 90:42 (4th ed. 2017).  "The mere inclusion of standard form language from another policy at the request of a policyholder or its broker should not result in a departure from the rule of contra proferentem."  *Id*.  Here, the disputed language was insurance industry form language from the ISO's standard Form No. CA00200310.  "Policy forms developed by ISO are approved by its constituent insurance carriers and then submitted to state agencies for review," and "[m]ost carriers use the basic ISO forms, at least as the starting point for their general liability policies."  *Pardee Const. Co. v. Ins. Co. of the West*, 92 Cal. Rptr. 2d 443, 456 n.15 (Ct. App. 2000).

Contra proferentem stems "from the fact that the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications."  *AIU*, 799 P.2d at 1265.  Although *AIU* acknowledged that the insured there "unquestionably possesse[d] both legal sophistication and substantial bargaining power," it opted to apply contra proferentem

anyway because the parties had not negotiated a technical meaning.  *Id.*  The California Supreme Court concluded that it would still construe the terms against the insurer because "such provisions, drafted by the insurers, are highly uniform in content and wording" and there was "no evidence . . . suggesting that the provisions in question were actually negotiated or jointly drafted."  *Id.*  Moreover, the court was concerned about the insurer interpreting terms in a technical manner, thus denying coverage when the insured was not on notice about the technical meaning.

*AIU* is distinguishable from the case before us.  Here, the provisions were initially offered by Universal's broker (although they consisted entirely of form language). Moreover, Universal does not rebut the district court's conclusion that it is a sophisticated party.  Most importantly, Universal – the insured – is asking the court to interpret policy language under the customary meaning in the insurance context.   Unlike *AIU*, where the court was concerned about restrictive, technical language being construed against the insured without notice, Universal is aware of the customary meaning in the insurance context and asks us to apply that meaning instead of the plain and ordinary meaning.  The typical concerns animating contra proferentem do not exist here.

Accordingly, we decline to apply contra proferentem in favor of Universal's interpretation.  We also decline to apply contra proferentem in favor of Atlantic.  The language here mirrors Atlantic's own forms – and the forms of many insurers – and does not warrant a presumption in favor of Atlantic's interpretation either.  The parties provide no reason

to protect the insured or the insurer from any ambiguous drafting in this instance.[5]

## IV.  Section 1644 and Customary Usage

The district court erred in holding that Atlantic met its burden of demonstrating that the first two war exclusions apply.  To the contrary, the record demonstrates that neither exclusion applies here.  Atlantic breached its contract by denying Universal coverage on that basis.

Under California law, the terms in an insurance policy are "understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or *unless a special meaning is given to them by usage, in which case the latter must be followed.*"  Cal. Civ. Code § 1644 (emphasis added).  A district court's failure to consider the special meaning of a term in "industry custom and practice" is reversible error. *See Nat'l Am. Ins. Co. of Cal. v. Certain Underwriters at Lloyd's London*, 93 F.3d 529, 537 (9th Cir. 1996).  Here, the district court erred in holding that the war exclusions should be understood in their ordinary and plain sense, instead of applying the special meaning of the terms in the insurance context.

---

[5] The Supreme Court recently addressed California's contra proferentem doctrine in *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1417–18 (2019).  The Court concluded that contra proferentem applies "only after a court determines that it cannot discern the intent of the parties." *Id.* "When a contract is ambiguous, contra proferentem provides a default rule based on public policy." *Id.* We need not address the Supreme Court's discussion of ambiguity because, as noted above, the public policy considerations for applying contra proferentem do not exist here.

We note that § 1644's requirement that courts apply
customary usage is cabined by a few requirements.
Generally, a party asking a court to apply customary usage
would be engaged in the relevant trade – here, the insurance
trade.  *See* Restatement (Second) of Contracts § 222(3)
(stating that "[u]nless otherwise agreed, a usage of trade in
the *vocation or trade in which the parties are engaged or a
usage of trade of which they know or have reason to know*
gives meaning to or supplements or qualifies their
agreement" (emphasis added)).  Although Universal is not in
the insurance trade, it is a sophisticated party that frequently
engages in business related to the insurance trade.  Moreover,
it is represented by a broker – who is Universal's agent – in
the insurance trade.

