Exhibit 3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

```
UNIVERSAL CABLE          )  CASE NO. 2:16-cv-4435-PA-MRW
PRODUCTIONS LLC,         )
et al.,                  )
                         )
        Plaintiffs,      )
                         )
        vs.              )
                         )
ATLANTIC SPECIALTY       )
INSURANCE COMPANY,       )
                         )
        Defendant.       )
_____)
```

DEPOSITION OF JAY J. SHAPIRO

Tuesday, May 23, 2017

Reported by:  Ingrid Suárez Egnatuk
              CSR No. 3098

Page 2

```
 1
 2          Deposition of JAY J. SHAPIRO, taken on behalf of
 3      Plaintiffs Universal Cable Productions LLC and
 4      Northern Entertainment Productions LLC, at
 5      707 Wilshire Boulevard, Suite 4000, Los Angeles,
 6      California 90017, commencing at 10:00 a.m.,
 7      Tuesday, May 23, 2017, before Ingrid Suarez
 8      Egnatuk, CSR No. 3098.
 9
10   APPEARANCES:
11      FOR PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS LLC
        AND NORTHERN ENTERTAINMENT PRODUCTIONS LLC:
12
            MITCHELL SILBERBERG & KNUPP LLP
13          BY:  LUCIA E. COYOCA, ESQ.
            11377 West Olympic Boulevard
14          Los Angeles, California 90064-1683
            (310) 312-2000
15          lec@msk.com
16      FOR DEFENDANT:
17          STRASBURGER & PRICE, LLP
            BY:  CARLA C. CRAPSTER, ESQ.
18          901 Main Street
            Suite 6000
19          Dallas, Texas 75202-3794
            (214) 651-4300
20          carla.crapster@strasburger.com
21      ANDERSON, McPHARLIN & CONNERS, LLP
            (Not present at deposition)
22          707 Wilshire Boulevard
            Suite 4000
23          Los Angeles, California 90017-3623
            (213) 688-0080
24
25
```

Page 3

```
 1                  I N D E X
 2   Witness:   JAY J. SHAPIRO
 3   Examination                                        Page
 4   By Ms. Coyoca                                         6
 5       AFTERNOON SESSION                               100
 6          (Exhibits bound under separate cover)
 7   Shapiro
     Exhibit       Description                          Page
 8
 9   1   Notice of Taking Deposition of Jay             10
         Shapiro and Request for Production
10       of Documents
11   2   Order Making Findings and Imposing             36
         Remedial Sanctions Pursuant to
12       Sections 4C and 21C of the Securities
         Exchange Act of 1934 and Rule 102(e)
13       of The Commission's Rules of Practice
14   3   Defendant Atlantic Specialty                   67
         Insurance Company's Rebuttal Expert
15       Witness Disclosure
16   4   E-mail chain ending December 10,               76
         2013, to Randi Richmond from Andrea
17       Garber
         UCP 003732 through UCP 003734
18   5   E-mail, December 11, 2013, to                  76
         Bernadette Milinovic and Wanda M.
19       Phillips from Andrea Garber
         AONNBCU0001748 through AONNBCU0001750
20
21   6   E-mail chain ending March 12, 2014,            77
         to Randi Richmond, Mark Winemaker,
22       and Ryan Greig from John Gaskin
         UCP004971 through UCP004972
23   7   "DIG" Locked Budget                            79
         PATTERN:  5 Episode - (8) Days in
24       Israel
         UCP014836 through UCP014881
25
```

Page 4

```
 1                  I N D E X
 2                 (Continued)
 3   Shapiro
     Exhibit         Description                        Page
 4
     8   Expert Report of Jay Shapiro                   81
 5       Analysis of Economic Damages:
         Rebuttal, April 25, 2017
 6
 7   9   DIG - New Mexico Season 1 -                    92
         First 5 episodes, Production
         Recap Report, 2014/2015 Season 1,
 8       Period Ending:  8/11/2016
         UCP018226 through UCP018227
 9
10   10  Expert Report of Robert                        103
         Wunderlich: Analysis of Economic
11       Damages, March 17, 2017
12   11  Documents produced by the witness              167
         JS000001 through JS000020
13
14              REFERENCED EXHIBITS
15   Williams
     Exhibit         Description                        Page
16
     1   Motion Pictures/Television Producers           41
17       Portfolio Declarations
         ATL003073 through ATL003127
18
19
20
21
22
23
24
25
```

Page 5

```
 1                  I N D E X
 2                 (Continued)
 3      QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
            (Indicated by "^" in the transcript)
 4
 5          Page         Line
 6           12           13
             15           12
 7           39           19
             39           25
 8           47           24
             48           14
 9           57            6
             57           17
10           57           23
             58            5
11           58           11
            175           15
12          176            8
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1    LOS ANGELES, CALIFORNIA
2    Tuesday, May 23, 2017
3    10:00 a.m.
4
5    JAY J. SHAPIRO,
6    having been first duly sworn, was
7    examined and testified as follows:
8
9    **EXAMINATION**
10   BY MS. COYOCA:
11   Q.  Mr. Shapiro, can you please state your full
12   name and address for the record.
13   **A.  Jay Shapiro, 11300 Olympic Boulevard,**
14   **Suite 910, L.A. 90064.**
15   Q.  Do you have a middle initial, sir?
16   **A.  J.**
17   Q.  And my name is Lucia Coyoca.  I introduced
18   myself before we went on the record.  My firm, Mitchell
19   Silberberg & Knupp, represents the plaintiffs in this
20   matter, Universal Cable Productions and Northern
21   Entertainment Productions LLC.
22   Have you ever had your deposition taken before,
23   Mr. Shapiro?
24   **A.  Yes.**
25   Q.  On how many occasions?

Page 7

1    **A.  Approximately 20.**
2    Q.  When is the last such deposition?
3    **A.  January, 2016.**
4    MS. CRAPSTER: Ms. Coyoca, I would just like to
5    note for the record that my name is Carla Crapster.  I'm
6    here on behalf of Atlantic Specialty Insurance Company,
7    defending the deposition today.
8    BY MS. COYOCA:
9    Q.  What was the subject matter of the last
10   deposition in the last case that you were taken?
11   **A.  It was a contractual claim, a breach of**
12   **contract claim, regarding an insurance contract.**
13   Q.  Were you serving as an expert witness in that
14   matter?
15   **A.  Yes.**
16   Q.  What was the name of the case?
17   **A.  O'Donnell vs. Misho, M-I-S-H-O.**
18   Q.  Which party were you rendering expert services
19   on?
20   **A.  O'Donnell.**
21   Q.  What was the case about, aside from breach of
22   contract with respect to an insurance --
23   MS. CRAPSTER: Objection.  Relevance.
24   THE WITNESS: Failure to pay a premium.
25   ///

Page 8

1    BY MS. COYOCA:
2    Q.  It was alleged that the insured had failed to
3    pay a premium?
4    **A.  That's correct.**
5    Q.  Was the insured in the matter the O'Donnell
6    party?
7    **A.  Yes.**
8    Q.  Did you write a report in that case?
9    **A.  No.**
10   Q.  Was the case in State Court or Federal Court?
11   **A.  State Court.**
12   Q.  Los Angeles Superior Court?
13   **A.  Santa Barbara.**
14   Q.  What law firm hired you?
15   MS. CRAPSTER: Objection.  Relevance.
16   THE WITNESS: Jim Nagel.
17   BY MS. COYOCA:
18   Q.  Do you remember Mr. Nagel's law firm?
19   **A.  I think it was Nagel & Associates.**
20   Q.  Is that a Los Angeles-based firm or
21   Santa Barbara?
22   **A.  Los Angeles.**
23   Q.  Given that you've been deposed 20 times,
24   Mr. Shapiro, I'm not going to belabor the admonition.
25   I'm just going to go over them briefly with you.

Page 9

1    You understand that you are under oath today
2    and sworn to tell the truth as if you were testifying in
3    a court of law?
4    **A.  Yes.**
5    Q.  Are there any physical or medical reasons why
6    you would be unable to give your full and complete
7    testimony today?
8    **A.  No.**
9    Q.  Are you taking any medications or under any
10   mental or emotional impairment that prohibit you from
11   being able to give your full and complete testimony
12   today?
13   **A.  No.**
14   Q.  Have you ever been deposed as a party to a
15   legal proceeding?
16   **A.  No.**
17   Q.  Have you ever been a party to a legal
18   proceeding?
19   **A.  Yes.**
20   Q.  What was the case in which you were a party?
21   MS. CRAPSTER: Objection.  Relevance.
22   THE WITNESS: Fee disputes with clients.
23   BY MS. COYOCA:
24   Q.  When is the last such fee dispute that you had
25   with a client?

Page 10

1 　A. Oh, it's been about three years; three,
2 four years.
3 　Q. How many times have you had a fee dispute with
4 a client in which you have ended up needing to litigate
5 against the former client?
6 　A. I can recall two occasions.
7 　Q. When is the last such occasion?
8 　A. Three to four years ago.
9 　Q. And the time before that?
10 　A. Maybe five years before that.
11 　MS. COYOCA: I'd like to mark as Exhibit 1 to
12 this deposition the Notice of Taking Deposition of Jay
13 Shapiro and Request for Production of Documents.
14 　Q. Could you please take a look at it when the
15 court reporter gives it to you.
16 　(Shapiro Exhibit 1 was
17 　marked for identification.)
18 　THE WITNESS: Yes.
19 BY MS. COYOCA:
20 　Q. Mr. Shapiro, have you seen this document
21 before?
22 　A. Yes.
23 　Q. Have you produced any documents in response to
24 the document request portion of this notice that begins
25 on page 3?

Page 11

1 　A. I believe I have.
2 　Q. What documents have been produced?
3 　(Interruption in proceedings.)
4 　MS. COYOCA: Off the record, please.
5 　(A discussion was held off the record.)
6 　(The question was read as follows:
7 　"What documents have been produced?")
8 　THE WITNESS: I produced my expert report, the
9 engagement letter, invoices. I believe that's it.
10 　MS. COYOCA: Ms. Crapster, the documents that
11 you handed me prior to the commencement of the
12 deposition that are marked JS00001 through 20, are these
13 the documents that are being produced in response to
14 Plaintiffs' Request for Production of Documents today?
15 　MS. CRAPSTER: That is correct.
16 　MS. COYOCA: Are there any other documents that
17 are being produced?
18 　MS. CRAPSTER: No.
19 BY MS. COYOCA:
20 　Q. Mr. Shapiro, in response to request for
21 production No. 1, that sought the production of all
22 documents that you reviewed prior to forming any
23 opinions, including any documents that do or do not
24 support your opinion; in other words, any documents you
25 reviewed.

Page 12

1 　A. Yes.
2 　Q. You identified certain documents in your
3 report.
4 　Are there any other documents that you reviewed
5 other than those that are identified in the schedule to
6 your report?
7 　A. No.
8 　Q. Do you keep a file concerning this matter?
9 　A. Yes.
10 　Q. Have you produced that file to counsel,
11 Ms. Crapster?
12 　A. I have.
13 　Q. ^What is in that file?
14 　MS. CRAPSTER: Objection. I'm going to
15 instruct the witness not to answer that question.
16 That's information that's protected by the
17 attorney-client privilege and Rule 26.
18 BY MS. COYOCA:
19 　Q. In Schedule A to your CV that is attached to
20 your expert report, you list a number of chapters that
21 you authored, entertainment chapters of Harcourt Brace's
22 COMPREHENSIVE GAAP GUIDE.
23 　Do you recall that?
24 　A. Yes.
25 　Q. Have you produced those chapters to your

Page 13

1 counsel?
2 　A. No.
3 　Q. Do you have copies of those chapters?
4 　A. No.
5 　MS. CRAPSTER: Ms. Coyoca, you have our
6 objections to these requests for production, and we've
7 set forth the reasons in those objections why those are
8 not being produced to you.
9 BY MS. COYOCA:
10 　Q. What chapters did you author with respect to
11 Harcourt Brace's COMPREHENSIVE GAAP GUIDE?
12 　A. Entertainment accounting.
13 　Q. When was the COMPREHENSIVE GAAP GUIDE by
14 Harcourt Brace published?
15 　MS. CRAPSTER: Objection. Relevance.
16 　THE WITNESS: To the best of my recollection,
17 eight or nine years ago.
18 BY MS. COYOCA:
19 　Q. How many such chapters did you author?
20 　A. I believe there's three.
21 　Q. What were the three chapters about?
22 　MS. CRAPSTER: Objection. Relevance.
23 　THE WITNESS: Entertainment accounting: Costs,
24 revenues, and amortization.
25 / / /

Case 2:16-cv-04435-PA-MRW   Document 162-4   Filed 12/30/19   Page 6 of 49   Page ID
#:12243

Universal Cable Productions LLC, et al. v.
Atlantic Specialty Insurance Company

Jay Shapiro
May 23, 2017

Page 14

1  BY MS. COYOCA:
2    Q.  Did you write any chapters concerning profit
3  participation accounting in the entertainment industry?
4        MS. CRAPSTER: Objection.  Relevance.
5        THE WITNESS: It may have been mentioned.
6  BY MS. COYOCA:
7    Q.  As to the three chapters that you authored, are
8  the subject matters, the three topics that you've
9  identified, broken out by each chapter?  For example, is
10 there a chapter that relates just to cost accounting in
11 the entertainment industry?
12   A.  I don't recall the organization.
13   Q.  Have you written anything relating to the
14 intersection between GAAP accounting versus
15 entertainment industry-related accounting?
16   A.  Not that I recall.
17   Q.  You indicate that you were featured in FATAL
18 SUBTRACTION, the decision regarding the Buchwald vs.
19 Paramount case.
20       What do you mean by that?
21   A.  I was the expert witness for Mr. Buchwald.
22   Q.  What about DECONSTRUCTING SAMMY DAVIS, JR.?
23   A.  I also served as his -- his estate's business
24 manager.
25   Q.  You served as the Estate of Sammy Davis, Jr.'s

Page 15

1  business manager?
2    A.  Yes.
3    Q.  How long did you hold that role?
4    A.  Oh, two to three years.
5    Q.  When did you first begin?
6    A.  It was a long time ago.  It could have been
7  seven, eight years ago.
8    Q.  Have you authored any other articles, books,
9  any other publications relating to accounting in the
10 entertainment industry?
11   A.  No.
12   Q.  ^Have you provided to your counsel copies of
13 any of the expert reports that you've rendered in any
14 other cases in which you've been retained?
15       MS. CRAPSTER: Objection.  Calls for
16 attorney-client privileged information.
17       I'll instruct the witness not to answer.
18 BY MS. COYOCA:
19   Q.  Did you render a report in the Cobb matter?
20   A.  Not that I recall.
21   Q.  You served as an expert witness in the Cobb vs.
22 Time Warner matter; is that correct?
23   A.  I did.
24   Q.  When did you render those services?
25   A.  I believe 2013.

Page 16

1    Q.  Where was that case filed?
2    A.  Southern District of Tennessee.
3    Q.  What work did you perform in that case?
4    A.  I evaluated documents that inferred that
5  Mr. Cobb had no earning power.
6    Q.  Were you working for the Cobb -- Mr. Cobb's
7  side or the Time Warner side?
8    A.  Mr. Cobb.
9    Q.  Did you ultimately render an opinion as to the
10 earnings potential of Mr. Cobb?
11   A.  I did.
12   Q.  Was that opinion ever documented in a written
13 report format?
14   A.  It was not.
15   Q.  Did you testify at trial?
16   A.  Yes.
17   Q.  Was that decision in that case challenged on
18 appeal?
19   A.  It was.
20   Q.  Were your holdings or your opinions addressed
21 in the appeal?
22   A.  I don't recall.
23   Q.  Who prevailed in the case?
24   A.  Time Warner.
25   Q.  What attorney or law firm hired you for the

Page 17

1  Cobb vs. Time Warner case?
2    A.  I don't recall the law firm.
3    Q.  Do you remember the name of the lawyer?
4    A.  No, ma'am.
5    Q.  Greer vs. Dove Books, did you render legal
6  services in that matter?
7    A.  Yes.
8    Q.  When?  Excuse me.  I want to correct my
9  question.
10       Did you render expert services in the Greer vs.
11 Dove Books matter?
12   A.  Yes.
13   Q.  What did you do?
14   A.  It was an issue of royalties on the sale of
15 Ms. Greer's book.
16   Q.  Which side did you perform services for?
17   A.  Ms. Greer.
18   Q.  Where was that case filed?
19   A.  Los Angeles County.
20   Q.  L.A. Superior Court?
21   A.  Yes.
22   Q.  When was it filed?
23   A.  I believe 2013.
24   Q.  Did you render a written report in that case?
25   A.  No.

Case 2:16-cv-04435-PA-MRW   Document 162-4   Filed 12/30/19   Page 7 of 49   Page ID
#:12244

Universal Cable Productions LLC, et al. v.
Atlantic Specialty Insurance Company

Jay Shapiro
May 23, 2017

Page 18

1  Q.  Did you provide deposition testimony?
2  A.  **Not that I recall.**
3  Q.  Did you testify at trial?
4  A.  **No.**
5  Q.  Did you form an opinion in that matter?
6  A.  **Yes.**
7  Q.  Was that opinion ever conveyed to opposing
8  counsel?  Do you know?
9  A.  **Not that I'm aware of.**
10  Q.  What was the result in that case?
11  A.  **There was a settlement with Ms. Greer by Dove**
12  **Books.**
13  Q.  What lawyer or law firm hired you in the
14  Greer vs. Dove Books matter?
15  A.  **Rick Rosenthal.**
16  Q.  Do you recall the name of Mr. Rosenthal's firm?
17  A.  **I do not.**
18  Q.  Is Mr. Rosenthal an attorney in Los Angeles?
19  A.  **He is.**
20  Q.  You served as a referee in the L.A. Superior --
21  excuse me -- in the CRASH matter; is that correct?
22  A.  **That is correct.**
23  Q.  What is that case about?
24  A.  **It was about the payment of a profit interest**
25  **to the licensee of the CRASH materials, the producer of**

Page 19

1  **the CRASH materials.**
2  Q.  The "CRASH materials," do you mean the CRASH
3  motion picture?
4  A.  **Yes.**
5  Q.  And the producer of CRASH was alleging a
6  contingent participation interest; is that correct?
7  A.  **He was.**
8  Q.  Who was the producer?
9  A.  **I don't recall the exact party.**
10  Q.  Where was the case filed?
11  A.  **Los Angeles Superior Court.**
12  Q.  What were your services in the matter?
13  A.  **I advised the judge in the case on the various**
14  **documents and analyses that were presented in evidence.**
15  Q.  Which judge?
16  A.  **Santa Monica Court, Judge Karlin, Craig Karlin.**
17  Q.  How were you appointed?
18  A.  **He was given a list of names, and he**
19  **interviewed me and chose me.**
20  Q.  Do you know which side put your name on the
21  list?
22  A.  **I do not.**
23  Q.  What was the result in that case?
24  A.  **I think there was ultimately a payment to the**
25  **plaintiff.**

Page 20

1  Q.  Did you render a written report in that case?
2  A.  **Not that I recall.**
3  Q.  Did you render an opinion to the court in that
4  case?
5  A.  **I did correspond with Judge Karlin.**
6  Q.  What was your opinion in the case?
7  A.  **That the plaintiff's documents appeared to be**
8  **more reliable than the defendant's.**
9  Q.  You rendered services in the Kasich,
10  K-A-S-I-C-H, vs. NTV matter; is that correct?
11  A.  **Yes.**
12  Q.  On your Schedule A to your CV after the Kasich
13  case note, it indicates "DECISIONS."
14  A.  **Yeah.  It was a motion picture film, and the**
15  **issue was it was licensed to NTV, and they hadn't paid**
16  **the producer anything.**
17  Q.  Did it concern the producer's fixed or
18  contingent compensation?
19  A.  **Contingent.**
20  Q.  Which side did you render services to?
21  A.  **Kasich.**
22  Q.  Was Kasich the producer?
23  A.  **He was.**
24  Q.  When was the case filed?
25  A.  **2013.**

Page 21

1  Q.  Which lawyer or law firm hired you?
2  A.  **I don't recall.**
3  Q.  Was it a law firm in Los Angeles?
4  A.  **Yes.**
5  Q.  Did you render a written report in that case?
6  A.  **No.**
7  Q.  Did you testify in deposition in the case?
8  A.  **I believe I did.**
9  Q.  Did you testify at trial in the matter?
10  A.  **No.**
11  Q.  How was the case resolved?
12  A.  **Settlement between the parties.**
13  Q.  What was the opinion that you rendered in the
14  Kasich vs. NTV matter?
15  A.  **That he was entitled to some amount of monies**
16  **from NTV's exploitation of the film.**
17  Q.  You rendered services in the Sterling vs.
18  Stiviano matter?
19  A.  **Yes.**
20  Q.  What services did you render?
21  A.  **I reviewed the accounting documents relative to**
22  **the case and the dollar amount settlement.**
23  Q.  Which side did you render services to?
24  A.  **Mrs. Sterling.**
25  Q.  Where was that case filed?

Case 2:16-cv-04435-PA-MRW   Document 162-4   Filed 12/30/19   Page 8 of 49   Page ID
#:12245

Universal Cable Productions LLC, et al. v.
Atlantic Specialty Insurance Company

Jay Shapiro
May 23, 2017

Page 22

1   A.   Los Angeles County in the Superior Court.
2   Q.   Who were the lawyers that hired you?
3   A.   Greenberg Glusker.
4   Q.   Bert Fields?
5   A.   Pierce O'Donnell.
6   Q.   Did you render a written report in the Stiviano
7   matter?
8   A.   I did not.
9   Q.   Did you testify in deposition in the
10  Sterling v. Stiviano matter?
11  A.   Yes.
12  Q.   Did you testify in any proceeding in the matter
13  other than the deposition?
14  A.   Trial.
15  Q.   What was your opinion in the matter?
16  A.   That Mrs. Sterling was entitled to a certain
17  dollar amount of monies.
18  Q.   Did you opine that Mrs. Stiviano was not?
19  A.   Indirectly, yes.
20  Q.   What do you mean by "indirectly"?
21  A.   Well, she was the recipient of Mr. Sterling's
22  generosity, and the case was essentially the return of
23  community funds.
24  Q.   A recoupment case?
25  A.   Yes.

Page 23

1   Q.   How was the case resolved?
2   A.   Ms. Stiviano returned certain properties
3   purchased with the funds.
4   Q.   Was the case resolved by settlement, or did it
5   go to verdict in the trial?
6   A.   It went to verdict.
7   Q.   Was the case appealed?
8   A.   Not that I'm aware of.
9   Q.   The O'Donnell vs. Misho Law Group, that's the
10  case you mentioned previously; is that correct?
11  A.   Yes.
12  Q.   Can you recall any other cases in which you
13  provided deposition testimony as an expert witness?
14  A.   Well, over the years, like I said,
15  approximately 20 times.
16  Q.   Can you recall the names of any cases other
17  than just the number 20?
18  A.   Well, if I had my full resume, I could identify
19  some more.  But I understood from counsel there was a
20  four-year window.
21  Q.   So you have a resume that contains a listing of
22  all the cases in which you've previously testified as an
23  expert; is that correct?
24  A.   It does exist.  Yes.
25  Q.   Have you ever given your testimony in a Federal

Page 24

1   Court action before?
2   A.   Yes.
3   Q.   What was that Federal Court action?
4   A.   The first I recall is the Cobb matter, Southern
5   District of Tennessee.
6   Q.   Any others?
7   A.   I believe there's others.  I just can't recall
8   them.
9   Q.   How long have you been rendering services as an
10  expert witness?
