1 | MARC J. SHRAKE (SBN 219331)
mshrake@fmglaw.com
2 | FREEMAN MATHIS & GARY, LLP
550 South Hope Street, Suite 2200
3 | Los Angeles, California 90071
Telephone: (213) 615-7039
4 | Facsimile: (213) 615-7000

5 | CHRISTOPHER W. MARTIN *(Pro Hac Vice)*
martin@mdjwlaw.com
6 | MELINDA R. BURKE *(Pro Hac Vice)*
burke@mdjwlaw.com
7 | MARTIN, DISIERE, JEFFERSON
& WISDOM LLP
8 | 9111 Cypress Waters Blvd., Suite 250
Dallas, Texas 75019
9 | Telephone: (214) 420-5500
Facsimile: (214) 420-5501

10 |

11 | **UNITED STATES DISTRICT COURT**

12 | **CENTRAL DISTRICT OF CALIFORNIA**

13 | **WESTERN DIVISION**

14 | UNIVERSAL CABLE ) CASE NO. 2:16-cv-4435-PA-MRW
PRODUCTIONS LLC, a Delaware )
15 | limited liability company, and ) **ATLANTIC SPECIALTY'S**
NORTHERN ENTERTAINMENT ) **MEMORANDUM OF**
16 | ) **CONTENTIONS OF FACT AND**
PRODUCTIONS LLC, a Delaware ) **LAW**
17 | limited liability company, )
) Trial Date: February 18, 2020
18 | )
Plaintiffs, )
19 | )
v. )
20 | )
ATLANTIC SPECIALTY )
21 | INSURANCE COMPANY, a New )
22 | York insurance company, )
)
23 | Defendant )
24 | )

25 |

26 |

27 |

28 |

# **TABLE OF CONTENTS**

I.   CLAIMS AND DEFENSES (L.R. 16-4.1) ..................................................... 1

   A.   Summary Statement of Claims Plaintiffs Pleaded and Plan to Pursue. ..................................................................................... 3

   B.   Elements Required to Establish Plaintiffs' Claims ............................ 4

   C.   Brief Description of Key Evidence in Opposition to Each Claim 11

   D.   Summary Statement of Counterclaims and Affirmative Defenses that ASIC Has Pleaded and Plans to Pursue. ............................... 38

       1.   Failure to Mitigate ................................................................. 38

       2.   Violation of Constitution ........................................................ 39

       3.   Policy Exclusion 1, General Conditions ................................. 39

       4.   Policy Exclusion 2, General Conditions ................................. 39

       5.   Policy Exclusion 3, General Conditions ................................. 40

       6.   Policy Exclusion 4, General Conditions ................................. 41

   E.   Elements Required to Establish ASIC's Affirmative Defenses .......................................................................................... 42

       1.   Failure to Mitigate ................................................................. 42

       2.   Violation of Constitution ........................................................ 42

       3.   Policy Exclusion 1, General Conditions ................................. 43

       4.   Policy Exclusion 2, General Conditions ................................. 43

       5.   Policy Exclusion 3, General Conditions ................................. 44

       6.   Policy Exclusion 4, General Conditions ................................. 45

   F.   Brief Description of Key Evidence in Support of Each of ASIC's Affirmative Defenses .......................................................... 46

       1.   Failure to Mitigate ................................................................. 46

       2.   Violation of Constitution ........................................................ 46

       3.   Policy Exclusion 1, General Conditions ................................. 47

       4.   Policy Exclusion 2, General Conditions ................................. 48

       5.   Policy Exclusion 3, General Conditions ................................. 49

| | 6. | Policy Exclusion 4, General Conditions | 50 |
| G. | | Anticipated evidentiary issues | 52 |
| | 1. | No evidence to prove elements of "loss" under the Policy | 52 |
| | 2. | District Court Opinion (Dkt No. 128), finding ASIC did not commit bad faith | 52 |
| | 3. | Ninth Circuit Opinion | 53 |
| | 4. | Plaintiffs' late disclosed fee records and fee contract | 53 |
| | 5. | Plaintiffs' contingent fee contract | 53 |
| | 6. | Net Worth of ASIC (re punitive damages) | 54 |
| | 7. | Whether Plaintiffs' have complied with witness identification, designation, and document disclosures regarding their attorney fee expert and documents supporting her opinion(s), whatever they may be (they have not been disclosed). | 54 |
| | 8. | Whether Plaintiffs' calculation of damages is based on a reliable methodology and whether there are facts to support the methodology. | 55 |
| | 9. | Whether Plaintiffs' expert Sagalow is qualified to provide any opinions regarding ASIC's claim handling. | 58 |
| | 10. | Whether negotiation of the policy, non-renewal, premium losses, or profitability of the NBC account or ASIC Entertainment division is of any probative value regarding whether ASIC breached the duty of good faith or whether Exclusion #3 applies to preclude coverage. | 59 |
| | 11. | Whether judgment as a matter of law is appropriate that ASIC did not breach the duty of good faith. | 59 |
| | 12. | Whether this Court should reconsider its ruling that Exclusion #3 applies; ASIC's position is that there is at least a fact issue as to the application of this Exclusion. | 59 |
| | 13. | Whether this Court should reconsider its ruling that Exclusion #4 applies | 59 |
| | 14. | Whether there is any evidence ASIC's coverage analysis and decision would support a punitive damage liability or damage inquiry of the jury. | 60 |
| | 15. | Whether ASIC's financial analysis of the NBC account or ASIC's entertainment division has any |

Freeman Mathis & Gary, LLP
Attorneys at Law

2

probative value regarding the issue of whether ASIC's acted reasonably in its coverage analysis and investigation and whether Exclusions #3 or #4 may apply to preclude coverage.................................................... 60

16. Whether ASIC should be allowed to designate a new expert regarding damages, considering the death of expert Shapiro, who may do more than "adopt" Shapiro's methodology and conclusions. ............................... 60

H.  Identification of issues of law. ........................................... 60

1. District Court Opinion (Dkt No. 128), finding ASIC did not commit bad faith ............................................... 60

2. Ninth Circuit Opinion ............................................... 60

3. Plaintiffs' late disclosed fee records and fee contract ............. 61

4. Plaintiffs' contingent fee contract ........................................... 61

5. Whether Plaintiffs' have complied with witness identification, designation, and document disclosures regarding their attorney fee expert and documents supporting her opinion(s), whatever they may be (they have not been disclosed). ................................................. 61

6. Whether negotiation of the policy, non-renewal, premium losses, or profitability of the NBC account or ASIC Entertainment division is of any probative value regarding whether ASIC breached the duty of good faith or whether Exclusion #3 applies to preclude coverage. ................................................. 61

7. Whether judgment as a matter of law is appropriate that ASIC did not breach the duty of good faith. .................... 62

8. Whether this Court should reconsider its ruling that Exclusion #3 applies. ............................................... 62

9. Whether this Court should reconsider its ruling that Exclusion #4 applies. ............................................... 62

10. Whether there is any evidence ASIC's coverage analysis and decision would support a punitive damage liability or damage inquiry of the jury...................... 62

11. Whether ASIC's financial analysis of the NBC account or ASIC's entertainment division has any probative value regarding the issue of whether ASIC's acted reasonably in its coverage analysis and investigation and whether Exclusions #3 or #4 may apply to preclude coverage.................................................... 62

12. Whether ASIC should be allowed to designate a new expert regarding damages, considering the death of

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

Freeman Mathis
& Gary, LLP
Attorneys at Law

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Freeman Mathis
& Gary, LLP
Attorneys at Law

expert Shapiro, who may do more than "adopt"
Shapiro's methodology and conclusions. ............................... 62

II.     BIFURCATION OF ISSUES (L.R. 16-4.3) ............................................... 63

III.    JURY TRIAL (L.R. 16-4.4) ....................................................................... 63

IV.     ATTORNEY'S FEE (L.R. 16-4.5) .............................................................. 63

V.      ABANDONMENT OF ISSUES (L.R. 16-4.6) ........................................... 63

VI.     WITNESS LIST (L.R. 16-5) ........................**Error! Bookmark not defined.**

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

1    Defendant Atlantic Specialty Insurance Company ("ASIC") submits this

2 Memorandum of Contentions of Fact and Law in advance of the jury trial set for

3 February 18, 2020, beginning at 9:00 A.M.

4 **I.    CLAIMS AND DEFENSES (L.R. 16-4.1)**

5    On November 30, 2019, the Court entered an order (Dkt. No. 157) ruling that

6 ASIC's denial of insurance coverage for Plaintiffs' Extra Expense claim is not

7 supported by any of the four "war risk" policy exclusions on which ASIC relies:

8         1.    War, including undeclared or civil war;

9         2.    Warlike action by a military force, including action in hindering

10               or defending against an actual or expected attack, by any

11               government, sovereign or other authority using military personnel

12               or other agents.

13         3.    Insurrection, rebellion, revolution, usurped power, or action taken

14               by governmental authority in hindering or defending against any

15               of these. Such loss or damage is excluded regardless of any other

16               cause or event that contributes concurrently or in any sequence to

17               the loss.

18         4.    Any weapon of war including atomic fission or radioactive force,

19               whether in time of peace or war.

20    The Court set the case for trial on two issues:  (1) damages, and (2) breach of

21 the implied covenant of good faith and fair dealing.

22    Leading to the November 30 order, ASIC moved for summary judgment

23 regarding the applicability of all four exclusions to Plaintiffs' claim.  Significantly,

24 ASIC also moved for summary judgment regarding Plaintiffs' claim it breached the

25 implied covenant of good faith and fair dealing on two grounds:  (1) because ASIC

26 did not commit a breach of the contract of insurance, it cannot have violated the

27 covenant of good faith and faith dealing and is, therefore, entitled to judgment in its

28 favor; (2) in the alternative, ASIC's position regarding the claim was at least

reasonable and, therefore, the claim of "bad faith" cannot stand.

On cross-motions for summary judgment, the Court initially, by order dated October 6, 2017 (Dkt. No. 128), entered judgment in favor of ASIC because Exclusion #1 and Exclusion #2 barred coverage for Plaintiffs' Extra Expense claim and, regardless of the correctness of ASIC's coverage decision, because ASIC acted reasonably in investigating Plaintiffs' claim and coming to that coverage decision.

The Court did not initially rule on the applicability of Exclusions #3 and #4.

On appeal by Plaintiffs, the Ninth Circuit Court of Appeals reversed summary judgment, found that Exclusion #1 and Exclusion #2 did not preclude coverage, and remanded the case for further proceedings on whether Exclusion #3 or Exclusion #4 applies, and on the claim for breach of the implied covenant.

This Court then entered an order (Dkt. No. 157) denying the parties' joint request for further briefing, finding that Exclusion #3 and Exclusion #4 do not bar coverage for Plaintiffs' Extra Expense claim, and setting the case for trial on February 18, 2020.

ASIC believes neither this Court's *initial* order nor the Ninth Circuit's appellate order directly addressed the applicability of Exclusions #3 and #4. "Insurrection," "rebellion" and "revolution" are by definition different than "war" and, because the Ninth Circuit holding is law of the case, then the Ninth Circuit's interpretation of the dual sovereignty requirements necessary to constitute a "war" directly implicate what actually happened in Israel in 2014 – an "insurrection, rebellion and revolution," and the "action taken by a governmental authority [Israel] in hindering or defending against any of these."  Because Exclusion #3 deals with conditions other than "war," ASIC is not asking for judgment as a matter of law on this issue at this time but merely for the opportunity to try the issue the factfinder as the Ninth Circuit order allows.

Regardless of whether or not this Court allows the factfinder to consider Exclusion #3 as a factual coverage matter, ASIC has to defend the bad faith

Freeman Mathis
& Gary, LLP
Attorneys at Law

allegations against it based on its state of mind when adjusting this claim and its belief of the reasonableness of its reliance on Exclusions #1, #2, #3 and #4 in denying this claim.  The fact that two Courts, with ample time and opportunity to consider the complex coverage issues, reached different conclusions regarding Exclusions #1 and #2 make it certain as a matter of law that ASIC's position was at least reasonable and a judgment as a matter of law in favor of ASIC finding it did not breach the duty of good faith would be proper.  ASIC requested in the parties' Joint Submission of remaining issues of fact and law to re-urge its motion for summary judgment as to the duty of good faith <u>and</u> regarding the applicability of Exclusions #3 or #4.  The Court denied ASIC's request and entered its most recent ruling that Exclusions #3 and #4 did not preclude coverage.

ASIC believes there are issues of fact that preclude summary judgment under the law of the case as stated in the decision by the Ninth Circuit regarding  Exclusion #3 and Exclusion #4 and, as such, ASIC respectfully asks for the ability to try to the factfinder the factual coverage issues regarding Exclusion #3 and #4 as allowed by the holding of the Ninth Circuit and ASIC also seeks judgment as a matter of law regarding  Plaintiffs' claim it breached the duty of good faith because, as a matter of law, ASIC was reasonable in its reliance on Exclusions #1, #2, #3 and #4 in denying Plaintiffs' claim and also because a *bona fide* controversy existed regarding the legal meaning of these exclusions until the Ninth Circuit for the first time gave meaning in this Circuit to Exclusions #1 and #2 in an insurance claim of this type.

### A.      Summary Statement of Claims Plaintiffs Pleaded and Plan to Pursue.

#### <u>Claim 1</u>:      The Recovery of Damages for Alleged Breach of Insurance Contract as found by the Court.

Plaintiffs' First Amended Complaint asserts claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing arising out a denial of "Extra Expense" insurance coverage following the relocation of the production of

Freeman Mathis
& Gary, LLP
Attorneys at Law

1   a television show called *Dig* from Israel to Croatia and New Mexico after Hamas

2   attacked Israel.

