1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, a Delaware limited liability company, and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, a Delaware limited liability company, | CASE NO. 2:16-cv-4435-PA-MRW |
| Plaintiffs, | **[PROPOSED] FINAL PRETRIAL CONFERENCE ORDER** |
| v. | Trial Date: February 18, 2020 |
| ATLANTIC SPECIALTY INSURANCE COMPANY, a New York insurance company, | Final Pretrial Conference: January 17, 2020 |
| Defendant. | |

1

# TABLE OF CONTENTS

**Page**

1.  THE PARTIES. ................................................................................. 1

2.  JURISDICTION AND VENUE. ......................................................... 5

3.  LENGTH OF TRIAL. ........................................................................ 6

4.  NON-JURY TRIAL. .......................................................................... 6

5.  ADMITTED FACTS. ......................................................................... 7

6.  STIPULATED BUT NOT ADMITTED FACTS. ............................... 8

7.  CLAIMS AND DEFENSES PRESENTED AT TRIAL. ................... 19

8.  ISSUES REMAINING FOR TRIAL. .............................................. 55

9.  DISCOVERY. .................................................................................. 56

10. DISCLOSURES. .............................................................................. 56

11. WITNESS LISTS. ............................................................................ 57

12. MOTIONS. ...................................................................................... 58

13. BIFURCATION. .............................................................................. 60

14. CONCLUSION. ...............................................**Error! Bookmark not defined.**

Following pretrial proceedings, pursuant to F.R.Civ.P. 16 and L.R. 16, IT IS ORDERED:

## 1.   **PARTIES**

The parties are:

    a.    Plaintiffs Universal Cable Productions LLC and Northern Entertainment Productions LLC ("Plaintiffs").

    b.    Defendant Atlantic Specialty Insurance Company ("Defendant").

Each of these parties has been served and has appeared.  There are no other parties named in the pleadings and not identified in the preceding paragraph.

The pleadings which raise the issues are:

    a.    Plaintiffs' First Amended Complaint for (1) Breach of Insurance Contract; and (2) Breach of Implied Covenant of Good Faith and Fair Dealing (Dkt. No. 10); and

    b.    Defendant's Original Answer to Plaintiffs' First Amended Complaint (Dkt. No. 14).

The Court's Order dated November 30, 2019 (Dkt. No. 157) found "that the issues of damages and Atlantic's bad faith are ready for trial . . . ."

**Plaintiffs' Position on Dismissed or Abandoned Affirmative Defenses.** Plaintiffs' position is that the following Affirmative Defenses asserted in Defendant's Answer have been dismissed or abandoned. Summary judgment in favor of Plaintiffs on Defendant's liability for breach of the insurance contract has been granted. *See Universal Cable Prods., LLC v. Atlantic Specialty Ins. Co.*, 929 F.3d 1143 (9th Cir. 2019), Dkt. 157 (Nov. 30, 2019 Order). Any remaining affirmative defenses to liability that Atlantic failed to raise in response to Plaintiffs' summary judgment motion as to liability are abandoned. *See, e.g.*, *Kaffaga v. Steinbeck*, 2017 WL 5989039, at

*1 (C.D. Cal. Aug. 25, 2017) ("Affirmative defenses not raised in opposition to a motion for partial summary judgment as to liability are deemed waived.") (citing *United Mine Workers of America 1974 Pension v. Pittson Co.*, 984 F.2d 469, 478 (D.C. Cir. 1993)); *Duarte Nursery, Inc. v. United States Army Corps of Engineers*, 2017 WL 3453206, at *3 (E.D. Cal. Aug. 11, 2017) (same).

      a.    Second Affirmative Defense (Exclusion 1, General Conditions), based on the Policy exclusion for "[w]ar, including undeclared or civil war."

      b.    Third Affirmative Defense (Exclusion 2, General Conditions), based on the Policy exclusion for "[w]arlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents."

      c.    Fourth Affirmative Defense (Exclusion 3, General Conditions), based on the Policy exclusion for "[i]nsurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these . . . ."

      c.    Fifth Affirmative Defense (Exclusion 4, General Conditions), based on the Policy exclusion for "[a]ny weapon of war including atomic fission or radioactive force, whether in time of peace or war."

      d.    Sixth Affirmative Defense (Failure to Mitigate), based on General Condition I(2) of the Policy, states: "Take all reasonable steps to protect the property from further damage and minimize the loss. Keep a record of your

expenses in doing so for consideration in the settlement of the claim. This will not increase the limit of insurance."

e.  Seventh Affirmative Defense (Other Insurance), based on the assertion that "the Policy provides only excess insurance" and "the Plaintiffs' loss is not covered by the Policy."

f.  Eighth Affirmative Defense (Warranty C), based on the assertion that Plaintiffs' "claims are barred by their breach of Warranty C of the Policy."

g.  Ninth Affirmative Defense (Fortuity Doctrine), based on the assertion that "Plaintiffs' claims are barred by the fortuity doctrine."

h.  Tenth Affirmative Defense (Uninsurable Claim), based on the assertion that "Plaintiffs' claims are uninsurable and barred by public policy."

i.  Eleventh Affirmative Defense (Exclusion 8, Section III—Extra Expense), based on the Policy exclusion for "[a]ny concern or fear of an occurrence which may affect the commencement of [sic] the continuation of the Insured Production, except the action of a civil authority that prevents access to, exit from (ingress or egress) or closes down the location and or facilities due to conditions that threaten the safety of cast, crew or property."

j.  Twelfth Affirmative Defense (Exclusion 9, Section III—Extra Expense), based on the Policy exclusion for "[a]n imminent peril or physical damage to property, facilities, or locations necessary to the insured production."

k.   Thirteenth Affirmative Defense (Exclusion 10, Section III—Extra Expense), based on the Policy exclusion for "[a]ny concern or belief that the commencement or continuation of Insured Production is inappropriate."

l.   Fourteenth Affirmative Defense (Exclusion 17, Section III—Extra Expense), based on the Policy exclusion for "[l]oss of use (including loss of use of animals), loss of market, interruption of business, or any other consequential loss."

**Defendant's Position on Dismissed or Abandoned Affirmative Defenses.**

Defendant has not waived any of its affirmative defenses and that issues of fact for trial remain regarding all of them.  Defendant believes neither this Court's *initial* order nor the Ninth Circuit's appellate order directly addressed the applicability of Exclusions #3 and #4.  "Insurrection," "rebellion" and "revolution" are by definition different than "war" and, because the Ninth Circuit holding is law of the case, then the Ninth Circuit's interpretation of the dual sovereignty requirements necessary to constitute a "war" directly implicate what actually happened in Israel in 2014 – an "insurrection, rebellion and revolution," and the "action taken by a governmental authority [Israel] in hindering or defending against any of these."  Because Exclusion #3 deals with conditions other than "war," Defendant is not asking for judgment as a matter of law on this issue at this time but merely for the opportunity to try the issue the factfinder as the Ninth Circuit order allows.

Regardless of whether or not this Court allows the factfinder to consider Exclusion #3 as a factual coverage matter, Defendant has to defend the bad faith allegations against it based on its state of mind when adjusting this claim and its belief of the reasonableness of its reliance on Exclusions #1, #2, #3 and #4 in denying this claim.  The fact that two Courts, with ample time and opportunity to consider the complex coverage issues, reached different conclusions regarding Exclusions #1 and

#2 make it certain as a matter of law that <u>Defendant</u>'s position was at least reasonable and a judgment as a matter of law in favor of <u>Defendant</u> finding it did not breach the duty of good faith would be proper.   <u>Defendant</u> requested in the parties' Joint Submission of remaining issues of fact and law to re-urge its motion for summary judgment as to the duty of good faith <u>and</u> regarding the applicability of Exclusions #3 or #4.  The Court denied <u>Defendant</u>'s request and entered its most recent ruling that Exclusions #3 and #4 did not preclude coverage.

<u>Defendant</u> believes there are issues of fact that preclude summary judgment under the law of the case as stated in the decision by the Ninth Circuit regarding Exclusion #3 and Exclusion #4 and, as such, <u>Defendant</u> respectfully asks for the ability to try to the factfinder the factual coverage issues regarding Exclusion #3 and #4 as allowed by the holding of the Ninth Circuit and <u>Defendant</u> also seeks judgment as a matter of law regarding  Plaintiffs' claim it breached the duty of good faith because, as a matter of law, <u>Defendant</u> was reasonable in its reliance on Exclusions #1, #2, #3 and #4 in denying Plaintiffs' claim and also because a *bona fide* controversy existed regarding the legal meaning of these exclusions until the Ninth Circuit for the first time gave meaning in this Circuit to Exclusions #1 and #2 in an insurance claim of this type.

## 2. <u>JURISDICTION AND VENUE</u>

Federal jurisdiction and venue are invoked upon the grounds of diversity jurisdiction under 28 U.S.C. §§ 1332(a) and (c). Complete diversity exists because Plaintiffs are limited liability companies that are citizens of Delaware and Pennsylvania by virtue of the citizenship of the entities in their chains of membership, and Defendant is a citizen of New York and Minnesota. The amount-in-controversy exceeds the sum of $75,000, exclusive of interest and costs. This is a judicial district in which a substantial part of the events and omissions giving rise to the claim occurred.  The facts requisite to federal jurisdiction and venue are admitted.

**3.**     **LENGTH OF TRIAL**

The parties' estimates of the length of trial depend in part on the Court's rulings on motions in *limine* and jury instructions.

  a.     Plaintiffs estimate the trial will take 3.5 days or fewer should the Court grant their motions *in limine* and provide the jury instructions on the facts decided by the Ninth Circuit in this case, which will eliminate extensive expert and fact testimony on issues regarding Hamas's lack of sovereignty. If those motions are denied and Hamas's lack of sovereignty becomes an issue of fact and expert testimony at trial (as opposed to instructions by the Court), Plaintiffs estimate the trial will likely take 7 days.

  b.     Defendant estimates (i) a trial will be unnecessary if the Court grants Defendant's motion *in limine* regarding Plaintiffs' failure to produce the evidence necessary to prove a "loss" under the insurance policy at issue, (ii) but if the Court denies that motion, a trial will take 4-6 trial days if the Court grants Defendant's motion *in limine* regarding Plaintiffs' failure to produce evidence necessary to prove legal expenses recoverable under *Brandt v. Superior Ct.,* 37 Cal. 3d 813 (1985), (iii) but if the Court denies that motion, a trial will take 5-7 trial days.

**4.**     **JURY TRIAL**

The trial is to be a jury trial.

