KALPANA SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
AMANDA K. BONN (270891)
abonn@susmangodfrey.com
CATRIONA LAVERY (310546)
clavery@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150

JACOB W. BUCHDAHL (*pro hac vice*)
jbuchdahl@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel: (212) 336-8330
Fax: (212) 336-8340

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ATLANTIC SPECIALTY INSURANCE COMPANY, <br> Defendant. | Case No.: 2:16-cv-4435-PA-MRW <br><br> The Honorable Percy Anderson <br> Dept. 9A <br><br> **REVISED DISPUTED JURY INSTRUCTIONS FILED JOINTLY BY PARTIES** <br><br> Pretrial Conference: January 17, 2020 <br> Time: 1:30 PM PST <br> Place: Courtroom 9A <br> Judge: Honorable Percy Anderson <br> Trial Date: February 18, 2020 |

1

015825\7082734

# REVISED DISPUTED JURY INSTRUCTIONS

## TABLE OF CONTENTS

| No. | Title | Source | Page |
|---|---|---|---|
| **PRELIMINARY JURY INSTRUCTIONS** | | | |
| 2. | Brief Introduction To Case/Claims And Defenses (Plaintiffs') | 9th Cir. Civil Jury Instr. 1.5. | 5 |
| 2. | Brief Introduction To Case/Claims And Defenses (Defendant's) | 9th Cir. Civil Jury Instr. 1.5. | 11 |
| **INSTRUCTIONS ON TYPES OF EVIDENCE** | | | |
| 3. | Judicial Notice (Plaintiffs') | 9th Cir. Civil Jury Instr. 2.3. | 15 |
| 3. | Judicial Notice (Defendant's) | 9th Cir. Civil Jury Instr. 2.3. | 29 |
| **INSTRUCTIONS REGARDING DELIBERATIONS** | | | |
| **INSURANCE CONTRACT INSTRUCTIONS** | | | |
| 9. | Damages For Breach Of A Duty To Pay A Covered Claim (Plaintiffs') | CACI NO. 2300 | 38 |
| **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** | | | |
| 10. | Breach Of The Implied Obligation Of Good Faith And Fair Dealing—Failure Or Delay In Payment—Essential Factual Elements (Plaintiffs') | CACI NO. 2331 | 42 |
| 11. | Breach Of The Implied Obligation Of Good Faith And Fair Dealing—Failure To Properly Investigate Claim (Plaintiffs') | CACI NO. 2332 | 45 |
| 13. | Good Faith And Fair Dealing (Defendant's) | *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 723 [68 Cal.Rptr.3d 746, 754, 171 P.3d 1082, 1089], as modified (Dec. 19, 2007). | 48 |

2

| 14. | Damages For Bad Faith (Plaintiffs') | CACI NO. 2350 (modified) | 51 |
|---|---|---|---|
| **INSTRUCTIONS SUBMITTED TO PRESERVE ERROR ONY** | | | |
| 4. | Contract Interpretation Construction Of Contract As A Whole (Defendant's) | CACI 314, 316, 317 | 55 |
| 5. | Plaintiff's Claims – Breach Of Contract (Defendant's) | CACI 2300 CACI 2300 | 58 |
| 6. | Affirmative Defenses Section V. Exclusions (Insurrection) (Defendant's) | CACI 2303 | 61 |
| 7. | Affirmative Defenses Section V. Exclusions (Weapon Of War) (Defendant's) | CACI 2303 | 64 |
| 8. | Affirmative Defenses – Failure To Mitigate (Defendant's) | CACI 358 | 67 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **<u>PRELIMINARY JURY INSTRUCTIONS</u>**

015825\7082734

1
2

### PLAINTIFFS' PROPOSED INSTRUCTION NO. 2
### CLAIMS AND DEFENSES

3      To help you follow the evidence, I will give you a brief summary of the case
4  and the positions of the parties:

5      This is an insurance coverage action filed by plaintiffs, Universal Cable
6  Productions, LLC and Northern Entertainment Productions, LLC. I will refer to them
7  collectively as Plaintiffs. Plaintiffs have filed this action against their former
8  insurance company, Atlantic Specialty Insurance Company. I will refer to it as
9  "ASIC" or "Defendant."

10      Plaintiffs alleged two claims against ASIC: (1) breach of an insurance contract
11  and (2) breach of the implied covenant of good faith and fair dealing. Both claims
12  arise out of ASIC's denial of coverage of a covered claim under a television
13  production insurance policy that ASIC issued to Universal for the period from
14  January 1, 2014, to June 30, 2014, which I will call the "Policy."

15      During the summer of 2014, Plaintiffs were filming a new television series
16  called *Dig* in Israel. Hamas—a Palestinian group that the United States designates as
17  a Foreign Terrorist Organization—fired rockets into Israel in June and July 2014. As
18  a result, Plaintiffs postponed and then moved production of their television series *Dig*
19  out of Israel and to New Mexico and Croatia instead, thereby incurring extra
20  expenses. Plaintiffs filed with Defendant an insurance claim for coverage of those
21  costs under the Policy.

22      ASIC denied coverage of Plaintiffs' claim, stating that although the Policy
23  covered expenses related to terrorism, Plaintiffs' loss was excluded from coverage.
24  ASIC relied on the Policy's war exclusions, which excluded coverage for expenses
25  resulting from "war" and "warlike action by a military force." ASIC concluded that
26  Hamas's actions were excluded acts of war.

27
28

5

Both "war" and "warlike action by a military force" have a specialized meaning in the insurance context requiring hostilities between sovereign governments. Hamas is not a sovereign. Atlantic therefore breached the Policy when it denied coverage of Plaintiffs' covered claim under the Policy by defining Hamas' conduct as "war" and "warlike action by a military force."

You, the jury, will be asked to decide three issues in this case:

First, what is the amount of Plaintiffs' covered loss under the Policy?

Second, did Defendant's breach of the Policy also breach the implied covenant of good faith and fair dealing and, if so, what damages, if any, should be awarded?

Third, did Defendant engage in the conduct with malice, oppression, or fraud, and, if so, what punitive damages, if any, should be awarded?

Plaintiffs seek to recover their covered losses under the Policy. Plaintiffs also assert that Defendant acted in bad faith in investigating and denying coverage under the Policy. Plaintiffs assert that as a result of Defendant's bad faith, they were damaged by having to incur attorneys' fees and costs to prove that their claim was covered. Plaintiffs also allege that they are entitled to recover prejudgment interest. Finally, Plaintiffs assert that Defendant acted with malice, oppression, or fraud, and therefore Defendant should pay punitive damages.

Defendant denies these assertions. Defendant asserts that the amount of Plaintiffs' covered claim is less than Plaintiffs allege. Defendant also asserts that its breach of the Policy was not done in bad faith or with malice, oppression, or fraud, and that therefore Plaintiffs are not entitled to attorneys' fees and costs or punitive damages.

Source: 9TH CIR. CIVIL JURY INSTR. 1.5 (Modified); *Universal Cable Prods. v. Atlantic Specialty Ins. Co.*, 929 F.3d 1046 (9th Cir. 2019); Atlantic's Response to Requests for Admission Nos. 32, 33.

6

1
2

**DEFENDANT'S OBJECTIONS TO**

**PLAINTIFFS' PROPOSED INSTRUCTION NO. 2**

3   Atlantic objects to the improper comment on the evidence and purported
4   characterization of the various disputed facts of this case, and does not agree to the
5   wording suggested and drafted by Plaintiffs.  This proposed version does not present
6   an unbiased and objective description.   Specifically, and without waiving any
7   objections to the unbiased of Plaintiffs' Instruction No. 2, Defendant objects to the
8   use of the terms "wrongful denial" and "covered claim" in paragraph, and the entirety
9   of paragraphs 6 – 10.

10   Alternatively and additionally, this instruction does not refer to all of the
11   affirmative defenses relied upon by Atlantic in the case.

12   Atlantic further objects to the plaintiffs' proposed Court's Instruction No. 2 on
13   the grounds that: (1) it fails to allocate the burden of proof as set forth in the Ninth
14   Circuit Modern Civil Jury Instructions ("MCJI") 1.5; and (2) it fails to instruct the
15   jury on the basic question of whether coverage applies without regard to the
16   exclusions. Atlantic contends that there is no coverage if one of the war-related
17   exclusions applies or any other exclusion or other affirmative defense.  Atlantic has
18   not conceded this point.

19   Additionally, Atlantic objects to the confusing reference to both plaintiffs as a
20   single reference to "Universal."  "Universal" is a part of the name of one of the two
21   plaintiffs.  Atlantic objects that the reference to "Universal" creates confusion and is
22   incomplete.  Atlantic objects to use of a term other than "Plaintiffs" which more
23   completely describes the relevant parties. The two plaintiffs, being separate insured
24   entities, bear separate burdens of proof and must be treated separately in the court's
25   instructions and verdict form.

