1  MARC J. SHRAKE (SBN 219331)
   mshrake@fmglaw.com
2  FREEMAN MATHIS & GARY, LLP
   550 South Hope Street, Suite 2200
3  Los Angeles, California 90071
   Telephone: (213) 615-7019
4  Facsimile: (213) 615-7000

5  CHRISTOPHER W. MARTIN *(Pro Hac Vice)*
   martin@mdjwlaw.com
6  MELINDA R. BURKE *(Pro Hac Vice)*
   burke@mdjwlaw.com
7  WILLIAM E. McMICHAEL *(Pro Hac Vice)*
   mcmichael@mdiwlaw.com
8  MARTIN, DISIERE, JEFFERSON
   & WISDOM LLP
9  9111 Cypress Waters Blvd., Suite 250
   Dallas, Texas 75019
10 Telephone: (214) 420-5500
   Facsimile: (214) 420-5501

11

   Attorneys for Defendant
12 Atlantic Specialty Insurance Company

13            **UNITED STATES DISTRICT COURT**

14   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

15 UNIVERSAL CABLE PRODUCTIONS          ) CASE NO. 2:16-cv-4435-PA-MRW
   LLC, a Delaware limited liability    )
16 company, and NORTHERN               ) **JOINT MOTION IN LIMINE:**
   ENTERTAINMENT PRODUCTIONS           ) **DEFENDANT ATLANTIC**
17 LLC, a Delaware limited liability    ) **SPECIALTY INSURANCE**
   company,                            ) **COMPANY'S MOTION IN**
18                                      ) **LIMINE NO. 4 REGARDING**
                                        ) **ROBERT WUNDERLICH**
            Plaintiffs,                 )
19        vs.                           ) **PLAINTIFFS' OPPOSITION**
                                        )
20 ATLANTIC SPECIALTY INSURANCE         ) **DEFENDANT'S REPLY**
   COMPANY, a New York insurance       )
21 company,                            ) **DECLARATION OF MARC J.**
                                        ) **SHRAKE**
22        Defendant.                    )
                                        ) Hearing Date:  February 10, 2020
23                                      ) Time:  1:30 p.m.
                                        ) Pretrial Conference: January 17, 2020
24                                      ) Time: 1:30 PM PST
                                        ) Place: Courtroom 9A
25                                      ) Judge:  Honorable Percy Anderson
                                        ) Trial:  February 18, 2020
26 _____ )

27        Plaintiffs intend to offer the testimony of Robert Wunderlich ("Wunderlich")

28 at trial for his opinion on the amount of the plaintiffs' damages in this case. Robert

Wunderlich's methodology is, as it has been in previous cases in which he was hired as an expert, entirely unreliable and based on assumptions the plaintiffs apparently instructed him to make and that he did not verify. Wunderlich's testimony and his report should be barred from evidence.

## SPECIFIC MATTER AT ISSUE

- Whether Wunderlich may testify as an expert, and whether his report may be admitted at trial.
- Whether Wunderlich's methodology used in reaching his opinions is flawed.
- Whether Wunderlich is qualified to testify in this case, and whether the facts and data from which he draws his conclusions are reliable.
- Whether Wunderlich's testimony will be helpful in this case.

**Counsel for ASIC has discussed these matters with counsel for Plaintiffs, and counsel for Plaintiffs has indicated that these matters will be mentioned or displayed in the presence of the jury before they are admitted in evidence.** *See* **Declaration of Marc J. Shrake.**

## SPECIFIC PREJUDICE TO ASIC IF THIS MOTION IS NOT GRANTED

The prejudice to Defendant is obvious.  An unqualified expert (who is not really an expert) allowed to testify will leave the jury with the impression that his or her opinions are more valuable than another witness's opinions because he or she has the seal of approval of the trial court by reason of the fact that the person is allowed to testify as an "expert."  This prejudice can only be remedied by not allowing this person to testify at trial as an expert.

## ASIC'S CONTENTIONS OF POINTS AND AUTHORITIES

*Dig* was originally scheduled to begin the production of a six-episode mini-series filmed in Israel. After intense fighting between Israelis and Palestinians began, however, the plaintiffs chose to postpone and ultimately move the production of *Dig* out of Israel.  The production was ultimately completed in New Mexico and

Freeman Mathis
& Gary, LLP
Attorneys at Law

1 Croatia in 2014. The plaintiffs seek the "extra" costs incurred as a result of the

2 relocation under the Policy, which states:

3      The amount of your loss will be determined based on:

4          1.      All necessary "Insurable Production Cost" **you incur to**

5                  **complete the "Insured Production" that exceeds the amount**

6                  **of "Insurable Production Cost" you would have incurred if**

7                  **the covered cause of loss had not occurred**;

8          2.      All other necessary expenses that reduce the amount of loss

9                  otherwise payable.

