

**THE OHIO STATE UNIVERSITY**

MORITZ COLLEGE OF LAW

Michael E. Moritz College of Law

Drinko Hall
55 West 12th Avenue
Columbus, OH 43210-1391

614-292-2631 Phone
614-292-2035 Fax

moritzlaw.osu.edu

March 17, 2017

Michael Keeley, Esq.
Strasburger & Price, LLP
901 Main Street, Suite 6000
Dallas TX 75202

### Background and Qualifications

I am John Quigley, Professor Emeritus, Moritz College of Law, The Ohio State University in Columbus, Ohio. I have been asked to give an opinion in *Universal Cable Productions LLC and Northern Entertainment Productions LLC v. Atlantic Specialty Insurance Company*, Case No. 2:16-cv-04435-PA-MRW.

I specialize in international law. I have taught international law since 1972 at the Moritz College of Law, The Ohio State University. I have extensive practical experience in international law. I have served as consultant or expert in international litigation. I have written several books and numerous scholarly articles on international law, and in particular on the law of war and on statehood. My curriculum vitae and publication list are attached as Exhibit 1.

In 2013, I served as expert in *Sokolow v. Palestine Liberation Organization*, U.S. District Court, Southern District of New York, Case No. 1:04-cv-397, 2013. This is the only case in which I have testified by trial or deposition in the last four years.

I am being compensated at a rate of $500 per hour. My compensation in the instant matter is not conditioned on the content of the opinions expressed in this report, nor is my compensation contingent on the results of these proceedings.

The materials I have considered are referenced in the text of this document or are attached as Exhibit 2.

### Summary of Opinions

Based on my experience and expertise in Israeli-Palestinian relations, the 2014 Gaza-Israel hostilities constituted a war as that term is used in international law and in ordinary parlance. These hostilities were waged with weapons of war. My opinion that these hostilities constituted a war is based on five considerations. First, The plain meaning of the term "war" includes the conflict that occurred in 2014 between Gaza and Israel. Second, while Hamas need not have

been a government or quasi-government for the conflict to have been considered a war, it is my opinion that Hamas is part of the government of the State of Palestine. Thus, the 2014 hostilities constituted a war between two states. Third, these hostilities involved territory under belligerent occupation. Fourth, Hamas is at the very least a de facto administration governing territory And fifth, the law that applied to the hostilities was humanitarian law. In reaching this opinion, I have considered and dismissed the contention that the designation of Hamas as a terrorist organization negates the character of the Gaza-Israel 2014 hostilities as a war. Even apart from the character of the 2014 Gaza-Israel hostilities as a war, actions taken by the military forces of the two sides that constituted warlike actions and defense against same.

## Discussion and Grounds for Opinions

*The Gaza-Israel hostilities of 2014*

Hostilities commenced between Israel and Gaza the second week in July 2014 and continued to late August 2014. Three Israeli teenagers were kidnapped on June 12, 2014 in the West Bank of the Jordan River, territory of Palestine occupied by Israel since 1967. The Israeli Government attributed the kidnapping to Hamas, which governs Gaza. Israel's army launched a large-scale search and arrest operation in the West Bank, detaining large numbers of Hamas personnel resident there. In response, military units associated with the Hamas administration in Gaza fired rockets into Israel from Gaza. Israel responded with an air campaign against Gaza, a campaign that led to more rocket-firing from Gaza. Israel called its military action against Gaza "Operation Protective Edge," thus giving it a designation of the type that governments give to wars.

Except for intermittent periods of ceasefire, rockets continued to be fired from Gaza into Israel and Israel continued air strikes. Damage was especially intense in neighborhoods of Gaza from which, according to Israel, rockets were being fired. [Benjamin Land and Maria Locke, *Scenes of war and heartbreak as Israel-Hamas conflict intensifies*, MSNBC, July 18, 2014] Horrifying images of war were sent around the world on social media. [Alastair Jamieson, How Technology Is Intensifying Gaza War between Israel and Hamas, *NBC News*, July 30, 2014] These and other major news outlets referred to the hostilities as a "war."

On July 17, 2014, a Hamas military force entered Israeli territory, using a sophisticated set of underground tunnels. This action prompted a ground assault by the Israeli Army into Gaza. According to a Commission of Inquiry organized by the United Nations Human Rights Council, during the period of hostilities, more than 6000 airstrikes were launched by Israel against Gaza, 14,500 tank shells were fired by Israel and 35,000 artillery shells. Entire neighborhoods in Gaza were destroyed. An estimated 4881 rockets and 1753 mortars were fired from Gaza into Israel, sending thousands to bomb shelters. Israel's ground assault into Gaza was met by Gaza's defenses. [Report of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1, June 24, 2015, UN Document A/HRC/29/52, paragraphs 27, 35, 48] Hamas fired rockets at incoming Israeli ground troops. The Commission of Inquiry counted 67 Israeli soldiers killed overall during the hostilities. On the Gaza side, the Commission of Inquiry counted 789 combatant deaths and 1462 civilian deaths for a total of 2251. Another 11,231 were counted as injured. [Report of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1, June 24, 2015, UN Document

A/HRC/29/52, paragraphs 20-21] Some 20,000 dwellings in Gaza were destroyed or otherwise rendered uninhabitable by Israeli Army bombing. [Signs of war still visible in Gaza, *MSNBC2*, January 16, 2015]

Half a million Gazans were forced to flee their homes as a result of the hostilities, primarily Israel's aerial attacks, and became displaced. On the Israeli side, 28,000 residents of southern Israel fled their homes because of rocket fire from Gaza and became displaced. [United Nations Office for the Coordination of Humanitarian Affairs, *Fragmented Lives Humanitarian Overview 2014*, Jerusalem, March 2015]

Efforts at ceasefires were made through the period of the hostilities by the United Nations Security Council. [U.N. Security Council Calls for 'Immediate' Gaza Cease-Fire, *NBC News*, July 28, 2014] The Security Council is the organ of the United Nations entrusted with "responsibility for the maintenance of international peace." [UN Charter, art. 24] Its involvement attested to the seriousness of the hostilities.

