UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE ) | CASE NO. 2:16-cv-4435-PA-MRW |
| PRODUCTIONS LLC, ) | |
| et al., ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
|   vs. ) | |
| ) | |
| ATLANTIC SPECIALTY ) | |
| INSURANCE COMPANY, ) | |
| ) | |
|     Defendant. ) | |
| _____) | |

DEPOSITION OF JAY J. SHAPIRO

Tuesday, May 23, 2017

Reported by:  Ingrid Suárez Egnatuk
              CSR No. 3098

Page 2

 1
 2     Deposition of JAY J. SHAPIRO, taken on behalf of
 3     Plaintiffs Universal Cable Productions LLC and
 4     Northern Entertainment Productions LLC, at
 5     707 Wilshire Boulevard, Suite 4000, Los Angeles,
 6     California 90017, commencing at 10:00 a.m.,
 7     Tuesday, May 23, 2017, before Ingrid Suarez
 8     Egnatuk, CSR No. 3098.
 9
10  APPEARANCES:
11      FOR PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS LLC
        AND NORTHERN ENTERTAINMENT PRODUCTIONS LLC:
12
            MITCHELL SILBERBERG & KNUPP LLP
13          BY:  LUCIA E. COYOCA, ESQ.
            11377 West Olympic Boulevard
14          Los Angeles, California 90064-1683
            (310) 312-2000
15          lec@msk.com
16       FOR DEFENDANT:
17          STRASBURGER & PRICE, LLP
            BY:  CARLA C. CRAPSTER, ESQ.
18          901 Main Street
            Suite 6000
19          Dallas, Texas 75202-3794
            (214) 651-4300
20          carla.crapster@strasburger.com
21          ANDERSON, McPHARLIN & CONNERS, LLP
            (Not present at deposition)
22          707 Wilshire Boulevard
            Suite 4000
23          Los Angeles, California 90017-3623
            (213) 688-0080
24
25

Page 3

 1              I N D E X
 2  Witness:   JAY J. SHAPIRO
 3  Examination                                        Page
 4  By Ms. Coyoca                                         6
 5      AFTERNOON SESSION                               100
 6          (Exhibits bound under separate cover)
 7  Shapiro
    Exhibit         Description                        Page
 8
 9  1    Notice of Taking Deposition of Jay             10
         Shapiro and Request for Production
         of Documents
10
    2    Order Making Findings and Imposing             36
11       Remedial Sanctions Pursuant to
         Sections 4C and 21C of the Securities
12       Exchange Act of 1934 and Rule 102(e)
         of The Commission's Rules of Practice
13
14  3    Defendant Atlantic Specialty                   67
         Insurance Company's Rebuttal Expert
         Witness Disclosure
15
16  4    E-mail chain ending December 10,               76
         2013, to Randi Richmond from Andrea
17       Garber
         UCP 003732 through UCP 003734
18  5    E-mail, December 11, 2013, to                  76
         Bernadette Milinovic and Wanda M.
19       Phillips from Andrea Garber
         AONNBCU0001748 through AONNBCU0001750
20
21  6    E-mail chain ending March 12, 2014,            77
         to Randi Richmond, Mark Winemaker,
         and Ryan Greig from John Gaskin
22       UCP004971 through UCP004972
23  7    "DIG" Locked Budget                            79
         PATTERN:  5 Episode - (8) Days in
24       Israel
         UCP014836 through UCP014881
25

Page 4

 1              I N D E X
 2              (Continued)
 3  Shapiro
    Exhibit         Description                        Page
 4
 5  8    Expert Report of Jay Shapiro                   81
         Analysis of Economic Damages:
         Rebuttal, April 25, 2015
 6
 7  9    DIG - New Mexico Season 1 -                    92
         First 5 episodes, Production
         Recap Report, 2014/2015 Season 1,
 8       Period Ending:  8/11/2016
         UCP018226 through UCP018227
 9
10  10   Expert Report of Robert                       103
         Wunderlich: Analysis of Economic
         Damages, March 17, 2017
11
12  11   Documents produced by the witness             167
         JS000001 through JS000020
13
14             REFERENCED EXHIBITS
15  Williams
    Exhibit         Description                        Page
16
17  1    Motion Pictures/Television Producers           41
         Portfolio Declarations
         ATL003073 through ATL003127
18
19
20
21
22
23
24
25

