CONTAINS CONFIDENTIAL PORTIONS
BOUND SEPARATELY

Page 1

1                UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
2                     WESTERN DIVISION
    ----------------------------------------------------
3

    UNIVERSAL CABLE PRODUCTIONS LLC,
4   a Delaware limited liability company,
    and NORTHERN ENTERTAINMENT PRODUCTIONS, LLC,
5   a Delaware limited liability company,
6                 Plaintiffs,          Case No.
                                  2:16-cv-4435-PA-MRW
7   -vs-
8   ATLANTIC SPECIALTY INSURANCE COMPANY,
    a New York insurance company,
9

                  Defendant.
10
    ----------------------------------------------------
11          ** CONTAINS CONFIDENTIAL PORTIONS **
12              ** BOUND SEPARATELY **
13               PAGES 234 - 238
14

15

16              VIDEOTAPED DEPOSITION
17                     OF
18                  SEAN DUFFY
19            Thursday, May 11, 2017
20              Minneapolis, MN
21

22

23

24
    Job No. 123966
25  Reported By:  Amy L. Larson, RPR

CONTAINS CONFIDENTIAL PORTIONS
BOUND SEPARATELY

## Page 2

APPEARANCES:

MITCHELL SILBERBERG & KNUPP
11377 West Olympic Boulevard
Los Angeles, CA 90064
By: Daniel Hayes, Esq.
For: Plaintiffs

STRASBURGER & PRICE
901 Main Street
Dallas, TX 75202
By: Michael Keeley, Esq.
For: Defendant/Deponent

ALSO PRESENT: Chris Paar, Esq.
Ben Abraham, Videographer

## Page 3

INDEX:
EXAMINATION BY:                    PAGE
Mr. Hayes..........................................6
CONFIDENTIAL - BOUND SEPARATELY AS DESIGNATED BY:
Mr. Keeley................................234 - 238
EXHIBITS MARKED FOR IDENTIFICATION:
Exhibit 1..........................................79
General Claims Practices
Bates ATL000735 -ATL000744
Exhibit 2..........................................88
Core Principles
Bates ATL000731 - ATL000732
Exhibit 3........................................118
Motion Picture/Television
Producers Portfolio
Declarations
Bates ATL003073 - ATL003127
Exhibit 4........................................167
July 2016 E-mail
Subject: 0AB097918
Bates ATL003211

Exhibit 5........................................187
Defendant's Amended Responses to
First Set of Interrogatories
No Bates
Exhibit 6........................................194
August 13, 2014 Letter
Bats ATL000087 - ATL000093
Exhibit 7........................................198
July 16, 2014 Meeting Invite
Subject: War Exclusion - Israel/Hamas Conflict
Bates ATL001564

Exhibit 8........................................204
July 2014 E-mail
Subject: OBE List for Sean
Bates ATL001694

## Page 4

INDEX: (Cont'd.)
EXHIBITS MARKED FOR IDENTIFICATION:       PAGE
Exhibit 9........................................204
Discontinued OPPS
Bates ATL001695 - ATL001709
Exhibit 10......................................207
July 2014 E-mail
Subject: Re: Privileged & Confidential
Bates ATL001800 - ATL001801

Exhibit 11......................................210
July 2014 E-mail
Subject: OBE - NBC 0AB097918
Bates ATL001826 - ATL001827
Exhibit 12......................................212
July 2014 E-mail Chain
Subject: OBE - NBC 0AB097918
Bates ATL001832 - ATL001834

Exhibit 13......................................215
July 2014 E-mail Chain
Subject: OBE - NBC 0AB097918
Bates ATL001835 - ATL001836
Exhibit 14......................................242
Claim Summary
Bates ATL004005 - ATL004097
Exhibit 15......................................265
File Note History
Bates ATL000001 - ATL000161
Exhibit 16......................................265
July 28, 2014 Letter
Bates ATL000094 - ATL000101
Exhibit 17......................................266
September 19, 2014 Letter
Bates ATL000705 - ATL000708

## Page 5

THE VIDEOTAPED DEPOSITION OF SEAN DUFFY, taken on
this 11th day of May, 2017, at the Law Offices of
Meagher & Geer, PLLP, 33 South Sixth Street, Suite
4400, Minneapolis, MN 55402, commencing at
approximately 9:58 a.m.

