KALPANA SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
AMANDA K. BONN (270891)
abonn@susmangodfrey.com
CATRIONA LAVERY (310546)
clavery@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150

JACOB W. BUCHDAHL (*pro hac vice*)
jbuchdahl@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel: (212) 336-8330
Fax: (212) 336-8340

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ATLANTIC SPECIALTY INSURANCE COMPANY, <br><br> Defendant. | Case No.: 2:16-cv-4435-PA-MRW <br><br> The Honorable Percy Anderson <br><br> **JOINT MOTION IN LIMINE NO. 4: PLAINTIFFS' MOTION TO BAR EVIDENCE OR ARGUMENT THAT PLAINTIFFS' DAMAGES MAY BE OFFSET BY TAX CREDITS** <br><br> Hearing Date: February 10, 2020, <br> Time: 1:30 p.m. <br> Pretrial Conference: January 17, 2020 <br> Place: Courtroom 9A <br> Trial Date: February 18, 2020 |

015825\7088590

**PLAINTIFFS' MOTION IN LIMINE NO. 4:**

## I.   INTRODUCTION

Plaintiffs Universal Cable Productions LLC and Northern Entertainment Productions LLC ("Universal" or "Plaintiffs") move to preclude Defendant from introducing any evidence or argument suggesting that the amount of Plaintiffs' covered loss should be reduced or offset due to tax benefits they may have received from completing filming *Dig* in New Mexico and Croatia rather than Israel.

Dr. Wunderlich, Plaintiffs' damages expert, opined that Plaintiffs incurred over $7.1 million in extra expenses as a result of relocating filming of *Dig* episodes 2-6 out of Israel and to New Mexico and Croatia. Defendant's former damages expert Mr. Shapiro (who, sadly, passed away) opined that Plaintiffs' covered losses should be **reduced by $1,571,445** because Plaintiffs allegedly received more generous tax credits for filming in New Mexico and Croatia than they would have received if they had completed filming in Israel. Bonn Decl. Ex. 10 (Shapiro Report) at 8 & Schedule A. The argument that Plaintiffs' covered losses should be offset by any tax benefits they received, however, is barred by (1) black-letter, California law and (2) the Policy language itself.

The California Court of Appeal has made clear that "evidence of tax benefits which a plaintiff may have received" should not "be considered in determining compensatory damages for the defendant's breach of [a] contract" and that such tax benefit "evidence is irrelevant." *DePalma v. Westland Software House*, 225 Cal. App. 3d 1534, 1536 (1990). As the court explained:

> There are several grounds for our conclusion tax consequences should not be considered as a mitigating factor in compensatory damage calculations in breach of contract cases. Those grounds are: (A) the federal "tax benefit rule" cancels out most windfalls to plaintiffs; (B) estimating tax consequences is not useful because it is speculative, time consuming, and confusing; (C) public policy is better served by having defendants pay the full amount of the damages they have caused by breaching their contracts.

*Id.* at 1540-41.

Moreover, the Policy defines a "loss" as "[a]ll necessary 'Insurable Production Cost' you incur to complete the 'Insured Production' that exceeds the amount of

1

'Insurable Production Cost' you would have incurred if the covered cause of the loss had not occurred." Ex. 11 at ATL003103. The term "Insurable Production Cost," in turn, is defined to include "all costs . . . chargeable directly to an 'Insured Production' or series of productions," and precludes any offset for tax benefits received. *Id.* at ATL0003081.

Accordingly, Plaintiffs respectfully move to preclude Defendant from introducing any evidence or argument at trial that the amount of Plaintiffs' covered losses should be offset by any tax benefit they received. Such evidence or argument would include any opinions by Mr. Shapiro, any substitute damages expert, any cross-examination of Plaintiffs' witnesses concerning tax credits, and any exhibit referencing or discussing tax credits.

## II.   **ARGUMENT**

### A.   **Compensatory Damages Are Not Reduced by Tax Benefits under Black-Letter, California Law.**

Under black-letter, California law, evidence of "tax consequences should not be considered as a mitigating factor in compensatory damage calculations in breach of contract cases." *DePalma*, 225 Cal. App. 3d at 1537. Yet, contrary to California law, Defendant's former damages expert Mr. Shapiro opined that:

> Plaintiffs should consider *mitigating economic benefits* accruing to them from the Relocation. This includes but is not limited to the *tax credits* that Plaintiffs received as a result of moving production to New Mexico and Croatia (minus the tax credits they would have received had production been completed in Israel).

Bonn Decl. Ex. 10 (Shapiro Report) at 8 (emphasis added). This is precisely the sort of evidence that the California Court of Appeal held was irrelevant in breach-of-contract cases as a matter of law. *DePalma,* 225 Cal. App. 3d at 1537.

In *DePalma*, the plaintiff sued the defendant for breaching a contract to provide licensed computer hardware and software, claiming that the computer equipment "did not function as promised." The defendant "proffered evidence of the respondent's tax returns," claiming "such evidence would show whether the respondent had received investment tax credits and/or depreciation allowances for the purchase of the computer system." *Id.* The defendant's "theory was that if received, such tax benefits should be

considered as an offset to any compensatory damage award to which the [plaintiff] might be entitled thus lowering [defendant's] liability." *Id.* The Court of Appeal disagreed as a matter of law, holding there were multiple "reasons for not allowing the trier [of fact] to consider tax benefits in damages determinations." *Id.* at 1544.

