# Exhibit 10

# EXPERT REPORT OF JAY SHAPIRO
# ANALYSIS OF ECONOMIC DAMAGES: REBUTTAL

## UNIVERSAL CABLE PRODUCTIONS LLC and NORTHERN ENTERTAINMENT PRODUCTIONS LLC

### V.

## ATLANTIC SPECIALTY INSURANCE COMPANY

**Prepared by:**

**Jay Shapiro**
**JAY SHAPIRO CPA**

**Prepared on behalf of:**
**Atlantic Specialty Insurance Company**

**U.S. DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**Case No. 2:16-cv-04435 – PA – MRW**

**April 25, 2017**

**Confidential**

## Universal Cable Productions LLC et al.
### v.
## Atlantic Specialty Insurance Company

### EXPERT REPORT OF JAY SHAPIRO
### ANALYSIS OF ECONOMIC DAMAGES: REBUTTAL

## TABLE OF CONTENTS

INTRODUCTION .............................................................................. 3

SUMMARY ..................................................................................... 4

OVERVIEW OF INSURANCE CLAIM ............................................. 5

ANALYSIS...................................................................................... 6

METHODOLOGY ............................................................................ 8

MATERIALS REVIEWED, COMPENSATION AND
QUALIFICATIONS........................................................................... 9

SCHEDULES ............................................................................. 11-18

Universal Cable Productions LLC et al.
v.
Atlantic Specialty Insurance Company

**EXPERT REPORT OF JAY SHAPIRO**
**ANALYSIS OF ECONOMIC DAMAGES: REBUTTAL**

## SCHEDULES

A.  Summary of Maximum Claim for Possible Extra Expenses

B.  Possible Incremental Costs

C.  Additional Film Tax Credits

D.  Documents, Data, and Materials Reviewed

E.  Resume of Jay Shapiro

## Universal Cable Productions LLC et al.
### v.
## Atlantic Specialty Insurance Company

## EXPERT REPORT OF JAY SHAPIRO
## ANALYSIS OF ECONOMIC DAMAGES: REBUTTAL

### INTRODUCTION

This litigation concerns an insurance claim related to the extra expense incurred to relocate production of a television program, "Dig," from its initial location in Israel to New Mexico and Croatia.

Plaintiffs Universal Cable Productions LLC ("UCP") and Northern Entertainment Productions LLC ("Northern Entertainment") are the television production companies behind the TV series, "Dig."

Defendant Atlantic Specialty Insurance Company ("Atlantic") is an insurance company, which provided coverage relative to possible risks associated with film production of "Dig."

"Dig" is a television program produced by Plaintiffs. It initially aired on the USA Network, an affiliate of UCP, during the spring of 2015. The plot of Dig involves a Jerusalem-based FBI agent who investigates the murder of an archeology student taking part in an archeological dig in Israel.

"Dig" was originally scheduled to begin the production of a six-episode mini-series filmed in Israel. Production of the pilot episode (episode#1) of "Dig" commenced in Israel on June 1st 2014 and was successfully completed on June 26, 2014. However, as a result of a deteriorating security situation, Plaintiffs chose to postpone and ultimately move the production of "Dig" out of Israel (the "Relocation"). The production was ultimately completed in New Mexico and Croatia, in the Fall of 2014.

This report concerns episodes #2 through #6 of the "Dig" series. Those are the only episodes on which Plaintiffs are seeking to recover "extra expenses" incurred as a result of the move out of Israel. Plaintiffs do not seek any extra expenses (nor could they) in

connection with the pilot because its filming was completed before the move. They also do not (nor could they) seek any extra expenses in connection with episodes #7-10 because the decision to film these episodes was not made until after the decision to move was already finalized.

Plaintiffs allege that Extra Expenses, as defined by Section III of Motion Pictures/Television Producers Portfolio policy # MP00163-04 dated 1/1/14 (the "Policy"), were incurred to relocate the production of "Dig" from its initial location in Israel to new locations in New Mexico and Croatia. They contend this is a covered loss under the Policy. Plaintiffs submitted an insurance claim to Atlantic. Atlantic denied the claim on the basis that exclusions relating to war applied.

