# Exhibit 24

CONTAINS CONFIDENTIAL PORTIONS
BOUND SEPARATELY

Page 1

1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2                    WESTERN DIVISION
   ---------------------------------------------------
3

   UNIVERSAL CABLE PRODUCTIONS LLC,
4  a Delaware limited liability company,
   and NORTHERN ENTERTAINMENT PRODUCTIONS, LLC,
5  a Delaware limited liability company,
6              Plaintiffs,          Case No.
                                2:16-cv-4435-PA-MRW
7  -vs-
8  ATLANTIC SPECIALTY INSURANCE COMPANY,
   a New York insurance company,
9

              Defendant.
10
   ---------------------------------------------------
11          ** CONTAINS CONFIDENTIAL PORTIONS **
12              ** BOUND SEPARATELY **
13               PAGES 234 - 238
14
15
16            VIDEOTAPED DEPOSITION
17                   OF
18               SEAN DUFFY
19           Thursday, May 11, 2017
20             Minneapolis, MN
21
22
23
24
   Job No. 123966
25 Reported By:  Amy L. Larson, RPR

CONTAINS CONFIDENTIAL PORTIONS
BOUND SEPARATELY

## Page 2

```
 1      APPEARANCES:
 2      MITCHELL SILBERBERG & KNUPP
        11377 West Olympic Boulevard
 3      Los Angeles, CA 90064
        By:  Daniel Hayes, Esq.
 4      For:  Plaintiffs
 5
 6      STRASBURGER & PRICE
        901 Main Street
 7      Dallas, TX  75202
        By:  Michael Keeley, Esq.
 8      For:  Defendant/Deponent
 9
10
11      ALSO PRESENT:  Chris Paar, Esq.
                       Ben Abraham, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1    INDEX:
 2    EXAMINATION BY:                PAGE
 3    Mr. Hayes...........................6
 4    CONFIDENTIAL - BOUND SEPARATELY AS DESIGNATED BY:
 5    Mr. Keeley.....................234 - 238
 6    EXHIBITS MARKED FOR IDENTIFICATION:
 7    Exhibit 1.............................79
      General Claims Practices
 8    Bates ATL000735 -ATL000744
 9    Exhibit 2.............................88
      Core Principles
10    Bates ATL000731 - ATL000732
11    Exhibit 3............................118
      Motion Picture/Television
12    Producers Portfolio
      Declarations
13    Bates ATL003073 - ATL003127
14    Exhibit 4............................167
      July 2016 E-mail
15    Subject:  0AB097918
      Bates ATL003211
16
17    Exhibit 5............................187
      Defendant's Amended Responses to
18    First Set of Interrogatories
      No Bates
19    Exhibit 6............................194
      August 13, 2014 Letter
20    Bats ATL000087 - ATL000093
21    Exhibit 7............................198
      July 16, 2014 Meeting Invite
22    Subject:  War Exclusion - Israel/Hamas Conflict
      Bates ATL001564
23
      Exhibit 8............................204
24    July 2014 E-mail
      Subject:  OBE List for Sean
25    Bates ATL001694
```

## Page 4

```
 1    INDEX:  (Cont'd.)
 2    EXHIBITS MARKED FOR IDENTIFICATION:     PAGE
 3    Exhibit 9............................204
      Discontinued OPPS
 4    Bates ATL001695 - ATL001709
 5    Exhibit 10...........................207
      July 2014 E-mail
 6    Subject:  Re:  Privileged & Confidential
      Bates ATL001800 - ATL001801
 7
      Exhibit 11...........................210
 8    July 2014 E-mail
      Subject:  OBE - NBC 0AB097918
 9    Bates ATL001826 - ATL001827
10    Exhibit 12...........................212
      July 2014 E-mail Chain
11    Subject:  OBE - NBC 0AB097918
      Bates ATL001832 - ATL001834
12
      Exhibit 13...........................215
13    July 2014 E-mail Chain
      Subject:  OBE - NBC 0AB097918
14    Bates ATL001835 - ATL001836
15    Exhibit 14...........................242
      Claim Summary
16    Bates ATL004005 - ATL004097
17    Exhibit 15...........................265
      File Note History
18    Bates ATL000001 - ATL000161
19    Exhibit 16...........................265
      July 28, 2014 Letter
20    Bates ATL000094 - ATL000101
21    Exhibit 17...........................266
      September 19, 2014 Letter
22    Bates ATL000705 - ATL000708
23
24
25
```

