**EXHIBIT D**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
CASE NO: 2:16-cv-04435-PA-MRW

UNIVERSAL CABLE PRODUCTIONS LLC, and
NORTHERN ENTERTAINMENT PRODUCTIONS LLC,
Plaintiffs,

v.

ATLANTIC SPECIALTY INSURANCE COMPANY,
Defendant

**REBUTTAL REPORT OF ANTHONY CLARK, AIC
IN RESPONSE TO REPORT OF TY R. SAGALOW**

This Rebuttal Report is provided in response to the Report of Ty R. Sagalow that was served in this case. This Rebuttal Report incorporates by reference, in its entirety, my first Expert Report dated March 17, 2017, as a rebuttal to the Report of Ty R. Sagalow. Additionally, I set forth below my opinions and discussion of the issues, with regard to and in rebuttal of the Report of Ty R. Sagalow.

In addition to all materials I reviewed for the preparation of my first Expert Report dated March 17, 2017, I have reviewed the Expert Report of Mr. Ty R. Sagalow, as well as the deposition testimony and exhibits of Andrea Garber and Susan Weiss.

I have not included in my Rebuttal Report any comments regarding the characterization or manner of description of items that Mr. Sagalow refers to as his Summary of Facts. Rather, my Rebuttal Report addresses the actual opinions and discussion provided by Mr. Sagalow.

In my Expert Report dated March 17, 2017, based on years of experience in the handling and supervision of a multitude of insurance claims within a number of

jurisdictions, I concluded that Atlantic Specialty Insurance Company (Atlantic) conducted a timely and proper investigation surrounding the events as they related to the claim presented by the plaintiffs in this case. I believe that Atlantic made a reasonable determination that the war exclusions, as enumerated in the applicable policy of insurance at issue in this matter, applied and therefore no payment could be made to the insured.

Mr. Sagalow believes that the application of any war exclusion was not proper and disagrees that Atlantic conducted a timely and proper investigation. He arrives at these conclusions through the application of his characterizations of enumerated "custom and practice in the insurance industry" that has resulted in a "number of standards." It is my belief, based upon my experience in the insurance industry over the course of my career, that this characterization by Mr. Sagalow is overly broad, and further that the application of these so-called "standards" cannot be used as a determination of whether or not the insurance company acted in a timely, proper, or reasonable manner in any one individual claim. From my handling and supervision of thousands of claims, I have learned that each individual claim speaks for itself, and, depending on the circumstances and facts surrounding that claim, a determination of coverage is made taking into account the specific terms and conditions of the applicable policy.

In Paragraph 36 through 43 of his Report, Mr. Sagalow makes statements regarding what he views as "customs and practice in the insurance industry." He further then uses these items to support his contention in paragraph 44 that Atlantic violated those "standards." In attempting to do so, it would appear to me that he is criticizing the decision to apply the war exclusions once the facts concerning the hostilities became known to Atlantic. This is especially true in the points that he enumerates in paragraph 36. These points appear to me to be legal considerations when reviewing the facts surrounding a claim.

Additionally, many of these points also appear to me to be the types of issues that may possibly be reviewed in a circumstance when there has been an assertion that the policy wording itself is ambiguous. There is and never has been claimed to be an ambiguity in the war exclusions in this case, based upon my review of the claim correspondence from the insured and the pleadings and papers I have reviewed. The insured has argued that the events should be considered a terrorist act as opposed to actions falling with the purview of the various war exclusions. As a result, Mr. Sagalow follows that lead and consistently characterizes all the events over the course of weeks of hostile activities between Hamas and Israel as "an act of terrorism." I believe that is a question for the court to decide. In my experience, the standard to apply, to understand, or to construe the language in the war exclusions is the plain and common meaning of the words of the war exclusions. But regardless, acts which in isolation might be considered terrorism, when considered as a whole certainly can constitute war or war like actions. Here, the conflict between Israel and Hamas constituted a war and war like acts.

Additionally, I do not agree that each of Mr. Sagalow's statements of custom and usage are in fact such. In the report, Mr. Sagalow states that a custom and practice is that insurance policy provisions should be viewed consistent with the reasonable expectations of a reasonable insured. In matters such as this, where the policy language is clear, it should be construed according to the plain and ordinary meaning of the words in the policy.

