# EXHIBIT "E"

MARC J. SHRAKE (SBN 219331)
  mjs@amclaw.com
ANDERSON, MCPHARLIN & CONNERS LLP
707 Wilshire Boulevard, Suite 4000
Los Angeles, California 90017-3623
Telephone: (213) 236-1691
Facsimile: (213) 622-7594

MICHAEL KEELEY *(Pro Hac Vice)*
  michael.keeley@strasburger.com
JOHN R. RIDDLE *(Pro Hac Vice)*
  john.riddle@strasburger.com
TONI SCOTT REED *(Pro Hac Vice)*
  toni.reed@strasburger.com
CARLA C. CRAPSTER *(Pro Hac Vice)*
  carla.crapster@strasburger.com
STRASBURGER & PRICE, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330

Attorneys for Defendant
Atlantic Specialty Insurance Company

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, a Delaware limited liability company, and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, a Delaware limited liability company, | Case No. 2:16-cv-04435-PA-MRW **DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S EXPERT WITNESS DISCLOSURE** |
| Plaintiffs, | |
| vs. | |
| ATLANTIC SPECIALTY INSURANCE COMPANY, a New York insurance company, | |
| Defendant. | |

*(left margin, vertical text)* ANDERSON, MCPHARLIN & CONNERS LLP — LAWYERS — 707 WILSHIRE BOULEVARD, SUITE 4000 — LOS ANGELES, CALIFORNIA 90017-3623

1  Atlantic Specialty Insurance Company ("Atlantic") submits the following

2  expert disclosures pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure

3  and the Court's Scheduling Order dated January 19, 2017 (Doc. 34), reserving the

4  right to supplement its disclosures at a later time either through direct

5  supplementation of this disclosure or through other discovery response and

6  deposition testimony.

## A.
## IDENTITY OF EXPERTS

9  1.  The following persons may offer expert testimony in this case:

10  a.  Professor John B. Quigley
    Professor Emeritus
11  The Ohio State University Moritz College of Law
12  Drinko Hall
    55 West 12th Avenue
13  Columbus, Ohio 43210-1391
14  (614) 292-1764

15  quigley.2@osu.edu

16  Professor Quigley is a retained expert for Atlantic. Professor Quigley teaches

17  International and Comparative Law at The Ohio State University Moritz College of

18  Law.  He is an expert in the nature of "war," statehood, state actors and sovereignty.

19  He is also an expert in Israeli-Palestinian relations and the 2014 50-day conflict that

20  occurred between Israel and Hamas.  Professor Quigley will testify that the 50-day

21  conflict was a war, that it was waged with weapons of war, and that it constituted

22  war-like actions and defense against war-like actions, as all those terms are

23  commonly used, and as all those terms are understood within his area of expertise

24  and study. Professor Quigley will further opine that Hamas is a part of the

25  government of the State of Palestine, and that Palestine does qualify as a state. He

26  will opine that Hamas is at least a de facto administration governing territory,

27  relying on the facts further recited in his report, including the fact that Hamas came

28

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

2

to power in 2006 through elections, that Hamas functions as a government, and that other states work with Hamas, thereby acknowledging its role as the governing body in Gaza.  Professor Quigley will further opine that the fact that the United States has designated Hamas as a terrorist organization does not impact the fact that the 2014 conflict was a war, constituted war-like actions and was waged with weapons of war. Professor Quigley will also testify regarding the nature of the war in the context of the facts of the Israeli-Palestinian conflicts and given the various roles and descriptions of the participants. He will testify that regardless of the designations given to the participants, the 2014 50-day conflict constituted a war, war-like actions and utilized weapons of war. Professor Quigley will also testify to the details of both the nature and history of Hamas and the nature and details of the 50-day war, which he has learned through his research and which support his opinions. For additional information regarding Professor Quigley's qualifications, opinions, and the facts and data supporting those opinions, please see his Expert Report, and the curriculum vitae attached thereto, which are together attached as Exhibit A and are incorporated herein by reference. The general substance of Professor Quigley's opinions may be supplemented depending upon the substance of testimony in future depositions and facts established through additional discovery. Professor Quigley may also rebut any expert testimony offered by Plaintiffs' expert witnesses with respect to the foregoing and any other related issues.

        b.     Dr. Ingrid Detter de Frankopan
                Montesa Sarl
                58 Route de la Fin
                CH-1874
                Champery, Switzerland
                +41 79 603 7125

                idfrankopan@gmail.com

3

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  Dr. de Frankopan is a retained expert for Atlantic. She is a barrister at law in
2  England and Wales and Professor Emeritus of International Law at Stockholm
3  University. Dr. de Frankopan is an expert in the law of war and armed conflict and
4  related fields. Dr. de Frankopan will testify that the summer 2014 conflict between
5  Israel and Palestine constituted a war or war-like activities, and involved the use of
6  weapons of war, as all those terms are commonly used, and as all those terms are
7  understood within her area of expertise and study. In particular, Dr. de Frankopan
8  will testify that based on the duration and intensity of the fighting, the number of
9  casualties, and other specifics of the conflict, it is her opinion that the conflict was a
10 war. Dr. de Frankopan will also testify to the details of both the nature and history of
11 Hamas and the nature and details of the 50-day war, which she has learned through
12 her research and which support her opinions. She will further opine that Palestine is
13 a quasi-state and Hamas is a semi-sovereign, but even if they are not, this does not
14 mean that the 2014 conflict was not a war.    Dr. de Frankopan will testify that
15 regardless of the designation of the participants, the 2014 conflict constituted a war,
16 at least war-like action and involved weapons of war. Dr. de Frankopan will further
17 opine that the fact that the United States has designated Hamas as a terrorist
18 organization does not alter the fact that the 2014 conflict was a war, constituted war-
19 like actions and used weapons of war. For additional information regarding Dr. de
20 Frankopan's qualifications, opinions, and the facts and data supporting those
21 opinions, please see her Expert Report, and the curriculum vitae attached thereto,
22 which are together attached as Exhibit B and are incorporated herein by reference.
23 The general substance of Dr. de Frankopan's opinions may be supplemented
24 depending upon the substance of testimony in future depositions and facts
25 established through additional discovery. Dr. de Frankopan may also rebut any
26 expert testimony offered by Plaintiffs' expert witnesses with respect to the foregoing
27 and any other related issues.
28

ATLANTIC SPECIALTY INSURANCE COMPANY'S
EXPERT WITNESS DISCLOSURE

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

c.    Mr. Frank Lowenstein
3810 Argyle Terrace, NW
Washington, D.C. 20011
(202) 255-0123

frankglowenstein@gmail.com

Frank Lowenstein is a retained expert for Atlantic. He is an attorney who previously worked for the U.S. Department of State as the Special Envoy for Israeli-Palestinian Negotiations. As the Special Envoy, Mr. Lowenstein had responsibility for all Israeli and Palestinian issues, including policy formation, speech writing, and press guidance. He met regularly with senior Israeli and Palestinian officials and traveled with then Secretary of State John Kerry on all trips related to Middle East peace. Mr. Lowenstein was the Special  Envoy for Israeli-Palestinian Negotiations during the 50-day conflict and traveled to Israel and Egypt during the summer of 2014 to facilitate the negotiation of a ceasefire between Palestinians and Israelis. Mr. Lowenstein has received the Distinguished Service Award from Secretary John Kerry, the highest honor offered by the U.S. State Department. Mr. Lowenstein will testify that in his opinion, the conflict was a war, constituted war-like actions by a military force, involved the use of weapons of war, and was also an insurrection, rebellion, or usurpation of power by the Palestinians, as all those terms are commonly used, and as all those terms are understood within his area of expertise and study. Mr. Lowenstein will also testify that he and his colleagues at the State Department, including John Kerry, repeatedly referred to the conflict as a war. Mr. Lowenstein will opine that Hamas is the semi-sovereign de facto ruling authority in Gaza and acts as a government in that it: has a judicial system, has a military force, provides social services, collects taxes, and administers hospitals and local police forces. He will state that Hamas has approximately 30,000 civil service employees in various ministries, including health and education. Mr. Lowenstein will also testify to the details of both the nature and history of Hamas and the nature and

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1  details of the 50-day war, which he has learned through his experience and research

2  and which support his opinions. Mr. Lowenstein will further opine that the fact that

3  the United States has designated Hamas as a terrorist organization does not alter that

4  the hostilities in the summer of 2014 constituted a war, war-like actions and

5  involved weapons of war.  Mr. Lowenstein is expected to testify regarding Israeli-

6  Palestinian relations both in 2014 and before.  For additional information regarding

7  Mr. Lowenstein's qualifications, opinions, and the facts and data supporting those

8  opinions, please see his Expert Report, and the curriculum vitae attached thereto,

9  which are together attached as Exhibit C and are incorporated herein by reference.

10 The general substance of Mr. Lowenstein's opinions may be supplemented

11 depending upon the substance of testimony in future depositions and facts

12 established through additional discovery. Mr. Lowenstein may also rebut any expert

13 testimony offered by Plaintiffs' expert witnesses with respect to the foregoing and

14 any other related issues.

15

16         d.     Mr. Anthony Clark

17                Clark Insurance Arbitration & Consulting, LLC
                  2100 Pebble Beach Drive

18                Plainfield, IL 60586-8384
                  815-260-3140

19

20                tclark112@sbcglobal.net

21 Mr. Clark is a retained expert for Atlantic. He is a principal with Clark Insurance

22 Arbitration & Consulting, LLC. He has over 40 years of experience as a property

23 insurance adjuster, supervisor, claims officer, and property insurance consultant.

24 Mr. Clark will opine that Atlantic Specialty Insurance Company properly conducted

25 a thorough and timely investigation into the circumstances surrounding the Extra

26 Expense claim as presented by plaintiffs and made a reasonable determination under

27 the terms and conditions of the applicable policy of insurance that the war

28

ANDERSON, MCPHARLIN & CONNERS LLP

LAWYERS

707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1   exclusions applied.  Mr. Clark will opine that Atlantic acted as a reasonable insurer

2   would by staying in communication with its insured during the investigation stage of

3   the claim, and by providing updates on its analysis on coverage.  Mr. Clark will

4   opine that Atlantic provided the insured with a clear and detailed explanation of the

5   denial in an expedited manner requested by the insured, that it responded in a

6   complete and timely manner to a request for reconsideration, that it continued to

7   communicate in an effort to reach some negotiated resolution, and that there are no

8   facts demonstrating a lack of good faith or failure on the part of Atlantic to act in a

9   reasonable fashion. For additional information regarding Mr. Clark's qualifications,

10  opinions, and the facts and data supporting those opinions, please see his Expert

11  Report, and the curriculum vitae attached thereto, which are together attached as

12  Exhibit D and are incorporated herein by reference.  The general substance of

13  Mr. Clark's opinions may be supplemented depending upon the substance of

14  testimony in future depositions and facts established through additional discovery.

15  Mr. Clark may also rebut any expert testimony offered by Plaintiffs' expert

16  witnesses with respect to the foregoing and any other related issues.

17

18  Atlantic Specialty reserves the right to call as expert witnesses any individuals

19  designated, identified, or disclosed as experts by any party, or identified or

20  discovered through further investigation.  Atlantic Specialty reserves the right to

21  disclose rebuttal experts.  Atlantic Specialty reserves the right to call at trial rebuttal

22  experts and other experts not named in this or any other disclosure as expert

23  witnesses to assist in the presentation of Atlantic Specialty's case or to rebut or

24  impeach the opinions and testimony of any experts who may testify at trial.  Atlantic

25  Specialty reserves the right to call as an expert witness any individual to the extent

26  his or her testimony may be construed as expert testimony and any lay witness to the

27  extent he or she may be qualified to give opinion testimony.

28

ATLANTIC SPECIALTY INSURANCE COMPANY'S
EXPERT WITNESS DISCLOSURE

DATED: March 17, 2017

MARC J. SHRAKE
ANDERSON, McPHARLIN & CONNERS LLP

-and-

MICHAEL KEELEY *(Pro Hac Vice)*
TONI SCOTT REED *(Pro Hac Vice)*
JOHN R. RIDDLE *(Pro Hac Vice)*
CARLA C. CRAPSTER *(Pro Hac Vice)*
STRASBURGER & PRICE, LLP

By:    */s/ Michael Keeley*
          Michael Keeley

Attorneys for Defendant ATLANTIC
SPECIALTY INSURANCE COMPANY

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

8

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

## PROOF OF SERVICE

I am employed in the County of Dallas, State of Texas.  I am over the age of eighteen years and not a party to the within action; my business address is 901 Main Street, Dallas, Texas 7502.

On March 17, 2017, I served the following document(s) described as **DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S DESIGNATION OF EXPERT WITNESSES** on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

Lucia E. Coyoca, Esq.                              Attorneys for Plaintiffs
Valentine A. Shalamitski, Esq.
Daniel M. Hayes, Esq.
Mitchell Silberberg & Knupp LLP
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

**BY MAIL:**  I am "readily familiar" with Strasburger & Price LLP's practice for collecting and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business.  Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Dallas, Texas, on that same day following ordinary business practices.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.  Executed on March 17, 2017, at Dallas, Texas.

Marianna Green

# EXHIBIT 'A'



# THE OHIO STATE UNIVERSITY
MORITZ COLLEGE OF LAW

Michael E. Moritz College of Law

Drinko Hall
55 West 12th Avenue
Columbus, OH 43210-1391

614-292-2631 Phone
614-292-2035 Fax

moritzlaw.osu.edu

March 17, 2017

Michael Keeley, Esq.
Strasburger & Price, LLP
901 Main Street, Suite 6000
Dallas TX 75202


## Background and Qualifications

I am John Quigley, Professor Emeritus, Moritz College of Law, The Ohio State University in Columbus, Ohio. I have been asked to give an opinion in *Universal Cable Productions LLC and Northern Entertainment Productions LLC v. Atlantic Specialty Insurance Company*, Case No. 2:16-cv-04435-PA-MRW.

I specialize in international law. I have taught international law since 1972 at the Moritz College of Law, The Ohio State University. I have extensive practical experience in international law. I have served as consultant or expert in international litigation. I have written several books and numerous scholarly articles on international law, and in particular on the law of war and on statehood. My curriculum vitae and publication list are attached as Exhibit 1.

In 2013, I served as expert in *Sokolow v. Palestine Liberation Organization*, U.S. District Court, Southern District of New York, Case No. 1:04-cv-397, 2013. This is the only case in which I have testified by trial or deposition in the last four years.

I am being compensated at a rate of $500 per hour. My compensation in the instant matter is not conditioned on the content of the opinions expressed in this report, nor is my compensation contingent on the results of these proceedings.

The materials I have considered are referenced in the text of this document or are attached as Exhibit 2.


## Summary of Opinions

Based on my experience and expertise in Israeli-Palestinian relations, the 2014 Gaza-Israel hostilities constituted a war as that term is used in international law and in ordinary parlance. These hostilities were waged with weapons of war. My opinion that these hostilities constituted a war is based on five considerations. First, The plain meaning of the term "war" includes the conflict that occurred in 2014 between Gaza and Israel. Second, while Hamas need not have

been a government or quasi-government for the conflict to have been considered a war, it is my
opinion that Hamas is part of the government of the State of Palestine. Thus, the 2014 hostilities
constituted a war between two states. Third, these hostilities involved territory under belligerent
occupation. Fourth,Hamas is at the very least a de facto administration governing territoryAnd
fifth, the law that applied to the hostilities was humanitarian law. In reaching this opinion, I have
considered and dismissed the contention that the designation of Hamas as a terrorist organization
negates the character of the Gaza-Israel 2014 hostilities as a war. Even apart from the character
of the 2014 Gaza-Israel hostilities as a war, actions taken by the military forces of the two sides
that constituted warlike actions and defense against same.

## Discussion and Grounds for Opinions

### *The Gaza-Israel hostilities of 2014*

Hostilities commenced between Israel and Gaza the second week in July 2014 and continued to
late August 2014. Three Israeli teenagers were kidnapped on June 12, 2014 in the West Bank of
the Jordan River, territory of Palestine occupied by Israel since 1967. The Israeli Government
attributed the kidnapping to Hamas, which governs Gaza. Israel's army launched a large-scale
search and arrest operation in the West Bank, detaining large numbers of Hamas personnel
resident there. In response, military units associated with the Hamas administration in Gaza fired
rockets into Israel from Gaza. Israel responded with an air campaign against Gaza, a campaign
that led to more rocket-firing from Gaza. Israel called its military action against Gaza "Operation
Protective Edge," thus giving it a designation of the type that governments give to wars.

Except for intermittent periods of ceasefire, rockets continued to be fired from Gaza into Israel
and Israel continued air strikes. Damage was especially intense in neighborhoods of Gaza from
which, according to Israel, rockets were being fired. [Benjamin Land and Maria Locke, *Scenes of
war and heartbreak as Israel-Hamas conflict intensifies*, MSNBC, July 18, 2014] Horrifying
images of war were sent around the world on social media. [Alastair Jamieson, How Technology
Is Intensifying Gaza War between Israel and Hamas, *NBC News*, July 30, 2014] These and other
major news outlets referred to the hostilities as a "war."

On July 17, 2014, a Hamas military force entered Israeli territory, using a sophisticated set of
underground tunnels. This action prompted a ground assault by the Israeli Army into Gaza.
According to a Commission of Inquiry organized by the United Nations Human Rights Council,
during the period of hostilities, more than 6000 airstrikes were launched by Israel against Gaza,
14,500 tank shells were fired by Israel and 35,000 artillery shells. Entire neighborhoods in Gaza
were destroyed. An estimated 4881 rockets and 1753 mortars were fired from Gaza into Israel,
sending thousands to bomb shelters. Israel's ground assault into Gaza was met by Gaza's
defenses. [Report of the independent commission of inquiry established pursuant to Human
Rights Council resolution S-21/1, June 24, 2015, UN Document A/HRC/29/52, paragraphs 27,
35, 48] Hamas fired rockets at incoming Israeli ground troops. The Commission of Inquiry
counted 67 Israeli soldiers killed overall during the hostilities. On the Gaza side, the Commission
of Inquiry counted 789 combatant deaths and 1462 civilian deaths for a total of 2251. Another
11,231 were counted as injured. [Report of the independent commission of inquiry established
pursuant to Human Rights Council resolution S-21/1, June 24, 2015, UN Document

Quigley Report
Page 3 of 10

A/HRC/29/52, paragraphs 20-21] Some 20,000 dwellings in Gaza were destroyed or otherwise rendered uninhabitable by Israeli Army bombing. [Signs of war still visible in Gaza, *MSNBC2*, January 16, 2015]

Half a million Gazans were forced to flee their homes as a result of the hostilities, primarily Israel's aerial attacks, and became displaced. On the Israeli side, 28,000 residents of southern Israel fled their homes because of rocket fire from Gaza and became displaced. [United Nations Office for the Coordination of Humanitarian Affairs, *Fragmented Lives Humanitarian Overview 2014*, Jerusalem, March 2015]

Efforts at ceasefires were made through the period of the hostilities by the United Nations Security Council. [U.N. Security Council Calls for 'Immediate' Gaza Cease-Fire, *NBC News*, July 28, 2014] The Security Council is the organ of the United Nations entrusted with "responsibility for the maintenance of international peace." [UN Charter, art. 24] Its involvement attested to the seriousness of the hostilities.

Each side characterized the hostilities as a war as they blamed the other. Israeli Prime Minister Benjamin Netanyahu said, while the hostilities were ongoing, "There is no war more just than this." [Be ready for 'prolonged' Gaza war, Netanyahu says, *Times of India*, July 29, 2014] David Roet, Israel's United Nations ambassador, told the United Nations Security Council, "This is not a war we chose," and again, "Israel did not want this war." [UN Security Council, 7222d meeting, July 22, 2014, at 6] The Palestine UN representative, Riyad Mansour, referred to "Israeli military aggression in Gaza" at the same Security Council meeting. [Id. at 4] Khaled Meshaal, the Hamas leader, said that the hostilities were "not a war of choice" on his side. [Khaled Meshaal: 'Not a war of choice,' *Al-Jazeera*, August 17, 2014]

The media characterized the hostilities as a "war" while they were in progress. NBC News reporter Cassandra Vinograd penned a piece on the ramifications of the hostilities under the headline "Public support for Israel shifting amid Gaza War, Britain warns." [NBC News, July 30, 2014] An NBC Jerusalem correspondent referred to the hostilities as "the current war in the Gaza Strip." [Gaza War: Hamas admits kidnapping three Israeli teens, *NBC News*, August 21, 2014]

As the hostilities ended, the media christened them the "50-day war," a reference to the "six-day war" involving the same territory in 1967. [Gaza cease-fire holds between Hamas and Israel after 50-day war, *NBC News*, August 27, 2014; Lizzie Dierden, Israel-Gaza Conflict: 50-Day War by Numbers, *The Independent*, August 27, 2014; Jodi Rudoren, *50 Days of War Leave Israelis and Palestinians Only More Entrenched*, New York Times, August 29, 2014]

With hindsight in the aftermath, the media continued to characterize the hostilities as a war, as in a Jerusalem byline piece in December 2014. [Gaza War: Israel opens eight new investigations into military operations, *NBC News*, December 7, 2014] A 2017 piece in an Israeli newspaper did the same. [Barak Ravid and Gil Cohen, Gaza War: 11 Key Headlines From Scathing Report Rattling Israel's Politicians and Military, *Haaretz*, February 28, 2017]

Quigley Report
Page 4 of 10

Based on my knowledge and scholarly work in the law of war, I find the 2014 Gaza-Israel
military hostilities to be a war. This conclusion flows first from the fact that the plain meaning of
the term "war" includes the conflict that occurred in 2014 between Gaza and Israel.  It flows,
second, from the fact that while Hamas need not have been a government or quasi-government
for the conflict to have been considered a war, the Hamas Administration in Gaza constitutes part
of the governing authority of the State of Palestine, therefore its military conflict with another
state, namely Israel, is between two states. It flows, third, from the fact that it arose in a situation
of belligerent occupation. It flows, fourth, from the fact that Hamas, even were it not deemed
part of a state, is a de facto administrator of territory. It flows, fifth, from the fact that the law
that was applied to the hostilities was humanitarian law.

*Under any definition of the term "war," Hamas and Israel were at war*

Given the scope of the conflict between Hamas and Israel, by any meaning of the term "war,"
Hamas and Israel were at war.  Israel directed a fierce military campaign at Hamas calculated to
destroy Hamas' tunnel system and prevent them from being able to launch any serious future
attacks against Israel.  Hamas, on the other hand, waged ground and air attacks against Israel in
support of their stated goal of forcing Israel out of what Hamas considers Palestinian territory.
Both sides used weapons of war over an extended period of time with the clear objective of
defeating the other side militarily. The battles were fought both on the ground and in the air with
sophisticated military weapons, resulting in the significant destruction of property and lives.
Additionally, world-wide the conflict was considered a war.

