1  MARC J. SHRAKE (SBN 219331)
   mshrake@fmglaw.com
2  WAYNE H. HAMMACK (SBN 202709)
   whammack@fmglaw.com
3  FREEMAN MATHIS & GARY, LLP
   550 South Hope Street, Suite 2200
4  Los Angeles, California 90071
   Telephone: (213) 615-7019
5  Facsimile: (213) 615-7000

6  CHRISTOPHER W. MARTIN (*Pro Hac Vice*)
   martin@mdjwlaw.com
7  MELINDA R. BURKE (*Pro Hac Vice*)
   burke@mdjwlaw.com
8  WILLIAM E. McMICHAEL (*Pro Hac Vice*)
   mcmichael@mdiwlaw.com
9  MARTIN, DISIERE, JEFFERSON
   & WISDOM LLP
10 9111 Cypress Waters Blvd., Suite 250
   Dallas, Texas 75019
11 Telephone: (214) 420-5500
   Facsimile: (214) 420-5501

12
   Attorneys for Defendant
13 Atlantic Specialty Insurance Company

14
               **UNITED STATES DISTRICT COURT**
15
     **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
16

17 UNIVERSAL CABLE PRODUCTIONS          ) CASE NO. 2:16-cv-4435-PA-MRW
   LLC, a Delaware limited liability       )
   company, and NORTHERN                 ) **WRITTEN PROFFER OF**
18 ENTERTAINMENT PRODUCTIONS            ) **EXPERT OPINION OF ASIC'S**
   LLC, a Delaware limited liability       ) **INTERNATIONAL LAW**
19 company,                              ) **EXPERT PROFESSOR JOHN B.**
                                         ) **QUIGLEY**
20              Plaintiffs,              )
             vs.                        ) Hearing Date:    TBD
21                                       )
   ATLANTIC SPECIALTY INSURANCE         ) File Date:  6/20/2016
22 COMPANY, a New York insurance        ) Pre-Trial Conference: 1/17/2020
   company,                              ) Trial Date:   2/18/2020
23                                       )
              Defendant.                )
24 _____ )

25 ///

26 ///

27 ///

28 ///

Freeman Mathis
& Gary, LLP
Attorneys at Law

### Written Proffer of Expert Opinions of ASIC's International Law Expert
### Professor John B. Quigley

Plaintiffs allege that ASIC breached the implied covenant of good faith and fair dealing in failing to properly investigate Plaintiffs' Dig claim and in denying coverage of Plaintiffs' Dig claim under the Policy. The claim was denied by ASIC under the war exclusions of the Policy. Professor John B. Quigley was engaged by ASIC to evaluate Plaintiffs' claims regarding the validity of the application of the war exclusions and to rebut the opinions set forth by Mr. Ross, Dr. Koh, and Mr. Levitt, Plaintiffs' expert witnesses, who offered opinions on the validity of the application of the war exclusions. Professor Quigley prepared an Expert Report and a Rebuttal Expert Report. The Quigley Expert Report was incorporated by reference in ASIC's Expert Witness Disclosure as Exhibit A.  [ASIC Expert Witness Disclosure, p. 3].  The Quigley Rebuttal Expert Report was incorporated by reference in ASIC's Rebuttal Expert Witness Disclosure as Exhibit A.  [ASIC Rebuttal Expert Witness Disclosure, p. 4].

Professor Quigley's opinions are set forth in the Disclosure and Rebuttal Disclosure and are provided in this Proffer. Professor Quigley was deposed by Plaintiffs but was not asked about each opinion set forth in his reports.  Moreover, ASIC reserved its questions of Professor Quigley until the time of trial.

ASIC now files this Proffer of the opinions of Professor Quigley as follows:

A. **Opinion and Citation to Expert Witness Disclosure:** The 50-day conflict in 2014 between Israel and Hamas was a war and was waged with weapons of war as those terms are commonly used and as those terms are understood within his area of expertise and study. [ASIC Expert Witness Disclosure, p. 2; ASIC Rebuttal Expert Witness Disclosure, p. 2]. As part of this opinion, Professor Quigley will testify that Hamas is a part of the government of the State of Palestine and that Palestine does qualify as a state; that Hamas is at least a de facto administration governing  territory because Hamas came to power in 2006

Freeman Mathis
& Gary, LLP
Attorneys at Law

through elections, Hamas functions as a government, and other states work with Hamas, thereby acknowledging its role as the governing body in Gaza; that the fact that the United States has designated Hamas as a terrorist organization does not impact the fact that the 2014 conflict was a war and was waged with weapons of war; and that, regardless of the designations given to the participants, the 2014 50-day conflict constituted a war and was waged with weapons of war.      [ASIC Expert Witness Disclosure, pp. 2-3; ASIC Rebuttal Expert Witness Disclosure, pp. 2-3].

1. **Relevance of Opinion:** Professor Quigley's opinion regarding the validity of the application of the war exclusions, as noted above, supports the reasonableness of the basis for the claim's denial and directly rebuts the opinions of Mr. Ross, Dr. Koh, and Mr. Levitt.

