# EXHIBIT G

1  MARC J. SHRAKE (SBN 219331)
      mjs@amclaw.com
2  ANDERSON, MCPHARLIN & CONNERS LLP
   707 Wilshire Boulevard, Suite 4000
3  Los Angeles, California 90017-3623
   Telephone: (213) 236-1691
4  Facsimile: (213) 622-7594

5  MICHAEL KEELEY *(Pro Hac Vice)*
      michael.keeley@strasburger.com
6  TONI SCOTT REED *(Pro Hac Vice)*
      toni.reed@strasburger.com
7  CARLA C. CRAPSTER *(Pro Hac Vice)*
      carla.crapster@strasburger.com
8  STRASBURGER & PRICE, LLP
   901 Main Street, Suite 6000
9  Dallas, Texas 75202
   Telephone: (214) 651-4300
10 Facsimile: (214) 651-4330

11 Attorneys for Defendant
   Atlantic Specialty Insurance Company

12

13              **UNITED STATES DISTRICT COURT**

14      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

15

16  UNIVERSAL CABLE                    Case No. 2:16-cv-04435-PA-MRW
    PRODUCTIONS LLC, a Delaware
17  limited liability company, and      **DEFENDANT ATLANTIC**
    NORTHERN ENTERTAINMENT              **SPECIALTY INSURANCE**
18  PRODUCTIONS LLC, a Delaware         **COMPANY'S REBUTTAL EXPERT**
    limited liability company,          **WITNESS DISCLOSURE**

19
              Plaintiffs,
20
       vs.
21
    ATLANTIC SPECIALTY
22  INSURANCE COMPANY, a New
    York insurance company,
23
              Defendant.
24

25

26

27

28

              ATLANTIC SPECIALTY INSURANCE COMPANY'S
              REBUTTAL EXPERT WITNESS DISCLOSURE

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1    Atlantic Specialty Insurance Company ("Atlantic") submits the following
2 rebuttal expert disclosures pursuant to Rule 26(a)(2) of the Federal Rules of Civil
3 Procedure and the Court's Scheduling Order dated January 19, 2017 (Doc. 34),
4 including as subsequently amended, reserving the right to supplement its disclosures
5 at a later time either through direct supplementation of this disclosure or through
6 other discovery response and deposition testimony.

## A.
## IDENTITY OF REBUTTAL EXPERTS

1.    The following persons may offer rebuttal expert testimony in this case:

a.    Professor John B. Quigley
      Professor Emeritus
      The Ohio State University Moritz College of Law
      Drinko Hall
      55 West 12th Avenue
      Columbus, Ohio 43210-1391
      (614) 292-1764

      quigley.2@osu.edu

16 Professor Quigley is a retained expert for Atlantic. Professor Quigley teaches
17 International and Comparative Law at The Ohio State University Moritz College of
18 Law. He is an expert in the nature of "war," statehood, state actors and sovereignty.
19 He is also an expert in Israeli-Palestinian relations and the 2014 50-day conflict that
20 occurred between Israel and Hamas. Professor Quigley has been designated as an
21 Expert Witness by Atlantic in this case, and he may also testify in rebuttal to experts
22 designated by the plaintiffs.

23 Professor Quigley will testify that the 50-day conflict was a war, that it was waged
24 with weapons of war, and that it constituted war-like actions and defense against
25 war-like actions, as all those terms are commonly used, and as all those terms are
26 understood within his area of expertise and study. Professor Quigley will further
27 opine that Hamas is a part of the government of the State of Palestine, and that

28

2

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1 Palestine does qualify as a state. He will opine that Hamas is at least a de facto
2 administration governing territory, relying on the facts further recited in his report,
3 including the fact that Hamas came to power in 2006 through elections, that Hamas
4 functions as a government, and that other states work with Hamas, thereby
5 acknowledging its role as the governing body in Gaza. Professor Quigley will
6 further opine that the fact that the United States has designated Hamas as a terrorist
7 organization does not impact the fact that the 2014 conflict was a war, constituted
8 war-like actions and was waged with weapons of war. Professor Quigley will also
9 testify regarding the nature of the war in the context of the facts of the Israeli-
10 Palestinian conflicts and given the various roles and descriptions of the participants.
11 He will testify that regardless of the designations given to the participants, the 2014
12 50-day conflict constituted a war, war-like actions and utilized weapons of war.
13 Professor Quigley will also testify to the details of both the nature and history of
14 Hamas and the nature and details of the 50-day war, which he has learned through
15 his research and which support his opinions.

16 Professor Quigley will testify in rebuttal to issues raised by plaintiffs' experts,
17 Dennis Ross, Harold Koh and Matthew Levitt. Subject matter and opinions of the
18 rebuttal are set forth in the Professor Quigley's Expert Report previously served,
19 which is incorporated by reference. Further, he will address as rebuttal the
20 assertions by plaintiffs' experts that if an army predominantly targets civilians, it
21 cannot be engaging in war. Further Dr. Quigley will rebut Dr. Koh's opinion that if
22 a group is not recognized by some nations or is designated as a terrorist
23 organization, a "war" cannot be waged with that group. Dr. Quigley will rebut Dr.
24 Koh's claims that the 2014 Gaza-Israeli conflict was merely a state sponsored
25 response to a terrorist attack that did not constitute a war. Finally, Dr. Quigley will
26 opine that the cease fire of the 2014 conflict as referred to by Mr. Ross in his report
27 is evidence that this conflict was indeed a war.

28

1 For additional information regarding Professor Quigley's qualifications, opinions,
2 and the facts and data supporting those opinions, please see his Expert Report, and
3 the curriculum vitae attached thereto, which were previously served in this case, and
4 please see his Rebuttal Expert Report, attached as Exhibit A, all of which are
5 incorporated herein by reference. The general substance of Professor Quigley's
6 opinions may be supplemented depending upon the substance of testimony in future
7 depositions and facts established through additional discovery.

8         b.   Dr. Ingrid Detter de Frankopan
9            Montesa Sarl
           58 Route de la Fin
10            CH-1874
11            Champery, Switzerland
           +41 79 603 7125
12
13            idfrankopan@gmail.com

14 Dr. de Frankopan is a retained expert for Atlantic. She is a barrister at law in
15 England and Wales and Professor Emeritus of International Law at Stockholm
16 University. Dr. de Frankopan is an expert in the law of war and armed conflict and
17 related fields. Dr. de Frankopan has been designated as an Expert Witness by
18 Atlantic in this case, and she may also testify in rebuttal to experts designated by the
19 plaintiffs.

20 Dr. de Frankopan will testify that the summer 2014 conflict between Israel and
21 Palestine constituted a war or war-like activities, and involved the use of weapons of
22 war, as all those terms are commonly used, and as all those terms are understood
23 within her area of expertise and study. In particular, Dr. de Frankopan will testify
24 that based on the duration and intensity of the fighting, the number of casualties, and
25 other specifics of the conflict, it is her opinion that the conflict was a war.
26 Dr. de Frankopan will also testify to the details of both the nature and history of
27 Hamas and the nature and details of the 50-day war, which she has learned through

28

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1 her research and which support her opinions. She will further opine that Palestine is
2 a quasi-state and Hamas is a semi-sovereign, but even if they are not, this does not
3 mean that the 2014 conflict was not a war. Dr. de Frankopan will testify that
4 regardless of the designation of the participants, the 2014 conflict constituted a war,
5 at least war-like action and involved weapons of war. Dr. de Frankopan will further
6 opine that the fact that the United States has designated Hamas as a terrorist
7 organization does not alter the fact that the 2014 conflict was a war, constituted war-
8 like actions and used weapons of war. Dr. de Frankopan may testify in rebuttal to
9 issues raised by plaintiffs' experts, Dennis Ross, Harold Koh and Matthew Levitt.
10 Subject matter and opinions of the rebuttal are set forth in the Dr. de Frankopan's
11 Expert Report previously served, which is incorporated by reference.

12 For additional information regarding Dr. de Frankopan's qualifications, opinions,
13 and the facts and data supporting those opinions, please see her Expert Report, and
14 the curriculum vitae attached thereto, which were previously served in this case,
15 which is incorporated by reference as if fully set forth and/or attached hereto. The
16 general substance of Dr. de Frankopan's opinions may be supplemented depending
17 upon the substance of testimony in future depositions and facts established through
18 additional discovery. Dr. de Frankopan may also rebut any expert testimony offered
19 by plaintiffs' expert witnesses with respect to the foregoing and any other related
20 issues.

21     c. Mr. Frank Lowenstein
22       3810 Argyle Terrace, NW
      Washington, D.C. 20011
23       (202) 255-0123
24
      frankglowenstein@gmail.com
25

26 Frank Lowenstein is a retained expert for Atlantic. He is an attorney who previously
27 worked for the U.S. Department of State as the Special Envoy for Israeli-Palestinian

5

ATLANTIC SPECIALTY INSURANCE COMPANY'S
REBUTTAL EXPERT WITNESS DISCLOSURE

Negotiations. As the Special Envoy, Mr. Lowenstein had responsibility for all Israeli and Palestinian issues, including policy formation, speech writing, and press guidance. He met regularly with senior Israeli and Palestinian officials and traveled with then Secretary of State John Kerry on all trips related to Middle East peace. Mr. Lowenstein was the Special Envoy for Israeli-Palestinian Negotiations during the 50-day conflict and traveled to Israel and Egypt during the summer of 2014 to facilitate the negotiation of a ceasefire between Palestinians and Israelis. Mr. Lowenstein has received the Distinguished Service Award from Secretary John Kerry, the highest honor offered by the U.S. State Department. Mr. Lowenstein has been designated as an Expert Witness by Atlantic in this case, and he may also testify in rebuttal to experts designated by the plaintiffs.

