# Exhibit B

**EXPERT WITNESS REPORT**

**Universal Cable Productions LLC, et al.**

**vs.**

**Atlantic Specialty Insurance Company**

**March 17, 2017**

**By**

**Ty R Sagalow**

## PRELIMINARY MATTERS

**I**

**Witness Qualifications**

My CV is attached.  In summary, I have been an insurance executive for over 34 years.  I have been affirmatively held to be an insurance expert under Rule 702 of the Federal Rules of Evidence by the United States District Court for the Southern District of California.

From 1987 to 2009, I held various senior positions in AIG including Chief Underwriting Officer, General Counsel, Chief Operating Officer and President of AIG Product Development for various divisions and subsidiaries.

I worked at AIG until 2010.  Following my time at AIG, I worked for Zurich North America and The Tower Group, initially in each job as the company's Chief Innovation Officer where I led teams that developed and drafted various insurance policies and products, among other activities.

Since February 2012, I have been CEO & Founder of Innovation Insurance Group, LLC, a consulting firm to the insurance industry, with offices in New York, New York and Millburn, New Jersey.  The company provides expert witness services and advice and counsel to both policyholders and insurers, as well as insurance brokers, in the areas of various types of insurance products.  For example, I have personally reviewed and been consulted on many policy language changes in property and casualty policies, and regularly advise insurance companies and policyholders on word choice, grammar, sentence construction, clarity and placement of provisions in the policy and in applications in order to make the insurance policy readable and understandable by the purchaser.  These consultations have also included an analysis of underwriting decisions to include, or not to include, an exclusion and the impact of such decisions on coverage and on the reasonable expectations of the insured.

In August 2015, I became Chief Executive Officer of Lemonade Insurance Company and Chief Insurance Officer of Lemonade, Inc. in addition to my position at Innovation Insurance Group, LLC.  I am also a licensed Property &Casualty insurance broker in several states since 2012.

As the chief underwriting officer at National Union, an AIG subsidiary, I was responsible for major underwriting decisions for that carrier.  As Assistant General Counsel and then General Counsel, I personally wrote, or led a team that wrote, all the insurance policies that National

Union produced from 1988 to 2000. In these capacities, my work involved, and I am knowledgeable about, policy forms which contain the same, or substantially the same, language on which I have been asked to comment in this case.

With respect to claims experience, as Chief Underwriting Officer of National Union, I had frequent contact with senior members of the claims department. As a matter of process, both senior underwriters and senior claims personnel worked hand in hand in the creation of any new insurance policy. This occurred for every major new policy. It was the practice of AIG to locate claims personnel physically next to underwriting personnel due to the frequent interaction of the two departments. Further, I frequently participated in major claim meetings. These meetings occurred several times a year for major claims. It also was commonplace for me to discuss with the head of the claims department coverage positions on potential claims submitted to the company. It would not be uncommon for this type of conversation to occur at least once a week.

I have taught seminars on proper claims process for the Claims Litigation Management Alliance's "Claims College."[1] I have taught in the following subject areas, which have included teaching the approaches to interpreting policy language in commercial coverages as well as handing issues of materiality in the application process:

- The Proper Role of the Claims Examiner.

- Stakeholders to Consider in the Claims Process.

- Best practices in communication and coordination in Claims.

- Dealing with other insurers, including excess insurers.

I graduated *summa cum laude* from Long Island University, *cum laude* from Georgetown University Law Center, and I have an L.L.M. from New York University Law School.

As mentioned earlier, since June of 2012, part of my consulting practice has been to serve as an expert witness in insurance coverage as to underwriting and claims matters and have been so retained over 50 times. I have been deposed as an insurance expert approximately 13 times and have testified at trial as an insurance expert once where, as mentioned earlier, I was affirmatively held to be an insurance expert in federal court.

---

[1] (https://www.facebook.com/pages/Claims-and-Litigation-Management-Alliance/161320700587039)

Details of these engagements are included in my CV.

I am the author or co-author of various works in the field of insurance and new product development.  Details of these publications are included in my CV.

## II

## Compensation

My compensation for this matter is $725 per hour.  Days at trial and depositions have a minimum of eight hours.  My compensation is not dependent upon my findings or the outcome in this matter.

## III

## Facts and Documents Considered

In reaching my conclusions, I reviewed documents obtained from U.S. government sources and various media reports, all of which are cited in the footnotes to my report.  In addition, I reviewed and considered the following case specific documentation in reaching my conclusions:

1.  The following insurance policies and applications:
    a.  Motion Picture/Television Producers Portfolio Policy No. MP00163-04 by Atlantic Specialty Insurance Company ("Atlantic") to NBCUniversal Media, LLC for the policy period of January 1, 2014 to June 30, 2015 providing, in relevant part, a limit of liability of $10,000,000 in "Extra Expense" ("Policy")
    b.  "DIG" Television Insurance Applications indicating a Filming Location of "Tel Aviv and West Jerusalem in Israel and Toronto, Canada" ("Application" and "Supplemental Application," hereinafter "Applications")
2.  The following Coverage Dispute pleadings and other related documents:
    a.  First Amended Complaint dated July 7, 2016
    b.  Answer to First Amended Complaint dated August 5, 2016
    c.  The expert reports of Ambassador Dennis Ross, Dr. Matthew Levitt, and Professor Harold Koh
3.  The following claims coverage correspondence:
    a.  Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter")

   b.   Letter from Lucia E. Coyoca, Mitchell Silberg & Knupp LLP, on behalf of
        Insured to Pamela A. Johnson dated August 13, 2014 (responding to First
        Denial Letter)

   c.   Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014
        ("Second Denial Letter")

4.  The following claim file documents:

   a.   Various documents including duplicate copies of the Policy, Denial Letters,
        Pleadings, file notes (redacted), First Notice Of Loss, various emails to/from
        claims (BATES ATL00001-161)

5.  The following underwriting and claims file documents:

   a.   Various correspondence to and from the parties and their representatives as
        specified by date and BATES number in Exhibit B.

6.  The following deposition transcripts and discovery responses:

   a.   Theresa Gooley

   b.   Daniel Gutterman

   c.   Peter Williams

   d.   Atlantic's Responses to Plaintiffs' First Set of Requests for Admission

   e.   Atlantic's Responses to Plaintiffs' Second Set of Interrogatories

7.  The following other documents:

   a.   "CORE PRINCIPLES" in claims drafted by Atlantic (Version September 1,
        2012)

   b.   "GENERAL CLAIMS PRACTICES" drafted by Atlantic

In reaching the opinions expressed herein, in addition to the materials described in this section
III, I relied on my knowledge of the insurance industry custom and practice as it relates to the
subjects discussed, gained from my thirty plus years of experience as a chief underwriting
officer, general counsel and chief innovation officer of large insurance companies and
extensive experience in well over 50 cases representing both policyholders and insurance
carriers in insurance disputes.  To the extent indicated in the list of materials or otherwise in
this report, or otherwise used for the purpose of this report, I may have also relied on materials
I have written or speeches I have given on the subject matter of this dispute.

I am aware that discovery is continuing in this matter and that additional documents may be provided to me to review in the future.  I reserve the right to amend or supplement this report after review of such additional information.

## IV

## Summary of Facts

To the best of my knowledge, the essential underlying facts are not in substantial disagreement between the parties:

1-      Universal Cable Productions ("UCP") and Northern Entertainment Productions ("NEP"), as indirect subsidiaries of the Named Insured, NBCUniversal Media LLC ("NBCUniversal"), are insureds under the Policy.  (Hereafter, all three are referred to as the "Insured.")  NBCUniversal is a leading media and entertainment company.

2-      Since at least January 1, 2010, NBCUniversal has purchased a Motion Picture/Television Producers Portfolio insurance policy from Atlantic Specialty ("Atlantic").  These types of policies cover, among other things, "extra expenses" associated with a re-location of insured listed productions as a result of an "Imminent Peril" (as defined in the Policy).

3-      Since 2010, NBCUniversal has submitted individual productions to Atlantic for individual underwriting and approval.  Premiums are substantial and vary from year to year.  Losses could also be substantial in the aggregate. (In short, this type of policy was not for the faint of heart.)

4-      Policies generally ran from January 1 to January 1 with short, separate applications being submitted during the course of the year for each production to be insured.  However, the Policy in this case was in effect for eighteen months, from January 1, 2014 to June 30, 2015.

5-      From January 1, 2010 to November 15, 2013, the Insured had paid Atlantic almost $5 million in premium with insured losses a little over $4.1 million.[2]

6-      For the policy in question, NBCUniversal paid Atlantic approximately another $2,192,682 in premium.

7-      On or about December 3, 2013, the Insured first advised Atlantic of a new 6 episode (subsequently extended to 10 episodes) series called "DIG."  Production would be, at least in part, in Israel.  On December 11, 2013, the Insured, through its broker Aon/Albert G.

---

[2] $4,967,372 in premium and $4,157,651 in losses (see ATL000765)

Ruben Insurance Services, Inc. ("Aon"), submitted to Atlantic the official Application for insurance for DIG.

8-    In its submission, Aon discussed with Atlantic the higher risks associated with producing a television show in Israel indicating: "I have been advised that the mayor of Jerusalem and the local police has been contacted and are assisting in assuring the safety of the production company when they are working in Jerusalem."[3]  Aon further requested that despite this presumably higher risk "we would like to avoid *any deviation from our standard policy terms* if possible."[4]  (Emphasis added.)

9-    On December 12, 2013, Atlantic confirmed coverage for DIG without any "deviation" from standard policy terms.  DIG would be covered under the then current 2013 policy but also "rolled over" to the soon-to-incept January 1, 2014 renewal policy.  Thereafter, on January 13, 2014, the Insured declared DIG as an Insured Production under the Policy, and Atlantic confirmed coverage under the 2014 Policy on January 14, 2014.[5]

10-   On or about June 1, 2014, filming of the DIG pilot episode commenced in Israel. Production for the pilot was completed on June 26, 2014, and production of the series' subsequent episodes was scheduled to begin on July 20, 2014.[6]

11-   However, production could be not begin as scheduled because of safety concerns due to rocket fire by the terrorist organization Hamas into Israel.[7]  To elaborate:

12-   According to the National Counterterrorism Center, Hamas has conducted many anti-Israel attacks in Israel since the 1990's.  The attacks have included large-scale bombings against Israeli civilian targets, small-arms attacks, improvised roadside explosives, suicide bombings, and rocket attacks.[8]

---

[3] ATL000405

[4] Ibid; although the email did not specify *which* terms the broker feared might be changed.  Given the environment in Israel and the reference to security measures, custom and practice would indicate Aon likely was concerned that Atlantic might insist on inclusion of a terrorism exclusion.  (The "standard terms" did not include any such exclusion.)

