# Exhibit C

LUCIA E. COYOCA (SBN 128314)
  lec@msk.com
VALENTINE A. SHALAMITSKI (SBN 236061)
  vas@msk.com
DANIEL M. HAYES (SBN 240250)
  dmh@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone:  (310) 312-2000
Facsimile:  (310) 312-3100

Attorneys for Plaintiffs
Universal Cable Productions LLC and
Northern Entertainment Productions LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, *et al.*,<br><br>            Plaintiffs,<br><br>      v.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY,<br><br>            Defendant. | CASE NO. 2:16-cv-4435-PA-MRW<br><br>**PLAINTIFFS' REBUTTAL EXPERT WITNESS DESIGNATION** |

Mitchell
Silberberg &
Knupp LLP

8834234.1

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, the Court's Scheduling Order dated September 15, 2016 (ECF No. 28), as subsequently amended (ECF No. 34), Plaintiffs Universal Cable Productions LLC and Northern Entertainment Productions LLC (collectively, "Plaintiffs") hereby disclose the following rebuttal expert witnesses and reports:

1. **Ty Sagalow** (information pursuant to Rule 26 was previously provided on January 17 and March 17, 2017, along with the original report) – rebuttal expert report is attached hereto as Exhibit A.

2. **Dr. Matthew Levitt** (information pursuant to Rule 26 was previously provided on January 17 and March 17, 2017, along with the original report) – rebuttal expert report is attached hereto as Exhibit B.

3. **Professor Harold Koh** (information pursuant to Rule 26 was previously provided on January 17 and March 17, 2017, along with the original report) – rebuttal expert report is attached hereto as Exhibit C.

4. **Ambassador Dennis Ross** (information pursuant to Rule 26 was previously provided on January 17 and March 17, 2017, along with the original report) – rebuttal expert report is attached hereto as Exhibit D.

Plaintiffs hereby reserve the right to supplement, amend, or modify this expert witness designation, including based on the expert witnesses identified by Defendant and their opinions, based on further information or documents which become available to Plaintiffs that reveal the need for additional expert witnesses to be identified, based on the outcome of potential law and motion proceedings, or as circumstances of the case may otherwise make appropriate.

Plaintiffs also reserve the right not to call any expert witness identified above, and to call in their case expert witnesses identified by Defendant who have been deposed. Plaintiffs also reserve the right to call any expert witnesses, whether or not designated, for purposes of impeaching the testimony of any expert witness offered by Defendant. Further, Plaintiffs reserve the right to call any lay witness as

1    to any matter on which said lay witness may be qualified to give opinion

2    testimony.

3    DATED:  April 28, 2017                LUCIA E. COYOCA
                                           VALENTINE A. SHALAMITSKI
4                                          DANIEL M. HAYES
                                           MITCHELL SILBERBERG & KNUPP LLP
5

6

7                                          By:   /s/ Lucia E. Coyoca
                                                 Lucia E. Coyoca
8                                                Attorneys for Plaintiffs
                                                 Universal Cable Productions LLC and
9                                                Northern Entertainment
                                                 Productions LLC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

2

# EXHIBIT A

**REBUTTAL EXPERT WITNESS REPORT**


**Universal Cable Productions LLC**

**VS**

**Atlantic Specialty Insurance Company**


**April 28, 2017**

**By**

**Ty R Sagalow**

# I

## QUESTIONS PRESENTED AND SUMMARY OF OPINIONS

1.      I have been asked by counsel for the policyholder to comment on the report of Atlantic Specialty Insurance Company ("Atlantic") insurance expert Anthony Clark, as well as Atlantic's non-insurance experts -- Ingrid de Frankopan, John Quigley and Frank Lowenstein -- to the extent these non-insurance expert opinions impact the opinions I set forth in my original expert reported dated March 17, 2017.

2.      In my March 17th report, I provided two main opinions:

   a.      Atlantic's *decision* to apply the War Exclusion[1] to the Insured's claim was inconsistent with industry custom and practice, and,

   b.      The decision-making *process* used by Atlantic in deciding to deny coverage also fell below industry custom and practice.

3.      These are two separate issues.  For example, it is clear that a carrier might be guilty of issue 1, coming to the wrong conclusion, while not guilty of issue 2.  In other words, a carrier may come to the wrong decision and also go about it in the wrong way, or may come to the wrong decision but not act in bad faith in the manner in which they went about their decision making process.  I have analyzed each issue separately.

---

[1] The following exclusion in Atlantic's policy is referred to as "the War Exclusion" herein, and the subparts are individually referred to as prong 1, prong 2, prong 3, and prong 4 respectively:
   1. "War, including undeclared or civil war; or
   2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
   3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
   4. Any weapon of war including atomic fission or radioactive force, whether in time of peace or war."

4.      Accordingly, I first reviewed Mr. Clark's report to determine where his opinions differ from mine as to these two issues.  After being retained over 50 times in less than 5 years as an insurance expert, I assumed that he would be asked to have, and would have, an opinion on both issues.

5.      However, what I discovered is that his report did not argue against my first opinion, that Atlantic was incorrect, from an insurance industry custom and practice point of view, when it denied coverage based on the Policy's War Exclusion.  Rather, he argued only that the *process* that Atlantic used in making the decision was reasonable and within industry standards (even if the decision itself was wrong).

6.      I reiterate my opinion that Atlantic's determination to apply the War Exclusion ran counter to industry custom and practice, and for the reasons discussed in the next section, I disagree with Mr. Clark's opinion that Atlantic acted reasonably in the process that they adopted in making their [incorrect] claims decision.

7.      Moreover, while none of the other experts whose reports I reviewed are insurance experts, and none profess to provide any opinion as to the applicability of the War Exclusion in an insurance policy, they mention – indeed go out of their way to mention – that in their opinion their respective (and sometimes inconsistent) definitions of "war" and "warlike" action, when viewed in the colloquial, "common" sense of the word[2] or "under the plain, ordinary meaning of the term[3]" encompass the Hamas/Israel hostilities in July 2014. Based on the documents I reviewed, it seems the likely reason why the experts were asked their opinions on this issue is becauseAtlantic is arguing, at least in part, that the words "war" or "warlike" in the Policy's War Exclusion should be interpreted in the "colloquial" sense of the

---

[2] See, e.g. Report of Ingrid Detter de Frankopan ("de Frankopan Report") at paras. 7, 19, 28, 66
[3] See, e.g. Report of Frank Lowenstein("Lowenstein Report") at page 9, first paragraph of "Opinion"

word, and in that sense they would apply to the Insured's claim excluding coverage under prong 1 (war) or prong 2 (warlike action by a military force) of the War Exclusion.

