1  MARC J. SHRAKE (SBN 219331)
   mshrake@fmglaw.com
2  WAYNE H. HAMMACK (SBN 202709)
   whammack@fmglaw.com
3  FREEMAN MATHIS & GARY, LLP
   550 South Hope Street, Suite 2200
4  Los Angeles, California 90071
   Telephone: (213) 615-7019
5  Facsimile: (213) 615-7000

6  CHRISTOPHER W. MARTIN (*Pro Hac Vice*)
   martin@mdjwlaw.com
7  MELINDA R. BURKE (*Pro Hac Vice*)
   burke@mdjwlaw.com
8  WILLIAM E. McMICHAEL (*Pro Hac Vice*)
   mcmichael@mdiwlaw.com
9  MARTIN, DISIERE, JEFFERSON
   & WISDOM LLP
10 9111 Cypress Waters Blvd., Suite 250
   Dallas, Texas 75019
11 Telephone: (214) 420-5500
   Facsimile: (214) 420-5501

12
   Attorneys for Defendant
13 Atlantic Specialty Insurance Company

14
                    **UNITED STATES DISTRICT COURT**
15
           **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
16

17 UNIVERSAL CABLE PRODUCTIONS        )  CASE NO. 2:16-cv-4435-PA-MRW
   LLC, a Delaware limited liability  )
   company, and NORTHERN              )  **WRITTEN PROFFER OF**
18 ENTERTAINMENT PRODUCTIONS          )  **EXPERT OPINION OF ASIC'S**
   LLC, a Delaware limited liability  )  **MIDDLE EAST AFFAIRS**
19 company,                           )  **EXPERT FRANK G.**
                                      )  **LOWENSTEIN**
20            Plaintiffs,             )
          vs.                         )  Hearing Date:    TBD
21                                    )
   ATLANTIC SPECIALTY INSURANCE       )  File Date:  6/20/2016
22 COMPANY, a New York insurance      )  Pre-Trial Conference: 1/17/2020
   company,                           )  Trial Date:   2/18/2020
23                                    )
              Defendant.              )
24 _____  )

25 ///

26 ///

27 ///

28 ///

Freeman Mathis
& Gary, LLP
Attorneys at Law

**Written Proffer of Expert Opinions of ASIC's Middle East Affairs Expert**

**Frank G. Lowenstein**

Plaintiffs allege that ASIC breached the implied covenant of good faith and fair dealing in failing to properly investigate Plaintiffs' *Dig* claim and in denying coverage of Plaintiffs' *Dig* claim under the Policy.  The claim was denied by ASIC under the war exclusions of the Policy.  Frank G. Lowenstein was engaged by ASIC to evaluate Plaintiffs' claims regarding the validity of the application of the war exclusions and to rebut the opinions set forth by Mr. Ross, Dr. Koh, and Mr. Levitt, Plaintiffs' expert witnesses, who offered opinions on the validity of the application of the war exclusions.  Mr. Lowenstein prepared an Expert Report and a Rebuttal Expert Report.  The Lowenstein Expert Report was incorporated by reference in ASIC's Expert Witness Disclosure as Exhibit C.  [ASIC Expert Witness Disclosure, p. 6].  The Lowenstein Rebuttal Expert Report was incorporated by reference in ASIC's Rebuttal Expert Witness Disclosure as Exhibit B.  [ASIC Rebuttal Expert Witness Disclosure, p. 7].

Mr. Lowenstein's opinions are set forth in the Disclosure and Rebuttal Disclosure and are provided in this Proffer.  Mr. Lowenstein was deposed by Plaintiffs but was not asked about each opinion set forth in his reports. Moreover, ASIC reserved its questions of Mr. Lowenstein until the time of trial.

ASIC now files this Proffer of the opinions of Mr. Lowenstein as follows:

A. **Opinion and Citation to Expert Witness Disclosure**:  The conflict between Hamas and Israel in the summer of 2014 was a war as that term is commonly used and understood in his field of expertise and study  [ASIC Expert Witness Disclosure, p. 5; ASIC Rebuttal Expert Witness Disclosure, p. 6].  In support of that opinion, Mr. Lowenstein will testify that he and his colleagues at the State Department, including John Kerry, repeatedly referred to the conflict as a war and that Hamas is the semi-sovereign de facto ruling authority in Gaza and acts as a government because it has a judicial system, has a military force, and provides social services, collects taxes, administers hospitals and local police forces, and has approximately 30,000 civil

Freeman Mathis
& Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S MIDDLE EAST AFFAIRS EXPERT FRANK G. LOWENSTEIN
16294934.1   11775-83955

service employees in various ministries. [ASIC Expert Witness Disclosure, p. 5; ASIC Rebuttal Expert Witness Disclosure, p. 6].

