KALPANA SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
AMANDA K. BONN (270891)
abonn@susmangodfrey.com
CATRIONA LAVERY (310546)
clavery@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150

JACOB W. BUCHDAHL (*pro hac vice*)
jbuchdahl@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel: (212) 336-8330
Fax: (212) 336-8340

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC and NORTHERN ENTERTAINMENT PRODUCTIONS LLC,<br><br>               Plaintiffs,<br><br>   v.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY,<br><br>               Defendant. | Case No.: 2:16-cv-4435-PA-MRW<br><br>**WRITTEN EXPERT PROFFER OF PLAINTIFFS' INSURANCE EXPERT TY SAGALOW**<br><br>The Honorable Percy Anderson<br>Dept. 9A<br><br>Trial Date: February 18, 2020 |

1

In accordance with this Court's Order dated January 10, 2020, Dkt. 186, Plaintiffs submit the following written proffer of the opinions of Mr. Ty R. Sagalow, who Plaintiffs have designated as an expert witness in their case-in-chief.

## I. MR. SAGALOW'S OPINIONS AND THEIR RELEVANCE

Mr. Sagalow's opinions, the bases therefore, and their relevance are set forth in detail in the attached chart below. In addition, and at a high level, Plaintiffs proffer that Mr. Sagalow's ultimate opinions are as follows:

1. Atlantic was acting against industry custom and practice when it applied the War Exclusion to the claim at issue,

2. Atlantic violated a number of industry customs and practices in its claims process and handling of the claim at issue.

*See* Report at 41; Rebuttal Report at 29-30; Plaintiffs' Expert Witness Disclosure at 1. These opinions are relevant to Plaintiffs' claim that Defendant breached the implied covenant of good faith and fair dealing ("bad faith claim"). Plaintiffs may establish bad faith by establishing either that (1) Defendant breached the obligation of good faith and fair dealing by unreasonably failing to pay benefits due under the insurance policy or (2) Defendant acted unreasonably by failing to conduct a proper investigation of Plaintiffs' claim. *See* Dkt. 166 at 5 (Plaintiffs' Memorandum of Contentions of Law and Fact).  Mr. Sagalow's testimony is relevant to determining whether Defendant unreasonably failed to pay policy benefits and whether Defendant failed to conduct a full, fair, prompt, and thorough investigation. *See id.* at 5-6.

3. Mr. Sagalow will also offer testimony that his qualifications provide a basis for his expert opinions in this case. Mr. Sagalow's qualifications are relevant because they will assist in establishing his credibility, expertise, and basis for his opinions with the jury.

4. If the Court permits Defendant to present Mr. Anthony Clark's testimony, Mr. Sagalow will to offer testimony to rebut Mr. Clark's opinions. Plaintiffs argue that Defendant should not be permitted to present the opinions of Mr.

Anthony Clark at trial because they are not relevant as a matter of law and fact.  Dkt. 208 at 6-7 (Joint Motion in Limine No. 2: Plaintiffs' Motion to Preclude Defendant from Contradicting its Denial-of-Coverage Letter) ("MIL 2").  Mr. Clark opined on the "plain and ordinary" meaning of the policy rather than its meaning according to industry custom and practice.  *Id.*  As such, Mr. Clark's opinion is no longer relevant.  *Id.*[1]

## II.    BASES FOR MR. SAGALOW'S OPINIONS

Mr. Sagalow bases all of his opinions on his educational background and more than 30 years of experience in the insurance industry as a chief underwriting officer, general counsel and chief innovation officer of large insurance companies, as well as extensive experience in well over 50 cases representing both policyholders and insurance carriers in insurance disputes.  *See* Report at 1-4, 44-47; *Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1178 (1999) (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience") (quoted by Fed. R. Evid. 702 Advisory Committee Notes).

In addition, Mr. Sagalow bases his opinions on the documents identified at pages 3-4 and 42-43 of the Report and the documents cited throughout the Rebuttal Report.  To assist the Court in performing its gatekeeper function under *Daubert*, Plaintiffs have identified the sources relied upon for specific opinions in the chart below. Dkt. 186; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-95 (1993); *see Kumho Tire Co.*, 526 U.S. at 148.

Plaintiffs have identified most pertinent sources for this Court's review in the chart below.  However, Mr. Sagalow's opinions are also the result of analysis based

---

[1] Mr. Sagalow's Rebuttal Report also addresses the opinions of Defendant's non-insurance experts Ingrid de Frankopan, John Quigley and Frank Lowenstein.  See Rebuttal Report at 19-29.  Plaintiffs understand that Defendant is no longer presenting these experts or their opinions at trial.  Accordingly, Plaintiffs will not present Mr. Sagalow's rebuttal to their reports.  If Defendant does in fact present its non-insurance experts, Mr. Sagalow will offer opinions in rebuttal.

on his experience in the insurance industry and review of the documents identified as a whole.

Mr. Sagalow may attend trial and reserves the right to amend his opinions in light of the evidence and arguments presented.   Please see the chart below for Mr. Sagalow's detailed opinions, the bases therefore, and their relevance.

| Opinion | Basis for opinion[2] | Why such testimony is relevant |
|---|---|---|
| **IV Summary of Facts** | | |
| To the best of my knowledge, the essential underlying facts are not in substantial disagreement between the parties: | | |
| 1- Universal Cable Productions ("UCP") and Northern Entertainment Productions ("NEP"), as indirect subsidiaries of the Named Insured, NBCUniversal Media LLC ("NBCUniversal"), are insureds under the Policy. (Hereafter, all three are referred to as the "Insured.") NBCUniversal is a leading media and entertainment company. | Plaintiffs' First Amended Complaint at paragraph 6 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 2- Since at least January 1, 2010, NBCUniversal has purchased a Motion Picture/Television Producers Portfolio insurance policy from Atlantic Specialty ("Atlantic"). These types of policies cover, among other things, "extra expenses" associated with a re-location of insured listed productions as a result of an "Imminent Peril" (as defined in the Policy). | Plaintiffs' First Amended Complaint at paragraph 17; PX WILLIAMS 1, ATL003073-3127, Policy MP00163-04 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |

---

[2] Unless otherwise specified, Mr. Sagalow relied on the documents cited in February, March and/or April of 2017.

| | | |
|---|---|---|
| 3- Since 2010, NBCUniversal has submitted individual productions to Atlantic for individual underwriting and approval. Premiums are substantial and vary from year to year. Losses could also be substantial in the aggregate. (In short, this type of policy was not for the faint of heart.) | PX WILLIAMS 1, ATL003073-3127, Policy MP00163-04 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 4- Policies generally ran from January 1 to January 1 with short, separate applications being submitted during the course of the year for each production to be insured. However, the Policy in this case was in effect for eighteen months, from January 1, 2014 to June 30, 2015. | PX WILLIAMS 1, ATL003073-3127, Policy MP00163-04 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 5- From January 1, 2010 to November 15, 2013, the Insured had paid Atlantic almost $5 million in premium with insured losses a little over $4.1 million.2 | PX 673, ATL000764-766, 11/15/13 email from W. Phillips to S. Weiss, A. Garber, and T. Peete, NBC 2013 Renewal Quote as of 11-13-2013 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| FOOTNOTE 2 $4,967,372 in premium and $4,157,651 in losses (see ATL000765) | PX 673, ATL000764-766, 11/15/13 email from W. Phillips to S. Weiss, A. Garber, and T. Peete, NBC 2013 Renewal Quote as of 11-13-2013 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue |

| | | and the basis for his opinion. |
|---|---|---|
| 6- For the policy in question, NBCUniversal paid Atlantic approximately another $2,367,381 in premium. | PX 669, ATL005268, Atlantic's profit / paid claims figures in connection with the Insured's policies for the years 2010 through 2015. | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 7- On or about December 3, 2013, the Insured first advised Atlantic of a new 6 episode (subsequently extended to 10 episodes) series called "DIG." Production would be, at least in part, in Israel. On December 11, 2013, the Insured, through its broker Aon/Albert G. Ruben Insurance Services, Inc. ("Aon"), submitted to Atlantic the official Application for insurance for DIG. | PX WILLIAMS 5, ATL000794-796, 12/3/13 email from W. Phillips to P. Williams re: Tentative 2014 Production – "Dig"; PX 674, ATL000405-406, 12/11/13 email from B. Milinovic to A. Garber, RE: "Dig" Season 1 Application/Declaration | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 8- In its submission, Aon discussed with Atlantic the higher risks associated with producing a television show in Israel indicating: "I have been advised that the mayor of Jerusalem and the local police has been contacted and are assisting in assuring the safety of the production company when they are working in Jerusalem."3 Aon further requested that despite this presumably higher | PX 674, ATL000405-406, 12/11/13 email from B. Milinovic to A. Garber, RE: "Dig" Season 1 Application/Declaration | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |

| | | |
|---|---|---|
| risk "we would like to avoid any deviation from our standard policy terms if possible."4 | | |
| FOOTNOTE 4 although the email did not specify which terms the broker feared might be changed. Given the environment in Israel and the reference to security measures, custom and practice would indicate Aon likely was concerned that Atlantic might insist on inclusion of a terrorism exclusion. (The "standard terms" did not include any such exclusion.) | PX 674, ATL000405-406, 12/11/13 email from B. Milinovic to A. Garber, RE: "Dig" Season 1 Application/Declaration;<br>Observations based on expert's extensive and specialized experience. | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 9- On December 12, 2013, Atlantic confirmed coverage for DIG without any "deviation" from standard policy terms. DIG would be covered under the then current 2013 policy but also "rolled over" to the soon-to-incept January 1, 2014 renewal policy. Thereafter, on January 13, 2014, the Insured declared DIG as an Insured Production under the Policy, and Atlantic confirmed coverage under the 2014 Policy on January 14, 2014.5 | PX 675, ATL000438, 1/13/14 email from B. Milinovic to A. Garber, RE: "Dig" S1 - 2014 Application/Declaration;<br>PX 701, AONNBCU0001516-519, 12/13/13 email from A. Garber to R. Richmond, RE: "Dig" potential Morocco shoot;<br>PX PHILLIPS 424, AONNBCU0001747, 12/13/13 email from A. Garber to W. Phillips RE: "Dig" S1 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 10- On or about June 1, 2014, filming of the DIG pilot episode commenced in Israel. Production for the pilot was completed on June 26, 2014, and production of the series' subsequent episodes was scheduled to begin on July 20, 2014.6 | First Amended Complaint at paragraph 21 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue |

| | | |
|---|---|---|
| | | and the basis for his opinion. |
| 11- However, production could be not begin as scheduled because of safety concerns due to rocket fire by the terrorist organization Hamas into Israel.7 To elaborate: | First Amended Complaint at paragraph 24-25 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| FOOTNOTE 7 Hamas has a long history of firing rockets into Israel, a history that Atlantic underwriters were no doubt aware of, given that Hamas is believed to have fired more than 11,000 rockets at Israel between 2000 and 2011 and 1,697 rockets in 2012. The periods in between rockets being fired is seen as a temporary interlude to rebuild as Hamas leader Ismail Haniyeh said on January 26, 2016: "There are those who think the calm is a time of rest … [b]ut this is a continuation of the struggle. Al-Aqsa Martyrs Brigades are working and preparing for Palestine." | PX 678, Background & Overview of Hamas, Jewish Virtual Library | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 12- According to the National Counterterrorism Center, Hamas has conducted many anti- Israel attacks in Israel since the 1990's. The attacks have included large-scale bombings against Israeli civilian targets, small-arms attacks, | Report of Matthew Levitt, pp. 7, 9, 12, and 19; Statement Of Genuine Disputes Of Material Facts In Support Of Opposition To Plaintiffs' Motion For Partial Summary Judgment, Dkt. 74-1 (reviewed January 2020). | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue |

| improvised roadside explosives, suicide bombings, and rocket attacks.8 | | and the basis for his opinion. |
|---|---|---|
| 13- The United States, Israel, European Union, Canada and Japan categorized Hamas at all relevant times as a terrorist organization.9 | PX 679, U.S. Department of State, Foreign Terrorist Organizations; PX 680, Australian National Security - Terrorist Organizations; PX 681, Government of Canada, Listed Terrorist Entities – Currently listed entities; PX 682, The Council of The European Union, COUNCIL DECISION (CFSP) 2017/154 of 27 January 2017 updating the list of persons, groups and entities subject to Articles 2, 3 and 4 of Common Position 2001/931/CFSP on the application of specific measures to combat terrorism, and repealing Decision (CFSP) 2016/1136; PX 683, Israel Ministry of Justice, List of Terrorist Organizations and Individuals; PX 684, Ministry of Foreign Affairs of Japan, Implementation of the Measures including the Freezing of Assets against Terrorists and the Like | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| The Hamas charter or manifesto advocates for the destruction of the state of Israel and calls for the "raising of the banner of Allah over every inch of Palestine."10 | PX 685, Q&A: What is Hamas, Bryony Jones, CNN | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue |

|  |  | and the basis for his opinion. |
|---|---|---|
| 14- The history of the region is replete with temporary respites from hostilities, some lasting longer than others, but inevitably Hamas would resume their terrorist activity.11 | First Amended Complaint at paragraph 22; PX 686, The National Counterterrorism Center, Hamas | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 15- One such re-emergence of Hamas terrorist activity occurred in June/July 2014, exactly when DIG was being produced. According to multiple State Department Daily Press Briefings, the essential facts are as follows: On or around June 12, 2014, three Israeli teenagers were kidnapped "with many signs that point to Hamas involvement."12 | First Amended Complaint at paragraph 23 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| On or about June 30, 2014, "the bodies of the three kidnapped teenagers" were found and there were reports "indicat[ing] that Hamas was involved.13 | First Amended Complaint at paragraph 23 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| After allegations were made that Hamas was responsible for the kidnappings, Hamas began firing rockets into Israel.14 | First Amended Complaint at paragraph 23; see Levitt Report, pp. 20-21; Statement Of Genuine Disputes Of Material Facts In Support Of | Aids the jury in understanding the facts that Mr. Sagalow |

| | Opposition To Plaintiffs' Motion For Partial Summary Judgment, Dkt. 74-1 (reviewed January 2020). | believed were pertinent to the bad faith issue and the basis for his opinion. |
|---|---|---|
| Shortly thereafter, Israel began to take affirmative action to protect its interests launching on July 8, 2014 "Operation Protective Edge" with a goal to eliminate the terror capabilities of Hamas.15 | Levitt Report, pp. 20-21; Statement Of Genuine Disputes Of Material Facts In Support Of Opposition To Plaintiffs' Motion For Partial Summary Judgment, Dkt. 74-1 (reviewed January 2020). | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 16- On July 10, 2014, Stephen Smith, Head of Security, Europe and International Security & Crisis Management at NBCUniversal sent an internal email indicating that: This is to advise you that the security environment in Israel currently prohibits NBCU Security from being able to guarantee the safety and security of our employees, production partners and associated crew and talent…We have looked at the magnitude and range, of current rocket attacks (which appear to target locations to be used in forthcoming filming)... and the potential for a further increase in hostilities including … acts of terrorism within Israel… [concluding] …Personnel based in country in relation to this | PX 703, ATL000295-299, 7/15/14 email from P. Johnson to D. Gutterman, RE: NBCU's "DIG" Season 1 - Imminent Peril claim notification | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |

| | | |
|---|---|---|
| production should make arrangements to leave.16 | | |
| On Friday, July 11, 2014,17 Andrea Garber, Sr. Director, Risk Management, of NBCUniversal, called Peter Williams, President of OneBeacon Entertainment (an Atlantic related entity) advising him of the situation and the decision by the Insured to postpone for one week the production of episodes 2/3 of DIG which was scheduled to begin on July 20, 2014. The estimated cost of the one week delay in production was up to approximately $350,000.18 | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter"); First Amended Complaint at paragraph 25 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| FOOTNOTE 17 The First Denial Letter states that this occurred on Thursday, July 10th. | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 17- On Tuesday, July 15, 2014, Aon submitted an official claim notice to Atlantic indicating a Date of Loss of 7/11/14 (hereafter the "Claim"). 19 | PX GUTTERMAN 21, ATL000001-000161, File Note History ("Claim File") | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |

| | | |
|---|---|---|
| The Claim was assigned to Daniel Gutterman (Senior Entertainment Claims Investigator) and Pamela A. Johnson (Entertainment Claims Manager) the same day. | PX JOHNSON 3, ATL000304-309, 7/15/14 E-mail from Pamela Johnson to Daniel Gutterman | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| Mr. Gutterman immediately flagged the "exclusions for [Civil Unrest]" prompting Ms. Johnson to comment approximately 40 minutes later: "It looks like we need to have a lot of further discussion about this."20 | PX 703, ATL000295-299, 7/15/14 email from P. Johnson to D. Gutterman, RE: NBCU's "DIG" Season 1 - Imminent Peril claim notification | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 18- That evening, in response to an email from Ms. Johnson, Mr. Williams asked: "Why is it not a covered claim they have immanent (sic) peril. Unless you are going to invoke the war exclusion."21 | PX JOHNSON 3, ATL000304-309, 7/15/14 E-mail from Pamela Johnson to Daniel Gutterman | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| Ms. Johnson responded: "I suggest we have a call about this tomorrow. Danny and I had a conversation with Susan [Aon] and Andrea [NBC] about what the production's plans were, but we didn't make any representation about whether there was coverage but we also did not | PX JOHNSON 3, ATL000304-309, 7/15/14 E-mail from Pamela Johnson to Daniel Gutterman; also see Mr. Gutterman Deposition at p.261, lines 13-25 – p.262, lines 1-2 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue |

