MARC J. SHRAKE (SBN 219331)
mshrake@fmglaw.com
WAYNE H. HAMMACK (SBN 202709)
whammack@fmglaw.com
FREEMAN MATHIS & GARY, LLP
550 South Hope Street, Suite 2200
Los Angeles, California 90071
Telephone: (213) 615-7019
Facsimile: (213) 615-7000

CHRISTOPHER W. MARTIN *(Pro Hac Vice)*
martin@mdjwlaw.com
MELINDA R. BURKE *(Pro Hac Vice)*
burke@mdjwlaw.com
MARTIN, DISIERE, JEFFERSON
& WISDOM LLP
9111 Cypress Waters Blvd., Suite 250
Dallas, Texas 75019
Telephone: (214) 420-5500
Facsimile: (214) 420-5501

Attorneys for Defendant
Atlantic Specialty Insurance Company

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, a Delaware limited liability company, and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY, a New York insurance company,<br><br>Defendant. | CASE NO. 2:16-cv-04435-PA-MRW<br>[*Hon. Percy Anderson; Ctrm. 9A*]<br><br>**DECLARATION OF MARC J. SHRAKE IN SUPPORT OF ATLANTIC SPECIALTY'S OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 3 REGARDING ISRAEL'S CONDUCT TOWARD GAZA**<br><br>Hearing Date: February 10, 2020<br>Time: 1:30 PM<br>Pretrial Conference: January 17, 2020<br>Time: 1:30 PM<br>Place: Courtroom 9A<br>Judge: Honorable Percy Anderson<br>Trial Date: February 18, 2020 |

I, Marc J. Shrake, declare as follows:

1. I am an attorney authorized to practice before all California courts and before this Court and am a partner with the law firm of Freeman Mathis & Gary, LLP, attorneys for Defendant Atlantic Specialty Insurance Company.

DECLARATION OF MARC J. SHRAKE

2. I have personal knowledge of the matters set forth in this Declaration, and if called upon to testify to them, could and would do so.

3. I make this Declaration in conjunction with, and in support of, Atlantic Specialty's Opposition to Motion in Limine No. 3 Re: Israel.

4. Attached to this Declaration as Exhibit 1 is a true and correct copy of pages 170-71 of the transcript of the deposition of Stephen Smith, given on April 18, 2017, in the captioned case.

5. Attached to this Declaration as Exhibit 2 is a true and correct copy of pages 264-65 of the transcript of the deposition of Stephen Smith, given on April 18, 2017, in the captioned case.

6. Attached to this Declaration as Exhibit 3 is a true and correct copy of pages 341-43 of the transcript of the deposition of Stephen Smith, given on April 18, 2017, in the captioned case.

7. Attached to this Declaration as Exhibit 4 is a true and correct copy of pages 364-65 of the transcript of the deposition of Stephen Smith, given on April 18, 2017, in the captioned case.

8. Attached to this Declaration as Exhibit 5 is a true and correct copy of pages 387-89 of the transcript of the deposition of Stephen Smith, given on April 18, 2017, in the captioned case.

I declare under penalty of perjury of the laws of the United States of America and the laws of the State of California that the foregoing is true and correct and that this declaration is executed this 13th day of January 2020 at Los Angeles, California.

