MARC J. SHRAKE (SBN 219331)
mshrake@fmglaw.com
WAYNE H. HAMMACK (SBN 202709)
whammack@fmglaw.com
FREEMAN MATHIS & GARY, LLP
550 South Hope Street, Suite 2200
Los Angeles, California 90071
Telephone: (213) 615-7019
Facsimile: (213) 615-7000

CHRISTOPHER W. MARTIN (*Pro Hac Vice*)
martin@mdjwlaw.com
MELINDA R. BURKE (*Pro Hac Vice*)
burke@mdjwlaw.com
MARTIN, DISIERE, JEFFERSON
& WISDOM LLP
9111 Cypress Waters Blvd., Suite 250
Dallas, Texas 75019
Telephone: (214) 420-5500
Facsimile: (214) 420-5501

Attorneys for Defendant
Atlantic Specialty Insurance Company

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, a Delaware limited liability company, and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY, a New York insurance company,<br><br>Defendant. | CASE NO. 2:16-cv-04435-PA-MRW<br>[*Hon. Percy Anderson; Ctrm. 9A*]<br><br>**DECLARATION OF MARC J. SHRAKE IN SUPPORT OF ATLANTIC SPECIALTY'S OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 4**<br><br>Hearing Date: February 10, 2020<br>Time: 1:30 PM<br>Pretrial Conference: January 17, 2020<br>Time: 1:30 PM<br>Place: Courtroom 9A<br>Judge: Honorable Percy Anderson<br>Trial Date: February 18, 2020 |

I, Marc J. Shrake, declare as follows:

1.    I am an attorney authorized to practice before all California courts and before this Court and am a partner with the law firm of Freeman Mathis & Gary, LLP, attorneys for Defendant Atlantic Specialty Insurance Company.

Freeman Mathis
& Gary, LLP
Attorneys at Law

1    2.      I have personal knowledge of the matters set forth in this Declaration,

2  and if called upon to testify to them, could and would do so.

3    3.      I make this Declaration in conjunction with, and in support of, Atlantic

4  Specialty's Opposition to Motion in Limine No. 4.

5    4.      Attached to this Declaration as Exhibit 1 are true and correct copies of

6  excerpts of the insurance policy at issue in the captioned case.

7    5.      Attached to this Declaration as Exhibit 2 are true and correct copies of

8  documents that are in Exhibit 5 to the Deposition of Jay Shapiro given in this case

9  and in Exhibit 8 to the Deposition of Andrea Garber given in this case.

10   6.      Attached to this Declaration as Exhibit 3 is a true and correct copy of an

11  excerpt from the Deposition of Andrea Garber given in this case.

12   7.      Attached to this Declaration as Exhibit 4 is a true and correct copy of

13  Exhibit 6 to the Deposition of Jay Shapiro given in this case.

14   8.      Attached to this Declaration as Exhibit 5 are true and correct copies of

15  excerpts from the Depositions of Barbara Ann Markus-Coffey given in this case.

16   9.      Attached to this Declaration as Exhibit 6 are true and correct copies of

17  excerpts from the Deposition of Wanda Phillips given in this case.

18      I declare under penalty of perjury of the laws of the United States of America

19  and the laws of the State of California that the foregoing is true and correct and that

20  this declaration is executed this 13th day of January 2020 at Los Angeles, California.

21

22  DATED:  January 13, 2019            MARC J. SHRAKE

23                              By:   */s/ Marc J. Shrake*

24                                    Marc J. Shrake

25

26

27

28

Freeman Mathis
& Gary, LLP
Attorneys at Law

**EXHIBIT 1**

policy extends to indemnify you for any additional expenses necessarily incurred by you to avoid or diminish such loss or claim, subject to any deductible provisions of this policy. This indemnification will not increase the limit of insurance, and we will not pay more for any loss than the amount that would have been payable had you not incurred the additional expenses.

**T. INADVERTENT ERRORS**
You will not be prejudiced by any unintentional or inadvertent omission, error or incorrect description of the property, persons, animals or exposures insured hereunder.

**U. INSPECTIONS OF SURVEYS**
(1) We have the right to:
    (a) Make inspections and surveys at any time;
    (b) Give you reports on the conditions we find; and
    (c) Recommend changes.
(2) We are not obligated to make any inspections, surveys, reports, or recommendations, and any such actions we do undertake related only to insurability and the premiums to be charged. We do not make safety recommendations. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:
    (a) Are safe or healthful; or
    (b) Comply with laws, regulations, codes or standards.
(3) Paragraphs (1) and (2) of this Condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**V. RECOVERIES**
If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

To the extent recovery is made from such other insurance, the deductible and/or the SIR under this policy will be reduced by such recovery. In no event will the deductible/SIR under this policy be greater than that shown in this policy. If recovery from such other insurance is greater than the deductible/SIR in this policy, then the deductible/SIR under this policy will apply.

