KALPANA SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
AMANDA K. BONN (270891)
abonn@susmangodfrey.com
CATRIONA LAVERY (310546)
clavery@susmangodfrey.com
CHELSEA SAMUELS (315257)
csamuels@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150

JACOB W. BUCHDAHL (*pro hac vice*)
jbuchdahl@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel: (212) 336-8330
Fax: (212) 336-8340

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC and NORTHERN ENTERTAINMENT PRODUCTIONS LLC,<br><br>            Plaintiffs,<br><br>     v.<br><br><br>ATLANTIC SPECIALTY INSURANCE COMPANY,<br>            Defendant. | Case No.: 2:16-cv-4435-PA-MRW<br><br>The Honorable Percy Anderson<br>Dept. 9A<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE OR EXCLUDE PORTIONS OF MS. RUSNAK'S DAMAGES OPINIONS**<br><br>Current Hr'g Date: Monday, Feb. 24, 2020<br>Requested Date: Monday, Feb. 10, 2020<br>Time: 1:30 p.m.<br>Place: Courtroom 9A<br>Trial Date: February 18, 2020 |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .................................................................................... 1

II.  ARGUMENT ......................................................................................... 6

    A.  Ms. Rusnak's Amortization Deduction Opinion Should Be Excluded .......... 7

        1.  This Is A Late-Disclosed Opinion Without Justification. ................... 8

        2.  The Policy Does Not Permit This Offset. ............................................ 9

        3.  Industry Custom and Practice Do Not Permit This Offset. ............... 12

        4.  Ms. Rusnak's Methodology for Calculating This Offset Is Unreliable As It Ignores the "But For" World ................................... 13

    B.  Ms. Rusnak's Tax Credit Deduction Opinion Should Be Excluded ............. 17

    C.  All of Ms. Rusnak's New Opinions Should Be Excluded. ........................... 18

III.  CONCLUSION ...................................................................................... 19

7093884v1/015825

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Boghos v. Certain Underwriters at Lloyd's of London*,
    36 Cal.4th 495 ......................................................................................................11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)...............................................................................4, 5, 13, 17

*DePalma v. Westland Software Hous*e,
    225 Cal. App. 3d 1534 (1990) ........................................................................6, 17

*In re Fisher*,
    649 F.3d 401 (5th Cir. 2011) ...........................................................................5, 16

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..........................................................................................4, 13

*Kemply v. Cashcall, Inc.*,
    2016 WL 1055251 (N.D. Cal. Mar. 16, 2016), *stricken in part on other
    grounds sub. nom.*, *de la Torre v. CashCall, Inc.*, 2016 WL 6829693
    (N.D. Cal. Nov. 23, 2016)...............................................................................15, 16

*In re Libor-Based Financial Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (2018) ..................................................................................16

*Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*,
    2010 WL 3892860 (N.D. Ind. Sept. 30, 2010) .......................................................9

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
    2006 WL 8442940 (N.D. Cal. Feb. 24, 2006), *aff'd*, 248 F. App'x 199
    (Fed. Cir. 2007)....................................................................................................13

*In re Northrop Grumman Corp. ERISA Litig.*,
    2016 WL 6826171 (C.D. Cal. Apr. 7, 2016) ......................................................3, 9

*Unilab Corp. v. Angeles-IPA*,
    244 Cal. App. 4th 622 (2016) ...............................................................................18

*United States v. Hankey*,
    203 F.3d 1160 (9th Cir. 2000) ..............................................................................12

7093884v1/015825

*Universal Cable Prods., LLC v. Atlantic Specialty Ins. Co.*,
    929 F.3d 1143 (9th Cir. 2019) ................................................................ 11

*White v. Western Title Ins. Co.*,
    40 Cal.3d 870 (1985) ............................................................................. 11

**Statutes**

Cal. Civ. Code § 1641 ................................................................................ 11, 18

Cal. Civ. Code § 1644 ...................................................................................... 11

**Other Authorities**

David W. Robertson, *The Common Sense of Cause in Fact*, 75 TEX. L. REV.
    1765, 1768 (1997) ................................................................................... 16

Fed. R. Evid. 702 ............................................................................................ 13

iii

7093884v1/015825

## I.   **INTRODUCTION**

During the Pre-Trial Conference on Friday, January 17, 2020, the Court indicated that it would permit Defendant to serve the report of its substitute damages expert Shannon Rusnak. *See* Dkt. 233. Defendant did so that evening.

