# EXHIBIT 3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNIVERSAL CABLE ) CASE NO. 2:16-cv-4435-PA-MRW
PRODUCTIONS LLC, )
et al., )
 )
 )
    Plaintiffs, )
 )
 )
    vs. )
 )
ATLANTIC SPECIALTY )
INSURANCE COMPANY, )
 )
    Defendant. )
_____)

DEPOSITION OF JAY J. SHAPIRO

Tuesday, May 23, 2017

Reported by:  Ingrid Suárez Egnatuk
              CSR No. 3098

## Page 2

```
 1
 2        Deposition of JAY J. SHAPIRO, taken on behalf of
 3   Plaintiffs Universal Cable Productions LLC and
 4   Northern Entertainment Productions LLC, at
 5   707 Wilshire Boulevard, Suite 4000, Los Angeles,
 6   California 90017, commencing at 10:00 a.m.,
 7   Tuesday, May 23, 2017, before Ingrid Suarez
 8   Egnatuk, CSR No. 3098.
 9
10   APPEARANCES:
11        FOR PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS LLC
          AND NORTHERN ENTERTAINMENT PRODUCTIONS LLC:
12
             MITCHELL SILBERBERG & KNUPP LLP
13           BY:  LUCIA E. COYOCA, ESQ.
             11377 West Olympic Boulevard
14           Los Angeles, California 90064-1683
             (310) 312-2000
15           lec@msk.com
16        FOR DEFENDANT:
17           STRASBURGER & PRICE, LLP
             BY:  CARLA C. CRAPSTER, ESQ.
18           901 Main Street
             Suite 6000
19           Dallas, Texas 75202-3794
             (214) 651-4300
20           carla.crapster@strasburger.com
21        ANDERSON, McPHARLIN & CONNERS, LLP
          (Not present at deposition)
22        707 Wilshire Boulevard
          Suite 4000
23        Los Angeles, California 90017-3623
          (213) 688-0080
24
25
```

## Page 3

```
                        I N D E X
Witness:   JAY J. SHAPIRO
Examination                                        Page
By Ms. Coyoca                                       6
     AFTERNOON SESSION                            100
     (Exhibits bound under separate cover)

Shapiro
Exhibit        Description                         Page
 1   Notice of Taking Deposition of Jay            10
     Shapiro and Request for Production
     of Documents

 2   Order Making Findings and Imposing            36
     Remedial Sanctions Pursuant to
     Sections 4C and 21C of the Securities
     Exchange Act of 1934 and Rule 102(e)
     of The Commission's Rules of Practice

 3   Defendant Atlantic Specialty                  67
     Insurance Company's Rebuttal Expert
     Witness Disclosure

 4   E-mail chain ending December 10,              76
     2013, to Randi Richmond from Andrea
     Garber
     UCP 003732 through UCP 003734

 5   E-mail, December 11, 2013, to                 76
     Bernadette Milinovic and Wanda M.
     Phillips from Andrea Garber
     AONNBCU0001748 through AONNBCU0001750

 6   E-mail chain ending March 12, 2014,           77
     to Randi Richmond, Mark Winemaker,
     and Ryan Greig from John Gaskin
     UCP004971 through UCP004972

 7   "DIG" Locked Budget                           79
     PATTERN:  5 Episode - (8) Days in
     Israel
     UCP014836 through UCP014881
```

## Page 4

```
                        I N D E X
                        (Continued)
Shapiro
Exhibit        Description                         Page

 8   Expert Report of Jay Shapiro                  81
     Analysis of Economic Damages:
     Rebuttal, April 25, 2015

 9   DIG - New Mexico Season 1 -                   92
     First 5 episodes, Production
     Recap Report, 2014/2015 Season 1,
     Period Ending:  8/11/2016
     UCP018226 through UCP018227

10   Expert Report of Robert                      103
     Wunderlich: Analysis of Economic
     Damages, March 17, 2017

11   Documents produced by the witness            167
     JS000001 through JS000020


             REFERENCED EXHIBITS

Williams
Exhibit        Description                         Page

 1   Motion Pictures/Television Producers          41
     Portfolio Declarations
     ATL003073 through ATL003127
```

## Page 5

```
                        I N D E X
                        (Continued)

     QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
        (Indicated by "^" in the transcript)

          Page           Line
           12             13
           15             12
           39             19
           39             25
           47             24
           48             14
           57              6
           57             17
           57             23
           58              5
           58             11
          175             15
          176              8
```

