# EXHIBIT 2

1                    UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                        WESTERN DIVISION

4

5    UNIVERSAL CABLE          )   CASE NO. 2:16-cv-4435-PA-MRW
     PRODUCTIONS LLC,         )
6    et al.,                  )
                              )
7          Plaintiffs,        )
                              )
8          vs.                )
                              )
9    ATLANTIC SPECIALTY       )
     INSURANCE COMPANY,       )
10                            )
           Defendant.         )
11   _____)

12

13

14

15

16                  DEPOSITION OF JAY J. SHAPIRO

                      Tuesday, May 23, 2017
17

18

19

20

21

22

23   Reported by:  Ingrid Suárez Egnatuk
                   CSR No. 3098
24

25

1

2          Deposition of JAY J. SHAPIRO, taken on behalf of

3          Plaintiffs Universal Cable Productions LLC and

4          Northern Entertainment Productions LLC, at

5          707 Wilshire Boulevard, Suite 4000, Los Angeles,

6          California 90017, commencing at 10:00 a.m.,

7          Tuesday, May 23, 2017, before Ingrid Suarez

8          Egnatuk, CSR No. 3098.

9

10   APPEARANCES:

11       FOR PLAINTIFFS UNIVERSAL CABLE PRODUCTIONS LLC
         AND NORTHERN ENTERTAINMENT PRODUCTIONS LLC:
12
             MITCHELL SILBERBERG & KNUPP LLP
13           BY:  LUCIA E. COYOCA, ESQ.
             11377 West Olympic Boulevard
14           Los Angeles, California 90064-1683
             (310) 312-2000
15           lec@msk.com

16        FOR DEFENDANT:

17           STRASBURGER & PRICE, LLP
             BY:  CARLA C. CRAPSTER, ESQ.
18           901 Main Street
             Suite 6000
19           Dallas, Texas 75202-3794
             (214) 651-4300
20           carla.crapster@strasburger.com

21           ANDERSON, MCPHARLIN & CONNERS, LLP
             (Not present at deposition)
22           707 Wilshire Boulevard
             Suite 4000
23           Los Angeles, California 90017-3623
             (213) 688-0080

24

25

1                          I N D E X

2       Witness:   JAY J. SHAPIRO

3       Examination                              Page

4       By Ms. Coyoca                              6

5           AFTERNOON SESSION                    100

6            (Exhibits bound under separate cover)

7       Shapiro
        Exhibit               Description         Page
8
9       1   Notice of Taking Deposition of Jay    10
            Shapiro and Request for Production
            of Documents
10
        2   Order Making Findings and Imposing    36
11          Remedial Sanctions Pursuant to
            Sections 4C and 21C of the Securities
12          Exchange Act of 1934 and Rule 102(e)
            of The Commission's Rules of Practice
13
        3   Defendant Atlantic Specialty          67
14          Insurance Company's Rebuttal Expert
            Witness Disclosure
15
        4   E-mail chain ending December 10,      76
16          2013, to Randi Richmond from Andrea
            Garber
17          UCP 003732 through UCP 003734

18      5   E-mail, December 11, 2013, to         76
            Bernadette Milinovic and Wanda M.
19          Phillips from Andrea Garber
            AONNBCU0001748 through AONNBCU0001750
20
        6   E-mail chain ending March 12, 2014,   77
21          to Randi Richmond, Mark Winemaker,
            and Ryan Greig from John Gaskin
22          UCP004971 through UCP004972

23      7   "DIG" Locked Budget                   79
            PATTERN:  5 Episode - (8) Days in
24          Israel
            UCP014836 through UCP014881
25

```
1                    I N D E X

2                    (Continued)

3    Shapiro
     Exhibit          Description           Page
4
5    8   Expert Report of Jay Shapiro         81
         Analysis of Economic Damages:
         Rebuttal, April 25, 2015
6
7    9   DIG - New Mexico Season 1 -          92
         First 5 episodes, Production
         Recap Report, 2014/2015 Season 1,
8        Period Ending:  8/11/2016
         UCP018226 through UCP018227
9
10   10  Expert Report of Robert            103
         Wunderlich: Analysis of Economic
         Damages, March 17, 2017
11
12   11  Documents produced by the witness  167
         JS000001 through JS000020
13

14                REFERENCED EXHIBITS

15   Williams
     Exhibit          Description           Page
16
17   1   Motion Pictures/Television Producers  41
         Portfolio Declarations
         ATL003073 through ATL003127
18

19

20

21

22

23

24

25
```

```
1                           I N D E X

2                          (Continued)

3           QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
                 (Indicated by "^" in the transcript)
4
                          Page      Line
5
                           12        13
6                          15        12
                           39        19
7                          39        25
                           47        24
8                          48        14
                           57         6
9                          57        17
                           57        23
10                         58         5
                           58        11
11                        175        15
                          176         8
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    LOS ANGELES, CALIFORNIA

 2                    Tuesday, May 23, 2017

 3                         10:00 a.m.

 4

 5                    JAY J. SHAPIRO,

 6            having been first duly sworn, was

 7            examined and testified as follows:

 8

 9                    EXAMINATION

10  BY MS. COYOCA:

11      Q.   Mr. Shapiro, can you please state your full

12  name and address for the record.

13      A.   Jay Shapiro, 11300 Olympic Boulevard,

14  Suite 910, L.A. 90064.

15      Q.   Do you have a middle initial, sir?

16      A.   J.

17      Q.   And my name is Lucia Coyoca.  I introduced

18  myself before we went on the record.  My firm, Mitchell

19  Silberberg & Knupp, represents the plaintiffs in this

20  matter, Universal Cable Productions and Northern

21  Entertainment Productions LLC.

22            Have you ever had your deposition taken before,

23  Mr. Shapiro?

24      A.   Yes.

25      Q.   On how many occasions?
```

1    A.    Approximately 20.

2    Q.    When is the last such deposition?

3    A.    January, 2016.

4         MS. CRAPSTER:  Ms. Coyoca, I would just like to

5    note for the record that my name is Carla Crapster.  I'm

6    here on behalf of Atlantic Specialty Insurance Company,

7    defending the deposition today.

8    BY MS. COYOCA:

9    Q.    What was the subject matter of the last

10   deposition in the last case that you were taken?

11   A.    It was a contractual claim, a breach of

12   contract claim, regarding an insurance contract.

13   Q.    Were you serving as an expert witness in that

14   matter?

15   A.    Yes.

16   Q.    What was the name of the case?

17   A.    O'Donnell vs. Misho, M-I-S-H-O.

18   Q.    Which party were you rendering expert services

19   on?

20   A.    O'Donnell.

21   Q.    What was the case about, aside from breach of

22   contract with respect to an insurance --

23        MS. CRAPSTER:  Objection.  Relevance.

24        THE WITNESS:  Failure to pay a premium.

25   / / /

```
 1   BY MS. COYOCA:

 2        Q.   It was alleged that the insured had failed to

 3   pay a premium?

 4        A.   That's correct.

 5        Q.   Was the insured in the matter the O'Donnell

 6   party?

 7        A.   Yes.

 8        Q.   Did you write a report in that case?

 9        A.   No.

10        Q.   Was the case in State Court or Federal Court?

11        A.   State Court.

12        Q.   Los Angeles Superior Court?

13        A.   Santa Barbara.

14        Q.   What law firm hired you?

15             MS. CRAPSTER:  Objection.  Relevance.

16             THE WITNESS:  Jim Nagel.

17   BY MS. COYOCA:

18        Q.   Do you remember Mr. Nagel's law firm?

19        A.   I think it was Nagel & Associates.

20        Q.   Is that a Los Angeles-based firm or

21   Santa Barbara?

22        A.   Los Angeles.

23        Q.   Given that you've been deposed 20 times,

24   Mr. Shapiro, I'm not going to belabor the admonition.

25   I'm just going to go over them briefly with you.
```

1          You understand that you are under oath today

2     and sworn to tell the truth as if you were testifying in

3     a court of law?

4          A.   Yes.

5          Q.   Are there any physical or medical reasons why

6     you would be unable to give your full and complete

7     testimony today?

8          A.   No.

9          Q.   Are you taking any medications or under any

10    mental or emotional impairment that prohibit you from

11    being able to give your full and complete testimony

12    today?

13         A.   No.

14         Q.   Have you ever been deposed as a party to a

15    legal proceeding?

16         A.   No.

17         Q.   Have you ever been a party to a legal

18    proceeding?

19         A.   Yes.

20         Q.   What was the case in which you were a party?

21         MS. CRAPSTER:  Objection.  Relevance.

22         THE WITNESS:  Fee disputes with clients.

23    BY MS. COYOCA:

24         Q.   When is the last such fee dispute that you had

25    with a client?

1        A.   Oh, it's been about three years; three,

2    four years.

3        Q.   How many times have you had a fee dispute with

4    a client in which you have ended up needing to litigate

5    against the former client?

6        A.   I can recall two occasions.

7        Q.   When is the last such occasion?

8        A.   Three to four years ago.

9        Q.   And the time before that?

10       A.   Maybe five years before that.

11            MS. COYOCA:   I'd like to mark as Exhibit 1 to

12   this deposition the Notice of Taking Deposition of Jay

13   Shapiro and Request for Production of Documents.

14       Q.   Could you please take a look at it when the

15   court reporter gives it to you.

16            (Shapiro Exhibit 1 was

17            marked for identification.)

18            THE WITNESS:   Yes.

19   BY MS. COYOCA:

20       Q.   Mr. Shapiro, have you seen this document

21   before?

22       A.   Yes.

23       Q.   Have you produced any documents in response to

24   the document request portion of this notice that begins

25   on page 3?

1        A.    I believe I have.

2        Q.    What documents have been produced?

3              (Interruption in proceedings.)

4              MS. COYOCA:  Off the record, please.

5         (A discussion was held off the record.)

6              (The question was read as follows:

7              "What documents have been produced?")

8              THE WITNESS:  I produced my expert report, the

9    engagement letter, invoices.  I believe that's it.

10             MS. COYOCA:  Ms. Crapster, the documents that

11   you handed me prior to the commencement of the

12   deposition that are marked JS00001 through 20, are these

13   the documents that are being produced in response to

14   Plaintiffs' Request for Production of Documents today?

15             MS. CRAPSTER:  That is correct.

16             MS. COYOCA:  Are there any other documents that

17   are being produced?

18             MS. CRAPSTER:  No.

19   BY MS. COYOCA:

20       Q.    Mr. Shapiro, in response to request for

21   production No. 1, that sought the production of all

22   documents that you reviewed prior to forming any

23   opinions, including any documents that do or do not

24   support your opinion; in other words, any documents you

25   reviewed.

1      A.   Yes.

2      Q.   You identified certain documents in your

3  report.

4           Are there any other documents that you reviewed

5  other than those that are identified in the schedule to

6  your report?

7      A.   No.

8      Q.   Do you keep a file concerning this matter?

9      A.   Yes.

10     Q.   Have you produced that file to counsel,

11  Ms. Crapster?

12     A.   I have.

13     Q.   ^What is in that file?

14          MS. CRAPSTER:  Objection.  I'm going to

15  instruct the witness not to answer that question.

16  That's information that's protected by the

17  attorney-client privilege and Rule 26.

18  BY MS. COYOCA:

19     Q.   In Schedule A to your CV that is attached to

20  your expert report, you list a number of chapters that

21  you authored, entertainment chapters of Harcourt Brace's

22  COMPREHENSIVE GAAP GUIDE.

23          Do you recall that?

24     A.   Yes.

25     Q.   Have you produced those chapters to your

1    counsel?

2         A.    No.

3         Q.    Do you have copies of those chapters?

4         A.    No.

5              MS. CRAPSTER:  Ms. Coyoca, you have our

6    objections to these requests for production, and we've

7    set forth the reasons in those objections why those are

8    not being produced to you.

9    BY MS. COYOCA:

10        Q.    What chapters did you author with respect to

11   Harcourt Brace's COMPREHENSIVE GAAP GUIDE?

12        A.    Entertainment accounting.

13        Q.    When was the COMPREHENSIVE GAAP GUIDE by

14   Harcourt Brace published?

15             MS. CRAPSTER:  Objection.  Relevance.

16             THE WITNESS:  To the best of my recollection,

17   eight or nine years ago.

18   BY MS. COYOCA:

19        Q.    How many such chapters did you author?

20        A.    I believe there's three.

21        Q.    What were the three chapters about?

22             MS. CRAPSTER:  Objection.  Relevance.

23             THE WITNESS:  Entertainment accounting:  Costs,

24   revenues, and amortization.

25   / / /

BY MS. COYOCA:

     Q.   Did you write any chapters concerning profit participation accounting in the entertainment industry?

          MS. CRAPSTER:  Objection.  Relevance.

          THE WITNESS:  It may have been mentioned.

BY MS. COYOCA:

     Q.   As to the three chapters that you authored, are the subject matters, the three topics that you've identified, broken out by each chapter?  For example, is there a chapter that relates just to cost accounting in the entertainment industry?

     A.   I don't recall the organization.

     Q.   Have you written anything relating to the intersection between GAAP accounting versus entertainment industry-related accounting?

     A.   Not that I recall.

     Q.   You indicate that you were featured in FATAL SUBTRACTION, the decision regarding the Buchwald vs. Paramount case.

          What do you mean by that?

     A.   I was the expert witness for Mr. Buchwald.

     Q.   What about DECONSTRUCTING SAMMY DAVIS, JR.?

     A.   I also served as his -- his estate's business manager.

     Q.   You served as the Estate of Sammy Davis, Jr.'s

1    business manager?

2        A.    Yes.

3        Q.    How long did you hold that role?

4        A.    Oh, two to three years.

5        Q.    When did you first begin?

6        A.    It was a long time ago.  It could have been

7    seven, eight years ago.

8        Q.    Have you authored any other articles, books,

9    any other publications relating to accounting in the

10   entertainment industry?

11       A.    No.

12       Q.    ^Have you provided to your counsel copies of

13   any of the expert reports that you've rendered in any

14   other cases in which you've been retained?

15            MS. CRAPSTER:  Objection.  Calls for

16   attorney-client privileged information.

17            I'll instruct the witness not to answer.

18   BY MS. COYOCA:

19       Q.    Did you render a report in the Cobb matter?

20       A.    Not that I recall.

21       Q.    You served as an expert witness in the Cobb vs.

22   Time Warner matter; is that correct?

23       A.    I did.

24       Q.    When did you render those services?

25       A.    I believe 2013.

1    Q.    Where was that case filed?

2    A.    Southern District of Tennessee.

3    Q.    What work did you perform in that case?

4    A.    I evaluated documents that inferred that

5  Mr. Cobb had no earning power.

6    Q.    Were you working for the Cobb -- Mr. Cobb's

7  side or the Time Warner side?

8    A.    Mr. Cobb.

9    Q.    Did you ultimately render an opinion as to the

10 earnings potential of Mr. Cobb?

11   A.    I did.

12   Q.    Was that opinion ever documented in a written

13 report format?

14   A.    It was not.

15   Q.    Did you testify at trial?

16   A.    Yes.

17   Q.    Was that decision in that case challenged on

18 appeal?

19   A.    It was.

20   Q.    Were your holdings or your opinions addressed

21 in the appeal?

22   A.    I don't recall.

23   Q.    Who prevailed in the case?

24   A.    Time Warner.

25   Q.    What attorney or law firm hired you for the

1    Cobb vs. Time Warner case?

2         A.    I don't recall the law firm.

3         Q.    Do you remember the name of the lawyer?

4         A.    No, ma'am.

5         Q.    Greer vs. Dove Books, did you render legal

6    services in that matter?

7         A.    Yes.

8         Q.    When?  Excuse me.  I want to correct my

9    question.

10             Did you render expert services in the Greer vs.

11   Dove Books matter?

12        A.    Yes.

13        Q.    What did you do?

14        A.    It was an issue of royalties on the sale of

15   Ms. Greer's book.

16        Q.    Which side did you perform services for?

17        A.    Ms. Greer.

18        Q.    Where was that case filed?

19        A.    Los Angeles County.

20        Q.    L.A. Superior Court?

21        A.    Yes.

22        Q.    When was it filed?

23        A.    I believe 2013.

24        Q.    Did you render a written report in that case?

25        A.    No.

1    Q.   Did you provide deposition testimony?

2    A.   Not that I recall.

3    Q.   Did you testify at trial?

4    A.   No.

5    Q.   Did you form an opinion in that matter?

6    A.   Yes.

7    Q.   Was that opinion ever conveyed to opposing

8  counsel?  Do you know?

9    A.   Not that I'm aware of.

10   Q.   What was the result in that case?

11   A.   There was a settlement with Ms. Greer by Dove

12  Books.

13   Q.   What lawyer or law firm hired you in the

14  Greer vs. Dove Books matter?

15   A.   Rick Rosenthal.

16   Q.   Do you recall the name of Mr. Rosenthal's firm?

17   A.   I do not.

18   Q.   Is Mr. Rosenthal an attorney in Los Angeles?

19   A.   He is.

20   Q.   You served as a referee in the L.A. Superior --

21  excuse me -- in the CRASH matter; is that correct?

22   A.   That is correct.

23   Q.   What is that case about?

24   A.   It was about the payment of a profit interest

25  to the licensee of the CRASH materials, the producer of

1    the CRASH materials.

2        Q.   The "CRASH materials," do you mean the CRASH

3    motion picture?

4        A.   Yes.

5        Q.   And the producer of CRASH was alleging a

6    contingent participation interest; is that correct?

7        A.   He was.

8        Q.   Who was the producer?

9        A.   I don't recall the exact party.

10       Q.   Where was the case filed?

11       A.   Los Angeles Superior Court.

12       Q.   What were your services in the matter?

13       A.   I advised the judge in the case on the various

14   documents and analyses that were presented in evidence.

15       Q.   Which judge?

16       A.   Santa Monica Court, Judge Karlin, Craig Karlin.

17       Q.   How were you appointed?

18       A.   He was given a list of names, and he

19   interviewed me and chose me.

20       Q.   Do you know which side put your name on the

21   list?

22       A.   I do not.

23       Q.   What was the result in that case?

24       A.   I think there was ultimately a payment to the

25   plaintiff.

1     Q.    Did you render a written report in that case?

2     A.    Not that I recall.

3     Q.    Did you render an opinion to the court in that

4  case?

5     A.    I did correspond with Judge Karlin.

6     Q.    What was your opinion in the case?

7     A.    That the plaintiff's documents appeared to be

8  more reliable than the defendant's.

9     Q.    You rendered services in the Kasich,

10  K-A-S-I-C-H, vs. NTV matter; is that correct?

11     A.    Yes.

12     Q.    On your Schedule A to your CV after the Kasich

13  case note, it indicates "DECISIONS."

14     A.    Yeah.  It was a motion picture film, and the

15  issue was it was licensed to NTV, and they hadn't paid

16  the producer anything.

17     Q.    Did it concern the producer's fixed or

18  contingent compensation?

19     A.    Contingent.

20     Q.    Which side did you render services to?

21     A.    Kasich.

22     Q.    Was Kasich the producer?

23     A.    He was.

24     Q.    When was the case filed?

25     A.    2013.

1    Q.   Which lawyer or law firm hired you?

2    A.   I don't recall.

3    Q.   Was it a law firm in Los Angeles?

4    A.   Yes.

5    Q.   Did you render a written report in that case?

6    A.   No.

7    Q.   Did you testify in deposition in the case?

8    A.   I believe I did.

9    Q.   Did you testify at trial in the matter?

10   A.   No.

11   Q.   How was the case resolved?

12   A.   Settlement between the parties.

13   Q.   What was the opinion that you rendered in the

14   Kasich vs. NTV matter?

15   A.   That he was entitled to some amount of monies

16   from NTV's exploitation of the film.

17   Q.   You rendered services in the Sterling vs.

18   Stiviano matter?

19   A.   Yes.

20   Q.   What services did you render?

21   A.   I reviewed the accounting documents relative to

22   the case and the dollar amount settlement.

23   Q.   Which side did you render services to?

24   A.   Mrs. Sterling.

25   Q.   Where was that case filed?

1      A.   Los Angeles County in the Superior Court.

2      Q.   Who were the lawyers that hired you?

3      A.   Greenberg Glusker.

4      Q.   Bert Fields?

5      A.   Pierce O'Donnell.

6      Q.   Did you render a written report in the Stiviano

7  matter?

8      A.   I did not.

9      Q.   Did you testify in deposition in the

10 Sterling v. Stiviano matter?

11     A.   Yes.

12     Q.   Did you testify in any proceeding in the matter

13 other than the deposition?

14     A.   Trial.

15     Q.   What was your opinion in the matter?

16     A.   That Mrs. Sterling was entitled to a certain

17 dollar amount of monies.

18     Q.   Did you opine that Mrs. Stiviano was not?

19     A.   Indirectly, yes.

20     Q.   What do you mean by "indirectly"?

21     A.   Well, she was the recipient of Mr. Sterling's

22 generosity, and the case was essentially the return of

23 community funds.

24     Q.   A recoupment case?

25     A.   Yes.

1     Q.   How was the case resolved?

2     A.   Ms. Stiviano returned certain properties

3    purchased with the funds.

4     Q.   Was the case resolved by settlement, or did it

5    go to verdict in the trial?

6     A.   It went to verdict.

7     Q.   Was the case appealed?

8     A.   Not that I'm aware of.

9     Q.   The O'Donnell vs. Misho Law Group, that's the

10   case you mentioned previously; is that correct?

11    A.   Yes.

12    Q.   Can you recall any other cases in which you

13   provided deposition testimony as an expert witness?

14    A.   Well, over the years, like I said,

15   approximately 20 times.

16    Q.   Can you recall the names of any cases other

17   than just the number 20?

18    A.   Well, if I had my full resume, I could identify

19   some more.  But I understood from counsel there was a

20   four-year window.

21    Q.   So you have a resume that contains a listing of

22   all the cases in which you've previously testified as an

23   expert; is that correct?

24    A.   It does exist.  Yes.

25    Q.   Have you ever given your testimony in a Federal

1    Court action before?

2        A.   Yes.

3        Q.   What was that Federal Court action?

4        A.   The first I recall is the Cobb matter, Southern

5    District of Tennessee.

6        Q.   Any others?

7        A.   I believe there's others.  I just can't recall

8    them.

9        Q.   How long have you been rendering services as an

10   expert witness?

11       A.   Well, it's about 50 percent of my practice.

12   I'd say 15 to 20 years.

13       Q.   Do you represent plaintiffs more than

14   defendants?

15            MS. CRAPSTER:  Objection.  Relevance.

16            THE WITNESS:  In the nature of my work, yes.

17   My plaintiffs are often artists, writers, directors.

18   BY MS. COYOCA:

19       Q.   So you --

20       A.   And the defendants tend to be studios.

21       Q.   So you represent predominantly the talent side;

22   is that correct?

23       A.   I do.

24       Q.   What percentage of your work relates to

25   primarily participation cases?

1     A.    I'd say half.

2     Q.    Have you ever previously rendered expert

3  services to the Strasburger Price firm?

4     A.    No.

5     Q.    Do you keep copies of the deposition

6  transcripts in which you -- in the cases in which you

7  have been deposed?

8     A.    No.

9     Q.    Do you have copies of any deposition

10  transcripts for any matter in which you've been deposed?

11     A.    No.

12     Q.    Mr. Shapiro, can you please describe your

13  educational history, beginning from college forward.

14     A.    My educational history beginning with college?

15     Q.    Yes.

16     A.    University of Wisconsin, bachelor's degree in

17  accounting.  I have a master's in business from Arizona

18  State University graduate school.

19     Q.    Any other advanced degrees?

20     A.    No.

21     Q.    You indicated you have a master's in business

22  from Arizona State University graduate school; is that

23  correct?

24     A.    Yes.

25     Q.    Your resume indicates that you have a master's

1    in accounting and finance.

2         A.   Yeah.  My major was accounting and finance.

3         Q.   Do you have an MBA?

4         A.   It's a master of science.

5         Q.   Are you a certified public accountant?

6         A.   I am.

7         Q.   Have you ever -- when were you first licensed?

8         A.   1977.

9         Q.   What did you do after you received your MS in

10   accounting and finance?  What was your first job?

11        A.   KPMG Peat Marwick.

12        Q.   How long were you at Peat Marwick?

13        A.   Eight or nine years.

14        Q.   Your resume indicates 1973 to 1982; is that

15   correct?

16        A.   Yes.

17        Q.   Where did you go after you left Peat Marwick?

18        A.   Laventhol Horwath.

19        Q.   Did you make partner at Peat Marwick before you

20   left?

