**EXHIBIT 4**

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                    WESTERN DIVISION
 4    _____
                                     )
 5    UNIVERSAL CABLE PRODUCTIONS    )
      LLC, a Delaware limited        )
 6    liability company; and         )
      NORTHERN ENTERTAINMENT         )
 7    PRODUCTIONS LLC, a Delaware    )
      limited liability company,     )
 8                                   )
              Plaintiffs,            )
 9                                   )
         vs.                         )Case No.
10                                   )2:16-cv-04435-PA-MRW
      ATLANTIC SPECIALTY INSURANCE   )
11    COMPANY, a New York insurance  )
      company,                       )
12                                   )
              Defendant.             )
13    _____)
      _____
14
15              C O N F I D E N T I A L
16    VIDEOTAPED DEPOSITION OF BARBARA-ANN MARKUS-CAFFREY
17               Los Angeles, California
18               Tuesday, May 23, 2017
19                    Volume I
20
21    Reported by:
      LORI SCINTA, RPR
22    CSR No. 4811
23
24
25    Job No. CS2618589
```

CONFIDENTIAL

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                     WESTERN DIVISION
 4   _____
                                    )
 5   UNIVERSAL CABLE PRODUCTIONS    )
     LLC, a Delaware limited        )
 6   liability company; and         )
     NORTHERN ENTERTAINMENT         )
 7   PRODUCTIONS LLC, a Delaware    )
     limited liability company,     )
 8                                  )
            Plaintiffs,             )
 9                                  )
        vs.                         ) Case No.
10                                  ) 2:16-cv-04435-PA-MRW
     ATLANTIC SPECIALTY INSURANCE   )
11   COMPANY, a New York insurance  )
     company,                       )
12                                  )
            Defendant.              )
13   _____ )
     _____
14
15              C O N F I D E N T I A L
16         Videotaped deposition of BARBARA-ANN
17   MARKUS-CAFFREY, Volume I, taken on behalf of
18   Defendant, at 11377 West Olympic Boulevard,
19   Suite 600, Los Angeles, California, beginning at
20   10:01 A.M. and ending at 1:01 P.M. on Tuesday,
21   May 23, 2017, before LORI SCINTA, RPR, Certified
22   Shorthand Reporter No. 4811.
23
24
25
```

```
 1   APPEARANCES:

 2

 3   For Plaintiffs:

 4        MITCHELL SILBERBERG & KNUPP LLP

 5        BY:  DANIEL HAYES

 6        Attorney at Law

 7        11377 West Olympic Boulevard

 8        6th Floor

 9        Los Angeles, California 90064

10        310.312.3250

11        Email:  dmh@msk.com

12

13   For Defendant:

14        STRASBURGER & PRICE, LLP

15        BY:  JOHN R. RIDDLE

16        Attorney at Law

17        901 Main Street

18        Suite 6000

19        Dallas, Texas 75202-3794

20        214.651.4672

21        Email:  john.riddle@strasburger.com

22

23

24

25
```

CONFIDENTIAL

Page 4

1  APPEARANCES (Continued):
2
3  Also Present:
4       AVI BRAZ, Senior Litigation Counsel,
5       NBCUniversal Television Group
6
7  Videographer:
8       STEVEN TOGAMI
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 5

```
 1                        INDEX
 2   WITNESS                                   EXAMINATION
 3   BARBARA-ANN MARKUS-CAFFREY
 4   Volume I
 5
 6                   BY MR. RIDDLE                     8
 7
 8                       EXHIBITS
 9
10   NUMBER              DESCRIPTION              PAGE
11   Exhibit 342   Collection of documents re      95
12                 budgets, UCP005411 to 5506
13
14   Exhibit 343   Email chain, UCP009963 to 965   108
15
16   Exhibit 344   Two-page document, the first    109
17                 page entitled, "DIG - New
18                 Mexico Season 1 - First 5
19                 episodes," UCP018226 to 227
20
21
22
23
24
25
```

CONFIDENTIAL

Page 6

INDEX (Continued):

