KALPANA SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
AMANDA K. BONN (270891)
abonn@susmangodfrey.com
CATRIONA LAVERY (310546)
clavery@susmangodfrey.com
CHELSEA SAMUELS (315257)
csamuels@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150

JACOB W. BUCHDAHL (*pro hac vice*)
jbuchdahl@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel: (212) 336-8330
Fax: (212) 336-8340

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC and NORTHERN ENTERTAINMENT PRODUCTIONS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY,<br><br>Defendant. | Case No.: 2:16-cv-4435-PA-MRW<br><br>The Honorable Percy Anderson<br>Dept. 9A<br><br>**REVISED DISPUTED JURY INSTRUCTION NO. 3**<br><br>Trial Date: February 18, 2020 |

Per this Court's Order, Dkt. 251, Plaintiffs Universal Cable Productions LLC and Northern Entertainment Productions LLC ("Universal" or "Plaintiffs") together with Defendant Atlantic Specialty Insurance Company ("Atlantic" or "Defendant") submit the following revised disputed jury instruction regarding judicial notice.

015825\7125662

# PLAINTIFFS' PROPOSED INSTRUCTION NO. 3
# JUDICIAL NOTICE

The court has decided to accept as proved the following facts. You must accept these facts as true.

**The *Dig* Claim.**

1. In June 2014, Plaintiffs began filming the television show *Dig* in Israel. [*Universal Cable Prods. v. Atlantic Specialty Ins. Co.*, 929 F.3d 1046, 1146-47 (9th Cir. 2019)]

2. Plaintiffs finished filming the pilot episode on June 26, 2014, and were on a scheduled "hiatus" until July 19, 2014.

3. In late June or early July 2014, Hamas began firing rockets from Gaza toward Israeli civilian populations, significantly increasing the number of attacks around July 8. [*Id.* at 1150]

4. On July 8, the U.S. State Department issued a warning regarding the "safety and security of civilians" in Israel, specifically in Jerusalem.

5. *Dig* was scheduled to film in Jerusalem over the next few weeks. [*Id.*]

6. On July 10, 2014, Plaintiffs' security team advised that "current rocket attacks" appeared "to target locations to be used in forthcoming filming" and it was concerned about "acts of terrorism within Israel." [*Id.*]

7. As a result, Plaintiffs' security team advised that they could no longer "guarantee the safety and security of our employees, production partners and associated crew and talent." [*Id.*]

8. On July 11, 2014, Plaintiffs decided to postpone production for a week and informed their insurance carrier, Atlantic. [*Id.*]

9. On July 15, 2014, Plaintiffs' insurance broker notified Atlantic in writing of Plaintiffs' claim, which I will refer to as the "claim." [*Id.*]

10. Plaintiffs decided to move the *Dig* production out of Israel on July 16, 2014, and notified Atlantic of that decision on July 17, 2014. [*Id.*]

015825\7125662

11. Plaintiffs completed filming *Dig* in New Mexico and Croatia.

**Atlantic's Denial of the *Dig* Claim.**

12. Plaintiffs sought coverage of the claim from Atlantic under their television production insurance policy, which I will call the Policy. [*Id.* at 1146-47, 1150]

13. The Policy covered losses due to "[i]mminent peril, defined as certain, immediate and impending danger of such probability and severity to persons or property that it would be unreasonable or unconscionable to ignore." [*Id.* at 1149]

14. Plaintiffs' loss was caused by "imminent peril." [*Id.* at 1151]

15. The Policy covered loss caused by the imminent peril of terrorism if that loss was not otherwise excluded. [*Id.* at 1149]

16. The Policy contained the following four war exclusions, which I will refer to as Exclusions 1 through 4:

 1. War, including undeclared or civil war; or
 2. Warlike action by a military force, including action in hindering or defending against an actual or expectd attack, by any government, sovereign, or other authority using military personnel or other agents; or
 3. Insurrection, rebellion, revolution, usurped power, or action taken by the governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event contributed concurrently or in any sequence ot the loss.
 4. Any weapon of war including atomic fission or radioactive force, whether in time of peace or war . . . . [*Id.* at 1149]

17. On July 17, 2014, Atlantic denied coverage of Plaintiffs' claim based on the Policy's Exclusion 1 for "war" and Exclusion 2 for "warlike action

4

by a military force." [*Id.* at 1150-51] Atlantic breached the Policy in doing so. [*Id.* at 1153]

