# Exhibit 1

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   UNIVERSAL CABLE PRODUCTIONS, )
     LLC, a Delaware limited      )
 5   liability company, and       )
     NORTHERN ENTERTAINMENT       )
 6   PRODUCTIONS, LLC, a Delaware )
     limited liability company,   )
 7                                )
                  Plaintiffs,     )
 8                                )
     vs.                          )   Case No.:
 9                                )   2:16-CV-4435-PA-MRW
     ATLANTIC SPECIALTY           )
10   INSURANCE COMPANY, a         )
     New York insurance           )
11   company,                     )
                                  )
12                Defendants.     )
     _____)
13

14

15       VIDEOTAPED DEPOSITION OF SHANNON RUSNAK

16              LOS ANGELES, CALIFORNIA

17           WEDNESDAY, FEBRUARY 5TH, 2020

18

19

20

21

22

23

24   Reported by: Marie Wilson, CSR No. 13480

25   Job No: 176501
```

Page 18

```
 1    think, one page earlier than the schedule we were
 2    just looking at --
 3        A.   Okay.
 4        Q.   -- it's a schedule titled "Summary of
 5    Extra Expenses."  Do you see that?
 6        A.   I do.
 7        Q.   And I want to make sure I understand what
 8    this summary is showing.  The first line item here
 9    identifies your calculation of extra expenses on
10    episodes two through six as being $6,899,094; is
11    that correct?
12        A.   With the caveat that -- that these are
13    possible extra expenses, and the actual
14    expenditures used to arrive at that $6.9 million do
15    need to be adjusted in order to truly reflect the
16    dollar spent on episodes two through six.
17        Q.   And once you identify approximately
18    $6.89 million as being the starting point of
19    potential extra expenses, you then subtract or
20    deduct approximately $1.6 million for the tax
21    credit savings; is that correct?
22        A.   Correct, the tax credit, slash, rebate
23    savings, yes.
24        Q.   And so up until this point on your
25    summary -- and we'll get to the next step that you
```

Page 19

```
 1    did -- but up until this point, you and Mr. Shapiro
 2    are both starting with possible incremental
 3    expenses and then subtracting tax credit rebate
 4    savings; is that right?
 5        A.   Well, with the exception that I have
 6    increased the calculation for the expenses related
 7    to the amortization cost in Israel.
 8        Q.   And so setting aside -- why don't we start
 9    with this, focusing first on just your calculation
10    of the possible extra expenses compared to
11    Mr. Shapiro's, you calculated that number as being
12    almost $3 million higher than Mr. Shapiro; right?
13        A.   Yes.
14        Q.   And then taking that number and
15    subtracting tax credits, if we just stopped there,
16    you also believe that number would have been about
17    a little under $3 million higher than what
18    Mr. Shapiro had calculated; is that correct?
19        A.   I'm sorry, are you saying it would be
20    $3 million higher?
21        Q.   Let me -- let me -- let me try that again.
22    I want to make sure I'm being clear.
23        A.   Yeah.
24        Q.   Your calculation of possible extra
25    expenses minus tax credit rebate savings is what?
```

Page 20

```
 1        A.   It is with the caveat that I -- you know,
 2    the actual expenses, so on and so forth, but let
 3    me -- minus -- that is $5,261,338.
 4        Q.   And that is -- if you compare that to what
 5    Mr. Shapiro calculated in his Schedule A, that's
 6    how much more than Mr. Shapiro's calculation?
 7        A.   $1.3 million.
 8        Q.   Let's try that again.
 9        A.   I'm sorry, I'm looking at Schedule B.
10    That's --
11        Q.   Why don't we look at Schedule A and try
12    that again.  So when you look at your calculation
13    of possible extra expenses, less the tax credit, as
14    you mentioned, you calculated that number to be
15    approximately $5.26 million; is that right?
16        A.   That's correct.
17        Q.   And how much more is that number than what
18    Mr. Shapiro calculated?
19        A.   2.9.
20        Q.   $2.9 million more?
21        A.   Yes.
22        Q.   You then, looking at your summary, make an
23    additional deduction of approximately $1.8 million;
24    is that right?
25        A.   Yes.
```

Page 21