If any party is not engaged in the trade, the party offering
customary usage must show the parties had actual or
constructive notice of the customary usage.[6]  *See id.* § 220(1)
(stating that "[a]n agreement is interpreted in accordance with
a relevant usage if each party knew or had reason to know of
the usage and neither party knew or had reason to know that
the meaning attached by the other was inconsistent with the
usage").  Here, Universal has met that burden.  As discussed
below, Universal provides unrebutted expert evidence
demonstrating the customary usage of "war" and "warlike
action by a military force" in the insurance context.  Caselaw
and insurance treatises buttress Universal's argument that
ordinary, popular meanings of these terms do not control in
this context.  Moreover, as Universal notes, Atlantic's own
denial letter stated that "Appleman on Insurance discusses

---

[6] This requirement ensures that customary usage is not used as a
shield against consumers who are entirely unaware of usage in a particular
trade.

exclusions for war, including the meaning of war and similar terms.  'War is a "course of hostility" between "states or state-like entities."'"  And Universal's expert noted that "if the policy does not contain a terrorism exclusion, there is a reasonable expectation that acts of terrorism by a known terrorist organization, regardless of however else they may be characterized, will be covered."  Universal stated that it reasonably expected the exclusionary clause would be interpreted according to customary usage, especially after the December 2013 emails about the policy's coverage in Israel. At the least, both parties should have known the customary usage of "war" and "warlike action" in the insurance context.

Accordingly, we apply the customary usage of the terms in the insurance context here.

*A.  The First War Exclusion*

    1.  *The special meaning of "war" in the insurance context*

Universal provided the district court with substantial unrebutted evidence that, in the insurance context, the term "war" has a special meaning that requires the existence of hostilities between de jure or de facto governments. Universal relied on caselaw, insurance treatises, and expert testimony to show the existence of this industry custom.

With regard to caselaw, Universal relied on a set of cases defining "war" in accordance with the international law definition:  war refers to and includes *only* hostilities carried on by entities that constitute governments at least de facto in character.  *See Pan Am. World Airways v. Aetna Cas. & Surety Co.*, 505 F.2d 989, 1012 (2d Cir. 1974); *see also*

22     UNIVERSAL CABLE V. ATLANTIC SPECIALTY INS.

*Holiday Inns*, 571 F. Supp. at 1503 (holding in the insurance context that "war" must be "between sovereign or quasi-sovereign states").  The courts in both *Pan Am* and *Holiday Inns* refused to treat violent actions by Palestinian terrorist organizations targeting civilians as falling within the "war" exclusion.  *Pan Am*, 505 F.2d at 1016 (declining to find that hijacking carried out by the Popular Front for the Liberation of Palestine fell within war exclusions); *Holiday Inns*, 571 F. Supp. at 1472, 1503 (declining to find that mortar shelling by Palestinian and Lebanese factions in Beirut fell within war exclusions).  *Holiday Inns* specifically rejected the argument that a "common meaning" of war applies in the insurance context, holding instead that "[i]n commercial litigation arising out of insurance policies, words and phrases are construed 'for insurance purposes' – a context quite different from those of politics or journalism."  571 F. Supp. at 1464 (quoting *Pan Am*, 505 F.2d at 993).  The Second Circuit in *Pan Am* concluded that "war is a course of hostility engaged in by entities that have at least significant attributes of sovereignty."  *Pan Am*, 505 F.2d at 1012.