11  A.   Well, it's about 50 percent of my practice.
12  I'd say 15 to 20 years.
13  Q.   Do you represent plaintiffs more than
14  defendants?
15      MS. CRAPSTER: Objection.  Relevance.
16      THE WITNESS: In the nature of my work, yes.
17  My plaintiffs are often artists, writers, directors.
18  BY MS. COYOCA:
19  Q.   So you --
20  A.   And the defendants tend to be studios.
21  Q.   So you represent predominantly the talent side;
22  is that correct?
23  A.   I do.
24  Q.   What percentage of your work relates to
25  primarily participation cases?

Page 25

1   A.   I'd say half.
2   Q.   Have you ever previously rendered expert
3   services to the Strasburger Price firm?
4   A.   No.
5   Q.   Do you keep copies of the deposition
6   transcripts in which you -- in the cases in which you
7   have been deposed?
8   A.   No.
9   Q.   Do you have copies of any deposition
10  transcripts for any matter in which you've been deposed?
11  A.   No.
12  Q.   Mr. Shapiro, can you please describe your
13  educational history, beginning from college forward.
14  A.   My educational history beginning with college?
15  Q.   Yes.
16  A.   University of Wisconsin, bachelor's degree in
17  accounting.  I have a master's in business from Arizona
18  State University graduate school.
19  Q.   Any other advanced degrees?
20  A.   No.
21  Q.   You indicated you have a master's in business
22  from Arizona State University graduate school; is that
23  correct?
24  A.   Yes.
25  Q.   Your resume indicates that you have a master's

**Page 26**

1  in accounting and finance.
2  **A.  Yeah.  My major was accounting and finance.**
3  Q.  Do you have an MBA?
4  **A.  It's a master of science.**
5  Q.  Are you a certified public accountant?
6  **A.  I am.**
7  Q.  Have you ever -- when were you first licensed?
8  **A.  1977.**
9  Q.  What did you do after you received your MS in
10 accounting and finance?  What was your first job?
11 **A.  KPMG Peat Marwick.**
12 Q.  How long were you at Peat Marwick?
13 **A.  Eight or nine years.**
14 Q.  Your resume indicates 1973 to 1982; is that
15 correct?
16 **A.  Yes.**
17 Q.  Where did you go after you left Peat Marwick?
18 **A.  Laventhol Horwath.**
19 Q.  Did you make partner at Peat Marwick before you
20 left?
21 **A.  No.**
22 Q.  How long were you at Laventhol?
23 **A.  '82 to November 20, 1990.**
24 Q.  What did you do after you left Laventhol?
25 **A.  I started my own practice.**

**Page 27**

1  Q.  Is that practice the Program Entertainment
2  Group?
3  **A.  No.  It would be Jay Shapiro CPA.**
4  Q.  Why did you leave Laventhol?
5  **A.  The firm dissolved.**
6  Q.  Did you work full time as the principal of Jay
7  Shapiro CPA for a period of years?
8  **A.  Well, from time to time I'd have clients that**
9  **needed more full-time services.  I would take kind of**
10 **positions as their acting or temporary chief financial**
11 **officer.**
12 Q.  What is the first such client that you --
13 **A.  Program Entertainment.**
14 Q.  Okay.  Mr. Shapiro, it's important that you let
15 me finish my question before you answer.  Otherwise, we
16 won't have a complete transcript.
17 **A.  Okay.**
18 Q.  Okay?
19    Also, it's important that you give verbal
20 responses, not nods of the head or shakes of the head.
21    Do you understand?
22 **A.  Yes.**
23 Q.  So the first such client that you remember
24 rendering services to as an outside chief financial
25 officer is the Program Entertainment Group; is that

**Page 28**

1  correct?
2  **A.  That's correct.**
3  Q.  What is the Program Entertainment Group?
4  **A.  They were a TV syndicator.**
5  Q.  Do they still exist?
6  **A.  I don't believe so.**
7  Q.  How long did you serve as the outside CFO for
8  Program Entertainment Group?
9  **A.  I don't recall.**
10 Q.  Your resume indicates 1990 to 1993; is that
11 right?
12 **A.  That sounds right.  Yes.**
13 Q.  Who hired you?
14 **A.  The CEO.**
15 Q.  Who is the CEO?
16 **A.  I don't recall his name.**
17 Q.  Why did you stop rendering services to the
18 Program Entertainment Group?
19 **A.  They didn't feel they needed the service any**
20 **further.**
21 Q.  Did you have a dispute with the Program
22 Entertainment Group when you left rendering services for
23 that entity?
24 **A.  No.**
25 Q.  Did you work full time for the Program

**Page 29**

1  Entertainment Group?
2  **A.  No.**
3  Q.  You continued having your own private practice
4  as well?
5  **A.  I did.**
6  Q.  What was the nature of the work that you did
7  during this period of time when you had your own
8  accounting firm and you were also simultaneously
9  rendering services to the Program Entertainment Group?
10 **A.  Well, I provided a wide variety of services:**
11 **Accounting, tax, some business management, forensic**
12 **accounting.  That's about it.**
13 Q.  Is there a particular area of industry that you
14 specialized in during this period of time?
15 **A.  Well, I've always specialized in entertainment.**
16 Q.  During this particular period of time, did you
17 predominantly represent talent?
18 **A.  I had some talent.**
19 Q.  What other areas in the industry did you
20 represent?
21 **A.  I have represented corporate entertainment**
22 **entities, investment partnerships in the entertainment**
23 **industry; basically, non-individuals engaged in**
24 **entertainment.**
25 Q.  Did you represent financiers?

**Page 30**

1   A.   From time to time I get work from people
2 financing entertainment projects.  Yes.
3   Q.   Did you predominantly specialize in television,
4 feature film, music industry, or any other area?
5   A.   Well, most of my clients were television and/or
6 film.  I did some music, but predominantly TV and film.
7   Q.   After you stopped representing the Program
8 Entertainment Group, did you begin representing any
9 other particular client rendering services as an outside
10 CFO similar to what you did for the Program
11 Entertainment Group?
12     MS. CRAPSTER: Objection.  Vague.
13     THE WITNESS: None that I recall.
14 BY MS. COYOCA:
15   Q.   Do you recall ever serving in a similar
16 capacity to what you did for the Program Entertainment
17 Group --
18   A.   Yes.
19   Q.   -- with respect to any other entity?
20   A.   Yes.
21   Q.   What entity is that?
22   A.   Well, again, if I had my resume, I think I have
23 a list of corporate entities I served in that capacity,
24 as indicated on my resume.
25   Q.   Is Impact Media Group another one?

**Page 31**

1   A.   Yes.
2   Q.   Was there any entity between the Program
3 Entertainment Group and Impact Media Group for which you
4 rendered services on an outside CFO basis?
5   A.   Not that I recall.
6   Q.   What is Impact Media Group?
7   A.   They were a syndicator of television programs.
8   Q.   Do they still exist?
9   A.   No.
10   Q.   Who hired you?
11   A.   The CEO.
12   Q.   It indicates on your resume that you served as
13 chief executive officer.
14   A.   Yeah.  He -- he left the company, and I took
15 his position.  I was asked by the board to take his
16 position.
17   Q.   Who was the CEO who hired you?
18   A.   Drew Levin.
19   Q.   Now, when you indicate that Impact Media Group
20 was a syndicator of television programming, did it
21 syndicate its own content?
22   A.   It produced and also acquired content for sale
23 to TV outlets and networks.
24   Q.   Did it predominantly sell in the U.S. or
25 internationally?

**Page 32**

1   A.   About 50/50.
2   Q.   Did it sell to any of the majors?
3   A.   Discovery Channel.
4   Q.   Any others?
5   A.   Mostly smaller.  Discovery Channel would have
6 been the largest.
7   Q.   Why did you leave -- or why did you stop
8 rendering accounting or financial services to the Impact
9 Media Group?
10   A.   They no longer needed services; bankruptcy.
11   Q.   The Impact Media Group went bankrupt?
12   A.   They did.
13   Q.   Did you have any kind of dispute with the
14 Impact Media Group prior to your departure from the
15 company?
16   A.   No.
17   Q.   Sunrise Media Group, what did you do for
18 Sunrise Media Group?
19   A.   I created Sunrise Media Group, and it's wholly
20 owned by me.
21   Q.   What does it do?
22   A.   We're consultants to film producers to assist
23 them in their sale of their content to users.
24   Q.   To users or to third-party distributors?
25   A.   They would be users.

**Page 33**

1   Q.   I'm sorry.  Does Sunrise Media Group render
2 services to producers who are selling their content to
3 third-party distributors?
4   A.   That's correct.
5   Q.   How many employees does Sunrise Media Group
6 have?
7   A.   Well, one time I had six employees.
8   Q.   How many currently?
9   A.   One.
10   Q.   Anyone other than yourself?
11   A.   No.
12   Q.   Does Sunrise Media Group still exist?
13   A.   Yes.
14   Q.   Does it still conduct business?
15   A.   Well, what do you mean by "conduct"?
16   Q.   Does it have any clients?
17   A.   We've been somewhat inactive in 2016.  In '17
18 there has been no business.
19   Q.   Do you currently work full time?
20   A.   Yes.
21   Q.   What percentage of your current full-time work
22 relates to rendering expert services?
23   A.   Well, I do 50 percent forensic accounting.
24 That would include expert services.
25   Q.   How many cases do you currently have ongoing?

Page 34

1   A.   At this time, one.
2   Q.   Just this one?
3   A.   Yes.
4   Q.   Do you continue to hold a certified public
5   accountant license in the state of California?
6   A.   Yes.
7   Q.   Are you licensed anyplace else?
8   A.   No.
9   Q.   Have you ever been licensed in any other
10  jurisdiction?
11  A.   Yes.
12  Q.   What jurisdictions?
13  A.   Wisconsin.
14  Q.   Any others?
15  A.   No.
16  Q.   Do you hold any other professional licenses or
17  certifications?
18  A.   No.
19  Q.   When did your Wisconsin license go inactive?
20  A.   '77.
21  Q.   Have you ever been disciplined or sanctioned by
22  the California Board of Public Accountancy?
23  A.   Yes.
24  Q.   When?
25  A.   About 10 years ago.

Page 35

1   Q.   Why were you sanctioned?
2   A.   I failed to sign up for an organization that
3   the requirement for such sign-up, I was unaware of.
4   Q.   What was the organization?
5   A.   Public Company Auditing Oversight Board.
6   Q.   Public company on the -- is it Auditing
7   Oversight Board?
8   A.   I believe so.
9   Q.   What organization sanctioned you?
10  A.   I wasn't sanctioned.  The discipline I received
11  was a probation.  All my services remain the same.  And
12  the ruling came from the Securities and Exchange
13  Commission.
14       MS. COYOCA: I'd like to mark as Exhibit 2 an
15  Order Making Findings and Imposing Remedial Sanctions
16  Pursuant to Section 4C and 21C of the Securities
17  Exchange Act of 1934 and Rule 102(e) of the Commission's
18  Rules of Practice.
19       MS. CRAPSTER: Ms. Coyoca, are we not
20  continuing to sequentially number the exhibits?
21       MS. COYOCA: I thought that's what we were
22  doing as well.  But when I was in the last deposition
23  with Mr. Keeley, he indicated that's not what you all
24  are doing.
25       MS. CRAPSTER: Okay.

Page 36

1        (Shapiro Exhibit 2 was
2        marked for identification.)
3        MS. COYOCA: Ms. Crapster, it would be my
4   preference that we would continue sequentially
5   numbering.  I understand that you all are marking your
6   own exhibits, even though there have been documents that
7   have been marked by plaintiffs' side with different
8   numbering.  But it was my understanding that's not what
9   your firm was doing.
10       If it is, then I'm happy to try to find out
11  what the last document number was that we offered and am
12  happy to continue on in that vein.
13       Is that --
14       MS. CRAPSTER: As we sit here today, I believe
15  Ms. Markus is being deposed as well.  So at this point
16  it's probably impossible to get a true sequential
17  numbering.  So I think for purposes of today, we can
18  continue with starting at 1.
19       MS. COYOCA: All right.  I'm going to mark them
20  all as Shapiro 1, Shapiro 2 -- okay? -- et cetera.
21       MS. CRAPSTER: I agree.
22  BY MS. COYOCA:
23  Q.   Mr. Shapiro, can you please take a look at the
24  document I've put in front of you.
25  A.   Yes.

Page 37

1   Q.   Do you recognize this document?
2   A.   Yes.
3   Q.   What is it?
4   A.   It's an administrative proceeding with the
5   Securities and Exchange Commission.
6   Q.   Is this the disciplinary Order that you were
7   speaking about in your previous response?
8   A.   Yes.
9   Q.   There is an entity referenced on page 2 that's
10  titled Daleco Resources Corporation.
11       Do you see that?
12  A.   Yes.
13  Q.   What is Daleco Resources Corp.?
14  A.   It was an oil and gas company.
15  Q.   Did you render services to Daleco?
16  A.   I did.
17  Q.   What services?
18  A.   Auditing services.
19  Q.   Auditing services?
20  A.   Yes.  I prepared an audit and opinion for their
21  Form 10-K for the year ending September 30, 2003.
22  Q.   What connection, if any, did Daleco have to the
23  entertainment industry?
24  A.   None.
25  Q.   On page 4 of this document, it indicates that

Page 38

1  after one year from the date of the order, the firm of
2  Jay Shapiro could request reinstatement before the SEC;
3  is that correct?
4      A.  Yes.
5      Q.  Did you --
6      A.  No.
7      Q.  Okay.  You need to let me finish asking my
8  question.
9          Did you seek reinstatement before the SEC?
10     A.  No.
11     Q.  Have you been found to be in violation of any
12  other provision of the Sarbanes–Oxley Act since this
13  decision?
14     A.  No.
15     Q.  As a result of the decision in this matter, the
16  Daleco matter, were you disciplined or sanctioned by the
17  California State Board of Accountancy?
18     A.  Yes.
19     Q.  What discipline or sanction did you receive?
20     A.  Two years' probation.
21     Q.  What were the terms of the probation?
22     A.  Quarterly reporting and take an ethics course.
23  There was no suspension of any practice privilege.
24     Q.  Okay.  So during the two-year probation period,
25  you were permitted to continue practicing as a certified

Page 39

1  public accountant; is that correct?
2      A.  In all capacities.
3      Q.  What two-year period of time were you on
4  probation?
5      A.  I think it was 2010 and '11.
6      Q.  Have you received any other discipline or
7  sanction by any regulatory board or authority during the
8  course of your practice?
9      A.  No.
10     Q.  Have you been engaged to render services in
11  this case?
12     A.  Yes.
13     Q.  When were you first engaged?
14     A.  March 27, 2017.
15     Q.  Who hired you?
16     A.  Ms. Crapster.
17     Q.  Did you know Ms. Crapster prior to this case?
18     A.  No.
19     Q.  ^Did Ms. Crapster indicate how she had located
20  you?
21         MS. CRAPSTER:  Objection.  Calls for
22  attorney-client privileged information.
23         I'll instruct the witness not to answer.
24  BY MS. COYOCA:
25     Q.  ^What did Ms. Crapster tell you when she first

Page 40

1  contacted you about the case?
2          MS. CRAPSTER:  Objection.  Calls for
3  attorney-client privileged information.
4          I'll instruct the witness not to answer.
5          MS. COYOCA:  Based on Rule 26, you're
6  instructing on what you told him about the case?
7          MS. CRAPSTER:  I'm going to need you to be much
8  more specific.  Rule 26 has some very narrow exceptions
9  to the attorney-client privileged protections that apply
10  to communications between attorneys and witnesses.  If
11  you want to narrow the question to precisely what
12  Rule 26 allows --
13         MS. COYOCA:  I believe I have.
14         MS. CRAPSTER:  -- I won't object to that.
15         MS. COYOCA:  I want to know if you're standing
16  on your objection that you're not going to tell him
17  [sic] what you told him about when you first contacted
18  him.
19         Is that correct?
20         THE WITNESS:  That's correct.
21         MS. COYOCA:  Can we go off the record for a
22  moment, please.
23         (A discussion was held off the record.)
24         MS. COYOCA:  Back on the record.
25     Q.  Mr. Shapiro, when Ms. Crapster contacted you on

Page 41

1  March 27, 2017, what did she tell you about the facts of
2  the case?
3      A.  I asked questions about the case.  She told me
4  that she represented an insurance company.  There was a
5  claim regarding extra expenses incurred on a relocation.
6  And when I asked her for more details, she sent me the
7  Complaint.
8      Q.  Did she indicate to you what she meant by
9  "extra expenses incurred on a relocation"?
10     A.  No.  That would be spelled out in the
11  Complaint.
12     Q.  Did you form an understanding as to what was
13  meant by "extra expenses incurred on a relocation"?
14     A.  I did.
15     Q.  What's your understanding?
16     A.  I found in the Complaint -- there was an
17  exhibit, the insurance policy.  And Section IX pretty
18  well explained the computation for extra expense.  And I
19  believe I brought a copy of my notes in that area today.
20     Q.  Okay.  We'll get to those in a moment.
21     A.  Okay.  And that's what I learned.
22     Q.  I want to show you a document that's previously
23  been marked as Williams Exhibit 1.  So I don't think
24  it's necessary to re-mark the document.
25         This is a copy of the Motion Picture/Television

1 Producers Portfolio policy issued by Atlantic Specialty
2 Insurance Company to NBCUniversal Media, LLC, Policy
3 No. MP00163-04, labeled Bates control ATL003073 through
4 3127.
5      Mr. Shapiro, you indicated that attached to the
6 Complaint was a copy of the insurance policy; is that
7 right?
8    **A.  Yes.**
9    Q.  Is this the policy that you were referring to?
10   **A.  Yes.  I believe it is.**
11   Q.  Okay.  If you'll look at Section IX, which is
12 on the page labeled ATL003106 --
13   **A.  I don't have -- oh.  Here it is.  Yes.**
14   Q.  -- Roman numeral IX is titled "Definition of
15 Loss."
16      Do you see that?
17   **A.  Yes.**
18   Q.  When you indicated that you looked at the
19 Definition of Loss, is this the section to which you're
20 referring?
21   **A.  Yes.**
22   Q.  The Definition of Loss references "insurable
23 production cost."
24      Do you see that term?
25   **A.  Yes.**

1    Q.  Did you review and look at the definition of
2 "insurable production cost"?
3    **A.  Well, I read through the policy.  I don't
4 remember particularly looking up the definition.**
5    Q.  Did you consider the definition of "insurable
6 production cost" in rendering your opinions in this
7 matter?
8    **A.  Yes.**
9    Q.  What's your understanding of the definition of
10 "insurable production cost"?
11   **A.  It was the amount that was in the application
12 for the insurance policy.**
13   Q.  So your understanding of "insurable production
14 cost" is whatever the dollar amount was that was in the
15 application for the insurance policy?
16   **A.  Yes.**
17   Q.  Now, when you indicate the "application for the
18 insurance policy," are you referring to the application
19 for the policy that we're looking at here in Exhibit 1,
20 or are you referring to the application to have the DIG
21 television show added as an insured production?
22   **A.  Well, I'm not sure what the document was
23 created -- which one it had been created for.  But there
24 was a document that looked like an application that had
25 a dollar amount of $25 million.**

1    Q.  That application that you're referencing, did
2 it refer specifically to the DIG television show?
3    **A.  It did.**
4    Q.  So it's your understanding that that
5 $25 million is the insurable production cost as it's
6 defined or referenced in Section IX?
7    **A.  Yes.**
8    Q.  Can you please turn to page ATL003081.
9    **A.  Yes.**
10   Q.  At the very bottom of the page in the
11 right-hand column there is Item 4 that's titled
12 "Insurable Production Cost."
13      Do you see that?
14   **A.  Yes.**
15   Q.  This is under Section II, capital A,
16 "Definitions."
17   **A.  Yes.**
18   Q.  This contains a specific definition of the term
19 "insurable production cost," does it not?
20   **A.  Yes.**
21   Q.  Is there a reference to a $25 million amount in
22 this provision?
23   **A.  No.**
24   **MS. CRAPSTER:** Objection.  Assumes facts not in
25 evidence.

1 **BY MS. COYOCA:**
2    Q.  Did you consider this definition of "insurable
3 production cost" in calculating the loss as referenced
4 in Section IX?
5    **A.  Well, I recognize production cost to include
6 all the matters described here, overhead, interest, then
7 direct costs of production.  So I assume the two things
8 were the same.**
9    Q.  If the amount, though, exceeded 25 million that
10 was incurred in the production costs associated with
11 DIG, is it your understanding that that $25 million in
12 the application would act as a cap on the insurable
13 production cost?
14      **MS. CRAPSTER:** Objection.  Lacks foundation.
15 Vague and ambiguous.
16      **THE WITNESS:** No.
17 **BY MS. COYOCA:**
18   Q.  Now, you indicated -- you referred to a folder
19 to your left that you referred to when you were
20 beginning to speak about the definition of "loss."
21      What's contained in that folder?
22   **A.  I have the Section III of the insurance policy
23 and a copy of my report.**
24   Q.  Anything else?
25   **A.  No.**

---

Page 46

1  Q.  What's the document that's on the top of the
2  front folder?
3  A.  It's just a piece of scratch paper with nothing
4  on it.
5  Q.  What's the note on the inside of the folder?
6  A.  Phone numbers.
7  Q.  Phone numbers for what?
8  A.  Ms. Crapster and the IT guy at Strasburger.
9  Q.  Now, when you say you have Section III of the
10  extra expense portion, are you referring -- excuse me --
11  Section III of the policy, are you referring to
12  Section III - Extra Expense, that begins on page
13  ATL0003103?
14  A.  Yes.
15  Q.  So the sections that you annotated and produced
16  here today are the pages that are contained at ATL003103
17  through 0003106?
18  A.  Yes.
19  Q.  Why didn't you copy and annotate and include in
20  your excerpts of the policy the definition of "insurable
21  production cost" that's contained on ATL0003081 through
22  3082?
23  A.  I didn't find it necessary.
24  Q.  Okay.  When you first spoke with Ms. Crapster,
25  what did she ask you to do?

---

Page 47

1  A.  She asked me to prepare a rebuttal to
2  Mr. Wunderlich's report.
3  Q.  Did she provide you a copy of Mr. Wunderlich's
4  report?
5  A.  She did.
6  Q.  When?
7  MS. CRAPSTER: Objection.  I think that is not
8  within the scope of what Rule 26 will allow you to
9  inquire about.
10  BY MS. COYOCA:
11  Q.  Well, when you first spoke with her on the
12  telephone -- by the way, did you speak with her for the
13  first time on the telephone?
14  A.  Yes.
15  Q.  When you spoke with her on the telephone on
16  March 27, did she indicate to you that Mr. Wunderlich
17  had prepared a report?
18  A.  I don't recall.
19  Q.  During that first conversation, did you have a
20  copy of the rebuttal report -- excuse me -- a copy of
21  Mr. Wunderlich's report so that you could address what
22  you would be rebutting?
23  A.  I did not.
24  Q.  ^What did Ms. Crapster ask you to rebut
25  specifically?

---

Page 48

1  MS. CRAPSTER: Objection.  I think that goes
2  beyond the scope of what Rule 26 will allow.
3  Instruct the witness not to answer.
4  BY MS. COYOCA:
5  Q.  Other than telling you she wanted you to
6  prepare a rebuttal report, what did she ask you to do
7  specifically?
8  A.  I don't remember any other request other than
9  prepare a rebuttal report.
10  Q.  Did she ask you to look at how Mr. Wunderlich
11  had calculated the extra expense claim under Section III
12  of the policy?
13  A.  Not at that time.
14  Q.  ^Did she subsequently ask you to do that?
15  MS. CRAPSTER: Objection.  I think that goes
16  beyond what Rule 26 will permit.