3         Plaintiffs seek at least $6.9 million as the claimed Extra Expense loss. But

4   Plaintiffs have not produced evidence to prove a "loss" as that term is defined in the

5   contract of insurance.  Specifically, Plaintiffs have not produced any evidence that

6   would show "the amount of 'Insurable Production Cost' [as defined in the Policy]

7   you would have incurred if the covered cause of loss had not occurred," an amount

8   that must be shown in order to establish a "loss" under the Policy.

9                      <u>Claim 2:</u>        **Breach of Implied Covenant of Good Faith and Fair**

10                                   **Dealing**

11         Plaintiffs contend that ASIC failed to deal fairly and in good faith with

12   Plaintiffs by allegedly failing to investigate the claim objectively and thoroughly and

13   allegedly willfully withholding and denying benefits under the policy.

14         Plaintiffs contend they are entitled to recover the attorneys' fees and other

15   costs incurred by them to establish their right to receive reimbursement for the *Dig*

16   Claim as alleged herein. But Plaintiffs produced no documents or other evidence

17   during the discovery period to support this claim.

18         Plaintiffs are requesting punitive damages, but there is no evidence that

19   ASIC's alleged conduct was done willfully, with the deliberate intent to injure, vex,

20   or annoy Plaintiffs, and in conscious disregard of Plaintiffs' rights so as to constitute

21   fraud, oppression, or malice.

22         **B.    Elements Required to Establish Plaintiffs' Claims**

23                      <u>Claim 1:</u>        **The Recovery of Damages for Alleged Breach of**

24                                   **Insurance Contract as found by the Court.**

25         If the factfinder cannot consider factual coverage issues  on the questions of

26   whether Exclusion #3 applies or Exclusion #4 applies, to establish a recoverable

27   "loss" under the Policy Plaintiffs must prove the extent to which, if at all, *all*

28   *"necessary 'Insurable Production Cost' [they] incur to complete the 'Insured*

Freeman Mathis
& Gary, LLP
Attorneys at Law

1 | *Production' . . .* exceeds *the amount of 'Insurable Production Cost' [they] would*
2 | *have incurred if the covered cause of loss had not occurred"*, plus "[a]ll other
3 | necessary expenses that reduce the amount of loss otherwise payable."

4 |     The jury instructions provide that to recover general compensatory damages
5 | for breach of contract, Plaintiffs must prove that when the parties made the contract,
6 | ASIC knew or reasonably could have foreseen that the harm was likely to occur in
7 | the ordinary course of events as a result of the breach of the contract.  To recover
8 | special compensatory damages, Plaintiffs must prove that when ASIC issued the
9 | policy, ASIC knew or reasonably should have known of the special circumstances
10 | leading to the harm Plaintiffs suffered.  *See* CACI 350, 351.

11 |     The Policy's Insuring Agreement describes ASIC's agreement to pay covered
12 | Extra Expense losses as follows:

### I.   INSURING AGREEMENT

We agree to pay to you such loss (as defined in Paragraph VII) not
including loss of earnings or profit, as you sustain by reason of such
extra expense you necessarily incur as a result of the interruption,
postponement, cancellation, relocation, curtailment or abandonment of
an Insured Production due to the following:

1.   The loss must be a direct result of an unexpected, sudden or
accidental occurrence entirely beyond your control to
include: . . .

*             *             *

g)   Imminent peril, defined as certain, immediate and
impending danger of such probability and severity to
person or property that it would be unreasonable or
unconscionable to ignore.

h)   Any expenses incurred to avoid a loss resulting from
imminent peril are covered to the extent that they

Freeman Mathis
& Gary, LLP
Attorneys at Law

serve to avoid a loss otherwise covered."

The Policy defines "loss" as used in the Insuring Agreement as follows:

### IX.   DEFINITION OF LOSS

The amount of your loss will be determined based on:

1. All necessary "Insurable Production Cost" you incur to complete the "Insured Production" that exceeds the amount of "Insurable Production Cost" you would have incurred if the coverage cause of loss had not occurred.

2. All other necessary expenses that reduce the amount of loss otherwise payable.

3. Your loss will not include loss of earnings of profit.

4. If you abandon an "Insured Production" that has been made substantially valueless solely because one of more coverage causes of loss reasonably, practically and necessarily prevents you from completing the "Insured Production", irrespective of any completion or delivery date requirements for the "Insured Production", we will pay as loss the total "Insurable Production Cost" you have incurred for the "Insured Production".

The Policy defines "Insurable Production Cost" as follows:

### II.   SPECIAL CONDITIONS

\*     \*     \*

### A.   DEFINITIONS

\*     \*     \*

4. "Insurable Production Cost" includes:  all costs, including overhead and interest on loans chargeable directly to an "Insured Production" or series of productions.  Insurable Production Cost also includes any amount of overhead only

Freeman Mathis & Gary, LLP
Attorneys at Law

1    when declared at the time you declare an "Insured

2    Production" or series of productions.  The following costs

3    shall not be included in "Insurable Production Cost":

4         (a)    Royalties Term Deals for Executive Producer(s),

5                Package Fee & Publicity, residuals, premiums paid

6                for this insurance, and personal property taxes;

7         (b)    Story, scenario, music rights, and sound rights,

8                except with respect to television series, specials and

9                pilots; and

10        (c)    "Continuity", except when a period of suspension

11               due to covered loss or damage exceeds ninety (90)

12               days.

13        (d)    Any other costs specifically stated not to be

14               "Insurable Production Costs" in an endorsement to

15               this policy.

16    Nevertheless, you have the option to include these

17    excluded costs at the time you declare an "Insured

18    Production" or series of productions.  In that case, such

19    costs will be included in the "Insurable Production Cost",

20    and

21        The amount of any loss or damage paid under this Policy.

22    The Policy defines "Insured Production" as follows:

23    **II.    SPECIAL CONDITIONS**

24                            *    *    *

25    **A.    DEFINITIONS**

26                            *    *    *

27        5.     "Insured Production" means a production or series of

28               productions that has been declared to us.

Freeman Mathis
& Gary, LLP
Attorneys at Law

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

The Policy's page titled "Motion Picture/Television Producers Portfolio Declaration" states in "Item 3.  Insured Production(s)" as follows:

2012 Television Production(s)

\*      \*      \*

## III.   EXCLUSIONS APPLICABLE TO ALL SECTIONS OF THIS POLICY

This policy does not insure against loss or damage caused directly or indirectly by:

\*      \*      \*

3.      Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

4.      Any weapon of war including atomic fission or radioactive force, whether in time of peace or war;

\*      \*      \*

**Claim 2:**      **Breach of Implied Covenant of Good Faith and Fair Dealing**

To establish the claim of breach of the implied covenant, Plaintiffs must prove all the following:

1.      That Plaintiffs suffered a loss covered under an insurance policy with ASIC;

2.      That ASIC was notified of the loss;

3.      That ASIC wrongly denied policy benefits owing to Plaintiffs under the Policy;

4.      That Plaintiffs were harmed; and,

Freeman Mathis & Gary, LLP
Attorneys at Law

5. That a wrongful denial of policy benefits was a substantial factor in causing Plaintiffs' harm.

*See* CACI 2331.

To establish a claim for breach of implied covenant for alleged failure to properly investigate or evaluate a claim, Plaintiffs must prove all the following:

1. That Plaintiffs suffered a loss covered under an insurance policy with ASIC;

2. That ASIC was notified of the loss;

3. That ASIC acted unreasonably by knowingly failing to adopt and implement reasonable standards for the prompt investigation and processing of Plaintiffs' claim, or otherwise knowingly failing to conduct a thorough, fair, and objective investigation into Plaintiffs' claim;

4. That Plaintiff was harmed by ASIC's failure to properly investigate its claim; and,

5. That ASIC's failure to properly investigate Plaintiffs' claim was a substantial factor in causing Plaintiffs' harm.

*See* CACI 2332; Cal. Ins. Code § 790.03(h)(3); 10 Cal Code Regs § 2695.7(d).

To establish a claim for breach of implied covenant for alleged failure in payment, Plaintiffs must prove all the following:

**1.** That Plaintiffs suffered a loss covered under an insurance policy with ASIC;

**2.** That ASIC was notified of the loss;

**3.** That ASIC unreasonably failed to pay policy benefits;

**4.** That Plaintiffs were harmed; and,

**5.** That ASIC's failure to pay policy benefits was a substantial factor in causing Plaintiffs' harm.

*See* CACI 2331.

Freeman Mathis
& Gary, LLP
Attorneys at Law

An insurance company is privileged to pursue its own economic interests and to assert in a permissible way its legal rights and communicate its legal position in good faith even if doing so will cause emotional distress.  An insurer denying or delaying benefits due to the existence of a genuine dispute with its insured about the existence of coverage liability or the amount of the coverage claim is not liable in bad faith even though it might be liable for breach of contract.  The genuine dispute doctrine does not diminish an insurer's obligation to investigate, process and evaluate the insured's claim thoroughly and fairly.  A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. To be privileged, the assertion of legal rights must be limited to circumstances in which the person has a good faith belief in the existence of the right asserted and the assertion must be done in a permissible, non-outrageous manner.  *See* CACI 2330; *Wilson v. 21st Century Ins. Co.,* 42 Cal. 4th 713 (2007).

To recover attorney's fees, Plaintiffs must establish by a preponderance of evidence that it was reasonably necessary for them to hire an attorney to recover the policy benefits because of ASIC's alleged breach of the obligation of good faith and fair dealing.  Plaintiffs may recover attorney's fees it incurred to obtain policy benefits, but not attorney's fees it incurred for other purposes. *See* CACI 2350.

To recover punitive damages, Plaintiffs must prove by clear and convincing evidence that ASIC acted with malice, oppression, or fraud.  To do this, Plaintiffs must prove one of the following by clear and convincing evidence:

1.    That the conduct constituting malice, oppression, or fraud was committed by one or more officers, directors, or managing agents of ASIC, who acted on behalf of ASIC; or,

2.    That the conduct constituting malice, oppression, or fraud was authorized by one or more officers, directors, or managing agents of ASIC; or,

Freeman Mathis
& Gary, LLP
Attorneys at Law

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

3.      That one or more officers, directors, or managing agents of ASIC knew of the conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred.

*See* CACI 3945, 3947.

**C.    Brief Description of Key Evidence in Opposition to Each Claim**

   **Claim 1**:      **The Recovery of Damages for Alleged Breach of Insurance Contract as found by the Court.**

If the factfinder cannot consider factual coverage issues   on the questions of whether Exclusion #3 applies or Exclusion #4 applies, the following evidence, or lack of evidence, demonstrates that Plaintiffs cannot prove the amount of any covered loss under the Policy, or alternatively did not suffer a loss in the amount they claim.  That is, even if none of Exclusions #1, #2, #3, or #4 applies to bar Plaintiffs' claim, Plaintiffs' "loss" as that term is defined in the Policy is less than $3 million.

   ▪    Plaintiffs have produced no evidence on the element of the "loss" definition *"Insurable Production Cost" you would have incurred if the covered cause of loss had not occurred.*  Plaintiffs proof consists of what it actually incurred to produce the program in question, not what the Policy requires that it prove to recover contractual benefits under the Policy.

   ▪    Plaintiffs' damages expert, Robert Wunderlich, testified that "no analysis was performed to determine what the expenses would have been if production had taken place in Israel."  Wunderlich Dep. at 247-48.  Plaintiffs' damage expert admits Plaintiffs failed to prove or provide for analysis what the Policy requires to recover contractual benefits.

   ▪    Mr. Wunderlich testified he did not consider in this analysis what Plaintiffs expected to spend to produce episodes 2-6.  Wunderlich Dep. at 214-17.  Again, Plaintiffs' damage expert admits

Freeman Mathis
& Gary, LLP
Attorneys at Law

Plaintiffs failed to prove or provide for analysis what the Policy requires to recover contractual benefits.

- Mr. Wunderlich testified that "what NBC budgeted to spend on the production in Israel was totally irrelevant to [his] calculation of extra expense. Wunderlich Dep. at 244. Again, Plaintiffs' damage expert admits Plaintiffs failed to prove or provide for analysis what the Policy requires to recover contractual benefits.

- Mr. Wunderlich testified that he "made no attempt to determine what the cost would have been to NBC if episodes 2-6 had been produced in Israel." Wunderlich Dep. at 247-48. Again, Plaintiffs' damage expert admits Plaintiffs failed to prove or provide for analysis what the Policy requires to recover contractual benefits.

- Mr. Wunderlich testified that he did not review information regarding the costs of producing episodes 7-10. Wunderlich Dep. at 359-60.

- Mr. Wunderlich testified he did not consider that the cost of episodes 7-10 was substantially less than the cost of episodes 2-6. Wunderlich Dep. at 360.

- Mr. Wunderlich testified his methodology did not consider any savings made by NBC when it moved the production to New Mexico and Croatia. Wunderlich Dep. at 70-72.

- Mr. Wunderlich testified that even if production were move to a location that was half the cost, he would still conclude there was an Extra Expense loss under the Policy. Wunderlich Dep. at 74-75.

- Mr. Wunderlich testified he did not consider refunds/tax credits to Plaintiffs from New Mexico and Croatia that were higher than the

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

Freeman Mathis
& Gary, LLP
Attorneys at Law

1    refunds/tax credits it would have received from Israel.