A timely demand for a jury trial has been made.

Under the Court's Order filed November 30, 2019 (Dkt. No. 157), on January 3, 2020, the parties shall lodge the Final Pretrial Conference Order and Pretrial Exhibit Stipulation and File Contentions of Fact and Law, Exhibit and Witness Lists, Joint Status Report Regarding Settlement, Agreed Upon Set of Instructions and Verdict Forms, and a Joint Statement Regarding Disputed Instructions, Verdicts, etc. Under the same order, at the Pretrial Conference on January 17, 2019, the parties shall submit any special questions requested to be asked on *voir dire*.

## 5. **ADMITTED FACTS**

The following facts are admitted and require no proof:  None.

## 6. **STIPULATED BUT NOT ADMITTED FACTS**

The following facts, though stipulated, shall be without prejudice to any evidentiary objection.

1. Defendant Atlantic Specialty Insurance Company ("Atlantic") is a OneBeacon Insurance Group company, which operates Atlantic and various OneBeacon entities.

2. Defendant issued its first of five production policies to NBCUniversal Media, LLC ("NBCUniversal") effective as of January 1, 2010.

3. The January 1, 2010 policy was issued after extensive negotiations.

4. Universal Cable Productions LLC ("UCP") and Northern Entertainment Productions LLC ("NEP") (collectively "Plaintiffs") are named insureds under the Policy.

5. The January 1, 2010 Policy insured against certain risks commonly insured in connection with television productions.

6. The January 1, 2010 Policy was renewed from year to year, until issuance of the policy at issue here, Motion Picture/Television Producers Portfolio Policy No. MP00163-04 ("Policy").

7.   The Policy had an eighteen month policy period, from January 1, 2014, to June 30, 2015.

8.   "Imminent peril" is defined in the Policy as "certain, immediate and impending danger of such probability and severity to person or property that it would be unreasonable or unconscionable to ignore."

9.   The Policy excludes from coverage losses caused by:

> 1. War, including undeclared or civil war; or

> 2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any sovereign, sovereign, or other authority using military personnel or other agents; . . . .

> 3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

> 4. Any weapon of war including atomic fission or radioactive force, whether in time of peace or war.

10.   Each Universal television show is added as an "Insured Production" on an individual basis.

11.   On December 11, 2013, Aon submitted an application to Defendant for *Dig* to be added to the Policy as an Insured Production.

12.   The application disclosed that production would take place in large part in Israel.

13.   In submitting *Dig* for coverage under the Policy, Andrea Garber, an Aon representative, informed Defendant, among other things, as follows:

> • "While in Israel, the production will be based in Tel Aviv and the majority of filming will be done in that city. Of the total 70 day

shoot, approximately 20 days will involve shooting only on the west side of Jerusalem."

- The NBCU Security team is already involved in the prepping of this project and they are meeting weekly with the production folks that are currently on board to discuss precautions and procedures that need to be taken as the project develops."

- "[T]he mayor of Jerusalem and the local police have been contacted and are assisting in assuring the safety of the production company when they are working in Jerusalem."

14.    Defendant expressed concerns about safety and security precautions while filming in Israel.

15.    Defendant assessed the risks associate with production in Israel, and agreed to accept the *Dig* production as an Insured Production under the Policy.

16.    Universal implemented additional security for the production in Israel.

17.    The *Dig* pilot episode commenced filming in Israel on or about June 2, 2014.

18.    Before June 2, 2014, conditions in Israel were considered safe for filming.

19.    Three Israeli teenagers were kidnapped on June 12, 2014.

20.    The U.S. State Department reported there were "many signs that point[ed] to Hamas involvement" in the kidnappings.

21.    Production of the *Dig* pilot episode was completed on June 26, 2014.

22.    On or about June 30, 2014, the bodies of the three missing teenagers were found, and it was again reported that there were signs "indicat[ing] that Hamas was involved."

23.    Hamas began firing rockets into Israel in June 2014.

24.    On July 8, 2014, the State Department warned about concerns as to "the

safety and security of civilians" in and around Israel and Jerusalem.

25. Certain *Dig* filming was scheduled to take place in and around Israel and specifically Jerusalem when production resumed.

26. As tensions increased throughout early July, the NBCUniversal security team evaluated the situation.

27. On July 10, 2014, the NBCUniversal security team advised the UCP *Dig* production team: "[T]he security environment in Israel currently prohibits NBCU Security from being able to guarantee the safety and security of our employees, production partners, associated crew and talent."

28. On July 11, 2014, UCP decided to postpone, for one week, production of the *Dig* episodes which had been scheduled to resume on July 20, 2014.

29. On July 11, 2014, UCP informed Defendant that, due to the circumstances and safety concerns for cast and crew members, production of the show was being postponed by one week.

30. UCP also told Defendant that UCP might be compelled to move the *Dig* production to another location if conditions did not improve.

31. On July 15, 2014, Aon submitted to Defendant a formal notice of the *Dig* claim for the extra expenses incurred in connection with the delay and subsequent relocation of the production (the "Claim").

32. On July 16, 2014, the State Department spokesperson reported: "right now the potential we're looking at is . . . an even greater escalation of violence" in and around Israel.

33. Faced with the prospect of escalating violence, UCP decided to move the *Dig* production out of Israel.

34. UCP informed Defendant of its decision to move the *Dig* production out of Israel on July 17, 2014.

35. The production of *Dig* was relocated to Croatia and the State of New Mexico.

36. UCP and NEP incurred expenses in connection with the initial delay in production and the subsequent relocation of the production to Croatia and New Mexico.

37. Defendant knows how to draft a terrorism exclusion.

38. Hamas' founding charter published in 1988 advocates the establishment of a separate Islamic fundamentalist Palestinian state, the destruction of the state of Israel, and the raising of "the banner of Allah over every inch of Palestine."

39. Hamas rejects the right of Israel to exist.

40. For the period from January 1, 2014, to June 30, 2015, Defendant issued a television production insurance policy to Plaintiffs (the "Policy").

41. After *Dig* began production in Israel, three Israeli teenagers were kidnapped on June 12, 2014, and Hamas was suspected of involvement in the kidnappings.

42. On June 30, 2014, the bodies of the three missing teenagers were recovered, and there were signs indicating Hamas was involved.

43. In late June or early July 2014, Hamas began firing rockets from Gaza into Israeli civilian populations, significantly increasing the number of attacks around July 8.

44. On July 8, the U.S. State Department issued a warning regarding the "safety and security of civilians" in Israel, specifically in Jerusalem.

45. *Dig* filming was scheduled to take place in Jerusalem over the next few weeks.

46. Two days later, the Universal security team advised the *Dig* production team that the "security environment in Israel currently prohibits NBCU Security from being able to guarantee the safety and security of our

employees, production partners and associated crew and talent." The security team indicated that "current rocket attacks" appeared "to target locations to be used in forthcoming filming" and it was concerned about "acts of terrorism within Israel."

47.   On July 11, 2014, the day after receiving the security team's advice, Universal decided to postpone production for a week and informed Defendant.

48.   Due to escalating violence, Universal decided to move the *Dig* production out of Israel altogether and notified Defendant of that decision on July 17, 2014.

**Joint Statement of the Parties Regarding Meet-and-Confer Efforts.** The parties continue to meet-and-confer to attempt to stipulate to facts (without prejudice to any evidentiary objection) that were (1) undisputed at summary judgment, (2) decided in the Ninth Circuit's order, or (3) admitted in discovery responses. The parties included a preliminary list of stipulations above and will continue to confer in good faith to reach additional stipulations where possible in advance of the pre-trial conference on January 17, 2020.

**Plaintiffs' Position:** It is Plaintiffs' position that the following additional facts were found by the Ninth Circuit and this Court on remand, are therefore law of the case, and require no further proof at trial:

49.   On July 17, 2014, Atlantic denied coverage under Exclusion 1 for "war" and Exclusion 2 for "warlike action by a military force."

50.   Atlantic denied coverage, stating that although the Policy covered expenses related to terrorism, Hamas' hostilities were excluded from coverage. Atlantic relied on the Policy's war exclusions, which excluded coverage for expenses resulting from "war" and "warlike

action by a military force." Atlantic concluded that Hamas' actions were excluded acts of "war" or "warlike action by a military force." Atlantic was incorrect.

51.  Under California law, the terms in an insurance policy are understood in their ordinary and popular sense unless a special meaning is given to them by usage, in which the latter must be followed.

52.  Both Exclusion 1 for "war" and Exclusion 2 for "warlike action by a military force" have a specialized meaning in the insurance context and the parties had, at the least, constructive notice of the meaning. Thus, these exclusions must be interpreted by applying the special meaning of the terms in the insurance context, rather than any ordinary and popular meaning.

53.  Under their specialized meaning, both Exclusion 1 for "war" and Exclusion 2 for "warlike action by a military force" require hostilities between either de jure or de facto sovereigns, and Hamas is neither. Atlantic therefore breached the Policy when it denied coverage by defining Hamas' conduct as "war" or "warlike action by a military force."

54.  Caselaw and insurance treatises confirm that ordinary, popular meanings of these terms do not control and that the specialized meaning in the insurance industry applies.

55.  The courts in *Pan Am. World Airways v. Aetna Cas. & Surety Co.*, 505 F.2d 989 (2d Cir. 1974) and *Holiday Inns v. Aetna Ins. Co.*, 571 F. Supp. 1460, 1503 (S.D.N.Y. 1983) refused to treat violent actions by Palestinian terrorist organizations targeting civilians as falling within the "war" exclusion. *Holiday Inns* specifically rejected the argument that a "common meaning" of war applies in the insurance context, holding instead that "in commercial litigation arising out of insurance

policies, words and phrases are construed 'for insurance purposes'—a context quite different from those of politics or journalism." The Second Circuit in *Pan Am* concluded that "war is a course of hostility engaged in by entities that have at least significant attributes of sovereignty."

56.   Similarly, a leading insurance treatise, 10A Couch on Insurance § 152:3 (3d ed. 2017), recognizes that in this context, "war" is defined as the employment of force between governments or entities essentially like governments, at least de facto, because "[w]ar is often viewed as the method by which a nation prosecutes its right by force." Couch does not discuss any other applicable meaning of "war" in the insurance context, including Atlantic's argument for a broader approach.

57.   Another treatise, 32-191 Appelman on Insurance Law & Practice Archive § 191.02 (2d ed. 2011), notes that "while the sovereign act and war exclusions are not entirely irrelevant to coverage of terrorist related losses, an insurer seeking to invoke these exclusions faces steep factual, legal, and political hurdles" because of caselaw defining war as the act of a sovereign.