26   The more detail in this description, the more likely it is that the instruction will
27   constitute an improper comment on the weight of the evidence.   Defendants

28

7

1  instruction on a Brief Introduction to Case/Claims & Defenses is more appropriate

2  and is not an improper comment on the weight of the evidence.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

**PLAINTIFFS' RESPONSE TO DEFENDANT'S OBJECTION**

Given that jurors will ***only*** be asked to decide "the issues of damages and Atlantic's bad faith," (Dkt 157), they will need some explanation as to the liability determination already rendered by the Court. Context is required, both to avoid the risk of confusion and to prevent Atlantic from relitigating the issue of liability. Atlantic's assertion that it needs to present its affirmative defenses is without support: it has no further defenses to make, because they all were abandoned (or rejected) at the summary judgment stage.

Plaintiffs' instruction ensures the jurors have a sufficient understanding of the liability ruling to enable them to evaluate damages and the issue of bad faith before them. The jury does not need to decide breach of contract – it is not before them as liability has been found in Plaintiffs' favor on its motion for summary judgment. Bizarrely, Atlantic insists that it "has not conceded" that no exclusions apply, but it need not concede that point: the Courts already have rejected each exclusion as a matter of law and any remaining affirmative defenses Atlantic failed to raise in response to Plaintiffs' summary judgment motion as to liability are abandoned. *See, e.g.*, *Kaffaga v. Steinbeck*, 2017 WL 5989039, at *1 (C.D. Cal. Aug. 25, 2017) ("Affirmative defenses not raised in opposition to a motion for partial summary judgment as to liability are deemed waived.") (citing *United Mine Workers of America 1974 Pension v. Pittson Co.*, 984 F.2d 469, 478 (D.C. Cir. 1993)); *Duarte Nursery, Inc. v. United States Army Corps of Engineers*, 2017 WL 3453206, at *3 (E.D. Cal. Aug. 11, 2017) (same).

It would be both improper and highly confusing for the jury to be instructed on defenses that already have been rejected as a matter of law, including whether any exclusions apply or any other affirmative defenses to liability.

Finally, there is nothing confusing about referring to the Plaintiffs collectively as "Universal." If appropriate, the jury could be instructed that both Plaintiffs are

9

1  subsidiaries of Universal, and that the jury may consider them as a single Plaintiff
2  for purposes of their damages determinations.

1
2

## DEFENDANT'S PROPOSED INSTRUCTION NO. 2
## BRIEF INTRODUCTION TO CASE/CLAIMS AND DEFENSES

3
4

To help you follow the evidence, I will give you a brief summary of the positions of the parties:

5
6
7
8
9
10
11

The Plaintiffs are Universal Cable Productions, LLC, and Northern Entertainment Productions LLC. The Plaintiffs assert that they suffered insured losses under the insurance policy in question, and that the insurer breached the policy by failing to pay the losses. The Plaintiffs also assert that the insurer breached its duty of good faith and fair dealing by failing to pay the losses, and by failing to conduct a proper investigation of the claim. The Plaintiffs have the burden of proving these claims.

12
13
14
15
16

The Defendant is ASIC Specialty Insurance Company; for convenience, I will refer to the Defendant as ASIC. ASIC denies the Plaintiffs' claims and also contends that coverage was excluded by one or more policy exclusions. ASIC has the burden of proof on its affirmative defenses based on the policy exclusions. The Plaintiffs deny ASIC's affirmative defenses.

17
18

Source: 9TH CIR. MCJI 1.5

19
20
21
22
23
24
25
26
27
28

11

015825\7082734

## PLAINTIFFS' OBJECTIONS TO
## DEFENDANT'S PROPOSED INSTRUCTION NO. 2

Atlantic's instructions improperly ask the jury to decide liability issues in direct contradiction to this Court's order and the order of the Ninth Circuit.  The Ninth Circuit found that Exclusions 1-2 did not apply, 929 F.3d 1143(9th Cir. 2019), and this Court held Exclusions 3-4 did not apply, setting this case for trial on the issues of damages and Atlantic's bad faith.  Dkt. 157. Atlantic's instruction treats this as a mere "assertion" by plaintiff and maintains its defenses regarding its completely-rejected exclusions: "ASIC denies the Plaintiffs' claims and also contends that coverage was excluded by one or more policy exclusions." Atlantic's instructions inappropriately ignore the prior decisions of the Ninth Circuit and this Court, and it would be improper as a matter of law to permit the jury to revisit those legal decisions.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DEFENDANT'S RESPONSE TO PLAINTIFFS' OBJECTIONS**

Defendant is entitled to ask this Court to reconsider, and will ask this Court to reconsider its ruling on Exclusions 3 and 4.  The Court's ruling on that request will determine whether there are any factual issues for the jury to resolve for the breach of contract claim.  Moreover, Defendant raises this issue in the verdict form and instructions to preserve error on this matter.

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **INSTRUCTIONS ON TYPES OF EVIDENCE**

14

015825\7082734

## PLAINTIFFS' PROPOSED INSTRUCTION NO. 3

## JUDICIAL NOTICE

The court has decided to accept as proved the following facts. You must accept these facts as true.

**The Policy:**

1. The policy at issue is Motion Picture/Television Producers Portfolio, No. MP00163-04, which was effective from January 1, 2014, through June 30, 2015. I will refer to it as the "Policy."

2. The "starting point" for the terms of the Policy was a manuscripted form prepared by Aon, which touts itself as the nation's leading insurance broker, that represented Universal in obtaining a new insurance policy. After Aon and Atlantic negotiated the terms, Atlantic issued its first policy to Universal in January 1, 2010. That policy was renewed during each of the next three years, and finally the Policy was issued for the final period of January 1, 2014, to June 1, 2015.

3. For the period from January 1, 2014, to June 30, 2015, Atlantic issued a television production insurance policy to Universal, which I will refer to as the "Policy."

4. The Policy covered losses that are a "direct result of an unexpected, sudden, or accidental occurrence entirely beyond your control to include . . . [i]mminent peril, defined as certain, immediate and impending danger of such probability and severity to persons or property that it would be unreasonable or unconscionable to ignore."

5. The Policy, which was negotiated before December 2013, covered loss caused by terrorism if that loss was not otherwise excluded.

6. The Policy excluded "war, including undeclared or civil war." I will call this Exclusion 1 or the "Exclusion for War."

15

7.     The Policy also excluded "warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents." I will call this Exclusion 2 or the "Exclusion for Warlike Action by a Military Force."

8.     On December 3, 2013, Universal's broker emailed Atlantic about three developments: (1) noting "that there is a production in development that is tentatively starting up in February 2014 and filming in Israel," specifically in "Tel Aviv and Jerusalem"; (2) stating "[w]e wanted to get some feedback from you on what issues we may have covering the production under the blanket policy – any additional premiums or exclusions beyond our standard terms"; and (3) asking Atlantic to let Universal "know what [Atlantic's] concerns may be on this."

9.     The broker then had a discussion with Atlantic "regarding issues they may have with the project entitled 'Dig,' potentially working in Israel." During that conversation, Atlantic indicated it "understands that [Universal] takes seriously safety and security precautions on every production but that they were particularly concerned about those precautions in this locale." As a result, Atlantic asked Universal to provide "specific information regarding the security efforts that will be taken during the course of principal photography."

10.     Atlantic then concluded that it would "not be imposing any additional premium or additional coverage terms on *Dig* relating to the work in Israel," the "primary reason for [which] is [its] confidence in the safety and security measures that will be taken during the production." Atlantic did not change the policy's terms, add any exclusions – such as a terrorism exclusion – or charge any additional premium.

16

**The *Dig* Claim.**

11.    Plaintiffs were filming a television show called *Dig* in Israel in June of 2014. Plaintiffs finished filming the pilot episode on June 26, 2014, and were on a scheduled "hiatus" until July 19, 2014.

12.    After *Dig* began production in Israel, three Israeli teenagers were kidnapped on June 12, 2014, and Hamas was suspected of involvement in the kidnappings.

13.    On June 30, 2014, the bodies of the three missing teenagers were recovered, and there were signs indicating Hamas was involved.

14.    On July 2, 2014, a Palestinian teenager was abducted and killed by Israelis, presumably in retaliation for the kidnapping of the Israeli teens. In late June or early July 2014, Hamas began firing rockets from Gaza into Israeli civilian populations, significantly increasing the number of attacks around July 8.

15.    Israel responded by launching a campaign against Hamas, called "Operation Protective Edge."

16.    On July 8, the U.S. State Department issued a warning regarding the "safety and security of civilians" in Israel, specifically in Jerusalem.

17.    *Dig* filming was scheduled to take place in Jerusalem over the next few weeks.