10         3.      Your loss will not include loss of earnings of profit.

11         4.      If you abandon an "Insured Production" that has been made

12                 substantially valueless solely because one or more covered

13                 causes of loss reasonably, practically and necessarily prevents

14                 you from completing the "Insured Production", irrespective of

15                 any completion or delivery date requirements for the "Insured

16                 Production", we will pay as loss the total "Insurable Production

17                 Cost" you have incurred for the "Insured Production".

18      It is the bolded language that is key to the analysis of what *extra* expenses

19 Plaintiffs are entitled to recover under the Policy. They are not entitled to recover any

20 amount that they would have spent if they had stayed in Israel. Only episodes 2

21 through 6 are at issue in this case. After leaving Israel, the plaintiffs decided to tack

22 on an additional four episodes to the series, but none of the costs associated with

23 those episodes are sought here.

24 **A.      The Requirements of Rule of Evidence 702 and the *Daubert* Standard**

25      Federal Rule of Evidence 702 provides as follows:

26      A witness who is qualified as an expert by knowledge, skill, experience,

27      training, or education may testify in the form of an opinion or otherwise if:

28      (a) the expert's scientific, technical, or other specialized knowledge will help

**Freeman Mathis**
**& Gary, LLP**
Attorneys at Law

-3-
DEFENDANT'S MOTION IN LIMINE NO. 4 REGARDING ROBERT WUNDERLICH

1    the trier of fact to understand the evidence or to determine a fact in issue;

2    (b) the testimony is based on sufficient facts or data;

3    (c) the testimony is the product of reliable principles and methods; and

4    (d) the expert has reliably applied the principles and methods to the facts of

5    the case.

6    The United States Supreme Court held in *Daubert v. Merrell Dow*

7 *Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), that Rule 702 requires that the trial

8 judge act as a gatekeeper to "ensure that any and all scientific testimony or evidence

9 admitted is not only relevant, but reliable." Under *Daubert* and its progeny, courts

10 must ensure that *all* expert testimony is relevant and based on reliable methodology.

11 **B.    Wunderlich's Opinions**

12    ***1.    NBC's Cost Bible is the exclusive basis of Wunderlich's opinions.***

13    Wunderlich bases his calculation of damages exclusively on a spreadsheet

14 prepared by Plaintiffs' parent company, NBCUniversal Media LLC ("NBCU").

15 There are several key elements to this spreadsheet. The spreadsheet's first tab has

16 more than 37,000 line entries and apparently lists a brief description of every cost

17 incurred to film episodes 2-6 of *Dig*. Plaintiffs refer to this as the "Cost Bible." The

18 other tabs contain smaller chunks of these costs, broken out by categories. The

19 spreadsheet contains a tab showing the "New Mexico Prep" expenses including, all

20 costs incurred for filming episodes 2-6. It also contains a tab for all "New Mexico

21 Wrap" expenses—purportedly showing all costs incurred to close out the production

22 of *Dig*. There is also a tab for "All Series" expenses, which are purportedly expenses

23 charged to all episodes (for example, the cost to build a set used in every episode).

24 There are tabs showing the expenses incurred for filming in Croatia.

25    ***2.    Wunderlich followed NBC's marching orders when calculating extra***

26      ***expense from the Cost Bible.***

27    Wunderlich totally relied on information provided by NBC employee B.J.

28 Markus when he analyzed which expense categories were duplicated in New Mexico

Freeman Mathis
& Gary, LLP
Attorneys at Law

-4-

DEFENDANT'S MOTION IN LIMINE NO. 4 REGARDING ROBERT WUNDERLICH

1  or Croatia, and he performed no specific analysis to determine whether certain

2  expenses should be counted or not. *Deposition of Wunderlich* at 80-82, 85, 88-89,

3  112. For example, Wunderlich deemed all the "prep" expense incurred in New

4  Mexico and Croatia was "extra expense," and based on the instructions of B.J.

5  Markus, no deductions were made from the total in the Cost Bible. *Id* at 42, 48, 166.

6  Wunderlich performed no independent assessment of the determinations made by

7  Markus, he could not explain why certain line items, like wardrobe, were included in

8  prep, and he conducted no analysis at any level to verify that there was an overlap

9  between what was expended in Israel and what he expended later. *Id* at 58-59, 168,

10  215-216. Wunderlich simply accepted the conclusion of Markus that certain line item

11  expenses were duplicative. *Id* at 59.