Each side characterized the hostilities as a war as they blamed the other. Israeli Prime Minister Benjamin Netanyahu said, while the hostilities were ongoing, "There is no war more just than this." [Be ready for 'prolonged' Gaza war, Netanyahu says, *Times of India*, July 29, 2014] David Roet, Israel's United Nations ambassador, told the United Nations Security Council, "This is not a war we chose," and again, "Israel did not want this war." [UN Security Council, 7222d meeting, July 22, 2014, at 6] The Palestine UN representative, Riyad Mansour, referred to "Israeli military aggression in Gaza" at the same Security Council meeting. [Id. at 4] Khaled Meshaal, the Hamas leader, said that the hostilities were "not a war of choice" on his side. [Khaled Meshaal: 'Not a war of choice,' *Al-Jazeera*, August 17, 2014]

The media characterized the hostilities as a "war" while they were in progress. NBC News reporter Cassandra Vinograd penned a piece on the ramifications of the hostilities under the headline "Public support for Israel shifting amid Gaza War, Britain warns." [NBC News, July 30, 2014] An NBC Jerusalem correspondent referred to the hostilities as "the current war in the Gaza Strip. [Gaza War: Hamas admits kidnapping three Israeli teens, *NBC News*, August 21, 2014]

As the hostilities ended, the media christened them the "50-day war," a reference to the "six-day war" involving the same territory in 1967. [Gaza cease-fire holds between Hamas and Israel after 50-day war, *NBC News*, August 27, 2014; Lizzie Dierden, Israel-Gaza Conflict: 50-Day War by Numbers, *The Independent*, August 27, 2014; Jodi Rudoren, *50 Days of War Leave Israelis and Palestinians Only More Entrenched*, New York Times, August 29, 2014]

With hindsight in the aftermath, the media continued to characterize the hostilities as a war, as in a Jerusalem byline piece in December 2014. [Gaza War: Israel opens eight new investigations into military operations, *NBC News*, December 7, 2014] A 2017 piece in an Israeli newspaper did the same. [Barak Ravid and Gil Cohen, Gaza War: 11 Key Headlines From Scathing Report Rattling Israel's Politicians and Military, *Haaretz*, February 28, 2017]

Based on my knowledge and scholarly work in the law of war, I find the 2014 Gaza-Israel military hostilities to be a war. This conclusion flows first from the fact that the plain meaning of the term "war" includes the conflict that occurred in 2014 between Gaza and Israel. It flows, second, from the fact that while Hamas need not have been a government or quasi-government for the conflict to have been considered a war, the Hamas Administration in Gaza constitutes part of the governing authority of the State of Palestine, therefore its military conflict with another state, namely Israel, is between two states. It flows, third, from the fact that it arose in a situation of belligerent occupation. It flows, fourth, from the fact that Hamas, even were it not deemed part of a state, is a de facto administrator of territory. It flows, fifth, from the fact that the law that was applied to the hostilities was humanitarian law.

*Under any definition of the term "war," Hamas and Israel were at war*

Given the scope of the conflict between Hamas and Israel, by any meaning of the term "war," Hamas and Israel were at war. Israel directed a fierce military campaign at Hamas calculated to destroy Hamas' tunnel system and prevent them from being able to launch any serious future attacks against Israel. Hamas, on the other hand, waged ground and air attacks against Israel in support of their stated goal of forcing Israel out of what Hamas considers Palestinian territory. Both sides used weapons of war over an extended period of time with the clear objective of defeating the other side militarily. The battles were fought both on the ground and in the air with sophisticated military weapons, resulting in the significant destruction of property and lives. Additionally, world-wide the conflict was considered a war.

*War between two states*

I do not believe Palestine has to be considered a state for there to have been war. But, Palestine was and is a state. Gaza is part of Palestine. No state other than Palestine makes a claim to Gaza. Gaza was part of Palestine coming out of World War I, under the Treaty of Lausanne of 1923. [Treaty of Peace, Lausanne, July 24, 1923, *League of Nations Treaty Series*, vol. 28, at 11] After Egypt occupied Gaza in 1948, Egypt administered Gaza as part of Palestine. Gaza was not incorporated into Egypt. In 1967 Israel occupied Gaza. In 1989, the Palestine Liberation Organization declared itself as the lawful governing authority of Gaza, along with the West Bank of the Jordan River. Israel withdrew from administration in Gaza in 2005. [John Quigley, *The Statehood of Palestine: International Law in the Middle East Conflict*, 2005]

Upwards of 130 states have accorded Palestine formal diplomatic recognition. [CRS Report for Congress, *The Palestinians: Background and U.S. Relations* (Jim Zanotti, Specialist in Middle Eastern Affairs), January 31, 2014, at 13] In 2012, the United Nations General Assembly declared by resolution that the observer mission that it had received since 1974 was the observer mission of a state. [UN General Assembly, Status of Palestine in the United Nations, Resolution 67/19, 29 November 2012] Since that time all international institutions that have had occasion to deal with the issue have dealt with Palestine as a state. The Prosecutor of the International Criminal Court on January 1, 2015 accepted a declaration filed by Palestine giving the Court jurisdiction over acts committed "in the occupied Palestinian territory, including East Jerusalem, since June 13, 2014." That declaration could be accepted by the Prosecutor only on the premise that Palestine is a state, since Article 12(3) of the Court's Statute accords the right to confer

jurisdiction only to states. On the basis of the Palestine declaration, the Prosecutor opened a
preliminary examination of possible war crimes committed in the Gaza-Israel hostilities. That
examination is ongoing. [International Criminal Court, Office of the Prosecutor, Report on
Preliminary Examination Activities 2016, paragraph 111]

On January 2, 2015, Palestine acceded to the Statute of the International Criminal Court. That
accession was filed, as required, with the Secretary-General of the United Nations. [International
Criminal Court, Office of the Prosecutor, Report on Preliminary Examination Activities 2016,
paragraph 111] Accession to the Statute is open only to states. The Secretary-General approved
Palestine's accession, thereby acknowledging Palestine's status as a state.

The United States deals with Palestine as a state. Beginning in 1993, the United States has
encouraged Israel and Palestine to agree on a border and other issues. An agreement was signed
at the White House to this end in 1993. [Declaration of Principles on Interim Self-Government
Arrangements, September 13, 1993]. Borders are arranged only between states. A cession of
territory can come only from a state. "Cession means the formal transfer of title (sovereignty)
over territory from one state to another." [Gerhard von Glahn, *Law Among Nations: An
Introduction to Public International Law* (1996), at 301] If Israel were to gain territory from
Palestine through negotiations, or if Palestine were to gain territory from Israel through
negotiations, the title would be valid because it came from a state.