Page 5

 1              I N D E X
 2              (Continued)
 3      QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
          (Indicated by "^" in the transcript)
 4
 5          Page      Line
             12        13
 6           15        12
             39        19
 7           39        25
             47        24
 8           48        14
             57         6
 9           57        17
             57        23
10           58         5
             58        11
11          175        15
            176         8
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 62

1 e-mail.
2 Q. When you say the "dating appeared to be
3 appropriate," what do you mean by that?
4 A. Well, it's my understanding that the move took
5 place on or about July 16, 2014. So if, in fact, there
6 were plans prior to that date, then I felt that was the
7 anticipated cost. Because when it comes to actual
8 costs, I searched and searched, but I really couldn't
9 find a document that showed me exactly what the actual
10 costs incurred and paid in Israel was.
11 Q. In terms of actual costs incurred and paid in
12 Israel, are you referring to actual costs incurred and
13 paid in Israel that related to the DIG episodes
14 subsequent to the pilot?
15 A. Yes.
16 Q. Was it your understanding that any of the DIG
17 episodes, aside from the DIG pilot, that it actually --
18 that those episodes had actually been produced in
19 Israel?
20 A. It was my understanding that they were not
21 produced in Israel. Yet when I saw Mr. Wunderlich's
22 deposition, he kept referring to "Israel costs
23 incurred." So I was -- I'm confused about that. But I
24 just saw the deposition over the weekend.
25 Q. So you just reviewed Mr. Wunderlich's

Page 63

1 deposition this past weekend?
2 A. Yes.
3 Q. Do you recall the date of the e-mail that you
4 referred to that referenced the budgeted amounts for
5 production of the episodes subsequent to the pilot in
6 Israel?
7 A. No. But if I could see the document, obviously
8 the date would be indicated. My feeling was it was
9 before July 16.
10 Q. Okay. Was the date of the e-mail in June,
11 2014?
12 A. I don't recall.
13 Q. April of 2014?
14 A. I don't recall the date.
15 Q. Okay. Are you familiar with the budgeting
16 process for television production?
17 A. I am.
18 Q. Do you know if budgeting is an ongoing process
19 that can occur up until the time a show actually goes
20 into production?
21   MS. CRAPSTER: Objection. Vague and ambiguous.
22 Lacks foundation.
23   THE WITNESS: Yes.
24 BY MS. COYOCA:
25 Q. In terms of determining the most accurate

Page 64

1 budget, would it be important to you to look at the most
2 current budget shortly prior to the time a show goes
3 into production?
4 A. Ideally, yes.
5 Q. Do you have an understanding of what the term
6 "pattern budget" means in the context of television
7 production accounting?
8 A. I've heard the term before, but I don't know
9 exactly its meaning.
10 Q. What is your understanding of what the term
11 "pattern budget" means?
12 A. That it's a continual document where the costs
13 are continually updated.
14 Q. What about the term "locked budget"? Have you
15 ever heard the term "locked budget" in the context of
16 television production accounting?
17 A. Absolutely.
18 Q. What's a locked budget?
19 A. Final.
20 Q. For purposes of analyzing the estimated
21 production costs for the Israel episodes subsequent to
22 the pilot, did you review and analyze any locked
23 budgets?
24 A. I believe there was a document on one episode
25 that said "locked budget" for one of the episodes.

Page 65

1 Episodes 2 through 6 are the episodes in question. I
2 believe one of those, there was a locked budget that I
3 saw a document on. But I did not see anything that was
4 2 through 6 in detail. And, therefore, I used the
5 number in the e-mail.
6 Q. I want to make sure I understand your response.
7   So the budgeting that you were attempting to
8 look at was for Episodes 2 through 6 of DIG; is that
9 correct?
10 A. Yes.
11 Q. And it was your belief that you did not have
12 any locked budget that looked at Episodes 2 through 6;
13 is that correct?
14 A. I didn't see a document that was in total.
15 Q. Now, did you look at any budget information for
16 Episodes 7 through 10, the Back 4?
17 A. Well, in the documents there often were
18 references to 7 through 10.
19 Q. But did you take those -- the budgeting for
20 those episodes into account in reaching your opinions?
21 A. The only use I made with 7 through 10 is I
22 noticed that those costs were considerably lower on an
23 episodic level than 2 through 6.
24 Q. In preparing your opinion or your analyses, did
25 you take into account, other than the manner which you