P R O C E E D I N G S

THE VIDEOGRAPHER: This is the           09:58:35
start of media number 1 of the video-recorded   09:58:36
deposition of Sean Duffy in the matter   09:58:40
Universal Cable Productions, LLC, et al. v.   09:58:43
Atlantic Specialty Insurance Company, in the   09:58:47
United States District Court, Central   09:58:49
District of California, Western Division.   09:58:52
This deposition is being held at   09:58:54
33 South Sixth Street, Minneapolis, Minnesota   09:58:56
on May 11th of 2017 at approximately 10 a.m.   09:58:59
My name is Ben Abraham, I'm the   09:59:07
legal video specialist from TSG Reporting,   09:59:10
Incorporated, headquartered at 747 Third   09:59:12
Avenue, New York, New York. The court   09:59:15
reporter is Amy Larson in association with   09:59:17
TSG Reporting.   09:59:21
Counsel, please introduce   09:59:22

CONTAINS CONFIDENTIAL PORTIONS
BOUND SEPARATELY

---

**Page 94**

1  Q. Could it have been more than 2 million?     12:02:16
2  A. No.                          12:02:18
3  Q. What was Pamela Johnson's authority?  Could     12:02:18
4    it have been more than 2 million?     12:02:22
5        MR. KEELEY:  Objection; asked and     12:02:24
6  answered --                     12:02:25
7        THE WITNESS:  No.          12:02:26
8        MR. KEELEY:  -- calls for     12:02:27
9  speculation.                    12:02:29
10       Let me finish my --        12:02:30
11       THE WITNESS:  Yeah.        12:02:31
12 BY MR. HAYES:                    12:02:32
13 Q. Could Pamela Johnson's authority have ever     12:02:32
14   been more than $2 million when she was an     12:02:34
15   employee of OneBeacon?          12:02:36
16       MR. KEELEY:  Same objections.     12:02:37
17 Asked and answered.              12:02:38
18       THE WITNESS:  No.          12:02:39
19 BY MR. HAYES:                    12:02:40
20 Q. How do you know?               12:02:40
21 A. Because I have not had any other direct other     12:02:44
22   than one person who has ever had more than     12:02:48
23   $2 million in authority.        12:02:52
24 Q. And who is that?               12:02:53
25 A. Joe Schmitt.                   12:02:53

---

**Page 95**

1  Q. And what was his authority?     12:02:57
2  A. At the time?  He had no authority.  He had     12:02:58
3    Chris's job.                  12:03:01
4  Q. When you say, "At the time," are you     12:03:01
5    referring to July 2014?        12:03:03
6  A. Correct.                      12:03:04
7  Q. What's his authority today?     12:03:05
8  A. $5 million.                   12:03:06
9  Q. Okay.  Let's go back to the Dig claim,     12:03:16
10   July 2014, okay?              12:03:21
11 A. Uh-huh.                       12:03:22
12 Q. If Pamela Johnson wanted to pay NBC Universal     12:03:23
13   for the losses it incurred on that claim,     12:03:28
14   could she do it with her own authority?     12:03:34
15 A. That depends upon what the dollar value was.     12:03:38
16 Q. Assume $7 million.              12:03:42
17 A. No.                           12:03:44
18 Q. Could she do it with Theresa Gooley's     12:03:44
19   authority?                    12:03:46
20 A. Up to Theresa's authority, which I believe     12:03:47
21   was either a million or $2 million, I don't     12:03:52
22   remember what it was.          12:03:55
23 Q. Assume $7 million, could Pamela pay the claim     12:03:55
24   with Theresa's say-so?         12:03:59
25 A. No.                           12:04:01