*First*, the court observed that "the federal 'tax benefit rule' cancels out most windfalls to plaintiffs . . . ." *Id.* at 1540. "In the vast majority of cases, the federal tax benefit rule prevents plaintiffs from reaping multiple recoveries," as it "allows the government to recapture past tax benefits awarded to a taxpayer if in a later year an event occurs which changes the basis, or is '…fundamentally inconsistent with the premise upon which the deduction was initially based.'" *Id.* at 1541 (internal alterations in original) (citation omitted). The court noted that multiple other decisions had relied upon the federal tax benefit rule as grounds for excluding evidence of tax consequences in setting compensatory damages. *Id.* at 1542 (citing *Burgess v. Premier Corp.*, 727 F.2d 826, 838 (9th Cir. 1984); *Danzig v. Jack Grynberg & Assocs.*, 161 Cal. App. 3d 1128, 1139 (1984). In *Burgess*, the Ninth Circuit held that damages are "equal to the doctors' losses exclusive of tax benefit" as "under the tax benefit rule, their prior tax benefits will be disallowed." *Burgess*, 727 F.2d at 838. In *Danzig*, 161 Cal. App. 3d at 1140, the California Court of Appeal held that "tax benefits, if any, enjoyed by plaintiff class members as a result of their partnership investments are irrelevant to the restitution award of damages" in light of the federal tax benefit rule.

*Second*, the court in *DePalma* held that "estimating tax consequences is not useful because it is speculative, time consuming, and confusing . . . ." *DePalma*, 225 Cal. App. 3d at 1540-41. The court noted the "necessarily complex and speculative nature of inquiring into tax consequences, as "it is very complicated and speculative to predict: (1) what portion of a damage award will actually be paid; (2) the year or years when a damage award will actually be received; (3) what the prevailing tax rate will be during the year(s) of receipt; and (4) how a damage award will be construed under the continuously changing Internal Revenue Code." *Id.* at 1544. Thus, the court was "concerned even the

most sophisticated attempts to make a prediction about tax consequences would result in only guesswork which has little probative value." *Id.* Any such probative value would be substantially outweighed by the fact that "trial judges and juries would be subjected to complicated, time consuming and confusing processes which would be required to admit and consider such minimally relevant evidence." *Id.* at 1545.

*Third*, the court in *DePalma* held that "[e]ven if evidence of tax consequences were admissible under Evidence Code section 352"—the California equivalent of Federal Rule of Evidence 403—it would still exclude such evidence "for reasons of public policy." *Id.* at 1545. The court recognized that there "is deterrent value against breaching a contract if contracting parties know they must compensate the other party in full, without being able to subtract any tax benefits the other party might receive." *Id.* And even "if there were no tax benefit rule or the IRS decided against applying the rule," the court would reach the same conclusion:

> In the present case, if respondent received an investment tax credit for purchasing the computer system, it was because the government was encouraging the purchase of such systems by conferring credits. For this court to rule such a subsidy should now in effect be taken from respondent and credited to the appellant would be at odds with the purpose of the credit; it would also be tantamount to awarding appellant government funding to subsidize his breach of contract. Since this court does not believe taxpayers should subsidize those who have not fulfilled their contractual obligations, we find little merit in appellant's theory.

*Id.* at 1545-46.

The same is true here. If Plaintiffs received tax credits for filming in New Mexico and Croatia, it was because the government was encouraging filming in those locations by conferring credits. The California Court of Appeal has recognized the important "deterrent value against breaching a contract" from making Defendant pay the damages sustained in full, without deducting any tax benefit. And any contrary ruling would be at odds with the purpose of the tax credits that Plaintiffs' received—it would be "tantamount to awarding" Defendant "government funding to subsidize [its] breach of contract." *Id.*

The law is absolutely clear: Plaintiffs' compensatory damages may not be "offset" by the supposedly mitigating effect of the tax credits received in New Mexico and Croatia.

Mr. Shapiro's opinions to the contrary should be barred, as should any similar evidence or argument which Defendant may attempt to introduce through a new expert, cross-examination of Plaintiffs' witnesses, or documentary exhibits concerning Plaintiffs' tax credits.

**B.    The Policy Precludes Deducting Tax Credits from Covered Losses.**

There is a second and independent reason for precluding evidence or argument concerning Plaintiffs' alleged tax benefits: the Policy itself prohibits deducting tax benefits from covered losses.