I was engaged by Defendant to evaluate the Plaintiffs' extra expense claim and the Plaintiff Expert Report of Robert Wunderlich of Discovery Economics, Inc. dated March 17, 2017 (the "PER"). In the Plaintiffs' First Amended Complaint, they contend that they had extra expenses "exceeding $6.9Million." The PER concluded that Plaintiffs had damages of almost $7.1 million in "extra expenses."

My analysis is based on documents, data, and information available to me as of the date of my report. I may update my analysis as appropriate, should additional information become available, or to respond to additional assertions made by Plaintiff or its expert witness.

## SUMMARY

The PER compiled the "extra expenses" allegedly incurred to relocate the production of episodes two through six of "Dig" from Israel to locations in New Mexico and Croatia and determined that such extra expenses totaled $ 7,092,845 (the "Plaintiff's Claim").

It appears that Plaintiff's Claim, which purports to represent extra expenses incurred, may **not** include sufficient extractions from the total amount of expenses incurred to reach the number of "extra expenses" that would not have been incurred had the production of

"Dig" stayed in Israel. This results in a damages calculation that is too high.

From data available to me as of this date, it is my opinion that a possible claim for extra expenses in this matter **should not exceed \$2,357,875.**

My rebuttal analysis, which utilizes a different methodology than PER, is summarized in Schedules A, B, and C to this report. Supporting information is contained in the report's additional schedules.

## OVERVIEW OF INSURANCE CLAIM

Given the definition of loss in the Policy as defined in paragraph # 9 of Section III, I have calculated the extra expenses incurred to relocate production of episodes two through six of "Dig" from Israel to locations in U.S. and Croatia.

The starting point for my analysis was the Full Cost Bible for production of episodes two through six of "Dig," which were filmed in New Mexico and Croatia. The Full Cost Bible is an accounting document, that the PER describes as prepared in the ordinary course of business, detailing expenses incurred in connection with production of a television program such as "Dig." I supplemented with data from other ledgers, budgets, and cost reports prepared by "Dig" accountants in the normal course of business. I also reviewed Plaintiffs' First Amended Complaint. A complete listing of the documents and data I reviewed is in Schedule D.

I reviewed the PER, which attempted to identify the additional expenses that would not have been incurred had the production been completed in Israel, as planned. These additional costs were summarized into four categories:

1.    "Prep" Expenses – PER defines this term as: "Preparation expenses correspond to expenses necessary to open production at a given location."

2.     "Wrap" Expenses – PER defines this term as: "Wrap expenses correspond to expenses necessary to close production at a given location."

3.     "All Series" Expenses – PER defines this term as: "All Series expenses including set design and construction correspond to costs incurred in connection with the series as a whole (i.e. set construction), and then amortized for accounting purposes against individual episodes, as opposed to costs directly incurred in connection with a single episode."

4.     Extra Compensation Expenses – PER defines this term as: "Additional costs were incurred in New Mexico for certain cast members, reflecting additional SAG – required compensation and higher negotiated compensation due to the longer time-span of production. Extra compensation costs were incurred in Croatia due to additional travel days for certain cast members and stunt crew."

## ANALYSIS

For both New Mexico and Croatia, the starting point of the PER calculation is the Full Cost Bible, detailing the costs of production in the new locations. Then, certain extractions were made from Prep, Wrap, and All Series and the addition of extra compensation expenses. After extracting all the amounts that would have been incurred regardless of the move, PER indicates that extra expenses due to the Relocation, and related claim against defendant totaled $7,092,845.