## Page 5

```
 1          THE VIDEOTAPED DEPOSITION OF SEAN DUFFY, taken on
 2      this 11th day of May, 2017, at the Law Offices of
 3      Meagher & Geer, PLLP, 33 South Sixth Street, Suite
 4      4400, Minneapolis, MN 55402, commencing at
 5      approximately 9:58 a.m.
 6
 7              P R O C E E D I N G S
 8
 9          THE VIDEOGRAPHER:  This is the        09:58:35
10      start of media number 1 of the video-recorded     09:58:36
11      deposition of Sean Duffy in the matter      09:58:40
12      Universal Cable Productions, LLC, et al. v.    09:58:43
13      Atlantic Specialty Insurance Company, in the   09:58:47
14      United States District Court, Central      09:58:49
15      District of California, Western Division.     09:58:52
16          This deposition is being held at        09:58:54
17      33 South Sixth Street, Minneapolis, Minnesota   09:58:56
18      on May 11th of 2017 at approximately 10 a.m.   09:58:59
19          My name is Ben Abraham, I'm the       09:59:07
20      legal video specialist from TSG Reporting,     09:59:10
21      Incorporated, headquartered at 747 Third    09:59:12
22      Avenue, New York, New York.  The court     09:59:15
23      reporter is Amy Larson in association with    09:59:17
24      TSG Reporting.                      09:59:21
25          Counsel, please introduce          09:59:22
```

CONTAINS CONFIDENTIAL PORTIONS
BOUND SEPARATELY

## Page 94

1  Q. Could it have been more than 2 million?          12:02:16
2  A. No.                                              12:02:18
3  Q. What was Pamela Johnson's authority? Could       12:02:18
4     it have been more than $2 million?               12:02:22
5            MR. KEELEY: Objection; asked and          12:02:24
6  answered --                                         12:02:25
7            THE WITNESS: No.                          12:02:26
8            MR. KEELEY: -- calls for                  12:02:27
9  speculation.                                        12:02:29
10           Let me finish my --                       12:02:30
11           THE WITNESS: Yeah.                         12:02:31
12 BY MR. HAYES:                                        12:02:32
13 Q. Could Pamela Johnson's authority have ever        12:02:32
14    been more than $2 million when she was an         12:02:34
15    employee of OneBeacon?                            12:02:36
16           MR. KEELEY: Same objections.               12:02:37
17 Asked and answered.                                  12:02:38
18           THE WITNESS: No.                           12:02:39
19 BY MR. HAYES:                                        12:02:40
20 Q. How do you know?                                  12:02:40
21 A. Because I have not had any other direct other     12:02:44
22    than one person who has ever had more than        12:02:48
23    $2 million in authority.                          12:02:52
24 Q. And who is that?                                  12:02:53
25 A. Joe Schmitt.                                      12:02:53