Also, simply because Atlantic agreed to cover the filming of *Dig* in Israel where Hamas has committed terrorist acts, does not mean that all losses involving Hamas will be covered. Instead, any loss must fit within a coverage provision of the policy and not be excluded. Here, Mr. Sagalow appears to overlook the fact that the conflict between Israel and Hamas was so extensive that it was a war. While insurance

companies might be willing to provide coverage for loss caused by isolated acts of terrorism, terrorism does not last over an extended period of time such as occurred here. What happened here clearly was a war and is subject to the war exclusions.

I also disagree that industry custom and practice requires insurers to take positions consistent with the U.S. Government when it comes to the identity of terrorist organizations. However, I am not aware that Atlantic has taken the position that Hamas is not a terrorist organization, only that it has taken the position that the conflict between Hamas and Israel amounted to a war. That position certainly is not inconsistent with the views of the United States Government.

Turning to the actual opinions that Mr. Sagalow states regarding the claims handling process, I disagree with the conclusions he has reached, and I outline and give my opinions as to why I believe that Atlantic did act in compliance with fair claim practices and standards as they apply to the following points from paragraph 44 in Mr. Sagalow's report. Mr. Sagalow's statement on each point is quoted below, and my rebuttal to it is stated after that quote.

a. **Sagalow: Deciding to apply the War Exclusion within 2 days after written notice of the claim was submitted by the Insured, without conducting a proper investigation;**

   Atlantic did not apply the war exclusion within two days of the written notice on July 15th. It is true that in a telephone discussion on July 17, 2014, with the insured and their broker, Aon, it was communicated that the war exclusions might apply. This early notification would have allowed the insured or Aon to provide Atlantic with materials and documentation for their consideration prior to any definitive denial. The custom and practice in the industry is that a claim is affirmatively denied when a written communication is given to the insured. This occurred on July 28th. The characterization that the investigation was not complete or that it was improper because of the limited time frame is

disingenuous at best, especially here where the insureds were pressing Atlantic for an immediate coverage decision.

b. **Sagalow: Failing to investigate the identity of Hamas as a terrorist organization and the potential impact of this fact on coverage;**

While Hamas is characterized as a terrorist organization by the U.S. government, that does not automatically qualify every military or hostile act as an act solely of terrorism. In my experience in handling claims, the circumstances surrounding any individual occurrence or series of occurrences determine the ultimate characterization. My review of the documents from the claims handling leads me to conclude that Atlantic did investigate the nature of Hamas, as well as the circumstances surrounding the occurrences and developed a characterization based upon the specific facts. My review also indicates that Atlantic discussed such analysis and conclusions in its claim correspondence.

The investigation that was conducted lead Atlantic to conclude that the events causing the relocation of the *Dig* production are not an isolated act of intimidation against a civilian population. Many other factors were evident once the circumstances were fully investigated, and those seem to have been discussed in letters to the insured. All of the other facts surrounding Hamas, including their status as the governing body of Gaza, their maintenance of a military force, and their use of weapons of war (rockets), and the circumstances over the entire period of hostilities between Hamas and Israel, appear to have been investigated, and it was a reasonable approach and conclusion for Atlantic to determine that the facts and circumstances would allow for the application of the war exclusions.

c. **Sagalow: Failing to determine the need for, and failing to retain, an outside expert on the Middle East;**

Based upon my claims experience, I would not agree that it was necessary to

retain an outside expert on the Middle East in order to analyze the facts during July and August 2014. It is unclear what an outside expert on the Middle East would add to the analysis of circumstances surrounding the hostilities that caused the insured to move the production.

d. **Sagalow: Failing to hire or obtain a coverage opinion from outside counsel before making a coverage decision;**

As noted earlier, a coverage decision was communicated to the insured on July 28th. After the initial discussion of the possible application of the war exclusions with the insured on the 17th to get their reaction/response/input, outside counsel was consulted on July 18th and seeking that opinion was one of the steps taken in the overall claim process. Atlantic received an outside coverage opinion prior to the date it made a final coverage decision.

e. **Sagalow: Failing to have substantive discussions with the underwriter on the Insured's account to determine the underwriter's intention at the time the underwriter agreed to accept DIG as an insured production;**