*War between two states*

I do not believe Palestine has to be considered a state for there to have been war. But, Palestine
was and is a state.  Gaza is part of Palestine. No state other than Palestine makes a claim to Gaza.
Gaza was part of Palestine coming out of World War I, under the Treaty of Lausanne of 1923.
[Treaty of Peace, Lausanne, July 24, 1923, *League of Nations Treaty Series*, vol. 28, at 11] After
Egypt occupied Gaza in 1948, Egypt administered Gaza as part of Palestine. Gaza was not
incorporated into Egypt. In 1967 Israel occupied Gaza. In 1989, the Palestine Liberation
Organization declared itself as the lawful governing authority of Gaza, along with the West Bank
of the Jordan River. Israel withdrew from administration in Gaza in 2005. [John Quigley, *The
Statehood of Palestine: International Law in the Middle East Conflict*, 2005]

Upwards of 130 states have accorded Palestine formal diplomatic recognition. [CRS Report for
Congress, *The Palestinians: Background and U.S. Relations* (Jim Zanotti, Specialist in Middle
Eastern Affairs), January 31, 2014, at 13] In 2012, the United Nations General Assembly
declared by resolution that the observer mission that it had received since 1974 was the observer
mission of a state. [UN General Assembly, Status of Palestine in the United Nations, Resolution
67/19, 29 November 2012] Since that time all international institutions that have had occasion to
deal with the issue have dealt with Palestine as a state. The Prosecutor of the International
Criminal Court on January 1, 2015 accepted a declaration filed by Palestine giving the Court
jurisdiction over acts committed "in the occupied Palestinian territory, including East Jerusalem,
since June 13, 2014." That declaration could be accepted by the Prosecutor only on the premise
that Palestine is a state, since Article 12(3) of the Court's Statute accords the right to confer

jurisdiction only to states. On the basis of the Palestine declaration, the Prosecutor opened a
preliminary examination of possible war crimes committed in the Gaza-Israel hostilities. That
examination is ongoing. [International Criminal Court, Office of the Prosecutor, Report on
Preliminary Examination Activities 2016, paragraph 111]

On January 2, 2015, Palestine acceded to the Statute of the International Criminal Court. That
accession was filed, as required, with the Secretary-General of the United Nations. [International
Criminal Court, Office of the Prosecutor, Report on Preliminary Examination Activities 2016,
paragraph 111] Accession to the Statute is open only to states. The Secretary-General approved
Palestine's accession, thereby acknowledging Palestine's status as a state.

The United States deals with Palestine as a state. Beginning in 1993, the United States has
encouraged Israel and Palestine to agree on a border and other issues. An agreement was signed
at the White House to this end in 1993. [Declaration of Principles on Interim Self-Government
Arrangements, September 13, 1993]. Borders are arranged only between states. A cession of
territory can come only from a state. "Cession means the formal transfer of title (sovereignty)
over territory from one state to another." [Gerhard von Glahn, *Law Among Nations: An
Introduction to Public International Law* (1996), at 301] If Israel were to gain territory from
Palestine through negotiations, or if Palestine were to gain territory from Israel through
negotiations, the title would be valid because it came from a state.

In 2003, the United States fashioned another arrangement that was premised on Palestine's status
as a state. A Performance-based Roadmap to a Permanent Two-State Solution to the Israeli-
Palestinian Conflict was drawn up by the United States, Russia, the European Union, and the
United Nations on April 30, 2003. The Roadmap charted three "phases" to lead to a peace
agreement between Israel and Palestine. [UN Document S/2003/529, May 7, 2003]

"Phase One" was to involve a build-up of Palestinian institutions of governance over a period of
a few weeks. "Phase Two," to begin in June 2003, would bring "Creation of an independent
Palestinian state" and the four sponsors, including the United States, would "promote
international recognition of Palestinian state, including possible UN membership." For a variety
of reasons, these phases were not implemented, but the fact that the United States could, at the
end of April 2003, anticipate advocating international recognition of Palestine by early June
2003 implied that Palestine was already a state as of the date of promulgation of the Roadmap.
Apart from a few weeks of shoring up institutions of governance, nothing fundamental would
change between 30 April and early June in Palestine's status. Thus, the United States was
dealing with Palestine as a state.

The Commission of Inquiry established by the UN Human Rights Council to examine the Gaza-
Israel 2014 hostilities viewed Hamas as an administration operating as part of the State of
Palestine. To make the point that Hamas was bound to respect international norms, it wrote, "The
State of Palestine is bound by the obligations contained in the treaties to which it has acceded.
The Commission thus viewed the hostilities as being between two states: Israel and Palestine.
[Report of the independent commission of inquiry established pursuant to Human Rights Council
resolution S-21/1, June 24, 2015, UN Document A/HRC/29/52, paragraph 12]

*War in the context of belligerent occupation*

A third  reason for my conclusion that the Gaza-Israel hostilities of 2014 constituted a war, and specifically a war international in character, is that they arose out an international belligerency. Gaza was taken and occupied by Israel in a war that occurred in 1967. The Office of the Prosecutor of the International Criminal Court, as part of its current examination of war crimes committed during the 2014 hostilities, placed the hostilities in the context of Israel's occupation dating from 1967. [International Criminal Court, Office of the Prosecutor, Report on Preliminary Examination Activities 2016, paragraph Paragraphs 116-120]

The hostilities of 1967 were universally regarded as a war, and a war of an international character. Gaza became territory under belligerent occupation from that time. Israel initially became the administrator in Gaza but withdrew from administration in 2005, after which it controlled entry into and exit from Gaza, controlled Gaza's airspace, and reserved for itself the right to enter with military force. Any hostilities between an organized military force in Gaza on the one hand and Israel on the other constitute a continuation of the 1967 war. Israel's leading legal analyst of war writes, "As the appellation 'belligerent occupation' suggests, there is an inextricable tie between this species of occupation and inter-State war. [Yoram Dinstein, *The International Law of Belligerent Occupation* (2009), at 31] Belligerent occupation continues even after a truce is put into effect and lasts until a complete withdrawal, typically accompanied by a peace treaty. If, during the time of belligerent occupation, forces of the occupied territory engage against forces of the occupier, such hostilities are a continuation of the hostilities that led to the occupation. In this situation, "The hostilities may be classified as resumption of IAC [international armed conflict] if the protagonists of hostilities are members of armed forces of the occupied state."

Gaza continued under belligerent occupation through the period of the hostilities of 2014. The Central Intelligence Agency *World Fact Book: Middle East: Gaza Strip* (updated December 14, 2016) notes Israel's withdrawal of settlements and military units from Gaza in 2005 but further notes that Israel "continues to control the Gaza Strip's land and maritime borders and airspace." UN Secretary-General Ban Ki Moon said in 2016 that Gaza remains under belligerent occupation. He referred to the fact that the Security Council has so said. "As the Security Council has made clear, Gaza, and the West Bank, including East Jerusalem, have been under military occupation since 1967." [*Secretary-General Stresses Palestine's Right to Exist, Israel's Need for Peace with Neighbours, in Final Security Council Briefing on Middle East*, UN Document SG/SM/18372-SC/12633-PAL/2211, December 16, 2016]

The UN Human Rights Council, in reacting to the Gaza-Israel hostilities as they were ongoing in 2014, referred to Israel as "the occupying power" in Gaza. [Human Rights Council Resolution A/HRC/RES/S-21/1, July 23, 2014, paragraph 6] The Office of the Prosecutor of the International Criminal Court concluded shortly after the end of the Gaza-Israel hostilities that Gaza remained under belligerent occupation. "Overall," said the Office of the Prosecutor, "there is a reasonable basis upon which to conclude that Israel continues to be an occupying power in Gaza despite the 2005 disengagement. The Office has therefore proceeded on the basis that the situation in Gaza can be considered within the framework of an international armed conflict in view of the continuing military occupation by Israel." [International Criminal Court, Office of

the Prosecutor, Situation on Registered Vessels of Comoros, Greece and Cambodia, Article 53(1) Report, November 6, 2014, paragraph 29]

"Armed conflict" is the term used in international law to refer to war. The fact that the terms are interchangeable is seen by their use in the titles of the major treaties on warfare: Two of the major treaties on war are the Convention relative to the Treatment of Prisoners of War (August 12, 1949) and the Convention on the Treatment of Civilians in Time of War (August 12, 1949). In 1977, a treaty was concluded to elaborate on and clarify provisions of the 1949 treaties. The term used in the title of the 1977 treaty was Protocol Additional to the Geneva Conventions of 12 August 1949 and relating to the Protection of Victims of International Armed Conflict (June 8, 1977). The 1977 treaty, relating to the same topic as the 1949 treaties on "war," used the term "armed conflict." The International Committee of the Red Cross, which is identified in these treaties as the agency that monitors compliance with them, describes the treaties as follows: "The Geneva Conventions and their Additional Protocols are international treaties that contain the most important rules limiting the barbarity of war." [International Committee of the Red Cross, *The Geneva Conventions of 1949 and their Additional Protocols*, January 1, 2014, https://www.icrc.org/en/document/geneva-conventions-1949-additional-protocols]

*Hamas as de facto government*

A fourth reason for my conclusion is that the Hamas administration is at least an administration of territory of a de facto character. Again, while I do not believe this is necessary for there to have been a war, this fact further supports my opinion to the extent others so believe.  Hamas came to power in Palestine through a Palestinian Legislative Council held in 2006. The Hamas Party won a majority of seats in that election to the Palestinian Legislative Council. That election was held with the encouragement and backing of the United States, including financial assistance to the electoral process. It was deemed a fair election by international observers. Internal contention developed following that election, leading to a failure to form a single administration for Palestine, and to an administration being formed by Hamas that took control in the Gaza sector of Palestine.

Since 2007, Hamas has remained the administration of Gaza. The Central Intelligence Agency's *World Fact Book Middle East: Gaza Strip* (updated December 14, 2016) states, "Hamas remains in de facto control of the Gaza Strip."

The Commission of Inquiry established by the UN Human Rights Council considered that Hamas was bound by international law because it exercised governmental-type functions. It said, "The authorities in Gaza must respect and ensure human rights norms because of their exercise of government-like functions." [Report of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1, June 24, 2015, UN Document A/HRC/29/52, paragraph 12]

As the administration of a piece of territory, Hamas functions as a government, even though as part of a larger Palestinian administration it does not conduct its own relations with the outside world.

Nonetheless, other states carry out activities in Gaza and in so doing work with Hamas, acknowledging its role as the governing body in Gaza. The most significant outside entity is the United Nations Relief and Works Agency, which operates schools and clinics and distributes humanitarian aid in Gaza. UNRWA's budget is composed of donations by states. The United States is the largest donor. [CRS Report for Congress, *Hamas: Background and Issues for Congress* (Jim Zanotti, Analyst in Middle Eastern Affairs), December 2, 2010, at 30] UNRWA coordinates its efforts with Hamas as the governing body in Gaza].

Hostilities between a de facto government and the government of a state constitute an armed conflict of an international character.

*Hostilities to which humanitarian law applied*

My fifth reason for concluding that the Gaza-Israel 2014 hostilities constituted a war is the fact that the conflict fell under humanitarian law. This is the body of law that applies to armed conflict, whether of an international or non-international character. Regardless of the characterization of Hamas, the 2014 Gaza-Israel hostilities were regarded by the international community and by Israel as being governed in the legal sphere by humanitarian law. That fact makes the hostilities a war.

Israel considered humanitarian law to be the law applicable to the hostilities. The Israeli Army, in conducting inquiries into whether any of its forces committed war crimes, used the law of armed conflict as its standard. [Israel clears forces in several deadly 2014 Gaza war cases, *U.S. News & World Report*, August 24, 2014] Israel's government report on the investigation of possible war crimes by its forces stated, "Israel is aware of allegations of violations of international law during the 2014 Gaza Conflict and is committed to investigating fully any credible accusation or reasonable suspicion of a serious violation of the Law of Armed Conflict." [State of Israel, *The 2014 Gaza Conflict 7 July – 26 August 2014, Factual and Legal Aspects*, May 2015, paragraph 409]

The United Nations Human Rights Council's Commission of Inquiry noted the applicability to the hostilities of the Convention on the Treatment of Civilians in Time of War of 1949 (Geneva Civilians Convention). This Convention, as indicated by its title, applies only in time of war. [Human Rights Council Resolution A/HRC/RES/S-21/1, July 23, 2014, preamble]

After discussing the Gaza-Israel hostilities at its July 28, 2014 meeting (meeting no. 7225), the United Nations Security Council, through its President, issued a statement, saying, "The Security Council calls for full respect of humanitarian law, including protection of the civilian population." [Statement by the President of the Security Council, United Nations Document S/PRST/2014/13, July 28, 2014] The reference to the "civilian population" encompassed civilians in both Gaza and Israel. Hence, the Security Council was characterizing the rocket fire from Gaza into Israel as governed by humanitarian law. Humanitarian law applies only to armed conflict, i.e., war, whether international in character or not. As a result, the Security Council's view of the Gaza-Israel hostilities was that they constituted a war.

Quigley Report
Page 9 of 10

Israel used humanitarian law in alleging violations by Hamas. Alan Baker, formerly a legal officer in Israel's Foreign Ministry, said that Hamas' "indiscriminate targeting of Israel's civilian population centers" amounted to "violations of international humanitarian law for which Hamas' leaders and commanders are accountable and prosecutable." [Alan Baker, *The Legal War: Hamas' Crimes Against Humanity and Israel's Right to Self-Defense*, 2014]

Israel has responded to the International Criminal Court since the Office of the Prosecutor opened a preliminary examination of the Gaza-Israel hostilities. Israel's purpose in so doing was to object to the Court's jurisdiction. Israel did not address the substance of what the Court is examining. In particular, it did not argue that what was being examined was not a war. [Israel provides ICC with information on 2014 Gaza War, *Times of Israel*, June 3, 2016]

The fact that investigations were conducted under humanitarian law as to whether war crimes under international law occurred is a clear indication that there is a war, as demonstrated by the investigations and the actions taken by the various parties.

*Terrorist acts during a war*

If acts that constitute terrorism were committed during the 2014 Gaza-Israel conflict, that fact does not negate the character of the conflict as a war. The characterization of an organization as terrorist is not relevant to whether that organization is at war, or to the status of that organization as being either a state or a non-state. Acts of terrorism can be committed during a war. The Geneva Conventions govern the legality of acts committed during war by states. The Protocol Additional to the Geneva Conventions of 12 August 1949 and relating to the Protection of Victims of International Armed Conflict (June 8, 1977) provides, in Article 51(2), "Acts or threats of violence the primary purpose of which is to spread terror among the civilian population are prohibited." Hence an organization at war, whether a non-state, a state, or a quasi-state is capable of spreading "terror" by engaging in acts of violence that is considered terrorism. The firing of rockets that spread terror in the civilian population of Israel can be acts of war, and here they were acts of war. The characterization of an entity as terrorist is a description of what the entity does, not what it is. A non-state entity can engage in terrorist acts. A state can engage in terrorist acts. And, historically even world wars that the United States was involved in included what some people believed to be acts of terror. But, that in no way lessens the fact that there was a war. And, that is the case with the conflict between Hamas and Israel in 2014.

*Warlike action*

In addition to the above analysis, it is my opinion that the military measures taken in the 2014 Gaza-Israel hostilities constituted warlike action, and that that action was, on each side, taken by a military force. The military units associated with Hamas and operating in Gaza constituted a military force, given their level of organization as such. Those units are called the Izz ad-Din al-Qassam Brigades, formed in 1991 and operating out of Gaza. In 2006, they engaged the Israel Defense Force, when it sent troops into Gaza. On the Israeli side, the Israel Defense Force is a military force, rated among the world's strongest, possessing advanced fighter jets and deployable nuclear weapons. During the 2014 hostilities, each side took action that was warlike

in character. Additionally, each side took military action that it regarded as defending against attack by the other side, and in so doing used military personnel.

The International Criminal Court described the course of Operation Protective Edge as follows: "The Operation consisted of three phases: after an initial phase focused on air strikes, Israel launched a ground operation on 17 July 2014, followed by a third phase of the operation launched on 5 August characterised by alternating ceasefires and aerial strikes. The hostilities ended on 26 August 2014 with both sides agreeing to an unconditional ceasefire." [International Criminal Court, Office of the Prosecutor, Report on Preliminary Examination Activities 2016, paragraph 114] This description depicts "warlike" action.

The 2014 Gaza-Israel hostilities were waged with weapons of war. Rockets from Gaza reached as far as Tel Aviv, causing disruption at Israel's international airport. The Israel Defense Forces reported during the hostilities that rockets were fired into Israel capable of reaching Israel's largest population centers and endangering 3.5 million Israeli lives. The military installations in Gaza that figured in the hostilities were numerous and sophisticated. The Israel Defense Forces reported that they bombed by air in Gaza 1,678 rocket launching facilities, 977 command and control centers, 237 military administration facilities, 191 weapons storage and manufacturing facilities, and 144 training and military compounds. [Israel Defense Forces, *Operation Protective Edge by the Numbers*, August 5, 2014] The rockets emanating from Gaza were sophisticated in mode of launching, as they were planted underground and were launched from a distance by remote control. [William Booth, Here's what really happened in the Gaza war (according to the Israelis), *Washington Post*, September 3, 2014]  Additionally, Israel utilized tanks, armored personnel carriers and gunboats, each of which constitute weapons of war.  And, Israel executed a ground invasion with soldiers using military weapons.

Israel's targeting was sufficiently sophisticated that Israel was able to strike particular apartments within high-rise apartment buildings. Israel's air strikes were sufficiently extensive that they resulted in the demolition of several neighborhoods in Gaza. The UN Human Rights Council characterized the hostilities as an "Israeli military assault on the occupied Gaza Strip." [Human Rights Council Resolution A/HRC/RES/S-21/1, July 23, 2014, preamble] Israel protected itself from Gaza-launched rockets with its highly sophisticated "iron dome" missile defense system.

## Conclusion

Based on my information and on my work over many years in the law relating to warfare and statehood, and taking into account the aforesaid considerations, I find the Gaza-Israel conflict of 2014 to have constituted a war. Additionally, I find that warlike action was taken by each side and included the use of weapons of war.

John Quigley

# EXHIBIT '1'

CURRICULUM VITAE
JOHN QUIGLEY

Moritz College of Law
The Ohio State University
55 West Twelfth Avenue
Columbus, Ohio 43210
Tel: (614) 292-1764

POSITIONS HELD

Professor Emeritus, Moritz College of Law, The Ohio State University, 2013 to date

President's Club Professor in Law, The Ohio State University, 1999-2013

Professor of Law, The Ohio State University, 1974-1999

Professor in Law, University of Dar es Salaam, Tanzania, 1982-1983 (on leave from The Ohio
State University)

Associate Professor, College of Law, The Ohio State University; and Adjunct Associate
Professor, Department of Political Science, The Ohio State University, 1972-1974

Assistant Professor, College of Law, The Ohio State University; and Adjunct Assistant
Professor, Department of Political Science, The Ohio State University, 1971-1972

Assistant Professor, Department of Slavic Languages and Literatures; Adjunct Assistant
Professor, College of Law; and Adjunct Assistant Professor, Department of Political Science,
The Ohio State University, 1969-1971

Research Associate in Law, Harvard Law School, 1967-1969

Research Fellow (via U.S.-U.S.S.R. cultural exchange program), Department of Civil Law,
Faculty of Law, Lomonosov Moscow State University, 1966-1967

EDUCATION

Harvard Law School, LL.B. 1966

Harvard University, M.A. in Regional Studies (U.S.S.R.) 1966

Harvard College, A.B. 1962 (cum laude)

BAR ADMISSIONS

Massachusetts (1967), Ohio (1973), United States District Court Southern District of Ohio (1976), United States Court of Appeals Sixth Circuit (1986), United States Supreme Court (1989), United States Court of Appeals Fourth Circuit (1997)

## AWARDS

Law Review Article of the Year for Scholarly Contribution to the Field of Penal Law, from the American Branch of the International Association of Penal Law, 2004

Special Recognition, House of Representatives, 121st General Assembly of Ohio, 1995

Distinguished Scholar Award, Ohio State University, 1995

Outstanding Professor Award, Ohio State University College of Law and the Law Alumni Association, 1998

## INTERNATIONAL LITIGATION

Consultant to Government of Mexico in *Avena and other Mexican Nationals (Mexico v. U.S.A.)*, International Court of Justice, Hague, Netherlands, 2003

Petitioner, Inter-American Commission on Human Rights, Organization of American States, Washington, D.C., in case of Juan Raul Garza, 1999

Petitioner, Inter-American Commission on Human Rights, Organization of American States, Washington, D.C., in case of Cesar Fierro, Case No. 11.331, decision December 20, 2003

Petitioner, Inter-American Commission on Human Rights, Organization of American States, Washington, D.C., in case of Carlos Santana, 1993

Brief and oral presentation, Committee on the Rights of the Child, Geneva, Switzerland, 2002

Consultant to Plaintiff in *Cintas Foundation v. Sotheby's*, Case No. 1991-C-No. 8334 High Court of Justice, Queen's Bench Division, London, England, 1998

Brief and Oral Argument, Request for Advisory Opinion, Inter-American Court of Human Rights, Organization of American States, San Jose, Costa Rica, 1998

Advocate and Counsel to the Government of Bosnia and Herzegovina, International Court of Justice, Hague, Netherlands, *Case Concerning Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Yugoslavia (Serbia and Montenegro))*, 1993-1994

AMICUS CURIAE BRIEFS ON INTERNATIONAL LAW ISSUES

Medellin v. Texas, U.S. Supreme Court, Case No. 06-984 (on Vienna Convention on Consular Relations), as counsel for the European Union, 2007

Maharaj v. Secretary for the Department of Corrections for the State of Florida, U.S. Supreme Court, Case No. 05-1555 (on Vienna Convention on Consular Relations), as counsel for the European Union (co-authored with S. Adele Shank), 2006 (request for certiorari)

Sanchez-Llamas v. Oregon, Bustillo v. Virginia, U.S. Supreme Court, Cases No. 04-10600 & 05-51 (on Vienna Convention on Consular Relations), as counsel for the European Union (co-authored with S. Adele Shank), 2005 (merits stage)

Medellin v. Dretke, U.S. Supreme Court, Case No. 04-5928 (on Vienna Convention on Consular Relations), as counsel for the European Union and Council of Europe), 2005 (merits stage)

Medellin v. Dretke, U.S. Supreme Court, Case No. 04-5928 (on Vienna Convention on Consular Relations), as counsel for the European Union and Council of Europe, 2004 (request for certiorari)

Poland and Madej v. Schomig, U.S. Supreme Court (on execution of foreign nationals), 2000

State v. Madej and Consul General for the Republic of Poland in Chicago, Supreme Court of Illinois, 1999

State v. Ramirez, Court of Appeals of Ohio, 11th District (consular access claim by foreign national murder defendant), 1998

Murphy v. Netherland, Warden, U.S. Supreme Court (seeking *certiorari* in Virginia murder case), 1997

Murphy v. Netherland, Warden, U.S. Court of Appeals, Fourth Circuit (seeking *habeas corpus* relief in Virginia murder case), 1996

Ohio v. Loza, Supreme Court of Ohio (on consular access claim by murder defendant), 1997

Ohio v. Loza, Ohio Court of Appeals, 12th District (on consular access claim by murder defendant), 1996

U.S. v. Berkan, Case No. 79-1528, U.S. Court of Appeals, First Circuit (on territorial status of naval base in Puerto Rico), 1981


GOVERNMENTAL CONSULTANCIES ON INTERNATIONAL LAW ISSUES

U.S. Information Agency, 1999, consulted with Legislative Initiative Foundation, a non-governmental human rights organization in Belarus

U.S. Information Agency, 1998, made presentations in Russian in Minsk, Belarus, as follows:
- "Implementation in Domestic Courts of Provisions of Treaties," Belarusian State University, International Relations Department, December 14, 1998
- "Programs to Promote the Rule of Law in East Europe: Success and Failure," Belarusian State University, International Relations Department, December 14, 1998
- "The Court System in the United States," Institute of Management of the President of Belarus, Law Department, December 15, 1998
- "Legal Profession in the United States," Minsk City Bar Association, December 16, 1998
- "Education in Human Rights Law," at United States Information Agency Office, December 17, 1998
- "Freedom of Speech: International Standards and the Experience of the United States," Belarusian Association of Journalists, December 17, 1998

Governor of Ohio Commission on Hispanic/Latino Affairs, 1999 (on internationally protected rights applicable to Hispanics arrested on criminal charges in Ohio)

U.S. Agency for International Development, consulted with Supreme Court of Ethiopia, Addis Ababa, Ethiopia, on due process standards in pending trials of officials of prior regime, November 1994

U.S. Agency for International Development, evaluated U.S.-funded programs under the Rule of Law Project in Poland, Lithuania, and Bulgaria during three-week fact-finding mission, March-April 1993