2. **Bases for Opinion:** Professor Quigley's opinion is based on his background as a professor of international and comparative law. Professor Quigley is an expert in the nature of "war," statehood, state actors, and sovereignty. Professor Quigley is also an expert in Israeli-Palestinian relations and the 2014 50-day conflict that occurred between Israel and Hamas.  Professor Quigley's qualifications and experience are further detailed on page 1 of his Expert Report.

   a. The Gaza-Israel hostilities of 2014 commenced during the second week in July 2014 and continued to late August 2014. Three Israeli teenagers were kidnapped on June 12, 2014 in the West Bank of the Jordan River, territory of Palestine occupied by Israel since 1967. The Israeli Government attributed the kidnapping to Hamas, which governs Gaza. Israel's army launched a large-scale search and arrest operation in the West Bank, detaining large numbers of Hamas personnel resident there. In response, military units associated with the Hamas administration in Gaza fired rockets into

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S INTERNATIONAL LAW EXPERT
PROFESSOR JOHN B. QUIGLEY

16294966.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

Israel from Gaza. Israel responded with an air campaign against Gaza, a campaign that led to more rocket-firing from Gaza. Israel called its military action against Gaza "Operation Protective Edge," thus giving it a designation of the type that governments give to wars.

b. Except for intermittent periods of ceasefire, rockets continued to be fired from Gaza into Israel, and Israel continued air strikes. Damage was especially intense in neighborhoods of Gaza from which, according to Israel, rockets were being fired. [Benjamin Land and Maria Locke, *Scenes of war and heartbreak as Israel-Hamas conflict intensifies, MSNBC*, July 18, 2014]. Horrifying images of war were sent around the world on social media. [Alastair Jamieson, How Technology is Intensifying Gaza War between Israel and Hamas, *NBC News*, July 30, 2014]. These and other major news outlets referred to the hostilities as a "war."

c. On July 17, 2014, a Hamas military force entered Israeli territory, using a sophisticated set of underground tunnels. This action prompted a ground assault by the Israeli Army into Gaza.

d. According to a Commission of Inquiry organized by the United Nations Human Rights Council, during the period of hostilities, more than 6000 airstrikes were launched by Israel against Gaza, and 14,500 tank shells and 35,000 artillery shells were fired. Entire neighborhoods in Gaza were destroyed. An estimated 4881 rockets and 1753 mortars were fired from Gaza into Israel, sending thousands to bomb shelters. Israel's ground assault into Gaza was met by Gaza's defenses. [Report of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1, June 24, 2015, UN Document A/HRC/29/52, paragraphs

Freeman Mathis
& Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S INTERNATIONAL LAW EXPERT
PROFESSOR JOHN B. QUIGLEY

16294966.1  11775-83955

27, 35, 48]. Hamas fired rockets at incoming Israeli ground troops. The Commission of Inquiry counted 67 Israeli soldiers killed overall during the hostilities. On the Gaza side, the Commission of Inquiry counted 789 combatant deaths and 1462 civilian deaths for a total of 2251. Another 11,231 were counted as injured. [Report of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1, June 24, 2015, UN Document A/HRC/29/52, paragraphs 20-21]. Some 20,000 dwellings in Gaza were destroyed or otherwise rendered uninhabitable by Israeli Army bombing. [Signs of war still visible in Gaza; *MSNBC2*, January 16, 2015].

e.  A half million Gazans were forced to flee their homes as a result of the hostilities, primarily Israel's aerial attacks, and became displaced. On the Israeli side, 28,000 residents of southern Israel fled their homes because of rocket fire from Gaza and became displaced. [United Nations Office for the Coordination of Humanitarian Affairs, *Fragmented Lives Humanitarian Overview 2014*, Jerusalem, March 2015].

f.  Efforts at ceasefires were made through the period of the hostilities by the United Nations Security Council. [U.N. Security Council Calls for 'Immediate' Gaza Cease-Fire, *NBC News*, July 28, 2014]. The Security Council is the organ of the United Nations entrusted with "responsibility for the maintenance of international peace."' [UN Charter, art. 24]. Its involvement attested to the seriousness of the hostilities.

g.  Each side characterized the hostilities as a war as they blamed the other. Israeli Prime Minister Benjamin Netanyahu said, while the hostilities were ongoing, "There is no war more just than this." [Be

Freeman Mathis
& Gary, LLP
Attorneys at Law

-5-
WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S INTERNATIONAL LAW EXPERT
PROFESSOR JOHN B. QUIGLEY
16294966.1   11775-83955

ready for 'prolonged' Gaza war, Netanyahu says, *Times of India*, July 29, 2014]. David Roet, Israel's United Nations ambassador, told the United Nations Security Council, "This is not a war we chose," and again, "Israel did not want this war." [UN Security Council, 7222d meeting, July 22, 2014, at 6]. The Palestine UN representative, Riyad Mansour, referred to "Israeli military aggression in Gaza" at the same Security Council meeting. [Id. at 4]. Khaled Meshaal, the Hamas leader, said that the hostilities were "not a war of choice" on his side. [Khaled Meshaal: 'Not a war of choice,' *Al-Jazeera*, August 17, 2014].

h. The media characterized the hostilities as a "war" while they were in progress. NBC News reporter Cassandra Vinograd penned a piece on the ramifications of the hostilities under the headline "Public support for Israel shifting amid Gaza War, Britain warns." *[NBC News*, July 30. 2014]. An NBC Jerusalem correspondent referred to the hostilities as "the current war in the Gaza Strip." [Gaza War: Hamas admits kidnapping three Israeli teens*, NBC News*, August 21, 2014].

i. As the hostilities ended, the media christened them the "50-day war," a reference to the "six-day war" involving the same territory in 1967. [Gaza cease-fire holds between Hamas and Israel after 50-day war, *NBC News*, August 27, 2014; Lizzie Dierden, Israel-Gaza Conflict: 50-Day War by Numbers, *The Independent*, August 27, 2014; Jodi Rudoren, *50 Days of War Leave Israelis and Palestinians Only More Entrenched, New York Times*, August 29, 2014].

j. With hindsight in the aftermath, the media continued to characterize the hostilities as a war, as in a Jerusalem byline piece

Freeman Mathis
& Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S INTERNATIONAL LAW EXPERT
PROFESSOR JOHN B. QUIGLEY

in December 2014. [Gaza War: Israel opens eight new investigations into military operations, *NBC News*, December 7, 2014]. A 2017 piece in an Israeli newspaper did the same. [Barak Ravid and Gil Cohen, Gaza War: 11 Key Headlines from Scathing Report Rattling Israel's Politicians and Military, *Haaretz*, February 28, 2017].

k.  The 2014 Gaza-Israel hostilities constituted a "war" as that term is used in international law and in ordinary parlance.

l.  These hostilities were waged with "weapons of war."

m.  The plain meaning of the term "war" includes the conflict that occurred in 2014 between Gaza and Israel.

n.  Given the scope of the conflict between Hamas and Israel, by any meaning of the term "war," Hamas and Israel were at war. Israel directed a fierce military campaign at Hamas calculated to destroy Hamas' tunnel system and prevent them from being able to launch any serious future attacks against Israel. Hamas, on the other hand, waged ground and air attacks against Israel in support of their stated goal of forcing Israel out of what Hamas considers Palestinian territory. Both sides used weapons of war over an extended period of time with the clear objective of defeating the other side militarily. The battles were fought both on the ground and in the air with sophisticated military weapons, resulting in the significant destruction of property and lives.