Mr. Lowenstein will testify that in his opinion, the conflict was a war, constituted war-like actions by a military force, involved the use of weapons of war, and was also an insurrection, rebellion, or usurpation of power by the Palestinians, as all those terms are commonly used, and as all those terms are understood within his area of expertise and study. Mr. Lowenstein will also testify that he and his colleagues at the State Department, including John Kerry, repeatedly referred to the conflict as a war. Mr. Lowenstein will opine that Hamas is the semi-sovereign de facto ruling authority in Gaza and acts as a government in that it: has a judicial system, has a military force, provides social services, collects taxes, and administers hospitals and local police forces. He will state that Hamas has approximately 30,000 civil service employees in various ministries, including health and education. Mr. Lowenstein will also testify to the details of both the nature and history of Hamas and the nature and details of the 50-day war, which he has learned through his experience and research and which support his opinions. Mr. Lowenstein will further opine that the fact that the United States has designated Hamas as a terrorist organization does not alter that the hostilities in the summer of 2014 constituted a

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1 war, war-like actions and involved weapons of war. Mr. Lowenstein is expected to
2 testify regarding Israeli-Palestinian relations both in 2014 and before.

3 Mr. Lowenstein may testify in rebuttal to issues raised by plaintiffs' experts, Dennis
4 Ross, Harold Koh and Matthew Levitt. Subject matter and opinions of the rebuttal
5 are set forth in the Mr. Lowenstein's Expert Report previously served, which is
6 incorporated by reference. Mr. Lowenstein may testify further in rebuttal that the
7 Court's decision in this case would not impact the policy position of the United
8 States Government or the United States' support for the peaceful resolution of the
9 Israeli-Palestinian conflict.

10 For additional information regarding Mr. Lowenstein's qualifications, opinions, and
11 the facts and data supporting those opinions, please see his Expert Report, and the
12 curriculum vitae attached thereto, which were previously served in this case, as well
13 as his Rebuttal Expert Report, attached as Exhibit B, all of which are incorporated
14 herein by reference. The general substance of Mr. Lowenstein's opinions may be
15 supplemented depending upon the substance of testimony in future depositions and
16 facts established through additional discovery.

17

18         d.   Mr. Anthony Clark
              Clark Insurance Arbitration & Consulting, LLC
19               2100 Pebble Beach Drive
20               Plainfield, IL 60586-8384
              815-260-3140
21

22               tclark112@sbcglobal.net

23 Mr. Clark is a retained expert for Atlantic. He is a principal with Clark Insurance
24 Arbitration & Consulting, LLC. He has over 40 years of experience as a property
25 insurance adjuster, supervisor, claims officer, and property insurance consultant. Mr.
26 Clark has been designated as an Expert Witness by Atlantic in this case, and he may
27 also testify in rebuttal to experts designated by the plaintiffs.

28

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1 Mr. Clark will opine that Atlantic Specialty Insurance Company properly conducted
2 a thorough and timely investigation into the circumstances surrounding the Extra
3 Expense claim as presented by plaintiffs and made a reasonable determination under
4 the terms and conditions of the applicable policy of insurance that the war
5 exclusions applied. Mr. Clark will opine that Atlantic acted as a reasonable insurer
6 would by staying in communication with its insured during the investigation stage of
7 the claim, and by providing updates on its analysis on coverage. Mr. Clark will
8 opine that Atlantic provided the insured with a clear and detailed explanation of the
9 denial in an expedited manner requested by the insured, that it responded in a
10 complete and timely manner to a request for reconsideration, that it continued to
11 communicate in an effort to reach some negotiated resolution, and that there are no
12 facts demonstrating a lack of good faith or failure on the part of Atlantic to act in a
13 reasonable fashion.

14 Mr. Clark may testify in rebuttal to plaintiffs' designated expert, Ty R. Sagalow.
15 Subject matter and opinions of the rebuttal are set forth in the Mr. Clark's Expert
16 Report previously served, which is incorporated by reference. Mr. Clark may testify
17 further in rebuttal to Mr. Sagalow, on those general subjects and related matters,
18 including industry custom and standards for the insurance industry, the claim
19 process and review of policy language, the role of the claim personnel, the
20 relationship with the insured/broker, and more particular responses to the individual
21 points and arguments that Mr. Sagalow asserts in his report, the substance of which
22 are contained within a Rebuttal Report issued by Mr. Clark.

23 For additional information regarding Mr. Clark's qualifications, opinions, and the
24 facts and data supporting those opinions, please see his Expert Report, and the
25 curriculum vitae attached thereto, which were served in this case, as well as his
26 Rebuttal Expert Report, attached as Exhibit C, all of which are incorporated herein
27 by reference. The general substance of Mr. Clark's opinions may be supplemented

28

ANDERSON, MCPHARLIN & CONNERS LLP
*LAWYERS*
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1 depending upon the substance of testimony in future depositions and facts
2 established through additional discovery.

        e.    Mr. Jay Shapiro, CPA
Jay Shapiro CPA
11300 W. Olympic Blvd.
Suite 910
Los Angeles, CA 90064
(310) 441-3600

jshapirocpa@gmail.com

9 Mr. Shapiro is a retained expert for Atlantic. He is a principal with Jay Shapiro
10 CPA. Mr. Shapiro has extensive experience in the area of accounting, finance,
11 financial consulting, and financial auditing as it relates to the entertainment industry.
12 Mr. Shapiro will testify in rebuttal to experts designated by the plaintiffs.

13 Mr. Shapiro will opine that the computation and methodology of the plaintiffs'
14 designated expert on the topic of damages is subject to criticism, and is not as
15 mathematically reliable as Mr. Shapiro's more straightforward approach.    Mr.
16 Shapiro will opine about the maximum amount of possible extra expenses that
17 plaintiffs may recover, based upon verifiable information produced in the case, and
18 about additional reductions to such computation that may also apply.  Mr. Shapiro
19 will provide an evaluation of plaintiffs' extra expense claim, in rebuttal to the report
20 and anticipated testimony of plaintiffs' expert, Robert Wunderlich.  Mr. Shapiro's
21 rebuttal testimony will analyze plaintiffs' alleged claim and address the analysis and
22 methodology of plaintiffs' expert, Robert Wunderlich, all as more fully set out in his
23 Rebuttal Expert Report.

24 For additional information regarding Mr. Shapiro's qualifications, opinions, and the
25 facts and data supporting those opinions, please see his Rebuttal Expert Report, and
26 the curriculum vitae attached thereto, attached as Exhibit D, all of which are
27 incorporated herein by reference. The general substance of Mr. Shapiro's opinions

28

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1 may be supplemented depending upon the substance of testimony in future
2 depositions and facts established through additional discovery, particularly since the
3 plaintiffs' production of documents relating to alleged damages is continuing.

<div style="margin-left:2em;">

4       f.    Mr. Peter D. Williams
5           Allianz Global Corporate & Specialty
          2350 W. Empire Avenue, Suite 200
6           Burbank, CA 91504
7           (818) 260-7418

8           peter.williams@ffic.com
9           Fact Witness in the Case

</div>

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

10 Mr. Williams is a fact witness and non-retained expert who may provide opinion
11 testimony for Atlantic. Mr. Williams has a degree in insurance matters from the
12 City of London University. He is an associate of the Chartered Institute of Loss
13 Adjusters. He obtained his certificate to be a loss adjuster from the Institute of
14 Insurance Adjusters in London. He has worked as a claims adjuster and claims
15 manager for various companies for over 35 years, including Gerald Trevor &
16 Associates, Graham Miller and Company, Ltd., Axis Insurance Adjusters, Hyperion
17 Insurance Adjusters and OneBeacon Entertainment handling primarily
18 entertainment industry matters. Mr. Williams is also an experienced underwriter
19 and was head of Underwriting at OneBeacon Entertainment. He was also President
20 of Underwriting at OneBeacon Entertainment. In his roles, Mr. Williams oversaw
21 underwriting at OneBeacon as it pertained to entertainment related risks including
22 film, television, sports, music, casinos and venues.

23 Mr. Williams may express rebuttal expert opinions in response to opinions that
24 plaintiffs may attempt to offer through testimony of Mr. Ty R. Sagalow.
25 Mr. Williams will opine regarding the custom and practice of underwriting
26 entertainment policies (property policies), the use of the war exclusions in such
27 policies, the purpose of the war exclusions, and the industry custom and practice to

28

1 the application of war exclusions. Mr. Williams will also opine regarding the
2 custom and practice associated with exclusions and other policy provisions
3 involving or referring to terrorism.

4 Mr. Williams is expected to express opinions regarding the roles of the claims
5 department and the underwriting department in connection with the determination of
6 coverage. Specifically, Mr. Williams is expected to testify that in determining the
7 available coverage under an insurance policy, a claims adjuster would decide based
8 on the language of the policy and the facts of the claim. It would not be the custom
9 and practice of the industry nor the standard to expect the adjuster to consult with
10 the underwriter on his or her coverage intent prior to making a coverage
11 determination on written policy language. Mr. Williams is expected to testify that it
12 is in keeping with insurance industry standards and practices for the claims
13 department to make policy language interpretations relating to the facts surrounding
14 the claim and to formalize their determination of coverage without requiring that
15 they know or consider the intent of the underwriter. Mr. Williams is also expected
16 to testify about the import and treatment of policy language negotiated between an
17 underwriter and a sophisticated broker/insured, such as the policy at issue.