[5] ATL000438, 0001567, 0001568

[6] First Amended Complaint at paragraph 21

[7] Hamas has a long history of firing rockets into Israel, a history that Atlantic underwriters were no doubt aware of, given that Hamas is believed to have fired more than 11,000 rockets at Israel between 2000 and 2011 and 1,697 rockets in 2012.  The periods in between rockets being fired is seen as a temporary interlude to rebuild as Hamas leader Ismail Haniyeh said on January 26, 2016:  "There are those who think the calm is a time of rest … [b]ut this is a continuation of the struggle.  Al-Aqsa Martyrs Brigades are working and preparing for Palestine." (http://www.jewishvirtuallibrary.org/background-and-overview-of-hamas)

[8] Levitt Report, pp. 7, 9, 12, and 19

13-    The United States, Israel, European Union, Canada and Japan categorized Hamas at all relevant times as a terrorist organization[9]. The Hamas charter or manifesto advocates for the destruction of the state of Israel and calls for the "raising of the banner of Allah over every inch of Palestine."[10]

14-    The history of the region is replete with temporary respites from hostilities, some lasting longer than others, but inevitably Hamas would resume their terrorist activity.[11]

15-    One such re-emergence of Hamas terrorist activity occurred in June/July 2014, exactly when DIG was being produced. According to multiple State Department Daily Press Briefings, the essential facts are as follows: On or around June 12, 2014, three Israeli teenagers were kidnapped "with many signs that point to Hamas involvement."[12] On or about June 30, 2014, "the bodies of the three kidnapped teenagers" were found and there were reports "indicat[ing] that Hamas was involved.[13] After allegations were made that Hamas was responsible for the kidnappings, Hamas began firing rockets into Israel.[14] Shortly thereafter, Israel began to take affirmative action to protect its interests launching on July 8, 2014 "Operation Protective Edge" with a goal to eliminate the terror capabilities of Hamas.[15]

16-    On July 10, 2014, Stephen Smith, Head of Security, Europe and International Security & Crisis Management at NBCUniversal sent an internal email indicating that:

> This is to advise you that the security environment in Israel currently prohibits NBCU Security from being able to guarantee the safety and security of our employees, production partners and associated crew and talent…We have looked at the magnitude and range, of current rocket attacks (which appear to target locations to be used in forthcoming filming)... and the potential for a further increase in

---

[9] See, e.g., U.S. Department of State, Foreign Terrorist Organizations available at http://www.state.gov/j/ct/rls/other/des/123085.htm; https://www.nationalsecurity.gov.au/Listedterroristorganisations/Pages/HamassIzzal-Dinal-QassamBrigades.aspx (Australia); https://www.publicsafety.gc.ca/cnt/ntnl-scrt/cntr-trrrsm/lstd-ntts/crrnt-lstd-ntts-en.aspx (Canada); http://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32017D0154&from=EN (European Union); http://www.justice.gov.il/En/Units/FBPS/DNFBPDuties/Pages/List-of-Terrorist-Organizations-and-Individuals.aspx (Israel); and, http://www.mofa.go.jp/announce/announce/2002/7/0705.html (Japan)
[10] Ref: http://www.cnn.com/2012/11/16/world/meast/hamas-explainer/
[11] First Amended Complaint at paragraph 22; https://www.nctc.gov/site/groups/hamas.html
[12] Ibid at paragraph 23
[13] Ibid at paragraph 23
[14] Ibid, and see Levitt Report, pp. 20-21
[15] Ibid

hostilities including … acts of terrorism within Israel… [concluding] …Personnel based in country in relation to this production should make arrangements to leave.[16]

On Friday, July 11, 2014,[17] Andrea Garber, Sr. Director, Risk Management, of NBCUniversal, called Peter Williams, President of OneBeacon Entertainment (an Atlantic related entity) advising him of the situation and the decision by the Insured to postpone for one week the production of episodes 2/3 of DIG which was scheduled to begin on July 20, 2014.  The estimated cost of the one week delay in production was up to approximately $350,000[18].

17-  On Tuesday, July 15, 2014, Aon submitted an official claim notice to Atlantic indicating a Date of Loss of 7/11/14[19] (hereafter the "Claim").  The Claim was assigned to Daniel Gutterman (Senior Entertainment Claims Investigator) and Pamela A. Johnson (Entertainment Claims Manager) the same day.  Mr. Gutterman immediately flagged the "exclusions for [Civil Unrest]" prompting Ms. Johnson to comment approximately 40 minutes later: "It looks like we need to have a lot of further discussion about this."[20]

18-  That evening, in response to an email from Ms. Johnson, Mr. Williams asked:  "Why is it not a covered claim they have immanent (sic) peril.  Unless you are going to invoke the war exclusion."[21]  Ms. Johnson responded: "I suggest we have a call about this tomorrow.  Danny and I had a conversation with Susan [Aon] and Andrea [NBC] about what the production's plans were, but we didn't make any representation about whether there was coverage but *we also did not alert them that this might not be a covered claim.  If this is going to be an issue, we need to alert them right away.*"[22]  (Emphasis added.)

19-  Mr. Gutterman sent an email to Mr. Williams on July 15, 2014 in the late afternoon, asking if Mr. Williams had suggested a "push" (e.g., delay) for longer than one week, because a "ground war" may still occur.[23]  Mr. Gutterman wrote: "Any chance you happened to suggest that they push for more than just the week, since the crew needs to be advised at least one week in advance for a push *and since a ground war still might occur.*

---

[16] ATL000298
[17] The First Denial Letter states that this occurred on Thursday, July 10th
[18] Ibid
[19] ATL000102
[20] ATL000295
[21] ATL000304
[22] ATL000305; also see Mr. Gutterman Deposition at p.261, lines 13-25 – p.262, lines 1-2
[23] See Mr. Gutterman Deposition at p. 238, lines 9-25 – p.239, lines 1-5

. . .." (Emphasis added.)[24]  This apparently set up the artificial distinction that the one week push was covered (because it was before the rejection of the cease fire), but the relocation was not (because it was after).

20- The following day, on July 16, 2014:

a.  Ms. Johnson emailed the policy's war exclusion to Mr. Williams and Mr. Gutterman.  Later that day she emailed Theresa Gooley (her supervisor) asking whether other business units inside Atlantic had treated the "Israeli/Hamas conflict" as triggering an exclusion for "warlike actions by a military force," indicating "I want to make sure OBE takes a consistent position.[25]

b.  There are four parts to the war exclusion.  It provides the Policy does not insure against loss or damage caused directly or indirectly by:

i.  "War, including undeclared or civil war; or

ii.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

iii.  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

iv.  Any weapon of war including atomic fission or radioactive force, whether in time of peace or war."  (Hereafter the foregoing is referred to as "the War Exclusion" and the subparts are individually referred to as prong 1, prong 2, prong 3, and prong 4 respectively.)

c.  Mr. Gutterman researched the conflict seemingly by conducting various Google searches.[26]  He remarked in the claim file: "3) Facts War in Israel with Hamas…. 7) Action Plan a) advise the u/w of the new claim b) Determine if war is covered.[27]"  He then contacted Wanda Phillips, the underwriter who decided to provide insurance for the DIG production in Israel.  However, he did

---

[24] Ibid
[25] ATL001555.  I note that I never saw a response from Ms. Gooley to Ms. Johnson's inquiry.
[26] See for example ATL001560 and ATL001561 (Note:  I have no way of knowing whether Mr. Gutterman used Google or another search engine. In this report, I use the word "Google" to include any internet search engine tool he may have used.)
[27] ATL000008 (I note that the claim file notes seem to jump from 7/16/14 to 7/28/17 with no notes in the file for the various conversations that took place in between these dates.)

not ask Ms. Phillips any of the following questions: (i) whether in deciding to provide coverage for DIG she took into consideration the violent activities of the region or the likelihood of an increase in terrorism from Hamas; (ii) why she did not add a terrorism exclusion to the coverage; or even (iii) whether she had considered Hamas launching rockets into Israel to be an act of terrorism or an act of war.  In other words, he did not ask a single question of the underwriter about the underwriter's intent as to the meaning of the terms "war" or "war-like" when she agreed to add DIG as an insured production.

Instead, Mr. Gutterman merely asked her to confirm that "Dig was declared" (i.e. it was an insured production).[28]  She responded: "The production Dig was declared, and we approved the filming in Israel with terms" later specifying that "we approved filming in East Jerusalem & Tel Aviv.  NBC Security team is to remain involved and continue working with production.  We required … coordination with the local police.[29]"  Despite the obvious conclusion that Ms. Phillips' remarks meant that underwriting had evaluated the security issues in Israel and went ahead with coverage anyway, subjecting it to certain security risk management procedures, neither Mr. Gutterman nor anyone else in the claims department ever asked whether underwriting had accepted and priced for the risk of an enhanced Israeli/Hamas conflict.  Indeed, I found no evidence that Mr. Gutterman, or anyone in the claims department, ever spoke to Ms. Phillips again on this claim.

21-   On July 17, 2014:

    d.  Ms. Johnson conducted her own research, on Westlaw, finding a case where the court did not apply that policy's war exclusion to a 1975/76 property loss claim in Lebanon for damages to a Holiday Inn hotel that were sustained during extended fighting between various groups for control over an area in Beirut.  In the decision, the court reiterates the policy interpretation rule: "Exclusions [in

---

[28] ATL001549
[29] ATL001547

insurance policy] will be given the interpretation which is most favorable to the insured."[30]

e.  Ms. Johnson and Mr. Gutterman called Susan Weiss of Aon and Andrea Garber of NBC on July 17 at 4 p.m. pacific.  According to an email from Mr. Gutterman to Ms. Johnson, Mr. Gutterman had plans to put into CWS notes (CWS is Atlantic's claims management system) the following summary of the conversation[31]:

    i.  The Insured advised Atlantic that "the situation in Israel has not improved;[32]" and that accordingly,

    ii.  The Insured "has decided to move the production."

    iii.  Ms. Johnson advised the Insured that the war exclusion will apply here for the move out of Israel;[33] but,

    iv.  the one week push "appears to be covered as it occurred before Hamas's rejection of the cease fire and Israel's then stating that they will be going forward with all force."

    v.  The Insured responded that "they do not believe Hamas can be considered a government and are considered by the US to be a terrorist organization.[34]"

22-  On July 18, 2014:

---

[30] *Holiday Inns Inc. vs Aetna Insurance Company et al* (ATL001636…) also stating on page 40 "What it comes down to is this.  'From the welter of conflicting evidence, reasonable men might draw any of a number of conflicting conclusions" on whether the damage to the Hilton was caused by those acting with the crucial element that trigger the exclusion.  "But I am not required to choose among these possible interpretations….it is Aetna's burden to prove the crucial element … Aetna has not sustained that burden.  Its defense based on the exclusion…fails."

[31] ATL003211 (I note that this document has a "sent" date of "7/3/2016" which seems unlikely, and it appears this email was a draft of an email Mr. Gutterman prepared.  Based on scheduling emails, it appears this call happened on 7/17/14 at around 4 pm.)

[32] Earlier, on July 16th, the U.S. State Department stated "right now the potential we're looking at is … an even greater escalation of violence" in and around Israel. (U.S. Department of State, Daily Press Briefing, Washington, DC, June 16, 2014 (available at http://www.state.gov/r/pa/prs/dpb/2014/07/229360.htm). See also The White House, Remarks by the President on Foreign Policy, July 16, 2014 ("Hamas continued to fire rockets at civilians, thereby prolonging the conflict.") (available at https://www.whitehouse.gov/the-press-office/2014/07/16/remarks-president-foreign-policy)

[33] While the email uses the phrase "potentially will apply" and the First Denial Letter uses the phrase "was seriously considering," deposition testimony of Ms. Gooley indicates that it was in this evening conversation of July 17th that Atlantic advised the Insured that they were not covering the relocation extra expenses due to the "war" exclusion.  See, e.g. Ms. Gooley Deposition at p. 169, lines 5-8, p. 170, lines 14-25, and p. 184, lines 17-25

[34] Mr. Gutterman's email confirms what was stated in the First Denial Letter, that the Insured "protested, asserting that the situation in Israel did not constitute a war because Hamas was a terrorist organization, not a governmental authority…."

    f.  Ms. Gooley advised Sean Duffy, SVP & Chief Claims Officer for OneBeacon Entertainment (an Atlantic related entity), of the Claim and that "the War Exclusion may act to limit or preclude coverage.  The applicable limits are $10M.  We are looking at it more closely including research on the exclusion and its application.[35]"  However, there is no evidence in the claim file to indicate that Ms. Gooley provided any direction or oversight to either Ms. Johnson or Mr. Gutterman as to how the investigation or analysis of the Claim should be conducted, including whether outside experts should be consulted as to Hamas or the situation in Israel.

    g.  Ms. Gooley hired outside counsel, Gene A. Weisberg, to review coverage.[36]

    h.  Mr. Gutterman continued his research, apparently by continuing to do Google searches.[37]

23- On July 21, 2014, Atlantic received a coverage opinion letter from Leon Gladstone (one of Mr. Weisberg's law partners), *after* the Insured already had been told that the War Exclusion applied and the Claim denied.[38]  On July 22, 2014, at 1:18 pm, Ms. Gooley advised Mr. Duffy that:  "we believe the policy exclusion for war operates to significantly limit and/or preclude any available coverage" indicating that "Pamela is having a discussion with NBC this evening about the claim.[39]

24- The next day, July 23rd, Mr. Duffy responded simply "I agree with the analysis" and forwarded Ms. Gooley's email to Dennis Crosby, Executive Vice President at OneBeacon Entertainment (an Atlantic related entity) stating "this seems correct to me.  Will update you if warranted."  Mr. Crosby then forwarded the email to Mr. Williams.  Mr. Williams, possibly believing that the claim was just for the one week delay which would not require a payout by Atlantic in all events because of the policy deductible, responds in a practical fashion: "I am aware and think the decision is justified.  Either way, the claim would fall within NBC's SIR [Self Insured Retention] but it is important we adhere to policy terms and conditions.[40]"

25- Meanwhile, Mr. Gutterman was still doing Google searches.