8.      For this reason, I will address these non-insurance experts' opinions as to the "colloquial" or "common" interpretation of the words "war" or "warlike."  In sum, for the reasons set forth in section IV of this report, I do not agree that the only reasonable interpretation of the words "war" or "warlike action," even applying the purported "colloquial" or "common sense" of those terms, means that the July 2014 hostilities between Hamas and Israel constitute "war" or "warlike action."  I also disagree with these non-insurance experts' assumption that this rule of policy interpretation (interpreting non-defined words in their "colloquial" or "common" sense meaning) is the rule to apply to the case at hand.

9.      Finally, Atlantic's non-insurance experts opine – in a conclusory fashion and with virtually no support or discernable methodology for their opinions – that Hamas' acts in July 2014 "could commonly be understood as an insurrection or rebellion[4]" and that "there can be absolutely no question that weapons of war were used[5]" during the Hamas/Israel hostilities in July 2014.  As with respect to prongs 1 and 2 of the War Exclusion noted above, it seems that Atlantic's experts are being asked for their opinion on these subjects so that Atlantic can argue, at least in part, that prong 3 (Insurrection, rebellion, etc.) or prong 4 (weapon of war including atomic fission or radioactive force) of the War Exclusion apply to preclude coverage of the Insured's claim.  For this reason, I will also address this view by Atlantic's experts in Section IV of this report below.  In short, however, Atlantic's non-expert opinions are wrong and inapposite in the insurance context.

---

[4] Lowenstein Report at page 12.  And see, e.g. Report of John Quigley ("Quigley Report") at p. 10
[5] Lowenstein Report at page 12

## II

### THE IMPACT AND IMPORTANCE OF WHAT IS NOT IN MR. CLARK'S REPORT: TO WIT, WHETHER THE WAR EXCLUSION IN FACT APPLIES AND WHAT RULE OF CONSTRUCTION SHOULD APPLY IN MAKING THAT DECISION

10.     As a foundation matter, before I comment on what is in Mr. Clark's report, it is important to note what opinions are missing from Mr. Clark's report.  As Atlantic's sole insurance expert, I would have expected that Mr. Clark would provide an opinion as to how the War Exclusion in issue should be interpreted from a point of view of industry custom and practice.  Tellingly, he did not.

### A.     The Foundation Coverage Issue

11.     We know that Mr. Clark did not offer an opinion on this foundation issue for several reasons:

a.      First, the expert typically sets forth the issue or issues that he or she will be addressing at the beginning of the report.  In Mr. Clark's case, his opening list of issues all deal with the *manner* in which Atlantic made its claims decision:

"[I]t is my opinion that Atlantic Specialty Insurance Company (Atlantic) properly conducted a thorough and timely investigation … and made a reasonable determination under the terms and conditions of the applicable policy… Atlantic acted as a reasonable carrier would by staying in communication … and providing updates to the insured… provid[ing] the insured with clear and detailed explanation of the denial in an expedited manner…Atlantic also responded in a complete and timely manner .. [and] continued to communicate with the insured…

Nothing in the claim file or in any other actions of Atlantic Specialty

indicates that any other extraneous motives affected the ultimate claim

decision.[6]"

b.      Second, the expert typically ends his or her report with all of his or her

final conclusions.  In Mr. Clark's concluding remarks, he only states the

following:

"Atlantic in the handling of this claim took all steps that a reasonable

insurer and claims handler would take to determine the pertinent facts

and circumstances surrounding this claim…"

In Mr. Clark's final paragraph of the report, which is typically the expert's

"bottom line," he states:

"No facts demonstrate a lack of good faith or failure on the part of

Atlantic to act in a reasonable fashion."

c.      Third, nowhere in Mr. Clark's report does he analyze whether the

decision made by Atlantic to deny coverage was correct, or consistent with,

industry standards.

12.      Thus, with respect to the coverage opinion, Mr. Clark just quotes what are

Atlantic's opinions, seemingly distancing himself from whether he agrees with those opinions

or not.[7]

---

[6] Report of Anthony Clark ("Clark Report") at page 4

[7] See for example "Atlantic, in the analysis of the applicable exclusions noted above, appears to have concluded that the common understanding and ordinary meaning given to the activities that caused the move of the production and any Extra Expense to be incurred by the insured was clearly a "war."  In addition, Atlantic appears to have concluded…" (Clark Report at page 7)

13.     The significance of this decision, i.e. the decision *not* to offer an expert opinion on the *foundation* issue of coverage, cannot be overstated.  As an expert I have been retained over 53 times in less than 5 years with many, if not most, of the cases dealing with a dispute involving coverage.  In those coverage cases that also included a "bad faith" allegation, I have never been retained only to comment on the "bad faith" allegation and not to provide an opinion on the underlying coverage dispute issue.

14.     In my experience, having an expert comment only on the "bad faith" issue and not the "coverage issue" would occur only when *either* the hired expert does not agree with his client's position as to coverage (and thus chooses to remain silent), or in circumstances where the expert feels he or she does not have the necessary expertise, in which case the party will then retain a second insurance expert to focus only on the coverage issue.

15.     In other words, I have certainly seen cases where a party hires two experts, one on "bad faith" and another on "coverage" but I have *never* seen a situation where a party hires one insurance expert in a "coverage+bad faith" case and that insurance expert only comments on the "bad faith" element but not the coverage element.

16.     In short, a rational conclusion from all this is that Mr. Clark either disagreed with his client Atlantic in its ultimate conclusion that the War Exclusion applied in this case, or believed he had insufficient expertise to have an opinion in the matter *and* that Atlantic could not find a single other insurance expert to agree with Atlantic's coverage position.

**B.**     **Rule of construction**

17.     What follows from the fact that Mr. Clark did not offer an opinion as to Atlantic's coverage position is the second critical missing piece of Mr. Clark's analysis.  He does not address what is the proper rule of construction to be used in analyzing the words in the Policy's War Exclusion.

18.     Atlantic has indicated that it believes the appropriate rule of construction to be used in this case is to define the words or phrases in the War Exclusion applying their colloquial, common or ordinary meaning.[8]

19.     Which rule of construction should apply in a particular coverage dispute falls squarely within the purview of an insurance expert.  Accordingly, when a party chooses to retain an insurance expert in a coverage dispute case where it is important to know which rule of construction should apply, it normally falls to that insurance expert to offer an opinion on the issue.

20.     In this case, however, not only did Mr. Clark not offer an opinion on the issue, but he affirmatively stated that he is not offering an opinion on this issue.  Specifically, he states in his report:

> "*[I]t is my understanding* from custom and practice of the industry that unless a term is specifically defined in a policy, it is to be viewed as it is commonly used or ordinarily understood[9]."