1.  Relevance of Opinion: Mr. Lowenstein's opinion regarding the validity of the application of the war exclusions, as noted above, supports the reasonableness of the basis for the claim's denial and directly rebuts the opinions of Mr. Ross, Dr. Koh, and Mr. Levitt.

2.  Bases for Opinion:  Mr. Lowenstein's opinion is based on his background as an attorney who previously worked for the U.S. Department of State as the Special Envoy for Israeli-Palestinian Negotiations.  As the Special Envoy, Mr. Lowenstein had responsibility for all Israeli and Palestinian issues, including policy formation, speech writing, and press guidance.  He met regularly with senior Israeli and Palestinian officials and traveled with then Secretary of State John Kerry on all trips related to Middle East peace.  Mr. Lowenstein was the Special Envoy for Israeli-Palestinian Negotiations during the 50-day conflict and traveled to Israel and Egypt during the summer of 2014 to facilitate the negotiation of a ceasefire between Palestinians and Israelis.  Mr. Lowenstein has received the Distinguished Service Award from Secretary John Kerry, the highest honor offered by the U.S. State Department.  Mr. Lowenstein's qualifications and experience are further detailed on pages 1-3 of his Expert Report.

   a.  In June 1967 as part of the Six Day War, Israel gained control over the Gaza Strip and West Bank; in 2005 Israel unilaterally withdrew its forces known as the IDF and all of its civilians from Gaza, leaving control to the Palestinian authority.

   b.  In January 2006 Hamas won a popular election for the Palestinian Legislative Council with its candidates winning 74 of the 132 seats; in 2007 Hamas' armed forces in Gaza defeated forces loyal to Palestinian Authority President Abbas and consolidated control over the Gaza strip;

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S MIDDLE EAST AFFAIRS EXPERT FRANK G. LOWENSTEIN

16294934.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

President Abbas dismissed the Hamas-led government and appointed a new caretaker government, which became the governing authority in the West Bank; Hamas named a new cabinet of ministers and has remained in control of the Gaza Strip ever since.

c. To prevent Hamas from obtaining additional weapons, Israel took control of all land crossings with Gaza and imposed a blockade on any goods coming into Gaza by sea; many consider Israel to technically be the occupying power in Gaza as well as the West Bank, despite not exercising any actual authority inside the Gaza Strip.

d. Hamas has been the de facto ruling authority in the Gaza Strip since at least 2007; Hamas performs the basic functions of government; Hamas provides social services, such as administering schools, hospitals, and local police forces; Hamas collects revenue from the people of Gaza in various ways, including licensing fees and taxes; Hamas receives assistance from some foreign governments; the Hamas government employs over 20,000 civil service employees in various ministries; Hamas also runs an ad hoc judicial system.

e. Hamas has a military force known as the Qassam Brigades; the Qassam Brigades were part of an estimated 16,000 fighters under Hamas command in the summer of 2014; these forces were reportedly divided into 6 brigades of 2,000-3,500 fighters

f. By the summer of 2014, Hamas and its affiliates had a stockpile of approximately 10,000 rockets and thousands of mortar shells; this arsenal included thousands of short-range rockets with a 9 kilogram warhead and maximum range of 15-20 kilometers, hundreds of medium range Grad rockets with a 45 kilogram warhead and range of approximately 45 kilometers, hundreds of M-75 warheads with a 60

Freeman Mathis
& Gary, LLP
Attorneys at Law

-4-

kilogram warhead and a range of up to 80 kilometers, and tens of long-range R-160 rockets with a range of 100-200 kilometers.

g. There have been a number of attempts by Hamas leadership and President Abbas since 2006 to create a government of national unity that would unify Gaza and the West Bank under the Palestinian Authority; in June 2014 an agreement between Hamas and President Abbas created a unity government that did not include any members of Hamas as ministers; the United States does not engage with Hamas or any of its members but determined that it was able to engage with this Government of National Consensus.