| | | |
|---|---|---|
| alert them that this might not be a covered claim. If this is going to be an issue, we need to alert them right away."22 | | and the basis for his opinion. |
| 19- Mr. Gutterman sent an email to Mr. Williams on July 15, 2014 in the late afternoon, asking if Mr. Williams had suggested a "push" (e.g., delay) for longer than one week, because a "ground war" may still occur.23 | PX JOHNSON 3, ATL000304-309, 7/15/14 E-mail from Pamela Johnson to Daniel Gutterman; See Mr. Gutterman Deposition at p. 238, lines 9-25 – p.239, lines 1-5 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| Mr. Gutterman wrote: "Any chance you happened to suggest that they push for more than just the week, since the crew needs to be advised at least one week in advance for a push and since a ground war still might occur. | PX JOHNSON 3, ATL000304-309, 7/15/14 E-mail from Pamela Johnson to Daniel Gutterman; See Mr. Gutterman Deposition at p. 238, lines 9-25 – p.239, lines 1-5 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| This apparently set up the artificial distinction that the one week push was covered (because it was before the rejection of the cease fire), but the relocation was not (because it was after). | PX JOHNSON 3, ATL000304-309, 7/15/14 E-mail from Pamela Johnson to Daniel Gutterman; See Mr. Gutterman Deposition at p. 238, lines 9-25 – p.239, lines 1-5 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 20- The following day, on July 16, 2014: a. Ms. Johnson emailed the policy's war exclusion to Mr. Williams and Mr. | PX 687, ATL001555, 7/16/14 email from P. Johnson to T. Gooley, Act of War exclusion - Are you available for a short call? | Aids the jury in understanding the facts that Mr. Sagalow |

| | | |
|---|---|---|
| Gutterman. Later that day she emailed Theresa Gooley (her supervisor) asking whether other business units inside Atlantic had treated the "Israeli/Hamas conflict" as triggering an exclusion for "warlike actions by a military force," indicating "I want to make sure OBE takes a consistent position.25 | | believed were pertinent to the bad faith issue and the basis for his opinion. |
| FOOTNOTE 25 I note that I never saw a response from Ms. Gooley to Ms. Johnson's inquiry. | PX 687, ATL001555, 7/16/14 email from P. Johnson to T. Gooley, Act of War exclusion - Are you available for a short call? | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| b. There are four parts to the war exclusion. It provides the Policy does not insure against loss or damage caused directly or indirectly by: i. "War, including undeclared or civil war; or ii. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or iii. Insurrection, rebellion, revolution, usurped power, or | PX WILLIAMS 1, ATL003073-3127, Policy MP00163-04 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |

| | | |
|---|---|---|
| action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. iv. Any weapon of war including atomic fission or radioactive force, whether in time of peace or war." (Hereafter the foregoing is referred to as "the War Exclusion" and the subparts are individually referred to as prong 1, prong 2, prong 3, and prong 4 respectively.) | | |
| c. Mr. Gutterman researched the conflict seemingly by conducting various Google searches.26 | PX 525, ATL001560-1561, 7/16/14 E-mail chain among Daniel Gutterman and Pamela Johnson; See Mr. Gutterman Deposition at p. 206, line 4, to p. 207, line 21. | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| FOOTNOTE 26 Note: I have no way of knowing whether Mr. Gutterman used Google or another search engine. In this report, I use the word "Google" to include any internet search engine tool he may have used. | PX 525, ATL001560-1561, 7/16/14 E-mail chain among Daniel Gutterman and Pamela Johnson; See Mr. Gutterman Deposition at p. 206, line 4, to p. 207, line 21. | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |

| | | |
|---|---|---|
| He remarked in the claim file: "3) Facts War in Israel with Hamas…. 7) Action Plan a) advise the u/w of the new claim b) Determine if war is covered.27" | PX GUTTERMAN 21, ATL000001-000161, File Note History ("Claim File") | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| FOOTNOTE 27 I note that the claim file notes seem to jump from 7/16/14 to 7/28/17 with no notes in the file for the various conversations that took place in between these dates. | PX GUTTERMAN 21, ATL000001-000161, File Note History ("Claim File") | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| He then contacted Wanda Phillips, the underwriter who decided to provide insurance for the DIG production in Israel. However, he did not ask Ms. Phillips any of the following questions: (i) whether in deciding to provide coverage for DIG she took into consideration the violent activities of the region or the likelihood of an increase in terrorism from Hamas; (ii) why she did not add a terrorism exclusion to the coverage; or even (iii) whether she had considered Hamas launching rockets into | PX GUTTERMAN 29, ATL001547-1550, 7/16/14 email from W. Phillips to D. Gutterman cc R. McFadden re: NBCU's "Dig" | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |

| | | |
|---|---|---|
| Israel to be an act of terrorism or an act of war. In other words, he did not ask a single question of the underwriter about the underwriter's intent as to the meaning of the terms "war" or "warlike" when she agreed to add DIG as an insured production. | | |
| Instead, Mr. Gutterman merely asked her to confirm that "Dig was declared" (i.e. it was an insured production).28 | PX GUTTERMAN 29, ATL001547-1550, 7/16/14 email from W. Phillips to D. Gutterman cc R. McFadden re: NBCU's "Dig" | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| She responded: "The production Dig was declared, and we approved the filming in Israel with terms" later specifying that "we approved filming in East Jerusalem & Tel Aviv. NBC Security team is to remain involved and continue working with production. We required … coordination with the local police.29" | PX GUTTERMAN 29, ATL001547-1550, 7/16/14 email from W. Phillips to D. Gutterman cc R. McFadden re: NBCU's "Dig" | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| Despite the obvious conclusion that Ms. Phillips' remarks meant that underwriting had evaluated the security issues in Israel and went ahead with coverage anyway, subjecting it to certain | PX GUTTERMAN 29, ATL001547-1550, 7/16/14 email from W. Phillips to D. Gutterman cc R. McFadden re: NBCU's "Dig" | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue |

| | | |
|---|---|---|
| security risk management procedures, neither Mr. Gutterman nor anyone else in the claims department ever asked whether underwriting had accepted and priced for the risk of an enhanced Israeli/Hamas conflict. Indeed, I found no evidence that Mr. Gutterman, or anyone in the claims department, ever spoke to Ms. Phillips again on this claim. | | and the basis for his opinion. |
| 21- On July 17, 2014:<br>    d. Ms. Johnson conducted her own research, on Westlaw, finding a case where the court did not apply that policy's war exclusion to a 1975/76 property loss claim in Lebanon for damages to a Holiday Inn hotel that were sustained during extended fighting between various groups for control over an area in Beirut. In the decision, the court reiterates the policy interpretation rule: "Exclusions [in insurance policy] will be given the interpretation which is most favorable to the insured."30 | PX 688, ATL001636-686, Holiday Inns Inc. v. Aetna Insurance Company et al (S.D.N.Y.); PX 526, ATL001635, 7/17/14 Westlaw Cover E-mail to Pamela Johnson re War Exclusion | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| FOOTNOTE 30 Holiday Inns Inc. vs Aetna Insurance Company et al (ATL001636…) also stating on page 40 "What it comes down to is this. 'From the welter of conflicting evidence, | PX 688, ATL001636-686, Holiday Inns Inc. v. Aetna Insurance Company et al (S.D.N.Y.) | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent |

| | | |
|---|---|---|
| reasonable men might draw any of a number of conflicting conclusions" on whether the damage to the Hilton was caused by those acting with the crucial element that trigger the exclusion. "But I am not required to choose among these possible interpretations….it is Aetna's burden to prove the crucial element … Aetna has not sustained that burden. Its defense based on the exclusion…fails." | | to the bad faith issue and the basis for his opinion. |
| e. Ms. Johnson and Mr. Gutterman called Susan Weiss of Aon and Andrea Garber of NBC on July 17 at 4 p.m. pacific. | PX 713, ATL000310-311, 7/17/14 email from S. Weiss to D. Gutterman and P. Johnson, FW: Claim Acknowledgement for NBCU's "DIG" Season 1 - Imminent Peril claim notification; PX GUTTERMAN 28, ATL003211, 7/3/16 email draft to P. Johnson re: 0AB097918 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| According to an email from Mr. Gutterman to Ms. Johnson, Mr. Gutterman had plans to put into CWS notes (CWS is Atlantic's claims management system) the following summary of the conversation31: | PX GUTTERMAN 28, ATL003211, 7/3/16 email draft to P. Johnson re: 0AB097918 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| FOOTNOTE 31 I note that this document has a "sent" date of "7/3/2016" which seems unlikely, and it appears this email was a draft of an email Mr. Gutterman prepared. Based on | PX GUTTERMAN 28, ATL003211, 7/3/16 email draft to P. Johnson re: 0AB097918 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent |

| | | |
|---|---|---|
| scheduling emails, it appears this call happened on 7/17/14 at around 4 pm. | | to the bad faith issue and the basis for his opinion. |
| i. The Insured advised Atlantic that "the situation in Israel has not improved;32" and that accordingly, | PX GUTTERMAN 28, ATL003211, 7/3/16 email draft to P. Johnson re: 0AB097918 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| FOOTNOTE 32 Earlier, on July 16th, the U.S. State Department stated "right now the potential we're looking at is … an even greater escalation of violence" in and around Israel. | PX 500, UCP000279-291, 7/16/14 U.S. Dept. of State Daily Press Briefing; See also PX 690, The White House, Remarks by the President on Foreign Policy, July 16, 2014; First Amended Complaint at paragraph 27 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| ii. The Insured "has decided to move the production." | PX GUTTERMAN 28, ATL003211, 7/3/16 email draft to P. Johnson re: 0AB097918 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| iii. Ms. Johnson advised the Insured that the war exclusion will apply here for the move out of Israel;33 but, | PX GUTTERMAN 28, ATL003211, 7/3/16 email draft to P. Johnson re: 0AB097918 | Aids the jury in understanding the facts that Mr. Sagalow |

|  |  | believed were pertinent to the bad faith issue and the basis for his opinion. |
|---|---|---|
| FOOTNOTE 33 While the email uses the phrase "potentially will apply" and the First Denial Letter uses the phrase "was seriously considering," deposition testimony of Ms. Gooley indicates that it was in this evening conversation of July 17th that Atlantic advised the Insured that they were not covering the relocation extra expenses due to the "war" exclusion. | See, e.g. Ms. Gooley Deposition at p. 169, lines 5-8, p. 170, lines 14-25, and p. 184, lines 17-25 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| iv. the one week push "appears to be covered as it occurred before Hamas's rejection of the cease fire and Israel's then stating that they will be going forward with all force." | PX GUTTERMAN 28, ATL003211, 7/3/16 email draft to P. Johnson re: 0AB097918 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| v. The Insured responded that "they do not believe Hamas can be considered a government and are considered by the US to be a terrorist organization.34" | PX GUTTERMAN 28, ATL003211, 7/3/16 email draft to P. Johnson re: 0AB097918 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |

| | | |
|---|---|---|
| FOOTNOTE 34 Mr. Gutterman's email confirms what was stated in the First Denial Letter, that the Insured "protested, asserting that the situation in Israel did not constitute a war because Hamas was a terrorist organization, not a governmental authority…." | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 22- On July 18, 2014: <br>     f. Ms. Gooley advised Sean Duffy, SVP & Chief Claims Officer for OneBeacon Entertainment (an Atlantic related entity), of the Claim and that "the War Exclusion may act to limit or preclude coverage. The applicable limits are $10M. We are looking at it more closely including research on the exclusion and its application.35" | PX GOOLEY 32, ATL001800-1801, 7/18/14 email from S. Duffy to T. Gooley re: Privileged and Confidential | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
|     However, there is no evidence in the claim file to indicate that Ms. Gooley provided any direction or oversight to either Ms. Johnson or Mr. Gutterman as to how the investigation or analysis of the Claim should be conducted, including whether outside experts should be consulted as to Hamas or the situation in Israel. | PX GUTTERMAN 21, ATL000001-000161, File Note History ("Claim File") | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |

| | | |
|---|---|---|
| g. Ms. Gooley hired outside counsel, Gene A. Weisberg, to review coverage.36 | 36 See Ms. Gooley Deposition at p.171, lines 21-23 and p.172, lines 15-19 | Plaintiffs intend only to offer evidence and testimony establishing that Defendant did not obtain a coverage opinion prior to making the decision to reject Plaintiffs' claim. This is relevant to bad faith. Defendant may not mention the subsequent coverage opinion. See Dkt. 96. In the event Defendants are permitted to reference the outside coverage opinion, Plaintiffs will present rebuttal testimony. |
| h. Mr. Gutterman continued his research, apparently by continuing to do Google searches.37 | PX 691, ATL000294, 7/18/14 email to/from D. Gutterman;<br>See Mr. Gutterman Deposition at p. 206, line 4, to p. 207, line 21. | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |

| | | |
|---|---|---|
| 23- On July 21, 2014, Atlantic received a coverage opinion letter from Leon Gladstone (one of Mr. Weisberg's law partners), after the Insured already had been told that the War Exclusion applied and the Claim denied.38 | See, e.g. Ms. Gooley Deposition at p. 169, lines 5-8, p. 170, lines 14-25, p. 184, lines 17-25; | Plaintiffs intend only to offer evidence and testimony establishing that Defendant did not obtain a coverage opinion prior to making the decision to reject Plaintiffs' claim. This is relevant to bad faith.  Defendant may not mention the subsequent coverage opinion.  See Dkt. 96. In the event Defendants are permitted to reference the outside coverage opinion, Plaintiffs will present rebuttal testimony. |
| On July 22, 2014, at 1:18 pm, Ms. Gooley advised Mr. Duffy that: "we believe the policy exclusion for war operates to significantly limit and/or preclude any available coverage" indicating that "Pamela is having a discussion with NBC this evening about the claim.39 | PX CROSBY 11, ATL001832-1834, 7/23/14 E-mail from Peter Williams to Dennis Crosby | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |

| | | |
|---|---|---|
| 24- The next day, July 23rd, Mr. Duffy responded simply "I agree with the analysis" and forwarded Ms. Gooley's email to Dennis Crosby, Executive Vice President at OneBeacon Entertainment (an Atlantic related entity) stating "this seems correct to me. Will update you if warranted." Mr. Crosby then forwarded the email to Mr. Williams. Mr. Williams, possibly believing that the claim was just for the one week delay which would not require a payout by Atlantic in all events because of the policy deductible, responds in a practical fashion: "I am aware and think the decision is justified. Either way, the claim would fall within NBC's SIR [Self Insured Retention] but it is important we adhere to policy terms and conditions.40" | PX CROSBY 11, ATL001832-1834, 7/23/14 E-mail from Peter Williams to Dennis Crosby | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 25- Meanwhile, Mr. Gutterman was still doing Google searches. | PX 719, ATL001828, 7/23/14 email from D. Gutterman to P. Johnson, "Some interesting articles…";<br>See Mr. Gutterman Deposition at p. 206, line 4, to p. 207, line 21. | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 26- On July 28, 2014, Ms. Johnson sent the First Denial Letter on Atlantic's behalf stating that the "decision is based on information | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, | Aids the jury in understanding the facts that Mr. Sagalow |

| | | |
|---|---|---|
| gathered about the situation in Israel, case law, treatises and consultation with counsel." In denying the Claim, Ms. Johnson cited prongs 1 and 2 of the War Exclusion and an endorsement to the policy involving the Terrorism Risk Insurance Act of 2002 ("TRIA"). Ms. Johnson's central theory seemed to be that once Hamas refused to agree to the cessation of hostilities on July 15th and "Israeli President Netanyahu gave the military authorization to use 'full force,' the conflict rose to the level of a "war" or "warlike action by a military force.41" Ms. Johnson further argued that "Hamas has become the government of the Gaza Strip. Hamas has a military wing … that has carried out the attacks on Israel that led to NBCU's claim." | NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") | believed were pertinent to the bad faith issue and the basis for his opinion. |
| FOOTNOTE 41 This theory, now I believe abandoned by Atlantic, permitted it to argue that the one week push was covered, but the later relocation was not. | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 27- With respect to terrorism, Ms. Johnson argued that the only coverage for terrorism was for a Certified Act of Terrorism under TRIA | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, | Aids the jury in understanding the facts that Mr. Sagalow |