DATED: January 13, 2019     MARC J. SHRAKE

By: */s/ Marc J. Shrake*
Marc J. Shrake

**Freeman Mathis & Gary, LLP**
Attorneys at Law

-2-
DECLARATION OF MARC J. SHRAKE

**EXHIBIT 1**

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 170

1 rating of 1 to 5. Some companies raise -- use a
2 rating of low, medium, high, extreme, and medium is
3 not a -- you know, it's one of a number of ways of
4 describing the situation.
5 BY MS. SCOTT REED:
6   Q.  Were you engaging in ongoing monitoring of
7 the security situation in Israel on July the 9th?
8   A.  Yes.
9   Q.  Were you reviewing, among other things,
10 travel warnings that were being issued?
11  A.  Yes.
12  Q.  Were you aware that, according to sources
13 that were reporting, more than 200 rockets had been
14 fired from Gaza and targeted Israel since the IDF
15 launched operative -- Operation Protective Edge on
16 July the 8th?
17      MR. HAYES:  Objection, lacks foundation.
18      THE WITNESS:  I was reviewing all
19 information available.
20 BY MS. SCOTT REED:
21  Q.  And do you recall reviewing information that
22 was reported from multiple sources that there had
23 been significant rockets fired from Gaza to target
24 Israel since the IDF launched Operation Protective
25 Edge on July 8?

Page 171

1       MR. HAYES:  Objection, vague, lacks
2 foundation.
3       THE WITNESS:  I was reviewing multiple
4 sources of information, and any escalation, any
5 direct evidence, would have been part of that review.
6 BY MS. SCOTT REED:
7   Q.  Did you note escalation in the activity that
8 was aimed from Gaza to Israel and out of Israel back
9 toward Gaza in July of 2014?
10      MR. HAYES:  Objection, vague, lacks
11 foundation.
12      THE WITNESS:  Noting and assessing
13 escalation and conflict is part of the risk
14 management and security process, not just on this
15 date but throughout an event of production.
16 BY MS. SCOTT REED:
17  Q.  Yes, sir.
18      And in the first two weeks of July of 2014,
19 as part of your work on the Dig production, did you
20 note that that was an uptick in activity?
21  A.  Yes.
22  Q.  And were there out of the ordinary sorts of
23 events beginning to occur?
24      MR. HAYES:  Objection, vague, lacks
25 foundation.

Page 172

1       THE WITNESS:  What do you mean by out of the
2 ordinary?  You know, could you be slightly more
3 specific?
4 BY MS. SCOTT REED:
5   Q.  Sure.
6   A.  200 rockets fired from Gaza?
7   Q.  Right.
8   A.  You know, is that out of the ordinary in
9 your opinion?
10      Because I don't really know what you mean by
11 out of the ordinary.
12  Q.  Let me try to improve 'cause I'm --  I'm
13 speaking to you from a lay perspective, and, of
14 course, you're coming to this from a security
15 perspective.  So I'll try to improve.
16  A.  Okay.
17  Q.  All right.  So you were in Israel during
18 production and filming for Dig, correct?
19  A.  Correct.
20  Q.  And you personally could look around and
21 sort of see the situations, and you were continuing
22 to receive security updates, right?
23      MR. HAYES:  Objection, vague, lacks
24 foundation, misstates prior testimony.
25      THE WITNESS:  I was receiving security

Page 173

1 information from multiple sources.
2 BY MS. SCOTT REED:
3   Q.  Yes.  And you could assess for yourself
4 based upon observing the conditions there how
5 security was at that point in time?
6       MR. HAYES:  Objection, vague, lacks
7 foundation, misstates prior testimony.
8       THE WITNESS:  Depending on the location I
9 was in, but, you know, I can't vouch for --
10 personally for every single instance that's
11 happening.
12 BY MS. SCOTT REED:
13  Q.  Sir, I'm talking about what you personally
14 observed.
15      When you were in various locations could you
16 personally observe what the security situation was
17 according to your own observations?
18      MR. HAYES:  Objection, vague, lacks
19 foundation, misstates prior testimony.
20      THE WITNESS:  I -- I honestly don't really
21 understand what the -- what the question is.
22      Are we still talking about this document
23 here or are we just talking -- I really don't
24 understand.
25