To the extent there is a recovery from other insurance when the loss exceeds the Deductible or SIR, we will share the recovery and costs proportionally.

**W. INSURANCE NOT TO BENEFIT OTHERS**
No person or organization, other than you, having custody of the property and to be paid for services shall benefit from this insurance. This restriction does not apply to a person or organization, other than a common carrier, which is working or providing services on your behalf.

**X. PROPERTY OF OTHERS**

In the event of loss or damage to property of others (insured hereunder) held by you for which a claim is made. We have the right to adjust such loss or damage with the owner or owners of such property. Receipt of payment by such owner or owners satisfaction of any claim by you for which such payment has been made. If legal proceedings are taken to enforce a claim against you as respects any such loss or damage, we shall, at our expense, conduct and control the defense of such legal proceeding on your behalf of and in your name. No action of ours in such regard will increase our liability under this policy.

**Y. EXCHANGE RATE**
The rate of exchange applied to a loss shall be the rate as paid by you to purchase the foreign funds to pay a claim.

We reserve the right, for claims that we settle directly with third parties to this policy, to adjust the claims at the prevailing exchange rate or the exchange rate used to actually purchase the foreign funds to pay a covered claim.

**II. SPECIAL CONDITIONS**

**A. DEFINITIONS**
1. "Continuity" means costs incurred to match or maintain the Environment of the "Insured Production" during "Principle Photography". The Environment includes weather, climate, natural lighting or seasonal changes in which you are filming the "Insured Production".
2. "Earthquake" means:
    (a) Any earth movement, such as an earthquake, landslide, mine subsidence, or earth sinking, rising or shifting; and
    (b) Volcanic eruption, meaning the eruption, explosion or effusion of a volcano;
Provided that all earth movements or volcanic eruptions that occur within any seventy-two (72) hour period will constitute a single earth movement or volcanic eruption.

3. "Flood" means, flood waters, surface water, waves, tide or tidal water, overflow or rupture of a dam, levy, dike or other surface containment structure, storm surge, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not.
4. "Insurable Production Cost" includes: all costs, including overhead and interest on loans chargeable directly to an "Insured Production" or series of productions. Insurable Production Cost also includes any amount of other overhead only when declared at the time you declare an "Insured Production" or series of productions. The fol-

ATL003081

# EXHIBIT 2

| From: | Andrea Garber |
|---|---|
| To: | Milinovic, Bernadette; Phillips, Wanda M. |
| Cc: | Deborah Kizner |
| Subject: | "Dig" Season 1 Application/Declaration |
| Date: | Wednesday, December 11, 2013 6:35:00 PM |
| Attachments: | Declaration Form DIG S1.doc |
| | image001.png |
| | image002.png |

Hi, Bernadette and Wanda –

Attached is the application/declaration for Season 1 of a new straight-to-series production entitled "Dig". This is the production that I briefly discussed with Wanda and Peter the week before last that is shooting in Israel. It has now been officially greenlit.

In addition to the information that is provided on the form, I have the following further details. While in Israel, the production will be based in Tel Aviv and the majority of filming will be done in that city. Of the total 70 day shoot, approximately 20 days will involve shooting only on the west side of Jerusalem. These will not be 20 continuous days but will follow the needs of each episode. The work in Jerusalem will be mostly exterior shooting and will involve public streets and areas that will look like archaeological dig sites. The NBCU Security team is already involved in the prepping of this project and they are meeting weekly with the production folks that are currently on board to discuss precautions and procedures that need to be taken as the project develops. These discussions include people from the production services company, Keshet. I have been advised that the mayor of Jerusalem and the local police have been contacted and are assisting in assuring the safety of the production company when they are working in Jerusalem.

The work in Toronto, Canada will be done at the beginning of March, 2014, prior to the start of principal photography in Israel. They think the location will be Toronto at this time but it could change to another snowy location. It only involves approximately one week of shooting.

Although the current order is 6 episodes, there is a possibility for the season to be extended to 13 episodes. The first episode of the season order will serve as the pilot episode. Casting has just begun and I have not been advised of any committed cast yet.

Please let me know if you need any further information. We would like to avoid any deviation from our standard policy terms if possible. Since the project is in the early stages of pre-production now, we will need coverage under the current policy. The majority of exposure will fall into the policy term starting 1/1/2014. Please confirm coverage at your earliest opportunity.