As Plaintiffs' predicted, Defendant used Ms. Rusnak's report as an opportunity to re-do its damages analysis on the eve of trial. Plaintiffs predicted that Defendant intended to do so for one simple reason: Defendant's former damages expert Mr. Shapiro made a fundamental error in his analysis that inadvertently confirmed Plaintiffs' damages calculation. Mr. Shapiro disagreed with Plaintiffs' damages calculation of approximately $7.1 million in extra expenses on episodes 2-6, contending that the measure of such damages must begin by comparing (1) "the TOTAL costs to produce these episodes" with (2) "the amount Plaintiffs expected to spend when they planned to produce the entirety of these five episodes in Israel." Ex. 2 (Shapiro Report) at 6. Mr. Shapiro erroneously believed the difference between the two—and thus Plaintiffs' maximum potential extra expenses—to be approximately $3.9 million:

| | |
|---|---|
| Costs Actually Incurred (eps. 2-6) | $ 21,464,745 (a) |
| Israeli Cost Data (eps. 2-6) | ($17,535,425) (b) |
| | $  3,929,320 |

*Id.* at 12 (Schedule B). In opposition to Defendant's motion to substitute Ms. Rusnak as an expert, Plaintiffs pointed out that (1) Mr. Shapiro had simply *overlooked* millions of dollars that Plaintiffs spent on episodes 2-6 in Israel and (2) if such spending was accounted for, it would wipe out the difference between Mr. Wunderlich's damages estimate and his own. Dkt. 162 at 7-8.

Ms. Rusnak's report effectively *concedes* this error. Ms. Rusnak admits that the "Potential extra expenses" for episodes 2-6 are **$6,899,094** "based upon a comparison of actual expenditures for the episodes in question for locations in Israel, Croatia and New Mexico compared to the budgeted expenditures for the same episodes in Israel." Dkt. 221-

1 (Rusnak Report) at 4. That number is nearly $3 million higher than Mr. Shapiro's estimate of $3.9 million. It is also so close to Plaintiffs' claimed damages figure of approximately $7.1 million that Plaintiffs would be willing to ***stipulate*** to it if this motion is otherwise granted, thus obviating the need for the issue of contract damages to be tried to the jury. A visualization of Ms. Rusnak's opinion on Plaintiffs' "potential extra expenses" is shown below:



Faced with this reality and adverse authority barring any deduction for tax credits,[1] Ms. Rusnak chose to come up with a new and equally specious way of debating Plaintiffs' damages figure. Ms. Rusnak offers an entirely new opinion, which Plaintiffs call the Amortization Deduction Opinion, in an attempt to reduce Plaintiffs' damages by **$1,814,922.** Ms. Rusnak contends that because the network later ordered episodes 7-10—and because some of the expenses Plaintiffs incurred on episodes 2-6 also benefited those future episodes[2]—Plaintiffs' expenses incurred in New Mexico should be re-amortized and

---

[1] *See* Plt.'s MIL No. 4, Dkt. 206.
[2] For example, sets built for episodes 2-6 could also have been used for episodes 7-10.

1   "redistribute[ed] . . . evenly across episodes 2 through 10." Ex. 221-1 at 9 ¶ 7.

2          This opinion is an improper new expert opinion on the eve of trial. There is no excuse

3   for Defendant not to have disclosed this opinion earlier in Mr. Shapiro's report. To the

4   contrary, Mr. Shapiro spotted this point, identified that it could serve as the basis for a

5   "possible reduction" to damages, but failed to quantify it. Ex. 2 (Shapiro Report) at 9.

6   Defendant should not be permitted to do so on the eve of trial. The "purpose of allowing

7   substitution of an expert is to put the movant in the same position it would have been in

8   but for the need to change experts"—not to put Defendant in a "better" position while

9   springing a new damages methodology and opinion on Plaintiffs on the eve of trial. *In re*

10  *Northrop Grumman Corp. ERISA Litig.*, 2016 WL 6826171, at *4 (C.D. Cal. Apr. 7, 2016).

11  In addition to being a new opinion belatedly offered on the eve of trial, this opinion should

12  also be excluded for multiple, additional reasons.

13         *First*, such a deduction is not permitted under the definitions of "Loss" and

14  "Insurable Production Cost" in the Policy. The Policy defines "loss" to include "[a]ll

15  necessary 'Insurable Production Cost' you incur to complete the Insured Production that

16  exceeds the amount of 'Insurable Production Cost' you would have incurred if the covered

17  cause of loss had not occurred . . . ." Ex. 1 (Policy) at ATL003106. "Insurable Production

18  Cost," in turn, is defined as "all costs" save specifically enumerated offsets—none of which

19  permits an offset simply because certain amortized expenses also benefit future episodes

20  that are subsequently ordered. *Id.* at ATL003081-82.