Page 62

1  e-mail.
2  Q. When you say the "dating appeared to be
3  appropriate," what do you mean by that?
4  A. Well, it's my understanding that the move took
5  place on or about July 16, 2014. So if, in fact, there
6  were plans prior to that date, then I felt that was the
7  anticipated cost. Because when it comes to actual
8  costs, I searched and searched, but I really couldn't
9  find a document that showed me exactly what the actual
10 costs incurred and paid in Israel was.
11 Q. In terms of actual costs incurred and paid in
12 Israel, are you referring to actual costs incurred and
13 paid in Israel that related to the DIG episodes
14 subsequent to the pilot?
15 A. Yes.
16 Q. Was it your understanding that any of the DIG
17 episodes, aside from the DIG pilot, that it actually --
18 that those episodes had actually been produced in
19 Israel?
20 A. It was my understanding that they were not
21 produced in Israel. Yet when I saw Mr. Wunderlich's
22 deposition, he kept referring to "Israel costs
23 incurred." So I was -- I'm confused about that. But I
24 just saw the deposition over the weekend.
25 Q. So you just reviewed Mr. Wunderlich's

Page 63

1  deposition this past weekend?
2  A. Yes.
3  Q. Do you recall the date of the e-mail that you
4  referred to that referenced the budgeted amounts for
5  production of the episodes subsequent to the pilot in
6  Israel?
7  A. No. But if I could see the document, obviously
8  the date would be indicated. My feeling was it was
9  before July 16.
10 Q. Okay. Was the date of the e-mail in June,
11 2014?
12 A. I don't recall.
13 Q. April of 2014?
14 A. I don't recall the date.
15 Q. Okay. Are you familiar with the budgeting
16 process for television production?
17 A. I am.
18 Q. Do you know if budgeting is an ongoing process
19 that can occur up until the time a show actually goes
20 into production?
21     MS. CRAPSTER: Objection. Vague and ambiguous.
22 Lacks foundation.
23     THE WITNESS: Yes.
24 BY MS. COYOCA:
25 Q. In terms of determining the most accurate

Page 64

1  budget, would it be important to you to look at the most
2  current budget shortly prior to the time a show goes
3  into production?
4  A. Ideally, yes.
5  Q. Do you have an understanding of what the term
6  "pattern budget" means in the context of television
7  production accounting?
8  A. I've heard the term before, but I don't know
9  exactly its meaning.
10 Q. What is your understanding of what the term
11 "pattern budget" means?
12 A. That it's a continual document where the costs
13 are continually updated.
14 Q. What about the term "locked budget"? Have you
15 ever heard the term "locked budget" in the context of
16 television production accounting?
17 A. Absolutely.
18 Q. What's a locked budget?
19 A. Final.
20 Q. For purposes of analyzing the estimated
21 production costs for the Israel episodes subsequent to
22 the pilot, did you review and analyze any locked
23 budgets?
24 A. I believe there was a document on one episode
25 that said "locked budget" for one of the episodes.

Page 65

1  Episodes 2 through 6 are the episodes in question. I
2  believe one of those, there was a locked budget that I
3  saw a document on. But I did not see anything that was
4  2 through 6 in detail. And, therefore, I used the
5  number in the e-mail.
6  Q. I want to make sure I understand your response.
7     So the budgeting that you were attempting to
8  look at was for Episodes 2 through 6 of DIG; is that
9  correct?
10 A. Yes.
11 Q. And it was your belief that you did not have
12 any locked budget that looked at Episodes 2 through 6;
13 is that correct?
14 A. I didn't see a document that was in total.
15 Q. Now, did you look at any budget information for
16 Episodes 7 through 10, the Back 4?
17 A. Well, in the documents there often were
18 references to 7 through 10.
19 Q. But did you take those -- the budgeting for
20 those episodes into account in reaching your opinions?
21 A. The only use I made with 7 through 10 is I
22 noticed that those costs were considerably lower on an
23 episodic level than 2 through 6.
24 Q. In preparing your opinion or your analyses, did
25 you take into account, other than the manner which you

Universal Cable Productions LLC, et al. v.
Atlantic Specialty Insurance Company

Jay Shapiro
May 23, 2017

Page 118

BY MS. COYOCA:
Q. Okay. But --
A. I wouldn't make such a comparison.
Q. Okay. But your opinion is that the prep costs, you thought, for Croatia were too high; correct?
A. Yes.
Q. And what do you base that on?
A. Well, the actual costs may or may not be too high. But I don't feel those numbers represent extra expense. That's my only focus.
Q. Okay. But when I asked you -- a little bit ago, I asked you whether or not you thought the production prep for Croatia was too high, and you had indicated --
A. Then, Counselor, I misspoke.
Q. Okay.
A. I have no information on whether the cost itself is too high.
Q. What about the prep cost with respect to New Mexico? Did you perform any analysis as to whether the prep cost for New Mexico was too high?
A. No.
MS. CRAPSTER: I'm going to object to that last question as to vague and ambiguous. It's unclear as to what she means by "too high."