21        A.   No.

22        Q.   How long were you at Laventhol?

23        A.   '82 to November 20, 1990.

24        Q.   What did you do after you left Laventhol?

25        A.   I started my own practice.

1      Q.   Is that practice the Program Entertainment

2  Group?

3      A.   No.  It would be Jay Shapiro CPA.

4      Q.   Why did you leave Laventhol?

5      A.   The firm dissolved.

6      Q.   Did you work full time as the principal of Jay

7  Shapiro CPA for a period of years?

8      A.   Well, from time to time I'd have clients that

9  needed more full-time services.  I would take kind of

10  positions as their acting or temporary chief financial

11  officer.

12      Q.   What is the first such client that you --

13      A.   Program Entertainment.

14      Q.   Okay.  Mr. Shapiro, it's important that you let

15  me finish my question before you answer.  Otherwise, we

16  won't have a complete transcript.

17      A.   Okay.

18      Q.   Okay?

19           Also, it's important that you give verbal

20  responses, not nods of the head or shakes of the head.

21           Do you understand?

22      A.   Yes.

23      Q.   So the first such client that you remember

24  rendering services to as an outside chief financial

25  officer is the Program Entertainment Group; is that

1    correct?

2         A.    That's correct.

3         Q.    What is the Program Entertainment Group?

4         A.    They were a TV syndicator.

5         Q.    Do they still exist?

6         A.    I don't believe so.

7         Q.    How long did you serve as the outside CFO for

8    Program Entertainment Group?

9         A.    I don't recall.

10        Q.    Your resume indicates 1990 to 1993; is that

11   right?

12        A.    That sounds right.  Yes.

13        Q.    Who hired you?

14        A.    The CEO.

15        Q.    Who is the CEO?

16        A.    I don't recall his name.

17        Q.    Why did you stop rendering services to the

18   Program Entertainment Group?

19        A.    They didn't feel they needed the service any

20   further.

21        Q.    Did you have a dispute with the Program

22   Entertainment Group when you left rendering services for

23   that entity?

24        A.    No.

25        Q.    Did you work full time for the Program

1    Entertainment Group?

2        A.   No.

3        Q.   You continued having your own private practice

4    as well?

5        A.   I did.

6        Q.   What was the nature of the work that you did

7    during this period of time when you had your own

8    accounting firm and you were also simultaneously

9    rendering services to the Program Entertainment Group?

10       A.   Well, I provided a wide variety of services:

11   Accounting, tax, some business management, forensic

12   accounting.  That's about it.

13       Q.   Is there a particular area of industry that you

14   specialized in during this period of time?

15       A.   Well, I've always specialized in entertainment.

16       Q.   During this particular period of time, did you

17   predominantly represent talent?

18       A.   I had some talent.

19       Q.   What other areas in the industry did you

20   represent?

21       A.   I have represented corporate entertainment

22   entities, investment partnerships in the entertainment

23   industry; basically, non-individuals engaged in

24   entertainment.

25       Q.   Did you represent financiers?

1    A.    From time to time I get work from people

2  financing entertainment projects.  Yes.

3    Q.    Did you predominantly specialize in television,

4  feature film, music industry, or any other area?

5    A.    Well, most of my clients were television and/or

6  film.  I did some music, but predominantly TV and film.

7    Q.    After you stopped representing the Program

8  Entertainment Group, did you begin representing any

9  other particular client rendering services as an outside

10  CFO similar to what you did for the Program

11  Entertainment Group?

12          MS. CRAPSTER:  Objection.  Vague.

13          THE WITNESS:  None that I recall.

14  BY MS. COYOCA:

15    Q.    Do you recall ever serving in a similar

16  capacity to what you did for the Program Entertainment

17  Group --

18    A.    Yes.

19    Q.    -- with respect to any other entity?

20    A.    Yes.

21    Q.    What entity is that?

22    A.    Well, again, if I had my resume, I think I have

23  a list of corporate entities I served in that capacity,

24  as indicated on my resume.

25    Q.    Is Impact Media Group another one?

1      A.   Yes.

2      Q.   Was there any entity between the Program

3  Entertainment Group and Impact Media Group for which you

4  rendered services on an outside CFO basis?

5      A.   Not that I recall.

6      Q.   What is Impact Media Group?

7      A.   They were a syndicator of television programs.

8      Q.   Do they still exist?

9      A.   No.

10      Q.   Who hired you?

11      A.   The CEO.

12      Q.   It indicates on your resume that you served as

13  chief executive officer.

14      A.   Yeah.  He -- he left the company, and I took

15  his position.  I was asked by the board to take his

16  position.

17      Q.   Who was the CEO who hired you?

18      A.   Drew Levin.

19      Q.   Now, when you indicate that Impact Media Group

20  was a syndicator of television programming, did it

21  syndicate its own content?

22      A.   It produced and also acquired content for sale

23  to TV outlets and networks.

24      Q.   Did it predominantly sell in the U.S. or

25  internationally?

1    A.    About 50/50.

2    Q.    Did it sell to any of the majors?

3    A.    Discovery Channel.

4    Q.    Any others?

5    A.    Mostly smaller.  Discovery Channel would have

6    been the largest.

7    Q.    Why did you leave -- or why did you stop

8    rendering accounting or financial services to the Impact

9    Media Group?

10    A.    They no longer needed services; bankruptcy.

11    Q.    The Impact Media Group went bankrupt?

12    A.    They did.

13    Q.    Did you have any kind of dispute with the

14    Impact Media Group prior to your departure from the

15    company?

16    A.    No.

17    Q.    Sunrise Media Group, what did you do for

18    Sunrise Media Group?

19    A.    I created Sunrise Media Group, and it's wholly

20    owned by me.

21    Q.    What does it do?

22    A.    We're consultants to film producers to assist

23    them in their sale of their content to users.

24    Q.    To users or to third-party distributors?

25    A.    They would be users.

1      Q.    I'm sorry.  Does Sunrise Media Group render

2  services to producers who are selling their content to

3  third-party distributors?

4      A.    That's correct.

5      Q.    How many employees does Sunrise Media Group

6  have?

7      A.    Well, one time I had six employees.

8      Q.    How many currently?

9      A.    One.

10     Q.    Anyone other than yourself?

11     A.    No.

12     Q.    Does Sunrise Media Group still exist?

13     A.    Yes.

14     Q.    Does it still conduct business?

15     A.    Well, what do you mean by "conduct"?

16     Q.    Does it have any clients?

17     A.    We've been somewhat inactive in 2016.  In '17

18 there has been no business.

19     Q.    Do you currently work full time?

20     A.    Yes.

21     Q.    What percentage of your current full-time work

22 relates to rendering expert services?

23     A.    Well, I do 50 percent forensic accounting.

24 That would include expert services.

25     Q.    How many cases do you currently have ongoing?

1      A.   At this time, one.

2      Q.   Just this one?

3      A.   Yes.

4      Q.   Do you continue to hold a certified public

5   accountant license in the state of California?

6      A.   Yes.

7      Q.   Are you licensed anyplace else?

8      A.   No.

9      Q.   Have you ever been licensed in any other

10   jurisdiction?

11      A.   Yes.

12      Q.   What jurisdictions?

13      A.   Wisconsin.

14      Q.   Any others?

15      A.   No.

16      Q.   Do you hold any other professional licenses or

17   certifications?

18      A.   No.

19      Q.   When did your Wisconsin license go inactive?

20      A.   '77.

21      Q.   Have you ever been disciplined or sanctioned by

22   the California Board of Public Accountancy?

23      A.   Yes.

24      Q.   When?

25      A.   About 10 years ago.

1      Q.    Why were you sanctioned?

2      A.    I failed to sign up for an organization that

3   the requirement for such sign-up, I was unaware of.

4      Q.    What was the organization?

5      A.    Public Company Auditing Oversight Board.

6      Q.    Public company on the -- is it Auditing

7   Oversight Board?

8      A.    I believe so.

9      Q.    What organization sanctioned you?

10      A.    I wasn't sanctioned.  The discipline I received

11   was a probation.  All my services remain the same.  And

12   the ruling came from the Securities and Exchange

13   Commission.

14          MS. COYOCA:  I'd like to mark as Exhibit 2 an

15   Order Making Findings and Imposing Remedial Sanctions

16   Pursuant to Section 4C and 21C of the Securities

17   Exchange Act of 1934 and Rule 102(e) of the Commission's

18   Rules of Practice.

19          MS. CRAPSTER:  Ms. Coyoca, are we not

20   continuing to sequentially number the exhibits?

21          MS. COYOCA:  I thought that's what we were

22   doing as well.  But when I was in the last deposition

23   with Mr. Keeley, he indicated that's not what you all

24   are doing.

25          MS. CRAPSTER:  Okay.

1          (Shapiro Exhibit 2 was

2          marked for identification.)

3          MS. COYOCA:  Ms. Crapster, it would be my

4    preference that we would continue sequentially

5    numbering.  I understand that you all are marking your

6    own exhibits, even though there have been documents that

7    have been marked by plaintiffs' side with different

8    numbering.  But it was my understanding that's not what

9    your firm was doing.

10          If it is, then I'm happy to try to find out

11    what the last document number was that we offered and am

12    happy to continue on in that vein.

13          Is that --

14          MS. CRAPSTER:  As we sit here today, I believe

15    Ms. Markus is being deposed as well.  So at this point

16    it's probably impossible to get a true sequential

17    numbering.  So I think for purposes of today, we can

18    continue with starting at 1.

19          MS. COYOCA:  All right.  I'm going to mark them

20    all as Shapiro 1, Shapiro 2 -- okay? -- et cetera.

21          MS. CRAPSTER:  I agree.

22    BY MS. COYOCA:

23      Q.   Mr. Shapiro, can you please take a look at the

24    document I've put in front of you.

25      A.   Yes.

1      Q.   Do you recognize this document?

2      A.   Yes.

3      Q.   What is it?

4      A.   It's an administrative proceeding with the

5   Securities and Exchange Commission.

6      Q.   Is this the disciplinary Order that you were

7   speaking about in your previous response?

8      A.   Yes.

9      Q.   There is an entity referenced on page 2 that's

10  titled Daleco Resources Corporation.

11           Do you see that?

12     A.   Yes.

13     Q.   What is Daleco Resources Corp.?

14     A.   It was an oil and gas company.

15     Q.   Did you render services to Daleco?

16     A.   I did.

17     Q.   What services?

18     A.   Auditing services.

19     Q.   Auditing services?

20     A.   Yes.  I prepared an audit and opinion for their

21  Form 10-K for the year ending September 30, 2003.

22     Q.   What connection, if any, did Daleco have to the

23  entertainment industry?

24     A.   None.

25     Q.   On page 4 of this document, it indicates that

1    after one year from the date of the order, the firm of

2    Jay Shapiro could request reinstatement before the SEC;

3    is that correct?

4        A.   Yes.

5        Q.   Did you --

6        A.   No.

7        Q.   Okay.  You need to let me finish asking my

8    question.

9             Did you seek reinstatement before the SEC?

10       A.   No.

11       Q.   Have you been found to be in violation of any

12   other provision of the Sarbanes-Oxley Act since this

13   decision?

14       A.   No.

15       Q.   As a result of the decision in this matter, the

16   Daleco matter, were you disciplined or sanctioned by the

17   California State Board of Accountancy?

18       A.   Yes.

19       Q.   What discipline or sanction did you receive?

20       A.   Two years' probation.

21       Q.   What were the terms of the probation?

22       A.   Quarterly reporting and take an ethics course.

23   There was no suspension of any practice privilege.

24       Q.   Okay.  So during the two-year probation period,

25   you were permitted to continue practicing as a certified

1    public accountant; is that correct?

2        A.    In all capacities.

3        Q.    What two-year period of time were you on

4    probation?

5        A.    I think it was 2010 and '11.

6        Q.    Have you received any other discipline or

7    sanction by any regulatory board or authority during the

8    course of your practice?

9        A.    No.

10       Q.    Have you been engaged to render services in

11   this case?

12       A.    Yes.

13       Q.    When were you first engaged?

14       A.    March 27, 2017.

15       Q.    Who hired you?

16       A.    Ms. Crapster.

17       Q.    Did you know Ms. Crapster prior to this case?

18       A.    No.

19       Q.    ^Did Ms. Crapster indicate how she had located

20   you?

21            MS. CRAPSTER:  Objection.  Calls for

22   attorney-client privileged information.

23            I'll instruct the witness not to answer.

24   BY MS. COYOCA:

25       Q.    ^What did Ms. Crapster tell you when she first

1    contacted you about the case?

2            MS. CRAPSTER:  Objection.  Calls for

3    attorney-client privileged information.

4            I'll instruct the witness not to answer.

5            MS. COYOCA:  Based on Rule 26, you're

6    instructing on what you told him about the case?

7            MS. CRAPSTER:  I'm going to need you to be much

8    more specific.  Rule 26 has some vary narrow exceptions

9    to the attorney-client privileged protections that apply

10   to communications between attorneys and witnesses.  If

11   you want to narrow the question to precisely what

12   Rule 26 allows --

13           MS. COYOCA:  I believe I have.

14           MS. CRAPSTER:  -- I won't object to that.

15           MS. COYOCA:  I want to know if you're standing

16   on your objection that you're not going to tell him

17   [sic] what you told him about when you first contacted

18   him.

19           Is that correct?

20           THE WITNESS:  That's correct.

21           MS. COYOCA:  Can we go off the record for a

22   moment, please.

23       (A discussion was held off the record.)

24           MS. COYOCA:  Back on the record.

25       Q.   Mr. Shapiro, when Ms. Crapster contacted you on

1   March 27, 2017, what did she tell you about the facts of

2   the case?

3        A.   I asked questions about the case.  She told me

4   that she represented an insurance company.  There was a

5   claim regarding extra expenses incurred on a relocation.

6   And when I asked her for more details, she sent me the

7   Complaint.

8        Q.   Did she indicate to you what she meant by

9   "extra expenses incurred on a relocation"?

10       A.   No.  That would be spelled out in the

11   Complaint.

12       Q.   Did you form an understanding as to what was

13   meant by "extra expenses incurred on a relocation"?

14       A.   I did.

15       Q.   What's your understanding?

16       A.   I found in the Complaint -- there was an

17   exhibit, the insurance policy.  And Section IX pretty

18   well explained the computation for extra expense.  And I

19   believe I brought a copy of my notes in that area today.

20       Q.   Okay.  We'll get to those in a moment.

21       A.   Okay.  And that's what I learned.

22       Q.   I want to show you a document that's previously

23   been marked as Williams Exhibit 1.  So I don't think

24   it's necessary to re-mark the document.

25            This is a copy of the Motion Picture/Television

```
1    Producers Portfolio policy issued by Atlantic Specialty

2    Insurance Company to NBCUniversal Media, LLC, Policy

3    No. MP00163-04, labeled Bates control ATL003073 through

4    3127.

5            Mr. Shapiro, you indicated that attached to the

6    Complaint was a copy of the insurance policy; is that

7    right?

8        A.   Yes.

9        Q.   Is this the policy that you were referring to?

10       A.   Yes.  I believe it is.

11       Q.   Okay.  If you'll look at Section IX, which is

12   on the page labeled ATL003106 --

13       A.   I don't have -- oh.  Here it is.  Yes.

14       Q.   -- Roman numeral IX is titled "Definition of

15   Loss."

16            Do you see that?

17       A.   Yes.

18       Q.   When you indicated that you looked at the

19   Definition of Loss, is this the section to which you're

20   referring?

21       A.   Yes.

22       Q.   The Definition of Loss references "insurable

23   production cost."

24            Do you see that term?

25       A.   Yes.
```

1    Q.   Did you review and look at the definition of

2    "insurable production cost"?

3    A.   Well, I read through the policy.  I don't

4    remember particularly looking up the definition.

5    Q.   Did you consider the definition of "insurable

6    production cost" in rendering your opinions in this

7    matter?

8    A.   Yes.

9    Q.   What's your understanding of the definition of

10   "insurable production cost"?

11   A.   It was the amount that was in the application

12   for the insurance policy.

13   Q.   So your understanding of "insurable production

14   cost" is whatever the dollar amount was that was in the

15   application for the insurance policy?

16   A.   Yes.

17   Q.   Now, when you indicate the "application for the

18   insurance policy," are you referring to the application

19   for the policy that we're looking at here in Exhibit 1,

20   or are you referring to the application to have the DIG

21   television show added as an insured production?

22   A.   Well, I'm not sure what the document was

23   created -- which one it had been created for.  But there

24   was a document that looked like an application that had

25   a dollar amount of $25 million.

1    Q.   That application that you're referencing, did

2    it refer specifically to the DIG television show?

3    A.   It did.

4    Q.   So it's your understanding that that

5    $25 million is the insurable production cost as it's

6    defined or referenced in Section IX?

7    A.   Yes.

8    Q.   Can you please turn to page ATL003081.

9    A.   Yes.

10   Q.   At the very bottom of the page in the

11   right-hand column there is Item 4 that's titled

12   "Insurable Production Cost."

13        Do you see that?

14   A.   Yes.

15   Q.   This is under Section II, capital A,

16   "Definitions."

17   A.   Yes.

18   Q.   This contains a specific definition of the term

19   "insurable production cost," does it not?

20   A.   Yes.

21   Q.   Is there a reference to a $25 million amount in

22   this provision?

23   A.   No.

24        MS. CRAPSTER:  Objection.  Assumes facts not in

25   evidence.

1    BY MS. COYOCA:

2        Q.   Did you consider this definition of "insurable

3    production cost" in calculating the loss as referenced

4    in Section IX?

5        A.   Well, I recognize production cost to include

6    all the matters described here, overhead, interest, then

7    direct costs of production.  So I assume the two things

8    were the same.

9        Q.   If the amount, though, exceeded 25 million that

10   was incurred in the production costs associated with

11   DIG, is it your understanding that that $25 million in

12   the application would act as a cap on the insurable

13   production cost?

14           MS. CRAPSTER:  Objection.  Lacks foundation.

15   Vague and ambiguous.

16           THE WITNESS:  No.

17   BY MS. COYOCA:

18       Q.   Now, you indicated -- you referred to a folder

19   to your left that you referred to when you were

20   beginning to speak about the definition of "loss."

21           What's contained in that folder?

22       A.   I have the Section III of the insurance policy

23   and a copy of my report.

24       Q.   Anything else?

25       A.   No.

1    Q.   What's the document that's on the top of the

2  front folder?

3    A.   It's just a piece of scratch paper with nothing

4  on it.

5    Q.   What's the note on the inside of the folder?

6    A.   Phone numbers.

7    Q.   Phone numbers for what?

8    A.   Ms. Crapster and the IT guy at Strasburger.

9    Q.   Now, when you say you have Section III of the

10  extra expense portion, are you referring -- excuse me --

11  Section III of the policy, are you referring to

12  Section III - Extra Expense, that begins on page

13  ATL0003103?

14    A.   Yes.

15    Q.   So the sections that you annotated and produced

16  here today are the pages that are contained at ATL003103

17  through 0003106?

18    A.   Yes.

19    Q.   Why didn't you copy and annotate and include in

20  your excerpts of the policy the definition of "insurable

21  production cost" that's contained on ATL0003081 through

22  3082?

23    A.   I didn't find it necessary.

24    Q.   Okay.  When you first spoke with Ms. Crapster,

25  what did she ask you to do?

1      A.   She asked me to prepare a rebuttal to

2   Mr. wunderlich's report.

3      Q.   Did she provide you a copy of Mr. Wunderlich's

4   report?

5      A.   She did.

6      Q.   When?

7           MS. CRAPSTER:  Objection.  I think that is not

8   within the scope of what Rule 26 will allow you to

9   inquire about.

10  BY MS. COYOCA:

11     Q.   Well, when you first spoke with her on the

12  telephone -- by the way, did you speak with her for the

13  first time on the telephone?

14     A.   Yes.

15     Q.   When you spoke with her on the telephone on

16  March 27, did she indicate to you that Mr. Wunderlich

17  had prepared a report?

18     A.   I don't recall.

19     Q.   During that first conversation, did you have a

20  copy of the rebuttal report -- excuse me -- a copy of

21  Mr. Wunderlich's report so that you could address what

22  you would be rebutting?

23     A.   I did not.

24     Q.   ^what did Ms. Crapster ask you to rebut

25  specifically?

1          MS. CRAPSTER:  Objection.  I think that goes

2     beyond the scope of what Rule 26 will allow.

3          Instruct the witness not to answer.

4     BY MS. COYOCA:

5       Q.   Other than telling you she wanted you to

6     prepare a rebuttal report, what did she ask you to do

7     specifically?

8       A.   I don't remember any other request other than

9     prepare a rebuttal report.

10      Q.   Did she ask you to look at how Mr. Wunderlich

11    had calculated the extra expense claim under Section III

12    of the policy?

13      A.   Not at that time.

14      Q.   ^Did she subsequently ask you to do that?

15         MS. CRAPSTER:  Objection.  I think that goes

16    beyond what Rule 26 will permit.

17         I'll instruct him not to answer.

18    BY MS. COYOCA:

19      Q.   Did you, Mr. Shapiro, at some point analyze how

20    Mr. Wunderlich had calculated the extra expense claim

21    under Section III of the policy?

22      A.   Yes.

23      Q.   Why did you do that?

24         MS. CRAPSTER:  Objection.  It's the same

25    question you asked before in a slightly different way.

1    That goes beyond the scope of what Rule 26 will allow.

2          MS. COYOCA:  Okay.  Ms. Crapster, I'm getting

3    into exactly what he was asked to do, and that is

4    specifically permitted under Rule 26.

5          MS. CRAPSTER:  He's answered that question for

6    you.  He explained to you that he was asked to rebut

7    Mr. Wunderlich's report.

8          MS. COYOCA:  I disagree with you entirely.

9    You're now instructing him that he is not permitted to

10   testify about what he was specifically asked to do in

11   rendering services as an expert; is that correct?

12         MS. CRAPSTER:  No, that's not correct.  I'm

13   telling you that the substance of the conversations that

14   he and I had are protected and privileged conversations.

15   And you may ask about the narrow scope of what we asked

16   him to do, but nothing beyond that.

17         MS. COYOCA:  Okay.  I disagree with you.

18         And I think you are, once again, as I indicated

19   off the record -- I'll now indicate it on the record.

20         I think you are instructing him improperly,

21   beyond the scope of Rule 26.  We are entitled to know

22   what he was asked to do and what he did, the information

23   that he relied on in rendering his opinions, and you are

24   instructing on questions that relate to what he was

25   asked to do.

1            And, therefore, I believe that we are going to

2    be able to strike Mr. Shapiro's opinion and testimony

3    from the case if you continue your instructions on this

4    ground.

5        Q.   Mr. Shapiro, you ultimately did analyze how

6    Mr. Wunderlich had calculated the extra expenses claim

7    that's been asserted in this case; is that right?

8        A.   I tried to.  Yes.

9        Q.   When did you undertake that analysis?

10       A.   April of this year.

11       Q.   What did you do?

12       A.   I read his report.  I reviewed documents.  I

13   reviewed the Complaint again, including the extra

14   expense section, and I came to the conclusion that the

15   methodology employed by Mr. Wunderlich was not an

16   appropriate approach to compute extra expense.

17       Q.   You indicated that you performed this work

18   during the month of April; is that right?

19       A.   Yes.

20       Q.   How long did it take you to complete your

21   analysis?

22       A.   Oh, I don't recall.

23       Q.   Did it take more than two hours?

24       A.   Yes.

25       Q.   Did it take more than 100 hours?

1      A.   In total, I think yes.

2      Q.   Did you have anyone assisting you in your

3  analysis?

4      A.   I have very -- I did have an administrative

5  person assist me in organizing the materials.

6      Q.   Is that someone who works for you full time?

7      A.   No.   Part time.

8      Q.   Who is that person?

9      A.   Maria Rodriguez.

10     Q.   What materials did Ms. Rodriguez assist you in

11  organizing?

12     A.   Well, there were a great deal of documents

13  essentially identifying what kind of information is on

14  the document so that I could see what I wanted to look

15  at in an organized manner.

16     Q.   Did she prepare some kind of report for you or

17  a document that identified the type of information that

18  was in each of the documents that you had been given to

19  review?

20     A.   No.

21     Q.   How did she identify them for you?

22     A.   Well, I guess there would have been some kind

23  of notes with the Bates number that this is something I

24  should look at first.

25     Q.   I want to make sure I understand.

1          So Ms. Rodriguez undertook the task of

2     reviewing the various documents and reports that you had

3     been provided, and she identified by notes what reports

4     contained what information, indicating to you what you

5     needed to look at?

6          MS. CRAPSTER:  Objection.  Vague and ambiguous

7     and misstates the evidence.

8          THE WITNESS:  No.  I chose what to look at

9     first.  It was just a note on what was on the document,

10    what types of information.