PREVIOUSLY MARKED EXHIBITS

| NUMBER | PAGE |
|---|---|
| Exhibit 38 | 43 |
| Exhibit 258 | 74 |
| Exhibit 314 | 48 |

INFORMATION REQUESTED

(None)

REFERENCE REQUESTED

(None)

INSTRUCTION NOT TO ANSWER

| Page | Line |
|---|---|
| 74 | 3 |
| 94 | 19 |
| 118 | 13 |
| 118 | 23 |
| 119 | 21 |

CONFIDENTIAL

Page 81

```
 1   and have subcategories that added up to the total
 2   number?
 3           MR. HAYES:  Objection.  Vague, lacks
 4   foundation, doc- -- document speaks for itself.
 5           THE WITNESS:  Yes.
 6   BY MR. RIDDLE:
 7       Q   Okay.  And did you use any of the
 8   categories that Mr. Wunderlich used in his report?
 9           MR. HAYES:  Objection.  Vague, lacks
10   foundation, the document speaks for itself.
11           THE WITNESS:  Some of them, yes.
12   BY MR. RIDDLE:
13       Q   Were there tax credits that were received
14   in connection with the shooting in Israel?
15           MR. HAYES:  Objection.  Vague, lacks
16   foundation.
17           THE WITNESS:  Yes.
18   BY MR. RIDDLE:
19       Q   If the production had remained in Israel,
20   would those tax credits have been larger than the
21   amount that -- that was received?
22           MR. HAYES:  Objection.  Vague, lacks
23   foundation, calls for speculation.
24           THE WITNESS:  Yes.
25   BY MR. RIDDLE:
```

CONFIDENTIAL

Page 82

```
 1         Q    Were there tax credits received for the
 2   filming in New Mexico?
 3              MR. HAYES:  Objection.  Vague, lacks
 4   foundation.
 5              THE WITNESS:  Yes.
 6   BY MR. RIDDLE:
 7         Q    Were there tax credits received for the
 8   filming in Croatia?
 9              MR. HAYES:  Same objections.
10              THE WITNESS:  Yes.
11   BY MR. RIDDLE:
12         Q    Did you ever do a comparison of the tax
13   credits that -- that you believed would have been
14   received for Episodes 2 through 6 had the shooting
15   remained in Israel versus the tax credits that were
16   received for the filming in New Mexico and Croatia?
17              MR. HAYES:  Objection.  Vague, lacks
18   foundation.
19              THE WITNESS:  No.
20   BY MR. RIDDLE:
21         Q    Is -- is there a reason why you did not do
22   that?
23              MR. HAYES:  Objection -- go ahead.
24              Vague, lacks foundation.
25              THE WITNESS:  Since we didn't shoot in
```

1    Israel Episodes 2 through 6, I wouldn't have a way
2    to ascertain what the tax credit value would be.
3    BY MR. RIDDLE:
4        Q    How was the tax credit value determined for
5    the pilot that was shot there?
6            MR. HAYES:  Objection.  Vague, lacks
7    foundation --
8    BY MR. RIDDLE:
9        Q    What was it based on?
10           MR. HAYES:  -- calls for speculation.
11           THE WITNESS:  The actual spend in Israel.
12   BY MR. RIDDLE:
13       Q    Was there a budget that projected the cost
14   of shooting episodes -- or producing Episodes 2
15   through 6 in Israel?
16           MR. HAYES:  Objection.  Vague, lacks
17   foundation.
18           THE WITNESS:  Yes.
19   BY MR. RIDDLE:
20       Q    Did you ever take that estimate in that
21   budget and determine that if that had been the
22   actual numbers, what the tax credit would have been
23   from Israel for being able to complete the shooting
24   there for those episodes?
25           MR. HAYES:  Objection.  Vague, lacks