**The Special Meaning of Exclusions 1 and 2**

18. Under California law, the terms in an insurance policy are understood in their ordinary and popular sense unless a special meaning is given to them by usage, in which the latter must be followed. [*Id.*]

19. In the insurance context, Exclusion 1 for "war" has a special meaning that requires hostilities between de jure or de facto sovereigns. [*Id.* at 1154-55]

20. In the insurance context, Exclusion 2 for "warlike action by a military force . . . by any government, sovereign, or other authority" has a special meaning requiring (1) operations of such general kind or character as belligerents have recourse to in war and (2) that such operations be carried out by the military forces of a de jure or de facto sovereign. [*Id.* at 1160]

21. By de jure or de facto sovereign, I mean the recognized government of a nation. [*Id.*]

22. Therefore, both Exclusion 1 for "war" and Exclusion 2 for "warlike action by a military force" require hostilities between recognized governments of nations. [*Id.* at 1147]

**Hamas's Rocket Fire Into Israel Caused Plaintiffs' Loss**

23. The cause of a loss under the Policy is the predominant, or most important cause of a loss. [*Id.* at 1161]

24. Plaintiffs' decision to postpone and relocate production was a result of Hamas firing rockets into Israel (where filming was occurring), and not a result of Israel's retaliatory conduct. [*Id.*]

25. Even if Israel countered Hamas's attacks, Israel's actions were not the cause of Plaintiffs' losses, [*Id.*]

5

26. Israel's conduct did not trigger Exclusions 1 and 2. [*Id.*]

27. Instead, the cause for the postponement and relocation was Hamas' rocket fire from Gaza into Israel. [*Id.*]

**Hamas Is Not a De Jure or De Facto Sovereign**

28. Hamas is neither a de jure nor a de facto sovereign, meaning it is not the recognized government of a nation. [*Id.* at 1147-48, 1157-59]

29. The United States has never recognized Palestine or Gaza as sovereign nations, nor has it ever recognized Hamas as the government of a nation. [*Id.* at 1158-59]

30. Hamas was founded in 1987. [*Id.* at 1148]

31. Hamas is committed "to the destruction of Israel and the establishment of an Islamic State in all of historic Palestine, comprised of present-day Israel, the West Bank, and Gaza." [*Id.*]

32. The Palestinian Authority has exercised limited rule in Gaza and parts of the West Bank since the mid-1990s. In a 2006 election, Hamas won a majority of seats in the Palestinian Authority's legislature. However, as of June 2014, Hamas ceded any governing functions in Gaza and Hamas's members no longer served as government ministers. [*Id.*]

33. Since 1997, the United States has designated Hamas as a Foreign Terrorist Organization and does not negotiate or enter into treaties with Hamas. [*Id.*]

34. The Constitution commits to the executive branch alone the authority to recognize, and to withdraw recognition from, foreign regimes. [*Id.* at 1159]

35. The executive branch refused to recognize Hamas as a de jure or de facto sovereign—meaning the government of a nation. [*Id.* at 1158-59]

**Atlantic Breached the Policy by Denying Coverage of Plaintiffs' *Dig* Claim**

015825\7125662

36. Plaintiffs were entitled to coverage of the *Dig* claim under the Policy. [Dkt. 157 at 3]
37. Because Hamas was not a de jure or de facto sovereign—meaning the recognized government of a nation—its conduct cannot be defined as "war" under Exclusion 1 or "warlike action by a military force" under Exclusion 2. [*Universal Cable Prods.*, 929 F.3d at 1157-61]
38. Atlantic breached the Policy when it denied coverage by defining Hamas' conduct as "war" under Exclusion 1 or "warlike action by a military force" under Exclusion 2. [*Id.* at 1153]
39. Exclusions 3 and 4 also do not exclude coverage for Plaintiffs' claim. [Dkt. 157 at 3]
40. For insurance purposes, Exclusion 3 applies to (1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers. [*Id.* at 1-2]
41. The purpose of Hamas's attacks in July 2014 was not to unseat the Prime Minister of Israel or to take over the Israeli government, but rather to (1) retaliate for the Israeli allegations that Hamas was responsible for the kidnapping an dmurder of three Israeli teens earlier in the summer, and (2) terrorize, injure, and kill Israel's civilian population. [*Id.* at 2]
42. Exclusion 4 applies to "[a]ny weapon of war including atomic fission or radioactive force . . . ." [*Id.*]
43. Hamas used weapons of terror, not weapons of war including atomic fission or radioactive force. [*Id.*]
44. Atlantic's denial of coverage of the *Dig* claim breached the Policy. [*Id.* at 3; *Universal Cable Prods.*, 929 F.3d at 1153]