```
 1        Q.   And Mr. Shapiro did not in his calculation
 2    of what he called the maximum extra expenses
 3    calculate or make that same $1.8 million deduction;
 4    correct?
 5        A.   That's correct.  He opined on it in his
 6    deposition and in his report.
 7        Q.   But he did not actually calculate or make
 8    the $1.8 million deduction that you did; is that
 9    correct?
10        A.   That's correct.
11        Q.   I want to talk a little bit more about
12    that $1.8 million deduction that you made, and
13    first of all, can you just explain, because I want
14    to make sure we're all on the same page, what it
15    means to amortize an expense across various
16    episodes just so a layperson could understand?
17        A.   Well, the amortization works much like an
18    allocation.  Amortization, in the financial sense,
19    is actually the reduction of a debt or an expense,
20    but in this instance, the amortization is much like
21    an allocation in terms of matching the expenses
22    with the episodes much like matching expenses, you
23    know, periodic expenses with revenues.
24        Q.   Let's use just an example for illustration
25    purposes.  One example of what you're referring to
```

Page 22

1  is that let's say a set was being built for a TV
2  show, let's say Friends.  There was a set that's
3  being built for the TV show Friends that would be
4  used not just in one specific episode but in many
5  episodes.
6       When you refer to amortization, one
7  illustration of that is that the expense of
8  building that set, say, the apartment in Friends,
9  might be divided up and allocated across various
10 episodes rather than to a single episode; is that
11 fair?
12    A.  Yes, that's correct.  So the difference
13 between an episodic cost, there are those expenses
14 that are direct with each episode versus the
15 amortization cost which don't -- can't necessarily
16 be attributed to a single episode, and thus, they
17 are allocated across all of the affected -- or all
18 of the episodes in question, so they are more like
19 a semi-variable or fixed type of expense.
20    Q.  And can you take a look in your report at
21 page 8 of your report, and you'll see that there is
22 a big letter "B" calculation methodology on it.
23    A.  Oh, the narrative?
24    Q.  Yeah, it's in the narrative section of
25 your report.

Page 23

1     A.  Okay.
2     Q.  If you look at page 8 of your report in
3  the paragraph numbered B3, you write that you added
4  to the New Mexico and Croatia costs an amount of
5  $3,255,413 for amortized Israeli costs.
6        Do you see that?
7     A.  I do.
8     Q.  And then you say the total actual Israeli
9  costs of $4,232,037 were allocated between 6.5
10 episodes, the pilot, a 90-minute episode and five,
11 60-minute episodes; is that correct?
12    A.  Correct.
13    Q.  And so I want to make sure I understand
14 what you did here.  You took the $4.2 million
15 number approximately divided it by 6.5 and assigned
16 1.5 X to the pilot compared to a 1 X weighting for
17 episodes two through six; is that right?
18    A.  Yes.
19    Q.  And is the reason that you assigned a 1.5
20 X weighting to the pilot was that it was 90
21 minutes, whereas the subsequent episodes were
22 60 minutes each?
23    A.  Correct.
24    Q.  And so in your view, when amortizing costs
25 between the pilot and episodes two through six, the

Page 24

1  correct approach is to weight the pilot 1.5 X what
2  the other episodes are weighted?
3     A.  Yes.
4     Q.  And is that what should be done looking at
5  both actual expenses and budgeted or but-for
6  expenses?
7     A.  Well, the actual expenses are the actual
8  expenses.
9     Q.  Do you know whether the budget, the
10 locked-pattern budget, for the Israeli
11 production --
12    A.  Wait, can I back up and answer that?
13    Q.  Yeah, sure.
14    A.  I'm sorry, I was thinking -- so the actual
15 expenses had a cost per episode of, I think,
16 $942,000 per episode.
17    Q.  Why don't we back up.  Let me ask another
18 question.  You considered the locked-pattern budget
19 to be a proxy that you used for what plaintiffs
20 would have spent in a but-for world where they
21 continued filming in Israel rather than
22 relocating --
23    A.  Right.
24    Q.  -- is that correct?
25    A.  Yes.

Page 25

1     Q.  And do you know whether in that
2  locked-pattern budget it also assigned a 1.5 X
3  weighting to the pilot in allocating the
4  amortizable expenses?
5     A.  I don't know as I sit here.
6     Q.  But your view is that whatever the
7  amortizable approach is whether you weight the
8  pilot 1.5 X or you weight all of the episodes
9  equally, that same approach to weighting should be
10 taken in looking both at amortizing the actual
11 costs and in considering the but-for world; is that
12 correct?
13    A.  That makes sense, yes.
14    Q.  Looking at that same page of your report,
15 page 8, if we look down at paragraph five, you
16 write, "From the actual costs, I deduct the but-for
17 or budgeted costs for episodes two through six in
18 the amount of $17,707,490."  Do you see that?
19    A.  I do.
20    Q.  And then you write, "The budget is based
21 upon the locked-pattern budget established for
22 Israeli production."  Do you see that?
23    A.  I do.
24    Q.  And what do you mean when you say the
25 but-for costs of the Israeli production?

Page 30

1  set forth in your summary schedule that the
2  possible extra expenses should be reduced by
3  approximately $1.8 million for New Mexico
4  amortization; is that correct?
5      A.  Correct, and that's actually adjustments
6  to the actual expenses incurred in New Mexico.
7      Q.  In other words, if we take a look at your