Similarly, a leading insurance treatise recognizes that in this context, "'war' is defined as the employment of force between governments or entities essentially like governments, at least de facto," because "[w]ar is often viewed as the method by which a nation prosecutes its right by force." 10A Couch on Insurance § 152:3 (3d ed. 2017).[7]  Another

---

[7] Couch refers to this meaning – requiring sovereignty – as the "ordinary meaning" of war.  10A Couch on Insurance § 152:3 (3d ed. 2017).  Couch states that the technical meaning of war in the insurance context requires "formally and constitutionally declared" war. *Id.* Couch does not discuss any other applicable meaning of "war" in the insurance context, including Atlantic's argument for a broader approach.

treatise notes that "while the sovereign act and war exclusions are not entirely irrelevant to coverage of terrorist related losses, an insurer seeking to invoke these exclusions faces steep factual, legal and political hurdles" because of caselaw defining war as the act of a sovereign.  32-191 Appleman on Insurance Law & Practice Archive § 191.02 (2d ed. 2011).

With regard to the record, Universal's insurance industry expert stated that under insurance industry custom, "an underwriter cannot merge the two concepts and say that 'an act of terrorism' can be also an 'act of war,'" because "if the policy does not contain a terrorism exclusion, there is a reasonable expectation that acts of terrorism by a known terrorist organization, regardless of however else they may be characterized, will be covered."  Atlantic did not rebut this argument; nevertheless, the district court did not consider Universal's expert testimony regarding the special meaning of "war" in the insurance context.  Moreover, Universal explained to the district court that even Atlantic's denial letters noted that "[w]ar is a course of hostility between states or state-like entities," and "[t]o constitute a de facto state, a group must have significant attributes of sovereignty."  The district court did not address this fact either.

The district court held that Universal "[did] not present specific evidence from the negotiation or drafting of the Policy reflecting the parties' intention to use any technical or special meaning of 'war,'" or any specific evidence that "the parties or [Universal's broker] had in mind the more restrictive meaning of 'war' discussed in *Pan Am* or *Holiday Inns* when the Policy was negotiated." (citing Cal. Civ. Code § 1644).  In coming to this conclusion, the district court conflated the various provisions of § 1644 and shifted the burden to Universal without any explanation.  Section 1644

24     UNIVERSAL CABLE V. ATLANTIC SPECIALTY INS.

states that words in a contract are "understood in their ordinary and popular sense . . . unless used by the parties in a technical sense, or *unless* a special meaning is *given to them by usage*, in which case the latter *must* be followed." Cal. Civ. Code § 1644 (emphases added). The former provision requires that the terms have been "used by the parties in a technical sense," but the latter requires simply that the special meaning of the terms be "given to them by usage." *Id.* This interpretation is supported by California law, which provides that "[p]arties are presumed to contract pursuant to fixed and established usage and custom of the trade or industry." *S. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.*, 88 Cal. Rptr. 2d 777, 785 (Ct. App. 1999); *see also Nat'l Am. Ins. Co. of Cal.*, 93 F.3d at 537 (holding that "[o]rdinary rules of construction permit custom or usage evidence both to explain the meaning of language and to imply terms, where no contrary intent appears from the terms of the contract").

Contrary to the district court's holding, California law does not require Universal to introduce "specific evidence from the negotiation or drafting of the Policy reflecting the parties' intention" to use any "special meaning of 'war.'" Such an interpretation would conflate § 1644's distinction between technical meaning and customary usage. Instead, as noted above in this Part IV, the only requirement is that the parties had at least constructive notice of the usage, which they did here. Atlantic failed to show that "war" did not have a special meaning in the insurance context, especially considering Universal's ample evidence to the contrary.

Atlantic does not explicitly dispute that "war" has a special meaning in the insurance industry requiring hostilities between de jure and de facto governments. Atlantic instead

focuses on whether California law requires this special meaning.