17  I'll instruct him not to answer.
18  BY MS. COYOCA:
19  Q.  Did you, Mr. Shapiro, at some point analyze how
20  Mr. Wunderlich had calculated the extra expense claim
21  under Section III of the policy?
22  A.  Yes.
23  Q.  Why did you do that?
24  MS. CRAPSTER: Objection.  It's the same
25  question you asked before in a slightly different way.

---

Page 49

1  That goes beyond the scope of what Rule 26 will allow.
2  MS. COYOCA: Okay.  Ms. Crapster, I'm getting
3  into exactly what he was asked to do, and that is
4  specifically permitted under Rule 26.
5  MS. CRAPSTER: He's answered that question for
6  you.  He explained to you that he was asked to rebut
7  Mr. Wunderlich's report.
8  MS. COYOCA: I disagree with you entirely.
9  You're now instructing him that he is not permitted to
10  testify about what he was specifically asked to do in
11  rendering services as an expert; is that correct?
12  MS. CRAPSTER: No, that's not correct.  I'm
13  telling you that the substance of the conversations that
14  he and I had are protected and privileged conversations.
15  And you may ask about the narrow scope of what we asked
16  him to do, but nothing beyond that.
17  MS. COYOCA: Okay.  I disagree with you.
18  And I think you are, once again, as I indicated
19  off the record -- I'll now indicate it on the record.
20  I think you are instructing him improperly,
21  beyond the scope of Rule 26.  We are entitled to know
22  what he was asked to do and what he did, the information
23  that he relied on in rendering his opinions, and you are
24  instructing on questions that relate to what he was
25  asked to do.

---

---

Page 50

1     And, therefore, I believe that we are going to
2 be able to strike Mr. Shapiro's opinion and testimony
3 from the case if you continue your instructions on this
4 ground.
5     Q.   Mr. Shapiro, you ultimately did analyze how
6 Mr. Wunderlich had calculated the extra expenses claim
7 that's been asserted in this case; is that right?
8     A.   I tried to.  Yes.
9     Q.   When did you undertake that analysis?
10    A.   April of this year.
11    Q.   What did you do?
12    A.   I read his report.  I reviewed documents.  I
13 reviewed the Complaint again, including the extra
14 expense section, and I came to the conclusion that the
15 methodology employed by Mr. Wunderlich was not an
16 appropriate approach to compute extra expense.
17    Q.   You indicated that you performed this work
18 during the month of April; is that right?
19    A.   Yes.
20    Q.   How long did it take you to complete your
21 analysis?
22    A.   Oh, I don't recall.
23    Q.   Did it take more than two hours?
24    A.   Yes.
25    Q.   Did it take more than 100 hours?

---

Page 51

1     A.   In total, I think yes.
2     Q.   Did you have anyone assisting you in your
3 analysis?
4     A.   I have very -- I did have an administrative
5 person assist me in organizing the materials.
6     Q.   Is that someone who works for you full time?
7     A.   No.  Part time.
8     Q.   Who is that person?
9     A.   Maria Rodriguez.
10    Q.   What materials did Ms. Rodriguez assist you in
11 organizing?
12    A.   Well, there were a great deal of documents
13 essentially identifying what kind of information is on
14 the document so that I could see what I wanted to look
15 at in an organized manner.
16    Q.   Did she prepare some kind of report for you or
17 a document that identified the type of information that
18 was in each of the documents that you had been given to
19 review?
20    A.   No.
21    Q.   How did she identify them for you?
22    A.   Well, I guess there would have been some kind
23 of notes with the Bates number that this is something I
24 should look at first.
25    Q.   I want to make sure I understand.

---

Page 52

1     So Ms. Rodriguez undertook the task of
2 reviewing the various documents and reports that you had
3 been provided, and she identified by notes what reports
4 contained what information, indicating to you what you
5 needed to look at?
6     MS. CRAPSTER:  Objection.  Vague and ambiguous
7 and misstates the evidence.
8     THE WITNESS:  No.  I chose what to look at
9 first.  It was just a note on what was on the document,
10 what types of information.
11 BY MS. COYOCA:
12    Q.   And when you indicate that she created notes,
13 did she append those notes to the particular documents
14 that had been printed out?
15    A.   No.
16    Q.   Did she prepare a note that was one document
17 that identified the information on the various documents
18 that you had asked her to look at?
19    A.   No.  It was more of a list of Bates numbers
20 that these documents had this type of data on them.
21    Q.   How long was the list?
22    A.   It was about one page.
23    Q.   Did you give that one-page document to
24 Ms. Crapster?
25    A.   No.  After I reviewed the data, I discarded the

---

Page 53

1 document.
2     Q.   You threw the note away?
3     A.   Yes.
4     Q.   You destroyed the note?  It no longer exists?
5     A.   It no longer exists.
6     Q.   You indicated that it took in total more than
7 100 hours to complete your analysis of Mr. Wunderlich's
8 report; is that correct?
9     A.   Well, the project itself took probably more
10 than 100 hours, the ending result being my report.
11    Q.   Okay.  So the entire project --
12    A.   Yes.
13    Q.   -- not just the criticism of Mr. Wunderlich's
14 report, took more than 100 hours?
15    A.   Yes.
16    MS. CRAPSTER:  Objection.  Misstates the
17 evidence.
18 BY MS. COYOCA:
19    Q.   Did it take more than 200 hours?
20    A.   I don't believe so.
21    Q.   Did it take more than 150 hours?
22    A.   I don't believe so.
23    Q.   Did it take more than 125 hours?
24    A.   I don't believe so.
25    Q.   So your best estimate is that it took between

---

Case 2:16-cv-04435-PA-MRW   Document 162-4   Filed 12/30/19   Page 16 of 49   Page ID
#:12253

Universal Cable Productions LLC, et al. v.
Atlantic Specialty Insurance Company

Jay Shapiro
May 23, 2017

Page 54

1  100 and 125 hours to complete all of your work on this
2  project?
3  **A.  Yes.**
4  Q.  Other than Ms. Rodriguez, did you have anyone
5  else assist you in the preparation of your report?
6  **A.  No.**
7  Q.  Mr. Shapiro, are you being paid for your
8  services as an expert in this case?
9  **A.  Yes.**
10  Q.  What are your -- what is your financial
11  arrangement with the Strasburger Price firm?
12  **A.  Well, I receive an hourly fee.**
13  Q.  What's your hourly rate?
14  **A.  For consulting, 375.**
15  Q.  Do you have a different hourly rate for
16  testifying?
17  **A.  I do.**
18  Q.  What is that?
19  **A.  625.**
20  Q.  Did you receive a retainer?
21  **A.  Yes.**
22  Q.  How much was the retainer?
23  **A.  7,500.**
24  Q.  Was the retainer applied against final fees or
25  evergreen?

Page 55

1  **A.  Final fees.**
2  Q.  To date, how much have you been paid by the
3  Strasburger firm for your work in this case?
4  **A.  About $24,000.**
5  Q.  Are there any invoices or amounts currently
6  due?
7  **A.  No.**
8  Q.  Are you paid directly by the Strasburger firm
9  or by Atlantic Specialty?
10  **A.  I believe the Beacon firm pays me.**
11  Q.  The Beacon firm, do you mean by that OneBeacon
12  Insurance?
13  **A.  Yes.**
14  Q.  The entity, OneBeacon Insurance?
15  **A.  That's correct.**
16  Q.  How many times have you spoken with
17  Ms. Crapster during the course of your engagement since
18  March 27, 2017?
19  **A.  Up to today?**
20  Q.  Yes.
21  **A.  Maybe 20 times.**
22  Q.  Have you spoken to any other attorneys from the
23  Strasburger Price firm?
24  **A.  Yes.**
25  Q.  Who else?

Page 56

1  **A.  Toni Reed.**
2  Q.  How many times have you spoken with Ms. Reed?
3  **A.  Two or three.**
4  Q.  Have you spoken with anybody else?
5  **A.  No.**
6  Q.  Did you provide Ms. Crapster or Ms. Reed a
7  draft of your report?
8  **MS. CRAPSTER:** Objection.  Not permitted by
9  Rule 26.
10  I'll instruct the witness not to answer.
11  **MS. COYOCA:** Again, so the record is clear, I'm
12  not asking for the content of the draft. I'm asking if
13  it was provided.
14  You're instructing on the basis of whether a
15  draft was provided; is that correct?
16  **MS. CRAPSTER:** I will allow the answer of
17  whether a draft was provided, but no questions about the
18  content of the draft or any details regarding
19  communications relating to the draft.
20  **THE WITNESS:** What was the question again?
21  (The question was read as follows:
22  "Did you provide Ms. Crapster or Ms. Reed
23  a draft of your report?")
24  **THE WITNESS:** Yes.
25  / / /

Page 57

1  **BY MS. COYOCA:**
2  Q.  When?
3  **A.  Late April.**
4  Q.  Mr. Shapiro, your report is dated April 25,
5  2017.
6  ^How long prior to the date of the report,
7  April 25, did you provide a draft of the report to
8  Ms. Crapster?
9  **MS. CRAPSTER:** Objection.  Instruct him not to
10  answer that question on the grounds that it's not
11  permitted by Rule 26.
12  **MS. COYOCA:** Again, I completely disagree with
13  your characterization of what Rule 26 provides.
14  Q.  Did you provide Ms. Crapster with more than one
15  draft of your report?
16  **A.  Not that I recall.**
17  Q.  ^Were changes made from the draft of your
18  report until the issuance of the final report?
19  **MS. CRAPSTER:** Objection.  I will instruct the
20  witness not to answer that question on the grounds of
21  Rule 26.
22  **BY MS. COYOCA:**
23  Q.  ^Did the dollar amount of what you
24  characterized as being the allowable claim change from
25  the time of your initial report to the rendering of your

Universal Cable Productions LLC, et al. v.
Atlantic Specialty Insurance Company

Jay Shapiro
May 23, 2017

---

Page 58

1  final report?
2      MS. CRAPSTER: Objection. I'll instruct the
3  witness not to answer that on the grounds of Rule 26.
4  BY MS. COYOCA:
5      Q.  ^Did your initial report contain less than the
6  full scope of opinions that you testified about in your
7  final report?
8      MS. CRAPSTER: Objection. I'll instruct the
9  witness not to answer on the grounds of Rule 26.
10  BY MS. COYOCA:
11      Q.  ^Did Ms. Crapster ask you to address any areas
12  that were not originally addressed in your first-draft
13  report?
14      MS. CRAPSTER: Objection. I'll instruct the
15  witness not to answer on the grounds of Rule 26 and the
16  attorney-client privilege.
17  BY MS. COYOCA:
18      Q.  What information did Ms. Crapster tell you,
19  during the course of your 20 conversations with her,
20  approximately 20 conversations, did you rely on in
21  preparing your report?
22      MS. CRAPSTER: I'll just clarify for the
23  witness that you can answer that only to the extent that
24  you're identifying the facts that I conveyed to you and
25  you relied on in your report.

---

Page 59

1      THE WITNESS: Well, as far as facts, I don't
2  believe she conveyed any facts to me.
3  BY MS. COYOCA:
4      Q.  Where did you obtain your understanding of the
5  facts?
6      A.  Mr. Wunderlich's report.
7      Q.  Anyplace else?
8      A.  The Complaint, the high volume of documents I
9  received, again, to address my purpose of rebuttal.
10  That's all the information I needed.
11      Q.  What accounting documents or records did you
12  review in preparing your report?
13      A.  Well, the documents I reviewed I listed in
14  Schedule D.
15      Q.  Right.  And we'll get to that in a moment.
16      But in terms of the types of documents
17  reviewed, generally speaking, did you --
18      A.  Generally speaking, they were production
19  finance analyses.  There were some invoices, but most of
20  them were production finance analysis.
21      Q.  You indicate "production finance analyses."
22      Did you review any of the accounting source
23  books and records relating to the DIG production in
24  preparing your report?
25      A.  No, Counselor.  I wasn't given that

---

Page 60

1  opportunity.
2      Q.  Did you review any production cost recap
3  reports?
4      A.  Those are the production analyses I'm referring
5  to.
6      Q.  Did you refer to or did you review any budget
7  documents?
8      A.  In those documents there were budgets.  Yes.
9      Q.  Did you refer to and examine any pattern
10  budgets?
11      A.  Yes.
12      Q.  So when you say the "production finance
13  analyses," do you include in that the types of documents
14  I'm speaking about now --
15      A.  Yes.
16      Q.  -- specifically production cost recap reports,
17  pattern budgets?
18      What about locked budgets?  Did you review any
19  locked budgets?
20      A.  I did see some.  Yes.
21      Q.  Did you rely on any locked budgets for purposes
22  of your analyses?
23      A.  Well, I'm not sure what "rely" means in this
24  sense.  I used them to understand the facts of the
25  situation.

---

Page 61

1      Q.  But in preparing your rebuttal report, one
2  component of your rebuttal report addresses the amount
3  of costs that were incurred in producing the show in
4  Croatia and New Mexico; is that correct?
5      A.  That is correct.
6      Q.  What is the source information on which you
7  relied in order to determine what those costs were?
8      A.  One of those production finance documents,
9  whether you call it a recap.  But the number appears a
10  dozen times.
11      Q.  Do you recall the specific type of document
12  that you reviewed in order to identify that number?
13      A.  I do not.
14      Q.  Okay.  Another component of your analysis
15  relates to the budgeted or estimated costs for the
16  production of a certain number of episodes if it had
17  gone forward in Israel; is that correct?
18      A.  Yes.
19      Q.  And where did you receive that budgeted
20  estimated dollar amount from?
21      A.  There is an e-mail that deals with that data,
22  refers to a budget if it would have gone forward.  And
23  the dating appeared to be appropriate.  Also I -- I was
24  comfortable with the TV insurance application with the
25  25 million, which seemed to be pretty close to the

---

Page 62

1  e-mail.
2    Q.   When you say the "dating appeared to be
3  appropriate," what do you mean by that?
4    A.   Well, it's my understanding that the move took
5  place on or about July 16, 2014.  So if, in fact, there
6  were plans prior to that date, then I felt that was the
7  anticipated cost.  Because when it comes to actual
8  costs, I searched and searched, but I really couldn't
9  find a document that showed me exactly what the actual
10  costs incurred and paid in Israel was.
11    Q.   In terms of actual costs incurred and paid in
12  Israel, are you referring to actual costs incurred and
13  paid in Israel that related to the DIG episodes
14  subsequent to the pilot?
15    A.   Yes.
16    Q.   Was it your understanding that any of the DIG
17  episodes, aside from the DIG pilot, that it actually --
18  that those episodes had actually been produced in
19  Israel?
20    A.   It was my understanding that they were not
21  produced in Israel.  Yet when I saw Mr. Wunderlich's
22  deposition, he kept referring to "Israel costs
23  incurred."  So I was -- I'm confused about that.  But I
24  just saw the deposition over the weekend.
25    Q.   So you just reviewed Mr. Wunderlich's

Page 63

1  deposition this past weekend?
2    A.   Yes.
3    Q.   Do you recall the date of the e-mail that you
4  referred to that referenced the budgeted amounts for
5  production of the episodes subsequent to the pilot in
6  Israel?
7    A.   No.  But if I could see the document, obviously
8  the date would be indicated.  My feeling was it was
9  before July 16.
10    Q.   Okay.  Was the date of the e-mail in June,
11  2014?
12    A.   I don't recall.
13    Q.   April of 2014?
14    A.   I don't recall the date.
15    Q.   Okay.  Are you familiar with the budgeting
16  process for television production?
17    A.   I am.
18    Q.   Do you know if budgeting is an ongoing process
19  that can occur up until the time a show actually goes
20  into production?
21      MS. CRAPSTER:  Objection.  Vague and ambiguous.
22  Lacks foundation.
23      THE WITNESS:  Yes.
24  BY MS. COYOCA:
25    Q.   In terms of determining the most accurate

Page 64

1  budget, would it be important to you to look at the most
2  current budget shortly prior to the time a show goes
3  into production?
4    A.   Ideally, yes.
5    Q.   Do you have an understanding of what the term
6  "pattern budget" means in the context of television
7  production accounting?
8    A.   I've heard the term before, but I don't know
9  exactly its meaning.
10    Q.   What is your understanding of what the term
11  "pattern budget" means?
12    A.   That it's a continual document where the costs
13  are continually updated.
14    Q.   What about the term "locked budget"?  Have you
15  ever heard the term "locked budget" in the context of
16  television production accounting?
17    A.   Absolutely.
18    Q.   What's a locked budget?
19    A.   Final.
20    Q.   For purposes of analyzing the estimated
21  production costs for the Israel episodes subsequent to
22  the pilot, did you review and analyze any locked
23  budgets?
24    A.   I believe there was a document on one episode
25  that said "locked budget" for one of the episodes.

Page 65

1  Episodes 2 through 6 are the episodes in question.  I
2  believe one of those, there was a locked budget that I
3  saw a document on.  But I did not see anything that was
4  2 through 6 in detail.  And, therefore, I used the
5  number in the e-mail.
6    Q.   I want to make sure I understand your response.
7      So the budgeting that you were attempting to
8  look at was for Episodes 2 through 6 of DIG; is that
9  correct?
10    A.   Yes.
11    Q.   And it was your belief that you did not have
12  any locked budget that looked at Episodes 2 through 6;
13  is that correct?
14    A.   I didn't see a document that was in total.
15    Q.   Now, did you look at any budget information for
16  Episodes 7 through 10, the Back 4?
17    A.   Well, in the documents there often were
18  references to 7 through 10.
19    Q.   But did you take those -- the budgeting for
20  those episodes into account in reaching your opinions?
21    A.   The only use I made with 7 through 10 is I
22  noticed that those costs were considerably lower on an
23  episodic level than 2 through 6.
24    Q.   In preparing your opinion or your analyses, did
25  you take into account, other than the manner which you

Page 66

1 just described, the actual costs that were incurred for
2 Episodes 7 through 10 in calculating your view of what
3 the claim amount should be.
4     **MS. CRAPSTER:** Objection. Vague and ambiguous.
5     **THE WITNESS:** Yeah. I never have calculated
6 what the claim amount should be. I was preparing a
7 rebuttal report. And as part of that, I gave a maximum
8 that no number on the claim could be greater than the
9 maximum. But I did not -- I wasn't able to compute the
10 claim amount.
11 **BY MS. COYOCA:**
12     Q. Okay. So in terms of your analysis, your
13 opinion was that the extra amount should not be greater
14 than 2,357,875; is that correct?
15     **A. That is correct.**
16     Q. In calculating that $2,357,875 amount, did you
17 take into account any of the actual costs that were
18 incurred in Episodes 7 through 10?
19     **A. No.**
20     Q. And in calculating that $2,357,875 amount, did
21 you take into account any budgeting information that was
22 provided with respect to the Back 4 Episodes 7 through
23 10?
24     **A. No.**
25     Q. In calculating the $2,357,875 amount, did you

Page 67

1 take into account any final locked budget information
2 for Episodes 2 through 6?
3     **MS. CRAPSTER:** Objection. Asked and answered.
4 Vague and ambiguous.
5     **THE WITNESS:** Yes.
6 **BY MS. COYOCA:**
7     Q. Where did you obtain that information from?
8     **A. The e-mail.**
9     Q. Other than the e-mail, though, what I'm asking
10 you is: Did you look at a locked budget and rely on the
11 information in a locked budget for Episodes 2 through 6
12 in calculating this 2,357,875 figure?
13     **MS. CRAPSTER:** Objection. Asked and answered.
14 Vague and ambiguous.
15     **THE WITNESS:** I was unable to find such a
16 document.
17     **MS. COYOCA:** I'd like to mark as Shapiro
18 Exhibit 3 a document that's entitled "Defendant Atlantic
19 Specialty Insurance Company's Rebuttal Expert Witness
20 Disclosure."
21        (Shapiro Exhibit 3 was
22        marked for identification.)
23 **BY MS. COYOCA:**
24     Q. Mr. Shapiro, have you seen this document
25 before?

Page 68

1     **A. No.**
2     Q. Okay. Could you please turn to page 9 of the
3 document.
4     **A. Okay. Yes.**
5     Q. Under the heading lower case e, your name
6 appears, Mr. Jay Shapiro, CPA.
7        Do you see that?
8     **A. I do.**
9     Q. In the paragraph that follows the entry of your
10 contact information, there is a description of your
11 experience and also the testimony that you are going to
12 be offering in the case.
13        Do you see that?
14     **A. Yes.**
15     Q. Beginning on line 13, it indicates, begin
16 quotes:
17        "Mr. Shapiro will opine that the
18        computation and methodology of the plaintiffs'
19        designated expert on the topic of damages is
20        subject to criticism and is not as
21        mathematically reliable as Mr. Shapiro's more
22        straightforward approach."
23        Do you see that?
24     **A. Yes.**
25     Q. Did you formulate an opinion that the

Page 69

1 plaintiffs' designated expert, Mr. Wunderlich -- that
2 his damages calculation was subject to criticism?
3     **A. Well, I'm not sure what "subject to criticism"**
4 **means.**
5     Q. Okay.
6     **A. Could you rephrase.**
7     Q. Well, I'm using the words that your lawyer used
8 in the document. So --
9     **A. I mean, I disagree with his methodology and**
10 **believe my approach to be more straightforward and, for**
11 **lack of a better description, more simplistic and**
12 **understandable.**
13     Q. Okay. You indicated that you disagree with
14 Mr. Wunderlich's methodology; correct?
15     **A. Yes.**
16     Q. Do you believe that Mr. Wunderlich's
17 methodology violates any provision of GAAP accounting?
18     **MS. CRAPSTER:** Objection. Vague and ambiguous.
19     **THE WITNESS:** I have no evidence of that.
20 **BY MS. COYOCA:**
21     Q. Do you believe that Mr. Wunderlich's analysis
22 violates any regulations or rules proscribed by FASB?
23     **MS. CRAPSTER:** Objection. Vague and ambiguous.
24     **THE WITNESS:** I have no evidence of that.
25 ///

---

Page 70

**BY MS. COYOCA:**

1  Q.  Okay.  You indicated that you disagree with his
2  methodology.  But is it your opinion that his
3  methodology violates any proscribed provision of any
4  rules of accountancy that apply to certified public
5  accountants?
6      **MS. CRAPSTER:** Objection.  Vague and ambiguous.
7      **THE WITNESS:** Well, I don't believe there's any
8  proscribed provisions that deal with this computation.
9  **BY MS. COYOCA:**
10  Q.  What about the rules that are applicable to the
11  work that is performed by forensic accountants rendering
12  services in connection with disputed matters?
13      **MS. CRAPSTER:** Objection.  Vague and ambiguous.
14  I'm not sure that was a question.
15      **THE WITNESS:** And I'm not sure that's a FASB or
16  GAAP issue.
17  **BY MS. COYOCA:**
18  Q.  Okay.  What about the AICPA rules, though, that
19  apply to forensic accounting in disputed matters?  Do
20  you believe that Mr. Wunderlich's analysis violates any
21  AICPA-proscribed rules for forensic accounting?
22      **A.  Well, the AICPA does have rules in that area,**
23  **and one of the rules is to use reasonable methodology.**
24      Q.  Do you believe that Mr. Wunderlich's is not a

---

Page 71

1  reasonable methodology?