2    Wunderlich Dep. at 102-03.

3    ▪    Jay Shapiro, a rebuttal expert witness for ASIC and the founder of

4         Jay Shapiro CPA, a professional services firm that provides

5         entertainment industry consulting services regarding financial and

6         accounting issues with a specialization in entertainment and

7         media matters. Shapiro was engaged to evaluate the Plaintiffs'

8         Extra Expense claim and the Plaintiff Expert Report of Robert

9         Wunderlich. He will testify that  methods used to calculate the

10        expenses incurred by the Plaintiffs to relocate production are

11        flawed and not sufficient to make a definitive determination about

12        whether each individual expense was incurred *as a result of*

13        *relocation* or whether it would have been incurred even if  the

14        production stayed in Israel. Shapiro's analysis is based on

15        documents he reviewed including detailed ledgers, cost reposts,

16        production recap reports, budgets, and other financial data

17        regarding the New Mexico and Croatia production of *Dig* and the

18        Plaintiffs' First Amended Complaint.

19   ▪    Defendant has filed Atlantic Specialty Insurance Company's

20        Motion for Leave to Amend Court's Scheduling Order to Allow

21        Substitution of Expert Witness on Account of Death of Jay

22        Shapiro, CPA (Doc. No. 160) which is pending before this Court.

23   ▪    ASIC will also rely on experts Anthony Clark, Professor Quigley,

24        Dr. Detter de Frankopan, Frank Lowenstein, Jay Shapiro, and, if

25        allowed, expert Shannon Rusnak.

26

27       In support of ASIC's position that Exclusion #3 and Exclusion #4 bar

28   coverage for Plaintiffs' claim, the following is a brief description of the key

Freeman Mathis
& Gary, LLP
Attorneys at Law

evidence:

- Because the Ninth Circuit  ruled in this case that the events in Israel were not a "war," they were by definition an "insurrection," "rebellion" or attempted "revolution" based on the following facts:

  - Even if Palestine is not a sovereign or quasi-sovereign entity, and even if Hamas was not the governing entity or the *de facto* government of the area (so that the war exclusion would preclude coverage), coverage is nevertheless excluded under the "insurrection, rebellion, revolution" exclusion. (Atlantic Policy No. MP00163-04 at p. 6 of 7, page 778 of Exhibit 44 to Atlantic's Motion for Summary Judgment).  That exclusion states that the policy "does not insure against loss or damage caused directly or indirectly by … insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." (*Id.*).  In light of the holding of the Ninth Circuit, insurrection, rebellion, attempted revolution and the actions taken by Israel in hindering or defending against these actions are the exact things that occurred in Israel in 2014 and, as such, they directly implicate Exclusion #3.

  - If the territory was not controlled by a Palestinian

entity, then it was controlled by Israel. The evidence for this conclusion is as follows:

-    As a result of the Six-Day War in 1967, Israel gained control over the entire area of Palestine. (Jim Zanotti, Cong. Research Serv., RL34074, The Palestinians: Background and U.S. Relations 3 (2015), Exhibit 4 to Atlantic's Motion for Summary Judgment, p. 46;  U.S. Department of State, Bureau of Democracy, Human Rights and Labor Practices for Israel and the Occupied Territories for 2014 4 (2015), available at https://www.state.gov/documents/organization/236814.pdf,  Exhibit 5 to Atlantic's Motion for Summary Judgment, p. 93;  Testimony of Frank Lowenstein, Affidavit of Frank Lowenstein, Exhibit 1 to Atlantic's Motion for Summary Judgment, p. 5 ¶ A).

-    Israel effectively annexed East Jerusalem and the Golan Heights leaving the West Bank and Gaza under military occupation. (Jim Zanotti, Cong. Research Serv., RL34074, The Palestinians: Background and U.S. Relations 3 (2015), Exhibit 4 to Atlantic's Motion for Summary Judgment, p. 46;  U.S. Department of State, Bureau of Democracy, Human Rights and Labor Practices for Israel and the Occupied

Freeman Mathis & Gary, LLP
Attorneys at Law

15

Territories for 2014 4 (2015), available at https://www.state.gov/documents/organization/236814.pdf,  Exhibit 5 to Atlantic's Motion for Summary Judgment, p. 141;  Testimony of Frank Lowenstein, Affidavit of Frank Lowenstein, Exhibit 1 to Atlantic's Motion for Summary Judgment, p. 5 ¶ A-B).

▫ Hamas is engaged now and always has been engaged in an insurrection or rebellion not only against Israel's control of and governance over  Palestinian territory, but also against Israel's governance/control of *any* territory in historic Palestine, including the area comprised of present-day Israel, the West Bank, Gaza, and the Golan Heights. The evidence includes:

- Hamas's charter, created in 1988, "commits the group to the destruction of Israel and the establishment of an Islamic state in all of historic Palestine."  The charter states, "Israel will exist and will continue to exist until Islam will obliterate it, just as it obliterated others before it." (Jim Zanotti, Cong. Research Serv., RL34074, The Palestinians: Background and U.S. Relations 3 (2015), Exhibit 4 to Atlantic's Motion for Summary Judgment, p. 76;  Jim Zanotti, Cong. Research Serv. R41514, Hamas, Background and Issue for Congress 13 (2010), Exhibit 8 to Atlantic's Motion for Summary Judgment, p.

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

Freeman Mathis
& Gary, LLP
Attorneys at Law

416; The Covenant of the Islamic Resistance Movement (Aug. 18, 1988) available at http://avalon.law.yale.edu/20thcentury/hamas.asp, Exhibit 9 to Atlantic's Motion for Summary Judgment, p. 468).

- The Qassam Brigades, Hamas's military wing, stated clearly its purpose for fighting during the 50-Day war - the overthrow of the Israeli government wherever it exercises authority and an end of Israeli control over Palestinians and Palestinian territory. (Al-Qassam Brigades Information Office: Military Communique, *Press Release of Abu Obeida*, Al-Qassam spokesperson (Aug. 20, 2014), available at http://www.qassam.ps/statement-1509-Press_Release_of_Abu_Obeida_Al_Qassam_spokesperson.html, Exhibit 93 to Atlantic's Motion for Summary Judgment, p. 1168; Al Qassam Brigades Information Office, *About Us*, available at http://www.qassam.ps/aboutus.html, Exhibit 94 to Atlantic's Motion for Summary Judgment, pp. 1170-71).

▫ "Insurrection" means "[1] a violent uprising by a group or movement [2] acting for the specific purpose of overthrowing the constituted government and seizing its powers. *Pan American World*

*Airways, Inc. v. Aetna Casualty & Surety Co.*, 505 F.2d 989, 1017 (2d Cir. 1974); *Younis Bros. & Co. v. Cigna Worldwide Ins. Co.*, 899 F. Supp. 1385 (E.D. Pa. 1995) aff'd 91 F.3d 13 (3d Cir. 1996).  A "rebellion" is "an open, organized, and armed resistance to one's government or ruler," or a "resistance to or defiance of any authority, control, or tradition." RANDOM HOUSE UNABRIDGED DICTIONARY 1609 (1993).  A revolution is "an overthrow or repudiation and the thorough replacement of an established government or political system by the people governed." *Id*. at 1649.

▫ Hamas's actions during the 50-Day war fell within the definitions of "insurrection, rebellion, or revolution."

▫ Testimony of Pamela Johnson, Teresa Gooley Wolf, Daniel Gutterman, and Aaron Stone regarding facts they gathered and documents reviewed in their research, as well as conversations with Plaintiffs' representatives during the claim investigation indicating that the event was a "war", but if not a war, it was an insurrection or rebellion.

▫ *Aaron* Stone, who testified as ASIC's corporate representative regarding its coverage investigation and decision, cited to the facts learned and considered, which included:

- Testimony of ASIC's experts Professor

Freeman Mathis
& Gary, LLP
Attorneys at Law

1  Quigley, Detter de Frankopan, and Frank
2  Lowenstein, describing the history and nature
3  of hostilities between Israel and Hamas and
4  other organizations.

5  -      Facts on the ground that led to moving
6  the production out of Israel, as understood,
7  discussed, and/or reported by Plaintiffs'
8  representatives, its security team and
9  witnesses, including Susan Weiss, Thomas
10  McCarthy, Kurt Ford, Mark Binke, Andrea
11  Garber, Malika Adams, Randi Richmond, and
12  Steve Smith.

13  ▪  Similarly, in light of the holding of the Ninth Circuit, the use of
14  "any weapon of war . . . whether in time of peace or war" fully
15  and accurately encompasses the guns, rockets, mortars, tanks,
16  bazookas, and other artillery which Israel and Hamas fired at each
17  other thousands of times over the 50 days of armed conflict in
18  2014 and, as such, the use of such weapons, which were the sole
19  cause of Plaintiffs' decision to move its filming operations out of
20  Israel in 2014, directly implicates Exclusion #4 in the Policy.

21  ▪  As detailed below, the undisputed record evidence on summary
22  judgment demonstrates that Israel and Hamas did, in fact, fire
23  guns, mortars, and rockets at one another during this time.

24  ▫      As demonstrated by Plaintiffs' own security alerts,
25  the fighting between Israel and Hamas slowly
26  escalated as each side retaliated with "tit-for-tat"
27  responses.

28  ▫      As the fighting worsened with almost daily barrages

Freeman Mathis
& Gary, LLP
Attorneys at Law

of missiles, rockets and fighter jet attacks, on July 8, 2014, Israel launched "Operation Protective Edge," an offensive campaign against Hamas.

- On July 9, 2014, Stephen Smith ("Smith"), NBCU's head of security for the production of *Dig*, sent an e-mail to the producers of *Dig* that contained a detailed timeline of the events of that day:  Gaza death toll between 25-35, with at least 300 injured; Iron Dome defense system deployed near Jerusalem, following large amounts of long range missiles fired from Gaza; public bomb shelters opened in Tel Aviv and Jerusalem; Hamas claims responsibility for firing of four rockets on Jerusalem, four on Tel Aviv, twelve on Ashdod and one on Haifa; five rockets fired toward Tel Aviv, four intercepted successfully, one landed in the sea, no injuries; Rockets aimed at Ben Gurion Airport; rocket fired towards Jerusalem hit a residents' building in Jerusalem, no injuries reported; due to rocket attacks, U.S. Embassy in Tel Aviv to operate in minimal staffing; the European hospital in Gaza has been hit by Israel fighter jets, casualties reported; rocket landed in Hadera area, city between Tel Aviv and Haifa, 60 miles from Gaza Gunmen from Hamas landed on the shore near Zikim adjacent to the Gaza border, where a kibbutz and a military base are located. Four gunmen were killed.

- The next day, Chris Biggs of NBCU wrote the following to Smith:  "Hamas' military wing . . . sent

Freeman Mathis
& Gary, LLP
Attorneys at Law

20

a seaborne unit to attack an Israeli position in
Ashkalon, southern Israel; and fired rockets against
Tel Aviv's Ben Gurion Airport and Jerusalem,"
while Israel "authorized the Israeli Defense Forces
(IDF) to call up to 40,000 reservists, and conducted
hundreds of air raids on Gaza."

▪ Plaintiffs have not identified what it is that ASIC could or should
have discovered by conducting a different investigation.

▪ Plaintiffs' representatives internally called this a "war" and
believed that the  war exclusion in the Policy might apply.

▪ Plaintiffs' own representatives referred to the conflict as a "war"
when dealing with ASIC.

▪ People around the globe, governments, politicians, pubic policy
analysists, reporters and news outlets repeatedly referred to the
2014 conflict in Israel as a "war."

▪ When informing the public about the 50-Day War in Israel in
2014, NBC News and MSNBC reporters and written articles by
the news organizations used the word "war" in their articles about
the conflict and on their television broadcasts.

▪ PNBCU itself thought the war exclusion was relevant.

▪ ASIC will also rely on experts Anthony Clark, Professor Quigley,
Dr. Detter de Frankopan, Frank Lowenstein, Jay Shapiro, and, if
allowed, expert Shannon Rusnak.

**Claim 2:**     **Breach of Implied Covenant of Good Faith and Fair**
                 **Dealing**

▪ Reasonable minds cannot differ as to whether there is a genuine
coverage dispute at issue here. "To establish a breach of the
implied covenant of good faith and fair dealing under California

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

Freeman Mathis
& Gary, LLP
Attorneys at Law

law, a plaintiff must show: (1) benefits due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause." *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001). "The key to a bad faith claim is whether or not the insurer's denial of coverage was reasonable." *Id.* "Under California law, a bad faith claim can be dismissed on summary judgment if the defendant can show that there was a genuine dispute as to coverage." *Id.*

- ▪ This Court initially agreed with ASIC that Exclusion #1 applies.
- ▪ This Court initially agreed with ASIC that Exclusion #2 applies.
- ▪ This Court found that under the circumstances, ASIC acted reasonably in denying coverage and that Plaintiffs' bad faith claim must fail.
- ▪ To the extent the Court has ruled that the events in Israel were not a "war", they were an insurrection or rebellion – and/or they were a governmental authority [Israel] acting in hindering or defending against insurrection or rebellion -- based on the evidence as follows:
  - ▫ The Palestinian political identity emerged between 1923 and 1948.
  - ▫ In 1947, the United Nations intended to create two states in what are now Israel and Palestine: one Jewish and one Arab.
  - ▫ For reasons that are still disputed, it ultimately founded only the Jewish state, Israel.
  - ▫ In 1947 and 1948, there was an "Arab-Israeli War" in which Israel defeated Arab nations and declared its independence.