58.   Exclusion 2 for "warlike action by a military force" also has a special meaning in the insurance industry that derives from a typical exclusion for "warlike operations." That special meaning requires (1) "operations of such a general kind or character as belligerents have recourse to in war" and (2) that such operations be carried out by the military forces of a sovereign or quasi-sovereign government.

59.   The *Pan Am* case distinguished between warlike operations and terrorist activity as follows: "There is no warrant in the general understanding of English, in history, or in precedent for reading the phrase 'warlike operations' to encompass (1) the infliction of intentional violence by political groups (neither employed by nor representing governments) (2)

1  upon civilian citizens of non-belligerent powers and their property (3)

2  at places far removed from the locale or the subject of any warfare."

3  60. A leading insurance treatise, 10A Couch on Insurance § 152:3-4 (3d ed.

4  2017), notes that "warlike operations" are "normally part of an armed

5  conflict between combatants and usually do not include intentional

6  violence against civilians by political groups." The treatise also notes

7  that the "standard war exclusion does not explicitly extend to acts of

8  terrorism," as "[t]errorists do not typically fit [the] profile" of

9  "combatants" who "operate lawfully in accordance with the laws and

10  customs of war." *Id.* § 152:18.

11  61. Industry custom and usage therefore dictate that both Exclusion 1 for

12  "war" and Exclusion 2 for "warlike action by a military force" require a

13  showing of de jure or de facto sovereignty.

14  62. Hamas is neither a de jure nor a de facto sovereign and therefore

15  Exclusion 1 for "war" and Exclusion 2 for "warlike action by a military

16  force" do not apply to Plaintiffs' *Dig* claim.

17  63. In the insurance context, the Constitution commits to the Executive

18  Branch of the U.S. Government alone the authority to recognize, and to

19  withdraw recognition from, foreign regimes. The Executive Branch of

20  the U.S. Government refused to recognize Hamas as a de jure or de facto

21  sovereign. Instead, the Secretary of State has consistently designated

22  Hamas as a Foreign Terrorist Organization since 1997.

23  64. Under international law, a state is "an entity that has a defined territory

24  and a permanent population, under the control of its own government,

25  and that engages in, or has the capacity to engage in, formal relations

26  with other such entities."

27  65. Atlantic argued that Hamas has significant attributes of sovereignty,

28  relying on the *Pan Am* and *Holiday Inns* cases. To the contrary, *Pan Am*

held that a terrorist group was not a de facto government because it was not acting on behalf of a recognized government. *Holiday Inns* also supports the conclusion that Hamas is not the de facto sovereign of Palestine.

66.    Gaza is part of Palestine and not its own sovereign state. Hamas never exercised actual control over all of Palestine and has agreed—at least in principle—not to disturb the Palestinian Authority, the de jure government of Palestine. Hamas agreed in June 2014 to cede any governing function it may have had to the Palestinian Authority.

67.    Hamas was not a de facto or de jure sovereign during the July 2014 conflict between Hamas and Israel. Thus, Hamas' conduct in the summer of 2014 cannot be defined as a "war" under Exclusion 1 for the purposes of interpreting this Policy.

68.    The nature of Hamas's conduct in June and July 2014 further supports the conclusion that Hamas was not engaging in "warlike action by a military force" under Exclusion 2.

69.    Couch's insurance treatise notes that "warlike operations" would "not include intentional violence against civilians by political groups." Hamas is such a political group. Furthermore, the specific action that disrupted *Dig*'s production was Hamas firing rockets into Israeli civilian centers. The weapons Hamas used were unguided missiles and were likely used to injure and kill civilians because of their indiscriminate nature. Hamas' conduct consisted of intentional violence against civilians—conduct which is far closer to acts of terror than "warlike action by a military force."

70.    Because Hamas is not a de facto sovereign—and because its actions did not constitute "warlike action by a military force"—Exclusion 2 for "warlike action by a military force" does not apply.

71.   Hamas' conduct consisted of intentional violence against civilians – conduct which is far closer to acts of terror than "warlike action by a military force."

72.   The efficient proximate cause of a loss is the predominant, or most important cause of a loss. The efficient proximate cause for the relocation was Hamas' rocket fire from Gaza into Israel.

73.   Even if Israel countered Hamas' attacks, Israel's actions were not the efficient proximate cause of Plaintiffs' losses in moving the production of *Dig*.

74.   Plaintiffs' decision to relocate production was a result of Hamas firing rockets into Israel (where filming was occurring), and not a result of Israel's retaliatory conduct.

75.   Thus, Israel's conduct as a sovereign nation did not trigger Exclusion 1 for "war" or Exclusion 2 for "warlike action by a military force."

76.   Plaintiffs were entitled to coverage of the *Dig* claim under the Policy.

77.   Atlantic's denial of coverage of the *Dig* claim breached the Policy.

**Defendant's Position:** It is Defendant's position that it must prove with evidence all of its factual assertions including those set forth in the Ninth Circuit's decision or this Court's orders. <u>Defendant</u> believes neither this Court's *initial* order nor the Ninth Circuit's appellate order directly addressed the applicability of Exclusions #3 and #4. "Insurrection," "rebellion" and "revolution" are by definition different than "war" and, because the Ninth Circuit holding is law of the case, then the Ninth Circuit's interpretation of the dual sovereignty requirements necessary to constitute a "war" directly implicate what actually happened in Israel in 2014 – an "insurrection, rebellion and revolution," and the "action taken by a governmental authority [Israel] in hindering or defending against any of these." Because Exclusion #3 deals with conditions other than "war," <u>Defendant</u> is not asking for judgment as a

matter of law on this issue at this time but merely for the opportunity to try the issue the factfinder as the Ninth Circuit order allows.

Regardless of whether or not this Court allows the factfinder to consider Exclusion #3 as a factual coverage matter, Defendant has to defend the bad faith allegations against it based on its state of mind when adjusting this claim and its belief of the reasonableness of its reliance on Exclusions #1, #2, #3 and #4 in denying this claim. The fact that two Courts, with ample time and opportunity to consider the complex coverage issues, reached different conclusions regarding Exclusions #1 and #2 make it certain as a matter of law that Defendant's position was at least reasonable and a judgment as a matter of law in favor of Defendant finding it did not breach the duty of good faith would be proper. Defendant requested in the parties' Joint Submission of remaining issues of fact and law to re-urge its motion for summary judgment as to the duty of good faith and regarding the applicability of Exclusions #3 or #4. The Court denied Defendant's request and entered its most recent ruling that Exclusions #3 and #4 did not preclude coverage.

Defendant believes there are issues of fact that preclude summary judgment under the law of the case as stated in the decision by the Ninth Circuit regarding Exclusion #3 and Exclusion #4 and, as such, Defendant respectfully asks for the ability to try to the factfinder the factual coverage issues regarding Exclusion #3 and #4 as allowed by the holding of the Ninth Circuit and Defendant also seeks judgment as a matter of law regarding  Plaintiffs' claim it breached the duty of good faith because, as a matter of law, Defendant was reasonable in its reliance on Exclusions #1, #2, #3 and #4 in denying Plaintiffs' claim and also because a *bona fide* controversy existed regarding the legal meaning of these exclusions until the Ninth Circuit for the first time gave meaning in this Circuit to Exclusions #1 and #2 in an insurance claim of this type.

## 7.      CLAIMS AND DEFENSES PRESENTED AT TRIAL

On November 30, 2019, the Court entered an order (Dkt. No. 157) ruling that Defendant's denial of insurance coverage for Plaintiffs' Extra Expense claim is not supported by any of the four "war risk" policy exclusions on which Defendant relies:

1.      War, including undeclared or civil war;

2.      Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents.

3.      Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

4.      Any weapon of war including atomic fission or radioactive force, whether in time of peace or war.

The Court set the case for trial on two issues:  (1) damages and (2) breach of the implied covenant of good faith and fair dealing.

On cross-motions for summary judgment, the Court initially, by order dated October 6, 2017 (Dkt. No. 128), entered judgment in favor of Defendant, holding that (1) Exclusion #1 and Exclusion #2 barred coverage for Plaintiffs' Extra Expense claim and (2) Defendant did not breach the implied obligation of good faith and fair dealing as a matter of law. The Court did not initially rule on the applicability of Exclusions #3 and #4.

On appeal by Plaintiffs, the Ninth Circuit Court of Appeals reversed, "hold[ing] that Atlantic breached its contract when it denied coverage by defining Hamas' conduct as 'war' and 'warlike action by a military force.'" *Universal Cable Prods., LLC v. Atlantic Specialty Ins. Co.*, 929 F.3d 1143, 1162 (9th Cir. 2019) The Ninth

Circuit therefore (1) "reverse[d] . . . entry of summary judgment in favor of Atlantic on the first and second war exclusions,"; (2) "direct[ed] the entry of summary judgment in favor of Universal on the first and second war exclusions; (3) "remand[ed] for the district court to address" exclusion 3 "in the first instance"; and (4) "vacat[ed] the grant of summary judgment on Universal's bad faith claim and remand[ed] for proceedings consistent with this opinion." *Id.*

This Court then entered an order (Dkt. No. 157) denying the parties' joint request for further briefing, finding that Exclusion #3 and Exclusion #4 do not bar coverage for Plaintiffs' Extra Expense claim, and setting the case for trial on February 18, 2020, on the issues of damages and bad faith.

**Plaintiffs:**

(a)    Plaintiffs plan to pursue the following claims against Defendant:

Claim 1:  Plaintiffs seek damages for Defendant's breach of the insurance contract ("Policy") with Plaintiffs as found by the Court.

Claim 2:  Plaintiffs claim Defendant breached the implied covenant of good faith and fair dealing in failing to properly investigate Plaintiffs' *Dig* claim and in denying coverage of Plaintiffs' *Dig* claim under the Policy, and seek compensatory and punitive damages.

(b)    The elements required to establish plaintiff's claims are:

Claim 1:  The elements required to establish breach of a duty to pay a covered loss under an insurance policy are:

      (i)    That Plaintiffs suffered a loss, all or part of which was covered under an insurance policy with Defendant;

(ii)    that Defendant was notified of the loss as required by the

policy; and

(iii)    the amount of the covered loss that Defendant failed to pay.

*See* CACI 2300 Breach of Contractual Duty to Pay a Covered Claim—

Essential Factual Elements.

Plaintiffs' position is that in light of the Court's order, only element (iii)

remains to be tried.