18.    Two days later, the Universal security team advised the *Dig* production team that the "security environment in Israel currently prohibits NBCU Security from being able to guarantee the safety and security of our employees, production partners and associated crew and talent." The security team indicated that "current rocket attacks" appeared "to target locations to be used in forthcoming filming" and it was concerned about "acts of terrorism within Israel."

17

015825\7082734

19. On July 11, 2014, the day after receiving the security team's advice, Universal decided to postpone production for a week and informed Atlantic.

20. On July 15, 2014, Universal's broker notified Atlantic in writing of Universal's claim relating to the one-week delay of *Dig*.

21. Due to escalating violence, Universal decided to move the Dig production out of Israel altogether on July 16, 2014, and notified Atlantic of that decision on July 17, 2014.

22. Plaintiffs completed filming *Dig* in New Mexico and Croatia.

23. The efficient proximate cause for *Dig*'s postponement and relocation was Hamas' rocket fire from Gaza into Israel.

**Atlantic's Denial of the *Dig* Claim.**

24. Plaintiffs submitted a claim to Atlantic for the "extra expenses" incurred as a result of their delay and relocation of *Dig*'s production.

25. On July 17, 2014, Atlantic denied coverage under Exclusion 1 for "war" and Exclusion 2 for "warlike action by a military force."

26. Atlantic denied coverage, stating that although the Policy covered expenses related to terrorism, Hamas' hostilities were excluded from coverage. Atlantic relied on the Policy's war exclusions, which excluded coverage for expenses resulting from "war" and "warlike action by a military force." Atlantic concluded that Hamas' actions were excluded acts of "war" or "warlike action by a military force." Atlantic was incorrect.

27. Under California law, the terms in an insurance policy are understood in their ordinary and popular sense unless a special meaning is given to them by usage, in which the latter must be followed.

015825\7082734

28.   Both Exclusion 1 for "war" and Exclusion 2 for "warlike action by a military force" have a specialized meaning in the insurance context and the parties had, at the least, constructive notice of the meaning. Thus, these exclusions must be interpreted by applying the special meaning of the terms in the insurance context, rather than any ordinary and popular meaning.

29.   Under their specialized meaning, both Exclusion 1 for "war" and Exclusion 2 for "warlike action by a military force" require hostilities between either de jure or de facto sovereigns, and Hamas is neither. Atlantic therefore breached the Policy when it denied coverage by defining Hamas' conduct as "war" or "warlike action by a military force."

30.   Caselaw and insurance treatises confirm that ordinary, popular meanings of these terms do not control and that the specialized meaning in the insurance industry applies.

31.   The courts in *Pan Am. World Airways v. Aetna Cas. & Surety Co.*, 505 F.2d 989 (2d Cir. 1974) and *Holiday Inns v. Aetna Ins. Co.*, 571 F. Supp. 1460, 1503 (S.D.N.Y. 1983) refused to treat violent actions by Palestinian terrorist organizations targeting civilians as falling within the "war" exclusion. *Holiday Inns* specifically rejected the argument that a "common meaning" of war applies in the insurance context, holding instead that "in commercial litigation arising out of insurance policies, words and phrases are construed 'for insurance purposes'—a context quite different from those of politics or journalism." The Second Circuit in *Pan Am* concluded that "war is a course of hostility engaged in by entities that have at least significant attributes of sovereignty."

32.     Similarly, a leading insurance treatise, 10A Couch on Insurance § 152:3 (3d ed. 2017), recognizes that in this context, "war" is defined as the employment of force between governments or entities essentially like governments, at least de facto, because "[w]ar is often viewed as the method by which a nation prosecutes its right by force." Couch does not discuss any other applicable meaning of "war" in the insurance context, including Atlantic's argument for a broader approach.

33.     Another treatise, 32-191 Appelman on Insurance Law & Practice Archive § 191.02 (2d ed. 2011), notes that "while the sovereign act and war exclusions are not entirely irrelevant to coverage of terrorist related losses, an insurer seeking to invoke these exclusions faces steep factual, legal, and political hurdles" because of caselaw defining war as the act of a sovereign.

34.     Exclusion 2 for "warlike action by a military force" also has a special meaning in the insurance industry that derives from a typical exclusion for "warlike operations." That special meaning requires (1) "operations of such a general kind or character as belligerents have recourse to in war" and (2) that such operations be carried out by the military forces of a sovereign or quasi-sovereign government.

35.     The *Pan Am* case distinguished between warlike operations and terrorist activity as follows: "There is no warrant in the general understanding of English, in history, or in precedent for reading the phrase 'warlike operations' to encompass (1) the infliction of intentional violence by political groups (neither employed by nor representing governments) (2) upon civilian citizens of non-belligerent powers and their property (3) at places far removed from the locale or the subject of any warfare."

20

36.   A leading insurance treatise, 10A Couch on Insurance § 152:3-4 (3d ed. 2017), notes that "warlike operations" are "normally part of an armed conflict between combatants and usually do not include intentional violence against civilians by political groups." The treatise also notes that the "standard war exclusion does not explicitly extend to acts of terrorism," as "[t]errorists do not typically fit [the] profile" of "combatants" who "operate lawfully in accordance with the laws and customs of war." *Id.* § 152:18.

37.   Industry custom and usage therefore dictate that both Exclusion 1 for "war" and Exclusion 2 for "warlike action by a military force" require a showing of de jure or de facto sovereignty.

**Hamas Is Not a De Jure or De Facto Sovereign**

38.   Hamas is neither a de jure nor a de facto sovereign and therefore Exclusion 1 for "war" and Exclusion 2 for "warlike action by a military force" do not apply to Plaintiffs' *Dig* claim.

39.   In the insurance context, the Constitution commits to the Executive Branch of the U.S. Government alone the authority to recognize, and to withdraw recognition from, foreign regimes. The Executive Branch of the U.S. Government refused to recognize Hamas as a de jure or de facto sovereign. Instead, the Secretary of State has consistently designated Hamas as a Foreign Terrorist Organization since 1997.

40.   Under international law, a state is "an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities."

41.   The Palestinian political identity emerged between 1923 and 1948. In 1947, the United Nations ("U.N.") intended to create two states in what

21

are now Israel and Palestine: one Jewish and one Arab. The U.N. ultimately founded only the Jewish state, Israel.

42.   In 1947 and 1948, there was an "Arab-Israeli War" in which Israel defeated Arab nations and declared its independence. The Palestinians who remained in the West Bank and Gaza were subject to Egyptian, Jordanian, or Israeli rule.

43.   In June 1967, Israel gained control over the entire area that had historically constituted Palestine. Ultimately, Israel annexed only East Jerusalem and the Golan Heights, leaving the West Bank and Gaza under Israeli occupation, but not under Israeli governance.

44.   In the mid-1990s, the Palestinian Authority was granted limited rule in Gaza and parts of the West Bank.

45.   In 2005, Israel unilaterally withdrew from Gaza, leaving control to the Palestinian Authority.

46.   According to a U.S. Congressional Research Service report, "[a]lthough not a state, the [Palestinian Authority] is organized like one – complete with democratic mechanisms; security forces; and executive, legislative, and judicial organs of governance." The legislative branch is called the Palestinian Legislative Council. Fatah and Hamas are the largest Palestinian political movements.

47.   Hamas was founded in 1987.

48.   Hamas is committed "to the destruction of Israel and the establishment of an Islamic State in all of historic Palestine, comprised of present-day Israel, the West Bank, and Gaza."

49.   In 2006, Hamas won a majority of the seats in the Palestinian Legislative Council. Since then, Hamas has provided social services in the Gaza

22

Strip, collected revenue, established a judicial branch of sorts, and received some assistance from foreign governments.

50. In June 2014, Hamas reached an agreement with Fatah to establish a consensus Palestinian Authority government. As part of the agreement, Hamas agreed to give up any formal responsibility for governing Palestine, and Hamas' members no longer served as government ministers. Nevertheless, Hamas' security forces remained in Gaza and have continued to exercise some control there.

51. The United States has never recognized Palestine or Gaza as sovereign territorial nations, nor has it ever recognized Hamas as a sovereign or quasi-sovereign (i.e., a de jure or de facto government).

52. Since 1997, the United States has designated Hamas as a Foreign Terrorist Organization.

53. Since 2007, Hamas has had a history of firing rockets into Israel.

54. The United States has continued to designate Hamas as a Foreign Terrorist Organization and does not negotiate or enter into treaties with Hamas.

55. The United States, the European Union, Canada, Australia, and multiple other countries do not recognize Hamas as a legitimate authority in either Palestine or Gaza. Hamas does not engage in formal relations on behalf of Palestine or Gaza. The record does not indicate that Hamas controls Palestine's borders, airspace, or immigration. In June 2014, Hamas recognized the Palestinian Authority's control over all governing functions in Gaza.

56.  Atlantic argued that Hamas has significant attributes of sovereignty, relying on the *Pan Am* and *Holiday Inns* cases. To the contrary, *Pan Am* held that a terrorist group was not a de facto government because it was

23

015825\7082734

not acting on behalf of a recognized government. *Holiday Inns* also supports the conclusion that Hamas is not the de facto sovereign of Palestine.