12      Wunderlich engaged in a pattern of entirely relying on Markus' instructions for

13  what expenses to include or exclude without verifying the information he was

14  provided. *Id* at 169, 179, 184-185. Wunderlich only subtracted the "wrap" and "all

15  series" expenses from New Mexico and Croatia that Markus told him to subtract. *Id*

16  at 46-47, 63-64. He performed no independent review of these expenses to determine

17  if they were actually incurred in Israel. *Id* at 169. Additionally, Wunderlich did not

18  perform an analysis to determine what the expenses would have been if production

19  had taken place in Israel. *Id* at 247-248. He performed no comparison between the

20  expenses actually incurred in Israel and later expenses he included in extra expense.

21  *Id* at 225-226.

22      ***3.    Wunderlich failed to verify any information NBC provided him and***

23      ***refused to consider NBC's budgetary expectations.***

24      Wunderlich did not look at what NBC expected to spend to produce episodes

25  2-6 and made no attempt to determine what the cost would be if episodes 2-6 were

26  produced in Israel. *Id* at 214, 217. What NBC budgeted to spend on the production in

27  Israel was totally irrelevant to Wunderlich's calculation of extra expense. *Id* at 244.

28  Further, Wunderlich failed to consider, and did not adjust for, the cost savings on

1 episodes 7-10 against the expenses incurred on episodes 2-6. He specifically did not

2 review information regarding the cost of producing episodes 7-10 and he did not note

3 that the cost of these episodes was substantially less expensive than episodes 2-6. *Id*

4 at 359-360. Finally, he refused to look at any savings made by NBC when it moved

5 production to New Mexico and Croatia. *Id* at 70-72. Despite production being moved

6 to a location that was half the cost, Wunderlich still concluded that there was "extra

7 expense" incurred. *Id* at 74-75. And, Wunderlich refused to consider the substantial

8 tax credits made to NBC by New Mexico and Croatia that were over and above what

9 it would have been received from Israel. *Id* at 102-103

10 **C.      Wunderlich's testimony will not be helpful to the jury.**

11         An expert's testimony assists the jury when the expert's knowledge and

12 experience are beyond that of the average juror and the testimony helps the jury to

13 understand the evidence or determine a fact issue. In other words, expert testimony is

14 unhelpful when jurors do not need expert "illumination" regarding an expertise.

15 *United States v. Seschillie*, 310 F.3d 1208, 1212 (9th Cir. 2002). Wunderlich's

16 testimony would do nothing to expand their understanding of this area of expertise in

17 any way that would be relevant to the disputed issues in this trial.

18         When coming to his conclusions, Wunderlich merely determined which prep,

19 wrap, and all series expense categories were not duplicated in New Mexico and

20 Croatia and exclude that from the total in the Cost Bible for episodes 2-6. *Deposition*

21 *of Robert Wunderlich*, pg. 44, 195-196. After removing the duplicative information

22 from the Cost Bible, Wunderlich applied basic arithmetic to determine the total.

23 Wunderlich's conclusions and testimony are not informed by his own expertise;

24 rather, they are based on a simple application of arithmetic which an average juror

25 could perform on their own. *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996)

26 (*quoting United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)). The jury is able

27 to evaluate the same evidence Wunderlich relied upon and is capable of drawing its

28 own conclusions without the introduction of Wunderlich's testimony. Here, the jury

**Freeman Mathis**
**& Gary, LLP**
Attorneys at Law

DEFENDANT'S MOTION IN LIMINE NO. 4 REGARDING ROBERT WUNDERLICH

1   is fully capable of understanding the items and descriptions within the Cost Bible and

2   the jury is fully capable of performing the simple calculations themselves. The basic

3   math applied by Wunderlich in drawing his conclusions is not beyond the knowledge

4   and ordinary intelligence of the average juror. Therefore, Wunderlich's testimony

5   offers nothing more than what lawyers for the parties can argue in closing argument

6   and would not assist the jury in making their decision, rather it would only serve to

7   instruct the jury on what result to reach. *United States v. Frazier*, 387 F.3d 1244,

8   1262–63 (11th Cir. 2004).