In 2003, the United States fashioned another arrangement that was premised on Palestine's status
as a state. A Performance-based Roadmap to a Permanent Two-State Solution to the Israeli-
Palestinian Conflict was drawn up by the United States, Russia, the European Union, and the
United Nations on April 30, 2003. The Roadmap charted three "phases" to lead to a peace
agreement between Israel and Palestine. [UN Document S/2003/529, May 7, 2003]

"Phase One" was to involve a build-up of Palestinian institutions of governance over a period of
a few weeks. "Phase Two," to begin in June 2003, would bring "Creation of an independent
Palestinian state" and the four sponsors, including the United States, would "promote
international recognition of Palestinian state, including possible UN membership." For a variety
of reasons, these phases were not implemented, but the fact that the United States could, at the
end of April 2003, anticipate advocating international recognition of Palestine by early June
2003 implied that Palestine was already a state as of the date of promulgation of the Roadmap.
Apart from a few weeks of shoring up institutions of governance, nothing fundamental would
change between 30 April and early June in Palestine's status. Thus, the United States was
dealing with Palestine as a state.

The Commission of Inquiry established by the UN Human Rights Council to examine the Gaza-
Israel 2014 hostilities viewed Hamas as an administration operating as part of the State of
Palestine. To make the point that Hamas was bound to respect international norms, it wrote, "The
State of Palestine is bound by the obligations contained in the treaties to which it has acceded.
The Commission thus viewed the hostilities as being between two states: Israel and Palestine.
[Report of the independent commission of inquiry established pursuant to Human Rights Council
resolution S-21/1, June 24, 2015, UN Document A/HRC/29/52, paragraph 12]

*War in the context of belligerent occupation*

A third  reason for my conclusion that the Gaza-Israel hostilities of 2014 constituted a war, and specifically a war international in character, is that they arose out an international belligerency. Gaza was taken and occupied by Israel in a war that occurred in 1967. The Office of the Prosecutor of the International Criminal Court, as part of its current examination of war crimes committed during the 2014 hostilities, placed the hostilities in the context of Israel's occupation dating from 1967. [International Criminal Court, Office of the Prosecutor, Report on Preliminary Examination Activities 2016, paragraph Paragraphs 116-120]

The hostilities of 1967 were universally regarded as a war, and a war of an international character. Gaza became territory under belligerent occupation from that time. Israel initially became the administrator in Gaza but withdrew from administration in 2005, after which it controlled entry into and exit from Gaza, controlled Gaza's airspace, and reserved for itself the right to enter with military force. Any hostilities between an organized military force in Gaza on the one hand and Israel on the other constitute a continuation of the 1967 war. Israel's leading legal analyst of war writes, "As the appellation 'belligerent occupation' suggests, there is an inextricable tie between this species of occupation and inter-State war. [Yoram Dinstein, *The International Law of Belligerent Occupation* (2009), at 31] Belligerent occupation continues even after a truce is put into effect and lasts until a complete withdrawal, typically accompanied by a peace treaty. If, during the time of belligerent occupation, forces of the occupied territory engage against forces of the occupier, such hostilities are a continuation of the hostilities that led to the occupation. In this situation, "The hostilities may be classified as resumption of IAC [international armed conflict] if the protagonists of hostilities are members of armed forces of the occupied state."

Gaza continued under belligerent occupation through the period of the hostilities of 2014. The Central Intelligence Agency *World Fact Book: Middle East: Gaza Strip* (updated December 14, 2016) notes Israel's withdrawal of settlements and military units from Gaza in 2005 but further notes that Israel "continues to control the Gaza Strip's land and maritime borders and airspace." UN Secretary-General Ban Ki Moon said in 2016 that Gaza remains under belligerent occupation. He referred to the fact that the Security Council has so said. "As the Security Council has made clear, Gaza, and the West Bank, including East Jerusalem, have been under military occupation since 1967." [*Secretary-General Stresses Palestine's Right to Exist, Israel's Need for Peace with Neighbours, in Final Security Council Briefing on Middle East*, UN Document SG/SM/18372-SC/12633-PAL/2211, December 16, 2016]

The UN Human Rights Council, in reacting to the Gaza-Israel hostilities as they were ongoing in 2014, referred to Israel as "the occupying power" in Gaza. [Human Rights Council Resolution A/HRC/RES/S-21/1, July 23, 2014, paragraph 6] The Office of the Prosecutor of the International Criminal Court concluded shortly after the end of the Gaza-Israel hostilities that Gaza remained under belligerent occupation. "Overall," said the Office of the Prosecutor, "there is a reasonable basis upon which to conclude that Israel continues to be an occupying power in Gaza despite the 2005 disengagement. The Office has therefore proceeded on the basis that the situation in Gaza can be considered within the framework of an international armed conflict in view of the continuing military occupation by Israel." [International Criminal Court, Office of

Quigley Report
Page 7 of 10

the Prosecutor, Situation on Registered Vessels of Comoros, Greece and Cambodia, Article
53(1) Report, November 6, 2014, paragraph 29]

"Armed conflict" is the term used in international law to refer to war. The fact that the terms are
interchangeable is seen by their use in the titles of the major treaties on warfare: Two of the
major treaties on war are the Convention relative to the Treatment of Prisoners of War (August
12, 1949) and the Convention on the Treatment of Civilians in Time of War (August 12, 1949).
In 1977, a treaty was concluded to elaborate on and clarify provisions of the 1949 treaties. The
term used in the title of the 1977 treaty was Protocol Additional to the Geneva Conventions of 12
August 1949 and relating to the Protection of Victims of International Armed Conflict (June 8,
1977). The 1977 treaty, relating to the same topic as the 1949 treaties on "war," used the term
"armed conflict." The International Committee of the Red Cross, which is identified in these
treaties as the agency that monitors compliance with them, describes the treaties as follows: "The
Geneva Conventions and their Additional Protocols are international treaties that contain the
most important rules limiting the barbarity of war." [International Committee of the Red Cross,
*The Geneva Conventions of 1949 and their Additional Protocols*, January 1, 2014,
https://www.icrc.org/en/document/geneva-conventions-1949-additional-protocols]

*Hamas as de facto government*

A fourth reason for my conclusion is that the Hamas administration is at least an administration
of territory of a de facto character. Again, while I do not believe this is necessary for there to
have been a war, this fact further supports my opinion to the extent others so believe.  Hamas
came to power in Palestine through a Palestinian Legislative Council election held in 2006. The
Hamas Party won a majority of seats in that election to the Palestinian Legislative Council. That
election was held with the encouragement and backing of the United States, including financial
assistance to the electoral process. It was deemed a fair election by international observers.
Internal contention developed following that election, leading to a failure to form a single
administration for Palestine, and to an administration being formed by Hamas that took control
in the Gaza sector of Palestine.

Since 2007, Hamas has remained the administration of Gaza. The Central Intelligence Agency's
*World Fact Book Middle East: Gaza Strip* (updated December 14, 2016) states, "Hamas remains
in de facto control of the Gaza Strip."