Page 70

BY MS. COYOCA:
Q. Okay. You indicated that you disagree with his methodology. But is it your opinion that his methodology violates any proscribed provision of any rules of accountancy that apply to certified public accountants?
MS. CRAPSTER: Objection. Vague and ambiguous.
THE WITNESS: Well, I don't believe there's any proscribed provisions that deal with this computation.
BY MS. COYOCA:
Q. What about the rules that are applicable to the work that is performed by forensic accountants rendering services in connection with disputed matters?
MS. CRAPSTER: Objection. Vague and ambiguous. I'm not sure that was a question.
THE WITNESS: And I'm not sure that's a FASB or GAAP issue.
BY MS. COYOCA:
Q. Okay. What about the AICPA rules, though, that apply to forensic accounting in disputed matters? Do you believe that Mr. Wunderlich's analysis violates any AICPA-proscribed rules for forensic accounting?
A. Well, the AICPA does have rules in that area, and one of the rules is to use reasonable methodology.
Q. Do you believe that Mr. Wunderlich's is not a

Page 71

reasonable methodology?
A. I believe the methodology is not reasonable in regard to Mr. Wunderlich's approach.
Q. What is the basis for your belief that Mr. Wunderlich's analysis was not reasonable?
A. Well, again, he refers to these incurred costs in Israel, which I can find no evidence of any incurred costs on Episodes 2 through 6. So starting with that.
Then he talks about items that are duplicative versus not duplicative. And there doesn't seem to be any detail analysis that I can look at on how he came up with that determination other than now that I've seen the deposition, apparently he received information from Mrs. Markus.
So I don't think the methodology of just receiving information from another party is a reasonable approach to computing extra expenses.
Q. Okay. Separate and apart, though, from the information that Mr. Wunderlich received, do you believe that Mr. Wunderlich's approach, in terms of reviewing the documentation with respect to costs that were actually incurred in Croatia and New Mexico and making a determination as to whether they were -- they would not have been incurred but for the move to Croatia and New Mexico, do you believe that that methodology is

Page 72

unreasonable, setting aside the issue of support for the methodology?
MS. CRAPSTER: Objection. Compound question. Vague and ambiguous.
THE WITNESS: Yeah. I'm not sure I understand the question.
BY MS. COYOCA:
Q. Okay. With respect to your criticism of Mr. Wunderlich's approach that it was not reasonable, is it your opinion that his methodology of reviewing the costs that were incurred in relocating the production to Croatia and New Mexico and extracting out those costs that would have been incurred already if the production stayed in Israel -- is that, in your view, an unreasonable methodology?
MS. CRAPSTER: Same objections.
THE WITNESS: Well, as you describe it, no. But I'm not sure that's what took place.
BY MS. COYOCA:
Q. Referring back to the designation, the expert witness designation, there is a sentence that begins at the end of line 15 which reads, begin quotes:
"Mr. Shapiro will opine about the maximum amount of possible extra expenses that plaintiffs may recover based upon verifiable

Page 73

information produced in the case and about additional reductions to such computation that may also apply," close quotes.
Do you see that sentence?
A. Yes.
Q. Is your opinion as to the dollar amounts as to the maximum amount of possible extra expenses -- is that amount the $2,357,875 figure that we've discussed?
A. Yes.
Q. Now, this designation indicates that that's based upon verifiable information produced in the case; is that correct?
A. That's what it says. Yes.
Q. Did you rely on verifiable information in coming up with your opinion?
A. Well, as best as the information I was given.
Q. Okay. So with respect to your opinion, I understand that it has two components, one component of which is the total amount of costs that were incurred in producing the show in Croatia and New Mexico; is that correct?
A. Well, you know, I'm more focused on the extra expense than the total cost of Croatia and New Mexico, which may or may not be the reliable number.
I'm not really focused on that. I'm focused on

Page 98

1  But I understand from my own insurance that the more
2  value I insure, the higher the premium is.
3      Q.  Okay.
4      A.  So I assume there's a relationship between the
5  two.
6      Q.  Okay.  Are you aware of whether there is a
7  deposit premium that is paid and then a true-up that's
8  done on a quarterly basis to calculate the amount that
9  may be owed based on the additional insurable production
10 cost?
11     A.  I am not.
12     Q.  You previously indicated when answering my
13 hypothetical that you would have to be assured that
14 there were additional premiums paid in order to be able
15 to answer my hypothetical question about whether the
16 Back 4 should be included in your calculation; is that
17 right?
18     A.  Yes.
19     Q.  So did you take into account the true-up and
20 additional premium paid under the policy in answering my
21 question?
22         MS. CRAPSTER: Objection.  Assumes facts not in
23 evidence.  Misstates the evidence.
24         THE WITNESS: I saw no indication that there
25 was additional premiums paid.