---

**Page 96**

1  Q. Assume $7 million, could Pamela pay the claim     12:04:01
2    with your say-so?             12:04:05
3  A. Yes.                          12:04:07
4  Q. Assuming $7 million, could Pamela pay the     12:04:07
5    claim with anything less than your say-so?     12:04:12
6  A. Anything less?  I don't know if I understand     12:04:15
7    what that means.              12:04:19
8  Q. Could she get somebody else's permission to     12:04:20
9    pay the claim other than you?     12:04:23
10 A. Nope.  Authority is a hierarchy.     12:04:25
11 Q. Okay.  Did you approve the denial of the Dig     12:04:27
12   claim?                        12:04:32
13 A. No.                           12:04:33
14 Q. Who did?                       12:04:35
15 A. I believe Pamela did.           12:04:36
16 Q. Did Theresa approve the denial of the Dig     12:04:40
17   claim?                        12:04:43
18 A. I don't know.  You'd have to ask Theresa.     12:04:44
19 Q. Does an adjuster have to get approval to deny     12:05:01
20   a claim that exceeds his or her monetary     12:05:07
21   authority?                    12:05:12
22 A. At OneBeacon or in entertainment?     12:05:13
23 Q. At OneBeacon.                   12:05:16
24 A. In certain business lines, certain managers     12:05:17
25   may tell their employees they'd like to see     12:05:20

---

**Page 97**

1    denial letters before they go out, or even     12:05:22
2    reservation of rights letters.  It just     12:05:26
3    depends on the business.        12:05:28
4  Q. In certain divisions, managers will tell     12:05:29
5    their adjusters that if they are going to     12:05:33
6    deny a claim that exceeds their monetary     12:05:36
7    authority, the manager needs to see the     12:05:40
8    denial letter first; is that what you mean?     12:05:42
9  A. No.                           12:05:44
10 Q. Okay.  What do you mean?         12:05:44
11 A. Certain areas may require an adjuster to tell     12:05:45
12   them about any denial regardless of the     12:05:50
13   value.                        12:05:53
14 Q. And is that how it works in the entertainment     12:05:54
15   group?                        12:05:57
16 A. I don't know one way or the other.     12:05:57
17 Q. Is that how it worked in July of 2014?     12:05:59
18 A. I don't -- I don't have any knowledge as to     12:06:01
19   how it worked.  I leave that to the     12:06:06
20   discretion of the individual managers as to     12:06:08
21   how they manage their business.     12:06:11
22 Q. Were you consulted prior to the denial of the     12:06:14
23   Dig claim?                    12:07:07
24       MR. KEELEY:  Objection; vague,     12:07:08
25 ambiguous.                       12:07:11

---

CONTAINS CONFIDENTIAL PORTIONS
BOUND SEPARATELY

---

Page 98

BY MR. HAYES:                                12:07:11
1
2   Q. Do you understand what I mean?           12:07:11
3   A. Consulted by what?                       12:07:12
4   Q. Consulted by who. Did you have any       12:07:15
5      conversations with Pamela Johnson or     12:07:17
6      Theresa Gooley or anyone else before the Dig   12:07:20
7      claim was denied?                        12:07:23
8   A. Other than the e-mail I saw, I don't have any   12:07:25
9      reason to believe I did. I have no memory of   12:07:28
10     doing so.                                12:07:31
11  Q. Did you ever offer an opinion regarding  12:07:32
12     whether or not the Dig claim should be denied   12:07:35
13     before it was denied?                    12:07:37
14  A. No.                                      12:07:39
15  Q. Why not?                                 12:07:39
16  A. That's not what I do.                    12:07:40
17  Q. If you were asked, would you have offered an   12:07:44
18     opinion?                                 12:07:47
19        MR. KEELEY: Objection; calls for      12:07:49
20     speculation.                             12:07:51
21        THE WITNESS: I'm not sure I know      12:07:53
22     what you mean by, "An opinion." I'm trying   12:07:55
23     to delineate between "opinion" and       12:07:57
24     "authority."                             12:08:00
25  BY MR. HAYES:                               12:08:04

---

Page 99

1   Q. "Opinion" meaning yes, the claim should be   12:08:04
2      denied or, no, it shouldn't.             12:08:06
3   A. That's generally not how I interact with my   12:08:09
4      employees.                               12:08:11
5   Q. Have you ever rendered such an opinion in   12:08:12
6      connection with a claim ever during your   12:08:15
7      tenure at OneBeacon?                     12:08:17
8   A. Had an opinion? Generally, I don't recall in   12:08:22
9      the initial resolution of a claim, but   12:08:29
10     certainly people give me a head's-up and tell   12:08:31
11     me that there are claims going on.        12:08:34
12        And I generally don't issue          12:08:35
13     opinions, but certainly I'm involved in   12:08:41
14     decisions regarding large claims and     12:08:43
15     litigation, et cetera, as part of the team   12:08:46
16     that looks at it.                        12:08:49
17  Q. What does it mean, "Involved in decisions   12:08:50
18     regarding large claims"?                 12:08:52
19  A. So if somebody wants to settle a claim for   12:08:55
20     over their authority, I obviously have a   12:08:57
21     Sarbanes-Oxley requirement to provide my   12:09:00
22     specific authority given that the system does   12:09:03
23     not allow them to establish reserves or make   12:09:08
24     payments in excess of their authority.   12:09:09
25        So certainly claims come to me where   12:09:11