Under the Policy, Atlantic agreed to pay "such loss . . . as you sustain by reason of such extra expense you necessarily incur as a result of the interruption, postponement, cancellation, relocation, curtailment, or abandonment of an Insured Production due to . . . [i]mminent peril . . . ." Bonn Decl. Ex. 11 at ATL003103. The "amount of your loss will be determined based on . . . [a]ll necessary '***Insurable Production Cost***' you incur to complete the 'Insured Production' that exceeds the amount of 'Insurable Production Cost' you would have incurred if the covered cause of the loss had not been incurred." *Id.* at ATL003106 (emphasis added). The Policy defines "Insurable Production Cost" as follows:

> 4.    'Insurable Production Cost' includes: all costs, including overhead and interest on loans chargeable directly to an 'Insured Production' or series of productions. Insurable Production Cost also includes any amount of other overhead only when declared at the time you declare an 'Insured Production' or series of productions. The following costs shall not be included in 'Insurable Production Cost':
>
> (a)    Royalties Term Deals for Executive Producer(s), Package Fee & Publicity, residuals, premiums paid for this insurance, and personal property taxes;
>
> (b)    Story, scenario, music rights, and sound rights, except with respect to television series, specials and pilots; and
>
> (c)    'Continuity', except when a period of suspension due to covered loss or damage exceeds ninety (90) days.
>
> (d)    Any other costs specifically stated not to be 'Insurable Production Costs' in an endorsement to this policy.

Nevertheless, you have the option to include these excluded costs at the time you

1   declare an 'Insured Production' or series of productions. In that case, such costs

2   will be included in the 'Insurable Production Cost', and

3   The amount of any loss or damage paid under this policy.

4   Bonn Decl. Ex. 11 at ATL003081-82.

5     "Under California law, the terms in an insurance policy are 'understood in their

6   ordinary and popular sense, rather than according to their strict legal meaning; unless

7   used by the parties in a technical sense, or unless a special meaning is given to them by

8   usage, in which case the latter must be followed." *Universal Cable Prods., LLC v. Atlantic*

9   *Specialty Ins. Co.*, 929 F.3d 1143, 1153 (9th Cir. 2019) (quoting Cal. Civ. Code § 1644)

10   (emphasis omitted). "'Under the familiar maxim of *expressio unius est exclusion alterius*,

11   it is well settled that, when a statute expresses certain exceptions to a general rule, other

12   exceptions are necessarily excluded.' This canon, based on common patterns of usage

13   and drafting, is equally applicable to the construction of contracts." *White v. Western Title*

14   *Ins. Co.*, 40 Cal.3d 870, 881 n.4 (1985) (citations omitted). In *Western Title Ins. Co.*, the

15   California Supreme Court relied on the *expressio unius* canon to conclude that "Paragraph

16   3, by excluding easements, liens, and encumbrances 'not shown by public records,'

17   implies inclusion of such interests when recorded." *Id.*

18     Similarly, here, "Insurable Production Cost" includes "all costs," unless such costs

19   (1) fall within the express exclusions listed in sub-paragraphs (a) through (c) or (2) are

20   "specifically stated not to be 'Insurable Production Costs' in an endorsement to this

21   Policy." Ex. 11 at ATL003081-82. Tax credits are not enumerated in sub-paragraphs (a)

22   through (c) nor "specifically stated not to be 'Insurable Production Costs' in an

23   endorsement to this Policy." *Id.* As such, the only reasonable interpretation of the Policy

24   is that it does not permit Insurable Production Costs—and, in turn, covered losses—to be

25   offset or reduced by tax credits.

26     Defendant's own witness Wanda Phillips, who negotiated the Policy on behalf of

27   Defendant, confirmed as much. Ms. Phillips admitted in deposition that (1) when tax

28   credits are insured, they are listed in the insurance policy as part of the Insurable

2:16-cv-04435-PA-MRW   Document 206   Filed 01/17/20   Page 8 of 24   Page ID #:26089

Production Cost and (2) tax credits were not insured under the NBCU Policy to the best of her memory:

> Q.   [W]ith respect to calculating a loss that may occur under the terms of the policy, part of that calculation of the loss depends on the amount of insurable production costs that was incurred on the show. Is that right?
>
> A.   That's correct.
>
> Q.   Okay. *In calculating the loss, is the amount of any tax credit that the production company might receive or does receive, does that go into the equation at all in calculating loss under the policy*?
>
> A.   *It can be, but again, that depends on how you craft the policy*. So if you are insuring that tax credit, you have to insure that amount as part of the production costs, thereby the rate applied to the production costs to determine the premium would also include the tax credit.
>
> Q.   So if it were to be included, you would expect to see if addressed in the calculation of the insurable production cost. Is that right?
>
> A.   It would be included.
>
> Q.   [I]f it is going to be, would you see the tax credit specifically addressed in the calculation of what constitutes an insurable production cost?
>
> A.   Again, *you can add the tax credit, and if you were adding it, you can add it as an agreement that is part of your insurable costs* or if you don't charge the premium for it, then it is not covered, so it can be done either way.
>
> Q.   And you have seen it done either way?
>
> A.   Yes.
>
> Q.   Without looking at the policy, it is not a memory test, but *do you recall how it was handled under the NBC Universal policy*?
>
> A.   *I don't believe tax credit was part of it* . . . .

Bonn Decl. Ex. 12 at 76:25-78:20 (emphasis added, objections omitted).

Defendant has never identified any contrary evidence. Mr. Shapiro's report offers no basis in the Policy language itself for concluding that tax credits may be deducted from insured losses or "Insurable Production Cost." Mr. Shapiro admitted as much in his deposition:

> Q.   So under "Definition of Loss" that's on page ATL003106, do you see

7

1    any reference here to the application of tax credits?