I do not believe this is the most accurate way to calculate the extra expenses incurred in connection with the Relocation. Instead, the most accurate approach is to compare what Plaintiffs expected to spend to produce episodes 2 through 6 in Israel, and what they ultimately did spend to produce those five episodes in New Mexico and Croatia. This is how I calculated the "extra expenses." I identified the TOTAL costs to produce these episodes, which included all the above items the PER considered. I then subtracted from that total the amount Plaintiffs expected to spend when they expected to produce the entirety of these five episodes in Israel. I also factored in the tax credits Plaintiffs expected to receive in

Israel and the tax credits they did receive in New Mexico and Croatia.

Any specific costs that would have been incurred whether the production had been completed in Israel, or at the new locations, as actually occurred, should **not** be part of the claim—only those costs that were incurred solely because of the Relocation.

It is my opinion that it is improper to include as "extra expenses" all prep and wrap expenses incurred in New Mexico and Croatia. Some of those prep expenses and wrap expenses, outlined in the PER, may have provided economic benefits to the final four episodes (#7-#10) and are therefore not properly considered as part of this claim. Any amounts incurred for prep and wrap on episodes 2 through 6 that were beneficial and saved money on episodes 7 through 10 provided a benefit to Plaintiffs that reduced their overall cost of filming episodes 7 through 10.[1] This benefit to Plaintiffs reduces the overall loss as a result of the relocation. It is therefore not appropriate to include *all* prep and wrap expenses for episodes 2 through 6 as "extra expenses," since Plaintiffs may have recouped some of these expenses in the form of reduced expenses or cost efficiencies on episodes 7 through 10.

It is my further opinion that based on the information provided to me, it is not possible—for me or anyone else—to make a definitive determination about whether each individual expense was incurred as a result of the Relocation, or whether it would have been incurred had the production stayed in Israel. This is a complicated question that can be answered only by a line-by-line analysis of each expense and much more information about the expense and the production than the plaintiffs have produced in this case. For example, in PER's schedule, New Mexico Prep Extra Expenses, the PER identifies $56,374 in "extra" wardrobe expenses. The plaintiffs have provided no explanation for why it was necessary to purchase additional wardrobe as a result of the Relocation. The plaintiffs must provide a narrative explanation of why these types of expenses (wardrobe is just one example) were incurred as a result

---

[1] The overall cost for producing episodes 7 through 10 is approximately $570,000 (13%) per episode less than the overall cost for producing episodes 2 through 6. *See* UCP018226-018227. No explanation was available for this significant cost reduction.

of the move in order to establish that these expenses truly did result from the Relocation. It is my opinion that this process is impossible based on the information I have reviewed or the information the plaintiff's expert reviewed without any explanation from "*Dig*" management.

The PER does not address my methodology of calculating damages or offer any justification for why the "extra expenses" are greater than $2,357,875 (the figure I believe is the maximum amount recoverable). In my opinion, not addressing this mathematically reliable alternative to the calculation of damages challenges the credibility of the PER's analysis.

## METHODOLOGY

1.    I believe my method is the more straightforward and reliable approach to calculating the damages on this claim: utilizing TOTAL production costs incurred at the new locations LESS expected Israeli costs that would have been incurred without the Relocation (Incremental Costs). Also, the Plaintiff's should consider mitigating economic benefits accruing to them from the Relocation. This includes but is not limited to the tax credits that Plaintiffs received as a result of moving production to New Mexico and Croatia (minus the tax credits they would have received had production been completed in Israel).

2.    Given the definition of loss in the Policy and my understanding of costs typically incurred to produce a six-episode TV series, I believe that the recoverable Extra Expenses are possible incremental costs or net costs which would not have been incurred in Israel, reduced by any economic advantages received as a result of the relocation. This should be the appropriate claim for Extra Expenses.

3.    The PER indicated a supported Total Cost at the new locations of $21,297,435 ( on Page 5) and various documents indicated UCP adjusted TOTAL costs at **$21,464,745** (UCP018227). I assumed that such was all inclusive of any "hiatus", "postponement" or "delay" items and Relocation effects including

extra compensation, extra travel days, and the significant cost savings of Croatia currency exchange.