## Page 95

1  Q. And what was his authority?                       12:02:57
2  A. At the time? He had no authority. He had          12:02:58
3     Chris's job.                                      12:03:01
4  Q. When you say, "At the time," are you              12:03:01
5     referring to July 2014?                           12:03:03
6  A. Correct.                                          12:03:04
7  Q. What's his authority today?                       12:03:05
8  A. $5 million.                                       12:03:06
9  Q. Okay. Let's go back to the Dig claim,             12:03:16
10    July 2014, okay?                                  12:03:21
11 A. Uh-huh.                                           12:03:22
12 Q. If Pamela Johnson wanted to pay NBC Universal     12:03:23
13    for the losses it incurred on that claim,         12:03:28
14    could she do it with her own authority?           12:03:34
15 A. That depends upon what the dollar value was.      12:03:38
16 Q. Assume $7 million.                                12:03:42
17 A. No.                                               12:03:44
18 Q. Could she do it with Theresa Gooley's             12:03:44
19    authority?                                        12:03:46
20 A. Up to Theresa's authority, which I believe        12:03:47
21    was either a million or $2 million, I don't       12:03:52
22    remember what it was.                             12:03:55
23 Q. Assume $7 million, could Pamela pay the claim     12:03:55
24    with Theresa's say-so?                            12:03:59
25 A. No.                                               12:04:01

## Page 96

1  Q. Assume $7 million, could Pamela pay the claim     12:04:01
2     with your say-so?                                 12:04:05
3  A. Yes.                                              12:04:07
4  Q. Assuming $7 million, could Pamela pay the         12:04:07
5     claim with anything less than your say-so?        12:04:12
6  A. Anything less? I don't know if I understand       12:04:15
7     what that means.                                  12:04:19
8  Q. Could she get somebody else's permission to       12:04:20
9     pay the claim other than you?                     12:04:23
10 A. Nope. Authority is a hierarchy.                    12:04:25
11 Q. Okay. Did you approve the denial of the Dig        12:04:27
12    claim?                                            12:04:32
13 A. No.                                               12:04:33
14 Q. Who did?                                          12:04:35
15 A. I believe Pamela did.                             12:04:36
16 Q. Did Theresa approve the denial of the Dig         12:04:40
17    claim?                                            12:04:43
18 A. I don't know. You'd have to ask Theresa.          12:04:44
19 Q. Does an adjuster have to get approval to deny     12:05:01
20    a claim that exceeds his or her monetary          12:05:07
21    authority?                                        12:05:12
22 A. At OneBeacon or in entertainment?                 12:05:13
23 Q. At OneBeacon.                                     12:05:16
24 A. In certain business lines, certain managers       12:05:17
25    may tell their employees they'd like to see       12:05:20

## Page 97

1     denial letters before they go out, or even        12:05:22
2     reservation of rights letters. It just            12:05:26
3     depends on the business.                          12:05:28
4  Q. In certain divisions, managers will tell          12:05:29
5     their adjusters that if they are going to         12:05:33
6     deny a claim that exceeds their monetary          12:05:36
7     authority, the manager needs to see the          12:05:40
8     denial letter first; is that what you mean?       12:05:42
9  A. No.                                               12:05:44
10 Q. Okay. What do you mean?                            12:05:44
11 A. Certain areas may require an adjuster to tell      12:05:45
12    them about any denial regardless of the           12:05:50
13    value.                                            12:05:53
14 Q. And is that how it works in the entertainment     12:05:54
15    group?                                            12:05:57
16 A. I don't know one way or the other.                12:05:57
17 Q. Is that how it worked in July of 2014?            12:05:59
18 A. I don't -- I don't have any knowledge as to       12:06:04
19    how it worked. I leave that to the                12:06:06
20    discretion of the individual managers as to       12:06:08
21    how they manage their business.                   12:06:11
22 Q. Were you consulted prior to the denial of the     12:06:14
23    Dig claim?                                        12:07:07
24           MR. KEELEY: Objection; vague,              12:07:08
25 ambiguous.                                           12:07:11