An important fact has been overlooked in Mr. Sagalow's Report. The policy wording at issue in this matter is not a standard Atlantic policy form. Regarding the war exclusions, and the policy overall, Aon presented what it referred to as a "manuscripted form" to Atlantic on behalf of the insured, with the request that it be used. War exclusions were a part of the form that was presented, and they were clearly acceptable to the insured and their knowledgeable broker Aon. In my experience with brokers of Aon's quality, if there were an exclusion or limitation that they did not wish to have applied to the insured's risk profile, Aon would be the one to request the change or present the alternative policy wording. The opposite occurred here. Aon provided Atlantic with a form that included war exclusions and stated that its form had to be used. I understand that there were negotiations between the parties concerning certain provisions of the form, but that there were no such discussions or negotiations concerning

6

any war exclusions. Also, when Aon solicited other insurers to write the policy in 2015, it informed those insurers that the policy was a "manuscripted form that is the property of Aon..." Clearly, Aon wanted the exclusions included within the policy, and it considered these exclusions to be its own.

When the *Dig* production was presented to Atlantic, the insured and Aon were aware of the risks in the Middle East and did not make any specific requests to change the policy wording for this production or eliminate the war exclusions for this production in Israel. Clearly Aon and the insured were willing to accept the risk that in the event that the war exclusions applied, including the use of weapons of war, war, and warlike action, no coverage would be available.

Additionally, it is my experience that "war exclusions" are very standard types used within the insurance industry, and thus knowledgeable brokers and insureds would understand the consequences of including them in the policy. Further, without a claim for ambiguity in the exclusion, the intent of the underwriter would not need to be considered as extrinsic evidence, and would be improper to consider. From my experience involved with claims over the course of my career, custom and practice in the industry is for the claim department to do the investigation into the claim, and any consultation with the underwriter is not considered as a normal practice.

Also, one important difference between the war exclusions in this policy and other examples of typical war exclusions is that the exclusions in Aon's form included an exclusion for weapons of war. Oftentimes that exclusion is limited to weapons of war involving nuclear fission. Here, the exclusion was not so limited.

Finally, Mr. Sagalow appears to overlook the fact that Ms. Johnson did consult with an underwriter. Peter Williams was the chief underwriter for Atlantic's

Entertainment Division. And, Mr. Williams was the supervisor of the particular underwriter here, Wanda Phillips. He also was the person in charge of approving the policy wording when Aon first brought it to Atlantic in 2010, and any changes along the way.

f. **Sagalow: Failing to conduct an investigation that complied with Atlantic's own guidelines and core principles;**

Without specific references in Mr. Sagalow's report on this item, I am unsure as to why it was enumerated. However, I have concluded that Atlantic's process was reasonable and complied with the requirements of California law, which I believe would be the governing principles here. In my experience, Atlantic's own guidelines would not alter or add to the standards that actually apply under the law of California.

g. **Sagalow: Misrepresenting the terms of the Policy by initially contending there was no coverage under the policy for acts of terrorism, unless such acts fell within the definition set forth in the TRIA endorsement;**

The analysis referenced here is a discussion in the denial letter communicated to the insured on July 28th. In their desire to communicate all reasons why coverage could not be afforded, Atlantic explained why the TRIA endorsement did not provide coverage, which it does not. When questioned, Atlantic later acknowledged that the TRIA endorsement was not a terrorism exclusion, but that it also did not provide coverage under the circumstances of this matter. Atlantic simply was attempting to cover all bases just in case the insured thought that the TRIA endorsement might provide coverage, which it does not. And, in a later letter, Atlantic confirmed that the endorsement did not apply.

h. **Sagalow: Failing to supervise and oversee the investigation of the claim, despite obvious and significant errors in analysis that surfaced during the limited investigation, including but not limited to, the misrepresentations as to the TRIA endorsement, not retaining an expert regarding the Middle East, and not obtaining an opinion from outside coverage counsel before making the decision to deny the claim;**

8

This point seems to be recounting of the other items above that I have addressed and making the assumption that there was no supervision in relation to those items. I do not see any supporting documentation for this opinion. I have previously commented that the fact that there was involvement of supervisors shows the seriousness of the consideration that Atlantic gave to this claim.

i. **Sagalow: Failing to evaluate possible alternative interpretations of the War Exclusion, other than the initial interpretation advanced by Atlantic, despite the fact that the claim raised novel legal issues, and Atlantic had limited experience in evaluating war exclusions prior to the DIG claim;**