U.S. Agency for International Development, assessed the rule of law situation in Ukraine, Belarus, and Moldova and formulated guidelines for future US-funded law reform projects, 1993-1994

John Quigley: Publications (last ten years)

**BOOKS**

Soviet Legal Innovation and the Law of the Western World, Cambridge University Press, 2007

Consular Law and Practice, Oxford University Press, 2008

The Law of Consular Access: A Documentary Guide, Routledge/Cavendish, 2009

The Statehood of Palestine: International Law in the Middle East Conflict, Cambridge
University Press, 2010

The Six-Day War and Israeli Self-Defense: Questioning the Legal Basis for Preventive War,
Cambridge University Press, 2013

The International Diplomacy of Israel's Founders: Deception at the United Nations in the Quest
for Palestine, Cambridge University Press, 2016

**ARTICLES**

"Justice in the Palestine-Israel Conflict," in Justice In Particular: Festschrift in Honour of
Professor P. J. Kozyris, Sakkoulas Publishers, 2007, pp. 331-349

"Security Council Resolution 242 and the Right of Repatriation," Journal of Palestine Studies,
Vol. 37, No. 1 (2007), pp. 49-61

"The Palestine Refugee Repatriation in the American Discourse," New Centennial Review, vol.
8, no. 2 (Fall 2008), pp. 273-286

"The International Court of Justice as a Forum for Genocide Cases," Case Western Reserve
Journal of International Law, Vol. 40, nos. 1-2 (2008), pp. 243-263

"In Memory of Harold J. Berman," Emory Law Journal, Vol. 57, No. 6 (2008), pp. 1439-1441

"Must Treaty Violations Be Remedied?: A Critique of Sanchez-Llamas v. Oregon," Georgia
Journal of International and Comparative Law, Vol. 36, No. 2 (2008), pp. 355-380

"'If You Are Not a United States Citizen . . .': International Requirements in the Arrest of

1

Foreigners", Ohio State Journal of Criminal Law, Vol. 6, no. 2 (2009), pp. 661-679

"President Bush's Directive on Foreigners under Arrest: A Critique of *Medellin v. Texas*", Emory International Law Review, Vol. 22, No. 2 (2009), pp. 423-454

"The United States' Withdrawal from International Court of Justice Jurisdiction in Consular Cases: Reasons and Consequences," Duke Journal of Comparative and International Law, Vol. 19, No. 2 (2009), pp. 263-305

Entry "Camp David Accords (1978)," Max Planck Encyclopedia of Public International Law (Max Planck Institute, Heidelberg and Oxford University Press 2009), vol. 1, pp. 1104-1108

"Genocide: A Useful Legal Category?", International Criminal Justice Review, vol. 19, no. 2 (2009), pp. 115-131

The International Criminal Court and the Gaza War, Palestine Yearbook of International Law, vol. 16 (2010), pp. 25-53

"Britain's Secret Re-Assessment of the Balfour Declaration. The Perfidy of Albion," Journal of the History of International Law (Max Planck Institute for Comparative Public Law and International Law), Vol. 13, No. 2, pp. 249-283 (2011)

"Palestine Is a State: A Horse with Black and White Stripes Is a Zebra," Michigan Journal of International Law, Vol. 32, No. 4, pp. 749-764 (2011)

"How to Fight Terror," William Mitchell Law Review (Journal of the National Security Forum), vol. 37, no. 5 (2011), pp. 5174-5186

"Palestine at the United Nations: What Does It Take to Be a State?", ILSA Quarterly (International Law Students Association), Vol. 20, No. 2, pp. 29-34 (2011)

"Who Admits New Members to the United Nations? (Think Twice Before You Answer), George Washington International Law Review, vol. 44, no. 2 (2012), pp. 179-241

"A Tragi-Comedy of Errors Erodes Self-Execution of Treaties: *Medellin v. Texas* and Beyond," Case Western Reserve Journal of International Law, Vol. 45, Nos. 1 & 2 (2012), pp. 403-433

"The Palestine Declaration to the International Criminal Court: The Statehood Issue," Rutgers Law Record, vol. 3 (2009), reprinted in Chantal Meloni and Gianni Tognoni (eds.), Is There a

2

Court for Gaza? A Test Bench for International Justice, T.M.C. Asser Press (2012), pp. 429-440

"The Status of Jerusalem after the Admission of Palestine to the United Nations," in Membership of Palestine in the United Nations: Legal and Political Implications (Cambridge Scholars Publishing, 2013)

"The Vienna Convention on Consular Relations: In Retrospect and into the Future," Southern Illinois University Law Journal, Vol. 38 (2013), pp. 1-25

"Why Britain Did Not Abandon the Balfour Declaration," in Maria Holt (ed.), Britain's Legacy in Palestine, Cambridge Scholars Publishing (2014)

"Israel's Settlements as a War Crime in the International Criminal Court," The Link (2014)

"Finding a Way Forward for Crimea," Cambridge Journal of International and Comparative Law, posted March 5, 2014 (on line only)

# EXHIBIT '2'

<u>Documents</u>

Plaintiff's Response to Interrogatories
First Amended Complaint
Atlantic Specialty's Answer to First Amended Complaint
Atlantic Specialty's First Amended Responses to Plaintiff's Interrogatories
Atlantic Specialty's Second Amended Responses to Plaintiff's Interrogatories
Policy
OneBeacon's Denial Letter (07/28/2014)
NBC's Response to Denial Letter (08/13/2014)
OneBeacon's Reply (09/19/2014)
Plaintiffs' Production Bates-Numbered UCP000137 - UCP000245


<u>News Articles</u>

MSNBC
http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies

NBC News
http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

The Wall Street Journal
http://www.wsj.com/articles/israel-pulls-forces-from-gaza-as-cease-fire-begins-1407231543

The New York Times
https://www.nytimes.com/2016/08/25/world/middleeast/israel-gaza-war.html
https://www.nytimes.com/2014/08/30/world/middleeast/50-days-of-war-leave-israelis-and-palestinians-only-more-entrenched.html

Time Magazine
http://time.com/3076594/israel-gaza-cease-fire-hamas-netanyahu/
http://time.com/3082458/gaza-war-crimes-israel-palestine/

The Washington Post
https://www.washingtonpost.com/news/worldviews/wp/2014/09/03/heres-what-really-happened-in-the-gaza-war-according-to-the-israelis/?utm_term=.e7ccbabd8102

U.S. News and World Report
http://www.usnews.com/news/world/articles/2016-08-24/israel-clears-forces-in-several-deadly-2014-gaza-war-cases
http://www.usnews.com/news/articles/2014/08/07/saudi-arabia-and-the-third-gaza-war

The Independent
http://www.independent.co.uk/news/world/middle-east/israel-gaza-conflict-50-day-war-by-numbers-9693310.html

The Los Angeles Times
http://www.latimes.com/world/middleeast/la-hp-storygallery-middle-east-conflict-storygallery.html
http://www.latimes.com/world/middleeast/la-fg-un-report-gaza-war-20150622-story.html

BBC News
http://www.bbc.com/news/world-middle-east-28252155
http://www.bbc.com/news/world-middle-east-33128955

Haaretz News (Israeli News Outlet)
http://www.haaretz.com/israel-news/.premium-1.612437

Middle East Quarterly
http://www.meforum.org/5084/rethinking-operation-protective-edge

Associated Press
http://bigstory.ap.org/article/3caf434feda5453dbd9df7477363489a/israel-clears-forces-several-deadly-2014-gaza-war-cases

Jerusalem Center for Public Affairs
http://jcpa.org/timeline-key-moments-gaza-war/

USA Today
http://www.usatoday.com/story/news/world/2016/08/10/gaza-city-families-displaced-war-israel/88002220/

Chicago Tribune
http://www.chicagotribune.com/news/opinion/commentary/ct-deaths-babies-gaza-war-palestinians-perspec-0129-20150128-story.html

Chicago Sun Times
http://chicago.suntimes.com/politics/decimated-hamas-makes-ludicrous-claims/

The Denver Post
http://www.denverpost.com/2014/08/26/israel-and-hamas-reach-an-uneasy-cease-fire-in-50-day-gaza-war/

The Dallas Morning News
http://www.dallasnews.com/news/news/2014/08/26/gaza-cease-fire-reached-after-50-day-war-that-killed-2200-and-settled-little

2

Newsday
http://www.newsday.com/news/world/at-un-israeli-and-palestinian-leaders-air-differences-1.12354379

The Houston Chronicle
http://www.houstonchronicle.com/news/nation-world/world/article/Israeli-house-strikes-killed-mostly-civilians-6080436.php

The Guardian
https://www.theguardian.com/world/2014/aug/26/gaza-ceasefire-israel-palestinians-halt-fighting

The Times of India
http://timesofindia.indiatimes.com/world/middle-east/Israel-Gaza-conflict-50-day-war-by-numbers/articleshow/41000781.cms

The Sydney Morning Herald
http://www.smh.com.au/comment/why-israel-lost-the-war-in-gaza-20140808-101ruh.html

China Daily
http://www.chinadaily.com.cn/world/2014-08/28/content_18500736.htm

The Daily Mail
http://www.dailymail.co.uk/news/article-2740643/Inside-bombed-Gaza-One-week-end-50-day-war-true-scale-devastation-revealed.html

The Telegraph
http://www.telegraph.co.uk/news/worldnews/middleeast/israel/11769685/Israel-may-have-committed-crimes-against-humanity-says-Amnesty.html


## Hard copies of articles associated with links

13,000 families in Gaza still displaced two years after war with Israel
USA Today - August 10, 2016

50 days of War Leave Israelis and Palestinians Only More Entrenched
The New York Times – August 29, 2014

After Seven Weeks of Gaza War, Hamas 1, Israel 0
Hareetz – January 11, 2017

Children suffer and die in Gaza. Who notices?
Chicago Tribune – January 29, 2015

3

Decimated Hamas makes ludicrous claims
Chicago Sun Times – September 5, 2014

Gaza casefire: Israel and Palestinians agree to halt weeks of fighting
The Guardian – August 27, 2014

Gaza cease-fire reached after 50-day war that killed 2,200 and settled little
DallasNews – August 24, 2016

Gaza-Israel conflict: Is the fighting over?
BBC – August 26, 2014

Here's what really happened in the Gaza ward (according to the Israelis)
The Washington Post – September 3, 2014

How Technology Is Intensifying Gaza War Between Israel and Hamas
NBC News – July 30, 2014

Inside bombed-out Gaza: One week on from end of 50-day war and the true scale of devastation is revealed
Daily Mail – September 2, 2014

Israel and Hamas may have committed war crimes in Gaza, U.N. report says
Los Angeles Times – June 22, 2015

Israel and Hamas reach an uneasy cease-fire in 50-day Gaza war
The Denver Post – August 26, 2014

Israel clears forces in several deadly 2014 Gaza war cases
Associated Press – August 24, 2016

Israel Clears Troops in Airstrike Near School in 2014 Gaza War
The New York Times – August 24, 2016

Israel may have committed crimes against humanity, says Amnesty
Telegraph UK – July 29, 2015

Israel Seeks to Gain Advantage by Reversing Course in Gaza
Time Magazine – August 3, 2014

Israel, Hamas Set Out Demands on Gaza
Wall Street Journal - August 6, 2014

Israel – Gaza conflict: 50-day war by numbers
The Times of India - August 27, 2014

4

Israel-Gaza conflict: 50-days war by numbers
The Independent – August 27, 2014

Israeli 2014 Gaza war actions lawful, report says
BBC – June 14, 2014

Israeli house strikes killed mostly civilians
Houston Chronicle – February 13, 2015


**Additional News Articles**

A news article published by the Washington Post, dated July 10, 2014, by Griff Witte and
William Booth, entitled "As cease-fire with Hamas fails to take shape, Netanyahu says, 'Our
answer is fire.'" This article is available at: https://www.washingtonpost.com/world/israel-
accepts-truce-plan-hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-
923ecc0c7d23_story.html?utm_term=.e99302eb1314.

A news article published by MSNBC dated July 18, 2014, by Benjamin Landy and Maria Lokke,
entitled "Scenes of war and heartbreak as Israeli ground forces invade Gaza." This article is
available at: http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-
intensifies.

A news article published by MSNBC dated July 18, 2014, by David Taintor, entitled "Obama
points to rebels in downed Malaysian jet." This article is available at:
http://www.msnbc.com/msnbc/obama-american-dead-malaysia-airlines-crash.

A news article published by MSNBC dated July 16, 2014, by Donna Stefano, entitled "In Israel
and Palestine, children imagine a world without war." This article is available at:
http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-world-without-war.

A news article published by the Times of Israel by Adiv Sterman, dated July 16, 2014, entitled
"Ground incursion in Gaza said 'very likely.'" This article is available at:
http://www.timesofisrael.com/idf-ground-incursion-in-gaza-very-likely/.

A collection of "LiveBlogs" published by the Times of Israel on July 7, 2014, by Itamar Sharon,
Marissa Newman, and Ilan Ben Zion, entitled "Israel launches 'Protective Edge'
counteroffensive on Gaza, Jewish suspects reenact teen's murder." This collection is available at:
http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-violence-continues/#!.

A news article published by Middle East Eye dated July 8, 2014, entitled "Hamas claims
responsibility for rockets fired at Jerusalem, Tel Aviv and Haifa." This article is available at:
http://www.middleeasteye.net/news/israels-army-prepared-ground-assault-gaza-official-
275282816.

A news article published by the Global News, dated July 9, 2014, entitled "UPDATE: Israel hits key Hamas targets in Gaza offensive." This article is available at: http://globalnews.ca/news/1438089/israel-strikes-hamas-targets-in-gaza-to-stop-rocket-fire/.

A news article published by the Global News, dated July 15, 2014, entitled "Israel: Hamas to pay price for its 'no' to truce." This article is available at: http://globalnews.ca/news/1451058/israel-hamas-to-pay-price-for-its-no-to-truce/.

The news article entitled "LIVE UPDATES: Operation Protective Edge, Day 7," published by Haaretz on July 15, 2014. The article is available at:  http://www.haaretz.com/israel-news/1.604898#!.


**Links to Additional News Articles**

http://www.haaretz.com/israel-news/LIVE-1.774365/Gaza-war-hamas-humanitarian-crisis

http://www.jpost.com/Israel-News/Politics-And-Diplomacy/State-comptroller-report-on-2014-Gaza-war-due-today-482789

http://www.cnn.com/2017/02/28/middleeast/israel-gaza-report/

https://www.ft.com/content/a4291a06-fdcc-11e6-96f8-3700c5664d30


**News Clips**

http://www.nbcnews.com/video/msnbc2/56804549#56804549

http://www.msnbc.com/the-last-word/watch/mh17-mystery-and-war-in-gaza-308247107963

http://www.msnbc.com/melissa-harris-perry/watch/what-it-means-to-live-in-a-war-zone-309370947801

http://www.msnbc.com/all-in-with-chris-hayes/watch/day-breaks-in-gaza-following-invasion-307348035939

http://www.msnbc.com/all-in-with-chris-hayes/watch/ground-war-in-gaza-307290179722

http://www.nbcnews.com/video/from-aug-2-2014-ayman-mohyeldin-reports-on-gaza-war-469303875925

http://www.nbcnews.com/watch/nightly-news/bloodiest-day-in-israels-fight-in-gaza-kills-more-than-70-309590595847 - uses the word "war" at about 2:53

6

http://www.nbcnews.com/watch/nightly-news/israeli-palestinian-conflict-brings-heaviest-fighting-in-years-299767363744 - broadcast on July 8, the first day of Operation Protective Edge, notes that this "could easily become the next war"

http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

http://timesofindia.indiatimes.com/world/middle-east/Israel-Gaza-conflict-50-day-war-by-numbers/articleshow/41000781.cms

http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

https://www.theguardian.com/world/video/2014/jul/09/israeli-airstrikes-gaza-hamas-rocket-attacks-video


**Additional Materials**

Congressional Research Service Reports
https://fas.org/sgp/crs/mideast/RL34074.pdf
January 31, 2014 by Jim Zanotti

https://fas.org/sgp/crs/mideast/R41514.pdf
December 2, 2010 by Jim Zanotti

US State Department Human Rights Report Israel 2014
https://www.state.gov/documents/organization/236814.pdf

Jerusalem Center for Public Affairs
Key Moments in a 50-Day War: A Time by Daniel Rubenstein
http://jcpa.org/timeline-key-moments-gaza-war/

Report of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1* ** ***United Nations General Assembly Human Rights Council, Twenty-ninth session, Human rights situation in Palestine and other occupied Arab territories, 24 June 2015.

Report of the detailed findings of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1* ** ***United Nations General Assembly Human Rights Council, Twenty-ninth session, Human rights situation in Palestine and other occupied Arab territories, 23 June 2015.

An Assessment of the 2014 Gaza Conflict, High Level Military Group, October 2015
http://www.high-level-military-group.org/pdf/hlmg-assessment-2014-gaza-conflict.pdf

Fragmented Lives Humanitarian Overview 2014
https://www.ochaopt.org/documents/annual_humanitarian_overview_2014_english_final.pdf

# EXHIBIT 'B'

*Universal Cable Productions LLC and Northern Entertainment Productions LLC*

*v*

*Atlantic Specialty Insurance Company*


Expert Report


by


Professor Dr. Ingrid Detter de Frankopan


I.  Qualifications


1.  I am Professor Dr. Ingrid Detter de Frankopan, D.Phil (Oxford); Jur.Dr
(Stockholm); Jub. Dr. (Stockholm); Lic. en droit (Paris); Dipl. Diritto Europeo (Turin),
Barrister-at-law at the Bar of England and Wales, and Lindhagen Professor Emeritus
of International Law at Stockholm University as well as former Fellow of St. Antony's
College and of Lady Margaret Hall, Oxford University.


2.  For over thirty years I have specialized in the law of war and armed conflict and
related fields.  My comprehensive work *The Law of War* [1] is now in its third edition. I
have also published substantial articles on the topics relating to armed conflict.[2] I have
published a further 14 other books on various central topics of international law,
including matters concerning sovereignty [3], independence and statehood [4] and on
intervention.[5] I have also assisted the US Department of State in two trials in the US
Supreme Court.[6] In these Cases my work on *The Law of War* was the only academic

---

[1] *The Law of War*, 1st ed., Cambridge: Cambridge University Press, (CUP), 1989; 2nd ed.,
Cambridge: Cambridge University Press, (CUP), 2000; 3rd ed., London: Ashgate, 2013.
[2] 'Illegal combatants and the Law of War', *Law Journal of George Washington University*,
2007; 'Extraordinary rendition', *University of North Carolina Law Journal*, 2008;
[3] *The International Legal Order*, London: Gower, 2nd ed., 1995;
[4] *International Law and the Independent State*, London: Gower, 2nd ed. 1987;
[5] 'New aspects of sovereignty and the Right to Protect – R2P', *St. Thomas More Institute*,
London, 2011, available at http://thomasmoreinstitute.org.uk/papers/1890/
[6] *Hamdi v. Rumsfeld*, (2004) 542 U.S. 507, 509 and *Rumsfeld v. Padilla*, (2004) 542 U.S. 426, 430.

work cited by the Department of State in their Pleadings. I have not testified at trial or in deposition in any other matter in the last four years. I have advised in the International War Crimes Tribunal for Former Yugoslavia, for example, in the *Case of General Gotovina*, acquitted on appeal. Furthermore, I was Advisor on International Law to Pope John Paul II for 23 years. A copy of my curriculum vitae is attached hereto as Exhibit '1'.

3. My compensation for work in this matter is $500.00 per hour. This compensation is not based in any way on the opinions provided in this report.

4. The materials that I have reviewed and considered are referenced herein or are attached hereto as Exhibit '2'.

II.  Purpose of Report

5. I have been asked by the Defendant in the Case *Universal Cable Productions LLC and Northern Entertainment Productions LLC v Atlantic Speciality Insurance Company* to prepare an independent Expert Report on the nature of the conflict between Hamas and Israel during the relevant time June - August 2014.

6. My report addresses whether, at the time, there was a 'state of war' or 'war-like activities' and the use of 'weapons of war' in the relevant area in and near Israel and Gaza.

III  Summary of Opinions

7. The prolonged and intense fighting between Hamas and Israel from June – August 2014 constituted a 'war' or 'war like activities' and involved the use of weapons of war, as understood in common language. In my opinion too, and based on my extensive experience, training and knowledge in this area, this was certainly a full scale 'war.'

8. The type of fighting in this conflict, that lasted for 50 (or 51) days, was both intense and sustained and showed all the essential elements to qualify this as a war situation. There was shelling and use of heavy weapons on both sides. There were air-force attacks by Israel countered by heavy artillery and rockets launched by Hamas. Israel deployed ground forces and Hamas counterattacked through tunnels from the Gaza strip.

9. On both sides in the conflict battles were fought by uniformed soldiers, answering to hierarchical commands as in traditional war situations.

10. Casualties were considerable on both sides and in this respect as well, the conditions of required level of intensity and length of sustained attacks were fulfilled for the conflict to be classified as a 'war' rather than be considered to constitute mere sporadic attacks or incursions.

11. In my experience as an Expert on what constitutes 'war', I have no hesitation to confirm that the 50 Day armed conflict between Hamas and Israel in July-August 2014 amounted to a 'war'.

IV.  Chronology of Events

12. The 50-Day War in 2014 was fought by Israel–Hamas. The conflict is also known as 'The Gaza War' or as 'Operation Protective Edge' (or Operation Cliff).  On 12 June three Israeli teenagers were kidnapped. When these young people were found murdered on 24 June, there was outrage in Israel: there was evidence that it was two Hamas members who had killed the teenagers.

13. The exact chronology in the 50-Day War is not clear - as often in military conflict when one side claims to have acted in response, and self-defense, to attacks of the other side. Both sides often claim to be the victimized target.

14. What is undisputed is that Hamas had engaged in military acts for several weeks,

or months, before June 2014. As early as January 2014, the United States and the United Kingdom issued travel warnings to visitors to Israel. But during the first week of July 2014, when Operation Protective Edge was launched, until 26 August 2014 the attacks by Hamas, and the response by Israel intensified to amount to full scale war.[7]

15. Thus, although the tensions between Israel and Hamas had gone on for some time, the tragic event of the murdered Israeli teenagers and the       subsequent military responses by both sides, caused Israel to launch a forceful military operation on 8 July 2014 in the Hamas Ruled Gaza strip. In response Hamas started new rocket attacks,

---

[7] There were numerous reports about the 'war scenes' and virtually *all* reports referred to the conflict as a 'war': See, *NBC News* http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536;
*The Wall Street Journal*:
http://www.wsj.com/articles/israel-pulls-forces-from-gaza-as-cease-fire-begins-1407231543;
*The New York Times*:
https://www.nytimes.com/2016/08/25/world/middleeast/israel-gaza-war.html
https://www.nytimes.com/2014/08/30/world/middleeast/50-days-of-war-leave-israelis-and-palestinians-only-more-entrenched.html
*Time Magazine*:
http://time.com/3076594/israel-gaza-cease-fire-hamas-netanyahu/
http://time.com/3082458/gaza-war-crimes-israel-palestine/
*The Washington Post*:
https://www.washingtonpost.com/news/worldviews/wp/2014/09/03/heres-what-really-happened-in-the-gaza-war-according-to-the-israelis/?utm_term=.e7ccbabd8102
*U.S. News and World Report*:
http://www.usnews.com/news/world/articles/2016-08-24/israel-clears-forces-in-several-deadly-2014-gaza-war-cases
http://www.usnews.com/news/articles/2014/08/07/saudi-arabia-and-the-third-gaza-war
*The Independent*:
http://www.independent.co.uk/news/world/middle-east/israel-gaza-conflict-50-day-war-by-numbers-9693310.html
*The Los Angeles Times*:
http://www.latimes.com/world/middleeast/la-hp-storygallery-middle-east-conflict-storygallery.html
http://www.latimes.com/world/middleeast/la-fg-un-report-gaza-war-20150622-story.html
*BBC News*:
http://www.bbc.com/news/world-middle-east-28252155
http://www.bbc.com/news/world-middle-east-33128955
*Haaretz News (Israeli News Outlet)*:
http://www.haaretz.com/israel-news/.premium-1.612437
*Middle East Quarterly*:
http://www.meforum.org/5084/rethinking-operation-protective-edge
*Associated Press*:
http://bigstory.ap.org/article/3caf434feda5453dbd9df7477363489a/israel-clears-forces-several-deadly-2014-gaza-war-cases
*Jerusalem Center for Public Affairs*:
http://jcpa.org/timeline-key-moments-gaza-war/
*USA Today*:
http://www.usatoday.com/story/news/world/2016/08/10/gaza-city-families-displaced-war-israel/88002220/
*Chicago Tribune*:
http://www.chicagotribune.com/news/opinion/commentary/ct-deaths-babies-gaza-war-palestinians-perspec-0129-20150128-story.html

targeting Israeli cities and infrastructure, resulting in seven weeks of Israeli operations. The military activities of both sides amounted to full scale war, resulting in the death of thousands of people, the vast majority of them Gazans.