Additionally, world-wide the conflict was considered a war.

o.  While Hamas need not have been a government or quasi-government for the conflict to have been considered a war, Hamas is part of the government of the State of Palestine; thus, the 2014 hostilities constituted a war between two states.

Freeman Mathis
& Gary, LLP
Attorneys at Law

p.  Palestine was and is a state. Gaza is part of Palestine. No state other than Palestine makes a claim to Gaza. Gaza was part of Palestine coming out of World War I, under the Treaty of Lausanne of 1923. [Treaty of Peace, Lausanne, July 24, 1923, *League of Nations Treaty Series*, vol. 28, at 11]. After Egypt occupied Gaza in 1948, Egypt administered Gaza. as part of Palestine. Gaza was not incorporated into Egypt. In 1967 Israel occupied Gaza. In 1989, the Palestine Liberation Organization declared itself as the lawful governing authority of Gaza, along with the West Bank of the Jordan River. Israel withdrew from administration in Gaza in 2005. [John Quigley, *The Statehood of Palestine: International Law in the Middle East Conflict*, 2005].

q.  Upwards of 130 states have accorded Palestine formal diplomatic recognition. [CRS Report for Congress, *The Palestinians: Background and U.S. Relations* (Jim Zanotti, Specialist in Middle Eastern Affairs), January 31, 2014, at 13]. In 2012, the United Nations General Assembly declared by resolution that the observer mission that it had received since 1974 was the observer mission of a state. [UN General Assembly, Status of Palestine in the United Nations, Resolution 67/19, 29 November 2012]. Since that time all international institutions that have had occasion to deal with the issue have dealt with Palestine as a state. The Prosecutor of the International Criminal Court on January 1, 2015 accepted a declaration filed by Palestine giving the Court jurisdiction over acts committed "in the occupied Palestinian territory, including East Jerusalem, since June 13, 2014." That declaration could be accepted by the Prosecutor only on the premise that Palestine is a state, since Article 12(3) of the Court's Statute accords the right to

Freeman Mathis
& Gary, LLP
Attorneys at Law

-8-

confer jurisdiction only to states. On the basis of the Palestine declaration, the Prosecutor opened a preliminary examination of possible war crimes committed in the Gaza-Israel hostilities. That examination is ongoing. [International Criminal Court, Office of the Prosecutor, Report on Preliminary Examination Activities 2016, paragraph 111].

r.  On January 2, 2015, Palestine acceded to the Statute of the International Criminal Court. That accession was filed, as required, with the Secretary-General of the United Nations. [International Criminal Court, Office of the Prosecutor, Report on Preliminary Examination Activities 2016, paragraph 111]. Accession to the Statute is open only to states. The Secretary-General approved Palestine's accession, thereby acknowledging Palestine's status as a state.

s.  The United States deals with Palestine as a state. Beginning in 1993, the United States has encouraged Israel and Palestine to agree on a border and other issues. An agreement was signed at the White House to this end in 1993. [Declaration of Principles on Interim Self-Government Arrangements, September 13, 1993]. Borders are arranged only between states. A cession of territory can come only from a state. "Cession means the formal transfer of title (sovereignty) over territory from one state to another." [Gerhard von Glahn, *Law Among Nations: An Introduction to Public International Law* (1996), at 301]. If Israel were to gain territory from Palestine through negotiations, or if Palestine were to gain territory from Israel through negotiations, the title would be valid because it came from a state.

Freeman Mathis
& Gary, LLP
Attorneys at Law

t.  In 2003, the United States fashioned another arrangement that was premised on Palestine's status as a state. A Performance-based Roadmap to a Permanent Two-State Solution to the Israeli Palestinian Conflict was drawn up by the United States, Russia, the European Union, and the United Nations on April 30, 2003. The Roadmap charted three "phases" to lead to a peace agreement between Israel and Palestine. [UN Document S/2003/529, May 7, 2003]. "Phase One" was to involve a build-up of Palestinian institutions of governance over a period of a few weeks. "Phase Two," to begin in June 2003, would bring "Creation of an independent Palestinian state, and the four sponsors, including the United States, would "promote international recognition of Palestinian state, including possible UN membership." For a variety of reasons, these phases were not implemented, but the fact that the United States could, at the end of April 2003, anticipate advocating international recognition of Palestine by early June 2003 implied that Palestine was already a state as of the date of promulgation of the Roadmap. Apart from a few weeks of shoring up institutions of governance, nothing fundamental would change between 30 April and early June in Palestine's status. Thus, the United States was dealing with Palestine as a state.

u.  The Commission of Inquiry established by the UN Human Rights Council to examine the GazaIsrael 2014 hostilities viewed Hamas as an administration operating as part of the State of Palestine. To make the point that Hamas was bound to respect international norms, it wrote, "The State of Palestine is bound by the obligations contained in the treaties to which it has acceded." The Commission thus viewed the hostilities as being between two

Freeman Mathis
& Gary, LLP
Attorneys at Law

-10-

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S INTERNATIONAL LAW EXPERT
PROFESSOR JOHN B. QUIGLEY

16294966.1   11775-83955

states: Israel and Palestine. [Report of the independent commission of inquiry established pursuant to Human Rights Council resolution S-21/1, June 24, 2015, UN Document A/HRC/29/52, paragraph 12].