18 With respect to the issues in this case, it is expected that Mr. Williams will testify
19 that if the claims adjuster made the determination that any of the war exclusions
20 applied, that determination is not altered by the intent of the underwriter. The
21 language of the policy and the facts of the claim are not altered by the underwriter's
22 intent especially here with the use of the AON manuscripted policy. Accordingly,
23 Atlantic acted within the standard custom and practice for claims handling, policy
24 interpretation, and investigation with respect to plaintiffs' claim.

25 For additional information regarding Mr. Williams' qualifications, opinions, and the
26 facts and data supporting those opinions, please refer to his deposition testimony
27 provided in the case. The general substance of Mr. Williams' opinions may be

28

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

11

1 supplemented depending upon the substance of testimony in future depositions and
2 facts established through additional discovery, particularly since the plaintiffs'
3 production of documents relating to alleged damages is continuing.

4
5

6 Atlantic Specialty reserves the right to call as expert witnesses any individuals
7 designated, identified, or disclosed as experts by any party, or identified or
8 discovered through further investigation. Atlantic Specialty reserves the right to
9 disclose rebuttal experts. Atlantic Specialty reserves the right to call at trial rebuttal
10 experts and other experts not named in this or any other disclosure as expert
11 witnesses to assist in the presentation of Atlantic Specialty's case or to rebut or
12 impeach the opinions and testimony of any experts who may testify at trial. Atlantic
13 Specialty reserves the right to call as an expert witness any individual to the extent
14 his or her testimony may be construed as expert testimony and any lay witness to the
15 extent he or she may be qualified to give opinion testimony.

16

17 DATED: April 28, 2017          MARC J. SHRAKE
18                                ANDERSON, McPHARLIN & CONNERS LLP

19                                        -and-

20                                MICHAEL KEELEY *(Pro Hac Vice)*
21                                TONI SCOTT REED *(Pro Hac Vice)*
22                                CARLA C. CRAPSTER *(Pro Hac Vice)*
                                 STRASBURGER & PRICE, LLP
23

24                                By:    */s/ Michael Keeley*
                                        Michael Keeley
25

26                                Attorneys for Defendant ATLANTIC
                                 SPECIALTY INSURANCE COMPANY
27

28
                                        12

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

**PROOF OF SERVICE**

I am employed in the County of Dallas, State of Texas. I am over the age of eighteen years and not a party to the within action; my business address is 901 Main Street, Dallas, Texas 7502.

On April 28, 2017, I served the following document(s) described as **DEFENDANT ATLANTIC SPECIALTY INSURANCE COMPANY'S REBUTTAL EXPERT WITNESS DISCLOSURE** on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

Lucia E. Coyoca, Esq.                    Attorneys for Plaintiffs
Valentine A. Shalamitski, Esq.
Daniel M. Hayes, Esq.
Mitchell Silberberg & Knupp LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

**BY MAIL:** I am "readily familiar" with Strasburger & Price LLP's practice for collecting and processing correspondence for mailing with the United States Postal Service. Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business. Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Dallas, Texas, on that same day following ordinary business practices.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made. Executed on April 28, 2017, at Dallas, Texas.

Marianna Green

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

# EXHIBIT A



THE OHIO STATE UNIVERSITY

MORITZ COLLEGE OF LAW

Michael E. Moritz College of Law

Drinko Hall
55 West 12th Avenue
Columbus, OH 43210-1391

614-292-2631 Phone
614-292-2035 Fax

moritzlaw.osu.edu

April 14, 2017

Michael Keeley, Esq.
Strasburger & Price, LLP
901 Main Street, Suite 6000
Dallas TX 75202

I am John Quigley. I wrote a report dated March 17, 2017, in *Universal Cable Productions LLC
and Northern Entertainment Productions LLC v. Atlantic Specialty Insurance Company*, Case
No. 2:16-cv-04435-PA-MRW. I have subsequently been provided with three other reports
written for this case by individuals identified as experts on behalf of Universal Cable Production
LLS and Northern Entertainment Productions LLC. I fully incorporate my original report in its
entirety as rebuttal to the reports of these individuals, Timothy Levitt, Harold Koh and Dennis
Ross. Additionally, in my opinion, certain of these reports raise issues and draw inaccurate
conclusions regarding those issues. Accordingly, the rebuttal herein is to four points made in
these reports. By submitting this rebuttal to these specific issues, it should not be construed that I
am agreeing to accept the remainder of the opinions set forth by Levitt, Koh and Ross. I, in fact,
do not, and my original report should be construed as a rebuttal to their reports. However, it is
my opinion that the issues addressed herein required separate treatment.

The materials that I have considered for this rebuttal are referenced in the text of this document.

*Professor Koh: targeting of civilians*

Professor Koh argues that the 2014 Gaza-Israel hostilities did not constitute a war because the
targeting by Hamas was directed at civilian, rather than military, objectives. This argument is
faulty on two grounds. First, Hamas did target the Israel Defense Force. Professor Koh refers to
mortar and rocket firings by Hamas. He does not distinguish between the two. While rockets
cannot be targeted with precision, mortars can. Hamas fired mortars at IDF positions. The UN
Commission of Inquiry made this factual finding in its 2015 report, at paragraph 91. The inquiry
team wrote:

91.   Mortar fire by the Palestinian armed groups appears to have often been aimed at specific
targets and is more precise than the rockets in the armed groups' arsenal. In numerous cases
mortars fired by Palestinian armed groups targeted IDF forces. While some of these attacks
were directed at IDF troops inside Gaza, a number of mortar attacks were directed at IDF
positions and troop concentrations inside Israel in the vicinity of the Gaza Strip. For instance,
on 16 July 2014 IDF assembly zones close to the Erez crossing were targeted, resulting in the

Quigley Rebuttal
Page **2** of 4

death of a civilian who was distributing food to soldiers. The IDF acknowledges that
approximately 10 IDF soldiers were killed along the Green Line seemingly in Israel, in the
course of a number of attacks during which mortars appear to have been fired at IDF forces.
Second, if one side in a war targets civilians, that fact does not negate the character of the
conflict as a war. The United Nations Security Council has characterized military situations as
involving war and as implicating the law of war when the targets have been civilian. Thus, in its
Resolution 445 of March 8, 1979, the Security Council condemned Southern Rhodesia for
"armed invasion" and "aggression" against Angola, Mozambique, and Zambia, while reciting
that the targets were "refugees and civilian populations" [Resolution 445]. The information that
formed the factual premise for this resolution was that Southern Rhodesia was attacking camps
housing refugees from Southern Rhodesia [UN Security Council meeting 2119, March 2, 1979].

Later the same year, the Security Council condemned Southern Rhodesia for "acts of aggression"
against Zambia, after reciting that the purpose of the military action was to destroy the
"economic infrastructure" of Zambia [Resolution 455, November 23, 1979].

The fact that an army targets predominantly civilians, or even entirely civilians, does not mean
that it is not engaging in war.

*Professor Koh: character of warring party*

Professor Koh argues that a conflict qualifies as a war only if one has a state on each side. He
says that "Hamas is not recognized under international law as the legitimate government of a
recognized nation-State" [Koh: paragraph 14] Professor Koh's position is faulty on both factual
and legal grounds. First, Hamas is an element of the government of Palestine, which is accepted
as a state by the international community. Second, status as the government of a state is not a
required element before a conflict constitutes a war.

Professor Koh argues [paragraph 8] that an act qualifies as an act of war only if
(a) the act has been committed by an agent of a *recognized foreign state*;
(b) that has been recognized as a *legitimate foreign government* by the community of nations
(including the United States of America); and,
(c) as part of an established *governmental chain of command* originating in a recognized foreign
leader.

This argument is refuted by Professor Koh himself. Professor Koh recently wrote an article titled *The
Emerging Law of 21ˢᵗ Century War* [66 Emory Law Journal 487 (2017)]. In this article, albeit bearing
"war" in the title, Professor Koh uses the term now commonly used in international instruments, namely,
"armed conflict" to describe the situations that fall under the term "war" as he uses it in his title. In this
article, Professor Koh says that one can have an "armed conflict between a nation-state and a
transnational terrorist network like Al Qaeda" [66 Emory Law Journal at 493]. There Professor Koh cites
the US Supreme Court, in support of his characterization: "In *Hamdan v. Rumsfeld*, the Justices of the
Supreme Court in 2006 apparently concluded that we [the United States] have engaged in just this kind
of non-international armed conflict since 9/11." Here Professor Koh acknowledges both that one can have
an armed conflict, i.e., a war, with a non-state actor (Al Qaeda), and that the fact that the non-state actor is
deemed to be terrorist does not negate the characterization of "armed conflict."

In a 2014 article, Professor Koh explicitly used the term "war" to refer to the conflict with Al
Qaeda in Afghanistan. He said, "The President [Obama] cogently summarized why we should

reject indefinite war in favor of an 'exit strategy' to bring this protracted conflict with Al Qaeda, like all wars, to an end. Last October, I argued that despite public skepticism, without fanfare, President Obama has made slow but steady progress toward achieving three key elements of his effort to end the Forever War: (1) disengaging from Afghanistan; . . ." [Harold Koh, Ending the Forever War: One Year After President Obama's NDU Speech, *Just Security*, May 23, 2014]

The Professor Koh who wrote the 2014 *Just Security* article and the 2017 *Emory Law Journal* article was correct. The Professor Koh who wrote the opposite in his Report was not.