---

[35] ATL001800
[36] See Ms. Gooley Deposition at p.171, lines 21-23 and p.172, lines 15-19
[37] See, e.g. ATL000294
[38] See, e.g. Ms. Gooley Deposition at p. 169, lines 5-8, p. 170, lines 14-25, p. 184, lines 17-25;
[39] ATL001833
[40] ATL001832

26- On July 28, 2014, Ms. Johnson sent the First Denial Letter on Atlantic's behalf stating that the "decision is based on information gathered about the situation in Israel, case law, treatises and consultation with counsel."  In denying the Claim, Ms. Johnson cited prongs 1 and 2 of the War Exclusion and an endorsement to the policy involving the Terrorism Risk Insurance Act of 2002 ("TRIA").  Ms. Johnson's central theory seemed to be that once Hamas refused to agree to the cessation of hostilities on July 15th and "Israeli President Netanyahu gave the military authorization to use 'full force,' the conflict rose to the level of a "war" or "warlike action by a military force.[41]"  Ms. Johnson further argued that "Hamas has become the government of the Gaza Strip.  Hamas has a military wing … that has carried out the attacks on Israel that led to NBCU's claim."

27- With respect to terrorism, Ms. Johnson argued that the only coverage for terrorism was for a Certified Act of Terrorism under TRIA and since for that coverage to be triggered the terrorist act "must be part of an effort to coerce or influence the United States population or government" and "the U.S. Secretary of the Treasury must certify the event as acts of terrorism," there was no coverage.

28- With respect to prong 1 of the War Exclusion, Ms. Johnson argued that Gaza, while not a recognized nation by most of the world, did possess "some indicia of sovereignty" and was therefore capable of waging war under some treatises' definitions of the word.  Johnson deemed irrelevant the fact that the "rockets are being fired into civilian areas, which may violate established norms of warfare and armed conflict under international law" because, she argued, "this is not a situation where a single civilian, or group of civilians, is the target."  No citation to a Middle East expert or any other expert was given for this "observation."

29- Finally, with respect to prong 2 of the War Exclusion[42] ("warlike action by a military force"), Ms. Johnson argued: "Hamas is a military force of a government, the government of Gaza.  Even though many, including Israel and the United States, consider Hamas to be a terrorist group, it is the government of a territory that is involved in the conflict" and therefore, she contended, this part of the exclusion applies.

30- On August 13, 2014, Lucia Coyoca, counsel for the Insured, responded to the First Denial Letter by pointing out the lack of a terrorist act as defined under TRIA did not mean there

---

[41] This theory, now I believe abandoned by Atlantic, permitted it to argue that the one week push was covered, but the later relocation was not.
[42] The letter refers to this as "Subparagraph 2" of the exclusion.

was a terrorism exclusion in the policy, and without such an exclusion terrorist acts were covered.

31-    With respect to prong 1 of the War Exclusion, Ms. Coyoca argued that as Hamas is a terrorist organization, its activities could not, by definition, be "acts of war" regardless of whether Hamas possesses "some attributes of sovereignty."  Ms. Coyoca pointed out that Atlantic's position directly contradicted established foreign policy of the United States government and most other western nations in the world.

32-    With respect to prong 2 ("warlike action by a military force"), Ms. Coyoca argued that since Hamas is, according to the United States, Canada and the European nations, a terrorist organization and not a government it could not be a "military force of … the government of Gaza" as Atlantic contended.

33-    On September 19, 2014, Ms. Johnson responded.  She conceded that the TRIA endorsement did not apply and acknowledged that there was no terrorism exclusion in the policy, thus withdrawing that argument.  But, she continued to argue that prongs 1 and 2 of the War Exclusion applied, contending in part, that "a government that is deemed to be a terrorist organization [can] have sufficient sovereignty to fall within the war exclusion" citing the governments of North Korea and Saddam Hussein's Iraq.  (Ms. Johnson apparently did not recognize the distinction used by the United States government between a terrorist organization and a State Sponsor of Terrorism.  Both Saddam Hussain's Iraq and North Korea fall into the latter category, not the former.)  Ms. Johnson also argued that, in effect, even if Hamas is not a "sovereign," Israel is and that was sufficient to trigger the exclusion.  There is nothing in the claim file to indicate that before responding, Atlantic reconsidered or reevaluated its position to determine if there were any other errors in its initial analysis, aside from the erroneous position asserted as to the TRIA endorsement.  Also, there is nothing in the claim file, after receipt of Ms. Coyoca's letter, to indicate Atlantic considered or analyzed the import of Atlantic ascribing a quasi-sovereignty status to Hamas that was contrary to the U.S. government's designation of Hamas as a terrorist organization.

34-    On or about June 20, 2016, the Insureds filed a lawsuit against Atlantic to resolve the dispute.

14

**V**

**Questions Presented and Summary of Opinions**

I have been asked by counsel for the Insured to provide an expert opinion with respect to the custom and practice in the insurance industry and the common understanding of certain provisions in an insurance policy.  More specifically, I have been retained to offer an expert opinion on prongs 1- 4 of the War Exclusion, and the application of industry custom and practice in considering whether the War Exclusion applies to the loss suffered by the Insured with respect to the DIG production in Israel in July of 2014.

In addition, I have been asked to provide an expert opinion as to the handling of the Claim by Atlantic specifically with respect to the obligation incumbent on all insurers to conduct a full, fair, and prompt investigation of claims weighing the interests of the insured and the insurer in an evenhanded manner.

For the reasons set forth below, it is my expert opinion that it would be contrary to custom and practice of the insurance industry to apply the War Exclusion to the Claim at issue, and that the manner in which Atlantic handled the Insured's claim violated industry custom and practice in claims handling in many respects.

More specifically, my expert opinions, based on industry custom and practice, are:

36.   Custom and practice in the insurance industry has resulted in a number of standards when analyzing provisions of insurance policies, and that among these are:

   a.   The meaning and application of insurance provisions at the time of a claim must be consistent with the course of dealings between the insured and the carrier's underwriter who underwrote the particular policy;

   b.   Exclusions and restrictions on coverage are to be interpreted narrowly and if there are two reasonable interpretations of a restrictive provision, the one favoring coverage controls;

   c.   Insurance policies are to be viewed "as a whole" and provisions in a policy should be examined in connection with other related provisions;

   d.   Coverage grants are to be construed broadly and if there are two reasonable interpretations of a coverage grant, the one favoring coverage controls; and,

   e.   Insurance policy provisions should be viewed consistent with the reasonable expectations of a reasonable insured placed in similar or the same circumstances.

15

37.     In circumstances where an underwriter specifically was aware of, underwrote and priced a risk where there was a historical frequency of activities involving a known terrorist organization, acknowledged those potential activities, and agreed to extend coverage without requiring a terrorist exclusion, loss arising from an otherwise covered peril that results from the activities of the known terrorist organization would be covered.

38.     In such circumstances, coverage would not be excluded by application of a "war" or "war-like" exclusion.

39.     Further, war exclusions do not apply to acts of terrorism even if such acts were in alleged "response" to an act by a sovereign nation, since to do so would largely eliminate the need for (and thus a decision not to include) a terrorism exclusion as terrorist organizations commonly try to justify their hostile acts in this manner.  The terrorist organization's "reason" for their terrorist attacks is an irrelevant factor to the underlying underwriting risk of the war exclusion.

40.     With respect to U.S. insureds, industry custom and practice attempts, whenever possible, to take positions consistent with the U.S. Government when it comes to the identity of terrorist organizations and not to elevate such organizations to the level of a sovereign (or quasi-sovereign) nation status against the position taken by the U.S. Government.

41.     Therefore, for the reasons above, it would be inconsistent with industry custom and practice to apply the War Exclusion in this case where the underwriter specifically underwrote the DIG production, knew of the risk of a Hamas terrorist attack during the DIG production, and chose not to add a terrorist exclusion to the DIG coverage.

42.     Custom and practice in the insurance industry has also resulted in a number of standards applicable to claims handling.  Claim adjusters are trained in such standards, or at least they should be. These standards and procedures have been developed so that an adjuster does not act in an arbitrary or capricious manner.  Industry custom and practice dictates that the insurer must act in good faith and deal fairly with the insured in connection with a claim.  A failure to adhere to claims handling standards results in a breach of that obligation.

43.     Among these standards are that the insurance company must treat its policyholder's interests with equal regard as its own interests and that the insurance company should assist the policyholder with the claim.  These are consistent with the insurance company's general obligation under industry standards to conduct a full, fair, thorough, and prompt investigation of the claim at its own expense.

44.     In this case, a number of Atlantic's actions with respect to the DIG claim violated these industry standards, as well as their own guidelines, including:

a.  Deciding to apply the War Exclusion within 2 days after written notice of the claim was submitted by the Insured, without conducting a proper investigation;

b.  Failing to investigate the identity of Hamas as a terrorist organization and the potential impact of this fact on coverage;

c.  Failing to determine the need for, and failing to retain, an outside expert on the Middle East;

d.  Failing to hire or obtain a coverage opinion from outside counsel *before* making a coverage decision;

e.  Failing to have substantive discussions with the underwriter on the Insured's account to determine the underwriter's intention at the time the underwriter agreed to accept DIG as an insured production;

f.  Failing to conduct an investigation that complied with Atlantic's own guidelines and core principles;

g.  Misrepresenting the terms of the Policy by initially contending there was no coverage under the policy for acts of terrorism, unless such acts fell within the definition set forth in the TRIA endorsement;

h.  Failing to supervise and oversee the investigation of the claim, despite obvious and significant errors in analysis that surfaced during the limited investigation, including but not limited to, the misrepresentations as to the TRIA endorsement, not retaining an expert regarding the Middle East, and not obtaining an opinion from outside coverage counsel *before* making the decision to deny the claim;

i.  Failing to evaluate possible alternative interpretations of the War Exclusion, other than the initial interpretation advanced by Atlantic, despite the fact that the claim raised novel legal issues, and Atlantic had limited experience in evaluating war exclusions prior to the DIG claim; and,

17

  j. Failing to take into consideration the U.S. government's position as to the status
of Hamas, and ascribing a quasi-sovereignty status to Hamas that was
inconsistent with the U.S. government's designation of Hamas as a terrorist
organization.

The above failures evidence a violation of the insurer's obligation to investigate claim
coverage in an evenhanded manner taking into *equal* consideration the interests of both the
insured and the insurer.