*Atlantic*, in the analysis of the applicable exclusions noted above, *appears to have concluded* that the common understanding and ordinary meaning given to the activities that caused the move of the production and any Extra Expense to be incurred by the insured was clearly a "war."[10]

21.     As with the foundation coverage issue discussed above, Mr. Clark's failure to opine as to the applicable rule of construction means either that he does not believe he has the

---

[8] See for example, Atlantic's memorandum in support of its motion for summary judgment filed in this case at pages 9-10.
[9] Clark Report at page 6. (emphasis added)
[10] Clark Report at page 7 (emphasis added)

necessary expertise to have an opinion or that he disagrees that the applicable rule of construction is "what is the common sense definition" of the undefined terms.

22.     Moreover, while Mr. Clark stated that it is his "understanding from custom and practice of the industry that unless a term is specifically defined in a policy, it is to be viewed as it is commonly used or ordinarily understood," for the reasons stated in section IV of this report, my expert opinion is that Mr. Clark's "understanding" is incomplete and erroneous as applied to the factual situation at issue here.

23.     Finally, on this subject, I note that in an unusual twist, Atlantic seems to have asked their *non-insurance* experts to offer an opinion as to what is the "ordinary" meaning of the words used in the War Exclusion (e.g., "war") for the purposes of analyzing the correct *insurance* interpretation of a policy exclusion.  Why they did not ask their *insurance* expert to do so is unclear.

### III

### MR. CLARK IS NOT CORRECT IN HIS VIEW THAT ATLANTIC ACTED REASONABLY AND WITHIN INDUSTRY CUSTOM IN ITS CLAIM HANDLING ACTIVITIES

A.     **Claims Handling Practices**

24.     In his 11 page report, Mr. Clark's first actual opinion (ignoring the summary on page 4) seemingly does not appear until page 10.  As the above section illustrates, from pages 4 thorough 10, it is unclear what Mr. Clark is attempting to do other than just repeating Atlantic's views without actually offering any expert opinion of these views.

25.     Eventually, however, on the second to last page of his report, Mr. Clark does offer an opinion.  This opinion addresses whether Atlantic's conduct in the investigation and

handling of the Insured's claim was consistent with industry custom and practice (regardless of

whether their ultimate denial decision was correct or not).

26.     He believes it was.  I disagree.

27.     Mr. Clark correctly sets forth some of the standards by which Atlantic will be

judged in this regard.  Specifically, Mr. Clark states that Atlantic's claims investigation must

be both "*thorough* and timely,[11]" and that Atlantic must have acted as a "reasonable carrier[12]"

in the handling of the claim.

28.     To support his conclusion that Atlantic's investigation fulfilled both these

prongs, Mr. Clarks set forth a number of sub-conclusions in the initial summary section of his

report specifically referencing Atlantic:

   a.     "Staying in communication with [the] insured during the investigation

          stage;[13]"

   b.     "Providing updates of its analysis on coverage;[14]"

   c.     "Provid[ing] the insured with a clear and detailed explanation of the

          denial in an expedited manner;[15]"

   d.     "Respond[ing] in a complete and timely manner to a request by the

          insured for reconsideration;[16]" and,

   e.     "Continu[ing] to communicate with its insured" after the claims decision

          was made.[17]

---

[11] Clark Report at page 4 (emphasis added)

[12] *Ibid*

[13] *Ibid*

[14] *Ibid*

[15] *Ibid*

[16] *Ibid*

[17] *Ibid*

29.     One major failure in his analysis is that he does not sufficiently distinguish between what the Insured is disputing as Atlantic's claims handling behavior and what it is not disputing.

30.     The Insured is not asserting that Atlantic failed to act in a timely manner, or that it failed to keep in touch with the Insured during the few days of its "investigation," or that it failed to articulate the basis for its denial of the claim in its denial letters.  (Atlantic's denial letters clearly indicated it was denying the Insured's claim on the basis of the first two parts of the War Exclusion and, with respect to the initial denial letter, the Terrorism Risk Insurance Act of 2002 ("TRIA") endorsement. These letters detailed various reasons and case law which it claims purportedly supported the decision.[18])

31.     However, the applicable standard is whether Atlantic conducted a "full, fair, thorough, and prompt" investigation.[19]  For ease of reference, I refer to this standard or its subparts herein as "fair, thorough, and prompt."  The deficiencies in Atlantic's investigation are as to the "fair and thorough" part of the standard which were addressed in my original report.[20]  In my view, Mr. Clark's opinion as to the fairness and thoroughness of Atlantic's investigation are both unsupported and unsupportable based on the agreed facts of this case.

**B.     <u>Mr. Clark's Bases for Concluding Atlantic Purportedly Conducted A Fair and Thorough Investigation Are Not Valid.</u>**

32.     Mr. Clark's attempts to show Atlantic conducted a "fair and thorough" claims investigation include the following arguments or observations:

---

[18] This behavior is to be contrasted with such questions as whether Atlantic's coverage determination was (a) correct, (b) even handed in its approach or (c) took into consideration and weighed properly competing definitions of "war" and "warlike," and the impact on the lack of terrorism exclusion on the application of the War Exclusion. None of which they were.

[19] See Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraph 43

[20] *Ibid* at paragraphs 104-148

a. "Using numerous reliable and authoritative sources, Atlantic thoroughly investigated the circumstances…[21]"

b. "Atlantic separately sought legal advice by requesting a coverage opinion to add to the overall process.[22]"

c. "[T]he ultimate decision of Atlantic was approved by additional supervisory personnel within Atlantic.[23]"

d. "Upon receipt of the [Insured's reconsideration] letter, Atlantic proceeded to give careful consideration to the points raised.  After this consideration, Atlantic still felt that they had reached the proper conclusion in denying the claim.[24]"

e. "Based upon all of its research, which *appears* to have comprehensive, *especially for the time involved,* Atlantic concluded … that this was a war.[25]"

33.     These arguments simply do not have merit.  I will deal with them one at a time.

34.     As to Mr. Clark's first basis, he opines that Mr. Gutterman's investigation was sufficient, and in support, Mr. Clark lists a "small sample" list of the "numerous reliable and authoritative sources" which Mr. Gutterman reviewed when investigating the claim which are a Washington post article, a New York Times article and two online articles appearing in msnbc.com and nbcnews.com.  The problem with this list is the same problem with all the other "sources" indicated in the documents I reviewed.  To wit, all that Mr. Gutterman seems to have done in "investigating" the claim is to conduct a Google search of then current events

---

[21] Clark Report at page 8

[22] Clark Report at page 9

[23] *Ibid.*

[24] Clark Report at pages 9 and 10.  Also indicating on page 10 that Atlantic "responded to it [the reconsideration request] promptly and completely"

[25] *Ibid* at page 8

in Israel.  In the context of the *insurance* coverage issue to be determined, recent press clippings are not "reliable and authoritative sources" for the purposes of a first impression claims analysis.