h. Since 2006, Hamas forces have sporadically fired rockets or mortars into Israel, and the IDF has responded with limited and calibrated air strikes; on at least 3 occasions since 2006 the conflict between the IDF and Hamas forces in Gaza has intensified to the point that the IDF has declared formal, large scale military campaigns against Hamas; in December 2008 the IDF launched Operation Cast Lead, which began with an intensive aerial bombardment targeting Hamas forces and infrastructure, followed by a ground invasion by the IDF; it is estimated that between 11,000 and 15,000 Palestinians and 13 Israelis died before the parties unilaterally entered into a cease fire, and Israel completed its withdrawal from the Gaza strip; in November 2012 fighting again intensified between Israel and Hamas and Israel declared Operation Pillar of Defense; the IDF struck more than 15,000 sites in the Gaza strip and 160 Gazans died and hundreds were wounded; the United States worked with Egypt to facilitate a formal ceasefire agreement between the parties.

i. In June 2014, following the kidnapping and murder of 3 Israeli teenagers by Hamas in the West bank and the resulting IDF campaign in the West

bank, Hamas increased its rocket and mortar attacks against Israel; 250 rockets were launched at Israel from Gaza in the last two weeks of June and the first week of July.

j.   On July 7, 2014, after additional rocket fire, the IDF announced Operation Protective Edge, a major military campaign against Hamas in Gaza; the purpose of the operation was "restoring security to Israeli civilians living under Hamas rocket fire;" the conflict escalated significantly at that point; on July 8, 2014, over 140 rockets were launched at Israel from Gaza, three landed in the hills around Jerusalem, air raid sirens sounded over much of Israel, Hamas fired four M-75 rockets at Tel Aviv, and a Hamas rocket reached Hadera (some 100 km away from the Gaza Strip).

k.  On July 8 Hamas tried to infiltrate its forces into Israel at Zikim Beach in a daylight amphibious assault; five Hamas militants were killed by the IDF.

l.   Intense rocket attacks on Israel continued steadily, causing air raid sirens to sound all around Israel in response to the daily barrage; over 100 rockets were launched from Gaza on July 9; over 190 rockets were fired on July 10; over 140 rockets were fired on July 11; over 130 rockets were fired on July 12; 100 rockets were fired on July 13; 115 rockets were fired on July 14; 150 rockets were fired on July 15; 130 rockets were fired on July 16.

m. During this period, Hamas incorporated additional elements of modern warfare and employed new weapons and tactics against Israel; they attempted psychological warfare operations; they launched an Unmanned Aerial Vehicle possibly carrying explosives; they sent about a dozen armed fighters through a tunnel from Gaza into Israel to conduct a major raid.

Freeman Mathis
& Gary, LLP
Attorneys at Law

n.   The IDF significantly intensified its aerial attacks against Hamas from July 8-17, hitting 50 targets on July 8, 120 targets on July 12, and approximately 95 targets on July 15; during the first 10 days of Operation Protective Edge, the Israeli Air Force struck nearly 2000 targets in the Gaza strip dropping hundreds of tons of ordnances.

o.   On July 17, 2014, Israel initiated a second phase of Operation Protective Edge, a large scale ground invasion of the Gaza strip; Israeli Prime Minister Netanyahu said the purpose of the operation was "to harm terror tunnels penetrating the Gaza strip into Israel;" the ground invasion involved thousands of IDF troops, including infantry, armored and engineering corps, artillery and intelligence forces, combined with aerial and naval support and accompanied by tanks and helicopter gunships; these forces engaged in extensive and prolonged combat with Hamas military forces and related militants; the most intense battle occurred in the Gaza City neighborhood of Shuja'iya, which Hamas was using for command and control, weapons storage, and tunneling operations; on July 19 and 20, 13 IDF soldiers were killed in combat, the highest single day death toll for the IDF since the war in Lebanon in 2006; much of Shuja'iya was destroyed and its inhabitants were forced to flee.

p.   By the time the war ended, 64 Israeli soldiers were killed and over 450 were wounded; the IDF found and neutralized 32 tunnels, 14 of which extended beyond Gaza and into Israel; the barrage of rocket and mortar attacks from Hamas and affiliated forces in Gaza continued throughout the 50 days of Operation Protective Edge; according to the United Nations Official Commission of Inquiry, Palestinian armed groups fired 4881 rockets and 1753 mortars toward Israel between July 7 and August 26; there was an estimated average of approximately 90 rockets and mortars fired at Israel per day; Hamas forces and related militants fired