| | | |
|---|---|---|
| and since for that coverage to be triggered the terrorist act "must be part of an effort to coerce or influence the United States population or government" and "the U.S. Secretary of the Treasury must certify the event as acts of terrorism," there was no coverage. | NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") | believed were pertinent to the bad faith issue and the basis for his opinion. |
| 28- With respect to prong 1 of the War Exclusion, Ms. Johnson argued that Gaza, while not a recognized nation by most of the world, did possess "some indicia of sovereignty" and was therefore capable of waging war under some treatises' definitions of the word. Johnson deemed irrelevant the fact that the "rockets are being fired into civilian areas, which may violate established norms of warfare and armed conflict under international law" because, she argued, "this is not a situation where a single civilian, or group of civilians, is the target." No citation to a Middle East expert or any other expert was given for this "observation." | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 29- Finally, with respect to prong 2 of the War Exclusion42 ("warlike action by a military force"), Ms. Johnson argued: "Hamas is a military force of a government, the government of Gaza. Even though many, including Israel and the United States, consider Hamas to be a | PX GUTTERMAN 18, ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue |

| | | |
|---|---|---|
| terrorist group, it is the government of a territory that is involved in the conflict" and therefore, she contended, this part of the exclusion applies. | | and the basis for his opinion. |
| FOOTNOTE 42 The letter refers to this as "Subparagraph 2" of the exclusion. | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 30- On August 13, 2014, Lucia Coyoca, counsel for the Insured, responded to the First Denial Letter by pointing out the lack of a terrorist act as defined under TRIA did not mean there was a terrorism exclusion in the policy, and without such an exclusion terrorist acts were covered. | PX GUTTERMAN 19, ATL000087-93, 8/13/14 Letter from Lucia Cocoya to Pamela Johnson | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 31- With respect to prong 1 of the War Exclusion, Ms. Coyoca argued that as Hamas is a terrorist organization, its activities could not, by definition, be "acts of war" regardless of whether Hamas possesses "some attributes of sovereignty." Ms. Coyoca pointed out that Atlantic's position directly contradicted established foreign policy of the United States | PX GUTTERMAN 19, ATL000087-93, 8/13/14 Letter from Lucia Cocoya to Pamela Johnson | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |

| | | |
|---|---|---|
| government and most other western nations in the world. | | |
| 32- With respect to prong 2 ("warlike action by a military force"), Ms. Coyoca argued that since Hamas is, according to the United States, Canada and the European nations, a terrorist organization and not a government it could not be a "military force of … the government of Gaza" as Atlantic contended. | PX GUTTERMAN 19, ATL000087-93, 8/13/14 Letter from Lucia Cocoya to Pamela Johnson | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 33- On September 19, 2014, Ms. Johnson responded. She conceded that the TRIA endorsement did not apply and acknowledged that there was no terrorism exclusion in the policy, thus withdrawing that argument. But, she continued to argue that prongs 1 and 2 of the War Exclusion applied, contending in part, that "a government that is deemed to be a terrorist organization [can] have sufficient sovereignty to fall within the war exclusion" citing the governments of North Korea and Saddam Hussein's Iraq. (Ms. Johnson apparently did not recognize the distinction used by the United States government between a terrorist organization and a State Sponsor of Terrorism. Both Saddam Hussain's Iraq and North Korea fall into the latter category, not the former.) Ms. Johnson also argued that, in | PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |

| | | |
|---|---|---|
| effect, even if Hamas is not a "sovereign," Israel is and that was sufficient to trigger the exclusion. | | |
| There is nothing in the claim file to indicate that before responding, Atlantic reconsidered or reevaluated its position to determine if there were any other errors in its initial analysis, aside from the erroneous position asserted as to the TRIA endorsement. Also, there is nothing in the claim file, after receipt of Ms. Coyoca's letter, to indicate Atlantic considered or analyzed the import of Atlantic ascribing a quasisovereignty status to Hamas that was contrary to the U.S. government's designation of Hamas as a terrorist organization. | PX GUTTERMAN 21, ATL000001-000161, File Note History ("Claim File") | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| 34- On or about June 20, 2016, the Insureds filed a lawsuit against Atlantic to resolve the dispute. | PX GUTTERMAN 21, ATL000001-000161, File Note History ("Claim File") at ATL000010 | Aids the jury in understanding the facts that Mr. Sagalow believed were pertinent to the bad faith issue and the basis for his opinion. |
| **V Questions Presented and Summary of Opinions** | | |
| I have been asked by counsel for the Insured to provide an expert opinion with respect to the custom and practice in the insurance industry | Personal knowledge of scope of assignment. | Plaintiffs only intend to offer testimony regarding prongs 1-2 of |

| | | |
|---|---|---|
| and the common understanding of certain provisions in an insurance policy. More specifically, I have been retained to offer an expert opinion on prongs 1- 4 of the War Exclusion, and the application of industry custom and practice in considering whether the War Exclusion applies to the loss suffered by the Insured with respect to the DIG production in Israel in July of 2014. | | the War Exclusion. *See* Plaintiffs' MIL 2, Dkt. 209. However, if Defendant is permitted to present evidence or argument regarding prongs 3-4, Plaintiffs will present Mr. Sagalow's opinions on all four prongs. |
| In addition, I have been asked to provide an expert opinion as to the handling of the Claim by Atlantic specifically with respect to the obligation incumbent on all insurers to conduct a full, fair, and prompt investigation of claims weighing the interests of the insured and the insurer in an evenhanded manner. | Personal knowledge of scope of assignment. | Relevant to Plaintiffs' bad faith claim. |
| For the reasons set forth below, it is my expert opinion that it would be contrary to custom and practice of the insurance industry to apply the War Exclusion to the Claim at issue, and that the manner in which Atlantic handled the Insured's claim violated industry custom and practice in claims handling in many respects. | Observations based on expert's extensive and specialized experience and review of the documents cited at pages 3-4 and 42-43 of the Report. | Relevant to Plaintiffs' bad faith claim. |
| More specifically, my expert opinions, based on industry custom and practice, are: | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. |

| | | |
|---|---|---|
| 36. Custom and practice in the insurance industry has resulted in a number of standards when analyzing provisions of insurance policies, and that among these are: | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. |
| a. The meaning and application of insurance provisions at the time of a claim must be consistent with the course of dealings between the insured and the carrier's underwriter who underwrote the particular policy; | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. |
| b. Exclusions and restrictions on coverage are to be interpreted narrowly and if there are two reasonable interpretations of a restrictive provision, the one favoring coverage controls; | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. |
| c. Insurance policies are to be viewed "as a whole" and provisions in a policy should be examined in connection with other related provisions; | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. |
| d. Coverage grants are to be construed broadly and if there are two reasonable interpretations of a coverage grant, the one favoring coverage controls; and, | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. |
| e. Insurance policy provisions should be viewed consistent with the reasonable expectations of a reasonable insured | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. |

| | | |
|---|---|---|
| placed in similar or the same circumstances. | | |
| 37. In circumstances where an underwriter specifically was aware of, underwrote and priced a risk where there was a historical frequency of activities involving a known terrorist organization, acknowledged those potential activities, and agreed to extend coverage without requiring a terrorist exclusion, loss arising from an otherwise covered peril that results from the activities of the known terrorist organization would be covered. | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. |
| 38. In such circumstances, coverage would not be excluded by application of a "war" or "war-like" exclusion. | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. |
| 39. Further, war exclusions do not apply to acts of terrorism even if such acts were in alleged "response" to an act by a sovereign nation, since to do so would largely eliminate the need for (and thus a decision not to include) a terrorism exclusion as terrorist organizations commonly try to justify their hostile acts in this manner. The terrorist organization's "reason" for their terrorist attacks is an irrelevant factor to the underlying underwriting risk of the war exclusion. | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim if Defendant is allowed to present evidence and argument regarding Israel's actions in Gaza.  See Plaintiffs' MIL 3, Dkt. 208. |

| | | |
|---|---|---|
| 40. With respect to U.S. insureds, industry custom and practice attempts, whenever possible, to take positions consistent with the U.S. Government when it comes to the identity of terrorist organizations and not to elevate such organizations to the level of a sovereign (or quasi-sovereign) nation status against the position taken by the U.S. Government. | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. |
| 41. Therefore, for the reasons above, it would be inconsistent with industry custom and practice to apply the War Exclusion in this case where the underwriter specifically underwrote the DIG production, knew of the risk of a Hamas terrorist attack during the DIG production, and chose not to add a terrorist exclusion to the DIG coverage. | Observations based on expert's extensive and specialized experience; PX 674, ATL000405-406, 12/11/13 email from B. Milinovic to A. Garber, RE: "Dig" Season 1 Application/Declaration; PX 675, ATL000438, 1/13/14 email from B. Milinovic to A. Garber, RE: "Dig" S1 - 2014 Application/Declaration; PX 701, AONNBCU0001516-519, 12/13/13 email from A. Garber to R. Richmond, RE: "Dig" potential Morocco shoot; PX PHILLIPS 424, AONNBCU0001747, 12/13/13 email from A. Garber to W. Phillips RE: "Dig" S1 | Relevant to Plaintiffs' bad faith claim. |
| 42. Custom and practice in the insurance industry has also resulted in a number of standards applicable to claims handling. Claim adjusters are trained in such standards, or at least they should be. These standards and | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. |

| | | |
|---|---|---|
| procedures have been developed so that an adjuster does not act in an arbitrary or capricious manner. Industry custom and practice dictates that the insurer must act in good faith and deal fairly with the insured in connection with a claim. A failure to adhere to claims handling standards results in a breach of that obligation. | | |
| 43. Among these standards are that the insurance company must treat its policyholder's interests with equal regard as its own interests and that the insurance company should assist the policyholder with the claim. These are consistent with the insurance company's general obligation under industry standards to conduct a full, fair, thorough, and prompt investigation of the claim at its own expense. | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. |
| 44. In this case, a number of Atlantic's actions with respect to the DIG claim violated these industry standards, as well as their own guidelines, including:<br>　　a. Deciding to apply the War Exclusion within 2 days after written notice of the claim was submitted by the Insured, without conducting a proper investigation; | Observations based on expert's extensive and specialized experience;<br>PX GUTTERMAN 15, ATL000735-744, General Claims Practices;<br>PX GUTTERMAN 16, ATL000731-732, Core Principles | Relevant to Plaintiffs' bad faith claim. |

| | | |
|---|---|---|
| b. Failing to investigate the identity of Hamas as a terrorist organization and the potential impact of this fact on coverage; c. Failing to determine the need for, and failing to retain, an outside expert on the Middle East; d. Failing to hire or obtain a coverage opinion from outside counsel before making a coverage decision; e. Failing to have substantive discussions with the underwriter on the Insured's account to determine the underwriter's intention at the time the underwriter agreed to accept DIG as an insured production; f. Failing to conduct an investigation that complied with Atlantic's own guidelines and core principles; g. Misrepresenting the terms of the Policy by initially contending there was no coverage under the policy for acts of terrorism, unless such acts fell within the definition set forth in the TRIA endorsement; h. Failing to supervise and oversee the investigation of the claim, despite obvious and significant errors in analysis | | |

| | | |
|---|---|---|
| that surfaced during the limited investigation, including but not limited to, the misrepresentations as to the TRIA endorsement, not retaining an expert regarding the Middle East, and not obtaining an opinion from outside coverage counsel before making the decision to deny the claim; i. Failing to evaluate possible alternative interpretations of the War Exclusion, other than the initial interpretation advanced by Atlantic, despite the fact that the claim raised novel legal issues, and Atlantic had limited experience in evaluating war exclusions prior to the DIG claim; and, j. Failing to take into consideration the U.S. government's position as to the status of Hamas, and ascribing a quasi-sovereignty status to Hamas that was inconsistent with the U.S. government's designation of Hamas as a terrorist organization. | | |
| The above failures evidence a violation of the insurer's obligation to investigate claim coverage in an evenhanded manner taking into | Observations based on expert's extensive and specialized experience; PX GUTTERMAN 15, ATL000735-744, General Claims Practices; | Relevant to Plaintiffs' bad faith claim. |

| | | |
|---|---|---|
| equal consideration the interests of both the insured and the insurer. | PX GUTTERMAN 16, ATL000731-732, Core Principles | |
| **DETAILED DISCUSSION**<br>**VI BACKGROUND OF INDUSTRY CUSTOM AND PRACTICE RESPECTING THE TERRORIST EXCLUSION AND THE WAR EXCLUSION** | | |
| 45. "War" exclusions, like most other provisions of an insurance policy, are the result of an underwriting weighing of likely frequency and severity of potential loss matched with an ability (or lack thereof) to price such potential loss. | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. Aids the jury in understanding industry custom and practice regarding war exclusions. |
| 46. The "easiest" underwriting risk is known as "low severity/high frequency" risks. The high frequency of these types of risk make the task of a loss likelihood by the insurer's actuaries easier while the relatively low severity of any individual loss translates to a lower individual shock to the carrier's bottom line. While, at the same time, a typical policyholder may more easily recognize that the high likelihood of the underwriter suffering a loss and thus are more likely to accept a premium charge associated with the risk. Auto insurance is a good example of this type of risk. | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. Aids the jury in understanding industry custom and practice regarding war exclusions. |

| | | |
|---|---|---|
| 47. On the other hand, "low frequency/high severity" risks can be the most challenging as policyholders will be less willing to pay for coverage under the theory that "this won't happen to me" while underwriters fear that in the unlikely event of the covered "peril" actually occurring, the amount of loss will greatly harm their book's profitability, or in a worst-case scenario, kill the company altogether. Nuclear war is a good example of this type of risk. | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim.  Aids the jury in understanding industry custom and practice regarding war exclusions. |
| 48. Seen in this light, the risk of even non-nuclear war falls much more in the second category. Wars may not happen too often but when they do there is potential for massive loss of life, property and arguably liability claims. As importantly, wars are unpredictable and there is nothing more frightening to an insurance underwriter than a low frequency, high severity, unpredictable loss. For this reason, war exclusions, in their various forms, are common. | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim.  Aids the jury in understanding industry custom and practice regarding war exclusions. |
| 49. Prior to the 9/11 terrorist attacks in New York, Washington D.C., and over Pennsylvania, there was limited discussion in the insurance industry about a "terrorism exclusion." In general, commercial insurance | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim.  Aids the jury in understanding industry custom and practice |

| | | |
|---|---|---|
| policies neither charged for the "terrorist" risk nor applied a special "terrorism exclusion." | | regarding war exclusions. |
| 50. To the extent commentators discussed the risk of terrorism it was in the context of whether terrorism would be excluded by a policy's "war" exclusion. | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim.  Aids the jury in understanding industry custom and practice regarding war exclusions. |
| 51. This atmosphere resulted in some short lived but intense concern in the immediate aftermath of 9/11 as to whether carriers would argue that their war exclusions applied to the event. Fortunately, by and large the insurance industry responded quickly that they would not seek to apply any war exclusion to the 9/11 terrorist attacks.43 | Observations based on expert's extensive and specialized experience; PX 520, UCP035416-35424, Attack on America: The Insurance Coverage Issue, by Christine Fuge, Jack P. Gibson, and Robin Olson | Relevant to Plaintiffs' bad faith claim.  Aids the jury in understanding industry custom and practice regarding war exclusions. |
| 52. The world, of course, dramatically changed as a result of 9/11 in many ways and this change was felt in no small degree by the insurance industry. No longer was the risk of terrorism largely theoretical with the "luxury" of combining in the mind of the underwriter the "risk of war" with the "risk of terrorism;" now the risk of terrorism, per se, needed to be evaluated, potentially charged for, or excluded. | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim.  Aids the jury in understanding industry custom and practice regarding war exclusions. |

| | | |
|---|---|---|
| 53. In a rare showing of a public/private partnership, the U.S. federal government passed the Terrorism Risk Insurance Act signed into law on November 22, 2002. This law created a risk sharing arrangement between the private insurance industry and the U.S. Government for "Certified Acts of Terrorism." Insurance companies would be forced to offer "TRIA" coverage for an additional premium in consideration for the federal government agreeing to cover "TRIA" losses in excess of, a rather high most in the industry would say, "deductible." | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim.  Aids the jury in understanding industry custom and practice regarding war exclusions. |
| 54. Of course, that still left the issue of what to do with non-TRIA terrorism exposure. Here underwriters had three choices: (1) cover it for an additional premium; (2) cover it without an additional premium; or, (3) exclude it. Depending on the underwriter and the risk involved any of the three options would be made. | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim.  Aids the jury in understanding industry custom and practice regarding war exclusions. |
| 55. The central point based on the foregoing analysis as to the insurance industry after 9/11, is that insurance underwriters can no longer be thought of as, or permitted to be, unsophisticated with respect to the "war" vs "terrorism" distinction, and the decision to | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim.  Aids the jury in understanding industry custom and practice |

| | | |
|---|---|---|
| either include or not include a terrorism exclusion. Indeed, some carriers have been known to simply add the word "terrorism" to their war exclusion to express their intent that it is now a "combination" exclusion. | | regarding war exclusions. |
| 56. The second and corollary point to the above is that an underwriter cannot merge the two concepts and say that "an act of terrorism" can be also "an act of war." Insureds have a reasonable expectation that the two risks in the post 9/11 world are separate risks to be underwritten and evaluated by the insurance company separately (even if such separate analysis resulted in the above referenced "combination" exclusion). | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim.  Aids the jury in understanding industry custom and practice regarding war exclusions. |
| 57. Once such an underwriting analysis is completed, the carrier may decide to exclude one type of risk, or the other, or even both, but in any event all insureds have a reasonable expectation that the insurance company will be crystal clear on which path they are taking. | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim.  Aids the jury in understanding industry custom and practice regarding war exclusions. |
| 58. Put another way, if the policy does not contain a terrorism exclusion, there is a reasonable expectation that acts of terrorism by a known terrorist organization, regardless of | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim.  Aids the jury in understanding industry custom and practice |