# EXHIBIT 2

Page 262

1    MR. HAYES: Objection, lacks foundation,
2 vague, and calls for speculation.
3        THE WITNESS: Tit-for-tat means one side
4 doing one thing and one side doing another. I'd just
5 like to say that's not the question that you
6 originally asked me. That's why I said I'm not the
7 author of this.
8        MR. HAYES: You originally said "you." Just
9 to clear up the record.
10 BY MS. SCOTT REED:
11   Q. You understand that I'm just trying to
12 understand in security talk, if one writer who's
13 communicating to another person in the security field
14 talks about tit-for-tat exchanges, can you describe
15 for the court what that is indicating?
16        MR. HAYES: Objection, vague, lacks
17 foundation, calls for speculation.
18        THE WITNESS: I -- I think tit-for-tat is a
19 term that most people would understand what that
20 means, and they'd also understand that when it's
21 referenced with exchanges one side was doing one
22 thing and the other side was responding in kind.
23 BY MS. SCOTT REED:
24   Q. All right. Sir. Thank you.
25   A. I'm trying to answer the questions that are

Page 263

1 asked, not anything else.
2   Q. I'd like to refer you, please, sir, down to
3 the bottom this assessments paragraph, the last
4 sentence that's on that page. (As read):
5        In such a scenario there remains
6        an increased potential for an
7        escalation between Gaza militants
8        and the IDF, which could result in
9        air strikes on Hamas infrastructure
10       in Gaza, as well as an increased
11       frequency of rocket fire from the
12       Gaza Strip.
13       Do you see that reference?
14   A. Yes.
15   Q. And was that a concern that you were
16 processing and reporting on during this time period?
17        MR. HAYES: Objection, vague, lacks
18 foundation.
19        THE WITNESS: I was reporting on the
20 deterioration of the security situation at that time.
21 BY MS. SCOTT REED:
22   Q. Oh, pardon me.
23        In the latter part of June, had you
24 developed a concern that there was an increased
25 potential for escalation between the Gaza militants

Page 264

1 and the IDF, which could result in air strikes on
2 Hamas infrastructure and Gaza as well as rocket fire
3 from the Gaza Strip toward Israel?
4        MR. HAYES: Objection, vague, lacks
5 foundation.
6        THE WITNESS: Sorry. Am I supposed to be
7 looking at a document here to answer that question
8 or? Or is it just a general question?
9 BY MS. SCOTT REED:
10   Q. It's a general question. Based upon your
11 experience, expertise, background and the work you
12 were doing, by this point in June, had you developed
13 a concern that there was an increased potential for
14 escalation between Gaza militants and the IDF, which
15 could result in air strikes on Hamas infrastructure
16 in Gaza, as well as rocket fire from the Gaza Strip
17 towards Israel?
18   A. There was a deterioration in the security
19 landscape and situation, and that's information would
20 have been contained within intelligence reports that
21 I received.
22   Q. It would have been?
23   A. I -- yes.
24   Q. Were you passing along those concerns to
25 your NBCUniversal colleagues?

Page 265

1        MR. HAYES: Objection, misstates testimony.
2        THE WITNESS: Throughout this production,
3 postproduction, during production, and preproduction,
4 I supplied information to a number of NBCU personnel
5 relating to the security situation in Israel, and the
6 safety and security of their personnel.
7 BY MS. SCOTT REED:
8   Q. And would your concerns about that
9 intensification we were just discussing have been
10 included in those various reports?
11        MR. HAYES: Objection, vague, misstates
12 testimony.
13        THE WITNESS: I would supply pertinent
14 information related to the deterioration of the
15 security situation in country.
16 BY MS. SCOTT REED:
17   Q. Did you continue to notice a deterioration
18 of the security situation in Israel after June the
19 24th?
20   A. Yes.
21        MS. SCOTT REED: Let me hand you
22 Exhibit 124, please, sir.
23        (Exhibit 124 was marked for identification by
24        the court reporter and is attached hereto.)
25        MS. SCOTT REED: For the record, UCP2704