Thanks and Regards,
- Andrea

**Andrea Garber | Account Executive**
**Aon/Albert G. Ruben Insurance Services, Inc.**
15303 Ventura Blvd., Suite 1200
Sherman Oaks, CA  91403-5817
CA License:  0806034
Tel: +1 818.777.5179 | Mobile: +1 818.399.0358 | Fax: +1 847.953.2846

Shapiro Exhibit 5

5-23-17

CONFIDENTIAL

AONNBCU0001748

Email: andrea.garber@aon.com | http://www.aonagr.com

  

This email message, including any attachment(s), is intended only for the named recipient(s) and may contain confidential, proprietary or legally privileged information. Unauthorized individuals or entities are not permitted access to this information. Any dissemination, distribution, disclosure, or copying of this information is unauthorized and strictly prohibited. If you have received this message in error, please advise the sender by reply email, and delete this message and any attachments.

CONFIDENTIAL

**AON**

*Aon/Albert G. Ruben Company*
*48 West 25th Street*
*New York, New York 10010*

## TELEVISION INSURANCE APPLICATION

1. **NAME OF PRODUCTION COMPANY**: __NBCU-TV__
2. **Address, City, State, Zip Code**: _100 Universal City Plaza, Universal City, CA 91608_

3. **Network Contact Name, Phone, E-mail, Fax #**: _Kurt Ford, 818-777-8106, Kurt.Ford@nbcuni.com_

4. **TITLE OF PRODUCTION**: _____"Dig" Season 1_

5. **Production is:**

| | | | |
|---|---|---|---|
| Television Pilot | ½ Hour / 1 Hour / Other _____ | | |
| Television Special | ½ Hour / 1 Hour / Other _____ | | |
| Television Series | ½ Hour / 1 Hour / Other _____ | Number of Episodes: _6_ |
| Movie of the Week | _____ | | |
| Special or Talk Show | ½ Hour / 1 Hour / Other _____ | Number of Episodes: _____ |
| Other | _____ | | |

6. **TOTAL INSURABLE PRODUCTION COST: (all costs directly chargeable to an insured production)**
   _$25,000,000 estimated for entire 6 episode order_

7. **TOTAL NET INSURABLE COST: (Item "6" above less script & writers fees; residual and royalty payments)**
   _$20,000,000 estimated for entire 6 episode order_

8. **Pre-Production:** _12/17/13_ Start Date of principal photography: _5/26/14_ Wrap/End Date _9/15/14_

   Post Production Period: _____ Delivery Date: _____ Air Date: _____ Hiatus Period _12/24/13 – 1/6/14_

9. **Synopsis of Program:** _The program tells the story of an American FBI agent named Peter who is stationed in Jerusalem. While investigating a murder, he uncovers a conspiracy linked to the history of Jerusalem and finds himself falling down an archaeological rabbit hole._

10. Filming Location(s) / Studio: _Tel Aviv and West Jerusalem in Israel and Toronto, Canada. Production service company Keshet will be used in Israel_

11. Describe any and all stunts: _____

11. **Name of Artist to be insured for cast insurance including Disgrace and Violent Death**

| | | | |
|---|---|---|---|
| 1. TBD | 7. _____ | | |
| 2. _____ | 8. _____ | | |
| 3. _____ | 9. _____ | | |
| 4. _____ | 10 _____ | | |
| 5. _____ | 11. _____ | | |
| 6. _____ | 12. _____ | | |

**eFAX or E-Mail FORM PRIOR TO START DATE OF PRODUCTION TO:**

**Page 1**

# EXHIBIT 3

Page 140

1   can see.

2   BY MR. KEELEY:

3       Q    And the third page of Exhibit 8,

4   "Television Insurance Application," that's the form

5   you mentioned earlier?

6       A    Yes.

7       Q    And in that, you are telling them a little

8   bit about the production, including the total

9   insurable production costs and then total net

10  insurable costs in items 6 and 7; is that right?

11      A    Yes.

12      Q    And were those two figures accurate, to

13  the best of your knowledge?

14      A    That was the best information I had at the

15  time, yes.

16      Q    Let me -- you have to go back to the first

17  page of Exhibit 8.

18           The very last paragraph, the second

19  sentence, would you read that aloud for me, please,

20  beginning with "we would."

21      A    (Reading):

22           "We would like to avoid any deviation from

23           our standard policy terms, if possible."

24      Q    Why did you want to avoid any deviation

25  from your standard policy terms?

# EXHIBIT 4

| | |
|---|---|
| **From:** | John Gaskin <gaskin.john@gmail.com> |
| **Sent:** | March 12, 2014 12:19 PM |
| **To:** | Richmond, Randi (NBCUniversal);'Mark Winemaker ';'Ryan Greig' |
| **Cc:** | Markus, BJ (NBCUniversal) |
| **Subject:** | RE: DIG - Budgets as at 03-11-2014 |
| **Attachments:** | DIG Amort-031114.pdf |

**From:** Richmond, Randi (NBCUniversal) [mailto:Randi.Richmond@nbcuni.com]
**Sent:** March-12-14 2:52 PM
**To:** 'John Gaskin'; Mark Winemaker ; Ryan Greig
**Cc:** Markus, BJ (NBCUniversal)
**Subject:** RE: DIG - Budgets as at 03-11-2014

I don't see the amort budget...