21         *Second*, as explained by Barbara-Ann ("BJ") Markus-Caffrey, it would be contrary

22  to Plaintiffs' ordinary business practices and the custom and practice in the television

23  production industry to "reconstitute" an amortization schedule simply because additional

24  episodes are subsequently ordered. *See* Markus-Caffrey Decl. ¶ 12. Ms. Rusnak offers zero

25  basis for her contrary opinion that it would be appropriate to engage in such a re-

26  amortization exercise. Ms. Rusnak simply asserts that certain New Mexico expenses

27  "should have been allocated to episodes 7 through 10" without identifying any basis for

28  that opinion whatsoever. And her Curriculum Vitae does not reflect any expertise or

experience in the television production industry—or the entertainment industry in general—that would permit her to opine that such a re-amortization comports with industry custom and practice. Ms. Rusnak's *ipse dixit* on this matter should not be permitted. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("… nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

*Third*, even taken on its own terms, Ms. Rusnak's methodology is unreliable because she only accounted for such a "re-amortization" in the "As Is" world and not in the "But For" world. By confining her Amortization Deduction to the "As Is" world,  while failing to make a similar deduction in the "But For" world, Ms. Rusnak artificially decreased the difference between Plaintiffs' actual and budgeted spend on episodes 2-6 (and thus, her measure of Plaintiffs' damages), as shown below:



Markus-Caffrey Decl. ¶ 14. But a proper conception of the "But For" world is one in which the network would also have ordered episodes 7-10—they just would have been filmed in

7093884v1/015825

Israel rather than Croatia and New Mexico. Courts have recognized that "ascertaining the existence of but-for causation requires a court to create a mental picture of a situation identical to the actual facts of the case in all respects save one: the defendant's wrongful conduct is now 'corrected' to the minimal extent necessary to make it conform to the law's requirements." *In re Fisher*, 649 F.3d 401, 403 (5th Cir. 2011). Similarly, here, the "but-for" world is one that is "identical to the actual facts of the case in all respects save one": Hamas' acts of terrorism that caused the delay and relocation of production would not have occurred.

Accounting for Ms. Rusnak's "re-amortization" not only in the "As Is" world but also the "But For" world would have ***increased*** Ms. Rusnak's measure of Plaintiffs' "Potential Extra Expenses" from $6,899,094 to **$7,169,212**:



Markus-Caffrey Decl. ¶ 24. Little wonder that Ms. Rusnak instead chose to apply a one-sided Amortization Deduction to the "As Is" world only. Understandable, perhaps, but unjustifiable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-95 (1993).

Apart from her improper Amortization Deduction Opinion, Ms. Rusnak also offers two other categories of opinions that should be excluded.

*First*, Ms. Rusnak—like Mr. Shapiro—also contends that Plaintiffs' "Potential Extra Expenses" should be offset because of the tax credits they received in New Mexico and Croatia. Ms. Rusnak calculates this offset to be $1,637,756 (compared to Mr. Shapiro's calculation of $1,571,445). *Compare* Dkt. 221-1 (Rusnak Report) at 4 *with* Ex. 2 (Shapiro Report) at 12. For the reasons set forth in Plaintiffs' Motion in *Limine* No. 4, any such deduction is barred by California law and the language of the Policy itself. *See* Dkt. 206; *DePalma v. Westland Software House*, 225 Cal. App. 3d 1534, 1536 (1990).

*Second*, Ms. Rusnak offers a variety of other new calculations quibbling with aspects of Mr. Wunderlich's damages analysis—each of which is a new opinion that was not included in Mr. Shapiro's report. To the contrary, Mr. Shapiro made clear in his deposition that the sole bases for his disagreement with Mr. Wunderlich's calculation of duplicated expenses was the "sheer magnitude" of the difference between Mr. Wunderlich's damages figure of $7.1 million and Mr. Shapiro's view that the maximum extra expenses were capped at approximately $3.9 million. Defendant should not be permitted to contradict and expand upon Mr. Shapiro's opinions at this late a date.

Plaintiffs therefore respectfully request that the Court strike  or exclude certain of Ms. Rusnak's damages opinions.

## II.   **ARGUMENT**

According to Ms. Rusnak, the proper starting point for measuring Plaintiffs' potential extra expenses is to make a "comparison of actual expenditures for the episodes in question for locations in Israel, Croatia and New Mexico" (*i.e.*, the "As Is" world) to "the budgeted expenditures for the same episodes in Israel," (*i.e.*, the "But For" world). *Compare* Dkt. 221-1 (Rusnak Report) at 5 *with* Markus-Caffrey Decl. at ¶ 6. Ms. Rusnak quantified Plaintiffs' potential extra expenses to be **$6,899,094** in Schedule 1:

///

///

| Description | Bates No. | Date/Schedule Reference | No. of Episodes | Amount |
|---|---|---|---|---|
| **Possible Incremental Costs Considering Episodes 2 through 6 Costs** Universal Cable Productions, LLC, et al. v. Atlantic Specialty Insurance Co. | | | | Schedule 1 |
| Total actual costs for episodes 2 though 6 - New Mexico/Croatia | UCP018226 | 8/11/2016 | 5 | $   21,351,171 |
| Add Israeli Amortization | [A] | | | 3,255,413 |
| Possible Total costs episodes 2 through 6 | | | | 24,606,584 |
| Less Projected Normal Episode Costs | [B] | | 5 | (17,707,490) |
| Total | | | | $   6,899,094 |