Page 119

BY MS. COYOCA:
Q. With respect to -- with respect to the wrap costs that are associated with Croatia, did you do any analysis or perform any analysis as to whether or not the wrap costs in Croatia were too high?
A. No.
MS. CRAPSTER: Objection. Same objection as earlier. It's vague and ambiguous as to what she means by "too high."
BY MS. COYOCA:
Q. Do you have any challenge at all to make with respect to the wrap costs associated with Croatia?
A. I have no information on that.
Q. And what about the wrap costs that are associated with New Mexico? Did you perform any analysis of the dollar amount of wrap costs that were incurred in New Mexico?
MS. CRAPSTER: Objection. Vague and ambiguous.
THE WITNESS: No.
BY MS. COYOCA:
Q. Now, your report on page 7 indicates that the amounts that were incurred for prep and wrap on Episodes 2 through 6 should not all be applied to 2 through 6; is that correct?
A. Well, I'm trying to indicate they should not

Page 120

represent extra expense.
Q. Okay. And why do you believe they should not reflect extra expense?
A. Because they're too high to represent something that's extra.
Q. Okay. I want to go back, then, to -- I'm not understanding your testimony.
You just indicated that they're too high to represent something that's extra; correct?
A. That's correct.
Q. Okay. What do you base your statement on that they're too high to represent extra expense?
A. The sheer magnitude of his total 7 million versus my 2.3.
Q. Anything else?
A. No.
Q. Did you perform any type of analysis at all with respect to the prep or wrap expenses incurred in New Mexico or Croatia to reach this conclusion that they're too high to reflect extra expense?
MS. CRAPSTER: Objection. Misstates the evidence and vague and ambiguous.
THE WITNESS: No.
BY MS. COYOCA:
Q. Now, on page 7 of your report, you indicate

Page 121

that any amount -- I'm sorry. Begin quotes:
"Any amounts incurred for prep and wrap on episodes 2 through 6 that were beneficial and saved money on episodes 7 through 10 provided a benefit to plaintiffs that reduced their overall cost of filming episodes 7 through 10," close quotes.
Do you see that?
A. Yes.
Q. What do you mean by that statement?
A. Well, I notice by looking at the documents that 7 through 10, the total episode costs were 13 percent lower than 2 through 6. And I thought one of the reasons might be that something in total costs as presented in the Wunderlich report, which he estimates to be extra expense, might, in fact, have benefited those subsequent shows.
Q. So if I understand you correctly, is it your position that the prep and wrap expenses, in your view, should have been amortized over the 2 through 10 episodes?
A. If, in fact, they relate to the other episodes. Except, you know, I don't have that kind of information. I meant it just as an observation. I have no details other than that.

Page 186

1  (At 4:15 p.m. the deposition of JAY J.
2  SHAPIRO was adjourned.)

Page 187

```
 1      I declare under penalty of perjury that I have
 2  read the foregoing transcript of my deposition testimony
 3  taken on Tuesday, May 23, 2017, at Los Angeles,
 4  California, and that, with the following exceptions
 5  which I have hand-marked on the transcript, the same is
 6  a true record of the testimony given by me at that
 7  deposition:
 8
 9  Page/Line    Should read           Reason for change:
10  _____   _____   _____
11  _____   _____   _____
12  _____   _____   _____
13  _____   _____   _____
14  _____   _____   _____
15  _____   _____   _____
16  _____   _____   _____
17  _____   _____   _____
18  _____   _____   _____
19  _____   _____   _____
20  _____   _____   _____
21  _____   _____   _____
22
23
24  Date _____             JAY J. SHAPIRO
25
```

Page 188

```
 1  STATE OF CALIFORNIA     )
                            )
 2  COUNTY OF LOS ANGELES   )
 3
 4      I, Ingrid Suárez Egnatuk, CSR No. 3098, a
 5  Certified Shorthand Reporter in and for the State of
 6  California, do hereby certify that the foregoing
 7  Confidential Deposition Testimony of JAY J. SHAPIRO was
 8  taken before me at the time and place therein set forth,
 9  at which time the witness was put under oath by me; that
10  the testimony of the witness and all objections made at
11  the time of the examination were recorded
12  stenographically by me and were thereafter transcribed
13  with computer-aided transcription; that the foregoing is
14  a full, complete, and true record of said proceedings.
15      I certify that a request has been made by, or
16  on behalf of, the witness to review, correct and sign
17  the transcript of these proceedings.
18      I further certify that I am neither counsel for
19  nor related to any party to said action, nor in anywise
20  interested in the outcome thereof.
21      In witness whereof, I have subscribed my name
22  this 1st day of June, 2017.
23
24          _____
25           Ingrid Suarez Egnatuk
             Certified Shorthand Reporter
```