11    BY MS. COYOCA:

12        Q.   And when you indicate that she created notes,

13    did she append those notes to the particular documents

14    that had been printed out?

15        A.   No.

16        Q.   Did she prepare a note that was one document

17    that identified the information on the various documents

18    that you had asked her to look at?

19        A.   No.  It was more of a list of Bates numbers

20    that these documents had this type of data on them.

21        Q.   How long was the list?

22        A.   It was about one page.

23        Q.   Did you give that one-page document to

24    Ms. Crapster?

25        A.   No.  After I reviewed the data, I discarded the

1    document.

2         Q.   You threw the note away?

3         A.   Yes.

4         Q.   You destroyed the note?  It no longer exists?

5         A.   It no longer exists.

6         Q.   You indicated that it took in total more than

7    100 hours to complete your analysis of Mr. Wunderlich's

8    report; is that correct?

9         A.   Well, the project itself took probably more

10   than 100 hours, the ending result being my report.

11        Q.   Okay.  So the entire project --

12        A.   Yes.

13        Q.   -- not just the criticism of Mr. Wunderlich's

14   report, took more than 100 hours?

15        A.   Yes.

16             MS. CRAPSTER:  Objection.  Misstates the

17   evidence.

18   BY MS. COYOCA:

19        Q.   Did it take more than 200 hours?

20        A.   I don't believe so.

21        Q.   Did it take more than 150 hours?

22        A.   I don't believe so.

23        Q.   Did it take more than 125 hours?

24        A.   I don't believe so.

25        Q.   So your best estimate is that it took between

1    100 and 125 hours to complete all of your work on this

2    project?

3         A.   Yes.

4         Q.   Other than Ms. Rodriguez, did you have anyone

5    else assist you in the preparation of your report?

6         A.   No.

7         Q.   Mr. Shapiro, are you being paid for your

8    services as an expert in this case?

9         A.   Yes.

10        Q.   What are your -- what is your financial

11   arrangement with the Strasburger Price firm?

12        A.   Well, I receive an hourly fee.

13        Q.   What's your hourly rate?

14        A.   For consulting, 375.

15        Q.   Do you have a different hourly rate for

16   testifying?

17        A.   I do.

18        Q.   What is that?

19        A.   625.

20        Q.   Did you receive a retainer?

21        A.   Yes.

22        Q.   How much was the retainer?

23        A.   7,500.

24        Q.   Was the retainer applied against final fees or

25   evergreen?

1       A.    Final fees.

2       Q.    To date, how much have you been paid by the

3  Strasburger firm for your work in this case?

4       A.    About $24,000.

5       Q.    Are there any invoices or amounts currently

6  due?

7       A.    No.

8       Q.    Are you paid directly by the Strasburger firm

9  or by Atlantic Specialty?

10      A.    I believe the Beacon firm pays me.

11      Q.    The Beacon firm, do you mean by that OneBeacon

12  Insurance?

13      A.    Yes.

14      Q.    The entity, OneBeacon Insurance?

15      A.    That's correct.

16      Q.    How many times have you spoken with

17  Ms. Crapster during the course of your engagement since

18  March 27, 2017?

19      A.    Up to today?

20      Q.    Yes.

21      A.    Maybe 20 times.

22      Q.    Have you spoken to any other attorneys from the

23  Strasburger Price firm?

24      A.    Yes.

25      Q.    Who else?

1    A.    Toni Reed.

2    Q.    How many times have you spoken with Ms. Reed?

3    A.    Two or three.

4    Q.    Have you spoken with anybody else?

5    A.    No.

6    Q.    Did you provide Ms. Crapster or Ms. Reed a

7  draft of your report?

8         MS. CRAPSTER:  Objection.  Not permitted by

9  Rule 26.

10        I'll instruct the witness not to answer.

11        MS. COYOCA:  Again, so the record is clear, I'm

12  not asking for the content of the draft.  I'm asking if

13  it was provided.

14        You're instructing on the basis of whether a

15  draft was provided; is that correct?

16        MS. CRAPSTER:  I will allow the answer of

17  whether a draft was provided, but no questions about the

18  content of the draft or any details regarding

19  communications relating to the draft.

20        THE WITNESS:  What was the question again?

21        (The question was read as follows:

22        "Did you provide Ms. Crapster or Ms. Reed

23     a draft of your report?")

24        THE WITNESS:  Yes.

25  / / /

1    BY MS. COYOCA:

2        Q.    When?

3        A.    Late April.

4        Q.    Mr. Shapiro, your report is dated April 25,

5    2017.

6              ^How long prior to the date of the report,

7    April 25, did you provide a draft of the report to

8    Ms. Crapster?

9              MS. CRAPSTER:  Objection.  Instruct him not to

10   answer that question on the grounds that it's not

11   permitted by Rule 26.

12             MS. COYOCA:  Again, I completely disagree with

13   your characterization of what Rule 26 provides.

14       Q.    Did you provide Ms. Crapster with more than one

15   draft of your report?

16       A.    Not that I recall.

17       Q.    ^Were changes made from the draft of your

18   report until the issuance of the final report?

19             MS. CRAPSTER:  Objection.  I will instruct the

20   witness not to answer that question on the grounds of

21   Rule 26.

22   BY MS. COYOCA:

23       Q.    ^Did the dollar amount of what you

24   characterized as being the allowable claim change from

25   the time of your initial report to the rendering of your

1    final report?

2            MS. CRAPSTER:  Objection.  I'll instruct the

3    witness not to answer that on the grounds of Rule 26.

4    BY MS. COYOCA:

5        Q.    ^Did your initial report contain less than the

6    full scope of opinions that you testified about in your

7    final report?

8            MS. CRAPSTER:  Objection.  I'll instruct the

9    witness not to answer on the grounds of Rule 26.

10   BY MS. COYOCA:

11       Q.    ^Did Ms. Crapster ask you to address any areas

12   that were not originally addressed in your first-draft

13   report?

14           MS. CRAPSTER:  Objection.  I'll instruct the

15   witness not to answer on the grounds of Rule 26 and the

16   attorney-client privilege.

17   BY MS. COYOCA:

18       Q.    What information did Ms. Crapster tell you,

19   during the course of your 20 conversations with her,

20   approximately 20 conversations, did you rely on in

21   preparing your report?

22           MS. CRAPSTER:  I'll just clarify for the

23   witness that you can answer that only to the extent that

24   you're identifying the facts that I conveyed to you and

25   you relied on in your report.

1          THE WITNESS:  Well, as far as facts, I don't

2     believe she conveyed any facts to me.

3     BY MS. COYOCA:

4          Q.   Where did you obtain your understanding of the

5     facts?

6          A.   Mr. Wunderlich's report.

7          Q.   Anyplace else?

8          A.   The Complaint, the high volume of documents I

9     received, again, to address my purpose of rebuttal.

10    That's about all the information I needed.

11         Q.   What accounting documents or records did you

12    review in preparing your report?

13         A.   Well, the documents I reviewed I listed in

14    Schedule D.

15         Q.   Right.  And we'll get to that in a moment.

16              But in terms of the types of documents

17    reviewed, generally speaking, did you --

18         A.   Generally speaking, they were production

19    finance analyses.  There were some invoices, but most of

20    them were production finance analysis.

21         Q.   You indicate "production finance analyses."

22              Did you review any of the accounting source

23    books and records relating to the DIG production in

24    preparing your report?

25         A.   No, Counselor.  I wasn't given that

1    opportunity.

2         Q.   Did you review any production cost recap

3    reports?

4         A.   Those are the production analyses I'm referring

5    to.

6         Q.   Did you refer to or did you review any budget

7    documents?

8         A.   In those documents there were budgets.  Yes.

9         Q.   Did you refer to and examine any pattern

10   budgets?

11        A.   Yes.

12        Q.   So when you say the "production finance

13   analyses," do you include in that the types of documents

14   I'm speaking about now --

15        A.   Yes.

16        Q.   -- specifically production cost recap reports,

17   pattern budgets?

18             What about locked budgets?  Did you review any

19   locked budgets?

20        A.   I did see some.  Yes.

21        Q.   Did you rely on any locked budgets for purposes

22   of your analyses?

23        A.   Well, I'm not sure what "rely" means in this

24   sense.  I used them to understand the facts of the

25   situation.

1    Q.   But in preparing your rebuttal report, one

2    component of your rebuttal report addresses the amount

3    of costs that were incurred in producing the show in

4    Croatia and New Mexico; is that correct?

5    A.   That is correct.

6    Q.   What is the source information on which you

7    relied in order to determine what those costs were?

8    A.   One of those production finance documents,

9    whether you call it a recap.  But the number appears a

10   dozen times.

11   Q.   Do you recall the specific type of document

12   that you reviewed in order to identify that number?

13   A.   I do not.

14   Q.   Okay.  Another component of your analysis

15   relates to the budgeted or estimated costs for the

16   production of a certain number of episodes if it had

17   gone forward in Israel; is that correct?

18   A.   Yes.

19   Q.   And where did you receive that budgeted

20   estimated dollar amount from?

21   A.   There is an e-mail that deals with that data,

22   refers to a budget if it would have gone forward.  And

23   the dating appeared to be appropriate.  Also I -- I was

24   comfortable with the TV insurance application with the

25   25 million, which seemed to be pretty close to the

1    e-mail.

2         Q.   When you say the "dating appeared to be

3    appropriate," what do you mean by that?

4         A.   Well, it's my understanding that the move took

5    place on or about July 16, 2014.  So if, in fact, there

6    were plans prior to that date, then I felt that was the

7    anticipated cost.  Because when it comes to actual

8    costs, I searched and searched, but I really couldn't

9    find a document that showed me exactly what the actual

10   costs incurred and paid in Israel was.

11        Q.   In terms of actual costs incurred and paid in

12   Israel, are you referring to actual costs incurred and

13   paid in Israel that related to the DIG episodes

14   subsequent to the pilot?

15        A.   Yes.

16        Q.   Was it your understanding that any of the DIG

17   episodes, aside from the DIG pilot, that it actually --

18   that those episodes had actually been produced in

19   Israel?

20        A.   It was my understanding that they were not

21   produced in Israel.  Yet when I saw Mr. Wunderlich's

22   deposition, he kept referring to "Israel costs

23   incurred."  So I was -- I'm confused about that.  But I

24   just saw the deposition over the weekend.

25        Q.   So you just reviewed Mr. Wunderlich's

1      deposition this past weekend?

2          A.   Yes.

3          Q.   Do you recall the date of the e-mail that you

4      referred to that referenced the budgeted amounts for

5      production of the episodes subsequent to the pilot in

6      Israel?

7          A.   No.  But if I could see the document, obviously

8      the date would be indicated.  My feeling was it was

9      before July 16.

10         Q.   Okay.  Was the date of the e-mail in June,

11     2014?

12         A.   I don't recall.

13         Q.   April of 2014?

14         A.   I don't recall the date.

15         Q.   Okay.  Are you familiar with the budgeting

16     process for television production?

17         A.   I am.

18         Q.   Do you know if budgeting is an ongoing process

19     that can occur up until the time a show actually goes

20     into production?

21              MS. CRAPSTER:  Objection.  Vague and ambiguous.

22     Lacks foundation.

23              THE WITNESS:  Yes.

24     BY MS. COYOCA:

25         Q.   In terms of determining the most accurate

1   budget, would it be important to you to look at the most

2   current budget shortly prior to the time a show goes

3   into production?

4       A.   Ideally, yes.

5       Q.   Do you have an understanding of what the term

6   "pattern budget" means in the context of television

7   production accounting?

8       A.   I've heard the term before, but I don't know

9   exactly its meaning.

10      Q.   What is your understanding of what the term

11  "pattern budget" means?

12      A.   That it's a continual document where the costs

13  are continually updated.

14      Q.   What about the term "locked budget"?  Have you

15  ever heard the term "locked budget" in the context of

16  television production accounting?

17      A.   Absolutely.

18      Q.   What's a locked budget?

19      A.   Final.

20      Q.   For purposes of analyzing the estimated

21  production costs for the Israel episodes subsequent to

22  the pilot, did you review and analyze any locked

23  budgets?

24      A.   I believe there was a document on one episode

25  that said "locked budget" for one of the episodes.

1    Episodes 2 through 6 are the episodes in question.  I

2    believe one of those, there was a locked budget that I

3    saw a document on.  But I did not see anything that was

4    2 through 6 in detail.  And, therefore, I used the

5    number in the e-mail.

6         Q.   I want to make sure I understand your response.

7              So the budgeting that you were attempting to

8    look at was for Episodes 2 through 6 of DIG; is that

9    correct?

10        A.   Yes.

11        Q.   And it was your belief that you did not have

12   any locked budget that looked at Episodes 2 through 6;

13   is that correct?

14        A.   I didn't see a document that was in total.

15        Q.   Now, did you look at any budget information for

16   Episodes 7 through 10, the Back 4?

17        A.   Well, in the documents there often were

18   references to 7 through 10.

19        Q.   But did you take those -- the budgeting for

20   those episodes into account in reaching your opinions?

21        A.   The only use I made with 7 through 10 is I

22   noticed that those costs were considerably lower on an

23   episodic level than 2 through 6.

24        Q.   In preparing your opinion or your analyses, did

25   you take into account, other than the manner which you

1    just described, the actual costs that were incurred for

2    Episodes 7 through 10 in calculating your view of what

3    the claim amount should be?

4              MS. CRAPSTER:  Objection.  Vague and ambiguous.

5              THE WITNESS:  Yeah.  I never have calculated

6    what the claim amount should be.  I was preparing a

7    rebuttal report.  And as part of that, I gave a maximum

8    that no number on the claim could be greater than the

9    maximum.  But I did not -- I wasn't able to compute the

10   claim amount.

11   BY MS. COYOCA:

12       Q.   Okay.  So in terms of your analysis, your

13   opinion was that the extra amount should not be greater

14   than 2,357,875; is that correct?

15       A.   That is correct.

16       Q.   In calculating that $2,357,875 amount, did you

17   take into account any of the actual costs that were

18   incurred in Episodes 7 through 10?

19       A.   No.

20       Q.   And in calculating that $2,357,875 amount, did

21   you take into account any budgeting information that was

22   provided with respect to the Back 4 Episodes 7 through

23   10?

24       A.   No.

25       Q.   In calculating the $2,357,875 amount, did you

1  take into account any final locked budget information

2  for Episodes 2 through 6?

3          MS. CRAPSTER:  Objection.  Asked and answered.

4  Vague and ambiguous.

5          THE WITNESS:  Yes.

6  BY MS. COYOCA:

7      Q.   Where did you obtain that information from?

8      A.   The e-mail.

9      Q.   Other than the e-mail, though, what I'm asking

10  you is:  Did you look at a locked budget and rely on the

11  information in a locked budget for Episodes 2 through 6

12  in calculating this 2,357,875 figure?

13          MS. CRAPSTER:  Objection.  Asked and answered.

14  Vague and ambiguous.

15          THE WITNESS:  I was unable to find such a

16  document.

17          MS. COYOCA:  I'd like to mark as Shapiro

18  Exhibit 3 a document that's entitled "Defendant Atlantic

19  Specialty Insurance Company's Rebuttal Expert Witness

20  Disclosure."

21          (Shapiro Exhibit 3 was

22          marked for identification.)

23  BY MS. COYOCA:

24      Q.   Mr. Shapiro, have you seen this document

25  before?

1      A.    No.

2      Q.    Okay.  Could you please turn to page 9 of the

3   document.

4      A.    Okay.  Yes.

5      Q.    Under the heading lower case e, your name

6   appears, Mr. Jay Shapiro, CPA.

7            Do you see that?

8      A.    I do.

9      Q.    In the paragraph that follows the entry of your

10  contact information, there is a description of your

11  experience and also the testimony that you are going to

12  be offering in the case.

13           Do you see that?

14     A.    Yes.

15     Q.    Beginning on line 13, it indicates, begin

16  quotes:

17           "Mr. Shapiro will opine that the

18       computation and methodology of the plaintiffs'

19       designated expert on the topic of damages is

20       subject to criticism and is not as

21       mathematically reliable as Mr. Shapiro's more

22       straightforward approach."

23           Do you see that?

24     A.    Yes.

25     Q.    Did you formulate an opinion that the

1    plaintiffs' designated expert, Mr. Wunderlich -- that

2    his damages calculation was subject to criticism?

3         A.   Well, I'm not sure what "subject to criticism"

4    means.

5         Q.   Okay.

6         A.   Could you rephrase.

7         Q.   Well, I'm using the words that your lawyer used

8    in the document.  So --

9         A.   I mean, I disagree with his methodology and

10   believe my approach to be more straightforward and, for

11   lack of a better description, more simplistic and

12   understandable.

13        Q.   Okay.  You indicated that you disagree with

14   Mr. Wunderlich's methodology; correct?

15        A.   Yes.

16        Q.   Do you believe that Mr. Wunderlich's

17   methodology violates any provision of GAAP accounting?

18             MS. CRAPSTER:  Objection.  Vague and ambiguous.

19             THE WITNESS:  I have no evidence of that.

20   BY MS. COYOCA:

21        Q.   Do you believe that Mr. Wunderlich's analysis

22   violates any regulations or rules proscribed by FASB?

23             MS. CRAPSTER:  Objection.  Vague and ambiguous.

24             THE WITNESS:  I have no evidence of that.

25   / / /

1    BY MS. COYOCA:

2        Q.   Okay.  You indicated that you disagree with his

3    methodology.  But is it your opinion that his

4    methodology violates any proscribed provision of any

5    rules of accountancy that apply to certified public

6    accountants?

7            MS. CRAPSTER:  Objection.  Vague and ambiguous.

8            THE WITNESS:  Well, I don't believe there's any

9    proscribed provisions that deal with this computation.

10   BY MS. COYOCA:

11       Q.   What about the rules that are applicable to the

12   work that is performed by forensic accountants rendering

13   services in connection with disputed matters?

14           MS. CRAPSTER:  Objection.  Vague and ambiguous.

15   I'm not sure that was a question.

16           THE WITNESS:  And I'm not sure that's a FASB or

17   GAAP issue.

18   BY MS. COYOCA:

19       Q.   Okay.  What about the AICPA rules, though, that

20   apply to forensic accounting in disputed matters?  Do

21   you believe that Mr. Wunderlich's analysis violates any

22   AICPA-proscribed rules for forensic accounting?

23       A.   Well, the AICPA does have rules in that area,

24   and one of the rules is to use reasonable methodology.

25       Q.   Do you believe that Mr. Wunderlich's is not a

1    reasonable methodology?

2        A.   I believe the methodology is not reasonable in

3    regard to Mr. Wunderlich's approach.

4        Q.   What is the basis for your belief that

5    Mr. Wunderlich's analysis was not reasonable?

6        A.   Well, again, he refers to these incurred costs

7    in Israel, which I can find no evidence of any incurred

8    costs on Episodes 2 through 6.  So starting with that.

9             Then he talks about items that are duplicative

10   versus not duplicative.  And there doesn't seem to be

11   any detail analysis that I can look at on how he came up

12   with that determination other than now that I've seen

13   the deposition, apparently he received information from

14   Mrs. Markus.

15            So I don't think the methodology of just

16   receiving information from another party is a reasonable

17   approach to computing extra expenses.

18       Q.   Okay.  Separate and apart, though, from the

19   information that Mr. Wunderlich received, do you believe

20   that Mr. Wunderlich's approach, in terms of reviewing

21   the documentation with respect to costs that were

22   actually incurred in Croatia and New Mexico and making a

23   determination as to whether they were -- they would not

24   have been incurred but for the move to Croatia and

25   New Mexico, do you believe that that methodology is

1    unreasonable, setting aside the issue of support for the

2    methodology?

3              MS. CRAPSTER:  Objection.  Compound question.

4    Vague and ambiguous.

5              THE WITNESS:  Yeah.  I'm not sure I understand

6    the question.

7    BY MS. COYOCA:

8         Q.   Okay.  With respect to your criticism of

9    Mr. Wunderlich's approach that it was not reasonable, is

10   it your opinion that his methodology of reviewing the

11   costs that were incurred in relocating the production to

12   Croatia and New Mexico and extracting out those costs

13   that would have been incurred already if the production

14   stayed in Israel -- is that, in your view, an

15   unreasonable methodology?

16             MS. CRAPSTER:  Same objections.

17             THE WITNESS:  Well, as you describe it, no.

18   But I'm not sure that's what took place.

19   BY MS. COYOCA:

20        Q.   Referring back to the designation, the expert

21   witness designation, there is a sentence that begins at

22   the end of line 15 which reads, begin quotes:

23             "Mr. Shapiro will opine about the maximum

24        amount of possible extra expenses that

25        plaintiffs may recover based upon verifiable

1      information produced in the case and about

2      additional reductions to such computation that

3      may also apply," close quotes.

4            Do you see that sentence?

5      A.   Yes.

6      Q.   Is your opinion as to the dollar amounts as to

7      the maximum amount of possible extra expenses -- is that

8      amount the $2,357,875 figure that we've discussed?

9      A.   Yes.

10     Q.   Now, this designation indicates that that's

11     based upon verifiable information produced in the case;

12     is that correct?

13     A.   That's what it says.  Yes.

14     Q.   Did you rely on verifiable information in

15     coming up with your opinion?

16     A.   Well, as best as the information I was given.

17     Q.   Okay.  So with respect to your opinion, I

18     understand that it has two components, one component of

19     which is the total amount of costs that were incurred in

20     producing the show in Croatia and New Mexico; is that

21     correct?

22     A.   Well, you know, I'm more focused on the extra

23     expense than the total cost of Croatia and New Mexico,

24     which may or may not be the reliable number.

25            I'm not really focused on that.  I'm focused on

1    what amounts exceeded insurable production cost.  And I

2    don't believe that amount can be more than the

3    2 million 357.

4            And as you can see, Counselor, there is a big

5    difference between Mr. Wunderlich's number and mine.  So

6    accordingly, I feel there's something in there that

7    doesn't belong.

8        Q.   Okay.  But I'm just trying to get at your

9    methodology in your calculation.

10       A.   Okay.

11       Q.   And in your report you indicated, within

12   quotes:

13            "I believe my method is the more

14            straightforward and reliable approach to

15            calculating the damages on this claim:

16            Utilizing total production costs incurred at

17            the new locations less expected Israeli costs

18            that would have been incurred without the

19            relocation (Incremental Costs)," close quotes.

20       A.   Yes.

21       Q.   So the question that I'm asking you is:  As to

22   the first part of that methodology that you've opined

23   about, the total production costs incurred at the new

24   locations, what verifiable information did you rely on

25   in order to determine what those total production costs

1    were?

2        A.   Well, I saw the Cost Bible.  I saw such amount

3    or adjust- -- the same amount with some slight

4    adjustment in various production analyses or production

5    recaps.  So I felt that that was a good number for

6    New Mexico/Croatia.

7        Q.   Did -- your total production cost amount that

8    you utilized in your report, is it the same total

9    production cost amount that was utilized by

10   Mr. Wunderlich?

11           MS. CRAPSTER:  Objection.  Vague and ambiguous.

12   Calls for speculation.

13           THE WITNESS:  Essentially, yes.

14   BY MS. COYOCA:

15       Q.   Now, in terms of the designation and the

16   reference to "verifiable information produced in the

17   case," did you do any separate work to verify that total

18   production cost amount that was utilized by you in your

19   analysis?

20       A.   No.

21       Q.   Now, with respect to the second part of your

22   statement of your methodology that referenced expected

23   Israeli costs that would have been incurred without the

24   relocation, the incremental costs, where did you get

25   that information from?

1    A.   Principally the e-mail that we've discussed.

2         MS. COYOCA:  I think we're on Exhibit 4.  Okay.

3    I want to mark as Exhibit 4 an e-mail chain that's

4    labeled Bates control UCP 003732 through 003734.

5         (Shapiro Exhibit 4 was

6         marked for identification.)

7    BY MS. COYOCA:

8    Q.   Mr. Shapiro, when you indicated you principally

9    relied on an e-mail for the costs, is this the e-mail to

10   which you were referring?

11   A.   No.

12        MS. COYOCA:  I'm going to mark as Exhibit 5 an

13   e-mail that's labeled AONNBCU001748 through 1750.

14        (Shapiro Exhibit 5 was

15        marked for identification.)

16   BY MS. COYOCA:

17   Q.   Mr. Shapiro, is this the e-mail to which you're

18   referring?

19   A.   Not primarily.  There's another e-mail.  But

20   this is the Television Insurance Application that had

21   the 25 million on it, line 6, Insurable Production Cost,

22   $25 million.  So I would use this document on a

23   secondary basis.