CONFIDENTIAL

Page 84

1  foundation.
2          THE WITNESS:  At the time we would have
3  initially budgeted Israel, an initial tax credit
4  estimate would have been prepared.
5  BY MR. RIDDLE:
6      Q   And would it have been one for the pilot
7  and the other five episodes after the pilot?
8          MR. HAYES:  Objection.  Vague, lacks
9  foundation.
10         THE WITNESS:  Yes.
11 BY MR. RIDDLE:
12     Q   So if we take the number that was in fact
13 paid for the pilot and compare it to that budgeted
14 number for the tax credit for shooting all six
15 episodes in Israel, that would give us the -- an
16 estimate of -- an estimate of the additional tax
17 credit for shooting the Episodes 2 through 6 in
18 Israel, correct?
19         MR. HAYES:  Objection.  Vague, lacks
20 foundation.
21         THE WITNESS:  I need you to ask that
22 question --
23 BY MR. RIDDLE:
24     Q   Sure.
25     A   -- more specifically.

CONFIDENTIAL

Page 85

```
1      Q   Okay.  In other words, you're saying that
2  there was a -- there's a budgeted amount -- and I
3  think there's a document we'll come to with it --
4  but there was a -- an estimate for the tax credit
5  that potentially would be earned if -- if the
6  shooting had -- in Israel had included the pilot
7  plus Episodes 2 through 6, correct?
8          MR. HAYES:  Objection.  Vague, lacks
9  foundation.
10         If there's a document that would assist the
11 witness in understanding this question, I ask that
12 you show it to her.
13         THE WITNESS:  Do you have a document?  Do
14 you have the document?
15 BY MR. RIDDLE:
16     Q   That's not my question.
17         The question is --
18         MR. HAYES:  That's my question.  Is there a
19 document that would clear up the ambigu- --
20         MR. RIDDLE:  The -- the --
21         MR. HAYES:  Hold on.  Hold on.  Hold on.
22         Is there a document that would clear up the
23 ambiguity embedded in these questions that would
24 help the witness understand what you're asking so
25 that she could give you an answer to your question?
```

1  BY MR. RIDDLE:
2      Q   The -- there was a -- are you saying there
3  was a budget prepared prior to the production that
4  had estimates of the tax credits for the shooting in
5  Israel?
6          MR. HAYES:  Objection.  Vague, lacks
7  foundation.
8          THE WITNESS:  Yes.
9  BY MR. RIDDLE:
10     Q   Okay.  And we know the -- we know the -- we
11 -- you -- you know the -- you don't -- I'm not
12 saying you know it here today, but somewhere there's
13 records showing the actual tax credit that was paid
14 for the shooting of the pilot in Israel, correct?
15         MR. HAYES:  Objection.  Vague, lacks
16 foundation.
17         THE WITNESS:  Yes.
18 BY MR. RIDDLE:
19     Q   Okay.  Did you go to any of the locations
20 during production?
21         MR. HAYES:  Objection.  Vague, lacks
22 foundation.
23         THE WITNESS:  Yes.
24 BY MR. RIDDLE:
25     Q   Which ones?

Page 100

1      Q    Okay.  And this was back when it was
2   planned that the pilot and those episodes would all
3   be shot in Israel, correct?
4           MR. HAYES:  Objection.  Vague, lacks
5   foundation.
6           THE WITNESS:  Yes.
7   BY MR. RIDDLE:
8      Q    Okay.  So you sent -- you emailed this but
9   you did not prepare this second page, correct?
10     A    Correct.
11     Q    Okay.  Can you -- if you would look through
12  the rest of the documents and see if those
13  correspond to the attachments that are listed in
14  your email.
15     A    I don't see the amort budget here.
16     Q    Okay.  Is the pattern budget there?
17     A    Yes.
18     Q    It's near the front of the stack; is that
19  correct?
20          MR. HAYES:  Objection.  Vague, lacks
21  foundation.
22          THE WITNESS:  Yes.
23  BY MR. RIDDLE:
24     Q    Okay.  And is the pilot budget in the
25  stack?