7

015825\7125662

| | |
|---|---|
| 1 | <u>Source:</u> 9TH CIR. CIVIL JURY INSTR. 2.3; *Universal Cable Prods. v.* |
| 2 | *Atlantic Specialty Ins. Co.*, 929 F.3d 1046 (9th Cir. 2019); Minute Order, Dkt. 157, |
| 3 | November 30, 2019. |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

015825\7125662

## DEFENDANT'S OBJECTIONS TO
## PLAINTIFFS' PROPOSED INSTRUCTION NO. 3

This instruction constitutes an improper comment on the weight of the evidence. The discussion of much of the issues is an improper comment on the weight of the evidence as it relates to the breach of contract claim or bad faith claim.

015825\7125662

## PLAINTIFFS' RESPONSE TO DEFENDANT'S OBJECTIONS

This instruction—which instructs the jury on facts determined by the Ninth Circuit and by this Court upon remand as a matter of law—is necessary in order to (1) permit the jury to determine whether the facts found by the Ninth Circuit and this Court also show bad faith and (2) prevent Atlantic from improperly confusing the jury and relitigating liability issues that have been decided as a matter of law. The Ninth Circuit's findings are law of the case and therefore the proper subject of judicial notice (as opposed to mere "commentary" on the evidence).[1]

Liability as to Atlantic's decision to deny coverage already has been determined in favor of both plaintiffs (Dkt. 157), and accordingly the only remaining issues are the amount of damages and whether Atlantic engaged in bad faith conduct warranting the award of punitive damages. As this Court has held, "the issues of damages and Atlantic's bad faith are ready for trial." Dkt. 157. Atlantic's attempts to re-raise liability issues should be rejected.

---

[1] *Pit River Home & Agricultural Coop. Ass'n v. United States*, 30 F.3d 1088, 1096-97 (9th Cir. 1994) ("A decision on a factual or legal issue must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court . . . ."); *SAS v. Sawabeh Info. Servs. Co.*, 2015 WL 12763541, at *8 (C.D. Cal. June 22, 2015) (citing decisions on law of the case and concluding "Judge Feess' factual finding, which was necessary to support his legal conclusion of willful infringement, is law of the case").

015825\7125662

# DEFENDANT'S PROPOSED INSTRUCTION NO. 3
# JUDICIAL NOTICE

The Court has decided to accept as proved the following facts. You must accept these facts as true.

### A. Brief History of Israel and Palestine

1. The Palestinian political identity emerged between 1923 and 1948. In 1947, the United Nations ("U.N.") intended to create two states in what are now Israel and Palestine: one Jewish and one Arab. The U.N. ultimately founded only the Jewish state, Israel. In 1947 and 1948, there was an "Arab-Israeli War" in which Israel defeated Arab nations and declared its independence. Almost 700,000 Palestinians were driven from their homes as a result. The Palestinians who remained in the West Bank and Gaza were subject to Egyptian, Jordanian, or Israeli rule. In June 1967, the Six-Day War occurred, in which Israel "decisively defeated the Arab states." As a result, Israel gained control over the entire area that constituted Palestine. But ultimately, Israel only effectively annexed East Jerusalem and the Golan Heights, leaving the West Bank and Gaza Strip under military occupation but not truly incorporated into Israel.

2. In the mid-1990s, the Palestinian Authority ("PA") was granted limited rule (under supervening Israeli occupational authority) in the Gaza Strip and parts of the West Bank. In 2005, Israel unilaterally withdrew its military forces and all of its civilians from Gaza, leaving control to the PA. According to the U.S. Congressional Research Service: "Although not a state, the PA is organized like one—complete with democratic mechanisms; security forces; and executive, legislative, and judicial organs of governance."

3. There are two primary competing Palestinian political parties or organizations. Fatah is the largest faction of the confederated multi-party Palestinian Liberation Organization, and is currently led by Yasser Arafat's successor, Mahmoud Abbas. The other, Hamas, is a Palestinian Islamic military and socio-political

11

movement that formed in 1987. In 2006, Hamas won a majority of the seats in the Palestinian Legislative Council. And, in 2007, Hamas gained control over the Gaza Strip.