8  schedule one, the next page, let me make sure I
9  understand what you're saying, "Plaintiff's data
10 indicated that the total actual costs in New Mexico
11 and Croatia for these episodes was approximately
12 $21.35 million," and what you're saying is that
13 number should be reduced by approximately
14 $1.8 million?
15     A.  Correct, and in addition to the $1.6
16 million for the tax --
17     Q.  Right.
18     A.  -- credit rebates.
19     Q.  So turning back to page 9 of your report
20 where you say, "I further reduce the extra expenses
21 by the amortized New Mexico expenses which should
22 have been allocated to episodes seven through 10,"
23 I want to talk about that sentence.
24     A.  Okay.
25     Q.  When plaintiffs had anticipated filming in

Page 31

1  Israel in June of 2014, that was based on the
2  network having ordered a pilot episode and episodes
3  two through six; is that correct?
4      A.  Correct.
5      Q.  In about mid-July of 2014, the decision
6  was made to relocate out of Israel; is that
7  correct?
8      A.  Yes, I think it might have been July 20th
9  if I remember the dates correctly.
10     Q.  And episodes two through six therefore
11 continued filming in New Mexico and Croatia;
12 correct?
13     A.  Yes.
14     Q.  And after that relocation in October of
15 2014, the network ordered additional episodes seven
16 through 10 also called the "back-four episodes"; is
17 that correct?
18     A.  Right.  I think that occurred about
19 October 10th if I recall correctly.
20     Q.  And so in your report when you say the
21 amortized New Mexico expenses which should have
22 been allocated to episodes seven through 10, are
23 you saying that once the network ordered episodes
24 seven through 10, plaintiffs should have taken the
25 amortizable expenses from episodes two through

Page 32

1  episodes 10 and allocated all of those expenses
2  evenly across episodes two through 10?
3      A.  Well, for purposes of their bookkeeping,
4  they can do it however they are going to do it, but
5  for purposes of the insurance claim, it's a
6  different matter.  It's -- it's a question of
7  matching the expenses to the relocated episodes, or
8  the episodes in question, and that requires some
9  adjustments to how they keep their books.
10     Q.  When you say that there were certain
11 amortized New Mexico expenses which should have
12 been allocated to episodes seven through 10, is
13 that statement "they should have been allocated to
14 episodes seven through 10" based on any
15 generally-accepted accounting principle?
16     A.  Generally-accepted accounting principle
17 don't apply to this practice, what I do.
18     Q.  Is there any accounting rule or accounting
19 principle that serves as the basis for your opinion
20 that the amortizable New Mexico expenses in part
21 should have been allocated to episodes seven
22 through 10?
23     A.  Well, it's effectively the policy
24 language --
25     Q.  So --

Page 33

1      A.  -- that dictates the calculation.
2      Q.  So when you say that there were
3  amortizable New Mexico expenses which should have
4  been allocated to episodes seven through 10, the
5  basis for your opinion is the policy language; is
6  that fair?
7      A.  Yes.
8      Q.  Any other basis besides the policy
9  language?
10     A.  Well, it's inherently the policy language
11 and, you know, the matching of the expenses to the
12 appropriate event.
13     Q.  I'm handing you a copy of plaintiff's
14 trial Exhibit Williams 1 which is a copy of the
15 policy.
16     A.  Okay.
17     Q.  It appears to be so to you; correct?
18     A.  Yes.
19     Q.  What language in the policy is the basis
20 for your opinion that certain amortizable expenses
21 in New Mexico should have been allocated to
22 episodes seven through 10?
23     A.  I'll show you that, and then as soon as I
24 answer this, before you ask your next question, can
25 I take a break just to get --

Page 38

1  already been filmed, you're left with episodes two
2  through 10 before the production is completed.
3      Seven through 10 wasn't affected by the
4  relocation.  There would not have been extra
5  expenses associated with those episodes, so the
6  projected expenses, or the but-for expenses, would
7  equal the actual expenses in any analysis that I
8  did with the exception that the amortization
9  expenses would need to be allocated across nine
10 episodes.
11     Q.  Is it your -- are you offering any opinion
12 that any of the prep, wrap and all series expenses
13 that plaintiffs incurred in New Mexico and that as
14 a matter of plaintiff's bookkeeping was allocated
15 to episodes two through six was actually not
16 necessary in order to complete filming of episodes
17 two through six?
18     A.  I'm opining that those expenses were also
19 necessary to film seven through 10, and therefore
20 the cost should be allocated across all of the
21 episodes.
22     Q.  Let me just come back to my question which
23 is a little bit different.  I'm not really asking
24 about also necessary, I just want to start from the
25 baseline.  You don't dispute, do you, that the

Page 39

1  prep, wrap and all series expenses that plaintiffs
2  incurred in New Mexico and that plaintiffs'
3  bookkeeping allocated to episodes two through six
4  were actually necessary in order for plaintiffs to
5  complete filming of episodes two through six?
6      A.  I don't know the answer to that with
7  respect to the all-series expenses.  With respect
8  to the prep and wrap, I would say yes, they were
9  necessary for episodes two through six, but they
10 were also necessary for seven through 10.  Seven
11 through 10 would not have been able to have been
12 filmed without prep and wrap expenses.
13     Q.  Is there --