First, Atlantic argues that under *Sony Computer Entertainment America, Inc. v. American Home Assurance Co.*, 532 F.3d 1007, 1013 (9th Cir. 2008), Universal bears the burden to submit some extrinsic evidence of the parties' intent to adopt a special meaning. *Sony* addressed technical meaning, which – unlike customary usage – does require a showing of intent.   Furthermore, § 1644 provides no qualifications or requirement of intent to its mandate regarding the application of customary usage.  As discussed, Atlantic's interpretation would render § 1644's distinction between technical meaning and customary usage surplusage. Moreover, Atlantic's reliance on interpretive rules requiring plain meaning in other contexts is misplaced, given § 1644's specific requirement that plain and ordinary meaning does not apply if customary usage exists.  *See Burger v. Emp. Ret. Sys.*, 226 P.2d 38, 39–40 (Cal. Dist. Ct. App. 1954) (requiring plain and ordinary meaning for constitutional measures adopted by popular vote); *Kaiser v. Hopkins*, 58 P.2d 1278, 1279 (Cal. 1936) (requiring plain and ordinary meaning for constitutional measures because they are adopted "by the meaning apparent on its face"); *Vandegrift v. Bd. of Supervisors*, 100 Cal. Rptr. 87, 90–91 (Ct. App. 1972) (same).

Second, Atlantic argues that the parties did not choose to use "war" in any formal or technical sense because of the inclusion of "undeclared war" in the first exclusion.  Atlantic relies on two non-binding cases that addressed whether insurance policies applied to undeclared wars during World War II.  *See N.Y. Life Ins. Co. v. Durham*, 166 F.2d 874, 876 (10th Cir. 1948) (holding that where an insurance policy

expressly excluded losses due to "undeclared war," the parties expressly "chose not to use the word 'war' in its technical or formal sense"); *Gagliormella v. Met Life Ins. Co.*, 122 F. Supp. 246, 249 (D. Mass. 1954) (holding that a policy excluded undeclared war between "United States and another country"). These cases are distinguishable for three reasons. First, both cases discuss war between de jure governments, which the Israeli-Hamas conflict was not. *See* Part IV.A.2. Second, the Tenth Circuit's interpretation of "undeclared war" as an express indication of the parties' intent to avoid the special meaning of the term "war" does not apply under California law, which mandates the application of a special meaning under § 1644. Third, Universal's unrebutted expert testimony notes that the current customary usage of "war" in the insurance industry was developed gradually after the 9/11 attacks (and related litigation) to distinguish between acts of war and acts of terror in the insurance context. Although Universal's expert does not discuss the contract's use of "undeclared war" and its potential implication here, Atlantic has not provided any evidence to contradict the expert's conclusion that "war" has a specialized meaning in this instance.

Finally, Atlantic relies on three cases – all outside the insurance context – holding that the 9/11 terrorist attacks were acts of war. Atlantic failed to recognize, however, that the district court in *In re September 11 Litigation*, 931 F. Supp. 2d 496, 514 (S.D.N.Y. 2013), *aff'd*, 751 F.3d 86, 90–91 (2d Cir. 2014), cautioned that its holding in the CERCLA[8] context should be "read narrowly, fitting the facts of this case only" and "should not be a precedent for cognate

---

[8] The Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–9675.

laws of insurance."   The Second Circuit reaffirmed this distinction, noting that courts should still have a "narrow reading of a contractual 'act of war' exclusion," but the "remedial purpose of CERCLA is both different and unrelated" to typical contractual terms. *In re Sept. 11 Litig.*, 751 F.3d at 92–93.  Similarly, Atlantic's reliance on *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), and *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), both habeas cases, fails to recognize that "war" has a special meaning in the insurance context.

Outside of these inapposite cases, Atlantic does not dispute that the insurance industry has a customary usage that limits exclusions for "war" to hostilities between de jure or de facto sovereigns.  The district court erred by failing to apply this special meaning.  Because the district court should have applied the special meaning, we need not address whether the district court's analysis of the plain and ordinary meaning of "war" was incorrect.

### 2.   *Hamas is neither a de jure nor a de facto sovereign*

The district court erroneously concluded that Universal did not meet its burden to demonstrate that "Hamas is a terrorist group for all purposes," and that the war exclusion applied.  But Universal does not need to show that Hamas acts as a terrorist group "for all purposes" in order to prove that the policy covers Hamas' conduct.   Instead, the appropriate question is whether Hamas was acting as a de jure or de facto sovereign at the time of the 2014 hostilities.