2      **A.  I believe the methodology is not reasonable in**
3  **regard to Mr. Wunderlich's approach.**
4      Q.  What is the basis for your belief that
5  Mr. Wunderlich's analysis was not reasonable?
6      **A.  Well, again, he refers to these incurred costs**
7  **in Israel, which I can find no evidence of any incurred**
8  **costs on Episodes 2 through 6.  So starting with that.**
9          **Then he talks about items that are duplicative**
10  **versus not duplicative.  And there doesn't seem to be**
11  **any detail analysis that I can look at on how he came up**
12  **with that determination other than now that I've seen**
13  **the deposition, apparently he received information from**
14  **Mrs. Markus.**
15          **So I don't think the methodology of just**
16  **receiving information from another party is a reasonable**
17  **approach to computing extra expenses.**
18      Q.  Okay.  Separate and apart, though, from the
19  information that Mr. Wunderlich received, do you believe
20  that Mr. Wunderlich's approach, in terms of reviewing
21  the documentation with respect to costs that were
22  actually incurred in Croatia and New Mexico and making a
23  determination as to whether they were -- they would not
24  have been incurred but for the move to Croatia and
25  New Mexico, do you believe that that methodology is

---

Page 72

1  unreasonable, setting aside the issue of support for the
2  methodology?
3      **MS. CRAPSTER:** Objection.  Compound question.
4  Vague and ambiguous.
5      **THE WITNESS:** Yeah.  I'm not sure I understand
6  the question.
7  **BY MS. COYOCA:**
8  Q.  Okay.  With respect to your criticism of
9  Mr. Wunderlich's approach that it was not reasonable, is
10  it your opinion that his methodology of reviewing the
11  costs that were incurred in relocating the production to
12  Croatia and New Mexico and extracting out those costs
13  that would have been incurred already if the production
14  stayed in Israel -- is that, in your view, an
15  unreasonable methodology?
16      **MS. CRAPSTER:** Same objections.
17      **THE WITNESS:** Well, as you describe it, no.
18  But I'm not sure that's what took place.
19  **BY MS. COYOCA:**
20  Q.  Referring back to the designation, the expert
21  witness designation, there is a sentence that begins at
22  the end of line 15 which reads, begin quotes:
23      "Mr. Shapiro will opine about the maximum
24  amount of possible extra expenses that
25  plaintiffs may recover based upon verifiable

---

Page 73

1  information produced in the case and about
2  additional reductions to such computation that
3  may also apply," close quotes.
4      Do you see that sentence?
5      A.  Yes.
6      Q.  Is your opinion as to the dollar amounts as to
7  the maximum amount of possible extra expenses -- is that
8  amount the $2,357,875 figure that we've discussed?
9      A.  Yes.
10      Q.  Now, this designation indicates that that's
11  based upon verifiable information produced in the case;
12  is that correct?
13      **A.  That's what it says.  Yes.**
14      Q.  Did you rely on verifiable information in
15  coming up with your opinion?
16      **A.  Well, as best as the information I was given.**
17      Q.  Okay.  So with respect to your opinion, I
18  understand that it has two components, one component of
19  which is the total amount of costs that were incurred in
20  producing the show in Croatia and New Mexico; is that
21  correct?
22      **A.  Well, you know, I'm more focused on the extra**
23  **expense than the total cost of Croatia and New Mexico,**
24  **which may or may not be the reliable number.**
25          **I'm not really focused on that.  I'm focused on**

---

Page 74

1  what amounts exceeded insurable production cost. And I
2  don't believe that amount can be more than the
3  2 million 357.
4        And as you can see, Counselor, there is a big
5  difference between Mr. Wunderlich's number and mine. So
6  accordingly, I feel there's something in there that
7  doesn't belong.
8     Q.  Okay.  But I'm just trying to get at your
9  methodology in your calculation.
10    A.  Okay.
11    Q.  And in your report you indicated, within
12 quotes:
13       "I believe my method is the more
14       straightforward and reliable approach to
15       calculating the damages on this claim:
16       Utilizing total production costs incurred at
17       the new locations less expected Israeli costs
18       that would have been incurred without the
19       relocation (Incremental Costs)," close quotes.
20    A.  Yes.
21    Q.  So the question that I'm asking you is:  As to
22 the first part of that methodology that you've opined
23 about, the total production costs incurred at the new
24 locations, what verifiable information did you rely on
25 in order to determine what those total production costs

Page 75

1  were?
2     A.  Well, I saw the Cost Bible.  I saw such amount
3  or adjust- -- the same amount with some slight
4  adjustment in various production analyses or production
5  recaps.  So I felt that that was a good number for
6  New Mexico/Croatia.
7     Q.  Did -- your total production cost amount that
8  you utilized in your report, is it the same total
9  production cost amount that was utilized by
10 Mr. Wunderlich?
11       MS. CRAPSTER: Objection.  Vague and ambiguous.
12 Calls for speculation.
13       THE WITNESS: Essentially, yes.
14 BY MS. COYOCA:
15    Q.  Now, in terms of the designation and the
16 reference to "verifiable information produced in the
17 case," did you do any separate work to verify that total
18 production cost amount that was utilized by you in your
19 analysis?
20    A.  No.
21    Q.  Now, with respect to the second part of your
22 statement of your methodology that referenced expected
23 Israeli costs that would have been incurred without the
24 relocation, the incremental costs, where did you get
25 that information from?

Page 76

1     A.  Principally the e-mail that we've discussed.
2        MS. COYOCA: I think we're on Exhibit 4.  Okay.
3  I want to mark as Exhibit 4 an e-mail chain that's
4  labeled Bates control UCP 003732 through 003734.
5        (Shapiro Exhibit 4 was
6        marked for identification.)
7  BY MS. COYOCA:
8     Q.  Mr. Shapiro, when you indicated you principally
9  relied on an e-mail for the costs, is this the e-mail to
10 which you were referring?
11    A.  No.
12       MS. COYOCA: I'm going to mark as Exhibit 5 an
13 e-mail that's labeled AONNBCU001748 through 1750.
14       (Shapiro Exhibit 5 was
15       marked for identification.)
16 BY MS. COYOCA:
17    Q.  Mr. Shapiro, is this the e-mail to which you're
18 referring?
19    A.  Not primarily.  There's another e-mail.  But
20 this is the Television Insurance Application that had
21 the 25 million on it, line 6, Insurable Production Cost,
22 $25 million.  So I would use this document on a
23 secondary basis.
24       I believe the document that I'm referring to is
25 footnoted on my schedule in my report.

Page 77

1        MS. COYOCA: Okay.  I'm going to mark as
2  Exhibit 6 an e-mail exchange that is Bates-labeled
3  UCP004971 through 4972.
4        (Shapiro Exhibit 6 was
5        marked for identification.)
6  BY MS. COYOCA:
7     Q.  Mr. Shapiro, is this the e-mail to which you
8  were referring?
9     A.  Yes.
10    Q.  Now, the date of this e-mail is March 12, 2014;
11 is that right?
12    A.  I believe March 11.
13    Q.  Oh.  You're correct.  The first one is
14 March 11, 2014, from John Gaskin to Mark Winemaker and
15 Ryan Greig with a cc to Randi Richmond and BJ Markus; is
16 that right?
17    A.  That's correct.
18    Q.  And then there is a subsequent e-mail from
19 Ms. Richmond that's dated March 12, 2014; is that
20 correct?
21    A.  Yes.
22    Q.  And then another e-mail from John Gaskin to
23 Ms. Richmond, Mark Winemaker, and Ryan Greig --
24    A.  Yes.
25    Q.  -- is that correct?

Page 78

1  A. Yes.
2  Q. Okay. So that March 11, 2014 e-mail that is
3 providing a DIG -- it indicates, "Here are the DIG
4 budgets as of 3/11/2014."
5    Is this the number on which you relied in order
6 to analyze the Israel budgeted estimated costs for the
7 five episodes after the pilot?
8  A. In the 17,535,425.
9  Q. Is that correct?
10  A. Yes.
11  Q. When was the pilot shot?
12  A. I believe the pilot was shot in June, completed
13 June 26, 2014.
14  Q. Did you analyze any budget information that was
15 provided that was subsequent to March of 2014?
16  A. Not that I recall.
17  Q. Would it have been impactful to your analysis
18 if there was subsequent budget information, subsequent
19 to March 11, 2014, that was different than the
20 $17,535,425 amount?
21  A. Yes. And if I came across such number, which
22 I've subsequently seen a 17 million 707 number, I would
23 include that in my maximum computation. It would
24 change. My model would stay the same, but the resulting
25 number would change.

Page 79

1  Q. Okay. I want to make sure I understand your
2 response.
3    If there was subsequent budgeting information
4 that was closer to the production pilot date, your
5 number might change; however, your methodology would
6 stay the same.
7    Is that correct?
8  A. That's correct.
9  MS. COYOCA: Okay. I'd like to mark as
10 Exhibit 7 a document titled "'DIG' Locked Budget,
11 PATTERN: 5 Episode - (8) Days in Israel," labeled Bates
12 control UCP014836 through 14881. And it's got a date at
13 the bottom left-hand corner, "PATTERN - Locked Budget
14 Dig Srs June 8, 2014."
15    (Shapiro Exhibit 7 was
16    marked for identification.)
17 BY MS. COYOCA:
18  Q. Mr. Shapiro, have you seen this document
19 before?
20  A. No, I don't believe I have.
21  Q. Was this document made available to you during
22 the course of your analyses?
23  A. It may have. I mean, again, there were
24 voluminous documents. But I don't recall this one
25 specifically, no.

Page 80

1  Q. Well, this is a document that is titled "Locked
2 Budget."
3    Do you see that?
4  A. Yes, I do.
5  Q. And based on your prior testimony, you
6 indicated that a locked budget, to you, indicates a
7 final budget; is that correct?
8  A. Yes.
9  Q. And the date of this budget is June 8, 2014, in
10 the lower left-hand corner.
11    Do you see that?
12  A. Yes.
13  Q. So for purposes of your analysis, would not the
14 locked budget that's dated June 8, 2014, be a more
15 reliable potential estimate of costs in Israel than the
16 March 11, 2014 e-mail?
17  A. Absolutely.
18    However, this particular document is only for
19 one episode. I would need all five episodes. It says
20 "5 Episode." It means No. 5 episode, not five episodes.
21 Notice that the total is only $3 million.
22  Q. Could you please take a look at Exhibit 6
23 again.
24  A. Yes.
25  Q. Exhibit 6 references for the pattern number the

Page 81

1 amount of $3,507,085 times 5 to come up with the
2 17,535,425 number; is that right?
3  A. That's correct.
4  Q. So with respect to the pattern locked budget
5 for 5 Episode (8) Days in Israel, could you simply not
6 multiply the 3.541498 amount times 5 as they did in the
7 March 11, 2016 e-mail?
8  A. That would appear to be reasonable. Yes.
9  MS. COYOCA: Okay. I want to mark as Exhibit 8
10 the Expert Report of Jay Shapiro Analysis of Economic
11 Damages: Rebuttal.
12    (Shapiro Exhibit 8 was
13    marked for identification.)
14  MS. COYOCA: And before we begin questions, I'd
15 like to take a brief break and go to the ladies' room.
16    (Recess from 12:02 p.m. to 12:13 p.m.)
17  MS. COYOCA: Back on the record.
18  Q. Mr. Shapiro, the document I've put in front of
19 you as Exhibit 8, is this the report that you prepared
20 to rebut Mr. Wunderlich's report?
21  A. Yes.
22  Q. Who typed this report?
23  A. I do.
24  Q. You do or you did?
25  A. I did.

Page 82

1 Q. Did you have any assistance in typing the
2 report?
3 A. Yes.
4 Q. By whom?
5 A. Maria Rodriguez.
6 Q. Could you turn to page 3 of your report,
7 please. In the bottom paragraph it reads, begin quotes:
8     "This report concerns episodes #2 through
9     #6 of the 'Dig' series. Those are the only
10    episodes on which plaintiffs are seeking to
11    recover 'extra expenses' incurred as a result
12    of the move out of Israel. Plaintiffs do not
13    seek any extra expenses (nor could they) in
14    connection with the pilot because its filming
15    was completed before the move. They also do
16    not (nor could they) seek any extra expenses in
17    connection with episodes #7-10 because the
18    decision to film these episodes was not made
19    until after the decision to move was already
20    finalized."
21    Do you see that?
22 A. Yes.
23 Q. Please explain to me why it is that under your
24 methodology you believe that Episodes 7-10 should have
25 been excluded from the calculation.

Page 83

1    A. Well, 7 through 10 I understood to be an
2 afterthought; that it was never planned to do; and they
3 were already in Croatia and New Mexico; and that the
4 claim had been made on 2 through 6. So I thought if the
5 claim was made on 2 through 6, any information regarding
6 7 through 10 was not relevant.
7    Q. Could you please take a look at the policy,
8 which is Williams Exhibit 1.
9    A. Yes.
10   Q. Now, under the "Definition of Loss" that we
11 were looking at earlier that appears on ATL003106 --
12   A. Yes.
13   Q. -- that definition of "loss" -- excuse me --
14 the calculation of the amount of loss is based on, begin
15 quotes:
16    "All necessary 'Insurable Production Cost'
17    you incur to complete the 'Insured Production'
18    that exceeds the amount of 'Insurable
19    Production Cost' you would have incurred if the
20    covered cause of loss had not occurred,"
21    semicolon, close quotes.
22    Do you see that?
23   A. Yes.
24   Q. So this definition of "loss" and the
25 calculation references the insurable production cost

Page 84

1 that would be incurred to complete the insured
2 production; is that right?
3    MS. CRAPSTER: Objection. Vague and ambiguous.
4    THE WITNESS: Yes.
5 BY MS. COYOCA:
6    Q. What is the insured production in this case?
7    A. I think it's the six episodes totaling
8 25 million.
9    Q. What is the insured production that is
10 referenced in the application for DIG?
11   A. I thought six episodes.
12   Q. And is the -- is that, in your view, a
13 limitation on the total amount of insured production
14 cost that could be recovered in this case?
15    MS. CRAPSTER: Objection. Calls for a legal
16 conclusion. It's vague and ambiguous.
17    THE WITNESS: Well, my understanding would be
18 25 would be the amount that I was insuring; and that
19 when it came to extra expense, it would be something
20 greater than the 25, would be my loss.
21 BY MS. COYOCA:
22   Q. So what I'm trying to understand, though, is it
23 your opinion that the insurable production cost could
24 not exceed the 25 that was referenced with respect to
25 Episodes 2 through 6? Is that your position?

Page 85

1    MS. CRAPSTER: Objection. Calls for a legal
2 conclusion and vague and ambiguous.
3    THE WITNESS: Yeah. I don't really have an
4 opinion on that.
5 BY MS. COYOCA:
6    Q. Well, if you're seeking to analyze the
7 necessary insurable production cost that's incurred to
8 complete the insured production, do you believe that
9 it's necessary to exclude any episodes beyond Episode 6?
10   A. Yes.
11   Q. Why?
12   A. It's my understanding it would be common sense.
13 When you insure, you have to have a set dollar amount,
14 and you can't have a claim at a later date and then all
15 of a sudden say, "My home was worth 20 million when I
16 told you it was only worth 2 million the first time."
17   Q. Is there a provision in the insurance policy
18 that you reviewed that limited the insurable production
19 cost to the number of episodes originally referenced in
20 the application?
21   A. Not that I recall.
22    MS. CRAPSTER: Objection. Calls for a legal
23 conclusion.
24 BY MS. COYOCA:
25   Q. Based on your experience with production

Page 86

1 accounting, is it your understanding that if production
2 adds subsequent episodes, that the insurance for the
3 production is limited to the number of episodes
4 originally estimated at the time of --
5 　　A.　Application?
6 　　Q.　Yes.
7 　　A.　Yes.
8 　　Q.　And what is that experience based on?
9 　　A.　Just general understanding.
10 　　Q.　Have you -- can you point to any specific
11 television program that you're aware of in your
12 experience where the insurance has been limited to the
13 number of episodes or estimated cost in the application
14 for insurance?
15 　　A.　No, I cannot.　Though I am aware there are
16 times that the policy gets amended.　Things change,
17 number of episodes changes, and you file some kind of
18 amendment to change your original understanding with the
19 insurance company.
20 　　Q.　And you're not aware, as you sit here today, of
21 there being any kind of amendment to the policy to add
22 the additional episodes to the insured production cost;
23 is that right?
24 　　A.　I am not.
25 　　Q.　Hypothetically, if there were such an

Page 87

1 amendment, would your opinion change with respect to the
2 methodology that you believe would need to be applied in
3 order to calculate the loss under Section IX, subpart 1?
4 　　MS. CRAPSTER:　Objection.　Calls for
5 speculation.
6 　　THE WITNESS:　I don't have an opinion on that.
7 BY MS. COYOCA:
8 　　Q.　Well, under the terms of subpart 1, it does not
9 specifically reference the insured production to a
10 specific -- excuse me.　Strike that.
11 　　Under subpart 1, the definition of "insurable
12 production cost," it does not reference any specific
13 dollar amount with respect to a particular production,
14 does it?
15 　　A.　No.　It's my understanding that insurance
16 policies often have a group of general, common, generic
17 disclosures, and the cover page gives you the specifics
18 of the coverage.
19 　　I saw this document as such a generic
20 disclosure; that the definitions don't have any
21 particular numbers but just give the generic description
22 of the coverages.
23 　　Q.　Are you referring to -- when you say the "cover
24 page," are you referring to the declarations?
25 　　A.　Yes.

Page 88

1 　　Q.　Okay.　With respect to how this particular
2 policy operates, are you aware of how productions get
3 added to the policy as insured productions?
4 　　A.　As I previously indicated, I'm aware of
5 situations where there was a change of plans, and the
6 project expanded.　Therefore, they needed additional
7 coverage.
8 　　Q.　That's not my question.
9 　　What I'm asking is:　Under this particular
10 policy, Williams Exhibit 1, are you aware of how
11 productions, NBCUniversal television productions, are
12 added as insured productions under the policy?
13 　　A.　I am not.
14 　　Q.　Okay.　I want you to assume a hypothetical.
15 　　Assume the hypothetical that productions are
16 added on a show-by-show basis for the entirety of the
17 television show.
18 　　With that assumption in mind, can you please
19 tell me if, under your opinion, using your methodology,
20 in order to calculate the loss, it would be necessary to
21 look at all episodes of the DIG production, not just 2
22 through 6?
23 　　MS. CRAPSTER:　Objection.　Calls for
24 speculation.　Vague and ambiguous.
25 　　THE WITNESS:　I don't know how to answer that.

Page 89

1 BY MS. COYOCA:
2 　　Q.　What don't you understand about the question?
3 　　A.　I mean, if the project keeps expanding, does
4 extra expense keep expanding?　Is that what you're
5 asking?
6 　　Q.　No.　I'm asking you to assume a hypothetical as
7 an expert.
8 　　The hypothetical is that television shows are
9 added on a show-by-show basis for the production of the
10 television show during that particular policy period.
11 　　And I want to know if, assuming that
12 hypothetical, in terms of calculation of loss under your
13 methodology, it would be necessary to look at all
14 episodes of DIG, i.e., 2 through 10, and not just 2
15 through 6.
16 　　MS. CRAPSTER:　Objection.　Calls for
17 speculation.　Vague and ambiguous.
18 　　THE WITNESS:　And the policy was appropriately
19 amended --
20 BY MS. COYOCA:
21 　　Q.　Yes.
22 　　A.　-- and additional premiums paid --
23 　　Q.　Yes.　You can --
24 　　A.　Because I changed the understanding.
25 　　-- then I think it would have a to be

Case 2:16-cv-04435-PA-MRW   Document 162-4   Filed 12/30/19   Page 25 of 49   Page ID
#:12262
Universal Cable Productions LLC, et al. v.
Atlantic Specialty Insurance Company
Jay Shapiro
May 23, 2017

Page 90

1  considered if that did take place, or I can only
2  speculate what effect it would have.
3     Q.  Have you done a calculation, utilizing your
4  methodology, of the total insurable production cost and
5  applying an estimate of Israeli costs, granted that
6  there was no concept of Episodes 7 through 10 for
7  Israel?  Have you done a calculation of that type that
8  applies to Episodes 2 through 10?
9     A.  No.
10       MS. CRAPSTER: I'll object that that last
11  question is vague and ambiguous.
12  BY MS. COYOCA:
13     Q.  In applying your methodology, did you include
14  the amounts that were incurred as actual costs in
15  Israel, as well as the actual costs incurred in Croatia
16  and New Mexico for Episodes 2 through 6, in coming up
17  with your calculation?
18     A.  Well, as I indicated, I used the best number
19  for Israel I could find, which essentially is that
20  e-mail or an estimate similar to what's in the e-mail
21  using the newer budget.
22     Q.  I'm actually asking you a different question.
23       In terms of calculating the cost of production
24  for the series for purposes of your calculation of loss,
25  did you include the costs of production that were

Page 91

1  incurred that were associated with the pilot?
2     A.  No.
3     Q.  Why not?
4     A.  Because the pilot was completed in Israel as
5  planned.  It can generate no extra expense.
6     Q.  But turning back to the Definition of Loss
7  under subpart 1 of the policy, it references "All
8  necessary 'Insurable Production Cost'" incurred to
9  complete the insured production, does it not?
10     A.  Yes.
11     Q.  So in order to calculate the insurable
12  production cost that's associated with the insured
13  production, wouldn't you have to look at the pilot plus
14  all subsequent episodes?
15     A.  For purposes of extra expense loss, the event,
16  the relocation event, took place after this was fully
17  complete.  It has no impact on the pilot.  The pilot was
18  completed on June 26, and the move took place on
19  July 16.  I just don't see how there can be any extra
20  expense for the pilot when it was done.
21     Q.  No.  I'm not asking you if there was any extra
22  expense incurred.  I'm asking about your calculation
23  under your methodology.
24     A.  Under my methodology, I have taken the pilot
25  into account because the 25 million, less the 8 million

Page 92

1  cost for the pilot, is the remaining 17.
2     Q.  And it's your understanding that $8 million was
3  the cost of the pilot?
4     A.  That appears in a couple of different
5  documents.  8,039,000, I think.  But, you know, there's
6  a couple of different numbers.  It's very close to
7  8 million.
8       MS. COYOCA: I'd like to mark as the next in
9  order, Exhibit 9, a document that is labeled "DIG -
10  New Mexico Season 1 - First 5 episodes, Production Recap
11  Report, 2014/2015 Season 1, Period Ending:  8/11/2016,"
12  Bates label UPC018226 through 18227.
13       (Shapiro Exhibit 9 was
14       marked for identification.)
15  BY MS. COYOCA:
16     Q.  Mr. Shapiro, have you seen this document
17  before?
18     A.  Yes, I have.
19     Q.  And what do you understand this to be?
20     A.  This is a Production Recap Report of the first
21  five episodes made after the move.
22     Q.  And if you turn to page 18227, the Front 5
23  episodes' dollar amount that's reflected in the
24  right-hand column under the chart --
25     A.  Yes.

Page 93

1     Q.  -- it indicates a number 21,464,745; is that
2  correct?
3     A.  That's correct.
4     Q.  And is that -- is this the source of
5  information for the document -- excuse me -- the number
6  that's referenced in your report on page 8?
7     A.  Yes.
8     Q.  Now -- and I believe I asked you, and you said
9  you didn't do any independent analysis of any of the
10  other production cost recap reports to confirm that
11  number; is that right?
12       MS. CRAPSTER: Objection.  Mischaracterizes
13  evidence.
14       THE WITNESS: I think what I said is I have
15  seen this number, not just here but in multiple other
16  documents.
17  BY MS. COYOCA:
18     Q.  Now, I believe you indicated that you believed
19  that the production costs associated with the pilot were
20  8 million; is that right?
21     A.  That's correct.
22     Q.  Where did you get that information from?
23     A.  It appears on multiple documents regarding the
24  pilot.  There's actual costs incurred.
25     Q.  Okay.  And in this production cost recap

Universal Cable Productions LLC, et al. v.