Freeman Mathis
& Gary, LLP
Attorneys at Law

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

- Almost 700,000 Palestinians were driven from their homes as a result.
- The Palestinians who remained in the West Bank and Gaza were subject to Egyptian, Jordanian, or Israeli rule.
- In June 1967, the Six-Day War occurred, in which Israel "decisively defeated the Arab states."
- As a result, Israel gained control over the entire area that constituted Palestine.
- But ultimately, Israel only effectively annexed East Jerusalem and the Golan Heights, leaving the West Bank and Gaza Strip under military occupation but not truly incorporated into Israel.
- In the mid-1990s, the Palestinian Authority (the "PA") was granted limited rule (under supervening Israeli occupational authority) in the Gaza Strip and parts of the West Bank.
- In 2005, Israel unilaterally withdrew its military forces and all its civilians from Gaza, leaving control to the PA.
- According to the U.S. Congressional Research Service: "Although not a state, the PA is organized like one -- complete with democratic mechanisms; security forces; and executive, legislative, and judicial organs of governance."
- There are two primary competing Palestinian political parties or organizations, Fatah and Hamas.
- Fatah is the largest faction of the confederated multi-

Freeman Mathis
& Gary, LLP
Attorneys at Law

23

party Palestinian Liberation Organization, and is currently led by Yasser Arafat's successor, Mahmoud Abbas.

▫ Hamas is a Palestinian Islamic military and socio-political movement that formed in 1987.

▫ Hamas has maintained its primary base of political support and military command in the Gaza Strip.

▫ In 2006, Hamas won a majority of the seats in the Palestinian Legislative Council.

▫ And, in 2007, Hamas gained control over the Gaza Strip, where it currently governs like any other government with "political, military and social welfare activities . . . ."  *See United States v. El-Mezain*, 664 F.3d 467, 485-86 (5th Cir. 2011) (Hamas has a military, political, and social service branch that runs hospitals and schools); *Estates of Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 250 (D.R.I. 2004) ("Hamas operates through a political branch and a military branch."); *In re Marzook*, 924 F. Supp. 565, 568 (S.D.N.Y. 1996).

▪ As Plaintiffs' own security team recognized in a security update, Hamas governs the Gaza Strip.

▪ In June 2014, Hamas and Fatah agreed to establish a "consensus" or "unity" PA government, much to Israel's anger, as it refused to deal with Hamas, whose Charter commits it "to the destruction of Israel and the establishment of an Islamic State in all of historic Palestine.

▪ Tensions soon thereafter began to build between Israelis and

1    Palestinians.

2    ▪    On June 12, 2014, three Israeli teenagers were kidnapped.

3    ▪    "In response, Israel launched an extensive search and arrest

4    operation."

5    ▪    These teenagers were later killed, allegedly by Hamas militants.

6    ▪    Because Plaintiffs were already in Israel filming *Dig*, the head of

7    security for NBCUniversal Media, LLC ("NBCU") was closely

8    monitoring events, and sent an e-mail on June 15, 2014, summing

9    up the building tension:  "In the past 48 hours, the extent of

10    Israeli military operations in Hebron and its environs have

11    significantly increased, highlighted by the deployment of over

12    2,500 IDF soldiers to the area.  While at this time operations

13    remain limited to searches and intelligence gathering, Israeli

14    military build ups, deployment of Iron Dome missile batteries,

15    and limited activation of military reserves, suggest that the IDF is

16    prepared for broader altercations, including armed confrontations

17    with militants, civil unrest in Palestinian urban centers, or a more

18    significant military offensive."

19    ▪    On July 2, Israelis abducted and killed a Palestinian teenager,

20    burning him alive, in what appeared to be an act of revenge.

21    ▪    Palestinians began launching rockets into Israel, which deployed

22    its Air Force to retaliate with airstrikes.

23    ▪    As demonstrated by Plaintiffs' own security alerts, the fighting

24    between Israel and Hamas slowly escalated as each side retaliated

25    with "tit-for-tat" responses.

26    ▪    As the fighting worsened with almost daily barrages of missiles,

27    rockets and fighter jet attacks, on July 8, 2014, Israel launched

28    "Operation Protective Edge," an offensive campaign against

Freeman Mathis
& Gary, LLP
Attorneys at Law

1          Hamas.

2      ▪    Israel continued this Operation for 50 days (between July 8 and

3          August 26, 2014), hence the name given world-wide to the

4          conflict, the "50-Day War."

5      ▪    During this time, "Hamas and other militant groups fired 4,465

6          rockets and mortar shells into Israel, while the [Israeli]

7          government conducted 5,242 airstrikes within Gaza and a 20-day

8          military ground operation in Gaza."

9      ▪    Both Hamas and Israel carried out seaborne attacks against each

10         other, while Israel pummeled Hamas from the air.

11      ▪    On July 9, 2014, Stephen Smith ("Smith"), NBCU's head of

12         security for the production of *Dig*, sent an e-mail to the producers

13         of *Dig* that contained a detailed timeline of the events of that day:

14         Gaza death toll between 25-35, with at least 300 injured; Iron

15         Dome defense system deployed near Jerusalem, following large

16         amounts of long range missiles fired from Gaza; public bomb

17         shelters opened in Tel Aviv and Jerusalem; Hamas claims

18         responsibility for firing of four rockets on Jerusalem, four on Tel

19         Aviv, twelve on Ashdod and one on Haifa; five rockets fired

20         toward Tel Aviv, four intercepted successfully, one landed in the

21         sea, no injuries; Rockets aimed at Ben Gurion Airport; rocket

22         fired towards Jerusalem hit a residents' building in Jerusalem, no

23         injuries reported; due to rocket attacks, U.S. Embassy in Tel Aviv

24         to operate in minimal staffing; the European hospital in Gaza has

25         been hit by Israel fighter jets, casualties reported; rocket landed in

26         Hadera area, city between Tel Aviv and Haifa, 60 miles from

27         Gaza Gunmen from Hamas landed on the shore near Zikim

28         adjacent to the Gaza border, where a kibbutz and a military base

Freeman Mathis
& Gary, LLP
Attorneys at Law

26

1    are located. Four gunmen were killed.

2    ▪    The next day, Chris Biggs of NBCU wrote the following to

3         Smith:  "Hamas' military wing . . . sent a seaborne unit to attack

4         an Israeli position in Ashkalon, southern Israel; and fired rockets

5         against Tel Aviv's Ben Gurion Airport and Jerusalem," while

6         Israel "authorized the Israeli Defense Forces (IDF) to call up to

7         40,000 reservists, and conducted hundreds of air raids on Gaza."

8    ▪    As the conflict wore on, it became increasingly clear to Plaintiffs

9         that Israel was planning a ground invasion.

10   ▪    While the dramatic clash between Israelis and Palestinians was

11        underway, Plaintiffs were filming *Dig*.

12   ▪    They finished filming the pilot episode on June 26, 2014, and

13        were on a scheduled "hiatus" until July 19, 2014.

14   ▪    On July 11, given the escalation of fighting, and following receipt

15        of a July 10 security assessment noting that NBCU could not

16        guarantee safety and security, the Plaintiffs decided to postpone

17        the production for one week.

18   ▪    On July 16, as hostilities continued to escalate and there was no

19        end in sight, the Plaintiffs decided to move production of *Dig* out

20        of Israel altogether.

21   ▪    On July 17, Israel's ground forces invaded Gaza.

22   ▪    Early on July 18, 2014, Smith sent an e-mail stating in part:

23        "Over 100 targets, including rocket launching sites and

24        underground tunnels, were targeted throughout Gaza during the

25        overnight hours of July 17-18 as more Israeli troops and armor

26        advanced into Gaza. Fourteen Hamas militants were reportedly

27        killed in Israeli attacks, while the Israel Defense Forces (IDF)

28        sustained its first fatality after a soldier was killed by light arms

Freeman Mathis
& Gary, LLP
Attorneys at Law

27

fire.  Rockets meanwhile continued to be fired into southern Israeli towns within a 40 km range of the Gaza Strip since the beginning of Israel's ground offensive.  At this time there has been no de- escalation in the conflict and the threat to personnel resulting in serious injury or loss of life remains considerable . . . . The Israeli military said it would be calling up an additional 18,000 reservists to support ongoing operations in the Gaza Strip. The launch of Israel's ground campaign underscores the likelihood that IDF operations will continue to escalate in both scope and size over the coming hours and days.  Although P.M. Natanjahu [sic] has stated that Israel's objective on the ground is to neutralize Hamas tunnels, we assess that Israel's ground campaign is likely to additionally target other militant infrastructure, especially rocket launching sites in Gaza periphery and the extensive underground networks that support them.  No realistic timeframe for any reduction in hostilities can be established at present."

- ▪ Plaintiffs completed filming in New Mexico and Croatia. Plaintiffs then submitted a claim to ASIC for the "extra expenses" incurred as a result of their move.

- ▪ The policy at issue is a Motion Picture/Television Producers Portfolio, No. MP00163-04, which was effective from January 1, 2014, through June 30, 2015 (the "Policy").

- ▪ Testimony of ASIC's experts Professor Quigley, Detter de Frankopan, and Frank Lowenstein, describing the history and nature of hostilities between Israel and Hamas and other organizations.

  - ▫ Professor Quigley, retained expert for ASIC, is an

Freeman Mathis
& Gary, LLP
Attorneys at Law

28

expert in the nature of "war," statehood, state actors and sovereignty, as well as, an expert in Israeli-Palestinian relations. Quigley's will testify that the 50-day conflict between Israel and Hamas was a war, that it was waged with weapons of war, and that it constituted war-like actions and defense against war-like action. Quigley relied on his knowledge in this area of in this area of expertise and the details of the specific conflict at issue in this case. Additionally, in order to come to his opinion he reviewed, the Plaintiffs' response to interrogatories, the Complaint, the correspondence between ASIC and the Plaintiffs regarding the coverage decision, numerous print and news articles detailing the events of the conflict at issue in this case, and reports drafted by the Congressional Research Office and the U.S. State Department.

        □    Dr. Detter de Frankopan, retained expert for ASIC, is an expert in the law of war and armed conflict. Dr. Frankopan will testify that based on the duration and intensity of the fighting, number of casualty, and other specifics of the conflict, it is her opinion that the conflict was a war. Frankopan relied on her research and knowledge of the nature and history of Hamas and the details of the 50-day conflict, to form her opinion. Additionally, Frankopan reviewed numerous news articles regarding the conflict at issue in this case, a number of academic sources

Freeman Mathis & Gary, LLP
Attorneys at Law

detailing the history and nature of both parties involved in the conflict, and reports drafted by the U.S. State Department, Congress, and other U.S. Government departments specializing in foreign relations and research. Frankopan may also rebut any expert testimony offered by the Plaintiffs' expert witnesses with respect to the same or related issues.

▫ Frank Lowenstein is a retained expert for ASIC and the former Special Envoy for Israeli-Palestinian Negotiations with the U.S. Department of State. Lowenstein will testify that the conflict at issue in this case was a war, constituted war like actions by a military force, involved weapons of war, and was also an insurrection, rebellion, or usurpation of power by the Palestinians. Lowenstein will also testify that he and his colleagues at the State Department frequently referred to the conflict at issue in this case as a war. Lowenstein will provide testimony about the social services provided in the Gaza Region by Hamas, the nature and history of Hamas, and the state of Israeli-Palestinian relations both in 2014 and before. In forming his opinion, Lowenstein reviewed numerous news articles regarding the conflict at issue in this case and reports drafted by the U.S. State Department, Congress, and other U.S. Government departments specializing in foreign relations and research.

▫ Anthony Clark is a retained expert for ASIC and a

Freeman Mathis
& Gary, LLP
Attorneys at Law

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

1           principal with Clark Insurance Arbitration &

2           Consulting, LLC, with over 40 years of experience

3           as a property insurance adjuster, supervisor, and

4           claims officer. Clark will testify that ASIC properly

5           conducted a thorough and timely investigation into

6           the circumstances surrounding the Plaintiffs' claim

7           and made a reasonable determination under the terms

8           and conditions of the applicable policy of insurance

9           that the war exclusions applied. Clark reviewed the

10          communications of ASIC with the Plaintiffs, that it

11          responded within a timely manner to a request for

12          reconsideration, and that it continued to

13          communicate to reach some negotiated resolution.

14          Based on this analysis Clark will testify that there are

15          no facts demonstrating a lack of good faith or failure

16          on the part of Atlantic to act in a reasonable fashion.

17          In order to come to his opinion he reviewed, the

18          Plaintiffs' response to interrogatories, the Complaint,

19          the correspondence between ASIC and the Plaintiffs

20          regarding the coverage decision, the policy at issue

21          in this case, and the depositions of Gutterman,

22          Gooley, and Williams, as well as, other relevant

23          documents used in ASIC's decision for this claim.