The Policy defines "loss" as follows:

## IX.    DEFINITION OF LOSS

The amount of your loss will be determined based on:

1.    All necessary "Insurable Production Cost" you

incur to complete the "Insured Production" that

exceeds the amount of "Insurable Production Cost"

you would have incurred if the covered cause of

loss had not occurred.

2.    All other necessary expenses that reduce the

amount of loss otherwise payable.

3.    Your loss will not include loss of earnings of profit.

4.    If you abandon an "Insured Production" that has

been made substantially valueless solely because

one of more coverage causes of loss reasonably,

practically and necessarily prevents you from

completing the "Insured Production", irrespective

of any completion or delivery date requirements for

the "Insured Production", we will pay as loss the

total "Insurable Production Cost" you have incurred

for the "Insured Production".

The Policy defines "Insurable Production Cost" as follows:

## II.     SPECIAL CONDITIONS

\*     \*     \*

### A.     DEFINITIONS

\*     \*     \*

4.     "Insurable Production Cost" includes:  all costs,

including overhead and interest on loans chargeable

directly to an "Insured Production" or series of

productions.  Insurable Production Cost also

includes any amount of overhead only when

declared at the time you declare an "Insured

Production" or series of productions.  The

following costs shall not be included in "Insurable

Production Cost":

(a)     Royalties Term Deals for Executive Producer(s),

Package Fee & Publicity, residuals, premiums paid

for this insurance, and personal property taxes;

(b)     Story, scenario, music rights, and sound rights,

except with respect to television series, specials and

pilots; and

(c)     "Continuity", except when a period of suspension

due to covered loss or damage exceeds ninety (90)

days.

(d)     Any other costs specifically stated not to be

"Insurable Production Costs" in an endorsement to this policy.

Nevertheless, you have the option to include these excluded costs at the time you declare an "Insured Production" or series of productions.  In that case, such costs will be included in the "Insurable Production Cost", and

The amount of any loss or damage paid under this Policy.

Claim 2:  Plaintiffs claim that Defendant breached the implied covenant of good faith and fair dealing ("bad faith"). Plaintiffs may establish bad faith by establishing either that (1) Defendant breached the obligation of good faith and fair dealing by failing to pay benefits due under the insurance policy ("Theory 1") or (2) Defendant acted unreasonably by failing to conduct a proper investigation of Plaintiffs' claim ("Theory 2"). Under either theory, Plaintiffs claim that Defendant acted with malice, oppression, or fraud giving rise to punitive damages.

Under Theory 1, Plaintiffs must prove all of the following:

      (i)     That Plaintiffs suffered a loss covered under an insurance policy with Defendant;

      (ii)    That Defendant was notified of the loss;

      (iii)   That Defendant unreasonably failed to pay Policy benefits;

      (iv)   That Plaintiffs were harmed;

      (v)    That Defendant's failure to pay Policy benefits was a substantial factor in causing Plaintiffs' harm; and

      (vi)   The amount of damages caused by Defendant.

To act or fail to act "unreasonably" means that the insurer had no proper cause for its conduct. In determining whether Defendant acted unreasonably, the jury should consider only the information that Defendant knew or reasonably should have known at the time when it failed to pay Policy benefits.

*See* CACI 2331 Breach of the Implied Obligation of Good Faith and Fair Dealing—Failure or Delay in Payment (First Party)—Essential Factual Elements; CACI 2350 Damages for Bad Faith;

Under <u>Theory 2</u>, Plaintiffs must prove all of the following:

      (i)     That Plaintiffs suffered a loss under an insurance policy issued by Defendant;

      (ii)    That Plaintiffs properly presented a claim to Defendant to be compensated for the loss;

      (iii)   That Defendant failed to conduct a full, fair, prompt, and thorough investigation of all of the bases of Plaintiffs' claim;

      (iv)   That Plaintiffs were harmed;

      (v)    That Defendant's failure to properly investigate the claim was a substantial factor in causing Plaintiffs' harm; and

      (vi)   The amount of damages caused by Defendant.

When investigating Plaintiffs' claim, Defendant had a duty to diligently search for an consider evidence that supported coverage of the claimed loss.

*See* CACI 2331 Breach of the Implied Obligation of Good Faith and Fair Dealing—Failure or Delay in Payment (First Party)—Essential Factual Elements; CACI 2350 Damages for Bad Faith.

Defendant's position is that the jury should also be instructed that an insurance company is privileged to pursue its own economic interests and to assert in a permissible way its legal rights and communicate its legal position in good faith even if doing so will cause emotional distress.  An insurer denying or delaying benefits due to the existence of a genuine dispute with its insured about the existence of coverage liability or the amount of the coverage claim is not liable in bad faith even though it might be liable for breach of contract.  The genuine dispute doctrine does not diminish an insurer's obligation to investigate, process and evaluate the insured's claim thoroughly and fairly.  A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. To be privileged, the assertion of legal rights must be limited to circumstances in which the person has a good faith belief in the existence of the right asserted and the assertion must be done in a permissible, non-outrageous manner. *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713 (2007).  Defendant's position is that this instruction is necessary to properly and completely instruct the jury regarding California law on the elements of of the Implied Obligation of Good Faith and Fair Dealing.

Plaintiffs' position is that (1) this instruction is an improper deviation from the CACI pattern instructions and (2) the genuine dispute doctrine is an affirmative defense and not a required element of Plaintiff's claim.

1

2

3     Plaintiffs seek attorney's fees as damages (*i.e.*, *Brandt* fees). To recover

4     attorney's fees, Plaintiffs must prove that because of Defendant's breach

5     of the obligation of good faith and fair dealing it was reasonably

6     necessary for Plaintiffs to hire an attorney to recover the policy benefits.

7     Plaintiffs may recover attorney's fees it incurred to obtain policy

8     benefits, but not attorney's fees it incurred for other purposes.

9     *See* CACI 2350.

10

11    Plaintiffs also seek punitive damages. To prove that Defendant's

12    conduct justifies an award of punitive damages, Plaintiffs must prove

13    that Defendant engaged in that conduct with malice, oppression, or

14    fraud. To do this, Plaintiffs must prove one of the following by clear

15    and convincing evidence:

16

17    (i)     That the conduct constituting malice, oppression, or fraud

18            was committed by one or more officers, directors, or

19            managing agents of Defendant, who acted on behalf of

20            Defendant; or

21    (ii)    That the conduct constituting malice, oppression, or fraud

22            was authorized by one or more officers, directors, or

23            managing agents of Defendant; or

24    (iii)   That one or more officers, directors, or managing agents

25            of Defendant knew of the conduct constituting malice,

26            oppression, or fraud and adopted or approved that conduct

27            after it occurred.

28

"Malice" means that Defendant acted with intent to cause injury or that Defendant's conduct was despicable and was done with a willful and knowing disregard of the rights or safety of another. A person acts with knowing disregard when he or she is aware of the probable dangerous consequences of his or her conduct and deliberately fails to avoid those consequences.

"Oppression" means that Defendant's conduct was despicable and subjected Plaintiffs to cruel and unjust hardship in knowing disregard of their rights.

"Despicable conduct" is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people.

"Fraud" means that Defendant intentionally misrepresented or concealed a material fact and did so intending to harm Plaintiffs.

An employee is a "managing agent" if he or she exercises substantial independent authority and judgment in his or her corporate decisionmaking such that his or her decisions ultimately determine corporate policy.

*See* CACI 3945 Punitive Damages—Entity Defendant—Trial Not Bifurcated.

(c)    In brief, the key evidence Plaintiffs rely on for each of the claims is:

Claim 1 (Breach of Insurance Contract):  Elements (i) ("That Plaintiff suffered a loss, all or part of which was covered under an insurance

policy with Defendant") and (ii) ("that Defendant was notified of the loss as required by the policy") have already been decided in Plaintiffs' favor by the Ninth Circuit and this Court and are therefore law of the case, requiring no further proof at trial.

For element (iii) ("the amount of the covered loss that Defendant failed to pay"), Plaintiffs will rely on (1) the testimony of their damages expert Robert W. Wunderlich, Ph.D.; (2) the testimony of either Randi Richmond or BJ Markus (Plaintiffs' employees with knowledge of Plaintiffs' extra expenses); and (3) documents reflecting their covered losses including the Full Cost Bible for the *Dig* production, potentially invoices or other ledgers evidencing such costs, and the Policy language regarding the "Insuring Agreement" for "Extra Expense," the definition of "Loss," and the definition of "Insurable Production Cost." Plaintiffs may also rely on videotaped deposition testimony from Defendant's former damages expert, Jay Shapiro.

Claim 2 (Breach of Implied Covenant of Good Faith and Fair Dealing): With respect to Theory 1 of bad faith, element (i) ("That Plaintiffs suffered a loss covered under an insurance policy with Defendant") and element (ii) ("That Defendant was notified of the loss) have been decided in Plaintiffs' favor by the Ninth Circuit and this Court, those decisions are law of the case, and these elements require no further proof at trial.

Similarly, with respect to Theory 2 of bad faith, element (i) ("That Plaintiffs suffered a loss under an insurance Policy issued by Defendant") and (ii) ("That Plaintiffs properly presented a claim to

Defendant to be compensated for the loss") have been decided in Plaintiffs' favor by the Ninth Circuit and this Court, those decisions are law of the case, and these elements require no further proof at trial.

To prove the remaining elements of their claim that Defendant breached the implied covenant of good faith and fair dealing and did so with malice, oppression, or fraud, Plaintiffs intend to rely primarily on the following evidence: (1) the testimony of Plaintiffs' insurance industry expert Ty Sagalow; (2) the testimony of Defendant's employees (current or former) with knowledge of the Policy and the handling of the *Dig* claim, including Teresa Gooley, Daniel Gutterman, Pamela Johnson, Peter Williams, and Dennis Crosby; (3) the testimony of either Randi Richmond or BJ Markus (Plaintiffs' employees with knowledge of the *Dig* claim); (4) the testimony of Susan Weiss, Plaintiffs' insurance broker with knowledge of the Policy and the *Dig* claim.

Plaintiffs also intend to rely on documentary evidence regarding Defendant's handling of the *Dig* claim including (1) documents showing a terrorism exclusion was deleted from the draft Policy and that Defendant knowingly decided not to add a terrorism exclusion or charge extra premiums when adding *Dig* to the Policy; (2) e-mails regarding Defendant's handling of the *Dig* claim; (3) Defendant's claim file for the *Dig* claim; (4) Defendant's policies and manuals regarding claims handling; and (5) Defendant's letters explaining the bases for its denial of coverage of the *Dig* claim.