57.    Gaza is part of Palestine and not its own sovereign state. Hamas never exercised actual control over all of Palestine and has agreed—at least in principle—not to disturb the Palestinian Authority, the de jure government of Palestine. Hamas agreed in June 2014 to cede any governing function it may have had to the Palestinian Authority.

58.    Hamas was not a de facto or de jure sovereign during the July 2014 conflict between Hamas and Israel. Thus, Hamas' conduct in the summer of 2014 cannot be defined as a "war" under Exclusion 1 for the purposes of interpreting this Policy.

59.    The nature of Hamas's conduct in June and July 2014 further supports the conclusion that Hamas was not engaging in "warlike action by a military force" under Exclusion 2.

60.    Couch's insurance treatise notes that "warlike operations" would "not include intentional violence against civilians by political groups." Hamas is such a political group. Furthermore, the specific action that disrupted *Dig*'s production was Hamas firing rockets into Israeli civilian centers. The weapons Hamas used were unguided missiles and were likely used to injure and kill civilians because of their indiscriminate nature. Hamas' conduct consisted of intentional violence against civilians—conduct which is far closer to acts of terror than "warlike action by a military force."

61.    Because Hamas is not a de facto sovereign—and because its actions did not constitute "warlike action by a military force"—Exclusion 2 for "warlike action by a military force" does not apply.

24

62.     Hamas' conduct consisted of intentional violence against civilians – conduct which is far closer to acts of terror than "warlike action by a military force."

**Israel's Sovereignty Does Not Trigger Exclusion 1 or Exclusion 2**

63.     The efficient proximate cause of a loss is the predominant, or most important cause of a loss. The efficient proximate cause for the relocation was Hamas' rocket fire from Gaza into Israel.

64.     Even if Israel countered Hamas' attacks, Israel's actions were not the efficient proximate cause of Plaintiffs' losses in moving the production of *Dig*.

65.     Plaintiffs' decision to relocate production was a result of Hamas firing rockets into Israel (where filming was occurring), and not a result of Israel's retaliatory conduct.

66.     Thus, Israel's conduct as a sovereign nation did not trigger Exclusion 1 for "war" or Exclusion 2 for "warlike action by a military force."

**Atlantic Breached the Policy by Denying Coverage of Plaintiffs' *Dig* Claim**

67.     Plaintiffs were entitled to coverage of the *Dig* claim under the Policy.

68.     Atlantic's denial of coverage of the *Dig* claim breached the Policy.

Source: 9TH CIR. CIVIL JURY INSTR. 2.3; *Universal Cable Prods. v. Atlantic Specialty Ins. Co.*, 929 F.3d 1046 (9th Cir. 2019).

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEFENDANT'S OBJECTIONS TO
## PLAINTIFFS' PROPOSED INSTRUCTION NO. 3

The two plaintiffs, being separate entities, bear separate burdens of proof and must be treated separately in the court's instructions and verdict form.  Defendant's special verdict form regarding breach of implied obligation of good faith and fair dealing and damages for implied obligation of good faith and fair dealing properly break down the questions as to each Plaintiff.

This instruction constitutes an improper comment on the weight of the evidence.  The instructions assumes a breach of contract which Defendant has not conceded.  The discussion of much of the issues is an improper comment on the weight of the evidence as it relates to the breach of contract claim and the bad faith claim.

015825\7082734

## PLAINTIFFS' RESPONSE TO DEFENDANT'S OBJECTIONS

This instruction—which instructs the jury on facts determined by the Ninth Circuit and by this Court upon remand as a matter of law—is necessary in order to (1) permit the jury to determine whether the facts found by the Ninth Circuit and this Court also show bad faith and (2) prevent Atlantic from improperly confusing the jury and relitigating liability issues that have been decided as a matter of law. The Ninth Circuit's findings are law of the case and therefore the proper subject of judicial notice (as opposed to mere "commentary" on the evidence).[1]

Atlantic's objections improperly call for the jury to make separate determinations as to damages and Atlantic's bad faith conduct. Liability as to Atlantic's decision to deny coverage already has been determined in favor of *both* plaintiffs (Dkt. 157), and accordingly the only remaining issues are the amount of damages and whether Atlantic engaged in bad faith conduct warranting the award of punitive damages. As this Court has held, "the issues of damages and Atlantic's bad faith are ready for trial." Dkt. 157. Atlantic's attempts to re-raise liability issues should be rejected.

Nothing turns on the fact that there two plaintiffs, particularly since they submitted a single insurance claim. The jury can award aggregate damages award to plaintiffs, who can then apportion any amounts between them.  Plaintiffs do not seek to separately assess and determine the damages to each plaintiff. Thus, it would be patently "inconsistent to instruct the jury to separately assess and determine the damages each plaintiff is entitled and then to return an aggregate award without

---

[1] *Pit River Home & Agricultural Coop. Ass'n v. United States*, 30 F.3d 1088, 1096-97 (9th Cir. 1994) ("A decision on a factual or legal issue must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court . . . ."); *SAS v. Sawabeh Info. Servs. Co.*, 2015 WL 12763541, at *8 (C.D. Cal. June 22, 2015) (citing decisions on law of the case and concluding "Judge Feess' factual finding, which was necessary to support his legal conclusion of willful infringement, is law of the case").

27

listing their necessary separate findings." *Canavin v. Pac. Southwest Airlines*, 148 Cal. App. 3d 512 (1983). To require findings as to each individual plaintiff would unnecessarily confuse the jury.

28

**DEFENDANT'S PROPOSED INSTRUCTION NO. 3**

**JUDICIAL NOTICE**

The Court has decided to accept as proved the following facts. You must accept these facts as true.

**A. A Brief History of Israel and Palestine**

1.     The Palestinian political identity emerged between 1923 and 1948. In 1947, the United Nations ("U.N.") intended to create two states in what are now Israel and Palestine: one Jewish and one Arab. The U.N. ultimately founded only the Jewish state, Israel. In 1947 and 1948, there was an "Arab-Israeli War" in which Israel defeated Arab nations and declared its independence. Almost 700,000 Palestinians were driven from their homes as a result. The Palestinians who remained in the West Bank and Gaza were subject to Egyptian, Jordanian, or Israeli rule. In June 1967, the Six-Day War occurred, in which Israel "decisively defeated the Arab states." As a result, Israel gained control over the entire area that constituted Palestine. But ultimately, Israel only effectively annexed East Jerusalem and the Golan Heights, leaving the West Bank and Gaza Strip under military occupation but not truly incorporated into Israel.

2.     In the mid-1990s, the Palestinian Authority ("PA") was granted limited rule (under supervening Israeli occupational authority) in the Gaza Strip and parts of the West Bank. In 2005, Israel unilaterally withdrew its military forces and all of its civilians from Gaza, leaving control to the PA. According to the U.S. Congressional Research Service: "Although not a state, the PA is organized like one—complete with democratic mechanisms; security forces; and executive, legislative, and judicial organs of governance."

3.     There are two primary competing Palestinian political parties or organizations. Fatah is the largest faction of the confederated multi-party Palestinian Liberation Organization, and is currently led by Yasser Arafat's successor, Mahmoud

29

Abbas. Hamas is a Palestinian Islamic military and socio-political movement that formed in 1987. It has maintained its primary base of political support and military command in the Gaza Strip. In 2006, Hamas won a majority of the seats in the Palestinian Legislative Council. And, in 2007, Hamas gained control over the Gaza Strip, where it currently governs with "political, military and social welfare activities . . . ." As plaintiffs' own security team recognized in a security update, Hamas governs the Gaza Strip.

**B. The 50-Day War**

4.       In June 2014, Hamas and Fatah agreed to establish a "consensus" or "unity" PA government as it refused to deal with Hamas, whose Charter commits it "to the destruction of Israel and the establishment of an Islamic State in all of historic Palestine. Tensions soon thereafter began to build between Israelis and Palestinians. On June 12, 2014, three Israeli teenagers were kidnapped. "In response, Israel launched an extensive search and arrest operation." These teenagers were later killed, allegedly by Hamas militants. Because plaintiffs were already in Israel filming Dig, the head of security for NBCUniversal Media, LLC ("NBCU") was closely monitoring events, and sent an e-mail on June 15, 2014, summing up the building tension:

In the past 48 hours, the extent of Israeli military operations in Hebron and its environs have significantly increased, highlighted by the deployment of over 2,500 IDF soldiers to the area. While at this time operations remain limited to searches and intelligence gathering, Israeli military build ups, deployment of Iron Dome missile batteries, and limited activation of military reserves, suggest that the IDF is prepared for broader altercations, including armed confrontations with militants, civil unrest in Palestinian urban centers, or a more significant military offensive.