9   **D.      Wunderlich is not qualified to opine on this area of expertise.**

10          Wunderlich lacks the qualifications to make his conclusions, his methods in

11   rendering these conclusions are questionable, and the facts and data from which he

12   draws his conclusions are unreliable. An expert must "possess skill, experience, or

13   knowledge in the particular field" in question, the specific question presented must

14   fall "within the reasonable confines of her expertise" and the "area of the witness'

15   competence [must] match the subject matter of the witness' testimony." *See Conroy*

16   *v. Vilsack*, 707 F.3d. 1163, 1169 (10th Cir. 2013); *Robinson v. GEICO Gen. Ins. Co.*,

17   447 F.3d 1096, 1100–01 (8th Cir. 2006). Further, Federal Rule of Evidence 702

18   requires that an expert's testimony be based on sufficient facts or data; be the product

19   of reliable principles and methods, and reliably apply the principles and methods to

20   the facts of the case. The expert's analysis must be reliable at every step and the court

21   must review each material part of an expert's theory to be reliable. *Amorgianos v.*

22   *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("[I]t is critical that an

23   expert's analysis be reliable at every step.").

24          Wunderlich is not a CPA and holds no certifications relevant to the analysis he

25   undertook in making his conclusions. Wunderlich lacks sufficient qualifications to

26   opine on this area of expertise and this renders his conclusions unreliable.

27          This motion in limine has been discussed with opposing counsel, and opposing

28   counsel has either indicated that such matter will be mentioned or displayed in the

**Freeman Mathis**
**& Gary, LLP**
Attorneys at Law

DEFENDANT'S MOTION IN LIMINE NO. 4 REGARDING ROBERT WUNDERLICH

1  presence of the jury before it is admitted in evidence or that counsel has refused to

2  stipulate that such matter will not be mentioned or displayed in the presence of the

3  jury unless and until it is admitted in evidence.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Freeman Mathis
& Gary, LLP**
Attorneys at Law

DEFENDANT'S MOTION IN LIMINE NO. 4 REGARDING ROBERT WUNDERLICH

1

2
3
4
5
6
7
8
9

10

11
12
13
14

15
16
17
18
19

20

21

22

23

24
25
26
27
28

**Freeman Mathis
& Gary, LLP**
Attorneys at Law

## PLAINTIFFS' OPPOSITION

Defendant's motion to exclude the opinions of Plaintiffs' damages expert Dr. Robert W. Wunderlich is baseless. At best, Defendant's motion includes arguments that Defendant is free to explore on cross-examination of Dr. Wunderlich at trial—arguments that go to the weight and not the admissibility of Dr. Wunderlich's opinions. "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). But even if "correctness" were the standard for excluding an expert, Defendant utterly fails to meet it for the reasons set forth below. Defendant's motion should be denied.

### A.   Defendant Mischaracterizes Dr. Wunderlich's Approach.

Defendant's scattershot motion attempts to undermine, with little explanation, the notion that Plaintiffs incurred over $7.1 million in extra expenses as a result of relocating filming from Israel to New Mexico and Croatia. But Defendant's critiques are wide of the mark, as shown by the analysis of its own expert Mr. Shapiro.

Mr. Shapiro opined that Plaintiffs' extra expenses should be calculated by (1) identifying "the TOTAL costs to produce these episodes" 2-6 (*i.e.*, the "Actual Costs") and (2) "then subtract[] from that total the amount Plaintiffs expected to spend when they planned to produce the entirety of these five episodes in Israel" (*i.e.*, the "Budgeted Costs"):

| | |
|---|---|
| Costs Actually Incurred (eps. 2-6) | $ 21,464,745 (a) |
| Israeli Cost Data (eps. 2-6) | ($17,535,425) ( b) |
| | $  3,929,320 |

Bonn Decl. Ex. 10 at 12. But Mr. Shapiro miscalculated the "Costs Actually Incurred" to be just over $21.4 million because he mistakenly relied on a document that (1) listed only costs incurred in New Mexico and Croatia and (2) therefore omitted over $4.3 million incurred on episodes 2-6 in Israel prior to the relocation. *See* Dkt. No. 162 at 8 (Plts.' Opp. to Motion to Substitute). Mr. Shapiro testified that he was "confused"

and unaware of the fact that expenses had been incurred in Israel. Bonn Decl. Ex. 13 at 62:16-24. Adding Plaintiffs' Israeli costs brings the "Costs Actually Incurred" up to over $25.7 (compared to the approximately $17.5 million in Budgeted Costs) and thus raises the extra expenses under Mr. Shapiro's own approach to over **$8.2 million.**

By contrast, Dr. Wunderlich conservatively calculated that Plaintiffs' extra expenses were **$7.1 million** by carefully scrutinizing over 800 financial and accounting records on a line-by-line basis, interviewing senior NBCUniversal personnel, and concluding which expenses had been duplicated in Israel and then yet again in New Mexico and Croatia. The categories of extra expenses cannot seriously be contested.