The Commission of Inquiry established by the UN Human Rights Council considered that
Hamas was bound by international law because it exercised governmental-type functions. It said,
"The authorities in Gaza must respect and ensure human rights norms because of their exercise
of government-like functions." [Report of the independent commission of inquiry established
pursuant to Human Rights Council resolution S-21/1, June 24, 2015, UN Document
A/HRC/29/52, paragraph 12]

As the administration of a piece of territory, Hamas functions as a government, even though as
part of a larger Palestinian administration it does not conduct its own relations with the outside
world.

Nonetheless, other states carry out activities in Gaza and in so doing work with Hamas, acknowledging its role as the governing body in Gaza. The most significant outside entity is the United Nations Relief and Works Agency, which operates schools and clinics and distributes humanitarian aid in Gaza. UNRWA's budget is composed of donations by states. The United States is the largest donor. [CRS Report for Congress, *Hamas: Background and Issues for Congress* (Jim Zanotti, Analyst in Middle Eastern Affairs), December 2, 2010, at 30] UNRWA coordinates its efforts with Hamas as the governing body in Gaza].

Hostilities between a de facto government and the government of a state constitute an armed conflict of an international character.

*Hostilities to which humanitarian law applied*

My fifth reason for concluding that the Gaza-Israel 2014 hostilities constituted a war is the fact that the conflict fell under humanitarian law. This is the body of law that applies to armed conflict, whether of an international or non-international character. Regardless of the characterization of Hamas, the 2014 Gaza-Israel hostilities were regarded by the international community and by Israel as being governed in the legal sphere by humanitarian law. That fact makes the hostilities a war.

Israel considered humanitarian law to be the law applicable to the hostilities. The Israeli Army, in conducting inquiries into whether any of its forces committed war crimes, used the law of armed conflict as its standard. [Israel clears forces in several deadly 2014 Gaza war cases, *U.S. News & World Report*, August 24, 2014] Israel's government report on the investigation of possible war crimes by its forces stated, "Israel is aware of allegations of violations of international law during the 2014 Gaza Conflict and is committed to investigating fully any credible accusation or reasonable suspicion of a serious violation of the Law of Armed Conflict." [State of Israel, *The 2014 Gaza Conflict 7 July – 26 August 2014, Factual and Legal Aspects*, May 2015, paragraph 409]

The United Nations Human Rights Council's Commission of Inquiry noted the applicability to the hostilities of the Convention on the Treatment of Civilians in Time of War of 1949 (Geneva Civilians Convention). This Convention, as indicated by its title, applies only in time of war. [Human Rights Council Resolution A/HRC/RES/S-21/1, July 23, 2014, preamble]

After discussing the Gaza-Israel hostilities at its July 28, 2014 meeting (meeting no. 7225), the United Nations Security Council, through its President, issued a statement, saying, "The Security Council calls for full respect of humanitarian law, including protection of the civilian population." [Statement by the President of the Security Council, United Nations Document S/PRST/2014/13, July 28, 2014] The reference to the "civilian population" encompassed civilians in both Gaza and Israel. Hence, the Security Council was characterizing the rocket fire from Gaza into Israel as governed by humanitarian law. Humanitarian law applies only to armed conflict, i.e., war, whether international in character or not. As a result, the Security Council's view of the Gaza-Israel hostilities was that they constituted a war.

Israel used humanitarian law in alleging violations by Hamas. Alan Baker, formerly a legal officer in Israel's Foreign Ministry, said that Hamas' "indiscriminate targeting of Israel's civilian population centers" amounted to "violations of international humanitarian law for which Hamas' leaders and commanders are accountable and prosecutable." [Alan Baker, *The Legal War: Hamas' Crimes Against Humanity and Israel's Right to Self-Defense*, 2014]

Israel has responded to the International Criminal Court since the Office of the Prosecutor opened a preliminary examination of the Gaza-Israel hostilities. Israel's purpose in so doing was to object to the Court's jurisdiction. Israel did not address the substance of what the Court is examining. In particular, it did not argue that what was being examined was not a war. [Israel provides ICC with information on 2014 Gaza War, *Times of Israel*, June 3, 2016]

The fact that investigations were conducted under humanitarian law as to whether war crimes under international law occurred is a clear indication that there is a war, as demonstrated by the investigations and the actions taken by the various parties.

*Terrorist acts during a war*

If acts that constitute terrorism were committed during the 2014 Gaza-Israel conflict, that fact does not negate the character of the conflict as a war. The characterization of an organization as terrorist is not relevant to whether that organization is at war, or to the status of that organization as being either a state or a non-state. Acts of terrorism can be committed during a war. The Geneva Conventions govern the legality of acts committed during war by states. The Protocol Additional to the Geneva Conventions of 12 August 1949 and relating to the Protection of Victims of International Armed Conflict (June 8, 1977) provides, in Article 51(2), "Acts or threats of violence the primary purpose of which is to spread terror among the civilian population are prohibited." Hence an organization at war, whether a non-state, a state, or a quasi-state is capable of spreading "terror" by engaging in acts of violence that is considered terrorism. The firing of rockets that spread terror in the civilian population of Israel can be acts of war, and here they were acts of war. The characterization of an entity as terrorist is a description of what the entity does, not what it is. A non-state entity can engage in terrorist acts. A state can engage in terrorist acts. And, historically even world wars that the United States was involved in included what some people believed to be acts of terror. But, that in no way lessens the fact that there was a war. And, that is the case with the conflict between Hamas and Israel in 2014.

*Warlike action*

In addition to the above analysis, it is my opinion that the military measures taken in the 2014 Gaza-Israel hostilities constituted warlike action, and that that action was, on each side, taken by a military force. The military units associated with Hamas and operating in Gaza constituted a military force, given their level of organization as such. Those units are called the Izz ad-Din al-Qassam Brigades, formed in 1991 and operating out of Gaza. In 2006, they engaged the Israel Defense Force, when it sent troops into Gaza. On the Israeli side, the Israel Defense Force is a military force, rated among the world's strongest, possessing advanced fighter jets and deployable nuclear weapons. During the 2014 hostilities, each side took action that was warlike

in character. Additionally, each side took military action that it regarded as defending against
attack by the other side, and in so doing used military personnel.

The International Criminal Court described the course of Operation Protective Edge as follows:
"The Operation consisted of three phases: after an initial phase focused on air strikes, Israel
launched a ground operation on 17 July 2014, followed by a third phase of the operation
launched on 5 August characterised by alternating ceasefires and aerial strikes. The hostilities
ended on 26 August 2014 with both sides agreeing to an unconditional ceasefire." [International
Criminal Court, Office of the Prosecutor, Report on Preliminary Examination Activities 2016,
paragraph 114] This description depicts "warlike" action.