Page 99

1  BY MS. COYOCA:
2      Q.  If there were additional premiums paid, would
3  that change your analysis in terms of the calculation of
4  loss under Section IX, subpart 1 of the policy?
5          MS. CRAPSTER: Objection.  Calls for
6  speculation.
7          THE WITNESS: Again, I'd have to have a lot
8  more education on insurance to come to that conclusion,
9  which I don't have.
10         MS. COYOCA: Okay.  Off the record.
11
12     (At 12:40 p.m. a luncheon recess was taken,
13     the proceedings to be resumed at 1:40 p.m.)
14 ///
15 ///
16 ///
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///

Page 100

1              AFTERNOON SESSION
2
3      (At 1:45 p.m. the proceedings were
4      resumed at the same place.)
5
6          MS. COYOCA: Back on the record.
7
8              EXAMINATION (Resumed)
9  BY MS. COYOCA:
10     Q.  Mr. Shapiro, can you please put Exhibit 8 in
11 front of you.  That is your report.
12     A.  Yes.
13     Q.  Please turn to page 4.
14         Are you there?
15     A.  Yes.
16     Q.  Okay.  At the bottom of the page -- we
17 discussed this before the lunch break.  I want to go
18 back to this -- it indicates that -- well, first of all,
19 why don't you tell me: What are you trying to convey in
20 the paragraph that begins, "It appears the plaintiffs'
21 claim"?
22     A.  Well, I realize that my maximum number is
23 materially different than plaintiffs' claim.  So I'm
24 making a reference here that it appears that the extra
25 expenses in that claim and the technique used which had

Page 101

1  these extractions -- maybe that sufficient extractions
2  from the total amount were not made because the
3  remaining amount is just too high.
4      Q.  Okay.  So with respect to your opinion that
5  sufficient extractions were not made, did you do a
6  calculation to identify what additional extractions
7  should have been applied but were not?
8      A.  No.
9      Q.  If you did not do such an analysis, how were
10 you able to determine that there were additional
11 extractions that should have been applied?
12     A.  Just by the magnitude of the difference.
13     Q.  And when you say "the magnitude of the
14 difference," you're referring to the difference between
15 Mr. Wunderlich's analysis of 7.1 million in extra
16 expenses versus your analysis --
17     A.  Of 2.3.
18     Q.  Okay.  Anything else?
19     A.  No.
20     Q.  Okay.  Did you review the extractions that
21 Mr. Wunderlich did apply?
22     A.  Yes.
23     Q.  Did you come to any conclusions with respect to
24 those extractions?
25     A.  Those adjustments, given his technique, seemed

Page 102

1 reasonable.
2 Q. Why did you not review and analyze whether
3 there were specific additional extractions that should
4 be applied?
5 A. I was unable to do that. I didn't have the
6 necessary documentation to do that.
7 Q. What documentation would you need in order to
8 be able to do that?
9 A. I would have to have some kind of analytical
10 analysis line by line showing what the cost was, what
11 was in there, and what was in the Israeli's expected
12 cost and compare the two. I would need much more
13 details.
14 Q. In analyzing the Wunderlich report, did you go
15 through and analyze the Full Cost Bible that he
16 references in his report?
17 A. Well, I -- I read the Full Cost Bible. I
18 noticed the total on the bottom. I was comfortable
19 where he got his numbers in his report from regarding
20 New Mexico/Croatia.
21 Q. But the point of divergence with his analysis
22 is that you believe that additional extractions should
23 have been applied?
24 A. Because of the magnitude of the claim. The
25 claim is to be extra expense, not total spent in