---

Page 100

1      I have to sign off on the reserve, and I will   12:09:13
2      do based on the recommendations of my staff.   12:09:15
3   Q. But you never weigh in on whether the claim   12:09:18
4      should be denied or not?                 12:09:21
5   A. Do I weigh in on whether claims should be   12:09:24
6      denied or not?                           12:09:28
7        We certainly have conversations       12:09:29
8      about claims. Whether that involves weighing   12:09:31
9      in on whether it should be deny, I'm sure   12:09:33
10     there are claims where I have an opinion.   12:09:36
11  Q. In your entire career at OneBeacon, has one   12:09:38
12     of your direct reports ever come to you and   12:09:44
13     said, "We should deny this claim," and you   12:09:46
14     respond, "No, we should pay it," has that   12:09:53
15     ever happened?                           12:09:56
16  A. Has that ever happened? I don't believe so.   12:09:57
17  Q. Has the reverse ever happened? Has a direct   12:10:00
18     report ever come to you and said, "I        12:10:02
19     recommend we pay this claim," or, "I want   12:10:04
20     authority to pay this claim," and you said,   12:10:07
21     "No, we're not going to pay this claim"?   12:10:10
22        Have you ever overruled one of your   12:10:14
23     direct reports on a decision to pay a claim?   12:10:15
24  A. Yes.                                      12:10:18
25  Q. How many times?                          12:10:18

---

Page 101

1   A. I have no idea.                          12:10:19
2   Q. More than ten?                           12:10:20
3   A. In seven years, probably.                12:10:21
4   Q. More than a hundred?                     12:10:24
5   A. I don't know.                            12:10:25
6   Q. So you do weigh in on the decision as to   12:10:26
7      whether or not to pay a claim?           12:10:28
8   A. So normally when I weigh in on the decision   12:10:29
9      to a claim is when there's a settlement, an   12:10:33
10     opportunity going into a mediation, how much   12:10:36
11     authority are they going to have, when would   12:10:39
12     we decide that, in fact, we need to try the   12:10:42
13     case.                                    12:10:45
14        So certainly I weigh in because I     12:10:45
15     have a responsibility to say -- they need to   12:10:46
16     say, "Sean Duffy gave me authority."     12:10:51
17  Q. What would you have done in this case if it   12:11:09
18     was your decision?                       12:11:11
19        MR. KEELEY: Objection; calls for      12:11:12
20     speculation, vague, ambiguous.           12:11:14
21  BY MR. HAYES:                               12:11:16
22  Q. What would you --                        12:11:16
23  A. You're asking the wrong guy.             12:11:17
24  Q. What would you have done in connection with   12:11:18
25     the Dig claim? Would you have paid that   12:11:20

---

CONTAINS CONFIDENTIAL PORTIONS
BOUND SEPARATELY

## Page 102

1  claim or denied it?                    12:11:22
2          MR. KEELEY: Objection; vague,    12:11:24
3  ambiguous, calls for speculation.       12:11:27
4          THE WITNESS: That's not what I   12:11:28
5  do.  I'm not an adjuster.               12:11:30
6  BY MR. HAYES:                           12:11:32
7  Q.  Do you have an answer to the question what   12:11:32
8  would you have done if it was your decision   12:11:37
9  to deny or pay the Dig claim?           12:11:39
10         MR. KEELEY: He answered the     12:11:42
11  question.  It's asked and answered.  Same   12:11:44
12  objections.                            12:11:45
13         THE WITNESS: Based on the       12:11:48
14  recommendations of my staff and any counsel   12:11:49
15  they've communicated with, I would support   12:11:52
16  their decision.                        12:11:54
17  BY MR. HAYES:                          12:11:55
18  Q.  Did you?                           12:11:55
19  A.  Did I support their decision?      12:11:58
20      I just don't have a memory of what   12:12:02
21  was going through my mind at that time.  I   12:12:06
22  believe I said, "Looks good to me," although   12:12:08
23  I don't remember the exact words in that   12:12:15
24  e-mail.                                12:12:16
25  Q.  So did you approve the decision to deny or   12:12:17