2    A.   **No.**

3    Q.   And if you look at the definition of 'insurable production cost' in
4         ATL00 – on ATL003081, in Item 4, the definition of 'insurable
         production cost,' where in this definition is there a provision for
         application of the tax credit in calculating the insurable production
5         cost?

6    A.   **I don't know. I see no direct reference to film tax credits.**

7    Q.   My understanding from your testimony earlier today was that your
         analysis was an attempt to calculate cost under the terms of the policy;
8         is that right. Excuse me. The claim under the term s of the policy; is
         that right?

9    A.   **Yes.** [Objection omitted]. **Yes that was my objective.**

10   Q.   If the – any tax credits accorded to the insured are not provided for in
11        the calculation of insurable production cost, then why did you apply
         it here?

12
13   A.   **Well, it's just my understanding in dealing with an insurance
         claim that the insured who has suffered a loss can't economically
         benefit from such loss. In this case, they did.**

14
15   Q.   But under the terms of the contract between the parties, there's no
         provision for the application of the tax credit, is that right?

16   A.   **Counselor, I'm not a lawyer, and I'm not familiar with the
         insurance contract in that respect.**

17

18   Bonn Decl. Ex. 13 at 159:9-160:21 (objections omitted). This is precisely the sort of

19   inadmissible expert "opinion evidence that is connected to existing data only by the *ipse*

20   *dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

21   III.   **CONCLUSION**

22        Both California law and the Policy itself are clear: Plaintiffs' covered losses may

23   not be offset or reduced by any tax credits they received for filming in New Mexico and

24   Croatia. Any evidence or argument suggesting that the jury should deduct tax benefits

25   from Plaintiffs' compensatory damages should be barred as a matter of law. This includes

26   any expert evidence from Mr. Shapiro (or any substitute damages expert), examination

27   of fact witnesses, or references in exhibits to the amount of any tax credit received.

28

1    **ATLANTIC SPECIALTY INSURANCE COMPANY'S OPPOSITION TO**
2    **PLAINTIFFS' MOTION *IN LIMINE* NO. 4**

3         Plaintiffs seek to exclude evidence or argument that Plaintiffs' damages may be
4    offset by tax credits Plaintiffs received as offsets to overhead associated with the subject
5    production. However, because Plaintiffs did not receive the tax credits as a result of any
6    alleged act or omission by ASIC, and because all parties considered tax credits to be
7    included in "insurable production costs," ASIC is free to introduce evidence and
8    argument regarding these tax credits so as to attack Plaintiffs' damages.

9         If Plaintiffs prevail on this motion, then Plaintiffs will likely receive a windfall
10   should they prevail on the breach of contract claim. Plaintiffs' damages expert opines that
11   Plaintiffs suffered millions of dollars in covered losses. However, Plaintiffs did not
12   actually incur certain overhead costs because of tax credits received from the Canadian,
13   Israeli, Croatian, and New Mexican governments. If ASIC cannot mention these tax
14   credits to challenge Plaintiffs' damage model, then Plaintiffs will present damages
15   evidence to the jury of losses they did not actually suffer.

16                          **ARGUMENT AND AUTHORITY**
17   **A.    Plaintiffs Misstate California Law to Justify Their Position.**

18        California law is clear: plaintiffs in a breach of contract action are entitled to
19   recover damages equivalent to the full detriment they suffer ***from the breach***. *See gen.*
20   Cal. Code § 3300; *DePalma v. Westland Software House*, 225 Cal. App. 3d 1534 (1990)
21   (emphasis added) (citing *Powers v. Powers*, 714 S.W.2d 384, 389 (Tex. App.—Corpus
22   Christi-Edinburg 1986, no writ) ("We are unaware of any principle or authority which
23   would allow an offset to the party who has breached a contract for a 'tax savings' the non-
24   breaching party 'realized' ***as a result of the breach***") (emphasis added)); *Anheuser-*
25   *Busch, Inc. v. Starley* 28 Cal. 2d 347 (1946); *Danzig v. Grynberg*, 161 Cal. App. 3d 1128,
26   1139-40 (1984) (tax benefits received from investment irrelevant in restitution for fraud).
27   However, Plaintiffs did not relocate production of *DIG* as a result of any alleged breach
28   by ASIC. Rather, Plaintiffs re-located production due to the existence of an armed conflict

that allegedly jeopardized the safety of Plaintiffs' employees and contractors. *See* Dkt. 10 – Plaintiff's First Amended Complaint.

Therefore, the main issue in this case is not whether ASIC is the proximate cause of Plaintiffs' relocation. Rather, the main issue is whether the Policy at issue covers the costs of Plaintiffs' relocation. Plaintiffs' own evidence shows that they negotiated tax credits with Canada and Israel to reduce overhead costs for *DIG*'s production prior to the events giving rise to Plaintiffs' claims. *See*, *e.g.*, *gen.*, Deposition of Barbara Ann Markus-Caffrey. Plaintiffs' also admit they received additional reductions to overhead costs when Croatia and New Mexico paid tax credits to relocate production. *Id*. Ignoring these credits would ignore the amount of insurable production costs associated with relocation. Therefore, unlike in collateral source rule-type cases, ASIC must be allowed to introduce evidence, testimony, or argument regarding these tax credits as a means of challenging Plaintiffs' damages evidence.