4.     The most detailed Israeli cost data available outlining the amount expected to be incurred in producing episodes 2 through 6 entirely in Israel comes from UCP004971-4972. The figures outlined in this documents are what I used to identify the costs which would have been incurred had no relocation taken place. Such data was supported by two e-mails involving UCP's insurance broker. UCP003732-3734, AONNBCU0001748-1750.

5.     My calculations show that Plaintiffs have *maximum* damages in connection with the Relocation of $2,357,875. This amount does not take into account other possible reductions that are appropriate, such as, for example, (1) the prep and wrap expenses incurred in episodes 2 through 6 that may have benefited the producing of episodes 7 through 10, (2) production quality improvements that could have been made to each episode, and (3) legal costs associated with the move (UCP004503 references legal expenses for war claims).

## MATERIALS REVIEWED, COMPENSATION AND QUALIFICATIONS

In preparation this report, I reviewed summary and detailed ledgers, cost reposts, production recap reports, budgets, and other financial data regarding the New Mexico and Croatia production of "Dig," and the Plaintiffs' First Amended Complaint. A complete list of the documents and data I reviewed is in Schedule D.

My qualifications as an expert are summarized in my current resume as is in Schedule E. My firm's compensation schedule includes hourly rates from $250-$375 for consulting and $625 for testimony.

I am the founder of JAY SHAPIRO CPA, a professional services firm that provides consulting regarding financial and accounting issues with a specialization in Entertainment & Media matters.
I have frequently provided financial , and accounting consulting for similar matters in this dispute, have participated in publications

and taught in professional environment the subjects dealing with "production accounting". I have served as an expert witness and a court-appointed expert regarding these issues.

Dated this 26th day of April 2017

JAY SHAPIRO

## Schedule A

## Summary of Maximum Claim for Possible Extra Expenses
### Five Episodes

| | | |
|---|---|---|
| **Schedule B –** | Possible Incremental Cost | $ 3,929,320 |
| **Schedule C-** | Additional Film Tax Credits | ($1,571,445) |
| | | $2,357,875 |

## Schedule B

### Possible Incremental Costs
### Five Episodes

Costs Actually Incurred (eps. 2-6)          $ 21,464,745 (a)

Israeli Cost Data (eps. 2-6)                ($17,535,425) ( b)

                                            $  3,929,320

(a) Final Bible with UCP adjustments included in UCP018226

(b) E-Mail 3/11/14 per UCP0004971

## Schedule C

### Additional Film Tax Credit
### 5 Episodes

| | |
|---|---|
| Realized – New Mexico production | $ 3,305,243 ( a) |
| Realized – Croatia production | $   370,202 ( a) |
| TOTAL | $ 3,675,445 |
| Anticipated – Israel | ($2,104,000)(b) |
| Additional Credit Realized(Economic Benefit) | $ 1,571,445 |

(a) See UCP004504

(b) See UCP004971

CONFIDENTIAL                                                    Page 13

## Schedule D

I reviewed the following Bates Numbers of documents produced by the plaintiffs:

Plaintiffs' First Amended Complaint

UCP004067-UCP018002

UCP080003-018124

UCP018125-UCP018227

UCP018228-UCP020052

UCP020063-UCP032749

UCP032750-UCP032854

UCP003732-3734

AONNBCU0001748-1750.

## Schedule E

**11300 W. Olympic Blvd**
**Suite #910**
**Los Angeles, CA 90064**

**Telephone (310) 441-3600**
**Facsimile   (310) 441-3610**
**E-mail: jshapirocpa@gmailcom**

1990 to **Present**
**Jay Shapiro CPA, Los Angeles, California**
**Owner**
Specializing in serving the entertainment industry and mid-size businesses on an international basis.  Over 1500 engagements have included forensic audits, accounting, income taxation, management consulting, and financial advisory services for a diverse group of clients.  Significant accomplishments include expert testimony for an international defense contractor, major Hollywood/business litigation, public offerings for NASDAQ and AMEX companies, and financial advisor in several workout situations, and mergers of companies up to $500 million in revenues.