CONTAINS CONFIDENTIAL PORTIONS
BOUND SEPARATELY

Page 98

1  BY MR. HAYES:                          12:07:11
2  Q. Do you understand what I mean?        12:07:11
3  A. Consulted by what?                   12:07:12
4  Q. Consulted by who.  Did you have any   12:07:15
5     conversations with Pamela Johnson or  12:07:17
6     Theresa Gooley or anyone else before the Dig  12:07:20
7     claim was denied?                    12:07:23
8  A. Other than the e-mail I saw, I don't have any  12:07:25
9     reason to believe I did.  I have no memory of  12:07:28
10    doing so.                            12:07:31
11 Q. Did you ever offer an opinion regarding  12:07:32
12    whether or not the Dig claim should be denied  12:07:35
13    before it was denied?                12:07:37
14 A. No.                                  12:07:39
15 Q. Why not?                             12:07:39
16 A. That's not what I do.                12:07:40
17 Q. If you were asked, would you have offered an  12:07:44
18    opinion?                             12:07:47
19       MR. KEELEY:  Objection; calls for  12:07:49
20    speculation.                         12:07:51
21       THE WITNESS:  I'm not sure I know  12:07:53
22    what you mean by, "An opinion."  I'm trying  12:07:55
23    to delineate between "opinion" and   12:07:57
24    "authority."                         12:08:00
25 BY MR. HAYES:                           12:08:04

Page 99

1  Q. "Opinion" meaning yes, the claim should be  12:08:04
2     denied or, no, it shouldn't.         12:08:06
3  A. That's generally not how I interact with my  12:08:09
4     employees.                           12:08:11
5  Q. Have you ever rendered such an opinion in  12:08:12
6     connection with a claim ever during your  12:08:15
7     tenure at OneBeacon?                 12:08:17
8  A. Had an opinion?  Generally, I don't recall in  12:08:22
9     the initial resolution of a claim, but  12:08:29
10    certainly people give me a head's-up and tell  12:08:31
11    me that there are claims going on.   12:08:34
12       And I generally don't issue      12:08:35
13    opinions, but certainly I'm involved in  12:08:41
14    decisions regarding large claims and  12:08:43
15    litigation, et cetera, as part of the team  12:08:46
16    that looks at it.                    12:08:49
17 Q. What does it mean, "Involved in decisions  12:08:50
18    regarding large claims"?             12:08:52
19 A. So if somebody wants to settle a claim for  12:08:55
20    over their authority, I obviously have a  12:08:57
21    Sarbanes-Oxley requirement to provide my  12:09:00
22    specific authority given that the system does  12:09:03
23    not allow them to establish reserves or make  12:09:08
24    payments in excess of their authority.  12:09:09
25       So certainly claims come to me where  12:09:11

Page 100

1     I have to sign off on the reserve, and I will  12:09:13
2     do based on the recommendations of my staff.  12:09:15
3  Q. But you never weigh in on whether the claim  12:09:18
4     should be denied or not?             12:09:21
5  A. Do I weigh in on whether claims should be  12:09:24
6     denied or not?                       12:09:28
7        We certainly have conversations  12:09:29
8     about claims.  Whether that involves weighing  12:09:31
9     in on whether it should be deny, I'm sure  12:09:33
10    there are claims where I have an opinion.  12:09:36
11 Q. In your entire career at OneBeacon, has one  12:09:38
12    of your direct reports ever come to you and  12:09:44
13    said, "We should deny this claim," and you  12:09:46
14    respond, "No, we should pay it," has that  12:09:53
15    ever happened?                       12:09:56
16 A. Has that ever happened?  I don't believe so.  12:09:57
17 Q. Has the reverse ever happened?  Has a direct  12:10:00
18    report ever come to you and said, "I  12:10:02
19    recommend we pay this claim," or, "I want  12:10:04
20    authority to pay this claim," and you said,  12:10:07
21    "No, we're not going to pay this claim"?  12:10:10
22       Have you ever overruled one of your  12:10:14
23    direct reports on a decision to pay a claim?  12:10:15
24 A. Yes.                                 12:10:18
25 Q. How many times?                     12:10:18