As there has been no claim of ambiguity in the war exclusions, I do not see how an alternative interpretation could be put forth. There have been many times in my career in the handling and supervision of claims that certain facts and circumstances surrounding a claim would lead us to analyze any exclusion or limitation anew. The exclusions in this case speak for themselves and are clear in their common understanding. Application to the facts at hand is certainly a reasonable course of action. Moreover, Atlantic wrote to its insured to further respond to the request for reconsideration, and to look at the arguments made by the insured. In my experience, the fact that Atlantic took that step and continued to communicate with the insured about their areas of disagreement showed good faith in the claims-handling process. There was even an in-person meeting later in the process where the discussions continued.

j. **Sagalow: Failing to take into consideration the U.S. government's position as to the status of Hamas, and ascribing a quasi-sovereignty status to Hamas that was inconsistent with the U.S. government's designation of Hamas as a terrorist organization;**

The designation of Hamas as a terrorist organization by the U.S. government is a result of political decisions in the exercise of the U.S. foreign policy. As noted earlier, from a claims-handling perspective, and from my claims experience, it is not a determinant in the fact that the hostilities between Hamas and Israel,

which caused the production to relocate, would still reasonably be concluded to fall within the conditions as noted in the war exclusions. Also, it is important to remember that Atlantic's decision does not rest solely upon any conclusion that Hamas was a quasi-sovereign. Indeed, the plain and ordinary meaning of the term "war" does not require Hamas to have been a sovereign or quasi-sovereign. Furthermore, coverage was also denied on the basis that the conflict constituted a war like action and involved the use of weapons of war, and that if nothing else, it amounted to a rebellion or an insurrection. None of these exclusions require a finding that Hamas was a sovereign or quasi-sovereign.

In section IX of his report, Mr. Sagalow returns again to the theme of the custom and practice in the insurance industry for the handling of claims. He enumerates a number of "standards" and then goes on in section X of his report to state that, in his opinion, Atlantic has failed to adhere to six of the standards he set up in section IX. In rebuttal, I am prepared to address the generalization of "standards" that "must" be adhered to in the handling of a claim, as stated in this Rebuttal Report. In my opinion, Atlantic complied with all appropriate standards in the industry.

As a trainee and in my early career, I was often exposed to many sources within the industry to assist me in understanding what would be needed to properly adjust a claim. These directives were often presented as practices that would result in good claims handling or investigative techniques. However, the directive that the facts and details that arose in the investigation of the individual claim would govern the activity of the adjuster and the prompt communication with the insured always tempered the guidelines. The only standard applying to all companies is the insurance regulations and requirements as promulgated by the individual state jurisdiction in which the claim occurred. As an adjuster and supervisor in my career, I recognized that practices had to be in compliance with state requirements. Any analysis of the propriety of a claim adjustment investigation and the ultimate

decision would be subject only to the state jurisdiction applicable to that individual claim.

In approaching the application of Mr. Sagalow's six standards to the claim at issue here in section X, it is clear that his opinion is colored to find any incident that he considers unreasonable as a failure on behalf of Atlantic.

a. **Sagalow: The insurance company must conduct a full, fair, and prompt investigation of the claim;**

In my opinion, Atlantic did just that in their investigation of the claim. They acted promptly, and considered numerous sources and references for information regarding the activities that were leading to the Extra Expense claim. They analyzed that information expeditiously at the request of the insured. The fact that the two parties, Israel, a "sovereign nation," and Hamas, an "other authority," were using rockets, war planes, ground troops, and tanks certainly would lead any reasonable reviewer of the facts to consider that these activities fell within the description of the war exclusions under the policy. Mr. Sagalow seems to be saying that Atlantic was too quick in considering the war exclusions. However, by doing so promptly Atlantic was able to notify the insured and its broker of the possible application of the exclusions. And, as I stated earlier, presented them with the opportunity to supply information for Atlantic's consideration. This investigation was fair, full, and prompt.

b. **Sagalow: The insurance company must disclose to its policyholder all benefits, coverages and limitations that may apply to the claim;**

Aon presented policy wording for the policy at issue in this litigation (including war exclusions) to Atlantic on behalf of the insured with the request that it be accepted. It then was involved in negotiations of the policy. Aon, and the insured, knew the wording of the policy as well as Atlantic. Aon later continued