16. It is this conflict that became known, by all authorities, as the 50-Day War or the Gaza War.

17. Some say the war should be called the 51-Day War alleging that Israel had started its attacks on 7 July: 'It's a 51-day war, not a 50-day war as the corporate media repeatedly say. 50 days means the war started on 8 July, when Hamas' military wing fired rockets into southern Israel, not on 7 July, when Israel commenced an air strike. The difference of a day is the difference between portraying Hamas as the aggressor and Israel as acting in self-defense or acknowledging that Israel was the aggressor and Hamas acting in self-defense.'[8]

18. The Israeli air campaign went on until 17 July when Hamas widened its attack by intruding through tunnels and Israel then engaged ground forces to counterattack. Israeli ground forces withdrew on 5 August but Hamas air attacks and Israeli air response continued until 26 August when Hamas accepted a ceasefire.[9]

V. 'War'

19. The term 'war' should indeed be applied in the 'normal' sense of the word. That is how a 'normal person' would understand the term and the relevant situation.

20. An accepted definition of 'war' that surpasses the *de minimis* threshold of occasional or sporadic armed attacks is:

---

[8] Blumenthal, M., *The 51-Day War: Ruin and Resistance in Gaza*, New York: Nation books, 2016.

[9] Hamas had rejected or violated 11 earlier proposals of ceasefire: Rubinstein, D., 'Key moments in a 50-Day War : A Timeline', in the Study *The Gaza War 2014. The War Israel did not Want and the Disaster it Averted*, Jerusalem Center for Public Affairs, 2015. See, *ibid.* for a day-to-day account of the events 7 July-26 August 2014.

'War is…a sustained struggle by armed force of a certain intensity between groups of a certain size, consisting of individuals who are armed, who wear distinctive insignia and who are subjected to military discipline under responsible command.'[10]

21. Traditionally one distinguishes between inter-State wars and civil wars. Naturally, civil wars will have one side that is a non-State -- the insurgents or the rebels -- and one side that is the 'State'. We need only think of the American Civil War, an internal conflict fought in the United States from 1861 to 1865. The Union faced secessionists in eleven Southern states. The Union won the war, which remains the bloodiest in US history. No one would question whether this was a 'war'.

22. Nor would any question whether the American War of Independence, sometimes called the American Revolutionary War (1775–1783), an armed conflict between the United Kingdom and thirteen of its North American colonies, was a war.

23. In the aftermath of the Second World War it became clear that there were other 'wars' than those fought between States or those that could be classified as civil wars. In the first edition of my *Law of War*, I noted in 1988 that some wars were fought with non-States.[11] Later, an influx of books agreed and noted that the 'old' type of war was no longer prevalent.[12] A number of academic schemes were established to study the 'new' type of war in contemporary society. They all accept that armed conflicts between a State and a non-State may qualify as 'war.'

24. Among these schemes we may note '*The Changing Character of War Programme (CCW)*', a highly prestigious project at Oxford University, devoted to the interdisciplinary study of war and armed conflict. The title itself indicates that 'war' is not necessarily understood nowadays as it was traditionally to mean inter-State wars or possibly civil wars of some scale, but *also wars between States and non-States* as well as wars between two or more non-States. The Leverhulme Trust invited

---

[10] See my *Law of War, op. cit., loc.cit.*
[11] Detter, I., *The Law of War*, 1st ed., 1988, Cambridge: Cambridge University Press; *cf.* 3rd ed., London: Ashgate, 2013.
[12] For example, Kaldor, M., *New and Old Wars*, 1st ed., New York: John Wiley, 1991; *cf.* 3rd ed., 2012.

Universities in the United Kingdom in 2003 to compete for a five-year research grant to study 'The Changing Character of War'. Oxford University won this competition and the Program is now in its 15th year.[13] It is a policy-relevant research program based in Pembroke College, University of Oxford, enjoying global influence and international partnerships. CCW has a Working Group that analyses changing attitudes to 'war.' The group is Interdisciplinary in outlook and open to diverse theoretical and methodological to the study of armed conflict, civil war and related issues, such as peace building and post-war reconstruction.

25. *The Correlates of War Project (COW)* is another ongoing Project on War Studies.[14]This is conducted at the University of Michigan and is a project that seeks to facilitate the collection, dissemination, and use of accurate and reliable quantitative data of wars and armed conflict in international relations. Key principles of the project include a commitment to standard scientific principles of replication, data reliability, documentation, review, and the transparency of data collection procedures.

26. Under the auspices of COW, important studies have been published on the degree of violence to the threshold above which an armed conflict is to be classified as a 'war'. *The Correlates of War Project* started with an attempt to define war in terms of types of violence. Not only is war impossible without violence but the taking of human life the primary and dominant characteristic of war.[15] The definition of war hinges in the COW opinion on two primary criteria: the threshold of battle-related fatalities of troops in combat, and the status of the war participants. Thus, to constitute a 'war' there must have occurred 1,000 battle-related deaths or more in a calendar year to show that the level of hostilities differentiates war from other types of conflict.[16]

---

[13] For many years led by the renowned Professor Hew Strachan, see his important lecture of the Changing Character of War at the *Europaeum* in 2006,
http://www.europaeum.org/files/publications/pamphlets/HewStrachan.pdfpublished by Oxford University Press in 2007.
[14] www.correlatesofwar.org

[15] Small, M. & Singer, J.D., *Resort to Arms: International and Civil War, 1816-1980*, Beverley Hills: Sage,1982, 205-206.
[16] Singer, J.D., & Small, M., *The Wages of War 1816-1965: A Statistical Handbook*, New York: John

27. As for the intensity of the armed conflict between Hamas and Israel in July-August 2014, NBC reported as early on 1 August 2014, more than three weeks before the end of the conflict, that 'The death toll now surpasses the about 1,400 Palestinians killed during the Gaza war of 2008-2009.'[17] The ultimate death toll was around 2,200 on the Palestinian side; 73 Israelis were also killed.[18]

28. As 'war' in the present case must be understood in the 'normal sense of the word', we must stress that the conflict between Israel and Hamas has been consistently referred to as a 'war' in newspapers, press reports, televised programs and in reports by States.

29. Even the Israeli Government repeatedly referred to the escalation of the armed conflict with Hamas as a 'war'.[19] The newspapers in Israel consistently also referred to the conflict as a '*war*.'[20]

30. News reports in other countries also referred to the conflict as a '*war*'. For example, the Financial Times, among numerous other newspapers, referred to the conflict as a '*war*'.[21] CNN reported that the State Comptroller's Report criticized 'Prime Minister Benjamin Netanyahu's government, claiming it had no strategic goals

---

Wiley, 1972, described two types of international wars, inter-state and 'extra-systemic'. Small and Singer updated the data to include data on civil wars in *Resort to Arms: International and Civil War, 1816-1980*, Beverley Hills: Sage,1982. Sarkees, M. R. & Wayman, F., Sarkees, M.R., 'Defining and categorizing wars,' in Sarkees, M.R., and Whelon Wayman, F., *Resort to War: A Data Guide to Inter-State, Extra- State, Intra-State, and Non-State Wars, 1816–2007*. Washington, DC: CQ Press, 2010: 39-73).

[17] http://www.nbcnews.com/storyline/middle-east-unrest/gaza-death-toll-nears-1-500-72-hour-truce-israel-n170236
[18] See, the *U.S. State Department Report*, 53,
https://www.state.gov/documents/organization/236814.pdf
[19] The time 'before the 2014 war with Hamas and its allies in the Gaza Strip broke out' ... the Report by the State Comptroller Joseph Shapira 'on the war'..; stating statements made 'two days after the outbreak of the war,' http://www.haaretz.com/israel-news/LIVE-1.774365/Gaza-war-hamas-humanitarian-crisis.
[20] Jerusalem Post stated that State Comptroller Joseph Shapira would publish 'his landmark report on conduct during the 2014 Gaza war'.
http://www.jpost.com/Israel-News/Politics-And-Diplomacy/State-comptroller-report-on-2014-Gaza-war-due-today-482789
[21] https://www.ft.com/content/a4291a06-fdec-11e6-96f8-3700c5664d30

when the 50-day *war* started in early July 2014.'[22] NBC reported on 20 July 2014 that Benjamin Netanyahu Says Israel's *War* in Gaza Will Be 'Prolonged',[23] and on 30 July 2014 that Britain warns that support for Israel waned in the wake of the 'Gaza *war*'.[24] Under the headline 'Gaza *War*', NBC reported on 21 August 2014 that Hamas had admitted killing the Israeli Teenagers,[25] and under a similar headline of the 'Gaza *War*' on 7 December 2014, announcing that 'Israel Opens Eight New Investigations Into Military Operations'.[26](italics added).

31. The Report of the UN Human Rights Council in 2015 also suggested that Israel and Palestinians 'may be guilty of war-crimes'.[27] For anyone to have committed a 'war crime' there must have been a 'war'.

32. NBC announced on 27 August 2014 that 'Gaza Cease-Fire Holds Between Hamas and Israel After 50-Day War'.[28] In this context, it should be stressed that even to speak of a 'cease-fire' there would have to be a 'war.' One does not speak of 'cease-fires' in the case of occasional incursions or mere incidental attacks.

VI. War-Like Actions and Weapons of War

33. If a situation cannot be qualified as 'war' it may be classified as 'war-like' activities, for which the threshold is lower.

---

[22] http://www.cnn.com/2017/02/28/middleeast/israel-gaza-report/
[23] http://www.nbcnews.com/storyline/middle-east-unrest/benjamin-netanyahu-says-israels-war-gaza-will-be-prolonged-n167286.
[24] http://www.nbcnews.com/storyline/middle-east-unrest/public-support-israel-shifting-amid-gaza-war-britain-warns-n168366
[25] http://www.nbcnews.com/storyline/west-bank-kidnappings/gaza-war-hamas-admits-kidnapping-three-israeli-teens-n186176
[26] http://www.nbcnews.com/storyline/middle-east-unrest/gaza-war-israel-opens-eight-new-investigations-military-operations-n263241

[27] http://www.nbcnews.com/news/world/israel-palestinians-committed-possible-gaza-war-crimes-u-n-report-n379636. On the *Report of the Human Rights Council*, see further *infra.*
[28] http://www.nbcnews.com/storyline/middle-east-unrest/gaza-cease-fire-holds-between-hamas-israel-after-50-day-n189821

34. If the exchange of hostilities during the 50 Day armed conflict did not involve a war, which in my opinion it did, it at the very least involved war-like action, weaponry of war, war-like methods and resulted in considerable casualties.

35. By any standards, should it be disputed that this was a 'war', there is no question that it certainly involved 'war-like' hostilities by two military forces, bearing in mind the type of heavy weapons used as well as rockets, anti-aircraft guns, grenades and mines. The use of this weaponry certainly constituted the use of weapons of war.

VII. Why This Conflict Constitutes War

   A.  Under The Strict Definition Of War, Palestine Is A Quasi-State
       and Hamas is a Sovereign Or Semi-Sovereign

36. The Parties that engage in war do not have to be 'recognized' as States or even as 'belligerents' by their enemy. Nor does 'war' have to be declared.[29] A 'country', a 'nation' or a 'group', and even a 'terrorist organization' can be a belligerent in spite of non-recognition.[30] In fact, the overwhelming number of 'wars' and 'armed conflicts' in modern international society are waged precisely between a State, or a group of States, and a terrorist organization. Nevertheless, it is my opinion that Palestine is at the very least, a quasi-State.

37. Hamas is *de facto* governing the Gaza strip where it has installed a 'Government'; Hamas has various 'Ministries' that include administration    over areas such as health and education. Earlier disputes with Fatah, led by Arafat, concerned the competition to finally take over power in larger areas. But, during 2014 and since, it is Hamas that alone governs the entire Gaza strip. In that sense, Hamas is also a 'State-like' figure and a 'semi-sovereign'.

38. The United Nations Human Rights Commission noted in its Report in 2015 that there are some *non-State actors that exercise government-like functions* and control over a territory. This, said the Report, is the case with Hamas that is 'governing' the

---

[29] Detter, I., *The Law of War,*. 3rd ed., London: Ashgate, 2013, Chapter One.
[30] *The Fjeld*, Prize Court of Alexandria, 17 ILR 1950 345. *Diah v Attorney General*, Supreme Court of Israel, 19 ILR 1952 550.

Gaza Strip. The Commission reminded such 'government-like' bodies that they are obliged to respect human rights norms when their conduct affects the human rights of the individuals under their control.[31]

39. Moreover, Hamas has indicated that, in governing the Gaza Strip, it is

> 'determined (...) to promote the rule of law, the respect for the judiciary, the separation of powers, the respect for human rights, the equality among citizens; to fight all forms of discrimination; to protect public liberties, including the freedom of the press and opinion.'[32]

40. Hamas has also confirmed its commitment to

> 'respect (...) public liberties; to strengthen the establishment of democracy; to protect human rights (...); and its respect for international law and international humanitarian law insofar as they conform with our character, customs and original traditions'.[33]

41. There is no reason why Hamas, as a 'terrorist organisation,' cannot be a belligerent and take part as a side in a full scale war.

42. According to the authoritative *Uppsala Conflict Data Program (UCDP)* a non-State conflict is defined as 'War' is defined *according to the intensity level* of the conflict.[34] The survey of UCDP states thus that the relevant intensity level is set according to the number of deaths inflicted by the conflict regardless of whether the conflicting entities are states. The survey of UCDP states that the relevant intensity

---

[31] A/HRC/10/22, para. 21, A/HRC/2/7, para. 19.
[32] Speech delivered by Prime Minister Ismail Haniya at the conference organized by the PCHR on 'The New Government and the Agenda for Human Rights'. Gaza, June 2006.
[33] Text of the National Unity Government programme delivered by then Prime Minister Ismail Haniya before the Palestinian Legislative Council, 17 March 2007.
http://www.islamicnews.net/Document/ShowDoc09.asp?DocID=91477&TypeID=9&TabIndex=2
[34] Melander, E., Pettersson, T., & Themnér, L., 'Organized violence, 1989–2015',Uppsala Conflict Data Program, Uppsala University, *Journal of Peace Research* 2016, Vol. 53(5) 727–742;

level is set according to the number of deaths inflicted by the conflict.[35]

> 'Intensity level
> (state-based)
> The intensity variable denotes what level of fighting a state-based conflict
> or dyad reaches in each specific calendar year. The variable has two
> categories:
> **Minor:** At least 25 but less than 1000 battle-related in one calendar year.
> **War:** At least 1000 battle-related deaths in one calendar year.'[36]

43. The Gaza conflict July-August 2014 thus comes easily under the definition of 'war' according to a chart published by UCDP, showing more than 2000 deaths caused by the conflict.[37] The 50-Day Gaza War showed violence exceeding what had been seen for 30 years.[38]

44. Commentators have stated that:

> 'The Israel–Palestine conflict reached the highest level of intensity
> since the early 1980s as a result of 'Operation Protective Edge'
> launched in July 2014. Attempts at negotiations broke down in
> April and after the kidnapping and murder of three Israeli youths in
> June, violence escalated to levels not seen in more than 30 years.
> Individuals connected to Hamas were suspected of the murders, but
> the group officially denied involvement. Israel launched aerial
> bombings with the expressed goal of stopping Hamas missile fire,
> but also conducted a ground incursion, trying to destroy the tunnel
> system that Hamas used to attack Israeli targets. In late August,
> after two months of almost daily attacks, a ceasefire was agreed to
> through Egyptian efforts.'

45. To the extent Palestine needs to be a quasi-state to be an entity capable of engaging in war, it meets this definition. Additionally, Hamas may be considered as a semi-sovereign in so far as it has taken control and is effectively administering the

---

[35] http://www.pcr.uu.se/research/ucdp/definitions/

[36] A 'dyad' is defined by UDCP as: '**Dyad** (state-based, non-state). A dyad is made up of two armed and opposing actors. In state-based conflicts a dyad is defined as two actors, with one or more being the government, that have a stated incompatibility. In a non-State conflict a dyad is constructed by at least two organised actors, of which none is the government of a State, that oppose each other with arms. In non-state conflicts it is possible for an alliance of non-state actors to enter into a dyad with either an opposing group, or an alliance of opposing groups.
**Comment:** When studying one-sided events UCDP do not look at dyads but armed actors (a government or a formally organised non-state group) attacking the civilian population; **Dyad active** (state-based, non-state)
State-based and non-state dyads are active when violence between their constituent parts causes at least 25 battle-related deaths in one calendar year. **Comment:** When studying one-sided events UCDP do not look at dyads but actors. One-sided actors are active when violence by a State or a formally organised non-state group causes at least 25 civilian deaths.

[37] http://ucdp.uu.se/#country/666

[38] 'Armed conflicts, 1946–2014' Thérèse Pettersson, T., & Wallensteen, P., Uppsala Conflict Data Program, Uppsala University, *Journal of Peace Research* 2015, Vol. 52(4) 536–550.

Gaza Strip.

46. Hamas is *de facto* controlling this territory. According to the *Uppsala Conflict Data Program (UCDP)* a 'government' in war situations is defined[39] as

> **'Government**
> (state-based, non-state, one-sided)
> The party controlling the capital of the State.
> **Comment:**
> The UCDP is concerned with who is controlling power in practice (*de facto*). We are not concerned with who is the rightful holder of the power (*de jure*). UCDP uses control of the capital as an indicator of the *de facto* government. This is not the same as saying that we are interested in whether the current government is a functional government. The government may control the capital and very little else but we still treat that party as the government. Almost by definition, if an armed conflict is occurring in a country, the government is not likely to be fully functional. The definition of 'government' was changed some years back from a definition including the concept of 'central government' to '... controlling the capital of the state.' The reason was that the previous wording was not consistent with the rest of the definition and instead of finding the "perfect" formulation; we simply changed the operationalisation itself. The definition of government as 'who controls the capital' is completely based on empirical patterns rather than theory. What we in fact do when we identify the government is that we try to identify the central government by simply looking at the parties' own statements about each other, and only then do we check if they also control the capital.'

47. On that score, the belligerent Hamas must be considered to be the 'government' of Gaza as it has control of the capital, or the largest city in the Gaza Strip, normally referred to as Gaza City or simply 'Gaza'.

48. In the UCDP a 'State' is defined[40] as:

> **'State**
> (state-based, non-state and one-sided)
> A State is either an internationally recognised sovereign government controlling a specified territory, or an internationally unrecognised government controlling a specified territory whose sovereignty is not disputed by another internationally recognised sovereign government previously controlling the same territory.
> **Comment:**
> Basically coincides with the list of UN member States, with the addition of a few non-members such as Taiwan. These are States both *de jure* and *de facto*. If we are dealing with a non-recognised entity, or

[39] http://www.pcr.uu.se/research/ucdp/definitions
[40] http://www.pcr.uu.se/research/ucdp/definitions

> a *de facto* State, it can meet the criteria of a State as defined here, if no
> other State claims that territory - given that the other State once used to
> control the entity.'

49. It is clear that Israel no longer actually 'claims' the Gaza Strip: On 12 September 2005, the Israeli cabinet formally declared an end to Israel's military occupation of the territory. This unilateral disengagement could probably justify the further qualification of Hamas as a 'quasi-State' under the UCDP criteria as this entity now has full territorial control of the Gaza territory as this is no longer officially disputed by Israel albeit there are issues about settlements.

### B. War Does Not Have To Be Between States

50. The overarching definition of war is: sustained combat, involving organized armed forces, resulting in a minimum of 1,000 battle-related fatalities (later specified as 1,000 battle-related fatalities within a 12 month period).

51. In terms of the second criterion, the status of the war participants, wars had to have participants on both sides that had organizations able to conduct combat (armed forces).

52. Over the last 40 years, the world has gradually entered into a state where the wars are undeclared, the battlefields can be anywhere, the uniforms are optional, and the combatants as well as the targets are often 'civilian'.[41] This so called *4th generation warfare* is precisely characterized by a *violent non-State actor (VNSA) fighting a State*.[42]

53. It is significant that few question the ability of non-States to engage in a 'war'. Such confrontations have been called 'asymmetric' conflicts in view of the difference

---

[41] Lind, W., *4th Generation Warfare Handbook*, Castalia House, 2014.
[42] First-generation warfare refers to battles fought with massed manpower, using line and column tactics with uniformed soldiers governed by the State. Second-generation warfare refers to tactics used after the invention of the rifled musket and breech-loading weapons. Third-generation warfare uses technology-derived tactics of leveraging speed, stealth and surprise to bypass the enemy's lines and collapse their forces from the rear. Essentially, this was the end of linear warfare on a tactical level, with units seeking not simply to meet each other face to face but to outmaneuver each other to gain the greatest advantage.

in strength and military ability and sheer disparity of power.[43] A war waged by a group which is not a State, against the traditional war waging machinery of the State, is possibly, by nature, an 'unequal' or an 'asymmetric' war.[44]

54. It is abundantly clear in practice that Parties to war do not have to be States. Nor does a war have to be declared; this practice was abandoned long ago.[45]

55. Nor do the Parties that engage in war have to be 'recognized' as States or even as 'belligerents' by their enemy. A 'country', a 'nation' or a 'group', and even a 'terrorist organization' can be a belligerent in spite of non-recognition.[46] In fact, the over-whelming number of 'wars' and 'armed conflicts' in modern international society are waged precisely between a State, or a group of States, and a terrorist organization.

56. A compelling proof that non-States are nowadays engaged in full scale war, often with a State or with a group of States, are the War Crimes Tribunals in The Hague: special tribunals have been set up precisely to convict soldiers fighting for a State *or* for a non-State body for war crimes if their acts violate the Law of War. The United Nations has established special international *criminal tribunals* to prosecute those responsible for *atrocities* during times of *war* and genocide. These may be members of State armed forces *or* of freedom fighters, members of liberation movements, members of groups who wish to establish their own State, or secede from another State, insurgents, rebels *or terrorists*.

57. There is thus now an International Criminal Court for war crimes in former Yugoslavia, (ICTY), a Special Court for Sierra Leone, a Special Tribunal for Cambodia, an International Tribunal for Rwanda and even a general International Criminal Court. All these Tribunals have the competence to try individuals and members of forces of States *and members of non-State armies* for violations of the

---

[43] Mack, A.J.R., 'Why big nations lose small wars', *World Politics*, 1975, available at
http://web.stanford.edu/class/polisci211z/2.2/Mack%20WP%201975%20Asymm%20Conf.pdf
[44] Detter, I., *The Law of War*,. 3rd ed., London: Ashgate, 2013, Chapter One.
[45] See my *Law of War, op.cit.*. Chapter One.
[46] *The Fjeld.* Prize Court of Alexandria, 17 ILR 1950 345. *Diah v Attorney General,* Supreme
Court of Israel, 19 ILR 1952 550.