v. The Gaza-Israel hostilities of 2014 constituted a war, and specifically a war international in character, because they arose out of an international belligerency.

w. Gaza was taken and occupied by Israel in a war that occurred in 1967. The Office of the Prosecutor of the International Criminal Court, as part of its current examination of war crimes committed during the 2014 hostilities, placed the hostilities in the context of Israel's occupation dating from 1967. [International Criminal Court, Office of the Prosecutor, Report on Preliminary Examination Activities 2016, paragraph Paragraphs 116-120].

x. The hostilities of 1967 were universally regarded as a war, and a war of an international character. Gaza became territory under belligerent occupation from that time. Israel initially became the administrator in Gaza but withdrew from administration in 2005, after which it controlled entry into and exit from Gaza, controlled Gaza's airspace, and reserved for itself the right to enter with military force. Any hostilities between an organized military force in Gaza on the one hand and Israel on the other constitute a continuation of the 1967 war. Israel's leading legal analyst of war writes, "As the appellation 'belligerent occupation' suggests, there is an inextricable tie between this species of occupation and inter-State war. [Yoram Dinstein, *The International Law of Belligerent Occupation* (2009), at 31]. Belligerent occupation continues even after a truce is put into effect and lasts until a complete withdrawal,

Freeman Mathis
& Gary, LLP
Attorneys at Law

-11-

typically accompanied by a peace treaty. If, during the time of belligerent occupation, forces of the occupied territory engage against forces of the occupier, such hostilities are a continuation of the hostilities that led to the occupation. In this situation, "The hostilities may be classified as resumption of IAC [international armed conflict] if the protagonists of hostilities are members of armed forces of the occupied state."

y. Gaza continued under belligerent occupation through the period of the hostilities of 2014. The Central Intelligence Agency *World Fact Book: Middle East: Gaza Strip* (updated December 14, 2016) notes Israel's withdrawal of settlements and military units from Gaza in 2005 but further notes that Israel "continues to control the Gaza Strip's land and maritime borders and airspace." UN Secretary-General Ban Ki Moon said in 2016 that Gaza remains under belligerent occupation. He referred to the fact that the Security Council has so said. "As the Security Council has made clear, Gaza, and the West Bank, including East Jerusalem, have been under military occupation since 1967." [*Secretary-General Stresses Palestine's Right to Exist, Israel's Need/or Peace with Neighbours, in Final Security Council Briefing on Middle East*, UN Document SG/SM/18372-SC/12633-PAU2211, December 16, 2016].

z. The UN Human Rights Council, in reacting to the Gaza-Israel hostilities as they were ongoing in 2014, referred to Israel as "the occupying power" in Gaza. [Human Rights Council Resolution A/HRC/RES/S-21/1, July 23, 2014, paragraph 6]. The Office of the Prosecutor of the International Criminal Court concluded shortly after the end of the Gaza-Israel hostilities that

Freeman Mathis
& Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S INTERNATIONAL LAW EXPERT
PROFESSOR JOHN B. QUIGLEY

Gaza remained under belligerent occupation. "Overall," said the Office of the Prosecutor, "there is a reasonable basis upon which to conclude that Israel continues to be an occupying power in Gaza despite the 2005 disengagement. The Office has therefore proceeded on the basis that the situation in Gaza can be considered within the framework of an international armed conflict in view of the continuing military occupation by Israel."   [International Criminal Court, Office of the Prosecutor, Situation on Registered Vessels of Comoros, Greece and Cambodia, Article 53(1) Report, November 6, 2014, paragraph 29].

aa. "Armed conflict" is the term used in international law to refer to war. The fact that the terms are interchangeable is seen by their use in the titles of the major treaties on warfare: Two of the major treaties on war are the Convention relative to the Treatment of Prisoners of War (August 12, 1949) and the Convention on the Treatment of Civilians in Time of War (August 12, 1949). In 1977, a treaty was concluded to elaborate on and clarify provisions of the 1949 treaties. The term used in the title of the 1977 treaty was Protocol Additional to the Geneva Conventions of 12 August 1949 and relating to the Protection of Victims of International Armed Conflict (June 8, 1977). The 1977 treaty, relating to the same topic as the 1949 treaties on "war," used the term "armed conflict." The International Committee of the Red Cross, which is identified in these treaties as the agency that monitors compliance with them, describes the treaties as follows: "The Geneva Conventions and their Additional Protocols are international treaties that contain the most important rules limiting the barbarity of war." [International Committee of the Red Cross, *The Geneva Conventions of 1949 and*

Freeman Mathis
& Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S INTERNATIONAL LAW EXPERT
PROFESSOR JOHN B. QUIGLEY

*their Additional Protocols*, January 1, 2014, https://www.icrc.org/en/document/geneva-conventions-1949-additional-protocols].

bb. Hamas is at the very least a de facto administration governing territory. While this fact is not necessary for there to have been a war, this fact further supports the conclusion that there was a war, to the extent others believe such a requirement is necessary.

cc. Hamas came to power in Palestine through a Palestinian Legislative Council election held in 2006. The Hamas Party won a majority of seats in that election to the Palestinian Legislative Council. That election was held with the encouragement and backing of the United States, including financial assistance to the electoral process. It was deemed a fair election by international observers. Internal contention developed following that election, leading to a failure to form a single administration for Palestine, and to an administration being formed by Hamas that took control in the Gazaa sector of Palestine.

dd. Since 2007, Hamas has remained the administration of Gaza. The Central Intelligence Agency's *World Fact Book Middle East: Gaza Strip* (updated December 14, 2016) states, "Hamas remains in de facto control of the Gaza Strip."

ee. The Commission of Inquiry established by the UN Human Rights Council considered that Hamas was bound by international law because it exercised governmental-type functions. It said, "The authorities in Gaza must respect and ensure human rights norms because of their exercise of government-like functions." [Report of the independent commission of inquiry established pursuant to