Numerous wars have been waged against an opponent that was not "recognized." Professor Koh makes the suggestion that one has a "war" only if the actor has been recognized by the "community of nations" that that this must include the United States of America. Such an absurd suggestion would mean that a government is not legitimate if recognized by every state in the world except the United States. But that absurdity aside, Professor Koh's statement that an act of war can be committed only by recognized government is incorrect. The Security Council resolutions cited above condemning Southern Rhodesia were aimed at an entity that governed Southern Rhodesia, having declared itself independent of Great Britain, but that had not achieved international recognition. The resolutions in fact called the perpetrator an "illegal regime" [Resolution 445, preamble paragraph 5] and an "illegal minority regime" [Resolution 455, preamble paragraph 3]. The fact that Southern Rhodesia was unrecognized did not prevent the Security Council for condemning it for "acts of aggression" and "armed invasion."

When war broke out in Korea in 1950, the Security Council adopted resolutions in which it recited that the government in the south of Korea was the only legitimate government in that country, yet said that a "breach of the peace" had occurred, precipitated by "forces from North Korea." [Resolution 82, June 25, 1950; Resolution 84; July 7, 1950] Here the initiation of war was attributed to a non-recognized entity.

The war in Vietnam was not the subject of Security Council resolutions, but the United States considered that that war was initiated by the entity that controlled the northern part of Vietnam. [US Department of State, Aggression from the North–The Record of North Vietnam's Campaign to Conquer South Vietnam (1965)] This was an entity the United States did not recognize. [US Department of State, Office of the Historian, A Guide to the United States' History of Recognition, Diplomatic, and Consular Relations, by Country, since 1776: Vietnam, accessible on Department of State website]

It is clear from international practice, as accepted by Professor Koh in his writings, that one can have a "war" despite the fact that one party is not recognized, and even if that party qualifies as "terrorist."

*Professor Koh: terrorism or war*

Professor Koh argues [paragraph 10] that a state may respond by military means to a terrorist act and that the 2014 Gaza-Israel conflict was of this type rather than a war [paragraph 14].He brings into his analysis the kidnapping by Hamas of three Israelis in the days preceding the onset of hostilities as an indication of the terrorist character of Hamas' activities. Whatever occurred in regard to this kidnapping is of no relevance to a characterization of the hostilities that ensued. If that kidnapping in some fashion was a precipitating event, the fact that it can be characterized as terrorism sheds no light on the character of the 2014 hostilities as a whole.

Quigley Rebuttal
Page 4 of 4

Moreover, as indicated above, Professor Koh acknowledged in his 2017 article that one can have an "armed conflict between a nation-state and a transnational terrorist network like Al Qaeda" [Harold Koh, *The Emerging Law of 21st Century War*, 66 Emory Law Journal at 493]. He attempts to distinguish the 2014 Gaza-Israel conflict by saying that "the nature of Hamas' acts were terrorist acts that fell outside the scope of the norms of warfare" [paragraph 14]. By so saying, Professor Koh is apparently suggesting that the actions of Hamas were not governed by the laws of war. In fact, however, the UN Commission of Inquiry concluded that Hamas' actions were governed by the law of war. Hamas' actions may have violated the norms of warfare, but it is that body of law that they violated.

*Dennis Ross: ceasefire as an indication of war*

In his paragraph 21, Dennis Ross relates that the United States endeavored through intermediaries to broker a "ceasefire" while the hostilities were in progress. Mr. Ross here unwittingly acknowledged that the hostilities constituted a war. Merriam-Webster defines "ceasefire" as "an agreement to stop fighting a war." One does not have a "ceasefire" in the context of a terrorist attack. When the attacks of September 11, 2001 in the United States finished, no one spoke of a "ceasefire" with the perpetrators. A ceasefire is an action that stops, whether temporarily or permanently, a war.

In the same paragraph, Mr. Ross refers to the fact that Israel offered terms for a "cessation of hostilities." That term is similar to "ceasefire." The Encyclopedia Britannica describes the term "cessation of hostilities" as one that applies "in law of war."

John Quigley

# EXHIBIT B

Frank G. Lowenstein
3810 Argyle Terrace, NW
Washington, D.C.  20011

April 26, 2017

Dear Mr. Keeley:

I write in response to your request to provide a rebuttal to certain
issues raised by Mr. Dennis Ross's Expert Report, including the question
of whether the Court's decision in this case could impact the policy
positions of the United States regarding Hamas or our support for a
peaceful resolution to the Israeli-Palestinian conflict.

By submitting this rebuttal to the specific issues below, it should not be
construed that I am agreeing to accept the remainder of the opinions set
forth by Mr. Ross, Dr. Harold Koh or Mr. Matthew Levitt.  Accordingly, I
fully incorporate my original report in its entirety as a rebuttal to the
reports of not only Mr. Ross, but Dr. Koh and Mr. Levitt which I have
reviewed.

First of all, it is important to note that the Court's ruling in this case
would not have to address the question of whether Hamas could be
considered a sovereign or semi-sovereign in Gaza. The everyday
meaning of "war" does not require that Hamas be found to be a
sovereign or quasi-sovereign.  In fact, the decision could well be based
on a finding or findings entirely unrelated to the standing of Hamas in
Gaza.

Specifically, the basis for the Court's ruling could well be that the
extended conflict between Israel and Hamas in the summer of 2014 was
a "war" under common usage and understanding of the term, even if
Hamas was viewed as nothing more than a terrorist organization; that
the conflict clearly involved warlike action by a military force, including
in defending against attacks by any authority using military personnel
or other agents; and/or that the conflict unquestionably involved the
use of weapons of war, whether in time of peace or war.

Moreover, even if the Court's decision did address this question, the only way that could -- even theoretically -- impact international perceptions of Hamas would be if that specific aspect of the ruling was publicized. Even in the very unlikely event this made it into the news internationally, it is hard to see how reporting on a U.S. civil court ruling in an insurance case would have any discernable effect on the standing of Hamas around the world.

In any event, no ruling by a U.S. court in a civil case would have any impact on the U.S. position with respect to Hamas. The U.S. policy is based on the interests of the U.S. and our closest allies, including Israel. The Court's decision on an insurance claim would have no effect on that position or the longstanding view of U.S. policy makers toward Hamas.

Similarly, U.S. administrations of both parties have long supported a peaceful resolution of the Israeli-Palestinian conflict. This position would not be influenced in any way by the Court's ruling in an insurance case.

Sincerely,

Frank G. Lowen

Frank Lowenstein

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**
**CASE NO: 2:16-cv-04435-PA-MRW**

UNIVERSAL CABLE PRODUCTIONS LLC, and
NORTHERN ENTERTAINMENT PRODUCTIONS LLC,
Plaintiffs,

v.

ATLANTIC SPECIALTY INSURANCE COMPANY,
Defendant

### REBUTTAL REPORT OF ANTHONY CLARK, AIC
### IN RESPONSE TO REPORT OF TY R. SAGALOW

This Rebuttal Report is provided in response to the Report of Ty R. Sagalow that was served in this case. This Rebuttal Report incorporates by reference, in its entirety, my first Expert Report dated March 17, 2017, as a rebuttal to the Report of Ty R. Sagalow. Additionally, I set forth below my opinions and discussion of the issues, with regard to and in rebuttal of the Report of Ty R. Sagalow.

In addition to all materials I reviewed for the preparation of my first Expert Report dated March 17, 2017, I have reviewed the Expert Report of Mr. Ty R. Sagalow, as well as the deposition testimony and exhibits of Andrea Garber and Susan Weiss.

I have not included in my Rebuttal Report any comments regarding the characterization or manner of description of items that Mr. Sagalow refers to as his Summary of Facts. Rather, my Rebuttal Report addresses the actual opinions and discussion provided by Mr. Sagalow.

In my Expert Report dated March 17, 2017, based on years of experience in the handling and supervision of a multitude of insurance claims within a number of

jurisdictions, I concluded that Atlantic Specialty Insurance Company (Atlantic) conducted a timely and proper investigation surrounding the events as they related to the claim presented by the plaintiffs in this case. I believe that Atlantic made a reasonable determination that the war exclusions, as enumerated in the applicable policy of insurance at issue in this matter, applied and therefore no payment could be made to the insured.

Mr. Sagalow believes that the application of any war exclusion was not proper and disagrees that Atlantic conducted a timely and proper investigation. He arrives at these conclusions through the application of his characterizations of enumerated "custom and practice in the insurance industry" that has resulted in a "number of standards." It is my belief, based upon my experience in the insurance industry over the course of my career, that this characterization by Mr. Sagalow is overly broad, and further that the application of these so-called "standards" cannot be used as a determination of whether or not the insurance company acted in a timely, proper, or reasonable manner in any one individual claim. From my handling and supervision of thousands of claims, I have learned that each individual claim speaks for itself, and, depending on the circumstances and facts surrounding that claim, a determination of coverage is made taking into account the specific terms and conditions of the applicable policy.

In Paragraph 36 through 43 of his Report, Mr. Sagalow makes statements regarding what he views as "customs and practice in the insurance industry." He further then uses these items to support his contention in paragraph 44 that Atlantic violated those "standards." In attempting to do so, it would appear to me that he is criticizing the decision to apply the war exclusions once the facts concerning the hostilities became known to Atlantic. This is especially true in the points that he enumerates in paragraph 36. These points appear to me to be legal considerations when reviewing the facts surrounding a claim.