My work in this matter is ongoing, and I reserve the right to modify, amend, restrict or
otherwise revise this opinion if I become aware of facts or considerations that require such a
revision, including without limitation, opinions offered by me or opinions or statements offered
by others (including other expert witnesses), whether prior to or in deposition or at trial.  This
is especially true given the fact that discovery has not been completed in this case.

## DETAILED DISCUSSION

### VI

### BACKGROUND OF INDUSTRY CUSTOM AND PRACTICE RESPECTING THE TERRORIST EXCLUSION AND THE WAR EXCLUSION

45. "War" exclusions, like most other provisions of an insurance policy, are the result of an
underwriting weighing of likely frequency and severity of potential loss matched with
an ability (or lack thereof) to price such potential loss.

46. The "easiest" underwriting risk is known as "low severity/high frequency" risks.  The
high frequency of these types of risk make the task of a loss likelihood by the insurer's
actuaries easier while the relatively low severity of any individual loss translates to a
lower individual shock to the carrier's bottom line.  While, at the same time, a typical
policyholder may more easily recognize that the high likelihood of the underwriter
suffering a loss and thus are more likely to accept a premium charge associated with the
risk.  Auto insurance is a good example of this type of risk.

47. On the other hand, "low frequency/high severity" risks can be the most challenging as
policyholders will be less willing to pay for coverage under the theory that "this won't
happen to me" while underwriters fear that in the unlikely event of the covered "peril"
actually occurring, the amount of loss will greatly harm their book's profitability, or in

a worst-case scenario, kill the company altogether. Nuclear war is a good example of this type of risk.

48.    Seen in this light, the risk of even non-nuclear war falls much more in the second category. Wars may not happen too often but when they do there is potential for massive loss of life, property and arguably liability claims. As importantly, wars are unpredictable and there is nothing more frightening to an insurance underwriter than a low frequency, high severity, unpredictable loss. For this reason, war exclusions, in their various forms, are common.

49.    Prior to the 9/11 terrorist attacks in New York, Washington D.C., and over Pennsylvania, there was limited discussion in the insurance industry about a "terrorism exclusion." In general, commercial insurance policies neither charged for the "terrorist" risk nor applied a special "terrorism exclusion."

50.    To the extent commentators discussed the risk of terrorism it was in the context of whether terrorism would be excluded by a policy's "war" exclusion.

51.    This atmosphere resulted in some short lived but intense concern in the immediate aftermath of 9/11 as to whether carriers would argue that their war exclusions applied to the event. Fortunately, by and large the insurance industry responded quickly that they would not seek to apply any war exclusion to the 9/11 terrorist attacks.[43]

52.    The world, of course, dramatically changed as a result of 9/11 in many ways and this change was felt in no small degree by the insurance industry. No longer was the risk of terrorism largely theoretical with the "luxury" of combining in the mind of the underwriter the "risk of war" with the "risk of terrorism;" now the risk of terrorism, per se, needed to be evaluated, potentially charged for, or excluded.

53.    In a rare showing of a public/private partnership, the U.S. federal government passed the Terrorism Risk Insurance Act signed into law on November 22, 2002. This law created a risk sharing arrangement between the private insurance industry and the U.S. Government for "Certified Acts of Terrorism." Insurance companies would be forced to offer "TRIA" coverage for an additional premium in consideration for the federal

---

[43] See, e.g. IRMI, "Attack on America: The Insurance Coverage Issues" found at https://www.irmi.com/articles/expert-commentary/attack-on-america-the-insurance-coverage-issues-(part-1-war-risk-exclusions)

government agreeing to cover "TRIA" losses in excess of, a rather high most in the industry would say, "deductible."

54.     Of course, that still left the issue of what to do with *non-TRIA terrorism exposure*. Here underwriters had three choices: (1) cover it for an additional premium; (2) cover it without an additional premium; or, (3) exclude it.  Depending on the underwriter and the risk involved any of the three options would be made.

55.     The central point based on the foregoing analysis as to the insurance industry after 9/11, is that insurance underwriters can no longer be thought of as, or permitted to be, unsophisticated with respect to the "war" vs "terrorism" distinction, and the decision to either include or not include a terrorism exclusion.  Indeed, some carriers have been known to simply add the word "terrorism" to their war exclusion to express their intent that it is now a "combination" exclusion.

56.     The second and corollary point to the above is that an underwriter cannot merge the two concepts and say that "an act of terrorism" can be also "an act of war."  Insureds have a reasonable expectation that the two risks in the post 9/11 world are separate risks to be underwritten and evaluated by the insurance company separately (even if such separate analysis resulted in the above referenced "combination" exclusion).

57.     Once such an underwriting analysis is completed, the carrier may decide to exclude one type of risk, or the other, or even both, but in any event all insureds have a reasonable expectation that the insurance company will be crystal clear on which path they are taking.

58.     Put another way, if the policy does not contain a terrorism exclusion, there is a reasonable expectation that acts of terrorism by a known terrorist organization, regardless of however else they may be categorized, will be covered.

59.     With this background, we next approach the circumstances and policy language used in the case at hand.

## VII

## APPLICATION OF THE ABOVE INDUSTRY CUSTOMS AND PRACTICES TO THE FACTS OF THIS CASE

60.     Applying the above custom and practice to the facts of this case is relatively straight forward because we do not have to speculate as to whether Wanda Phillips, the Atlantic

underwriter who handled the underwriting on the Policy, actually knew of the DIG production, and that it was being produced, at least in part, in Israel. She did.

61. Nor do we need to speculate as to whether the security risk of filming in Israel in 2014 was evaluated by Ms. Phillips. It was.

62. Nor do we need to speculate as to whether the issue of modifying the terms of the policy as a result of the security risk in Israel, whether by, for example, increasing the deductible or inserting a terrorism exclusion, ever came up in conversation or communication. It did.

63. The facts in this regard are clear:

    i. Coverage for DIG, as is the case with all productions, was individually and separately applied for with the application stating that production would take place, in part, in Israel.

    ii. Aon, the Insured's broker, specifically brought up with Ms. Phillips the issue of whether Atlantic would insist on modifying the "standard terms" which clearly was a reference, as any good underwriter will tell you, to a possible increase in deductible, rate or insertion of an exclusion, in this case, a terrorism exclusion.

    iii. Ms. Phillips, for her part, analyzed the security risk, and as she told Mr. Gutterman, decided to keep the standard terms (e.g. no terrorism exclusion) but insisted upon various risk management procedures to reduce the security risk inherent in the area for the Insured's personnel.

64. Accordingly, it seems clear that Ms. Phillips correctly understood the risk of a terrorist attack, including presumably from Hamas, and concluded that Atlantic would cover such a risk as long as various risk management procedures were taken[44]. In my view, this was a very reasonable underwriting decision.

65. In light of this, it would be the reasonable expectation of the Insured that a terrorist attack by Hamas would be covered under the policy, and that Atlantic would not try to escape coverage by seeking to expand the application of the War Exclusion to include terrorism.

66. However, this is exactly what Atlantic is trying to do.

---

[44] I note that this report is written before any deposition of Ms. Phillips. However, I often find that looking at actions taken at the time rather than "recollection" provided years after the fact is most indicative of a true understanding of events.

21

67.   Putting aside the now disregarded, and frankly implausible, argument that the lack of TRIA coverage means that the policy in fact has a terrorism exclusion, in its First Denial Letter Atlantic argues several points[45] it contends supports the denial of coverage based on prong 1 ("war") or prong 2 ("warlike actions by a military force") of the War Exclusion.[46]   These include:

i.   The "ground forces" trigger, where perils that existed prior to Hamas rejecting Egypt's cease fire proposal and Israel's resulting decision to use "full force" are covered, but perils occurring after are excluded by the War Exclusion.  Atlantic does not appear to be vigorously advancing this position as it has not included this argument (so far) in any of its pleadings.  Atlantic should abandon the argument entirely as there is no language in the exclusion, nor industry custom and practice, to support such a distinction[47].

ii.   The conflict "involves sophisticated military weapons fired from one territory into another country, Israel."[48]   This argument, which seems to align itself with prong 4 ("any weapon of war") of the exclusion now also seems to have been discarded by the carrier.[49]

iii.   The hostilities between Israel and Hamas are between "state or state-like entities," and are therefore a "war."  Similarly, Hamas has "significant attributes of sovereignty" making it a "state or state-like" entity.  In this regard, Atlantic reasons that Hamas has become "the government of the Gaza Strip," and despite that fact that it "is not a recognized nation, at least by most of the world, it does have some indicia of sovereignty."[50]

68.   With respect to and perhaps in anticipation of the "reasonable expectations of the insured" counterargument, the First Denial Letter also argues that "MSNBC, an affiliate organization of the insured, has referred to the conflict as a war for the past several

---

[45] Indeed the various arguments have seemed to have changed a bit over the course of communications.
[46] Some pleadings also alleged the third prong ("Insurrection") and/or the fourth prong ("weapon of war") applying to the Claim, but deposition testimony of Atlantic's witnesses are to the contrary.  Mr. Williams testified prong 4 did not apply to the Claim, while Ms. Gooley testified prong 3 was inapplicable.
[47] See, e.g. Deposition of Mr. Gutterman (the existence of a "ground offensive" being a piece of evidence of a "war") at p. 250, lines 1-23 and Deposition of Mr. Williams (the existence of "widespread hostilities" as the "defining definition" of what constitutes a "war") at pp. 245-247
[48] First Denial Letter at page 7
[49] See Deposition of Mr. Williams at p. 252, lines 23-25
[50] First Denial Letter at p. 6

days.  This should be considered in taking into account the insured's reasonable expectations."

69.    In its Second Denial Letter, in addition to admitting that its implied terrorism exclusion argument makes no sense and is withdrawn, the insurer argues:

    i.    The mere "casualty and damage numbers" show that the "Israel/Gaza conflict clearly was a war."[51]

    ii.    Emphasizing the language "warlike" in the second prong of the exclusion, Atlantic argued that this word evidences an "intent" for the exclusion to be broadly applied, contending that the exclusion is "broad enough to encompass war, conflicts that look like war and specifically actions to defend against an actual or expected attack."[52]  In this regard, the letter argues that the attacks were carried out by Hamas' "military wing" which is a "military force" as that term in used in the second prong.[53]

    iii.    That a terrorist organization can possess "sufficient sovereignty" to fall within the war exclusion citing, as examples, North Korea and Saddam Hussein era Iraq.

    iv.    Finally, regardless of whether Hamas is a "quasi-sovereign" entity possessing "some indicia of sovereignty," the fact that Israel as the other party to the conflict surely is a "legitimate sovereign, not a terrorist organization" is sufficient.  In a similar vein, the carrier argued that "regardless of whether Hamas is defined as a terrorist organization, *Israel's* actions and the resulting escalation fall squarely within the exclusion."[54] (emphasis added).

70.    Ignoring the now disregarded theories, the two Denial Letters essentially come down to the following six arguments in favor of applying the War Exclusion:

    i.    The mere "casualty and damage numbers" show that the "Israel/Gaza conflict clearly was a war;"

    ii.    Even if Hamas is not a "quasi-sovereign" nation possessing "some indicia of sovereignty," Israel as the other party to the conflict is a "legitimate sovereign, not a terrorist organization" which is sufficient to trigger the exclusion;

---

[51] Ibid references various property and death statistics from external sources.
[52] Second Denial Letter at p. 2
[53] Second Denial Letter at p. 3
[54] Ibid

23

    iii.  Even assuming Hamas is a terrorist organization, terrorist organizations can still possess "sufficient sovereignty" to fall within the war exclusion citing, as examples, North Korea and Saddam Hussein era Iraq;

    iv.  At a minimum, Hamas is a "quasi-sovereign" nation possessing "some indicia of sovereignty" and thus is able to commit "an act of war" triggering prong 1;

    v.  The attacks were carried out by Hamas' "military wing" and thus was a "warlike action by A military force" as that phrase in used in prong 2; and finally,

    vi.  The above analysis is consistent with the "reasonable expectations of this Insured" because the Insured's affiliate used the term "war" to describe the Israel/Hamas conflict.