35.     Moreover, as noted in my original report, a quick Google search, just as Mr. Gutterman did when he was investigating the claim, shows that the majority of commentators label Hamas as a terrorist organization, which leads to the corresponding reasonable conclusion that Hamas' acts were acts of terror, not "war."  However, Mr. Gutterman's investigation does not weigh the import of Hamas being designated as a terrorist organization in assessing whether the claim is covered.[26]  Additional authoritative sources to the same effect were also readily available, such as the official position of the U.S. government labeling Hamas as a terrorist organization,[27] and Mr. Gutterman testified he did not look to the U.S. government's official position as to Hamas in investigating the claim.[28]  Atlantic also could have consulted experts, such as a Middle East expert or an international law expert, on the Hamas/Israel conflict and on the definition of "war."  It did not do so.  What is clear, however, is that for the purposes of making an *insurance* determination none of the sources Mr. Gutterman did consult were "reliable and authoritative sources."

36.     Mr. Clark's second basis, obtaining an outside legal counsel opinion, does potentially deal with getting an opinion from an insurance expert with regard to the issue in dispute.  But, the support for this second basis is also faulty under the facts of this case.

37.     In supporting the notion of a *thorough* investigation by pointing to the decision to seek outside counsel advice, Mr. Clark fails to mention that, according to the testimony of Theresa Gooley, Atlantic's claims supervisor, Atlantic only sought an outside counsel opinion

---

[26] See Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraphs 78-83
[27] *Ibid* at paragraph 81
[28] Mr. Gutterman deposition, pp. 267-68, ll. 14-23.

*after* the decision to deny coverage had already been made.[29]  Obtaining an outside legal

opinion for a complex case is generally a good idea, particularly in cases of first impression,

but, under industry custom and practice, a carrier fails its duty to the insured when the insurer

fails to obtain this opinion *before* making its decision to deny the claim.[30]  Moreover, in a case

like this even if the coverage opinion was obtained prior to the claim being officially denied,

this would still have been too late.  Given that this is a claim that involves an exclusion with

which Atlantic has had virtually no experience, at a minimum Atlantic should have obtained

the coverage opinion *first,* so that it had an understanding of the industry's definition of these

terms, before deciding whether the facts met the industry definition.

38.    As to Mr. Clark's third basis, that the coverage decision was reviewed and

approved by senior management (e.g. people who would be presumed to have greater

experience which thus evidences a more "thorough" investigation), I assume that Mr. Clark is

referring to Sean Duffy, Chief Claims Officer for Atlantic and Mr. Dennis Crosby, Executive

Vice President of Atlantic.[31]  Assuming this is the case, Mr. Clark has apparently not read nor

been advised of Atlantic's attorney's letter of March 17, 2017 (which I have reviewed) from

Toni Scott Reed of Strasburger & Price, LLP to Daniel M. Hayes of Mitchell Silberberg Knupp

LLP where Atlantic, through their counsel, argues that Mr. Crosby's deposition should not be

taken and Mr. Duffy's deposition should be limited because in the view of Atlantic's counsel[32]:

"Mr. Duffy had only *fleeting* involvement with the *Dig* claim.  As you know

from the correspondence we produced, he stated in a one-sentence email that he

---

[29] See, e.g. Ms. Gooley Deposition at p. 169, lines 5-8, p. 170, lines 14-25, p. 184, lines 17-25

[30] I have not reviewed this "coverage opinion" because I understand that Atlantic refused to produce it in this
action.  Therefore, it is not possible for me to assess whether Atlantic acted in good faith by following the
coverage opinion or in bad faith by ignoring it.

[31] I note that Mr. Clark fails to footnote or indicate in any way who he is referring to but based on the documents I
read, these seems to be the only senior management level people he could be referencing.

[32] March 17, 2017 letter from Read to Hayes at pages 8-9

13

agreed with the analysis in the denial letter.  That was the extent of his

involvement."

And with respect to Mr. Crosby, Ms. Reed stated:

"Mr. Crosby had even less involvement with the *Dig* claim.  He was forwarded

the denial letter at one point and then proceeded to forward it on to Peter

Williams (who already knew of the *Dig* claim) and in that forwarding e-mail

said only: "FYI."  This is the total of his involvement in the *Dig* claim."

In short, Atlantic's counsel claims that both Mr. Duffy and Mr. Crosby are "apex" employees

who have nothing more than second-hand cumulative knowledge of the claim, to the extent

they have any knowledge at all.

39.     Given this letter, Mr. Clark's argument that Atlantic's claims investigation was

"fair and thorough" because the coverage decision was reviewed and approved by senior

management does not appear to be factually correct.

40.     As for Mr. Clark's fourth basis, that Atlantic's "reconsideration response" letter

supports the notion that their investigation was "thorough," the fact that a carrier quickly

responds to an insured's request for consideration with a reaffirmation of denial is not evidence

of thoroughness.  However, more importantly, Mr. Clark fails to mention that in their

reconsideration request, Atlantic admits that one of the original grounds for denial, the lack of

terrorism coverage due to the lack of TRIA coverage, was a mistake.

41.     This is an important fact about Atlantic's reconsideration letter – it was an

admission by Atlantic that its original coverage position was put together so quickly without

adequate oversight that a simple and fundamental coverage analysis error was made.  Worse,

there is no evidence to suggest that this recognition that an error had been made prompted

Atlantic to revisit any of its other denial of coverage grounds or, perhaps more to the point, that

the claim investigator should talk to Wanda Phillips, Atlantic's underwriter, to find out whether the lack of a terrorism exclusion meant that Ms. Phillips actually intended a Hamas terrorist attack to be covered when she wrote the Policy.

42.     In other words, instead of Atlantic's reconsideration response letter evidencing a thoroughness of investigation as Mr. Clark seems to argue, it actually does the opposite.

43.     Finally, as to Mr. Clark's fifth basis for concluding Atlantic's claims handling was proper, Mr. Clark's main "defense" as to the lack of completeness of the Atlantic investigation seems to be the oft repeated excuse given by Atlantic that the rush to judgment was the fault of the Insured, or its broker, who "wanted a determination of coverage as soon as possible.[33]"

44.     As stated in my original report, the fact that an insured wants to know whether he has coverage under his insurance policy does not excuse the insurer's obligation to thoroughly investigate the claim, nor excuse the insurer's obligation to conduct an evenhanded investigation weighing the interests of the insured and the insurer in equal fashion.[34]

45.     In short, whether or not "time was of the essence" as Mr. Clark remarks, a carrier is not permitted to say to an insured "You want an answer now?  Ok, no coverage!"