3360 rockets alone at Israel; 2303 rockets hit Israel; 115 rockets hit populated areas; 6 civilians were killed in Israel; 16 Israelis were injured; direct damage to civilian property in Israel amounted to almost $25 million.

q. The IDF responded with a comprehensive, sustained, and intensive military campaign; according to the UN Inquiry, between July 7 and August 26, the IDF carried out more than 6000 air strikes in Gaza; the IDF fired 14,500 tank shells and approximately 35,000 artillery shells in Gaza.

r. The IDF targeted the military and governance infrastructure of Hamas; IDF aerial, naval, and ground forces struck 1678 rocket launching facilities, 977 command and control centers, 237 military administration facilities, 191 weapons storage and manufacturing facilities, and 144 training and military compounds.

s. The fighting took a severe toll in Gaza; according to the UN Inquiry, 2251 Palestinians were killed, 11,231 Palestinians were injured, 18,000 housing units were destroyed, and the number of Internally Displaced Persons in Gaza reached 500,000 at the height of the hostilities.

t. Reflecting the scale, intensity, and duration of the conflict, the vast amount of damage caused, and the large number of combatants and civilians killed and injured on both sides, Secretary of State Kerry repeatedly and publicly described these events as a "war;" on July 20 just before leaving to begin efforts to help negotiate a ceasefire, Secretary Kerry said of the situation in Gaza: "war is ugly, and bad things are going to happen;" in October 2014, Secretary Kerry said: "This is the third time in less than six years that we've seen war break out and Gaza left in rubble;" in a 2015 speech, Secretary Kerry again

Freeman Mathis
& Gary, LLP
Attorneys at Law

-8-
WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S MIDDLE EAST AFFAIRS EXPERT FRANK G. LOWENSTEIN

16294934.1   11775-83955

described "the turmoil of three wars with Gaza" and asked: "How is Israel advantaged…to have another war with Gaza?;"in his final speech on Middle East peace at the State Department, Secretary Kerry again described having witnessed first hand "the devastation of war in Gaza."

u.  The International Crisis Group described the conflict as "the most devastating war yet waged in Gaza;" press reports at the time and since, including from NBC, CNN, the New York Times, and the Washington Post, have regularly referred to the "war" between Israel and Hamas; as of March 2017, CNN and a number of other publications have again described the 2014 events as a "war."

v.  The International Criminal Court is conducting a preliminary examination of Israel for "war crimes" in connection with Operation Protection Edge.

w.  Based on these facts (a.-v.), Israel and Hamas fought a "war" in the summer of 2014; it cannot be considered to have been anything but a war under the plain, ordinary meaning of the term; that is why countless press reports and people around the world repeatedly used the term war;" it is the only word that truly conveys the extent and duration of the fighting the damage caused and the loss of life; this is reflected in the fact that the Secretary of State (who makes policy for the State Department) publicly referred to the Gaza conflict as a "war;" the term "war" was regularly used during my travels with Secretary Kerry.

x.  The sheer scale, duration, and intensity speaks for itself; after Operation Protective Edge was announced on July 7, there was a dramatic escalation of fighting on both sides which clearly distinguished the events from the normal exchange of hostilities between Israel and Hamas; thus, most people consider July 7 as the beginning of the war.

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S MIDDLE EAST AFFAIRS EXPERT FRANK G. LOWENSTEIN

16294934.1  11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

y.   In the first ten days of the war, Hamas fired over 1000 rockets at Israel, an average of over 140 per day, compared with some 250 total in the three weeks proceeding Operation Protective Edge; Hamas fighters attempted to infiltrate Israel twice by amphibious assault and through a tunnel attack; during this period alone, the Israeli Air Force attacked nearly 2000 targets in the Gaza strip and dropped hundreds of tons of ordnance.

z.   Intensified fighting continued for fifty days; this period of time was far longer than any terrorist attack; thousands of rockets and mortars were fired at Israel during the war; the international airport was closed; the rocket and mortar fire threatened 70% of the Israeli population; 1600 Israelis were injured; air raid sirens went off regularly all around the country.

aa.  The country was clearly at war; I experienced this firsthand during my visit to Israel with Secretary Kerry in July of 2014 when we met with Prime Minister Netanyahu in Tel Aviv.

bb.  Eighty thousand members of the IDF were mobilized, demonstrating that the nation was at war; aerial, naval, and ground forces struck over 4000 sites over Gaza with some 6000 air strikes alone during the war; there was a large-scale ground invasion involving air, sea, and armored elements and including thousands of IDF soldiers engaged in direct combat with Hamas forces deep into Gaza; 64 IDF soldiers were killed and over 450 were wounded; the extent of the ground attack was extraordinary with 14,500 tank shells and approximately 35,000 artillery shells fired in Gaza.

cc.  The scale of the devastation in Gaza is obviously commensurate with war; 2000 Palestinians died; 11,000 Palestinians were injured; 18,000 housing units were destroyed; the number of Internally Displaced

Freeman Mathis & Gary, LLP
Attorneys at Law

1   Persons was 28% of the population; there was billions of dollars of

2   damage.