| | | |
|---|---|---|
| however else they may be categorized, will be covered. | | regarding war exclusions. |
| 59. With this background, we next approach the circumstances and policy language used in the case at hand. | Observations based on expert's extensive and specialized experience | Relevant to Plaintiffs' bad faith claim. Aids the jury in understanding industry custom and practice regarding war exclusions. |
| **VII APPLICATION OF THE ABOVE INDUSTRY CUSTOMS AND PRACTICES TO THE FACTS OF THIS CASE** | | |
| 60. Applying the above custom and practice to the facts of this case is relatively straight forward because we do not have to speculate as to whether Wanda Phillips, the Atlantic underwriter who handled the underwriting on the Policy, actually knew of the DIG production, and that it was being produced, at least in part, in Israel. She did. | PX WILLIAMS 5, ATL000794-796, 12/3/13 email from W. Phillips to P. Williams re: Tentative 2014 Production – "Dig"; PX 674, ATL000405-406, 12/11/13 email from B. Milinovic to A. Garber, RE: "Dig" Season 1 Application/Declaration | Relevant to Plaintiffs' bad faith claim. Knowledge at time of contracting is relevant to the reasonable expectations of the parties. |
| 61. Nor do we need to speculate as to whether the security risk of filming in Israel in 2014 was evaluated by Ms. Phillips. It was. | PX PHILLIPS 424, AONNBCU0001747, 12/13/13 email from A. Garber to W. Phillips RE: "Dig" S1 | Relevant to Plaintiffs' bad faith claim. Knowledge at time of contracting is relevant to the reasonable expectations of the parties. |

| | | |
|---|---|---|
| 62. Nor do we need to speculate as to whether the issue of modifying the terms of the policy as a result of the security risk in Israel, whether by, for example, increasing the deductible or inserting a terrorism exclusion, ever came up in conversation or communication. It did. | PX 701, AONNBCU0001516-519, 12/13/13 email from A. Garber to R. Richmond, RE: "Dig" potential Morocco shoot; PX PHILLIPS 424, AONNBCU0001747, 12/13/13 email from A. Garber to W. Phillips RE: "Dig" S1 | Relevant to Plaintiffs' bad faith claim. Knowledge at time of contracting is relevant to the reasonable expectations of the parties. |
| 63. The facts in this regard are clear:<br>    i. Coverage for DIG, as is the case with all productions, was individually and separately applied for with the application stating that production would take place, in part, in Israel.<br>    ii. Aon, the Insured's broker, specifically brought up with Ms. Phillips the issue of whether Atlantic would insist on modifying the "standard terms" which clearly was a reference, as any good underwriter will tell you, to a possible increase in deductible, rate or insertion of an exclusion, in this case, a terrorism exclusion.<br>    iii. Ms. Phillips, for her part, analyzed the security risk, and as she told Mr. Gutterman, decided to keep the standard terms (e.g. no terrorism exclusion) but insisted upon various risk management | PX 701, AONNBCU0001516-519, 12/13/13 email from A. Garber to R. Richmond, RE: "Dig" potential Morocco shoot; PX PHILLIPS 424, AONNBCU0001747, 12/13/13 email from A. Garber to W. Phillips RE: "Dig" S1 | Relevant to Plaintiffs' bad faith claim. Knowledge at time of contracting is relevant to the reasonable expectations of the parties. |

| | | |
|---|---|---|
| procedures to reduce the security risk inherent in the area for the Insured's personnel. | | |
| 64. Accordingly, it seems clear that Ms. Phillips correctly understood the risk of a terrorist attack, including presumably from Hamas, and concluded that Atlantic would cover such a risk as long as various risk management procedures were taken44. In my view, this was a very reasonable underwriting decision. | Observations based on expert's extensive and specialized experience; PX 701, AONNBCU0001516-519, 12/13/13 email from A. Garber to R. Richmond, RE: "Dig" potential Morocco shoot; PX PHILLIPS 424, AONNBCU0001747, 12/13/13 email from A. Garber to W. Phillips RE: "Dig" S1 | Relevant to Plaintiffs' bad faith claim. Knowledge at time of contracting is relevant to the reasonable expectations of the parties. |
| FOOTNOTE 44 I note that this report is written before any deposition of Ms. Phillips. However, I often find that looking at actions taken at the time rather than "recollection" provided years after the fact is most indicative of a true understanding of events. | Observations based on expert's extensive and specialized experience | Relevant to scope of opinions proffered. |
| 65. In light of this, it would be the reasonable expectation of the Insured that a terrorist attack by Hamas would be covered under the policy, and that Atlantic would not try to escape coverage by seeking to expand the application of the War Exclusion to include terrorism. | Observations based on expert's extensive and specialized experience; PX 701, AONNBCU0001516-519, 12/13/13 email from A. Garber to R. Richmond, RE: "Dig" potential Morocco shoot; PX PHILLIPS 424, AONNBCU0001747, 12/13/13 email from A. Garber to W. Phillips RE: "Dig" S1 | Relevant to Plaintiffs' bad faith claim. Knowledge at time of contracting is relevant to the reasonable expectations of the parties. |
| 66. However, this is exactly what Atlantic is trying to do. | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon | Relevant to Plaintiffs' bad faith claim. |

| | Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter"); PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to unreasonableness of Defendant's failure to pay benefits due. |
|---|---|---|
| 67. Putting aside the now disregarded, and frankly implausible, argument that the lack of TRIA coverage means that the policy in fact has a terrorism exclusion, in its First Denial Letter Atlantic argues several points45 it contends supports the denial of coverage based on prong 1 ("war") or prong 2 ("warlike actions by a military force") of the War Exclusion.46 These include: | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| i. The "ground forces" trigger, where perils that existed prior to Hamas rejecting Egypt's cease fire proposal and Israel's resulting decision to use "full force" are covered, but perils occurring after are excluded by the War Exclusion. Atlantic does not appear to be vigorously advancing this position as it has not included this argument (so far) in any of its pleadings. Atlantic should abandon the argument entirely as there is no | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter"); See, e.g. Deposition of Mr. Gutterman (the existence of a "ground offensive" being a piece of evidence of a "war") at p. 250, lines 1-23 and Deposition of Mr. Williams (the existence of "widespread hostilities" as the "defining definition" of what constitutes a "war") at pp. | Plaintiffs do not intend to present testimony regarding Israel's conduct in Gaza unless needed to rebut Defendant's evidence and arguments.  See Plaintiffs' MIL 3, Dkt. 208. |

| | | |
|---|---|---|
| language in the exclusion, nor industry custom and practice, to support such a distinction47. | 245-247;<br>PX WILLIAMS 1, ATL003073-3127, Policy MP00163-04 | |
| ii. The conflict "involves sophisticated military weapons fired from one territory into another country, Israel."48 | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") p. 7 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| This argument, which seems to align itself with prong 4 ("any weapon of war") of the exclusion now also seems to have been discarded by the carrier.49 | See Deposition of Mr. Williams at p. 252, lines 23-25 | Plaintiffs do not intend to present testimony re prong 4 unless needed to rebut Defendant's evidence and arguments.  *See* Plaintiffs' MIL 2, Dkt. 209. |
| iii. The hostilities between Israel and Hamas are between "state or state-like entities," and are therefore a "war." Similarly, Hamas has "significant attributes of sovereignty" making it a "state or state-like" entity. In this regard, Atlantic reasons that Hamas has become | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") p. 6 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a |

| | | |
|---|---|---|
| "the government of the Gaza Strip," and despite that fact that it "is not a recognized nation, at least by most of the world, it does have some indicia of sovereignty."50 | | proper investigation of Plaintiffs' claim. |
| Footnote 45 Indeed the various arguments have seemed to have changed a bit over the course of communications. | PX GUTTERMAN 18, ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") p. 6 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| Footnote 46 Some pleadings also alleged the third prong ("Insurrection") and/or the fourth prong ("weapon of war") applying to the Claim, but deposition testimony of Atlantic's witnesses are to the contrary. Mr. Williams testified prong 4 did not apply to the Claim, while Ms. Gooley testified prong 3 was inapplicable. | Deposition of Mr. Williams at p. 252, lines 7 to 25; Deposition of Ms. Gooley at p. 151, lines 16 to 24. | Plaintiffs do not intend to present testimony re prongs 3 or 4 unless needed to rebut Defendant's evidence and arguments. See Plaintiffs' MIL 2, Dkt. 209. |
| 68. With respect to and perhaps in anticipation of the "reasonable expectations of the insured" counterargument, the First Denial Letter also argues that "MSNBC, an affiliate organization of the insured, has referred to the conflict as a | PX GUTTERMAN 18, ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to |

| | | |
|---|---|---|
| war for the past several days. This should be considered in taking into account the insured's reasonable expectations." | | pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 69. In its Second Denial Letter, in addition to admitting that its implied terrorism exclusion argument makes no sense and is withdrawn, the insurer argues: | PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
|     i. The mere "casualty and damage numbers" show that the "Israel/Gaza conflict clearly was a war."51 FOOTNOTE 51 Ibid references various property and death statistics from external sources. | PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") p. 2 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
|     ii. Emphasizing the language "warlike" in the second prong of the exclusion, Atlantic argued that this word evidences an "intent" for the exclusion to be broadly applied, contending that the | PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") p. 2 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to |

| | | |
|---|---|---|
| exclusion is "broad enough to encompass war, conflicts that look like war and specifically actions to defend against an actual or expected attack."52 | | pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| In this regard, the letter argues that the attacks were carried out by Hamas' "military wing" which is a "military force" as that term in used in the second prong.53 | PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") p. 3 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| iii. That a terrorist organization can possess "sufficient sovereignty" to fall within the war exclusion citing, as examples, North Korea and Saddam Hussein era Iraq. | PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") p. 4 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| iv. Finally, regardless of whether Hamas is a "quasi-sovereign" entity possessing "some indicia of sovereignty," the fact that Israel as the other party to the conflict surely is a "legitimate sovereign, | PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to |

| | | |
|---|---|---|
| not a terrorist organization" is sufficient. In a similar vein, the carrier argued that "regardless of whether Hamas is defined as a terrorist organization, Israel's actions and the resulting escalation fall squarely within the exclusion."54 | | pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 70. Ignoring the now disregarded theories, the two Denial Letters essentially come down to the following six arguments in favor of applying the War Exclusion:<br>    i. The mere "casualty and damage numbers" show that the "Israel/Gaza conflict clearly was a war;"<br>    ii. Even if Hamas is not a "quasi-sovereign" nation possessing "some indicia of sovereignty," Israel as the other party to the conflict is a "legitimate sovereign, not a terrorist organization" which is sufficient to trigger the exclusion;<br>    iii. Even assuming Hamas is a terrorist organization, terrorist organizations can still possess "sufficient sovereignty" to fall within the war exclusion citing, as examples, North Korea and Saddam Hussein era Iraq; | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter");<br>PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. Plaintiffs do not intend to present testimony regarding Israel's conduct in Gaza unless needed to rebut Defendant's evidence and arguments.  See Plaintiffs' MIL 3, Dkt. 208. |

| | | |
|---|---|---|
| iv. At a minimum, Hamas is a "quasi-sovereign" nation possessing "some indicia of sovereignty" and thus is able to commit "an act of war" triggering prong 1;<br>v. The attacks were carried out by Hamas' "military wing" and thus was a "warlike action by a military force" as that phrase in used in prong 2; and finally,<br>vi. The above analysis is consistent with the "reasonable expectations of this Insured" because the Insured's affiliate used the term "war" to describe the Israel/Hamas conflict. | | |
| 71. I will take each of the above in order, analyzing the issue from a point of view of industry custom and practice. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. |
| 72. The first two arguments can be easily dispensed with and I rather doubt Atlantic will actually be making them given the lack of support for such arguments based on custom and practice in the industry. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. |
| i. The 9/11 attacks killed 2,996 people, injured over 6,000 others and caused at least $10 billion in property and | PX 506, "How much did the September 11 terrorist attack cost America?" 2004 Institute for the Analysis of Global Security. Retrieved April 30, 2014. Matthew J. Morgan (August 4, 2009) | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of |

| | | |
|---|---|---|
| infrastructure damage and $3 trillion in total costs.55 | PX 692, The Impact of 9/11 on Politics and War: The Day that Changed Everything? Palgrave Macmillan. p. 222. ISBN 0-230-60763-2. Carter, Shan; Cox, A. "One 9/11 Tally: $3.3 Trillion." Retrieved September 14, 2015. | Defendant's failure to pay benefits due. |
| The four coordinated attacks were committed by the Islamic terrorist group al-Qaeda and no one in the insurance industry has ever argued that the terrorist attacks were an "act of war" based on the theory that so many people died and so much damage was caused.56 | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |
| Footnote 56 Of course, while the 9/11 attacks may have been referred to as "acts of war" against the US colloquially or for other purposes, such references are not relevant to the question of how the term "war" should be interpreted when used in an insurance policy, particularly when the policy contains no terrorism exclusion. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |
| Thus, for Atlantic to suggest that the "casualty and damage numbers" themselves show that the "Israel/Gaza conflict clearly was a war" does not have any support in custom and practice in the industry. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |

| | | |
|---|---|---|
| ii. Similar to the above, there is no support in industry custom and practice that a counterattack against a terrorist organization by a sovereign nation converts the terrorist attacks into a "war." | Observations based on expert's extensive and specialized experience. | Plaintiffs do not intend to present testimony regarding Israel's conduct in Gaza unless needed to rebut Defendant's evidence and arguments.  See Plaintiffs' MIL 3, Dkt. 208. |
| If that was the case, there would likely be no need for a terrorism exclusion since every terrorist attack against a sovereign nation always prompts a response by that sovereign nation. | Observations based on expert's extensive and specialized experience. | Plaintiffs do not intend to present testimony regarding Israel's conduct in Gaza unless needed to rebut Defendant's evidence and arguments.  See Plaintiffs' MIL 3, Dkt. 208. |
| It is true (as discussed in argument "vi" below) that sovereign nations and their leaders do tend to overuse the term "war" such as the "War on Drugs,"57 "War on Poverty,"58 and, of course, the "War on Terror" declared by President Bush following the 9/11 attacks. However, using the phrase "War on Terror" does not convert terrorism to a | PX 514, 10/28/72 Richard Nixon: Campaign Statement About Crime and Drug Abuse; PX 516, See President Lyndon B. Johnson's State of the Union Address of January 8, 1964 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |

| | | |
|---|---|---|
| "war" excluded by the insurance policies' war exclusions and, to my knowledge, no carrier has ever taken such a position. | | |
| 73. Argument "iii" argues that even if Hamas is a terrorist organization it can still be a sovereign nation citing, as examples, North Korea and Iraq when controlled by Saddam Hussein. | PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |
| This argument demonstrates a fundamental misunderstanding of the difference between a "terrorist organization" and a "State Sponsor of Terrorism."59 | PX 693, See generally https://en.wikipedia.org/wiki/State_Sponsors_of_Terrorism | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |
| A "State Sponsor of Terrorism" is a designation applied by the United States Department of State to countries which the Department alleges to have "repeatedly provided support for acts of international terrorism." | PX 693, See generally https://en.wikipedia.org/wiki/State_Sponsors_of_Terrorism | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |
| Inclusion on the list imposes unilateral sanctions. It is this list that includes Saddam Hussein's Iraq, and North Korea (but notably does not include Gaza) | PX 693, See generally https://en.wikipedia.org/wiki/State_Sponsors_of_Terrorism | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of |

| | | |
|---|---|---|
| | | Defendant's failure to pay benefits due. |
| And, of course, each of Iraq and North Korea are sovereign nations to begin with, whereas Hamas is plainly not. | PX 693, See generally https://en.wikipedia.org/wiki/ State_Sponsors_of_Terrorism | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |
| FOOTNOTE 60 Iraq was one of the countries that was first put on the list in 1979, briefly removed in 1982 to allow US companies to sell arms to it while it was fighting another country on the list, Iran, but was re-added following Iraq's 1990 invasion of Kuwait. It was "permanently" removed following the overthrow of Saddam Hussein. | PX 693, See generally https://en.wikipedia.org/wiki/ State_Sponsors_of_Terrorism | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |
| FOOTNOTE 60 North Korea went on the list of State Sponsors of Terrorism starting in 1988 following the terrorist bombing of a South Korean plane and was added due to its selling of weapons to terrorist groups | PX 693, See generally https://en.wikipedia.org/wiki/ State_Sponsors_of_Terrorism | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |
| FOOTNOTE 60 North Korea was removed from the list in 2009 by President Bush. In 2010, the Obama administration refused to put the country back on the list following North Korea's sinking of a South Korean navy ship | PX 693, See generally https://en.wikipedia.org/wiki/ State_Sponsors_of_Terrorism | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of |