# EXHIBIT 3

Page 338

1  MS. SCOTT REED: UCP2422 through 2426.
2  Q. Can you identify Exhibit 147 as a July 7th,
3  2014 security report from Max Security Intelligence
4  directed to you via e-mail?
5  A. Yes.
6  Q. Did you receive this July 7th security
7  update?
8  A. I have no reason to doubt that I received
9  it.
10 Q. Is this the type of information that you
11 were gathering for your work providing security for
12 the Dig production?
13 A. Yes.
14 Q. On the second page under the heading:
15 Assessments, was Max Security Intelligence continuing
16 to advise that there was increased potential for an
17 escalation in hostilities between Hamas and others in
18 Palestine on one side and Israelis on the other?
19 A. How far down is that -- sorry -- in this
20 assessment?
21 Q. Just the first half of the first paragraph
22 regarding assessments.
23 MR. HAYES: Objection, document speaks for
24 itself.
25 THE WITNESS: Yes.

Page 339

1 BY MS. SCOTT REED:
2  Q. In the second half of that first paragraph,
3  sir, there is a reference to Hamas' military wing,
4  the Izz Al-Din Al-Qassam brigades.
5     Do you see that?
6  A. I do.
7  Q. Do you know what the Izz Al-Din Al-Qassam
8  brigades is?
9  A. No.
10 Q. And are you familiar with Hamas' having a
11 military wing?
12 A. I -- I don't know the structure of Hamas.
13 Q. Are you familiar with any of the military
14 capabilities of Hamas' military wing?
15 MR. HAYES: Objection, vague, lacks
16 foundation.
17 THE WITNESS: No.
18 BY MS. SCOTT REED:
19 Q. As part of your work on the Dig production,
20 did you undertake any sort of study or review of
21 Hamas' military wing or its capabilities?
22 MR. HAYES: Objection, vague, lacks
23 foundation.
24 THE WITNESS: No.
25 Did you get that?

Page 340

1  No. Sorry.
2  MS. SCOTT REED: Hand you Exhibit 148,
3  please, sir.
4  (Exhibit 148 was marked for identification by
5  the court reporter and is attached hereto.)
6  MS. SCOTT REED: This is UCP2569, and
7  clipped to it is a printout of the link to
8  Haaretz.com.
9  Q. Can you identify the first page marked 2569
10 as an e-mail from Mr. Biggs to you?
11 A. Yes.
12 Q. And in this, was he including a link to an
13 article that was at Haaretz.com?
14 A. Yes.
15 Q. Did you open that link and review the news
16 report?
17 A. I couldn't say definitively yes or no, but I
18 have no reason to doubt that.
19 Q. Was this information that Mr. Biggs was
20 gathering as part of his work on the Dig production?
21 A. Yes.
22 Q. And was this information that you and he
23 were reviewing and processing in order to continue to
24 report to NBCUniversal?
25 A. Yes.

Page 341

1  MS. SCOTT REED: Let me hand you
2  Exhibit 149, please, sir, UCP1865.
3  (Exhibit 149 was marked for identification by
4  the court reporter and is attached hereto.)
5  BY MS. SCOTT REED:
6  Q. Can you identify Exhibit 149 as an e-mail
7  from Mr. Biggs to you and Ms. Noordeloos of July 7,
8  2014?
9  A. Yes.
10 Q. Was Mr. Biggs reporting additional factual
11 developments to you regarding a response to Gaza
12 rockets?
13 A. He's reported factual developments and
14 hearsay as well in this document. So the first line
15 I take to be a factual statement. The second one is
16 a -- by the fact it starts early leaks from cabinet
17 meeting, it's -- would come from sources we may not
18 be able to confirm.
19 MS. SCOTT REED: Let me hand you
20 Exhibit 150, please, sir.
21 (Exhibit 150 was marked for identification by
22 the court reporter and is attached hereto.)
23 MS. SCOTT REED: UCP2816 through 2820.
24 Q. Can you identify Exhibit 150 as a July 7th
25 Max Security Intelligence report sent to you via