**From:** John Gaskin [mailto:gaskin.john@gmail.com]
**Sent:** Tuesday, March 11, 2014 10:24 AM
**To:** Mark Winemaker ; Ryan Greig
**Cc:** Richmond, Randi (NBCUniversal); Markus, BJ (NBCUniversal)
**Subject:** DIG - Budgets as at 03-11-2014

Here are the Dig budgets as of 03-11-2014.

An overview looks like this:

| | | | |
|---|---|---|---|
| | | Pilot | 7,594,906.00 |
| Pattern | 3,507,085.00 | | |
| | x 5 | | 17,535,425.00 |
| | Gross | | 25,130,331.00 |
| | IS Tax Cr | - | 3,100,000.00 |
| | CN Tax Cr | - | 350,000.00 |
| | Reduce 1 day IS,for Snow Shoot | - | 95,000.00 |
| | Rough "Net" Estimate | | 21,680,331.00 |
| | | | |
| | Amort | | 5,512,962.00 |
| | Snow Shoot (In Pilot) | | 1,502,177.00 |

**Shapiro Exhibit 6**

5-23-17

**DIG Amort**

| ACCT | DESCRIPTION | Feb 11/14 Amort | Mar 11/14 Amort | Incr / (Decr) | March 11, 2014 EXPLANATIONS |
|------|-------------|-----------------|-----------------|---------------|------------------------------|
| 600 | PRODUCER | 160,796 | 169,568 | $ 8,772 | Increase Liat's fee; Extend weeks Jason Augistine |
| 610 | STORY | 73,621 | 81,249 | $ 7,628 | Increase wks on M.Shorer;  Increase Wrtr Meal Money |
| 620 | DIRECTOR | 31,999 | 23,038 | $ (8,961) | Drop Director "Intervening Days" |
| 630 | CAST | 7,500 | 7,500 | $ - | |
| 640 | CAST OTHERS | 3,341 | 3,341 | $ - | |
| 660 | STUNTS | 37,188 | 34,788 | $ (2,400) | Reduce Holidays from 5 days to 3 days |
| 670 | CASTING & OTHER | 47,880 | 37,100 | $ (10,780) | Correct subtotaling error of $10,780 |
| 680 | ATL TRVL/LIVING | 729,970 | 725,650 | $ (4,320) | Decrease # of EP Htl Days $20K; Increase Other ATL Living |
| 685 | TEST | 7,500 | 7,500 | $ - | |
| 690 | ATL FRINGES | 37,482 | 35,524 | $ (1,958) | Per above |
| | **Total Above-the-Line** | **1,137,277** | **1,125,258** | **$ (12,019)** | |
| 700 | EXTRA TALENT | | | $ - | |
| 705 | PRODUCTION STAFF | 535,163 | 528,525 | $ (6,638) | Reduce Holidays from 5 days to 3 days |
| 710 | CAMERA | 193,813 | 191,873 | $ (1,940) | Reduce Holidays from 5 days to 3 days |
| 715 | ART DIRECTION | 153,527 | 156,511 | $ 2,984 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 720 | SET CONSTRUCTION | 620,060 | 620,060 | $ - | |
| 721 | SET STRIKE | 170,080 | 170,080 | $ - | |
| 725 | GRIP/SET OPERATIONS | 74,710 | 76,965 | $ 2,255 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 730 | ELECTRICAL | 86,183 | 91,742 | $ 5,559 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day), Esp. Riggers |
| 735 | SPECIAL EFFECTS | 31,842 | 31,842 | $ - | |
| 740 | SECOND UNIT | 0 | 0 | $ - | |
| 745 | SET DRESSING | 179,000 | 181,637 | $ 2,637 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 750 | PROPERTY | 70,292 | 71,475 | $ 1,183 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 755 | WARDROBE | 191,104 | 192,169 | $ 1,065 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 760 | MAKE - UP & HAIR | 22,910 | 23,754 | $ 844 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 765 | PRODUCTION SOUND | 6,974 | 7,115 | $ 141 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 770 | TRANSPORTATION | 204,381 | 204,985 | $ 604 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 775 | LOCATION EXPENSES | 818,206 | 827,632 | $ 9,426 | Moved a/c#775-23 from Pilot/Series to Amort (Locn Off Furn/Xerox/Maint) |
| 780 | SPECIAL PHOTOGRAPHY | 0 | 0 | $ - | |
| 795 | FRINGES | 185,197 | 180,013 | $ (5,184) | Primarily reducing # of holidays on US Hires |
| 796 | STUDIO STAGE | 346,508 | 355,208 | $ 8,700 | Actualize office rentals |
| 799 | PRODUCTION DAILIES | 0 | 0 | $ - | |
| | **Total Production** | **3,889,950** | **3,911,586** | **$ 21,636** | |
| 801 | EDITING | 75,589 | 74,017 | $ (1,572) | Reduce Holidays from 5 days to 3 days |
| 802 | MUSIC | 15,000 | 15,000 | $ - | |
| 803 | POST PROD SOUND | 0 | 0 | $ - | |
| 804 | STOCK SHOTS | 0 | 0 | $ - | |
| 805 | TITLES | 35,000 | 35,000 | $ - | |
| 806 | OPTICALS | 0 | 0 | $ - | |
| 807 | IMAGE MASTERING | 0 | 0 | $ - | |
| 808 | COMPLETION DELIVERAB | 0 | 0 | $ - | |
| | **Total Post Production** | **125,589** | **124,017** | **$ (1,572)** | |
| 910 | ADMINISTRATIVE | 352,374 | 352,101 | $ (273) | |
| 920 | PUBLICITY | 0 | 0 | $ - | |
| 940 | AMORT | 0 | 0 | $ - | |
| 981 | RESIDUALS | 0 | 0 | $ - | |
| 982 | AGENCY PACKAGE FEE | 0 | 0 | $ - | |
| 985 | COST RECOUPMENT | 0 | 0 | $ - | |
| | **Total Other** | **352,374** | **352,101** | **$ (273)** | |
| | **Grand Total** | **5,505,190** | **5,512,962** | **$ 7,772** | |