Ms. Rusnak reached this conclusion by (1) taking what she deemed to be Plaintiffs' actual costs of $24,606,584 on episodes 2-6 and (2) subtracting $17,707,490 in budgeted costs set forth in the Locked Pattern Budget dated June 8, 2014. Dkt. 221-1 (Rusnak Report) at Schedule 1. This figure is approximately $3 million ***greater*** than the $3.9 million that Mr. Shapiro erroneously calculated. That is because, as Ms. Rusnak acknowledges, Plaintiffs in fact spent at least $3,255,413 in "Amortized Israeli costs"—those that "had been incurred in Israel" and "would apply to episodes 2 through 6 had the production not relocated . . . ." Dkt. 221-1 (Rusnak Report) at 8.

Rather than concede Plaintiffs' damages are in fact roughly what they claim, Ms. Rusnak instead makes a series of improper deductions—all of which should be excluded as a matter of law. Should such opinions be excluded, Plaintiffs would consider stipulating that their extra expenses are $6,899,094 that Ms. Rusnak calculated prior to the improper deductions, thereby obviating the need for any trial on Plaintiffs' contract damages and leaving solely the issue of bad faith and bad faith damages for the jury to decide.

### A. Ms. Rusnak's Amortization Deduction Opinion Should Be Excluded.

Ms. Rusnak opines that Plaintiffs' "Possible Extra Expenses" should be reduced by $1,814,922 because those amounts "should have been allocated to episodes 7 through 10" rather than episodes 2-6. Ms. Rusnak explained this opinion as follows:

///

7

> I further reduced the extra expenses by the amortized New Mexico expenses which should have been allocated to episodes 7 through 10. As noted above, there were no Prep or Wrap expenses allocated episodes 7 through 10 and very limited Amort/All Series expenses were allocated to these episodes. As noted on Schedule 3, episode 2 through 6 amortized cost for New Mexico totaled $1,046,691 per episode; whereas, amortized costs for episode 7 through 10 totaled only $229,977 per episode. By redistributing all the costs evenly across episodes 2 through 10, I arrive at an amount of $683,707 per episode, or $3,418,534 for episodes 2 through 6. The $3,418,534 amount resulted in a $1,814,922 overstatement and reduction to the extra expenses.

Dkt. 221-1 (Rusnak Report) at 9 ¶ 7. In other words, Ms. Rusnak assumed that because the network later picked up the "Back Four" episodes 7-10, (1) the amortization schedule should have been "retroactively reconstitute[d]" to "amortize such expenses across nine episodes (episodes 2-10)" rather than five (episodes 2-6) and (2) the portion of the amortized costs allocated to episodes 7-10 should be removed from Plaintiffs' extra expense calculation of episodes 2-6. Markus Decl. ¶ 12. This Amortization Deduction Opinion should be excluded for multiple reasons discussed below.

### 1.     This Is A Late-Disclosed Opinion Without Justification.

*First*, Ms. Rusnak's opinion is a late-disclosed expert opinion without any justification. Mr. Shapiro's report calculated Plaintiffs' extra expenses to be $2,357,875 by (1) opining (erroneously) that the difference between Plaintiffs' actual and budgeted spending on episodes was $3,929,320 and (2) deducting $1,571,455 for "additional film tax credits." Ex. 2 (Shapiro Report) at 11.

Mr. Shapiro noted that this number represented Plaintiffs' "*maximum* damages" and "does not take into account other possible reductions that are appropriate, such as, for example . . . the prep and wrap expenses incurred in episodes 2 through 6 that may have

8

benefited the producing of episodes 7 through 10." *Id.* at 9 (emphasis in original). Mr. Shapiro, however, did not attempt to quantify the amount of any such "possible reduction." Instead, he admitted in his deposition that he (1) "meant [this opinion] just as an observation" and (2) had "no details other than that." Ex. 3 (Shapiro Dep.) at 121:18-25.

Yet now for the first time, over a year-and-a-half later and just one month before trial, Defendant offered a new opinion stating (1) that such a deduction must, in fact, be taken (as opposed to it being merely a "possible reduction") and (2) the amount of such a deduction should be calculated as $1,814,922 through a newly-disclosed methodology.