24        I believe the document that I'm referring to is

25   footnoted on my schedule in my report.

1          MS. COYOCA:  Okay.  I'm going to mark as

2     Exhibit 6 an e-mail exchange that is Bates-labeled

3     UCP004971 through 4972.

4          (Shapiro Exhibit 6 was

5          marked for identification.)

6     BY MS. COYOCA:

7          Q.   Mr. Shapiro, is this the e-mail to which you

8     were referring?

9          A.   Yes.

10         Q.   Now, the date of this e-mail is March 12, 2014;

11    is that right?

12         A.   I believe March 11.

13         Q.   Oh.  You're correct.  The first one is

14    March 11, 2014, from John Gaskin to Mark Winemaker and

15    Ryan Greig with a cc to Randi Richmond and BJ Markus; is

16    that right?

17         A.   That's correct.

18         Q.   And then there is a subsequent e-mail from

19    Ms. Richmond that's dated March 12, 2014; is that

20    correct?

21         A.   Yes.

22         Q.   And then another e-mail from John Gaskin to

23    Ms. Richmond, Mark Winemaker, and Ryan Greig --

24         A.   Yes.

25         Q.   -- is that correct?

1      A.   Yes.

2      Q.   Okay.  So that March 11, 2014 e-mail that is

3   providing a DIG -- it indicates, "Here are the DIG

4   budgets as of 3/11/2014."

5           Is this the number on which you relied in order

6   to analyze the Israel budgeted estimated costs for the

7   five episodes after the pilot?

8      A.   In the 17,535,425.

9      Q.   Is that correct?

10     A.   Yes.

11     Q.   When was the pilot shot?

12     A.   I believe the pilot was shot in June, completed

13  June 26, 2014.

14     Q.   Did you analyze any budget information that was

15  provided that was subsequent to March of 2014?

16     A.   Not that I recall.

17     Q.   Would it have been impactful to your analysis

18  if there was subsequent budget information, subsequent

19  to March 11, 2014, that was different than the

20  $17,535,425 amount?

21     A.   Yes.  And if I came across such number, which

22  I've subsequently seen a 17 million 707 number, I would

23  include that in my maximum computation.  It would

24  change.  My model would stay the same, but the resulting

25  number would change.

1      Q.   Okay.  I want to make sure I understand your

2    response.

3           If there was subsequent budgeting information

4    that was closer to the production pilot date, your

5    number might change; however, your methodology would

6    stay the same.

7           Is that correct?

8      A.   That's correct.

9           MS. COYOCA:  Okay.  I'd like to mark as

10   Exhibit 7 a document titled "'DIG' Locked Budget,

11   PATTERN:  5 Episode - (8) Days in Israel," labeled Bates

12   control UCP014836 through 14881.  And it's got a date at

13   the bottom left-hand corner, "PATTERN - Locked Budget

14   Dig Srs June 8, 2014."

15           (Shapiro Exhibit 7 was

16           marked for identification.)

17   BY MS. COYOCA:

18     Q.   Mr. Shapiro, have you seen this document

19   before?

20     A.   No, I don't believe I have.

21     Q.   Was this document made available to you during

22   the course of your analyses?

23     A.   It may have.  I mean, again, there were

24   voluminous documents.  But I don't recall this one

25   specifically, no.

1    Q.   Well, this is a document that is titled "Locked

2    Budget."

3         Do you see that?

4    A.   Yes, I do.

5    Q.   And based on your prior testimony, you

6    indicated that a locked budget, to you, indicates a

7    final budget; is that correct?

8    A.   Yes.

9    Q.   And the date of this budget is June 8, 2014, in

10   the lower left-hand corner.

11        Do you see that?

12   A.   Yes.

13   Q.   So for purposes of your analysis, would not the

14   locked budget that's dated June 8, 2014, be a more

15   reliable potential estimate of costs in Israel than the

16   March 11, 2014 e-mail?

17   A.   Absolutely.

18        However, this particular document is only for

19   one episode.  I would need all five episodes.  It says

20   "5 Episode."  It means No. 5 episode, not five episodes.

21   Notice that the total is only $3 million.

22   Q.   Could you please take a look at Exhibit 6

23   again.

24   A.   Yes.

25   Q.   Exhibit 6 references for the pattern number the

1    amount of $3,507,085 times 5 to come up with the

2    17,535,425 number; is that right?

3        A.   That's correct.

4        Q.   So with respect to the pattern locked budget

5    for 5 Episode (8) Days in Israel, could you simply not

6    multiply the 3.541498 amount times 5 as they did in the

7    March 11, 2016 e-mail?

8        A.   That would appear to be reasonable.  Yes.

9            MS. COYOCA:  Okay.  I want to mark as Exhibit 8

10   the Expert Report of Jay Shapiro Analysis of Economic

11   Damages:  Rebuttal.

12           (Shapiro Exhibit 8 was

13           marked for identification.)

14           MS. COYOCA:  And before we begin questions, I'd

15   like to take a brief break and go to the ladies' room.

16           (Recess from 12:02 p.m. to 12:13 p.m.)

17           MS. COYOCA:  Back on the record.

18       Q.   Mr. Shapiro, the document I've put in front of

19   you as Exhibit 8, is this the report that you prepared

20   to rebut Mr. Wunderlich's report?

21       A.   Yes.

22       Q.   Who typed this report?

23       A.   I do.

24       Q.   You do or you did?

25       A.   I did.

1      Q.   Did you have any assistance in typing the

2    report?

3      A.   Yes.

4      Q.   By whom?

5      A.   Maria Rodriguez.

6      Q.   Could you turn to page 3 of your report,

7    please.   In the bottom paragraph it reads, begin quotes:

8          "This report concerns episodes #2 through

9        #6 of the 'Dig' series.  Those are the only

10       episodes on which plaintiffs are seeking to

11       recover 'extra expenses' incurred as a result

12       of the move out of Israel.  Plaintiffs do not

13       seek any extra expenses (nor could they) in

14       connection with the pilot because its filming

15       was completed before the move.  They also do

16       not (nor could they) seek any extra expenses in

17       connection with episodes #7-10 because the

18       decision to film these episodes was not made

19       until after the decision to move was already

20       finalized."

21          Do you see that?

22     A.   Yes.

23     Q.   Please explain to me why it is that under your

24   methodology you believe that Episodes 7-10 should have

25   been excluded from the calculation.

1       A.   Well, 7 through 10 I understood to be an

2   afterthought; that it was never planned to do; and they

3   were already in Croatia and New Mexico; and that the

4   claim had been made on 2 through 6.  So I thought if the

5   claim was made on 2 through 6, any information regarding

6   7 through 10 was not relevant.

7       Q.   Could you please take a look at the policy,

8   which is Williams Exhibit 1.

9       A.   Yes.

10      Q.   Now, under the "Definition of Loss" that we

11  were looking at earlier that appears on ATL003106 --

12      A.   Yes.

13      Q.   -- that definition of "loss" -- excuse me --

14  the calculation of the amount of loss is based on, begin

15  quotes:

16           "All necessary 'Insurable Production Cost'

17       you incur to complete the 'Insured Production'

18       that exceeds the amount of 'Insurable

19       Production Cost' you would have incurred if the

20       covered cause of loss had not occurred,"

21       semicolon, close quotes.

22           Do you see that?

23      A.   Yes.

24      Q.   So this definition of "loss" and the

25  calculation references the insurable production cost

1   that would be incurred to complete the insured

2   production; is that right?

3          MS. CRAPSTER:  Objection.  Vague and ambiguous.

4          THE WITNESS:  Yes.

5   BY MS. COYOCA:

6      Q.   What is the insured production in this case?

7      A.   I think it's the six episodes totaling

8   25 million.

9      Q.   What is the insured production that is

10  referenced in the application for DIG?

11     A.   I thought six episodes.

12     Q.   And is the -- is that, in your view, a

13  limitation on the total amount of insured production

14  cost that could be recovered in this case?

15         MS. CRAPSTER:  Objection.  Calls for a legal

16  conclusion.  It's vague and ambiguous.

17         THE WITNESS:  Well, my understanding would be

18  25 would be the amount that I was insuring; and that

19  when it came to extra expense, it would be something

20  greater than the 25, would be my loss.

21  BY MS. COYOCA:

22     Q.   So what I'm trying to understand, though, is it

23  your opinion that the insurable production cost could

24  not exceed the 25 that was referenced with respect to

25  Episodes 2 through 6?  Is that your position?

1           MS. CRAPSTER:  Objection.  Calls for a legal

2    conclusion and vague and ambiguous.

3           THE WITNESS:  Yeah.  I don't really have an

4    opinion on that.

5    BY MS. COYOCA:

6       Q.   Well, if you're seeking to analyze the

7    necessary insurable production cost that's incurred to

8    complete the insured production, do you believe that

9    it's necessary to exclude any episodes beyond Episode 6?

10      A.   Yes.

11      Q.   Why?

12      A.   It's my understanding it would be common sense.

13   When you insure, you have to have a set dollar amount,

14   and you can't have a claim at a later date and then all

15   of a sudden say, "My home was worth 20 million when I

16   told you it was only worth 2 million the first time."

17      Q.   Is there a provision in the insurance policy

18   that you reviewed that limited the insurable production

19   cost to the number of episodes originally referenced in

20   the application?

21      A.   Not that I recall.

22          MS. CRAPSTER:  Objection.  Calls for a legal

23   conclusion.

24   BY MS. COYOCA:

25      Q.   Based on your experience with production

1    accounting, is it your understanding that if production

2    adds subsequent episodes, that the insurance for the

3    production is limited to the number of episodes

4    originally estimated at the time of --

5         A.    Application?

6         Q.    Yes.

7         A.    Yes.

8         Q.    And what is that experience based on?

9         A.    Just general understanding.

10        Q.    Have you -- can you point to any specific

11   television program that you're aware of in your

12   experience where the insurance has been limited to the

13   number of episodes or estimated cost in the application

14   for insurance?

15        A.    No, I cannot.  Though I am aware there are

16   times that the policy gets amended.  Things change,

17   number of episodes changes, and you file some kind of

18   amendment to change your original understanding with the

19   insurance company.

20        Q.    And you're not aware, as you sit here today, of

21   there being any kind of amendment to the policy to add

22   the additional episodes to the insured production cost;

23   is that right?

24        A.    I am not.

25        Q.    Hypothetically, if there were such an

1    amendment, would your opinion change with respect to the

2    methodology that you believe would need to be applied in

3    order to calculate the loss under Section IX, subpart 1?

4              MS. CRAPSTER:  Objection.  Calls for

5    speculation.

6              THE WITNESS:  I don't have an opinion on that.

7    BY MS. COYOCA:

8        Q.   Well, under the terms of subpart 1, it does not

9    specifically reference the insured production to a

10   specific -- excuse me.  Strike that.

11             Under subpart 1, the definition of "insurable

12   production cost," it does not reference any specific

13   dollar amount with respect to a particular production,

14   does it?

15       A.   No.  It's my understanding that insurance

16   policies often have a group of general, common, generic

17   disclosures, and the cover page gives you the specifics

18   of the coverage.

19             I saw this document as such a generic

20   disclosure; that the definitions don't have any

21   particular numbers but just give the generic description

22   of the coverages.

23       Q.   Are you referring to -- when you say the "cover

24   page," are you referring to the declarations?

25       A.   Yes.

1    Q.   Okay.  With respect to how this particular

2    policy operates, are you aware of how productions get

3    added to the policy as insured productions?

4    A.   As I previously indicated, I'm aware of

5    situations where there was a change of plans, and the

6    project expanded.  Therefore, they needed additional

7    coverage.

8    Q.   That's not my question.

9    What I'm asking is:  Under this particular

10   policy, Williams Exhibit 1, are you aware of how

11   productions, NBCUniversal television productions, are

12   added as insured productions under the policy?

13   A.   I am not.

14   Q.   Okay.  I want you to assume a hypothetical.

15   Assume the hypothetical that productions are

16   added on a show-by-show basis for the entirety of the

17   television show.

18   With that assumption in mind, can you please

19   tell me if, under your opinion, using your methodology,

20   in order to calculate the loss, it would be necessary to

21   look at all episodes of the DIG production, not just 2

22   through 6?

23   MS. CRAPSTER:  Objection.  Calls for

24   speculation.  Vague and ambiguous.

25   THE WITNESS:  I don't know how to answer that.

1    BY MS. COYOCA:

2        Q.   What don't you understand about the question?

3        A.   I mean, if the project keeps expanding, does

4    extra expense keep expanding?  Is that what you're

5    asking?

6        Q.   No.  I'm asking you to assume a hypothetical as

7    an expert.

8             The hypothetical is that television shows are

9    added on a show-by-show basis for the production of the

10   television show during that particular policy period.

11            And I want to know if, assuming that

12   hypothetical, in terms of calculation of loss under your

13   methodology, it would be necessary to look at all

14   episodes of DIG, i.e., 2 through 10, and not just 2

15   through 6.

16            MS. CRAPSTER:  Objection.  Calls for

17   speculation.  Vague and ambiguous.

18            THE WITNESS:  And the policy was appropriately

19   amended --

20   BY MS. COYOCA:

21       Q.   Yes.

22       A.   -- and additional premiums paid --

23       Q.   Yes.  You can --

24       A.   Because I changed the understanding.

25            -- then I think it would have a to be

1    considered if that did take place, or I can only

2    speculate what effect it would have.

3        Q.   Have you done a calculation, utilizing your

4    methodology, of the total insurable production cost and

5    applying an estimate of Israeli costs, granted that

6    there was no concept of Episodes 7 through 10 for

7    Israel?  Have you done a calculation of that type that

8    applies to Episodes 2 through 10?

9        A.   No.

10            MS. CRAPSTER:  I'll object that that last

11   question is vague and ambiguous.

12   BY MS. COYOCA:

13       Q.   In applying your methodology, did you include

14   the amounts that were incurred as actual costs in

15   Israel, as well as the actual costs incurred in Croatia

16   and New Mexico for Episodes 2 through 6, in coming up

17   with your calculation?

18       A.   Well, as I indicated, I used the best number

19   for Israel I could find, which essentially is that

20   e-mail or an estimate similar to what's in the e-mail

21   using the newer budget.

22       Q.   I'm actually asking you a different question.

23            In terms of calculating the cost of production

24   for the series for purposes of your calculation of loss,

25   did you include the costs of production that were

1    incurred that were associated with the pilot?

2         A.    No.

3         Q.    Why not?

4         A.    Because the pilot was completed in Israel as

5    planned.  It can generate no extra expense.

6         Q.    But turning back to the Definition of Loss

7    under subpart 1 of the policy, it references "All

8    necessary 'Insurable Production Cost'" incurred to

9    complete the insured production, does it not?

10        A.    Yes.

11        Q.    So in order to calculate the insurable

12   production cost that's associated with the insured

13   production, wouldn't you have to look at the pilot plus

14   all subsequent episodes?

15        A.    For purposes of extra expense loss, the event,

16   the relocation event, took place after this was fully

17   complete.  It has no impact on the pilot.  The pilot was

18   completed on June 26, and the move took place on

19   July 16.  I just don't see how there can be any extra

20   expense for the pilot when it was done.

21        Q.    No.  I'm not asking you if there was any extra

22   expense incurred.  I'm asking about your calculation

23   under your methodology.

24        A.    Under my methodology, I have taken the pilot

25   into account because the 25 million, less the 8 million

1    cost for the pilot, is the remaining 17.

2         Q.   And it's your understanding that $8 million was

3    the cost of the pilot?

4         A.   That appears in a couple of different

5    documents.  8,039,000, I think.  But, you know, there's

6    a couple of different numbers.  It's very close to

7    8 million.

8              MS. COYOCA:  I'd like to mark as the next in

9    order, Exhibit 9, a document that is labeled "DIG -

10   New Mexico Season 1 - First 5 episodes, Production Recap

11   Report, 2014/2015 Season 1, Period Ending:  8/11/2016,"

12   Bates label UPC018226 through 18227.

13             (Shapiro Exhibit 9 was

14             marked for identification.)

15   BY MS. COYOCA:

16        Q.   Mr. Shapiro, have you seen this document

17   before?

18        A.   Yes, I have.

19        Q.   And what do you understand this to be?

20        A.   This is a Production Recap Report of the first

21   five episodes made after the move.

22        Q.   And if you turn to page 18227, the Front 5

23   episodes' dollar amount that's reflected in the

24   right-hand column under the chart --

25        A.   Yes.

1      Q.    -- it indicates a number 21,464,745; is that

2   correct?

3      A.    That's correct.

4      Q.    And is that -- is this the source of

5   information for the document -- excuse me -- the number

6   that's referenced in your report on page 8?

7      A.    Yes.

8      Q.    Now -- and I believe I asked you, and you said

9   you didn't do any independent analysis of any of the

10  other production cost recap reports to confirm that

11  number; is that right?

12        MS. CRAPSTER:  Objection.  Mischaracterizes the

13  evidence.

14        THE WITNESS:  I think what I said is I have

15  seen this number, not just here but in multiple other

16  documents.

17  BY MS. COYOCA:

18     Q.    Now, I believe you indicated that you believed

19  that the production costs associated with the pilot were

20  8 million; is that right?

21     A.    That's correct.

22     Q.    Where did you get that information from?

23     A.    It appears on multiple documents regarding the

24  pilot.  There's actual costs incurred.

25     Q.    Okay.  And in this production cost recap

1   report, there is total cost before breakage reflected

2   for the pilot amount, isn't there?  For the pilot, is

3   there not?

4       A.   There is a number there, yes.

5       Q.   And it's 11,470,620; right?

6       A.   Yes.

7       Q.   And that's obviously greater than the 8 million

8   that you've referenced; isn't that right?

9       A.   It certainly is.

10      Q.   Did you take that into account?

11      A.   No.

12      Q.   Did you notice that when you were doing your

13  analysis?

14      A.   I did not.

15      Q.   And with respect to the Back 4 episodes, which

16  is the information that's reflected under the Front 5

17  episodes entry on page 18227, there is a dollar amount

18  of 14,890,385; is that right?

19      A.   Yes.

20      Q.   And did you take that dollar amount into

21  account in calculating the maximum amount of loss that

22  would be incurred on the claim?

23      A.   No.  It wasn't necessary.

24      Q.   Mr. Shapiro, referring back to Exhibit 6 --

25  that would be the John Gaskin e-mail.

1      A.    Yes.

2      Q.    -- you indicated you believed the $17.5 million

3   number, you believed, for the Episodes 2 through 6

4   correlated to the $8 million you anticipated pilot

5   dollar amount of cost; is that right?

6           MS. CRAPSTER:  Objection.  Misstates the

7   evidence.

8           THE WITNESS:  I believe the 17 million 535

9   correlates to the computation for the estimated cost on

10  the five episodes.

11  BY MS. COYOCA:

12     Q.    Okay.  But you previously indicated that you

13  thought that the $25 million insurable production cost

14  amount roughly correlated, I believe was your

15  terminology, to the 17.5 estimated cost for the

16  Episodes 2-6 and the $8 million cost for the Israel

17  pilot; is that right?

18     A.    Yeah.  And on this document it says 7 and a

19  half million, totaling 25.130, which correlates to the

20  25 million.

21     Q.    Right.  So my question to you is this:  Is it

22  your belief that, looking at the production cost recap

23  report that's in Exhibit 9, that the amount of insurable

24  production cost would be limited to the 11.470 that was

25  incurred with respect to the Israel pilot and whatever

1  the differential would be up to 25 million?  Is that

2  your position?

3           MS. CRAPSTER:  Objection.  Misstates the

4  evidence.  Vague and ambiguous.

5           THE WITNESS:  Well, I don't know where the

6  11 million 470 comes from because a half-dozen other

7  documents say 8 million.  So I'd have to see some detail

8  on what makes the 11 million 470.

9           But I do know that the pilot is included in the

10 insurable production cost number.

11 BY MS. COYOCA:

12    Q.   Okay.  Why is the pilot included in the

13 insurable production cost number but not the Back 4

14 episodes?

15    A.   Because the application that I saw said six

16 episodes, $25 million.

17    Q.   Okay.  So all I'm trying to understand is:

18 With respect to that $25 million amount, is it your

19 position that that $25 million amount applies just to

20 whatever amount of costs gets you through the pilot and

21 whatever number of episodes up to 25 million?

22           MS. CRAPSTER:  Objection.  Misstates the

23 evidence.  Vague and ambiguous.

24           THE WITNESS:  Well, I believe it covers the

25 pilot and five subsequent episodes.  When I saw the

1    pilot was 8 million, and I saw the e-mail at 17 million

2    for the five episodes, it seemed like that made sense.

3    It was 8 and 17, 25 million.

4    BY MS. COYOCA:

5        Q.    Okay.  But what I'm asking you is that if the

6    insurable production cost amount actually exceeds the

7    amount of the estimate that's on the application, is it

8    your position that any amount above that is not insured?

9            MS. CRAPSTER:  Same objections.  Misstates the

10   testimony.  Vague and ambiguous.

11           THE WITNESS:  I'm not an expert on insurance.

12   So I don't fully understand, if you exceed the amount

13   that you declared initially, what the coverage is.  But

14   I did start out with the basis that 25 million was my

15   starting point, and 17 million of that was my starting

16   point for my analysis.

17   BY MS. COYOCA:

18       Q.    Did it raise any questions in your mind,

19   though, when you saw that the total amount of cost

20   before breakage for pilot, first five episodes, Back 4

21   episodes, totaled 47,825,750?

22       A.    No.

23       Q.    Now, under the policy, are you familiar with

24   how the premium is calculated for the policy?

25       A.    Well, I'm not specifically familiar with that.

1  But I understand from my own insurance that the more

2  value I insure, the higher the premium is.

3      Q.   Okay.

4      A.   So I assume there's a relationship between the

5  two.

6      Q.   Okay.  Are you aware of whether there is a

7  deposit premium that is paid and then a true-up that's

8  done on a quarterly basis to calculate the amount that

9  may be owed based on the additional insurable production

10 cost?

11     A.   I am not.

12     Q.   You previously indicated when answering my

13 hypothetical that you would have to be assured that

14 there were additional premiums paid in order to be able

15 to answer my hypothetical question about whether the

16 Back 4 should be included in your calculation; is that

17 right?

18     A.   Yes.

19     Q.   So did you take into account the true-up and

20 additional premium paid under the policy in answering my

21 question?

22          MS. CRAPSTER:  Objection.  Assumes facts not in

23 evidence.  Misstates the evidence.

24          THE WITNESS:  I saw no indication that there

25 was additional premiums paid.

```
1   BY MS. COYOCA:

2       Q.   If there were additional premiums paid, would

3   that change your analysis in terms of the calculation of

4   loss under Section IX, subpart 1 of the policy?

5            MS. CRAPSTER:  Objection.  Calls for

6   speculation.

7            THE WITNESS:  Again, I'd have to have a lot

8   more education on insurance to come to that conclusion,

9   which I don't have.

10           MS. COYOCA:  Okay.  Off the record.

11

12           (At 12:40 p.m. a luncheon recess was taken,

13           the proceedings to be resumed at 1:40 p.m.)

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /
```

                          AFTERNOON SESSION

 1

 2

 3              (At 1:45 p.m. the proceedings were

 4              resumed at the same place.)

 5

 6              MS. COYOCA:  Back on the record.

 7

 8                    EXAMINATION (Resumed)

 9   BY MS. COYOCA:

10       Q.    Mr. Shapiro, can you please put Exhibit 8 in

11   front of you.  That is your report.

12       A.    Yes.

13       Q.    Please turn to page 4.

14             Are you there?

15       A.    Yes.

16       Q.    Okay.  At the bottom of the page -- we

17   discussed this before the lunch break.  I want to go

18   back to this -- it indicates that -- well, first of all,

19   why don't you tell me:  What are you trying to convey in

20   the paragraph that begins, "It appears the plaintiffs'

21   claim"?

22       A.    Well, I realize that my maximum number is

23   materially different than plaintiffs' claim.  So I'm

24   making a reference here that it appears that the extra

25   expenses in that claim and the technique used which had

1    these extractions -- maybe that sufficient extractions

2    from the total amount were not made because the

3    remaining amount is just too high.

4        Q.   Okay.  So with respect to your opinion that

5    sufficient extractions were not made, did you do a

6    calculation to identify what additional extractions

7    should have been applied but were not?

8        A.   No.

9        Q.   If you did not do such an analysis, how were

10   you able to determine that there were additional

11   extractions that should have been applied?

12       A.   Just by the magnitude of the difference.

13       Q.   And when you say "the magnitude of the

14   difference," you're referring to the difference between

15   Mr. Wunderlich's analysis of 7.1 million in extra

16   expenses versus your analysis --

17       A.   Of 2.3.

18       Q.   Okay.  Anything else?

19       A.   No.

20       Q.   Okay.  Did you review the extractions that

21   Mr. Wunderlich did apply?

22       A.   Yes.

23       Q.   Did you come to any conclusions with respect to

24   those extractions?