CONFIDENTIAL

Page 101

```
 1        A    Yes.
 2        Q    Okay.  If you look at the third page of
 3   that document, do you have an understanding as to
 4   what that is?
 5             MR. HAYES:  Objection.  Vague, lacks
 6   foundation.
 7             THE WITNESS:  Yes.
 8   BY MR. RIDDLE:
 9        Q    And what is your understanding?
10             MR. HAYES:  Same objections.
11             THE WITNESS:  This document is an overview
12   of what the studio anticipated to spend on Season 1.
13   BY MR. RIDDLE:
14        Q    In Israel?
15        A    Correct.
16        Q    Okay.  And that's -- again, that's just for
17   the pilot and Episodes 2 through 6, correct?
18        A    Yes.
19        Q    Okay.  And then if we look at "Gross
20   Pattern Budget," it indicates -- it's got a list or
21   a numerical listing of $3,541,498 times five with a
22   total of $17,707,490, correct?
23        A    Yes.
24        Q    And that was the locked budget for Episodes
25   2 through 6 in Israel, correct?
```

```
 1              MR. HAYES:  Objection.  Vague, lacks
 2   foundation.
 3              THE WITNESS:  Yes.
 4   BY MR. RIDDLE:
 5       Q    Okay.  And you see under there it's got tax
 6   credit listed of 3,643,813?
 7       A    Yes.
 8       Q    Is that an estimate of the tax credit that
 9   was expected if all this -- if all these episodes,
10   including the pilot, had been filmed in Israel?
11              MR. HAYES:  Objection.  Vague, lacks
12   foundation.
13              THE WITNESS:  Yes.
14   BY MR. RIDDLE:
15       Q    Okay.  Did you have any -- did you come up
16   with that tax credit number or did somebody else?
17              MR. HAYES:  Objection.  Vague, lacks
18   foundation.
19              THE WITNESS:  As I recall, the accountant
20   in Israel would have come up with that estimate and
21   I would have reviewed her work.
22   BY MR. RIDDLE:
23       Q    Okay.  And farther on down it's -- it looks
24   like it says, "6.5 episodes," and then underneath it
25   it says, "Gross Pattern Budget."
```

```
 1              Do you see that?
 2         A    I do.
 3         Q    In fact, actually up -- farther up, it's
 4   got that 6.5 episodes listed -- or stated, too,
 5   correct?
 6              MR. HAYES:  Objection.  Vague, lacks
 7    foundation.
 8              THE WITNESS:  Yes.
 9   BY MR. RIDDLE:
10         Q    Okay.  And if we look down at the --
11   basically, it's not the bottom of the page but it's
12   near the bottom of what's printed on the page,
13   there's a statement, "6.5 episodes breaks down to
14   one 90-minute pilot and five one-hour episodes,"
15   correct?
16              MR. HAYES:  Objection.  The document speaks
17    for itself.
18              THE WITNESS:  Correct.
19   BY MR. RIDDLE:
20         Q    Okay.  So that's what the 6.5 episodes is
21   referring to, the pilot and the five subsequent
22   episodes, correct?
23         A    Correct.
24         Q    All right.
25              (Discussion off the record.)
```

```
 1    BY MR. RIDDLE:
 2        Q    Well, if we look at tax credit, the
 3    reason -- of course that's a negative number as it's
 4    reflected here, correct?
 5             MR. HAYES:  Objection.  Vague, lacks
 6    foundation.
 7             THE WITNESS:  Correct.
 8    BY MR. RIDDLE:
 9        Q    Okay.  Which would lower the overall
10    budgeted amount, correct?
11             MR. HAYES:  Objection.  Vague, lacks
12    foundation.
13             THE WITNESS:  No.
14    BY MR. RIDDLE:
15        Q    No?  Why not?
16        A    The budget's the budget.
17        Q    And this is just a potential offset against
18    that number, correct?
19             MR. HAYES:  Objection.  Vague, lacks
20    foundation.
21             THE WITNESS:  Correct.
22    BY MR. RIDDLE:
23        Q    Okay.  And this shows a -- a gross pattern
24    budget for the -- for Episodes 2 through 5 of
25    $17,707,490.
```