### B. The Conflict Giving Rise to Plaintiffs' Claims.

4. In June 2014, Hamas and Fatah agreed to establish a "consensus" or "unity" PA government. Tensions soon began to build between Israelis and Palestinians. On June 12, 2014, three Israeli teenagers were kidnapped. "In response, Israel launched an extensive search and arrest operation." These teenagers were later killed, allegedly by Hamas militants.

5. On July 2, Israelis abducted and killed a Palestinian teenager, burning him alive, in what appeared to be an act of revenge. Palestinians began launching rockets into Israel, which deployed its Air Force to retaliate with airstrikes.

6. The fighting between Israel and Hamas slowly escalated as each side retaliated with "tit-for-tat" responses. As the fighting worsened with almost daily barrages of missiles, rockets and fighter jet attacks, on July 8, 2014, Israel launched "Operation Protective Edge," an offensive campaign against Hamas. Israel continued this Operation for 50 days (between July 8 and August 26, 2014. During this time, Hamas and other militant groups fired 4,465 rockets and mortar shells into Israel, while the Israeli government conducted 5,242 airstrikes within Gaza and a 20-day military ground operation in Gaza. Both Hamas and Israel carried out seaborne attacks against each other, while Israel pummeled Hamas from the air. On July 17, Israel's ground forces invaded Gaza.

7. In the ensuing days and weeks, Israel escalated its airstrikes and attacked with tanks and soldiers on the ground. By August 1st, NBCU's security team reported that "1,460 Palestinians, mostly civilians, have died in the conflict … Sixty-three Israelis, mostly soldiers, have died." Although there were several attempts to broker a ceasefire, all but the last were unsuccessful. On August 26, 2014, both sides agreed to an indefinite ceasefire.

015825\7125662

### C. The Devastation of the Conflict.

8. The 50 days of fighting resulted in Palestinian fatalities totaling at least 2,220, at least half of whom were civilians. Approximately 11,000 Palestinians were wounded. The Israeli Defense Force lost 67 soldiers and 6 Israeli citizens. According to the U.S. Department of State Human Rights Report on Israel and Palestine for 2014, "by August 5, hostilities during Operation Protective Edge internally displaced approximately 520,000 persons in Gaza." Approximately 10,000 Israelis were displaced. Infrastructure was damaged with "Israeli armed forces destroy[ing] electrical, water, and other public infrastructure," with damage estimates ranging from $15.6 billion to $31.2 billion Israeli new shekels ($4- $8 billion).

### D. Dig and the Decision to Leave Israel

9. While the clash between Israelis and Palestinians was underway, Plaintiffs were filming a television show called Dig. They finished filming the pilot episode on June 26, 2014, and were on a scheduled "hiatus" until July 19, 2014. On July 11, given the escalation of fighting, and following receipt of a July 10 security assessment noting that NBCU could not guarantee safety and security, Plaintiffs decided to postpone the production for one week. On July 16, as hostilities continued to escalate and there was no end in sight, Plaintiffs chose to move production of Dig out of Israel. They completed filming in New Mexico and Croatia.

### E. The Policy

10. The policy at issue is a Motion Picture/Television Producers Portfolio, No. MP00163-04, which was effective from January 1, 2014, through June 30, 2015 (the "Policy"). The "starting point" for the terms of the Policy was a manuscripted form prepared by Aon, which touts itself as the nation's leading insurance broker, that represented NBCU in obtaining a new insurance policy. After Aon and Atlantic negotiated the terms, Atlantic issued its first policy to NBCU in January 1, 2010. The Policy renewed during each of the next three years, and finally the Policy was issued for the final period of January 1, 2014, to June 1, 2015.

1    Source: 9TH CIR. CIVIL JURY INSTR. 2.3.

015825\7125662

# PLAINTIFFS' OBJECTIONS TO
# DEFENDANT'S PROPOSED INSTRUCTION NO. 3

Plaintiffs received Defendant's proposed revised instruction 3 twenty minutes before this Court's filing deadline. Plaintiffs are reviewing. The emphasis on Israel's conduct is not faithful to the Ninth Circuit's order, for the reason set forth in our MIL No. 3, Dkt. 208.