14     A.  And to what -- I'm sorry, and to what
15 extent the prep and wrap were increased as a result
16 of the additional four episodes I don't know as I
17 sit here, but it appeared that there definitely was
18 an increase when I compare the prep and wrap for
19 New Mexico versus -- I mean, the budgeted prep and
20 wrap for New Mexico versus the budgeted prep and
21 wrap in Israel for episodes two through six, and
22 the all series, of course, there was an increase
23 there.
24     Q.  I want to make sure I understand that.
25 I'm a little bit confused by that.  When the budget

Page 40

1  for filming in New Mexico and Croatia was created
2  for prep and wrap, there was not yet an expectation
3  that there would even be an episode seven through
4  10; correct?
5      A.  For New Mexico, as I sit here, I don't
6  recall when that budget was prepared --
7      Q.  And so --
8      A.  -- but they --
9      Q.  What is your basis for saying that the
10 budgeted prep and wrap in New Mexico was higher
11 than what had been budgeted in Israel because of
12 episodes seven through 10?
13     A.  Well, I said I -- I said I didn't know,
14 but to what extent they would have additional
15 equipment, additional rental, additional
16 construction as a result of additional episodes,
17 because episode seven through 10 had no prep or
18 wrap allocated to it, additional purchases related
19 to seven through 10.
20     And back to your question about the
21 budget, even if the budget was prepared prior,
22 there was an idea that the series would get
23 extended, so to what extent that would have been
24 factored in their budget I don't know.
25     Q.  You have said that you don't disagree that

Page 41

1  the prep, wrap and all series expenses in
2  New Mexico that plaintiffs attributed to episodes
3  two through six were necessary to complete filming
4  episodes two through six, but you also believe they
5  were necessary for episodes seven through 10.  What
6  language in the policy allows for a deduction of
7  necessary insurable production costs to complete
8  filming episodes two through six --
9      MR. MARTIN:  Object to the form.
10     MS. BONN:  -- because they were also
11 necessary for future episodes seven through 10?
12     MR. MARTIN:  Object to the form.
13     THE WITNESS:  Again, I point back to
14 ATL003106 No. 1 and the insurable production costs
15 to complete the insured production through episode
16 10 and the allocation of the amortization expenses
17 across the appropriate episodes.
18 BY MS. BONN:
19     Q.  You compared what was actually spent
20 compared to the locked pattern budget for Israel
21 which you used as a proxy for what would have been
22 spent in the but-for world; is that correct?
23     A.  For two through six as a starting point --
24     Q.  The lock --
25     A.  -- I'm sorry, before the adjustments to

11 (Pages 38 to 41)

Page 42

1    the actual expenditures.
2        Q.  The locked-pattern budget for filming in
3    Israel amortized items like prep, wrap, all series
4    across the pilot and episodes two through six; is
5    that correct?
6        A.  Correct.
7        Q.  And that's because when that
8    locked-pattern budget was created, there was not
9    yet an anticipation that there would be an episode
10   seven through 10; is that right?
11       A.  That's my understanding, yes.
12       Q.  In --
13           THE VIDEOGRAPHER:  Can you set your water
14   bottle --
15           THE WITNESS:  Oh, I'm sorry.
16           THE VIDEOGRAPHER:  That's fine.  Thank
17   you.
18   BY MS. BONN:
19       Q.  In your conception of the but-for world,
20   is it one in which plaintiffs would also have
21   filmed the pilot and episodes two through 10 that
22   they would have done so in Israel rather than
23   partially in New Mexico and Croatia?
24       A.  No.  In my but-for world, they would have
25   filmed episode -- conceptually, they would have

Page 43

1    filmed episode -- the pilot and episodes two
2    through six in Israel, and at the point in time
3    when there was knowledge of episodes seven through
4    10, that was filmed in New Mexico and Croatia.
5    Whether that would have been filmed in Israel, I
6    could only hypothetically guess.
7        Q.  So in your conception of the but-for
8    world, one in which the insured loss did not occur,
9    you assumed that the pilot and episodes two through
10   six would have filmed in Israel and yet episodes
11   seven through 10 would have filmed in New Mexico
12   and Croatia?
13       A.  Well, I didn't assume either because that
14   didn't factor into the calculation as I presented
15   it.
16       Q.  Did you think it was -- let me try that
17   question again.  Is that all right with you?
18       A.  Sure.
19       Q.  To measure the loss in this case under the
20   language of the policy, one needs to compare the
21   necessary insurable production cost incurred to
22   complete the insured production against what would
23   have been incurred if the covered cause of the loss
24   had not occurred; is that right?
25       A.  Correct.

Page 44

1        Q.  And when we say what would have been
2    incurred if the covered cause of loss had not
3    occurred, another way of phrasing that is what
4    would have happened in a hypothetical but-for world
5    where the covered cause, the relocation, did not
6    occur; is that right?
7        A.  Correct.
8        Q.  And in your report, you refer to the
9    budgeted costs for episode two through six?
10       A.  Let me get where --
11       Q.  This is on page 8.  As -- excuse me, you
12   refer to the budgeted costs for episode two through
13   six in Israel as being the but-for costs; is that
14   right?
15       A.  I'm sorry, where?
16       Q.  At the bottom of page 8 of your report.