"Under international law, a state is an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such

28    UNIVERSAL CABLE V. ATLANTIC SPECIALTY INS.

entities."   Restatement (Third) of Foreign Relations Law
§ 201 (1987); *see also Holiday Inns*, 571 F. Supp. at
1499–1500. The United States, the European Union, Canada,
Australia, and multiple other countries do not recognize
Hamas as a legitimate authority in either Palestine or Gaza –
the relevant territories for our analysis.   Hamas does not
engage in formal relations on behalf of Palestine (or even
Gaza).   The record does not indicate that Hamas controls
Palestine's borders, airspace, or immigration.   This is
particularly important when we consider Hamas' recognition
of the Palestinian Authority's control over all governing
functions.

Atlantic argues that Hamas has significant attributes of
sovereignty, which supports the district court's conclusion
that Hamas is a de facto sovereign.   Atlantic relies on *Pan Am*
and *Holiday Inns* in coming to this conclusion, but Atlantic
cherry-picks selected portions of those cases' descriptions of
what constitutes a de facto sovereign.

*Pan Am* focused on whether the entity in question had
"significant attributes of sovereignty," or whether it was an
entity "that constitute[d] government[] at least de facto in
character," similar to "enemy nations at war with one
another." 505 F.2d at 1012.   Atlantic incorrectly states that
*Pan Am* described a de facto government as "a force
[controlling] a substantial territory with trappings of state."
*Id.* at 1009.   That definition was not *Pan Am*'s holding, but
rather part of a summary of the parties' arguments before the
district court.   To the contrary, *Pan Am* held that a terrorist
group was not a de facto government because it was not
acting on behalf of the recognized government.   *Id.* at 1012.

Atlantic also argues that in *Holiday Inns*, the court held war can exist between de facto governments, meaning entities that "stake out and maintain adverse claims to territory." 571 F. Supp. at 1500. Atlantic does not include the full quotation:

> *It is not sufficient to achieve such status that the group or entity in question occupy territory* within the boundary of the sovereign state upon the consent of that state's de jure government. That is so, even if that government's consent extends to permitting its guests to exercise considerable control and autonomy within the camps or other facilities in which they dwell. "De facto governments" manifest "attributes of sovereignty" when they stake out and maintain adverse claims to territory, *accompanying those claims with declarations of independence and sovereignty.*

*Id*. (emphases added). *Holiday Inns* also held that private militias do not constitute de facto sovereigns when a de jure government exists in the form of executive and legislative leadership (even if that de jure government functions with "considerable difficulty"). *Id*. *Holiday Inns* specifically noted that a de facto sovereign would not recognize the de jure government's sovereignty, let alone agree not to disturb it. *Id*. Here, the Palestinian Authority is the de jure government, and Hamas has recognized the Palestinian Authority as the controlling government of Palestine. *Holiday Inns* therefore supports the conclusion that Hamas is not the de facto sovereign of Palestine.

Atlantic argues that "Hamas operates political, military, and social branches," and its social service branch operates hospitals, schools, and other services, just like any other government. *See United States v. El-Mezain*, 664 F.3d 467, 485–86 (5th Cir. 2011); *see also Estates of Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 250 (D.R.I. 2004) (concluding that "Hamas operates through a political branch and a military branch"). Atlantic does not dispute that Gaza is part of Palestine and not its own sovereign state. At most, Hamas exerted control over Gaza. Hamas never exercised actual control over all of Palestine and has agreed – at least in principle – not to disturb the Palestinian Authority, the de jure government of Palestine. Hamas has not declared itself independent from Palestine. Atlantic also does not dispute that Hamas agreed in June 2014 to cede any governing function it may have had to the Palestinian Authority. As noted by the Congressional Research Service, Hamas has a vested interest in separating its military and political factions. 2010 CRS Hamas Report at 18.

In sum, based on the record before us, Hamas did not constitute a de facto or de jure sovereign during the July 2014 conflict between Hamas and Israel.