Atlantic Specialty Insurance Company

Jay Shapiro
May 23, 2017

Page 94

1 report, there is total cost before breakage reflected
2 for the pilot amount, isn't there?  For the pilot, is
3 there not?
4    **A.   There is a number there, yes.**
5    Q.   And it's 11,470,620; right?
6    **A.   Yes.**
7    Q.   And that's obviously greater than the 8 million
8 that you've referenced; isn't that right?
9    **A.   It certainly is.**
10    Q.   Did you take that into account?
11    **A.   No.**
12    Q.   Did you notice that when you were doing your
13 analysis?
14    **A.   I did not.**
15    Q.   And with respect to the Back 4 episodes, which
16 is the information that's reflected under the Front 5
17 episodes entry on page 18227, there is a dollar amount
18 of 14,890,385; is that right?
19    **A.   Yes.**
20    Q.   And did you take that dollar amount into
21 account in calculating the maximum amount of loss that
22 would be incurred on the claim?
23    **A.   No.  It wasn't necessary.**
24    Q.   Mr. Shapiro, referring back to Exhibit 6 --
25 that would be the John Gaskin e-mail.

Page 95

1    **A.   Yes.**
2    Q.   -- you indicated you believed the $17.5 million
3 number, you believed, for the Episodes 2 through 6
4 correlated to the $8 million you anticipated pilot
5 dollar amount of cost; is that right?
6      **MS. CRAPSTER:** Objection.  Misstates the
7 evidence.
8      **THE WITNESS:** I believe the 17 million 535
9 correlates to the computation for the estimated cost on
10 the five episodes.
11 BY MS. COYOCA:
12    Q.   Okay.  But you previously indicated that you
13 thought that the $25 million insurable production cost
14 amount roughly correlated, I believe was your
15 terminology, to the 17.5 estimated cost for the
16 Episodes 2-6 and the $8 million cost for the Israel
17 pilot; is that right?
18    **A.   Yeah.  And on this document it says 7 and a**
19 **half million, totaling 25.130, which correlates to the**
20 **25 million.**
21    Q.   Right.  So my question to you is this:  Is it
22 your belief that, looking at the production cost recap
23 report that's in Exhibit 9, that the amount of insurable
24 production cost would be limited to the 11.470 that was
25 incurred with respect to the Israel pilot and whatever

Page 96

1 the differential would be up to 25 million?  Is that
2 your position?
3      **MS. CRAPSTER:** Objection.  Misstates the
4 evidence.  Vague and ambiguous.
5      **THE WITNESS:** Well, I don't know where the
6 11 million 470 comes from because a half-dozen other
7 documents say 8 million.  So I'd have to see some detail
8 on what makes the 11 million 470.
9      But I do know that the pilot is included in the
10 insurable production cost number.
11 BY MS. COYOCA:
12    Q.   Okay.  Why is the pilot included in the
13 insurable production cost number but not the Back 4
14 episodes?
15    **A.   Because the application that I saw said six**
16 **episodes, $25 million.**
17    Q.   Okay.  So all I'm trying to understand is:
18 With respect to that $25 million amount, is it your
19 position that that $25 million amount applies just to
20 whatever amount of costs gets you through the pilot and
21 whatever number of episodes up to 25 million?
22      **MS. CRAPSTER:** Objection.  Misstates the
23 evidence.  Vague and ambiguous.
24      **THE WITNESS:** Well, I believe it covers the
25 pilot and five subsequent episodes.  When I saw the

Page 97

1 pilot was 8 million, and I saw the e-mail at 17 million
2 for the five episodes, it seemed like that made sense.
3 It was 8 and 17, 25 million.
4 BY MS. COYOCA:
5    Q.   Okay.  But what I'm asking you is that if the
6 insurable production cost amount actually exceeds the
7 amount of the estimate that's on the application, is it
8 your position that any amount above that is not insured?
9      **MS. CRAPSTER:** Same objections.  Misstates the
10 testimony.  Vague and ambiguous.
11      **THE WITNESS:** I'm not an expert on insurance.
12 So I don't fully understand, if you exceed the amount
13 that you declared initially, what the coverage is.  But
14 I did start out with the basis that 25 million was my
15 starting point, and 17 million of that was my starting
16 point for my analysis.
17 BY MS. COYOCA:
18    Q.   Did it raise any questions in your mind,
19 though, when you saw that the total amount of cost
20 before breakage for pilot, first five episodes, Back 4
21 episodes, totaled 47,825,750?
22    **A.   No.**
23    Q.   Now, under the policy, are you familiar with
24 how the premium is calculated for the policy?
25    **A.   Well, I'm not specifically familiar with that.**

Page 98

1 But I understand from my own insurance that the more
2 value I insure, the higher the premium is.
3    Q.  Okay.
4    A.  So I assume there's a relationship between the
5 two.
6    Q.  Okay.  Are you aware of whether there is a
7 deposit premium that is paid and then a true-up that's
8 done on a quarterly basis to calculate the amount that
9 may be owed based on the additional insurable production
10 cost?
11   A.  I am not.
12   Q.  You previously indicated when answering my
13 hypothetical that you would have to be assured that
14 there were additional premiums paid in order to be able
15 to answer my hypothetical question about whether the
16 Back 4 should be included in your calculation; is that
17 right?
18   A.  Yes.
19   Q.  So did you take into account the true-up and
20 additional premium paid under the policy in answering my
21 question?
22      MS. CRAPSTER: Objection.  Assumes facts not in
23 evidence.  Misstates the evidence.
24      THE WITNESS: I saw no indication that there
25 was additional premiums paid.

Page 99

1 BY MS. COYOCA:
2    Q.  If there were additional premiums paid, would
3 that change your analysis in terms of the calculation of
4 loss under Section IX, subpart 1 of the policy?
5      MS. CRAPSTER: Objection.  Calls for
6 speculation.
7      THE WITNESS: Again, I'd have to have a lot
8 more education on insurance to come to that conclusion,
9 which I don't have.
10     MS. COYOCA: Okay.  Off the record.
11
12     (At 12:40 p.m. a luncheon recess was taken,
13      the proceedings to be resumed at 1:40 p.m.)
14 / / /
15 / / /
16 / / /
17 / / /
18 / / /
19 / / /
20 / / /
21 / / /
22 / / /
23 / / /
24 / / /
25 / / /

Page 100

1        AFTERNOON SESSION
2
3        (At 1:45 p.m. the proceedings were
4        resumed at the same place.)
5
6      MS. COYOCA: Back on the record.
7
8        EXAMINATION (Resumed)
9 BY MS. COYOCA:
10   Q.  Mr. Shapiro, can you please put Exhibit 8 in
11 front of you.  That is your report.
12   A.  Yes.
13   Q.  Please turn to page 4.
14      Are you there?
15   A.  Yes.
16   Q.  Okay.  At the bottom of the page -- we
17 discussed this before the lunch break.  I want to go
18 back to this -- it indicates that -- well, first of all,
19 why don't you tell me:  What are you trying to convey in
20 the paragraph that begins, "It appears the plaintiffs'
21 claim"?
22   A.  Well, I realize that my maximum number is
23 materially different than plaintiffs' claim.  So I'm
24 making a reference here that it appears that the extra
25 expenses in that claim and the technique used which had

Page 101

1 these extractions -- maybe that sufficient extractions
2 from the total amount were not made because the
3 remaining amount is just too high.
4    Q.  Okay.  So with respect to your opinion that
5 sufficient extractions were not made, did you do a
6 calculation to identify what additional extractions
7 should have been applied but were not?
8    A.  No.
9    Q.  If you did not do such an analysis, how were
10 you able to determine that there were additional
11 extractions that should have been applied?
12   A.  Just by the magnitude of the difference.
13   Q.  And when you say "the magnitude of the
14 difference," you're referring to the difference between
15 Mr. Wunderlich's analysis of 7.1 million in extra
16 expenses versus your analysis --
17   A.  Of 2.3.
18   Q.  Okay.  Anything else?
19   A.  No.
20   Q.  Okay.  Did you review the extractions that
21 Mr. Wunderlich did apply?
22   A.  Yes.
23   Q.  Did you come to any conclusions with respect to
24 those extractions?
25   A.  Those adjustments, given his technique, seemed

Page 102

1 reasonable.
2 Q. Why did you not review and analyze whether
3 there were specific additional extractions that should
4 be applied?
5 A. I was unable to do that. I didn't have the
6 necessary documentation to do that.
7 Q. What documentation would you need in order to
8 be able to do that?
9 A. I would have to have some kind of analytical
10 analysis line by line showing what the cost was, what
11 was in there, and what was in the Israeli's expected
12 cost and compare the two. I would need much more
13 details.
14 Q. In analyzing the Wunderlich report, did you go
15 through and analyze the Full Cost Bible that he
16 references in his report?
17 A. Well, I -- I read the Full Cost Bible. I
18 noticed the total on the bottom. I was comfortable
19 where he got his numbers in his report from regarding
20 New Mexico/Croatia.
21 Q. But the point of divergence with his analysis
22 is that you believe that additional extractions should
23 have been applied?
24 A. Because of the magnitude of the claim. The
25 claim is to be extra expense, not total spent in

Page 103

1 New Mexico and Croatia.
2 Q. With respect to your review of that Full Cost
3 Bible, did you attempt to do any type of testing with
4 respect to the expenses that were incurred to determine
5 whether or not there were, in fact, expenses that were
6 reflected that you felt should not be incurred?
7 MS. CRAPSTER: Objection. Vague and ambiguous.
8 THE WITNESS: I wasn't given the opportunity to
9 do that.
10 BY MS. COYOCA:
11 Q. What do you mean you were not given the
12 opportunity to do it?
13 A. Well, it would take -- he had the advantage,
14 which I did not have, of conversations with production
15 personnel. I didn't have that advantage, nor was I able
16 to see any kind of documentation over and above what was
17 presented to me.
18 MS. COYOCA: Okay. I'd like to mark as -- I
19 believe we're on Exhibit 10 -- the Expert Report of
20 Robert Wunderlich: Analysis of Economic Damages.
21 (Shapiro Exhibit 10 was
22 marked for identification.)
23 BY MS. COYOCA:
24 Q. Mr. Shapiro, is this the expert report of
25 Mr. Wunderlich that you reviewed and that you are

Page 104

1 critiquing in your expert report?
2 A. Yes.
3 Q. In your -- in your expert report, which was
4 attached as Exhibit 8, you indicate on page 7 at the
5 last full paragraph on the page, begin quote:
6 "It is my further opinion that based on
7 the information provided to me, it is not
8 possible - for me or anyone else - to make a
9 definitive determination about whether each
10 individual expense was incurred as a result of
11 the Relocation or whether it would have been
12 incurred had the production stayed in Israel."
13 Do you see that?
14 A. Yes.
15 Q. What is the basis for that opinion?
16 A. Well, in the whole body of information
17 available, I don't think anyone can make that
18 determination.
19 Q. However, if -- you indicated that
20 Mr. Wunderlich had the advantage of being able to speak
21 to individuals at NBCUniversal who were involved in the
22 production; is that right?
23 A. Yes.
24 Q. So if an accountant was able to go through and
25 test particular expenses to determine -- and get the

Page 105

1 information as to what was incurred, would it be
2 possible, then, to make a determination as to whether
3 particular expenses were or were not extra?
4 MS. CRAPSTER: Objection. Calls for
5 speculation. Vague and ambiguous.
6 THE WITNESS: Possibly.
7 BY MS. COYOCA:
8 Q. Do you know whether or not Mr. Wunderlich did
9 that?
10 A. It's my belief he did not.
11 Q. What is that based on?
12 A. His deposition.
13 Q. What specifically did he testify to in his
14 deposition that led you to that?
15 A. Well, it appears that most of his decisions
16 were based on information that he just parroted from
17 Mrs. Markus.
18 Q. From BJ Markus?
19 A. Yes.
20 Q. And your criticism of his restatement of
21 Ms. Markus's information is based on what?
22 A. Well, I think that to come up with the
23 appropriate determination, he would have to do some
24 independent analysis, and I didn't see much evidence of
25 that.

Page 106

1  Q. If you were adopting Mr. Wunderlich's
2  methodology -- and I understand that you are not. But
3  assuming for purposes of this hypothetical that you are,
4  what additional steps do you think Mr. Wunderlich should
5  have done that he did not do?
6      MS. CRAPSTER: Objection. Calls for
7  speculation.
8      THE WITNESS: I wouldn't even know where to
9  start to speculate on that.
10  BY MS. COYOCA:
11  Q. Well, your complaint is that you believe that
12  there is some unquantified amount of expenses that
13  should have been extracted that were not; is that
14  correct?
15  A. Based on a $7 million claim, yes.
16  Q. Okay. So I'm just trying to drill down on that
17  analysis, that opinion that you've reached.
18  A. Well, I reached the opinion because I can't
19  believe a number greater than 2.357 could, in fact, be
20  the claim.
21  Q. Okay. And I'm trying to get at your
22  substantive analysis that led you to believe that there
23  is no way that there could have been a number greater
24  than 2.357.
25  A. I'm also trying to explain. If the total costs

Page 107

1  are such compared to the Israeli expected costs, and
2  the difference is only 2.357, then, clearly, if he
3  uses any numbers by categories that he has, they would
4  need some kind of extraction because they're just too
5  large.
6  Q. Did you analyze -- with respect to categories
7  of loss, did you analyze what extractions should have
8  been made that were not with respect to prep costs for
9  Croatia?
10  A. I was unable to do that.
11  Q. What about wrap costs?
12  A. I was unable to do that analysis in any of the
13  categories.
14  Q. Okay. But I just would like it on the record.
15      Did you do that analysis with respect to
16  New Mexico prep costs?
17  A. No.
18  Q. Did you do the analysis with respect to
19  New Mexico wrap?
20  A. No.
21  Q. Did you do or perform any analysis with respect
22  to whether the additional compensation amounts were not
23  properly included?
24  A. I did -- I didn't do any analysis, but I
25  understood those to be extra expenses.

Page 108

1  Q. Is it your position that any of the
2  compensation extra expenses that were identified, that
3  any of those should have been extracted?
4  A. No.
5  Q. What about all series extra expenses, that
6  portion of Mr. Wunderlich's report that addressed all
7  series extra expenses? Did you perform any analysis to
8  try to determine what all series extra expenses should
9  have been extracted?
10  A. No.
11  Q. Now, central to your analysis is the projected
12  estimate of costs that would be incurred if the
13  Episodes 2 through 6 had been shot in Israel; isn't that
14  correct?
15  A. Yes.
16  Q. What analysis, if any, did you perform to test
17  the possible variance of the estimated projected Israel
18  budgeted costs versus potential actual?
19      MS. CRAPSTER: Objection. Vague and ambiguous.
20      THE WITNESS: I don't think I understand the
21  question.
22  BY MS. COYOCA:
23  Q. Well, you understand that your 3.1 or .2 number
24  that you opined about as to the Israel extra -- excuse
25  me -- the Israel projected cost, you understand that

Page 109

1  that is an estimated budget number; correct?
2  A. Yes.
3  Q. Okay. So my question to you is: What
4  analysis, if any, did you apply in order to determine
5  whether there was a variance between projected estimates
6  performed by NBCUniversal versus actual numbers?
7  A. There were no --
8      MS. CRAPSTER: Same objection. Vague and
9  ambiguous.
10      THE WITNESS: There were no actual numbers for
11  Israel because the events for Episodes 2 through 6
12  didn't take place.
13  BY MS. COYOCA:
14  Q. Right.
15      But I am asking you: Separate and apart from
16  the fact that there were no actuals for Israel, in terms
17  of the budgeting process and looking at the budget
18  numbers, did you independently perform any type of
19  analysis to determine whether or not there was a
20  possible variance that would have resulted if actuals
21  had actually been incurred?
22      MS. CRAPSTER: Objection. Vague and ambiguous
23  still.
24      THE WITNESS: No.
25  ///

Page 110

**BY MS. COYOCA:**

Q. In your experience with entertainment accounting, is it your experience that budgeted costs for a television show before the show has even gone to shoot a pilot, that those budgeted costs are 100 percent accurate?

**A. No. My understanding would be many times they're inaccurate.**

Q. And based on your experience in the industry, have you ever developed an opinion as to the percentage of inaccuracy of projected budget information versus actuals?

**A. I have no information on that.**

Q. On what did you base your statement that many times you believe they are inaccurate?

**A. Well, often the budget and the actual numbers differ because events that actually happen weren't contemplated.**

Q. Can you give an example of events that might occur which were not originally contemplated?

**MS. CRAPSTER:** Objection. Calls for speculation.

**THE WITNESS:** Yes. A scene changes, and additional set and wardrobe is necessary. Sometimes there's location problems. You are going to plan to use

Page 111

a certain location; it's not available. Sometimes there's casting issues. The cast isn't available on time. We have to substitute and hadn't planned on that. Anything can change from the plan.

The budget is a nice planning tool, but it can't contemplate everything that could actually happen.

**BY MS. COYOCA:**

Q. Are you familiar with the budgeting process for a television show that is produced by a major in a foreign jurisdiction?

**A. Not directly.**

Q. Do you have any opinion as to whether the budgeting for a television show produced by a major that is shot in a foreign location, whether the budgeting on that type of show is 100 percent spot on to actuals?

**A. It would be more difficult.**

Q. For the same reasons as you previously identified?

**A. And probably more. Currency could change. There could be political issues, like there could be an incident of war. I mean, situations can happen that, in a domestic situation, would be rare.**

Q. And in this particular instance, in terms of the budgeting that you -- the budget numbers that you utilized which were developed in March of 2014, did you

Page 112

do any type of analysis to determine whether or not that budgeting took into account the potential unforeseen contingencies resulting from shooting in a foreign location?

**A. I have no information on that.**

**MS. CRAPSTER:** Objection to the last question. Vague and ambiguous.

**BY MS. COYOCA:**

Q. But if there were some additional factoring in with respect to budget amounts to take into account the unknown contingencies of a foreign location, that would impact your analysis, would it not?

**MS. CRAPSTER:** Objection. Calls for speculation. Lacks foundation.

**THE WITNESS:** Yes. Because I was forced to use the budgeted number for Israel because I had to have a starting point in the analysis.

**BY MS. COYOCA:**

Q. Well, but in terms of a starting point for your analysis, the projected Israel cost for Episodes 2 through 6 that you used, the starting point and the ending point was the John Gaskin e-mail; isn't that right?

**MS. CRAPSTER:** Objection. Misstates the evidence.

Page 113

**BY MS. COYOCA:**

Q. That's set forth in Exhibit 6.

**A. Yes.**

Q. Now, if there was some type of factoring into the budgeting process that resulted in the budget being higher, that would result in your maximum expense amount being higher as well; isn't that right?

**MS. CRAPSTER:** Objection. Calls for speculation.

**THE WITNESS:** Well, it would change the numbers, but -- my model would stay the same, but the numbers would change.

**BY MS. COYOCA:**

Q. On page 7 of your report -- again, this is going back to Exhibit 8 --

**A. Yes.**

Q. -- you indicate that -- actually, I apologize. I want you to go to page 8.

You indicate in the final sentence in the first partial paragraph on page 8 that, begin quotes:

"It is my opinion that this process is impossible based on the information I have reviewed or the information the plaintiffs' expert reviewed without any explanation from 'Dig' management."

Page 114

1    Do you see that?
2    A.  Yes.
3    Q.  Mr. Wunderlich, though, did receive
4 explanations from DIG management, did he not?
5    **A.  Well, he received information from DIG**
6 **management.  I'm not sure it's an explanation of**
7 **anything.  It looked, to me, like it's more, "This is**
8 **the number, and this is the extraction."  But I don't**
9 **think that's an explanation to anything.**
10    Q.  Well, though, you don't know what specific
11 information Mr. Wunderlich received in response to
12 questions that he may have asked with respect to extra
13 expense items, do you?
14    **A.  I do not.**
15    Q.  And, in fact, on page 9 of Mr. Wunderlich's
16 report, which has been marked as Exhibit 10 --
17    **A.  Yes.**
18    Q.  -- Mr. Wunderlich references discussions that
19 he had with Eric Gray, the chief financial officer of
20 NBCUniversal Cable Entertainment Studios and Content,
21 did he not?
22    **A.  Yes.**
23    Q.  And also on page 9 he indicates he consulted
24 with Randi Richmond, the senior VP of production,
25 NBCUniversal Cable Productions; BJ Markus,

Page 115

1 vice president, production finance, NBCUniversal Cable
2 Productions; and Eric Gray, chief financial officer,
3 NBCUniversal Cable Entertainment Studios and Content.
4    Do you know what discussions Mr. Wunderlich
5 had, if any, with any of these individuals as to
6 particular expense items that were included in the extra
7 expense?
8    **A.  I do not.**
9    Q.  Now, going back to your report on page 7 of
10 your report, you indicate that it is improper to include
11 as extra expenses all the prep and wrap expenses
12 incurred in New Mexico and Croatia; is that correct?
13    **A.  Yes.**
14    Q.  What is the basis for that opinion?
15    **A.  Well, certainly the New Mexico prep expenses**
16 **were included in their entirety, and the other expenses**
17 **that were included or represented to be extra expenses**
18 **seemed much too high.**
19    Q.  And what do you base your statement that they
20 seemed much too high on?
21    **A.  On the sheer difference between those numbers**
22 **and the Israeli projection.**
23    Q.  The budgeting process that was done for the
24 Israel shoot, that took place over a period of several
25 months, did it not?

Page 116

1    **A.  I'm sure it did.**
2    Q.  Well, we looked at one budget that was the
3 e-mail that you testified about -- that was in March --
4 and we looked at the final locked budget in June of
5 2014.
6    **A.  Yes.**
7    Q.  So that budgeting process extended over a
8 period of several months, did it not?
9    **A.  Yes.**
10    Q.  And, in fact, when we looked at the application
11 for DIG to be added as an insured production -- that was
12 Exhibit 5 -- that indicates that preproduction would
13 begin as of December 17, 2013, does it not?
14    **A.  I don't have the document in front of me.**
15    Q.  Why don't you refer back to Exhibit 5.  Could
16 you please take a look at Item 8.
17    **A.  Yes.  It does give a date, preproduction,**
18 **December 17, 2013; start of principal photography,**
19 **May 26, 2014.**
20    Q.  Okay.  So do you know when the budgeting
21 process began for DIG?
22    **A.  Well, it probably began on or about**
23 **December 17, 2013.**
24    Q.  Now, did you take into account the difference
25 in prep costs that would be associated with shooting in

Page 117

1 a new location that was done on a very expedited basis,
2 such as the move to Croatia or New Mexico?
3    **MS. CRAPSTER:**  Objection.  Assumes facts not in
4 evidence.
5    **THE WITNESS:**  I didn't have enough
6 documentation to determine what was an expedited basis
7 or not.
8    **BY MS. COYOCA:**
9    Q.  Okay.  Do you know when the DIG production
10 moved out of Israel?
11    **A.  I thought on or about July 16, 2014.**
12    Q.  Do you know when production started up again in
13 Croatia?
14    **A.  I don't recall the exact date.**
15    Q.  And what about production in New Mexico?
16    **A.  I don't recall the date.**
17    Q.  Would the fact that the production prep that
18 would need to be done in a new location on an emergency
19 expedited basis -- would that impact your analysis in
20 comparing those prep costs against the prep costs for
21 Israel?
22    **MS. CRAPSTER:**  Objection.  Calls for
23 speculation and assumes facts not in evidence.
24    **THE WITNESS:**  I'm not using prep costs, Israel.