24    ▪    Facts on the ground that led to moving the production out of

25        Israel, as understood, discussed, and/or reported by Plaintiffs'

26        representatives, its  security team and witnesses, including Susan

27        Weiss, Thomas McCarthy, Kurt Ford, Mark Binke, Andrea

28        Garber, Malika Adams, Randi Richmond, and Steve Smith.

**Freeman Mathis
& Gary, LLP**
Attorneys at Law

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

1    ▪    ASIC reasoned that either Exclusions #1 or Exclusion #2 applied,
2         but that if they did not apply, then Exclusion #3
3         (insurrection/rebellion) or Exclusion #4 would apply, based on
4         ASIC's research of the facts and issues and on information from
5         Plaintiffs.
6    ▪    Exclusion #3 does not reference the term "war" and is not tied to
7         any special meaning of "war" and, as such, ASIC's evaluation
8         was reasonable.
9    ▪    Exclusion #4 does not require there be a "war"; rather, only that a
10        weapon that *could be used* in a war be utilized; therefore, ASIC's
11        evaluation was reasonable.
12   ▪    Malika Adams -- an employee of NBCU's parent company –
13        voiced concern over whether the policy's war exclusions may
14        apply to Plaintiffs' claim.
15   ▪    NBCU's news affiliates (among many other news outlets) called
16        the event that caused Plaintiffs' loss a "war."
17   ▪    NBCU's security personnel charged with reporting the facts to
18        Plaintiffs' producers called it a "war."
19   ▪    A representative of one of the actors in the television production
20        called it a "war."
21   ▪    ASIC's position is rooted in application of a California statute
22        that requires application of the ordinary meaning unless a
23        specialized meaning applies.
24   ▪    ASIC reviewed the case law before denying Plaintiffs' claim.
25   ▪    ASIC provided its coverage decision to NBCU expeditiously.
26        NBCU notified ASIC of its claim on July 15, 2014.  NBCU
27        demanded that ASIC provide an instantaneous coverage decision.
28   ▪    Testimony of Pamela Johnson, Teresa Gooley Wolf, Daniel

**Freeman Mathis
& Gary, LLP**
Attorneys at Law

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

Gutterman, Peter Williams, and Aaron Stone regarding facts they gathered and documents reviewed in their research, as well as conversations with Plaintiffs' representatives during the claim investigation indicating that the event was a "war", but if not a war, it was an insurrection or rebellion.

▪ Aaron Stone, who testified as ASIC's corporate representative regarding its coverage investigation and decision, cited to the facts learned and considered.

▪ ASIC considered, in denying the *Dig* Claim, all the facts and information that it received from the Plaintiffs, as well as the facts revealed by its own investigation of the *Dig* Claim and independent research.

▪ Regarding its investigation, ASIC refers to and incorporates specific claim-related documents produced in this case, which reflect facts considered, which are Bates numbered ATL001458 – ATL001463 (reference to foreign travel advice); ATL001199– ATL001204 (reference to U.S. travel warning); ATL001529 (reference to foreign travel advice and Hamas article); ATL001562 – ATL001563 (reference to news stories specified in links stated); ATL000502 (reference to news article); ATL000294(reference to reporting on events and specific links to news stories); ATL001828 (reference to reporting on facts and developments and mentions of *Dig*); ATL00385 -ATL00392 (references to facts); ATL001877 (references to articles); ATL002171 –ATL002175 and ATL002172 – ATL002175 (references to facts).

▪ The facts set forth in the December 2, 2010 Congressional Research Service Report titled "Hamas: Background and Issues

Freeman Mathis & Gary, LLP
Attorneys at Law

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

1    for Congress," which was authored by Jim Zanotti, who is
2    identified as an Analyst in Middle Eastern Affairs.
3    Representatives of ASIC, including at least Pamela Johnson,
4    reviewed that report. Ms. Johnson, who is no longer employed by
5    ASIC, was prepared to testify more specifically as to what she
6    had relied upon in this report before her deposition was
7    unilaterally cancelled by the Plaintiffs. Among other things, ASIC
8    believes Ms. Johnson, on behalf of ASIC, relied upon the entirety
9    of the report, including but not limited to, the fact that Hamas was
10   identified in that    Report as a religious and political organization
11   and the Report's statement that, since June 2007, Hamas has had
12   control over the Gaza Strip, that Hamas governs the Gaza strip,
13   and that Hamas has a "military wing."

14   ▪    ASIC also relied on the timeline included in this Report, which
15        sets forth a long history of the key dates in Hamas's history and
16        its many conflicts with Israel, several of which are referred to as
17        wars.

18   ▪    The statement by Israeli President Benjamin Netanyahu, as
19        reported in the news, that Israel would use "full force" against
20        militants in Gaza.

21   ▪    The statement by Israeli President Benjamin Netanyahu, as
22        reported in the news, that "Hamas chose to continue fighting and
23        will pay the price for that decision . . . .  When there is no cease-
24        fire, our answer is fire."

25   ▪    A report by the Washington Post stating that: Israel had struck at
26        least 25 targets inside Gaza, including the home of a senior
27        Hamas leader Mahmoud Al Zahar; Hamas militants had fired at
28        least 13 rockets into southern Israel; Israel's "Iron was deflecting

1    fire from Gaza; Israel had announced plans for a ground attack on

2    Gaza; Israel dropped leaflets into Gaza warning the population to

3    evacuate; Israel had invaded Gaza with tanks and gunboats.

4    ▪    Several sources, in particular, Black's Law Dictionary, The

5    Dictionary of International and Comparative Law, and the

6    Handbook of Humanitarian Law in Armed Conflicts, that define

7    "war" as including any hostile conflict by means of armed forces

8    between nations, states, or rulers, or even between two "parties."

9    ASIC quoted these definitions on page 6 of its July 28, 2014

10    denial letter to Andrea Garber.

11    ▪    Hamas was the governing authority over the Gaza Strip in July

12    2014 and had a military wing known as the Qassam Brigades, as

13    well as a police force, a security force, and intelligence personnel.

14    ▪    In several news articles published in July 2014 by MSNBC and in

15    television reports that appeared on the news channel MSNBC

16    (which is an affiliate of NBC Universal), the Israeli-Palestinian

17    "conflict" in 2014 was referred to as a "war."

18    ▪    Reported events and details of actions that occurred during June

19    and July 2014, as reported in various news sources, including but

20    not limited to CBS news videos and MSNBC videos, articles, and

21    features, including direct clashes of armed forces from opposing

22    sides of the war, gunfights, firing of long-range rockets, rocket

23    attacks into Tel Aviv, Jerusalem, and/or Southern Israel, planning

24    for a ground incursion, a ground campaign, war planes, gunboats,

25    mutual exchange of air strikes, rejection of a proposed cease fire,

26    and injuries and deaths in Israel, Palestine, Gaza City, and/or the

27    Gaza Strip, and comments from Israel regarding its intentions.

28    ▪    Hamas militants stated on al-Aqsa TV that Hamas was firing

Freeman Mathis
& Gary, LLP
Attorneys at Law

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

rockets in response to "Israeli aggression against Palestinians in the West Bank, Jerusalem and Gaza." According to news reports, the statement was issued in the name of the Qassam Brigades and laid out four conditions for a ceasefire: ending all action in Jerusalem and the West Bank, ending the fire on and siege of Gaza, releasing all the prisoners who were re-arrested in the Israeli operation launched on June 12, 2014, after the disappearance of  three  Israeli settlers and  the  ceasing of "meddling" in the Palestinian Unity government.

- Moussa Abu Marzouk, a top Hamas official, stated, as reported in a news article:  "There should be a new equation so that we will not have a war on Gaza every two years."

- The word "militants" is used to describe Hamas forces in various news articles and the Congressional Reports identified in subparts (a) and (b) of this response to Interrogatory No. 3.

- Hamas spokesman Sami Abu Zuhri stated, as reported in a news article: "There will be no truce without an end to the war that the Occupation (Israel) began, a lifting of the blockade and a halt to all violations and killings in Gaza and the West Bank."

- Facts learned through research of Hamas and Palestine, and Hamas's ongoing conflicts and prior wars with Israel, including operations, official positions held, and  capabilities,  which research  included  review  of  the  primary  sources discussing Hamas and Palestine, as listed in "Hamas," appearing in Wikipedia (http://en.wikipedia.org/wiki/Hamas) as it existed on July 16, 2014, with its references to primary source materials, the specifics of which Pamela Johnson may be able to identify, as well as a review of multiple news reports referring to the war

Freeman Mathis
& Gary, LLP
Attorneys at Law

36

1   between Israel and Palestine/Hamas, including print reports as
2   well as news reports by MSNBC and CBS.

3   ▪   ASIC will also rely on experts Anthony Clark, Professor Quigley,
4   Dr. Detter de Frankopan, Frank Lowenstein, Jay Shapiro, and, if
5   allowed, expert Shannon Rusnak.

6   *See* Defendants section above entitled "A brief description of the key evidence
7   demonstrating Exclusions #3 and Exclusion #4 apply to bar coverage for Plaintiffs'
8   claim" for a description of these two exclusions.

9       **Claim 2:**   **Damages for Breach of Implied Covenant of Good Faith**
10              **and Fair Dealing:   Attorney's Fees in establishing**
11              **coverage (under *Brandt*)**

12  ▪   Plaintiffs did not timely designate an expert to support *any*
13  attorneys' fee claim.

14  ▪   Plaintiffs did not timely produce any documents to support *any*
15  attorney's fee claim.

16  ▪   On Friday, December 27, 2019, minutes before midnight,
17  Plaintiffs sent their trial witness list to counsel for Defendant.  For
18  the first time in the history of this case, Lucia Coyoca was
19  identified as a witness to testify on the issue of "Plaintiffs'
20  damages (attorneys' fees and costs) in connection with the breach
21  of contract claim."  To be clear, this was not an expert
22  designation, but simply a list of witnesses to be called at trial.

23  ▪   Plaintiffs simultaneously produced for the first time in the history
24  of this case documents constituting invoices for Plaintiffs' legal
25  fees from August 2014 to November 2019 reflecting over $2.9
26  million in legal fees.  Over five years' worth of legal invoices
27  were produced in an untimely fashion as counsel for the Parties
28  were scrambling over the holidays to complete their extensive

Freeman Mathis
& Gary, LLP
Attorneys at Law

pre-trial filings on the eve of trial.

- Still without any designated expert on attorneys' fees, there is no witness who can verify or prove up the contingent fee contract between Plaintiffs and their counsel, much less testify about how the contingent fee contract impacts the award of attorneys' fees to Plaintiffs in a case of this nature which mixes a breach of contract claim with an extra-contractual bad faith claim.

- Plaintiffs cannot use a contingent fee contract to prove the amount of their attorneys' fees, the reasonableness or necessity of their attorneys' fees, or otherwise use that contract at trial for any issue to be tried in this case because it doesn't establish the reasonableness or necessity of any legal work completed, set forth the reasonable time incurred for any necessary task, establish a reasonable hourly rate for a multitude of time keepers, address the fact the legal services were provided by different lawyers from different law firms over several years or otherwise meet the legal requirements for a recovery of attorney fees in a case of this nature.

- ASIC will also rely on experts Anthony Clark, Professor Quigley, Dr. Detter de Frankopan, Frank Lowenstein, Jay Shapiro, and, if allowed, expert Shannon Rusnak.

**D. Summary Statement of Counterclaims and Affirmative Defenses that ASIC Has Pleaded and Plans to Pursue.**

ASIC has no counterclaims. ASIC has pleaded and plans to pursue the following affirmative defenses:

**1. Failure to Mitigate**

General Condition I(2) of the Policy provides that the insureds are required to: Minimize Loss or Damage – Take all reasonable steps to protect the property from

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

Freeman Mathis
& Gary, LLP
Attorneys at Law

further damage and minimize the loss. Keep a record of your expenses in doing so for consideration in the settlement of the claim. This will not increase the limit of insurance.  To the extent Plaintiffs failed to take all reasonable steps to minimize their loss, or to keep a record of their expenses in doing so, their claims are barred from coverage by General Condition I(2) of the Policy, and by the common law.

### 2.  Violation of Constitution

Plaintiffs' claim for exemplary and punitive damages violates the Constitution of the United States of America and the applicable State Constitution or Constitutions.

### 3.  Policy Exclusion 1, General Conditions

Exclusion 1 of the General Conditions section of the Policy provides that the Policy does not insure against loss or damage caused directly or indirectly by:

1. War, including undeclared or civil war;

ASIC contends that Plaintiffs' claims are barred by Exclusion #1 of the General Conditions section of the Policy.  The Ninth Circuit Court of Appeals has determined this Exclusion does not preclude coverage.  However, ASIC relied on this exclusion as it was part of its coverage investigation, analysis, and decision. ASIC's reliance on Exclusion #1 and the courts' handling of this exclusion goes to ASIC's state of mind when denying coverage and the reasonableness of ASIC's conduct under Plaintiffs' bad faith claim.

This exclusion is relevant to ASIC's defense to the bad faith claim to demonstrate ASIC's state of mind and the reasonableness of its decision in denying coverage.

### 4.  Policy Exclusion 2, General Conditions

Exclusion 2 of the General Conditions section of the Policy provides that the Policy does not insure against loss or damage caused directly or indirectly by:

2.       Warlike action by a military force, including action in hindering

Freeman Mathis
& Gary, LLP
Attorneys at Law

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents.

ASIC contends that Plaintiffs' claims are barred by Exclusion #2 of the General Conditions.  The Ninth Circuit Court of Appeals has determined this Exclusion does not preclude coverage.  However, ASIC relied on this exclusion as it was part of its coverage investigation, analysis, and decision.  ASIC's reliance on Exclusion #2 and the courts' handling of this exclusion goes to ASIC's state of mind when denying coverage and the reasonableness of ASIC's conduct under Plaintiffs' bad faith claim.

This exclusion is relevant to ASIC's defense to the bad faith claim to demonstrate ASIC's state of mind and the reasonableness of its decision in denying coverage.