Plaintiffs also intend to request that the Court take judicial notice of the factual and legal conclusions reflected in the Ninth Circuit's decision and this Court's subsequent November 30, 2019 order, which make clear (1) the meaning of the "War Exclusions" and (2) the reasons why none of the War Exclusions applies (including, but not limited to, the fact that the special meaning of such Exclusions governs, that Exclusions 1 and 2 require actions by a sovereign, and that Hamas is not a sovereign). *See Universal Cable Prods., LLC v. Atlantic Specialty Ins. Co.*, 929 F.3d 1143 (9th Cir. 2019), Dkt. 157 (Nov. 30, 2019 Order).

To prove their damages resulting from Defendant's bad faith, Plaintiffs intend to rely on the testimony of (1) Plaintiffs' damages expert Robert W. Wunderlich, Ph.D.; (2) the testimony of either Randi Richmond or BJ Markus (Plaintiffs' employees); and (3) Plaintiffs' former counsel Lucia Coyoca regarding Plaintiffs' attorneys' fees and costs. Plaintiffs also intend to rely on documents evidencing Plaintiffs' attorneys' fees and costs, including redacted invoices and fee agreement(s).

Plaintiffs also intend to rely on the following additional evidence demonstrating that Defendant's conduct justifies an award of punitive damages: (1) evidence regarding Defendant's pattern or practice of denying valid claims in bad faith, including the decision in *OneBeacon Ins. Co. v. T Wade Welch & Assocs.*, 841 F.3d 669 (5th Cir. 2016); (2) evidence regarding Defendant's financial condition, including annual reports; (3) evidence regarding Defendant's financial motive for denying the *Dig* claim, including documents produced by Defendant

showing that it exited this line of insurance underwriting because it
was unprofitable and because "Profitability is the Goal!"

Plaintiffs reserve the right to present additional evidence included on
their exhibit list, deposition designations, and witness lists, to rebut
any evidence presented by Defendant or based on the outcome of the
Court's rulings on motions in limine or any other pre-trial matter.

**Defendant:**

(a)     Defendant plans to pursue the following counterclaims and affirmative
defenses:

**1.     Failure to Mitigate**

General Condition I(2) of the Policy provides that the insureds
are required to: Minimize Loss or Damage – Take all reasonable
steps to protect the property from further damage and minimize
the loss. Keep a record of your expenses in doing so for
consideration in the settlement of the claim. This will not
increase the limit of insurance.  To the extent Plaintiffs failed to
take all reasonable steps to minimize their loss, or to keep a
record of their expenses in doing so, their claims are barred from
coverage by General Condition I(2) of the Policy, and by the
common law.

**2.     Violation of Constitution**

Plaintiffs' claim for exemplary and punitive damages violates
the Constitution of the United States of America and the
applicable State Constitution or Constitutions.

### 3.   Policy Exclusion 1, General Conditions

Exclusion 1 of the General Conditions section of the Policy provides that "the Policy does not insure against loss or damage caused directly or indirectly by: . . . 1. War, including undeclared or civil war; . . . ."

Defendant contends that Plaintiffs' claims are barred by Exclusion 1 of the General Conditions section of the Policy. The Ninth Circuit Court of Appeals has determined this Exclusion does not preclude coverage.  However, Defendant relied on this exclusion as it was part of its coverage investigation, analysis, and decision.  Defendant's reliance on Exclusion 1 and the courts' handling of this exclusion goes to Defendant's state of mind when denying coverage and the reasonableness of Defendant's conduct under Plaintiffs' bad faith claim.

This exclusion is relevant to Defendant's defense to the bad faith claim to demonstrate Defendant's state of mind and the reasonableness of its decision in denying coverage.

### 4.   Policy Exclusion 2, General Conditions

Exclusion 2 of the General Conditions section of the Policy provides that the "Policy does not insure against loss or damage caused directly or indirectly by: . . . 2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents."

Defendant contends that Plaintiffs' claims are barred by Exclusion 2 of the General Conditions.  The Ninth Circuit Court of Appeals has determined this Exclusion does not preclude coverage.  However, Defendant relied on this exclusion as it was part of its coverage investigation, analysis, and decision. Defendant's reliance on Exclusion 2 and the courts' handling of this exclusion goes to Defendant's state of mind when denying coverage and the reasonableness of Defendant's conduct under Plaintiffs' bad faith claim.

This exclusion is relevant to Defendant's defense to the bad faith claim to demonstrate Defendant's state of mind and the reasonableness of its decision in denying coverage.

5. **Policy Exclusion 3, General Conditions**

Exclusion 3 of the General Conditions section of the Policy provides that the "Policy does not insure against loss or damage caused directly or indirectly by:  . . . 3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."

Plaintiffs' claims are barred by Exclusion 3 of the General Conditions section of the Policy.  This Court has determined this Exclusion does not preclude coverage.  However, Defendant

relied on it as it was part of its coverage investigation, analysis,
and decision and contends there are disputed issues of fact to be
resolved by the jury.  Defendant relied on this exclusion as it
was part of its coverage investigation, analysis, and decision.
Defendant's reliance on Exclusion 3 and the courts' handling of
this exclusion goes to Defendant's state of mind when denying
coverage and the reasonableness of Defendant's conduct under
Plaintiffs' bad faith claim.

This exclusion is relevant to Defendant's defense to the bad
faith claim to demonstrate Defendant's state of mind and the
reasonableness of its decision in denying coverage.

6.      **Policy Exclusion 4, General Conditions**

Exclusion 4 of the General Conditions section of the Policy
provides that the "Policy does not insure against loss or damage
caused directly or indirectly by: . . . 4. Any weapon of war
including atomic fission or radioactive force, whether in time of
peace or war.

Defendant contends that Plaintiffs' claims are barred by
Exclusion 4 of the General Conditions section of the Policy.
This Court has determined this Exclusion does not preclude
coverage.

However, Defendant relied on it as it was part of its coverage
investigation, analysis, and decision and contends there are
disputed fact issues regarding Policy Exclusion 4 that must be

1    resolved by a jury.

2

3         Defendant relied on this exclusion as it was part of its coverage

4    investigation, analysis, and decision.  Defendant's reliance on

5    Exclusion 4 and the courts' handling of this exclusion goes to

6    Defendant's state of mind when denying coverage and the

7    reasonableness of Defendant's conduct under Plaintiffs' bad

8    faith claim.

9

10        This exclusion is relevant to Defendant's defense to the bad

11   faith claim to demonstrate Defendant's state of mind and the

12   reasonableness of its decision in denying coverage.

13

14   **Plaintiffs contend** that Defendant is not entitled to try its affirmative

15   defenses of failure to mitigate or policy exclusions to the jury because

16   (1) the Court has already granted summary judgment for Plaintiffs on

17   liability, concluding that Defendant breached the Policy in denying

18   Plaintiffs' covered claim; and (2) the Court explicitly concluded that

19   Exclusions 1-4 did not apply. *Universal Cable Prods., LLC v. Atlantic

20   Specialty Ins. Co.*, 929 F.3d 1143 (9th Cir. 2019), Dkt. 157 (Nov. 30,

21   2019 Order). This Court's findings at summary judgment are law of the

22   case and Defendant is not entitled to re-litigate its defenses to the jury.

23   To the extent that Defendant failed to raise affirmative defenses to

24   liability at summary judgment (such as failure to mitigate), any such

25   defense has been abandoned and also may not be tried to the jury. *See,

26   e.g.*, *Kaffaga v. Steinbeck*, 2017 WL 5989039, at *1 (C.D. Cal. Aug. 25,

27   2017) ("Affirmative defenses not raised in opposition to a motion for

28   partial summary judgment as to liability are deemed waived.")

(citing *United Mine Workers of America 1974 Pension v. Pittson Co.*, 984 F.2d 469, 478 (D.C. Cir. 1993)); *Duarte Nursery, Inc. v. United States Army Corps of Engineers*, 2017 WL 3453206, at *3 (E.D. Cal. Aug. 11, 2017) (same).

**Defendant** **contends** neither this Court's *initial* order nor the Ninth Circuit's appellate order directly addressed the applicability of Exclusions #3 and #4.  "Insurrection," "rebellion" and "revolution" are by definition different than "war" and, because the Ninth Circuit holding is law of the case, then the Ninth Circuit's interpretation of the dual sovereignty requirements necessary to constitute a "war" directly implicate what actually happened in Israel in 2014 – an "insurrection, rebellion and revolution," and the "action taken by a governmental authority [Israel] in hindering or defending against any of these." Because Exclusion #3 deals with conditions other than "war," <u>Defendant</u> is not asking for judgment as a matter of law on this issue at this time but merely for the opportunity to try the issue the factfinder as the Ninth Circuit order allows.

Regardless of whether or not this Court allows the factfinder to consider Exclusion #3 as a factual coverage matter, <u>Defendant</u> has to defend the bad faith allegations against it based on its state of mind when adjusting this claim and its belief of the reasonableness of its reliance on Exclusions #1, #2, #3 and #4 in denying this claim.  The fact that two Courts, with ample time and opportunity to consider the complex coverage issues, reached different conclusions regarding Exclusions #1 and #2 make it certain as a matter of law that <u>Defendant</u>'s position was at least reasonable and a judgment as a matter of law in favor of <u>Defendant</u> finding it did not breach the duty of good faith would be

proper.  <u>Defendant</u> requested in the parties' Joint Submission of remaining issues of fact and law to re-urge its motion for summary judgment as to the duty of good faith <u>and</u> regarding the applicability of Exclusions #3 or #4.  The Court denied <u>Defendant</u>'s request and entered its most recent ruling that Exclusions #3 and #4 did not preclude coverage.

<u>Defendant</u> believes there are issues of fact that preclude summary judgment under the law of the case as stated in the decision by the Ninth Circuit regarding  Exclusion #3 and Exclusion #4 and, as such, <u>Defendant</u> respectfully asks for the ability to try to the factfinder the factual coverage issues regarding Exclusion #3 and #4 as allowed by the holding of the Ninth Circuit and <u>Defendant</u> also seeks judgment as a matter of law regarding  Plaintiffs' claim it breached the duty of good faith because, as a matter of law, <u>Defendant</u> was reasonable in its reliance on Exclusions #1, #2, #3 and #4 in denying Plaintiffs' claim and also because a *bona fide* controversy existed regarding the legal meaning of these exclusions until the Ninth Circuit for the first time gave meaning in this Circuit to Exclusions #1 and #2 in an insurance claim of this type

(b)   Defendant contends that the elements required to establish Defendant's counterclaims and affirmative defenses are:

### 1.    <u>**Failure to Mitigate**</u>

If Defendant breached the contract and the breach caused harm, Plaintiffs are not entitled to recover damages for harm that Defendant proves Plaintiffs could have avoided with reasonable efforts or expenditures. Plaintiffs were also required to keep a

record of their expenses. The jury should consider the reasonableness of Plaintiffs' efforts considering the circumstances facing it at the time, including its ability to make the efforts or expenditures without undue risk of hardship.