30

015825\7082734

5.      On July 2, Israelis abducted and killed a Palestinian teenager, burning him alive, in what appeared to be an act of revenge. Palestinians began launching rockets into Israel, which deployed its Air Force to retaliate with airstrikes.

6.      As demonstrated by plaintiffs' own security alerts, the fighting between Israel and Hamas slowly escalated as each side retaliated with "tit-for-tat" responses. As the fighting worsened with almost daily barrages of missiles, rockets and fighter jet attacks, on July 8, 2014, Israel launched "Operation Protective Edge," an offensive campaign against Hamas. Israel continued this Operation for 50 days (between July 8 and August 26, 2014), hence the name given world-wide to the conflict, the "50Day War." During this time, Hamas and other militant groups fired 4,465 rockets and mortar shells into Israel, while the Israeli government conducted 5,242 airstrikes within Gaza and a 20-day military ground operation in Gaza. Both Hamas and Israel carried out seaborne attacks against each other, while Israel pummeled Hamas from the air. On July 17, Israel's ground forces did in fact invade Gaza.

7.      In the ensuing days and weeks, Israel escalated its airstrikes and attacked with tanks and soldiers on the ground. By August 1st, NBCU's security team reported that "1,460 Palestinians, mostly civilians, have died in the conflict … Sixty-three Israelis, mostly soldiers, have died." Although there were several attempts to broker a ceasefire, all but the last were unsuccessful. On August 26, 2014, both sides agreed to an indefinite ceasefire, drawing the war to a close.

8.      Former Secretary of State John Kerry, who traveled to the area to negotiate a ceasefire, described the fighting as "war" in three public speeches and on a television program. Other prominent politicians agreed. Mr. Kerry's predecessor, Hillary Clinton, also referred to the conflict as a war. Critically, even Israeli officials, who refuse to negotiate with Hamas because they consider them terrorists, acknowledged Israel was at war, stating that Israel's airstrikes against Palestinians were a "declaration of war" and that "Hamas is determined to wage war."

31

**C. The Devastation of the War**

9.      The 50 days of fighting resulted in Palestinian fatalities totaling at least 2,220, at least half of whom were civilians. Approximately 11,000 Palestinians were wounded. The Israeli Defense Force lost 67 soldiers and 6 Israeli citizens. According to the U.S. Department of State Human Rights Report on Israel and Palestine for 2014, "by August 5, hostilities during Operation Protective Edge internally displaced approximately 520,000 persons in Gaza." Approximately 10,000 Israelis were displaced by the war. Infrastructure was damaged with "Israeli armed forces destroy[ing] electrical, water, and other public infrastructure," with damage estimates ranging from 15.6 billion to as high as 31.2 billion Israeli new shekels ($4- $8 billion).

**D.  Dig and the Decision to Leave Israel**

10.      While the clash between Israelis and Palestinians was underway, Plaintiffs were filming a television show called Dig. They finished filming the pilot episode on June 26, 2014, and were on a scheduled "hiatus" until July 19, 2014. On July 11, given the escalation of fighting, and following receipt of a July 10 security assessment noting that NBCU could not guarantee safety and security, Plaintiffs decided to postpone the production for one week. On July 16, as hostilities continued to escalate and there was no end in sight, Plaintiffs decided to move production of Dig out of Israel altogether. They completed filming in New Mexico and Croatia. Plaintiffs then submitted a claim to Atlantic for the "extra expenses" incurred as a result of their move.

**E. The Policy**

11.      The policy at issue is a Motion Picture/Television Producers Portfolio, No. MP00163-04, which was effective from January 1, 2014, through June 30, 2015 (the "Policy"). The "starting point" for the terms of the Policy was a manuscripted form prepared by Aon, which touts itself as the nation's leading insurance broker,

32

that represented NBCU in obtaining a new insurance policy. After Aon and Atlantic negotiated the terms, Atlantic issued its first policy to NBCU in January 1, 2010. That policy was renewed during each of the next three years, and finally the Policy was issued for the final period of January 1, 2014, to June 1, 2015.

Source: 9TH CIR. CIVIL JURY INSTR. 2.3.

015825\7082734

1
2

**PLAINTIFFS' OBJECTIONS TO**

**DEFENDANT'S PROPOSED INSTRUCTION NO. 3**

3

4

5

6

7

8

Plaintiffs object to this instruction because (1) it is not faithful to the Ninth Circuit's decision; (2) many of the additional alleged "facts" that Defendant included are not the proper subject of judicial notice because they are subject to reasonable dispute; and (3) the alleged "facts" are irrelevant and substantially more prejudicial than probative and risk confusing the jury in light of the Ninth Circuit's order and this Court's order on remand.

9

10

11

12

13

14

15

16

17

18

19

20

21

Atlantic has not even identified the source for these purported "facts," which are subject to reasonable dispute. It is therefore improper to take judicial notice of them. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("But a court may not take judicial notice of a fact that is 'subject to reasonable dispute.'") (quoting Fed. R. Evid. 201(b)). Many of these purported "facts" address the Israeli military's actions in Gaza and suggest that there was a "war." The Ninth Circuit has already held that there was not a "war" or "warlike action by a military force" under the Policy and that "the efficient proximate cause for the relocation was Hamas' rocket fire from Gaza into Israel" and not "Israel's conduct as a sovereign nation" or "Israel counter[ing] Hamas's attacks . . . ." *Universal Cable Productions, LLC v. Atlantic Specialty Ins. Co.*, 929 F.3d 1143, 1161 (9th Cir. 2019). Accordingly, the purported "facts" to the contrary that Atlantic includes would contravene the Ninth Circuit's order and confuse the jury about the meaning of "war" under the Policy.

22
23
24
25
26
27
28

34

015825\7082734

1

## **DEFENDANT'S RESPONSE TO PLAINTIFFS' OBJECTIONS**

2

While Plaintiffs contend that this instruction is an attempt to relitigate legal

3 issues resolved by the Ninth Circuit (like whether this was a "war"), that is not the

4 purpose of this instruction.  Whether the Ninth Circuit held that this was or was not

5 a "war" as a matter of law is not the issue in Plaintiffs' bad faith claim.  This

6 information contained within this instruction comes from various people, officials,

7 institutions, and other governments who call this event a "war," which goes to the

8 issue of whether Defendant's conduct was reasonable in denying coverage and

9 whether Defendant's interpretation of the War Exclusions was reasonable.  The issue

10 in this bad faith claim is not whether a court subsequently held this to not be a war,

11 but rather, what information was available to Defendant when determining whether

12 there was coverage.  This instruction encompasses that information.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INSTRUCTIONS CONCERNING DELIBERATIONS**

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

015825\7082734

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INSURANCE CONTRACT INSTRUCTIONS

015825\7082734

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## PLAINTIFFS' PROPOSED INSTRUCTION NO. 9

## DAMAGES FOR BREACH OF A DUTY TO PAY A COVERED CLAIM

Atlantic breached its duty to pay Plaintiffs for a loss covered under an insurance Policy. To recover damages for the breach, Plaintiffs must prove the amount of the covered loss that Atlantic failed to pay.

Source: CACI NO. 2300 (modified); CACI 350 (modified); *Universal Cable Prods. v. Atlantic Specialty Ins. Co.*, 929 F.3d 1046 (9th Cir. 2019).

38

1
2

## **DEFENDANT'S OBJECTIONS TO**
## **PLAINTIFFS' PROPOSED INSTRUCTION NO. 9**

3      Atlantic objects on the grounds that the blanket reference to "Universal" is
4   improper and incomplete, as well as confusing based upon the actual names of the
5   parties to the case.  The two plaintiffs, being separate insured entities, bear separate
6   burdens of proof and must be treated separately in the court's instructions and the
7   verdict form.

8      This instruction assumes Plaintiffs' breach of contract claim has been
9   established.  Defendant still has affirmative defenses to Plaintiffs' breach of contract
10  claim.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

39

## **PLAINTIFFS' RESPONSE TO DEFENDANT'S OBJECTIONS**

Atlantic improperly seeks the jury to make separate determinations as to damages and Atlantic's bad faith conduct.  Liability as to Atlantic's decision to deny coverage already has been determined in favor of *both* plaintiffs (Dkt. 157), and accordingly the only remaining issues are the amount of damages and whether Atlantic engaged in bad faith conduct warranting the award of punitive damages. Nothing turns on the fact that there two plaintiffs, particularly given that submitted a single insurance claim.

Atlantic once again tries to get the jury to decide an issue already decided by the rulings of this Court and the Ninth Circuit.  The jury does not need to decide breach of contract – it is not before them as liability has been found in Plaintiffs' favor on its motion for summary judgment.  Atlantic's affirmative defenses raised in response to Plaintiffs' motion for summary judgment have been rejected.  All other affirmative defenses to breach of contract have been waived.