*First*, Plaintiffs were forced to almost entirely duplicate "prep" and "wrap" expenses as a result of the relocation. Bonn Decl. Ex. 14 (Wunderlich Report) at 3. In a "but-for" world in which the insured event did not occur, Plaintiffs would only have incurred a *single set* of "prep" and "wrap" expenses in Israel. However, Plaintiffs were actually forced to "prep" in Israel for episodes 2-6, "wrap" in Israel prematurely, and then duplicate "prep" and "wrap" expenses in New Mexico and Croatia:

| "But-For" World | "As-Is" World |
|---|---|
| Prep in Israel | Prep in Israel |
| Wrap in Israel | Wrap in Israel |
| | Prep in New Mexico |
| | Wrap in New Mexico |
| | Prep in Croatia |
| | Wrap in Croatia |

*Second*, Plaintiffs were forced to duplicate certain "All Series" expenses. "All Series expenses correspond to expenses incurred in connection with the series as a whole, and then amortized against individual episodes, as opposed to expenses incurred in connection with a single episode." *Id.* Examples include "expenses related to set construction, rentals, set dressing, and travel incurred in connection with the entirety of the series as opposed to a single episode." *Id.* For instance, Plaintiffs were forced to incur $764,512 in construction in New Mexico (*e.g.*, to build sets) after having already done so in Israel. Ex. 14 (Wunderlich Report) at Schedule B3. In a

1   "but-for" world, Plaintiffs would only have expended construction costs to build sets

2   in Israel and would not have duplicated construction costs in New Mexico as well.

3       *Third*, Plaintiffs were forced to incur additional cast compensation expenses as

4   a result of the relocation. Two cast members "were not members of SAG (the Screen

5   Actors Guild)." *Id.* at 6. While they were not "subject to SAG requirements" if

6   production proceeded in Israel, their compensation "had to be adjusted to required

7   SAG compensation levels when the production was relocated to New Mexico . . . ."

8   *Id.* Two other cast members "negotiated increased compensation due to the extended

9   timespan of the production . . . ." *Id.*

10      Defendant mischaracterizes Dr. Wunderlich's methodology for calculating

11  these expenses, contending that (1) he "base[d] his calculation of damages ***exclusively***"

12  on a spreadsheet called the "Cost Bible" and (2) "engaged in a pattern of entirely

13  relying" on instructions from "NBC employee BJ Markus" to decide "which expense

14  categories were duplicated . . . ." *Supra* at 4-5 (emphasis added). This grossly distorts

15  Dr. Wunderlich's approach.

16      Dr. Wunderlich analyzed over 800 financial documents produced in discovery.

17  Bonn Decl. Ex. 14 at D1. These included "summary and detailed ledgers, cost reports,

18  production recap reports, budgets, and other financial data regarding the New Mexico

19  and Croatia production of *Dig*." *Id.* at 3. Dr. Wunderlich also analyzed the "Full Cost

20  Bible for production of episodes two through six of *Dig* in New Mexico and Croatia"—

21  a document that is "a ledger, a type of accounting document prepared in the ordinary

22  course of business, detailing expenses incurred in connection with production of a

23  television program such as *Dig*." *Id.* In addition to analyzing detailed financial records

24  from the *Dig* production, Dr. Wunderlich interviewed "Randi Richmond, Senior Vice

25  President Production, NBCUniversal Cable Productions; BJ Markus, Vice President

26  Production Finance, NBCUniversal Cable Productions; and Eric Gray, Chief Financial

27  Officer, NBCUniversal Cable Entertainment Studios and Content." *Id.*

28      Dr. Wunderlich did not "totally rel[y]" on Ms. Markus to decide "which expense

**Freeman Mathis
& Gary, LLP**
Attorneys at Law

-11-
DEFENDANT'S MOTION IN LIMINE NO. 4 REGARDING ROBERT WUNDERLICH

1  categories were duplicated," as Defendant contends. *Supra* at 5. To the contrary, Dr.

2  Wunderlich testified repeatedly that he concluded which expenses were duplicated by

3  analyzing the financial documents themselves, and that he received input from Ms.

4  Markus on (1) what various codes in the financial documents stood for and (2)

5  particular expenses that should be "extracted" based on the financial documents

6  because they were not duplicated. *See, e.g.*, Bonn Decl. Ex. 15 at 46:13-48:16.