The 2014 Gaza-Israel hostilities were waged with weapons of war. Rockets from Gaza reached
as far as Tel Aviv, causing disruption at Israel's international airport. The Israel Defense Forces
reported during the hostilities that rockets were fired into Israel capable of reaching Israel's
largest population centers and endangering 3.5 million Israeli lives. The military installations in
Gaza that figured in the hostilities were numerous and sophisticated. The Israel Defense Forces
reported that they bombed by air in Gaza 1,678 rocket launching facilities, 977 command and
control centers, 237 military administration facilities, 191 weapons storage and manufacturing
facilities, and 144 training and military compounds. [Israel Defense Forces, *Operation Protective
Edge by the Numbers*, August 5, 2014] The rockets emanating from Gaza were sophisticated in
mode of launching, as they were planted underground and were launched from a distance by
remote control. [William Booth, Here's what really happened in the Gaza war (according to the
Israelis), *Washington Post*, September 3, 2014]  Additionally, Israel utilized tanks, armored
personnel carriers and gunboats, each of which constitute weapons of war.  And, Israel executed
a ground invasion with soldiers using military weapons.

Israel's targeting was sufficiently sophisticated that Israel was able to strike particular apartments
within high-rise apartment buildings. Israel's air strikes were sufficiently extensive that they
resulted in the demolition of several neighborhoods in Gaza. The UN Human Rights Council
characterized the hostilities as an "Israeli military assault on the occupied Gaza Strip." [Human
Rights Council Resolution A/HRC/RES/S-21/1, July 23, 2014, preamble] Israel protected itself
from Gaza-launched rockets with its highly sophisticated "iron dome" missile defense system.

## Conclusion

Based on my information and on my work over many years in the law relating to warfare and
statehood, and taking into account the aforesaid considerations, I find the Gaza-Israel conflict of
2014 to have constituted a war. Additionally, I find that warlike action was taken by each side
and included the use of weapons of war.

John Quigley

# EXHIBIT '1'

CURRICULUM VITAE
JOHN QUIGLEY

Moritz College of Law
The Ohio State University
55 West Twelfth Avenue
Columbus, Ohio 43210
Tel: (614) 292-1764

POSITIONS HELD

Professor Emeritus, Moritz College of Law, The Ohio State University, 2013 to date

President's Club Professor in Law, The Ohio State University, 1999-2013

Professor of Law, The Ohio State University, 1974-1999

Professor in Law, University of Dar es Salaam, Tanzania, 1982-1983 (on leave from The Ohio State University)

Associate Professor, College of Law, The Ohio State University; and Adjunct Associate Professor, Department of Political Science, The Ohio State University, 1972-1974

Assistant Professor, College of Law, The Ohio State University; and Adjunct Assistant Professor, Department of Political Science, The Ohio State University, 1971-1972

Assistant Professor, Department of Slavic Languages and Literatures; Adjunct Assistant Professor, College of Law; and Adjunct Assistant Professor, Department of Political Science, The Ohio State University, 1969-1971

Research Associate in Law, Harvard Law School, 1967-1969

Research Fellow (via U.S.-U.S.S.R. cultural exchange program), Department of Civil Law, Faculty of Law, Lomonosov Moscow State University, 1966-1967

EDUCATION

Harvard Law School, LL.B. 1966

Harvard University, M.A. in Regional Studies (U.S.S.R.) 1966

Harvard College, A.B. 1962 (cum laude)

BAR ADMISSIONS

Massachusetts (1967), Ohio (1973), United States District Court Southern District of Ohio (1976), United States Court of Appeals Sixth Circuit (1986), United States Supreme Court (1989), United States Court of Appeals Fourth Circuit (1997)

## AWARDS

Law Review Article of the Year for Scholarly Contribution to the Field of Penal Law, from the American Branch of the International Association of Penal Law, 2004

Special Recognition, House of Representatives, 121st General Assembly of Ohio, 1995

Distinguished Scholar Award, Ohio State University, 1995

Outstanding Professor Award, Ohio State University College of Law and the Law Alumni Association, 1998

## INTERNATIONAL LITIGATION

Consultant to Government of Mexico in *Avena and other Mexican Nationals (Mexico v. U.S.A.)*, International Court of Justice, Hague, Netherlands, 2003

Petitioner, Inter-American Commission on Human Rights, Organization of American States, Washington, D.C., in case of Juan Raul Garza, 1999

Petitioner, Inter-American Commission on Human Rights, Organization of American States, Washington, D.C., in case of Cesar Fierro, Case No. 11.331, decision December 20, 2003

Petitioner, Inter-American Commission on Human Rights, Organization of American States, Washington, D.C., in case of Carlos Santana, 1993

Brief and oral presentation, Committee on the Rights of the Child, Geneva, Switzerland, 2002

Consultant to Plaintiff in *Cintas Foundation v. Sotheby's*, Case No. 1991-C-No. 8334 High Court of Justice, Queen's Bench Division, London, England, 1998

Brief and Oral Argument, Request for Advisory Opinion, Inter-American Court of Human Rights, Organization of American States, San Jose, Costa Rica, 1998

Advocate and Counsel to the Government of Bosnia and Herzegovina, International Court of Justice, Hague, Netherlands, *Case Concerning Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Yugoslavia (Serbia and Montenegro))*, 1993-1994

AMICUS CURIAE BRIEFS ON INTERNATIONAL LAW ISSUES

Medellin v. Texas, U.S. Supreme Court, Case No. 06-984 (on Vienna Convention on Consular Relations), as counsel for the European Union, 2007

Maharaj v. Secretary for the Department of Corrections for the State of Florida, U.S. Supreme Court, Case No. 05-1555 (on Vienna Convention on Consular Relations), as counsel for the European Union (co-authored with S. Adele Shank), 2006 (request for certiorari)

Sanchez-Llamas v. Oregon, Bustillo v. Virginia, U.S. Supreme Court, Cases No. 04-10600 & 05-51 (on Vienna Convention on Consular Relations), as counsel for the European Union (co-authored with S. Adele Shank), 2005 (merits stage)

Medellin v. Dretke, U.S. Supreme Court, Case No. 04-5928 (on Vienna Convention on Consular Relations), as counsel for the European Union and Council of Europe), 2005 (merits stage)

Medellin v. Dretke, U.S. Supreme Court, Case No. 04-5928 (on Vienna Convention on Consular Relations), as counsel for the European Union and Council of Europe, 2004 (request for certiorari)