Page 103

1 New Mexico and Croatia.
2 Q. With respect to your review of that Full Cost
3 Bible, did you attempt to do any type of testing with
4 respect to the expenses that were incurred to determine
5 whether or not there were, in fact, expenses that were
6 reflected that you felt should not be extra?
7     MS. CRAPSTER: Objection. Vague and ambiguous.
8     THE WITNESS: I wasn't given the opportunity to
9 do that.
10 BY MS. COYOCA:
11 Q. What do you mean you were not given the
12 opportunity to do it?
13 A. Well, it would take -- he had the advantage,
14 which I did not have, of conversations with production
15 personnel. I didn't have that advantage, nor was I able
16 to see any kind of documentation over and above what was
17 presented to me.
18     MS. COYOCA: Okay. I'd like to mark as -- I
19 believe we're on Exhibit 10 -- the Expert Report of
20 Robert Wunderlich: Analysis of Economic Damages.
21     (Shapiro Exhibit 10 was
22     marked for identification.)
23 BY MS. COYOCA:
24 Q. Mr. Shapiro, is this the expert report of
25 Mr. Wunderlich that you reviewed and that you are

Page 104

1 critiquing in your expert report?
2 A. Yes.
3 Q. In your -- in your expert report, which was
4 attached as Exhibit 8, you indicate on page 7 at the
5 last full paragraph on the page, begin quotes:
6     "It is my further opinion that based on
7     the information provided to me, it is not
8     possible - for me or anyone else - to make a
9     definitive determination about whether each
10     individual expense was incurred as a result of
11     the Relocation or whether it would have been
12     incurred had the production stayed in Israel."
13     Do you see that?
14 A. Yes.
15 Q. What is the basis for that opinion?
16 A. Well, in the whole body of information
17 available, I don't think anyone can make that
18 determination.
19 Q. However, if -- you indicated that
20 Mr. Wunderlich had the advantage of being able to speak
21 to individuals at NBCUniversal who were involved in the
22 production; is that right?
23 A. Yes.
24 Q. So if an accountant was able to go through and
25 test particular expenses to determine -- and get the

Page 105

1 information as to what was incurred, would it be
2 possible, then, to make a determination as to whether
3 particular expenses were or were not extra?
4     MS. CRAPSTER: Objection. Calls for
5 speculation. Vague and ambiguous.
6     THE WITNESS: Possibly.
7 BY MS. COYOCA:
8 Q. Do you know whether or not Mr. Wunderlich did
9 that?
10 A. It's my belief he did not.
11 Q. What is that based on?
12 A. His deposition.
13 Q. What specifically did he testify to in his
14 deposition that led you to that?
15 A. Well, it appears that most of his decisions
16 were based on information that he just parroted from
17 Mrs. Markus.
18 Q. From BJ Markus?
19 A. Yes.
20 Q. And your criticism of his restatement of
21 Ms. Markus's information is based on what?
22 A. Well, I think that to come up with the
23 appropriate determination, he would have to do some
24 independent analysis, and I didn't see much evidence of
25 that.

Page 158

 1  Q. What about New Mexico?
 2  A. **I'm not directly familiar with those either.**
 3  Q. So if that matching process occurred in the
 4  actual issuance of the tax credit or the tax rebate in
 5  those two jurisdictions, you believe it is appropriate
 6  in calculating the loss -- and specifically the
 7  insurable production cost -- you believe it's
 8  appropriate to apply the entire amount of the tax credit
 9  potentially available to just a portion of the cost?
10      MS. CRAPSTER: Objection. Misstates the
11  testimony and vague and ambiguous.
12      THE WITNESS: Yeah. I don't understand the
13  question.
14  BY MS. COYOCA:
15  Q. Well, so as part of your calculation of loss
16  under the terms of the policy --
17  A. Yes.
18  Q. -- you have to specifically look at the
19  insurable production costs; right?
20  A. Yes.
21  Q. Now, first of all, under insurable production
22  cost, is the insurer permitted to take advantage of the
23  tax credits that are specifically accorded as part of
24  the production process?
25  A. **I'm not sure if the tax credits are mentioned**

Page 159

 1  **in the policy.**
 2  Q. Let's take a look. Can you go back to
 3  Exhibit 1.
 4      MS. CRAPSTER: To be clear, this is Williams
 5  Exhibit 1, not Shapiro Exhibit 1.
 6      MS. COYOCA: Right.
 7      THE WITNESS: Yes.
 8  BY MS. COYOCA:
 9  Q. So under "Definition of Loss" that's on page
10  ATL003106, do you see any reference here to the
11  application of tax credits?
12  A. No.
13  Q. And if you look at the definition of "insurable
14  production cost" in ATL00- -- on ATL003081 in Item 4,
15  the definition of "insurable production cost," where in
16  this definition is there a provision for application of
17  the tax credit in calculating the insurable production
18  cost?
19  A. **I don't know. I see no direct reference to**
20  **film tax credits.**
21  Q. My understanding from your testimony earlier
22  today was that your analysis was an attempt to calculate
23  cost under the terms of the policy; is that right?
24  Excuse me. The claim under the terms of the policy; is
25  that right?