## Page 103

1  not?                                   12:12:20
2  A.  I did not.                         12:12:20
3  Q.  Okay.                              12:12:22
4  A.  They don't need my authority to deny a claim.   12:12:23
5  Q.  But they would have needed your authority to   12:12:27
6  approve the Dig claim, right?          12:12:30
7  A.  To pay it?                         12:12:31
8  Q.  Yes.                               12:12:32
9  A.  Yes.                               12:12:33
10         MR. KEELEY: How you doing?      12:13:00
11         THE WITNESS: I'm fine.  I just   12:13:02
12  got a scratchy throat.                 12:13:06
13  BY MR. HAYES:                          12:13:14
14  Q.  Did you review Danny Gutterman's deposition   12:13:15
15  transcript?                           12:13:17
16  A.  I did not.                         12:13:17
17  Q.  Mr. Gutterman testified that at OneBeacon he   12:13:20
18  has been taught to always look for coverage.   12:13:24
19      Is that --                        12:13:28
20  A.  Yes.                               12:13:28
21  Q.  Is that correct?                   12:13:29
22  A.  That is correct.                   12:13:30
23  Q.  And is that what you tell your direct reports   12:13:34
24  to do --                              12:13:42
25  A.  Absolutely.                        12:13:43

## Page 104

1  Q.  -- always look for coverage?        12:13:44
2  A.  Sorry, I didn't mean to interrupt.   12:13:46
3      Absolutely.                        12:13:48
4  Q.  What does that mean, "Always look for   12:13:49
5  coverage"?                            12:13:51
6  A.  That means that the objective is not to find   12:13:51
7  ways to deny coverage.  The objective is to   12:13:55
8  take the facts and the policy, and if   12:13:58
9  coverage is apparent, to cover the claim.   12:14:00
10  Q.  The objective is to find ways to find   12:14:04
11  coverage?                             12:14:08
12  A.  The objective is to find ways to pay the   12:14:09
13  claim if it is covered under the policy.   12:14:12
14      And it's important to understand   12:14:15
15  that over time in our industry some companies   12:14:17
16  have taken a different approach.       12:14:21
17      And so that mandate to my employees   12:14:22
18  is simply telling them, we write policies, we   12:14:25
19  care about our insureds, we accept premium,   12:14:29
20  and where there is coverage, you should pay   12:14:31
21  it.  You should not find ways to deny it.   12:14:33
22  Q.  What companies have taken a different   12:14:36
23  approach?                             12:14:38
24  A.  You can use Google and figure it out.   12:14:40
25  Q.  Okay.  Well, if you don't feel comfortable   12:14:42

## Page 105

1  identifying the companies, what did you mean   12:14:48
2  by, "Different approach," just so I   12:14:50
3  understand?                           12:14:52
4  A.  So at times, and you can see this in   12:14:52
5  litigation, companies are accused at times of   12:14:55
6  doing everything possible to not pay a claim.   12:14:58
7      And in my industry, over the years,   12:15:01
8  in 20 years of doing this, I've certainly   12:15:03
9  seen companies that behave that way, whether   12:15:05
10  they are people who are on towers of   12:15:07
11  insurance with us or who insure us personally   12:15:09
12  or et cetera.                         12:15:12
13      So it is just a general statement   12:15:13
14  that tells my employees, your job is not to   12:15:14
15  find ways to deny claims.             12:15:18
16  Q.  And has OneBeacon ever been accused of trying   12:15:20
17  to find ways to deny claims?          12:15:24
18  A.  We've certainly been accused of   12:15:27
19  inappropriately denying claims.       12:15:30
20  Q.  Based on the application of exclusions,   12:15:31
21  right?                                12:15:34
22  A.  All kinds of different things, exclusions,   12:15:35
23  terms, conditions, recision.          12:15:38
24  Q.  Based on the overbroad interpretation of   12:15:40
25  exclusions, right?                    12:15:43