**B.    "Insurable Production Cost" Includes Offsets for Tax Credits.**

Both the plain language of the Policy and Plaintiffs' own evidence refute the argument that "the Policy prohibits deducting tax benefits from covered losses." The Policy explicitly provides that the amount of an covered loss is determined "based on…[a]ll necessary 'Insurable Production Cost' you incur to complete the 'Insured Production' that exceeds the amount of the 'Insurable Production Cost' you would have incurred if the covered cause of the loss had not been incurred." *See* Policy ATL003106.[1] The Policy defines "Insurable Production Cost" as follows:

> 4.    'Insurable Production Cost' includes: all costs, including overhead and interest on loans chargeable directly to an 'Insured Production' or series of productions.

*See* Policy ATL003081-82.

---

[1] True and correct copies of the cited exhibits and excerpts from the transcripts referenced deposition testimony are attached as Exhibits to the Declaration of Marc J. Shrake submitted with this Opposition.

While this Policy does not explicitly discuss "tax credits," it explicitly includes "overhead" as a component of "insurable production cost." *Id*.  Overhead is commonly understood as "business expenses that cannot be allocated to a particular product or services" (e.g. taxes). "Overhead," Black's Law Dictionary (10th ed. 2014). It follows logically that, if the Policy includes taxes as a component of "insurable production cost," then it must also include tax credits therein as well.

Plaintiffs plainly understood this reality because Plaintiffs included tax credits as a part of calculating insurable production costs. When Plaintiffs applied to insure "DIG, Season 1," Plaintiffs provided ASIC with information to underwrite the production. *See* Exhibit 5 to Deposition of Jay Shapiro, Exhibit 8 to Deposition of Andrea Garber (AONNBCU0001748-50). As a part of that application, Plaintiffs provided ASIC with the accurate amounts of "Total Insurable Production Costs" and "Total Net Insurable Cost" for the production. *Id*. at AONNBCU0001750; *see also* Deposition of Andrea Garber at p.140, ¶¶ 7 – 15.

Subsequent production and email communications among Plaintiffs' employees clarify the mathematical calculations wherein Plaintiffs determine the gross cost of production, but then subtract various tax credits to determine the net production cost. *See*, *e.g.*, Exhibit 6 to Deposition of Jay Shapiro, UCP004971 (subtracting "IS Tax Cr" (i.e. Israel Tax Credit) and "CN Tax Cr" (i.e. Canada Tax Credit) from estimated gross insurable costs). In other words, when Plaintiffs applied for the Policy, Plaintiffs reduced their net insurable costs by the amount of the tax credits they anticipated receiving from Israel and Canada.

Additionally, Plaintiffs' own witness, Barbara Ann Markus-Caffrey, Vice President of Production Finance, testified that Plaintiffs included tax credits both when estimating costs of production *and* when calculating final costs of production:

Q.    Were there tax credits that were received in connection with the shooting in Israel?

A.    Yes.

11

1  …

2  Q.   Were there tax credits received for the filming in Croatia?

3  A.   Yes.

4  …

5  Q.   Okay. And then if we look at "Gross Pattern Budget," it indicates – its got a

6       list or numerical listing of $3,541,498 times five with a total of $17,707,490,

7       correct?

8  A.   Yes

9  Q.   And that was the locked budget for Episodes 2 through 6 in Israel, correct?

10  A.   Yes.

11  Q.   Okay. And you see under there it's got tax credit listed of 3,463,813?

12  A.   Yes.

13  Q.   Is that an estimate of the tax credit that was expected if all this – if all these

14       episodes, including the pilot, had been filmed in Israel?

15  A.   Yes.

16  …

17  Q.   Well, if we look at tax credit, the reason – of course that's a negative number

18       as its reflected here, correct?

19  A.   Correct.

20  Q.   Okay. Which would lower the overall budgeted amount, correct?

21  A.   No.

22  Q.   No? Why not?

23  A.   The budget's the budget.

24  Q.   And this is just a potential offset against that number, correct?

25  A.   Correct.

26  …

27  Q.   Exhibit 344…and does this represent actual expenditures on Episodes 2

28       through 5 – 2 through 6 of DIG?

12

1    A.    Yes, it does.

2    …

3    Q.    Okay. And that – that would include the costs incurred at the New Mexico

4          locations and the Croatia locations, correct?

5    A.    Yes.

6    Q.    Okay. And does Exhibit 344 also reflect that there were some tax credits that

7          were obtained in Israel, in New Mexico and in Croatia?

8    A.    Yes.

9    …

10   Q.    Okay. And then there's also an amount for Croatia of $370,202, correct?

11   A.    Correct.

12   Q.    And is that the final number that was received for that production in – in

13         terms of the tax credit?

14   A.    Yes.

15   Q.    Okay. And then there's another number for New Mexico for Exhibits [sic] 2

16         through 6 that's listed here, correct?

17   A.    Yes.

18   Q.    And that number that's on – on this document, at least, which is Exhibit 344,

19         is $3,305,243, correct?