April 2002 to September 2015
Sunrise Media Group, Inc., Los Angeles, California
**Chairman and Chief Executive Officer**
Founded company specializing in financing, development, production, and distribution of entertainment content and consulting in all aspects of the entertainment and media industry on a worldwide basis.

February 2001 to April 2002
Impact Media Group, Inc., Los Angeles, California
**Chief Executive Officer**
President, Chief Financial Officer, and Director responsible for all worldwide financial, administrative, and operational affairs of this independent television producer and distributor.  The Company owned 2,000 hours of programming worldwide, in addition to producing a wide variety of programming for leading U.S. and international broadcasters and video markets.

-1-

1990-1993
The Program Entertainment Group, Sherman Oaks, California
**Executive Vice President-Finance and Administration**
Responsible for financial planning, SEC reporting, office administration, and investment activities for this publicly held television Syndication Company. Reported to Chief Executive Officer and supervised six people.

1982-1990
Laventhol & Horwath, Los Angeles, California
**Partner/Director of Audit and Accounting Services**
Responsible for management of a $5.5 million worldwide audit practice (most profitable in firm) and supervision of five partners and fifty professional staff. Served as **National Director** of Entertainment and Media Industry Services. Personally developed over $500,000 of new business while handling $1.6 million in client billing for various specialized industries and professional firms. Senior technical partner in L.A. office and active in firm's SEC review and quality review programs. Promoted to partner in 1983. Recognized internationally as an authority in entertainment/media accounting matters.

1973-1982
Peat, Marwick Mitchell & Co., Los Angeles, California
**Audit-Senior Manager**
Primarily responsible for management of audit and accounting engagements, which demanded extensive knowledge of, financial issues affecting the entertainment, merchandising, real estate and financial service industries. Promoted to Senior Manager in 1980.

**EDUCATION**:    M.S. in Accounting/Finance with distinction, 1973
Arizona State University Graduate School of Business
Administration

B.B.A. in Accounting, 1972
University of Wisconsin

**PROFESSIONAL**    Certified Public Accountant, 1978 to Present
**CREDENTIALS/**
**AFFILIATIONS:**    **Chairman**, Entertainment & Sports Industry Committee, California Society of CPA's

**Chairman**, AICPA Entertainment Accounting Standards
Taskforce

**Chairman**, Positive Enforcement Committee, California State
Board of Accountancy

**State Board Member/Vice President**, California Society of
CPA's

**Member**, Academy of Television Arts and Sciences (ATAS)  and
Paley Center for Media

**Adjunct Professor**, USC School of Accounting, UCLA
Department of Entertainment Studies, ASU School of Film

**Editorial Review Board**, the Practical Accountant

**Trustee**, Zeta Beta Tau Fraternity

**Member**,  So. Cal Fraud Investigator Association, and Association
of Certified Fraud Examiners (**CFE**)

**Recipient**, City of Los Angeles Certificate of Appreciation.

**Producer**, *World of Mirth*, live stage play

**Diplomate**, and Board Member of American Board of Forensic
Accounting – **DABFA**

**Member**, Beverly Hills Bar Association

 **Featured Speaker**, American Board of Forensic Accounting-
2015 Annual Conference

-3-

## SCHEDULE A

## LITIGATION

**Expert Witness Testimony-last four years:**

Cobb v. Time Warner, Inc.
Greer v. Dove Books
L A Superior Court Referee (CRASH)
Kasich v. NTV (DECISIONS)
Sterling v. Stiviano
O'Donnell v. Misho Law Group

**Authored**, entertainment chapters (production, distribution, and broadcasting) of Harcourt Brace's Comprehensive GAAP Guide

**Featured**, in Fatal Subtraction, the Inside Story of Buchwald v. Paramount; and Deconstructing Sammy (Sammy Davis Jr)