Page 101

1  A. I have no idea.                      12:10:19
2  Q. More than ten?                      12:10:20
3  A. In seven years, probably.            12:10:21
4  Q. More than a hundred?                12:10:24
5  A. I don't know.                       12:10:25
6  Q. So you do weigh in on the decision as to  12:10:26
7     whether or not to pay a claim?       12:10:28
8  A. So normally when I weigh in on the decision  12:10:29
9     to a claim is when there's a settlement, how  12:10:33
10    opportunity going into a mediation, how much  12:10:36
11    authority are they going to have, when would  12:10:39
12    we decide that, in fact, we need to try the  12:10:42
13    case.                                12:10:45
14       So certainly I weigh in because I  12:10:45
15    have a responsibility to say -- they need to  12:10:46
16    say, "Sean Duffy gave me authority."  12:10:51
17 Q. What would you have done in this case if it  12:11:09
18    was your decision?                   12:11:11
19       MR. KEELEY:  Objection; calls for  12:11:12
20    speculation, vague, ambiguous.       12:11:14
21 BY MR. HAYES:                          12:11:16
22 Q. What would you --                   12:11:16
23 A. You're asking the wrong guy.        12:11:17
24 Q. What would you have done in connection with  12:11:18
25    the Dig claim?  Would you have paid that  12:11:20

CONTAINS CONFIDENTIAL PORTIONS
BOUND SEPARATELY

Page 102

1  claim or denied it?                          12:11:22
2         MR. KEELEY:  Objection; vague,         12:11:24
3  ambiguous, calls for speculation.            12:11:27
4         THE WITNESS:  That's not what I        12:11:28
5  do.  I'm not an adjuster.                     12:11:30
6  BY MR. HAYES:                                 12:11:32
7  Q.  Do you have an answer to the question what  12:11:32
8  would you have done if it was your decision    12:11:37
9  to deny or pay the Dig claim?                 12:11:39
10         MR. KEELEY:  He answered the           12:11:42
11  question.  It's asked and answered.  Same     12:11:44
12  objections.                                   12:11:45
13         THE WITNESS:  Based on the             12:11:48
14  recommendations of my staff and any counsel   12:11:49
15  they've communicated with, I would support    12:11:52
16  their decision.                               12:11:54
17  BY MR. HAYES:                                 12:11:55
18  Q.  Did you?                                  12:11:55
19  A.  Did I support their decision?             12:11:58
20       I just don't have a memory of what       12:12:02
21  was going through my mind at that time.  I    12:12:06
22  believe I said, "Looks good to me," although  12:12:08
23  I don't remember the exact words in that      12:12:15
24  e-mail.                                       12:12:16
25  Q.  So did you approve the decision to deny or  12:12:17

Page 103

1  not?                                          12:12:20
2  A.  I did not.                                12:12:20
3  Q.  Okay.                                     12:12:22
4  A.  They don't need my authority to deny a claim.  12:12:23
5  Q.  But they would have needed your authority to  12:12:27
6  approve the Dig claim, right?                 12:12:30
7  A.  To pay it?                                12:12:31
8  Q.  Yes.                                      12:12:32
9  A.  Yes.                                      12:12:33
10         MR. KEELEY:  How you doing?            12:13:00
11         THE WITNESS:  I'm fine.  I just        12:13:02
12  got a scratchy throat.                        12:13:06
13  BY MR. HAYES:                                 12:13:14
14  Q.  Did you review Danny Gutterman's deposition  12:13:15
15  transcript?                                   12:13:17
16  A.  I did not.                                12:13:17
17  Q.  Mr. Gutterman testified that at OneBeacon he  12:13:20
18  has been taught to always look for coverage.  12:13:24
19  Is that --                                    12:13:28
20  A.  Yes.                                      12:13:28
21  Q.  Is that correct?                          12:13:29
22  A.  That is correct.                          12:13:30
23  Q.  And is that what you tell your direct reports  12:13:34
24  to do --                                      12:13:42
25  A.  Absolutely.                               12:13:43