11

to refer to the policy as its "manuscripted form" and property. Since this policy was presented by a sophisticated broker for a sophisticated insured that understood their risks in light of the policy wording, I do not see how Atlantic would have been under any obligation to enumerate "...to its policyholder all benefits, coverages and limitations that may apply to the claim." But, there is nothing to indicate that Atlantic acted improperly in this regard.

c. **Sagalow: The insurance company must not misrepresent facts or policy provisions or fail to bring to the policyholder's attention facts or policy provisions which it is relying upon in denying or limiting coverage;**

In my opinion, Atlantic did not misrepresent any facts or policy provisions or fail to bring to the policyholder's attention facts or policy provisions it relied upon in denying coverage. The denial letters to the insured also enumerated and explained the reasoning behind the application of the exclusion. All aspects of the war exclusions (meaning all parts or sub-parts) were specifically set out and quoted to the insured, to refer the insured to those specific parts and exclusions. While every sub-clause may not have been separately discussed with a separate heading in the denial letters, the enumeration of those clauses would still alert the sophisticated insured and their knowledgeable representative, Aon, that all sections of the exclusion could apply.

d. **Sagalow: The insurance company must treat its policyholder's interests with equal regard as its own interests;**

Mr. Sagalow contends that Atlantic did not consider the policyholder's interests with equal regard for three reasons: a) did not investigate whether the actions of Hamas should be considered Terrorism as opposed to acts of war; b) did not consult with Middle East expert regarding Hamas as either a terrorist vs. sovereign nation; and c) did not consult with counsel before making the claims decision. My opinion in this matter has been stated earlier: namely a) Atlantic was reasonable in taking the position that the facts surrounding the acts of

12

Hamas and the response by Israel would be commonly understood to be acts of war; b) the war exclusions did not solely pertain to the acts of a sovereign nation and Hamas as a terrorist organization and the exclusions state that an "other authority" can certainly commit acts of war, or warlike acts, or use weapons of war, as enumerated in the policy; and c) Atlantic did consult counsel prior to the definitive denial of the claim.

e. **Sagalow: In cases of "first impression" or when the claims examiner is not familiar with the coverage issues at play, experts should be brought in on a timely basis to provide an opinion;**

Once again, I do not believe any outside expertise was needed. The war exclusions are clear on their face, and it is abundantly clear that the circumstances of this matter amounted to war. Moreover, the President of the Entertainment Division of Atlantic, and its chief underwriter, Peter Williams, was very experienced and very knowledgeable about the meaning of the various clauses in the policy as presented to Atlantic, and his input was sought. Additionally, as indicated above, outside counsel did provide an opinion.

f. **Sagalow: In cases where the decision of the insurance underwriter played a critical role in the issue of dispute, the claims department cannot make a determination without the active involvement of the underwriting department and the individual account underwriter;**

The contention that the underwriter in this matter played a critical role in the issue of the dispute is unfounded. A sophisticated broker presented the coverage to Atlantic for a sophisticated insured that understood the possible risks in conducting a production in the Middle East. They presented the policy to Atlantic with the inclusion of the various parts of the war exclusions, which generally are a very standard and typical type of exclusion (except as noted above), which I usually see in almost all policies. Aon and its sophisticated insured never sought to have the war exclusions removed or abrogated for this individual production. To the contrary, they agreed upon the very war

exclusions at issue and asked Atlantic to issue a coverage form with those exclusions stated in it, and continued to request renewal policies with the same language. The wording was clear and unambiguous. Aon has claimed it as its own. From my experience in these types of matters, the claim department would not have had any reason to seek out any opinion from their own underwriter, because the war exclusions are not ambiguous, and because the policy was negotiated by Aon as its manuscripted policy. But, once again, Peter Williams, the President of the Entertainment Division and the chief underwriter of that division was consulted.

In conclusion, the report from Mr. Sagalow has done nothing to change my opinions as fully stated in my original Expert Report. Atlantic acted reasonably in the handing of this claim.

It is my understanding that discovery is still open and ongoing in this matter. Should any additional information be presented to me for review, I reserve the right to modify my opinions as I see fit.

*Anthony Clark*

Anthony Clark, AIC