Law of War. In the case law of these Tribunals there is ample evidence that non-State armies can be belligerents and take part in full-scale wars.

58. It is also abundantly clear in practice that war may be waged with a non-State, even with a terrorist organization. That non-State entity may also make a declaration of war, even if there is no such obligation on States any more.

59. Furthermore, States are restrained from waging war by the rules of the United Nations unless they act in clear self-defense. But a terrorist organization is already a law breaker, so they are not held back by the UN Charter prohibition to wage war.

60. Thus, it was actually the terrorists who declared war on the 'West'. Even before 9/11, in 1996, Osama bin Laden 'declared war' on the United States, by issuing a formal declaration[47] that was reiterated in a 1998 statement ordering all Muslims to pursue the indiscriminate killing of American civilians and military personnel.[48]

61. The terrorist organization Al-Qaeda sought to claim that this action was *in response* to the fact that the United States, and others, had declared war 'on Allah' and on the Muslims.[49]

62. In fact, *the vast majority of contemporary wars have, on one side, a non-State.*

63. Therefore, regardless of how anyone seeks to classify Hamas, the hostilities between Hamas and Israel in July August 2014 did constitute a war.

---

[47] See U.S. Dep't of State, Fact Sheet, Usama bin Laden, (1998), http://www.state.gov/ www/regions/africa/fs_bin_ladin.html. and my *Law of War*, 3rd ed., Chapter One.

[48] See World Islamic Front, *Jihad* Against Jews and Crusaders, (Feb. 23, 1998), *available at* http://www.ciaonet.org/cbr/cbr00/video/cbr_ctd/cbr_ctd_28.html This document was published by an umbrella organization calling itself the 'World Islamic Front Against Crusaders and Jews,' which is a vehicle used by Osama bin Laden to build working relationships between al Qaeda and other Islamic groups. Michael Scheuer, Coalition Warfare: How al-Qaeda Uses the World Islamic Front Against Crusaders and Jews, Part I, 2 *Terrorism Focus*, (March, 2005), *available at* http://www.jamestown.org/terrorism/news/ article.php?articleid=2369530. See, in detail, my *Law of War, op. cit.,* 9 *et seq.*

[49] See, in detail, my *Law of War, op. cit.,* 9 *et seq.*

17

## C. The Fact That Hamas Is Listed As A Terrorist Organization Does Not Disqualify This Organization to Take Part in A War

64. The fact that an entity is a 'terrorist organization' does not necessarily mean that all its acts are 'terrorist acts'.[50] A terrorist organization can also engage in a war and in war-like hostilities.

65. It is absurd to claim that by 2014, terrorists cannot wage war. Today, ISIS in Syria is certainly listed by most countries as a 'terrorist organization'. Who denies today that ISIS is involved in a 'war' in Syria? Similarly, even if Hamas is listed as a 'terrorist organization' by the US State Department this does not preclude such an organization from taking part in a war.

66. Some of the activities of Hamas may be limited to occasional or sporadic acts of terrorism. But if Hamas engages in prolonged and intense hostilities, this will certainly amount to a 'war' in the accepted sense of the word. It is imperative to use the term 'war' in a sense in which a normal person understands this concept: when rockets are launched by Hamas, Israel responds with their air strikes and a ground invasion, and there are hostilities causing more than 2000 deaths within 50 days, that is, to the average bystander, and to me, an expert on such matters, a *war*.

Professor Dr. Ingrid Detter de Frankopan

17 March 2017

---

[50] Besides, terrorist acts would only be covered if they were 'endorsed' under the new system under the TRIA legislation.

# EXHIBIT '1'

## Professor Dr. Dr. Ingrid Detter de Frankopan

Summary *curriculum vitae*

Educated at Lyceum, Stockholm, Sweden & Mon Fertile, Morges, Switzerland;
and at the Universities of Stockholm, Oxford, Paris and Turin;

I. Academic Degrees

Doctor of Philosophy, Oxford University;
Juris Kandidat, Juris Licentiate and Juris Doctor, University of Stockholm;
Licence en droit, Université de Paris, Panthéon-Sorbonne, Paris I;
Diploma, Diritto Europeo, Università di Torino;

II. Legal Appointments

Judge, High Court of Stockholm;
Legal Adviser on International Law to H.H. Pope John Paul II;
Barrister-at-Law, Middle Temple and Lincoln's Inn, London;

Counsel and Adviser to the US Justice Department in two terrrorist trials in the US Supreme Court,
in two terrorist trials, *Hamdi v Rumsfeld* and *Rumsfeld v Padilla*, in which my work on
the *Law of War* was cited as the only academic authority;

Counsel in the *Freezing Assets Case* (settled), concerning rights of the UK Government to freeze
assets of Iran in US Banks in London, pending the release of the hostages at the US
Embassy in Teheran;

Counsel in the *Sir William Lithgow ad Others v the Government of the United Kingdom*,
concerning the application of compensation rules under international law in the UK
and the effect in the UK of prohibition of to retrospective legislation under international law;

Counsel in an ICC Arbitration in Geneva in  a Case between a Multinational and and an Investment
Company concerning international rules of agency;

Counsel in a Case on State immunity in the Swiss Supreme Court, presenting Pleadings in German;

Counsel, pleading in German, before the Swiss Data Protection Commission in a Case
concerning State immunity;

Legal Adviser to the Swedish Delegation of the United Nations Disarmament Conference, Geneva,
specialising in Chemical, Biological and Space Weapons;

Expert appointed by the European Commission of the United Nations to advise on Privatisation in
Eastern Europe after the fall of Communism;

Expert engaged by the UK Minister of Justice for analysis of the Brexit situation;

2

III. Academic Appointments

Fellow of St. Antony's College, Oxford University;
Smedley-Maclean Scholar; British Council Scholar;
Talbot Research Fellow, Lady Margaret Hall, Oxford University;
University Lecturer and Tutor in International Law, Oxford University;
Lecturer in International Relations, London School of Economics;
Visiting Professor, University of Melbourne;
Research Professor in International Law of the Swedish State Council
Professor of International Law, University of Uppsala;
Lindhagen Professor of International Law, Stockholm University;


IV. Languages: Fluent English, French, German, Italian, Croatian and all Scandinavian languages;
    Working knowledge of Russian, Spanish, Portugese and Dutch;


V. Membership of Distinguished Bodies:

| Member: | Life Fellow: |
|---|---|
| Royal Institute of International Affairs | Royal Academy of Art |
| International Institute of Strategic Studies | European Academy |
| Société française pour le droit international | International Academy of Astonautics |
| International Law Association | The Polish Hearth Club (*Ognisko polske*) |
| European Space Law Centre | |
| International Institute of Space Law | |


VI. Publications:


Books:

1.     *Law Making by International Organisations*, Stockholm: Norstedt, 1965;
2.     *Essays on the Law of Treaties*, London: Sweet & Maxwell, 1967;
3.     *The East African Community and the Common Market*, London: Longman, 1970;
4.     *Finance and Protection of Investments in Developing Countries*, London: Gower, 1974;
         2nd ed. 1987;
5.     *International Law and the Independent State*, London: Gower, 1974; 2nd ed. 1987;
6.     *International Adoptions and the Conflict of Laws*, Uppsala: Almquist & Wiksell, 1975;
7.     *Bibliography of International Law*, New York: Bowker, 1975;
8.     *Ekonomisk integrationsrätt*, Stockholm: Almquist & Wiksell, 1976;
9.     *International Law for Students*, Stockholm:Jagellonica, 1989;
10.    *International Law*, Stockholm: Jagellonica, 1989;
11.    *The Concept of International Law*, Stockholm: Norstedt, 1987; 2nd ed. 1995;
12.    *The International Legal Order*, London: Gower, 2nd ed., 1995;
13.    *The Law of War*, Cambridge: Cambridge University Press, 1987; 2nd ed. 2000; 3rd ed. by Ashgate, 2013;
14.    *The Suicide of Europe*, London: Jagellonica, 2016.
15.    *Philosophie du droit des gens*, (forthcoming), 2017;
16.    *Theory of International Law*, (forthcoming), 2017;

3

Articles:

1.       'Aspects institutionnels de l'Association de Libre Echange (EFTA)', *Annuaire français de droit international,* 1960;
2.       'Organs of international organizations exercising their treaty making power', *British Yearbook of International Law,* 1962;
3.       'The problem of unequal treaties', *International and Comparative Law Quarterly,* 1966;
4.       'South West Africa and the dilemma of the International Court', *Newman Yearbook, University of Melbourne,* 1966;
5.       'Land-locked States and the Law of the Sea', *Acta Scandinavia Juris Gentium,* 1976;
6.       'Super-tankers and international straits', *Festschrift Schmidt,* 1976;
7.       'Foreign warships and immunity for espionage', *American Journal of international Law,* 1984;
8.       'Ubåtsspionaget och folkrätten' (Submarine espionage and international law), *Svensk juristtidning,* 1985;
9.       'Ubåtsspionaget: missförstånd på missförstånd'('Submarine espionage: misunderstanding upon misunderstanding'), *Svensk juristtidning,* 1985;
10.     'Treaties of the modern era', *Oxford World Encyclopedia,* Oxford, 1986;
11.     'Legal value of recommendations of international organizations', *University College London-Moscow Symposium ,* 1987;
12.     'International straits and UNCLOS ', *Ezegodnik mezdunarodnovo pravo,* Moscow, 1986;
13.     'What is international law and what is international relations? ', *Journal of International Studies,* 1987;
14.     'The human environment: Stockholm and its follow-up', in Taylor & Groom, *Global Issues in the UN Framework,* London and New York, 1989;
15.     'Legal issues of privatisation in Eastern Europe', *SIRIL Occasional Papers,* 1990;
16.     'Implementation of environmental conventions', *SIRIL Occasional Papers,* 1990;
17.     'Space satellites, jurisdiction and militarisation of Outer Space', *Rome Space Symposium',* 1993;
18.     'The role of States in international environmental regulation', in *International Environmental Negotiations, Process, Issues and Contexts,* Swedish Council for Planning and Coordination of Research, Forskningsrådsnämnden & Swedish Institute of International Affairs, Stockholm, 1993;
19.     'The effect of resolutions of international organizations', *Mélanges Krzysztof Skubiszewski,* ed.  Jerzy Makarczyk, Nijhoff 1996;
20.     'Illegal combatants and the Law of War', *Law Journal of George Washington University,* 2007;
21.     'Extraordinary rendition', *University of North Carolina Law Journal,* 2008;
22.     'New Aspects of Sovereignty and the Right to Protect – R2P', published by St. Thomas More Institute, London, 2011, available at http://thomasmoreinstitute.org.uk/papers/1890/

and numerous book reviews, minor articles and notes;
Status: married with five children.

4

Contact:

Address:

Montesa Sàrl,                                          Frankopan@aol.com;   or
58 Route de la Fin,                                    idfrankopan@gmail.com; or
CH-1874 Champéry,                                      Ingrid.Detter@aol.com.
Switzerland;                                           tel.: +41 79 603 7125

or:

*Academy of War Studies, (AWS)*,                       AcaWars@aol.com
Château de Verrey, F- 21690 Verrey,                    tel.:+33 380 35 86 47
Bourgogne,
France;

or:

Three Stone Barristers' Chambers,                      idetter@threestone.law
 Lincoln's Inn, London WC2A 3XL,                       tel.: +44 (0)20 7242 4937

                                                                 :

# EXHIBIT '2'

## Documents

Plaintiff's Response to Interrogatories
First Amended Complaint
Atlantic Specialty's Answer to First Amended Complaint
Atlantic Specialty's First Amended Responses to Plaintiff's Interrogatories
Atlantic Specialty's Second Amended Responses to Plaintiff's Interrogatories
Policy
OneBeacon's Denial Letter (07/28/2014)
NBC's Response to Denial Letter (08/13/2014)
OneBeacon's Reply (09/19/2014)
Plaintiffs' Production Bates-Numbered UCP000137 - UCP000245

## News Articles

MSNBC
http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies

NBC News
http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

The Wall Street Journal
http://www.wsj.com/articles/israel-pulls-forces-from-gaza-as-cease-fire-begins-1407231543

The New York Times
https://www.nytimes.com/2016/08/25/world/middleeast/israel-gaza-war.html
https://www.nytimes.com/2014/08/30/world/middleeast/50-days-of-war-leave-israelis-and-palestinians-only-more-entrenched.html

Time Magazine
http://time.com/3076594/israel-gaza-cease-fire-hamas-netanyahu/
http://time.com/3082458/gaza-war-crimes-israel-palestine/

The Washington Post
https://www.washingtonpost.com/news/worldviews/wp/2014/09/03/heres-what-really-happened-in-the-gaza-war-according-to-the-israelis/?utm_term=.e7ccbabd8102

U.S. News and World Report
http://www.usnews.com/news/world/articles/2016-08-24/israel-clears-forces-in-several-deadly-2014-gaza-war-cases
http://www.usnews.com/news/articles/2014/08/07/saudi-arabia-and-the-third-gaza-war

The Independent
http://www.independent.co.uk/news/world/middle-east/israel-gaza-conflict-50-day-war-by-numbers-9693310.html

The Los Angeles Times
http://www.latimes.com/world/middleeast/la-hp-storygallery-middle-east-conflict-storygallery.html
http://www.latimes.com/world/middleeast/la-fg-un-report-gaza-war-20150622-story.html

BBC News
http://www.bbc.com/news/world-middle-east-28252155
http://www.bbc.com/news/world-middle-east-33128955

Haaretz News (Israeli News Outlet)
http://www.haaretz.com/israel-news/.premium-1.612437

Middle East Quarterly
http://www.meforum.org/5084/rethinking-operation-protective-edge

Associated Press
http://bigstory.ap.org/article/3caf434feda5453dbd9df7477363489a/israel-clears-forces-several-deadly-2014-gaza-war-cases

Jerusalem Center for Public Affairs
http://jcpa.org/timeline-key-moments-gaza-war/

USA Today
http://www.usatoday.com/story/news/world/2016/08/10/gaza-city-families-displaced-war-israel/88002220/

Chicago Tribune
http://www.chicagotribune.com/news/opinion/commentary/ct-deaths-babies-gaza-war-palestinians-perspec-0129-20150128-story.html

Chicago Sun Times
http://chicago.suntimes.com/politics/decimated-hamas-makes-ludicrous-claims/

The Denver Post
http://www.denverpost.com/2014/08/26/israel-and-hamas-reach-an-uneasy-cease-fire-in-50-day-gaza-war/

The Dallas Morning News
http://www.dallasnews.com/news/news/2014/08/26/gaza-cease-fire-reached-after-50-day-war-that-killed-2200-and-settled-little

Newsday
http://www.newsday.com/news/world/at-un-israeli-and-palestinian-leaders-air-differences-1.12354379

The Houston Chronicle
http://www.houstonchronicle.com/news/nation-world/world/article/Israeli-house-strikes-killed-mostly-civilians-6080436.php

The Guardian
https://www.theguardian.com/world/2014/aug/26/gaza-ceasefire-israel-palestinians-halt-fighting

The Times of India
http://timesofindia.indiatimes.com/world/middle-east/Israel-Gaza-conflict-50-day-war-by-numbers/articleshow/41000781.cms

The Sydney Morning Herald
http://www.smh.com.au/comment/why-israel-lost-the-war-in-gaza-20140808-101ruh.html

China Daily
http://www.chinadaily.com.cn/world/2014-08/28/content_18500736.htm

The Daily Mail
http://www.dailymail.co.uk/news/article-2740643/Inside-bombed-Gaza-One-week-end-50-day-war-true-scale-devastation-revealed.html

The Telegraph
http://www.telegraph.co.uk/news/worldnews/middleeast/israel/11769685/Israel-may-have-committed-crimes-against-humanity-says-Amnesty.html

## Hard copies of articles associated with links

13,000 families in Gaza still displaced two years after war with Israel
USA Today - August 10, 2016

50 days of War Leave Israelis and Palestinians Only More Entrenched
The New York Times – August 29, 2014

After Seven Weeks of Gaza War, Hamas 1, Israel 0
Hareetz – January 11, 2017

Children suffer and die in Gaza. Who notices?
Chicago Tribune – January 29, 2015

3

Decimated Hamas makes ludicrous claims
Chicago Sun Times – September 5, 2014

Gaza casefire: Israel and Palestinians agree to halt weeks of fighting
The Guardian – August 27, 2014

Gaza cease-fire reached after 50-day war that killed 2,200 and settled little
DallasNews – August 24, 2016

Gaza-Israel conflict: Is the fighting over?
BBC – August 26, 2014

Here's what really happened in the Gaza ward (according to the Israelis)
The Washington Post – September 3, 2014

How Technology Is Intensifying Gaza War Between Israel and Hamas
NBC News – July 30, 2014

Inside bombed-out Gaza: One week on from end of 50-day war and the true scale of devastation is revealed
Daily Mail – September 2, 2014

Israel and Hamas may have committed war crimes in Gaza, U.N. report says
Los Angeles Times – June 22, 2015

Israel and Hamas reach an uneasy cease-fire in 50-day Gaza war
The Denver Post – August 26, 2014

Israel clears forces in several deadly 2014 Gaza war cases
Associated Press – August 24, 2016

Israel Clears Troops in Airstrike Near School in 2014 Gaza War
The New York Times – August 24, 2016

Israel may have committed crimes against humanity, says Amnesty
Telegraph UK – July 29, 2015

Israel Seeks to Gain Advantage by Reversing Course in Gaza
Time Magazine – August 3, 2014

Israel, Hamas Set Out Demands on Gaza
Wall Street Journal - August 6, 2014

Israel – Gaza conflict: 50-day war by numbers
The Times of India - August 27, 2014

4

Israel-Gaza conflict: 50-days war by numbers
The Independent – August 27, 2014

Israeli 2014 Gaza war actions lawful, report says
BBC – June 14, 2014

Israeli house strikes killed mostly civilians
Houston Chronicle – February 13, 2015

**Additional News Articles**

A news article published by the Washington Post, dated July 10, 2014, by Griff Witte and
William Booth, entitled "As cease-fire with Hamas fails to take shape, Netanyahu says, 'Our
answer is fire.'" This article is available at: https://www.washingtonpost.com/world/israel-
accepts-truce-plan-hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-
923ecc0c7d23_story.html?utm_term=.e99302eb1314.

A news article published by MSNBC dated July 18, 2014, by Benjamin Landy and Maria Lokke,
entitled "Scenes of war and heartbreak as Israeli ground forces invade Gaza." This article is
available at: http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-
intensifies.

A news article published by MSNBC dated July 18, 2014, by David Taintor, entitled "Obama
points to rebels in downed Malaysian jet." This article is available at:
http://www.msnbc.com/msnbc/obama-american-dead-malaysia-airlines-crash.

A news article published by MSNBC dated July 16, 2014, by Donna Stefano, entitled "In Israel
and Palestine, children imagine a world without war." This article is available at:
http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-world-without-war.

A news article published by the Times of Israel by Adiv Sterman, dated July 16, 2014, entitled
"Ground incursion in Gaza said 'very likely.'" This article is available at:
http://www.timesofisrael.com/idf-ground-incursion-in-gaza-very-likely/.

A collection of "LiveBlogs" published by the Times of Israel on July 7, 2014, by Itamar Sharon,
Marissa Newman, and Ilan Ben Zion, entitled "Israel launches 'Protective Edge'
counteroffensive on Gaza, Jewish suspects reenact teen's murder." This collection is available at:
http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-violence-continues/#!.

A news article published by Middle East Eye dated July 8, 2014, entitled "Hamas claims
responsibility for rockets fired at Jerusalem, Tel Aviv and Haifa." This article is available at:
http://www.middleeasteye.net/news/israels-army-prepared-ground-assault-gaza-official-
275282816.

5

A news article published by the Global News, dated July 9, 2014, entitled "UPDATE: Israel hits key Hamas targets in Gaza offensive." This article is available at: http://globalnews.ca/news/1438089/israel-strikes-hamas-targets-in-gaza-to-stop-rocket-fire/.

A news article published by the Global News, dated July 15, 2014, entitled "Israel: Hamas to pay price for its 'no' to truce." This article is available at: http://globalnews.ca/news/1451058/israel-hamas-to-pay-price-for-its-no-to-truce/.

The news article entitled "LIVE UPDATES: Operation Protective Edge, Day 7," published by Haaretz on July 15, 2014. The article is available at:   http://www.haaretz.com/israel-news/1.604898#!.

## Links to Additional News Articles

http://www.haaretz.com/israel-news/LIVE-1.774365/Gaza-war-hamas-humanitarian-crisis

http://www.jpost.com/Israel-News/Politics-And-Diplomacy/State-comptroller-report-on-2014-Gaza-war-due-today-482789

http://www.cnn.com/2017/02/28/middleeast/israel-gaza-report/

https://www.ft.com/content/a4291a06-fdcc-11e6-96f8-3700c5664d30

## News Clips

http://www.nbcnews.com/video/msnbc2/56804549#56804549

http://www.msnbc.com/the-last-word/watch/mh17-mystery-and-war-in-gaza-308247107963

http://www.msnbc.com/melissa-harris-perry/watch/what-it-means-to-live-in-a-war-zone-309370947801

http://www.msnbc.com/all-in-with-chris-hayes/watch/day-breaks-in-gaza-following-invasion-307348035939

http://www.msnbc.com/all-in-with-chris-hayes/watch/ground-war-in-gaza-307290179722

http://www.nbcnews.com/video/from-aug-2-2014-ayman-mohyeldin-reports-on-gaza-war-469303875925

http://www.nbcnews.com/watch/nightly-news/bloodiest-day-in-israels-fight-in-gaza-kills-more-than-70-309590595847 - uses the word "war" at about 2:53

http://www.nbcnews.com/watch/nightly-news/israeli-palestinian-conflict-brings-heaviest-fighting-in-years-299767363744 - broadcast on July 8, the first day of Operation Protective Edge, notes that this "could easily become the next war"

http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

http://timesofindia.indiatimes.com/world/middle-east/Israel-Gaza-conflict-50-day-war-by-numbers/articleshow/41000781.cms

http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

https://www.theguardian.com/world/video/2014/jul/09/israeli-airstrikes-gaza-hamas-rocket-attacks-video


## Additional Materials

Congressional Research Service Reports
https://fas.org/sgp/crs/mideast/RL34074.pdf
January 31, 2014 by Jim Zanotti

https://fas.org/sgp/crs/mideast/R41514.pdf
December 2, 2010 by Jim Zanotti

US State Department Human Rights Report Israel 2014
https://www.state.gov/documents/organization/236814.pdf

Jerusalem Center for Public Affairs
Key Moments in a 50-Day War:  A Time by Daniel Rubenstein
http://jcpa.org/timeline-key-moments-gaza-war/

Report of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1* ** ***United Nations General Assembly Human Rights Council, Twenty-ninth session, Human rights situation in Palestine and other occupied Arab territories, 24 June 2015.

Report of the detailed findings of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1* ** ***United Nations General Assembly Human Rights Council, Twenty-ninth session, Human rights situation in Palestine and other occupied Arab territories, 23 June 2015.

An Assessment of the 2014 Gaza Conflict, High Level Military Group, October 2015
http://www.high-level-military-group.org/pdf/hlmg-assessment-2014-gaza-conflict.pdf

7

Fragmented Lives Humanitarian Overview 2014
https://www.ochaopt.org/documents/annual_humanitarian_overview_2014_english_final.pdf

# EXHIBIT 'C'

Frank G. Lowenstein
3810 Argyle Terrace, NW
Washington, D.C.  20011

March 16, 2017

## Expert Report

Dear Mr. Keeley:

I write in response to your request to provide an expert opinion on whether the conflict in the summer of 2014 between Israel and Hamas constituted a war, included warlike actions by military forces, involved the use of weapons of war, and/or were part of an insurgency or rebellion.