Freeman Mathis & Gary, LLP
Attorneys at Law

-14-

Human Rights Council resolution S-21/1, June 24, 2015, UN Document A/HRC/29/52, paragraph 12].

ff. As the administration of a piece of territory, Hamas functions as a government, even though as part of a larger Palestinian administration it does not conduct its own relations with the outside world.

gg. Nonetheless, other states carry out activities in Gaza and in so doing work with Hamas, acknowledging its role as the governing body in Gaza. The most significant outside entity is the United Nations Relief and Works Agency, which operates schools and clinics and distributes humanitarian aid in Gaza. UNRWA's budget is composed of donations by states. The United States is the largest donor. [CRS Report for Congress, *Hamas: Background and Issues for Congress* (Jim Zanotti, Analyst in Middle Eastern Affairs), December 2, 2010, at 30]. UNRWA coordinates its efforts with Hamas as the governing body in Gaza.

hh. Hostilities between a de facto government and the government of a state constitute an armed conflict of an international character.

ii. The Gaza-Israel 2014 hostilities constituted a war because the conflict fell under humanitarian law. This is the body of law that applies to armed conflict, whether of an international or non-international character. Regardless of the characterization of Hamas, the 2014 Gaza-Israel hostilities were regarded by the international community and by Israel as being governed in the legal sphere by humanitarian law. That fact makes the hostilities a war.

jj. Israel considered humanitarian law to be the law applicable to the hostilities. The Israeli Army, in conducting inquiries into whether

Freeman Mathis
& Gary, LLP
Attorneys at Law

any of its forces committed war crimes, used the law of armed conflict as its standard. [Israel clears forces in several deadly 2014 Gaza war cases, *U.S. News & World Report*, August 24, 2014]. Israel's government report on the investigation of possible war crimes by its forces stated, "Israel is aware of allegations of violations of international law during the 2014 Gaza Conflict and is committed to investigating fully any credible accusation or reasonable suspicion of a serious violation of the Law of Armed Conflict." [State of Israel, *The 2014 Gaza Conflict 7 July- 26 August 2014, Factual and Legal Aspects*, May 2015, paragraph 409].

kk. The United Nations Human Rights Council's Commission of Inquiry noted the applicability to the hostilities of the Convention on the Treatment of Civilians in Time of War of 1949 (Geneva Civilians Convention). This Convention, as indicated by its title, applies only in time of war. [Human Rights Council Resolution A/HRC/RES/S-21/1, July 23, 2014, preamble]

ll. After discussing the Gaza-Israel hostilities at its July 28, 2014 meeting (meeting no. 7225), the United Nations Security Council, through its President, issued a statement, saying, "The Security Council calls for full respect of humanitarian law, including protection of the civilian population." [Statement by the President of the Security Council, United Nations Document S/PRST/2014/13, July 28, 2014] The reference to the "civilian population" encompassed civilians in both Gaza and Israel. Hence, the Security Council was characterizing the rocket fire from Gaza into Israel as governed by humanitarian law. Humanitarian law applies only to armed conflict, i.e., war, whether international in

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S INTERNATIONAL LAW EXPERT
PROFESSOR JOHN B. QUIGLEY

16294966.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

character or not. As a result, the Security Council's view of the Gaza-Israel hostilities was that they constituted a war.

mm.    Israel used humanitarian law in alleging violations by Hamas. Alan Baker, formerly a legal officer in Israel's Foreign Ministry, said that Hamas' "indiscriminate targeting of lsrael's civilian population centers" amounted to "violations of international humanitarian law for which Hamas' leaders and commanders are accountable and prosecutable." [Alan Baker, The Legal War: Hamas' Crimes Against Humanity and Israel's Right to Self-Defense. 2014]

nn. Israel has responded to the International Criminal Court since the Office of the Prosecutor opened a preliminary examination of the Gaza-Israel hostilities. Israel's purpose in so doing was to object to the Court's jurisdiction. Israel did not address the substance of what the Court is examining. In particular, it did not argue that what was being examined was not a war. [Israel provides ICC with information on 2014 Gaza War, Times of Israel. June 3, 2016]

oo. The fact that investigations were conducted under humanitarian law as to whether war crimes under international law occurred is a clear indication that there is a war, as demonstrated by the investigations and the actions taken by the various parties.

pp. The designation of Hamas as a terrorist organization does not negate the character of the Gaza-lsrael 2014 hostilities as a war.

qq. If acts that constitute terrorism were committed during the 2014 GazaIsrael conflict, that fact does not negate the character of the conflict as a war. The characterization of an organization as terrorist is not relevant to whether that organization is at war or to

Freeman Mathis
& Gary, LLP
Attorneys at Law

-17-

the status of that organization as being either a state or a non-state. Acts of terrorism can be committed during a war. The Geneva Conventions govern the legality of acts committed during war by states. The Protocol Additional to the Geneva Conventions of 12 August 1949 and relating to the Protection of Victims of International Armed Conflict (June 8, 1977) provides, in Article 51(2), "Acts or threats of violence the primary purpose of which is to spread terror among the civilian population are prohibited." Hence an organization at war, whether a non-state, a state , or a quasi-state is capable of spreading "terror" by engaging in acts of violence that is considered terrorism. The firing of   rockets   that spread terror in the civilian population of Israel can be acts of war, and here they were acts of war. The characterization of an entity as terroristis a description of what the entity does, not what it is. A non-state entity can engage in terrorist acts. A state can engage in terrorist acts. And, historically even world wars that the United States was involved in included what some people believed to be acts of terror. But, that in no way lessens the fact that there was a war. And, that is the case with the conflict between Hamas and Israel in 2014.

3.  **Statements Relied Upon:**

a.  None.

4.  **Documents Relied Upon:**

a.  See Exhibit A for a complete list of documents relied upon by Mr. Quigley, which are also set forth in the Quigley Reports.