2

Additionally, many of these points also appear to me to be the types of issues that
may possibly be reviewed in a circumstance when there has been an assertion that
the policy wording itself is ambiguous. There is and never has been claimed to be an
ambiguity in the war exclusions in this case, based upon my review of the claim
correspondence from the insured and the pleadings and papers I have reviewed.
The insured has argued that the events should be considered a terrorist act as
opposed to actions falling with the purview of the various war exclusions. As a
result, Mr. Sagalow follows that lead and consistently characterizes all the events
over the course of weeks of hostile activities between Hamas and Israel as "an act of
terrorism." I believe that is a question for the court to decide. In my experience, the
standard to apply, to understand, or to construe the language in the war exclusions
is the plain and common meaning of the words of the war exclusions. But
regardless, acts which in isolation might be considered terrorism, when considered
as a whole certainly can constitute war or war like actions. Here, the conflict
between Israel and Hamas constituted a war and war like acts.

Additionally, I do not agree that each of Mr. Sagalow's statements of custom and
usage are in fact such. In the report, Mr. Sagalow states that a custom and practice is
that insurance policy provisions should be viewed consistent with the reasonable
expectations of a reasonable insured. In matters such as this, where the policy
language is clear, it should be construed according to the plain and ordinary
meaning of the words in the policy.

Also, simply because Atlantic agreed to cover the filming of *Dig* in Israel where
Hamas has committed terrorist acts, does not mean that all losses involving Hamas
will be covered. Instead, any loss must fit within a coverage provision of the policy
and not be excluded. Here, Mr. Sagalow appears to overlook the fact that the conflict
between Israel and Hamas was so extensive that it was a war. While insurance

3

companies might be willing to provide coverage for loss caused by isolated acts of
terrorism, terrorism does not last over an extended period of time such as occurred
here. What happened here clearly was a war and is subject to the war exclusions.

I also disagree that industry custom and practice requires insurers to take positions
consistent with the U.S. Government when it comes to the identity of terrorist
organizations. However, I am not aware that Atlantic has taken the position that
Hamas is not a terrorist organization, only that it has taken the position that the
conflict between Hamas and Israel amounted to a war. That position certainly is not
inconsistent with the views of the United States Government.

Turning to the actual opinions that Mr. Sagalow states regarding the claims handling
process, I disagree with the conclusions he has reached, and I outline and give my
opinions as to why I believe that Atlantic did act in compliance with fair claim
practices and standards as they apply to the following points from paragraph 44 in
Mr. Sagalow's report. Mr. Sagalow's statement on each point is quoted below, and
my rebuttal to it is stated after that quote.

a. **Sagalow: Deciding to apply the War Exclusion within 2 days after written notice of the claim was submitted by the Insured, without conducting a proper investigation;**

Atlantic did not apply the war exclusion within two days of the written notice on
July 15th. It is true that in a telephone discussion on July 17, 2014, with the
insured and their broker, Aon, it was communicated that the war exclusions
might apply. This early notification would have allowed the insured or Aon to
provide Atlantic with materials and documentation for their consideration prior
to any definitive denial. The custom and practice in the industry is that a claim is
affirmatively denied when a written communication is given to the insured. This
occurred on July 28th. The characterization that the investigation was not
complete or that it was improper because of the limited time frame is

4

disingenuous at best, especially here where the insureds were pressing Atlantic
for an immediate coverage decision.

b. **Sagalow: Failing to investigate the identity of Hamas as a terrorist organization and the
potential impact of this fact on coverage;**

While Hamas is characterized as a terrorist organization by the U.S. government,
that does not automatically qualify every military or hostile act as an act solely of
terrorism. In my experience in handling claims, the circumstances surrounding
any individual occurrence or series of occurrences determine the ultimate
characterization. My review of the documents from the claims handling leads
me to conclude that Atlantic did investigate the nature of Hamas, as well as the
circumstances surrounding the occurrences and developed a characterization
based upon the specific facts. My review also indicates that Atlantic discussed
such analysis and conclusions in its claim correspondence.

The investigation that was conducted lead Atlantic to conclude that the events
causing the relocation of the *Dig* production are not an isolated act of
intimidation against a civilian population. Many other factors were evident once
the circumstances were fully investigated, and those seem to have been
discussed in letters to the insured. All of the other facts surrounding Hamas,
including their status as the governing body of Gaza, their maintenance of a
military force, and their use of weapons of war (rockets), and the circumstances
over the entire period of hostilities between Hamas and Israel, appear to have
been investigated, and it was a reasonable approach and conclusion for Atlantic
to determine that the facts and circumstances would allow for the application of
the war exclusions.

c. **Sagalow: Failing to determine the need for, and failing to retain, an outside expert on the
Middle East;**

Based upon my claims experience, I would not agree that it was necessary to

5

retain an outside expert on the Middle East in order to analyze the facts during
July and August 2014. It is unclear what an outside expert on the Middle East
would add to the analysis of circumstances surrounding the hostilities that
caused the insured to move the production.

d. **Sagalow: Failing to hire or obtain a coverage opinion from outside counsel before making a coverage decision;**

As noted earlier, a coverage decision was communicated to the insured on July
28th. After the initial discussion of the possible application of the war exclusions
with the insured on the 17th to get their reaction/response/input, outside
counsel was consulted on July 18th and seeking that opinion was one of the steps
taken in the overall claim process. Atlantic received an outside coverage opinion
prior to the date it made a final coverage decision.

e. **Sagalow: Failing to have substantive discussions with the underwriter on the Insured's account to determine the underwriter's intention at the time the underwriter agreed to accept DIG as an insured production;**

An important fact has been overlooked in Mr. Sagalow's Report. The policy
wording at issue in this matter is not a standard Atlantic policy form. Regarding
the war exclusions, and the policy overall, Aon presented what it referred to as a
"manuscripted form" to Atlantic on behalf of the insured, with the request that it
be used. War exclusions were a part of the form that was presented, and they
were clearly acceptable to the insured and their knowledgeable broker Aon. In
my experience with brokers of Aon's quality, if there were an exclusion or
limitation that they did not wish to have applied to the insured's risk profile, Aon
would be the one to request the change or present the alternative policy
wording. The opposite occurred here. Aon provided Atlantic with a form that
included war exclusions and stated that its form had to be used. I understand
that there were negotiations between the parties concerning certain provisions
of the form, but that there were no such discussions or negotiations concerning

6

any war exclusions. Also, when Aon solicited other insurers to write the policy in 2015, it informed those insurers that the policy was a "manuscripted form that is the property of Aon..." Clearly, Aon wanted the exclusions included within the policy, and it considered these exclusions to be its own.

When the *Dig* production was presented to Atlantic, the insured and Aon were aware of the risks in the Middle East and did not make any specific requests to change the policy wording for this production or eliminate the war exclusions for this production in Israel. Clearly Aon and the insured were willing to accept the risk that in the event that the war exclusions applied, including the use of weapons of war, war, and warlike action, no coverage would be available.

Additionally, it is my experience that "war exclusions" are very standard types used within the insurance industry, and thus knowledgeable brokers and insureds would understand the consequences of including them in the policy. Further, without a claim for ambiguity in the exclusion, the intent of the underwriter would not need to be considered as extrinsic evidence, and would be improper to consider. From my experience involved with claims over the course of my career, custom and practice in the industry is for the claim department to do the investigation into the claim, and any consultation with the underwriter is not considered as a normal practice.

Also, one important difference between the war exclusions in this policy and other examples of typical war exclusions is that the exclusions in Aon's form included an exclusion for weapons of war. Oftentimes that exclusion is limited to weapons of war involving nuclear fission. Here, the exclusion was not so limited.

Finally, Mr. Sagalow appears to overlook the fact that Ms. Johnson did consult with an underwriter. Peter Williams was the chief underwriter for Atlantic's

7

Entertainment Division. And, Mr. Williams was the supervisor of the particular underwriter here, Wanda Phillips. He also was the person in charge of approving the policy wording when Aon first brought it to Atlantic in 2010, and any changes along the way.

f. **Sagalow: Failing to conduct an investigation that complied with Atlantic's own guidelines and core principles;**

Without specific references in Mr. Sagalow's report on this item, I am unsure as to why it was enumerated. However, I have concluded that Atlantic's process was reasonable and complied with the requirements of California law, which I believe would be the governing principles here. In my experience, Atlantic's own guidelines would not alter or add to the standards that actually apply under the law of California.

g. **Sagalow: Misrepresenting the terms of the Policy by initially contending there was no coverage under the policy for acts of terrorism, unless such acts fell within the definition set forth in the TRIA endorsement;**

The analysis referenced here is a discussion in the denial letter communicated to the insured on July 28th. In their desire to communicate all reasons why coverage could not be afforded, Atlantic explained why the TRIA endorsement did not provide coverage, which it does not. When questioned, Atlantic later acknowledged that the TRIA endorsement was not a terrorism exclusion, but that it also did not provide coverage under the circumstances of this matter. Atlantic simply was attempting to cover all bases just in case the insured thought that the TRIA endorsement might provide coverage, which it does not. And, in a later letter, Atlantic confirmed that the endorsement did not apply.

h. **Sagalow: Failing to supervise and oversee the investigation of the claim, despite obvious and significant errors in analysis that surfaced during the limited investigation, including but not limited to, the misrepresentations as to the TRIA endorsement, not retaining an expert regarding the Middle East, and not obtaining an opinion from outside coverage counsel before making the decision to deny the claim;**