71.    I will take each of the above in order, analyzing the issue from a point of view of industry custom and practice.

72.    The first two arguments can be easily dispensed with and I rather doubt Atlantic will actually be making them given the lack of support for such arguments based on custom and practice in the industry.

    i.  The 9/11 attacks killed 2,996 people, injured over 6,000 others and caused at least $10 billion in property and infrastructure damage and $3 trillion in total costs.[55] The four coordinated attacks were committed by the Islamic terrorist group al-Qaeda and no one in the insurance industry has *ever* argued that the terrorist attacks were an "act of war" based on the theory that so many people died and so much damage was caused.[56] Thus, for Atlantic to suggest that the "casualty and damage numbers" themselves show that the "Israel/Gaza conflict clearly was a war" does not have any support in custom and practice in the industry.

    ii.  Similar to the above, there is no support in industry custom and practice that a counterattack against a terrorist organization by a sovereign nation converts the terrorist attacks into a "war." If that was the case, there would likely be no need

---

[55] *"How much did the September 11 terrorist attack cost America?" 2004 Institute* for the Analysis of Global Security. Retrieved April 30, 2014. Matthew J. Morgan (August 4, 2009). *The Impact of 9/11 on Politics and War: The Day that Changed Everything?* Palgrave Macmillan. p. 222. ISBN 0-230-60763-2. Carter, Shan; Cox, A. *"One 9/11 Tally: $3.3 Trillion."* Retrieved September 14, 2015.

[56] Of course, while the 9/11 attacks may have been referred to as "acts of war" against the US colloquially or for other purposes, such references are not relevant to the question of how the term "war" should be interpreted when used in an insurance policy, particularly when the policy contains no terrorism exclusion.

for a terrorism exclusion since every terrorist attack against a sovereign nation always prompts a response by that sovereign nation. It is true (as discussed in argument "vi" below) that sovereign nations and their leaders do tend to overuse the term "war" such as the "War on Drugs,"[57] "War on Poverty,"[58] and, of course, the "War on Terror" declared by President Bush following the 9/11 attacks. However, using the phrase "War on Terror" does not convert terrorism to a "war" excluded by the insurance policies' war exclusions and, to my knowledge, no carrier has ever taken such a position.

73. Argument "iii" argues that even if Hamas is a terrorist organization it can still be a sovereign nation citing, as examples, North Korea and Iraq when controlled by Saddam Hussein. This argument demonstrates a fundamental misunderstanding of the difference between a "terrorist organization" and a "State Sponsor of Terrorism."[59] A "State Sponsor of Terrorism" is a designation applied by the United States Department of State to countries which the Department alleges to have "repeatedly provided support for acts of international terrorism." Inclusion on the list imposes unilateral sanctions. It is this list that includes Saddam Hussein's Iraq, and North Korea (but notably does not include Gaza).[60] And, of course, each of Iraq and North Korea are sovereign nations to begin with, whereas Hamas is plainly not.

74. Thus, in my view, Atlantic's arguments really boil down to reasons (iv) and (v) above, to wit: Hamas is a "quasi-sovereign" nation possessing "some indicia of sovereignty," that is able to commit "an act of war" whose military arm attacked Israel in a "warlike action by military force" thereby triggering both prongs 1 and 2.

75. These two arguments obviously relate to each other. While I understand that the policyholder has retained other experts to provide opinions on whether from a non-

---

[57] See _"Richard Nixon: Special Message to the Congress on Drug Abuse Prevention and Control."_ Found at _http://www.presidency.ucsb.edu/ws/?pid=3048_

[58] See President Lyndon B. Johnson's State of the Union Address of January 8, 1964

[59] See generally https://en.wikipedia.org/wiki/State_Sponsors_of_Terrorism

[60] Iraq was one of the countries that was first put on the list in 1979, briefly removed in 1982 to allow US companies to sell arms to it while it was fighting another country on the list, Iran, but was re-added following Iraq's 1990 invasion of Kuwait. It was "permanently" removed following the overthrow of Saddam Hussein. North Korea went on the list of State Sponsors of Terrorism starting in 1988 following the terrorist bombing of a South Korean plane and was added due to its selling of weapons to terrorist groups (see _"State Sponsors: North Korea."_ _Council on Foreign Relations_ found at http://www.cfr.org/state-sponsors-of-terrorism/state-sponsors-north-korea/p9364). North Korea was removed from the list in 2009 by President Bush. In 2010, the Obama administration refused to put the country back on the list following North Korea's sinking of a South Korean navy ship commenting that the action was taken by the North Korean military. This decision is consistent with the theory that such an act might be an "act of war" against South Korea but not an "act of terrorism."

25

insurance context Hamas is a "sovereign or quasi-sovereign nation," I will provide an opinion from an insurance industry custom and practice point of view.[61]

76.     At one point Atlantic argued that "[a]lthough the rockets are being fired into civilian areas, which may violate established norms of warfare and armed conflict under international law, this is not a situation where a single civilian, or group of civilians, is the target."[62]   Atlantic seems to be arguing that in order to be a terrorist attack, as opposed to an act of war, Hamas must have "targeted" a "single civilian or group of civilians."   This theory is not consistent with industry custom or practice and, like the "ground troops" distinction, I know of no example where a carrier made such a distinction.   Indeed, under this theory the 9/11 attack on the World Trade Center s would have been considered an act of war for insurance purposes, because it did not "target" a "single civilian or group of civilians."   Instead, the target was a physical building which was a major commercial symbol of the United States (which the terrorists likely knew had people inside).   However, as noted above, this argument is contrary to insurance industry custom and practice.

77.     Atlantic's second argument in favor of considering Hamas to be a "quasi-sovereign nation" (and thus acts by its "military arm" being a "warlike action by a military force") essentially argues that Hamas is the *de facto* government of Gaza.

78.     There are a number of diverging views on the issue, and yet Atlantic failed to take into account any view, other than the one that supported its denial of coverage – that Hamas purportedly is the *de facto* government of Gaza.   Rather than identifying the competing views and analyzing each one before making a determination that the only reasonable interpretation of the War Exclusion supported denial of coverage, it simply chose the one interpretation that would benefit Atlantic economically.   For example, performing a quick Google search just as Mr. Gutterman did when he was investigating the claim, yields the results set forth immediately below, which Mr. Gutterman could also have accessed when performing his investigation.   And yet, there is no record of such an investigation in Atlantic's claim file.

---

[61] Given the complexity of the issues, it would be consistent with insurance industry custom and practice for Atlantic to accept the views of Middle East experts regarding the Israel/Hamas conflict and adopt an interpretation of "war" (or "warlike actions by a military force") favorable to the finding of coverage that is in accord with those experts' views.   Conversely, it is *inconsistent* with industry custom and practice for Atlantic to simply ignore those views altogether.

[62] First Denial Letter at p. 7

79.     For example, the majority of commentators label Hamas as a terrorist organization, and nothing else.  This line of thinking is exemplified in NPR's recounting of a speech by Steven A. Cook, a Middle East expert at the Council on Foreign Relations:

> [He] started off the evening by acknowledging several facts, which he immediately said were entirely irrelevant.  Yes, he said, Hamas was legitimately elected freely and fairly.  Yes, Israel has illegally occupied the West Bank and, until recently, Gaza.  Yes, Hamas has done much good with its social programs.  But, he said, none of that matters. Hamas' central charter calls for the violent overthrow of Israel.  Hamas continues to kill innocent civilians.  The group must lay down its arms and renounce its violent charter.  Until then, Cook said, Hamas can only be labeled a terrorist group.[63]

80.     In the same recounting, NPR summarized a logical approach as to how to determine whether Hamas is simply a terrorist organization, regardless of the "social programs" they may sponsor within Gaza set forth by John O'Sullivan, a senior fellow at the Hudson Institute:

> A terrorist is a man who murders indiscriminately, distinguishing neither between civilian and innocent and guilty nor soldier and civilian."  Terrorism, O'Sullivan argued, is an issue of tactics, not ultimate goals.  There can be pro-Nazi and anti-Nazi terrorists, he said; pro-Israel terrorists and anti-Israel ones.  In other words, it doesn't matter what we think of Hamas' ultimate goals.  All that is important, he argued, is that they employ indiscriminate violence.  Until they stop, they should be labeled as terrorists and treated as international pariahs.

81.     And certainly, there have been a wealth of United States political leaders who have labeled Hamas as a terrorist organization and nothing else, including recent presidential hopeful Ted Cruz who made this comment *exactly at the time of the claim* at issue:

> Hamas is, unequivocally, a terrorist organization with blood on its hands that must be condemned on the world stage.  There should be no path forward for Hamas to have any role in any future government formed by the Palestinian

---

[63] As reported by NPR found at http://www.npr.org/2006/12/06/6583080/hamas-government-or-terrorist-organization

Authority, and no nation should accommodate, legitimize, or negotiate with this group that engages in the killing of innocent civilians.  The Palestinian Authority should immediately renounce Hamas and actively work to expel Hamas from civil society.[64]  (Ted Cruz, JD, US Senator (R-Tx), June 30, 2014)

82. Accordingly, the best argument that Atlantic can make is that there are multiple, and conflicting, views of Hamas' status.

83. As discussed in the next section of this report, *at minimum*, the above means that there are two "reasonable" interpretations of whether acts by Hamas are "acts of terrorism" or "acts of war" and this fact, *standing alone*, means that industry custom and practice would dictate that coverage must be granted for the Claim at issue.

84. However, custom and practice would not weigh these two views equally.  Put another way, in reality, there are not two "reasonable" interpretations of the application of the issue as to whether actions by Hamas are "acts of war" (or war-like) versus "acts of terrorism."  It has been the unwavering position of the United States for decades that Hamas is a terrorist organization, plain and simple, and nothing more.  During 9/11, the entire insurance industry rallied around calling attacks against civilian areas by extremist groups 'Terrorism' not excluded by the war exclusion.  And so too must Atlantic here if it wishes to act in accordance with this industry custom and practice.

85. Addressing the next point, we return to the issue of the "reasonable expectations of the insured" and how that industry concept impacts the issue at hand.

86. Atlantic acknowledges that the Insured's reasonable expectation of coverage should impact a proper coverage analysis.  It is correct in doing so.  However, its conclusion as to what the reasonable expectations of the Insured should be is inconsistent with the agreed upon facts

87. Atlantic essentially argued in its Denial Letters that, because an affiliate of the Insured, MSNBC, called the 2014 hostilities between Hamas and Israel a "war," the Insured should reasonable expect that its insurance carrier would also define it this way[65].

88. For the reasons discussed above, this argument really does not hold water. The use of the term "war" by the press is as broad, if not broader, than the use by politicians.  Indeed, commentators have used the "war metaphor" for decades for a wide variety of

---

[64] https://www.cruz.senate.gov/?p=press_release&id=1860.  Similar remarks at the time were made by Senator Robert Menendez, Chair of the US Senate Foreign Relations Committee.
[65] See also Deposition of Mr. Gutterman stating that MSNBC specifically calling the hostilities a war was another "fact" indicating to him that a war was going on at p. 148, lines 12-15

activities even including such phrases as the "War on Christmas" and the "War on Women."[66]  It was perhaps for this reason that the statements in this regard made in the Denial Letters were fairly soft. (See, for example, "We note that"[67] and "this should be considered."[68])

89.     Accordingly, under insurance custom and practice, when such words that are used in insurance policies for a particular purpose, such as delineating what precisely is excluded from coverage, the meaning ascribed to them is based on the usage of the words or terms in the insurance industry.  Thus, even though the same word (e.g., "war") may have another colloquial meaning, when the insurer is considering coverage pursuant to the terms of an insurance policy, the custom and practice is for the insurer to use the insurance industry meaning of such words used in the policy, not their colloquial meaning or the broad use such words may have in the press or by politicians.