46.     As I noted in my original report, what Atlantic could have and should have told their insured if Atlantic was uncomfortable with making a quick *favorable* coverage decision was: "This is a complex issue which our claims examiners are seeing for the first time.  We have concerns about the possible applicability of the war exclusion and need to do further research.  For now, we are reserving our rights on the claim and will stay in touch with you

---

[33] Clark Report at page 8.  This notion is repeated several times in Mr. Clark's report.  For example, also see his comments further down the same page 8 that Atlantic "produce[d] a substantial coverage position *quickly as the insured had requested*" (emphasis added) as well as his reference on page 9 that "The denial was made in an expeditious and timely manner, *as the insured requested*." (emphasis added)

[34] See Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraphs 125-126

while our investigation proceeds.  We plan on conducting the investigation as quickly as

possible, understanding our obligation to you to be thorough and the complexity of the issue.

In the meantime, please feel free to provide us with any additional information you believe will

be helpful to our investigation."[35]

47.     This is what Atlantic could have done and should have done (given their

apparent reluctance to immediately recognize coverage) but it did not do so.

48.     I note that Mr. Clark does not deal *at all* with one of the major deficiencies in

Atlantic's "thorough" investigation: their utter failure to find out from the insurance

underwriter, Ms. Phillips, whether she intended for there to be coverage for attacks by Hamas,

a terrorist organization, since she decided not to put a terrorism exclusion on the Policy.

Indeed, no underwriting materials or emails are even listed in Mr. Clark's list of documents

reviewed.

49.     Mr. Clark deals only peripherally with the obligation of the insurer to

investigate the claim in an *even handled* and *fair* manner, treating equally the interests of the

insured and the insurer.  This failure goes to the heart of Atlantic's claims handling failings in

this case as I discussed in my original report.[36]  In sum, Atlantic failed to take into

consideration alternative views of the War Exclusion or the impact of the exclusion in light of

the fact that there is no terrorism exclusion on the policy.

50.     Mr. Clark's report includes what might be called some "throw away" lines

potentially related to this issue.  For example, on page 4 in his initial summary of opinions he

states "Nothing in the claim file or in any other actions of Atlantic Specialty indicates that any

other *extraneous* motives affected the ultimate claim decision".

---

[35] See *ibid* at paragraphs 107-108 and 115-116

[36] See *ibid* at paragraphs 112-148

16

51.     I am not sure what Mr. Clark means by "extraneous motives."  However, to the extent Mr. Clark is arguing that this means Atlantic's claims handling of the *Dig* claim was *evenhanded* and took into proper consideration the views of the insured and the insurer weighing each in an equal fashion, I disagree.

52.     More specifically, as mentioned above and detailed in my original report, Atlantic's investigation is particularly one-sided in that it did not consider potential alternative interpretations of the word "war" (including the correct, in my view, interpretation advanced by the Insured consistent with industry custom and practice), the impact of the Policy's lack of terrorism exclusion on the application of the War Exclusion, the underwriting decision and analysis done by their own underwriter, and the impact of all of this on the reasonable expectations of the Insured.[37]  Had Atlantic considered the claim evenhandedly and fairly, all of these considerations could have led Atlantic to the conclusion that Hamas' terrorist acts are exactly that, terrorist acts, and that the War Exclusion did not apply to the claim.

53.     Instead, Atlantic looked narrowly at the word "war" and chose a definition which they contend would make the War Exclusion apply to the claim, in order to avoid their obligations under the Policy.

54.     On page 6 of this report, Mr. Clark seems once again to blame the Insured for Atlantic's decision to only review the War Exclusion in its claims investigation when he states: "Due to the facts presented to Atlantic, Atlantic quickly began to review the facts in the context of the several war exclusions in the policy."  Mr. Clark does not indicate what "facts" he is referring to; however, the facts and documents I reviewed demonstrate a series of actual and threatened terrorist attacks by a known terrorist organization causing an Imminent Peril against an insured for which Atlantic provided coverage, specifically without a terrorism exclusion.

---

[37] See *ibid* at paragraphs 78-105

C.   **Atlantic's Purported Motivation**

55.     Finally, Mr. Clark argues that Atlantic's good faith is demonstrated by the fact that they (1) have paid other claims made by the Insured[38] and (2) made a settlement offer in this case (presumably despite their view that there was no coverage)[39].

56.     To respond to these, it is axiomatic that the fact that a carrier's claims handling practices was consistent with industry standard in the past does not exclude the possibility that they have departed from industry standard in another case, even with the same insured. Moreover, based on what I understand to be Atlantic's profit / paid claims figures in connection with the Insured's policies for the years 2010 through 2015, Atlantic paid out a total of $5,374,531 (after the Insured paid large deductibles) on about 54 claims, and earned premiums of $7,433,862.[40]  However, the *Dig* claim at issue here, alone, exceeds the amount Atlantic paid on these 54 claims over the period of five years.  In other words, payment of the *Dig* claim would have put Atlantic in the "red" when it seemingly was, prior to the *Dig* claim, in the "black".  This fact can render both Atlantic's prior claims payment history irrelevant and also potentially supply the "extraneous motives" Mr. Clark failed to detect.  With respect to the "settlement offer," I am advised that this "offer" was for less than the deductible and thus would have not resulted in any cash payment to the Insured.  In any event making a settlement offer, especially one that falls within the insured deductible, on a claim that should have been covered in the first instance is no evidence of good faith.

57.     Accordingly, none of what appears in Mr. Clark's report supports any conclusion other than that Atlantic acted below industry custom and practice in handling the claim, as discussed at length in my original report.

---

[38] Clark Report at page 10
[39] Clark Report at page 10
[40] ATL005268

18

## IV

## THE THREE NON-INSURANCE EXPERTS DO NOT SUPPORT THE APPLICATION OF THE WAR EXCLUSION TO THE *DIG* CLAIM

58.     Normally, as the insurance expert retained by one party I would only comment on the expert report of the opposing party's insurance expert.  However, in this case, the opinions stated by Atlantic's non-insurance experts are apparently being offered  to support several critical insurance issues, and thus I need to comment on their reports.

59.     Atlantic has submitted three non-insurance experts of various backgrounds and experiences, although none apparently have any experience dealing with insurance or insurance policies in any way.