3   dd. These events clearly constituted a war as that term is commonly used

4   and understood; in the 21st century it is commonly understood that wars

5   are often fought against terrorist organizations rather than traditional

6   state actors; al Qaeda's attack on the United States on 9/11 was widely

7   viewed as an act of war; President Bush told the nation on September

8   20, 2001 that enemies of freedom had committed an act of war against

9   our country; President Bush declared that we were at war with terror,

10  beginning with al Qaeda; the Authorization for Use of Military Force

11  ("AUMF") passed by Congress authorized the use of the United States

12  Armed Forces against those responsible for the attacks on September

13  11, 2001 and any "associated forces;" the AUMF satisfied the

14  requirements of the War Powers Act; the AUMF has provided a basis

15  for an ongoing war against al Qaeda, the Taliban, and related terrorist

16  groups in Afghanistan; nobody would ever question that the United

17  States has been fighting a war in Afghanistan; the AUMF has provided

18  a basis for ongoing operations against terrorist organizations around the

19  world; in December 2016 the Office of the President published a brief

20  concluding that the AUMF provides Congressional authorization for

21  the use of force against ISIS and other Islamic militant groups.

22  ee. Even under the outdated notion that a "war" requires two states or quasi-

23  state actors, Hamas would qualify at a minimum as a semi-sovereign;

24  Hamas is the unquestionable de facto authority in Gaza; Hamas did in

25  fact win a popular election for the Palestinian legislature in 2006;

26  since 2007, Hamas has exercised many of the traditional attributes of

27  sovereignty in Gaza, including collecting taxes, operating the borders,

28  employing tens of thousands of civil service employees, and keeping its

Freeman Mathis
& Gary, LLP
Attorneys at Law

-11-

own military and security forces.

ff. In the summer of 2014, there was a Government of National Consensus with President Abbas and Hamas that at least nominally unified the Palestinians in the West Bank and Gaza under a single Palestinian Authority; negotiations in Cairo on a ceasefire were officially conducted by a unified delegation of Hamas and Fatah.

gg. The conflict between Israel and Hamas in the summer of 2014 constituted a war regardless of whether one characterizes Hamas as a terrorist organization or a semi-sovereign.

3. Statements Relied Upon:

   a. None

4. Documents Relied Upon:

   a. See Exhibit A for a complete list of documents relied upon by Mr. Lowenstein, which are also set forth in The Lowenstein Reports.

B. **Opinion and Citation to Expert Witness Disclosure:**  The conflict between Hamas and Israel in the summer of 2014 constituted war-like actions by a military force as those terms are commonly used and understood in his field of expertise and study [ASIC Expert Witness Disclosure, p. 5; ASIC Rebuttal Expert Witness Disclosure, p. 6].

1. Relevance of Opinion: Mr. Lowenstein's opinion regarding the validity of the application of the war exclusions, as noted above, supports the reasonableness of the basis for the claim's denial and directly rebuts the opinions of Mr. Ross, Dr. Koh, and Mr. Levitt.

2. Bases for Opinion:  Mr. Lowenstein's opinion is based on his background as an attorney who previously worked for the U.S. Department of State as the Special Envoy for Israeli-Palestinian Negotiations.  As the Special Envoy, Mr. Lowenstein had responsibility for all Israeli and Palestinian issues, including policy formation, speech writing, and press guidance.  He met regularly with

16294934.1  11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

senior Israeli and Palestinian officials and traveled with then Secretary of State John Kerry on all trips related to Middle East peace.  Mr. Lowenstein was the Special Envoy for Israeli-Palestinian Negotiations during the 50-day conflict and traveled to Israel and Egypt during the summer of 2014 to facilitate the negotiation of a ceasefire between Palestinians and Israelis.  Mr. Lowenstein has received the Distinguished Service Award from Secretary John Kerry, the highest honor offered by the U.S. State Department.  Mr. Lowenstein's qualifications and experience are further detailed on pages 1-3 of his Expert Report.