| | | |
|---|---|---|
| commenting that the action was taken by the North Korean military. This decision is consistent with the theory that such an act might be an "act of war" against South Korea but not an "act of terrorism." | | Defendant's failure to pay benefits due. |
| 74. Thus, in my view, Atlantic's arguments really boil down to reasons (iv) and (v) above, to wit: Hamas is a "quasi-sovereign" nation possessing "some indicia of sovereignty," that is able to commit "an act of war" whose military arm attacked Israel in a "warlike action by military force" thereby triggering both prongs 1 and 2. | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter"); PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 75. These two arguments obviously relate to each other. While I understand that the policyholder has retained other experts to provide opinions on whether from a non-insurance context Hamas is a "sovereign or quasi-sovereign nation," I will provide an opinion from an insurance industry custom and practice point of view.61 | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter"); PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. Plaintiffs do not intend to present testimony regarding their sovereignty or war |

| | | experts.  See MIL 2, Dkt. 209. |
|---|---|---|
| FOOTNOTE 61 Given the complexity of the issues, it would be consistent with insurance industry custom and practice for Atlantic to accept the views of Middle East experts regarding the Israel/Hamas conflict and adopt an interpretation of "war" (or "warlike actions by a military force") favorable to the finding of coverage that is in accord with those experts' views. Conversely, it is inconsistent with industry custom and practice for Atlantic to simply ignore those views altogether. | Observations based on expert's extensive and specialized experience;<br>see also PX GUTTERMAN 15, ATL000735-744, General Claims Practices | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 76. At one point Atlantic argued that "[a]lthough the rockets are being fired into civilian areas, which may violate established norms of warfare and armed conflict under international law, this is not a situation where a single civilian, or group of civilians, is the target."62 Atlantic seems to be arguing that in order to be a terrorist attack, as opposed to an act of war, Hamas must have "targeted" a "single civilian or group of civilians." This theory is not consistent with industry custom or practice and, like the "ground troops" distinction, I know of no example where a carrier made such a distinction.  Indeed, under | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter");<br>Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| this theory the 9/11 attack on the World Trade Center would have been considered an act of war for insurance purposes, because it did not "target" a "single civilian or group of civilians." Instead, the target was a physical building which was a major commercial symbol of the United States (which the terrorists likely knew had people inside). However, as noted above, this argument is contrary to insurance industry custom and practice. | | |
| 77. Atlantic's second argument in favor of considering Hamas to be a "quasi-sovereign nation" (and thus acts by its "military arm" being a "warlike action by a military force") essentially argues that Hamas is the de facto government of Gaza. | PX GUTTERMAN 18, ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter"); PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 78. There are a number of diverging views on the issue, and yet Atlantic failed to take into account any view, other than the one that supported its denial of coverage – that Hamas purportedly is the de facto government of Gaza. | PX GUTTERMAN 18, ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter"); PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a |

|  | dated September 19, 2014 ("Second Denial Letter");<br>Observations based on expert's extensive and specialized experience;<br>see also PX GUTTERMAN 15, ATL000735-744, General Claims Practices | proper investigation of Plaintiffs' claim. |
|---|---|---|
| Rather than identifying the competing views and analyzing each one before making a determination that the only reasonable interpretation of the War Exclusion supported denial of coverage, it simply chose the one interpretation that would benefit Atlantic economically. | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter");<br>PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter");<br>PX GUTTERMAN 21, ATL000001-000161, File Note History ("Claim File") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| For example, performing a quick Google search just as Mr. Gutterman did when he was investigating the claim, yields the results set forth immediately below, which Mr. Gutterman could also have accessed when performing his investigation. | PX 525, ATL001560-1561, 7/16/14 E-mail chain among Daniel Gutterman and Pamela Johnson;<br>See Mr. Gutterman Deposition at p. 206, line 4, to p. 207, line 21. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| And yet, there is no record of such an investigation in Atlantic's claim file. | PX GUTTERMAN 21, ATL000001-000161, File Note History ("Claim File") | Relevant to Plaintiffs' bad faith claim. Relevant to |

| | | Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
|---|---|---|
| 79. For example, the majority of commentators label Hamas as a terrorist organization, and nothing else. | PX 694, Hamas: Government or Terrorist Organization (NPR), by Adam Davidson; PX 695, Hamas has the blood of three young boys on its hands, Ted Cruz Press Release, dated 7/5/14 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| This line of thinking is exemplified in NPR's recounting of a speech by Steven A. Cook, a Middle East expert at the Council on Foreign Relations: [He] started off the evening by acknowledging several facts, which he immediately said were entirely irrelevant. Yes, he said, Hamas was legitimately elected freely and fairly. Yes, Israel has illegally occupied the West Bank and, until recently, Gaza. Yes, Hamas has done much good with its social programs. But, he said, none of that matters. Hamas' central charter calls for the violent overthrow of Israel. Hamas continues to kill innocent civilians. The | PX 694, Hamas: Government or Terrorist Organization (NPR), by Adam Davidson | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| group must lay down its arms and renounce its violent charter. Until then, Cook said, Hamas can only be labeled a terrorist group.63 | | |
| 80. In the same recounting, NPR summarized a logical approach as to how to determine whether Hamas is simply a terrorist organization, regardless of the "social programs" they may sponsor within Gaza set forth by John O'Sullivan, a senior fellow at the Hudson Institute: A terrorist is a man who murders indiscriminately, distinguishing neither between civilian and innocent and guilty nor soldier and civilian." Terrorism, O'Sullivan argued, is an issue of tactics, not ultimate goals. There can be pro- Nazi and anti-Nazi terrorists, he said; pro-Israel terrorists and anti-Israel ones. In other words, it doesn't matter what we think of Hamas' ultimate goals. All that is important, he argued, is that they employ indiscriminate violence. Until they stop, they should be labeled as terrorists and treated as international pariahs. | PX 694, Hamas: Government or Terrorist Organization (NPR), by Adam Davidson | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 81. And certainly, there have been a wealth of United States political leaders who have labeled Hamas as a terrorist organization and nothing else, including recent presidential hopeful Ted Cruz who made this comment | PX 695, Hamas has the blood of three young boys on its hands, Ted Cruz Press Release, dated 7/5/14 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to |

| | | |
|---|---|---|
| exactly at the time of the claim at issue: Hamas is, unequivocally, a terrorist organization with blood on its hands that must be condemned on the world stage. There should be no path forward for Hamas to have any role in any future government formed by the Palestinian Authority, and no nation should accommodate, legitimize, or negotiate with this group that engages in the killing of innocent civilians. The Palestinian Authority should immediately renounce Hamas and actively work to expel Hamas from civil society.64 | | pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 82. Accordingly, the best argument that Atlantic can make is that there are multiple, and conflicting, views of Hamas' status. | PX 694, Hamas: Government or Terrorist Organization (NPR), by Adam Davidson; PX 695, Hamas has the blood of three young boys on its hands, Ted Cruz Press Release, dated 7/5/14 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 83. As discussed in the next section of this report, at minimum, the above means that there are two "reasonable" interpretations of whether acts by Hamas are "acts of terrorism" or "acts of war" and this fact, standing alone, means that industry custom and practice would dictate | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and |

| | | |
|---|---|---|
| that coverage must be granted for the Claim at issue. | | failure to conduct a proper investigation of Plaintiffs' claim. |
| 84. However, custom and practice would not weigh these two views equally. Put another way, in reality, there are not two "reasonable" interpretations of the application of the issue as to whether actions by Hamas are "acts of war" (or war-like) versus "acts of terrorism." It has been the unwavering position of the United States for decades that Hamas is a terrorist organization, plain and simple, and nothing more. During 9/11, the entire insurance industry rallied around calling attacks against civilian areas by extremist groups 'Terrorism' not excluded by the war exclusion. And so too must Atlantic here if it wishes to act in accordance with this industry custom and practice. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 85. Addressing the next point, we return to the issue of the "reasonable expectations of the insured" and how that industry concept impacts the issue at hand. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a |

| | | proper investigation of Plaintiffs' claim. |
|---|---|---|
| 86. Atlantic acknowledges that the Insured's reasonable expectation of coverage should impact a proper coverage analysis. It is correct in doing so. However, its conclusion as to what the reasonable expectations of the Insured should be is inconsistent with the agreed upon facts. | PX GUTTERMAN 18, ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter"); PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 87. Atlantic essentially argued in its Denial Letters that, because an affiliate of the Insured, MSNBC, called the 2014 hostilities between Hamas and Israel a "war," the Insured should reasonable expect that its insurance carrier would also define it this way65. | PX GUTTERMAN 18, ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter"); PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| FOOTNOTE 65 See also Deposition of Mr. Gutterman stating that MSNBC specifically calling the hostilities a war was another "fact" indicating to him that a war was going on at p. 148, lines 12-15 | Deposition of Mr. Gutterman at p. 148, lines 12-15 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a |

| | | proper investigation of Plaintiffs' claim. |
|---|---|---|
| 88. For the reasons discussed above, this argument really does not hold water. The use of the term "war" by the press is as broad, if not broader, than the use by politicians. Indeed, commentators have used the "war metaphor" for decades for a wide variety of activities even including such phrases as the "War on Christmas" and the "War on Women."66 | PX 696, Wikipedia- War as a metaphor | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| It was perhaps for this reason that the statements in this regard made in the Denial Letters were fairly soft. (See, for example, "We note that"67 and "this should be considered."68) | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter"); PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 89. Accordingly, under insurance custom and practice, when such words that are used in insurance policies for a particular purpose, such as delineating what precisely is excluded from coverage, the meaning ascribed to them is based on the usage of the words or terms in the insurance industry. Thus, even though the same | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a |

| | | |
|---|---|---|
| word (e.g., "war") may have another colloquial meaning, when the insurer is considering coverage pursuant to the terms of an insurance policy, the custom and practice is for the insurer to use the insurance industry meaning of such words used in the policy, not their colloquial meaning or the broad use such words may have in the press or by politicians. | | proper investigation of Plaintiffs' claim. |
| 90. Finally, the "reasonable expectation of the insured" industry standard goes against Atlantic in this case.69 | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| FOOTNOTE 69 This is true even if the original 2010 policy was drafted, in part, by Aon, the Insured's broker. I do note that the War Exclusion does not seem to be manuscript or tailored to the insured but is an example of industry standard language presumably created by insurers. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| As more fully discussed earlier in this report, given Ms. Phillips specific review and acceptance of the DIG Israel risk with questions about and instructions regarding security, the absence of a terrorism exclusion, the almost universal acknowledgement of Hamas as a terrorist organization, it would be the reasonable expectation of the Insured that a Hamas attack would be considered terrorism (and therefore covered), and not an act of "war or warlike action." | Observations based on expert's extensive and specialized experience; PX 674, ATL000405-406, 12/11/13 email from B. Milinovic to A. Garber, RE: "Dig" Season 1 Application/Declaration; PX 675, ATL000438, 1/13/14 email from B. Milinovic to A. Garber, RE: "Dig" S1 - 2014 Application/Declaration; PX 701, AONNBCU0001516-519, 12/13/13 email from A. Garber to R. Richmond, RE: "Dig" potential Morocco shoot; PX PHILLIPS 424, AONNBCU0001747, 12/13/13 email from A. Garber to W. Phillips RE: "Dig" S1 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| **VIII**<br><br>**IN THE BEST CASE SCENARIO FOR THE INSURER, THERE ARE STILL TWO REASONABLE APPLICATIONS OF THE WAR EXCLUSION TO TERRORIST ACTS COMMITTED BY HAMAS AND THEREFORE CUSTOM AND PRACTICE WOULD PREVENT ATLANTIC FROM APPLYING THE WAR EXCLUSION.** | | |
| 92. Because Atlantic is attempting to apply an exclusion, custom and practice (and the law of most jurisdictions) dictate that the burden is on Atlantic to show that there is no other | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of |

| | | |
|---|---|---|
| reasonable interpretation of the exclusion other than the one that denies coverage. | | Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| Atlantic acknowledges this practice in its Second Denial Letter when it states "The only reasonable interpretation of the situation that led to the production's extraction from Israel is that it was caused by war, or warlike action by a military force. As a result, the war exclusion applies."70 | PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 93. Atlantic is correct on the standard; however, it is incorrect on the result of applying that standard. Simply put, under the facts of this case, Atlantic cannot meet its burden, pursuant to industry custom and practice, to show that the only reasonable interpretation of the War Exclusion is that it applies to the actions by Hamas against Israeli (and other) civilians in June/July 2014. | PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 94. First, the documents I reviewed as well as the testimony of Atlantic's representatives seem to indicate that even Atlantic is confused as to what the War Exclusion means, flip- | See, for example, Deposition of Mr. Gutterman at p. 238, lines 9-25 – p. 239, lines 1-5, p. 244, lines 10-15 and at p. 249, lines 10-18 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of |

| | | |
|---|---|---|
| flopping several times as to what portion of the Exclusion might apply to the claim and why. For example:<br><br>a. Mr. Gutterman, at least initially, emphasized that the existence (or lack of existence) of a "ground war" would be the trigger (or at least would be "a" trigger) as to whether the hostilities were a "war."71<br><br>b. Mr. Williams, at least in his testimony,72 testified that the, or a, trigger for the Exclusion is the existence of "wide spread" hostilities.<br><br>c. The Denial Letters do not speak of either of these concepts.<br><br>d. The Denial Letters' analysis relates only to prongs 1 and 2 of the Exclusion. However, the pleadings then allege prongs 3 and 4 apply too. But, Ms. Gooley testified that prong 3 did not apply. 73 Mr. Williams testified that prong 4 does not apply, 74 which contradicted Ms. Gooley's testimony75 that the First Denial Letter did in fact "rely" on prong 4. | 72 Deposition of Mr. Williams at p. 246, lines 23-25 – p. 247, lines 1-17<br>PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter"); PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter")<br>73 Deposition of Ms. Gooley p. 215, lines 3-9, p. 217, lines 22-25 – p. 218, lines 1-3 and p. 220, lines 14-17;<br>74 Deposition of Mr. Williams at p. 252, lines 23-25;  75 Deposition of Ms. Gooley at p. 218, lines 13-25 | Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 95. Atlantic also provided the Insured with confusing and sometimes contradictory | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon | Relevant to Plaintiffs' bad faith claim. |

| | | |
|---|---|---|
| explanations. For example, Atlantic stated in its First Denial Letter that Gaza "is not a recognized nation, at least by most the world" while at the same time stating that "Hamas has become the government of the Gaza Strip." | Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter") | Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 96. Ms. Johnson attempted at one point to try to find consistency, at least consistency within her own organization, when she asked Ms. Gooley what positions other departments or Atlantic affiliates might have taken with respect to the Israel/Hamas conflict. However, as far as I can tell by the documents I reviewed, Ms. Gooley never answered her question and Ms. Johnson never asked again. | PX GOOLEY 31, ATL001571-1572, 7/17/14 email from T. Gooley to P. Johnson re: Act of War exclusion – Are you available for a short call? | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 97. If the reader is confused by all of this, it is not surprising. Perhaps, Atlantic's real view of the definition of war is best summed up by Mr. Gutterman in the following exchange from his deposition76: Q- Prior to your involvement in the DIG claim, what was your understanding of what war meant?... A- I don't know if I ever had a definition of what war was. I think it's just – I know it when I see it. Q- And how has that understanding changed since the DIG claim, if at all? A- I don't believe that it has. | Deposition of Mr. Gutterman at p. 52, lines 11-22 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| 98. While Mr. Gutterman's "I know it when I see it" response may describe Justice Stewart's threshold test for obscenity, this standard is wholly unacceptable under the applicable insurance industry custom and practice. The above is a strong indication that even Atlantic could not figure out what the War Exclusion means. This supports a finding that the Exclusion is hopelessly vague and ambiguous, and therefore cannot be applied to the Claim. | Deposition of Mr. Gutterman at p. 52, lines 11-22 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 99. In addition to the abstract confusion as to what "war" is, the issue of what Hamas is, is also debated as discussed at length in the proceeding sections. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |
| 100. What does all this confusion and disagreement mean for our insurance coverage analysis? | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |
| 101. Custom and practice is clear that when there are two reasonable interpretations of an exclusion or policy restriction, the one favoring coverage should be applied. This is consistent with another industry custom, which is to | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of |

| | | |
|---|---|---|
| uphold the reasonable expectations of the insured. | | Defendant's failure to pay benefits due. |
| 102. Given the above, applying these doctrines to the facts of this case is straightforward. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |
| 103. Because there is a sober and considered view of many, if not most, experts in the field that Hamas is a terrorist organization, and not a sovereign or quasi-sovereign state, it is inconsistent for Atlantic to now take a contrary position in order to deny coverage. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |
| 104. In conclusion, for all the reasons set forth above, Atlantic acted in a manner inconsistent with industry custom and practice when it applied the War Exclusion to the Claim at issue. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |
| 105. Having reviewed Atlantic's decision to apply the War Exclusion and finding it inconsistent with industry practice, this report next turns to the claims process Atlantic used to make that decision in order to answer the question as to whether such claims process also violated industry custom and practice. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due. |