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 342

1  e-mail?
2    A.  Yes.
3    Q.  Did you receive this Max Security report on
4  or about July the 7th?
5    A.  Yes.
6    Q.  Would you have reviewed this information on
7  receiving it from Max Security?
8    A.  I have no reason to doubt that I did.
9    Q.  Was this the type of information that you
10 were gathering as part of your work in connection
11 with the Dig production?
12   A.  Yes.
13   Q.  Does part of this report indicate that
14 cross-border fire between the Israel defense forces,
15 IDF, and Gaza-based militants escalated during the
16 evening hours of July 7?
17       MR. HAYES:  Objection, document speaks for
18 itself.
19       THE WITNESS:  Yes.
20 BY MS. SCOTT REED:
21   Q.  In the next paragraph did Max Security
22 report to you as part of its work for NBCUniversal
23 that on the ground dozens of rockets and mortars have
24 been fired toward Southern Israeli communities
25 bordering the Gaza Strip while numerous Israeli air

Page 343

1  strikes were reported into Gaza as well?
2        MR. HAYES:  Objection, document speaks for
3  itself.
4        THE WITNESS:  Yes.
5  BY MS. SCOTT REED:
6    Q.  Did this report of July 7th indicate to you
7  that there continued to be an intensification of the
8  mutual activity back and forth between Palestine or
9  Hamas on one side and Israel on the other?
10       MR. HAYES:  Objection, vague and lacks
11 foundation.
12       THE WITNESS:  Yes.
13 BY MS. SCOTT REED:
14   Q.  And did you take this report as further
15 evidence that escalation was continuing?
16   A.  Yes.
17       MS. SCOTT REED:  Let me hand you
18 Exhibit 151, sir, UCP1855 through 1856.
19       (Exhibit 151 was marked for identification by
20   the court reporter and is attached hereto.)
21 BY MS. SCOTT REED:
22   Q.  Can you identify Exhibit 151 as an e-mail
23 from you to Ms. Richmond on July the 8th, 2014?
24   A.  Yes.
25   Q.  As part of this report, did you either quote

Page 344

1  or summarize the information you'd received from Max
2  Security in Exhibit 150?
3        MR. HAYES:  Objection, vague, lacks
4  foundation, and compound.
5        THE WITNESS:  Yes.
6  BY MS. SCOTT REED:
7    Q.  Did you quote part of it?
8    A.  Yes.
9    Q.  Did you summarize other parts of it?
10   A.  Yes.
11   Q.  Did you rely upon Exhibit 150, the July 7th
12 security report from Max Security, in order to
13 provide information in your report that's documented
14 as Exhibit 151?
15       MR. HAYES:  Objection, vague, lacks
16 foundation.
17       THE WITNESS:  Information from Exhibit 150
18 is included in the information in Exhibit 151.
19 BY MS. SCOTT REED:
20   Q.  And you relied upon Exhibit 150 in order to
21 quote or summarize that information?
22       MR. HAYES:  Same objections.
23       THE WITNESS:  Yes.
24 BY MS. SCOTT REED:
25   Q.  In Exhibit 151, you state toward the top

Page 345

1    (as read):
2        Summarizing the info below, there
3    is significant risk of an escalation
4    as conditions for a ceasefire are
5    unlikely to be acceptable.
6        Do you see that?
7    A.  Yes.
8    Q.  Was that your conclusion as of July the 8th?
9    A.  Yes.
10   Q.  Did you believe that things would continue
11 to intensify following July the 8th based upon the
12 information you had gathered?
13   A.  Yes.
14   Q.  Were you predicting any stop or cessation of
15 the hostilities as of July the 8th?
16       MR. HAYES:  Objection, vague, asked and
17 answered.
18       THE WITNESS:  No.
19       MS. SCOTT REED:  Let me hand you
20 Exhibit 152, please, sir.
21       (Exhibit 152 was marked for identification by
22   the court reporter and is attached hereto.)
23       MS. SCOTT REED:  UCP1845 through 1849.
24   Q.  Can you identify Exhibit 152 as a July 8th,
25 2014 Max Security Intelligence report sent to you via