DIG Amort - BudgetComparison-0311143/11/14

CONFIDENTIAL

UCP004972

# EXHIBIT 5

CONFIDENTIAL

Page 81

1   and have subcategories that added up to the total

2   number?

3            MR. HAYES:  Objection.  Vague, lacks

4   foundation, doc- -- document speaks for itself.

5            THE WITNESS:  Yes.

6   BY MR. RIDDLE:

7      Q   Okay.  And did you use any of the

8   categories that Mr. Wunderlich used in his report?

9            MR. HAYES:  Objection.  Vague, lacks

10  foundation, the document speaks for itself.

11           THE WITNESS:  Some of them, yes.

12  BY MR. RIDDLE:

13     Q   Were there tax credits that were received

14  in connection with the shooting in Israel?

15           MR. HAYES:  Objection.  Vague, lacks

16  foundation.

17           THE WITNESS:  Yes.

18  BY MR. RIDDLE:

19     Q   If the production had remained in Israel,

20  would those tax credits have been larger than the

21  amount that -- that was received?

22           MR. HAYES:  Objection.  Vague, lacks

23  foundation, calls for speculation.

24           THE WITNESS:  Yes.

25  BY MR. RIDDLE:

CONFIDENTIAL

Page 82

1       Q   Were there tax credits received for the

2   filming in New Mexico?

3           MR. HAYES:  Objection.  Vague, lacks

4   foundation.

5           THE WITNESS:  Yes.

6   BY MR. RIDDLE:

7       Q   Were there tax credits received for the

8   filming in Croatia?

9           MR. HAYES:  Same objections.

10          THE WITNESS:  Yes.

11  BY MR. RIDDLE:

12      Q   Did you ever do a comparison of the tax

13  credits that -- that you believed would have been

14  received for Episodes 2 through 6 had the shooting

15  remained in Israel versus the tax credits that were

16  received for the filming in New Mexico and Croatia?

17          MR. HAYES:  Objection.  Vague, lacks

18  foundation.

19          THE WITNESS:  No.

20  BY MR. RIDDLE:

21      Q   Is -- is there a reason why you did not do

22  that?

23          MR. HAYES:  Objection -- go ahead.

24          Vague, lacks foundation.

25          THE WITNESS:  Since we didn't shoot in

CONFIDENTIAL

Page 83

1   Israel Episodes 2 through 6, I wouldn't have a way

2   to ascertain what the tax credit value would be.

3   BY MR. RIDDLE:

4        Q    How was the tax credit value determined for

5   the pilot that was shot there?

6             MR. HAYES:  Objection.  Vague, lacks

7   foundation --

8   BY MR. RIDDLE:

9        Q    What was it based on?

10            MR. HAYES:  -- calls for speculation.

11            THE WITNESS:   The actual spend in Israel.

12  BY MR. RIDDLE:

13       Q    Was there a budget that projected the cost

14  of shooting episodes -- or producing Episodes 2

15  through 6 in Israel?