The "purpose of allowing substitution of an expert is to put the movant in the same position it would have been in but for the need to change experts; it is not an opportunity to designate a better expert." *In re Northrop Grumman*, 2016 WL 6826171, at *4 (citations and quotations omitted). In similar circumstances, courts have limited "new damages expert[s]" to testifying "about the same subject matter as the prior expert ***without making any meaningful changes***." *Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, 2010 WL 3892860, at *1 (N.D. Ind. Sept. 30, 2010) (emphasis added). In *Lincoln*, the court recognized "the inevitable prejudice that would result if entirely new damages theories were introduced a mere six months from trial"; here, Defendant disclosed this new damages computation one month before trial is set to begin when numerous other important pre-trial filings and deadlines are coming due. Defendant should not be permitted to derail Plaintiffs' trial preparation by forcing them to respond to a new and substantively different damages report at the eleventh hour.

## 2.      The Policy Does Not Permit This Offset.

*Second*, Ms. Rusnak's Amortization Deduction is not permitted by the Policy itself. Under the Policy, Atlantic agreed to pay "such loss . . . as you sustain by reason of such extra expense you necessarily incur as a result of the interruption, postponement, cancellation, relocation, curtailment, or abandonment of an Insured Production due to "imminent peril . . . ." Loss is further defined as follows:

///

## IX.   DEFINITION OF LOSS

The amount of your loss will be determined based on:

1.     All necessary "Insurable Production Cost" you incur to complete the "Insured Production that exceeds the amount of "Insurable Production Cost" you would have incurred if the covered cause of loss had not occurred;

2.     All other necessary expenses that reduce the amount of loss otherwise payable.

3.     Your loss will not include loss of earnings of [sic] profit. . . . .

Ex. 1 (Policy) at ATL003106.

Thus, the relevant question under the Policy is whether Plaintiffs' duplicative Prep, Wrap, and All Series expenses in New Mexico were "necessary . . . to complete the 'Insured Production'" of episodes 2-6. Ms. Rusnak does not dispute that they were. Ms. Rusnak instead contends that those losses—even if required to complete the filming of episodes 2-6—should  be discounted because they also inured to the benefit of future episodes 7-10 (*e.g.*, because sets built for episodes 2-6 would also be used in future episodes, for instance).

But nothing in the Policy permits such an offset. To the contrary, the definition of "Insurable Production Cost" is "all costs" unless (1) specifically enumerated as an offset in sub-sections 4(a)-(c) or (2) specifically listed in an endorsement to the Policy pursuant to subsection 4(d):

4.     'Insurable Production Cost' includes: ***all costs***, including overhead and interest on loans chargeable directly to an 'Insured Production' or series of productions. Insurable Production Cost also includes any amount of other overhead only when declared at the time you declare an 'Insured Production' or series of productions. The following costs shall not be included in 'Insurable Production Cost':

(a)     Royalties Term Deals for Executive Producer(s), Package Fee & Publicity, residuals, premiums paid for this insurance, and personal property taxes;

(b)     Story, scenario, music rights, and sound rights, except with respect to television series, specials and pilots; and

(c)     'Continuity', except when a period of suspension due to covered loss or damage exceeds ninety (90) days.

> (d)   Any other costs specifically stated not to be 'Insurable Production Costs' in an endorsement to this policy.
>
> Nevertheless, you have the option to include these excluded costs at the time you declare an "Insured Production" or series of productions. In that case, such costs will be included in the "Insurable Production Cost", and
>
> The amount of any loss or damage paid under this policy.

Ex. 1 (Policy) at ATL003081-82. "Under California law, the terms of an insurance policy are 'understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense or unless a special meaning is given to them by usage, in which case the latter must be followed." *Universal Cable Prods., LLC v. Atlantic Specialty Ins. Co.*, 929 F.3d 1143, 1153 (9th Cir. 2019) (quoting Cal. Civ. Code § 1644) (emphasis omitted). "'Under the familiar maxim of *expressio unius est exclusion alterius*, it is well settled that, when a statute expresses certain exceptions to a general rule, other exceptions are necessarily excluded.' This canon, based on common patterns of usage and drafting, is equally applicable to the construction of contracts." *White v. Western Title Ins. Co.*, 40 Cal.3d 870, 881 n.4 (1985) (citations omitted). In *Western Title Ins. Co.*, the California Supreme Court relied on the *expressio unius* canon to conclude that "Paragraph 3, by excluding easements, liens, and encumbrances 'not shown by public records,' implies inclusion of such interests when recorded." *Id.*

Similarly, here, "Insurable Production Cost" includes "all costs," unless such costs (1) fall within the express exclusions listed in sub-paragraphs (a) through (c) or (2) are "specifically stated not to be 'Insurable Production Costs' in an endorsement to this Policy." Ex. 11 at ATL003081-82. There is no deduction or offset specified in sub-paragraphs (a) through (c) or an endorsement that complies with subsection (d) for costs that benefit future episodes that are later ordered. Permitting Defendant to nevertheless make such a deduction here would improperly render sub-paragraph (d)—and its requirement that any exclusion from "all costs" be specifically stated in an endorsement—a nullity. *Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal.4th 495, 502 (noting the "effect" of Civil Code section 1641 "is to disfavor constructions of contractual provisions that would render other provisions surplusage").