25       A.   Those adjustments, given his technique, seemed

1    reasonable.

2         Q.   Why did you not review and analyze whether

3    there were specific additional extractions that should

4    be applied?

5         A.   I was unable to do that.  I didn't have the

6    necessary documentation to do that.

7         Q.   What documentation would you need in order to

8    be able to do that?

9         A.   I would have to have some kind of analytical

10   analysis line by line showing what the cost was, what

11   was in there, and what was in the Israeli's expected

12   cost and compare the two.  I would need much more

13   details.

14        Q.   In analyzing the Wunderlich report, did you go

15   through and analyze the Full Cost Bible that he

16   references in his report?

17        A.   Well, I -- I read the Full Cost Bible.  I

18   noticed the total on the bottom.  I was comfortable

19   where he got his numbers in his report from regarding

20   New Mexico/Croatia.

21        Q.   But the point of divergence with his analysis

22   is that you believe that additional extractions should

23   have been applied?

24        A.   Because of the magnitude of the claim.  The

25   claim is to be extra expense, not total spent in

1    New Mexico and Croatia.

2         Q.   With respect to your review of that Full Cost

3    Bible, did you attempt to do any type of testing with

4    respect to the expenses that were incurred to determine

5    whether or not there were, in fact, expenses that were

6    reflected that you felt should not be extra?

7              MS. CRAPSTER:  Objection.  Vague and ambiguous.

8              THE WITNESS:  I wasn't given the opportunity to

9    do that.

10   BY MS. COYOCA:

11        Q.   What do you mean you were not given the

12   opportunity to do it?

13        A.   Well, it would take -- he had the advantage,

14   which I did not have, of conversations with production

15   personnel.  I didn't have that advantage, nor was I able

16   to see any kind of documentation over and above what was

17   presented to me.

18             MS. COYOCA:  Okay.  I'd like to mark as -- I

19   believe we're on Exhibit 10 -- the Expert Report of

20   Robert Wunderlich:  Analysis of Economic Damages.

21             (Shapiro Exhibit 10 was

22             marked for identification.)

23   BY MS. COYOCA:

24        Q.   Mr. Shapiro, is this the expert report of

25   Mr. Wunderlich that you reviewed and that you are

1    critiquing in your expert report?

2       A.    Yes.

3       Q.    In your -- in your expert report, which was

4    attached as Exhibit 8, you indicate on page 7 at the

5    last full paragraph on the page, begin quotes:

6           "It is my further opinion that based on

7       the information provided to me, it is not

8       possible - for me or anyone else - to make a

9       definitive determination about whether each

10      individual expense was incurred as a result of

11      the Relocation or whether it would have been

12      incurred had the production stayed in Israel."

13          Do you see that?

14      A.    Yes.

15      Q.    What is the basis for that opinion?

16      A.    Well, in the whole body of information

17   available, I don't think anyone can make that

18   determination.

19      Q.    However, if -- you indicated that

20   Mr. Wunderlich had the advantage of being able to speak

21   to individuals at NBCUniversal who were involved in the

22   production; is that right?

23      A.    Yes.

24      Q.    So if an accountant was able to go through and

25   test particular expenses to determine -- and get the

1    information as to what was incurred, would it be

2    possible, then, to make a determination as to whether

3    particular expenses were or were not extra?

4              MS. CRAPSTER:  Objection.  Calls for

5    speculation.  Vague and ambiguous.

6              THE WITNESS:  Possibly.

7    BY MS. COYOCA:

8         Q.   Do you know whether or not Mr. Wunderlich did

9    that?

10        A.   It's my belief he did not.

11        Q.   What is that based on?

12        A.   His deposition.

13        Q.   What specifically did he testify to in his

14   deposition that led you to that?

15        A.   Well, it appears that most of his decisions

16   were based on information that he just parroted from

17   Mrs. Markus.

18        Q.   From BJ Markus?

19        A.   Yes.

20        Q.   And your criticism of his restatement of

21   Ms. Markus's information is based on what?

22        A.   Well, I think that to come up with the

23   appropriate determination, he would have to do some

24   independent analysis, and I didn't see much evidence of

25   that.

1    Q.   If you were adopting Mr. Wunderlich's

2    methodology -- and I understand that you are not.  But

3    assuming for purposes of this hypothetical that you are,

4    what additional steps do you think Mr. Wunderlich should

5    have done that he did not do?

6         MS. CRAPSTER:  Objection.  Calls for

7    speculation.

8         THE WITNESS:  I wouldn't even know where to

9    start to speculate on that.

10   BY MS. COYOCA:

11   Q.   Well, your complaint is that you believe that

12   there is some unquantified amount of expenses that

13   should have been extracted that were not; is that

14   correct?

15   A.   Based on a $7 million claim, yes.

16   Q.   Okay.  So I'm just trying to drill down on that

17   analysis, that opinion that you've reached.

18   A.   Well, I reached the opinion because I can't

19   believe a number greater than 2.357 could, in fact, be

20   the claim.

21   Q.   Okay.  And I'm trying to get at your

22   substantive analysis that led you to believe that there

23   is no way that there could have been a number greater

24   than 2.357.

25   A.   I'm also trying to explain.  If the total costs

1    are such compared to the Israeli expected costs, and

2    the difference is only 2.357, then, clearly, if he

3    uses any numbers by categories that he has, they would

4    need some kind of extraction because they're just too

5    large.

6        Q.   Did you analyze -- with respect to categories

7    of loss, did you analyze what extractions should have

8    been made that were not with respect to prep costs for

9    Croatia?

10       A.   I was unable to do that.

11       Q.   What about wrap costs?

12       A.   I was unable to do that analysis in any of the

13   categories.

14       Q.   Okay.  But I just would like it on the record.

15            Did you do that analysis with respect to

16   New Mexico prep costs?

17       A.   No.

18       Q.   Did you do the analysis with respect to

19   New Mexico wrap?

20       A.   No.

21       Q.   Did you do or perform any analysis with respect

22   to whether the additional compensation amounts were not

23   properly included?

24       A.   I did -- I didn't do any analysis, but I

25   understood those to be extra expenses.

1    Q.   Is it your position that any of the

2  compensation extra expenses that were identified, that

3  any of those should have been extracted?

4    A.   No.

5    Q.   What about all series extra expenses, that

6  portion of Mr. Wunderlich's report that addressed all

7  series extra expenses?  Did you perform any analysis to

8  try to determine what all series extra expenses should

9  have been extracted?

10    A.   No.

11    Q.   Now, central to your analysis is the projected

12  estimate of costs that would be incurred if the

13  Episodes 2 through 6 had been shot in Israel; isn't that

14  correct?

15    A.   Yes.

16    Q.   What analysis, if any, did you perform to test

17  the possible variance of the estimated projected Israel

18  budgeted costs versus potential actual?

19         MS. CRAPSTER:  Objection.  Vague and ambiguous.

20         THE WITNESS:  I don't think I understand the

21  question.

22  BY MS. COYOCA:

23    Q.   Well, you understand that your 3.1 or .2 number

24  that you opined about as to the Israel extra -- excuse

25  me -- the Israel projected cost, you understand that

1    that is an estimated budget number; correct?

2        A.   Yes.

3        Q.   Okay.  So my question to you is:  What

4    analysis, if any, did you apply in order to determine

5    whether there was a variance between projected estimates

6    performed by NBCUniversal versus actual numbers?

7        A.   There were no --

8            MS. CRAPSTER:  Same objection.  Vague and

9    ambiguous.

10           THE WITNESS:  There were no actual numbers for

11   Israel because the events for Episodes 2 through 6

12   didn't take place.

13   BY MS. COYOCA:

14       Q.   Right.

15           But I am asking you:  Separate and apart from

16   the fact that there were no actuals for Israel, in terms

17   of the budgeting process and looking at the budget

18   numbers, did you independently perform any type of

19   analysis to determine whether or not there was a

20   possible variance that would have resulted if actuals

21   had actually been incurred?

22           MS. CRAPSTER:  Objection.  Vague and ambiguous

23   still.

24           THE WITNESS:  No.

25   / / /

1    BY MS. COYOCA:

2        Q.   In your experience with entertainment

3    accounting, is it your experience that budgeted costs

4    for a television show before the show has even gone to

5    shoot a pilot, that those budgeted costs are 100 percent

6    accurate?

7        A.   No.  My understanding would be many times

8    they're inaccurate.

9        Q.   And based on your experience in the industry,

10   have you ever developed an opinion as to the percentage

11   of inaccuracy of projected budget information versus

12   actuals?

13       A.   I have no information on that.

14       Q.   On what did you base your statement that many

15   times you believe they are inaccurate?

16       A.   Well, often the budget and the actual numbers

17   differ because events that actually happen weren't

18   contemplated.

19       Q.   Can you give an example of events that might

20   occur which were not originally contemplated?

21            MS. CRAPSTER:  Objection.  Calls for

22   speculation.

23            THE WITNESS:  Yes.  A scene changes, and

24   additional set and wardrobe is necessary.  Sometimes

25   there's location problems.  You are going to plan to use

1    a certain location; it's not available.  Sometimes

2    there's casting issues.  The cast isn't available on

3    time.  We have to substitute and hadn't planned on that.

4    Anything can change from the plan.

5         The budget is a nice planning tool, but it

6    can't contemplate everything that could actually happen.

7    BY MS. COYOCA:

8         Q.   Are you familiar with the budgeting process for

9    a television show that is produced by a major in a

10   foreign jurisdiction?

11        A.   Not directly.

12        Q.   Do you have any opinion as to whether the

13   budgeting for a television show produced by a major that

14   is shot in a foreign location, whether the budgeting on

15   that type of show is 100 percent spot on to actuals?

16        A.   It would be more difficult.

17        Q.   For the same reasons as you previously

18   identified?

19        A.   And probably more.  Currency could change.

20   There could be political issues, like there could be an

21   incident of war.  I mean, situations can happen that, in

22   a domestic situation, would be rare.

23        Q.   And in this particular instance, in terms of

24   the budgeting that you -- the budget numbers that you

25   utilized which were developed in March of 2014, did you

1   do any type of analysis to determine whether or not that

2   budgeting took into account the potential unforeseen

3   contingencies resulting from shooting in a foreign

4   location?

5       A.   I have no information on that.

6            MS. CRAPSTER:  Objection to the last question.

7   Vague and ambiguous.

8   BY MS. COYOCA:

9       Q.   But if there were some additional factoring in

10   with respect to budget amounts to take into account the

11   unknown contingencies for a foreign location, that would

12   impact your analysis, would it not?

13            MS. CRAPSTER:  Objection.  Calls for

14   speculation.  Lacks foundation.

15            THE WITNESS:  Yes.  Because I was forced to use

16   the budgeted number for Israel because I had to have a

17   starting point in the analysis.

18   BY MS. COYOCA:

19       Q.   Well, but in terms of a starting point for your

20   analysis, the projected Israel cost for Episodes 2

21   through 6 that you used, the starting point and the

22   ending point was the John Gaskin e-mail; isn't that

23   right?

24            MS. CRAPSTER:  Objection.  Misstates the

25   evidence.

```
 1    BY MS. COYOCA:

 2         Q.   That's set forth in Exhibit 6.

 3         A.   Yes.

 4         Q.   Now, if there was some type of factoring into

 5    the budgeting process that resulted in the budget being

 6    higher, that would result in your maximum expense amount

 7    being higher as well; isn't that right?

 8              MS. CRAPSTER:  Objection.  Calls for

 9    speculation.

10              THE WITNESS:  Well, it would change the

11    numbers, but -- my model would stay the same, but the

12    numbers would change.

13    BY MS. COYOCA:

14         Q.   On page 7 of your report -- again, this is

15    going back to Exhibit 8 --

16         A.   Yes.

17         Q.   -- you indicate that -- actually, I apologize.

18    I want you to go to page 8.

19              You indicate in the final sentence in the first

20    partial paragraph on page 8 that, begin quotes:

21              "It is my opinion that this process is

22         impossible based on the information I have

23         reviewed or the information the plaintiffs'

24         expert reviewed without any explanation from

25         'Dig' management."
```

1          Do you see that?

2     A.   Yes.

3     Q.   Mr. Wunderlich, though, did receive

4   explanations from DIG management, did he not?

5     A.   Well, he received information from DIG

6   management.  I'm not sure it's an explanation of

7   anything.  It looked, to me, like it's more, "This is

8   the number, and this is the extraction."  But I don't

9   think that's an explanation to anything.

10    Q.   Well, though, you don't know what specific

11  information Mr. Wunderlich received in response to

12  questions that he may have asked with respect to extra

13  expense items, do you?

14    A.   I do not.

15    Q.   And, in fact, on page 9 of Mr. Wunderlich's

16  report, which has been marked as Exhibit 10 --

17    A.   Yes.

18    Q.   -- Mr. Wunderlich references discussions that

19  he had with Eric Gray, the chief financial officer of

20  NBCUniversal Cable Entertainment Studios and Content,

21  did he not?

22    A.   Yes.

23    Q.   And also on page 9 he indicates he consulted

24  with Randi Richmond, the senior VP of production,

25  NBCUniversal Cable Productions; BJ Markus,

1    vice president, production finance, NBCUniversal Cable

2    Productions; and Eric Gray, chief financial officer,

3    NBCUniversal Cable Entertainment Studios and Content.

4           Do you know what discussions Mr. Wunderlich

5    had, if any, with any of these individuals as to

6    particular expense items that were included in the extra

7    expense?

8        A.   I do not.

9        Q.   Now, going back to your report on page 7 of

10   your report, you indicate that it is improper to include

11   as extra expenses all the prep and wrap expenses

12   incurred in New Mexico and Croatia; is that correct?

13       A.   Yes.

14       Q.   What is the basis for that opinion?

15       A.   Well, certainly the New Mexico prep expenses

16   were included in their entirety, and the other expenses

17   that were included or represented to be extra expenses

18   seemed much too high.

19       Q.   And what do you base your statement that they

20   seemed much too high on?

21       A.   On the sheer difference between those numbers

22   and the Israeli projection.

23       Q.   The budgeting process that was done for the

24   Israel shoot, that took place over a period of several

25   months, did it not?

1      A.    I'm sure it did.

2      Q.    Well, we looked at one budget that was the

3   e-mail that you testified about -- that was in March --

4   and we looked at the final locked budget in June of

5   2014.

6      A.    Yes.

7      Q.    So that budgeting process extended over a

8   period of several months, did it not?

9      A.    Yes.

10     Q.    And, in fact, when we looked at the application

11  for DIG to be added as an insured production -- that was

12  Exhibit 5 -- that indicates that preproduction would

13  begin as of December 17, 2013, does it not?

14     A.    I don't have the document in front of me.

15     Q.    Why don't you refer back to Exhibit 5.  Could

16  you please take a look at Item 8.

17     A.    Yes.  It does give a date, preproduction,

18  December 17, 2013; start of principal photography,

19  May 26, 2014.

20     Q.    Okay.  So do you know when the budgeting

21  process began for DIG?

22     A.    Well, it probably began on or about

23  December 17, 2013.

24     Q.    Now, did you take into account the difference

25  in prep costs that would be associated with shooting in

1    a new location that was done on a very expedited basis,

2    such as the move to Croatia or New Mexico?

3              MS. CRAPSTER:  Objection.  Assumes facts not in

4    evidence.

5              THE WITNESS:  I didn't have enough

6    documentation to determine what was an expedited basis

7    or not.

8    BY MS. COYOCA:

9        Q.    Okay.  Do you know when the DIG production

10   moved out of Israel?

11       A.    I thought on or about July 16, 2014.

12       Q.    Do you know when production started up again in

13   Croatia?

14       A.    I don't recall the exact date.

15       Q.    And what about production in New Mexico?

16       A.    I don't recall the date.

17       Q.    Would the fact that the production prep that

18   would need to be done in a new location on an emergency

19   expedited basis -- would that impact your analysis in

20   comparing those prep costs against the prep costs for

21   Israel?

22             MS. CRAPSTER:  Objection.  Calls for

23   speculation and assumes facts not in evidence.

24             THE WITNESS:  I'm not using prep costs, Israel.

25   I'm using total costs, Israel.

1    BY MS. COYOCA:

2        Q.   Okay.  But --

3        A.   I wouldn't make such a comparison.

4        Q.   Okay.  But your opinion is that the prep costs,

5    you thought, for Croatia were too high; correct?

6        A.   Yes.

7        Q.   And what do you base that on?

8        A.   Well, the actual costs may or may not be too

9    high.  But I don't feel those numbers represent extra

10   expense.  That's my only focus.

11       Q.   Okay.  But when I asked you -- a little bit

12   ago, I asked you whether or not you thought the

13   production prep for Croatia was too high, and you had

14   indicated --

15       A.   Then, Counselor, I misspoke.

16       Q.   Okay.

17       A.   I have no information on whether the cost

18   itself is too high.

19       Q.   What about the prep cost with respect to

20   New Mexico?  Did you perform any analysis as to whether

21   the prep cost for New Mexico was too high?

22       A.   No.

23            MS. CRAPSTER:  I'm going to object to that last

24   question as to vague and ambiguous.  It's unclear as to

25   what she means by "too high."

```
 1    BY MS. COYOCA:

 2        Q.   With respect to -- with respect to the wrap

 3    costs that are associated with Croatia, did you do any

 4    analysis or perform any analysis as to whether or not

 5    the wrap costs in Croatia were too high?

 6        A.   No.

 7             MS. CRAPSTER:  Objection.  Same objection as

 8    earlier.  It's vague and ambiguous as to what she means

 9    by "too high."

10    BY MS. COYOCA:

11        Q.   Do you have any challenge at all to make with

12    respect to the wrap costs associated with Croatia?

13        A.   I have no information on that.

14        Q.   And what about the wrap costs that are

15    associated with New Mexico?  Did you perform any

16    analysis of the dollar amount of wrap costs that were

17    incurred in New Mexico?

18             MS. CRAPSTER:  Objection.  Vague and ambiguous.

19             THE WITNESS:  No.

20    BY MS. COYOCA:

21        Q.   Now, your report on page 7 indicates that the

22    amounts that were incurred for prep and wrap on

23    Episodes 2 through 6 should not all be applied to 2

24    through 6; is that correct?

25        A.   Well, I'm trying to indicate they should not
```

1    represent extra expense.

2         Q.   Okay.  And why do you believe they should not

3    reflect extra expense?

4         A.   Because they're too high to represent something

5    that's extra.

6         Q.   Okay.  I want to go back, then, to -- I'm not

7    understanding your testimony.

8              You just indicated that they're too high to

9    represent something that's extra; correct?

10        A.   That's correct.

11        Q.   Okay.  What do you base your statement on that

12   they're too high to represent extra expense?

13        A.   The sheer magnitude of his total 7 million

14   versus my 2.3.

15        Q.   Anything else?

16        A.   No.

17        Q.   Did you perform any type of analysis at all

18   with respect to the prep or wrap expenses incurred in

19   New Mexico or Croatia to reach this conclusion that

20   they're too high to reflect extra expense?

21             MS. CRAPSTER:  Objection.  Misstates the

22   evidence and vague and ambiguous.

23             THE WITNESS:  No.

24   BY MS. COYOCA:

25        Q.   Now, on page 7 of your report, you indicate

1      that any amount -- I'm sorry.  Begin quotes:

2              "Any amounts incurred for prep and wrap on

3         episodes 2 through 6 that were beneficial and

4         saved money on episodes 7 through 10 provided a

5         benefit to plaintiffs that reduced their

6         overall cost of filming episodes 7 through 10,"

7         close quotes.

8              Do you see that?

9      A.   Yes.

10     Q.   What do you mean by that statement?

11     A.   Well, I notice by looking at the documents that

12     7 through 10, the total episode costs were 13 percent

13     lower than 2 through 6.  And I thought one of the

14     reasons might be that something in total costs as

15     presented in the Wunderlich report, which he estimates

16     to be extra expense, might, in fact, have benefited

17     those subsequent shows.

18     Q.   So if I understand you correctly, is it your

19     position that the prep and wrap expenses, in your view,

20     should have been amortized over the 2 through 10

21     episodes?

22     A.   If, in fact, they relate to the other episodes.

23     Except, you know, I don't have that kind of information.

24     I meant it just as an observation.  I have no details

25     other than that.

1    Q.   Okay.  So if you were to assume for purposes of
2    this analysis that the expenses, in fact, did relate to
3    all 2 through 10 episodes, would it be your position
4    that they should be amortized over the 9 episodes?
5              MS. CRAPSTER:  Objection.  Calls for
6    speculation.
7              THE WITNESS:  Some, yes.
8    BY MS. COYOCA:
9    Q.   Okay.  So if you're going to amortize prep and
10   wrap expenses over all episodes, not just 2 through 6
11   but also 7 through 10, then would you not also have to
12   include the costs that were associated with those
13   episodes in the analysis?
14             MS. CRAPSTER:  Objection.  Vague and ambiguous.
15   Calls for speculation.
16             THE WITNESS:  No.  Because I don't think
17   Episodes 7 through 10 are part of the event, the loss
18   event.
19   BY MS. COYOCA:
20   Q.   But if you're going to amortize the costs
21   associated with prep and wrap over the lifetime,
22   wouldn't it be appropriate to also include the other
23   costs that were associated with the 7 through 10
24   episodes?
25             MS. CRAPSTER:  Same objections.  Ambiguous.

1    Vague.  Calls for speculation.

2              THE WITNESS:  I don't have an answer.  I don't

3    know how to answer that.

4    BY MS. COYOCA:

5         Q.   And, again, looking to the definition of "loss"

6    and the definition of "insurable production cost" under

7    the policy, the terms of the policy, which analyzes

8    what's necessary to complete the insured production,

9    wouldn't it be appropriate to take into account the

10   costs -- not just prep and wrap costs, but all costs

11   associated with 7 through 10?

12             MS. CRAPSTER:  Objection.  Misstates the

13   evidence.  Assumes facts not in evidence.  Vague and

14   ambiguous.  Calls for speculation.

15             THE WITNESS:  Again, I'm not an insurance

16   expert.  But I don't believe anything other than 2

17   through 6 has an event of loss.  Therefore, none of that

18   data belongs in the computation of extra expense.

19   BY MS. COYOCA:

20        Q.   I want to make sure I understand you.

21             Are you saying that all prep and wrap expenses

22   should be removed from the extra expense calculation?

23        A.   No.  Only the ones that were extra because of

24   the relocation to Croatia and New Mexico.

25        Q.   And, again, did you perform an analysis to

1   determine which of those prep and wrap costs were, in

2   fact, extra?

3   A.   And, again, I didn't have the opportunity to do

4   that.

5   Q.   Could you please turn back to the Wunderlich

6   report.  So I want to look at Schedule A1 to the report.

7   And it appears right after page 10.

8   A.   Yes.

9   Q.   So looking -- let's take New Mexico.  There's

10  dollar amounts that are listed for prep extra expenses,

11  wrap extra expenses, all series extra expenses, and

12  compensation extra expenses.

13       Do you see that?

14  A.   Yes.

15  Q.   So the prep extra expenses that are associated

16  with New Mexico that are listed as being 1,477,588, did

17  you do any analysis of that number?

18  A.   No.

19  Q.   If you turn the page, there is a listing of the

20  extra expenses that are associated with New Mexico prep;

21  is that correct?

22  A.   Yes.

23  Q.   And in the left-hand column, there is a listing

24  of account numbers.

25       Do you see that?

1    A.   Yes.

2    Q.   Did you go back -- in order to analyze any of

3  the extra New Mexico prep expenses that are listed here,

4  did you go back to the accounting reports that were

5  provided to you and search for these accounts in order

6  to make a determination as to what you thought was

7  inappropriately included?

8         MS. CRAPSTER:  Objection.  Misstates facts and

9  assumes facts not in evidence.  Ambiguous.

10        THE WITNESS:  I did not.  I didn't find it

11  necessary to perform my engagement.

12  BY MS. COYOCA:

13    Q.   Well, but you indicated that you believe that

14  there were extra expenses associated with New Mexico

15  prep that should not have been included; is that

16  correct?

17    A.   Based on the overall magnitude of the

18  difference between his 7 million and my 2.3 and the fact

19  that New Mexico prep uniquely has no exclusions, which

20  essentially is saying all New Mexico prep is extra,

21  which seems unreasonable.

22    Q.   Aside from seeming unreasonable to you and

23  because you think the number is too high, did you do any

24  analysis of the financial documentation that was

25  provided to you in order to test your hypothesis that it

1    was too high?