Plaintiffs object to this instruction because (1) it is not faithful to the Ninth Circuit's decision; (2) many of the additional alleged "facts" that Defendant included are not the proper subject of judicial notice because they are subject to reasonable dispute; and (3) the alleged "facts" are irrelevant and substantially more prejudicial than probative and risk confusing the jury in light of the Ninth Circuit's order and this Court's order on remand.

Atlantic has not even identified the source for these purported "facts," which are subject to reasonable dispute. It is therefore improper to take judicial notice of them. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("But a court may not take judicial notice of a fact that is 'subject to reasonable dispute.'") (quoting Fed. R. Evid. 201(b)). Many of these purported "facts" address the Israeli military's actions in Gaza and suggest that there was a "war." The Ninth Circuit has already held that there was not a "war" or "warlike action by a military force" under the Policy and that "the efficient proximate cause for the relocation was Hamas' rocket fire from Gaza into Israel" and not "Israel's conduct as a sovereign nation" or "Israel counter[ing] Hamas's attacks . . . ." *Universal Cable Productions, LLC v. Atlantic Specialty Ins. Co.*, 929 F.3d 1143, 1161 (9th Cir. 2019). Accordingly, the purported "facts" to the contrary that Atlantic includes would contravene the Ninth Circuit's order and confuse the jury about the meaning of "war" under the Policy.

015825\7125662

### DEFENDANT'S RESPONSE TO PLAINTIFFS' OBJECTIONS

While Plaintiffs contend that this instruction is an attempt to relitigate legal issues resolved by the Ninth Circuit (like whether this was a "war"), that is not the purpose of this instruction. Whether the Ninth Circuit held that this was or was not a "war" as a matter of law is not the issue in Plaintiffs' bad faith claim. This information contained within this instruction comes from various people, officials, institutions, and other governments who call this event a "war," which goes to the issue of whether Defendant's conduct was reasonable in denying coverage and whether Defendant's interpretation of the War Exclusions was reasonable. The issue in this bad faith claim is not whether a court subsequently held this to not be a war, but rather, what information was available to Defendant when determining whether there was coverage. This instruction encompasses that information.

015825\7125662

| | | |
|---|---|---|
| DATED: February 6, 2020 | | By */s/ Kalpana Srinivasan* |

KALPANA SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
AMANDA K. BONN (270891)
abonn@susmangodfrey.com
CATRIONA LAVERY (310546)
clavery@susmangodfrey.com
CHELSEA SAMUELS (315257)
csamuels@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150

JACOB W. BUCHDAHL (*pro hac vice*)
jbuchdahl@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel: (212) 336-8330
Fax: (212) 336-8340
*Attorneys for Plaintiffs*

DATED: February 6, 2020            By */s/ Melinda R. Burke*

MARC J. SHRAKE
FREEMAN MATHIS & GARY, LLP
550 South Hope Street, Suite 2200
Los Angeles, CA 90071-2631
Tel: (213) 615-7039
-and-
MICHAEL KEELEY (*pro hac vice*)
JOHN R. RIDDLE (*pro hac vice*)
TONI SCOTT REED (*pro hac vice*)
CLARK HILL STRASBURGER PLC
901 Main Street, Suite 6000
Dallas, TX 75202
Tel: (214) 651-4718

17

015825\7125662

>                             CHRISTOPHER W. MARTIN
>                             *(Pro Hac Vice)*
>                             martin@mdjwlaw.com
>                             MELINDA R. BURKE *(Pro Hac Vice)*
>                             burke@mdjwlaw.com
>                             MARTIN, DISIERE, JEFFERSON
>                             & WISDOM LLP
>                             9111 Cypress Waters Blvd., Suite 250
>                             Dallas, Texas 75019
>                             Telephone: (214) 420-5500
>                             Facsimile: (214) 420-5501
>
>                             *Attorneys for Defendant*

<u>Attestation Regarding Signatures</u>

I, Kalpana Srinivasan, attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

>                             By: /s/ *Kalpana Srinivasan*
>                                    Kalpana Srinivasan

<u>Certificate of Service</u>

I certify that on February 6, 2020, I filed the foregoing with the Clerk of the United States District Court for the Central District of California by using the Court's CM/ECF system, which will send notifications of such filing to all counsel of record.

>                             */s/ Kalpana Srinivasan*
>                                Kalpana Srinivasan

015825\7125662