17       A.  No. 5?
18       Q.  Correct.  You refer to the budgeted costs
19   for episodes two through six in Israel as the
20   but-for costs; is that right?
21       A.  I do, yes.
22       Q.  And so those budgeted costs of
23   $17.7 million approximately were from the
24   locked-pattern budget; is that correct?
25       A.  Correct.

Page 45

1        Q.  And that locked-pattern budget was created
2    at a time when plaintiffs anticipated filming only
3    a pilot and episodes two through six; is that
4    correct?
5        A.  Correct.
6        Q.  In your conception of a hypothetical
7    but-for world where the covered cause of the loss
8    had not occurred, would plaintiffs have still
9    filmed episodes seven through 10?
10       A.  I would assume so.
11       Q.  In your conception of a hypothetical
12   but-for world where the covered cause of the loss
13   had not occurred, where would plaintiffs have
14   filmed episodes seven through 10?
15       A.  I'm sorry, could you rephrase that
16   question?  I mean, not rephrase, but could you ask
17   that question again?
18       Q.  In your conception of a hypothetical
19   but-for world where the covered cause of the loss
20   had not occurred, where would plaintiffs have
21   filmed episodes seven through 10?
22       A.  I would think it would make the most sense
23   that they would continue filming in Israel.
24       Q.  Did you undertake any analysis of what the
25   per-episode amortizable expenses would have been in

Page 98

1  A. Not that I can think of.
2  Q. Are there any additional materials that
3  you plan to review that you have not yet reviewed?
4  A. No.
5  Q. Approximately, how many hours have you
6  billed to this engagement to date?
7  A. I don't know how many hours, but I think
8  between staff and myself, it's probably about 80 --
9  between eighty and 100,000.
10  Q. Have you budgeted approximately how much
11  additional expense you think you're likely to bill
12  up through and including your trial testimony?
13  A. No.
14  MS. BONN: Okay. That's all of the
15  questions I have for today. Thank you so much for
16  your time.
17  THE WITNESS: Thank you.
18
19  EXAMINATION
20  BY MR. MARTIN:
21  Q. Ms. Rusnak, you were asked earlier this
22  morning about the methodology that went into your
23  report in the answers to some of the questions you
24  gave and you made a reference to the insurance
25  policy at issue in this lawsuit.

Page 99

1  Can you tell me if you used any other
2  framework or relied upon anything else for your
3  work in this case?
4  A. Well, I think I discussed, you know, the
5  accounting foundation of the matching of expenses
6  to -- in this incident matching the expenses to the
7  episodes or the affected episodes.
8  Q. Do those accounting principles differ
9  whether you're dealing with a similar way of
10  accounting for oil wells or different businesses, a
11  construction site, or other things you may be
12  doing, different component parts have to be
13  analyzed across a series of transactions?
14  A. No. It is looking at -- in determining
15  the extra expenses, it's always looking at what
16  would have happened but for the event versus the
17  actual expenditures and analyzing the incremental
18  expenses.
19  Q. And are those accounting principles that
20  you have applied here consistent with the same
21  accounting principles that you and others have used
22  over the last 35 years of your career to figure out
23  what is or is not an extra expense?
24  A. Yes.
25  MR. MARTIN: No further questions. Pass

Page 100

1  the witness.
2  EXAMINATION
3  BY MS. BONN:
4  Q. What are the accounting principles on
5  which you based your opinion that the New Mexico
6  amortizable expenses should have been allocated
7  evenly across episodes two through 10?
8  A. It's the accounting foundation in years of
9  analyzing extra expenses and the fact that those
10  expenses benefited all of the episodes. Without
11  allocating to those episodes, there would have been
12  a windfall. Effectively, the insured would have
13  been able to produce episodes seven through 10
14  without incurring any prep or wrap or a significant
15  amount of all-series costs.
16  Q. Is there any specific accounting
17  principle, meaning a generally-accepted accounting
18  principle, or any other accounting rule that
19  requires amortizing amortizable costs across
20  episodes two through 10 evenly?
21  A. Generally-accepted accounting principles
22  are something completely different, and it is based
23  upon the accounting foundation of common industry
24  practice, analyzing extra expenses and attributing
25  and matching the expenses to the appropriate unit

Page 101

1  or period or, in this instant, episodes.
2  Q. When you say "common industry practice,"
3  are you referring to the insurance industry?
4  A. I'm referring to the practice of
5  evaluating extra expenses in accordance with the
6  various insurance contracts. They are all very
7  similar.
8  Q. So you said common industry practice, and
9  I'm just trying to understand what industry are you
10  speaking of?
11  A. Forensic accounting.
12  Q. Do you know what the common industry
13  practice is in the entertainment industry for
14  amortizing expenses in a television series when
15  episodes are ordered midway through a season?
16  A. I think it's -- from what I read, it
17  varies.
18  Q. What is that opinion based on?
19  A. Internet research.
20  Q. When did you conduct this Internet
21  research?
22  A. Probably at the beginning of my
23  engagement, but the way that the industry does it
24  is -- is not necessarily applicable to my analysis.
25  My analysis is based upon the actual expenditures

26 (Pages 98 to 101)

**Page 102**