Our conclusion is bolstered by the executive branch's refusal to recognize Hamas as a de jure or de facto sovereign at the material time. "Who is the sovereign, de jure or de facto, of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). The Supreme Court has held that "recognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called

'a republic of whose existence we know nothing,' and the judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory[.]"  *Baker v. Carr*, 369 U.S. 186, 212 (1962) (citation omitted).  It is only "once sovereignty over an area is politically determined and declared" that "courts may examine the resulting status[.]"  *Id*.  This court has recognized in the insurance context that "the Constitution commits to the executive branch alone the authority to recognize, and to withdraw recognition from, foreign regimes."  *Mingtai Fire & Marine Ins. Co., Ltd. v. United Parcel Serv.*, 177 F.3d 1142, 1145 (9th Cir. 1999).  *Mingtai Fire* held that "whether China is the sovereign, de jure or de facto, of the territory of Taiwan is a political question" and thus "we look to the statements and actions of the 'political departments' in order to answer" the question.  *Id*.

The executive branch has never recognized Gaza as a state or Hamas as a de jure or de facto sovereign.  Instead, pursuant to its authority under § 219 of the INA, 8 U.S.C. § 1189(a)(1), the Secretary of State has consistently designated Hamas as a Foreign Terrorist Organization since 1997.  Atlantic does not dispute that the executive branch does not recognize Hamas as a sovereign and instead designates Hamas as a foreign terrorist organization.

Atlantic responds to Universal's arguments about the executive branch by arguing that the definition of "war" in the insurance context under California law "is not a political question to be answered by reference to formal executive or legislative action."  Atlantic cites *Ungar v. Palestine Liberation Organization*, 402 F.3d 274, 280 (1st Cir. 2005), which held that a district court's decision regarding sovereignty does not "signal[] an official position on behalf

of the United States with respect to the political recognition of Palestine." *Ungar* is inapplicable here for two reasons. First, it is non-binding, whereas *Mingtai Fire* is binding on this court. *Mingtai Fire* holds that a court's recognition of sovereignty, even in the insurance context, is a political question. Second, in *Ungar*, the district court declined to recognize Palestine as a state or the Palestinian Authority as a sovereign. The district court's "resolution of that question [was] not incompatible with any formal position thus far taken by the political branches," and thus did not affect the official position of the United States in any manner. *Id*. Here, the district court's analysis – and Atlantic's interpretation – would contradict the executive branch's refusal to recognize Hamas as a sovereign.

Even if the executive branch's position were not per se binding on this court, its position certainly informs our analysis when we face a political question. After considering the factual and historical record and the executive branch's position, we conclude Hamas is not a de jure or a de facto sovereign. Thus, Hamas' conduct in the summer of 2014 cannot be defined as "war" for the purposes of interpreting this policy.

## B.  The Second War Exclusion

### 1.  *The district court erred in applying "warlike action by a military force" to Hamas' conduct*

The district court's interpretation of the second war exclusion, which excludes coverage for "warlike action by a military force" by a "government, sovereign, or other authority," is infected by many of the same legal errors as the district court's interpretation of the first exclusion. Like the

first exclusion ("war"), the second exclusion ("warlike action") has a special meaning in the insurance industry that derives from the typical exclusion for "warlike operations." *See Pan Am*, 505 F.2d at 1015–17 (analyzing multiple cases holding that "warlike operations" also requires a de jure or a de facto sovereign).    That special meaning requires (1) "operations of such a general kind or character as belligerents have recourse to in war," and (2) that such operations be carried out by the military forces of a sovereign or quasi-sovereign government. *See Pan Am World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 368 F. Supp. 1098, 1130 (S.D.N.Y. 1973), *aff'd*, 505 F.2d 989; *see also Holiday Inns*, 571 F. Supp at 1503 (refusing to apply exclusion for "war, invasion, act of foreign enemy, hostilities or *warlike operations* (whether war be declared or not)" to Palestinian and Lebanese sub-national factions' shelling of a Holiday Inn in Beirut (emphasis added)).  As with the first exclusion, Atlantic fails to demonstrate how Hamas is a de facto or de jure sovereign and thus engaged in "warlike action by a military force" instead of covered acts of terrorism.