25 I'm using total costs, Israel.

Page 118

BY MS. COYOCA:

Q.   Okay.  But --

A.   I wouldn't make such a comparison.

Q.   Okay.  But your opinion is that the prep costs, you thought, for Croatia were too high; correct?

A.   Yes.

Q.   And what do you base that on?

A.   Well, the actual costs may or may not be too high.  But I don't feel those numbers represent extra expense.  That's my only focus.

Q.   Okay.  But when I asked you -- a little bit ago, I asked you whether or not you thought the production prep for Croatia was too high, and you had indicated --

A.   Then, Counselor, I misspoke.

Q.   Okay.

A.   I have no information on whether the cost itself is too high.

Q.   What about the prep cost with respect to New Mexico?  Did you perform any analysis as to whether the prep cost for New Mexico was too high?

A.   No.

MS. CRAPSTER: I'm going to object to that last question as to vague and ambiguous.  It's unclear as to what she means by "too high."

---

Page 119

BY MS. COYOCA:

Q.   With respect to -- with respect to the wrap costs that are associated with Croatia, did you do any analysis or perform any analysis as to whether or not the wrap costs in Croatia were too high?

A.   No.

MS. CRAPSTER: Objection.  Same objection as earlier.  It's vague and ambiguous as to what she means by "too high."

BY MS. COYOCA:

Q.   Do you have any challenge at all to make with respect to the wrap costs associated with Croatia?

A.   I have no information on that.

Q.   And what about the wrap costs that are associated with New Mexico?  Did you perform any analysis of the dollar amount of wrap costs that were incurred in New Mexico?

MS. CRAPSTER: Objection.  Vague and ambiguous.

THE WITNESS: No.

BY MS. COYOCA:

Q.   Now, your report on page 7 indicates that the amounts that were incurred for prep and wrap on Episodes 2 through 6 should not all be applied to 2 through 6; is that correct?

A.   Well, I'm trying to indicate they should not

---

Page 120

represent extra expense.

Q.   Okay.  And why do you believe they should not reflect extra expense?

A.   Because they're too high to represent something that's extra.

Q.   Okay.  I want to go back, then, to -- I'm not understanding your testimony.

You just indicated that they're too high to represent something that's extra; correct?

A.   That's correct.

Q.   Okay.  What do you base your statement on that they're too high to represent extra expense?

A.   The sheer magnitude of his total 7 million versus my 2.3.

Q.   Anything else?

A.   No.

Q.   Did you perform any type of analysis at all with respect to the prep or wrap expenses incurred in New Mexico or Croatia to reach this conclusion that they're too high to reflect extra expense?

MS. CRAPSTER: Objection.  Misstates the evidence and vague and ambiguous.

THE WITNESS: No.

BY MS. COYOCA:

Q.   Now, on page 7 of your report, you indicate

---

Page 121

that any amount -- I'm sorry.  Begin quotes:

"Any amounts incurred for prep and wrap on episodes 2 through 6 that were beneficial and saved money on episodes 7 through 10 provided a benefit to plaintiffs that reduced their overall cost of filming episodes 7 through 10," close quotes.

Do you see that?

A.   Yes.

Q.   What do you mean by that statement?

A.   Well, I notice by looking at the documents that 7 through 10, the total episode costs were 13 percent lower than 2 through 6.  And I thought one of the reasons might be that something in total costs as presented in the Wunderlich report, which he estimates to be extra expense, might, in fact, have benefited those subsequent shows.

Q.   So if I understand you correctly, is it your position that the prep and wrap expenses, in your view, should have been amortized over the 2 through 10 episodes?

A.   If, in fact, they relate to the other episodes.  Except, you know, I don't have that kind of information.  I meant it just as an observation.  I have no details other than that.

Page 122

1  Q.  Okay.  So if you were to assume for purposes of
2  this analysis that the expenses, in fact, did relate to
3  all 2 through 10 episodes, would it be your position
4  that they should be amortized over the 9 episodes?
5      MS. CRAPSTER: Objection.  Calls for
6  speculation.
7      THE WITNESS: Some, yes.
8  BY MS. COYOCA:
9  Q.  Okay.  So if you're going to amortize prep and
10 wrap expenses over all episodes, not just 2 through 6
11 but also 7 through 10, then would you not also have to
12 include the costs that were associated with those
13 episodes in the analysis?
14     MS. CRAPSTER: Objection.  Vague and ambiguous.
15 Calls for speculation.
16     THE WITNESS: No.  Because I don't think
17 Episodes 7 through 10 are part of the event, the loss
18 event.
19 BY MS. COYOCA:
20 Q.  But if you're going to amortize the costs
21 associated with prep and wrap over the lifetime,
22 wouldn't it be appropriate to also include the other
23 costs that were associated with the 7 through 10
24 episodes?
25     MS. CRAPSTER: Same objections.  Ambiguous.

Page 123

1  Vague.  Calls for speculation.
2      THE WITNESS: I don't have an answer.  I don't
3  know how to answer that.
4  BY MS. COYOCA:
5  Q.  And, again, looking to the definition of "loss"
6  and the definition of "insurable production cost" under
7  the policy, the terms of the policy, which analyzes
8  what's necessary to complete the insured production,
9  wouldn't it be appropriate to take into account the
10 costs -- not just prep and wrap costs, but all costs
11 associated with 7 through 10?
12     MS. CRAPSTER: Objection.  Misstates the
13 evidence.  Assumes facts not in evidence.  Vague and
14 ambiguous.  Calls for speculation.
15     THE WITNESS: Again, I'm not an insurance
16 expert.  But I don't believe anything other than 2
17 through 6 has an event of loss.  Therefore, none of that
18 data belongs in the computation of extra expense.
19 BY MS. COYOCA:
20 Q.  I want to make sure I understand you.
21     Are you saying that all prep and wrap expenses
22 should be removed from the extra expense calculation?
23 A.  No.  Only the ones that were extra because of
24 the relocation to Croatia and New Mexico.
25 Q.  And, again, did you perform an analysis to

Page 124

1  determine which of those prep and wrap costs were, in
2  fact, extra?
3  A.  And, again, I didn't have the opportunity to do
4  that.
5  Q.  Could you please turn back to the Wunderlich
6  report.  So I want to look at Schedule A1 to the report.
7  And it appears right after page 10.
8  A.  Yes.
9  Q.  So looking -- let's take New Mexico.  There's
10 dollar amounts that are listed for prep extra expenses,
11 wrap extra expenses, all series extra expenses, and
12 compensation extra expenses.
13     Do you see that?
14 A.  Yes.
15 Q.  So the prep extra expenses that are associated
16 with New Mexico that are listed as being 1,477,588, did
17 you do any analysis of that number?
18 A.  No.
19 Q.  If you turn the page, there is a listing of the
20 extra expenses that are associated with New Mexico prep;
21 is that correct?
22 A.  Yes.
23 Q.  And in the left-hand column, there is a listing
24 of account numbers.
25     Do you see that?

Page 125

1  A.  Yes.
2  Q.  Did you go back -- in order to analyze any of
3  the extra New Mexico prep expenses that are listed here,
4  did you go back to the accounting reports that were
5  provided to you and search for these accounts in order
6  to make a determination as to what you thought was
7  inappropriately included?
8      MS. CRAPSTER: Objection.  Misstates facts and
9  assumes facts not in evidence.  Ambiguous.
10     THE WITNESS: I did not.  I didn't find it
11 necessary to perform my engagement.
12 BY MS. COYOCA:
13 Q.  Well, but you indicated that you believe that
14 there were extra expenses associated with New Mexico
15 prep that should not have been included; is that
16 correct?
17 A.  Based on the overall magnitude of the
18 difference between his 7 million and my 2.3 and the fact
19 that New Mexico prep uniquely has no exclusions, which
20 essentially is saying all New Mexico prep is extra,
21 which seems unreasonable.
22 Q.  Aside from seeming unreasonable to you and
23 because you think the number is too high, did you do any
24 analysis of the financial documentation that was
25 provided to you in order to test your hypothesis that it

Case 2:16-cv-04435-PA-MRW   Document 162-4   Filed 12/30/19   Page 34 of 49   Page ID
#:12271
Universal Cable Productions LLC, et al. v.
Atlantic Specialty Insurance Company

Jay Shapiro
May 23, 2017

Page 126

1  was too high?
2     A.  No.
3     Q.  Mr. Shapiro, you did have financial reports
4  that reflected the costs that were incurred that were
5  entered by account number, did you not?
6     A.  Yes.
7     Q.  You could have performed the analysis had you
8  chosen to do so; is that correct?
9        MS. CRAPSTER: Objection.  Vague and ambiguous
10  as to what "the analysis" means.
11        THE WITNESS: If you mean by analysis, trace it
12  back to each one of the account numbers, I didn't find
13  that necessary in the task I was given.
14  BY MS. COYOCA:
15     Q.  Okay.  But what I'm asking is:  Could you have
16  done it with the documentation you had been provided?
17        MS. CRAPSTER: Same objection.
18        THE WITNESS: It would have been possible to
19  trace this table back to the respective account numbers,
20  I believe.  I didn't do it.  But I found no evidence
21  that any of the Croatian or New Mexico costs were
22  misstated.  My only objection is they're not all extra
23  expense.
24  BY MS. COYOCA:
25     Q.  But my question to you is not whether you could

Page 127

1  go back and trace for purposes of determining whether
2  they were accurately stated in terms of the amount, what
3  I'm asking you is: You could go back to the accounts in
4  order to analyze the dollar amounts that are included
5  and make a determination as to whether the amounts were
6  appropriately earmarked as extra or not; isn't that
7  correct?
8        MS. CRAPSTER: Objection.  Vague and ambiguous
9  as to what she means by "analyze."
10        THE WITNESS: None of the data I was provided
11  had that kind of detail to do that.
12  BY MS. COYOCA:
13     Q.  Well, specifically, for example, you criticized
14  the wardrobe amount of 56,374 in your report, did you
15  not?
16     A.  Yes.
17     Q.  And that has an account number that's 755;
18  isn't that right?
19     A.  Yes.
20     Q.  But you didn't go back to the financial
21  documentation that had been produced in the case in
22  order to review the entries associated with 755, did
23  you?
24        MS. CRAPSTER: Objection.  Assumes facts not in
25  evidence.

Page 128

1        THE WITNESS: The only documentation provided,
2  of course, was the Cost Bible.  And if the Cost Bible
3  showed that amount and showed some postings, that
4  wouldn't give me enough evidence to determine it was
5  extra.
6  BY MS. COYOCA:
7     Q.  With respect to any of, though, for example,
8  the costs that are associated with below-the-line
9  costs --
10     A.  Yes.
11     Q.  -- did you ask the lawyers in the case for any
12  type of backup documentation for any of the recorded
13  entries in the Bible?
14     A.  I did ask, "Is there anything else that could
15  give me that information?"
16     Q.  And what was the response?
17     A.  "This is all the documents that we have."
18     Q.  Did you ever review any -- any invoice backup
19  documentation with respect to the DIG production?
20     A.  I did see some invoices in the discovery
21  documents I received.
22     Q.  And did you take those into account in
23  performing your analysis?
24     A.  Well, I noted that they were, in fact,
25  purchases.  You know, my purpose wasn't to audit

Page 129

1  production costs.  It was to determine a reasonable
2  amount of the claim.
3     Q.  Right.
4        But my question to you is directed towards your
5  opinion that, in your view, the expenses that were
6  incurred -- let's just specifically focus on New Mexico
7  prep for now.
8     A.  Right.
9     Q.  -- that those were not all extra, and you made
10  that conclusion, you came to that conclusion just based
11  on the total amount which you thought was too high.
12     A.  And --
13        MS. CRAPSTER: Objection.  Misstates the
14  evidence.
15        THE WITNESS: Also it's unreasonable that every
16  dollar of New Mexico prep cost would, in fact, be extra.
17  So I think the schedule is mistitled.  It's probably a
18  schedule of New Mexico prep costs, but it is not extra
19  expense New Mexico prep.
20  BY MS. COYOCA:
21     Q.  Again, though, my question to you is:  Did you
22  perform any type of analysis with respect to underlying
23  documentation in order to try to determine whether those
24  New Mexico prep costs were all, in fact, actual?
25        MS. CRAPSTER: Objection.  Vague and ambiguous

Page 130

1 as to what she means by "analysis."
2     THE WITNESS: Yeah. I don't fully understand
3 "analysis." I reviewed the documents as they were.
4 There were invoices; not a lot. But the invoice isn't
5 going to tell me whether it's extra expense.
6 BY MS. COYOCA:
7     Q. Well, but an underlying invoice would give you
8 information with respect to the cost that was incurred,
9 would it not?
10     A. Yes, it would.
11     Q. It would indicate who was charging the cost?
12     A. Yes.
13     Q. And it would also indicate the date of the
14 loss, in all likelihood; correct?
15     A. Yes.
16     Q. And the dollar amount of the loss?
17     A. Yes.
18     Q. And, in fact, most of the invoices would
19 reflect a description of the -- what was being
20 purchased; isn't that correct?
21     A. In some cases, yes.
22     MS. CRAPSTER: I'm just going to go back. I
23 believe you meant to say "cost." You said "loss" in the
24 last few questions. I think the word should be "cost."
25     MS. COYOCA: Okay. I thought I said "cost."

Page 131

1     THE WITNESS: I thought you said "cost" also.
2 BY MS. COYOCA:
3     Q. Thank you, Mr. Shapiro.
4     Let me just ask it in summary fashion so the
5 record is clear.
6     With respect to individual invoices, in many
7 instances invoices would reflect who was charging the
8 cost, the date of the cost, the amount of the cost, and
9 a description of what was being purchased; is that
10 correct?
11     MS. CRAPSTER: Objection. Assumes facts not in
12 evidence.
13     THE WITNESS: In most cases, yes.
14 BY MS. COYOCA:
15     Q. Now, I believe you testified that in your
16 review of documentation, you saw only a few invoices --
17 is that right? -- or a limited number of invoices?
18     A. A limited number.
19     MS. CRAPSTER: Objection. Misstates --
20     THE WITNESS: A limited number.
21     MS. CRAPSTER: -- the testimony. Objection to
22 the last question.
23 BY MS. COYOCA:
24     Q. Did you ask to see any other invoice documents?
25     A. The only question I asked, "Is there anything

Page 132

1 else?"
2     Q. I'm specifically, though, focused on: Did you
3 ever ask, "Is there any source invoice documentation?"
4     MS. CRAPSTER: Objection. Asked and answered.
5     THE WITNESS: The only question I asked, "Is
6 there anything else?"
7 BY MS. COYOCA:
8     Q. Well, at the point in time when you were
9 asking, "Is there anything else?" had you already
10 reviewed all the documentation and determined whether or
11 not there was invoice documentation included in what you
12 had been provided?
13     A. Yes. I found a few invoices. But I was hoping
14 maybe there were more.
15     Q. And further to that hope that there would be
16 more invoices, again, did you specifically say, "In
17 order to challenge that these expenses that are
18 identified as being extra, I need to look at the
19 underlying invoice documentation"?
20     MS. CRAPSTER: Objection. Mischaracterizes the
21 testimony. Assumes facts not in evidence and --
22     THE WITNESS: No. I didn't feel it was
23 necessary.
24 BY MS. COYOCA:
25     Q. Now, if you turn to Schedule B2 of the

Page 133

1 Wunderlich report --
2     A. Yes.
3     Q. -- that lists the extra expenses that
4 Mr. Wunderlich claimed for New Mexico wrap; is that
5 right?
6     A. Yes.
7     Q. And in your opinion, not all of those expenses
8 should have been included in extra expense; is that
9 right?
10     A. Possibly, yes.
11     Q. Why is it just possibly?
12     A. Again, my analysis is in total. I didn't
13 analyze it by category.
14     Q. And, in fact, Mr. Wunderlich did not include
15 all of the wrap expenses for New Mexico in the extra
16 expense claim, did he?
17     A. No. That was refreshing.
18     Q. Could you please turn to page 7 of
19 Mr. Wunderlich's report.
20     Did you perform any analysis of the description
21 of Mr. Wunderlich's review of the Full Cost Bible as to
22 the New Mexico all series expenses?
23     MS. CRAPSTER: Objection. Vague and ambiguous
24 and unclear as to what she means by "analysis."
25     THE WITNESS: No.

Page 134

**BY MS. COYOCA:**

Q. Well, did you look at them?

A. Yes.

Q. Did you try to test to determine whether or not his analysis was correct?

A. What do you mean by "correct"?

Q. Well, you've indicated that your analysis you did in total. You just think the total amount was too large. And I'm trying to get at what the basis is for that opinion. And so I'm trying to determine what it is that you did with respect to each of the categories of expenses as to which Mr. Wunderlich included in his claim calculation.

A. It's --

MS. CRAPSTER: I'll object to that as mischaracterizing the testimony.

THE WITNESS: It's of no value to analyze it by category.

BY MS. COYOCA:

Q. Why is it of no value to analyze it by category?

A. Because the loss can only be the maximum amount of total cost difference.

Q. Based on your chosen methodology; correct?

A. That's correct.

Page 135

Q. But your chosen methodology relies heavily on estimates or budgets of costs as to Israel; correct?

A. You mean -- 'cause that's the only Israeli information available.

Q. But is it correct that that's what your analysis relies on?

A. Yes.

Q. Okay. So do you think that the most reliable analysis of what truly was extra would be to review each and every expense that was included in the extra expense calculation?

A. Well, that would be the most reliable. Maybe not the most practical.

Q. Okay. And do you believe that the most reliable calculation of extra expense would not rely on estimate -- estimated cost amounts as opposed to actual cost amounts?

MS. CRAPSTER: Objection. Calls for speculation.

THE WITNESS: Well, in a perfect world. But here there are no actual amounts available.

BY MS. COYOCA:

Q. But there were actual amounts available for Croatia and New Mexico; correct?

A. Yes.

Page 136

Q. So to take the place of the estimated costs for Israeli production, rather than using estimates, you could have gone, in a perfect world, and done an analysis of the actual expenses that were incurred?

A. If I had the detail information behind each expense and I could verify what it was for and was it, in fact, extra from what would have been needed to complete a TV one-hour production.

Q. Okay. Now, in your experience in handling accounting for entertainment-related matters -- let's just stick with television -- is the concept of testing during the course of auditing one that is familiar to you?

A. Yes.

Q. And what's testing?

A. Testing is you would take a look at an account, make individual detail selections. And if, in fact, the result was favorable, you would conclude the entire account is favorable.

Q. Okay. Did you attempt to perform any type of testing with respect to any of the expense accounts that were reflected in Mr. Wunderlich's report?

A. No. Because the Universal Cable Production records were not made available to me.

Q. Okay. Do you know if there was invoice

Page 137

documentation broader than what was provided to you? Do you know if it was actually produced in the case?

A. I do not.

Q. I want you to assume for a moment that you did have all of the invoices available to perform a test.

In your view, would it be more reliable to perform an audit test of the extra expenses that were claimed rather than using your methodology of comparing estimated costs against actual costs?

MS. CRAPSTER: Objection. Calls for speculation and assumes facts not in evidence.

THE WITNESS: Well, I believe the most ideal method would have been for Universal to submit a detail claim of extra items and -- with supporting backup that both the insurance company and themselves could have to support the amount of the claim.

BY MS. COYOCA:

Q. So Mr. --

A. So if there was an invoice that was, in fact, extra, let it be identified in a separate document. That's the most reasonable way of analyzing it.

Q. Okay. So with respect to Mr. Wunderlich's report and his identification of the categories of loss and then the breakdown by account as to -- I'm sorry. Let me start over 'cause I used "loss" again.

Page 138

1    With respect to Mr. Wunderlich's analysis of
2  the extra expense claim stating the amount of the claim
3  broken down by category of expenses, which are further
4  broken down by schedules according to accounts, in your
5  view, if you had all the invoices, would it be possible
6  to then test those categories of expenses with the
7  invoices?
8       MS. CRAPSTER: Objection.  Vague and ambiguous.
9  Assumes facts not in evidence.
10       THE WITNESS: Well, I'd have a better
11  opportunity.  But I don't know for sure that could just
12  be done with that.  You probably would need some input
13  from DIG management.
14  BY MS. COYOCA:
15    Q.  So if you had the invoices and input from DIG
16  management, the task of analyzing the account entries
17  with respect to the expenses that are claimed on each of
18  the schedules, it would be possible to do that?
19       MS. CRAPSTER: Objection.  Calls for
20  speculation.  Mischaracterizes the testimony.  Vague and
21  ambiguous.
22       THE WITNESS: Yeah.  If an addition was put in
23  the format I discussed, a listing of all the items in
24  the claim, then the invoices would, in fact, support
25  that.  That would be the most reasonable method.

Page 139

BY MS. COYOCA:
1
2    Q.  And it would be a method that would be superior
3  to the methodology that you utilized in your report; is
4  that right?
5       MS. CRAPSTER: Objection.  Vague and ambiguous.
6  BY MS. COYOCA:
7    Q.  Actually, let me take the question away.
8       Rather than "superior," would it be a more
9  reliable method to perform the calculation in the manner
10  we've been discussing, as opposed to the methodology in
11  your report?
12    A.  Yes.
13    Q.  Now, on page 8 of your report, you indicate
14  that, begin quotes:
15       "The PER does not address my methodology
16    of calculating damages or offer any
17    justification for why the extra expenses are
18    greater than $2,357,875 (the figure I believe
19    is the maximum amount recoverable)."
20       And then you state your opinion, begin quotes:
21       "In my opinion, not addressing this
22    mathematically reliable alternative to the
23    calculation of damages challenges the
24    credibility of the PER's analysis," close
25    quotes.

Page 140

1    Do you see that?
2    A.  Yes.
3    Q.  What did you mean by the statements that are
4  made in that paragraph?
5    A.  Well, it's essentially what I've been saying.
6  I think that failure to consider the total costs using
7  the Israeli estimate is a serious weakness in the
8  methodology.
9    Q.  Now, at the time you rendered your report, as
10  of April 25, 2017 --
11    A.  Yes.
12    Q.  -- Mr. Wunderlich's report already had been
13  issued, had it not?
14    A.  Yes.
15    Q.  And his report was issued back in March;
16  correct?
17    A.  Yes.
18    Q.  So how could Mr. Wunderlich have addressed your
19  calculation in his report when you hadn't even submitted
20  it yet?
21    A.  I think it's just a basic situation where you
22  look at the total cost change rather than ignore it and
23  go into these -- these category analyses and these input
24  from Ms. Markus.  And, to me, this was a starting point.
25  So I seriously disagree with the methodology.

Page 141

1    Q.  Okay.  But my question --
2    A.  Even without my report being issued before he
3  issued his, I think he should have thought about the
4  issue that total cost didn't go up that much.  How can
5  extra expense -- I don't believe he has a full
6  understanding of what extra expense is.
7    Q.  What's your understanding of what extra expense
8  is?
9    A.  It's amounts that exceed the insurable
10  production cost as a result of the loss event.
11    Q.  And you don't believe Mr. Wunderlich
12  understands that definition as you phrased it; is that
13  right?
14    A.  I do not.
15    Q.  And in your analysis and coming to your
16  methodology, you challenge the fact that he did not look
17  at what originally had been projected as the costs for
18  production of the show if it stayed in Israel; right?
19    A.  I don't think he gave any consideration to what
20  would have happened if they stayed in Israel.  Even
21  though the numbers were changing and maybe not going to
22  be actual, but it was the best thing you had.  To ignore
23  that, I feel, was inappropriate.
24       And then I'm further confused by his deposition
25  where he says he saw costs incurred.

Page 142

1  Q.  Israel-incurred costs and --
2  A.  On several -- he makes reference to that
3  several times, which further confuses me.