### 5.  Policy Exclusion 3, General Conditions

Exclusion 3 of the General Conditions section of the Policy provides that the Policy does not insure against loss or damage caused directly or indirectly by:

3.   Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

Plaintiffs' claims are barred by Exclusion #3 of the General Conditions section of the Policy.  This Court has recently determined this Exclusion does not preclude coverage.  However, ASIC relied on it as a part of its coverage investigation, analysis, and decision and contends there are disputed issues of fact regarding Exclusion #3 to be resolved by the jury because of the holding of the Ninth Circuit. If the 50 day armed conflict in Israel in 2014 was not a "war" for the reasons set

Freeman Mathis
& Gary, LLP
Attorneys at Law

1  forth by the Ninth Circuit then by definition the armed conflict in 2014 was an

2  insurrection, rebellion and/or action taken by a governmental authority [Israel] in

3  hindering or defending against any such insurrection or rebellion.  ASIC relied on

4  this exclusion as it was part of its coverage investigation, analysis, and decision.

5  ASIC's reliance on Exclusion #3 goes to its state of mind at the time it denied

6  Plaintiffs' claim and the Courts' handling of this exclusion goes to  and the

7  reasonableness of ASIC's conduct in relying on this exclusion in defense of

8  Plaintiffs' bad faith claim.  This exclusion is relevant to ASIC's defense to the bad

9  faith claim to demonstrate ASIC's state of mind and the reasonableness of its

10  decision in denying coverage.

11              **6.  Policy Exclusion 4, General Conditions**

12         Exclusion 4 of the General Conditions section of the Policy provides

13  that the Policy does not insure against loss or damage caused directly or indirectly

14  by:

15              4.       Any weapon of war including atomic fission or radioactive force,

16                       whether in time of peace or war.

17         Plaintiffs' claims are barred by Exclusion #4 of the General Conditions section

18  of the Policy.  This Court has recently determined this Exclusion does not preclude

19  coverage.  However, ASIC relied on this exclusion as it was a part of its coverage

20  investigation, analysis, and decision and it contends there are disputed fact issues

21  regarding Policy Exclusion #4 that must be resolved by a jury. in light of the holding

22  of the Ninth Circuit, the use of "any weapon of war…whether in time of peace or

23  war" fully and accurately encompasses the guns, rockets, mortars, tanks, bazookas,

24  and other artillery which Israel and Hamas fired at each other thousands of times

25  over the 50 days of armed conflict in 2014 and, as such, the use of such weapons,

26  which were the sole cause of Plaintiffs' decision to move its filming operations out

27  of Israel in 2014, directly implicates Exclusion #4 in the Policy.  ASIC relied on this

28  exclusion as it was part of its coverage investigation, analysis, and decision and its

Freeman Mathis
& Gary, LLP
Attorneys at Law

41

state of mind is critical to defend itself from Plaintiffs' bad faith claims. Additionally, ASIC's reliance on Exclusion #4 and the Courts' prior handling of this exclusion goes to  the reasonableness of ASIC's conduct in denying this claim because of this exclusion to defend against  Plaintiffs' bad faith claim.

This exclusion is relevant to ASIC's defense to the bad faith claim to demonstrate ASIC's state of mind and the reasonableness of its decision in denying coverage.

### E.     Elements Required to Establish ASIC's Affirmative Defenses

#### 1.  Failure to Mitigate

If ASIC breached the contract and the breach caused harm, Plaintiffs are not entitled to recover damages for harm that ASIC proves Plaintiffs could have avoided with reasonable efforts or expenditures. Plaintiffs were also required to keep a record of their expenses. The jury should consider the reasonableness of Plaintiffs' efforts considering the circumstances facing it at the time, including its ability to make the efforts or expenditures without undue risk of hardship.

If Plaintiffs made reasonable efforts to avoid harm, then the jury award should include reasonable amounts that it spent for this purpose. *See* CACI 358.

#### 2.  Violation of Constitution

To establish this defense, ASIC must prove that Plaintiffs' claim for punitive damages exceeds the amount allowed under either the Constitution of the United States or the Constitution of the Constitution of the State of California. To succeed, ASIC must prove that either the Constitution of the United States or the Constitution of the State of California impose limits on the amount of punitive damages Plaintiffs may recover, and that Plaintiffs' claim for punitive damages exceeds those limits. *See* CACI 2303.  This is a question of law for the Court to determine if implicated by the jury verdict in this case.

Freeman Mathis
& Gary, LLP
Attorneys at Law

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

### 3.  Policy Exclusion 1, General Conditions

In every insurance policy there is an implied obligation of good faith and fair dealing that neither the insurance company nor the insured will do anything to injure the right of the other party to receive the benefits of the agreement.  To fulfill its implied obligation of good faith and fair dealing, an insurance company must give at least as much consideration to the interests of the insured as it gives to its own interests.  To breach the implied obligation of good faith and fair dealing, an insurance company must unreasonably act or fail to act in a manner that deprives the insured of the benefits of the policy. To act unreasonably is not a mere failure to exercise reasonable care. It means that the insurer must act or fail to act without proper cause. However, it is not necessary for the insurer to intend to deprive the insured of the benefits of the policy.  An insurance company is privileged to pursue its own economic interests and to assert in a permissible way its legal rights and communicate its legal position in good faith even if doing so will cause emotional distress.  An insurer denying or delaying benefits due to the existence of a genuine dispute with its insured about the existence of coverage liability or the amount of the coverage claim is not liable in bad faith even though it might be liable for breach of contract.  The genuine dispute doctrine does not diminish an insurer's obligation to investigate, process and evaluate the insured's claim thoroughly and fairly.  A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. To be privileged, the assertion of legal rights must be limited to circumstances in which the person has a good faith belief in the existence of the right asserted and the assertion must be done in a permissible, non-outrageous manner.

*See* CACI 2330; *Wilson v. 21st Century Ins. Co.,* 42 Cal. 4th 713 (2007).

### 4.  Policy Exclusion 2, General Conditions

In every insurance policy there is an implied obligation of good faith and fair dealing that neither the insurance company nor the insured will do anything to injure

Freeman Mathis
& Gary, LLP
Attorneys at Law

the right of the other party to receive the benefits of the agreement.  To fulfill its implied obligation of good faith and fair dealing, an insurance company must give at least as much consideration to the interests of the insured as it gives to its own interests.  To breach the implied obligation of good faith and fair dealing, an insurance company must unreasonably act or fail to act in a manner that deprives the insured of the benefits of the policy. To act unreasonably is not a mere failure to exercise reasonable care. It means that the insurer must act or fail to act without proper cause. However, it is not necessary for the insurer to intend to deprive the insured of the benefits of the policy.  An insurance company is privileged to pursue its own economic interests and to assert in a permissible way its legal rights and communicate its legal position in good faith even if doing so will cause emotional distress.  An insurer denying or delaying benefits due to the existence of a genuine dispute with its insured about the existence of coverage liability or the amount of the coverage claim is not liable in bad faith even though it might be liable for breach of contract.  The genuine dispute doctrine does not diminish an insurer's obligation to investigate, process and evaluate the insured's claim thoroughly and fairly.  A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. To be privileged, the assertion of legal rights must be limited to circumstances in which the person has a good faith belief in the existence of the right asserted and the assertion must be done in a permissible, non-outrageous manner.

*See* CACI 2330; *Wilson v. 21st Century Ins. Co.,* 42 Cal. 4th 713 (2007).

### 5.  Policy Exclusion 3, General Conditions

In every insurance policy there is an implied obligation of good faith and fair dealing that neither the insurance company nor the insured will do anything to injure the right of the other party to receive the benefits of the agreement.  To fulfill its implied obligation of good faith and fair dealing, an insurance company must give at least as much consideration to the interests of the insured as it gives to its own

Freeman Mathis & Gary, LLP
Attorneys at Law

1  interests.  To breach the implied obligation of good faith and fair dealing, an

2  insurance company must unreasonably act or fail to act in a manner that deprives the

3  insured of the benefits of the policy. To act unreasonably is not a mere failure to

4  exercise reasonable care. It means that the insurer must act or fail to act without

5  proper cause. However, it is not necessary for the insurer to intend to deprive the

6  insured of the benefits of the policy.  An insurance company is privileged to pursue

7  its own economic interests and to assert in a permissible way its legal rights and

8  communicate its legal position in good faith even if doing so will cause emotional

9  distress.  An insurer denying or delaying benefits due to the existence of a genuine

10 dispute with its insured about the existence of coverage liability or the amount of the

11 coverage claim is not liable in bad faith even though it might be liable for breach of

12 contract.  The genuine dispute doctrine does not diminish an insurer's obligation to

13 investigate, process and evaluate the insured's claim thoroughly and fairly.  A

14 genuine dispute exists only where the insurer's position is maintained in good faith

15 and on reasonable grounds. To be privileged, the assertion of legal rights must be

16 limited to circumstances in which the person has a good faith belief in the existence

17 of the right asserted and the assertion must be done in a permissible, non-outrageous

18 manner.

19 *See* CACI 2330; *Wilson v. 21st Century Ins. Co.,* 42 Cal. 4th 713 (2007).

20 **6.  Policy Exclusion 4, General Conditions**

21      In every insurance policy there is an implied obligation of good faith and fair

22 dealing that neither the insurance company nor the insured will do anything to injure

23 the right of the other party to receive the benefits of the agreement.  To fulfill its

24 implied obligation of good faith and fair dealing, an insurance company must give at

25 least as much consideration to the interests of the insured as it gives to its own

26 interests.  To breach the implied obligation of good faith and fair dealing, an

27 insurance company must unreasonably act or fail to act in a manner that deprives the

28 insured of the benefits of the policy. To act unreasonably is not a mere failure to

Freeman Mathis
& Gary, LLP
Attorneys at Law

exercise reasonable care. It means that the insurer must act or fail to act without proper cause. However, it is not necessary for the insurer to intend to deprive the insured of the benefits of the policy.  An insurance company is privileged to pursue its own economic interests and to assert in a permissible way its legal rights and communicate its legal position in good faith even if doing so will cause emotional distress.  An insurer denying or delaying benefits due to the existence of a genuine dispute with its insured about the existence of coverage liability or the amount of the coverage claim is not liable in bad faith even though it might be liable for breach of contract.  The genuine dispute doctrine does not diminish an insurer's obligation to investigate, process and evaluate the insured's claim thoroughly and fairly.  A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. To be privileged, the assertion of legal rights must be limited to circumstances in which the person has a good faith belief in the existence of the right asserted and the assertion must be done in a permissible, non-outrageous manner.

*See* CACI 2330; Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713 (2007).

### F.    Brief Description of Key Evidence in Support of Each of ASIC's Affirmative Defenses

#### 1.  Failure to Mitigate

A brief description of key evidence supporting this defense is the damage analysis of now-deceased expert Jay Shapiro and/or its new expert, Shannon Rusnak, if the Court allows designation.  Much of the damage claimed is improperly characterized as an extra expense attributable to the move out of Israel.  Evidence of failure to mitigate will also come from Plaintiffs' witnesses, including BJ Markus who purportedly allocated expenses between shooting locations.

#### 2.  Violation of Constitution

To establish this defense, Defendant must prove that Plaintiffs' claim for punitive damages exceeds the amount allowed under either the Constitution of

Freeman Mathis
& Gary, LLP
Attorneys at Law

the United States or the Constitution of the Constitution of the State of California. To succeed, Defendant must prove that either the Constitution of the United States or the Constitution of the State of California impose limits on the amount of punitive damages Plaintiffs may recover, and that Plaintiffs' claim for punitive damages exceeds those limits.  *See* CACI 2303.

### 3.  Policy Exclusion 1, General Conditions

The Court has ruled this exclusion is not applicable; however, evidence of why ASIC believed it was applicable will be offered through the testimony of its representatives, including Pamela Johnson, Teresa Gooley, Daniel Gutterman, and Aaron Stone (30(b)(6) witness) who evaluated the facts and applicability of the exclusion, including the documents and information ASIC relied on as testified to in their depositions and as set forth in ASIC's interrogatory response and summary judgment motion setting forth in detail its investigation.

Pamela Johnson, the ASIC employee who made the final decision to deny the Plaintiffs' claim studied multiple sources and performed research to gain an understanding of the nature of the conflict in the region. Johnson reviewed news reports from print sources including the Washington Post and the New York Times, news media sources including reports from NBC, MSNBC, and the BBC. Johnson also reviewed case law from various Federal Circuit Courts of Appeals and the Supreme Court which discussed the definition of "war" and previous applications of the war exclusion. Johnson provided many of these sources to other ASIC employees who were also reviewing the Plaintiffs' claim.

Teresa Gooley, the Vice President of Claims at ASIC who oversaw Johnson, reviewed the investigation performed by Johnson and she also relied on reports in the media to understand the nature of the conflict in the region. Gooley discussed the application of the war exclusions with Johnson before a final decision was made regarding the Plaintiffs' claim. Gooley specifically recalls watching news reports from NBC and MSNBC and relying on this information when she discussed the final

Freeman Mathis
& Gary, LLP
Attorneys at Law

1 coverage decision with Johnson.

2        Danny Gutterman was a claim handler at ASIC and worked directly with

3 Johnson to determine if the war exclusions applied to the Plaintiffs' claim.

4 Gutterman frequently sent the information he was researching to Johnson for her

5 review to aid in the handling of the claim. Gutterman also relied on his prior

6 experience with the entertainment industry to aid in his research of the claim and the

7 research he analysis he provided to Johnson.

8        Aaron Stone, a Vice President of ASIC, testified as ASIC's 30 (b)(6)

9 representative regarding multiple topics, including ASIC's claim investigation,

10 analysis, and decision. ASIC investigation and analysis included the following:

### 4.  Policy Exclusion 2, General Conditions

12        The Court has ruled this exclusion is not applicable; however, evidence of why

13 ASIC believed it was applicable will be offered through the testimony of its

14 representatives, including Pamela Johnson, Teresa Gooley, Daniel Gutterman, and

15 Aaron Stone (30(b)(6) witness) who evaluated the facts and applicability of the

16 exclusion, including the documents and information ASIC relied on as testified to in

17 their depositions and as set forth in ASIC's interrogatory response and summary

18 judgment motion setting forth in detail its investigation.