If Plaintiffs made reasonable efforts to avoid harm, then the jury award should include reasonable amounts that it spent for this purpose.

*See* CACI 358.

### 2. <u>Violation of Constitution</u>

To establish this defense, Defendant must prove that Plaintiffs' claim for punitive damages exceeds the amount allowed under either the Constitution of the United States or the Constitution of the Constitution of the State of California. To succeed, Defendant must prove that either the Constitution of the United States or the Constitution of the State of California impose limits on the amount of punitive damages Plaintiffs may recover, and that Plaintiffs' claim for punitive damages exceeds those limits.

*See* CACI 2303.

### 3. <u>Policy Exclusion 1, General Conditions</u>

In every insurance policy there is an implied obligation of good faith and fair dealing that neither the insurance company nor the insured will do anything to injure the right of the other party to receive the benefits of the agreement.  To fulfill its implied obligation of good faith and fair dealing, an insurance company

must give at least as much consideration to the interests of the
insured as it gives to its own interests.  To breach the implied
obligation of good faith and fair dealing, an insurance company
must unreasonably act or fail to act in a manner that deprives the
insured of the benefits of the policy. To act unreasonably is not a
mere failure to exercise reasonable care. It means that the
insurer must act or fail to act without proper cause. However, it
is not necessary for the insurer to intend to deprive the insured
of the benefits of the policy.  An insurance company is
privileged to pursue its own economic interests and to assert in a
permissible way its legal rights and communicate its legal
position in good faith even if doing so will cause emotional
distress.  An insurer denying or delaying benefits due to the
existence of a genuine dispute with its insured about the
existence of coverage liability or the amount of the coverage
claim is not liable in bad faith even though it might be liable for
breach of contract.  The genuine dispute doctrine does not
diminish an insurer's obligation to investigate, process and
evaluate the insured's claim thoroughly and fairly.  A genuine
dispute exists only where the insurer's position is maintained in
good faith and on reasonable grounds. To be privileged, the
assertion of legal rights must be limited to circumstances in
which the person has a good faith belief in the existence of the
right asserted and the assertion must be done in a permissible,
non-outrageous manner.

*See* CACI 2330; Wilson v. 21st Century Ins. Co., 42 Cal. 4th
713 (2007).

### 4.   Policy Exclusion 2, General Conditions

In every insurance policy there is an implied obligation of good faith and fair dealing that neither the insurance company nor the insured will do anything to injure the right of the other party to receive the benefits of the agreement.  To fulfill its implied obligation of good faith and fair dealing, an insurance company must give at least as much consideration to the interests of the insured as it gives to its own interests.  To breach the implied obligation of good faith and fair dealing, an insurance company must unreasonably act or fail to act in a manner that deprives the insured of the benefits of the policy. To act unreasonably is not a mere failure to exercise reasonable care. It means that the insurer must act or fail to act without proper cause. However, it is not necessary for the insurer to intend to deprive the insured of the benefits of the policy.  An insurance company is privileged to pursue its own economic interests and to assert in a permissible way its legal rights and communicate its legal position in good faith even if doing so will cause emotional distress.  An insurer denying or delaying benefits due to the existence of a genuine dispute with its insured about the existence of coverage liability or the amount of the coverage claim is not liable in bad faith even though it might be liable for breach of contract.  The genuine dispute doctrine does not diminish an insurer's obligation to investigate, process and evaluate the insured's claim thoroughly and fairly.  A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. To be privileged, the assertion of legal rights must be limited to circumstances in

which the person has a good faith belief in the existence of the
right asserted and the assertion must be done in a permissible,
non-outrageous manner.

*See* CACI 2330; Wilson v. 21st Century Ins. Co., 42 Cal. 4th
713 (2007).

5.   **Policy Exclusion 3, General Conditions**

In every insurance policy there is an implied obligation of good
faith and fair dealing that neither the insurance company nor the
insured will do anything to injure the right of the other party to
receive the benefits of the agreement.  To fulfill its implied
obligation of good faith and fair dealing, an insurance company
must give at least as much consideration to the interests of the
insured as it gives to its own interests.  To breach the implied
obligation of good faith and fair dealing, an insurance company
must unreasonably act or fail to act in a manner that deprives the
insured of the benefits of the policy. To act unreasonably is not a
mere failure to exercise reasonable care. It means that the
insurer must act or fail to act without proper cause. However, it
is not necessary for the insurer to intend to deprive the insured
of the benefits of the policy.  An insurance company is
privileged to pursue its own economic interests and to assert in a
permissible way its legal rights and communicate its legal
position in good faith even if doing so will cause emotional
distress.  An insurer denying or delaying benefits due to the
existence of a genuine dispute with its insured about the
existence of coverage liability or the amount of the coverage
claim is not liable in bad faith even though it might be liable for

breach of contract. The genuine dispute doctrine does not diminish an insurer's obligation to investigate, process and evaluate the insured's claim thoroughly and fairly. A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. To be privileged, the assertion of legal rights must be limited to circumstances in which the person has a good faith belief in the existence of the right asserted and the assertion must be done in a permissible, non-outrageous manner.

*See* CACI 2330; Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713 (2007).

6. **Policy Exclusion 4, General Conditions**

In every insurance policy there is an implied obligation of good faith and fair dealing that neither the insurance company nor the insured will do anything to injure the right of the other party to receive the benefits of the agreement. To fulfill its implied obligation of good faith and fair dealing, an insurance company must give at least as much consideration to the interests of the insured as it gives to its own interests. To breach the implied obligation of good faith and fair dealing, an insurance company must unreasonably act or fail to act in a manner that deprives the insured of the benefits of the policy. To act unreasonably is not a mere failure to exercise reasonable care. It means that the insurer must act or fail to act without proper cause. However, it is not necessary for the insurer to intend to deprive the insured of the benefits of the policy. An insurance company is privileged to pursue its own economic interests and to assert in a

permissible way its legal rights and communicate its legal position in good faith even if doing so will cause emotional distress.  An insurer denying or delaying benefits due to the existence of a genuine dispute with its insured about the existence of coverage liability or the amount of the coverage claim is not liable in bad faith even though it might be liable for breach of contract.  The genuine dispute doctrine does not diminish an insurer's obligation to investigate, process and evaluate the insured's claim thoroughly and fairly.  A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. To be privileged, the assertion of legal rights must be limited to circumstances in which the person has a good faith belief in the existence of the right asserted and the assertion must be done in a permissible, non-outrageous manner.

*See* CACI 2330; Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713 (2007).

**Plaintiffs contend** that Defendant is not entitled to try its affirmative defenses of failure to mitigate or policy exclusions to the jury because (1) the Court has already granted summary judgment for Plaintiffs on liability, concluding that Defendant breached the Policy in denying Plaintiffs' covered claim; and (2) the Court explicitly concluded that Exclusions 1-4 did not apply. *Universal Cable Prods., LLC v. Atlantic Specialty Ins. Co.*, 929 F.3d 1143 (9th Cir. 2019), Dkt. 157 (Nov. 30, 2019 Order). This Court's findings at summary judgment are law of the case and Defendant is not entitled to re-litigate its defenses to the jury. To the extent that Defendant failed to raise affirmative defenses to

liability at summary judgment (such as failure to mitigate), any such defense has been abandoned and also may not be tried to the jury. *See, e.g.*, *Kaffaga v. Steinbeck*, 2017 WL 5989039, at *1 (C.D. Cal. Aug. 25, 2017) ("Affirmative defenses not raised in opposition to a motion for partial summary judgment as to liability are deemed waived.") (citing *United Mine Workers of America 1974 Pension v. Pittson Co.*, 984 F.2d 469, 478 (D.C. Cir. 1993)); *Duarte Nursery, Inc. v. United States Army Corps of Engineers*, 2017 WL 3453206, at *3 (E.D. Cal. Aug. 11, 2017) (same).

**Defendant contends** neither this Court's *initial* order nor the Ninth Circuit's appellate order directly addressed the applicability of Exclusions #3 and #4.  "Insurrection," "rebellion" and "revolution" are by definition different than "war" and, because the Ninth Circuit holding is law of the case, then the Ninth Circuit's interpretation of the dual sovereignty requirements necessary to constitute a "war" directly implicate what actually happened in Israel in 2014 – an "insurrection, rebellion and revolution," and the "action taken by a governmental authority [Israel] in hindering or defending against any of these." Because Exclusion #3 deals with conditions other than "war," Defendant is not asking for judgment as a matter of law on this issue at this time but merely for the opportunity to try the issue the factfinder as the Ninth Circuit order allows.

Regardless of whether or not this Court allows the factfinder to consider Exclusion #3 as a factual coverage matter, Defendant has to defend the bad faith allegations against it based on its state of mind when adjusting this claim and its belief of the reasonableness of its reliance on

Exclusions #1, #2, #3 and #4 in denying this claim. The fact that two Courts, with ample time and opportunity to consider the complex coverage issues, reached different conclusions regarding Exclusions #1 and #2 make it certain as a matter of law that <u>Defendant</u>'s position was at least reasonable and a judgment as a matter of law in favor of <u>Defendant</u> finding it did not breach the duty of good faith would be proper. <u>Defendant</u> requested in the parties' Joint Submission of remaining issues of fact and law to re-urge its motion for summary judgment as to the duty of good faith <u>and</u> regarding the applicability of Exclusions #3 or #4. The Court denied <u>Defendant</u>'s request and entered its most recent ruling that Exclusions #3 and #4 did not preclude coverage.

<u>Defendant</u> believes there are issues of fact that preclude summary judgment under the law of the case as stated in the decision by the Ninth Circuit regarding  Exclusion #3 and Exclusion #4 and, as such, <u>Defendant</u> respectfully asks for the ability to try to the factfinder the factual coverage issues regarding Exclusion #3 and #4 as allowed by the holding of the Ninth Circuit and <u>Defendant</u> also seeks judgment as a matter of law regarding  Plaintiffs' claim it breached the duty of good faith because, as a matter of law, <u>Defendant</u> was reasonable in its reliance on Exclusions #1, #2, #3 and #4 in denying Plaintiffs' claim and also because a *bona fide* controversy existed regarding the legal meaning of these exclusions until the Ninth Circuit for the first time gave meaning in this Circuit to Exclusions #1 and #2 in an insurance claim of this type

(c)    In brief, the key evidence Defendant relies on for each counterclaim and affirmative is:

**1.     Failure to Mitigate**

Damage analysis of  now-deceased expert Jay Shapiro and/or its new expert, Shannon Rusnak, if the Court allows designation. Much of the damage claimed is improperly characterized as an extra expense attributable to the move out of Israel.  Evidence of failure to mitigate will also come from Plaintiffs' witnesses, including BJ Markus who purportedly allocated expenses between shooting locations.