40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## BREACH OF IMPLIED COVENANT OF

## GOOD FAITH AND FAIR DEALING

41

1

2

3

4

**PLAINTIFFS' PROPOSED INSTRUCTION NO. 10**

**BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR**

**DEALING—FAILURE OR DELAY IN PAYMENT—ESSENTIAL**

**FACTUAL ELEMENTS**

Plaintiffs claim that Atlantic breached the obligation of good faith and fair dealing by failing to pay benefits due under the insurance policy. To establish this claim, Plaintiffs must prove all of the following:

1. That Atlantic unreasonably failed to pay Policy benefits;

2. That Plaintiffs were harmed; and

3. That Atlantic's failure to pay policy benefits was a substantial factor in causing Plaintiffs' harm.

To act or fail to act "unreasonably" means that the insurer had no proper cause for its conduct. In determining whether Atlantic acted unreasonably, you should consider only the information that Atlantic knew or reasonably should have known at the time when it failed to pay policy benefits.

Source: CACI NO. 2331 (modified); *Universal Cable Prods. v. Atlantic Specialty Ins. Co.*, 929 F.3d 1046 (9th Cir. 2019).

42

015825\7082734

1
2

## **DEFENDANT'S OBJECTIONS TO**
## **PLAINTIFFS' PROPOSED INSTRUCTION NO. 10**

3

4

5

6

7

Atlantic objects on the grounds that the blanket reference to "Universal" is improper and incomplete, as well as confusing based upon the actual names of the parties to the case.  The two plaintiffs, being separate insured entities, bear separate burdens of proof and must be treated separately in the court's instructions and the verdict form.

8

9

Atlantic also objects as this question omits sub-questions 1 and 2 from CACI 2331, and therefore, is incomplete.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

43

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PLAINTIFFS' RESPONSE TO DEFENDANT'S OBJECTIONS

Atlantic improperly seeks the jury to make separate determinations as to damages and Atlantic's bad faith conduct.  Given that liability already has been determined in favor of both plaintiffs as to Atlantic's decision to deny coverage (Dkt. 157,), the only issue that remains is the amount of damages and whether Atlantic engaged in bad faith conduct warranting the award of punitive damages.  Nothing turns on the fact that there were two insured plaintiffs– which submitted a single claim – and for which the Court has already found liability.

44

015825\7082734

## PLAINTIFFS' PROPOSED INSTRUCTION NO. 11

## BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING—FAILURE TO PROPERLY INVESTIGATE CLAIM

Plaintiffs claim that Atlantic acted unreasonably, that is, without proper cause, by failing to conduct a proper investigation of its claim. To establish this claim, Plaintiffs must prove all of the following:

1.     That Atlantic failed to conduct a full, fair, prompt, and thorough investigation of all of the bases of Universal's claim;

2.     That Plaintiffs were harmed; and

3.     That Atlantic's failure to properly investigate the claim was a substantial factor in causing Plaintiffs' harm.

When investigating Plaintiffs' claim, Atlantic had a duty to diligently search for and consider evidence that supported coverage of the claimed loss.

Source: CACI NO. 2332 (modified); *Universal Cable Prods. v. Atlantic Specialty Ins. Co.*, 929 F.3d 1046 (9th Cir. 2019).

45

1
2

### **DEFENDANT'S OBJECTIONS TO**
### **PLAINTIFFS' PROPOSED INSTRUCTION NO. 11**

3
4
5
6
7

Atlantic objects on the grounds that the blanket reference to "Universal" is improper and incomplete, as well as confusing based upon the actual names of the parties to the case.  The two plaintiffs, being separate insured entities, bear separate burdens of proof and must be treated separately in the court's instructions and the verdict form.

8
9

Atlantic also objects as this question omits sub-questions 1 and 2 from CACI 2332, and therefore, is incomplete.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

015825\7082734

1

## **PLAINTIFFS' RESPONSE TO DEFENDANT'S OBJECTIONS**

Atlantic improperly seeks the jury to make separate determinations as to damages and Atlantic's bad faith conduct.  Given that liability already has been determined in favor of both plaintiffs as to Atlantic's decision to deny coverage (Dkt. 157,), the only issue that remains is the amount of damages and whether Atlantic engaged in bad faith conduct warranting the award of punitive damages.  Nothing turns on the fact that there were two insured plaintiffs– which submitted a single claim – and for which the Court has already found liability.

47

## DEFENDANT'S PROPOSED INSTRUCTION NO. 13
## GOOD FAITH AND FAIR DEALING

An insurance company is privileged to pursue its own economic interests and to assert in a permissible way its legal rights and communicate its legal position in good faith even if doing so will cause emotional distress.

An insurer denying or delaying benefits due to the existence of a genuine dispute with its insured about the existence of coverage liability or the amount of the coverage claim is not liable in bad faith even though it might be liable for breach of contract.

The genuine dispute doctrine does not diminish an insurer's obligation to investigate, process and evaluate the insured's claim thoroughly and fairly. A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. To be privileged, the assertion of legal rights must be limited to circumstances in which the person has a good faith belief in the existence of the right asserted and the assertion must be done in a permissible, non-outrageous manner.

Source: *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 723 [68 Cal.Rptr.3d 746, 754, 171 P.3d 1082, 1089], as modified (Dec. 19, 2007).

48

015825\7082734

**PLAINTIFFS' OBJECTIONS TO**

**DEFENDANT'S PROPOSED INSTRUCTION NO. 13**

Atlantic's proposed instruction deviates from the CACI pattern instructions on good faith and fair dealing by inserting language regarding the "genuine dispute" doctrine without cause to do so. The Directions for Use that accompany the CACI instruction on breach of the implied covenant of good faith and fair dealing make clear that the omission of such language from the pattern instruction was intentional: "The genuine-dispute doctrine is subsumed within the test of reasonableness or proper cause (element 3). No specific instruction on the doctrine need be given." CACI No. 2331 Breach of the Implied Obligation of Good Faith and Fair Dealing—Failure or Delay in Payment (First Party)—Essential Factual Elements, Directions for Use. This Direction for Use also explicitly cites the case that Atlantic relies on, *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 724 (Ct. App. 2007), making clear that this case does not alter the conclusion that separate language on the genuine dispute doctrine need not be included. Plaintiffs respectfully submit that the Court should issue pattern CACI instructions on the obligation of good faith and fair dealing.

49

015825\7082734

1

**DEFENDANT'S RESPONSE TO PLAINTIFFS' OBJECTIONS**

Notice that Plaintiffs do not argue that this instruction is in any way inaccurate.  In fact, this instruction is the law in California known as the genuine dispute doctrine.  This language adds a layer of practicality and explanation to make the jurors' task much more easy and efficient so they know exactly what the standard is when deciding if conduct violate the duty of good faith and fair dealing.

50

015825\7082734

## PLAINTIFFS' PROPOSED INSTRUCTION NO. 14

## DAMAGES FOR BAD FAITH

If you decide that Plaintiffs have proved their claim against Atlantic, you also must decide how much money will reasonably compensate Plaintiffs for the harm. This compensation is called "damages."

The amount of damages must include an award for all harm that was caused by Atlantic, even if the particular harm could not have been anticipated.

Plaintiffs must prove the amount of their damages.

However, Plaintiffs do not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

The following are the specific items of damages claimed by Plaintiffs:

> Attorneys' fees and costs incurred to recover the insurance policy benefits.

To recover attorney fees, Plaintiffs must prove that because of Atlantic's breach of the obligation of good faith and fair dealing it was reasonably necessary for them to hire attorneys to recover the policy benefits. Plaintiffs may recover attorney fees they incurred to obtain policy benefits but not attorney fees they incurred for other purposes.

Source: CACI NO. 2350 (modified); CACI 3288 (modified).

51

015825\7082734

1

2

**DEFENDANT'S OBJECTIONS TO**

**PLAINTIFFS' PROPOSED INSTRUCTION NO. 14**

3

4

5

6

7

Atlantic objects on the grounds that the blanket reference to "Universal" is improper and incomplete, as well as confusing based upon the actual names of the parties to the case. The two plaintiffs, being separate insured entities, bear separate burdens of proof and must be treated separately in the court's instructions and the verdict form.

8

9

10

Atlantic also objects to the reference to prejudgment interest. This is not mentioned within CACI 2350. The "items of damages" improperly includes "prejudgment interest," and the last three paragraphs discuss prejudgment interest.

11

12

13

14

15

16

17

18

Plaintiffs cite the *North Oakland* case in support of their request for the jury to award prejudgment interest. However, in that case, the jury did not award prejudgment interest. The jury awarded damages for breach of an oral contract, the district court later awarded prejudgment interest, and then subsequently set aside its previous order awarding prejudgment interest. *North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828 [76 Cal.Rptr.2d 743]. Nowhere in that case did the court hold that the jury should have resolved the issue of prejudgment interest. That is an issue that should be taken up with the Court, not the jury.