7      It is entirely appropriate for Dr. Wunderlich to have done so. "An expert may

8  base an opinion on facts or data in the case that the expert has been made aware of or

9  personally observed." Fed. R. Civ. P. 703. The facts or data on which the expert relies

10  "need not be admissible for the opinion to be admitted" so long as "experts in the

11  particular field would reasonably rely on those kinds of facts or data in forming an

12  opinion on the subject . . . ." *Id.* Damages experts routinely rely on financial

13  documentation like the "Full Cost Bible" and also on interviews with company

14  personnel to explain such accounting documentation. For instance, in *Int'l Adhesive*

15  *Coating Co. v. Bolton Emerson Int'l., Inc.*, 851 F.2d 540, 545 (1st Cir. 1988), a

16  damages expert Vesey "testified that he derived his damage estimates by reviewing

17  International's business and financial records and through interviews with company

18  personnel." The First Circuit held that it was "obvious that these are sources of

19  information normally and reasonably relied upon by accountants, and Vesey testified

20  to this effect as well. The jury was entitled to believe Vesey's testimony." *Id.* Courts

21  within the Ninth Circuit have reached similar conclusions.[1]

22      Defendant offers no argument that the facts or data provided by Ms. Markus to

23

24  ___
[1] *See, e.g.*, *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 780 (N.D.
25  Cal. 2017) ("It is unquestionable that an expert forming an opinion about the salary
and the hours worked by an employee would rely on statements by the employee in an
26  interview. Thus, Ostiller's decision to rely on an interview with McGeehan to
determine McGeehan's salary, benefits, and hours worked was consistent with the
27  Federal Rules of Evidence."); *Bourns, Inc. v. Raychem Corp.*, 1999 WL 35131842, at
*2 (C.D. Cal. Dec. 28, 1999) ("Although the [economics expert's] interviews
28  constitute hearsay evidence, the interviews are the kind of evidence reasonably relied
upon by experts in measuring damages.").

Freeman Mathis
& Gary, LLP
Attorneys at Law

DEFENDANT'S MOTION IN LIMINE NO. 4 REGARDING ROBERT WUNDERLICH

Dr. Wunderlich are not the type that are reasonably relied upon by damages experts to form conclusions. To the contrary, Defendant's own damages expert Mr. Shapiro testified that he thought the "extractions" Dr. Wunderlich made to eliminate non-duplicated expenses based on his interview with Ms. Markus "***seemed reasonable***." Bonn Decl. Ex. 13 at 101:23-102:1 (emphasis added).

Defendant is free to cross-examine Dr. Wunderlich at trial concerning the fact that he relied on his interview with Ms. Markus and to argue to the jury that such reliance affects the weight that should be given to his testimony. Fed. R. Evid. 705 ("Unless the court orders otherwise, an expert may state an opinion—and give the reasons for it—without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination.").

## B.  Defendant's Methodological Critiques Are Mistaken.

Defendant attempts to undermine Dr. Wunderlich's methodology by parroting the critiques of its own damages expert, Mr. Shapiro. But Mr. Shapiro himself admitted that Mr. Wunderlich's description of his approach—"reviewing the costs that were incurred in relocating the production to Croatia and New Mexico and extracting out those costs that would have been incurred already if the production stayed in Israel"— was not an "unreasonable methodology . . . ." Bonn Decl. Ex. 13 at 72:8-18.

Mr. Shapiro made clear that the basis for his disagreement was the sheer "magnitude of the difference" between Dr. Wunderlich's calculation of extra expenses and his own. *Id.* at 101:9-103:17. But, as shown below, the "magnitude" of the difference between Mr. Shapiro and Dr. Wunderlich's calculations resulted from (1) Mr. Shapiro's miscalculation of "Actual Costs" and (2) Mr. Shapiro's erroneous deductions for items that are precluded as a matter of law and by the Policy itself. Taking Mr. Shapiro's preferred methodology and adjusting for obvious errors in his analysis shows that Plaintiffs' extra expenses are even ***greater*** than what Dr. Wunderlich conservatively calculated.

///

**Freeman Mathis & Gary, LLP**
Attorneys at Law

### 1.    Defendant's "Budget" Critique Is Mistaken.

*First*, Defendant argues that Dr. Wunderlich "did not look at what NBC expected to spend to produce episodes 2-6" and ignored "[w]hat NBC budgeted to spend on the production in Israel . . . ." *See supra* at 6. This parrots Mr. Shapiro's preferred methodology of subtracting budgeted costs for filming episodes 2-6 of *Dig* in Israel from the actual costs of filming those episodes. Bonn Decl. Ex. 10 at 6. But, as discussed above, Mr. Shapiro made a calculation error in utilizing this method by omitting over $4.3 million that had actually been spent in Israel on episodes 2-6 prior to the relocation. Using Mr. Shapiro's "actual v. budgeted" methodology but applying it to the correct spending figures actually yields an even ***greater*** extra expense calculation of $8.2 million than Dr. Wunderlich's conservative opinion of $7.1 million.