Poland and Madej v. Schomig, U.S. Supreme Court (on execution of foreign nationals), 2000

State v. Madej and Consul General for the Republic of Poland in Chicago, Supreme Court of Illinois, 1999

State v. Ramirez, Court of Appeals of Ohio, 11th District (consular access claim by foreign national murder defendant), 1998

Murphy v. Netherland, Warden, U.S. Supreme Court (seeking *certiorari* in Virginia murder case), 1997

Murphy v. Netherland, Warden, U.S. Court of Appeals, Fourth Circuit (seeking *habeas corpus* relief in Virginia murder case), 1996

Ohio v. Loza, Supreme Court of Ohio (on consular access claim by murder defendant), 1997

Ohio v. Loza, Ohio Court of Appeals, 12th District (on consular access claim by murder defendant), 1996

U.S. v. Berkan, Case No. 79-1528, U.S. Court of Appeals, First Circuit (on territorial status of naval base in Puerto Rico), 1981

GOVERNMENTAL CONSULTANCIES ON INTERNATIONAL LAW ISSUES

U.S. Information Agency, 1999, consulted with Legislative Initiative Foundation, a non-governmental human rights organization in Belarus

U.S. Information Agency, 1998, made presentations in Russian in Minsk, Belarus, as follows:
- "Implementation in Domestic Courts of Provisions of Treaties," Belarusian State University, International Relations Department, December 14, 1998
- "Programs to Promote the Rule of Law in East Europe: Success and Failure," Belarusian State University, International Relations Department, December 14, 1998
- "The Court System in the United States," Institute of Management of the President of Belarus, Law Department, December 15, 1998
- "Legal Profession in the United States," Minsk City Bar Association, December 16, 1998
- "Education in Human Rights Law," at United States Information Agency Office, December 17, 1998
- "Freedom of Speech: International Standards and the Experience of the United States," Belarusian Association of Journalists, December 17, 1998

Governor of Ohio Commission on Hispanic/Latino Affairs, 1999 (on internationally protected rights applicable to Hispanics arrested on criminal charges in Ohio)

U.S. Agency for International Development, consulted with Supreme Court of Ethiopia, Addis Ababa, Ethiopia, on due process standards in pending trials of officials of prior regime, November 1994

U.S. Agency for International Development, evaluated U.S.-funded programs under the Rule of Law Project in Poland, Lithuania, and Bulgaria during three-week fact-finding mission, March-April 1993

U.S. Agency for International Development, assessed the rule of law situation in Ukraine, Belarus, and Moldova and formulated guidelines for future US-funded law reform projects, 1993-1994

John Quigley: Publications (last ten years)

**BOOKS**

Soviet Legal Innovation and the Law of the Western World, Cambridge University Press, 2007

Consular Law and Practice, Oxford University Press, 2008

The Law of Consular Access: A Documentary Guide, Routledge/Cavendish, 2009

The Statehood of Palestine: International Law in the Middle East Conflict, Cambridge
University Press, 2010

The Six-Day War and Israeli Self-Defense: Questioning the Legal Basis for Preventive War,
Cambridge University Press, 2013

The International Diplomacy of Israel's Founders: Deception at the United Nations in the Quest
for Palestine, Cambridge University Press, 2016

**ARTICLES**

"Justice in the Palestine-Israel Conflict," in Justice In Particular: Festschrift in Honour of
Professor P. J. Kozyris, Sakkoulas Publishers, 2007, pp. 331-349

"Security Council Resolution 242 and the Right of Repatriation," Journal of Palestine Studies,
Vol. 37, No. 1 (2007), pp. 49-61

"The Palestine Refugee Repatriation in the American Discourse," New Centennial Review, vol.
8, no. 2 (Fall 2008), pp. 273-286

"The International Court of Justice as a Forum for Genocide Cases," Case Western Reserve
Journal of International Law, Vol. 40, nos. 1-2 (2008), pp. 243-263

"In Memory of Harold J. Berman," Emory Law Journal, Vol. 57, No. 6 (2008), pp. 1439-1441

"Must Treaty Violations Be Remedied?: A Critique of Sanchez-Llamas v. Oregon," Georgia
Journal of International and Comparative Law, Vol. 36, No. 2 (2008), pp. 355-380

"'If You Are Not a United States Citizen . . .': International Requirements in the Arrest of

1

Foreigners", Ohio State Journal of Criminal Law, Vol. 6, no. 2 (2009), pp. 661-679

"President Bush's Directive on Foreigners under Arrest: A Critique of *Medellin v. Texas*", Emory
International Law Review, Vol. 22, No. 2 (2009), pp. 423-454

"The United States' Withdrawal from International Court of Justice Jurisdiction in Consular
Cases: Reasons and Consequences," Duke Journal of Comparative and International Law, Vol.
19, No. 2 (2009), pp. 263-305

Entry "Camp David Accords (1978)," Max Planck Encyclopedia of Public International Law
(Max Planck Institute, Heidelberg and Oxford University Press 2009), vol. 1, pp. 1104-1108

"Genocide: A Useful Legal Category?", International Criminal Justice Review, vol. 19, no. 2
(2009), pp. 115-131

The International Criminal Court and the Gaza War, Palestine Yearbook of International Law,
vol. 16 (2010), pp. 25-53

"Britain's Secret Re-Assessment of the Balfour Declaration. The Perfidy of Albion," Journal of
the History of International Law (Max Planck Institute for Comparative Public Law and
International Law), Vol. 13, No. 2, pp. 249-283 (2011)

"Palestine Is a State: A Horse with Black and White Stripes Is a Zebra," Michigan Journal of
International Law, Vol. 32, No. 4, pp. 749-764 (2011)

"How to Fight Terror," William Mitchell Law Review (Journal of the National Security Forum),
vol. 37, no. 5 (2011), pp. 5174-5186

"Palestine at the United Nations: What Does It Take to Be a State?", ILSA Quarterly
(International Law Students Association), Vol. 20, No. 2, pp. 29-34 (2011)

"Who Admits New Members to the United Nations? (Think Twice Before You Answer), George
Washington International Law Review, vol. 44, no. 2 (2012), pp. 179-241

"A Tragi-Comedy of Errors Erodes Self-Execution of Treaties: *Medellin v. Texas* and Beyond,"
Case Western Reserve Journal of International Law, Vol. 45, Nos. 1 & 2 (2012), pp. 403-433

"The Palestine Declaration to the International Criminal Court: The Statehood Issue," Rutgers
Law Record, vol. 3 (2009), reprinted in Chantal Meloni and Gianni Tognoni (eds.), Is There a