Page 160

 1  A. Yes.
 2      MS. CRAPSTER: Objection. Mischaracterizes the
 3  testimony.
 4      THE WITNESS: Yes. That was my objective.
 5  BY MS. COYOCA:
 6  Q. If the -- any tax credits accorded to the
 7  insured are not provided for in the calculation of
 8  insurable production cost, then why did you apply it
 9  here?
10  A. **Well, it's just my understanding in dealing**
11  **with an insurance claim that the insured who has**
12  **suffered a loss can't economically benefit from such**
13  **loss. In this case, they did.**
14  Q. But under the terms of the contract between the
15  parties, there's no provision for the application of the
16  tax credit; is that right?
17      MS. CRAPSTER: Objection. Calls for a legal
18  conclusion.
19      THE WITNESS: Counselor, I'm not a lawyer, and
20  I'm not familiar with the insurance contract in that
21  respect.
22  BY MS. COYOCA:
23  Q. When you were calculating the application of
24  the tax credit and the additional credit to be realized,
25  did you ask to see the Croatian or New Mexico reports on

Page 161

 1  the tax credit accorded?
 2      MS. CRAPSTER: Objection. I think that calls
 3  for privileged information that's protected by Rule 26.
 4      THE WITNESS: I don't recall.
 5  BY MS. COYOCA:
 6  Q. Would -- the calculation under the taxing
 7  authorities, would their calculation be relevant to your
 8  analysis, do you believe?
 9  A. **Well, I would hope it would be the same as put**
10  **on this document. I can't see a reason why the number**
11  **wouldn't be the same. I can only use the data that's**
12  **available.**
13  Q. Under GAAP principles -- separate and apart
14  from what you did, under GAAP principles do you think it
15  is necessary under the matching principle to match
16  revenue with the associated costs, i.e., that portion of
17  the tax credit with the associated costs attributable to
18  that revenue under GAAP?
19      MS. CRAPSTER: Objection. Vague and ambiguous.
20      THE WITNESS: Well, if you had a GAAP
21  situation, yes, it would be appropriate to match.
22  BY MS. COYOCA:
23  Q. Under Schedule A to your report -- excuse me --
24  to your CV which is attached to your report --
25  A. Yeah.

Page 186

1   (At 4:15 p.m. the deposition of JAY J.
2   SHAPIRO was adjourned.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 187

1     I declare under penalty of perjury that I have
2 read the foregoing transcript of my deposition testimony
3 taken on Tuesday, May 23, 2017, at Los Angeles,
4 California, and that, with the following exceptions
5 which I have hand-marked on the transcript, the same is
6 a true record of the testimony given by me at that
7 deposition:
8
9 Page/Line   Should read         Reason for change:
10 _____   _____   _____
11 _____   _____   _____
12 _____   _____   _____
13 _____   _____   _____
14 _____   _____   _____
15 _____   _____   _____
16 _____   _____   _____
17 _____   _____   _____
18 _____   _____   _____
19 _____   _____   _____
20 _____   _____   _____
21 _____   _____   _____
22
23
24 _____     _____
   Date                      JAY J. SHAPIRO
25

Page 188

1  STATE OF CALIFORNIA    )
                                )
2  COUNTY OF LOS ANGELES  )
3
4      I, Ingrid Suárez Egnatuk, CSR No. 3098, a
5 Certified Shorthand Reporter in and for the State of
6 California, do hereby certify that the foregoing
7 Confidential Deposition Testimony of JAY J. SHAPIRO was
8 taken before me at the time and place therein set forth,
9 at which time the witness was put under oath by me; that
10 the testimony of the witness and all objections made at
11 the time of the examination were recorded
12 stenographically by me and were thereafter transcribed
13 with computer-aided transcription; that the foregoing is
14 a full, complete, and true record of said proceedings.
15      I certify that a request has been made by, or
16 on behalf of, the witness to review, correct and sign
17 the transcript of these proceedings.
18      I further certify that I am neither counsel for
19 nor related to any party to said action, nor in anywise
20 interested in the outcome thereof.
21      In witness whereof, I have subscribed my name
22 this 1st day of June, 2017.
23
24       _____
          Ingrid Suarez Egnatuk
25       Certified Shorthand Reporter