CONTAINS CONFIDENTIAL PORTIONS
BOUND SEPARATELY

## Page 266

1  (Whereupon, Exhibit 17 was        16:40:40
2  marked for identification.)        16:40:41
3  BY MR. HAYES:        16:40:41
4  Q. Do you recognize the document marked        16:40:41
5  Exhibit 17?        16:40:43
6  A. Again, I may have reviewed this. I reviewed        16:40:46
7  a few letters from Pamela back and forth,        16:40:49
8  this may have been one of them. I just don't        16:40:51
9  specifically recognize it.        16:40:54
10  Q. Prior to preparing for your deposition, had        16:40:57
11  you ever seen this document before, the        16:41:00
12  document marked Exhibit 17?        16:41:02
13  A. Not to my knowledge, no.        16:41:03
14  Q. Do you know whether or not OneBeacon has ever        16:42:14
15  reconsidered its decision to deny the Dig        16:42:16
16  claim?        16:42:19
17  A. Has it ever reconsidered its decision?        16:42:23
18  I'm aware Pamela offered to pay        16:42:25
19  certain costs as an accommodation. I don't        16:42:27
20  know whether that was a reconsideration.        16:42:30
21  Other than that, I just don't know.        16:42:34
22  I have no knowledge.        16:42:35
23  Q. Have you ever been involved in any        16:42:38
24  discussions concerning any potential        16:42:40
25  reconsideration of the decision to deny the        16:42:44

## Page 267

1  Dig claim?        16:42:46
2  A. No.        16:42:49
3  Q. And are you aware of any such discussions        16:42:50
4  other than the -- what you termed        16:42:52
5  "accommodation" you just referred to?        16:42:55
6  A. No, I'm not.        16:42:57
7  THE WITNESS: Someone has called        16:43:19
8  me three times. I just want to see if it's        16:43:20
9  my daughter so I'm just checking to see if        16:43:24
10  it's her.        16:43:26
11  MR. HAYES: If you need to --        16:43:26
12  THE WITNESS: It's not. I'm okay.        16:43:29
13  MR. HAYES: Can we take a        16:44:12
14  five-minute break?        16:44:14
15  THE WITNESS: Sure.        16:44:16
16  MR. KEELEY: Another break?        16:44:16
17  THE VIDEOGRAPHER: It's 4:45 p.m.        16:44:18
18  We're going off the record.        16:44:21
19  (Whereupon, a brief recess        16:44:23
20  was taken.)        17:06:53
21  THE VIDEOGRAPHER: It's 5:08 p.m.,        17:06:53
22  and we're back on the record.        17:07:00
23  MR. HAYES: I have no further        17:07:02
24  questions.        17:07:03
25  MR. KEELEY: We'll reserve.        17:07:04

## Page 268

1  THE WITNESS: So we're done?        17:07:05
2  THE VIDEOGRAPHER: It's 5:08 p.m.,        17:07:05
3  and we're going off the record.        17:07:12
4  (Whereupon, the foregoing
5  deposition concluded at 5:08 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 269

ERRATA SHEET
Case Name: Universal Cable Productions, LLC,
et al. vs. Atlantic Specialty
Insurance Co.
Deposition Date: 5-11-17
Deponent: Sean Duffy
Pg. Line  Now Reads  Should Read  Reason

_____ Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME THIS ____ DAY OF
_____, 2017.

(Notary Public)  MY COMMISSION EXPIRES:_____

CONTAINS CONFIDENTIAL PORTIONS
BOUND SEPARATELY

Page 270

1    STATE OF MINNESOTA  )
            ) ss
2    COUNTY OF ANOKA    )

3

4        Be it known that I took the foregoing
     deposition of Sean Duffy, on May 11, 2017, in
     Minneapolis, Minnesota;

5

6        That I was then and there a notary public
     in and for the County of Anoka, State of Minnesota,
     and that by virtue thereof, I was duly authorized
7    to administer an oath;

8        That the witness was by me first duly
     sworn to testify to the truth, the whole truth and
9    nothing but the truth relative to said cause;

10       That the foregoing transcript is a true
     and correct transcript of my stenographic notes in
11   said matter;

12       That the witness reserved the right to
     read and sign the transcript;

13

14       That I am not related to any of the
     parties hereto, nor interested in the outcome of
     the action;

15

16       WITNESS MY HAND AND SEAL this 23rd day of
     May, 2017.

17

18       _____

         Amy L. Larson, RPR
19       My Commission Expires 01/31/20

20

21

22

23

24

25