20   A.    Correct.

21   *See* Deposition of Barbara Ann Markus-Caffrey at p.81, ¶¶ 13-17; p.82, ¶¶ 1-5; p.83, ¶ 1

22   – p.84, ¶ 4; p.86, ¶¶ 2 – 8, 12 – 17; p.101, ¶ 11 – p.102, ¶ 13; p.104, ¶¶ 2 – 25; Corporate

23   Representative Deposition of Barbara Ann Markus-Caffrey at p.14, ¶ 25; p.15, ¶¶ 4 – 16,

24   p.16 ¶ 4 – p.18, ¶ 8 (all objections omitted).

25        Such actions comport with ASIC's testimony that any tax credits received are

26   included in "insurable production costs." For example, Wanda Phillips testified:

27   Q.    Earlier today Ms. Coyoca asked you the following question: in calculating

28         the loss, is the amount of any tax credit that the production company might

13

1    receive or does receive, does that go into the equation at all in calculating

2    loss under the policy? Do you remember her asking you that question?

3    A.    I recall.

4    Q.    Okay. I want to make sure I understood or understand your answer, so could

5    you please explain to me how tax credits that NBC might receive in

6    connection with a production would figure into a loss that it might incur?

7    A.    So in a production budget, there are several line items, and so you insure, for

8    the most part the production company will insure, they can insure two parts.

9    They can insure the day-to-day cost, the production costs, insurable

10    production cost. They can also insure items such as story, scenario, script,

11    tax credits, and all of those things they would lose in the event of an

12    abandonment.

    So if we have a budget, I will just use $20 million as an example, and they

13    are receiving a 10 percent tax credit, that comes off the budget pretty much

14    so they don't spend that money. It is a credit to the production company.

15    Q.    Okay. So let me ask you this. Tell me what your understanding would be in

16    a situation such as the claim here where NBC has claimed a loss because it

17    left production in Israel and moved to Croatia and New Mexico. In

18    calculating its loss, what effect would the fact that NBC received tax credits

19    for filming in New Mexico have on the calculation of its loss?

20

21    A.    So New Mexico is where they went after the first filming where they actually

22    incurred the loss?

23    Q.    Yes. That is one of the locations. They went to New Mexico and to Croatia.

24    A.    So an example would be, if it cost them $5 million to move to New Mexico

25    but they received a million dollars of that in tax credits, then they have

26    actually only lost $ 4 million.

27    Q.    Okay. So, if the extra expense that an insured such as NBC incurs in moving

28    is $ 5 million, but they receive a $ 1 million tax credit, then the loss they

would be entitled to collect under the policy would be $4 million. Is that correct?

A.     $ 4 million would be the amount they actually lost.

*See* Deposition of Wanda Phillips, p. 274, ¶ 20 – p. 276, ¶ 6 (objections omitted).

Yet despite both the plain language of the Policy and clear evidence of the fact that both Plaintiffs and ASIC considered tax credits to reduce to total amount of insurable loss, Plaintiffs now argue that the Court should exclude all evidence of tax credits Plaintiffs received from filming in Canada, Israel, Croatia, and New Mexico. Such argument ignores the plain fact that Plaintiffs *did not* incur certain overhead costs as a result of receiving these tax credits. If Plaintiffs prevail on excluding, then they will present evidence and testimony to the jury of costs that they did not incur. Therefore, their damages evidence will go uncontroverted despite the fact that Plaintiffs received these tax credits for reasons unrelated to ASIC's alleged breach of contract or duty of good faith.

Accordingly, the Court should deny the Motion *in Limine* No. 4.

15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION IN LIMINE NO. 4:**

## I.   INTRODUCTION

Defendant's opposition erroneously (1) minimizes the California Court of Appeal's holding in *Depalma v. Westland Software House*, 225 Cal. App. 3d 1534, 1540 (1990) and (2) mischaracterizes the documentary evidence it cites. But the law is clear. The Policy is clear. The evidence is clear. None permits Plaintiffs' damages to be offset by any tax credits they received. Plaintiffs therefore respectfully request that the Court grant their motion.

## II.   ARGUMENT

### A.   The Law Is Clear: Tax Consequences Are Irrelevant Under *Depalma.*

The law is clear: "[T]ax benefits should not be considered as a mitigating factor in compensatory damage calculations for breach of contract." *Depalma*, 225 Cal. App. 3d at 1540-41. Defendant attempts to minimize the holding in *Depalma* by suggesting it is limited to tax consequences realized "as a result of the breach." *Supra* at 9. Defendant contends that because it did not cause Plaintiffs to relocate filming, this principle does not apply. *Id.* Defendant is mistaken.

The court in *Depalma* held that "tax consequences should not be considered as offsets for defendants ***in breach of contract actions***"—not merely in actions where Defendant's breach caused the loss and the resulting tax savings. *Id.* at 1540 (emphasis added). Defendant's suggestion that it did not "cause" Plaintiffs to relocate is a distinction without a difference. Of course, in any case involving first-party insurance, it is the covered event that causes the underlying loss, while the insurer causes damages when it denies payment of a valid claim. Effectively, Defendant argues for an "insurance breach" exception to the rule announced in *Depalma*. But nothing in *Depalma* permits such an exception. To the contrary, the court justified its broad holding in part because "estimating tax consequences is not useful because it is speculative, time consuming, and confusing"—reasoning that would apply regardless whether the defendant caused the loss directly or in the case of breach of an insurance policy, by failing to pay a covered claim.