Page 104

1  Q.  -- always look for coverage?              12:13:44
2  A.  Sorry, I didn't mean to interrupt.        12:13:46
3       Absolutely.                              12:13:48
4  Q.  What does that mean, "Always look for      12:13:49
5  coverage"?                                    12:13:51
6  A.  That means that the objective is not to find  12:13:51
7  ways to deny coverage.  The objective is to   12:13:55
8  take the facts and the policy, and if         12:13:58
9  coverage is apparent, to cover the claim.     12:14:00
10  Q.  The objective is to find ways to find      12:14:04
11  coverage?                                     12:14:08
12  A.  The objective is to find ways to pay the   12:14:09
13  claim if it is covered under the policy.      12:14:12
14       And it's important to understand         12:14:15
15  that over time in our industry some companies  12:14:17
16  have taken a different approach.              12:14:21
17       And so that mandate to my employees      12:14:22
18  is simply telling them, we write policies, we  12:14:25
19  care about our insureds, we accept premium,   12:14:29
20  and where there is coverage, you should pay   12:14:31
21  it.  You should not find ways to deny it.     12:14:33
22  Q.  What companies have taken a different      12:14:36
23  approach?                                     12:14:38
24  A.  You can use Google and figure it out.     12:14:40
25  Q.  Okay.  Well, if you don't feel comfortable  12:14:42

Page 105

1  identifying the companies, what did you mean   12:14:48
2  by, "Different approach," just so I           12:14:50
3  understand?                                   12:14:52
4  A.  So at times, and you can see this in       12:14:52
5  litigation, companies are accused at times of  12:14:55
6  doing everything possible to not pay a claim.  12:14:58
7       And in my industry, over the years,      12:15:01
8  in 20 years of doing this, I've certainly     12:15:03
9  seen companies that behave that way, whether  12:15:05
10  they are people who are on towers of          12:15:07
11  insurance with us or who insure us personally  12:15:09
12  or et cetera.                                 12:15:12
13       So it is just a general statement        12:15:13
14  that tells my employees, your job is not to   12:15:14
15  find ways to deny claims.                     12:15:18
16  Q.  And has OneBeacon ever been accused of trying  12:15:20
17  to find ways to deny claims?                  12:15:24
18  A.  We've certainly been accused of           12:15:27
19  inappropriately denying claims.               12:15:30
20  Q.  Based on the application of exclusions,    12:15:31
21  right?                                        12:15:34
22  A.  All kinds of different things, exclusions,  12:15:35
23  terms, conditions, recision.                  12:15:38
24  Q.  Based on the overbroad interpretation of   12:15:40
25  exclusions, right?                            12:15:43

CONTAINS CONFIDENTIAL PORTIONS
BOUND SEPARATELY

---

Page 266

```
1              (Whereupon, Exhibit 17 was      16:40:40
2          marked for identification.)         16:40:41
3   BY MR. HAYES:                              16:40:41
4   Q.  Do you recognize the document marked   16:40:41
5       Exhibit 17?                            16:40:43
6   A.  Again, I may have reviewed this.  I reviewed  16:40:46
7       a few letters from Pamela back and forth,   16:40:49
8       this may have been one of them.  I just don't  16:40:51
9       specifically recognize it.             16:40:54
10  Q.  Prior to preparing for your deposition, had  16:40:57
11      you ever seen this document before, the   16:41:00
12      document marked Exhibit 17?            16:41:02
13  A.  Not to my knowledge, no.               16:41:03
14  Q.  Do you know whether or not OneBeacon has ever  16:42:14
15      reconsidered its decision to deny the Dig   16:42:16
16      claim?                                 16:42:19
17  A.  Has it ever reconsidered its decision?  16:42:23
18      I'm aware Pamela offered to pay        16:42:25
19      certain costs as an accommodation.  I don't  16:42:27
20      know whether that was a reconsideration.  16:42:30
21      Other than that, I just don't know.     16:42:34
22      I have no knowledge.                   16:42:35
23  Q.  Have you ever been involved in any      16:42:38
24      discussions concerning any potential    16:42:40
25      reconsideration of the decision to deny the  16:42:44
```