Based on my experience, including my service as Special Envoy for Israeli-Palestinian Negotiations at the United States Department of State, including an official trip to Israel during this period with Secretary of State John Kerry, it is clear that under common understanding or usage of the terms this conflict was a war, certainly included numerous warlike actions, unquestionably involved the use of weapons of war by military forces, and if nothing else, was an insurgency or rebellion.

Set forth below are: (1) my qualifications and experience; (2) the relevant factual background; and (3) the specific reasoning and analysis for this opinion.  I would be very glad to explain further or answer any additional questions.

## I.  Qualifications and Experience

From 2005 to 2008, I served as Senior Foreign Policy Advisor to Senator John Kerry and directed the Senate Foreign Relations Committee's Subcommittee on Near East and South and Central Asian Affairs, which included responsibility for all Israeli-Palestinian issues.

In January of 2009, Senator Kerry became Chairman of the Senate Foreign Relations Committee and I took over as the Committee's Chief Counsel, which included responsibility for all legal matters before the Committee.  In March of 2010, I became the Staff Director of the Committee and served in that capacity until September of 2011.

1

During my service in the Senate, I travelled extensively with Senator Kerry throughout the region, including numerous trips to Iraq, Syria, Afghanistan, Pakistan and Israel and the West Bank. In January of 2009, I travelled to Gaza Strip with Senator Kerry in the aftermath of Operation Cast Lead to review the conditions and receive briefings on reconstruction efforts. At that time, we were the first official U.S. delegation to enter Gaza in 8 years.

In February of 2013, I joined the State Department as the Deputy Special Envoy for Israeli-Palestinian Negotiations and Senior Advisor to the Secretary of State. In this capacity, I played a central role in the Israeli-Palestinian negotiations that took place from August 2013 until April 2014, travelling frequently to Israel and the West Bank. On June 27, 2014, I became the Special Envoy for Israeli-Palestinian Negotiations, initially in an Acting capacity.

As Special Envoy, I was the senior official at the State Department with responsibility for Israeli and Palestinian issues, including policy formation, speech writing and press guidance. I met regularly with senior Israeli and Palestinian officials and travelled with Secretary Kerry on all trips related to Middle East peace.

I also served as the United States representative to the Middle East Quartet. The Quartet, which also includes the European Union, the Russian Federation and the United Nations, was created by the international community in 2002 to advance Middle East peace. In this capacity, I travelled with the other Quartet envoys throughout the Middle East and Europe to engage key stakeholders on Israeli-Palestinian issues, including the situation in Gaza.

During the Gaza war in July of 2014, I travelled with Secretary Kerry to Cairo and Israel as part of U.S. efforts to help negotiate a ceasefire agreement between Israel and Hamas. Secretary Kerry and I were in daily contact with Prime Minister Netanyahu and his national security team during this period, and we met in person with the Prime Minister and senior Israeli security officials at the Ministry of Defense in Tel Aviv at the height of the war, when Ben Gurion airport was closed on July 23, 2014. I also spent over a week in Cairo in August of 2014 monitoring the ceasefire negotiations between Israel and the Palestinians.

In November of 2016, I received the Distinguished Service Award from Secretary Kerry, the highest honor offered by the State Department.

From 2003 to 2004, I was Director of National Security Policy for the Kerry-Edwards presidential campaign. Prior to joining the campaign, I practiced law for six years in Boston at Hill & Barlow, which is now the Boston office of DLA Piper.  I also practiced law in Washington DC, at Arent Fox, for six months prior to joining Senator Kerry's Senate staff in 2005.  Finally, I served as a Legislative Assistant for Foreign Policy and Defense issues for Senator J. Robert Kerrey from 1990 to 1994.

I received a BA from Yale University in 1990, majoring in History, and a JD from Boston College Law School in 1997. I spent my third year as a visiting student at Yale Law School, where I studied international law.

A copy of my CV is attached as Exhibit 1.  I am being compensated at a rate of $750 per hour for my work on this matter.  I have no publications in the last 10 years and I have not testified in trial or at deposition in the last 4 years.

**Documents Considered**

The documents that I have considered in preparing this report are either referenced herein or are attached as Exhibit 2.

**Factual Background**

In June of 1967, as part of what is commonly referred to as the Six Day War, Israel gained control over the Gaza Strip and the West Bank.  In 2005, Israel unilaterally withdrew its military forces, known as the Israel Defense Forces (or "IDF"), and all of its civilians from Gaza, leaving control to the Palestinian National Authority, commonly known as the Palestinian Authority.

In January of 2006, Hamas won a popular election for the Palestinian Legislative Council, the legislature of the Palestinian Authority, with its candidates winning 74 of the 132 seats.  In 2007, Hamas' armed forces in Gaza defeated forces loyal to Palestinian Authority President Mahmoud Abbas and consolidated control over the Gaza Strip. President Abbas then dismissed the Hamas-led government and appointed a new caretaker government, which became the governing authority in the West Bank.  Hamas named a new cabinet of ministers and has remained in control of Gaza Strip ever since.

3

To prevent Hamas, a designated Foreign Terrorist Organization by the United
States that is committed to the destruction of Israel, from obtaining additional
weapons, Israel took control of all land crossings with Gaza and imposed a
blockade on any goods coming into Gaza by sea.  As a result, many consider
Israel to technically be the occupying power in Gaza as well as the West Bank,
despite not exercising any actual authority inside the Gaza Strip.

Since at least 2007, Hamas has been the de facto ruling authority in Gaza Strip,
performing the basic functions of government, including providing social
services such as administering schools, hospitals and local police forces.  They
collect revenue from the people of Gaza in various ways, including licensing
fees and taxes, and receive assistance from foreign governments.  The Hamas
government in Gaza employs over 20,000 civil service employees in various
ministries, including health and education. Hamas also runs an ad hoc judicial
system.

Hamas has a military force, known as the Izz ad-Din al-Qassam Brigades
("Qassam Brigades"). The Qassam Brigades were part of an estimated 16,000
fighters under Hamas command in the summer of 2014. These forces were
reportedly divided into six brigades of 2,000 to 3,500 fighters.

By the summer of 2014, the IDF reportedly estimated that Hamas and its
affiliates had a stockpile of approximately 10,000 rockets and thousands of
mortar shells.  According to the IDF, this arsenal included thousands of short-
range Qassam rockets with a 9 kilogram warhead and maximum range of 15-
20 kilometers, hundreds of medium range Grad rockets with a 45 kilogram
warhead and range of approximately 45 kilometers, hundreds of M-75
warheads with a 60 kilogram warhead and a range of up to 80 kilometers, and
tens of long-range R-160 rockets with a range of 100-200 kilometers.

Since 2006, there have been a number of attempts by President Abbas and the
Hamas leadership to create a government of national unity that would unify
Gaza and the West Bank under the Palestinian Authority. In June of 2014, an
agreement between President Abbas and Hamas created a unity government
that did not include any members of Hamas as ministers.  The United States
does not engage with Hamas or any of its members, but determined that it
was able to engage with this Government of National Consensus.

Since taking power in 2006, Hamas forces have sporadically fired rockets or mortars into Israel, and the IDF has responded with limited and calibrated air strikes. On at least 3 occasions since then, however, the conflict between the IDF and Hamas forces in Gaza has intensified significantly to the point where the IDF has declared formal, large scale military campaigns against Hamas.

In December 2008, the IDF launched Operation Cast Lead, which began with an intensive aerial bombardment targeting Hamas forces and infrastructure. This was followed by a ground invasion by the IDF on January 3, 2009.  It is estimated that between 1,100 and 1,500 Palestinians and 13 Israelis died before the parties unilaterally entered into a ceasefire and Israel completed the withdrawal of its forces from Gaza Strip on January 21, 2009.

In November 2012, fighting again intensified between Israel and Hamas, and on November 14, 2012, Israel declared Operation Pillar of Defense. According to the IDF, it struck more than 1,500 sites in the Gaza Strip.  Over 160 Gazans reportedly died and hundreds were wounded during this operation. The United States worked with Egypt to help facilitate a formal ceasefire agreement between the parties, which was announced on November 21, 2012.

In June of 2014, following the kidnapping and murder of 3 Israeli teenagers by Hamas in the West Bank and the resulting IDF campaign in the West Bank, Hamas increased its rocket and mortar attacks against Israel. There were reportedly 250 rockets launched at Israel from Gaza in the last two weeks of June and the first week of July.

On July 7, 2014, after some 80 rockets were fired at Israel, the IDF announced Operation Protective Edge, a major military campaign against Hamas in Gaza. According to the IDF, the purpose was "restoring security to Israeli civilians living under Hamas rocket fire."

At that point, the conflict escalated significantly. On July 8, 2014, over 140 rockets were reportedly launched at Israel from Gaza, including three that landed in the hills around Jerusalem.  Air raid sirens sounded over much Israel, and Hamas announced publicly that it had fired four of its M-75 rockets at Tel Aviv. A Hamas rocket even reached the Israeli city of Hadera, some 100 km away from the Gaza Strip.

On July 8th, Hamas also tried to infiltrate its forces into Israel at Zikim Beach, just to the north of Gaza Strip, in a daylight amphibious assault. Five Hamas

militants were killed by the IDF, with one Israeli soldier wounded.

The intense rocket attacks on Israel from Gaza continued steadily, causing air raid sirens to sound all around Israel in response to the daily barrage. According to a report compiled by the International Institute for Counter Terrorism, over 100 rockets were launched from Gaza on July 9th, including one that landed near a kindergarten and another that was intercepted by the Iron Dome air defense system over Tel Aviv.  Over 190 rockets were fired at Israel on July 10th, over 140 rockets on July 11th, some 130 on July 12th, over 100 on July 13th, approximately 115 on the 14th, over 150 on the 15th, and some 130 on the 16th.

During this period, Hamas also tried to incorporate additional elements of modern warfare and employed new weapons and tactics against Israel. They attempted psychological warfare operations, including threatening and false text messages sent to Israeli civilians' cell phones. They launched an Unmanned Aerial Vehicle possibly carrying explosives at Israel on July 14th, demonstrating potentially unprecedented new capabilities. And on July 17th, Hamas sent about a dozen armed fighters through a tunnel from Gaza into Israel to conduct a major raid against Israeli civilians. They were intercepted by the IDF near Kibbutz Sufa before they reached their target.

For its part, the IDF significantly intensified its aerial attacks on Hamas in Gaza from July 8th -July 17th, hitting some 50 targets on July 8th, 120 on July 12th and approximately 95 on the July 15th. During the first ten days of Operation Protective Edge, the Israeli Air Force struck nearly 2000 targets in the Gaza Strip, dropping hundreds of tons of ordnance.

On July 17, 2014, following the attempted tunnel attack inside Israel by Hamas forces, Israel initiated a second phase of Operation Protective Edge, a large scale ground invasion of the Gaza Strip.  According to Israeli Prime Minister Netanyahu, the purpose was "to harm terror tunnels penetrating the Gaza Strip into Israel." The ground invasion involved thousands of IDF troops, including infantry, armored and engineering corps, artillery and intelligence forces, combined with aerial and naval support and accompanied by tanks and helicopter gunships, which engaged in extensive and prolonged combat with Hamas military forces and related militants.

The most intense battle occurred in the Gaza City neighborhood of Shuja'iya, which Hamas was reportedly using for command and control, weapons

6

storage and tunneling operations. On July 19th and 20th, 13 IDF soldiers were
killed in combat with Hamas forces, including 7 when Hamas fired an anti-
tank missile at an armored personnel carrier, the highest single day death toll
for the IDF since the war in Lebanon in 2006.  Much of Shuja'iya was
destroyed and its inhabitants forced to flee.

By the time the war ended, 64 Israeli soldiers were killed and over 450
wounded, according to the IDF. The IDF found and neutralized 32 tunnels, 14
of which extended beyond Gaza into Israel.

The steady barrage of rocket and mortar attacks from Hamas and affiliated
forces in Gaza continued throughout the 50 days of Operation Protective Edge.
According to the United Nations Official Commission of Inquiry, between July
7th and August 26th, Palestinian armed groups fired 4,881 rockets and 1,753
mortars towards Israel. There were an estimated average of approximately 90
rocket and mortars fired at Israel per day, threatening some 70 percent of
Israel's population. According to official IDF figures, Hamas forces and related
militants in Gaza fired 3,360 rockets alone at Israel; 2,303 rockets hit Israel,
and 115 rockets hit populated areas.

Six civilians were killed in Israel, and up to 1,600 Israelis were injured,
including 270 children. Direct damage to civilian property in Israel amounted
to almost $25 million.

The IDF responded with a comprehensive, sustained and intensive military
campaign to neutralize the threat from Hamas in Gaza.  According to the UN
Inquiry, between July 7th and August 26th, the IDF carried out more than
6,000 airstrikes in Gaza. The IDF reported that they fired 14,500 tank shells
and approximately 35,000 artillery shells in Gaza.

The IDF clearly targeted the military and governance infrastructure of Hamas,
including the Qassam Brigades, its other security forces and related militant
groups.  According to IDF figures, its aerial, naval and ground forces struck
4,762 sites across Gaza, including:

- 1,678 rocket launching facilities;
- 977 command and control centers;
- 237 military administration facilities;
- 191 weapons storage and manufacturing facilities; and

7

- 144 training and military compounds.

In Gaza, the fighting took a severe toll. According to the UN Inquiry:

- 2,251 Palestinians, including 1,462 civilians, were killed. Of the Palestinian fatalities, 551 were children and 299 women. 11,231 Palestinians were injured, including 3,436 children and 3,540 women.

- 18,000 housing units were destroyed in whole or part.

- At the height of hostilities, the number of Internally Displaced Persons in Gaza reached 500,000, or 28 per cent of the population.

Reflecting the scale, intensity, and duration of the conflict, the vast amount of damage caused, and the large numbers of combatants and civilians killed and injured on both sides, Secretary of State Kerry repeatedly and publicly described this as a "war."

Appearing on ABC's "This Week" on July 20th, just before leaving to begin efforts to help negotiate a ceasefire, Secretary Kerry said of the situation in Gaza: "war is ugly, and bad things are going to happen."

At the Gaza reconstruction donor conference in Cairo in October 2014, Secretary Kerry said: "This is the third time in less than six years that we've seen war break out and Gaza left in rubble." The United States pledged $212 million dollars for Gaza reconstruction. A total of $5.4 billion dollars was pledged at the Conference.

In a speech at the Brookings Institution in 2015, Secretary Kerry again described "the turmoil of three wars with Gaza," and asked: "How is Israel advantaged…to have another war with Gaza?"

In his final speech on Middle East peace at the State Department in December 2016, he again described having witnessed first hand "the devastation of war in Gaza."

The International Crisis Group described the conflict as "the most devastating war yet waged in Gaza." Press reports at the time and since, including from NBC, CNN, the New York Times, and the Washington Post, have regularly referred to the "war" between Israel and Hamas. As recently as March of

2017, CNN and a number of other publications have again described the 2014 events as a "war."  See Exhibit 3 for illustrative list.

The International Criminal Court is currently conducting a preliminary examination of Israel for "war crimes" in connection with Operation Protective Edge.

## Opinion

In my opinion, Israel and Hamas fought a "war" in the summer of 2014. Under the plain, ordinary meaning of the term, it cannot be considered to have been anything but a war.

That is why countless press reports and people around the world repeatedly used the term "war."  It is the only word that truly conveys the extent and duration of the fighting, the damage caused, and the loss of life.

This is reflected in the fact that the Secretary of State, who makes policy for the State Department, publicly referred to the Gaza conflict as a war. And it is consistent with my experience during travels with Secretary Kerry and the Quartet, when the term war was regularly used.

The sheer scale, duration and intensity of this conflict speaks for itself.  After Operation Protective Edge was announced on July 7th, the dramatic escalation of the fighting on both sides clearly distinguished it from the normal exchange of hostilities between Israel and Hamas. Thus, most people consider July 7th, the launch of Operation Protective Edge, as the beginning of the war, and I agree.

In fact, in the first ten days of the war, Hamas fired over 1000 rockets at Israel, an average of over 140 per day, compared with some 250 total in the three weeks preceding commencement of Operation Protective Edge.  Hamas fighters attempted to infiltrate Israel twice, by amphibious assault and through an attack tunnel.  During this period alone, the Israeli Air Force attacked nearly 2,000 targets in the Gaza Strip and dropped hundreds of tons of ordnance.

The intensified fighting continued for 50 days, far longer than any terrorist attack.  Thousands of rockets and mortars were fired at Israel during the war, an average of some 90 per day. They caused the international airport to be

9

closed, and threatened some 70% of the Israeli population. Some 1,600 Israeli
civilians were injured, including 270 children.  Air raid sirens went off
regularly all around the country.

The country was clearly at war. I experienced this first hand during my visit to
Israel with Secretary Kerry on July 23, 2014, the only time we met with Prime
Minister Netanyahu at the Ministry of Defense in Tel Aviv instead of his office
in Jerusalem.  The international airport was closed due to rocket fire from
Gaza, and air raid sirens were going off all around the country.

The fact that over 80,000 members of the IDF were mobilized is very telling,
clearly demonstrating that the nation was at war.  Aerial, naval and ground
forces struck over 4,000 sites across Gaza, with some 6,000 airstrikes alone
during the war.  And there was a large-scale ground invasion involving air, sea
and armored elements and including thousands of IDF soldiers engaged in
direct combat with Hamas forces deep into Gaza.  A reported 64 IDF soldiers
were killed and over 450 wounded.  The extent of the ground attack was
extraordinary, with 14,500 tank shells and approximately 35,000 artillery
shells fired in Gaza.

The scale of the devastation in Gaza is obviously commensurate with war.
Over 2,000 Palestinians, including over 1,200 civilians, over 500 were
children and nearly 300 women died. Over 11,000 Palestinians were injured,
including over 6,000 women and children.  Some 18,000 housing units were
destroyed in whole or part, and the number of Internally Displaced Persons in
Gaza reached 500,000, or 28 per cent of the population. There was billions of
dollars of damage.

Taken together, these events clearly constituted a war as that term is
commonly used and understood.

It is equally clear that in the 21st century, it is commonly understood that wars
are often fought against terrorist organizations rather than traditional state
actors. When al Qaeda attacked the United States on 9/11 it was widely
viewed as an act of war, and the United States responded accordingly.
President Bush spoke to the nation on September 20, 2001, and explained that
the enemies of freedom, referring to al Qaeda, had committed an act of war
against our country.  And, in that same speech, he declared that we were at
war with terror, beginning with al Qaeda.

In fact, the Authorization for Use of Military Force (AUMF) passed by the United States Congress on September 14, 2001, authorized the use of United States Armed Forces against those responsible for the attacks on September 11, 2001 and any "associated forces." The AUMF satisfied the requirements of the War Powers Act, and has provided a basis for an ongoing war against Al Qaeda, the Taliban and related terrorist groups in Afghanistan for the past 16 years.  Nobody would ever question that the United States has been fighting a war in Afghanistan.

The AUMF has also provided a basis for our ongoing operations against terrorist organizations around the world. In fact, as of December 2016, the Office of the President published a brief concluding that the AUMF still provides Congressional authorization for the use of force against ISIS and other Islamic militant groups.

Even under a clearly outdated notion that a "war" requires two states or quasi-state actors, Hamas would qualify at a minimum as a semi-sovereign given that it is the unquestionable de facto authority in Gaza.   Hamas did in fact win a popular election for the Palestinian legislature in 2006. And since 2007, they have exercised many of the traditional attributes of sovereignty in Gaza, including collecting taxes, operating the borders, employing tens of thousands of civil service employees and keeping its own military and security forces.

Moreover, in the summer of 2014, there was Government of National Consensus with President Abbas and Hamas that at least nominally unified the Palestinians in the West Bank and Gaza under a single Palestinian Authority. In fact, negotiations in Cairo on a ceasefire were officially conducted by a unified delegation of Hamas and Fatah.

Accordingly, the conflict between Israel and Hamas in the summer 2014 constituted a war regardless of whether one characterizes Hamas as terrorist organization or a semi-sovereign.

At a minimum, it is obvious that these events constituted warlike action by a military force. The IDF is of course the military force of the Israeli government, and the purpose of Operation Protective Edge was expressly to hinder or defend against an expected attack – in this case rocket and tunnel attacks by Hamas.  The events in Israel that summer were the direct – or at least the indirect -- result of the warlike actions of this military force.

11

Furthermore, the Qassam Brigades are by all accounts the military force of Hamas, which if nothing else is the de facto authority in Gaza. That's why Israeli forces targeted over 900 command and control centers, over 200 military administration facilities, and over 140 training and military compounds. And militants associated with Hamas and its affiliates at a minimum constituted other agents – if not military personnel -- of that authority.

If nothing else, there can be absolutely no question that weapons of war were used extensively over an extended period of time.  The IDF deployed much of its arsenal, including tanks, warships, and modern military aircraft, that simply cannot be described as anything other than weapons of war.  Again, at a minimum, the situation in Israel was the direct or indirect result of the use of these weapons by the IDF.

For its part, the Qassam Brigades fired hundreds of sophisticated long-range rockets at Israel and used anti-tank missiles that are weapons of war under any common usage of the term, in addition to mortars and other smaller arms customarily used by military forces in combat.

Finally, the actions of Hamas in the summer of 2014 could commonly be understood as an insurrection or rebellion against Israel. Many consider Israel to be the occupying power in all of the Palestinian territories, including Gaza, despite the fact that they have withdrawn their forces and Hamas is the effective governing authority there.  The Hamas Charter calls for the liberation of historic Palestine from Israeli occupation, and this war could readily be seen as a rebellion or insurrection by Hamas against Israel in furtherance of that objective.

In summary, for the reasons set forth above, it is absolutely clear that the under common understanding or usage of the terms, Israel and Hamas fought a war in the summer of 2014, it certainly included numerous warlike actions by a military force, unquestionably involved the use of weapons of war, and if nothing else, was an insurgency or rebellion.

I would be very glad to explain further or answer any additional questions.


Sincerely,

Frank Lowenstein

# EXHIBIT '1'

# Frank G. Lowenstein

3810 Argyle Terrace, NW, Washington, D.C. 20011 / 202.255.0123 (c) / frankglowenstein@gmail.com

---

**UNITED STATES DEPARTMENT OF STATE**                                     **Washington, DC**
*Special Envoy for Israeli-Palestinian Negotiations*                        **6/14 -1/17**
*Deputy Special Envoy and Senior Advisor to the Secretary*                   **3/13-5/14**
- Responsible for Israeli and Palestinian issues, including policy, speeches and press guidance
- Directly engaged in Israeli-Palestinian negotiations (2013/14)
- Accompanied Secretary Kerry on all travel related to Middle East peace process.
- Represented the U.S. in international diplomatic engagements, including through Middle East Quartet.
- Received Distinguished Service Award, highest honor offered by the State Department.

**PODESTA GROUP**                                                        Washington, DC
*Principal, International Sector*                                          10/11–2/13
- Developed strategic messaging and government outreach campaign for firm clients.
- Helped build global government relations practice.

**U.S. SENATE COMMITTEE ON FOREIGN RELATIONS**                           Washington, DC
*Staff Director*                                                            1/9–9/11
*Chief Counsel and Deputy Staff Director*
- Managed over 40 professional staff members and Committee budget.
- Responsible for Committee agenda, oversight activities, and legal and legislative matters, including
  ratification of New START treaty.

**SENATOR JOHN F. KERRY (D-MA)**                                         Washington, DC
*Senior Foreign Policy Advisor*                                           10/05–12/8
- Drafted policy speeches, floor statements, op-eds, and press releases; development of legislation on Iraq,
  Afghanistan, Pakistan and Burma; organized and staffed foreign travel.
- Sole staff to Chairman of SFRC Subcommittee on Near East and South and Central Asian Affairs.