B.  **Opinion and Citation to Expert Witness Disclosure:**  The 50-day conflict in 2014 between Israel and Hamas constituted war-like actions anddefense against war-like actions as those terms are commonly used and as those terms are

Freeman Mathis
& Gary, LLP
Attorneys at Law

understood within his area of expertise and study. [ASIC Expert Witness Disclosure, p. 2; ASIC Rebuttal Expert Witness Disclosure, p. 2]. As part of this opinion, Professor Quigley will testify that the fact that the United States has designated Hamas as a terrorist organization does not impact the fact that the 2014 conflict constituted war-like    actions and was waged with weapons of war. [ASIC Expert Witness Disclosure, p. 3; ASIC Rebuttal Expert Witness Disclosure, p.3]

1. **Relevance of Opinion:** Professor Quigley's opinion regarding the validity of the application of the war exclusions, as noted above, supports the reasonableness of the basis for the claim's denial and directly rebuts the opinions of Mr. Ross, Dr. Koh, and Mr. Levitt

2. **Bases for Opinion:** Professor Quigley's opinion is based on his background as a professor of international and comparative law. Professor Quigley is an expert in the nature of "war," statehood, state actors, and sovereignty. Professor Quigley is also an expert in Israeli-Palestinian relations and the 2014 50-day conflict that occurred between Israel and Hamas. Professor Quigley's qualifications and experience are further detailed on page 1 of his Expert Report.

   a. Please refer to the bases for opinion A, noted in section A(2)(a-qq) .

   b. Even apart from the character of the 2014 Gaza-Israel hostilities as a war, actions taken by the military forces of the two sides constituted warlike actions and defense against same.

   c. The military measures taken in the 2014 Gaza-Israel hostilities constituted warlike action, and that action was, on each side, taken by a military force. The military units associated with Hamas and operating in Gaza constituted a military force, given their level of organization as such. Those units are called

16294966.1  11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

the lzz ad-Din al-Qassam Brigades, formed in 1991 and operating out of Gaza. In 2006, they engaged the Israel Defense Force, when it sent troops into Gaza. On the Israeli side, the Israel Defense Force is a military force, rated among the world's strongest, possessing advanced fighter jets and deployable nuclear weapons. During the 2014 hostilities, each side took action that was warlike in character. Additionally, each side took military action that it regarded as defending against attack by the other side, and in so doing used military personnel.

d.  The International Criminal Court described the course of Operation Protective Edge as follows: "The Operation consisted of three phases: after an initial phase focused on air strikes, Israel launched a ground operation on 17 July 2014, followed by a third phase of the operation launched on 5 August characterized by alternating ceasefires and aerial strikes. The hostilities ended on 26 August 2014 with both sides agreeing to an unconditional cease fire." [International Criminal Court, Office of the Prosecutor, Report on Preliminary Examination Activities 2016, paragraph 114]. This description depicts "warlike" action.

e.  The 2014 Gaza-Israel hostilities were waged with weapons of war.

Rockets from Gaza reached as far as Tel Aviv, causing disruption at Israel's international airport.  The Israel Defense Forces reported during the hostilities that rockets were fired into Israel capable of reaching Israel's largest population centers and endangering 3.5 million Israeli lives. The military installations in Gaza that figured in the hostilities were numerous and sophisticated. The Israel Defense Forces reported that they

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S INTERNATIONAL LAW EXPERT
PROFESSOR JOHN B. QUIGLEY

16294966.1  11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

bombed by air in Gaza 1,678 rocket launching facilities, 977 command and control centers, 237 military administration facilities, 191 weapons storage and manufacturing facilities, and 144 training and military compounds. [Israel Defense Forces, *Operation Protective Edge by the Numbers,* August 5, 2014]. The rockets emanating from Gaza were sophisticated in mode of launching, as they were planted underground and were launched from a distance by remote control. [William Booth, Here's what really happened in the Gaza war (according to the Israelis), *Washington Post,* September 3, 2014]. Additionally, Israel utilized tanks, armored personnel carriers, and gunboats, each of which constitute weapons of war. And, Israel executed a ground invasion with soldiers using military weapons. Israel's targeting was sufficiently sophisticated that Israel was able to strike particular apartments within high-rise apartment buildings. Israel's air strikes were sufficiently extensive that they resulted in the demolition of several neighborhoods in Gaza. The UN Human Rights Council characterized the hostilities as an "Israeli military assault on the occupied Gaza Strip." [Human Rights Council Resolution AIHRC/RES/S-21/1, July 23, 2014, preamble]. Israel protected itself from Gaza-launched rockets with its highly sophisticated "iron dome" missile defense system.

3. **Statements Relied Upon:**

   a. None.

4. **Documents Relied Upon:**

   a. See Exhibit A for a complete list of documents relied upon by Mr. Quigley, which are also set forth in the Quigley Reports.

Freeman Mathis
& Gary, LLP
Attorneys at Law

C. **Rebuttal Opinions and Citation to Expert Witness Disclosure:** Professor Quigley will address as rebuttal the assertion by Plaintiffs' experts that, if an army predominantly targets civilians, it cannot be engaging in war; Dr. Koh's opinion that, if a group is not recognized by some nations or is designated as a terrorist organization, a " war" cannot be waged with that group; Dr. Koh's claims that the 2014 Gaza-Israeli conflict was merely a state sponsored response to a terrorist attack and did not constitute a war; and that the ceasefire of 2014 conflict as referred to in Mr. Ross's report evidences the fact this indeed was a war. [ASIC Rebuttal Expert Witness Disclosure, p. 3].

1. **Relevance of Opinion:** Professor Quigley's opinion regarding the validity of the application of the war exclusions, as noted above, supports the reasonableness of the basis for the claim's denial and directly rebuts the opinions of Mr. Ross, Dr. Koh, and Mr. Levitt.