8

This point seems to be recounting of the other items above that I have addressed and making the assumption that there was no supervision in relation to those items. I do not see any supporting documentation for this opinion. I have previously commented that the fact that there was involvement of supervisors shows the seriousness of the consideration that Atlantic gave to this claim.

i. **Sagalow: Failing to evaluate possible alternative interpretations of the War Exclusion, other than the initial interpretation advanced by Atlantic, despite the fact that the claim raised novel legal issues, and Atlantic had limited experience in evaluating war exclusions prior to the DIG claim;**

As there has been no claim of ambiguity in the war exclusions, I do not see how an alternative interpretation could be put forth. There have been many times in my career in the handling and supervision of claims that certain facts and circumstances surrounding a claim would lead us to analyze any exclusion or limitation anew. The exclusions in this case speak for themselves and are clear in their common understanding. Application to the facts at hand is certainly a reasonable course of action. Moreover, Atlantic wrote to its insured to further respond to the request for reconsideration, and to look at the arguments made by the insured. In my experience, the fact that Atlantic took that step and continued to communicate with the insured about their areas of disagreement showed good faith in the claims-handling process. There was even an in-person meeting later in the process where the discussions continued.

j. **Sagalow: Failing to take into consideration the U.S. government's position as to the status of Hamas, and ascribing a quasi-sovereignty status to Hamas that was inconsistent with the U.S. government's designation of Hamas as a terrorist organization;**

The designation of Hamas as a terrorist organization by the U.S. government is a result of political decisions in the exercise of the U.S. foreign policy. As noted earlier, from a claims-handling perspective, and from my claims experience, it is not a determinant in the fact that the hostilities between Hamas and Israel,

which caused the production to relocate, would still reasonably be concluded to
fall within the conditions as noted in the war exclusions. Also, it is important to
remember that Atlantic's decision does not rest solely upon any conclusion that
Hamas was a quasi-sovereign. Indeed, the plain and ordinary meaning of the
term "war" does not require Hamas to have been a sovereign or quasi-sovereign.
Furthermore, coverage was also denied on the basis that the conflict constituted
a war like action and involved the use of weapons of war, and that if nothing else,
it amounted to a rebellion or an insurrection. None of these exclusions require a
finding that Hamas was a sovereign or quasi-sovereign.

In section IX of his report, Mr. Sagalow returns again to the theme of the custom and
practice in the insurance industry for the handling of claims. He enumerates a
number of "standards" and then goes on in section X of his report to state that, in his
opinion, Atlantic has failed to adhere to six of the standards he set up in section IX.
In rebuttal, I am prepared to address the generalization of "standards" that "must"
be adhered to in the handling of a claim, as stated in this Rebuttal Report. In my
opinion, Atlantic complied with all appropriate standards in the industry.

As a trainee and in my early career, I was often exposed to many sources within the
industry to assist me in understanding what would be needed to properly adjust a
claim. These directives were often presented as practices that would result in good
claims handling or investigative techniques. However, the directive that the facts
and details that arose in the investigation of the individual claim would govern the
activity of the adjuster and the prompt communication with the insured always
tempered the guidelines. The only standard applying to all companies is the
insurance regulations and requirements as promulgated by the individual state
jurisdiction in which the claim occurred. As an adjuster and supervisor in my
career, I recognized that practices had to be in compliance with state requirements.
Any analysis of the propriety of a claim adjustment investigation and the ultimate

10

decision would be subject only to the state jurisdiction applicable to that individual claim.

In approaching the application of Mr. Sagalow's six standards to the claim at issue here in section X, it is clear that his opinion is colored to find any incident that he considers unreasonable as a failure on behalf of Atlantic.

a. **Sagalow: The insurance company must conduct a full, fair, and prompt investigation of the claim;**

In my opinion, Atlantic did just that in their investigation of the claim. They acted promptly, and considered numerous sources and references for information regarding the activities that were leading to the Extra Expense claim. They analyzed that information expeditiously at the request of the insured. The fact that the two parties, Israel, a "sovereign nation," and Hamas, an "other authority," were using rockets, war planes, ground troops, and tanks certainly would lead any reasonable reviewer of the facts to consider that these activities fell within the description of the war exclusions under the policy. Mr. Sagalow seems to be saying that Atlantic was too quick in considering the war exclusions. However, by doing so promptly Atlantic was able to notify the insured and its broker of the possible application of the exclusions. And, as I stated earlier, presented them with the opportunity to supply information for Atlantic's consideration. This investigation was fair, full, and prompt.

b. **Sagalow: The insurance company must disclose to its policyholder all benefits, coverages and limitations that may apply to the claim;**

Aon presented policy wording for the policy at issue in this litigation (including war exclusions) to Atlantic on behalf of the insured with the request that it be accepted. It then was involved in negotiations of the policy. Aon, and the insured, knew the wording of the policy as well as Atlantic. Aon later continued

11

to refer to the policy as its "manuscripted form" and property. Since this policy
was presented by a sophisticated broker for a sophisticated insured that
understood their risks in light of the policy wording, I do not see how Atlantic
would have been under any obligation to enumerate ". . .to its policyholder all
benefits, coverages and limitations that may apply to the claim." But, there is
nothing to indicate that Atlantic acted improperly in this regard.

c. **Sagalow: The insurance company must not misrepresent facts or policy provisions or fail
to bring to the policyholder's attention facts or policy provisions which it is relying upon
in denying or limiting coverage;**

In my opinion, Atlantic did not misrepresent any facts or policy provisions or fail
to bring to the policyholder's attention facts or policy provisions it relied upon in
denying coverage. The denial letters to the insured also enumerated and
explained the reasoning behind the application of the exclusion. All aspects of
the war exclusions (meaning all parts or sub-parts) were specifically set out and
quoted to the insured, to refer the insured to those specific parts and exclusions.
While every sub-clause may not have been separately discussed with a separate
heading in the denial letters, the enumeration of those clauses would still alert
the sophisticated insured and their knowledgeable representative, Aon, that all
sections of the exclusion could apply.

d. **Sagalow: The insurance company must treat its policyholder's interests with equal regard
as its own interests;**

Mr. Sagalow contends that Atlantic did not consider the policyholder's interests
with equal regard for three reasons: a) did not investigate whether the actions of
Hamas should be considered Terrorism as opposed to acts of war; b) did not
consult with Middle East expert regarding Hamas as either a terrorist vs.
sovereign nation; and c) did not consult with counsel before making the claims
decision. My opinion in this matter has been stated earlier: namely a) Atlantic
was reasonable in taking the position that the facts surrounding the acts of

12

Hamas and the response by Israel would be commonly understood to be acts of
war; b) the war exclusions did not solely pertain to the acts of a sovereign nation
and Hamas as a terrorist organization and the exclusions state that an "other
authority" can certainly commit acts of war, or warlike acts, or use weapons of
war, as enumerated in the policy; and c) Atlantic did consult counsel prior to the
definitive denial of the claim.

e.  Sagalow: In cases of "first impression" or when the claims examiner is not familiar with
    the coverage issues at play, experts should be brought in on a timely basis to provide an
    opinion;

Once again, I do not believe any outside expertise was needed. The war
exclusions are clear on their face, and it is abundantly clear that the
circumstances of this matter amounted to war. Moreover, the President of the
Entertainment Division of Atlantic, and its chief underwriter, Peter Williams, was
very experienced and very knowledgeable about the meaning of the various
clauses in the policy as presented to Atlantic, and his input was sought.
Additionally, as indicated above, outside counsel did provide an opinion.

f.  Sagalow: In cases where the decision of the insurance underwriter played a critical role in
    the issue of dispute, the claims department cannot make a determination without the
    active involvement of the underwriting department and the individual account
    underwriter;

The contention that the underwriter in this matter played a critical role in the
issue of the dispute is unfounded. A sophisticated broker presented the
coverage to Atlantic for a sophisticated insured that understood the possible
risks in conducting a production in the Middle East. They presented the policy to
Atlantic with the inclusion of the various parts of the war exclusions, which
generally are a very standard and typical type of exclusion (except as noted
above), which I usually see in almost all policies. Aon and its sophisticated
insured never sought to have the war exclusions removed or abrogated for this
individual production. To the contrary, they agreed upon the very war

13

exclusions at issue and asked Atlantic to issue a coverage form with those
exclusions stated in it, and continued to request renewal policies with the same
language.  The wording was clear and unambiguous.  Aon has claimed it as its
own.  From my experience in these types of matters, the claim department
would not have had any reason to seek out any opinion from their own
underwriter, because the war exclusions are not ambiguous, and because the
policy was negotiated by Aon as its manuscripted policy.  But, once again, Peter
Williams, the President of the Entertainment Division and the chief underwriter
of that division was consulted.

In conclusion, the report from Mr. Sagalow has done nothing to change my opinions
as fully stated in my original Expert Report.  Atlantic acted reasonably in the
handing of this claim.

It is my understanding that discovery is still open and ongoing in this matter.
Should any additional information be presented to me for review, I reserve the right
to modify my opinions as I see fit.