90.     Finally, the "reasonable expectation of the insured" industry standard goes against Atlantic in this case.[69]  As more fully discussed earlier in this report, given Ms. Phillips specific review and acceptance of the DIG Israel risk with questions about and instructions regarding security, the absence of a terrorism exclusion, the almost universal acknowledgement of Hamas as a terrorist organization, it would be the reasonable expectation of the Insured that a Hamas attack would be considered terrorism (and therefore covered), and not an act of "war or warlike action."


# VIII

**IN THE BEST CASE SCENARIO FOR THE INSURER, THERE ARE STILL TWO REASONABLE APPLICATIONS OF THE WAR EXCLUSION TO TERRORIST ACTS COMMITTED BY HAMAS AND THEREFORE CUSTOM AND PRACTICE WOULD PREVENT ATLANTIC FROM APPLYING THE WAR EXCLUSION.**

92.     Because Atlantic is attempting to apply an exclusion, custom and practice (and the law of most jurisdictions) dictate that the burden is on Atlantic to show that there is no other

---

[66] See generally https://en.wikipedia.org/wiki/War_as_metaphor
[67] First Denial Letter at p. 7
[68] Ibid
[69] This is true even if the original 2010 policy was drafted, in part, by Aon, the Insured's broker.  I do note that the War Exclusion does not seem to be manuscripted or tailored to the insured but is an example of industry standard language presumably created by insurers.

reasonable interpretation of the exclusion other than the one that denies coverage. Atlantic acknowledges this practice in its Second Denial Letter when it states "The *only* reasonable interpretation of the situation that led to the production's extraction from Israel is that it was caused by war, or warlike action by a military force. *As a result*, the war exclusion applies."[70]  (Emphasis added.)

93.   Atlantic is correct on the standard; however, it is incorrect on the result of applying that standard.  Simply put, under the facts of this case, Atlantic cannot meet its burden, pursuant to industry custom and practice, to show that the *only* reasonable interpretation of the War Exclusion is that it applies to the actions by Hamas against Israeli (and other) civilians in June/July 2014.

94.   First, the documents I reviewed as well as the testimony of Atlantic's representatives seem to indicate that even Atlantic is confused as to what the War Exclusion means, flip-flopping several times as to what portion of the Exclusion might apply to the claim and why.  For example:

   a.   Mr. Gutterman, at least initially, emphasized that the existence (or lack of existence) of a "ground war" would be the trigger (or at least would be "a" trigger) as to whether the hostilities were a "war."[71]

   b.   Mr. Williams, at least in his testimony,[72] testified that the, or a, trigger for the Exclusion is the existence of "wide spread" hostilities.

   c.   The Denial Letters do not speak of either of these concepts.

   d.   The Denial Letters' analysis relates only to prongs 1 and 2 of the Exclusion. However, the pleadings then allege prongs 3 and 4 apply too.  But, Ms. Gooley testified that prong 3 did not apply.[73]  Mr. Williams testified that prong 4 does not apply,[74] which contradicted Ms. Gooley's testimony[75] that the First Denial Letter did in fact "rely" on prong 4.

95.   Atlantic also provided the Insured with confusing and sometimes contradictory explanations.  For example, Atlantic stated in its First Denial Letter that Gaza "is not a

---

[70] Second Denial Letter at p. 4
[71] See, for example, Deposition of Mr. Gutterman at p. 238, lines 9-25 – p. 239, lines 1-5, p. 244, lines 10-15 and at p. 249, lines 10-18
[72] Deposition of Mr. Williams at p. 246, lines 23-25 – p. 247, lines 1-17
[73] Deposition of Ms. Gooley p. 215, lines 3-9, p. 217, lines 22-25 – p. 218, lines 1-3 and p. 220, lines 14-17
[74] Deposition of Mr. Williams at p. 252, lines 23-25
[75] Deposition of Ms. Gooley at p. 218, lines 13-25

recognized nation, at least by most the world" while at the same time stating that "Hamas has become the government of the Gaza Strip."

96.     Ms. Johnson attempted at one point to try to find consistency, at least consistency within her own organization, when she asked Ms. Gooley what positions other departments or Atlantic affiliates might have taken with respect to the Israel/Hamas conflict.  However, as far as I can tell by the documents I reviewed, Ms. Gooley never answered her question and Ms. Johnson never asked again.

97.     If the reader is confused by all of this, it is not surprising.  Perhaps, Atlantic's real view of the definition of war is best summed up by Mr. Gutterman in the following exchange from his deposition[76]:

> Q-     Prior to your involvement in the DIG claim, what was your understanding of what war meant?...
>
> A-     I don't know if I ever had a definition of what war was.  I think it's just – I know it when I see it.
>
> Q-     And how has that understanding changed since the DIG claim, if at all?
>
> A-     I don't believe that it has.

98.     While Mr. Gutterman's "I know it when I see it" response may describe Justice Stewart's threshold test for obscenity, this standard is wholly unacceptable under the applicable insurance industry custom and practice.  The above is a strong indication that even Atlantic could not figure out what the War Exclusion means.  This supports a finding that the Exclusion is hopelessly vague and ambiguous, and therefore cannot be applied to the Claim.

99.     In addition to the abstract confusion as to what "war" is, the issue of what Hamas is, is also debated as discussed at length in the proceeding sections.

100.    What does all this confusion and disagreement mean for our insurance coverage analysis?

101.    Custom and practice is clear that when there are two reasonable interpretations of an exclusion or policy restriction, the one favoring coverage should be applied.  This is consistent with another industry custom, which is to uphold the *reasonable* expectations of the insured.

---

[76] Deposition of Mr. Gutterman at p. 52, lines 11-22

102.   Given the above, applying these doctrines to the facts of this case is straightforward.

103.   Because there is a sober and considered view of many, if not most, experts in the field that Hamas is a terrorist organization, and not a sovereign or quasi-sovereign state, it is inconsistent for Atlantic to now take a contrary position in order to deny coverage.

104.   In conclusion, for all the reasons set forth above, Atlantic acted in a manner inconsistent with industry custom and practice when it applied the War Exclusion to the Claim at issue.

105.   Having reviewed Atlantic's decision to apply the War Exclusion and finding it inconsistent with industry practice, this report next turns to the *claims process* Atlantic used to make that decision in order to answer the question as to whether such claims process also violated industry custom and practice.


# IX

## GENERAL STANDARDS FOR CLAIMS HANDLING AND INVESTIGATION

104.   Custom and practice in the insurance industry has resulted in a number of standards applicable to claims handling.  Claim adjusters are trained in such standards, or at least they should be.  These standards and procedures have been developed so that an adjuster does not act in an arbitrary or capricious manner.  In many cases claims manuals have been written so that an adjuster may refer to written guidelines to assist his or her decision-making.

105.   The insurance industry recognizes that good faith and fair dealing are the essence of insurance contracts.  When a carrier first receives a claim or a notice of an incident that may lead to a claim, the first step is for the insurer to promptly acknowledge in writing receipt of the claim usually also informing the policyholder of the contact information for the assigned adjuster.

106.   After this initial notification, the insurer must then promptly evaluate whether the claim or incident involves a risk potentially covered by the policy.

107.   More specifically, the insurance carrier must then conduct a full, fair and prompt investigation, after which the insurance carrier must advise the insured as to whether the carrier has concluded whether there is coverage for the submitted claim or not and the reasons for its determination.  If no determination can be made, the carrier may

choose to cover the claim under a "reservation of rights" letter indicating, in essence, that there are insufficient facts to make a final determination so the carrier will be providing coverage as an initial matter.

108.   If a reservation of rights letter is issued, the insurer must promptly and fully investigate the claim to determine, if at all possible, whether the reasons for the reservation are valid, and so inform the insured.

109.   Further, if after making an adverse coverage determination, the insurer becomes aware of facts that should lead it to make a conclusion different than the one the carrier previously advised, the carrier has a duty to "update" the insured with the new conclusions and take steps consistent with them.

110.   A failure to adhere to such standards results in a breach of the duty of good faith and fair dealings applicable to the insurer-policyholder relationship.

111.   Among the specific standards applicable to claims handing are:

   a)   The insurance company must treat its policyholder's interests with equal regard as its own interests;

   b)   The insurance company should assist the policyholder with the claim;

   c)   The insurance company must disclose to its policyholder all benefits, coverages and limitations that may apply to the claim;

   d)   The insurance company must conduct a full, fair, and prompt investigation of the claim at its own expense;

   e)   In cases of "first impression" or when the claims examiner is not familiar with the coverage issues at play, experts should be brought in on a timely basis to provide an opinion;

   f)   The insurance company cannot shift the burden of investigation on to the insured;

   g)   The insurance company cannot off load the burden of investigation to outside counsel;

   h)   The insurance company must fully, fairly and promptly evaluate and adjust the claim;

   i)   The insurance company must give a written explanation if it partially or

totally denies a claim pointing out facts or policy provisions that support such a denial;

j)      The insurance company cannot hide from its insured the fact that the claim examiner is also investigating coverage or rescission of the Policy;

k)      The insurance company must not misrepresent facts or policy provisions or fail to bring to the policyholder's attention facts or policy provisions which it is relying upon in denying or limiting coverage;

l)      The duty of good faith and fair dealing continues into litigation with the insured; and,

m)      In cases where the decision of the insurance underwriter played a critical role in the issue in dispute, the claims department cannot make a determination without the active involvement of the underwriting department and the individual account underwriter (if that person is still employed at the time of the claim investigation).  This is almost always the case with respect to possible coverage denial based on an exclusion or other condition limiting coverage.

**X**

**APPLICATION OF CLAIMS HANDLING STANDARDS TO THE FACTS OF THE CLAIM AT ISSUE**

112.    Applying these industry standards to the Claim at issue, Atlantic failed to adhere to a number of industry claims standards including:

a.      The insurance company must conduct a *full*, *fair,* and prompt investigation of the claim;

b.      The insurance company must disclose to its policyholder all benefits, coverages and limitations that may apply to the claim;

c.      The insurance company must not misrepresent facts or policy provisions or fail to bring to the policyholder's attention facts or policy provisions which it is relying upon in denying or limiting coverage;

d.      The insurance company must treat its policyholder's interests with equal regard as its own interests;

e.  In cases of "first impression" or when the claims examiner is not familiar with the coverage issues at play, experts should be brought in on a timely basis to provide an opinion; and,

f.  In cases where the decision of the insurance underwriter played a critical role in the issue of dispute, the claims department cannot make a determination without the active involvement of the underwriting department and the individual account underwriter

113.  I will examine each of these in order.

114.  As to the first practice, the most common complaint of a claims department in my experience is that they do not act promptly.  Sometimes months or even years can go by before a carrier will advise the insured that it is not covering the claim (or not covering it anymore).  In this case, Atlantic certainly cannot be accused of not acting promptly.

115.  However, acting promptly is not the rule.  A claim must be investigated *fully* and *thoroughly* as well as promptly.[77]  Put another way, a "quick NO" is not the way for a claim department to avoid acting below industry standards.

116.  The above should be self-evident, but the record indicates that this rule was not understood, and certainly was not followed, by Atlantic in this case.  This fact is all the more disturbing given that by its own admission, Atlantic had not previously considered application of a war exclusion in its history, before the DIG Claim.[78]

117.  Despite this lack of experience, it took Atlantic only two days to decide this claim of first impression:

a.  On 7/15, Aon submitted the Claim to Atlantic.  Mr. Gutterman immediately flagged the War Exclusion for investigation.

b.  On 7/16, Ms. Johnson emailed Mr. Gutterman a copy of the War Exclusion. Mr. Gutterman notes in the claim file: "Facts War in Israel with Hamas."