60.     The most central opinion in these reports, at least from an insurance point of view, is the contention by each writer that the hostilities between Hamas and Israel in July of 2014 was a "war" or "warlike hostilities by a military force," with use of "weapons of war," when those words or phrases are considered based on their colloquial, "common sense" or "ordinary" meaning.[41]

61.     The direct implication by Atlantic is that this is the rule to be applied to the Policy's War Exclusion, prongs 1, 2, and 4, and thus the opinions of these experts, if true, mean that the War Exclusion of the Policy applies to exclude coverage.

62.     There are at least six flaws with this theory:

a.      The "common sense or ordinary meaning" of the word is not the correct rule of construction to be used in this case in the first place;

---

[41] I am not addressing here the various comments by the experts that "war" means what the media says is a war or what a politician calls a war or that the definition hinges on the number of people killed (see e.g. de Frankopan Report at paragraphs 27-29) because these issues are discussed at length in my original report at paragraphs 72, 87-89.  For the same reason, I do not express additional comment on these experts' view that Gaza is a state or semi-sovereign state with Hamas as its government beyond commenting, as I did in my original report, that these opinions simply support the fact that there are experts on both sides of this issue, and note that I quoted from experts with the absolute opposite opinion in my original report at paragraphs 73-84.

b.      Some of the experts' definitions run counter to the same definitions offered by Atlantic's own representatives;

c.      The experts' definition of the terms are so broad that they would apply to all terrorist activities anywhere around the world defeating the need for or purpose of any terrorism exclusion;

d.      For the same reason, the experts' definition would render the Terrorism Risk Insurance Act meaningless;

e.      If applied, the result would run counter to the position taken by every insurance company in the last 16 years as to the events of "9/11"; and finally,

f.      Multiple variations of how the words "war", "warlike", and "weapons of war" are defined, both within and among these three non-insurance expert reports, show that there are multiple interpretations of these words.  This, in turn, supports the conclusion that, at least with respect to the facts of this claim, the Insured had a reasonable expectation that its more insured-friendly definition[42] would apply, as detailed at length in my original report.[43]

63.      Beginning with the first flaw, as a foundation issue, Atlantic's assumption that the correct rule of construction to be applied in this case calls for application of the colloquial, "common sense" or "ordinary" meaning of the terms "war" or "warlike" is not correct from an industry custom and practice point of view.

64.      There is a three-step rule process in construing policy meaning as to specific words or phrases:

---

[42] To wit, in this expert's opinion, that an act of terrorism cannot be an act of war when done by a recognized terrorism organization such as Hamas.

[43] See Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraphs 45-58 and 60-90

a.      Rule 1:  Defined words shall have the meaning assigned to them in the policy definition.

b.      Rule 2:  Undefined words shall have any applicable "special" meaning that is needed in order for the entire policy's terms and conditions to make sense and be consistent with the dealings between the parties.

c.      Rule 3:  Absent a definition in the policy or an applicable special meaning, words in the policy shall be interpreted in accordance with their "common sense" or ordinary meaning.

65.     The umbrella theme which ties all these steps together is that insurance policies should be interpreted in accordance with the reasonable expectations of the parties and especially the reasonable expectations of the insured.

66.     Accordingly, a person seeking to interpret a word or phrase in an insurance policy does not get to Rule 3 (the "common sense" definition rule) unless both Rules 1 and 2 are not applicable.

67.     In this case, both parties agree that Rule 1 is not applicable.  There is no definition of "war" or "warlike" in the policy.

68.     However, Atlantic and Mr. Clark seems to have forgotten about Rule 2.  Since "9/11" the terms in the war exclusions *have* a special meaning in the insurance industry. Specifically, one that states that an act of terrorism by a recognized terrorist organization does not trigger the War Exclusion (although it might trigger a terrorism exclusion).

69.     For this reason, a proper analysis of the War Exclusion never gets to Rule 3.

70.     A review of the last four flaws of Atlantic experts' arguments sheds a brighter light on why this is true.

21

71.     There is a conflict between these experts' interpretation of some of the words in the War Exclusion (which as I indicate later in this report might be fine in various non-insurance contexts but not when construing an insurance policy) and the interpretations stated by Atlantic's own representatives in the context of the *Dig* claim.

72.     For example, both Dr. de Frankopan and Mr. Quigley state that the use by Hamas of rockets are "weapons of war"[44] and Mr. Quigley stated that the "battles" were fought with "sophisticated military weapons"[45]; however, then President of OneBeacon Entertainment (a division of Atlantic) Peter Williams testified that the "weapon of war" exclusion (i.e. prong 4 of the War Exclusion: "Any weapon of war including atomic fission or radioactive force…") does not apply to this claim because it required atomic or radioactive involvement, which unquestionably did not occur here.[46]

73.     Mr. William's testimony and interpretation is also consistent with the parties' drafting history of the War Exclusion.  On December 17, 2009, Atlantic agreed to use the "form policy" which Atlantic and Aon (the Insured's broker) had been negotiating.[47]  That "form policy" included prong 4 of the War Exclusion as follows:  "Any weapon of war *employing* atomic fission or radioactive force…[48]" (emphasis added).  This language is consistent with the language used in the standard form promulgated by the Insurance Services Office ("ISO").[49]  Then, the parties continued to negotiate and revise *other* provisions of the Policy through about March 2010, but *not* the War Exclusion.[50]  It appears that due to various

---

[44] de Frankopan Report at para 35; Quigley Report at page 10

[45] Quigley Report at page 4

[46] Mr. Williams Deposition at p. 23 lines 2-23, p. 30 lines 13-21, and p. 252 lines 7-22

[47] AONNBCU0004125

[48] AONNBCU0004144

[49] ISO is a rough equivalent of ABA for lawyers.  ISO collects statistical data, promulgates rating information, develops standard policy forms which are widely used or copied.

[50] AONNBCU0003795-3865, AONNBCU0004055-4089, AONNBCU0004132-4054, AONNBCU0004125-4131, UCP032892-32935

formatting changes and revisions to *other* policy provisions, an unintended revision was made to prong 4 of the War Exclusion, as follows:  "Any weapon of war *including* atomic fission or radioactive force…[51]" (emphasis added).

74.    The industry custom in regard to manuscripted or specially developed policy forms (including forms drafted by the insured's broker, if that is the case here) is crystal clear. Once language has been agreed to by the parties or their representatives, that is it.  No changes can be made.  However, in the case where an insured or broker draft language is changed by the insurance carrier *after* it has been agreed to[52], the change in language must be interpreted in the same manner as if the change did not occur, i.e. that the change is non-substantive from a coverage point of view.  For the insurer to change language in the policy form after prior language has already been agreed to by the parties, and to intend that change to substantively change the terms of coverage, is a completely unacceptable practice under industry standards, and the change would be of no effect.