 a. Please refer to the bases for opinion A, noted in section A(2)(a-gg).

 b. At a minimum, it is obvious that these events constituted warlike action by a military force; the IDF is the military force of the Israeli government; the purpose of Operation Protective Edge was expressly to hinder or defend against an expected attack; the events in Israel in the summer of 2014 were the result of warlike actions of this military force.

 c. The Qassam Brigades are by all accounts the military force of Hamas which is the de facto authority in Gaza; this is the reason that Israeli forces targeted over 900 command and control centers, over 200 military administration facilities, and over 140 training and military compounds; militants associated with Hamas and its affiliates constituted other agents, if not military personnel, of that authority.

3. Statements Relied Upon:

 a. None

4. Documents Relied Upon:

 a. See Exhibit A for a complete list of documents relied upon by Mr. Lowenstein, which are also set forth in The Lowenstein Reports.

C. **Opinion and Citation to Expert Witness Disclosure:**  The conflict between Hamas and Israel in the summer of 2014 involved the use of weapons of war  as  those terms

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S MIDDLE EAST AFFAIRS EXPERT FRANK G. LOWENSTEIN

16294934.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

are commonly used and understood in his field of expertise and study  [ASIC Expert Witness Disclosure, p. 5; ASIC Rebuttal Expert Witness Disclosure, p. 6].

1.  Relevance of Opinion: Mr. Lowenstein's opinion regarding the validity of the application of the war exclusions, as noted above, supports the reasonableness of the basis for the claim's denial and directly rebuts the opinions of Mr. Ross, Dr. Koh, and Mr. Levitt.

2.  Bases for Opinion:  Mr. Lowenstein's opinion is based on his background as an attorney who previously worked for the U.S. Department of State as the Special Envoy for Israeli-Palestinian Negotiations.  As the Special Envoy, Mr. Lowenstein had responsibility for all Israeli and Palestinian issues, including policy formation, speech writing, and press guidance.  He met regularly with senior Israeli and Palestinian officials and traveled with then Secretary of State John Kerry on all trips related to Middle East peace.  Mr. Lowenstein was the Special Envoy for Israeli-Palestinian Negotiations during the 50-day conflict and traveled to Israel and Egypt during the summer of 2014 to facilitate the negotiation of a ceasefire between Palestinians and Israelis.  Mr. Lowenstein has received the Distinguished Service Award from Secretary John Kerry, the highest honor offered by the U.S. State Department.  Mr. Lowenstein's qualifications and experience are further detailed on pages 1-3 of his Expert Report.

a.  Please refer to the bases for opinion A, noted in section A(2)(a-gg).

b.  Please refer to the bases for opinion B, noted in section B(2)(a-c).

c.  There can be absolutely no question that weapons of war were used extensively over a period of time; the IDF deployed much of its arsenal, including tanks, warships, and modern military aircraft; these things cannot be described as anything other than weapons of war; at a minimum, the situation in Israel was the result of the use of these weapons by the IDF.

Freeman Mathis & Gary, LLP
Attorneys at Law

-14-

d. The Qassam Brigades fired hundreds of sophisticated long-range rockets at Israel; the Qassam Brigades used anti-tank missiles; the rockets and the missiles are weapons of war under any common usage of the term; mortars and other smaller arms, which are also weapons of war were used by military forces in combat.

3. Statements Relied Upon:

a. None

4. Documents Relied Upon:

a. See Exhibit A for a complete list of documents relied upon by Mr. Lowenstein, which are also set forth in The Lowenstein Reports.

D. **Opinion and Citation to Expert Witness Disclosure:** The conflict between Hamas and Israel in the summer of 2014 was also an insurrection, rebellion, or usurpation of power by the Palestinians, as all those terms are commonly used and understood in his field of expertise and study [ASIC Expert Witness Disclosure, p. 5; ASIC Rebuttal Expert Witness Disclosure, p. 6].

1. Relevance of Opinion: Mr. Lowenstein's opinion regarding the validity of the application of the war exclusions, as noted above, supports the reasonableness of the basis for the claim's denial and directly rebuts the opinions of Mr. Ross, Dr. Koh, and Mr. Levitt.