| **IX GENERAL STANDARDS FOR CLAIMS HANDLING AND INVESTIGATION** | | |
|---|---|---|
| 104. Custom and practice in the insurance industry has resulted in a number of standards applicable to claims handling. Claim adjusters are trained in such standards, or at least they should be. These standards and procedures have been developed so that an adjuster does not act in an arbitrary or capricious manner. In many cases claims manuals have been written so that an adjuster may refer to written guidelines to assist his or her decision-making. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 105. The insurance industry recognizes that good faith and fair dealing are the essence of insurance contracts. When a carrier first receives a claim or a notice of an incident that may lead to a claim, the first step is for the insurer to promptly acknowledge in writing receipt of the claim usually also informing the policyholder of the contact information for the assigned adjuster. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 106. After this initial notification, the insurer must then promptly evaluate whether the claim or incident involves a risk potentially covered by the policy. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper |

| | | investigation of Plaintiffs' claim. |
|---|---|---|
| 107. More specifically, the insurance carrier must then conduct a full, fair and prompt investigation, after which the insurance carrier must advise the insured as to whether the carrier has concluded whether there is coverage for the submitted claim or not and the reasons for its determination. If no determination can be made, the carrier may choose to cover the claim under a "reservation of rights" letter indicating, in essence, that there are insufficient facts to make a final determination so the carrier will be providing coverage as an initial matter. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 108. If a reservation of rights letter is issued, the insurer must promptly and fully investigate the claim to determine, if at all possible, whether the reasons for the reservation are valid, and so inform the insured. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 109. Further, if after making an adverse coverage determination, the insurer becomes aware of facts that should lead it to make a conclusion different than the one the carrier previously advised, the carrier has a duty to | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper |

| | | |
|---|---|---|
| "update" the insured with the new conclusions and take steps consistent with them. | | investigation of Plaintiffs' claim. |
| 110. A failure to adhere to such standards results in a breach of the duty of good faith and fair dealings applicable to the insurer-policyholder relationship. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 111. Among the specific standards applicable to claims handing are: a) The insurance company must treat its policyholder's interests with equal regard as its own interests; b) The insurance company should assist the policyholder with the claim; c) The insurance company must disclose to its policyholder all benefits, coverages and limitations that may apply to the claim; d) The insurance company must conduct a full, fair, and prompt investigation of the claim at its own expense; e) In cases of "first impression" or when the claims examiner is not familiar with the coverage issues at play, experts should be brought in on a timely basis to provide an opinion; f) The insurance company cannot shift the burden of investigation on to the insured; g) The insurance company cannot off load the | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |

burden of investigation to outside counsel; h) The insurance company must fully, fairly and promptly evaluate and adjust the claim; i) The insurance company must give a written explanation if it partially or totally denies a claim pointing out facts or policy provisions that support such a denial; j) The insurance company cannot hide from its insured the fact that the claim examiner is also investigating coverage or rescission of the Policy; k) The insurance company must not misrepresent facts or policy provisions or fail to bring to the policyholder's attention facts or policy provisions which it is relying upon in denying or limiting coverage; l) The duty of good faith and fair dealing continues into litigation with the insured; and, m) In cases where the decision of the insurance underwriter played a critical role in the issue in dispute, the claims department cannot make a determination without the active involvement of the underwriting department and the individual account underwriter (if that person is still employed at the time of the claim investigation). This is almost always the case with respect to possible coverage denial based

| | | |
|---|---|---|
| on an exclusion or other condition limiting coverage. | | |
| **X APPLICATION OF CLAIMS HANDLING STANDARDS TO THE FACTS OF THE CLAIM AT ISSUE** | | |
| 112. Applying these industry standards to the Claim at issue, Atlantic failed to adhere to a number of industry claims standards including: a. The insurance company must conduct a full, fair, and prompt investigation of the claim; b. The insurance company must disclose to its policyholder all benefits, coverages and limitations that may apply to the claim; c. The insurance company must not misrepresent facts or policy provisions or fail to bring to the policyholder's attention facts or policy provisions which it is relying upon in denying or limiting coverage; d. The insurance company must treat its policyholder's interests with equal regard as its own interests; e. In cases of "first impression" or when the claims examiner is not familiar with the coverage issues at play, experts should be brought in on a timely basis to provide an opinion; and, f. In cases where the decision of the insurance underwriter played a critical role in the issue of dispute, the claims department cannot make a | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| determination without the active involvement of the underwriting department and the individual account underwriter 113. I will examine each of these in order. | | |
| 114. As to the first practice, the most common complaint of a claims department in my experience is that they do not act promptly. Sometimes months or even years can go by before a carrier will advise the insured that it is not covering the claim (or not covering it anymore). In this case, Atlantic certainly cannot be accused of not acting promptly. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 115. However, acting promptly is not the rule. A claim must be investigated fully and thoroughly as well as promptly.77 Put another way, a "quick NO" is not the way for a claim department to avoid acting below industry standards. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| FOOTNOTE 77 There is an old consultant's saying "Do you want it quick or do you want it right?" The purpose of this line is to advise the client that correct decisions take time and that a rushed decision is often a wrong one. This is a lesson that Atlantic, in terms of this particular Claim, seems to have forgotten. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| 116. The above should be self-evident, but the record indicates that this rule was not understood, and certainly was not followed, by Atlantic in this case. This fact is all the more disturbing given that by its own admission, Atlantic had not previously considered application of a war exclusion in its history, before the DIG Claim.78 | PX 657, Atlantic's response to Plaintiffs' RFA 26 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| FOOTNOTE 78 Ms. Gooley testified she could not recall any claims, other than the DIG Claim, where Atlantic considered potential application of a war exclusion. | Deposition of Ms. Gooley at p. 38, lines 5-10. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 117. Despite this lack of experience, it took Atlantic only two days to decide this claim of first impression: | (See Deposition of Ms. Gooley at p. 169, lines 5-8, p. 170, lines 14-25 and p. 184, lines 17-25) (see p. 39, lines 15-17) (see p. 40, lines 1-5). | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| a. On 7/15, Aon submitted the Claim to Atlantic. Mr. Gutterman immediately flagged the War Exclusion for investigation. | PX 703, ATL000295-299, 7/15/14 email from P. Johnson to D. Gutterman, RE: NBCU's "DIG" Season 1 - Imminent Peril claim notification; PX GUTTERMAN 21, | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper |

| | | |
|---|---|---|
| | ATL000001-000161, File Note History ("Claim File") | investigation of Plaintiffs' claim. |
| b. On 7/16, Ms. Johnson emailed Mr. Gutterman a copy of the War Exclusion. Mr. Gutterman notes in the claim file: "Facts War in Israel with Hamas." | PX GUTTERMAN 21, ATL000001-000161, File Note History ("Claim File") | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| c. On 7/17, Atlantic tells the Insured the Claim is not covered due to the War Exclusion. 79 | (See Deposition of Ms. Gooley at p. 169, lines 5-8, p. 170, lines 14-25 and p. 184, lines 17-25) (see p. 39, lines 15-17) (see p. 40, lines 1-5). | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| FOOTNOTE 79 While it is true that the First Denial Letter did not go out until 7/28 and there was some activity after 7/17, Ms. Gooley testified that in Ms. Johnson's and Mr. Gutterman's phone call with the Insured on 7/17, the Insured was told that the Claim would be excluded.  Ms. Gooley also testified that she did not generally even review the work that Johnson does in investigating claims and could not recall a single occasion where she directed | (See Deposition of Ms. Gooley at p. 169, lines 5-8, p. 170, lines 14-25 and p. 184, lines 17-25) (see p. 39, lines 15-17) (see p. 40, lines 1-5). | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| Johnson to do additional work investigating a claim. | | |
| 118. Ms. Gooley could not recall any other Atlantic claim where a coverage determination was made in two days (admitting that two days is a 'fairly expedited' time frame)80. | Deposition of Ms. Gooley at p. 180, lines 19-25 – p. 181, lines 1-5 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 119. To make matters worse, this claim fell outside the experience of Atlantic according to the testimony of Atlantic's claims representatives. | PX 657, Atlantic's response to Plaintiffs' RFA 26; Deposition of Ms. Gooley at p. 38, lines 5-10. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 120. Ms. Gooley also testified that she could not recall any other instance during her time with Atlantic, or prior to that, that she or anyone else considered the potential applicability of a war exclusion | Deposition of Ms. Gooley at p. 38, lines 5-10. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 121. Indeed, Ms. Gooley testified that prior to the DIG claim, she could not recall ever working on an extra expense coverage claim.81 | Deposition of Ms. Gooley at p. 31, lines 14-25 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to |

| | | conduct a proper investigation of Plaintiffs' claim. |
|---|---|---|
| 122. This begs the question as to why and how Atlantic could decide a case of first impression adverse to its Insured in only two days. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 123. Ms. Gooley's deposition is helpful in this regard. In essence, according to Ms. Gooley, it was the Insured's fault. | Deposition of Ms. Gooley at p. 52, lines 2-14 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 124. Ms. Gooley testified that while Atlantic always wants to do a thorough investigation, there is always a "balancing of facts and time," "whether the insured needs an answer quickly" resulting in "time pressure."82 | Deposition of Ms. Gooley at p. 52, lines 2-14 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 125. Or, perhaps, according to Ms. Gooley, it was really Aon's fault as she indicated that Atlantic "moved as quickly as we could on this | Deposition of Ms. Gooley at p. 178, lines 22-25 – p. 179, lines 1-2 | Relevant to Plaintiffs' bad faith claim. Relevant to |

| | | |
|---|---|---|
| particular claim" knowing that the Insured wanted an answer right away, and that "Aon had pushed OneBeacon [Atlantic] very hard to get an answer as soon as possible…"83 | | Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 126. Of course, a claims examiner cannot shift blame for a faulty investigation simply because the insured desired to know whether there was coverage under the policy. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 127. In addition to timing, Atlantic's actual investigation of the claim was deficient. According to the claims file that was produced, the investigation was limited to reviewing information about the situation in Israel on the internet, doing Google searches, and reviewing one legal case.84 In my opinion, this limited effort does not meet the prerequisite of conducting a thorough investigation before making a determination to deny the claim of first impression. | PX 691, ATL000294, 7/18/14 email to/from D. Gutterman, no subject;  PX 524, ATL000501, 7/16/14 E-mail chain among Daniel Gutterman and Pamela Johnson; PX 525, ATL001560-1561, 7/16/14 E-mail chain among Daniel Gutterman and Pamela Johnson; PX 526, ATL001635, 7/17/14 Westlaw Cover E-mail to Pamela Johnson re War Exclusion; PX 688, ATL001636-686, Holiday Inns Inc. v. Aetna Insurance Company et al; PX GUTTERMAN 21, ATL000001-000161, File Note History ("Claim File") | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 128. Atlantic also misrepresented the terms of the policy to its insureds. It incorrectly invoked the TRIA endorsement in its First Denial | PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, | Relevant to Plaintiffs' bad faith claim. Relevant to |

| | | |
|---|---|---|
| Letter, and claimed there was no coverage for terrorism under the policy since the acts did not meet the TRIA definition for Certified Acts of Terrorism. | NBCUniversal Media, dated July 28, 2014 ("First Denial Letter"); | Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| When this was pointed out to Atlantic, it acknowledged it had made a mistake in its Second Denial Letter, but did not go back to investigate whether other mistakes had been made. For example, Atlantic did not reevaluate whether the hostilities in Israel constituted terrorism rather than war, and reevaluate the Claim in light of the fact that the Policy did not exclude coverage for acts of terrorism. | PX GUTTERMAN 19, ATL000087-93, 8/13/14, Letter from Lucia E. Coyoca to Pamela A. Johnson; PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 129. Atlantic also failed to investigate or take into consideration the longstanding designation by the U.S. government of Hamas' status as a terrorist organization, or evaluate the ramifications of taking a position as to Hamas' status that was not in accord with that of the U.S. government. | PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 130. Atlantic also failed in perhaps the most important practice – that the insurer consider the interests of its insureds with equal regard to its own interests – when evaluating the facts of this case. | PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| 131. Under the facts of this case, balancing the interest of both the Insured and Atlantic in an evenhanded manner would have resulted in Atlantic taking a number of steps they did not:<br>    a. Investigate equally (or, at all, before the claims decision was made) as noted above, whether the attacks by Hamas should be considered "acts of terrorism" rather than "acts of war;"<br>    b. Consult with outside Middle East experts given that the issue (Hamas: Terrorist or sovereign nation) was outside Atlantic's expertise;<br>    c. Consult with outside counsel before making the claims decision on the issue of the meaning and applicability of the War Exclusion given that no one in claims had any prior experience with the Exclusion. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 132. Ms. Gooley, the individual at Atlantic responsible for supervising Ms. Johnson's and Mr. Gutterman's investigation of the Claim, did virtually nothing, seemingly simply "rubber stamping" the decision to deny the Claim. | See, e.g. Deposition of Ms. Gooley at p. 103, lines 1-22; Deposition of Mr. Gutterman at p. 264, lines 11-17;<br>Deposition of Ms. Gooley at p. 142, lines 21-25 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| She testified that she did not instruct Mr. Gutterman to review whether the attacks by Hamas were terrorism, and Mr. Gutterman himself testified he did not recall doing so.85 | See, e.g. Deposition of Ms. Gooley at p. 103, lines 1-22; Deposition of Mr. Gutterman at p. 264, lines 11-17 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| Ms. Gooley also testified that she did not instruct Ms. Johnson to consider whether Hamas was a terrorist organization in the context of reviewing the Claim.86 | Deposition of Ms. Gooley at p. 142, lines 21-25 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 133. For the reasons discussed in detail in an earlier section of this report, determining whether the attacks by Hamas was an act of terrorism is critical to the analysis of the War Exclusion as no carrier, to my knowledge, has ever taken the position that an act of terrorism by a non-sovereign nation was also an act of war. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 134. Also as discussed earlier, the issue of who Hamas is and how to categorize their actions is discussed at length among Middle East experts. According to Atlantic's own General Claim Practices guidelines, a claims examiner must | PX GUTTERMAN 15, ATL000735-744, One Beacon General Claims Practices; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper |

| | | |
|---|---|---|
| "Determine the need for outside vendors to assist in the investigation."87 | | investigation of Plaintiffs' claim. |
| Yet, this was not done here, even though the applicability of the war exclusion was something that neither Ms. Gooley, Mr. Gutterman, Ms. Johnson or, apparently, anyone else at Atlantic has ever dealt with. | PX 657, Atlantic's response to Plaintiffs' RFA 26 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 135. When Ms. Gooley was asked about retaining an outside vendor "if the factual circumstances of the claim involved an area that was not of common understanding or knowledge," Ms. Gooley responded "I'm trying to think of a particular type of claim where we wouldn't have the common understanding or knowledge … at least the way OneBeacon [Atlantic] is structured that we have – we have the skill level and the experience to handle claims."88 | Deposition of Ms. Gooley at p. 50, lines 3-17 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 136. Given her prior testimony that no one in Atlantic's claims department had experience with applying the war exclusion or an understanding of Middle East politics,89 this response is puzzling to say the least. | Deposition of Ms. Gooley at p. 50, lines 3-17; Deposition of Ms. Gooley at p. 38, lines 5-10. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| FOOTNOTE 89 Wanda Phillips apparently had an understanding of middle east security, but no one in claims apparently ever asked her opinion. | PX PHILLIPS 424, AONNBCU0001747, 12/13/13 email from A. Garber to W. Phillips RE: "Dig" S1 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 137. On a similar vein, use of outside coverage counsel is a common part of a claims examiner's investigation. This is especially true with new issues or ones that the examiner has no or little prior experience. | Observations based on expert's extensive and specialized experience; See PX GUTTERMAN 15, ATL000735-744, One Beacon General Claims Practices; | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 138. Given the facts at issue, it would have been prudent to retain coverage counsel to examine the issue of the war exclusion, any applicable case law and to render an opinion as to coverage before actually making the claims decision. This is particularly important where, as here, there was no internal agreement as to what the Exclusion, meant, and no one in the claims department had prior experience with the Exclusion. Atlantic's claims personnel reviewing the Claim needed to know how the Exclusion was defined, before it could | PX 657, Atlantic's response to Plaintiffs' RFA 26 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| undertake an analysis as to the facts of the Claim. | | |
| 139. However, in a somewhat bizarre turn, the testimony of Atlantic representatives is that the decision to deny the claim occurred on July 17, 2014 and the denial was conveyed to the Insured on that date, but the decision to hire outside counsel was not made until the next day on July 18, 2014. | Deposition of Ms. Gooley at page 184, line 18 to 185, line 4 | Plaintiffs intend only to offer evidence and testimony establishing that Defendant did not obtain a coverage opinion prior to making the decision to reject Plaintiffs' claim. This is relevant to bad faith.  Defendant may not mention the subsequent coverage opinion.  See Dkt. 96. In the event Defendants are permitted to reference the outside coverage opinion, Plaintiffs will present rebuttal testimony. |
| 140. Finally, but perhaps most disturbingly, Atlantic's claims department never spoke to the only person at Atlantic who would have a substance based opinion as to whether the company intended to cover attacks by Hamas | Deposition of Mr. Gutterman at p. 298, lines 13-25 – p. 299, line 1 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper |

| | | |
|---|---|---|
| into Israel in July 2014, Wanda Phillips, the underwriter. | | investigation of Plaintiffs' claim. |
| 141. The reasons for this are unclear. It is the obvious thing to do and consistent with industry custom. Ms. Phillips could have advised Mr. Gutterman, for example, whether she contemplated the possibility of Hamas attacks when she decided to provide coverage, when she decided not to depart from "standard terms" (e.g. no terrorism exclusion) and when she required various risk management security measures be implemented. Mr. Gutterman testified that he did not even ask Ms. Phillips why she insisted upon these security measures.90 | Deposition of Mr. Gutterman at p. 298, lines 13-25 – p. 299, line 1 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 142. Indeed, no one in Atlantic's claims group spoke to Ms. Phillips even after receiving the Insured's letter of August 13, 2014 reminding them that the Policy was underwritten with the full understanding that the production would take place in Israel. | See Deposition of Mr. Gutterman at p. 298, lines 13-25 – p. 299, line 1 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 143. Why Mr. Gutterman did not reach out to Ms. Phillips on these issues, or even mention them when he did reach out to her to confirm that DIG was an insured production seems to puzzle even Mr. Gutterman. When asked: | Deposition of Mr. Gutterman at p. 172, lines 15-19; also see similarly p. 174, lines 16-23 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper |

| | | |
|---|---|---|
| "What would you do if you had a question about the scope of coverage?" He responded: "Usually I discuss it with my supervisors, and then discuss it with the underwriters to see what their intent was."91 Picture perfect response. Unfortunately, that is not what he did here. | | investigation of Plaintiffs' claim. |
| 144. Ms. Gooley apparently never learned this simple lesson. When asked a virtually identical question in her deposition, she responded that it is not important to go back to the underwriter if "the language of the policy is clear and is unambiguous, you apply the law – you apply the policy as it is written." When asked the obvious follow-up question: "What if the language of the policy is not clear or unambiguous, do you think in that circumstance it's important to go back to the underwriter?" She still responded that she would interpret what the words of the policy meant indicating: "I don't know that I would go back to the underwriter."92 | Deposition of Ms. Gooley at p. 61, lines 23-25 – p. 62, lines 1-20 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 145. Not only does Ms. Gooley's response indicate that she could learn a lesson from her "more junior" colleague but it evidences a lack of internal consistency at Atlantic which in | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper |

| | | |
|---|---|---|
| itself represents a below industry custom and practice. | | investigation of Plaintiffs' claim. |
| 146. Perhaps it is fitting to end this final section of the report with the testimony of Daniel Gutterman who said in describing the culture of Atlantic claims group: We really want to find coverage. I mean, that's – I was taught that from Peter (Williams) and Pamela (Johnson), over and over and over again, so if we can find it, we'll do so. We want people to – we want to find coverage.93 | Deposition of Mr. Gutterman at p. 174, line 25 – p. 175, lines 1-4 | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 147. Regrettably, Atlantic failed miserably in this case. It failed to find coverage where coverage existed, and moreover failed to properly conduct a full, fair, and prompt investigation of the claim weighing its own interests as well as the interests of the insureds in an evenhanded manner. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| **XI CONCLUSION** | | |
| 148. In conclusion, for the reasons set forth above, it is my expert opinion that: a. Atlantic was acting against industry custom and practice when it applied the War Exclusion to the claim at issue, and b. Atlantic violated a number of industry customs and practices in its claims process and handling of the claim at issue. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a |

| | | |
|---|---|---|
| | | proper investigation of Plaintiffs' claim. |
| **April 28, 2017 Rebuttal Report**<br>**I QUESTIONS PRESENTED AND SUMMARY OF OPINIONS** | | |
| 2. In my March 17th report, I provided two main opinions: a. Atlantic's decision to apply the War Exclusion1 to the Insured's claim was inconsistent with industry custom and practice, and, b. The decision-making process used by Atlantic in deciding to deny coverage also fell below industry custom and practice. 3. These are two separate issues. For example, it is clear that a carrier might be guilty of issue 1, coming to the wrong conclusion, while not guilty of issue 2. In other words, a carrier may come to the wrong decision and also go about it in the wrong way, or may come to the wrong decision but not act in bad faith in the manner in which they went about their decision making process. I have analyzed each issue separately. | Sagalow March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 4. Accordingly, I first reviewed Mr. Clark's report to determine where his opinions differ from mine as to these two issues. After being retained over 50 times in less than 5 years as an insurance expert, I assumed that he would be | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |

| | | |
|---|---|---|
| asked to have, and would have, an opinion on both issues. | | |
| 5. However, what I discovered is that his report did not argue against my first opinion, that Atlantic was incorrect, from an insurance industry custom and practice point of view, when it denied coverage based on the Policy's War Exclusion. Rather, he argued only that the process that Atlantic used in making the decision was reasonable and within industry standards (even if the decision itself was wrong). | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 6. I reiterate my opinion that Atlantic's determination to apply the War Exclusion ran counter to industry custom and practice, and for the reasons discussed in the next section, I disagree with Mr. Clark's opinion that Atlantic acted reasonably in the process that they adopted in making their [incorrect] claims decision. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| **II THE IMPACT AND IMPORTANCE OF WHAT IS NOT IN MR. CLARK'S REPORT: TO WIT, WHETHER THE WAR EXCLUSION IN FACT APPLIES AND WHAT RULE OF CONSTRUCTION SHOULD APPLY IN MAKING THAT DECISION** | | |

| | | |
|---|---|---|
| 10. As a foundation matter, before I comment on what is in Mr. Clark's report, it is important to note what opinions are missing from Mr. Clark's report. As Atlantic's sole insurance expert, I would have expected that Mr. Clark would provide an opinion as to how the War Exclusion in issue should be interpreted from a point of view of industry custom and practice. Tellingly, he did not. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| **A. The Foundation Coverage Issue** | | |
| 11. We know that Mr. Clark did not offer an opinion on this foundation issue for several reasons: a. First, the expert typically sets forth the issue or issues that he or she will be addressing at the beginning of the report. In Mr. Clark's case, his opening list of issues all deal with the manner in which Atlantic made its claims decision: "[I]t is my opinion that Atlantic Specialty Insurance Company (Atlantic) properly conducted a thorough and timely investigation … and made a reasonable determination under the terms and conditions of the applicable policy… Atlantic acted as a reasonable carrier would by staying in communication … and providing updates to the insured… provid[ing] the insured with clear and detailed explanation of the denial in an | Report of Anthony Clark ("Clark Report") at page 4; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |

| | | |
|---|---|---|
| expedited manner…Atlantic also responded in a complete and timely manner .. [and] continued to communicate with the insured… Nothing in the claim file or in any other actions of Atlantic Specialty indicates that any other extraneous motives affected the ultimate claim decision.6" | | |
| b. Second, the expert typically ends his or her report with all of his or her final conclusions. In Mr. Clark's concluding remarks, he only states the following: "Atlantic in the handling of this claim took all steps that a reasonable insurer and claims handler would take to determine the pertinent facts and circumstances surrounding this claim…" In Mr. Clark's final paragraph of the report, which is typically the expert's "bottom line," he states: "No facts demonstrate a lack of good faith or failure on the part of Atlantic to act in a reasonable fashion." | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| c. Third, nowhere in Mr. Clark's report does he analyze whether the decision made by Atlantic to deny coverage was correct, or consistent with, industry standards. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |

| | | |
|---|---|---|
| 12. Thus, with respect to the coverage opinion, Mr. Clark just quotes what are Atlantic's opinions, seemingly distancing himself from whether he agrees with those opinions or not.7 | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| FOOTNOTE 7 See for example "Atlantic, in the analysis of the applicable exclusions noted above, appears to have concluded that the common understanding and ordinary meaning given to the activities that caused the move of the production and any Extra Expense to be incurred by the insured was clearly a "war." In addition, Atlantic appears to have concluded…" | Anthony Clark March 17, 2020 Report at page 7; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 13. The significance of this decision, i.e. the decision not to offer an expert opinion on the foundation issue of coverage, cannot be overstated. As an expert I have been retained over 53 times in less than 5 years with many, if not most, of the cases dealing with a dispute involving coverage. In those coverage cases that also included a "bad faith" allegation, I have never been retained only to comment on the "bad faith" allegation and not to provide an opinion on the underlying coverage dispute issue. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |

| | | |
|---|---|---|
| 14. In my experience, having an expert comment only on the "bad faith" issue and not the "coverage issue" would occur only when either the hired expert does not agree with his client's position as to coverage (and thus chooses to remain silent), or in circumstances where the expert feels he or she does not have the necessary expertise, in which case the party will then retain a second insurance expert to focus only on the coverage issue. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 15. In other words, I have certainly seen cases where a party hires two experts, one on "bad faith" and another on "coverage" but I have never seen a situation where a party hires one insurance expert in a "coverage+bad faith" case and that insurance expert only comments on the "bad faith" element but not the coverage element. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 16. In short, a rational conclusion from all this is that Mr. Clark either disagreed with his client Atlantic in its ultimate conclusion that the War Exclusion applied in this case, or believed he had insufficient expertise to have an opinion in the matter and that Atlantic could not find a single other insurance expert to agree with Atlantic's coverage position | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| **B. Rule of construction** | | |

| | | |
|---|---|---|
| 17. What follows from the fact that Mr. Clark did not offer an opinion as to Atlantic's coverage position is the second critical missing piece of Mr. Clark's analysis. He does not address what is the proper rule of construction to be used in analyzing the words in the Policy's War Exclusion. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 18. Atlantic has indicated that it believes the appropriate rule of construction to be used in this case is to define the words or phrases in the War Exclusion applying their colloquial, common or ordinary meaning.8 | See for example, Atlantic's memorandum in support of its motion for summary judgment filed in this case at pages 9-10. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 19. Which rule of construction should apply in a particular coverage dispute falls squarely within the purview of an insurance expert. Accordingly, when a party chooses to retain an insurance expert in a coverage dispute case where it is important to know which rule of construction should apply, it normally falls to that insurance expert to offer an opinion on the issue. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 20. In this case, however, not only did Mr. Clark not offer an opinion on the issue, but he affirmatively stated that he is not offering an opinion on this issue. Specifically, he states in his report: "[I]t is my understanding from | Anthony Clark March 17, 2020 Report at pages 6-7; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at |

| | | |
|---|---|---|
| custom and practice of the industry that unless a term is specifically defined in a policy, it is to be viewed as it is commonly used or ordinarily understood9." Atlantic, in the analysis of the applicable exclusions noted above, appears to have concluded that the common understanding and ordinary meaning given to the activities that caused the move of the production and any Extra Expense to be incurred by the insured was clearly a "war."10 | | trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 21. As with the foundation coverage issue discussed above, Mr. Clark's failure to opine as to the applicable rule of construction means either that he does not believe he has the necessary expertise to have an opinion or that he disagrees that the applicable rule of construction is "what is the common sense definition" of the undefined terms. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 22. Moreover, while Mr. Clark stated that it is his "understanding from custom and practice of the industry that unless a term is specifically defined in a policy, it is to be viewed as it is commonly used or ordinarily understood," for the reasons stated in section IV of this report, my expert opinion is that Mr. Clark's "understanding" is incomplete and erroneous as applied to the factual situation at issue here. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |

| | | |
|---|---|---|
| **III MR. CLARK IS NOT CORRECT IN HIS VIEW THAT ATLANTIC ACTED REASONABLY AND WITHIN INDUSTRY CUSTOM IN ITS CLAIM HANDLING ACTIVITIES** | | |
| **A. Claims Handling Practices** | | |
| 24. In his 11 page report, Mr. Clark's first actual opinion (ignoring the summary on page 4) seemingly does not appear until page 10. As the above section illustrates, from pages 4 thorough 10, it is unclear what Mr. Clark is attempting to do other than just repeating Atlantic's views without actually offering any expert opinion of these views. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 25. Eventually, however, on the second to last page of his report, Mr. Clark does offer an opinion. This opinion addresses whether Atlantic's conduct in the investigation and handling of the Insured's claim was consistent with industry custom and practice (regardless of whether their ultimate denial decision was correct or not). | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 26. He believes it was. I disagree. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at |

| | | trial. See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
|---|---|---|
| 27. Mr. Clark correctly sets forth some of the standards by which Atlantic will be judged in this regard. Specifically, Mr. Clark states that Atlantic's claims investigation must be both "thorough and timely,11" and that Atlantic must have acted as a "reasonable carrier12" in the handling of the claim. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial. See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 28. To support his conclusion that Atlantic's investigation fulfilled both these prongs, Mr. Clarks set forth a number of sub-conclusions in the initial summary section of his report specifically referencing Atlantic: a. "Staying in communication with [the] insured during the investigation stage;13" b. "Providing updates of its analysis on coverage;14" c. "Provid[ing] the insured with a clear and detailed explanation of the denial in an expedited manner;15" d. "Respond[ing] in a complete and timely manner to a request by the insured for reconsideration;16" and, e. "Continu[ing] to communicate with its insured" after the claims decision was made.17 | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial. See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 29. One major failure in his analysis is that he does not sufficiently distinguish between what | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted |

| | | |
|---|---|---|
| the Insured is disputing as Atlantic's claims handling behavior and what it is not disputing. | | to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 30. The Insured is not asserting that Atlantic failed to act in a timely manner, or that it failed to keep in touch with the Insured during the few days of its "investigation," or that it failed to articulate the basis for its denial of the claim in its denial letters. (Atlantic's denial letters clearly indicated it was denying the Insured's claim on the basis of the first two parts of the War Exclusion and, with respect to the initial denial letter, the Terrorism Risk Insurance Act of 2002 ("TRIA") endorsement. These letters detailed various reasons and case law which it claims purportedly supported the decision.18) | PX GUTTERMAN 18, ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter"); PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| FOOTNOTE 18 This behavior is to be contrasted with such questions as whether Atlantic's coverage determination was (a) correct, (b) even handed in its approach or (c) took into consideration and weighed properly competing definitions of "war" and "warlike," and the impact on the lack of terrorism exclusion on the application of the War Exclusion. None of which they were. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |

| | | |
|---|---|---|
| 31. However, the applicable standard is whether Atlantic conducted a "full, fair, thorough, and prompt" investigation.19 | See Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraph 43; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| For ease of reference, I refer to this standard or its subparts herein as "fair, thorough, and prompt." The deficiencies in Atlantic's investigation are as to the "fair and thorough" part of the standard which were addressed in my original report.20 | See Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraph 104-148; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| In my view, Mr. Clark's opinion as to the fairness and thoroughness of Atlantic's investigation are both unsupported and unsupportable based on the agreed facts of this case. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| **B. Mr. Clark's Bases for Concluding Atlantic Purportedly Conducted A Fair and Thorough Investigation Are Not Valid.** | | |
| 32. Mr. Clark's attempts to show Atlantic conducted a "fair and thorough" claims investigation include the following arguments or observations: | Anthony Clark March 17, 2020 Report | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |

| | | |
|---|---|---|
| a. "Using numerous reliable and authoritative sources, Atlantic thoroughly investigated the circumstances...21" | Anthony Clark March 17, 2020 Report at page 8 | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| b. "Atlantic separately sought legal advice by requesting a coverage opinion to add to the overall process.22" | Anthony Clark March 17, 2020 Report at page 9 | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| c. "[T]he ultimate decision of Atlantic was approved by additional supervisory personnel within Atlantic.23" | Anthony Clark March 17, 2020 Report at page 9 | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| d. "Upon receipt of the [Insured's reconsideration] letter, Atlantic proceeded to give careful consideration to the points raised. After this consideration, Atlantic still felt that they had reached the proper conclusion in denying the claim.24" | Anthony Clark March 17, 2020 Report at pages 9 and 10. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| FOOTNOTE 24 Also indicating on page 10 that Atlantic "responded to it [the | Anthony Clark March 17, 2020 Report at page 10. | Relevant to Plaintiffs' bad faith claim if |

| | | |
|---|---|---|
| reconsideration request] promptly and completely" | | Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
|     e. "Based upon all of its research, which appears to have comprehensive, especially for the time involved, Atlantic concluded … that this was a war.25" | Anthony Clark March 17, 2020 Report at pages 8. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 33. These arguments simply do not have merit. I will deal with them one at a time. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 34. As to Mr. Clark's first basis, he opines that Mr. Gutterman's investigation was sufficient, and in support, Mr. Clark lists a "small sample" list of the "numerous reliable and authoritative sources" which Mr. Gutterman reviewed when investigating the claim which are a Washington post article, a New York Times article and two online articles appearing in msnbnc.com and nbcnews.com. The problem with this list is the same problem with all the other "sources" indicated in the documents I reviewed. To wit, | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |

| | | |
|---|---|---|
| all that Mr. Gutterman seems to have done in "investigating" the claim is to conduct a Google search of then current events in Israel. In the context of the insurance coverage issue to be determined, recent press clippings are not "reliable and authoritative sources" for the purposes of a first impression claims analysis. | | |
| 35. Moreover, as noted in my original report, a quick Google search, just as Mr. Gutterman did when he was investigating the claim, shows that the majority of commentators label Hamas as a terrorist organization, which leads to the corresponding reasonable conclusion that Hamas' acts were acts of terror, not "war." However, Mr. Gutterman's investigation does not weigh the import of Hamas being designated as a terrorist organization in assessing whether the claim is covered.26 | See Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraphs 78-83 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| Additional authoritative sources to the same effect were also readily available, such as the official position of the U.S. government labeling Hamas as a terrorist organization,27 and Mr. Gutterman testified he did not look to the U.S. government's official position as to Hamas in investigating the claim.28 Atlantic also could have consulted experts, such as a Middle East expert or an international law | See Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraph 81; Mr. Gutterman deposition, pp. 267-68, ll. 14-23. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| expert, on the Hamas/Israel conflict and on the definition of "war." It did not do so. What is clear, however, is that for the purposes of making an insurance determination none of the sources Mr. Gutterman did consult were "reliable and authoritative sources." | | |
| 36. Mr. Clark's second basis, obtaining an outside legal counsel opinion, does potentially deal with getting an opinion from an insurance expert with regard to the issue in dispute. But, the support for this second basis is also faulty under the facts of this case. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Plaintiffs intend only to offer evidence and testimony establishing that Defendant did not obtain a coverage opinion prior to making the decision to reject Plaintiffs' claim. This is relevant to bad faith. Defendant may not mention the subsequent coverage opinion. See Dkt. 96. In the event Defendants are permitted to reference the outside coverage opinion, Plaintiffs will present rebuttal testimony. |

| 37. In supporting the notion of a thorough investigation by pointing to the decision to seek outside counsel advice, Mr. Clark fails to mention that, according to the testimony of Theresa Gooley, Atlantic's claims supervisor, Atlantic only sought an outside counsel opinion after the decision to deny coverage had already been made.29 | See, e.g. Ms. Gooley Deposition at p. 169, lines 5-8, p. 170, lines 14-25, p. 184, lines 17-25 | Plaintiffs intend only to offer evidence and testimony establishing that Defendant did not obtain a coverage opinion prior to making the decision to reject Plaintiffs' claim. This is relevant to bad faith.  Defendant may not mention the subsequent coverage opinion.  See Dkt. 96. In the event Defendants are permitted to reference the outside coverage opinion, Plaintiffs will present rebuttal testimony. |
|---|---|---|
| Obtaining an outside legal opinion for a complex case is generally a good idea, particularly in cases of first impression, but, under industry custom and practice, a carrier fails its duty to the insured when the insurer fails to obtain this opinion before making its decision to deny the claim.30 | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| FOOTNOTE 30 I have not reviewed this "coverage opinion" because I understand that Atlantic refused to produce it in this action. Therefore, it is not possible for me to assess whether Atlantic acted in good faith by following the coverage opinion or in bad faith by ignoring it. | Observations based on expert's extensive and specialized experience. | Plaintiffs intend only to offer evidence and testimony establishing that Defendant did not obtain a coverage opinion prior to making the decision to reject Plaintiffs' claim. This is relevant to bad faith.  Defendant may not mention the subsequent coverage opinion.  See Dkt. 96. In the event Defendants are permitted to reference the outside coverage opinion, Plaintiffs will present rebuttal testimony. |
| Moreover, in a case like this even if the coverage opinion was obtained prior to the claim being officially denied, this would still have been too late. | Observations based on expert's extensive and specialized experience. | Plaintiffs intend only to offer evidence and testimony establishing that Defendant did not obtain a coverage opinion prior to making the decision to |

| | | reject Plaintiffs' claim. This is relevant to bad faith.  Defendant may not mention the subsequent coverage opinion.  See Dkt. 96. In the event Defendants are permitted to reference the outside coverage opinion, Plaintiffs will present rebuttal testimony. |
|---|---|---|
| Given that this is a claim that involves an exclusion with which Atlantic has had virtually no experience, at a minimum Atlantic should have obtained the coverage opinion first, so that it had an understanding of the industry's definition of these terms, before deciding whether the facts met the industry definition. | PX 657, Atlantic's response to Plaintiffs' RFA 26; Deposition of Ms. Gooley at p. 38, lines 5-10; Experience | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 38. As to Mr. Clark's third basis, that the coverage decision was reviewed and approved by senior management (e.g. people who would be presumed to have greater experience which thus evidences a more "thorough" investigation), I assume that Mr. Clark is referring to Sean Duffy, Chief Claims Officer | Anthony Clark March 17, 2020 Report | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |

| for Atlantic and Mr. Dennis Crosby, Executive Vice President of Atlantic.31 | | |
|---|---|---|
| FOOTNOTE 31 I note that Mr. Clark fails to footnote or indicate in any way who he is referring to but based on the documents I read, these seems to be the only senior management level people he could be referencing. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| Assuming this is the case, Mr. Clark has apparently not read nor been advised of Atlantic's attorney's letter of March 17, 2017 (which I have reviewed) from Toni Scott Reed of Strasburger & Price, LLP to Daniel M. Hayes of Mitchell Silberberg Knupp LLP where Atlantic, through their counsel, argues that Mr. Crosby's deposition should not be taken and Mr. Duffy's deposition should be limited because in the view of Atlantic's counsel32: "Mr. Duffy had only fleeting involvement with the Dig claim. As you know from the correspondence we produced, he stated in a one-sentence email that he agreed with the analysis in the denial letter. That was the extent of his involvement." And with respect to Mr. Crosby, Ms. Reed stated: "Mr. Crosby had even less involvement with the Dig claim. He was forwarded the denial letter at | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience; March 17, 2017 letter from Read to Hayes at pages 8-9 | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |

| | | |
|---|---|---|
| one point and then proceeded to forward it on to Peter Williams (who already knew of the Dig claim) and in that forwarding e-mail said only: "FYI." This is the total of his involvement in the Dig claim." In short, Atlantic's counsel claims that both Mr. Duffy and Mr. Crosby are "apex" employees who have nothing more than second-hand cumulative knowledge of the claim, to the extent they have any knowledge at all. | | |
| 39. Given this letter, Mr. Clark's argument that Atlantic's claims investigation was "fair and thorough" because the coverage decision was reviewed and approved by senior management does not appear to be factually correct. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience; March 17, 2017 letter from Read to Hayes at pages 8-9 | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 40. As for Mr. Clark's fourth basis, that Atlantic's "reconsideration response" letter supports the notion that their investigation was "thorough," the fact that a carrier quickly responds to an insured's request for consideration with a reaffirmation of denial is not evidence of thoroughness. However, more importantly, Mr. Clark fails to mention that in their reconsideration request, Atlantic admits that one of the original grounds for denial, the | Anthony Clark March 17, 2020 Report; PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |

| | | |
|---|---|---|
| lack of terrorism coverage due to the lack of TRIA coverage, was a mistake. | | |
| 41. This is an important fact about Atlantic's reconsideration letter – it was an admission by Atlantic that its original coverage position was put together so quickly without adequate oversight that a simple and fundamental coverage analysis error was made. Worse, there is no evidence to suggest that this recognition that an error had been made prompted Atlantic to revisit any of its other denial of coverage grounds or, perhaps more to the point, that the claim investigator should talk to Wanda Phillips, Atlantic's underwriter, to find out whether the lack of a terrorism exclusion meant that Ms. Phillips actually intended a Hamas terrorist attack to be covered when she wrote the Policy. | PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 42. In other words, instead of Atlantic's reconsideration response letter evidencing a thoroughness of investigation as Mr. Clark seems to argue, it actually does the opposite. | PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 43. Finally, as to Mr. Clark's fifth basis for concluding Atlantic's claims handling was | Anthony Clark March 17, 2020 Report; | Relevant to Plaintiffs' bad faith claim if |

| proper, Mr. Clark's main "defense" as to the lack of completeness of the Atlantic investigation seems to be the oft repeated excuse given by Atlantic that the rush to judgment was the fault of the Insured, or its broker, who "wanted a determination of coverage as soon as possible.33" This notion is repeated several times in Mr. Clark's report. For example, also see his comments further down the same page 8 that Atlantic "produce[d] a substantial coverage position quickly as the insured had requested" as well as his reference on page 9 that "The denial was made in an expeditious and timely manner, as the insured requested." | Observations based on expert's extensive and specialized experience. | Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 44. As stated in my original report, the fact that an insured wants to know whether he has coverage under his insurance policy does not excuse the insurer's obligation to thoroughly investigate the claim, nor excuse the insurer's obligation to conduct an evenhanded investigation weighing the interests of the insured and the insurer in equal fashion.34 | See Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraphs 125-126; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| 45. In short, whether or not "time was of the essence" as Mr. Clark remarks, a carrier is not | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted |

| | | |
|---|---|---|
| permitted to say to an insured "You want an answer now? Ok, no coverage!" | | to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 46. As I noted in my original report, what Atlantic could have and should have told their insured if Atlantic was uncomfortable with making a quick favorable coverage decision was: "This is a complex issue which our claims examiners are seeing for the first time. We have concerns about the possible applicability of the war exclusion and need to do further research. For now, we are reserving our rights on the claim and will stay in touch with you while our investigation proceeds. We plan on conducting the investigation as quickly as possible, understanding our obligation to you to be thorough and the complexity of the issue. In the meantime, please feel free to provide us with any additional information you believe will be helpful to our investigation."35 | See Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraphs 107-108 and 115-116; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's to conduct a proper investigation of Plaintiffs' claim. |
| 47. This is what Atlantic could have done and should have done (given their apparent reluctance to immediately recognize coverage) but it did not do so. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| 48. I note that Mr. Clark does not deal at all with one of the major deficiencies in Atlantic's "thorough" investigation: their utter failure to find out from the insurance underwriter, Ms. Phillips, whether she intended for there to be coverage for attacks by Hamas, a terrorist organization, since she decided not to put a terrorism exclusion on the Policy. Indeed, no underwriting materials or emails are even listed in Mr. Clark's list of documents reviewed. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 49. Mr. Clark deals only peripherally with the obligation of the insurer to investigate the claim in an even handled and fair manner, treating equally the interests of the insured and the insurer. This failure goes to the heart of Atlantic's claims handling failings in this case as I discussed in my original report.36 In sum, Atlantic failed to take into consideration alternative views of the War Exclusion or the impact of the exclusion in light of the fact that there is no terrorism exclusion on the policy. | See Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraphs 112-148; Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 50. Mr. Clark's report includes what might be called some "throw away" lines potentially related to this issue. For example, on page 4 in his initial summary of opinions he states "Nothing in the claim file or in any other actions of Atlantic Specialty indicates that any | Anthony Clark March 17, 2020 Report | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |

| | | |
|---|---|---|
| other extraneous motives affected the ultimate claim decision". | | |
| 51. I am not sure what Mr. Clark means by "extraneous motives." However, to the extent Mr. Clark is arguing that this means Atlantic's claims handling of the Dig claim was evenhanded and took into proper consideration the views of the insured and the insurer weighing each in an equal fashion, I disagree. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| 52. More specifically, as mentioned above and detailed in my original report, Atlantic's investigation is particularly one-sided in that it did not consider potential alternative interpretations of the word "war" (including the correct, in my view, interpretation advanced by the Insured consistent with industry custom and practice), the impact of the Policy's lack of terrorism exclusion on the application of the War Exclusion, the underwriting decision and analysis done by their own underwriter, and the impact of all of this on the reasonable expectations of the Insured.37 Had Atlantic considered the claim evenhandedly and fairly, all of these considerations could have led Atlantic to the conclusion that Hamas' terrorist acts are exactly that, terrorist acts, and that the War Exclusion did not apply to the claim. | See Ty Sagalow Expert Witness Report dated March 17, 2017, at paragraphs 78-105; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |

| | | |
|---|---|---|
| 53. Instead, Atlantic looked narrowly at the word "war" and chose a definition which they contend would make the War Exclusion apply to the claim, in order to avoid their obligations under the Policy. | See, e.g., PX GUTTERMAN 18,  ATL000094-101, Letter from Pamela A. Johnson, AVP One Beacon Entertainment, to Andrea Garber, NBCUniversal Media, dated July 28, 2014 ("First Denial Letter"); PX GUTTERMAN 20, ATL000705-708, Letter from Pamela A. Johnson to Lucia E. Coyoca dated September 19, 2014 ("Second Denial Letter") | Relevant to Plaintiffs' bad faith claim. Relevant to Defendant's failure to conduct a proper investigation of Plaintiffs' claim. |
| 54. On page 6 of this report, Mr. Clark seems once again to blame the Insured for Atlantic's decision to only review the War Exclusion in its claims investigation when he states: "Due to the facts presented to Atlantic, Atlantic quickly began to review the facts in the context of the several war exclusions in the policy." Mr. Clark does not indicate what "facts" he is referring to; however, the facts and documents I reviewed demonstrate a series of actual and threatened terrorist attacks by a known terrorist organization causing an Imminent Peril against an insured for which Atlantic provided coverage, specifically without a terrorism exclusion. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| **C. Atlantic's Purported Motivation** | | |
| 55. Finally, Mr. Clark argues that Atlantic's good faith is demonstrated by the fact that they (1) have paid other claims made by the | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted |

| | | |
|---|---|---|
| Insured38 and (2) made a settlement offer in this case (presumably despite their view that there was no coverage)39. | | to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. Plaintiffs do not intend to offer testimony regarding settlement offers unless Defendant offers testimony or evidence regarding settlement offers. |
| 56. To respond to these, it is axiomatic that the fact that a carrier's claims handling practices was consistent with industry standard in the past does not exclude the possibility that they have departed from industry standard in another case, even with the same insured. Moreover, based on what I understand to be Atlantic's profit / paid claims figures in connection with the Insured's policies for the years 2010 through 2015, Atlantic paid out a total of $5,374,531 (after the Insured paid large deductibles) on about 54 claims, and earned premiums of $7,433,862.40 However, the Dig claim at issue here, alone, exceeds the amount Atlantic paid on these 54 claims over the period of five years. In other words, payment of the Dig claim would have put Atlantic in the | PX 669, ATL005268, Atlantic's profit / paid claims figures in connection with the Insured's policies for the years 2010 through 2015 | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. Plaintiffs do not intend to offer testimony regarding settlement offers unless Defendant offers testimony or evidence regarding settlement offers. |

| | | |
|---|---|---|
| "red" when it seemingly was, prior to the Dig claim, in the "black". This fact can render both Atlantic's prior claims payment history irrelevant and also potentially supply the "extraneous motives" Mr. Clark failed to detect. With respect to the "settlement offer," I am advised that this "offer" was for less than the deductible and thus would have not resulted in any cash payment to the Insured. In any event making a settlement offer, especially one that falls within the insured deductible, on a claim that should have been covered in the first instance is no evidence of good faith. | | |
| 57. Accordingly, none of what appears in Mr. Clark's report supports any conclusion other than that Atlantic acted below industry custom and practice in handling the claim, as discussed at length in my original report. | Anthony Clark March 17, 2020 Report; Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| **V CONCLUSION** | | |
| 91. In conclusion, for the reasons set forth above, it is my expert opinion that: a. Mr. Clark is incorrect in his opinion that the claims handling by Atlantic fell within industry standards. Rather, Atlantic acted well below industry standards by failing to conduct a thorough investigation balancing the interests | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |

| | | |
|---|---|---|
| of both the insured and the insurer in an evenhanded manner. | | |
| b. The appropriate rule of construction to evaluate the undefined words and phrases in the policy's War Exclusion is not the colloquial or "common or ordinary meaning" rule but rather the rule applying "special" meaning to the words. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim if Defendant is permitted to present Mr. Clark at trial.  See Plaintiffs' MIL 2, Dkt. 208 at 6-7. |
| c. When applying this rule of construction in a post "9/11" world, an act of terrorism committed by a recognized terrorist organization is not an act of war subject to exclusion by a war exclusion. Rather, an act of terrorism is subject to exclusion by a policy's terrorism exclusion, if there is one. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| d. Applying the appropriate rule of construction and interpreting the "insurrection, rebellion" and "weapon of war" exclusions according to industry custom and practice, these exclusions do not apply to the claim. | Observations based on expert's extensive and specialized experience. | Relevant if Defendant is permitted to argue Exclusions 3 and 4. See Plaintiffs' MIL 2, Dkt. 209. |
| e. Accordingly, Atlantic was acting against industry custom and practice when it applied the War Exclusion to the claim at issue, and, | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to |

| | | |
|---|---|---|
| | | pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |
| f. Atlantic violated a number of industry customs and practices in its claims process and handling of the claim at issue. | Observations based on expert's extensive and specialized experience. | Relevant to Plaintiffs' bad faith claim. Relevant to unreasonableness of Defendant's failure to pay benefits due and failure to conduct a proper investigation of Plaintiffs' claim. |

1

DATED:   January 23, 2020

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KALPANA SRINIVASAN
JACOB W. BUCHDAHL
AMANDA K. BONN
CATRIONA LAVERY
SUSMAN GODFREY L.L.P.

By:   */s/ Amanda K. Bonn*
Amanda K. Bonn
*Attorneys for Plaintiffs*