# EXHIBIT 4

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 362

1 them about your assessment?
2     MR. HAYES: Objection, vague, lacks
3 foundation.
4     THE WITNESS: Yes.
5 BY MS. SCOTT REED:
6   Q. And attached to this is a July 9th, 2014
7 Israel Dig update prepared by Mr. Biggs, correct?
8   A. That's correct.
9   Q. Had you reached a collusion about the
10 recommendation on security that you have by this
11 point on July the 9th?
12     MR. HAYES: Objection, vague, lacks
13 foundation.
14     THE WITNESS: I couldn't say exactly at what
15 point I reached the conclusion.
16 BY MS. SCOTT REED:
17   Q. Do you know on what day of the month?
18     MR. HAYES: Same objections.
19     THE WITNESS: I -- I don't know if it was
20 the 9th or the 10th of July. It was around -- it was
21 around -- around that time.
22 BY MS. SCOTT REED:
23   Q. July 9 or 10?
24   A. My -- my recommendation was on July the
25 10th, which is my recollection when the conclusion

Page 363

1 was reached.
2   Q. July 10th is when you communicated your
3 conclusion?
4   A. Yeah, that's my understanding, yeah.
5     MS. SCOTT REED: Will you look at 166,
6 please, sir.
7     (Exhibit 166 was marked for identification by
8     the court reporter and is attached hereto.)
9     MS. SCOTT REED: UCP2393.
10   Q. Can you identify this as an e-mail from
11 Mr. Biggs to you on July 9th reporting further
12 factual events or news reports?
13   A. I can.
14   Q. Can you identify Exhibit 167 as another
15 e-mail from Mr. Biggs, July 9th, reporting further
16 facts or news reports?
17     (Exhibit 167 was marked for identification by
18     the court reporter and is attached hereto.)
19     THE WITNESS: Yes.
20 BY MS. SCOTT REED:
21   Q. And is this information that you and
22 Mr. Biggs were compiling as part of your assessment
23 of the security situation in Israel?
24   A. Yes.
25     MS. SCOTT REED: Let me hand you 168,

Page 364

1 please, sir, UCP2821.
2     (Exhibit 168 was marked for identification by
3     the court reporter and is attached hereto.)
4 BY MS. SCOTT REED:
5   Q. Can you identify this as an e-mail string of
6 July 9th, 2014 in which you were involved?
7   A. Yes.
8     MS. SCOTT REED: Here's 169, please, sir,
9 UCP2324.
10     (Exhibit 169 was marked for identification by
11     the court reporter and is attached hereto.)
12 BY MS. SCOTT REED:
13   Q. Can you identify this as a July 9th, 2014
14 e-mail you sent to Brian Brady to report further
15 events and summaries?
16   A. Yes.
17   Q. And did you report that you were still in an
18 escalation phase?
19     MR. HAYES: Objection, vague, lacks
20 foundation, document speaks for itself.
21     THE WITNESS: Yes.
22 BY MS. SCOTT REED:
23   Q. Were you expecting on July 9th a continuing
24 intensification of the two-sided interactive activity
25 that was going on?

Page 365

1     MR. HAYES: Objection, vague, lacks
2 foundation.
3     THE WITNESS: I expected an escalation; an
4 escalation of the conflict and a deterioration in the
5 security situation.
6     MS. SCOTT REED: Let me hand you 170,
7 please, sir, UCP2372 through 2376.
8     (Exhibit 170 was marked for identification by
9     the court reporter and is attached hereto.)
10 BY MS. SCOTT REED:
11   Q. Can you identify this as a July 9th, 2014
12 Max analysis that was sent to you by e-mail?
13   A. Yes.
14   Q. What's Operation Protective Edge?
15   A. It's the name given by the Israeli Defense
16 Force to their operations in this conflict.
17   Q. And do you see the indication that Israel
18 launched Operation Protective Edge on July the 7th?
19   A. On the first line, yes.
20   Q. Yes, sir.
21     And was this information that you received
22 from the Max analysis report the type that you were
23 gathering and incorporating into your assessment of
24 security for Dig?
25     MR. HAYES: Objection, vague, lacks