16            MR. HAYES:  Objection.  Vague, lacks

17  foundation.

18            THE WITNESS:   Yes.

19  BY MR. RIDDLE:

20       Q    Did you ever take that estimate in that

21  budget and determine that if that had been the

22  actual numbers, what the tax credit would have been

23  from Israel for being able to complete the shooting

24  there for those episodes?

25            MR. HAYES:  Objection.  Vague, lacks

CONFIDENTIAL

Page 84

1    foundation.

2            THE WITNESS:  At the time we would have

3    initially budgeted Israel, an initial tax credit

4    estimate would have been prepared.

5    BY MR. RIDDLE:

6        Q    And would it have been one for the pilot

7    and the other five episodes after the pilot?

8            MR. HAYES:  Objection.  Vague, lacks

9    foundation.

10           THE WITNESS:  Yes.

11   BY MR. RIDDLE:

12       Q    So if we take the number that was in fact

13   paid for the pilot and compare it to that budgeted

14   number for the tax credit for shooting all six

15   episodes in Israel, that would give us the -- an

16   estimate of -- an estimate of the additional tax

17   credit for shooting the Episodes 2 through 6 in

18   Israel, correct?

19           MR. HAYES:  Objection.  Vague, lacks

20   foundation.

21           THE WITNESS:  I need you to ask that

22   question --

23   BY MR. RIDDLE:

24       Q    Sure.

25       A    -- more specifically.

CONFIDENTIAL

Page 86

1    BY MR. RIDDLE:

2        Q    The -- there was a -- are you saying there

3    was a budget prepared prior to the production that

4    had estimates of the tax credits for the shooting in

5    Israel?

6            MR. HAYES:  Objection.  Vague, lacks

7    foundation.

8            THE WITNESS:  Yes.

9    BY MR. RIDDLE:

10       Q    Okay.  And we know the -- we know the -- we

11   -- you -- you know the -- you don't -- I'm not

12   saying you know it here today, but somewhere there's

13   records showing the actual tax credit that was paid

14   for the shooting of the pilot in Israel, correct?

15           MR. HAYES:  Objection.  Vague, lacks

16   foundation.

17           THE WITNESS:  Yes.

18   BY MR. RIDDLE:

19       Q    Okay.  Did you go to any of the locations

20   during production?

21           MR. HAYES:  Objection.  Vague, lacks

22   foundation.

23           THE WITNESS:  Yes.

24   BY MR. RIDDLE:

25       Q    Which ones?

CONFIDENTIAL

Page 101

1      A    Yes.

2      Q    Okay.  If you look at the third page of

3    that document, do you have an understanding as to

4    what that is?

5           MR. HAYES:  Objection.  Vague, lacks

6    foundation.

7           THE WITNESS:  Yes.

8    BY MR. RIDDLE:

9      Q    And what is your understanding?

10          MR. HAYES:  Same objections.

11          THE WITNESS:  This document is an overview

12   of what the studio anticipated to spend on Season 1.

13   BY MR. RIDDLE:

14     Q    In Israel?

15     A    Correct.

16     Q    Okay.  And that's -- again, that's just for

17   the pilot and Episodes 2 through 6, correct?

18     A    Yes.

19     Q    Okay.  And then if we look at "Gross

20   Pattern Budget," it indicates -- it's got a list or

21   a numerical listing of $3,541,498 times five with a

22   total of $17,707,490, correct?

23     A    Yes.

24     Q    And that was the locked budget for Episodes

25   2 through 6 in Israel, correct?

CONFIDENTIAL

                                                        Page 102

1            MR. HAYES:  Objection.  Vague, lacks

2    foundation.

3            THE WITNESS:  Yes.

4    BY MR. RIDDLE:

5        Q    Okay.  And you see under there it's got tax

6    credit listed of 3,643,813?

7        A    Yes.

8        Q    Is that an estimate of the tax credit that

9    was expected if all this -- if all these episodes,

10   including the pilot, had been filmed in Israel?

11           MR. HAYES:  Objection.  Vague, lacks

12   foundation.

13           THE WITNESS:  Yes.

14   BY MR. RIDDLE:

15       Q    Okay.  Did you have any -- did you come up

16   with that tax credit number or did somebody else?

17           MR. HAYES:  Objection.  Vague, lacks

18   foundation.

19           THE WITNESS:  As I recall, the accountant

20   in Israel would have come up with that estimate and

21   I would have reviewed her work.

22   BY MR. RIDDLE:

23       Q    Okay.  And farther on down it's -- it looks

24   like it says, "6.5 episodes," and then underneath it

25   it says, "Gross Pattern Budget."