11

7093884v1/015825

### 3.    Industry Custom and Practice Do Not Permit This Offset.

*Third*, television production industry custom and practice do not permit this offset. As explained by Barbara-Ann ("BJ") Markus-Caffrey, NBCUniversal's Vice President of Production and Finance who has over fifteen years of relevant experience:

> [T]he network ordered episodes 7-10 (also called the "Back Four episodes") after Plaintiffs had already relocated to New Mexico and Croatia and begun incurring Prep, Wrap, and Amort/All Series expenses on episodes 2-6. Plaintiffs had thus already created the amortization schedule for Prep, Wrap, and Amort/All Series expenses based on the then-ordered episodes 2-6, thereby amortizing such expenses across five episodes (episodes 2-6). It would be contrary to Plaintiffs' ordinary business practices and the television industry customs and practices with which I am familiar to retroactively reconstitute the amortization schedule to amortize such expenses across nine episodes (episodes 2-10) simply because the network later decided to pick up the "Back Four" episodes. Instead, Plaintiffs' ordinary business practices—which are consistent with the custom and practice in the television industry—is to (1) create a separate amortization schedule for any such newly-added episodes, accounting for any going-forward expenses attributable to such episodes, and (2) leave any previous amortization schedule as-is. That is what Plaintiffs did with respect to *Dig*.

Markus-Caffrey Decl. ¶ 12. Ms. Rusnak offers no basis for her contrary conclusion. Instead, Ms. Rusnak simply asserts that certain "New Mexico amortization costs . . . should have been allocated to episodes 7 through 10 . . . ." Dkt. 221-1 (Rusnak Report) at 4, 9.

"In assessing whether an expert has the appropriate qualifications, the court considers whether the expert offers some special knowledge, skill, experience, training, or education on the subject matter." *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir.

2000) (citing Fed. R. Evid. 702). Neither Ms. Rusnak's report, nor her Curriculum Vitae, nor her proffer filed with this Court reflects that she has any experience in the customs and practices in the television production industry with respect to amortizing costs across episodes. To the contrary, Ms. Rusnak's report indicates that her "notable" engagements have been in energy, maritime, retail, banking, healthcare, environmental, and labor matters—not in entertainment generally or television production finance specifically. *See MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 2006 WL 8442940, at *4 (N.D. Cal. Feb. 24, 2006) (granting motion to strike where expert failed to explain his basis for an alleged "routine practice in the industry"), *aff'd*, 248 F. App'x 199 (Fed. Cir. 2007).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Here, Ms. Rusnak's opinion that certain expenses "should" have been re-amortized across episodes 7-10 is divorced from (1) the Policy itself and (2) industry custom and practice. Ms. Rusnak offers no basis for her conclusion—not even any relevant experience in the television production finance industry. Ms. Rusnak's *ipse dixit* must be excluded.

### 4. Ms. Rusnak's Methodology for Calculating This Offset Is Unreliable As It Ignores the "But For" World.

*Finally*, even assuming that the network picking up episodes 7-10 would justify re-amortizing across all episodes, Ms. Rusnak improperly accounted for such a deduction only in the "as is" world and not in the "but for" world. By doing so, Ms. Rusnak artificially narrowed her calculation of Plaintiffs' extra expenses from $6,899,094 to $5,084,172 by (1) reducing her calculation of the actual amounts spent on episodes 2-6 while (2) leaving the budgeted amounts for those episodes untouched, as shown below:

///

///

13



This "one-sided Amortization Deduction in the 'As-Is' world only" is improper. Markus-Caffrey Decl. ¶ 15. "If one were engaging in a thought experiment as to what Plaintiffs would have done in a 'But For' world where Hamas' conduct did not force Plaintiffs to relocate, one must also assume and account for the fact that the network would have ordered episodes 7-10, which would have filmed in Israel." *Id.* ¶ 16. Yet Plaintiffs' "Locked Pattern Budget—which Ms. Rusnak uses as a proxy for the 'But For' world—did not account for episodes 7-10 because they had not yet been ordered." *Id.*

Making a similar Amortization Deduction from the Locked Pattern Budget to account for episodes 7-10 reveals that "both Plaintiffs' 'actual spend' and 'budgeted spend' would have downshifted, but the difference between the two would have ***increased*** to $7,169,212 (compared to the difference of $6,899,094 that Ms. Rusnak calculated prior to any Amortization Deduction)."[3] *Id.* ¶ 24. A visualization of this calculation is shown below:

///

---

[3] *See* Markus-Caffrey Decl. ¶¶ 18-26 (explaining calculation method).