2         A.   No.

3         Q.   Mr. Shapiro, you did have financial reports

4    that reflected the costs that were incurred that were

5    entered by account number, did you not?

6         A.   Yes.

7         Q.   You could have performed the analysis had you

8    chosen to do so; is that correct?

9              MS. CRAPSTER:  Objection.  Vague and ambiguous

10   as to what "the analysis" means.

11             THE WITNESS:  If you mean by analysis, trace it

12   back to each one of the account numbers, I didn't find

13   that necessary in the task I was given.

14   BY MS. COYOCA:

15        Q.   Okay.  But what I'm asking is:  Could you have

16   done it with the documentation you had been provided?

17             MS. CRAPSTER:  Same objection.

18             THE WITNESS:  It would have been possible to

19   trace this table back to the respective account numbers,

20   I believe.  I didn't do it.  But I found no evidence

21   that any of the Croatian or New Mexico costs were

22   misstated.  My only objection is they're not all extra

23   expense.

24   BY MS. COYOCA:

25        Q.   But my question to you is not whether you could

1    go back and trace for purposes of determining whether

2    they were accurately stated in terms of the amount, what

3    I'm asking you is:  You could go back to the accounts in

4    order to analyze the dollar amounts that are included

5    and make a determination as to whether the amounts were

6    appropriately earmarked as extra or not; isn't that

7    correct?

8            MS. CRAPSTER:  Objection.  Vague and ambiguous

9    as to what she means by "analyze."

10           THE WITNESS:  None of the data I was provided

11   had that kind of detail to do that.

12   BY MS. COYOCA:

13       Q.   Well, specifically, for example, you criticized

14   the wardrobe amount of 56,374 in your report, did you

15   not?

16       A.   Yes.

17       Q.   And that has an account number that's 755;

18   isn't that right?

19       A.   Yes.

20       Q.   But you didn't go back to the financial

21   documentation that had been produced in the case in

22   order to review the entries associated with 755, did

23   you?

24           MS. CRAPSTER:  Objection.  Assumes facts not in

25   evidence.

1           THE WITNESS:  The only documentation provided,

2    of course, was the Cost Bible.  And if the Cost Bible

3    showed that amount and showed some postings, that

4    wouldn't give me enough evidence to determine it was

5    extra.

6    BY MS. COYOCA:

7       Q.   With respect to any of, though, for example,

8    the costs that are associated with below-the-line

9    costs --

10      A.   Yes.

11      Q.   -- did you ask the lawyers in the case for any

12   type of backup documentation for any of the recorded

13   entries in the Bible?

14      A.   I did ask, "Is there anything else that could

15   give me that information?"

16      Q.   And what was the response?

17      A.   "This is all the documents that we have."

18      Q.   Did you ever review any -- any invoice backup

19   documentation with respect to the DIG production?

20      A.   I did see some invoices in the discovery

21   documents I received.

22      Q.   And did you take those into account in

23   performing your analysis?

24      A.   Well, I noted that they were, in fact,

25   purchases.  You know, my purpose wasn't to audit

1    production costs.  It was to determine a reasonable

2    amount of the claim.

3        Q.    Right.

4              But my question to you is directed towards your

5    opinion that, in your view, the expenses that were

6    incurred -- let's just specifically focus on New Mexico

7    prep for now.

8        A.    Right.

9        Q.    -- that those were not all extra, and you made

10   that conclusion, you came to that conclusion just based

11   on the total amount which you thought was too high.

12       A.    And --

13             MS. CRAPSTER:  Objection.  Misstates the

14   evidence.

15             THE WITNESS:  Also it's unreasonable that every

16   dollar of New Mexico prep cost would, in fact, be extra.

17   So I think the schedule is mistitled.  It's probably a

18   schedule of New Mexico prep costs, but it is not extra

19   expense New Mexico prep.

20   BY MS. COYOCA:

21       Q.    Again, though, my question to you is:  Did you

22   perform any type of analysis with respect to underlying

23   documentation in order to try to determine whether those

24   New Mexico prep costs were all, in fact, actual?

25             MS. CRAPSTER:  Objection.  Vague and ambiguous

1    as to what she means by "analysis."

2              THE WITNESS:  Yeah.  I don't fully understand

3    "analysis."  I reviewed the documents as they were.

4    There were invoices; not a lot.  But the invoice isn't

5    going to tell me whether it's extra expense.

6    BY MS. COYOCA:

7       Q.   Well, but an underlying invoice would give you

8    information with respect to the cost that was incurred,

9    would it not?

10      A.   Yes, it would.

11      Q.   It would indicate who was charging the cost?

12      A.   Yes.

13      Q.   And it would also indicate the date of the

14   loss, in all likelihood; correct?

15      A.   Yes.

16      Q.   And the dollar amount of the loss?

17      A.   Yes.

18      Q.   And, in fact, most of the invoices would

19   reflect a description of the -- what was being

20   purchased; isn't that correct?

21      A.    In some cases, yes.

22              MS. CRAPSTER:  I'm just going to go back.  I

23   believe you meant to say "cost."  You said "loss" in the

24   last few questions.  I think the word should be "cost."

25              MS. COYOCA:  Okay.  I thought I said "cost."

1          THE WITNESS:  I thought you said "cost" also.

2    BY MS. COYOCA:

3      Q.    Thank you, Mr. Shapiro.

4          Let me just ask it in summary fashion so the

5    record is clear.

6          With respect to individual invoices, in many

7    instances invoices would reflect who was charging the

8    cost, the date of the cost, the amount of the cost, and

9    a description of what was being purchased; is that

10   correct?

11         MS. CRAPSTER:  Objection.  Assumes facts not in

12   evidence.

13         THE WITNESS:  In most cases, yes.

14   BY MS. COYOCA:

15     Q.    Now, I believe you testified that in your

16   review of documentation, you saw only a few invoices --

17   is that right? -- or a limited number of invoices?

18     A.    A limited number.

19         MS. CRAPSTER:  Objection.  Misstates --

20         THE WITNESS:  A limited number.

21         MS. CRAPSTER:  -- the testimony.  Objection to

22   the last question.

23   BY MS. COYOCA:

24     Q.    Did you ask to see any other invoice documents?

25     A.    The only question I asked, "Is there anything

1    else?"

2         Q.   I'm specifically, though, focused on:  Did you

3    ever ask, "Is there any source invoice documentation?"

4              MS. CRAPSTER:  Objection.  Asked and answered.

5              THE WITNESS:  The only question I asked, "Is

6    there anything else?"

7    BY MS. COYOCA:

8         Q.   Well, at the point in time when you were

9    asking, "Is there anything else?" had you already

10   reviewed all the documentation and determined whether or

11   not there was invoice documentation included in what you

12   had been provided?

13        A.   Yes.  I found a few invoices.  But I was hoping

14   maybe there were more.

15        Q.   And further to that hope that there would be

16   more invoices, again, did you specifically say, "In

17   order to challenge that these expenses that are

18   identified as not being extra, I need to look at the

19   underlying invoice documentation"?

20             MS. CRAPSTER:  Objection.  Mischaracterizes the

21   testimony.  Assumes facts not in evidence and --

22             THE WITNESS:  No.  I didn't feel it was

23   necessary.

24   BY MS. COYOCA:

25        Q.   Now, if you turn to Schedule B2 of the

1    Wunderlich report --

2         A.   Yes.

3         Q.   -- that lists the extra expenses that

4    Mr. Wunderlich claimed for New Mexico wrap; is that

5    right?

6         A.   Yes.

7         Q.   And in your opinion, not all of those expenses

8    should have been included in extra expense; is that

9    right?

10        A.   Possibly, yes.

11        Q.   Why is it just possibly?

12        A.   Again, my analysis is in total.  I didn't

13   analyze it by category.

14        Q.   And, in fact, Mr. Wunderlich did not include

15   all of the wrap expenses for New Mexico in the extra

16   expense claim, did he?

17        A.   No.  That was refreshing.

18        Q.   Could you please turn to page 7 of

19   Mr. Wunderlich's report.

20             Did you perform any analysis of the description

21   of Mr. Wunderlich's review of the Full Cost Bible as to

22   the New Mexico all series expenses?

23             MS. CRAPSTER:  Objection.  Vague and ambiguous

24   and unclear as to what she means by "analysis."

25             THE WITNESS:  No.

1    BY MS. COYOCA:

2        Q.   Well, did you look at them?

3        A.   Yes.

4        Q.   Did you try to test to determine whether or not

5    his analysis was correct?

6        A.   What do you mean by "correct"?

7        Q.   Well, you've indicated that your analysis you

8    did in total.  You just think the total amount was too

9    large.  And I'm trying to get at what the basis is for

10   that opinion.  And so I'm trying to determine what it is

11   that you did with respect to each of the categories of

12   expenses as to which Mr. Wunderlich included in his

13   claim calculation.

14       A.   It's --

15            MS. CRAPSTER:  I'll object to that as

16   mischaracterizing the testimony.

17            THE WITNESS:  It's of no value to analyze it by

18   category.

19   BY MS. COYOCA:

20       Q.   Why is it of no value to analyze it by

21   category?

22       A.   Because the loss can only be the maximum amount

23   of total cost difference.

24       Q.   Based on your chosen methodology; correct?

25       A.   That's correct.

1    Q.    But your chosen methodology relies heavily on

2    estimates or budgets of costs as to Israel; correct?

3    A.    You mean -- 'cause that's the only Israeli

4    information available.

5    Q.    But is it correct that that's what your

6    analysis relies on?

7    A.    Yes.

8    Q.    Okay.  So do you think that the most reliable

9    analysis of what truly was extra would be to review each

10   and every expense that was included in the extra expense

11   calculation?

12   A.    Well, that would be the most reliable.  Maybe

13   not the most practical.

14   Q.    Okay.  And do you believe that the most

15   reliable calculation of extra expense would not rely on

16   estimate -- estimated cost amounts as opposed to actual

17   cost amounts?

18        MS. CRAPSTER:  Objection.  Calls for

19   speculation.

20        THE WITNESS:  Well, in a perfect world.  But

21   here there are no actual amounts available.

22   BY MS. COYOCA:

23   Q.    But there were actual amounts available for

24   Croatia and New Mexico; correct?

25   A.    Yes.

1    Q.   So to take the place of the estimated costs for

2    Israeli production, rather than using estimates, you

3    could have gone, in a perfect world, and done an

4    analysis of the actual expenses that were incurred?

5    A.   If I had the detail information behind each

6    expense and I could verify what it was for and was it,

7    in fact, extra from what would have been needed to

8    complete a TV one-hour production.

9    Q.   Okay.  Now, in your experience in handling

10   accounting for entertainment-related matters -- let's

11   just stick with television -- is the concept of testing

12   during the course of auditing one that is familiar to

13   you?

14   A.   Yes.

15   Q.   And what's testing?

16   A.   Testing is you would take a look at an account,

17   make individual detail selections.  And if, in fact, the

18   result was favorable, you would conclude the entire

19   account is favorable.

20   Q.   Okay.  Did you attempt to perform any type of

21   testing with respect to any of the expense accounts that

22   were reflected in Mr. Wunderlich's report?

23   A.   No.  Because the Universal Cable Production

24   records were not made available to me.

25   Q.   Okay.  Do you know if there was invoice

1    documentation broader than what was provided to you?  Do

2    you know if it was actually produced in the case?

3         A.   I do not.

4         Q.   I want you to assume for a moment that you did

5    have all of the invoices available to perform a test.

6              In your view, would it be more reliable to

7    perform an audit test of the extra expenses that were

8    claimed rather than using your methodology of comparing

9    estimated costs against actual costs?

10             MS. CRAPSTER:  Objection.  Calls for

11   speculation and assumes facts not in evidence.

12             THE WITNESS:  Well, I believe the most ideal

13   method would have been for Universal to submit a detail

14   claim of extra items and -- with supporting backup that

15   both the insurance company and themselves could have to

16   support the amount of the claim.

17   BY MS. COYOCA:

18        Q.   So Mr. --

19        A.   So if there was an invoice that was, in fact,

20   extra, let it be identified in a separate document.

21   That's the most reasonable way of analyzing it.

22        Q.   Okay.  So with respect to Mr. Wunderlich's

23   report and his identification of the categories of loss

24   and then the breakdown by account as to -- I'm sorry.

25   Let me start over 'cause I used "loss" again.

1          With respect to Mr. Wunderlich's analysis of

2     the extra expense claim stating the amount of the claim

3     broken down by category of expenses, which are further

4     broken down by schedules according to accounts, in your

5     view, if you had all the invoices, would it be possible

6     to then test those categories of expenses with the

7     invoices?

8          MS. CRAPSTER:  Objection.  Vague and ambiguous.

9     Assumes facts not in evidence.

10          THE WITNESS:  Well, I'd have a better

11     opportunity.  But I don't know for sure that could just

12     be done with that.  You probably would need some input

13     from DIG management.

14     BY MS. COYOCA:

15     Q.    So if you had the invoices and input from DIG

16     management, the task of analyzing the account entries

17     with respect to the expenses that are claimed on each of

18     the schedules, it would be possible to do that?

19          MS. CRAPSTER:  Objection.  Calls for

20     speculation.  Mischaracterizes the testimony.  Vague and

21     ambiguous.

22          THE WITNESS:  Yeah.  If an addition was put in

23     the format I discussed, a listing of all the items in

24     the claim, then the invoices would, in fact, support

25     that.  That would be the most reasonable method.

1    BY MS. COYOCA:

2        Q.   And it would be a method that would be superior

3    to the methodology that you utilized in your report; is

4    that right?

5            MS. CRAPSTER:   Objection.   Vague and ambiguous.

6    BY MS. COYOCA:

7        Q.   Actually, let me take the question away.

8            Rather than "superior," would it be a more

9    reliable method to perform the calculation in the manner

10   we've been discussing, as opposed to the methodology in

11   your report?

12       A.   Yes.

13       Q.   Now, on page 8 of your report, you indicate

14   that, begin quotes:

15           "The PER does not address my methodology

16       of calculating damages or offer any

17       justification for why the extra expenses are

18       greater than $2,357,875 (the figure I believe

19       is the maximum amount recoverable)."

20           And then you state your opinion, begin quotes:

21           "In my opinion, not addressing this

22       mathematically reliable alternative to the

23       calculation of damages challenges the

24       credibility of the PER's analysis," close

25       quotes.

1       Do you see that?

2       A.   Yes.

3       Q.   What did you mean by the statements that are

4    made in that paragraph?

5       A.   Well, it's essentially what I've been saying.

6    I think that failure to consider the total costs using

7    the Israeli estimate is a serious weakness in the

8    methodology.

9       Q.   Now, at the time you rendered your report, as

10   of April 25, 2017 --

11      A.   Yes.

12      Q.   -- Mr. Wunderlich's report already had been

13   issued, had it not?

14      A.   Yes.

15      Q.   And his report was issued back in March;

16   correct?

17      A.   Yes.

18      Q.   So how could Mr. Wunderlich have addressed your

19   calculation in his report when you hadn't even submitted

20   it yet?

21      A.   I think it's just a basic situation where you

22   look at the total cost change rather than ignore it and

23   go into these -- these category analyses and these input

24   from Ms. Markus.  And, to me, this was a starting point.

25   So I seriously disagree with the methodology.

1      Q.    Okay.  But my question --

2      A.    Even without my report being issued before he

3    issued his, I think he should have thought about the

4    issue that total cost didn't go up that much.  How can

5    extra expense -- I don't believe he has a full

6    understanding of what extra expense is.

7      Q.    What's your understanding of what extra expense

8    is?

9      A.    It's amounts that exceed the insurable

10   production cost as a result of the loss event.

11     Q.    And you don't believe Mr. Wunderlich

12   understands that definition as you phrased it; is that

13   right?

14     A.    I do not.

15     Q.    And in your analysis and coming to your

16   methodology, you challenge the fact that he did not look

17   at what originally had been projected as the costs for

18   production of the show if it stayed in Israel; right?

19     A.    I don't think he gave any consideration to what

20   would have happened if they stayed in Israel.  Even

21   though the numbers were changing and maybe not going to

22   be actual, but it was the best thing you had.  To ignore

23   that, I feel, was inappropriate.

24         And then I'm further confused by his deposition

25   where he says he saw costs incurred.

1      Q.   Israel-incurred costs and --

2      A.   On several -- he makes reference to that

3  several times, which further confuses me.

4      Q.   Okay.  And they're referenced in his report as

5  well, are they not?

6      A.   Well, I didn't see any reference to

7  Israeli-incurred.

8      Q.   And are you aware of -- in your analysis, when

9  you were going through everything, did you look at any

10  costs that were incurred and paid while still in Israel

11  that actually applied to all series?

12      A.   I saw no documentation on that.

13      Q.   You saw no documentation?

14      A.   No.

15      Q.   And did you ever raise the issue that there may

16  be costs that were incurred in Israel that already were

17  taken into account in calculating extra expense when

18  comparing the projections for Israel against actuals in

19  Croatia and New Mexico?

20           MS. CRAPSTER:  Objection.  Vague and ambiguous.

21           THE WITNESS:  Yeah.  I don't understand the

22  question.

23  BY MS. COYOCA:

24      Q.   Well, if there were costs that were actually

25  incurred and paid in Israel but that redounded to the

1    benefit of the episodes that were shot in Croatia and

2    New Mexico, wouldn't you need to take those expenses

3    into account in calculating extra expense under your

4    methodology?

5           MS. CRAPSTER:  Same objection.  Vague and

6    ambiguous.

7           THE WITNESS:  Yes.  If such document existed

8    that showed that.  I saw no document that showed that.

9    BY MS. COYOCA:

10      Q.   Why would you need to take it into account?

11      A.   Well --

12          MS. CRAPSTER:  Objection.  Vague and ambiguous.

13          THE WITNESS:  It would reduce the amount of

14   additional expenses that have to be incurred if it's

15   already been incurred.

16   BY MS. COYOCA:

17      Q.   Well, but if it's already been incurred and

18   paid in Israel, and you've got a projection that's a

19   budget, wouldn't those amounts have to be removed from

20   the projection budgets in Israel?

21      A.   Yes.  And I saw no reference to that in the

22   Wunderlich report, and I found none independently of

23   that.  But that would have been a valuable analysis.

24      Q.   Are you familiar with what Keshet is?

25      A.   An Israeli production company.

1    Q.   Right.  And Keshet was utilized on the DIG

2    show; right?

3    A.   Yes.

4    Q.   And there are references to expenses incurred

5    associated with Keshet; right?

6    A.   Yes.

7    Q.   And those fees -- excuse me -- those costs

8    would be associated with fees that need to be paid to

9    Keshet; is that correct?

10         MS. CRAPSTER:  Objection.  Vague and ambiguous.

11   Assumes facts not in evidence.

12         THE WITNESS:  I have no idea.

13   BY MS. COYOCA:

14   Q.   Well, Keshet charges a production fee for its

15   services, does it not?

16   A.   They probably do.  Yes.

17   Q.   And Keshet also -- well, no.  Let me just ask

18   you this:  Are you familiar with expenses flowing

19   through a local production company to be charged to a

20   show?

21   A.   Yes.

22   Q.   Relatively common practice.  Yes?

23   A.   It is.

24   Q.   So any production fees that would be charged by

25   Keshet, those would be associated with services rendered

1    in Israel; right?

2        A.    Yes.

3            MS. CRAPSTER:  Objection.  Assumes facts not in

4    evidence.

5    BY MS. COYOCA:

6        Q.    And any invoices that would flow through

7    Keshet, you could reasonably assume those were

8    associated with services in Israel as well; right?

9            MS. CRAPSTER:  Objection.  Assumes facts not in

10   evidence.

11           THE WITNESS:  Well, all I can assume is Keshet

12   probably handles other shows.  So if the invoice was

13   appropriate for DIG, they were in the position to handle

14   that, yes.

15   BY MS. COYOCA:

16       Q.    Can you please turn to page 9 of your report.

17       A.    Yes.

18       Q.    In Item No. 5, you indicate, "This amount" --

19   begin quotes:

20           "This amount does not take into account

21        other possible reductions that are appropriate

22        such as, for example, (1) the prep and wrap

23        expenses incurred in episodes 2 through 6 that

24        may have benefited the producing of episodes 7

25        through 10."

1          Now, we've discussed that topic; is that

2     correct?

3          A.   Yes.

4          Q.   Is there anything further with respect to your

5     opinions about the inclusion or exclusion of prep and

6     wrap expenses that you have not yet told me?

7          A.   No.

8          Q.   Okay.  Then the second amount that you

9     referenced is No. 2, begin quotes:

10              "Production quality improvements that

11         could have been made to each episode," close

12         quotes.

13         A.   Yes.

14         Q.   What do you mean by that?

15         A.   Well, once we arrived in Croatia and

16    New Mexico, we might have changed our mind about the

17    story, spruce up the sets.  You know, make changes to

18    make each show a greater value, maybe new kinds of

19    wardrobe, technology changes.  You know, we could have

20    decided maybe these shows will be high definition or add

21    a camera.  I mean, we had the ability -- as long as

22    we're relocating, we may want to rethink the plan.

23         Q.   So your view is that if those kinds of

24    decisions were made, that they should -- and were

25    included in the extra expense, that they should not have

1    been included; is that correct?

2         A.    That is correct.

3         Q.    And have you identified any such categories of

4    production quality improvements that were made that

5    should not have been charged?

6         A.    No.

7         Q.    Are you aware of any changes that were made to

8    production -- for example, to use one of your examples,

9    script changes -- that would serve to reduce the costs

10   associated with production?

11        A.    No.

12        Q.    Did you look at any documentation or

13   information that discussed the fact that a portion of

14   the script was based in Arizona?  Did you see that?

15        A.    No.

16        Q.    And are you aware of whether there were changes

17   to script in order to have the storyline set in

18   New Mexico in order to avoid the need to cheat for

19   Arizona?

20        A.    No.

21        Q.    That, in fact, would be an effort to mitigate

22   the expense, would it not?

23        A.    Yes.

24             MS. CRAPSTER:  Let me object to the last

25   question on the grounds that it calls for a legal

1    conclusion.

2            MS. COYOCA:  Okay.  Could we just take a break

3    for a moment?  We've been going about an hour and a

4    half.  Thanks.

5            (Recess from 2:57 p.m. to 3:07 p.m.)

6            MS. COYOCA:  Back on the record.

7        Q.   Okay.  Mr. Shapiro, I would like to understand

8    the calculation that you performed in order to arrive at

9    your $2,357,875 number.

10           So looking at the methodology section of your

11   report on page 8, you indicate that you started with, I

12   believe, the Total Cost, capital T, capital C --

13       A.   Yes.

14       Q.   -- Total Cost amount of 21,297,435 and the

15   adjusted total costs of 21,464,745.

16       A.   Yes.

17       Q.   And that 21,464,745 number is one that you

18   obtained pursuant to --

19       A.   The document we saw this morning.

20       Q.   Right.  The Shapiro Exhibit 9, which is

21   UCP018227.  So could you please pull Exhibit 9 out.

22       A.   Yes.

23       Q.   Okay.  And on page UCP018227, we established

24   that the Front 5 episodes, which is 21,464,745 -- that's

25   your adjusted total cost number in your report; correct?

```
1         A.    Yes.

2         Q.    Now, this indicates total cost before breakage.

3         A.    Yes.

4         Q.    Did you take into account any breakage

5    calculation?

6         A.    I did not.

7         Q.    Do you know what breakage is?

8         A.    It's an arrangement with the user of the

9    product, the broadcast entity.  It's a cost reduction

10   per arrangement.

11        Q.    Now, the next number that was important to your

12   analysis is the Israeli cost data; is that correct?

13        A.    Yes.

14        Q.    And you believed the most detailed Israeli cost

15   data was in UCP004971-4972; is that right?

16        A.    Yes.  At the time.

17        Q.    Right.  And that's Exhibit -- what we've marked

18   as Exhibit 6; correct?

19        A.    Yes.

20        Q.    Okay.  I want you to pull out Exhibit 6,

21   please.  Thank you.

22              So this document which bears a March 11, 2014

23   date is not the most immediate budget prior to

24   production of the pilot; is that right?

25              MS. CRAPSTER:  Objection.  Vague and ambiguous.
```

1          THE WITNESS:  Well, I'm certainly willing to

2     recognize we saw another document this morning that

3     could change this number because it's a more recent

4     budget.

5     BY MS. COYOCA:

6          Q.   Okay.  And if you turn to Schedule B of your

7     report --

8          A.   Yes.

9          Q.   -- the calculation that you performed was to

10    subtract from the 21,464,745 number the total amount of

11    the Israel costs anticipated for 2 through 6 episodes;

12    is that right?