```
 1    and how they should be allocated to the event.
 2        Q.  So at the -- near the beginning of your
 3    engagement, you conducted Internet research in
 4    order to determine the entertainment industry
 5    practice for amortizing expenses when additional
 6    episodes are ordered partway through a TV season?
 7        A.  Right, that was just some of the research
 8    that came up.  It said that some instances the
 9    expenses are allocated amongst the additional --
10    the amortization expenses are allocated amongst the
11    additional episodes.
12        Q.  What prompted you to conduct that Internet
13    research?
14        A.  It was just overall -- like with any
15    engagement, I do research on the industry, and it
16    was basic research on amortization and pattern and
17    episodic budgeting and expenses.
18        Q.  What sources did you look at on the
19    Internet regarding entertainment industry practices
20    for amortizing expenses when episodes are ordered
21    partway through a TV season?
22        A.  I don't recall what it was.  It didn't
23    affect my analysis industry practices.
24        Q.  And you don't cite or rely on that
25    Internet research in your report; is that fair?
```

**Page 103**

```
 1        A.  That's fair, uh-huh, I didn't rely on it
 2    for my opinion, so I didn't feel it was necessary
 3    to cite it.
 4        Q.  And so you are not offering any opinion
 5    about the entertainment industry practice for
 6    amortizing expenses in a scenario where episodes
 7    are ordered partway through a TV season; is that
 8    correct?
 9        A.  That's correct.
10            MS. BONN:  Okay.  I have nothing further
11    at this time.  Thank you.
12            THE WITNESS:  Thank you.
13            MR. MARTIN:  We reserve all of our other
14    questions until the time of trial.
15            Thank you, Ms. Rusnak.
16            THE WITNESS:  Thank you.
17            THE VIDEOGRAPHER:  This concludes today's
18    deposition.  Off video at 3:11 p.m.  Thank you.
19            (Whereupon, the deposition was concluded
20            at 3:11 p.m.)
21
22
23
24
25
```

**Page 104**