*Pan Am* distinguished between warlike operations and terrorist activity as follows:

> There is no warrant in the general understanding of English, in history, or in precedent for reading the phrase 'warlike operations' to encompass (1) the infliction of intentional violence by political groups (neither employed by nor representing governments) (2) upon civilian citizens of non-belligerent powers and their property (3) at places far removed from the locale or the subject of any warfare.  .  .  .  This

> conclusion is merely reinforced when the evident and avowed purpose of the destructive action is not coercion or conquest in any sense, but the striking of spectacular blows for propaganda effects.

*Pan Am*, 505 F.2d at 1015–16 (quoting *Pan Am. World Airways, Inc.*, 368 F. Supp. at 1130). A leading insurance treatise notes that "warlike operations" are "normally part of an armed conflict between combatants and usually do not include *intentional violence against civilians by political groups*." 10A Couch on Insurance § 152:3–4 (3d ed. 2017). The treatise also notes that "the standard war exclusion does not explicitly extend to acts of terrorism," as "[t]errorists do not typically fit [the] profile" of "combatants" who "operate lawfully in accordance with the laws and customs of war." *Id*. § 152:18. Atlantic does not provide any evidence to the contrary or explain why warlike operations should cover acts of terrorism.

Atlantic notes that Universal's customary usage for "warlike action" seemingly conflates "war" and "warlike action." Nevertheless, we do not have to identify the precise differences between the two exclusions to conclude that neither exclusion applies here. Customary usage dictates that both exclusions require a showing of de jure or de facto sovereignty, and Atlantic cannot show either. Much of the analysis for the "war" exception applies here.

Moreover, the nature of Hamas' conduct in June and July 2014 also supports our conclusion that Hamas was not engaging in "warlike action by a military force." Couch's insurance treatise notes that "warlike operations" would "not include intentional violence against civilians by political

UNIVERSAL CABLE V. ATLANTIC SPECIALTY INS.     35

groups." *Id.* § 152:4.  Hamas constitutes such a political group.  Furthermore, the specific action that disrupted *Dig*'s production was Hamas firing rockets into Israeli civilian centers.  One of Universal's experts relied on a U.N. report that determined that the weapons Hamas used were unguided missiles and were likely used to injure and kill civilians because of their indiscriminate nature.  Hamas' conduct consisted of intentional violence against civilians – conduct which is far closer to acts of terror than "warlike action by a military force."

Because Hamas is not a de facto sovereign – and because its actions did not constitute "warlike action by a military force," – we hold that the second war exclusion does not apply here.

> 2.  *The district court erred in failing to address the efficient proximate cause doctrine in holding Israel indirectly contributed to Hamas' conduct*

In applying the "warlike action" exclusion, the district court concluded that Israel's retaliatory actions also triggered this exclusion.  The district court held that "Israel is indisputably a sovereign state, and its actions directly or indirectly contributed to the situation that caused postponement and relocation of the Dig production," as "[i]t is not disputed that Israel took action to counter Hamas' attacks."  This conclusion is incorrect for two reasons.

First, even if Israel countered Hamas' attacks, the district court does not explain how Israel's actions were the proximate cause of Universal's losses in moving the production of *Dig*.  The evidence indicates that, at the least, Universal's decision to relocate production was a result of

Hamas firing rockets into Israel (where filming was occurring), and not a result of Israel's retaliatory conduct.

Moreover, the district court's analysis is contrary to California's efficient proximate cause doctrine. "Policy exclusions are unenforceable to the extent that they conflict with section 530 [of the California Insurance Code] and the efficient proximate cause doctrine." *Julian v. Hartford Underwriters Ins. Co.*, 110 P.3d 903, 907 (Cal. 2005). The California Supreme Court has held that the "efficient proximate" cause is the "predominant, or most important cause of a loss." *Id.* (citing *Garvey v. State Farm Fire & Cas. Co.*, 770 P.2d 704 (Cal. 1989)). Thus, "the fact that an excluded risk contributed to the loss would not preclude coverage if such a risk was a remote cause of the loss." *Id.*