4  Q.  Okay.  And they're referenced in his report as
5  well, are they not?
6  A.  Well, I didn't see any reference to
7  Israeli-incurred.
8  Q.  And are you aware of -- in your analysis, when
9  you were going through everything, did you look at any
10 costs that were incurred and paid while still in Israel
11 that actually applied to all series?
12 A.  I saw no documentation on that.
13 Q.  You saw no documentation?
14 A.  No.
15 Q.  And did you ever raise the issue that there may
16 be costs that were incurred in Israel that already were
17 taken into account in calculating extra expense when
18 comparing the projections for Israel against actuals in
19 Croatia and New Mexico?
20 MS. CRAPSTER: Objection.  Vague and ambiguous.
21 THE WITNESS: Yeah.  I don't understand the
22 question.
23 BY MS. COYOCA:
24 Q.  Well, if there were costs that were actually
25 incurred and paid in Israel but that redounded to the

Page 143

1  benefit of the episodes that were shot in Croatia and
2  New Mexico, wouldn't you need to take those expenses
3  into account in calculating extra expense under your
4  methodology?
5  MS. CRAPSTER: Same objection.  Vague and
6  ambiguous.
7  THE WITNESS: Yes.  If such document existed
8  that showed that.  I saw no document that showed that.
9  BY MS. COYOCA:
10 Q.  Why would you need to take it into account?
11 A.  Well --
12 MS. CRAPSTER: Objection.  Vague and ambiguous.
13 THE WITNESS: It would reduce the amount of
14 additional expenses that have to be incurred if it's
15 already been incurred.
16 BY MS. COYOCA:
17 Q.  Well, but if it's already been incurred and
18 paid in Israel, and you've got a projection that's a
19 budget, wouldn't those amounts have to be removed from
20 the projection budgets in Israel?
21 A.  Yes.  And I saw no reference to that in the
22 Wunderlich report, and I found none independently of
23 that.  But that would have been a valuable analysis.
24 Q.  Are you familiar with what Keshet is?
25 A.  An Israeli production company.

Page 144

1  Q.  Right.  And Keshet was utilized on the DIG
2  show; right?
3  A.  Yes.
4  Q.  And there are references to expenses incurred
5  associated with Keshet; right?
6  A.  Yes.
7  Q.  And those fees -- excuse me -- those costs
8  would be associated with fees that need to be paid to
9  Keshet; is that correct?
10 MS. CRAPSTER: Objection.  Vague and ambiguous.
11 Assumes facts not in evidence.
12 THE WITNESS: I have no idea.
13 BY MS. COYOCA:
14 Q.  Well, Keshet charges a production fee for its
15 services, does it not?
16 A.  They probably do.  Yes.
17 Q.  And Keshet also -- well, no.  Let me just ask
18 you this:  Are you familiar with expenses flowing
19 through a local production company to be charged to a
20 show?
21 A.  Yes.
22 Q.  Relatively common practice.  Yes?
23 A.  It is.
24 Q.  So any production fees that would be charged by
25 Keshet, those would be associated with services rendered

Page 145

1  in Israel; right?
2  A.  Yes.
3  MS. CRAPSTER: Objection.  Assumes facts not in
4  evidence.
5  BY MS. COYOCA:
6  Q.  And any invoices that would flow through
7  Keshet, you could reasonably assume those were
8  associated with services in Israel as well; right?
9  MS. CRAPSTER: Objection.  Assumes facts not in
10 evidence.
11 THE WITNESS: Well, all I can assume is Keshet
12 probably handles other shows.  So if the invoice was
13 appropriate for DIG, they were in the position to handle
14 that, yes.
15 BY MS. COYOCA:
16 Q.  Can you please turn to page 9 of your report.
17 A.  Yes.
18 Q.  In Item No. 5, you indicate, "This amount" --
19 begin quotes:
20    "This amount does not take into account
21    other possible reductions that are appropriate
22    such as, for example, (1) the prep and wrap
23    expenses incurred in episodes 2 through 6 that
24    may have benefited the producing of episodes 7
25    through 10."

Case 2:16-cv-04435-PA-MRW   Document 162-4   Filed 12/30/19   Page 39 of 49   Page ID
#:12276

Universal Cable Productions LLC, et al. v.
Atlantic Specialty Insurance Company

Jay Shapiro
May 23, 2017

---

Page 146

1    Now, we've discussed that topic; is that
2  correct?
3    A.  Yes.
4    Q.  Is there anything further with respect to your
5  opinions about the inclusion or exclusion of prep and
6  wrap expenses that you have not yet told me?
7    A.  No.
8    Q.  Okay.  Then the second amount that you
9  referenced is No. 2, begin quotes:
10   "Production quality improvements that
11   could have been made to each episode," close
12   quotes.
13   A.  Yes.
14   Q.  What do you mean by that?
15   **A.  Well, once we arrived in Croatia and**
16 **New Mexico, we might have changed our mind about the**
17 **story, spruce up the sets.  You know, make changes to**
18 **make each show a greater value, maybe new kinds of**
19 **wardrobe, technology changes.  You know, we could have**
20 **decided maybe these shows will be high definition or add**
21 **a camera.  I mean, we had the ability -- as long as**
22 **we're relocating, we may want to rethink the plan.**
23   Q.  So your view is that if those kinds of
24  decisions were made, that they should -- and were
25  included in the extra expense, that they should not have

---

Page 147

1  been included; is that correct?
2    **A.  That is correct.**
3    Q.  And have you identified any such categories of
4  production quality improvements that were made that
5  should not have been charged?
6    **A.  No.**
7    Q.  Are you aware of any changes that were made to
8  production -- for example, to use one of your examples,
9  script changes -- that would serve to reduce the costs
10  associated with production?
11   **A.  No.**
12   Q.  Did you look at any documentation or
13  information that discussed the fact that a portion of
14  the script was based in Arizona?  Did you see that?
15   **A.  No.**
16   Q.  And are you aware of whether there were changes
17  to script in order to have the storyline set in
18  New Mexico in order to avoid the need to cheat for
19  Arizona?
20   **A.  No.**
21   Q.  That, in fact, would be an effort to mitigate
22  the expense, would it not?
23   **A.  Yes.**
24      MS. CRAPSTER:  Let me object to the last
25  question on the grounds that it calls for a legal

---

Page 148

1  conclusion.
2     MS. COYOCA:  Okay.  Could we just take a break
3  for a moment?  We've been going about an hour and a
4  half.  Thanks.
5     (Recess from 2:57 p.m. to 3:07 p.m.)
6     MS. COYOCA:  Back on the record.
7    Q.  Okay.  Mr. Shapiro, I would like to understand
8  the calculation that you performed in order to arrive at
9  your $2,357,875 number.
10      So looking at the methodology section of your
11  report on page 8, you indicate that you started with, I
12  believe, the Total Cost, capital T, capital C --
13   **A.  Yes.**
14   Q.  -- Total Cost amount of 21,297,435 and the
15  adjusted total costs of 21,464,745.
16   **A.  Yes.**
17   Q.  And that 21,464,745 number is one that you
18  obtained pursuant to --
19   **A.  The document we saw this morning.**
20   Q.  Right.  The Shapiro Exhibit 9, which is
21  UCP018227.  So could you please pull Exhibit 9 out.
22   **A.  Yes.**
23   Q.  Okay.  And on page UCP018227, we established
24  that the Front 5 episodes, which is 21,464,745 -- that's
25  your adjusted total cost number in your report; correct?

---

Page 149

1    **A.  Yes.**
2    Q.  Now, this indicates total cost before breakage.
3    **A.  Yes.**
4    Q.  Did you take into account any breakage
5  calculation?
6    **A.  I did not.**
7    Q.  Do you know what breakage is?
8    **A.  It's an arrangement with the user of the**
9  **product, the broadcast entity.  It's a cost reduction**
10 **per arrangement.**
11   Q.  Now, the next number that was important to your
12  analysis is the Israeli cost data; is that correct?
13   **A.  Yes.**
14   Q.  And you believed the most detailed Israeli cost
15  data was in UCP004971-4972; is that right?
16   **A.  Yes.  At the time.**
17   Q.  Right.  And that's Exhibit -- what we've marked
18  as Exhibit 6; correct?
19   **A.  Yes.**
20   Q.  Okay.  I want you to pull out Exhibit 6,
21  please.  Thank you.
22      So this document which bears a March 11, 2014
23  date is not the most immediate budget prior to
24  production of the pilot; is that right?
25      MS. CRAPSTER:  Objection.  Vague and ambiguous.

Page 150

1    THE WITNESS: Well, I'm certainly willing to
2  recognize we saw another document this morning that
3  could change this number because it's a more recent
4  budget.
5  **BY MS. COYOCA:**
6    Q.  Okay.  And if you turn to Schedule B of your
7  report --
8    **A.  Yes.**
9    Q.  -- the calculation that you performed was to
10 subtract from the 21,464,745 number the total amount of
11 the Israel costs anticipated for 2 through 6 episodes;
12 is that right?
13   **A.  Well, I think you misspoke.  I took the**
14 **New Mexico/Croatia number Episodes 2 through 6 and**
15 **subtracted the Israeli number.  Yes.**
16   Q.  Okay.  And, again, that Israeli cost data,
17 17,535,425, was drawn specifically from Exhibit 6?
18   **A.  Exhibit 6.  Correct.**
19   Q.  And you agree with me, do you not, that that
20 calculation of 17,535,425 number appears to be drawn
21 from the pattern amount of 3,507,085 times 5; correct?
22   **A.  Yes.**
23   Q.  So the sum of that subtraction that you reached
24 was 3,929,320; correct?
25   **A.  Yes.**

Page 151

1    Q.  And to you, what does that number represent?
2    **A.  Incremental costs.**
3    Q.  The incremental costs incurred as a result of
4  the relocation of the production to Croatia and
5  New Mexico; is that right?
6    **A.  No.  The total incremental costs**
7  **New Mexico/Croatia actually incurred from what we**
8  **thought we were going to incur and expected to incur in**
9  **Israel.**
10   Q.  Okay.  Now, you then deducted certain amounts
11 relating to tax credits; is that right?
12   **A.  Yes.**
13   Q.  So if you look at Schedule A, you deducted from
14 the $3.9 million number the amount of $1,571,445; is
15 that right?
16   **A.  Yes.**
17   Q.  And that's how you reached your $2,357,875?
18   **A.  That's correct.**
19   Q.  All right.  So the film tax credit calculation
20 is set forth on another schedule.  That's Schedule C;
21 right?
22   **A.  That's correct.**
23   Q.  All right.  I'm looking at Schedule C now.
24 That's page 13 of your report.
25   **A.  Yes.**

Page 152

1    Q.  The realized tax credit for the New Mexico
2  production, you indicated that that was from UCP004504;
3  is that right?
4    **A.  Yes.**
5    Q.  Okay.  We'll come back to that.
6      On the anticipated Israel tax credit, you have
7  2,104,000; right?
8    **A.  Yes.**
9    Q.  And that is derived from UCP004971; is that
10 right?
11   **A.  Which is Exhibit 6.**
12   Q.  So on Exhibit 6 I see on the e-mail sent by
13 Mr. Gaskin to Mr. Winemaker and Ryan Greig an amount
14 that's listed as IS Tax Cr, an amount of 3,100,000.
15   **A.  Yes.**
16   Q.  So how did you calculate the 2.1 million from
17 that $3.1 million amount?
18   **A.  Well, some of the tax credit, the 3,100,000,**
19 **results from the pilot that was completed.  So I wanted**
20 **to remove that effect.  So I calculated the percentage**
21 **3 million 100 over the 25.130 spent and used that**
22 **percentage against the 17.535.  And I thought that was**
23 **the estimated anticipated credit for Episodes 2 through**
24 **6 if done in Israel.  Then I was comparing apples to**
25 **apples.**

Page 153

1    Q.  And why didn't you use the actual Israeli tax
2  credit that was provided on the pilot?
3    **A.  Because it included -- the pilot is not an**
4  **event of loss.  That's Episode 1.  And I'm only doing**
5  **Episodes 2 through 6 because they're the ones that are**
6  **the event of the loss.**
7    Q.  Okay.  So I want to make sure I understand your
8  analysis here.
9      So if you turn to Shapiro Exhibit 9, which is
10 the production cost recap report --
11     Do you have that?
12   **A.  Yeah.**
13   Q.  -- on page 18227 --
14   **A.  Okay.**
15   Q.  -- there is a tax credit recap in the lower
16 left-hand corner; correct?
17   **A.  Yes.**
18   Q.  And in it it reflects the insured credit on --
19 excuse me -- the Israel credit on the pilot as being,
20 under Current, $1,234,699.  That's the actual tax credit
21 applied to the pilot; correct?
22   **A.  It appears to be.  Yes.**
23   Q.  So, again, I want to understand why you would
24 not have deducted 1,234,699 from 3,100,000 in order to
25 determine the amount of tax credit available for

---

Page 154

1 Episodes 2-6?

2    A.   I think I already had computed the tax credit
3 before I realized this document had that.  But your
4 approach would also be appropriate.

5       I used the ratio approach when I could have
6 also used the actual pilot credit and subtracting it out
7 of the estimate.

8    Q.   Under the calculation where you take the actual
9 Israeli credit on the pilot of 1,234,699 --

10   A.   Yeah.

11   Q.   -- and you deduct it from the 3.1 million, you
12 come up with a calculation that is less than the
13 2.4 million that's reflected in your chart; isn't that
14 right?

15   A.   The 2 million 104?

16   Q.   I'm sorry.  The 2 million 104.

17   A.   Yes.  You would substitute that subtraction --
18 the result of that subtraction in there.

19   Q.   Which is approximately 1,866,000 -- right? --
20 doing a rough math calculation?

21   A.   Yeah.  It would be less; therefore, causing the
22 additional credit to even be more valuable.

23   Q.   Now, in calculating the additional credit
24 realized, the economic benefit, and subtracting that
25 from the total amount of incremental cost --

---

Page 155

1    A.   Yes.

2    Q.   -- did you do any matching analysis with
3 respect to the tax credit versus the costs that were
4 charged?

5    A.   No.

6    Q.   Okay.  So under matching principles, wouldn't
7 it be appropriate to match the amount of the credit,
8 i.e., the revenues, to the costs actually incurred in
9 applying this calculation?

10      MS. CRAPSTER: Objection.  Assumes facts not in
11 evidence.  Vague and ambiguous.

12      THE WITNESS: Well, that would be an
13 alternative technique.  But, quite frankly, these are
14 given numbers, and they don't have to be matched with
15 anything.  They're facts.

16 BY MS. COYOCA:

17   Q.   Well, but for purposes of performing a
18 calculation of loss based on the definition in the
19 policy and the insurable production cost, is it your
20 position that you do not need to match tax credit
21 revenue to the actual costs that it relates to?

22      MS. CRAPSTER: Objection.  Misstates the
23 testimony.

24      THE WITNESS: My only position on the tax
25 credit is it's an economic benefit realized by the

---

Page 156

1 relocation.  And it should be, as we previously
2 discussed, a mitigating circumstance in regard to the
3 expected expense or extra expense loss.

4 BY MS. COYOCA:

5    Q.   When you state that applying the matching
6 principle of revenue to actual cost incurred, that
7 that's an alternative technique, why did you not employ
8 it here?

9       MS. CRAPSTER: Objection.  Misstates the
10 testimony.

11      THE WITNESS: To compute the number -- I'm
12 looking for the economic benefit -- the matching isn't
13 necessary.

14 BY MS. COYOCA:

15   Q.   Why not?

16   A.   I don't see any reason why it would have to be
17 done.  There are three facts presented.  You make a
18 calculation.  You don't have to match it with anything.
19 If this is the credit they received, they received it
20 for some reason.  It's been matched and reviewed by the
21 government authorities.

22   Q.   So let's get to that.

23      Did you actually review the tax credit
24 calculations that were -- excuse me -- the tax credit
25 reports that were provided by the taxing authorities in

---

Page 157

1 Croatia and New Mexico?

2    A.   That wasn't produced to me.

3    Q.   So what do you base your statement on that the
4 tax credits were already matched?

5    A.   Just my general understanding of how the
6 procedure works.

7    Q.   What is your general understanding of how the
8 procedure works?

9    A.   That applications are made to government
10 authorities.  The matching takes place at that time, and
11 they can choose whether to audit or review it.  And then
12 the credit is given.

13   Q.   And as part of that process, the actual costs
14 are reviewed; correct?

15   A.   Yes.

16   Q.   And the actual costs are compared against the
17 tax credit available, i.e., the matching occurs; is that
18 right?

19   A.   Yes.

20      MS. CRAPSTER: Objection.  Calls for
21 speculation.

22      THE WITNESS: In most localities, yes.

23 BY MS. COYOCA:

24   Q.   And do you know if that occurred in Croatia?

25   A.   I'm not familiar with the rules in Croatia.

---

Page 158

1   Q.   What about New Mexico?
2   A.   I'm not directly familiar with those either.
3   Q.   So if that matching process occurred in the
4   actual issuance of the tax credit or the tax rebate in
5   those two jurisdictions, you believe it is appropriate
6   in calculating the loss -- and specifically the
7   insurable production cost -- you believe it's
8   appropriate to apply the entire amount of the tax credit
9   potentially available to just a portion of the cost?
10      MS. CRAPSTER:   Objection.  Misstates the
11  testimony and vague and ambiguous.
12      THE WITNESS:   Yeah.  I don't understand the
13  question.
14  BY MS. COYOCA:
15  Q.   Well, so as part of your calculation of loss
16  under the terms of the policy --
17  A.   Yes.
18  Q.   -- you have to specifically look at the
19  insurable production costs; right?
20  A.   Yes.
21  Q.   Now, first of all, under insurable production
22  cost, is the insurer permitted to take advantage of the
23  tax credits that are specifically accorded as part of
24  the production process?
25  A.   I'm not sure if the tax credits are mentioned

Page 159

1   in the policy.
2   Q.   Let's take a look.  Can you go back to
3   Exhibit 1.
4       MS. CRAPSTER:   To be clear, this is Williams
5   Exhibit 1, not Shapiro Exhibit 1.
6       MS. COYOCA:   Right.
7       THE WITNESS:   Yes.
8   BY MS. COYOCA:
9   Q.   So under "Definition of Loss" that's on page
10  ATL003106, do you see any reference here to the
11  application of tax credits?
12  A.   No.
13  Q.   And if you look at the definition of "insurable
14  production cost" in ATL00- -- on ATL003081 in Item 4,
15  the definition of "insurable production cost," where in
16  this definition is there a provision for application of
17  the tax credit in calculating the insurable production
18  cost?
19  A.   I don't know.  I see no direct reference to
20  film tax credits.
21  Q.   My understanding from your testimony earlier
22  today was that your analysis was an attempt to calculate
23  cost under the terms of the policy; is that right?
24  Excuse me.  The claim under the terms of the policy; is
25  that right?

Page 160

1   A.   Yes.
2       MS. CRAPSTER:   Objection.  Mischaracterizes the
3   testimony.
4       THE WITNESS:   Yes.  That was my objective.
5   BY MS. COYOCA:
6   Q.   If the -- any tax credits accorded to the
7   insured are not provided for in the calculation of
8   insurable production cost, then why did you apply it
9   here?
10  A.   Well, it's just my understanding in dealing
11  with an insurance claim that the insured who has
12  suffered a loss can't economically benefit from such
13  loss.  In this case, they did.
14  Q.   But under the terms of the contract between the
15  parties, there's no provision for the application of the
16  tax credit; is that right?
17      MS. CRAPSTER:   Objection.  Calls for a legal
18  conclusion.
19      THE WITNESS:   Counselor, I'm not a lawyer, and
20  I'm not familiar with the insurance contract in that
21  respect.
22  BY MS. COYOCA:
23  Q.   When you were calculating the application of
24  the tax credit and the additional credit to be realized,
25  did you ask to see the Croatian or New Mexico reports on

Page 161

1   the tax credit accorded?
2       MS. CRAPSTER:   Objection.  I think that calls
3   for privileged information that's protected by Rule 26.
4       THE WITNESS:   I don't recall.
5   BY MS. COYOCA:
6   Q.   Would -- the calculation under the taxing
7   authorities, would their calculation be relevant to your
8   analysis, do you believe?
9   A.   Well, I would hope it would be the same as put
10  on this document.  I can't see a reason why the number
11  wouldn't be the same.  I can only use the data that's
12  available.
13  Q.   Under GAAP principles -- separate and apart
14  from what you did, under GAAP principles do you think it
15  is necessary under the matching principle to match
16  revenue with the associated costs, i.e., that portion of
17  the tax credit with the associated costs attributable to
18  that revenue under GAAP?
19      MS. CRAPSTER:   Objection.  Vague and ambiguous.
20      THE WITNESS:   Well, if you had a GAAP
21  situation, yes, it would be appropriate to match.
22  BY MS. COYOCA:
23  Q.   Under Schedule A to your report -- excuse me --
24  to your CV which is attached to your report --
25  A.   Yeah.

Case 2:16-cv-04435-PA-MRW   Document 162-4   Filed 12/30/19   Page 43 of 49   Page ID
#:12280

Universal Cable Productions LLC, et al. v.
Atlantic Specialty Insurance Company

Jay Shapiro
May 23, 2017

Page 162

1  Q.  -- it provides that you've been -- you've
2  provided expert witness testimony over the last
3  four years in the cases that are identified; is that
4  right?
5  A.  Yes.
6  Q.  So are these cases where you've just simply
7  provided expert testimony, or are these all cases in
8  which you've been retained as an expert?
9  A.  Where I provided testimony.
10  Q.  Are there other cases where you have been
11  retained as an expert?
12  A.  In the last four years?
13  Q.  Yes.
14  A.  Yes.
15  Q.  What cases are those?
16  A.  Well, I don't recall.  I would have to have my
17  full resume.  But often, issues I'm involved with settle
18  before there is any testimony.
19  Q.  Were you retained as an expert in the
20  Larson vs. NBCUniversal matter?
21  A.  Yes, I was.
22  Q.  Are you currently serving as an expert in the
23  Larson vs. NBCUniversal matter?
24  A.  No.
25  Q.  Is that matter concluded?

Page 163

1  A.  As far as I'm concerned, yes.
2  Q.  Did you issue a report in the Larson vs.
3  NBCUniversal matter?
4  A.  No.
5  Q.  Did you provide deposition testimony in the
6  matter?
7  A.  No.
8  Q.  Did you provide an opinion in the matter in any
9  shape or form?
10  A.  I provided consulting services to the lawyers
11  involved and certain financial information relating to
12  the many shows that were part of the litigation.  I
13  believe they settled the matter in mediation.
14  Q.  Other than the Larson case, can you recall any
15  other matters within the last four years in which you
16  have been retained as an expert?
17  A.  Not off my -- without seeing my resume, no.
18  Q.  But you believe that your full resume, as
19  opposed to just the one that's attached to your report,
20  would contain a full listing of all such cases; is that
21  correct?
22  A.  It does.
23  MS. COYOCA: Counsel, we have not received that
24  resume.  Are you going to produce it?
25  MS. CRAPSTER: I don't believe so.  We've

Page 164

1  produced a resume that's compliant with Rule 26.  It
2  specifically states that CVs attached to expert reports
3  need to list cases in which testimony was provided
4  during the last four years and publications over the
5  last 10 years.
6  MS. COYOCA: So you're refusing to produce his
7  full resume?
8  MS. CRAPSTER: I don't believe we have any
9  obligation to produce it.  I don't believe you've even
10  asked for it until right this minute.  So I'm not going
11  to voluntarily produce it.