19        Pamela Johnson, the ASIC employee who made the final decision to deny the

20 Plaintiffs' claim studied multiple sources and performed research to gain an

21 understanding of the nature of the conflict in the region. Johnson reviewed news

22 reports from print sources including the Washington Post and the New York Times,

23 news media sources including reports from NBC, MSNBC, and the BBC. Johnson

24 also reviewed case law from various Federal Circuit Courts of Appeals and the

25 Supreme Court which discussed the definition of "war" and previous applications of

26 the war exclusion. Johnson provided many of these sources to other ASIC employees

27 who were also reviewing the Plaintiffs' claim.

28        Teresa Gooley, the Vice President of Claims at ASIC who oversaw Johnson,

Freeman Mathis
& Gary, LLP
Attorneys at Law

1   reviewed the investigation performed by Johnson and she also relied on reports in the

2   media to understand the nature of the conflict in the region. Gooley discussed the

3   application of the war exclusions with Johnson before a final decision was made

4   regarding the Plaintiffs' claim. Gooley specifically recalls watching news reports

5   from NBC and MSNBC and relying on this information when she discussed the final

6   coverage decision with Johnson.

7       Danny Gutterman was a claim handler at ASIC and worked directly with

8   Johnson to determine if the war exclusions applied to the Plaintiffs' claim.

9   Gutterman frequently sent the information he was researching to Johnson for her

10  review to aid in the handling of the claim. Gutterman also relied on his prior

11  experience with the entertainment industry to aid in his research of the claim and the

12  research he analysis he provided to Johnson.

13      Aaron Stone another Vice President of ASIC has an understand of the terms of

14  the war exclusion included in the Plaintiffs' policy and relied on his understanding of

15  the industry and the practices of ASIC to confirm that the war exclusion applied.

### 5.  Policy Exclusion 3, General Conditions

17      The Court has ruled this exclusion is not applicable; however, evidence of why

18  ASIC believed it was applicable will be offered through the testimony of its

19  representatives, including Pamela Johnson, Teresa Gooley, Daniel Gutterman, and

20  Aaron Stone (30(b)(6) witness) who evaluated the facts and applicability of the

21  exclusion, including the documents and information ASIC relied on as testified to in

22  their depositions and as set forth in ASIC's interrogatory response and summary

23  judgment motion setting forth in detail its investigation.

24      Pamela Johnson, the ASIC employee who made the final decision to deny the

25  Plaintiffs' claim studied multiple sources and performed research to gain an

26  understanding of the nature of the conflict in the region. Johnson reviewed news

27  reports from print sources including the Washington Post and the New York Times,

28  news media sources including reports from NBC, MSNBC, and the BBC. Johnson

Freeman Mathis
& Gary, LLP
Attorneys at Law

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW

also reviewed case law from various Federal Circuit Courts of Appeals and the Supreme Court which discussed the definition of "war" and previous applications of the war exclusion. Johnson provided many of these sources to other ASIC employees who were also reviewing the Plaintiffs' claim.

Teresa Gooley, the Vice President of Claims at ASIC who oversaw Johnson, reviewed the investigation performed by Johnson and she also relied on reports in the media to understand the nature of the conflict in the region. Gooley discussed the application of the war exclusions with Johnson before a final decision was made regarding the Plaintiffs' claim. Gooley specifically recalls watching news reports from NBC and MSNBC and relying on this information when she discussed the final coverage decision with Johnson.

Danny Gutterman was a claim handler at ASIC and worked directly with Johnson to determine if the war exclusions applied to the Plaintiffs' claim. Gutterman frequently sent the information he was researching to Johnson for her review to aid in the handling of the claim. Gutterman also relied on his prior experience with the entertainment industry to aid in his research of the claim and the research he analysis he provided to Johnson.

Aaron Stone another Vice President of ASIC has an understand of the terms of the war exclusion included in the Plaintiffs' policy and relied on his understanding of the industry and the practices of ASIC to confirm that the war exclusion applied.

Multiple experts have determined that the circumstances in Israel at the time Plaintiffs stopped production of Dig in Israel in 2014 were because of the "insurrection" and "rebellion" by Hamas and/or the actions taken by a governmental authority [Israel] in hindering or defending against the insurrection and rebellion of Hamas as those  terms are used in the Policy.

### 6.  Policy Exclusion 4, General Conditions

The Court has ruled this exclusion is not applicable; however, evidence of why ASIC believed it was applicable will be offered through the testimony of its

Freeman Mathis & Gary, LLP
Attorneys at Law

representatives, including Pamela Johnson, Teresa Gooley, Daniel Gutterman, and Aaron Stone (30(b)(6) witness) who evaluated the facts and applicability of the exclusion, including the documents and information ASIC relied on as testified to in their depositions and as set forth in ASIC's interrogatory response and summary judgment motion setting forth in detail its investigation.

Pamela Johnson, the ASIC employee who made the final decision to deny the Plaintiffs' claim studied multiple sources and performed research to gain an understanding of the nature of the conflict in the region. Johnson reviewed news reports from print sources including the Washington Post and the New York Times, news media sources including reports from NBC, MSNBC, and the BBC. Johnson also reviewed case law from various Federal Circuit Courts of Appeals and the Supreme Court which discussed the definition of "war" and previous applications of the war exclusion. Johnson provided many of these sources to other ASIC employees who were also reviewing the Plaintiffs' claim.

Teresa Gooley, the Vice President of Claims at ASIC who oversaw Johnson, reviewed the investigation performed by Johnson and she also relied on reports in the media to understand the nature of the conflict in the region. Gooley discussed the application of the war exclusions with Johnson before a final decision was made regarding the Plaintiffs' claim. Gooley specifically recalls watching news reports from NBC and MSNBC and relying on this information when she discussed the final coverage decision with Johnson.

Danny Gutterman was a claim handler at ASIC and worked directly with Johnson to determine if the war exclusions applied to the Plaintiffs' claim. Gutterman frequently sent the information he was researching to Johnson for her review to aid in the handling of the claim. Gutterman also relied on his prior experience with the entertainment industry to aid in his research of the claim and the research he analysis he provided to Johnson.

Aaron Stone another Vice President of ASIC has an understand of the terms of

1  the war exclusion included in the Plaintiffs' policy and relied on his understanding of
2  the industry and the practices of ASIC to confirm that the war exclusion applied.

3       Multiple experts have determined that the circumstances in Israel at the time
4  Plaintiffs stopped production of Dig in Israel were caused by  armed conflict which
5  involved "weapons of war" and the use of such "weapons of war" by Hams and
6  Israel against each other was the sole reason why Plaintiffs moved their production
7  efforts out of Israel in 2014.

8       **G.      Anticipated evidentiary issues.**

9           **1.  No evidence to prove elements of "loss" under the Policy.**

10      ASIC discusses above the deficiencies in Plaintiffs' damages evidence.

11          **2.  District Court Opinion (Dkt No. 128), finding ASIC did not**
12              **commit bad faith**

13      Evidence of this Court's approval of ASIC's interpretation of the War
14  Exclusions in granting summary judgment in favor of ASIC on the breach of contract
15  claim is relevant to ASIC's defense against the remaining bad faith claim.

16      In the *Morris* case, a trial court granted summary judgment in favor of an
17  insurance company on the issue of whether there was any coverage.  *Morris v. Paul*
18  *Revere Life Ins. Co.,* 109 Cal. App. 4th 966, 972 (2003).  While that case was on
19  appeal, the California Supreme Court issued an opinion in another case that would
20  effectively reverse the summary judgment in that case.  *Id.*  The case was remanded
21  to resolve the remaining claim of bad faith.  *Id.*  The trial court entered summary
22  judgment in favor of the insurer based in part on the argument that courts from other
23  jurisdictions had split on this issue, and therefore, could not be bad faith.  *Id.* at 972-
24  73.

25      While ruling that the trial court properly granted summary judgment in favor
26  of the insurer on the bad faith claim, the court reasoned:

27          Moreover, we must also reject the suggestion in *Filippo Industries* that
            any court opinion issued after the insurance company made its initial
28          decision to deny coverage could not be considered in determining

Freeman Mathis
& Gary, LLP
Attorneys at Law

52

whether the decision was reasonable. If, as in this case, the coverage issue turns upon analysis of a legal point-and assuming the governing law has not changed in the interim—*the fact that a court had interpreted that law in the same manner as did the insurer, whether before or after, is certainly probative of the reasonableness, if not necessarily the ultimate correctness, of its position*.

*Id.* at 976 (emphasis added).  The evidence of this Court's prior rulings on summary judgments on the issue of coverage and Plaintiffs' breach of contract claim is relevant to Defendant's "genuine dispute" defense.

### 3. Ninth Circuit Opinion

ASIC expects Plaintiffs will attempt to introduce the entirety of the Ninth Circuits decision as evidence.  This is improper under the Federal Rules of Evidence.

### 4. Plaintiffs' late disclosed fee records and fee contract

Plaintiffs should be barred from using the recently untimely produced fee records to support their claim for attorney's fees.  Their production is untimely and includes fee records that should have been produced before the close of discovery.  A court may properly sanction or preclude evidence within the control of that party if it was not timely produced.  *Silverman v. Miranda,* 918 F.Supp.2d 200, 217 (S.D.N.Y. 2013), vacated sub nom. *Silverman v. Teamsters Local 210 Affiliated Health and Ins. Fund,* 761 F.3d 277 (2d Cir. 2014).  The fact that Plaintiffs produced these fee records well after the close of discovery is inherently prejudicial.  "Indeed, a district court may abuse its discretion by admitting testimony or documents that a proponent fails to timely identify or produce when under a legal obligation to do so." *Valdez v. Cockrell,* 287 F.3d 392, 393 (5th Cir. 2002).

Therefore, in light of these late-disclosed fee records, this Court should not allow Plaintiffs to use these documents at trial.  As such, Plaintiffs' claim for attorneys' fees must fail as well.

### 5. Plaintiffs' contingent fee contract

Plaintiffs cannot use their contingent fee contract as evidence of reasonable or

Freeman Mathis
& Gary, LLP
Attorneys at Law

necessary legal fees as it is irrelevant and improper evidence of what are reasonable and necessary attorney's fees.  A contingent fee agreement does not preclude an inquiry as to the reasonableness of the amount of the fee.  *Blattman v. Gadd* 112 Cal. App. 76, 92-93 (1931).  Elements courts may consider for attorney's fees includes the status of the parties, the nature of the controversy, and the work involved.  *Id.*  A contingent fee may not necessarily reflect a "reasonable" fee.  *Rader v. Thrasher,* 57 Cal. 2d 244, 253, 18 Cal.Rptr. 736, 368 P.2d 360 (1962)

### 6.  Net Worth of ASIC (re punitive damages)

ASIC will bring a motion in limine to bar the introduction of such evidence as irrelevant, unduly prejudicial, and confusing.

### 7.  Whether Plaintiffs' have complied with witness identification, designation, and document disclosures regarding their attorney fee expert and documents supporting her opinion(s), whatever they may be (they have not been disclosed).

It is Defendant's position Plaintiffs have not complied as they failed to timely designate an expert witness as to fees.  On Dec. 27, 2019, for the first time, Plaintiffs disclosed fee invoices totaling over $2.9 million and their contract with the Susman firm, along with identifying Lucia Coyoca as a witness on attorneys' fees.  Plaintiffs have not designated any witness on attorneys' fees.  Late disclosure of this significant component of the damages they seek to recover is irreparably prejudicial to Defendant.  Defendant was not required to designate a fee expert and had no information from which such expert could have developed an opinion.  Plaintiffs have no good cause for such extraordinarily late disclosure of this significant evidence and should be precluded from offering any evidence of attorneys' fees.

In light of Plaintiffs' failure to designate an expert on attorneys' fees and late production of invoices on attorneys' fees, this evidence should be struck, this witness should be struck, and in the absence of a timely designated expert, Plaintiffs' claim for attorneys' fees should be struck.

### 8. Whether Plaintiffs' calculation of damages is based on a reliable methodology and whether there are facts to support the methodology.

Defendant contends Plaintiffs' calculation is not reliable and its expert, Wunderlich, is not qualified.

An expert's testimony assists the jury when the expert's knowledge and experience on a relevant issue are beyond that of the average juror and the testimony helps the jury to understand the evidence or determine a fact issue. An expert's testimony is unhelpful when jurors do not need expert "illumination" regarding an expertise. *United States v. Seschillie*, 310 F.3d 1208, 1212 (9th Cir. 2002). Mr. Wunderlich's testimony would do nothing to expand the jury's understanding of his area of expertise in any way that would be relevant to the disputed issues at trial.

Plaintiffs' so-called "Cost Bible" is the exclusive basis for Mr. Wunderlich's opinions, and it does not provide the information necessary to calculate a "loss" as that term is defined in the Policy. Mr. Wunderlich bases his calculation of damages exclusively on a spreadsheet prepared by the Plaintiffs' parent company, NBCUniversal Media LLC ("NBCU"). The spreadsheet's first tab has more than 37,000 line entries and purports to list a brief description of every cost actually incurred to film episodes 2-6 of *Dig*. Plaintiffs have referred to this as the "Cost Bible." The other tabs contain smaller chunks of these costs, broken out by certain categories. The spreadsheet contains a tab for all "New Mexico Prep" expenses (*i.e.,* purportedly all costs incurred to prepare for filming episodes 2-6). It also contains a tab for all "New Mexico Wrap" expenses (*i.e.,* purportedly all costs incurred to close out the production of *Dig*). There is also a tab for "All Series" expenses (*i.e.,* purportedly all expenses charged to all episodes (*e.g.,* the cost to build a set used in every episode). There are also tabs for expenses incurred for filming in Croatia. 12.