**2.     Violation of Constitution**

"The constitutionality of the [punitive damages] award presents a question of law."  *Williams v. ConAgra Poultry Co.* (8th Cir. 2004) 378 F.3d 790, 796.  In other words, the constitutionality about the amount of the punitive damages awarded is a question for this Court to resolve as a matter of law, and not a question for the jury.

An award of punitive damages would violate the Due Process Clause of the Fifth and Fourteenth Amendments and the prohibition against the imposition of excessive fines contained in the Eighth Amendment to the United States Constitution and the corresponding provisions of the California Constitution.

**3.     Policy Exclusion 1, General Conditions**

The Court has ruled this exclusion is not applicable; however, evidence of why Defendant believed it was applicable will be offered through the testimony of its representatives, including Pamela Johnson, Teresa Gooley, Daniel Gutterman, and Aaron

Stone (30(b)(6) witness) who evaluated the facts and applicability of the exclusion, including the documents and information Defendant relied on, including without limitation information received from Plaintiffs, their representatives, and security personnel regarding the conflict and hostilities, as testified to in their depositions and as set forth in Defendant's interrogatory response and summary judgment motion setting forth in detail its investigation.

Pamela Johnson, the Defendant's employee who made the final decision to deny the Plaintiffs' claim studied multiple sources and performed research to gain an understanding of the nature of the conflict in the region. Johnson reviewed news reports from print sources including the Washington Post and the New York Times, news media sources including reports from NBC, MSNBC, and the BBC. Johnson also reviewed case law from various Federal Circuit Courts of Appeals and the Supreme Court which discussed the definition of "war" and previous applications of the war exclusion. Johnson provided many of these sources to other Defendant employees who were also reviewing the Plaintiffs' claim.

Teresa Gooley, the Vice President of Claims at Defendant who supervised Johnson, reviewed the investigation performed by Johnson and she also relied on reports in the media to understand the nature of the conflict in the region. Gooley discussed the application of the war exclusions with Johnson before a final decision was made regarding the Plaintiffs' claim.

Gooley specifically recalls watching news reports from NBC and MSNBC and relying on this information when she discussed the final coverage decision with Johnson.

Danny Gutterman was a claim handler at Defendant and worked directly with Johnson to determine if the war exclusions applied to the Plaintiffs' claim. Gutterman frequently sent the information he was researching to Johnson for her review to aid in the handling of the claim. Gutterman also relied on his prior experience with the entertainment industry to aid in his research of the claim and the research he analysis he provided to Johnson.

Aaron Stone, a Vice President of Defendant, testified as Defendant's 30 (b)(6) representative regarding multiple topics, including Defendant's claim investigation, analysis, and decision.

Defendant will also rely on experts Anthony Clark, Professor Quigley, Dr. Detter de Frankopan, Frank Lowenstein, Jay Shapiro, and, if allowed, expert Shannon Rusnak.

**4.      Policy Exclusion 2, General Conditions**

The Court has ruled this exclusion is not applicable; however, evidence of why Defendant believed it was applicable will be offered through the testimony of its representatives, including Pamela Johnson, Teresa Gooley, Daniel Gutterman, and Aaron

Stone (30(b)(6) witness) who evaluated the facts and applicability of the exclusion, including the documents and information Defendant relied on, including without limitation information received from Plaintiffs, their representatives, and security personnel regarding the conflict and hostilities, as testified to in their depositions and as set forth in Defendant's interrogatory response and summary judgment motion setting forth in detail its investigation.

Pamela Johnson, the Defendant employee who made the final decision to deny the Plaintiffs' claim studied multiple sources and performed research to gain an understanding of the nature of the conflict in the region. Johnson reviewed news reports from print sources including the Washington Post and the New York Times, news media sources including reports from NBC, MSNBC, and the BBC. Johnson also reviewed case law from various Federal Circuit Courts of Appeals and the Supreme Court which discussed the definition of "war" and previous applications of the war exclusion. Johnson provided many of these sources to other Defendant employees who were also reviewing the Plaintiffs' claim.

Teresa Gooley, the Vice President of Claims at Defendant who supervised Johnson, reviewed the investigation performed by Johnson and she also relied on reports in the media to understand the nature of the conflict in the region. Gooley discussed the application of the war exclusions with Johnson before a final decision was made regarding the Plaintiffs' claim.

Gooley specifically recalls watching news reports from NBC and MSNBC and relying on this information when she discussed the final coverage decision with Johnson.

Danny Gutterman was a claim handler at Defendant and worked directly with Johnson to determine if the war exclusions applied to the Plaintiffs' claim. Gutterman frequently sent the information he was researching to Johnson for her review to aid in the handling of the claim. Gutterman also relied on his prior experience with the entertainment industry to aid in his research of the claim and the research he analysis he provided to Johnson.

Aaron Stone another Vice President of Defendant has an understanding of the terms of the war exclusion included in the Plaintiffs' policy and relied on his understanding of the industry and the practices of Defendant to confirm that the war exclusion applied.

Defendant will also rely on experts Anthony Clark, Professor Quigley, Dr. Detter de Frankopan, Frank Lowenstein, Jay Shapiro, and, if allowed, expert Shannon Rusnak.

5.    **Policy Exclusion 3, General Conditions**

The Court has ruled this exclusion is not applicable; however, evidence of why Defendant believed it was applicable will be offered through the testimony of its representatives, including Pamela Johnson, Teresa Gooley, Daniel Gutterman, and Aaron

Stone (30(b)(6) witness) who evaluated the facts and applicability of the exclusion, including the documents and information Defendant relied on, including without limitation information received from Plaintiffs, their representatives, and security personnel regarding the conflict and hostilities, as testified to in their depositions and as set forth in Defendant's interrogatory response and summary judgment motion setting forth in detail its investigation.

Pamela Johnson, the Defendant employee who made the final decision to deny the Plaintiffs' claim studied multiple sources and performed research to gain an understanding of the nature of the conflict in the region. Johnson reviewed news reports from print sources including the Washington Post and the New York Times, news media sources including reports from NBC, MSNBC, and the BBC. Johnson also reviewed case law from various Federal Circuit Courts of Appeals and the Supreme Court which discussed the definition of "war" and previous applications of the war exclusion. Johnson provided many of these sources to other Defendant employees who were also reviewing the Plaintiffs' claim.

Teresa Gooley, the Vice President of Claims at Defendant who supervised Johnson, reviewed the investigation performed by Johnson and she also relied on reports in the media to understand the nature of the conflict in the region. Gooley discussed the application of the war exclusions with Johnson before a final decision was made regarding the Plaintiffs' claim.

1    Gooley specifically recalls watching news reports from NBC
2    and MSNBC and relying on this information when she discussed
3    the final coverage decision with Johnson.

4

5    Danny Gutterman was a claim handler at Defendant and worked
6    directly with Johnson to determine if the war exclusions applied
7    to the Plaintiffs' claim. Gutterman frequently sent the
8    information he was researching to Johnson for her review to aid
9    in the handling of the claim. Gutterman also relied on his prior
10   experience with the entertainment industry to aid in his research
11   of the claim and the research he analysis he provided to
12   Johnson.

13

14   Aaron Stone another Vice President of Defendant has an
15   understanding of the terms of the war exclusion included in the
16   Plaintiffs' policy and relied on his understanding of the industry
17   and the practices of Defendant to confirm that the war exclusion
18   applied.

19

20   Defendant will also rely on experts Anthony Clark, Professor
21   Quigley, Dr. Detter de Frankopan, Frank Lowenstein, Jay
22   Shapiro, and, if allowed, expert Shannon Rusnak.

23

24   Multiple experts have determined that the circumstances in
25   Israel at the time Plaintiffs stopped production of *Dig* in Israel
26   have determined that this was an "insurrection" as that term is
27   used in the Policy.

28

1

2      **6.      <u>Policy Exclusion 4, General Conditions</u>**

3               The Court has ruled this exclusion is not applicable; however,

4      evidence of why Defendant believed it was applicable will be

5      offered through the testimony of its representatives, including

6      Pamela Johnson, Teresa Gooley, Daniel Gutterman, and Aaron

7      Stone (30(b)(6) witness) who evaluated the facts and

8      applicability of the exclusion, including the documents and

9      information Defendant relied on, including without limitation

10     information received from Plaintiffs, their representatives, and

11     security personnel regarding the conflict and hostilities, as

12     testified to in their depositions and as set forth in Defendant's

13     interrogatory response and summary judgment motion setting

14     forth in detail its investigation.

15

16               Pamela Johnson, the Defendant employee who made the final

17     decision to deny the Plaintiffs' claim studied multiple sources

18     and performed research to gain an understanding of the nature of

19     the conflict in the region. Johnson reviewed news reports from

20     print sources including the Washington Post and the New York

21     Times, news media sources including reports from NBC,

22     MSNBC, and the BBC. Johnson also reviewed case law from

23     various Federal Circuit Courts of Appeals and the Supreme

24     Court which discussed the definition of "war" and previous

25     applications of the war exclusion. Johnson provided many of

26     these sources to other Defendant employees who were also

27     reviewing the Plaintiffs' claim.

28

1    Teresa Gooley, the Vice President of Claims at Defendant who
2    supervised Johnson, reviewed the investigation performed by
3    Johnson and she also relied on reports in the media to
4    understand the nature of the conflict in the region. Gooley
5    discussed the application of the war exclusions with Johnson
6    before a final decision was made regarding the Plaintiffs' claim.
7    Gooley specifically recalls watching news reports from NBC
8    and MSNBC and relying on this information when she discussed
9    the final coverage decision with Johnson.

10

11   Danny Gutterman was a claim handler at Defendant and worked
12   directly with Johnson to determine if the war exclusions applied
13   to the Plaintiffs' claim. Gutterman frequently sent the
14   information he was researching to Johnson for her review to aid
15   in the handling of the claim. Gutterman also relied on his prior
16   experience with the entertainment industry to aid in his research
17   of the claim and the research he analysis he provided to
18   Johnson.