19

20

21

22

23

24

25

26

27

28

015825\7082734

1

**PLAINTIFFS' RESPONSE TO DEFENDANT'S OBJECTIONS**

2   Atlantic's instructions improperly call for the jury to make separate

3   determinations as to damages and Atlantic's bad faith conduct. Liability as to

4   Atlantic's decision to deny coverage already has been determined in favor of *both*

5   plaintiffs (Dkt. 157), and accordingly the only remaining issues are the amount of

6   damages and whether Atlantic engaged in bad faith conduct warranting the award of

7   punitive damages. Nothing turns on the fact that there two plaintiffs, particularly

8   given that submitted a single. Here, the jury can award a single aggregate damages

9   award to plaintiffs, who can then apportion any amounts between them.  Plaintiffs do

10   not seek to separately assess and determine the damages to each plaintiff. Thus, it

11   would be patently "inconsistent to instruct the jury to separately assess and determine

12   the damages each plaintiff is entitled and then to return an aggregate award without

13   listing their necessary separate findings." *Canavin v. Pac. Southwest Airlines*, 148

14   Cal. App. 3d 512 (1983). To require findings as to each individual plaintiff would

15   lead to unnecessary confusion for the jury.

16   It is appropriate the jury to consider the award of prejudgment interest. Cal.

17   Civ. Code Section 3287(a) ("A person who is entitled to recover damages certain, or

18   capable of being made certain by calculation, and the right to recover which is vested

19   in the person upon a particular day, is entitled also to recover interest thereon from

20   that day . . . ."); *North Oakland Med. Clinic v. Rogers*, 65 Cal. App. 4th 824 (1998)

21   (indicating "jury" could "determine[] whether the damages were liquidated or

22   unliquidated" for purposes of awarding "interest under section 3287").

23

24

25

26

27

28

53

1

## **INSTRUCTIONS REQUESTED TO PRESERVE ERROR**

# DEFENDANT'S PROPOSED INSTRUCTION NO. 4

## CONTRACT INTERPRETATION

## CONSTRUCTION OF CONTRACT AS A WHOLE

In deciding what the words of a contract mean, you must decide what the parties intended at the time the contract was created. You may consider the usual and ordinary meaning of the language used in the contract as well as the circumstances surrounding the making of the contract.

You should assume that the parties intended technical words used in the contract to have the meaning that is usually given to them by people who work in that technical field, unless you decide that the parties clearly used the words in a different sense.

In deciding what the words of a contract meant to the parties, you should consider the whole contract, not just isolated parts. You should use each part to help you interpret the others, so that all the parts make sense when taken together. The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.

A contract must be interpreted to give effect to the mutual, expressed intention of the parties. Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone.

Source: CACI 314, 316, 317; Cal. Civ. Code, § 1641; *Quantification Settlement Agreement Cases*, 201 Cal. App. 4th 758, 798–99, 134 Cal. Rptr. 3d 274, 307–08 (2011).

55

1

2

**PLAINTIFFS' OBJECTIONS TO**

**DEFENDANT'S PROPOSED INSTRUCTION NO. 4**

3

4

5

This instruction is unnecessary given the issues that remain in the case. The instruction also flouts the directive of the Ninth Circuit as to the appropriate contact term interpretation in the case.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

The jurors are not being asked to decide breach of contract—the courts already have decided that. Jurors thus will not need to interpret contract terms as part of their determination of damages or bad faith conduct. Additionally, the Ninth Circuit, in ruling on the Exclusions 1-2, concluded that there are specialized terms that govern insurance industry agreements. As the Ninth Circuit held, "[u]nder California law, the terms in an insurance policy are 'understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or *unless a special meaning is given to them by usage, in which case the latter must be followed*." *Universal Cable Productions, LLC v. Atlantic Specialty Insurance Co.*, 929 F.3d 1143, 1153 (9th Cir. 2019) (emphasis in original) (citing Cal. Civ. Code § 1644). The Ninth Circuit held the "special meaning of the terms [of the war exclusions as used in] the insurance context." *Id*. It would be improper to tell the jury anything beyond the direct contract interpretation instructions given as a matter of law by the Ninth Circuit. This entire instruction is unneeded and only underscores Atlantic's efforts to attempt to resurrect decided liability issues.

21

22

23

24

25

26

27

28

56

## DEFENDANT'S RESPONSE TO PLAINTIFFS' OBJECTIONS

Defendant is entitled to ask this Court to reconsider, and will ask this Court to reconsider its ruling on Exclusions 3 and 4.  The Court's ruling on that request will determine whether there are any factual issues for the jury to resolve for the breach of contract claim.  Moreover, Defendant raises this issue in the verdict form and instructions to preserve error on this matter.

015825\7082734

1
2

**DEFENDANT'S PROPOSED INSTRUCTION NO. 5**

**PLAINTIFF'S CLAIMS – BREACH OF CONTRACT**

3       Plaintiffs claim that their losses were covered under the Extra Expense
4   coverage of the insurance policy. For this coverage to apply, the Plaintiffs must have
5   sustained losses by reason of extra expense necessarily incurred as a result of the
6   interruption, postponement, cancellation, relocation, curtailment or abandonment of
7   an Insured Production due to the following:

8       The loss must be a direct result of an unexpected, sudden or accidental
9   occurrence entirely beyond their control, including:

10      a.       Imminent peril, defined as certain, immediate and impending danger of
11  such probability and severity to persons or property that it would be unreasonable or
12  unconscionable to ignore, or

13      b.       Any expenses incurred to avoid a loss resulting from imminent peril, to
14  the extent that they serve to avoid a loss otherwise covered. Loss of earnings or profit
15  is not covered under the Extra Expense coverage.

16

17      <u>Source:</u> CACI 2300; Policy, Section III—Extra Expense

18
19
20
21
22
23
24
25
26
27
28

1
2

# **PLAINTIFFS' OBJECTIONS TO**
# **DEFENDANT'S PROPOSED INSTRUCTION NO. 5**

3
4
5
6
7
8
9

There is no breach of contract issue for the jury to decide. Atlantic once again tries to get the jury to decide an issue already decided by the rulings of this Court and the Ninth Circuit.  Specifically, Atlantic asks jurors to decide whether coverage applies. But the Court and the Ninth Circuit already have ruled that Atlantic had no basis to deny coverage to Plaintiffs. As this Court has held, "the issues of damages and Atlantic's bad faith are ready for trial." Dkt. 157. Atlantic's attempts to re-raise liability issues should be rejected.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

015825\7082734

1

## **DEFENDANT'S RESPONSE TO PLAINTIFFS' OBJECTIONS**

Defendant is entitled to ask this Court to reconsider, and will ask this Court to reconsider its ruling on Exclusions 3 and 4.  The Court's ruling on that request will determine whether there are any factual issues for the jury to resolve for the breach of contract claim.  Moreover, Defendant raises this issue in the verdict form and instructions to preserve error on this matter.

60

## DEFENDANT'S PROPOSED INSTRUCTION NO. 6

## AFFIRMATIVE DEFENSES

## SECTION V. EXCLUSIONS (INSURRECTION)

ASIC claims that the Plaintiffs' losses are not covered because they are specifically excluded under the policy. To succeed, ASIC must prove that the Plaintiffs' losses were caused by matters set forth in one or more exclusions under the policy. An exclusion applies if the losses were caused, directly, or indirectly, by one or more of the following:

> Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these; such loss is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

To establish this defense, Atlantic must prove that Plaintiffs' loss arises directly or indirectly out of conditions specifically excluded from coverage under Section V. Exclusions. To succeed, Atlantic must demonstrate that the loss or damage was caused directly or indirectly by (1) insurrection, or (2) rebellion, or (3) revolution, or (4) usurped power, or (5) action taken by governmental authority in hindering or defending against any of these.

Source: CACI 2303; Policy, Dice Producers Portfolio Policy Conditions Sect. V.a.(3)(c).

61

015825\7082734

# PLAINTIFFS' OBJECTIONS

## TO DEFENDANT'S PROPOSED INSTRUCTION NO. 6

Undeterred by this Court's ruling as a matter of law, Atlantic boldly offers an instruction for the jury to decide if it could properly deny coverage "because they are specifically excluded under the policy." Atlantic would then have the jury decide whether "the loss or damage was caused directly or indirectly by (1) insurrection, or (2) rebellion, or (3) revolution, or (4) usurped power, or (5) action taken by governmental authority in hindering or defending against any of these." This Court already undertook that analysis (Dkt 157) and concluded "that War Exclusions 3 and 4 do not apply to preclude coverage." *Id.* Atlantic's attempts to undo an order of this Court through a jury instruction should be rejected.

015825\7082734

## **DEFENDANT'S RESPONSE TO PLAINTIFFS' OBJECTIONS**

Defendant is entitled to ask this Court to reconsider, and will ask this Court to reconsider its ruling on Exclusions 3 and 4.  The Court's ruling on that request will determine whether there are any factual issues for the jury to resolve for the breach of contract claim.  Moreover, Defendant raises this issue in the verdict form and instructions to preserve error on this matter.