### 2.    Defendant's "Episodes 7-10" Critique Is Mistaken.

*Second*, Defendant argues that Dr. Wunderlich "did not adjust for" the "cost savings on episodes 7-10 against the expenses incurred on episodes 2-6." *Supra* at 6. Defendant's motion fails to cite any reason why Dr. Wunderlich ***should*** have offset extra expenses incurred on episodes 2-6 because they also inured to the benefit of later episodes. To the contrary, this argument is barred by the Policy itself.

Under the Policy, Atlantic agreed to pay "such loss . . . as you sustain by reason of such extra expense you necessarily incur as a result of the interruption, postponement, cancellation, relocation, curtailment, or abandonment of an Insured Production due to . . . [i]mminent peril . . . ." Bonn Decl. Ex. 11 at ATL003103. The "amount of your loss will be determined based on . . . [a]ll necessary 'Insurable Production Cost' you incur to complete the 'Insured Production' that exceeds the amount of 'Insurable Production Cost' you would have incurred if the covered cause of the loss had not been incurred." *Id.* at ATL003106. Paragraph 4 of the Policy defines "Insurable Production Cost" as "all costs," except (1) under Subparagraphs 4(a)-(c) certain enumerated excluded costs; and (2) under Subparagraph 4(d), any "other costs specifically stated not to be 'Insurable Production Costs' in an endorsement to this

Policy." *Id.* at ATL003081-82. None of Subparagraphs 4(a)-(c) exclude costs that also inure to the benefit of other, future episodes. Nor is there an endorsement to the Policy excluding such costs in accordance with Subparagraph 4(d).

Defendant's argument that the necessary expenses Plaintiffs incurred on episodes 2-6 due to the relocation should be offset because those expenses also benefited future episodes lacks any support in the Policy.

### 3.      Defendant's "Cost Savings" Critique Is Mistaken.

*Third*, Defendant cites pages 74-75 of Dr. Wunderlich's deposition for the proposition that he failed to consider "any savings made by NBC when it moved production to New Mexico and Croatia . . . [d]espite production being moved to a location that was half the cost . . . ." *Supra* at 6. But that portion of Dr. Wunderlich's deposition addressed a *hypothetical question:*

> **Q.**     So let me have you *assume a situation* where *Dig* was not completed in Israel. It was moved to an alternative location and the alternative location cost half of what NBCUniversal expected to spend in Israel.
>              Under that circumstance, are you opining to the court that there would be extra expense?

Bonn Decl. Ex. 15 at 74:14-19. Defendant presents zero evidence that there were any *actual* "cost savings" that Dr. Wunderlich should have deducted or that New Mexico and Croatia were "half the cost" of Israel as a location.

To the contrary, Mr. Shapiro's own methodology—when adjusted to account for the $4.3 million in expenses incurred in Israel of which Mr. Shapiro was simply unaware—shows that filming was over *$8.2 million over budget* as a result of relocating to New Mexico and Croatia. In other words, there were no "cost savings"; Plaintiffs were forced to incur substantially more money to film *Dig* due to the relocation than what had been budgeted.

### 4.      Defendant's "Tax Credit" Critique Is Mistaken.

*Fourth*, Defendant contends that Dr. Wunderlich should have offset his extra expense calculation because Plaintiffs received more favorable "tax credits" in "New

Freeman Mathis
& Gary, LLP
Attorneys at Law

DEFENDANT'S MOTION IN LIMINE NO. 4 REGARDING ROBERT WUNDERLICH

Mexico and Croatia that were over and above" what they would have received in Israel. *Supra* at 6. But under black-letter, California law, evidence of "tax consequences should not be considered as a mitigating factor in compensatory damage calculations in breach of contract cases." *DePalma v. Westland Software House*, 225 Cal. App. 3d 1534, 1536 (1990). In addition, as discussed in Part B.3 above, the Policy itself does not permit offsetting "Insurable Production Cost" with tax credits, either (1) under the specifically excluded costs in Subparagraphs 4(a)-(c) or (2) under an endorsement that complies with Subparagraph 4(d). Mr. Shapiro admitted that he had no support for his "tax credit" deduction theory in the Policy itself, that it was "just my understanding in dealing with an insurance claim," and that he's "not a lawyer" and "not familiar with the insurance contract in that respect." Bonn Decl. Ex. 13 at 159:9-160:21.