2

Court for Gaza? A Test Bench for International Justice, T.M.C. Asser Press (2012), pp. 429-440

"The Status of Jerusalem after the Admission of Palestine to the United Nations," in Membership of Palestine in the United Nations: Legal and Political Implications (Cambridge Scholars Publishing, 2013)

"The Vienna Convention on Consular Relations: In Retrospect and into the Future," Southern Illinois University Law Journal, Vol. 38 (2013), pp. 1-25

"Why Britain Did Not Abandon the Balfour Declaration," in Maria Holt (ed.), Britain's Legacy in Palestine, Cambridge Scholars Publishing (2014)

"Israel's Settlements as a War Crime in the International Criminal Court," The Link (2014)

"Finding a Way Forward for Crimea," Cambridge Journal of International and Comparative Law, posted March 5, 2014 (on line only)

# EXHIBIT '2'

### Documents

Plaintiff's Response to Interrogatories
First Amended Complaint
Atlantic Specialty's Answer to First Amended Complaint
Atlantic Specialty's First Amended Responses to Plaintiff's Interrogatories
Atlantic Specialty's Second Amended Responses to Plaintiff's Interrogatories
Policy
OneBeacon's Denial Letter (07/28/2014)
NBC's Response to Denial Letter (08/13/2014)
OneBeacon's Reply (09/19/2014)
Plaintiffs' Production Bates-Numbered UCP000137 - UCP000245


### News Articles

MSNBC
http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies

NBC News
http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

The Wall Street Journal
http://www.wsj.com/articles/israel-pulls-forces-from-gaza-as-cease-fire-begins-1407231543

The New York Times
https://www.nytimes.com/2016/08/25/world/middleeast/israel-gaza-war.html
https://www.nytimes.com/2014/08/30/world/middleeast/50-days-of-war-leave-israelis-and-palestinians-only-more-entrenched.html

Time Magazine
http://time.com/3076594/israel-gaza-cease-fire-hamas-netanyahu/
http://time.com/3082458/gaza-war-crimes-israel-palestine/

The Washington Post
https://www.washingtonpost.com/news/worldviews/wp/2014/09/03/heres-what-really-happened-in-the-gaza-war-according-to-the-israelis/?utm_term=.e7ccbabd8102

U.S. News and World Report
http://www.usnews.com/news/world/articles/2016-08-24/israel-clears-forces-in-several-deadly-2014-gaza-war-cases
http://www.usnews.com/news/articles/2014/08/07/saudi-arabia-and-the-third-gaza-war

1

The Independent
http://www.independent.co.uk/news/world/middle-east/israel-gaza-conflict-50-day-war-by-numbers-9693310.html

The Los Angeles Times
http://www.latimes.com/world/middleeast/la-hp-storygallery-middle-east-conflict-storygallery.html
http://www.latimes.com/world/middleeast/la-fg-un-report-gaza-war-20150622-story.html

BBC News
http://www.bbc.com/news/world-middle-east-28252155
http://www.bbc.com/news/world-middle-east-33128955

Haaretz News (Israeli News Outlet)
http://www.haaretz.com/israel-news/.premium-1.612437

Middle East Quarterly
http://www.meforum.org/5084/rethinking-operation-protective-edge

Associated Press
http://bigstory.ap.org/article/3caf434feda5453dbd9df7477363489a/israel-clears-forces-several-deadly-2014-gaza-war-cases

Jerusalem Center for Public Affairs
http://jcpa.org/timeline-key-moments-gaza-war/

USA Today
http://www.usatoday.com/story/news/world/2016/08/10/gaza-city-families-displaced-war-israel/88002220/

Chicago Tribune
http://www.chicagotribune.com/news/opinion/commentary/ct-deaths-babies-gaza-war-palestinians-perspec-0129-20150128-story.html

Chicago Sun Times
http://chicago.suntimes.com/politics/decimated-hamas-makes-ludicrous-claims/

The Denver Post
http://www.denverpost.com/2014/08/26/israel-and-hamas-reach-an-uneasy-cease-fire-in-50-day-gaza-war/

The Dallas Morning News
http://www.dallasnews.com/news/news/2014/08/26/gaza-cease-fire-reached-after-50-day-war-that-killed-2200-and-settled-little

2

Newsday
http://www.newsday.com/news/world/at-un-israeli-and-palestinian-leaders-air-differences-1.12354379

The Houston Chronicle
http://www.houstonchronicle.com/news/nation-world/world/article/Israeli-house-strikes-killed-mostly-civilians-6080436.php

The Guardian
https://www.theguardian.com/world/2014/aug/26/gaza-ceasefire-israel-palestinians-halt-fighting

The Times of India
http://timesofindia.indiatimes.com/world/middle-east/Israel-Gaza-conflict-50-day-war-by-numbers/articleshow/41000781.cms

The Sydney Morning Herald
http://www.smh.com.au/comment/why-israel-lost-the-war-in-gaza-20140808-101ruh.html

China Daily
http://www.chinadaily.com.cn/world/2014-08/28/content_18500736.htm

The Daily Mail
http://www.dailymail.co.uk/news/article-2740643/Inside-bombed-Gaza-One-week-end-50-day-war-true-scale-devastation-revealed.html

The Telegraph
http://www.telegraph.co.uk/news/worldnews/middleeast/israel/11769685/Israel-may-have-committed-crimes-against-humanity-says-Amnesty.html


**Hard copies of articles associated with links**

13,000 families in Gaza still displaced two years after war with Israel
USA Today - August 10, 2016

50 days of War Leave Israelis and Palestinians Only More Entrenched
The New York Times – August 29, 2014

After Seven Weeks of Gaza War, Hamas 1, Israel 0
Hareetz – January 11, 2017

Children suffer and die in Gaza. Who notices?
Chicago Tribune – January 29, 2015

3

Decimated Hamas makes ludicrous claims
Chicago Sun Times – September 5, 2014

Gaza casefire: Israel and Palestinians agree to halt weeks of fighting
The Guardian – August 27, 2014

Gaza cease-fire reached after 50-day war that killed 2,200 and settled little
DallasNews – August 24, 2016

Gaza-Israel conflict: Is the fighting over?
BBC – August 26, 2014

Here's what really happened in the Gaza ward (according to the Israelis)
The Washington Post – September 3, 2014

How Technology Is Intensifying Gaza War Between Israel and Hamas
NBC News – July 30, 2014

Inside bombed-out Gaza: One week on from end of 50-day war and the true scale of devastation is revealed
Daily Mail – September 2, 2014

Israel and Hamas may have committed war crimes in Gaza, U.N. report says
Los Angeles Times – June 22, 2015