16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.    The Policy Is Clear: Tax Credits Are Irrelevant to Calculating Loss.**

The Policy is clear: "Insurable Production Cost" includes "all costs" except those (1) enumerated in sub-paragraphs 4(a)-(c) or (2) "specifically stated not to be 'Insurable Production Costs' in an endorsement to this policy." Ex. 11 at ATL003081-82. Defendant itself admits that the Policy "does not explicitly discuss 'tax credits' . . . ." *Supra* at 11.

Defendant suggests that it is "logical" that tax credits are part of "insurable production costs." *Id.* To the contrary, there is nothing "logical" about calling a tax ***credit*** a ***cost***. For instance, the cost of undergraduate tuition at UCLA is $13,225 per year. A student who pays that tuition might be eligible for a $2,5000 American Opportunity Tax Credit on her federal income taxes. But the fact that the student later receives such a tax credit does not change the fact that the ***cost*** of UCLA tuition is $13,225 per year. Other than its *ipse dixit* about what is supposedly "logical," Defendant cites absolutely nothing in the Policy language that, on its face, would permit reducing "Insurable Production Cost" based on tax credits.

Defendant attempts to introduce extrinsic evidence to cast doubt on whether "all costs" should be read as "all costs minus tax credits." But such parol evidence is only "admissible to interpret an insurance policy if relevant to prove a meaning to which the language of the instrument is reasonably susceptible" and may not "contradict[] a clear and explicit policy provision." *George v. Automobile Club of S. Cal.*, 201 Cal. App. 4th 1112, 1121 (2011) (quotation marks and citation omitted).

The Policy is not reasonably susceptible to a construction allowing "all costs" to be offset by tax credits. To the contrary, allowing an offset based on tax credits would improperly render subparagraph 4(d)—which requires that any offset other than those listed in subparagraphs 4(a)-(c) must be "specifically stated in an endorsement"—a nullity. *See, e.g.*, *Unilab Corp. v. Angeles-IPA*, 244 Cal. App. 4th 622, 637-38 (2016) (rejecting contract interpretation that "would render the independent contractor provision of the agreement between Angeles and its physicians a nullity" as doing so "would be contrary to the general rule of contract interpretation that 'the whole of a contract is to be

17

taken together, so as to give effect to every part'") (citing Cal. Civ. Code § 1641); *see also Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal.4th 495, 502 (2005) (noting the "effect" of Civil Code section 1641 "is to disfavor constructions of contractual provisions that would render other provisions surplusage").

Thus, the Policy is clear: Defendant's experts cannot deduct tax credits from "Insurable Production Cost" in calculating Plaintiffs' loss—nor can Defendant argue that the jury is entitled to do so.

## C. The Evidence Is Clear: Tax Credits Are Irrelevant to Insurable Production Cost.

But even if the Court were to consider the parol evidence Defendant cites, that evidence, too, is clear:  "All costs" as used in the Policy really means "all costs"—not costs less tax credits received.

Defendant contends that the parol evidence it cites demonstrates that "Plaintiffs included tax credits as a part of calculating insurable production costs." *Id.* at 11. But the evidence Defendant cites shows precisely the ***opposite*** of what Defendant represents. Instead, the very evidence Defendant relies upon shows that (1) the "Total Insurable Production Cost" on Plaintiffs' application to add *Dig* to the Policy was based on ***gross costs*** and (2) the "Net Insurable Production Cost" on Plaintiffs' *Dig* application deducted ***only*** the offsets listed in subparagraphs 4(a)-(d) (and not tax credits, as Defendant misleadingly suggests).

Defendant cites the application to add *Dig* as an insured production under the Policy. That application, however, shows that the "Total Insurable Production Cost" of $25,000,000 included "all costs" and the "Total Net Insurable Cost" reduced that number to $20,000,000 by deducting "script & writers fees; residual and royalty payments"—*i.e.*, the specific offsets listed in subparagraphs 4(a)-(c) of the Policy:



*Supra* at 11 (citing Shrake Decl. Ex. 2 at 3).

Defendant then cites the below document for the proposition that "when Plaintiffs applied for the Policy, Plaintiffs reduced their net insurable costs by the amount of the tax credits they anticipated receiving from Israel and Canada":

From: John Gaskin [mailto:gaskin.john@gmail.com]
Sent: Tuesday, March 11, 2014 10:24 AM
To: Mark Winemaker ; Ryan Greig
Cc: Richmond, Randi (NBCUniversal); Markus, BJ (NBCUniversal)
Subject: DIG - Budgets as at 03-11-2014

Here are the Dig budgets as of 03-11-2014.

An overview looks like this:

|  |  |  |
|---|---|---|
|  | Pilot | 7,594,906.00 |
| Pattern | 3,507,085.00 |  |
| x 5 |  | 17,535,425.00 |
| Gross |  | 25,130,331.00 |
| IS Tax Cr |  | - 3,100,000.00 |
| CN Tax Cr |  | - 350,000.00 |
| Reduce 1 day IS,for Snow Shoot | - | 95,000.00 |
| Rough "Net" Estimate |  | 21,680,331.00 |
|  |  |  |
| Amort |  | 5,512,962.00 |
| Snow Shoot (In Pilot) |  | 1,502,177.00 |

*Supra* 11 (citing Shrake Decl. Ex. 4 at 1). This document is an internal discussion of Plaintiffs' "Budget" for *Dig*, and not of how to calculate "Insurable Production Cost" under the Policy. But comparing this e-mail to the application confirms that the $25 million "Total Insurable Production Cost" was based on the estimated $25,130,000 ***gross budget*** for filming—***without*** deducting $3.45 million in Israeli and Canadian tax credits.