---

Page 267

```
1       Dig claim?                             16:42:46
2   A.  No.                                    16:42:49
3   Q.  And are you aware of any such discussions  16:42:50
4       other than the -- what you termed       16:42:52
5       "accommodation" you just referred to?   16:42:55
6   A.  No, I'm not.                           16:42:57
7              THE WITNESS:  Someone has called  16:43:19
8       me three times.  I just want to see if it's  16:43:20
9       my daughter so I'm just checking to see if  16:43:24
10      it's her.                              16:43:26
11             MR. HAYES:  If you need to --    16:43:26
12             THE WITNESS:  It's not.  I'm okay.  16:43:29
13             MR. HAYES:  Can we take a         16:44:12
14      five-minute break?                     16:44:14
15             THE WITNESS:  Sure.             16:44:16
16             MR. KEELEY:  Another break?      16:44:16
17             THE VIDEOGRAPHER:  It's 4:45 p.m.  16:44:18
18  We're going off the record.                16:44:21
19             (Whereupon, a brief recess       16:44:23
20          was taken.)                        17:06:53
21             THE VIDEOGRAPHER:  It's 5:08 p.m.,  17:06:53
22  and we're back on the record.              17:07:00
23             MR. HAYES:  I have no further    17:07:02
24  questions.                                 17:07:03
25             MR. KEELEY:  We'll reserve.      17:07:04
```

---

Page 268

```
1              THE WITNESS:  So we're done?     17:07:05
2              THE VIDEOGRAPHER:  It's 5:08 p.m.,  17:07:05
3   and we're going off the record.            17:07:12
4              (Whereupon, the foregoing
5          deposition concluded at 5:08 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 269

```
1                   ERRATA SHEET
2   Case Name:  Universal Cable Productions, LLC,
                 et al. vs. Atlantic Specialty
3                Insurance Co.
    Deposition Date:  5-11-17
4   Deponent:  Sean Duffy
5   Pg.  Line  Now Reads    Should Read  Reason
6   ___  ___  _____    _____    _____
7   ___  ___  _____    _____    _____
8   ___  ___  _____    _____    _____
9   ___  ___  _____    _____    _____
10  ___  ___  _____    _____    _____
11  ___  ___  _____    _____    _____
12  ___  ___  _____    _____    _____
13  ___  ___  _____    _____    _____
14  ___  ___  _____    _____    _____
15  ___  ___  _____    _____    _____
16  ___  ___  _____    _____    _____
17  ___  ___  _____    _____    _____
18  ___  ___  _____    _____    _____
19  ___  ___  _____    _____    _____
20
21           _____
                 Signature of Deponent
22
23  SUBSCRIBED AND SWORN BEFORE ME THIS ____ DAY OF
24  _____, 2017.
    _____
25  (Notary Public)  MY COMMISSION EXPIRES:_____
```

CONTAINS CONFIDENTIAL PORTIONS
BOUND SEPARATELY

Page 270

1    STATE OF MINNESOTA  )
              ) ss
2    COUNTY OF ANOKA    )
3
       Be it known that I took the foregoing
4    deposition of Sean Duffy, on May 11, 2017, in
     Minneapolis, Minnesota;
5
       That I was then and there a notary public
6    in and for the County of Anoka, State of Minnesota,
     and that by virtue thereof, I was duly authorized
7    to administer an oath;
8       That the witness was by me first duly
     sworn to testify to the truth, the whole truth and
9    nothing but the truth relative to said cause;
10      That the foregoing transcript is a true
     and correct transcript of my stenographic notes in
11   said matter;
12      That the witness reserved the right to
     read and sign the transcript;
13
       That I am not related to any of the
14   parties hereto, nor interested in the outcome of
     the action;
15
       WITNESS MY HAND AND SEAL this 23rd day of
16   May, 2017.
17
18   _____
          Amy L. Larson, RPR
19        My Commission Expires 01/31/20
20
21
22
23
24
25