**ARENT FOX LLP**                                                        Washington, DC
*Associate, Business Department*                                           3/05–9/05

**KERRY-EDWARDS PRESIDENTIAL CAMPAIGN/DNC**                              Washington, DC
*Director of National Security Policy*                                     5/03–11/04

**HILL & BARLOW, P.C.**                                                      Boston, MA
*Associate, Real Estate Department*                                        10/97–1/03

**SENATOR J. ROBERT KERREY (D-NE)**                                      Washington, DC
*Legislative Assistant for Foreign Policy and Defense Issues*               9/90–6/94

---

**BOSTON COLLEGE LAW SCHOOL**                                               Newton, MA
*Juris Doctor*, 1997

**YALE LAW SCHOOL**                                                      New Haven, CT
*Visiting Student* (3rd year), 1996-1997
Allard K. Lowenstein International Human Rights Law Clinic

**YALE UNIVERSITY**                                                      New Haven, CT
*Bachelor of Arts* (History), 1990

# EXHIBIT '2'

## Documents

Plaintiff's Response to Interrogatories
First Amended Complaint
Atlantic Specialty's Answer to First Amended Complaint
Atlantic Specialty's First Amended Responses to Plaintiff's Interrogatories
Atlantic Specialty's Second Amended Responses to Plaintiff's Interrogatories
Policy
OneBeacon's Denial Letter (07/28/2014)
NBC's Response to Denial Letter (08/13/2014)
OneBeacon's Reply (09/19/2014)
Plaintiffs' Production Bates-Numbered UCP000162 - UCP000245

## News Articles

MSNBC
http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies

NBC News
http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

The Wall Street Journal
http://www.wsj.com/articles/israel-pulls-forces-from-gaza-as-cease-fire-begins-1407231543

The New York Times
https://www.nytimes.com/2016/08/25/world/middleeast/israel-gaza-war.html
https://www.nytimes.com/2014/08/30/world/middleeast/50-days-of-war-leave-israelis-and-palestinians-only-more-entrenched.html

Time Magazine
http://time.com/3076594/israel-gaza-cease-fire-hamas-netanyahu/
http://time.com/3082458/gaza-war-crimes-israel-palestine/

The Washington Post
https://www.washingtonpost.com/news/worldviews/wp/2014/09/03/heres-what-really-happened-in-the-gaza-war-according-to-the-israelis/?utm_term=.e7ccbabd8102

U.S. News and World Report
http://www.usnews.com/news/world/articles/2016-08-24/israel-clears-forces-in-several-deadly-2014-gaza-war-cases
http://www.usnews.com/news/articles/2014/08/07/saudi-arabia-and-the-third-gaza-war

The Independent
http://www.independent.co.uk/news/world/middle-east/israel-gaza-conflict-50-day-war-by-numbers-9693310.html

The Los Angeles Times
http://www.latimes.com/world/middleeast/la-hp-storygallery-middle-east-conflict-storygallery.html
http://www.latimes.com/world/middleeast/la-fg-un-report-gaza-war-20150622-story.html

BBC News
http://www.bbc.com/news/world-middle-east-28252155
http://www.bbc.com/news/world-middle-east-33128955

Haaretz News (Israeli News Outlet)
http://www.haaretz.com/israel-news/.premium-1.612437

Middle East Quarterly
http://www.meforum.org/5084/rethinking-operation-protective-edge

Associated Press
http://bigstory.ap.org/article/3caf434feda5453dbd9df7477363489a/israel-clears-forces-several-deadly-2014-gaza-war-cases

Jerusalem Center for Public Affairs
http://jcpa.org/timeline-key-moments-gaza-war/

USA Today
http://www.usatoday.com/story/news/world/2016/08/10/gaza-city-families-displaced-war-israel/88002220/

Chicago Tribune
http://www.chicagotribune.com/news/opinion/commentary/ct-deaths-babies-gaza-war-palestinians-perspec-0129-20150128-story.html

Chicago Sun Times
http://chicago.suntimes.com/politics/decimated-hamas-makes-ludicrous-claims/

The Denver Post
http://www.denverpost.com/2014/08/26/israel-and-hamas-reach-an-uneasy-cease-fire-in-50-day-gaza-war/

The Dallas Morning News
http://www.dallasnews.com/news/news/2014/08/26/gaza-cease-fire-reached-after-50-day-war-that-killed-2200-and-settled-little

2

Newsday
http://www.newsday.com/news/world/at-un-israeli-and-palestinian-leaders-air-differences-1.12354379

The Houston Chronicle
http://www.houstonchronicle.com/news/nation-world/world/article/Israeli-house-strikes-killed-mostly-civilians-6080436.php

The Guardian
https://www.theguardian.com/world/2014/aug/26/gaza-ceasefire-israel-palestinians-halt-fighting

The Times of India
http://timesofindia.indiatimes.com/world/middle-east/Israel-Gaza-conflict-50-day-war-by-numbers/articleshow/41000781.cms

The Sydney Morning Herald
http://www.smh.com.au/comment/why-israel-lost-the-war-in-gaza-20140808-101ruh.html

China Daily
http://www.chinadaily.com.cn/world/2014-08/28/content_18500736.htm

The Daily Mail
http://www.dailymail.co.uk/news/article-2740643/Inside-bombed-Gaza-One-week-end-50-day-war-true-scale-devastation-revealed.html

The Telegraph
http://www.telegraph.co.uk/news/worldnews/middleeast/israel/11769685/Israel-may-have-committed-crimes-against-humanity-says-Amnesty.html


**Hard copies of articles associated with links**

13,000 families in Gaza still displaced two years after war with Israel
USA Today - August 10, 2016

50 days of War Leave Israelis and Palestinians Only More Entrenched
The New York Times – August 29, 2014

After Seven Weeks of Gaza War, Hamas 1, Israel 0
Hareetz – January 11, 2017

Children suffer and die in Gaza. Who notices?
Chicago Tribune – January 29, 2015

3

Decimated Hamas makes ludicrous claims
Chicago Sun Times – September 5, 2014

Gaza casefire: Israel and Palestinians agree to halt weeks of fighting
The Guardian – August 27, 2014

Gaza cease-fire reached after 50-day war that killed 2,200 and settled little
DallasNews – August 24, 2016

Gaza-Israel conflict: Is the fighting over?
BBC – August 26, 2014

Here's what really happened in the Gaza ward (according to the Israelis)
The Washington Post – September 3, 2014

How Technology Is Intensifying Gaza War Between Israel and Hamas
NBC News – July 30, 2014

Inside bombed-out Gaza: One week on from end of 50-day war and the true scale of devastation
is revealed
Daily Mail – September 2, 2014

Israel and Hamas may have committed war crimes in Gaza, U.N. report says
Los Angeles Times – June 22, 2015

Israel and Hamas reach an uneasy cease-fire in 50-day Gaza war
The Denver Post – August 26, 2014

Israel clears forces in several deadly 2014 Gaza war cases
Associated Press – August 24, 2016

Israel Clears Troops in Airstrike Near School in 2014 Gaza War
The New York Times – August 24, 2016

Israel may have committed crimes against humanity, says Amnesty
Telegraph UK – July 29, 2015

Israel Seeks to Gain Advantage by Reversing Course in Gaza
Time Magazine – August 3, 2014

Israel, Hamas Set Out Demands on Gaza
Wall Street Journal - August 6, 2014

Israel – Gaza conflict: 50-day war by numbers
The Times of India - August 27, 2014

4

Israel-Gaza conflict: 50-days war by numbers
The Independent – August 27, 2014

Israeli 2014 Gaza war actions lawful, report says
BBC – June 14, 2014

Israeli house strikes killed mostly civilians
Houston Chronicle – February 13, 2015


**Additional News Articles**

A news article published by the Washington Post, dated July 10, 2014, by Griff Witte and William Booth, entitled "As cease-fire with Hamas fails to take shape, Netanyahu says, 'Our answer is fire.'" This article is available at: https://www.washingtonpost.com/world/israel-accepts-truce-plan-hamas-balks/2014/07/15/04373008-0bf5-11e4-8c9a-923ecc0c7d23_story.html?utm_term=.e99302eb1314.

A news article published by MSNBC dated July 18, 2014, by Benjamin Landy and Maria Lokke, entitled "Scenes of war and heartbreak as Israeli ground forces invade Gaza." This article is available at: http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies.

A news article published by MSNBC dated July 18, 2014, by David Taintor, entitled "Obama points to rebels in downed Malaysian jet." This article is available at: http://www.msnbc.com/msnbc/obama-american-dead-malaysia-airlines-crash.

A news article published by MSNBC dated July 16, 2014, by Donna Stefano, entitled "In Israel and Palestine, children imagine a world without war." This article is available at: http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-world-without-war.

A news article published by the Times of Israel by Adiv Sterman, dated July 16, 2014, entitled "Ground incursion in Gaza said 'very likely.'" This article is available at: http://www.timesofisrael.com/idf-ground-incursion-in-gaza-very-likely/.

A collection of "LiveBlogs" published by the Times of Israel on July 7, 2014, by Itamar Sharon, Marissa Newman, and Ilan Ben Zion, entitled "Israel launches 'Protective Edge' counteroffensive on Gaza, Jewish suspects reenact teen's murder." This collection is available at: http://www.timesofisrael.com/as-israel-grapples-with-homegrown-killers-violence-continues/#!.

A news article published by Middle East Eye dated July 8, 2014, entitled "Hamas claims responsibility for rockets fired at Jerusalem, Tel Aviv and Haifa." This article is available at: http://www.middleeasteye.net/news/israels-army-prepared-ground-assault-gaza-official-275282816.

A news article published by the Global News, dated July 9, 2014, entitled "UPDATE: Israel hits key Hamas targets in Gaza offensive." This article is available at: http://globalnews.ca/news/1438089/israel-strikes-hamas-targets-in-gaza-to-stop-rocket-fire/.

A news article published by the Global News, dated July 15, 2014, entitled "Israel: Hamas to pay price for its 'no' to truce." This article is available at: http://globalnews.ca/news/1451058/israel-hamas-to-pay-price-for-its-no-to-truce/.

The news article entitled "LIVE UPDATES: Operation Protective Edge, Day 7," published by Haaretz on July 15, 2014. The article is available at: http://www.haaretz.com/israel-news/1.604898#!.


**Links to Additional News Articles**

MSNBC
http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-world-without-war

NBC
http://www.nbcnews.com/news/world/israel-hamas-exchange-missile-fire-gaza-war-looms-n151111

http://www.nbcnews.com/storyline/middle-east-unrest/public-support-israel-shifting-amid-gaza-war-britain-warns-n168366

http://www.nbcnews.com/storyline/middle-east-unrest/gaza-death-toll-nears-1-500-72-hour-truce-israel-n170236

http://www.nbcnews.com/storyline/west-bank-kidnappings/gaza-war-hamas-admits-kidnapping-three-israeli-teens-n186176

http://www.nbcnews.com/storyline/middle-east-unrest/gaza-cease-fire-holds-between-hamas-israel-after-50-day-n189821

http://www.nbcnews.com/storyline/middle-east-unrest/gaza-war-israel-opens-eight-new-investigations-military-operations-n263241

http://www.nbcnews.com/news/world/israel-palestinians-committed-possible-gaza-war-crimes-u-n-report-n379636

Washington Post
http://www.worldaffairsjournal.org/content/cease-fire-hamas-fails-take-shape-netanyahu-says-%E2%80%98our-answer-fire%E2%80%99

6

CNN
http://www.cnn.com/2017/02/28/middleeast/israel-gaza-report/

http://www.cnn.com/2014/08/01/opinion/miller-gaza-hamas-israel-cease-fire-obstacles/

http://www.cnn.com/2014/08/04/world/meast/gaza-israel-why-civilian-deaths/

BBC
http://www.bbc.com/news/world-middle-east-33223365

The Atlantic
https://www.theatlantic.com/international/archive/2014/08/hillary-clinton-failure-to-help-syrian-rebels-led-to-the-rise-of-isis/375832/

https://www.theatlantic.com/international/archive/2014/08/the-one-place-where-israel-and-hamas-are-communicating/375589/

Global News
http://globalnews.ca/news/1451058/israel-hamas-to-pay-price-for-its-no-to-truce/

Salon
http://www.salon.com/2016/02/09/74_of_gaza_homes_destroyed_by_israel_in_summer_2014_war_have_not_been_rebuilt_as_violent_repression_escalates/

CBS
http://www.cbsnews.com/news/rocket-fired-from-gaza-hits-southern-israel-military-says/

http://www.cbsnews.com/news/hamas-claims-extended-cease-fire-deal-reached-with-israel/

Miscellaneous
http://www.haaretz.com/israel-news/LIVE-1.774365/Gaza-war-hamas-humanitarian-crisis

http://www.jpost.com/Israel-News/Politics-And-Diplomacy/State-comptroller-report-on-2014-Gaza-war-due-today-482789

https://www.ft.com/content/a4291a06-fdcc-11e6-96f8-3700c5664d30

**News Clips**

http://www.nbcnews.com/video/msnbc2/56804549#56804549

http://www.msnbc.com/the-last-word/watch/mh17-mystery-and-war-in-gaza-308247107963

http://www.msnbc.com/melissa-harris-perry/watch/what-it-means-to-live-in-a-war-zone-309370947801

7

http://www.msnbc.com/all-in-with-chris-hayes/watch/day-breaks-in-gaza-following-invasion-307348035939

http://www.msnbc.com/all-in-with-chris-hayes/watch/ground-war-in-gaza-307290179722

http://www.nbcnews.com/video/from-aug-2-2014-ayman-mohyeldin-reports-on-gaza-war-469303875925

http://www.nbcnews.com/watch/nightly-news/bloodiest-day-in-israels-fight-in-gaza-kills-more-than-70-309590595847 - uses the word "war" at about 2:53

http://www.nbcnews.com/watch/nightly-news/israeli-palestinian-conflict-brings-heaviest-fighting-in-years-299767363744 - broadcast on July 8, the first day of Operation Protective Edge, notes that this "could easily become the next war"

http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

http://timesofindia.indiatimes.com/world/middle-east/Israel-Gaza-conflict-50-day-war-by-numbers/articleshow/41000781.cms

http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

https://www.theguardian.com/world/video/2014/jul/09/israeli-airstrikes-gaza-hamas-rocket-attacks-video


**Additional Materials**

Congressional Research Service Reports
https://fas.org/sgp/crs/mideast/RL34074.pdf
January 31, 2014 by Jim Zanotti

https://fas.org/sgp/crs/mideast/R41514.pdf
December 2, 2010 by Jim Zanotti

US State Department Human Rights Report Israel 2014
https://www.state.gov/documents/organization/236814.pdf

Jerusalem Center for Public Affairs
Key Moments in a 50-Day War: A Time by Daniel Rubenstein
http://jcpa.org/timeline-key-moments-gaza-war/

8

Report of the independent commission of inquiry established pursuant to Human Rights Council
resolution S-21/1* ** ***United Nations General Assembly Human Rights Council, Twenty-
ninth session, Human rights situation in Palestine and other occupied Arab territories, 24 June
2015.

Report of the detailed findings of the independent commission of inquiry established pursuant to
Human Rights Council resolution S-21/1* ** ***United Nations General Assembly Human
Rights Council, Twenty-ninth session, Human rights situation in Palestine and other occupied
Arab territories, 23 June 2015.

Remarks on Middle East Peace, John Kerry, Secretary of State, The Dean Acheson Auditorium,
Washington, D.C., December 28, 2016
https://2009-2017.state.gov/secretary/remarks/2016/12/266119.htm

Brookings Institution's 2015 Saban Forum Keynote Address, John Kerry, Secretary of State,
Willard Hotel, Washington, D.C., December 5, 2015
https://2009-2017.state.gov/secretary/remarks/2015/12/250388.htm

Remarks at the Gaza Donors Conference, John Kerry, Secretary of State, Cairo, Egypt, October
12, 2014
https://2009-2017.state.gov/secretary/remarks/2014/10/232896.htm

An Assessment of the 2014 Gaza Conflict, High Level Military Group, October 2015
http://www.high-level-military-group.org/pdf/hlmg-assessment-2014-gaza-conflict.pdf

Fragmented Lives Humanitarian Overview 2014
https://www.ochaopt.org/documents/annual_humanitarian_overview_2014_english_final.pdf

CRS Report for Congress, February 9, 2016 by Aaron D. Pina
https://fas.org/sgp/crs/mideast/RL33269.pdf

Amnesty International: Israel Remains the Occupying Power in Gaza and is Thus Bound By the
Law of Occupation, July 25, 2014 by WashingtonsBlog
http://www.washingtonsblog.com/2014/07/amnesty-international-israel-remains-occupying-
power-gaza-thus-bound-law-occupation.html

Gaza civil servants receive pay in boost to Palestinian Unity, Reuters, October 29, 2014
http://www.reuters.com/article/us-mideast-palestinians-unity-idUSKBN0II14B20141029

Hamas' Order of Battle:  Weapons, Training and Targets, Jerusalem Center for Public Affairs by
Lenny Ben-David
http://jcpa.org/hamas-weapons-training-targets/

Operation 'Protective Edge':  A Detailed Summary of Events, 07/12/104, ICT
https://www.ict.org.il/Article/1262/Operation-Protective-Edge-A-Detailed-Summary-of-Events

Obama administration to work with Palestinian unity government, Reuters, June 2, 2014
http://www.reuters.com/article/us-palestinian-unity-usa-idUSKBN0ED1VQ20140603

Israel and Hamas:  Conflict in Gaza (2008-2009), Congressional Research Service, February 19,
2009 by Jim Zanotti, Coordinator
https://fas.org/sgp/crs/mideast/R40101.pdf

Operation Pillar of Defense-IDF updates, Israel Ministry of Foreign Affairs, 22 Nov. 2012
http://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Palestinian/Pages/Operation_Pillar_of_Defense_
Nov_2012-IDF_updates.aspx

Gaza crisis:  Toll of operations in Gaza, BBC News, 1 September 2014
http://www.bbc.com/news/world-middle-east-28439404

'This Week' Transcript:  Sec. John Kerry and PM Benjamin Netanyahu, ABC News, July 20,
2014
http://abcnews.go.com/ThisWeek/week-transcript-sec-john-kerry-pm-benjamin-
netanyahu/story?id=24632816

No Exit?  Gaza & Israel Between Wars, International Crisis Group, 26 August 2015
https://www.crisisgroup.org/middle-east-north-africa/eastern-mediterranean/israelpalestine/no-
exit-gaza-israel-between-wars

Toward a Lasting Ceasefire in Gaza, International Crisis Group, 23 October 2014
https://www.crisisgroup.org/middle-east-north-africa/eastern-
mediterranean/israelpalestine/toward-lasting-ceasefire-gaza

A Classical Analysis of the 2014 Israel-Hamas Conflict, Combating Terrorism Center at West
Point, December 10, 2014 by Elad Popovich
https://www.ctc.usma.edu/posts/a-classical-analysis-of-the-2014-israel-hamas-conflict

Israel Launches Ground Invasion of Gaza, Time, July 17, 2014, by Eliana Dockterman
http://time.com/3002257/israel-gaza/

Israeli ground troops enter Gaza after 10 days of bombings and airstrikes as Hamas threatens to
make IDF
http://www.dailymail.co.uk/news/article-2695422/Hamas-Israel-resume-attacks-brief-truce.html

# EXHIBIT '3'

MSNBC

1. http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies
2. http://www.msnbc.com/msnbc/israel-and-palestine-children-imagine-world-without-war


NBC News

3. http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536
4. http://www.nbcnews.com/news/world/israel-hamas-exchange-missile-fire-gaza-war-looms-n151111
5. http://www.nbcnews.com/storyline/middle-east-unrest/public-support-israel-shifting-amid-gaza-war-britain-warns-n168366
6. http://www.nbcnews.com/storyline/middle-east-unrest/gaza-death-toll-nears-1-500-72-hour-truce-israel-n170236
7. http://www.nbcnews.com/storyline/west-bank-kidnappings/gaza-war-hamas-admits-kidnapping-three-israeli-teens-n186176
8. http://www.nbcnews.com/storyline/middle-east-unrest/gaza-cease-fire-holds-between-hamas-israel-after-50-day-n189821
9. http://www.nbcnews.com/storyline/middle-east-unrest/gaza-war-israel-opens-eight-new-investigations-military-operations-n263241
10. http://www.nbcnews.com/news/world/israel-palestinians-committed-possible-gaza-war-crimes-u-n-report-n379636

The Wall Street Journal

11. http://www.wsj.com/articles/israel-pulls-forces-from-gaza-as-cease-fire-begins-1407231543

The New York Times

12. https://www.nytimes.com/2016/08/25/world/middleeast/israel-gaza-war.html
13. https://www.nytimes.com/2014/08/30/world/middleeast/50-days-of-war-leave-israelis-and-palestinians-only-more-entrenched.html

Time Magazine

14. http://time.com/3076594/israel-gaza-cease-fire-hamas-netanyahu/
15. http://time.com/3082458/gaza-war-crimes-israel-palestine/

The Washington Post

16. https://www.washingtonpost.com/news/worldviews/wp/2014/09/03/heres-what-really-happened-in-the-gaza-war-according-to-the-israelis/?utm_term=.e7ccbabd8102

17. http://www.worldaffairsjournal.org/content/cease-fire-hamas-fails-take-shape-netanyahu-says-%E2%80%98our-answer-fire%E2%80%99

CNN

18. http://www.cnn.com/2017/02/28/middleeast/israel-gaza-report/
19. http://www.cnn.com/2014/08/01/opinion/miller-gaza-hamas-israel-cease-fire-obstacles/
20. http://www.cnn.com/2014/08/04/world/meast/gaza-israel-why-civilian-deaths/

U.S. News and World Report

21. http://www.usnews.com/news/world/articles/2016-08-24/israel-clears-forces-in-several-deadly-2014-gaza-war-cases
22. http://www.usnews.com/news/articles/2014/08/07/saudi-arabia-and-the-third-gaza-war

The Independent

23. http://www.independent.co.uk/news/world/middle-east/israel-gaza-conflict-50-day-war-by-numbers-9693310.html

The Los Angeles Times

24. http://www.latimes.com/world/middleeast/la-hp-storygallery-middle-east-conflict-storygallery.html
25. http://www.latimes.com/world/middleeast/la-fg-un-report-gaza-war-20150622-story.html

BBC News

26. http://www.bbc.com/news/world-middle-east-28252155
27. http://www.bbc.com/news/world-middle-east-33128955
28. http://www.bbc.com/news/world-middle-east-33223365

Haaretz News (Israeli News Outlet)

29. http://www.haaretz.com/israel-news/.premium-1.612437

Middle East Quarterly

30. http://www.meforum.org/5084/rethinking-operation-protective-edge

The Atlantic

31. https://www.theatlantic.com/international/archive/2014/08/hillary-clinton-failure-to-help-syrian-rebels-led-to-the-rise-of-isis/375832/
32. https://www.theatlantic.com/international/archive/2014/08/the-one-place-where-israel-and-hamas-are-communicating/375589/

Associated Press

33. http://bigstory.ap.org/article/3caf434feda5453dbd9df7477363489a/israel-clears-forces-several-deadly-2014-gaza-war-cases

Jerusalem Center for Public Affairs

34. http://jcpa.org/timeline-key-moments-gaza-war/

USA Today

35. http://www.usatoday.com/story/news/world/2016/08/10/gaza-city-families-displaced-war-israel/88002220/

Chicago Tribune

36. http://www.chicagotribune.com/news/opinion/commentary/ct-deaths-babies-gaza-war-palestinians-perspec-0129-20150128-story.html

Chicago Sun Times

37. http://chicago.suntimes.com/politics/decimated-hamas-makes-ludicrous-claims/

The Denver Post

38. http://www.denverpost.com/2014/08/26/israel-and-hamas-reach-an-uneasy-cease-fire-in-50-day-gaza-war/

The Dallas Morning News

39. http://www.dallasnews.com/news/news/2014/08/26/gaza-cease-fire-reached-after-50-day-war-that-killed-2200-and-settled-little

Newsday

40. http://www.newsday.com/news/world/at-un-israeli-and-palestinian-leaders-air-differences-1.12354379

The Houston Chronicle

41. http://www.houstonchronicle.com/news/nation-world/world/article/Israeli-house-strikes-killed-mostly-civilians-6080436.php

The Guardian

42. https://www.theguardian.com/world/2014/aug/26/gaza-ceasefire-israel-palestinians-halt-fighting

The Times of India

43. http://timesofindia.indiatimes.com/world/middle-east/Israel-Gaza-conflict-50-day-war-by-numbers/articleshow/41000781.cms

The Sydney Morning Herald

44. http://www.smh.com.au/comment/why-israel-lost-the-war-in-gaza-20140808-101ruh.html

China Daily

45. http://www.chinadaily.com.cn/world/2014-08/28/content_18500736.htm

The Daily Mail

46. http://www.dailymail.co.uk/news/article-2740643/Inside-bombed-Gaza-One-week-end-50-day-war-true-scale-devastation-revealed.html

The Telegraph

47. http://www.telegraph.co.uk/news/worldnews/middleeast/israel/11769685/Israel-may-have-committed-crimes-against-humanity-says-Amnesty.html

Global News

48. http://globalnews.ca/news/1451058/israel-hamas-to-pay-price-for-its-no-to-truce/

Salon

49. http://www.salon.com/2016/02/09/74_of_gaza_homes_destroyed_by_israel_in_summer_2014_war_have_not_been_rebuilt_as_violent_repression_escalates/

CBS

50. http://www.cbsnews.com/news/rocket-fired-from-gaza-hits-southern-israel-military-says/
51. http://www.cbsnews.com/news/hamas-claims-extended-cease-fire-deal-reached-with-israel/

4

# EXHIBIT 'D'

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
CASE NO: 2:16-cv-04435-PA-MRW

UNIVERSAL CABLE PRODUCTIONS LLC, and
NORTHERN ENTERTAINMENT PRODUCTIONS LLC,
Plaintiffs,
v.