2. **Bases for Opinion:** Professor Quigley's opinion is based on his background as a professor of international and comparative law. Professor Quigley is an expert in the nature of "war," statehood, state actors, and sovereignty. Professor Quigley is also an expert in Israeli-Palestinian relations and the 2014 50-day conflict that occurred between Israel and Hamas. Professor Quigley 's qualifications and experience are further detailed on page 1 of his Expert Report.

   a. Please refer to the bases for opinion A, noted in section A(2)(a-qq).

   b. Please refer to the bases for opinion B, noted in section B(2)(a-f).

   c. Professor Koh argues that the 2014 Gaza-Israel hostilities did not constitute a war because the targeting by Hamas was

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S INTERNATIONAL LAW EXPERT
PROFESSOR JOHN B. QUIGLEY

16294966.1  11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

directed at civilian, rather than military, objectives. This argument is faulty on two grounds.

i.

First, Hamas did target the Israel Defense Force. Professor Koh refers to mortar and rocket firings by Hamas. He does not distinguish between the two. While rockets cannot be targeted with precision, mortars can. Hamas fired mortars at IDF positions. The UN Commission of Inquiry made this factual finding in its 2015 report, at paragraph 91. The inquiry team wrote: "Mortar fire by the Palestinian armed groups appears to have often been aimed at specific targets and is more precise than the rockets in the armed groups' arsenal. In numerous cases mortars fired by Palestinian armed groups targeted IDF forces. While some of these attacks were directed at IDF troops inside Gaza, a number of mortar attacks were directed at IDF positions and troop concentrations inside Israel in the vicinity of the Gaza Strip. For instance, on 16 July 2014 IDF assembly zones close to the Erez crossing were targeted, resulting in the death of a civilian who was distributing food to soldiers. The IDF acknowledges that approximately 10 IDF soldiers were killed along the Green Line seemingly in Israel, in the course of a number of attacks during which mortars appear to have been fired at IDF forces.

ii.  Second, if one side in a war targets civilians, that fact does not negate the character of the conflict as a war. The United Nations Security Council has characterized military situations as involving war and as implicating the law of war when the targets have been civilian. Thus, in its Resolution 445 of

Freeman Mathis
& Gary, LLP
Attorneys at Law

March 8, 1979, the Security Council condemned Southern

Rhodesia for   "armed invasion" and "aggression"

against Angola, Mozambique, and Zambia, while reciting that

the targets were "refugees and civilian

populations." [Resolution 445]. The information that formed

the factual premise for this resolution was that

Southern Rhodesia was attacking camps housing refugees

from Southern Rhodesia. [UN Security Council meeting 2119,

March 2,1979]. Later the same year, the Security Council

condemned Southern Rhodesia for "acts of aggression" against

Zambia, after reciting that the purpose of the military action

was to destroy the "economic infrastructure" of Zambia.

[Resolution 455, November 23, 1979].  The fact that an army

targets predominantly civilians, or even entirely civilians, does

not mean that it is not engaging in war.

d.  Professor Koh argues that a conflict qualifies as a war only if
one has a state on each side.

i. Professor Koh says that "Hamas is not recognized under
international law as the legitimate government of a recognized
nation-State." [Koh: paragraph 14].  Professor Koh's position
is faulty on both factual and legal grounds. First, Hamas is an
element of the government of Palestine, which is accepted as
a state by the international community. Second, status as the
government of a state is not a required element before a
conflict constitutes a war.

ii. Professor Koh argues [paragraph 8] that an act qualifies
as an act of war only if: (a) the act has been committed by an
agent   of   a   recognized   foreign   state; (b)   that   has

-24-

Freeman Mathis
& Gary, LLP
Attorneys at Law

been recognized as a legitimate foreign government by the community of nations (including the United States of America); and (c) as part of an established governmental chain of command originating in a recognized foreign leader.

iii. This argument is refuted by Professor Koh himself. Professor Koh recently wrote an article titled *The Emerging Law of 21st Century War.* [66 Emory Law Journal 487 (2017)]. In this article, albeit bearing "war" in the title, Professor Koh uses the

term now commonly used in international instruments, namely, "armed conflict" to describe the situations that fall under the term "war" as he uses it in his title. In this article, Professor Koh says that one can have an "armed conflict between a nation-state and a transnational terrorist network like Al Qaeda." [66 Emory Law Journal at 493]. There Professor Koh cites the US Supreme Court, in support of his characterization: "In *Hamdan v. Rumsfeld,* the Justices of the Supreme Court in 2006 apparently concluded that we [the United States] have engaged in just this kind of non-international armed conflict since 9/11." Here Professor Koh acknowledges both that one can have an armed conflict, i.e., a war, with a non-state actor (Al Qaeda), and that the fact that the non-state actor is deemed to be terrorist does not negate the characterization of "armed conflict."

iv. In a 2014 article, Professor Koh explicitly used the term "war" to refer to the conflict with Al Qaeda in Afghanistan. He said, "The President [Obama] cogently summarized why we should reject indefinite war in favor of an exit strategy to bring this

Freeman Mathis
& Gary, LLP
Attorneys at Law

16294966.1   11775-83955

protracted conflict   with   Al   Qaeda,   like   all wars, to an end. Last October, I argued that despite public skepticism, without fanfare, President Obama has made slow but steady progress toward achieving three key elements of his effort to end the Forever War: (1) disengaging from Afghanistan; …" [Harold *Koh,*

*Ending* the Forever War: One Year After President *Obam a's NDU Speech, Just Security,* May 23, 2014].

v. The Professor Koh who wrote the 2014 *Just Security* article and the 2017 *Emory Law Journal* article was correct. The Professor Koh who wrote the opposite in his Expert Report was not.

vi. Numerous wars have been waged against an opponent that was not "recognized." Professor Koh makes the suggestion that one has a "war" only if the actor has been recognized by the "community of nations" and that this must include the United States of America. Such an absurd suggestion would mean that a government is not legitimate if recognized by every state in the world except the United States. But that absurdity aside, Professor Koh's statement that an act of war can be committed only by recognized government is incorrect.   The   Security Council resolutions cited above condemning Southern Rhodesia were aimed at an entity that governed  Southern Rhodesia, having declared itself independent of Great Britain, but that had not achieved international recognition. The resolutions in fact called the perpetrator  an illegal  regime" [Resolution 445,  preamble paragraph 5] and an "illegal minority regime" [Resolution