Anthony Clark, AIC

14

# EXHIBIT D

# EXPERT REPORT OF JAY SHAPIRO
## ANALYSIS OF ECONOMIC DAMAGES: REBUTTAL

## UNIVERSAL CABLE PRODUCTIONS LLC and NORTHERN ENTERTAINMENT PRODUCTIONS LLC

### V.

## ATLANTIC SPECIALTY INSURANCE COMPANY

Prepared by:

**Jay Shapiro**
**JAY SHAPIRO CPA**

Prepared on behalf of:
**Atlantic Specialty Insurance Company**

**U.S. DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Case No. 2:16-cv-04435 – PA – MRW

April 25, 2017

Confidential

**Universal Cable Productions LLC et al.**
**v.**
**Atlantic Specialty Insurance Company**

**EXPERT REPORT OF JAY SHAPIRO**
**ANALYSIS OF ECONOMIC DAMAGES: REBUTTAL**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................. 3

SUMMARY .................................................................................... 4

OVERVIEW OF INSURANCE CLAIM ............................................ 5

ANALYSIS...................................................................................... 6

METHODOLOGY ........................................................................... 8

MATERIALS REVIEWED, COMPENSATION AND
QUALIFICATIONS.......................................................................... 9

SCHEDULES ............................................................................ 11-18

**Universal Cable Productions LLC et al.**
**v.**
**Atlantic Specialty Insurance Company**

**EXPERT REPORT OF JAY SHAPIRO**
**ANALYSIS OF ECONOMIC DAMAGES: REBUTTAL**

### SCHEDULES

A.   Summary of Maximum Claim for Possible Extra Expenses

B.   Possible Incremental Costs

C.   Additional Film Tax Credits

D.   Documents, Data, and Materials Reviewed

E.   Resume of Jay Shapiro

**Universal Cable Productions LLC et al.**

**v.**

**Atlantic Specialty Insurance Company**

## EXPERT REPORT OF JAY SHAPIRO
## ANALYSIS OF ECONOMIC DAMAGES: REBUTTAL

### INTRODUCTION

This litigation concerns an insurance claim related to the extra expense incurred to relocate production of a television program, "Dig," from its initial location in Israel to New Mexico and Croatia.

Plaintiffs Universal Cable Productions LLC ("UCP") and Northern Entertainment Productions LLC ("Northern Entertainment") are the television production companies behind the TV series, "Dig."

Defendant Atlantic Specialty Insurance Company ("Atlantic") is an insurance company, which provided coverage relative to possible risks associated with film production of "Dig."

"Dig" is a television program produced by Plaintiffs. It initially aired on the USA Network, an affiliate of UCP, during the spring of 2015. The plot of Dig involves a Jerusalem-based FBI agent who investigates the murder of an archeology student taking part in an archeological dig in Israel.

"Dig" was originally scheduled to begin the production of a six-episode mini-series filmed in Israel. Production of the pilot episode (episode#1) of "Dig" commenced in Israel on June 1st 2014 and was successfully completed on June 26, 2014. However, as a result of a deteriorating security situation, Plaintiffs chose to postpone and ultimately move the production of "Dig" out of Israel (the "Relocation"). The production was ultimately completed in New Mexico and Croatia, in the Fall of 2014.

This report concerns episodes #2 through #6 of the "Dig" series. Those are the only episodes on which Plaintiffs are seeking to recover "extra expenses" incurred as a result of the move out of Israel. Plaintiffs do not seek any extra expenses (nor could they) in

connection with the pilot because its filming was completed before the move. They also do not (nor could they) seek any extra expenses in connection with episodes #7-10 because the decision to film these episodes was not made until after the decision to move was already finalized.

Plaintiffs allege that Extra Expenses, as defined by Section III of Motion Pictures/Television Producers Portfolio policy # MP00163-04 dated 1/1/14 (the "Policy"), were incurred to relocate the production of "Dig" from its initial location in Israel to new locations in New Mexico and Croatia. They contend this is a covered loss under the Policy. Plaintiffs submitted an insurance claim to Atlantic. Atlantic denied the claim on the basis that exclusions relating to war applied.

I was engaged by Defendant to evaluate the Plaintiffs' extra expense claim and the Plaintiff Expert Report of Robert Wunderlich of Discovery Economics, Inc. dated March 17, 2017 (the "PER"). In the Plaintiffs' First Amended Complaint, they contend that they had extra expenses "exceeding $6.9Million." The PER concluded that Plaintiffs had damages of almost $7.1 million in "extra expenses."

My analysis is based on documents, data, and information available to me as of the date of my report. I may update my analysis as appropriate, should additional information become available, or to respond to additional assertions made by Plaintiff or its expert witness.

## SUMMARY

The PER compiled the "extra expenses" allegedly incurred to relocate the production of episodes two through six of "Dig" from Israel to locations in New Mexico and Croatia and determined that such extra expenses totaled $ 7,092,845 (the "Plaintiff's Claim").

It appears that Plaintiff's Claim, which purports to represent extra expenses incurred, may **not** include sufficient extractions from the total amount of expenses incurred to reach the number of "extra expenses" that would not have been incurred had the production of

"Dig" stayed in Israel. This results in a damages calculation that is
too high.

From data available to me as of this date, it is my opinion that a
possible claim for extra expenses in this matter **should not
exceed \$2,357,875.**

My rebuttal analysis, which utilizes a different methodology than
PER, is summarized in Schedules A, B, and C to this report.
Supporting information is contained in the report's additional
schedules.

## OVERVIEW OF INSURANCE CLAIM

Given the definition of loss in the Policy as defined in paragraph #
9 of Section III, I have calculated the extra expenses incurred to
relocate production of episodes two through six of "Dig" from Israel
to locations in U.S. and Croatia.

The starting point for my analysis was the Full Cost Bible for
production of episodes two through six of "Dig," which were filmed
in New Mexico and Croatia. The Full Cost Bible is an accounting
document, that the PER describes as prepared in the ordinary
course of business, detailing expenses incurred in connection with
production of a television program such as "Dig." I supplemented
with data from other ledgers, budgets, and cost reports prepared by
"Dig" accountants in the normal course of business. I also reviewed
Plaintiffs' First Amended Complaint. A complete listing of the
documents and data I reviewed is in Schedule D.

I reviewed the PER, which attempted to identify the additional
expenses that would not have been incurred had the production
been completed in Israel, as planned. These additional costs were
summarized into four categories:

    1.   "Prep" Expenses – PER defines this term as:
"Preparation expenses correspond to expenses necessary to open
production at a given location."

2.    "Wrap" Expenses – PER defines this term as: "Wrap expenses correspond to expenses necessary to close production at a given location."

3.    "All Series" Expenses – PER defines this term as: "All Series expenses including set design and construction correspond to costs incurred in connection with the series as a whole (i.e. set construction), and then amortized for accounting purposes against individual episodes, as opposed to costs directly incurred in connection with a single episode."

4.    Extra Compensation Expenses – PER defines this term as: "Additional costs were incurred in New Mexico for certain cast members, reflecting additional SAG – required compensation and higher negotiated compensation due to the longer time-span of production. Extra compensation costs were incurred in Croatia due to additional travel days for certain cast members and stunt crew."

## ANALYSIS

For both New Mexico and Croatia, the starting point of the PER calculation is the Full Cost Bible, detailing the costs of production in the new locations. Then, certain extractions were made from Prep, Wrap, and All Series and the addition of extra compensation expenses. After extracting all the amounts that would have been incurred regardless of the move, PER indicates that extra expenses due to the Relocation, and related claim against defendant totaled $7,092,845.

I do not believe this is the most accurate way to calculate the extra expenses incurred in connection with the Relocation. Instead, the most accurate approach is to compare what Plaintiffs expected to spend to produce episodes 2 through 6 in Israel, and what they ultimately did spend to produce those five episodes in New Mexico and Croatia. This is how I calculated the "extra expenses." I identified the TOTAL costs to produce these episodes, which included all the above items the PER considered. I then subtracted from that total the amount Plaintiffs expected to spend when they expected to produce the entirety of these five episodes in Israel. I also factored in the tax credits Plaintiffs expected to receive in

Israel and the tax credits they did receive in New Mexico and
Croatia.

Any specific costs that would have been incurred whether the
production had been completed in Israel, or at the new locations, as
actually occurred, should **not** be part of the claim—only those costs
that were incurred solely because of the Relocation.

It is my opinion that it is improper to include as "extra expenses" all
prep and wrap expenses incurred in New Mexico and Croatia. Some
of those prep expenses and wrap expenses, outlined in the PER,
may have provided economic benefits to the final four episodes (#7-
#10) and are therefore not properly considered as part of this claim.
Any amounts incurred for prep and wrap on episodes 2 through 6
that were beneficial and saved money on episodes 7 through 10
provided a benefit to Plaintiffs that reduced their overall cost of
filming episodes 7 through 10.[1] This benefit to Plaintiffs reduces the
overall loss as a result of the relocation. It is therefore not
appropriate to include *all* prep and wrap expenses for episodes 2
through 6 as "extra expenses," since Plaintiffs may have recouped
some of these expenses in the form of reduced expenses or cost
efficiencies on episodes 7 through 10.

It is my further opinion that based on the information provided to
me, it is not possible—for me or anyone else—to make a definitive
determination about whether each individual expense was incurred
as a result of the Relocation, or whether it would have been
incurred had the production stayed in Israel. This is a complicated
question that can be answered only by a line-by-line analysis of
each expense and much more information about the expense and
the production than the plaintiffs have produced in this case. For
example, in PER's schedule, New Mexico Prep Extra Expenses, the
PER identifies $56,374 in "extra" wardrobe expenses. The plaintiffs
have provided no explanation for why it was necessary to purchase
additional wardrobe as a result of the Relocation. The plaintiffs
must provide a narrative explanation of why these types of
expenses (wardrobe is just one example) were incurred as a result

---

[1] The overall cost for producing episodes 7 through 10 is approximately $570,000 (13%) per episode
less than the overall cost for producing episodes 2 through 6. *See* UCP018226-018227. No
explanation was available for this significant cost reduction.

of the move in order to establish that these expenses truly did result
from the Relocation. It is my opinion that this process is impossible
based on the information I have reviewed or the information the
plaintiff's expert reviewed without any explanation from "*Dig*"
management.