---

[77] There is an old consultant's saying "Do you want it *quick* or do you want it *right?*"  The purpose of this line is to advise the client that correct decisions take time and that a rushed decision is often a wrong one.  This is a lesson that Atlantic, in terms of this particular Claim, seems to have forgotten.

[78] Atlantic's response to Plaintiffs' RFA 26.  Ms. Gooley testified she could not recall any claims, other than the DIG Claim, where Atlantic considered potential application of a war exclusion.  Deposition of Ms. Gooley at p. 38, lines 5-10.

c. On 7/17[79] Atlantic tells the Insured the Claim is not covered due to the War Exclusion.

118.   Ms. Gooley could not recall any other Atlantic claim where a coverage determination was made in two days (admitting that two days is a 'fairly expedited' time frame)[80].

119.   To make matters worse, this claim fell outside the experience of Atlantic according to the testimony of Atlantic's claims representatives.

120.   Ms. Gooley also testified that she could not recall any other instance during her time with Atlantic, or prior to that, that she or anyone else considered the potential applicability of a war exclusion

121.   Indeed, Ms. Gooley testified that prior to the DIG claim, she could not recall ever working on an extra expense coverage claim.[81]

122.   This begs the question as to why and how Atlantic could decide a case of first impression *adverse* to its Insured in only two days.

123.   Ms. Gooley's deposition is helpful in this regard.  In essence, according to Ms. Gooley, it was the Insured's fault.

124.   Ms. Gooley testified that while Atlantic always *wants* to do a thorough investigation, there is always a "balancing of facts and time," "whether the insured needs an answer quickly" resulting in "time pressure."[82]

125.   Or, perhaps, according to Ms. Gooley, it was really Aon's fault as she indicated that Atlantic "moved as quickly as we could on this particular claim" knowing that the Insured wanted an answer right away, and that "Aon had pushed OneBeacon [Atlantic] very hard to get an answer as soon as possible…"[83]

126.   Of course, a claims examiner cannot shift blame for a faulty investigation simply because the insured desired to know whether there was coverage under the policy.

---

[79] While it is true that the First Denial Letter did not go out until 7/28 and there was some activity after 7/17, Ms. Gooley testified that in Ms. Johnson's and Mr. Gutterman's phone call with the Insured on 7/17, the Insured was told that the Claim would be excluded.  (See Deposition of Ms. Gooley at p. 169, lines 5-8, p. 170, lines 14-25 and p. 184, lines 17-25)  Ms. Gooley also testified that she did not generally even review the work that Johnson does in investigating claims (see p. 39, lines 15-17) and could not recall a single occasion where she directed Johnson to do additional work investigating a claim (see p. 40, lines 1-5).

[80] Deposition of Ms. Gooley at p. 180, lines 19-25 – p. 181, lines 1-5

[81] Deposition of Ms. Gooley at p. 31, lines 14-25

[82] Deposition of Ms. Gooley at p. 52, lines 2-14

[83] Deposition of Ms. Gooley at p. 178, lines 22-25 – p. 179, lines 1-2

127. In addition to timing, Atlantic's actual investigation of the claim was deficient. According to the claims file that was produced, the investigation was limited to reviewing information about the situation in Israel on the internet, doing Google searches, and reviewing one legal case.[84] In my opinion, this limited effort does not meet the prerequisite of conducting a thorough investigation before making a determination to deny the claim of first impression.

128. Atlantic also misrepresented the terms of the policy to its insureds. It incorrectly invoked the TRIA endorsement in its First Denial Letter, and claimed there was no coverage for terrorism under the policy since the acts did not meet the TRIA definition for Certified Acts of Terrorism. When this was pointed out to Atlantic, it acknowledged it had made a mistake in its Second Denial Letter, but did not go back to investigate whether other mistakes had been made. For example, Atlantic did not reevaluate whether the hostilities in Israel constituted terrorism rather than war, and re-evaluate the Claim in light of the fact that the Policy did *not* exclude coverage for acts of terrorism.

129. Atlantic also failed to investigate or take into consideration the longstanding designation by the U.S. government of Hamas' status as a terrorist organization, or evaluate the ramifications of taking a position as to Hamas' status that was not in accord with that of the U.S. government.

130. Atlantic also failed in perhaps the most important practice – that the insurer consider the interests of its insureds with equal regard to its own interests – when evaluating the facts of this case.

131. Under the facts of this case, balancing the interest of both the Insured and Atlantic in an evenhanded manner would have resulted in Atlantic taking a number of steps they did not:

 a. Investigate equally (or, at all, before the claims decision was made) as noted above, whether the attacks by Hamas should be considered "acts of terrorism" rather than "acts of war;"

 b. Consult with outside Middle East experts given that the issue (Hamas: Terrorist or

---

[84] See, e.g., ATL000294, ATL000501, ATL001560-ATL001561, ATL001635, ATL001636-ATL001686

sovereign nation) was outside Atlantic's expertise;

    c.  Consult with outside counsel *before* making the claims decision on the issue of the meaning and applicability of the War Exclusion given that no one in claims had any prior experience with the Exclusion.

132.    Ms. Gooley, the individual at Atlantic responsible for supervising Ms. Johnson's and Mr. Gutterman's investigation of the Claim, did virtually nothing, seemingly simply "rubber stamping" the decision to deny the Claim.  She testified that she did not instruct Mr. Gutterman to review whether the attacks by Hamas were terrorism, and Mr. Gutterman himself testified he did not recall doing so[85].  Ms. Gooley also testified that she did not instruct Ms. Johnson to consider whether Hamas was a terrorist organization in the context of reviewing the Claim.[86]

133.    For the reasons discussed in detail in an earlier section of this report, determining whether the attacks by Hamas was an act of terrorism is critical to the analysis of the War Exclusion as no carrier, to my knowledge, has ever taken the position that an act of terrorism by a non-sovereign nation was also an act of war.

134.    Also as discussed earlier, the issue of who Hamas is and how to categorize their actions is discussed at length among Middle East experts.  According to Atlantic's own General Claim Practices guidelines, a claims examiner must "Determine the need for outside vendors to assist in the investigation."[87]  Yet, this was not done here, even though the applicability of the war exclusion was something that neither Ms. Gooley, Mr. Gutterman, Ms. Johnson or, apparently, anyone else at Atlantic has ever dealt with.

135.    When Ms. Gooley was asked about retaining an outside vendor "if the factual circumstances of the claim involved an area that was not of common understanding or knowledge," Ms. Gooley responded "I'm trying to think of a particular type of claim where we wouldn't have the common understanding or knowledge … at least the way OneBeacon [Atlantic] is structured that we have – we have the skill level and the experience to handle claims."[88]

136.    Given her prior testimony that *no one* in Atlantic's claims department had experience

---

[85] See, e.g. Deposition of Ms. Gooley at p. 103, lines 1-22; Deposition of Mr. Gutterman at p. 264, lines 11-17
[86] Deposition of Ms. Gooley at p. 142, lines 21-25
[87] ATL000736
[88] Deposition of Ms. Gooley at p. 50, lines 3-17

with applying the war exclusion or an understanding of Middle East politics,[89] this response is puzzling to say the least.

137.    On a similar vein, use of outside coverage counsel is a common part of a claims examiner's investigation.  This is especially true with new issues or ones that the examiner has no or little prior experience.

138.    Given the facts at issue, it would have been prudent to retain coverage counsel to examine the issue of the war exclusion, any applicable case law and to render an opinion as to coverage *before* actually making the claims decision.  This is particularly important where, as here, there was no internal agreement as to what the Exclusion, meant, and no one in the claims department had prior experience with the Exclusion.  Atlantic's claims personnel reviewing the Claim needed to know how the Exclusion was defined, before it could undertake an analysis as to the facts of the Claim.

139.    However, in a somewhat bizarre turn, the testimony of Atlantic representatives is that the decision to deny the claim occurred on July 17, 2014 and the denial was conveyed to the Insured on that date, but the decision to hire outside counsel was not made until the next day on July 18, 2014.

140.    Finally, but perhaps most disturbingly, Atlantic's claims department *never* spoke to the only person at Atlantic who would have a substance based opinion as to whether the company intended to cover attacks by Hamas into Israel in July 2014, Wanda Phillips, the underwriter.

141.    The reasons for this are unclear.  It is the obvious thing to do and consistent with industry custom.  Ms. Phillips could have advised Mr. Gutterman, for example, whether she contemplated the possibility of Hamas attacks when she decided to provide coverage, when she decided not to depart from "standard terms" (e.g. no terrorism exclusion) and when she required various risk management security measures be implemented.  Mr. Gutterman testified that he did not even ask Ms. Phillips why she insisted upon these security measures[90].

142.    Indeed, no one in Atlantic's claims group spoke to Ms. Phillips even after receiving the

---

[89] Wanda Phillips apparently had an understanding of middle east security, but no one in claims apparently ever asked her opinion.
[90] Deposition of Mr. Gutterman at p. 298, lines 13-25 – p. 299, line 1

Insured's letter of August 13, 2014 reminding them that the Policy was underwritten with the full understanding that the production would take place in Israel.

143.   Why Mr. Gutterman did not reach out to Ms. Phillips on these issues, or even mention them when he did reach out to her to confirm that DIG was an insured production seems to puzzle even Mr. Gutterman.  When asked: "What would you do if you had a question about the scope of coverage?"  He responded: "Usually I discuss it with my supervisors, and then discuss it with the underwriters to see what their intent was."[91] Picture perfect response.  Unfortunately, that is not what he did here.

144.   Ms. Gooley apparently never learned this simple lesson.  When asked a virtually identical question in her deposition, she responded that it is not important to go back to the underwriter if "the language of the policy is clear and is unambiguous, you apply the law – you apply the policy as it is written."  When asked the obvious follow-up question: "What if the language of the policy is not clear or unambiguous, do you think in that circumstance it's important to go back to the underwriter?" She still responded that she would interpret what the words of the policy meant indicating: "I don't know that I would go back to the underwriter."[92]

145.   Not only does Ms. Gooley's response indicate that she could learn a lesson from her "more junior" colleague but it evidences a lack of internal consistency at Atlantic which in itself represents a below industry custom and practice.

146.   Perhaps it is fitting to end this final section of the report with the testimony of Daniel Gutterman who said in describing the culture of Atlantic claims group:

> We really want to find coverage.  I mean, that's – I was taught that from Peter (Williams) and Pamela (Johnson), over and over and over again, so if we can find it, we'll do so.  We want people to – we want to find coverage.[93]

147.   Regrettably, Atlantic failed miserably in this case.  It failed to find coverage where coverage existed, and moreover failed to properly conduct a *full*, *fair*, and prompt investigation of the claim weighing its own interests as well as the interests of the insureds in an evenhanded manner.

---

[91] Deposition of Mr. Gutterman at p. 172, lines 15-19; also see similarly p. 174, lines 16-23
[92] Deposition of Ms. Gooley at p. 61, lines 23-25 – p. 62, lines 1-20
[93] Deposition of Mr. Gutterman at p. 174, line 25 – p. 175, lines 1-4

## XI

### <u>CONCLUSION</u>

148.    In conclusion, for the reasons set forth above, it is my expert opinion that:

      a.    Atlantic was acting against industry custom and practice when it applied the War Exclusion to the claim at issue, and

      b.    Atlantic violated a number of industry customs and practices in its claims process and handling of the claim at issue.