75.    In this action, Atlantic argues that prong 4 should *not* be interpreted in a sense that the parties intended it to be interpreted – i.e., "weapon of war *employing* atomic fission or radioactive force" – meaning, as even Mr. Williams testified, that for prong 4 of the War Exclusion to apply, the "weapon" must use or employ "atomic fission or radioactive force."[53] Instead, Atlantic argues for a much broader interpretation, seeking to obviate the parties' intent and insert nonexistent words into prong 4, as follows:  "weapon of war, *including,* [but not limited to] atomic fission or radioactive force….[54]"

---

[51] UCP032892-32935 at UCP032906

[52] This sometimes happen either inadequately or when, for example, the "final author" decides on his or her own to make a non-substantive change which he or she does not believe is necessary to advise the other side because it is not meant to change coverage.

[53] See Atlantic's memorandum in support of its motion for summary judgment filed in this case at pages 20-21

[54] *Ibid* at page 20 (emphasis and insertion in original)

76.     It is my opinion that Atlantic's position is contrary to the insurance industry custom and practice and would be considered under industry custom and practice to be tantamount to fraud on the Insured.  However, it is not necessary to accuse Atlantic of acting in a fraudulent manner.  Instead, it simply should be assumed that the change in language (from "employing" to "including") either means Atlantic's drafter did not intend to make any change in coverage, i.e. the exclusion should have the limited impact stated by Mr. Williams and thus is inapplicable to this claim, or the meaning should be construed  pursuant to custom and practice, as being limited to a weapon that uses atomic fission or radioactive force.  Thus, Atlantic's contrary argument also violates the following standard which resulted from custom and practice in the insurance industry:  "The meaning and application of insurance provisions at the time of a claim must be consistent with the course of dealings between the insured and the carrier's underwriter who underwrote the particular policy.[55]"

77.     Two of the three non-insurance expert opinions include an opinion of the definition of "war" which if applied to an insurance context would render almost any hostilities by anyone, and any terrorist activity, a "war."  Specifically:

> a.     Dr. de Frankopan states:
>
> > "Over the last 40 years, the world has gradually entered into a state where the wars are undeclared, the battlefields can be anywhere, the uniforms are optional and the combatants as well as the targets are often 'civilian.' [56]"

---

[55] Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraph 36(a)
[56] de Frankopan Report at para. 52

"In fact, the over-whelming number of 'wars' and 'armed conflicts' in modern international society are waged precisely between a State, or a group of States, and a terrorist organization.[57]"

b.      Mr. Lowenstein states:

"It is equally clear that in the 21st century, it is commonly understood that wars are often fought against terrorist organizations rather than traditional state actors.[58]"

c.      By contrast, Mr. Williams, President of OneBeacon Entertainment at the time the claim was denied, testified that an act by terrorists, such as a suicide bombing, would be an act of terrorism which would be covered under the policy, thereby contradicting Atlantic's non-insurance experts' proposed definitions.[59]

78.      These interpretations by Atlantic's non-insurance experts, if adopted, are so broad as to render the decision to include a terrorism exclusion in an insurance policy meaningless.  Every insurance policy with a war exclusion would also operate to exclude terrorist attacks.  As I indicated in my original report, this may have been the position of the insurance industry prior to "9/11" but it has not been the position of the insurance industry since then.[60]  Rather, the language used in prongs 1, 2, and 3 of the War Exclusion is routinely used in various insurance policies, including for example, even automobile insurance, often

---

[57] de Frankopan Report at para. 55.  Similarly her statement in para 58 that "It is also abundantly clear in practice that war may be waged with a non-State, even with a terrorist organization."
[58] Lowenstein Report at page 10
[59] Mr. Williams Deposition at p. 145 lines 6-17
[60] See Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraphs 49-58

using standard ISO forms to exclude "war" events, while losses caused by terrorism are separately excluded, particularly after 9/11, as detailed in my original report.[61]

79.     Indeed, we need not ponder whether these experts would regard "9/11" as an "act of war" which would presumably trigger the war exclusion in insurance policies as Dr. de Frankopan says this directly in her report: "Even before 9/11, in 1996, Osama bin Laden 'declared war' on the United states, by issuing a formal declaration. Thus, it was actually the terrorists who declared war on the 'West.'[62]"

80.     This position completely ignores the insurance industry custom and practice and the controlling reasonable expectations of the insured. Here, the Insured paid Atlantic more than $2 million in premium for the Policy, specifically discussed with Atlantic the location of the insured production, Israel, and the increased safety risks. The risks of acts by Hamas in and against Israel are well known. Yet, Atlantic agreed to insure the production knowing these facts without requesting a terrorism exclusion. However, when the production incurred a loss because of the acts of a terrorist group, Atlantic refused to cover the loss, contending that those were not acts of terrorism, but "acts of war." Atlantic's wrongful denial cannot be made right by Atlantic's non-insurance experts.

81.     Similarly to Dr. de Frankopan, Mr. Lowenstein commented with regard to "9/11":

>     "When al Qaeda attacked the United States on 9/11 it was widely viewed as an act of war, and the United States responded accordingly. President Bush spoke to the nation on September 20, 2001, and explained that enemies of freedom, referring to al Qaeda, had committed an act of war against our country. And in

---

[61] Ibid e.g. at paragraph 56

[62] de Frankopan Report at para. 60 adding in paragraph 63 "Therefore, regardless of how anyone seeks to classify Hamas, the hostilities between Hamas and Israel in July August 2014 did constitute a war."

that same speech, he declared that we were at war with terror, beginning with al Qaeda.[63]"

82.     As an American I applauded President Bush's speech embracing the need for a 'War against Terrorism' in general and al Qaeda in particular.  However, as an insurance executive at AIG I applauded AIG's decision along with those of all the other insurance companies in the world declaring that "9/11" will not be considered a "war" for the purposes of the war exclusion regardless of whether it would be considered a "war" for political, social, economic or other purposes.

83.     This shows, perhaps more clearly than any other argument I have made in this report so far, that what is considered a "war" in ordinary meaning, in political meaning or in the minds of the media is broader than, and should not be used, in the context of interpreting the war exclusion in an insurance policy.

84.     To help prove this point, I note the view of at least one of Atlantic's *non-insurance* experts that absent a TRIA endorsed cover, coverage would be excluded for *any* terrorist attack.  Dr. de Frankopan states in her report:  "Besides, terrorist acts would only be covered if they were 'endorsed' under the new system under the TRIA legislation."[64]

85.     This statement by Dr. Frankopan is highly significant for at least three reasons:

a.     First, of course, it is wrong.

b.     Second, it indicates a lack of thoroughness on Dr. de Frankopan's part, since Atlantic's reply denial letter specifically corrected this initial incorrect position (the reply denial letter was one of the 9 documents Dr. de Frankopan says she reviewed).