2. Bases for Opinion: Mr. Lowenstein's opinion is based on his background as an attorney who previously worked for the U.S. Department of State as the Special Envoy for Israeli-Palestinian Negotiations. As the Special Envoy, Mr. Lowenstein had responsibility for all Israeli and Palestinian issues, including policy formation, speech writing, and press guidance. He met regularly with senior Israeli and Palestinian officials and traveled with then Secretary of State John Kerry on all trips related to Middle East peace. Mr. Lowenstein was the Special Envoy for Israeli-Palestinian Negotiations during the 50-day conflict and traveled to Israel and Egypt during the summer of 2014 to facilitate the

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S MIDDLE EAST AFFAIRS EXPERT FRANK G. LOWENSTEIN

16294934.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

negotiation of a ceasefire between Palestinians and Israelis.  Mr. Lowenstein has received the Distinguished Service Award from Secretary John Kerry, the highest honor offered by the U.S. State Department.  Mr. Lowenstein's qualifications and experience are further detailed on pages 1-3 of his Expert Report.

      a.  Please refer to the bases for opinion A, noted in section A(2)(a-gg).

      b.  Please refer to the bases for Opinion B, noted in section B(2)(a-c).

      c.  The actions of Hamas in the summer of 2014 could commonly be understood as an insurrection or rebellion against Israel.

      d.  Many consider Israel to be the occupying power in all of the Palestinian territories, including Gaza, despite the fact that they have withdrawn their forces and Hamas is the effective governing authority there.

      e.  The Hamas Charter calls for the liberation of historic Palestine from Israeli occupation.

      f.  The war in the summer of 2014 could readily be seen as a rebellion or insurrection by Hamas against Israel in furtherance of the Charter's objective.

   3.  Statements Relied Upon:

      a. None

   4.  Documents Relied Upon:

      a. See Exhibit A for a complete list of documents relied upon by Mr. Lowenstein, which are also set forth in The Lowenstein Reports.

E.  Opinion and Citation to Expert Witness Disclosure:  The fact that the United States has designated Hamas as a terrorist organization does not alter the fact that the hostilities in the summer of 2014 constituted a war and warlike actions and involved weapons of war [ASIC Expert Witness Disclosure, p. 6; ASIC Rebuttal Expert Witness Disclosure, pp. 6-7].

WRITTEN PROFFER OF EXPERT OPINION OF ASIC'S MIDDLE EAST AFFAIRS EXPERT FRANK G. LOWENSTEIN

16294934.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

1.  Relevance of Opinion: Mr. Lowenstein's opinion regarding the validity of the application of the war exclusions, as noted above, supports the reasonableness of the basis for the claim's denial and directly rebuts the opinions of Mr. Ross, Dr. Koh, and Mr. Levitt.

2.  Bases for Opinion:  Mr. Lowenstein's opinion is based on his background as an attorney who previously worked for the U.S. Department of State as the Special Envoy for Israeli-Palestinian Negotiations.  As the Special Envoy, Mr. Lowenstein had responsibility for all Israeli and Palestinian issues, including policy formation, speech writing, and press guidance.  He met regularly with senior Israeli and Palestinian officials and traveled with then Secretary of State John Kerry on all trips related to Middle East peace.  Mr. Lowenstein was the Special Envoy for Israeli-Palestinian Negotiations during the 50-day conflict and traveled to Israel and Egypt during the summer of 2014 to facilitate the negotiation of a ceasefire between Palestinians and Israelis.  Mr. Lowenstein has received the Distinguished Service Award from Secretary John Kerry, the highest honor offered by the U.S. State Department.  Mr. Lowenstein's qualifications and experience are further detailed on pages 1-3 of his Expert Report.

    a.  Please refer to the bases for opinion A, noted in section A(2)(a-gg).

    b.  Please refer to the bases for opinion B, noted in section B(2)(a-c).

    c.  Please refer to the bases for opinion C, noted in section C(2)(a-d).

    d.  Please refer to the bases for opinion D, noted in section D(2)(a-f).

3.  Statements Relied Upon:

    a. None

4.  Documents Relied Upon:

    a. See Exhibit A for a complete list of documents relied upon by Mr. Lowenstein, which are also set forth in The Lowenstein Reports.

F.  Opinion and Citation to Expert Witness Disclosure:  The Court's decision in this

Freeman Mathis
& Gary, LLP
Attorneys at Law

case would not impact the policy position of the United States Government or the United States' support for the peaceful resolution of the Israeli-Palestinian conflict [ASIC Rebuttal Expert Witness Disclosure, p. 7].