**EXHIBIT 5**

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 386

1  Q.  You report here that (as read):
2      During the period of Israeli
3   acceptance, it is estimated that
4   47 rockets were fired from Gaza
5   toward Israel.
6      Do you see that?
7  A.  Yes.
8  Q.  And did that inform the assessment that you
9  were providing at this point?
10  A.  That was part of the assessment, yes --
11  Q.  So as of -- pardon me.
12  A.  Yes, sorry.
13  Q.  As of July the 16th, 2014 were you still
14  providing a security assessment that you could not
15  guarantee the safety and security of personnel for
16  production in Israel?
17  A.  Yes.
18  Q.  Was the situation worse on July 16th than
19  you assessed it to be on July the 10th?
20  A.  I would have to refer to other information
21  to answer that accurately.
22  Q.  Is your overall feeling that after your
23  recommendation on July 10th, things were either at a
24  sustained level or increasing in hostility?
25      MR. HAYES:  Objection, vague, lacks

Page 387

1  foundation.
2      THE WITNESS:  My -- my assessment was that
3  there was no cessation of violence and the situation
4  had not improved.
5  BY MS. SCOTT REED:
6  Q.  Did you predict that there was or assess
7  that there was not a likelihood of cessation either?
8  A.  Yes.
9  Q.  Can you identify Exhibit 193 as a July 16th,
10  2014 security alert that you received via e-mail?
11      (Exhibit 193 was marked for identification by
12   the court reporter and is attached hereto.)
13      THE WITNESS:  Yes, I can.
14  BY MS. SCOTT REED:
15  Q.  Did this information continue to inform your
16  assessment of the security situation for the Dig
17  production?
18  A.  Yes.
19      MR. HAYES:  Objection.
20      THE WITNESS:  Sorry.
21      MR. HAYES:  Vague, lacks foundation.
22  BY MS. SCOTT REED:
23  Q.  You're reporting in this that -- or pardon
24  me -- Max Security is stating in this that (as read):
25      Israel's cabinet approved the

Page 388

1   call-up of an additional
2   8,000 reservists, bringing the total
3   number of troops called up to
4   50,000.
5      Do you see that?
6  A.  I do.
7  Q.  And was this one of the sources that
8  reported that information to you?
9  A.  Yes.
10      MR. HAYES:  Objection, vague, lacks
11  foundation.
12  BY MS. SCOTT REED:
13  Q.  Did that information affect the assessment
14  that you were providing on an ongoing basis about
15  safety and security for Dig?
16  A.  That would have formed part of my assessment
17  and how I came to the conclusions; that and other
18  information sources.
19  BY MS. SCOTT REED:
20  Q.  And did that fact continue to cause you to
21  conclude that you could not assure safety or security
22  for production in Israel?
23      MR. HAYES:  Objection, vague, lacks
24  foundation.
25      THE WITNESS:  That was a -- a number of

Page 389

1  factors that were taken into conversation.
2  BY MS. SCOTT REED:
3  Q.  Yes, sir.
4      And was that one of them?
5  A.  Yes.
6      MS. SCOTT REED:  He needs to change the
7  tape.
8      MR. HAYES:  Why does he need to change the
9  tape?  Is it seven hours?
10      VIDEO OPERATOR:  Yeah.  I was just
11  indicating that was the seven-hour --
12      MS. SCOTT REED:  Oh, I'm sorry, I
13  misunderstood.  All right.  Then stop me when we get
14  there.  I thought we had a hard break.
15      VIDEO OPERATOR:  Right.  Just to be clear,
16  we hit that time where you were looking at, but we've
17  got -- we have more time.
18      MR. HAYES:  What does that mean?
19      VIDEO OPERATOR:  I've got to think carefully
20  here.
21      MS. SCOTT REED:  Let's go off the record for
22  a moment.
23      VIDEO OPERATOR:  We're off the record.  The
24  time is 6:42 p.m.
25