CONFIDENTIAL

Page 104

1   BY MR. RIDDLE:

2       Q   Well, if we look at tax credit, the

3   reason -- of course that's a negative number as it's

4   reflected here, correct?

5           MR. HAYES:  Objection.  Vague, lacks

6   foundation.

7           THE WITNESS:  Correct.

8   BY MR. RIDDLE:

9       Q   Okay.  Which would lower the overall

10  budgeted amount, correct?

11          MR. HAYES:  Objection.  Vague, lacks

12  foundation.

13          THE WITNESS:  No.

14  BY MR. RIDDLE:

15      Q   No?  Why not?

16      A   The budget's the budget.

17      Q   And this is just a potential offset against

18  that number, correct?

19          MR. HAYES:  Objection.  Vague, lacks

20  foundation.

21          THE WITNESS:  Correct.

22  BY MR. RIDDLE:

23      Q   Okay.  And this shows a -- a gross pattern

24  budget for the -- for Episodes 2 through 5 of

25  $17,707,490.

CONFIDENTIAL

Page 14

1    foundation.

2             THE WITNESS:  Yes.

3    BY MR. RIDDLE:

4        Q   Okay.  And looking at Page -- the -- the

5    third page of this document --

6             MR. HAYES:  Are we referring to UCP 5413?

7             MR. RIDDLE:  Of course.

8        Q   There is a line that says -- well, there is

9    an entry for "Pilot Cost."

10            Do you see that?

11       A   Yes.

12       Q   Okay.  And then underneath that it says

13   "gross pattern budget," and then there is a total

14   for that of $17,707,490, correct?

15       A   Yes.

16       Q   What does that represent, that -- that

17   17.7 million amount?

18       A   That estimates that -- I'm sorry.  The 17

19   million is what we estimated to spend on the five

20   episodes of DIG in Israel.

21       Q   After the pilot?

22       A   After the pilot.

23       Q   Okay.  Thanks.

24            And then I believe -- I believe there's an

25   Exhibit 344.  It's actually the one that's turned

CONFIDENTIAL

Page 15

1    like that (indicating).

2        A    Yes.

3        Q    Okay.  If you'd look at that.

4             And does this represent actual expenditures

5    on Episodes 2 through 5 -- 2 through 6 of DIG?

6             MR. HAYES:  Objection.  Vague, lacks

7    foundation.

8             THE WITNESS:  Yes, it does.

9    BY MR. RIDDLE:

10       Q    Okay.  And what is the total that was spent

11   on Episodes 2 through 6 of DIG for -- for

12   production?

13            MR. HAYES:  Objection.  Vague, lacks

14   foundation.

15            THE WITNESS:  In New Mexico, the total

16   spent for Episodes 2 through 6 was $21,464,745.

17   BY MR. RIDDLE:

18       Q    And was there additional -- was there an

19   additional expense related to the Croatia part of

20   the production?

21            MR. HAYES:  Objection.  Vague, lacks

22   foundation.

23            THE WITNESS:  The Croatia --

24   BY MR. RIDDLE:

25       Q    For -- for Episodes 2 through 6?

CONFIDENTIAL

Page 16

1        A    Yes.

2             MR. HAYES:   Same objections.

3             (Speaking simultaneously.)

4             THE WITNESS:   The Croatia -- the Croatia

5    expenditures are included in that $21,464,000

6    number.

7    BY MR. RIDDLE:

8        Q    Oh, okay.   So the -- the figure 21,464,745,

9    that actually includes the production cost for

10   Episodes 2 through 6 of DIG, correct?

11            MR. HAYES:   Objection.   Vague, lacks

12   foundation, asked and answered.

13            THE WITNESS:   Yes.

14   BY MR. RIDDLE:

15       Q    Okay.   And that -- that would include the

16   costs incurred at the New Mexico locations and the

17   Croatia locations, correct?

18            MR. HAYES:   Same objections.

19            THE WITNESS:   Yes.

20   BY MR. RIDDLE:

21       Q    Okay.   And does Exhibit 344 also reflect

22   that there were some tax credits that were obtained

23   in Israel, in New Mexico and in Croatia?

24            MR. HAYES:   Objection.   Vague, lacks

25   foundation.

CONFIDENTIAL

Page 18

1    $3,305,243, correct?

2        A    Correct.

3        Q    And then is it true that there was actually

4    a -- a -- a downward adjustment to that number of

5    approximately $100,000?

6            MR. HAYES:  Objection.  Vague, lacks

7    foundation.

8            THE WITNESS:  As I recall, yes, but I would

9    need to go back and look at some additional

10   documentation to verify.

11   BY MR. RIDDLE:

12       Q    Okay.  But as we sit here today, is it your

13   best recollection that it was approximately

14   $100,000?

15           MR. HAYES:  Objection.  Vague, lacks

16   foundation.