14



By contrast, Ms. Rusnak offers no explanation why it is a reliable methodology to re-amortize Plaintiffs' actual spending on episodes 2-6 to account for the subsequent order of episodes 7-10, but not to conduct a similar re-amortization in the "But For" world based on Plaintiffs' pattern budget.

Courts recognize that "but for causation is a hypothetical construct." *Kemply v. Cashcall, Inc.*, 2016 WL 1055251, at *11 (N.D. Cal. Mar. 16, 2016) (citing authorities), *stricken in part on other grounds sub. nom.*, *de la Torre v. CashCall, Inc.*, 2016 WL 6829693, at *17 (N.D. Cal. Nov. 23, 2016). "To deal with the cases where 'but-for' causation presents certain added complexities," courts and commentators have suggested "framing the 'but-for' analysis as follows":

> Properly framing the but-for issue in a lawsuit is a significantly complex mental operation involving four essential steps. First, one must identify the injury or injuries for which redress is sought….Second, oen must identify the defendant's wrongful conduct.

7093884v1/015825

> The third step is the trickiest. It involves using the imagination to create a counterfactual hypothesis. One creates a mental picture of a situation identical to the actual facts of the case in all respects save one: the defendant's wrongful conduct is now 'corrected' to the minimal extent necessary to make it conform to the law's requirements….

*Id.* (quoting David W. Robertson, *The Common Sense of Cause in Fact*, 75 Tex. L. Rev. 1765, 1768 (1997)); *see also In re Fisher*, 649 F.3d at 403 (same).

"The but-for world, by construction, does not exist, but it still must be constructed in a reasonable way such that a reasonable approximation of damages may be made. An oversimplification that fails to consider important aspects of the but-for world will fail to yield such a reasonable approximation…." *In re Libor-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 560 (2018). Where an expert's methodology "fail[s] to take into account" the "relevant aspects of the but-for world," such a "methodology cannot be fairly said to calculate 'damages.'" *Id.*

There is no justification for Ms. Rusnak's decision to "re-amortize" Plaintiffs' actual spending on episodes 2-6 to account for future episodes 7-10 while failing to conduct a similar "re-amortization" deduction in the "But For" world when considering Plaintiffs' Locked Pattern Budget. The only apparent reason for such an inconsistent approach is that it artificially serves to decrease Ms. Rusnak's damages calculation—whereas making such a deduction in both the "As Is" and "But For" worlds would show that Plaintiffs' damages are even closer to Plaintiffs' estimated $7.1 million than Ms. Rusnak's initial computation would suggest:

| Ms. Rusnak's "As-Is" World Amortization Deduction | | | |
|---|---|---|---|
| | "Actual Spend" | "Budgeted Spend" | Difference |
| **Episodes 2-6** | $24,606,584.00 | $17,707,490.00 | $6,899,094.00 |
| **Amort Deduction** | ($1,814,922.00) | N/A | |
| **Total** | $22,791,662.00 | $17,707,490.00 | **$5,084,172.00** |

16

| "As Is" World and "But For" World Amortization Deduction | | | |
|---|---|---|---|
| | "Actual Spend" | "Budgeted Spend" | Difference |
| **Episodes 2-6** | $24,606,584.00 | $17,707,490.00 | $6,899,094.00 |
| **Amort Deduction** | ($1,814,922.00) | ($2,095,040.00) | |
| **Total** | $22,791,662.00 | $15,612,450.00 | **$7,169,212** |

*See* Markus-Caffrey Decl. ¶ 26. Ms. Rusnak's Amortization Deduction Opinion should therefore be excluded because it is not based on a reliable methodology under *Daubert*.

### B.   Ms. Rusnak's Tax Credit Deduction Opinion Should Be Excluded.

In addition to her improper Amortization Deduction Opinion, Ms. Rusnak also opines that Plaintiffs' damages should be reduced by $1,637,756 for what she calls "additional tax credit/rebate savings." Dkt. 221-1 (Rusnak Report) at 4. This mirrors Mr. Shapiro's opinion that Plaintiffs' damages should be offset because of the tax credits they received in New Mexico and Israel, though he calculated the amount of such an offset to be $1,571,445. Ex. 2 (Shapiro Report) at 12. For the reasons set forth more fully in Plaintiffs' Motion in *Limine* No. 4, such a deduction is barred as a matter of California law and the Policy itself.

The California Court of appeal has held that "evidence of tax benefits which a plaintiff may have received" should not "be considered in determining compensatory damages for the defendant's breach of [a] contract" and that such tax benefit "evidence is irrelevant." *DePalma v. Westland Software House*, 225 Cal. App. 3d 1534, 1536 (1990). As the court explained:

> There are several grounds for our conclusion tax consequences should not be considered as a mitigating factor in compensatory damage calculations in breach of contract cases. Those grounds are: (A) the federal "tax benefit rule" cancels out most windfalls to plaintiffs; (B) estimating tax consequences is not useful because it is speculative, time consuming, and confusing; (C) public policy is better served by having defendants pay the full amount of the damages they have caused by breaching their contracts.