13         A.   Well, I think you misspoke.  I took the

14    New Mexico/Croatia number Episodes 2 through 6 and

15    subtracted the Israeli number.  Yes.

16         Q.   Okay.  And, again, that Israeli cost data,

17    17,535,425, was drawn specifically from Exhibit 6?

18         A.   Exhibit 6.  Correct.

19         Q.   And you agree with me, do you not, that that

20    calculation of 17,535,425 number appears to be drawn

21    from the pattern amount of 3,507,085 times 5; correct?

22         A.   Yes.

23         Q.   So the sum of that subtraction that you reached

24    was 3,929,320; correct?

25         A.   Yes.

1      Q.    And to you, what does that number represent?

2      A.    Incremental costs.

3      Q.    The incremental costs incurred as a result of

4   the relocation of the production to Croatia and

5   New Mexico; is that right?

6      A.    No.  The total incremental costs

7   New Mexico/Croatia actually incurred from what we

8   thought we were going to incur and expected to incur in

9   Israel.

10     Q.    Okay.  Now, you then deducted certain amounts

11  relating to tax credits; is that right?

12     A.    Yes.

13     Q.    So if you look at Schedule A, you deducted from

14  the $3.9 million number the amount of $1,571,445; is

15  that right?

16     A.    Yes.

17     Q.    And that's how you reached your $2,357,875?

18     A.    That's correct.

19     Q.    All right.  So the film tax credit calculation

20  is set forth on another schedule.  That's Schedule C;

21  right?

22     A.    That's correct.

23     Q.    All right.  I'm looking at Schedule C now.

24  That's page 13 of your report.

25     A.    Yes.

1    Q.   The realized tax credit for the New Mexico

2    production, you indicated that that was from UCP004504;

3    is that right?

4    A.   Yes.

5    Q.   Okay.  We'll come back to that.

6         On the anticipated Israel tax credit, you have

7    2,104,000; right?

8    A.   Yes.

9    Q.   And that is derived from UCP004971; is that

10   right?

11   A.   Which is Exhibit 6.

12   Q.   So on Exhibit 6 I see on the e-mail sent by

13   Mr. Gaskin to Mr. Winemaker and Ryan Greig an amount

14   that's listed as IS Tax Cr, an amount of 3,100,000.

15   A.   Yes.

16   Q.   So how did you calculate the 2.1 million from

17   that $3.1 million amount?

18   A.   Well, some of the tax credit, the 3,100,000,

19   results from the pilot that was completed.  So I wanted

20   to remove that effect.  So I calculated the percentage

21   3 million 100 over the 25.130 spent and used that

22   percentage against the 17.535.  And I thought that was

23   the estimated anticipated credit for Episodes 2 through

24   6 if done in Israel.  Then I was comparing apples to

25   apples.

1      Q.   And why didn't you use the actual Israeli tax
2  credit that was provided on the pilot?
3      A.   Because it included -- the pilot is not an
4  event of loss.  That's Episode 1.  And I'm only doing
5  Episodes 2 through 6 because they're the ones that are
6  the event of the loss.
7      Q.   Okay.  So I want to make sure I understand your
8  analysis here.
9           So if you turn to Shapiro Exhibit 9, which is
10  the production cost recap report --
11           Do you have that?
12     A.   Yeah.
13     Q.   -- on page 18227 --
14     A.   Okay.
15     Q.   -- there is a tax credit recap in the lower
16  left-hand corner; correct?
17     A.   Yes.
18     Q.   And in it it reflects the insured credit on --
19  excuse me -- the Israel credit on the pilot as being,
20  under Current, $1,234,699.  That's the actual tax credit
21  applied to the pilot; correct?
22     A.   It appears to be.  Yes.
23     Q.   So, again, I want to understand why you would
24  not have deducted 1,234,699 from 3,100,000 in order to
25  determine the amount of tax credit available for

1    Episodes 2-6?

2        A.   I think I already had computed the tax credit

3    before I realized this document had that.  But your

4    approach would also be appropriate.

5            I used the ratio approach when I could have

6    also used the actual pilot credit and subtracting it out

7    of the estimate.

8        Q.   Under the calculation where you take the actual

9    Israeli credit on the pilot of 1,234,699 --

10       A.   Yeah.

11       Q.   -- and you deduct it from the 3.1 million, you

12   come up with a calculation that is less than the

13   2.4 million that's reflected in your chart; isn't that

14   right?

15       A.   The 2 million 104?

16       Q.   I'm sorry.  The 2 million 104.

17       A.   Yes.  You would substitute that subtraction --

18   the result of that subtraction in there.

19       Q.   Which is approximately 1,866,000 -- right? --

20   doing a rough math calculation?

21       A.   Yeah.  It would be less; therefore, causing the

22   additional credit to even be more valuable.

23       Q.   Now, in calculating the additional credit

24   realized, the economic benefit, and subtracting that

25   from the total amount of incremental cost --

1    A.    Yes.

2    Q.    -- did you do any matching analysis with

3  respect to the tax credit versus the costs that were

4  charged?

5    A.    No.

6    Q.    Okay.  So under matching principles, wouldn't

7  it be appropriate to match the amount of the credit,

8  i.e., the revenues, to the costs actually incurred in

9  applying this calculation?

10         MS. CRAPSTER:  Objection.  Assumes facts not in

11  evidence.  Vague and ambiguous.

12         THE WITNESS:  Well, that would be an

13  alternative technique.  But, quite frankly, these are

14  given numbers, and they don't have to be matched with

15  anything.  They're facts.

16  BY MS. COYOCA:

17    Q.    Well, but for purposes of performing a

18  calculation of loss based on the definition in the

19  policy and the insurable production cost, is it your

20  position that you do not need to match tax credit

21  revenue to the actual costs that it relates to?

22         MS. CRAPSTER:  Objection.  Misstates the

23  testimony.

24         THE WITNESS:  My only position on the tax

25  credit is it's an economic benefit realized by the

1    relocation.  And it should be, as we previously

2    discussed, a mitigating circumstance in regard to the

3    expected expense or extra expense loss.

4    BY MS. COYOCA:

5        Q.   When you state that applying the matching

6    principle of revenue to actual cost incurred, that

7    that's an alternative technique, why did you not employ

8    it here?

9             MS. CRAPSTER:  Objection.  Misstates the

10   testimony.

11            THE WITNESS:  To compute the number -- I'm

12   looking for the economic benefit -- the matching isn't

13   necessary.

14   BY MS. COYOCA:

15       Q.   Why not?

16       A.   I don't see any reason why it would have to be

17   done.  There are three facts presented.  You make a

18   calculation.  You don't have to match it with anything.

19   If this is the credit they received, they received it

20   for some reason.  It's been matched and reviewed by the

21   government authorities.

22       Q.   So let's get to that.

23            Did you actually review the tax credit

24   calculations that were -- excuse me -- the tax credit

25   reports that were provided by the taxing authorities in

1    Croatia and New Mexico?

2        A.    That wasn't produced to me.

3        Q.    So what do you base your statement on that the

4    tax credits were already matched?

5        A.    Just my general understanding of how the

6    procedure works.

7        Q.    What is your general understanding of how the

8    procedure works?

9        A.    That applications are made to government

10   authorities.  The matching takes place at that time, and

11   they can choose whether to audit or review it.  And then

12   the credit is given.

13       Q.    And as part of that process, the actual costs

14   are reviewed; correct?

15       A.    Yes.

16       Q.    And the actual costs are compared against the

17   tax credit available, i.e., the matching occurs; is that

18   right?

19       A.    Yes.

20           MS. CRAPSTER:  Objection.  Calls for

21   speculation.

22           THE WITNESS:  In most localities, yes.

23   BY MS. COYOCA:

24       Q.    And do you know if that occurred in Croatia?

25       A.    I'm not familiar with the rules in Croatia.

1     Q.   What about New Mexico?

2     A.   I'm not directly familiar with those either.

3     Q.   So if that matching process occurred in the

4  actual issuance of the tax credit or the tax rebate in

5  those two jurisdictions, you believe it is appropriate

6  in calculating the loss -- and specifically the

7  insurable production cost -- you believe it's

8  appropriate to apply the entire amount of the tax credit

9  potentially available to just a portion of the cost?

10     MS. CRAPSTER:  Objection.  Misstates the

11  testimony and vague and ambiguous.

12     THE WITNESS:  Yeah.  I don't understand the

13  question.

14  BY MS. COYOCA:

15     Q.   Well, so as part of your calculation of loss

16  under the terms of the policy --

17     A.   Yes.

18     Q.   -- you have to specifically look at the

19  insurable production costs; right?

20     A.   Yes.

21     Q.   Now, first of all, under insurable production

22  cost, is the insurer permitted to take advantage of the

23  tax credits that are specifically accorded as part of

24  the production process?

25     A.   I'm not sure if the tax credits are mentioned

1    in the policy.

2        Q.   Let's take a look.  Can you go back to

3    Exhibit 1.

4             MS. CRAPSTER:  To be clear, this is Williams

5    Exhibit 1, not Shapiro Exhibit 1.

6             MS. COYOCA:  Right.

7             THE WITNESS:  Yes.

8    BY MS. COYOCA:

9        Q.   So under "Definition of Loss" that's on page

10   ATL003106, do you see any reference here to the

11   application of tax credits?

12       A.   No.

13       Q.   And if you look at the definition of "insurable

14   production cost" in ATL00- -- on ATL003081 in Item 4,

15   the definition of "insurable production cost," where in

16   this definition is there a provision for application of

17   the tax credit in calculating the insurable production

18   cost?

19       A.   I don't know.  I see no direct reference to

20   film tax credits.

21       Q.   My understanding from your testimony earlier

22   today was that your analysis was an attempt to calculate

23   cost under the terms of the policy; is that right?

24   Excuse me.  The claim under the terms of the policy; is

25   that right?

1        A.    Yes.

2               MS. CRAPSTER:  Objection.  Mischaracterizes the

3    testimony.

4               THE WITNESS:  Yes.  That was my objective.

5    BY MS. COYOCA:

6        Q.    If the -- any tax credits accorded to the

7    insured are not provided for in the calculation of

8    insurable production cost, then why did you apply it

9    here?

10       A.    Well, it's just my understanding in dealing

11   with an insurance claim that the insured who has

12   suffered a loss can't economically benefit from such

13   loss.  In this case, they did.

14       Q.    But under the terms of the contract between the

15   parties, there's no provision for the application of the

16   tax credit; is that right?

17              MS. CRAPSTER:  Objection.  Calls for a legal

18   conclusion.

19              THE WITNESS:  Counselor, I'm not a lawyer, and

20   I'm not familiar with the insurance contract in that

21   respect.

22   BY MS. COYOCA:

23       Q.    When you were calculating the application of

24   the tax credit and the additional credit to be realized,

25   did you ask to see the Croatian or New Mexico reports on

1    the tax credit accorded?

2            MS. CRAPSTER:  Objection.  I think that calls

3    for privileged information that's protected by Rule 26.

4            THE WITNESS:  I don't recall.

5    BY MS. COYOCA:

6        Q.   Would -- the calculation under the taxing

7    authorities, would their calculation be relevant to your

8    analysis, do you believe?

9        A.   Well, I would hope it would be the same as put

10   on this document.  I can't see a reason why the number

11   wouldn't be the same.  I can only use the data that's

12   available.

13       Q.   Under GAAP principles -- separate and apart

14   from what you did, under GAAP principles do you think it

15   is necessary under the matching principle to match

16   revenue with the associated costs, i.e., that portion of

17   the tax credit with the associated costs attributable to

18   that revenue under GAAP?

19           MS. CRAPSTER:  Objection.  Vague and ambiguous.

20           THE WITNESS:  Well, if you had a GAAP

21   situation, yes, it would be appropriate to match.

22   BY MS. COYOCA:

23       Q.   Under Schedule A to your report -- excuse me --

24   to your CV which is attached to your report --

25       A.   Yeah.

1      Q.   -- it provides that you've been -- you've

2   provided expert witness testimony over the last

3   four years in the cases that are identified; is that

4   right?

5      A.   Yes.

6      Q.   So are these cases where you've just simply

7   provided expert testimony, or are these all cases in

8   which you've been retained as an expert?

9      A.   Where I provided testimony.

10     Q.   Are there other cases where you have been

11  retained as an expert?

12     A.   In the last four years?

13     Q.   Yes.

14     A.   Yes.

15     Q.   What cases are those?

16     A.   Well, I don't recall.  I would have to have my

17  full resume.  But often, issues I'm involved with settle

18  before there is any testimony.

19     Q.   Were you retained as an expert in the

20  Larson vs. NBCUniversal matter?

21     A.   Yes, I was.

22     Q.   Are you currently serving as an expert in the

23  Larson vs. NBCUniversal matter?

24     A.   No.

25     Q.   Is that matter concluded?

1      A.    As far as I'm concerned, yes.

2      Q.    Did you issue a report in the Larson vs.

3  NBCUniversal matter?

4      A.    No.

5      Q.    Did you provide deposition testimony in the

6  matter?

7      A.    No.

8      Q.    Did you provide an opinion in the matter in any

9  shape or form?

10     A.    I provided consulting services to the lawyers

11  involved and certain financial information relating to

12  the many shows that were part of the litigation.  I

13  believe they settled the matter in mediation.

14     Q.    Other than the Larson case, can you recall any

15  other matters within the last four years in which you

16  have been retained as an expert?

17     A.    Not off my -- without seeing my resume, no.

18     Q.    But you believe that your full resume, as

19  opposed to just the one that's attached to your report,

20  would contain a full listing of all such cases; is that

21  correct?

22     A.    It does.

23           MS. COYOCA:  Counsel, we have not received that

24  resume.  Are you going to produce it?

25           MS. CRAPSTER:  I don't believe so.  We've

1    produced a resume that's compliant with Rule 26.  It

2    specifically states that CVs attached to expert reports

3    need to list cases in which testimony was provided

4    during the last four years and publications over the

5    last 10 years.

6            MS. COYOCA:  So you're refusing to produce his

7    full resume?

8            MS. CRAPSTER:  I don't believe we have any

9    obligation to produce it.  I don't believe you've even

10   asked for it until right this minute.  So I'm not going

11   to voluntarily produce it.

12   BY MS. COYOCA:

13       Q.   Earlier today I asked you if you had ever been

14   sanctioned, disciplined by any regulatory authority.

15   And we discussed the SEC matter and also the probation

16   that you received with respect to that matter from the

17   California Board of Accountancy; is that right?

18       A.   Yes.

19       Q.   Are there any other times during the course of

20   your career where you have been sanctioned or

21   disciplined or censured in any way?

22       A.   Not that I recall.

23       Q.   In 1992 did the California Board of Accountancy

24   bring an action against you which resulted in your

25   accounting certificate being revoked which then was

1     stayed with three years' probation?

2          A.   Well, there was a lot of litigation in that

3     time when Laventhol dissolved, when there were years of

4     litigation from the Laventhol matter.  I was the audit

5     partner in charge of Laventhol, and I participated a lot

6     in that litigation.

7          Q.   I'm not asking you about that litigation,

8     though.

9               I'm asking you:  Were you -- in July of 1993,

10    were you -- was your accounting certificate by the

11    California Board of Accountancy revoked and then the

12    revocation stayed with three years' probation?

13         A.   Well, one of the Laventhol matters did go into

14    '92, and I think there was some board action on it.

15    But, you know, it's 30 years ago.  I don't really

16    remember all the details.

17         Q.   Well, 1993 would be 23 years ago -- correct? --

18    24 years ago?

19         A.   24 years.  Yes.

20         Q.   And as you sit here today, you don't recall

21    having your certificate, accounting certificate, revoked

22    and then the revocation stayed with a three-year

23    probationary imposition of discipline?

24         A.   Well, it was a time when a lot of things were

25    going on.  There was some board action.  I don't

1    remember exactly what it was.

2         Q.   Are you a member of the AICPA?

3         A.   No.

4         Q.   Were you a member of the AICPA at any point in

5    your career?

6         A.   Yes.

7         Q.   Was your membership terminated by the AICPA?

8         A.   As a result of the SEC matter, they wanted to

9    have hearings, et cetera, and I couldn't afford the

10   additional costs.  So I did, in fact, end my membership.

11        Q.   Did you end your membership, or did the AICPA

12   terminate your membership?

13        A.   Well, as you know, Counselor, it's certainly on

14   the Internet.  They call it "termination."  But as far

15   as I'm concerned, I chose not to.

16        Q.   Do you dispute that you were found guilty of

17   violating AICPA Bylaw 7.4.6?

18        A.   Well, I didn't fail to cooperate with them to

19   belong to that trade association.  But that, of course,

20   is not a regulatory agency.

21        Q.   Okay.  Is there any other organization,

22   separate and apart from whether it's a regulatory or

23   licensing organization, that relates to professional

24   services as an accountant that you have been sanctioned,

25   disciplined, or censured by?

1       A.   Not that I recall.

2            MS. COYOCA:  I want to mark as the next

3   exhibit -- I believe we are on Exhibit 11 -- the set of

4   documents that were produced by counsel, Ms. Crapster,

5   prior to the commencement of the deposition today.

6   They're labeled Bates control No. JS000001 through 20.

7            (Shapiro Exhibit 11 was

8            marked for identification.)

9   BY MS. COYOCA:

10      Q.   Mr. Shapiro, what is the first document that is

11  labeled No. 1?

12      A.   It looks like my signature on the Nondisclosure

13  Agreement.

14      Q.   Did you review the terms of the Nondisclosure

15  Agreement?

16      A.   I did.

17      Q.   Did you have Ms. -- was it Rodriguez, Maria

18  Rodriguez?

19      A.   Yes.

20      Q.   Did you have her sign Attachment A?

21      A.   No.

22      Q.   Where do you retain all the documents and

23  information that's been provided to you by counsel?

24      A.   I retain them through the Viewpoint program on

25  my computer.

1    Q.    So you retain the documents electronically --

2    A.    Right.

3    Q.    -- only?

4    A.    I don't have a hard copy.

5    Q.    The computer on which you retain the

6    information, is it a laptop, desktop, something else?

7    A.    A desktop.

8    Q.    Who has access to the desktop other than

9    yourself?

10   A.    Just myself.  And I don't believe they're

11   contained on my drive.  I believe the program is more of

12   a cloud application.  And, in fact, the documents have

13   to be called down from the cloud.

14   Q.    The access to Viewpoint, is it password

15   protected?

16   A.    Yes.

17   Q.    Turning to page 2, this appears to be your

18   engagement agreement --

19   A.    Yes.

20   Q.    -- with respect to this matter contained on

21   pages 2 through 4; is that right?

22   A.    That's correct.

23   Q.    Did you undertake any analysis as to damages

24   with respect to the claim for fair dealing that's

25   referenced in your first paragraph?

1     A.   No.

2         Q.   Mr. Shapiro, during the course of your

3    analysis, did you consult with any production expert to

4    analyze the expenses that were incurred to try to do an

5    assessment of whether there were extra expenses?

6              MS. CRAPSTER:  Objection.  Vague and ambiguous.

7              THE WITNESS:  No.

8    BY MS. COYOCA:

9         Q.   Do you know a gentleman by the name of Graham

10   Henderson?

11        A.   No.

12        Q.   On the second page of your letter, it indicates

13   that your billing rates for consulting range from 250 to

14   375 per hour.

15             Do you see that?

16        A.   Yes.

17        Q.   When do you bill out at 250 versus 375?

18        A.   250 would be Ms. Rodriguez.

19        Q.   Is Ms. Rodriguez a CPA?

20        A.   No.

21        Q.   Is she an accountant?

22        A.   No.

23        Q.   Does she have any kind of accountant or

24   accounting training?

25        A.   Only through working with me.

1    Q.   Does Ms. Rodriguez work for you full time?

2    A.   No.  Part time.

3    Q.   Turning to page JS00005 --

4    A.   Yes.

5    Q.   -- these -- the documents that are contained in

6    5 through 10 appear to be invoices.

7    A.   Yes.

8    Q.   The last invoice date is May 2, 2017.

9    A.   Yes.

10   Q.   Have you incurred any time other than what's

11   reflected in these invoices as to this matter?

12   A.   Other than what's on the two invoices?

13   Q.   Yes.

14   A.   Yes.

15   Q.   What other work have you done?

16   A.   Time since May 2.

17   Q.   What work have you done between May 2 and now?

18   A.   I've prepared for this deposition.  Since

19   May 2, that's all I recall.

20   Q.   How long -- how much time did you spend in

21   preparing for your deposition?

22   A.   Well, over a couple of days, 10 hours.

23   Q.   What did you do to prepare for your deposition?

24   A.   I reread the Complaint.  I looked at a couple

25   more documents.  I had a meeting with Ms. Crapster.  I

1    had -- I read my report. I looked at Wunderlich's

2    report again, plus I reviewed the depo for

3    Mr. Wunderlich.

4        Q.   Anything else?

5        A.   No.

6        Q.   Now, you said you looked at a couple more

7    documents when you were responding.

8        A.   Yeah.

9        Q.   Other than the reports, the Wunderlich

10   deposition transcript, and the Complaint, what other

11   documents did you look at?

12       A.   Well, I have some of my favorites. I like my

13   e-mail document, our Exhibit 6. You know, I reviewed

14   that again. I just wanted to make sure I knew where the

15   important numbers came from.

16       Q.   Did you go back through the documents that

17   originally had been provided to see if you could find

18   any more updated Israel estimated costs other than your

19   favorite Exhibit 6?

20       A.   Not at that time, no.

21       Q.   You indicated you met with Ms. Crapster. How

22   long did your meeting with Ms. Crapster take?

23       A.   Three, four hours.

24       Q.   When did that meeting occur?

25       A.   Yesterday.

1      Q.   Any other meetings with anyone from the

2   Strasburger Price firm?

3      A.   No.

4      Q.   With respect to your invoice documents, other

5   than the entries that -- as to the rate of 250, is there

6   any other way to demarcate work that was performed by

7   Ms. Rodriguez?

8      A.   No.

9      Q.   On the first page of invoice 6500, there is a

10  reference to a "Telephone Conference-CC" on March 30,

11  2017.

12         Do you see that?

13     A.   On what page?

14     Q.   5.

15     A.   Yes.

16     Q.   That conference took an hour and 25 minutes; is

17  that correct?

18     A.   That's what it indicates.  Yes.

19     Q.   Who were you speaking with?

20     A.   Ms. Crapster.

21     Q.   Anyone else?

22     A.   Ms. Reed could have been on the phone also.

23     Q.   Do you recall that she was on the phone?

24     A.   On two occasions she was on the phone.  I don't

25  know if this is one of them.

1      Q.   Now, when we discussed your initial contact

2  with Ms. Crapster earlier today, I believe you indicated

3  you thought the call took place on the 29th of March.

4           Does this refresh your recollection that the

5  call actually took place on the 30th, or were there two

6  calls?

7           MS. CRAPSTER:  Objection.  Misstates the

8  testimony.

9           THE WITNESS:  Well, it is what it is.  If it

10  says the 30th, then I'm mistaken, and the call took

11  place on the 30th.

12  BY MS. COYOCA:

13     Q.   There isn't another different call that's not

14  reflected here that was --

15     A.   If there was a call, it would be reflected,

16  Counselor.

17     Q.   Okay.  Please don't interrupt me.  I just need

18  to get my question out.

19     A.   Okay.

20     Q.   On page 6 on April 4, 2017, this is a reference

21  to a half-hour conference call.

22           Do you see that?

23     A.   Yes.

24     Q.   Who participated in that call?

25     A.   To the best of my recollection, Ms. Crapster.

1      Q.   What about Ms. Reed?

2      A.   I believe she would have been involved in

3  longer conversations.

4      Q.   Okay.  On page 7 that invoice is dated

5  April 20, 2017, and it's identified as invoice

6  No. 6500A.

7           Do you see that?

8      A.   Yes.

9      Q.   And that invoice appears to reference a call

10  that took place on March 26, 2017.

11           Do you see that?

12      A.   Yes.

13      Q.   Okay.  First of all, what's the difference

14  between invoice 6500 and invoice 6500A?

15      A.   Yeah.  6500 was still outstanding, and I

16  updated it through the new date.  April 4, I updated

17  through April 20.

18      Q.   Why did you bill twice in the same month?

19      A.   I don't recall why, other than they must have

20  asked me for an update.

21      Q.   Why did you not bill all of the time that was

22  performed in March on the April 4 invoice, or did you?

23      A.   I believe I did.  The 3/26 phone call is there.

24  I believe it's just the 6500 invoice expanded for an

25  extra two weeks.

1      Q.    So on page 8 you have a total due amount on

2   4/14/17 of 14,364; right?