```
 1    STATE OF CALIFORNIA  )
                           ) ss.
 2    COUNTY OF LOS ANGELES )
 3
 4        I, SHANNON RUSNAK, do hereby certify under
 5    penalty of perjury that I have read the foregoing
 6    transcript of my deposition, taken on February 5th,
 7    2020; that I have made any corrections, additions,
 8    or deletions that appear noted herein; that my
 9    testimony as contained herein, as correct, is a
10    true and accurate transcription of my testimony.
11
12        DATED this____day of_____, 2020,
13    at_____, _____.
14
15
16
17            _____
                        SHANNON RUSNAK
18
19
20
21
22
23
24
25
```

**Page 105**

```
 1    NAME OF CASE:
 2    DATE OF DEPOSITION:
 3    NAME OF WITNESS:
 4    Reason Codes:
 5        1.  To clarify the record.
 6        2.  To conform to the facts.
 7        3.  To correct transcription errors.
 8    Page _____ Line _____ Reason _____
 9    From _____ to _____
10    Page _____ Line _____ Reason _____
11    From _____ to _____
12    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
17    From _____ to _____
18    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
23    From _____ to _____
24
25            _____
```

Page 106

```
 1    STATE OF CALIFORNIA   )
                            ) ss.
 2    COUNTY OF LOS ANGELES )
 3
 4         I, MARIE WILSON, CSR 13480, a Certified
 5    Shorthand Reporter in and for the State of
 6    California, County of Los Angeles, do hereby
 7    certify:
 8         That SHANNON RUSNAK, the witness named in
 9    the foregoing deposition, before the commencement
10    of the deposition, was duly administered an oath in
11    accordance with CCP 2094;
12         That said deposition was taken down in
13    stenograph writing by me and thereafter transcribed
14    into typewriting under my direction.
15         I further certify that I am neither
16    related to any party to said action, nor in any way
17    interested, financially or otherwise, in the
18    outcome thereof.
19
20         Dated this 6th day of February, 2020.
21
22
23         _____
24              MARIE WILSON, CSR NO. 13480
25
```

28 (Page 106)