Here, the record demonstrates that the efficient proximate cause for the relocation was Hamas' rocket fire from Gaza into Israel. The district court's reliance on Israel's indirect contribution to continued hostilities from Hamas was not supported by any evidence in the record. Atlantic's letter denying coverage noted that Universal had to relocate because of "heightened violence in [Israel]" due to Hamas "firing rockets into those cities [Tel Aviv and Jerusalem]" where filming was likely to occur. More importantly, the district court did not consider what the predominant cause of *Dig*'s relocation actually was, and Atlantic provides no evidence that Israeli retaliation was the predominant cause of Universal's losses. The district court erred in holding that because Israel indirectly contributed to Hamas' conduct, Israel's conduct as a sovereign nation triggered the war exclusion here.

Accordingly, we reverse the district court's grant of summary judgment with regard to the second war exclusion.

## V.  Exclusion Three

Atlantic also asks us to affirm on a ground the district court did not reach: the third exclusion ("insurrection, rebellion, [or] revolution").  As Universal stated at oral argument – and confirmed by the parties' briefing on the motion to strike – this question implicates potential factual disputes that the district court has yet to consider.  We thus remand to the district court to decide the applicability of the third exclusion in the first instance.[9]

## VI.  Universal's Bad Faith Claim

Similarly, because we hold that Hamas does not constitute a de jure or de facto sovereign, the policy covers Hamas' hostilities as acts of terrorism creating imminent peril (unless the district court finds that the third exclusion applies).  The district court's summary judgment of Universal's bad faith claim was predicated on its erroneous analysis of the first and second war exclusions.  Because we reverse the district court's entry of judgment in favor of Atlantic and conclude that Atlantic breached its contract, and because triable issues of fact remain with regard to Universal's claim that Atlantic acted in bad faith in denying its claim, we vacate the district

---

[9] Although Atlantic initially raised the fourth exclusion in district court, neither the district court nor the parties on appeal address it.  We leave it to the district court to decide whether the fourth exclusion remains a live issue and, if so, to decide its applicability in the first instance.

court's judgment on Universal's bad faith claim and remand for further proceedings consistent with our opinion.[10]

## VII.  Motion to Strike

Atlantic filed a motion to strike portions of Universal's reply brief and further excerpts of the record because Universal relied on materials that were not a part of the district court record (and of which we cannot take judicial notice). These materials were two deposition transcripts that were not filed with the district court, but were filed as further excerpts of the record here.  The transcripts involved the third war exclusion, which the district court did not consider.

Because we do not reach the third war exclusion, the motion to strike the portions of the record and reply brief that rely on the unsubmitted materials, *see* Fed. R. App. P. 10; 9th Cir. Rule 30-2, has been mooted.

We decline to sanction Universal for its conduct because the depositions were not scheduled by the parties until after briefing on the summary judgment motion was completed. Universal, thus, did not have an opportunity to supplement the record before this appeal was taken because the district court did not rule on the third war exclusion.

## VIII.  Conclusion

For the reasons stated above, we hold that Atlantic breached its contract when it denied coverage by defining

---

[10] We, of course, recognize and leave open the possibility that how the district court decides the third and fourth exclusions may affect its ultimate decision of Universal's bad faith claim.

Hamas' conduct as "war" and "warlike action by a military force."  We reverse the district court's entry of summary judgment in favor of Atlantic on the first and second war exclusions, and direct the entry of summary judgment in favor of Universal on the first and second war exclusions.  Because the district court did not address the third war exclusion – whether Hamas' actions constituted "insurrection, rebellion, or revolution" – we remand for the district court to address that question in the first instance.  We vacate the grant of summary judgment on Universal's bad faith claim and remand for proceedings consistent with this opinion.

Atlantic's motion to strike [Dkt. 33] is **DENIED** as moot, and the request for sanctions is **DENIED**.  Costs on appeal are awarded to Universal.

**REVERSED in part, VACATED in part, and REMANDED with directions.**