12  BY MS. COYOCA:
13  Q.  Earlier today I asked you if you had ever been
14  sanctioned, disciplined by any regulatory authority.
15  And we discussed the SEC matter and also the probation
16  that you received with respect to that matter from the
17  California Board of Accountancy; is that right?
18  A.  Yes.
19  Q.  Are there any other times during the course of
20  your career where you have been sanctioned or
21  disciplined or censured in any way?
22  A.  Not that I recall.
23  Q.  In 1992 did the California Board of Accountancy
24  bring an action against you which resulted in your
25  accounting certificate being revoked which then was

Page 165

1  stayed with three years' probation?
2  A.  Well, there was a lot of litigation in that
3  time when Laventhol dissolved, when there were years of
4  litigation from the Laventhol matter.  I was the audit
5  partner in charge of Laventhol, and I participated a lot
6  in that litigation.
7  Q.  I'm not asking you about that litigation,
8  though.
9  I'm asking you: Were you -- in July of 1993,
10  were you -- was your accounting certificate by the
11  California Board of Accountancy revoked and then the
12  revocation stayed with three years' probation?
13  A.  Well, one of the Laventhol matters did go into
14  '92, and I think there was some board action on it.
15  But, you know, it's 30 years ago.  I don't really
16  remember all the details.
17  Q.  Well, 1993 would be 23 years ago -- correct? --
18  24 years ago?
19  A.  24 years.  Yes.
20  Q.  And as you sit here today, you don't recall
21  having your certificate, accounting certificate, revoked
22  and then the revocation stayed with a three-year
23  probationary imposition of discipline?
24  A.  Well, it was a time when a lot of things were
25  going on.  There was some board action.  I don't

Page 166

1  remember exactly what it was.
2      Q.  Are you a member of the AICPA?
3      A.  No.
4      Q.  Were you a member of the AICPA at any point in
5  your career?
6      A.  Yes.
7      Q.  Was your membership terminated by the AICPA?
8      A.  As a result of the SEC matter, they wanted to
9  have hearings, et cetera, and I couldn't afford the
10 additional costs.  So I did, in fact, end my membership.
11     Q.  Did you end your membership, or did the AICPA
12 terminate your membership?
13     A.  Well, as you know, Counselor, it's certainly on
14 the Internet.  They call it "termination."  But as far
15 as I'm concerned, I chose not to.
16     Q.  Do you dispute that you were found guilty of
17 violating AICPA Bylaw 7.4.6?
18     A.  Well, I didn't fail to cooperate with them to
19 belong to that trade association.  But that, of course,
20 is not a regulatory agency.
21     Q.  Okay.  Is there any other organization,
22 separate and apart from whether it's a regulatory or
23 licensing organization, that relates to professional
24 services as an accountant that you have been sanctioned,
25 disciplined, or censured by?

Page 167

1      A.  Not that I recall.
2          MS. COYOCA: I want to mark as the next
3  exhibit -- I believe we are on Exhibit 11 -- the set of
4  documents that were produced by counsel, Ms. Crapster,
5  prior to the commencement of the deposition today.
6  They're labeled Bates control No. JS000001 through 20.
7          (Shapiro Exhibit 11 was
8          marked for identification.)
9  BY MS. COYOCA:
10     Q.  Mr. Shapiro, what is the first document that is
11 labeled No. 1?
12     A.  It looks like my signature on the Nondisclosure
13 Agreement.
14     Q.  Did you review the terms of the Nondisclosure
15 Agreement?
16     A.  I did.
17     Q.  Did you have Ms. -- was it Rodriguez, Maria
18 Rodriguez?
19     A.  Yes.
20     Q.  Did you have her sign Attachment A?
21     A.  No.
22     Q.  Where do you retain all the documents and
23 information that's been provided to you by counsel?
24     A.  I retain them through the Viewpoint program on
25 my computer.

Page 168

1      Q.  So you retain the documents electronically --
2      A.  Right.
3      Q.  -- only?
4      A.  I don't have a hard copy.
5      Q.  The computer on which you retain the
6  information, is it a laptop, desktop, something else?
7      A.  A desktop.
8      Q.  Who has access to the desktop other than
9  yourself?
10     A.  Just myself.  And I don't believe they're
11 contained on my drive.  I believe the program is more of
12 a cloud application.  And, in fact, the documents have
13 to be called down from the cloud.
14     Q.  The access to Viewpoint, is it password
15 protected?
16     A.  Yes.
17     Q.  Turning to page 2, this appears to be your
18 engagement agreement --
19     A.  Yes.
20     Q.  -- with respect to this matter contained on
21 pages 2 through 4; is that right?
22     A.  That's correct.
23     Q.  Did you undertake any analysis as to damages
24 with respect to the claim for fair dealing that's
25 referenced in your first paragraph?

Page 169

1      A.  No.
2      Q.  Mr. Shapiro, during the course of your
3  analysis, did you consult with any production expert to
4  analyze the expenses that were incurred to try to do an
5  assessment of whether there were extra expenses?
6          MS. CRAPSTER: Objection.  Vague and ambiguous.
7          THE WITNESS: No.
8  BY MS. COYOCA:
9      Q.  Do you know a gentleman by the name of Graham
10 Henderson?
11     A.  No.
12     Q.  On the second page of your letter, it indicates
13 that your billing rates for consulting range from 250 to
14 375 per hour.
15         Do you see that?
16     A.  Yes.
17     Q.  When do you bill out at 250 versus 375?
18     A.  250 would be Ms. Rodriguez.
19     Q.  Is Ms. Rodriguez a CPA?
20     A.  No.
21     Q.  Is she an accountant?
22     A.  No.
23     Q.  Does she have any kind of accountant or
24 accounting training?
25     A.  Only through working with me.

Universal Cable Productions LLC, et al. v.
Atlantic Specialty Insurance Company

Jay Shapiro
May 23, 2017

---

Page 170

1  Q.  Does Ms. Rodriguez work for you full time?
2  A.  No.  Part time.
3  Q.  Turning to page JS00005 --
4  A.  Yes.
5  Q.  -- these -- the documents that are contained in
6  5 through 10 appear to be invoices.
7  A.  Yes.
8  Q.  The last invoice date is May 2, 2017.
9  A.  Yes.
10  Q.  Have you incurred any time other than what's
11  reflected in these invoices as to this matter?
12  A.  Other than what's on the two invoices?
13  Q.  Yes.
14  A.  Yes.
15  Q.  What other work have you done?
16  A.  Time since May 2.
17  Q.  What work have you done between May 2 and now?
18  A.  I've prepared for this deposition.  Since
19  May 2, that's all I recall.
20  Q.  How long -- how much time did you spend in
21  preparing for your deposition?
22  A.  Well, over a couple of days, 10 hours.
23  Q.  What did you do to prepare for your deposition?
24  A.  I reread the Complaint.  I looked at a couple
25  more documents.  I had a meeting with Ms. Crapster.  I

---

Page 171

1  had -- I read my report.  I looked at Wunderlich's
2  report again, plus I reviewed the depo for
3  Mr. Wunderlich.
4  Q.  Anything else?
5  A.  No.
6  Q.  Now, you said you looked at a couple more
7  documents when you were responding.
8  A.  Yeah.
9  Q.  Other than the reports, the Wunderlich
10  deposition transcript, and the Complaint, what other
11  documents did you look at?
12  A.  Well, I have some of my favorites.  I like my
13  e-mail document, our Exhibit 6.  You know, I reviewed
14  that again.  I just wanted to make sure I knew where the
15  important numbers came from.
16  Q.  Did you go back through the documents that
17  originally had been provided to see if you could find
18  any more updated Israel estimated costs other than your
19  favorite Exhibit 6?
20  A.  Not at that time, no.
21  Q.  You indicated you met with Ms. Crapster.  How
22  long did your meeting with Ms. Crapster take?
23  A.  Three, four hours.
24  Q.  When did that meeting occur?
25  A.  Yesterday.

---

Page 172

1  Q.  Any other meetings with anyone from the
2  Strasburger Price firm?
3  A.  No.
4  Q.  With respect to your invoice documents, other
5  than the entries that -- as to the rate of 250, is there
6  any other way to demarcate work that was performed by
7  Ms. Rodriguez?
8  A.  No.
9  Q.  On the first page of invoice 6500, there is a
10  reference to a "Telephone Conference-CC" on March 30,
11  2017.
12      Do you see that?
13  A.  On what page?
14  Q.  5.
15  A.  Yes.
16  Q.  That conference took an hour and 25 minutes; is
17  that correct?
18  A.  That's what it indicates.  Yes.
19  Q.  Who were you speaking with?
20  A.  Ms. Crapster.
21  Q.  Anyone else?
22  A.  Ms. Reed could have been on the phone also.
23  Q.  Do you recall that she was on the phone?
24  A.  On two occasions she was on the phone.  I don't
25  know if this is one of them.

---

Page 173

1  Q.  Now, when we discussed your initial contact
2  with Ms. Crapster earlier today, I believe you indicated
3  you thought the call took place on the 29th of March.
4      Does this refresh your recollection that the
5  call actually took place on the 30th, or were there two
6  calls?
7      MS. CRAPSTER:  Objection.  Misstates the
8  testimony.
9      THE WITNESS:  Well, it is what it is.  If it
10  says the 30th, then I'm mistaken, and the call took
11  place on the 30th.
12  BY MS. COYOCA:
13  Q.  There isn't another different call that's not
14  reflected here that was --
15  A.  If there was a call, it would be reflected,
16  Counselor.
17  Q.  Okay.  Please don't interrupt me.  I just need
18  to get my question out.
19  A.  Okay.
20  Q.  On page 6 on April 4, 2017, this is a reference
21  to a half-hour conference call.
22      Do you see that?
23  A.  Yes.
24  Q.  Who participated in that call?
25  A.  To the best of my recollection, Ms. Crapster.

---

Page 174

1   Q.  What about Ms. Reed?
2   A.  I believe she would have been involved in
3   longer conversations.
4   Q.  Okay.  On page 7 that invoice is dated
5   April 20, 2017, and it's identified as invoice
6   No. 6500A.
7   Do you see that?
8   A.  Yes.
9   Q.  And that invoice appears to reference a call
10  that took place on March 26, 2017.
11  Do you see that?
12  A.  Yes.
13  Q.  Okay.  First of all, what's the difference
14  between invoice 6500 and invoice 6500A?
15  A.  Yeah.  6500 was still outstanding, and I
16  updated it through the new date.  April 4, I updated
17  through April 20.
18  Q.  Why did you bill twice in the same month?
19  A.  I don't recall why, other than they must have
20  asked me for an update.
21  Q.  Why did you not bill all of the time that was
22  performed in March on the April 4 invoice, or did you?
23  A.  I believe I did.  The 3/26 phone call is there.
24  I believe it's just the 6500 invoice expanded for an
25  extra two weeks.

Page 175

1   Q.  So on page 8 you have a total due amount on
2   4/14/17 of 14,364; right?
3   A.  As of the 4th.
4   Q.  Okay.  And then the --
5   A.  Additional work.
6   Q.  -- tasks that are reflected below that is the
7   additional work that was performed that you billed as of
8   4/24?
9   A.  That's correct.
10  Q.  Looking at page 9 --
11  A.  Yes.
12  Q.  -- there's a conference call referenced on
13  4/6/07 and postponement.
14  Do you see that?
15  A.  Yes.
16  Q.  ^What did that call relate to?
17  MS. CRAPSTER: Objection.  That calls for
18  privileged information that's protected by the privilege
19  and Rule 32.
20  I'll instruct the witness not to answer.
21  BY MS. COYOCA:
22  Q.  Who was on the call?
23  A.  To the best of my recollection, Ms. Crapster.
24  Q.  There is another call referenced on 4/7 for
25  three-quarters of an hour.

Page 176

1   Do you see that?
2   A.  Yes.
3   Q.  Who was on that call?
4   A.  To the best of my recollection, Ms. Crapster.
5   Q.  There is an indication on 4/9/17 "Special
6   Review for CC," three hours.
7   Do you see that?
8   A.  Yes.
9   Q.  ^What is that in reference to?
10  MS. CRAPSTER: I'll instruct the witness not to
11  answer to the extent that's going to reveal any
12  attorney-client privileged information.
13  BY MS. COYOCA:
14  Q.  Did you have a three-hour conference call on
15  April 9, 2017?
16  A.  That's what the invoice seems to indicate.
17  Yes.
18  Q.  Who was on that conference call?
19  A.  To the best of my recollection, Ms. Crapster.
20  Q.  Anyone else?
21  A.  Not that I recall.
22  Q.  There is another call referenced on 4/18/2017,
23  three-quarters of an hour.
24  Who was on that call?
25  A.  To the best of my recollection, Ms. Crapster.

Page 177

1   Q.  Of the calls we've reviewed so far, which one
2   was Ms. Reed on?
3   A.  I don't recall which ones.  I do recall
4   speaking to her twice.
5   Q.  And on those calls Ms. Crapster was also
6   present?
7   A.  Yes.
8   Q.  Turning to the last page of the invoice,
9   JS000010, there is a two-hour conference call referenced
10  on 4/25/2017.
11  Who was on that call?
12  A.  Well, this one, it clearly says "TR."  That
13  would be Toni Reed.  So she -- that's one of the two
14  calls that I previously indicated.
15  Q.  Okay.  So the references to "CC" are not
16  references to conference calls; they're actually
17  references to Carla Crapster?
18  A.  That's correct.
19  Q.  You had an hour and a quarter call on
20  4/26/2017.  That was a call just with Ms. Crapster?
21  A.  I believe so.  Yes.
22  Q.  Could you please turn to page JS000014.
23  A.  Yes.
24  Q.  Under "Categories" -- well, first of all, do
25  you recognize this e-mail?

Page 178

1  **A.** No.
2  **Q.** Did Ms. Crapster send you documents from time
3  to time?
4  **A.** Yes.
5  **Q.** Did she send you the DIG Back 4 budgets?
6  **A.** **Well, the category here seems to indicate she**
7  **did.**
8  **Q.** Do you recall reviewing the DIG Back 4 budgets?
9  **A.** No.
10 **Q.** Under "Categories," there is an indication,
11 begin quotes, "In DM, #8859240: SP: 15247: 0131."
12     Do you know what that's in reference to?
13 **A.** I do not.
14 **Q.** Turning to the last documents in the documents
15 produced by your counsel today, it's the excerpts of the
16 policy, and it begins on page "JS000017" handwritten in.
17 **A.** Yes.
18 **Q.** There is a note up in the right-hand corner
19 that says "Policy #" and then some indications.
20     Do you see that?
21 **A.** Yes.
22 **Q.** Is that your handwriting?
23 **A.** It is.
24 **Q.** In the folder that you brought in with you
25 earlier today, you indicated that you had notes on the

Page 179

1  extra expense portion of the policy; is that right?
2  **A.** Yes.
3  **Q.** Were there any other notes on the extra expense
4  portion in your folder other than what's reflected in
5  this document?
6  **A.** **No.  This is a photocopy of what's in my**
7  **folder.**
8  **Q.** Did you highlight any provisions of the policy?
9  **A.** I did.
10 **Q.** Which portions did you highlight?
11 **A.** **I highlighted a lot of portions.  But loss, the**
12 **section -- or paragraph 1 and then paragraph 9.**
13 **Q.** When you say "loss," paragraph 1, are you
14 referring to Roman numeral No. IX on page JS000020?
15 **A.** Yes.
16 **Q.** Are you referring to subparagraph 1 only?
17 **A.** **No.  1, 2, 3, and 4 would be highlighted.**
18 **Q.** Now, you indicated that you also highlighted
19 another portion.
20 **A.** **Yes.  On JS 17, the Insuring Agreement, I**
21 **highlighted some information there so I could**
22 **familiarize myself with the loss.  "The Loss must be a**
23 **direct result of an unexpected, sudden or accidental**
24 **occurrence."**
25 **Q.** Anything else?

Page 180

1  **A.** **Imminent peril.  I thought the understanding of**
2  **these particular things would be important.  So it's the**
3  **nature of my normal style to highlight things that I**
4  **think later on I might want to go back to.**
5  **Q.** Anything else?
6  **A.** No.
7  **Q.** You said it's the nature of your normal style
8  to highlight things that you might later want to go back
9  to.
10     When you were highlighting "Definition of
11 Loss," did you note that there was a specific definition
12 of "insurable production cost"?
13     **MS. CRAPSTER:** Objection.  Asked and answered.
14     **THE WITNESS:** Well, I believe that's in
15 Section IX.
16 **BY MS. COYOCA:**
17 **Q.** Okay.  But did you note this provision of the
18 policy and highlight it when you were reviewing the
19 excerpts of the policy that you thought would be
20 necessary for you to understand for purposes of your
21 analysis?
22     **MS. CRAPSTER:** Objection.  Asked and answered.
23     **THE WITNESS:** I don't believe so.
24 **BY MS. COYOCA:**
25 **Q.** In approximately how many cases have you been

Page 181

1  retained as an expert on behalf of the plaintiff?
2  **A.** **Well, I have more plaintiffs.  About 70 percent**
3  **of my cases are plaintiff.**
4  **Q.** And what is your best estimate of the number of
5  times you've been retained as an expert in the 15 to
6  20 years you've been doing expert work?
7  **A.** **40 times.**
8  **Q.** So 70 percent of those 40 times is your
9  estimate of the times that you've rendered services on
10 behalf of plaintiffs?
11 **A.** Yes.
12 **Q.** And the remaining 30 percent, I take it, would
13 be for defendants?
14 **A.** **Would be defendants.  In fact, most of my**
15 **defendants would be insurance companies.**
16 **Q.** Is there a particular insurance company for
17 which you primarily render services?
18 **A.** No.
19 **Q.** Have you previously ever rendered expert
20 services to OneBeacon?
21 **A.** No.
22 **Q.** Have you previously ever rendered services in a
23 case that is being handled by the Strasburger firm?
24 **A.** No.
25 **Q.** Have you ever worked -- performed work for

Page 182

1  Fireman's Fund?
2    A.  No.
3    Q.  Same question as to Travelers.
4    A.  Travelers, maybe.  But it was a long time ago.
5    Q.  Was it an entertainment-related matter?
6    A.  Yes.
7    Q.  What was the matter?
8    A.  Well, my insurance work is usually claims made
9  by entertainers who have suffered injury.  There are
10  moments they tend to be exaggerated.
11    Q.  So predominantly usually under cast coverage
12  portions of policy?
13    A.  Or also automobile accident matters where the
14  injured party is an entertainer.
15    Q.  Have you rendered services to Travelers on more
16  than one occasion, to the best of your recollection?
17    A.  No.
18    Q.  Have you rendered services to Chubb in any
19  entertainment-related matters?
20    A.  No.
21    Q.  Any other insurers or insurance-related
22  entities that you can recall where you have rendered
23  expert services in connection with an entertainment
24  matter?
25    A.  AIG, Farmers, State Farm.  That's about it.

Page 183

1    Q.  State Farm work, was that related to an auto
2  case?
3    A.  It was.
4    Q.  The AIG case, was that an entertainment-related
5  case?
6    A.  It was.
7    Q.  What was it about?
8    A.  A fidelity bond.
9    Q.  On a motion picture?
10    A.  A group of motion pictures.  Yes.
11    Q.  A slate?
12    A.  A slate.
13    Q.  On what did you render services in that case?
14    A.  A certain review of the claims that were
15  involved.
16    Q.  When did you perform your work?
17    A.  It was a long time ago.  Nine, ten years ago.
18    Q.  When slates of films were still being financed
19  by insurers?
20    A.  That's correct.
21    Q.  What about Farmers?  Was it an
22  entertainment-related case?
23    A.  It was, again, auto, with the entertainer being
24  the injured party.  And, of course, his claim is a loss
25  of earning power.

Page 184

1    Q.  Have you ever been disqualified as an expert by
2  a court?
3    A.  No.
4    Q.  Have you ever been challenged as an expert in
5  any court proceeding?
6    A.  What does "challenged" mean?
7    Q.  Has any Daubert motion ever been filed relating
8  to your methodology or your qualifications to serve as
9  an expert?
10    A.  Not to my knowledge.
11    Q.  Was any challenge made to your expertise or
12  your opinion in the Cobb matter?
13    A.  Not that I recall.
14    Q.  Is there any other work you plan to do prior to
15  testifying at the trial in this case?
16    A.  I don't know.  It depends if I'm given any
17  additional data that would help with understanding the
18  story of what's happened here.
19    Q.  As you sit here today, do you plan on doing any
20  additional work?
21    A.  I have no plan.
22    MS. COYOCA:  Okay.  Off the record.
23    (Recess from 4:08 p.m. to 4:13 p.m.)
24    MS. COYOCA:  Back on the record.
25    Q.  Mr. Shapiro, we previously discussed your

Page 185

1  report and specifically page 9 and your opinion that
2  there may have been production quality improvements that
3  could have been made to each episode that potentially
4  would reduce the claim amount; is that correct?
5    A.  Well, that would reduce the actual costs to be
6  considered as extra.  And if some of those items were
7  considered extra and they resulted from a quality
8  improvement, yes.
9    Q.  Okay.  So my specific question to you is:  Are
10  you aware of any specific production quality
11  improvements that were made to the production of DIG
12  that were characterized as extra expenses?
13    A.  No.
14    MS. COYOCA:  Okay.  I have nothing further.
15    MS. CRAPSTER:  Atlantic will reserve questions
16  for trial.
17    MS. COYOCA:  Do you want to recite the stip, or
18  do you want me to?
19    MS. CRAPSTER:  I think we can rely on the
20  stipulation that's been entered from the previous cases.
21    MS. COYOCA:  So for purposes of the reporter,
22  it's 14 days, and you're relieved of your
23  responsibilities when the original is transmitted to
24  counsel for the witness.
25  ///

Page 186

1    (At 4:15 p.m. the deposition of JAY J.
2    SHAPIRO was adjourned.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 187

1        I declare under penalty of perjury that I have
2    read the foregoing transcript of my deposition testimony
3    taken on Tuesday, May 23, 2017, at Los Angeles,
4    California, and that, with the following exceptions
5    which I have hand-marked on the transcript, the same is
6    a true record of the testimony given by me at that
7    deposition:
8
9    Page/Line     Should read              Reason for change:
10   _____   _____    _____
11   _____   _____    _____
12   _____   _____    _____
13   _____   _____    _____
14   _____   _____    _____
15   _____   _____    _____
16   _____   _____    _____
17   _____   _____    _____
18   _____   _____    _____
19   _____   _____    _____
20   _____   _____    _____
21   _____   _____    _____
22
23
24   Date _____          JAY J. SHAPIRO
25

Page 188

1    STATE OF CALIFORNIA     )
2                            )
     COUNTY OF LOS ANGELES   )
3
4        I, Ingrid Suárez Egnatuk, CSR No. 3098, a
5    Certified Shorthand Reporter in and for the State of
6    California, do hereby certify that the foregoing
7    Confidential Deposition Testimony of JAY J. SHAPIRO was
8    taken before me at the time and place therein set forth,
9    at which time the witness was put under oath by me; that
10   the testimony of the witness and all objections made at
11   the time of the examination were recorded
12   stenographically by me and were thereafter transcribed
13   with computer-aided transcription; that the foregoing is
14   a full, complete, and true record of said proceedings.
15       I certify that a request has been made by, or
16   on behalf of, the witness to review, correct and sign
17   the transcript of these proceedings.
18       I further certify that I am neither counsel for
19   nor related to any party to said action, nor in anywise
20   interested in the outcome thereof.
21       In witness whereof, I have subscribed my name
22   this 1st day of June, 2017.
23
24   _____
25        Ingrid Suarez Egnatuk
          Certified Shorthand Reporter