Mr. Wunderlich simply followed NBC's marching orders when calculating extra expense from the Cost Bible. He relied entirely on the information provided by

Freeman Mathis & Gary, LLP
Attorneys at Law

NBC employee B.J. Markus for his conclusions about which expense categories were duplicated in New Mexico or Croatia.  He performed no analysis to determine whether certain expenses should be counted or not.  Wunderlich Dep. at 80-82, 85, 88-89, 112.  For example, Mr. Wunderlich opines that all "prep" expense incurred in New Mexico and Croatia was "extra expense" based solely on the instructions of B.J. Markus.  He therefore made no deductions were made from the total in the "Cost Bible."  Wunderlich Dep. at 42, 48, 166. Wunderlich performed no independent assessment of the determinations made by B.J. Markus.  Mr. Wunderlich  could not explain why certain line items, such as wardrobe, were included in "prep," and he conducted no analysis at any level to verify that there was an overlap between what was expended in Israel and what he expended later.  Wunderlich Dep. at 58-59, 168, 215-16.  Wunderlich simply accepted the conclusion of Markus that certain line item expenses were duplicative.  Wunderlich Dep. at 59.13. Wunderlich engaged in a pattern of relying entirely on Markus's instructions for what expenses to include or exclude.  He did not verify any information he was provided.  Wunderlich Dep.at 169, 179, 184-85.  Wunderlich only subtracted the "wrap" and "all series" expenses from New Mexico and Croatia that Markus told him to subtract.  Wunderlich Dep. at 46-47, 63-64.  He performed no independent review of these expenses to verify they were actually incurred in Israel.  Wunderlich Dep. at 169.  He performed no comparison between the expenses actually incurred in Israel and later expenses he included in extra expense.  Wunderlich Dep. at 225-26. 14.  Wunderlich failed to verify any information NBC provided him and refused to consider NBC's budgetary expectations.

Mr. Wunderlich was instructed which prep, wrap, and all series expense categories were not duplicated in New Mexico and Croatia, and then he performed a calculation to exclude that amount from the total in the "Cost Bible" for episodes 2-6.  Wunderlich Dep. at 44, 195-96.  After deducting  the duplicative information from the "Cost Bible," Mr. Wunderlich applied basic arithmetic to determine the

Freeman Mathis
& Gary, LLP
Attorneys at Law

1  total.  Mr. Wunderlich's conclusions and testimony are not informed by his own

2  expertise; rather, they are based on simple arithmetic a juror can perform.  *United*

3  *States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996) (quoting *United States v. Benson*,

4  941 F.2d 598, 604 (7th Cir. 1991)).  The jury can, by itself and without aid, evaluate

5  the same evidence Mr. Wunderlich relied upon and draw their own conclusions

6  without Mr. Wunderlich's guidance.  The jury is fully capable of understanding the

7  items and descriptions within the "Cost Bible" and is also fully capable of

8  performing the simple calculations themselves.  The basic arithmetic of Mr.

9  Wunderlich to reach his numbers is not beyond the knowledge and ordinary

10 intelligence of the average juror.  Mr. Wunderlich's testimony would not assist the

11 jury in making its own decision, but instead would serve only to instruct the jury on

12 what result to reach.  It would offer nothing more than what lawyers for the parties

13 can argue in closing argument  *United States v. Frazier*, 387 F.3d 1244, 1262–63

14 (11th Cir. 2004).

15        Wunderlich is not qualified to opine on this area of expertise.  Wunderlich

16 lacks the proper qualifications to make his conclusions, his methods in rendering

17 these conclusions are questionable, and the facts and data from which he draws his

18 conclusions are unreliable. It is not enough that an expert be qualified in general.

19 The expert must "possess skill, experience, or knowledge in the particular field" in

20 question, the specific question presented must fall "within the reasonable confines of

21 her expertise," and the "area of the witness' competence [must] match the subject

22 matter of the witness' testimony."  *See Conroy v. Vilsack*, 707 F.3d 1163, 1169

23 (10th Cir. 2013); *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100–01 (8th

24 Cir. 2006).  Further, Federal Rule of Evidence 702 requires that an expert's

25 testimony be based on sufficient facts or data; be the product of reliable principles

26 and methods and, reliably apply the principles and methods to the facts of the case.

27 The expert's analysis must be reliable at every step and the court must review each

28 material part of an expert's theory to be reliable.  *Amorgianos v. Nat'l R.R.*

Freeman Mathis
& Gary, LLP
Attorneys at Law

1    *Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("[I]t is critical that an expert's
2    analysis be reliable at every step.").

3          Mr. Wunderlich is not a certified public accountant and he holds no
4    certifications that are relevant to the analysis he undertook in making his
5    conclusions.  Wunderlich Dep. at 315, 318-19, 321-24. Further, Mr. Wunderlich's
6    expert testimony has been restricted by courts several times in the past and 2/3 of his
7    income is from litigation consulting.  Wunderlich Dep. at 318-19, 321-24.
8    Wunderlich lacks sufficient qualifications to opine on this area of expertise and this
9    renders his conclusions unreliable.

10               **9.  Whether Plaintiffs' expert Sagalow is qualified to provide any**
11                    **opinions regarding ASIC's claim handling.**

12         Defendants' contention is that he is not qualified in any manner to render an
13   opinion regarding claim handling.

14         In his report, Sagalow states that he has "been asked to provide an expert
15   opinion as to the handling of the Claim by Atlantic specifically with respect to the
16   obligation incumbent on all insurers to conduct a full, fair, and prompt investigation
17   of claims weighing the interests of the insured and the insurer in an evenhanded
18   manner." He then purports to lay out the "general standards for claims handling and
19   investigation" that he considers to be applicable to insurance companies, before
20   concluding that "Atlantic failed to adhere to a number of industry claims standards."
21   But Sagalow simply is not qualified to opine on "industry claims standards" or
22   whether Atlantic "failed to adhere" to these standards.

23         Sagalow <u>has never held a position as a claim handler</u>. Sagalow cannot be
24   permitted to testify as to Atlantic's claim handling or opine that it was somehow
25   deficient. His testimony on this would be uninformed speculation from an
26   unqualified witness. Further, he impermissibly attempts to offer a legal opinion as to
27   coverage under the cloak of claim handling commentary: Atlantic "failed to find
28   coverage where coverage existed." But "an expert witness cannot give an opinion as

Freeman Mathis
& Gary, LLP
Attorneys at Law

to her legal conclusion, i.e., an opinion on the ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir. 2008).

Under Rule 702, Sagalow simply is not qualified to testify as to Atlantic's claim handling, much less that it "violated a number of industry customs and practices in its claims process and handling of the claim at issue," as he speculates at the conclusion of his report.

> **10. Whether negotiation of the policy, non-renewal, premium losses, or profitability of the NBC account or ASIC Entertainment division is of any probative value regarding whether ASIC breached the duty of good faith or whether Exclusion #3 applies to preclude coverage.**

ASIC's position is that the Policy's terms are as they are written, and these issues have no bearing on the foregoing issues.

Whether judgment as a matter of law is appropriate that ASIC did not breach the duty of good faith.

ASIC contends that considering the differing conclusions between this Court and Ninth Circuit, ASIC cannot be held to have breached the duty, as a matter of law.

> **11. Whether this Court should reconsider its ruling that Exclusion #3 applies; ASIC's position is that there is at least a fact issue as to the application of this Exclusion.**

ASIC's position is that the Court's holding that the "war" exclusions #1 and #2 do not apply does not mean also that Exclusion #3 does not apply, as a matter of law.

> **12. Whether this Court should reconsider its ruling that Exclusion #4 applies**

ASIC's position is that there is at least a fact issue as to the application of this Exclusion.

Freeman Mathis
& Gary, LLP
Attorneys at Law

59

13. **Whether there is any evidence ASIC's coverage analysis and decision would support a punitive damage liability or damage inquiry of the jury.**

ASIC's position is that it would not, considering its careful and considered analysis and the findings of this Court that it acted reasonably.

14. **Whether ASIC's financial analysis of the NBC account or ASIC's entertainment division has any probative value regarding the issue of whether ASIC's acted reasonably in its coverage analysis and investigation and whether Exclusions #3 or #4 may apply to preclude coverage.**

ASIC's position is that it does not.

15. **Whether ASIC should be allowed to designate a new expert regarding damages, considering the death of expert Shapiro, who may do more than "adopt" Shapiro's methodology and conclusions.**

ASIC's position is that it should be allowed to designate a professional who has studied the data and developed opinions she can independently support based on her analysis.

## H.   Identification of issues of law.

### 1.  District Court Opinion (Dkt No. 128), finding ASIC did not commit bad faith

Evidence of this Court's approval of ASIC's interpretation of the War Exclusions in granting summary judgment in favor of ASIC on the breach of contract claim is relevant to ASIC's defense against the remaining bad faith claim.  This issue is discussed in more detailed in the prior section above.

### 2.  Ninth Circuit Opinion

ASIC expects Plaintiffs will attempt to introduce the entirety of the Ninth

Freeman Mathis
& Gary, LLP
Attorneys at Law

Circuits decision as evidence.  This is improper under the Federal Rules of Evidence.

### 3.  Plaintiffs' late disclosed fee records and fee contract

Plaintiffs should be barred from using the recently untimely produced fee records to support their claim for attorney's fees.  Their production is untimely and includes fee records that should have been produced before the close of discovery.  This issue is discussed in more detailed in the prior section above.

### 4.  Plaintiffs' contingent fee contract

Plaintiffs cannot use their contingent fee contract as evidence of reasonable or necessary legal fees as it is irrelevant and improper evidence of what are reasonable and necessary attorney's fees.  This issue is discussed in more detailed in the prior section above.

### 5.  Whether Plaintiffs' have complied with witness identification, designation, and document disclosures regarding their attorney fee expert and documents supporting her opinion(s), whatever they may be (they have not been disclosed).

Plaintiffs have not complied as they failed to timely designate an expert witness as to fees and on Dec. 27, 2019, for the first time, disclosed fee invoices totaling over $2.9 million and their contract with the Susman firm.  Late disclosure of this significant component of the damages they seek to recover is irreparably prejudicial to Defendant.  This issue is discussed in more detailed in the prior section above.

### 6.  Whether negotiation of the policy, non-renewal, premium losses, or profitability of the NBC account or ASIC Entertainment division is of any probative value regarding whether ASIC breached the duty of good faith or whether Exclusion #3 applies to preclude coverage.

ASIC's position is that the Policy's terms are as they are written, and negotiation of the Policy has no bearing on the foregoing issues.

**Freeman Mathis & Gary, LLP**
Attorneys at Law

**7. Whether judgment as a matter of law is appropriate that ASIC did not breach the duty of good faith.**

ASIC contends that considering the differing conclusions between this Court and 9th Circuit, ASIC cannot be held to have breached the duty, as a matter of law.

**8. Whether this Court should reconsider its ruling that Exclusion #3 applies.**

ASIC's position is that there is at least a fact issue as to the application of this Exclusion.

**9. Whether this Court should reconsider its ruling that Exclusion #4 applies.**

ASIC's position is that there is at least a fact issue as to the application of this Exclusion.

**10. Whether there is any evidence ASIC's coverage analysis and decision would support a punitive damage liability or damage inquiry of the jury.**

ASIC's position is that it would not, considering its careful and considered analysis and the findings of this Court that it acted reasonably.

**11. Whether ASIC's financial analysis of the NBC account or ASIC's entertainment division has any probative value regarding the issue of whether ASIC's acted reasonably in its coverage analysis and investigation and whether Exclusions #3 or #4 may apply to preclude coverage.**

ASIC's position is that it does not.

**12. Whether ASIC should be allowed to designate a new expert regarding damages, considering the death of expert Shapiro, who may do more than "adopt" Shapiro's methodology and conclusions.**

ASIC's position is that it should be allowed to designate a professional who

Freeman Mathis
& Gary, LLP
Attorneys at Law

has studied the data and developed opinions she can independently support based on her analysis.

## II.   BIFURCATION OF ISSUES (L.R. 16-4.3)

None.

## III.   JURY TRIAL (L.R. 16-4.4)

A timely jury demand was made.

## IV.   ATTORNEY'S FEE (L.R. 16-4.5)

ASIC has discussed above why Plaintiffs are not entitle to attorney's fees or costs.

## V.   ABANDONMENT OF ISSUES (L.R. 16-4.6)

ASIC has not abandoned any pleaded claims or affirmative defenses.


DATED:  January 3, 2020

MARC J. SHRAKE
FREEMAN MATHIS & GARY, LLP

-and-

CHRISTOPHER W. MARTIN *(Pro Hac Vice)*
MELINDA R. BURKE *(Pro Hac Vice)*
MARTIN, DISIERE, JEFFERSON
& WISDOM LLP


By:     */s/ Marc J. Shrake*
Attorneys for Defendant ATLANTIC
SPECIALTY INSURANCE COMPANY

Freeman Mathis
& Gary, LLP
Attorneys at Law

ATLANTIC SPECIALTY'S MEMO OF CONTENTIONS OF FACT AND LAW