19

20   Aaron Stone another Vice President of Defendant has an
21   understanding of the terms of the war exclusion included in the
22   Plaintiffs' policy and relied on his understanding of the industry
23   and the practices of Defendant to confirm that the war exclusion
24   applied.

25

26   Defendant will also rely on experts Anthony Clark, Professor
27   Quigley, Dr. Detter de Frankopan, Frank Lowenstein, Jay
28   Shapiro, and, if allowed, expert Shannon Rusnak.

Multiple experts have determined that the circumstances in Israel at the time Plaintiffs stopped production of *Dig* in Israel have determined that this was an "insurrection" as that term is used in the Policy.

## 8.   ISSUES REMAINING FOR TRIAL

In view of the admitted facts and the elements required to establish the claims, the following issues remain to be tried:

**Claim 1 (Breach of Insurance Contract):**

    1.    The amount of the covered loss that Defendant failed to pay (Claim 1);

    2.    Whether the covered loss was a liquidated claim, meaning certain or capable of being made certain by calculation, such that prejudgment interest is mandatory;

    3.    If not mandatory, whether discretionary prejudgment interest is warranted; and

    4.    The amount of prejudgment interest.

**Claim 2 (Breach of Implied Covenant of Good Faith and Fair Dealing):**

Theory 1 (Failure to Pay Policy Benefits):

    1.    Whether Defendant unreasonably failed to pay Policy benefits;

    2.    Whether Plaintiffs were harmed;

    3.    Whether Defendant's unreasonable failure to pay Policy benefits was a substantial factor in causing Plaintiffs' harm; and

    4.    The amount of Plaintiffs' damages (including attorneys' fees and costs to prove breach of the Policy, and prejudgment

interest)

Theory 2 (Failure to Properly Investigate Claim):

1.  Whether Defendant failed to conduct a full, fair, prompt, and
    thorough investigation of all of the bases of Plaintiffs' claim;

2.  Whether Plaintiffs were harmed;

3.  Whether Defendant's failure to properly investigate the claim
    was a substantial factor in causing Plaintiffs' harm; and

4.  The amount of Plaintiffs' damages (including attorneys' fees
    and costs to prove breach of the Policy, and prejudgment
    interest)

**Punitive Damages**

1.  Whether Defendant engaged in the conduct above with malice,
    oppression or fraud;

2.  Whether the conduct constituting malice, oppression, or fraud
    was committed by, authorized by, or adopted and approved after
    the fact by one or more officers, directors, or managing agents
    of Defendant, who acted on behalf of Defendant; and

3.  The amount of punitive damages.

**9.   DISCOVERY**

All discovery is complete, with the caveat that Defendant is seeking to
substitute a new expert witness. Defendant has filed a motion seeking to substitute a
new damages expert for their former expert Mr. Shapiro, who, sadly, passed away.
*See* Dkt. 161. Should the Court permit Defendant to introduce a new damages report,
Plaintiffs reserve the right to depose any such expert and rebut any such report.

**10.   DISCLOSURES**

Except for Defendant's caveat below,  all disclosures under F.R.Civ.P. 26(a)(3) have been made.

Defendant contends certain information, documents, and other material are subject to a motion *in limine* based on alleged failure to comply with the discovery rules. Plaintiffs disagree and will oppose any such motion.

The joint exhibit list of the parties has been filed under separate cover as required by L.R. 16-6.1. Unless all parties agree that an exhibit shall be withdrawn, all exhibits will be admitted without objection at trial, except those exhibits objected to in the parties' exhibit list stipulation, which will be filed today.

The objections and grounds therefor are reflected in the Pre-Trial Exhibit Stipulation, which is being filed today.

## 11.   **WITNESS LISTS**

Witness lists of the parties have been filed with the Court.

Only the witnesses identified on the lists will be permitted to testify (other than solely for impeachment).

Each party intending to present evidence by way of deposition testimony has marked such depositions in accordance with L.R. 16-2.7. For this purpose, the depositions reflected in the chart of designations shall be lodged with the Clerk as required by L.R. 32-1.

Plaintiffs' and Defendant's objections to the presentation of testimony by deposition, are reflected in the deposition designation chart required by this Court, which is being filed today.

## 12.   **EXPERT WITNESSES**

**Plaintiffs' expert witnesses:**

Ty Sagalow (will call)

Robert Wunderlich, Ph.D. (will call)

Ambassador Dennis Ross (may call)

Dean Harold Koh (may call)

Matthew Levitt (may call)

**Defendant's expert witnesses:**

Professor John B. Quigley

Dr. Ingrid Detter de Frankopan

Frank Lowenstein

Anthony Clark

Jay Shapiro*

Shannon Rusnak

**13.   MOTIONS**

The following law and motion matters and motions in limine, and no others, are pending or contemplated:

1.   Defendant's Motion for Leave to Amend Court's Scheduling Order to Allow Substitution of Expert Witness;

2.   Plaintiffs' Anticipated Motions in Limine:

a.   Motion to preclude evidence or argument that Plaintiffs' covered claim should be reduced by any tax benefit received in New Mexico and/or Croatia.

b.   Motion to preclude relitigating issues decided by the Ninth Circuit and this Court upon remand including precluding evidence or argument (1) concerning the Court's first summary judgment order; (2) that Defendant acted in good faith given the plain and ordinary meaning of "war" or "warlike action by a military force"; (3) concerning evidence that Defendant did not consider at the time it denied coverage and that was not the basis

for denying coverage; (4) concerning Israel's conduct; and (5) concerning hostilities post-dating July 16, 2014, when Plaintiffs decided to relocate.

    c.    Motion to preclude Defendant from introducing evidence or argument regarding Plaintiffs belonging to a larger corporate family including, for example, Comcast and/or MSNBC.

    d.    Motion to preclude Defendant from relying on the coverage opinion it sought from outside counsel under the sword/shield doctrine.

3.    Defendant's Anticipated Motions in Limine:

    a.    No evidence to prove elements of "loss" under the Policy.

    b.    Whether Defendants may introduce District Court Opinion (Dkt No. 128), finding Defendant did not commit bad faith.

    c.    Ninth Circuit Opinion:  See above discussion regarding District Court Opinion.

    d.    Motion to preclude Plaintiffs from using the recently, untimely produced fee records to support their claim for attorney's fees.

    e.    Motion to preclude Plaintiffs from using their contingent fee contract as evidence of reasonable or necessary legal fees.

    f.    Motion to preclude Plaintiffs' from introducing documents or information or calling witnesses regarding their attorney fee expert and documents supporting her opinion(s), whatever they may be (they have not been disclosed).

    g.    Motion to preclude Plaintiffs from introducing evidence of Defendant's net worth (re punitive damages).

    h.    Motion to preclude Plaintiffs from introducing evidence of negotiation of the policy, non-renewal, premium losses, or

profitability of the NBC account or ASIC Entertainment division.

i.   Motion to preclude Plaintiffs from introducing evidence of Defendant's financial analysis of the NBC account or ASIC's entertainment division.

j.   Whether judgment as a matter of law is appropriate that Defendant did not breach the duty of good faith.

k.   Whether this Court should reconsider its ruling that does not Exclusion #3 apply.

l.   Whether this Court should reconsider its ruling that Exclusion #4 does not apply.

m.   Whether there is any evidence Defendant's coverage analysis and decision would support a punitive damage liability or damage inquiry of the jury.

n.   Whether Plaintiffs' calculation of damages is based on a reliable methodology and whether there are facts to support the methodology.

o.   Whether Plaintiffs' expert Sagalow is qualified to provide any opinions regarding Defendant's claim handling.

p.   Motion to preclude Plaintiffs from introducing evidence of negotiation of the policy, non-renewal, premium losses, or profitability of the NBC account or ASIC Entertainment division.

## 14.   **BIFURCATION**

None.

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues remaining to be litigated, this Final Pretrial

Conference Order shall supersede all pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

Dated:   _____, 2020

_____
UNITED STATES DISTRICT JUDGE

Approved as to form and content.

_____

DATED: January 3, 2020          By */s/ Kalpana Srinivasan*
                                KALPANA SRINIVASAN (237460)
                                ksrinivasan@susmangodfrey.com
                                AMANDA K. BONN (270891)
                                abonn@susmangodfrey.com
                                CATRIONA LAVERY (310546)
                                clavery@susmangodfrey.com
                                SUSMAN GODFREY L.L.P.
                                1900 Avenue of the Stars, Suite 1400
                                Los Angeles, CA 90067-6029
                                Tel: (310) 789-3100
                                Fax: (310) 789-3150
                                JACOB W. BUCHDAHL (*pro hac vice*)
                                jbuchdahl@susmangodfrey.com
                                SUSMAN GODFREY L.L.P.
                                1301 Avenue of the Americas, 32nd Floor
                                New York, NY 10019-6023
                                Tel: (212) 336-8330
                                Fax: (212) 336-8340

                                *Attorneys for Plaintiffs*


DATED: January 3, 2020          By */s/ Melinda R. Burke*
                                MARC J. SHRAKE
                                FREEMAN MATHIS & GARY, LLP
                                550 South Hope Street, Suite 2200
                                Los Angeles, CA 90071-2631
                                Tel: (213) 615-7039
                                -and-
                                MICHAEL KEELEY (*pro hac vice*)
                                JOHN R. RIDDLE (*pro hac vice*)
                                TONI SCOTT REED (*pro hac vice*)
                                CLARK HILL STRASBURGER PLC
                                901 Main Street, Suite 6000
                                Dallas, TX 75202
                                Tel: (214) 651-4718

                                CHRISTOPHER W. MARTIN
                                (*Pro Hac Vice*)
                                martin@mdjwlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MELINDA R. BURKE *(Pro Hac Vice)*
burke@mdjwlaw.com
MARTIN, DISIERE, JEFFERSON
& WISDOM LLP
9111 Cypress Waters Blvd., Suite 250
Dallas, Texas 75019
Telephone: (214) 420-5500
Facsimile: (214) 420-5501

*Attorneys for Defendant*

<u>Attestation Regarding Signatures</u>

    I, Kalpana Srinivasan, attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

By: <u>/s/ *Kalpana Srinivasan*    </u>
          Kalpana Srinivasan

1

## **CERTIFICATE OF SERVICE**

2          I certify that on January 3, 2020, I filed the foregoing with the Clerk of the

3   United States District Court for the Central District of California by using the Court's

4   CM/ECF system, which will send notifications of such filing to all counsel of record.

5

6                                    */s/ Kalpana Srinivasan*

7                                    Kalpana Srinivasan

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28