015825\7082734

# DEFENDANT'S PROPOSED INSTRUCTION NO. 7

## AFFIRMATIVE DEFENSES

### SECTION V. EXCLUSIONS (WEAPON OF WAR)

ASIC claims that the Plaintiffs' losses are not covered because they are specifically excluded under the policy. To succeed, ASIC must prove that the Plaintiffs' losses were caused by matters set forth in one or more exclusions under the policy. An exclusion applies if the losses were caused, directly, or indirectly, by one or more of the following:

> A weapon of war including atomic fission or radioactive force, whether in time of peace or war.

To establish this defense, Atlantic must prove that Plaintiffs' loss arises directly or indirectly out of conditions specifically excluded from coverage under Section V. Exclusions. To succeed, Atlantic must demonstrate that the loss or damage was caused directly or indirectly by a weapon of war which includes weapons that utilize atomic fission or radioactive force, whether in time of peace or war.

Source: CACI 2303; Policy, Dice Producers Portfolio Policy Conditions Sect. V.a.(4).

64

015825\7082734

1
2

**PLAINTIFFS' OBJECTIONS TO**

**DEFENDANT'S PROPOSED INSTRUCTION NO. 7**

3       As with its proposed instruction regarding insurrection, Atlantic improperly

4   offers an instruction for the jury to decide if it could properly deny coverage "because

5   they are specifically excluded under the policy." This Court already undertook that

6   analysis (Dkt 157 at 2-3) and has concluded "that War Exclusions 3 and 4 do not

7   apply to preclude coverage." *Id*. Again, Atlantic's attempts to undo an order of this

8   Court through a jury instruction should be rejected.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **DEFENDANT'S RESPONSE TO PLAINTIFFS' OBJECTIONS**

Defendant is entitled to ask this Court to reconsider, and will ask this Court to reconsider its ruling on Exclusions 3 and 4.  The Court's ruling on that request will determine whether there are any factual issues for the jury to resolve for the breach of contract claim.  Moreover, Defendant raises this issue in the verdict form and instructions to preserve error on this matter.

015825\7082734

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEFENDANT'S PROPOSED INSTRUCTION NO. 8

## AFFIRMATIVE DEFENSES – FAILURE TO MITIGATE

ASIC claims that the Plaintiffs' losses are not completely covered because they are specifically excluded under the policy. To succeed, ASIC must prove that the Plaintiffs' losses were caused by a failure to mitigate.

**Failure to Mitigate.** General Condition I(2) of the Policy provides that the insureds are required to:

> Minimize Loss or Damage – Take all reasonable steps to protect the property from further damage and minimize the loss. Keep a record of your expenses in doing so for consideration in the settlement of the claim. This will not increase the limit of insurance.

To the extent Plaintiffs failed to take all reasonable steps to minimize their loss, or to keep a record of their expenses in doing so, their claims are barred from coverage by General Condition I(2) of the Policy, and by the common law.

If Atlantic breached the contract and the breach caused harm, Plaintiffs are not entitled to recover damages for harm that Atlantic proves Plaintiffs could have avoided with reasonable efforts or expenditures. The jury should consider the reasonableness of Plaintiffs' efforts in light of the circumstances facing it at the time, including its ability to make the efforts or expenditures without undue risk of hardship.

If Plaintiffs made reasonable efforts to avoid harm, then the jury aware should include reasonable amounts that it spent for this purpose.

Source: CACI 358; Policy – Motion Picture Television Portfolio General Conditions I.I(2).

67

015825\7082734

**PLAINTIFFS' OBJECTIONS TO**

**DEFENDANT'S PROPOSED INSTRUCTION NO. 8**

Atlantic tries to convert a question regarding the proof of the amount of damages into a liability defense. This is improper. This Court and the Ninth Circuit have held that Atlantic improperly withheld coverage under the policy between it and the insureds. The only issues for the jury are the amount of damages to the Plaintiffs and whether that denial of coverage was the result of bad faith.

While Atlantic is of course permitted to contest the amount of damages sustained by Plaintiffs, "failure to mitigate" is not an affirmative defense to breach of contract liability at this stage of this case. To the extent "failure to mitigate" was a defense to liability at any stage, Atlantic abandoned it by failing to raise it in response to Plaintiffs' summary judgment motion as to liability. *See, e.g.*, *Kaffaga v. Steinbeck*, 2017 WL 5989039, at *1 (C.D. Cal. Aug. 25, 2017) ("Affirmative defenses not raised in opposition to a motion for partial summary judgment as to liability are deemed waived.") (citing *United Mine Workers of America 1974 Pension v. Pittson Co.*, 984 F.2d 469, 478 (D.C. Cir. 1993)); *Duarte Nursery, Inc. v. United States Army Corps of Engineers*, 2017 WL 3453206, at *3 (E.D. Cal. Aug. 11, 2017) (same).

The question for the jury is the amount of Plaintiffs' covered losses. The definition of a covered loss is included in the insurance policy itself. It is incorrect for Atlantic to overlay a "mitigation" concept on top of that. Converting a damages question into a liability question – when there is no breach of contract claim remaining – would be confusing for the jury.

015825\7082734

**DEFENDANT'S RESPONSE TO PLAINTIFFS' OBJECTIONS**

The first paragraph of this instruction is simply a quote from the Policy language that requires Plaintiffs to mitigate their damages. Plaintiffs do not object to this language.

In the second paragraph, Defendant has not turned this question into a bar for coverage as Plaintiffs claim. The instruction plainly states:

> _To the extent Plaintiffs failed to take all reasonable steps to minimize their loss_, or to keep a record of their expenses in doing so, their claims are barred from coverage by General Condition I(2) of the Policy, and by the common law.

Plaintiffs claims are not barred by failing to mitigate, but they are barred to the extent they failed to mitigate. In other words, if the Plaintiffs failed to mitigate in the amount of $1 million, then their claim is barred (or reduced) to the extent of $1 million. This is not a complete bar or liability defense as Plaintiffs claim. Furthermore, this instruction was never designed to be "an affirmative defense to breach of contract liability," as Plaintiffs claim.

Plaintiff admits that Defendant is entitled to contest the amount of the damages, which is what this instruction does. At a bare minimum, the last two paragraphs of this instruction come verbatim from CACI 358, and should be permitted. The first two paragraphs simply show where this duty arises in the Policy.

Defendant is entitled to ask this Court to reconsider, and will ask this Court to reconsider its ruling on Exclusions 3 and 4. The Court's ruling on that request will determine whether there are any factual issues for the jury to resolve for the breach of contract claim. Moreover, Defendant raises this issue in the verdict form and instructions to preserve error on this matter.

69

015825\7082734

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED: January 15, 2020          By */s/ Kalpana Srinivasan*

KALPANA SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
AMANDA K. BONN (270891)
abonn@susmangodfrey.com
CATRIONA LAVERY (310546)
clavery@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150

JACOB W. BUCHDAHL (*pro hac vice*)
jbuchdahl@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel: (212) 336-8330
Fax: (212) 336-8340

*Attorneys for Plaintiffs*

DATED: January 15, 2020          By */s/ Melinda R. Burke*

MARC J. SHRAKE
FREEMAN MATHIS & GARY, LLP
550 South Hope Street, Suite 2200
Los Angeles, CA 90071-2631
Tel: (213) 615-7039
-and-
MICHAEL KEELEY (*pro hac vice*)
JOHN R. RIDDLE (*pro hac vice*)
TONI SCOTT REED (*pro hac vice*)
CLARK HILL STRASBURGER PLC
901 Main Street, Suite 6000
Dallas, TX 75202
Tel: (214) 651-4718

70

015825\7082734

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CHRISTOPHER W. MARTIN
*(Pro Hac Vice)*
martin@mdjwlaw.com
MELINDA R. BURKE *(Pro Hac Vice)*
burke@mdjwlaw.com
MARTIN, DISIERE, JEFFERSON
& WISDOM LLP
9111 Cypress Waters Blvd., Suite 250
Dallas, Texas 75019
Telephone: (214) 420-5500
Facsimile: (214) 420-5501

*Attorneys for Defendant*

Attestation Regarding Signatures

I, Kalpana Srinivasan, attest that all signatories listed, and on whose behalf the
filing is submitted, concur in the filing's content and have authorized the filing.

By: /s/ *Kalpana Srinivasan*
Kalpana Srinivasan

71

015825\7082734

## **CERTIFICATE OF SERVICE**

I certify that on January 15, 2020, I filed the foregoing with the Clerk of the United States District Court for the Central District of California by using the Court's CM/ECF system, which will send notifications of such filing to all counsel of record.

*/s/ Kalpana Srinivasan*
Kalpana Srinivasan

72

015825\7082734