## C.   Dr. Wunderlich Is Qualified and His Opinions Are Relevant.

Finally, Defendant recites a series of boilerplate requirements for expert testimony and argues, without any elucidation, that Dr. Wunderlich fails to meet them. *Supra* at 6-7. The arguments are also logically inconsistent—Defendant contends that all Dr. Wunderlich performed was "basic arithmetic" for which no expert analysis is necessary, only to turn around and argue that Dr. Wunderlich is unqualified to testify about such issues because he is not a Certified Public Accountant. *Compare supra* at 6 *with supra* at 8. Both arguments are wide of the mark.

Dr. Wunderlich is qualified and his opinions will aid the jury in calculating extra expenses. Dr. Wunderlich received his M.B.A. from UCLA with an emphasis in Finance, has served as a damages expert since the 1990s (with extensive experience in film and television), and has testified as an expert 16 times in trials and arbitrations in the last 10 years alone—as his 10-page CV explains in great detail. Bonn Decl. Ex. 14 (Wunderlich Report) at Schedule E1.

Defendant's motion raises cross-examination points that are hardly persuasive in any event. Defendant is free to attempt to persuade the jury with them; but such arguments are no basis for excluding Dr. Wunderlich's opinions.

**Freeman Mathis
& Gary, LLP**
Attorneys at Law

-16-
DEFENDANT'S MOTION IN LIMINE NO. 4 REGARDING ROBERT WUNDERLICH

## ASIC'S REPLY

Under the Policy, Plaintiffs must prove their loss, which states:

The amount of your loss will be determined based on:

1.  All necessary "Insurable Production Cost" **you incur to complete the "Insured Production" that exceeds the amount of "Insurable Production Cost" you would have incurred if the covered cause of loss had not occurred**.

2.  All other necessary expenses that reduce the amount of loss otherwise payable.

3.  Your loss will not include loss of earnings of profit.

4.  If you abandon an "Insured Production" that has been made substantially valueless solely because one or more covered causes of loss reasonably, practically and necessarily prevents you from completing the "Insured Production", irrespective of any completion or delivery date requirements for the "Insured Production", we will pay as loss the total "Insurable Production Cost" you have incurred for the "Insured Production".

Throughout years of discovery, which closed long ago, and thousands of submissions, Plaintiffs have not demonstrated, or even stated, the claimed amount of the "Insurable Production Cost" if the claimed loss had not occurred.

DATED:  January 17, 2020

MARC J. SHRAKE
FREEMAN MATHIS & GARY, LLP

-and-

CHRISTOPHER W. MARTIN *(Pro Hac Vice)*
MELINDA R. BURKE *(Pro Hac Vice)*
WILLIAM E. McMICHAEL *(Pro Hac Vice)*
MARTIN, DISIERE, JEFFERSON
& WISDOM LLP

By:    */s/ Christopher W. Martin*
Attorneys for Defendant ATLANTIC
SPECIALTY INSURANCE COMPANY

Freeman Mathis
& Gary, LLP
Attorneys at Law

-17-

## DECLARATION OF MARC J. SHRAKE

I, Marc J. Shrake, declare as follows:

1.      I am an attorney authorized to practice before all California courts and before this Court and am a partner with the law firm of Freeman Mathis & Gary, LLP, attorneys for Defendant Atlantic Specialty Insurance Company.

2.      I have personal knowledge of the matters set forth in this Declaration, and if called upon to testify to them, could and would do so.

3.      I make this Declaration in conjunction with, and in support of, Atlantic Specialty's Motion in Limine No. 4.

4.      Counsel for ASIC has discussed the matters raised in Motion in Limine No. 4 with counsel for Plaintiffs, and counsel for Plaintiffs has indicated that these matters will be mentioned or displayed in the presence of the jury before they are admitted in evidence.

I declare under penalty of perjury of the laws of the United States of America and the laws of the State of California that the foregoing is true and correct and that this declaration is executed this 17th day of January 2020 at Los Angeles, California.

DATED:  January 17, 2019                    MARC J. SHRAKE


                                        By:   */s/ Marc J. Shrake*
                                              Marc J. Shrake

**Freeman Mathis
& Gary, LLP**
Attorneys at Law

-18-
DEFENDANT'S MOTION IN LIMINE NO. 4 REGARDING ROBERT WUNDERLICH