Israel and Hamas reach an uneasy cease-fire in 50-day Gaza war
The Denver Post – August 26, 2014

Israel clears forces in several deadly 2014 Gaza war cases
Associated Press – August 24, 2016

Israel Clears Troops in Airstrike Near School in 2014 Gaza War
The New York Times – August 24, 2016

Israel may have committed crimes against humanity, says Amnesty
Telegraph UK – July 29, 2015

Israel Seeks to Gain Advantage by Reversing Course in Gaza
Time Magazine – August 3, 2014

Israel, Hamas Set Out Demands on Gaza
Wall Street Journal - August 6, 2014

Israel – Gaza conflict: 50-day war by numbers
The Times of India - August 27, 2014

4

Israel-Gaza conflict: 50-days war by numbers
The Independent – August 27, 2014

Israeli 2014 Gaza war actions lawful, report says
BBC – June 14, 2014

Israeli house strikes killed mostly civilians
Houston Chronicle – February 13, 2015


**Additional News Articles**

A news article published by the Washington Post, dated July 10, 2014, by Griff Witte and William Booth, entitled "As cease-fire with Hamas fails to take shape, Netanyahu says, 'Our answer is fire.'" This article is available at: https://www.washingtonpost.com/world/israel-accepts-truce-plan-hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-923ecc0c7d23_story.html?utm_term=.e99302eb1314.

A news article published by MSNBC dated July 18, 2014, by Benjamin Landy and Maria Lokke, entitled "Scenes of war and heartbreak as Israeli ground forces invade Gaza." This article is available at: http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies.

A news article published by MSNBC dated July 18, 2014, by David Taintor, entitled "Obama points to rebels in downed Malaysian jet." This article is available at: http://www.msnbc.com/msnbc/obama-american-dead-malaysia-airlines-crash.

A news article published by MSNBC dated July 16, 2014, by Donna Stefano, entitled "In Israel and Palestine, children imagine a world without war." This article is available at: http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-world-without-war.

A news article published by the Times of Israel by Adiv Sterman, dated July 16, 2014, entitled "Ground incursion in Gaza said 'very likely.'" This article is available at: http://www.timesofisrael.com/idf-ground-incursion-in-gaza-very-likely/.

A collection of "LiveBlogs" published by the Times of Israel on July 7, 2014, by Itamar Sharon, Marissa Newman, and Ilan Ben Zion, entitled "Israel launches 'Protective Edge' counteroffensive on Gaza, Jewish suspects reenact teen's murder." This collection is available at: http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-violence-continues/#!.

A news article published by Middle East Eye dated July 8, 2014, entitled "Hamas claims responsibility for rockets fired at Jerusalem, Tel Aviv and Haifa." This article is available at: http://www.middleeasteye.net/news/israels-army-prepared-ground-assault-gaza-official-275282816.

A news article published by the Global News, dated July 9, 2014, entitled "UPDATE: Israel hits
key Hamas targets in Gaza offensive." This article is available at:
http://globalnews.ca/news/1438089/israel-strikes-hamas-targets-in-gaza-to-stop-rocket-fire/.

A news article published by the Global News, dated July 15, 2014, entitled "Israel: Hamas to pay
price for its 'no' to truce." This article is available at: http://globalnews.ca/news/1451058/israel-
hamas-to-pay-price-for-its-no-to-truce/.

The news article entitled "LIVE UPDATES: Operation Protective Edge, Day 7," published by
Haaretz on July 15, 2014. The article is available at:  http://www.haaretz.com/israel-
news/1.604898#!.


**Links to Additional News Articles**

http://www.haaretz.com/israel-news/LIVE-1.774365/Gaza-war-hamas-humanitarian-crisis

http://www.jpost.com/Israel-News/Politics-And-Diplomacy/State-comptroller-report-on-2014-
Gaza-war-due-today-482789

http://www.cnn.com/2017/02/28/middleeast/israel-gaza-report/

https://www.ft.com/content/a4291a06-fdcc-11e6-96f8-3700c5664d30


**News Clips**

http://www.nbcnews.com/video/msnbc2/56804549#56804549

http://www.msnbc.com/the-last-word/watch/mh17-mystery-and-war-in-gaza-308247107963

http://www.msnbc.com/melissa-harris-perry/watch/what-it-means-to-live-in-a-war-zone-
309370947801

http://www.msnbc.com/all-in-with-chris-hayes/watch/day-breaks-in-gaza-following-invasion-
307348035939

http://www.msnbc.com/all-in-with-chris-hayes/watch/ground-war-in-gaza-307290179722

http://www.nbcnews.com/video/from-aug-2-2014-ayman-mohyeldin-reports-on-gaza-war-
469303875925

http://www.nbcnews.com/watch/nightly-news/bloodiest-day-in-israels-fight-in-gaza-kills-more-
than-70-309590595847 - uses the word "war" at about 2:53

http://www.nbcnews.com/watch/nightly-news/israeli-palestinian-conflict-brings-heaviest-fighting-in-years-299767363744 - broadcast on July 8, the first day of Operation Protective Edge, notes that this "could easily become the next war"

http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

http://timesofindia.indiatimes.com/world/middle-east/Israel-Gaza-conflict-50-day-war-by-numbers/articleshow/41000781.cms

http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

https://www.theguardian.com/world/video/2014/jul/09/israeli-airstrikes-gaza-hamas-rocket-attacks-video

**Additional Materials**

Congressional Research Service Reports
https://fas.org/sgp/crs/mideast/RL34074.pdf
January 31, 2014 by Jim Zanotti

https://fas.org/sgp/crs/mideast/R41514.pdf
December 2, 2010 by Jim Zanotti

US State Department Human Rights Report Israel 2014
https://www.state.gov/documents/organization/236814.pdf

Jerusalem Center for Public Affairs
Key Moments in a 50-Day War:  A Time by Daniel Rubenstein
http://jcpa.org/timeline-key-moments-gaza-war/

Report of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1* ** ***United Nations General Assembly Human Rights Council, Twenty-ninth session, Human rights situation in Palestine and other occupied Arab territories, 24 June 2015.

Report of the detailed findings of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1* ** ***United Nations General Assembly Human Rights Council, Twenty-ninth session, Human rights situation in Palestine and other occupied Arab territories, 23 June 2015.

An Assessment of the 2014 Gaza Conflict, High Level Military Group, October 2015
http://www.high-level-military-group.org/pdf/hlmg-assessment-2014-gaza-conflict.pdf

7

Fragmented Lives Humanitarian Overview 2014
https://www.ochaopt.org/documents/annual_humanitarian_overview_2014_english_final.pdf