Defendant cites the deposition testimony of Ms. Markus-Caffrey for the proposition that Plaintiffs "include tax credits both when estimating costs of production and when calculating final costs of production." *Supra* at 11. But, once again, the testimony cited discussed only Plaintiffs' internal budgeting and not its calculation of "Total Insurable Production Cost" under the Policy. *See* Shrake Decl. Ex. 5. And, even then, Ms. Markus-Caffrey made clear that Plaintiffs do not view tax credits as reducing the gross budget—instead they simply amount to a "potential" offset:

> Q.   Well, if we look at the tax credit, the reason – of course, that's a negative number as it's reflected here, correct?
>
> A.   Correct.
>
> Q.   Okay. Which would lower the overall budgeted amount, correct?
>
> A.   No.
>
> Q.   No? Why not?
>
> A.   The budget's the budget.
>
> Q.   And this is just a potential offset against that number, correct?
>
> A.   Correct.

*Id.* at 104 (emphasis added).

Finally, Defendant cites its own re-direct examination of Wanda Phillips—who admitted during cross-examination by Plaintiffs' counsel that she did not "believe tax credit was part of" the "NBC Universal policy." Bonn Decl. Ex. 12 at 76:25-78:20. But even on re-direct examination by Defendant's counsel—who expressly attempted to clean up this damaging testimony—Ms. Phillips' testimony confirms Plaintiffs' position:

> Q.   [S]o could you please explain to me how tax credits that NBC might receive in connection with a production would figure into a loss that it might incur?
>
> A.   So in a production budget, there are several line items, and so you insure, for the most part the production company will insure, they can insure two parts. They can insure the day-to-day cost, the production costs, insurable production cost. ***They can also insure items such as story, scenario, script, tax credits, and all of those things they would lose in the event of an abandonment***….

*See* Shrake Decl. Ex. 6 at 275:3-20 (emphasis added). Ms. Phillips addressed a hypothetical involving "items such as story, scenario, script, tax credits." But of the items in that list, only "[s]tory" and "scenario"—and not "tax credits"—are permitted offsets against "Insurable Production Cost" based on the actual language in Plaintiffs' Policy. *See* Bonn Decl. Ex. Bonn Decl. Ex. 11 at ATL003081-82 (Paragraph 4(c)).

## III.   **CONCLUSION**

The law is clear: evidence of "tax consequences should not be considered as a mitigating factor in compensatory damage calculations in breach of contract cases." *DePalma*, 225 Cal. App. 3d at 1537.

The Policy is clear: Plaintiffs' "loss" is calculated by reference to "Insurable Production Cost," which includes "all costs" except specifically enumerated offsets (none of which is for tax credits).

The evidence is clear: Plaintiffs calculated the "Total Insurable Production Cost" in their application to add *Dig* to the Policy based on the gross budget and without deducting any tax credits. And Plaintiffs then calculated the "Net Insurable Production Cost" only by deducting "script & writers fees; residual and royalty payments" and not by deducting tax credits.

Plaintiffs respectfully submit that evidence of Plaintiffs' tax credits are irrelevant as a matter of California law and the Policy itself. Defendant should be precluded from offering any evidence or argument concerning such tax credits to the jury.


DATED:      January 17, 2020              SUSMAN GODFREY L.L.P.

                                          */s/ Amanda Bonn*
                                          KALPANA SRINIVASAN (237460)
                                          ksrinivasan@susmangodfrey.com
                                          AMANDA K. BONN (270891)
                                          abonn@susmangodfrey.com
                                          CATRIONA LAVERY (310546)
                                          clavery@susmangodfrey.com
                                          SUSMAN GODFREY L.L.P.
                                          1900 Avenue of the Stars, Suite 1400

Los Angeles, CA 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150

JACOB W. BUCHDAHL
(*pro hac vice*)
jbuchdahl@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas
32nd Floor
New York, NY 10019-6023
Tel: (212) 336-8330
Fax: (212) 336-8340

*Attorneys for Plaintiffs*

DATED:  January 17, 2020

MARC J. SHRAKE
FREEMAN MATHIS & GARY, LLP

-and-

CHRISTOPHER W. MARTIN
(*Pro Hac Vice*)
MELINDA R. BURKE
(*Pro Hac Vice*)
MARTIN, DISIERE, JEFFERSON
& WISDOM LLP

*s/ Christopher W. Martin*
Attorneys for Defendant
ATLANTIC SPECIALTY
INSURANCE COMPANY

## Attestation Regarding Signatures

I, Amanda Bonn, attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

By: *s/ Amanda Bonn*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I certify that on January 17, 2020, I filed the foregoing with the Clerk of the United States District Court for the Central District of California by using the Court's CM/ECF system, which will send notifications of such filing to all counsel of record.

By: */s/ Amanda Bonn*