ATLANTIC SPECIALTY INSURANCE COMPANY,
Defendant

### EXPERT REPORT OF ANTHONY CLARK, AIC

I am the Principal of Clark Insurance Arbitration & Consulting, LLC located in Plainfield, Illinois. Strasburger & Price, LLP, on behalf of Atlantic Specialty Insurance Company, has engaged me as an expert witness for the purpose of forming an opinion in the above referenced case regarding the denial of the claim and whether the denial of the claim by the insurance company would be considered reasonable given the circumstances from which the claim arose.

I have over 40 years of experience as a property insurance adjuster, supervisor, claims officer, and property insurance consultant. I retired from the position of Vice President of Property Claims for a major international insurance carrier in 2014 and am now engaged as a consultant. During the first fifteen years of my career I was a field adjuster progressing from a trainee, initially involved in homeowners and small commercial losses, to the level of Executive General Adjuster handling significant commercial losses exclusively. I was then promoted to the position of Assistant Vice President of property claims with responsibility for the direct supervision of a staff of General Adjusters located throughout the United States as well as conducting extensive training regarding the handling of commercial losses. In addition, I had responsibility for the set up and field supervision of the catastrophe response team during major natural disaster events that included

1

tornadoes, hurricanes, hailstorms, and earthquakes.  As a result of this experience, I
am very familiar with the handling, supervision, and management of first party
property claims in many jurisdictions.  During my career I have directly handled and
supervised claims in California.  My experience includes the internal audit and
review of claim files for an independent adjusting firm.  Thus I was required to be
familiar with the statutory requirements of multiple jurisdictions.  Throughout my
career, both as an adjuster and in supervision, I have been involved in claims where
there were allegations of bad faith handling of claims and was required to respond
to those allegations.  I have prepared industry presentations and taught classes
related to the appropriate handling of first party property claims for the past 30
years of my career.

My background and experience is fully described in the C.V. attached to this report.
I have not testified as an expert at trial in the past four years.  I have testified in
deposition on three matters within the past four years as noted on the C.V.  I have
not authored any publications within the past 10 years.

My fee for consultation, review, and reporting is $350 per hour and for deposition or
testimony time is $400 per hour.  Expenses are reimbursed on an actual incurred
basis and travel time is $150 per hour.

**Documents Reviewed**

1.  Plaintiffs' First Amended Complaint for (1) Breach of Insurance Contract; and (2) Breach of Implied Covenant of Good Faith and Fair Dealing, Filed 07/07/16.

2.  Defendant's Original Answer to Plaintiffs' First Amended Complaint, Filed 08/05/16.

3.  Plaintiffs' Response to Defendant's First Set of Interrogatories, Filed June 20, 2016.

4.  Defendant's Second Amended Responses to Plaintiffs' First Set of Interrogatories, served on February 22, 2017.

5.  Atlantic Specialty Insurance Company Policy Number MP 00163-04.

6.  Letter of July 28, 2014 from Pamela A. Johnson of OneBeacon Entertainment to Andrea Garber of NBC Universal Media, LLC.

7.  Letter of August 13, 2014 from Lucia E. Coyoca, A Professional Corporation of Mitchell Silberberg & Knupp LLP to Pamela A. Johnson as a response to her letter of July 28, 2014.

8.  Letter of September 13, 2014 from Pamela A Johnson to Lucia E. Coyoca as a response to the letter of August 13, 2014.

9.  Atlantic Specialty Insurance Company documents encompassing the following Bates reference numbers: ATL000001 through ATL000161, ATL000294 through ATL000319, ATL000322 through ATL000328, and ATL000393 through ATL000399.

10.  Atlantic Specialty Insurance Company production of claim correspondence and documents for the DIG claim.

11.  Deposition Testimony of Daniel Gutterman, with exhibits.

12.  Deposition Testimony of Theresa Gooley, with exhibits.

13.  Deposition Testimony of Peter Williams, with exhibits.

**Summary of Opinions**

Based on my experience in the handling, review, and denial of claims, it is my
opinion that Atlantic Specialty Insurance Company (Atlantic) properly conducted a
thorough and timely investigation into the circumstances surrounding the Extra
Expense claim as presented by the plaintiffs and made a reasonable determination
under the terms and conditions of the applicable policy of insurance that the war
exclusion applied and therefore could make no payment to the insured.  Atlantic
acted as a reasonable carrier would by staying in communication with its insured
during the investigation stage of the claim, and by providing updates on its analysis
on coverage.  Atlantic then proceeded to provide the insured with a clear and
detailed explanation of the denial in an expedited manner as requested by the
insured.  Atlantic also responded in a complete and timely manner to a request by
the insured for reconsideration.  Atlantic continued to communicate with its insured
in efforts to discuss the coverage issues and reach some negotiated resolution,
including through an in-person meeting and a settlement offer.

It is my opinion that this determination—that coverage was precluded by applicable
exclusions in the policy—was made solely from the specific circumstances as they
were made known to, investigated by, and considered by Atlantic Specialty
Insurance Company, and those circumstances were considered in light of the policy
contract wording.  Nothing in the claim file or in any other actions of Atlantic
Specialty indicates that any other extraneous motives affected the ultimate claim
decision.

**Discussion**

The actions and activity leading up to the various circumstances that came into
focus in early July of 2014 between Israel and Hamas in the Gaza Strip has been

4

documented through many sources and news reports.  Following is a small sample of the reporting, which according to the claim file materials were reviewed and considered by Atlantic:

https://www.washingtonpost.com/news/worldviews/wp/2014/09/03/heres-what-really-happened-in-the-gaza-war-according-to-the-israelis/?utm_term=.e7ccbabd8102

http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies

http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

https://www.nytimes.com/2014/08/30/world/middleeast/50-days-of-war-leave-israelis-and-palestinians-only-more-entrenched.html

http://time.com/3076594/israel-gaza-cease-fire-hamas-netanyahu/

According to the claim materials maintained by Atlantic, the insured notified Atlantic Specialty Insurance Company by telephone call on July 11, 2014 that due to the outbreak of hostilities they believed that the Imminent Peril portion of the Extra Expense coverage in the policy could be applicable and that they would delay the resumption of filming one of their productions, namely *DIG*, in Israel for one week. Within a very short time period, due to the ongoing conflict, the production was ultimately moved to Croatia and New Mexico.

It is my understanding that the insured sought Extra Expense coverage, in connection with its position that the Imminent Peril condition would apply.  Due to

5

the facts that were presented to Atlantic, Atlantic quickly began to review the facts
in the context of the several war exclusions in the policy, which are set out here:

III. EXCLUSIONS APPLICABLE TO ALL SECTIONS OF THIS POLICY

This policy does not insure against loss or damage caused directly or
indirectly by:

1. War, including undeclared or civil war, or

2. Warlike action by a military force, including action in hindering or
defending against an actual or expected attack, by any government,
sovereign or other authority using military personnel or other agents, or

3. Insurrection, rebellion, revolution, usurped power, or action taken by
governmental authority in hindering or defending against any of these.
Such loss or damage is excluded regardless of any other cause or event
that contributes concurrently or in any sequence to the loss.

4. Any weapon of war including atomic fission or radioactive force,
whether in time of peace or war;

In considering all the factors that are entering into an analysis at the time of a
coverage determination, it is my understanding from the custom and practice of the
industry that unless a term is specifically defined in a policy, it is to be viewed as it is
commonly used or ordinarily understood.

In looking at the entire political situation in the Middle East and the historical
perspective of the Israeli and Palestinian relationship, the claim materials indicate
that Atlantic noted some points and some research that appeared to be important to
understanding the reasonable application of the terms and conditions of the
contract at issue here, and the application of the common use and understanding of
the terms in the contract.

1. Hamas directed its military force to engage in rocket attacks on
   Israel in June and July 2014.
2. Israel engaged in not only air strikes directed to the Gaza Strip but
   also a ground invasion into the Gaza Strip.

3.  This ongoing action between the parties continued for a period of
    time until late August when the Israelis withdrew from Gaza.

4.  During the conflict, 2,143 Palestinians and 69 Israelis were killed,
    Israel struck 5,283 targets in Gaza, Hamas fired 4,564 rockets into
    Israel, and more than 50,000 buildings in Gaza were damaged or
    destroyed.

5.  Hamas is the de facto governing entity in the Gaza Strip and is
    known to have a military force at its disposal.

6.  The action between the Hamas and Israeli forces was clearly
    warlike and a majority of the reputable news and media outlets
    clearly labeled this activity as a "war" including affiliates of the
    insured, MSNBC and NBC News.

Atlantic, in the analysis of the applicable exclusions noted above, appears to have
concluded that the common understanding and ordinary meaning given to the
activities that caused the move of the production and any Extra Expense to be
incurred by the insured was clearly a "war."  In addition, Atlantic appears to have
concluded that war occurred between a "government, sovereign," namely Israel, and
an "other authority," namely Hamas, the controlling entity in the Gaza Strip.  Both
entities used military forces as well as "weapons of war," namely: rockets, war
planes, and tanks.  In regard to its process of research and its analysis of the facts, I
found that Atlantic followed a reasonable approach to its analysis and ultimate
conclusion.

Communications from the insured make clear that the insured preferred that
Atlantic consider this to be a terrorist action merely because the United States has
designated Hamas as a terrorist organization. Atlantic's writings communicated the
concept that such a designation does not change the fact that the events leading up
to and precipitating the moving of the filming were not terrorist attacks but rather

7

an outbreak and continuation of ongoing hostilities that amounted to a war or
warlike actions. Based upon all of its research, which appears to have been
comprehensive, especially for the time involved, Atlantic concluded that all the
activity involved in these events lead one to the conclusion: that this was a war.

On Friday, July 11, 2014, after hostilities had escalated earlier in the week and
security reports seemed to indicate that the production could not be protected,
Atlantic was provided with a verbal notice by telephone call to the President of the
Entertainment division that a claim would be filed. On Tuesday, July 15, 2014,
Atlantic received a written submission of a claim through the ordinary
claims-reporting channels. It included a security notice from July 10, 2014,
reporting conditions as of that date. At the time of the written notice and on several
occasions until a final and detailed, written coverage determination was
communicated to the insured, it was made clear through the insured's broker, Aon,
that the insured wanted a determination of coverage as soon as possible. Time was
of the essence and that was impressed upon Atlantic. In response to this request,
Atlantic began its own investigation of the circumstances surrounding the hostilities
as well as reviewing all the materials as supplied by the insured on an expedited
basis as requested.

Using numerous reliable and authoritative sources, Atlantic thoroughly investigated
the circumstances as reported and considered pertinent data in order to produce a
substantiated coverage position quickly as the insured had requested. Furthermore,
over the period immediately following the notice of loss, Atlantic continued to
monitor the ongoing hostilities between Hamas and Israel, including the reporting
of a ground invasion of Gaza by Israeli armed forces. It was during this period of
time that Atlantic analyzed the information and stayed in contact with its insured
(and its broker), communicating its belief, based upon its analysis, that the war
exclusions appeared to apply to these facts. In addition to conducting its own

8

independent analysis and reaching a coverage decision, which was made relying on
the various news articles and up-to-date reports as the hostilities were unfolding,
as well as information provided to it by the insured, Atlantic separately sought legal
advice by requesting a coverage opinion to add to the overall process. Ultimately,
Atlantic communicated its final conclusion in writing that the war exclusions in the
policy would be applicable.

Atlantic continued to stay in communication with its insured and the insured's
broker, including through telephone calls of July 15, July 17, and July 22. The file
materials indicate that Atlantic provided updates on its ongoing process and its
analysis that the war exclusions could apply here in the calls of July 17 and July 22.
The file materials also indicate that Pamela Johnson involved her supervisor in the
claim review process, and that the ultimate decision of Atlantic was approved by
additional supervisory personnel within Atlantic.

After Atlantic arrived at its final conclusion, it provided NBCUniversal Media LLC
(NBCU) with a letter on July 28, 2014 that fully explained their reasoning in denying
the claim. The letter clearly laid out all the facts as Atlantic came to understand
them, and in detail, enumerated the results of their investigation and the reasoning
for the application of the exclusion and thus the denial of the claim. The denial was
made in an expeditious and timely manner, as the insured had requested, as well as
providing a reasonable and complete explanation for the conclusion. The denial
documented the prior verbal discussions of the matter as well.

In a response letter dated August 13, 2014, Mitchell Silberberg & Knupp LLP as a
representative for NBCU responded to the July 28, 2014 denial letter by presenting
their view and requested a reconsideration of the denial. Upon receipt of the letter,
Atlantic proceeded to give careful consideration to the points raised. After this
consideration, Atlantic still felt that they had reached the proper conclusion in

denying the claim. On September 19, 2014 Atlantic responded to the request for reconsideration with a letter that set forth the position that it remained their conclusion that the insurance policy did not insure the claim. Furthermore, Atlantic proceeded in this letter to once again address all the points as they were raised in the response letter and provide a complete and timely response.

All the activity undertaken by Atlantic in response to the claim as presented and the requests for coverage determination leads me to the opinion that Atlantic acted in compliance with all reasonable insurance industry claim standards and fully and timely communicated the results of their investigation and their conclusion to the insured. Upon receipt of a request for reconsideration, Atlantic gave serious consideration to the request and responded to it promptly and completely, restating all their reasoning for the continued denial of the claim.

Even after there was disagreement regarding application of the war exclusions, Atlantic continued to make efforts to resolve the claim. Atlantic met in person with its insured (and the insured's outside counsel) in November 2014, continuing its efforts to discuss the claim and the exclusions. As a show of good faith, even though it was not obligated to do so, Atlantic made a settlement offer in an effort to resolve the disputed claim.

Atlantic reviewed this claim in the context of a long-standing relationship with this insured, where Atlantic had reviewed and paid many other claims. This was not a single or isolated incident whereby a single claim was submitted on this policy and not paid. Atlantic demonstrated in the ongoing relationship that it certainly would pay covered claims under the policy. It seems clear from what I have reviewed that, while Atlantic was willing to make very significant payments to the insureds in the past, exceeding $4 million in a prior single policy period, it was not willing to pay

this claim only because it, in good faith, had concluded the claim was excluded under the policy.

Atlantic in the handling of this claim took all steps that a reasonable insurer and claim handler would take to determine the pertinent facts and circumstances surrounding this claim. They relied on reputable and trustworthy sources for background information and real-time reporting regarding the hostilities that ultimately caused the insured to make the decision to move the production out of Israel. By expediting their thorough investigation as requested by the insured, Atlantic acted in a manner that reflected best practices as recognized in the insurance industry and made their coverage determination based on the circumstances surrounding this individual claim and the applicable terms and conditions of the policy contract at issue. Atlantic communicated fully and clearly, and continued to do so over the course of the claim's existence.

No facts demonstrate a lack of good faith or failure on the part of Atlantic to act in a reasonable fashion.

Anthony Clark, AIC
March 17, 2017

# EXHIBIT '1'

## *Curriculum Vitae*

Anthony "Tony" Clark
Clark Insurance Arbitration & Consulting, LLC
2100 Pebble Beach Drive
Plainfield, IL 60586-8384
815-260-3140
tclark112@sbcglobal.net

Tony has experience as a field adjuster, claim management officer, and insurance instructor.   Additional experience has been gained through active participation in claim industry trade associations.   Tony is also a certified arbitrator with ARIAS-US.

Tony retired as Head of the Property Claims Division for Allianz Global Corporate & Specialty North America where he managed claims arising from Property, Energy, and Engineering (Builder's Risk) lines of business for large multinational corporate insureds.

Besides being a certified arbitrator with ARIAS-US, he is available to act as a consultant to the claims industry either as an auditor, coverage and claim handling expert or consultant, appraisal umpire, or arbitrator in various other matters where he has a particular interest and feels that he can contribute. The practice is not limited to representation of either the client or company side of the business.

History:

February 2014 to Present – Self-employed as Principal, Clark Insurance Arbitration and Consulting, LLC.

Tony has been retained in sixteen litigation matters as an expert providing opinions regarding industry custom and practice in the application of coverage provisions and the appropriateness of the claim handling activity.  He has also been retained as a party arbitrator in three reinsurance disputes.   One matter, a boiler and machinery reinsurance coverage dispute, has been concluded with an award.  Another boiler and machinery matter is still open.  A third reinsurance dispute recently settled just prior to the scheduled arbitration hearings.  Finally, he was retained as a party arbitrator in a direct insurance arbitration regarding application of code issues, building valuations, and business interruption value and coverage, but that matter settled prior to any action by the arbitration panel.  Tony will be providing lessons plans and seminars for an independent adjusting company as well.

Expert report and deposition for defendants.  United States District Court for the Western District of Missouri at Kansas City, Case No. 4:13-cv-00945-ODS, Performing Arts Community Improvement District, Plaintiff v. Ace American Insurance Company, Defendant.

Expert deposition for defendant.  Superior Court of the State of California, County of Los Angeles, Case No. BC45397.  Northrop Grumman Corp., Plaintiff vs. Aon Risk Insurance Services West, Inc., Defendant.  (Matter settled before deposition was transcribed.)

Expert report and deposition for defendant.  United States District Court for the Northern District of Illinois, Eastern Division, Case No. 13-CV-03482, PQ Corporation, Plaintiff, vs. Lexington Insurance Company, Defendant.

October 2003 to January 2014 - Vice President Property Claims - Allianz Global Corporate & Specialty (AGCS)

Head of Property Claims Department for Americas
Included US, Canada, Mexico, Brazil
Responsible for Property/Energy/Engineering (Builders Risk and Power Generation) Lines of Business
Member of Executive Management Team
Manage claims staff
Manage litigation
Negotiate and conclude claims with clients, brokers, and representative counsel
Interact with Underwriting Department on coverage and lessons learned
Provide Local/Global Management reports
Participate in Global projects and Global Claims Council
Participate in Market Management Client/Broker Meetings
Presenter at Global Managers meetings – Business Income 2010 and Thailand Flood Lessons Learned Supply Chain Coverage 2012

May, 1999 to Sept. 2003 - Manager Professional Development – VeriClaim (formerly McLarens Toplis)

Conduct Educational Seminars for all level of adjusters, internal and client
Basic Adjusting Skills, e.g., estimating, investigating, reporting
Advanced Commercial Adjusting
Business Income, incl., Gross Earnings, Loss of Profits, Extra Expense, Expediting Expense, Rental Income and Value, Stated Value Forms
Specialized Coverage, e.g., Boiler and Machinery, Inland Marine

Conduct Internal Audits and Client External Audits
Function as Executive General Adjuster on assigned losses

July 1976 – April 1999 - Progression from Adjuster Trainee to Assistant Vice President
Property, Continental Insurance Company – CNA purchased Continental 1996
Supervision of 18 member General Adjusting Staff
Home Office Supervision Responsibility for claims over $5M for marine and international divisions.
Home Office responsibility for subrogation/salvage recovery 1993 - 1994
Catastrophe Coordinator – Responsibility for initial survey, set-up, and supervision of major losses.   (Andrew, Northridge Earthquake, various Hurricanes / Catastrophes 1990 through 1999)
Setup Project for evaluation of third party business income losses resulting from Exxon Valdez oil spill on behalf of Trans-Alaska Pipeline Fund - 1991. Evaluated claims for lost income presented by Native American Tribes and several major fishing/canning operations.
Primary Developer and Instructor for Advanced Property Training Program 1984 - 1999
Eight week course of study over two year period covering over 20 topics relating to Commercial Adjusting – Trained over 60 participants

Industry Involvement:
AIC designation granted June 1981
RPA (Registered Professional Adjuster) designation granted December 1998, Retired 2014
Member RPA Board of Directors 2007 to 2013
Member RPA Education Committee 2000 to 2005
Member – LEA (Loss Executives Association) – 1996 to 2013 (Retired 2014)
Panelist LEA Education Conference
Response to Dirty Bomb Attack - 2005
Appraisal in Major Losses - 2007
Member PLRB Claims Conference Planning Committee 2000 to 2007
PLRB Claims Conference Vice-Chairman - 2006, Chairman - 2007
Member PLRB Regional Advisory Board 2004 to 2005
Member PLRB Property and Liability Advisory Board 2006 to 2013
Workshop Panelist PLRB Claims Conference
Catastrophe Review 1986 through 1998 inclusive
Most Asked Coverage Questions 1999 & 2000
Property Communication 2003
Appraising Large Commercial Losses 2008-2009
Equipment Losses, A Different Adjustment Challenge 2011
Dram Shop Mock Trial – Role as the Judge 2014
Mediation – Removing the Mystique 2015 and 2016

Business Income Presentation
    NJ Chapter of CPCU Society – 1994
    Chicago Chapter of IMUA - 2005
Ethics Presentation
    RPA meeting - 2000 and 2004
    ISO Catastrophe Conference – 2001
    Combined Claims Conference in California – 2002
    Combined regional meeting NAIIA & RPA – 2007
Earthquake Preparation Seminar Memphis I-Day – 1995
Panelist – IFAA (International Federation of Adjusting Associations),
    Educational Conference – Catastrophe Claims - 2015
Panelist on Inland Marine Insurance topic at CPCU annual meeting 2004
Faculty Member at ARIAS-US Spring Conference – Supply Chain Coverage
Issues – 2013
Vericlaim Inc., Instructor, Generation Next development seminars, 2016
through 2017
Member – Boiler and Machinery Association of Chicago 1996 - 2003
Member – Western Loss Association - 2010 - 2013
Member Arbitration Panel (5 member) for two arbitrations representing
Boiler and Machinery aspect – Boiler and Machinery vs. Property – 1993
Party Arbitration (3 member) representing property carrier – Boiler and
Machinery vs. Property – 2002

Education:
    St. Mary's Seminary, Perryville, MO
        Bachelor of Science - 1971
        Major - Philosophy
        Minors – Mathematics and Education
    Catholic University, Washington, DC
        Graduate Studies in Philosophy
    DeAndreis Seminary, Lemont, IL
        Graduate Studies in Theology