Freeman Mathis
& Gary, LLP
Attorneys at Law

455, preamble paragraph 3]. The fact that Southern Rhodesia was unrecognized did not prevent the Security Council for condemning it for "acts of aggression" and "armed invasion."

vii. When war broke out in Korea in 1950, the Security Council adopted resolutions in which it recited that the government in the south of Korea was the only legitimate government in that country, yet said that a "breach of the peace" had occurred, precipitated by "forces from North Korea." [Resolution 82, June 25, 1950; Resolution 84; July 7, 1950]. Here the initiation of war was attributed to a non-recognized entity.

viii. The war in Vietnam was not subject of Security Council resolutions, but the United Stated considered that that war was initiated by the entity that controlled the northern part of Vietnam. [US Department of State, Aggression from the North-The Record of North Vietnam's Campaign to Conquer South Vietnam (1965)]. This was an entity the United States did not recognize. [US Department of State, Office of the Historian, A Guide to the Untied States' History of Recognition, Diplomatic, and Consular Relations, by Country, since 1776: Vietnam, accessible on Department of State website].

ix. It is clear from international practice, as accepted by Professor Koh in his writings, that one can have a "war" despite the fact that one party is not recognized, and even if that party qualifies as "terrorist."

e. Professor Koh argues [paragraph 10] that a state may respond by military means to a terrorist act and that the 2014 Gaza-Israel conflict was of this type rather than a war [paragraph 14].

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S INTERNATIONAL LAW EXPERT
PROFESSOR JOHN B. QUIGLEY

Freeman Mathis
& Gary, LLP
Attorneys at Law

16294966.1  11775-83955

i. Professor Koh brings into his analysis the kidnapping by Hamas of three Israelis in the days preceding the onset of hostilities as an indication of the terrorist character of Hamas' activities. Whatever occurred in regard to this kidnapping is of no relevance to a characterization of the hostilities that ensued. If that kidnapping in some fashion was a precipitating event, the fact that it can be characterized as terrorism sheds no light on the character of the 2014 hostilities as a whole.

ii. Moreover, as indicated above, Professor Koh acknowledged in his 2017 article that one can have an "armed conflict between a nation-state and a transnational terrorist network like Al Qaeda." [Harold Koh, The Emerging Law of 21st Century War, 66 Emory Law Journal at 493]. He attempts to distinguish the 2014 Gaza-Israel conflict by saying that "the nature of Hamas' acts were terrorist acts that fell outside the scope of the norms of warfare" [paragraph 14]. By so saying, Professor Koh apparently suggesting that the actions of Hamas were not governed by the laws of war. In fact, however, the UN Commission of Inquiry concluded that Hamas' actions may have violated the norms of warfare, but it is that body of law that they violated.

f. In paragraph 21 of his Expert Report, Dennis Ross relates that the United States endeavored through intermediaries to broker a "ceasefire" while the hostilities were in progress. Mr. Ross here unwittingly acknowledged that the hostilities constituted a war. Merriam-Webster defines "ceasefire" as "an agreement to stop fighting war." One does not have a "ceasefire" in the context of a terrorist attack. When the attacks of September 11,

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S INTERNATIONAL LAW EXPERT
PROFESSOR JOHN B. QUIGLEY

16294966.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

1           2001 in the United States finished, no one spoke of a "ceasefire"

2           with the perpetrators. A ceasefire is an action that stops,

3           whether temporarily or permanently, a war. In the same

4           paragraph, Mr. Ross refers to the fact that Israel offered terms

5           for a "cessation of hostilities." That term is similar to

6           "ceasefire." The Encyclopedia Britannica describes the term

7           "cessation of hostilities" as one that applies "in law of war."

8      **3. Statements Relied Upon:**

9         a.     None.

10      **4. Documents Relied Upon:**

11         a.     See Exhibit A for a complete list of documents relied upon

12           by Mr. Quigley, which are also set forth in the Quigley Reports.

13 Professor Quigley's curriculum vitae is submitted with this proffer as Exhibit "B."

14 Professor Quigley's Expert Report is submitted with this proffer as Exhibit "C."

15 Professor Quigley's Amended Exhibit No. 2 is submitted with this proffer as Exhibit

16 "D."

17 Professor Quigley's Rebuttal Expert Report is submitted with this proffer as Exhibit

18 "E."

19 ASIC's Expert Witness Disclosure is submitted with this proffer as Exhibit "F."

20 ASIC's Rebuttal Expert Witness Disclosure is submitted with this proffer as Exhibit

21 "G."

22 Copies of non-electronic documents are being obtained.

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

Freeman Mathis
& Gary, LLP
Attorneys at Law

-29-
WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S INTERNATIONAL LAW EXPERT
PROFESSOR JOHN B. QUIGLEY
16294966.1   11775-83955

1  DATED:  January 23, 2020          By:  /s/ Christopher W. Martin

2                                    MARC J. SHRAKE
3                                    FREEMAN MATHIS & GARY, LLP

4                                              -and-

5                                    CHRISTOPHER W. MARTIN *(Pro Hac Vice)*
                                     MELINDA R. BURKE *(Pro Hac Vice)*
6                                    WILLIAM E. McMICHAEL *(Pro Hac Vice)*
                                     MARTIN, DISIERE, JEFFERSON
7                                    & WISDOM LLP

8                                    Attorneys for Defendant ATLANTIC
                                     SPECIALTY INSURANCE COMPANY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Freeman Mathis
& Gary, LLP
Attorneys at Law

-30-
WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S INTERNATIONAL LAW EXPERT
PROFESSOR JOHN B. QUIGLEY

16294966.1  11775-83955