The PER does not address my methodology of calculating damages
or offer any justification for why the "extra expenses" are greater
than $2,357,875 (the figure I believe is the maximum amount
recoverable). In my opinion, not addressing this mathematically
reliable alternative to the calculation of damages challenges the
credibility of the PER's analysis.

## METHODOLOGY

1.      I believe my method is the more straightforward and
reliable approach to calculating the damages on this claim: utilizing
TOTAL production costs incurred at the new locations LESS
expected Israeli costs that would have been incurred without the
Relocation (Incremental Costs). Also, the Plaintiff's should consider
mitigating economic benefits accruing to them from the Relocation.
This includes but is not limited to the tax credits that Plaintiffs
received as a result of moving production to New Mexico and
Croatia (minus the tax credits they would have received had
production been completed in Israel).

2.      Given the definition of loss in the Policy and my
understanding of costs typically incurred to produce a six-episode
TV series, I believe that the recoverable Extra Expenses are possible
incremental costs or net costs which would not have been incurred
in Israel, reduced by any economic advantages received as a result
of the relocation. This should be the appropriate claim for Extra
Expenses.

3.      The PER indicated a supported Total Cost at the new
locations of $21,297,435 ( on Page 5) and various documents
indicated  UCP   adjusted  TOTAL  costs  at  **$21,464,745**
(UCP018227). I assumed that such was all inclusive of any "hiatus",
"postponement" or "delay" items and Relocation effects including

extra compensation, extra travel days, and the significant cost savings of Croatia currency exchange.

4.     The most detailed Israeli cost data available outlining the amount expected to be incurred in producing episodes 2 through 6 entirely in Israel comes from UCP004971-4972. The figures outlined in this documents are what I used to identify the costs which would have been incurred had no relocation taken place. Such data was supported by two e-mails involving UCP's insurance broker. UCP003732-3734, AONNBCU0001748-1750.

5.     My calculations show that Plaintiffs have *maximum* damages in connection with the Relocation of $2,357,875. This amount does not take into account other possible reductions that are appropriate, such as, for example, (1) the prep and wrap expenses incurred in episodes 2 through 6 that may have benefited the producing of episodes 7 through 10, (2) production quality improvements that could have been made to each episode, and (3) legal costs associated with the move (UCP004503 references legal expenses for war claims).

## MATERIALS REVIEWED, COMPENSATION AND QUALIFICATIONS

In preparation this report, I reviewed summary and detailed ledgers, cost reposts, production recap reports, budgets, and other financial data regarding the New Mexico and Croatia production of "Dig," and the Plaintiffs' First Amended Complaint. A complete list of the documents and data I reviewed is in Schedule D.

My qualifications as an expert are summarized in my current resume as is in Schedule E. My firm's compensation schedule includes hourly rates from $250-$375 for consulting and $625 for testimony.

I am the founder of JAY SHAPIRO CPA, a professional services firm that provides consulting regarding financial and accounting issues with a specialization in Entertainment & Media matters.
I have frequently provided financial , and accounting consulting for similar matters in this dispute, have participated in publications

and taught in professional environment the subjects dealing with "production accounting". I have served as an expert witness and a court-appointed expert regarding these issues.

Dated this 26th day of April 2017

JAY SHAPIRO

## Schedule A

### Summary of Maximum Claim for Possible Extra Expenses
### Five Episodes

| | | |
|---|---|---|
| **Schedule B –** | Possible Incremental Cost | $ 3,929,320 |
| **Schedule C-** | Additional Film Tax Credits | ($1,571,445) |
| | | $2,357,875 |

## Schedule B

## Possible Incremental Costs
## Five Episodes

Costs Actually Incurred (eps. 2-6)          $ 21,464,745 (a)

Israeli Cost Data (eps. 2-6)                  ($17,535,425) ( b)

                                              $  3,929,320

(a) Final Bible with UCP adjustments included in UCP018226

(b) E-Mail 3/11/14 per UCP0004971

## Schedule C

### Additional Film Tax Credit
### 5 Episodes

| | |
|---|---|
| Realized – New Mexico production | $ 3,305,243 ( a) |
| Realized – Croatia production | $   370,202 ( a) |
| TOTAL | $ 3,675,445 |
| Anticipated – Israel | ($2,104,000)(b) |
| Additional Credit Realized(Economic Benefit) | $ 1,571,445 |

(a) See UCP004504

(b) See UCP004971

CONFIDENTIAL

## Schedule D

I reviewed the following Bates Numbers of documents produced by the plaintiffs:

Plaintiffs' First Amended Complaint

UCP004067-UCP018002

UCP080003-018124

UCP018125-UCP018227

UCP018228-UCP020052

UCP020063-UCP032749

UCP032750-UCP032854

UCP003732-3734

AONNBCU0001748-1750.

CONFIDENTIAL

## Schedule E

**11300 W. Olympic Blvd**
**Suite #910**
**Los Angeles, CA 90064**

**Telephone (310) 441-3600**
**Facsimile  (310) 441-3610**
**E-mail: jshapirocpa@gmailcom**

1990 to **Present**
**Jay Shapiro CPA, Los Angeles, California**
**Owner**
Specializing in serving the entertainment industry and mid-size businesses on an international basis. Over 1500 engagements have included forensic audits, accounting, income taxation, management consulting, and financial advisory services for a diverse group of clients. Significant accomplishments include expert testimony for an international defense contractor, major Hollywood/business litigation, public offerings for NASDAQ and AMEX companies, and financial advisor in several workout situations, and mergers of companies up to $500 million in revenues.

April 2002 to September 2015
Sunrise Media Group, Inc., Los Angeles, California
**Chairman and Chief Executive Officer**
Founded company specializing in financing, development, production, and distribution of entertainment content and consulting in all aspects of the entertainment and media industry on a worldwide basis.

February 2001 to April 2002
Impact Media Group, Inc., Los Angeles, California
**Chief Executive Officer**
President, Chief Financial Officer, and Director responsible for all worldwide financial, administrative, and operational affairs of this independent television producer and distributor. The Company owned 2,000 hours of programming worldwide, in addition to producing a wide variety of programming for leading U.S. and international broadcasters and video markets.

1990-1993
The Program Entertainment Group, Sherman Oaks, California
**Executive Vice President-Finance and Administration**
Responsible for financial planning, SEC reporting, office
administration, and investment activities for this publicly held
television Syndication Company. Reported to Chief Executive
Officer and supervised six people.

1982-1990
Laventhol & Horwath, Los Angeles, California
**Partner/Director of Audit and Accounting Services**
Responsible for management of a $5.5 million worldwide audit
practice (most profitable in firm) and supervision of five partners
and fifty professional staff. Served as **National Director** of
Entertainment and Media Industry Services. Personally developed
over $500,000 of new business while handling $1.6 million in
client billing for various specialized industries and professional
firms. Senior technical partner in L.A. office and active in firm's
SEC review and quality review programs. Promoted to partner in
1983. Recognized internationally as an authority in
entertainment/media accounting matters.

1973-1982
Peat, Marwick Mitchell & Co., Los Angeles, California
**Audit-Senior Manager**
Primarily responsible for management of audit and accounting
engagements, which demanded extensive knowledge of, financial
issues affecting the entertainment, merchandising, real estate and
financial service industries. Promoted to Senior Manager in 1980.

**EDUCATION**:      M.S. in Accounting/Finance with distinction, 1973
Arizona State University Graduate School of Business
Administration

B.B.A. in Accounting, 1972
University of Wisconsin

**PROFESSIONAL CREDENTIALS/ AFFILIATIONS:**      Certified Public Accountant, 1978 to Present

**Chairman**, Entertainment & Sports Industry Committee,
California Society of CPA's

**Chairman**, AICPA Entertainment Accounting Standards
Taskforce

**Chairman**, Positive Enforcement Committee, California State
Board of Accountancy

**State Board Member/Vice President**, California Society of
CPA's

**Member**, Academy of Television Arts and Sciences (ATAS)  and
Paley Center for Media

**Adjunct Professor**, USC School of Accounting, UCLA
Department of Entertainment Studies, ASU School of Film

**Editorial Review Board**, the Practical Accountant

**Trustee**, Zeta Beta Tau Fraternity

**Member**,  So. Cal Fraud Investigator Association, and Association
of Certified Fraud Examiners (**CFE**)

**Recipient**, City of Los Angeles Certificate of Appreciation.

**Producer**, *World of Mirth*, live stage play

**Diplomate**, and Board Member of American Board of Forensic
Accounting – **DABFA**

**Member**, Beverly Hills Bar Association

 **Featured Speaker**, American Board of Forensic Accounting-
2015 Annual Conference

-3-

## SCHEDULE A

## LITIGATION

**Expert Witness Testimony-last four years:**

Cobb v. Time Warner, Inc.
Greer v. Dove Books
L A Superior Court Referee (CRASH)
Kasich v. NTV (DECISIONS)
Sterling v. Stiviano
O'Donnell v. Misho Law Group

**Authored**, entertainment chapters (production, distribution, and broadcasting) of Harcourt Brace's Comprehensive GAAP Guide

**Featured**, in Fatal Subtraction, the Inside Story of Buchwald v. Paramount; and Deconstructing Sammy (Sammy Davis Jr)