Sincerely,

Ty R. Sagalow

## Exhibit A

| Date(s) of Email or Correspondence | [Beginning] BATES Number |
|---|---|
| Digs Application | ATL000437 |
| Policy | ATL000518 |
| 11/15/13 (underwriting) (1/1/14 renewal quote) | ATL000749 |
| 11/15/13 (underwriting) (1/1/14 renewal quote) | ATL000764 |
| 12/3/13 (underwriting) | ATL000794 |
| 12/10/13 (underwriting) | AONNBCU0001399 |
| 12/11/2013 (underwriting) | ATL000405 |
| 12/13/13 (underwriting) | AONNBCU0001516 |
| 12/13/13 (underwriting) | AONNBCU0001747 |
| 1/13/14 (underwriting) | ATL000438 |
| 2/20/14 (confirming Israel location) | ATL000402 |
| 7/14/14 – 7/15/14 (claims) | ATL000298 |
| 7/14/14 – 7/15/14 (claims) | ATL000300 |
| 7/15/14 (claims) | ATL000304 |
| 7/15/14 (claims) | ATL000295 |
| 7/15/14 (claims) | ATL000325 |
| 7/15/14 (claims) | ATL000982 |
| 7/15/14 (claims) | ATL000986 |
| 7/16/14 (claims) | ATL000322 |
| 7/16/14 (claims) | ATL000501 |
| 7/16/14 (claims) | ATL001547 |
| 7/16/14 (claims) | ATL001101 |
| 7/16/14 (claims) | ATL001111 |
| 7/16/14 (claims) | ATL001329 |
| 7/16/14 (claims) | ATL001529 |
| 7/16/14 (claims) | ATL001531 |
| 7/16/14 (claims) | ATL001555 |
| 7/16/14 (claims) | ATL001560 |
| 7/16/14 (claims) | ATL001565 |
| 7/17/14 (claims) | ATL000310 |
| 7/17/14 (claims) | ATL001637 |
| 7/17/14 (claims) | ATL001531 |
| 7/17/14 (claims) | ATL000310 |
| 7/17/14 (claims) | ATL001564 |
| 7/17/14 (claims) | ATL001566 |
| 7/17/14 (claims) | ATL001567 |
| 7/17/14 (claims) | ATL001568 |
| 7/17/14 (claims) | ATL001571 |
| 7/17/14 (claims) | ATL001635 |
| 7/17/14 (claims) | ATL001694 |
| 7/17/14 (claims) | ATL001695 |
| 7/17/14 (claims) | ATL001773 |
| 7/18/14 (claims) | ATL000294 |

| | |
|---|---|
| 7/18/14 (claims) | ATL000502 |
| 7/18/14 (claims) | ATL001800 |
| 7/20/14 Various MSNBC articles (undated)(claims) | ATL000312 |
| 7/21/14 (claims) | ATL001808 |
| 7/23/14 (claims) | ATL001832 |
| 7/23/14 (claims) | ATL001828 |
| 7/23/14 (claims) | ATL001835 |
| 7/25/14 (claims) | ATL000323 |
| 7/25/14 (aon to claims) | ATL000398 |
| 7/28/14 (First Denial Letter) | ATL000384 |
| 7/28/14 (claims) | ATL000503 |
| 7/28/14 (claims) | ATL001858 |
| 7/28/14 (claims) | ATL000384 |
| 7/28/14 (claims) | ATL001877 |
| 7/29/14 (claims) | ATL001907 |
| 7/29/14 (claims) | ATL001908 |
| 7/30/14 (claims) | ATL000512 |
| 7/30/14 (claims) | ATL001910 |
| 9/10/14 (claims) | ATL000267 |
| 9/10/14 (claims) | ATL000269 |
| 9/12/14 (underwriting) | ATL000276 |
| 9/15/14 (claims) | ATL002139 |
| 10/10/14 (underwriting) | ATL000453 |
| 11/6/14 (underwriting) | ATL000460 |
| 11/7/14 Updated DIG application (showing 10 eps and move from Israel) | ATL000293 |
| 12/11/2013 – 12/20/14 (underwriting) | ATL000407 |
| "7/3/16" (claims) | ATL0003211 |

# TY R. SAGALOW

2 World Financial Center, 30th Floor, N.Y. N.Y. 10281• (917) 620-2174 •

tysagalow@innovationinsurancegroup.com

## SUMMARY

**CEO & Founder, Innovation Insurance Group, LLC**, a premier consulting firm to the insurance industry specializing in expert witness services focused in management and professional liability, and product development. (www.innovationinsurancegroup.com). Former senior executive for large global insurance companies with proven track record of management success. Expertise in new product development, management/professional liability products, cyber-risk and reputational risk products.  Customer Focused, Results-oriented, entrepreneurial, visionary, inventive.

## KEY POSITIONS

- CEO & Founder of insurance consulting firm specializing in new product development and expert witness services.
- Chief Insurance Officer of Lemonade Inc, a Sequoia backed "P2P" Insurance company
- Former Chief Innovation Officer of AIG, Zurich North America and Tower Group.
- Former Chief Underwriting Officer for National Union (world's largest D&O/E&O underwriter)
- Former General Counsel for National Union (world's largest D&O/E&O underwriter)
- Former Chief Operating Officer for AIG eBusiness Risk Solutions (largest US based cyber-risk insurance company)
- Licensed P&C Insurance Broker

## KEY ACHIEVEMENTS

- Over 45 successful client engagements in its first 48 months (Innovation Insurance Group, LLC) including major insurance companies, insurance brokers, law firms (representing both carrier and policyholder) and entrepreneurs.
- Exclusive "*Ask the Expert*" senior advisor for Advisen (D&O, E&O and Cyber)
- Host of "*Innovations in Insurance with Ty Sagalow*", "*What's New in Insurance*" - World Risk and Insurance News
- No 1 "New Product Innovator of the Year " for 2011 for first time in company 180 year history (Zurich)
- Produced $1.5B+ GWP from products enhanced from 2009 to 2011; (Zurich)
- 28   Improved development to launch cycle time by 33% (Zurich)
- 29   Chief designer of cyber-insurance, a $1B industry premium business in 2012 (AIG)
- 30   Chief designer of reputational risk insurance for Zurich and AIG
- 31   Chief designer of Y2k Insurance (AIG)
- 32   Chief designer of Coverage C (Entity Coverage) in Directors and Officers liability insurance (AIG)

44

- Authored several published works
- Frequent Speaker before industry forums, FOX; testified before Congress and Chaired Congressional committees

## PROFESSIONAL EXPERIENCE

**Innovation Insurance Group, LLC** *CEO & Founder* **(3/12 to Present) (4/11/-8/11)**
Founded first known consulting company designed to provide broad array of product development services to the insurance industry. In 2013, firm created a second major practice group providing expert witness services specialized in management and professional liability.  For more information, www.innovationinsurancegroup.com; a list of clients and partners in expert witness field, go to http://innovationinsurancegroup.com/our-services/expert-witness-services/

**Lemonade, Inc,** *Chief Insurance Officer* **(8/16 - present)**
**Lemonade Insurance Company,** *Chief Executive Officer* **(8/16- present)**
Responsible for insurance operations at first "Peer-to-Peer" insurance carrier.

**Tower Group,** *Chief Innovation Officer (8/11 - 3/12)*
Responsible for shepherding #40 P&C company to its next evolution of organic growth thru the development of new products.

**Zurich North America,** *Chief Innovation Officer (1/09 - 4/11)*
Responsible for department charged with creating or enhancing products and launching them into marketplace for U.S.
- $1.5B in premium generated from products created new or enhanced from January 2009 (over $250M in new business)
- Launched 66 products in 2010 presenting 22.7% of all current products generating 17% of all GWP in Dec 2010
- Launched 12 "national Sales campaigns" in various industry verticals with minimum annual GWP of $50M each.

**AIG,** *President, Product Development - Worldwide* (2004-2009)
Responsible for department charged with creating new products for all member companies of AIG in General Insurance
 Launched new insurance product every 15 days. Both foreign and US product launches.
 Called "a unit without peer in the insurance industry"

**AIG,** *Chief Operating Officer, AIG e-Business Risk Solutions* (2000-2003)

Found and created cyber-risk insurance, a new market niche producing $20M (Y1) climbing to $100M (Y4)

**AIG,** *Chief Underwriting Officer and General Counsel, National Union* (1988-1994)
(1994-1999)
Responsible for all major underwriting decisions for largest management liability insurance carrier producing approximately $4 billion in sales annually. Responsible for managing in-house attorneys.

**AIG,** *Staff Counsel* (1983-1988) Responsible for cases under portfolio as staff litigation counsel.

## PUBLIC POLICY EXPERIENCE

*Public Policy Advocacy* (2000 -Present) Experienced in public policy, lobbying and legislative process in cyber-risk security.

## EDUCATION

**New York University Law School**, New York, NY (L.L.M, 1987)
**Georgetown University Law Center**, Washington, DC (J.D. *cum laude,* 1983)
**Long Island University**, Brookville, NY (B.A. *summa cum laude,* 1980)

## BAR and LICENSES

New York Bar (1983)
U.S. Supreme Court Bar (2003)
P&C Insurance Broker (multiple states)

## BOARDS AND CHAIRS

Chairman, Internet Security Alliance (2007-2011); Board Member, Financial Services Information, Sharing and Analysis Center (FS/ISAC) (2004-2009); Chaired various congressional committee and private sector task forces

## SELECTIVE MAJOR PUBLICATIONS

Directors and Officers Liability and Insurance Handbook, National Association of Corporate Directors, 1999; Director and Officer Liability: Indemnification and Insurance (with Josiah Hatch and John Olson), Clark Boardman Callaghan, 1990, 1994; @ Risk, The definitive guide to legal issues of insurance and reinsurance of internet, e-commerce, cyber

## APPEARANCES

Have appeared on FOX, CNBC, Bloomberg Radio, World Business Review and National Press Club. Have appeared at the White House, Departments of Treasury, Defense, Homeland Security, and Congress in addition to regular industry forums.

## ADDITIONAL INFORMATION

http://innovationinsurancegroup.com/about/ty-r-sagalow-ceo/
www.linkedin.com/in/tysagalow

<u>All List of Publications (2006-2016)</u>

1.   Accounting Irregularities and Financial Fraud (with Michael Young) (*Harcourt Brace & Co, 2000-2006)*

2.  *The Role of Cyber Insurance in Fighting the War on Terror,* Cutter IT Journal, May 2006.

3.  Top Ten Steps When Faced with a D&O Denial Letter (Financier Worldwide, August 2014)

<u>Testimony at Deposition or Trial (2012-2016)</u>

1.  First Horizon v Certain Underwriters at Lloyds, et al (Deposition) (District Court, Tennessee, 2013)

2.  JP Morgan Chase v Indian Harbor (Deposition) (Supreme Court, State of New York, 2014)

3.  FDIC v Rafael Arrillaga-Torrens, Jr. et al [Eurobank] (Deposition) (District Court, Puerto Rico, 2014)

4.  Millennium v Darwin Insurance Company (Deposition, Trial)  (District Court, San Diego) (2014, 2015)

5.  Sandburg vs National Union  (fact witness) (Deposition) (District Court, Texas) (2014)

6.  Millennium vs. Allied World Insurance Company (Deposition) (District Court, San Diego) (2014)

7.  Repid vs. Philadelphia Insurance et al (Deposition) (Circuit Court, Maryland) (2015)

8.  Imperium vs. Shelton & Associates (Deposition)(District Court, Mississippi) (2015)

9.  Beazley vs. ACE (Deposition)(District Court, New York)(2015)

10. Illinois National Insurance vs. AlixPartners (Circuit Court, Michigan) (2016)

11. Baldwin vs. Aon Risk Services (Superior Court, Frenso (CA) (2016)

12. Patriarch Partners vs. Axis Insurance Company (District Court, NY) (2016)

13. Fidelity and Deposit Company of Maryland (Zurich) vs First National Community Bankcorp (District Court, PA)(2016)

14. Crowley Maritime Corporation vs National Union Fire Insurance Company of Pittsburgh, P.A. (District Court, FL) (2017)