---

[63] Lowenstein Report at page 10
[64] de Frankopan Report at footnote 50

27

c.      Third and perhaps most importantly, as stated above, it shows the danger of relying upon the opinions of non-insurance experts who are talking about contexts other than insurance and applying these conclusions to insurance issues.

86.      Finally, whatever the definitions of "war," "warlike," or "weapons of war" are according to these experts, they seem to change over time.  Indeed, Dr. de Frankopan fully admits that there is a constant morphing of the definition of war in the international law context.[65]  The fact that these experts do not agree on a consistent definition of war, and that at least one of the experts opines there is a constant morphing of the definition, demonstrates how unworkable the "colloquial" standard really is for insurance purposes.  The words in the policy must have a definite meaning that does not change over time or depend on what the media says about the events involved in the claim.

87.      For all of the above reasons, whatever proper use these non-insurance experts opinions on the definitions of "war," "warlike", or "weapons of war" may have outside the insurance context, they are not helpful to, and indeed often contrary to, the meaning of those words in the War Exclusion in Atlantic's Policy and determining whether the War Exclusion should apply to the Insured's claim.

88.      Further, Mr. Lowenstein and Mr. Quigley state, without providing any support or methodology for their opinions, that Hamas' acts in July 2014 "could commonly be understood as an insurrection or rebellion.[66]"  These statements are presumably provided to support Atlantic's argument that prong 3 (Insurrection, rebellion, etc.) of the War Exclusion would apply to preclude coverage of the Insured's claim.  I disagree.

---

[65] de Frankopan Report at para. 24
[66] Lowenstein Report at page 12, and see, e.g. Quigley Report at p. 10

89.     I reviewed the Rebuttal Report submitted by Professor Harold Koh, which defines "insurgency" or "rebellion" as "an organized effort by a group of armed rebels to overthrow the civilian government" of a state, with the goal of "install[ing] itself as the legitimate successor government.[67]"  Based on the report submitted by Dr. Matthew Levitt, Hamas was not seeking to overthrow the government of Israel with the goal of "install[ing] itself as the legitimate successor government," but instead Hamas was seeking to destroy Israel altogether.

90.     More importantly, as detailed in my original report, based on the custom and practice in the insurance industry:  "Exclusions and restrictions on coverage are to be interpreted narrowly and if there are two reasonable interpretations of a restrictive provision, the one favoring coverage controls.[68]"  As a result, Mr. Lowenstein's and Mr. Quigley's opinions as to whether Hamas' acts in July 2014 "could commonly be understood as an insurrection or rebellion" cannot serve to preclude coverage of the Insured's claim based on insurance industry custom and practice, because theirs is not the only interpretation (let alone a reasonable interpretation), and the Insured has presented an alternative reasonable interpretation.  Thus, the Insured's interpretation should control.

## V

## CONCLUSION

91.     In conclusion, for the reasons set forth above, it is my expert opinion that:

a.      Mr. Clark is incorrect in his opinion that the claims handling by Atlantic fell within industry standards.  Rather, Atlantic acted well below industry standards by failing to conduct a thorough investigation

---

[67] Rebuttal Report of Professor Harold Koh at page 2

[68] Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraph 36(b)

balancing the interests of both the insured and the insurer in an evenhanded manner.

b.    The appropriate rule of construction to evaluate the undefined words and phrases in the policy's War Exclusion is not the colloquial or "common or ordinary meaning" rule but rather the rule applying "special" meaning to the words.

c.    When applying this rule of construction in a post "9/11" world, an act of terrorism committed by a recognized terrorist organization is not an act of war subject to exclusion by a war exclusion.  Rather, an act of terrorism is subject to exclusion by a policy's terrorism exclusion, if there is one.

d.    Applying the appropriate rule of construction and interpreting the "insurrection, rebellion" and "weapon of war" exclusions according to industry custom and practice, these exclusions do not apply to the claim.

e.    Accordingly, Atlantic was acting against industry custom and practice when it applied the War Exclusion to the claim at issue, and,

f.    Atlantic violated a number of industry customs and practices in its claims process and handling of the claim at issue.

Respectfully submitted,

_____
Ty R. Sagalow

Dated:  April 28, 2017

30

1

## PROOF OF SERVICE

2    STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3        I am employed in the County of Los Angeles, State of California, I am over
4    the age of eighteen years and am not a party to this action; my business address is
     Mitchell Silberberg & Knupp LLP, 11377 West Olympic Boulevard, Los Angeles,
5    CA 90064-1683, and my business email address is vas@msk.com.

6        On April 28, 2017, I served a copy of the foregoing document(s) described
     as **PLAINTIFFS' REBUTTAL EXPERT WITNESS DESIGNATION** on the
7    interested parties in this action at their last known address as set forth below by
     taking the action described below:

8    Marc J. Shrake, Esq.                      Michael Keeley, Esq.
9    ANDERSON, MCPHARLIN &                     Toni Scott Reed
     CONNERS LLP                               Carla C. Crapster, Esq.
10   707 Wilshire Boulevard, Suite 4000        STRASBURGER & PRICE, LLP
     Los Angeles, CA  90017-3623               901 Main Street, Suite 6000
11   Tel:  (213) 236-1691                      Dallas, TX  75202
     Fax:  (213) 622-7594                      Tel:  (214) 651-4300
12   Email:  mjs@amclaw.com                    Fax:  (214) 651-4330
                                               Email: michael.keeley@strasburger.com;
13   *Attorneys for Defendant Atlantic*        toni.Reed@strasburger.com;
     *Specialty Insurance Company*             carla.crapster@strasburger.com

14                                             *Attorneys for Defendant Atlantic Specialty*
15                                             *Insurance Company*

16   ☑ **BY ELECTRONIC MAIL**:  I served the above-mentioned document
        electronically on the parties listed at the email addresses above and, to the
17      best of my knowledge, the transmission was complete and without error in
        that I did not receive an electronic notification to the contrary.

18   ☑ **BY MAIL**:  I placed the above-mentioned document(s) in sealed
19      envelope(s) addressed as set forth above, and deposited each envelope in the
        mail at Los Angeles, California.  Each envelope was mailed with postage
20      thereon fully prepaid.

21       I declare under penalty of perjury under the laws of the United States that
     the above is true and correct.

22       Executed on April 28, 2017, at Los Angeles, California.

23

24                                        _____
                                                 Valentine A. Shalamitski
25

26

27

28

Mitchell
Silberberg &
Knupp LLP

8502070.1