1.   Relevance of Opinion: Mr. Lowenstein's opinion is relevant to the validity of the application of the war exclusions, as noted above, and supports the reasonableness of the basis for the claim's denial.  His opinion directly rebuts the opinion of Mr. Ross.

2.   Bases for Opinion:  Mr. Lowenstein's opinion is based on his background as an attorney who previously worked for the U.S. Department of State as the Special Envoy for Israeli-Palestinian Negotiations.  As the Special Envoy, Mr. Lowenstein had responsibility for all Israeli and Palestinian issues, including policy formation, speech writing, and press guidance.  He met regularly with senior Israeli and Palestinian officials and traveled with then Secretary of State John Kerry on all trips related to Middle East peace.  Mr. Lowenstein was the Special Envoy for Israeli-Palestinian Negotiations during the 50-day conflict and traveled to Israel and Egypt during the summer of 2014 to facilitate the negotiation of a ceasefire between Palestinians and Israelis.  Mr. Lowenstein has received the Distinguished Service Award from Secretary John Kerry, the highest honor offered by the U.S. State Department.  Mr. Lowenstein's qualifications and experience are further detailed on pages 1-3 of his Expert Report.

a.   Please refer to the bases for opinion A, noted in section A(2)(a-gg).

b.   The Court's ruling in this case would not have to address the question of whether Hamas could be considered a sovereign or semi-sovereign in Gaza because the everyday meaning of "war" does not require that Hamas be found to be a sovereign or a quasi-sovereign; the Court's decision could well be based on a finding entirely unrelated to the standing of Hamas in Gaza.

Freeman Mathis
& Gary, LLP
Attorneys at Law

   c.  The extended conflict between Israel and Hamas in the summer of 2014 was a "war" under common usage and understanding of the term, even if Hamas was viewed as nothing more than a terrorist organization.

   d.  The conflict clearly involved warlike action by military force including defending against attacks by any authority using military personnel or other agents.

   e.  The conflict unquestionably involved the use of weapons of war, whether in time of peace or war.

   f.  Even if the Court's decision did address the question of Hamas' sovereignty, the only way that could even theoretically impact international perceptions of Hamas would be if that specific aspect of the ruling was publicized; in that very unlikely event, it is hard to see how reporting on a U.S. civil court ruling in an insurance case would have any effect on the standing of Hamas around the world.

   g.  No ruling by a U.S. court in a civil case would have any impact on the U.S. position with respect to Hamas; the U.S. policy is based on the interests of the U.S. and our closest allies; the Court's decision on an insurance claim would have no effect on that position or the longstanding view of U.S. policy makers toward Hamas.

   h.  U.S. administrations of both parties have long supported a peaceful resolution of the Israeli-Palestinian conflict; this position would not be influenced in any way by the Court's ruling in an insurance case.

3.  Statements Relied Upon:

   a. None

4.  Documents Relied Upon:

   a.  See Exhibit A for a complete list of documents relied upon by Mr. Lowenstein, which are also set forth in The Lowenstein Reports.

Mr. Lowenstein's curriculum vitae is submitted with this proffer as Exhibit "B."

1   Mr. Lowenstein's Expert Report is submitted with this proffer as Exhibit "C."

2   Mr. Lowenstein's Rebuttal Expert Report is submitted with this proffer as Exhibit "D."

3   ASIC's Expert Witness Disclosure is submitted with this proffer as Exhibit "E."

4   ASIC's Rebuttal Expert Witness Disclosure is submitted with this proffer as Exhibit "F."

5   Copies of non-electronic documents are being obtained.

6

7   DATED:  January 23, 2020          By:  /s/ Christopher W. Martin

8                                     MARC J. SHRAKE
                                      FREEMAN MATHIS & GARY, LLP
9
                                                    -and-
10
                                      CHRISTOPHER W. MARTIN *(Pro Hac Vice)*
11                                    MELINDA R. BURKE *(Pro Hac Vice)*
                                      WILLIAM E. McMICHAEL *(Pro Hac Vice)*
12                                    MARTIN, DISIERE, JEFFERSON
                                      & WISDOM LLP
13
                                      Attorneys for Defendant ATLANTIC
14                                    SPECIALTY INSURANCE COMPANY

15

16

17

18

19

20

21

22

23

24

25

26

27

28