17           THE WITNESS:  Yes, that is my recollection.

18   BY MR. RIDDLE:

19       Q    Now, of these extra expenses that you

20   believe were -- that resulted from the location of

21   the production of DIG being moved out of Israel, how

22   much of that was incurred by Universal Cable

23   Productions LLC?

24           MR. HAYES:  Objection.  Vague, lacks

25   foundation.

# EXHIBIT 6

Confidential

Page 274

1       Thank you very much.      07:13
2         MR. KEELEY:  We will take a short
3 break.  I am going to have a few
4 questions, Ms. Phillips.
5         THE VIDEOGRAPHER:  The time is 7:14
6 p.m.  We are off the record.      07:13
7         (Recess taken from 7:14 p.m. to 7:23
8 p.m.)
9         THE VIDEOGRAPHER:  The time is 7:23
10 p.m.  We are back on the record.
11 EXAMINATION BY MR. KEELEY:      07:23
12    Q.  Ms. Phillips, are you okay?
13    A.  Yes.
14    Q.  Been a very long day.
15    A.  Yes.
16    Q.  I'm sorry, but I have got a few      07:23
17 questions for you, but I will do my best to make
18 them short and get you out of here as quickly as
19 we can.  Okay?
20       Earlier today Ms. Coyoca asked you
21 the following question:  In calculating the loss,   07:23
22 is the amount of any tax credit that the
23 production company might receive or does receive,
24 does that go into the equation at all in
25 calculating loss under the policy?  Do you

Page 275

1 remember her asking you that question?     07:23
2    A.  I recall.
3    Q.  Okay.  I want to make sure I
4 understood or understand your answer, so could
5 you please explain to me how tax credits that NBC
6 might receive in connection with a production   07:23
7 would figure into a loss that it might incur?
8         MS. COYOCA:  Objection.  Assumes
9 facts not in evidence.  Vague and
10 ambiguous.  Calls for a legal conclusion.
11 You can answer.  Excuse me.      07:24
12    A.  So in a production budget, there are
13 several line items, and so you insure, for the
14 most part the production company will insure,
15 they can insure two parts.  They can insure the
16 day-to-day cost, the production costs, insurable  07:24
17 production cost.  They can also insure items such
18 as story, scenario, script, tax credits, and all
19 of those things they would lose in the event of
20 an abandonment.
21       So if we have a budget, I will just   07:24
22 use $20 million as an example, and they are
23 receiving a 10 percent tax credit, that comes off
24 the budget pretty much so they don't spend that
25 money.  It is a credit to the production company.

Page 276

1    Q.  Okay.  So let me ask you this.  Tell   07:24
2 me what your understanding would be in a
3 situation such as the claim here where NBC has
4 claimed a loss because it left production in
5 Israel and moved to Croatia and New Mexico.  In
6 calculating its loss, what effect would the fact  07:25
7 that NBC received tax credits for filming in New
8 Mexico have on the calculation of its loss?
9         MS. COYOCA:  Objection.  Potentially
10 calls for a legal conclusion.  Vague and
11 ambiguous.  Assumes facts not in evidence.  07:25
12    A.  So New Mexico is where they went
13 after the first filming where they actually
14 incurred the loss?
15    Q.  Yes.  That is one of the locations.
16 They went to New Mexico and to Croatia.    07:25
17    A.  So an example would be, if it cost
18 them $5 million to move to New Mexico but they
19 received a million dollars of that in tax
20 credits, then they have actually only lost
21 $4 million.      07:26
22    Q.  Okay.  So, if the extra expense that
23 an insured such as NBC incurs in moving is
24 5 million, but they receive a $1 million tax
25 credit, then the loss they would be entitled to

Page 277

1 collect under the policy would be $4 million?   07:26
2         MS. COYOCA:  Same objections as to
3 the prior question.
4    Q.  Is that correct?
5    A.  $4 million would be the amount that
6 they actually lost.      07:26
7    Q.  Okay.  Ms. Coyoca asked you a
8 question earlier about whether you agreed that
9 NBC and Atlantic had pretty much finalized
10 negotiations concerning the general terms and
11 conditions section of the policy prior to the   07:27
12 policy being bound.  Do you recall that?
13    A.  I just want to make sure I am clear.
14 So the policy was bound 1/1/2010.
15    Q.  Okay.
16    A.  The question was, was there still   07:27
17 negotiations to the policy wording after the
18 policy incepted?
19    Q.  Correct.
20    A.  Yes, there was.
21    Q.  Okay.  Do you recall for how long   07:27
22 there were negotiations concerning the terms of
23 the policy after 1/1/14?
24    A.  There was quite a bit of still back
25 and forth and cleaning up for quite a bit.