*Id.* at 1540-41.

Moreover, the Policy defines a "loss" as "[a]ll necessary 'Insurable Production Cost' you incur to complete the 'Insured Production' that exceeds the amount of 'Insurable

7093884v1/015825

Production Cost' you would have incurred if the covered cause of the loss had not occurred." Ex. 11 at ATL003103. The term "Insurable Production Cost," in turn, is defined to include "all costs . . . chargeable directly to an 'Insured Production' or series of productions," and precludes any offset for tax benefits received. *Id.* at ATL0003081. Permitting such a deduction would render the subsections of the "Insurable Production Cost" definition "a nullity" as doing so "would be contrary to the general rule of contract interpretation that 'the whole of a contract is to be taken together, so as to give effect to every part.'" *Unilab Corp. v. Angeles-IPA*, 244 Cal. App. 4th 622, 637-38 (2016) (citing Cal. Civ. Code § 1641).

Absent her improper Amortization Deduction and tax credit deduction, Ms. Rusnak is left with the opinion that Plaintiffs' "Extra Expenses 2 through 6" total $6,899,094, as shown at Page 4 of her report:

| Description | Amount |
|---|---|
| Extra Expenses 2 through 6 | $ 6,899,094 |
| Less Additional Tax Credit/Rebate Savings | (1,637,756) |
| Less New Mexico Amortization | (1,814,922) |
| Total | $ 3,446,417 |

Dkt. 221-1 (Rusnak Report) at 4.

### C.   All of Ms. Rusnak's New Opinions Should Be Excluded.

*Finally*, Ms. Rusnak attempts to make scattershot critiques of Mr. Wunderlich's extra expense calculation by claiming that his categories of duplicated expenses are inflated. For instance, Ms. Rusnak opines that:

- "Actual costs in Israeli Prep account 1095 were $213,624 under budget due at least in part to the early termination of filming in Israel, which further inflates Wunderlich's overstatement of extra expenses";

7093884v1/015825

- "Actual costs of $352,528 in Israeli Wrap account 1098 were $113,307 under budget due at least in part to early termination of filming in Israel, which further inflates Wunderlich's overstatement of extra expenses";

- "Actual costs in Israeli Amort/All Series account 1096 were $938,179 under budget due at least in part to early termination of filming in Israel, which further inflates Wunderlich's overstatement of extra expenses";

- Mr. Wunderlich's "net claimed Croatia expenses" are "inflated" based on several other computations Ms. Rusnak provides concerning Plaintiffs' spend in Israel.

Dkt. 221-1 (Rusnak Report) at 5-8. Not a single one of these opinions was set forth in Mr. Shapiro's report.

To the contrary, Mr. Shapiro mistakenly believed that Plaintiffs **had not spent anything in Israel** on episodes 2-6. Mr. Shapiro testified that he was unaware of "any incurred costs on Episodes 2 through 6" in Israel and was "confused" by the fact that Plaintiffs' damages expert (correctly) contended such expenses had been incurred. Ex. 3 (Shapiro Dep.) at 62:16-24. Mr. Shapiro testified that he believed certain categories of Mr. Wunderlich's damages calculations appeared to be "much too high," but expressly based that decision solely on the "sheer magnitude of his total 7 million versus my 2.3" (*i.e.*, Mr. Shapiro's mistaken belief that actual spend only exceeded budgeted spend by $3,929,320, less $1,571,445 for tax credits). Ex. 3 (Shapiro Dep.) at 119:21-120:14. When asked if there was "anything else" to support that opinion, Mr. Shapiro answered clearly: "No." *Id.* at 120:15-16.

## III.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion and exclude Ms. Rusnak's damages opinions concerning (1) the Amortization Deduction, (2) the Tax Credit Deduction, and (3) supposed "inflation" in Mr. Wunderlich's analysis. Absent such new and unreliable opinions, Ms. Rusnak is left with her admission that Plaintiffs' "Potential extra expenses" on episodes 2-6 total $6,899,094. If Plaintiffs' motion is otherwise granted, they would consider stipulating to that number—despite the fact that it is slightly lower than their own damages calculation—such that the jury need only decide the issue of bad faith and bad-faith related damages.

DATED:  January 27, 2020

SUSMAN GODFREY L.L.P.

*/s/ Amanda K. Bonn*
KALPANA SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
AMANDA K. BONN (270891)
abonn@susmangodfrey.com
CATRIONA LAVERY (310546)
clavery@susmangodfrey.com
CHELSEA SAMUELS (315257)
csamuels@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150

JACOB W. BUCHDAHL (*pro hac vice*)
jbuchdahl@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel: (212) 336-8330
Fax: (212) 336-8340

*Attorneys for Plaintiffs*

20