3      A.    As of the 4th.

4      Q.    Okay.  And then the --

5      A.    Additional work.

6      Q.    -- tasks that are reflected below that is the

7   additional work that was performed that you billed as of

8   4/24?

9      A.    That's correct.

10      Q.    Looking at page 9 --

11      A.    Yes.

12      Q.    -- there's a conference call referenced on

13   4/6/07 and postponement.

14          Do you see that?

15      A.    Yes.

16      Q.    ^what did that call relate to?

17          MS. CRAPSTER:  Objection.  That calls for

18   privileged information that's protected by the privilege

19   and Rule 26.

20          I'll instruct the witness not to answer.

21   BY MS. COYOCA:

22      Q.    Who was on the call?

23      A.    To the best of my recollection, Ms. Crapster.

24      Q.    There is another call referenced on 4/7 for

25   three-quarters of an hour.

1          Do you see that?

2    A.    Yes.

3    Q.    Who was on that call?

4    A.    To the best of my recollection, Ms. Crapster.

5    Q.    There is an indication on 4/9/17 "Special

6    Review for CC," three hours.

7          Do you see that?

8    A.    Yes.

9    Q.    ^What is that in reference to?

10         MS. CRAPSTER:  I'll instruct the witness not to

11   answer to the extent that's going to reveal any

12   attorney-client privileged information.

13   BY MS. COYOCA:

14   Q.    Did you have a three-hour conference call on

15   April 9, 2017?

16   A.    That's what the invoice seems to indicate.

17   Yes.

18   Q.    Who was on that conference call?

19   A.    To the best of my recollection, Ms. Crapster.

20   Q.    Anyone else?

21   A.    Not that I recall.

22   Q.    There is another call referenced on 4/18/2017,

23   three-quarters of an hour.

24         Who was on that call?

25   A.    To the best of my recollection, Ms. Crapster.

1     Q.   Of the calls we've reviewed so far, which one

2   was Ms. Reed on?

3     A.   I don't recall which ones.  I do recall

4   speaking to her twice.

5     Q.   And on those calls Ms. Crapster was also

6   present?

7     A.   Yes.

8     Q.   Turning to the last page of the invoice,

9   JS000010, there is a two-hour conference call referenced

10  on 4/25/2017.

11         Who was on that call?

12    A.   Well, this one, it clearly says "TR."  That

13  would be Toni Reed.  So she -- that's one of the two

14  calls that I previously indicated.

15    Q.   Okay.  So the references to "CC" are not

16  references to conference calls; they're actually

17  references to Carla Crapster?

18    A.   That's correct.

19    Q.   You had an hour and a quarter call on

20  4/26/2017.  That was a call just with Ms. Crapster?

21    A.   I believe so.  Yes.

22    Q.   Could you please turn to page JS000014.

23    A.   Yes.

24    Q.   Under "Categories" -- well, first of all, do

25  you recognize this e-mail?

1       A.    No.

2       Q.    Did Ms. Crapster send you documents from time

3    to time?

4       A.    Yes.

5       Q.    Did she send you the DIG Back 4 budgets?

6       A.    Well, the category here seems to indicate she

7    did.

8       Q.    Do you recall reviewing the DIG Back 4 budgets?

9       A.    No.

10       Q.    Under "Categories," there is an indication,

11    begin quotes, "In DM, #8859240: SP: 15247: 0131."

12            Do you know what that's in reference to?

13       A.    I do not.

14       Q.    Turning to the last documents in the documents

15    produced by your counsel today, it's the excerpts of the

16    policy, and it begins on page "JS000017" handwritten in.

17       A.    Yes.

18       Q.    There is a note up in the right-hand corner

19    that says "Policy #" and then some indications.

20            Do you see that?

21       A.    Yes.

22       Q.    Is that your handwriting?

23       A.    It is.

24       Q.    In the folder that you brought in with you

25    earlier today, you indicated that you had notes on the

1      extra expense portion of the policy; is that right?

2          A.   Yes.

3          Q.   Were there any other notes on the extra expense

4      portion in your folder other than what's reflected in

5      this document?

6          A.   No.  This is a photocopy of what's in my

7      folder.

8          Q.   Did you highlight any provisions of the policy?

9          A.   I did.

10         Q.   Which portions did you highlight?

11         A.   I highlighted a lot of portions.  But loss, the

12     section -- or paragraph 1 and then paragraph 9.

13         Q.   When you say "loss," paragraph 1, are you

14     referring to Roman numeral No. IX on page JS000020?

15         A.   Yes.

16         Q.   Are you referring to subparagraph 1 only?

17         A.   No.  1, 2, 3, and 4 would be highlighted.

18         Q.   Now, you indicated that you also highlighted

19     another portion.

20         A.   Yes.  On JS 17, the Insuring Agreement, I

21     highlighted some information there so I could

22     familiarize myself with the loss.  "The Loss must be a

23     direct result of an unexpected, sudden or accidental

24     occurrence."

25         Q.   Anything else?

1    A.   Imminent peril.  I thought the understanding of

2    these particular things would be important.  So it's the

3    nature of my normal style to highlight things that I

4    think later on I might want to go back to.

5    Q.   Anything else?

6    A.   No.

7    Q.   You said it's the nature of your normal style

8    to highlight things that you might later want to go back

9    to.

10         When you were highlighting "Definition of

11   Loss," did you note that there was a specific definition

12   of "insurable production cost"?

13         MS. CRAPSTER:  Objection.  Asked and answered.

14         THE WITNESS:  Well, I believe that's in

15   Section IX.

16   BY MS. COYOCA:

17   Q.   Okay.  But did you note this provision of the

18   policy and highlight it when you were reviewing the

19   excerpts of the policy that you thought would be

20   necessary for you to understand for purposes of your

21   analysis?

22         MS. CRAPSTER:  Objection.  Asked and answered.

23         THE WITNESS:  I don't believe so.

24   BY MS. COYOCA:

25   Q.   In approximately how many cases have you been

1    retained as an expert on behalf of the plaintiff?

2        A.    Well, I have more plaintiffs.  About 70 percent

3    of my cases are plaintiff.

4        Q.    And what is your best estimate of the number of

5    times you've been retained as an expert in the 15 to

6    20 years you've been doing expert work?

7        A.    40 times.

8        Q.    So 70 percent of those 40 times is your

9    estimate of the times that you've rendered services on

10   behalf of plaintiffs?

11       A.    Yes.

12       Q.    And the remaining 30 percent, I take it, would

13   be for defendants?

14       A.    Would be defendants.  In fact, most of my

15   defendants would be insurance companies.

16       Q.    Is there a particular insurance company for

17   which you primarily render services?

18       A.    No.

19       Q.    Have you previously ever rendered expert

20   services to OneBeacon?

21       A.    No.

22       Q.    Have you previously ever rendered services in a

23   case that is being handled by the Strasburger firm?

24       A.    No.

25       Q.    Have you ever worked -- performed work for

1    Fireman's Fund?

2        A.    No.

3        Q.    Same question as to Travelers.

4        A.    Travelers, maybe.  But it was a long time ago.

5        Q.    Was it an entertainment-related matter?

6        A.    Yes.

7        Q.    What was the matter?

8        A.    Well, my insurance work is usually claims made

9    by entertainers who have suffered injury.  There are

10   moments they tend to be exaggerated.

11       Q.    So predominantly usually under cast coverage

12   portions of policy?

13       A.    Or also automobile accident matters where the

14   injured party is an entertainer.

15       Q.    Have you rendered services to Travelers on more

16   than one occasion, to the best of your recollection?

17       A.    No.

18       Q.    Have you rendered services to Chubb in any

19   entertainment-related matters?

20       A.    No.

21       Q.    Any other insurers or insurance-related

22   entities that you can recall where you have rendered

23   expert services in connection with an entertainment

24   matter?

25       A.    AIG, Farmers, State Farm.  That's about it.

1    Q.    State Farm work, was that related to an auto

2    case?

3    A.    It was.

4    Q.    The AIG case, was that an entertainment-related

5    case?

6    A.    It was.

7    Q.    What was it about?

8    A.    A fidelity bond.

9    Q.    On a motion picture?

10   A.    A group of motion pictures.  Yes.

11   Q.    A slate?

12   A.    A slate.

13   Q.    On what did you render services in that case?

14   A.    A certain review of the claims that were

15   involved.

16   Q.    When did you perform your work?

17   A.    It was a long time ago.  Nine, ten years ago.

18   Q.    When slates of films were still being financed

19   by insurers?

20   A.    That's correct.

21   Q.    What about Farmers?  Was it an

22   entertainment-related case?

23   A.    It was, again, auto, with the entertainer being

24   the injured party.  And, of course, his claim is a loss

25   of earning power.

1     Q.   Have you ever been disqualified as an expert by

2  a court?

3     A.   No.

4     Q.   Have you ever been challenged as an expert in

5  any court proceeding?

6     A.   What does "challenged" mean?

7     Q.   Has any Daubert motion ever been filed relating

8  to your methodology or your qualifications to serve as

9  an expert?

10    A.   Not to my knowledge.

11    Q.   Was any challenge made to your expertise or

12  your opinion in the Cobb matter?

13    A.   Not that I recall.

14    Q.   Is there any other work you plan to do prior to

15  testifying at the trial in this case?

16    A.   I don't know.  It depends if I'm given any

17  additional data that would help with understanding the

18  story of what's happened here.

19    Q.   As you sit here today, do you plan on doing any

20  additional work?

21    A.   I have no plan.

22         MS. COYOCA:  Okay.  Off the record.

23         (Recess from 4:08 p.m. to 4:13 p.m.)

24         MS. COYOCA:  Back on the record.

25    Q.   Mr. Shapiro, we previously discussed your

1    report and specifically page 9 and your opinion that

2    there may have been production quality improvements that

3    could have been made to each episode that potentially

4    would reduce the claim amount; is that correct?

5         A.   Well, that would reduce the actual costs to be

6    considered as extra.  And if some of those items were

7    considered extra and they resulted from a quality

8    improvement, yes.

9         Q.   Okay.  So my specific question to you is:  Are

10   you aware of any specific production quality

11   improvements that were made to the production of DIG

12   that were characterized as extra expenses?

13        A.   No.

14             MS. COYOCA:  Okay.  I have nothing further.

15             MS. CRAPSTER:  Atlantic will reserve questions

16   for trial.

17             MS. COYOCA:  Do you want to recite the stip, or

18   do you want me to?

19             MS. CRAPSTER:  I think we can rely on the

20   stipulation that's been entered from the previous cases.

21             MS. COYOCA:  So for purposes of the reporter,

22   it's 14 days, and you're relieved of your

23   responsibilities when the original is transmitted to

24   counsel for the witness.

25   / / /

1              (At 4:15 p.m. the deposition of JAY J.

2         SHAPIRO was adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I declare under penalty of perjury that I have

2     read the foregoing transcript of my deposition testimony

3     taken on Tuesday, May 23, 2017, at Los Angeles,

4     California, and that, with the following exceptions

5     which I have hand-marked on the transcript, the same is

6     a true record of the testimony given by me at that

7     deposition:

8

9     Page/Line      Should read           Reason for change:

10    _____      _____  _____

11    _____      _____  _____

12    _____      _____  _____

13    _____      _____  _____

14    _____      _____  _____

15    _____      _____  _____

16    _____      _____  _____

17    _____      _____  _____

18    _____      _____  _____

19    _____      _____  _____

20    _____      _____  _____

21    _____      _____  _____

22

23

      _____        _____
24    Date                     JAY J. SHAPIRO

25

1  STATE OF CALIFORNIA     )

2                          )
   COUNTY OF LOS ANGELES  )

3

4          I, Ingrid Suárez Egnatuk, CSR No. 3098, a

5  Certified Shorthand Reporter in and for the State of

6  California, do hereby certify that the foregoing

7  Confidential Deposition Testimony of JAY J. SHAPIRO was

8  taken before me at the time and place therein set forth,

9  at which time the witness was put under oath by me; that

10 the testimony of the witness and all objections made at

11 the time of the examination were recorded

12 stenographically by me and were thereafter transcribed

13 with computer-aided transcription; that the foregoing is

14 a full, complete, and true record of said proceedings.

15         I certify that a request has been made by, or

16 on behalf of, the witness to review, correct and sign

17 the transcript of these proceedings.

18         I further certify that I am neither counsel for

19 nor related to any party to said action, nor in anywise

20 interested in the outcome thereof.

21         In witness whereof, I have subscribed my name

22 this 1st day of June, 2017.

23

24         _____
                   Ingrid Suarez Egnatuk
25                 Certified Shorthand Reporter
                         No. 3098

| From: | Andrea Garber |
|---|---|
| To: | Milinovic, Bernadette; Phillips, Wanda M. |
| Cc: | Deborah Kizner |
| Subject: | "Dig" Season 1 Application/Declaration |
| Date: | Wednesday, December 11, 2013 6:35:00 PM |
| Attachments: | Declaration Form DIG S1.doc |
| | image001.png |
| | image002.png |

Hi, Bernadette and Wanda –

Attached is the application/declaration for Season 1 of a new straight-to-series production entitled "Dig". This is the production that I briefly discussed with Wanda and Peter the week before last that is shooting in Israel. It has now been officially greenlit.

In addition to the information that is provided on the form, I have the following further details. While in Israel, the production will be based in Tel Aviv and the majority of filming will be done in that city. Of the total 70 day shoot, approximately 20 days will involve shooting only on the west side of Jerusalem. These will not be 20 continuous days but will follow the needs of each episode. The work in Jerusalem will be mostly exterior shooting and will involve public streets and areas that will look like archaeological dig sites. The NBCU Security team is already involved in the prepping of this project and they are meeting weekly with the production folks that are currently on board to discuss precautions and procedures that need to be taken as the project develops. These discussions include people from the production services company, Keshet. I have been advised that the mayor of Jerusalem and the local police have been contacted and are assisting in assuring the safety of the production company when they are working in Jerusalem.

The work in Toronto, Canada will be done at the beginning of March, 2014, prior to the start of principal photography in Israel. They think the location will be Toronto at this time but it could change to another snowy location. It only involves approximately one week of shooting.

Although the current order is 6 episodes, there is a possibility for the season to be extended to 13 episodes. The first episode of the season order will serve as the pilot episode. Casting has just begun and I have not been advised of any committed cast yet.

Please let me know if you need any further information. We would like to avoid any deviation from our standard policy terms if possible. Since the project is in the early stages of pre-production now, we will need coverage under the current policy. The majority of exposure will fall into the policy term starting 1/1/2014. Please confirm coverage at your earliest opportunity.

Thanks and Regards,
- Andrea

**Andrea Garber | Account Executive**
**Aon/Albert G. Ruben Insurance Services, Inc.**
15303 Ventura Blvd., Suite 1200
Sherman Oaks, CA  91403-5817
CA License:  0806034
Tel: +1 818.777.5179 | Mobile: +1 818.399.0358 | Fax: +1 847.953.2846



Shapiro Exhibit 5

5-23-17

CONFIDENTIAL

Email: andrea.garber@aon.com | http://www.aonagr.com



This email message, including any attachment(s), is intended only for the named recipient(s) and may contain confidential, proprietary or legally
privileged information. Unauthorized individuals or entities are not permitted access to this information. Any dissemination, distribution, disclosure,
or copying of this information is unauthorized and strictly prohibited. If you have received this message in error, please advise the sender by reply
email, and delete this message and any attachments.

CONFIDENTIAL

AONNBCU0001749

**Aon**

*Aon/Albert G. Ruben Company*
*48 West 25th Street*
*New York, New York 10010*

## TELEVISION INSURANCE APPLICATION

1.  **NAME OF PRODUCTION COMPANY**:  NBCU-TV

2.  **Address, City, State, Zip Code**:  100 Universal City Plaza, Universal City, CA  91608

3.  **Network Contact Name, Phone, E-mail, Fax #**:  Kurt Ford, 818-777-8106, Kurt.Ford@nbcuni.com

4.  **TITLE OF PRODUCTION**:  "Dig" Season 1

5.  **Production is**:

| | | |
|---|---|---|
| Television Pilot | ½ Hour / 1 Hour / Other | |
| Television Special | ½ Hour / 1 Hour / Other | |
| Television Series | ½ Hour / 1 Hour / Other | Number of Episodes: 6 |
| Movie of the Week | | |
| Special or Talk Show | ½ Hour / 1 Hour / Other | Number of Episodes: |
| Other | | |

6.  **TOTAL INSURABLE PRODUCTION COST: (all costs directly chargeable to an insured production)**
    $25,000,000 estimated for entire 6 episode order

7.  **TOTAL NET INSURABLE COST: (Item "6" above less script & writers fees; residual and royalty payments)**
    $20,000,000 estimated for entire 6 episode order

8.  Pre-Production:  12/17/13   Start Date of principal photography:   5/26/14   Wrap/End Date  9/15/14

    Post Production Period:_____   Delivery Date: _____   Air Date: _____   Hiatus Period 12/24/13 – 1/6/14

9.  **Synopsis of Program**:  The program tells the story of an American FBI agent named Peter who is stationed in Jerusalem. While investigating a murder, he uncovers a conspiracy linked to the history of Jerusalem and finds himself falling down an archaeological rabbit hole.

10. Filming Location(s) / Studio:  Tel Aviv and West Jerusalem in Israel and Toronto, Canada.  Production service company  Keshet will be used in Israel

11. Describe any and all stunts: _____

11. **Name of Artist to be insured for cast insurance including Disgrace and Violent Death**

| | | | |
|---|---|---|---|
| 1. | TBD | 7. | |
| 2. | | 8. | |
| 3. | | 9. | |
| 4. | | 10 | |
| 5. | | 11. | |
| 6. | | 12. | |

**eFAX or E-Mail FORM PRIOR TO START DATE OF PRODUCTION TO:**

**Page 1**

AONNBCU0001750

| | |
|---|---|
| **From:** | John Gaskin <gaskin.john@gmail.com> |
| **Sent:** | March 12, 2014 12:19 PM |
| **To:** | Richmond, Randi (NBCUniversal);'Mark Winemaker ';'Ryan Greig' |
| **Cc:** | Markus, BJ (NBCUniversal) |
| **Subject:** | RE: DIG - Budgets as at 03-11-2014 |
| **Attachments:** | DIG Amort-031114.pdf |

**From:** Richmond, Randi (NBCUniversal) [mailto:Randi.Richmond@nbcuni.com]
**Sent:** March-12-14 2:52 PM
**To:** 'John Gaskin'; Mark Winemaker ; Ryan Greig
**Cc:** Markus, BJ (NBCUniversal)
**Subject:** RE: DIG - Budgets as at 03-11-2014

I don't see the amort budget...

**From:** John Gaskin [mailto:gaskin.john@gmail.com]
**Sent:** Tuesday, March 11, 2014 10:24 AM
**To:** Mark Winemaker ; Ryan Greig
**Cc:** Richmond, Randi (NBCUniversal); Markus, BJ (NBCUniversal)
**Subject:** DIG - Budgets as at 03-11-2014

Here are the Dig budgets as of 03-11-2014.

An overview looks like this:

|  |  |  |  |
|---|---|---|---|
| | | Pilot | 7,594,906.00 |
| Pattern | 3,507,085.00 | | |
| | x 5 | | 17,535,425.00 |
| | Gross | | 25,130,331.00 |
| | IS Tax Cr | - | 3,100,000.00 |
| | CN Tax Cr | - | 350,000.00 |
| | Reduce 1 day IS,for Snow Shoot | - | 95,000.00 |
| | Rough "Net" Estimate | | 21,680,331.00 |
| | | | |
| | Amort | | 5,512,962.00 |
| | Snow Shoot (In Pilot) | | 1,502,177.00 |

Shapiro Exhibit 6

5-23-17

**DIG Amort**

| ACCT | DESCRIPTION | Feb 11/14 Amort | Mar 11/14 Amort | Incr / (Decr) | March 11, 2014 EXPLANATIONS |
|------|-------------|-----------------|-----------------|---------------|------------------------------|
| 600 | PRODUCER | 160,796 | 169,568 | $ 8,772 | Increase Liat's fee; Extend weeks Jason Augistine |
| 610 | STORY | 73,621 | 81,249 | $ 7,628 | Increase wks on M.Shorer;  Increase Wrtr Meal Money |
| 620 | DIRECTOR | 31,999 | 23,038 | $ (8,961) | Drop Director "Intervening Days" |
| 630 | CAST | 7,500 | 7,500 | $ - | |
| 640 | CAST OTHERS | 3,341 | 3,341 | $ - | |
| 660 | STUNTS | 37,188 | 34,788 | $ (2,400) | Reduce Holidays from 5 days to 3 days |
| 670 | CASTING & OTHER | 47,880 | 37,100 | $ (10,780) | Correct subtotaling error of $10,780 |
| 680 | ATL TRVL/LIVING | 729,970 | 725,650 | $ (4,320) | Decrease # of EP Htl Days $20K; Increase Other ATL Living |
| 685 | TEST | 7,500 | 7,500 | $ - | |
| 690 | ATL FRINGES | 37,482 | 35,524 | $ (1,958) | Per above |
| | **Total Above-the-Line** | **1,137,277** | **1,125,258** | **$ (12,019)** | |
| 700 | EXTRA TALENT | | | $ - | |
| 705 | PRODUCTION STAFF | 535,163 | 528,525 | $ (6,638) | Reduce Holidays from 5 days to 3 days |
| 710 | CAMERA | 193,813 | 191,873 | $ (1,940) | Reduce Holidays from 5 days to 3 days |
| 715 | ART DIRECTION | 153,527 | 156,511 | $ 2,984 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 720 | SET CONSTRUCTION | 620,060 | 620,060 | $ - | |
| 721 | SET STRIKE | 170,080 | 170,080 | $ - | |
| 725 | GRIP/SET OPERATIONS | 74,710 | 76,965 | $ 2,255 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 730 | ELECTRICAL | 86,183 | 91,742 | $ 5,559 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day), Esp. Riggers |
| 735 | SPECIAL EFFECTS | 31,842 | 31,842 | $ - | |
| 740 | SECOND UNIT | 0 | 0 | $ - | |
| 745 | SET DRESSING | 179,000 | 181,637 | $ 2,637 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 750 | PROPERTY | 70,292 | 71,475 | $ 1,183 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 755 | WARDROBE | 191,104 | 192,169 | $ 1,065 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 760 | MAKE - UP & HAIR | 22,910 | 23,754 | $ 844 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 765 | PRODUCTION SOUND | 6,974 | 7,115 | $ 141 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 770 | TRANSPORTATION | 204,381 | 204,985 | $ 604 | Increase Pay Hrs from 11 to 11.5Hrs (Basic Day) |
| 775 | LOCATION EXPENSES | 818,206 | 827,632 | $ 9,426 | Moved a/c#775-23 from Pilot/Series to Amort (Locn Off Furn/Xerox/Maint) |
| 780 | SPECIAL PHOTOGRAPHY | 0 | 0 | $ - | |
| 795 | FRINGES | 185,197 | 180,013 | $ (5,184) | Primarily reducing # of holidays on US Hires |
| 796 | STUDIO STAGE | 346,508 | 355,208 | $ 8,700 | Actualize office rentals |
| 799 | PRODUCTION DAILIES | 0 | 0 | $ - | |
| | **Total Production** | **3,889,950** | **3,911,586** | **$ 21,636** | |
| 801 | EDITING | 75,589 | 74,017 | $ (1,572) | Reduce Holidays from 5 days to 3 days |
| 802 | MUSIC | 15,000 | 15,000 | $ - | |
| 803 | POST PROD SOUND | 0 | 0 | $ - | |
| 804 | STOCK SHOTS | 0 | 0 | $ - | |
| 805 | TITLES | 35,000 | 35,000 | $ - | |
| 806 | OPTICALS | 0 | 0 | $ - | |
| 807 | IMAGE MASTERING | 0 | 0 | $ - | |
| 808 | COMPLETION DELIVERAB | 0 | 0 | $ - | |
| | **Total Post Production** | **125,589** | **124,017** | **$ (1,572)** | |
| 910 | ADMINISTRATIVE | 352,374 | 352,101 | $ (273) | |
| 920 | PUBLICITY | 0 | 0 | $ - | |
| 940 | AMORT | 0 | 0 | $ - | |
| 981 | RESIDUALS | 0 | 0 | $ - | |
| 982 | AGENCY PACKAGE FEE | 0 | 0 | $ - | |
| 985 | COST RECOUPMENT | 0 | 0 | $ - | |
| | **Total Other** | **352,374** | **352,101** | **$ (273)** | |
| | **Grand Total** | **5,505,190** | **5,512,962** | **$ 7,772** | |

DIG Amort - BudgetComparison-0311143/11/14

CONFIDENTIAL

UCP004972